## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN EDUCATIONAL RESEARCH ASSOCIATION, INC. 1430 K Street, NW Suite 1200 Washington, DC 20005, | ) ) ) ) ) ) |
| AMERICAN PSYCHOLOGICAL ASSOCIATION, INC. 750 First Street NE Washington, DC 20002-4242, and | ) ) ) ) ) |
| NATIONAL COUNCIL ON MEASUREMENT IN EDUCATION, INC. 2424 American Lane Madison, WI 53704, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| PUBLIC.RESOURCE.ORG, INC. 1005 Gravenstein Highway North Sebastopol, CA 95472 | ) ) ) ) |
| Defendant. | ) ) |

Civil Action No. _____

**COMPLAINT FOR COPYRIGHT INFRINGEMENT AND CONTRIBUTORY COPYRIGHT INFRINGEMENT**

## COMPLAINT

Plaintiffs, as and for their Complaint against Defendant, allege as follows:

1.      This is an action by three non-profit organizations: the American Educational Research Association, Inc., the American Psychological Association, Inc., and the National Council on Measurement in Education, Inc. (collectively, "Plaintiffs"), creators of the work entitled "Standards for Educational and Psychological Testing" (the "Standards").  This action seeks injunctive relief against Public.Resource.Org, Inc. for infringement and contributory infringement of Plaintiffs' copyright in the Standards.

**THE PARTIES**

2.      Plaintiff, American Educational Research Association, Inc. ("AERA"), is a District of Columbia not-for-profit corporation whose main offices are located at 1430 K Street, NW, Suite 1200, Washington, DC 20005.

3.      AERA is the major national scientific society for research on education and learning.  AERA's mission is to advance knowledge about education, to encourage scholarly inquiry related to education, and to promote the use of research to improve education and serve the public good.

4.      Plaintiff, American Psychological Association, Inc. ("APA"), is a District of Columbia not-for-profit corporation whose main offices are located at 750 First Street, NE, Washington, DC 20002.

5.      APA is the largest scientific and professional organization representing psychology in the United States.  APA is the world's largest association of psychologists and counts a vast number of researchers, educators, clinicians, consultants and students among its members.   APA's mission is to advance the creation, communication and application of psychological knowledge to benefit society and improve people's lives.

6.      Plaintiff, National Council on Measurement in Education, Inc. ("NCME"), is a District of Columbia not-for-profit corporation whose main offices are located at 2424 American Lane, Madison, WI  53704.

7.      NCME is a professional organization for individuals involved in assessment, evaluation, testing, and other aspects of educational measurement. NCME's members are involved in the construction and use of standardized tests; new forms of assessment, including performance-based assessment; program design; and program evaluation.  NCME's members

include university faculty; test developers; state and federal testing and research directors; professional evaluators; testing specialists in business, industry, education, community programs, and other professions; licensure, certification, and credentialing professionals; graduate students from educational, psychological, and other measurement programs; and others involved in testing issues and practices.

8.       Upon information and belief, Defendant, Public.Resource.Org, Inc. ("Public Resource"), is a California not-for-profit corporation having offices located at 1005 Gravenstein Highway, North Sebastopol, CA 95472.

9.       According to its Articles of Incorporation, which can be found at https://public.resource.org/public.resource.articles.html, the purpose of Public Resource is to

> create, architect, design, implement, operate and maintain public works projects on the Internet for EDUCATIONAL, CHARITABLE, AND SCIENTIFIC PURPOSES to the benefit of the general public and the public interest; to increase and diffuse knowledge about the Internet in its broadest sense; to promote and facilitate the expansion, development, and growth of the public infrastructure of the Internet by any means consistent with the public interest through other activities, including, but not limited to, publications, meetings, conferences, training, educational seminars, and the issuance of grants and other financial support to educational institutions, foundations and other organizations exclusively for EDUCATIONAL, CHARITABLE, AND SCIENTIFIC PURPOSES.

10.      Upon information and belief, Public Resource publishes on the Internet, and in particular on the website https://law.resource.org, *inter alia*, state and municipal codes, public safety codes, and technical standards.

11.      Upon information and belief, at least some of the codes and standards that Public Resource publishes on the Internet, and in particular on the website https://law.resource.org, are subject to U.S. copyright protection.

12.      Upon information and belief, Public Resource publishes these codes and standards on the Internet, and in particular on the website https://law.resource.org, without

obtaining the permission of the copyright owners of these works.

13.    AERA and APA, two of the three joint copyright owners of the Standards, are located in Washington, DC.

14.    Public Resource has designed the website https://law.resource.org/pub/us/cfr/manifest.us.html to attract visitors from the District of Columbia to copy, distribute to others, or incorporate into other works, Plaintiff's Standards.

15.    Public Resource has designed the website https://law.resource.org/pub/us/code/dc/ to attract visitors from the District of Columbia by providing online copies of the District of Columbia Code.

16.    On the website https://public.resource.org/about/index.html, Public Resource solicits donations from the public to support Public Resource's activities, via credit card or through Public Resource's PayPal account.  Upon information and belief, Public Resource has received donations to support its activities from Google, Yahoo!, the Electronic Frontier Foundation, Creative Commons Corporation, Justia Inc., Fenwick & West LLP, Durie Tangri, Davis Wright Tremaine LLP, iRights Law, Alston & Bird, the Elbaz Family Foundation, the Cutts Foundation, the O'Reilly Foundation, the Beal Fund, the Sunlight Foundation, the Omidyar Network, and others.

17.    Public Resource, through the website https://public.resource.org, solicits visitors from the District of Columbia to submit financial donations to Public Resource.

18.    Public Resource, through the website https://public.resource.org/about.index.html, allows visitors from the District of Columbia to e-mail Public Resource directly at the e-mail address carl@media.org.

19.    Upon information and belief, Public Resource has collaborated with organizations

in Washington, DC to copy videos and upload them to YouTube.  National Technical Information Service Library of Commerce, https://public.resource.org/ntis.gov/ (last visited Apr. 25, 2014); *see also* Kate Murphy, *Catching Up With Carl Malamud*, N.Y. TIMES, Jan. 26, 2013, www.nytimes.com/2013/01/27/opinion/sunday/catching-up-with-carl-malamud.html.

20.     Upon information and belief, Public Resource, through its President and founder Carl Malamud, has testified in Washington, DC before the Subcommittee on Courts, Intellectual Property, and the Internet of the House Judiciary Committee regarding the scope of protection to be afforded copyrighted works.  *An Edict of Government Amendment: Hearing on the Scope of Copyright Protection Before the Subcomm. On Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary*, 113th Cong. (2014) (statement of Carl Malamud, President, Public.Resource.Org.).

21.     Upon information and belief, Public Resource, through its President and founder Carl Malamud, has participated in conferences and given speeches in Washington, DC since at least 2009.  Peter Glaskowsky, *Carl Malamud's digital manifesto*, CNET News, Sept. 16, 2009, http://news.cnet.com/8301-13512_3-10354324-23.html;  Carl  Malamud,  gov  2.0  Expo, www.gov2expo.com/gov2expo2010/public/schedule/speaker/1824 (last visited  Apr.  25,  2014); *An Evening with Carl Malamud, Next Tuesday at ALA's Washington DC HQ, Resource Shelf,* http://web.resourceshelf.com/go/resourceblog/58874 (last visited Apr. 25, 2014).

22.     Defendant has designed its website(s) to encourage visitors from the District of Columbia to copy, to distribute to others in this District and/or to create derivative works based on Plaintiffs' Standards.

23.     Defendant also sells various items on the Internet, including Public.Resource.Org mouse      pads,      stamps,      and      stickers,      among      other      items.      *See*

http://www.zazzle.com/carlmalamud/gifts.  This website is available to residents of the District

of Columbia, who may purchase Defendants' merchandise when visiting the site.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and

1338(a).  This is a civil action arising under an Act of Congress relating to copyrights.

25.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 and 1400(a).  The

Claims plaintiffs allege in this Complaint arose, in substantial part, in the District of Columbia.

Defendant may be found in Washington, DC, and this Court has personal jurisdiction over

Defendant.  Defendant has directed its infringing activities to Washington, DC and, on

information and belief, materially contributed to the infringing activities of third parties in this

District.

26.     This Court has jurisdiction over Defendant, because, whether directly or through

an authorized agent, Defendant has been present in Washington, DC; transacted business in

Washington, DC; caused tortious injury by an act or omission in Washington, DC; and/or caused

tortious injury in Washington, DC by an act or omission outside Washington, DC. Defendant

also regularly does and/or solicits business; engages in other persistent courses of conduct;

and/or derives substantial revenue from goods used or consumed, or services rendered, in

Washington, DC.

## FACTS

### Creation of the Standards for Educational and Psychological Testing

27.     In 1954, Plaintiff APA prepared and published the "Technical Recommendations

for Psychological Tests and Diagnostic Techniques."  In 1955, Plaintiffs AERA and NCME

prepared and published a companion document entitled, "Technical Recommendations for

Achievement Tests."   Subsequently, a joint committee of the three organizations modified, revised and consolidated the two documents into the first Joint Standards.  Beginning with the 1966 revision, the three organizations (AERA, APA and NCME – collectively, the "Plaintiffs") collaborated in developing the "Joint Standards" (or simply, the "Standards").  Each subsequent revision of the Standards has been careful to cite the previous Standards and note that it is a revision and update of that document.

28.     Beginning in the mid-1950s, Plaintiffs formed and periodically reconstituted a committee of experts in psychological and educational assessment, charged with the initial development of the Technical Recommendations and then each subsequent revision of the (renamed) Standards. These committees were formed by the Plaintiffs' Presidents (or their designees), who would meet and jointly agree on the membership.  Often a chair or co-chairs of these committees were selected by joint agreement.  Beginning with the 1966 version of the Standards, this committee became referred to as the "Joint Committee."

29.     Many different fields of endeavor rely on assessments.  Plaintiffs have ensured that the range of these fields of endeavor is represented in the Joint Committee's membership – *e.g.*, admissions, achievement, clinical counseling, educational, licensing-credentialing, employment, policy, and program evaluation.    Similarly, the Joint Committee's members represent expertise across major functional assessment areas – *e.g.*, validity, equating, reliability, test development, scoring, reporting, interpretation, large scale interpolation and cognitive behavioral therapy.

30.     From the time of their initial creation to the present, the preparation and periodic revisions to the Standards entail intensive labor and considerable cross-disciplinary expertise. Each time the Standards are revised, Plaintiffs select and arrange for meetings of the leading

authorities in psychological and educational assessments. During these meetings, certain Standards are combined, pared down and/or augmented, others are deleted altogether, and some are created as whole new individual Standards. The most recent version of the Standards is nearly 200 pages, and took several years to complete.

**Why the Standards Were Created**

31. The Standards originally were created to improve professional practice in testing and assessment. The Standards can be used to guide the sound and ethical use of tests, and also to evaluate the quality of tests and testing practices.

32. The Standards are intended to guide test developers and test users. Test user Standards refer to those that help decide how to choose certain tests, interpret scores, or make decisions based on tests results. Test users include clinical or industrial psychologists, research directors, school psychologists, counselors, employment supervisors, teachers, and various administrators who select or interpret tests for their organizations. The intended audience of the Standards is broad and cuts across audiences with varying backgrounds and different training. The Standards are not simply intended for members of the Plaintiffs that are the sponsoring organizations of the Standards.

33. An essential component of responsible professional practice is maintaining technical competence. Many professional associations also have developed standards and principles of technical practice in assessment. The Standards have been widely cited to address technical, professional, and operational norms for all forms of assessments that are professionally developed and used in a variety of settings.

34. The Standards are designed to apply to professional test developers, sponsors, publishers, and users by providing criteria for the evaluation of tests, testing practices, and the

effects of test use. The Standards have been used to develop testing guidelines for such activities as college admissions, personnel selection, test translations, test user qualifications, and computer-based testing.

35.     The Standards were not created in response to an expressed governmental or regulatory need, nor were they prepared in response to any legislative action or judicial decision. However, the Standards have been cited in judicial decisions related to the proper use and evidence for assessment, as well as by state and federal legislators.

**The Benefits that the Standards Bring to the Relevant Public and Constituencies**

36.     The Standards' primary purposes are to provide criteria for evaluating tests and testing practices, and to encourage test developers, sponsors, publishers, and users to adopt the Standards. There is no requirement for members of the professional associations or testing organizations and users to do so. There is no mechanism to enforce compliance with the Standards on the part of the test developer or test user. The Standards, moreover, do not attempt to provide psychometric answers to policy or legal questions.

37.     On the other hand, the Standards apply broadly to a wide range of standardized instruments and procedures that sample an individual's behavior, including tests, assessments, inventories, scales, and other testing vehicles. The Standards apply equally to standardized multiple-choice tests, performance assessments (including tests comprised of only open-ended essays), and hands-on assessments or simulations. The main exceptions are that the Standards do not apply to unstandardized questionnaires (*e.g.*, unstructured behavioral checklists or observational forms), teacher-made tests, and subjective decision processes (*e.g.*, a teacher's evaluation of students' classroom participation over the course of a semester).

**Promotion and Distribution of the Standards,
and Income Earned by Plaintiffs from Sales of the Standards**

38.     Plaintiffs promote and sell copies of the Standards via their websites, at annual meetings, in public listings to students, and to educational institution faculty.  Advertisements promoting the Standards have appeared in meeting brochures, in scholarly journals, and in the hallways at professional meetings.   None of the Plaintiff organizations has solicited any government agency to incorporate the Standards into the Code of Federal Regulations or other rules of Federal or State agencies.

39.     As the designated publisher of the Standards, AERA sometimes provides promotional complementary print copies to students or professors.  To date, the Standards have never been posted by any of the three Plaintiffs, or with the permission of the three Plaintiffs, on any publicly accessible website.   All print copies of the Standards bear a copyright notice.  Except for a few complementary print copies, the Standards are not digitized or given away for free; and certainly they are not made available to the public by any of the three organizations for anyone to copy free of charge.

40.     The Standards are sold at retail prices ranging from $35.00 to $40.00 per copy. Income generated from sales of the 1999 Standards, on average, has been approximately in excess of $127,000 per year.

**<u>Plaintiffs' Ownership of the Copyright in the Standards</u>**

41.     The Standards comprise an original work of authorship, entitled to protection under the U.S. Copyright Act, 17 U.S.C. §§ 101, *et seq.*

42.     The Plaintiffs are joint owners of the copyright in and to the Standards.

43.     The Standards have been registered with the U.S. Register of Copyrights under Registration Number TX 5-100-196, having an effective date of December 8, 1999.  *See* Exhibit

A attached.

44.     A Supplementary copyright registration for the Standards has been issued by the

U.S. Register of Copyrights under Supplementary Registration Number TX 6-434-609, having

an effective date of February 25, 2014.  *See* Exhibit B attached.

**Defendant's Copying, and Enabling Others to**
**Copy, the Standards without Plaintiffs' Permission**

45.     On                                   its                              website,

https://law.resource.org/pub/us/cfr/ibr/001/aera.standards.1999.pdf, Defendant has published in

its entirety Plaintiffs' 1999 Standards.

46.     Defendant   published   Plaintiffs'   1999   Standards   to   its   website,

https://law.resource.org/pub/us/cfr/ibr/001/aera.standards.1999.pdf, without the permission or

authorization of any of the Plaintiff organizations.

47.     In front of the unauthorized copy of the 1999 Standards that Defendant published

to   its   https://law.resource.org/pub/us/cfr/ibr/001/aera.standards.1999.pdf website, Defendant

placed a cover sheet or "Certificate," falsely implying that the publication of Plaintiffs'

Standards to Defendants' website was somehow authorized or sanctioned by U.S. law.

48.     Defendant's activities have encouraged others to publish the Standards without

Plaintiffs' permission or authorization.  *See, e.g.*, the posting of Plaintiffs' 1999 Standards to the

Internet Archive at   https://archive.org/details/gov.law.aera.standards.1999.   The posting of

Plaintiffs' 1999 Standards to the Internet Archive is in the exact same format, and uses the same

cover sheet or "Certificate" employed by Defendant in its publication of the Plaintiffs' Standards

to Defendant's website.

49.     Plaintiff AERA requested in writing that Defendant remove the Standards from its

online postings.  Defendant refused.

## FIRST CAUSE OF ACTION
### (Copyright Infringement)

50.     Plaintiffs repeat and re-allege paragraphs 1 through 49 of the Complaint.

51.     Defendant's activities – publishing Plaintiffs' Standards to the Internet without Plaintiffs' permission or authorization – violate Plaintiffs' exclusive rights under the U.S. Copyright Act, 17 U.S.C. § 106.

52.     Defendant's activities – publishing Plaintiffs' Standards to the Internet without Plaintiffs' permission or authorization – constitute infringement of Plaintiffs' copyright in the Standards.

53.     Defendant has knowingly, willfully and deliberately infringed Plaintiffs' copyright in the Standards, and continues to do so.

54.     Plaintiffs have suffered and continue to suffer damages as a result of Defendant's actions, in an amount to be proven at trial.

55.     During the period in which Defendant is infringing, Plaintiffs have no adequate remedy at law for the injuries that continue to be inflicted by Defendant.

## SECOND CAUSE OF ACTION
### (Contributory Copyright Infringement)

56.     Plaintiffs repeat and re-allege paragraphs 1 through 55 of the Complaint.

57.     Upon information and belief, in addition to Defendant's direct infringement of Plaintiffs' copyright in the Standards, other persons and/or entities have directly infringed Plaintiffs' copyright in the Standards.

58.     Upon information and belief, Defendant has known, and/or with the exercise of reasonable diligence should have known, that other persons and/or entities have directly infringed Plaintiffs' copyright in the Standards.

59.    Upon information and belief, Defendant has substantially participated in other persons' and/or entities' direct infringement of Plaintiffs' copyright in the Standards.

60.    Defendant has contributorily infringed Plaintiffs' copyright in the Standards by intentionally inducing and/or encouraging others to directly infringe upon same.

61.    Defendant has knowingly, willfully and deliberately contributorily infringed Plaintiffs' copyright in the Standards, and continues to do so.

62.    Plaintiffs have suffered and continue to suffer damages as a result of Defendant's actions, in an amount to be proven at trial.

63.    During the period in which Defendant's activities continue, Plaintiffs have no adequate remedy at law for the injuries continued to be inflicted by Defendant.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs, AERA, APA and NCME, request the following relief:

A.    Judgment in Plaintiffs' favor and against Defendant;

B.    An injunction preliminarily and permanently enjoining and restraining Defendant, including its officers, directors, agents, employees, representatives, and all persons acting in concert with Defendant to (i) remove all infringing copies of Plaintiffs' Standards from websites and any other locations under Defendant's dominion and control; (ii) cease providing any members of the public with access to Plaintiffs' Standards unless it is with Plaintiffs' express written authorization and permission; and (iii) cease engaging in further acts constituting copyright infringement and/or contributory copyright infringement of Plaintiffs' Standards, pursuant to 17 U.S.C. § 502.

C.    The impoundment and (where applicable) destruction of (i) all infringing copies of Plaintiffs' Standards made or used by Defendant in violation of Plaintiffs' copyright in the

Standards, (ii) all articles by means of which such infringing copies may be or have been reproduced, and (iii) all records documenting the manufacture, sale, or receipt of things involved in any such violation, provided that any records seized shall be taken into the custody of the court, pursuant to 17 U.S.C. §§ 503(a) and (b).

    D.      An award of Plaintiffs' costs and attorneys' fees, pursuant to 17 U.S.C. § 505.

    E.      Such other and further relief as the Court may deem just and proper.

                       Respectfully submitted,

                       OBLON, SPIVAK, McCLELLAND,
                        MAIER & NEUSTADT,LLP

By:   */s/ Jonathan Hudis*
        Jonathan Hudis (DC Bar # 418872)
        Kathleen Cooney-Porter (DC Bar # 434526)
        1940 Duke Street
        Alexandria, VA 22314
        Tel. (703) 413-3000
        Fax (703) 413-2220
        E-Mail jhudis@oblon.com
        E-Mail kcooney-porter@oblon.com

        Attorneys for Plaintiffs

        AMERICAN EDUCATIONAL RESEARCH
         ASSOCIATION, INC.
        AMERICAN PSYCHOLOGICAL
         ASSOCIATION, INC.
        NATIONAL COUNCIL ON
         MEASUREMENT IN EDUCATION, INC.

JH:KCP:jh {10259179_1.DOCX}        Dated: May 23, 2014