## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN EDUCATIONAL RESEARCH ASSOCIATION, INC., AMERICAN PSYCHOLOGICAL ASSOCIATION, INC., and NATIONAL COUNCIL ON MEASUREMENT IN EDUCATION, INC., )<br><br>Plaintiffs, )<br><br>v. )<br><br>PUBLIC.RESOURCE.ORG, INC., )<br><br>Defendant. ) | Civil Action No. 1:14-cv-00857-TSC-DAR<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND ENTRY OF A PERMANENT INJUNCTION** |

Jonathan Hudis (DC Bar # 418872)
QUARLES & BRADY LLP
1700 K Street NW, Suite 825
Washington, DC 20006-3825
Tel. (202) 372-9600
Fax (202) 372-9599
E-Mail Jonathan.Hudis@quarles.com

Kathleen Cooney-Porter (DC Bar # 434526)
OBLON, McCLELLAND, MAIER & NEUSTADT, LLP
1940 Duke Street
Alexandria, VA 22314
Tel. (703) 413-3000
Fax (703) 413-2220
E-Mail kcooney-porter@oblon.com

Attorneys for Plaintiffs

AMERICAN EDUCATIONAL RESEARCH
 ASSOCIATION, INC.
AMERICAN PSYCHOLOGICAL
 ASSOCIATION, INC.
NATIONAL COUNCIL ON
 MEASUREMENT IN EDUCATION, INC.

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ........................................................... 1

STATEMENT OF FACTS ................................................................. 3

SUMMARY OF ARGUMENT ........................................................... 27

ARGUMENT ..................................................................................... 27

I.   THE MATERIAL FACTS OF RECORD, OF WHICH THERE IS NO GENUINE
     DISPUTE, WARRANT THE GRANT OF SUMMARY JUDGMENT IN PLAINTIFFS'
     FAVOR ..................................................................................... 27

     A.  Defendant has Committed Acts of Copyright
         Infringement and Contributory Copyright Infringement ............................................. 29

         1.  Direct Infringement ..................................................... 29

         2.  Contributory Infringement........................................... 34

         3.  Defendant's Infringing Activities Are Unjustified.................................... 36

         4.  Defendant's Infringing Activities Are Not Fair Use ................................. 43

             a.  The Purpose and Character of Public Resource's Use Cuts Against a Finding of
                 Fair Use. ............................................................. 44

             b.  The Nature of the 1999 Standards is a Neutral Fair Use Factor. ........................... 46

             c.  Public Resource Misappropriated the Sponsoring Organizations' Entire Work. ... 46

             d.  Public Resource Drastically Affected the Market for and Value of the 1999
                 Standards.  If Allowed to Continue, Public Resource's Activities Will Decimate
                 the Market for and Value of Future Standards Published by the Sponsoring
                 Organizations.......................................................... 47

             e.  Balancing the Factors, Public Resource's Infringement Cannot be Excused as Fair
                 Use........................................................................ 51

         5.  Public Resource's Other Defenses are Without Merit................................. 51

II.   PLAINTIFFS MEET THE STANDARDS FOR THE ISSUANCE OF A PERMANENT INJUNCTION AGAINST DEFENDANT'S FURTHER INFRINGING ACTIVITIES . 53

   A.   Standards for the Issuance of a Permanent Injunction ................................................... 53

   B.   Plaintiffs Have Suffered Irreparable Injury; and the Remedies Available at Law, such as Monetary Damages, are Inadequate to Compensate for that Injury ............................. 53

      1.   Loss of Control Over Content .................................................................................... 54

      2.   Loss of Business Opportunities ................................................................................. 54

      3.   Adverse Affect on the Efforts Put into Creating Plaintiffs' Standards...................... 55

   C.   The Balance of Hardships Weigh In Plaintiffs' Favor .................................................. 56

   D.   Issuance of a Permanent Injunction is in the Public Interest......................................... 56

CONCLUSION ................................................................................................................................ 57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001)..............................................33

*AAMC v. Princeton Review, Inc.*, 332 F. Supp. 2d 11 (D.D.C. 2004).........................................52

*Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994)...........................................44

*\*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................................................28

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).............................................................................................52

*Author's Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014) ......................................45, 49, 50

*Authors Guild v. Google, Inc.*, 2015 WL 6079426 (2d Cir., Oct. 16, 2015) ..............46, 47, 50, 51

*Authors Guild, Inc. v. Google, Inc.*, 954 F. Supp. 2d 282 (S.D.N.Y. 2013) ...............................33

*Banks v. Manchester*, 128 U.S. 244 (1888) .....................................................................................37

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)...........................................................................52

*BMG Music v. Gonzalez*, 430 F.3d 888 (7th Cir. 2005) ................................................................48

*Breaking the Chain Found. v. Capital Educ. Support, Inc.*,
    589 F. Supp. 2d 25 (D.D.C. 2008) ..............................................................................................54

*Brownmark Films, LLC v. Comedy Partners*, 800 F. Supp. 2d 991 (E.D. Wis. 2011)................32

*Call of the Wild Movie, LLC v. Does*, 770 F. Supp. 2d 332 (D.D.C. 2011) ................................32

*\*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ...............................44, 45, 46, 47, 48

*\*CCC Info. Services v. Maclean Hunter Market Reports, Inc.*, 44 F.3d 61 (2d Cir. 1994)....39, 43

*\*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ............................................................................28

*Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922 (Fed. Cir. 2012) .....................................54

*Davis v. Blige*, 505 F.3d 90 (2d Cir. 2007)...............................................................................31, 32

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003).......................................1

*DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68 (D.D.C. 2007) .........................................29, 32

*\*eBay Inc. v. MercExchange, L.L.C.* 547 U.S. 388 (2006)...........................................................53

iii

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) ................................ 29

*First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968) ......................... 28, 29

*Folsom v. Marsh*, 9 F. Cas. 342 (No. 4,901) (CCD Mass. 1841) ................................. 44

*Fox TV Stations, Inc. v. FilmOn X LLC*, 966 F. Supp. 2d 30 (D.D.C. 2013) ........................ 54, 56

*Fox v. Washington,* 236 U.S. 273 (1915).................................................................. 43

*Hanley-Wood LLC v. Hanley Wood LLC*, 783 F. Supp. 2d 147 (D.D.C. 2011)......................... 54

*Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985) ............... 44, 46, 47

*Howie v. Office of Eddie Bernice Johnson*, 570 F. Supp.2d 115 (D.D.C. 2008)................... 28, 29

*Lotus Dev. Corp. v. Borland Int'l*, 49 F.3d 807 (1st Cir. 1995) ........................ 29, 32

*Loving v. Internal Revenue Service*, 917 F.Supp.2d 67 (D.D.C. 2013)........................ 53

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986).................... 29

*Maxwood Music Ltd. v. Malakian*, 713 F.Supp.2d 327 (S.D.N.Y. 2010).................... 31

*MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005).................................. 34, 36

*Miller v. French*, 530 U.S. 327 (2000) ...................................................... 43

*Mitchell Bros. Film Grp. v. Cinema Adult Theater*, 604 F.2d 852 (5th Cir. 1979) ..................... 52

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)........................... 53

*Nat'l Cable Television Ass'n, Inc. v. Broad. Music, Inc.*, 772 F. Supp. 614 (D.D.C. 1991) ........ 52

*Newborn v. Yahoo!, Inc.*, 391 F. Supp. 2d 181 (D.D.C. 2005)................................ 34

*Practice Management Info. Corp. v. American Medical Ass'n,*
121 F.3d 516 (9th Cir. 1997).................................................................. 39, 40, 43

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004)............................ 55

*Rundquist v. Vapiano SE*, 798 F. Supp. 2d 102 (D.D.C. 2011) ............................ 34

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) ........................................ 57

*Seltzer v. Green Day, Inc.,* 725 F.3d 1170 (9th Cir. 2013)............................ 45

*Slate v. Am. Broad. Cos.*, 941 F. Supp. 2d 27 (D.D.C. 2013)............................ 53

*Tech 7 Sys., Inc. v. Vacation Acquisition, LLC*, 594 F. Supp. 2d 76 (D.D.C. 2009) ............. 53

*Veeck v. Southern Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791 (5th Cir. 2003) .......... 31, 37, 38, 39

*Walt Disney Co. v. Powell*, 897 F.2d 565 (D.C. Cir. 1990) ............................................. 54

*Wheaton v. Peters*, 33 U.S. 591 (1834) ................................................................. 37

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
   227 F.3d 1110 (9th Cir. 2000) ......................................................... 48, 49

*WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594 (S.D.N.Y. 2011) ......................................... 55, 56, 57

**Statutes**

1 C.F.R. § 51.3 .................................................................................................. 14

1 C.F.R. § 51.5 .................................................................................................. 14

1 C.F.R. § 51.7(a)(3) ......................................................................................... 14

17 U.S.C. § 101 ............................................................................................. 31, 33

17 U.S.C. § 106 ............................................................................................. 32, 33

17 U.S.C. § 106(1) ............................................................................................. 33

17 U.S.C. § 106(2) ............................................................................................. 33

17 U.S.C. § 106(3) ............................................................................................. 33

17 U.S.C. § 107 .................................................................................................. 43

17 U.S.C. § 107(3) ............................................................................................. 46

17 U.S.C. § 107(4) ......................................................................................... 47, 49

17 U.S.C. § 201(e) ......................................................................................... 40, 41

17 U.S.C. § 410(c) ............................................................................................. 29

17 U.S.C. § 501(a) ............................................................................................. 34

34 C.F.R. § 668.146 ........................................................................................... 13

5 U.S.C. § 552(a)(1) ........................................................................................... 14

National Technology Transfer and Advancement Act of 1995 ("NTTAA"),
   Pub. L. No. 104-113 § 12(d) ......................................................... 13, 42

**Other Authorities**

*Circular No. A-119 Revised*, OFFICE OF MANAGEMENT AND BUDGET (Revised Feb. 10, 1998),
   http://www.whitehouse.gov/omb/circulars_a119............................................................ 6, 41, 42

Leval, P.N., *Toward A Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990)............................... 45

**Rules**

Fed. R. Civ. P. 56(a) .................................................................................................................. 28

Fed. R. Civ. P. 56(c) .................................................................................................................. 28

Fed. R. Civ. P. 56(e)(3)............................................................................................................... 28

**Treatises**

1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 6.03
   (Matthew Bender & Co. 2015) ................................................................................................ 31

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, § 13.09[B]
   (Matthew Bender & Co. 2015) ................................................................................................ 52

## PRELIMINARY STATEMENT

Plaintiffs, the American Educational Research Association, Inc. ("AERA"), the American Psychological Association, Inc. ("APA"), and the National Council on Measurement in Education, Inc. ("NCME") (collectively, "Plaintiffs" or the "Sponsoring Organizations"), submit this Memorandum of Points and Authorities in support of Plaintiffs' Motion for Summary Judgment and the entry of a Permanent Injunction.

The Sponsoring Organizations' work, the "Standards for Educational and Psychological Testing (1999 ed.)" (the "1999 Standards") were written at great expense, including many years of volunteer effort given by a select group of the leading minds in educational and psychological testing of their time. Until recently updated by the 2014 edition, for fifteen years the 1999 Standards were considered the foremost authority of best practices in the preparation and administration of tests; particularly in the areas of validity, reliability, and fairness. The 1999 Standards continue to have enduring value for those in the testing profession who (i) need to know the state of best testing practices as they existed between 1999 and 2014, (ii) believe they still may be held accountable to the guidance of the 1999 Standards even now, and/or (iii) study the changes in best testing practices over time.

Defendant, Public.Resource.Org, Inc. ("Public Resource"), by assertion of a "species of mutant copyright law,"[1] has made itself judge, jury, and executioner of the Sponsoring Organizations' rights in the 1999 Standards – merely due to the happenstance that the Standards were cited in federal and state regulations. Without the Sponsoring Organizations' permission, Public Resource created a PDF (Acrobat Reader) version of the 1999 Standards and posted the PDF file to two unrestricted Internet websites. Moreover, Public Resource posted the 1999

---

[1] *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34 (2003) (castigating the plaintiffs for asserting a claim of reverse passing off under Trademark Act Section 43(a), 15 U.S.C. § 1125(a) that "would create a species of mutant copyright law that limits the public's 'federal right to 'copy and to use' expired copyrights".).

Standards online without any access, download, or printing restrictions – resulting in widespread acts of copyright infringement by Internet users.

Until this suit was filed and the Sponsoring Organizations threatened to seek a preliminary injunction, Public Resource refused to remove these Internet postings.  During the time that the 1999 Standards were posted online, the Sponsoring Organizations suffered significant financial harm due to lost sales.

Public Resource has removed its unauthorized postings of the 1999 Standards from the Internet – pending a resolution of this litigation on the merits.  However, it would be very simple for Public Resource to re-post the 1999 Standards online.  Moreover, unless this Court permanently enjoins Public Resource, Defendant intends re-post the 1999 Standards and also to post the Sponsoring Organizations' updated 2014 Standards online.

The Sponsoring Organizations earn no profits from sales of the Standards.  All profits from the Standards are deposited into a Development Fund to underwrite future, updated editions.  Without the income generated from these sales, the Sponsoring Organizations will not have funding for future updates and the project likely will cease.  As a result, the testing profession, and the public to whom educational and psychological tests are administered, will suffer.

Plaintiffs' motion is supported by the Declarations of Felice J. Levine, Ph.D. (Executive Director of AERA, publisher of the 1999 and 2014 Standards), Marianne Ernesto (Director, Testing and Assessment of APA), Lauress Wise, Ph.D. (Past President of NCME, and Vice-Chair of the Joint Committee for writing of the 2014 Standards), Wayne J. Camara, Ph.D. (former NCME President, former member of the APA Council of Representatives, Project Director for the 1999 Standards and Member of the Management Committee overseeing the sale

of, and financial accounting for, this work), Dianne L. Schneider, Ph.D. (former APA Staff Liaison for the 1999 Standards, and Project Coordinator for the 2014 Standards), Kurt F. Geisinger, Ph.D. (Plaintiffs' expert), and Jonathan Hudis (Plaintiffs' counsel).

## STATEMENT OF FACTS

Plaintiffs, AERA, APA, and NCME, are District of Columbia not-for-profit corporations (Levine Decl., ¶ 4; Ernesto Decl., ¶ 3; Wise Decl., ¶ 3).

AERA is the major national scientific society for research on education and learning. AERA's mission is to advance knowledge about education, to encourage scholarly inquiry related to education, and to promote the use of research to improve education and serve the public good (Levine Decl., ¶ 5).

APA is the largest scientific and professional organization representing psychology in the United States. APA is the world's largest association of psychologists and counts a vast number of researchers, educators, clinicians, consultants and students among its members. APA's mission is to advance the creation, communication, and application of psychological knowledge to benefit society and improve people's lives (Ernesto Decl., ¶ 4).

NCME is a professional organization for individuals involved in assessment, evaluation, testing, and other aspects of educational measurement. NCME's members are involved in the construction and use of standardized tests; new forms of assessment, including performance-based assessment; program design; and program evaluation (Wise Decl., ¶ 4).

### Creation of the Standards for Educational and Psychological Testing

Plaintiffs have been preparing and publishing versions of the Standards for Educational and Psychological Testing for over fifty years. In 1954, Plaintiff APA prepared and published the "Technical Recommendations for Psychological Tests and Diagnostic Techniques" (Camara Decl., ¶ 7; Ernesto Decl., ¶ 5). In 1955, Plaintiffs AERA and NCME prepared and published a

3

companion document entitled, "Technical Recommendations for Achievement Tests" (Levine Decl., ¶ 6; Camara Decl., ¶ 7; Wise Decl., ¶ 5).  Subsequently, a joint committee of the three organizations modified, revised, and consolidated the two documents into the first Joint Standards.  Beginning with the 1966 revision, the three organizations (AERA, APA and NCME – collectively, the "Sponsoring Organizations") collaborated in developing the "Joint Standards" (or simply, the "Standards").  Each subsequent revision of the Standards has been careful to note that it is a revision and update of the prior version (Levine Decl., ¶ 6; Camara Decl., ¶ 7;) Ernesto Decl., ¶ 6; Wise Decl., ¶ 6).

Beginning in the mid-1950s, the Sponsoring Organizations formed and periodically reconstituted a committee of highly trained and experienced experts in psychological and educational assessment, charged with the initial development of the Technical Recommendations and then each subsequent revision of the (renamed) Standards.  These committees were formed by the Sponsoring Organizations' Presidents (or their designees), who would meet and jointly agree on the membership.  Often a chair or co-chairs of these committees were selected by joint agreement.  Beginning with the 1966 version of the Standards, this committee became referred to as the "Joint Committee" (Levine Decl., ¶ 7; Camara Decl., ¶ 8; Ernesto Decl., ¶ 7; Wise Decl., ¶ 7).

Financial and operational oversight for the Standards' revisions, promotion, distribution, and for the sale of the 1999 and 2014 Standards has been undertaken by a periodically reconstituted Management Committee, comprised of the designees of the three Sponsoring Organizations (Levine Decl., ¶ 8; Camara Decl., ¶ 9; Schneider Decl., ¶ 4; Ernesto Decl., ¶ 8; Wise Decl., ¶ 8).  All members of the Joint Committee(s) and the Management Committee(s) are *unpaid* volunteers.  The expenses associated with the ongoing development and publication of

4

the Standards include travel and lodging expenses (for the Joint Committee and Management Committee members), support staff time, printing and shipment of bound volumes, and advertising costs (Levine Decl., ¶ 9; Camara Decl., ¶ 10; Schneider Decl., ¶ 5; Ernesto Decl., ¶ 9; Wise Decl., ¶ 9).

Many different fields of endeavor rely on assessments.  The Sponsoring Organizations have ensured that the range of these fields of endeavor is represented in the Joint Committees' membership – *e.g.*, admissions, achievement, clinical counseling, educational, licensing-credentialing, employment, policy, and program evaluation.  Similarly, the Joint Committee's members, who are *unpaid volunteers*, represent expertise across major functional assessment areas – *e.g.*, validity, equating, reliability, test development, scoring, reporting, interpretation, and large scale interpolation (Levine Decl., ¶ 10; Ernesto Decl., ¶ 10; Wise Decl., ¶ 10).

From the time of their initial creation to the present, the preparation of and periodic revisions to the Standards entail intensive labor and considerable cross-disciplinary expertise. Each time the Standards are revised, the Sponsoring Organizations select and arrange for meetings of the leading authorities in psychological and educational assessments (known as the Joint Committee).  During these meetings, certain Standards are combined, pared down, and/or augmented, others are deleted altogether, and some are created as whole new individual Standards.  The 1999 version of the Standards is nearly 200 pages, took more than five years to complete (Levine Decl., ¶ 11; Ernesto Decl., ¶ 11; Camara Decl., ¶ 11), and is the result of work put in by the Joint Committee to generate a set of best practices on educational and psychological testing that are respected and relied upon by leaders in their fields (Camara Decl., ¶ 11; Wise Decl., ¶ 11).

Draft revisions of the 1985 Standards, for what became the 1999 Standards, were widely

distributed for public review and comment three times during this revision effort to gauge whether the testing community believed the revised drafts to be current and inclusive of the topics at issue (Schneider Decl., ¶ 6). The Joint Committee received thousands of pages of comments and proposed text revisions from: the membership of the Sponsoring Organizations, scientific, professional, trade and advocacy groups, credentialing boards, state and federal government agencies, test publishers and developers, and academic institutions. While the Joint Committee reviewed and took under advisement these helpful comments, the final language of the 1999 Standards was a product of the Joint Committee members (Camara Decl., ¶ 12; Schneider Decl., ¶ 7). When the 1985 Standards were revised, more than half the content of the 1999 Standards resulted from newly written prose of the Joint Committee (Camara Decl., ¶ 12).

**Why the Standards Were Created and**
**The Benefits that the Standards Bring to the Relevant Public and Constituencies**

The Standards originally were created as principles and guidelines – a set of best practices to improve professional practice in testing and assessment across multiple settings, including education and various areas of psychology. The Standards can and should be used as a recommended course of action in the sound and ethical development and use of tests, and also to evaluate the quality of tests and testing practices. Additionally, an essential component of responsible professional practice is maintaining technical competence. Many professional associations also have developed standards and principles of technical practice in assessment. The Sponsoring Organizations' Standards have been and still are used for this purpose (Geisinger Decl., ¶ 18; Camara Decl., ¶ 13; Wise Decl., ¶ 12).

The Standards, however, are not simply intended for members of the Sponsoring Organizations, AERA, APA, and NCME. The intended audience of the Standards is broad and cuts across audiences with varying backgrounds and different training. For example, the

Standards also are intended to guide test developers, sponsors, publishers, and users by providing criteria for the evaluation of tests, testing practices, and the effects of test use. Test user standards refer to those standards that help test users decide how to choose certain tests, interpret scores, or make decisions based on tests results. Test users include clinical or industrial psychologists, research directors, school psychologists, counselors, employment supervisors, teachers, and various administrators who select or interpret tests for their organizations. There is no mechanism, however, to enforce compliance with the Standards on the part of the test developer or test user. The Standards, moreover, do not attempt to provide psychometric answers to policy or legal questions (Camara Decl., ¶ 14; Wise Decl., ¶ 13; Geisinger Decl., ¶ 19; Ernesto Decl., ¶ 12).

The Standards promote the development of high quality tests and the sound use of results from such tests. Without such high quality standards, tests might produce scores that are not defensible or accurate, not an adequate reflection of the characteristic they were intended to measure, and not fair to the person tested. Consequently, decisions about individuals made with such test scores would be no better, or even worse, than those made with no test score information at all. Thus, the Standards help to ensure that measures of student achievement are relevant, that admissions decisions are fair, that employment hiring and professional credentialing result in qualified individuals being selected, and patients with psychological needs are diagnosed properly and treated accordingly. Quality tests protect the public from harmful decision making and provide opportunities for education and employment that are fair to all who seek them (Camara Decl., ¶ 15; Wise Decl., ¶ 14).

The Standards apply broadly to a wide range of standardized instruments and procedures that sample an individual's behavior, including tests, assessments, inventories, scales, and other

testing vehicles.  The Standards apply equally to standardized multiple-choice tests, performance assessments (including tests comprised of only open-ended essays), and hands-on assessments or simulations.   The  main  exceptions  are  that  the  Standards  do  not  apply  to  unstandardized questionnaires (*e.g.*, unstructured behavioral checklists or observational forms), teacher-made tests, and subjective decision processes (*e.g.*, a teacher's evaluation of students' classroom participation over the course of a semester) (Camara Decl., ¶ 16; Wise Decl., ¶ 15; Geisinger Decl., ¶ 20; Ernesto Decl., ¶ 13).

The Standards have been used to develop testing guidelines for such activities as college admissions, personnel selection, test translations, test user qualifications, and computer-based testing.   The  Standards  also  have  been  widely  cited  to  address  technical,  professional,  and operational norms for all forms of assessments that are professionally developed and used in a variety of settings.   The Standards additionally provide a valuable public service to state and federal governments as they voluntarily choose to use them.  For instance, each testing company, when submitting proposals for testing administration, instead of relying on a patchwork of local, or even individual and proprietary, testing design and implementation criteria, may rely instead on  the  Sponsoring  Organizations'  Standards  to  afford  the  best  guidance  for  testing  and assessment practices (Camara Decl., ¶ 17; Wise Decl., ¶ 16; Geisinger Decl., ¶ 21; Ernesto Decl., ¶ 14).

The Standards were not created or updated to serve as a legally binding document, in response to an expressed governmental or regulatory need, nor in response to any legislative action or judicial decision.  However, the Standards have been cited in judicial decisions related to the proper use and evidence for assessment, as well as by state and federal legislators.  These citations in judicial decisions and during legislative deliberations occurred without any lobbying

by the Plaintiffs (Levine Decl., ¶ 12; Camara Decl., ¶ 18; Ernesto Decl., ¶ 15; Wise Decl., ¶ 17).

During the discovery phase of this litigation, however, Plaintiff APA located in its archives correspondence relating to APA's support for proposed legislation sought to be introduced in 2001 by Senator Paul Wellstone (D-MN) on Fairness and Accuracy in High Stakes Educational Decisions for Students - a suggested amendment to the Elementary and Secondary Education Act ("No Child Left Behind Act") 147 Cong. Rec. S. 4,644 (daily ed. May 9, 2001) (Ernesto Decl., ¶¶ 16-22, Exhs. NN-SS). Some of these letters are unsigned and are not printed on APA letterhead. Therefore, in accordance with APA practices and protocols, it is likely that the unsigned letters (not printed on letterhead) were internal discussion drafts that were never sent (Ernesto Decl., ¶ 23).

Regarding the signed letters that were printed on APA letterhead, they relate to Senator Wellstone's proposed legislation that tests and assessments administered by the states are of high quality and used appropriately for the benefit of test administrators and test takers. These are goals that are consistent with APA policy as then reflected in the 1999 Standards. Even though Senator Wellstone's amendments sought, in part, to mandate states' compliance with the Standards, none of the Sponsoring Organizations actively advocated for this – and in any event Senator Wellstone's proposed amendment including this language was never enacted into law (Ernesto Decl., ¶ 24, Exh. TT).

APA's search of its records did not disclose any further communications with Congress relating to the Standards and, to the best of APA's knowledge, it has not engaged in communications with Congress regarding citation of the Standards in legislation since 2001 (Ernesto Decl., ¶ 25). Moreover, neither AERA nor NCME has ever communicated with Congress for the purpose of encouraging the enactment of the Standards into law (Levine Decl.,

¶¶ 12-13; Wise Decl., ¶ 18).   None of the Sponsoring Organizations has solicited any government agency to incorporate the Standards into the Code of Federal Regulations or other rules of Federal or State agencies (Levine Decl., ¶ 13; Ernesto Decl., ¶ 26; Wise Decl., ¶ 19).  Rather, in the policymaking arena, the Sponsoring Organizations believe the Standards should be treated as guidelines informing the enactment of legislation and regulations consistent with best practices in the development and use of tests – to insure that they are valid, reliable and fair (Wise Decl., ¶ 20; Ernesto Decl., ¶ 27).

**Promotion and Distribution of the Standards,**
**and Use of Income Earned from Sales of the Standards**

Plaintiffs promote and sell copies of the Standards via referrals to the AERA website, at annual meetings, in public offerings to students, and to educational institution faculty.  Advertisements promoting the Standards have appeared in meeting brochures, in scholarly journals, and in the hallways at professional meetings (Levine Decl., ¶ 14, Exh. NNN; Ernesto Decl., ¶ 28, Exh. UU; Wise Decl., ¶ 21, Exh. KKK).   All copies of the Standards bear a copyright notice (Levine Decl., ¶ 15, 28, Exh. TTT).

Distribution of the Standards is closely monitored by the Sponsoring Organizations.  AERA, the designated publisher of the Standards, sometimes does provide promotional complementary print copies to students or professors.  Except for these few complementary print copies, however, the Standards are not given away for free; and certainly they are not made available to the public by any of the three organizations for anyone to copy free of charge (Levine Decl., ¶ 16; Ernesto Decl., ¶ 29; Wise Decl., ¶ 22).   To date, Plaintiffs have never posted, or authorized the posting of, a digitized copy of the 1999 Standards on any publicly accessible website (Levine Decl., ¶ 16; Ernesto Decl., ¶ 30; Wise Decl., ¶ 23).

The 1999 Standards have been sold at modest retail prices ranging from $25.95 to $49.95

per copy.  From 2000 to 2014, except for the near two-year period during which Public Resource posted unauthorized copies online and sales diminished significantly, income generated from sales of the 1999 Standards, on average, had been approximately in excess of $127,000 per year (Levine Decl., ¶¶ 17-18 Exh. OOO).

After the 2014 Standards were published in the late summer of 2014, AERA for a time discontinued sales of the 1999 Standards.  This was to encourage sales of the newly-revised edition – the 2014 Standards (Levine Decl., ¶ 19, Exh. PPP).  However, so long as purchasers are made aware that it is no longer the current edition, the 1999 Standards do have an enduring value for those in the testing and assessment profession who (i) need to know the state of best testing practices as they existed between 1999 and 2014, (ii) believe they still may be held accountable to the guidance of the 1999 Standards even now, and/or (iii) study the changes in best testing and assessment practices over time.  For these reasons, in the summer of 2015 AERA resumed sales of the 1999 Standards (Levine Decl., ¶ 20, Exh. QQQ).

The Sponsoring Organizations do not keep any of the proceeds generated from the sales of the Standards.  Rather, the income from these sales is used by the Sponsoring Organizations to offset their development and production costs and to generate funds for subsequent revisions. This allows the Sponsoring Organizations to develop up-to-date, high quality Standards that otherwise would not be developed due to the time and effort that goes into producing them (Levine Decl., ¶ 21; Geisinger Decl., ¶ 22; Camara Decl., ¶ 19; Ernesto Decl., ¶ 31).  Without receiving at least some moderate income from the sales of the Standards to offset their production costs and to allow for further revisions, it is very likely that the Sponsoring Organizations would no longer undertake to periodically update them, and it is unknown who else would (Levine Decl., ¶ 22; Ernesto Decl., ¶ 32; Wise Decl., ¶ 24; Geisinger Decl., ¶ 22).

At one time, funding for the Standards revision process from third party sources (*e.g.*, governmental agencies, foundations, other associations interested in testing and assessment issues, etc.) was considered.  However, this option was not seriously considered as the difficulty and/or potential conflicts of interest in doing so left the Sponsoring Organizations to conclude that financial support for the Standards revisions should be self-funding – that is, from the sale of prior editions of the Standards (Levine Decl., ¶ 23; Camara Decl., ¶ 20).

Due to the small membership size of Plaintiff NCME, and the relative minor portion of the membership of Plaintiffs AERA and APA who devote their careers to testing and assessment, it is highly unlikely that the members of the Sponsoring Organizations will vote for a dues increase to fund future Standards revision efforts if Public Resource successfully defends this case and is allowed to post the Standards online for the public to download or print for free.  As a result, the Sponsoring Organizations would likely abandon their practice of periodically updating the Standards (Levine Decl., ¶ 24; Camara Decl., ¶ 24; Geisinger Decl., ¶ 23; Ernesto Decl., ¶ 33).

**Plaintiffs' Ownership of the Copyright in the Standards**

The Plaintiffs are joint owners of the copyright in and to the Standards.  The Standards were registered with the U.S. Register of Copyrights under Registration Number TX 5-100-196, having an effective date of December 8, 1999 (Levine Decl., ¶ 25, Exh. RRR).  A supplementary copyright registration for the Standards was issued by the U.S. Register of Copyrights under Supplementary Registration Number TX 6-434-609, having an effective date of February 25, 2014 (Levine Decl., ¶ 26, Exh. SSS).

The Joint Committee that authored the 1999 Standards comprised 16 members (Levine Decl., ¶¶ 27-28, Exh. TTT).  Except for Manfred Meier (who could not be located, nor could his

heirs), work made-for-hire letters were signed by 13 Joint Committee Members, and posthumous assignments were signed by the heirs of 2 deceased Joint Committee Members, vesting ownership of the copyright to the 1999 Standards in the Sponsoring Organizations (Ernesto Decl., ¶ 34, Exhs. VV-HHH).

**Reference to Plaintiffs' Standards in the Code of Federal Regulations**

Government agencies also use standards, including by incorporating them by reference in statutes and regulations. The National Technology Transfer and Advancement Act of 1995 ("NTTAA"), for example, requires federal agencies to use privately developed standards whenever possible. Pub. L. No. 104-113 § 12, 110 Stat. 775, 782-83 (1996), codified at 15 U.S.C. § 272.

In alignment with the NTTAA, the Department of Education used privately developed standards in Section 668.146 of Title 34 of the Code of Federal Regulations, Subtitle B: Regulations of the Offices of the Department of Education, Chapter VI: Office of Postsecondary Education, Department of Education Part 668: Student Assistance General Provisions, Subpart J: Approval of Independently Administered Tests; Specification of Passing Score; Approval of State Process (the "Department of Education Regulations"), in relevant part, provides:

(a) Except as provided in § 668.148, the Secretary approves a test under this subpart if –

    (1) The test meets the criteria set forth in paragraph (b) of this section …

(b) To be approved under this subpart, a test must –

…

    (6) Meet all standards for test construction provided in the 1999 edition of the *Standards for Educational and Psychological Testing*, prepared by a joint committee of the American Educational Research Association, the American Psychological Association, and the National Council on Measurement in Education incorporated by reference in this section. Incorporation by reference of this document has been approved by the Director of the Office of the Federal Register pursuant to the Director's authority under *5 U.S.C. 552*(a) and

13

1 CFR part 51. The incorporated document is on file at the Department of Education, Federal Student Aid, room 113E2, 830 First Street, NE., Washington, DC 20002, phone (202) 377-4026, and at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 1-866-272-6272, or go to: http://www.archives.gov/federal-register/code-of-federal-regulations/ibr-locations.html. The document also may be obtained from the American Educational Research Association at: http://www.aera.net ….

It is notable that Plaintiff's' 1999 Standards are referred to by way of *citation* in the U.S. Department of Education Regulations.  However, the *text* of Plaintiffs' Standards is not integrated word-for-word, in whole or in part, into those regulations.  Therefore, no one could, or should, interpret the Standards as "the law."

On the other hand, the Department of Education Regulations are in compliance with Federal law – which requires that materials incorporated by reference in the Federal Register must be "reasonably available to the class of persons affected."  5 U.S.C. § 552(a)(1); 1 C.F.R. § 51.7(a)(3).  Thus, it is required that (i) a copy of the incorporated material must be on file with the Office of the Federal Register and (ii) the regulations incorporating such material must state the ways those incorporated materials are reasonably available to interested parties. 1 C.F.R. §§ 51.3, 51.5.  There is no requirement that such materials be available to the public at no cost.

**Defendant's Copying, and Enabling Others to**
**Copy, the Standards without Plaintiffs' Permission**

Defendant Public Resource is a California non-profit corporation founded in 2007 by Mr. Carl Malamud ("Malamud"), with the aim of making government information more accessible with particular emphasis on the law (Hudis Decl., ¶ 2, Exh. A, pp. 77, 93-94, 163-164).  The identified purpose and objective of Public Resource is to create and maintain so-called informational "public works projects for the Internet" (Hudis Decl., ¶ 2, Exh. A, pp. 94-95, 105-109, ¶ 3, Exh. B, Section II.B., ¶ 4, Exh. C. Section 2.1).  In actuality, Public Resource maintains

an assortment of seemingly random websites, which contain materials ranging from technical projects in which Malamud has been involved, to his commentary on government databases and entities (*e.g.*, PACER, EDGAR, the Government Printing Office and the Smithsonian), to myriad collections of legislative, regulatory, and case law materials (Hudis Decl., ¶ 2, Exh. A, pp. 78-84, 96-102, 111-113, ¶ 5, Exh. D).

Of particular interest for this litigation is Public Resource's website titled https://law.resource.org, on which Public Resource posted the infringing digital copy of the Sponsoring Organizations' 1999 Standards (Hudis Decl., ¶¶ 2, Exh. A, pp. 83-88, 234). Public Resource does not provide any other services, and does not sell any products (Hudis Decl., ¶ 2, Exh. A, pp. 102-103, 127).

Malamud has worked in the computer science, computer networks, and information technology fields since 1980. Although he has no formal education on these subjects, Malamud has written many books and articles on, and taught classes in, these areas (Hudis Decl., ¶ 2, Exh. A, pp. 22-77, ¶ 6, Exh. E). On behalf of Public Resource, Malamud spends his time operating its varied websites, giving speeches, sending letters and FOIA requests to government officials, and attending to the company's finances (Hudis Decl., ¶ 2, Exh. A, pp. 78-79, 88-90).

While Public Resource does have a Board of Directors to whom Malamud reports, the company has no other officers, employees or members (Hudis Decl., ¶¶ 2, Exh. A, pp. 90, 120-123, Exh. E). In short, except for the retention of independent contractors here and there (Hudis Decl., ¶ 2, Exh. A, pp. 135-136), Malamud *is* Public Resource.

Public Resource obtains its funding and/or outside legal assistance from a cadre of law firms, foundations and Internet companies (*e.g.*, Google and Creative Commons) (Hudis Decl., ¶ 2, Exh. A, pp. 135-136, ¶ 5, Exh. D). In 2013, Malamud used a Kickstarter crowd-funding

campaign to raise between $100,000 and $1.2 million in order to finance Public Resource's infringing operation of re-typing (or "double-keying") third-party standards, and publishing them to the https://law.resource.org website.  However, this Kickstarter effort was unsuccessful (Hudis Decl., ¶ 2, Exh. A, pp. 82-83, 206-212, ¶ 7, Exh. F).

In Malamud's view, "standards" are a set of best practices that the organization publishing them believes should be widely adopted.  An example given by Malamud are the best practice standards for computer networking promulgated by the Internet Engineering Task Force (Hudis Decl., ¶ 2, Exh. A, pp. 59-60).  As early as 1991, Malamud knew that copying and widely disseminating standards, for free and without permission (which Malamud code-named the "Bruno Experiment" or "Project Bruno, Baby Killer"), would adversely impact the revenues of the organizations that published authorized copies of those standards (Hudis Decl., ¶ 2, Exh. A, pp. 156-160, ¶ 9, Exh. G, production pp. AERA_APA_NCME_32219-32226).

As recently as March 2012, three months before Public Resource unlawfully copied and posted Plaintiffs' 1999 Standards to the Internet, Malamud clearly knew that the copying of others' copyrighted standards to its website constituted copyright infringement:

> Public.Resource.Org spent [funds] … buying privately-produced … standards …. These … standards govern and protect a wide range of activity …. We have started copying those … standards despite the fact they are festooned with copyright warnings, shrinkwrap agreements and other dire warnings. (Deleted material referring to "technical public safety standards").
>
> ***
>
> We know from all the copyright warnings, terms of use, scary shrink wrap agreements, and other red-hot rhetoric that accompanies these documents that the producers continue to believe that copies may not be made under any circumstances.

(Hudis Decl., ¶ 2, Exh. A, pp. 181-184, ¶ 9, Exh. H (Malamud, C., *Liberating America's Secret, For-Pay Laws*, boingboing, March 19, 2012), production pp. AERA_APA_NCME_31764-

31765).

It is nonetheless Malamud's unwavering belief that, once a governmental entity incorporates a standard by reference into a statute or a regulation, the standard becomes "the law" and as such loses its copyright protection (Hudis Decl., ¶ 2, Exh. A, pp. 172-73, 218-219, 257, 358-61). Following the "logic" of this fallacious line of thinking, once standards lose their copyright protection in this manner, anyone can copy them, convert them to digital form, post them on the Internet and allow others to download or print them at will and for free (Hudis Decl., ¶ 2, Exh. A, pp. 187-88). Should any court adopt this point of view, the public policy ramifications would be profoundly damaging to the future promulgation of voluntary industry standards - such as the 1999 Standards (and its updated successor versions) involved in this case.

Continuing with the ill-conceived thought process Malamud postulated as early as 1991, he callously believes that it is perfectly acceptable for standards development organizations, such as Plaintiffs, to lose their copyright in standards incorporated by reference – and with it the economic value that copyright brings. According to Malamud, though knowing very little about the Sponsoring Organizations' operations, finances, policies or practices for updating their Standards (Hudis Dec., ¶ 2, Exh. A, pp. 192-93, 199-201, 223-232), in such circumstances Plaintiffs (and similarly situated standards development organizations) should simply change their business model(s) by finding other ways to finance updates to their Standards, or making the government pay for the updates:

> **BOB GARFIELD (Interviewer):** There is an expense attached to developing and codifying these standards. If we take the revenue away from those who do this work, then what happens?

> **CARL MALAMUD:** Well, there's two answers to that. One is that the non-profits that develop these standards have a lot of different revenue streams. They do conferences, they do certification. They develop standards that aren't law. … And so, *maybe they need to adjust their business model*, particularly given the

17

fact they are a non-profit public charity.  Answer number two is that *government has shirked its responsibilities*.  It said, gee, we can just incorporate these privately developed standards in the law, and we won't have to pay anything. And the only people that get screwed up by this are the citizens that need to read the law.

(Hudis Decl., ¶ 2, Exh. A, pp. 173-180, ¶ 10, Exh. I (Garfield, B., *Making Laws More Public Transcript - On The Media*, interview of Carl Malamud, <u>The Media</u>, April 13, 2012), production p. AERA_APA_NCME_32076) (emphasis added).

In March 2012, Public Resource began copying standards incorporated by reference into the Code of Federal Regulations, and providing the copies of these standards to others.  In May 2012, Public Resource began the process of posting copies these standards to its website.  By May 2015, Public Resource had posted PDF copies of over 1,000 standards to its website (Hudis Decl., ¶ 2, Exh. A, pp. 216-218).  To demonstrate the depth and breadth of Public Resource's activities, Defendant has published to its website https://law.resource.org, *inter alia*, numerous state and municipal codes, public safety codes, and technical standards – *see, e.g.*, https://law.resource.org/pub/us/code/safety.html                                    and https://law.resource.org/pub/us/cfr/manifest.us.html   (Hudis Decl., ¶¶ 11-12, Exhs. J-K).

Several of the codes and standards that Public Resource publishes on the https://law.resource.org website are subject to U.S. copyright protection (Hudis Decl., ¶¶ 13-20, Exhs. L-S), and it is believed that Public Resource publishes these codes and standards to the https://law.resource.org website without obtaining the permission of the copyright owners of these works – for example: the Safety Standard for Belt Manlifts: ASME A90.1-2003; the Guidelines for the definition of onshore gas gathering lines, the Classification in Mental Retardation (1983 revision), the Official methods of analysis of the Association of Official Analytical Chemists, the Glazing Manual (1990 edition), Mobile and Locomotive Cranes:

ASME B30.5-2004, Drinking water system components: health effects: American national standard/NSF international standard for drinking water additives : ANSI/INSF 61-2001, and the Minimum design loads for buildings and other structures (Special ed. 2003).

In early 2012, Malamud was perusing through the Code of Federal Regulations, looking for various standards purportedly incorporated by reference therein, when he came upon a reference to the Sponsoring Organizations' 1999 Standards (Hudis Decl., ¶ 2, Exh. A, pp. 232-233).  On May 17, 2012, Public Resource purchased a used copy of the 1999 Standards from an Amazon re-seller, "The Book Grove" (Hudis Decl., ¶ 2, Exh. A, pp. 232-240, ¶ 21, Exh. T, Int. Ans. 1, ¶¶ 22-23, Exhs. U and V).  Public Resource only paid for the 1999 Standards, however, after a failed attempt in 2009 of procuring them for free (or at least at a reduced cost) from the National Archives pursuant to a Freedom of Information Act request and accompanying "fee waiver" (Hudis Decl., ¶ 2, Exh. A, pp. 240-51, ¶ 24, Exh. W (production pp. AERA_APA_NCME_10153-57 and 10167) and ¶ 25, Exh. X).

Upon receipt of the purchased paper copy of the 1999 Standards, Malamud disassembled the book, removed the spine, trimmed the pages to give them an even border, scanned the pages to create a PDF (Acrobat Reader) file using a Xerox scanner, and named the PDF file "aera.standards.1999.pdf."  Malamud then appended a cover sheet, or self-made "Certificate," to the front of the PDF file giving a false semblance of governmental approval or permission to the unauthorized copying and online posting of the 1999 Standards (Hudis Decl., ¶ 2, Exh. A, pp. 257-259, 261-264, ¶ 21, Exh. T, Int. Anss. 3-4, ¶ 26, Exh. Y):



Next, Malamud *claims* he post-processed Public Resource's PDF file of the scanned 1999 Standards to generate Optical Character Recognition ("OCR") on the text (Hudis Decl., ¶ 2, Exh. A, p. 260, ¶ 21, Exh. T, Int. Anss. 3-4).  However, according to Public Resource's expert, James Fruchterman, Malamud never OCR-processed the PDF file, so all Malamud and Public Resource posted to the Internet was an *image-only* document (Hudis Decl., ¶ 27, Exh. Z, pp. 309-310, ¶ 28, Exh. AA, p. 9 (and sub-Exh. B thereto)).  OCR is the process of having a machine recognize letters and words, generally from documents, and translate those into letter or word equivalents (Hudis Decl., ¶ 27, Exh. Z, pp. 29-30).  Without OCR-processing, Public Resource's unauthorized copying and posting of the 1999 Standards provided no additional technical value, such as for word-searching, online identification, or text-to-speech utilization for the blind and visually impaired (Hudis Decl., ¶ 27, Exh. Z, pp. 30, 122, 200-01, 206, 271-72, 315-16).

In the final step of the process, Malamud claims he stamped metadata into the headers of the PDF file, posted the file (the entirety of Plaintiffs' 1999 Standards) to Public Resource's https://law.resource.org website as well as the website of the Internet Archive (https://archive.org) (Answer & Counterclaim, Court Dkt. 12, ¶¶ 7, 55; Hudis Decl., ¶ 2, Exh. A, pp. 233-34, 271-72; ¶ 21, Exh. T, Int. Ans. No. 2).  In Defendant's interrogatory answers

(verified by Malamud), Public Resource describes a detailed quality control process attendant to the unlawful digital copying of the Sponsoring Organizations' 1999 Standards.   During deposition questioning, however, Malamud was unsure whether he followed those quality control procedures at all (Hudis Decl., ¶ 2, Exh. A, pp. 260-61, 267-68, 274-275, ¶ 21, Exh. T, Int. Anss. 3-4, ¶ 35, Exh. HH, Admission No. 2).

The Internet Archive is a nonprofit organization whose mission is to build and maintain a digital library of the Internet.  The Internet Archive builds this Internet library – which it makes available for public use – by scanning, digitally capturing, and saving the electronically scanned and captured third-party websites, and by receiving content submissions from third parties who have access to do so by the establishment of user accounts (Hudis Decl., ¶ 29, Exh. BB, pp. 31-41).  Malamud has such user account access (Hudis Decl., ¶ 29, Exh. BB, pp. 51-56), through which he uploaded the entirety of the 1999 Standards to the Internet Archive's website on May 26-27, 2012 (Hudis Decl., ¶ 29, Exh. BB, pp. 59-112, ¶ 30, Exh. CC (¶¶ 3-18 therein), ¶ 32, Exh. EE, ¶ 33, Exh. FF).   Public Resource posted Plaintiffs' 1999 Standards to its website and the Internet Archive website without the permission or authorization of any of the Sponsoring Organizations (Hudis Decl., ¶ 35, Exh. HH, Admission Nos. 4-5; Levine  Decl., ¶ 29; Ernesto Decl., ¶ 35; Wise Decl., ¶  26).

By uploading the 1999 Standards to the Internet Archive, Public Resource violated the Internet Archive's Terms of Use in effect at the time of Public Resource's infringement, which in relevant part states:

> This terms of use agreement (the "Agreement") governs your use of the collection of Web pages and other digital content (the "Collections") available through the Internet Archive (the "Archive"). When accessing an archived page, you will be presented with the terms of use agreement. If you do not agree to these terms, please do not use the Archive's Collections or its Web site (the "Site").

* * *

21

Some of the content available through the Archive may be governed by local, national, and/or international laws and regulations … You agree to abide by all applicable laws and regulations, including intellectual property laws, in connection with your use of the Archive. In particular, *you certify that your use of any part of the Archive's Collections will be … limited to noninfringing or fair use under copyright law.* In using the Archive's site, Collections, and/or services, you further agree … (b) *not to act in any way that might give rise to civil or criminal liability*, [and] … (e) *not to infringe any copyright*, trademark, patent, *or other proprietary rights of any person*, …

(Hudis Decl., ¶ 29, Exh. BB, pp. 41-45, ¶ 31, Exh. DD) (emphasis added)

The unauthorized copy of the Sponsoring Organizations' 1999 Standards that Malamud published to the Internet Archive at https://archive.org/details/gov.law.aera.standards.1999 was in the exact same format, using the same cover sheet or "Certificate" employed by Public Resource in the posting of the Sponsoring Organizations' 1999 Standards to Defendant's own website.  All of the surrounding text associated with  the posting to the Internet Archive website was inserted by Malamud – including the insertion of "Creative Commons License: CC0 1.0 Universal," indicating that *no rights are being asserted* over the item (Hudis Decl., ¶ 2, Exh. A, pp. 275-284, ¶ 29, Exh. BB, pp. 57-63, ¶ 30, Exh. CC (¶ 2 therein), ¶ 34, Exh. GG):

 

Public Resource claims the Sponsoring Organizations' 1999 Standards were posted to Public Resource's https://law.resource.org website and to the Internet Archive https://archive.org website from July 11, 2012 to June 10, 2014 (Hudis Decl., ¶ 21, Ex. T, Int. Ans. 2).   As

previously noted, Public Resource actually uploaded the 1999 Standards to Internet Archive's website on May 26-27, 2012.  The Sponsoring Organizations have no ability to verify when Public Resource uploaded the 1999 Standards to its own website, because neither the "file creation date" nor user access logs were produced during discovery, notwithstanding production requests for this documentation and an accompanying discovery motion demanding production that in relevant part was denied (Hudis Decl., ¶ 36).

Although based on incomplete reporting because Public Resource destroyed some of its records (Hudis Decl., ¶ 2, Exh. A, pp. 272-74, 328-336), during the near two year period that the Sponsoring Organizations' 1999 Standards were posted on Public Resource's https://law.resource.org website, they were accessed *at least* 4,164 times (Hudis Decl., ¶ 21, Exh. T, Int. Ans. 2 and Amended Ans. 5 (labeled 6)).  During that same period, the Sponsoring Organizations' 1999 Standards were accessed on the Internet Archive https://archive.org website 1,290 times (Hudis Decl., ¶ 29, Exh. BB, pp. 124-132, ¶ 37, Exh. II).

The Internet Archive's website is open to the public and does not restrict an Internet user's ability to download or print the Sponsoring Organizations' 1999 Standards. Public Resource also placed no such restrictions on its website (Hudis Decl., ¶ 2, Exh. A, pp. 347-48), as Defendant's expert, Mr. Fruchterman, confirmed (Hudis Decl., ¶ 27, Exh. Z, pp. 327-28).  Mr. Fruchterman also confirmed that there were no sign-up procedures to enter Public Resource's https://law.resource.org website, nor was there any Digital Rights Management (or "DRM") plan to protect against wide-spread copying of the files accessed from Public Resource's site (Hudis Decl., ¶ 27, Exh. Z, pp. 324-27, 167-173).

The parties and the Court can only speculate on the number of further electronic copies of the 1999 Standards that were made and distributed to others by the original Internet users who

23

accessed the unauthorized copies that Public Resource posted to its site and the Internet Archive site.  There simply is no way for Plaintiffs to calculate with any degree of certainty the number of university/college professors, students, testing companies and others who would have purchased Plaintiffs' Standards but for their wholesale posting on Defendant's https://law.resource.org website and the Internet Archive http://archive.org website (Levine Decl., ¶ 30; Geisinger Decl., ¶ 24).

In late 2013 and early 2014, the Sponsoring Organizations became aware that the 1999 Standards had been posted on the Internet without their authorization, and that students were obtaining free copies from the posting source.  Upon further investigation, the Sponsoring Organizations discovered that Public Resource was the source of the online posting (Camara Decl, ¶ 21, Exh. MMM; Wise Decl., ¶¶ 27-28, Exh. LLL).

In December 2013, Plaintiff AERA requested in writing that Public Resource remove the 1999 Standards from its online postings (Levine Decl., ¶ 31, Exh. UUU).  Defendant flatly refused (Hudis Decl., ¶ 2, Exh. A, pp. 310-19, ¶ 38, Exh. JJ, ¶ 39, Exh. KK).  Once this lawsuit was filed and the Sponsoring Organizations threatened to file a motion for a preliminary injunction, Public Resource agreed in June 2014 to remove its postings of the 1999 Standards from its https://law.resource.org website and from Internet Archive's https://archive.org website – pending a resolution of this litigation on the merits.  Public Resource's undertaking included the promise not to post any revision of the 1999 Standards (i.e., the 2014 Standards) pending the outcome of this litigation (Hudis Decl., ¶ 2, Exh. A, pp. 322-28, ¶ 40, Exh. LL, ¶ 41, Exh. MM).  Had Public Resource not made, and followed through with, these promises, the Sponsoring Organizations would have filed a preliminary injunction motion and were seriously contemplating delaying publication of the 2014 Standards (Levine  Decl., ¶ 32).

By June 2014, when Public Resource finally removed its online postings of the 1999 Standards, the damage already had been done.  In Fiscal Year ("FY") 2011 to FY 2012, as compared to FY 2011, the Sponsoring Organizations experienced a 34% drop in sales of the 1999 Standards.  In FY 2013, sales of the 1999 Standards remained at their low level from the prior fiscal year (Levine Decl., ¶¶ 18, 33, Exh. OOO).  This is notable, given that Public Resource posted the Standards to the Internet in 2012-2013, and that the Sponsoring Organizations' updated Standards were not published until the summer of 2014 (Levine Decl., ¶ 34).  For a publication with the longevity of the 1999 Standards, one otherwise would expect to see a gradual decline in sales year-over-year; not the precipitous drop in sales experienced by the 1999 Standards in 2012 and 2013 (Geisinger Decl., ¶ 25).

Past harm from Public Resource's infringing activities includes misuse of Plaintiffs' intellectual property without permission (Ernesto Decl., ¶ 36; Geisinger Decl., ¶ 26), lost sales that cannot be totally accounted for – due to potentially infinite Internet distribution, for example by psychometrics students (Wise Decl., ¶¶ 27-28, Exh. LLL; Levine Decl., ¶ 35; Geisinger Decl., ¶ 26), and lack of funding that otherwise would have been available for the update of the Sponsoring Organizations' Standards from the 1999 to the 2014 versions (Levine Decl., ¶ 35; Camara Decl., ¶ 22; Geisinger Decl., ¶ 26).

Should Public Resource's infringement be allowed to continue, the harm to the Sponsoring Organizations, and public at large who rely on the preparation and administration of valid, fair and reliable tests, includes: (i) uncontrolled publication of the 1999 Standards without any notice that those guidelines have been replaced by the 2014 Standards; (ii) future unquantifiable loss of revenue from sales of authorized copies of the 1999 Standards (with proper notice that they are no longer the current version) and the 2014 Standards; and (iii) lack of

funding for future revisions of the 2014 Standards and beyond (Levine Decl., ¶ 36; Camara Decl., ¶ 23; Ernesto Decl., ¶ 37; Geisinger Decl., ¶ 27).

Without the sales revenue from prior Standards versions (because – if Public Resource succeeds in this litigation – this publication will be made freely available online), it is very unlikely that future updates to the Standards will be undertaken.  This is because NCME is too small an organization to financially support periodic updates of the Standards, AERA does not have the budget for it, and an insufficient number of psychometricians are members of APA for it to justify the ongoing expenditures.  Charging extra membership fees to fund ongoing updates to the Standards would never happen, because the governing bodies of AERA, APA and NCME would not vote for it.  If these Sponsoring Organizations ceased updating the Standards, it is unlikely that other organizations would step in and continue the effort (Geisinger Decl., ¶ 23).

The harm caused to the public by out-of-date Standards will be significant, because the testing and assessment fields are constantly changing, given updates in testing technology and ever-evolving collective thought on the validity, reliability and fairness of tests.  Members of the public who would be harmed by discontinued update of the Standards include psychometrics professors, students and professionals, as well as test developers, administrators and test takers (Geisinger Decl., ¶ 28).

Notwithstanding the harm it has caused, and could potentially continue to cause, Public Resource's intentions are crystal clear.  Although not now publicly available pending the outcome of this litigation, Public Resource still has an unauthorized copy of the Sponsoring Organizations' 1999 Standards on its server (Hudis Decl., ¶ 2, Exh. A, pp. 273, 309); as does the Internet Archive (Hudis Decl., ¶ 29, Exh. BB, pp. 116-17).  It would be very simple for Public Resource to re-post the 1999 Standards to Public Resource's website with little effort (Hudis

Decl., ¶ 2, Exh. A, pp. 306-07).   Moreover, should Public Resource successfully defend this lawsuit, it has every intention of similarly posting the Sponsoring Organizations' 2014 Standards to the Internet in the same manner it posted Plaintiffs' 1999 Standards (Hudis Decl., ¶ 2, Exh. A, pp. 308-09).

## SUMMARY OF ARGUMENT

The material facts of record, of which there is no genuine dispute, demonstrate that Public Resource has committed acts of copyright infringement and contributory copyright infringement, warranting the grant of summary judgment in the Sponsoring Organizations' favor. Defendant's infringing activities are not only unjustified, but they also fail to qualify as fair use. Public Resource's other defenses are unsupported by the facts and are without merit.

The Sponsoring Organizations also are entitled to the issuance of a permanent injunction against Public Resource's further infringing activities.  Plaintiffs have suffered irreparable injury; and monetary damages are inadequate to compensate for that injury.  The irreparable harms to the Sponsoring Organizations include: (i) loss of control over content, (ii) loss of business opportunities, and (iii) adverse effect on the efforts put into creating Plaintiffs' Standards.

The balance of hardships weigh in Plaintiffs' favor, and the issuance of a permanent injunction is in the public interest.  Consequently, the Court should issue a permanent injunction, prohibiting Public Resource from infringing upon the Sponsoring Organizations' copyright.

## ARGUMENT

I.   THE MATERIAL FACTS OF RECORD, OF WHICH THERE IS NO GENUINE
     DISPUTE, WARRANT THE GRANT OF SUMMARY JUDGMENT IN PLAINTIFFS'
     FAVOR

The Sponsoring Organizations' Complaint asserts two causes of action, that Public Resource has engaged in acts of copyright infringement and contributory copyright infringement.

Public Resource concedes its infringing activities.  This leaves the Court with but one obligation, to decide whether Public Resource's infringement can be excused as a matter of law.  It cannot.

A.      Standards for the Grant of Summary Judgment

Summary judgment must be granted to the Sponsoring Organizations in this action "if the[y] show[] that there is no genuine dispute as to any material fact and [they] … [are] … entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing to the standard under the former Fed. R. Civ. P. 56(c)).  The Sponsoring Organizations, as the moving parties, "bear[] the initial responsibility of informing the … court of the basis for [their] motion, and identifying those portions of [the record] which [they] believe[] demonstrate the absence of a genuine issue of material fact."  *Celotex Corp.*, 477 U.S. at 323.

A genuine issue of material fact exists only if Public Resource presents sufficient evidence "favoring [Defendant] … for [a fact finder] … to return a verdict [in its favor]."  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968).  Thus, if Public Resource "fails to properly address [the Sponsoring Organizations'] … assertion[s] of fact …, the court may … grant summary judgment if [Plaintiffs'] … motion and supporting materials — including the facts considered undisputed — show that the [Sponsoring Organizations are] entitled to it …."  Fed. R. Civ. P. 56(e)(3).

In other words, to withstand the Sponsoring Organizations' properly supported motion for summary judgment, Public Resource may not rest upon the mere allegations or denials of its Answer, nor solely upon allegations or conclusory statements, but "must present specific facts that would enable [the court as the fact finder] … to find in [Defendant's] … favor."  *Howie v. Office of Eddie Bernice Johnson*, 570 F. Supp.2d 115, 119 (D.D.C. 2008); *see also First Nat.*

*Bank*, 391 U.S. at 288.  "If the evidence [presented by Public Resource] is merely colorable, or is not significantly probative, summary judgment [in the Sponsoring Organizations' favor] may be granted."  *Howie,* 570 F. Supp.2d at 119 (internal citations omitted).  Accordingly, "[w]here the record taken as a whole could not lead a rational trier of fact to find for [Public Resource] …, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

> A.   Defendant has Committed Acts of Copyright
> Infringement and Contributory Copyright Infringement

Public Resource's admittedly infringing activities – as demonstrated by their Answer & Counterclaim, interrogatory answers, and deposition testimony – are crystal clear.   Public Resource cannot argue otherwise.

> 1.   Direct Infringement

"To establish copyright infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

In order to show ownership of a valid copyright, "'a plaintiff must prove that the work as a whole is original and that the plaintiff complied with applicable statutory formalities.'"  *DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 81 (D.D.C. 2007) (quoting *Lotus Dev. Corp. v. Borland Int'l*, 49 F.3d 807, 813 (1st Cir. 1995)).  "In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute *prima facie* evidence of the validity of the copyright and of the facts stated in the certificate …."  Copyright Act Section 410(c); 17 U.S.C. § 410(c).

Plaintiffs' copyright registration certificates support the validity of the Sponsoring Organizations' 1999 Standards and their ownership of the copyright in the 1999 Standards.  The

application to register Plaintiffs' Standards was submitted to the Register of Copyrights on December 8, 1999 (Levine Decl., ¶ 25, Exh. RRR), one month after they were published.  As stated on the registration certificate, the application filing date was also the effective date of the registration.  A supplementary registration (to correct ownership information) was obtained, and was effective as of February 25, 2014 (Levine Decl., ¶ 26, Exh. SSS).  The registration certificates are therefore *prima facie* evidence of the validity of the Sponsoring Organizations' Standards and their ownership of the copyright in the Standards.  Public Resource has the burden of overcoming the Sponsoring Organizations' presumption of copyright ownership.  Defendant cannot meet this burden.

The Sponsoring Organizations, moreover, are not resting merely on the presumptions afforded by the registration certificates.  Plaintiffs have explained in detail the origins of, and the original creative work of authorship embodied in, the Standards (Levine Decl., ¶ 11; Ernesto Decl., ¶ 11; Wise Decl., ¶ 11).  Moreover, of the 16 members of the Joint Committee who authored the 1999 Standards (Levine Decl., ¶¶ 27-28, Exh. TTT), 13 of them signed work made-for-hire letters and the heirs of 2 deceased members signed posthumous assignments – vesting ownership of the copyright to the 1999 Standards in the Sponsoring Organizations (Ernesto Decl., ¶ 34, Exhs. VV-HHH).

During discovery, Public Resource attempted mightily, without success, to find evidence disputing the Sponsoring Organizations' copyright ownership in the 1999 Standards.  Public Resource's theory — which Plaintiffs expect Public Resource to raise again during briefing — was that, unless the Sponsoring Organizations establish incontrovertible ownership of the contributions of every single individual who possibly contributed in any way to the 1999 Standards, Plaintiffs cannot sue for copyright infringement.  Public Resource's theory is

incorrect on the facts and the law.  Plaintiffs are the copyright owners of the 1999 Standards as the organizational authors overseeing their development, *see Veeck v. Southern Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791, 794 (5th Cir. 2003) (*en banc*), and because all contributors, to the extent they could be located, signed work made-for-hire agreements, or the heirs of the deceased contributors signed assignments, transferring their copyrightable interests in the 1999 Standards to the Sponsoring Organizations.

However, the Sponsoring Organizations do not have to own the copyright in entirety of the 1999 Standards.  Each Plaintiff need only have co-ownership of the copyright in the Standards in order to bring an action for infringement.  *Davis v. Blige*, 505 F.3d 90, 98 (2d Cir. 2007).  To rebut the presumption of ownership provided by Plaintiffs' copyright certificates, Public Resource must show that the totality of the copyright is owned by other parties – which Defendant cannot do.

Without question, the 1999 Standards are a "joint work," *i.e.*, "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole."  17 U.S.C. § 101.  "The essence of joint authorship is a joint laboring in furtherance of a preconcerted common design."  1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 6.03 (Matthew Bender & Co. 2015.  The authors of a single work can be joint authors even if their contributions are unequal.  *Id.* at § 6.07; *Maxwood Music Ltd. v. Malakian*, 713 F.Supp.2d 327, 344 (S.D.N.Y. 2010).  The 1999 Standards are thus a joint work, having been drafted, revised, and edited for the common purpose of creating an integrated, unified work.

Each of the co-authors of a joint work owns the copyright in the complete work and, in the absence of any assignment of those rights, can exercise any of the rights of ownership,

including bringing a suit for copyright infringement. Those rights can be, and in this case have been, transferred to others – the Sponsoring Organizations. *Davis*, 505 F.3d at 98 (likening co-ownership of copyright to tenancy in common); *Brownmark Films, LLC v. Comedy Partners*, 800 F. Supp. 2d 991, 997 (E.D. Wis. 2011) (assignee not required to have been assigned copyright by all co-owners of a copyright to have standing to sue for infringement). Here, the Sponsoring Organizations own all or substantially all of the copyright in the 1999 Standards.

In order to prove the second *Feist* prong (copying), the Sponsoring Organizations must show that "(1) [Public Resource] … copied the [1999 Standards] … as a factual matter and (2) that 'the copying of copyrighted material was so extensive that it rendered the offending and copyrighted works substantially similar.'" *DSMC*, 479 F. Supp. 2d at 82 (quoting *Lotus*, 49 F.3d at 813). Copyright Act Section 106, 17 U.S.C. § 106, in relevant part, provides:

> Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
>
> **(1)** to reproduce the copyrighted work in copies …;
> **(2)** to prepare derivative works based upon the copyrighted work;
> **(3)** to distribute copies … of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending …;
> **(5)** in the case of literary … works … to display the copyrighted work publicly;
> …

Public Resource clearly "copied" the Sponsoring Organizations' Standards. In this context, "copying" means exercising any of the exclusive rights that 17 U.S.C. § 106 vests in the Sponsoring Organizations as the copyright owners. *See Call of the Wild Movie, LLC v. Does*, 770 F. Supp. 2d 332, 351 (D.D.C. 2011). Public Resource consequently violated several of the Sponsoring Organizations' exclusive rights.

Public Resource violated Plaintiffs' exclusive reproduction rights under 17 U.S.C. § 106(1) when it scanned the 1999 Standards into PDF digital format. *See Authors Guild, Inc. v.*

*Google, Inc.*, 954 F. Supp. 2d 282, 289 (S.D.N.Y. 2013) (digitally reproducing paper books constitutes reproducing under § 106(1)]), *aff'd sub nom.*, 804 F.3d 202, (2d Cir. 2015).

Public Resource's uploading process to its website and to the Internet Archive website also recast the Sponsoring Organizations' Standards into different forms, thus violating Plaintiffs' exclusive rights under 17 U.S.C. § 106(2) to create derivative works. *See* 17 U.S.C. § 101 ("derivative work" includes any form in which a work "may be recast, transformed, or adapted").

Public Resource additionally violated the Sponsoring Organizations' exclusive rights to distribute copies of and to display their Standards under 17 U.S.C. §§ 106(3) and (5), when Defendant uploaded the Sponsoring Organizations' Standards to its website and to the Internet Archive website for the public to access, print or download at will — which they have done thousands of times. *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014 (9th Cir. 2001) (uploading digital files for others to copy violates distribution right); *Authors Guild v. Google*, 954 F.Supp.2d at 289 (making digital copies of books available for download constitutes distribution under § 106(3) and displaying portions of the books to the public constitutes display under § 106(5)).

Public Resource copied and posted the Sponsoring Organizations' 1999 Standards *in their entirety* to Defendant's website and to the Internet Archive website (Hudis Decl., ¶¶ __, Exhs. __), without the permission or authorization of any of the Plaintiffs (Levine  Decl., ¶ 29; Ernesto Decl., ¶ 35; Wise Decl., ¶ 26).   The offending material posted to Public Resource's website and to the Internet Archive website was not just substantially similar to the Sponsoring Organizations' copyrighted Standards, the works are *identical*.   Public Resource has thus violated Plaintiffs' rights belonging exclusively to them under 17 U.S.C. § 106 – and, therefore,

has engaged in copyright infringement.  17 U.S.C. § 501(a).

　　　　2.　　Contributory Infringement

"One infringes contributorily by intentionally inducing or encouraging direct infringement." *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005).  "To establish a claim of contributory copyright infringement, [the Sponsoring Organizations] … must allege '(1) direct infringement by … third part[ies]; (2) knowledge by [Public Resource] … that third parties were directly infringing; and (3) substantial participation by [Public Resource] … in the infringing activities.'" *Rundquist v. Vapiano SE*, 798 F. Supp. 2d 102, 126 (D.D.C. 2011) (quoting *Newborn v. Yahoo!, Inc.*, 391 F. Supp. 2d 181, 186 (D.D.C. 2005)).

To satisfy the second, "knowledge," prong of their contributory copyright infringement claim, the Sponsoring Organizations may show either that Public Resource was notified of specific infringing uses of the 1999 Standards and has failed to act to prevent future infringing uses, or that Public Resource willfully blinded itself to such infringing uses.  *Newborn v. Yahoo!, Inc.*, 391 F. Supp.2d at 186.  To satisfy the third, "substantial participation," prong of their contributory copyright infringement claim, the Sponsoring Organizations "must show 'a relationship between ... [Public Resource's actions] and the alleged infringing activity ...'" *Id.*

*Direct Third-Party Infringement*: Although based on incomplete reporting because of the destruction of some of Public Resource's records (Hudis Decl., ¶ 2, Exh. A, pp. 272-74, 328-336), during the near two year period that 'Plaintiffs' 1999 Standards were posted on Public Resource's https://law.resource.org website, they were accessed *at least* 4,164 times (Hudis Decl., ¶ 21, Exh. T, Int. Ans. 2 and Amended Ans. 5 (labeled 6)).  During that same period,  the 1999 Standards were accessed on the Internet Archive https://archive.org website 1,290 times (Hudis Decl., ¶ 29, Exh. BB, pp. 124-132, ¶ 37, Exh. II).  At a minimum, this is evidence of thousands of examples of direct infringement of the Sponsoring Organizations' 1999 Standards

by Internet users.  Plaintiffs have been made aware that at least some of those users who obtained the 1999 Standards for free from Public Resource did so to avoid paying the modest sale price for authorized print copies (Camara Decl, ¶ 21, Exh. MMM; Wise Decl., ¶¶ 27-28, Exh. LLL).

*Defendant's Knowledge*: Public Resource clearly knew that Internet users were accessing the unauthorized PDF copy of Plaintiffs' 1999 Standards published on its website.  Even after the Sponsoring Organizations complained about the infringement, Public Resource refused to remove the offending publication from the Internet until this lawsuit was brought and the Sponsoring Organizations threatened to move for a preliminary injunction (Levine  Decl., ¶ 31, Exh. UUU; Hudis Decl., ¶ 2, Exh. A, pp. 310-19, 322-28, ¶ 38, Exh. JJ, ¶ 39, Exh. KK, ¶ 40, Exh. LL, ¶ 41, Exh. MM).

*Defendant's Willful Blindness*: The Internet Archive site placed no restrictions on an Internet user's ability to download or print the Sponsoring Organizations' 1999 Standards; and Public Resource placed no such restrictions on its website (Hudis Decl., ¶ 2, Exh. A, pp. 347-48, ¶ 27, Exh. Z, pp. 327-28).   There also were no sign-up procedures to enter Public Resource's https://law.resource.org website, nor was there any Digital Rights Management (or "DRM") plan to protect against wide-spread copying of the files accessed from Public Resource's site (Hudis Decl., ¶ 27, Exh. Z, pp. 324-27, 167-173).   Thus, even if Public Resource had no direct knowledge of the third-party infringement (which it did), Defendant made itself willfully blind to the infringing activity occurring on its website without taking any steps to prevent it.

*Substantial Participation*: In front of the unauthorized copy of the 1999 Standards that Public Resource published to its website and to the Internet Archive website, Public Resource placed a cover sheet, or "Certificate," falsely implying that the Internet publication of the Sponsoring Organizations' Standards was somehow authorized or sanctioned by U.S. law (Hudis

Decl., ¶ 2, Exh. A, pp. 257-259, 261-264, ¶ 21, Exh. T, Int. Anss. 3-4, ¶ 26, Exh. Y). The unauthorized copy of Plaintiffs' 1999 Standards that Public Resource and Malamud published to the Internet Archive website is in the exact same format, using the same cover sheet or "Certificate" employed by Public Resource in the posting of the Sponsoring Organizations' 1999 Standards to Defendant's own website. The surrounding text associated with Malamud's posting to the Internet Archive website included the insertion of "Creative Commons License: <u>CC0 1.0 Universal</u>," indicating that *no rights are being asserted* over the item (Hudis Decl., ¶ 2, Exh. A, pp. 275-284, ¶ 29, Exh. BB, pp. 57-63, ¶ 30, Exh. CC (¶ 2 therein), ¶ 34, Exh. GG).

"Evidence of 'active steps ... taken to encourage direct infringement,' (citation omitted) such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe, and a showing that infringement was encouraged overcomes the law's reluctance to find liability when a defendant merely sells a commercial product suitable for some lawful use (citations omitted) …." *MGM Studios v. Grokster*, 545 U.S. at 936.

Public Resource has therefore engaged in contributory copyright infringement, encouraging and resulting in direct infringement by Internet users on a fairly extensive scale. "When a widely shared service or product is used to commit infringement, it may be impossible to enforce rights in the protected work effectively against all direct infringers, the only practical alternative being to go against the distributor [here, Public Resource] of the copying device for secondary liability [here, the unauthorized copies of the 1999 Standards posted online] on a theory of contributory ... infringement." *MGM Studios v. Grokster*, 545 U.S. at 929-30.

3.     Defendant's Infringing Activities Are Unjustified

In no respect does Public Resource claim it needs access to the Sponsoring

Organizations' Standards in order to comply with any government regulations referencing them. Rather, Public Resource urges it has the right to post copies of Plaintiffs' Standards on its website, and on the Internet Archive website, so that others can copy, print, or distribute them for free.

In Public Resource's letter refusing to remove Plaintiffs' Standards from its online postings (Hudis Decl., ¶ 39, Exh. KK), Defendant relies on *Wheaton v. Peters*, 33 U.S. 591 (1834), *Banks v. Manchester*, 128 U.S. 244 (1888) and *Veeck v. Southern Building Code Congress International, Inc.*, 293 F.3d 791 (5th Cir. 2002) to justify its actions.  None of these decisions supports Public Resource's position.

*Wheaton v. Peters* concerned alleged copyright infringement of the so-called "Wheaton's Reports," a connected and complete series of decisions in cases decided by the Supreme Court. *Wheaton*, 33 U.S. at 667-68.  At the conclusion of its opinion, the Court stated that "no reporter has or can have any copyright in the written opinions delivered by this court; and that the judges thereof cannot confer on any reporter any such right." *Id*. at 668.

In *Banks v. Manchester*, the plaintiffs entered into an exclusive contract with the State of Ohio to publish the decisions of the Ohio Supreme Court.  The defendant re-printed certain Ohio Supreme Court opinions from the plaintiffs' volume of decisions, causing the plaintiffs to bring suit for an injunction.  *Banks*, 128 U.S. at 245-49.  The Supreme Court affirmed the trial court's ruling for the defendant, because "[j]udges … have no pecuniary interest or proprietorship, as against the public at large, in the fruits of their judicial labors.  This extends to whatever work they perform in their capacity as judges, and as well to … the opinions and decisions themselves. … What a court or a judge thereof cannot confer on a reporter as the basis of a copyright in him, they cannot confer on any other person or on the state." *Id*. at 253-254.

37

Neither *Wheaton* nor *Banks* applies here because the Sponsoring Organizations' work presently at issue is a set of voluntary standards, not the judicial opinions of any court.

*Veeck* concerned a website operator who published local building codes to his site, without the permission of Southern Building Code Congress International, Inc. ("SBCCI").  It was SBCCI that wrote the text of the codes which were adopted by local Texas municipalities. *Veeck*, 293 F.3d at 793.  In response to SBCCI's demand that Veeck, the website operator, cease and desist from this practice, he filed a declaratory judgment action seeking a ruling that his activities were non-infringing.  SBCCI counterclaimed, *inter alia*, for copyright infringement. *Id*. at 794.

Citing *Banks*, the *Veeck* court held that "'the law,' whether articulated in judicial opinions or legislative acts or ordinances, is in the public domain and thus not amenable to copyright[,]" and therefore "[a]s governing law, … the building codes of [the local municipalities] … cannot be copyrighted." *Id.* at 796.  The reasoning of the Fifth Circuit Court of Appeals was that "in continuing to write and publish model building codes, SBCCI is creating copyrightable works of authorship.  When those codes are enacted into law, however, they become to that extent 'the law' of the governmental entities and may be reproduced or distributed as 'the law' of those jurisdictions." *Id.* at 802.

The *Veeck* court, however, was careful to limit the reach of its decision:

> [W]e have no hesitation in confirming [the] … predisposition against the copyrightability of model codes to the extent they have been adopted as law.  But *the limits of this holding must be explained*.  Several national standards-writing organizations joined SBCCI as amici out of fear that their copyrights may be vitiated simply by the common practice of governmental entities' incorporating their standards in laws and regulations.  This case does not involve references to extrinsic standards.  Instead, it concerns the wholesale adoption of a model code promoted by its author, SBCCI, precisely for use as legislation.  *Caselaw that derives from official incorporation of extrinsic standards is distinguishable in*

*reasoning and result*.

*Id.* at 803-04 (emphasis added).

Thus, whatever wisdom on enacted codes can be gleaned from the holding in *Veeck*, it is a holding with which Plaintiffs do not agree.  Moreover, no decision issued from the Supreme Court or the D.C. Circuit Court of Appeals has so held.

In any event, the holding in *Veeck* does not apply to this case.  Thus, the "extrinsic standards" cases distinguished by the *Veeck* court should be examined as they are much closer to the present facts before this Court.

In *CCC Info. Services v. Maclean Hunter Market Reports, Inc.*, 44 F.3d 61 (2d Cir. 1994), a New York statute required insurance companies to use the "Red Book," a privately prepared and copyrighted list of projected automobile values, as one of several standards in calculating the payments upon the total loss of a vehicle.  *CCC Info. Servs.*, 44 F.3d at 63-64. CCC Information Services systematically loaded portions of the Red Book onto its computer network and distributed the information to its customers.  One of CCC's theories was that the Red Book had entered the public domain.  *Id.* at 64.

Addressing the public domain issue, the Second Circuit Court of Appeals stated that "[w]e are not prepared to hold that a state's reference to a copyrighted work as a legal standard for valuation results in loss of the copyright."  *Id.* at 74.  The Second Circuit feared that a ruling in favor of the defendant, CCC Information Systems, would call into question the copyrightability of school books once they were assigned as part of a mandatory school curriculum.  *Id.*

*Practice Management Info. Corp. v. American Medical Ass'n*, 121 F.3d 516 (9th Cir. 1997), *amended*, 133 F.3d 1140 (9th Cir. 1998) involved the American Medical Association's

("AMA's") copyrighted coding system for reporting physicians' services and medical procedures. The Federal Health Care Financing Administration ("HCFA") agreed with AMA to use the AMA's coding system for identifying physicians' services on Medicare and Medicaid reimbursement forms. AMA granted a "non-exclusive, royalty-free, and irrevocable" license to HCFA to reproduce or distribute AMA's codes. *Practice Mgmt.*, 121 F.3d at 517.

The Ninth Circuit held that HCFA's decision to adopt regulations requiring physicians to use a version of the AMA code on Medicaid claim forms did not place the code in the public domain under *Banks*. *Practice Mgmt.*, 121 F.3d at 518-519. The Ninth Circuit feared that reaching the opposite conclusion would have "expose[d] copyrights on a wide range of privately authored model codes, standards, and reference works to invalidation." *Id*. at 519. The Ninth Circuit suggested that federal court rules regarding citations could invalidate the copyrightability of the Blue Book. *Id*. at n.5.

The parallels of *CCC* and *Practice Management* to the present case are obvious. The Sponsoring Organizations produce the Standards as a public service to provide a comprehensive description and explanation of the rationale for best testing practices with accompanying commentary. Plaintiffs should not have to fear that, if a federal or state agency makes reference to the Standards in promulgating regulations, their copyright in the Standards will be lost to copyists of the likes of Public Resource.

Moreover, a contrary holding – *i.e.*, that a federal or state agency's reference to voluntary standards in promulgating regulations causes the standards to lose their copyright – would be antithetical to Copyright Act Section 201(e), 17 U.S.C. § 201(e), which states:

> (e) INVOLUNTARY TRANSFER. — When an individual author's ownership of a copyright, or of any of the exclusive rights under a copyright, has not previously been transferred voluntarily by that individual author, *no action by any governmental body or other official or organization purporting to seize,*

*expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under a copyright, shall be given effect under this title*, except as provided under title 11.[2] (Emphasis Added).

Thus, in Copyright Act Section 201(e), Congress has stated generally that no action by governmental body can divest an owner of its copyright. The Executive Branch, through the Office of Management and Budget ("OMB"), more specifically and directly has spoken to the protection of copyright when so-called "Voluntary Consensus Standards" are referred to in federal government agency regulations:

**MEMORANDUM FOR HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES**

**SUBJECT:** Federal Participation in the Development and Use of Voluntary Consensus Standards and in Conformity Assessment Activities

Revised OMB CircularA-119 establishes policies on Federal use and development of voluntary consensus standards and on conformity assessment activities. …

\* \* \*

## POLICY

### 6. What Is The Policy For Federal Use Of Standards?

All federal agencies must use voluntary consensus standards in lieu of government-unique standards in their procurement and regulatory activities, except where inconsistent with law or otherwise impractical. …

\* \* \*

### j. How should my agency reference voluntary consensus standards?

Your agency should reference voluntary consensus standards, along with sources of availability, in appropriate publications, regulatory orders, and related internal documents. In regulations, the reference must include the date of issuance. For all other uses, your agency must determine the most appropriate form of reference, which may exclude the date of issuance as long as users are elsewhere directed to

---

[2] In 1978, Section 201(e) was amended by deleting the period at the end and adding ", except as provided under title 11." United States Code Title 11 is entitled "Bankruptcy." This clause was added to make it explicit that the prohibition on involuntary transfers did not apply to bankruptcy. Act of November 6, 1978, Pub. L. 95-598, tit. III, § 313, 92 Stat. 2549, 2676.

the latest issue. *If a voluntary standard is used and published in an agency document, your agency must observe and protect the rights of the copyright holder and any other similar obligations.*

*Circular No. A-119 Revised*, OFFICE OF MANAGEMENT AND BUDGET (Revised Feb. 10, 1998),

http://www.whitehouse.gov/omb/circulars_a119 (emphasis added).

  OMB Circular No. A-119 Revised was promulgated as a set of guidelines for the use of privately developed voluntary consensus standards, pursuant to the authority provided in the National Technology Transfer and Advancement Act of 1995 ("NTTAA"), Pub. L. No. 104-113 § 12(d), 110 Stat. 775, codified at 15 U.S.C. § 272, which declares that "all Federal agencies and departments shall use technical standards that are developed or adopted by voluntary consensus bodies, using such technical standards as a means to carry out policy objectives or activities." *Id.* Thus, it is also the Congressionally authorized policy of the Executive Branch that, if voluntary standards are used and published in an agency document (such as Federal Regulations), the agency must observe and protect the rights of the copyright owner which created and published those standards.

  Consequently, neither case law, the Copyright Act, nor agency regulation(s) justify Public Resource's wholesale copying of Plaintiffs' Standards and publishing the Standards on Public Resource's website.  Public Resource's activities constitute copyright infringement, and have contributed to others' infringement.  Defendant's activities should be enjoined.

  Were this Court to rule that voluntary standards lose copyright protection upon incorporation by reference into a statute or government regulation, such a ruling would create serious tensions with other areas of law and within the Copyright Act itself.  For example, if the incorporation by reference of a standard obliterates the owners' copyright in that standard, the government entity incorporating the standard will have taken Plaintiffs' property without just

compensation.  *CCC*, 44 F.3d at 74 ("[A] rule that the adoption of such a reference by a state legislature or administrative body deprived the copyright owner of its property would raise very substantial problems under the Takings Clause of the Constitution."); *Practice Management*, 121 F.3d at 520 (citing *CCC* for same concern).  This would subject governmental entity to substantial takings liability.  This is not a desirable result.

Under the doctrine of constitutional avoidance, "constitutionally doubtful constructions should be avoided where fairly possible," *Miller v. French*, 530 U.S. 327, 336 (2000) (quotation marks and citation omitted).  This Court should not interpret the Copyright Act as creating the constitutional problems that are implicit in Public Resource's argument.  *See, e.g., Fox v. Washington,* 236 U.S. 273, 277 (1915) ("So far as statutes fairly may be construed in such a way as to avoid doubtful constitutional questions they should be so construed.").

4.      Defendant's Infringing Activities Are Not Fair Use

Any analysis of Public Resource's copyright infringement liability would be incomplete without a discussion of Defendant's faux justification for its actions – fair use (Answer & Counterclaim, Court Dkt. 12, ¶¶ 19, 112-115, 126, 128, 129 and 4th Affirmative Defense). Copyright Act Section 107, 17 U.S.C. § 107, in relevant part, provides:

> Notwithstanding the provisions of section[] 106 …, the fair use of a copyrighted work, including such use by reproduction in copies … or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> **(1)** the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> **(2)** the nature of the copyrighted work;
>
> **(3)** the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

**(4)** the effect of the use upon the potential market for or value of the copyrighted work.

When Defendant's infringing activities are considered against the backdrop of the factors of Copyright Action Section 107, Public Resource cannot avail itself of the fair use defense. Although it is a copyright-parody case, *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) is the Supreme Court's seminal decision concerning the statutory fair use defense. The *Campbell* decision teaches that fair use must be considered on a case-by-case basis, that the statutory factors are illustrative, not limitative, and cannot be considered in isolation, and that all factors must be explored and weighed together. *Campbell*, 510 U.S. at 577-78.

*Campbell*, 510 U.S. at 590, and its precedential predecessor, *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 561 (1985), also teach that fair use is an affirmative defense. As such, Public Resource, as "the party claiming that its secondary use of the original copyrighted work [the 1999 Standards] constitutes a fair use … carries the burden of proof as to all issues in the dispute." *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 918 (2d Cir. 1994).

a.     The Purpose and Character of Public Resource's Use Cuts Against a Finding of Fair Use.

To begin, characterizing Public Resource's type of use of the 1999 Standards does little to answer the first factor of the fair use inquiry. "[T]he mere fact that a use is educational and not for profit does not insulate it from a finding of infringement, any more than the commercial character of a use bars a finding of fairness." *Campbell*, 510 U.S. at 584. Rather, the purpose of the inquiry is to determine whether Public Resource's use "'supersede[s] the objects' of the original creation ('supplanting' the original [1999 Standards]), or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message …." *Id.*, 510 U.S. at 579 (*quoting Folsom v. Marsh*, 9 F. Cas. 342, 348 (No. 4,901)

(CCD Mass. 1841)).

In answering this inquiry, the Supreme Court in *Campbell*, 510 U.S. at 579, borrowed from the analysis posed by Second Circuit Judge Pierre Leval in his law review article entitled Leval, P.N., *Toward A Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990) ("Leval"), in which he states:

> [T]he question of justification turns primarily on whether, and to what extent, the challenged use is *transformative*. The use must be productive and must employ the quoted matter *in a different manner or for a different purpose from the original*. *A quotation of copyrighted material that merely repackages or republishes the original is unlikely to pass the test*; … it would merely "supersede the objects"' of the original.  If, on the other hand, the secondary use adds value to the original—if the quoted matter is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings— this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society.

Leval, 103 Harv. L. Rev. at 1111 (emphasis added).

In the context of this litigation, merely converting printed text to digital format and publishing it online, whatever the professed noble purpose, is <u>not</u> transformative.  *See Author's Guild, Inc. v. HathiTrust*, 755 F.3d 87, 101 (2d Cir. 2014) ("[T]he district court concluded that the use of digital copies to facilitate access for print-disabled persons is a transformative use (citation omitted).  This is a misapprehension; providing expanded access to the print disabled is not 'transformative.'"); *See also, Seltzer v. Green Day, Inc.,* 725 F.3d 1170, 1177 (9th Cir. 2013) ("In the typical 'non-transformative' case, the use is one which makes no alteration to the *expressive content or message* of the original work.") (emphasis in original).  Rather, publishing an unprotected PDF-file of the 1999 Standards to the Internet, for free access, downloading and printing by any and all Internet users, supersedes and supplants the market for authorized copies of the Standards, sold at modest prices.

           b.      The Nature of the 1999 Standards is a Neutral Fair Use Factor.

The Sponsoring Organizations' 1999 Standards is nearly 200 pages and took more than five years to complete (Levine Decl., ¶ 11; Ernesto Decl., ¶ 11; Camara Decl., ¶ 11), resulting from work put in by a volunteer Joint Committee to generate a set of best practices on educational and psychological testing that are respected and relied upon by leaders in their fields (Camara Decl., ¶ 11; Wise Decl., ¶ 11).

The second fair use factor suggests a greater need to disseminate factual works than works of fiction or fantasy. *Harper & Row*, 471 U.S. at 563. While the Standards are not fiction or fantasy, they certainly cannot be considered a mere recitation of facts. Rather, the Standards comprise the collective expert opinions of psychometric, testing and assessment experts on the preparation, administration, and use of tests. Characterizing the Standards as comprising core expressive content (which they do) or as an assemblage of facts (which they are not) in any event "is not much help … in separating the fair use sheep from the infringing goats" in this case. *Campbell*, 510 U.S. at 586; *see also*, *Authors Guild v. Google, Inc.*, 2015 WL 6079426, *12 (2d Cir., Oct. 16, 2015) ("courts have hardly ever found that the second factor in isolation played a large role in explaining a fair use decision."). At best, this fair use factor is neutral.

           c.      Public Resource Misappropriated the Sponsoring Organizations' Entire Work.

When the Court considers "the amount and substantiality of the portion [of the 1999 Standards that Public Resource] used in relation to the … work as a whole", Copyright Act Section 107(3), 17 U.S.C. § 107(3), it bears repeating that Public Resource posted PDF copies of the *entire* 1999 Standards to its website (Answer & Counterclaim, Court Dkt. 12, ¶¶ 7, 55; Hudis Decl., ¶ 2, Exh. A, pp. 233-34, 271-72, ¶ 21, Exh. T, Int. Ans. No. 2) and the Internet Archive website (Hudis Decl., ¶ 29, Exh. BB, pp. 59-112, ¶ 30, Exh. CC (¶¶ 3-18 therein), ¶ 21, Exh. EE,

¶ 33, Exh. FF).  Public Resource did not OCR-process these PDF files.  Consequently, they were worthless for purposes of word-searching, online identification, or text-to-speech utilization for the blind and visually impaired (Hudis Decl., ¶ 27, Exh. Z, pp. 309-10, ¶ 28, Exh. AA, p. (and sub-Exh. B thereto)).

As the Supreme Court stated in *Campbell*, 510 U.S. at 587-88:

> [W]hether "a substantial portion of the infringing work was copied verbatim" from the copyrighted work is a relevant question, (citation omitted), for it may reveal a dearth of transformative character or purpose under the first factor, or a greater likelihood of market harm under the fourth; *a work composed primarily of an original, particularly its heart, with little added or changed, is more likely to be a merely superseding use, fulfilling demand for the original*. (Emphasis Added).

On the other hand, complete unchanged copying has been found justified as fair use "when the copying was reasonably appropriate to achieve the copier's transformative purpose and was done in such a manner *that it did not offer a competing substitute for the original*." *Authors Guild v. Google,* 2015 WL 6079426 at *12 (emphasis added).  Here, there was no transformative purpose to Public Resource's infringement; and its wholesale copying was done in such a manner that it offered a free competing substitute for authorized purchased copies of the 1999 Standards.  Factual analysis of the third fair use factor undermines Public Resource's justification for relying on the fair use defense in this case.

   d.   Public Resource Drastically Affected the Market for and Value of the 1999 Standards.  If Allowed to Continue, Public Resource's Activities Will Decimate the Market for and Value of Future Standards Published by the Sponsoring Organizations.

The fourth fair use factor, ""the effect of the use upon the potential market for or value of the copyrighted work," Copyright Act Section 107(4), 17 U.S.C. § 107(4), "is undoubtedly the single most important element of fair use."  *Harper & Row*, 471 U.S. at 566.  "More important, to negate fair use one need only show that if the challenged use 'should become widespread, it

would adversely affect the *potential* market for the copyrighted work.' (citations omitted).  If the defendant's work adversely affects the value of any of the rights in the copyrighted work … the use is not fair." *Id.* at 568.

This factor, "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also []whether unrestricted and widespread conduct of the sort engaged in by the defendant … would result in a substantially adverse impact on the potential market[] for the original." *Campbell*, 510 U.S. at 590 (citations omitted).

Public Resource's infringement has already adversely affected the market for authorized copies of the 1999 Standards.  During the near 2-year period that Public Resource posted unauthorized PDF copies of the 1999 Standards to its website and the Internet Archive website, these files were accessed thousands of times (Hudis Decl., ¶ 21, Exh. T, Int. Ans. 2 and Amended Ans. 5 (labeled 6), ¶ 29, Exh. BB, pp. 124-132, ¶ 37, Exh. II).  During that same 2-year period, the Sponsoring Organizations experienced a 34% drop in sales revenue (Levine Decl., ¶¶ 18, 33, Exh. OOO).  If Public Resource's unrestricted and widespread conduct was allowed to continue with respect to the Sponsoring 'Organizations' 2014 Standards – which it intends to do if successful in this litigation (Hudis Decl., ¶ 2, Exh. A, pp. 308-09) – this would result in a devastating adverse impact on the potential market for the purchase of authorized copies. (Geisinger Decl., ¶ 27).  *See, e.g., BMG Music v. Gonzalez*, 430 F.3d 888 (7th Cir. 2005) ("Music downloaded for free from the Internet is a close substitute for purchased music; many people are bound to keep the downloaded files without buying originals.").

In *Worldwide Church of God v. Philadelphia Church of God, Inc.,* 227 F.3d 1110, 1112-13 (9th Cir. 2000), *cert. denied*, 532 U.S. 958 (2001), Plaintiff ("WCG"), a religious non-profit, owned the copyright in the book *Mystery of the Ages* ("MOA"), written by its late Pastor

General.  Subsequent to the Pastor General's death, WCG retired further printing and distribution

of the MOA, as being outdated when compared to the modern teachings of the WCG.  Defendant

("PCG"), also a religious non-profit and a competitor, nevertheless made numerous copies of the

entirety of the MOA, which it distributed to PCG members and to the public.

Finding that the fair use defense was not availing to defendant PCG, even in the absence

of particular pecuniary harm, the Ninth Circuit Court of Appeals stated:

> This case presents a novel application of the fair use doctrine where the copyright
> owner is a not-for-profit organization.  As might be expected, published case law
> deals with works marketed for profit. However, it cannot be inferred from that
> fact that the absence of a conventional market for a work, the copyright to which
> is held by a nonprofit, effectively deprives the holder of copyright protection. *If
> evidence of actual or potential monetary loss were required, copyrights held by
> nonprofits would be essentially worthless. Religious, educational and other public
> interest institutions would suffer if their publications invested with an institution's
> reputation and goodwill could be freely appropriated by anyone.* The statute by
> its terms is not limited to market effect but includes also "the effect of the use on
> the *value* of the copyrighted work." 17 U.S.C. § 107(4) (emphasis added). … The
> fact remains that PCG has unfairly appropriated *MOA* in its entirety for the very
> purposes for which WCG created *MOA*.

*Worldwide Church of God,* 227 F.3d at 1119-20 (emphasis added).

Here, the Sponsoring Organizations have suffered financial losses from Public

Resource's actions, and will suffer further losses should Public Resource's infringement continue

with respect to not only the 1999 Standards but, as Defendant intends, the 2014 Standards as

well.

*Worldwide Church of God* stands in contrast to recent cases decided by the Second

Circuit Court of Appeals finding in favor of the fair use defense, because the defendant in each

case took considerable steps to forestall market harm to the copyright owners.  In *Authors Guild

v. HathiTrust*, 755 F.3d at 90-92, several research universities allowed Google to scan the books

in their collections so as to create a digital repository of them, and founded the HathiTrust

Digital Library (or "HDL") to operate the repository.  Collegiate members of the HDL made the millions of books in their collections available for inclusion in the repository for three purposes: 1) allowing the general public to search for particular terms across all digital copies in the repository, but unless the copyright holder authorized broader use the search results showed only the page numbers on which the search term was found within the work and the number of times the term appears on each page - without displaying any text; 2) allowing member libraries to provide access to patrons having expert-certified print disabilities of the full text of copyrighted works in the repository; and 3) preserving the copyrighted books in digital form, so that HDL members could create replacement copies of the books, if members already owned original copies that were lost, destroyed, or stolen, and replacement copies were unobtainable.

Finding these practices to be fair use over the objections of the Authors Guild and its members, the Second Circuit Court of Appeals noted, *inter alia*, "the extensive security measures the [HDL had] undertaken to safeguard against the risk of a data breach [and thus widespread infringement by the public]", including: rigorous physical security controls, highly restricted web and network access, and a mass download prevention system called a "choke." *Authors Guild v. HathiTrust*, 755 F.3d at 100.

In *Authors Guild v. Google*, Google made digital copies of tens of millions of books submitted to it for that purpose by major libraries.  *Authors Guild*, 2015 WL 6079426 at *1. Once the books were scanned, Google established a publicly available search function.  Internet users could use this function to search the digitized books without charge to determine whether a book contained a specified word or term; and also see "snippets" of text containing the searched-for terms.  *Id.*  Additionally, Google allowed the participating libraries to download and retain digital copies of the books they submitted, under agreements which committed the libraries not

to use their digital copies in violation of copyright laws.  *Id.*

Finding these practices to be fair use over the objections of the Authors Guild and its members, the Second Circuit once again noted, *inter alia*, "Google['s] safeguards from public view [of] the digitized copies it makes[,] allow[ing] access only to the extent of permitting the public to search for the very limited information accessible through the search function and snippet view"; and its "stor[age of the scanned material] on computers walled off from public Internet access[,] protected by the same impressive security measures used … to guard its own confidential information." *Authors Guild v. Google*, 2015 WL 6079426 at *17 - *18.

Public Resource has not established any security measures against mass printing or downloading by Internet users as were found in the *Authors Guild v. HathiTrust* and *Authors Guild v. Google* cases (Hudis Decl., ¶ 2, Exh. A, pp. 347-48, ¶ 27, Exh. Z, pp. 167-173, 324-28).

> e.  Balancing the Factors, Public Resource's Infringement Cannot be Excused as Fair Use.

Public Resource's use, and threatened future use, of the 1999 Standards, and intended future use of the 2014 Standards, served and will serve as a market substitutes for these works. The nature of the 1999 Standards is a neutral fair use factor.  Public Resource misappropriated the entirety of the 1999 Standards, and did so in a way that radically affected the market for and value of the 1999 Standards.  If Public Resource's activities continue, they will lay waste to the market for and value of future Standards of the Sponsoring Organizations.  Public Resource's fair use defense should not be upheld.

> 5.  Public Resource's Other Defenses are Without Merit

Public Resource's Answer and Counterclaim also asserts the affirmative defenses of unclean hands, copyright misuse, waiver and estoppel.  Public Resource has no supportable basis for asserting these throw-away defenses, which on their face do not meet the pleading

requirements of *Iqbal/Twombly*. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[A] plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (internal citations and quotation marks omitted). *See also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement.") (internal citations and quotation marks omitted). Moreover, these defenses are ill-suited to the facts of this case.

*Unclean Hands* applies when a plaintiff commits a wrongful act having a strong factual nexus to the defendant's infringing conduct. *Nat'l Cable Television Ass'n, Inc. v. Broad. Music, Inc.*, 772 F. Supp. 614, 652 (D.D.C. 1991); *Mitchell Bros. Film Grp. v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979). Examples include when "plaintiff misused the process of the courts by falsifying a court order, by falsifying evidence, or by misrepresenting the scope of his copyright to the court and opposing party." 4 *Nimmer on Copyright*, § 13.09[B] (2015). There is no evidence of such conduct occurring here.

*Copyright Misuse* applies when a plaintiff uses its copyright "to secure an exclusive right or limited monopoly not granted by the Copyright office and which is contrary to public policy to grant." *AAMC v. Princeton Review, Inc.*, 332 F. Supp. 2d 11, 17 (D.D.C. 2004). Misuse typically arises due to some form of anticompetitive conduct, and "failure to show [a] violation of the antitrust laws makes it more difficult for the court to find copyright misuse." *Id.* at 19 (quotation marks omitted); *see also Nat'l Cable Television*, 772 F. Supp. at 652. There is no evidence that the Sponsoring Organizations engaged in the type of anticompetitive conduct necessary to support this defense.

*Waiver and Estoppel* apply when a plaintiff expressly waives its rights or intentionally acts in a manner leading a defendant to believe its conduct is acceptable or will not be acted upon by plaintiff. *Tech 7 Sys., Inc. v. Vacation Acquisition, LLC*, 594 F. Supp. 2d 76, 85-86 (D.D.C. 2009); *Slate v. Am. Broad. Cos.*, 941 F. Supp. 2d 27, 40-41 (D.D.C. 2013). There is no evidence that Plaintiffs engaged in such conduct.

These defenses should be summarily dismissed.

II.      PLAINTIFFS MEET THE STANDARDS FOR THE ISSUANCE OF A PERMANENT
         INJUNCTION AGAINST DEFENDANT'S FURTHER INFRINGING ACTIVITIES

Upon a finding of unjustified copyright infringement by Public Resource, the Court should issue a permanent injunction.

A.      Standards for the Issuance of a Permanent Injunction

To obtain permanent injunctive relief, "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.* 547 U.S. 388, 391 (2006).

B.      Plaintiffs Have Suffered Irreparable Injury; and the Remedies Available at Law,
        such as Monetary Damages, are Inadequate to Compensate for that Injury

In applying the *eBay* test, the Court should properly look to the future threat of injury. *Loving v. Internal Revenue Service*, 917 F.Supp.2d 67, 80-81 (D.D.C. 2013), *citing Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162 (2010). Plaintiffs will likely suffer three distinct irreparable harms if a permanent injunction is not issued; harms that cannot be rectified by monetary damages at the end of this case.

1.      Loss of Control Over Content

From the time that Public Resource made the Sponsoring Organizations' Standards available on its website and the Internet Archive site, Plaintiffs had no ability to prevent further misappropriations of their copyrighted work or to ensure the quality of others' reproductions of the Standards.  *See Fox TV Stations, Inc. v. FilmOn X LLC*, 966 F. Supp. 2d 30, 49-50 (D.D.C. 2013), *stay and reconsideration denied*, No. 13-758, 2013 U.S. Dist. LEXIS 130257 (D.D.C Sept. 12, 2013) (considering "loss of control over content and threat of viral infringement" as a factor showing that irreparable harm was likely without an injunction).  This Court repeatedly has recognized that the threat of continuing infringement justifies the grant of an injunction. *Breaking the Chain Found. v. Capital Educ. Support, Inc.*, 589 F. Supp. 2d 25, 30 (D.D.C. 2008) (citing *Walt Disney Co. v. Powell*, 897 F.2d 565, 567 (D.C. Cir. 1990)); *Hanley-Wood LLC v. Hanley Wood LLC*, 783 F. Supp. 2d 147, 151 (D.D.C. 2011).

2.      Loss of Business Opportunities

The Sponsoring Organizations underwrite the costs of developing future versions of the Standards by relying on the proceeds from the sales of earlier versions of their Standards (Levine Decl., ¶ 21).  This allows Plaintiffs to develop up-to-date, high quality Standards that would otherwise not be developed due to the time and effort that goes into producing them  (Levine Decl., ¶ 21; Ernesto Decl., ¶ 31; Wise Decl., ¶ 24).

By Public Resource making an unauthorized copy of the Standards available for free on its website and the Internet Archive site, Defendant caused the Sponsoring Organizations to lose incalculable business opportunities and revenue that support Plaintiffs' development and updating of these Standards.  Public Resource's infringement cannot be adequately cured by monetary damages, as there is no way to determine how many sales opportunities were lost and will be lost due to the infringement.  *See Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922,

54

930 (Fed. Cir. 2012) (finding that loss of business opportunities, including an inability to measure the loss of sales due to the existence of the infringer, was a valid ground for finding irreparable harm).  While *Celsis in Vitro* was a patent infringement case in which a preliminary injunction was granted, the irreparable harm caused by the loss of indeterminable business opportunities similarly applies in the present copyright infringement action.

The Sponsoring Organizations' inability to quantify how much business they have lost and will lose by potential customers having free access to the Standards on Public Resource's website and the Internet Archive site further supports Plaintiffs' contention that the harms they have suffered and will suffer are irreparable.  *WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 620 (S.D.N.Y. 2011), *stay denied*, No. 10-7415, 2011 U.S. Dist. LEXIS 43582 (S.D.N.Y. Apr. 19, 2011), *aff'd*, 691 F.3d 275, 285 (2d Cir. 2012) (finding that plaintiffs inability to specify the harms showed that the harms were "unquantifiable, and thus irreparable"); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) ("irreparable harm may be found where damages are difficult to establish and measure.").

3.      Adverse Affect on the Efforts Put into Creating Plaintiffs' Standards

The Standards are the culmination of over 5 years of work (Levine  Decl., ¶ 11; Ernesto Decl., ¶ 11) put in by the Joint Committee to generate a set of best practices on educational and psychological testing that are respected and relied upon by leaders in their fields (Wise  Decl., ¶ 11; Geisinger Decl., ¶ 18).  The creation and updating of the Standards includes efforts by the Sponsoring Organizations to ensure that leaders in their fields, governmental organizations, and industry stakeholders all accept the Standards as being the guideline on educational and psychological testing (Ernesto Decl., ¶ 14).

Were it not for the Sponsoring Organizations, these Standards, or standards of this kind, would not be created (Levine  Decl., ¶ 22; Ernesto Decl., ¶ 32; Wise Decl., ¶ 24; Geisinger Decl.,

¶ 23).   Accordingly, Public Resource's posting of unauthorized copies of Plaintiffs' Standards adversely affects the quantity and quality of efforts the Joint Committee selected by AERA, APA, and NCME put into creating and updating the Standards.   This jeopardizes the ability of the Sponsoring Organizations to continue periodically updating them.   *WPIX. v. ivi*, 691 F.3d at 286.   Allowing Defendant's activities to continue not only affects Plaintiffs but also extends to all other Standards copyright holders.   *Id.*   ("Continued live retransmissions of copyrighted television programming over the Internet without consent would thus threaten to destabilize the entire industry.").

      C.       The Balance of Hardships Weigh In Plaintiffs' Favor

As described immediately above, there are significant, irreparable harms that the Sponsoring Organizations face if Public Resource is permitted to continue infringing Plaintiffs' copyright in their Standards.   On the other hand, Public Resource "has no cognizable interest in continuing to infringe Plaintiffs' copyrights and thus cannot complain of the harm it will suffer if ordered to cease doing so."   *Fox*, 966 F. Supp. 2d at 51; *see also, WPIX*, 691 F.3d at 287 ("it is axiomatic that an infringer of copyright cannot complain about the loss of ability to offer its infringing product.").   If it wishes, Public Resource has available to it plenty of other non-proprietary statutory content that Defendant could post on its website without violating the copyrights of the Sponsoring Organizations and other voluntary standards organizations – and thus will suffer no recognizable harm if a permanent injunction is entered.   Thus, in this case, the balance of harms tips in the Sponsoring Organizations' favor.

      D.       Issuance of a Permanent Injunction is in the Public Interest

Finally, in deciding whether to issue a permanent injunction, the Court must consider the public's interest.   *Fox Television Stations*, 966 F. Supp. 2d at 51 (finding public interest favored an injunction because "the public interest can only be served by upholding copyright protections

and correspondingly, preventing the misappropriation of skills, creative energies, and resources which are invested in the protected work"). "The object of copyright law is to promote the store of knowledge available to the public. … [T]o the extent [the Copyright Act] accomplishes this end by providing individuals a financial incentive to contribute to the store of knowledge, the public's interest [is] accounted for by the plaintiff's interest." *Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010). While it is true that ""[t]he public [has an] interest in free expression [in] … the marketplace of ideas …., "[s]ome uses [of a plaintiff's work] … will so patently infringe another's copyright, without giving rise to an even colorable fair use defense, that the likely … value in the [defendant's] use is virtually nonexistent." *Id.* at 82-83. Such is the case here.

Allowing Public Resource and others to freely copy Plaintiffs' Standards will detract from the important store of knowledge – recommended best practices for testing design and administration – available to the public. If Plaintiffs do not have incentives, secured by copyright protection, to continue updating the Standards, they will cease to do so. *WPIX*, 691 F.3d at 287 ("Inadequate protections for copyright owners can threaten the very store of knowledge to be accessed; encouraging the production of creative work thus ultimately serves the public's interest in promoting the accessibility of such works."). It is unlikely that others will fill the void. Public Resource patently infringed upon the copyright in Plaintiffs' standards, and encouraged others to do so as well. There is no societal value in Defendant's activities, and any claim to the contrary should not be a pretext for blatant copyright infringement.

## CONCLUSION

The evidence of record shows without question that Public Resource infringed upon the Sponsoring Organizations' copyright in the 1999 Standards, and without Court intervention will do so again. Plaintiffs have suffered, and will continue to suffer, irreparable harm in the absence of an injunction. Money damages will not adequately compensate for this harm.

57

The balance of hardships tips decidedly in the Sponsoring Organizations' favor. Plaintiffs have a significant interest in upholding the copyright in their Standards, whereas Defendant has no fair use or other legal justification to continue its infringement.  Finally, the public interest would be served by the issuance of a permanent injunction.  The incentives for Plaintiffs to continue their contributions to the store of public knowledge will be preserved, while Public Resource's claim of fair use will be not be held up as a pretext for deliberate infringement.  Consequently, the Court should issue a permanent injunction, prohibiting Public Resource from infringing upon the Sponsoring Organizations' copyright in the 1999 Standards.

Respectfully submitted,

QUARLES & BRADY LLP

*/s/ Jonathan Hudis*

Dated: December 21, 2015    By:   Jonathan Hudis (DC Bar # 418872)
1700 K Street NW, Suite 825
Washington, DC 20006-3825
Tel. (202) 372-9600
Fax (202) 372-9599
E-Mail Jonathan.Hudis@quarles.com

Kathleen Cooney-Porter (DC Bar # 434526)
OBLON, McCLELLAND, MAIER &
NEUSTADT, LLP
1940 Duke Street
Alexandria, VA 22314
Tel. (703) 413-3000
Fax (703) 413-2220
E-Mail kcooney-porter@oblon.com

Attorneys for Plaintiffs

AMERICAN EDUCATIONAL RESEARCH
 ASSOCIATION, INC., AMERICAN
PSYCHOLOGICAL  ASSOCIATION, INC.
NATIONAL COUNCIL ON
MEASUREMENT IN EDUCATION, INC.