# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN EDUCATIONAL RESEARCH ASSOCIATION, INC., AMERICAN PSYCHOLOGICAL ASSOCIATION, INC., and NATIONAL COUNCIL ON MEASUREMENT IN EDUCATION, INC., | ) ) ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| PUBLIC.RESOURCE.ORG, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

Civil Action No. 1:14-cv-00857-TSC-DAR

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Pursuant to the Local Rule 7(h), Plaintiffs, American Educational Research Association, Inc. ("AERA"), American Psychological Association, Inc. ("APA") and National Council on Measurement in Education, Inc. ("NCME") (collectively, "Plaintiffs" or the "Sponsoring Organizations") submit, in support of their Motion for Summary Judgment, a Statement of Material Facts as to which there are no genuine issues that otherwise would be left for trial:

## I.      Plaintiffs

1.      Plaintiffs, AERA, APA, and NCME, are District of Columbia not-for-profit corporations (Levine Decl., ¶ 4; Ernesto Decl., ¶ 3; Wise Decl., ¶ 3).

2.      AERA is the major national scientific society for research on education and learning.  AERA's mission is to advance knowledge about education, to encourage scholarly inquiry related to education, and to promote the use of research to improve education and serve the public good (Levine Decl., ¶ 5).

3.      APA is the largest scientific and professional organization representing psychology in the United States.  APA is the world's largest association of psychologists and counts a vast number of researchers, educators, clinicians, consultants and students among its

members.   APA's mission is to advance the creation, communication, and application of psychological knowledge to benefit society and improve people's lives (Ernesto Decl., ¶ 4).

4.      NCME is a professional organization for individuals involved in assessment, evaluation, testing, and other aspects of educational measurement.   NCME's members are involved in the construction and use of standardized tests; new forms of assessment, including performance-based assessment; program design; and program evaluation (Wise Decl., ¶ 4).

## II.      Creation of Plaintiffs' Work, the Standards for Educational and Psychological Testing

5.      Plaintiffs have been preparing and publishing versions of the Standards for Educational and Psychological Testing for over fifty years.  In 1954, Plaintiff APA prepared and published the "Technical Recommendations for Psychological Tests and Diagnostic Techniques" (Camara Decl., ¶ 7; Ernesto Decl., ¶ 5).

6.      In 1955, Plaintiffs AERA and NCME prepared and published a companion document entitled, "Technical Recommendations for Achievement Tests" (Levine Decl., ¶ 6; Camara Decl., ¶ 7; Wise Decl., ¶ 5).

7.      Subsequently, a joint committee of the three organizations modified, revised, and consolidated the two documents into the first Joint Standards.  Beginning with the 1966 revision, the three organizations (AERA, APA and NCME – collectively, the "Sponsoring Organizations") collaborated in developing the "Joint Standards" (or simply, the "Standards"). Each subsequent revision of the Standards has been careful to note that it is a revision and update of the prior version (Levine Decl., ¶ 6; Camara Decl., ¶ 7;) Ernesto Decl., ¶ 6; Wise Decl., ¶ 6).

8.      Beginning in the mid-1950s, the Sponsoring Organizations formed and periodically reconstituted a committee of highly trained and experienced experts in psychological and educational assessment, charged with the initial development of the Technical

Recommendations and then each subsequent revision of the (renamed) Standards. These committees were formed by the Sponsoring Organizations' Presidents (or their designees), who would meet and jointly agree on the membership. Often a chair or co-chairs of these committees were selected by joint agreement. Beginning with the 1966 version of the Standards, this committee became referred to as the "Joint Committee" (Levine Decl., ¶ 7; Camara Decl., ¶ 8; Ernesto Decl., ¶ 7; Wise Decl., ¶ 7).

9.     Financial and operational oversight for the Standards' revisions, promotion, distribution, and for the sale of the 1999 and 2014 Standards has been undertaken by a periodically reconstituted Management Committee, comprised of the designees of the three Sponsoring Organizations (Levine Decl., ¶ 8; Camara Decl., ¶ 9; Schneider Decl., ¶ 4; Ernesto Decl., ¶ 8; Wise Decl., ¶ 8).

10.     All members of the Joint Committee(s) and the Management Committee(s) are *unpaid* volunteers. The expenses associated with the ongoing development and publication of the Standards include travel and lodging expenses (for the Joint Committee and Management Committee members), support staff time, printing and shipment of bound volumes, and advertising costs (Levine Decl., ¶ 9; Camara Decl., ¶ 10; Schneider Decl., ¶ 5; Ernesto Decl., ¶ 9; Wise Decl., ¶ 9).

11.     Many different fields of endeavor rely on assessments. The Sponsoring Organizations have ensured that the range of these fields of endeavor is represented in the Joint Committees' membership – *e.g.*, admissions, achievement, clinical counseling, educational, licensing-credentialing, employment, policy, and program evaluation. Similarly, the Joint Committee's members, who are *unpaid volunteers*, represent expertise across major functional assessment areas – *e.g.*, validity, equating, reliability, test development, scoring, reporting,

interpretation, and large scale interpolation (Levine Decl., ¶ 10; Ernesto Decl., ¶ 10; Wise Decl., ¶ 10).

12.     From the time of their initial creation to the present, the preparation of and periodic revisions to the Standards entail intensive labor and considerable cross-disciplinary expertise.  Each time the Standards are revised, the Sponsoring Organizations select and arrange for meetings of the leading authorities in psychological and educational assessments (known as the Joint Committee).  During these meetings, certain Standards are combined, pared down, and/or augmented, others are deleted altogether, and some are created as whole new individual Standards.  The 1999 version of the Standards is nearly 200 pages, took more than five years to complete (Levine Decl., ¶ 11; Ernesto Decl., ¶ 11; Camara Decl., ¶ 11).

13.     The 1999 Standards is the result of work put in by the Joint Committee to generate a set of best practices on educational and psychological testing that are respected and relied upon by leaders in their fields (Camara Decl., ¶ 11; Wise Decl., ¶ 11).

14.     Draft revisions of the 1985 Standards, for what became the 1999 Standards, were widely distributed for public review and comment three times during this revision effort to gauge whether the testing community believed the revised drafts to be current and inclusive of the topics at issue (Schneider Decl., ¶ 6).

15.     The Joint Committee received thousands of pages of comments and proposed text revisions from: the membership of the Sponsoring Organizations, scientific, professional, trade and advocacy groups, credentialing boards, state and federal government agencies, test publishers and developers, and academic institutions.  While the Joint Committee reviewed and took under advisement these helpful comments, the final language of the 1999 Standards was a product of the Joint Committee members (Camara Decl., ¶ 12; Schneider Decl., ¶ 7).

16.     When the 1985 Standards were revised, more than half the content of the 1999 Standards resulted from newly written prose of the Joint Committee (Camara Decl., ¶ 12).

**III.    Why the Standards Were Created and
The Benefits that the Standards Bring to the Relevant Public and Constituencies**

17.     The Standards originally were created as principles and guidelines – a set of best practices to improve professional practice in testing and assessment across multiple settings, including education and various areas of psychology.  The Standards can and should be used as a recommended course of action in the sound and ethical development and use of tests, and also to evaluate the quality of tests and testing practices.   Additionally, an essential component of responsible professional practice is maintaining technical competence.   Many professional associations also have developed standards and principles of technical practice in assessment. The Sponsoring Organizations' Standards have been and still are used for this purpose (Geisinger Decl., ¶ 18; Camara Decl., ¶ 13; Wise Decl., ¶ 12).

18.     The Standards, however, are not simply intended for members of the Sponsoring Organizations, AERA, APA, and NCME.  The intended audience of the Standards is broad and cuts across audiences with varying backgrounds and different training.  For example, the Standards also are intended to guide test developers, sponsors, publishers, and users by providing criteria for the evaluation of tests, testing practices, and the effects of test use.  Test user standards refer to those standards that help test users decide how to choose certain tests, interpret scores, or make decisions based on tests results.  Test users include clinical or industrial psychologists, research directors, school psychologists, counselors, employment supervisors, teachers, and various administrators who select or interpret tests for their organizations.  There is no mechanism, however, to enforce compliance with the Standards on the part of the test developer or test user.  The Standards, moreover, do not attempt to provide psychometric

answers to policy or legal questions (Camara Decl., ¶ 14; Wise Decl., ¶ 13; Geisinger Decl., ¶ 19; Ernesto Decl., ¶ 12).

19.     The Standards promote the development of high quality tests and the sound use of results from such tests.  Without such high quality standards, tests might produce scores that are not defensible or accurate, not an adequate reflection of the characteristic they were intended to measure, and not fair to the person tested.  Consequently, decisions about individuals made with such test scores would be no better, or even worse, than those made with no test score information at all.  Thus, the Standards help to ensure that measures of student achievement are relevant, that admissions decisions are fair, that employment hiring and professional credentialing result in qualified individuals being selected, and patients with psychological needs are diagnosed properly and treated accordingly.  Quality tests protect the public from harmful decision making and provide opportunities for education and employment that are fair to all who seek them (Camara Decl., ¶ 15; Wise Decl., ¶ 14).

20.     The Standards apply broadly to a wide range of standardized instruments and procedures that sample an individual's behavior, including tests, assessments, inventories, scales, and other testing vehicles.  The Standards apply equally to standardized multiple-choice tests, performance assessments (including tests comprised of only open-ended essays), and hands-on assessments or simulations.  The main exceptions are that the Standards do not apply to unstandardized questionnaires (*e.g.*, unstructured behavioral checklists or observational forms), teacher-made tests, and subjective decision processes (*e.g.*, a teacher's evaluation of students' classroom participation over the course of a semester) (Camara Decl., ¶ 16; Wise Decl., ¶ 15; Geisinger Decl., ¶ 20; Ernesto Decl., ¶ 13).

21.     The Standards have been used to develop testing guidelines for such activities as

college admissions, personnel selection, test translations, test user qualifications, and computer-based testing.  The Standards also have been widely cited to address technical, professional, and operational norms for all forms of assessments that are professionally developed and used in a variety of settings.  The Standards additionally provide a valuable public service to state and federal governments as they voluntarily choose to use them.  For instance, each testing company, when submitting proposals for testing administration, instead of relying on a patchwork of local, or even individual and proprietary, testing design and implementation criteria, may rely instead on the Sponsoring Organizations' Standards to afford the best guidance for testing and assessment practices (Camara Decl., ¶ 17; Wise Decl., ¶ 16; Geisinger Decl., ¶ 21; Ernesto Decl., ¶ 14).

22.     The Standards were not created or updated to serve as a legally binding document, in response to an expressed governmental or regulatory need, nor in response to any legislative action or judicial decision.  However, the Standards have been cited in judicial decisions related to the proper use and evidence for assessment, as well as by state and federal legislators.  These citations in judicial decisions and during legislative deliberations occurred without any lobbying by the Plaintiffs (Levine Decl., ¶ 12; Camara Decl., ¶ 18; Ernesto Decl., ¶ 15; Wise Decl., ¶ 17).

23.     During the discovery phase of this litigation, however, Plaintiff APA located in its archives correspondence relating to APA's support for proposed legislation sought to be introduced in 2001 by Senator Paul Wellstone (D-MN) on Fairness and Accuracy in High Stakes Educational Decisions for Students - a suggested amendment to the Elementary and Secondary Education Act ("No Child Left Behind Act") 147 Cong. Rec. S. 4,644 (daily ed. May 9, 2001) (Ernesto Decl., ¶¶ 16-22, Exhs. NN-SS).

24.     Some of APA's letters are unsigned and are not printed on APA letterhead. Therefore, in accordance with APA practices and protocols, it is likely that the unsigned letters (not printed on letterhead) were internal discussion drafts that were never sent (Ernesto Decl., ¶ 23).

25.     Regarding the signed letters that were printed on APA letterhead, they relate to Senator Wellstone's proposed legislation that tests and assessments administered by the states are of high quality and used appropriately for the benefit of test administrators and test takers. These are goals that are consistent with APA policy as then reflected in the 1999 Standards. Even though Senator Wellstone's amendments sought, in part, to mandate states' compliance with the Standards, none of the Sponsoring Organizations actively advocated for this – and in any event Senator Wellstone's proposed amendment including this language was never enacted into law (Ernesto Decl., ¶ 24, Exh. TT).

26.     APA's search of its records did not disclose any further communications with Congress relating to the Standards and, to the best of APA's knowledge, it has not engaged in communications with Congress regarding citation of the Standards in legislation since 2001 (Ernesto Decl., ¶ 25).

27.     Moreover, neither AERA nor NCME has ever communicated with Congress for the purpose of encouraging the enactment of the Standards into law (Levine Decl., ¶¶ 12-13; Wise Decl., ¶ 18).

28.     None of the Sponsoring Organizations has solicited any government agency to incorporate the Standards into the Code of Federal Regulations or other rules of Federal or State agencies (Levine Decl., ¶ 13; Ernesto Decl., ¶ 26; Wise Decl., ¶ 19).

29.     Rather, in the policymaking arena, the Sponsoring Organizations believe the

Standards should be treated as guidelines informing the enactment of legislation and regulations consistent with best practices in the development and use of tests – to insure that they are valid, reliable and fair (Wise Decl., ¶ 20; Ernesto Decl., ¶ 27).

**IV.   Promotion and Distribution of the Standards,
and Use of Income Earned from Sales of the Standards**

30.     Plaintiffs promote and sell copies of the Standards via referrals to the AERA website, at annual meetings, in public offerings to students, and to educational institution faculty. Advertisements promoting the Standards have appeared in meeting brochures, in scholarly journals, and in the hallways at professional meetings (Levine Decl., ¶ 14, Exh. NNN; Ernesto Decl., ¶ 28, Exh. UU; Wise Decl., ¶ 21, Exh. KKK).

31.     All copies of the Standards bear a copyright notice (Levine Decl., ¶ 15, 28, Exh. TTT).

32.     Distribution of the Standards is closely monitored by the Sponsoring Organizations.   AERA, the designated publisher of the Standards, sometimes does provide promotional complementary print copies to students or professors.   Except for these few complementary print copies, however, the Standards are not given away for free; and certainly they are not made available to the public by any of the three organizations for anyone to copy free of charge (Levine Decl., ¶ 16; Ernesto Decl., ¶ 29; Wise Decl., ¶ 22).

33.     To date, Plaintiffs have never posted, or authorized the posting of, a digitized copy of the 1999 Standards on any publicly accessible website (Levine Decl., ¶ 16; Ernesto Decl., ¶ 30; Wise Decl., ¶ 23).

34.     The 1999 Standards have been sold at modest retail prices ranging from $25.95 to $49.95 per copy.   From 2000 to 2014, except for the near two-year period during which Public Resource posted unauthorized copies online and sales diminished significantly, income

generated from sales of the 1999 Standards, on average, had been approximately in excess of $127,000 per year (Levine Decl., ¶¶ 17-18 Exh. OOO).

35.     After the 2014 Standards were published in the late summer of 2014, AERA for a time discontinued sales of the 1999 Standards.  This was to encourage sales of the newly-revised edition – the 2014 Standards (Levine Decl., ¶ 19, Exh. PPP).  However, so long as purchasers are made aware that it is no longer the current edition, the 1999 Standards do have an enduring value for those in the testing and assessment profession who (i) need to know the state of best testing practices as they existed between 1999 and 2014, (ii) believe they still may be held accountable to the guidance of the 1999 Standards even now, and/or (iii) study the changes in best testing and assessment practices over time.  For these reasons, in the summer of 2015 AERA resumed sales of the 1999 Standards (Levine Decl., ¶ 20, Exh. QQQ).

36.     The Sponsoring Organizations do not keep any of the proceeds generated from the sales of the Standards.  Rather, the income from these sales is used by the Sponsoring Organizations to offset their development and production costs and to generate funds for subsequent revisions.  This allows the Sponsoring Organizations to develop up-to-date, high quality Standards that otherwise would not be developed due to the time and effort that goes into producing them (Levine Decl., ¶ 21; Geisinger Decl., ¶ 22; Camara Decl., ¶ 19; Ernesto Decl., ¶ 31).

37.     Without receiving at least some moderate income from the sales of the Standards to offset their production costs and to allow for further revisions, it is very likely that the Sponsoring Organizations would no longer undertake to periodically update them, and it is unknown who else would (Levine Decl., ¶ 22; Ernesto Decl., ¶ 32; Wise Decl., ¶ 24; Geisinger Decl., ¶ 22).

38.     At one time, funding for the Standards revision process from third party sources (*e.g.*, governmental agencies, foundations, other associations interested in testing and assessment issues, etc.) was considered.  However, this option was not seriously considered as the difficulty and/or potential conflicts of interest in doing so left the Sponsoring Organizations to conclude that financial support for the Standards revisions should be self-funding – that is, from the sale of prior editions of the Standards (Levine Decl., ¶ 23; Camara Decl., ¶ 20).

39.     Due to the small membership size of Plaintiff NCME, and the relative minor portion of the membership of Plaintiffs AERA and APA who devote their careers to testing and assessment, it is highly unlikely that the members of the Sponsoring Organizations will vote for a dues increase to fund future Standards revision efforts if Public Resource successfully defends this case and is allowed to post the Standards online for the public to download or print for free. As a result, the Sponsoring Organizations would likely abandon their practice of periodically updating the Standards (Levine Decl., ¶ 24; Camara Decl., ¶ 24; Geisinger Decl., ¶ 23; Ernesto Decl., ¶ 33).

**V.     Plaintiffs' Ownership of the Copyright in the Standards**

40.     The Plaintiffs are joint owners of the copyright in and to the Standards.  The Standards were registered with the U.S. Register of Copyrights under Registration Number TX 5-100-196, having an effective date of December 8, 1999 (Levine Decl., ¶ 25, Exh. RRR).

41.     A supplementary copyright registration for the Standards was issued by the U.S. Register of Copyrights under Supplementary Registration Number TX 6-434-609, having an effective date of February 25, 2014 (Levine Decl., ¶ 26, Exh. SSS).

42.     The Joint Committee that authored the 1999 Standards comprised 16 members (Levine Decl., ¶¶ 27-28, Exh. TTT).  Except for Manfred Meier (who could not be located, nor

could his heirs), work made-for-hire letters were signed by 13 Joint Committee Members, and posthumous assignments were signed by the heirs of 2 deceased Joint Committee Members, vesting ownership of the copyright to the 1999 Standards in the Sponsoring Organizations (Ernesto Decl., ¶ 34, Exhs. VV-HHH).

## VI.   Reference to Plaintiffs' Standards in the Code of Federal Regulations

43.    Government agencies also use standards, including by incorporating them by reference in statutes and regulations.  The National Technology Transfer and Advancement Act of 1995 ("NTTAA"), for example, requires federal agencies to use privately developed standards whenever possible. Pub. L. No. 104-113 § 12, 110 Stat. 775, 782-83 (1996), codified at 15 U.S.C. § 272.

44.    In alignment with the NTTAA, the Department of Education used privately developed standards in Section 668.146 of Title 34 of the Code of Federal Regulations, Subtitle B: Regulations of the Offices of the Department of Education, Chapter VI: Office of Postsecondary Education, Department of Education Part 668: Student Assistance General Provisions, Subpart J: Approval of Independently Administered Tests; Specification of Passing Score; Approval of State Process (the "Department of Education Regulations"), in relevant part, provides:

(a) Except as provided in § 668.148, the Secretary approves a test under this subpart if –

    (1) The test meets the criteria set forth in paragraph (b) of this section …

(b) To be approved under this subpart, a test must –

…

    (6) Meet all standards for test construction provided in the 1999 edition of the *Standards for Educational and Psychological Testing*, prepared by a joint committee of the American Educational Research Association, the American Psychological Association, and the National Council on Measurement in Education incorporated by reference in this section. Incorporation by reference

of this document has been approved by the Director of the Office of the Federal Register pursuant to the Director's authority under *5 U.S.C. 552*(a) and 1 CFR part 51. The incorporated document is on file at the Department of Education, Federal Student Aid, room 113E2, 830 First Street, NE., Washington, DC 20002, phone (202) 377-4026, and at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 1-866-272-6272, or go to: http://www.archives.gov/federal-register/code-of-federal-regulations/ibr-locations.html. The document also may be obtained from the American Educational Research Association at: http://www.aera.net ….

45.     It is notable that Plaintiff's' 1999 Standards are referred to by way of *citation* in the U.S. Department of Education Regulations.  However, the *text* of Plaintiffs' Standards is not integrated word-for-word, in whole or in part, into those regulations.  Therefore, no one could, or should, interpret the Standards as "the law."

46.     On the other hand, the Department of Education Regulations are in compliance with Federal law – which requires that materials incorporated by reference in the Federal Register must be "reasonably available to the class of persons affected."  5 U.S.C. § 552(a)(1); 1 C.F.R. § 51.7(a)(3).

47.     Thus, it is required that (i) a copy of the incorporated material must be on file with the Office of the Federal Register and (ii) the regulations incorporating such material must state the ways those incorporated materials are reasonably available to interested parties. 1 C.F.R. §§ 51.3, 51.5.  There is no requirement that such materials be available to the public at no cost.

## VII.     Defendant's Copying, and Enabling Others to Copy, the Standards without Plaintiffs' Permission

48.     Defendant Public Resource is a California non-profit corporation founded in 2007 by Mr. Carl Malamud ("Malamud"), with the aim of making government information more accessible with particular emphasis on the law (Hudis Decl., ¶ 2, Exh. A, pp. 77, 93-94, 163-

164).

49.     The identified purpose and objective of Public Resource is to create and maintain so-called informational "public works projects for the Internet" (Hudis Decl., ¶ 2, Exh. A, pp. 94-95, 105-109, ¶ 3, Exh. B, Section II.B., ¶ 4, Exh. C. Section 2.1).

50.     In actuality, Public Resource maintains an assortment of seemingly random websites, which contain materials ranging from technical projects in which Malamud has been involved, to his commentary on government databases and entities (*e.g.*, PACER, EDGAR, the Government Printing Office and the Smithsonian), to myriad collections of legislative, regulatory, and case law materials (Hudis Decl., ¶ 2, Exh. A, pp. 78-84, 96-102, 111-113, ¶ 5, Exh. D).

51.      Of particular interest for this litigation is Public Resource's website titled https://law.resource.org, on which Public Resource posted the infringing digital copy of the Sponsoring Organizations' 1999 Standards (Hudis Decl., ¶¶ 2, Exh. A, pp. 83-88, 234).

52.     Public Resource does not provide any other services, and does not sell any products (Hudis Decl., ¶ 2, Exh. A, pp. 102-103, 127).

53.     Malamud has worked in the computer science, computer networks, and information technology fields since 1980.  Although he has no formal education on these subjects, Malamud has written many books and articles on, and taught classes in, these areas (Hudis Decl., ¶ 2, Exh. A, pp. 22-77, ¶ 6, Exh. E).

54.     On behalf of Public Resource, Malamud spends his time operating its varied websites, giving speeches, sending letters and FOIA requests to government officials, and attending to the company's finances (Hudis Decl., ¶ 2, Exh. A, pp. 78-79, 88-90).

55.     While Public Resource does have a Board of Directors to whom Malamud

reports, the company has no other officers, employees or members (Hudis Decl., ¶¶ 2, Exh. A, pp. 90, 120-123, Exh. E).

56.    In short, except for the retention of independent contractors here and there (Hudis Decl., ¶ 2, Exh. A, pp. 135-136), Malamud *is* Public Resource.

57.    Public Resource obtains its funding and/or outside legal assistance from a cadre of law firms, foundations and Internet companies (*e.g.*, Google and Creative Commons) (Hudis Decl., ¶ 2, Exh. A, pp. 135-136, ¶ 5, Exh. D).

58.    In 2013, Malamud used a Kickstarter crowd-funding campaign to raise between $100,000 and $1.2 million in order to finance Public Resource's infringing operation of re-typing (or "double-keying") third-party standards, and publishing them to the https://law.resource.org website.  However, this Kickstarter effort was unsuccessful (Hudis Decl., ¶ 2, Exh. A, pp. 82-83, 206-212, ¶ 7, Exh. F).

59.    In Malamud's view, "standards" are a set of best practices that the organization publishing them believes should be widely adopted.  An example given by Malamud are the best practice standards for computer networking promulgated by the Internet Engineering Task Force (Hudis Decl., ¶ 2, Exh. A, pp. 59-60).

60.    As early as 1991, Malamud knew that copying and widely disseminating standards, for free and without permission (which Malamud code-named the "Bruno Experiment" or "Project Bruno, Baby Killer"), would adversely impact the revenues of the organizations that published authorized copies of those standards (Hudis Decl., ¶ 2, Exh. A, pp. 156-160, ¶ 9, Exh. G, production pp. AERA_APA_NCME_32219-32226).

61.    As recently as March 2012, three months before Public Resource unlawfully copied and posted Plaintiffs' 1999 Standards to the Internet, Malamud clearly knew that the

copying of others' copyrighted standards to its website constituted copyright infringement:

> Public.Resource.Org spent [funds] … buying privately-produced … standards …. These … standards govern and protect a wide range of activity …. We have started copying those … standards despite the fact they are festooned with copyright warnings, shrinkwrap agreements and other dire warnings. (Deleted material referring to "technical public safety standards").
>
> ***
>
> We know from all the copyright warnings, terms of use, scary shrink wrap agreements, and other red-hot rhetoric that accompanies these documents that the producers continue to believe that copies may not be made under any circumstances.

(Hudis Decl., ¶ 2, Exh. A, pp. 181-184, ¶ 9, Exh. H (Malamud, C., *Liberating America's Secret, For-Pay Laws*, boingboing, March 19, 2012), production pp. AERA_APA_NCME_31764-31765).

62.     It is nonetheless Malamud's unwavering belief that, once a governmental entity incorporates a standard by reference into a statute or a regulation, the standard becomes "the law" and as such loses its copyright protection (Hudis Decl., ¶ 2, Exh. A, pp. 172-73, 218-219, 257, 358-61).

63.     According to Malamud's line of thinking, once standards lose their copyright protection in this manner, anyone can copy them, convert them to digital form, post them on the Internet and allow others to download or print them at will and for free (Hudis Decl., ¶ 2, Exh. A, pp. 187-88).

64.     Malamud further believes that it is perfectly acceptable for standards development organizations, such as Plaintiffs, to lose their copyright in standards incorporated by reference – and with it the economic value that copyright brings. According to Malamud, though knowing very little about the Sponsoring Organizations' operations, finances, policies or practices for updating their Standards (Hudis Dec., ¶ 2, Exh. A, pp. 192-93, 199-201, 223-232),

in such circumstances Plaintiffs (and similarly situated standards development organizations) should simply change their business model(s) by finding other ways to finance updates to their Standards, or making the government pay for the updates:

> **BOB GARFIELD (Interviewer):** There is an expense attached to developing and codifying these standards.  If we take the revenue away from those who do this work, then what happens?
>
> **CARL MALAMUD:** Well, there's two answers to that.  One is that the non-profits that develop these standards have a lot of different revenue streams.  They do conferences, they do certification.  They develop standards that aren't law. … And so, *maybe they need to adjust their business model*, particularly given the fact they are a non-profit public charity.  Answer number two is that *government has shirked its responsibilities*.  It said, gee, we can just incorporate these privately developed standards in the law, and we won't have to pay anything.  And the only people that get screwed up by this are the citizens that need to read the law.

(Hudis Decl., ¶ 2, Exh. A, pp. 173-180, ¶ 10, Exh. I (Garfield, B., *Making Laws More Public Transcript - On The Media*, interview of Carl Malamud, <u>The Media</u>, April 13, 2012), production p. AERA_APA_NCME_32076) (emphasis added).

65.    In March 2012, Public Resource began copying standards incorporated by reference into the Code of Federal Regulations, and providing the copies of these standards to others.  In May 2012, Public Resource began the process of posting copies these standards to its website.  By May 2015, Public Resource had posted PDF copies of over 1,000 standards to its website (Hudis Decl., ¶ 2, Exh. A, pp. 216-218).

66.    To demonstrate the depth and breadth of Public Resource's activities, Defendant has published to its website https://law.resource.org, *inter alia*, numerous state and municipal codes, public safety codes, and technical standards – *see, e.g.*, https://law.resource.org/pub/us/code/safety.html                                          and https://law.resource.org/pub/us/cfr/manifest.us.html   (Hudis Decl., ¶¶ 11-12, Exhs. J-K).

67.     Several of the codes and standards that Public Resource publishes on the https://law.resource.org website are subject to U.S. copyright protection (Hudis Decl., ¶¶ 13-20, Exhs. L-S), and it is believed that Public Resource publishes these codes and standards to the https://law.resource.org website without obtaining the permission of the copyright owners of these works – for example: the Safety Standard for Belt Manlifts: ASME A90.1-2003; the Guidelines for the definition of onshore gas gathering lines, the Classification in Mental Retardation (1983 revision), the Official methods of analysis of the Association of Official Analytical Chemists, the Glazing Manual (1990 edition), Mobile and Locomotive Cranes: ASME B30.5-2004, Drinking water system components: health effects: American national standard/NSF international standard for drinking water additives : ANSI/INSF 61-2001, and the Minimum design loads for buildings and other structures (Special ed. 2003).

68.     In early 2012, Malamud was perusing through the Code of Federal Regulations, looking for various standards purportedly incorporated by reference therein, when he came upon a reference to the Sponsoring Organizations' 1999 Standards (Hudis Decl., ¶ 2, Exh. A, pp. 232-233).

69.     On May 17, 2012, Public Resource purchased a used copy of the 1999 Standards from an Amazon re-seller, "The Book Grove" (Hudis Decl., ¶ 2, Exh. A, pp. 232-240, ¶ 21, Exh. T, Int. Ans. 1, ¶¶ 22-23, Exhs. U and V).

70.     Public Resource only paid for the 1999 Standards, however, after a failed attempt in 2009 of procuring them for free (or at least at a reduced cost) from the National Archives pursuant to a Freedom of Information Act request and accompanying "fee waiver" (Hudis Decl., ¶ 2, Exh. A, pp. 240-51, ¶ 24, Exh. W (production pp. AERA_APA_NCME_10153-57 and 10167) and ¶ 25, Exh. X).

71.     Upon receipt of the purchased paper copy of the 1999 Standards, Malamud disassembled the book, removed the spine, trimmed the pages to give them an even border, scanned the pages to create a PDF (Acrobat Reader) file using a Xerox scanner, and named the PDF file "aera.standards.1999.pdf."   Malamud then appended a cover sheet, or self-made "Certificate," to the front of the PDF file giving a false semblance of governmental approval or permission to the unauthorized copying and online posting of the 1999 Standards (Hudis Decl., ¶ 2, Exh. A, pp. 257-259, 261-264, ¶ 21, Exh. T, Int. Anss. 3-4,  ¶ 26, Exh. Y):



72.     Next, Malamud *claims* he post-processed Public Resource's PDF file of the scanned 1999 Standards to generate Optical Character Recognition ("OCR") on the text (Hudis Decl., ¶ 2, Exh. A, p. 260, ¶ 21, Exh. T, Int. Anss. 3-4).

73.     However, according to Public Resource's expert, James Fruchterman, Malamud never OCR-processed the PDF file, so all Malamud and Public Resource posted to the Internet was an *image-only* document (Hudis Decl., ¶ 27, Exh. Z, pp. 309-310, ¶ 28, Exh. AA, p. 9 (and sub-Exh. B thereto)).

74.     OCR is the process of having a machine recognize letters and words, generally

from documents, and translate those into letter or word equivalents (Hudis Decl., ¶ 27, Exh. Z, pp. 29-30).

75.     Without OCR-processing, Public Resource's unauthorized copying and posting of the 1999 Standards provided no additional technical value, such as for word-searching, online identification, or text-to-speech utilization for the blind and visually impaired (Hudis Decl., ¶ 27, Exh. Z, pp. 30, 122, 200-01, 206, 271-72, 315-16).

76.      In the final step of the process, Malamud claims he stamped metadata into the headers of the PDF file, posted the file (the entirety of Plaintiffs' 1999 Standards) to Public Resource's   https://law.resource.org website as well as the website of the Internet Archive (https://archive.org) (Answer & Counterclaim, Court Dkt. 12, ¶¶ 7, 55; Hudis Decl., ¶ 2, Exh. A, pp. 233-34, 271-72; ¶ 21, Exh. T, Int. Ans. No. 2).

77.     In Defendant's interrogatory answers (verified by Malamud), Public Resource describes a detailed quality control process attendant to the unlawful digital copying of the Sponsoring Organizations' 1999 Standards.  During deposition questioning, however, Malamud was unsure whether he followed those quality control procedures at all (Hudis Decl., ¶ 2, Exh. A, pp. 260-61, 267-68, 274-275, ¶ 21, Exh. T, Int. Anss. 3-4, ¶ 35, Exh. HH, Admission No. 2).

78.     The Internet Archive is a nonprofit organization whose mission is to build and maintain a digital library of the Internet.  The Internet Archive builds this Internet library – which it makes available for public use – by scanning, digitally capturing, and saving the electronically scanned and captured third-party websites, and by receiving content submissions from third parties who have access to do so by the establishment of user accounts (Hudis Decl., ¶ 29, Exh. BB, pp. 31-41).

79.     Malamud has such user account access (Hudis Decl., ¶ 29, Exh. BB, pp. 51-56),

through which he uploaded the entirety of the 1999 Standards to the Internet Archive's website on May 26-27, 2012 (Hudis Decl., ¶ 29, Exh. BB, pp. 59-112, ¶ 30, Exh. CC (¶¶ 3-18 therein), ¶ 32, Exh. EE, ¶ 33, Exh. FF).

80.     Public Resource posted Plaintiffs' 1999 Standards to its website and the Internet Archive website without the permission or authorization of any of the Sponsoring Organizations (Hudis Decl., ¶ 35, Exh. HH, Admission Nos. 4-5; Levine  Decl., ¶ 29; Ernesto Decl., ¶ 35; Wise Decl., ¶ 26).

81.     By uploading the 1999 Standards to the Internet Archive, Public Resource violated the Internet Archive's Terms of Use in effect at the time of Public Resource's infringement, which in relevant part states:

> This terms of use agreement (the "Agreement") governs your use of the collection of Web pages and other digital content (the "Collections") available through the Internet Archive (the "Archive"). When accessing an archived page, you will be presented with the terms of use agreement. If you do not agree to these terms, please do not use the Archive's Collections or its Web site (the "Site").
>
> * * *
>
> Some of the content available through the Archive may be governed by local, national, and/or international laws and regulations … You agree to abide by all applicable laws and regulations, including intellectual property laws, in connection with your use of the Archive. In particular, *you certify that your use of any part of the Archive's Collections will be … limited to noninfringing or fair use under copyright law*. In using the Archive's site, Collections, and/or services, you further agree … (b) *not to act in any way that might give rise to civil or criminal liability*, [and] … (e) *not to infringe any copyright*, trademark, patent, *or other proprietary rights of any person*, …

(Hudis Decl., ¶ 29, Exh. BB, pp. 41-45, ¶ 31, Exh. DD) (emphasis added)

82.     The unauthorized copy of the Sponsoring Organizations' 1999 Standards that Malamud        published        to        the        Internet        Archive        at https://archive.org/details/gov.law.aera.standards.1999  was in the exact same format, using the same cover sheet or "Certificate" employed by Public Resource in the posting of the Sponsoring

Organizations' 1999 Standards to Defendant's own website. All of the surrounding text associated with the posting to the Internet Archive website was inserted by Malamud – including the insertion of "Creative Commons License: <u>CC0 1.0 Universal</u>," indicating that *no rights are being asserted* over the item (Hudis Decl., ¶ 2, Exh. A, pp. 275-284, ¶ 29, Exh. BB, pp. 57-63, ¶ 30, Exh. CC (¶ 2 therein), ¶ 34, Exh. GG):

 

83.    Public Resource claims the Sponsoring Organizations' 1999 Standards were posted to Public Resource's https://law.resource.org website and to the Internet Archive https://archive.org website from July 11, 2012 to June 10, 2014 (Hudis Decl., ¶ 21, Ex. T, Int. Ans. 2).

84.    As previously noted, Public Resource actually uploaded the 1999 Standards to Internet Archive's website on May 26-27, 2012. The Sponsoring Organizations have no ability to verify when Public Resource uploaded the 1999 Standards to its own website, because neither the "file creation date" nor user access logs were produced during discovery, notwithstanding production requests for this documentation and an accompanying discovery motion demanding production that in relevant part was denied (Hudis Decl., ¶ 36).

85.    Although based on incomplete reporting because Public Resource destroyed some of its records (Hudis Decl., ¶ 2, Exh. A, pp. 272-74, 328-336), during the near two year period

that the Sponsoring Organizations' 1999 Standards were posted on Public Resource's https://law.resource.org website, they were accessed *at least* 4,164 times (Hudis Decl., ¶ 21, Exh. T, Int. Ans. 2 and Amended Ans. 5 (labeled 6)).

86.     During that same period, the Sponsoring Organizations' 1999 Standards were accessed on the Internet Archive https://archive.org website 1,290 times (Hudis Decl., ¶ 29, Exh. BB, pp. 124-132, ¶ 37, Exh. II).

87.      The Internet Archive's website is open to the public and does not restrict an Internet user's ability to download or print the Sponsoring Organizations' 1999 Standards. Public Resource also placed no such restrictions on its website (Hudis Decl., ¶ 2, Exh. A, pp. 347-48), as Defendant's expert, Mr. Fruchterman, confirmed (Hudis Decl., ¶ 27, Exh. Z, pp. 327-28).

88.     Mr. Fruchterman also confirmed that there were no sign-up procedures to enter Public Resource's https://law.resource.org website, nor was there any Digital Rights Management (or "DRM") plan to protect against wide-spread copying of the files accessed from Public Resource's site (Hudis Decl., ¶ 27, Exh. Z, pp. 324-27, 167-173).

89.     The parties and the Court can only speculate on the number of further electronic copies of the 1999 Standards that were made and distributed to others by the original Internet users who accessed the unauthorized copies that Public Resource posted to its site and the Internet Archive site.

90.     There simply is no way for Plaintiffs to calculate with any degree of certainty the number of university/college professors, students, testing companies and others who would have purchased Plaintiffs' Standards but for their wholesale posting on Defendant's https://law.resource.org website and the Internet Archive http://archive.org website (Levine Decl., ¶ 30; Geisinger Decl., ¶ 24).

91.     In late 2013 and early 2014, the Sponsoring Organizations became aware that the 1999 Standards had been posted on the Internet without their authorization, and that students were obtaining free copies from the posting source.  Upon further investigation, the Sponsoring Organizations discovered that Public Resource was the source of the online posting (Camara Decl, ¶ 21, Exh. MMM; Wise Decl., ¶¶ 27-28, Exh. LLL).

92.     In December 2013, Plaintiff AERA requested in writing that Public Resource remove the 1999 Standards from its online postings (Levine Decl., ¶ 31, Exh. UUU).  Defendant flatly refused (Hudis Decl., ¶ 2, Exh. A, pp. 310-19, ¶ 38, Exh. JJ, ¶ 39, Exh. KK).  Once this lawsuit was filed and the Sponsoring Organizations threatened to file a motion for a preliminary injunction, Public Resource agreed in June 2014 to remove its postings of the 1999 Standards from its https://law.resource.org website and from Internet Archive's  https://archive.org website – pending a resolution of this litigation on the merits.  Public Resource's undertaking included the promise not to post any revision of the 1999 Standards (i.e., the 2014 Standards) pending the outcome of this litigation (Hudis Decl., ¶ 2, Exh. A, pp. 322-28, ¶ 40, Exh. LL, ¶ 41, Exh. MM).

93.     Had Public Resource not made, and followed through with, these promises, the Sponsoring Organizations would have filed a preliminary injunction motion and were seriously contemplating delaying publication of the 2014 Standards (Levine  Decl., ¶ 32).

## VIII.   Harm to Plaintiffs Caused by Defendant's Infringement

94.     By June 2014, when Public Resource finally removed its online postings of the 1999 Standards, the damage already had been done.  In Fiscal Year ("FY") 2011 to FY 2012, as compared to FY 2011, the Sponsoring Organizations experienced a 34% drop in sales of the 1999 Standards.  In FY 2013, sales of the 1999 Standards remained at their low level from the prior fiscal year (Levine Decl., ¶¶ 18, 33, Exh. OOO).

95.     The timing of the drop in sales is notable, given that Public Resource posted the Standards to the Internet in 2012-2013, and that the Sponsoring Organizations' updated Standards were not published until the summer of 2014 (Levine Decl., ¶ 34).

96.     For a publication with the longevity of the 1999 Standards, one otherwise would expect to see a gradual decline in sales year-over-year; not the precipitous drop in sales experienced by the 1999 Standards in 2012 and 2013 (Geisinger Decl., ¶ 25).

97.     Past harm from Public Resource's infringing activities includes misuse of Plaintiffs' intellectual property without permission (Ernesto Decl., ¶ 36; Geisinger Decl., ¶ 26), lost sales that cannot be totally accounted for – due to potentially infinite Internet distribution, for example by psychometrics students (Wise Decl., ¶¶ 27-28, Exh. LLL; Levine Decl., ¶ 35; Geisinger Decl., ¶ 26).

98.     The harm also includes lack of funding that otherwise would have been available for the update of the Sponsoring Organizations' Standards from the 1999 to the 2014 versions (Levine Decl., ¶ 35; Camara Decl., ¶ 22; Geisinger Decl., ¶ 26).

99.     Should Public Resource's infringement be allowed to continue, the harm to the Sponsoring Organizations, and public at large who rely on the preparation and administration of valid, fair and reliable tests, includes: (i) uncontrolled publication of the 1999 Standards without any notice that those guidelines have been replaced by the 2014 Standards; (ii) future unquantifiable loss of revenue from sales of authorized copies of the 1999 Standards (with proper notice that they are no longer the current version) and the 2014 Standards; and (iii) lack of funding for future revisions of the 2014 Standards and beyond (Levine Decl., ¶ 36; Camara Decl., ¶ 23; Ernesto Decl., ¶ 37; Geisinger Decl., ¶ 27).

100.    Without the sales revenue from prior Standards versions (because – if Public

Resource succeeds in this litigation – this publication will be made freely available online), it is very unlikely that future updates to the Standards will be undertaken.  This is because NCME is too small an organization to financially support periodic updates of the Standards, AERA does not have the budget for it, and an insufficient number of psychometricians are members of APA for it to justify the ongoing expenditures.  Charging extra membership fees to fund ongoing updates to the Standards would never happen, because the governing bodies of AERA, APA and NCME would not vote for it.  If these Sponsoring Organizations ceased updating the Standards, it is unlikely that other organizations would step in and continue the effort (Geisinger Decl., ¶ 23).

## IX.     Harm to the Public

101.     The harm caused to the public by out-of-date Standards will be significant, because the testing and assessment fields are constantly changing, given updates in testing technology and ever-evolving collective thought on the validity, reliability and fairness of tests. Members of the public who would be harmed by discontinued update of the Standards include psychometrics professors, students and professionals, as well as test developers, administrators and test takers (Geisinger Decl., ¶ 28).

## X.     The Continuing Harm Defendant will Cause without the Court's Intervention

102.     Notwithstanding the harm it has caused, and could potentially continue to cause, Public Resource's intentions are crystal clear.  Although not now publicly available pending the outcome of this litigation, Public Resource still has an unauthorized copy of the Sponsoring Organizations' 1999 Standards on its server (Hudis Decl., ¶ 2, Exh. A, pp. 273, 309); as does the Internet Archive (Hudis Decl., ¶ 29, Exh. BB, pp. 116-17).

103.     It would be very simple for Public Resource to re-post the 1999 Standards to

Public Resource's website with little effort (Hudis Decl., ¶ 2, Exh. A, pp. 306-07).

104.    Moreover, should Public Resource successfully defend this lawsuit, it has every intention of similarly posting the Sponsoring Organizations' 2014 Standards to the Internet in the same manner it posted Plaintiffs' 1999 Standards (Hudis Decl., ¶ 2, Exh. A, pp. 308-09).

Respectfully submitted,

QUARLES & BRADY LLP

Dated: December 21, 2015          By:   */s/ Jonathan Hudis*
                                        Jonathan Hudis (DC Bar # 418872)
                                        1700 K Street NW, Suite 825
                                        Washington, DC 20006-3825
                                        Tel. (202) 372-9600
                                        Fax (202) 372-9599
                                        E-Mail Jonathan.Hudis@quarles.com

                                        Kathleen Cooney-Porter (DC Bar # 434526)
                                        OBLON, McCLELLAND, MAIER &
                                        NEUSTADT, LLP
                                        1940 Duke Street
                                        Alexandria, VA 22314
                                        Tel. (703) 413-3000
                                        Fax (703) 413-2220
                                        E-Mail kcooney-porter@oblon.com

                                        Attorneys for Plaintiffs

                                        AMERICAN EDUCATIONAL RESEARCH
                                         ASSOCIATION, INC., AMERICAN
                                        PSYCHOLOGICAL  ASSOCIATION, INC.
                                        NATIONAL COUNCIL ON
                                        MEASUREMENT IN EDUCATION, INC.