# EXHIBIT A

Case No. 1:14-cv-00857-TSC-DAR

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3   _____

 4   AMERICAN EDUCATIONAL RESEARCH      )

 5   ASSOCIATION, INC., AMERICAN        )

 6   PSYCHOLOGICAL ASSOCIATION, INC., )

 7   and NATIONAL COUNCIL ON            )

 8   MEASUREMENT IN EDUCATION, INC.,  ) Civil Action No.

 9                  Plaintiffs,     ) 1:14-cv-00857-TSC-DAR

10          v.                        )

11   PUBLIC.RESOURCE.ORG,              )

12                  Defendant.        )

13   _____)

14

15

16        VIDEOTAPED DEPOSITION OF CARL MALAMUD

17

18

19   DATE:            May 12, 2015

20   TIME:            9:33 a.m.

21   LOCATION:        Fenwick & West

22                    555 California Street

23                    12th Floor

24                    San Francisco, California  94104

25   REPORTED BY:     Diane S. Martin, CSR 6464, CCRR
```

Page 2

1                A P P E A R A N C E S:

2

3    For the Plaintiffs:

4            OBLON, McCLELLAND, MAIER & NEUSTADT, LLP

5            BY:  JONATHAN HUDIS, ESQ.

6                 KATHERINE D. CAPPAERT, ESQ.

7            1940 Duke Street

8            Alexandria, Virginia  22314

9            703-413-3000

10           jhudis@oblon.com

11           kcappaert@oblon.com

12

13   For the Defendant Public.Resource.Org:

14           FENWICK & WEST

15           BY:  ANDREW P. BRIDGES, ESQ.

16           555 California Street

17           112th Floor

18           San Francisco, California  94104

19           415-875-2300

20           abridges@fenwick.com

21           BY:  MATTHEW BECKER, ESQ.

22           801 California Street

23           Mountain View, California  94041

24           650-988-8500

25           mbecker@fenwick.com

Page 3

1             A P P E A R A N C E S: (Continued)

2

3    For the Defendant Electronic Frontier Foundation:

4         ELECTRONIC FRONTIER FOUNDATION

5         BY:  CORYNNE McSHERRY, ESQ.

6              MITCHELL L. STOLTZ, ESQ.

7         815 Eddy Street

8         San Francisco, California  94109

9         415-436-9333

10        corynne@eff.org

11        mitch@eff.org

12

13

14   The Videographer:       Anthony Hensley

15

16

17

18

19

20

21

22

23

24

25

Carl Malamud                                                        May 12, 2015
                          San Francisco, CA

                                                                      Page 4

 1                      EXAMINATION INDEX

 2     EXAMINATION BY:                              PAGE

 3     MR. HUDIS                                    10

 4

 5

 6

 7                       EXHIBIT INDEX

 8     PLAINTIFFS'                                  PAGE

 9     13 -  Notice of Deposition of Carl Malamud     14

10     14 -  Notice of Deposition of Defendant        14

11           Public.Resource.Org, Inc.

12     15 -  Reference Citations                      28

13     16 -  Articles of Incorporation of            94

14           Public.Resource.Org

15     17 -  Bylaws of Public.Resource.Org, Inc.     94

16     18 -  Letter to Public.Resource.Org, Inc. from  94

17           IRS dated September 25, 2007

18     19 -  Public.Resource.Org home page, Bates    110

19           AERA_APA_NCME_0031411

20     20 -  Public.Resource.Org Agency Directory,   110

21           Bates AERA_APA_NCME_0031412 to 31413

22     21 -  Defendant-Counterclaimant              125

23           Public.Resource.Org, Inc.'s Initial

24           Disclosures Pursuant to

25           Fed.R.Civ.P.26(a)(1)

Carl Malamud                                                      May 12, 2015
San Francisco, CA

Page 5

1              EXHIBIT INDEX (Continued)

2    PLAINTIFFS'                                            PAGE

3    22 -  Exploring the Internet, a Technical        155

4          Travelogue, Bates AERA_APA_NCME_0032079

5          to 32228

6    23 -  E-mail from Carl Malamud to Jonathan       166

7          Siegel dated October 1, 2011, Bates

8          AERA_APA_NCME_0031488 to 31489

9    24 -  On The Media transcript, Bates             173

10         AERA_APA_NCME_0032075 to 0032078

11   25 -  Boing Boing Official Guest Memorandum of   181

12         Law, Bates AERA_APA_NCME_0031764 to 31769

13   26 -  Kickstarter Campaign, Bates                185

14         AERA_APA_NCME_0031480 to 31485

15   27 -  Kickstarter Campaign, Bates                207

16         AERA_APA_NCME_0031480 to 31485

17   28 -  An Edicts of Government Amendment, Bates    213

18         AERA_APA_NCME_0031208 to 0031250

19   29 -  Defendant-Counterclaimant                  236

20         Public.Resource.Org, Inc.'s Amended

21         Responses to

22         Plaintiffs-Counterdefendants' First Set

23         of Interrogatores Nos. 1-8

24   30 -  Receipt from Amazon.com, Bates             237

25         PROAERA_00000446 to 447

Carl Malamud                                                       May 12, 2015
San Francisco, CA

Page 6

1                  EXHIBIT INDEX (Continued)

2     PLAINTIFFS'                                      PAGE

3     31 -  Standards for Educational and             239

4           Psychological Testing, Bates

5           AERA_APA_NCME_0000001 to 201

6     32 -  Letter to Gary M. Stern from Carl         240

7           Malamud dated July 14, 2009, Bates

8           PROAERA_00010153 to 10195

9     33 -  Letter to Carl Malamud from National      251

10          Archives and Records Administration

11          dated August 3, 2009, Bates

12          PROAERA_00010247 to 249

13    34 -  AERA:  Standard for Educational and       261

14          Psychological Testing, Bates

15          AERA_APA_NCME_0031528 to 31738

16    35A - Yo! Your Honor transcription dated April  287

17          7, 2015, Bates AERA_APA_NCME_0032046 to

18          32074

19    35B - Yo! Your Honor transcription dated April  287

20          7, 2015, Bates AERA_APA_NCME_0032046 to

21          32074 CD

22    36 -  Directory of Tables and ReadMe File,      293

23          Bates PROAERA_00000830 to 837

24

25

Carl Malamud                                                                  May 12, 2015
San Francisco, CA

```
 1            EXHIBIT INDEX (Continued)

 2   PLAINTIFFS'                                    PAGE

 3   37 -  AERA:  Standard for Educational and      301

 4         Psychological Testing, Bates

 5         PROAERA_00000822 to 823

 6   38 -  E-mail from Carl Malamud to Alexis Rossi  304

 7         dated 6/11/2014, Bates PROAERA_00000824

 8   39 -  E-mail from John Neikirk to Carl Malamud  310

 9         dated 12/16/2013, Bates

10         AERA_APA_NCME_0005129

11   40 -  Letter to John Neikirk from Carl Malamud  313

12         dated December 19, 2013, Bates

13         AERA_APA_NCME_0005127 to 5128

14   41 -  E-mail from Carl Malamud to Christopher   319

15         Butler dated 12/19/2013, Bates

16         PROAERA_00000810

17   42 -  E-mail from Jonathan Hudis to Carl        322

18         Malamud dated 6/10/2014, Bates

19         PROAERA_00000820 to 821

20   43 -  Memorandum dated 6/12/2014                324

21   44 -  Spreadsheet, Bates PROAERA_00000827       336

22   45 -  Defendant-Counterclaimant                 351

23         Public.Resource.Org, Inc.'s Responses to

24         Plaintiffs' Second Set of

25         Interrogatories
```

Page 8

```
 1              EXHIBIT INDEX (Continued)

 2   PLAINTIFFS'                               PAGE

 3   46 -  Public.Resource.Org, Inc.'s Counterclaim  358

 4         for Declaratory Relief; Answer to

 5         Complaint

 6   47 -  E-mail from Carl Malamud to All Members   366

 7         of the Public.Resource Legal Staff dated

 8         December 28, 2012, Bates

 9         AERA_APA_NCME_0031807 to 809

10

11

12              INDEX OF MARKED QUESTIONS

13   PAGE                                       LINE

14   18                                           5

15      Q.  Without revealing the substance of

16   attorney-client communications, who did you speak

17   with to prepare to testify today?

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2                       --oOo--

3          THE VIDEOGRAPHER:  Good morning.  We're on

4     the video record, ladies and gentlemen, at

5     9:33 a.m.  I am Anthony Hensley from Alderson Court

6     Reporting in Washington D.C.  The phone number is

7     202-289-2260.

8          This is matter pending before the court of

9     the United States District Court for the District

10    of Columbia in the case captioned American

11    Educational Research Association et al., versus

12    Public.Resource.Org, Incorporated, case number

13    1-14-cv-00857-TSC-DAR.

14          This is the beginning of Disc 1, Volume 1

15    of the deposition of Carl Malamud on 5/11/2015.

16          We're located at address 555 California

17    Street, San Francisco, California.  This is taken

18    on behalf of the plaintiffs.

19          Counsel, would you please identify

20    yourselves starting with the questioning attorney.

21          MR. HUDIS:  Jonathan Hudis, and Katherine

22    Cappaert for the plaintiffs.

23          MR. BRIDGES:  Andrew Bridges and Matt

24    Becker of Fenwick & West for the defendant.

25          MR. SMITH:  Corynne McSherry from the

1    Electronic Frontier Foundation for the defendant.

2             THE VIDEOGRAPHER:  You may proceed.

3             MR. HUDIS:  Just a correction for the

4    record.  Today is May 12th, 2015.

5    BY MR. HUDIS:

6        Q.  Sir, could I have your full name and

7    address for the record?

8             Oh, go ahead.

9             THe REPORTER:  Thank you.

10            Sir, could I have you raise your right

11   hand, please.

12                     CARL MALAMUD,

13   called as a witness, after having been duly sworn

14   by the Certified Shorthand Reporter to tell the

15   truth, the whole truth, and nothing but the truth,

16   testified as follows:

17                     EXAMINATION

18   BY MR. HUDIS:

19       Q.  Sir, if I could have your full name and

20   address for the record.

21       A.  Carl Andrew Malamud, and my address is

22   1005, Gravenstein Highway North in Sebastapol,

23   California.  Zip code is 95472.

24       Q.  And is that your home address?

25       A.  No, that's my work address.

1      Q.  All right.  And your home address, sir?

2      A.  It's P.O. Box 361 in Bodega, California,

3   94992.

4      Q.  Mr. Malamud, we're here to take your

5   deposition in the matter of American Educational

6   Research Association and its co-plaintiffs versus

7   Public.Resource.Org.

8          The parties all have long names.  So I want

9   to establish some working acronyms between the two

10  of us.

11         So if I say AERA, do you understand that to

12  mean the American Educational Research Association,

13  Inc.?

14     A.  Yes, I do.

15     Q.  And if I use the acronym APA, that will

16  refer to the American Psychological Association,

17  Inc.

18     A.  Yes.

19     Q.  And if I use the acronym NCME, that will

20  refer to National Council on Measurement and

21  Education, Inc.

22     A.  Yes.

23     Q.  And if I refer to Public.Resource, that

24  will be a shorthand version of Public.Resource.Org,

25  Inc.?

Page 12

1      A.   That's correct.

2      Q.   And a couple of housekeeping matters,

3   Mr. Malamud.

4           You understand that today you're giving

5   testimony under oath?

6      A.   I do.

7      Q.   And that the court reporter is taking down

8   everything you are saying?

9      A.   I do.

10     Q.   And we will need audible responses from

11  you.  So no nods or gestures.

12     A.   Yes.

13     Q.   If at any point, Mr. Malamud, you don't

14  understand a question, please let me know and I

15  will try to clarify that question for you.

16     A.   I will.

17     Q.   If you need a break for any reason, please

18  let me know and we can provide that break for you.

19  Except if there is a question pending, you must

20  answer the question before we take the break.  Is

21  that okay?

22     A.   Yes, I understand.

23     Q.   All right.  If at any point you come to

24  realize that an answer that you've already given is

25  not completely correct, please let me know and I

Page 13

1    will give you an opportunity to correct that

2    answer.  Do you understand?

3        A.  I do.

4        Q.  All right.

5            MR. BRIDGES:  I would like to take the time

6    to say that under the rules, we do request the

7    opportunity to review and correct the deposition

8    afterwards.

9            MR. HUDIS:  Thank you, Counsel.

10   BY MR. HUDIS:

11       Q.  Is there any reason, Mr. Malamud, either by

12   your taking medication or by reason of illness,

13   that you cannot testify completely, accurately and

14   truthfully today?

15       A.  There is no reason.

16       Q.  Have you been deposed before?

17       A.  Yes, I have.

18       Q.  In what case or what cases?

19       A.  That was in the case of --

20           MR. BRIDGES:  Sorry.  I need for you to

21   give me time to --

22           THE WITNESS:  Yes, sir.

23           MR. BRIDGES:  That was not objectionable,

24   but give me time.

25           THE WITNESS:  That was the case ASTM et

1    al., versus Public.Resource.Org.

2    BY MR. HUDIS:

3       Q.  Have you been deposed in any other cases?

4       A.  No, I have not.

5       Q.  One other housekeeping matter that your

6    counsel just reminded me.

7           So for the benefit of the court reporter,

8    wait until I finish my question before you start

9    answering so that for one thing, the court reporter

10   has a clean transcript.  And the other, your

11   counsel has time to object if he wants to.

12          Do you understand that?

13      A.  Yes, I understand.

14          (PLAINTIFFS' EXHIBITS 13-14 WERE MARKED.)

15   BY MR. HUDIS:

16      Q.  Mr. Malamud, I put in front of you what has

17   now been marked as Plaintiff's Exhibit Malamud 13.

18          Have you seen this deposition notice

19   before, Exhibit 13 that is directed to you?

20          MR. BRIDGES:  I'm sorry, so which -- it

21   appears as though two -- I received two.  I just

22   want -- 13 is -- okay.

23          THE WITNESS:  It says 14.

24          MR. BRIDGES:  Yes.  The one he's looking at

25   is -- this is 13.  It came to me.

Carl Malamud                                              May 12, 2015
San Francisco, CA

Page 15

1   BY MR. SPEAR:

2       Q.  All right.  Are we good?

3       A.  The document entitled notice of deposition

4   of Carl Malamud.

5       Q.  Right.  And that's Exhibit 13?

6       A.  Yes, it is.

7       Q.  Have you seen this deposition notice of

8   Exhibit 13 before?

9       A.  Yes, I have.

10      Q.  When for the first time?

11      A.  When it was served, I believe.

12      Q.  So if we gave it to your counsel on April

13  9, that's the first time around which you probably

14  saw Exhibit 13?

15          MR. BRIDGES:  Objection.  Calls for

16  speculation.

17  BY MR. HUDIS:

18      Q.  You may answer.

19      A.  I saw it in April.

20      Q.  What did you do to prepare to testify

21  regarding the deposition notice of Exhibit 13?

22          MR. BRIDGES:  Objection.  Argumentative;

23  lacks foundation; assumes facts not in evidence.

24  BY MR. HUDIS:

25      Q.  You may answer.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1      A.  I reviewed the deposition notice.  I

2   reviewed the materials that were disclosed to the

3   plaintiffs during the discovery process.

4      Q.  Do you remember which documents you

5   reviewed?

6      A.  It was the materials that were disclosed to

7   the plaintiffs.

8      Q.  Do you remember any specific documents that

9   you reviewed?

10     A.  There were a large number of such

11  documents.  Would you like a couple examples?

12     Q.  Yes, please.

13     A.  There was a California Code of Regulations.

14  There were some -- there was a FOIA request.  There

15  was an electronic mail.  There were some letters.

16     Q.  Anything else that you can remember at this

17  time?

18     A.  I think that was the main material.  There

19  were some appendices to some of the -- the letters

20  and electronic mail.

21     Q.  All right.  Do you remember in total how

22  many documents you might have reviewed to prepare

23  to testify?

24        MR. BRIDGES:  Objection.  Calls for

25  speculation.

Carl Malamud                                                      May 12, 2015
                          San Francisco, CA

1          THE WITNESS:  I don't know how many

2     exactly, no.

3     BY MR. HUDIS:

4          Q.  In preparation for testifying today,

5     pursuant to the personal deposition notice of

6     Exhibit 13, did you talk with anybody?

7          MR. BRIDGES:  Objection.  To the extent it

8     calls for the witness to reveal attorney-client

9     communications, I'll object on that basis and

10    instruct the witness not to answer.

11    BY MR. HUDIS:

12         Q.  All right.  Without revealing the substance

13    of attorney-client communications, who did you

14    speak with to prepare to testify today?

15         MR. BRIDGES:  If -- if he had a

16    conversation with attorneys, that answer would call

17    for divulging of attorney-client communications

18    itself.  And I'd object and instruct the witness

19    not to answer.

20         If you want to ask him about any

21    conversations he had with persons other than

22    attorneys, please do so.

23         MR. HUDIS:  All right.  So you're

24    instructing the witness not to answer whether he

25    spoke with attorneys regarding this preparation?

Carl Malamud                                                                May 12, 2015
San Francisco, CA

1          MR. BRIDGES:  If you're asking about

2     talking with attorneys regarding preparation, yes,

3     that's correct.

4          MR. HUDIS:  Mark that question for ruling.

5     BY MR. HUDIS:

6       Q.  Besides counsel, who, if anyone, did you

7     speak with to prepare to testify today?

8       A.  I didn't speak to anybody.

9       Q.  Did you speak with anyone at Internet

10    Archive to prepare to testify today?

11      A.  No, I did not.

12      Q.  How long did you take to prepare for your

13    deposition testimony today?

14         MR. BRIDGES:  Objection.  Argumentative;

15    lacks foundation.

16         THE WITNESS:  I spent several hours a day,

17    all of last week.  And I spent some time over the

18    weekend and on Monday preparing.

19    BY MR. HUDIS:

20      Q.  And how long in total do you think you

21    spent preparing to testify?

22         MR. BRIDGES:  Actually, same objections and

23    also vague and ambiguous.

24         Are you referring to his personal

25    deposition as opposed to his 30(b)(6) deposition?

1        MR. HUDIS:  Yes.

2        MR. BRIDGES:  Then it's -- lacks

3   foundation; argumentative; vague and ambiguous.

4   BY MR. HUDIS:

5        Q.  You may answer.

6        A.  My preparation was for my deposition in

7   both of my capacities.  So I was unable to separate

8   out which times were one or the other.

9        Q.  That's fine.  Then how long in total did

10  you prepare to testify in all your capacities

11  today?

12        MR. BRIDGES:  Objection.  Vague and

13  ambiguous.

14  BY MR. HUDIS:

15        Q.  You may answer.

16        A.  Well, it was a few hours a day last week.

17  It was tens of hours.  I don't have an exact

18  number.

19        MR. BRIDGES:  Please give me time to

20  object.

21  BY MR. HUDIS:

22        Q.  Mr. Malamud, I'd like to now place in front

23  of you what has been marked as Exhibit 14.  And

24  that is the deposition notice directed to

25  Public.Resource.

Carl Malamud                                                May 12, 2015
San Francisco, CA

Page 20

1          Do you see that?

2     A.  I do.

3     Q.  Which topics of the deposition notice in

4  Exhibit 14 are you prepared to testify to today?

5          MR. BRIDGES:  I'm going to note for the

6  record that there are objections which we as

7  lawyers have interposed, and I will state for the

8  record that we are not -- the defendant is not

9  producing Mr. Malamud with respect to categories 4,

10  10, 11, 19, 23, 29 and 30.  And we will object to

11  any questions on those topics.

12          Of course, questions to Mr. Malamud on

13  those topics may proceed to the extent that they

14  are otherwise unobjectionable.  But they would not

15  be pursuant to Rule 30(b)(6).

16          MR. HUDIS:  So, Counsel, other than the

17  ones that you specifically named, is Mr. Malamud

18  prepared to testify on all the other deposition

19  topics in the deposition notice of Exhibit 14?

20          MR. BRIDGES:  Yes.

21  BY MR. HUDIS:

22     Q.  Now, with respect to the deposition notice

23  of Exhibit 14, what did you do to prepare to

24  testify regarding these topics?

25          MR. BRIDGES:  Objection.  Vague and

Carl Malamud                                                        May 12, 2015
San Francisco, CA

1    ambiguous.

2    BY MR. HUDIS:

3        Q.  You may answer.

4        A.  The same thing that I recently described to

5    you about my personal preparation.

6        Q.  And you reviewed the same documents and the

7    same number of documents?

8            MR. BRIDGES:  Lacks foundation; vague and

9    ambiguous.

10   BY MR. HUDIS:

11       Q.  You may answer.

12       A.  Yes.  My preparation was in toto.  It

13   wasn't separate by the type of deposition.

14       Q.  And to prepare to testify for your

15   deposition of Exhibit 14, did you speak with

16   counsel?

17           MR. BRIDGES:  I will not object to that

18   question exactly as phrased.

19           THE WITNESS:  I spoke with counsel.

20   BY MR. HUDIS:

21       Q.  Did you speak with anyone else besides

22   counsel in order to prepare to testify on the

23   deposition topics of Exhibit 14?

24       A.  No, I did not.

25       Q.  Did you speak with anyone at Internet

Page 22

1    Archive to prepare to testify today?

2        A.  No, I did not.

3        Q.  And you spent the same number of hours in

4    total to prepare to testify regarding Exhibits 13

5    and 14, as you described before?

6            MR. BRIDGES:  Objection.  Vague and

7    ambiguous.

8    BY MR. HUDIS:

9        Q.  You may answer.

10           MR. BRIDGES:  Lacks foundation.

11           THE WITNESS:  My preparation was for the

12   deposition.  I did not separate my time out between

13   the two roles that I play.

14   BY MR. HUDIS:

15       Q.  To prepare to testify today with respect to

16   both deposition notices of Exhibit 13 and 14, did

17   you speak with Ms. Rebecca Malamud?

18       A.  No, I did not.

19       Q.  Mr. Malamud, what's the highest level of

20   your education?

21       A.  Highest degree?

22       Q.  Yes.

23       A.  I have an MBA.

24       Q.  Do you have a bachelor's degree?

25       A.  Yes, I do.

Page 23

1    Q.  All right.  And from where?

2    A.  Indiana University.

3    Q.  And what was the degree in?

4    A.  Business economics and public policy.

5    Q.  And when did you receive that degree?

6    A.  Which degree?

7    Q.  The B.S. in business economics and public

8    policy.

9    A.  1980.

10   Q.  Towards your bachelor's degree, did you

11   have any major concentration?

12   A.  Business economics and public policy.

13   Q.  Did you have a minor concentration?

14   A.  No, that was the program.

15   Q.  And you said you have an MBA?

16   A.  I do.

17   Q.  And from which institution did you receive

18   your MBA?

19   A.  Indiana University.

20       MR. BRIDGES:  Again, I'll ask you to give

21   me time to object.

22       THE WITNESS:  Yes.

23   BY MR. HUDIS:

24   Q.  And what type of -- what type of MBA degree

25   was that?

```
 1          MR. BRIDGES:  Objection.  Vague and
 2    ambiguous.
 3    BY MR. HUDIS:
 4        Q.  You may answer.
 5        A.  It was an MBA granted as part of the
 6    doctoral program in business economics and public
 7    policy.
 8        Q.  And I believe you said you received your
 9    MBA from Indiana University?
10        A.  That's correct.
11        Q.  And what year did you receive your MBA?
12        A.  I think it was 1982.  It might have been
13    early '83.
14        Q.  Did you have any concentration towards your
15    MBA, major concentration?
16        A.  My doctoral course work was in anti-trust
17    and regulation economics.
18        Q.  Did you have a minor concentration?
19        A.  No, I did not.
20        Q.  Mr. Malamud, do you have any formal legal
21    training?
22          MR. BRIDGES:  Objection.  Vague and
23    ambiguous.
24    BY MR. HUDIS:
25        Q.  You may answer.
```

Page 25

1       A.   I did a year at the Georgetown Law Center,

2   the first year of law school.

3       Q.   And what year was that?

4       A.   1984.

5       Q.   And I take it you didn't go on to finish

6   the degree?

7       A.   No, I did not.

8       Q.   Now, you said you did a doctorate.  Do you

9   have a Ph.D.?

10      A.   No, I do not.

11      Q.   Do you --

12           MR. BRIDGES:  Again, I need time to object.

13           THE WITNESS:  Yes, sir.

14           MR. BRIDGES:  I'll object to that as

15   misstating testimony.

16           Go ahead.

17   BY MR. HUDIS:

18      Q.   Do you have any other degrees?

19      A.   No, I do not.

20      Q.   Do you possess any certificates of any kind

21   for training?

22           MR. BRIDGES:  Objection.  Vague and

23   ambiguous.

24           THE WITNESS:  No.

25   BY MR. HUDIS:

Page 26

1      Q.  Mr. Malamud, I'd like you to define a term

2   for me, "computer science."

3           MR. BRIDGES:  Objection.  Argumentative;

4   vague and ambiguous.

5   BY MR. HUDIS:

6      Q.  You may answer.

7      A.  It's an academic discipline having to do

8   with the study of computers.

9      Q.  And how about "computer networks"?

10          MR. BRIDGES:  Objection.  Vague and

11  ambiguous; argumentative; lacks foundation; assumes

12  facts not in evidence.

13          THE WITNESS:  Computer networks are -- is

14  the discipline and study of how one computer

15  communicates with another computer.

16  BY MR. HUDIS:

17     Q.  Thank you.

18          Have you written any books on computer

19  science or computer networks?

20     A.  Yes.

21          MR. BRIDGES:  Objection.  Vague and

22  ambiguous.

23          THE WITNESS:  Yes.

24  BY MR. HUDIS:

25     Q.  As your counsel said, give him time to

Carl Malamud                                                     May 12, 2015
San Francisco, CA

```
 1   object.

 2      A.  I will try.  Sorry.

 3      Q.  Thank you.

 4          So do you consider yourself to have any

 5   expertise in computer science or computer networks

 6   or both?

 7          MR. BRIDGES:  Objection.  Vague and

 8   ambiguous; compound; argumentative.

 9          MR. HUDIS:  Good point, Counsel.

10          MR. BRIDGES:  Could call for a legal

11   conclusion.

12          MR. HUDIS:  Good point, Counsel.

13   BY MR. HUDIS:

14      Q.  Do you consider yourself to have expertise

15   in computer science?

16          MR. BRIDGES:  Objection.  Vague and

17   ambiguous; argumentative; may call for a legal

18   conclusion.

19          THE WITNESS:  I have worked in the

20   profession since 1980.  I think it's up to others

21   to decide whether I have expertise or not.

22   BY MR. HUDIS:

23      Q.  And if you could briefly summarize your

24   work in the profession over that 30 years.

25          MR. BRIDGES:  Objection.  Calls for a
```

1    narrative; vague and ambiguous.

2    BY MR. HUDIS:

3       Q.  You may answer.

4       A.  I'm not sure what you're asking for.  Do

5    you want to know what jobs I worked or --

6       Q.  We'll take that later.

7           Do you consider yourself to have an

8    expertise in computer networks?

9           MR. BRIDGES:  Objection.  Vague and

10   ambiguous; argumentative; may call for a legal

11   conclusion.

12          THE WITNESS:  Again, I've worked in the

13   profession since 1980, and I believe it's up to

14   others to decide whether I have expertise or not.

15          (PLAINTIFFS' EXHIBIT 15 WAS MARKED.)

16   BY MR. HUDIS:

17      Q.  Mr. Malamud, I show you a document that has

18   now been marked as Exhibit 15.  And I'd like you to

19   look at the exhibit and tell me if that appears to

20   be a representative list of books you have authored

21   or co-authored?

22          MR. BRIDGES:  Objection.  Lacks foundation;

23   vague and ambiguous.

24          THE WITNESS:  It is some books by me, but

25   there's a number of other items in this list.

Page 29

1   BY MR. HUDIS:

2      Q.  And the other items in the list, are they

3   items that you co-authored with others?

4          MR. BRIDGES:  Objection.  Lacks foundation;

5   vague and ambiguous.

6          THE WITNESS:  This is a rather strange

7   list.  Item number 1, Gage, Bailey, Kahn, Malamud,

8   I have no idea what that is.  It may have been some

9   conference proceedings.

10         MR. BRIDGES:  I'll -- I'll ask the witness

11  not to speculate.

12         And I would object to the question at this

13  point on the grounds that may call for speculation

14  and lacks foundation.

15         THE WITNESS:  There are a number of items

16  in here including pamphlets, and it looks like at

17  least one video presentation.

18  BY MR. HUDIS:

19     Q.  Do you recognize the titles on Exhibit 15

20  as either authored by you or co-authored by you?

21         MR. BRIDGES:  Objection.  Lacks foundation;

22  vague and ambiguous; potentially argumentative;

23  compound.

24         Do you want him to identify particular

25  titles?

Carl Malamud                                                        May 12, 2015
San Francisco, CA

1          MR. HUDIS:  I'll --

2     BY MR. HUDIS:

3        Q.  Well, first answer that question.

4          MR. BRIDGES:  All those same objections

5     apply.

6          THE WITNESS:  At first glance, these do

7     appear to be items that I was involved with, either

8     as an author, a co-author or a producer.

9     BY MR. HUDIS:

10       Q.  Are there any items on Exhibit 15 which you

11    do not recognize your involvement as either an

12    author, co-author or producer?

13         MR. BRIDGES:  Objection.  Lacks foundation;

14    vague and ambiguous.

15         THE WITNESS:  I'm not sure what item number

16    1 is on that list, the number one, Gage, Bailey,

17    Kahn.

18         MR. BRIDGES:  Objection.  The question

19    was -- I'm sorry.  Not objection.

20         The question is, are there any items which

21    you do not recognize?  That's the question.

22         THE WITNESS:  Yes.

23    BY MR. HUDIS:

24       Q.  Which one?

25       A.  Item number 1.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

                                                              Page 31

1       Q.  Any others?

2       A.  No.

3       Q.  Of the ones you recognize on Exhibit 15,

4    what generally are the subject matters of these

5    writings?

6            MR. BRIDGES:  Objection.  Massively lacks

7    foundation; massively compound; vague and

8    ambiguous, and misleading and assumes facts not in

9    evidence.

10           THE WITNESS:  There's a large number of

11   topics.  I'd be happy to discuss the individual

12   items and tell you what they're about.

13   BY MR. HUDIS:

14       Q.  Sure.  Sure.

15           So the second item, "12 Tables of American

16   Law."  What -- what is that about?

17           MR. BRIDGES:  Objection.  Vague and

18   ambiguous.

19           THE WITNESS:  That is a lecture I gave at

20   the Harvard Law School to a series -- to a

21   collection of law librarians that had convened.

22   BY MR. HUDIS:

23       Q.  And what was the topic?

24           MR. BRIDGES:  Objection.  Vague and

25   ambiguous.

Page 32

1          THE WITNESS:  The topic was a history of

2     the 12 tables of Roman law, and the application of

3     the concept of promulgation of the law to current

4     system of American justice.

5     BY MR. HUDIS:

6        Q.  The next item, "Law.gov, a revolution in

7     legal affairs."  Could you tell me the subject

8     matter of that item?

9          MR. BRIDGES:  Objection.  Vague and

10    ambiguous.

11         THE WITNESS:  That was a kickoff panel

12    session for the Law.gov effort, which was a attempt

13    to study the question of the availability of

14    primary legal materials in the United States.

15    BY MR. HUDIS:

16       Q.  Availability where?

17       A.  Generally.

18       Q.  On the Internet?  Elsewhere?

19         MR. BRIDGES:  Objection.  Asked and

20    answered.

21         THE WITNESS:  Generally.  The availability

22    of legal materials in the United States.

23    BY MR. HUDIS:

24       Q.  And the next item, "Cyberjockeying in the

25    21st Century," what was that item about?

Carl Malamud                                              May 12, 2015
San Francisco, CA

1          MR. BRIDGES:  Objection.  Vague and

2     ambiguous.

3          THE WITNESS:  That was a satellite-based

4     video production that was produced by Mr. John Gage

5     of Sun Microsystems, and I was a guest where I

6     demonstrated the first radio station on the

7     Internet and how it worked.

8          MR. BRIDGES:  I'll just instruct the

9     witness to answer the question.

10          That question was, what was that item

11     about?

12     BY MR. HUDIS:

13     Q.  The next item, "The currents of our time."

14          What -- what was that publication about?

15          MR. BRIDGES:  Objection.  Vague and

16     ambiguous.

17     BY MR. HUDIS:

18     Q.  You may answer.

19     A.  It was about the procurement of information

20     technology by the federal government.

21     Q.  What did you -- what did you mean in your

22     last answer by "information technology"?

23     A.  Computers, computer networks and software.

24     Q.  The next item, "The future of the Internet

25     protocol."  What was that item about?

Carl Malamud                                                      May 12, 2015
San Francisco, CA

Page 34

1        MR. BRIDGES:  Objection.  Vague and

2    ambiguous.

3        THE WITNESS:  That was a series of

4    interviews that I conducted with Internet engineers

5    about the future of the Internet protocol.

6    BY MR. HUDIS:

7      Q.  And what did you mean by "Internet

8    protocol"?

9        MR. BRIDGES:  Objection.  Vague and

10   ambiguous.

11       THE WITNESS:  The Internet protocol is a

12   specific networking protocol known as IP, which is

13   one of the foundations of the Internet.

14   BY MR. HUDIS:

15     Q.  The next item, "Ten rules for radicals."

16   What was that item about?

17       MR. BRIDGES:  Objection.  Vague and

18   ambiguous.

19       THE WITNESS:  That was a speech before the

20   World Wide Web conference.

21   BY MR. HUDIS:

22     Q.  And what was your speech about?

23       MR. BRIDGES:  Objection.  Asked and

24   answered; vague and ambiguous.

25       THE WITNESS:  It was a keynote speech about

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1    my experiences in the past and some lessons that I

2    had for the attendees.

3    BY MR. HUDIS:

4        Q.  Could you summarize the lessons you

5    imparted to the attendees?

6            MR. BRIDGES:  Objection.  Vague and

7    ambiguous.

8            THE WITNESS:  I can summarize one.  I

9    explained the story of how I put the Securities and

10   Exchange Commission EDGAR database online and the

11   efforts that we undertook in order to get the

12   government to -- to -- to run that service

13   themselves.

14   BY MR. HUDIS:

15       Q.  And the EDGAR database, that's the database

16   for the Securities and Exchange Commission?

17           MR. BRIDGES:  Objection.  Vague and

18   ambiguous.

19           THE WITNESS:  EDGAR is the Electronic Data

20   Gathering, and I forget what AR is, and it is, in

21   fact, the information dissemination database of the

22   Securities and Exchange Commission.

23   BY MR. HUDIS:

24       Q.  And the next item, "Concert in the park,

25   Internet 1996 World Exposition," what -- what was

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1   that item about?

2        MR. BRIDGES:  Objection.  Vague and

3   ambiguous.

4        THE WITNESS:  I was simply a producer on

5   that item.  It was a series of audio compositions

6   by Martin Lucas and Corrine Becknell, and it was

7   released as an audio CD.

8   BY MR. HUDIS:

9     Q.  The next item, "Three revolutions in

10  American law," what was that item about?

11       MR. BRIDGES:  Objection.  Vague and

12  ambiguous.

13       THE WITNESS:  It was a paper about the

14  history of promulgation of the law in the United

15  States beginning with the Wheaton v Peters

16  decision.

17  BY MR. HUDIS:

18    Q.  And what specific area of the law?

19       MR. BRIDGES:  Objection.  Lacks foundation;

20  vague and ambiguous.

21       THE WITNESS:  About promulgation of -- of

22  the law.  Of the laws.

23  BY MR. HUDIS:

24    Q.  And what did you mean by "promulgation"?

25    A.  Promulgation is the process of publication

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 37

1    and dissemination of primary legal materials.

2        Q.  The next item, "Security and networks."

3    What was that item about?

4            MR. BRIDGES:  Objection.  Vague and

5    ambiguous.

6            THE WITNESS:  That was two different audio

7    interviews I did as part of the radio station on

8    the Internet that I ran, one with Jeffrey Schiller

9    and one with John Romkey, about security and

10   networks.

11           MR. BRIDGES:  And I'll ask the witness

12   simply to answer the question that is asked.

13   BY MR. HUDIS:

14       Q.  Mr. Malamud, the next item, "By the

15   people."  What was that item about?

16           MR. BRIDGES:  Objection.  Vague and

17   ambiguous.

18           THE WITNESS:  It was a speech that I gave

19   to the Gov 2.0 conference, I believe was the

20   official name of that.

21   BY MR. HUDIS:

22       Q.  What was the topic of that speech?

23           MR. BRIDGES:  Objection.  Vague and

24   ambiguous.

25           THE WITNESS:  It discussed the history of,

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1    among other things, the government printing office.

2    BY MR. HUDIS:

3        Q.  Do you remember what else that speech was

4    about besides the government printing office?

5            MR. BRIDGES:  Objection.  Vague and

6    ambiguous.

7            THE WITNESS:  It was about the creation of

8    the official journals of government.

9    BY MR. HUDIS:

10       Q.  What did you mean by "official journals"?

11       A.  The official journals of government in the

12   United States include the Congressional Record, the

13   Federal Register, the Code of Federal Regulation

14   and the papers of the president.

15       Q.  The next item, "Mobile IP networking."

16   What was that item about?

17           MR. BRIDGES:  Objection.  Vague and

18   ambiguous.

19           THE WITNESS:  As with the security networks

20   thing we discussed previously, it was an interview

21   that I conducted as part of Internet talk radio

22   with Internet engineers.

23   BY MR. HUDIS:

24       Q.  The next item, "Global network operations,"

25   what was that item about?

Carl Malamud                                                May 12, 2015
                        San Francisco, CA

1          MR. BRIDGES:  Objection.  Vague and

2     ambiguous.

3          THE WITNESS:  Same as the previous.  It was

4     a discussion with Internet engineers about the work

5     that they do.

6     BY MR. HUDIS:

7       Q.  The next item, "Law.gov, the raw materials

8     of our democracy, a shining city upon the hill, an

9     appeal to the court."  What was that item about?

10         MR. BRIDGES:  Objection.  Vague and

11    ambiguous.

12         THE WITNESS:  That was a pamphlet that

13    contained prepared remarks that I delivered upon

14    three occasions.

15    BY MR. HUDIS:

16      Q.  And what is the subject matter of that

17    pamphlet?

18         MR. BRIDGES:  Objection.  Vague and

19    ambiguous.

20         THE WITNESS:  There were -- the subject

21    matter was the Law.gov effort and the question of

22    promulgation of primary legal materials in the

23    United States.

24    BY MR. HUDIS:

25      Q.  As you described before?

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1          MR. BRIDGES:  Objection.  Vague and

2     ambiguous.

3     BY MR. HUDIS:

4        Q.  What do you mean by "primary legal

5     materials"?

6        A.  Primary legal materials are edicts of

7     government.  Those are materials that have the

8     force of law that are -- are -- originated from a

9     governmental body.

10       Q.  Could you give me some examples, please?

11       A.  A supreme court opinion.

12       Q.  So legal opinions?

13         MR. BRIDGES:  Objection.  Vague and

14    ambiguous; misstates testimony.

15         THE WITNESS:  A supreme court opinion is

16    one example.  There are other court opinions that

17    also are edicts of government, yes.

18    BY MR. HUDIS:

19       Q.  Would a statute passed by a legislature be

20    another edict of government?

21         MR. BRIDGES:  Objection.  Vague and

22    ambiguous; lacks foundation.

23         THE WITNESS:  Yes, statutes are edicts of

24    government.

25    BY MR. HUDIS:

Carl Malamud                                                  May 12, 2015
San Francisco, CA

Page 41

1     Q.  Would an agency regulation be another edict

2   of government?

3         MR. BRIDGES:  Objection.  Vague and

4   ambiguous; lacks foundation.

5         THE WITNESS:  Any materials that have the

6   force of law, and that includes a regulation.

7   BY MR. HUDIS:

8     Q.  The next item, "DEC Networks and

9   architectures."  What was that item about?

10     A.  That was a professional reference book

11   about the computer networking protocols that were

12   adopted by the Digital Equipment Corporation.

13     Q.  What did you mean by "computer networking

14   protocols"?

15     A.  It's a suite of specifications that were

16   known as DECnets, which is how Digital Equipment

17   Corporation computers were able to communicate with

18   each other.

19     Q.  When you say the "suite of specifications,"

20   do you mean software?

21     A.  No, I mean protocol specifications.

22     Q.  What do you mean by "protocol

23   specifications"?

24     A.  A detailed and formal description of the

25   way that one computer communicates with another

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 42

1    computer.

2       Q.  The next item, "The World's Fair For the

3    Global Village."  What was that item about?

4          MR. BRIDGES:  Objection.  Vague and

5    ambiguous.

6          THE WITNESS:  That was a book that I wrote

7    about the Internet 1996 World Exposition.

8          This listing is incorrect in the sense of

9    there were two additional contributors to that

10   book.

11   BY MR. HUDIS:

12      Q.  And who were the two additional

13   contributors?

14      A.  The afterword was by a musician named

15   Laurie Anderson.  The foreword was by his holiness,

16   the Dalai Lama.

17      Q.  And generally what was the book, "The

18   World's Fair For the Global Village," about?

19          MR. BRIDGES:  Objection.  Vague and

20   ambiguous.

21          THE WITNESS:  It was a description of the

22   Internet 1996 World Exposition, which I was a

23   co-founder of, and served as secretary general.

24   BY MR. HUDIS:

25      Q.  The next item, "Ingres:  Tools for building

Carl Malamud                                        May 12, 2015
San Francisco, CA

1    an information architecture."  What was that item

2    about?

3         MR. BRIDGES:  Objection.  Vague and

4    ambiguous.

5         THE WITNESS:  It is a professional

6    reference book about the Ingres relational database

7    management system.

8    BY MR. HUDIS:

9       Q.  Could you describe the Ingres --

10        THE REPORTER:  It is a professional book

11   about the Ingres --

12        THE WITNESS:  Professional reference book.

13   BY MR. HUDIS:

14      Q.  Could you describe for me what is the

15   Ingres information database management system?

16      A.  That's the Ingres relational database

17   management system.

18      Q.  Thank you.

19      A.  RDMS.

20      Q.  And could you describe what it is, please?

21      A.  It is one of the two early relational

22   database management systems.  Somewhat akin to a

23   system called Oracle that is very popular today.

24        Ingres and DB2 were the original two

25   relational database systems.  That's capital D,

Page 44

1    capital B letter 2.

2       Q.  Could you tell me the next item, what it is

3    about, "Analyzing DECnet/OSI phase Roman Numeral

4    V"?

5            MR. BRIDGES:  Objection.  Vague and

6    ambiguous.

7            THE WITNESS:  My first book about DEC was

8    about something known as DECnet phase IV.  This

9    book was about the successor to DECnet phase IV, a

10   system of international protocols known as open

11   systems interconnect, or OSI, and this was a

12   professional reference book that discussed in

13   detail the protocols inherent in that protocol

14   suite.

15   BY MR. HUDIS:

16      Q.  In simple terms, what -- what are -- what

17   is the purpose of those protocols?

18           MR. BRIDGES:  Objection.  Vague and

19   ambiguous.

20           THE WITNESS:  OSI was an alternative to

21   TCP/IP, which is the foundation of today's

22   Internet.  So it is a full protocol suite that

23   goes -- that describes all the different

24   capabilities that computers will have when they

25   communicate with each other.

Carl Malamud                                                    May 12, 2015
                              San Francisco, CA

 1   BY MR. HUDIS:

 2      Q.  So it's an Internet communications

 3   protocol?

 4          MR. BRIDGES:  Objection.  Misstates

 5   testimony; vague and ambiguous.

 6          THE WITNESS:  It's a protocol suite, and

 7   that is a whole set of protocols.

 8   BY MR. HUDIS:

 9      Q.  For Internet communications?

10          MR. BRIDGES:  Objection.  Vague and

11   ambiguous.

12          THE WITNESS:  No, because Internet

13   communications is the Internet protocol suite.

14   This was an alternative that was devised, and it

15   was, in effect, a competitor to the Internet.

16   BY MR. HUDIS:

17      Q.  All right.  So it's computer-to-computer

18   communications?

19          MR. BRIDGES:  Objection.  Vague; misstates

20   testimony; vague and ambiguous.

21          THE WITNESS:  Computer-to-computer

22   communications, routing protocols, and a whole

23   suite of other functions that make up a protocol

24   suite.  Again, equivalent to the Internet protocol

25   suite.

Carl Malamud                                                    May 12, 2015
                        San Francisco, CA

 1   BY MR. HUDIS:

 2      Q.  So the next item, "Exploring the Internet,

 3   a Technical Travelogue," t-r-a-v-e-l-o-u-g-e.

 4          What was that item about?

 5          MR. BRIDGES:  Objection.  Vague and

 6   ambiguous.

 7          THE WITNESS:  That was a book I wrote that

 8   described three trips I made around the world to

 9   visit people that were creating what has become our

10   modern Internet.

11   BY MR. HUDIS:

12      Q.  The next item in Exhibit 15, "Stacks:

13   Interoperability in today's computer networks."

14   What was that item about?

15          MR. BRIDGES:  Objection.  Vague and

16   ambiguous.

17          THE WITNESS:  That was a professional

18   reference book that described a series of new and

19   emerging topics in the field of computer networks

20   aimed at advanced networking engineers.  It was a

21   way of letting them know what was coming around --

22   around the corner.

23   BY MR. HUDIS:

24      Q.  The next item on which you are co-author

25   with many authors, what is the next item, "Law.gov

Carl Malamud                                                          May 12, 2015
                               San Francisco, CA

 1    workshops"?

 2            MR. BRIDGES:  Objection.  Lacks foundation;

 3    vague and ambiguous; assumption facts not in

 4    evidence.

 5            THE WITNESS:  Yeah, co-author is incorrect.

 6    And this really is not a bibliographic item.

 7    BY MR. HUDIS:

 8        Q.  Then what is that item, "Law.gov

 9    workshops"?

10        A.  I organized a series of 15 workshops around

11    the country focused on the issue of promulgation of

12    primary legal materials in the United States.

13        Q.  And were these individuals who were named

14    with you in this reference, lecturers with you on

15    that same series of workshops?

16            MR. BRIDGES:  Objection.  Lacks foundation;

17    assumes facts not in evidence; vague and ambiguous.

18            THE WITNESS:  Lecturers would be an

19    incorrect characterization.  These were all

20    participants in one or more of the workshops.

21    BY MR. HUDIS:

22        Q.  What do you mean by "participants"?

23        A.  In each case these people made a brief

24    presentation and then participated in discussions.

25        Q.  The next item, "Analyzing Novell networks."

Page 48

1   What was that item about?

2          MR. BRIDGES:  Objection.  Vague and

3   ambiguous.

4          THE WITNESS:  It was a professional

5   reference book about the Novell networking protocol

6   suite.  It was part of a three-volume series we had

7   previously discussed analyzing DECnet OSI phase V.

8   This was a companion volume to that.

9   BY MR. HUDIS:

10     Q.  And what was the subject matter of that

11  companion volume?

12     A.  The Novell protocol suite, which was

13  another mechanism for computers to communicate with

14  computers, like OSI, or what we know of as the

15  Internet today.

16     Q.  And the next item, what is -- what was

17  "Global network operations"?

18         MR. BRIDGES:  Objection.  Lacks foundation;

19  vague and ambiguous.

20         THE WITNESS:  That's another one of those

21  audio interviews I did with network engineers as

22  part of the program Geek of the Week.

23  BY MR. HUDIS:

24     Q.  What was the subject of that interview?

25         MR. BRIDGES:  Objection.  Vague and

1   ambiguous.

2          THE WITNESS:  There were four different

3   interviews.  Each of these individuals was involved

4   in one aspect or another of global network

5   operations on the emerging Internet computer

6   network.

7   BY MR. HUDIS:

8      Q.  And what was your involvement in this item?

9          MR. BRIDGES:  Objection.  Vague and

10   ambiguous.

11          THE WITNESS:  I was the host and producer

12   of Geek of the Week.

13   BY MR. HUDIS:

14      Q.  And the last item on this list, what was

15   "Analyzing Sun networks"?

16          MR. BRIDGES:  Objection.  Vague and

17   ambiguous.

18          THE WITNESS:  That was a professional

19   reference book.  It was part of a three-volume

20   series that included analyzing DECnet OSI,

21   analyzing Novell networks.

22          The analyzing Sun networks volume had to do

23   with the TCP/IP protocol suite, which is known

24   today as the Internet.

25   BY MR. HUDIS:

Page 50

1       Q.   Mr. Malamud, what experience do you have

2   working with textual databases, converting them

3   into new formats and making them available on the

4   Internet?

5           MR. BRIDGES:   Objection.   Massively

6   overbroad and vague; ambiguous; lacks foundation

7   and compound.

8           THE WITNESS:   I have -- I'm sorry, could

9   you repeat that question?

10  BY MR. HUDIS:

11      Q.   Yes.

12      A.   There were a lot of parts to that.

13      Q.   Yes.

14          What experience do you have working with

15  textual databases, converting them into new formats

16  and making them available on the Internet?

17          MR. BRIDGES:   Same objections.   And I'll

18  add another objection of argumentative.

19  BY MR. HUDIS:

20      Q.   You may answer.

21          MR. BRIDGES:   And to the extent there's a

22  legal conclusion implied in that, I would object on

23  that basis as well.

24          THE WITNESS:   So would you like a specific

25  example?   Is that what you're looking for?

1   BY MR. HUDIS:

2      Q.  Yes.

3      A.  Okay.  In 1991 and '92, I worked with my

4   colleague, Michael Swartz, a professor at the time

5   at the University of Colorado, to convert the

6   international telecommunication union protocol

7   specifications into a format that was viewable on

8   the Internet, and then I posted those standards on

9   the Internet.

10     Q.  And what do you mean by "posted"?

11     A.  In those days, posting meant making textual

12  files available using the FTP protocol.

13     Q.  And when you say make available, do you

14  mean make available on the Internet?

15         MR. BRIDGES:  Objection.  Lacks foundation;

16  vague and ambiguous.

17         THE WITNESS:  That database was distributed

18  using a facility known as anonymous FTP, which was

19  a mechanism that allowed anybody to access the

20  material that was connected to the Internet.

21  BY MR. HUDIS:

22     Q.  Can you give me any other examples that

23  come to mind of your experience with working with

24  textual databases, converting them into new formats

25  and making them available on the Internet?

Page 52

1          MR. BRIDGES:  All the same objections as to

2     earlier.  Vague and ambiguous; lacks foundation;

3     potentially -- and argumentative; potentially

4     calling for a legal conclusion.

5          THE WITNESS:  In 1993 and 1994 I headed a

6     project that took magnetic tapes that we purchased

7     from the Securities and Exchange Commission's

8     vendor, and converted those files into a database

9     accessible on the Internet using a variety of

10    access mechanisms.

11    BY MR. HUDIS:

12       Q.  Can you give me any other examples of your

13    experience in working with textual databases,

14    converting them into new formats and making them

15    available on the Internet?

16          MR. BRIDGES:  All the same objections.

17    Vague and ambiguous; lacks foundation;

18    argumentative; potentially calling for legal

19    conclusion; compound.

20          THE WITNESS:  A third example is I

21    purchased the magnetic tapes that were produced by

22    the United States Patent and Trademark Office

23    consisting of the patent database and the trademark

24    database.  I then converted that data into a format

25    that was compatible with Internet access and posted

1   that information using a variety of access

2   mechanisms.

3   BY MR. HUDIS:

4       Q.   Mr. Malamud, what experience, if any, do

5   you have working with printed textual materials,

6   converting them into new formats and making them

7   available on the Internet?

8           MR. BRIDGES:   Same objections.   Vague and

9   ambiguous; lacks foundation; argumentative;

10  possibly calling for a legal conclusion.

11          THE WITNESS:   I was responsible for

12  procuring, scanning, processing and posting the

13  historical opinions of the court of appeals known

14  as the National Reporter System, as well as the

15  federal cases, which was the predecessor to the

16  National Reporter System.

17  BY MR. HUDIS:

18      Q.   And what did you -- what did you do with

19  those reporter systems?

20          MR. BRIDGES:   Objection.   Vague and

21  ambiguous.

22  BY MR. HUDIS:

23      Q.   In your last answer, you said you were

24  responsible for procuring, scanning, processing and

25  posting historical opinions.   What did you mean by

Page 54

1    "processing"?

2         A.   Processing involved a number of steps,

3    beginning with the scanning of the documents, and

4    proceeded to include a process known as

5    double-keying, which is a way of converting the

6    printed page into, in our case, valid HTML files

7    with proper metadata.

8         Q.   In your last answer, what did you mean by

9    double-keying?

10        A.   Double-keying is a technical term of art

11   used by legal publishers.  It is the process of

12   having the information typed independently twice,

13   and then the two copies compared to each other as a

14   way of looking for errors in the transcription.

15        Q.   Is there such a thing as triple-keying?

16             MR. BRIDGES:  Objection.  Lacks foundation;

17   vague and ambiguous.

18             THE WITNESS:  Yes.

19   BY MR. HUDIS:

20        Q.   And what is that process?

21        A.   That process is independently typing the

22   data three times and comparing the results.

23        Q.   What did you mean by "valid HTML files"?

24             MR. BRIDGES:  Objection.  Lacks foundation.

25             THE WITNESS:  A valid HTML file is one that

Page 55

1    conforms to one of the HTML specifications that are

2    produced by the W3C organization, which is the

3    standards making body for HTML.

4    BY MR. HUDIS:

5        Q.  And what is a valid HTML file?

6            MR. BRIDGES:  Objection.

7    BY MR. HUDIS:

8        Q.  Under that protocol?

9            MR. BRIDGES:  Objection.  Lacks foundation;

10   vague and ambiguous.

11           THE WITNESS:  It is a file that --

12           MR. BRIDGES:  May call for -- may be a

13   hypothetical and call for speculation.

14           THE WITNESS:  It's a file that conforms to

15   the protocol specification, the contents of which

16   conform to what the protocol says it should.

17   BY MR. HUDIS:

18       Q.  And what's the significance of the HTML

19   file conforming to the specification?

20           MR. BRIDGES:  Objection.  Lacks foundation;

21   vague and ambiguous.

22           THE WITNESS:  Well, it's important that a

23   file posted on a web server conform to the HTML

24   standard because that means that a browser or other

25   client will correctly parse the data and display it

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1  to the user or perform other actions on that HTML

2  file.

3  BY MR. HUDIS:

4      Q.  And what did you mean by "proper metadata"?

5          MR. BRIDGES:  Objection.  Lacks foundation.

6          THE WITNESS:  There are a number of

7  specifications that list the metadata that --

8  specifications and best current practices that list

9  the metadata that should be, in this case, in the

10  header section of an HTML file.  An example of that

11  is the title of the document.

12  BY MR. HUDIS:

13     Q.  Do you have any experience, Mr. Malamud,

14  working with graphic design web tools?

15         MR. BRIDGES:  Objection.  Vague and

16  ambiguous; lacks foundation.

17         THE WITNESS:  Yes.

18  BY MR. HUDIS:

19     Q.  Can you give me some examples of the types

20  of graphic design web tools you've worked with?

21     A.  So graphic design web tools is kind of a

22  broad example.  And I'm not a graphic designer, but

23  I certainly have used programs such as Photoshop

24  and tools for authoring, SVG graphics, for example.

25     Q.  What about MathML?

1          MR. BRIDGES:  Objection.  Vague and

2     ambiguous.

3          THE WITNESS:  Well, that's not a graphic

4     design tool.  MathML is a specification for

5     expressing mathematical formulas, and I am, in

6     fact, familiar with that specification.

7     BY MR. HUDIS:

8       Q.  And how long have you been working with

9     graphic design web tools such as SVG and Photoshop?

10          MR. BRIDGES:  Objection.  Lacks foundation;

11     vague and ambiguous; compound.

12          THE WITNESS:  I've been using graphic

13     design tools since the early '80s, but that's

14     before the web, so ...

15     BY MR. HUDIS:

16       Q.  All right.  And have you been using graphic

17     design web tools since the advent of the web, say,

18     mid 1990s?

19          MR. BRIDGES:  Objection.  Lacks foundation;

20     vague and ambiguous.

21          THE WITNESS:  I've been building websites

22     since the web began, and as part of that process

23     one uses graphic design web tools, as you call

24     them.

25     BY MR. HUDIS:

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1      Q.  Mr. Malamud, are you a member of any

2   professional associations?

3          MR. BRIDGES:  Objection.  Vague and

4   ambiguous.

5          THE WITNESS:  Professional associations?

6   BY MR. HUDIS:

7      Q.  For example, I am a member of the American

8   Intellectual Property Law Association.

9          So are you a member of any professional

10  associations?

11     A.  Well, I'm a member of EFF.  I don't know if

12  that counts.

13         MR. BRIDGES:  I'll ask the witness to

14  testify as to what he knows.  If he doesn't

15  understand the question, then he should ask for a

16  further explanation of the question.

17         THE WITNESS:  Yes, sir.

18  BY MR. HUDIS:

19     Q.  Do you understand my question?

20     A.  Vaguely.  It's a broad question.

21         "No" I think is the proper answer.

22     Q.  Are you -- are you a member of any

23  engineering societies?

24         MR. BRIDGES:  Objection.  Vague and

25  ambiguous.

Carl Malamud                                                          May 12, 2015
San Francisco, CA

Page 59

1        THE WITNESS:  I was a participant in the

2   Internet Engineering Task Force.

3   BY MR. HUDIS:

4        Q.  When was that?

5        A.  Late '80s to mid '90s.  Later than that,

6   actually.  I was, all the way through 2005 I was a

7   participant.

8        Q.  Is that organization still in existence?

9        MR. BRIDGES:  Objection.  Lacks foundation;

10  vague and ambiguous.

11       THE WITNESS:  Yes.

12  BY MR. HUDIS:

13       Q.  What was your affiliation with the Internet

14  Engineering Task Force?

15       A.  I played a number of roles.  I was a

16  creator of Internet drafts and requests for

17  comments, which is the proposals for standards and

18  standards that are created by the Internet

19  Engineering Task Force.

20       Q.  What's a standard?

21       MR. BRIDGES:  Objection.  Lacks foundation;

22  vague and ambiguous.

23       THE WITNESS:  A standard is a document that

24  was marked by the Internet Engineering Task Force

25  as being a standard.  It's a decision made by the

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1   management organization of the IETF.

2   BY MR. HUDIS:

3       Q.  I don't think that answers my question.

4           What do you understand to be a standard?

5           MR. BRIDGES:  Asked and answered.  He did

6   answer your question.

7           MR. HUDIS:  I disagree, Counsel.

8           THE WITNESS:  Well, are you --

9           MR. BRIDGES:  Vague and ambiguous; lacks

10  foundation.

11          THE WITNESS:  Do you want to know what an

12  IETF standards?

13  BY MR. HUDIS:

14      Q.  No, I want to know generally what your

15  understanding of a standard is?

16          MR. BRIDGES:  Objection.  Vague; lacks

17  foundation in context; argumentative.

18          THE WITNESS:  It is a very vague question

19  in the sense that a standard is anything that the

20  organization publishes or creates or says.  It's a

21  standard.

22  BY MR. HUDIS:

23      Q.  Is a standard a set of norms that an

24  organization would like others to follow?

25          MR. BRIDGES:  Objection.  Entirely lacks

1  foundation; vague and ambiguous.

2        THE WITNESS:  It depends --

3        MR. BRIDGES:  And may call for opinion

4  testimony.  It may call for legal conclusion.  And

5  may be argumentative.

6        THE WITNESS:  Again, it depends on the

7  organization.  I can tell you what an IETF standard

8  is.

9  BY MR. HUDIS:

10     Q.  Give me an example of what an IETF

11  standards is.

12     A.  IETF standard is a document that the IETF

13  believes should be widely adopted that describes a

14  set of best practices or mechanisms involved in

15  some aspect of computer networking.

16        MR. BRIDGES:  I'll ask the witness to

17  listen to the question and answer the question.

18        The question was, give me an example of an

19  IETF standard.

20  BY MR. HUDIS:

21     Q.  You said that you are a member of EFF and

22  that in the past you were a member of the Internet

23  Engineering Task Force.

24        Have you been a member of any other

25  professional associations?

1          MR. BRIDGES:  Objection.  Misstates

2     testimony; vague and ambiguous; lacks foundation.

3          THE WITNESS:  IETF does not have members.

4     It has participants.  That's an important

5     distinction.

6          And no, I have not.

7     BY MR. SPEAR:

8     Q.  Mr. Malamud, I would like to discuss with

9     you, your professional experience since you

10    received your MBA from Indiana University in 1983

11    or 1984.

12         After you received your MBA, what was the

13    first gainful employment that you had?

14    A.  So you just want to know about my

15    employment after my MBA?

16    Q.  Yes.

17    A.  Okay.  I -- after my MBA, my next job was

18    as the Board of Governors of the Federal Reserve

19    System.

20    Q.  What did you do there?

21    A.  I worked with a small group to create a

22    plan and implement the plan for putting computer

23    networks into the research division of the Board of

24    Governors of the Federal Reserve System.

25    Q.  Do you remember what your title was at the

1    Board of Governors of the Federal Reserve?

2         A.   Senior systems analyst.

3         Q.   How long did you hold that position?

4         A.   One year as an employee.

5         Q.   So was that 1983 to 1984?

6         A.   It was 1984, I'm pretty sure.

7         Q.   You said one year as an employee.  At some

8    point were you a consultant for the Board of

9    Governors of the Federal Reserve?

10        A.   Subsequent to my year of employment, I

11   became a consultant to the Board of Governors of

12   the Federal Reserve System.

13        Q.   And how long were you a consultant?

14        A.   Approximately a year.

15        Q.   So that would have been 1985?

16        A.   Approximately.

17        Q.   What did you do for the Board of Governors

18   of the Federal Reserve as a consultant?

19        A.   The same thing I did as an employee.

20        Q.   What was your next position of gainful

21   employment?

22        A.   I was a consultant to a number of

23   government agencies.

24        Q.   Do you remember which ones?

25        A.   Yes, I do.

Carl Malamud                                                     May 12, 2015
San Francisco, CA

1    Q.  Please --

2         MR. BRIDGES:  Go ahead.

3    BY MR. HUDIS:

4    Q.  Please tell me which ones they are.  Or

5    were.

6    A.  The Department of Defense, the Joint Chiefs

7    of Staff, Argon National Laboratory, Lawrence

8    Livermore National Laboratory.

9    Q.  Let's put some time frames on this.

10        When were you a consultant for the

11   Department of Defense?

12   A.  I don't remember the exact dates.  My

13   consulting business was predominantly from 1985

14   into the late 1980s.

15   Q.  Approximate -- approximately what year?

16   1989, your consulting business?

17   A.  Yes, as a -- yes.

18   Q.  So your consulting business was for all of

19   these clients, the Department of Defense, the Joint

20   Chiefs of Staff, Argon and Lawrence Livermore?

21        MR. BRIDGES:  Objection.  Vague and

22   ambiguous.

23        THE WITNESS:  My consulting business had

24   two aspects.  One was consulting with the

25   government agencies.

Page 65

1        The other was giving advanced seminars on

2   computer networks and relational databases.

3        MR. BRIDGES:  I'll ask the witness to

4   answer the question.  If he wants to invite you

5   beyond the question, he can ask about those.

6   BY MR. HUDIS:

7    Q.  And the part of your consulting business

8   working with government agencies, what did that

9   entail?

10        MR. BRIDGES:  Objection.  Vague and

11   ambiguous.

12        THE WITNESS:  I worked in the area of

13   relational databases and computer networking.

14   BY MR. HUDIS:

15    Q.  What do you mean by "relational databases"?

16    A.  The Ingres relational database management

17   system.

18    Q.  That you described before?

19    A.  Yes.

20    Q.  All right.  After your consulting business

21   ended in approximately 1989, what did you do next

22   for gainful employment?

23    A.  In the late '80s, around 1988, I began

24   writing, and by I'm pretty sure '89, I was making

25   my living as a writer.

Carl Malamud                                                May 12, 2015
San Francisco, CA

1       Q.   And what was the subject of your writings?

2            MR. BRIDGES:   Objection.  Vague.

3            THE WITNESS:   That's the documents that we

4    went over, the professional reference books.

5    BY MR. HUDIS:

6       Q.   That was the references in Exhibit 15?

7       A.   That's correct.

8            MR. BRIDGES:   I do want to note for the

9    record an objection generally to Exhibit 15.  It

10   appears to be a printout of documents from a

11   catalog.  It appears to have been an incomplete set

12   of results, pursuant to a selection that we assume

13   was made by plaintiffs' counsel, rather than a

14   straight printout of all responsive items.

15   BY MR. HUDIS:

16      Q.   And how long did you make your living as a

17   writer?

18      A.   Through 1992.

19      Q.   And what did you do for gainful employment

20   starting in 1992?

21      A.   I founded the Internet Multicasting

22   Service.

23      Q.   Is that company still in existence today?

24      A.   No.

25      Q.   How long was the Internet Multicasting

Page 67

1    Service in existence?

2        A.  It was active through 1997.

3        Q.  What was the nature of the business of the

4    Internet Multicasting Service?

5        A.  The Internet Multicasting Service was a

6    501(c)(3) nonprofit that was engaged in creating

7    new services for the Internet.

8        Q.  What types of new services?

9        A.  One example was I created the first radio

10   station on the Internet.

11       Q.  Any other examples?

12       A.  A second example is we took the Securities

13   and Exchange Commission EDGAR database and made it

14   available on the Internet for the public to use.

15       Q.  Any others examples?

16       A.  A third example is we took the U.S. patent

17   And Trademark database and made it available on the

18   Internet for the public to use.

19       Q.  Any other examples?

20       A.  A fourth example is we created the Internet

21   1996 World Exposition, a World's Fair for the

22   Internet.

23       Q.  And what was that?

24       A.  It --

25           MR. BRIDGES:  Objection.  Vague and

Page 68

1   ambiguous.

2         THE WITNESS:  It was a set of activities

3   taking place in 50 countries around the world

4   modeled on the metaphor of a world's fair.

5   BY MR. HUDIS:

6      Q.  And what activities were taking place in

7   the 50 countries?

8         MR. BRIDGES:  Objection.  Vague and

9   ambiguous.

10        THE WITNESS:  A huge number of activities.

11        In Japan there were street festivals, for

12   example.

13        In Taiwan there were thousands of computers

14   throughout the country that people could go up to

15   and learn about the Internet, which was a new

16   phenomenon in those days.  Those are two examples.

17   BY MR. HUDIS:

18      Q.  What was the general theme of Internet 1996

19   a world's fair?

20      A.  A world's fair for the information age.

21      Q.  Was it a general theme of teaching people

22   about the Internet?

23        MR. BRIDGES:  Objection.  Misstates the

24   testimony; vague and ambiguous.

25        THE WITNESS:  There were two goals.  One

Page 69

1   was teaching the world about the Internet and what

2   it could do.  The second was to make a substantial

3   contribution to Internet infrastructure.

4   BY MR. HUDIS:

5       Q.  What did you mean by "Internet

6   infrastructure"?

7       A.  I can give you two examples.  One is, with

8   a contribution of two terabytes of disc from

9   Quantum and a set of large scale computers from Sun

10  Microsystems, we were able to put large computers

11  in different locations around the world, which were

12  mirroring common Internet databases, such as the

13  world's fair website.

14      Q.  Have you told me all of the services you

15  can remember that were conducted by the Internet

16  Multicasting Service?

17          MR. BRIDGES:  Objection.  Vague and

18  ambiguous; lack of foundation.

19          THE WITNESS:  There's at least two more.

20  We ran north.pole.org, which was the first home for

21  Santa Claus on the Internet.

22          A second example is with my colleague

23  Dr. Marshall T. Rose, we created a service called

24  TPC.int, TPC standing for the phone company.

25  BY MR. HUDIS:

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1      Q.   And what was that service?

2      A.   TPC.int was a mechanism that allowed an

3  individual to send electronic mail which would then

4  go to a fax machine that was addressed by its phone

5  number.

6      Q.   Have you told me all of the services you

7  can remember that were performed by the Internet

8  Multicasting Service?

9           MR. BRIDGES:  Objection.  Vague and

10  ambiguous.

11           THE WITNESS:  I'm sure we had a number of

12  other small websites, what we would call a

13  microsite today.

14  BY MR. HUDIS:

15      Q.   Anything else?

16           MR. BRIDGES:  Same objection.

17           THE WITNESS:  Those were our main

18  activities.

19  BY MR. HUDIS:

20      Q.   And what did you do for gainful employment

21  after the Internet Multicasting Service was no

22  longer in business?

23      A.   In 1996 I went to the MIT Media Lab where I

24  was a visiting professor.

25      Q.   How long were you a visiting professor at

1    the MIT Media Lab?

2       A.   Maybe eight months.  Eight or nine months.

3       Q.   After your terms of term as visiting

4    professor at the MIT Media Lab, what did you do

5    next for gainful employment?

6       A.   I was a visiting professor at Keio

7    University, K-e-i-o, in Japan.

8       Q.   What kinds of courses did you teach at the

9    MIT Media Lab?

10      A.   I did not.  I consulted with students and I

11   wrote a book.

12      Q.   What was the book?

13      A.   "The Internet 1996 World Exposition."

14      Q.   How long were you a visiting professor at

15   Keio University in Japan?

16      A.   I'd say about six months.

17      Q.   What year was that?

18      A.   '97.

19      Q.   What kinds of courses, if any, did you

20   teach at Keio University?

21      A.   I did not.  I consulted with the faculty

22   and with graduate students.

23      Q.   What was the nature of the consultations?

24      A.   Doctoral dissertations concerned with the

25   Internet and networking protocols.

Page 72

1      Q.  Was that the same type of consultations

2   that you did at the MIT Media Lab?

3         MR. BRIDGES:  Objection.  Lacks foundation;

4   vague and ambiguous.

5         THE WITNESS:  Yes, that's correct.

6   BY MR. HUDIS:

7      Q.  After your employment with Keio University,

8   what next did you do for gainful employment?

9      A.  I spent a few months in Amsterdam at RIPE,

10   which is the Internet numbering authority for the

11   European region.

12         MR. BRIDGES:  Mr. Hudis, I think I'm going

13   to need a break in a minute or two.  Is this a

14   convenient time?

15         MR. HUDIS:  Yes, let's take a break.

16         THE VIDEOGRAPHER:  The time is 10:50, and

17   we are off the record.

18         (Recess taken.)

19         THE VIDEOGRAPHER:  The time is 11:01, and

20   we are back on the record.

21   BY MR. HUDIS:

22      Q.  Mr. Malamud, how long were you employed at

23   RIPE?

24      A.  I was not employed at RIPE.  I was in

25   residence at RIPE.

Page 73

1      Q.   How long were you in residence at RIPE?

2      A.   Just a few months.

3      Q.   So what year was that?

4      A.   1997.

5      Q.   What did you do at RIPE?

6           MR. BRIDGES:   Objection.   Vague and

7      ambiguous.

8      BY MR. HUDIS:

9      Q.   What, if anything, did you do at RIPE?

10     A.   I learned about the operation of Internet

11     number registries.

12     Q.   After RIPE, what was your next place of

13     gainful employment?

14     A.   I was the founder and chief executive

15     officer of Invisible Worlds.

16     Q.   What was the nature of that business,

17     Invisible Worlds?

18     A.   It was an Internet startup.

19     Q.   What do you mean by Internet startup?

20     A.   It was a new company that was attempting to

21     create a new service for the Internet.

22     Q.   And what service was that?

23     A.   In today's parlance, it was a semantic web

24     company.

25     Q.   And what does that mean?

Page 74

1      A.  It's a little complicated.  It was involved

2  with transferring metadata between different

3  computers on the Internet.

4      Q.  Is that company still in existence?

5      A.  No, it is not.

6      Q.  How long was that company in existence?

7      A.  It was formally dissolved, I believe, in

8  2002.

9      Q.  So it was in existence from 1997 to 2002?

10     A.  1998 through 2001 was the active period of

11 the company.

12         MR. BRIDGES:  I'll ask the witness to

13 answer the precise question asked.

14 BY MR. HUDIS:

15     Q.  And it was just an inactive period from

16 2001 to 2002?

17     A.  Yes.

18     Q.  What did you do next for gainful employment

19 after Invisible Worlds?

20     A.  I was a co-founder and CEO of a company

21 called NetTopBox, Inc., all one word, capital N,

22 capital T, capital B.

23     Q.  Is that company still in existence?

24     A.  No, it is not.

25     Q.  When was it in existence?

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1      A.  I'm trying to refresh my memory here.  I

2  believe 2001 through 2003.  I may be off a year on

3  those dates.

4      Q.  What was the nature of the business of

5  NetTopBox, Inc.?

6      A.  It was an attempt to create an electronic

7  programming guide for the Internet.

8      Q.  What do you mean by "electronic programming

9  guide"?

10      A.  In layman's terms, something like the T.V.

11  Guide.

12      Q.  After NetTopBox, Inc. was dissolved, what

13  did you do next for gainful employment?

14      A.  I was hired as a consultant by the Internet

15  Architecture Board and Internet Engineering Task

16  Force.

17      Q.  How long were you a consultant for the

18  Internet Architecture Board and Internet

19  Engineering Task Force?

20          MR. BRIDGES:  Objection.  Compound.

21          THE WITNESS:  A little over a year.

22  BY MR. HUDIS:

23      Q.  So that would have been 2004?

24      A.  Yeah, '04 to '05.

25      Q.  And what was the nature of your consultancy

Carl Malamud                                                      May 12, 2015
San Francisco, CA

1    with these organizations?

2        A.   I was charged with investigating and

3    proposing mechanisms for the governance of the

4    Internet standards-making process.

5        Q.   And if you could briefly describe what that

6    means, "mechanisms for the governance of the

7    Internet standards-making process"?

8        A.   The core issue I investigated was the

9    proper institutional home for the Internet

10   Engineering Task Force, which at the time was an

11   unincorporated association.

12       Q.   What did you mean by "proper institutional

13   home"?

14       A.   That was actually the question I was

15   investigating, what should that institutional home

16   be.

17       Q.   Well, what did you mean by "institutional

18   home"?

19           MR. BRIDGES:   Objection.   Lacks foundation.

20           THE WITNESS:   I can tell you what the

21   conclusion was of that process.

22   BY MR. HUDIS:

23       Q.   What was the conclusion of that process?

24       A.   That the Internet society would provide

25   the -- the corporate framework that would then run

Page 77

1    the Internet Engineering Task Force and the

2    associated standards-making process.

3        Q.  Back to your consultancy with the

4    Architectural Board and the Internet Engineering

5    Task Force.  What did you do for gainful

6    employment?

7        A.  I worked at the Center for American

8    Progress.

9        Q.  What's the nature of that business?

10            MR. BRIDGES:  Objection.  Lacks foundation;

11    vague and ambiguous.

12            THE WITNESS:  It is a 501(c)(3) think tank.

13    BY MR. HUDIS:

14        Q.  And what did you do there?

15        A.  I was a senior fellow and the chief

16    technology officer.

17        Q.  And what years was that?

18        A.  2005 to 2006.

19        Q.  What did you do next for gainful

20    employment?

21        A.  I founded Public.Resource.Org.

22        Q.  And that was in 2007?

23        A.  That's correct.

24        Q.  Are you presently employed by

25    Public.Resource?

Carl Malamud                                              May 12, 2015
San Francisco, CA

1      A.  I am.

2      Q.  And you are the founder of Public.Resource?

3      A.  I am.

4      Q.  What is your current title with

5   Public.Resource?

6      A.  Founder and president.

7      Q.  Is that the position you have held from

8   2007 until today?

9      A.  It is.

10     Q.  What is your -- what are your duties and

11  responsibilities as founder and president of

12  Public.Resource?

13         MR. BRIDGES:  Objection.  Vague and

14  ambiguous; compound.

15         THE WITNESS:  I'm responsible for the

16  activities of Public.Resource.Org.

17  BY MR. HUDIS:

18     Q.  What are those activities?

19     A.  Well, there's the governance of the

20  corporation.

21     Q.  What else?

22     A.  There is the operation of websites and

23  Internet services.

24     Q.  What types of websites and services does

25  Public.Resource provide?

Carl Malamud                                                          May 12, 2015
San Francisco, CA

1      A.   There's a number of different services.

2      Q.   Could you name them for me, please?

3      A.   Sure.   Public.Resource.Org is our main

4   corporate website.

5      Q.   And what kind of information is on the

6   Public.Resource.Org site?

7      A.   It has speeches by me.   Correspondence.

8   And governance information, such as financials.

9      Q.   Anything else?

10     A.   A number of web pages describing our

11  interaction with a number of government agencies.

12     Q.   What kinds of interactions?

13     A.   Well, for example, there is a page devoted

14  to USCourts.gov, which contains a number of letters

15  back and forth with officials about the PACER

16  system and court of appeals decisions.

17     Q.   Does Public.Resource operate any other

18  websites?

19     A.   Yes, we do.

20     Q.   Could you name another one, please?

21     A.   House.resource.org.

22     Q.   What is provided on House.resource.org?

23     A.   That is a system that I created in

24  cooperation with the United States House of

25  Representatives at the request of Speaker Boehner

1    and Chairman Darrell Issa.  It contains video from

2    congressional hearings.

3        Q.  Anything else?

4            MR. BRIDGES:  Objection.  Vague and

5    ambiguous.

6    BY MR. HUDIS:

7        Q.  Does the House.resource.org website provide

8    anything else besides video from congressional

9    hearings?

10       A.  There's some correspondence that was back

11   and forth between myself and Congress as part of

12   this effort.

13       Q.  Does Public.Resource operate any other

14   websites?

15       A.  Yes.

16       Q.  Could you tell me another one?

17       A.  WWLBD.org, which stands for what would

18   Luther Burbank do?

19       Q.  What kind of information is provided on the

20   WWLBD.org site?

21       A.  That is a site devoted to the seed catalogs

22   that the Smithsonian Institution scanned.

23       Q.  Spell, in that context, seed?

24       A.  S-e-e-d.

25       Q.  And literally is your website providing

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 81

1    information about seeds, plant seeds?

2        A.  It is covers of seed catalogs, which the

3    Smithsonian scanned and made available on a limited

4    and restricted basis.

5        Q.  Just so I understand, do you mean seed,

6    literally plant seed catalogs?

7        A.  Yes, like Burpee.

8        Q.  Is that all generally that the WWLBD.org

9    website provides?

10           MR. BRIDGES:  Objection.  Vague and

11   ambiguous.

12           THE WITNESS:  It is the seed catalog covers

13   and essay discussing the restrictions on use that

14   were imposed by the Smithsonian.

15   BY MR. HUDIS:

16       Q.  Restrictions on use of what?

17       A.  Of the seed catalog images.

18       Q.  Does Public.Resource provide any other

19   websites?

20       A.  Yes, we do.

21       Q.  Could you name another one, please?

22       A.  YesWeScan.Org.

23       Q.  What type of information does YesWeScan.Org

24   provide?

25       A.  It has gone through several different life

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 82

1    times, if you will.  It began with a series of

2    proposals that I authored about the operation of

3    the government printing office, and my

4    qualifications to be public printer of the United

5    States.

6        Q.  Does the YesWeScan.Org website provide any

7    other information?

8        A.  The second iteration of YesWeScan.Org was a

9    letter from myself and John D. Podesta to President

10   Obama discussing the digitization of federal

11   archives.

12       Q.  Does the YesWeScan.Org website provide any

13   other information?

14       A.  The third iteration of YesWeScan.Org was an

15   effort to get individuals to fund, adopt the

16   double-keying of volumes of the Federal Reporter.

17       Q.  That's West Federal Reporter?

18       A.  F1.  So yes, the -- yes.

19       Q.  F first?

20       A.  Yes.

21       Q.  Does the YesWeScan.Org website provide any

22   other information?

23       A.  The most recent iteration was a crowd

24   funding exercise for the scanning and posting of

25   state statutes and codes.

Carl Malamud                                                          May 12, 2015
                            San Francisco, CA

Page 83

1      Q.  Does the YesWeScan.Org website provide any

2   other information?

3      A.  I think that's its four life times.  I

4   think that's correct.

5      Q.  Does Public.Resource operate any other

6   websites?

7      A.  Law.Resource.Org.

8      Q.  What information is provided on the

9   Law.Resource.Org website?

10     A.  Primary legal materials.

11     Q.  Can you give me examples?

12     A.  Court of appeals decisions.

13     Q.  Anything else?

14     A.  The federal cases.

15     Q.  Anything else?

16     A.  The California cases from Judge McAllister.

17         MR. BRIDGES:  Just leave me time to object.

18         THE WITNESS:  Yes.

19   BY MR. HUDIS:

20     Q.  Anything else?

21     A.  Materials incorporated by reference into

22   state and federal law.

23     Q.  What types of materials incorporated by

24   state and federal law are provided on the

25   Law.Resource.Org website?

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 84

1          MR. BRIDGES:  Objection.  Vague; ambiguous.

2          THE WITNESS:  An example is California's

3     Title 24.

4     BY MR. HUDIS:

5        Q.  Is Title 24 a statute or a state

6     regulation?

7        A.  It's a regulation.

8        Q.  Any other types of materials that are

9     posted on the Law.Resource.Org website?

10         MR. BRIDGES:  Objection.  Vague and

11    ambiguous.

12         THE WITNESS:  I think that's a good

13    description of what's on there, yes.

14    BY MR. HUDIS:

15       Q.  Are standards posted on the

16    Law.Resource.Org website?

17         MR. BRIDGES:  Objection.  Lacks foundation;

18    vague and ambiguous; possibly argumentative.

19         THE WITNESS:  Standards incorporated by

20    reference into federal and state regulations are on

21    the Law.Resource.Org website.

22    BY MR. HUDIS:

23       Q.  What do you mean by incorporation by

24    reference?

25         MR. BRIDGES:  Objection.  May call for a

Page 85

1    legal conclusion.

2    BY MR. HUDIS:

3        Q.  You may answer.

4            MR. BRIDGES:  Vague and ambiguous.

5    BY MR. HUDIS:

6        Q.  You may answer.

7        A.  Incorporation by reference at the federal

8    level is a formal process which is run by the

9    Office of the Federal Register, which incorporates

10   specific materials into the Code of Federal

11   Regulations.

12       Q.  And as a result of that formal process

13   engaged in by the Office of the Federal Register,

14   how are these materials incorporated by reference

15   into the Code of Federal Regulations?

16           MR. BRIDGES:  Objection.  May call for

17   legal conclusion; vague and ambiguous.

18           THE WITNESS:  I'm not sure what you mean by

19   "how are."

20   BY MR. HUDIS:

21       Q.  How would I know that materials are

22   incorporated into the Code of Federal Regulations?

23           MR. BRIDGES:  Objection.  Hypothetical;

24   calls for speculation; vague and ambiguous.

25           THE WITNESS:  The Code of Federal

Page 86

1    Regulations itself will contain a very specific and

2    formal statement signifying that a particular

3    specific document was incorporated with the

4    approval of the director of the Office of the

5    Federal Register.

6    BY MR. HUDIS:

7        Q.  And how are materials incorporated by

8    reference at the state level?

9            MR. BRIDGES:  Objection.  Lacks foundation;

10   may call for a legal conclusion; may call for

11   opinion testimony; vague and ambiguous, and it may

12   be argumentative.

13           THE WITNESS:  That's a very broad question.

14   I think it varies by state.

15   BY MR. HUDIS:

16       Q.  Could you give me an example of how

17   material has been incorporated by reference at the

18   state level?

19           MR. BRIDGES:  Same objections.

20           THE WITNESS:  The State of California again

21   has very specific language that will be shown in

22   the California Code of Regulations, and it

23   specifically is the phrase "incorporated by

24   reference," and then a specific indicator to a very

25   specific standard and edition of that standard or

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1    other document.

2    BY MR. HUDIS:

3        Q.  Is material incorporated by reference into

4    state reg -- into federal regulations by the same

5    methods that you just described for the California

6    Code of Regulations?

7            MR. BRIDGES:  Objection.  Utterly lacks

8    foundation; vague and ambiguous; competence; may

9    call for speculation; may call for legal

10   conclusion; argumentative.

11           THE WITNESS:  They are two very separate

12   processes.

13   BY MR. HUDIS:

14       Q.  When material is incorporated by reference

15   at the federal level, does it contain specific

16   language that the material is incorporated by

17   reference?

18           MR. BRIDGES:  Objection.  Lacks foundation;

19   hypothetical; vague and ambiguous; competence; may

20   call for speculation; may call for opinion and

21   legal conclusion.

22           THE WITNESS:  In order for the material to

23   be incorporated by reference in the Code of Federal

24   Regulations, it does require very specific

25   language, including the phrase "incorporated by

Page 88

1    reference."

2    BY MR. HUDIS:

3        Q.  Now, you said part of your duties and

4    responsibilities as founder and president of

5    Public.Resource was its governance and the websites

6    and services that it provides.

7            What are your other duties and

8    responsibilities for Public.Resource, if any?

9            MR. BRIDGES:  Objection.  Vague and

10   ambiguous.

11           THE WITNESS:  I give a number of speeches.

12   BY MR. HUDIS:

13       Q.  And you give these speeches on behalf of

14   Public.Resource?

15       A.  Yes, that's my only professional activity.

16       Q.  Is there anything else that you do on

17   behalf of Public.Resource?

18       A.  I send letters.

19       Q.  To whom?

20       A.  To government officials, for example.

21       Q.  For what purpose?

22       A.  An example would be a FOIA request.

23       Q.  Freedom of Information Act request?

24       A.  That's correct.

25       Q.  And what types of materials were you

Page 89

1    looking for with these FOIA requests?

2            MR. BRIDGES:  Objection.  Vague and

3    ambiguous.

4            THE WITNESS:  An example was a FOIA request

5    to the Internal Revenue Service for the particular

6    format of the form 990, which is the filings of

7    exempt organizations.

8    BY MR. HUDIS:

9        Q.  Can you give me another example of a FOIA

10   request that you made to a government agency?

11       A.  I sent a large number of FOIA requests out

12   asking how much agencies spent on PACER and retail

13   legal information services.

14       Q.  Have you told me all your duties and

15   responsibilities that you're aware of on behalf of

16   Public.Resource?

17           MR. BRIDGES:  Objection.  Argumentative;

18   lacks foundation; vague and ambiguous.

19           THE WITNESS:  No, I have other

20   responsibilities.

21   BY MR. HUDIS:

22       Q.  Could you name them for me, please?

23       A.  I handle our finances.  So bookkeeping and

24   auditing and the -- the taxes.  And I am engaged in

25   supervising the litigation effort in which

Page 90

1    Public.Resource is currently engaged in.

2        Q.   Anything else?

3        A.   That's a good overview.  Yeah, no, I think

4    that's a good overview of what I do.

5        Q.   Do you report to anybody at

6    Public.Resource?

7            MR. BRIDGES:  Objection.  Vague and

8    ambiguous.

9            THE WITNESS:  I report to our board of

10   directors.

11   BY MR. HUDIS:

12       Q.   Does anybody report to you at

13   Public.Resource?

14           MR. BRIDGES:  Objection.  Vague and

15   ambiguous.

16           THE WITNESS:  What do you mean "report" to

17   me?

18   BY MR. HUDIS:

19       Q.   Somebody that you supervise as another

20   officer of the corporation or employees.

21       A.   No.

22       Q.   Are there any other employees of

23   Public.Resource, besides yourself?

24       A.   No.

25       Q.   Mr. Malamud, since you have been president

Carl Malamud                                                    May 12, 2015
                            San Francisco, CA

1    and CEO of Public.Resource, do you get a salary?

2        A.   Yes, I do.

3        Q.   And how much is that salary?

4            MR. BRIDGES:   We'll presumptively mark the

5    deposition confidential subject to --

6            THE WITNESS:   We're 501(c)(3).  My salary

7    is published.

8            MR. BRIDGES:   Okay, I withdraw that.

9            Go ahead.

10           THE WITNESS:   $180,000 a year.

11   BY MR. HUDIS:

12       Q.   And how long have you taken that as an

13   annual salary from Public.Resource?  For how many

14   years?

15       A.   I think I've been at 180 for three years.

16       Q.   And before that what was your annual

17   salary?

18       A.   I began at 144 and then -- yeah.

19       Q.   And you've had increases since then in your

20   annual salary up to 180,000 a year?

21           MR. BRIDGES:   Objection.  Misstates

22   testimony; lacks foundation.

23           THE WITNESS:   I had one increase, if I

24   recollect.

25   BY MR. HUDIS:

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1      Q.  So in 2007 until 2011 your salary was

2    approximately $144,000, and then from 2011 until

3    now your salary has been at approximately $180,000?

4      A.  That's not correct.  My salary began at

5    144.  There was a step to 160 at some point.  And

6    then up to 180.  And I don't recall the exact dates

7    when those steps were.

8      Q.  Presently, Mr. Malamud, do you have any

9    other gainful employment besides your roles at

10   public -- at Public.Resource?

11     A.  I do not.

12     Q.  Presently are you an officer of any other

13   companies?

14     A.  No.

15     Q.  Presently are you a director of any other

16   companies?

17     A.  I am on the board of directors of Common

18   Crawl.

19     Q.  What is Common Crawl?

20     A.  It is a 501(c)(3) nonprofit devoted to an

21   open crawl of the Internet.

22     Q.  What is an "open crawl of the Internet"?

23     A.  A crawl is what a search engine such as

24   Google does.

25     Q.  And what is an open crawl?

Carl Malamud                                                May 12, 2015
San Francisco, CA

Page 93

1       A.   That is a crawl of the Internet that's

2    available to others to openly use.

3       Q.   Without restriction?

4           MR. BRIDGES:   Objection.   Vague and

5    ambiguous.

6    BY MR. HUDIS:

7       Q.   When you say it is a crawl of the Internet

8    that's available to others to openly use, what did

9    you mean by for "others to openly use"?

10      A.   The data is available on the Amazon hosting

11   service for any organization to use for analysis.

12      Q.   Are you an employee of any other companies

13   today?

14      A.   I am not.

15      Q.   Besides Common Crawl and Public.Resource,

16   do you have any roles in any other nonprofit

17   organizations today?

18          MR. BRIDGES:   Objection.   Vague and

19   ambiguous.

20          THE WITNESS:   No, I do not.

21   BY MR. HUDIS:

22      Q.   And Public.Resource is an IRS 501(c)(3)

23   nonprofit corporation?

24      A.   It is.

25      Q.   And it was incorporated in California in

Page 94

1    2007?

2        A.   That's correct.

3            (PLAINTIFFS' EXHIBITS 16-18 WERE MARKED.)

4            MR. HUDIS:   All right.   Let's go off the

5    record.   There's ten minutes left.   So let's go off

6    the record.

7            MR. BRIDGES:   Okay.

8            MR. HUDIS:   And I'll do the marking with

9    you, Andrew.

10           THE VIDEOGRAPHER:   This marks the end of

11   Disc 1, Volume 1 in the deposition of Carl Malamud.

12           The time is 11:34 and we are off the

13   record.

14           (Discussion off the record.)

15           THE VIDEOGRAPHER:   This marks the beginning

16   of Disc 2, Volume 1 in the deposition of Carl

17   Malamud.

18           The time is 11:40, and we are on the

19   record.

20   BY MR. HUDIS:

21       Q.   Mr. Malamud, what is the purpose of

22   Public.Resource?

23           MR. BRIDGES:   Objection.   Vague and

24   ambiguous and may lack foundation.

25           THE WITNESS:   It's the creation and

Carl Malamud                                            May 12, 2015
San Francisco, CA

Page 95

1    maintenance of public works projects for the

2    Internet.

3    BY MR. HUDIS:

4        Q.  What do you mean by "public works

5    projects"?

6        A.  Operational services that have real

7    information that people can access.

8        Q.  What do you mean by "operational services"?

9        A.  Public works is a term that refers to a

10   creation of infrastructure that's used by the

11   public.  And that is what we attempt to do for the

12   Internet.

13       Q.  And in that regard what are the objectives

14   of Public.Resource?

15           MR. BRIDGES:  Objection.  Vague; asked and

16   answered; vague and ambiguous; lacks foundation.

17           THE WITNESS:  I guess I don't understand

18   the difference between purpose and objective.

19   BY MR. HUDIS:

20       Q.  Do you make no distinction between the two

21   terms, purpose and objectives?

22           MR. BRIDGES:  Object -- objection.

23   Counsel, he needs to understand your question.

24           MR. HUDIS:  Okay.

25           MR. BRIDGES:  You need to explain what you

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1    mean.

2            MR. HUDIS:  Fair enough, Counsel.

3            MR. BRIDGES:  You can ask him -- he can

4    answer the question.

5            MR. HUDIS:  Fair enough.

6    BY MR. HUDIS:

7        Q.  In creating an infrastructure for the

8    Internet, what objectives does Public.Resource have

9    towards that goal?

10           MR. BRIDGES:  Objection.  Vague and

11   ambiguous; confusing.

12           THE WITNESS:  To create something that is

13   useful to the public.

14   BY MR. HUDIS:

15       Q.  Could you give me an example?

16       A.  Yes.  The IRS database we created.

17       Q.  Before the break you listed a number of

18   websites that are operated by Public.Resource.  I

19   want to make sure that I have them all.

20   Public.Resource.Org, USCourts.gov,

21   House.Resource.org, WWLBD.org, YesWeScan.Org,

22   Law.Resource.Org.

23           Have I named them all?

24           MR. BRIDGES:  Objection.  Lacks foundation;

25   vague and ambiguous.

Page 97

1          THE WITNESS:  USCourts.gov is not a

2    website.  It is a web page on Public.Resource.Org,

3    and the answer to your question is no.

4    BY MR. HUDIS:

5        Q.  What other websites does Public.Resource

6    operate?

7        A.  There is Yo.YourHonor.org.

8        Q.  What kind of information is provided on

9    Yo.YourHonor.org?

10       A.  It is a discussion of the PACER system,

11   P-A-C-E-R, which is the public access to court

12   electronic records.

13       Q.  You're not a fan of the PACER system; are

14   you?

15          MR. BRIDGES:  Objection.  Argumentative;

16   vague and ambiguous; lacks foundation.

17          THE WITNESS:  I'm a big fan of the PACER

18   system.  I think it's an essential piece of

19   information technology infrastructure.

20   BY MR. HUDIS:

21       Q.  Do you have criticisms of how the PACER

22   system is operated?

23       A.  I do.

24       Q.  And what are those criticisms?

25          MR. BRIDGES:  Objection.  Relevance.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1          THE WITNESS:  There's a number of issues

2   with the PACER system.  We uncovered a systematic

3   and pervasive set of violations of judicial

4   conference privacy rules, and we furnished that

5   information to the judicial conference in the form

6   of an audit, is one example.

7   BY MR. HUDIS:

8      Q.  Are your criticisms of the PACER system

9   posted as information to the Yo.YourHonor.org

10  website?

11         MR. BRIDGES:  Objection.  Vague and

12  ambiguous.

13         THE WITNESS:  There is a substantial essay

14  on the website that discusses a number of issues

15  having to do with the PACER system.

16  BY MR. HUDIS:

17     Q.  Now, are these issues criticisms,

18  commentary, extolling the virtues of PACER?  What

19  type of information concerning PACER is posted on

20  Yo.YourHonor.org?

21         MR. BRIDGES:  Objection.  Extraordinarily

22  compound; vague and ambiguous.

23         THE WITNESS:  I would say all of the above.

24  It's a discussion of the PACER system.

25  BY MR. HUDIS:

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1      Q.  Have we discussed today all of the web

2   pages or websites operated today by

3   Public.Resource?

4          MR. BRIDGES:  Objection.  Compound; vague

5   and ambiguous.

6          THE WITNESS:  Also continue to operate a

7   number of the websites that originated with the

8   Internet Multicasting Service.

9   BY MR. HUDIS:

10     Q.  Could you name those websites for me,

11  please?

12     A.  North.pole.org.  Park.org.  Town.hall.org.

13  My.phone.org.  Museum.media.org.

14         I think that's all of them, but there could

15  be a few that I'm missing.

16     Q.  Is that all you remember today?

17     A.  That's all I remember today.

18     Q.  What kind of information is posted on the

19  park.org website?

20     A.  That was the website created for the

21  Internet in the 1996 World Exposition.

22     Q.  What kind of information is posted on the

23  town.hall.org website?

24     A.  That is the archives of Internet talk

25  radio.

Carl Malamud                                                May 12, 2015
San Francisco, CA

Page 100

1      Q.  What kind of information is posted at the

2   my.phone.org website?

3      A.  It's a single web page with the line, this

4   is the web page for my phone.  It's inactive right

5   now.

6      Q.  What kind of information is posted at the

7   museum.media.org website?

8      A.  That is the archives of the Internet

9   Multicasting Service.

10     Q.  And what kinds of archives are posted

11  there?

12     A.  It's things like historical essays about

13  the EDGAR database.

14         There's one more website I just remembered.

15  Mappa.mundi.net, M-a-p-p-a, dot m-u-n-d-i, dot net.

16     Q.  What kind of information is posted at the

17  mappa.mundi.net website?

18     A.  Mappa, m-a-p-p-a.  Mappa.mundi.net was an

19  early EZ, an electronic magazine on the Internet.

20     Q.  What kind of information is posted there?

21         MR. BRIDGES:  Objection.  Lacks foundation.

22         THE WITNESS:  A series of columns I wrote

23  for the EZ, for example.

24  BY MR. HUDIS:

25     Q.  On what topics?

1       A.  Mapping the Internet was one topic.

2       Q.  Any others you can remember?

3       A.  There is a tribute to my friend Jon Postel

4  when he passed away called the Internet prayer

5  wheel.

6       Q.  For the record, who was Jon Postel?

7       A.  Jon Postel was one of the early and

8  instrumental creators of the Internet.

9       Q.  Have you told me all of the websites that

10  you can recall today operated by Public.Resource?

11      A.  I think we still have undesign.net is still

12  active.

13      Q.  What -- what kind of information is posted

14  at undesign.net?

15      A.  It was a tribute to Tibor Kalman and a

16  discussion of --

17      Q.  Could you spell his name, please?

18      A.  T-i-b-o-r, K-a-l-m-a-n.  A tribute to Tibor

19  Kalman, and a discussion of the role of

20  advertising.

21      Q.  Who is or was Tibor Kalman?

22      A.  A famous designer.

23      Q.  Of what?

24      A.  You know, I don't know.  That was done in

25  conjunction with Rebecca Malamud.

Page 102

```
 1      Q.  Earlier, Mr. Malamud, you said that

 2  Internet ar -- excuse me, that Public.Resource

 3  operates websites and provides services.  What

 4  kinds of services does Internet -- excuse me, does

 5  Public.Resource provide?  Or are the websites the

 6  provision of the services?

 7      A.  "Service" is a technical term of art, and

 8  it is the protocols that are used to access

 9  information.  So a website is an example of a

10  service.

11      Q.  What other services does Public.Resource

12  provide, other than the provision of these

13  websites?

14      A.  The websites are accessible using the HTTP

15  service, and are also accessible using the FTP

16  service.  FTP stands for file transfer protocol.

17      Q.  Other than providing the websites, the HTTP

18  service and the FTP service, are there any other

19  services that Public.Resource provides?

20      A.  We did provide information access using the

21  rsync protocol, r-s-y-n-c, and we terminated that

22  in January.

23      Q.  Have you told me all of the services that

24  Public.Resource provides?

25      A.  The only service we provide is access via
```

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1    the Internet.  And again, the word "service" is a

2    technical term of art denoting the protocols.

3        Q.  Does Public.Resource sell any products?

4        A.  No, we do not.

5        Q.  Mr. Malamud, before the break we marked a

6    few exhibits.  I'd like you to look at them,

7    please.

8            Exhibits 16, 17 and 18.  Let's take them

9    one at a time.

10           What is Exhibit 16?

11       A.  It appears to be a copy of our articles of

12   incorporation.

13           MR. HUDIS:  Counsel, would you stipulate

14   that Exhibit 16 is an authentic business record of

15   Public.Resource?

16           MR. BRIDGES:  I don't know.  I think the

17   witness should -- I'm nervous about stipulating

18   when I don't have personal knowledge.

19           MR. HUDIS:  Okay.

20           MR. BRIDGES:  It looks to be a record of

21   the Secretary of State of the State of California,

22   given the file stamp.

23           MR. HUDIS:  I'll ask the witness.

24   BY MR. HUDIS:

25       Q.  Mr. Malamud, is Exhibit 16 an authentic

1   business record of Public.Resource?

2          MR. BRIDGES:  I'll object to the extent it

3   calls for any kind of legal conclusion.

4          You can testify as to whether you think

5   it's an accurate reproduction of it.

6          THE WITNESS:  This appears at first glance.

7   Obviously, I would want to go check my originals.

8   This appears at first glance to be a copy of our

9   articles of incorporation, yes.

10  BY MR. HUDIS:

11     Q.  And these articles of incorporation were

12  prepared about the time of the founding of

13  Public.Resource.Org, Inc.?

14     A.  Well, yes.

15     Q.  And is Exhibit 16, the articles of

16  incorporation, kept on your company's website?

17     A.  Yes.

18     Q.  And is that website operated in the regular

19  course of Public.Resource's business?

20         MR. BRIDGES:  Objection.  Lacks foundation;

21  may call for a legal conclusion; argumentative.

22  BY MR. HUDIS:

23     Q.  You may answer.

24         MR. BRIDGES:  Vague and ambiguous.

25  BY MR. HUDIS:

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 105

1      Q.   You may answer.

2      A.   Yes.

3      Q.   And the articles of incorporation were made

4   at the time that you founded Public.Resource?

5      A.   The articles of incorporation are what

6   created the corporation.

7      Q.   Let's look at Exhibit 17.  What is this

8   document?

9           MR. BRIDGES:  Check it out.

10          THE WITNESS:  This appears to be a copy of

11  our bylaws.

12  BY MR. HUDIS:

13     Q.   Do you have any reason to doubt that

14  Exhibit 17 is an authentic document?

15          MR. BRIDGES:  Objection.  Lacks foundation;

16  vague and ambiguous.

17          THE WITNESS:  I do not.

18          MR. BRIDGES:  Assumes facts not in

19  evidence.

20          I will note that this document has lines

21  without signatures on the final page.

22          THE WITNESS:  The version of our bylaws

23  posted on our website has no signatures on it.

24          I have no reason to doubt.  I would

25  obviously want to double-check this with the copy

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1    that I have.

2    BY MR. HUDIS:

3        Q.  I'll represent to you, Mr. Malamud, that I

4    obtained Exhibits 16 and 17 from your website.

5        A.  Mm-hm.

6            MR. HUDIS:  Counsel, can you stipulate that

7    Exhibit 17 is an authentic business record of

8    Public.Resource?

9            MR. BRIDGES:  Let me get back to you after

10   a break when I'll have to confer with my client.  I

11   anticipate that will not be a problem.

12           MR. HUDIS:  Because I'd rather not have to

13   go through the foundation if I don't have to.

14           MR. BRIDGES:  I understand.  I just want to

15   confirm with him during a break.

16           MR. HUDIS:  Do you want to -- I'll allow

17   you to do that right now if you'd like.  We can go

18   off the record.

19           MR. BRIDGES:  Sure.

20           MR. HUDIS:  Andrew, do you want us to step

21   out of the room?

22           MR. BRIDGES:  No.  No.  We need to go off

23   the record though.

24           THE VIDEOGRAPHER:  The time is 11:58, and

25   we are off the record.

 1        (Discussion off the record.)

 2        THE VIDEOGRAPHER:  The time is 12:02, and

 3   we are back on the record.

 4        MR. BRIDGES:  So, Mr. Hudis, 18 we can

 5   stipulate to the authenticity.

 6        17 we can stipulate this does appear to be

 7   a copy of what is posted on the website, and we

 8   believe this is a genuine copy of the article of

 9   incorporation -- of the form of the articles of

10   incorporation without the signatures.

11        So I think -- you know, if -- the problem

12   is --

13        THE WITNESS:  Bylaws.

14        MR. BRIDGES:  The bylaws, thank you.

15        The concern is if -- it's a long document

16   and needs to be compared.  If there is an issue

17   with that, we can get back and let you know that.

18        So the stipulation is sort of a conditional

19   stipulation, subject to a correction at the time of

20   the transcript if we find after comparing it, there

21   is a material variance.

22        MR. HUDIS:  Okay.  So, Counsel, unless

23   there is a material variance, we can stipulate that

24   Exhibits 16 and 17 are authentic business records

25   of Public.Resource?

Page 108

1          MR. BRIDGES:  Yes, subject to our right to

2     correct the deposition to the extent we may need to

3     correct that stipulation if there is a material

4     variance on 17.

5          MR. HUDIS:  Understood and agreed.

6          And Exhibit 18, you are stipulating that

7     that's an authentic document.

8          MR. BRIDGES:  Yes.

9          MR. HUDIS:  Can we stipulate that it's a

10    business record of Public.Resource?

11         MR. BRIDGES:  We'll stipulate that it is a

12    document in the possession of Public.Resource.  I

13    would consider it to be a business record, I would

14    think, of the Internal Revenue service.

15         MR. HUDIS:  Satisfied.

16    BY MR. HUDIS:

17       Q.  Turning, Mr. Malamud, to Exhibit 16.

18         Does paragraph II B of the articles of

19    incorporation accurately describe the purpose of

20    Public.Resource?

21         MR. BRIDGES:  Objection.  Lacks foundation;

22    vague and ambiguous and may call for legal

23    expertise and legal conclusion.

24         THE WITNESS:  Yes.

25    BY MR. HUDIS:

Carl Malamud                                                  May 12, 2015
San Francisco, CA

1       Q.  Turning to Exhibit 17.  Does section 2.1 of

2    the bylaws of Public.Resource accurately describe

3    the objectives and purposes of Public.Resource?

4           MR. BRIDGES:  Same objections.

5           THE WITNESS:  Yes.

6    BY MR. HUDIS:

7       Q.  Mr. Malamud, I show you what's been marked

8    as Exhibit 18.  Could you please tell me what that

9    document is?

10          MR. BRIDGES:  I'll object to the extent it

11   requires him to -- object to the extent it requires

12   legal expertise to characterize it or seeks a legal

13   conclusion.

14          The witness may testify as to what he

15   knows.

16          THE WITNESS:  I don't know the official

17   title of this.  It's a -- I believe it's called a

18   Form 1045.  It's a notification of nonprofit

19   status.

20   BY MR. HUDIS:

21      Q.  And does it indicate to you that

22   Public.Resource attained its nonprofit status in

23   September of 2007?

24          MR. BRIDGES:  Objection.  Vague and

25   ambiguous; may call for a -- may call for legal

Carl Malamud                                                                    May 12, 2015
San Francisco, CA

1    expertise or conclusion.

2    BY MR. HUDIS:

3        Q.   Should I repeat the question, Mr. Malamud?

4        A.   Yeah.

5        Q.   Does Exhibit 18 indicate to you that

6    Public.Resource attained its nonprofit status in

7    September of 2007?

8            MR. BRIDGES:  Same objections.

9            THE WITNESS:  The date of the letter is

10   September 25th.  That's not the date of the

11   nonprofit status.

12   BY MR. HUDIS:

13       Q.   What is the date of the nonprofit status?

14       A.   April 13th, 2007.

15       Q.   Fair enough.  And I see that date.

16       A.   Yeah.

17       Q.   Thank you very much.

18           (PLAINTIFFS' EXHIBITS 19-20 WERE MARKED.)

19   BY MR. HUDIS:

20       Q.   Mr. Malamud, please take a moment to look

21   at Exhibits 19 and 20.

22       A.   Okay.

23       Q.   Have you looked at the exhibits?

24       A.   Yes, I have.

25       Q.   Could you tell me what Exhibit 19 is?

Page 111

1     A.  It looks like an out of date copy of the

2   Public.Resource.Org home page.

3     Q.  So since the time that my office printed

4   this web page of Exhibit 19, you have updated the

5   content since then?

6         MR. BRIDGES:  Objection.  Misstates

7   testimony; vague and ambiguous.

8         THE WITNESS:  When did you print this?

9   BY MR. HUDIS:

10    Q.  Our best recollection is January of 2015.

11    A.  I don't know.  I would have to

12  double-check.

13    Q.  I amend that because Exhibit 20 was also

14  printed on the same date.  So we probably printed

15  it in March of 2014.

16    A.  Yeah.  That makes sense.

17    Q.  So this -- so Exhibit 19 and 20 appears to

18  you to be the content of the home page and the

19  about page of the Public.Resource.Org website in or

20  about March of 2014?

21        MR. BRIDGES:  Objection.  May call for

22  speculation if he doesn't have definite memory;

23  vague and ambiguous; compound; lacks foundation.

24        THE WITNESS:  I'd have to speculate.  It

25  has the look and feel of what those pages typically

Carl Malamud                                                      May 12, 2015
San Francisco, CA

Page 112

1    look like, but I don't know at specific points in

2    time.

3    BY MR. HUDIS:

4       Q.  Now, Exhibit 19, in the center are these

5    some of the websites that Public.Resource provides

6    to the public?

7       A.  Yes.  And there's one more website that I

8    forgot to tell you about on there.

9       Q.  Which one?

10      A.  Bulk --

11          MR. BRIDGES:  I'm sorry.

12          THE WITNESS:  Pardon me.

13          MR. BRIDGES:  I object on the grounds it

14   lacks foundation; very confusing to me.

15          What are you directing his attention to in

16   this exhibit?

17          MR. HUDIS:  Sure.  Counsel, do you see

18   where it says "Watch FedFlix" in the center of the

19   page on Exhibit 19?

20          MR. BRIDGES:  Right.

21          MR. HUDIS:  And there are a number of

22   websites listed below that?

23          MR. BRIDGES:  Okay.  I just wanted to be

24   clear.

25          MR. HUDIS:  Yes.

Carl Malamud                                           May 12, 2015
San Francisco, CA

1          MR. BRIDGES:  If that's what you're

2    referring to, fine.

3          MR. HUDIS:  Yes.

4    BY MR. HUDIS:

5      Q.  So continue, Mr. Malamud.

6      A.  Bulk.resource.org is the website that I

7    forgot to tell you about.

8      Q.  So what kind of information is provided on

9    the Bulk.resource.org website?

10     A.  Its primary function is the home for

11   approximately 8 million IRS-exempt organization

12   filings.

13     Q.  And when you say "exempt," do you mean tax

14   exempt?

15     A.  Exempt organizations is a category that the

16   IRS has assigned.  Many of them are tax exempt, but

17   it also includes political organizations.

18     Q.  So if I remember my Internal Revenue Code,

19   those are 501(c)(3) and 501(c)(4) organizations?

20         MR. BRIDGES:  Objection.  May call for

21   legal expertise or conclusion.

22         THE WITNESS:  Also section 527

23   organizations.

24   BY MR. HUDIS:

25     Q.  So all three?

Page 114

1      A.  Yes.

2      Q.  Do you have -- if you could please look at

3   Exhibit 20.  Do you see that?

4      A.  Yes.

5      Q.  Are the current trustees of Public.Resource

6   Tim Stanley, Ed Walters and yourself?

7      A.  Yes.

8      Q.  Who is Tim Stanley?

9      A.  Tim Stanley is the CEO of Justia.

10     Q.  And what is Justia?

11     A.  It is a company in the legal information

12  services industry.

13     Q.  What kind of service do they provide?

14         MR. BRIDGES:  Objection.  Vague and

15  ambiguous.

16         THE WITNESS:  One example is a directory

17  for lawyers.

18  BY MR. HUDIS:

19     Q.  Any other services that Justia provides

20  that you're aware of?

21         MR. BRIDGES:  Objection.  Vague and

22  ambiguous.

23         THE WITNESS:  They provide a large number

24  of files such as court opinions for public access.

25  BY MR. HUDIS:

1     Q.   And who is Ed Walters?

2     A.   Mr. Walters is the CEO of FastCase, all one

3  word.

4     Q.   And what is the business of FastCase?

5     A.   FastCase is a company in the legal

6  information services industry.

7     Q.   What kind of information do they provide?

8     A.   They provide access to court opinions,

9  statutes, and other information.

10    Q.   What kinds of other information?

11    A.   You know, I don't know.  Court opinions and

12  statutes.

13    Q.   Do the former trustees of Public.Resource

14  also include Dale Dougherty, Marshall Rose and Hal

15  Varian?

16    A.   Yes.

17    Q.   Who is Dale Dougherty?

18    A.   Dale Dougherty is the founder of Maker

19  Media.

20    Q.   What is Maker Media?

21    A.   It's a company that, among other things,

22  operates the Maker Faire.  That's all one word,

23  dash F-a-i-r-e.

24    Q.   What is Maker Faire?

25    A.   It is a set of events around the world

Page 116

1    devoted to the maker movement.

2         Q.   What is the maker movement?

3         A.   People that like to make things.

4         Q.   Inventors?

5         A.   For example, inventors.

6         Q.   Who is Marshall Rose?

7         A.   Dr. Rose is an Internet engineer.

8         Q.   Who is Hal Varian?

9         A.   Dr. Varian is the chief economist of

10   Google.

11        Q.   How long did Mr. Dougherty serve on

12   Public.Resource's board?

13        A.   Six years.

14        Q.   What years?

15        A.   2007 to 2013.

16        Q.   Why did he leave Public.Resource's board?

17             MR. BRIDGES:  Objection.  May call for

18   speculation; vague and ambiguous.

19             THE WITNESS:  He put in his time, and I

20   thanked him very much.

21   BY MR. HUDIS:

22        Q.   So he voluntarily left?

23        A.   Absolutely.

24        Q.   And Dr. Rose, how long was he on

25   Public.Resource's board?

Page 117

1      A.   The same period of time, 2007 to 2013,

2   June.

3      Q.   Why did he leave Public.Resource's board?

4           MR. BRIDGES:  Objection.  May call for

5   speculation; vague and ambiguous.

6           THE WITNESS:  Dr. Rose created a new

7   Internet startup, and I was assisting him in that,

8   and we decided at the time that that would not have

9   him be an outside director.  And so again, I

10   thanked him for his valuable service.

11   BY MR. HUDIS:

12      Q.   And Hal Varian, when did he -- how long did

13   he serve on Public.Resource's board?

14      A.   The same period of time.

15      Q.   Why did he leave the board?

16           MR. BRIDGES:  Object.

17           THE WITNESS:  He was an investor -- I'm

18   sorry.

19           MR. BRIDGES:  The same objections.

20           THE WITNESS:  Okay.

21           MR. BRIDGES:  May call for speculation and

22   vague and ambiguous.

23   BY MR. HUDIS:

24      Q.   Mr. Malamud, between you and myself, we're

25   having a nice conversation.  You have to give

Page 118

1    Mr. Bridges time to object.

2       A.  Thank you.

3       Q.  All right.  So I'm sorry.  We were in the

4    middle of your answer.

5            Why did Mr. Varian leave Public.Resource's

6    board?

7            MR. BRIDGES:  Same objection.

8            THE WITNESS:  Dr. Varian was an investor in

9    Dr. Rose's company.

10   BY MR. HUDIS:

11      Q.  So that, is it true to say that they --

12   Dr. Varian and Dr. Rose needed time to operate

13   their startup company?

14           MR. BRIDGES:  No.  Objection.  Misstates

15   testimony.

16           THE WITNESS:  Public.Resource.Org requires

17   that the majority of the board of directors are not

18   interested parties, and because I had a business

19   relationship with Dr. Rose, that would have made

20   him an interested party.

21   BY MR. HUDIS:

22      Q.  And Dr. Varian as well?

23      A.  Because he was an investor in Dr. Rose's

24   company, yes.

25      Q.  If we could turn back -- Mr. Malamud, if we

1   could turn back to the bylaws, Exhibit 17.  Does

2   section 3.3 accurately describe the functions of

3   the Public.Resource trustees?

4          MR. BRIDGES:  Objection.  May call for a

5   legal conclusion and lacks foundation and vague and

6   ambiguous.

7          THE WITNESS:  Yes.  It's the specification

8   of the duties of the trustees.

9   BY MR. HUDIS:

10     Q.  What other duties, if any, besides those

11  listed in section 3.3 of Exhibit 17, do the

12  trustees perform for Public.Resource?

13         MR. BRIDGES:  Objection.  Lacks foundation;

14  vague and ambiguous; confusing; argumentative.

15         THE WITNESS:  These are the duties.  It

16  says, "Supervise all officers, agents and employees

17  of the corporation."

18  BY MR. HUDIS:

19     Q.  So besides what are listed here in section

20  3.3, do the trustees of Public.Resource perform any

21  other duties for the company?

22         MR. BRIDGES:  Same objections.  Lack of

23  foundation; vague and ambiguous; confusing;

24  argumentative.

25         THE WITNESS:  I believe clause C,

Page 120

1    "supervise all officers," is pretty inclusive, and

2    I think that covers their duties.

3    BY MR. HUDIS:

4        Q.  Does section 4.4 of the bylaws, Exhibit 17,

5    accurately describe the president's duties?

6            MR. BRIDGES:  Objection.  May call for a

7    legal conclusion; vague and ambiguous;

8    argumentative; lacks foundation.

9            THE WITNESS:  Yes.

10   BY MR. HUDIS:

11       Q.  Mr. Malamud, do you perform any other

12   duties on behalf of Public.Resource as its

13   president, other than those that are stated in

14   section 4.6 of Exhibit 17?

15           MR. BRIDGES:  Objection.  Argumentative;

16   lacks foundation; vague and ambiguous; may call for

17   a legal conclusion and construction of the

18   document.

19           THE WITNESS:  Section 4.6 says, "He or she

20   shall perform all duties incident to his or her

21   office."  I think that's pretty inclusive.

22   BY MR. HUDIS:

23       Q.  Mr. Malamud, section 4.1 of Exhibit 17, the

24   bylaws, provides for the following officers.  "A

25   president, a secretary and a chief financial

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1    officer who shall be designated the treasurer."

2            Today who is the secretary of

3    Public.Resource?

4        A.   That would be me.

5        Q.   Today who is the chief financial

6    officer/treasurer of Public.Resource?

7        A.   That is me.

8        Q.   Mr. Malamud, if you could turn to section

9    5.1 of the bylaws, Exhibit 17.  And 5.2.

10           Are there today operating committees of

11   Public.Resource?

12           MR. BRIDGES:  Objection.  Vague and

13   ambiguous; lacks foundation.

14           THE WITNESS:  We have a small board.  We

15   operate as a committee of the whole.  So yes, we

16   do.

17   BY MR. HUDIS:

18       Q.   Other than the board, does Public.Resource

19   have any other committees?

20           MR. BRIDGES:  Objection.  Argumentative;

21   lacks foundation; vague and ambiguous; asked and

22   answered.

23           THE WITNESS:  Yes.  Again, the audit

24   committee, for example, is a committee of the whole

25   board.

Carl Malamud                                          May 12, 2015
San Francisco, CA

Page 122

1   BY MR. HUDIS:

2      Q.   Okay.   Other than the committee of the

3   whole, which is the board and the audit committee,

4   does Public.Resource -- Public.Resource have any

5   other operating committees?

6           MR. BRIDGES:   Objection.   Asked and

7   answered; lacks foundation; vague and ambiguous.

8           THE WITNESS:   No.

9   BY MR. HUDIS:

10     Q.   Mr. Malamud, could you turn to article 13

11  of the bylaws, Exhibit 17?   Are you there?

12     A.   Yes.

13     Q.   How many members does Public.Resource have

14  in the Council of Public Engineers?

15     A.   None.

16     Q.   What is the Council of Public Engineers?

17     A.   The bylaws were created in a fashion that

18  allowed us to become a membership organization in

19  the future.   We have not activated that.

20     Q.   Besides yourself, does Public.Resource have

21  any employees?

22     A.   No.

23     Q.   Who is or was Joel Hardi, H-a-r-d-i?

24     A.   He was an employee.

25     Q.   What did he do?

Carl Malamud                                                          May 12, 2015
San Francisco, CA

1       A.  He was a systems engineer.

2       Q.  For how long was he a systems engineer at

3   Public.Resource?

4       A.  It was less than a year.

5       Q.  Do you remember what year?

6       A.  2008.

7           MR. HUDIS:  Let's go off the record.

8           MR. BRIDGES:  Shall we break for lunch?

9           MR. HUDIS:  Yeah.  That's why I want to --

10  we're at a good breaking point.

11          THE VIDEOGRAPHER:  The time is 12:26.  We

12  are off the record.

13          (Lunch recess taken.)

14          THE VIDEOGRAPHER:  The time is 1:11, and we

15  are back on the record.

16  BY MR. HUDIS:

17      Q.  Mr. Malamud, before we had the break you

18  were telling me about Joel Hardi, and he was a

19  systems engineer for Public.Resource in 2008?

20      A.  That's correct.

21      Q.  What did he do as systems engineer for the

22  year he was with you?

23      A.  He did systems administration and

24  programming.

25      Q.  Mr. Malamud, how does Public.Resource

Carl Malamud                                                        May 12, 2015
San Francisco, CA

Page 124

1    obtain funding for its operations?

2            MR. BECKER:  Objection.  Relevance.

3    Objection.  This is beyond the scope of the

4    30(b)(6) designation.

5            THE WITNESS:  We receive contributions and

6    grants.

7            And I wanted to add there was one more

8    website that I remembered.  When an appropriate

9    time, I'd be happy to tell you what it is.

10   BY MR. HUDIS:

11       Q.  You know what, Mr. Malamud?  Why don't we

12   do that right now?

13       A.  All right.

14       Q.  So there is another website that is

15   provided by Public.Resource?

16       A.  Yes.

17       Q.  And what is the name of that website?

18       A.  Betterdogfood.org.

19       Q.  And what information is provided on the

20   Betterdogfood.org website?

21       A.  It's a spoof of Silicon Valley.  It's a

22   fake dot com.  We give you the dog and sell you the

23   dog food.

24       Q.  So Public.Resource obtains funding for its

25   operations by contributions and grants?

Carl Malamud                                                    May 12, 2015
                        San Francisco, CA

1          MR. BECKER:  Objection.  Again, beyond the

2     scope of Mr. Malamud's 30(b)(6) designation.  May

3     misstate prior testimony.

4          THE WITNESS:  We receive contributions and

5     grants.

6          MR. HUDIS:  It's deposition topic 4, and if

7     I could put something into the record.

8          (PLAINTIFFS' EXHIBIT 21 WAS MARKED.)

9     BY MR. HUDIS:

10     Q.  If we notice on item 2 on --

11          MR. BECKER:  Counsel, what exhibit number

12     is this?

13          MR. HUDIS:  Yeah, 21.  So I've marked as

14     Exhibit 21 -- thank you, Counsel.

15          We have marked as Exhibit 21

16     Public.Resource's initial disclosures pursuant to

17     FRCP 26(a)(1), and under the items relating to the

18     documents that Public.Resource may use to support

19     its claims of defense, among them it says documents

20     relating to Public.Resource's income and finances.

21          So we believe that Public.Resource has put

22     its income and finances into -- into relevant play

23     in the litigation, and we did notice it as a topic.

24          MR. BECKER:  And we have had a discussion

25     about this, and of course, Public.Resource

1    disagrees with your characterization.

2         This says documents that Public.Resource

3    may use to support its claims for defenses.  Any

4    such documents that Public.Resource plans to use to

5    support its claims for defenses have been produced

6    to plaintiffs, and the -- I should also note that

7    category 4 is far broader than simply documents

8    relating to Public.Resource's income and finances.

9    Its records and communications and information

10   relating to Public.Resource's income and finances.

11        MR. HUDIS:  So I'll ask the questions,

12   Counsel.  If you have objections, we can either

13   take Mr. Malamud's testimony subject to your

14   objections, or you're within your rights to tell

15   him not to answer.  I just want to make my record.

16        MR. BECKER:  Mm-hm.

17   BY MR. HUDIS:

18   Q.  Does Public.Resource sell any products?

19        MR. BECKER:  I'm just going to take a

20   moment to say that we have a standing objection to

21   all questions that are related to the records,

22   communications and information relating to

23   Public.Resource's income and finances as being

24   beyond the scope of the 30(b)(6) designation.

25        MR. HUDIS:  Okay.  So, Counsel --

```
 1          MR. BECKER:  And also being irrelevant.

 2          MR. HUDIS:  So, Counsel, we do disagree.

 3   So I'll just make the record and ask my questions

 4   and we can proceed from there.

 5   BY MR. HUDIS:

 6      Q.  So, Mr. Malamud, does product -- does

 7   Public.Resource sell any products?

 8          MR. BECKER:  Objection.  Vague and

 9   ambiguous and all prior objections.

10          THE WITNESS:  Some of our pamphlets are

11   available for purchase on Lulu, but nobody's ever

12   bought them.

13   BY MR. HUDIS:

14      Q.  Does Public.Resource sell any services?

15          MR. BECKER:  Same objections.  Vague and

16   ambiguous.

17          THE WITNESS:  No.

18   BY MR. HUDIS:

19      Q.  Now, you mentioned before that

20   Public.Resource obtains grants.  Do you recall

21   that?

22      A.  Yes.

23      Q.  From let's say the five largest.  From whom

24   does Public.Resource obtain grants from the five

25   largest that you can remember?
```

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1          MR. BECKER:  Objection.  For the same

2    objections prior.  Vague and ambiguous, and also an

3    objection on privacy grounds for any individuals or

4    entities that are not publicly listed among their

5    list of provided grants to Public.Resource.Org.

6          THE WITNESS:  Our list of contributors is

7    confidential.  As part of the schedule B of our

8    Form 990 we have listed some of our contributors on

9    our "About" page.

10   BY MR. HUDIS:

11        Q.  So if we could look at Exhibit 20,

12   Mr. Malamud.

13        A.  Okay.

14        Q.  And you see under "Our Contributors"?

15        A.  Yes.

16        Q.  So are -- strike that.

17             Under the first bullet point where it says,

18   "Pro bono legal support for our 2013 activities."

19   Do you see that?

20        A.  I do.

21        Q.  And the pro bono legal support provided,

22   these are all law firms?

23        A.  No.

24        Q.  Which one -- which one of these entities is

25   not a law firm?

Carl Malamud                                                          May 12, 2015
San Francisco, CA

Page 129

1        A.   Christopher Sprigman is a professor of law.

2        Q.   Except for Christopher Sprigman, all the

3    rest of the pro bono legal supporters in 2013 are

4    these law firms listed in here?

5             MR. BECKER:   Objection.  Vague.

6             What do you mean by law firm?

7             MR. HUDIS:   It says, "the following law

8    firms."

9    BY MR. HUDIS:

10       Q.   You may answer.

11       A.   Yes.

12       Q.   Are there any other law firms that have

13   provided pro bono legal support to Public.Resource

14   that are not listed here on Exhibit 20?

15            MR. BECKER:   Objection to the extent that

16   this calls for anything that is attorney-client

17   privilege, including the -- the type of legal

18   support that any entity may or may not have

19   provided to Public.Resource.Org.

20   BY MR. HUDIS:

21       Q.   You may answer.

22       A.   We have disclosed it.  Morrison & Foerster

23   represents us on a pro bono basis.

24       Q.   Any other law firms?

25       A.   Not that we have disclosed.

Carl Malamud                                                          May 12, 2015
San Francisco, CA

Page 130

1      Q.  And then on the next bullet it says, "Major

2   support for our 2012 activities is provided by a

3   grant from Google.Org with additional support from

4   the Elbaz Family Foundation and the Cutts

5   Foundation.

6          Do you see that?

7          MR. BECKER:  Objection.  The document

8   speaks for itself.

9          THE WITNESS:  I do.

10  BY MR. HUDIS:

11     Q.  All right.  And could you tell me the

12  amounts of the grants of these three entities in

13  2012?

14         MR. BECKER:  Objection.  Once again,

15  renewing the objection that this is beyond the

16  scope of the 30(b)(6) designation.  Objection.

17  Competence to the extent that the witness is in a

18  position to state specific figures.  Objection for

19  relevance.

20  BY MR. HUDIS:

21     Q.  You may answer.

22     A.  Google.Org was a million dollar grant in

23  2012.

24         The Cutts Foundation was $10,000.

25         And I forget how much the Elbaz Family

Carl Malamud                                                          May 12, 2015
San Francisco, CA

1    Foundation was.

2        Q.  Has Public.Resource obtained grants from

3    any other entities larger than a hundred thousand

4    dollars?

5            MR. BECKER:  Objection.  Vague and

6    ambiguous.  Objection.  The -- may call for

7    privileged information concerning the identities of

8    donors, and their first amended rights in

9    association and rights of free speech.

10           Objection.  Relevance.

11           THE WITNESS:  I'm willing to answer that

12   question with respect to the publicly disclosed

13   donors.  As I explained before some of our donors

14   have not been publicly disclosed.

15           And would you repeat the question?  Make

16   sure I get it right.

17   BY MR. HUDIS:

18       Q.  Sure.  Has Public.Resource obtained grants

19   from any other entity at this time larger than a

20   hundred thousand dollars?

21           MR. BECKER:  All the same objections,

22   including vague and ambiguous.

23           THE WITNESS:  There are two individual

24   grants that are greater than that sum.  The Arcadia

25   Foundation provided a grant of $200,000.

Page 132

1          The Omidyar Network provided a grant of

2   $500,000 plus $750,000 in a matching funds

3   challenge.

4          Let me add -- greater than a hundred

5   thousand dollars.  I believe that's the list.

6   BY MR. HUDIS:

7      Q.  Could you spell Arcadia for me?

8      A.  A-r-c-a-d-i-a.

9      Q.  And could you spell Omidyar?

10     A.  O-m-i-d-y-a-r.

11     Q.  And is Arcadia a foundation?

12     A.  I believe that's their formal name.

13     Q.  And is Omidyar Network a foundation?

14     A.  Yes, it is.

15     Q.  Have you provided to us all of the publicly

16  disclosed entities who have donated to

17  Public.Resource in amounts greater than a hundred

18  thousand dollars?

19         MR. BECKER:  Objection.  Vague and

20  ambiguous.  Objection.  Relevance.  Objection.

21  Beyond the scope of the 30(b)(6) designation.

22  Objection.  Competence.

23         THE WITNESS:  It's -- we've disclosed all

24  of those on our about page, and you can simply

25  refresh this document and you'll have the list.

Carl Malamud                                                    May 12, 2015
                        San Francisco, CA

1   BY MR. HUDIS:

2       Q.   What is the Project 10 award?

3            MR. BECKER:  Objection.  Vague and

4   ambiguous.

5            THE WITNESS:  The project 10 to 100.

6   BY MR. HUDIS:

7       Q.   Oh, Project 10 to 100 award?

8       A.   Is a set of grants that Google gave out in

9   celebration of their tenth anniversary.

10      Q.   And what is the Mitchell Kapor Foundation?

11      A.   It is a private foundation run by Mitchell

12  Kapor.

13      Q.   What is the Sunlight Foundation?

14      A.   The Sunlight Foundation is a nonprofit

15  organization based in Washington D.C.

16      Q.   What is Creative Commons?

17      A.   Creative Commons is a nonprofit

18  organization based in San Francisco, which is the

19  creator of the Creative Commons licenses.

20      Q.   What are the creative commons licenses?

21           MR. BECKER:  Objection.  Vague and

22  ambiguous; relevance.

23           THE WITNESS:  I'm not a lawyer so I'm not

24  sure the proper characterization, but it is a set

25  of licenses that people can apply to content that

Carl Malamud                                                                May 12, 2015
San Francisco, CA

1   permit other people to use that content under

2   certain conditions.

3   BY MR. HUDIS:

4      Q.  Understanding you're not a lawyer, what are

5   those conditions?

6         MR. BECKER:  Objection.  May call for a

7   legal conclusion; vague and ambiguous.  Objection

8   for relevance.  Objection for beyond the scope of

9   the 30(b)(6) designation.  Objection for

10  competence.

11        THE WITNESS:  One example of the creative

12  commons license is attribution non-commercial use.

13  And what that says is you may use this content as

14  long as you provide attribution and only use it for

15  non-commercial purposes.

16  BY MR. HUDIS:

17     Q.  Does Public.Resource obtain funding for its

18  operations from sources other than contributions or

19  grants?

20        MR. BECKER:  Objection for being beyond the

21  scope of the 30(b)(6,) and objection for relevance.

22  Objection to the extent that it calls for

23  information concerning the identities of any

24  private donors that have not been publicly

25  disclosed and therefore would impact their privacy

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1   rights.

2          THE WITNESS:  We had a small in-kind

3   contribution of a computer.  And that would be it.

4   BY MR. HUDIS:

5      Q.  So other than the donation of the in-kind

6   computer and contributions and grants, does

7   Public.Resource have any other sources of funding

8   for its operations?

9          MR. BECKER:  All the same objections.

10         THE WITNESS:  No.

11         MR. BECKER:  Vague and ambiguous.

12         THE WITNESS:  Contributions and grants.

13  BY MR. HUDIS:

14     Q.  Does Public.Resource retain any independent

15  contractors?

16         MR. BECKER:  Objection.  Vague and

17  ambiguous.

18         THE WITNESS:  Yes.

19  BY MR. HUDIS:

20     Q.  For what purpose?

21         MR. BECKER:  Objection.  Vague and

22  ambiguous.

23         THE WITNESS:  We -- one independent

24  contractor is Point.B Studio, which does graphic

25  design support.

Carl Malamud                                          May 12, 2015
San Francisco, CA

Page 136

1   BY MR. HUDIS:

2       Q.   And that's -- that business Point.B Studio

3   is operated by Rebecca Malamud?

4            MR. BECKER:  Objection.  Assumes facts not

5   in evidence; vague and ambiguous.

6            THE WITNESS:  She's the principal of

7   Point.B Studio, yes.

8   BY MR. HUDIS:

9       Q.   Who is or was Mike Kail, K-a-i-l?

10           MR. BECKER:  Objection.  Vague; compound.

11           THE WITNESS:  Mike D. Kail provides system

12  administration support to Public.Resource on a

13  part-time basis.

14  BY MR. HUDIS:

15      Q.   What is systems administration support?

16      A.   That is the maintenance and operation of

17  UNIX-based computers that we use as servers.  UNIX

18  is all capital letters.

19      Q.   Who -- who or what is HTC Global?

20      A.   A former contractor.

21      Q.   What services did they provide to

22  Public.Resource?

23           MR. BECKER:  Objection.  Vague.

24           THE WITNESS:  Double-key services.

25  BY MR. HUDIS:

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1      Q.   Does Public.Resource retain any independent

2   contractors today who provide double-key services

3   to your company?

4           MR. BECKER:  Objection.  Irrelevance.

5   Objection.  Vague.

6           THE WITNESS:  No.

7   BY MR. HUDIS:

8      Q.   Mr. Malamud, could we turn back to the

9   bylaws of Public.Resource, Exhibit 17?

10     A.   Okay.

11     Q.   Could we turn to section 7.6?

12          Since 2007 has Public.Resource issued any

13   annual reports?

14     A.   Yes.

15     Q.   Are these reports published on

16   Public.Resource's website?

17     A.   I don't know.

18     Q.   Since 2007 -- now I'm -- strike that.

19          So now we're on -- I'm looking at section

20   7.7 of Exhibit 17, the bylaws of Public.Resource.

21          Since 2007 has Public.Resource issued any

22   annual statements of specific transactions?

23     A.   I think you left out a part of section 7.7.

24   It's annual statement of specific transactions to

25   members.  We have no members.  We have not issued

Page 138

1    any statements.

2        Q.  Thank you for the correction, Mr. Malamud.

3    I appreciate it.

4            Turning to section 9.4 of Exhibit 17, the

5    bylaws.

6            Since 2007 has Public.Resource kept board

7    meetings -- kept board meeting minutes?

8        A.  We conduct all of our board business by

9    electronic mail.  And yes, in fact, that's part of

10   our document retention.

11       Q.  Are those meeting minutes published on

12   Public.Resource's website?

13       A.  No.

14       Q.  Since 2007 has Public.Resource kept board

15   committee meeting minutes?

16       A.  As I said earlier, we function as a

17   committee of the whole, and yes, we did.

18       Q.  Where are these reports and minutes kept?

19       A.  They're --

20           MR. BECKER:  Objection.  Relevance.

21           THE WITNESS:  They're in electronic mail,

22   and they were also furnished to our auditors and

23   our accountant.

24           MR. HUDIS:  Counsel, we would like

25   production of Public.Resource's annual reports and

Page 139

 1   board minutes from 2007 until now.

 2            MR. BECKER:  Counsel, what is the basis for

 3   that request?  Do you believe that any of your

 4   written document requests would include those

 5   documents?

 6            MR. HUDIS:  I'd have to look, and if they

 7   don't, we'll certainly propound more.

 8            MR. BECKER:  And, Counsel, what is the

 9   relevance of those documents that you're requesting

10   to --

11            MR. HUDIS:  Oh, any of the reports or

12   meeting minutes that would discuss either the

13   posting of the 1999 standards or this litigation.

14            MR. BECKER:  Counsel, what is the basis for

15   requesting them back to 2007?

16            MR. HUDIS:  Good point.  We'll amend our

17   request back to 2012.

18            MR. BECKER:  Counsel, what is the basis for

19   requesting all -- all minutes as opposed to simply

20   any that would mention the 1999 standards and this

21   litigation?

22            MR. HUDIS:  I agree.  I agree.  We'll limit

23   our request to any board minutes and any annual

24   reports of Public.Resource that mention either the

25   1999 standards or this litigation from 2012 to the

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1   present.

2           MR. BECKER:  We will take this under

3   advisement and reserve objections.

4   BY MR. HUDIS:

5       Q.  Mr. Malamud, what is the Internet Archive?

6           MR. BECKER:  Objection.  Vague.

7           THE WITNESS:  It's a nonprofit corporation

8   based in San Francisco.

9   BY MR. HUDIS:

10      Q.  What is the business of Internet Archive?

11          MR. BECKER:  Objection.  Vague and

12  competence.

13          THE WITNESS:  And I'm sorry, your question

14  was, what --

15  BY MR. HUDIS:

16      Q.  What is the business of Internet Archive?

17      A.  So that is probably a question best asked

18  of them.  If I were to characterize it, I would say

19  it is a public library on the Internet.

20      Q.  And are you familiar with the URL of

21  Public.Resource's website?

22          MR. BECKER:  Objection.  Vague.

23          THE WITNESS:  I'm not sure what you're

24  asking there.

25  BY MR. HUDIS:

Page 141

1     Q.  Is www.archive.org the URL of

2   Public.Resource's website?

3         MR. BECKER:  Objection.  Confusing.

4         THE WITNESS:  No, it is not.

5   BY MR. HUDIS:

6     Q.  Oh, thank you.  I misspoke.

7         What is the URL of Internet Archive's

8   website?

9     A.  Archive.org.

10    Q.  What relationship, if any, do you have with

11  the Internet Archive?

12        MR. BECKER:  I'd just like to note my --

13  our objection that Mr. Malamud is not designated to

14  discuss generally any interaction between the

15  Internet Archive and Public.Resource.Org.

16  Mr. Malamud is only designated to discuss those

17  interactions that may relate to the 1999 standards.

18        MR. HUDIS:  Well, we -- he -- Mr. Malamud

19  is appearing here not only in his Rule 30(b)(6)

20  capacity, but he is also appearing here in his

21  personal capacity.

22        So I will ask again.

23  BY MR. HUDIS:

24    Q.  Mr. Malamud, what relationship, if any, do

25  you have with Internet Archive?

Page 142

 1          MR. BECKER:  And same objection, as well as

 2    vague.

 3    BY MR. HUDIS:

 4       Q.  You may answer.

 5       A.  I'm a user.

 6       Q.  Mr. Malamud, are you a registered user with

 7    Internet Archive?

 8          MR. BECKER:  Objection.  Vague.

 9          THE WITNESS:  Yes, I am.

10    BY MR. HUDIS:

11       Q.  What rights does an Internet Archive

12    registered user have?

13          MR. BECKER:  Objection.  Assumes facts not

14    in evidence.

15          THE WITNESS:  So again, the specific nature

16    of the rights is something you would have to ask

17    the Internet Archive, but a user can read content

18    and can create what is known as an item.

19    BY MR. HUDIS:

20       Q.  What -- in relation to the Internet

21    Archive, what is an item?

22       A.  An example of an item is a piece of video.

23       Q.  Could the creation of an item be also

24    written content?

25          MR. BECKER:  Objection.  Competence.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1    Objection.  Vague.

2          THE WITNESS:  Items have types, and one

3    type of an item is a text item.

4    BY MR. HUDIS:

5       Q.  Are there other types of items that one can

6    create on Internet Archive?

7       A.  Yes.

8       Q.  And what are they?

9       A.  Audio.  What I would call an opaque item,

10   just an arbitrary file, such as a zip file.  Data

11   is actually the formal type name for that.

12      Q.  So generally these items could include

13   video, text, audio and opaque data, such as a zip

14   file?

15         MR. BECKER:  Objection.  Compound.

16   Objection.  Vague.

17         THE WITNESS:  I'm not sure that's the

18   complete list, but that is certainly a subset of

19   the items one can create.

20   BY MR. HUDIS:

21      Q.  Do you have administrator privileges with

22   Internet Archive?

23         MR. BECKER:  Objection.  Vague.  Objection.

24   Competence.

25         THE WITNESS:  Yes, although that's a

Page 144

1    carefully defined term.

2    BY MR. HUDIS:

3        Q.  And how would you define "administrator

4    privileges"?

5        A.  It allows me to create and edit items

6    within the collections that I have created or have

7    access to.

8        Q.  You anticipated one of my later questions.

9        A.  Sorry about that.

10       Q.  No, that's -- that's actually very good.

11            With respect to the Internet Archive, what

12   is a collection?

13       A.  A collection is a set of items that are

14   grouped together.

15       Q.  Are these sets of items grouped together in

16   a collection under a theme?

17            MR. BECKER:  Objection.  Vague.

18            THE WITNESS:  Typically.

19   BY MR. HUDIS:

20       Q.  Mr. Malamud, do you have an e-mail address?

21       A.  Yes, I do.

22       Q.  And is that e-mail address Carl@media.org?

23       A.  Yes.

24       Q.  Is your e-mail address also the user name

25   that you use to log on to Internet Archive's

Carl Malamud                                                    May 12, 2015
                         San Francisco, CA

 1    servers so that you can post content to their

 2    website?

 3        A.  Yes.

 4        Q.  For questions that are going to follow

 5    later, Mr. Malamud, I'd like to know your

 6    understanding of certain terms related to the

 7    Internet.

 8            First, content.  What is content in

 9    relation to the Internet?

10            MR. BECKER:  Objection.  Vague and

11    ambiguous.  Objection.  Relevance.  May be

12    argumentative.

13            THE WITNESS:  That's a broad philosophical

14    question, sir.  I mean, that sounds like the --

15    something one would write an essay about.

16    BY MR. HUDIS:

17        Q.  All right.  So we'll -- we'll take the

18    definition by way of example.

19            Can content include textual data?

20        A.  Sure, yes.

21        Q.  Can content include graphical data such as

22    image -- images?

23        A.  Images would be content, yes.

24        Q.  Yes.  And would data files be content?

25        A.  Maybe or maybe not.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1      Q.  In what way would data files be considered

2  content for the Internet?

3      A.  So content in my mind, and again, this is a

4  broad, philosophical topic, implies something that

5  a human being can look at and take some meaning

6  from.

7          So a data file might include a binary

8  image.  Is that content or not?  Again, that's --

9  it would be a fascinating essay.

10     Q.  Which brings me to my next question.

11         What does it mean to view content on an

12  Internet website?

13         MR. BECKER:  Objection.  Vague.

14         THE WITNESS:  So view to me sounds to me

15  like a human being at a computer using the

16  Internet.  So I think that is an end user looking

17  at an item that is available from another computer.

18  BY MR. HUDIS:

19     Q.  What does it mean to access content on an

20  Internet website?

21         MR. BECKER:  Objection.  Vague.  Objection.

22  May also be argumentative.  Objection.  May call

23  for a legal conclusion.

24         THE WITNESS:  So access is a more precise

25  technical term, and that to me implies that a

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 147

1    computer, not necessarily a human being, but a

2    computer has requested some data from another

3    computer, and that request was successful and the

4    data was transferred.

5    BY MR. HUDIS:

6        Q.  What does it mean to download content from

7    an Internet website?

8            MR. BECKER:  Objection.  Vague.  Objection.

9    May call for a legal conclusion.  Objection.  May

10   be argumentative.

11           THE WITNESS:  Again, that's a vague term,

12   like view.  But from the standpoint of an

13   individual human being at a computer, download

14   implies taking some content from another location

15   and having it copied on your personal computer, for

16   example.

17   BY MR. HUDIS:

18       Q.  Could you tell us what an HTTP question is,

19   otherwise known as a hypertext transfer protocol

20   request?

21       A.  It is one of a series of operations --

22   protocol operations defined in the HTTP protocol

23   specification.

24       Q.  And what does it do?

25           MR. BECKER:  Objection.  Vague.

Carl Malamud                                                    May 12, 2015
                        San Francisco, CA

Page 148

1          THE WITNESS:  Well, there's different kinds

2    of requests.

3    BY MR. HUDIS:

4       Q.  There are different kinds of HTTP requests?

5       A.  Yes.

6       Q.  All right.  Could you tell me what they

7    are?  Are there many?

8          MR. BECKER:  Objection.  Compound.

9    BY MR. HUDIS:

10      Q.  Are there many types of HTTP requests?

11      A.  Okay.  Let me preface this by saying I

12   would want to review the HTTP protocol

13   specification, but there are several, I can say

14   that for a fact.

15      Q.  All right.  So if you could name me a few

16   of the ones that you recall at this time.

17      A.  One of the more common requests is the get

18   request, g-e-t.  And that request is how a client

19   asks for a particular URL from a server.

20      Q.  All right.  What's another type of HTTP

21   request?

22      A.  The post request is used to add data to,

23   for example, a web form on the server.

24      Q.  Can you tell us another type of HTTP

25   request?

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 149

1        A.  The head request asks for the metadata

2   associated with the document, such as the last

3   modified time or the number of bytes.

4        Q.  Can you name another type of HTTP request?

5        A.  There is a put request, and I would have to

6   consult for the precise definition of that one.

7        Q.  What generally does a put request do?

8            MR. BECKER:  Objection.  Vague.

9            THE WITNESS:  I'd want to --

10           MR. BECKER:  Objection.  Competence.

11           THE WITNESS:  I'd want to look at the HTTP

12   protocol specification.  It's not something I'm

13   familiar with.

14   BY MR. HUDIS:

15       Q.  Is there any other type of HTTP request

16   that you can think of as we sit here now?

17       A.  There are others, and I do not know what

18   they are right now.

19       Q.  If an Internet user wants to obtain data

20   from a website, would that be a get request?

21           MR. BECKER:  Objection.  Hypothetical.

22   Objection.  Vague.

23           THE WITNESS:  A get request is one of the

24   more common mechanisms for accessing data from an

25   HTTP server.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1    BY MR. HUDIS:

2         Q.  What is a file transfer protocol or an FTP

3    transfer?

4              MR. BECKER:  Objection.  Vague.  Objection.

5    May be compound.

6              THE WITNESS:  So the file transfer protocol

7    is a protocol specification written by Jon Postel,

8    which specifies a series of operations in which a

9    client may get listings of files and transfer

10   files.

11             Jon is J-o-n, by the way.

12             MR. HUDIS:  Postel is P-o-s-t-e-l.

13   BY MR. HUDIS:

14        Q.  What is an rsync data transfer?

15        A.  Rsync is another mechanism for the transfer

16   of files with a particular focus on replication of

17   one archive on a system to an identical archive on

18   another system.

19        Q.  Does an archive -- does an F -- strike

20   that.

21             Does an rsync data transfer ensure that the

22   data on the source server and the destination

23   server are the same?

24             MR. BECKER:  Objection.  Vague and

25   ambiguous.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1          Objection.  Assumes facts not in evidence.

2     Objection.  Lacks foundation.

3          THE WITNESS:  The intent of rsync is

4     replication.  However, the word assurance, I do not

5     know what specific steps the rsync software takes

6     to verify the identity.  So it could be that the

7     files are different, but again, I just don't know

8     what those mechanisms are.

9     BY MR. HUDIS:

10       Q.  Does an rsync transfer typically -- is an

11    rsync transfer typically used to synchronize files

12    and directories between two systems?

13         MR. BECKER:  Objection.  Vague and

14    ambiguous.  May assume facts not in evidence.

15         THE WITNESS:  Rsync is typically used -- we

16    use it internally to make a replica of one of our

17    servers on another one as a backup.

18    BY MR. HUDIS:

19       Q.  What does it mean to post content to an

20    Internet website?

21         MR. BECKER:  Objection.  Vague and

22    ambiguous.

23         THE WITNESS:  I can think of two meanings

24    of that term.  So the first meaning is a user fills

25    out a form such as a comment.  And that data then

Carl Malamud                                           May 12, 2015
San Francisco, CA

1    appears on that website, for example, at the end of

2    a blog post.  So that's example 1.

3            Example 2 would be taking a file and

4    transferring it on to another system, which then

5    becomes publicly visible, much as one would do if

6    we were updating our blog and it is hosted on some

7    other site.

8    BY MR. HUDIS:

9        Q.  And what does it mean to publish content to

10   an Internet website?

11           MR. BECKER:  Objection.  May call for --

12   actually, objection.  Does call for a legal

13   conclusion; vague.  Objection.  Ambiguous;

14   argumentative.

15           THE WITNESS:  Publish is a vague term.

16   Post is more precise, and it's a term that I prefer

17   to use.

18   BY MR. HUDIS:

19       Q.  You've never used the term publish with

20   respect to transferring data to another website?

21           MR. BECKER:  Objection.  Argumentative.

22   Objection.  Vague as to time period.

23           THE WITNESS:  I have used the word publish.

24   Just like many laymen, I've used the term

25   imprecisely at times.

1   BY MR. HUDIS:

2       Q.   Okay.   To you does post and publish mean

3   the same thing, only post is a more precise term?

4           MR. BECKER:   Objection.   Argumentative.

5   Objection.   May call for a legal conclusion.

6   Objection.   Assumes facts not in evidence.

7           THE WITNESS:   No.

8   BY MR. HUDIS:

9       Q.   Have you ever posted content to Internet

10  Archive's website?

11      A.   Yes.

12      Q.   Do you remember when for the first time?

13  Just a year would be fine.

14          MR. BECKER:   Objection.   Relevance.

15          THE WITNESS:   I don't remember the year.   I

16  think it probably had the numbers 19 at the

17  beginning.

18  BY MR. HUDIS:

19      Q.   So sometime in the 1990s, maybe?

20      A.   I would be speculating, but that would be

21  my guess.

22      Q.   We discussed earlier the concept of

23  incorporation by reference.

24          Is the mere listing of a standard in the

25  government regulation incorporation by reference?

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 154

1          MR. BECKER:  Objection.  Calls for a legal

2     conclusion.  Objection.  Vague.  Objection.

3     Argumentative.  Objection.  It assumes facts not in

4     evidence.  Objection.  May be a hypothetical.

5          THE WITNESS:  No, it is not.

6     BY MR. HUDIS:

7          Q.  In your experience what types of documents

8     have been incorporated by reference by a

9     governmental agency?

10         MR. BECKER:  Objection.  Calls for a legal

11    conclusion.  Objection.  Competence.  Objection.

12    Vague.  Objection.  Argumentative.

13         THE WITNESS:  Are you talking about the

14    Code of Federal Regulations, or is this kind of a

15    general-purpose question?

16    BY MR. HUDIS:

17         Q.  A general-purpose question.

18         A.  I can give you specific examples.

19         Q.  Please.

20         A.  Well, in the Code of Federal Regulations, a

21    number of agencies have incorporated documents.

22    The Department of Education, for example, has

23    incorporated by reference the standards at issue in

24    this litigation.

25         Q.  Other than standards, what other documents

Page 155

1   have you observed incorporation by reference into

2   governmental regulations?

3           MR. BECKER:  Objection.  Calls for a legal

4   conclusion.  Objection.  Competence.

5           THE WITNESS:  My focus has been on

6   standards incorporated by reference into the Code

7   of Federal Regulations.  So that's what I'd look

8   for.

9   BY MR. HUDIS:

10      Q.  Which brings me to my next question.  When

11  did you first become interested in making available

12  to the Internet public documents that have been

13  incorporated by reference by some governmental

14  agency?

15          MR. BECKER:  Objection.  Assumes facts not

16  in evidence.  Objection.  Lacks foundation.

17  Objection.  Vague as to time period.

18          THE WITNESS:  In 2008 I posted California's

19  Title 24 to our website.

20  BY MR. HUDIS:

21      Q.  And that is when you first became

22  interested in this area?

23      A.  It's when I became interested in technical

24  standards that have the force of law.

25          (PLAINTIFFS' EXHIBIT 22 WAS MARKED.)

Page 156

1   BY MR. HUDIS:

2       Q.   Mr. Malamud, I've placed in front of you a

3   document that we have marked as Exhibit 22 bearing

4   production numbers AERA_APA_NCME 32079 through

5   32228.

6            I'd like to know if you recognize the

7   document.

8       A.   Well, it appears to be an incomplete set of

9   excerpts from a book I wrote.  It appears to be.

10           MR. BECKER:  I'd like to just object to the

11  extent that this document may be incomplete, and to

12  the extent that this document appears to have

13  handwriting on page 32082, and may have other

14  notations throughout it.

15           MR. HUDIS:  Counsel, could I see your copy?

16  It should not have -- okay.  If you see any other

17  handwritten notations, they shouldn't be there on

18  your copy, and I don't think they are on

19  Mr. Malamud's copy as the original exhibit.

20           So if it does contain handwritten notes, we

21  can --

22           THE WITNESS:  There are several handwritten

23  notes on Bates number 32087, for example, has a

24  series of handwritten notes.  There is a mark under

25  my name on 32086.  There is writing on 32088.

Page 157

1          MR. HUDIS:  Oh, those are not our

2     handwriting.  It was on the document as we obtained

3     it from the Internet.

4          So, Counsel, just to address your

5     objections, this is only one chapter from the whole

6     book.

7     BY MR. HUDIS:

8        Q.  So, Mr. Malamud, could you please turn to

9     production page 32224 of Exhibit 22.

10       A.  Okay.

11       Q.  And if you see the penultimate paragraph at

12    the bottom where it starts with "Many

13    jurisdictions"?

14       A.  Yes.

15       Q.  All right.  The second sentence and the

16    third sentence say, "Even a private standards body

17    might be considered by the courts to be

18    quasi-governmental.  Many places such as the U.S.

19    make standards a procurement requirement making

20    copyright enforcement questionable at best."

21          Was this one of your early thoughts on

22    incorporation by reference?

23          MR. BECKER:  Objection.  Vague.

24          THE WITNESS:  I'm not a lawyer, and this is

25    not about incorporation by reference.  This is

Page 158

1    about standards made by quasi-governmental

2    organizations.  A totally different topic.

3    BY MR. HUDIS:

4        Q.  Could we turn to the next page.  Page 3225

5    of Exhibit 22.  It says two-thirds of the way down

6    the page, "I gave a little speech about the morals

7    necessity of disseminating standards."

8             What did you mean by that?

9        A.  This was a --

10            MR. BECKER:  Objection.  Vague.

11            THE WITNESS:  This was in the context of a

12   visit to the International Organization For

13   Standards or organization, known as --

14   International Organization For Standardization,

15   known as ISO.  The acronym is different than the

16   name, which says something about them.

17            And this was the organization that was

18   attempting to have the whole Internet run on the

19   open systems interconnection protocol suite, and my

20   little speech to the gentlemen that I visited was

21   that if they wanted their protocol suite to be

22   ubiquitous, to be globally adopted, that would only

23   work if those standards were readily available for

24   people to read.

25   BY MR. HUDIS:

Carl Malamud                                                          May 12, 2015
San Francisco, CA

1    Q.  When you say "readily available," do you

2    mean -- did you mean readily available for free?

3         MR. BECKER:  Objection.  Vague.  Objection.

4    Relevance.

5         THE WITNESS:  The IETF made its protocol

6    specifications available for me.  And my little

7    moral lecture to the International Organization For

8    Standardization was that if they wished to win this

9    race to become the basis for the modern Internet,

10   that would only happen if their standards were, in

11   fact, available for free, so anybody could read

12   them.

13   BY MR. HUDIS:

14   Q.  The next paragraph says, "We then started

15   talking about applying Bruno to the ISO world."

16        First of all, what is Bruno?

17   A.  Bruno was a project that I undertook with

18   the blessings of the secretary general of the

19   International Telecommunication Union to convert

20   and post the ITU specifications to the Internet so

21   anybody could read them for free.

22   Q.  So it was basically wide dissemination of

23   documents on the Internet?

24   A.  Of ITU specifications.  And the ITU is

25   specifications for the telephone network.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1    Q.  What is an ITU specification?

2    A.  How a modem works, for example.

3    Q.  And please define ISO.

4    A.  ISO is the International Organization for

5    Standardization.

6    Q.  And the next sentence begins with Eicher.

7    Who is Eicher?

8    A.  Eicher was the secretary general of the

9    International Organization for Standardization.

10   Q.  Now, the rest of this paragraph reads,

11   "Eicher was quite frank.  25 percent of ISO

12   revenues came from the sale of standards documents.

13   How did I propose to replace that revenue?  Even

14   more importantly, ISO was controlled by its member

15   organizations, which also made much money from

16   standards sales.  How did I propose to convince

17   groups like ANSI that posting standards for free

18   would help them?"

19        Do you see that?

20   A.  Yes, I do.

21        MR. BECKER:  Objection.  The document

22   speaks for itself.  Objection.  Relevance.

23   BY MR. HUDIS:

24   Q.  In this context -- sorry.  I'm sorry if I

25   spoke over you.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1          In this context, what is ANSI?

2     A.  ANSI is the American National Standards

3  Institute.

4     Q.  So you pose a series of questions here on

5  page 32225, and then on the next page you say, and

6  this is on page 32226 of Exhibit 22, "I proposed my

7  high resolution/low resolution compromise.  The

8  plan would post low resolution versions of

9  documents for free on the network and allow ISO and

10  ANSI to continue to sell high resolution versions

11  either on paper or electronically."

12          So was that your answer to the question

13  that you posed on the prior page, 32225?

14          MR. BECKER:  Objection.  The document

15  speaks for itself.

16          THE WITNESS:  It was one of my thoughts in

17  1991 as to a way that ISO could function in a

18  modern world.

19  BY MR. HUDIS:

20     Q.  Then in two paragraphs later, you say, "The

21  crucial assumption was that people with the free

22  version would then pay for documents."  And at the

23  end of that paragraph it says, "Giving away

24  standards would lead to increased revenues."

25          So here is my question about that crucial

Carl Malamud                                              May 12, 2015
San Francisco, CA

1   assumption.

2          What if people who had copies of lower

3   resolution versions of these documents were just

4   fine with this quality?  What if -- if I may

5   finish.  What if they did not want to pay for the

6   high resolution copies?

7          MR. BECKER:  Objection.  Compound.

8   Objection.  Relevance.  Objection.  The document

9   speaks for itself.  Objection.  Argumentative.

10  Objection.  Assumes facts not in evidence.  And

11  also hypothetical.  Calls for speculation.  And

12  competence.

13         THE WITNESS:  So this was a informal

14  discussion in 1991.  I have since gathered more

15  experience on that particular topic, and I actually

16  believe that that statement is true.

17  BY MR. HUDIS:

18     Q.  On what basis?

19     A.  When I put the SEC EDGAR database online

20  for free, there was great speculation that that

21  would destroy the revenues of those vendors that

22  were selling the reports of public corporations.

23         And after I turned that service back over

24  to the Securities and Exchange Commission, I

25  donated my software and hardware and they begin --

Page 163

1    began ranning it -- running it, I had the president

2    of one of those vendors that was in the industry

3    come up to me and say, "You know?  Our business

4    went way up because a lot more people were reading

5    those EDGAR documents, and those that were serious

6    about the financial industry began subscribing to

7    all our commercial services, to have all the back

8    copies, to have red lines, to have all the

9    value-added things that the industrial folks can

10   do."  So that's my personal experience with that

11   topic.

12        I'm glad people are still reading this

13   book.

14   BY MR. HUDIS:

15   Q.  Mr. Malamud, why did you become interested

16   in making available to the public, documents that

17   were incorporated by reference by a governmental

18   agency?

19        MR. BECKER:  Objection.  Calls for a legal

20   conclusion.  Objection.  Vague and ambiguous.

21   Objection.  Argumentative.  Objection.  Lacks

22   foundation.

23        THE WITNESS:  Public.Resource.Org was

24   founded with the aim of making government

25   information more accessible with the particular

Carl Malamud                                                May 12, 2015
San Francisco, CA

Page 164

1    focus on the law.

2           Information such as building codes and fire

3    codes are, in fact, the law.  And they are

4    critically important legal documents.  And that's

5    why I became interested in them.

6    BY MR. HUDIS:

7       Q.  What did you do -- strike that.

8           What did you decide to do about making

9    available to the public, documents that were

10   incorporated by reference by a governmental agency?

11          MR. BECKER:  Objection.  Calls for a legal

12   conclusion.  Objection.  Vague and ambiguous.

13   Objection.  Vague as to time period.

14          THE WITNESS:  Could you repeat that

15   question?

16   BY MR. HUDIS:

17      Q.  Yes.  What did you do -- decide to do about

18   making available to the public documents that were

19   incorporated by reference by a governmental agency?

20          MR. BECKER:  Same objections.

21          THE WITNESS:  So making available, I don't

22   know what that term means, but what I did is I

23   posted California's Title 24 on our website at the

24   time, Bulk.Resource.Org.

25   BY MR. HUDIS:

Carl Malamud                                                      May 12, 2015
San Francisco, CA

1      Q.   That's exactly what I meant.

2           So after you posted Title 24, what other

3  types of materials did you start posting after that

4  of like kind?

5           MR. BECKER:  Objection.  Vague and

6  ambiguous.  What -- as to "like kind."  Objection.

7  Vague as to time period.

8           THE WITNESS:  If by "like kind" you mean

9  building codes and similar documents --

10  BY MR. HUDIS:

11     Q.  I do.

12     A.  I did a careful survey of state regulations

13  and statutes looking for explicit and deliberate

14  incorporation by reference, and posted a series of

15  building electrical, fire, plumbing codes.

16     Q.  What did you mean by "explicit and

17  deliberate incorporation by reference"?

18          MR. BECKER:  Objection.  Calls for legal --

19  may call for a legal conclusion.  Additionally, a

20  standing objection to this line of questioning to

21  the extent that it is not asking about the 1999

22  standards.  It is beyond the 30(b)(6) designation.

23          THE WITNESS:  I looked for a explicit

24  mention of a specific standard for a particular

25  year and the words "incorporated by reference," as

Page 166

1    opposed to a passing mention of a document or a

2    mention of the adoption of a document but not

3    specifying which specific edition of that document

4    they were talking about.

5              (PLAINTIFFS' EXHIBIT 23 WAS MARKED.)

6    BY MR. HUDIS:

7        Q.  Mr. Malamud, do you recognize this

8    document?

9        A.  Yes, I do.

10       Q.  This is Exhibit 23.  What is this document?

11       A.  This appears to be e-mail from me to

12   Jonathan Siegel of the Administrative Conference of

13   the United States.

14       Q.  And who is Jonathan Siegel?

15       A.  I don't remember his exact title.  He was

16   in a capacity as a research director or a program

17   director for the activities of ACUS, the

18   Administrative Conference of the United States.

19       Q.  That brings me to my next question.  Who or

20   what is ACUS?

21       A.  ACUS is a governmental body which is

22   partially appointed by the president and partially

23   appointed by the chairman, who is appointed by the

24   president, and it is the -- a body that formulates

25   recommendations on administrative law.

Carl Malamud                                                      May 12, 2015
San Francisco, CA

1          MR. HUDIS:  We're going to go off the

2    record.

3          THE WITNESS:  Okay.

4          MR. HUDIS:  He wants to switch media.

5          THE WITNESS:  Yeah.

6          THE VIDEOGRAPHER:  This marks the end of

7    Disc 2, Volume 1 in the deposition of Carl Malamud.

8          The time is 2:18, and we are off the

9    record.

10         (Recess taken.)

11         THE VIDEOGRAPHER:  This marks the beginning

12   of Disc 3, Volume 1 in the deposition of Carl

13   Malamud.

14         The time is 2:26, and we are on the record.

15   BY MR. HUDIS:

16     Q.  Mr. Malamud, Exhibit 23, do you have any

17   reason to doubt that this document is authentic?

18         THE VIDEOGRAPHER:  Shoot, sorry, guys.

19   I've got to stop.  Can I stop?  I'm so sorry.  I

20   had an accident here.

21         THE WITNESS:  That's okay.

22         MR. HUDIS:  Yep.

23         (Discussion off the record.)

24         THE VIDEOGRAPHER:  This marks the beginning

25   of Disc 3, Volume 1 in the deposition of Carl

Carl Malamud                                                    May 12, 2015
                        San Francisco, CA

                                                              Page 168

1   Malamud.

2           The time is 2:28, and we are on the record.

3   BY MR. HUDIS:

4       Q.  Mr. Malamud, do you have any reason to

5   doubt the authenticity of Exhibit 23?

6           MR. BECKER:  Objection to the extent that

7   it is not clear where this document has come from.

8           THE WITNESS:  It appears to be e-mail from

9   me to Mr. Siegel, but I would want to check it.  Is

10  this something we disclosed to you or --

11  BY MR. HUDIS:

12      Q.  It's something we found on the Internet.

13      A.  Oh, okay.  It appears to be the e-mail that

14  I sent, yes.

15      Q.  And what was the reason that you sent this

16  e-mail of October 1, 2011 to Mr. Siegel?

17      A.  I was a member of the committee that was

18  looking at the issue of incorporation by reference

19  for the Administrative Conference for the United

20  States.

21      Q.  And why did you write this particular

22  e-mail to Mr. Siegel?

23          MR. BECKER:  Objection to relevance as to

24  ACUS and this line of questioning.

25          I'll note that for category 21,

Page 169

1    Public.Resource has designated Carl Malamud only as

2    to the -- its participation, if any, in Federal

3    Government committees on the subject of

4    incorporation by reference of the 1999 standards

5    into any government laws, statutes, regulations or

6    ordinances.

7    BY MR. HUDIS:

8        Q.  You may answer.

9        A.  I had some concerns about the -- the

10   procedures and the way that the committee was going

11   about doing its deliberations on incorporation by

12   reference.  So I wrote this e-mail to Mr. Siegel,

13   who had overall direction over the committee

14   process.

15       Q.  And which committee was that?

16       A.  The committee -- I don't know what the

17   formal name was.  It was the committee that was

18   dealing with the issue of incorporation by

19   reference.

20       Q.  And in paragraph 1, what did you mean by

21   the preamble?

22       A.  The preamble to the proposed recommendation

23   that the Administrative Conference was considering.

24       Q.  And you say here in paragraph numbered 1

25   for the preamble, "Would it make sense to

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 170

1    acknowledge that the issue of copyright and

2    standards, after they've been incorporated into

3    law, is unsettled and that ACUS is not taking a

4    position on this subject?"  What did you mean?

5         MR. BECKER:  Objection.  The document

6    speaks for itself.  Objection.  Vague.

7         THE WITNESS:  I felt it inappropriate for

8    ACUS to be taking a strong position on what the

9    copyright status was of documents incorporated into

10   law.

11   BY MR. HUDIS:

12        Q.  Why?

13        A.  Frankly, there was a young staff member who

14   was doing the research for this recommendation who

15   felt very strongly that standards incorporated by

16   reference into law maintained their copyright, even

17   as a part of the Code of Federal Regulations.  And

18   as I said in this paragraph here, I think it would

19   be fair to say this is above our pay grade.  I felt

20   that the young staffer was -- was stretching.

21        Q.  So that brings me to my next question.

22        The next sentence says, "There is obviously

23   a strong bias towards protecting and honoring

24   copyright on the one hand, but we also have the

25   Veeck," V-e-e-c-k, "decision and some ambiguity in

Page 171

1    the law.  I think it would be fair to say this is,"

2    quote, "above our pay grade," period, unquote.

3         A couple of questions on that passage.

4         What did you mean in the third sentence by

5    "some ambiguity in the law"?

6         MR. BECKER:  Again, same objections.  The

7    document speaks for itself.  It's beyond the scope

8    of the 30(b)(6) designation.  And the objection on

9    relevance grounds.  Again, objection that this may

10   call for a legal conclusion.

11        THE WITNESS:  So I'm not a lawyer, but I

12   read the Veeck decision, and it seemed to me that

13   the researcher at ACUS was drawing conclusions from

14   the Veeck decision that while perhaps appropriate

15   for a federal judge to be making, were

16   inappropriate to be laying them down as categorical

17   statements.  I felt she was reading into the Veeck

18   decision in ways that were perhaps not supported by

19   the language.  And again, I'm not a lawyer.

20   BY MR. HUDIS:

21        Q.  I understand.

22        What conclusions was the researcher drawing

23   from Veeck that concerned you?

24        MR. BECKER:  Objection.  Relevance.

25   Objection.  Vague.  Objection.  Lacks foundation.

1        THE WITNESS:  So it's pronounced Veeck, by

2    the way.  It's a Dutch name.  P. Veeck.  It -- the

3    preamble was taking at the time a strong position

4    that standards incorporated into reference by law

5    had copyright and that the law could have

6    copyright.

7        And again, I felt that this young staffer

8    was simply moving beyond what a body such as the

9    Administrative Conference of the United States

10   could say is the established truth.  I felt she was

11   speculating, to use the language we use in

12   depositions.

13   BY MR. HUDIS:

14   Q.  And what did you mean by "I think it would

15   be fair to say this is above our pay grade"?

16        MR. BECKER:  Objection again.  The document

17   speaks for itself.  Objection.  Asked and answered.

18        THE WITNESS:  So I'm not a lawyer, but I

19   have looked at a number of documents that indicate

20   that in the United States the law has no copyright.

21   And that includes, in many formulations, materials

22   incorporated by reference into the law.  Mr. Bhatia

23   from ANSI, for example, B-h-a-t-i-a, has stated

24   many times that standards incorporated by reference

25   are the law, and it seemed to me that that was a

Page 173

1    long-standing policy of the United States.

2         And again, this was something that if one

3    were to draw a different conclusion that a portion

4    of the law in fact, did maintain copyright and one

5    needed a license to access and use that material,

6    that was certainly not a statement that the

7    organization such as the Administrative Conference

8    of the United States should be making.

9         (PLAINTIFFS' EXHIBIT 24 WAS MARKED.)

10   BY MR. HUDIS:

11   Q.  Mr. Malamud, I'll now show you what's been

12   marked as Exhibit 24.  Before I ask you questions

13   about the document, what is On The Media?

14   A.  Oh, that's a National Public Radio program.

15   Q.  Who is Bob Garfield?

16   A.  I assume he's a host or reporter.

17   Q.  Do you recognize Exhibit 24?

18   A.  No, I do not.  I remember doing an

19   interview with On The Media, however.

20   Q.  Did you do this interview with On The Media

21   on or about April 13, 2012?

22   A.  That sounds about right.

23   Q.  What was the purpose of the interview?

24   A.  I think you'd have to ask On The Media.

25   Q.  What was your purpose for giving the

Carl Malamud                                                      May 12, 2015
San Francisco, CA

Page 174

1    interview?

2            MR. BECKER:  Objection for relevance.

3            THE WITNESS:  If a well-respected program

4    such as On The Media by National Public Radio wants

5    me to talk to them, I will generally make myself

6    available.

7    BY MR. HUDIS:

8        Q.  Exhibit 24 appears to be an interview that

9    you gave in April of 2012 to Mr. Garfield.  I'd

10   like to ask you a couple of questions.

11           If you would turn in Exhibit 24 to

12   production page AERA_APA_NCME 32076.

13       A.  Okay.  Yes.

14       Q.  Mr. Garfield in the middle of the page

15   asks, "There is an expense attached to developing

16   and codifying these standards.  If we take the

17   revenue away from those who do this work, then what

18   happens?"  And you provide two answers.  I'll read

19   them.

20           "Well, there's two answers to that.  One is

21   that the nonprofits that develop these standards

22   have a lot of different revenue streams.  They do

23   conferences.  They do certification.  They develop

24   standards that aren't law.  In fact, the vast

25   majority of their standards are not.  And so maybe

Page 175

1   they need to adjust their business model,

2   particularly given the fact that they are a

3   nonprofit public charity."

4        You continue.  "Answer number two is that

5   government has shirked its responsibilities.  It

6   said 'Gee, we can just incorporate these privately

7   developed standards in the law and we won't have to

8   pay anything.'  And the only people that get

9   screwed up by this are the citizens that need to

10  read the law."

11       Do you recall giving those answers to

12  Mr. Garfield at the interview of April 2012?

13       MR. BECKER:  Objection.  Mr. Malamud has

14  said that he does not recognize this document.

15  Objection to the extent that it's not clear how

16  this document was transcribed or its authenticity.

17  Objection with regards to relevance, particularly

18  on the grounds that the plaintiffs have said that

19  the finances and revenue of the plaintiffs, other

20  than directly related to the sale of the 1999

21  standards, is not at issue in this case as they so

22  claim.

23       Objection on the grounds that the question

24  assumes facts not in evidence.

25       MR. HUDIS:  I don't mind the objections,

Page 176

1    Counsel.  I just mind the ones that would try to

2    indicate the -- to the witness how he should answer

3    his questions.

4    BY MR. HUDIS:

5        Q.  So my question about this document, do you

6    recall this interview?

7        A.  Yes, I do.

8        Q.  All right.  Do you recall giving this

9    answer that I just read into the record?

10       A.  No, I don't, but I'd be happy to discuss

11   the general topics that are addressed there.

12       Q.  Sure.

13           So if standards development organizations

14   lose their copyright by incorporation by reference,

15   is it your theory that the standards

16   organization -- development organization should

17   make their money some other way?

18           MR. BECKER:  Objection.  Vague.  Objection.

19   May call for a legal conclusion.  Objection.

20   Hypothetical.  Objection.  May mischaracterize the

21   witness.

22   BY MR. HUDIS:

23       Q.  You may answer.

24       A.  I have testified on this subject before

25   Congress saying that I believe that when a standard

1   is incorporated by reference, usually with the

2   active ascents of -- of the SDO, that organization

3   is given a gold seal of approval, right.  They are

4   the original creator of what has become a portion

5   of American law, and that that is a unique

6   marketing opportunity.

7         That opportunity can be used to -- to sell

8   authenticated versions of the standard.  To sell

9   auxiliary products.  That there are a number, in

10  general, of business models that can emerge out of

11  this favored position.

12        As to how that specifically applies to a

13  specific SDO, again, we would want to look at -- I

14  would want to look at the very specific nature of

15  that organization.  But I still talk in general

16  about the unique position of having a standard

17  incorporated by reference into federal law and how

18  favorable that is.

19  BY MR. HUDIS:

20    Q.  And is it your view that once incorporated

21  by reference, the standard loses its copyright

22  enforcement ability and the standards development

23  organization that wrote that standard,

24  "incorporated by reference," would have to obtain

25  its income some other way than selling the

Page 178

1   standard?

2          MR. BECKER:  Objection.  Calls for a legal

3   conclusion.  Objection.  Argumentative.  Objection.

4   Lacks foundation and assumes facts not in evidence.

5   Objection.  Vague.

6          THE WITNESS:  So I disagree with that

7   characterization.  I -- I believe that even if the

8   law is available to citizens, that does not

9   preclude a standards development organization

10  continuing to sell that document.  Particularly

11  selling an authenticated version, a redlined

12  version, a version with commentary.  I believe

13  there are a number of ways one can continue to make

14  that -- that document available for sale.

15  BY MR. HUDIS:

16     Q.  Is one of your alternative theories that

17  once a standard is incorporated by reference, that

18  the government should pay for it?

19         MR. BECKER:  Objection.  May call for a

20  legal conclusion.  Objection.  Lacks foundation.

21  Assumes facts not in evidence.  Objection.

22  Argumentative.

23         THE WITNESS:  So there are some things I

24  know and some things I can speculate on.

25         The thing that I know is that the law in

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1    the United States has no copyright, and one is free

2    to read and speak the law.  Without needing a

3    license, without needing permission.

4         What I can speculate on is different ways

5    that one might go about handling issues such as

6    revenue and whether the government should be paying

7    or not, and I frankly don't have strong views as to

8    whether or not the -- this scenario that I posited

9    here is the right solution.

10        MR. BECKER:  I would advise the witness not

11   to speculate and only to give those answers that

12   the witness knows.

13        THE WITNESS:  Okay.

14   BY MR. HUDIS:

15   Q.  Do you have any views, whether they're

16   strong or not, whether once a standard is

17   incorporated by reference into a government

18   regulation, the government should pay for that?

19        MR. BECKER:  Objection.  May call for a

20   legal conclusion.  Objection.  Vague.  Objection.

21   Lacks foundation and assumes facts not in evidence.

22   And argumentative.

23        THE WITNESS:  So the government is already

24   paying in many different revenue streams for

25   standards.  They pay for access.  They help fund

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 180

1    development.  And in many cases standards are

2    created, and there are other revenue streams that

3    go to the organization, such as the funding of

4    basic research.

5         So I don't think it's an either/or

6    proposition.  I think there's already a lot of

7    money flowing.

8    BY MR. HUDIS:

9        Q.  I don't believe your last answer,

10   Mr. Malamud, answered my question.

11       A.  Okay.  Could you restate the question?

12       Q.  Sure.  Do you have any views, whether they

13   are strong or not, whether once a standard is

14   incorporated by reference into a government

15   regulation, the government should pay for that?

16          MR. BECKER:  All the same objections and

17   also asked and answered.

18          THE WITNESS:  I believe I did answer your

19   question in the sense of the government is already

20   paying.

21          Now, my view is it proper for government

22   money to go to an SDO?  In theory, yes.

23          MR. HUDIS:  Just for the record Exhibit 24

24   bears production numbers AERA_APA_NCME 32075

25   through 32078.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1          (PLAINTIFFS' EXHIBIT 25 WAS MARKED.)

2    BY MR. HUDIS:

3      Q.  Mr. Malamud, I've placed in front of you a

4    document that's been marked as Exhibit 25, bearing

5    production numbers AERA_APA_NCME 31764 through

6    31768.

7          Do you recognize this document?

8      A.  It appears to be an essay that I wrote for

9    boingboing.  This appears to be a printout of that.

10     Q.  Do you have any reason to doubt the

11   authenticity of this document, Exhibit 25?

12     A.  No, but I'd want to double check.  It

13   appears to be the essay that I wrote.

14     Q.  And what is boingboing?

15     A.  Boingboing is a blog.

16     Q.  And do you recall posting this blog on

17   March 19th, 2012, to boingboing?

18     A.  I'm not sure of the exact date, but I did,

19   in fact, author a boingboing official guest

20   memorandum of law.

21     Q.  Why did you call it a memorandum of law?

22     A.  Because it was talking about an obscure

23   topic in a publication that reaches a very general

24   audience.

25     Q.  Under the first heading Roman numeral I,

Page 182

1    code is law, Lessig, L-e-s-s-i-g.  In the second

2    paragraph it says, "Public.Resource.Org spent

3    $7,414.26 buying privately produced, technical

4    public safety standards that have been incorporated

5    into U.S. Federal law."

6           And then I'm skipping a sentence.  It then

7    says, "We have started copying those 73 standards

8    despite the fact" that -- "despite the fact they

9    are festooned with copyright warnings, shrink wrap

10   agreements and other dire warnings."

11          When did Public.Resource start copying

12   these 73 standards?

13          MR. BECKER:  Objection.  Assumes facts not

14   in evidence; lacks foundation; vague; argumentative

15   as to "copying."

16          THE WITNESS:  So these were printed

17   documents, and it was a period of January through

18   approximately March 19th.  Actually, March 15th was

19   the period.

20   BY MR. HUDIS:

21      Q.  Of what year?

22      A.  Of 2012.

23      Q.  And could you turn to the next page, page

24   31765 of Exhibit 25.  Under Roman numeral II, "If a

25   law isn't public, it isn't law."  The middle

Carl Malamud                                          May 12, 2015
San Francisco, CA

Page 183

1    paragraph just before the picture that says,

2    "Notice," you see where it says the paragraph

3    starts "Public.Resource.Org has a mission"?

4        A.  Yes, I do.

5        Q.  The next sentence says, "We've taken a

6    gamble and spent $7,414.26 to buy 73 of these

7    technical public safety standards that are

8    incorporated into the U.S. Code of Federal

9    Regulations.  We made 25 print copies of each of

10   these standards and bound each document in a red,

11   white, blue patriotic certificate of incorporation

12   stating that the documents are legally binding on

13   citizens and residents in the United States, and

14   that criminal penalties may apply for

15   noncompliance."

16          In this paragraph why did you state "we've

17   taken a gamble"?

18          MR. BECKER:  Objection.  The document

19   speaks for itself.

20          THE WITNESS:  $7,414.26 is a lot of money

21   to be spending on a program that I simply decided

22   was important to do.

23   BY MR. HUDIS:

24       Q.  And why was it important?

25       A.  Because the law needs to be available in

1   the United States.

2       Q.  At the bottom of this page, 31765, it says,

3   "We know from all the copyright warnings, terms of

4   use, scary shrink wrap agreements and other red hot

5   rhetoric that accompanies these documents, that the

6   producers continue to believe that copies may not

7   be made under any circumstances."

8       Is this why you were taking a gamble on

9   making the copies of the technical standards?

10      MR. BECKER:  Objection.  The document

11  speaks for itself.  Objection.  I'll also note that

12  it's not clear whether the highlighting that's on

13  this page is on the authentic document or whether

14  it's been added to the documents.

15      THE WITNESS:  Yeah, I agree.  There was no

16  highlighting in the original.  I'm not sure where

17  that came from.

18  BY MR. HUDIS:

19      Q.  Must have been from us.

20      A.  Okay.  So your question again?

21      Q.  The question is, the passage that I just

22  read, does this explain why you were taking a

23  gamble by making the copies of the 73 standards?

24      MR. BECKER:  All the same objections.  Also

25  objection for misstates prior testimony and asked

Page 185

1    and answered.

2            THE WITNESS:  The gamble was the financial

3    risk.  I mean, spending close to $10,000 on

4    something is a lot of money for a small nonprofit

5    like mine.

6            (PLAINTIFFS' EXHIBIT 26 WAS MARKED.)

7    BY MR. HUDIS:

8        Q.  I now mark as Exhibit 26 a document bearing

9    production numbers AERA_APA_NCME pages 31832

10   through 31847.

11           Mr. Malamud, do you recognize this

12   document?

13       A.  Yes, I do.

14       Q.  What is this document?

15       A.  It is a response to the Office of

16   Management and Budget Requests for information on

17   the -- as they put it, the development and use of

18   voluntary consensus standards and in conformity

19   assessment activities.

20       Q.  Do you have any reason to doubt this letter

21   is authentic?

22       A.  No, I do not.

23       Q.  And the date of the letter is April 11,

24   2012?

25       A.  That sounds about right, yes.

Carl Malamud                                              May 12, 2015
                        San Francisco, CA

                                                        Page 186

1       Q.  What was your purpose of writing this

2    letter to Cass Sunstein at the Office of

3    Information of Regulatory Affairs?

4           MR. BECKER:  Objection.  Vague.

5           THE WITNESS:  Ask for information.  It was

6    a request for information.

7    BY MR. HUDIS:

8       Q.  And what type of information?

9       A.  I believe I answered it.  It was a request

10   for information about federal participation in the

11   development and use of voluntary consensus

12   standards.

13      Q.  And you co-wrote this letter with David

14   Halperin?

15      A.  Yes, I did.

16      Q.  In the second paragraph on page 31832 of

17   Exhibit 26, it says, "We believe that the

18   fundamental law of the United States requires that

19   the government make standards that are incorporated

20   by reference into federal regulations widely

21   available to the public without charge, and that

22   such standards be deemed in the public domain,

23   rather than subject to copyright restrictions."

24          In that sentence, what does "fundamental

25   law" mean?

Carl Malamud                                                                May 12, 2015
San Francisco, CA

1          MR. BECKER:  Objection.  The document

2     speaks for itself.  Objection.  May call for a

3     legal conclusion.

4          THE WITNESS:  That would be primary legal

5     materials.  That's materials that are emanating

6     from a law-making entity, such as in the Code of

7     Federal Regulations.

8     BY MR. HUDIS:

9       Q.  So what is the fundamental law of the

10    United States that requires standards incorporated

11    by reference into federal law be made public

12    without charge?

13         MR. BECKER:  Objection.  Misstates the

14    document.  Objection.  May call for a legal

15    conclusion.  Objection.  The  document speaks for

16    itself.

17         THE WITNESS:  It is clearly established

18    that the Code of Federal Regulations and

19    Congressional statutes and supreme court opinions

20    must be made available to the public without

21    restrictions on use, and standards that are

22    explicitly incorporated by reference into the Code

23    of Federal Regulations are part and parcel of the

24    Code of Federal Regulations, and that is a

25    fundamental principle of American law, that this

Carl Malamud                                                May 12, 2015
San Francisco, CA

Page 188

1    material must be made available to the public.

2    BY MR. HUDIS:

3       Q.  In the final paragraph of page 31832 of

4    Exhibit 26, it says, Public.Resource --

5    "Public.Resource.Org, whose mission is to make law

6    available to all citizens."  Do you see that?

7       A.  I'm sorry, what page are we on?

8       Q.  The page -- the very first page of the

9    document.

10      A.  Yes, I see that.

11      Q.  All right.  And that mission is done by

12   making the law available on the websites that you

13   mentioned earlier?

14         MR. BECKER:  Objection.  The document

15   speaks for itself.  Objection.  May mischaracterize

16   previous testimony.  Objection.  May call for a

17   legal conclusion.

18         THE WITNESS:  Making the law available to

19   all citizens, one mechanism is to post that on our

20   website.

21   BY MR. HUDIS:

22      Q.  Could you please turn to page 31836 of

23   Exhibit 26.

24      A.  Okay.

25      Q.  In the middle of the page it says, "A

Page 189

1    copyrighted work does not become law simply because

2    the statute refers to it."

3              What did you mean by that?

4              MR. BECKER:  Objection.  The document

5    speaks for itself.  Objection.  May call for a

6    legal conclusion.

7              THE WITNESS:  This, again, is a subject

8    that we discussed previously when we were

9    discussing incorporation by reference at the state

10   level.  It needs to be an explicit and deliberate

11   incorporation into the law.  Not simply a passing

12   mention of some external document.

13   BY MR. HUDIS:

14      Q.  Mr. Malamud, could you please turn to page

15   31838 of Exhibit 26.

16      A.  Okay.

17      Q.  At the bottom of the page it says, "In

18   order to be eligible for incorporation for a

19   reference, a publication must meet standards

20   including that the publication substantially

21   reduces the volume of material published in the

22   Federal Register and is reasonably available to and

23   usable by the class of persons affected by the

24   publication."

25              My question is --

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1          MR. BECKER:  I'm sorry, where are we,

2     Counsel?

3          MR. HUDIS:  Bottom of 31838.

4     BY MR. HUDIS:

5        Q.  My question, Mr. Malamud, is this passage

6     your understanding of a publication that is

7     eligible for incorporation by reference?

8          MR. BECKER:  Objection.  This document

9     speaks for itself, and unintelligible,

10    incomprehensible question.

11    BY MR. HUDIS:

12       Q.  You may answer.

13       A.  We are quoting one CFR 51.7(a)(3) and

14    (a)(4).  That's what that sentence is doing, is

15    it's simply restating what the CFR states.

16       Q.  But is this your understanding of a

17    document that would qualify for incorporation by

18    reference?

19         MR. BECKER:  Objection.  Calls for a legal

20    conclusion.  Objection.  Vague as to "this."

21         THE WITNESS:  That section of the CFR

22    states two conditions that must be met before a

23    standard or other document can be incorporated by

24    reference in the CFR.

25    BY MR. HUDIS:

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 191

1       Q.   Could you turn to page 31839 of Exhibit 26.

2       A.   I'm there.

3       Q.   And do you see it refers to OMB Circular

4  A-119 at the bottom of the page?

5       A.   Yes, I see that.

6       Q.   To the best of your knowledge has this

7  circular changed in language since 1980 -- 1998, so

8  far as you're aware?

9            MR. BECKER:  Objection.  Competence.

10 Objection.  Calls -- may call for a legal

11 conclusion.  Objection.  Assumes facts not in

12 evidence; lacks foundation.

13           THE WITNESS:  The document is currently

14 being revised by the Office of Management and

15 Budget, and I believe they published a notice of

16 proposed ruling.

17 BY MR. HUDIS:

18      Q.   Today has OMB Circular-A119 changed since

19 19 -- 1998?

20           MR. BECKER:  All the same objections and

21 asked and answered.

22           THE WITNESS:  Yeah, I don't know.  I would

23 have to look at their website.

24 BY MR. HUDIS:

25      Q.   On the next page, page 31840 of Exhibit 26,

Page 192

1    in the second paragraph at the end of the paragraph

2    it says, "Today the only thing impeding the broader

3    availability to the public of standards

4    incorporation by reference into the law is the

5    interest of standards development organizations in

6    making money by charging for the standards."

7            Do you see that?

8       A.  I do.

9       Q.  All right.  Do you know how much the

10   plaintiffs in this action charge for the 1999

11   Standards of Educational and Psychological Testing?

12           MR. BECKER:  Objection.  Competence.

13   Objection.  Misleading.

14   BY MR. HUDIS:

15      Q.  Go ahead, Mr. Malamud.

16           MR. BECKER:  Excuse me.  Argumentative and

17   assumes facts not in evidence.

18           THE WITNESS:  I don't believe they charge

19   anything.  I don't think it's available for sale;

20   is it?

21   BY MR. HUDIS:

22      Q.  At the time you purchased the standards, do

23   you know how much you paid for them?

24           MR. BECKER:  Objection.  Assumes facts not

25   in evidence.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1          THE WITNESS:  In the $60 range, I believe.

2    BY MR. HUDIS:

3       Q.  Could you turn to page 31840.  At the

4    bottom on -- in Exhibit 26, it says, "Greater

5    public access to standards" incorporation by

6    reference -- "incorporated by reference into

7    federal regulations might alert policy and industry

8    communities to the fact that federal rules are too

9    often connected to outdated private standards and

10   are in need of updating to improve public safety."

11          What is your support for this statement?

12          MR. BECKER:  Objection.  The document

13   speaks for itself.  Objection.  May call for a

14   legal conclusion.

15          THE WITNESS:  In surveying the Code of

16   Federal Regulations, I was shocked by how old some

17   of the standards that are still on the books.

18   There are standards from the '40s and '50s and

19   '60s.  There is a crane safety standard from the

20   1960s, which is still required.

21          And one has to believe that the state of

22   the art in safety for cranes has probably advanced

23   since that point in time.

24   BY MR. HUDIS:

25       Q.  Do you know the plaintiffs' policies or

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 194

1    practices for updating the standards on the

2    educational and psychological testing?

3            MR. BECKER:  Objection.  Competence.

4            THE WITNESS:  I don't know what you mean by

5    "practices."

6    BY MR. HUDIS:

7       Q.  How often they do so; when they do so; the

8    circumstances under which they do so?

9       A.  Well, I can answer one part of that

10   question.  I believe there was an '85 standard, a

11   '99 standard, and a 2014 standard has recently been

12   issued.

13      Q.  Right.  Do you know the circumstances under

14   which the standards for educational and

15   psychological testing have been updated?

16           MR. BECKER:  Objection.  I'll simply note

17   that the witness should not divulge any information

18   that has resulted from attorney-client

19   communications.

20           THE WITNESS:  I read on a website that the

21   plaintiffs put together having to do with the

22   revision of the standards and was able to read a

23   little bit about what they were doing and why they

24   were doing it for the 2014 standard.

25   BY MR. HUDIS:

Page 195

```
 1       Q.  And what is your understanding as a result

 2   of that reading?

 3           MR. BECKER:  Objection.  Vague.

 4           THE WITNESS:  Oh, now, I'm not an expert in

 5   this area.  My take-away was that the standard was

 6   old and they wanted to revise it.

 7   BY MR. HUDIS:

 8       Q.  If you could turn to page 31845 in Exhibit

 9   26.  In the middle of the page it says, "Defenders

10   of upholding copyright protection" and charge --

11   "protections and charging fees in this context

12   claim that granting citizens more reasonable access

13   to the law will destroy the economic incentives

14   that today motivate private organizations to craft

15   important standards."

16           Who have you heard say this?

17           MR. BECKER:  Objection.  The document

18   speaks for itself.  Objection.  Relevance;

19   argumentative.

20           THE WITNESS:  I --

21           MR. BECKER:  Assumes facts not in evidence.

22           THE WITNESS:  I've heard that statement or

23   a variant of that statement several times.  For

24   example, there was a hearing before the Pipeline

25   Hazardous Materials Safety Administration known as
```

Carl Malamud                                                      May 12, 2015
San Francisco, CA

Page 196

1    PHMSA, P-H-M-S-A, and I heard representatives from

2    the National Fire Protection Association, ASTM and

3    asked me all explain that this basic theory would

4    hold in their view.  It's a theory I disagree with,

5    but it's what I've heard many times.

6    BY MR. HUDIS:

7        Q.  Have you read this theory anywhere?

8            MR. BECKER:  Objection.  Vague.

9            THE WITNESS:  Well, yes, we made a

10   transcript of the PHMSA hearing, so I read it

11   there.

12   BY MR. HUDIS:

13       Q.  Any other writings on this theory besides

14   the PHMSA hearing?

15       A.  There's been a couple of speeches by the

16   president of ANSI and by both the current and past

17   president of the National Fire Protection

18   Association of -- on this general line of thought.

19       Q.  In that same paragraph the second to last

20   sentence, it says, "We do recognize the importance

21   of giving private SDO," that's standards

22   development organizations?

23       A.  That's correct.

24       Q.  All right, "private SDOs adequate

25   incentives to create standards."

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1          What incentives did you mean?

2          MR. BECKER:  Objection.  The document

3     speaks for itself.  This is a partial quoting out

4     of context.  Objection.  Vague and ambiguous.

5     Lacks foundation.

6          THE WITNESS:  As my lawyer said, that was

7     taken out of context of a broader discussion of the

8     importance of this area of activity, this society.

9          I do think it is important that SDOs

10    continue to operate.  I believe they do valuable

11    work.

12          One of the incentives is what I previously

13    discussed with you, the gold seal of approval of

14    the American government by deeming that a

15    particular standard is, in fact, incorporated by

16    reference in the law.  I believe that's a huge

17    marketing advantage for an organization.

18    BY MR. HUDIS:

19      Q.  So how are the rights to these incentives

20    to create standards to be protected?

21          MR. BECKER:  Objection.  Vague and

22    ambiguous; confusing; hypothetical; calls for

23    speculation.

24          THE WITNESS:  Yeah, you used the words

25    rights.  Is that right really what you meant?

Carl Malamud                                                          May 12, 2015
                              San Francisco, CA

 1   Could you repeat the question?

 2   BY MR. HUDIS:

 3       Q.  How were the rights to these incentives to

 4   create standards to be protected?

 5            MR. BECKER:  All the same objections, and

 6   also objection that this calls for a legal

 7   conclusion.

 8            THE WITNESS:  It sounds to me like you're

 9   asking about a legal thing, and what I'm talking

10   about here is the fact that our government has a

11   number of relationships with the SDOs ranging from

12   funding research directly relevant to a standard,

13   to funding research in general for their members.

14   Purchasing documents.  Helping create a platform

15   where different players can get together.

16            And so I think there are a number of

17   different mechanisms that can lead the government

18   and our SDOs to work together happily to continue

19   to create these important standards, and yet still

20   satisfy that fundamental requirement that the law

21   must be available to those that must obey it.

22            MR. BECKER:  I'd just like to renew my

23   objections, my standing objection concerning the

24   fact that this line of discussion is regarding

25   standards other than the 1999 standards, and is

Page 199

1    therefore outside of the scope of the 30(b)(6)

2    designation.

3    BY MR. HUDIS:

4       Q.  Mr. Malamud, could you please turn to page

5    31846 in Exhibit 26.  At the top it says, "We

6    understand that SDOs need money to fund their

7    standards development efforts."

8            Where is that money supposed to come from?

9            MR. BECKER:  Objection.  The document

10   speaks for itself.  Objection again that this is a

11   selected and partial quoting of a much longer

12   sentence.  Objection.  Hypothetical.  Objection.

13   Calls for speculation; argumentative.

14           THE WITNESS:  So the sentence, you read the

15   first half.  "We understand that SDOs need money to

16   fund their standards developing efforts.  But

17   perhaps these organizations have begun treating

18   this revenue stream as an opportunity for a

19   financial windfall at the expense of U.S.

20   citizens."

21   BY MR. HUDIS:

22      Q.  Do you have any basis to say that for the

23   plaintiffs as to the Standards for Educational and

24   Psychological Testing?

25      A.  No.  That was not an example I had in mind

Page 200

1    when I wrote that sentence.

2       Q.  All right.  And so that's -- so we

3    discussed the second half.  And I'm still

4    concentrating on the first half of that sentence.

5    "We understand the SDOs need to fund their

6    standards development efforts."

7          Where is this revenue supposed to come

8    from?

9          MR. BECKER:  Objection.  Once again this

10   calls for speculation.  It's a hypothetical.  It --

11   the document speaks for itself.

12         THE WITNESS:  So I do not have to do sharer

13   responsibility for any of the three plaintiffs.  So

14   I am merely speculating when I say how they should

15   run their businesses.  It is not my area of

16   expertise.

17         But it seems to me that these three

18   organizations have a number of revenue streams,

19   some of them quite substantial.  Some of them

20   related to the standards.  Some of them not related

21   to the standards.  And I believe that it's

22   important that as the Internet changes things, as

23   we become able to make the law available to all

24   people, that perhaps that might lead to some

25   adjustments in the business models.  But I believe

Page 201

1    there's a lot of money, particularly at the APA,

2    for example, is a very large organization.  I just

3    don't believe that these organizations would stop

4    developing these standards, because I believe that

5    it's an important and crucial part of their --

6    their mission.

7         And this is my personal speculation about

8    their models.  Again, I don't run the APA.  I'm not

9    their CFO, and so it's not necessarily an area that

10   I know a lot about.

11   BY MR. HUDIS:

12   Q.  This next question basically goes to the

13   rest of the theories posited on page 31846 and

14   31847 of Exhibit 26.  So I'll just ask it straight

15   out.

16        Is it your view, Mr. Malamud, that once the

17   standard is incorporated by reference, the SDO who

18   created that standard should look to other sources

19   for revenue than the sale of that standard?

20        MR. BECKER:  Objection.  Calls for a legal

21   conclusion.  Objection.  Argumentative; assumes

22   facts not in evidence; hypothetical; calls for

23   speculation.  Objection to the extent that there is

24   a characterization of two entire pages of this

25   document that have not been discussed, and assumes

1    facts not in evidence.

2          THE WITNESS:  We previously discussed this

3    topic, and I believe that when a standard has been

4    incorporated by reference into law, the original

5    creator of that standard, the SDO, as we say here,

6    has a number of revenue opportunities, including

7    continued sale of the standard, and particularly an

8    authenticated version, a redlined version, a

9    commentary, a manual.  There's all sorts of things

10   one can do.

11         And the fact that this organization was the

12   original creator of that document gives a

13   tremendous credibility.

14         And so I just don't believe that the

15   revenue streams will go away.  I do believe that

16   there is a potential, at least, for an adjustment

17   of business models as time progresses, but that's

18   the case for any organization.

19   BY MR. HUDIS:

20     Q.  And what did you mean by "adjustment of

21   business models"?

22     A.  I think the Internet has forced government,

23   industry, to adjust the way they do business.  And

24   I believe that that is equally true for private

25   nonprofit organizations engaged in public missions,

1    such as the APA or such as Public.Resource.Org.

2        Q.  And what do you mean by "adjustment" by the

3    way one does business in this context?

4        A.  I believe a continual assertion that a

5    document that is the law cannot be copied without a

6    license and special permission is an unfounded

7    assertion.  And in this letter we are discussing

8    here in Exhibit 26, I gave a series of examples of

9    revenue streams that were possible or already exist

10   in many of these nonprofit organizations.  And

11   again, this is something that I believe any

12   organization continually faces as technology

13   progresses.

14          The printing press forced an adjustment in

15   the business models of legal publishers.  The

16   Internet has forced a dramatic change in the

17   business models of a large number of organizations.

18   And I just think that that -- that SDOs should not

19   be surprised that they may need to adjust their

20   business models over time.

21       Q.  And that adjustment of a business model

22   will include foregoing a revenue stream from a

23   straight sale of the standards as incorporated by

24   reference?

25          MR. BECKER:  Objection.  Misstates prior

Page 204

1    testimony; argumentative; asked and answered.

2           THE WITNESS:  I am not convinced that the

3    revenue stream would go away.  And that is based on

4    my actual experience putting information online

5    that at one time was charged for, and then became

6    available at no cost to citizens.

7           And as we discussed earlier in the case of

8    the Securities and Exchange Commission, making the

9    documents more broadly available, vastly increased

10   the number of readers, lead to increased revenue

11   streams for those documents.

12          The Bible is sold, despite the fact that

13   it's available.  You can take the Bible.  You can

14   copy it.  You can print your own edition, but a lot

15   of people buy the Bible from publishers because

16   they want the particular edition or version or --

17   or form factor that that Bible has.

18   BY MR. HUDIS:

19      Q.  Mr. Malamud, what is your understanding of

20   what a code or a statute is?

21          MR. BECKER:  Objection.  Calls for a legal

22   conclusion; vague and ambiguous; assumes facts not

23   in evidence; lacks foundation.

24          THE WITNESS:  Did you mean code or statute?

25   BY MR. HUDIS:

Page 205

1     Q.   Yes.

2     A.   Okay.  So a statute is a law passed by a --

3  typically a legislature is one how would normally

4  use the word statute as opposed to ordinance, for

5  example.

6         A code is a much broader term.  It's short

7  for codification.

8     Q.   And how is a code to be distinguished from

9  a standard?

10        MR. BECKER:  Objection.  Calls for a legal

11  conclusion; lacks foundation; assumes facts not in

12  evidence; competence.

13        THE WITNESS:  The two terms are often used

14  interchangeably.  And, in fact, when laymen are

15  talking about standards and codes, they are

16  definitely used interchangeably, and in this case

17  by "laymen," I include lawyers and SDO executives.

18  So the terms really are -- are basically conflated.

19  BY MR. HUDIS:

20     Q.   Synonymous, in your view?

21     A.   Oh --

22        MR. BECKER:  Objection.  Misstates prior

23  testimony.

24        THE WITNESS:  So I believe codes equals

25  standards in common usage.

Page 206

1        Statutes are different than codes in the

2   sense that a code is a codification of the statute.

3   Each statute is put into a different portion of the

4   code, and therefore functions as a stand-alone

5   document to a particular area of the law, as do

6   many standards.

7   BY MR. HUDIS:

8      Q.  And what is your understanding of what a

9   regulation is?

10        MR. BECKER:  Objection.  Vague; calls for a

11   legal conclusion; lacks foundation.

12        THE WITNESS:  So I'm not a lawyer and I

13   don't know the technical term, but a regulation is

14   what the executive branch does.  A statute is what

15   the legislative branch does.  Both have the force

16   of law.

17   BY MR. HUDIS:

18      Q.  Mr. Malamud, what is Kickstarter?

19        MR. BECKER:  Objection.  Relevance.

20   Objection.  Objection to the extent that this line

21   of questioning is going to be -- asked for the

22   identities of any donors or potential private --

23   private donors to Public.Resource.Org that have

24   sought to keep their identities anonymous, and

25   therefore have a privacy interest.

Page 207

1          THE WITNESS:  It's a crowd-funding

2   platform.

3   BY MR. HUDIS:

4      Q.  What is a crowd-funding platform?

5      A.  It is a place where people can create a

6   thing or an idea or a mission and get other people

7   to give them money to carry out that objective.

8      Q.  Does Public.Resource use Kickstarter to

9   raise operating funds?

10         MR. BECKER:  Objection.  Irrelevant.

11   Objection.  Beyond the scope of the 30(b)(6)

12   designation.  Objection to the extent that this

13   answer implicates the identities of any private

14   donors who have a privacy right.

15         THE WITNESS:  We did not use it to raise

16   operating funds.  We did use it.

17   BY MR. HUDIS:

18      Q.  For what purpose?

19      A.  For raising money for a specific task,

20   which was the double-keying of standards.

21   Double-keying of standards incorporated by

22   reference into law.

23         (PLAINTIFFS' EXHIBIT 27 WAS MARKED.)

24   BY MR. HUDIS:

25      Q.  Mr. Malamud, I show you what has been

Page 208

1   marked as Exhibit 27 bearing production pages

2   AERA_APA_NCME 31480 through 31485.

3          Have you seen this document before?

4      A.  It appears to be the posting I made on

5   Kickstarter for the double-key campaign I just

6   described to you.

7      Q.  Do you have any reason to doubt its

8   authenticity, Exhibit 27?

9      A.  No.

10     Q.  Now, it says at the top, Mr. Malamud,

11  "Funding unsuccessful.  This project's funding goal

12  was not reached on October 28th."

13         Do you see that?

14     A.  Yes, I do.

15     Q.  October 28th of what year?

16     A.  2013.

17     Q.  And it says below the picture, "We are

18  converting 28,040 public safety standards into

19  valid HTML files to make them freely accessible and

20  more usable."

21         Was that the reason you were seeking to

22  raise funds through Kickstarter?

23         MR. BECKER:  Objection.  The document

24  speaks for itself.

25         THE WITNESS:  We were raising funds

Carl Malamud                                                          May 12, 2015
San Francisco, CA

Page 209

1    specifically for the double-key operation of

2    documents.

3    BY MR. HUDIS:

4        Q.  And further down on page 31480, it says,

5    "In the last two years we've posted 28,040 public

6    safety codes from around the world."

7            Did you mean codes, or did you mean

8    standards?

9            MR. BECKER:  Objection.  The document

10   speaks for itself.

11           THE WITNESS:  The terms are interchangeable

12   in this context.

13   BY MR. HUDIS:

14       Q.  And then it says, "We post all these

15   documents on Law.Resource.Org and make them

16   available on the Internet Archive."

17           Did you do that project in 2013?

18           MR. BECKER:  Objection.  The document

19   speaks for itself.  Objection.  Vague.  Objection.

20   Lacks foundation.

21           THE WITNESS:  And the answer is no, we

22   didn't do it in 2013.  The paragraph says, "In the

23   last two years we've posted these standards."

24   So ...

25   BY MR. HUDIS:

Carl Malamud                                              May 12, 2015
San Francisco, CA

1      Q.  So you -- so you conducted that activity in

2  2011 -- in 2011 and 2012, you said the last two

3  years?

4          MR. BECKER:  Objection.  The document

5  speaks for itself.  Objection.  Misstates

6  testimony.

7          THE WITNESS:  What I was saying there is

8  from the two-year period ending September 28th,

9  2013, which is the date that I published this blog

10  post, we had posted those documents.

11  BY MR. HUDIS:

12      Q.  And then if you would please turn to the

13  text that spans from production pages 31482 to

14  31483.

15          At the bottom of 31482 it says, "Your help

16  matters.  Your support is what makes our work

17  possible."

18          Do you see that?

19      A.  Yes, I do.

20      Q.  All right.  And then on the next page, you

21  set to raise at least a hundred thousand dollars

22  for this Kickstarter campaign?

23      A.  Kickstarter requires that you set a minimum

24  amount, and the minimum amount we set was a hundred

25  thousand dollars.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1       Q.   And you were looking to raise up to 1.2

2    million dollars for this campaign?

3            MR. BECKER:  Objection.  The document

4    speaks for itself.

5            THE WITNESS:  The way Kickstarter works is

6    you may get a lot more than the minimum, and it's

7    considered good form to say what you would do if

8    you happened to be wildly successful, which, of

9    course, we were not.

10   BY MR. HUDIS:

11      Q.   And what did the contributors get for their

12   contribution to this campaign?

13      A.   So contributors to Kickstarter can, of

14   course, say they don't want anything, but at

15   different levels there are a different set of

16   prizes, I guess is the right word, equivalent to a

17   gift that NPR might give you in a pledging

18   campaign.  And those are listed on the page Bates

19   numbered 31481.

20           MR. BECKER:  I'd just like to state an

21   objection to the question for vague and misleading

22   to the extent it asks what did people get for this

23   campaign, their contributions to this campaign.

24   BY MR. HUDIS:

25      Q.   Mr. Malamud, so the goal of this

Page 212

1    Kickstarter campaign by Public.Resource was to

2    raise money so that Public.Resource could post

3    standards on the Internet and make them available

4    to Internet users for free?

5          MR. BECKER:  Objection.  May -- misstates

6    prior testimony.  The document speaks for itself.

7    BY MR. HUDIS:

8       Q.  You may answer.

9          MR. BECKER:  Objection.  Compound.

10   Objection.  Argumentative.  Objection.  Assumes

11   facts not in evidence.

12   BY MR. HUDIS:

13      Q.  Go ahead, Mr. Malamud.

14      A.  The purpose of the campaign was to fund the

15   double-keying of the standards.

16      Q.  And what happened with those standards that

17   were double-keyed?

18          MR. BECKER:  Objection.  Misleading.

19   Objection.  Vague and ambiguous.

20          THE WITNESS:  None of those standards were

21   double-keyed as a result of this effort.  Right?

22   This was an unsuccessful effort.  This led to

23   nothing.  Except a tremendous amount of my time

24   maintaining the Kickstarter campaign, but it was

25   unsuccessful.

Page 213

1    BY MR. HUDIS:

2        Q.  Mr. Malamud, have you testified before

3    Congress regarding incorporation by reference

4    issues?

5        A.  Yes, I --

6            MR. BECKER:  Objection.  Vague.

7            THE WITNESS:  Yes, I have.

8    BY MR. HUDIS:

9        Q.  When was that?

10           MR. BECKER:  Objection.  Vague and

11   ambiguous.

12           THE WITNESS:  Was it January 2014?  I'm

13   assuming you have a set of my -- my testimony.  You

14   can probably tell me.  I know it was January.

15   BY MR. HUDIS:

16       Q.  Of 2014?

17       A.  I think it was '14, but I'm not certain

18   about that.

19           (PLAINTIFFS' EXHIBIT 28 WAS MARKED.)

20   BY MR. HUDIS:

21       Q.  Mr. Malamud, I show you a document that's

22   been marked as Exhibit 28 bearing production

23   numbers AERA_APA_NCME 31208 through 31250.

24           Do you recognize the document?

25       A.  It's a badly mangled version of my

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1    testimony, which was posted on our website.

2         MR. BECKER:  Objection to the extent that

3    this document may have errors or other content in

4    it or may have -- otherwise be incorrectly

5    formatted.

6    BY MR. HUDIS:

7         Q.  Do you have any reason to doubt that this

8    document is authentic?

9         A.  Yeah, it appears to be my testimony.

10        Q.  Mr. Malamud, could you please turn to page

11   31215 of Exhibit 28.

12        A.  Okay.

13        Q.  And at the bottom it says, "In 2008

14   Public.Resource.Org began posting state-mandated

15   public safety codes.  Although the model codes as

16   developed by the SDOs had copyright restrictions,

17   we based our the actions on the ruling of the Veeck

18   case," and then you quote from it.

19        My question is, here in 2008 were the text

20   of these model codes written into state laws or

21   were they incorporated by reference?

22        MR. BECKER:  Objection.  Relevance.

23   Objection.  Compound.  Objection.  Vague and

24   ambiguous; may call for a legal conclusion; assumes

25   facts not in evidence; lacks foundation.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1          THE WITNESS:  California Title 24 is a

2     publication of the State of California that

3     actually has the codes as part of the state

4     regulations.  So it is not incorporated by

5     reference into the CCR.

6          Most states use the incorporation by

7     reference mechanisms.  So the answer to your

8     question is both.

9     BY MR. HUDIS:

10         Q.  Mr. Malamud, could you turn to page 31217

11    in Exhibit 28.

12         A.  Okay.

13         Q.  And in the second paragraph, second

14    sentence it says, "When SDOs have offered copies of

15    standards to read with or without a fee, that

16    access has come with significant limitations on

17    use, and SDOs have jealously guarded against the

18    right of anyone but themselves to communicate these

19    provisions to others."

20         Do you see that?

21         A.  I do.

22         Q.  When was the first time that you were aware

23    that an SDO had such a policy?

24         MR. BECKER:  Objection.  Vague.  Objection.

25    Lacks foundation and assumes facts not in evidence.

Page 216

1          THE WITNESS:  When I bought California

2    Title 24 and at the beginning there was a big

3    notice saying that I couldn't repeat this part of

4    the law because of what appeared to be copyright

5    assertions by the State of California.

6    BY MR. HUDIS:

7          Q.   That was 2008?

8          A.   I don't know when I bought Title 24, but I

9    posted it in 2008.  But shortly before that.

10         Q.   If you could turn to page 31218 in Exhibit

11   28.

12         A.   Okay.

13         Q.   It says at the top, "In March 2012

14   Public.Resource.Org began the process of making

15   available technical standards incorporated by

16   reference into the CFR."  That's the Code of

17   Federal Regulations?

18         A.   That's correct.

19         Q.   At this time in March 2012, was

20   Public.Resource only providing these documents in

21   print?

22         MR. BECKER:  Objection.  Vague and

23   ambiguous; lacks foundation and assumes facts not

24   in evidence.

25         THE WITNESS:  In March 2012 we made 25

 1   copies of 73 carefully selected standards and

 2   mailed them, FedEx, actually, to ten standards

 3   organizations, seven government officials and asked

 4   for their comment on a whole series of issues that

 5   were raised by the lack of availability of the law.

 6   BY MR. HUDIS:

 7       Q.  And continuing in that same paragraph,

 8   towards the end it says, and I realize I'm starting

 9   mid sentence, "In May 2012 we began the process of

10   posting these standards on our website.  We have

11   posted a total of 969 standards that are required

12   by federal law."

13           My question is, as of today, May 2015, how

14   many standards incorporated into law have you

15   posted on Public.Resource's website?

16           MR. BECKER:  I'll restate the objection

17   that this is beyond the 30(b)(6) designation.  And

18   I will object to the extent that it calls for a

19   legal conclusion.  And that it assumes facts not in

20   evidence.  And lacks foundation.

21           THE WITNESS:  Is your question federal law?

22   Because that's what this statement was in the

23   testimony.

24   BY MR. HUDIS:

25       Q.  Yes.

Page 218

1      A.  I believe there's approximately 1,020

2   standards incorporated by reference into the CFR on

3   the Law.Resource.Org website.  And that number is a

4   guess based on the number of PDF files in that

5   particular directory.  So it may be a different

6   number.

7      Q.  Mr. Malamud, could you turn to page 31222

8   of Exhibit 28.

9      A.  Okay.

10      Q.  In the first paragraph on that page the

11   last sentence it says, "Standards incorporated by

12   reference have the force of law and are no

13   different than text authored" -- or -- "authored

14   directly by the government."

15          Do you see that?

16      A.  I do.

17      Q.  What is the basis for that statement?

18          MR. BECKER:  Objection.  Calls for a legal

19   conclusion.

20          THE WITNESS:  One basis for that statement

21   is a speech Mr. Bhatia made, which was quoted on

22   the ANSI website that said standards incorporated

23   by reference into law are the law.  Very clear.

24   BY MR. HUDIS:

25      Q.  What other basis do you have for making

Page 219

1    that statement?

2        A.   There are several bases.  One is the

3    compendium of copyright office procedures, both the

4    second and the third edition published by the U.S.

5    copyright Office, which has a strong statement

6    about edicts of government, that the law must be

7    available and has no copyright.

8            The creation of the Federal Register and

9    the Code of Federal Regulations contains a great

10   deal of legislative history and language about how

11   the purpose of the official journals of government

12   is to make the law available to people, and how

13   standards incorporated by reference into the code

14   are part and parcel of the Code of Federal

15   Regulations.  They are as if they are contained in

16   the actual document.

17           MR. BECKER:  I'd like to state a further

18   objection to this line of testimony in that

19   Mr. Malamud has been designated as a 30(b)(6)

20   representative for factual bases for issues such as

21   these, but not for any legal bases.

22           THE WITNESS:  Yes.  And I want to be very

23   clear.  I am not a lawyer.  This is based on my

24   reading of -- I've read quite a bit about this

25   subject, but I'm not a professional in this field.

Page 220

1    But I have read court opinions and other documents

2    and this is my -- my assessment as a layman of

3    these materials.

4    BY MR. HUDIS:

5        Q.  Could you turn to page 31223 of Exhibit 28.

6        A.  Yes.

7        Q.  And I am directing you to the second full

8    paragraph where it starts, "Reading the law."

9            Do you see that?

10       A.  I do.

11       Q.  And it says in the second sentence,

12   "Activities that our organization undertakes, such

13   as putting all the standards required by law in one

14   location with common access methods or rekeying the

15   texts in order to make them searchable and

16   available on new platforms, are purportedly

17   prohibited under this scheme."

18           Do you see that?

19       A.  I do.

20       Q.  To what scheme were you referring?

21           MR. BECKER:  Objection.  The document

22   speaks to itself -- excuse me.  Objection.  The

23   document speaks for itself.  Objection.  Lacks

24   foundation and assumes facts not in evidence.

25           THE WITNESS:  If you go two paragraphs

Page 221

 1   back, the paragraph beginning on Bates number 31222

 2   and ending at the top of 31223, you'll see that my

 3   testimony describes the concept of the legal

 4   reading room in which standards development

 5   organizations have recently begun posting read-only

 6   copies of standards with restricted functionality

 7   such as no printing, terms of use, license

 8   agreements and a variety of other restrictions

 9   that.

10   BY MR. HUDIS:

11       Q.  And that was the scheme to which you were

12   referring?

13       A.  The legal reading room scheme, yes.

14       Q.  Mr. Malamud, on page 31227 of Exhibit 28,

15   it says at the bottom, "As this committee considers

16   revisions to the Copyright Act, there is one simple

17   change that would make a world of difference to the

18   functioning of our system of government, which is

19   to specify, as the Copyright Office stated, that

20   edicts of government are not copyrightable for

21   reasons of public policy."

22           Do you see that?

23       A.  I do.

24       Q.  Has this suggested text ever been enacted

25   as part of the U.S. Copyright Act, to the best of

Carl Malamud                                                              May 12, 2015
San Francisco, CA

Page 222

1   your knowledge?

2          MR. BECKER:  Objection.  Calls for a legal

3   conclusion.

4          THE WITNESS:  This was January 2014

5   testimony.  Chairman Goodlatte has been undergoing

6   a two-year process of revision of the Copyright

7   Act, and that -- that process is currently

8   underway.  This testimony was invited as -- as part

9   of that examination by the chairman.

10  BY MR. HUDIS:

11     Q.  As you and I sit here today in May of 2015,

12  has the language, "edicts of government are not

13  copyrightable for reasons of public policy," been

14  enacted into the U.S. Copyright Act?

15         MR. BECKER:  Objection.  Calls for a legal

16  conclusion.  Objection.  Argumentative; lacks

17  foundation; assumes facts not in evidence.

18  Objection.  Competence.

19         THE WITNESS:  There was a long-standing

20  public policy, and that's what the Copyright Office

21  was talking about.  There has not been a U.S.

22  statute passed in the last couple years that deals

23  specifically with this topic.

24         I believe, however, that if one looks

25  carefully at the mechanisms of incorporation by

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 223

1  reference that are specified in statutes such as

2  the APA, at least it's my reading, again, as an

3  amateur, that the policy is that the law must be

4  available and that that would include standards

5  that are incorporated by reference.

6  BY MR. HUDIS:

7     Q.  Thank you, Doc -- thank you, Mr. Malamud,

8  but that does not answer my question.

9         My question is, yes or no, has the

10 language, "as of today edicts of government are not

11 copyrightable for reasons of public policy," been

12 enacted into the U.S. Copyright Act?

13        MR. BECKER:  All the same objections and

14 asked and answered.

15        THE WITNESS:  I did answer your question.

16 I said that there had not been a statute in the

17 last two years that -- that included -- in the

18 Copyright Act that included this phrase.

19 BY MR. HUDIS:

20    Q.  Mr. Malamud, generally what do you know

21 about the American Educational Research

22 Association?

23        MR. BECKER:  Objection.  Vague.

24        THE WITNESS:  Oh, I don't know a huge

25 amount.  I know they're suing me.

Carl Malamud                                                        May 12, 2015
San Francisco, CA

 1   BY MR. HUDIS:

 2       Q.  Besides that.

 3       A.  I've looked at their website briefly,

 4   particularly after the litigation commenced, to

 5   learn a little bit more about their activities.

 6       Q.  Do you know what they do?

 7           MR. BECKER:  Objection.  Vague.

 8           THE WITNESS:  They hold meetings.  They

 9   just had their annual meetings.  They had all sorts

10   of what appeared to be very interesting talks about

11   education.  They lobby for education funding to

12   their membership is my impression, but again, I

13   don't know the organization very well.  But they

14   advocate for more money flowing to research and

15   education, a noble cause.

16   BY MR. HUDIS:

17       Q.  What do you know about the American

18   Psychological Association?

19           MR. BECKER:  Objection.  Vague; calls for a

20   narrative.

21           THE WITNESS:  Oh, I know a little bit about

22   the APA.  When I was in -- sophomore in college I

23   did an internship with the National Association of

24   Private Psychiatric Hospitals, and as part of that

25   I spent a few months in Washington and attended

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1   some APA functions.  So I -- I got to see a little

2   bit about what -- what they did and how they did

3   it.

4   BY MR. HUDIS:

5      Q.  What do you know about the National Council

6   on Measurement and Education?

7          MR. BECKER:  Objection.  Vague; calls for a

8   narrative.

9          THE WITNESS:  Almost nothing.

10  BY MR. HUDIS:

11     Q.  Do you know what kind of work the AERA

12  does?

13         MR. BECKER:  Objection.  Vague.

14         THE WITNESS:  Well, I know one piece of

15  work they do, which is they coordinate and publish

16  the Standards for Educational and Psychological

17  Testing.

18  BY MR. HUDIS:

19     Q.  Do you know what kind of work the APA does?

20         MR. BECKER:  Objection.  Vague.

21         THE WITNESS:  I know they're a very large

22  organization that is involved in a number of

23  things.  I recently read about their involvement in

24  the torture program, for example.  So I know about

25  that from news reports.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 226

1    BY MR. HUDIS:

2       Q.  What do you know about the work that the

3    NCME does?

4          MR. BECKER:  Objection.  Vague.

5          THE WITNESS:  Nothing beyond the name of

6    the organization.  Measurement education.

7    BY MR. HUDIS:

8       Q.  Besides the standards that we are

9    discussing today, do you know anything about the

10   publications of either the AERA, the APA or the

11   NCME?

12         MR. BECKER:  Objection.  Vague; calls for a

13   narrative.

14         THE WITNESS:  I briefly looked at the AERA

15   bookstore and saw a listing of the various

16   publications that they did, but they don't mean

17   much to me.

18   BY MR. HUDIS:

19      Q.  Did you look at the APA bookstore?

20         MR. BECKER:  Same objections.

21         THE WITNESS:  I did, looking for the

22   standards at issue, and found that they were not

23   available on the APA bookstore, and that brought me

24   over to the AERA bookstore.  So that was the extent

25   of that examination.

Page 227

1          MR. HUDIS:  Just for the benefit of the

2     court reporter, AERA is A-E-R-A.  Good.

3     BY MR. HUDIS:

4        Q.  What do you know about the Standards for

5     Educational and Psychological Testing?

6          MR. BECKER:  Objection.  Vague; calls for a

7     narrative.

8          To the extent that any of the witness's

9     knowledge comes from attorney-client

10    communications, I'll instruct him not to answer,

11    with that particular knowledge.

12          Lacks foundation.

13          THE WITNESS:  So I'm not an expert in this

14    area, but the standards at issue are standards that

15    specify how to create tests that are valid and

16    fair.  So it is a standard for the creation of

17    tests that are used in a variety of applications.

18    BY MR. HUDIS:

19       Q.  What is your understanding of who prepared

20    the standards?  All right.  So withdraw the

21    question.

22          When I refer from now on to "the

23    standards," I am referring to the Standards for

24    Educational and Psychological Testing.  Is that

25    okay?

Carl Malamud                                                                    May 12, 2015
San Francisco, CA

Page 228

1        A.   The 1999 version, or just in general?

2        Q.   I will specify.

3        A.   Okay.

4        Q.   But so we have an understanding between the

5    two of us, if I refer to "the standards," it's the

6    Standards for Educational and Psychological

7    Testing.

8        A.   I'm fine with that.

9        Q.   Do you know who prepared the standards?

10       MR. BECKER:  Objection.  Vague.  Objection.

11   May call for a legal conclusion.

12       To the extent that the answer to this

13   question requires the witness to divulge any

14   attorney-client confidential information, I will --

15   I will instruct the witness not to divulge that

16   privileged information.

17       Assumes facts not in evidence and lacks

18   foundation.

19       THE WITNESS:  So I know there was a

20   committee involved in the preparation of the

21   standards.  It appears all three of the editions,

22   '85, '99 and 2014.

23       My impression is that there were a large

24   number of other individuals in the three

25   organizations and others involved as well in this

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 229

 1    process.

 2    BY MR. HUDIS:

 3        Q.  Do you know who publishes the standards?

 4            MR. BECKER:  Objection.  Calls for a legal

 5    conclusion.

 6            Objection to the extent that the witness

 7    has learned this information from -- through

 8    attorney-client privileged communications, I'll

 9    instruct the witness not to divulge that

10    information.

11            THE WITNESS:  I believe it's AERA and the

12    other two organizations are the ones certainly that

13    are claiming to be the publisher and owner of the

14    copyright, hence the litigation that we're

15    currently engaged in.

16    BY MR. HUDIS:

17        Q.  Do you know the purpose of the standards?

18            MR. BECKER:  Objection.  Vague.

19            THE WITNESS:  Yeah.  It's what we recently

20    discussed, the creation of fair and accurate and

21    valid tests that are used in a variety of

22    applications.

23    BY MR. HUDIS:

24        Q.  And are you familiar with how the standards

25    are updated over time?

Page 230

1          MR. BECKER:  Objection.  Vague.

2          Objection.  To the extent that any of this

3    information has come from attorney-client

4    communications, I will instruct the witness not to

5    divulge any privileged information.

6          THE WITNESS:  I'm aware that they are

7    updated.  I'm not terribly clear on the exact

8    process that the organizations went through to do

9    that.

10   BY MR. HUDIS:

11        Q.  Do you know who uses the standards?

12        MR. BECKER:  Objection.  Vague.

13        Again, to the extent that this answer

14   requires the divulging of any attorney-client

15   privileged communications, I'll instruct the

16   witness not to divulge that information.

17        Competence.  Lacks foundation.

18        THE WITNESS:  So I know some of the people

19   that use the standard.  I know that the Department

20   of Education has incorporated by reference into its

21   regulations.  So I am -- I know that the Department

22   of Education has people that use it.

23        I know a lot of state governments are

24   putting together tests that conform to the

25   standards.

Carl Malamud                                                    May 12, 2015
                        San Francisco, CA

1            I believe there are a number of other

2     agencies, I believe Office of Personnel Management,

3     I believe Department of Defense, a number of state

4     organizations, are all users of the standard

5     because they specify that it shall be used.

6     BY MR. HUDIS:

7        Q.  Do you know of any non-governmental users

8     of the standards?

9            MR. BECKER:  All the same objections.

10    Vague.

11           To the extent that there is any information

12    that the witness has learned from his attorneys, I

13    will instruct him not to divulge this privileged

14    information.

15           THE WITNESS:  I know that the Educational

16    Testing Service, ETS and a number of organizations

17    that create tests, are users of the standard, and

18    the reason I know that is there's been a series of

19    procurements by government organizations that

20    require the use of the standard.

21    BY MR. HUDIS:

22       Q.  Do you know of any other non-governmental

23    users of the standards?

24           MR. BECKER:  All the same objections.  Also

25    object for competence.

Page 232

1           THE WITNESS:  My sister read it in the

2    course of her doctoral course work.

3    BY MR. HUDIS:

4       Q.  And what was your sister's doctoral course

5    work?

6       A.  On, I want to state this properly.  I

7    believe physical and rehabilitative therapy.  A

8    subset of psychology.

9       Q.  How did the standards first come to your

10   attention?

11          MR. BECKER:  Objection.  Vague.  Objection.

12   Ambiguous.

13          THE WITNESS:  I was looking at the

14   standards incorporated by reference under the Code

15   of Federal Regulations, and the standards at issue

16   were one of the ones that were specified.

17   BY MR. HUDIS:

18      Q.  And what year was that?

19      A.  Probably 2012.  Early 2012.

20      Q.  When did Public.Resource --

21      A.  Might have been earlier.  Might have been

22   earlier.  I'm not sure.

23      Q.  Sometime in 20 -- in 2012?

24      A.  Coming to my attention in the sense of

25   remembering it now, yes.

Carl Malamud                                            May 12, 2015
San Francisco, CA

1      Q.  What, if anything, made you interested in

2   acquiring the standards?

3      A.  It was --

4          MR. BECKER:  Objection.  Vague.

5          THE WITNESS:  -- incorporated by reference

6   into the Code of Federal Regulations.

7   BY MR. HUDIS:

8      Q.  When did Public.Resource first make the

9   decision to post the standards to one of its

10  websites?

11         MR. BECKER:  Objection.  Vague.  Objection.

12  Lacks foundation.  Objection.  May call for a legal

13  conclusion.

14         THE WITNESS:  So it would have been

15  sometime after obtaining a copy of the standard and

16  examining it and satisfying myself that, in fact,

17  it was the document that was incorporated by

18  reference, and sometime between the procurement,

19  which I believe was in May 2012, and the actual

20  posting, which I believe was in July 2012.

21  BY MR. HUDIS:

22     Q.  So how did Public.Resource come to the

23  decision to post the standards on one of its

24  websites?

25         MR. BECKER:  Objection.  Vague and

Page 234

1    ambiguous.

2         THE WITNESS:  By determining that it was

3    incorporated by reference and that this particular

4    document that I held in my hand was the specific

5    document that had been incorporated by reference.

6    BY MR. HUDIS:

7       Q.  On which of its websites did

8    Public.Resource post the standards?

9       A.  Law.Resource.Org.

10      Q.  Mr. Malamud, this question is directed to

11   you personally.

12        Do you claim any copyright ownership

13   interest in the Standards for Educational and

14   Psychological Testing?

15        MR. BECKER:  Objection.  Calls for a legal

16   conclusion.  Objection.  Argumentative; lacks

17   foundation; competence.

18        THE WITNESS:  I do not.

19   BY MR. HUDIS:

20      Q.  Does Public.Resource claim any copyright

21   ownership interest in the Standards for Educational

22   and Psychological Testing?

23        MR. BECKER:  All the same objections.

24        THE WITNESS:  We do not.  We do not.

25   BY MR. HUDIS:

1      Q.  When did you first procure the standards?

2      A.  May 2012.

3      Q.  What was the year of the publication of the

4   particular standards that you procured?

5          MR. BECKER:  Objection.  Vague; assumes

6   facts not in evidence.

7          THE WITNESS:  I don't know the year of the

8   publication.  I know it's a 1999 edition.

9   BY MR. HUDIS:

10     Q.  That's what I wanted to know.  Thank you.

11         Have you procured any earlier or subsequent

12  versions of the standards?

13     A.  Subsequent to the commencement of

14  litigation, I purchased a copy of the 2014 and 1985

15  standards because I wanted to see what was in them.

16  I have not posted those documents.

17     Q.  Mr. Malamud, did you personally procure the

18  1999 standards?

19     A.  I did.

20     Q.  From -- from what source did you procure

21  the 1999 standards?

22     A.  It's --

23         MR. BECKER:  Objection.  Vague.

24         THE WITNESS:  It's called the Amazon

25  Marketplace.  So I paid my money to Amazon, and

Carl Malamud                                                May 12, 2015
San Francisco, CA

Page 236

1    that was through a used book seller that actually

2    had the document and sent it to me.

3              (PLAINTIFFS' EXHIBIT 29 WAS MARKED.)

4    BY MR. HUDIS:

5         Q.  I marked the next document as Exhibit 29,

6    and it is Defendant's Amended Responses to

7    Plaintiff's Interrogatories.

8              Mr. Malamud, do you recognize this

9    document?

10        A.  I do.

11        Q.  Mr. Malamud, if you could turn to the last

12   page.  On page 15, is that your signature?

13        A.  Yes, it is.

14        Q.  Mr. Malamud, could you please turn to the

15   question and answer to interrogatory number 1 on

16   page 4 of Exhibit 29.

17        A.  I'm there.

18        Q.  And it says in the third paragraph of that

19   interrogatory answer, "Public.Resource purchased a

20   printed copy from," quote, "The Book Grove,"

21   unquote, "a used book seller on May 17, 2012."

22             And does this interrogatory answer verify

23   the source from which you procured the 1999

24   standards?

25        A.  Yes.  The Book Grove was the used book

Page 237

 1   seller on the Amazon marketplace.

 2       Q.  And does interrogatory answer number 1 also

 3   state the date of purchase?

 4       A.  It does.

 5       Q.  And that date is May 17th, 2012?

 6       A.  That is correct.

 7           MR. BECKER:  Objection.  The interrogatory

 8   speaks for itself.

 9           (PLAINTIFFS' EXHIBIT 30 WAS MARKED.)

10   BY MR. HUDIS:

11       Q.  Mr. Malamud, have you taken the time to

12   read what has now been marked as Exhibit 30?

13       A.  I have.

14       Q.  And the document Exhibit 30 bears

15   production pages PROAERA 446 through 5 --

16   through -- well --

17       A.  446.

18           MR. HUDIS:  PROAERA 446, PROAERA 447 and

19   PROAERA 544.

20           Counsel, just so we have an understanding,

21   this is a part of a much larger document of many

22   other purchases that Carl Malamud made.  We are

23   only concentrating on a specific purchase.

24           THE WITNESS:  I don't have 544 here.  I

25   have two pages.

Carl Malamud                                              May 12, 2015
                          San Francisco, CA

1   BY MR. HUDIS:

2       Q.  Okay.  So my colleague, Ms. Cappaert, has

3   told me that I've misspoken.  So I'm going to

4   re-identify the document.

5           Exhibit number 30 should contain production

6   pages PROAERA 446 and 447.

7       A.  That's correct.

8       Q.  I apologize, Mr. Malamud.  That was my

9   error.

10      A.  Oh, that's okay.

11      Q.  Okay.  So, Mr. Malamud, if you could take a

12  look at the document.  Do you have any doubt that

13  this document is authentic?

14      A.  No, I do not.

15          MR. HUDIS:  Counsel, can you stipulate that

16  Exhibit 30 is a business record of

17  Public.Resource?

18          MR. BECKER:  It appears to be a document

19  produced by Public.Resource that is a receipt.

20          MR. HUDIS:  I'll take that representation.

21  Thank you.

22  BY MR. HUDIS:

23      Q.  Mr. Malamud, Exhibit 30, is this the

24  receipt for the 1999 standards book that you

25  purchased?

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 239

1        A.  Yes, it is.

2        Q.  And for what purpose did you procure the

3   1999 standards?

4        A.  To look at the document and ascertain that

5   it was, in fact, the document incorporated by

6   reference into the Code of Federal Regulations.

7             (PLAINTIFFS' EXHIBIT 31 WAS MARKED.)

8   BY MR. HUDIS:

9        Q.  Mr. Malamud, I show you what's been marked

10  as Exhibit 31.  It bears production numbers

11  AERA_APA_NCME 1 through 201.

12       A.  Do you want me to read the document?

13       Q.  No, I do not.

14       A.  Okay.

15       Q.  Mr. Malamud, is this the book that you

16  purchased from The Book Grove on May 17, 2012?

17            MR. BECKER:  Objection.  Vague.  Objection.

18  The witness has been instructed not to read the

19  document.  Objection.  Misleading.

20  BY MR. HUDIS:

21       Q.  Mr. --

22       A.  I don't know if this is the one that I

23  bought, but this appears to be a copy of the

24  standards at issue.

25       Q.  Did you buy the standards at issue from the

Page 240

1   Book Grove?

2       A.  Yes.

3       Q.  Mr. Malamud, according to Exhibit 30, you

4   paid $64.48 for the book plus shipping and

5   handling.

6       A.  68.47, including shipping and handling,

7   yes.

8       Q.  Mr. Malamud, did you ever attempt to

9   acquire a copy of the 1999 standards for free?

10      A.  I think the answer to that is yes.

11      Q.  From where?

12      A.  See, I'm not sure "free" is the right term.

13  I submitted a Freedom of Information Act request

14  that included the standards at issue.  That request

15  was denied.  So I have no idea if there would have

16  been a charge or not in making that data available.

17  So that's a qualified yes.

18          (PLAINTIFFS' EXHIBIT 32 WAS MARKED.)

19  BY MR. HUDIS:

20      Q.  Mr. Malamud, I show you what's been marked

21  as Exhibit 32 bearing pro -- pages PROAERA 10153

22  through 10195.

23          Do you recognize the document?

24      A.  It appears to be a Freedom of Information

25  Act request I submitted to Mr. Stern, who is the

1    general counsel of the National Archives.

2        Q.  Is the National Archives and Records

3    Administration also known as NARA, N-A-R-A?

4        A.  Yes, it is.

5        Q.  And this letter of July 14th, 2009, Exhibit

6    32, this was a freedom of information request by

7    Public.Resource?

8        A.  Yes, it was.

9            MR. HUDIS:  Counsel, can you stipulate that

10   Exhibit 32 is a business record of Public.Resource?

11           MR. BECKER:  I'm not certain if it

12   constitutes a business record by Public.Resource,

13   but it is a document produced by Public.Resource.

14   BY MR. HUDIS:

15       Q.  Mr. Malamud, so was this document, Exhibit

16   32, created on or about July 14th, 2009?

17       A.  It's when I sent it, it is.

18       Q.  Have you kept a copy of Exhibit 32 in

19   Public.Resource's records?

20       A.  Yes, we disclosed it to you.

21       Q.  And writing such letters such as Exhibit 32

22   is the regular practice of Public.Resource?

23           MR. BECKER:  Objection.  Vague.

24           THE WITNESS:  I don't know about regular

25   practice, but it was certainly not unusual for me

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 242

1    to write a letter.

2    BY MR. HUDIS:

3        Q.  A letter like this, Exhibit 32?

4        A.  Well, that particular FOIA request was

5    fairly unique at the time, and I don't believe we

6    did that again for quite a while.  So ...

7        Q.  You've done it on more than one occasion?

8        A.  FOIA requests?

9        Q.  Yes.

10       A.  Oh, yeah, I've submitted a lot of FOIA

11   requests over time.

12       Q.  And that's part of what you do during your

13   business at Public.Resource?

14       A.  If -- if there is a reason to request

15   government information that is not otherwise

16   available, yes.

17       Q.  What types of materials were you attempting

18   to obtain by this FOIA request of Exhibit 32?

19       A.  Standards incorporated by reference into

20   the Code of Federal Regulations.

21       Q.  Mr. Malamud, could you turn to production

22   page 10154 of Exhibit 32.

23       A.  Okay.

24       Q.  Do you see the text under "What I am

25   specifically asking for"?

Page 243

1      A.  I do.

2      Q.  So reading this first paragraph and its

3  bullet points that follow, were you asking

4  Mr. Stern that either the government post these

5  items to the Internet or allow Public.Resource to

6  do it?

7          MR. BECKER:  Objection.  Vague and

8  ambiguous.  The document speaks for itself.

9  Possibly compound.

10          THE WITNESS:  I outlined three different

11  ways that the FOIA request could be satisfied.

12  BY MR. HUDIS:

13      Q.  And in the next paragraph you say, "I am

14  particularly interested in technical standards for

15  Underwriters Laboratories, the American National

16  Standards Institute and other standards that are

17  expensive and unavailable on the Internet and in

18  public libraries."

19          Do you see that?

20      A.  I do.

21      Q.  Would you consider the 1999 standards to be

22  expensive?

23          MR. BECKER:  Objection.  Vague.  Objection.

24  Lacks foundation; assumes facts not in evidence.

25          THE WITNESS:  I think a $50 document is

Page 244

1   expensive.  Whether it's unduly expensive is

2   another question.  But I think $50 is a lot of

3   money.

4   BY MR. HUDIS:

5       Q.  Do you think the price for which you paid

6   for the standards, to be unduly expensive?

7       A.  Of this particular standard?

8       Q.  Yes.

9       A.  Well, I guess it's by comparison to what?

10  And who was doing the purchasing; right?  So --

11      Q.  While you were doing the purchasing?

12      A.  I was doing the purchasing, and I have

13  spent considerable funds purchasing standards that

14  are much more expensive, and so by comparison to

15  the Underwriters Laboratory $800 price, 50 is

16  certainly less.

17          I do think that's a lot of money though.

18      Q.  And on page 10155 of Exhibit 32, you were

19  requesting a public-interest fee waiver.  Do you

20  see that?

21      A.  I do.

22      Q.  All right.  So by this public-interest fee

23  waiver, were you asking NARA to provide the

24  standards, whose list is attached at the back of

25  Exhibit 32, to Public.Resource for free?

1        MR. BECKER:  Objection.  The document

2    speaks for itself; assumes facts not in evidence

3    and lacks foundation.

4        THE WITNESS:  That's a standard mechanism

5    in a FOIA request is if the request is in the

6    public interest, to request a fee waiver and yes,

7    we did, in fact, request one.

8    BY MR. HUDIS:

9      Q.  So you were asking for NARA to provide

10    copies of these standards for free?

11      A.  Well, no.  We were asking for a

12    public-interest fee waiver, and it's up to the

13    government to decide if they're going to waive all

14    or some of the fees.

15        MR. BECKER:  Let me just say, give me a

16    moment to object.

17        THE WITNESS:  Sorry about that.

18        MR. BECKER:  All the same objections and

19    also asked and answered and mischaracterizes

20    testimony.

21    BY MR. HUDIS:

22      Q.  Mr. Malamud, could you look at production

23    page 10156 of Exhibit 32.

24      A.  Okay.

25      Q.  Up at the top of the page it says in the

Page 246

1    first bullet point, "Public.Resource.Org maintains

2    one of the most popular and visible document

3    servers on the Internet for legal information and

4    have demonstrated public expertise to disseminate

5    this information to a broad spectrum of the

6    public."

7           What was the basis for you making that

8    statement?

9           MR. BECKER:  Objection.  Misquotes the

10   document.  The document speaks for itself.  Vague.

11          THE WITNESS:  It's based on the fact that

12   we were at the time serving the opinions of the

13   court of appeals of the United States, which were

14   unavailable in any other location on the Internet,

15   and the service was very popular.

16   BY MR. HUDIS:

17      Q.  And what did you mean by "very popular"?

18      A.  When I would go to a conference, a lot of

19   people would come up to me and say, "This is really

20   great that the court of appeal opinions are

21   available on the Internet."

22      Q.  Mr. Malamud, could you look at page 10157

23   of Exhibit 32.  At the top of that page it says,

24   "Given the lack of any specific regulations

25   governing disclosure of materials incorporated by

Carl Malamud                                                May 12, 2015
San Francisco, CA

1    reference, given the importance of these core

2    materials, and given the clear unqualified language

3    of the president, NARA should disclose this

4    material."

5          Do you see that?

6      A.  I do.

7      Q.  All right.  I'm concentrating on just the

8    first part of that sentence.

9          What is the basis for saying "there is a

10   lack of any specific regulations concerning

11   disclosure of materials incorporated by reference"?

12         MR. BECKER:  Objection.  The document

13   speaks for itself; calls for speculation;

14   competence; assumes facts not in evidence.

15         THE WITNESS:  I meant that the Office of

16   the Federal Register on their website had taken --

17   not addressed the issue of public availability of

18   these -- these documents.

19   BY MR. HUDIS:

20     Q.  "These documents," meaning what, standards?

21     A.  The standards incorporated by reference

22   under the Code of Federal Regulations.

23     Q.  Mr. Malamud, attached to the letter of

24   Exhibit 32 is an appendix.  What is this an

25   appendix of?

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 248

1          MR. BECKER:  Objection.  The document

2   speaks for itself.

3          THE WITNESS:  It is a listing of standards

4   incorporated by reference, which I obtained by

5   looking at the National Institute of Standards and

6   Technology database of standards incorporated by

7   reference.

8   BY MR. HUDIS:

9      Q.  And was this a list of standards that

10  Public.Resource was asking NARA to provide?

11         MR. BECKER:  Objection.  The document

12  speaks for itself.

13         THE WITNESS:  Yes.  This is standards

14  incorporated by reference, and this was a FOIA

15  request for all standards incorporated by

16  reference.

17  BY MR. HUDIS:

18     Q.  And you were asking that NARA provide these

19  standards incorporation by reference pursuant to a

20  fee waiver?

21         MR. BECKER:  Objection.  The document

22  speaks for itself; mischaracterizes -- potentially

23  mischaracterizes prior testimony.

24         THE WITNESS:  There was a fee waiver, but

25  there was also an offer to pay funds as well.  So

Page 249

1    there was -- this is a standard FOIA request in

2    which you say, "I'm willing to pay a certain amount

3    of money.  If it costs more than that amount of

4    money, please contact me."  And by the way, this is

5    also in the public interest.

6    BY MR. HUDIS:

7         Q.  Where in --

8         A.  On Bates number 10156, the section

9    limitation of fees.  "If you decide that we qualify

10   neither as news media or for a public interest fee

11   waiver, we agree to pay fees up to a maximum of

12   $5,000.  If $5,000 is not sufficient," and it goes

13   on to say, "please provide a partial response with

14   $5,000 worth of documents."

15        Q.  So you were willing to pay up to $5,000 to

16   procure the standards listed on appendix A?

17            MR. BECKER:  Objection.  Mischaracterizes

18   prior testimony; vague and ambiguous; misleading.

19            THE WITNESS:  It says "$5,000 worth of

20   documents."  So as to how many documents that would

21   end up being, we don't know.  And since FOIA didn't

22   grant the FOIA request -- NARA didn't grant the

23   FOIA request, it's really moot.

24   BY MR. HUDIS:

25        Q.  And on page 10167 of Exhibit 32, is the

Page 250

1    1999 edition of the standards one of the documents

2    you were asking NARA for?

3          MR. BECKER:  Objection.  The document

4    speaks for itself.

5          THE WITNESS:  10167?  Is that the right

6    number?

7    BY MR. HUDIS:

8          Q.  Yes, sir.

9          A.  Because I'm not seeing a 10167.  I'm

10   looking here to see if it's someplace else.  Can

11   you direct me to where on that page?

12         Q.  It's the equivalent of appendix A, page 10.

13         A.  I'm on that page.  I'm just not seeing it.

14   I'm sorry.  I may be missing it.

15         Q.  Do you see --

16         A.  I see a bunch of ANSI.

17         Q.  Keep going.

18         A.  AOAC, the officials methods.  APA.  Oh, I

19   see.  It's listed under APA.  That's because the

20   NIST database listed it under the American

21   Psychological Association.  Yes, I do see -- in

22   fact, see the standards at issue here.

23         Q.  All right.  So just so we have a clean

24   record, and on page 10167 of Exhibit 32, is the

25   1999 edition of the standards one of the documents

Page 251

1    you were asking NARA for?

2          MR. BECKER:  Objection.  Misstates prior

3    testimony; the document speaks for itself; asked

4    and answered; vague.

5          THE WITNESS:  The standards at issue are,

6    in fact, listed on page 10 of appendix A of my FOIA

7    request.

8    BY MR. HUDIS:

9       Q.  Which is the equivalent of production

10   page --

11      A.  10167.

12      Q.  Thank you, sir.

13          (PLAINTIFFS' EXHIBIT 33 WAS MARKED.)

14   BY MR. HUDIS:

15      Q.  So, Mr. Malamud, I show you Exhibit 33,

16   which has been -- Exhibit 33, which bears

17   production numbers PROAERA 10247 through 10249.

18          Do you recognize the document?

19      A.  It appears to be the response from the

20   Office of the Federal Register to my FOIA request.

21      Q.  So Exhibit 33 is the response to your

22   letter of Exhibit 32?

23      A.  Yes.

24      Q.  Do you have any reason to doubt the

25   authenticity of Exhibit 33?

Page 252

1       A.  I do not.

2       Q.  Mr. Malamud, I'm looking now at

3   Mr. Mosley's letter of Exhibit 33.  And I draw your

4   attention to the third paragraph, the last sentence

5   in that paragraph.

6           "While the standards themselves are not set

7   out in their entirety in the CFR text, there was

8   enough information set out in the regulation text

9   that affected parties can obtain or inspect these

10  standards in order to comply with the regulation."

11          Do you agree with that statement, with

12  respect to the 1999 standards?

13          MR. BECKER:  Objection.  Potentially seeks

14  legal conclusion; argumentative; lacks foundation.

15          THE WITNESS:  No, I do not believe that

16  there is enough information set out in the CFR

17  text.  I believe one would need to consult the

18  standards at issue in order to understand what they

19  specify.

20          MR. BECKER:  I'm sorry, are we going off

21  the record?

22          MR. HUDIS:  He has to.  We've got five

23  minutes left.

24          THE VIDEOGRAPHER:  This marks the end of

25  Disc 3, Volume 1 in the deposition of Carl Malamud.

Page 253

1          The time is 4:23 and we are off the record.

2          (Recess taken.)

3          THE VIDEOGRAPHER:  This marks the beginning

4     of Disc 4, Volume 1 in the deposition of Carl

5     Malamud.

6          The time is 4:33, and we are on the record.

7     BY MR. HUDIS:

8        Q.  Mr. Malamud, I'm referring you to Exhibit

9     33, page 10247 at the bottom.  And in his letter to

10    you, Mr. Mosley says, "Contrary to your

11    suggestions, there is no federal law, regulation or

12    presidential memorandum that requires the standards

13    incorporated by reference to be set out in full

14    text in the CFR or posted verbatim on the National

15    Archives and Records Administration, NARA,

16    website."

17         Mr. Malamud, do you agree or disagree with

18    that statement?

19       A.  I disagree with that statement.

20       Q.  Why?

21       A.  There are certainly a series of

22    presidential memoranda having to do with the

23    availability of government information.  President

24    Obama has been extremely aggressive in his

25    open-government platform in a series of memoranda

Page 254

1    on availability of documents.

2           In terms of federal law, I believe very

3    strongly that it is a long-standing public policy

4    in the United States that the law has no copyright.

5    That goes back to the decision of Wheaton v.

6    Peters.

7           Again, I'm not a lawyer, but I have read

8    fairly extensively on this very specific topic, and

9           I believe if you look at everything from

10   supreme court decisions to U.S. Copyright Office

11   policy, it's very clear that the law has no

12   copyright and must be available to citizens to

13   inform themselves as to their rights and their

14   obligations.

15     Q.  Another comment that -- or another

16   statement that Mr. Mosley made in his letter of

17   Exhibit 33, you already said you disagreed with.

18   "There is enough information set out in the

19   regulation text that affected -- that affected

20   parties can obtain or inspect these standards in

21   order to comply with the regulation."

22          And you said you disagreed with that;

23   correct?

24     A.  That is correct.

25     Q.  Why do you disagree with that statement?

Carl Malamud                                                    May 12, 2015
                        San Francisco, CA

1          MR. BECKER:  Objection to the extent that

2     calls for a legal conclusion.

3          THE WITNESS:  Because I believe the

4     standards incorporated by reference are integral

5     parts of the documents, of the Code of Federal

6     Regulations.  And one cannot understand the Code of

7     Federal Regulations based on a very brief summary.

8     One needs to actually read the text.

9     BY MR. HUDIS:

10         Q.  That's not what Mr. Mosley is saying here.

11    He says that "There is enough information set out

12    in the regulation text that affected parties can

13    obtain or inspect these standards in order to

14    comply with the regulation."

15         A.  I believe the provisions to obtain them are

16    difficult.  They involve high costs and

17    restrictions on use.  I believe the inspection

18    facility provided by the National Archives and

19    the -- the regulatory agencies doing the

20    incorporation, are not nearly adequate.

21         One has to travel to Washington D.C. with a

22    roll of quarters in your pocket to -- to inspect

23    the documents.  That's just not the way one needs

24    to make the law available in this day and age.

25         MR. BECKER:  I'll instruct the witness to

Page 256

1    wait for a question to be asked by counsel.

2         THE WITNESS:  Yes.

3    BY MR. HUDIS:

4      Q.  Mr. Malamud, at the end -- well, it's not

5    the end.  On page 10248 of Exhibit 33 at the

6    bottom, Mr. Mosley says in his letter to you,

7    "Although many of our library holdings are in the

8    public domain as products of employees or agents of

9    the federal government, some documents incorporated

10   by reference do or may have copyright protection.

11   You are responsible for obtaining any necessary

12   permission for use, copying and publication from

13   copyright holders and for -- and for any other

14   applicable provisions of the Copyright Act."  And

15   he cites Title 17 of the United States code.

16        Do you agree or disagree with that

17   statement?

18        MR. BECKER:  Objection.  Calls for a legal

19   conclusion.  Objection.  Form.

20        THE WITNESS:  It says, "some documents

21   incorporated by reference do or may have copyright

22   protection."  It is my understanding that the law

23   in the United States has no copyright.  It is owned

24   by the people.  Not by the government agencies.

25   BY MR. HUDIS:

Carl Malamud                                                                          May 12, 2015
San Francisco, CA

1      Q.  So the moment any standard is incorporated

2   by reference into a federal regulation, it loses

3   its copyright protection; is that correct,

4   according to your view?

5          MR. BECKER:  Objection.  Calls for a legal

6   conclusion.  Objection.  Argumentative.  Objection.

7   May misstate prior testimony.

8          THE WITNESS:  I think words like "loses its

9   copyright" are loaded.  I do believe that the Code

10  of Federal Regulations has no copyright.  It's a

11  law.  And that standards incorporated by reference

12  into the Code of Federal Regulations are an

13  integral part of the code and therefore have no

14  copyright.

15  BY MR. HUDIS:

16     Q.  Mr. Malamud, once you procured the 1999

17  standards in May of 2012, what, if anything, did

18  you do with them?

19         MR. BECKER:  Objection.  Form.

20         THE WITNESS:  I examined the standard to

21  determine that it was, in fact, the document that

22  was specified and incorporated by reference.

23  BY MR. HUDIS:

24     Q.  What else did you do with the standards

25  once you had them?

Page 258

1      A.  I scanned the standard and turned it into a

2    PDF file.

3      Q.  So I would like to draw your attention back

4    to Exhibit 29, which is the interrogatory answers.

5    And I draw your attention to interrogatory answer

6    number 3 at the bottom of page 5 in Exhibit 29.  Do

7    you see that?

8      A.  Yes, I see that.

9      Q.  All right.  Now, do you see

10   Public.Resource's answer that starts at the bottom

11   of page 5 and continues on page 6?

12     A.  I do.

13     Q.  Does this interrogatory answer accurately

14   state what you did with the 1999 standards once you

15   procured them?

16           MR. BECKER:  Objection.  Form.

17           THE WITNESS:  It does.

18   BY MR. HUDIS:

19     Q.  All right.  So as I understand, you

20   disassembled the book; correct?

21     A.  Mm-hm.

22           MR. BECKER:  Objection.  Form.

23   BY MR. HUDIS:

24     Q.  You removed the spine and any other

25   extraneous materials.  You trimmed the document.

Carl Malamud                                                          May 12, 2015
San Francisco, CA

Page 259

1    Do you see that?

2         A.  I do.

3         Q.  All right.  And then you scanned it on a

4    Xerox 4250 scanner at 30 or 40 dots per inch.  Do

5    you see that?

6         A.  At 300 or 400 dots per inch.  Yes, I do.

7         Q.  And then you named the file

8    AERA.standards.1999.PDF?

9         A.  That's correct.

10        Q.  Now, the book that you got from the

11   reseller on Amazon, you said it was a used book?

12        A.  I really don't recall if it was used or

13   new.

14        Q.  Did you check the quality of the pages of

15   the book before you scanned them?

16        A.  Yes, I did.

17        Q.  Did you notice -- did you compare your

18   copy -- your procured copy of the 1999 standards to

19   a new version of the standards?

20        MR. BECKER:  Objection.  Vague and

21   ambiguous; possibly misleading and misstates the

22   testimony.

23        THE WITNESS:  So again, I'm not sure

24   whether it was new or used.  I simply have no

25   recollection.  I know I was able to obtain it on

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1    the Amazon Marketplace.

2            What was the rest of your question?

3    BY MR. HUDIS:

4        Q.  Did you compare the used version that you

5    procured with a new version of the standards?

6            MR. BECKER:  Same objections.

7            THE WITNESS:  So again, I'm not sure if it

8    was a used or a new.  Did I compare it to another

9    copy of the standards?

10   BY MR. HUDIS:

11       Q.  Correct.

12       A.  No, I did not.

13       Q.  And in interrogatory answer number 3 you

14   talk about a quality check process.  Could you tell

15   me what that quality check process was?

16       A.  In the case of a scan, making sure all the

17   pages are there and that the scan was successful.

18       Q.  Did you check to make sure all the pages

19   were there?

20       A.  I believe I did, yes.

21       Q.  And then you say, "The files are post

22   process to optimize the scan and to generate

23   optical character recognition on the text."

24           Did you do that?

25       A.  Yes, I believe I did.

Carl Malamud                                                          May 12, 2015
San Francisco, CA

1      Q.  And then it says, "Public.Resource then

2   double checks the IBR."  That's incorporation by

3   reference?

4      A.  That's correct.

5      Q.  "The incorporation by references, puts a

6   cover sheet on the files and stamps metadata into

7   the headers."

8          What kind of metadata did you stamp into

9   the headers?

10      A.  I have not examined the AERA standard

11   recently, but the normal practice is to stamp in

12   the name of the standard and possibly the CFR site

13   that we have there.  And the name of the original

14   publisher, I believe, was also in the metadata.

15      Q.  Did you or anyone on Public.Resource's

16   behalf use graphic design web tools to post the

17   1999 standards to the Internet?

18          MR. BECKER:  Objection.  Compound.

19   Objection.  Vague.

20          THE WITNESS:  I created the cover sheet,

21   the certificate of incorporation using graphic

22   design tools.  I did not apply any graphic design

23   tools to the core document, because it was simply a

24   scan.

25          (PLAINTIFFS' EXHIBIT 34 WAS MARKED.)

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1    BY MR. HUDIS:

2        Q.   Mr. Malamud, I show you a document that has

3    been marked as Exhibit 34, bearing production

4    numbers AERA_APA_NCME 31528 through 31738.

5            Do you recognize this document?

6        A.   It appears to be a copy of the standards at

7    issue with the certificate of incorporation on the

8    top.

9        Q.   All right.  And is this the cover sheet

10   that you appended on top of the 1999 standards

11   posted on Public.Resource's website?

12       A.   Yes, it appears to be.

13       Q.   Who prepared this cover sheet?

14       A.   I did.

15       Q.   And who chose the language for the cover

16   sheet?

17       A.   I did.

18       Q.   What was your intention, Mr. Malamud, for

19   appending this cover sheet of Exhibit 34 on top of

20   the 1999 standards posted on Public.Resource's

21   website?

22       A.   I wanted to be very clear that this was a

23   posting of a standard incorporated by reference

24   into the Code of Federal Regulations.  I wanted to

25   place this document in context.

Carl Malamud                                                    May 12, 2015
                        San Francisco, CA

Page 263

1      Q.  And what was your purpose on the cover

2   sheet of using the medallion that had the word

3   "Repeatedly Approved."

4      A.  To signify that the executive director of

5   the Office of the Federal Register had explicitly

6   and deliberately approved this incorporation by

7   reference.

8      Q.  We just went through the process that you

9   used.  We asked you the question, did you digitize

10  or convert to a digital format the 1999 standards,

11  and we went through that process.

12        My question is, who participated in the

13  process of disassembling the paper version of the

14  1999 standards, scanning them and processing them,

15  as you described here in interrogatory answer

16  number 3 and posting them to the Internet?

17        MR. BECKER:  Objection.  Compound.

18        THE WITNESS:  That was me.

19  BY MR. HUDIS:

20     Q.  Did Point.B Studio participate in this

21  process?

22     A.  No.

23     Q.  Did Rebecca Malamud participate in this

24  process?

25     A.  She did not.

Carl Malamud                                                      May 12, 2015
San Francisco, CA

Page 264

1     Q.   Did HTC Global participate in this process?

2     A.   They did not.

3     Q.   Did anyone else besides yourself

4  participate in this process?

5     A.   It's just me.

6     Q.   I'd like you to look in Exhibit 29,

7  interrogatory answer number 4 on page 6.

8          So consistent with your -- your prior

9  testimony, does this interrogatory answer number 4

10 in Exhibit 29 accurately identify all the persons

11 and entities who were involved in disassembling the

12 paper version of the 1999 standards, scanning them,

13 processing them and posting them to the Internet?

14         MR. BECKER:  Objection to form.

15         THE WITNESS:  Yes, it was me.

16 BY MR. HUDIS:

17    Q.   I just want to go a little bit into depth

18 about quality control.

19         So what quality control procedures did you

20 use to ensure the quality of the textual comment --

21 content of the 1999 standards that you posted to

22 the Internet?

23         MR. BECKER:  Objection.  Vague.

24         THE WITNESS:  This is a scan of a document.

25 BY MR. HUDIS:

Page 265

1      Q.   Mm-hm.

2      A.   It's a pixel-by-pixel replication of what

3   was on the printed page.

4      Q.   I'll be more specific.

5           Did you check for missing or incorrectly

6   scanned pages?

7      A.   I believe I did.

8      Q.   Did you check for pages that may have had

9   blurred text?

10     A.   I believe I did.

11     Q.   Now, you say, "I believe I did."  Do you

12  know for sure that you did?

13     A.   My standard procedure is to do those

14  things.  I don't know this specific document simply

15  because I don't recollect back to that period in

16  May 2012.  So I can't testify under oath that I

17  did, in fact, do that.  But that certainly is my

18  standard procedure.

19     Q.   Mr. Malamud, what is search engine

20  optimization?

21     A.   Search engine optimization is a technical

22  term of art that has to do with how documents that

23  are on a web server show up in search engine

24  results.

25     Q.   Please continue.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1       A.   In particular with the PDF document, what

2   you want in a search engine result is rather than,

3   for example, a snippet of OCR, you want the actual

4   title of the document to show up in a description.

5   It's what Google would cause a snippet.

6            So by embedding metadata in the header of

7   the PDF file, the attempt is to make sure that that

8   document title shows up in the search engine

9   results so people know what that document is.

10      Q.   So, Mr. Malamud, did you check the metadata

11  you added to the PDF file comprising the 1999

12  standards for search engine optimization?

13      A.   Well, when I created the script that embeds

14  the metadata in the header, I had in mind search

15  engine optimization.

16           So assuming I did my job right, and

17  remember search engines change over time.  So if

18  you did something in one period of time, that

19  doesn't necessarily mean that a search engine will

20  react the same way later on.

21           But assuming that I wrote that initial

22  script properly, then this document would have

23  shown up in a meaningful fashion in search engine

24  results.

25      Q.   And your answer just now said, "assuming."

Carl Malamud                                                           May 12, 2015
San Francisco, CA

Page 267

1    You don't know for sure with respect to this

2    particular document?

3        A.   I don't recollect looking at this document

4    in Google or Bing or other search engine results to

5    determine that fact.

6        Q.   Did you check the quality of the optical

7    character recognition process for accuracy for the

8    1999 standards?

9            MR. BECKER:  Objection.  Form.

10           THE WITNESS:  Hold on a second.  I'd like

11   to double-check something.

12           OCR is inherently prone to certain errors.

13   And what I used was the best available OCR that I

14   had, which was in Adobe Acrobat Pro.  But I did not

15   pull up the underlying text.  The underlying OCR

16   text is used to search a file; not to read a file.

17           Does that answer your question?

18   BY MR. HUDIS:

19       Q.   So in doing a quality check of the optical

20   character recognition process for accuracy, did you

21   attempt to pull up the underlying text after the

22   scan was completed?

23       A.   No.

24           MR. BECKER:  Objection.  Form.

25           THE WITNESS:  No.  And I never said that I

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 268

1    did do that on a consistent basis.  It's not part

2    of our normal workflow, no.

3    BY MR. HUDIS:

4       Q.  Was the PDF file of the 1999 standards that

5    you created ever converted from PDF to any other

6    format before posting to the Internet?

7           MR. BECKER:  Objection.  Form.

8           THE WITNESS:  I don't think so.

9    BY MR. HUDIS:

10      Q.  So the 1999 standards that you scanned and

11   creed a PDF file, was it ever converted to JPEG?

12          MR. BECKER:  Objection.  Form.

13          THE WITNESS:  I'm not sure what that means.

14   BY MR. HUDIS:

15      Q.  Was it converted from PDF format to a JPEG

16   format?

17          MR. BECKER:  Same objection.

18          THE WITNESS:  I don't think that would make

19   any sense on a document like that.  You'd end up

20   with, you know, a couple hundred JPEG files.

21          No.  I certainly wouldn't have done that.

22   BY MR. HUDIS:

23      Q.  Okay.  Did you convert it to SBG format?

24      A.  No.  That wouldn't make any sense at all.

25      Q.  And would you have any -- would you have

Page 269

1    had any reason to convert the PDF file of the 1999

2    standards to a MathML format?

3              MR. BECKER:  Objection.  Form.

4              THE WITNESS:  I don't -- well, first of

5    all, MathML is embedded in an HTML file.

6              And second of all, at least to the best of

7    my recollection, I don't think there's any

8    mathematical formulas in the standards at issue.

9    BY MR. HUDIS:

10       Q.  So that brings me to my next question.

11              Was the PDF file that you created from the

12    1999 standards ever converted to HTML format?

13              MR. BECKER:  Objection.  Form.

14              THE WITNESS:  No, we didn't do that.

15    BY MR. HUDIS:

16       Q.  Was the PDF file of the 1999 standards that

17    you created ever converted from PDF to a format

18    making the standards accessible to the visually

19    impaired?

20              MR. BECKER:  Objection.  Form.  Objection.

21    Competence; lacks foundation and assumes facts not

22    in evidence.

23              THE WITNESS:  The OCR procedure does, in

24    fact, make the document accessible to the visually

25    impaired.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 270

1   BY MR. HUDIS:

2       Q.  In what way?

3       A.  A screen reader is able to read the

4   underlying text, granted with potential OCR errors,

5   but the vast majority of the text is accessible to

6   those that are visually impaired.

7       Q.  Are you familiar with the format,

8   refreshable Braille?

9       A.  No, I'm not.

10      Q.  Did you convert the PDF file of the 1999

11  standards that you made to refreshable Braille

12  format?

13      A.  We don't do that.  We convert to HTML.

14      Q.  Did -- and you didn't convert --

15      A.  So no.  No is the answer.

16      Q.  All right.  And you didn't convert the PDF

17  file to HTML either?

18      A.  This particular standard, no, we did not.

19      Q.  Okay.  And did you convert the PDF file

20  that you created from the 1999 standards to large

21  print?

22          MR. BECKER:  Objection.  Form.

23          THE WITNESS:  It is an unencumbered PDF,

24  and so a viewer can, in fact, magnify the text that

25  is there.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1          So in that sense, large print, we did not

2     retype the documents into a large print edition.

3     BY MR. HUDIS:

4        Q.  Mr. Malamud, do you have any materials in

5     your -- in Public.Resource's possession documenting

6     the process you went through of disassembling the

7     paper version of the 1999 standards, scanning them,

8     processing them and posting them to the Internet?

9          MR. BECKER:  Objection.  Compound.

10          THE WITNESS:  No, there's no intermediate

11     process.  That's a book and then it gets scanned.

12          THE REPORTER:  Did you say "there's no

13     intermediate product"?

14          THE WITNESS:  Intermediate process.

15     BY MR. HUDIS:

16        Q.  Mr. Malamud, once you converted the 1999

17     standards from paper to the PDF format, what did

18     you do with the contents of the file?

19        A.  I posted the file to Law.Resource.Org and

20     to the Internet Archive.

21        Q.  Mr. Malamud, could you please return your

22     attention to Exhibit 29, interrogatory answer

23     number 2.

24        A.  Okay.

25        Q.  Does interrogatory answer number 2

1    accurately state when and where you posted the 1999

2    standards to the Internet?

3        A.  It does.

4        Q.  And what was the date that you posted the

5    standards to the Internet?

6            MR. BECKER:  Objection.  Form.

7            THE WITNESS:  As our interrogatory says,

8    July 11, 2012 on Law.Resource.Org and ...

9    BY MR. HUDIS:

10       Q.  All right.  And --

11       A.  Yeah.

12       Q.  And as you said, you posted the standards

13   to Law.Resource.Org, and you also posted the

14   standards to the Internet Archive; correct?

15       A.  That is correct.

16       Q.  Mr. Malamud, what is the name of the

17   Public.Resource web server to which you saved the

18   file containing the contents of the 1999 standards?

19       A.  Law.Resource.Org.

20       Q.  That's the name of the server?

21       A.  Yes.

22           MR. BECKER:  Please give me time to object.

23           MR. HUDIS:  I'm sorry.

24           THE WITNESS:  That was my fault.

25           MR. HUDIS:  I don't want to be rude,

Carl Malamud                                                      May 12, 2015
San Francisco, CA

Page 273

1    Counsel, seriously.  Okay.

2    BY MR. HUDIS:

3        Q.  Is the file containing the 1999 standards

4    still saved on that web server?

5            MR. BECKER:  Objection.  Vague and

6    ambiguous; assumes facts not in evidence.

7            THE WITNESS:  It is not in the document

8    tree of the web server, no.

9    BY MR. HUDIS:

10       Q.  Do you still have that file still saved

11   somewhere within Public.Resource's computer

12   systems?

13       A.  Yes, I do.

14       Q.  Where?

15       A.  One copy on my desktop.  One copy in the

16   not published directory.  I don't know what the

17   exact name of it is.  Someplace on our server, but

18   it's a private area that's not accessible to -- to

19   anybody but myself and our systems administrator.

20       Q.  Mr. Malamud, does Public.Resource have any

21   logs from its web servers documenting the date on

22   which the 1999 standards were posted to

23   Public.Resource's website?

24           MR. BECKER:  Objection.  Vague and

25   ambiguous.  Objection.  Lacks foundation.  And

1  assumes facts not in evidence.

2       THE WITNESS:  There's no logs, but there

3  was a file creation date on the file.

4  BY MR. HUDIS:

5    Q.  Has any documentation noting the file

6  creation date ever been produced to us?

7    A.  I don't know.

8       MR. HUDIS:  Counsel, if that document has

9  not been provided to us, it should be provided to

10 us now.

11      THE WITNESS:  So the file creation date was

12 the date that the standard was posted.  And when at

13 your request we removed that standard and replaced

14 it with a stub, that's going to be the new creation

15 date.  So I don't believe there's going to be a

16 record.

17 BY MR. HUDIS:

18   Q.  What about the old creation date when the

19 original standards file was -- was posted to your

20 web server?

21   A.  I moved it to a different area.  I mean,

22 you can make the request and we'll go look and see

23 if that's there, but it's --

24   Q.  Thank you, Mr. Malamud, I appreciate that.

25      Did you post the entirety of the 1999

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1    standards to Public.Resource's website?

2       A.  Yes.

3       Q.  Mr. Malamud, as it pertains to the Internet

4    Archive, what is a collection?

5           MR. BECKER:  Objection.  Asked and

6    answered.

7           THE WITNESS:  A collection is a set of

8    items that often have a common theme.

9    BY MR. HUDIS:

10      Q.  And you said you posted the 1999 standards

11   to Internet Archive's website; correct?

12      A.  That is correct.

13      Q.  And did you post the entirety of the 1999

14   standards to Internet Archive's website?

15      A.  I did.

16      Q.  Under which collection at the Internet

17   Archive did you post the 1999 standards?

18          MR. BECKER:  Objection.  Form.

19          THE WITNESS:  The current name of that

20   collection is Codes of the World.

21   BY MR. HUDIS:

22      Q.  How did you choose this particular

23   collection to which to post the 1999 standards?

24      A.  It's the --

25          MR. BECKER:  Objection.  Assumes facts not

Page 276

1    in evidence.

2           THE WITNESS:  It's the collection I created

3    to hold the standards incorporated by reference.

4    BY MR. HUDIS:

5        Q.  All right.  So you created the Codes of the

6    World collection on Internet Archive's website?

7        A.  I did.

8        Q.  Mr. Malamud, I show you what was previously

9    marked at Internet Archive's deposition in this

10   case as Butler Exhibit 6.

11          Do you see that?

12       A.  I do.  Let me correct a misstatement.  It

13   wasn't called Codes of the World.  It was called

14   Global Public Safety Codes is the name of the

15   collection.

16       Q.  And what types of materials did you post to

17   the Global Public Safety Codes collection on

18   Internet Archive?

19       A.  Standards incorporated by reference in the

20   law.

21       Q.  Do you recognize Butler Exhibit 6?

22       A.  This is a document you created?

23       Q.  It's a document we printed from the

24   Internet Archive.

25       A.  This appears to be a series of screen dumps

Page 277

1    from that item in which you are paging through the

2    standards at issue, is what this appears to be.

3        Q.  That's exactly correct.  And you just saved

4    me about five minutes of explanation.

5        A.  Oh, sorry about that.

6        Q.  That's fine.  Thank you very much,

7    Mr. Malamud.

8            What is the web tool, if you know, that

9    creates the ability for a user to turn the pages of

10   the 1999 standards like a book?

11           MR. BECKER:  Objection.  Vague and

12   ambiguous; confusing.

13           THE WITNESS:  I have heard it called book

14   reader, but I don't know the details of what the

15   code is or how it's embedded or anything of that

16   sort.

17   BY MR. HUDIS:

18       Q.  So you've heard it referred to as a book

19   reader application?

20       A.  Yes.

21       Q.  All right.  Have you ever heard of a DjVu

22   Reader?

23       A.  Yes, I have.

24       Q.  And what -- what is its function, to the

25   best of your knowledge?

Carl Malamud                                                    May 12, 2015
San Francisco, CA

 1      A.   DjVu is another format for creating

 2  documents, and a DjVu Reader is one that enables

 3  one to page through a document in a DjVu format.

 4      Q.   When you posted the 1999 standards --

 5  skip -- strike that.

 6           Looking at Exhibit Butler 6, does this look

 7  like the '99 -- 1999 standards --

 8           MR. BECKER:  Objection.  Form.

 9           MR. HUDIS:  I didn't finish.

10  BY MR. HUDIS:

11      Q.   -- were presented in page-turning format

12  using either book reader or DjVu Reader?

13           MR. BECKER:  Same -- same objection.

14           THE WITNESS:  Yeah, if this is the standard

15  Internet Archive screen, this is a PDF file that is

16  being used for the -- the page turning capability.

17  BY MR. HUDIS:

18      Q.   Now I'll continue with my next question.

19           When you posted the 1999 standards to the

20  Internet Archive website, did you input the

21  following information to go with the file?  And

22  I'll take them one at a time.  Author?

23      A.   I did.  That's actually a standard Internet

24  Archive field that I believe is required.

25      Q.   And did you input that information?

Carl Malamud                                                      May 12, 2015
San Francisco, CA

Page 279

1      A.  I did in the sense of the API call that

2   created this -- this item.

3      Q.  The API call is?

4      A.  API is application programming interface,

5   and it is a mechanism to write a command script

6   that talks to a remote system and creates an item,

7   in this case at the Internet Archive.

8      Q.  So when you use the API call to post the

9   1999 standards to the Internet Archive website, did

10  you input the information under author?

11         MR. BECKER:  Objection.  Form.

12         THE WITNESS:  Yes, although I believe in

13  the API call, it's called creator.  And the

14  Internet Archive images it as author.

15  BY MR. HUDIS:

16     Q.  And did you input the language for subject?

17     A.  I did.

18     Q.  Did you input the language for language?

19     A.  Yes.

20     Q.  Did you input the language for collection?

21     A.  I specified which collection this item

22  would be, and this field here is automatically

23  generated, I believe, by the Internet Archive.

24     Q.  Now, if you would please turn to the next

25  page of Exhibit Butler 6.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 280

1           Did you input the information for

2    identifier?

3        A.  Yes, I specified the identifier.

4        Q.  Did you input the information for the

5    credits?

6        A.  The phrase uploaded by Public.Resource.Org,

7    yes, I did.

8        Q.  Did you input the information for license

9    URL?

10       A.  Yes, I did.

11       Q.  And what was the purpose of you inputting

12   the URL for CreativeCommons.org?

13           MR. BECKER:  Objection.  Form.

14           THE WITNESS:  Any specification of

15   providence on the Internet Archive uses the

16   Creative Commons mechanism.

17   BY MR. HUDIS:

18       Q.  And what is the significance of using the

19   Creative Commons mechanism?

20           MR. BECKER:  Objection.  Vague and

21   ambiguous.

22           THE WITNESS:  In this case it's a Creative

23   Commons CC0 license.

24   BY MR. HUDIS:

25       Q.  What is a Creative Commons 0 license?

Carl Malamud                                                        May 12, 2015
San Francisco, CA

1      A.  CC.

2          MR. BECKER:  Objection.  Vague and

3  ambiguous; may call for a legal conclusion.

4          THE WITNESS:  CC0, again, I'm not a lawyer,

5  is no rights asserted.  The creator of this

6  identifier is not asserting any rights over this

7  item.

8  BY MR. HUDIS:

9      Q.  And that would have been you?

10     A.  That's correct.

11     Q.  And did you insert the language for media

12  type?

13     A.  Yes, I specified in the API call that this

14  was a object of type text.

15     Q.  And did you insert the information for

16  identifier access?

17     A.  That's automatically generated based on the

18  name of the identifier.

19     Q.  And what is identifier ark?

20     A.  I have no idea.

21     Q.  Did you insert that information for

22  identifier ark?

23     A.  No, I don't know what that is.

24     Q.  In what format did you post the 1999

25  standards to the Internet Archive website?

Carl Malamud                                                     May 12, 2015
San Francisco, CA

Page 282

```
1            MR. BECKER:  Objection.  Form.

2            THE WITNESS:   A PDF document.

3    BY MR. HUDIS:

4       Q.  Did you post the 1999 standards to the

5    Internet Archive website in any other format?

6       A.  The API call that created that item ID

7    uploaded a PDF file.

8       Q.  When Public.Resource posts standards

9    incorporated by reference by a governmental agency

10   to one of its websites, is it Public.Resource's

11   policy to always post the same standard to a

12   collection on the Internet Archive website?

13           MR. BECKER:  Objection.  Vague and

14   ambiguous; may assume facts not in evidence.

15           THE WITNESS:  Not always, but it's a

16   general practice.

17   BY MR. HUDIS:

18       Q.  Turning back to Exhibit Butler 6.  Please

19   turn to the first page, Mr. Malamud.

20       A.  Okay.

21       Q.  And I'd like you to look on the left-hand

22   side of the page.  I'd like to know what the

23   following entries mean, if you know.

24           PDF 4.2 M?

25       A.  Where does it say that?
```

Page 283

1     Q.  To the very --

2     A.  Oh, I see.  I see what you're talking

3  about.

4     Q.  All right.  What does the entry PDF 14.2 M

5  mean?

6     A.  14.2 M is 14.2 megabytes.

7         And PDF is the item in PDF format.  In this

8  case it's the one that I uploaded.

9     Q.  And then the next entry is EPUB 335.4 K.

10  What does that entry mean?

11    A.  It is the same item in EPUB format, which

12  is an e-book format.

13    Q.  And what does the next entry mean here,

14  full text 6.86. -- I'll start again.  68 -- full

15  text 686.0 K.  What does that mean?

16        MR. BECKER:  Objection for

17  mischaracterizing the document.

18        THE WITNESS:  That file is 686 kilobytes in

19  size.  And the full text is derived from an OCR

20  process that the Internet Archive conducts on all

21  text items.

22  BY MR. HUDIS:

23    Q.  And the next entry I believe is a shorthand

24  for DjVu.  Do you understand that?

25    A.  I do.

Carl Malamud                                          May 12, 2015
San Francisco, CA

1          MR. BECKER:  Objection.  Form.

2    BY MR. HUDIS:

3        Q.  And so the next entry DjVu 8.2 M, what does

4    that mean?

5        A.  It's the item in DjVu format 8.2 megabytes.

6        Q.  And then what does -- what does it mean

7    when it says, "All files HTTPS"?

8        A.  By clicking on that link, you can see all

9    the files in that item, such as the PDF file, the

10   EPUB file, but also a metadata file, for example.

11       Q.  Besides Law.Resource.Org and Internet

12   Archive, did you post the 1999 standards to any

13   other website?

14       A.  I did not.

15       Q.  Mr. Malamud, in your opinion what value did

16   Public.Resource add to the 1999 standards by

17   disassembling the paper version, scanning it,

18   processing it, as you described in interrogatory

19   answer number 3, and posting the file to the

20   Internet?

21          MR. BECKER:  Objection as compound -- the

22   question is compound; may misstate prior testimony;

23   vague and ambiguous.

24          THE WITNESS:  The value we provided is to

25   make a document that was incorporated by reference

Carl Malamud                                                          May 12, 2015
                            San Francisco, CA

Page 285

1    under the Code of Federal Regulations available on

2    the Internet for people to read.

3    BY MR. HUDIS:

4        Q.  For free?

5            MR. BECKER:  Also object as argumentative

6    to that last question.

7    BY MR. HUDIS:

8        Q.  For free?

9        A.  We never charge for content.

10       Q.  Mr. Malamud, did Public.Resource anticipate

11   incurring legal liability for posting the 1999

12   standards on the Internet?

13           MR. BECKER:  Objection.  I will instruct

14   the witness not to answer as to any attorney-client

15   privileged communications.  And moreover, object to

16   any legal conclusions.

17           THE WITNESS:  We did not.

18   BY MR. HUDIS:

19       Q.  Mr. Malamud, you scanned and posted the

20   1999 standards to the -- to the Internet, did you

21   consult with educational or psychological

22   professionals?

23           MR. BECKER:  Objection as vague and

24   ambiguous; argumentative; potentially objection

25   towards competence.

Carl Malamud                                                    May 12, 2015
                          San Francisco, CA

Page 286

1            THE WITNESS:  No.

2    BY MR. HUDIS:

3       Q.  Before you scanned and posted the 1999

4    standards to the Internet, did you check the

5    records of the U.S. copyright Office to determine

6    whether the 1999 standards were registered?

7            MR. BECKER:  Objection.  Calls for -- it

8    may call for a legal conclusion.  Objection as to

9    being potentially misleading.  And objection as to

10   competence, and argumentative and lacks foundation.

11           THE WITNESS:  I did not.

12   BY MR. HUDIS:

13      Q.  Before you scanned and posted the 1999

14   standards to the Internet, did you consult with

15   counsel to determine whether the scanning and

16   posting of this work to the Internet would not be a

17   violation of U.S. copyright law?

18           MR. BECKER:  Objection.  I will instruct

19   the witness not to provide any information about

20   privileged communications between the witness and

21   counsel.

22           THE WITNESS:  I'm not going to discuss my

23   discussions with counsel.

24   BY MR. HUDIS:

25      Q.  Before you scanned and posted the 1999

Page 287

1    standards on the Internet, did you obtain

2    permission from either AERA, APA or NCME to do so?

3           MR. BECKER:  Objection.  Argumentative;

4    assumes facts not in evidence; may call for a legal

5    conclusion.

6           THE WITNESS:  I did not.

7           (PLAINTIFFS' EXHIBITS 35A-35B WERE MARKED.)

8    BY MR. HUDIS:

9       Q.  Mr. Malamud, do you recall giving a speech

10   at MIT entitled Yo! Your Honor in April of this

11   year?

12      A.  I do.

13      Q.  And who co-hosted your speech?

14          MR. BECKER:  Objection.  Assumes facts not

15   in evidence.

16          THE WITNESS:  It was the MIT Center for

17   Civic Media and the Laboratory for Social Machines.

18   BY MR. HUDIS:

19      Q.  Mr. Malamud, that speech was -- was made

20   available on the Internet.  We had it transcribed.

21   What I gave you was the text of the speech, and the

22   CD is the download of the audio and video, just so

23   you can -- you and your counsel can assure yourself

24   that the transcription was accurate.  I only have a

25   few questions for it.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 288

1          MR. BECKER:  And I'll just state an

2     objection that we are unable at this moment to view

3     the contents of this CD.  So we have no knowledge

4     as to what is actually on that CD, nor does the

5     deponent.

6          And also state an objection to the -- to

7     the extent that this document 35-A has been

8     transcribed by counsel for plaintiffs, and at

9     present we do not know whether it is accurate or

10    not.

11    BY MR. HUDIS:

12      Q.  Mr. Malamud, on Exhibit 35-A if you could

13    turn to page AERA -- well, let me just identify the

14    document.

15          Exhibit 35-A bears production numbers

16    AERA_APA_NCME 32036 through 32074.

17          Mr. Malamud, could you please turn to

18    production page 32039.

19      A.  Okay.  I want to note, however, that there

20    appears to be a large number of transcription

21    errors, but I'm on page 32039.

22      Q.  Thank you, Mr. Malamud.

23          In the middle of that page it says, "So we

24    did two things that were fairly significant in 2007

25    and 2008.  I began posting all the building codes

1    for the country because these are the law.  These

2    are not advisory codes.  These are incorporated in

3    the law in all our states.  Things like the

4    national electric code, and I began posting those

5    and nothing happened."

6          What did you expect to happen?

7          MR. BECKER:  Objection again to the fact

8    that the witness has noted that there are

9    transcription errors in this document.  The

10   document may not accurately reflect what is

11   purported to be Mr. Malamud's April 7th speech.

12   And objection to the extent that this document

13   otherwise speaks for itself, and vague and

14   ambiguous; argumentative.

15         THE WITNESS:  If you look at the statement

16   that you read it says, "I began posting these and

17   nothing happened."  Nobody sent me take-down

18   notices, and there are copyright assertions on

19   these documents.  I dealt with that a little later

20   in the speech, if I remember right.

21         So nothing happened.  Nobody sent me

22   take-down notices.  And just as importantly, nobody

23   picked up the phone and called me up and said,

24   "Let's talk about these building codes."

25   BY MR. HUDIS:

Page 290

1      Q.  So continuing that same answer here as you

2   were talking with a moderator, going down lower on

3   the page it says, "And so I did that for a few

4   years and nothing much happened.  I began posting

5   all the safety standards that are required by law

6   at the federal level and the Code of Federal

7   Regulations.  And then the shit kind of hit the fan

8   on that one.  We got sued in two district court

9   cases by six plaintiffs, and we're currently in

10  court.  It's an intense legal battle."

11          Were you speaking of the AERA lawsuit and

12  the ASTM lawsuit?

13      A.  I was.

14      Q.  If you could turn to page -- production

15  page 32066 in Exhibit 35-A.

16      A.  Okay.

17      Q.  At the top of the -- at the top of the page

18  it says, "So to me it's about education.  But also

19  about justice and democracy and, you know, those

20  kinds of little things, because I think that's an

21  important thing in the United States.  We are

22  overly lawyered, and one of the reasons is you have

23  to be part of the guild in order to access the

24  material, and I've been doing this issue for a

25  while.  There are so many people that are

 1   non-lawyers that are intensely interested in the

 2   operation of our system of justice, and I think

 3   those people should have the same access as those

 4   that are actually practicing inside."

 5          Do you see that?

 6   A.  I do.

 7   Q.  What did you mean by "part of the guild"?

 8          MR. BECKER:  Objection.  Same objections

 9   concerning the authenticity of this document, as

10   well as the document speaking for itself; vague.

11          THE WITNESS:  I was discussing the PACER

12   system, first of all.  Not the standards at issue

13   or incorporation by reference.

14          I meant that there is a feeling within the

15   legal profession that the only people that need to

16   access the PACER system are those in the legal

17   profession, and I believe that feeling is misguided

18   and wrong.

19   BY MR. HUDIS:

20   Q.  Let's then return to the 1999 standards.

21          Do you know whether AERA, APA or NCME

22   restrict access to the 1999 standards?

23          MR. BECKER:  Objection.  To the extent that

24   any of Mr. Malamud's knowledge comes from

25   discussion with counsel, I will instruct him not to

Page 292

1    answer, as to any knowledge that he has that has

2    come from counsel.

3            Objection to the extent that this may call

4    for a legal conclusion.  Objection to the extent

5    that it's argumentative and vague and ambiguous.

6            THE WITNESS:  If by "restrict" you mean

7    impose conditions on people attempting to make

8    documents incorporated by reference in the law,

9    yes, I believe they do restrict.

10   BY MR. HUDIS:

11       Q.  In what way?

12       A.  You're suing me for having posted this

13   document that was incorporated by reference in the

14   law.  I think that's evidence of an attempt to

15   restrict that process.

16       Q.  Mr. Malamud, if the three plaintiffs that

17   have brought this lawsuit charged 50 or $60 for a

18   printed copy of the 1999 standards, do you believe

19   that is a restriction to the access of the 1999

20   standards by the public?

21           MR. BECKER:  Objection.  Misleading.

22   Objection.  Hypothetical; calls for speculation;

23   lacks foundation and assumes facts not in evidence

24   and argumentative.

25           THE WITNESS:  The issue is not whether the

Page 293

1    plaintiffs are charging $60 for purchasing a

2    printed copy.  The issue is whether the plaintiffs

3    are restricting the ability of Public.Resource to

4    make documents incorporated by reference into the

5    Code of Federal Regulations available to citizens

6    on the Internet.

7    BY MR. HUDIS:

8        Q.  Do you believe that charging $60 a copy for

9    the 1999 standards is a restriction on the public's

10   access to the 1999 standards?

11           MR. BECKER:  Objection.  Asked and

12   answered.  Objection.  Argumentative; calls for

13   speculation; assumes facts not in evidence.

14           THE WITNESS:  Charging $60 for a document

15   and only making it available on that basis,

16   certainly restricts the ability of citizens to

17   easily find and read that particular portion of the

18   Code of Federal Regulations.

19           (PLAINTIFFS' EXHIBIT 36 WAS MARKED.)

20   BY MR. HUDIS:

21       Q.  Mr. Malamud, I show you what's been marked

22   as Exhibit 36, bearing production numbers PROAERA

23   830 through PROAERA 837.

24           Do you recognize the document?

25       A.  I do.  It appears to be a copy of table 12

Page 294

1    of the 12 tables.

2        Q.  What are the 12 tables?

3        A.  It is the directory, if you will, on

4    Law.Resource.Org to standards incorporated by

5    reference.

6        Q.  Do you have any reason to doubt the

7    authenticity of Exhibit 36?

8        A.  I do not.

9            MR. HUDIS:  Counsel, can you stipulate that

10   Exhibit 36 is a business record of Public.Resource?

11           MR. BRIDGES:  Well, I will respond to this.

12   You're saying Exhibit 36 as an -- as a directory is

13   a business record?  I'm not -- I'm not clear what

14   the stipulation is that you're asking for.

15           MR. HUDIS:  Yeah, so I just want to know,

16   this is a document that Mr. Malamud said he's

17   created during his work at Public.Resource.  He's

18   identified the document as authentic.  And I would

19   like to know if you can stipulate that Exhibit 36

20   is a business record of Public.Resource.

21           MR. BRIDGES:  What -- what do you mean by

22   "business record" in this context?

23           MR. HUDIS:  A business record under Federal

24   Rules of Evidence 8036.

25           MR. BRIDGES:  Let me look at that rule.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1        I don't think we're going to stipulate to

2   that.  I don't think this is a record of a

3   regularly conducted activity.

4        MR. HUDIS:  All right.  Let me just ask

5   Mr. Malamud the questions.

6   BY MR. HUDIS:

7      Q.  Mr. Malamud, did you create Exhibit 36?

8      A.  I did.

9      Q.  Okay.  And did -- from what information did

10  you create Exhibit 36?

11     A.  It is a record of correspondence with --

12  related to the Law.Resource.Org documents.

13     Q.  And has this document been kept in the

14  regularly -- in the regular course of

15  Public.Resource's business?

16       MR. BECKER:  Objection.  Ambiguous;

17  possibly argumentative.

18       THE WITNESS:  Yeah, I don't know regularly

19  kept.  It was created at the end of December 2012,

20  and I have updated it on occasion.

21  BY MR. HUDIS:

22     Q.  And making records of the type shown in

23  Exhibit 36 is a regular practice of

24  Public.Resource's business?

25       MR. BECKER:  Objection.  Vague and

Page 296

1    ambiguous; argumentative; lacks foundation.

2         THE WITNESS:  Yeah, I don't know about a

3    regular practice, but in the case of letters

4    received and sent relating to Law.Resource.Org,

5    this is a place where I've posted some of that

6    correspondence.

7    BY MR. HUDIS:

8         Q.  As Exhibit 36 was produced to us by your

9    counsel, we could not tell whether these columns

10   had any particular headings because it's all black.

11        Mr. Malamud, are there column heading

12   designations to this table of Exhibit 36?

13        A.  I don't know.  I would have to check.  It

14   certainly doesn't appear to be so, however, from

15   the formatting.  You'll notice that the text in the

16   column above that is in white, right.  When there's

17   a dark header.  So I don't know.  I mean we can go

18   check.  It's online.

19        Q.  Let's take a break.  Can you check that

20   online?

21        A.  Well, I can't.  I don't have a computer.

22   But you can if you'd like.  Do you want me to give

23   you the URL?

24        Q.  We'll check.

25        A.  Okay.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1          THE VIDEOGRAPHER:  Take a break?

2          MR. HUDIS:  Yes.  Just so she can get

3     there.

4          THE WITNESS:  Sure.

5          MR. BECKER:  Off the record.

6          THE VIDEOGRAPHER:  The time is 5:36 and we

7     are off the record.

8          (Recess taken.)

9          THE VIDEOGRAPHER:  The time is 5:45, and we

10    are back on the record.

11    BY MR. HUDIS:

12       Q.  Mr. Malamud, while we were on a break, we

13    checked the color version of Exhibit 36 on

14    Public.Resource's website, and could you please

15    tell us for the record what the column headings are

16    for the four columns of Exhibit 36?

17       A.  The four columns are "Date," "RFC,"

18    "Initiator" and "Description."

19       Q.  What does RFC refer to?

20       A.  Request for comment.

21       Q.  And that was -- and so the second column

22    labeled RFC, that is a request for comment from

23    whom to whom?

24       A.  RFC is a term used in the Internet

25    Engineering Task Force for numbering documents.

Page 298

 1    And so it's simply a sequential numbering

 2    mechanism.

 3        Q.  So other than the sequential numbering, RFC

 4    has no other significance?

 5        A.  (Witness shaking head from side to side.)

 6            MR. BRIDGES:  Objection.  Lacks foundation;

 7    vague and ambiguous.

 8            THE WITNESS:  No, it's just a term I used.

 9    BY MR. HUDIS:

10        Q.  Okay.  And the column labeled initiator,

11    what did you mean by initiator?

12        A.  The organization that authored the

13    correspondence or other information that is listed

14    in the next column.

15        Q.  And what information did you put in the

16    description column?

17        A.  Well, it depends.  If it was a -- a grayed

18    out section, it's a section divider.  And then the

19    other components are individual documents.

20        Q.  Overall, what did you collect in Exhibit

21    36?

22            MR. BRIDGES:  Objection.  Lacks foundation;

23    vague and ambiguous; argumentative.

24            THE WITNESS:  Two things.  One are blog

25    posts that are relevant to the Law.Resource.Org

Page 299

1    activities.

2    BY MR. HUDIS:

3        Q.  And you say there was a second item?

4        A.  Letters received from institutions having

5    to do with the Law.Resource.Org activities.

6        Q.  Were some of these letters that were

7    received from institutions complaining about

8    Public.Resource posting standards incorporated by

9    reference on to its website?

10           MR. BRIDGES:  Objection.  Compound;

11   argumentative; vague and ambiguous.

12           THE WITNESS:  Yes.

13   BY MR. HUDIS:

14       Q.  And could you tell me what information is

15   provided in the row on page PROAERA 832 at the

16   bottom bearing the date 12/16/2013?

17       A.  That was the take-down notice from AERA

18   regarding the standards at issue.

19       Q.  The 1999 standards?

20       A.  That's correct.

21       Q.  Mr. Malamud, at some time after you posted

22   the 1999 standards to the Internet, did you remove

23   them from public view?

24           MR. BRIDGES:  Objection.  Lacks foundation;

25   vague and ambiguous.

1          THE WITNESS:  Yes.

2    BY MR. HUDIS:

3      Q.  When did you do this?

4          MR. BRIDGES:  Same objection.

5          THE WITNESS:  I believe that would be June

6    2014.  That date is specified in the interrogatory

7    answers.

8    BY MR. HUDIS:

9      Q.  I was just going to direct you there.

10          So if you could go back to Exhibit 29.

11    Interrogatory answer number 2, page 5.

12      A.  I'm there.

13      Q.  All right.  And so June 10, 2014 is when

14    you removed the 1999 standards from public view

15    from Law.Resource.Org and from the Internet

16    Archive?

17          MR. BRIDGES:  Objection.  Compound; lacks

18    foundation and all the other objections I gave to

19    the earlier question along this line.

20          THE WITNESS:  That's correct.

21    BY MR. HUDIS:

22      Q.  What, if anything, did you put in place of

23    the content of the 1999 standards on

24    Public.Resource's website once the standards were

25    removed?

Carl Malamud                                          May 12, 2015
                    San Francisco, CA

1          MR. BRIDGES:  Objection.  Vague and

2     ambiguous; lacks foundation.

3          THE WITNESS:  I put what I call a stub

4     document, with the cover sheet and a single page

5     explaining the document had been removed from view.

6          (PLAINTIFFS' EXHIBIT 37 WAS MARKED.)

7     BY MR. HUDIS:

8     Q.  Mr. Malamud, I show you what's been marked

9     as Exhibit 37 bearing production numbers PROAERA

10    822 through PROAERA 823.

11         Is this the stub document that you were

12    referring to?

13    A.  It is.

14    Q.  Do you have any reason to doubt the

15    authenticity of this document?

16    A.  I do not.

17         MR. BRIDGES:  Objection.  Vague and

18    ambiguous; lacks foundation.

19         THE WITNESS:  I do not.

20    BY MR. HUDIS:

21    Q.  What was the purpose of posting this single

22    page where the content of the 1999 standards

23    previously was on Public.Resource's website?

24         MR. BRIDGES:  I'm sorry.  I -- it's

25    misleading; confusing question.  I'll ask the court

Page 302

1    reporter to reread it.  You may have misspoken.

2          MR. HUDIS:  No, it's mistranscribed.  I'm

3    going to ask it again, Counsel.  Thank you.

4          MR. BRIDGES:  I heard it the same way the

5    transcription.

6          MR. HUDIS:  Okay.

7    BY MR. HUDIS:

8      Q.  What was the purpose of posting this single

9    page where the content of the 1999 standards

10   previously was on the Public.Resource's website?

11         MR. BRIDGES:  Objection.  Vague and

12   ambiguous; lacks foundation.

13         THE WITNESS:  So anybody accessing that URL

14   knew that the document had been removed and it was

15   not a technical error.

16   BY MR. HUDIS:

17     Q.  When did you post this stub page to

18   Public.Resource's website?

19     A.  June 10th, 2014.

20     Q.  And on page 823 why did you use the word

21   "temporarily"?

22         MR. BRIDGES:  Objection.  Argumentative.

23         THE WITNESS:  Because it's pending the

24   resolution of this litigation.

25         MR. HUDIS:  Turning back to Exhibit 29,

Page 303

1    interrogatory number 2, the answer on page 5 of

2    Exhibit 29.

3         So June 10th, 2014 was the date that you

4    removed the 1999 standards from public view on

5    Public.Resource.Org's website and on Internet

6    Archive's website?

7         MR. BRIDGES:  I'm sorry, are you --

8    objection.  Are you asking him if that's what the

9    interrogatory says?

10        MR. HUDIS:  No, I'm asking him the date of

11   removal.

12        MR. BRIDGES:  I think it's asked and

13   answered.

14        THE WITNESS:  June 10th, 2014.  It's in the

15   interrogatory.

16   BY MR. HUDIS:

17     Q.  Mr. Malamud, do you know what a make-dark

18   command is?

19        MR. BRIDGES:  Objection.  Lacks foundation;

20   vague and ambiguous.

21        THE WITNESS:  Yes, although you need to

22   place that in context.  I mean, I have a general

23   impression of what you mean.

24   BY MR. HUDIS:

25     Q.  All right.  What is a make -- what is your

Page 304

1    understanding of a make-dark command?

2            MR. BRIDGES:  Objection.  Lacks foundation.

3            THE WITNESS:  Yeah, do you have a specific

4    instance of -- of that and I'd be happy to --

5    BY MR. HUDIS:

6       Q.  Sure.

7       A.  -- to talk about it.

8       Q.  Did you remove the 1999 standards from

9    public view on Internet Archive's website by

10   issuing a make-dark command to their server as a

11   registered user having administrative privileges to

12   do so?

13           MR. BRIDGES:  Objection.  Lacks foundation;

14   vague and ambiguous.

15           THE WITNESS:  I used the item manager, and

16   I pressed the make-dark button on that form.

17   BY MR. HUDIS:

18      Q.  All right.  All right.  And what is the

19   purpose of the make-dark button?

20           MR. BRIDGES:  Objection.  May lack

21   competence.

22           THE WITNESS:  It makes the document

23   inaccessible for public view.

24           (PLAINTIFFS' EXHIBIT 38 WAS MARKED.)

25   BY MR. HUDIS:

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 305

1    Q.  Mr. Malamud, I show you a document that's

2   been marked Exhibit 38 bearing production number

3   PROAERA 824.

4        Do you recognize the document?

5    A.  I do.

6    Q.  What is this document of Exhibit 38?

7    A.  It is e-mail to the Internet Archive

8   informing them that I have made an item go dark.

9    Q.  Do you remember sending this e-mail of

10  Exhibit 38?

11   A.  I do.

12   Q.  And why did you send this e-mail to Alexis

13  Rossi at -- why did you send this e-mail to Alexis

14  Rossi on June 11, 2014?

15   A.  Alexis is responsible for the collections

16  on the Internet Archive.

17   Q.  And Alexis Rossi is an employee of Internet

18  Archive?

19       MR. BRIDGES:  Objection.  May lack

20  competence.

21       THE WITNESS:  She is.

22  BY MR. HUDIS:

23   Q.  And in your e-mail you carbon copy to

24  collections-service@Archive.org.

25       Why did you add this e-mail address as a cc

Carl Malamud                                                      May 12, 2015
San Francisco, CA

1    in your e-mail to Alexis Rossi?

2         A.  Because that's the proper address to inform

3    the Internet Archive about matters pertaining to a

4    collection.

5         Q.  And what do you mean by matters relating to

6    a collection?

7         A.  If you have technical problems with your

8    collection or other issues or problems, that would

9    be the address that you would write to.

10        Q.  And at the end of this e-mail there's a

11   URL.  Do you see that?

12        A.  I do.

13        Q.  And it ends with AERA.standards.1999?

14        A.  I see that.

15        Q.  All right.  Is this the URL where you

16   posted the 1999 standards on Internet Archive's

17   website?

18        A.  It is.

19        Q.  Mr. Malamud, if Public.Resource succeeds in

20   this lawsuit brought by AERA and its co-plaintiffs,

21   will Public.Resource repost the 1999 standards on

22   its website?

23            MR. BRIDGES:  Objection.  Hypothetical.

24            THE WITNESS:  I guess I'd have to read the

25   decision and make my determination based on that.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1    BY MR. HUDIS:

2        Q.  Well, if you're totally successful?

3            MR. BRIDGES:  Again, hypothetical.

4            THE WITNESS:  Our goal is to post all

5    standards incorporated by reference into the Code

6    of Federal Regulations.  So yes.

7    BY MR. HUDIS:

8        Q.  If Public.Resource is successful in this

9    litigation, how easy or difficult would it be for

10   you to repost the 1999 standards on

11   Public.Resource's website?

12           MR. BRIDGES:  Hypothetical; lacks

13   foundation; assumes facts not in evidence; vague

14   and ambiguous; compound.

15           THE WITNESS:  It wouldn't be difficult.

16   BY MR. HUDIS:

17       Q.  If the next version of the Standards on

18   Educational and Psychological Testing, the 2014

19   version, is ever incorporated by reference by a

20   state or federal agency, will you post that version

21   of the standards to the Internet as well?

22           MR. BRIDGES:  Objection.  Hypothetical;

23   compound; vague and ambiguous.

24           THE WITNESS:  I don't know.

25   BY MR. HUDIS:

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1      Q.   How would you make that determination?

2           MR. BRIDGES:   Objection.   May call for

3    speculation; vague and ambiguous; argumentative.

4           THE WITNESS:   I would want to look at the

5    specific nature of the incorporation by reference.

6    I would want to look at that specific standard, and

7    I'd want to make a determination if that was an

8    area that I wanted to continue to invest resources

9    in.  So I don't know.  It would depend on the

10   specifics.

11   BY MR. HUDIS:

12      Q.  If you looked at the 2014 standards and

13   made a determination that it was an area in which

14   you wanted to continue to invest resources, if

15   Public.Resource is successful in this litigation

16   and the 2014 standards are incorporated by

17   reference by a state or federal agency, would you

18   post the 2014 standards to the Internet?

19          MR. BRIDGES:   Entirely hypothetical; lacks

20   foundation; argumentative; vague and ambiguous.

21          THE WITNESS:   So I really don't know about

22   the states.

23          If the federal government did a deliberate

24   and explicit incorporation by reference in what I

25   felt was a substantive rule, right, not an offhand

Page 309

1    thing, then I would certainly consider strongly

2    posting that document.

3    BY MR. HUDIS:

4        Q.   What is -- what distinction do you make

5    between substantive and offhand?

6        A.   I look for an explicit and deliberate

7    incorporation by reference.

8        Q.   If I asked you this before, Mr. Malamud,

9    and certainly your counsel will tell me, I

10   apologize.

11       Even though the 1999 standards have been

12   removed from public view on Public.Resource's

13   website, is the digital file containing the text of

14   the 1999 standards still stored somewhere on

15   Public.Resource's computer systems?

16       MR. BRIDGES:   Objection.  Vague and

17   ambiguous.

18       THE WITNESS:  Yes.

19   BY MR. HUDIS:

20       Q.   Even though the 1999 standards were removed

21   from public view on Internet Archive's website, to

22   the best of your knowledge is the digital file

23   containing the text of the 1999 standards still

24   stored somewhere on Internet Archive's computer

25   systems?

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 310

1      A.  I do not --

2           MR. BRIDGES:  Same objection.  Vague and

3   ambiguous.

4           THE WITNESS:  I don't --

5           MR. BRIDGES:  And lacks foun -- I'm sorry.

6           THE WITNESS:  I'm sorry.

7           MR. BRIDGES:  And maybe competence and may

8   call for speculation.

9           THE WITNESS:  I do not have access to that

10  document.  And so I do not know.

11          (PLAINTIFFS' EXHIBIT 39 WAS MARKED.)

12  BY MR. HUDIS:

13      Q.  Mr. Malamud, I show you what's been marked

14  as Exhibit 39 bearing production number

15  AERA_APA_NCME 5129.

16          Do you recognize this document?

17      A.  I do.

18      Q.  What is this document of Exhibit 39?

19      A.  It is a take-down notice from John S.

20  Neikirk.

21      Q.  I believe he pronounces it Neikirk.

22      A.  I've never met the gentleman.

23      Q.  Do you have any reason to doubt the

24  authenticity of Exhibit 39?

25          MR. BRIDGES:  Objection.  Lacks foundation.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1          THE WITNESS:  I do not.

2    BY MR. HUDIS:

3        Q.  Do you recall receiving this e-mail from

4    Mr. Neikirk?

5        A.  I do.

6        Q.  When you received this e-mail from

7    Mr. Neikirk, do you know with which organization he

8    was affiliated?

9          MR. BRIDGES:  Objection.  You're asking

10   him -- sorry.  Objection.  Competence; may call for

11   speculation; lacks personal knowledge.

12         THE WITNESS:  His signature line said

13   American Educational Research Association.

14   BY MR. HUDIS:

15       Q.  And do you remember receiving this e-mail

16   of Exhibit 39 --

17       A.  I do.

18       Q.  -- from Mr. Neikirk?

19       A.  I received this e-mail, yes.

20       Q.  What did you do in response to

21   Mr. Neikirk's e-mail?

22         MR. BRIDGES:  Objection.  Argumentative;

23   lacks foundation.

24         THE WITNESS:  I sent him a letter a couple

25   days later.

Carl Malamud                                                          May 12, 2015
San Francisco, CA

1    BY MR. HUDIS:

2         Q.  In either December 2013 or January 2014 did

3    you consult with counsel after receiving

4    Mr. Neikirk's e-mail?

5              MR. BRIDGES:  Objection.  That's --

6    contains the -- an implication that the

7    consultation would be regarding the e-mail.

8              Further, the question calls for

9    attorney-client privileged information.  Objection.

10   I instruct the witness not to answer.

11   BY MR. HUDIS:

12        Q.  In either December 2013 or January 2014 did

13   you remove the 1999 standards from public view

14   where you had posted them on the Internet?

15             MR. BRIDGES:  Objection.  Vague and

16   ambiguous; lacks foundation.

17             THE WITNESS:  I did not.

18   BY MR. HUDIS:

19        Q.  Did you reply to Mr. Neikirk's e-mail?

20             MR. BRIDGES:  Objection.  I think that's

21   asked and answered.

22             THE WITNESS:  Yes, I did.

23             MR. BRIDGES:  Vague and ambiguous and

24   argumentative.

25   BY MR. HUDIS:

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1        Q.  Do you remember -- do you remember when you

2   responded to Mr. Neikirk's e-mail of Exhibit 39?

3        A.  I believe it was on December 19th.

4            (PLAINTIFFS' EXHIBIT 40 WAS MARKED.)

5   BY MR. HUDIS:

6        Q.  Mr. Malamud, I show you what has been

7   marked as Exhibit 40 bearing production numbers

8   AERA_APA_NCME 5127 through 5128.

9            Do you recognize Exhibit 40?

10       A.  I do.

11       Q.  Is Exhibit 40 your response to

12  Mr. Neikirk's e-mail of Exhibit 39?

13       A.  It is.

14       Q.  Is this your digital signature at the

15  bottom of the second page of the letter of Exhibit

16  39 on page 5128?

17           MR. BRIDGES:  Objection.  Misformed

18  question; lacks foundation.

19           THE WITNESS:  It is.

20  BY MR. HUDIS:

21       Q.  Did anyone --

22           MR. BRIDGES:  Sorry, I'll ask the witness

23  to listen carefully to the question.  That was a

24  question about Exhibit 39.

25           MR. HUDIS:  Thank you, Counsel.  I

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1    appreciate it.

2    BY MR. HUDIS:

3        Q.   Is this your digital signature at the

4    bottom of the second page of the letter of Exhibit

5    40, page 5128?

6        A.   Yes, it is.

7        Q.   Did anyone help you write this letter of

8    Exhibit 40?

9            MR. BRIDGES:   Objection.   To the extent

10   this calls for an implicit revelation of

11   attorney-client communications, I would object on

12   the grounds that it's privileged, and I would

13   instruct the witness not to answer.   But only to

14   that extent.

15           THE WITNESS:   I'm not going to be able to

16   answer that question.

17   BY MR. HUDIS:

18       Q.   In the first paragraph of Exhibit 40 on the

19   first page, there is a word missing.   I believe it

20   should say, "I am in."   Do you see that?

21       A.   I do.

22       Q.   All right.   So I'm going to read the

23   sentence with the word "in" in it.

24           "Dear Mr. Neikirk, I am in receipt of your

25   communication of December 16 regarding the

Page 315

1   publication of the AERA publication standard for

2   Educational and Psychological Testing," in parens

3   1999, at

4   HTTPS//Law.Resource.Org/pub/US/US/IBR/001/AERA.

5   standards.1999.PDF."

6           "We are responsible for uploading this

7   document.  In addition, you will find this document

8   at HTTPS://archive.org/details/thegov.law.AERA.

9   standards.1999."

10          Do you see that?

11          MR. BRIDGES:  Objection.  Misquotes the

12   letter.

13          THE WITNESS:  I do.

14   BY MR. HUDIS:

15     Q.  Specifically in this first paragraph what

16   did you mean when you used the term "publication"

17   the first time it appears in the sentence?

18          MR. BRIDGES:  Objection to the extent it

19   may imply a legal conclusion or legal expertise or

20   opinion; vague and ambiguous.

21          THE WITNESS:  There's a couple typos in

22   this sentence.  I meant posting.

23   BY MR. HUDIS:

24     Q.  All right.  So when you used the term

25   publication, you meant posting?

Page 316

1      A.  In this sentence, yes.

2      Q.  What did you mean by "We are responsible

3  for uploading this document"?

4      A.  It meant that I was the person that

5  uploaded that document.

6      Q.  To where?  The two URLs in that paragraph?

7      A.  Yes, that's what the --

8          MR. BRIDGES:  Object.

9          THE WITNESS:  Sorry.

10         MR. BRIDGES:  Objection.  Lacks foundation;

11  vague and ambiguous.

12         THE WITNESS:  Yes.

13  BY MR. HUDIS:

14     Q.  If you could on Exhibit 40 please go on

15  page 5127 to the third paragraph.

16     A.  Okay.

17     Q.  And I will read the first sentence.  "While

18  the standards drafted by the American Educational

19  Research Association were entitled to copyright

20  protection when issued, once they were incorporated

21  into regulations, these standards became the law,

22  and thus, have entered the public domain."

23         Do you see that?

24     A.  I do.

25     Q.  What did you mean when you said, "the

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 317

1    standards drafted by the American Educational

2    Research Association were entitled to copyright

3    protection when issued"?

4          MR. BRIDGES:  Objection to the extent it

5    calls for a legal opinion; legal expertise; legal

6    conclusion; vague and ambiguous; lacks foundation.

7          THE WITNESS:  So I'm not a lawyer.  I know

8    one thing.  That the law in the United States has

9    no copyright.  And thus a standard incorporated by

10   reference into the Code of Federal Regulations has

11   no copyright.

12   BY MR. HUDIS:

13     Q.  Mr. Malamud, could you turn to the next

14   page of Exhibit 40.  Page 5128.  And I am directing

15   your attention to the last paragraph of the letter.

16         As you can see by looking at the document

17   in question, a cover sheet has been prepended

18   clearly spelling out the section of the Code of

19   Federal Regulations that has incorporated by

20   reference this document into law.

21         Do you see that?

22     A.  I do.

23     Q.  And referring you back to Exhibit 34, is

24   this the cover sheet to which you were referring in

25   your letter of Exhibit 40?

Carl Malamud                                                          May 12, 2015
San Francisco, CA

1        A.   34?

2        Q.   Yes.

3        A.   Yes, it is.

4        Q.   Mr. Malamud, at the end of your letter of

5   Exhibit 40, did you decline to remove the 1999

6   standards from the websites where you posted the

7   document on the Internet?

8            MR. BRIDGES:  Objection.  Are you asking

9   him if that's what the letter says?

10           MR. HUDIS:  Yes.

11           MR. BRIDGES:  Or are you asking him

12   something -- okay.

13           MR. HUDIS:  No.  Yes.  Yes, I am asking him

14   if that's what the letter says.

15           MR. BRIDGES:  The letter -- objection.  The

16   letter speaks for itself.  The document speaks for

17   itself.

18           THE WITNESS:  The letter says, "We

19   respectfully decline to remove this document."

20   BY MR. HUDIS:

21       Q.   At the end of your letter of Exhibit 40,

22   did you also decline to seek permission from anyone

23   to post the 1999 standards on the Internet?

24           MR. BRIDGES:  Objection.  Argumentative;

25   lacks foundation; vague and ambiguous.

Page 319

1          THE WITNESS:  The letter states, "We

2     respectfully decline to request permission."

3     BY MR. HUDIS:

4          Q.  Mr. Malamud, had Mr. Neikirk sent you his

5     e-mail of Exhibit 39 a year earlier in 2012, would

6     Public.Resource have removed the 1999 standards

7     from where you posted the document on the Internet?

8          MR. BRIDGES:  Objection.  A hypothetical;

9     calls for speculation; vague and ambiguous.

10          THE WITNESS:  So you're asking if the date

11     of his letter was December 19th, 2012, we would

12     have changed our answer?

13     BY MR. HUDIS:

14          Q.  Correct.

15          MR. BRIDGES:  Same objections.

16          THE WITNESS:  No.

17          (PLAINTIFFS' EXHIBIT 41 WAS MARKED.)

18     BY MR. HUDIS:

19          Q.  Mr. Malamud, I show you a document marked

20     Exhibit 41 bearing production number PROAERA 810.

21          Do you recognize the document?

22          A.  I do.

23          Q.  What is this document?

24          A.  It is -- it's an incomplete electronic

25     mail.  So it is a electronic mail from me to

Carl Malamud                                                    May 12, 2015
                          San Francisco, CA

                                                               Page 320

 1    Mr. Butler at the Internet Archive.

 2        Q.  All right.  So Mr. -- to the best of your

 3    knowledge Mr. Butler, Christopher Butler, is an

 4    employee of Internet Archive?

 5        A.  I believe --

 6            MR. BRIDGES:  Objection.  Calls for --

 7    sorry.  Objection.  Lacks competence.

 8            THE WITNESS:  Yes.

 9    BY MR. HUDIS:

10        Q.  And you cc'd Brewster -- how do you

11    pronounce that?

12        A.  Kahle.

13        Q.  Kahle.  And you cc'd Brewster Kahle in your

14    e-mail to Mr. Butler of Exhibit 41?

15        A.  I did.

16        Q.  And who is Brewster Kahle?

17        A.  He is the founder and librarian of the

18    Internet Archive.

19        Q.  What, if anything, was attached to this

20    e-mail of Exhibit 41?

21            MR. BRIDGES:  I instruct the witness not to

22    speculate.  I object to the extent it calls for

23    speculation.

24            THE WITNESS:  The attachments line in the

25    header says AERA.org, and a date.  So this appears

Carl Malamud                                                      May 12, 2015
San Francisco, CA

1    to be the correspondence with Mr. Neikirk.

2    BY MR. HUDIS:

3        Q.  And is that the correspondence of exhibits

4    39 and 40?

5        A.  Based on the file names, I would say yes.

6        Q.  Why did you send this e-mail of Exhibit 41

7    to Mr. Butler at the Internet Archive?

8        A.  Because I keep Mr. Butler informed on any

9    take-down activity, and he keeps me informed on any

10   take-down activity.

11       Q.  What do you mean by take-down activity?

12       A.  A letter invoking the DMCA or otherwise

13   complaining about copyright violations.

14       Q.  At this time in December 2013 did you make

15   the 1999 standards go dark on Internet Archive's

16   website?

17       MR. BRIDGES:  Objection.  Lacks foundation;

18   vague and ambiguous.

19       THE WITNESS:  No, I did not.

20   BY MR. HUDIS:

21       Q.  Why not?

22       MR. BRIDGES:  Objection.  Argumentative;

23   lacks foundation; vague and ambiguous.

24       THE WITNESS:  Because I did not believe

25   there was any copyright violation involved.

Page 322

1   BY MR. HUDIS:

2       Q.  So after you refused to remove the 1999

3   standards from public view on the Internet in

4   December 2013, why did you then remove the 1999

5   standards from public view on Public.Resource's

6   website and the Internet Archive's website in June

7   2014?

8           MR. BRIDGES:  Objection.  To the extent the

9   question might call for disclosure of

10  attorney-client privileged communications, I would

11  object on the grounds of privilege and instruct the

12  witness not to answer.

13          If he can answer beyond that objection and

14  instruction, he may.

15          THE WITNESS:  That would involve

16  discussions with counsel.  I'm not going to answer

17  that question.

18          (PLAINTIFFS' EXHIBIT 42 WAS MARKED.)

19  BY MR. HUDIS:

20      Q.  Mr. Malamud, I show you what's been marked

21  as Exhibit 42 bearing production numbers PROAERA

22  820 and PROAERA 821.

23          Do you recognize the document?

24      A.  I do.

25      Q.  Do you have any reason to doubt the

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 323

1    authenticity of Exhibit 42?

2            MR. BRIDGES:  Objection.  Vague and

3    ambiguous; lacks foundation.

4            THE WITNESS:  I do not.

5    BY MR. HUDIS:

6        Q.  Do you remember receiving this e-mail of

7    Exhibit 42 from me on June 10th, 2014?

8        A.  I do.

9        Q.  What did you do after receiving this e-mail

10   of Exhibit 42?

11           MR. BRIDGES:  Objection.  To the extent

12   this question calls for an answer that would

13   disclose attorney-client communications, I would

14   object on the grounds of privilege and instruct the

15   witness not to answer.

16           In addition, it's vague and ambiguous and

17   lacks foundation.

18   BY MR. HUDIS:

19       Q.  Can you answer my question, Mr. Malamud,

20   without revealing the substance of attorney-client

21   communications?

22       A.  No.

23       Q.  Mr. Malamud, could you return to Exhibit

24   38.  Why did you send the e-mail of Exhibit 38 to

25   Alexis Rossi the day after receiving my e-mail of

Carl Malamud                                                          May 12, 2015
San Francisco, CA

Page 324

1   Exhibit 42?

2          MR. BRIDGES:  Object.  Asked and answered,

3   and argumentative and lacks foundation.

4          THE WITNESS:  Because that was the day that

5   I made that item go dark.

6          (PLAINTIFFS' EXHIBIT 43 WAS MARKED.)

7   BY MR. HUDIS:

8      Q.  Mr. Malamud, I show you what's been marked

9   as Exhibit 43.

10         Do you recognize this document?

11     A.  I do.

12     Q.  What is this document of Exhibit 43?

13     A.  This is a memorandum concerning the posting

14  of the standards at issue.

15     Q.  Is that your signature at the bottom left

16  of Exhibit 43?

17     A.  It is.

18     Q.  Did anyone help you write this memo Exhibit

19  43?

20         MR. BRIDGES:  Objection.  To the extent the

21  question calls for disclosure of attorney-client

22  communications, I would object on the grounds of

23  privilege and would instruct the witness not to

24  answer.

25         THE WITNESS:  I'll be unable to answer that

Page 325

1    question.

2    BY MR. HUDIS:

3        Q.  Who was this memo of Exhibit 43 intended

4    for?

5            MR. BRIDGES:  Objection.  Lacks foundation.

6            THE WITNESS:  I believe it was for you.

7    BY MR. HUDIS:

8        Q.  "You," meaning me, plaintiff's counsel?

9        A.  Plaintiffs.

10       Q.  Thank you.

11           Mr. Malamud, could you read the first

12   paragraph of the memo to yourself.  Tell me when

13   you're done.

14       A.  Okay.

15       Q.  I am not going to read the whole paragraph.

16   "This memorandum is in reference to the lawsuit

17   named above," and I'm skipping, "and specifically

18   in response to the stated intention to file a

19   preliminary injunction motion."

20           What did you mean?

21       A.  Well, I believe you had said you were going

22   to file a preliminary injunction motion.

23       Q.  And I will read in full the second sentence

24   of the second paragraph of Exhibit 43.

25           "Public.Resource also believes that this

Page 326

1    case deserves the Court's fullest attention without

2    a rush to reach an interim ruling in the absence of

3    a full record."

4         What did you mean by that?

5         MR. BRIDGES:  Objection.  Lacks foundation;

6    vague and ambiguous.

7         THE WITNESS:  As I state in the next

8    paragraph, "In order to focus this case on

9    developing an appropriate record for a decision on

10   the merits, Public.Resource.Org has voluntarily

11   removed the document in question from the websites

12   under its control."

13        And as you had stated in a previous

14   sentence, this was so it was done without a rush to

15   reach an interim ruling in the absence of a full

16   record.

17   BY MR. HUDIS:

18        Q.  I'd like to now direct your attention,

19   Mr. Malamud, to the fourth paragraph of Exhibit 43.

20   And it says, "Until the conclusion at trial on the

21   merits in this case, Public.Resource.Org will keep

22   the document in question off of the websites under

23   its control and will not disseminate the document

24   in whole or in part, including any revisions, and

25   will maintain the status on the Internet Archive to

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1   prevent any public access to the document from the

2   archive's websites."  Do you see that?

3          MR. BRIDGES:  Objection.  The document

4   speaks for itself.

5          THE WITNESS:  I do.

6   BY MR. HUDIS:

7       Q.  What did you mean by that sentence?

8          MR. BRIDGES:  Objection.  The document

9   speaks for itself; lacks foundation; vague and

10  ambiguous; argumentative.

11         THE WITNESS:  I think the sentence is very

12  clear; right?

13  BY MR. HUDIS:

14      Q.  What did you mean?

15      A.  I meant "Until the conclusion of trial on

16  the merits of this case, Public.Resource.Org will

17  keep the document in question off of the websites

18  under its control and will not disseminate the

19  document in whole or in part, including any

20  revisions, and will maintain the status on the

21  Internet Archive to prevent any public access to

22  the document from the archive's websites."

23      Q.  And this memo was written by you on June

24  12th, 2014?

25         MR. BRIDGES:  Objection.  Lacks foundation;

1    vague and ambiguous.

2          THE WITNESS:  Yes.

3    BY MR. HUDIS:

4      Q.  Since the time of this memo of Exhibit 43,

5    have the 1999 standards been reposted to a website

6    under Public.Resource's control?

7          MR. BRIDGES:  Objection.  Vague and

8    ambiguous; argumentative.

9          THE WITNESS:  Yes.

10   BY MR. HUDIS:

11     Q.  Why?

12     A.  There was a technical malfunction in one of

13   our servers and by mistake a copy of the full

14   standard was posted in place of the stub.

15     Q.  And when was that?

16     A.  That was in January 2015.

17     Q.  Mr. Malamud, during the two-year period

18   that the 1999 standards were posted to

19   Public.Resource's website, was a record kept of how

20   many Internet users viewed or accessed the

21   standards from that website location?

22         MR. BRIDGES:  Objection.  Utterly lacks

23   foundation; argumentative; vague and ambiguous,

24   and -- yeah.  And competence.

25         THE WITNESS:  Our server log's document

Page 329

1   retention policy was a two-week window until

2   litigation commenced in the ASTM case when we began

3   keeping the logs permanently.  And so we -- we did

4   not keep a record prior to that.

5   BY MR. HUDIS:

6       Q.  Do you know the earliest date on which you

7   kept such logs?

8           MR. BRIDGES:  Objection.  Again, lacks

9   foundation; argumentative; vague and ambiguous and

10  competence.

11          THE WITNESS:  So again, the document

12  retention policy was a two-week window on the logs,

13  and in September -- August or September of 2013 we

14  changed that policy because litigation had

15  commenced.  And so at that point we began keeping

16  the logs permanently.

17  BY MR. HUDIS:

18      Q.  And do you still have those logs today?

19          MR. BRIDGES:  Same objections.  I think I

20  missed a compound objection to the underlying

21  question.

22          THE WITNESS:  Yes.

23  BY MR. HUDIS:

24      Q.  In what form are the logs kept?

25          MR. BRIDGES:  Same objections.

Page 330

1          THE WITNESS:  In log format.  Standard.

2     Apache web server log format.

3     BY MR. HUDIS:

4        Q.  Are they kept in print format or electronic

5     format?

6          MR. BRIDGES:  Same objections.

7          THE WITNESS:  Electronic.

8     BY MR. HUDIS:

9        Q.  Has Public.Resource produced these logs to

10    us?

11         MR. BRIDGES:  Objection.  Competence; may

12    call for speculation; may call for some form of

13    legal conclusion; vague and ambiguous.

14         THE WITNESS:  No, we did not.

15         MR. HUDIS:  Counsel, we've had discussions

16    about this.  We're again demanding the logs that

17    provide documentation of the information

18    Public.Resource gave us in its amended response to

19    interrogatory number 6.

20         MR. BRIDGES:  I believe that there's a

21    motion to compel pending.  Am I correct on that

22    issue, Mr. Hudis?

23         MR. HUDIS:  You are correct.

24         MR. BRIDGES:  And I believe we gave you an

25    opportunity to -- first of all, I believe that this

Carl Malamud                                                                    May 12, 2015
San Francisco, CA

1    was mentioned for the first time in your reply

2    brief; is that correct?

3          MR. HUDIS:  That's not correct.

4          MR. BRIDGES:  That's my understanding.

5    That motion has been pending, and you elected to

6    proceed with this deposition in the absence of a

7    ruling on that motion to compel.

8          I'm not sure what you mean by the fact that

9    you are demanding the logs.  You have chosen to

10   proceed with this deposition in the absence of a

11   ruling on that motion.  And so the demand -- your

12   demand appears to be moot.  It is a question that

13   is before the court.

14   BY MR. HUDIS:

15     Q.  Mr. Malamud, I'd like you to turn your

16   attention back to Exhibit Number 29.

17     A.  Okay.

18     Q.  Does Public.Resource's answer to exhibit --

19   to interrogatory number 6, accurately state the

20   number of Internet users who viewed or accessed the

21   1999 standards posted to Public.Resource's website

22   from June 2013 to October 2014?

23         MR. BRIDGES:  Objection.  That objection --

24   that interrogatory is itself subject to a number of

25   objections, and is a competence issue, and it's

1  vague and ambiguous; may lack foundation.

2        Are you asking him if that's what the

3  interrogatory says?  Or are you asking him whether

4  that is his memory sitting here today?  I'd like to

5  know where you're going, what you're looking for.

6        MR. HUDIS:  Sure.  I want to know whether

7  Mr. Malamud, in looking at the answer to

8  interrogatory number 6, can verify the accuracy of

9  the information provided.

10        MR. BRIDGES:  The verification was

11  furnished on page 16 of Exhibit 29 at the time of

12  the response.  Are you asking him if this is his

13  independent memory today?

14        MR. HUDIS:  Yes.

15        MR. BRIDGES:  Objection.  Objection.  You

16  can ask him the questions of what -- what numbers

17  he believes there are independently.

18        If you're -- if you're asking him to look

19  at the document, then you need to find out if it

20  refreshes an independent recollection.

21  BY MR. HUDIS:

22    Q.  Mr. Malamud, does the answer in

23  interrogatory number 6 refresh your independent

24  recollection of the number of Internet users who

25  viewed or accessed the 1999 standards posted to

Page 333

1    Public.Resource's website from June 2013 to October

2    2014?

3         MR. BRIDGES:  Objection.  The same

4    objections on vagueness, and lacks foundation and

5    argumentativeness.

6         THE WITNESS:  And so again, the document

7    retention policy was a two-week policy until that

8    period in August when litigation commenced.

9         The standard at issue was removed in June

10   of 2014.  And so this interrogatory, as it says in

11   the answer, is, in fact, a complete record from

12   September of 2013 to June of 2014.

13   BY MR. HUDIS:

14        Q.  So then with respect to the number of FTP

15   requests for the file name AERA.standards.1999.PDF,

16   why does the information go back to June of 2013?

17        A.  Because we had an FTP log hanging around

18   that was not conforming with our document retention

19   policy, and since that data was there, we furnished

20   it to you.

21        Q.  So now I'd like to take you one at a time

22   as to the information provided in interrogatory --

23   answer -- amended interrogatory answer number 6.

24        Mr. Malamud, on page 9, the information is

25   stated as the number of HTTP requests.  Do you see

Page 334

1   that?

2       A.  Yes.

3       Q.  All right.  What do these numbers

4   represent?

5           MR. BRIDGES:  Objection.  The document

6   speaks for itself.  It's been verified.

7           THE WITNESS:  It's the number --

8           MR. BRIDGES:  If he's testifying -- it's

9   not clear whether you're asking him to explain this

10  document or to give percipient testimony.

11          MR. HUDIS:  To explain the document.

12          MR. BRIDGES:  Objection.

13  BY MR. HUDIS:

14      Q.  So what --

15          MR. BRIDGES:  Objection on the grounds that

16  it lacks foundation; vague and ambiguous;

17  misleading and fails to account for objections, and

18  the document speaks for itself.

19  BY MR. HUDIS:

20      Q.  So what do these numbers represent in HTTP

21  requests?

22          MR. BRIDGES:  Same objections.

23          THE WITNESS:  The number of accesses to the

24  standards at issue using the HTTP protocol.

25  BY MR. HUDIS:

1      Q.  By month and year?

2          MR. BRIDGES:  Same objections.

3          THE WITNESS:  Yes.

4   BY MR. HUDIS:

5      Q.  Okay.  And what do the numbers of H -- of

6   FTP requests represent?

7          MR. BRIDGES:  Same objections.

8          THE WITNESS:  Number of file transfers by

9   month and year.

10  BY MR. HUDIS:

11     Q.  And what do the number of rsync requests

12  represent?

13         MR. BRIDGES:  Objection.  The document --

14  same objections and the document speaks for itself.

15         THE WITNESS:  Number of rsync accesses by

16  month and year.

17  BY MR. HUDIS:

18     Q.  So if there are accountings of HTTP

19  requests or FTP requests in interrogatory answer

20  number -- amended interrogatory answer number 6

21  after June of 2014, were those requests for the

22  stub document?

23     A.  That's correct.

24         MR. HUDIS:  Andrew, he's got to change the

25  video, so we're off.

Page 336

1          THE VIDEOGRAPHER:  This marks the end of

2    Disc 4, Volume 1 in the deposition of Carl Malamud.

3          The time is 6:38 and we are off the record.

4          (Recess taken.)

5          THE VIDEOGRAPHER:  This marks the beginning

6    of Disc 5, Volume 1 in the deposition of Carl

7    Malamud.

8          The time is 6:46, and we are on the record.

9    BY MR. HUDIS:

10     Q.  Mr. Malamud, in your last answer we

11   discussed referrals to the stub document.

12          Is that the document of Exhibit 37?

13     A.  It is.

14     Q.  Mr. Malamud, during the two-year period

15   that the 1999 standards were posted by you to

16   Internet Archive's website, do you know whether a

17   record was kept of how many Internet users viewed

18   or accessed the standards from that website?

19          MR. BRIDGES:  Objection.  Vague and

20   ambiguous.

21          THE WITNESS:  I don't know if they kept a

22   record.  There is a view count number that I

23   believe was there.

24          (PLAINTIFFS' EXHIBIT 44 WAS MARKED.)

25   BY MR. HUDIS:

1       Q.  Mr. Malamud, I show you a document that has

2    been marked as Exhibit 44 bearing a single

3    production number PROAERA 827, and it says, "This

4    document has been produced in native format."  So

5    what follows it looks like an Excel spreadsheet.

6          Do you see that?

7       A.  I do.

8       Q.  Do you know what this document is, Exhibit

9    44?

10      A.  I'm not totally sure.

11          MR. BRIDGES:  Object on the grounds of

12   competence and may call for speculation.

13          THE WITNESS:  Was this a document produced

14   by us or the Internet Archive?

15   BY MR. HUDIS:

16      Q.  It was produced by your counsel.

17      A.  It appears --

18          MR. BRIDGES:  I'll direct the witness to

19   testify as to what he knows.

20          MR. HUDIS:  Fair enough, Counsel.

21          THE WITNESS:  Well, this is a spreadsheet.

22   I can tell you what -- what I see here on this

23   document, if that's useful to you.

24   BY MR. HUDIS:

25      Q.  Please.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1      A.  It's a spreadsheet that's got a series of

2   identifiers and downloads as well as the title

3   creator of documents.  Clearly documents

4   incorporated by reference.  And there is a date

5   field.

6      Q.  Mr. Malamud, to the best of your knowledge

7   what does the creator column represent?

8          MR. BRIDGES:  Objection.  Competence; may

9   call for speculation.

10          THE WITNESS:  This is clearly a set of

11   technical standards incorporated by reference, and

12   so the creator is the original creator of the

13   standard.  And then there is a title.

14   BY MR. HUDIS:

15      Q.  Do you know -- do you know what the date

16   column represents?

17          MR. BRIDGES:  I'd ask the witness -- object

18   to the extent I think the witness may not be

19   competent and this may call for speculation.

20          THE WITNESS:  I don't know what the date

21   field says.

22   BY MR. HUDIS:

23      Q.  Do you know what the downloads column

24   represents?

25          MR. BRIDGES:  Objection.  Competence; vague

Page 339

1  and ambiguous; may call for speculation -- or calls

2  for speculation.

3        THE WITNESS:  Yeah, I'd have to speculate,

4  sir.  I'm sorry.  This is just not a document that

5  I -- I remember.  So no.

6  BY MR. HUDIS:

7     Q.  Do you know what the identifier column

8  represents?

9        MR. BRIDGES:  Objection.  Competence; calls

10  for speculation.

11        THE WITNESS:  That is the naming scheme

12  that I used for Internet Archive identifiers.

13  BY MR. HUDIS:

14     Q.  Do you know what the title column

15  represents?

16        MR. BRIDGES:  Objection.  Competence; may

17  call for speculation; vague and ambiguous.

18        THE WITNESS:  Yeah, that's what I had

19  explained previously, that this appears to be a

20  listing of standards incorporated by reference, and

21  so there's the creator and the name -- the title of

22  the document.

23  BY MR. HUDIS:

24     Q.  Do you know the source of this document of

25  Exhibit 44?

Page 340

1          MR. BRIDGES:  Objection.  I think that may

2     be asked and answered.

3          THE WITNESS:  No, I do not.  I -- like I

4     said, I do not recall this.  That --

5     BY MR. HUDIS:

6        Q.  Do you know who created this document?

7          MR. BRIDGES:  Objection.  Competence; calls

8     for speculation.

9          THE WITNESS:  I simply don't recall this

10    document.

11    BY MR. HUDIS:

12       Q.  Mr. Malamud, if you would turn to the

13    bottom of the first spreadsheet page of Exhibit 44.

14       A.  Reads American Architectural Manufacturers

15    Association?

16       Q.  No.  It -- so for the -- for the page I'm

17    looking at of Exhibit 44, it says American

18    Educational Research Association.

19          MR. BRIDGES:  That's not -- that's not the

20    case on our -- on our exhibits.

21    BY MR. HUDIS:

22       Q.  Could you find on the document American

23    Educational Research Association?

24       A.  Yes.  It's on page 2 in the middle of the

25    page.

Carl Malamud                                                      May 12, 2015
San Francisco, CA

1      Q.  Thank you.  If you go to -- on that row, if

2   you go to the identifier.  Is that -- is

3   gov.log.AERA.standards. 99 -- dot 1999, is that the

4   identifier that you used for the 1999 standards

5   that you posted to the Internet Archive?

6           MR. BRIDGES:  Objection.  Vague and

7   ambiguous; may call for speculation.

8           THE WITNESS:  It is.

9   BY MR. HUDIS:

10     Q.  Do you believe that Exhibit 44 came from

11  the Internet Archive?

12          MR. BRIDGES:  Objection.  Calls for

13  speculation; competence.  He's testified he doesn't

14  know where this came from.  He hasn't seen it

15  before.

16          THE WITNESS:  I really don't recollect this

17  spreadsheet.

18  BY MR. HUDIS:

19     Q.  Mr. Malamud, we had asked Public

20  research -- Resource to search for and produce

21  materials relating to its posting or publication of

22  the 1999 standards on one of its websites.  What

23  materials did you search for?

24          MR. BRIDGES:  Objection.  May call for

25  attorney-client communications, in which case it

Carl Malamud                                                  May 12, 2015
San Francisco, CA

Page 342

1    would be privileged, and I would object on the

2    grounds of privilege, and I would instruct the

3    witness not to answer.

4           If you're asking what Mr. Malamud -- it's

5    also vague and ambiguous; lacks foundation.

6    BY MR. HUDIS:

7      Q.  I'd like to know, Mr. Malamud, what records

8    you searched for, independent of your discussions

9    with counsel?

10          MR. BRIDGES:  All the other objections

11   still apply.

12          THE WITNESS:  Having to do with the posting

13   of the standards on Public.Resource.Org websites?

14   BY MR. HUDIS:

15     Q.  Yes.

16          MR. BRIDGES:  Same objections.

17          THE WITNESS:  Well, we've gone over that

18   process of the posting of the standards at issue on

19   the Law.Resource.org website.

20   BY MR. HUDIS:

21     Q.  What I want to know is what documents did

22   you search for?

23          MR. BRIDGES:  Objection.  Argumentative;

24   lacks foundation; vague and ambiguous.

25          THE WITNESS:  Well, the number of accesses

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1    information I searched are logs, and computed the

2    number of accesses per month based on the criteria

3    that I indicated in the interrogatory answers.

4    BY MR. HUDIS:

5        Q.   Interrogatory -- amended interrogatory

6    answer number 6?

7        A.   That's correct.

8        Q.   And what else did you search for?

9             MR. BRIDGES:  Objection.  Vague and

10   ambiguous.

11            I think there's some confusion going on

12   here.  You were talking about in response to a

13   document request?

14            MR. HUDIS:  Yes.

15            MR. BRIDGES:  Can you show him the document

16   requests?

17            MR. HUDIS:  I can read it to him, sure.

18            MR. BRIDGES:  You're asking what he

19   searched for in response to a document request?

20            MR. HUDIS:  Mm-hm.

21            MR. BRIDGES:  These are interrogatories.

22   He was asking about document requests.

23            THE WITNESS:  The discovery process.

24   BY MR. HUDIS:

25       Q.   Yes, sir.

Carl Malamud                                                          May 12, 2015
San Francisco, CA

Page 344

1          MR. BRIDGES:  Searching for documents.

2          THE WITNESS:  I did not conduct those

3    searches.  I gave materials to our legal team and

4    their discovery engine and they did the searches.

5    So I didn't search for anything.

6    BY MR. HUDIS:

7       Q.  So you said you gave the materials to your

8    legal team.  What I want to know is from

9    Public.Resource's records, what materials did you

10   search for to give to your counsel?

11          I do not want to know your communications

12   with counsel.  I want to know the materials you

13   searched for.

14          MR. BRIDGES:  Here's the difficulty.

15          MR. HUDIS:  Sure.

16          MR. BRIDGES:  I think the legal team did

17   the searching.  He turned -- he gave access to the

18   legal team.  The legal team did the searching.

19   So ...

20          MR. HUDIS:  Thank you for the

21   clarification.

22          MR. BRIDGES:  Yeah.

23   BY MR. HUDIS:

24       Q.  Did -- Mr. Malamud, did you do any

25   independent searches for discovery records,

Page 345

1    independently yourself?

2        A.  No, I didn't.

3            MR. BRIDGES:  Objection.  Lacks foundation;

4    vague and ambiguous.

5            THE WITNESS:  No, I did not.

6    BY MR. HUDIS:

7        Q.  So the document request, Mr. Malamud, was

8    "Produce those documents, things and/or items,

9    electronically stored information regarding

10   Public.Resource posting or publishing the 1999

11   standards to a Public.Resource website."

12           And just to clarify, you're saying that

13   your counsel did the search of Public.Resource's

14   records.  You did not do that search yourself?

15       A.  That's correct.

16       Q.  Mr. Malamud, before or after

17   Public.Resource posted the 1999 standards to the

18   Internet, did you ever hear someone complain that

19   he or she could not obtain a copy of the 1999

20   standards on his or her own?

21           MR. BRIDGES:  Objection.  Vague and

22   ambiguous; lacks foundation; compound.

23           THE WITNESS:  I did not.

24   BY MR. HUDIS:

25       Q.  Before or after Public.Resource posted the

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1   1999 standards to the Internet, did you ever

2   receive written correspondence complaining that

3   someone could not obtain a copy of the 1999

4   standards on his or her own?

5          MR. BRIDGES:  Same objections;

6   argumentative.

7          THE WITNESS:  I did not.

8   BY MR. HUDIS:

9      Q.  During the two-year period that the 1999

10  standards were posted to Public.Resource's website,

11  was a record kept of how many Internet users

12  downloaded the standards from that website location

13  to their computer hard drives?

14         MR. BRIDGES:  Objection.  Lacks foundation;

15  argumentative; assumes facts not in evidence; vague

16  and ambiguous.

17         THE WITNESS:  We would have no way of

18  determining that.

19  BY MR. HUDIS:

20     Q.  During the two-year period that the 1999

21  standards were posted to Public.Resource's website,

22  did Public.Resource deploy any protocols or use any

23  settings on its web server to prevent Internet

24  users from downloading the 1999 standards to their

25  computer hard drives?

Page 347

1        MR. BRIDGES:  Objection.  Argumentative;

2    lacks foundation; possibly competence; vague and

3    ambiguous.

4        THE WITNESS:  The only thing we know about

5    is access to the data and the fact that the data

6    left our computer in response to a request.  So I

7    don't know about downloads.  It's technically

8    impossible to determine that.

9    BY MR. HUDIS:

10       Q.  I didn't want to -- my last question was

11   not about logging downloads.  What I wanted to know

12   is once an HTTP request or an FTP request or an

13   rsync request was made of Public.Resource's server

14   where the 1999 standards were, did Public.Resource

15   deploy any protocols or use any settings on its web

16   server to prevent Internet users from downloading

17   the 1999 standards to their computer hard drives?

18       MR. BRIDGES:  Objection.  Argumentative;

19   lacks foundation; assumes facts not in evidence.

20       THE WITNESS:  I have no idea how one would

21   do that.

22   BY MR. HUDIS:

23       Q.  During the two-year period that the 1999

24   standards were posted to Public.Resource's website,

25   did Public.Resource deploy any protocols or use any

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1    settings on its web server to prevent Internet

2    users from printing to paper the 1999 standards

3    accessed from that website?

4             MR. BRIDGES:  All the same objections,

5    plus, Mr. Hudis, I've been -- you've been prefacing

6    many of your questions with the phrase, "During the

7    two-year period that the 1999 standards were posted

8    to Public.Resource's website."  It's not clear to

9    me that they were posted to the website for two

10   years.

11            So every time you ask that question, I'm

12   going to object on the grounds that it lacks

13   foundation; argumentative and misstates -- it

14   misstates evidence.

15            So in addition to that, the other

16   objections apply to this question.  Mainly lacks

17   foundation; argumentative; vague and ambiguous;

18   possibly competence.

19            THE WITNESS:  No, we did not.

20            MR. HUDIS:  Counsel, just for the record,

21   so we can avoid some disagreements, if possible,

22   interrogatory answer number 2 says the 1999

23   standard was first posted to the Law.Resource.Org

24   website on July 11, 2012.  And then it says the

25   1999 standard was last posted to a Public.Resource

Page 349

1   website on June 10, 2014.

2   BY MR. HUDIS:

3       Q.  Mr. Malamud, during the two-year period

4   that the 1999 standards were posted to

5   Public.Resource's website, or any time after that

6   until today, did Public.Resource receive any

7   communications from people who claimed to have

8   accessed a copy of the 1999 standards from

9   Public.Resource's website?

10          MR. BRIDGES:  Mr. Hudis, you've just given

11   me dates that are not two years.  And then you

12   immediately ask a question that says, "during the

13   two-year period."

14          I'm not sure why you insist on using

15   two-year period, but every time you ask a question

16   that says "during the two-year period," I'm going

17   to object as misleading, misstating the facts, and

18   deceptive.

19          MR. HUDIS:  Counsel.

20          MR. BRIDGES:  Yes.

21          MR. HUDIS:  Would you accept an

22   introductory phrase "approximate two-year period"?

23          MR. BRIDGES:  I will not.  If you want to

24   say, "during the period," fine.

25          MR. HUDIS:  I'll accept that.

Page 350

```
 1          MR. BRIDGES:  But if you want to start

 2     making a characterization, I'm going to object,

 3     unless it's accurate.

 4          MR. HUDIS:  Counsel, I'll accept that.

 5     Thank you very much.

 6          MR. BRIDGES:  The -- there are other -- you

 7     might want to restate your question because I had

 8     other objections that I didn't get around to on

 9     that.

10     BY MR. HUDIS:

11       Q.  During the period that the 1999 standards

12     were posted to Public.Resource's website, or at any

13     other time after that until today, did

14     Public.Resource receive any communications from

15     people who claimed to have accessed a copy of the

16     1999 standards from Public.Resource's website?

17          MR. BRIDGES:  Objection.  Lacks foundation;

18     competence; vague and ambiguous.  Also

19     argumentative and may call for a legal conclusion

20     to the extent you were trying to give "copy" a

21     copyright term.  And argumentative.  I said that.

22          THE WITNESS:  No.

23          MR. HUDIS:  Counsel, instead of the word

24     "copy," would you prefer I use the term

25     reproduction?  I don't want to use a charged word
```

Carl Malamud                                                                May 12, 2015
San Francisco, CA

Page 351

1     here.  I just want to get some information.

2            MR. BRIDGES:  You could use a -- accessed a

3     file containing.  I would accept that.

4            MR. HUDIS:  Thank you, Counsel.

5     BY MR. HUDIS:

6        Q.  Does Public.Resource know what people do

7     with their files containing the 1999 standards that

8     they obtained from Public.Resource's website?

9            MR. BRIDGES:  Objection.  Utterly lacks

10    foundation; assumes facts not in evidence;

11    argumentative; vague and ambiguous and competence.

12           THE WITNESS:  No.

13    BY MR. HUDIS:

14       Q.  Does Public.Resource know what people do,

15    if anything, with their file containing the 1999

16    standards that they obtained from Internet

17    Archive's website after you posted the standards

18    there?

19           MR. BRIDGES:  Same objections.  Lacks

20    foundation; assumes facts not in evidence;

21    argumentative; vague and ambiguous; competence;

22    calls for ...

23           THE WITNESS:  No.

24           (PLAINTIFFS' EXHIBIT 45 WAS MARKED.)

25    BY MR. HUDIS:

Carl Malamud                                               May 12, 2015
San Francisco, CA

Page 352

 1      Q.  Mr. Malamud, I show you what has been

 2  marked as Exhibit 45.  It is Public.Resource's

 3  responses to plaintiff's second set of

 4  interrogatories.

 5      A.  Okay.

 6      Q.  Is that your signature at the bottom of

 7  page 10?

 8      A.  It is.

 9          MR. BRIDGES:  I'm sorry.  Whoa.

10          MR. HUDIS:  Everything okay, Counsel?

11          MR. BRIDGES:  No, it's not okay.

12          THE WITNESS:  There's two page 10s.  The

13  document goes up to 12 and then there is a 10 at

14  the end.  Is it the same on your copy?

15          MR. HUDIS:  Mm-hm.  That's how it was given

16  to us.

17          Counsel, should we stay on the record or go

18  off the record?

19          MR. BRIDGES:  We'll stay on the record.

20          I think you can get his testimony that's

21  his signature on the final page of Exhibit 45.

22  BY MR. HUDIS:

23      Q.  Sure.  Mr. Malamud, is that your signature

24  on the final page of Exhibit 45?

25      A.  It is.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 353

```
 1        Q.  Now, Mr. Malamud, I'd like you to read
 2   Public.Resource's answers to interrogatory numbers
 3   9 and 11.  You don't have to read them into the
 4   record.  I just want you to familiarize yourself
 5   with the information contained in those
 6   interrogatory answers.  Tell me when you're done.
 7        A.  9 and 11 or 9 and 10?
 8        Q.  9 and 11.
 9        A.  Okay.
10            Okay.
11        Q.  Do interrogatory answers numbers 9 and 11
12   identify all of the state and federal regulations
13   of which Public.Resource is currently aware in
14   which the 1999 standards have been incorporated by
15   reference?
16            MR. BRIDGES:  Objection.  Competence, in
17   terms of recalling all of the instances that may
18   exist; vague and ambiguous; may call for a legal
19   conclusion.
20            THE WITNESS:  I would have to disclose
21   communications with counsel to answer that
22   question.
23   BY MR. HUDIS:
24        Q.  I want your -- your independent knowledge;
25   not substance of attorney-client communications.
```

Page 354

1      A.  Well, my knowledge is based on my

2    attorney-client communications.  So I can't really

3    answer that.

4      Q.  All right.  So you cannot answer my

5    question without revealing substance of

6    attorney-client communications?

7      A.  Yeah.

8      Q.  Mr. Malamud, could you read in Exhibit 45

9    interrogatory answer number 10?

10     A.  Okay.

11     Q.  Does interrogatory answer number 10

12   identify all the instances of which a state or

13   federal agency cited the 1999 standards of which

14   Public.Resource is aware?

15        MR. BRIDGES:  Objection.  May -- may lack

16   competence; lacks foundation; vague and ambiguous.

17        And to the extent that the answer would

18   depend upon attorney-client communications, I would

19   object on the grounds of privilege and instruct him

20   not to answer to that extent.

21        THE WITNESS:  I would have to divulge my

22   communications with counsel to answer that

23   question.

24   BY MR. HUDIS:

25     Q.  So you can't answer my question without

1   revealing the substance of attorney-client

2   communications?

3       A.  That's correct.

4       Q.  The citations in interrogatory number 10,

5   are these examples of incorporation by reference of

6   the 1999 standards?

7           MR. BRIDGES:  I'm sorry?  I think

8   interrogatory number -- interrogatory -- the answer

9   to interrogatory number 10 speaks for itself.

10          THE WITNESS:  The interrogatory asks for

11  times it has been cited by a government agency; not

12  times that it was incorporated by reference.

13  BY MR. HUDIS:

14      Q.  So what I want to know is, in the answer

15  are these examples or are they not examples of the

16  1999 standards incor -- being incorporated by

17  reference into law --

18          MR. BRIDGES:  Objection.

19          MR. HUDIS:  Let me finish.

20  BY MR. HUDIS:

21      Q.  -- in interrogatory answer number 10?

22          MR. BRIDGES:  Objection.  Competence; may

23  call for speculation; lacks foundation; may require

24  legal conclusion or legal expertise; legal opinion.

25          THE WITNESS:  So incorporation by reference

Carl Malamud                                                      May 12, 2015
San Francisco, CA

1    is a technical process that would involve the

2    Federal Register and the Code of Federal

3    Regulations at the federal level.

4          Would involve potentially a statute or a

5    regulation at the state level.

6          So a number of these documents cited here

7    are papers, right.  So that wouldn't be an

8    incorporation by reference issue.

9          There are a series of Federal Register

10   publications that are listed in the interrogatory.

11   I would have to pull up those individual documents

12   and look at them to see whether or not that was, in

13   fact, an incorporation by reference, in addition to

14   the citation, which is what you asked for.

15   BY MR. HUDIS:

16     Q.  Mr. Malamud, does Public.Resource claim

17   that any of the plaintiffs have promoted the 1999

18   standards as being incorporated by reference into

19   law?

20         MR. BRIDGES:  Objection to the extent it

21   calls for a legal conclusion or -- or attorney work

22   product or for attorney-client privilege, and also

23   vague and ambiguous.

24         THE WITNESS:  So can you repeat that

25   question?

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1   BY MR. HUDIS:

2       Q.   Yes.   Does -- does Public.Resource claim

3   that any of the plaintiffs have promoted the 1999

4   standards as being incorporated by reference into

5   law?

6           MR. BRIDGES:   Same objections to the extent

7   it calls for a legal conclusion or attorney work

8   product or attorney-client privilege.   Also vague

9   and ambiguous.

10          THE WITNESS:   Yeah, I don't know the

11  official positions of the plaintiffs for promoting

12  things.   I just don't know what that means.

13          I know individuals associated with the

14  standards at issue have discussed the fact that the

15  standards have been incorporated by reference.

16  Promoted seems like a loaded term.

17  BY MR. HUDIS:

18      Q.   Does Public.Resource claim that any of the

19  plaintiffs have encouraged the 1999 standards as

20  being incorporated by reference into law?

21          MR. BRIDGES:   All the same objections.

22          THE WITNESS:   I don't know the answer to

23  that.   I believe that's something that -- that

24  would require an examination of the discovery

25  materials and depositions and that.   That's exactly

Page 358

1   the kind of issue that I believe is going to be

2   discussed and brought out as we continue this

3   litigation.  I don't know the answer to that.

4   BY MR. HUDIS:

5      Q.  Does Public.Resource claim that any of the

6   plaintiffs have consented to, accepted or

7   acquiesced in the 1999 standards as being

8   incorporated by reference into law?

9          MR. BRIDGES:  Objection.  Calls for legal

10  conclusions; calls for attorney work product; lacks

11  foundation; competence; vague and ambiguous.

12         THE WITNESS:  I don't know the answer

13  either way to that.

14         (PLAINTIFFS' EXHIBIT 46 WAS MARKED.)

15  BY MR. HUDIS:

16     Q.  Mr. Malamud, I have marked as Exhibit 46

17  Public.Resource's answer and counterclaim to the

18  plaintiffs' complaint in this action.  I'd like you

19  to turn to page 25.

20     A.  Okay.

21     Q.  And I would like you to look at the top of

22  page 25, and numbered paragraph 2.  Do you see

23  that?

24     A.  The one that reads "Plaintiffs have no

25  copyrights in works that government entities have

Page 359

1    incorporated by reference into law"?

2        Q.  Yes.

3            And what is the factual basis for that

4    statement?

5            MR. BRIDGES:  Objection.  Calls for a legal

6    conclusion; calls for attorney work product;

7    competence and may call for attorney-client

8    communications.

9            To that extent I would object on the

10   grounds of privilege and instruct the witness not

11   to answer.  If he feels that he can answer

12   otherwise for that instruction, then he may

13   proceed.

14           THE WITNESS:  So you would like my personal

15   opinion as a layman as to why standards

16   incorporated by reference in the law have no

17   copyright; is that correct?

18   BY MR. HUDIS:

19      Q.  Well, specifically directed to plaintiffs'

20   work here, the 1999 standards.

21           MR. BRIDGES:  All the same objections and

22   partial instruction.

23           THE WITNESS:  I can't speak to the specific

24   standard at issue.  I can tell you why I believe

25   that standards incorporated by reference under the

Page 360

1   Code of Federal Regulations have no copyright.

2   BY MR. HUDIS:

3       Q.   What -- what is Public.Resource's basis for

4   making that statement?

5           MR. BRIDGES:  I'm sorry?

6   BY MR. HUDIS:

7       Q.   Public.Resource's basis for making that

8   statement?

9           MR. BRIDGES:  What statement?  The basis

10  for making the -- for asserting the second

11  affirmative defense?

12          MR. HUDIS:  Yes, sir.

13          MR. BRIDGES:  Okay.  I think that's asked

14  and answered, and all the same objections and

15  partial instruction from earlier.

16          THE WITNESS:  So I can't speak to the

17  specific standards at issue.  I can speak in

18  general terms as to why I believe the standards

19  incorporated by reference under the CFR have no

20  copyright.

21  BY MR. HUDIS:

22      Q.   And why is that?

23          MR. BRIDGES:  Same objections and partial

24  instruction.  The instruction he may answer to the

25  extent it doesn't depend upon any attorney-client

Page 361

1    privileged communication.

2          THE WITNESS:  So as a layman; not a lawyer,

3    I have read widely on this subject, and looked at a

4    number of supreme court decisions on the question

5    of copyright into the law.

6          I have examined the compendium of Copyright

7    Office practices issued by the U.S. copyright

8    Office.

9          I participated in the Administrative

10   Conference of the U.S. deliberations on this issue.

11         I have read fairly widely in the history of

12   promulgation of the law, both in the United States

13   and in the common-law system more generally, and I

14   have read the legislative history, and

15   congressional hearings that led to the creation of

16   the Federal Register and the official journals, as

17   well as the incorporation-by-reference mechanism,

18   which was in the 1960s, and based on this reading,

19   it is my feeling that the law has no copyright in

20   the United States.  A standard deliberately and

21   explicitly incorporated by reference into law is

22   the law.  And therefore the standards have no

23   copyright.

24   BY MR. HUDIS:

25         Q.  If you could turn back to Exhibit 46, page

Page 362

1    25, numbered paragraph 3.  It says, "Lack of

2    ownership of the alleged copyrights bars

3    plaintiffs' claim."

4            What is Public.Resource's factual basis for

5    that statement?

6            MR. BRIDGES:  Objection.  Attorney work

7    product; attorney-client privilege and instruct --

8    instruct the witness not to answer.

9            THE WITNESS:  I won't be able to answer

10   that question.

11   BY MR. HUDIS:

12      Q.  Mr. Malamud, on page 25 of Exhibit 46, the

13   fourth paragraph says, "The doctrine of copyright

14   fair use bars plaintiffs' claim."  What is the

15   factual basis for this statement?

16           MR. BRIDGES:  I'll object on the grounds of

17   attorney work product and attorney-client

18   privilege.

19           And to the extent this would depend upon

20   attorney-client communications, I would object on

21   the grounds of privilege and would instruct the

22   witness not to answer.

23           Also calls for a legal conclusion and

24   object on the grounds of competence.

25           If the witness can answer beyond the

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1    instruction I've given, he is free to.

2          THE WITNESS:  I'm not a lawyer.  This is

3    beyond my competence.

4    BY MR. HUDIS:

5       Q.  Mr. Malamud, on page 25 of Exhibit 46, the

6    paragraph says, "The doctrine of unclean hands bars

7    plaintiffs' claim -- claims."

8          What is the factual basis for that

9    statement?

10         MR. BRIDGES:  All the same objections as to

11   the previous line of questions.

12         THE WITNESS:  I don't even know what the

13   doctrine of unclean hands is.  I'm not qualified to

14   answer that question.

15   BY MR. HUDIS:

16      Q.  On page 25 of Exhibit 46, the sixth

17   paragraph says, "The doctrine of copyright misuse

18   bars plaintiffs' claims."

19         What is the factual basis for that

20   statement?

21         MR. BRIDGES:  All the same objections and

22   partial instruction as to the previous questions.

23         THE WITNESS:  I'm not familiar with the

24   doctrine of copyright misuse.  I'm not qualified to

25   answer that question.

1  BY MR. HUDIS:

2      Q.  Mr. Malamud, on page 25 of Exhibit 46, the

3  seventh paragraph says, "Waiver and estoppel bars

4  plaintiffs's claims."  What is the factual basis

5  for that statement?

6          MR. BRIDGES:  All the same objections and

7  partial instruction apply here as to the previous

8  questions.

9          THE WITNESS:  I'm not familiar with how

10 waiver and estoppel work.  I'm not qualified to

11 answer that question.

12 BY MR. HUDIS:

13     Q.  Mr. Malamud, on page 25 of Exhibit 46 the

14 eighth paragraph reads, "Lack of irreparable injury

15 bars plaintiffs' demand for injunction."  What is

16 the factual basis for that statement?

17         MR. BRIDGES:  All the same objections and

18 partial instruction apply here as to the previous

19 questions.

20         THE WITNESS:  I don't know what lack of

21 irreparable injury bars means in a legal context.

22 I'm not qualified to answer that.

23 BY MR. HUDIS:

24     Q.  On page 25 of Exhibit 46, the ninth

25 paragraph reads, "Injunction would greatly harm the

Carl Malamud                                                      May 12, 2015
San Francisco, CA

1    public interest, and thus, the public interest bars

2    plaintiffs' demand for an injunction."

3         What's the factual basis for that

4    statement?

5         MR. BRIDGES:  All the same objections and

6    partial instruction apply here as to the previous

7    questions.

8         If he -- if he can answer beyond that

9    partial instruction, he may.

10        THE WITNESS:  I'm not sure I understand the

11   implications of an injunction and what specifically

12   that would mean in this context.  Again, that's a

13   legal question.  I would need to know what that

14   means before I could answer that.

15   BY MR. HUDIS:

16      Q.  Mr. Malamud, who is Dr. David Michaels?

17      A.  Dr. David Michaels is the assistant

18   Secretary of Labor and the administrator of the

19   Occupational Health and Safety Administration.

20      Q.  Who is Mr. Shems, S-h-e-m-s, Peterson?

21      A.  Mr. Peterson is the retired chief building

22   inspector for Sonoma County, California.

23      Q.  Who is Mr. Raymond Mosley?

24      A.  Mr. Mosley is the former executive director

25   of the Office of the Federal Register at the

Page 366

1    National Archives and Records Administration.

2        Q.  Who is Benjamin Goldstein?

3        A.  Mr. Goldstein is a former official at the

4    Department Of Energy.

5        Q.  Have any of these gentlemen, Dr. Michaels,

6    Mr. Peterson, Mr. Mosley or Mr. Goldstein, provided

7    any statements to Public.Resource discussing

8    incorporation by reference in this case?

9            MR. BRIDGES:  Objection.  Vague and

10   ambiguous; lacks foundation.

11           THE WITNESS:  I don't know.  I'm letting

12   our legal team handle that issue.  I really don't

13   know.

14           (PLAINTIFFS' EXHIBIT 47 WAS MARKED.)

15   BY MR. HUDIS:

16       Q.  Mr. Malamud, I show you what's been marked

17   as Exhibit 47, bearing a document production

18   numbers AERA_APA_NCME 31807 through 31809.

19           Please take a moment to review the

20   document.

21       A.  Okay.

22           MR. BRIDGES:  I need to hold on for a

23   second.

24           MR. HUDIS:  Sure.

25           MR. BRIDGES:  I need to go off the record

Page 367

```
 1   briefly to consult with my client about this

 2   document.

 3        THE VIDEOGRAPHER:  The time is 7:32, and we

 4   are off the record.

 5        (Discussion off the record.)

 6        THE VIDEOGRAPHER:  The time is 7:37, and we

 7   are back on the record.

 8   BY MR. HUDIS:

 9     Q.  Mr. Malamud, I'll show you what's been

10   marked as Exhibit 47.  Do you recognize this

11   document?

12     A.  Yes, I do.

13     Q.  What is it?

14     A.  It is a notice from the American Petroleum

15   Institute that was sent from the Internet Archive

16   and forwarded along to me.

17     Q.  So do you recall receiving API's e-mail

18   correspondence to Internet Archive being forwarded

19   to you at the end of 2012?

20        MR. BRIDGES:  Objection.  You're referring

21   to this document?

22        MR. HUDIS:   Yes.

23        THE WITNESS:  Are you objecting or --

24        MR. BRIDGES:  No.

25        THE WITNESS:  Oh, yes.  I do remember.
```

Carl Malamud                                                      May 12, 2015
San Francisco, CA

1   BY MR. HUDIS:

2       Q.  Okay.  And Mr. Butler, Chris Butler, is an

3   employee of Internet Archive?

4           MR. BRIDGES:  Objection.  Competence.

5           THE WITNESS:  Yes.

6   BY MR. HUDIS:

7       Q.  Do you know why Mr. Butler forwarded API's

8   cease-and-desist copyright notice to you?

9           MR. BRIDGES:  Objection.  Competence; calls

10  for speculation.

11          THE WITNESS:  I am the creator of that

12  particular collection, and any take-down notices go

13  to my attention.

14  BY MR. HUDIS:

15      Q.  All right.  That was my next question.  Did

16  you post API's technical standards to a collection

17  on the Internet Archive?

18          MR. BRIDGES:  Objection.  Lacks foundation;

19  vague and ambiguous.

20          THE WITNESS:  I did.

21  BY MR. HUDIS:

22      Q.  When did you post API's technical standards

23  to a collection on Internet Archive?

24          MR. BRIDGES:  Objection.  Lacks foundation;

25  vague and ambiguous.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 369

1          THE WITNESS:  Before November 2nd, 2012.

2     BY MR. HUDIS:

3          Q.  So around that time?

4          MR. BRIDGES:  Objection.  Misstates

5     testimony.

6          THE WITNESS:  I don't know.

7          MR. BRIDGES:  Vague and ambiguous; lacks

8     foundation.

9          THE WITNESS:  I don't know when I posted

10    them.

11    BY MR. HUDIS:

12         Q.  At the time that you posted API's technical

13    standards to a collection on the Internet Archive,

14    did you also post API's technical standards to a

15    Public.Resource website?

16         MR. BRIDGES:  Objection.  Lacks foundation;

17    vague and ambiguous.

18         THE WITNESS:  I did.

19    BY MR. HUDIS:

20         Q.  What did you do, if anything, in response

21    to receiving API's e-mail correspondence to

22    Internet Archive after it was forwarded to you by

23    Mr. Butler?

24         MR. BRIDGES:  Objection.  Vague and

25    ambiguous; argumentative; lacks foundation.

1          THE WITNESS:  I sent a response to the

2    author of that letter, Mr. Brett Heavner.

3    BY MR. HUDIS:

4       Q.  Did you forward Mr. Butler's e-mail and the

5    API e-mail to anyone affiliated with

6    Public.Resource?

7          MR. BRIDGES:  Objection.  Vague and

8    ambiguous; may call for speculation.

9          THE WITNESS:  I would have to speculate.  I

10   don't remember.

11   BY MR. HUDIS:

12      Q.  Well, who are all members of the

13   Public.Resource legal staff?

14         MR. BRIDGES:  Objection.  Lacks foundation.

15         THE WITNESS:  Well, that's an interesting

16   question because we don't really have a legal

17   staff.  I have one part-time of counsel.  So this

18   was clearly my attempt at some form of humor.

19         MR. BRIDGES:  Jonathan, they were an Army

20   you never want to see.

21         MR. HUDIS:  Or never could.

22   BY MR. HUDIS:

23      Q.  After receiving Mr. Heavner's e-mail, did

24   you remove API's technical standards from public

25   view, either from Public.Resource's website or

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1    Internet Archive's website?

2         MR. BRIDGES:  Objection.  Lacks foundation;

3    vague and ambiguous; argumentative.

4         THE WITNESS:  We did not.

5    BY MR. HUDIS:

6      Q.  Did you respond to Mr. Heavner -- strike

7    that.

8         Did you respond to Mr. Heavner's e-mail of

9    November 2nd, 2012?

10        MR. BRIDGES:  Objection.  Vague and

11   ambiguous; also asked and answered.

12        THE WITNESS:  I did.

13   BY MR. HUDIS:

14     Q.  Mr. Malamud, in response to Mr. Heavner's

15   e-mail of November 2, 2012 as shown in Exhibit 47,

16   did you send him a letter similar to the one you

17   sent to John Neikirk reflected in Exhibit 40?

18        MR. BRIDGES:  Objection.  Totally

19   argumentative; lacks foundation; vague and

20   ambiguous.

21        THE WITNESS:  I sent him a letter

22   explaining that the standards were incorporated by

23   reference into federal law, and respectfully

24   declined to remove the standards.

25   BY MR. HUDIS:

Page 372

1      Q.  Did anyone from API follow up with you

2    after receiving that letter?

3          MR. BRIDGES:  Objection.  Lacks foundation;

4    vague and ambiguous.

5          THE WITNESS:  No, they dropped the matter.

6    We didn't hear from them again.

7          MR. HUDIS:  Mr. Malamud, that's all the

8    questions I have for you at this point, subject to

9    our outstanding discovery motion pending with the

10   court.  Thank you for your time.

11         THE WITNESS:  Great.  Thank you, sir.

12         MR. BRIDGES:  I'll just say that you had an

13   opportunity to postpone this deposition until after

14   the motion to compel.  The choice to proceed with

15   the motion to compel pending, and to take I think

16   over eight-and-a-half hours of deposition was --

17   was a choice that was the plaintiffs' own decision.

18   And so if there are no more questions, the

19   depositions of Public.Resource.Org and Mr. Malamud

20   have, in fact, concluded.

21         MR. HUDIS:  We would disagree, Counsel.

22         MR. BRIDGES:  Well, then ask whatever

23   questions you want for the next 25 minutes and then

24   it's over.

25         MR. HUDIS:  Counsel, we don't have to

Page 373

1    argue.  There are questions that we would like to

2    ask Mr. Malamud, but we cannot until the court

3    rules on our pending motion to compel.  We don't --

4          MR. BRIDGES:  You have chosen to proceed

5    now without waiving a -- a ruling by the court.

6          If at some time you wish to seek what I

7    suppose would be something like 20 more minutes of

8    Mr. Malamud's deposition, the costs attendant to

9    that for the defendant -- well, we would oppose.

10   And in any event if -- if you are unwilling to

11   proceed, we would insist on being paid the

12   extraordinary costs of the second session.

13         MR. HUDIS:  We would respectfully disagree

14   with that position.

15         THE VIDEOGRAPHER:  This marks the end of

16   Disc 5, Volume 1 and ends today's deposition of

17   Carl Malamud.

18         The time is 7:47, and we are off the

19   record.

20         (The deposition of CARL MALAMUD

21          was adjourned at 7:47 p.m. this date.)

22                    --oOo--

23

24

25

Page 374

1                    CERTIFICATE OF DEPONENT

2

3     I hereby certify that I have read and examined the

4     foregoing transcript, and the same is a true and

5     accurate record of the testimony given by me.

6     Any additions or corrections that I feel are

7     necessary, I will attach on a separate sheet of

8     paper to the original transcript.

9

10                          _____

11                          Signature of Deponent

12

13    I hereby certify that the individual representing

14    himself/herself to be the above-named individual,

15    appeared before me this _____ day of _____,

16    2015, and executed the above certificate in my

17    presence.

18

19                          _____

20                          NOTARY PUBLIC IN AND FOR

21

22                          _____

23                          County Name

24

25    MY COMMISSION EXPIRES:

REPORTER'S CERTIFICATE

The undersigned Certified Shorthand Reporter licensed in the State of California does hereby certify:

I am authorized to administer oaths or affirmations pursuant to Code of Civil Procedure, Section 2093(b), and prior to being examined, the witness was duly administered an oath by me.

I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the outcome of this action.

I am the deposition officer who stenographically recorded the testimony in the foregoing deposition, and the foregoing transcript is a true record of the testimony given by the witness.

Before completion of the deposition, review of the transcript [X] was [ ] was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

In witness whereof, I have subscribed my name this __14th__ day of __May__, 2015.

_Diane S. Martin_
_____
DIANE S. MARTIN, CSR No. 6464