**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN EDUCATIONAL RESEARCH ASSOCIATION, INC., AMERICAN PSYCHOLOGICAL ASSOCIATION, INC., and NATIONAL COUNCIL ON MEASUREMENT IN EDUCATION, INC., | Case No. 1:14-CV-00857-TSC-DAR |
| Plaintiffs, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT-COUNTERCLAIMANT PUBLIC.RESOURCE.ORG'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION** |
| v. | |
| PUBLIC.RESOURCE.ORG, | |
| Defendant. | Action Filed:   May 23, 2014 |

**[PUBLIC VERSION]**

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

FACTUAL BACKGROUND ...................................................................................3

    A.    Public Resource Is A Non-Profit Committed to Educating the Public About the Law....................................................................................3

    B.    Volunteers from Many Sectors Authored the Plaintiffs' 1999 Standards, But Plaintiffs Claim Copyright Ownership Because of Their Facilitating Role. ....................................................................3

    C.    The Federal Government Has Incorporated by Reference the 1999 Standards Into Law. ...............................................................5

    D.    Public Resource Began Making Standards Incorporated by Reference Freely Available Online In Accessible Formats. ......................................8

    E.    Plaintiffs Removed the 1999 Standards From Sale and Are Unaffected By the Availability of the Incorporated Standards Appearing Freely On Public Resource's Website..................................................9

ARGUMENT ........................................................................................................10

I.      SUMMARY JUDGMENT STANDARD........................................................10

II.    PLAINTIFFS CANNOT HOLD A STATUTORY MONOPOLY OVER THE LAW. ....................................................................................................11

    A.    The Law Is Not Subject to Copyright. ................................................11

          1.    An unbroken line of case law holds that the law is excluded from copyright, and the Copyright Office recognizes that exclusion. ..................................................................................11

          2.    The Plain Text of the Copyright Act Reinforces this Understanding. ..........................................................................12

          3.    A Statutory Monopoly In the Law Would Conflict with Fundamental Constitutional Protections.....................................13

    B.    Incorporated Standards Are Laws and Cannot be Subject to a Statutory Monopoly. ..........................................................................15

          1.    The leading cases recognize that standards development organizations cannot restrict access to the law. .........................15

i

# TABLE OF CONTENTS
## (Continued)

Page

    2.    Incorporated Standards, As Law, Are Also Uncopyrightable Facts, Ideas, Principles, Systems, Processes, and Procedures. ..................18

    3.    No court has ever found that government edicts are copyrightable..............................................................................19

C.    Plaintiffs Have Actively Encouraged Transformation of Their Standards Into Law and Cannot Now Complain of a "Taking." ..........................22

D.    Public Policy Favors Promoting Public Access to the Law...................................24

    1.    Plaintiffs do not make the law reasonably accessible..............................24

    2.    The Plaintiffs do not need a copyright statutory monopoly and copyright incentives in order to develop standards...................................26

E.    Plaintiffs Misinterpret the Copyright Act. ............................................................30

III.    EVEN BEFORE INCORPORATION, THE STANDARDS ARE PRIMARILY UNCOPYRIGHTABLE SYSTEMS, DISCOVERIES, PROCESSES, PROCEDURES, AND *SCÈNES À FAIRE*. ......................................................................31

A.    The 1999 Standards Are Procedures, Systems, and Principles.............................32

B.    The Incorporated Standards Are *Scènes à Faire*. ..................................................34

IV.    PUBLIC RESOURCE'S POSTING IS A LAWFUL FAIR USE. ...................................35

A.    Public Resource's Posting of the Legally Binding 1999 Standards Is Transformative, Is Noncommercial, and Is for Beneficial Public Purposes. ............................................................................................................35

    1.    Expanding access to the law is a transformative purpose..........................36

    2.    Providing new information about the law by enabling software-based analysis is a transformative and publicly beneficial purpose. ..................................................................................................38

    3.    Providing access for people with print disabilities is a legally favored fair use purpose..........................................................................40

    4.    Public Resource's use of the 1999 Standards is non-commercial...............................................................................................42

## TABLE OF CONTENTS
### (Continued)

Page

B.      The 1999 Standards Are a Factual Document. ....................................................42

C.      Public Resource Uses No More of the Standards than Necessary........................43

D.      Public Resource's Use of the 1999 Standards Has Not Caused, and
        Will Not Cause, Harm in Any Relevant Market....................................................44

        1.      Plaintiffs themselves have shut down the market for the
                1999 Standards............................................................................................45

        2.      Only the 1999 Standards are relevant to the fair use inquiry;
                Public Resource has not posted the 2014 edition and will not
                do so unless it becomes law.......................................................................46

        3.      There is no proper market for the exclusive right to control
                access to, and dissemination of, the law. ..................................................47

V.      PUBLIC RESOURCE IS NOT SECONDARILY LIABLE FOR COPYRIGHT
        INFRINGEMENT.............................................................................................................49

A.      Plaintiffs Cannot Prove Direct Infringement by Third Parties. ............................50

B.      Plaintiffs Cannot Establish Intent to Infringe or Even Knowledge of
        Any Infringement....................................................................................................52

VI.     DEFENDANTS HAVE NOT JUSTIFIED, AND CANNOT JUSTIFY, A
        PERMANENT INJUNCTION. .......................................................................................55

A.      Plaintiffs Have Experienced No Irreparable Injury to Any Valid Legal
        Interest....................................................................................................................55

        1.      Plaintiffs have no competent evidence of future harm. .............................56

        2.      "Loss of control" without actual business injury does not
                authorize an injunction...............................................................................57

A.      An Injunction Would Harm Public Resource's Ability to Serve the
        Public Interest. .......................................................................................................57

C.      The Public Interest Favors Access to Laws, Edicts, and Records of
        Government..............................................................................................................57

CONCLUSION.......................................................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
 562 F.3d 630 (4th Cir. 2009) ...................................................................36, 38, 40

*Am. Inst. of Physics v. Schwegman, Lundberg & Woessner, P.A.*,
 No. 12-528, 2013 WL 4666330 (D. Minn. Aug. 30, 2013)....................................37

*Am. Inst. of Physics v. Winstead PC*,
 No. 3:12-CV-1230-M, 2013 WL 6242843 (N.D. Tex. Dec. 3, 2013) .....................37

*Amoco Prod. Co. v. Vill. of Gambell, AK*,
 480 U.S. 531 (1987)..............................................................................................55

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986)..............................................................................................10

*Apple, Inc. v. Samsung Electronics Co.*,
 678 F.3d 1314 (Fed. Cir. 2012)............................................................................55

*ATC Distrib. Grp., Inc. v. Whatever It Takes Transmission & Parts, Inc.*,
 402 F.3d 700 (6th Cir. 2005) ...............................................................................34

*Authors Guild, Inc. v. HathiTrust*,
 755 F.3d 87 (2d Cir. 2014)........................................................................38, 40, 41

*Authors Guild v. Google, Inc.*,
 804 F.3d 202 (2d Cir. 2015)........................................................................36, 38, 43, 44

*Banks v. Manchester*,
 128 U.S. 244 (1888)........................................................................................11, 12

*Bateman v. Mnemonics, Inc.*,
 79 F.3d 1532 (11th Cir. 1996) .............................................................................35

*BellSouth Advert. & Publ'g Corp. v. Donnelley Info. Publ'g, Inc*,
 999 F.2d 1436 (11th Cir. 1993) ...........................................................................34

*Bikram's Yoga College of India, L.P. v. Evolation Yoga, LLC*,
 803 F.3d 1032 (9th Cir. 2015) .............................................................................33

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
 448 F.3d 605 (2d Cir. 2006)..................................................................................38

iv

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Blanch v. Koons*,
  467 F.3d 244 (2d Cir. 2006) ............................................................................45, 46

*Bond v. Blum*,
  317 F.3d 385 (4th Cir. 2003) ...............................................................................37

*Building Officials & Code Administrators v. Code Technology, Inc.*,
  628 F.2d 730 (1st Cir. 1980) ...............................................................................16

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994) .................................................................................. *passim*

*Cartoon Network LP v. CSC Holdings, Inc.*,
  536 F.3d 121 (2d Cir. 2008) ............................................................................51, 52

*CCC Information Services Inc. v. McLean Hunter Market Reports, Inc.*,
  44 F.3d 61 (2d Cir. 1994) ...............................................................................19, 20

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ............................................................................................10

*Computer Assocs. Int'l, Inc. v. Altai, Inc.*,
  982 F.2d 693 (2d Cir. 1992) .................................................................................34

*Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*,
  843 F.2d 600 (1st Cir. 1988) ...............................................................................18

*Connecticut v. Massachusetts*,
  282 U.S. 660 (1931) ............................................................................................57

*Consumers Union of U.S., Inc. v. Gen. Signal Corp.*,
  724 F.2d 1044 (2d Cir. 1983) ......................................................................42, 43, 46

*Costar Grp. Inc. v. Loopnet, Inc.*,
  164 F. Supp. 2d 688 (D. Md. 2001) *aff'd*, 373 F.3d 544 (4th Cir. 2004) ...............................53

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) ....................................................................................55, 57, 58

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991) ............................................................................................32

*Field v. Google Inc.*,
  412 F. Supp. 2d 1106 (D. Nev. 2006) ...................................................................46

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Fox News Network, LLC v. TVEyes, Inc.,*
    43 F. Supp. 3d 379, 395 (S.D.N.Y. 2014)..............................................................44

*Fox v. Washington,*
    236 U.S. 273 (1915)................................................................................................15

*Garcia v. Google, Inc.,*
    786 F.3d 733 (9th Cir. 2015) (en banc) ................................................................49

*Globe Newspaper Co. v. Superior Court for Norfolk Cty.,*
    457 U.S. 596 (1982)...............................................................................................14

*Golan v. Holder,*
    132 S. Ct. 873 (2012).............................................................................................13

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972)...............................................................................................15

*Greene v. Dalton,*
    164 F.3d 671 (D.C. Cir. 1999) ................................................................10, 26, 28

*Harding v. Gray,*
    9 F.3d 150 (D.C. Cir. 1993) ..................................................................................10

*Harper & Row Publ'rs., Inc. v. Nation Enters.,*
    471 U.S. 539 (1985)...............................................................................................42

*Healthcare Advocates Inc. v. Harding, Earley, Follmer & Frailey,*
    497 F. Supp. 2d 627 (E.D. Pa. 2007) ....................................................................37

*Howell v. Miller,*
    91 F. 129 (6th Cir. 1898) (Harlan, J.) ...................................................................12

*Katz v. Google Inc.,*
    802 F.3d 1178 (11th Cir. 2015) ......................................................................45, 49

*Kern River Gas Transmission Co. v. Coastal Corp.,*
    899 F.2d 1458 (5th Cir. 1990), *cert. denied*, 498 U.S. 952 (1990)...................18, 19

*Lenz v. Universal Music Corp,*
    801 F.3d 1126 (9th Cir. 2015) ..............................................................................35

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    387 F.3d 522 (6th Cir. 2004) ...........................................................34, 37, 38, 43

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Mattel, Inc. v. Walking Mountain Prods.*,
    353 F.3d 792 (9th Cir. 2003) ...............................................................................46

\*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005).......................................................................49, 50, 52, 53

*Mills v. Alabama*,
    384 U.S. 214 (1966).........................................................................................14

*Musser v. Utah*,
    333 U.S. 95 (1948)...........................................................................................14

*Newborn v. Yahoo!, Inc.*,
    391 F. Supp. 2d 181 (D.D.C. 2005) ...........................................................49, 54

*Newport-Mesa Unified Sch. Dist. v. California Dep't of Educ.*,
    371 F. Supp. 2d 1170 (C.D. Cal. 2005) ............................................................41

*Nieman v. VersusLaw, Inc.*,
    512 Fed. App'x. 635, 2013 WL 1150277 (7th Cir. Mar. 19, 2013).........................14

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*,
    166 F.3d 65 (2d Cir. 1999)...............................................................................32

*Nuñez v. Caribbean Int'l News Corp.*,
    235 F.3d 18 (1st Cir. 2000)..........................................................................44, 47

*Nuzzo v. FBI*,
    No. 95–cv–1708, 1996 WL 741587 (D.D.C. Oct. 8, 1996)..................................11

*O'Shea v. Littleton*,
    414 U.S. 488 (1974).........................................................................................55

\*Online Policy Grp. v. Diebold, Inc.*,
    337 F. Supp. 2d 1195 (N.D. Cal. 2004) .........................................38, 45, 47, 48

\*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ............................................................... *passim*

*Practice Management Information Corp. v. American Medical Ass'n*,
    121 F.3d 516 (9th Cir. 1997) ..................................................................19, 20, 21

*Pub. Warehousing Co. K.S.C. v. Def. Supply Ctr. Phila.*,
    489 F. Supp. 2d 30 (D.D.C. 2007) ...................................................................55

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*R.W. Beck v. E3 Consulting*,
   577 F.3d 1133 (10th Cir. 2009) ..............................................................................13

*Rains v. Cascade Indus., Inc.*,
   402 F.2d 241 (3d Cir. 1968)....................................................................................11

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*,
   907 F. Supp. 1361 (N.D. Cal. 1995) .......................................................................53

*Righthaven, LCC v. Jama*,
   No. 2:10-CV-1322, 2011 WL 1541613 (D. Nev. Apr. 22, 2011)................................46, 48, 49

*Silvers v. Sony Pictures Entm't, Inc.*,
   402 F.3d 881 (9th Cir. 2005) ............................................................................13, 43

*\*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984).................................................................................... *passim*

*Sturdza v. United Arab Emirates*,
   281 F.3d 1287 (D.C. Cir. 2002) .............................................................................32

*Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*,
   24 F.3d 1088 (9th Cir. 1994) .................................................................................50

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
   756 F.3d 73 (2d Cir. 2014).............................................................................41, 43

*U.S. v Jefferson County*,
   380 F. 2d 385 (5th Cir. 1967) ................................................................................26

*United States v. Aina–Marshall*,
   336 F.3d 167 (2d Cir. 2003)...................................................................................54

*\*United States v. Myers*,
   553 F.3d 328 (4th Cir. 2009) .................................................................................17

*\*Veeck v. S. Bldg. Code Cong. Int'l, Inc.*,
   293 F.3d 791 (5th Cir. 2002) (*en banc*) ............................................................ *passim*

*Viacom Int'l Inc. v. YouTube, Inc.*,
   940 F. Supp. 2d 110 (S.D.N.Y. 2013)......................................................................54

*\*Wheaton v. Peters*,
   33 U.S. (8 Pet.) 591 (1834) ...................................................................................11

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008).............................................................................................58

REGULATIONS

1 C.F.R. part 51...............................................................................................17

*1 C.F.R. § 51.1, *et seq.*................................................................................17, 48

34 C.F.R. Part 668, Subpart F..........................................................................8

34 C.F.R. § 668.141.........................................................................................58

*34 C.F.R. § 668.146.......................................................................5, 6, 7, 11, 16, 58

34 C.F.R. § 668.148..........................................................................................7

50 Fed. Reg. 40895..........................................................................................20

50 Fed. Reg. 40897..........................................................................................20

75 Fed. Reg. 66923............................................................................................7

78 Fed. Reg. 17598..........................................................................................16

FEDERAL STATUTES AND MATERIALS

*5 U.S.C. § 552............................................................................................5, 17, 19

*17 U.S.C. § 101 (Copyright Act of 1976)............................................. *passim*

*17 U.S.C. § 102(b) (Copyright Act, Section 102(b)).......................... *passim*

17 U.S.C. § 105 (Copyright Act, Section 105) ..................................................13

*17 U.S.C. § 106 (Copyright Act, Section 106) ...............................35, 51, 52

*17 U.S.C. § 107...........................................................................35, 38, 39, 46

17 U.S.C. § 201(a) ..........................................................................................31

H.R. Rep. No. 94–1476 (1976), 1976 U.S.C.C.A.N. 5659................................40

*U.S. Const. art. I § 8, cl. 8.........................................................................2, 18, 49

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

RULES

Fed. R. Civ. P. 30(b)(6)....................................................................................4, 29, 30

Fed. R. Civ. P. 56(c) ...............................................................................................10

STATE LAW

Md. Admin. Rule 09.12.26.04 ................................................................................17

Md. Admin. Rule 09.12.26.06 ...........................................................................11, 17

Minn. Admin. Rule 4761.2460, Subp. 2(C)........................................................11, 17

N.Y. Comp. Codes R. & Regs. tit. 11, § 216.7 ......................................................20

OTHER AUTHORITIES

1 Goldstein on Copyright § 2.49 n.45.2.............................................................16, 19

1 Goldstein on Copyright § 2.5.2, at 2:51...............................................................27

4 Nimmer on Copyright § 13.03[B][3].................................................................19, 34

4 Nimmer on Copyright § 14.06[C][1][a].................................................................32

Ashley, Kevin D. & Stefanie Brüninghaus, *Computer Models for
    Legal Prediction*................................................................................................39

Code of the District of Columbia, http://dccode.org/simple/.....................................39

D.C. Municipal Regulations and D.C. Register, http://www.dcregs.dc.gov/ ...............39

Kasunic, Robert, *Is that All There Is? Reflections on the Nature of the
    Second Fair Use Factor*, 31 Colum. J.L. & Arts 529 (2008) .................................43

Lastres, Steven A., *Rebooting Legal Research in a Digital Age,* LLRX
    (Aug. 10, 2013), https://www.llrx.com/files/rebootinglegalresearch.pdf ..............40

*Leval, Pierre N., *Toward A Fair Use Standard*,
    103 Harv. L. Rev. 1105 (1990)........................................................................38, 39

Li, William, et al., *Law Is Code: A Software Engineering Approach to Analyzing
    the United States Code,* 10 J. Bus. & Tech. L. 297 (2015)....................................39

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Samuelson, Pamela, *Questioning Copyrights in Standards*,
    48 B.C. L. Rev 193 (2007)......................................................................................27

Smith, Thomas A., *The Web of Law*, 44 San Diego L. Rev. 309 (2007).......................................39

*Strauss, Peter L., *Private Standards Organizations and Public Law 16*
    (Columbia Pub. Law Research, Paper No. 13-334, 2013),
    http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2194210 ...............................................22

U.S. Copyright Office, Compendium of Copyright Office Practices
    § 313.6(c)(2) (3d ed. 2014)......................................................................................12

**INTRODUCTION**

Public Resource deserves summary judgment in its favor on multiple independent but related grounds. The core issue here is simple: the 1999 Standards for Educational and Psychological Testing have been incorporated into law. They have become enforceable as law, and the public has a fundamental due process right to access, disseminate, and comment on them (including by annotations) at will. For more than 200 years, our courts and legislatures have recognized that it would be profoundly unjust to allow any person to claim a monopoly property right in the law, whether that law takes the form of legal opinions, statutes, or regulations. No matter who holds the pen, as a matter of law and policy in our democratic system, the citizens are the true authors and owners of the law.

In the closely analogous case of *Veeck v. Southern Building Code Congress International*, the Fifth Circuit Court of Appeals confirmed that this fundamental principle does not change just because our government has chosen to outsource the crafting of some regulations to private organizations and then incorporate those regulations by reference into law. Once incorporated, those rules are binding law. For example, under the Higher Education Act, states must comply with Department of Education rules that include the 1999 Standards or risk losing federal funds for education. As a result, millions of parents and students are affected by the legally binding standards, and they may wish to review, share, and comment on them. Journalists and education advocates share the same interest.

To be clear, this case does not concern Public Resource's right to speak or share standards as *private standards.* It concerns the public's right to speak, share, and comment upon *the law*. Public Resource does not post standards that have not been incorporated into law, such as the 2014 edition of the Standards for Educational and Psychological Testing. The sole document at issue in this case, the 1999 Standards, is current law but obsolete as a standard.

Indeed, Plaintiffs stopped distributing the 1999 Standards altogether for almost a year, resuming sales only for purposes of this case, and subject to a variety of practical barriers.

Plaintiffs' copyright claim—which they claim includes the right to shut down most public access altogether—is fundamentally incompatible with the purposes of copyright and with the public's practical and constitutional interest in knowing the law that governs important aspects of their daily lives. Moreover, *the law*, as a public fact, system, process, and procedure, is excluded from the statutory monopoly under traditional copyright law doctrines.  No one may claim a "right to exclude" others from using the law, and the Court should grant summary judgment to Public Resource on this ground alone.

But that issue is only the first flaw in Plaintiffs' case. The Plaintiffs' claims also fail, in whole or in part, for several other reasons: (1) *even apart from their status as law*, the 1999 Standards are largely systems, processes, and procedures, which the Copyright Act specifically excludes from copyright protection; (2) Public Resource's posting of the 1999 Standards is a lawful fair use; and (3) Plaintiffs have not established, and cannot establish conclusively, direct infringement by any third parties, which is a precondition for summary judgment on their contributory infringement claim.[1]

As the Court may surmise, the flaws in Plaintiffs' case share a common theme. Plaintiffs wish to stretch copyright law beyond its statutory borders and distort the very purposes of copyright law. Copyright is intended "to promote the Progress of Science and useful Arts," by encouraging creative expression, to the benefit of the public. *See* U.S. Const. art. I § 8, cl. 8. Copyright incentives are neither needed nor appropriate to encourage lawmaking or standardization of industry practices. Those who write the laws—whether elected or unelected

---

[1] Public Resource also disputes Plaintiffs' claim of ownership of the 1999 Standards but does not seek summary judgment on that issue at this time.

(like lobbyists)—do not need and should not have control over others' access to the law, whether to exercise raw political power or extract lucre.

Public Resource respectfully urges the Court to recognize the limits of copyright, and to protect due process, by granting summary judgment to Public Resource.

<strong>FACTUAL BACKGROUND</strong>

Public Resource posts many forms of law on its website. This includes statutes, regulations, and standards that have been incorporated by reference into law.

**A.      Public Resource Is A Non-Profit Committed to Educating the Public About the Law.**

Public.Resource.org is a non-profit corporation whose mission is to maintain public works projects on the Internet, including the dissemination of statutes, regulations, and other material that constitutes the law. (Public Resource's Statement of Material Facts ("SMF") ¶¶ 1-2.) Public Resource maintains an archive of laws and other government authored materials on several domains under the public.resource.org website. (*Id.* ¶ 2.) Public Resource has made judicial opinions, Internal Revenue Service records, patent filings, and safety regulations accessible on the Internet. (*Id.* ¶ 4). It does not charge for access to this archive or accept donations or gifts that are tied to the posting of specific standards or groups of standards. (*Id.* ¶ 5–6.) Its operating income is not based on the amount of traffic its websites receive. (*Id.* ¶ 7.)

**B.      Volunteers from Many Sectors Authored the Plaintiffs' 1999 Standards, But Plaintiffs Claim Copyright Ownership Because of Their Facilitating Role.**

The 1999 Standards that Plaintiffs published were developed by unpaid volunteers. (SMF ¶ 8.) Plaintiffs highlight the work of the 17 volunteer Joint Committee members who helped develop the 1999 Standards, but these are just a subset of all contributors to the 1999 Standards. Hundreds of individuals, organizations, and government entities provided proposed

3

text and comments for 1999 Standards. (*Id.* ¶ 9.) The volunteers draft the standards to achieve a consensus of best practices in the areas covered by the 1999 Standards. (*Id.* ¶ 10.)

In December 1999, one of the Plaintiffs, AERA, sought and obtained a copyright registration claiming to be the sole author of the 1999 Standards. (*Id.* ¶ 11.) Fourteen years later, in February 2014, Plaintiffs obtained a supplemental copyright registration that listed all the Plaintiff organizations as authors and copyright owners of the 1999 Standards, ostensibly "to correct an error in the listing of copyright ownership in the prior registration." (*Id.* ¶ 12.) Yet in February 2014, at the time of that corrective filing, Plaintiffs did not have any copyright assignments from the persons who actually authored the 1999 Standards. (*Id.* ¶ 13.) It was not until April 2014 and throughout the rest of that year that Plaintiffs began to obtain certain forms[2] from some of these individuals. (*Id.*) Plaintiffs now claim to be "joint owners" of the standards. (Plaintiffs' Memorandum of Points and Authorities, ECF 60-1 ("Pls. Mem.") at 12.) Plaintiffs' staffs provide facilitative and administrative functions, but they do not author the standards or control the final content. (SMF ¶ 17.) Plaintiffs have not sought or obtained assignments from the many hundreds of individuals and organizations that participated in the development of the 1999 Standards. (*Id.* ¶ 18.). Nor have Plaintiffs done anything to ensure that the alleged assignors had authority to assign copyrights to the Plaintiffs. (*Id.* ¶ 19.)

---

[2] In their motion, Plaintiffs refer to these as "work made-for-hire letters," as well as "posthumous assignments" from alleged heirs. The description of them "work made-for-hire letters" is inconsistent with AERA's Rule 30(b)(6) representative's characterization of them as "assignments" at deposition. The documents were signed a decade and a half after the fact, and Plaintiffs did not compensate the people who developed the 1999 Standards for their work. (SMF ¶ 14.) The "posthumous assignments" were also made without any consideration having been delivered to the alleged heirs who signed them. (*Id.* ¶ 15.) There is a genuine dispute regarding whether these are valid copyright assignments.

**C.      The Federal Government Has Incorporated by Reference the 1999 Standards Into Law.**

The federal government has incorporated by reference the 1999 Standards into law at

34 C.F.R. § 668.146. (*Id.* ¶ 20; Pls. Mem. 13.) Plaintiffs have actively encouraged—and indeed

lobbied—the government to adopt the 1999 Standards as law. (SMF ¶ 52–56.)

The federal government incorporates standards into law following a rigorous notice and

comment period. Generally, an agency responsible for regulating an industry will publish a

notice in the Federal Register concerning the agency's intent to incorporate a standard into law

and will ask the public to submit comments. (*Id.* ¶ 22–24.)

At the end of the notice and comment process, the agency will determine whether to

incorporate the standard by reference. (*Id.* ¶ 24.) If the agency incorporates the standard by

reference, the Director of the Federal Register then approves the incorporation by reference.

5 U.S.C. § 552(a). The federal government expressly encourages agencies to incorporate

standards by reference, as opposed to reprinting the entire text of the standards, to limit the

length of the Code of Federal Regulations. (*Id.* ¶ 26.) The standard then becomes the law of the

United States. Standards are also incorporated by reference into state and local laws (*Id.* ¶ 21.)

Plaintiffs benefit from the incorporation of their standards into law. (*Id.* ¶ 30.) When a

standard is incorporated by reference into the Code of Federal Regulations, the code itself

informs readers that they may obtain a copy of the standards from the Office of the Federal

Register ("OFR") or from the SDO that published the standard. *E.g.*, 34 C.F.R. § 668.146. The

OFR directs people who want to read incorporated standards to "contact the standards

organization that developed the material." (*Id.* ¶ 27.) Alternatively, one may submit a written

request to the OFR to inspect (and make limited photocopies of) an incorporated standard at an

office in Washington, D.C. (*Id.*)

The Higher Education Act requires states to comply with the 1999 Standards in developing and administering a variety of tests in order to receive federal aid. (*Id.* ¶ 33.) Federal aid to students under the Department of Education's Title IV program totals some $150 billion annually[3], and for-profit colleges in 2009 were taking in as much as $32 billion of that amount.[4] (*Id.*)

One specific example of the effect of the 1999 Standards' incorporation into law is their role in the so-called "ability to benefit" (ATB) program. This program allows access to federal aid for students who lack a high school diploma or a GED certificate if they either (1) complete at least 6 credit hours in a post-secondary school; or (2) pass an independently administered Department of Education approved ability to benefit test.[5] (*Id.* ¶ 34.) In a 2009 report, the U.S. Government Accountability Office raised concerns that some for-profit colleges were helping students cheat on the ability to benefit test or falsifying test results.[6] (*Id.*)

The Department of Educations responded by issuing new regulations for ATB tests, codified at 34 C.F.R. 668.146, with specific requirements to enhance the quality and integrity of the tests. (*Id.* ¶ 35.) To be approved by the Secretary of Education, an ATB test must "Meet all standards for test construction provided in the 1999 edition of the *Standards for Educational and*

---

[3] Title IV programs include Federal Perkins Loans, Direct Loans (including Stafford and PLUS loans), Pell Grants, and Federal Work Study, representing the majority of federal student aid. http://federalstudentaid.ed.gov/site/front2back/programs/programs/fb_03_01_0030.htm.

[4] *See* Senate Health Education Labor & Pensions Committee report, For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success http://www.help.senate.gov/imo/media/for_profit_report/Contents.pdf.

[5] Congress abolished the ability to benefit program in 2012 but restored it in 2014. *See* Department of Education letter, DCL ID: GEN-15-09, "Title IV Eligibility for Students Without a Valid High School Diploma Who Are Enrolled in Eligible Career Pathway Programs," https://ifap.ed.gov/dpcletters/GEN1509.html.

[6] GAO, PROPRIETARY SCHOOLS: Stronger Department of Education Oversight Needed to Help Ensure Only Eligible Students Receive Federal Student Aid, August 2009. http://www.gao.gov/new.items/d09600.pdf.

*Psychological Testing*," i.e. the 1999 Standards.[7] (*Id.*) The Department made one specific change

to its final version of the 2010 Rule, codified at § 668.146(b)(6), in response to a comment

pointing out that the Department's proposed rule used outdated language present in the 1985

AERA Standards, but revised in the 1999 Standards.[8] (*Id.* ¶ 36.) Thus, Department officials

deliberately shaped the regulation to harmonize its printed provisions with those provisions that

were incorporated by reference, i.e. the 1999 Standards. (*Id.*)

A wide range of parties might want access to the 1999 Standards in order to determine

whether a given ATB test was in compliance with those regulation. These parties include:

- Test publishers in the business of devising ATB tests, and states devising ATB tests for students in their state—both wanting to ensure their products are compliant with the law;

- Federal and state law enforcement and education oversight agencies, seeking to ensure the integrity of higher education programs;

- Students, and potentially lawyers for students, assessing whether a test was compliant in order to contest denial of ATB benefits or, alternatively, to seek loan forgiveness on the grounds that the school acted improperly;

- Journalists and advocacy organizations evaluating the quality and integrity of higher education programs in which federal money—and student futures—are invested; and

- Schools, whether large and small; for-profit, non-profit, or state; seeking to ensure that the tests they use comply with federal ATB rules in order to receive aid and to

---

[7] 34 C.F.R. § 668.146(b)(6). The 1999 Standards are referenced again with respect to tests conducted in foreign languages for non-native speakers of English, 34 C.F.R. § 668.148(a)(1)(iv), for test modifications to accommodate students with disabilities, 34 C.F.R. § 668.148(a)(2)(i), and for specific requirements for computer-based tests. 34 C.F.R. § 668.148(a)(3)(i)

[8] 75 F.R. 66923

avoid potential liability. The Department of Education also can cut off Title IV

money and impose civil fines if it concludes that a college has made "a substantial

misrepresentation about the nature of its educational program, its financial charges, or

the employability of its graduates." 34 C.F.R. Part 668, Subpart F. Thus, if a school

represented the test it used as compliant with the 1999 Standards, but in fact it was

not, it could face serious penalties.

Public Resource's work makes this incorporated law accessible to all of these affected citizens.

### D. Public Resource Began Making Standards Incorporated by Reference Freely Available Online In Accessible Formats.

Beginning in 2008, Public Resource began posting state safety regulations and statutes

online, including portions of the incorporated standards in this case. (*Id.* ¶ 37.) Public Resource

purchased paper copies of the codes and scanned them into PDF files. (*Id.*) Public Resource then

applied metadata and optical character recognition ("OCR") to the PDF files. (*Id.*) Public

Resource also placed a cover sheet on each document to make it clear that Public Resource was

posting the document because it had been incorporated by reference into law. (*Id.*) Public

Resource improved this process over time and began posting some of the standards in HTML

format, which included converting formulas and graphics into appropriate formats. (*Id.*)

In 2012, Public Resource began to post on its website copies of standards incorporated by

reference into law. Public Resource began by purchasing paper copies of 73 standards, copying

them and placing a cover sheet and notice of incorporation on each one, and sending the copies

and additional material to government officials and ten standards organizations. (*Id.* ¶ 38.) Then

Public Resource president Carl Malamud began searching for copies of additional incorporated

standards, many of which were not available from the standards organizations, often because the

version incorporated into law had been superseded by a later version of the standard. (*Id.* ¶ 38.)

Public Resource makes the standards it posts freely available on its website. (*Id.* ¶ 5.)

### E.     Plaintiffs Removed the 1999 Standards From Sale and Are Unaffected By the Availability of the Incorporated Standards Appearing Freely On Public Resource's Website.

In May 2014, Plaintiffs sued Public Resource for posting on its website and the Internet

Archive website the 1999 Standards. (Compl. ECF No. 1.) Subsequently, so as to ensure a full

record, in June 2014 Public Resource agreed to take down the versions of the 1999 Standards

that it had posted on its website and on the Internet Archive website, pending the resolution of

this case. (SMF ¶ 39.) Shortly thereafter, in August 2014, Plaintiffs published the new 2014

edition of the *Standards for Educational and Psychological Testing* ("the 2014 Standards"), and

then subsequently removed the 1999 Standards from sale. (SMF ¶ 40.) This is in keeping with

Plaintiffs' past practice of taking prior editions of the Standards off sale once the new edition is

published. (SMF ¶ 41–42.) Plaintiffs only put the 1999 Standards on sale once more in July 2015

after the issue was brought to their attention at deposition in April and May of that year. (SMF

¶ 43.)



9

Plaintiffs included an unsealed complete version of the 1999 Standards in their Motion for Summary Judgment filing (ECF No. 60-25–26; SMF ¶ 48), which is now available for download to the public for a $6 fee, and may also be available on RECAP (a service that provides PACER documents for free) now or in the future. (SMF ¶ 49.) Other than this, Plaintiffs have never made an electronic version of the 1999 Standards available to the public, nor do they plan to, and they have not published any other versions of the 1999 Standards that would be accessible to people who are blind or visually disabled. (SMF ¶ 50.)

## ARGUMENT

## I.    SUMMARY JUDGMENT STANDARD

A court must grant summary judgment if it determines that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment on the undisputed facts as a matter of law." Fed. R. Civ. P. 56(c). *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A movant has the burden to make an initial showing of the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden is met, the movant is entitled to a judgment as a matter of law if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. That showing may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993). Instead, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Greene*, 164 F.3d at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

Where, as here, parties file cross-motions for summary judgment, each must carry its own burden under the applicable legal standard. *See Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968); *Nuzzo v. FBI*, No. 95–cv–1708, 1996 WL 741587, at *1 (D.D.C. Oct. 8, 1996).

## II.     PLAINTIFFS CANNOT HOLD A STATUTORY MONOPOLY OVER THE LAW.

No copyright exists in the law itself. This is true for the United States Code and the Code of Federal Regulations. It is true for every state's codes and for local ordinances. It is equally true where the law was drafted by volunteers and then made into law by a legislature or agency. In this case, the 1999 Standards have become law through incorporation by reference into various federal and state regulations. *See, e.g.*, 34 C.F.R. § 668.146(b)(6); Md. Admin. Rule 09.12.26.06(E)(1)(c)(i); Minn. Admin. Rule 4761.2460, Subp. 2(C). As a result, they are outside the copyright statutory monopoly.

### A.     The Law Is Not Subject to Copyright.

#### 1.     An unbroken line of case law holds that the law is excluded from copyright, and the Copyright Office recognizes that exclusion.

For nearly two centuries it has been a fundamental principle of American jurisprudence that the texts that make up the law are in the public domain and cannot be under private control. Indeed, the Supreme Court's first copyright decision, *Wheaton v. Peters*, 33 U.S. (8 Pet.) 591 (1834) established this principle. In that case, one of the Court's own official reporters claimed copyright in his annotated collections of the Court's opinions. The Court declared that it was "unanimously of opinion that no reporter has or can have any copyright in the written opinions delivered by this Court." *Id.* at 668. Similarly, in *Banks v. Manchester*, 128 U.S. 244 (1888), the Court rejected a copyright claim by a court reporter for a collection of the opinions of the Ohio Supreme Court. "The whole work done by the judges constitutes the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all, whether it is

11

a declaration of unwritten law, or an interpretation of a constitution or a statute." *Id.* at 253. In

1898, the Sixth Circuit observed that "any person desiring to publish the statutes of a state may

use any copy of such statutes to be found in any printed book, whether such book be the property

of the state or the property of an individual." *Howell v. Miller*, 91 F. 129, 137 (6th Cir. 1898)

(Harlan, J.).

Decisions such as *Banks* "represent[] a continuous understanding that 'the law,' whether

articulated in judicial opinions or legislative acts or ordinances, is in the public domain and thus

not amenable to copyright." *Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791, 796 (5th Cir.

2002) (*en banc*). The U.S. Copyright Office has expanded on this fundamental principle with

respect to all forms of law from all sources, not merely U.S. Government works:

> As a matter of longstanding public policy, the U.S. Copyright Office will not
> register a government edict that has been issued by any state, local, or territorial
> government, including *legislative enactments, judicial decisions, administrative
> rulings, public ordinances, or similar types of official legal materials*. Likewise,
> the Office will not register a government edict issued by any foreign government.

U.S. Copyright Office, Compendium of Copyright Office Practices § 313.6(c)(2) (3d ed. 2014)

(emphasis added).

### 2.    The Plain Text of the Copyright Act Reinforces this Understanding.

The exclusion of the law from the copyright statutory monopoly long predates the 1976

Copyright Act, but the Act reinforces the principle in two ways. Section 102(b) of the Copyright

Act, 17 U.S.C. § 102(b), precludes copyright for "any idea, procedure, process, system, method

of operation, concept, principle, or discovery, regardless of the form in which it is described,

explained, illustrated, or embodied in such work." Law is a "system of rules that a particular

country or community recognizes as regulating the actions of its members and may enforce by

the imposition of penalties."[9] As a system, the law itself and particular laws are excluded from copyright pursuant to the terms of the Copyright Act itself.

Section 102(b) helps ensure that "courts do not unwittingly grant protection to an idea by granting exclusive rights in the only, or one of only a few, means of expressing that idea." *R.W. Beck v. E3 Consulting*, 577 F.3d 1133, 1145 (10th Cir. 2009) (citation omitted). The only way to express codified laws, or law that is incorporated by reference from other sources, is to use the language of the law itself. Once incorporated in to law, standards become "the unique, unalterable expression of the 'idea' that constitutes local law." *Veeck*, 293 F.3d at 801. Under Section 102(b), they cannot be subject to copyright restrictions.

Moreover, section 105 of the Copyright Act, 17 U.S.C. § 105, denies copyright for any work of the U.S. Government. When Congress enacts a bill that was drafted by a private lobbyist, the resulting law is still a U.S. government work. So too for a regulation enacted by an agency by incorporating by reference a pre-existing standard.

### 3.   A Statutory Monopoly In the Law Would Conflict with Fundamental Constitutional Protections.

In *Golan v. Holder*, 132 S. Ct. 873, 890 (2012), the Supreme Court recognized the potential tension between the First Amendment and copyright, and it identified the exclusion of ideas, which Section 102(b) codifies, as essential to balancing copyright and free speech protections. *Id.* at 889–91. Copyright, while authorized by the Constitution, is a statutory right. *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 883–84 (9th Cir. 2005). It cannot trump fundamental constitutional rights.

---

[9] *See* "Law," Oxford English Dictionary, https://www.oxforddictionaries.com/us/definition/american_english/law.

Section 102(b) plays that vital balancing role with respect to the law. Communication about the law is a core speech interest. *See, e.g.*, *Nieman v. VersusLaw, Inc.*, 512 Fed. App'x. 635, 2013 WL 1150277, at *2 (7th Cir. Mar. 19, 2013). As the Supreme Court noted in striking down a statute that would close criminal trials, "'a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs.' [This] serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government." *Globe Newspaper Co. v. Superior Court for Norfolk Cty.*, 457 U.S. 596, 604 (1982) (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)).

Accordingly, copyright restrictions on communicating the law could put the Copyright Act in conflict with the First Amendment. Section 102(b)'s exclusion of laws from copyrightability helps resolve that conflict, ensuring that copyright does not interfere with the public's ability to access, share, and discuss the law.

Equal protection of the laws and due process are also jeopardized if some citizens can afford convenient access to the laws that all are bound to obey (with potential penalties for non-compliance), but others cannot. As Thomas Paine observed, "Every man is a proprietor in government, and considers it a necessary part of his business to understand . . . . The government of a free country, properly speaking, is not in the persons, but in the laws." Thomas Paine, Rights of Man 39 (1791). A law that is vague "may run afoul of the Due Process Clause because it fails to give adequate guidance to those who would be law-abiding, to advise defendants of the nature of the offense with which they are charged, or to guide courts in trying those who are accused." *Musser v. Utah*, 333 U.S. 95, 97 (1948). Similarly, the Supreme Court has stated:

14

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning.

*Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

A law that a citizen cannot access is the vaguest of vague laws. Allowing any entity to restrict access to the law would thwart the essential democratic requirement of notice. *See Fox v. Washington*, 236 U.S. 273, 277 (1915) (courts should avoid construing statutes in ways that raise constitutional concerns). The public must be able to review and understand the rules we live by, so that they do not become traps for the unwary.

## B. Incorporated Standards Are Laws and Cannot be Subject to a Statutory Monopoly.

The fundamental right to access and share the law does not disappear when the law in question is a technical standard that has become law through incorporation by reference.

### 1. The leading cases recognize that standards development organizations cannot restrict access to the law.

As the Fifth Circuit concluded in *Veeck*, once a standard is incorporated into the law, the people become the owner of that law. In that case, Peter Veeck, a Texas resident who hosted a noncommercial website collecting information about north Texas, purchased and then posted online model building codes that had been incorporated into the law of two Texas towns. 293 F.3d at 793. The private organization that initially developed the codes accused Veeck of copyright infringement. Sitting *en banc*, the Fifth Circuit rejected the claim:

> Lawmaking bodies in this country enact rules and regulations only with the consent of the governed. The very process of lawmaking demands and incorporates contributions by "the people," in an infinite variety of individual and organizational capacities. Even when a governmental body consciously decides to enact proposed model building codes, it does so based on various legislative considerations, the sum of which produce its version of "the law." In performing

15

their function, the lawmakers represent the public will, and the public are the final "authors" of the law.

. . .

. . . [P]ublic ownership of the law means precisely that "the law" is in the "public domain" for whatever use the citizens choose to make of it. Citizens may reproduce copies of the law for many purposes, not only to guide their actions but to influence future legislation, educate their neighborhood association, or simply to amuse.

293 F.3d at 799.

The Fifth Circuit's reasoning in *Veeck* echoes that of the First Circuit in *Building Officials & Code Administrators v. Code Technology, Inc*., 628 F.2d 730 (1st Cir. 1980). In that case, the First Circuit vacated a preliminary injunction obtained by the creator and copyright holder of a model building code that Massachusetts had adopted into law. *Id.* at 731. The Court remanded for further proceedings, observing:

The citizens are the authors of the law, and therefore its owners, regardless of who actually drafts the provisions, because the law derives its authority from the consent of the public, expressed through the democratic process.

. . . [C]itizens must have free access to the laws which govern them.

. . . .

[I]t is hard to see how the public's essential due process right of free access to the law (including a necessary right freely to copy and circulate all or part of a given law for various purposes), can be reconciled with the exclusivity afforded a private copyright holder . . . .

*Id.* at 734, 736.

To be clear, "copyrighted works do not 'become law' merely because a statute refers to them." *See Veeck*, 293 F.3d at 805 (citing 1 Goldstein on Copyright **§** 2.49 n.45.2). In this case, however, the material in question has not merely been cited by a government agency. Instead, it has been expressly adopted as the law of the land through the incorporation by reference process, as part of a set of regulations "for improving integrity" in education. 78 Fed. Reg. 17598; 34 C.F.R. § 668.146. The regulations state that "[i]ncorporation by reference of this document [the 1999 Standards] has been approved by the Director of the Office of the Federal Register pursuant

16

to the Director's authority under 5 U.S.C. 552(a) and 1 C.F.R. part 51." *Id.* Because they are incorporated by reference, the 1999 Standards are "deemed published in the Federal Register" and have the same legal import as if they had been reproduced word for word there. 5 U.S.C. § 552(a).[10]

As the Office of the Federal Register has explained, material incorporated by reference, "like any other properly issued rule, has the force and effect of law." (SMF ¶ 31.); *see also United States v. Myers*, 553 F.3d 328, 331 (4th Cir. 2009) (material incorporated by reference has the same force of law as the incorporating regulation itself). The only reason the federal government instead incorporates some regulations by reference instead of reproducing them word for word is to limit the (already considerable) length of the Code of Federal Regulations. (*Id.*) That goal, however laudable, cannot be read as a reason to grant a private entity ownership and control over regulations that bind the public. As much as landmark health care acts or Supreme Court civil rights decisions, the 1999 Standards are a legal mandate. ███████

████████████████████████████████████████████████

Like the plaintiffs in the *ASTM v. Public.Resource.Org* case, Plaintiffs here try to distinguish *Veeck* by characterizing the incorporated standards at issue here as "extrinsic standards," rather than texts that have been adopted into law. (Pls. Mem. 38.) That distinction does not hold because the standard at issue here *has* been adopted into law through the incorporation process of 5 U.S.C. § 552 and 1 C.F.R. § 51.1 *et seq.* As with the building codes at

---

[10] Likewise, several states have explicitly incorporated the 1999 Standards by reference into their laws. In Maryland, the 1999 Standards are part of the state regulations that govern tests to license crane operators. Md. Admin. Rule 09.12.26.04(A)–(B), 09.12.26.06(E)(1)(c)(i). In Minnesota, they are part of the regulations for Health Department licensing of lead supervisors, lead inspectors, and lead risk assessors. Minn. Admin. Rule 4761.2460.

issue in *Veeck*, the 1999 Standards were subject to "wholesale adoption," not mere "reference[s]" *Veeck*, 293 F.3d at 804.

**2.      Incorporated Standards, As Law, Are Also Uncopyrightable Facts, Ideas, Principles, Systems, Processes, and Procedures.**

As the Fifth Circuit noted in *Veeck*, once adopted into law, "codes are 'facts' under copyright law. They are the unique, unalterable expression of the 'idea' that constitutes local law." 293 F.3d at 801. In other words, by virtue of government action the idea and the expression have merged. And "[w]hen there is essentially only one way to express an idea, the idea and expression are inseparable, and copyright is no bar to copying that expression." *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 606 (1st Cir. 1988). The Fifth Circuit also expressly rejected the notion that some laws might be "less factual" than others: "It should be obvious that for copyright purposes, laws are 'facts': the U.S. Constitution is a fact; the Federal Tax Code and its regulations are facts; the Texas Uniform Commercial Code is a fact. Surely, in principle, the building codes of rural Texas hamlets are no less 'facts' than the products of more august legislative or regulatory bodies." *Id.*

The process of incorporation by reference is analogous to the process discussed in *Kern River Gas Transmission Co. v. Coastal Corp.,* 899 F.2d 1458 (5th Cir. 1990), *cert. denied*, 498 U.S. 952 (1990). There the plaintiff took a United States Geographical Survey topographical map and added lines and mile markings where it proposed to locate a natural gas pipeline. The Federal Energy Regulatory Commission expressly approved that route. The defendant then copied that map to prepare a competing bid. The court concluded that "the idea of the location of the pipeline and its expression embodied in [the map] are inseparable and not subject to protection." *Id.* at 1463–64. "To extend protection to the lines would be to grant Kern River a

18

monopoly of the idea for locating a proposed pipeline in the chosen corridor, a foreclosure of competition that Congress could not have intended to sanction through copyright law." *Id.*

The merger doctrine exists "precisely to avoid such absurd results as conferring on the first planner of a pipeline a 'copyright' over its proposed location in a given corridor . . . ." 4 Nimmer on Copyright § 13.03[B][3]. Merger helped avoid similarly absurd results in *Veeck* (conferring the drafters of a code copyright over that law), and it does the same work here. As in *Kern*, in this case, after the initial creation, government officials gave legal effect to the Plaintiffs' document. At the point of incorporation into law, the idea (the law) and the expression (the 1999 Standards) became inseparable and therefore not subject to copyright.

### 3.    No court has ever found that government edicts are copyrightable.

Attempting to avoid the plain meaning of the Copyright Act, settled law, and the Constitution, Plaintiffs invoke *CCC Information Services Inc. v. McLean Hunter Market Reports, Inc*., 44 F.3d 61, 74 (2d Cir. 1994), and *Practice Management Information Corp. v. American Medical Ass'n*, 121 F.3d 516 (9th Cir. 1997). (Pls. Mem. 39–40.) But those cases, unlike *Veeck,* did not address whether government edicts could be copyrighted. Instead, as the *Veeck* court and a leading treatise note, they 'involved compilations of data that had received governmental approval, not content that had been enacted into positive law'." *Veeck*, 293 F.3d at 805, *citing* 1 Goldstein on Copyright § 2.49 n.45.2.

In *CCC*, for example, the defendant argued that the Red Book, a compilation of automobile valuations, was not copyrightable because state regulations included it as one possible metric for valuing cars. 44 F.3d at 73. The Red Book was neither a government edict nor a set of rules; it was simply an approved reference. As noted, while mere reference to a document in a regulation might not transform the document into a law, applying the procedure of 5 U.S.C. § 552 and its implementing regulations explicitly does. For example, while the

Minnesota Health Department regulations state that "The [1999] APA standards are incorporated by reference," one of the regulations at issue in *CCC* merely said "[m]anuals approved for use are . . . The Redbook. . . .," without any mention of incorporation. N.Y. Comp. Codes R. & Regs. tit. 11, § 216.7.

*Practice Management* also presented different circumstances. *See Veeck*, 293 F.3d at 804. In that case, the American Medical Association ("AMA") had created and copyrighted a list of code numbers, the Physician's Current Procedural Terminology ("CPT"), for physicians to report their services. *Practice Mgmt.*, 121 F.3d at 517. The AMA granted the federal Health Care Financing Administration ("HCFA") a non-exclusive, royalty-free license to use the CPT in exchange for HFCA's promise that it would not use any other set of code numbers. *Id.* at 517–18. HCFA later created its own coding system for Medicare and Medicaid claims, the HCFA common procedure coding system ("HCPCS"), that included the AMA code numbers but added new information that HFCA developed. *See Veeck*, 293 F.3d at 805 (citing 50 Fed. Reg. 40895, 40897). Practice Management ("PMI"), a publisher of medical books, sought from the AMA a discount to use the AMA's code numbers (not the government's HCPCS system). When the AMA refused to provide the discount, PMI sought a declaratory judgment that the AMA's copyright was unenforceable. *Practice Mgmt.*, 121 F.3d at 518. Under those facts, the Ninth Circuit concluded that the AMA's copyright in the CPT coding lists was, in theory, enforceable against PMI. *Id.* at 520–21. (Nevertheless, the court ultimately refused to enforce the AMA's copyright, concluding that the AMA had abused its copyright by extracting HCFA's agreement not to adopt any coding system besides the CPT. *Id.* at 521.)

The factual, legal and policy issues here are distinct First, the plaintiff in *Practice Management* was seeking to invalidate the copyright on the AMA coding lists only (the CPT),

not the government's own document (the HCPCS) and the two documents were not identical. As

the Fifth Circuit noted in *Veeck*:

> [U]nlike Veeck, Practice Management Information Corporation, a commercial
> publisher of medical textbooks, was not trying to publish its own version of the
> HCPCS. Practice Management desired to sell a cheaper edition of the AMA's
> code, which was also used by insurance companies and had other non-
> governmental uses. *It is not clear how the Ninth Circuit would have decided the
> case if Practice Management had published a copy of the HCPCS.*

293 F.3d at 805 (emphasis added). In other words, what had become the law was quite different

from the original coding lists, and it appeared that the plaintiff was not interested in publishing

the law. In this case, by contrast, as in *Veeck*, Public Resource wishes to post online only what

has been expressly adopted as law.

Second, in contrast to the coding lists (tables with descriptions of medical procedures

matched to numbers) at issue in *Practice Management*, the 1999 Standards read and function as

rules. In *Practice Management* the medical codes were never themselves law, even if regulations

required persons to refer to the codes. Here, as with the text of the model building code in *Veeck*,

the incorporated standards are part of the law itself, imposing numerous specific requirements

and technical specifications.

Third, the concern expressed by the court in *Practice Management,* that depriving

privately created materials of copyright might undermine the economic incentive to create them,

121 F.3d at 518–19, cannot apply to the incorporated standards in this case. The 1999 Standards

have been superseded by the 2014 Standards and are therefore obsolete as an industry standard.

(SMF ¶ 40, 51.) Thus, its continuing value now is *as law*. Any economic incentive for creating

them has run its course.[11] As for future standards, as discussed below at pages 45–46, Plaintiffs

have ample incentives to continue their work.

### C.   Plaintiffs Have Actively Encouraged Transformation of Their Standards Into Law and Cannot Now Complain of a "Taking."

Plaintiffs suggest that depriving them of a statutory monopoly in the law might qualify as

a taking and that the doctrine of constitutional avoidance counsels against it. (Pls. Mem. 28).

That argument fundamentally misconstrues that doctrine, which simply means that a statute

should be interpreted so as to avoid placing its constitutionality in doubt. Plaintiffs' farfetched

public policy argument that they could be entitled to file "takings" claims against governments

that incorporated their standards into law, even if true, does not create a constitutional conflict. If

a taking occurred, Plaintiffs might be entitled to compensation from the government, but that

would not make the Copyright Act unconstitutional.

Even on its own terms, Plaintiffs' takings argument fails. Plaintiffs admit that they have

never asked any government official to refrain from incorporating the 1999 Standard into

regulations and never protested after the fact—even after the *Veeck* decision put them on notice

that their copyrights were invalid as to standards incorporated into law. (Pls. Answer ¶¶ 72–74,

78–80 (ECF No. 14)). And they actively sought to have the 1999 Standards incorporated into

law. For example, Plaintiff AERA specifically urged federal regulators to hold off on a new set

of regulations until the 1999 Standards were completed. (SMF ¶ 52.). ███████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

---

[11] Even if the documents were available for purchase, to charge for access to them would be inappropriate "monopoly pricing of law, not copyright pricing to the market for voluntary consensus standards." Peter L. Strauss, *Private Standards Organizations and Public Law 16* (Columbia Pub. Law Research, Paper No. 13-334, 2013), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2194210.

[12]

There is a good reason the Plaintiffs strive to have the standards they help develop become law. Adoption gives the 1999 Standards "authoritative value." (SMF ¶ 54.) Moreover if, as Plaintiffs claim, their standards ensure the most "defensible" and "accurate" testing results, regulations requiring compliance with a common standard support Plaintiffs' respective missions of advancing research, knowledge and effective "high-stakes" testing. (Pls. Mem. 3, 7.)

---

[12] Plaintiffs now try to claim this letter was never sent—but their internal memo says otherwise. (SMF ¶ 56.) Indeed, Ms. Ernesto's statement in her declaration suggesting that it is "likely" the letter was never sent is contradicted by this memo, written in 2002 and reflecting on activity by APA's lobbyists in 2001, as well as by her own statements.

(*Id.*)

The government did not "take" the 1999 Standards. Plaintiffs gave them to the public freely and deliberately, and with an eye to their own advantage.

> ### D.      Public Policy Favors Promoting Public Access to the Law.

The principle that the law must be public and available to citizens to read and speak has its roots in the concept of the rule of law itself. "The law must be accessible . . . the successful conduct of trade, investment and business generally is promoted by a body of accessible legal rules governing commercial rights and obligations." *See* Thomas Henry Bingham, The Rule of Law 37–38 (Penguin Press 2011). Citizens are expected to obey the law, but they cannot do so effectively if they do not know it. "Citizens are subject only to the law, not to the arbitrary will or judgment of another who wields coercive government power. This entails that the laws be declared publicly in clear terms in advance." Brian Z. Tamanaha, On the Rule of Law: History, Politics, Theory 34 (Cambridge Univ. Press 2004).

> ### 1.      Plaintiffs do not make the law reasonably accessible.

Today, one can access and share judicial opinions, statutes, and most codified regulations online, almost instantly, for free, through a variety of databases. Absent Public Resource's efforts, however, the situation is strikingly different for just one important category of law: incorporated standards. For example, the law permits parents to review testing protocols. In order to exercise that right, however, they must make their way to the Washington, D.C. reading room of the Department of Education, or the National Archives ([https://www.law.cornell.edu/cfr/text/34/668.146](https://www.law.cornell.edu/cfr/text/34/668.146)) (SMF ¶ 27.) If they cannot afford travel to D.C., the alternative is to go to Plaintiff AERA directly and pay a fee for access. As Plaintiffs admit, that fee can run as high as $50. (Pls. Mem. 10).

But even that that assumes that Plaintiffs are willing to sell access of a copy of the Standards. Plaintiffs have repeatedly emphasized their firm belief that they should be able to

control access to the 1999 Standards—including the right not to make the 1999 Standards available *at all*. (SMF ¶ 58.) Indeed, Plaintiffs discontinued sales of the 1999 Standards in order to stimulate sales of the 2014 edition. (Pls. Mem. 11.) But the 2014 edition is not the edition *incorporated into law*. As an apparent strategic move in light of this litigation, Plaintiffs resumed sales of the 1999 edition in July 2015. (SMF ¶ 59–60.) But Plaintiffs claim the power to suppress access to the standards at their whim. Indeed, they are likely to do so as soon as this litigation ends, given that Plaintiffs believe the availability of a superseded standard to be harmful. (SMF ¶ 59.) Indeed, AERA's representative explicitly stated that they would one day discontinue sales of the 1999 Standards again. (*Id*.) Access to the law should never be subject to the marketing whims of a publisher or the political whims of a lobbying group.

Even after they made the 1999 Standards available for purchase again, Plaintiffs imposed significant barriers to access. In July 2015, shortly after Public Resource raised the issue of future sales of the 1999 Standards in depositions, AERA placed a single link to the 1999 Standards from the page from which it sells the 2014 edition of the Standards.[13] The linked page advises users that Plaintiffs "recommend use of the 2014 Standard*s* as the authoritative source of testing standards."[14] The 1999 edition does *not* appear in the "Complete List of AERA Books" on AERA's website.[15] And the 1999 Edition is not available for purchase through AERA's online bookstore. *Id.* Instead, a purchaser must fill out a separate "Mail or Fax Order Form" for the 1999 edition. (SMF ¶ 60.)

---

[13] *See* http://www.aera.net/Publications/Books/StandardsforEducationalPsychological Testing%28NewEdition%29/tabid/15578/Default.aspx.

[14] *See* http://www.aera.net/Publications/Books/Standards%281999Ed%29/tabid/16144/ Default.aspx.

[15] *See* http://www.aera.net/Publications/tabid/10067/Default.aspx; http://www.aera.net /Publications/Books/AERABooksList/tabid/13233/Default.aspx.

As for Plaintiffs APA and NCME, they maintain pages on their websites to advertise the

Testing Standards and direct visitors to the AERA store to purchase the 2014 edition.[16] Neither

of these pages links to the 1999 edition. (SMF ¶ 61.)

Finally, like the Plaintiffs in *ASTM*, the Plaintiffs here make no effort to provide access

for print-disabled people. Plaintiffs admit that neither the 1999 nor the 2014 Standards have ever

been available in a format that is accessible to individuals who are blind. (SMF ¶ 50.)

All evidence suggests that, other than as a strategic ploy in this litigation, Plaintiffs

actively oppose public access to the 1999 Standards, which they consider not "authoritative"

despite their authoritative status as law. As ten states noted in an amicus brief filed in support of

Peter Veeck, the Roman emperor Caligula famously published his tax laws only in narrow

places, in excessively small letters, to prevent practical access to them. Declaration of Matthew

Becker, Ex. 74 (Amici Brief filed in *Veeck* litigation) (citing *U.S. v Jefferson County*, 380 F. 2d

385, 410–11 (5th Cir. 1967). A statutory monopoly in the law confers similar power on a

standards organization. That burden on the people's ability to access and know the law is no

more tolerable as a revenue strategy of standards development organizations than as the whim of

a cruel and dissolute Roman emperor.

### 2.  The Plaintiffs do not need a copyright statutory monopoly and copyright incentives in order to develop standards.

Plaintiffs' self-serving threat to stop developing testing standards if they cannot retain

their statutory monopoly when their standards are incorporated into law is not plausible.

*Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (allegations or conclusory statements

insufficient to raise fact issue on summary judgment). Standards development organizations, and

---

[16] *See* http://www.apa.org/science/programs/testing/standards.aspx;
http://www.ncme.org/ncme/NCME/Publication/NCME/Publication/Testing_Standards.aspx.

the thousands of volunteers upon whom they rely, have ample non-copyright rewards and incentives to continue that work.

As the court in *Veeck* observed: "[I]t is difficult to imagine an area of creative endeavor in which the copyright incentive is needed less. Trade organizations have powerful reasons stemming from industry standardization, quality control, and self-regulation to produce these model codes; it is unlikely that, without copyright, they will cease producing them." 293 F.3d at 806 (quoting 1 Goldstein on Copyright § 2.5.2, at 2:51).

The same is true here. The 1999 Standards reflected the contributions of "scientific, professional, trade and advocacy groups, credentialing boards, state and federal government agencies, test publishers and developers, and academic institutions." (Pls. Mem. 6.) All of these volunteers rely on the standards (or realize they will be required to comply with them) and, therefore, have every incentive to help shape them, as do the committee members who controlled the final production. Indeed, Plaintiffs' own expert testified that participants contribute to the standard for three reasons: to "[c]ontribute back to the field, to contribute to the standards, and to serve the associations." (SMF ¶ 62.) None of those reasons would change if the Plaintiffs lost a statutory monopoly on those contributions when they become law.

For these reasons the argument that these Plaintiffs require copyright incentives in order to carry out their mission strains credulity. As one prominent scholar has observed, copyrighting standards actually creates perverse incentives that conflict with those overarching goals:

> The long-term credibility of [standards development organizations] depends on their ability not only to produce sound standards but also to produce standards in which the [standards development organizations] do not have such a strong financial interest that they succumb to the temptation to abuse the standards process by making their standards into a cash cow that must be purchased by anyone affected by the standard.

Pamela Samuelson, *Questioning Copyrights in Standards*, 48 B.C. L. Rev 193, 223–24 (2007).

The only basis for the Plaintiffs' claim that they would cease developing standards absent the promise of copyright royalties is a set of self-serving assertions. (Pls. Mem. 12.) Those assertions fail the sniff test. According to the Plaintiffs themselves, their own members benefit from the testing standards they develop, because they create a common set of rules for the development, use and evaluation of tests. (Pl. Mem. 6.) Plaintiffs, for example, admit that they benefits from the standards. (SMF ¶ 63.) Indeed, Plaintiffs' own expert stated that NCME naturally "cares a lot" about the standards. (SMF ¶ 64.) AERA's representative admitted that the 1999 Standards are "integral" to AERA's mission of "serving the public good through sound research, which includes sound methods and practices." (SMF ¶ 65.)

Further, while Plaintiffs may shoulder some expenses associated with producing the standards (though volunteers and their employers likely bear the majority of them (SMF ¶ 66.)), Plaintiffs have many other means of earning revenue, including selling other standards that are not incorporated into law, charging membership dues and conference fees, and obtaining government research grants, all of which are current sources of income for Plaintiffs. (SMF ¶ 67.)  Indeed, Plaintiff APA's annual revenues in 2012 alone were approximately $119 million. (SMF ¶ 68.) Given that the standards development process depends on the effort of countless unpaid volunteers (who (or whose employers) require no copyright rewards for their volunteer work), Plaintiffs' statement that they will no longer manage standards development if they cannot count on a statutory monopoly if the output becomes law is simply an unsupported self-serving threat. *See Greene*, 164 F.3d at 675.

Finally, the Plaintiffs have no evidence that lack of a statutory monopoly would affect sales of the 1999 Standards. The best evidence they can muster is a misleading reference to a drop in sales within the 2-year period that Public Resource posted the 1999 Standards. But

Plaintiffs' annual revenue charts for the 1999 Standards show that sales were declining faster in the year before Public Resource posted the 1999 Standards than in the year after the Standards were posted. (SMF ¶ 44.)

| Year | Revenue | % Change | Units Sold | % Change |
|---|---|---|---|---|
| FY 2000 | | | 3,797 | |
| FY 2001 | | | 3,755 | -1.11% |
| FY 2002 | | | 5,592 | 48.92% |
| FY 2003 | | | 3,310 | -40.81% |
| FY 2004 | | | 3,218 | -2.78% |
| FY 2005 | | | 3,803 | 18.18% |
| FY 2006 | | | 3,888 | 2.24% |
| FY 2007[1] | | | 3,077 | -20.86% |
| FY 2008 | | | 3,358 | 9.13% |
| FY 2009 | | | 2,590 | -22.87% |
| FY 2010 | | | 3,043 | 17.49% |
| FY 2011 | | | 2,132 | -29.94% |
| FY 2012 | | | 1,649 | -22.65% |
| FY 2013 | | | 1,732 | 5.03% |
| FY 2014 | | | 855 | -50.64% |

(SMF ¶ 44.) Indeed, sales actually *increased* in 2013 over 2012. (SMF ¶ 44, 47.) According to



(SMF ¶ 45). Dr.

(SMF ¶ 45).

---

[1] Public Resource was unable to determine a continuous annual sales trend because Plaintiff did not produce monthly sales information. (SMF ¶ 44.) The data, however, does not suggest would affect the analysis.



(SMF ¶ 46).

(*Id.*) In fact, *they did.* (*Id.*)

(*Id.*)[17]

Moreover, even if it were relevant, Plaintiffs have not shown that copyright is necessary to their revenue stream. Many publishers sell compilations of statutes and codes without the benefit of copyright; people will still pay for the convenience of having a physical book of codes on their shelf. (SMF ¶ 68–72.) And numerous other standards development organizations function effectively without claiming copyright in standards incorporated into law.

E.     **Plaintiffs Misinterpret the Copyright Act.**

Plaintiffs' remaining arguments against the public's right to access and share the law deserve swift rejection.

---

[17] Plaintiffs also imply that only Public Resource's posting of the standard could have caused a "precipitous drop" instead of a "gradual decline in sales year-over-year." (Pls. Mem. 25.) However, their only source for this speculation was Dr. Geisinger, who invoked his experience publishing several books, none of which was a standard or had later versions that could affect demand, as with the 1999 Standards. (Defendant's Mot. to Strike Geisinger at 4–5). Dr. Geisinger is not competent to opine as to the causation of any change in Plaintiffs' sales. In contrast, AERA's Dr. Levine testified that "there would be demand for a new version of the standards because of the large number of persons knowing that the new standards are under revision and *waiting to buy the new standard*." (SMF ¶ 45) (emphasis added).

First, Plaintiffs wrongly claim that 17 U.S.C. § 201(a) and the absence of a specific statutory provision addressing incorporation by reference support their view of the law. (Pls. Mem. 20.) The principle that the law cannot be copyrighted long predates the 1976 Copyright Act, and nothing in the Act suggests any intent to contravene it. Section 201(a) merely vests copyright initially in the author; that section is consistent with Public Resource's interpretation. (There is a substantial question whether Plaintiffs—as opposed to the countless volunteers who actually drafted the 1999 Standards—were the authors, but Public Resource does not press that issue here.) How a copyright vests does not affect its scope or whether Plaintiffs may enforce a statutory monopoly to control access to the law.

Second, Plaintiffs argue that Public Resource's interpretation would permit involuntary transfers of their alleged copyrights (Pls. Mem. 40), but there is no question of a transfer of copyright here. Whatever copyright the 1999 Standards may enjoy as private standards, *as law* they are not under copyright, and therefore there is nothing to transfer.

Third, the various studies and statutes Plaintiffs cite, recommending that federal agencies take advantage of voluntary consensus standards, say nothing about what happens when such standards became laws. The opinions of various executive branch agencies, including the Office of Management and Budget, are not the conclusions of copyright or constitutional experts, much less legal precedents.

## III.   EVEN BEFORE INCORPORATION, THE STANDARDS ARE PRIMARILY UNCOPYRIGHTABLE SYSTEMS, DISCOVERIES, PROCESSES, PROCEDURES, AND *SCÈNES À FAIRE*.

Plaintiffs have challenged, and seek an injunction against, Public Resource's posting of the 1999 Standards. But a claim of infringement, and any relief, must be confined to the use of copyrightable expression. "To prevail on a copyright claim, a plaintiff must prove both ownership of a valid copyright and that the defendant copied original or 'protectible' aspects of

the copyrighted work." *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1295 (D.C. Cir. 2002)

(citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 348, 361 (1991)). "The scope of

[an] injunction . . . should generally be no broader than the infringement; courts should modify

injunctions that impinge on non-copyrightable expression." 4 Nimmer on Copyright

§ 14.06[C][1][a] ( (citations omitted). *See also Nihon Keizai Shimbun, Inc. v. Comline Bus. Data,*

*Inc.*, 166 F.3d 65, 75 (2d Cir. 1999).

Much of the 1999 Standards are non-copyrightable. Plaintiffs repeatedly stress, and

Public Resource does not dispute, that the 1999 Standards were the product of substantial time

and effort by the volunteers who developed them. (Pls. Mem. 5.) But investment and effort are

not a basis for copyright. Original creative expression is necessary. *Feist,* 499 U.S. at 346, 353

(rejecting the argument that "sweat of the brow" is sufficient to confer benefits of copyright).

As the Supreme Court explained: "the first person to find and report a particular fact has

not created the fact; he or she has merely discovered its existence." *Id.* at 347. The standards at

issue here summarize of the "discoveries" of thousands of volunteers and government employees

who, through experience and research, have determined the optimal principles, practices, and

procedures for testing. Those discoveries are no doubt valuable. But they are not copyrightable.

A.      **The 1999 Standards Are Procedures, Systems, and Principles.**

As noted, Section 102(b) excludes ideas, procedures, systems, and principles (among

other things) from copyright. The 1999 Standards are procedures, systems and principles for

production of fair and valid tests.

As Plaintiffs' own representative stated, the standards "███████████████████

████████████████████████████████████████████████████

█████████████████████████████" (SMF ¶ 77.) Plaintiffs define the 1999 Standards as

"Technical Recommendations" or "principles and guidelines to improve professional practice."

(Pls. Mem. 4, 6.) They are the product of "intensive labor" and "expertise," (Pls. Mem. 5), that

summarize and reinforce "technical, professional and operational norms." (Pls. Mem. 8.)

The design of the 1999 Standards resulted from a technical committee's review of the

relevant research, public input, and committee expertise, all of which aimed to create the best

rule based on available evidence. The developers' ███████████████████████████

(SMF ¶ 76.) The goal is to ████████████████████████████████████████

█████████████ (SMF ¶ 78.), in order to ensure accurate and defensible testing protocols. Indeed,

Plaintiffs do not believe that the standards can be expressed another way. For example,

Plaintiffs' own witness stated ████████████████████████████████████████

██████████████████████████████████ (SMF ¶ 79.) ████████████████████████████

██████████████████████ (*Id.* ¶ 80.)

Nor do the incorporated standards qualify as creative compilations, because their utility

dictates their organization. Guidance on this point is in the recent Ninth Circuit decision in

*Bikram's Yoga College of India, L.P. v. Evolation Yoga, LLC*, 803 F.3d 1032 (9th Cir. 2015). In

that case, the plaintiff claimed that the order and sequence of certain yoga poses (the

"Sequence") was copyrightable. The court rejected that argument because "the medical and

functional considerations at the heart of the Sequence compel the very selection and arrangement

of poses and breathing exercises for which [plaintiff] claims copyright protection." *Id.* at 1042.

The court concluded: "The Sequence's composition renders it more effective as a process or

system, but not any more suitable for copyright protection as an original work of authorship." *Id.*

The same is true here. Plaintiffs optimize for enforceable clarity, not creativity. While

they may have made choices about how to organize the 1999 Standards, the relevant inquiry is

not whether one could imagine some other, less useful, method of arrangement. *See Bikram's*

*Yoga*, 803 F.3d at 1042; *BellSouth Advert. & Publ'g Corp. v. Donnelley Info. Publ'g, Inc.*, 999 F.2d 1436, 1443 (11th Cir. 1993); *see also ATC Distrib. Grp., Inc. v. Whatever It Takes Transmission & Parts, Inc.*, 402 F.3d 700, 712 (6th Cir. 2005) (fact that publisher "could have arranged the parts information in other ways that were potentially less clear or useful . . . is insufficient to demonstrate the creativity necessary for copyright protection"). Instead, it is whether, as here, the Plaintiffs made the optimal choice to render their *system* more *effective* as such. *See also* 4 Nimmer on Copyright § 13.03[B][3].

     **B.**     **The Incorporated Standards Are *Scènes à Faire*.**

     The compilations are also uncopyrightable *scènes à faire*. The *scènes à faire* doctrine excludes from protection those elements of a work that necessarily result from factors "external to the author's creativity." 4 Nimmer on Copyright § 13.03[F][3]; *see also Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 709–10 (2d Cir. 1992).

     Here, Plaintiffs admit that their standards are dictated by external factors: specifically, the current state of technical information on test development and use. (SMF ¶ 81.) For example, the 1999 Standards were intended to remedy technical deficiencies in the prior 1985 standards, as there were definitions and statements that "more recent research had suggested were incorrect or outdated." (SMF ¶ 82.) The choices in development of the Standards were also dictated by practical requirements and industry demands, as the industry participants voiced them in the development process. (Pl. Memo. at 6; SMF ¶ 83.) Thus, they are like the elements of a software program that are dictated by practical realities rather than creative design and therefore excluded from copyright. *See, e.g.*, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 535 (6th Cir. 2004) (content primarily shaped by extrinsic factors such as hardware standards and mechanical specifications may not obtain copyright).

## IV.   PUBLIC RESOURCE'S POSTING IS A LAWFUL FAIR USE.

Even if the Court were to find that Plaintiffs can exercise a statutory monopoly over a portion of the law, the statutory monopoly does not prohibit fair uses. The rights of a copyright owner, in section 106 of the Copyright Act, are expressly "[s]ubject to . . . section[] 107." *See* 17 U.S.C. § 106 (initial wording). The fair use of a work is not, as Plaintiffs contend, an "infringement [that] can be excused." (Pls. Mem. 28.) The statute is clearly to the contrary: "Notwithstanding the provisions of section[] 106 . . . , the fair use of a copyrighted work . . . is not an infringement of copyright." Fair use is "a right granted by the Copyright Act of 1976  . . . [and] not an infringement." *Lenz v. Universal Music Corp*, 801 F.3d 1126, 1133 (9th Cir. 2015) (quoting *Bateman v. Mnemonics, Inc.,* 79 F.3d 1532, 1542 n.22 (11th Cir. 1996)).

The fair use doctrine has four non-exclusive statutory factors: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for non-profit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. The Court must evaluate these factors "in light of the purposes of copyright," which are "[t]o promote the Progress of Science and useful Arts, and to serve the welfare of the public." *Perfect 10*, *Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1163 (9th Cir. 2007) (citations and internal quotations omitted). All four statutory factors support fair use here, as does the Constitutional purpose of copyright.

### A.      Public Resource's Posting of the Legally Binding 1999 Standards Is Transformative, Is Noncommercial, and Is for Beneficial Public Purposes.

Public Resource posted the 1999 Standards for several purposes, all of which support a finding of fair use. Public Resource's interest in the 1999 Standards is solely in publicizing the

law and making it available to all. Public Resource has enabled access to the law for all those affected by it, and in particular for those who are blind or have other disabilities with respect to printed books. And by posting the 1999 Standards in a form that can be read by computer software, Public Resource has enabled new ways of learning about and interacting with the law. Moreover, Public Resource's purpose is noncommercial, a fact that Plaintiffs do not dispute. (*See* Plaintiffs' Statement of Undisputed Material Facts ¶¶ 48, 52.)

### 1.    Expanding access to the law is a transformative purpose.

The first fair use factor favors transformative purposes and uses. *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 578–79 (1994). A transformative use is one "that communicates something new and different from the original or expands its utility, thus serving copyright's overall objective of contributing to public knowledge." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015) (citing *Campbell,* 510 U.S. at 579); *see also A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009) (a fair use "can be transformative in function or purpose").

Incorporation by reference into law transformed the 1999 Standards even before Public Resource obtained it, by turning it from a statement of best practices into the law of the land. Incorporation into law gave the 1999 Standards "a further purpose or different character." *Campbell*, 510 U.S. at 579. Public Resource's posting of the 1999 Standards built on that initial transformation and is itself transformative.

Plaintiffs sold print copies of the 1999 Standards as a guide to test designers and administrators, and a statement of best practices for assessment professionals. (SMF ¶ 84.) The Plaintiffs seek to provide answers to questions like "*How do I design a test that can accurately diagnose psychological dysfunctions,*" or "*How do I administer a test fairly to non-native English speakers?*"

Public Resource has had a very different purpose for posting the 1999 Standards. Public Resource provides access to standards incorporated into law as part of an online archive of laws and other government documents, so that citizens are able to read, speak, and engage critically with the laws that govern them. (SMF ¶ 2.) Posting the 1999 Standards was part of that mission. The Public Resource websites answer different questions, such as "*What is the law governing tests that determine eligibility for government benefits,*" and "*Does the test my child took comply with the law?*"

Public Resource's use of the 1999 Standards is "indifferent" to any copyrightable expression it allegedly contains. *See Am. Inst. of Physics v. Schwegman, Lundberg & Woessner, P.A.*, No. 12-528, 2013 WL 4666330, at *12 (D. Minn. Aug. 30, 2013). For Public Resource's purpose, it matters only that the standards it posts are legal requirements that the public must obey. Thus, Public Resource transformed the 1999 Standards "from an item of expressive content to evidence of the facts within it." *Am. Inst. of Physics v. Winstead PC*, No. 3:12-CV-1230-M, 2013 WL 6242843, at *5 (N.D. Tex. Dec. 3, 2013). Public Resource's use of standards incorporated by reference into law is akin to copying and displaying documents in the process of fulfilling a legal requirement, or in the course of judicial and administrative proceedings. *Bond v. Blum*, 317 F.3d 385, 394–97 (4th Cir. 2003) (copying and submission of copyrighted manuscript in child custody proceeding as evidence of the admissions it contained was fair use); *Healthcare Advocates Inc. v. Harding, Earley, Follmer & Frailey*, 497 F. Supp. 2d 627, 639 (E.D. Pa. 2007) (copying images from website to gather facts for the defense of an earlier copyright infringement suit was fair use). Like such uses, posting an incorporated standard to communicate the legal facts it embodies does not "seek[] to exploit or unjustly benefit from any creative energy that [Plaintiffs] devoted to writing" the Standards. *See Lexmark*, 387 F.3d at 544.

Even for source material other than legal texts, copying for a new and different purpose indifferent to any creative expression is transformative. *See Bill Graham Archives v. Dorling Kindersley Ltd.,* 448 F.3d 605, 608–09 (2d Cir. 2006) (use of concert poster images as "historical artifacts" on a timeline in a book rather than for "artistic expression and promotion" was transformative); *Online Policy Grp. v. Diebold, Inc*., 337 F. Supp. 2d 1195, 1203 (N.D. Cal. 2004) (posting corporation's emails on the Internet to inform the public of defects in electronic voting machines was transformative); *see also Lexmark,* 387 F.3d at 544 (using a copyrighted computer program in a competing product as a password that unlocked the functionality of a printer rather than for the program's intrinsic use was transformative). Public Resource's purpose of informing the public about the rules it must follow falls into that rubric. The purpose is a form of news reporting, a paradigmatic example of fair use in 17 U.S.C. § 107.

> ### 2. Providing new information about the law by enabling software-based analysis is a transformative and publicly beneficial purpose.

Public Resource's use is also transformative because it enables citizens to engage with this portion of the law in new ways that "provide otherwise unavailable information." *Authors Guild*, 804 F.3d at 215; *see also Authors Guild, Inc. v. HathiTrust,* 755 F.3d 87, 97–98 (2d Cir. 2014); *Vanderhye,* 562 F.3d at 638–640 (digital reproduction of student manuscripts in their entirety to detect plagiarism is transformative); *Perfect 10,* 508 F.3d at 1165 (search engine reproducing small images of copyrighted photos to aid in finding them is transformative); *see also* Pierre N. Leval, *Toward A Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990) (fair use protects a use that creates "new information . . . new insights and understandings.").

Public Resource posted the 1999 Standards to its website in Portable Document Format (PDF), which is readable by numerous devices and software programs. Widely available optical character recognition (OCR) software can transform PDF files into text that can be read by an

even greater variety of software. The version that Public Resource posted to the Internet Archive underwent OCR and was converted into a variety of file formats. (SMF ¶ 37). Public Resource's regular practice is to further convert the standards it posts into standard Hypertext Markup Language (HTML) to make them still more accessible. It intended to do so for the 1999 Standards but the filing of this lawsuit interrupted that work. (SMF ¶ 38.) Public Resource also works to ensure that standards incorporated by reference into law, along with the other legal materials it posts, are indexed and represented accurately by search engines. (*Id.*)

Plaintiffs try to dismiss Public Resource's work as "merely converting printed text to digital format." (Pls. Mem. 45.) Plaintiffs miss the point. Once a legal text like the 1999 Standards is available in new formats, software-based searching and analysis can reveal new information about the source material. *See* Thomas A. Smith, *The Web of Law*, 44 San Diego L. Rev. 309, 312–14 (2007) (describing computer analysis of citations in judicial opinions); Kevin D. Ashley & Stefanie Brüninghaus, *Computer Models for Legal Prediction*, 46 Jurimetrics 309, 312 (2006) ("To apply such prediction tools, the case data must be amenable to computer processing."); William Li et al., *Law Is Code: A Software Engineering Approach to Analyzing the United States Code,* 10 J. Bus. & Tech. L. 297, 309 (2015) (describing how comprehensive software analysis of the U.S. Code is made possible by the Code's availability in Extensible Markup Language format). This enabling of criticism, comment, scholarship, and research are additional paradigmatic examples of fair use in 17 U.S.C. § 107.

In the United States, nearly all statutes, regulations, and reported judicial opinions are available on the Internet, in standard formats readable by software, for free. *See, e.g.*, Legal Information Institute, https://www.law.cornell.edu/; Google Scholar, https://scholar.google.com/; Code of the District of Columbia, http://dccode.org/simple/; D.C. Municipal Regulations and

D.C. Register, http://www.dcregs.dc.gov/. This new availability has transformed legal practice and scholarship and vastly increased public access. *See* Steven A. Lastres, *Rebooting Legal Research in a Digital Age,* LLRX (Aug. 10, 2013), https://www.llrx.com/files/rebootinglegal research.pdf.

 In contrast, although Plaintiff AERA conceded that "███████████████

████████████████████████████████████████████

██████████████ the Plaintiffs in this case provide the legally binding 1999 Standards only in print while suppressing attempts to access and use the Standards in electronic formats. (SMF¶ 85–86.) Public Resource's posting of the 1999 Standards enabled the same powerful search and analysis tools that can be used for most other state and federal laws. As several courts have found, enabling search and analysis is highly transformative and favors a finding of fair use. *See HathiTrust*, 755 F.3d at 97; *Vanderhye*, 562 F.3d at 638–40; *Perfect 10*, 508 F.3d at 1165.

  **3.**  **Providing access for people with print disabilities is a legally favored fair use purpose.**

 Additionally, Public Resource enables blind and other print-disabled individuals to access the law. Accessibility for the disabled is a well-established fair use purpose. "Making a copy of a copyrighted work for the convenience of a blind person is expressly identified by the House Committee Report as an example of fair use, with no suggestion that anything more than a purpose to entertain or to inform need motivate the copying." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 455 n.40 (1984); *see also HathiTrust,* 755 F.3d at 103 (purpose of promoting accessibility by the disabled favored finding of fair use). The drafters of the Copyright Act of 1976 identified accessibility as a "special instance illustrating the application of the fair use doctrine." H.R. Rep. No. 94–1476, at 73 (1976), 1976 U.S.C.C.A.N. 5659, 5686.

Access to the 1999 Standards is particularly important for people with print disabilities because the Standards contain the legal requirements for tests used to determine students' eligibility for federal grants, including whether those tests are fair to students with disabilities. (SMF ¶ 87.)[18] Federal and state statutes concerning access to testing protocols have been held to support a finding of fair use. "[A] school giving parents of special education students copies of their children's test protocols when requested under [state law] is a fair use." *Newport-Mesa Unified Sch. Dist. v. California Dep't of Educ.*, 371 F. Supp. 2d 1170, 1179 (C.D. Cal. 2005).

Public Resource made the 1999 Standards accessible to print-disabled readers by scanning a print copy to create a digital version and making that version available online in a standard format. (SMF ¶ 37–38). James Fruchterman, Public Resource's expert on accessibility, concluded that "a person who is blind or print disabled would have been able to locate a version of the 1999 Standards on the Public.Resource.Org website when it was still hosted there" and would be able to "perform[] optical character recognition on the Public.Resource.Org image file" containing the 1999 Standards. (SMF ¶ 88.) The reader would then "be able to perform all of the functional tasks: reading the entire standard, navigating to a specific place in the standard, or searching on key terms." (*Id.*) The version that Public Resource posted to the Internet Archive website had optical character recognition performed on it, so it was immediately readable by people who are blind or have visual disabilities. (*Id.*)

Plaintiffs, in contrast, provide the 1999 Standards only in print. (SMF ¶ 86.) Mr. Fruchterman could not locate the 1999 Standards on the Internet from any source, Public

---

[18] Plaintiffs make much of the Second Circuit's statement in *HathiTrust* that "providing expanded access to the print disabled is not 'transformative.'" 755 F.3d at 101. (*See also* Pls. Mem. 45.) They neglect to mention that the Second Circuit nonetheless found that providing such access supported a finding of fair use under Supreme Court precedent. *Id.* at 102. The "transformative use" designation does not end the first factor inquiry. *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.,* 756 F.3d 73, 84 (2d Cir. 2014) (quoting *Campbell,* 510 U.S. at 579)).

Resource having disabled access to the Standards through its website and the Internet Archive during this litigation. (SMF ¶ 89.) Nor is the document available through any of the main libraries that serve people with print disabilities, and Plaintiffs state that they have not given permission for any braille versions to be created. (SMF ¶¶ 90–91.) Mr. Fruchterman noted that, while print copies of the 1999 Standards may be available, "most blind people themselves do not have the ability to convert books" and would require that "their employer, educational institution, or a specialized library for the blind create [an accessible copy]." (SMF ¶ 92.) Thus, only Public Resource has enabled print-disabled citizens to access this portion of the law independently.

### 4.    Public Resource's use of the 1999 Standards is non-commercial.

Public Resource's use of the 1999 standards is non-commercial, which supports fair use. *See Campbell,* 510 U.S. at 584. Public Resource is a non-profit organization funded entirely by donations, contributions and grants. (SMF ¶ 1.) It does not charge for access to the 1999 Standards or any other information on its website. (SMF ¶ 5.) The Plaintiffs have not asserted that Public Resource's use of the 1999 Standards is commercial.

### B.    The 1999 Standards Are a Factual Document.

"The law [of fair use] recognizes a greater need to disseminate factual works than works of fiction or fantasy." *Harper & Row Publ'rs., Inc. v. Nation Enters.*, 471 U.S. 539, 563 (1985). "Since the risk of restraining the free flow of information is more significant with informational work, the scope of permissible fair use is greater." *Consumers Union of U.S., Inc. v. Gen. Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir. 1983).

The 1999 Standards fall squarely on the factual end of the spectrum. As a part of the law, the text of the Standards is a legal fact. In addition, Plaintiffs concede that the 1999 Standards are procedures. As such, if they are not entirely excluded from copyright by 17 U.S.C. § 102(b),

their nature supports a determination of fair use.[19] *Consumers Union*, 724 F.2d at 1049; *see* pages 32–34, above.

Plaintiffs dismiss this factor as unimportant. (Pls. Mem. 46.) Copyright experts would beg to differ. *See* Robert Kasunic, *Is that All There Is? Reflections on the Nature of the Second Fair Use Factor*, 31 Colum. J.L. & Arts 529, 554–55 (2008). Important or not, the factor favors a conclusion of fair use.

### C.    Public Resource Uses No More of the Standards than Necessary.

The third statutory factor favors fair use where the amount of the original work used is "reasonable in relation to the purpose of the copying." *Authors Guild*, 804 F.3d at 221; *see also Campbell*, 510 U.S. at 586–87. The copying of entire works is fair use when it reasonably fulfills the user's purpose. *See, e.g.*, *Sony*, 464 U.S. at 449–50 (copying of entire television programs for time-shifting is fair use); *Lexmark*, 387 F.3d at 544 (copying of entire computer program as required for compatibility with printer is fair use); *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 90 (2d Cir. 2014) (copying and dissemination of entire recordings of press conferences was "reasonable in light of its purpose of disseminating important financial information to investors and analysts.").

There can be no serious dispute that the purpose for which Public Resource posted the 1999 Standards requires posting the complete document that the law has incorporated. There is no portion or excerpt short of the entirety that would fully inform the public of its rights and obligations under the law. Partial access could even create the false impression that a test that complied with only part of the Standards would fulfill Department of Education or state law

---

[19] The Second Circuit's recent *Authors Guild* decision does not alter this conclusion. That court did not impose a different meaning on the second statutory factor but simply downplayed its importance. 804 F.3d at 220.

requirements. Plaintiffs themselves forbid reprinting of individual sections of the Standards

because "the standards are regarded as a unitary document." (SMF ¶ 93.)

Because Public Resource's use of the 1999 Standards is transformative, copying that is

"literally necessary" or "reasonably appropriate" to that use tilts the third factor in favor of fair

use. *Authors Guild*, 804 F.3d at 221. Plaintiffs' recitation of cases in which the party accused of

infringement used technological measures to limit copying of the work at issue is not relevant

here, where "to copy any less than" the entire work "would have made the [work] useless" for

the fair use purpose. *Nuñez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 24 (1st Cir. 2000); (*see*

Pls. Mem. 49–51.)

**D.    Public Resource's Use of the 1999 Standards Has Not Caused, and Will Not Cause, Harm in Any Relevant Market.**

The fourth fair use factor concerns "meaningful or significant effect 'upon the potential

market for or value of the copyrighted work.'" *Authors Guild*, 804 F.3d at 224 (citation omitted).

Where a use is highly transformative, only a strong showing of harm will weigh against fair use.

"Market harm is a matter of degree, and the importance of this factor will vary, not only with the

amount of harm, but also with the relative strength of the showing on other factors." *Fox News

Network, LLC v. TVEyes, Inc.*, 43 F. Supp. 3d 379, 395 (S.D.N.Y. 2014) (quoting *Campbell*, 510

U.S. at 590 n. 21). And market effects that "occur in relation to interests that are not protected by

the copyright" are not relevant to the fourth factor inquiry. *Authors Guild*, 804 F.3d at 224.

As discussed above, at pages 28–30, Plaintiffs provided no competent evidence that

Public Resource's activities harmed sales of the 1999 Standards.

Looking ahead, the undisputed facts show that Plaintiffs themselves shut down the

market for the 1999 edition of the standards, the only work at issue in this case. And copyright

law does not protect a market for the right to control "the conditions under which the public may use" public law. (Pls. Answer ¶14 (ECF No. 14)). The fourth factor favors fair use.

### 1.   Plaintiffs themselves have shut down the market for the 1999 Standards.

Where there is no actual or potential market for the work at issue, the fourth factor inclines towards fair use. *Katz v. Google Inc.*, 802 F.3d 1178, 1184 (11th Cir. 2015); *see also Blanch v. Koons*, 467 F.3d 244, 258 (2d Cir. 2006); *Online Policy Grp. v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1203 (N.D. Cal. 2004). The only document at issue in this lawsuit is the legally binding 1999 edition of the Standards. Plaintiffs, by their own admissions and actions, have little interest in revenue from sales of the 1999 edition. On the contrary, they seek to restrict access to it and deter sales. Thus, there is no actual or potential market for copies of the 1999 Standards that Public Resource could affect.

Plaintiffs halted all sales of the 1999 edition after publishing the 2014 Standards in August 2014, mere months after filing this lawsuit. (SMF ¶ 40). ███████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████ (SMF ¶ 94.)

███████████████████████████████████████████████

(SMF ¶ 95.), even though the 1999 edition remains the law of the land. Plaintiffs resumed sales in 2015 but, as noted in above, they have made it difficult to find, much less purchase, the 1999 Standards through Plaintiffs' normal channels.

Plaintiffs now sell the 2014 edition of the Standards, and they promote and market only the 2014 edition. ███████████████████████████████████████████

███████████████████████████████ (SMF ¶ 41–42.) ███████████████

███████████████████████████████████████████████

███████████████ as only Plaintiff AERA published and sold new copies of the 1999

Standards. (SMF ¶ 42.) Nor are Plaintiffs seeking any royalty or other revenue from Public

Resource for its use of the 1999 Standards. (Complaint 13–14 (ECF No. 1)).

The inescapable conclusion from these facts is that Plaintiffs have no interest in any

market for the legally binding 1999 edition. The single link to a mail order form on a single page

buried within AERA's website cannot overcome that conclusion. Plaintiffs have "failed to allege

that a 'market' exists for [their] copyright at all," and the Court should "decline[] to simply

presume the existence of a market." *Righthaven, LCC v. Jama*, No. 2:10-CV-1322, 2011 WL

1541613, at *5 (D. Nev. Apr. 22, 2011).

Because "there is no likely market for the challenged use of the plaintiff's work[], the

fourth fair use factor favors the defendant." *Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1121 n.9

(D. Nev. 2006) (citing *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 805–06 (9th Cir.

2003)); *see also Blanch v. Koons*, 467 F.3d 244, 258 (2d Cir. 2006) (fourth factor favored fair

use where plaintiff had ceased to publish or license her photograph).

> **2.      Only the 1999 Standards are relevant to the fair use inquiry; Public Resource has not posted the 2014 edition and will not do so unless it becomes law.**

Plaintiffs' argument that Public Resource will harm the market for the *2014 edition* of the

Standards and "future Standards" if it succeeds in this litigation is both legally and factually

incorrect. As a matter of law, only harms to the potential market for "*the* copyrighted work" at

issue are relevant to the fair use inquiry. 17 U.S.C. § 107 (emphasis added); *see Consumers

Union of United States, Inc. v. Gen. Signal Corp.,* 724 F.2d 1044, 1051 (2d Cir. 1983) (refusing

to consider impact of actual copying on plaintiff's future works); *Campbell*, 510 U.S. at 574

(fourth factor is concerned with the "potential market for *the* original.") (emphasis added).

Plaintiffs have not claimed infringement of the 2014 edition, let alone "future Standards" they have not yet written. Allegations concerning the "overall impact to [Plaintiffs'] business"— apart from "the market for the reproduced [work]"—are "irrelevant to a finding of fair use." *Nuñez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 24 (1st Cir. 2000).

Public Resource has not posted the 2014 edition of the Standards anywhere. (SMF ¶ 40.) It is undisputed that Public Resource posts *only* those standards that have become law. Consistent with this policy, Mr. Malamud testified that he would consider posting the 2014 edition only "[i]f the federal government did a deliberate and explicit incorporation by reference," and only after determining "if that was an area that I wanted to continue to invest resources in." (*Id.*)[20] Public Resource does not (and need not) contest Plaintiffs' claim of copyright in the 2014 edition or their ability to control its distribution. Thus, even if the market for the 2014 edition were legally relevant to the fair use analysis, Plaintiffs cannot show any imminent effect on that market.

### 3. There is no proper market for the exclusive right to control access to, and dissemination of, the law.

Plaintiffs claim "the power to determine the conditions under which Public Resource and others may access, reproduce, publish, translate, reformat or annotate the [1999] Standards," despite the Standards' status as binding law. (Pls. Answer to Counterclaims ¶ 14, ECF No. 14.) But when a work is informational and public access to the information is vital, facilitating access to the work does not, as a matter of law, harm its "market" or "value." *See Diebold*, 337 F. Supp.

---

[20] Plaintiffs mischaracterize this testimony as stating that Mr. Malamud "intends" to post the 2014 edition "if successful in this litigation." (Pls. Mem. 48.) In fact, the very testimony they cite makes clear that Mr. Malamud would consider doing so only if the 2014 edition is deliberately incorporated by reference. (SMF ¶ 40.)

2d at 1203; *Righthaven*, 2011 WL 1541613, at \*4–\*5 ("using the work for informational purposes" does not create market harm).

Although Plaintiffs assert that no one apart from historians should use the 1999 Standards, they acknowledge that many people "believe they still may be held accountable to the guidance of the 1999 Standards." (Pls. Mem. 11.) That belief is accurate. The 1999 Standards, not the 2014 Standards, form part of the Department of Education's regulations for the design of tests. "Incorporation by reference of a publication is limited to the edition of the publication that is approved." 1 C.F.R. § 51.1(f). The public has a compelling need to access, discuss, and communicate the 1999 Standards *as law*. Plaintiffs have never had a legitimate right to prevent people from using and distributing the 1999 Standards *as law*, and therefore cannot claim they will suffer harm from losing that purported right.

Given that copyright does not protect the ability to suppress distribution of information of public importance, especially where the claimant seeks no financial benefit from its distribution, the opinion in *Worldwide Church of God v. Philadelphia Church of God, Inc.* does not apply here. 227 F.3d 1110 (9th Cir. 2001). In that case, one church copied and used another church's "core" liturgy for "the very purposes for which [plaintiff] created [it]" and as a "marketing device." *Id.* at 1118–20. The court held marketing value to be a form of "compensation" that the defendant acquired from its copying of the document. *Id.* at 1119. There was no indication that the broader public had any interest in the document, and the court emphasized that "[t]his is not a case of abuse of the copyright owner's monopoly as an instrument to suppress facts." *Id.* at 1116 (citation omitted).

Here, in contrast, the public importance of the 1999 Standards *as law* is undisputed, and it overcomes Plaintiffs' desire to suppress access to them. *See Diebold*, 337 F. Supp. 2d at 1203;

*Righthaven*, 2011 WL 1541613, at *4 (distinguishing *Worldwide Church of God*). Public

Resource has never sought benefit or compensation from its posting of the 1999 Standards and

has never used it as a marketing device. (SMF ¶ 5.) In addition, Public Resource's use is highly

transformative. The Ninth Circuit has distinguished *Worldwide Church of God* from instances

where the challenged use was highly transformative and market harm "may not be so readily

inferred." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165, 1168 (9th Cir. 2007).

Finally, the Ninth Circuit and other courts have since rejected the rationale in *Worldwide Church*

*of God* that copyright protects against harms to "reputation." *Garcia v. Google, Inc*., 786 F.3d

733, 745 (9th Cir. 2015) (en banc); *see also Katz v. Google Inc.*, 802 F.3d 1178, 1184 (11th Cir.

2015) (per curiam).

Public Resource's use of the 1999 Standards furthers the purpose of copyright law by

improving access to vital knowledge, promoting the "Progress of Science." U.S. Const. art. I § 8

cl. 8. All four factors of the fair use analysis favor Public Resource, and the Court should grant

summary judgment to Public Resource on this additional ground.

## V.   PUBLIC RESOURCE IS NOT SECONDARILY LIABLE FOR COPYRIGHT INFRINGEMENT.

Contributory liability requires introducing facts proving that a party "intentionally

induc[ed] or encourage[ed] direct infringement." *Metro-Goldwyn-Mayer Studios Inc. v.*

*Grokster, Ltd.*, 545 U.S. 913, 930 (2005). This Court has identified three elements: "(1) direct

infringement by a third party, (2) knowledge by the defendant that the third parties were directly

infringing, and (3) substantial participation by the defendant in the infringing activities."

*Newborn v. Yahoo!, Inc.*, 391 F. Supp. 2d 181, 186 (D.D.C. 2005) (citation omitted). The first

element demands that plaintiff show "what materials are being infringed and that the plaintiff

owns the copyright for those materials." *Newborn v. Yahoo!, Inc.*, 391 F. Supp. 2d 181, 187

(D.D.C. 2005). If plaintiff sufficiently supports these allegations, a defendant may defeat

summary judgment by introducing evidence raising a genuine issue of fact as to whether the

alleged infringement was actually fair use. *Perfect 10, Inc. v. Amazon.com, Inc*., 508 F.3d 1146,

1158 (9th Cir. 2007) (citing *Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 590 (1994)).

Plaintiffs' claim fails as a matter of law at the first and second elements.

## A.     Plaintiffs Cannot Prove Direct Infringement by Third Parties.

In order to show that Public Resource is liable for contributing to infringement by third

parties, Plaintiffs must first prove that third parties actually infringed. There can be no liability

for contributory infringement "unless the authorized or otherwise encouraged activity itself could

amount to infringement." *Subafilms, Ltd. v. MGM-Pathe Commc'ns Co*., 24 F.3d 1088, 1092

(9th Cir. 1994); *see also Grokster*, 545 U.S. at 940 ("[T]he inducement theory of course requires

evidence of actual infringement . . . .").

Moreover, where a colorable claim of fair use exists, the plaintiff must prove that the

third parties' use was not fair. In *Sony Corp. of Am. v. Universal City Studios, Inc.*, for example,

rightsholders sought to hold a manufacturer of videocassette recorders liable for alleged

infringements by its customers. 464 U.S. 417 (1984). After the manufacturer asserted that

customers' use of the recorders for "time-shifting" was fair use, the Supreme Court adopted "an

interpretation of the concept of 'fair use' that requires the copyright holder to demonstrate some

likelihood of harm." *Id.* at 454. "What is necessary," the Court wrote, "is a showing by a

preponderance of the evidence that *some* meaningful likelihood of future harm exists." *Id.* at 451.

Here, even if the 1999 Standards could be subject to copyright, using them *as law* is a fair

use, as described above. The purpose of Public Resource's websites is to enable access to legally

incorporated standards as laws so that the public can know and share the law. Because sharing

the law is a "substantial noninfringing use" of the material posted on the websites, it defeats a claim of contributory infringement. *Sony*, 464 U.S. at 442.

Plaintiffs' contributory infringement claim has a second fatal flaw: Plaintiffs have not produced evidence that anyone other than Public Resource and Mr. Malamud has reproduced the 1999 Standards. Plaintiffs merely state that the 1999 Standards "were accessed" from Public Resource's website and the Internet Archive. (Pls. Mem. 23, 34.)

"Access" to a document does not imply a reproduction, or any other potentially infringing act under 17 U.S.C. § 106. The evidence Plaintiffs proffered with respect to third party conduct is Public Resource's Amended Interrogatory Responses and Mr. Malamud's deposition testimony. (Pls. Mem. 34.) Plaintiffs' Interrogatory No. 5 requested "the number of visitors who viewed and/or accessed the 1999 Standards" on the Public Resource website. (ECF No. 60-23 [Hudis Decl. Exh. T, at 7].) After conferring on the issue, the parties agreed that "accessed" means "to digitally retrieve or open an electronic file or data," and "viewed" means "the act of seeing or examining." (*Id*. at 8.) Mr. Malamud gave a similar definition at deposition. "[A]ccess," he testified, "implies that a computer, not necessarily a human being, but a computer has requested some data from another computer, and that request was successful and the data was transferred." (SMF ¶ 98.) Plaintiffs have proposed no other meaning for the words "accessed" and "viewed."

By any definition, "accessing" a document from a website does not imply that a reproduction was made for purposes of copyright law. Reproduction requires the making of a copy "for a period of more than transitory duration." *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 127 (2d Cir. 2008). A copy is a "material object," such as a computer hard drive containing a digital file. 17 U.S.C. § 101. "Accessing" or "viewing" alone does not result in a

reproduction, even if data passes through a buffer during its journey across the Internet. *Cartoon Network*, 536 F.3d at 129–30. The Copyright Act does not grant a right to control "access" or "viewing." *See* 17 U.S.C. § 106. And Plaintiffs have made no attempt to show that any access to the Standards on Public Resource's website or the Internet Archive actually resulted in a reproduction or any distribution by any person.

Access does not even imply an act of human volition, as required for a claim of direct copyright infringement. The "accesses" Plaintiffs' rely on were simply transmissions of data from one computer to another, which can be initiated by software acting autonomously. Plaintiffs made no effort to show (through expert testimony or otherwise) that any accesses to the 1999 Standards were a result of human volition rather than a mere byproduct of the activities of automated systems. *See Cartoon Network*, 536 F.3d at 131–32 (technology that "automatically obeys commands" does not give rise to direct copyright infringement).

In short, Plaintiffs have shown only that some number of human beings or automated systems arrived at the 1999 Standards on Public Resource's website and the Internet Archive, not that any reproductions were made or copies were distributed. Because Plaintiffs have proved no act of infringement by others, they cannot show contributory infringement by Public Resource.

**B.     Plaintiffs Cannot Establish Intent to Infringe or Even Knowledge of Any Infringement.**

Just as Plaintiffs have not shown that any third party infringed upon the 1999 Standards after accessing it from Public Resource's website, they have not shown that Public Resource intended or even knew of any such infringement. Contributory liability requires "an affirmative intent that the product be used to infringe." *Grokster*, 545 U.S. at 936. "*Grokster* tells us that "contribution to infringement must be intentional for liability to arise." *Amazon*, 508 F.3d at

1170, citing *Grokster*, 545 U.S. at 930.  "'[M]ere knowledge of infringing potential or of actual

infringing uses would not be enough[.]'"  *Grokster*, 545 U.S. at 937, citing *Sony*, 464 U.S. at 439.

As to specific instances of alleged infringement, which Plaintiffs have presented no

evidence of, when a website operator "cannot reasonably verify a claim of infringement . . .

because of a possible fair use defense," the operator's "lack of knowledge will be found

reasonable," defeating any claim that the operator intended to induce infringement.  *Religious*

*Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1374 (N.D. Cal. 1995);

*see also Costar Grp. Inc. v. Loopnet, Inc.*, 164 F. Supp. 2d 688, 698 (D. Md. 2001) *aff'd*, 373

F.3d 544 (4th Cir. 2004) (the theory of "knowledge giving rise to liability only exists when there

is no colorable claim of users' noninfringment.").

Here, there is clearly at least a colorable claim that users who share the 1999 standards, if

such user existed, were not infringing copyright, for the same reasons that Public Resource's

own use of the Standards was noninfringing. This reasonable belief means that Public Resource

did not intend for website visitors to infringe copyright in the Standards.

In addition, Plaintiffs have not even established that Public Resource knew or could know

of any infringing reproductions, as opposed to mere viewing of the 1999 Standards. The operator

of a website can observe and log instances where a device on the Internet accesses data on the

website. (SMF ¶ 99.) Public Resource kept such logs during this litigation with respect to the

1999 Standards. (ECF No. 60-23 [Hudis Decl. Exh. T, at 7].) However, a website operator has no

way of knowing whether any access to data resulted in a reproduction being made (or why), just

as a library has no way of knowing whether a patron made photocopies of a book while

borrowing it (and if they did, whether it was a fair or otherwise permitted use). (SMF ¶ 98.)

Plaintiffs cite no evidence to the contrary. Instead, they apparently assume that knowledge about third-party access to the 1999 Standards implies knowledge that reproductions occurred. (*See* Pls. Mem. 35.) It does not. Nor did AERA Vice President John Nelkirk's email to Mr. Malamud put Public Resource on notice of any third-party reproductions, as Plaintiffs represent. The email said only that the 1999 Standards were posted to the Public Resource website and that AERA believed that posting to be "unlawful." (ECF No. 60-45 [Hudis Decl. Ex. JJ].) It did not mention any reproduction or other infringement by third parties. *See Newborn v. Yahoo!, Inc.*, 391 F. Supp. 2d 181, 189 (D.D.C. 2005) (dismissing claim of contributory infringement where plaintiff "provided the defendants with only scant information to which they can evaluate the claims against them").

Finally, Plaintiffs have not shown that Public Resource engaged in "willful blindness" as to any third-party reproduction of the 1999 Standards. Willful blindness applies only when a person "was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." *Viacom Int'l Inc. v. YouTube, Inc.*, 940 F. Supp. 2d 110, 115 (S.D.N.Y. 2013) (quoting *United States v. Aina–Marshall,* 336 F.3d 167, 170 (2d Cir. 2003)). As it is simply not possible for Public Resource, as a website operator, to know whether any visitor to the website made a copy of the 1999 Standards as opposed to simply viewing them online, Public Resource could not have "consciously avoided" that knowledge. And none of the measures Plaintiffs suggest Public Resource could have taken, such as placing "restrictions on an Internet user's ability to download" the 1999 Standards, or applying "Digital Rights Management," could have given Public Resource any knowledge of infringement by third parties. (Pls. Mem. 35.) Even if such measures were effective at *preventing* copying—and

Plaintiffs have not shown this—the measures could not have informed Public Resource that copies were made.

In summary, Plaintiffs have not shown either direct infringement by others or Public Resource's knowledge of any direct infringement. The claim of contributory infringement fails.

## VI.   DEFENDANTS HAVE NOT JUSTIFIED, AND CANNOT JUSTIFY, A PERMANENT INJUNCTION.

Plaintiffs cannot satisfy the first requirement for a permanent injunction: actual success on the merits of their infringement claims. *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 546 n.12 (1987); *see also Pub. Warehousing Co. K.S.C. v. Def. Supply Ctr. Phila.*, 489 F. Supp. 2d 30, 35 (D.D.C. 2007) ("If a plaintiff has no likelihood of success on the merits, inquiry into the remaining factors is unnecessary.").

Moreover, as an equitable remedy, an injunction does not follow automatically from success on the merits. Plaintiffs must prove all four elements: "(1) that [they have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff[s] and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). These factors provide separate and independent grounds for denying an injunction.

### A.   Plaintiffs Have Experienced No Irreparable Injury to Any Valid Legal Interest.

Irreparable injury cannot be presumed. Plaintiffs must prove a "likelihood of substantial and immediate irreparable injury." *Apple, Inc. v. Samsung Electronics Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)). They cannot prove irreparable injury here.

### 1. Plaintiffs have no competent evidence of future harm.

As described above with respect to fair use, Plaintiffs have not shown that Public Resource's posting of the 1999 Standards caused them financial harm. Plaintiffs use revenues from sales of the current edition of the Testing Standards to fund development of the next edition. (SMF ¶ 101.) Once they publish a new edition, Plaintiffs do not market old, superseded editions. (SMF ¶ 102.) They recall unfilled orders for old editions, destroy unsold copies, and post warnings that prior editions should not be used. (SMF ¶ 103.) Thus, Plaintiffs are not seeking any "business opportunities" with respect to the 1999 Standards.

Moreover, the development of the 2014 edition was fully funded more than three times over at the time of its publication. Plaintiffs spent approximately $400,000 to develop the 2014 Standards (SMF ¶ 104.) ███████████████████████████████████

██████████████████████████████████████████████████████████

████████████ (SMF ¶ 105.) ███████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████The ███████████████████████████████

██████████████████████████████████ (*Id.*)

The 2014 edition has not become law to Public Resource's knowledge. Unless that event occurs, Public Resource will not consider posting the 2014 edition online. (SMF ¶ 40.) Plaintiffs' claim of copyright in the 2014 edition remains unchallenged for the indefinite future.

In light of these facts, Plaintiffs' claim that Public Resource's posting "jeopardizes" continued development of the Standards, (Pls. Mem. 56), depends on a chain of false or unsupported suppositions: that Plaintiffs are depending on future revenues from the sale of the 1999 Standards to fund future development (which they are not); that the 2014 edition will soon be incorporated into law (which is speculative and could be discouraged by Plaintiffs); that

Public Resource will post it soon after that (which depends on its future priorities, *see* SMF ¶ 38.); that the posting will have a significant effect on sales (which is contradicted by Plaintiffs' sales data to date); and that all of this will happen before Plaintiffs have funded the development of the next edition (which has likely occurred *already*). Alleged harm that is "merely feared as liable to occur at some indefinite time in the future" does not justify an injunction. *Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931).

> ### 2.    "Loss of control" without actual business injury does not authorize an injunction.

Plaintiffs claim a "right to determine how [the 1999 Standard] is distributed to the public." (SMF¶ 58, 96.) As a matter of law, claiming a "statutory right to exclude" alone does not entitle a party to permanent injunctive relief, because "the creation of a right is distinct from the provision of remedies for violations of that right," and the equitable remedy of injunction requires a full equitable analysis rather than "broad classifications." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392–93 (2006). Having shown no real and non-speculative prospect of future business harm, Plaintiffs cannot rest their claim for an injunction on an alleged "loss of control," as this would amount to a forbidden presumption in favor of an injunction. *See id.*

### A.    An Injunction Would Harm Public Resource's Ability to Serve the Public Interest.

While Plaintiffs have shown no likelihood of experiencing irreparable harm, by contrast a permanent injunction will harm Public Resource's mission of providing the public with access to the full universe of government edicts.

### C.    The Public Interest Favors Access to Laws, Edicts, and Records of Government.

Plaintiffs have expressed an intention to restrict access to and distribution of the 1999 Standards despite their status as binding law, and they claim a right to do so. (SMF ¶ 58.) Given

that intention, enjoining Public Resource from facilitating access to the 1999 Standards would be particularly detrimental to the public interest. For example, by law, the 1999 Standards (not the 2014 edition) govern the design of widely used tests that determine eligibility for most federal student financial aid for those without high school diplomas. 34 C.F.R. §§ 668.141(a)(1), 668.146(b)(6). Students, parents, teachers, researchers, and new entrants in the market for government-approved tests all have an interest in knowing the full scope of the government's requirements for such tests and in communicating those requirements to others. If Plaintiffs are able to enjoin Public Resource and others from reproducing and communicating the 1999 Standards, those with an interest in the law of testing will need to search for the few remaining publicly available paper copies or to ferret out the obscure single link on AERA's website (assuming that AERA maintains it) that leads to an order form, pay $45.95, and wait for a physical delivery. (SMF ¶ 59.)

In contrast to the gauntlet that Plaintiffs impose on those who need or want access to the law of testing, nearly all other binding laws and regulations in the nation are no farther away than a smartphone, tablet, or the Internet terminal in a public library, and they can be accessed, printed, transmitted, excerpted, and annotated for free. Giving Plaintiffs the ability to limit or withhold access to an important piece of state and federal law does not serve the public interest.

Plaintiffs ignore the importance of public access to the law, arguing that only "upholding copyright protection" can satisfy the public interest test for an injunction. (Pls. Mem. 58.) The Supreme Court has long since rejected any approach that would collapse the public interest inquiry into the merits. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 26–27, 32 (2008) ("[t]he balance of equities and consideration of the public interest . . . are pertinent in assessing the propriety of any injunctive relief."); *eBay*, 547 U.S. at 393 (forbidding "broad classifications"

in place of equitable analysis). And, as described above, Plaintiffs' self-serving threat that they will "cease" to develop testing standards without the power to withhold access to older versions is contradicted by their own sales data.

> Copyright exists primarily to advance the public good, not private financial reward:
>
> > The monopoly privileges that Congress may authorize are neither unlimited nor primarily designed to provide a special private benefit. Rather, the limited grant is a means by which an important public purpose may be achieved. It is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired.

*Sony*, 464 U.S. at 429. The development of "recommended best practices for testing design and administration," (Pls. Mem. 57), is not at stake here. Public access is at stake. The public interest strongly favors denying an injunction.

## CONCLUSION

The various legal authorities and arguments of Public Resource above provide independent pathways to the same inescapable result: the 1999 Standards are law, and the AERA Plaintiffs cannot stop Public Resource from sharing the law. On each of these bases, the Court should grant summary judgment to Public Resource and deny Plaintiffs' motion for injunction.

Dated:    January 21, 2016                          Respectfully submitted,


                                                    */s/   Andrew P. Bridges*
                                                    Andrew P. Bridges (admitted)
                                                    abridges@fenwick.com
                                                    Sebastian E. Kaplan (*pro hac vice* pending)
                                                    skaplan@fenwick.com
                                                    Matthew Becker (admitted)
                                                    mbecker@fenwick.com
                                                    FENWICK & WEST LLP
                                                    555 California Street, 12th Floor
                                                    San Francisco, CA 94104
                                                    Telephone:    (415) 875-2300
                                                    Facsimile:    (415) 281-1350


                                                    Corynne McSherry (admitted *pro hac vice*)
                                                    corynne@eff.org
                                                    Mitchell L. Stoltz (D.C. Bar No. 978149)
                                                    mitch@eff.org
                                                    ELECTRONIC FRONTIER FOUNDATION
                                                    815 Eddy Street
                                                    San Francisco, CA 94109
                                                    Telephone:    (415) 436-9333
                                                    Facsimile:    (415) 436-9993


                                                    David Halperin (D.C. Bar No. 426078)
                                                    davidhalperindc@gmail.com
                                                    1530 P Street NW
                                                    Washington, DC 20005
                                                    Telephone: (202) 905-3434


                                                    *Attorneys for Defendant-Counterclaimant*
                                                    Public.Resource.Org, Inc.

SF/5546626.14