**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN EDUCATIONAL RESEARCH ASSOCIATION, INC., AMERICAN PSYCHOLOGICAL ASSOCIATION, INC., and NATIONAL COUNCIL ON MEASUREMENT IN EDUCATION, INC., | Case No. 1:14-CV-00857-TSC-DAR |
| Plaintiffs, | **STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT-COUNTERCLAIMANT PUBLIC.RESOURCE.ORG, INC.'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION** |
| v. | |
| PUBLIC.RESOURCE.ORG, | |
| Defendant. | Action Filed:   May 23, 2014 |

**[PUBLIC VERSION]**

Pursuant to the Local Civil Rule 7(h), Defendant-Counterclaimant Public.Resource.Org,

Inc. ("Public Resource") contends that there are no genuine disputes as to the following facts.

Each of the following facts supports Public Resource's Motion for Summary Judgment:

| Short Form Citation | Document Title |
|---|---|
| C. Malamud Decl. | Declaration of Carl Malamud, dated January 21, 2016 |
| M. Becker Decl. | Declaration of Matthew Becker, dated January 21, 2016 |
| Request for Judicial Notice | Public Resource's Request for Judicial Notice, dated January 21, 2016 |
| Butler Dep. | Deposition of Christopher Butler, Internet Archive, dated December 2, 2014 |
| Butler Ex. | Exhibit marked in the deposition of Christopher Butler, Internet Archive, dated December 2, 2014 |

| Short Form Citation | Document Title |
|---|---|
| Camara Dep. | Deposition of Wayne Camara, dated May 1, 2015. |
| Camara Ex. | Exhibit marked in the deposition of Wayne Camara, dated May 1, 2015. |
| Ernesto Dep. | deposition of Marianne Ernesto, dated April 29, 2015 |
| Ernesto Ex. | Exhibit marked in the deposition of Marianne Ernesto, dated April 29, 2015 |
| Fruchterman Rep. | Expert Report of James Fruchterman, dated June 13, 2015 |
| Geisinger Dep. | Deposition of Kurt F. Geisinger, dated September 10, 2015 |
| Geisinger Ex. | Exhibit marked in the deposition of Kurt F. Geisinger, dated September 10, 2015 |
| Levine Dep. | Deposition of Felice Levine, dated May 4, 2015 |
| Levine Ex. | Exhibit marked in the deposition of Felice Levine, dated May 4, 2015 |
| Malamud Dep. | Deposition of Carl Malamud, dated May 12, 2015 |
| Malamud Ex. | Exhibit marked in the deposition of Carl Malamud, dated May 12, 2015 |
| Schneider Dep. | Deposition of Diane L. Schneider, dated April 23, 2015 |
| Schneider Ex. | Exhibit marked in the deposition of Diane L. Schneider, dated April 23, 2015 |
| Wise Dep. | Deposition of Lauress Wise, dated May 11, 2015 |
| Wise Ex. | Exhibit marked in the deposition of Lauress Wise, dated May 11, 2015 |

## STATEMENT OF MATERIAL FACTS

## I.    FACTUAL BACKGROUND

1.    Public.Resource.org is a nonprofit corporation, funded entirely by donations, contributions, and grants. January 21, 2015 Declaration of Carl Malamud in support of Public Resource's Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment ("C. Malamud Decl.") ¶ 3, 30.

2.    Public Resource's core mission is to make the law and other government materials more widely available so that people, businesses, and organizations can easily read and discuss our laws and the operations of government.  This involves maintaining public works projects on the Internet, including the publication of statutes, regulations, and other material that constitutes the law.  C. Malamud Decl. ¶ 4, Ex. 1.

3.    Public Resource maintains an archive of laws and other government authored materials on several domains under the public.resource.org website. C. Malamud Decl. ¶ 9–14.

4.    Public Resource has made judicial opinions, Internal Revenue Service records, patent filings, and safety regulations accessible on the Internet. C. Malamud Decl. ¶ 10.

5.    Public Resource does not charge for access to the archive of laws and other government authored materials on several domains under the public.resource.org website. C. Malamud Decl. ¶ 24. Public Resource has never sought benefit or compensation from its posting of the 1999 Standards and has never used it as a marketing device. *Id.* ¶ 31.

6.    Public Resource does not accept donations or gifts that are tied to the posting of specific standards or groups of standards. C. Malamud Decl. ¶ 30.

7.      Public Resource's operating income is not based on the amount of traffic its websites receive, and Public Resource does not advertise on its websites.  C. Malamud Decl. ¶ 30.

8.      The 1999 Standards that Plaintiffs published were developed by unpaid volunteers. Plaintiffs' Statement of Material Facts ("Pls. SMF") ¶ 10; Index of Consolidated Exhibits ("ICE") Ex. 2 (Schneider Dep. 90:5–10).

9.      Plaintiffs highlight the work of the 17 volunteer Joint Committee members who helped develop the 1999 Standards, but these are just a subset of all contributors to the 1999 Standards. Hundreds of individuals, organizations, and government entities provided proposed text and comments for 1999 Standards. Listed in the preface to the 1999 Standards alongside the Joint Committee members are sponsoring associations, scientific and professional membership organizations, credentialing boards, government and federal agencies, test publishers, and academic institutions. The preface states: "Draft versions of the *Standards* were widely distributed for public review and comment three times during this revision effort, providing the Committee with a total of nearly 8,000 pages of comments.  Organizations who submitted comments on drafts are listed below.  Many individuals contributed to the input from each organization . . . ." ICE Ex. 3 (Ernesto Dep. 147:25–148:08; 149:12–150:24); ICE Ex. 29 (Ernesto Ex. 1105, Preface to 1999 Standards listing contributors).

10.     The volunteers draft the standards to achieve a consensus of best practices in the areas covered by the 1999 Standard.  ICE Ex. 2 (Schneider Dep. 176:23–177:06.)

11.     In December 1999, one of the plaintiffs, AERA, sought and obtained a copyright registration claiming to be the sole author of the 1999 Standards. Ex. 3 (Ernesto Dep. 32:07–25); ICE Ex. 10 (Ernesto Ex. 1064, Copyright Right Office TX Form).

12.     In February 2014, Plaintiffs obtained a supplemental copyright registration that listed each plaintiff organization as an author and owner of the 1999 Standards.  ICE Ex. 3 (Ernesto Dep. 32:07–34:01; 122:23–124:08); ICE Ex. 28 (Ernesto Ex. 1104, Copyright Registration).

13.     In February 2014, Plaintiffs did not yet have any alleged copyright assignments from the people who authored the 1999 Standards.  It was not until two months later, in April of 2014 and throughout the rest of that year, that Plaintiffs began to obtain alleged copyright assignments from some of these individuals. ICE Ex. 3 (Ernesto Dep. 42:11–22; 124:12–127:12; 141:25–13); ICE Exs. 11 (Ernesto Ex. 1065), 13 (Ernesto Ex. 1069), 14 (Ernesto Ex. 1070), 15 (Ernesto Ex. 1071), 16 (Ernesto Ex. 1072), 17 (Ernesto Ex. 1075), 18 (Ernesto Ex. 1078), 19 (Ernesto Ex. 1082), 20 (Ernesto Ex. 1085), 21 (Ernesto Ex. 1086), 22 (Ernesto Ex. 1089), 23 (Ernesto Ex. 1090), 24 (Ernesto Ex. 1091), 25 (Ernesto Ex. 1094), 26 (Ernesto Ex. 1097).

14.     In their motion, Plaintiffs refer to 13 of these alleged assignments as "work made-for-hire letters."  These documents were signed a decade-and-a-half after completion of the 1999 Standards, and no work for hire agreements existed prior to 2014. ICE Ex. 3 (Ernesto Dep. 141:25–142:13). At deposition, Plaintiffs' Rule 30(b)(6) designee on the subject of copyright ownership identified these documents as "assignments," rather than work made-for-hire letters. ICE Ex. 3 (Ernesto Dep. 44:22–09).

15.     In their motion, Plaintiffs refer to two of these alleged assignments as "posthumous assignments."  These alleged posthumous assignments were made without Plaintiffs providing any consideration to the assignees, despite the assignment claiming that "good and valuable consideration" had been delivered to the alleged heirs who signed them. ICE Ex. 3 (Ernesto Dep. 81:03–82:14; 85:19–87:03).

16.     Plaintiffs now claim to be "joint owners" of the standards. (Plaintiffs' Memorandum of Points and Authorities, ECF 60-1 ("Pls. Mem.") at 12.)

17.     Plaintiffs' staffs provide facilitative and administrative functions towards the development of the 1999 Standards, but they do not author the standards or control the final content. ICE Ex. 3 (Ernesto Dep. 34:02–40:07).

18.     Plaintiffs have not sought or obtained assignments from the many hundreds of individuals and organizations that participated in the development of the 1999 Standards. ICE Ex. 3 (Ernesto Dep. 147:25–151:25).

19.     Plaintiffs have not taken any steps to ensure that the alleged assignors had authority to assign copyrights to the Plaintiffs.  Plaintiffs simply assumed that the assignors had ownership of the copyrights at issue and were able to grant them to Plaintiffs through the alleged assignments. ICE Ex. 3 (Ernesto Dep. 152:02–154:20).

20.     The 1999 Standards are incorporated by reference into federal law at 34 C.F.R. § 668.146.  Plaintiffs acknowledge that the 1999 Standards have been incorporated by reference into the law.  Pls. Mem. at 13–14.

21.     The 1999 Standards are also incorporated into state law.  *See, e.g.*, Md. Admin. Rule 09.12.26.06(E)(1)(c)(i); Minn. Admin. Rule 4761.2460, Subp. 2(C).

22.     In order to enact rules, a federal agency must follow minimum procedures to guarantee adequate public notice and opportunity to comment. 5 U.S.C. §553.

23.     A federal agency must publish proposed rule changes in the Federal Register, including changes to a standard incorporated by reference into the Code of Federal Regulations. 5 U.S.C. §553(b); 1 C.F.R. § 51.11(a) (2015).

24.     A standard incorporated by reference into the Code of Federal Regulations must be a "proposed rule" or "final rule" of a federal agency. 1 C.F.R. §51.5(a)-(b) (2015).

25.     Before the federal government incorporates a standard by reference into law as a final rule, it must be approved by the Director of the Federal Register. 1 C.F.R. § 51.3 (2015).

26.     Standards are incorporated by reference—as opposed to reprinting the entire text of the standards—to limit the length of the Code of Federal Regulations. Request for Judicial Notice ("RJN") ¶ 1, ICE Ex. 64 ("Incorporation by Reference" webpage of the Office of the Federal Register, http://www.archives.gov/federal-register/cfr/ibr-locations.html).

27.     Standards incorporated by reference into the Code of Federal Regulations are made available in the Washington D.C. reading room of the Office of the Federal Register, or for purchase from the Plaintiffs. The Office of the Federal Register directs people who want to read incorporated standards to "contact the standards organization that developed the material." Alternatively, one may submit a written request to the Office of the Federal Register to inspect (and make limited photocopies of) an incorporated standard in Washington, D.C. RJN ¶ 1, ICE Ex. 64.

28.     Public Resource posted versions of the 1999 Standards on its website and on the Internet Archive website. C. Malamud Decl. ¶ 25.

29.     The 1999 Standards were promulgated as private industry standards for over 11 years before being incorporated into law by the Department of Education on July 1, 2011. RJN ¶ 8, ICE Ex. 71 ("Program Integrity Issues," Federal Register, available at: https://www.federal register.gov/articles/2010/10/29/2010-26531/program-integrity-issues#h-4).

30.     The Plaintiffs have acknowledged that individuals would want to read the 1999 Standards because people "believe they still may be held accountable" to them.  Pls. Mem. 1, 11.

31.     The Office of the Federal Register states: "The legal effect of incorporation by reference is that the material is treated as if it were published in the Federal Register and CFR. This material, like any other properly issued rule, has the force and effect of law. Congress authorized incorporation by reference in the Freedom of Information Act to reduce the volume of material published in the Federal Register and CFR." RJN ¶ 1, ICE Ex. 64.

32.     The Office of the Federal Register is required to maintain a copy of each incorporated standard. It makes a copy of each standard available for public viewing, upon written request for an appointment, at its Washington, D.C. reading room. RJN ¶ 1, ICE Ex. 64.

33.     Failure to comply with the standards incorporated by law may result in penalties. Under 34 C.F.R. § 668.146, the Higher Education Act requires states to comply with the 1999 Standards in developing and administering a variety of tests in order to receive federal aid. Federal aid to students under the Department of Education's Title IV program totals approximately $150 billion annually. RJN ¶ 2, ICE Ex. 65 (New York Times, "Putting a Number on Federal Education Spending"); RJN ¶ 3, ICE Ex. 66 ("Federal Pell Grant Program—Funding Status"). Title IV programs include Federal Perkins Loans, Direct Loans (including Stafford and PLUS loans), Pell Grants, and Federal Work Study, representing the majority of federal student aid. RJN ¶ 4, ICE Ex. 67 ("What are Title IV Programs?"). For-profit colleges in 2009 were taking in as much as $32 billion of that amount. RJN ¶ 5, ICE Ex. 68 (Senate Health Education Labor & Pensions Committee report, For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success").

34.     One specific example of the effect of the 1999 Standards' incorporation into law is their role in the so-called "ability to benefit" (ATB) program. This program allows access to federal aid for students who lack a high school diploma or a GED certificate if they either (1)

complete at least 6 credit hours in a post-secondary school; or (2) pass an independently administered Department of Education approved ability to benefit test. Congress abolished the ability to benefit program in 2012 but restored it in 2014. RJN ¶ 6, ICE Ex. 69 (Department of Education letter, DCL ID: GEN-15-09, "Title IV Eligibility for Students Without a Valid High School Diploma Who Are Enrolled in Eligible Career Pathway Programs"). In a 2009 report, the U.S. Government Accountability Office raised concerns that some for-profit colleges were helping students cheat on the ability to benefit test or falsifying test results. RJN ¶ 7, ICE Ex. 70 (GAO, PROPRIETARY SCHOOLS: Stronger Department of Education Oversight Needed to Help Ensure Only Eligible Students Receive Federal Student Aid, August 2009).

35.     The Department of Educations responded by issuing new regulations for ATB tests, codified at 34 CFR 668.146, with specific requirements to enhance the quality and integrity of the tests. To be approved by the Secretary of Education, an ATB test must "Meet all standards for test construction provided in the 1999 edition of the *Standards for Educational and Psychological Testing*," i.e. the 1999 Standards. 34 C.F.R. § 668.146(b)(6).  The 1999 Standards are referenced again with respect to tests conducted in foreign languages for non-native speakers of English, 34 C.F.R. § 668.148(a)(1)(iv), for test modifications to accommodate students with disabilities,  34 C.F.R. § 668.148(a)(2)(i), and for specific requirements for computer-based tests. 34 C.F.R. § 668.148(a)(3)(i)

36.      The Department made one specific change to its final version of the 2010 Rule, codified at § 668.146(b)(6), in response to a comment pointing out that the Department's proposed rule used outdated language present in the 1985 AERA Standards, but revised in the 1999 Standards. 75 F.R. 66923. Department officials deliberately shaped the regulation to harmonize its printed provisions with those provisions that were incorporated by reference, i.e.

the 1999 Standards.

37.     Beginning in 2008, Public Resource began posting state safety regulations and statutes online, including portions of the incorporated standards in this case. Public Resource purchased paper copies of the codes and scanned them into PDF files. Public Resource then applied metadata and optical character recognition ("OCR") to the PDF files. Public Resource also placed a cover sheet on each document to make it clear that Public Resource was posting the document because it had been incorporated by reference into law. Public Resource improved this process over time and began posting some of the standards in HTML format, which included converting formulas and graphics into appropriate formats. C. Malamud Decl. ¶¶ 16–17. The version of the 1999 Standards that Public Resource posted to the Internet Archive underwent OCR and was converted into a variety of file formats. Becker Decl. ¶ 51, Ex. 51 (Fruchterman Rep. 11–12).

38.     In 2012, Public Resource began to post copies of standards incorporated by reference into law on its website. Public Resource began by purchasing paper copies of 73 standards, copying them and placing a cover sheet and notice of incorporation on each one, and sending the copies and additional material to government officials and ten SDOs. Then, Public Resource began searching for copies of additional incorporated standards, many of which were not available from the SDOs, likely because the version incorporated into law had been superseded by a later version of the standard. C. Malamud Decl. ¶¶ 20–23. Public Resource's regular practice is to further convert the standards it posts into standard Hypertext Markup Language (HTML) to make them still more accessible. It intended to do so for the 1999 Standards but the filing of this lawsuit interrupted that work. *Id.* ¶ 25. Public Resource also

works to ensure that standards incorporated by reference into law, along with the other legal materials it posts, are indexed and represented accurately by search engines. *Id.* ¶ 29.

39.     In May 2014, Plaintiffs sued Public Resource for posting on its website and the Internet Archive website the 1999 Standards. Compl. ECF No. 1.  Subsequently, so as to ensure a full record, in June 2014 Public Resource agreed to take down the versions of the 1999 Standards that it had posted on its website and on the Internet Archive website, pending the resolution of this case. C. Malamud Decl. ¶ 25; ICE Ex. 9 (Malamud Ex. 43).

40.     Shortly thereafter, in August 2014, Plaintiffs published the new 2014 edition of the *Standards for Educational and Psychological Testing* ("the 2014 Standards"), and then subsequently removed the 1999 Standards from sale.  Plfs. SMF ¶ 35; ICE Ex. 5 (Levine Dep. 42:12–23; 43:09–24).  Public Resource has not posted the 2014 edition of the Standards anywhere. C. Malamud Decl. ¶ 33. Public Resource would only consider posting an electronic copy of the 2014 edition of the Standards if it were incorporated into law. *Id.*; ICE Ex. 7 (Malamud Depo 308:7–9, 308:23–309:2).

41.     In the past, Plaintiffs have ceased selling the prior edition of the Standards for Educational and Psychological Testing when a new edition is published.  ICE Ex. 8 (Geisinger Dep. 101:15–19).

42.     After the 1999 Standards were published, Plaintiffs ceased selling the prior 1985 edition of the Standards. ICE Ex. 3 (Ernesto Dep. 212:16–21). In year 2000, Plaintiffs recalled copies of the 1985 Standards, and stated that the old stock of Standards was supposed to be destroyed. This is Plaintiffs' practice following the publication of a new edition of the Standards. ICE Ex. 5 (Levine Dep. 79:23–84:11; 84:15–88:22; 90:21–92:07; 97:17–99:24); ICE Ex. 35 (1197); ICE Ex. 36 (Levine Ex. 1198); ICE Ex.37 (Levine Ex. 1200). This is despite the fact that

the1985 Standards were incorporated by reference into law under 34 C.F.R. 668.146 from July 1,
1996 until they were replaced by the 1999 Standards in 2011. *See* 60 Federal Register 61830–
61844, Vol. 60, No. 231, Dec. 1, 1995, available at https://www.gpo.gov/fdsys/pkg/FR-1995-12-
01/pdf/95-29125.pdf. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ ICE Ex. 3 (Ernesto Dep. 206:14–208:4).

43.    Plaintiffs only put the 1999 Standards on sale once more in July 2015 after the
issue was brought to their attention at deposition in April and May of that year.  Plfs. Mem. at
11; ICE Ex. 3 (Ernesto Dep. 1, 203:15–207:10, 208:20–209:11); ICE Ex. 5 (Levine Dep. 1,
42:12–23).

44.    ████████████████████████████████████████████████

████████████████████████████████████████████████

████████ ICE Ex. 38 (Levine Ex. 1205); ICE Ex. 39 (Levine Ex. 1207); ICE Ex. 40 (Levine
Ex. 1208); ICE Ex. 41 (Levine Ex. 1211); ICE Ex. 5 (Levine Dep. 120:06–121:18; 148:02–
149:05). Plaintiffs' financial data provides the following image of sales oscillation for the 1999
Standards:

| Year | Revenue | % Change | Units Sold | % Change |
|---|---|---|---|---|
| FY 2000 | ████ |  | 3,797 |  |
| FY 2001 | ████ | ████ | 3,755 | -1.11% |
| FY 2002 | ████ | ████ | 5,592 | 48.92% |
| FY 2003 | ████ | ████ | 3,310 | -40.81% |
| FY 2004 | ████ | ████ | 3,218 | -2.78% |
| FY 2005 | ████ | ████ | 3,803 | 18.18% |
| FY 2006 | ████ | ████ | 3,888 | 2.24% |

| Year | Revenue | % Change | Units Sold | % Change |
|------|---------|----------|------------|----------|
| FY 2007[1] | ███ | ██ | 3,077 | -20.86% |
| FY 2008 | ███ | | 3,358 | 9.13% |
| FY 2009 | ███ | | 2,590 | -22.87% |
| FY 2010 | ███ | | 3,043 | 17.49% |
| FY 2011 | ███ | | 2,132 | -29.94% |
| FY 2012 | ███ | | 1,649 | -22.65% |
| FY 2013 | ███ | | 1,732 | 5.03% |
| FY 2014 | ███ | | 855 | -50.64% |

45.     Dr. Levine attributed the ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ ICE Ex. 5 (Levine Dep. 141:19–142:08).

████████████████████████████████████████████

████████████████████████████████████████████

████████████████ ICE Ex. 5 (Levine Dep. 114:9–17).

46.     Plaintiffs' expert, ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ ECF No.

60-88 (Geisinger Decl. ¶ 25); ICE Ex. 8 (Geisinger Dep. 93:20–97:04). ████████████

████████████████████████████████████████████

████████████████ ICE Ex. 8 (Geisinger Dep. 93:20–94:7; 95:6–21). ████████

---

[1] ████████████████████████████████████████████████████

██████████████████████████████ Public Resource was unable to determine a
continuous annual sales trend because Plaintiff did not produce monthly sales information.

███████████████████████████████████████████████████

███████ ICE Ex. 8 (Geisinger Dep. 94:2–7).

47.   ████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████ ICE Ex. 38 (Levine Ex. 1205); ICE Ex. 39 (Levine Ex.

1207); ICE Ex. 40 (Levine Ex. 1208); ICE Ex. 41 (Levine Ex. 1211); ICE Ex. 5 (Levine Dep.

120:06–121:18; 135:11–137:03; 138:08–140:18; 148:02–149:05).

48.   In their Motion for Summary Judgment filing, Plaintiffs included an unsealed,

complete version of the 1999 Standards, split into two documents and totaling 100 pages or more

in each document. (ECF No. 60-25–60-26.) Because the document was not sealed or otherwise

designated as confidential, it is now available to the public to download.  PACER charges $0.10

per page, but caps charges at $3.00 per document, so it would cost $6.00 to download a complete

version of the 1999 Standards from PACER. *See* "Electronic Public Access Fee Schedule,"

Pacer.gov, Dec. 1, 2013, at https://www.pacer.gov/documents/epa_feesched.pdf.

49.   RECAP is a service created by the Center for Information Technology Policy at

Princeton University and Free Law Project, through which member of the public can access

PACER documents for free. Once an individual who has RECAP installed on her computer

accesses a document on PACER, RECAP uploads the document to its system and makes it

available to the public for free, through the RECAP website or browser plugin. *See* "About,"
RECAP the Law, at https://www.recapthelaw.org/about/. If someone who has the RECAP
browser plugin installed accesses Plaintiffs' summary judgment filing on PACER, RECAP will
upload it and the public will be able to access the 1999 Standards for free.

50.     At deposition this past spring, Plaintiffs' corporate designee asserted that they
have never made an electronic version of the 1999 Standards available to the public, nor do they
plan to. ICE Ex. 3 (Ernesto Dep. 207:11–208:04); ICE Ex. 5 (Levine Dep. 59:22–60:14).
Plaintiffs also asserted that they have not published any other versions of the 1999 Standards or
2014 Standards that would be accessible to people who are blind or visually disabled, including
braille formats. ICE Ex. 3 (Ernesto Dep. 208:05–19); ICE Ex. 5 (Levine Dep. 65:13–20, 79:09–
19).

## II.     PLAINTIFFS CANNOT HOLD A STATUTORY MONOPOLY OVER THE LAW

51.     The 1999 Standards have been superseded by the 2014 Standards and are
therefore obsolete as an industry standard. Plaintiffs themselves express concern about the
continued use of the 1999 Standards, claiming that it would harm the public, and state that the
2014 Standards should be used instead. ECF No. 60-88 (Geisinger Decl. ¶ 28); ICE Ex. 8
(Geisinger Dep. 105:25–109:13, 245:22–249:14); ICE Ex. 4 (Camara Dep. 295:14–296:13); ICE
Ex. 6 (Wise Dep. 332:11–333:8).

52.     According to Wayne Camara, Plaintiffs' Rule 30(b)(6) witness on the subject of
Plaintiffs' efforts to influence the requirements imposed by federal and state governments
regarding incorporation by reference, ██████████████████████████████████████████
████████████████████████████████████████ *See* ICE Ex. 53 (Wayne
Camara, "OCR Issues Draft Guide on Disparate Impact in Educational Testing," Society for
Industrial and Organizational Psychology, October 1999); ICE Ex. 4 (Camara Dep. 43:16–18).

53.     Plaintiff APA spends millions on lobbying every year, and that work has included calling attention to the 1999 Standards in order "to inform particular individuals about best practices as it relates to testing and assessment, as they might have been formulating legislation." ICE Ex. 3 (Ernesto Dep. 174:11–175:14); ICE Ex. 30 (Ernesto Ex. 1112).

54.     ████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ ICE Ex. 33 (Ernesto Ex. 1121); ICE Ex. 3 (Ernesto Dep. 209:15–22). Adoption into law gives the Standards "authoritative value." ICE Ex. 3 (Ernesto Dep. 176:14–23).

55.     ███████████████████████████████████████

████████ ICE Ex. 44 (Levine Ex. 1217); ICE Ex. 45 (Levine Ex. 1218); ICE Ex. 46 (Levine Ex. 1219); ICE Ex. 5 (Levine Dep. 176:22–177:01; 178:14–179:15; 179:19–180:04).

56.     ██████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

57.     The law permits parents to review testing protocols, but in order to exercise that right, they must make their way to the Washington, D.C. reading room of the Department of Education, or the National Archives. *See* 34 C.F.R. § 668.146.

58.     Plaintiffs have repeatedly emphasized their firm belief that they should be able to control access to the 1999 Standards—including the right not to make the 1999 Standards available *at all.* ICE Ex. 3 (Ernesto Dep. 222:2–223:5); ECF No. 14 (Pls. Answer ¶¶14, 19). AERA's representative stated that they could one day discontinue sales of the 1999 Standards again. ICE Ex. 5 (Levine Dep. 55:09–56:10)..

59.     In July 2015, shortly after Public Resource raised the issue of future sales of the 1999 Standards in depositions, AERA placed a single link to the 1999 Standards from the page at which it sells the 2014 edition of the Standards. "Standards for Educational & Psychological Testing (2014 Edition)," AERA, at http://www.aera.net/Publications/Books/Standardsfor EducationalPsychologicalTesting%28NewEdition%29/tabid/15578/Default.aspx. The linked page advises users that Plaintiffs "recommend use of the 2014 Standard*s* as the authoritative source of testing standards." "1999 Standards," AERA, at http://www.aera.net/Publications/ Books/Standards%281999Ed%29/tabid/16144/Default.aspx.  The 1999 edition does *not* appear in the "Complete List of AERA Books" on AERA's website. "Publications," AERA, at http://www.aera.net/Publications/tabid/10067/Default.aspx; "AERA Books List," AERA,

http://www.aera.net/Publications/Books/AERABooksList/tabid/13233/Default.aspx. And the

1999 Edition is not available for purchase through AERA's online bookstore. *Id.* Instead, a

purchaser must print and fill out a "Mail or Fax Order Form" for the 1999 edition. "AERA Book

Order Form," AERA, at http://www.aera.net/Portals/38/docs/Publications/Official%20AERA

%20Book%20Order%20Form.pdf.

60.     Plaintiffs APA and NCME maintain pages on their websites to advertise the

Testing Standards and direct visitors to the AERA store to purchase the 2014 edition but neither

of these pages links to the 1999 edition. "The Standards for Educational and Psychological

Testing," APA, at http://www.apa.org/science/programs/testing/standards.aspx; "Testing

Standards," NCME, at http://www.ncme.org/ncme/NCME/Publication/NCME/Publication

/Testing_Standards.aspx.

61.     Participants contribute to the Standards for three principal reasons: to

███████████████████████████████████████████████████████ ICE

Ex. 8 (Geisinger Dep. 219:1–5).

62.     APA benefits from the Standards.  ICE Ex. 6 (Wise Dep. 89:15–17).

63.     As an organization dedicated to measurement in testing, the NCME's mission is

closely tied to the 1999 Standards. ███████████████████████ ICE Ex. 8

(Geisinger Dep. 191:2).

64.     ████████████████████████████████████████

████████████████████████████████████████████████████

██████████████ ICE Ex. 5 (Levine Dep. 36:19–37:18; 39:11–18).

65.     ████████████████████████████████████████

████████ ICE Ex. 8 (Geisinger Dep. 159:1–161:17).

66.     Plaintiffs have many other means of earning revenue, including selling other standards that are not incorporated into law, charging membership dues and conference fees, and obtaining government research grants, all of which are current sources of income for Plaintiffs. *See, e.g.*, ICE Ex. 54 (AERA "Membership Benefits"); ICE Ex. 55 (APA "Member" Webpage).

67.     Plaintiff APA's annual revenues in 2012 alone were approximately $119 million. ICE Ex. 8 (Geisinger Dep. 176:2–12).

68.     Matthew Bender/LexisNexis sells the District of Columbia Official Code for $849.00. ICE Ex. 56 (LexisNexis Store webpage).

69.     Matthew Bender/LexisNexis sells the "Criminal Jury Instructions for the District of Columbia, Fifth Edition" for $186.00. ICE Ex. 57 (LexisNexis Store webpage).

70.     Thomson Reuters/WestLaw sells "District of Columbia Rules of Court – District, 2015 ed. (Vol. 1, District of Columbia Court Rules)" for $167. ICE Ex. 58 (WestLaw Store Webpage).

71.     Barnes & Noble sells "Moby Dick" for $8.99 in paperback as part of its Barnes & Noble Classics Series. Barnes & Noble includes additional interpretive material such as "new introductions," "chronologies of contemporary historical, biographical, and cultural events," "study questions," etc." Barnes & Noble further states that the book is "beautifully designed and []printed to superior specifications." ICE Ex. 59 (Barnes & Noble Store Webpage).

72.     Barnes & Noble sells "The Adventures of Tom Sawyer" for $6.25 in paperback as part of its Barnes & Noble Classics Series. Barnes & Noble includes additional interpretive material such as "new introductions," "chronologies of contemporary historical, biographical, and cultural events," "study questions," etc." Barnes & Noble further states that the book is "beautifully designed and []printed to superior specifications." ICE Ex. 60 (Barnes & Noble

Store Webpage). Barnes & Noble promotes its Barnes & Noble Classics by calling attention to the "original ancillary materials included in each edition." ICE Ex. 61 ("About Barnes & Noble Classics" Webpage).

73.    [INTENTIONALLY BLANK]

74.    [INTENTIONALLY BLANK]

75.    [INTENTIONALLY BLANK]

76.    [INTENTIONALLY BLANK]

## III.    EVEN BEFORE INCORPORATION, THE STANDARDS ARE PRIMARILY UNCOPYRIGHTABLE SYSTEMS, DISCOVERIES, PROCESSES, PROCEDURES, AND *SCENES A FAIRE*.

77.    The standards "describe procedures, statistical procedures, research procedures . . . how to design a test, how to collect evidence of its validity, how to calculate the reliability of the tests." ICE Ex. 4 (Camara Dep. 166:8–22).

78.    Plaintiffs desired the Joint Committee developing the standards to ████████ ████████████████████████ ICE Ex. 4 (Camara Dep. 98:6–16).

79.    Plaintiffs goal in developing the Standards is to ████████████████████ ████████████████████████" in order to ensure accurate and defensible testing protocols. ICE Ex. 4 (Camara Dep. 62:4–18).

80.    The Standards cannot be expressed in a different way. *See* Paragraphs 81 and 82 below.

81.    Rephrasing the Standards would risk making the Standards unclear. ICE Ex. 2 (Schneider Dep. 136:18–21).

82.    ████████████████████████████████████████████████████████. ICE Ex. 2 (Schneider Dep. 136:11–137:15).

83.     The expression of the Standards are dicated by the current state of technical information on test development and use. ICE Ex. 4 (Camara Dep. 23:4–14, 62:2–18); ICE Ex. 34 (Camara Dep. Ex. 1157).

84.     Plaintiffs intended the 1999 Standards to remedy technical deficiencies in the prior 1985 standards, as there were definitions and statements that "█████████████████ ████████████████████████████" ICE Ex. 4 (Camara Dep. 131:25–132:11).

85.     The choices in development of the Standards were also dictated by practical requirements and industry demands, as the industry participants voiced them in the development process. *E.g.*, ICE Ex. 6 (Wise Dep. 82:13–20).

## IV.     PUBLIC RESOURCE'S POSTING IS A LAWFUL FAIR USE.

86.     Plaintiffs sold print copies of the 1999 Standards as a guide to test designers and administrators, and a statement of best practices for assessment professionals. ECF No. 60-25 (Hudis Decl. Ex. V at 86 ("the *Standards* are directed to test providers, and not to test takers.")).

87.     ██████████████████████████████████████████████████ ██████████████████████████████████████. ICE Ex. 5 (Levine Dep. 50:20–23).

88.     Plaintiffs do not make the 1999 Standards available for sale in electronic formats, only in print. Pls. Mem. 10.

89.     The Standards contain the legal requirements for tests used to determine students' eligibility for federal grants, including whether those tests are fair to students with disabilities. ICE Ex. 51 (Fruchterman Rep. 6); ECF No. 60-25 (Hudis Decl. Ex. V at 101–106).

90.     James Fruchterman, Public Resource's expert on accessibility, concluded that "a person who is blind or print disabled would have been able to locate a version of the 1999 Standards on the Public.Resource.Org website when it was still hosted there" and would be able

to "perform[] optical character recognition on the Public.Resource.Org image file" containing the 1999 Standards. ICE Ex. 51 (Fruchterman Rep. 11–12.). The reader would then "be able to perform all of the functional tasks: reading the entire standard, navigating to a specific place in the standard, or searching on key terms." *Id.* The version that Public Resource posted to the Internet Archive website had optical character recognition performed on it, so it was immediately readable by people who are blind or have visual disabilities. *Id.*

91.     Mr. Fruchterman could not locate the 1999 Standards on the Internet from any source, Public Resource having disabled access to the Standards through its website and the Internet Archive during this litigation. ICE Ex. 51 (Fruchterman Rep. 5).

92.     The 1999 Standards are not available through any of the main libraries that serve people with print disabilities. ICE Ex. 51 (Fruchterman Rep. 5.).

93.     ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ created. ICE Ex. 5 (Levine Dep. 79:9–19).

94.     While print copies of the 1999 Standards may be available, most blind people themselves do not have the ability to convert books and would require that their employer, educational institution, or a specialized library for the blind create an accessible copy. ICE Ex. 51 (Fruchterman Rep. 8).



95.     ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ICE Ex. 43 (Levine Ex. 1214); ICE Ex. 5 (Levine Dep. 164:6–169:4).

96.     ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. ICE Ex. 5 (Levine Dep. 49:17–50:8); ICE Ex. 8 (Geisinger Dep. 110:5–110:21).

97.   ███████████████████████████████████████

███████████████ Ex. 4 (Camara Dep. 295:9–296:7); ICE Ex. 8 (Geisinger Dep. 110:5–

110:21); ICE Ex. 6 (Wise 332:16–333:8).

## V.   PUBLIC RESOURCE IS NOT SECONDARILY LIABLE.

98.   Mr. Malamud defined access to imply that a computer, not necessarily a human

being, but a computer has requested some data from another computer, and that request was

successful and the data was transferred. ICE Ex. 7 (Malamud Dep. 146:19–147:4).

99.   The operator of a website can observe and log instances where a device on the

Internet accesses data on the website. ICE Ex. 7 (Malamud Dep. 328:17–329:16).

100.   A website operator has no way of knowing whether any access to data resulted in

a reproduction being made, just as a library has no way of knowing whether a patron made

photocopies of a book while borrowing it. ICE Ex. 73 at § 4.3 ("Internet Engineering Task Force

Request for Comments 7231, "Hypertext Transfer Protocol (HTTP/1.1): Semantics and Content"

(June 2014)."). Therefore, Public Resource did not have any way of knowing whether visitors to

its sites were making copies.

## VI.   DEFENDANTS HAVE NOT JUSTIFIED, AND CANNOT JUSTIFY, A PERMANENT INJUNCTION.

101.   Plaintiffs use revenues from sales of the current edition of the Testing Standards

to fund development of the next edition. ICE Ex. 5 (Levine Dep. 82:05–14).

102.   Once Plaintiffs publish a new edition of the standards, they cease marketing the

old, superseded editions. *See* Paragraphs 41–42, *supra*.

103.   Once Plaintiffs publish a new edition of the standards, they recall unfilled orders

for old editions, destroy unsold copies, and post warnings that prior editions should not be used.

*See* Paragraphs 41–42, *supra*.

104.   Plaintiffs spent approximately $400,000 to develop the 2014 Standards. ICE Ex. 8
(Geisinger Dep. 200:05–201:22.).

105.   As of December 31, 2014, just after the 2014 Standards were published,

███████████████████████████████████████████████████████████

ICE Ex. 38 (Levine Ex. 1205); ICE Ex. 42 (Levine Ex. 1212); ICE Ex. 5 (Levine Dep. 134:05–
135:07; 160:04–22); ICE Ex. 8 (Geisinger Dep. 310:20–311:03); ICE Ex. 50 (Geisinger Ex.
1263).

Dated:    January 21, 2016                    Respectfully submitted,


                                              /s/   Andrew P. Bridges
                                              Andrew P. Bridges (admitted)
                                              abridges@fenwick.com
                                              Sebastian E. Kaplan (*pro hac vice* pending)
                                              skaplan@fenwick.com
                                              Matthew Becker (admitted)
                                              mbecker@fenwick.com
                                              FENWICK & WEST LLP
                                              555 California Street, 12th Floor
                                              San Francisco, CA 94104
                                              Telephone:    (415) 875-2300
                                              Facsimile:    (415) 281-1350


                                              Corynne McSherry (admitted *pro hac vice*)
                                              corynne@eff.org
                                              Mitchell L. Stoltz (D.C. Bar No. 978149)
                                              mitch@eff.org
                                              ELECTRONIC FRONTIER FOUNDATION
                                              815 Eddy Street
                                              San Francisco, CA 94109
                                              Telephone:    (415) 436-9333
                                              Facsimile:    (415) 436-9993


                                              David Halperin (D.C. Bar No. 426078)
                                              davidhalperindc@gmail.com
                                              1530 P Street NW
                                              Washington, DC 20005
                                              Telephone: (202) 905-3434


                                              *Attorneys for Defendant-Counterclaimant*
                                              Public.Resource.Org, Inc.

SF/5546532.5