# EXHIBIT 7

```
 1             IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF COLUMBIA

 3    _____

 4    AMERICAN EDUCATIONAL RESEARCH      )

 5    ASSOCIATION, INC., AMERICAN        )

 6    PSYCHOLOGICAL ASSOCIATION, INC.,   )

 7    and NATIONAL COUNCIL ON            )

 8    MEASUREMENT IN EDUCATION, INC.,    ) Civil Action No.

 9                  Plaintiffs,          ) 1:14-cv-00857-TSC-DAR

10         v.                            )

11    PUBLIC.RESOURCE.ORG,               )

12                  Defendant.           )

13    _____)

14

15

16        VIDEOTAPED DEPOSITION OF CARL MALAMUD

17

18

19    DATE:             May 12, 2015

20    TIME:             9:33 a.m.

21    LOCATION:         Fenwick & West

22                      555 California Street

23                      12th Floor

24                      San Francisco, California  94104

25    REPORTED BY:      Diane S. Martin, CSR 6464, CCRR
```

Page 110

1  expertise or conclusion.
2  BY MR. HUDIS:
3      Q.  Should I repeat the question, Mr. Malamud?
4      A.  Yeah.
5      Q.  Does Exhibit 18 indicate to you that
6  Public.Resource attained its nonprofit status in
7  September of 2007?
8          MR. BRIDGES:  Same objections.
9          THE WITNESS:  The date of the letter is
10 September 25th.  That's not the date of the
11 nonprofit status.
12 BY MR. HUDIS:
13     Q.  What is the date of the nonprofit status?
14     A.  April 13th, 2007.
15     Q.  Fair enough.  And I see that date.
16     A.  Yeah.
17     Q.  Thank you very much.
18         (PLAINTIFFS' EXHIBITS 19-20 WERE MARKED.)
19 BY MR. HUDIS:
20     Q.  Mr. Malamud, please take a moment to look
21 at Exhibits 19 and 20.
22     A.  Okay.
23     Q.  Have you looked at the exhibits?
24     A.  Yes, I have.
25     Q.  Could you tell me what Exhibit 19 is?

Page 111

1      A.  It looks like an out of date copy of the
2  Public.Resource.Org home page.
3      Q.  So since the time that my office printed
4  this web page of Exhibit 19, you have updated the
5  content since then?
6          MR. BRIDGES:  Objection.  Misstates
7  testimony; vague and ambiguous.
8          THE WITNESS:  When did you print this?
9  BY MR. HUDIS:
10     Q.  Our best recollection is January of 2015.
11     A.  I don't know.  I would have to
12 double-check.
13     Q.  I amend that because Exhibit 20 was also
14 printed on the same date.  So we probably printed
15 it in March of 2014.
16     A.  Yeah.  That makes sense.
17     Q.  So this -- so Exhibit 19 and 20 appears to
18 you to be the content of the home page and the
19 about page of the Public.Resource.Org website in or
20 about March of 2014?
21         MR. BRIDGES:  Objection.  May call for
22 speculation if he doesn't have definite memory;
23 vague and ambiguous; compound; lacks foundation.
24         THE WITNESS:  I'd have to speculate.  It
25 has the look and feel of what those pages typically

Page 112

1  look like, but I don't know at specific points in
2  time.
3  BY MR. HUDIS:
4      Q.  Now, Exhibit 19, in the center are these
5  some of the websites that Public.Resource provides
6  to the public?
7      A.  Yes.  And there's one more website that I
8  forgot to tell you about on there.
9      Q.  Which one?
10     A.  Bulk --
11         MR. BRIDGES:  I'm sorry.
12         THE WITNESS:  Pardon me.
13         MR. BRIDGES:  I object on the grounds it
14 lacks foundation; very confusing to me.
15         What are you directing his attention to in
16 this exhibit?
17         MR. HUDIS:  Sure.  Counsel, do you see
18 where it says "Watch FedFlix" in the center of the
19 page on Exhibit 19?
20         MR. BRIDGES:  Right.
21         MR. HUDIS:  And there are a number of
22 websites listed below that?
23         MR. BRIDGES:  Okay.  I just wanted to be
24 clear.
25         MR. HUDIS:  Yes.

Page 113

1          MR. BRIDGES:  If that's what you're
2  referring to, fine.
3          MR. HUDIS:  Yes.
4  BY MR. HUDIS:
5      Q.  So continue, Mr. Malamud.
6      A.  Bulk.resource.org is the website that I
7  forgot to tell you about.
8      Q.  So what kind of information is provided on
9  the Bulk.resource.org website?
10     A.  Its primary function is the home for
11 approximately 8 million IRS-exempt organization
12 filings.
13     Q.  And when you say "exempt," do you mean tax
14 exempt?
15     A.  Exempt organizations is a category that the
16 IRS has assigned.  Many of them are tax exempt, but
17 it also includes political organizations.
18     Q.  So if I remember my Internal Revenue Code,
19 those are 501(c)(3) and 501(c)(4) organizations?
20         MR. BRIDGES:  Objection.  May call for
21 legal expertise or conclusion.
22         THE WITNESS:  Also section 527
23 organizations.
24 BY MR. HUDIS:
25     Q.  So all three?

Page 146

1  Q. In what way would data files be considered
2  content for the Internet?
3  A. So content in my mind, and again, this is a
4  broad, philosophical topic, implies something that
5  a human being can look at and take some meaning
6  from.
7     So a data file might include a binary
8  image. Is that content or not? Again, that's --
9  it would be a fascinating essay.
10 Q. Which brings me to my next question.
11    What does it mean to view content on an
12 Internet website?
13    MR. BECKER: Objection. Vague.
14    THE WITNESS: So view to me sounds to me
15 like a human being at a computer using the
16 Internet. So I think that is an end user looking
17 at an item that is available from another computer.
18 BY MR. HUDIS:
19 Q. What does it mean to access content on an
20 Internet website?
21    MR. BECKER: Objection. Vague. Objection.
22 May also be argumentative. Objection. May call
23 for a legal conclusion.
24    THE WITNESS: So access is a more precise
25 technical term, and that to me implies that a

Page 147

1  computer, not necessarily a human being, but a
2  computer has requested some data from another
3  computer, and that request was successful and the
4  data was transferred.
5  BY MR. HUDIS:
6  Q. What does it mean to download content from
7  an Internet website?
8     MR. BECKER: Objection. Vague. Objection.
9  May call for a legal conclusion. Objection. May
10 be argumentative.
11    THE WITNESS: Again, that's a vague term,
12 like view. But from the standpoint of an
13 individual human being at a computer, download
14 implies taking some content from another location
15 and having it copied on your personal computer, for
16 example.
17 BY MR. HUDIS:
18 Q. Could you tell us what an HTTP question is,
19 otherwise known as a hypertext transfer protocol
20 request?
21 A. It is one of a series of operations --
22 protocol operations defined in the HTTP protocol
23 specification.
24 Q. And what does it do?
25    MR. BECKER: Objection. Vague.

Page 148

1     THE WITNESS: Well, there's different kinds
2  of requests.
3  BY MR. HUDIS:
4  Q. There are different kinds of HTTP requests?
5  A. Yes.
6  Q. All right. Could you tell me what they
7  are? Are there many?
8     MR. BECKER: Objection. Compound.
9  BY MR. HUDIS:
10 Q. Are there many types of HTTP requests?
11 A. Okay. Let me preface this by saying I
12 would want to review the HTTP protocol
13 specification, but there are several, I can say
14 that for a fact.
15 Q. All right. So if you could name me a few
16 of the ones that you recall at this time.
17 A. One of the more common requests is the get
18 request, g-e-t. And that request is how a client
19 asks for a particular URL from a server.
20 Q. All right. What's another type of HTTP
21 request?
22 A. The post request is used to add data to,
23 for example, a web form on the server.
24 Q. Can you tell us another type of HTTP
25 request?

Page 149

1  A. The head request asks for the metadata
2  associated with the document, such as the last
3  modified time or the number of bytes.
4  Q. Can you name another type of HTTP request?
5  A. There is a put request, and I would have to
6  consult for the precise definition of that one.
7  Q. What generally does a put request do?
8     MR. BECKER: Objection. Vague.
9     THE WITNESS: I'd want to --
10    MR. BECKER: Objection. Competence.
11    THE WITNESS: I'd want to look at the HTTP
12 protocol specification. It's not something I'm
13 familiar with.
14 BY MR. HUDIS:
15 Q. Is there any other type of HTTP request
16 that you can think of as we sit here now?
17 A. There are others, and I do not know what
18 they are right now.
19 Q. If an Internet user wants to obtain data
20 from a website, would that be a get request?
21    MR. BECKER: Objection. Hypothetical.
22 Objection. Vague.
23    THE WITNESS: A get request is one of the
24 more common mechanisms for accessing data from an
25 HTTP server.

Page 158

1     about standards made by quasi-governmental
2     organizations.  A totally different topic.
3     BY MR. HUDIS:
4        Q.  Could we turn to the next page.  Page 3225
5     of Exhibit 22.  It says two-thirds of the way down
6     the page, "I gave a little speech about the morals
7     necessity of disseminating standards."
8            What did you mean by that?
9        A.  This was a --
10           MR. BECKER:  Objection.  Vague.
11           THE WITNESS:  This was in the context of a
12    visit to the International Organization For
13    Standards or organization, known as --
14    International Organization For Standardization,
15    known as ISO.  The acronym is different than the
16    name, which says something about them.
17           And this was the organization that was
18    attempting to have the whole Internet run on the
19    open systems interconnection protocol suite, and my
20    little speech to the gentlemen that I visited was
21    that if they wanted their protocol suite to be
22    ubiquitous, to be globally adopted, that would only
23    work if those standards were readily available for
24    people to read.
25    BY MR. HUDIS:

Page 159

1        Q.  When you say "readily available," do you
2     mean -- did you mean readily available for free?
3            MR. BECKER:  Objection.  Vague.  Objection.
4     Relevance.
5            THE WITNESS:  The IETF made its protocol
6     specifications available for me.  And my little
7     moral lecture to the International Organization For
8     Standardization was that if they wished to win this
9     race to become the basis for the modern Internet,
10    that would only happen if their standards were, in
11    fact, available for free, so anybody could read
12    them.
13    BY MR. HUDIS:
14       Q.  The next paragraph says, "We then started
15    talking about applying Bruno to the ISO world."
16           First of all, what is Bruno?
17       A.  Bruno was a project that I undertook with
18    the blessings of the secretary general of the
19    International Telecommunication Union to convert
20    and post the ITU specifications to the Internet so
21    anybody could read them for free.
22       Q.  So it was basically wide dissemination of
23    documents on the Internet?
24       A.  Of ITU specifications.  And the ITU is
25    specifications for the telephone network.

Page 160

1        Q.  What is an ITU specification?
2        A.  How a modem works, for example.
3        Q.  And please define ISO.
4        A.  ISO is the International Organization for
5     Standardization.
6        Q.  And the next sentence begins with Eicher.
7     Who is Eicher?
8        A.  Eicher was the secretary general of the
9     International Organization for Standardization.
10       Q.  Now, the rest of this paragraph reads,
11    "Eicher was quite frank.  25 percent of ISO
12    revenues came from the sale of standards documents.
13    How did I propose to replace that revenue?  Even
14    more importantly, ISO was controlled by its member
15    organizations, which also made much money from
16    standards sales.  How did I propose to convince
17    groups like ANSI that posting standards for free
18    would help them?"
19           Do you see that?
20       A.  Yes, I do.
21           MR. BECKER:  Objection.  The document
22    speaks for itself.  Objection.  Relevance.
23    BY MR. HUDIS:
24       Q.  In this context -- sorry.  I'm sorry if I
25    spoke over you.

Page 161

1            In this context, what is ANSI?
2        A.  ANSI is the American National Standards
3     Institute.
4        Q.  So you pose a series of questions here on
5     page 32225, and then on the next page you say, and
6     this is on page 32226 of Exhibit 22, "I proposed my
7     high resolution/low resolution compromise.  The
8     plan would post low resolution versions of
9     documents for free on the network and allow ISO and
10    ANSI to continue to sell high resolution versions
11    either on paper or electronically."
12           So was that your answer to the question
13    that you posed on the prior page, 32225?
14           MR. BECKER:  Objection.  The document
15    speaks for itself.
16           THE WITNESS:  It was one of my thoughts in
17    1991 as to a way that ISO could function in a
18    modern world.
19    BY MR. HUDIS:
20       Q.  Then in two paragraphs later, you say, "The
21    crucial assumption was that people with the free
22    version would then pay for documents."  And at the
23    end of that paragraph it says, "Giving away
24    standards would lead to increased revenues."
25           So here is my question about that crucial

Carl Malamud  
San Francisco, CA  
May 12, 2015

Page 170

1  acknowledge that the issue of copyright and
2  standards, after they've been incorporated into
3  law, is unsettled and that ACUS is not taking a
4  position on this subject?" What did you mean?
5      MR. BECKER: Objection. The document
6  speaks for itself. Objection. Vague.
7      THE WITNESS: I felt it inappropriate for
8  ACUS to be taking a strong position on what the
9  copyright status was of documents incorporated into
10  law.
11  BY MR. HUDIS:
12     Q. Why?
13     A. Frankly, there was a young staff member who
14  was doing the research for this recommendation who
15  felt very strongly that standards incorporated by
16  reference into law maintained their copyright, even
17  as a part of the Code of Federal Regulations. And
18  as I said in this paragraph here, I think it would
19  be fair to say this is above our pay grade. I felt
20  that the young staffer was -- was stretching.
21     Q. So that brings me to my next question.
22     The next sentence says, "There is obviously
23  a strong bias towards protecting and honoring
24  copyright on the one hand, but we also have the
25  Veeck," V-e-e-c-k, "decision and some ambiguity in

Page 171

1  the law. I think it would be fair to say this is,"
2  quote, "above our pay grade," period, unquote.
3      A couple of questions on that passage.
4      What did you mean in the third sentence by
5  "some ambiguity in the law"?
6      MR. BECKER: Again, same objections. The
7  document speaks for itself. It's beyond the scope
8  of the 30(b)(6) designation. And the objection on
9  relevance grounds. Again, objection that this may
10  call for a legal conclusion.
11     THE WITNESS: So I'm not a lawyer, but I
12  read the Veeck decision, and it seemed to me that
13  the researcher at ACUS was drawing conclusions from
14  the Veeck decision that while perhaps appropriate
15  for a federal judge to be making, were
16  inappropriate to be laying them down as categorical
17  statements. I felt she was reading into the Veeck
18  decision in ways that were perhaps not supported by
19  the language. And again, I'm not a lawyer.
20  BY MR. HUDIS:
21     Q. I understand.
22     What conclusions was the researcher drawing
23  from Veeck that concerned you?
24     MR. BECKER: Objection. Relevance.
25  Objection. Vague. Objection. Lacks foundation.

Page 172

1      THE WITNESS: So it's pronounced Veeck, by
2  the way. It's a Dutch name. P. Veeck. It -- the
3  preamble was taking at the time a strong position
4  that standards incorporated into reference by law
5  had copyright and that the law could have
6  copyright.
7      And again, I felt that this young staffer
8  was simply moving beyond what a body such as the
9  Administrative Conference of the United States
10  could say is the established truth. I felt she was
11  speculating, to use the language we use in
12  depositions.
13  BY MR. HUDIS:
14     Q. And what did you mean by "I think it would
15  be fair to say this is above our pay grade"?
16     MR. BECKER: Objection again. The document
17  speaks for itself. Objection. Asked and answered.
18     THE WITNESS: So I'm not a lawyer, but I
19  have looked at a number of documents that indicate
20  that in the United States the law has no copyright.
21  And that includes, in many formulations, materials
22  incorporated by reference into the law. Mr. Bhatia
23  from ANSI, for example, B-h-a-t-i-a, has stated
24  many times that standards incorporated by reference
25  are the law, and it seemed to me that that was a

Page 173

1  long-standing policy of the United States.
2      And again, this was something that if one
3  were to draw a different conclusion that a portion
4  of the law in fact, did maintain copyright and one
5  needed a license to access and use that material,
6  that was certainly not a statement that the
7  organization such as the Administrative Conference
8  of the United States should be making.
9      (PLAINTIFFS' EXHIBIT 24 WAS MARKED.)
10  BY MR. HUDIS:
11     Q. Mr. Malamud, I'll now show you what's been
12  marked as Exhibit 24. Before I ask you questions
13  about the document, what is On The Media?
14     A. Oh, that's a National Public Radio program.
15     Q. Who is Bob Garfield?
16     A. I assume he's a host or reporter.
17     Q. Do you recognize Exhibit 24?
18     A. No, I do not. I remember doing an
19  interview with On The Media, however.
20     Q. Did you do this interview with On The Media
21  on or about April 13, 2012?
22     A. That sounds about right.
23     Q. What was the purpose of the interview?
24     A. I think you'd have to ask On The Media.
25     Q. What was your purpose for giving the

44 (Pages 170 to 173)

Carl Malamud  
San Francisco, CA  
May 12, 2015

Page 174

1  interview?
2      MR. BECKER: Objection for relevance.
3      THE WITNESS: If a well-respected program
4  such as On The Media by National Public Radio wants
5  me to talk to them, I will generally make myself
6  available.
7  BY MR. HUDIS:
8      Q. Exhibit 24 appears to be an interview that
9  you gave in April of 2012 to Mr. Garfield. I'd
10 like to ask you a couple of questions.
11     If you would turn in Exhibit 24 to
12 production page AERA_APA_NCME 32076.
13     A. Okay. Yes.
14     Q. Mr. Garfield in the middle of the page
15 asks, "There is an expense attached to developing
16 and codifying these standards. If we take the
17 revenue away from those who do this work, then what
18 happens?" And you provide two answers. I'll read
19 them.
20     "Well, there's two answers to that. One is
21 that the nonprofits that develop these standards
22 have a lot of different revenue streams. They do
23 conferences. They do certification. They develop
24 standards that aren't law. In fact, the vast
25 majority of their standards are not. And so maybe

Page 175

1  they need to adjust their business model,
2  particularly given the fact that they are a
3  nonprofit public charity."
4      You continue. "Answer number two is that
5  government has shirked its responsibilities. It
6  said 'Gee, we can just incorporate these privately
7  developed standards in the law and we won't have to
8  pay anything.' And the only people that get
9  screwed up by this are the citizens that need to
10 read the law."
11     Do you recall giving those answers to
12 Mr. Garfield at the interview of April 2012?
13     MR. BECKER: Objection. Mr. Malamud has
14 said that he does not recognize this document.
15 Objection to the extent that it's not clear how
16 this document was transcribed or its authenticity.
17 Objection with regards to relevance, particularly
18 on the grounds that the plaintiffs have said that
19 the finances and revenue of the plaintiffs, other
20 than directly related to the sale of the 1999
21 standards, is not at issue in this case as they so
22 claim.
23     Objection on the grounds that the question
24 assumes facts not in evidence.
25     MR. HUDIS: I don't mind the objections,

Page 176

1  Counsel. I just mind the ones that would try to
2  indicate the -- to the witness how he should answer
3  his questions.
4  BY MR. HUDIS:
5      Q. So my question about this document, do you
6  recall this interview?
7      A. Yes, I do.
8      Q. All right. Do you recall giving this
9  answer that I just read into the record?
10     A. No, I don't, but I'd be happy to discuss
11 the general topics that are addressed there.
12     Q. Sure.
13     So if standards development organizations
14 lose their copyright by incorporation by reference,
15 is it your theory that the standards
16 organization -- development organization should
17 make their money some other way?
18     MR. BECKER: Objection. Vague. Objection.
19 May call for a legal conclusion. Objection.
20 Hypothetical. Objection. May mischaracterize the
21 witness.
22 BY MR. HUDIS:
23     Q. You may answer.
24     A. I have testified on this subject before
25 Congress saying that I believe that when a standard

Page 177

1  is incorporated by reference, usually with the
2  active ascents of -- of the SDO, that organization
3  is given a gold seal of approval, right. They are
4  the original creator of what has become a portion
5  of American law, and that that is a unique
6  marketing opportunity.
7      That opportunity can be used to -- to sell
8  authenticated versions of the standard. To sell
9  auxiliary products. That there are a number, in
10 general, of business models that can emerge out of
11 this favored position.
12     As to how that specifically applies to a
13 specific SDO, again, we would want to look at -- I
14 would want to look at the very specific nature of
15 that organization. But I still talk in general
16 about the unique position of having a standard
17 incorporated by reference into federal law and how
18 favorable that is.
19 BY MR. HUDIS:
20     Q. And is it your view that once incorporated
21 by reference, the standard loses its copyright
22 enforcement ability and the standards development
23 organization that wrote that standard,
24 "incorporated by reference," would have to obtain
25 its income some other way than selling the

45 (Pages 174 to 177)

Page 178

1  standard?
2       MR. BECKER: Objection. Calls for a legal
3  conclusion. Objection. Argumentative. Objection.
4  Lacks foundation and assumes facts not in evidence.
5  Objection. Vague.
6       THE WITNESS: So I disagree with that
7  characterization. I -- I believe that even if the
8  law is available to citizens, that does not
9  preclude a standards development organization
10 continuing to sell that document. Particularly
11 selling an authenticated version, a redlined
12 version, a version with commentary. I believe
13 there are a number of ways one can continue to make
14 that -- that document available for sale.
15 BY MR. HUDIS:
16      Q. Is one of your alternative theories that
17 once a standard is incorporated by reference, that
18 the government should pay for it?
19      MR. BECKER: Objection. May call for a
20 legal conclusion. Objection. Lacks foundation.
21 Assumes facts not in evidence. Objection.
22 Argumentative.
23      THE WITNESS: So there are some things I
24 know and some things I can speculate on.
25      The thing that I know is that the law in

Page 179

1  the United States has no copyright, and one is free
2  to read and speak the law. Without needing a
3  license, without needing permission.
4       What I can speculate on is different ways
5  that one might go about handling issues such as
6  revenue and whether the government should be paying
7  or not, and I frankly don't have strong views as to
8  whether or not the -- this scenario that I posited
9  here is the right solution.
10      MR. BECKER: I would advise the witness not
11 to speculate and only to give those answers that
12 the witness knows.
13      THE WITNESS: Okay.
14 BY MR. HUDIS:
15      Q. Do you have any views, whether they're
16 strong or not, whether once a standard is
17 incorporated by reference into a government
18 regulation, the government should pay for that?
19      MR. BECKER: Objection. May call for a
20 legal conclusion. Objection. Vague. Objection.
21 Lacks foundation and assumes facts not in evidence.
22 And argumentative.
23      THE WITNESS: So the government is already
24 paying in many different revenue streams for
25 standards. They pay for access. They help fund

Page 180

1  development. And in many cases standards are
2  created, and there are other revenue streams that
3  go to the organization, such as the funding of
4  basic research.
5       So I don't think it's an either/or
6  proposition. I think there's already a lot of
7  money flowing.
8  BY MR. HUDIS:
9       Q. I don't believe your last answer,
10 Mr. Malamud, answered my question.
11      A. Okay. Could you restate the question?
12      Q. Sure. Do you have any views, whether they
13 are strong or not, whether once a standard is
14 incorporated by reference into a government
15 regulation, the government should pay for that?
16      MR. BECKER: All the same objections and
17 also asked and answered.
18      THE WITNESS: I believe I did answer your
19 question in the sense of the government is already
20 paying.
21      Now, my view is it proper for government
22 money to go to an SDO? In theory, yes.
23      MR. HUDIS: Just for the record Exhibit 24
24 bears production numbers AERA_APA_NCME 32075
25 through 32078.

Page 181

1       (PLAINTIFFS' EXHIBIT 25 WAS MARKED.)
2  BY MR. HUDIS:
3       Q. Mr. Malamud, I've placed in front of you a
4  document that's been marked as Exhibit 25, bearing
5  production numbers AERA_APA_NCME 31764 through
6  31768.
7       Do you recognize this document?
8       A. It appears to be an essay that I wrote for
9  boingboing. This appears to be a printout of that.
10      Q. Do you have any reason to doubt the
11 authenticity of this document, Exhibit 25?
12      A. No, but I'd want to double check. It
13 appears to be the essay that I wrote.
14      Q. And what is boingboing?
15      A. Boingboing is a blog.
16      Q. And do you recall posting this blog on
17 March 19th, 2012, to boingboing?
18      A. I'm not sure of the exact date, but I did,
19 in fact, author a boingboing official guest
20 memorandum of law.
21      Q. Why did you call it a memorandum of law?
22      A. Because it was talking about an obscure
23 topic in a publication that reaches a very general
24 audience.
25      Q. Under the first heading Roman numeral I,

Page 230

1   MR. BECKER: Objection. Vague.
2   Objection. To the extent that any of this
3   information has come from attorney-client
4   communications, I will instruct the witness not to
5   divulge any privileged information.
6   THE WITNESS: I'm aware that they are
7   updated. I'm not terribly clear on the exact
8   process that the organizations went through to do
9   that.
10  BY MR. HUDIS:
11  Q. Do you know who uses the standards?
12  MR. BECKER: Objection. Vague.
13  Again, to the extent that this answer
14  requires the divulging of any attorney-client
15  privileged communications, I'll instruct the
16  witness not to divulge that information.
17  Competence. Lacks foundation.
18  THE WITNESS: So I know some of the people
19  that use the standard. I know that the Department
20  of Education has incorporated by reference into its
21  regulations. So I am -- I know that the Department
22  of Education has people that use it.
23  I know a lot of state governments are
24  putting together tests that conform to the
25  standards.

Page 231

1   I believe there are a number of other
2   agencies, I believe Office of Personnel Management,
3   I believe Department of Defense, a number of state
4   organizations, are all users of the standard
5   because they specify that it shall be used.
6   BY MR. HUDIS:
7   Q. Do you know of any non-governmental users
8   of the standards?
9   MR. BECKER: All the same objections.
10  Vague.
11  To the extent that there is any information
12  that the witness has learned from his attorneys, I
13  will instruct him not to divulge this privileged
14  information.
15  THE WITNESS: I know that the Educational
16  Testing Service, ETS and a number of organizations
17  that create tests, are users of the standard, and
18  the reason I know that is there's been a series of
19  procurements by government organizations that
20  require the use of the standard.
21  BY MR. HUDIS:
22  Q. Do you know of any other non-governmental
23  users of the standards?
24  MR. BECKER: All the same objections. Also
25  object for competence.

Page 232

1   THE WITNESS: My sister read it in the
2   course of her doctoral course work.
3   BY MR. HUDIS:
4   Q. And what was your sister's doctoral course
5   work?
6   A. On, I want to state this properly. I
7   believe physical and rehabilitative therapy. A
8   subset of psychology.
9   Q. How did the standards first come to your
10  attention?
11  MR. BECKER: Objection. Vague. Objection.
12  Ambiguous.
13  THE WITNESS: I was looking at the
14  standards incorporated by reference under the Code
15  of Federal Regulations, and the standards at issue
16  were one of the ones that were specified.
17  BY MR. HUDIS:
18  Q. And what year was that?
19  A. Probably 2012. Early 2012.
20  Q. When did Public.Resource --
21  A. Might have been earlier. Might have been
22  earlier. I'm not sure.
23  Q. Sometime in 20 -- in 2012?
24  A. Coming to my attention in the sense of
25  remembering it now, yes.

Page 233

1   Q. What, if anything, made you interested in
2   acquiring the standards?
3   A. It was --
4   MR. BECKER: Objection. Vague.
5   THE WITNESS: -- incorporated by reference
6   into the Code of Federal Regulations.
7   BY MR. HUDIS:
8   Q. When did Public.Resource first make the
9   decision to post the standards to one of its
10  websites?
11  MR. BECKER: Objection. Vague. Objection.
12  Lacks foundation. Objection. May call for a legal
13  conclusion.
14  THE WITNESS: So it would have been
15  sometime after obtaining a copy of the standard and
16  examining it and satisfying myself that, in fact,
17  it was the document that was incorporated by
18  reference, and sometime between the procurement,
19  which I believe was in May 2012, and the actual
20  posting, which I believe was in July 2012.
21  BY MR. HUDIS:
22  Q. So how did Public.Resource come to the
23  decision to post the standards on one of its
24  websites?
25  MR. BECKER: Objection. Vague and

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 262

1  BY MR. HUDIS:
2      Q. Mr. Malamud, I show you a document that has
3  been marked as Exhibit 34, bearing production
4  numbers AERA_APA_NCME 31528 through 31738.
5      Do you recognize this document?
6      A. It appears to be a copy of the standards at
7  issue with the certificate of incorporation on the
8  top.
9      Q. All right. And is this the cover sheet
10 that you appended on top of the 1999 standards
11 posted on Public.Resource's website?
12     A. Yes, it appears to be.
13     Q. Who prepared this cover sheet?
14     A. I did.
15     Q. And who chose the language for the cover
16 sheet?
17     A. I did.
18     Q. What was your intention, Mr. Malamud, for
19 appending this cover sheet of Exhibit 34 on top of
20 the 1999 standards posted on Public.Resource's
21 website?
22     A. I wanted to be very clear that this was a
23 posting of a standard incorporated by reference
24 into the Code of Federal Regulations. I wanted to
25 place this document in context.

Page 263

1      Q. And what was your purpose on the cover
2  sheet of using the medallion that had the word
3  "Repeatedly Approved."
4      A. To signify that the executive director of
5  the Office of the Federal Register had explicitly
6  and deliberately approved this incorporation by
7  reference.
8      Q. We just went through the process that you
9  used. We asked you the question, did you digitize
10 or convert to a digital format the 1999 standards,
11 and we went through that process.
12     My question is, who participated in the
13 process of disassembling the paper version of the
14 1999 standards, scanning them and processing them,
15 as you described here in interrogatory answer
16 number 3 and posting them to the Internet?
17     MR. BECKER: Objection. Compound.
18     THE WITNESS: That was me.
19 BY MR. HUDIS:
20     Q. Did Point.B Studio participate in this
21 process?
22     A. No.
23     Q. Did Rebecca Malamud participate in this
24 process?
25     A. She did not.

Page 264

1      Q. Did HTC Global participate in this process?
2      A. They did not.
3      Q. Did anyone else besides yourself
4  participate in this process?
5      A. It's just me.
6      Q. I'd like you to look in Exhibit 29,
7  interrogatory answer number 4 on page 6.
8      So consistent with your -- your prior
9  testimony, does this interrogatory answer number 4
10 in Exhibit 29 accurately identify all the persons
11 and entities who were involved in disassembling the
12 paper version of the 1999 standards, scanning them,
13 processing them and posting them to the Internet?
14     MR. BECKER: Objection to form.
15     THE WITNESS: Yes, it was me.
16 BY MR. HUDIS:
17     Q. I just want to go a little bit into depth
18 about quality control.
19     So what quality control procedures did you
20 use to ensure the quality of the textual comment --
21 content of the 1999 standards that you posted to
22 the Internet?
23     MR. BECKER: Objection. Vague.
24     THE WITNESS: This is a scan of a document.
25 BY MR. HUDIS:

Page 265

1      Q. Mm-hm.
2      A. It's a pixel-by-pixel replication of what
3  was on the printed page.
4      Q. I'll be more specific.
5      Did you check for missing or incorrectly
6  scanned pages?
7      A. I believe I did.
8      Q. Did you check for pages that may have had
9  blurred text?
10     A. I believe I did.
11     Q. Now, you say, "I believe I did." Do you
12 know for sure that you did?
13     A. My standard procedure is to do those
14 things. I don't know this specific document simply
15 because I don't recollect back to that period in
16 May 2012. So I can't testify under oath that I
17 did, in fact, do that. But that certainly is my
18 standard procedure.
19     Q. Mr. Malamud, what is search engine
20 optimization?
21     A. Search engine optimization is a technical
22 term of art that has to do with how documents that
23 are on a web server show up in search engine
24 results.
25     Q. Please continue.

Carl Malamud                                                                                        May 12, 2015
San Francisco, CA

Page 266

1   A. In particular with the PDF document, what
2   you want in a search engine result is rather than,
3   for example, a snippet of OCR, you want the actual
4   title of the document to show up in a description.
5   It's what Google would cause a snippet.
6        So by embedding metadata in the header of
7   the PDF file, the attempt is to make sure that that
8   document title shows up in the search engine
9   results so people know what that document is.
10       Q. So, Mr. Malamud, did you check the metadata
11  you added to the PDF file comprising the 1999
12  standards for search engine optimization?
13       A. Well, when I created the script that embeds
14  the metadata in the header, I had in mind search
15  engine optimization.
16       So assuming I did my job right, and
17  remember search engines change over time. So if
18  you did something in one period of time, that
19  doesn't necessarily mean that a search engine will
20  react the same way later on.
21       But assuming that I wrote that initial
22  script properly, then this document would have
23  shown up in a meaningful fashion in search engine
24  results.
25       Q. And your answer just now said, "assuming."

Page 267

1   You don't know for sure with respect to this
2   particular document?
3        A. I don't recollect looking at this document
4   in Google or Bing or other search engine results to
5   determine that fact.
6        Q. Did you check the quality of the optical
7   character recognition process for accuracy for the
8   1999 standards?
9            MR. BECKER: Objection. Form.
10           THE WITNESS: Hold on a second. I'd like
11  to double-check something.
12           OCR is inherently prone to certain errors.
13  And what I used was the best available OCR that I
14  had, which was in Adobe Acrobat Pro. But I did not
15  pull up the underlying text. The underlying OCR
16  text is used to search a file; not to read a file.
17           Does that answer your question?
18  BY MR. HUDIS:
19       Q. So in doing a quality check of the optical
20  character recognition process for accuracy, did you
21  attempt to pull up the underlying text after the
22  scan was completed?
23       A. No.
24           MR. BECKER: Objection. Form.
25           THE WITNESS: No. And I never said that I

Page 268

1   did do that on a consistent basis. It's not part
2   of our normal workflow, no.
3   BY MR. HUDIS:
4        Q. Was the PDF file of the 1999 standards that
5   you created ever converted from PDF to any other
6   format before posting to the Internet?
7            MR. BECKER: Objection. Form.
8            THE WITNESS: I don't think so.
9   BY MR. HUDIS:
10       Q. So the 1999 standards that you scanned and
11  creed a PDF file, was it ever converted to JPEG?
12           MR. BECKER: Objection. Form.
13           THE WITNESS: I'm not sure what that means.
14  BY MR. HUDIS:
15       Q. Was it converted from PDF format to a JPEG
16  format?
17           MR. BECKER: Same objection.
18           THE WITNESS: I don't think that would make
19  any sense on a document like that. You'd end up
20  with, you know, a couple hundred JPEG files.
21           No. I certainly wouldn't have done that.
22  BY MR. HUDIS:
23       Q. Okay. Did you convert it to SBG format?
24       A. No. That wouldn't make any sense at all.
25       Q. And would you have any -- would you have

Page 269

1   had any reason to convert the PDF file of the 1999
2   standards to a MathML format?
3            MR. BECKER: Objection. Form.
4            THE WITNESS: I don't -- well, first of
5   all, MathML is embedded in an HTML file.
6            And second of all, at least to the best of
7   my recollection, I don't think there's any
8   mathematical formulas in the standards at issue.
9   BY MR. HUDIS:
10       Q. So that brings me to my next question.
11           Was the PDF file that you created from the
12  1999 standards ever converted to HTML format?
13           MR. BECKER: Objection. Form.
14           THE WITNESS: No, we didn't do that.
15  BY MR. HUDIS:
16       Q. Was the PDF file of the 1999 standards that
17  you created ever converted from PDF to a format
18  making the standards accessible to the visually
19  impaired?
20           MR. BECKER: Objection. Form. Objection.
21  Competence; lacks foundation and assumes facts not
22  in evidence.
23           THE WITNESS: The OCR procedure does, in
24  fact, make the document accessible to the visually
25  impaired.

Page 270

1    BY MR. HUDIS:
2        Q. In what way?
3        A. A screen reader is able to read the
4    underlying text, granted with potential OCR errors,
5    but the vast majority of the text is accessible to
6    those that are visually impaired.
7        Q. Are you familiar with the format,
8    refreshable Braille?
9        A. No, I'm not.
10       Q. Did you convert the PDF file of the 1999
11   standards that you made to refreshable Braille
12   format?
13       A. We don't do that. We convert to HTML.
14       Q. Did -- and you didn't convert --
15       A. So no. No is the answer.
16       Q. All right. And you didn't convert the PDF
17   file to HTML either?
18       A. This particular standard, no, we did not.
19       Q. Okay. And did you convert the PDF file
20   that you created from the 1999 standards to large
21   print?
22       MR. BECKER: Objection. Form.
23       THE WITNESS: It is an unencumbered PDF,
24   and so a viewer can, in fact, magnify the text that
25   is there.

Page 271

1        So in that sense, large print, we did not
2    retype the documents into a large print edition.
3    BY MR. HUDIS:
4        Q. Mr. Malamud, do you have any materials in
5    your -- in Public.Resource's possession documenting
6    the process you went through of disassembling the
7    paper version of the 1999 standards, scanning them,
8    processing them and posting them to the Internet?
9        MR. BECKER: Objection. Compound.
10       THE WITNESS: No, there's no intermediate
11   process. That's a book and then it gets scanned.
12       THE REPORTER: Did you say "there's no
13   intermediate product"?
14       THE WITNESS: Intermediate process.
15   BY MR. HUDIS:
16       Q. Mr. Malamud, once you converted the 1999
17   standards from paper to the PDF format, what did
18   you do with the contents of the file?
19       A. I posted the file to Law.Resource.Org and
20   to the Internet Archive.
21       Q. Mr. Malamud, could you please return your
22   attention to Exhibit 29, interrogatory answer
23   number 2.
24       A. Okay.
25       Q. Does interrogatory answer number 2

Page 272

1    accurately state when and where you posted the 1999
2    standards to the Internet?
3        A. It does.
4        Q. And what was the date that you posted the
5    standards to the Internet?
6        MR. BECKER: Objection. Form.
7        THE WITNESS: As our interrogatory says,
8    July 11, 2012 on Law.Resource.Org and ...
9    BY MR. HUDIS:
10       Q. All right. And --
11       A. Yeah.
12       Q. And as you said, you posted the standards
13   to Law.Resource.Org, and you also posted the
14   standards to the Internet Archive; correct?
15       A. That is correct.
16       Q. Mr. Malamud, what is the name of the
17   Public.Resource web server to which you saved the
18   file containing the contents of the 1999 standards?
19       A. Law.Resource.Org.
20       Q. That's the name of the server?
21       A. Yes.
22       MR. BECKER: Please give me time to object.
23       MR. HUDIS: I'm sorry.
24       THE WITNESS: That was my fault.
25       MR. HUDIS: I don't want to be rude,

Page 273

1    Counsel, seriously. Okay.
2    BY MR. HUDIS:
3        Q. Is the file containing the 1999 standards
4    still saved on that web server?
5        MR. BECKER: Objection. Vague and
6    ambiguous; assumes facts not in evidence.
7        THE WITNESS: It is not in the document
8    tree of the web server, no.
9    BY MR. HUDIS:
10       Q. Do you still have that file still saved
11   somewhere within Public.Resource's computer
12   systems?
13       A. Yes, I do.
14       Q. Where?
15       A. One copy on my desktop. One copy in the
16   not published directory. I don't know what the
17   exact name of it is. Someplace on our server, but
18   it's a private area that's not accessible to -- to
19   anybody but myself and our systems administrator.
20       Q. Mr. Malamud, does Public.Resource have any
21   logs from its web servers documenting the date on
22   which the 1999 standards were posted to
23   Public.Resource's website?
24       MR. BECKER: Objection. Vague and
25   ambiguous. Objection. Lacks foundation. And

Page 274

 1  assumes facts not in evidence.
 2        THE WITNESS: There's no logs, but there
 3  was a file creation date on the file.
 4  BY MR. HUDIS:
 5     Q. Has any documentation noting the file
 6  creation date ever been produced to us?
 7     A. I don't know.
 8        MR. HUDIS: Counsel, if that document has
 9  not been provided to us, it should be provided to
10  us now.
11        THE WITNESS: So the file creation date was
12  the date that the standard was posted. And when at
13  your request we removed that standard and replaced
14  it with a stub, that's going to be the new creation
15  date. So I don't believe there's going to be a
16  record.
17  BY MR. HUDIS:
18     Q. What about the old creation date when the
19  original standards file was -- was posted to your
20  web server?
21     A. I moved it to a different area. I mean,
22  you can make the request and we'll go look and see
23  if that's there, but it's --
24     Q. Thank you, Mr. Malamud, I appreciate that.
25        Did you post the entirety of the 1999

Page 275

 1  standards to Public.Resource's website?
 2     A. Yes.
 3     Q. Mr. Malamud, as it pertains to the Internet
 4  Archive, what is a collection?
 5        MR. BECKER: Objection. Asked and
 6  answered.
 7        THE WITNESS: A collection is a set of
 8  items that often have a common theme.
 9  BY MR. HUDIS:
10     Q. And you said you posted the 1999 standards
11  to Internet Archive's website; correct?
12     A. That is correct.
13     Q. And did you post the entirety of the 1999
14  standards to Internet Archive's website?
15     A. I did.
16     Q. Under which collection at the Internet
17  Archive did you post the 1999 standards?
18        MR. BECKER: Objection. Form.
19        THE WITNESS: The current name of that
20  collection is Codes of the World.
21  BY MR. HUDIS:
22     Q. How did you choose this particular
23  collection to which to post the 1999 standards?
24     A. It's the --
25        MR. BECKER: Objection. Assumes facts not

Page 276

 1  in evidence.
 2        THE WITNESS: It's the collection I created
 3  to hold the standards incorporated by reference.
 4  BY MR. HUDIS:
 5     Q. All right. So you created the Codes of the
 6  World collection on Internet Archive's website?
 7     A. I did.
 8     Q. Mr. Malamud, I show you what was previously
 9  marked at Internet Archive's deposition in this
10  case as Butler Exhibit 6.
11        Do you see that?
12     A. I do. Let me correct a misstatement. It
13  wasn't called Codes of the World. It was called
14  Global Public Safety Codes is the name of the
15  collection.
16     Q. And what types of materials did you post to
17  the Global Public Safety Codes collection on
18  Internet Archive?
19     A. Standards incorporated by reference in the
20  law.
21     Q. Do you recognize Butler Exhibit 6?
22     A. This is a document you created?
23     Q. It's a document we printed from the
24  Internet Archive.
25     A. This appears to be a series of screen dumps

Page 277

 1  from that item in which you are paging through the
 2  standards at issue, is what this appears to be.
 3     Q. That's exactly correct. And you just saved
 4  me about five minutes of explanation.
 5     A. Oh, sorry about that.
 6     Q. That's fine. Thank you very much,
 7  Mr. Malamud.
 8        What is the web tool, if you know, that
 9  creates the ability for a user to turn the pages of
10  the 1999 standards like a book?
11        MR. BECKER: Objection. Vague and
12  ambiguous; confusing.
13        THE WITNESS: I have heard it called book
14  reader, but I don't know the details of what the
15  code is or how it's embedded or anything of that
16  sort.
17  BY MR. HUDIS:
18     Q. So you've heard it referred to as a book
19  reader application?
20     A. Yes.
21     Q. All right. Have you ever heard of a DjVu
22  Reader?
23     A. Yes, I have.
24     Q. And what -- what is its function, to the
25  best of your knowledge?

Carl Malamud                                                                                    May 12, 2015
San Francisco, CA

Page 306

1    in your e-mail to Alexis Rossi?
2        A. Because that's the proper address to inform
3    the Internet Archive about matters pertaining to a
4    collection.
5        Q. And what do you mean by matters relating to
6    a collection?
7        A. If you have technical problems with your
8    collection or other issues or problems, that would
9    be the address that you would write to.
10       Q. And at the end of this e-mail there's a
11   URL. Do you see that?
12       A. I do.
13       Q. And it ends with AERA.standards.1999?
14       A. I see that.
15       Q. All right. Is this the URL where you
16   posted the 1999 standards on Internet Archive's
17   website?
18       A. It is.
19       Q. Mr. Malamud, if Public.Resource succeeds in
20   this lawsuit brought by AERA and its co-plaintiffs,
21   will Public.Resource repost the 1999 standards on
22   its website?
23          MR. BRIDGES: Objection. Hypothetical.
24          THE WITNESS: I guess I'd have to read the
25   decision and make my determination based on that.

Page 307

1    BY MR. HUDIS:
2        Q. Well, if you're totally successful?
3           MR. BRIDGES: Again, hypothetical.
4           THE WITNESS: Our goal is to post all
5    standards incorporated by reference into the Code
6    of Federal Regulations. So yes.
7    BY MR. HUDIS:
8        Q. If Public.Resource is successful in this
9    litigation, how easy or difficult would it be for
10   you to repost the 1999 standards on
11   Public.Resource's website?
12          MR. BRIDGES: Hypothetical; lacks
13   foundation; assumes facts not in evidence; vague
14   and ambiguous; compound.
15          THE WITNESS: It wouldn't be difficult.
16   BY MR. HUDIS:
17       Q. If the next version of the Standards on
18   Educational and Psychological Testing, the 2014
19   version, is ever incorporated by reference by a
20   state or federal agency, will you post that version
21   of the standards to the Internet as well?
22          MR. BRIDGES: Objection. Hypothetical;
23   compound; vague and ambiguous.
24          THE WITNESS: I don't know.
25   BY MR. HUDIS:

Page 308

1        Q. How would you make that determination?
2           MR. BRIDGES: Objection. May call for
3    speculation; vague and ambiguous; argumentative.
4           THE WITNESS: I would want to look at the
5    specific nature of the incorporation by reference.
6    I would want to look at that specific standard, and
7    I'd want to make a determination if that was an
8    area that I wanted to continue to invest resources
9    in. So I don't know. It would depend on the
10   specifics.
11   BY MR. HUDIS:
12       Q. If you looked at the 2014 standards and
13   made a determination that it was an area in which
14   you wanted to continue to invest resources, if
15   Public.Resource is successful in this litigation
16   and the 2014 standards are incorporated by
17   reference by a state or federal agency, would you
18   post the 2014 standards to the Internet?
19          MR. BRIDGES: Entirely hypothetical; lacks
20   foundation; argumentative; vague and ambiguous.
21          THE WITNESS: So I really don't know about
22   the states.
23          If the federal government did a deliberate
24   and explicit incorporation by reference in what I
25   felt was a substantive rule, right, not an offhand

Page 309

1    thing, then I would certainly consider strongly
2    posting that document.
3    BY MR. HUDIS:
4        Q. What is -- what distinction do you make
5    between substantive and offhand?
6        A. I look for an explicit and deliberate
7    incorporation by reference.
8        Q. If I asked you this before, Mr. Malamud,
9    and certainly your counsel will tell me, I
10   apologize.
11          Even though the 1999 standards have been
12   removed from public view on Public.Resource's
13   website, is the digital file containing the text of
14   the 1999 standards still stored somewhere on
15   Public.Resource's computer systems?
16          MR. BRIDGES: Objection. Vague and
17   ambiguous.
18          THE WITNESS: Yes.
19   BY MR. HUDIS:
20       Q. Even though the 1999 standards were removed
21   from public view on Internet Archive's website, to
22   the best of your knowledge is the digital file
23   containing the text of the 1999 standards still
24   stored somewhere on Internet Archive's computer
25   systems?

Carl Malamud                                                                                    May 12, 2015
San Francisco, CA

Page 326

1   case deserves the Court's fullest attention without
2   a rush to reach an interim ruling in the absence of
3   a full record."
4        What did you mean by that?
5        MR. BRIDGES: Objection. Lacks foundation;
6   vague and ambiguous.
7        THE WITNESS: As I state in the next
8   paragraph, "In order to focus this case on
9   developing an appropriate record for a decision on
10  the merits, Public.Resource.Org has voluntarily
11  removed the document in question from the websites
12  under its control."
13       And as you had stated in a previous
14  sentence, this was so it was done without a rush to
15  reach an interim ruling in the absence of a full
16  record.
17  BY MR. HUDIS:
18       Q. I'd like to now direct your attention,
19  Mr. Malamud, to the fourth paragraph of Exhibit 43.
20  And it says, "Until the conclusion at trial on the
21  merits in this case, Public.Resource.Org will keep
22  the document in question off of the websites under
23  its control and will not disseminate the document
24  in whole or in part, including any revisions, and
25  will maintain the status on the Internet Archive to

Page 327

1   prevent any public access to the document from the
2   archive's websites."  Do you see that?
3        MR. BRIDGES: Objection. The document
4   speaks for itself.
5        THE WITNESS: I do.
6   BY MR. HUDIS:
7        Q. What did you mean by that sentence?
8        MR. BRIDGES: Objection. The document
9   speaks for itself; lacks foundation; vague and
10  ambiguous; argumentative.
11       THE WITNESS: I think the sentence is very
12  clear; right?
13  BY MR. HUDIS:
14       Q. What did you mean?
15       A. I meant "Until the conclusion of trial on
16  the merits of this case, Public.Resource.Org will
17  keep the document in question off of the websites
18  under its control and will not disseminate the
19  document in whole or in part, including any
20  revisions, and will maintain the status on the
21  Internet Archive to prevent any public access to
22  the document from the archive's websites."
23       Q. And this memo was written by you on June
24  12th, 2014?
25       MR. BRIDGES: Objection. Lacks foundation;

Page 328

1   vague and ambiguous.
2        THE WITNESS: Yes.
3   BY MR. HUDIS:
4        Q. Since the time of this memo of Exhibit 43,
5   have the 1999 standards been reposted to a website
6   under Public.Resource's control?
7        MR. BRIDGES: Objection. Vague and
8   ambiguous; argumentative.
9        THE WITNESS: Yes.
10  BY MR. HUDIS:
11       Q. Why?
12       A. There was a technical malfunction in one of
13  our servers and by mistake a copy of the full
14  standard was posted in place of the stub.
15       Q. And when was that?
16       A. That was in January 2015.
17       Q. Mr. Malamud, during the two-year period
18  that the 1999 standards were posted to
19  Public.Resource's website, was a record kept of how
20  many Internet users viewed or accessed the
21  standards from that website location?
22       MR. BRIDGES: Objection. Utterly lacks
23  foundation; argumentative; vague and ambiguous,
24  and -- yeah. And competence.
25       THE WITNESS: Our server log's document

Page 329

1   retention policy was a two-week window until
2   litigation commenced in the ASTM case when we began
3   keeping the logs permanently. And so we -- we did
4   not keep a record prior to that.
5   BY MR. HUDIS:
6        Q. Do you know the earliest date on which you
7   kept such logs?
8        MR. BRIDGES: Objection. Again, lacks
9   foundation; argumentative; vague and ambiguous and
10  competence.
11       THE WITNESS: So again, the document
12  retention policy was a two-week window on the logs,
13  and in September -- August or September of 2013 we
14  changed that policy because litigation had
15  commenced. And so at that point we began keeping
16  the logs permanently.
17  BY MR. HUDIS:
18       Q. And do you still have those logs today?
19       MR. BRIDGES: Same objections. I think I
20  missed a compound objection to the underlying
21  question.
22       THE WITNESS: Yes.
23  BY MR. HUDIS:
24       Q. In what form are the logs kept?
25       MR. BRIDGES: Same objections.

83 (Pages 326 to 329)

Page 374

1      CERTIFICATE OF DEPONENT
2
3      I hereby certify that I have read and examined the
4      foregoing transcript, and the same is a true and
5      accurate record of the testimony given by me.
6      Any additions or corrections that I feel are
7      necessary, I will attach on a separate sheet of
8      paper to the original transcript.
9
10                     _____
11                       Signature of Deponent
12
13     I hereby certify that the individual representing
14     himself/herself to be the above-named individual,
15     appeared before me this _____ day of _____,
16     2015, and executed the above certificate in my
17     presence.
18
19                     _____
20                     NOTARY PUBLIC IN AND FOR
21
22                     _____
23                            County Name
24
25     MY COMMISSION EXPIRES:

Page 375

1      REPORTER'S CERTIFICATE
2         The undersigned Certified Shorthand Reporter
3      licensed in the State of California does hereby
4      certify:
5         I am authorized to administer oaths or
6      affirmations pursuant to Code of Civil Procedure,
7      Section 2093(b), and prior to being examined, the
8      witness was duly administered an oath by me.
9         I am not a relative or employee or attorney or
10     counsel of any of the parties, nor am I a relative or
11     employee of such attorney or counsel, nor am I
12     financially interested in the outcome of this action.
13        I am the deposition officer who
14     stenographically recorded the testimony in the
15     foregoing deposition, and the foregoing transcript is a
16     true record of the testimony given by the witness.
17        Before completion of the deposition, review of
18     the transcript [X] was [ ] was not requested.  If
19     requested, any changes made by the deponent (and
20     provided to the reporter) during the period allowed are
21     appended hereto.
22        In witness whereof, I have subscribed my name
23     this ____ day of _____, 2015.
24                     _____
25         DIANE S. MARTIN, CSR No. 6464