# EXHIBIT 61

Christopher Butler                                    December 2, 2014
San Francisco, CA

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2                       for the

 3              DISTRICT OF COLUMBIA

    _____

 4   AMERICAN EDUCATIONAL         )

 5   RESEARCH ASSOC., INC.,       )

 6   et al.                       )

 7           Plaintiffs           )

 8                                )   Civil Action No.:

 9   v.                           )   1:14-cv-00857-TSC

10                                )

11   PUBLIC.RESOURCE.ORG, INC.,   )

12           Defendant.           )

    _____)

13

14              San Francisco, California

15              Tuesday, December 2, 2014

16        Videotaped deposition of CHRISTOPHER BUTLER,

17   a witness herein, called for examination by counsel

18   for Plaintiffs in the above-entitled matter, the

19   witness having been by me first duly sworn, taken

20   at the offices of Harvey Siskind, LLP, Four

21   Embarcadero Center, 39th Floor, San Francisco,

22   California at 9:10 a.m., on Tuesday, December 2,

23   2014, and the proceedings being taken down by

24   Stenotype by CINDY TUGAW, RPR, CSR and transcribed

25   under her direction.
```

Page 54

1    meetings at Internet Archive was those other four
2    or five times?
3        A.  No.
4        Q.  What else do you know about Mr. Malamud?
5        MS. AHMAD:  Objection, outside the scope
6    of the deposition topics.
7        MR. HUDIS:
8        Q.  You may answer.
9        A.  I know he's involved with Public Resource.
10       Q.  That was my next question.
11          What, if anything, do you know about
12   Mr. Malamud's relationship to Public Resource?
13       A.  As I understand it, he -- he's very
14   central at Public Resource.  I don't know his exact
15   title and responsibilities at the organization.
16       Q.  Is that the extent of your knowledge of
17   the relationship between Mr. Malamud and Public
18   Resource?
19       A.  Yes.
20       Q.  Is Public Resource allowed to post content
21   to Internet Archive's website?
22       A.  Yes.
23       Q.  Is Carl Malamud allowed to post content
24   into Internet Archive's website?
25       A.  Yes.

Page 55

1        MS. LU:  Objection, vague and ambiguous.
2        MR. HUDIS:
3        Q.  When was Public Resource given access to
4    publish content to Internet Archive's website?
5        MS. LU:  Vague and ambiguous.
6        THE WITNESS:  I don't know.
7        MR. HUDIS:
8        Q.  When was Carl Malamud given access to post
9    content to Internet Archive's website?
10       MS. LU:  Lack of personal knowledge, vague
11   and ambiguous.
12       MR. HUDIS:
13       Q.  You may answer.
14       A.  I don't know.
15       Q.  Is there a formal agreement between
16   Internet Archive and Public Resource that
17   memorializes, if there is one, posting rights to
18   the Internet Archive website?
19       MS. LU:  Objection, lack of personal
20   knowledge, assumes facts not in evidence.
21       MR. HUDIS:
22       Q.  You may answer.
23       A.  If a -- if a user account was set up
24   through the -- through the site and our terms of
25   use were agreed to, then our terms of use would

Page 56

1    fall under that description.  I'm not aware of any
2    other agreements.
3        Q.  Do you know whether the terms of use were
4    agreed to by Public Resource or Carl Malamud or
5    both?
6        MS. LU:  Objection, lack of personal
7    knowledge, assumes facts not in evidence.
8        MR. HUDIS:
9        Q.  You may answer if you know.
10       A.  I don't know.
11       Q.  Other than the terms of use of Exhibit 5,
12   you said there was no formal agreement between
13   Public Resource or Carl Malamud and Internet
14   Archive for posting rights.
15          Was there any informal agreement?
16       MS. LU:  Objection, misstates prior
17   testimony.
18       MR. HUDIS:
19       Q.  You may answer.
20       A.  Can you define "posting rights"?
21       Q.  Permission to upload content to Internet
22   Archive's website.
23       A.  I'm not aware of any.
24       MR. HUDIS:  Off the record.
25       VIDEO OPERATOR:  The time is 10:33 a.m.

Page 57

1    We are off the record.
2        (Discussion off the record.)
3        (Plaintiffs' Exhibit 6 marked for
4        identification.)
5        VIDEO OPERATOR:  The time is 10:41 a.m.
6    We are on the record.
7        Mr. HUDIS:  I've now marked as Exhibit 6 a
8    web page with different views which I will discuss
9    with the witness in a moment.  It's a total of
10   eight pages.
11       Q.  Mr. Butler, what we did -- it's on the
12   date stamped up in the upper left-hand corner,
13   March 14, 2014.
14          The way that we understand the material
15   which we call the 1999 standards was uploaded to
16   Internet Archive's website.  The material in this
17   frame here, showing the witness, has the ability so
18   that electronically you read it like a book.
19          So we took a first shot of the web page
20   with the first page of the '99 standards, and then
21   the second page which is the front cover of the
22   '99 standards, and then we took another shot,
23   screenshot, of the inside cover and copyright page,
24   and then finally the table of contents.
25          Do you see that?

Page 58

1     A.  Yes.
2     Q.  So these are, in fact, different shots of
3  the same page with different turns, electronically,
4  of the book.
5        Do you understand that?
6     A.  I understand.
7     Q.  Okay.  So --
8        MS. AHMAD:  Yes.  So you should answer
9  questions about this exhibit assuming that that
10  description is accurate.
11        THE WITNESS:  I understand.
12        MR. HUDIS:
13     Q.  Mr. Butler, do you recognize Exhibit 6 as
14  a web page from Internet Archive's website that
15  existed at one time?
16        MS. LU:  Objection, lack of personal
17  knowledge.
18        THE WITNESS:  This has the layout of an
19  Internet Archive details page.  I recognize it as
20  the layout and design of an Internet Archive
21  details page.
22        MR. HUDIS:
23     Q.  Do you know what material is posted on
24  this web page of Exhibit 6?
25        MS. LU:  Objection, lack of personal

Page 59

1  knowledge.
2        THE WITNESS:  I see a title for the
3  material.
4        MR. HUDIS:
5     Q.  What title is that?
6     A.  The title is "AERA:  Standard for
7  Educational and Psychological Testing," and then
8  there's a date in parentheses following that,
9  "1999."
10     Q.  According to this exhibit, the bottom of
11  the second page, who posted the 1999 standards to
12  this web page?
13        MS. LU:  Objection, lack of personal
14  knowledge.
15        THE WITNESS:  On the -- on the second
16  page, I see a metadata tag entitled, "Credits" that
17  reads "Uploaded by Public.Resource.Org.
18        As I understand the function of our
19  website, the submitter would have submitted that
20  tag and the text displayed beside it, reading
21  "Uploaded by Public.Resource.Org."
22        MR. HUDIS:  Counsel, can you stipulate
23  that Exhibit 6 is a business record of Internet
24  Archive that existed at one time, at least on
25  March 14th, 2014?

Page 60

1        MS. AHMAD:  No, I can't.
2        MR. HUDIS:
3     Q.  On the second page of Exhibit 6, it says,
4  "Identifier-access."
5        Do you see that?
6     A.  Yes.
7     Q.  Based upon your knowledge of an Internet
8  Archive details page, who created this identifier
9  access string?
10        MS. LU:  Objection, vague and ambiguous,
11  lack of personal knowledge.
12        MR. HUDIS:
13     Q.  You may answer.
14     A.  I don't know.  I don't know whether a
15  submitter would have created that or whether the
16  Internet Archive's automated processes created it.
17     Q.  To the best of your knowledge it's one or
18  the other?
19        MS. LU:  Objection, lack of personal
20  knowledge.
21        THE WITNESS:  To the best of my knowledge,
22  it would either have been performed by Internet
23  Archive's automated processes or an account holder
24  with requisite permission to edit this item's
25  metadata.

Page 61

1        MR. HUDIS:
2     Q.  To the best of your knowledge, if you
3  could look on Page 1, beneath the -- beneath the
4  frame containing the 1999 standards, who wrote the
5  text under where it says, "Description"?
6        MS. LU:  Objection, lack of personal
7  knowledge.
8        THE WITNESS:  The service requires a
9  description to be provided by the submitter at the
10  time of upload.  That information may subsequently
11  be edited by an account that has permissions to do
12  so.
13        MR. HUDIS:
14     Q.  And in this context, that account would
15  have been by Public.Resource.Org?
16        MS. LU:  Objection, lack of personal
17  knowledge and argumentative.
18        THE WITNESS:  Sorry, could you repeat the
19  question, please?
20        MR. HUDIS:
21     Q.  Yes,  yes.
22        Is it correct to say that the text on this
23  web page of Exhibit 6, beneath the frame containing
24  the 1999 standards, was provided by the submitter?
25        MS. LU:  Objection, lack of personal

16 (Pages 58 to 61)

Christopher Butler                                              December 2, 2014
San Francisco, CA

Page 126

```
 1        MR. HUDIS:
 2     Q. So your company defines download count.
 3  Does the download count distinguish between an
 4  Internet user's view of a page versus capturing and
 5  copying content to go to another computer?
 6        MS. LU:  Objection, vague and ambiguous.
 7        THE WITNESS:  The download count does not
 8  distinguish between, for example, a visit to a web
 9  page without, for instance, saving that file
10  through the -- a browser's downloader or selecting
11  files' save-as from the browser.
12        MR. HUDIS:
13     Q. Does Internet Archive's download count
14  distinguish between visits from human beings over
15  the Internet versus Internet crawling robots, or
16  bots, or uploaders, or internal visits from
17  Internet Archive processes or staff?
18        MS. LU:  Objection, vague and ambiguous.
19        THE WITNESS:  No.  The download count does
20  not distinguish between all of those different
21  types of access.
22        MR. HUDIS:
23     Q. For the purposes of my next question, I
24  need your definition of what an IP address is.
25     A. Okay.
```

Page 127

```
 1     Q. What is an IP address?
 2        MS. LU:  Objection, to the extent it calls
 3  for expert testimony.
 4        THE WITNESS:  What I know about an
 5  IP address is that it is a unique number associated
 6  with a computer that is connected to a network.
 7        MR. HUDIS:
 8     Q. Does Internet Archive's download count
 9  include or exclude multiple visits from the same
10  IP address during a given day?
11        MS. LU:  Objection, vague and ambiguous.
12        THE WITNESS:  During a day, as defined by
13  UTC time, Internet Archive's systems are designed
14  to log multiple visits from the same IP -- count,
15  excuse me, count multiple visits from the same
16  IP address as only one download.
17        MR. HUDIS:
18     Q. Does Internet Archive maintain any records
19  or other information that would enable it to be
20  more specific about what is included or excluded
21  from a download count?
22        MS. LU:  Objection, vague and ambiguous.
23        THE WITNESS:  Can you read the question
24  again, please?
25        MR. HUDIS:  Yes.
```

Page 128

```
 1     Q. Does Internet Archive maintain any records
 2  or other information that would enable it to be
 3  more specific about what is included or excluded
 4  from a download count?
 5        MS. LU:  Same objection.
 6        THE WITNESS:  I'm not aware of any further
 7  information that we would be able to supply.
 8        MR. HUDIS:
 9     Q. How does Internet Archive obtain the
10  download count of a specific web page after the
11  uploaded content is removed?
12        MS. LU:  Objection, lack of personal
13  knowledge, assumes facts not in evidence.  Counsel,
14  if you want to ask him about how someone retrieved
15  this Exhibit 11, then I would not object to that.
16        MR. HUDIS:
17     Q. All right.  I'm going to ask you
18  specifically about Exhibit 11.  I'd like to know
19  generally how the information was obtained.
20        We've established that a make_dark command
21  was run for the content of the 1999 standards in
22  June of 2014, correct?
23        MS. LU:  Objection, misstates prior
24  testimony, lack of personal knowledge.
25        MR. HUDIS:
```

Page 129

```
 1     Q. When was this make_dark command of
 2  Exhibit 9 run?
 3     A. The date listed on the task log for this
 4  task which has a command listed of make_dark.php is
 5  June 11th, 2014.
 6     Q. I've now marked as Exhibit 11 a one-page
 7  document that's in front of you.
 8        What is the date of this document?
 9     A. The date of Exhibit 11 is November 25th,
10  2014.
11     Q. What is this document?
12     A. This document is a screen capture of the
13  Mac Terminal application.  The Terminal was used by
14  myself to submit a query to archive.org's systems
15  to obtain archive.org's records for the download
16  count for the item with identifier gov.law.aera
17  .standards.1999.
18     Q. The make_dark command of Exhibit 9
19  associated with that identifier was run in June of
20  2014, correct?
21     A. The task log lists that date -- the task
22  log associated with the make_dark command lists
23  that date.
24     Q. And the same identifier you got at a
25  download -- a set of download information on
```

33 (Pages 126 to 129)

Christopher Butler                                                    December 2, 2014
San Francisco, CA

Page 142

```
 1              CERTIFICATE OF DEPONENT
 2
 3    I hereby certify that I have read and examined the
 4    foregoing transcript, and the same is a true and
 5    accurate record of the testimony given by me.
 6    Any additions or corrections that I feel are
 7    necessary, I will attach on a separate sheet of
 8    paper to the original transcript.
 9
10              _____
11                  Signature of Deponent
12
13    I hereby certify that the individual representing
14    himself/herself to be the above-named individual,
15    appeared before me this _____ day of _____,
16    2014, and executed the above certificate in my
17    presence.
18
19              _____
20              NOTARY PUBLIC IN AND FOR
21
22              _____
23                     County Name
24
25    MY COMMISSION EXPIRES:
```

Page 143

```
 1    STATE OF CALIFORNIA    )
 2    COUNTY OF SAN FRANCISCO )
 3         I, CINDY TUGAW, a Certified Shorthand
 4    Reporter of the State of California, duly
 5    authorized to administer oaths pursuant to Section
 6    8211 of the California Code of Civil Procedure, do
 7    hereby certify that
 8              CHRISTOPHER BUTLER,
 9    the witness in the foregoing deposition, was by me
10    duly sworn to testify the truth, the whole truth
11    and nothing but the truth in the within-entitled
12    cause; that said testimony of said witness was
13    reported by me, a disinterested person, and was
14    thereafter transcribed under my direction into
15    typewriting and is a true and correct transcription
16    of said proceedings.
17         I further certify that I am not of counsel
18    or attorney for either or any of the parties in the
19    foregoing deposition and caption named, nor in any
20    way interested in the outcome of the cause named in
21    said caption.
22         Dated the 11th day of December, 2014.
23
24              CINDY TUGAW
25              CSR NO. 4805
```

37 (Pages 142 to 143)

Alderson Reporting Company
1-800-FOR-DEPO