# EXHIBIT 72



# FEDERAL REGISTER
The Daily Journal of the United States Government

**Rule**

# Program Integrity Issues

A Rule by the Education Department on 10/29/2010

**ACTION**      Final Regulations.

**SUMMARY**      The Secretary is improving integrity in the programs authorized under title IV of the Higher Education Act of 1965, as amended (HEA), by amending the regulations for Institutional Eligibility Under the HEA, the Secretary's Recognition of Accrediting Agencies, the Secretary's Recognition Procedures for State Agencies, the Student Assistance General Provisions, the Federal Family Education Loan (FFEL) Program, the William D. Ford Federal Direct Loan Program, the Teacher Education Assistance for College and Higher Education (TEACH) Grant Program in part 686, the Federal Pell Grant Program, and the Academic Competitiveness Grant (AGC) and National Science and Mathematics Access to Retain Talent Grant (National Smart Grant) Programs.

**UNIFIED AGENDA**      **Program Integrity Issues**

*4 actions from June 18th, 2010 to July 1st, 2011*



| August 2nd, 2010 | October 29th, 2010 | July 1st, 2011 |
|---|---|---|
| ▪ NPRM Comment Period End | ▪ Final Action<br>▪ 75 FR 66832 | ▪ Final Action Effective |

**TABLE OF**      ▪ **DATES:**

---

⬅ Previous Document
Next Document ➡

⚠ **LEGAL DISCLAIMER**

Font Controls   [ + ] [ − ] [ A ] [ A ]

📄 PDF   📄 DEV   🖨 PRINT

**Publication Date:**
Friday, October 29, 2010

**Agency:**
Department of Education

**Dates:**
These regulations are effective July 1, 2011 with the exception of the revision of subpart E of part 668, Verification and Updating of Student Aid Application Information. Revised subpart E of part 668 is effective July 1, 2012. The incorporation by reference of certain publications listed in the rule is approved by the Director of the Federal Register as of July 1, 2011.

**Effective Date:**
07/01/2011

**Entry Type:**
Rule

**Action:**
Final regulations.

**Document Citation:**
75 FR 66831

**Page:**
66831 -66975 (145 pages)

**CFR:**

## CONTENTS

Back to Top

▪ FOR FURTHER INFORMATION CONTACT:

▪ SUPPLEMENTARY INFORMATION:

▪ Implementation Date of These Regulations

▪ Analysis of Comments and Changes

▪ General Comments

▪ Gainful Employment in a Recognized Occupation (§§ 600.2, 600.4, 600.5, 600.0, 668.6, and 668.8) Gainful Employment Reporting and Disclosure Requirements (§ 668.6)

  ▪ General

  ▪ Placement Rates

  ▪ On-Time Completion Rate

  ▪ Median Loan Debt

  ▪ Student Information Database

  ▪ Links to O*Net

  ▪ Disclosing Program Costs

  ▪ One-Year Program

▪ Definition of a Credit Hour (§§ 600.2, 602.24, 603.24, and 668.8)

  ▪ General

  ▪ Institutional Determination and Flexibility

  ▪ Out-of-Class Student Work

  ▪ Authority and Need To Regulate

  ▪ Administrative Burden

▪ Accrediting Agency Procedures (§ 602.24(f))

  ▪ Notification Requirements

▪ State Agency Procedures (§ 603.24(c))

  ▪ General

▪ Program Eligibility: Clock-to-Credit-Hour Conversion (§ 668.8)

▪ State Authorization (§§ 600.4(a)(3), 600.5(a)(4), 600.6(a)(3), 600.9, and 668.43(b))

  ▪ General—No Mandate for a State Licensing Agency

  ▪ Implementation

    ▪ Examples

  ▪ Exemptions: Accreditation and Years of Operation

34 CFR 600
34 CFR 602
34 CFR 603
34 CFR 668
34 CFR 682
34 CFR 685
34 CFR 686
34 CFR 690
34 CFR 691

**Agency/Docket Number:**

Docket ID ED-2010-OPE-0004

**RIN:**

1840-AD02

**Document Number:**

2010-26531

**Shorter URL:**

https://federalregister.gov/a/2010-26531

## RELATED TOPICS

▪ Administrative practice and procedure

▪ Aliens

▪ Colleges and universities

▪ Consumer protection

▪ Education

▪ Education of disadvantaged

▪ Elementary and secondary education

▪ Foreign relations

▪ Grant programs-education

▪ Loan programs-education

▪ Reporting and recordkeeping requirements

▪ Selective Service System

▪ Student aid

▪ Vocational education

- Complaints

  - Reciprocity and Distance Education

  - State Institutions

  - Religious Institutions

  - Tribal Institutions

- Part 668Student Assistance General Provisions Retaking
  Coursework (§ 668.2)

- Written Arrangements (§§ 668.5 and 668.43)

  - General

  - Written Arrangements Between Two or More Eligible
    Institutions (§ 668.5(a))

  - Requirements for Arrangements Between Eligible
    Institutions and Ineligible Institutions or Organizations
    (§ 668.5(c))

  - Disclosures to Students (§§ 668.5(e) and 668.43(a)(12))

- Incentive Compensation (§ 668.14(b))

  - General

  - Current Safe Harbors

  - Permissible Compensation Activities

- Satisfactory Academic Progress (§§ 668.16(e), 668.32(f), and
  668.34)

  - General

  - General

  - Delayed Implementation

- Satisfactory Academic Progress (§ 668.34)

  - Consistency Among Categories of Students

  - Frequency of Evaluation

  - Minimum GPA

  - Pace

  - Transfer Credits

  - Financial Aid Probation and Financial Aid Warning
    Statuses

  - Appeals

  - Maximum Timeframe

  - Notification

- Evaluating the Validity of High School Diplomas (§

668.16(p))

- High School Diploma (§ 668.16(p)]

■ Return of Title IV, HEA Program Funds (§§ 668.22(a),
  668.22(b), 668.22(f), and 668.22(l))

  ■ Treatment of Title IV, HEA Program Funds When a
    Student Withdraws From Term-Based Programs With
    Modules or Compressed Courses (§§ 668.22(a), 668.22 (f)
    and 668.22 (l))

■ Withdrawal Date for a Student Who Withdraws From an
  Institution That Is Required To Take Attendance (§§
  668.22(b) and 668.22(l))

■ Verification and Updating of Student Aid Application
  Information (Subpart E of Part 668)

  ■ General (§ 668.51)

■ Definitions (§ 668.52)

■ Policies and Procedures—Professional Judgment (§
  668.53(c))

■ Selection of FAFSA Information for Verification (§ 668.54)

■ Updating Information (§ 668.55)

■ Information To Be Verified (§ 668.56)

■ Acceptable Documentation (§ 668.57(a)(2), (a)(4)(ii)(A), (a)
  (5), (a)(7), and (d))

■ Interim Disbursements (§ 668.58(a)(3))

■ Consequences of a Change in an Applicant's FAFSA
  Information (§ 668.59)

■ Deadlines for Submitting Documentation and the
  Consequences of Failing To Provide Documentation (§
  668.60(c)(1))

■ Recovery of Funds (§ 668.61)

■ Misrepresentation (Subpart F—§§ 668.71 Through 668.75)

  ■ General

■ Scope and Special Definitions (§ 668.71)

■ Nature of Educational Program (§ 668.72)

■ Employability of Graduates (§ 668.74)

■ Ability To Benefit (§ 668.32(e) and Subpart J)

  ■ Student Eligibility—General (§ 668.32(e))

■ Subpart J—Approval of Independently Administered Tests;
  Specification of Passing Score; Approval of State Process

■

- Special Definitions (§ 668.142)

- Application for Test Approval (§ 668.144)

- Test Approval Procedures (§ 668.145)

- Criteria for Approving Tests (§ 668.146)

- Additional Criteria for the Approval of Certain Tests (§ 668.148)

- Agreement Between the Secretary and a Test Publisher or a State (§ 668.150)

- Administration of Tests (§ 668.151)

- Administration of Tests for Individuals Whose Native Language Is Not English or for Individuals With Disabilities (§ 668.153)

- Disbursements (§§ 668.164(i), 685.102(b), 685.301(e), 686.2(b), and 686.37(b))

  - Provisions for Books and Supplies (§ 668.164(i))

- Reporting Disbursements, Adjustments, and Cancellations (§§ 685.102(b), 685.301(e), 686.2(b), and 686.37(b))

- Executive Order 12866

  - Regulatory Impact Analysis

- Paperwork Reduction Act of 1995

  - Section 668.6—Gainful Employment

  - Section 668.8—Eligible Program

  - Section 668.16—Standards of Administrative Capability

  - Section 668.22—Treatment of Title IV, HEA Program Funds When a Student Withdraws

  - Section 668.34—Satisfactory Progress

  - Section 668.43—Institutional Information

  - Section 668.55—Updating Information

  - Section 668.56—Information To Be Verified

  - Section 668.57—Acceptable Documentation

  - Section 668.59—Consequences of a Change in FAFSA Information

  - Section 668.144—Application for Test Approval

  - Section 668.150—Agreement Between the Secretary and a Test-Publisher or a State

  - Section 668.151—Administration of Tests

  - Section 668.152—Administration of Tests by Assessment

Centers

  ▪ Section 668.164—Disbursing Funds

 ▪ Intergovernmental Review

 ▪ Assessment of Educational Impact

 ▪ Electronic Access to This Document

▪ List of Subjects

▪ PART 600—INSTITUTIONAL ELIGIBILITY UNDER THE
   HIGHER EDUCATION ACT OF 1965, AS AMENDED

▪ PART 602—THE SECRETARY'S RECOGNITION OF
   ACCREDITING AGENCIES

▪ PART 603—SECRETARY'S RECOGNITION PROCEDURES
   FOR STATE AGENCIES

▪ PART 668—STUDENT ASSISTANCE GENERAL
   PROVISIONS

▪ Subpart E—Verification and Updating of Student Aid
   Application Information

▪ Subpart E—Verification and Updating of Student Aid
   Application Information

▪ Subpart F—Misrepresentation

▪ Subpart F—Misrepresentation

▪ Subpart J—Approval of Independently Administered Tests;
   Specification of Passing Score; Approval of State Process

▪ Subpart J—Approval of Independently Administered Tests;
   Specification of Passing Score; Approval of State Process

▪ PART 682—FEDERAL FAMILY EDUCATION LOAN (FFEL)
   PROGRAM

▪ PART 685—WILLIAM D. FORD FEDERAL DIRECT LOAN
   PROGRAM

▪ PART 686—TEACHER EDUCATION ASSISTANCE FOR
   COLLEGE AND HIGHER EDUCATION (TEACH) GRANT
   PROGRAM

▪ PART 690—FEDERAL PELL GRANT PROGRAM

▪ PART 691—ACADEMIC COMPETITIVENESS GRANT (ACG)
   AND NATIONAL SCIENCE AND MATHEMATICS ACCESS
   TO RETAIN TALENT GRANT (NATIONAL SMART GRANT)
   PROGRAMS

▪ Appendix A—Regulatory Impact Analysis

  ▪ Executive Order 12866

    ▪ Regulatory Impact Analysis

- Need for Federal Regulatory Action

- Regulatory Alternatives Considered

- Benefits

- Costs

- Net Budget Impacts

- Assumptions, Limitations, and Data Sources

- Accounting Statement

- Regulatory Flexibility Act Certification

- Footnotes

TABLES
Back to Top

- Meets State Authorization Requirements[*]

- Collection of Information

- Chart A—State Authorization Requirements

- Table 2—Accounting Statement: Classification of Estimated Expenditures

⬚

**DATES:**
Back to Top

These regulations are effective July 1, 2011 with the exception of the revision of subpart E of part 668, Verification and Updating of Student Aid Application Information. Revised subpart E of part 668 is effective July 1, 2012. The incorporation by reference of certain publications listed in the rule is approved by the Director of the Federal Register as of July 1, 2011.

**FOR FURTHER INFORMATION CONTACT:**
Back to Top

For information related to the provisions on high school diplomas and verification of information on the Free Application for Federal Student Aid (FAFSA), Jacquelyn Butler. Telephone: (202) 502-7890 or via the Internet at: *Jacquelyn.Butler@ed.gov.*

For information related to the return of title IV, HEA funds calculation provisions for term-based modules or taking attendance, Jessica Finkel or Wendy Macias. Telephone: (202) 502-7647 or via the Internet at: *Jessica.Finkel@ed.gov.* Telephone: (202) 502-7526 or via the Internet at: *Wendy.Macias@ed.gov.*

For information related to the provisions on retaking coursework, Vanessa Freeman. Telephone: (202) 502-7523 or via the Internet at: *Vanessa.Freeman@ed.gov.*

For information on the provisions related to incentive compensation, Marty Guthrie. Telephone: (202) 219-7031 or via the Internet at: *Marty.Guthrie@ed.gov.*

For information related to the provisions on satisfactory academic progress, Marty Guthrie or Marianna Deeken. Telephone: (202) 219-7031 or via the Internet at: *Marty.Guthrie@ed.gov.* Telephone: (206) 615-2583 or via the Internet at: *Marianna.Deeken@ed.gov.*

For information related to the provisions on ability to benefit, Dan Klock. Telephone: (202) 377-4026 or via the Internet at *Dan.Klock@ed.gov.*

For information related to gainful employment in a recognized occupation, John Kolotos. Telephone: (202) 502-7762 or via the Internet at: *John.Kolotos@ed.gov.*

For information related to the provisions for written agreements between institutions, Carney McCullough. Telephone: (202) 502-7639 or via the Internet at: *Carney.McCullough@ed.gov.*

For information related to the provisions on misrepresentation, Carney McCullough or Vanessa Freeman. Telephone: (202) 502-7639 or via the Internet at: *Carney.McCullough@ed.gov.* Telephone: (202) 502-7523 or via the Internet at: *Vanessa.Freeman@ed.gov.*

For information related to the provisions on timeliness and method of disbursement, Harold McCullough. Telephone: (202) 377-4030 or via the Internet at: *Harold.McCullough@ed.gov.*

For information related to the provisions related to the definition of credit hour, Fred Sellers. Telephone: (202) 502-7502 or via the Internet at: *Fred.Sellers@ed.gov.*

For information related to provisions on State authorization, Fred Sellers. Telephone: (202) 502-7502 or via the Internet at: *Fred.Sellers@ed.gov.*

If you use a telecommunications device for the deaf (TDD), call the Federal Relay Service (FRS), toll free, at 1-800-877-8339.

Individuals with disabilities can obtain this document in an accessible format (*e.g.,* braille, large print, audiotape, or computer diskette) on request to one of the contact persons listed under FOR FURTHER INFORMATION CONTACT.

**SUPPLEMENTARY INFORMATION:**   On June 18, 2010, the Secretary published a notice of proposed rulemaking (NPRM) for program integrity issues in the

**Federal Register** (75 FR 34806).

In the preamble to the NPRM, the Secretary discussed on pages 34808 through 34848 the major regulations proposed in that document to strengthen and improve the administration of programs authorized under the HEA. These proposed regulations included the following:

- Requiring institutions to develop and follow procedures to evaluate the validity of a student's high school diploma if the institution or the Secretary has reason to believe that the diploma is not valid or was not obtained from an entity that provides secondary school education;

- Expanding eligibility for title IV, HEA program assistance to students who demonstrate they have the ability to benefit by satisfactorily completing six credits of college work, or the equivalent amounts of coursework, that are applicable toward a degree or certificate offered by an institution;

- Amending and adding definitions of terms related to ability to benefit testing, including "assessment center," "independent test administrator," "individual with a disability," "test," "test administrator," and "test publisher";

- Consolidating into a single regulatory provision the approval processes for ability to benefit tests developed by test publishers and States;

- Establishing requirements under which test publishers and States must provide descriptions of processes for identifying and handling test score abnormalities, ensuring the integrity of the testing environment, and certifying and decertifying test administrators;

- Requiring test publishers and States to describe any accommodations available for individuals with disabilities, as well as the process a test administrator would use to identify and report to the test publisher instances in which these accommodations were used;

- Revising the test approval procedures and criteria for ability to benefit tests, including procedures related to the approval of tests for speakers of foreign languages and individuals with disabilities;

- Revising the definitions and provisions that describe the activities that constitute substantial misrepresentation by an institution of the nature of its educational program, its financial charges, or the employability of its graduates;

- Removing the "safe harbor" provisions related to incentive compensation for any person or entity engaged

in any student recruitment or admission activity, including making decisions regarding the award of title IV, HEA program assistance;

- Clarifying what is required for an institution of higher education, a □ proprietary institution of higher education, and a postsecondary vocational institution to be considered legally authorized by the State;

- Defining a *credit hour* and establishing procedures that certain institutional accrediting agencies must have in place to determine whether an institution's assignment of a credit hour is acceptable;

- Modifying provisions to clarify whether and when an institution must award student financial assistance based on clock or credit hours and the standards for credit-to-clock-hour conversions;

- Modifying the provisions related to written arrangements between two or more eligible institutions that are owned or controlled by the same person or entity so that the percentage of the educational program that may be provided by the institution that does not grant the degree or certificate under the arrangement may not exceed 50 percent;

- Prohibiting written arrangements between an eligible institution and an ineligible institution that has had its certification to participate in title IV, HEA programs revoked or its application for recertification denied;

- Expanding provisions related to the information that an institution with a written arrangement must disclose to a student enrolled in a program affected by the arrangement, including, for example, the portion of the educational program that the institution that grants the degree or certificate is not providing;

- Revising the definition of *unsubsidized student financial aid programs* to include TEACH Grants, Federal PLUS Loans, and Direct PLUS Loans;

- Codifying current policy that an institution must complete verification before the institution may exercise its professional judgment authority;

- Eliminating the 30 percent verification cap;

- Retaining the ability of institutions to select additional applicants for verification;

- Replacing the five verification items for all selected applicants with a targeted selection from items included in an annual **Federal Register** notice published by the Secretary;

- Allowing interim disbursements when changes to an applicant's FAFSA information would not change the amount that the student would receive under a title IV, HEA program;

- Codifying the Department's IRS Data Retrieval System Process, which allows an applicant to import income and other data from the IRS into an online FAFSA;

- Requiring the processing of changes and corrections to an applicant's FAFSA information;

- Modifying the provisions related to institutional satisfactory academic progress policies and the impact these policies have on a student's eligibility for title IV, HEA program assistance;

- Expanding the definition of *full-time student* to allow, for a term-based program, repeated coursework taken in the program to count towards a full-time workload;

- Clarifying when a student is considered to have withdrawn from a payment period or period of enrollment for the purpose of calculating a return of title IV, HEA program funds;

- Clarifying the circumstances under which an institution is required to take attendance for the purpose of calculating a return of title IV, HEA program funds;

- Modifying the provisions for disbursing title IV, HEA program funds to ensure that certain students can obtain or purchase books and supplies by the seventh day of a payment period;

- Updating the definition of the term *recognized occupation* to reflect current usage;

- Establishing requirements for institutions to submit information on students who attend or complete programs that prepare students for gainful employment in recognized occupations; and

- Establishing requirements for institutions to disclose on their Web site and in promotional materials to prospective students, the on-time completion rate, placement rate, median loan debt, program cost, and other information for programs that prepare students for gainful employment in recognized occupations.

| | |
|---|---|
| **Implementation Date of These Regulations** | Section 482(c) of the HEA requires that regulations affecting programs under title IV of the HEA be published in final form by November 1 prior to the start of the award year (July 1) to |

Back to Top
which they apply. However, that section also permits the Secretary to designate any regulation as one that an entity subject to the regulation may choose to implement earlier and to specify the conditions under which the entity may implement the provisions early.

The Secretary has not designated any of the provisions in these final regulations for early implementation. As indicated in the DATES section, the regulations contained in subpart E of part 668, Verification and Updating of Student Aid Application Information are effective July 1, 2012.

While the Secretary has designated amended § 600.9(a) and (b) as being effective July 1, 2011, we recognize that a State may be unable to provide appropriate State authorizations to its institutions by that date. We are providing that the institutions unable to obtain State authorization in that State may request a one-year extension of the effective date of these final regulations to July 1, 2012, and if necessary, an additional one-year extension of the effective date to July 1, 2013. To receive an extension of the effective date of amended § 600.9(a) and (b) for institutions in a State, an institution must obtain from the State an explanation of how a one-year extension will permit the State to modify its procedures to comply with amended § 600.9.

## Analysis of Comments and Changes

Back to Top

The regulations in this document were developed through the use of negotiated rulemaking. Section 492 of the HEA requires that, before publishing any proposed regulations to implement programs under title IV of the HEA, the Secretary must obtain public involvement in the development of the proposed regulations. After obtaining advice and recommendations, the Secretary must conduct a negotiated rulemaking process to develop the proposed regulations. The negotiated rulemaking committee did not reach consensus on the proposed regulations that were published on June 18, 2010. The Secretary invited comments on the proposed regulations by August 2, 2010. Approximately 1,180 parties submitted comments, a number of which were substantially similar. An analysis of the comments and of the changes in the regulations since publication of the NPRM follows.

We group major issues according to subject, with appropriate sections of the regulations referenced in parentheses. We discuss other substantive issues under the sections of the regulations to which they pertain. Generally, we do not address minor, nonsubstantive changes, recommended changes that the law does not authorize the Secretary to make, or comments pertaining to operational processes. We also do

not address comments pertaining to issues that were not within the scope of the NPRM.

**General Comments**

Back to Top

*Comment:* We received a significant number of comments that expressed support for the Secretary's proposed regulations. Many of the commenters noted that the proposed regulations would protect taxpayer investments in higher education by helping to curtail fraud and abuse and would protect the interests of a diverse population of students who are seeking higher education for personal and professional growth. Some of the commenters also stated that the Secretary's proposed regulations would provide a level playing field that benefits the majority of institutions of higher education that are committed to sound academic and administrative practices.

*Discussion:* The Department appreciates the numerous comments we received in support of the proposed regulations.

*Changes:* None.

*Comment:* Several commenters disagreed with the process by which the Department developed the proposed regulations. The commenters believe that the Department did not negotiate in good faith and did not follow faithfully the Federal negotiated rulemaking process. These commenters believed that the Department excluded important members of the proprietary school sector from the process and failed to provide adequate time for review of and comment on the proposed regulations. Because of the complexity of the proposed regulations, these same commenters also requested that the Department delay the effective date for implementation of the final regulations. Several other commenters believed that before negotiating proposed regulations with such a broad scope, the Department should have conducted studies to assess the impact the proposed regulations would have on affected institutions. Lastly, one commenter expressed the view that the Department began negotiations without presenting examples of abuse or data that supported additional regulation and that many of the Department's concerns about program integrity could have been better addressed by enforcing current regulations.

*Discussion:* We disagree with the commenters who said that the Department did not act in good faith in negotiating the proposed regulations or that we did not follow the negotiated rulemaking process. In conducting the negotiated rulemaking for these proposed regulations, the Department followed the requirements in section 492 of the HEA, which govern the negotiated rulemaking process and require the Department to

choose non-Federal negotiators from the groups involved in the student financial assistance programs authorized by title IV of the HEA. As addressed earlier in this preamble, all of these groups were represented during the negotiations.

We believe that the 45-day public comment period was an adequate period of time for interested parties to submit comments, especially in light of the fact that prior to issuing the proposed regulations, the Department conducted public hearings and three negotiated rulemaking sessions, where stakeholders and members of the public had an opportunity to weigh in on the development of much of the language reflected in the proposed regulations. In addition, we believe that the 45-day public comment period is necessary in light of the HEA's master calendar requirements. Under those requirements, the Department must publish final regulations by November 1, 2010, in order for them to be effective on July 1, 2011. The Department must adhere to the master calendar set forth by Congress and does not have the statutory authority to amend it.

We also do not agree that, except for certain provisions of the regulations such as those that may involve systems changes that require adequate lead time to make, implementation of the final regulations should be delayed. For example, the proposed regulations on FAFSA verification cannot be implemented by the July 1, 2011 effective date because the changes would require system updates that will not be in place by that date. We discuss the implementation delay of regulations that involve these system changes elsewhere in this preamble. Absent these system-related or similar issues, however, we believe a delay in implementing the final regulations will undermine the Department's goal of protecting taxpayers and students by ensuring the integrity of the title IV, HEA programs.

Lastly, we disagree with the commenters who stated that the Department should have conducted a study to assess the impact of the proposed regulations on institutions of higher education before negotiating the proposed changes and those commenters who stated that the Department did not present examples of abuse or data to support the proposed regulations. The Department's decision to improve program integrity by strengthening the regulations was based on many factors, including feedback we received from the public. Specifically, the Department developed a list of proposed regulatory provisions based on advice and recommendations submitted by individuals and organizations as testimony in a series of three public hearings in June of 2009, as well as written

comments submitted directly to the Department. Department staff also identified issues for discussion and negotiation. The proposed regulations that were negotiated during negotiated rulemaking and included in the proposed regulations were developed for one or more of the following reasons:

- To implement provisions of the HEA, as amended by the Higher Education Opportunity Act of 2008 (HEOA).

- To update current regulations that had not been updated in some time so that they more accurately reflect the state of the law as well as the Department's current practices and policies (*e.g.,* aligning the regulations with the Department's FAFSA simplification initiative).

- To respond to problems identified by students and financial aid advisors about the aggressive sales tactics used by some institutions.

- To respond to a report from the United States Government Accountability Office published in August of 2009 that raised concerns about proprietary institutions and recommended stronger Department oversight to ensure that only eligible students receive Federal student aid.

We believe that all of these factors provided ample support for the Department to immediately propose stronger regulations to protect students and prevent fraud and abuse in the title IV, HEA programs.

*Changes:* None.

*Comment:* Many commenters expressed concern about what they argued would be a negative impact of the proposed regulations on institutions of higher education, particularly proprietary institutions. These commenters stated that the proposed regulations are too complex and too broad in scope and that, as a result, they would disproportionately impose burdens on the institutions that serve many of the students who need the most financial assistance. Other commenters stated that, in these trying economic times, institutions simply do not have the resources to administer the disclosure, reporting, and implementation requirements included in the proposed regulations. Some of these commenters stated that they feared that the cost of compliance with these regulations, which many argued were ambiguous or inconsistent, would drive their small proprietary institutions out of business.

Several commenters stated that the proposed regulations target the entire proprietary school sector of higher education, while the actions of only a few proprietary institutions are cause for

concern. These commenters decried the Department's "one-size-fits-all" approach to ensuring program integrity. ☐ Lastly, one commenter requested that the Department indicate in each section of the final regulations the types of institutions to which that specific section applies.

*Discussion:* The Department is aware that some institutions may have limited resources to implement some provisions of the final regulations and is committed to assisting these institutions in every way possible to ensure that all institutions can comply with program requirements. Several of the changes are to discrete areas of existing regulations rather than wholly new requirements. As such, institutions wishing to continue to participate in the title IV, HEA programs have already absorbed many of the administrative costs related to implementing these final regulations. Any additional costs are primarily due to new procedures that, while possibly significant in some cases, are a cost of continued program participation.

The Department believes that the benefits of these regulations for students, consumers, and taxpayers justify the burdens of institutional compliance, as discussed, in the Regulatory Impact Analysis in Appendix A. These regulations strengthen the Federal student aid programs by protecting students from aggressive or misleading recruiting practices and clarifying State oversight responsibilities, providing consumers with better information about the effectiveness of career colleges and training programs, and ensuring that only eligible students or programs receive aid.

We do not believe it is necessary to specifically indicate in each section which institutions are covered by a particular regulation because all provisions of these regulations apply to all postsecondary institutions, unless otherwise specified.

*Changes:* None.

*Comment:* A number of commenters stated that the proposed regulations would harm students who are already disadvantaged, underserved, and not adequately represented in postsecondary institutions because they would limit their choice of educational programs and their chances of getting a quality education. Other commenters noted that the proposed regulations could become a barrier to access for needy students, as well as adult students who work full-time, because aid may be discontinued for programs that do not meet new regulatory requirements. Finally, one commenter urged the Department to ensure that the final regulations further the objectives of student access and success, and promote quality

educational programs.

*Discussion:* We are confident that the regulations strengthening program integrity are in the best interest of students, consumers, and taxpayers, and will improve the quality of the programs offered at institutions by ensuring that all programs meet a threshold of quality. We believe that students, particularly disadvantaged, high-need students who are the most vulnerable, are not well served by enrollment in programs that leave them with limited or low-paying job prospects and with crushing debt that they are unable to repay. Students who complete their educational programs should not expect results that leave them in a worse situation than when they began their educational programs. We believe the regulations will hold institutions accountable and ensure that students can have confidence in the quality of the educational programs in which they invest their time, energy, and money. The Department has a fiscal responsibility to American taxpayers to ensure the value of education provided by all institutions and programs that are eligible for Federal student aid, regardless of whether they are public, private nonprofit, or proprietary institutions, and these regulations will aid the Department in achieving the best possible return on taxpayers' investment.

*Changes:* None.

**Gainful Employment in a Recognized Occupation (§§ 600.2, 600.4, 600.5, 600.0, 668.6, and 668.8) Gainful Employment Reporting and Disclosure Requirements (§ 668.6)**

Back to Top

**General**

*Comment:* Many commenters believed that the proposed reporting and disclosure requirements should apply to all programs, regardless of the type of institution or credential awarded, or whether the programs are otherwise subject to the gainful employment provisions. Alternatively, other commenters maintained that since these requirements were targeted to prevent known abuses in the for-profit sector, they should apply only to those institutions.

A number of commenters supported the proposed requirements and Web-based disclosure approach. Some of the commenters urged the Department to require institutions to provide the information under § 668.6(b) in a clear, prominent, user-friendly, and easily understood manner. The commenters also recommended that this information be given directly to prospective students prior to enrolling or making a verbal or written commitment to enroll. Other commenters made similar suggestions including making the information available in a prominent, clear, and conspicuous location in the first promotional materials conveyed to prospective

students. Another commenter believed that disclosures could be helpful if they are offered early in the process and are clear and conspicuous. However, the commenter opined that there is virtually no evidence that disclosures impact consumer decision making in a meaningful way. The commenter further stated that the fiction that disclosures are sufficient to regulate markets is especially apparent for low-literate consumers, citing an example where a client was pressured to enroll in a medical assisting program at a for-profit institution even though she dropped out of school in the 9th grade and had a 6th grade reading level. The student did not complete the program, never found work, and defaulted on her loans. The commenter concluded that disclosures are not an adequate counterweight to school overreaching and are useful only in conjunction with substantive standards.

*Discussion:* As we noted in the NPRM for these regulations (75 FR 34808-34809), the reporting and disclosure requirements in § 668.6 apply only to programs that prepare students for gainful employment, as provided under sections 102(b) and (c) and 101(b)(1) of the HEA.

With regard to the comments on how an institution should disclose on its Web site the information required in § 668.6(b), and when it would be most beneficial to students to receive this information, we expect institutions to abide by the intent of the provisions—to enable students to make an informed choice about a program—by making the disclosures in a clear, timely, and meaningful manner. To this end, and to help ensure that the disclosures are easily accessible, an institution must prominently provide the required information on the home page of its program Web site and provide a prominent and direct link to this page on any other Web page about a program. The information displayed must be in an open format that can be retrieved, downloaded, indexed, and searched by commonly used Web search applications. An open format is one that is platform-independent, is machine-readable, and is made available to the public without restrictions that would impede the reuse of that information.

In addition, we agree with the suggestion that an institution should be required to make this information available in the promotional materials ☐ conveyed to prospective students. To promote the goal of facilitating informed choice, the disclosure must be simple and meaningful.

The Department intends to develop in the future a disclosure form and will be seeking public comment about the design of the form through the information collection process under the Paperwork Reduction Act of 1995 (PRA). While the form will

be developed through that process, the regulations require institutions to provide clear and prominent notice, delivered to students at appropriate times and in promotional materials prior to enrollment. Until a form is developed and approved under the PRA process, institutions must comply with these disclosure requirements independently. In addition, we agree with the comments that disclosures alone are likely to be inadequate and have proposed to establish program performance standards in our NPRM on Program Integrity—Gainful Employment that was published in the **Federal Register** on July 26, 2010 (75 FR 43616).

*Changes:* Section 668.6(b) has been revised to provide that an institution must prominently provide the information it is required to disclose about a program in a simple and meaningful manner on the home page of its program Web site, and provide prominent and direct links to this page on any other Web page containing general, academic, or admissions information about the program. The revised provision also states that an institution must use the disclosure form developed by the Secretary when it becomes available and the disclosure information must be displayed on the institution's Web site in an open format that can be retrieved, downloaded, indexed, and searched by commonly use Web search applications. An open format is one that is platform-independent, is machine-readable, and is made available to the public without restrictions that would impede the reuse of that information.

Finally, § 668.6(b) has been revised to provide that an institution must make the information available in the promotional materials conveyed to prospective students.

**Placement Rates**

*Comment:* Many commenters objected to using the placement rate calculation in § 668.8(g) arguing that it is overly burdensome and administratively complex. The commenters opined that tracking a student for 180 days after graduation for a period of 13 weeks was too long and believed that it would be virtually impossible for the Department or any other auditor to affirm the accuracy of the placement data because the tracking period represents nothing more than a snap-shot of how many students were employed for 13 weeks at the time the data was collected. The commenters asserted that if the Department requires placement information to be disclosed to students, the information that an institution currently provides to its accrediting agency, which routinely assesses that information, would be more accurate. In addition, the

commenters were concerned about potential conflicts with the misrepresentation provisions in subpart F of part 668 on the grounds that any placement rate disclosed to students would be obsolete as soon as it was posted to an institution's Web site. Some of the same commenters objected to the proposed alternative of relying on State-sponsored workforce data systems arguing that there is no consistency between the States that maintain employment outcome data, and that in many cases the data collected fails to provide a full and accurate depiction of the demand, growth, and earnings of key occupations.

A number of commenters opposed using the placement rate calculation in § 668.8(g) arguing that it is a highly restrictive measure developed solely for extremely short programs offered by a few institutions. The commenters noted that an institution is already required under § 668.41(d)(5) to disclose any placement rates it calculates and that it would be confusing to students to disclose any additional rates beyond those that it is required to calculate under accrediting agency or State requirements. Some of these commenters suggested that in cases where an institution is not required by its accrediting agency to calculate placement rates, the institution should calculate the rates using a methodology from a national accrediting agency or the State in which the institution is authorized to operate. Under either the agency or State methodology, the commenters requested flexibility in determining the rates for degree programs because employment opportunities for graduates of degree programs are much more diverse than for graduates of occupationally specific training programs.

One commenter stated that its institution's mission of educating working adults is at odds with the concept of placement rates—many of the institution's students are already employed and enroll to enhance their careers through further education. In addition, the commenter stated that it would be impractical to administer a job placement regime for students taking online programs who reside throughout the world. The commenter recommended that placement rates be calculated in accordance with an institution's accrediting agency or State requirements, but that the proposed disclosures should not apply where there are no agency or State requirements. As an alternative, the commenter suggested that regionally accredited institutions, which are not required to track employment outcomes, conduct post graduation surveys asking program graduates if they are working in their field. An affirmative response would count as a "placement" even if the graduate maintained the same

employment he or she had while attending the institution. Along the same lines, another commenter suggested that the Department allow an institution that is not required by an outside agency to calculate placement rates, to develop and implement a method that best reflects the make-up of its student body, including surveys, collecting employer documentation, or other methods.

One commenter objected to using the placement rate calculation intended for short-term programs in § 668.8(g) because all of its programs were at or above the baccalaureate level. While the commenter stated that requiring public disclosure of relevant outcomes puts pressure on an institution to ensure that it is providing a good education to its students, the commenter suggested that unless an institution's accrediting agency or State requires it to disclose placement rates, the institution should only disclose rates that it calculates on an annual basis for internal purposes or any employment or placement information it receives from surveying its students. Another commenter made the same suggestions and asked the Department to clarify that placement rates would only need to be updated annually.

Another commenter argued that the placement rate methodology in § 668.8(g) was never intended for gainful employment purposes and made several recommendations including:

(1) Excluding from the total number of students who completed a program during an award year, the students who are unable to seek employment due to a medical condition, active military duty, international status, continuing education, incarceration, or death. In addition, an institution could exclude those graduates who certify they are not seeking employment or those that it is unable to locate. The commenter specified the documentation an institution would have to obtain for each of these exclusions.

(2) Removing the requirement in § 668.8(g)(1)(iii) that a student must be employed, or have been employed, for 13 weeks and allowing students to find employment within 6 months from the last graduation date in the award year.

(3) Replacing the employer certification, income tax form, and Social Security provisions in § 668.8(g)(3) with other ways that an institution would verify that a student obtained gainful employment.

Several commenters suggested using the methodology developed by a national accrediting agency because the proposed method in § 668.8(g) does not take into

consideration circumstances that would prevent graduates from seeking employment, such as health issues, military deployment or continuing education, or practical issues related to the employment of international or foreign students.

Several commenters stated it would be difficult, if not impossible, for these institutions to obtain the data needed to calculate placement rates. Some of these commenters supported the use of State-sponsored workforce data systems, but cautioned that many community colleges would not be able to obtain sufficiently detailed placement information through data matches with these systems to satisfy the proposed requirements. Other commenters noted that some States do not have workforce data systems, so institutions in those States would have to use the non preferred placement rate methodology under § 668.8(g). Many of the commenters believed the requirement to document employment on a case-by-case basis under § 668.8(g)(2) would be overly burdensome and labor intensive. Others opined that the placement provisions are counterproductive, claiming that a substantial number of community colleges eschewed participating in programs under the Workforce Investment Act because of placement rate requirements. On the other hand, another commenter supported the placement rate provisions and recommended that all institutions in a State participate in a workforce data system, if the State has one. The commenter asked the Department to clarify how the data obtained from a workforce data system would be used to meet the placement rate requirements and the timeline for reporting those rates. In addition, the commenter suggested revising the placement rate provisions in § 668.8(g) to more closely align those provisions with practices used by State data systems.

One commenter stated that in order to receive Federal funding under the Carl D. Perkins Career and Technical Education Act, a program must receive State approval that entails a review of documentation requiring that the program be high demand, high wage or in an emerging field. As part of the State review, the institution provides documentation of potential placement. The commenter recommended that the Department waive the gainful employment provisions for all certificate programs approved by the State under this review process.

A commenter supported disclosing placement rate data, but noted that the institution would only be able to report on graduates who are employed in the State or continued their education. The institution would not be able to provide occupationally specific placement data, or data about graduates who find employment outside the State, because the

State's labor data base only tracks (1) the type of business a graduate is employed by, not the occupation of the graduate, and (2) graduates who are employed in the State.

Several other commenters supported the proposed placement rate disclosures, but believed that the provisions in § 668.8(g) were inadequate. The commenters made several suggestions, including:

(1) Expanding the category of students who complete a program (currently in § 668.8(g)(1)(i)) to include students who are eligible for a degree or certificate. The commenters stated they are aware of institutions that delay providing the degree or certificate to students, which omits these students from the placement rate calculation.

(2) Specifying that the time standards in § 668.8(g) (employment within 180 days of completing a program and employment for 13 weeks) also apply to rates calculated from State workforce data systems.

(3) Specifying that employment must be paid. The commenters stated they are aware of institutions that have counted students in unpaid internships as being employed.

(4) To be counted in the placement rate, providing that a student must find employment in one of the SOC codes identified for the program unless the student finds a job that pays more than any of the identified SOC codes. The commenters believed that some institutions stretch the concept of a "related" comparable job as currently provided in § 668.8(g)(1)(ii). For example, an institution might include any job at a hospital, including the lowest paying jobs, when the student was trained for a skilled job such as an x-ray technician. The higher earnings recommendation would condition a successful placement but allow an institution to count a student employed in an unrelated SOC.

(5) To address the situation where a student cannot qualify for employment until he or she passes a licensing or certification examination, providing that the 180-day period during which the student would otherwise have to find employment should start after the results of the examination are available.

(6) To be counted in the placement rate, specifying that a student must work for at least 32 hours per week. The commenters stated that they are aware of institutions that include as successful placements any student that works at any time during a week, even if it is only for a few hours per week.

(7) Specifying that institutions must use a State data system if it is available to ensure accurate reporting.

(8) If the institution chooses to demonstrate placement rates by salary, providing that documentation must include signed copies of tax returns, W-4s or paystubs to document earnings.

(9) To more thoroughly substantiate placement rates, requiring the auditor who performs the institution's compliance audit under § 668.23 to directly contact former students and employers whose statements were obtained by the institution.

*Discussion:* We are persuaded by the comments that using the methodology in § 668.8(g) may not be the most appropriate method for determining the placement rate for the majority of the programs that are subject to the gainful employment provisions. Moreover, in view of the varied suggestions for how the rate should be calculated, documented, and verified, in early 2011 we will begin the process for developing the method to calculate placement rates for institutions through the National Center for Education Statistics (NCES). These final regulations establish some reporting requirements using existing placement data as explained below, with a transition in a later period for institutions to disclose placement rates obtained from the NCES methodology. NCES will develop a placement rate methodology and the processes necessary for determining and documenting student employment and reporting placement data to the Department using the Integrated Postsecondary Education Data System (IPEDS).

NCES employs a collaborative process that affords the public significant opportunities to participate in making, and commenting on, potential changes to IPEDS. Potential changes are ☐ examined by the IPEDS Technical Review Panel (TRP), which is a peer review panel that includes individuals representing institutions, education associations, data users, State governments, the Federal government, and other groups. The TRP meets to discuss and review IPEDS-related plans and looks at the feasibility and timing of the collection of proposed new items, added institutional burden, and possible implementation strategies. After each meeting, a meeting report and suggestions summary is posted to the IPEDS Web site. The postsecondary education community then has 30 days to submit comments on the meeting report and summary. After those comments are considered, the Department requests the Office of Management and Budget (OMB) to include the changes in the next IPEDS data collection. This request for forms clearance is required by the Paperwork Reduction Act of 1995, as amended. A description of the changes and the associated institutional reporting burden is included in the request which is then published by OMB as a notice in the **Federal Register**, initiating a 60-day public

comment period. After that, a second notice is published in the **Federal Register**, initiating a 30-day public comment period. Issues raised by commenters are resolved, and then OMB determines whether to grant forms clearance. Only OMB cleared items are added to the IPEDS data collection.

Although we agree with the commenters that the data maintained or processes used by workforce data systems may vary State by State, and that the data systems are not available to all institutions or in all States, we continue to believe that these data systems afford participating institutions an efficient and accurate way of obtaining employment outcome information. However, because of State-to-State variances and in response to comments about how employment outcome data translate to a placement rate, NCES will develop the methods needed to use State employment data to calculate placement rates under its deliberative process for IPEDS.

Until the IPEDS-developed placement rate methodology is implemented, an institution that is required by its accrediting agency or State to calculate a placement rate, or that otherwise calculates a placement rate, must disclose that rate under the current provisions in § 668.41(d)(5). However, under new § 668.6(b), the institution must disclose on its Web site and promotional materials the placement rate for each program that is subject to the gainful employment provisions if that information is available or can be determined from institutional placement rate calculations. Consequently, to satisfy the new disclosure requirements, an institution that calculates a placement rate for one or more programs would disclose that rate under § 668.6(b) by identifying the accrediting agency or State agency under whose requirements the rate was calculated. Otherwise, if an accrediting agency or State requires an institution to calculate a placement rate only at the institutional level, the institution must use the agency or State methodology to calculate the placement rate for each of its programs from information it already collects and must disclose the program-specific placement rates in accordance with § 668.6(b).

*Changes:* Section 668.6(b) has been revised to specify that an institution must disclose for each program the placement rate calculated under a methodology developed by its accrediting agency, State, or the National Center for Education Statistics (NCES). The institution must disclose the accrediting agency or State-required placement rate beginning on July 1, 2011 and must identify the accrediting agency or State agency under whose requirements the rate was calculated. The NCES-developed placement rate would have to be disclosed when the

rates become available.

## On-Time Completion Rate

*Comment:* Many commenters asked the Department to clarify the meaning of "on-time" completion rate. Other commenters assumed that "on-time" completion referred to the graduation rate currently calculated under the Student Right to Know requirements in § 668.45, or encouraged the Department to either (1) adopt the current requirements in § 668.45 for gainful employment purposes, or (2) use a completion rate methodology from an accrediting agency or State, to minimize confusion among students and burden on institutions. One of the commenters suggested that if the Department intended "on-time" to mean 100 percent of normal time for completion, then the proposed rate should be calculated in the same manner as the completion rate in § 668.45 for normal time and incorporate the exclusions for students transferring out of programs and other exceptions identified in § 668.45(c) and (d). Another commenter opined that absent significant enforcement to ensure that all institutions consistently use the same definition of "on-time" completion rate, students will be unfairly led to believe that institutions who report conservatively have less favorable outcomes than institutions who report aggressively. One commenter cautioned that it may be misleading to focus heavily on graduation and placement rates, particularly for institutions whose students are employed while seeking a degree.

A number of commenters supported the "on-time" completion requirement, and in general all of the proposed disclosures, stating that providing outcome data would allow prospective students to make more informed decisions. The commenters believed that better outcome data will help to ensure that the taxpayer investment is well spent, and that students are protected from programs that overcharge and under-deliver.

A commenter stated that under State licensing requirements for cosmetology schools a student must be present, typically for 1,500 hours, to qualify for graduation and to complete the program. Taking attendance and ensuring that a student is present for these hours is typically required. The commenter reasoned that for a student to complete the program "on-time" the student could not miss a single day or even be late for classes as opposed to a credit hour program where a student does not have to attend classes 100 percent of the time but will still be considered to satisfy the on-time requirement. To mitigate the difference between clock and credit hour programs and account for legitimate circumstances where a

student would miss classes, the commenter suggested that the standard for "on-time" incorporate the concept of a maximum timeframe under the satisfactory academic progress provisions that allow a student to complete a program at a specified rate.

*Discussion:* In proposing the on-time completion rate requirement, the Department intended to include all students who started a program to determine the portion of those students who completed the program no later than its published length. This approach differed significantly in two ways from the completion rate under the Student Right to Know (SRK) provisions in § 668.45. First, in calculating the completion rate the SRK methodology includes in the cohort only full-time, first-time undergraduate students, not all students. Second, the SRK rate is based on 150 percent of normal time, not the actual length of the program. However, in view of the comments suggesting that we use the SRK methodology, or a modified version, we examined whether the cohort of students under SRK could be expanded to include all students and from that, ▯ whether a completion rate could be calculated based on normal time, as defined in § 668.41(a). We concluded that doing this would be difficult and too complex for institutions and the Department.

We believe prospective students should know the extent to which former students completed a program on time, not only to ground their expectations but to plan for the time they will likely be attending the program—an important consideration for many students who cannot afford to continue their education without earnings from employment. Therefore, to minimize burden on institutions while providing meaningful information to prospective students, an institution must calculate an on-time completion rate for each program subject to the gainful employment provisions by:

(1) Determining the number of students who completed the program during the most recently completed award year.

(2) Determining the number of students in step (1) who completed the program within normal time, regardless of whether the students transferred into the program or changed programs at the institution. For example, the normal time to complete an associate degree is two years. The two-year timeframe would apply to all students who enroll in the program. In other words, if a student transfers into the program, regardless of the number of credits the institution accepts from the student's attendance at the prior institution, the transfer credits have no bearing on the two-year timeframe. This student would still have two years to complete from the date he or she began attending the two-year program.

To be counted as completing on time, a student who enrolls in the two-year program from another program at the institution would have to complete the two-year program in normal time beginning from the date the student started attending the prior program.

(3) Dividing the number of students who completed within normal time in step (2) by the total number of completers in step (1) and multiplying by 100.

With regard to the commenter who believed that a student could not miss a single day of classes to complete a program on time, we note that under § 668.4(e) a student can be excused from attending classes. Under this section, a student may be excused for an amount of time that does not exceed the lesser of (1) any thresholds established by the institution's accrediting agency or State agency, or (2) 10 percent of the clock hours in a payment period. Absent any State or accrediting agency requirements, for a typical payment period of 450 clock hours a student could miss 45 hours. In the commenter's example of a 1,500 clock hour program, the student could miss 150 hours and still complete on time for this requirement. Also, under § 668.41(a), normal time for a certificate program is the time published in the institution's catalog and that time may include make-up days. So, an institution could schedule make-up days, as part of normal time, to enable students who missed classes to complete the number of hours required for State licensing purposes.

*Changes:* Section 668.6(b) has been revised to specify how an institution calculates an on-time completion rate for its programs.

## Median Loan Debt

*Comment:* Many commenters objected strongly to the requirement in proposed § 668.6(a)(4) that an institution report annually to the Department, for each student attending a program that leads to gainful employment, the amount each student received from private education loans and institutional financing plans.

With regard to private education loans taken out by students, the commenters argued that because the loans are self-certified, in many cases an institution is not aware of the loans and should only have to report the amount of the private loans it knows about or the amount of those loans that were paid directly to the institution. Commenters representing students and consumer advocacy groups contended that most institutions have preferred lender lists, help students arrange

private loans, recommend a lender, receive student payments from a lender, or otherwise have information about the lender. Consequently, to clarify that an institution cannot avoid reporting on private loans by feigned ignorance, the commenters suggested that an institution report any private loan it knows about or should reasonably know about. To clarify the meaning of "private education loan" one commenter suggested that the Department reference the definition in § 601.2.

With regard to institutional financing plans, many commenters, argued that an institution should only be required to report the amount of any remaining institutional loans or debt obligations owed by a student after he or she completes the program, not the amount of the loan or credit extended to the student at the start of, or during, the program.

Many commenters asked the Department to clarify whether median loan debt would include only loan debt incurred by students who completed a particular program or loan debt incurred from previously attended programs or institutions. Some of the commenters argued that it would be difficult to determine the relevant loan debt of students who enroll in postbaccalaureate certificate programs and end up concurrently pursuing an associated master's degree. The commenters argued that extracting the portion of debt that applies to the certificate would be difficult, but reporting based on the total debt accumulated during the graduate-level enrollment period would overstate the amount borrowed if the intent was to report on the certificate program. They also believed that an institution would have to track loan debt pertaining to credits accepted for a program that were not necessarily earned by students who continue in a graduate program, including transfer credits accepted from other institutions. In addition, the commenters believed that for any undergraduate work that "transfers up," the portion of the loan debt from that period would have to be identified. In view of these complexities and considering that two-year transfer programs are excluded from the reporting requirements, the commenters requested a similar exclusion for graduate certificate programs where the credits apply directly to a graduate degree. Along the same lines, other commenters requested that postbaccalaureate certificate programs or courses such as a certification as a school principal, district superintendent, or director of instruction be exempted from these regulations.

A commenter requested an exemption for four-year degree-granting institutions stating that such institutions only have a

handful of certificate programs that would be of no concern to the Department.

A few commenters believed that institutions should either (1) be allowed to disclose separately the amount of loan debt students accumulate for institutional charges and the amount incurred for living expenses, or (2) not be required to disclose loan debt incurred for living expenses because that debt is incurred at the student's discretion and not be required to disclose loan debt incurred by a student at prior, unrelated institutions.

Other commenters urged the Department to use the mean instead of the median loan debt arguing that using median debt would unjustly penalize students attending institutions with larger numbers of borrowers by ☐ providing a competitive advantage to institutions with smaller populations of student loan borrowers.

Many commenters supported the proposed requirement for disclosing the median debt of students who complete a program, but suggested that institutions should also disclose the median debt of noncompleters. The commenters stated that it was one thing for students to be told that 40 percent graduate with $20,000 in loan debt, but it's another for them to understand that the majority of students who don't complete have $15,000 in loan debt they would have to repay. The commenters believed that separating the disclosures by completers and noncompleters would enable better comparisons between programs, and would not create the appearance of low median debt for programs with low completion rates. In addition, to minimize burden the commenters suggested that collecting the data needed to calculate the median loan debt could appropriately be limited to programs in which a significant share of students borrow. According to the commenters, this approach would ensure that potential students and the Department know when a program has high student borrowing rates and low completion rates.

*Discussion:* We agree with the commenters that the debt an institution reports under § 668.6(a)(4) for institutional financing plans is the amount a student is obligated to repay upon completing the program. Under this same section, an institution must also report the amount of any private education loans it knows that students received.

The HEOA amended both the HEA and the Truth-in-Lending Act (TILA) to require significant new disclosures for borrowers of private education loans. The HEOA also requires private education lenders to obtain a private loan self-certification

form from every borrower of such a loan before the lender may disburse the private education loan.

Although the term "private education lender" is defined in the TILA, the Federal Reserve Board considers an entity to be a private education lender, including an institution of higher education, if it meets the definition of "creditor." The term "creditor" is defined by the Federal Reserve Board in 12 CFR 226.2(a)(17) as a person who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments (not including a down payment), and to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract. A person regularly extends consumer credit only if it extended credit more than 25 times (or more than 5 times for transactions secured by a dwelling) in the preceding calendar year. If a person did not meet these numerical standards in the preceding calendar year, the numerical standards must be applied to the current calendar year.

The term *private education loan* is defined in 12 CFR 226.46(b)(5) as an extension of credit that:

- Is not made, insured, or guaranteed under title IV of the HEA;

- Is extended to a consumer expressly, in whole or in part, for postsecondary educational expenses, regardless of whether the loan is provided by the educational institution that the student attends;

- Does not include open-end credit or any loan that is secured by real property or a dwelling; and

- Does not include an extension of credit in which the covered educational institution is the creditor if (1) the term of the extension of credit is 90 days or less (short-term emergency loans) or (2) an interest rate will not be applied to the credit balance and the term of the extension of credit is one year or less, even if the credit is payable in more than four installments (institutional billing plans).

Examples of private education loans include, but are not limited to, loans made expressly for educational expenses by financial institutions, credit unions, institutions of higher education or their affiliates, States and localities, and guarantee agencies.

As noted previously, the HEOA requires that before a creditor may consummate a private education loan, it must obtain a

self-certification form from the borrower. The Department, in consultation with the Federal Reserve Board, developed and disseminated the private loan self-certification form in Dear Colleague Letter GEN 10-01 published in February of 2010.

The Department's regulations in 34 CFR 601.11(d), published on October 28, 2009, require an institution to provide the self-certification form and the information needed to complete the form upon an enrolled or admitted student applicant's request. An institution must provide the private loan self-certification form to the borrower even if the institution already certifies the loan directly to the private education lender as part of an existing process. An institution must also provide the self-certification form to a private education loan borrower if the institution itself is the creditor. Once the private loan self-certification form and the information needed to complete the form are disseminated by the institution, there is no requirement that the institution track the status of a borrower's private education loan.

The Federal Reserve Board, in 12 CFR 226.48, built some flexibility into the process of obtaining the self-certification form for a private education lender. The private education lender may receive the form directly from the consumer, the private education lender may receive the form from the consumer through the institution of higher education, or the lender may provide the form, and the information the consumer will require to complete the form, directly to the borrower. However, in all cases the information needed to complete the form, whether obtained by the borrower or by the private education lender, must come directly from the institution.

Thus, even though an institution is not required to track the status of its student borrowers' private education loans, the institution will know about all the private education loans a student borrower receives, with the exception of direct-to-consumer private education loans, because most private education loans are packaged and disbursed through the institution's financial aid office. The institution must report these loans under § 668.6(a)(4). Direct-to-consumer private education loans are disbursed directly to a borrower, not to the school. An institution is not involved in a certification process for this type of loan.

We wish to make clear that any loan, extension of credit, payment plan, or other financing mechanism that would otherwise not be considered a private education loan but that results in a debt obligation that a student must pay to an institution after completing a program, is considered a loan

debt arising from an institutional financing plan and must be reported as such under § 668.6(a)(4).

The Department will use the debt reported for institutional financing plans and private education loans along with any FFEL or Direct Loan debt from NSLDS that was incurred by students who completed a program to determine the median loan debt for the program. In general, median loan debt for a program at an institution does not include debt incurred by students who attended a prior institution, unless the prior and current institutions are under common ownership or control, or are otherwise related entities. In cases where a student changes programs while attending an institution or matriculates to a higher credentialed program at the institution, the Department will associate the total ☐ amount of debt incurred by the student to the program the student completed. So, in the commenter's example where a student enrolls in a postbaccalaureate certificate program and is concurrently pursuing a master's degree, the debt the student incurs for the certificate program would be included as part of the debt the student incurs for completing the program leading to a master's degree. If the student does not complete the master's degree program, but completes the certificate program, then only the debt incurred by the student for the certificate program would be used in determining the certificate program's median loan debt.

The Department will provide the median loan debt to an institution for each of its programs, along with the median loan debt identified separately for FFEL and Direct Loans, and for private education loans and institutional financing plans. The institution would then disclose these debt amounts, as well as any other information the Department provides to the institution about its gainful employment programs, on its Web site and in its promotional materials to satisfy the requirements in § 668.6(b)(5).

While we generally agree with the suggestion that disclosing the median loan debt for students who do not complete a program may be helpful to prospective students, determining when or whether students do not complete is problematic for many programs even for students who withdraw or stop attending during a payment period—those students may return the following payment period. Because further review and analysis are needed before we could propose a requirement along these lines, institutions will need to report the CIP code for every student who attends a program subject to the gainful employment provisions and the total number of students who are enrolled in each of its programs at the end of

an award year.

In cases where a student matriculates from one program to a higher credentialed program at the same institution, the Department will associate all the loan debt incurred by the student at the institution to the highest credentialed program completed by the student. To do this, the institution must inform the Department that even though a student completed a program, the student is continuing his or her education at the institution in another program. We wish to make clear that an institution would still need to provide the information under § 668.6(a) about each program the student completes. The Department will include the student's loan debt in calculating the median loan debt for the program the student most recently completed, or delay including the student's associated loan debt in calculating the median loan debt for the higher credentialed program. The Department will include the student's associated debt for the higher credentialed program when the student completes that program. If the student does not complete the higher credentialed program, then only the loan debt incurred by the student for completing the first program would be used in calculating the median loan debt for the first program.

Similarly, in cases where a student transfers from school A to school B, the Department will delay including the loan debt incurred by a student attending a program at school A pending the student's success at school B. If the student completes a higher credentialed program at school B, the median loan debt for that program includes only the student's loan debt incurred at school B. If the student does not complete the program at school B, then only the student's loan debt incurred for completing the program at school A is included in calculating the median loan debt for the program at school A. In other words, a student who completes a program and continues his or her education at the same institution or at another institution is considered to be in an in-school status and we will delay using the student's loan debt until the student completes a higher credentialed program or stops attending. The following chart and discussion illustrate this process.

| School A | | | School B | | | |
|---|---|---|---|---|---|---|
| Student | | Loan debt | | | Loan debt | |
| | Certificate | $3,000 | Completed | Degree | $4,000 | Complet |
| 1 | | | Yes | | | Yes |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2 | | | Yes | | | No |
| 3 | | | Yes | | | Yes |
| Same School | | | | | | |
| 4 | | | Yes | | | Yes |
| 5 | | | Yes | | | No |
| 6 | | | Yes | | | Yes |

*Student 1.* Student is in an in-school status until the degree program is completed at School B. School A and B would report loan debt for each of their programs. Only the $4,000 debt incurred by the student at School B would be included in the median loan debt calculation for the degree program (highest credential completed). The student's loan debt at School A would not be included in calculating the median loan debt for the certificate program.

*Student 2.* Student is in an in-school status while attending School B, but does not complete the degree program. Only the $3,000 debt incurred by the student at School A would be included in the median loan debt calculation for the certificate program. The student's loan debt at School B would not be included in calculating the median loan debt for the degree program because the student did not complete that program.

*Student 3.* Student is in an in-school status while attending School B, but the degree program at School B is not subject to the gainful employment provisions. When the student completes the degree program, none of the student's debt would be included in the median loan debt calculation for the certificate program and no calculation would be performed for the degree program because it is not subject to the gainful employment provisions.

*Student 4.* Student is in an in-school status until the degree program is completed. All of the student's debt at ☐ the school is associated to the degree program and included in the median loan debt calculation for the degree program. None of the student's debt is included in calculating the median loan debt of the certificate program.

*Student 5.* Student is in an in-school status while attending the degree program, but does not complete that program. Only the $3,000 debt incurred by the student for completing the certificate program would be included in the median loan debt calculation for that program. None of the student's debt would

be included in the median loan debt calculation for the degree program because the student did not complete that program.

*Student 6.* Student is in an in-school status while attending the degree program, but the degree program is not subject to the gainful employment provisions. When the student completes the degree program, none of the student's debt would be included in the median loan debt calculation for the certificate program and no calculation would be performed for the degree program because it is not subject to the gainful employment provisions.

The Department disagrees with the suggestions that an institution should not be required to disclose loan debt incurred by students for living expenses because many students cannot afford to enroll in a program without borrowing to pay for living expenses and other education-related costs. Identifying only a portion of the loan debt that a student is likely to incur not only defeats the purpose of the disclosure but also may be misleading. With respect to the comments that loan debt related to living expenses should be disclosed separately from loan debt tied directly to institutional charges, we are concerned about how institutions would make or portray these disclosures and believe that separating the debt amounts would be confusing to prospective students.

We find little merit in the argument that using median loan debt, instead of mean loan debt, would provide a competitive advantage to institutions with fewer student loan borrowers. Assuming that an institution with fewer borrowers has the same enrollment as an institution with a large number of borrowers, then regardless of whether the mean or the median is used, the loan debt will be lower for an institution with fewer borrowers because all of the students who do not borrow would reduce its mean or median loan debt.

When these regulations take effect on July 1, 2011, the Department will require institutions to report no later than October 1, 2011 the information described in § 668.6(a) for the 2006-07, 2007-08, and 2008-09 award years. In accordance with the record retention requirements under § 668.24(e), most institutions should have the required information. We note that many institutions may have an existing practice of keeping student records for longer periods, or do so for State or accrediting purposes. If an institution has the records for the earlier periods, it must report the information described in § 668.6(a). Institutions that are not otherwise required to maintain the information for the 2006-07 award year described in § 668.6(a) at the time this regulation goes into

effect on July 1, 2011, should consider doing so for their own purposes. In any case, if an institution is unable to report all or some the required information, it must provide an explanation of why the missing information is not available.

*Changes:* Section 668.6(a) has been revised to provide that in accordance with procedures established by the Secretary, an institution must provide (1) information for the award year beginning on July 1, 2006 and subsequent award years, (2) information about whether a student matriculated to a higher credentialed program at the institution, (3) if it has evidence, information that a student transferred to a higher credentialed program at another institution, and (4) if the institution is unable to report required information, an explanation of why the missing information is not available.

### Student Information Database

*Comment:* Several commenters questioned the Department's ability to collect data under section 134 of the HEA which prohibits the Department from developing, implementing, or maintaining a Federal database of personally identifiable information. The commenters claimed that obtaining identifying information on program completers by CIP code and program completion date would constitute a violation of section 134 of the HEA. Some of the commenters suggested that institutions provide only aggregate information for individuals by CIP code and opined that the completion date was not necessary and should be removed. These commenters reasoned that the Department should use existing information, such as enrollment and loan repayment data in NSLDS and in any other systems, to determine when students are enrolled or have completed their program. Another commenter cited section 134 of the HEA as a reason why an institution should not be required to provide information on private or institutional loans.

Because section 134 of the HEA exempts existing systems that are needed to operate the student aid programs, some commenters asked the Department to clarify which current systems would be used to gather the information requested under proposed § 668.6(a). Several of the commenters did not believe that institutions should have to collect and report information for students who completed their programs in the past three years and requested that the information be prospective (students who begin attending a program after July 1, 2011).

*Discussion:* Section 134 of the HEA places restrictions on the

Department's ability to develop, implement, or maintain a new database of personally identifiable information about individuals attending institutions and receiving title IV, HEA program funds, including systems that track individual students over time. It does not prohibit the Department from including such information in an existing system that is necessary for the operation of the Federal student aid programs. In this case, the information being reported is already a part of the information that is maintained by institutions in their student financial aid and academic records, and is subject to compliance and program reviews. Institutions reporting that students have started or completed a program for which those students received title IV, HEA program funds will augment the existing information in the Department's systems that are used to monitor and maintain the operations for the title IV, HEA programs. The information is also being compiled to create aggregate information to evaluate whether a program demonstrates that it leads to gainful employment for its students, rather than to monitor the individual students attending those programs over time. For those reasons, the reporting and use of this information is not prohibited under the law.

*Changes:* None.

## Links to O*Net

*Comment:* Several commenters agreed it was important to inform students and the public about possible job opportunities that could result from enrolling in a program, but were concerned that the proposed requirement would not serve to accurately inform students. Some of the commenters believed that the proposed requirements might work for some programs like teaching and nursing. However, for graduate-level programs, like MBAs and PhDs in Psychology, institutions would be required to provide an unwieldy amount of data. For example, it would be impossible for an institution to identify and disclose the full range and number of job opportunities that might exist for MBA graduates. As an alternative, the commenters suggested that the Department require schools to disclose the types of employment found by their graduates in the preceding three years. Other commenters had similar concerns and suggested that instead of disclosing all occupations by name and SOC code, the Department should allow an institution to disclose a sampling or representative set of links for the occupations stemming from its programs. Otherwise, the commenters were concerned that an institution would run afoul of the

misrepresentation provisions unless it fully and completely listed all of the SOC and O*NET codes related to each program offered at the institution. Another commenter suggested that an institution should only list those occupations in which a majority of its program completers were placed.

A commenter claimed that it would be confusing and misleading to provide information on hundreds of jobs. To illustrate this point, the commenter stated that entering a CIP code of 52 for "Business, Management, Marketing and Related Support Services" would lead to 86 codes representing more than 300 occupational profiles. To avoid confusing students, the commenter suggested that an institution provide links only to those careers where its students have typically found employment.

One commenter thought that the link to O*Net was unnecessary because students could use search engines to research potential jobs.

Another commenter supported the O*NET disclosures because the additional administrative burden was not significant and the change was long overdue.

*Discussion:* In general, we do not believe that the links to O*NET will lead to an unwieldy amount of information when the full 6-digit CIP code is entered on the SOC crosswalk at *http://online.onetcenter.org/crosswalk/*. For example, entering the full 6 digit CIP code, 52.9999, for Business, Management, Marketing and Related Support Services, identifies only nine related occupations (SOCs). As shown below, it is these links to, and the names of, the nine occupations that an institution must post on its Web site.

52.9999Business, Management, Marketing, & Related Support Services, Other

11-9151.00Social and Community Service Managers

11-9199.00Managers, All Other

13-1199.00Business Operations Specialists, All Other

41-1011.00First-Line Supervisors/Managers of Retail Sales Workers

41-1012.00First-Line Supervisors/Managers of Non-Retail Sales Workers

41-3099.00Sales Representatives, Services, All Other

41-4011.00Sales Representatives, Wholesale and Manufacturing, Technical and Scientific Products

41-4012.00Sales Representatives, Wholesale and
Manufacturing, Except Technical and Scientific Products

41-9099.00Sales and Related Workers, All Other

However, for 6-digit CIP codes that yield more than ten
occupations, an institution may, in lieu of providing links to all
the identified SOCs, provide links to a representative sample of
the SOCs for which its graduates typically find employment
within a few years after completing a program.

*Changes:* Section 668.6(b) has been revised to allow an
institution to provide prospective students with Web links to a
representative sample of the SOCs for which its graduates
typically find employment within a few years after completing
the program.

## Disclosing Program Costs

*Comment:* Many commenters supported the proposal to
disclose program costs. The commenters lauded this
information as more useful to students than disclosing costs by
credit hour or by semester and several commenters
encouraged the Department to make this section of the
regulations effective as soon as possible.

Some commenters indicated that the program costs in
proposed § 668.6(b)(2) differ from the costs an institution
makes available under § 668.43(g). The commenters suggested
that all costs that a student may incur should be disclosed
including charges for full-time and part-time students,
estimates of costs for necessary books and supplies as well as
estimated transportation costs. Other commenters asked the
Department to clarify how program costs under the proposed
Web site disclosures would be calculated differently than those
required in the student consumer information section of the
regulations. In addition, some of these commenters noted that
although § 668.43 requires an institution to disclose program
cost upon request, many students do not know to ask for it, or
the information is not currently presented in a clear manner.
Another commenter noted that the phrase "institutional costs"
could be interpreted to mean only those costs payable to the
institution and recommended that the phrase be changed to
"cost of attendance."

Several commenters opined that providing program costs
would confuse students. One of the commenters
recommended using just the net price calculator as that would
also ease institutional burden.

*Discussion:* Although we recently revised § 668.43(a) to

provide that an institution must make program cost information readily available, not just upon the request of a student, that section does not require the institution to disclose program costs on its Web site. All of the disclosures in § 668.6(b), including the disclosure of program costs, must be on the same Web page to enable a prospective student to easily obtain pertinent information about a program and compare programs. Along these lines, and in view of the recent GAO investigation (see *http://www.gao.gov/new.items/d10948t.pdf*) raising concerns over program cost information, § 668.6(b) specifically requires an institution to disclose on the same Web page (1) Links to O*NET identifying the occupations stemming from a program or Web links to a representative sample of the SOCs for which its graduates typically find employment within a few years after completing the program, (2) the on-time graduation rate of students completing the program, (3) the placement rate for students completing the program, (4) the median loan debt incurred by students completing the program, and (5) the costs of that program. The institution must disclose the total amount of tuition and fees it charges a student for completing the program within normal time, the typical costs for books and supplies (unless those costs are included as part of tuition and fees), and the cost of room and board if the institution provides it. The institution may include information on other costs, such as transportation and living expenses, but in all cases must provide a Web link, or access, to the institutional information it is required to provide under § 668.43(a).

*Changes:* Section 668.6(b) has been revised to provide that an institution must disclose, for each program, all of the required information in its promotional materials and on a single Web page. The institution must provide a prominent and direct link to this page on the program home page of its Web site or from any other page containing general, academic, or admissions information about the program. In addition, this section is revised to specify that an institution must disclose the total amount of tuition and fees it charges a student for completing the program within normal time, the typical costs for books and supplies (unless those costs are included as part of tuition and fees), and the amount of room and board, if applicable. The institution may include information on other costs, such as transportation and living expenses, but must provide a Web link, or access, to the program cost information it makes available under § 668.43(a).

**One-Year Program**

*Comment:* A commenter supported removing references to degree programs in proposed § 600.4(a)(4)(iii) believing it would avoid confusion and misrepresentation of the programs subject to the proposed regulations on gainful employment. Another commenter noted that for technical reasons the Department should have instead revised § 600.4(a)(4)(i)(C).

To better understand which programs would be subject to the reporting and disclosure requirements in proposed § 668.6, another commenter asked the Department to clarify whether the phrase "fully transferable to a baccalaureate degree" means that every credit must be transferable to that degree.

*Discussion:* A program is fully transferable to a baccalaureate degree if it meets the requirements in § 668.8(b)(1)(ii) and qualifies a student for admission into a third year of a bachelors degree program.

We agree that proposed § 600.4(a)(4)(iii) should be removed in order to avoid confusion and misrepresentation of the programs subject to the regulations on gainful employment. We also agree that § 600.4(a)(4)(i)(C) should be revised to state that an institution of higher education provides an educational program that is at least a one academic year training program that leads to a certificate, or other nondegree recognized credential, and prepares students for gainful employment in a recognized occupation.

*Changes:* Proposed § 600.4(a)(4)(iii) has been removed and § 600.4(a)(4)(i)(C) has been revised as noted in the discussion above.

**Definition of a Credit Hour (§§ 600.2, 602.24, 603.24, and 668.8)**

Back to Top

### General

*Comment:* Several commenters supported the Secretary's proposed definition of a credit hour, including a commenter representing institutional registrars and admissions officers. A few commenters believed that institutions are already using this definition. One commenter believed that the Secretary's definition aligned with New York State's regulatory definition of a semester hour.

*Discussion:* We appreciate the support of those commenters who approved of the definition of a credit hour. Like some commenters, we believe that many institutions and others, including States, are already following the definition of a credit hour or a reasonably comparable standard that would require minimal or no adjustment for purposes of participating in Federal programs.

*Changes:* None.

*Comment:* Several commenters believed that during the negotiated rulemaking process, Federal and non-Federal negotiators reached tentative agreement on proposed credit-hour regulations that did not include a definition of a credit hour. A few commenters believed that during the negotiated rulemaking process, most non-Federal negotiators were opposed to a Federal credit-hour definition. Several of these commenters believed that the Department should adhere to the proposed regulations agreed upon during the negotiated rulemaking process and should remove the credit-hour definition from the regulations.

Other commenters believed that the Federal and non-Federal negotiators agreed to proposed regulations that relied more heavily on accrediting agencies and institutions to determine credit assignment policies. These commenters believed that the proposed regulations did not appropriately reflect this position.

*Discussion:* The commenters are correct in noting that during the negotiated rulemaking process tentative agreement was reached on the proposal related to credit hours that did not include a definition of a credit hour as proposed by the Department. Tentative agreement was reached by removing the definition from the proposals to satisfy one non-Federal negotiator. The Federal and non-Federal negotiators tentatively agreed to proposed credit hour regulations that relied heavily on accrediting agencies and institutions in determining the appropriate credit hours that represented a student's academic work. We also agree with the commenters who proposed continuing this reliance to a significant degree, and we believe that this reliance is reflected in the final regulations. We note that tentative agreements reached during the negotiated rulemaking meetings are not binding on the Department in form or substance. It is not unusual for most if not all of the substance of a tentative agreement to be included in a proposed regulation because the Department sees the benefits that are realized through the discussion process. In some cases, though, changes may be made upon further reflection, or to reinstate concepts that may have been removed in furtherance of an overall consensus that was not achieved. In the case of the definition of a credit hour we determined that the proposed definition of a *credit hour* is necessary to establish a basis for measuring eligibility for Federal funding. This standard measure will provide increased assurance that a credit hour has the necessary educational content to support the amounts of Federal funds that are awarded to participants in Federal funding programs and that

students at different institutions are treated equitably in the awarding of those funds.

*Changes:* None.

## Institutional Determination and Flexibility

*Comment:* Many commenters believed that institutions and accrediting agencies should have the ultimate responsibility for determining academic credit. Several commenters believed that institutions must have the discretion to use their existing systems of self-review and faculty involvement to determine the appropriate credit to assign to academic activities. Some of these commenters also believed that institutional processes are solely capable of considering the unique qualities of each class, program, professor, and institution. Two commenters believed that any problems with credit assignment can be addressed through existing institutional review procedures.

A few commenters agreed with the provision in proposed paragraph (3) of the credit-hour definition allowing institutions to provide reasonable "equivalencies" for the amount of work specified in proposed paragraph (1) of the definition. Two of these commenters believed that this provision allows institutions to use alternative methods of instruction and measures of credit that are more appropriate for institutions with nontraditional students entering the modern workforce. These commenters suggested making proposed paragraph (3) the first paragraph in the credit-hour definition in § 600.2. Another of these commenters believed that this provision would allow institutions the flexibility to use and develop innovative forms of course content delivery.

Several commenters believed that a Federal definition of a credit hour would undermine the integrity of the American higher education system ⬚ which they believed has been effective at assigning credit for over 100 years. One commenter noted that the education community has been able to reach consensus on credit determinations despite the lack of a uniform definition.

Many commenters believed that credit hours are fundamentally measurements of academic achievement and others believed that the Secretary's only reason for defining a credit hour is to have a standard measure for determining eligibility for and distribution of title IV, HEA program funds. The commenters believed that credit hours should not be treated as fiscal units. One of these commenters contended that the systems of assigning academic credit and determining the distribution of title IV, HEA program funds are different

and should be kept separate. Another commenter expressed concern that treating credit hours as fiscal units would cause the Federal Government to give consideration to fiscal matters above all others.

Several commenters believed that the Secretary's proposed definition of a credit hour is too restrictive and does not account for institutional or programmatic variances. These commenters believed that a Federal credit-hour definition is inapplicable to a diverse educational system composed of different types of institutions, programs, and course formats.

One commenter expressed concern that the proposed credit-hour definition did not account for events that may occur within institutions' academic calendars, such as Federal and religious holidays, natural disasters, or campus safety issues. This commenter believed that these events may prohibit institutions' compliance with proposed paragraph (1) of the credit-hour definition because institutions may not meet the requirements for classroom instruction or minimum weeks in a semester.

A few commenters believed that the proposed credit-hour definition needed more specificity in proposed paragraph (1) with regard to the quantity of time that constitutes a credit hour. One commenter suggested revising the proposed definition to specifically state that a credit hour consists of 50 minutes of instructor contact for every credit earned in a 16 week semester and two hours of out-of-class work for each credit. Another commenter suggested defining a credit hour in proposed paragraph (1) of the definition in terms of clock hours.

One commenter suggested generalizing the proposed definition of a credit hour to state: (1) A credit hour is a unit of measure associated with the achievement of prescribed learning outcomes for a particular course of study, regardless of instructional delivery, (2) each institution participating in title IV, HEA programs must define, document, and consistently apply its process for the determination of credit for the achievement of learning outcomes, and (3) some institutions may also adhere to a standard academic credit conversion rate as defined by their accrediting agency or State agency.

One commenter believed that all accrediting agencies should be required to use a more general definition of a credit hour wherein a semester hour consists of at least 15 hours of classroom contact; 30 hours of supervised laboratory instruction, shop instruction, or documented independent study activities; or not fewer than 45 hours of externship,

internship, or work related experience. This commenter believed that a quarter hour should consist of at least 10 hours of classroom contact; 20 hours of supervised laboratory instruction, shop instruction, or documented independent study activities; or not fewer than 30 hours of externship, internship, or work related experience.

One commenter believed that the proposed credit-hour definition provided institutions with too much autonomy to determine an equivalent amount of work as defined in proposed paragraph (1) because there are no standard measures for student learning outcomes. This commenter suggested revising proposed paragraph (1) to equate classroom time with direct faculty instruction and three hours of laboratory work with one hour of classroom time and two hours of out-of-class work. The commenter also suggested revising proposed paragraphs (2) and (3) to require institutions to establish and document academic activities equivalent to the work defined in proposed paragraph (1) and revising proposed paragraph (3) to require institutions to compare student achievement to the intended outcomes assigned and student achievement attained for credit hours measured under proposed paragraph (1).

*Discussion:* The credit-hour definition in § 600.2 and the provisions in §§ 602.24(f) and 603.24(c) were designed to preserve the integrity of the higher education system by providing institutions, accrediting agencies, and State agencies recognized under 34 CFR part 603 with the responsibility for determining the appropriate assignment of credit hours to student work. Under proposed §§ 602.24(f) and 603.24(c), the institution's accrediting agency, or recognized State agency if, in lieu of accreditation, the institution is approved by one of the four State agencies recognized under 34 CFR part 603, would be responsible for reviewing and evaluating the reliability and accuracy of an institution's assignment of credit hours in accordance with the definition of credit hour in § 600.2. These final regulations employ these basic principles of reliance on institutions and on accrediting agencies or, if appropriate, recognized State agencies, for ensuring institutions' appropriate determinations of the credit hours applicable to students' coursework.

The credit-hour definition in § 600.2 is intended to establish a quantifiable, minimum basis for a credit hour that, by law, is used in determining eligibility for, and the amount of, Federal program funds that a student or institution may receive. We believe that the definition of a credit hour in § 600.2 is consistent with general practice, provides for the necessary

flexibilities, and may be used by institutions in their academic decision-making processes and accrediting agencies and recognized State agencies in their evaluation of institutions' credit assignments.

We note, however, that institutions, accrediting agencies recognized under **34 CFR part 602**, and State agencies recognized under **34 CFR part 603** are required to use the definition in § 600.2 for Federal program purposes such as determining institutional eligibility, program eligibility, and student enrollment status and eligibility. We believe that in most instances the definition will generally require no or minimal change in institutional practice to the extent an institution adopts the definition for its academic purposes rather than maintaining a separate academic standard.

The provisions in §§ 600.2, 602.24, and 603.24 neither limit nor prescribe the method or manner in which institutions may assign credits to their courses for academic or other purposes apart from Federal programs. These regulations do not require institutions to adopt the definition of a credit hour in § 600.2 in lieu of existing institutional measurements of academic achievement, but rather to quantify academic activity for purposes of determining Federal funding. An institution will be able to continue using the long-standing credit-assignment practices that it has found to be most effective for determining credit hours or equivalent measures for academic purposes, so long as it either ensures conformity, or uses a different □ measure, for determining credit hours for Federal purposes. This position is consistent with the application of other Federal program requirements. For example, an institution may choose to define full-time enrollment status in a semester for academic purposes as 15 semester hours while it defines full-time for title IV, HEA program purposes as 12 semester hours under the minimum requirements of the definition of *full-time* in § 668.2.

We do not agree that the proposed definition is too restrictive or is inapplicable in a diverse educational system. Nor do we believe that the definition would prevent institutions from taking into consideration events such as Federal and religious holidays or campus safety issues. In the event of natural disasters, the Department has consistently provided guidance on how the regulations may be applied in such exceptional circumstances. The credit-hour definition allows an institution to establish an academic calendar that meets its needs and its students' needs, while ensuring a consistent measure of students' academic engagement for Federal purposes.

We do not agree with the commenters that paragraph (1) of the

proposed credit-hour definition needs more specificity of the term "one hour." We believe that it is unnecessary to define one hour as either 50 minutes or one clock hour because the primary purpose of paragraph (1) of the proposed credit-hour definition is to provide institutions with a baseline, not an absolute value, for determining reasonable equivalencies or approximations for the amount of academic activity defined in the paragraph.

We do not agree that the proposed definition should be more generalized or that differing standards should be adopted. A credit hour is a basic unit for determining the eligibility of recipients for, and the amount of, Federal assistance that may be provided to parties participating in Federal programs. We believe the proposed definition provides a consistent basis for the equitable treatment of participants and recipients.

*Changes:* We have revised the definition of *credit hour* to clarify the basic principles applied in the proposed definition of a *credit hour* to delineate further that it is an institution's responsibility to determine the appropriate credit hours or equivalencies. The revision requires that, except as provided in § 668.8(k) and (l), an institution determines the credit hours applicable to an amount of work represented in intended learning outcomes and verified by evidence of student achievement that reasonably approximates not less than the amount of work described in paragraph (1) or (2) of the definition of credit hour in § 600.2 of the final regulations. The final regulations also continue to provide that institutions may establish other measures that approximate the minimum standards in paragraph (1) or (2) of the definition in § 600.2, thus permitting each institution to consider the unique characteristics of its course and program offerings, as well as, its distinctive student populations.

*Comment:* Many commenters believed that credit hours do not represent a reasonable assessment of student learning. Many commenters believed that the Secretary's proposed definition of a credit hour dictates that the outdated concept of "seat time" is the main metric by which program substance should be judged rather than the appropriate focus on student learning outcomes.

A few commenters believed that a credit hour, and in particular, the Carnegie Unit, does not account for academic rigor. These commenters believed that a student's completion of a specified number of hours of direct instruction and out-of-class work does not provide assurance that the student has acquired a certain level of competency.

Two commenters believed that the proposed credit-hour definition does not consider the actual behavior of students in American higher education. One commenter believed that the typical student does not spend two hours on out-of-class work for every hour of instruction. The other commenter believed that there has not been enough research into the amount of time that students are engaged in academic activities.

One commenter believed that the Secretary's proposed credit-hour definition put too much emphasis on work outside of class instead of student learning outcomes.

A few commenters believed that credit hours are measurements of educational inputs. One commenter stated that credit hours, when used to determine eligibility for financial aid, are only proximate preconditions for student learning and are equivalent to other input measures such as scores on standardized tests, high school GPAs, or faculty degrees.

One commenter believed that the credit-hour definition would force institutions to treat all students the same, regardless of ability, as long as they are in class for the specified number of hours.

One commenter expressed concern that the Secretary's proposed credit-hour definition does not consider current efforts in higher education to increase institutional accountability. This commenter believed that the proposed credit-hour definition would undermine institutional efforts to assess student learning outcomes.

*Discussion:* We do not agree with the commenters that the credit-hour definition emphasizes the concept of "seat-time" as the primary metric for determining student work. We believe that the definition of a *credit hour* in § 600.2 in these final regulations emphasizes that institutions may award credit to courses for an amount of work represented by verifiable student achievement of institutionally established learning outcomes.

Eligibility for Federal programs requires that institutions are able to demonstrate that the amount of work in a course assigned credit for Federal purposes will constitute a reasonable approximation of the amount of academic activity defined in paragraph (1) of the definition of credit hour in § 600.2. Institutions are responsible and accountable for demonstrating that each course has the appropriate amount of educational content to receive credit for Federal program purposes and for students to achieve the level of competency defined by institutionally established course objectives.

*Changes:* None.

*Comment:* Many commenters believed that a Federal credit-hour definition will stifle institutions' ability to develop new and innovative education models, especially with regard to delivery methods. Several commenters believed that institutions' ability to respond creatively to changing pedagogies, circumstances, and student needs would be limited under the proposed credit-hour definition.

A few commenters believed that the proposed credit-hour definition would limit innovation in education at a critical time. One of these commenters believed that because of the economic recession, institutions need to be more innovative in developing alternative delivery methods. One commenter believed that institutions must be able to respond to the rapidly changing education sector. Another commenter believed that other nations are currently developing new educational models and the United States will fall behind these nations in education.

Many commenters believed that the Secretary's proposed credit-hour definition would have a negative impact on alternative delivery methods such as compressed and accelerated programs, online and distance education programs, and hybrid programs with online and in-class components. A few commenters believed that the proposed credit-hour definition would particularly suppress innovation of delivery methods because institutions would be focused on ensuring they meet the Federal definition of a credit hour and not on the desired academic outcomes. These commenters believed that institutions would not be able to respond to changing student populations by diversifying delivery methods. A few commenters noted that minority students and nontraditional students such as veterans, active military personnel, and working adults would be particularly harmed because they rely on programs offered through alternative delivery methods.

Several commenters believed that the proposed credit-hour definition is not applicable to alternative delivery methods. A few commenters believed that credit hours are not compatible with technological advancements in education. These commenters believed that the proposed credit-hour definition would minimize the use of technology in education. Some commenters believed that proposed paragraph (1) assumed a classroom or lecture based model of instruction and was not applicable to online or hybrid programs.

A few commenters questioned how to measure direct faculty

instruction with regard to an online or hybrid program when no physical classroom exists. Two commenters noted that in distance education and hybrid programs, the concept of contact hours does not apply. The commenters recommended expanding paragraph (3) of the proposed definition to specifically address that institutions offering nontraditional programs including distance delivery programs and accelerated programs may provide institutionally established equivalencies for the amount of work required in paragraph (1) within the discretion of the institution.

Several commenters believed that the Secretary's proposed credit-hour definition would negatively impact how earned credits are calculated for online and hybrid courses.

One commenter believed that the Secretary's proposed credit-hour definition represented an effort by the Secretary to reinstate a regulation that had been removed in 2002 which required higher education programs that did not operate in a standard semester, trimester, or quarter system to offer a minimum of 12 hours of course work per week to maintain eligibility for title IV, HEA program funds.

Two commenters believed that the Secretary's proposed credit-hour regulations would legitimize institutions' use of the Carnegie Unit, which generally consists of a ratio of two hours of work outside of class for every hour of classroom time, and increase scrutiny on institutions that do not currently use the Carnegie Unit. These commenters believed that under the proposed regulations, an institutional credit system that is not currently based on the Carnegie Unit would be undervalued because these institutions would have a significant burden to develop and demonstrate student achievement of learning outcomes that their peers using the Carnegie Unit would not have.

*Discussion:* We do not agree with the commenters that the credit-hour definition in § 600.2 will limit institutions' flexibility to creatively respond to innovations in educational delivery methods and changing student needs. A fundamental component of the credit-hour definition in § 600.2 provides that institutions must determine the academic activity that approximates the amount of work defined in paragraph (1) based on institutionally established learning outcomes and verifiable student achievement. The definition allows institutions that have alternative delivery methods, measurements of student work, or academic calendars to determine intended learning outcomes and verify evidence of student achievement.

All institutions participating in title IV, HEA programs have a responsibility to ensure appropriate treatment of Federal funds, regardless of course format or educational delivery method. The definition in § 600.2 provides institutions with a baseline for determining the amount of student work necessary for title IV, HEA program eligibility, but does not specify the particular program formats or delivery methods that institutions must use.

The credit-hour definition is not a reinstatement of the old "12-hour rule," that was removed from the Department's regulations in 2002. The 12-hour rule required programs that did not operate in standard semester-, trimester-, or quarter-term systems to offer a minimum of 12 hours of course work per week to maintain eligibility for Federal programs. The credit-hour definition in these final regulations applies to all institutions, regardless of whether they operate on a standard-term academic calendar. In addition, while the old 12-hour rule required 12 hours of instruction, examination, or preparation offered by an institution per week, the credit-hour provisions in § 600.2 require institutions to provide students with an amount of work equivalent to the amount of work described in paragraph (1) of the credit-hour definition.

*Changes:* None.

*Comment:* Several commenters objected to proposed paragraph (3) of the credit-hour definition. A few commenters believed that paragraph (3) of the proposed credit-hour definition is vague regarding the entity responsible for determining "reasonable equivalencies." A few commenters believed that the proposed credit-hour provisions did not provide enough guidance on what academic activities the Department would accept as reasonable equivalencies for the amount of work defined in proposed paragraph (1). A few commenters believed that the term "reasonable" put the Department in the position of final arbiter on the determination of reasonable equivalencies.

One commenter believed that proposed paragraph (3) created uncertainty and the potential for litigation related to whether an institution's proposed equivalency for the work defined in paragraph (1) is reasonable. This commenter expressed concern that institutions would be liable for using equivalencies that the Department viewed as unacceptable. One commenter asked for clarification on the types of corrective actions that the Department can take to enforce the provisions of the credit-hour definition in proposed § 600.2.

*Discussion:* Institutions have a responsibility to ensure that the

use of Federal program funds is in accordance with applicable regulations. In addition, the Department has the oversight responsibility to determine that institutions are acting in accordance with the definition of a credit hour in these final regulations to ensure the appropriate use of Federal program funds. It is therefore necessary and appropriate for the Secretary to review an institution's assignment of credit for Federal purposes and an accrediting agencies' or State agencies' evaluations of an institution's credit polices and their implementation to determine whether an institution is assigning credit hours for Federal program purposes in accordance with these final regulations. If an institution is found to be out of compliance for Federal program purposes with the credit-hour definition in § 600.2, the amount or Title IV, HEA funds awarded under the incorrect assignment of credit hours may be recalculated to establish a repayment liability owed by the ☐ institution. In cases where the amount of credit hours assigned to a program is significantly overstated, the Secretary may fine the institution or limit, suspend, or terminate its participation in Federal programs.

*Changes:* None.

*Comment:* Some commenters believed that the proposed credit-hour definition would alter institutions' current credit assignments and courses. A few of these commenters believed that a Federal definition of a credit hour sets an expectation that institutions should assign additional credit to courses if the work exceeds the amount defined in the proposed definition. One commenter believed that the proposed definition would increase the amount of class time that students are required to complete in order to earn credit. Another commenter believed that the proposed definition could cause institutions to increase courses' lecture or theory content and decrease hands-on training.

One commenter believed that the proposed credit-hour definition would force accrediting agencies to impose homework requirements on vocational institutions.

*Discussion:* The credit-hour definition does not require institutions to alter their assignment of credit to courses for academic purposes; however, institutions have the responsibility to demonstrate that credit hours assigned to courses for Federal program purposes adhere to the minimum standards of the credit-hour definition in § 600.2. If an institution determines that its current assignment of credits to its programs for Federal program purposes does not satisfy the minimum standards in the regulation, the institution will either have to reduce the credits associated with the program,

increase the work required for the program, or both.

There is no requirement for institutions to assign additional credit to courses if the amount of work exceeds the amount described in paragraph (1) of the credit-hour definition. We have revised the credit-hour definition in § 600.2 to clarify that the amount of work described in paragraph (1) represents a minimum acceptable level of academic activity for which credit can be awarded to constitute a credit hour for Federal purposes. Institutions may use their discretion to assign additional credit if the amount of work for a course justifies such an assignment of credit in accordance with § 600.2.

There is no requirement under the credit-hour definition that would force accrediting agencies to impose homework requirements on vocational institutions. In general, institutions will be assessed to determine if they have established credit hours for title IV, HEA program purposes that meet at least the minimum standards in the regulation. Unless the program is subject to the credit-to-clock-hour conversion requirements in § 668.8(l) and (k), an institution would be required to determine the appropriate credit hours in accordance with paragraphs (1) and (2) of the credit-hour definition in § 600.2 of these final regulations for a program or coursework in a program that has no student work outside the classroom.

*Changes:* We have revised the credit-hour definition in § 600.2 to clarify that the amount of work specified in paragraph (1) is a minimum standard and that there is no requirement for the standard to be exceeded.

*Comment:* One commenter believed that the proposed provisions in § 600.2 did not appropriately address faculty workloads or faculty time in class.

*Discussion:* We do not believe that § 600.2 should address faculty workloads or faculty time in class as these issues are institutional administrative considerations outside the scope of these final regulations which set minimum standards for the measurement of credit hours.

*Changes:* None.

*Comment:* One commenter questioned why the proposed credit-hour regulations did not address § 668.9 which provides in paragraph (b) that a public or private nonprofit hospital-based school of nursing that awards a diploma at the completion of the school's program of education is not required to apply the formula contained in § 668.8(l) to determine the number of semester, trimester, or quarter hours

in that program for purposes of calculating Title IV, HEA program funds. This commenter questioned whether for-profit hospital-based nursing programs would be subject to the proposed provisions in § 668.8(k) and (l).

*Discussion:* Section 481A of the HEA and § 668.9(b) specify that any regulations promulgated by the Secretary concerning the relationship between clock hours and semester, trimester, or quarter hours in calculating student grant, loan, or work assistance under the title IV, HEA programs do not apply to a public or private nonprofit hospital-based school of nursing that awards a diploma at the completion of the school's program of education.

*Changes:* None.

*Comment:* One commenter believed that institutions would need an accrediting or State agency's review of their programs' compliance with the proposed credit-hour definition in § 600.2. The commenter believed that the regulations are unclear on how programs should operate in the interim.

One commenter expressed concern that waiting for accrediting agencies to revise their standards after the proposed regulations are finalized would be detrimental to institutions offering programs in alternative formats.

One commenter believed that institutions will be developing new credit policies and should be afforded an adjustment period to receive and react to guidance from State agencies on their credit assignment policies.

*Discussion:* The provisions in §§ 602.24 and 603.24 provide that an institution must have a process for assigning credit that meets its accrediting agency's or State agency's standards, as well as, the credit-hour definition in § 600.2. An institution's credit assignment process is subject to review by its accrediting agency or, in some cases, a State agency recognized under 34 CFR part 603. We believe that institutions already have processes for assigning credit and, to the extent that these existing processes do not comply with these final regulations, institutions will need to revise their credit assignments to comply with the credit-hour definition in these final regulations for Federal program purposes. During the interim period between the effective date of these regulations and an accrediting agency's or State agency's review of institutions' compliance with the credit-hour definition in § 600.2, an institution is responsible and accountable for ensuring that its credit-hour assignments conform to the provisions of the credit-hour definition in § 600.2 of these final regulations and that its processes are in

accord with its designated accrediting agency's or recognized State agency's requirements.

*Changes:* None.

## Out-of-Class Student Work

*Comment:* Several commenters did not agree with the component of proposed paragraph (1) of the credit-hour definition related to student work outside of class. A few commenters believed that an institution cannot determine how much time students spend on work outside of class and that quantifying work outside of the class does not account for variations in students' learning abilities and styles. One commenter believed that the Secretary's proposed credit-hour definition did not take into account the nature of different courses. This commenter believed that certain courses require more direct faculty instruction and supervision while other courses may require more study outside of the classroom.

Two commenters did not agree with the Secretary's proposed credit-hour definition with regard to the ratio of classroom time to time outside of class and suggested revising the proposed definition to allow for more direct classroom instruction. These commenters recommended revising proposed paragraph (1) to define a credit hour as one hour of classroom or direct faculty instruction and a minimum of two hours of student work in or out of the classroom.

One commenter recommended that the Department distinguish class time from time outside of class by making explicit in the proposed definition that class time refers to instruction.

One commenter asked for clarification of proposed paragraph (2) regarding whether a credit hour awarded for laboratory work must consist of one-hour work in the laboratory and two hours outside the laboratory performing either preparation or follow up activities.

*Discussion:* Institutions must demonstrate that the credit hours awarded for the amount of academic work necessary for Federal program purposes approximates the amount of work defined in paragraph (1) of the definition of credit hour in § 600.2. The credit-hour definition in § 600.2 sets a minimum standard and institutions may offer additional hours of instructional time to courses or provide for additional student work outside of class beyond what is specified in paragraph (1) of the definition at their discretion. We do not believe it is necessary to decrease the amount of out-of-class time specified

in paragraph (1) of the definition.

We do not want to limit the interpretation of class time only to direct instruction in order to take into consideration other in-class activities such as examinations. Similarly, the provisions related to laboratory work in paragraph (2) of the definition do not require one hour of work in the laboratory and two hours of out-of-class work related to the laboratory. Paragraph (2) of the credit-hour definition allows institutions to use their discretion to determine the in-class and out-of-class components for laboratory work to the extent the credit awarded reasonably approximates the requirements of paragraph (1) of the credit-hour definition in § 600.2. An institution's basis for making this determination would be subject to review by its accrediting agency, the State agency recognized under 34 part 603, and the Department in order to demonstrate that it was reasonable.

*Changes:* None.

### Authority and Need To Regulate

*Comment:* Several commenters believed that the Secretary does not have the legal authority to promulgate the proposed regulations in §§ 600.2, 602.24, 603.24, and 668.8. These commenters believed the credit-hour definition in proposed § 600.2 represented a Federal intrusion into academic matters. A few commenters believed that the General Education Provisions Act (20 U.S.C. 1232a) and the Department of Education Organization Act (20 U.S.C. 3403) prohibit the Secretary from exercising undue control of curricula, programs, administration, and personnel of educational institutions. These commenters believed that the Secretary needs explicit Congressional authorization to promulgate regulations that intrude in the academic decision-making process at institutions. Two commenters recommended including language in the final regulations reaffirming that it is appropriate for institutions and accrediting agencies to address student achievement, but that it is not within the Secretary's authority.

Many commenters believed that a Federal definition of a credit hour represents a Federal intrusion into a core academic issue and the academic decision-making process. A few of these commenters expressed concern that a Federal definition of a credit hour would set a precedent for Federal interference in other academic matters. One commenter representing institutional registrars and admissions officers believed the proposed definition of a credit hour should be revised to

require an institution to make a reasonable determination of whether the institution's assignment of credit hours conforms to commonly accepted practice in higher education as demonstrated in the portability of such credits to other institutions of higher education offering similar programs.

One commenter believed that the Secretary is not authorized to make academic decisions and did not want institutions to be subject to any adverse administrative action by the Department if the Department did not concur with an institution's or accrediting agency's determination of appropriate credit. This commenter suggested that the final regulations specify that the credit hours awarded for a program shall be deemed in compliance with the definition of a credit hour as defined in § 600.2, where the credit hours awarded have been approved by the institution's accrediting agency based upon a review performed in accordance with § 602.24(f).

Several commenters believed that the Secretary's proposed credit-hour definition was incongruent with existing Federal laws, State regulations, or accrediting agency policies.

One commenter believed that the proposed credit-hour definition in § 600.2 could conflict with the Americans with Disabilities Act of 1990, as amended, which requires entities such as institutions of higher education to make reasonable accommodations for students with disabilities.

Several commenters believed that the proposed credit-hour definition would force some institutions that use credit hours to use clock hours. These commenters believed that this change would conflict with some State regulations and is not required by any other Federal agency.

A few commenters believed that the proposed credit-hour regulations were harmful to institutions that had been required to convert from clock hours to credit hours by State mandates. These commenters believed that these institutions would be at a disadvantage compared to institutions that were previously using credit hours. One commenter recommended that the Department allow institutions that have converted to credit hours based on State mandates to use State-mandated clock-to-credit-hour conversion rates to determine Federal program eligibility.

Several commenters believed that the proposed credit-hour definition may directly violate some State regulations because it inherently requires that institutions take attendance.

*Discussion:* The Secretary is authorized under 20 U.S.C. 1221e-

3, to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department. The intent of the regulations in §§ 600.2, 602.24, 603.24, and 668.8 is not to interfere with the academic decision-making processes at institutions, accrediting agencies, and recognized State agencies, but to rely on these processes to ensure the integrity of the Federal programs, including the title IV, HEA programs. Fundamental to these decision-making processes is the measurement of the credit used to determine the amounts of title IV, HEA program funds provided to eligible students who are enrolled in eligible programs. Since the regulations establish a minimum standard, and institutions may choose to include more work for their credit hours than the minimum amount, credit hours at one institution will not necessarily equate to credit hours at another institution for a ☐ similar program. Thus, we do not agree with the recommendation that an institution should be required to demonstrate the portability of such credits to other institutions of higher education offering similar programs as we believe such a requirement would, in fact, interfere with the academic decision-making processes at institutions.

These regulations should not be inconsistent with current Federal laws, State regulations, and accrediting agencies' policies because of their intended narrow application to the determination of eligibility for, and distribution of, Federal program funds. Therefore, to the extent an institution determines that it may be necessary to use a current credit assignment system, for example, to comply with other requirements such as State mandates, an institution may continue using its current system for purposes unrelated to Federal programs.

We do not agree with the commenter that the credit-hour definition in § 600.2 conflicts with the Americans with Disabilities Act of 1990, as amended. The credit-hour definition in § 600.2 does not prohibit institutions from developing policies for academically accommodating students with disabilities in accordance with the Americans with Disabilities Act of 1990, as amended. The credit-hour definition provides institutions with the flexibility to determine the appropriate credit hours or equivalencies to award for student work.

*Changes:* None.

*Comment:* Several commenters believed that a Federal definition of a credit hour is unnecessary. Many of these commenters noted that there has been no history of fraudulent

practices in credit assignment by institutions in the nonprofit sector and that any fraud or abuses identified have been in the for-profit sector. Some of these commenters believed that it is unfair to apply a Federal definition of a credit hour to all institutions. One commenter suggested that the credit-hour definition apply only to institutions that are not accredited by regional or specialized accreditors.

A few commenters believed that the Secretary's only motive to define a credit hour stemmed from a report from the Department's Inspector General regarding one regional accrediting agency's accreditation of a for-profit institution it found to have inappropriate credit-hour policies. One commenter believed that although there have been problems reported with some institutions' assignment of credit hours, these problems were primarily related to two regional accrediting agencies' evaluation of degree programs and not with vocational career education programs.

One commenter expressed concern that enforcement of institutions' compliance with the credit-hour definition would be directed primarily at for-profit institutions even though there have been inappropriate credit awarding practices at nonprofit institutions as well.

A few commenters believed that institutional credit assignment problems identified in the nonprofit sector are effectively resolved through the existing processes of accreditation and institutional self-review.

One commenter suggested that instead of establishing a Federal credit-hour definition, the Department should require institutions to describe their credit assignment policies in their catalogs and promotional materials.

*Discussion:* The Secretary did not intend to define a credit hour for Federal program purposes as a punitive measure against institutions in a particular sector or institutions that have engaged in inappropriate credit awarding practices in the past. Instead, the revised credit-hour definition is intended to provide a minimum, consistent standard for all institutions regardless of State, sector, or accreditor in determining the amount of student work necessary to award credit hours equitably for Federal program purposes.

*Changes:* None.

*Comment:* A few commenters believed that a Federal credit-hour definition is unnecessary because State agencies already review institutions' credit-hour policies within their general oversight of an institution's integrity.

*Discussion:* We do not agree. Many State agencies do not perform such oversight activities nor do they use a uniform standard that would assure the equitable administration of Federal programs.

*Changes:* None.

## Administrative Burden

*Comment:* Several commenters believed that the proposed credit-hour provisions would cause an undue administrative and financial burden on institutions. A few commenters believed that institutions would be forced to focus their administrative resources on ensuring that their programs and courses conform to the Federal credit-hour definition and remain eligible for title IV, HEA program funds instead of other important academic matters such as ensuring program integrity. Other commenters believed that in order to comply with the proposed credit-hour definition, institutions would be burdened with administrative tasks such as reevaluating and significantly restructuring their credit-assignment systems, ensuring compliance with their accrediting agency's standards, reconfiguring the use of classroom space, and recalculating students' financial aid packages.

One commenter believed that State agencies and accrediting agencies will be burdened by the requirement to focus on institutions at a more detailed level and will need to increase their staffs and costs to account for the increased workload. This commenter believed that increased costs would be passed to institutions, and subsequently, to students.

*Discussion:* We do not believe that assigning credit to courses in accordance with the definition of credit hour in § 600.2 for Federal program purposes will cause any significant increase in administrative or financial burden on institutions. Institutions participating in Federal programs such as title IV, HEA programs are already responsible for ensuring the appropriate treatment of Federal funds, including accurate distribution of Federal funds to students. Institutions will not be required to change their current systems of awarding credit for academic purposes which in many instances will already be compliant with these final regulations, but some institutions will be required to make the necessary changes to ensure accurate and equitable credit assignments for Federal program purposes.

We do not believe that the credit-hour definition will cause any significant increase in the administrative burden on accrediting agencies or State agencies recognized under 34

CFR part 603. Section 496(a)(5) of the HEA requires accrediting agencies recognized by the Secretary to evaluate an institution's or program's "measures of program length and the objectives of the degrees or credentials offered" which inherently requires accrediting agencies to evaluate the courses that constitute institutions' programs.

*Changes:* None.

## Accrediting Agency Procedures (§ 602.24(f))

Back to Top

*Comment:* Several commenters supported the addition of § 602.24(f). These commenters believed that accrediting agencies are the appropriate entities to ensure institutions' compliance with the credit-hour provisions in § 600.2.

Many other commenters believed that the proposed provisions in § 602.24(f) are unnecessary. These commenters ☐ believed that the integrity of institutions' assignment of credit hours is already reviewed and evaluated by accrediting agencies through a system of peer review. These commenters also believed that the peer-review system is capable of recognizing how credit hours are defined in different settings. A few commenters noted that the Secretary has already permitted accrediting agencies to perform this function and that accreditors have been diligent in their duties. One commenter believed that the Secretary could tighten Federal regulatory control over institutions' credit-hour policies by revising the existing accrediting agency recognition regulations in 34 CFR part 602.

One commenter believed that accrediting agencies have long-standing practices, or in the case of some national accrediting agencies, formulas that provide reasonable measures of credit hours.

*Discussion:* We agree with the commenters who believed that accrediting agencies' peer-review systems are structured to evaluate the appropriateness of institutions' credit policies and assignments in diverse educational settings. Amending § 602.24 to add § 602.24(f) initially was a proposal of the non-Federal negotiators representing accrediting agencies to clarify their role in overseeing the assignment of credit hours by institutions as it relates to Federal program requirements. With the addition of the credit-hour definition in § 600.2, we added § 602.24(f) regarding an accrediting agency's review of an institution's policies and procedures for assigning credit hours, and the institution's application of these policies because this addition indicates how those requirements fit together and makes the two regulations consistent.

We note that these provisions relate solely to an accrediting

agency's consideration of an institution's implementation of the credit-hour definition for Federal program purposes. The regulations do not require the accrediting agency to use the definition of credit hour in § 600.2 for non-Federal purposes nor do the regulations prohibit an accrediting agency from only using the definition of credit hour in § 600.2.

We believe that § 602.24(f) is the appropriate place to define accrediting agencies' responsibilities for reviewing institutions' processes for assigning credit for title IV, HEA program purposes because § 602.24 defines the procedures institutional accreditors must have if the institutions they accredit participate in title IV, HEA programs.

*Changes:* None.

*Comment:* Several commenters did not support the addition of § 602.24(f) because they believed the proposed provisions would allow the Department to indirectly regulate academic matters. A few of these commenters requested that the Department add language to the regulations making it clear that no provision in § 602.24 would permit the Secretary to establish any criteria that specifies, defines, or prescribes the procedures that accrediting agencies shall use to assess any institution's credit-hour policies or procedures.

One commenter believed that by requiring accrediting agencies to ensure institutions' compliance with the proposed credit-hour definition in § 600.2, the Department would be placing accrediting agencies into a quasi-regulatory role for which they are neither designed nor intended. This commenter believed that over time accrediting agencies' regulatory role will be seen as their most important role and accrediting agencies will in effect become government agents. Another commenter believed that proposed § 602.24(f) would cause accrediting agencies to focus on institutions' assignment of credit hours instead of other valuable areas of review.

One commenter requested clarification of whether § 602.24(f) would allow the Department to rely exclusively on an accrediting agency's determination of an institution's definition and assignment of credit, or whether the Department would have separate authority under the regulations to evaluate and regulate an institution's definition or assignment of credit for title IV, HEA program eligibility purposes.

One commenter believed that an accrediting agency found to be permitting inappropriate credit assignment activities at institutions should be cited and forced to address the identified issues. Another commenter believed that

institutions' policies for assigning credit are extremely diverse, and that the Department is not capable of properly determining whether an accrediting agency has appropriately evaluated the variety of institutional policies.

One commenter believed the provisions in § 602.24(f) are unnecessary because section 496(a)(5)(H) of the HEA requires accrediting agencies to assess institutions' measures of program length but does not mandate any quantitative requirements establishing the components necessary for the measure of credit.

*Discussion:* The provisions in § 602.24(f) reflect that accrediting agencies are the oversight bodies responsible for evaluating the appropriateness of institutions' policies and procedures for assigning credit that is consistent with Federal program purposes. This role is in accordance with the provisions of the HEA under which accrediting agencies have the primary responsibility, as part of the oversight triad with the Federal Government and State agencies, to determine whether institutions participating in Federal programs such as the title IV, HEA programs, meet minimum standards of educational quality. The provisions in § 602.24(f) further support accrediting agencies in fulfilling these responsibilities but do not prescribe the methods by which accrediting agencies must perform these evaluations.

If the Secretary determines that a recognized accrediting agency does not comply with the provisions in § 602.24(f) for purposes of Federal programs, or is not effective in its performance with respect to these provisions, then the Secretary may restrict or remove the agency's recognition in accordance with 34 CFR part 602, subpart C.

We do not agree that the provisions in § 602.24(f) are unnecessary. While section 496(a)(5)(H) of the HEA requires accrediting agencies to assess institutions' measures of program length, we believe the provisions in § 602.24(f) provide necessary clarification regarding the means of evaluating an institution's assignment of credit hours.

*Changes:* None.

*Comment:* A few commenters believed that the provisions in § 602.24(f) were not specific enough with regard to the requirements for accrediting agencies.

One commenter proposed that the Department require accrediting agencies to base their evaluations of the validity of institutions' credit-hour assignments on the manner in which other institutions offering similar programs assess and accept

credits for purposes of evaluating credit for transfer.

One commenter asked the Department to revise proposed § 602.24(f)(1)(ii) to specify that accrediting agencies must make a determination of whether an institution's assignment of credit hours conforms to the provisions in proposed § 600.2.

One commenter recommended that the Department require accrediting agencies to prescribe clearly the methodologies and equivalencies that will be utilized by institutions to determine the amount of work specified by the credit assigned to courses as ☐ represented through stated student learning outcomes and demonstrated achievement of those outcomes, regardless of the delivery method.

One commenter recommended revising the proposed accrediting agency requirements in § 602.24(f) to state that in the case of competency-based programs that do not use clock hours or classroom time as a basis for credit, an accrediting agency must determine the appropriate assignment of credit by reviewing a well-substantiated list of competencies and assessing documented evidence of student achievement of competencies.

A few commenters requested that the Department revise proposed § 602.24(f)(2) to clarify that accrediting agencies have the authority and autonomy to determine review methodologies and techniques.

One commenter believed that it would be appropriate for an accrediting agency to review a sample of an institution's curriculum to determine whether the credit assignment policies were being appropriately applied by an institution, but it would not be appropriate for an accrediting agency to employ an unspecified sample of other institutions to determine whether or not the credits awarded for a particular course or program conformed to commonly accepted practice in higher education. This commenter suggested revising proposed paragraph § 602.24(f)(2) to specify that the agency must sample courses within an institution's program of study.

One commenter suggested that accrediting agencies review annual institutional submissions of data, policies, and procedures for assigning credit hours.

*Discussion:* We do not believe that further specificity is appropriate or necessary in § 602.24(f). Accrediting agencies must have the flexibility to review institutional credit-assignment processes that may vary widely in their policies and implementation and may have differing methods for measuring student work such as direct assessment. We believe

that accrediting agencies are capable of developing appropriate methods for evaluating institutional credit processes without providing further specificity in the regulations. We note that accrediting agencies must demonstrate their ability to appropriately review these areas in order to receive recognition by the Secretary as reliable authorities on the quality of education or training offered by the institutions and programs they accredit, and that evaluation by the Secretary continues during periodic reviews of accrediting agencies.

We believe that it is not necessary to specify how an accrediting agency should review a competency-based program that does not use credit hours or clock hours as a basis for credit. In the case of a competency-based program, the institution may either base the assignment of credit on the time it takes most students to complete the program, or the program must meet the definition of a direct assessment program in § 668.10. In the first scenario, the institution's accrediting agency would review the institution's compliance with the provisions in § 600.2 or § 668.8(k) and (l) as applicable. In the second scenario, the institution's accrediting agency must review and approve each of the institution's direct assessment program's equivalencies in terms of credit hours or clock hours.

*Changes:* None.

*Comment:* A few commenters opposed the proposed provisions in § 602.24(f)(1)(i)(A) and (B) requiring accrediting agencies to evaluate an institution's policies and procedures for determining credit hours in accordance with proposed § 600.2 and to evaluate an institution's application of those policies and procedures to its programs and courses. Two commenters suggested that the provisions should not require accrediting agencies to evaluate compliance with proposed § 600.2 but should permit institutions to justify the manner in which credit hours are assigned and permit accrediting agencies to determine whether an institution's application of its policies and procedures are appropriate. These commenters believed that the proposed provisions require accrediting agencies to instruct institutions to follow a specific approach to assigning credit hours.

A few commenters suggested that the cross reference to the proposed credit-hour definition in § 600.2 be stricken from proposed § 602.24(f)(1)(i)(A) and replaced with a provision requiring accrediting agencies to conduct their review of an institution's assignment of credit hours consistent with the provisions of § 602.16(f).

*Discussion:* We do not believe that the provisions in proposed § 602.24(f) require accrediting agencies to mandate specific policies for institutions with regard to assigning credit hours to programs and coursework. However, we do believe that it is necessary to specify in § 602.24(f) that accrediting agencies must review an institution's policies and procedures for determining credit hours, and the application of those policies and procedures to programs and coursework in accordance with § 600.2 for title IV, HEA program purposes. Accreditation by an accrediting agency recognized by the Secretary is an institutional and programmatic requirement for eligibility for the title IV, HEA programs.

It is appropriate to specify the responsibilities of an accrediting agency in reviewing institutions' processes for assigning credit hours in § 602.24, and not § 602.16. The provisions in § 602.24 are related specifically to procedures accrediting agencies must have for institutions they accredit to obtain eligibility to participate in title IV, HEA programs. The provisions in § 602.16(f) address the processes used by accrediting agencies in setting standards in statutorily-defined areas required for agencies to be recognized by the Secretary.

*Changes:* None.

*Comment:* A few commenters expressed concern about proposed § 602.24(f)(1)(ii), which requires accrediting agencies to determine whether an institution's assignment of credit hours conforms to commonly accepted practice in higher education.

A few commenters believed that this proposal was inconsistent with the proposed credit-hour definition in § 600.2 and expressed a preference for the language in proposed § 602.24(f)(1)(ii).

One commenter suggested striking this proposed provision from the regulations and including this information in the "Guide to the Accrediting Agency Recognition Process" issued by the Department. This guide was issued in August 2010 under the title "Guidelines for Preparing/Reviewing Petitions and Compliance Reports."

One commenter suggested revising proposed § 602.24(f)(1)(ii) to require accrediting agencies to evaluate institutions' assignment of credit hours based on a comparative study of similar institutions.

*Discussion:* We do not agree that the provisions in §§ 600.2 and 602.24(f)(1)(ii) are inconsistent. The provisions in § 600.2 establish a title IV, HEA program requirement for institutions

to award credit hours for an amount of academic work that is a reasonable equivalency to the amount of work defined in paragraph (1) of the credit-hour definition. By comparison, the reference to "commonly accepted practice in higher education" in § 602.24(f)(1)(ii) establishes the parameters for accrediting agencies to determine whether institutions establish reasonable equivalences for the amount of work in paragraph (1) of the credit-hour definition within the framework of acceptable institutional practices at comparable institutions of higher education.

We believe that it is necessary to include § 602.24(f)(1)(ii) in the regulations, rather than solely in the Department's "Guidelines for Preparing/Reviewing Petitions and Compliance Reports." The regulations provide the requirements for accrediting agencies recognized by the Secretary whereas the "Guidelines for Preparing/Reviewing Petitions and Compliance Reports" provides guidance to accrediting agencies seeking the Secretary's recognition and does not have the force of regulations. We will rely upon the accrediting agencies to choose the methods used to evaluate institutions' processes for assigning credit hours.

*Changes:* None.

*Comment:* One commenter expressed concern that the reference to "commonly accepted practice in higher education" in proposed § 602.24(f)(1)(ii) may require institutions that primarily use clock hours to adopt credit-hour assignment policies that were developed by traditional four-year degree granting institutions, but are unsuitable for specialized institutions.

*Discussion:* The reference to "commonly accepted practice in higher education" in § 602.24(f)(1)(ii) is not a requirement for clock-hour institutions to convert to credit hours.

*Changes:* None.

## Notification Requirements

*Comment:* Several commenters opposed proposed § 602.24(f)(4) that would require an accrediting agency, that identifies noncompliance with the agency's policies regarding an institution's credit assignments during a review under proposed § 602.24(f), to notify the Secretary of the identified deficiencies. A few commenters believed that proposed § 602.24(f)(4) lacked due process provisions. Some of these commenters believed that the notification requirement would force accrediting agencies to report minor or trivial credit-

hour problems to the Department. One commenter believed that institutions would not be afforded an opportunity to respond to allegations or attempt immediate corrective actions which may lead to delayed resolutions to credit assignment problems.

A few commenters believed that proposed § 602.24(f)(4) was redundant with regard to the existing notification requirements in § 602.27. These commenters suggested removing proposed paragraph § 602.24(f)(4) and cross-referencing § 602.27.

One commenter believed that proposed § 602.24(f)(4) contradicts the requirements of proposed § 602.24(f)(3) which requires an accrediting agency to take appropriate action to address any institutional deficiencies it identifies as part of its review under proposed § 602.24(f)(1)(i).

A few commenters believed that the terms "systemic noncompliance" and "significant noncompliance" in proposed § 602.24(f)(4) need clarification. One commenter suggested specifying that if an accrediting agency has any reason to believe that an institution is failing to meet its title IV, HEA program responsibilities, or is engaged in fraud or abuse, then that agency must notify the Department in accordance with existing regulations. Another commenter suggested specifying that if an accrediting agency determines that an institution does not develop and adhere to an acceptable credit assignment policy, then the agency must promptly notify the Secretary. This commenter also suggested that because institutions will be developing new credit policies, they should be afforded an adjustment period to receive and react to guidance from accrediting agencies on their credit assignment policies prior to being reported to the Secretary.

*Discussion:* We agree with the commenters that § 602.24(f)(4) does not specify due process provisions for institutions. Section 602.24(f)(4) only requires an accrediting agency to report its findings and an agency's process of establishing and reporting a finding will rely upon the agency's own procedures. The Secretary recognition process ensures that accrediting agency procedures provide due process. Further, we believe § 602.24(f)(4) is needed because it corresponds to the provisions in § 602.27 that require an accrediting agency to submit information upon request from the Secretary about an accredited or preaccredited institution's compliance with its title IV, HEA program responsibilities. The provisions in § 602.24(f)(4) specify the agency's existing responsibility under § 602.27 with regard to inappropriate institutional processes for assigning credits.

We do not agree with the commenter who believed that § 602.24(f)(3) and (f)(4) is contradictory. The provisions in § 602.24(f)(3) require an accrediting agency to take appropriate action to address any institutional deficiencies it identifies as part of its review under § 602.24(f)(1)(i). Section 602.24(f)(4), however, requires an accrediting agency to notify the Secretary of any severe deficiencies such as systemic or significant noncompliance with the agency's policies identified at an institution during a review under § 602.24(f).

The terms "systemic noncompliance" and "significant noncompliance" do not encompass trivial or minor deficiencies. The term "systemic noncompliance" refers to an institutional process for awarding credits that is fundamentally flawed with regard to assigning credit hours in accordance with the credit-hour definition in § 600.2 and its accrediting agencies policies. The term "significant noncompliance" refers to institutional assignment of credit hours to individual courses or programs that are particularly egregious with regard to the compliance with § 600.2.

We do not believe that it is necessary to delay the effective date of the definition of a credit hour in § 600.2 or § 602.24(f) in these final regulations. An institution must implement the definition of a credit hour regardless of whether its accrediting agency has issued guidance on the implementation of § 602.24(f). While an accrediting agency is required to implement § 602.24(f) effective July 1, 2011, we will review on a case-by-case basis, based on an adequate justification as determined by the Secretary, any reasonable request from an accrediting agency for a delayed implementation date.

*Changes:* None.

**State Agency Procedures (§ 603.24(c))**

*Back to Top*

**General**

*Comment:* Several commenters opposed proposed § 603.24(c). A few commenters believed that the proposed provisions would be confusing for State agencies and that State agencies do not have the administrative capabilities to review institutions' credit-hour policies. One commenter believed that the proposed provisions would lead to inconsistencies and inequalities between States based on States' reviews of institutions' credit policies and enforcement of institutions' compliance with the proposed credit-hour definition at § 600.2.

One commenter believed that some State agencies, such as those in Iowa, would not be able to comply with proposed §

603.24(c) because the agencies may operate within the defined scope authorized by the State code and compliance would require changes in State law. This commenter also believed that some State agencies would not have the expertise to evaluate institutions' credit policies.

One commenter suggested specifying that if a State agency determines that an institution does not develop and adhere to an acceptable credit assignment ☐ policy, the agency must promptly notify the Secretary.

One commenter believed that with regard to proposed § 603.24(c)(2), it would be appropriate for a State agency to review a sample of an institution's curriculum to determine whether the credit assignment policies were being appropriately applied by an institution, but it would not be appropriate for a State agency to employ an unspecified sample of other institutions to determine whether the credits awarded for a particular course or program conformed to commonly accepted practice in higher education. This commenter suggested revising proposed § 603.24(c)(1) to require State agencies to evaluate an institution's assignment of credit hours based on a comparative study of similar institutions, and to revise proposed § 603.24(c)(2) to specify that the agency must sample courses within an institution's program of study.

*Discussion:* We do not agree with the commenters who believed that State agencies subject to the recognition criteria in 34 CFR part 603 will be confused by § 603.24(c) or will lack the administrative resources to meet these requirements. To be subject to § 603.24(c), a State agency must be an agency recognized by the Secretary under 34 CFR part 603 as a reliable authority regarding the quality of public postsecondary vocational education in its State. The only States that currently have recognized State agencies under 34 CFR part 603 are New York, Pennsylvania, Oklahoma, and Puerto Rico.

As with accrediting agencies that are recognized by the Secretary, we do not believe it is necessary to define the specific methods that State agencies recognized by the Secretary should use to evaluate institutions' processes for assigning credit hours.

We believe that § 603.24(c)(4) provides the necessary level of specificity with regard to a recognized State agency's notification to the Secretary in case of institutional noncompliance with the credit-hour definition in § 600.2.

*Changes:* None.

**Program Eligibility: Clock-to-Credit-Hour Conversion (§ 668.8)**

Back to Top

*Comment:* One commenter questioned whether it is necessary to have a clock-to-credit-hour conversion if a credit hour is defined in the regulations and accrediting agencies are required to review institutional policies for awarding credits to ensure compliance. Two commenters believed that proposed §§ 600.2 and 668.8(l) define a credit hour in two different ways and are therefore inconsistent. These commenters believed that it is illogical to define credit hours for purposes of the title IV, HEA programs in different ways depending on whether or not a program is subject to the clock-hour-to-credit-hour conversion.

*Discussion:* On October 1, 1990, the Secretary published proposed regulations (55 FR 40148-40150) to establish standards for clock-to-credit-hour-conversion for undergraduate vocational training programs and on July 23, 1993, the Secretary published final regulations (58 FR 39618-39623) based on the public comments. The Secretary published the regulations to address significant abuse in the title IV, HEA programs, citing, for example, a 309 clock-hour program that was converted to a 27.7 quarter-credit program. We believe that the potential for such abuse continues to exist and that § 668.8(k) and (l) continues to be essential to the administrative integrity of the title IV, HEA programs. In § 668.8(l)(2) of the final regulations, we have included consideration by an institution's accrediting agency of the institution's policies and procedures, and their implementation, for determining credit hours in a program if an institution seeks to establish any conversions that are less than the conversion rate specified in § 668.8(l)(1).

Due to the separate conversion formula in new § 668.8(l), programs that are subject to the clock-to-credit-hour conversion in § 668.8(l) are exempted from using the credit-hour definition in § 600.2. Therefore, we do not believe there is any inconsistency between the definition in § 600.2 and the provisions of § 668.8(l).

*Changes:* None.

*Comment:* One commenter asked for clarification regarding whether an institution that was recently approved for a degree program must wait for students to graduate from the program before it utilizes the exemption, in proposed § 668.8(k)(1)(ii), from the requirements to perform a clock-to-credit-hour conversion under the provisions in proposed § 668.8(l) with regard to students in a diploma program in which all credits are fully transferable to the new degree program.

*Discussion:* Section 668.8(k)(1)(ii) provides that an institution's shorter length program is not subject to the conversion formula in § 668.8(l) if each course within the shorter program is acceptable for full credit toward a degree that is offered by the institution that requires at least two academic years of study. Additionally, under § 668.8(k)(1)(ii), an institution would be required to demonstrate that students enroll in, and graduate from, the longer length degree program. Thus, for a recently approved degree program that is at least two academic years in length, an institution must use clock hours for its title IV, HEA programs that are fully accepted for transfer into the new degree program until students graduate from the new degree program unless the institution offers other degree programs, each with graduates, and all the coursework in the first year of the program is acceptable for full credit toward one or more of these other degree programs. After students graduate from the new degree program, the programs at the institutions that are fully accepted for transfer into the new degree program will qualify under the exception in § 668.8(k)(1)(ii). We believe that it is essential that an institution is able to demonstrate that students graduate from the longer length degree program to ensure that the exception provided in § 668.8(k)(1)(ii) is being appropriately applied. We note that in an instance where a student is enrolled in a new degree program in which the first year of study may lead to a certificate or diploma and the second year provides an associate's degree, any student in the first year must have eligibility for title IV, HEA programs determined on a clock-hour basis until students graduate from the program with a degree after completing the second year.

*Changes:* None.

*Comment:* Several commenters did not agree with the provisions in proposed § 668.8(k)(2)(i)(A) and (B), which provide for when a program is required to measure student progress in clock hours.

Two commenters believed that if an institution's State licensing board or accrediting agency approve a credential to be awarded in credit hours, then that approval should be sufficient to award title IV, HEA program funds based on credit hours. These commenters believed that the provisions in § 668.8(k)(2)(i)(A) and (B) create an unnecessary duplication of services provided by these approving entities. One commenter believed that this provision would be detrimental to institutions that have received licensing, accrediting, or Federal approval to use credit hours because these institutions would need to convert to clock hours.

A few commenters believed that proposed § 668.8(k)(2)(i)(A) is unclear on the requirement to measure student progress in clock hours. These commenters believed that State agencies' disclosure and calculation requirements may involve clock hours ☐ but do not necessarily require that an institution measure student progress in clock hours. These commenters recommended revising proposed § 668.8(k)(2)(i)(A) so that an institution is not required to measure student progress in clock hours unless the Federal or State authority requires the institution to measure student progress exclusively in clock hours. One commenter believed that many accrediting agencies and State agencies require institutions to include a clock-to-credit-hour conversion rate as part of the new program submission process, but it is not the agencies' intent to consider these credit-hour programs as clock-hour programs. The commenter suggested adding a provision to proposed § 668.8(k)(2)(i)(A) so that it does not apply to institutions that are required to include a clock-to-credit-hour conversion rate in their accrediting agency or State application for a new program.

One commenter believed that accrediting agencies' standards vary with regard to requirements for programs offering a certain number of clock hours in order for a graduate to be eligible to take a certification or licensure exam and students' requirement to attend the programs' clock hours. This commenter believed that there should be no requirement for a program to be a clock-hour program unless an accrediting agency specifies that students must attend the clock hours to take the certification or licensure exam.

A few commenters believed that credit-hour programs are more recognized by employers and institutions. These commenters believed that it is difficult for students in clock-hour programs to transfer to credit-hour programs. The commenters also believed that employer-paid or employer-reimbursed tuition programs are generally administered based on credit hours.

One commenter believed that the proposed clock-to-credit-hour conversion provisions that only use credit hours were not consistent concerning States throughout the proposed regulations.

*Discussion:* The provisions in § 668.8(k)(2)(i)(A) provide that a program must be considered a clock-hour program for title IV, HEA program purposes if the program is required to measure student progress in clock hours for Federal or State approval or licensure. We believe that any requirement for a program to be measured in clock hours to receive Federal or

State approval or licensure, and any requirement for a graduate to complete clock hours to apply for licensure or authorization to practice an occupation demonstrates that a program is fundamentally a clock-hour program, regardless of whether the program has received Federal, State, or accrediting approval to offer the program in credit hours. As clock-hour programs, these programs are required to measure student progress in clock hours for title IV, HEA program purposes. In these circumstances where a requirement exists for the program to be measured in clock hours, this becomes the fundamental measure of that program for title IV, HEA program purposes. This outcome is not changed for such a program when an institution's State licensing board or accrediting agency also allows the institution to award a credential based upon credit hours, or when a State licensing board may require that a program be measured in clock hours but the program is approved by the institution's accrediting agency in credit hours. Further, because the institution is already required to report or otherwise establish the underlying clock hours of a program, we do not agree that provisions in § 668.8(k)(2)(i)(A) and (B) create an unnecessary duplication of services provided by these approving entities. We also do not believe that using clock hours for title IV, HEA program purposes will be detrimental to institutions that have received licensing, accrediting, or Federal approval to use credit hours for academic purposes. In the case of institutions that are required to include a clock-to-credit-hour conversion rate in their accrediting agency or State application for a new program, we do not believe those accrediting agency or State requirements would affect the application of the provisions of § 668.8(k)(2)(i)(A) and (B) because the institution is clearly required to establish the clock hours in the program to receive approval.

With regard to the commenters who believed that credit-hour programs are more recognized and accepted by employers and institutions, there are no provisions in § 668.8(k) and (l) that would prevent a program that must be considered a clock-hour program for title IV, HEA program purposes from also being offered in credit hours for academic or other purposes. We agree there was an inconsistency in proposed § 668.8(l)(2) with State requirements. Proposed § 668.8(l)(2) incorrectly referred to an institution's relevant State licensing authority when it should have referred to an institution's recognized State agency for the approval of public postsecondary vocational institutions that approves the institution in lieu of accreditation by a nationally recognized accrediting agency. This has been corrected.

*Changes:* Section 668.8(l)(2) has been modified to remove the reference from proposed § 668.8(l)(2) to an institution's relevant State licensing authority and now refers to an institution's recognized State agency for the approval of public postsecondary vocational institutions.

*Comment:* Several commenters did not agree with proposed § 668.8(k)(2)(iii) that provides that an institution must require attendance in the clock hours that are the basis for credit hours awarded, except as provided in current § 668.4(e).

Some of these commenters questioned the effect this provision would have on institutions' attendance policies and asked that the Department clarify whether institutions are required to take attendance and have attendance policies that prohibit students from having absences. Two commenters believed that institutions would be required to take attendance in clock hours and credit hours. A few commenters noted that institutions that recently converted to systems using credit hours instead of clock hours, but that do not take attendance, would be particularly burdened.

A few commenters believed that the Department did not address how institutions should handle typical classroom absences or extended leaves of absence when calculating clock hours completed or converting credit hours to clock hours. One commenter expressed concern that this provision in proposed § 668.8(k)(2)(iii) would decrease institutions' ability to address students' needs in regard to absences. A few commenters asked whether a student must attend 100 percent of the clock hours in a course in order to receive credit for the course.

One commenter believed that the proposed provision is impractical because most institutions use a 50-minute instructional hour instead of a 60-minute clock hour. This commenter also believed that the provision was unclear on whether the relevant clock hours would be considered to be provided if no instructor appeared for the clock hour.

One commenter believed that the Department should clearly state in the final regulations that § 668.8(k)(2)(iii) is not intended to be a test of the reasonable equivalencies that institutions can develop with regard to determining credit hours as that term is defined in proposed § 600.2.

*Discussion:* We believe it is essential for an institution to require students to ☐ complete the clock hours that are the basis for the credit hours awarded in a program even when an institution converts a program to credit hours under the

provisions of § 668.8(k) and (l). These programs are still required to contain the clock hours that support the conversion under the regulations, and institutions are expected to make sure that those clock hours are completed by the students, subject to the institution's existing policies for excused absences and make-up classes.

We do not agree with the commenters who believe that § 668.8(k)(2)(iii) does not provide for excused absences or would require 100 percent attendance, because the regulations for clock hour programs already account for excused absences. Section 668.8(k)(2)(iii) specifically accounts for excused absences in accordance with the current regulations in § 668.4(e) which provides guidance on when an institution, in determining whether a student has successfully completed the clock hours in a payment period, may include clock hours for which the student has an excused absence. An institution should ensure that students taking a program in credit hours are still completing the clock hours associated with the conversion, and excused absences from the classes should be within the tolerance permitted in the clock hour regulations. With regard to a leave of absence, an institution is expected to ensure that a student returning from an approved leave of absence still completes the clock hours that are needed to support the conversion for the program.

We do not agree with the commenter who believed that § 668.8(k)(2)(iii) is impractical because most institutions use a 50-minute instructional hour instead of a 60-minute clock hour. A clock hour is currently defined in § 600.2 as (1) a 50- to 60-minute class, lecture, or recitation in a 60-minute period; (2) a 50- to 60-minute faculty-supervised laboratory, shop training, or internship in a 60-minute period; or (3) sixty minutes of preparation in a correspondence course. We also do not agree with this commenter's belief that the provision is unclear on whether the relevant clock hours would be considered to be provided if no instructor appeared for the clock hour. If a student is unable to complete a clock hour because the instructor is not present, there is no clock hour to be counted towards meeting the required clock hours unless it may be counted as an approved absence.

*Changes:* None.

*Comment:* One commenter believed that the Department should clearly state in the final regulations that § 668.8(k)(2) (iii) is not intended to be a test of the reasonable equivalencies that institutions can develop with regard to determining credit hours as that term is defined in § 600.2.

*Discussion:* We do not believe it is necessary to amend § 668.8(k)(2)(iii) to state that the provision is not intended to be a test of the reasonable equivalencies that institutions can develop with regard to determining credit hours as defined in § 600.2. The credit-hour definition in § 600.2 specifically excludes its applicability to a program subject to the conversion formula in § 668.8(l).

*Changes:* None.

*Comment:* Many commenters believed that proposed § 668.8(l) would decrease students' eligibility for title IV, HEA program funds. These commenters believed that students enrolled in short-term and nondegree programs measured in credit hours would unjustly experience a decrease in their eligibility for title IV, HEA program funds because the proposed clock-to-credit-hour conversion would require institutions to use 900 clock hours instead of the current 720 clock hours to support the same amount of credit hours.

These commenters believed that students' decreased eligibility would force them to withdraw from short-term and nondegree programs or rely on loans which would increase their debt. One of these commenters expressed concern that the decreased eligibility for title IV, HEA program funds would disproportionately impact nontraditional and financially disadvantaged students.

*Discussion:* We do not agree with the commenters who believed that students currently enrolled in short-term or nondegree programs would unjustly experience a decrease in their eligibility for title IV, HEA program funds nor do we believe that the conversion formula inappropriately impacts students' title IV, HEA program eligibility. We do not believe that the clock-to-credit-hour conversion rate in current § 668.8(l) provides equitable outcomes for students taking similar programs measured in clock-hours and credit hours. The current regulations result in students in some credit hour programs having greater eligibility based on a conversion from clock hours to credit hours that assumed student work outside of class is always present in the same ratio to the time the students spend in class. The changes to the conversion formula in § 668.8(l) of these final regulations provide for a more equitable accounting for student work outside of class. New § 668.8(l)(2) would provide for conversion based on the varying rates of work outside class for particular educational activities within a student's courses or program rather than mandating the use of a constant ratio that may be incorrect. An institution applying the appropriate conversion rate to a program in accordance with § 668.8(l)(1) would be considered compliant

with § 668.8(l).

*Changes:* None.

*Comment:* Many commenters believed that the proposed clock-to-credit-hour conversion formula would force institutions to increase the lengths of their programs or offer associate's degrees in order to retain their eligibility for title IV, HEA program funds. Several of these commenters believed that increasing program lengths would cause financial hardships for students by delaying students' entry into workforce and increasing tuition. A few commenters believed that many programs would be potentially eliminated because of the institutional burden of unnecessarily extending program lengths.

*Discussion:* We do not agree with these commenters. Under the current regulations in § 668.8(d), public and private nonprofit institutions and proprietary institutions offering undergraduate programs may have eligible programs with a minimum of 600 clock hours, 16 semester or trimester hours, or 24 quarter hours. To the extent that any short-term programs would not have been eligible for title IV, HEA program funds in the past due to the inequitable clock-to-credit-hour conversion rate, we believe that students enrolled in these programs should not have been eligible for title IV, HEA program funds. Short-term programs offered in credit hours that contained outside work that met or exceeded the assumed outside work that was implicit in the conversion should be in compliance with the new requirements and unaffected by the change.

*Changes:* None.

*Comment:* A few commenters questioned how proposed § 668.8(l) would affect institutional credit policies. One commenter believed that programs that were designed to be compliant with the clock-to-credit-hour conversion ratio for a semester hour in current § 668.8(l) cannot be easily or quickly changed because using the ratio alters the delivery, design, and curricular structure of the programs.

One commenter requested clarification of how the conversion should be applied when one program has courses that require outside work and other courses that do not.

*Discussion:* We do not believe that it is necessary for programs to change their structure or credit assignments for academic purposes if they are subject to the conversion formula in new § 668.8(l); however, institutions are responsible for ensuring that the credit hours awarded for title IV, HEA program

purposes comply with the provisions in § 668.8(l). In some instances, there may be no discernable difference between institutions' determinations of credit hours for academic purposes and title IV, HEA program purposes depending on the outcome of determinations of work outside of class and instructional periods within a program. Some institutions may currently award fewer credits then the existing regulations allow or would be allowed under the final regulations.

The provisions in § 668.8(l)(2) provide an exception to the minimum standard for converting clock hours to credit hours in § 668.8(l)(1) for coursework in a program that qualifies for a lesser rate of conversion based on additional student work outside of class. In a case where a program offers courses with work outside of class, an institution must use the standards in § 668.8(l)(1) for the courses without the work outside of class and may apply the exception in § 668.8(l)(2) to courses with work outside of class.

*Changes:* None.

*Comment:* One commenter supported proposed § 668.8(l)(2) because it provides institutions the ability to account for work outside of class. One commenter supported the provision, but recommended that the Department specify when an institution is eligible to use work outside of class as part of the total clock-hour calculation.

A few commenters asked for clarification regarding proposed § 668.8(l)(2) and the work outside of class that may be combined with clock hours of instruction in order to meet or exceed the numeric requirements established in § 668.8(l)(1). These commenters requested clarification on how institutions should measure student's completion of work outside of class, whether work outside of class should be identified in course syllabi, whether work outside of class should be graded, and what entity should determine that a program is suited to include work outside of class.

*Discussion:* Under § 668.8(l)(2), an institution may use a determination of appropriate amounts of work outside of class for various educational activities in a course or program in determining the appropriate conversion rate from clock hours to credit hours for each educational activity in the course or program. However, we do not believe that it is appropriate for the Department to provide more specificity for determining the appropriate conversion rates for various educational activities in a course or program. An institution, in accordance with the requirements of its designated accrediting agency, or State agency for the approval of public postsecondary

vocational institutions, recognized under **34 CFR 603**, is responsible for making determinations of the appropriate credit hours under proposed § 668.8(l)(2). If an institution is unsure of how to apply the provisions of § 668.8(l)(2) to a program, it would be considered compliant if it uses the appropriate conversion ratio specified in § 668.8(l)(1).

*Changes:* None.

*Comment:* One commenter suggested eliminating the provision in proposed § 668.8(k)(2)(ii) that requires institutions to measure student progress in clock hours in any program if the credit hours awarded for the program are not in compliance with the definition of credit hour in § 600.2. The commenter believed the Secretary's proposed credit-hour definition in § 600.2 allowed the Secretary to interfere in academic matters.

*Discussion:* The definition of credit hour in § 600.2 is intended to establish a quantifiable, minimum basis for a credit hour for Federal program purposes, including the title IV, HEA programs. We believe that it is necessary to establish the standards by which a program that awards credit hours that are not in compliance with the definition of credit hour in § 600.2 may still be eligible for title IV, HEA program funds. Thus, § 668.8(k)(2)(ii) provides that a program that does not award credit hours in compliance with § 600.2 may still be eligible for title IV, HEA programs using the underlying clock-hours of the program.

*Changes:* None.

*Comment:* A few commenters requested clarification on how to address students that are already enrolled in programs that may change the measurement of student progress to comply with proposed § 668.8(k) and (l). A few of these commenters also requested additional time to comply with the proposed regulations in these sections. One commenter requested that current students should be permitted to complete their programs using the current conversion ratio. One commenter asked that the Secretary allow institutions that offered credit-hour programs in the 2010-11 academic year, but will need to measure student progress in clock hours under proposed § 668.8(k)(2)(i)(B), to continue measuring student progress in these programs using credit hours.

One commenter asked whether institutions are required to execute revised Enrollment Agreements with currently enrolled students when the new regulations take effect.

One commenter suggested that the conversation rate in §

668.8(l) should not be applied to existing programs for at least one year from July 1, 2011 to allow for accrediting agencies to create procedures for assessing institutions' assignment of credit hours. This commenter added that only new programs should be required to use the proposed conversion rate.

One commenter requested that the proposed provisions in § 668.8(l)(2)(i) not take effect for two award years in order for institutions that use clock hours to have time to redesign their programs.

*Discussion:* We agree with the commenters' concerns regarding the applicability of the changes to § 668.8(k) and (l) to students enrolled prior to the effective date of these regulations in programs affected by the changes in the requirements. We agree that for students enrolled in programs subject to the provisions in § 668.8(k) and (l) as of the July 1, 2011 effective date of these final regulations, an institution may choose to apply the regulations in current § 668.8(k) and (l) until these students complete the program or to apply amended § 668.8(k) and (l) in these final regulations for all students enrolled in payment periods or assigned to the 2011-12 and subsequent award years. For students who enroll or reenroll on or after July 1, 2011 in programs affected by changes in § 668.8(k) and (l), institutions must determine title IV, HEA eligibility using § 668.8(k) and (l) in these final regulations.

We do not agree that a delay in the effective date is needed for institutions to allow institutions more time to bring their existing programs into compliance. If an institution's accrediting agency, or State agency, is not yet compliant with the provisions of § 602.24(f) for an accrediting agency, or § 603.24(c) for a State agency, the institution must use the conversion formula in § 668.8(l)(1) of these final regulations until the State agency and accrediting agency are compliant.

*Changes:* None. 

## State Authorization (§§ 600.4(a)(3), 600.5(a)(4), 600.6(a)(3), 600.9, and 668.43(b))

Back to Top

## General—No Mandate for a State Licensing Agency

*Comment:* Several commenters believed the proposed regulations would create mandates for States to create new State oversight bodies or licensing agencies, or compel States to create bureaucratic structures that would further strain higher education resources. Some commenters believed that a majority of the States would have to modify licensing requirements or adopt new legislation and that the regulations would cause a major shift in State responsibility.

*Discussion:* These final regulations do not mandate that a State create any licensing agency for purposes of Federal program eligibility. Under the final regulations, an institution may be legally authorized by the State based on methods such as State charters, State laws, State constitutional provisions, or articles of incorporation that authorize an entity to offer educational programs beyond secondary education in the State. If the State had an additional approval or licensure requirement, the institution must comply with those requirements. In the case of an entity established as a business or nonprofit charitable organization, *i.e.,* not as an educational institution, the entity would be required to have authorization from the State to offer educational programs beyond secondary education. While these final regulations require the creation of a State licensing agency, a State may choose to rely on such an agency to legally authorize institutions to offer postsecondary education in the State for purposes of Federal program eligibility.

*Changes:* None.

*Comment:* Several commenters supported the proposed regulations as an effort to address fraud and abuse in Federal programs through State oversight. An association representing State higher education officials noted that despite differences in State practice, all the States, within our Federal system, have responsibilities to protect the interests of students and the public in postsecondary education and supported the basic elements of proposed § 600.9. A State agency official praised the Department's proposed regulations but suggested that the Department insert "by name" in the proposed § 600.9(a)(1) to provide some protection against recurrence of situations such as the one in California when the State licensing agency lapsed prior to the State renewing the agency or a successor to the agency and no State approval was in place that named an institution as licensed or authorized to operate in the State.

*Discussion:* We appreciate the support of the commenters. We agree with the commenter that a State's authorization should name the institution being authorized. We believe that by naming the institution in its authorization for the institution to offer postsecondary education in the State, the State is providing the necessary positive authorization expected under § 600.9.

*Changes:* We are amending proposed § 600.9, where appropriate, to recognize that an institution authorized by name in a State will meet the State authorization requirements as discussed further in response to other comments.

*Comment:* Some commenters believed that the proposed

regulations exceeded the Department's authority and infringed on the States' authority. One commenter requested that the proposed regulations be eliminated because private institutions are authorized through various unique authorizations. Another commenter believed that the proposed regulations upset the balance of the "Triad" of oversight by States, accrediting agencies, and the Federal Government. One commenter questioned whether the Department could impose conditions restricting a State's freedom of action in determining which institutions are authorized by the State by requiring that a State's authorization must be subject to, for example, adverse actions and provision for reviewing complaints. The commenter believed that there was no intent to have the Department impose such conditions. Another commenter believed that proposed § 600.9 unnecessarily intruded on each State's prerogative to determine its own laws and regulations relative to the authorization of higher education institutions and to define the conditions for its own regulations. One commenter suggested that the Department only apply proposed § 600.9 to the problem areas that the commenter identified as substandard schools, diploma mills, and private proprietary institutions.

One commenter believed that the proposed regulations would infringe upon the States' sovereignty by commanding state governments to implement legislation enacted by Congress. Specifically, the commenter noted that under the proposed regulations the States must adopt legislation or rules that expressly authorize institutions to offer postsecondary programs and further make such an authorization subject to adverse action by the State and that the proposed regulations would require that States establish a process to act on complaints about the institution and enforce State laws against the institution. The commenter believed that the Department would improperly direct State officials to participate in the administration of a federally enacted regulatory scheme in violation of State Sovereignty. By doing so, the commenter believed that the Federal Government would be forcing State governments to absorb the financial burden of implementing a Federal regulatory program, while allowing the Federal government to take credit for "solving" problems without having to ask their constituents to pay for the solutions with higher Federal taxes. The commenter believed that the Department cannot construe the HEA to require a State to regulate according to the Department's wishes. The commenter believed that such a construction would exceed the Department's authority under the HEA and violate the States'

rights under the Tenth Amendment.

*Discussion:* We disagree with the commenters that the proposed regulations exceed the Department's authority and infringe on States' authority. Under the provisions of the HEA and the institutional eligibility regulations, the Department is required to determine whether an institution is legally authorized by a State to offer postsecondary education if the institution is to meet the definition of an institution of higher education, proprietary institution of higher education, or postsecondary vocational institution (20 U.S.C. 1001 and 1002) as those terms are defined in §§ 600.4, 600.5, and 600.6 of the institutional eligibility regulations. In accordance with the provisions of the HEA, the Department is establishing minimum standards to determine whether an institution is legally authorized to offer postsecondary education by a State for purposes of Federal programs. The proposed regulations do not seek to regulate what a State must do, but instead considers whether a State authorization is sufficient for an institution that participates, or seeks to participate, in Federal programs.

Contrary to the commenter's suggestion that the Department is upsetting the Triad, we believe these regulations clarify the role of the States, a key participant in the Triad, in establishing an institution's eligibility for Federal programs. Further, the Department believes that clarifying the State role in the Triad will address some of the oversight concerns raised by ☐ another commenter regarding problem areas with certain types of institutions.

*Changes:* None.

*Comment:* Several commenters questioned the need for proposed § 600.9. For example, several commenters questioned whether the Department's concern that the failure of California to reinstate a State regulatory agency was justified. Commenters believed that the regulations would not have prevented the concerns the Department identified in the case of the lapsing of the California State agency. One commenter believed the California issue was resolved and that accreditation and student financial aid processes worked. Some commenters believed that the current State regulatory bodies or other authorization methods were sufficient. One commenter stated that authorizations are spelled out in State statutes, and there is no need for the regulations. Some commenters believed that additional information is needed, such as a State-by-State review of the impact of proposed § 600.9, or the States with adequate or inadequate oversight. Several commenters were concerned that proposed § 600.9

would unnecessarily impact small States without discernable problems. Some commenters believed there is no evidence of marginal institutions moving to States with lower standards and that there is no danger to title IV, HEA program funds. One commenter believed that proposed § 600.9 should be eliminated because the commenter believed that its full effect is not known and that it will be chaotic if implemented. Another commenter believed that proposed § 600.9 would be burdensome, is not economically feasible, and would leave an institution at the mercy of the State. One commenter believed that proposed § 600.9 would encourage for-profit institutions to undermine State agencies such as through lobbying to underfund an agency and would stall reconsideration of legislation.

Some commenters believed that the Department's concerns were valid. One of these commenters believed that, in the absence of regulations, many States have forfeited their public responsibilities to accrediting agencies. In the case of the interim lapse of the State regulatory agency in California, the commenter believed that we do not know yet the extent of the mischief that may have occurred or may still occur, but the commenter has received reports that schools began operating in the gap period and are being allowed to continue to operate without State approval until the new agency is operational. The commenter understood that at least one of those schools closed abruptly, leaving many students with debts owed and no credential to show for their efforts.

Some commenters believed that the proposed regulations would not address issues with degree mills as they are not accredited. Some commenters urged the Department to offer leadership and support of Federal legislation and funding to combat diploma mills.

One commenter recommended that the Department use Federal funds for oversight. Another commenter suggested that the Department encourage the Federal Government to provide incentives to the States.

*Discussion:* We do not agree with the commenters who believe that proposed § 600.9 should be eliminated. For example, we believe these regulations may have prevented the situation in California from occurring or would have greatly reduced the period of time during which the State failed to provide adequate oversight. While it may appear that the California situation was satisfactorily resolved as some commenters suggested, the absence of a regulation created uncertainty. As one commenter noted, during the period when the State failed to act, it appears that problems did occur, and that no process

existed for new institutions to obtain State authorization after the dissolution of the State agency. We are concerned that States have not consistently provided adequate oversight, and thus we believe Federal funds and students are at risk as we have anecdotally observed institutions shopping for States with little or no oversight. As a corollary effect of establishing some minimal requirements for State authorization for purposes of Federal programs, we believe the public will benefit by reducing the possibilities for degree mills to operate, without the need for additional Federal intervention or funding. We do not believe that additional information is needed to support § 600.9 in these final regulations as § 600.9 only requires an institution demonstrate that it meets a minimal level of authorization by the State to offer postsecondary education. Because the provisions of § 600.9 are minimal, we believe that many States will already satisfy these requirements, and we anticipate institutions in all States will be able to meet the requirements under the regulations over time. This requirement will also bring greater clarity to State authorization processes as part of the Triad. Since the final regulations only establish minimal standards for institutions to qualify as legally authorized by a State, we believe that, in most instances they do not impose significant burden or costs. States are also given numerous options to meet these minimum requirements if they do not already do so, and this flexibility may lead to some States using different authorizations for different types of institutions in order to minimize burden and provide better oversight. The question of whether these regulations will impact the ability of any group to seek changes to a State's requirements is beyond the purview of these final regulations. As one commenter requested, we will continue to support oversight functions as provided under Federal law, and we believe that these final regulations will provide the necessary incentives to the States to assure a minimal level of State oversight.

*Changes:* None.

*Comment:* Some commenters questioned how the Department would enforce the proposed regulations. One commenter stated that the Department has no mechanism to enforce the proposed regulations and asks how they will improve program integrity. One commenter questioned why an institution may be held accountable for the actions of the State over which it has no direct control.

*Discussion:* Any institution applying to participate in a Federal program under the HEA must demonstrate that it has the legal authority to offer postsecondary education in accordance with

§ 600.9 of these final regulations. If a State declines to provide an institution with legal authorization to offer postsecondary education in accordance with these regulations, the institution will not be eligible to participate in Federal programs.

As to an institution's inability to control the actions of a State, we do not believe such a circumstance is any different than an institution failing to comply with an accreditation requirement that results in the institution's loss of accredited status. We believe that in any circumstance in which an institution is unable to qualify as legally authorized under § 600.9 of these final regulations, the institution and State will take the necessary actions to meet the requirements of § 600.9 of these final regulations.

*Changes:* None.

*Comment:* One commenter believed that proposed § 600.9 would result in an unfunded mandate by the Federal Government. Another commenter stated that many States may see proposed § 600.9 as a revenue-generating opportunity and pass the costs of this requirement on to institutions, which would have no choice but to pass that cost on to students.

*Discussion:* We do not agree that § 600.9 of these final regulations will result in an unfunded mandate by the Federal Government, since many States will already be compliant and options are available that should permit other States to come into compliance with only minimal changes in procedures or requirements if they want to provide acceptable State authorizations for institutions. The regulations also include a process for an institution to request additional time to become compliant. Furthermore, if a State is unwilling to become compliant with § 600.9, there is no requirement that it do so. We also do not agree that States will see coming into compliance with § 600.9 as a revenue-generating opportunity, since any required changes are likely to be minimal.

*Changes:* None.

## Implementation

*Comment:* Some commenters believed that the proposed regulations are ambiguous in meaning and application or are vague in identifying which State policies are sufficient. For example, one State higher education official suggested that proposed § 600.9 should be amended to differentiate among authorities to operate arising from administrative authorization of private institutions from legislation and from constitutional provisions assigning responsibility to operate

public institutions. The commenter believed that proposed § 600.9 obfuscated the various means of establishing State authorization and the fundamental roles of State legislatures and State constitutions and recommended that these means of authorization and roles of State entities should be clarified.

Several commenters questioned what authorizing an institution to offer postsecondary programs entails. A few commenters pointed out that there is a wide array of State approval methods and many institutions were founded before the creation of State licensing agencies. An association representing State higher education officials urged that ample discretionary authority explicitly be left to the States. One commenter indicated that proposed § 600.9 failed to address when more than one State entity is responsible for a portion of the oversight in States where dual or multiple certifications are required. Another commenter believed that proposed § 600.9 did not adequately address the affect an institution's compliance with proposed § 600.9 would have if one of two different State approvals lapsed and both were necessary to be authorized to operate in the State or if the State ceased to have a process for handling complaints but the institutions continued to be licensed to offer postsecondary education. Some commenters asked whether specific State regulatory frameworks would meet the provisions of the proposed regulations. For example, one commenter believed that, under State law and practice in the commenter's State, the private institutions in the State already met the requirements in proposed § 600.9 that the commenter believed included: (1) The institution being authorized by a State through a charter, license, approval, or other document issued by an appropriate State government agency or State entity; (2) the institution being authorized specifically as an educational institution, not merely as a business or an eleemosynary organization; (3) the institution's authorization being subject to adverse action by the State; and (4) the State having a process to review and appropriately act on complaints concerning an institution. The commenter noted that all postsecondary institutions in the State must either have a "universal charter" awarded by the legislature or be approved to offer postsecondary programs. The commenter noted that these institutions are authorized as educational institutions, not as businesses. In another example, a commenter from another State believed that current law in the commenter's State addresses and covers many of the requirements outlined in proposed § 600.9. The commenter noted that many of the State laws are enforced by the State's Attorney General and attempt to protect individuals from fraud and abuse in the State's system of higher

education. However, the commenter believed that it remained unclear whether the State would be required to create an oversight board for independent institutions like the commenter's institution or would be subject to State licensure requirements via the State licensure agency. The commenter believed that either option would erode the autonomy of the commenter's institution and add layers of bureaucracy to address issues currently covered by State and Federal laws.

One commenter suggested that proposed § 600.9(a)(1) be amended to provide that authorization may be based on other documents issued by an appropriate State government agency and delete the reference to "state entity." The commenter believed that the documents would affirm or convey the authority to the institution to operate educational programs beyond secondary education by duly enacted State legislation establishing an institution and defining its mission to provide such educational programs or by duly adopted State constitutional provisions assigning authority to operate institutions offering such educational programs.

Some commenters questioned whether there were any factors that a State may not consider when granting legal authorization. One commenter requested confirmation that under the proposed regulations authorization does not typically include State regulation of an institution's operations nor does it include continual oversight. A few commenters expressed concern regarding the involvement of the States in authorization and that a State's role may extend into defining, for example, curriculum, teaching methods, subject matter content, faculty qualifications, and learning outcomes. One commenter was concerned that proposed § 600.9 would create fiscal constraints on an institution due to, for example, additional reporting requirements or would impose homogeneity upon institutions that would compromise their unique missions. One commenter stated that the Department does not have the authority to review issues of academic freedom or curriculum content.

One commenter wanted assurances that the Department does not intend to use the proposed regulations to strengthen State oversight of colleges beyond current practices. One commenter was concerned that States could exercise greater and more intrusive oversight of private colleges.

One commenter suggested that the Department grandfather all institutions currently operating under a State's regulatory authority without a determination of its adequacy. Another indicated that private colleges and universities operating under a State-approved charter issued prior to 1972 are

already subject to State regulation, even as they are exempt from State licensing. One commenter believed that the Department should accept State laws and regulations that can be reasonably interpreted as meeting the regulatory requirements.

*Discussion:* We agree with the commenters who were concerned that proposed § 600.9 may be viewed as ambiguous in describing a minimal standard for establishing State legal authorization. We agree, in principle, with the State higher education official who suggested that proposed § 600.9 should be amended to differentiate the types of State authorizations for institutions to operate, but not based upon whether the source of the authorization is administrative or legislative. We believe the distinction for purposes of Federal programs is whether the legal entities are specifically established under State requirements as educational institutions or instead are established as business or nonprofit charitable organizations that may operate without being specifically established as educational institutions. We believe this clarification addresses the concerns of whether specific States' requirements were compliant with § 600.9 as provided in these final regulations.

We continue to view State authorization to offer postsecondary educational programs as a substantive requirement where the State takes an active role in authorizing an institution to offer postsecondary education. This view means that a State may choose a number of ways to authorize an institution either as an educational institution or as a business or nonprofit charitable organization without specific authorization by the State to offer postsecondary educational programs. These legal means include provisions of a State's constitution or law, State charter, or articles of incorporation that name the institution as established to offer postsecondary education. In addition, such an institution also may be subject to approval or licensure by State boards or State agencies that license or approve the institution to offer postsecondary education. If a legal entity is established by a State as a business or a nonprofit charitable organization and not specifically as an educational institution, it may be subject to approval or licensure by State boards or State agencies that license or approve the institution to offer postsecondary education. The key issue is whether the legal authorization the institution receives through these means is for the purpose of offering postsecondary education in the State.

In some instances, as one commenter noted, a State may have multiple State entities that must authorize an institution to offer postsecondary programs. In this circumstance, to comply

with § 600.9, we would expect that the institution would demonstrate that it was authorized to offer postsecondary programs by all of the relevant State entities that conferred such authorizations to that type of institution.

We do not believe it is relevant that an institution may have been established prior to any State oversight. We are concerned that institutions currently be authorized by a State to offer postsecondary education, although we recognize that a State's current approval for an institution may be based on historical facts. We therefore do not believe it is necessary to grandfather institutions currently operating under a State's regulations or statutes nor are we making any determination of the adequacy of a State's methods of authorizing postsecondary education apart from meeting the basic provisions of § 600.9 in these final regulations. If a private college or university is operating under a State-approved charter specifically authorizing the institution by name to offer postsecondary education in the State, a State may exempt an institution from any further State licensure process. The requirement to be named specifically in a State action also applies if the institution is exempt from State licensure based upon another condition, such as its accreditation by a nationally recognized accrediting agency or years in operation.

Further, these regulations only require changes where a State does not have any authorizing mechanisms for institutions other than an approval to operate as a business entity, or does not have a mechanism to review complaints against institutions. We anticipate that many States already meet these requirements, and will have time to make any necessary adjustments to meet the needs of the institutions.

With regard to the commenters who were concerned with the potential scope of a State's authority, we note that the Department does not limit a State's oversight of institutions, and only sets minimum requirements for institutions to show they are legally authorized by a State to provide educational programs above the secondary level. These regulations neither increase nor limit a State's authority to authorize, approve, or license institutions operating in the State to offer postsecondary education. Further, nothing in these final regulations limits a State's authority to revoke the authorization, approval, or license of such institutions. Section 600.9 ensures that an institution qualifies for Federal programs based on its authorization by the State to offer postsecondary education.

*Changes:* We are amending proposed § 600.9 to distinguish the type of State approvals that are acceptable for an

institution to demonstrate that it is authorized by the State to offer educational programs beyond the secondary level.

An institution is legally authorized by the State if the State establishes the institution by name as an educational institution through a charter, statute, constitutional provision, or other action to operate educational programs beyond secondary education, including programs leading to a degree or certificate. If, in addition, the State has an applicable State approval or licensure process, the institution must also comply with that process to be considered legally authorized. However, an institution created by the State may be exempted by name from any State approval or licensure requirements based on the institution's accreditation by an accrediting agency recognized by the Secretary or based upon the institution being in operation for at least 20 years.

If the legal entity is established by a State as a business or a nonprofit charitable organization and not specifically as an educational institution, the State must have a separate procedure to approve or license the entity by name to operate programs beyond secondary education, including programs leading to a degree or certificate. For an institution authorized under these circumstances, the State may not exempt the entity from the State's approval or licensure requirements based on accreditation, years in operation, or other comparable exemption.

The following chart and examples illustrate the basic principles of amended § 600.9: ☐

| Meets State Authorization Requirements* | Back to Top | |
|---|---|---|
| **Legal entity** | **Entity description** | **Approval or licensure process** |
| Educational institution | A public, private nonprofit, or for-profit institution established by name by a State through a charter, statute, or other action issued by an appropriate State agency or State entity as an educational institution authorized to operate educational programs beyond secondary education, including programs leading to a degree or certificate | The institution must comply with any applicable State approval or licensure process and be approved or licensed by name, and may be exempted from such requirement based on its accreditation, or being in operation at least 20 years, or use both criteria. |
| Business | A for-profit entity established by the State on the basis of an authorization or license to conduct commerce or provide | The State must have a State approval or licensure process, and the institution must |

| | services | | comply with the State |
| --- | --- | --- | --- |
| | | | approval or licensure |
| | | | process and be |

*Examples*

*Institutions considered legally authorized under amended §
600.9:*

- A college has a royal charter from the colonial period
  recognized by the State as authorizing the institution by
  name to offer postsecondary programs. The State has no
  licensure or approval process.

- A community college meets the requirements based upon
  its status as a public institution.

- A nonprofit institution has State constitutional
  authorization by name as a postsecondary institution;
  State does not apply a licensure or approval process.

- A nonprofit institution has a State charter as a
  postsecondary institution. State law, without naming the
  institution, considers the institution to be authorized to
  operate in lieu of State licensure based on accreditation
  by a regional accrediting agency.

- An individual institution is owned by a publically traded
  corporation that is incorporated in a different State from
  where the institution is located. The institution is licensed
  to provide educational programs beyond the secondary
  level in the State where it is located.

- An institution is owned by a publicly traded corporation
  established as a business without the articles of
  incorporation specifying that the institution is authorized
  to offer postsecondary education, but the institution is
  licensed by the State to operate postsecondary education
  programs.

- An individual institution is owned by a publically traded
  corporation that is incorporated in a different State from
  where the institution is located. The State licenses the
  institution by name as a postsecondary institution.

- Rabbinical school awarding only a certificate of Talmudic
  studies has exemption as a religious institution offering
  only religious programs.

- Tribal institution is chartered by the tribal government.

*Institutions not considered legally authorized under amended
§ 600.9:*

- An institution is a publicly traded corporation established

as a business without the articles of incorporation specifying that it is authorized to offer postsecondary education, and the State has no process to license or approve the institution to offer postsecondary education.

- A nonprofit institution is chartered as a postsecondary institution. A State law considers the institution to be authorized based on accreditation in lieu of State licensure but the institution is not named in the State law and does not have a certification by an appropriate State official, *e.g.,* State Secretary of Education or State Attorney General, that it is in compliance with the exemption for State licensure requirements.

- An institution is established as a nonprofit entity without specific authorization to offer postsecondary education, but State law considers the institution to be authorized based on it being in operation for over 30 years. The State Secretary of Education issues a certificate of good standing to the institution naming it as authorized to offer postsecondary education based on its years in operation.

- A Bible college is chartered as a religious institution and offers liberal arts and business programs as well as Bible studies. It is exempted by State law from State licensure requirements but does not meet the definition of a religious institution exempt from State licensure for Federal purposes because it offers other programs in addition to religious programs.

- An institution is authorized based solely on a business license, and the State considers the institution to be authorized to offer postsecondary programs based on regional accreditation.

*Comment:* One commenter provided proposed wording to amend proposed § 600.9(a)(1) to clarify that the State entity would include a State's legal predecessor. The commenter believed that the change was necessary to ensure that colonial charters would satisfy the State authorization requirement.

*Discussion:* If a State considers an institution authorized to offer postsecondary education programs in the State based on a colonial charter that established the entity as an educational institution offering programs beyond the secondary level, the institution would be considered to meet the provisions of § 600.09(a)(1)(i) of these final regulations so long as the institution also meets any additional licensure requirements or approvals required by the State.

*Changes:* None.

*Comment:* Several commenters expressed concern that all

institutions within a State could lose title IV, HEA program eligibility at once and that the regulations put students at risk of harm through something neither they nor the institution can control.

One commenter was concerned with how the Department would specifically assess State compliance with proposed § 600.9. Another commenter believed □ that the Department should accept State laws and regulations that can be reasonably interpreted as meeting the requirements of § 600.9 especially if State officials interpret their laws and regulations in such a manner.

One commenter requested that the Department explain how it would address currently enrolled students if a State is deemed not to provide sufficient oversight in accordance with Federal regulatory requirements. Another commenter asked how the Department will avoid such negative consequences as granting closed school loan discharges for large numbers of enrolled students. One commenter requested that the Department provide for seamless reinstatement of full institutional eligibility when a State meets all eligibility requirements after losing eligibility.

*Discussion:* We do not anticipate that all institutions in a State will lose title IV, HEA program assistance due to any State failing to provide authorization to its institutions under the regulations, because States may meet this requirement in a number of ways, and also with different ways for different types of institutions. If a State were to undergo a change that limited or removed a type of State approval that had previously been in place, it would generally relate to a particular set of institutions within a State. For example, a licensing agency for truck driving schools could lapse or be closed at a State Department of Transportation without providing another means of authorizing postsecondary truck driving programs. Only the eligibility of truck driving schools in the State would be affected under § 600.9 while the State could continue to be compliant for all other institutions in the State. It also seems likely that the State would consider alternate ways to provide State authorization for any institutions affected by such a change.

We believe that the provisions in amended § 600.9 are so basic that State compliance will be easily established for most institutions. The determination of whether an institution has acceptable State authorization for Federal program purposes will be made by the Department. We also note that the regulations permit a delayed effective date for this requirement under certain circumstances discussed below,

and this delay will also limit the disruption to some institutions within a State.

If an institution ceased to qualify as an eligible institution because its State legal authorization was no longer compliant with amended § 600.9, the institution and its students would be subject to the requirements for loss of eligibility in subpart D of part 600 and an institution would also be subject to § 668.26 regarding the end of its participation in those programs. If an institution's State legal authorization subsequently became compliant with amended § 600.9, the institution could then apply to the Department to resume participation in the title IV, HEA program.

*Changes:* None.

*Comment:* Several commenters were concerned that students may lose eligibility for title IV, HEA program funds if a State is not compliant with proposed § 600.9. Some commenters noted that States may have to take steps to comply, which may include making significant statutory changes, and the regulations therefore need to allow adequate time for such changes, reflecting the various State legislative calendars. In some cases, the commenters believed a State's noncompliance would be because the State could no longer afford to meet the provisions of proposed § 600.9. One commenter believed that alternative pathways should be allowed for meeting State authorization and that States that exempt or grant waivers from licensing should be considered to fulfill requirements of proposed § 600.9 and another questioned whether a State that is not in compliance would have an opportunity to cure perceived problems before all institutions operating in the State lost institutional eligibility.

*Discussion:* We recognize that a State may not already provide appropriate authorizations as required by § 600.9 for every type of institution within the State. However, we believe the framework in § 600.9 is sound and provides a State with different ways to meet these requirements. Unless a State provides at least this minimal level of review, we do not believe it should be considered as authorizing an institution to offer an education program beyond secondary education.

If a State is not compliant with § 600.9 for a type or sector of institutions in a State, we believe the State and affected institutions will create the necessary means of establishing legal authorization to offer postsecondary education in the State in accordance with amended § 600.9. However, in the event a State is unable to provide appropriate State authorizations to its institutions by the July 1, 2011 effective

date of amended § 600.9(a) and (b), we are providing that the institutions unable to obtain State authorization in that State may request a one-year extension of the effective date of these final regulations to July 1, 2012, and if necessary, an additional one-extension of the effective date to July 1, 2013. As described in the section of the preamble entitled "Implementation Date of These Regulations," to receive an extension of the effective date of amended § 600.9(a) and (b) for institutions in a State, an institution must obtain from the State an explanation of how a one-year extension will permit the State to modify its procedures to comply with amended § 600.9.

*Changes:* None.

*Comment:* A few commenters requested that the Department identify, publish, and maintain a list of States that meet or do not meet the requirements. One commenter cited an analysis that estimated that 13 States would comply with the proposed regulations upon implementation; 6 States would clearly not be in compliance; and 37 States would likely have to amend, repeal, or otherwise modify their laws. One commenter requested data to be provided by the Department for each sector of postsecondary education, including how many States are out of compliance, how many institutions are within those States, and how many students are enrolled at those institutions.

*Discussion:* We do not believe that there is a need to maintain and publish a list of States that meet, or fail to meet the requirements. States generally employ more than one method of authorizing postsecondary education. For example, a State may authorize a private nonprofit university through issuing a charter to establish the university, another private nonprofit college through an act of the State legislature, a for-profit business school through a State postsecondary education licensing agency, a cosmetology school through a State cosmetology board, and a truck-driving school through the State's Department of Transportation. We believe that an institution of whatever sector and type already is aware of the appropriate State authorizing method or methods that would establish the institution's legal authorization to offer postsecondary education and publication of any list is unnecessary.

*Changes:* None.

*Comment:* One commenter expressed concern with whether a State must regulate the activities of institutions and exercise continual oversight over institutions.

*Discussion:* While a State must have a process to handle student complaints under amended § 600.9(a) for all institutions in the State except Federal and tribal institutions, the regulations do not require, nor do they prohibit, any ☐ process that would lead to continual oversight by a State.

*Changes:* None.

*Comment:* Several commenters expressed concern regarding the financial burden on the States to make changes in State laws and the amount of time that would be needed to make the necessary changes. Commenters feared that the States would most likely have to reduce further State tax subsidies provided to public institutions. As a result, costs will be increased for students at public institutions to cover lost revenues and increase costs for the title IV, HEA programs. One commenter stated that schools could delay progress of degree completion at State funded universities because they will be forced to reduce offerings.

*Discussion:* We do not believe that it would impose an undue financial burden on States to comply with the provisions in § 600.9. In most instances we believe that a State will already be compliant for most institutions in the State or will need to make minimal changes to come into compliance. Thus, we do not agree with commenters who believed that the regulations would generally impact the funding of public institutions in a State or would necessitate a reduction in the offerings at public institutions.

*Changes:* None.

### Exemptions: Accreditation and Years of Operation

*Comment:* Several commenters supported the existing practice by which a State bases an institution's legal authorization to offer postsecondary education upon its accreditation by a nationally recognized accrediting agency, *i.e.,* an accrediting agency recognized by the Secretary. The commenters believed that proposed § 600.9 should be revised or clarified to permit existing practices allowing exemption by accreditation. Another commenter indicated that several States have exempted accredited institutions from State oversight unless those institutions run afoul of their accreditors' requirements. One commenter believed that proposed § 600.9 would require the creation of unnecessary, duplicative, and unaffordable new bureaucracies, and recommended that its State should continue its partial reliance on nationally recognized accrediting agencies. Another commenter believed it appropriate that a State delegate some or all of its licensure

function to a nationally recognized accrediting agency provided that the State enters into a written agreement with the accrediting agency.

One commenter stated that the Department should eliminate the ambiguity about how much a State may rely on accrediting agencies. Several commenters stated that the regulations are confusing as to which exemptions are permissible and which are not. One commenter believed that the Department should make it clear that although a State is not prohibited from relying on accrediting agencies for quality assessments, the essential duties of State authorization cannot be collapsed into the separate requirement for accreditation.

Some commenters noted that an institution's legal authorization may be based on a minimum number of years that an institution has been operating. One of the commenters cited a minimum number of years used by States that ranged as low as 10 years of operation while two other commenters noted that institutions had been exempted in their State because they had been in operation over 100 years and were accredited. The commenters believed that the Department should consider it acceptable for a State to rely on the number of years an institution has been operating.

Some commenters did not think that States should be allowed to defer authorization to accrediting agencies. One of these commenters believed that basing State authorization on accreditation was contrary to law. One commenter believed that existing law makes clear that institutional eligibility for title IV, HEA programs is based on the Triad of accreditation, State authorization, and the Federal requirements for administrative capability and financial responsibility. As a result the commenter believed that the extent to which States may rely on accrediting agencies should be clear and limited. Along the same lines, another commenter believed strongly that accrediting agencies should never be allowed to grant authorization to operate in a State, and that further clarifications about the ways in which accrediting agencies may substitute for State agencies is necessary. One commenter encouraged the Department to study more carefully the role of State entities and accreditation agencies. Another commenter believed that relying on accrediting agencies to be surrogates for State authorization is inappropriate and should not be the sole determinant for authorization. One commenter stated that accreditation may not be accepted as a sufficient basis for granting or continuing authorization to operate and that the authorization process must be independent of any accreditation process or decision.

One commenter believed that proposed § 600.9 would undermine the role of accreditation and the public-private partnership and would call for States to intrude into academic areas. The commenter believed that the proposed regulations would move toward establishing accreditation as a State actor, a role that is incompatible with accreditation's commitment to self-regulation and peer and professional review. Another commenter believed that the Department should make it clear that although a State is not prohibited from relying on accrediting agencies for quality assessments, the essential duties of State authorization cannot be collapsed into the separate requirement for accreditation. If an institution's State and accrediting agency have different standards, one commenter was concerned regarding which entity's standards would be applied.

*Discussion:* While we recognize and share the concerns of some commenters that States should not be allowed to defer authorization to accrediting agencies, we believe that such a practice would be permissible so long as it does not eliminate State oversight and clearly distinguishes the responsibilities of the State and accreditor under such an arrangement. We also do not agree that additional study is needed of the roles of State entities and accrediting agencies as we believe these relationships are well understood.

We believe that accreditation may be used to exempt an institution from other State approval or licensing requirements if the entity has been established by name as an educational institution through a charter, statute, constitutional provision, or other action issued by an appropriate State entity to operate educational programs beyond secondary education, including programs leading to a degree or certificate. For such an educational institution, a State could rely on accreditation to exempt the institution from further approval or licensing requirements, but could not do so based upon a preaccredited or candidacy status.

We also agree with the commenters that States may utilize an institution's years in operation to exempt it from State licensure requirements, but only, as with accreditation, for a legal entity that the State establishes as an educational institution authorized to offer postsecondary education. However, we believe that there should be a minimum standard for allowing years of operation to exempt an institution to ensure that this exemption is not set to a short period of time that would not provide a historical basis to ⬜ evaluate the institution. Based on our consideration of the public comment, we believe that standard should be at least 20 years of

operation. As in the case of accreditation, such an exemption could only be used if the State has established the entity as an educational institution. As noted above, a State may use a separate process to recognize by name the entity as an educational institution that offers programs beyond the secondary level if an institution was not authorized by name to offer educational programs in its approval as a legal entity within a State. We note that a State may also base a licensing exemption on a combination of accreditation and the number of years an institution has been in operation, as long as the State requirements meet or exceed at least one of the two minimum requirements, that is, an institution must be fully accredited or must have been operating for at least 20 years.

If an institution is established as a legal entity to operate as a business or charitable organization but lacks authorization to operate by name as an educational institution that offers postsecondary education, the institution may not be exempted from State licensing or approval based on accreditation, years in operation, or comparable exemption from State licensure or approval.

We do not believe that permitting such exemptions from State licensing requirements will distort the oversight roles of the State and an accrediting agency. We believe these comments are based on a misunderstanding of the role of a State agency recognized by the Secretary under 34 CFR part 603 as a reliable authority regarding the quality of public postsecondary vocational education in its State. Public postsecondary vocational institutions are approved by these agencies in lieu of accreditation by a nationally recognized accrediting agency. As noted in the comments, there are overlapping interests among all members of the Triad in ensuring that an educational institution is operating soundly and serving its students, and a State may establish licensing requirements that rely upon accreditation in some circumstances.

If an institution's State and accrediting agency have different standards, there is no conflict for purposes of the institution's legal authorization by the State, as the institution must establish its legal authorization in accordance with the State's requirements.

*Changes:* We have amended proposed § 600.9 to provide that, if an institution is an entity that is established by name as an educational institution by the State and the State further requires compliance with applicable State approval or licensure requirements for the institution to qualify as legally authorized by the State for Federal program purposes, the

State may exempt the institution by name from the State approval or licensure requirements based on the institution's accreditation by one or more accrediting agencies recognized by the Secretary or based upon the institution being in operation for at least 20 years. If an institution is established by a State as a business or a nonprofit charitable organization, for the institution to qualify as legally authorized by the State for Federal program purposes, the State may not exempt the institution from the State's approval or licensure requirements based on accreditation, years in operation, or other comparable exemption.

## Complaints

*Comment:* An association of State higher education officials recommended that the States, through their respective agencies or attorneys general, should retain the primary role and responsibility for student consumer protection against fraudulent or abusive practices by postsecondary institutions. The commenter stated that handling complaints is not a role that can or should be delegated to nongovernmental agencies such as accrediting agencies, nor should it be centralized in the Federal Government. Another commenter asked about the role of State enforcement of laws unrelated to postsecondary institutions licensure such as a law related to fraud or false advertising. A few commenters asked for clarification as to whether State consumer protection agencies or State Attorneys General could retain the primary role for student consumer protection and handling student complaints. One commenter believed that the proposed regulations failed to address circumstances where the State licensure or approval agency and the agency handling complaints are different agencies.

Several commenters recommended that the Department allow States to rely on accrediting agencies but require a memorandum of understanding with the accrediting association that would include, at a minimum, procedures for periodic reports on actions taken by the association and procedures for handling student complaints. One commenter strongly believed that accrediting agencies should never be allowed to handle complaints in lieu of the State.

One commenter expressed concern that the Department is requiring States to serve as an additional check on institutional integrity, but believed that there would be no check on the State.

One commenter from an accrediting agency believed that proposed § 600.9(b)(3) is an unnecessary use of limited public

resources, is impractical, and would be impractical and chaotic to administer. Several other commenters expressed concern that requiring States to act on complaints would be duplicative because 34 CFR 602.23 already requires accrediting agencies to have a process to respond to complaints regarding their accredited institutions. One commenter requested that the Department exempt public postsecondary institutions from the complaint processes. Otherwise, the commenter asked that the Department clarify that a State is permitted to determine whether an institution within its borders is sufficiently accountable through institutional complaint and sanctioning processes. One commenter requested that the Department clarify that student complaints unrelated to violations of State or Federal law are not subject to State process or reviewing and acting on State laws, instead the commenter believed that student complaints are appropriately addressed at the institutional level. A commenter questioned how the requirements for State review of complaints relate to student complaints about day-to-day instruction or operations and whether the potential review process represents an expansion of State authority. The commenter believes that student complaints that are unrelated to violations of State or Federal law are appropriately addressed at the institutional level and thus not subject to the process for review of complaints included as part of proposed § 600.9.

One commenter suggested that the Department's Office of Ombudsman respond to student complaints as an alternative if a State does not have a process for complaints.

*Discussion:* We agree with the commenters who believed that the States should retain the primary role and responsibility for student consumer protection against fraudulent or abusive practices by some postsecondary institutions. For an institution to be considered to be legally authorized to offer postsecondary programs, a State would be expected to handle complaints regarding not only laws related to licensure and approval to operate but also any other State laws including, for example, laws related to fraud or false advertising. We agree that a State may fulfill this role through a State agency or □ the State Attorney General as well as other appropriate State officials. A State may choose to have a single agency or official handle complaints regarding institutions or may use a combination of agencies and State officials. All relevant officials or agencies must be included in an institution's institutional information under § 668.43(b). Directly relying on an institution's accrediting agency would not comply with § 600.9(a)(1) of these final regulations; however, to the extent a complaint relates to an institution's quality of education or

other issue appropriate to consideration by an institution's accrediting agency, a State may refer a complaint to the institution's accrediting agency for resolution. We do not believe it is necessary to prescribe memoranda of understanding or similar mechanisms if a State chooses to rely on an institution's accrediting agency as the State remains responsible for the appropriate resolution of a complaint. Section 600.9(a)(1) requires an institution to be authorized by a State, thus providing an additional check on institutional integrity; however, we do not believe there are inadequate checks on State officials and agencies as they are subject to audit, review, and State legislative action.

We do not agree with the commenters that proposed § 600.9(b)(3) would unnecessarily use State resources, be impractical, or be chaotic to administer. There are complaints that only a State can appropriately handle, including enforcing any applicable State law or regulations. We do not agree that public institutions should be exempt from this requirement as a complainant must have a process, independent of any institution—public or private, to have his or her complaint considered by the State. The State is not permitted to rely on institutional complaint and sanctioning processes in resolving complaints it receives as these do not provide the necessary independent process for reviewing a complaint. A State may, however, monitor an institution's complaint resolution process to determine whether it is addressing the concerns that are raised within it.

We do not agree with the suggestions that the Department's Student Loan Ombudsman is an appropriate alternative to a State complaints process. The Ombudsman is charged, under the HEA, with the informal resolution only of complaints by borrowers under the title IV, HEA loan programs. By comparison, a State's complaint resolution process would cover the breadth of issues that arise under its laws or regulations.

*Changes:* We have amended proposed § 668.43(b) to provide that an institution must make available to a student or prospective student contact information for filing complaints with its accreditor and with its State approval or licensing entity and any other relevant State official or agency that would appropriately handle a student's complaint.

*Comment:* One commenter believed that proposed § 668.43(b) under which an institution must provide to students and prospective students the contact information for filing complaints with the institution's State approval or licensing entity should make allowance for situations in which a State

has no process for complaints, or defers to the accrediting agency to receive and resolve complaints. Another commenter believed that, in the case of distance education, the institution should be responsible for responding to complaints. Instead of providing students and prospective students, under proposed § 668.43(b), the contact information for filing complaints with the institution's accrediting agency and State approval or licensing entity, the commenter recommended that the institution provide students with the institution's name, location, and Web site to file complaints.

*Discussion:* We do not agree that proposed § 668.43(b) needs to make allowance for an institution in a State without a process for complaints, since every State is charged with enforcing its own laws and no institution is exempt from complying with State laws. If no complaint process existed, the institution would not be considered to be legally authorized. With respect to an institution offering distance education programs, the institution must provide, under § 668.43(b), not only the contact information for the State or States in which it is physically located, but also the contact information for States in which it provides distance education to the extent that the State has any licensure or approval processes for an institution outside the State providing distance education in the State.

*Changes:* None.

### Reciprocity and Distance Education

*Comment:* In general, commenters expressed concerns regarding legal authorization by a State in circumstances where an institution is physically located across State lines as well as when an institution is operating in another State from its physical location through distance education or online learning. One commenter urged the Department to include clarifying language regarding a State's ability to rely on other States' authorization in the final regulation rather than in the preamble. Several commenters requested that the Department limit the State authorization requirement in § 600.9 to the State in which the institution is physically located. One commenter believed that a State should only be allowed to rely on another State's determination if the school has no physical presence in the State and the other State's laws, authority, and oversight are at least as protective of students and taxpayers. One commenter asked whether the phrase "the State in which the institution operates" is the same as "where the institution is domiciled". The commenter asked for clarification of the meaning of "operate" including whether it means where online

students are located, where student recruiting occurs, where an instructor is located, or where fundraising activity is undertaken. One commenter requested that the Department clarify and affirm that reciprocity agreements that exist between States with respect to public institutions operating campuses or programs in multiple States are not impacted by these regulations. Another commenter believed that the Department should issue regulations rather than merely provide in the preamble of the NPRM that a State is allowed to enter into an agreement with another State. One commenter asked whether an institution that operates in more than one State can rely on an authorization from a State that does not meet the authorization requirements. One commenter urged the Department to clarify that States may rely on the authorization by other States, particularly as it relates to distance education. One commenter stated that the proposed regulations would be highly problematic for students who transfer between different States.Another commenter feared that large proprietary schools that are regional or national in scope would likely lobby States to turn over their oversight to another State where laws, regulations, and oversight are more lax. Another commenter was concerned that for-profit institutions may lobby a State to relinquish its responsibilities to a State of those institutions' choosing. This situation could result in a State with little regulation that is home to a large for-profit institution actually controlling policies in many States where the corporation does business. One commenter suggested that if an institution is not physically located in a State, the State could enter into an agreement with other States where the □ institution does have physical locations to rely on the information the other States relied on in granting authority. In this case, the commenter recommended that the oversight be at least as protective of students and the public as those of the State, and the State should consider any relevant information it receives from other sources. However, the commenter thought the State should retain authority to take independent adverse action including revoking the authority to offer postsecondary programs in the State. Another commenter expressed concern that the proposed regulations would confuse and burden the States and institutions because they are not clear regarding whether a State can continue to rely on the authorization of another State. The commenter believed that without clarification, an institution that offers education to students located in other States might be needlessly burdened with seeking authorization from each of those States. Another commenter expressed concern that the proposed regulations could potentially require an institution offering distance education courses in 50 different States to

obtain authorization in each State, which would be an administrative burden that could result in increased tuition fees for students. Another commenter stated that during the negotiations, the Department indicated it was not its intent to require authorization in every State. Therefore, the commenter urged the Department to include this policy expressly in the final regulations.

*Discussion:* We agree with the commenters that further clarification is needed regarding legal authorization across State lines in relation to reciprocity between States and to distance education and correspondence study. In making these clarifications, we are in no way preempting any State laws, regulations, or other requirements established by any State regarding reciprocal agreements, distance education, or correspondence study.

To demonstrate that an institution is legally authorized to operate in another State in which it has a physical presence or is otherwise subject to State approval or licensure, the institution must demonstrate that it is legally authorized by the other State in accordance with § 600.9. We continue to believe that we do not need to regulate or specifically authorize reciprocal agreements. If both States provide authorizations for institutions that comply with § 600.9 and they have an agreement to recognize each other's authorization, we would consider the institution legally authorized in both States as long as the institution provided appropriate documentation of authorization from the home State and of the reciprocal agreement. In addition, the institution must provide the complaint contact information under 34 CFR 668.43(b) for both States.

If an institution is offering postsecondary education through distance or correspondence education in a State in which it is not physically located, the institution must meet any State requirements for it to be legally offering distance or correspondence education in that State. An institution must be able to document upon request from the Department that it has such State approval.

A public institution is considered to comply with § 600.9 to the extent it is operating in its home State. If it is operating in another State, we would expect it to comply with the requirements, if any, the other State considers applicable or with any reciprocal agreement between the States that may be applicable.

*Changes:* We have revised § 600.9 to clarify in paragraph (c) that, if an institution is offering postsecondary education

through distance or correspondence education to students in a State in which it is not physically located, the institution must meet any State requirements for it to be legally offering postsecondary distance or correspondence education in that State. We are further providing that an institution must be able to document upon request by the Department that it has the applicable State approval.

## State Institutions

*Comment:* Many commenters requested that public institutions be exempted from the proposed regulations. They were concerned that requiring States to reexamine their State authorization for public colleges would not be a good use of resources. One commenter requested that the Department explicitly state that public institutions are by definition agents of the State and thus need no further authorization. One commenter from a State university system believed that the Federal Government should not impose a uniform model with "one size fits all States." Another commenter noted that a State may not have legal power over decisions made by authorities given under the State's constitution for oversight of certain public postsecondary institutions. One commenter believed that public institutions should be exempt from the proposed requirements for adverse actions and complaint processes.

*Discussion:* As instrumentalities of a State government, State institutions are by definition compliant with § 600.9(a)(1)(i), and no exemption from the provisions of § 600.9 of these final regulations is necessary. We do not agree that State institutions should be exempt from the requirement that a State have a process to review and appropriately act on complaints concerning an institution. We believe that students, their families, and the public should have a process to lodge complaints that is independent of an institution.

*Changes:* None.

## Religious Institutions

*Comment:* Two commenters requested a definition of the term *religious institution.* One of these commenters felt strongly that a religious exemption must be tailored to prevent loopholes for abuse but needed to offer an alternative for religious institutions so that changes to a State's constitution would not be necessary. The commenter suggested that a religious institution should be exempted if the institution is owned, controlled, operated, and maintained by a religious organization lawfully operating as a nonprofit religious

corporation pursuant to the Internal Revenue Code and meets the following requirements:

- Instruction is limited to the principles of that religious organization.

- A diploma or degree awarded by the institution is limited to evidence of completion of that education.

- The institution offers degrees and diplomas only in the beliefs and practices of the church, religious denomination, or religious organization.

- The institution does not award degrees in any area of physical science.

- Any degree or diploma granted by the institution contains on its face, in the written description of the title of the degree being conferred, a reference to the theological or religious aspect of the degree's subject area.

- A degree awarded by the institution reflects the nature of the degree title, such as "associate of religious studies," "bachelor of religious studies," "master of divinity," or "doctor of divinity."

*Discussion:* We agree with the commenters that a definition of a *religious institution* is needed to clarify the applicability of a religious exemption. We also agree that a modification to the proposed regulations is needed to allow a State to provide an exemption to religious institutions without requiring the State to change its constitution.

*Changes:* We have expanded § 600.9(b) to provide that an institution is considered to be legally authorized by the State if it is exempt from State authorization as a religious institution by State law in addition to the provision of the proposed regulations that the exemption by law, or exempt under the State's constitution. We have also included a definition of a *religious institution,* which provides that an institution is considered a religious institution if it is owned, controlled, operated, and maintained by a religious organization lawfully operating as a nonprofit religious corporation and awards only religious degrees or religious certificates including, but not limited to, a certificate of Talmudic studies, an associate of biblical studies, a bachelor of religious studies, a master of divinity, or a doctor of divinity. We note, however, that a religious institution is still subject to the requirement in § 600.9(a)(1) of these final regulations that, for the institution to be considered to be legally authorized in the State, the State must have a process to review and appropriately act on complaints concerning the institution.

**Tribal Institutions**

*Comment:* One commenter suggested the Department should exempt from State authorization any institution established and operated by tribal governments. Three commenters stated that the Department should recognize that tribal institutions would not be subject to State oversight but instead the tribe would exercise oversight. One of those commenters suggested amending the regulations to add "tribal authority" wherever State authority is mentioned in the proposed regulations.

*Discussion:* We agree that tribal institutions are not subject to State oversight for institutions operating within tribal lands. Proposed § 600.9(a)(2) provided that a tribal college would be considered to meet the basic provisions of proposed § 600.9(a)(1) if it was authorized to offer educational programs beyond secondary education by an Indian tribe as defined in 25 U.S.C. 1802(2). However, proposed § 600.9(b), could be read as inappropriately making a tribal institution subject to adverse actions by the State and a State process for handling student complaints. We did not intend to make a tribal institution subject to any State process for handling complaints and have clarified the language in § 600.9. If a tribal college is located outside tribal lands within a State, or has a physical presence or offers programs to students that are located outside tribal lands in a State, the tribal college must demonstrate that it has the applicable State approvals needed in those circumstances.

*Changes:* Section 600.9 has been revised to clarify the status of tribal institutions. As noted elsewhere in this preamble, we have removed proposed § 600.9(b)(2) regarding adverse actions. Further, we are providing that, in § 600.9(a)(2)(ii) of the final regulations, the tribal government must have a process to review and appropriately act on complaints concerning a tribal institution and enforce applicable tribal requirements or laws.

**Part 668 Student Assistance General Provisions Retaking Coursework (§ 668.2)**

Back to Top

*Comment:* Many commenters agreed with the Secretary's proposal to amend the definition of *full-time student* in § 668.2(b) to allow repeated coursework to count towards a student's enrollment status in term-based programs. The commenters believed the change would alleviate the administrative burden related to tracking student coursework to prevent payment based on repeated coursework, as is currently required.

*Discussion:* The Department agrees with the commenters that amending the definition of *full-time student* in § 668.2(b) will

be beneficial for students who retake coursework.

*Changes:* None.

*Comment:* Several commenters asked the Department to clarify whether amending the definition of *full-time student* will apply to all students, regardless of their enrollment status, including less-than-half-time, half-time, and three-quarter-time enrollment statuses.

*Discussion:* Less-than-half-time, half-time, and three-quarter-time statuses are generally defined in relation to the definition of a *full-time student.* In § 668.2 half-time and three-quarter-time statuses generally are defined as at least one-half and three quarters of the academic workload of a full-time student, respectively. Less-than-half-time status is not defined, as the term is self-explanatory in its relationship to half-time and full-time statuses. Thus, including this provision in the definition of *full-time student* will apply to less-than-full-time students who are enrolled in term-based programs.

*Changes:* None.

*Comment:* Some commenters asked the Department to allow early implementation of this retaking coursework provision, because the Department's current guidance in the Federal Student Aid Handbook does not provide for this benefit.

*Discussion:* We have determined, as a general policy, that no provisions of these final regulations should be designated for early implementation. We will update the Handbook for the 2011-2012 award year to reflect the amended definition of *full-time student* in these final regulations.

*Changes:* None.

*Comment:* Some commenters questioned whether institutions may continue to set their own policy in regards to retaking coursework and awarding credits for repeated coursework. One commenter asked the Department to clarify if the proposed regulation on retaking coursework would allow a student to repeat courses already passed to achieve a higher grade. Another commenter asked the Department to clarify whether a student who has already earned the maximum number of remedial courses allowed could be paid to retake coursework if the student repeats more remedial courses.

*Discussion:* In general, the regulations do not affect an institution's policies governing whether a student may retake coursework in term-based programs, including repeating courses to achieve a higher grade, as these regulations apply only to determining enrollment status for title IV, HEA

program purposes. Moreover, the regulations do not limit an institution's ability to establish policies for title IV, HEA program purposes to the extent those policies are not in conflict with title IV, HEA program requirements. However, with respect to repeating coursework previously passed by a student in a term-based program, the student's enrollment status for title IV, HEA purposes may include any coursework previously taken in the program, but we are limiting the provision so that it may not include more than one repetition of a previously passed course or any repetition of previously passed coursework that would be taken due to a student's failure of other coursework. In other words, an institution may pay a student one time for retaking previously passed coursework if, for example, the student needed to meet an academic standard for that particular course, such as a minimum grade. Conversely, an institution may not pay a student for retaking previously passed courses if the student is required to retake those courses because the student failed a different course in a prior term. For example, if a student enrolls in four classes in the fall semester and passes three of them, the institution could require the student to retake the failed class and also require the student to retake the other three classes because of failing the one class. If the student retakes the four classes in the spring semester, the failed class would be included in the student's enrollment □ status, but the three classes passed in the fall would not be included in determining the student's enrollment status for the spring semester for purposes of the title IV, HEA programs. We believe these revisions are necessary to limit potential abuse from courses being retaken multiple times, while providing institutions sufficient flexibility to meet the needs of most students.

We would also note that an institution's satisfactory academic progress policy could further limit a student from retaking coursework, because the credits associated with any course the student retakes count toward the maximum time-frame requirement.

The regulations do not affect the one-year academic limitation on noncredit and reduced-credit remedial coursework under § 668.20(d) and (f). For example, if a student repeats a remedial course that exceeds the one-year limitation, the course could not be considered in the student's enrollment status.

*Changes:* We have revised the definition of *full-time student* in § 668.2(b) to provide that a student's enrollment status for a term-based program may include repeating any coursework previously taken in the program but may not include more

than one repetition of a previously passed course, or any repetition of a previously passed course due to the student's failing other coursework.

*Comment:* One commenter recommended that the change in the definition of *full-time student* should be expanded to include nonstandard-term and nonterm programs.

*Discussion:* Since the change in the definition applies to all term-based programs, the change would apply to standard terms, including semesters, trimesters, and quarters, as well as nonstandard terms. Under the definition of a *nonterm payment period* in § 668.4(c), a student's coursework is divided into payment periods based on the hours and weeks of instructional time in the program. In general, under these nonterm provisions a student must successfully complete the credit or clock hours in a payment period to advance to the next payment period, and may not be paid for repeating coursework regardless of whether the student successfully completed it unless the provisions of § 668.4(g) apply.

*Changes:* None.

## Written Arrangements (§§ 668.5 and 668.43)

Back to Top

### General

*Comment:* Several commenters agreed with the proposed regulations relating to written arrangements. One commenter commended the Department's proposals on this topic, noting that they strike a fair balance in the presence of many minutia-driven concerns. Some commenters stated that the proposed changes eliminate inconsistencies that exist in the current regulations and provide better information to students while allowing institutions to determine the best way to disseminate the required information. Other commenters stated that they agreed with the proposed changes in §§ 668.5 and 668.43 because if an eligible institution enters into a written arrangement with another eligible institution, under which the other eligible institution provides part of the educational program to students enrolled in the first institution, it is important for all parties to have a clear understanding of which institution is providing the credential and the majority of the education and training.

*Discussion:* We appreciate the commenters' support of the proposed changes reflected in §§ 668.5 and 668.43.

*Changes:* None.

### Written Arrangements Between Two or More Eligible Institutions (§ 668.5(a))

*Comment:* Some commenters objected to the Department's assertion—in the preamble of the NPRM (75 FR 34806, 34815) —that students who want to take more than 50 percent of an educational program at another institution could transfer to the institution that provides the preponderance of the program's coursework. One commenter stated that students should be allowed to take courses at more than one campus of eligible institutions that have a written arrangement without needing to go through unnecessary activities related to transfer of credit.

Several commenters disagreed with the proposed changes reflected in § 668.5(a)(2)(ii). First, they argued that imposing a limitation on the portion of an educational program one institution can provide under a written arrangement is not consistent with the purpose of consortium agreements, which is to allow students to obtain a degree or certificate from their institution of choice while allowing them to satisfy course requirements by taking courses delivered by another institution. Second, the commenters disagreed with the limitation because we do not place similar restrictions on institutions when they accept transfer students who have earned more than half of the credits that will go toward their educational program at another institution. Finally, the commenters argued that more students are attending multiple institutions before completing their degree or certificate programs and a requirement that the credential-granting institution must provide 50 percent of the individual student's educational program would be a barrier to the students' postsecondary success.

In addition, a few commenters noted that current articulation agreements allow students to further their education at another institution that may accept enough credits on transfer that the student has less than 50 percent of the program remaining to be completed. Some commenters expressed the view that the proposed regulations governing written arrangements should not apply to articulation agreements while others sought clarification of whether the Department's position is that they do apply to such agreements. Commenters expressed concern that the proposal would result in undue hardship and fewer opportunities for students in small communities who take a portion of their coursework locally. One commenter asked whether the proposed changes reflected in § 668.5 affect students who obtained college credit while still in high school.

*Discussion:* There appears to be some confusion about the scope of the proposed changes to § 668.5. Under proposed §

668.5(a)(1), eligible institutions that are not under common ownership may enter into a written arrangement (which may include the type of consortium agreements mentioned by the commenters) under which the non-degree-granting institution offers part of the degree-granting institution's educational program; this provision does not impose a specific limitation on the portion of the educational program that may be offered by the non-degree-granting institution. In contrast, under proposed § 668.5(a)(2)(ii), if a written arrangement is between two or more eligible institutions that are under common ownership (*i.e.,* are owned or controlled by the same individual, partnership or corporation), the degree- or certificate-granting institution must provide more than 50 percent of the educational program. In this situation, a student is considered a regular student at the degree- or certificate-granting institution while taking a portion of the educational program at another institution under common ownership. Under this regulatory framework, a consortium agreement between two eligible institutions that are not under common ownership is not subject to the 50 percent limitation in § 668.5(a)(2)(ii).

Moreover, § 668.5(a) does not apply to articulation agreements under which ▯ institutions agree to accept credits when students transfer from one institution to another, or to cases where individual students transfer to a different institution to complete their educational programs. Students who enroll in an institution and have college credits accepted on transfer that were earned while in high school also do not come within the scope of this regulation.

*Changes:* None.

*Comment:* A number of commenters disagreed with proposed § 668.5(a)(2), which has the effect of limiting the relative portions of an educational program provided by more than one institution under the same ownership or control. Some commenters argued that the limit is arbitrary and inappropriate because—for all intents and purposes—institutions under common ownership are the same. A few commenters suggested that the regulations should focus more narrowly on the institutions with problems as opposed to all institutions under common ownership. Some commenters were unclear about what constitutes "common ownership" and what types of written arrangements are subject to the 50 percent limitation in § 668.5(a)(2)(ii).

Some commenters indicated that the proposed regulations should apply to all institutions and not apply only to for-profit institutions. Several commenters expressed concern about the

applicability of this provision to the many written arrangements between public institutions within a State and whether a State is considered to "own" all of its institutions. Other commenters asked the Department to clarify that public and private nonprofit institutions are not covered by the proposed language in § 668.5(a)(2).

In addition, commenters raised concerns about the potential impact these regulations could have on students who move to another area and want to transfer to another location of the same institution. One commenter stated that the proposed change would discourage students who finish a program from transferring to another institution under the same control for a higher level program.

Some commenters objected to the Department's assertions in the preamble of the NPRM that written arrangements are used by institutions under common ownership to circumvent other regulations and argued that the Department provided only anecdotal evidence to support the proposed changes in § 668.5. Commenters stated that institutions that are circumventing the current regulations will find other opportunities to do so and should face sanctions under the misrepresentation provisions.

*Discussion:* As indicated in the preamble to the NPRM, the Department focused its regulatory changes on the types of institutions and situations where problems have been identified rather than expanding a requirement for accrediting agencies to review written arrangements between institutions under common ownership. We modeled these regulations on the language in § 668.5(c)(3)(ii)(B), regarding written arrangements between an eligible institution and an ineligible institution or organization because that section of the regulations refers to institutions that are owned or controlled by the same individual, partnership, or corporation.

We do not agree with the commenter who stated that the regulations are arbitrary and inappropriate because institutions under common ownership are the same entity. This is because institutions are approved to participate in the Federal student aid programs as separate entities, and they must individually demonstrate eligibility as an institution, eligibility for the programs they offer, program compliance, cohort default rates, financial responsibility, and administrative capability. Some limitations on institutions that are based on program measures can be circumvented if programs that appear to be offered by one institution are actually offered by another institution. The prohibition in this regulation will ensure that the institution providing most of

the program will be the one associated with the students that are taking the program.

Section 668.5(a)(2) does not apply to public or private nonprofit institutions because these institutions are not owned or controlled by other entities and generally act autonomously. Some nonprofit institutions may have business relationships through management agreements or service agreements where similar concerns could arise, but those instances are expected to be infrequent and will be addressed on a case-by-case basis.

These provisions do not impact the ability of individual students to transfer to another location of the same institution or to another institution under the same ownership or control either to complete an educational program or to enroll in a higher-level program. When a student transfers to a new institution and enrolls for the purpose of completing a degree or certificate, the new institution becomes the degree-granting institution.

We agree that institutions that circumvent or otherwise violate regulations should face appropriate sanctions.

*Changes:* None.

*Comment:* A number of commenters supported the proposed changes to § 668.5 regarding the limitations on the portion of the educational program that may be offered by another institution under a written arrangement, but sought clarification on how to measure portions of educational programs for these purposes. These commenters suggested that, for the purposes of determining the percentage of the educational program provided by each institution, we should track the provision of educational services on a programmatic basis rather than by the amount of coursework an individual student may elect to take.

*Discussion:* For purposes of determining the portions of the educational program provided by each institution under any written arrangement under § 668.5, the degree-granting institution is responsible for limiting the amount of the program that may be taken from any other institution.

Because an institution cannot offer more than 50 percent of an educational program through another institution that is under common ownership or control, if an institution offered an educational program on campus and online (through a written arrangement with another institution under common ownership) and offered students the option of taking courses by either method, the institution must ensure that each student completes more than 50 percent of the educational

program on campus. If the same institution enrolled students who live beyond a reasonable commuting distance to the campus and, therefore, take the online portion of the program first, the institution must be able to demonstrate that the students intend to attend on campus to complete at least 50 percent of their educational program.

*Changes:* None.

*Comment:* Some commenters agreed that the institution that grants the degree or certificate should provide more than 50 percent of the educational program, but suggested that monitoring for compliance with this regulatory provision should be done by accrediting agencies rather than the Department. These commenters noted that to the extent that written arrangements are part of a deliberative process related to the development of curriculum and academic requirements, they are part of a decision-making process best performed by an institution's faculty and leadership and best evaluated by accrediting agencies. Some commenters stated that the Department should rely on accrediting agencies to set appropriate limits on the portion of an ▢ educational program that can be provided by the non-degree-granting institution. One commenter stated that, currently, some national accrediting agencies allow students the opportunity to take more than 50 percent of their educational program from the non-degree-granting institution.

*Discussion:* We acknowledge the important role that an institution's faculty and leadership play in the development of written arrangements as well as the role of accrediting agencies in monitoring the use of such arrangements in accordance with their standards. However, as we learned during negotiations, accrediting agencies have differing practices concerning the review of written arrangements, and some accrediting agencies do not routinely review written arrangements. As such, we believe that it is important to establish a threshold for the amount of the educational program that can be offered under a written arrangement by an institution under common ownership with a host institution. Accrediting agencies may establish a more restrictive measure if they wish to do so.

*Changes:* None.

*Comment:* One commenter expressed concern that proposed § 668.5(a) would affect the Service Members Opportunity College Army Degree (SOCAD) Institution Agreements currently in place, which allow 75 percent of an educational program to be provided by the non-degree-granting

institution. However, the Contract Administrator of SOCAD provided a separate comment stating that the proposed regulations would not affect the current relationships provided to members of the military.

*Discussion:* As noted earlier, the proposed limitations in § 668.5(a)(2) apply only to written arrangements between two or more eligible institutions that are owned or controlled by the same individual, partnership, or corporation. To the extent that the eligible institutions that participate in SOCAD are not owned or controlled by the same individual, partnership, or corporation, they are not subject to the proposed changes in § 668.5(a)(2).

*Changes:* None.

*Comment:* One commenter supported the clarification that the enrolling institution has all the necessary approvals to offer an educational program in the format in which it is being provided. Another commenter argued that it is nonsensical to require the enrolling institution to have all the same approvals as the providing institution. The commenter stated that written arrangements exist to permit flexibility for students and additional options for students in pursuing their education goals. One of the benefits of such arrangements, argued the commenter, is to provide student access to learning resources and opportunities that the degree-granting institution cannot provide. For example, written arrangements may afford students access to online learning from an institution with demonstrated competencies in providing distance education. Our clarification in the preamble to the NPRM that the institution enrolling the student must have the approval to offer an education program in the format in which it is being offered limits the ability for campus-based schools to offer cutting-edge online delivery methods for some programs even when these online courses are provided by affiliated and fully accredited institutions. One commenter argued that the Department had failed to provide data to support this limitation. Another commenter suggested that there should be a transition or grace period to allow institutions to get any needed approvals.

*Discussion:* We agree that written arrangements are designed to provide educational flexibility for students and to allow them access to resources and opportunities that may not be available from their degree-granting institution. However, we believe that it is important that the degree-granting institution have all the necessary approvals to offer the educational program in the format in which it is being offered. We note that only in cases in which an institution is offering more than

50 percent of an educational program through distance education is the institution required to receive approval from its accrediting agency to offer distance education. Therefore, a student who is taking only a few courses online as part of a written arrangement would not be likely to trigger the requirement that an institution seek approval from its accrediting agency to offer distance education. We do not see a need for a transition or grace period to allow institutions to get any needed approvals because we believe that most institutions already have the necessary approvals in place.

*Changes:* None.

### Requirements for Arrangements Between Eligible Institutions and Ineligible Institutions or Organizations (§ 668.5(c))

*Comment:* One commenter supported the expansion of the list of conditions that preclude an arrangement between an eligible institution and an ineligible entity reflected in proposed § 668.5(c). Another commenter stated that the list of exclusions in proposed § 668.5(c) is overly broad. This commenter agreed with the Department's intent but pointed out that denial of recertification (§ 668.5(c)(iv)) may be due to a factor such as program length. The commenter suggested that we narrow § 668.5(c)(iv) to cover only denials of recertification that are based on the institution's lack of administrative capability or financial responsibility.

*Discussion:* We appreciate the support for the expansion of the list of conditions that preclude an arrangement between an eligible institution and an ineligible entity reflected in § 668.5(c). We disagree with the commenter who recommended that we limit the denial of recertification condition to cover only those recertification denials that are based on the institution's lack of administrative capability or financial responsibility. An institution that has its recertification denied because it does not offer one or more programs of sufficient length to qualify to participate in the Title IV, HEA programs has committed a serious programmatic violation that the Department believes should be included in this prohibition.

*Changes:* None.

### Disclosures to Students (§§ 668.5(e) and 668.43(a)(12))

*Comment:* Several commenters supported the requirement that institutions providing an educational program under § 668.5(a), (b), or (c) inform students when part of their educational program is provided by a different institution and

of additional charges that the student may incur when enrolling in an educational program that is provided in part by another institution. They noted that all communication to students should be clear, user-friendly, and understandable. One commenter suggested that we revise § 668.43(a)(12)(ii) to require the institution to include in its description of its written arrangements the Web sites along with the names and locations of the other institutions or organizations that are providing the portion of the educational program that the degree- or certificate-granting institution is not providing. Another commenter asked whether § 668.43(a)(12)(iv) requires the institution to include in its description of its written arrangements an estimate of the costs incurred by students taking online courses (*e.g.,* the costs of purchasing a computer and obtaining Internet access).

A few commenters requested clarification on whether the required student notifications apply only to educational programs that require  students to take coursework at another institution or whether they apply to institutions that enter into arrangements when students choose to take coursework at another institution. The commenters stated that if the notifications apply to both situations, the regulations would create an overwhelming burden for institutions. These commenters expressed concern that this burden would result in institutions limiting the use of written arrangements and that this, in turn, would result in less choice for students.

*Discussion:* We appreciate the support for requiring additional disclosures regarding the portion of a program being provided by a different institution and the additional costs that a student may incur under such an arrangement. We agree that these disclosures should be clear and understandable. While we agree that providing the Web site of the non-degree-granting institution in the disclosures may be helpful to students, on balance, we determined that requiring that particular disclosure is not necessary and that the decision to include such information in the disclosure should be left to the degree-granting institution's discretion.

As noted by the commenters, the required disclosures include disclosure of the estimated additional costs students may incur as the result of enrolling in an educational program that is provided, in part, under a written arrangement. Therefore, when the coursework provided through the written arrangement is provided online, it would be appropriate to include estimated additional costs such as the costs of purchasing a computer and obtaining Internet access.

As stated in the preamble to the NPRM, the disclosure

requirements reflected in §§ 668.5(e) and 668.43(a)(12) apply to written arrangements between or among institutions under which the degree-granting institution can offer educational programs that are provided, in part, by another institution (*i.e.,* on an educational program-by-program basis) and not to individual, student-initiated written arrangements. We acknowledged that requiring disclosures to individual, student-initiated written arrangements would be impractical, burdensome and unnecessary because the student is a party to the arrangement and would already have the information required to be disclosed.

*Changes:* None.

| | |
|---|---|
| **Incentive Compensation (§ 668.14(b))** | **General** |
| Back to Top | |

*Comment:* A significant number of commenters supported the Secretary's proposed changes to § 668.14(b)(22), which they stated would align the regulations with the statute and comprehensively ban the use of commissions, bonuses, and other direct forms of compensation based on success in securing enrollments or the award of financial aid. These commenters supported our efforts to ensure the integrity of the Federal student aid programs and to protect students against aggressive admissions and recruitment practices. They agreed that the current regulations, which included the language describing permitted compensation activities (*i.e.,* "safe harbors"), did not achieve the goals intended by the Congress. These commenters expressed the belief that the current safe harbors enable institutions to circumvent the law.

Several commenters stated that the proposed definitions reflected in § 668.14(b)(22)(iii) would be particularly helpful and expressed appreciation for our readiness to provide broad and appropriate guidance to institutions, rather than opinions on an individual institution's arrangements, in evaluating compensation issues.

Numerous commenters, particularly groups representing admissions counselors, specifically supported the deletion of the twelve safe harbors. The groups representing admissions counselors stated that they believe that counselors should be compensated in the form of a fixed salary. They further argued that because the admissions profession is a form of counseling, admissions professionals can only discharge their ethical obligations if they are free of vested interests in the enrollment decisions made by the prospective students they advise. The commenters representing admissions personnel also noted that elimination of the safe harbors would help prevent a

recruiter's financial interest from overriding a student's academic interest.

*Discussion:* The Secretary appreciates the support offered by the commenters.

*Changes:* None.

*Comment:* A number of commenters who expressed support for the Secretary's goal in proposing changes to § 668.14(b)(22) requested modifications to the regulatory language or to the preamble discussion. The majority of these commenters requested clarifications to assist institutions in understanding whether particular compensation activities would be prohibited under proposed § 668.14(b)(22).

Many commenters opposed the proposed changes and appealed for the Department to retain the current safe harbors. They challenged the legal adequacy of the changes and asserted that the need for the proposed changes remained unsupported by any evidence or data. Some commenters alleged that the Department had failed to specify sound reasons for the change in policy and instead had offered nonspecific references to its reviews of compensation practices and expenditures of resources.

Other commenters asked whether all payments permitted under the current safe harbors would be prohibited under this new regulatory framework.

*Discussion:* Under section 410 of the General Education Provisions Act (20 U.S.C. 1221e-3), the Secretary has the authority to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing applicable programs administered by, the Department. For regulations governing the title IV, HEA programs, the Secretary also must ensure that the development and issuance of those regulations comply with the negotiated rulemaking requirements in section 492 of the HEA. In 2002, the Department adopted the incentive compensation safe harbors reflected in current § 668.14(b)(22)(ii) under the statutory authority granted in GEPA and the negotiated rulemaking requirements in the HEA. The Department adopted the current safe harbors based on a "purposive reading of section 487(a)(20) of the HEA." (67 FR 51723 (August 8, 2002).) Since that time, however, the Department's experience has demonstrated that unscrupulous actors routinely rely upon these safe harbors to circumvent the intent of section 487(a)(20) of the HEA. As such, rather than serving to effectuate the goals intended by Congress through its adoption of section 487(a)(20) of the HEA, the safe harbors

have served to obstruct those objectives and have hampered the Department's ability to efficiently and effectively administer the title IV, HEA programs.

For example, it has been the Department's experience that many institutions routinely use employee evaluation forms that acknowledge that the number of students enrolled is an important, if not the most important, variable, in determining recruiter compensation. These forms also list certain qualitative factors that are ostensibly considered in making compensation decisions. The forms, on their face, appear to demonstrate compliance with the first safe harbor, which permits compensation schemes that are not "solely" based on the number enrolled. However, the Department has been repeatedly advised by institutional employees that these other qualitative factors are not really considered when compensation decisions are made, and that they are identified only to create the appearance of title IV compliance. It is clear from this information that institutions are making actual compensation decisions based exclusively on the numbers of students enrolled.

The Department's need to look behind the documents that institutions allege they have used to make recruiter compensation decisions requires the expenditure of enormous amounts of resources, and has resulted in an inability to adequately determine whether institutions are in compliance with the incentive compensation ban in many cases.

For these reasons, we believe it is appropriate to remove the safe harbors and instead to require institutions to demonstrate that their admissions compensation practices do not provide any commission, bonus, or other incentive payment based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid to any person or entity engaged in any student recruitment or admission activity or in making decisions regarding the award of title IV, HEA program funds. We believe that institutions can readily determine if a payment or compensation is permissible under section 487(a)(20) of the HEA by analyzing—

(1) Whether it is a commission, bonus, or other incentive payment, defined as an award of a sum of money or something of value paid to or given to a person or entity for services rendered; and

(2) Whether the commission, bonus, or other incentive payment is provided to any person based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid, which are defined as activities engaged

in for the purpose of the admission or matriculation of students for any period of time or the award of financial aid.

If the answer to each of these questions is yes, the commission, bonus, or incentive payment would not be permitted under the statute.

Therefore, going forward, actions that were permitted under current § 668.14(b)(22) will neither be automatically prohibited, nor automatically permitted. Instead, institutions will need to re-examine their practices to ensure that they comply with § 668.14(b)(22). To the extent that a safe harbor created an exception to the statutory prohibition found in section 487(a)(20) of the HEA, its removal would establish that such an exception no longer exists.

*Changes:* None.

## Current Safe Harbors

*Comment:* Several commenters stated that removing the safe harbor from current § 668.14(b)(22)(ii)(B), which permits compensation to recruiters based upon enrollment of students in ineligible title IV, HEA programs, is contrary to congressional intent. These commenters stated that the HEA was not intended to regulate other educational endeavors of the institution. In addition, one commenter asked about a specific practice permitted by some State cosmetology boards that allows two non-title IV, HEA eligible programs to be combined and in that form, to become eligible for title IV, HEA aid. Another commenter asked about how the removal of this safe harbor would impact advanced education classes that are not title IV eligible.

*Discussion:* In our experience, institutions have used the safe harbor reflected in § 668.14(b)(22)(ii)(B) to steer students away from title IV, HEA programs. We believe that retaining this safe harbor would continue to allow institutions to manipulate the system by initially enrolling students in non-title IV, HEA eligible programs so that the institutions pay incentive compensation to recruiters based on such enrollments, only to later re-enroll the same students in title IV, HEA eligible programs.

We do not agree that the removal of this safe harbor is contrary to congressional intent. In particular, the only exception Congress provided in section 487(a)(20) of the HEA is to the recruitment of foreign students residing in foreign countries who are not eligible to receive Federal student assistance. For the reasons addressed in the preceding discussions, we believe

it is inappropriate to carve out a further exception to include non-foreign students who are not immediately receiving Title IV funds.

Moreover, as to the comment regarding cosmetology schools, there is nothing in the identified practice that supports allowing compensation to be paid to recruitment personnel that is otherwise inconsistent with section 487(a)(20) of the HEA.

Finally, to the extent that the HEA's ban on the payment of incentive compensation is not otherwise limited to students enrolled in title IV, HEA eligible programs, institutions need to make sure that they are in compliance with the prohibition on incentive compensation regardless of the nature of the particular program of instruction.

*Changes:* None.

*Comment:* A few commenters expressed concerns about the safe harbor reflected in current § 668.14(b)(22)(ii)(C), which permits compensation to recruiters who arrange contracts between an institution and an employer, where the employer pays the tuition and fees for its employees (either directly to the institution or by reimbursement to the employee). One commenter noted that because under this type of contract there is no direct contact between the entity or individual seeking the arrangement and the student, these contracts seem to be permissible. Another commenter asked whether the following type of arrangement would be permissible without this safe harbor: An employee secures contracts for non-degree training that is not eligible for title IV, HEA program funding, and such contracts are billed at a flat rate and are paid for by the employer. This commenter specifically asked whether the employee in this situation may be compensated based on revenue from those contracts.

*Discussion:* This safe harbor permits compensation that is ultimately based upon success in securing enrollments. Because this is inconsistent with section 487(a)(20) of the HEA, we believe that the safe harbor should not be retained in these final regulations. We agree with the commenter that in some instances compensation to recruiters who arrange contracts between an institution and an employer, where the employer pays the tuition and fees for its employees, would be permissible under the ban on incentive compensation. As previously discussed, we encourage institutions to apply the two-part test provided within the NPRM in evaluating whether a particular compensation practice is permissible. Given the number of possible variables within any particular proposal,

the Department is not prepared to say that the examples generally offered by commenters will always be permissible, but we acknowledge that there are circumstances where such arrangements may prove to be compliant with the HEA.

We strongly believe that institutions do not need to rely on safe harbors to protect compensation that complies with section 487(a)(20) of the HEA. Ultimately, the institution must determine whether its compensation is based in any part, directly or indirectly, on securing enrollments or the award of □ financial aid. If it is not, such compensation would continue to be permissible even with the removal of the safe harbor from current § 668.14(b)(22)(ii)(C).

*Changes:* None.

*Comment:* A number of commenters voiced their support for the safe harbor from current § 668.14(b)(22)(ii)(E), which permits compensation based upon a student's successfully completing his or her educational program or one academic year of his or her educational program, whichever is shorter. Some commenters expressed concern that removal of this safe harbor would eliminate an important safeguard for students because this safe harbor encourages institutions to admit only qualified students. Other commenters noted that to disallow incentive compensation based on completion of an educational program is contrary to the Administration's stated goal of student retention. Several commenters suggested that the Department should measure the positive effect that incentive payments based on completion of an educational program can have on students' educational experience. Another commenter asked whether payments based on a graduated student's employment in the student's field of study would be permitted under the new regulatory framework for incentive compensation.

*Discussion:* The Department believes that an institution's resolute and ongoing goal should be for its students to complete their educational programs. Employees should not be rewarded beyond their standard salary or wages for their contributions to this fundamental duty. The safe harbor in current § 668.14(b)(22)(ii)(E) permits compensation that is "indirectly" based upon securing enrollments—that is, unless the student enrolls, the student cannot successfully complete an educational program. With the proliferation of short-term, accelerated programs, and the potential for shorter and shorter programs, we have seen increased efforts by institutions to rely upon this safe harbor to incentivize recruiters. Accordingly, we believe that the retention of the current safe harbor can be readily exploited, and that it is not

necessary for institutions to appreciate the value of keeping students in school. On balance, we believe that the proliferation of these types of programs justify any benefit that this safe harbor allegedly provided students by encouraging institutions to admit only qualified students.

We disagree with the commenter who stated that removal of this safe harbor is inconsistent with the Administration's goal of increasing student retention in postsecondary education. Institutions should not need this safe harbor allowing incentive payments to recruiters to demonstrate their commitment to retaining students within their program of instruction.

In addition, there is nothing about the making of incentivized payments to recruiters based upon student retention that enhances the quality of a student's educational experience. If the program of instruction has value and is appropriate for a student's needs, a student will likely enjoy a positive educational experience regardless of the manner in which the student's recruiter is compensated.

Finally, the Department's experience has shown that some institutions pay incentive compensation to recruiters based upon claims that the students who the recruiter enrolled graduated and received jobs in their fields of study. Yet, included among the abuses the Department has seen, for example, is a circumstance where a student's field of study was culinary arts, and the so-called employed student was working an entry-level position in the fast food industry. Such a position did not require the student to purchase a higher education "credential." As a result, we believe that paying bonuses to recruiters based upon retention, completion, graduation, or placement remain in violation of the HEA's prohibition on the payment of incentive compensation.

*Changes:* None.

*Comment:* Many commenters questioned our rationale for eliminating the safe harbor in current § 668.14(b)(22)(ii)(G), which exempts managerial and supervisory employees who do not directly manage or supervise employees who are directly involved in recruiting or admissions activities, or the awarding of title IV, HEA program funds from the prohibition on receiving incentive payments. These commenters argued that a bright line designation is needed and that the incentive compensation ban should only apply to employees who are involved in direct recruitment or admission of students or decisions involving the award of title IV, HEA aid. Others recommended that we retain this safe harbor, and that we

clarify that the words "indirectly or directly" do not apply to the determination of which persons are covered by the prohibition. Several commenters expressed their concerns about having the regulations prohibit compensation practices at any level of an organization, no matter how far removed from actual recruitment, admissions, or financial aid activity. These commenters argued that such an approach would prevent institutions from evaluating top management with respect to student population metrics or any other business or organizational metric that is a function of student enrollment.

A few commenters raised more specific concerns about the compensation of top college officials in situations where the president attends an open house or speaks with potential students who the institution is recruiting, either in a group or individually. Some commenters also asked whether the proposed regulations would permit a president to receive a bonus or other payment if one factor in attaining the bonus or other payment was meeting an institutional management plan or goal that included increasing minority enrollment by a certain percentage.

Finally, a few commenters asked whether institutions can still reward athletic coaches whose student athletes stay in school and graduate.

*Discussion:* We intend the incentive compensation ban in § 668.14(b)(22)(i) to apply to all employees at an institution who are engaged in any student recruitment or admission activity or in making decisions regarding the award of title IV, HEA program funds. We interpret these employees to include any higher level employee with responsibility for recruitment or admission of students, or making decisions about awarding title IV, HEA program funds. To make this clearer, we are revising § 668.14(b)(22)(iii) to add a definition for the term *entity or person engaged in any student recruitment or admission activity or in making decisions about the award of financial aid.* This new definition expressly includes any employee who undertakes recruiting or admitting of students or who makes decisions about and awards title IV, HEA program funds, as well as higher level employees as specified.

Therefore, the actions of a college president could potentially come within the HEA's prohibition on the payment of incentive compensation. However, the Department does not see how mere attendance at an open house or speaking with prospective students about the value of a college education or the virtues of attending a particular institution would violate the incentive compensation plan. Other activities should be evaluated within the context of the Department's previously

discussed two-part test to receive assistance as to whether a particular activity is permissible.

Finally, recruitment of student athletes is not different from ▢ recruitment of other students. Incentive compensation payments to athletic department staff are governed by the restrictions included in § 668.14(b)(22). If the payments are made based on success in securing enrollments or the award of financial aid, the payments are prohibited; however, the Department does not consider "bonus" payments made to coaching staff or other athletic department personnel to be prohibited if they are rewarding performance other than securing enrollment or awarding financial aid, such as a successful athletic season, team academic performance, or other measures of a successful team.

*Changes:* We have added a definition of the term *entity or person engaged in any student recruitment or admission activity or in making decisions about the award of financial aid* to § 668.14(b)(22)(iii). New paragraph (b)(22)(iii)(C) of this section provides that the term means—

(*1*) With respect to an entity, any institution or organization that undertakes the recruiting or the admitting of students or that makes decisions about and awards title IV, HEA program funds; and

(*2*) With respect to a person, any employee who undertakes recruiting or admitting of students or who makes decisions about and awards title IV, HEA program funds, and any higher level employee with responsibility for recruitment or admission of students, or making decisions about awarding title IV, HEA program funds.

*Comment:* One commenter asked how the removal of the safe harbor from current § 668.14(b)(22)(ii)(H), which permits an institution to provide a token gift not to exceed $100 to an alumnus or student provided that the gift is not in the form of money and no more than one gift is provided annually to an individual, will affect institutions compensating students for referrals. The commenter asked whether an individual who is referred can be given a scholarship for friends or family of the individual who is referring or a tuition waiver.

*Discussion:* Section 668.14(b)(22) does not prohibit institutions from providing any commission, bonus, or incentive payment to students who are referrals. Therefore, an individual who is referred to an institution should be able to receive whatever scholarship money or tuition assistance that he or she may otherwise be eligible to receive without violating the HEA.

*Changes:* None.

*Comment:* Several commenters asked for clarification regarding the safe harbor in current § 668.14(b)(22)(ii)(J) permitting an institution to award compensation for Internet-based recruitment and admission activities that provide information about the institution to prospective students, refer prospective students to the institution, or permit prospective students to apply for admission online. Specifically, the commenters asked us to clarify that institutions can make payments to third parties that provide Internet-based recruitment and admission services as long as they do not otherwise violate the statutory prohibition. Other commenters asked for confirmation that click-through payments are permitted if the third party is paid based on those who click, not those who enroll. Other commenters requested examples of permitted relationships.

*Discussion:* The HEA does not prohibit advertising and marketing activities by a third party, as long as payment to the third party is based on those who "click" and is not based in any part, directly or indirectly, on the number of individuals who enroll or are awarded financial aid; therefore, the regulatory language would not prohibit such click-through payments. Further, institutions may make payments to third parties and entities with formal third-party arrangements as long as the parties are not compensated in any part, directly or indirectly, based on success in securing enrollments or the award of financial aid.

*Changes:* None.

*Comment:* Many commenters offered suggestions regarding the safe harbors reflected in current § 668.14(b)(22)(ii)(K) and (b)(22)(ii)(L), which both involve payments to third parties for shared services. A number of commenters representing organizations that provide a variety of services to institutions asked for clarification about their continued ability to assist institutions in this way, as long as the compensation arrangements are not prohibited by the HEA. Many commenters asked whether tuition-sharing arrangements with third-parties to secure servicers that include recruitment would be permitted. They questioned whether these arrangements should be treated the same as arrangements involving volume-driven payments. Several commenters expressed concern about the affect these regulations will have on third parties who provide services to assist students who study abroad.

One commenter suggested that entities that provide enrollment

services be able to elect to be treated as "third-party servicers," with all of the restrictions, obligations, liabilities, reporting requirements, and oversight that accompany that status.

Other commenters asked whether institutions would be held accountable for the actions of third-party servicers. A few commenters also requested the Department to provide examples of arrangements with third parties that would be permitted under the new regulatory framework (*i.e.,* with the removal of the safe harbors from current § 668.14(b)(22)(ii)(K) and (b)(22)(ii)(L)).

*Discussion:* The Department understands the value of partnerships between institutions and entities that provide various support and administrative services to these institutions. Such arrangements are permitted under these regulations as long as no entity or person engaged in any student recruitment or admission activity or in making decisions about the award of financial aid (as defined in § 668.14(b)(22)(iii)(C)) is compensated in any part, directly or indirectly, based upon success in securing enrollments or the award of financial aid.

In addition, as the Department stated in the NPRM, arrangements under which an institution is billed based on the number of student files that are processed (*e.g.,* a volume-driven arrangement) are not automatically precluded, provided that payment is not based in any part, directly or indirectly, on success in securing student enrollments or the award of financial aid.

Further, it is longstanding Department policy that an institution is responsible for the actions of any entity that performs functions and tasks on the institution's behalf. The definition of a *third-party servicer* is established in § 668.2; the responsibilities of a third-party servicer are described in § 668.25. No additional language is needed.

*Changes:* None.

### Permissible Compensation Activities

*Comment:* Many commenters requested clarification on the types of compensation that would be permitted under proposed § 668.14(b)(22) and section 487(a)(20) of the HEA. A few commenters who supported the proposed changes to § 668.14(b)(22) suggested additional alterations to strengthen the language—such as moving language we had included in the NPRM preamble to the regulatory text—to ensure that incentive payments are not based "in any part" on success in

securing enrollments or financial aid.

In addition, several commenters suggested that more than two changes in pay in a calendar year should be considered evidence that the payments are incentive compensation.

These commenters also requested guidance about allowable salary ⬜ adjustments, including whether raises (for promotions) would be permitted and whether reductions (for demotions) would be permitted. Some commenters requested clarification on whether a salary could be paid. One commenter asked whether benefits could be paid at differential rates by class of employee or on a sliding scale by salary.

*Discussion:* Based on these comments, the Secretary agrees that some modifications to the language in proposed § 668.14(b)(22) would be helpful to ensure that incentive payments are not based "in any part" on success in securing enrollments or financial aid. In particular, we agree that it is appropriate to add language to avoid confusion as to whether some part of an individual's compensation may be based on incentive compensation. For this reason, we are revising § 668.14(b)(22)(i) to reinforce the idea that compensation must not be based in any part, directly or indirectly, on success in securing enrollments or the award of financial aid.

In addition, we support revising the regulations to provide that an employee who receives multiple compensation adjustments in a calendar year is considered to have received adjustments based upon success in securing enrollments or the award of financial aid in violation of the incentive compensation ban in § 668.14(b)(22) if those adjustments create compensation that is based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid.

Finally, with respect to the requests for clarification on allowable salary adjustments, we note that individuals may be compensated in any fashion that is consistent with the prohibition identified in section 487(a)(20) of the HEA. Accordingly, while not commenting on any specific compensation structure that an institution may choose to implement, the Department recognizes, for example, that institutions often maintain a hierarchy of recruitment personnel with different amounts of responsibility. As long as an institution complies with section 487(a)(20) of the HEA, it may be appropriate for an institution to have salary scales that reflect an added amount of responsibility. Institutions also remain free to promote and demote recruitment personnel, as long as these decisions are consistent with the HEA's

prohibition on the payment of incentive compensation. Finally, it is appropriate to pay recruitment personnel a fixed salary.

*Changes:* We have revised § 668.14(b)(22)(i)(A) (which has been redesignated as § 668.14(b)(22)(i)) to clarify that a prohibited incentive compensation includes any commission, bonus, or other incentive payment based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid to any person or entity engaged in any student recruitment or admission activity or in making decisions regarding the award of title IV, HEA program funds.

In addition, we have redesignated proposed § 668.14(b)(22)(i)(B) as § 668.14(b)(22)(i)(A) and added a new paragraph (b)(22)(i)(B) to provide that, for the purposes of this paragraph, an employee who receives multiple adjustments to compensation in a calendar year and is engaged in any student enrollment or admission activity or in making decisions regarding the award of title IV, HEA program funds is considered to have received such adjustments based upon success in securing enrollments or the award of financial aid if those adjustments create compensation that is based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid.

Finally, we have revised § 668.14(b)(22)(ii) to provide that eligible institutions, organizations that are contractors to eligible institutions, and other entities may make merit-based adjustments to employee compensation provided that such adjustments are not based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid.

*Comment:* Commenters raised a number of questions related to the two-part test the Department has offered that will demonstrate whether a compensation plan or payment complies with the statute and the implementing regulations. Many commenters seemed confused about the application of the two-part test and raised a wide range of specific questions about employment possibilities and compensation practices. For example, some commenters asked for clarification about the types of items that could be considered something of value, such as letters of recommendation to volunteer interns.

Several commenters asked that we include the language of the two-part test in the regulatory text.

Finally, one commenter asserted that the two-part test will not add clarity on compensation issues but instead will raise questions about the legality of certain types of merit-based

compensation systems that seem to fall outside the scope of compensation restriction but that could fail to satisfy the two-part test.

*Discussion:* As discussed earlier in this preamble, the Department has described a two-part test for evaluating whether a payment constitutes a commission, bonus, or other incentive payment based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid to any person or entity engaged in any student recruitment or admission activity or in making decisions regarding the award of title IV, HEA program aid in violation of the ban reflected in § 668.14(b)(22)(i). The Department first described this test in the preamble to NPRM. (*See* 75 FR 34818 (June 18, 2010).) The test consists of the following two questions, the answers to which will permit an institution to know whether the compensation is considered incentive compensation:

(1) Whether the payment is a commission, bonus, or other incentive payment, defined as an award of a sum of money or something of value paid to or given to a person or entity for services rendered; and

(2) Whether the commission, bonus, or other incentive payment is provided to any person based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid, which are defined as activities engaged in for the purpose of the admission or matriculation of students for any period of time or the award of financial aid.

If the answer to each of these questions is yes, the payment would not be permitted under section 487(a)(20) of the HEA or § 668.14(b)(22). The Department merely provided this test as a tool to help institutions evaluate compensation practices they may consider implementing. The test does not add any substantive requirements that are not otherwise included in § 668.14(b)(22)(i). For this reason, we do not think it is necessary or appropriate to include the text of the test in the regulations.

The Department further notes that, as a general matter, it does not believe that the provision of letters of recommendation to volunteer interns would constitute a proscribed incentive payment.

Finally, we disagree with the comment that the two-part test will not serve generally to answer institutions' questions regarding a particular compensation plan. As previously stated, we believe that the prohibition identified in section 487(a)(20) of the HEA is clear and that institutions should not have difficulty maintaining □ compliance with the new

regulatory language. To the extent an institution has questions about what it intends to do, the Department has offered the two-part test as an aid to reaching a proper conclusion. To the extent that an institution does not wish to use the test to assist it in evaluating its practices, it is not required to do so.

*Changes:* None.

*Comment:* A number of commenters questioned the use of the term "indirectly" in the prohibition on incentive compensation in proposed § 668.14(b)(22). They expressed concern about the broad scope of this term and believed that interpretive discord will result from its inclusion in § 668.14(b)(22). These commenters argued that any compensation involving an institution of higher education is based indirectly on success in securing enrollments and asked how far removed an activity must be in order for it not to be considered indirectly related. Other commenters specifically requested that we define the term "indirectly."

Several commenters suggested that proposed § 668.14(b)(22)(i)(A) should use the term "solely" rather than "directly or indirectly" (*i.e.,* "it will not provide any commission, bonus, or other incentive payment based solely upon success" rather than "it will not provide any commission, bonus, or other incentive payment based directly or indirectly upon success"). These and other commenters alleged that the language in proposed § 668.14(b)(22)(i)(A) is not consistent with congressional intent. Many of these commenters cited to the conference report, which states that the use of the term "indirectly" does not mean that institutions are prohibited from basing salaries on merit; they may not, however, be based "solely" on the number of students recruited, admitted, enrolled, or awarded.

*Discussion:* The Department does not agree with the view that the use of the phrase "directly or indirectly" will lead to interpretation problems or that it is inconsistent with congressional intent. Given the Department's experience with how the safe harbor in current § 668.14(b)(22)(i)(A), which permits up to two salary adjustments per year provided that they are not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid, has been abused, the Department does not believe that it serves congressional intent to limit the incentive compensation ban in section 487(a)(20) of the HEA to those payments that are based solely upon success in securing enrollments or the award of financial aid. The Department believes that, consistent with section 487(a)(20) of the HEA, incentive payments should not be based in any part, directly or indirectly, on success in securing

enrollments or the award of financial aid.

The safe harbor in current § 668.14(b)(22)(i)(A) has led to allegations in which institutions conceded that their compensation structures included consideration of the number of enrolled students, but averred that they were not *solely* based upon such numbers. In some of these instances, the substantial weight of the evidence suggested that the other factors purportedly analyzed were not truly considered, and that, in reality, the institution based salaries exclusively upon the number of students enrolled. After careful consideration, the Department determined that removal of the safe harbor was preferable to retaining but revising the safe harbor. For example, we considered suggestions that we change the word *solely* to some other modifier, such as "primarily" or "substantially," but ultimately determined that doing so would not correct the problem. With such a change, we believe the evaluation of any alternative arrangement would merely shift to whether the compensation was "primarily" or "substantially" based upon enrollments. Such a shift would not reduce the ability of an unscrupulous actor to claim that student enrollments constituted this lesser factor within a recruiter's evaluation and would foster the same sorts of abuses that have become apparent by institutions attempting to assert that their compensation practices are not solely based on enrollments.

*Changes:* None.

*Comment:* A number of commenters raised questions about proposed § 668.14(b)(22)(ii), which allows eligible institutions, organizations that are contractors to eligible institutions, and other entities to make merit-based adjustments to employee compensation provided that such adjustments are not based upon success in securing enrollments or the award of financial aid. They expressed concern that limiting merit-based adjustments to those that are not based upon success in securing enrollments or the award of financial aid would make it impossible for them to award merit increases for employees whose job it is to enroll students. They noted that there are no standard evaluative factors concerning enrollment that are not directly or indirectly based on securing enrollments.

Some commenters requested clarification about whether an increase could be based on seniority or length of employment, including whether a retention bonus could be paid based on the employee's retention at the institution if it is paid evenly to all employees.

Some commenters argued that the regulations should recognize and permit compensation based on the performance of, and success at, the core job functions of admissions representatives and financial aid officials. They questioned how it would be possible to measure employee performance without evaluating success. They asked that we provide concrete guidance about how institutions can make salary adjustments without violating the incentive compensation prohibition.

*Discussion:* Section 668.14(b)(22) does not prohibit merit-based compensation for financial aid or admissions staff. An institution may use a variety of standard evaluative factors as the basis for this type of compensation; however, consistent with section 487(a)(20) of the HEA and § 668.14(b)(22), an institution may not consider the employee's success in securing student enrollments or the award of financial aid in providing this type of compensation. Further, an increase in compensation that is based in any part either directly or indirectly on the number of students recruited or awarded financial aid is prohibited.

As previously mentioned, many institutions currently claim to evaluate their recruitment personnel on a series of qualitative factors, as well as on the number of enrolled students, to demonstrate compliance with the safe harbor reflected in current § 668.14(b)(22)(i)(A), which prohibits compensation based solely on the number of students enrolled. As a result, it appears that these institutions have identified other factors that are not dependent upon student enrollments that we believe could by themselves be considered for making a merit-based compensation decision. In addition, seniority or length of employment is an appropriate basis for making a compensation decision separate and apart from any consideration of the numbers of students enrolled. Finally, as many commenters from groups representing admissions personnel noted, as a general matter, recruitment personnel should be compensated with a fixed salary to ensure that their ability to focus on what is in a student's best interest is not compromised.

*Changes:* None.

*Comment:* Several commenters raised issues about the relationship between an institution's goals and payments to employees. Many asked whether □ employees could be rewarded through profit-sharing or other payments for success in meeting retention, graduation, and placement goals as long as they are not rewarded for the number of students recruited and admitted. These commenters requested that we define an

acceptable percentage of an employee's compensation adjustment that can be based on the number of students recruited, admitted, enrolled, or awarded financial aid.

One commenter asked that we clarify whether payments tied to overall institutional revenues, including profit-sharing, pension, and retirement plans are allowed. A number of commenters asked more broadly whether such plans would be permissible. A few commenters requested changes to incorporate the distribution of profit-sharing or bonus payments under certain circumstances, such as when a payment is made to a broad group of employees.

*Discussion:* While there is no statutory proscription upon offering employees either profit-sharing or a bonus, if either is based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid, it is not permitted under section 487(a)(20) of the HEA or § 668.14(b)(22).

The Department agrees with commenters that there are circumstances when profit-sharing payments should be permitted. Under proposed § 668.14(b)(22), an institution may distribute profit-sharing payments if those payments are not provided to any person who is engaged in student recruitment or admission activity or in making decisions regarding the award of title IV, HEA program funds. The Department believes that such payments are consistent with the HEA as they are not being made to a particular group who is active in admissions or financial aid.

For this reason, we are making a change to § 668.14(b)(22)(ii) to provide that institutions may make payments, including profit-sharing payments, so long as they are not provided to any person who is engaged in student recruitment or admission activity or in making decisions regarding the award of title IV, HEA program funds.

*Changes:* We have revised § 668.14(b)(22)(ii) to clarify that, notwithstanding the ban in § 668.14(b)(22)(i), eligible institutions, organizations that are contractors to eligible institutions, and other entities may make profit-sharing payments, so long as such payments are not provided to any person who is engaged in student recruitment or admission activity or in making decisions regarding the award of title IV, HEA program funds.

*Comment:* Several commenters asked us to clarify what kinds of activities would not be considered under the definition of *securing enrollments or the award of financial aid.* They asked that we revise the regulations to provide explicitly that

payments based on any additional activities are not allowed if they are directly or indirectly based on enrollment or the awarding of aid.

Other commenters raised questions about the use of "aggregators," that is, entities that assist an institution with the institution's outreach efforts. These efforts include but are not limited to, identifying students, offering counseling and information on multiple institutions, and encouraging potential students to fill out an application directly with the individual institutions. Aggregators are paid based on the student remaining at the institution for a certain time period rather than based on the fact that the student enrolls. Commenters asked us to clarify whether these practices are permitted under section 487(a)(20) of the HEA and § 668.14(b)(22).

Some commenters focused on arrangements under which institutions pay third parties for student contact information and asked whether such information may be sorted or qualified. Further, they questioned whether institutions would be permitted to pay only for information that yields actual contact with a student. They asked that we confirm that institutions may pay students for contact information on a per person basis as long as payments are not based on the number of students who apply or enroll. In addition, they suggested that we allow qualitative factors to be included in the consideration of the price to provide incentives to third parties to appropriately identify students that more closely fit an institution's profile.

Some commenters believed that the proposed definition of *securing enrollments or the award of financial aid* does not make it clear that the activities are prohibited through the completion of a student's educational program.

*Discussion:* The Department agrees that it would be helpful to clarify the type of activities that are and are not considered securing enrollments or the award of financial aid. For this reason, we have revised the definition of securing enrollments or the award of financial aid to specifically include (as examples) contact through preadmission or advising activities, scheduling an appointment for the prospective student to visit the enrollment office or any other office of the institution, attendance at such an appointment, or involvement in a prospective student's signing of an enrollment agreement or financial aid application (see § 668.14(b)(22)(iii)(B)(*1*) of these final regulations).

We also revised the definition to clarify that it does not include

making a payment to a third party for the provision of student contact information provided that such payment is not based on any additional conduct by the third party, such as participation in preadmission or advertising activities, scheduling an appointment to visit the enrollment office or any other office of the institution or attendance at such an appointment, or the signing, or being involved in the signing of a prospective student's enrollment agreement or financial aid application (see § 668.14(b)(22)(iii)(B)(*2*) of these final regulations).

With respect to the comments requesting guidance on "aggregators," we do not believe it is necessary or appropriate for the Department to indicate whether these types of activities would, across the board, be permitted. Each arrangement must be evaluated on its specific terms. As noted earlier in this preamble, we believe any institution can determine whether a payment it intends to make is prohibited by § 668.14(b)(22) by applying the two-part test we have described. Specifically, the first step for an institution in determining if payment for an activity or action is considered incentive compensation is to evaluate whether the entity is receiving something of value, then to determine whether the payment is made based in any part, directly or indirectly, on success in securing enrollments or the award of financial aid.

Finally, we agree with commenters that the definition of the term *securing enrollments or the award of financial aid* should be revised to specify that these activities include activities that run throughout completion of the student's educational program.

*Changes:* We have revised the definition of securing enrollments or the award of financial aid in § 668.14(b)(22) (iii)(B) to provide more detail about actions that are considered to be covered by the definition. We also have revised the definition to clarify that it includes activities through the completion of an educational program.

*Comment:* Numerous commenters requested that the Department offer guidance on the practical implementation of the proposed definitions. Many expressed concern about our stated intention to address ⬜ only broadly applicable principles rather than responding to questions on individual compensation issues. These commenters asserted that institutions need guidance before they should be the subject of an investigation or legal action. They raised concerns about the confusion that could result without additional clarification and the attendant costs to partners in the student aid process in "today's legal environment." They believed that the

Department already knows that guidance will be needed based on our pre-2002 experiences and noted that issuing guidance is a fundamental purpose of the Department and should be continued.

*Discussion:* The Department believes the proposed language is clear and reflective of section 487(a)(20) of the HEA. As modified, it is designed to appropriately guide institutions as they evaluate compensation practices. To the extent that ongoing questions arise on a particular aspect of the regulations, the Department will respond appropriately in a broadly applicable format and will distribute the information widely to all participating institutions. This response may include a clarification in a Department publication, such as the Federal Student Aid Handbook or a Dear Colleague Letter. The Department does not intend to provide private guidance regarding particular compensation structures in the future and will enforce the regulations as written.

*Changes:* None.

## Satisfactory Academic Progress (§§ 668.16(e), 668.32(f), and 668.34)

Back to Top

### General

*Comment:* Many commenters supported the proposed changes to the Satisfactory Academic Progress (SAP) regulations. Several commenters noted that the consolidation of the SAP requirements into § 668.34 would ease compliance and suggested that it would be helpful to revise the Federal Student Aid (FSA) Handbook to mirror the new organization of the requirements in the regulations.

Several commenters noted that they appreciated that the proposed SAP regulations retain the flexibility provided under the current regulations for institutions to establish policies that best meet the needs of their students.

Many commenters expressed support for the proposed changes to the SAP regulations because they viewed them as a means for helping hold students accountable for their academic goals earlier in their careers, which they believed would lead to lower student debt levels. Several commenters noted that their current policy and practices either met or exceeded the requirements in the proposed regulations.

Many commenters supported, in particular, the definition of the terms *financial aid warning* and *financial aid probation* as well as the standardized definitions of other terms related to SAP. These commenters stated that this standardization would lead to a more consistent application of the SAP regulations among institutions, which, in turn, will make them more

understandable to students.

Many commenters also supported the SAP regulations because they give those institutions that choose to evaluate SAP more frequently than annually the ability to use a financial aid warning status, which they viewed as being beneficial to students. They stated that such a warning would lead to early intervention for students who face academic difficulties. Commenters also noted that the financial aid warning status will allow financial aid offices to strengthen their SAP policies to encourage students to use designated support services on campus and lead to further student success.

*Discussion:* The Department appreciates the support of its efforts to improve program integrity through its SAP regulations. With regard to the comment recommending that we revise the FSA Handbook to align it with the changes we have made in the SAP regulations, we will take this recommendation into account during the next revision of the FSA Handbook.

*Changes:* None.

## General

*Comment:* Several commenters did not support the proposed changes to the SAP regulations. Two commenters stated that the Department should delay implementation of the SAP regulations, including proposed § 668.34, so that we can resubmit these proposals for negotiation and evaluation in a future negotiated rulemaking proceeding. These commenters argued that the Department had not made a sufficient argument for what would be gained by the changes, and how these benefits would justify the additional burden imposed upon institutions by these regulations.

Two commenters stated that institutions were in the best position to design and implement a satisfactory academic progress policy that fit their institutional needs, and that the current regulations were sufficient for achieving this purpose. These commenters asserted that the proposed changes were intrusive and would lead to increased audit exceptions. These commenters also noted that the Department should consider incentives to encourage institutions to research student success in light of their own SAP policies. One commenter stated that the proposed regulations were too prescriptive, and that institutions would require significant guidance in the FSA Handbook in order to be able to comply with the new regulations.

Two commenters stated that while they generally agreed with the Department's desire to clarify the SAP regulations and with the proposed approach reflected in the NPRM, the regulations had a number of unintended consequences. These commenters indicated that the Department's proposal would force institutions to choose whether to take on additional workload by evaluating students each term, or to take on the additional workload caused by the dramatic increase in appeals. One of the commenters noted as an example an institution that has a number of Alaskan Native students to whom it provides significant support, particularly early in their careers; in this case, the commenter stated that these students would be significantly harmed by these SAP regulations as the students often cannot remedy their academic problems in a short period of time. Both of these commenters noted that while the Department believes that it has to address abuses with the current regulations, that it should weigh this against the unintended consequences of the proposed regulations, which include increased workload for institutions and unfair impact on certain groups of students.

*Discussion:* The Department disagrees with the commenters who suggested that these regulations should be resubmitted for the negotiated rulemaking process. The proposed changes to the SAP regulations in §§ 668.16(e), 668.32(f), and 668.34 have already been through the negotiated rulemaking process. In fact, the negotiators reached tentative agreement on these proposed changes. During negotiations, most negotiators stated that it was appropriate for the Department to provide certain flexibilities for those institutions that chose to check on the satisfactory academic progress of students more often than was required by the statutory minimum of annually. Many of the negotiators said that they supported the proposed changes to the SAP regulations because they continued to provide significant flexibilities for institutions to craft SAP policies that met the needs of their student bodies ▯ while still preserving program integrity. For the commenter who suggested that the Department should encourage institutions to study the consequences of their SAP policies and allow incentives for doing so, we will take this under advisement when we next have the opportunity to develop experimental site proposals.

We do not agree with the commenters who suggest that the SAP regulations are too prescriptive or intrusive. Section 484(c)(1)(A) of the HEA requires that an eligible student be making satisfactory progress towards program completion, and that institutions check at least annually for programs longer than a year, that a student is annually meeting that requirement. These regulations do not require institutions to

do any more than what is required by the HEA, and are not more difficult to comply with than the current regulations. Therefore, institutions should not experience increased incidents of noncompliance. We will continue to provide any applicable and needed guidance in the FSA Handbook to assist institutions in complying with the regulations.

We do agree with the commenters who stated that an increase in SAP monitoring to a payment period by payment period basis would increase administrative burden. However, institutions are free to continue to monitor as frequently as they currently do, and are not required to change their SAP policy and monitor every payment period. As for the unintended consequences for particular groups of students, these regulations allow for institutions to craft SAP policies that best fit the needs of their students. An institution could evaluate the needs of any special student groups and find ways to work effectively with those students. For example, a specific student may need to have assistance developing an academic plan that will enable him or her to be successful.

*Changes:* None.

### Delayed Implementation

*Comment:* Several commenters suggested that implementation of the proposed changes to §§ 668.16(e), 668.32(f) and 668.34 should be delayed for a couple of years to allow institutions to prepare their policies and procedures to comply with the regulatory changes. One commenter recommended that implementation be delayed until the 2012-13 award year to allow for institutions to make changes to their monitoring systems. Another commenter encouraged the Department to delay implementation of the regulations for SAP, but noted that if we do not delay implementation, then the Department should issue guidance as to how the new regulations will affect summer crossover payment periods. This commenter expressed concern that, without this additional guidance, it will be unclear as to which SAP regulations apply to students enrolled in summer.

*Discussion:* While the Department appreciates that some institutions may have to make changes to computer monitoring systems, or written policies and procedures, we do not believe that the changes to the SAP regulations are extensive enough to warrant delayed implementation. Institutions that may have to adjust or change their SAP policy will have to publicize such a change to students, and let students know when any new SAP policy is effective. As such,

the summer crossover payment period would be addressed by the school's new policy and would be subject to the effective date of the school's new policy. For example, a school may decide that for the purpose of this policy change, a 2011-12 summer crossover period will be subject to their current SAP policy and procedures, as part of the 2010-11 award year. This would be acceptable, and should be addressed in the school's notification to their students of the effective date of any new policy.

*Changes:* None.

## Satisfactory Academic Progress (§ 668.34)

Back to Top

*Comment:* Two commenters stated that the term "financial aid applicants" should be substituted for the word "students" in § 668.34. The commenters indicated that students who had not applied for financial aid would be confused by notifications about eligibility under the SAP regulations. These commenters argued that institutions should only be required to send notifications to financial aid applicants, and that the proposed requirement that notifications be sent to all of an institution's students is unreasonable.

*Discussion:* There is no requirement in the proposed regulations for schools to notify students who are not applying or receiving title IV, HEA aid of their eligibility under SAP. These regulations do not impose such a requirement. Moreover, we do not believe it is necessary to replace the term "student" with the term "financial aid applicant" in these regulations since we are referring to general student eligibility criteria, which affect not only financial aid applicants, but recipients of title IV, HEA funds as well. There is no attempt to regulate any other students in these regulations.

*Changes:* None.

### Consistency Among Categories of Students

*Comment:* One commenter noted that proposed § 668.34(a)(2) retained the language from current § 668.16(e)(3) that the institution's policy must be consistent among categories of students. This commenter questioned whether, within the categories of students, an institution could evaluate sub-categories of students differently. For example, within the group of undergraduate students, could an institution choose to evaluate freshmen and sophomore students every payment period but upperclassmen only once a year. The commenter noted that this approach might be used if the institution determined that students in the first two years needed more intervention, and that after that time students were more

likely to remain enrolled until graduation. The commenter also asked if this approach is allowable, could the institution use a financial aid warning for those students who are evaluated every payment period.

One commenter noted that proposed § 668.34(a)(2) does not appear to allow for different evaluation periods based upon the type of student or program being evaluated. For example, this commenter noted that an institution may want to evaluate undergraduates each payment period and evaluate graduate students annually. The commenter proposed changes to the regulatory language that would allow for such a difference.

*Discussion:* These regulations retain the flexibility for an institution to evaluate different categories of students differently, as long as the policy provides for consistent application of standards within each of the categories of students. Institutions retain flexibility to create a policy within those groups of students to best meet the needs of its student body. If they wish to institute a policy that evaluates freshmen and sophomores every payment period, and juniors and seniors annually, an institution is free to do so. Such a policy would only allow for the automatic financial aid warning status to be used for those students who are evaluated every payment period. This would, however, allow for a policy that is sensitive to the needs of the institution's student body. For this reason, we do not believe that any changes are needed to respond to the commenters' concerns.

*Changes:* None.

## Frequency of Evaluation

*Comment:* One commenter supported the proposed regulations, but expressed concern that an institution may not have ⬜ time prior to the start of the next term to evaluate SAP, thereby resulting in students owing a repayment of title IV, HEA funds. Several commenters noted that for some academic periods there is not enough time to evaluate students prior to the beginning of the next payment period. These commenters noted that this is particularly true for institutions with quarters and even most traditional calendar schools for the period after the summer term. One commenter stated that, in order to accommodate the realities of institutions that use the quarter system, all institutions that monitor their students' satisfactory academic progress more frequently than annually should be allowed to use the financial aid warning status.

Several commenters argued that the Department should not require institutions to evaluate more frequently than annually.

Numerous commenters did not agree with the Department giving additional flexibilities to those institutions that evaluate the satisfactory academic progress of its students each payment period rather than annually.

One commenter stated that it was unfair to "pressure" institutions to check a student's satisfactory academic progress more frequently than once per year, particularly if they have stable student populations and good graduation rates. This commenter argued that these types of institutions should be allowed to use the flexibility of the financial aid warning status even if they monitored SAP less frequently than every payment period. Another commenter representing an association noted that some of its members objected to what they perceived as the Department restricting flexibility when an institution is in compliance with the minimum yearly requirement established under section 484(c)(1)(A) of the HEA. Another commenter argued that it would decrease student success to require all institutions to check satisfactory progress each payment period, as students would not know from one term to the next what their eligibility for aid might be. This commenter expressed concern that this would particularly disadvantage low income and minority students.

One commenter argued that by strengthening other parts of the SAP regulations, only one probationary period for example, abuses could be curtailed, and institutions would not be encouraged to create more lenient policies.

*Discussion:* The Department appreciates the fact that there could be an increased administrative burden for some institutions to change the frequency with which they monitor the satisfactory academic progress of their students to a payment period-by-payment period basis. However, changing the frequency for monitoring satisfactory academic progress is not required under these regulations; institutions still have the flexibility to create a policy that best meets the needs of their student body. If an institution believes, for example, that evaluating SAP every payment period would create too much uncertainty for their students, then they are not required to develop such a policy.

With respect to the commenter who suggested that institutions with stable student populations and good graduation rates should be able to use the flexibility of the financial aid warning status even if they monitored SAP on an annual basis, we do not believe it is appropriate to allow extended periods of financial aid warning because this is essentially providing title IV, HEA aid to students who are not making progress towards program completion. We understand that some institutions

believe that the Department is unfairly placing restrictions on institutions that choose to stay with minimum annual evaluations, or to evaluate less frequently than every payment period. However, we do not believe that it is appropriate to continue to allow a student who does not meet eligibility criteria to continue to receive title IV, HEA funds without a formal intervention by the institution in the form of an appeal approval or an academic plan.

*Changes:* None.

*Comment:* Several commenters noted that students who attend quarter schools face an inequity under proposed § 668.34 in that they could lose title IV, HEA eligibility after 20 weeks, whereas for a student at a semester school, they could lose title IV, HEA eligibility after 30 weeks, which is an academic year. These commenters asserted that this subjects the student at a quarter school to more rigorous evaluation. These commenters expressed concern that institutions might choose to evaluate the SAP of their students annually in order to level the playing field for their students, as well as relieve administrative burden.

One commenter expressed concern that the term "annually" in § 668.34 was subject to interpretation and that questions would arise as to whether this term referred to every calendar year, every 12 months, or every academic year. This commenter suggested that the Department revise § 668.34(a) (3)(ii) and (d) to refer to "every academic year" rather than "annually".

*Discussion:* The Department notes that a student in a quarter program would be evaluated three times in an academic year, while the student in a semester program would be evaluated twice in an academic year. While some institutions may view this as a more rigorous evaluation, it also allows more opportunities for intervention by the institution. We would hope that an institution would develop a policy that would best serve the needs of students, and that if the institution believes that more frequent evaluations would be beneficial, that it would work with faculty and other parties to attempt to make such a review possible, for example, by shortening the amount of time that it takes grades to become available for evaluation.

The Department notes that institutions that currently review student progress annually choose to review all students at a specific point in time, such as at the end of the spring term or spring payment period. The Department agrees that this is an appropriate and reasonable institutional policy for an institution that reviews academic progress annually. We do

not believe that further regulatory language is necessary to specify that the reviews happen every academic year because if the review happens annually, it necessarily will happen every academic year.

*Changes:* None.

*Comment:* Several commenters indicated that the proposed SAP regulations will not work well for nonterm and nonstandard term programs. They noted that because students in these types of programs complete payment periods at various points during the year, institutions with these types of programs would be unable to evaluate SAP at the end of each payment period. One commenter specifically asked the Department to clarify how SAP in a nonterm program could be evaluated under proposed § 668.34. Another commenter noted that institutions with 8-week terms would find it overly burdensome to evaluate academic progress every payment period. This commenter indicated that an unintended consequence of the proposed changes reflected in § 668.34 would be that institutions with nonstandard term or nonterm programs would evaluate less frequently than currently, due to the administrative burden. Several commenters suggested that to avoid this unintended consequence, the regulations should allow institutions with nonterm programs to set evaluations based upon ☐ calendar dates rather than payment period completion. One commenter stated that these "scheduled satisfactory academic progress calculation" periods could then be used as the basis for the student's continued receipt of aid or placement on financial aid warning. This commenter also suggested that we revise § 668.34 to make the financial aid warning status available to those institutions with nonterm programs that evaluate student academic progress more frequently than annually but not in conjunction with payment periods. The commenter expressed that much confusion will result if the Department does not address how institutions with nonterm programs, where the annual review date chosen for SAP review does not coincide with a payment period, can comply with these regulations.

Another commenter stated that the Department should consider studying different instructional delivery models in order to determine how to best regulate accountability for institutions that need to evaluate SAP for students in nonstandard programs.

*Discussion:* The Department recognizes the complicated monitoring that institutions with nonterm and nonstandard term programs will need to implement to comply with § 668.34 for evaluating the academic progress of students in

these programs, if they choose to evaluate SAP on a payment period-by-payment period bases. This is because, for these programs, institutions could have students completing payment periods on a daily basis. We understand why institutions may find it easier to set one particular calendar date to evaluate the SAP of all of their students in these programs. However, we do not believe that this approach will work because on any given date, any particular student could be at the beginning, middle, or end of a payment period. The SAP review must account for completed coursework, and students in the middle of a payment period, for example, might still have days or weeks to go to finish that work. We do believe that the institution could set a particular time period when it evaluates SAP for all of its students. For example, the institution could set a policy that SAP evaluation will occur for all students upon the completion of the payment period in a given month(s). The evaluation would then include all of the coursework that an individual student completes for the payment period completed in that month. We do not believe that evaluating students at any moment in time other than at the end of a payment period is an appropriate measure of the student's current progress towards program completion, as it is not generally possible to evaluate the work in progress. By evaluating all of the most recently completed work, a SAP evaluation will be most accurate in portraying a student's progress, and will enable the institution to evaluate SAP prior to making the payment for the next payment period thereby insuring payments only to eligible students. We have, therefore, made a change to the proposed regulations to clarify that the evaluation must occur at the end of a payment period. With regards to the commenter who suggested that the Department should conduct a study in order to determine the best way to regulate accountability for students in nontraditional programs, we will take this recommendation under advisement.

*Changes:* We have revised § 668.34(a)(3)(ii) to provide that, for programs longer than an academic year in length, satisfactory academic progress is measured at the end of each payment period or at least annually to correspond to the end of a payment period.

*Comment:* Two commenters noted that the proposed SAP regulations do not address students with disabilities and their needs, especially during the appeals process, as such students may need several appeals.

*Discussion:* When evaluating a student appeal under § 668.34, an institution may take into consideration factors that could

have affected the student's academic progress. These factors can include whether the student has a disability or other extenuating circumstances. Additional considerations may also be given in an academic plan for a student who has a disability as long as applicable title IV, HEA program requirements are followed. Therefore, we do not believe that it is necessary to include any additional regulatory language on evaluating the SAP of students with disabilities or the appeals process for those students.

*Changes:* None.

*Comment:* One commenter, who expressed concern that the proposed SAP regulations were cumbersome, asked whether the regulations would permit two specific types of situations. First, the commenter asked whether an institution could retain the ability to utilize the financial aid warning status if its SAP policy stated that it would begin monitoring a student's academic progress after the student's first academic year, and then continue to monitor the student's progress every payment period thereafter. Second, the commenter asked whether a student could continue to receive title IV, HEA aid without further appeal if the student is in financial aid warning status and he or she submits, and continues to meet the terms of, an acceptable academic plan.

*Discussion:* The proposed regulations allow for significant flexibilities for institutions. If the institution wishes to monitor at different periods in time, such as at the end of the first year, and then by payment period after that, it is free to do so. In this situation, only those students who are evaluated each payment period may receive the automatic financial aid warning status.

With regard to the second scenario described by the commenter, a student who has appealed a determination that he or she is not meeting satisfactory academic progress and is attending his or her program under an approved academic plan because he or she is on financial aid warning status remains eligible for title IV, HEA aid as long as he or she continues to meet the conditions of that plan. In such a situation, the student's academic progress would simply be re-evaluated at the same time as the institution's other title IV, HEA aid recipients are evaluated, unless its policy called for a different review period.

*Changes:* None.

*Comment:* One commenter noted that at his institution summer is considered a trailing term, and the institution evaluates SAP at the end of the spring term. The commenter

asked whether summer coursework could be used retroactively as part of the student's academic plan. The commenter also questioned whether the institution could state in its SAP policy that it reviews SAP after all work for the academic year is completed. Under this approach, the institution would review some students in the spring and others after they complete summer term. Another commenter asked how to handle an optional summer term.

*Discussion:* An institution may choose to state in its SAP policy that it monitors academic progress at the end of the student's completion of the academic year. These SAP regulations still leave the flexibility to the institution to determine what policy will best serve its students. We note, however, that under an institution's SAP policy, the institution must evaluate all of the student's coursework at some point, and that the financial aid warning status described in § 668.34(b) is only available to institutions that evaluate a student's academic progress every payment period.

If an institution evaluates SAP by payment period, then it would evaluate a student's academic progress at the end of each payment period that the student attends. If the institution evaluates SAP □ annually, then it would evaluate all of the coursework that the student has attempted and completed since the last annual evaluation to determine whether the student is making satisfactory academic progress. There are no periods of the student's attendance that are not considered in the evaluation.

*Changes:* None.

### Minimum GPA

*Comment:* One commenter noted that, under current § 668.34(b), a student must have a "C" average or its equivalent after two years in order to make satisfactory academic progress. The commenter noted that the Department's guidance in this area has been that the student must have a "C" average or its equivalent after two years of attendance, regardless of the student's enrollment status during that time. The commenter stated that proposed § 668.34(4)(ii) states that the "C" average is required at the end of two academic years. The commenter asked the Department to clarify whether the use of the phrase "two academic years" as opposed to the phrase "two years" results in any substantive change in how the Department interprets this requirement. Another commenter stated that the current regulations are sufficient in this area, because they allow institutions to interpret the

phrase "two years" in the way that is best for their students.

*Discussion:* The term "academic year" is used in section 484(c)(1)(B) of the HEA, which states that a student is considered to be maintaining satisfactory academic progress if the student has a cumulative "C" average, or its equivalent or academic standing consistent with the requirements for graduation, as determined by the institution, at the end of the second such academic year. We changed the reference from "year" to "academic year" in § 668.34 to more closely align this regulatory language with the corresponding statutory language. This change, however, does not alter the Department's interpretation that this requirement means that a student must have a "C" average or its equivalent after two years of attendance, regardless of the student's enrollment status.

*Changes:* None.

## Pace

*Comment:* Two commenters noted that proposed § 668.34(a)(5)(ii) states that an institution is not required to include remedial coursework when determining the attempted and completed hours for purposes of evaluating a student's pace toward completion of the program. Both commenters requested clarification that an institution may, but is not required to, include remedial coursework when making its SAP determination.

*Discussion:* It is the Department's longstanding position that an institution is not required to include remedial courses when calculating the student's progress towards program completion. While an institution is not required to include remedial courses when calculating pace under the SAP analysis, it may do so as long as its SAP policy otherwise meets the requirements in § 668.34.

*Changes:* None.

*Comment:* One commenter, who noted that its students enter a program at multiple points during the year, asked the Department to clarify how to calculate a student's "pace" toward program completion under proposed § 668.34(a)(5)(ii). This commenter also asked whether full time or part time enrollment should be used to calculate pace toward completion under these regulations. Another commenter asked the Department to clarify how pace relates to maximum timeframe under these regulations. This commenter questioned whether a time component of weeks or months to

program completion needed to be part of the pace measurement. Another commenter expressed concern that proposed § 668.34(a)(5) is less clear than a strict percentage of completion policy. This commenter, who came up with a 67 percent minimum required completion rate when applying the pace formula and the maximum timeframe requirements to the normal BA graduation requirements, argued that the Department should revise the regulations to list the minimum completion rate that would allow a student to complete his or her program in a 150 percent maximum timeframe (67 percent completion in the commenter's calculation).

This commenter also stated that any institution that had a stricter than minimum SAP policy, such as higher required completion rates, should be allowed to use the financial aid warning status, even if it only checked SAP on an annual basis. The commenter stated that this would allow those institutions with stricter policies and high completion rates to use the flexibility offered through the use of the financial aid warning status.

*Discussion:* Proposed § 668.34(a)(5)(i), together with the definition of *maximum timeframe* in § 668.34(b), defines "pace" for purposes of SAP evaluations; it is the pace at which a student must progress through his or her educational program to ensure that the student will complete the program within the maximum timeframe and provides for measurement of the student's progress at each SAP evaluation. Proposed § 668.34(a)(5)(ii) provides the formula that an institution must use at each SAP evaluation to calculate pace: divide the cumulative number of hours the student has successfully completed by the cumulative number of hours the student has attempted. This calculation is to be used regardless of the student's enrollment status, as the formula is designed to measure completion appropriately for each student regardless of whether that student attends full time or part time. The Department believes that these requirements for measuring pace toward program completion provide maximum flexibility for both students and institutions. Students are free to attend at whatever enrollment status is appropriate for them, and institutions can measure the pace as appropriate for their students. Because a graduated pace standard (*i.e.,* 50 percent the first year, 60 percent the second year, and 70 percent every year thereafter) is permissible, the Department does not believe it is appropriate to regulate a specific completion rate for all students in all programs at all institutions.

*Changes:* None.

### Transfer Credits

*Comment:* Several commenters stated that, for purposes of calculating pace toward program completion under § 668.34(a)(5), transfer credits should only count in the completed hours category, but not the attempted hours category, because those credits were not taken at the institution determining SAP. Another commenter stated that transfer credits should only be counted in the attempted hours category but not the completed hours category. One commenter requested clarification as to whether the requirement in § 668.34(a)(6) to count transfer credits as both attempted and completed means that institutions are required to request and evaluate all applicable transcripts.

*Discussion:* Whether or not an institution evaluates the transcripts of all coursework taken by a student at previous institutions is a decision left to the institution. The Department has not required institutions to request transcripts for previously completed work, and is not doing so now. However, in so much as credits taken at another institution are accepted towards the student's academic program under the institution's academic requirements, we do believe it is appropriate to include those credits in both the attempted and completed hours ☐ category when measuring pace towards completion for each SAP evaluation period.

*Changes:* None.

*Comment:* One commenter recommended that the Department revise § 668.34(a) to require transfer credits to be considered when determining progress towards maximum timeframe, but not for purposes of determining the pace of completion for each evaluation period. This commenter stated that counting transfer credits when looking at each evaluation period would give transfer students an unfair advantage in the pace to completion calculation.

Another commenter noted that the practice of excluding courses that were not degree applicable from the pace calculation for evaluating SAP has prompted many students to change majors in order to retain financial aid eligibility. The commenter opined that this practice leaves the door open to abuse of the system. Additionally, the commenter stated that the Department should require that all courses that the student had attempted and completed in his entire career be included in the pace computation for purposes of determining the student's progress toward program completion.

*Discussion:* The Department acknowledges that transfer

students may have a slight advantage over other students when an institution calculates their pace toward program completion. However, this inclusion of transfer credits in the calculation of pace will allow for a more level playing field for all students, and standardize treatment of completed credits in the SAP evaluation. This is because including transfer credits in the calculation of pace means we are considering all completed work for all students.

We also note that the Department has had a longstanding policy that institutions are free to set their own SAP policy that deals with major changes as they relate to measurement of maximum timeframe. Therefore, if an institution wishes to limit the number of major changes that it will allow a student, then it is free to set a policy that does so.

*Changes:* None.

### Financial Aid Probation and Financial Aid Warning Statuses

*Comment:* Many commenters found the definitions of the terms *financial aid warning* and *financial aid probation* in proposed § 668.34(b) to be helpful. These commenters stated that it was very useful to have standard vocabulary to use when discussing SAP. Some commenters noted that these terms and concepts matched their current policy while others requested slight changes to the terms or definitions so that they align more closely with their own institution's policies. Several commenters sought clarification, however, as to whether institutions are required under these regulations to use the newly defined terms of *financial aid warning* and *financial aid probation* in their consumer information and other communications with students, or whether we would allow them to continue to use their current terminology. These commenters expressed concern that their students might be confused if they changed the terminology used in this area.

*Discussion:* The Department intends to allow institutions to have as much flexibility as possible in developing an appropriate SAP policy for their institution as well as consumer information materials for their students. However, institutions must incorporate these regulations changes into the information that they provide to students; this includes ensuring that the information made available by the institution uses the terminology used in these regulations.

*Changes:* None.

*Comment:* Several commenters expressed support for the

addition of the concept of a financial aid warning status, but believed that the use of this status should be available to all institutions, regardless of how often they performed a SAP evaluation. Some of the commenters asserted that this would allow institutions additional flexibility in administering SAP that would be beneficial for students. Some commenters also noted that it would be an administrative burden to review students more frequently. Others indicated that they had stable student populations and did not need to evaluate more often than annually. At least one commenter opined that schools with good graduation and completion rates should be able to use the financial aid warning status regardless of how often they checked SAP. Some commenters argued that the financial aid warning status should be an option for all institutions to use automatically and without intervention, and for periods as long as a year or until the next scheduled evaluation. One commenter suggested that in exchange for allowing all institutions to use the financial aid warning status regardless of how often they evaluate students' academic progress, institutions should be required to remind students of their SAP standards at the end of any payment period in which an evaluation is not done. Some commenters wanted to know if the financial aid warning status could be used to evaluate a student's progress and to help to prepare an academic plan and appeal for the student, so that the student would not suffer a lapse in eligibility.

*Discussion:* While we appreciate the fact that institutions support the flexibility that the financial aid warning status provides, the Department feels strongly that this option should only be available when an institution evaluates SAP each payment period. It is important to remember that a student who is on a financial aid warning status is one who is not actually meeting SAP standards.

If an institution has a stable student population and does not believe it needs to evaluate SAP each payment period, then it is not required to do so. We recognize that there is an additional administrative burden involved for institutions to evaluate every payment period, but we also believe students benefit from the early intervention of this approach. We believe that this approach will impact favorably on student completion rates, as well as help minimize student debt levels for those that are not on track to complete a program successfully. We note that, during the negotiated rulemaking process, several negotiators had a SAP policy that required checking a student's academic progress each payment period. These negotiators related numerous student success stories that resulted from early intervention. This demonstrated success

with this approach led to the negotiators supporting the proposed SAP regulations.

We believe that it is important to get students back on track as soon as possible, and not allow the continued provision of title IV, HEA aid to students who are not making progress towards program completion under the institution's SAP standards. Allowing a financial aid warning status for one payment period allows the institution to provide an alert to that student of his status, as well as provide any needed support services. The institution could use the time to meet with the student and, if the situation means that an appeal will be necessary, to help the student prepare that appeal or to prepare an academic plan. The same benefit is not realized if the student simply receives notice of the institution's SAP policy, as he may not understand his individual status with regards to the policy.

*Changes:* None.

*Comment:* Several commenters expressed support for the financial aid warning and financial aid probation statuses proposed in § 668.34, but requested that the Department add to the SAP regulations a defined term for a student who has lost eligibility for title IV, HEA aid as a result of an institution's evaluation under the SAP regulations. Several other commenters questioned what status would be assigned to a student who was reinstated on an academic plan and was making progress under that plan. These commenters wondered whether these individuals would still be considered to be on financial aid probation status, or if the Department planned to define another term to refer to them.

*Discussion:* A student who is not meeting SAP is simply not eligible to receive title IV, HEA aid, as he or she does not meet one of the basic student eligibility criteria. For this reason, we do not believe it is necessary to define another term to describe this individual, just as we do not have specific terms to describe students who may not be meeting other basic student eligibility criteria.

A student who has been reinstated to eligibility under an academic plan and is making progress under that plan is considered to be an eligible student. The student is not considered to be on financial aid warning status or financial probation status, provided he or she is otherwise making satisfactory progress.

*Changes:* None.

*Comment:* A few commenters argued that proposed § 668.34(c) could be interpreted to allow an institution to place

a student on financial aid warning status for more than one payment period, and that, under this interpretation, the student would be able to get title IV, HEA aid for multiple payment periods when the student is on financial aid warning status as long as the student was within range of moving into compliance with the institution's SAP standards. These commenters stated that the language in § 668.34(c) does not need to be interpreted so narrowly so as to limit the number of payment periods during which a student could be placed on financial aid status to one payment period.

Other commenters suggested that students could develop and follow an academic plan during the period of their financial aid warning and that this approach would allow for students to be put on financial aid warning status for multiple periods. These commenters all opined that there was a range of deficiencies within any category of student failure, and that students may require differing amounts of intervention to get back on track to meet the institution's SAP standards. The commenters stated that institutions should be able to define different bands of need for assigning financial aid warning statuses. Several other commenters requested that the Department clarify that students may be placed on financial aid warning or financial aid status for multiple payment periods throughout their academic careers.

Other commenters asked the Department to clarify whether the requirements around financial aid warning or financial aid probationary statuses allow students to receive title IV, HEA aid for more than one payment period. One commenter indicated that lack of financial aid during a period in which the student is on financial aid probationary status would cause problems for students. The commenter stated that this would cause barriers for the most needy and at-risk students.

*Discussion:* The financial aid warning status and the financial aid probationary status are both defined in § 668.34(b). A student who has not made satisfactory academic progress and is placed under one of these statuses may continue to receive title, IV HEA aid for one payment period only, under very specific circumstances. We do not intend for the language in § 668.34(b) to be interpreted in any other fashion. To respond to the commenter who believed that lack of financial support during this period would disadvantage students, it is important to note that both of these statuses provide for one payment period of title IV, HEA funds. It is possible for institutions that are able to use the financial aid warning status to do any sort of intervention with a student that they deem appropriate during the period of time the student is in

that status, including help them to prepare an appeal or refer them to other student support services. We do not believe that it is appropriate, however, to continue placing students on a financial aid warning status for more than one payment period because these are students who are not making progress toward program completion. We do not believe it is appropriate to put the student on an academic plan and simply continue such a plan without an appropriate appeal. This is because we believe that a student should be required to file an appeal and explain the reason that he or she has not been able to meet the SAP standards, and what in his or her situation has changed. It is important for the student to have ownership in his or her current situation and the resulting academic plan, with an understanding of the consequences the student faces if he or she fails to follow the academic plan. We do agree with the commenters who suggest that it is possible for a student to be subject to more than one period of financial aid warning, or to submit more than one appeal throughout an academic career, if the institution's SAP policy allows it.

*Changes:* None.

*Comment:* Numerous commenters objected to the requirement in the proposed regulations for institutions to check SAP on a payment period-by-payment period basis. They argued that it is unreasonable for the Department to impose such a requirement on institutions that do not have any history of abuse in this area and that otherwise have good SAP policies. These commenters noted that it would be overly burdensome to require institutions to change their SAP procedures to require SAP evaluations every payment period.

*Discussion:* Section 668.34(a)(3) is consistent with current § 668.16(e)(2)(ii)(B), which requires institutions to check academic progress for programs that are longer than an academic year at least annually. While institutions can check academic progress for these programs more frequently, they are not required to do so. Under these regulations, institutions are only required to evaluate satisfactory academic progress more frequently if the program is shorter than an academic year.

*Changes:* None.

*Comment:* A couple of commenters asked the Department to confirm that the financial aid warning and financial aid probation status would be applied to the student's next payment period (following the institution's determination that the student is not maintaining SAP) and not simply to the next payment period at the institution. These commenters argued

that it was important to apply the status to the student during the next term that the student was actually in attendance.

One commenter believed that a program of an academic year in length or shorter should not be allowed to use the financial aid warning status because a student in such a program would never be denied title IV, HEA funds for not making SAP.

*Discussion:* Under these regulations, an institution would apply the financial aid warning or financial aid probation status to a student during the student's next period of attendance. It is not reasonable to assume that the student would be considered to be on financial aid warning, for example, if he or she were not in attendance. For shorter programs (*i.e.,* those that are an academic year or less), the definition of a payment period does not allow ☐ disbursement of aid until the student has successfully completed the previous payment period. For such programs, if an institution places the student on financial aid warning, the student will either complete the program or withdraw. If the student completes the program, then he or she has been successful. If he or she withdraws, then the return of funds requirements in § 668.22 will apply. In either case, the student received only those funds for which he or she was eligible. We do not plan to make any changes in this area.

*Changes:* None.

## Appeals

*Comment:* Many commenters agreed with allowing students who would otherwise lose eligibility for title IV, HEA aid to appeal the loss of eligibility. Some commenters expressed concern that the requirements for an appeal were too prescriptive; for example, the commenters noted that § 668.34(b) requires that students articulate what had changed in their situation and that students might not be able to comply with this requirement. Other commenters stated that the Department should make the SAP appeal regulations more prescriptive, including by specifying the type of documentation required to be submitted with an appeal. Several commenters believed that it was too burdensome on institutions to require them to address student appeals, while others stated that it was too burdensome to require institutions to develop or evaluate academic plans for students who appeal.

*Discussion:* These SAP regulations do not require that an institution accept or evaluate student appeals of determinations that the student is not making SAP. Moreover, the regulations do not require institutions to develop or

process an academic plan for a student who appeals. These are merely offered as options for institutions who wish to allow those students who are no longer meeting the SAP standards to continue to receive title IV, HEA aid. It is important to note that an academic plan for a student may be as complicated as a course by course plan toward degree completion, or as simple as a mathematical calculation that specifies the percentage of coursework that the student must now complete. Academic plans need not be complicated or detailed; the purpose of these plans is merely to put the student on track to successful program completion. Section 668.34(a)(10) does require that an institution that does not accept appeals notify students as to how eligibility for title IV, HEA aid can be regained by those who do not meet SAP standards. An institution is free to craft a SAP policy that allows appeals or not, and to specify when and how such appeals will be permitted as well as how often and how many times a student may appeal. Likewise, an institution may or may not allow an academic plan to be submitted for a student. The SAP policy of the institution should specify the conditions under which an academic plan might be approved, or if one will be considered at all. Because institutions have significant flexibility in this area, the Department does not believe that these regulations will impose any additional burden.

*Changes:* None.

*Comment:* Some commenters requested clarification as to when students on an academic plan would be evaluated. Several commenters requested that we clarify that a student may submit more than one appeal during the course of his or her academic career. A couple of commenters inquired whether students could appeal the 150 percent completion requirement, and exceed this maximum timeframe if they are progressing under an approved academic plan.

One commenter also asked the Department to clarify what is meant by the requirement in § 668.34(c)(3)(iii)(B) and (d)(2)(iii)(B) that an academic plan ensure that the student meet the SAP standards at a specific point in time. The commenter noted that the student could actually be able to graduate the following term, and questioned whether an appeal could be approved at that point.

*Discussion:* Under these regulations, the institution has the flexibility to specify whether students on an academic plan would have their academic progress evaluated at the same time as other students, or whether they would be subject to more frequent SAP evaluations. They should determine what is best for students and make their policy clear in their SAP

standards.

As noted earlier in this preamble, an institution also retains flexibility under these SAP regulations to allow multiple appeals by an individual student. Alternatively, an institution could decide not to allow appeals at all. We note, however, that because pace to program completion within 150 percent of the published length of the educational program is required to be evaluated each SAP evaluation period, it would be reasonable to assume that a student who is not meeting the institution's SAP standards is not on schedule to complete the program within the required maximum timeframe. Therefore, this component of the SAP standards would be subject to appeal, if the institution chooses to permit appeals. Finally, we expect institutions to assist a student who appeals on this basis to plot a course to successful completion within a new maximum timeframe and to then monitor this pace toward completion. Any academic plan would need to take into account the student's progression to completion of his or her program, which could, in fact, be the next term.

*Changes:* None.

## Maximum Timeframe

*Comment:* Several commenters stated that the Department should clarify the 150 percent maximum timeframe requirement. One of the commenters noted that § 668.34(b) did not define maximum timeframe, as applied to programs that are a combination of credit and clock hours or a combination of undergraduate and graduate work. One of the commenters argued that the final regulations should reinforce the 150 percent maximum timeframe requirement for all programs. Another commenter stated that we should clarify that the 150 percent maximum timeframe only applies to determining title IV, HEA eligibility. This commenter suggested that this maximum timeframe should not be used for other purposes. For example, the commenter stated that it was not appropriate for the Government to determine whether or not a student should be allowed to complete a degree simply because title IV, HEA eligibility had run out. Another commenter asked whether the 150 percent maximum timeframe applied to the student's entire academic career or only to the student's current academic program. The commenter gave the example of a student who had one degree, and asked if an institution would include those earned credits when evaluating whether the student was progressing in his or her program within the maximum timeframe.

*Discussion:* The Department believes in allowing institutions the flexibility to define the 150 percent maximum timeframe in the most appropriate way for the program in question. In particular, individual institutions are in the best position to determine whether their combined programs, such as those noted by the commenters, should be evaluated as the sum of its parts (*i.e.,* part clock hour and part credit for example) or as one type of program based on the structure of the majority of the program.

The 150 percent maximum timeframe only applies to the student's eligibility to receive title IV, HEA aid. The Department has never regulated whether or not a student is able to continue on □ to degree completion under an institution's academic criteria. The Department also wishes to clarify that the 150 percent maximum timeframe applies only to the student's current program of study. Under these regulations, institutions retain flexibility to define their programs of study in their SAP policy, as well as how they will determine how previously taken coursework applies to the student's current program of study.

*Changes:* None.

### Notification

*Comment:* Several commenters requested clarification of the notification requirement in § 668.34(a)(11). Specifically, these commenters questioned whether this provision would require institutions to notify all students or only those who were not making SAP.

*Discussion:* Proposed § 668.34(a)(11) only requires institutions to notify students of the results of their SAP evaluation if the results affect the student's eligibility to receive title IV, HEA aid. Institutions are not required to notify students who are making SAP of the results of the evaluation.

*Changes:* None.

**Evaluating the Validity of High School Diplomas (§ 668.16(p))**

Back to Top

### High School Diploma (§ 668.16(p))

The Department received over 100 submissions about the new high school diploma regulation. Most of these supported our proposed changes, either with little or no qualification, or with suggested modifications and concerns. Others offered suggestions and concerns without explicitly supporting the proposed regulation.

We noted in the preamble to the NPRM that the Department

intends to add questions on the Free Application for Federal Student Aid (FAFSA) asking for the name of the high school the student graduated from and the State where the school is located. The 2011-2012 FAFSA will have one question with three fields. Students who indicate that they will have a high school diploma when they begin college for the 2011-2012 year are instructed to provide the name of the high school where they received or will receive that diploma and the city and state where the school is located. In the online application, FAFSA on the Web, students will not be allowed to skip this question, though for 2011-2012 it will only be presented to first-time undergraduate students. There will be a drop-down list of both public and private high schools, populated by the National Center for Education Statistics (NCES), within the Department of Education, from which most students will be able to select the high school that awarded them a diploma. Students who cannot find their school and those who complete a paper FAFSA will write in the name, city, and State of their high school. It is important to note that the absence of a high school on the drop-down list does not mean that the high school the student indicated he or she graduated from is not legitimate. It just means that the school was not included in the NCES list. Similarly, the inclusion of a high school on the drop-down list does not necessarily mean that the high school is legitimate.

In addition to the information in the following discussions, we will provide more guidance on implementing § 668.16(p), as necessary, in Dear Colleague Letters, electronic announcements, and the Federal Student Aid Handbook.

*Comment:* Several commenters observed that many institutions already perform some kind of high school evaluation as part of their admission process, and one noted that because of this, it is appropriate for the Department to establish regulations requiring the validation of high school diplomas. One commenter appreciated that proposed § 668.16(p) would help institutions when they are challenged by students or high school diploma mills for looking into the validity of high school diplomas. Another commenter noted that a list of "good" high schools would be valuable for students in deciding whether they would want to obtain a diploma from a given source. Another commenter opined that the identification of suspect schools benefits students.

*Discussion:* We appreciate the support of these commenters. The list of schools that will appear on FAFSA on the Web is meant only as an aid for students in completing the FAFSA. It is not a list of "good" schools, and it may happen that an institution will need to evaluate the diploma from one of these

schools. Also, a school that does not appear on the list should not be inferred to be "bad." The intent of new § 668.16(p) is to have institutions develop a process for evaluating the legitimacy of a student's claim to have completed high school and not to have simply purchased a document that purports they completed a high school curriculum. Under this provision, institutions must develop and follow procedures to evaluate the validity of a student's high school completion if the institution or the Secretary has reason to suspect the legitimacy of the diploma.

*Changes:* None.

*Comment:* Many commenters requested that the Department provide institutions with clear guidance on how to review the validity of high school diplomas and that it provide this guidance as soon as possible. Although, as noted previously, many institutions review high school credentials, one large college noted that there are no common practices for these types of reviews and asked that the Department delay the effective date of this regulatory requirement if it is unable to release the needed guidance far enough in advance of July 1, 2011. This commenter stated that such a delay would be needed for schools to have enough time to create their procedures and train their employees on following the procedures. One commenter asked what the effect of this requirement would be on the student's eligibility for title IV, HEA program assistance when an institution is unable to determine whether a given diploma is valid.

*Discussion:* There is no plan to delay the implementation of § 668.16(p). As noted earlier in this discussion, more guidance will be forthcoming about evaluating the validity of high school diplomas, and many institutions have been evaluating the validity of high school diplomas for years. We encourage financial aid administrators (FAAs) to consult with each other in this matter, which can be especially useful for similar types of institutions in the same State, where differing levels of oversight by State departments of education will have a significant effect on what procedures an institution might establish.

With respect to the comment asking about student eligibility for title IV, HEA program assistance when an institution is unable to determine whether the student's diploma is valid, we note that there are alternatives for the student to establish aid eligibility under § 668.32(e), such as passing an ATB test, or completing six credits of college coursework that apply to a program at the current school.

*Changes:* None.

*Comment:* Various commenters either requested that we create a list of fraudulent or "bad" high schools or asked if we planned to do so. Many commenters asked that we make available both a list of "bad" high schools and a list of acceptable schools and that we update them frequently, some suggesting at least quarterly. Some commenters requested that the effective date for this regulatory provision be delayed until at least 2012-2013 so the Department can have a complete list of acceptable schools and can address ▢ issues such as foreign postsecondary schools, defunct schools, and missing records.

Finally, some commenters asked what we would consider acceptable documentation when a high school does not appear in the Department's database of acceptable high schools.

*Discussion:* As noted earlier in this preamble, we are not delaying the effective date of § 668.16(p). We believe it is an important new provision that can be implemented for the 2011-2012 year on the basis we describe in this preamble.

To emphasize a point earlier in this preamble, a school's inclusion on the list on FAFSA on the Web does not mean that it is exempt from possible review by an institution. Acceptable documentation for a review can include a high school diploma and a final transcript that shows all the courses the student completed.

*Changes:* None.

*Comment:* One commenter requested that the high school diploma validation required under § 668.16(p) apply only to undergraduates. Others asked for institutions to be able to waive diploma validation for students who are substantially older than traditional college age and for students whose high school no longer exists or cannot be readily identified.

*Discussion:* For 2011-2012, the Department will only ask first-year undergraduate students to provide on FAFSA on the Web information about the high school they graduated from. However, § 668.16(p) requires institutions to review any high school diploma if the institution or the Secretary has reason to believe the diploma is not valid. In those instances the institution must evaluate the validity of the student's high school completion whether the diploma was obtained by an undergraduate or other student and regardless of whether the student's high school no longer exists or is not easily identified. We do not believe it is appropriate to limit this requirement to only undergraduate students or those whose high schools are not easily identified because the student

eligibility requirement to have a high school diploma or its recognized equivalent or to meet an alternative standard applies to all students.

*Changes:* None.

*Comment:* Several commenters expressed concern about the difficulty of validating high schools, not only for older students, but also for students who graduated from a high school in a different part of the country, or in another country. One commenter suggested that the Department permit institutions to use copies of foreign secondary school credentials, attestations, and proof of entry into the United States after the age of compulsory attendance, when evaluating the secondary school education of foreign-born students. Another commenter stated that many admissions offices use the "credential score" for foreign countries instead of the name of the school, and that the Department should give guidance on how institutions can use that score to evaluate diplomas from foreign schools. A couple of commenters expressed concern that under proposed § 668.16(p) students who went to foreign schools would be adversely affected and possibly denied access to postsecondary education.

*Discussion:* An institution may consider various kinds of documentation when developing its procedures for evaluating the validity of a student's high school diploma. For example, there are companies that provide services for determining the validity of foreign secondary school diplomas; documentation from such companies can inform an institution's diploma evaluation.

*Changes:* None.

*Comment:* A couple of commenters asked if there will be an appeal process for students if an institution determines that their high school diploma is invalid. Others observed that different institutions may decide differently about a given high school's diploma and asked whether the Department will be the final arbiter in these situations.

*Discussion:* The regulations do not provide for an appeal process for students if an institution determines their high school diploma is invalid. The Department considers institutions to be our agents in administering the title IV, HEA programs and to have final authority in many decisions. Consequently, we do not generally have appeal processes in place for institutional determinations of student eligibility. Moreover, the Department will not intervene in cases where a high school diploma is deemed valid at one institution but not another.

*Changes:* None.

*Comment:* Several commenters asked what the effect of proposed § 668.16(p) would be on homeschooling, and some commenters noted that a home school credential is different from a high school diploma and asked that the Department emphasize this difference. Others asked that we provide guidance on State-granted credentials for homeschoolers and best practices for verifying home school credentials. One organization asked that the achievements of homeschoolers not be ignored, and that the proposed regulations and any related FAFSA changes recognize that graduates of home schools receive a diploma from their program.

Finally, one commenter questioned why the Department is so interested in the quality of a high school diploma (which is not defined in the HEA or the Department's regulations) when homeschooled students are taught by their parents, who (typically) lack credentials and curriculum standards.

*Discussion:* Section 668.16(p) does not apply to homeschooled students. For guidance pertaining to homeschooled students, please see Chapter 1 of Volume 1 of the Federal Student Aid Handbook.

*Changes:* None.

*Comment:* Many commenters asked if there would be, or suggested that there should be, a mechanism for schools and State and local agencies, accrediting bodies, and education departments to suggest schools that should be added to any acceptable and unacceptable lists that the Department develops in connection with § 668.16(p). One commenter requested that when we ask States to provide lists of approved schools, they provide all high schools and not just public high schools, which the commenter noted fall under more State oversight. Another commenter recommended referring to the College Entrance Examination Board (CEEB) code for high schools to determine whether those are acceptable, and another suggested consulting the College Board and the Department of Defense to help build the list of acceptable high schools. A few commenters asked what will happen when an institution evaluates a diploma from a school not on the Department's list of acceptable high schools and finds that the school is acceptable. The commenter wondered if this will mean that institutions will have their own lists of acceptable schools separate from the Department's.

*Discussion:* As noted earlier in this preamble, we intend to use information from NCES to create a drop-down list in FAFSA

on the Web populated by the names of public and private high schools that NCES provides to us. Neither inclusion on the list nor exclusion from it is an indication of whether a high school will need to be reviewed by a postsecondary institution under § 668.16(p).

There is a procedure by which private schools may submit their name for inclusion on the private school list. Postsecondary institutions are not ☐ responsible for submitting the names of secondary schools.

*Changes:* None.

*Comment:* A couple of commenters distinguished between a high school diploma and a transcript, and suggested that a transcript is more valuable for institutions to use to determine the validity of the student's high school completion. Another commenter noted that transcripts and diplomas are not interchangeable and that the Department should clarify this.

*Discussion:* We agree that a high school transcript is not the same as a diploma. It is the latter that is required under the student eligibility regulations and the statute, not the former. A transcript may be a valuable tool in determining whether a high school diploma is valid because by listing the courses the student completed, it demonstrates the extent of his or her secondary school education.

*Changes:* None.

*Comment:* One commenter seemed to think that an institution would submit documentation to the Department for review if a student was chosen for verification due to not answering the FAFSA questions about his or her high school diploma.

*Discussion:* The Department does not plan to require institutions to submit individuals' high school documentation for validation. Moreover, the Department does not intend to select applicants for verification just because they did not complete the high school diploma questions on the FAFSA.

*Changes:* None.

*Comment:* A few commenters suggested that institutions should not be considered to have reason to believe that an applicant's high school diploma is not valid or was not obtained from an entity that provides secondary school education, unless the information from FAFSA processing suggests that. These commenters argued that institutions should not be obligated to investigate whether every applicant's high school diploma is valid, nor should the institution be required, if it is an institution that collects

diploma information as part of the admissions process, to cross-check that information against the information from the FAFSA because that would be too burdensome.

*Discussion:* For the 2011-2012 award year, we will not provide any additional high school diploma information on the Institutional Student Information Record (ISIR) beyond what the student submitted on the FAFSA. We will not expect institutions to check the ISIR high school data for every student against other information obtained by the institution during the admissions process. However, if an institution has reason to believe (or the Secretary indicates) that a high school diploma is not valid, the institution must follow its procedures to evaluate the validity of the diploma.

*Changes:* None.

*Comment:* One commenter requested that the Department declare that § 668.16(p) will not be retroactive.

*Discussion:* This requirement will apply to institutions beginning on July 1, 2011, the effective date for these regulations. This means that institutions will be required to follow the procedures developed under § 668.16(p) for any applicant who completes a FAFSA beginning with the 2011-2012 award year.

*Changes:* None.

*Comment:* Several commenters requested that we allow FAAs to forego diploma validation for students who have completed six credits of college coursework that applies to a program of study at the institution or if the student's ability to be admitted to the institution or eligibility for title IV, HEA aid is otherwise not affected.

*Discussion:* It is correct that a student without a high school diploma would be eligible for title IV, HEA aid if he or she meets one of the other academic criteria, such as successfully completing six credits or 225 clock hours of college-level coursework that apply to a program at the current institution. However, because students have that flexibility does not obviate the requirement that for an institution to be eligible, it must admit as regular students only those with a high school diploma, or the recognized equivalent, or who are beyond the age of compulsory school attendance.

*Changes:* None.

*Comment:* One commenter asked that if the Department permits waivers to the requirement in § 668.16(p) to follow procedures to check the validity of a high school diploma, that

institutions, in particular those that do not admit students without a diploma or the equivalent, be permitted to evaluate the validity of a diploma if they choose.

*Discussion:* There will be no waivers of the requirement that an institution must evaluate the validity of a high school diploma when it or the Secretary has reason to believe that the diploma is not valid or was not obtained from a school that provides secondary school education.

*Changes:* None.

*Comment:* One commenter asked that we interpret section 123 of the HEA (20 U.S.C. 1011l) to apply to high school diploma mills as well as college diploma mills.

*Discussion:* This section of the HEA provides that the Department will, among other things, maintain information on its Web site to educate students, families, and employers about diploma mills and that it will collaborate with other Federal agencies to broadly disseminate to the public information on how to identify diploma mills. While section 105 of the HEA (20 U.S.C. 1003) defines diploma mill only in terms of postsecondary education, we intend to examine the issue of high school diploma mills further.

*Changes:* None.

*Comment:* One commenter urged the Department's Office of Inspector General to be actively engaged with other agencies in detecting fraud, especially given that high school diploma mills may adopt names of legitimate schools.

*Discussion:* The Department's Office of Inspector General will continue to work with other agencies as appropriate to detect fraud in this area.

*Changes:* None.

*Comment:* One institution commented that it finds it difficult to explain to students who present questionable high school credentials why those credentials are not sufficient for receiving title IV, HEA aid.

*Discussion:* In a situation such as this, we believe that it would be appropriate for the institution to explain to students the concept of a high school diploma mill, *i.e.,* an entity that offers a credential, typically for a fee, and requires little or no academic work on the part of the purchaser of the credential. We believe that students with a credential from a diploma mill would not have a sufficient educational foundation for success at the postsecondary level and should not receive title IV, HEA aid.

*Changes:* None.

*Comment:* One commenter urged the Department to clarify that the diplomas of high schools that are not accredited are not necessarily invalid under § 668.16(p). Several commenters asked whether a new high school that was operating but had not yet received accreditation would be acceptable under this regulation. A small private high school expressed concern that the new provision would hinder its students from going to college because it is not accredited and this provision may be misinterpreted to mean that non-accredited high schools are not acceptable. The school asked that we disabuse the public of the mistaken notion that for students to receive title IV, HEA aid, their high school diplomas must be from accredited schools.

*Discussion:* Diplomas issued by high schools that are not accredited (more common among private than public high schools) often meet college admissions standards and are generally acceptable for receiving title IV, HEA aid. We have noted for several years in the Federal Student Aid Handbook that high schools do not need to be accredited for their diplomas to be acceptable for title IV, HEA eligibility. The Department's recognition of accreditation exists only at the postsecondary level.

*Changes:* None.

*Comment:* One organization representing colleges suggested that we should not remove a high school from any list we create if that school closes.

*Discussion:* We do not plan to remove closed schools from a list.

*Changes:* None.

*Comment:* One commenter expressed concern that because many for-profit colleges do not require proof of a high school diploma (many require only that the applicant provide a signed statement of high school completion), they will not be diligent when evaluating the validity of their applicants' high school diplomas.

*Discussion:* Whether any institution fails to appropriately investigate the validity of a student's high school completion will be determined in program reviews, audits, and other Department oversight processes.

*Changes:* None.

*Comment:* One commenter claimed that institutions are not

qualified to determine the quality of anyone's high school diploma, education, or secondary learning.

*Discussion:* We disagree with this commenter. Section 668.16(p) only requires that institutions develop and follow procedures to determine the validity of a student's high school completion when they or the Secretary have reason to believe that the high school diploma is not valid or was not obtained from an entity that provides secondary school education. We do not believe that an institution will need any unique qualifications to make this determination; as noted earlier, many institutions already evaluate the high school completion of students during the admissions process.

*Changes:* None.

*Comment:* One commenter opined that using a list of unacceptable schools is a less effective method of dealing with high school validation, and that the best method would be to have a large database of all high school graduation records.

*Discussion:* While we appreciate the commenter's suggestion, we do not believe that the creation or use of a single database of all graduation records from the entire country is feasible.

*Changes:* None.

*Comment:* One commenter stated that some institutions do not have the resources to evaluate the validity of high school diplomas and that the Department should make those determinations with the help of appropriate State agencies.

*Discussion:* We believe that administrators at institutions, who have direct contact with applicants, are in the best position to evaluate the validity of high school completions. We will issue further guidance on how to make those evaluations efficient and will try to minimize the administrative burden on institutions.

*Changes:* None.

*Comment:* One commenter claimed that the Department wants to keep the list of acceptable high schools secret to avoid having to defend its inclusion of the schools on the FAFSA list.

*Discussion:* As noted earlier in this preamble, FAFSA on the Web will include a list of schools to help students fill out the application; it will not be a list of acceptable schools. It will be available to the public via FAFSA on the Web, though whether it can be accessed without filling out the application and whether it will be available as a separate document, such as the Federal School Code List, are not yet decided.

*Changes:* None.

*Comment:* Several commenters expressed concern that complying with § 668.16(p) would place a disproportionate burden on institutions and students, and that community colleges in particular would be burdened because of their larger numbers of immigrant and non-traditional students. These commenters noted that the FAFSA will get larger by two questions. One commenter noted that the added questions are acceptable even with the Department's attempt to simplify the FAFSA, while another opined that requiring a high school diploma does not seem to be a significant hurdle.

*Discussion:* The Department will be mindful of ways in which to limit the additional burden § 668.16(p) will impose. However, because one of the statutorily defined eligibility criteria for receiving title IV, HEA aid is that a student completed high school, we do not consider it an unacceptable burden on students to report on their FAFSA the name, city, and State of the high school that awarded them their diploma. Also, there are enough alternatives to having a high school diploma that make satisfying the academic criterion for student eligibility reasonable. Finally, we consider the inclusion on the FAFSA of three additional, easy-to-answer fields a reasonable increase in the size of the FAFSA.

*Changes:* None.

*Comment:* One commenter noted that the new questions on the FAFSA will not solve the problem of identifying questionable diplomas because the questions will only determine if a high school is on the approved list.

*Discussion:* We agree that the Department's list of schools will not solve the problem. Section 668.16(p), however, requires institutions to develop and follow procedures to determine the validity of a student's high school completion when they or the Secretary has reason to believe that the high school diploma is not valid or was not obtained from an entity that provides secondary school education. Accordingly, we believe that the new FAFSA question and the requirements in § 668.16(p) will go a long way to identifying those schools that are providing invalid diplomas.

*Changes:* None.

*Comment:* One commenter expressed the opinion that institutions should be responsible for verifying high school diplomas or General Education Development (GED) certificates with a copy of either document, or with a transcript. The commenter argued that if students cannot

provide this documentation to the institution, they should be required to take an ability-to-benefit (ATB) test. Other commenters stated that all institutions should be required to verify that every title IV, HEA aid recipient has a high school diploma or GED.

*Discussion:* We do not plan to require that all institutions ask, in every instance, for a copy of a student's diploma or transcript. Moreover, ATB tests are not the only alternative to a high school diploma or GED certificate for establishing title IV, HEA eligibility; for example, as noted earlier in this preamble, students who complete six credit hours or 225 clock hours of college coursework that apply to a program at the current institution and are beyond the age of compulsory school attendance do not need to have a high school diploma. Therefore, we decline to make any changes to the regulations in response to these comments.

*Changes:* None.

*Comment:* One commenter argued that verifying authenticity of high school diplomas is a waste of resources because even students who have □ completed high school and obtained a valid high school diploma might still not be ready for college. The commenter stated that the Department should focus instead on improving secondary school education and not connect title IV, HEA eligibility to the high school credential until the work of improving high schools has been completed.

*Discussion:* Improving high school education is an important objective of the Secretary; however, the Department does not consider it necessary to refrain from requiring institutions to develop and follow procedures for evaluating the validity of high school diplomas until the task of improving high school education nationwide has been completed. And we believe verifying the validity of high school diplomas is necessary to ensuring compliance with the eligibility requirements for the receipt of title IV, HEA aid.

*Changes:* None.

*Comment:* One commenter suggested that because § 668.16(p) does not require documentation of a diploma or graduation from an applicant's high school directly, the fraud surrounding this issue will just switch to the use of fraudulent diplomas or transcripts purportedly from legitimate high schools. Also, this commenter pointed out that it will be easy for unscrupulous college employees to skirt this requirement by telling students to simply list the name of a legitimate school or where to get a forged diploma, just as recruiters now tell students where they can buy a high school diploma.

*Discussion:* Institutions are free to request that documentation come directly from the high school. We also acknowledge that it will be impossible to eliminate all potential fraud, yet we believe that the extra step of requiring validation under § 668.16(p) will help to eliminate some of it. As we noted in the preamble to the NPRM, the Department has other avenues for addressing fraudulent activities committed at an institution.

*Changes:* None.

*Comment:* One commenter noted that when an institution is evaluating the validity of a student's high school education and his or her diploma or transcript is not available, it should be able to accept a certified statement from the student that serves as documentation of graduation and explains why the student could not obtain a copy of the diploma.

*Discussion:* A certified statement from a student is not sufficient documentation of this requirement. It should be rare that students cannot provide a copy of either their high school diploma or final transcript, and there might be such instances where an institution can still validate a student's high school education without a copy of the diploma or transcript. But FAAs should remember that there are established alternatives for a high school diploma, such as the GED certificate or ATB test.

*Changes:* None.

*Comment:* One commenter suggested that the Department should determine if a significant number of students indicated they had valid diplomas, when they, in fact, did not. The commenter recommended that the Department make § 668.16(p) voluntary or require compliance through a pilot program because building and maintaining an accurate database will be difficult and students will make mistakes that could delay their eligibility for a semester, a year, or a whole degree program.

*Discussion:* We do not plan to make compliance with § 668.16(p) voluntary or part of a pilot program. We expect that delays resulting from evaluation of high school diplomas will be minimal or nonexistent.

*Changes:* None.

*Comment:* One commenter stated that the new FAFSA questions on high school completion should be required and that students should not be able to enter an invalid school, or leave the questions blank.

*Discussion:* As noted earlier, we intend to require that students

who indicate that they have a high school diploma also give the name of the school that awarded the diploma and the city and State in which the school is located. They will be able to select a school from the Department's list or be prompted to write in the name of the school. Students will be unable to complete the online FAFSA unless they provide this information.

*Changes:* None.

*Comment:* Commenters noted that, even if students indicate that their diploma is from an acceptable school, it does not prove the student actually graduated from that school. These commenters argued that proposed § 668.16(p) is not an improvement to the current practice, and that the extra step required under the new regulatory provision will not help for institutions that do not require a diploma for admission.

*Discussion:* The proposed change reflected in § 668.16(p) is designed to reduce the number of students who indicate that they have a high school diploma, but who do not, or who only possess a credential from a "diploma mill." We believe that many students with such credentials will indicate the name of the entity they received it from, either because they honestly believe they have a legitimate high school diploma or because they will be reluctant to provide the name of a school they did not graduate from because the financial aid office will easily be able to determine that such a statement is false. All institutions, including those that do not require a high school diploma for admission, will be subject to the requirements in § 668.16(p) and, therefore, will need to evaluate the credentials supplied by students as proof of high school completion if they or the Department has reason to believe the credential is not valid. We believe that this required process will reduce the number of bad credentials.

*Changes:* None.

*Comment:* One commenter suggested that unless the Department clarifies what is a valid high school diploma, it should not, as part of a program review, substitute its judgment for an institution's determination. The commenter argued that if an institution acted reasonably, the eligibility of a student should not be questioned, even if the Department, or another school, reaches a different conclusion about the high school the student attended. Another commenter asked that the Department make clear in this preamble that institutions may change their determinations about a given high school. New information may move a school from the "good" list to the "bad" one, or vice versa. The commenter wanted to ensure that the Department does not dissuade institutions from

making such adjustments by deeming that a later determination indicates an earlier one was inappropriate.

*Discussion:* We do not plan to second-guess the decisions of college administrators in these matters, such as moving a high school from a "good" list to a "bad" list (or vice versa), as long as they are reasonable.

*Changes:* None.

*Comment:* One commenter stated that it was not fair to require students to provide a high school diploma because, in the commenter's experience, homeschooled students have only a transcript as proof of completing a secondary school education.

*Discussion:* As we noted earlier in this preamble, the procedure for determining the validity of homeschooled students' education is not affected by § 668.16(p).

*Changes:* None.

*Comment:* One commenter observed that students in high school special education programs might receive a certificate or award that is not a high ☐ school diploma when they did not complete the required coursework to receive an actual diploma from the school and that these students may incorrectly believe that the certificate or award is a diploma.

*Discussion:* Students who do not complete the required coursework to receive a high school diploma from their secondary school by definition did not earn a high school diploma. These students are not eligible for title IV, HEA aid unless they meet the academic requirement under one of the alternatives to a high school diploma in § 668.32(e), or they are students with intellectual disabilities who are seeking Pell, FSEOG, or FWS program assistance under § 668.233.

*Changes:* None.

*Comment:* One commenter asked us to clarify what would cause an institution to have "reason to believe that the high school diploma is not valid or was not obtained from an entity that provides secondary school education."

*Discussion:* We expect that there may be a number of situations in which an institution will have reason to believe that an applicant's high school diploma is not valid or was not obtained from an entity that provides secondary school education. For example, institutions may come across information that suggests that the applicant's diploma or transcript was purchased with little work expected of the student. Often FAAs receive conflicting information from

students themselves, typically as remarks that cast doubt on some element of the students' application information. We expect the same regarding valid high school diplomas. Moreover, institutions may have reason to believe that a high school diploma is invalid if they recognize the name of the high school as an entity that they identified in the past as being a high school diploma mill.

*Changes:* None.

*Comment:* One commenter requested that we add a check box on the FAFSA for applicants who completed secondary school in a foreign country and an empty space for them to fill in the name of their secondary school. The commenter suggested that in this situation, the student's FAFSA would receive a "C" code, not automatically, but at random, so that due diligence would still be required by the institution.

*Discussion:* When completing the FAFSA, applicants will be able to enter the name of their high school if it is not on the Department's drop-down list.

*Changes:* None.

*Comment:* One commenter expressed concern that the wording of the second new question proposed for the FAFSA, as noted in the preamble to the NPRM, could be misleading and suggested that the Department use either of the following questions instead:

- In what State is the school listed in question #1 located? or

- In what State was the school in which the student completed high school located?

*Discussion:* As we noted earlier in this preamble, the 2011-2012 FAFSA asks for applicants to indicate the name of the high school where they received or will receive their diploma and the city and State where the school is located.

*Changes:* None.

| | |
|---|---|
| **Return of Title IV, HEA Program Funds (§§ 668.22(a), 668.22(b), 668.22(f), and 668.22(l))**<br><br>Back to Top | **Treatment of Title IV, HEA Program Funds When a Student Withdraws From Term-Based Programs With Modules or Compressed Courses (§§ 668.22(a), 668.22 (f) and 668.22 (l))**<br><br>*Comment:* Approximately 80 commenters, mostly representing institutions, commented on the proposed changes to the treatment of title IV, HEA program funds when a student withdraws from a program offered in modules. |

Approximately 26 of these commenters opposed the proposed changes, with some commenters recommending that the Department not issue final regulations at this time and instead seek further input from the community.

Many of these commenters believed the proposed changes would be too burdensome to institutions. Several commenters were concerned about the additional administrative and financial burden the proposed changes would impose on institutions by requiring them to identify and process more students as withdrawals. A few commenters believed that, as a result of this burden, the proposed regulations would discourage schools from offering programs in modules, potentially causing disruptive changes in course offerings at institutions. A few commenters believed institutions would be unable to comply with the proposed regulations because they are too complicated or too difficult to explain to students. One commenter believed the proposed regulations would force an institution to delay disbursements to prevent the institution or student from having to return unearned title IV, HEA program funds if the student withdrew.

Many of these commenters also believed that the proposed changes would be harmful to students because some students who withdrew after completing one course in one module would earn less title IV, HEA program funds. In particular, some commenters believed it was unfair to treat as a withdrawal a student who withdrew from a course or courses in the payment period or period of enrollment, but who would attend courses later in the same payment period or period of enrollment, and wanted to know how to handle title IV, HEA program funds in such cases. A few commenters believed the proposed regulations would discourage students from enrolling in programs structured in modules, including compressed courses to accelerate completion of their program, which the commenters believed was in conflict with the provisions for two Federal Pell Grants in one award year, which were implemented to support and make equitable aid available for students who wish to complete their program sooner. A few commenters were concerned that a student who would now be counted as a withdrawal would be burdened with more debt: To the institution for any remaining balance of tuition and fees, and to the Department for Federal loans and or grant overpayments. One commenter noted that treating a student as a withdrawal also has negative consequences for a student under the provisions on satisfactory academic progress and loan repayment.

A few commenters believed the proposed regulations unfairly

targeted certain programs or institutions. Some of the commenters believed the proposed changes would treat students in module programs inequitably when compared to students in more traditional programs where courses are offered concurrently. One commenter believed that the proposed regulations would have a disproportionately negative affect for students in career technical programs, as many of those programs are taught in a condensed, modular form. Some commenters believed the proposed regulations unfairly focused on only term-based credit-hour programs.

Approximately 25 of the commenters expressed an understanding of the Department's concern with students receiving full or large amounts of title IV, HEA program funds for a short period of attendance during a payment period or period of enrollment. A couple of those commenters agreed with the proposed changes. Others believed that the current guidance from Dear Colleague Letter of December 2000, GEN-00-24, Return of Title IV Aid-Volume #1—which provided that a student who completed only one module or compressed course within a term was not considered to have □ withdrawn—should be incorporated into the regulations. These commenters believed that a student who has earned credits in a payment period or period of enrollment who then ceases attendance should not be treated as a withdrawal, as the existing regulations in 34 CFR 690.80(b)(2)(ii), requiring recalculations of title IV, HEA program funds when a student did not begin attendance in all classes, are a sufficient safeguard against students receiving full or large amounts of title IV, HEA program funds for a short period of attendance in a program offered in modules. Two commenters believed that the satisfactory academic program provisions should be sufficient to prevent long-term abuse by students of title IV, HEA program funds.

Several commenters suggested alternative approaches to ensure that students are not receiving title IV, HEA program funds for periods in which they are not in attendance. A few commenters believed that a student attending a certain percentage of the payment period or period of enrollment (commenters suggested 60 percent) should be deemed to have completed a payment period or period of enrollment. A couple of commenters believed that the determination of whether a student should be treated as a withdrawal should be based on credit hours completed, rather than days completed, meaning that a student who ceased attendance would not be treated as a withdrawal as long as the student completed the minimum number of credits required to be eligible for a particular title IV, HEA program. A few commenters supported setting a

minimum length of a module that must be completed, after which a student who ceased attendance would not be considered to have withdrawn. A few commenters suggested requiring institutions to award or pay title IV, HEA program funds by module, or to delay payment until a student has earned enough credits to support the enrollment status necessary for eligibility of the aid. One commenter suggested limiting the amount of title IV, HEA program funds that can be earned by a student to the lesser of actual charges or the amount calculated under the Return of Title IV Funds provisions (*i.e.,* the provisions of § 668.22). A couple of commenters believed an institution should be able to exercise professional judgment or use its own discretion to determine whether a student has truly withdrawn from class. One commenter suggested that, for clock-hour and nonterm programs, a student be considered to have withdrawn if the student had not been in attendance for 35 consecutive days and had not completed the payment period or period of enrollment.

One commenter believed that the proposed changes addressing completion of a payment period or period of enrollment by students in clock-hour programs were incorrect as all determinations of title IV, HEA program funds earned by students who withdraw from clock-hour programs aid are based on scheduled hours, and the changes referred to clock hours completed.

*Discussion:* We note that these final regulations do not change how institutions are currently required to treat students when they withdraw from programs offered in modules (*i.e.,* sequentially) in nonterm credit-hour programs, and some nonstandard-term credit-hour programs. The Secretary believes that the approach proposed in the NPRM treats students more equitably across all programs by eliminating the major differences in the treatment of students who withdraw from term-based and nonterm-based programs offered in modules and, therefore, is a better approach than basing the determination of completion of a payment period or period of enrollment on completion of one course/module, even if a minimum length of such a course/module were set. In addition, this approach more accurately reflects the statutory requirement in section 484B(a)(1) of the HEA that applies the Return of Title IV Funds requirements to any recipient of title IV, HEA program funds who "withdraws from an institution during a payment period or period of enrollment in which the student began attendance" and the fact that title IV, HEA program funds are awarded for an entire payment period or period of enrollment. Some of the alternatives suggested by

the commenters—determining completion based on attendance of a certain percentage of the payment period or period of enrollment; using credit hours completed, instead of days completed; delaying awarding or paying title IV, HEA program funds; equating unearned aid to actual charges; and leaving the determination of completion of the period up to institutional discretion—are not supported by the HEA, which requires in section 484B(a) that students earn title IV, HEA program funds on a pro rata basis up through the 60 percent point of a period based on days completed, for credit-hour programs, and clock hours completed, for clock-hour programs. Completing more than 60 percent of the period then entitles a student to have earned 100 percent of the funds for the period. The law therefore does not permit the alternative measures of when a student may keep 100 percent of the title IV, HEA program funds that were suggested by the commenters.

The Secretary agrees that it is reasonable to allow an institution not to treat as a withdrawal a student who ceases attendance during a payment period or period of enrollment, but intends to attend a course later in the payment period or period of enrollment. This position is consistent with the guidance provided in the Department's Dear Colleague Letter of December 2000, GEN-00-24, Return of Title IV Aid-Volume #1, for the treatment of title IV, HEA program funds when a student withdraws without completing at least one course in a payment period or period of enrollment. These final regulations have been modified to incorporate this policy and provide that a student is not considered to have withdrawn if the student ceased attending the modules he or she was scheduled to attend, but the institution obtains a written confirmation from the student at the time of the withdrawal that he or she will attend a module that begins later in the same payment period or period of enrollment. This will provide more flexibility for a student who provides the authorization. This confirmation must be obtained at the time of withdrawal, even if the student has already registered for subsequent courses. However, these final regulations provide that, for nonterm and nonstandard-term programs, a confirmation is valid only if the module the student plans to attend begins no later than 45 calendar days after the end of the module the student ceased attending. If the institution has not obtained a written confirmation that the student intends to return to a nonterm or nonstandard-term program within 45 calendar days of the end of the module the student ceased attending, the student is considered to have withdrawn. A student who has provided written confirmation of his or her

intent to return is permitted to change the date of return to a module that begins even later in the same payment period or period of enrollment, provided that the student does so in writing prior to the return date that he or she had previously confirmed, and, for nonterm and nonstandard-term programs, the later module that he or she will attend begins no later than 45 calendar days after the end of the module the student ceased attending. If an institution obtains a written confirmation of future attendance but the student does not return as scheduled, the student is ☐ considered to have withdrawn from the payment period or period of enrollment and the student's withdrawal date and the total number of calendar days in the payment period or period of enrollment would be the withdrawal date and total number of calendar days that would have applied if the student had not provided written confirmation of future attendance.

Title IV, HEA program funds are awarded to a student with the expectation that the student will complete the period of time for which the aid has been awarded. When a student does not complete enough of his or her education to earn all of the originally awarded title IV, HEA program funds, it is in the best interest of the taxpayer to have the unearned Federal funds returned to the government as expeditiously as possible for use by other students. It is also fairer to all students receiving title IV, HEA program funds to have the way those funds are earned be comparable regardless of the way their programs are structured. In general, the Secretary believes that long gaps in attendance during a payment period or period of enrollment are not in the best interest of students and increase the likelihood that a student will not return to the institution. Should the student not return, the Secretary does not wish to unduly delay the return of title IV, HEA program funds. The Secretary agrees with the suggestion that, for clock-hour and nonterm programs, a student be considered to have withdrawn if the student has not been in attendance for a specified period of time and has not completed the payment period or period of enrollment, although the Secretary believes that 45 days, rather than 35 days, as suggested by the commenter, is an appropriate period of time. Thus, in addition to limiting a student's confirmation of return in a nonterm or nonstandard-term program to a module that begins no later than 45 calendar days after the end of the module the student ceased attending, if a student in a nonterm or nonstandard-term program is not scheduled to begin another course within a payment period or period of enrollment for more than 45 calendar days, the institution must treat the student as a withdrawal for title IV, HEA program fund purposes, unless

the student is on an approved leave of absence, as defined in § 668.22(d).

We do not believe that students should be penalized if they do not confirm an intent to return to a module later in the payment period or period of enrollment, but do return to the module anyway, or if they are not scheduled to begin a course within a payment period or period of enrollment in a nonterm or nonstandard-term program for over 45 days, but do return and begin a course within that payment period or period of enrollment. Thus, in these situations, we believe it is appropriate for the institution to "undo" the Return of Title IV Funds calculation and treat those students as if they had not ceased attendance. This final regulation is consistent with current regulations for students who withdraw from clock-hour programs and nonterm credit-hour programs. Under § 668.4(f), a student who returns to a nonterm credit-hour program or clock-hour program (regardless of whether the program is offered in modules) within 180 days after withdrawing is treated as if he or she did not cease attendance (*i.e.,* is considered to remain in that same payment period, and is eligible to receive any title IV, HEA program funds for which he or she was eligible prior to withdrawal, including funds that were returned by the institution or student under the provisions of § 668.22). If a student returns to a clock-hour or nonterm credit-hour programs after 180 days, the student's withdrawal is not "undone"; he or she must begin a new payment period and aid for that period is determined in accordance with the provisions of § 668.4(g). The Secretary believes that similar treatment is warranted for students who withdraw from term-based programs offered in modules. That is, if a student returns to a term-based credit-hour program offered in modules prior to the end of the payment period or period of enrollment, the student is treated as if he or she did not cease attendance, and is eligible to receive any title IV, HEA program funds for which he or she was eligible prior to withdrawal, including funds that were returned by the institution or student under the provisions of § 668.22. However, the institution must make adjustments to reflect any changes to the student's enrollment status.

While we acknowledge that requiring institutions to treat as withdrawals students who cease attending at any point during the payment period or period of enrollment, rather than just those students who cease attending before completing at least one course, is likely to increase the number of Return of Title IV Fund calculations an institution must perform for these programs, we note that institutions have always had to track students in module programs beyond the first course/module

to determine whether a student began attendance in all the courses they were scheduled to attend, in case the student's enrollment status changed upon ceasing attendance, resulting in required recalculations of the title IV, HEA program funds awarded. While we recognize that some students must withdraw due to circumstances beyond their control, we are concerned with the commenters' contention that there will be a substantial increase in burden due to the number of students who cease attendance during a payment period or period of enrollment. We do not believe that it is in a student's best interest to withdraw and we would expect that institutions are doing all they can to prevent withdrawals through counseling, student support services, and proper enrollment procedures. In response to the commenter who believed the proposed regulations would force institutions to delay disbursements to prevent the institution or student from having to return unearned title IV, HEA program funds if they withdraw, we are providing that, under amended § 668.164(i), an institution would be required to provide a way for a Federal Pell Grant eligible student to obtain or purchase required books and supplies by the seventh day of a payment period under certain conditions if the student were to have a title IV credit balance.

The commenter who noted that the determination of title IV, HEA program funds that are earned by a student who withdraws from a clock-hour program are based on scheduled hours is correct in that once it has been determined that a student has not completed the payment period or period of enrollment, the percentage of the payment period or period of enrollment completed is determined by dividing the total number of clock hours in the payment period or period of enrollment into the number of clock hours scheduled to be completed at the time the student ceased attending (§ 668.22(f)(1)(ii)(A)). However, a student has not completed a clock hour payment period or period of enrollment until he or she has completed all the hours and all of the weeks of instructional time that he or she was scheduled to attend in that period.

Because different institutions use different names to refer to this type of program structure, in amended § 668.22(l)(6), we have defined the term "offered in modules" to mean if a course or courses in the program do not span the entire length of the payment period or period of enrollment. In addition, to clarify the types of programs that are considered to be nonstandard-term programs or nonterm programs, in amended § 668.22(l)(8), we have defined the term "nonstandard-term program" as ☐ a term-based program that does not qualify under 34 CFR 690.63(a)(1) or (2) to calculate Federal Pell Grant payments

under 34 CFR 690.63(b) or (c). We note that nonterm programs include any program offered in clock hours for title IV, HEA program purposes as well as any nonterm credit-hour program.

*Changes:* Section 668.22(a)(2) has been revised to provide that, for a payment period or period of enrollment in which courses in the program are offered in modules, a student who would otherwise be considered to have withdrawn from an institution because, prior to ceasing attendance the student has not completed all of the days or scheduled hours he or she was scheduled to attend, is not considered to have withdrawn if the institution obtains written confirmation from the student at the time of withdrawal that he or she will attend a module that begins later in the same payment period or period of enrollment, provided that, for a nonterm or nonstandard-term program, that module begins no later than 45 days after the end of the module the student ceased attending. However, if that student does not return as scheduled, the student is considered to have withdrawn from the payment period or period of enrollment and the student's withdrawal date and the total number of calendar days in the payment period or period of enrollment would be the withdrawal date and total number of calendar days that would have applied if the student had not provided written confirmation of future attendance in accordance with § 668.22(a)(2)(ii)(A).

Section 668.22(a)(2) also has been revised to cross-reference § 668.4(f), which provides that, if a student withdraws from a nonterm credit-hour or clock-hour program during a payment period or period of enrollment and then reenters the same program within 180 days, the student remains in that same period when he or she returns and, subject to conditions established by the Secretary, is eligible to receive any title IV, HEA program funds for which he or she was eligible prior to withdrawal, including funds that were returned by the institution or student under the provisions of this section. Section 668.22(a)(2) has been further revised to provide that, if a student withdraws from a term-based credit-hour program offered in modules during a payment period or period of enrollment and reenters the same program prior to the end of the period, the student remains in the same payment period or period of enrollment when he or she returns and, subject to conditions established by the Secretary, is eligible to receive any title IV, HEA program funds for which he or she was eligible prior to withdrawal, including funds that were returned by the institution or student under the provisions of this section.

In addition, § 668.22(a)(2) has been revised to provide that, if a student in a nonterm or nonstandard-term program is not scheduled to begin another course within a payment period or period of enrollment for more than 45 calendar days, the institution must treat the student as a withdrawal for title IV, HEA program fund purposes, unless the student is on an approved leave of absence, as defined in § 668.22(d).

Finally, § 668.22(a)(2) has been revised to clarify that a student in a clock hour program has not completed a payment period or period of enrollment until the student has completed both the weeks of instructional time and the clock hours scheduled to be completed in the period.

Section 668.22(l)(6) and (8) has been revised to add definitions of a program that is offered in modules and of a nonstandard-term program.

*Comment:* Approximately 40 commenters asked the Department to clarify how the regulations would apply in different situations. Some of these commenters questioned how enrollment status changes due to an institution's add/drop policy would be differentiated from a withdrawal. For example, some commenters asked for guidance on the handling of title IV, HEA program funds when a student withdraws without beginning attendance in all courses, or notifies the institution that he or she will not be attending a future module that he or she was scheduled to attend. One commenter believed that the proposed regulations would be in conflict with the Department's guidance that allows a Direct Loan to be disbursed based on anticipated enrollment during a term, such as a summer term, where a student is enrolled for two consecutive courses. The commenter's understanding is that if the student does not begin the second course to establish half time enrollment, the student can keep the funds.

*Discussion:* A student that begins attending but then ceases attendance in all classes during a payment period is a withdrawal unless the institution obtains written confirmation from the student that he or she plans to attend a course that begins later in the payment period or period of enrollment, as applicable. Anytime a student begins attendance in at least one course, but does not begin attendance in all the courses he or she was scheduled to attend, regardless of whether the student is a withdrawal, the institution must check to see if it is necessary to recalculate the student's eligibility for Pell Grant and campus-based funds based on a revised enrollment status and cost of education (34 CFR 690.80(b)(2)(ii)). If the student is a withdrawal, this recalculation must be done before performing a Return of Title IV Funds calculation, and the

institution must use the recalculated amounts of aid in the Return of Title IV Funds calculation. If the student has not begun attendance in enough courses to establish a half-time enrollment status, the institution may not make a first disbursement of a Direct Loan to the student (34 CFR 685.303(b)(2)(i)), or a second disbursement of Pell Grant funds, although the funds are included as aid that could have been disbursed in the Return of Title IV Funds calculation. Courses that were officially dropped prior to the student ceasing attendance are not days that the student was scheduled to attend, unless the student remained enrolled in other courses offered on those days. Correspondingly, courses that were officially added prior to the student ceasing attendance are days the student was scheduled to attend.

If a student officially drops a course or courses he or she was scheduled to attend and doing so does not result in the student no longer attending any courses, the student is not a withdrawal, and the dropped courses are handled as changes in enrollment status, as applicable.

An institution can determine whether a student in a program offered in modules is a withdrawal by answering the following questions:

(1) After beginning attendance in the payment period or period of enrollment, did the student cease to attend or fail to begin attendance in a course he or she was scheduled to attend? If the answer is no, this is not a withdrawal. If the answer is yes, go to question 2.

(2) When the student ceased to attend or failed to begin attendance in a course he or she was scheduled to attend, was the student still attending any other courses? If the answer is yes, this is not a withdrawal, however other regulatory provisions concerning recalculation may apply. If the answer is no, go to question 3.

(3) Did the student confirm attendance in a course in a module beginning later in the period (for nonterm and nonstandard term programs, this must be no later than 45 calendar days after the end of the module the student ceased attending). If the answer is yes, this is not a withdrawal, unless the student does not ☐ return. If the answer is no, this is a withdrawal.

Take, for example, a student who is a recipient of title IV, HEA program funds who is scheduled to complete two courses in each of the first two of three modules within the payment period.

*Scenario 1:* The student begins attendance in both courses in

the first module, but ceases to attend both courses after just a few days and does not confirm that he will return to any courses in modules two or three. The student is a withdrawal because he or she ceased to attend courses he or she was scheduled to attend (Yes to question 1); was not still attending any other courses (No to question 2); and did not confirm attendance in a course in a module beginning later in the period (No to question 3).

*Scenario 2:* If, however, the student begins attendance in both courses in the first module, but drops just one of the courses after just a few days, the student is not a withdrawal. Although the student ceased to attend a course he or she was scheduled to attend (Yes to question 1), the student was still attending another course (Yes to question 2).

*Scenario 3:* If the student completes both courses in module one, but officially drops both courses in module two while still attending the courses in module one, the student is not a withdrawal. Because the student officially dropped both courses in module two before they began, the student did not cease to attend or fail to begin attendance in a course he or she was scheduled to attend (No to question 1). However, because the student did not begin attendance in all courses, other regulatory provisions concerning recalculation may apply.

*Changes:* None.

*Comment:* Several commenters asked the Department to clarify what it means to "complete all the days" or "complete all of the clock hours" in a payment period or period of enrollment. More specifically, commenters asked if students would be required to attend every day of every course, or be in attendance on the last day of the payment period or period of enrollment. Some of the commenters noted that, due to individual student schedules, students do not attend all days in the payment period or period of enrollment. Commenters were concerned that a student who was not in attendance on the last day of the payment period would be counted as a withdrawal. To address this concern, one commenter suggested that the wording of the regulations be changed to say that a student is considered to have withdrawn from a payment period or period of enrollment if the student does not complete *substantially* all of the days in the payment period or period of enrollment.

Some of the commenters asked how limited absences (for example, for illness), incompletes, and leaves of absence would be treated. Commenters also asked if a student is considered to have completed a course in a payment period or period of

enrollment if the student received a grade for that course or, for a clock-hour program, earns all the clock hours for the course, regardless of absences. A couple of the commenters asked if the definition of what it means to complete all the days or complete all the clock hours would affect in-school deferments for title IV, HEA program loans. Some commenters asked under what circumstances an institution would have to prove that the student attended all days in a period and what documentation would constitute that proof. Commenters asked if the issue would arise only if all of a student's grades are Fs or if it becomes otherwise apparent that the student has ceased attendance without formally withdrawing. A few commenters wanted to know how intersessions—a period of time between terms when courses are offered—would be handled.

A few commenters asked the Department to clarify what the length of the payment period or period of enrollment is when performing a Return of Title IV Funds calculation for a withdrawn student who was not scheduled to attend courses over the entire term and how an institution would determine whether the student has completed more than 60 percent of the payment period or period of enrollment (*i.e.,* earned all of his or her title IV, HEA program funds). One commenter believed there would be no possible way for an institution to determine the days the student was scheduled to attend for an on-line class that is self-paced as there are no "scheduled days" in a self-paced program.

*Discussion:* Section 668.22(f)(1)(i) has always required an institution to determine the days in the payment period or period of enrollment that were completed by a student who withdraws from a program offered in credit hours in order to determine the percentage of the payment period or period of enrollment completed by the student. These final regulations do not change what it means to complete days for credit-hour programs, or clock hours for clock-hour programs, for purposes of the determination of the amount of aid earned by a student who withdraws from a program, nor do they change an institution's responsibility for having a procedure for determining whether a title IV recipient who began attendance during a period completed the period or should be treated as a withdrawal. The Department does not require that an institution use a specific procedure for making this determination; however, we have provided guidance to assist institutions in making these determinations. For example, consistent with the Department's guidance provided in its Dear Colleague Letter of November 2004, GEN-04-12, Return of Title IV Aid, an institution may presume a student

completed the period in a program offered in modules if the student did not officially withdraw from the institution and received a passing grade in all courses the student was scheduled to attend during the period. If a student in a program offered in modules does not receive a passing grade in the last course or courses he or she was scheduled to attend, the institution must otherwise demonstrate that the student completed the period, which can sometimes be done using the institution's grading policy if the failing grades reflect whether the student participated in those courses. Consistent with current requirements, if a student is determined to have withdrawn from an institution under § 668.22, the student is no longer considered to be enrolled and in attendance at an institution and, therefore, is ineligible for an in-school deferment and must be reported by the institution as a withdrawal for this purpose (34 CFR 674.34(b)(1)(i) and 34 CFR 685.204(b)(1)(i)(A)).

Consistent with the guidance provided in the Department's Dear Colleague Letter of December 2000, GEN-00-24, Return of Title IV Aid-Volume #1, for the treatment of title IV, HEA program funds when a student withdraws without completing at least one course in a payment period or period of enrollment, to determine whether the percentage of the payment period or period of enrollment completed for a student who withdraws from a program offered in modules, the institution would include in the denominator (the total number of calendar days in the payment period or period of enrollment) all the days in the modules the student was scheduled to attend, except for scheduled breaks of at least five consecutive days and days when the student was on an approved leave of absence. The numerator would include the number of the total days in the payment period or period of enrollment that the student has □ completed. For example, a student was scheduled to attend an intersession of three weeks of instructional time at the end of a fall semester, and, in accordance with the Department's past guidance, the institution has included that intersession with the fall term for purposes of the program's academic calendar when determining the payment of title IV, HEA program funds. In this circumstance the days in that intersession are included in the total number of days in the payment period for that student, except for scheduled breaks of at least five consecutive days, and days in which the student was on an approved leave of absence. Note that all the courses in the fall term are considered modules for purposes of a Return of Title IV Funds calculation when the intersession is included in the payment period.

Regarding the comment that there would be no possible way for an institution to determine the days the student was scheduled to attend for an on-line class that is self-paced, we note that, for Title IV, HEA program purposes, an institution is required to determine a program schedule for a payment period or period of enrollment.

*Changes:* Section 668.22(f)(2)(ii) has been revised to clarify that, when determining the percentage of payment period or period of enrollment completed, the total number of calendar days in a payment period or period of enrollment does not include, for a payment period or period of enrollment in which any courses in the program are offered in modules, any scheduled breaks of at least five consecutive days when the student is not scheduled to attend a module or other course offered during that period of time.

## Withdrawal Date for a Student Who Withdraws From an Institution That Is Required To Take Attendance (§§ 668.22(b) and 668.22(l))

Back to Top

*Comment:* Commenters were unsure about the effect of the proposed changes, and a number of them asked for clarification. A few commenters expressed concern that the Department was requiring institutions to take attendance. Others thought that, in instances in which individual faculty members take attendance by choice, the entire institution would then be considered an institution required to take attendance. Some commenters believed that if an institution or an outside entity required attendance taking for students in some but not all programs, then the institution would be considered one that has to take attendance for students in all programs. Other commenters believed that the proposed regulations would require institutions that take attendance for a limited period of time and use those attendance records, to continue to take attendance beyond that point.

Some commenters advocated a more restricted definition of an institution that is required to take attendance, suggesting that an institution should only be required to take attendance if an outside entity collects and maintains those records. One commenter did not believe that an outside entity should be able to require an institution to take attendance, and others opposed the provision that institutions required by an outside entity to take attendance must use these attendance records for the purposes of a Return of Title IV Funds calculation.

In general, we received comments on the application of the regulations to subpopulations of students and on the use of attendance records during a limited period. With respect to attendance requirements for subpopulations of students, most commenters did not object to the current policy that if some

students at the institution are subject to attendance taking requirements, then institutions would have to follow the last day of attendance regulations for those students. Other commenters agreed with this position, but believed that this condition should only be applied when taking attendance is required for the entire payment period, for all classes the student enrolls in, and only when imposed by an outside entity. One commenter disagreed with our position on the treatment of subpopulations of students, recommending that we modify the regulations to specify that the taking attendance requirement must be imposed by an outside entity and be applicable to the entire institution in order for an institution to be considered one required to take attendance.

One commenter supported the proposed change that if an institution requires the taking of attendance for a limited period of time, then those attendance records must be used to determine a withdrawal date. A few commenters objected to considering institutions that take attendance during a limited period of time to be institutions required to take attendance, even for only that limited period, suggesting that this provision should only be applied when taking attendance is required for the entire payment period or period of enrollment.

*Discussion:* The regulations do not require institutions to take attendance. Instead, under the regulations the Department considers an "institution that is required to take attendance" to include not only an institution that is required to take attendance by an outside entity, but also an institution that itself requires its faculty to take attendance in certain circumstances.

Regarding faculty attendance records, if an institution does not require faculty to take attendance, but a faculty member chooses to take attendance, then the institution would not then be considered an institution required to take attendance. If, however, the institution requires its faculty to take attendance, whether at the program, department, or institutional level, then those attendance records must be used by the institution in determining a student's date of withdrawal. Institutions that do not require the taking of attendance and are not required to take attendance by an outside entity are not prohibited from using individual faculty members' attendance records in determining a student's date of withdrawal. The Department encourages institutions to use the best information available in making this determination.

We do not agree with commenters who believed that if attendance taking is required for some students, then the institution would be required to take attendance for all

students. These final regulations do not change our existing policy. Under our current guidance and regulations, if an outside entity requires an institution to take attendance for only some students, for instance, for students receiving financial assistance under a State program, the institution must use its attendance records to determine a withdrawal date for those students. Similarly, under these final regulations, if the institution itself requires attendance taking for students in certain programs or departments, then the institution must use its attendance records to determine a withdrawal date for students in those programs or departments. These attendance taking regulations only apply when an institution either requires the taking of attendance or is required by an outside entity to take attendance, but not when a student is required to self-certify attendance directly to an outside entity. For example, a veterans' benefits requirement that benefit recipients self-report attendance would not result in an institutional requirement to take attendance of those students unless the institution is required to verify the student's self-certification.

An institution that is required by an outside entity to take attendance during a limited period, or that requires its faculty to do so, must use any attendance records from that limited period in determining a withdrawal date for a student. For students in attendance at the end of that limited period, if the institution is not required to take attendance and does not require its faculty to do so, then the guidelines for determining a withdrawal date for an institution that is not required to take attendance would apply. The Department continues to believe that the best data available should be used in determining a student's withdrawal date from classes, and, accordingly, if an institution requires the taking of attendance or is required to take attendance for any limited period, then those records must be used.

Lastly, we disagree with the comment that an outside entity should not be able to require an institution to take attendance. We continue to believe that our policy that an "institution that is required to take attendance" means an institution that is required to take attendance by an outside entity is a reasonable interpretation of the statute. The phrase "required to take attendance" presupposes that an entity has this requirement, and under this regulation, that entity may be either the institution itself or a separate entity.

*Changes:* None.

*Comment:* A few commenters expressed concern about who would decide what "required to take attendance means."

Specifically, they were concerned that the Department would determine that an institution or outside entity had a requirement that attendance be taken at an institution, even if the institution or outside entity disagreed with that conclusion. The commenters believed that the entity requiring the taking of attendance should make the determination about when attendance must be taken and what kind of documentation to support attendance taking is necessary, and that the Department should not superimpose its view of attendance taking on that entity. In particular, a few commenters opposed the idea that the Department would consider clock-hour institutions to be institutions required to take attendance if an outside entity or the institutions themselves did not believe that they were. One commenter recommended that we remove § 668.22(b)(3)(i)(C), believing that an institution could be found in noncompliance by the Department if the institution or outside entity had a different interpretation of whether taking attendance was required.

A couple of commenters requested clarification that, in a case where a student must be physically present to demonstrate a competency or skill, attendance taking would not be automatically required. Instead, the institution or another outside entity would have the responsibility of deciding whether attendance taking was necessary. Further, one commenter suggested that a "requirement" to take attendance should mean a written regulation or policy tied to determining seat time and not a quality inherent to the type of program.

*Discussion:* For institutions that are required to measure the clock hours a student completes in a program, the Department believes that this is, in substance, a requirement for those institutions to take attendance for those programs since they satisfy both the requirement of determining that a student is present and that the student is participating in a core academic activity. The Department is looking at the substance of the information that is available rather than the way that information is described or portrayed by the institution or outside entity. If the institution is required to collect information or record information about whether a student was in attendance during a payment period, or during a limited period of time during a payment period, that information should be used to determine if the student ceased attendance during that period.

*Changes:* None.

*Comment:* Commenters had a number of questions about the documentation and the maintenance of attendance records, generally requesting clarification about how attendance must

be documented and what constitutes attendance in an academic or academically-related activity. One commenter asked for specific guidance as to the definition of an attendance record, and requested clarification as to how often attendance must be taken at an institution required to take attendance. Another commenter asked what documentation would be sufficient to demonstrate attendance in cases in which students do not physically attend class but watch a video or podcast of the lecture remotely. Similarly, a commenter asked whether a student would be considered in attendance if he or she participated in an academically-related activity but was not physically present, such as working with an instructor by phone or e-mail. A few commenters requested clarification and guidance about what the Department believes constitutes attendance in a distance education context and how an institution should document that attendance. One commenter requested that the Department ensure that the evidence required of last day of attendance in online programs for the purpose of a Return of Title IV Funds calculation be substantially comparable to that required of traditional, face-to-face programs. The same commenter was also concerned that the Department would be requiring documentation beyond that required in the past without providing sufficient time for institutions to implement this change.

*Discussion:* In accordance with § 668.22(b)(2) and (c)(4), an institution must document a student's withdrawal date and maintain that documentation as of the date of the institution's determination that the student withdrew. As noted in the Federal Student Aid Handbook (FSA Handbook), the determination of a student's withdrawal date is the responsibility of the institution; a student's certification of attendance that is not supported by institutional documentation would not be acceptable documentation of the student's last date of attendance at an academically-related activity. As with other title IV, HEA program records, documentation of attendance must be retained and be available for examination in accordance with the provisions of § 668.24. If an institution is required to take attendance or is an institution that is not required to take attendance, but is using a last date of attendance at an academically-related activity as a withdrawal date, it is up to the institution to ensure that accurate records are kept for purposes of identifying a student's last date of academic attendance or last date of attendance at an academically-related activity. An institution must also determine and maintain the records that most accurately support its determination of a student's withdrawal date and the institution's use of one withdrawal

date over another if the institution has conflicting information.

To count as attendance for title IV, HEA program purposes, attendance must be "academic attendance" or "attendance at an academically-related activity." We have defined those terms in new § 668.22(l)(7) by providing examples of academically-related activities that institutions that are not required to take attendance may use in determining a student's last date of attendance at an academically-related activity. Certainly, traditional academic attendance is acceptable, *i.e.,* a student's physical attendance in a class where there is an opportunity for direct interaction between the instructor and students. Additionally, academically-related activities may include an exam, a tutorial, computer-assisted instruction, academic counseling, academic advising, turning in a class assignment, or attending a study group that is assigned by the institution. The □ Department has provided further guidance on this policy in the FSA Handbook, specifying that living in institutional housing and participating in the institution's meal plan are examples of activities that are not academically-related. The Department finds it acceptable for an institution that is required to take attendance to use the institution's records of attendance at the activities listed in § 668.22(l)(7) as evidence of attendance, provided there is no conflict with the requirements of the outside entity that requires the institution to take attendance or, if applicable, the institution's own requirements.

However, in these final regulations, we are revising the list of acceptable activities because the Secretary no longer considers participation in academic counseling or advising to be an activity that demonstrates academic attendance or attendance at an academically-related activity. The Secretary has encountered several instances of abuse of this particular provision by institutions that contact students who have ceased attendance, and treated that contact as "academic counseling" to facilitate a later withdrawal date, resulting in an inflated amount of "earned" title IV, HEA program funds. The Secretary does not view such contact as evidence of academic attendance, but notes that if the student resumed attendance and completed the period of enrollment no return calculation would be needed. Even if the student resumed attendance and later stopped attending, the student's participation in other activities that are already included on the list of academic activities could be used to establish a later withdrawal date. Thus, participation in academic counseling or advising without subsequent participation in other academic or academically-related activities is no longer an acceptable example of participation in an academically related activity.

With respect to what constitutes attendance in a distance education context, the Department does not believe that documenting that a student has logged into an online class is sufficient by itself to demonstrate academic attendance by the student because a student logging in with no participation thereafter may indicate that the student is not even present at the computer past that point. Further, there is also a potential that someone other than the student may have logged into a class using the student's information to create the appearance the student was on-line. Instead, an institution must demonstrate that a student participated in class or was otherwise engaged in an academically-related activity, such as by contributing to an online discussion or initiating contact with a faculty member to ask a course-related question. This position is consistent with the current guidance the Department has provided to individual institutions regarding the applicability of the regulations to online programs.

When assessing an institution's compliance with any program requirement, the Department looks at information provided by the institution in support of the compliance of its policies and procedures.

*Changes:* We have removed the reference to academic counseling and advising in current § 668.22(c)(3)(ii) and have added to the regulations a combined definition of *academic attendance* and *attendance at an academically-related activity* in § 668.22(l)(7) to clarify that both institutions required to take attendance and those that are not required to take attendance may use institutionally-documented attendance at certain activities as a student's withdrawal date. We have also redesignated current § 668.22(c)(3)(i) as § 668.22(c)(3) to reflect the removal of § 668.22(c)(3)(ii).

We have added to the definition at § 668.22(l)(7) both existing guidance from the FSA Handbook and examples of academic attendance for online programs. For additional clarity, we have specified that physically attending a class where there is an opportunity for direct interaction between the instructor and students is considered academic attendance and have specified that participating in academic counseling or advising is not considered academic attendance.

*Comment:* A number of commenters opposed the proposed changes, believing that they would impose additional burdens on institutions, be too complex to administer, and prove counterproductive to the goals of the Department.

In terms of additional burden, the commenters argued that the proposed regulations could become too complex, noting that

institutions might have different attendance taking requirements, depending on the program or academic department. Others suggested that it would be too confusing and burdensome to take attendance for only a limited period. Two commenters did not support adverse actions or audit findings by the Department against institutions that did not demonstrate 100 percent compliance with the attendance taking requirements.

Commenters also pointed out potential barriers to administering these regulations properly. A few believed that it would be difficult to ensure complete and accurate attendance records across faculty and programs, arguing that these records would not necessarily fully reflect a student's attendance at academically-related activities. A couple of commenters questioned the feasibility of achieving full compliance with attendance taking policies across faculty. One commenter did not believe that attendance records held by individual faculty members or departments should constitute available data. One commenter believed that the additional complexity of the regulations would make it impossible to complete a Return of Title IV Funds calculation in the required timeframe.

The commenters also argued that the additional burden and complexity of the regulations would ultimately undermine attempts to mitigate the potential for fraud and abuse of Federal funds and would hamper attempts to improve student success in higher education. Specifically, a number of commenters believed that the proposed regulations would create an economic disincentive to taking attendance, causing many institutions that voluntarily take attendance to stop doing so. They argued that this provision would make it more difficult to identify a date on which a student has withdrawn from classes, compelling more institutions to use a mid-point date when performing a Return of Title IV Funds calculation. The commenters further asserted that institutions take attendance for a variety of reasons, and that ending this practice would lead to lower retention and graduation rates and, subsequently, higher student loan default rates.

Due to the perceived complexity of this issue, two commenters requested that the Department delay the implementation of these regulations. One suggested gathering additional input from the community to develop proposed regulations, while the other recommended reconvening a negotiated rulemaking committee to further consider these issues.

*Discussion:* We appreciate the concerns of the commenters about possible harms that might come from the proposed

changes. The goal of determining the amount of funds a student earned before he or she stopped attending should be a shared one, and the claim that the institutions would stop taking attendance in order to increase the funds a student would receive beyond the point where the student stopped attending is troubling. The Department continues to believe □ that institutions should use the best data available in determining a student's withdrawal date from classes. Accordingly, if an institution requires the taking of attendance or is required to take attendance for any limited period of a semester or other payment period, then those records should be used when determining a student's date of withdrawal for the purposes of a Return of Title IV Funds calculation.

With respect to comments regarding the complexity of the regulations, they address the taking attendance policies that are either required by an outside party or required by the institution itself. Institutions would already be expected to follow these requirements, and the regulations provide for that attendance information to be used when it indicates a student has stopped attending during this limited period. For students in attendance at the end of that limited period, the guidelines for determining a withdrawal date for an institution that is not required to take attendance would apply until the start of the next period during which attendance taking is required. Any increase in overall burden is mitigated since this requirement is tied to policies for taking attendance that are already in place at institutions, and uses the existing requirements for determining the amount of Federal funds a student earned based upon that information. Cases of noncompliance are addressed on a case by case basis when the occurrences are isolated, and institutions are expected to take appropriate corrective actions when an error is brought to their attention during a self-audit, a compliance audit, or a program review. Accordingly, the Department does not believe it is necessary to delay the implementation date of these regulations, or to reopen the issue for negotiation.

*Changes:* None.

*Comment:* A few commenters opposed the proposed changes, arguing that the proposed regulations exceed the Secretary's authority under the law. The commenters believed that Congress intentionally allowed institutions the option to use the midpoint of the payment period because it recognized that institutions have already incurred costs when a student fails to withdraw officially. A few commenters believed that the definition of last day of attendance under the statute is sufficient and that the Department should not make any

changes to the regulations. Some commenters opposed the proposal that an "institution required to take attendance" includes an institution that takes attendance voluntarily, arguing that the wording of the statute, which states "institutions that are required to take attendance" and not "institutions that take attendance," indicates that Congress did not intend to include institutions that choose to take attendance in that category. Other commenters expressed strong support for the broadened definition.

*Discussion:* Under the law, institutions that are required to take attendance must use that information to determine when students who do not complete a class stopped attending. It is common for the Department to view requirements established by an institution, such as an institutional refund policy, as being a requirement for that institution. The Secretary believes it is reasonable to interpret the law to include instances where the institution itself is establishing the requirement to take attendance for a program, a department, or the entire institution. The regulations do not include instances where a faculty member would monitor student attendance but was not required to do so by the institution. Furthermore, there is no reason that attendance information required by an institution would be different in substance from attendance information required by other entities. It is the process of taking attendance itself that leads to the information being available, regardless of whether it is required by the institution or an outside entity. The law provides that institutions that are required to take attendance must use that information for students who stop attending, and the regulations define the term "required to take attendance" to include instances where the institution itself is establishing that requirement for a program, a subpopulation of a program, a department, or the entire institution. The Secretary also believes that this information should be used when it is available, even if attendance is not required and is only taken for a limited period during the payment period or period of enrollment.

*Changes:* None.

*Comment:* A number of commenters requested clarification about whether an institution would be required to perform a Return of Title IV Funds calculation for students that were not in attendance on the last day of a limited census period. Specifically, a few commenters believed that § 668.22(b)(3)(iii)(B) could be interpreted in different ways. First, it could be read to mean that an institution must treat a student who is not in attendance on the last day of a limited period of attendance taking as a withdrawal, even if the student

continued to attend classes or was engaged in another academically-related activity after the end of the limited period. Along these lines, a few commenters pointed out that it could be difficult for an institution to ascertain whether a student actually withdrew, or whether the student was in fact only absent for a class or two. Second, it could be read to mean that if an institution has attendance records during a limited period, the institution must use those attendance records, as the best available source of information, in determining a student's date of withdrawal. One commenter believed that this interpretation could require an institution not otherwise required to take attendance to take attendance beyond the end of the limited attendance period to determine if the student came back. The commenter further requested clarification about when an institution in this situation would have to determine that the student actually withdrew.

Three commenters provided potential modifications to the language related to taking attendance during a limited time period. The first suggested replacing the words "in attendance at the end of the limited period" with the words "in attendance during the limited period" to account for the fact that a student might have attended earlier in the limited period but was only absent on that last day, perhaps due to illness or another legitimate reason. The second commenter recommended modifying the words "a student in attendance" to read "a student determined by the institution to be in attendance" in order to give institutions the necessary flexibility to determine that a student actually withdrew from all courses and was not just absent on that particular day. The third commenter suggested replacing the phrase "in attendance at the end of the limited period" with "in attendance at the last regularly scheduled class meeting prior to the census date" to account for courses that do not meet on the last day of the limited period.

One commenter believed that the Department should require institutions to have a limited number of hours or credits that a student may miss without having to be considered a withdrawal.

*Discussion:* Standing alone, information that a student was absent on the last date attendance was taken during a limited period of time is the best evidence that the student has ceased attendance. That presumption is easily refuted when a student has gone on to complete the payment period, since the student will have earned a grade for the class. For a student who did not complete the class, the institution may determine whether there ☐ is evidence that the student was academically engaged

in the class at a point after the limited period when attendance was taken. Unless an institution demonstrates that a withdrawn student who is not in attendance at the end of the limited period of required attendance taking attended after the limited period, the student's withdrawal date would be determined according to the requirements for an institution that is required to take attendance. That is, the student's withdrawal date would be the last date of academic attendance, as determined by the institution from its attendance records. If the institution demonstrates that the student attended past the end of the limited period, the student's withdrawal date is determined in accordance with the requirements for an institution that is not required to take attendance. So, for a student the institution has determined attended past the limited period and has unofficially withdrawn, the student's withdrawal date is the midpoint of the payment period of period of enrollment unless the institution uses a later date when the student was academically engaged in the class. The institution therefore has the option to document a student's last date of attendance at an academically-related activity, but an institution is not required to take attendance past the end of the limited period of attendance taking.

We do not interpret a requirement to take attendance in one class for a "census date" as taking attendance for purposes of this regulation. For example, some institutions have courses that meet only on Mondays and Wednesdays, and other courses that meet on Tuesdays and Thursdays. In those cases, a "census date" may be taken on two different days in order to establish attendance in both sets of courses that meet on alternate days. With respect to the suggestion that an institution be permitted to have a policy to establish a different procedure or presumption for a student who is absent at the end of a limited period of attendance taking, this is addressed in practice by having the institution determine if the student participated in an academically related activity at a later point in the payment period, not by adding a regulation that otherwise ignores an absence on the last date attendance was taken for the student.

*Changes:* None.

*Comment:* A few commenters believed that the proposed regulations would cause a greater financial burden for a student who withdraws from courses prior to the midpoint of the semester. A few commenters noted that institutions that voluntarily maintain attendance records would now have to use those records to determine the student's actual last date of

attendance instead of using a midpoint date. In the case of clock-hour institutions, commenters were concerned that institutions would be required to use an actual last date of attendance instead of a scheduled last date of attendance. In these situations, a student might receive fewer funds to cover costs incurred for the entire payment period, even if he or she withdrew before the end of that payment period.

*Discussion:* The Department recognizes that using an actual last date of attendance instead of a midpoint of the semester may require an institution to return more unearned aid; this outcome, however, is equitable. For institutions using credit hours that are determined to be required to take attendance for all or a part of the period, the regulation may establish an earlier date of withdrawal for a student that stops attending during a period when attendance is taken. This outcome provides a more consistent treatment with other institutions that have programs where student progress is tracked by measuring clock hours, and more closely tracks the requirements in the law that students earn title IV funds as they progress through a period until they complete more than 60 percent of the period. Institutions are responsible for determining the amount of title IV, HEA program assistance that a student earned under the applicable regulations, and unearned funds for a student must be returned in accordance with the procedures in § 668.22. By establishing a more accurate date a student ceased attendance during a period when attendance is taken, the regulation will tend to increase the amount of unearned funds that are used to reduce the loan amounts students received for that period under § 668.22(i).

*Changes:* None.

*Comment:* A number of commenters from cosmetology schools believed that the proposed regulations would put some institutions in a position of being unable to comply with both Federal and State regulations. Specifically, they were concerned that the proposed regulations would require institutions that are credit-hour institutions to become clock-hour institutions if they take attendance, forcing them, depending on individual State laws, to be out of compliance with State requirements that those institutions use credit hours.

*Discussion:* We do not agree that these regulations create a conflict between Federal and State laws. Institutions that use clock hours for a program for State reporting or licensing purposes will be treated as institutions that are required to take attendance under this regulation, and the clock hours attended will be used to determine when a student ceased

attendance. To the extent that such an institution uses credit hours for its academic purposes, that institution will not be affected by this regulation. The requirement to determine the amount of aid a student earned before ceasing attendance is separate from the question of whether that institution uses credit hours for academic purposes. The clock hours are used to measure the amount of funds a student earned, the same way that other institutions that are required to take attendance will measure earnings under this regulation.

*Changes:* None.

*Comment:* A few commenters suggested modifications to the regulatory language that would require institutions to use the best information available in determining a student's withdrawal date. Specifically, one commenter recommended amending § 668.22(c) to make the midpoint of the payment period the "last resort" option for determining a student's last date of attendance when a student unofficially withdraws such that a school would be required to use the midpoint of the payment period only in the absence of other documentation of a student's attendance. Another commenter recommended that we require institutions to use the best available data when determining a withdrawal date instead of allowing schools that are not required to take attendance to use a default date of the midpoint of the payment period of period of enrollment. The commenter believed that using this language would best support the Department's goals.

*Discussion:* We do not believe that the suggested modifications are supportable under the HEA because the requirement to use attendance information is only applicable for periods when attendance taking is required. Under section 484B(c)(1) of the HEA, if a student stops attending an institution at a point where attendance taking is not required, the institution uses the midpoint of the payment period, or may use a later date when the student was participating in an academically related activity.

*Changes:* None.

*Comment:* One commenter was concerned that if an institution that is required to take attendance did not have a valid ISIR before a student's last date of attendance, the student would be unintentionally penalized and unable to receive title IV, HEA program assistance. ☐

*Discussion:* We do not agree. An institution must act in accordance with § 668.164(g), which contains the requirements for making a late disbursement, including circumstances where a student did not have a valid SAR or

valid ISIR on the student's last date of attendance.

*Changes:* None.

**Verification and Updating of Student Aid Application Information (Subpart E of Part 668)**

Back to Top

**General (§ 668.51)**

*Comment:* One commenter questioned whether the Department would describe, in the final regulations, our plans to provide training to assist institutions to prepare for and comply with verification requirements reflected in subpart E of part 668.

*Discussion:* The Department will issue guidance through the *Application and Verification Guide* and other training materials, as needed. The Department will also provide training through our regional training officers. For information on our current and future training activities and learning resources, institutions should visit the Training for Financial Aid Professionals Web site at *http://www2.ed.gov/ offices/OSFAP/training/index.html*.

*Changes:* None.

*Comment:* Some commenters requested that the Department delay implementing the new verification requirements until the 2012-13 award year to give institutions sufficient time to train their staff and make the necessary system changes.

*Discussion:* The Department recognizes that institutions may need time to make changes to their institutional processing systems to comply with the requirements in subpart E of part 668. Accordingly, as described in the DATES section of these final regulations, we will delay the effective date of the changes to this subpart until July 1, 2012, which means that it will be effective for the 2012-13 award year.

*Changes:* None.

*Comment:* Some commenters noted that because no new loans can be certified under the Federal Family Education Loan (FFEL) Program effective July 1, 2010, all references to the FFEL Program and loan certification should be removed from the regulatory language in this subpart.

*Discussion:* We concur with the commenters. We had not removed the references to FFEL in the NPRM because that notice was already under development when the legislative change to end new lending under the FFEL Program was enacted. Our intent was to make the necessary technical corrections in the final regulations.

*Changes:* Throughout subpart E of part 668, we have removed

references to the FFEL Program and any corresponding regulatory citations. Specifically, we have removed references to "Subsidized Stafford Loan," "Unsubsidized Stafford Loan," "Federal PLUS Loan," and "lender" as well as certifications for Subsidized Stafford loans from §§ 668.52, 668.58, and 668.60.

## Definitions (§ 668.52)

Back to Top

*Comment:* Some commenters expressed support for the Department's efforts to simplify and clarify the definitions used throughout the verification regulations under subpart E of part 668. One commenter noted that changing the defined term *application* to *FAFSA,* and using the term *FAFSA information* in place of the term *application* helps distinguish the FAFSA from other financial aid applications used at many institutions.

*Discussion:* We appreciate the commenters' support.

*Changes:* None.

*Comment:* Two commenters suggested that we change the names of the defined terms *FAFSA information, subsidized student financial assistance programs,* and *unsubsidized student financial assistance programs.* Specifically, one commenter suggested that we use the term "Federal Methodology (FM) need analysis data" or "ISIR data" rather than *FAFSA information* to better reflect what institutions receive once the data reported on the FAFSA have been processed. In addition, one commenter stated that using the terms "subsidized" and "unsubsidized" to modify student financial assistance programs will confuse applicants because those terms are more commonly used when referring to loan programs. The commenter stated that families would better understand the type of aid we are referring to by using the terms "need-based student financial assistance programs" and "non-need-based student financial assistance programs."

Another commenter requested that the Department include in the regulations definitions for the terms "applicant" and "timely manner."

*Discussion:* While we appreciate the suggestions, we do not believe the suggested changes are necessary. We also do not agree that using the term "subsidized" and "unsubsidized" throughout subpart E will confuse applicants and their families about the type of aid we are referring to since these regulations are written for FAAs at institutions of higher education and not applicants and their families. An institution may, when communicating with students and families, use whatever terminology it believes will best be understood by its students and families.

However, we did make some revisions to the list of definitions under § 668.52. Specifically, we determined that the definitions for *Free Application for Federal Student Aid (FAFSA), Institutional Student Information Record (ISIR),* and *Student Aid Report (SAR)* would be more appropriately included in § 668.2(b) of subpart A because these terms are used throughout part 668 of the Student Assistance General Provisions regulations and not just under subpart E.

We also revised the definitions for *Valid Student Aid Report (valid SAR)* and *Valid Institutional Student Information Record (valid ISIR)* in § 668.2(b) to specify that a valid ISIR is an ISIR on which all the information reported on a student's FAFSA is accurate and complete as of the date the application is signed, and a valid SAR is a student aid report on which all of the information reported on a student's FAFSA is accurate and complete as of the date the application is signed.

In addition, we also changed the defined terms from *Student Aid Report (SAR)* to *Valid Student Aid Report (valid SAR)* and *Institutional Student Information Record (ISIR)* to *Valid Institutional Student Information Record (valid ISIR)* under §§ 668.54(b), 668.58, 668.59, and 668.61. Prior to these final regulations, an institution was not required to obtain a valid SAR or valid ISIR in order to make a disbursement under the campus-based programs and the title IV, HEA loan programs. Institutions could rely on their own calculations to determine an applicant's award amount without having to submit corrections through the Department's Central Processing System (CPS) and receiving the corrected SAR or ISIR. Consistent with the revisions to § 668.59(a), which require that any change to a nondollar item and any change to a dollar item on the FAFSA that is $25 or more must be submitted to the CPS for reprocessing, an institution must have a valid SAR or a valid ISIR to disburse funds from the subsidized student financial assistance programs. By definition, a valid SAR or valid ISIR can only be created after information has been processed through the Department's Central Processing System.

Finally, we also determined that we no longer need to define the terms valid SAR or valid ISIR under **34 CFR 690.2** of the Federal Pell Grant Program regulations as they are defined in part 668 because they apply to all of the title IV, HEA programs. For this reason, we have removed these definitions from this section.

*Changes:* The terms and corresponding definitions for *Free Application for Federal Student Aid (FAFSA), Institutional*

*Student Information Record (ISIR),* and *Student Aid Report (SAR)* have been removed from § 668.52. Instead, we now define *Free Application for Federal Student Aid (FAFSA), Institutional Student Information Record (ISIR),* and *Student Aid Report (SAR)* under General definitions in § 668.2(b). We have also revised the definitions for *valid Institutional Student Information Record (valid ISIR)* and *valid Student Aid Report (valid SAR)* in § 668.2(b). We have removed the definitions for the terms *valid Student Aid Report (valid SAR)* and *valid Institutional Student Information Record (valid ISIR)* from **34 CFR 690.2**(b) and revised the definition of these terms under § 668.2(b) to no longer refer to the definitions in **34 CFR 690.2**(b) of the Federal Pell Grant Program regulations.

*Comment:* One commenter asked the Department to clarify the meaning of the term "applicant" as used throughout the verification regulations. The commenter suggested that the regulations should use the term "applicant" to refer to a student who is accepted for admission at an institution, rather than to a student who submits a FAFSA. The commenter argued that having "applicants" cover all students who submit a FAFSA would be administratively burdensome for institutions because it would require them to verify CPS-selected transactions for students who do not enroll at the institution.

*Discussion:* The term "applicant," as used throughout the verification regulations, refers to an individual who applies for assistance under the title IV, HEA program by completing and submitting a FAFSA.

While the term "applicant," as used in subpart E of part 668 covers individuals who may not enroll at the institution, we note that § 668.54 only requires an institution to verify the FAFSA information selected by the Secretary under § 668.56 and any FAFSA information the institution has reason to believe is inaccurate. Therefore, only those applicants who are enrolled at the institution and whose FAFSA information falls into one of these categories are subject to verification.

*Changes:* None.

**Policies and Procedures—Professional Judgment (§ 668.53(c))**

Back to Top

*Comment:* Many commenters expressed support for § 668.53(c), which requires an institution to complete verification prior to exercising the professional judgment authority allowed under section 479A of the HEA. These commenters indicated that this requirement, which is consistent with their policy to complete verification first, is

important to ensure that the data reported on the FAFSA is accurate before making any adjustments to it.

*Discussion:* We appreciate the commenters' support.

*Changes:* None.

*Comment:* Some commenters questioned the process for completing verification prior to exercising professional judgment in special circumstances that require a dependency override in order to create a valid Student Aid Report (valid SAR) or valid Institutional Student Information Record (valid ISIR).

*Discussion:* The authority given to FAAs to exercise professional judgment under section 479A of the HEA is separate and apart from the authority given FAAs to make a dependency override decision under section 480(d)(1)(I) of the HEA. Section 479A of the HEA authorizes an FAA to make adjustments on a case-by-case basis to the cost of attendance or to the values of the data items used to calculate the EFC to allow for treatment of an individual eligible applicant with special circumstances as long as the adjustments are based on adequate documentation.

In the definition of "independent student" in section 480(d)(1)(I) of the HEA, an applicant may be considered to be an independent student if the FAA makes a documented determination that the applicant is independent by reason of other unusual circumstances.

In practice, an FAA would first determine whether an otherwise dependent applicant should be considered an independent student using the FAA's authority under section 480(d)(1) of the HEA, in order to obtain a valid SAR or valid ISIR, and then would subsequently make any corrections or professional judgment adjustments to the applicant's FAFSA information.

We will provide guidance in the Federal Student Aid Handbook to address operational details as needed.

*Changes:* None.

*Comment:* Several commenters expressed concern that requiring an institution to complete verification before exercising professional judgment would make it difficult for institutions to appropriately handle emergency situations. The commenters noted that delays would occur as a result of having to complete verification, submit any changes to CPS, and wait for the new SAR or ISIR upon which the professional judgment decision would be based. Some commenters

suggested making modifications to systems software, *i.e.* FAA Access, to allow multiple changes to be made simultaneously to resolve this problem.

*Discussion:* We appreciate the commenters' suggestion for improving our operational process. We will take this suggestion into consideration as we look for ways to improve our services to institutions.

Currently, the CPS will process changes to an applicant's FAFSA information as a result of the verification process or a professional judgment determination and report the results on a new ISIR sent to the institution usually the next day. However the two transactions cannot be processed on the same day. This is because after the institution receives the ISIR that was created as a result of verification, the institution would use that ISIR transaction to make adjustments to the applicant's FAFSA information using the professional judgment process. While we understand the commenters' concerns about any delay that may occur with having to submit transactions separately, we believe that any delay will be slight. In addition, institutions have the option of making interim disbursements, as allowed under § 668.58, until a corrected valid SAR or valid ISIR is received.

*Changes:* None.

*Comment:* One commenter asked whether an applicant who is selected to verify the parent's household size, but who requests that the institution use its professional judgment authority under section 479A of the HEA to examine the parent's income listed on the FAFSA, would be required to verify all five items before the institution could exercise its professional judgment.

Another commenter argued that the requirement to complete verification before exercising professional judgment would delay the financial aid process and would create an additional hurdle for families in need. This commenter questioned why institutions have to go through an extra step to evaluate an applicant's eligibility through the verification process if the institution is updating those same fields when exercising professional judgment to revise an applicant's eligibility under section 479A of the HEA. 

*Discussion:* Under these final regulations, an institution must verify the items selected for verification before making any professional judgment adjustments regardless of whether an institution is making adjustments to the item being verified. Prior to the effective date for subpart E of part 668 of these final regulations, for an application selected for verification, an institution must verify the data elements identified in current

§ 668.56 before making any adjustments regardless of whether an institution is making adjustments to the item being verified.

*Changes:* None.

*Comment:* One commenter asked whether an institution must complete verification prior to exercising professional judgment if the applicant's FAFSA information is selected for verification by the institution, rather than by the Secretary.

*Discussion:* To ensure that any professional judgment adjustments made by an institution are based on accurate information, we believe that all FAFSA information selected for verification, whether selected by the Secretary or the institution, must be verified before the institution can exercise professional judgment. We are making a change to § 668.53(c) to make this clearer.

*Changes:* We have revised § 668.53(c) by removing the phrase "by the Secretary" after the words "selected for verification" to provide that verification, regardless of whether the FAFSA information to be verified is selected by the Secretary or the institution, must be completed prior to exercising professional judgment.

## Selection of FAFSA Information for Verification (§ 668.54)

Back to Top

*Comment:* Many commenters supported our proposal to target verification to those items reported on the FAFSA that are most prone to error, based on a set of criteria that identifies which items are most likely to contain erroneous data, instead of requiring verification of all five items listed in current § 668.56 for FAFSAs selected for verification.

Another commenter agreed with proposed § 668.54(b)(1)(iii), which excludes from verification applicants who only receive unsubsidized student financial assistance. This commenter stated that this approach would be more efficient for applicants and free up time for institutional staff to help other applicants.

*Discussion:* The Department appreciates the commenters' support.

*Changes:* None.

*Comment:* Many commenters opposed removing the institutional option to limit the total number of applicants who must be verified to 30 percent of all applicants. They argued that removing this limitation, which is reflected in current § 668.54(a)(2)(ii), would increase the workload of FAAs already struggling with reductions in staff and in State budgets, with a

multitude of regulatory changes, and with increased enrollments. Some commenters noted that the Department currently targets Pell-eligible applicants for verification and were concerned that community colleges would be unduly impacted if the 30 percent limitation were removed. Commenters stated that more institutions may need to use the 30 percent limit to manage their workload due to the large increase in applicants applying to institutions with open enrollment. Many commenters expressed concern that the Department would significantly increase the number of applicants whose FAFSAs are selected for verification if a limit is not established in the regulations.

One commenter noted that additional study of the current verification process is needed to determine which corrections provide the most meaningful improvements in program integrity.

A commenter recommended that we retain the 30 percent limit for at least two years, during which time we can monitor whether the proposed approach of targeting information to be verified, as reflected in § 668.56, actually reduces an institution's burden. If, after this two-year period, we have evidence to show that burden on institutions has been reduced, the commenter suggested that the limit on the percentage of applicants whose FAFSAs must be verified should be lifted or modified.

*Discussion:* The Department reviews, studies, and analyzes verification data on an ongoing basis. Annually, the Department develops a comprehensive predictive model by applying sophisticated statistical techniques to FAFSA application data from the most recent application filing years along with corresponding payment data from those same years. The model is designed to identify the characteristics of FAFSA applications containing information that is likely to have errors which, if not corrected, will result in an improper payment of title IV, HEA program funds. The model contains a series of application groupings that identifies that application's statistical likelihood of error. The Department selects applications with the highest likelihood of significant error for verification.

We are confident that, when fully implemented, the targeted selection of FAFSA information to be verified will result in a more efficient and effective verification process. While some institutions, particularly those that enroll greater numbers of Pell Grant applicants, have more applicants whose FAFSA information is selected for verification, we believe that overall burden will be reduced across institutions. This is because for

each applicant whose FAFSA information is selected, the items to be verified will be limited to specific items the Secretary has selected for that applicant (see proposed § 668.56(b)) rather than all five items listed in current § 668.56. For example, one applicant may be required to verify the five items required under the current regulations (because the Secretary includes them in the **Federal Register** notice published under § 668.56(a) and specifies that those items must be verified for that one applicant) while another applicant may only be required to verify adjusted gross income (AGI) and household size (because the Secretary includes these two items in the **Federal Register** notice published under § 668.56(a) and specifies that these are the only items that must be verified for this applicant). The Department also notes that it does not view the 30 percent limitation as applying to its own enforcement and monitoring activities, including program reviews and audits.

*Changes:* None.

*Comment:* Some commenters asked the Department to clarify how subpart E of part 668 will affect institutions that are currently allowed to establish their own verification criteria under the Quality Assurance (QA) Program.

*Discussion:* The changes made to the verification regulations in subpart E of part 668 will not diminish the importance of the QA Program. In fact, we are currently in the process of developing a plan to expand the number of institutions that participate in the QA Program. We are especially interested in increasing the participation of minority serving institutions, community colleges, proprietary institutions, and institutions that serve non-traditional students or that offer instruction in non-traditional ways. Also, the changes made to the verification regulations are not expected to alter the way the QA Program operates. In fact, the Department expects that data and results generated from institutions participating in the QA Program will help us assess the effectiveness of the new verification regulations in subpart E of part 668.

*Changes:* None.

*Comment:* Two commenters stated that the FAFSA information of ☐ applicants who are incarcerated at the time verification would occur and applicants who are immigrants who recently arrived in the United States should not be subject to verification. One commenter noted that verification in these cases would require institutions to spend a significant amount of time explaining the Federal requirements to these applicants when their eligibility for aid may not be affected by

the data gathered to complete verification. Another commenter stated that a dependent applicant whose parents are deceased or are physically incapacitated should also be excluded from verification.

*Discussion:* We do not agree with the commenters. Applicants who are incarcerated, recent immigrants to the United States, or whose parents are physically incapacitated, should be able to provide the documentation required to complete verification by providing their institution with the documentation that was used to complete the FAFSA.

An applicant whose parents are deceased would be independent and therefore there would be no verification of parental information on an independent student's FAFSA.

*Changes:* None.

*Comment:* Several commenters expressed concern that the new process for verifying different FAFSA items would cause difficulties because, after one instance of verification, there potentially would be other items that the applicant would need to verify during subsequent transactions (a "verification loop"). One commenter suggested that if the Department uses the targeted approach for verification, it should limit verification selection to one time per applicant and accept a subsequent correction for that targeted item as closure of the verification process for that application. One commenter noted that repeated verification does not currently occur because, under the current regulations, applicants are required to verify all items the first time. One commenter expressed concern that multiple verifications may occur for one student if the institution submits corrections to CPS and the student also initiates changes to the ISIR data. The commenter recommended including some protections for institutions that submit corrections to ISIR data. One commenter asked for guidance on what an institution is required to do when an applicant is selected for verification, completes it, is then selected for verification again but fails to complete the second verification process.

*Discussion:* As noted earlier, the Department has delayed implementation of the changes to subpart E of part 668, including §§ 668.54 and 668.56, which provide for the targeted approach to verification, until the 2012-13 award year. Therefore, for the 2011-12 award year, institutions will continue to verify, for all FAFSAs selected for verification by the Secretary, the five data items listed in current § 668.56. As we develop the selection criteria for determining which FAFSA information must be verified for an individual applicant (*i.e.,*

selection criteria for determining which FAFSA information is prone to error), we will build into the system procedures that limit the possibility of any applicant being subject to additional FAFSA items needing verification after the first selection has been made. However if our analysis shows that, based on submissions of corrections, additional FAFSA information should be verified, perhaps because it is inconsistent with the "corrected information," an applicant may have to verify those additional items.

In the NPRM, we inadvertently omitted § 668.54(a)(4) from the verification regulations. Under current § 668.54(a)(4), if an applicant is selected for verification by the Secretary, the institution must require the applicant to verify the information as specified in § 668.56 on each additional application the applicant submits for the award year except for information already verified for the applicable award year. We are restoring § 668.54(a)(4) to provide that if an applicant is selected by the Secretary to verify his or her FAFSA information, the institution must require the applicant to verify the information in accordance with § 668.56 if the applicant is selected for a subsequent verification of FAFSA information, except that applicant is not required to provide documentation for that FAFSA information previously verified to the extent that the FAFSA information previously verified remains unchanged.

Under current regulations, an applicant who has completed verification once, whose FAFSA information is selected a second time for verification, is only required to verify FAFSA information not verified previously. When the revised § 668.54(a)(4) becomes effective, such an applicant would be required to complete the second verification process if the FAFSA information selected has changed for that award year. If the applicant fails to do so, he or she may forfeit eligibility for title IV aid in accordance with § 668.60(b).

*Changes:* We have revised § 668.54 by reinstating current § 668.54(a)(4) to provide that if an applicant is selected by the Secretary to verify his or her FAFSA information under § 668.54(a)(1), the institution must require the applicant to verify the information as specified in § 668.56 if the applicant is selected for a subsequent verification of FAFSA information, except that applicant is not required to provide documentation for the FAFSA information previously verified to the extent that the FAFSA information previously verified remains unchanged.

*Comment:* Some commenters suggested that the proposed verification requirements in subpart E of part 668 would increase barriers for the neediest students to apply for

financial aid to pursue higher education.

*Discussion:* We do not agree. When this subpart is fully implemented in the 2012-13 award year, the verification process is expected to be more efficient and effective for both students and institutions. Thus, we do not expect that these new requirements will add a burden or increase barriers for students, including those from low-income backgrounds. We have not been presented with any evidence to support that these requirements will increase barriers for the neediest students to apply for financial aid to pursue higher education.

*Changes:* None.

## Updating Information (§ 668.55)

Back to Top

*Comment:* While a few commenters supported the requirement in § 668.55(a)(1)(ii), which may result in making dependency status updates in mid-year, many stressed the difficulties that would arise as a result of this requirement. A primary concern expressed was that this requirement would result in a substantial increase in burden for institutions, particularly because a student's financial aid package is affected by the student's dependency status. One commenter claimed that to comply with this requirement, institutions would need to hire extra staff, which would not be possible in the current economy. In addition, some commenters noted that there would be undesirable consequences for the student: One who marries and becomes independent could lose eligibility for the Pell Grants already awarded and received because the spouse's financial data would be taken into account. Others stated that students might get married to increase their Pell eligibility or that divorce, rather than marriage, would decrease Pell eligibility; as one institution noted, many of its dependent students become eligible for more aid after they marry and become independent. Some commenters requested that there be no change in this area or that FAAs be permitted to make dependency status changes under certain circumstances, such as during verification, or at their discretion. For example, one commenter suggested requiring the reporting of a change to dependency status until the first disbursement of title IV, HEA aid has been made and that if the dependency status update results in a change in the applicant's EFC, the lower value should be used. A couple of commenters observed that students who married late in the award year would become independent and need to have their aid repackaged for the award year. One commenter opposed all mid-year dependency status changes because they undermine the "snapshot" approach to the application process and create a large administrative burden. Another commenter

noted the potential for students who divorced and became dependent again to lose eligibility for the aid they received because their parents would refuse to provide information for the application. Still another remarked that it is hard for institutions to track dependency status during the award year because accurate tracking requires that students notify the institution of changes. One commenter, who stated that he appreciated that when an update is due to a change in the student's marital status, institutions would only be required to make the update if notified by the student, also noted that this approach can penalize the student who is honest and reports the marital status change. This commenter argued that such a change in dependency status should be reflected in the application for the following year, as occurs under the current regulations. Another commenter suggested that although the Department affirmed that it is not the institution's responsibility to initiate updating, this view ignores the burden imposed on institutions to resolve conflicts in information they receive from different sources. This commenter requested relief for institutions so that they would only need to make a dependency status change in ISIR information if the student or family was the source of the information supporting the dependency change. Another commenter asked whether institutions are required to keep track of potential dependency status changes that are indicated by other campus offices when the student does not report the change. One commenter asked that there be a cut-off date after which an institution would no longer be required to make dependency status changes. Another commenter agreed with the Department's logic for not having a cut-off date, and asked that institutions be permitted to set their own date based on their academic calendar.

One commenter who supported mid-year dependency status changes requested that the Department allow updates to household size and number in college when there is a change in marital status. Another commenter asked for early implementation of § 668.55(c) because students are adversely affected by the current regulations.

*Discussion:* We agree that mid-year verification updates to household size and number in college and dependency status updates would be burdensome to institutions if they resulted from a change in a student's marital status. Accordingly, we have revised § 668.55(a) to provide that if an applicant's dependency status changes at any time during the award year, the applicant must update his or her FAFSA information, except when the dependency status change is due to a change in the applicant's marital status. Also, to reduce burden to

institutions with regard to updating information, in § 668.55(b)(2), we specify that an applicant is not required to provide documentation of household size, number in college, or the financial data of an applicant's spouse during a subsequent verification of these data items if the information has not changed. However, new paragraph (c) of this section would allow the institution, at its discretion, to require an applicant to update the applicant's marital status, even if it results in a change in the applicant's dependency status, if the institution determines the update is necessary to address an inequity or to reflect more accurately the applicant's ability to pay.

In response to the comments about establishing cut-off dates for making updates, we note that under the revised provisions, an institution that decides to have marital status updated pursuant to § 668.55(c) may also incorporate in its policy a cut-off date after which it will not consider any updates to a student's marital status.

*Changes:* We have revised § 668.55(a) to provide that if any of the factors that impact an applicant's dependency status changes at any time during the award year, the applicant must update his or her FAFSA information, except if the item is the applicant's marital status.

Paragraph (b) of § 668.55 has been revised to provide that an applicant who is selected for verification of his or her household size or number in college must update those items to be correct as of the date of verification, except when the update is due to a change in the applicant's marital status. As revised, § 668.55(b)(2) also provides that an applicant is not required to provide documentation of household size or number in college during a subsequent verification for the same award year of either item if the information has not changed. Finally, paragraph (c) of § 668.55 provides that an institution may, at its discretion, update an applicant's marital status, even if the update will result in a change in the applicant's dependency status if the institution determines the update is necessary to address an inequity or to reflect more accurately the applicant's ability to pay.

*Comment:* One commenter asked whether, when a student's marital status is updated, the student must have his or her spouse's income reported to the CPS for recalculation of the student's EFC. Another commenter requested that the Department clarify how to treat income in cases when the student marries or divorces, regardless of whether verification was performed. A third commenter wondered why the household size and number in college items are updated while

the income and assets items are not updated for new family members (*e.g.,* the stepparent of a dependent student or the spouse of an independent student).

*Discussion:* As we stated earlier in this preamble, we have revised § 668.55 to provide that there is no updating of an applicant's dependency status based on a change in marital status except at the discretion of an FAA. In such cases where an FAA chooses to update a student's dependency status as a result of a change in the student's marital status regardless of whether the student is being verified, all of the information must be consistent with the change to the marital status. This includes income (either adding the spouse's income or deducting a former spouse's income) as well as household size and number in college. Note, however, that the revised regulations do not allow for updating when an otherwise independent student marries or divorces, *i.e.,* there is no change in dependency status and the student is not selected for verification.

During verification, household size and number in college are updated, but the income and assets of new family members are not typically includable items on the FAFSA; for example, the income or assets of a grandparent who comes to live in the dependent student's family would not be includable. Moreover, section 475(f)(3) of the HEA excludes a stepparent's income and assets from being reported on the ☐ FAFSA when a dependent student's parent remarries after the FAFSA was submitted, though we have stated for several years in the Application and Verification Guide that an institution may use professional judgment to include the stepparent's financial information.

*Changes:* As noted earlier in this discussion, we have revised § 668.55 to provide that applicants are not required to update their household size, number in college, and dependency status when the update is needed as a result of a change in the student's marital status, unless the institution chooses to update those items. When the institution determines that updates are required as a result of a change in a student's marital status, the student's FAFSA information needs to reflect the accurate household size, number in college, dependency status, and the spouse's financial information.

*Comment:* Some commenters questioned whether, when completing the FAFSA, students could project their marital status. One commenter argued that students should not be able to project marital status as they project household size based on unborn children.

*Discussion:* Because projected marital status is prone to error, applicants may not project their marital status when completing the FAFSA.

*Changes:* None.

*Comment:* A few commenters asked whether the student or the institution is responsible for updating information that impacts dependency status.

*Discussion:* Students and institutions both are able to update information that impacts an applicant's dependency status. Students can use FAFSA Corrections on the Web (COTW) or a paper SAR to submit updates. Institutions can use FAA Access to CPS Online or other Departmental electronic processes to submit updates on the student's behalf.

*Changes:* None.

*Comment:* One commenter asked us to clarify whether an institution must process a change in dependency status if a student is no longer enrolled at the institution.

*Discussion:* An institution is not required to process a change in an applicant's dependency status if the student does not enroll or is no longer enrolled at the institution. However, if the student subsequently enrolls or reenrolls for the award year, required updates must be made.

*Changes:* None.

## Information To Be Verified (§ 668.56)

Back to Top

*Comment:* Several commenters expressed concern that even though the number of items to be verified under the new targeted approach reflected in § 668.56 will be reduced, the new approach will not alleviate the burden on the applicant or the institution because the institution must still identify and resolve discrepancies in the information the institution receives from different sources pursuant to § 668.16(f). For example, if a student were selected to verify AGI or untaxed IRA income, and the documentation for that is the tax return, the institution will need to check the other data on the tax return to ensure there are no conflicts with what was reported on the FAFSA. One of these commenters stated that it will continue to require full verification of all data items and to collect all documentation unless the applicant uses the IRS Data Retrieval Process. Another commenter suggested that relaxing the requirement to resolve discrepancies in information under § 668.16(f) would be a reasonable solution if the Department is using historical data that supports targeting specific data elements.

*Discussion:* Under § 668.16(f), an institution is required to resolve discrepancies in the information it receives from different sources with respect to a student's application for financial aid under the title IV, HEA programs. Therefore, conflicting information between the FAFSA information and other information at the institution must be resolved, and these regulations under subpart E do not change this. We have no reason to believe that the new approach to selecting items for verification will increase instances of conflicting information since any such conflicts would occur under the current regulations where every applicant selected for verification must verify information from a tax return.

*Changes:* None.

*Comment:* Some commenters disagreed with the proposed targeted approach to select items to be verified reflected in § 668.56 because they predicted that it would add to the burden of institutions. One commenter stated that having verifiable items different from the current five would require institutions to modify their automated correspondence and other processes. This would result in the use of more paper at a time when institutions are trying to reduce their carbon footprint.

*Discussion:* While a change in the number and type of verifiable items will require some work by financial aid offices, we believe that there should not necessarily be an increase in paper use and that once systems are automated, any additional administrative burden should be minimized. In fact, the use of the IRS Data Retrieval Process will reduce the amount of FAFSA information that institutions are required to verify and decrease the documentation an institution must collect and maintain. We believe the benefits to institutions and to students as a result of this process justify any extra work that institutions and students will experience in the short term.

As explained earlier in this preamble, we are delaying the effective date for the changes to subpart E of part 668 until July 1, 2012, the 2012-13 award year. This will allow more time for institutions to prepare.

*Changes:* None.

*Comment:* Various commenters observed that because the items for verification will be unpredictable, institutions will not be able to inform applicants and parents before receiving the ISIR what documentation will be required for verification. Commenters requested that the Department provide the expected date for publishing the set of verifiable items in the **Federal Register** in advance so that institutions have time to implement any changes in the items to be verified.

Commenters requested advance notice as late as mid-December to as early as 5 or 6 months prior to the beginning of the application cycle each January. Commenters stated that institutions will have difficulties setting up complicated systems and training aid administrators and other staff to comply with the changes reflected in the new approach to verification, especially given limited resources on so many campuses. One commenter asked the Department to set a maximum number of items that can be selected for verification each year. Some commenters suggested having multi-year sets of verification items, rather than different ones each year, to expedite the verification process and to allow institutions time to plan. One commenter asked that each year the Department obtain public comment on the selection criteria the Department will use to select items for verification. One commenter asked how institutions would verify applicants' FAFSAs consistently for the overlap of two processing years. Another commenter asked that the new regulations be delayed until the IRS Data Retrieval Process is fully implemented, while another commenter asked for a safe harbor period during crossover periods when institutions can use the old ☐ verification criteria, or adopt early the new criteria.

*Discussion:* While institutions will need to wait for the receipt of the ISIR before requesting specific verification documentation from applicants, we do not envision that this will substantially delay the time required for applicants to complete verification. During the early years of implementation of the targeted approach to verification, there will be stability in the FAFSA information the Secretary selects from year to year. For example, we would retain the five items included in the current regulations and supplement them as needed. However, it is unlikely that an applicant would have to verify all five data elements.

We will publish in the **Federal Register** the set of potential verification items the Department intends to verify for an upcoming award year four to six months prior to the start of the application processing year (January 1, 2012 for the 2012-13 award year) to give institutions time to modify their systems. The maximum number of items that could be selected for verification in any given year is the entire list of items we plan to publish in the **Federal Register** notice for that year. Because the selection of verification items for a particular award year will be based upon a sophisticated statistical analysis of prior year and other relevant data, we do not anticipate the **Federal Register** notice providing multi-year selection criteria, nor, for the same reason, do we intend to solicit public comments on the verification items we select.

To verify an applicant's FAFSA information that overlaps two processing years, the institution must determine which award year's EFC will be used and apply the verification criteria established for that award year.

*Changes:* None.

*Comment:* Various commenters expressed concern that the new approach for targeting items for verification will unfairly affect traditionally black, community, and career colleges. One commenter requested that we not use the verification process to target low-income demographic groups and that we consider some kind of relief for these groups regarding discrepancies in information under § 668.16(f). Another commenter questioned whether the new approach for targeting items for verification could be seen as a means of profiling applicants.

*Discussion:* Historically the Department has used verification to focus on those FAFSAs that are likely to include errors that will result in incorrect awards. It is not our intent to single out any demographic population or a particular type of institution; rather, our goal is to continue to select for verification FAFSA information that most likely needs to be corrected.

As stated earlier, § 668.16(f) requires an institution to resolve discrepancies in the information it receives from different sources and these regulations under subpart E will not change this requirement.

*Changes:* None.

*Comment:* One commenter asked if verification should be required when a student appeals for a professional judgment change to the cost of attendance.

*Discussion:* We do not plan to add to the list of verification exclusions in § 668.54(b) students who request a professional judgment change.

*Changes:* None.

*Comment:* Several commenters stated that an exclusion from verification could be granted when the student or parent used the IRS Data Retrieval Process to supply income and tax data on the FAFSA.

*Discussion:* Section 668.57(a)(2) of the new regulations codifies our determination that in instances when an applicant or parent is required to have his or her AGI, taxes paid, or income earned from work verified, the institution may consider as acceptable documentation the information

reported by the student on the FAFSA and reported to the institution on the ISIR if the Secretary has identified those items as having come from the IRS and as having not been changed. The Secretary will so indicate by a flag on the ISIR that the information came directly from the IRS and was not changed. There will be separate flags for the student's information and, if applicable, for the parents' information.

*Changes:* None.

*Comment:* One commenter expressed concern that students will be confused and will miss the verification information on their SAR. The commenter stated that the verification worksheet will not work anymore because not all items will be used for each student and asked if institutions will need to develop their own interchangeable forms that will list only those items an applicant or parent must verify.

*Discussion:* Institutions have always been able and will continue to be able to develop and use their own verification worksheets as long as it captures the essential verification items. Institutions could create a single form with all the verification criteria for the coming award year and select for each student the pertinent items, or they could modify their form so that each student receives an individualized request for documentation. We will work with the community to determine if there still is a need for a Department-developed verification worksheet, and, if so, how it should be formatted.

*Changes:* None.

*Comment:* One organization requested that we create unique codes on the ISIR that correspond with each verification item so that institutions can automate their correspondence with applicants and other processes. Another commenter suggested that comments included on the SAR should be expanded to assist the applicant in sending the documentation to verify the specific items selected for verification to the institution he or she is seeking to attend.

*Discussion:* As suggested by the commenters, we will include on each applicant's ISIR item specific flags that will indicate which items need to be verified. We will also provide notification to the applicant on the Student Aid Report (SAR) of the need to have information verified.

*Changes:* None.

*Comment:* One commenter asked that the Department be responsible for completing verification and that the Department report to institutions when an applicant's aid can be disbursed.

*Discussion:* The commenter's request has been suggested before, and we have determined that most institutions are not interested in the Department performing verification and would, notwithstanding the workload, prefer to work with students directly.

*Changes:* None.

**Acceptable Documentation (§ 668.57(a)(2), (a)(4) (ii)(A), (a)(5), (a)(7), and (d))**

Back to Top

*Comment:* One commenter suggested that, for applicants and parents who have not filed their taxes prior to filling out the FAFSA and who indicate that they will be filing, the CPS should automatically draw down the IRS data and send a reprocessed ISIR, once the applicant files the required tax returns. A commenter noted that the IRS Data Retrieval Process would not benefit applicants and their families who complete the FAFSA (using estimated income) prior to completing their Federal income tax return in order to meet various State aid deadlines. One commenter asked whether data retrieved from the IRS can be used to make corrections to a FAFSA if the IRS Data Retrieval Process was not used to complete the original FAFSA. In this situation, the commenter asked whether the corrected data would be considered verified.

*Discussion:* Under our current agreement with the IRS, only the tax filer, at the time he or she is completing the FAFSA or, starting in 2011-12, at the time he or she is making corrections, can request that IRS tax information be displayed and only the tax filer can choose to have that information imported into the applicant's FAFSA for initial filings or into the CPS record for corrections. However, working with the IRS we have been able to mitigate (although not eliminate) the inherent calendar conflicts between the beginning of a FAFSA processing year in January, the many State and institutional deadlines occurring as early as February, and the IRS tax return filing timelines. Beginning with the 2011-12 processing year, the IRS plans to provide applicants and their families with FAFSA on the Web access to tax return information within approximately 10 days of the return's filing date if the return was filed electronically and within two weeks if a paper return was filed. Also, beginning with the 2011-12 FAFSA processing year, applicants and parents will be able to access IRS tax return information using the FAFSA COTW process. Thus, many applicants, who, because of their original FAFSA filing date (or for any reason), did not use the IRS Data Retrieval Process when they originally completed the FAFSA will be able to use the process to "correct" the original FAFSA information. Like applicants who use the IRS Data Retrieval Process when originally

completing the FAFSA, if applicants and parents use the FAFSA COTW process to import IRS data on the FAFSA, the institution may consider that data as acceptable documentation in accordance with § 668.57(a)(2) if that data was not changed. As mentioned earlier, an applicant's ISIR will indicate that the information came directly from the IRS and was not changed.

*Changes:* None.

*Comment:* Several commenters supported the IRS Data Retrieval Process, which will allow applicants and their families to import data obtained from the IRS to populate an applicant's online FAFSA. Many commenters agreed that this process will reduce an institution's burden and help expedite the financial aid process by not requiring verification of IRS imported data; however, one commenter argued that it would be more appropriate to eliminate FAFSAs populated with IRS data through the IRS Data Retrieval Process entirely from verification.

*Discussion:* The Department appreciates the commenters' support. We do not agree that individuals who retrieve income and tax data from the IRS should be exempt from the verification process because not all FAFSA information can be imported from the IRS database and an applicant's FAFSA may be selected for verification as a result of a data item that cannot be retrieved from the IRS. However, as discussed earlier in this preamble, an institution may consider as acceptable documentation IRS retrieved information if the Secretary has identified those items as having come from the IRS and not having been changed. We are exploring a process that would automatically exclude from verification FAFSA items that came from the IRS and were not changed.

*Changes:* Section 668.57(a)(2) has been revised to clarify that an institution may use IRS transferred data as acceptable documentation for verification purposes if it is limited to the IRS data that was transferred for the specific award year, and the Secretary has identified the data as having been obtained from the IRS and not having been changed.

*Comment:* One commenter questioned whether applicants should be allowed to use data from the second processing tax year because that data may not accurately reflect a student's or parent's current income. The commenter asserted that the use of these data may cause confusion when completing the FAFSA and that this, in turn, will increase burden on institutions, which will be responsible for responding to increased requests for professional judgment reviews.

Another commenter pointed out that using data from the second processing tax year would not benefit some California Community Colleges that have a high population of families who have experienced job losses.

*Discussion:* Section 480(a) of the HEA gives the Secretary the option of using income and other data from the second preceding tax year to calculate an applicant's EFC. While the Department does not plan to exercise this option at this time, we believe it is appropriate to include this provision in the regulations to allow for this flexibility in the future.

We are revising § 668.57(a)(1)(i), (a)(1)(ii), (a)(1)(iii) to make conforming changes consistent with other paragraphs under this section that clarify the specific year that the documentation provided for under this section must be submitted to the institution.

*Changes:* Section 668.57 has been revised in paragraphs (a)(1) (i), (a)(1)(ii), (a)(1)(iii), and (a)(2) to add the phrase "for the specified year" as defined under § 668.52.

*Comment:* We received a number of comments expressing concern regarding the operational aspect of the IRS Data Retrieval Process. For instance, a few commenters were unclear if an applicant, whose marital status has changed since filing an income tax return, could use the IRS Data Retrieval Process to import only his or her data from an income tax return filed jointly. Another commenter asked if the appropriate fields from a married couple's separately filed tax return would be added together before the data are imported into an online FAFSA.

*Discussion:* For the reasons noted by the commenters, the IRS Data Retrieval Process has not and will not be offered to an applicant (or parent) whose marital status changed after the end of the tax year. Also, because the current configuration of the IRS Data Retrieval Process cannot access both tax returns when a married applicant or the married parents of a dependent student filed separately (IRS Filing Status of "Married Filing Separately), our FAFSA on the Web instructions advise such tax filers not to use the IRS Data Retrieval Process. Similarly the IRS Data Retrieval Process cannot extract the income of one individual that filed jointly. We are working with the IRS to find a resolution to this issue. In the meantime, if an institution is aware that such individuals did use the IRS Data Retrieval Process the institution must collect tax return information from the other spouse.

*Changes:* None.

*Comment:* One commenter noted that most Pell-eligible applicants would not benefit from the IRS Data Retrieval Process since they are not required to file a Federal tax return because they do not earn enough. Therefore, this commenter argued that these applicants and the institutions that serve them would not experience the reduction in burden the IRS Data Retrieval Process is expected to provide.

*Discussion:* The commenter is correct.

*Changes:* None.

*Comment:* One commenter requested guidance on the level of knowledge FAAs are expected to have regarding tax filing requirements. Specifically, the commenter expressed concern that FAAs may not have the knowledge necessary to ensure that applicants are filing their tax returns under the correct tax filing status (*i.e.,* single, married filing jointly, married filing separately, and head of household).

*Discussion:* We do not expect FAAs to be experts in IRS and tax filing requirements. However, FAAs are ☐ expected to have a basic understanding of relevant tax issues that can considerably affect an applicant's eligibility. We expect FAAs to be able to ascertain whether an applicant or his or her family members identified on the applicant's FAFSA were required to file a tax return, what the correct filing status for the applicant should be, and that an individual cannot be claimed as an exemption by more than one person.

*Changes:* None.

*Comment:* One commenter asked for clarification on whether institutions have the authority to require an individual who is required to file a U.S. tax return but who has been granted a filing extension by the IRS to submit tax documents before proceeding with verification. Another commenter asked why the Department would not require the actual tax return filed with the IRS to be used to complete verification for a student or parent that files a tax extension. This commenter stated that a student should not receive any aid until verification is completed using the actual tax return (not the documentation provided under § 668.57(a)(4)(ii)). Another commenter supported the requirement that an applicant who is granted an extension to file his or her income tax return must submit a copy of the return that was filed, and the institution must re-verify the AGI and taxes paid by the applicant and his or her spouse or parents.

*Discussion:* Section 668.57(a)(4)(ii)(A) provides that an institution must accept a copy of IRS Form 4868, "Application

for Automatic Extension of Time to File U.S. Individual Income Tax Return," that was filed with the IRS or a copy of the IRS's approval for an extension beyond the automatic six-month extension as acceptable documentation to verify an applicant's FAFSA information for an applicant that has been granted a tax filing extension. An institution may request a copy of the tax return once filed, but it may not delay verifying an applicant's FAFSA information until the tax return is received if the applicant provides the documentation approved by the Secretary under § 668.57.

The Department does not require an applicant that has been granted a tax extension to submit the actual tax return filed with the IRS because of the extended period of time that may elapse before the applicant actually files the return. This would delay the applicant's aid, which we believe would be inappropriate. We believe the income information collected on IRS Form 4868 and IRS Form W-2 should be sufficient documentation to verify the AGI, income earned from work, or U.S. taxes paid if those items are selected for verification. However, the regulations do provide that the institution may require the applicant to submit the actual tax return that was filed with the IRS. If the institution receives a copy of the return, it must reverify the AGI and taxes paid by the applicant and his or her spouse or parents.

We believe clarification is needed for the one commenter who appeared to interpret § 668.57(a)(5) to mean that in all cases applicants who are granted a tax extension must submit the actual tax return once it is filed, and that the institution must reverify the AGI and taxes paid by the applicant and his or her spouse or parents once it receives the filed return. An applicant who files an extension is only required to provide a copy of the tax return that was filed if the institution requires a copy. Only if the institution requires the applicant to submit the tax return that was filed would the institution be required to reverify the AGI and taxes paid by the applicant and his or her spouse or parents. This differs from what occurs under the current regulations. Under the current regulations, if an institution required an applicant who was granted a tax filing extension to submit the return to the institution once it was filed, the institution could decide whether or not to reverify the AGI and taxes paid by the applicant and his or her spouse or parents.

*Changes:* None.

*Comment:* None.

*Discussion:* We are making a technical change to § 668.57(a)

(4)(iii)(B) to clarify that an individual who is self-employed or who has filed an income tax return with a foreign government must provide a signed statement that certifies the amount of taxes paid in addition to his or her AGI.

*Changes:* Section 668.57(a)(4)(iii)(B) has been revised to provide that an institution must accept a written certification of the amount of taxes paid for an individual who is self-employed or has filed an income tax return with a foreign government.

*Comment:* One commenter sought clarification on § 668.57(a)(7), which provides that an institution may accept in lieu of a copy of an income tax return signed by the filer of the return or one of the filers of a joint return, a copy of the filer's return that includes the preparer's Social Security Number, Employer Identification Number or the Preparer Tax Identification Number and has been signed by the preparer of the return or stamped with the name and address of the preparer of the return. The commenter asked whether it would be acceptable for the preparer to write or type his or her name on a filer's tax return. The commenter noted that guidance in the 2010-11 Application and Verification Guide is much broader, as it allows the preparer to stamp, type, sign, or print his or her name on a filer's tax return.

*Discussion:* We agree with the commenter and have revised § 668.57(a)(7) to expand the options a tax preparer has for being identified on an applicant's tax return to make it consistent with the guidance provided in the 2010-11 Application and Verification Guide.

*Changes:* We have revised § 668.57(a)(7) to provide that in addition to having the preparer's signature or stamp on a filer's tax return, the institution may accept a paper return on which the tax preparer has typed or printed his or her own name.

**Interim Disbursements (§ 668.58(a)(3))**

Back to Top

*Comment:* Some commenters supported § 668.58(a)(3), which allows an institution to make an interim disbursement prior to receiving the reprocessed SAR or ISIR if, after verification, the institution determines that changes to the applicant's information will not change the amount the applicant would receive under a title IV, HEA program and the requirement in § 668.59(a) that requires institutions to submit all corrections to the Department for reprocessing. One commenter did not support allowing an institution to disburse aid to a student before the student's corrected FAFSA information has been submitted and the institution receives a reprocessed SAR or

ISIR.

*Discussion:* The Department appreciates the commenters' support and notes that interim disbursements are optional, not required.

*Changes:* None.

*Comment:* One commenter stated that because all corrections must be submitted to the Department under § 668.59(a), there is no need to allow interim disbursements. This commenter recommended that we remove from the regulations all provisions related to interim disbursements.

*Discussion:* We believe it is important to continue to give institutions the flexibility to determine whether to make interim disbursements to individual applicants prior to the completion of verification to alleviate a hardship a student may experience if there is a delay in receiving his or her financial aid. And, as noted earlier, interim disbursements are optional, not required.

*Changes:* None. ☐

*Comment:* One commenter indicated that there is a problem with the cross-references in proposed § 668.58. The same commenter also expressed concern that this provision does not make clear how interim disbursements for the FWS Program are treated if the student after working is determined to have an overpayment.

*Discussion:* We agree with the commenter that there are problems with the cross-references for interim disbursements in proposed § 668.58. Specifically, we believe that in § 668.58(a)(1) and (a)(3)(i), we need to clarify that corrections to the student's FAFSA information must be made in accordance with § 668.59(a). In addition, in proposed § 668.58(b) we had an erroneous cross-reference for the interim disbursements made under the FWS Program. Proposed § 668.58(b) also did not cross-reference each type of interim disbursement that is allowed under certain conditions, either before verification is completed or after verification is completed but before the institution has received the valid SAR or valid ISIR reflecting the corrections. For clarity, we believe it is appropriate to revise § 668.58(b) so that it addresses each type of interim disbursement. Further, we believe that specific cross-references to § 668.61 need to be added to § 668.58(b) to clarify how institutions must handle any overpayments that occur because of an interim disbursement such as under the FWS Program.

*Changes:* We have revised § 668.58(a)(1) and (a)(3)(i) by

clarifying that corrections to a student's FAFSA information must be made in accordance with § 668.59(a). In addition, we have revised § 668.58(b) to correctly and completely cross-reference each type of interim disbursement that is allowed. Further, we have revised § 668.58(b) to explain, with more specificity, how institutions must handle the recovery of each type of overpayment due to an interim disbursement, including those made for the FWS Program. We also added specific cross-references to § 668.61 in § 668.58(b) to provide clarity to institutions on handling the recovery of any overpayments that may occur because of an interim disbursement.

## Consequences of a Change in an Applicant's FAFSA Information (§ 668.59)

Back to Top

*Comment:* A number of commenters agreed with the proposal to remove the $400 tolerance reflected in current § 668.59(a) and, instead, to require all changes to an applicant's FAFSA information be reported to the Department for reprocessing to ensure a student's award is based on accurate information.

Several other commenters objected to the proposal to remove the dollar tolerance because they believed it would increase administrative burden, particularly for larger institutions, and would delay payments to students. One commenter noted that the current tolerance allows FAAs to use their own judgment to determine when it was necessary to reprocess corrections that have minimal impact on student eligibility.

One commenter noted that removing the $400 tolerance will not be a problem for institutions but, like many other commenters, opposed requiring all changes to an applicant's FAFSA information to be submitted to the Department for reprocessing. The commenter expressed concern about this requirement, especially when the student's eligibility either would not be affected or where there were minor errors, *i.e.,* an AGI was off by $1. One commenter recommended that the Department consider providing institutions with some administrative relief in this area, given that institutions will need to implement several other changes as a result of the issuance of these verification regulations. Many commenters recommended that the Department retain the current $400 tolerance or allow for a reasonable tolerance of a modest sum to allow for minor errors made by applicants and their families.

*Discussion:* We appreciate the concerns raised by commenters and acknowledge the burden associated with having to submit all changes to an applicant's FAFSA information to the Department for reprocessing. While our goal is to obtain the most accurate data available to help in our efforts to identify

error-prone applications, we agree that the regulations should provide a means for dealing with minor errors in financial information reported on an applicant's FAFSA information without requiring that these minor changes be submitted to the Department for reprocessing. While we do not agree that it is appropriate to retain the $400 tolerance from current § 668.59(a), we are revising § 668.59 to address minor errors in financial information so that institutions need not submit changes resulting from these types of errors to the Department for reprocessing. It is important to note, however, that institutions will still be required to submit all errors in nonfinancial information to the Department for reprocessing.

Specifically, we have revised § 668.59(a) to require institutions to submit, for reprocessing, any change to an individual data element on an applicant's FAFSA that is $25 or more. For example if the difference reported for AGI is $24, and taxes paid is $20, the institution would not be required to submit changes to the Department for reprocessing. However, if the difference for AGI is $25, and $20 for taxes paid, the institution would be required to update all changes, not just the change that exceeded the tolerance.

We also made conforming changes in § 668.164(g)(2)(i) to reflect that any dependent student, whose parent is applying for a Direct PLUS Loan must complete a FAFSA in accordance with section 483 of the HEA in order to obtain a SAR or ISIR with an official EFC to meet the conditions for a late disbursement.

In addition we have amended § 668.164(g)(4)(iv) to reflect the changes that were made under § 668.59(a) that require all changes to an applicant's FAFSA information be submitted to the CPS System for correction, except financial data that is less than $25. Therefore, an institution may not make a late disbursement of any title IV, HEA assistance until it obtains a valid SAR or valid ISIR.

*Changes:* We have revised § 668.59(a) to provide that if an applicant's FAFSA information changes as a result of verification, the applicant or the institution must submit to the Secretary any change to a nondollar item on the FAFSA and any change to a dollar item on the FAFSA if the change to that dollar item is $25 or more.

We have revised § 668.164(g)(2)(i) to require an applicant whose parent is applying for a Direct PLUS loan to have a SAR or ISIR with an official EFC to meet the conditions for a late disbursement.

We have also revised § 668.164(g)(4)(iv) to provide that an

institution may not make a late disbursement of any title IV, HEA program assistance unless it receives a valid SAR or valid ISIR for the student by the deadline date established by the Secretary in a **Federal Register** notice.

*Comment:* One commenter stated that it is not opposed to requiring that institutions submit all corrections to CPS but expressed concern with the increased number of applicants selected for verification when there is a change to a school code or address.

*Discussion:* It is true that, in a limited number of instances, verification could be triggered when an applicant makes a correction to his or her address or to a school code. This is because the ☐ statistical analysis that determines whether an applicant's record or a particular item should be verified due to the likelihood of error includes factors beyond those that are used to calculate the EFC. We do not believe that the number of these instances will be significant.

*Changes:* None.

*Comment:* One commenter indicated that the proposed regulations are confusing with respect to the handling of overpayments due to interim disbursements made after an applicant had been selected for verification, and the handling of overpayments due to disbursements made before an applicant was selected for verification.

*Discussion:* We agree with the commenter that proposed § 668.59(b), (c), and (d) may be confusing because these paragraphs do not clearly state how institutions must handle an overpayment that is the result of interim disbursements made after the applicant is selected for verification. Further, proposed § 668.59(b), (c), and (d) may also be confusing because these paragraphs do not clearly state how institutions must handle an overpayment that is the result of a disbursement that is made before the applicant is selected for verification but that is later discovered to be an overpayment. While proposed § 668.59(b), (c), and (d) was intended to describe how to handle an overpayment in both of these situations if the applicant is receiving aid under the subsidized student financial assistance programs, we believe that further changes are needed so that this section clearly states that an institution must comply with both the procedures in § 668.61 for an interim disbursement that is determined later to be an overpayment, and the appropriate overpayment requirements in the applicable program regulations for overpayments discovered during verification that were due to disbursements made prior to a student being selected for verification.

*Changes:* We have revised § 668.59(b), which covers the consequences of a change in an applicant's FAFSA information as the result of verification for the Federal Pell Grant Program, to provide that for purposes of the Federal Pell Grant Program the institution must follow the procedures in § 668.61 for handling overpayments due to interim disbursements, and the procedures in § 690.79 for overpayments that are not the result of interim disbursements.

We have also revised § 668.59(c), which covers the consequences of a change in an applicant's FAFSA information as the result of verification for the subsidized student financial assistance programs, excluding the Federal Pell Grant Program. Section 668.59(c) also covers the Direct Subsidized Loan Program that was handled originally in proposed § 668.59(d). As revised, § 668.59(c) now provides that the institution must follow the procedures in § 668.61 for handling overpayments due to interim disbursements, including for the FWS Program. Further, § 668.59(c) now provides that the institution must follow the procedures in § 673.5(f) for handling overpayments that are not the result of interim disbursements under the Federal Perkins Loan or FSEOG programs. Finally, we have revised § 668.59(c) to also provide that the institution must follow the procedures in § 685.303(e) for handling overpayments that are not the result of interim disbursements under the Direct Subsidized Loan Program.

The content in § 668.59(d) has been incorporated into paragraph § 668.59(c).

## Deadlines for Submitting Documentation and the Consequences of Failing To Provide Documentation (§ 668.60(c)(1))

Back to Top

*Comment:* Two commenters concurred with the provision under proposed § 668.60(c)(1) that allows a student who completes verification while the student is no longer enrolled to be paid based on the valid SAR or valid ISIR. These commenters stated that this approach was preferable to current § 668.60(c)(1), which provides that the student is paid based on the higher of the two EFCs if the student submits a valid SAR or valid ISIR while the student is no longer enrolled. Under that approach, the student would receive the lesser amount of a Federal Pell Grant.

*Discussion:* We appreciate the commenters' support.

*Changes:* None.

*Comment:* One commenter encouraged the Department to allow institutions to implement § 668.60(c)(1) prior to the 2011-12 award year.

*Discussion:* While we appreciate the commenter's desire to

implement this provision prior to the 2011-12 award year, we believe that allowing early implementation would interfere with policies already in place for the 2010-11 award year, and how that may impact aid already disbursed, *i.e.,* how to account for aid disbursed for a summer term that was assigned to the prior award year. As noted earlier in this preamble, the changes to subpart E of part 668, including § 668.60, will become effective on July 1, 2012, so that it will be implemented beginning with the 2012-13 award year and forward.

*Changes:* None.

## Recovery of Funds (§ 668.61)

Back to Top

*Comment:* One commenter supported the proposed changes to § 668.61. Another commenter noted that § 668.61 should only address recovery of funds in the event of overpayments resulting from interim disbursements—not overpayments that are not the result of interim disbursements. This commenter indicated that this section also contains erroneous cross-references. In addition, this commenter stated that this section should provide information on how to treat overpayments made under the FWS Program as interim disbursements because the student must be paid for all hours worked.

*Discussion:* Section 668.61 is about handling the recovery of overpayments due to interim disbursements. The recovery of overpayments that are not the result of interim disbursements, including overpayments that result from disbursements made before an applicant was selected for verification and later after selection for verification the applicant's SAR and ISIR must be corrected, are addressed by the appropriate overpayment requirements in the applicable program regulations. We agree with the commenter that some of the cross-references in proposed § 668.61 need to be corrected.

We also agree with the commenter that it would be helpful for § 668.61 to provide details on how to handle the recovery of overpayments that occur from interim disbursements for students employed under the FWS Program. Under § 668.58(a)(2)(ii), an institution is allowed to employ an applicant under the FWS Program for the first 60 consecutive days after the student's enrollment in that award year prior to verification, if the institution does not have reason to believe that an applicant's FAFSA information is inaccurate. If an FWS overpayment occurs due to this interim disbursement, the institution must follow the procedures in § 668.61(b). We have revised § 668.61(b) to clarify that the institution must attempt to adjust the applicant's other financial aid to eliminate the overpayment due to an interim disbursement

under the FWS Program. This revised § 668.61(b) provides that, if the institution is unable to eliminate the overpayment by adjusting the applicant's other financial aid, the institution must reimburse the FWS Program account by making restitution from its own funds. The applicant must still be paid for all work performed under the Federal labor laws. ☐ Because the applicant was employed, the applicant must be placed on the institution's own payroll account and all required employer contributions for social security, workers' compensation, or any other welfare or insurance program, must still be paid by the institution because this applicant was an employee.

In addition, the institution is allowed under § 668.58(a)(3) to employ a student under the FWS Program for the first 60 consecutive days prior to receiving the corrected valid SAR or valid ISIR if, after verification, it determines that an applicant's information will not change the amount that the applicant would receive under that program. In § 668.61(c), we require that if an FWS overpayment occurs because the institution does not receive the valid SAR or valid ISIR reflecting corrections within the established deadline dates, the institution must reimburse the FWS Program account by making restitution from its own funds. In § 668.61(c), we clarify that the student must still be paid for all work performed under the institution's own payroll account and the institution must still handle all employer requirements.

*Changes:* We have revised § 668.61, including the section heading, to clarify that this section is about handling overpayments due to interim disbursements made under § 668.58. We have also corrected the cross-references in this section. In addition, we have revised § 668.61(b) to provide specific procedures for recovering funds from any FWS overpayment that results from an interim disbursement made before verification is completed. We have revised § 668.61(c) that describes the procedures for handling overpayments due to an allowable interim disbursement of subsidized student financial assistance, including any disbursement from FWS employment, before the institution receives the valid SAR or valid ISIR reflecting the corrections. Section 668.61(c) now makes it clear that the applicant must still be paid for all work performed under the institution's own payroll account.

**Misrepresentation (Subpart F—§§ 668.71 Through 668.75)**

Back to Top

## General

*Comment:* A significant number of commenters generally or fundamentally supported the proposed regulations in subpart F of part 668. Several commenters stated that the proposed

regulations on misrepresentation reflect an excellent, much-needed improvement over current regulatory language and that they will significantly enhance the Department's ability to address deceptive practices that compromise the ability of students to make informed choices about institutions and the expenditure of their resources on higher education. One commenter agreed, in particular, with proposed §§ 668.72 and 668.73, which ensure that all students have access and transparent information about their educational program and its cost. This commenter noted that accurate disclosures are needed in order to protect students, especially in light of the many documented instances in which students have had their expectations regarding postsecondary education outcomes (*e.g.*, completed degrees, good jobs and high salaries) not met with success but with failure and mountains of debt instead. One commenter stated that the proposed regulations on misrepresentation provide additional protections against misleading and overly aggressive advertising and marketing tactics. Another commenter strongly supported the proposals and stated that integrity in how institutions present themselves is key to ensuring students are not victims of false promises or misunderstanding when making a decision about higher education. Finally, we received many comments that supported the Department's mission of helping students make sound decisions and maintaining the integrity of the title IV, HEA programs but expressed concern about some of the specific language.

*Discussion:* We appreciate the commenters' support. We address the comments and concerns on specific language in the relevant sections that follow.

*Changes:* None.

*Comment:* Many commenters strenuously opposed the proposed revisions to the misrepresentation regulations in subpart F of part 668. Some commenters argued that, because misrepresentation is an issue more appropriately addressed by the Federal Trade Commission (FTC), the Department should have adopted in these regulations the language from the FTC guidelines so that those guidelines would be applicable to all institutions participating in the title IV, HEA programs. These commenters noted that for-profit institutions are already subject to the FTC guidelines and that the results of that guidance have served their students well and that other sectors of higher education should be subject to the FTC guidelines as well.

Several commenters stated that students would be confused by the proposed regulations dealing with misrepresentation.

Specifically, the commenters expressed concern that because institutions disclose information to many parties, including accrediting agencies, the Department, current and prospective students, and the general public, information required to be disclosed under the title IV, HEA program regulations is complex and not always easy to understand. Therefore, the commenters argued that students will not be able to make informed decisions about which institution to attend because, under the title IV, HEA program regulations, they will be provided different statistics and will have difficulty understanding them.

One commenter expressed concern that while the education community is in need of clear guidance on ethical practices and the proposed regulations are well-intended, they are too vague and subjective. A few commenters urged the Department not to adopt the proposed regulations as final unless they are significantly clarified.

Finally, one group of commenters stated that the proposed changes to subpart F of part 668 are unfair to for-profit schools. Some commenters appeared to believe that the revisions reflected in proposed subpart F of part 668 would only apply to for-profit schools.

*Discussion:* During the negotiations that were held during the months of November 2009 through January 2010, we discussed whether to adopt the FTC guidelines in our misrepresentation regulations. Some non-Federal negotiators strongly opposed adopting the FTC guidelines in the Department's regulations because doing so, they argued, would be duplicative and heavy-handed.

The FTC only has jurisdiction over for-profit entities, and those entities are already subject to the FTC guidelines. The FTC guidelines do not apply to degree-granting institutions, and we believe it would not be appropriate to adopt the FTC guidelines wholesale. Instead, we have reviewed the guidelines carefully and incorporated only those that we determined are appropriate for inclusion in our regulations (*i.e.,* those that we believe should be applicable to all eligible institutions participating in the title IV, HEA programs).

With regard to the commenters who expressed concern for students being confused by these regulations, we note that the proposed regulations apply to institutions participating in the title IV, HEA programs and not to students. Because students are not the intended audience for these regulations, we do not believe that students will be □ confused by the regulations. If students have questions about the regulations, they have a

variety of sources to assist them in understanding them, including by contacting the Department with their questions.

We disagree with the commenters who opined that the proposed regulations are too vague and subjective. Section 487 of the HEA provides that institutions participating in the title IV, HEA programs shall not engage in substantial misrepresentation of the nature of the institution's educational program, its financial charges, or the employability of its graduates. The regulations in subpart F of part 668 set forth the types of activities that constitute misrepresentation by an institution and describe the actions that the Secretary may take if the Secretary determines that an institution has engaged in substantial misrepresentation. The proposed changes to the regulations strengthen the Department's regulatory enforcement authority against institutions that engage in substantial misrepresentation and clarify what constitutes misrepresentation.

The commenters who stated that the proposed regulations are unfair because they only apply to for-profit institutions are incorrect. Subpart F of part 668 applies to all institutions that participate in the title IV, HEA programs.

*Changes:* None.

*Comment:* Some commenters argued that the proposed regulations are legally deficient on their face, redundant, and provide no insight or guidance on conduct that may constitute "substantial misrepresentation." They stated that the proposed regulations do not contain any standards of intent, harm, or materiality. In addition, some commenters stated that the regulations are missing a quantitative element because they do not identify what exactly would trigger penalties (*e.g.*, a single complaint, a pattern of misrepresentation, a dollar amount of title IV, HEA aid). These commenters stated that a degree of materiality of misrepresentation should be taken into account when determining whether to impose a sanction on an institution.

*Discussion:* We disagree with the commenters who opined that the Department does not have the legal authority to regulate in this area. Current subpart F of part 668 has been in place for over 25 years. The proposed changes strengthen the Department's regulatory enforcement authority over institutions that engage in substantial misrepresentation and further clarify what constitutes misrepresentation.

The U.S. Government Accountability Office (GAO) was recently asked to conduct undercover testing to determine whether for-profit colleges' representatives engaged in fraudulent,

deceptive, or otherwise questionable marketing practices. The undercover tests at 15 for-profit institutions found that four institutions encouraged fraudulent practices and that all 15 made deceptive or otherwise questionable statements to GAO's undercover applicants. Institutional personnel engaged in deceptive practices, including by encouraging applicants to falsify their FAFSA information, by exaggerating applicants' potential salary after graduation, and by failing to provide clear information about the institution's program duration, costs, and graduation rate. In some instances, the undercover applicants received accurate and helpful information from institutional personnel, such as not to borrow more money than necessary.

The information uncovered by the GAO during its investigation reinforces the Department's decision to amend the misrepresentation regulations in subpart F.

We disagree with commenters who claim the regulations are legally deficient because they fail to establish the need for specific intent as an element of misrepresentation or do not define a requisite degree of harm before the Department may initiate an enforcement action.

The Department has always possessed the legal authority to initiate a sanction under part 668, subpart G for any violation of the title IV, HEA program regulations. However, the Department has also always operated within a rule of reasonableness and has not pursued sanctions without evaluating the available evidence in extenuation and mitigation as well as in aggravation.

The Department intends to continue to properly consider the circumstance surrounding any misrepresentation before determining an appropriate response. Depending on the facts presented, an appropriate response could run the gamut from no action at all to termination of an institution's title IV, HEA eligibility depending upon all of the facts that are present.

We disagree with the commenters who stated that the proposed regulations are redundant. Although the FTC publishes guidelines for consumers to use to avoid deceptive advertising, promotional, marketing, and sales practices by vocational training providers, the FTC guidelines are considered administrative interpretations of the statutes that the FTC is charged with implementing as opposed to implementing the statutory requirement in section 487 of the HEA, which the Department is charged with implementing.

We disagree with the commenters who stated that the proposed regulations do not provide guidance on what

constitutes "substantial misrepresentation." The proposed regulations define "substantial misrepresentation" as "any misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment."

In determining whether an institution has engaged in substantial misrepresentation and whether to impose penalties, the Department uses a rule of reasonableness and considers various factors.

*Changes:* None.

*Comment:* Some commenters suggested that we adopt more concrete and narrowly defined terms in subpart F of part 668 to address abuses while protecting legitimate institutions and programs from baseless charges. These commenters stated that the proposed regulations on misrepresentation contain a number of vague and broad phrases that leave the door wide open for interpretation by States, accrediting agencies, and the Department. These commenters expressed concern that the lack of specificity in the regulations will fuel the potential for frivolous lawsuits brought as class actions against institutions. One commenter opined that the proposed regulations would function as a "perpetual employment act for lawyers" because, under the regulations, routine marketing claims would become a potential source of lawsuits and claims for years.

Some commenters also expressed concern about allegations of misrepresentation from disgruntled students and employees or former employees and as a result of journalists misreporting facts. These commenters argued that it is not appropriate for the actions of a single individual or a single incident, whether malicious or unintended in nature, to dramatically affect an institution.

*Discussion:* We disagree with the commenters who stated that the proposed regulations are too broad and open for interpretation. We proposed specific changes to the current regulations to clarify the types of false, erroneous, or misleading statements about an institution's educational program, the cost of the program, financial aid available, and the employability of its graduates that would be prohibited as misrepresentations under subpart F of part 668.

We understand that some commenters have concerns about baseless charges and frivolous lawsuits that may be brought by students and employees including by dissatisfied students and disgruntled employees as well as fears that "routine marketing claims" would lead to lawsuits. We do not believe that the proposed regulations will increase litigation by students and

employees against the institution. These regulations do not provide an additional avenue for litigation for students, employees and other members of the public. Instead, the regulations specify the conditions under which the Department may determine that an institution has engaged in substantial misrepresentation and the enforcement actions that the Department may choose to pursue. As the Department does in evaluating any regulatory violation, in determining whether an institution has engaged in substantial misrepresentation and the appropriate enforcement action to take, the Department will consider the magnitude of the violation and whether there was a single, isolated occurrence.

*Changes:* None.

*Comment:* Many commenters expressed concern that the proposed changes would eliminate due process protections for institutions in the case of substantial misrepresentation. The commenters requested that we retain the procedures from current § 668.75, arguing that the removal of these procedures conflicts with the HEA and exceeds the Department's statutory authority to regulate in this area.

Several commenters also expressed concern about the proposed removal of current § 668.75 because that section required the Department to review complaints and to dispose of them informally if the complaints were determined to be minor and could be readily corrected. The commenters argued that the proposed regulations would eliminate this sensible approach in exchange for using other procedures. These commenters recommended that we amend § 668.71(a) to include an option for the Department to allow an institution to correct minor, inadvertent, and readily correctable misrepresentations and to make appropriate restitution. They noted that these types of misrepresentations are bound to occur given the amount of information institutions must report and that simple human error should not constitute misrepresentation. Other commenters expressed concern that, under the proposed regulations, simple mistakes could trigger sanctions even if an institution has no history of misrepresentation problems.

*Discussion:* The Department is removing the provisions in § 668.75 because they are formulaic and have been proven unnecessary. The Departments takes its enforcement responsibilities seriously, and its history demonstrates that it does not overreact to single, isolated transgressions. We intend to enforce the misrepresentation regulations with the same degree of fairness that we enforce all other title IV, HEA program requirements. To the extent the Department chooses

to initiate an action based upon a violation of the misrepresentation regulations, nothing in the proposed regulations diminishes the procedural rights that an institution otherwise possesses to respond to that action.

*Changes:* None.

*Comment:* Some commenters stated that enforcement by the Department is not necessary and is not the best way to allocate the Department's resources because State agencies, accrediting agencies and the FTC already enforce laws prohibiting misrepresentation. For example, some commenters noted that accrediting agencies have standards on institutional integrity and review the ways in which each institution represents itself as part of the accrediting process. The accrediting agencies perform regular reviews of all advertising and promotional material and publish specific guidelines for institutions regarding acceptable statements by staff. The commenters recommended that the Department continue to rely on this process, rather than adopting the proposed regulations, which they argue, will result in an unnecessary duplication of enforcement efforts. Another commenter asked us to clarify whether the Department—and not State authorizing agencies—is responsible for monitoring compliance with the misrepresentation regulations.

While a number of commenters argued that it is not appropriate for the Department to take enforcement actions to prevent misrepresentation, other commenters stated that in cases of true misrepresentation strong enforcement steps would go a long way in eliminating fraud and abuse and limiting the need for other measures to combat abuse that arises in the absence of such enforcement.

*Discussion:* We disagree with the commenters who stated that the Department should not be responsible for enforcement of these misrepresentation regulations because others, including State agencies, accrediting agencies, and the FTC are already enforcing laws against misrepresentation. The Department is responsible for ensuring that institutions participating in the title IV, HEA programs comply with section 487 of the HEA, which prohibits institutions from engaging in substantial misrepresentation of the nature of the institution's educational program, its financial charges, or the employability of its graduates. We acknowledge that other agencies and entities also enforce various laws and standards that guard against misrepresentation and are pleased that we have partners in ensuring that institutions do not make false, erroneous, or misleading statements to students, prospective students, and members of the public. We agree with the commenters who

supported strong enforcement in this area. We believe that strengthening the misrepresentation regulations and enforcement of these regulations is critical to maintaining the integrity of the title IV, HEA programs.

*Changes:* None.

*Comment:* Many commenters argued that we should revise the regulations to link enforcement to situations in which the institution or its employees are making a conscious decision to mislead the consumer. The commenters suggested that the definition of misrepresentation be amended to include an element of intent to deceive; under this definition, institutions would face sanctions only if the Department determined that the misleading statement was made with the intent to deceive.

*Discussion:* In determining whether an institution has engaged in substantial misrepresentation and the appropriate sanctions to impose if substantial misrepresentation has occurred, the Department considers a variety of factors, including whether the misrepresentation was intentional or inadvertent.

*Changes:* None.

*Comment:* Some commenters expressed concern that they will be unable to comply with the misrepresentation regulations because they are required to comply with so many regulations that inadvertent misrepresentations are bound to occur.

*Discussion:* As previously discussed, before initiating any action, the Department carefully evaluates all of the circumstances surrounding an alleged misrepresentation. However, the Department rejects the notion that institutions are incapable of complying with multiple title IV, HEA program regulations, while at the same time ensuring that they do not make misrepresentations, inadvertent or otherwise.

*Changes:* None.

*Comment:* Some commenters expressed concern with the effect these proposed misrepresentation regulations could have on students. They argued that the regulations would conflict with State laws and create confusion in an area long regulated by the States. For example, given that students file complaints with the State, the commenters stated that an additional Federal remedy would be duplicative and would create uncertainty for students.

Other commenters expressed concern about institutions that require students to sign arbitration and confidentiality agreements as part of their enrollment contracts. These agreements serve to limit access to qualified legal counsel for

students who may want to pursue a misrepresentation claim. Some commenters stated that the regulations should not be interpreted to create an express or implied private right of action against an institution for misrepresentation.

*Discussion:* We disagree with the commenters who stated that students will be confused by the misrepresentation regulations because they otherwise typically pursue claims of misrepresentation under State law. Nothing in the proposed regulations alters a student's ability to pursue claims of misrepresentation pursuant to State law and nothing in the proposed regulations creates a new Federal private right of action. The regulations are intended to make sure that institutions are on notice that the Department believes that misrepresentations constitute a serious violation of the institutions' fiduciary duty and that the Department will carefully and fairly evaluate claims of misrepresentation before determining an appropriate course of action.

*Changes:* None.

### Scope and Special Definitions (§ 668.71)
Back to Top

*Comment:* Many commenters expressed concern about the expansion of the misrepresentation regulations to cover false or misleading statements made by representatives of the institution or any ineligible institution, organization or person with whom the institution has an agreement. The commenters believed that this change will result in holding institutions accountable for what is said, may be said, or inadvertently is said, by individuals or organizations that may have no official connection to an institution, and that institutions cannot monitor inadvertent and unofficial comments. Commenters argued that the proposals would expose good institutions to sanctions based on actions beyond their control. Many commenters sought clarification about which representatives of the institution are covered by the regulations. For example, commenters pointed to statements that may be made by students through the use of social media. One commenter suggested we modify the definition of misrepresentation to clarify that institutions are responsible for statements made by representatives or entities compensated by the institution. Another commenter recommended that we include only individuals under the direct control of the institution, including spokespersons and enrollment management companies.

We received another suggestion to limit covered agreements to those relating to marketing or admissions. Many commenters expressed concern that, without this change, the proposed regulations would apply to the hundreds of contracts a large

institution may have with various vendors and service providers. They suggested that the institution only be responsible for communications from and statements by individuals or entities authorized to speak for the institution or who have representative authority to respond to the subject in question.

Commenters were particularly concerned about the penalties that could result from misinformation provided by an entity other than the institution. The commenters argued that the institution should not be subjected to undue penalties if the institution took steps to monitor and mitigate such possible misrepresentations, and in fact, took action upon identifying any incidences. For example, institutions provide information to companies that compile college rankings that are often derided as inaccurate, incomplete or false. Commenters believed that any penalties should be limited to statements related to the relationship between the institution and the entity.

*Discussion:* As noted elsewhere in this preamble, the Department enforces its regulations, including those in subpart F of part 668 within a rule of reasonableness. We strongly believe that the concerns voiced by many commenters have ignored this fact. We do not expect, for example, to find actionable violations in the comments made by students and routine vendors. However, the Department acknowledges that the language in § 668.71 may be unnecessarily broad. For this reason, we agree to limit the reach of the ban on making substantial misrepresentations to statements made by any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs or those that provide marketing, advertising, recruiting, or admissions services. We have done this by narrowing the language in § 668.71(b) and the definition of the term *misrepresentation.* As a result, statements made by students through social media outlets would not be covered by these misrepresentation regulations. Also, statements made by entities that have agreements with the institution to provide services, such as food service, other than educational programs, marketing, advertising, recruiting, or admissions services would not be covered by these misrepresentation regulations.

*Changes:* We have revised § 668.71(b) and the definition of the term *misrepresentation* in § 668.71(c) to clarify that the ban on misrepresentations for which an institution is responsible only extends to false, erroneous, or misleading statements about the institution that are made by an ineligible institution,

organization, or persons with whom the institution has an agreement to provide educational programs or to provide marketing, advertising, recruiting, or admissions services.

*Comment:* Some commenters noted a need for the regulations to clearly differentiate between "misrepresentation" and "substantial misrepresentation." Other commenters questioned how we will determine what constitutes "substantial misrepresentation." These commenters asked what the standards are for determining what constitutes harm, materiality, or intent to misrepresent. Another commenter suggested that we revise the definition of *substantial misrepresentation* to include misrepresentations that are disseminated—not only those that are "made".

*Discussion:* The Department is comfortable with its ability to make the distinction between a misrepresentation and a substantial misrepresentation. We believe that the regulatory definitions we are establishing are clear and can easily be used to evaluate alleged violations of the regulations. Moreover, as previously stated, we routinely evaluate the seriousness of title IV, HEA program violations before determining what, if any, action is appropriate. There is nothing in the proposed misrepresentation regulations that will alter the manner in which the Department reviews any violation of part 668, subpart F before deciding how it should respond.

*Changes:* None. 

*Comment:* Some commenters supported the proposed definition of misrepresentation in § 668.71(c), which, as applied in these regulations, prohibits making false, erroneous, or misleading statements directly or indirectly to students, prospective students, or any member of the public, an accrediting agency, a State agency or the Secretary. They stated that these changes provide much needed updates to the current regulations and that the remedies give the Department needed flexibility. The commenters noted that the Department should not tolerate institutions that knowingly misrepresent facts and provide misinformation on purpose to students, their families and the public, and that we should hold institutions accountable that encourage students to enroll but fail to deliver on statements regarding accreditation and employability.

Other commenters expressed concern about broadening the list of entities to which an institution may not make a false, erroneous, or misleading statement to include accrediting agencies, State agencies or any member of the public. These commenters remarked that the effect of this regulatory change

is that the list now includes anyone. The commenters argued that the determination of whether an institution has made misleading statements to an accrediting agency or State agency should be made by that agency, not the Department, and that the agency should take appropriate action. One commenter suggested that the list of entities should also include parents who may be signing or cosigning loans.

*Discussion:* The Department believes that in its stewardship of the title IV, HEA programs, it is essential to monitor the claims made by institutions not only to students and prospective students, but also those made to the Department's partners who help maintain the integrity of these programs. While it is likely that other oversight agencies will respond appropriately to any substantial misrepresentations that are made to them, only the Department has the overall responsibility for preserving the propriety of the administration of the title IV, HEA programs.

In addition, because parents are also members of the public, and most, if not all, statements made to them will also be made to students or prospective students, the Department does not believe that further enumeration to include parents is necessary.

*Changes:* None.

*Comment:* Some commenters noted that the term "misleading statement" is not defined by the FTC, and opined that, because the term's definition merely reiterates what has always been required for a finding of a substantial misrepresentation, it is unnecessary for the Department to define the term in its regulations. Some commenters suggested that, instead, the Department follow the FTC's practice of acknowledging that a finding of misrepresentation is a fact-specific inquiry based on a flexible standard.

Many commenters appeared to be particularly concerned about the use of the phrase "capacity, likelihood, or tendency to deceive or confuse" in the description of a "misleading statement". Some commenters stated that they do not believe that an enforceable or defensible basis for misrepresentation is created by including the likelihood of any form of communication to confuse or "have the capacity" to confuse a student or potential student. One commenter suggested we clarify that in order to constitute misrepresentation, the statement must have the "capacity or tendency" to deceive or confuse and be "likely" to deceive or confuse. The commenter cited examples of statements frequently made in marketing materials by institutions, such as "there is a place for everyone

at XYZ." Other commenters noted that institutions provide information on a variety of complex issues that students and others may find confusing. In particular, certain terms of art such as "cost of attendance" and "graduation rate" may not be familiar to the general public and may be confusing to them. Another commenter requested that we clarify that a misrepresentation is not made if confusion results from the accurate reporting of disclosures required under various laws.

These commenters expressed concern that attempts to comply with recently promulgated regulations on college cost, transparency, and outcomes measures may result in confusion and lead to reported complaints of misrepresentation.

Several commenters argued that the Department needs to address the issue of misrepresentation through omissions of important information. One commenter suggested that we add language in the description of the term misleading statement to include an omission, if in the absence of an affirmative disclosure is likely to result in a person assuming something that is incorrect.

One commenter stated that oral statements should not be included in the definition of *misrepresentation.* The commenter questioned how the Department would know that an oral misleading statement was made.

Many commenters expressed concern that the proposed misrepresentation regulations will restrict their capability to use the Internet for fear of misrepresentation. These commenters noted that their top lead source is the Internet and that Internet marketing is the bloodline of all institutions. The commenters also pointed out that Internet marketing has issues relating to domain name ownership, name confusion, and pirating, and that, when the Department enforces these regulations, it needs to be careful in ensuring that it has the correct institution.

*Discussion:* The Department believes that it is appropriate to define the term misrepresentation in its regulations in order to distinguish misrepresentation from substantial misrepresentation. As discussed elsewhere in this preamble, the Department agrees that determining whether a misrepresentation has been made should be accomplished through a fact-specific inquiry and that enforcement actions should only be brought when reasonable.

With regard to the comments who stated that the "capacity, likelihood, or tendency to deceive or confuse" language will be confusing, we have no reason to believe that this language will have any such effect. Moreover, we do not believe that it is

necessary to revise the regulations to state that a misleading statement must have both the capacity or tendency and likelihood to deceive because we believe that a statement that has any of the characteristics of the capacity, likelihood, or tendency to deceive or confuse is misleading.

By adopting these proposed regulations, the Department is not seeking to create extraneous bases upon which it can initiate enforcement actions. Rather, we want to ensure that the regulations help, rather than hinder, our ability to protect students, prospective students, and others from misleading statements made about an eligible institution, the nature of its educational program, its financial charges, or the employability of its graduates. The Department believes it can be trusted to properly evaluate whether a claim is confusing to a degree that it becomes actionable. It is also important to remember that it is only substantial misrepresentations that rise to the level where the Department may contemplate action.

As far as the failure of the proposed regulations to address affirmative omissions, the Department believes that the purpose of these regulations is to make sure that all statements an institution makes are truthful. Separately, the Department requires an ☐ institution to make a number of disclosures to students and to the extent that any of these disclosures are inaccurate and constitute substantial misrepresentation, they are actionable. The Department believes that the totality of its regulations provides a sufficient basis to protect against the making of substantial misrepresentations without creating another category of misrepresentations that are more logically covered within the context of disclosures.

In addition, we disagree with the commenter who argued that oral statements should not be included in the definition of the term *misrepresentation.* We have seen and heard clear and unambiguous examples of oral statements that we view as misrepresentations in the GAO's video of its undercover testing.

With respect to the commenters who expressed concern about how these regulations may affect an institution's ability to use the Internet for marketing purposes, we note that it should not matter where a misrepresentation takes place. What is important is to curb the practice of misleading students regarding an eligible institution, including about the nature of its educational program, its financial charges, or the employability of its graduates. We strongly believe that institutions should be able to find a way to comply with these

regulations when using the Internet for marketing.

Finally, we understand the many complexities of domain name ownership, trademark infringement and the like and will ensure that we are targeting the correct entities in any enforcement action we take under these regulations.

*Changes:* None.

*Comment:* Several commenters objected to including testimonials and endorsements in the definition of misrepresentation, because doing so holds institutions responsible for unsolicited testimonials or endorsements of any kind. The commenters noted that testimonials are widely used as the most relevant form of marketing. One commenter suggested that we modify the regulations to refer to testimonials that the institution "requested" a student to make "as part of the student's program" as opposed to "required" the student to make "to participate in a program." Another commenter believed we should expand the definition of the term *misrepresentation* to include endorsements or testimonials for which students are given incentives or rewards.

*Discussion:* The Department disagrees that changes to the definition of *misrepresentation* are needed. First, with respect to the commenters who stated that the definition is too broad, we note that the thrust of the definition is that the statement must be false, erroneous, or misleading. The inclusion within the definition of certain student endorsements or testimonials (*i.e.,* those that are given under duress or are required for participation in a program) establishes the circumstances under which endorsements or testimonials are necessarily considered to be false, erroneous, or misleading. We believe that including these types of endorsements and testimonials in the definition of misrepresentation is appropriate because endorsements or testimonials provided under these circumstances are suspect, at best.

Second, we do not believe it is necessary to expand the definition of misrepresentation to include endorsements or testimonials for which students are given incentives or rewards. We do not believe that an endorsement or testimonial for which a student was given a token reward such as a mug or t-shirt should automatically be considered false, erroneous, or misleading.

*Changes:* None.

**Nature of**   *Comment:* One commenter supported the proposed changes to

**Educational Program (§ 668.72)**

Back to Top

§ 668.72 stating that the changes will reduce the motivation for institutions to use aggressive and misleading recruitment tactics to increase enrollment. The commenter noted that the requirements in this section align with their association's principles of good practice under which members represent and promote their schools, institutions or services by providing precise information about their academic major and degree programs.

*Discussion:* The Department appreciates this support.

*Changes:* None.

*Comment:* One commenter stated that § 668.72 was inherently unclear and asked for additional clarification without providing any specifics.

*Discussion:* The Department disagrees with this commenter and believes that the language in this section is clear. Moreover, because only false, erroneous, or misleading statements that constitute substantial misrepresentations are potentially actionable, institutions are on notice as to what they need to do to assure themselves of compliance.

*Changes:* None.

*Comment:* Some commenters recommended that we add language to this section to address specific concerns about clinical experience. One commenter argued that institutions should be required to inform students of any clinical experience the student needs to obtain a required license or certification, whether the institution or the student secures the appropriate clinical placement, and how the clinical experience relates to the ability to obtain employment. The commenter argued that the failure to inform a student of this information should constitute misrepresentation.

*Discussion:* We believe that the language in § 668.72 sufficiently covers false, erroneous, or misleading statements made by institutions concerning their educational programs. We further note that information such as that suggested by the commenter is more appropriately addressed in the student consumer information disclosures contained in subpart D of part 668 and note that institutions are required to disclose information about the academic program of the institution, which would include information about any required clinical experience.

*Changes:* None.

*Comment:* One commenter suggested that we add language to § 668.72 to specifically address misrepresentation related to

whether course credits earned at the institution are transferable toward a substantially similar degree. This commenter noted that, in some cases, courses may be accepted but not count toward a degree at the new institution.

*Discussion:* We believe that the language in § 668.72(b)(1), which prohibits false, erroneous, or misleading statements about whether a student may transfer course credits earned at the institution to any other institution, is sufficient and provides more protection for students than the commenter's suggestion to limit the coverage to statements related to whether course credits are transferable toward a substantially similar degree.

*Changes:* None.

*Comment:* A few commenters suggested that we expand § 668.72(c)(2) to include "States in which the program is offered" rather than merely "the State in which the institution is located" so that the requirement reaches students who are enrolled through distance learning. One commenter noted that institutions that offer courses online should have additional responsibilities to students who take these courses. The commenter also asserted that these institutions should know and communicate to students what the State's requirements are to be employed ☐ in that job and whether successful completion of the program will qualify them for such a job. Another commenter stated that an institution should know State licensing requirements in all the States in which it is providing the program and further opined that if the institution does not know the requirements, it could limit enrollment to students residing in the States in which it does know.

*Discussion:* The Department agrees with the commenters who believe institutions should be responsible for making statements that are not false, erroneous, or misleading in States in which the institution's educational programs are offered and not only in the State where the institution is located.

*Changes:* We have revised § 668.72(c) to prohibit false, erroneous, or misleading statements concerning whether completion of an educational program qualifies a student for licensure or employment in the States in which the educational program is offered.

*Comment:* One commenter suggested that we add "including the recognized occupations for which the program prepares students" at the end of § 668.72(g) to address the proposed requirements in § 668.6(b)(1) under which an institution must

disclose on its Web site the occupations the program prepares students to enter and that we add a new paragraph to address misrepresentation about the kinds of disclosures that will be required under proposed § 668.6.

*Discussion:* We disagree with the commenter's suggestion to add language in § 668.72 to address the proposed regulations in § 668.6. The language in § 668.72(g) prohibits false, erroneous, or misleading statements concerning the availability, frequency, and appropriateness of its courses and programs to the employment objectives that it states its programs are designed to meet. We believe that this language is sufficient to guard against misrepresentation in the disclosures required under § 668.6. For additional information on those requirements, please see the section on *Gainful Employment (§ 668.6)* earlier in the preamble to these final regulations.

*Changes:* None.

*Comment:* Some commenters recommended that we add language to this section to address specific concerns about accreditation. One commenter suggested that the regulations be modified to require an institution to explicitly disclose a lack of specialized program or institutional accreditation if such accreditation is associated with the ability to apply to take or to take, the examination required for a local, State, or Federal license, or a non-governmental certification generally required as a precondition for employment or to perform certain functions in the State in which the institution is located. Some commenters suggested that misrepresentation related to requirements that are generally needed to be employed in the fields for which the training is provided be expanded to include withheld information. The commenters cited the testimony of Yasmine Issa who testified before the Senate Health, Education, Labor, and Pensions Committee on June 24, 2010. Ms. Issa testified that important information about the value of the educational credential she was pursuing and future employability was withheld. In particular, the program in which she was enrolled lacked specialized accreditation and, as a result, she was unable to sit for a licensing exam. The commenters argued that omission of important information should constitute misrepresentation if such omission is likely to lead someone to make incorrect assumptions as happened with Ms. Issa.

*Discussion:* The Department agrees with the commenters who requested that we expand these regulations to prohibit the withholding of information related to requirements that are generally needed to be employed in the fields for which the

training is provided. To address circumstances such as the ones experienced by Ms. Issa, the Department has inserted the words "or requires specialized accreditation" in § 668.72(n). As amended, this provision now provides that misrepresentation concerning the nature of an eligible institution's educational program includes any failure by an eligible institution to disclose the fact that a degree has not been authorized by the appropriate State educational agency or that it requires specialized accreditation in any advertising or promotional materials that reference such degree.

*Changes:* We have revised § 668.72(n) to include a failure to disclose that the degree requires specialized accreditation as misrepresentation.

## Employability of Graduates (§ 668.74)

Back to Top

*Comment:* Some commenters raised concerns about misrepresentation related to the institution's knowledge about the current or likely future employment conditions, compensation or opportunities in the occupation for which students are being prepared. Commenters argued that predictions about future employment or compensation should not be deemed misrepresentations unless such predictions are based on statements of fact which at the time they were made are objectively false or themselves misleading. The commenters requested confirmation that general statements of opinion about the benefits of enrolling in or completing a program would not be treated as misrepresentation about the future. Other commenters sought clarification that any information provided by an institution that is directly attributable to a State or the Federal government or any direct link to a governmental Web site such as the O*NET Web site would not be considered misrepresentation if the data and projections from the government or on the Web site are incorrect, confusing, or do not come true.

*Discussion:* As noted elsewhere in this preamble, the regulations in subpart F of part 668 only address false, erroneous, or misleading statements. Moreover, in enforcing this subpart, the Department intends to continue to carefully evaluate all of the surrounding circumstances before reaching any conclusions regarding the occurrence of a violation and the appropriate response. Predictions that are not based on false or misleading information, general statements and opinions, and information provided by State and Federal governments would not be the basis for a misrepresentation claim.

*Changes:* None.

**Ability To Benefit (§ 668.32(e) and Subpart J)**

Back to Top

## Student Eligibility—General (§ 668.32(e))

*Comment:* Most commenters supported the Department's implementation of section 484(d)(4) of the HEA, which was added in 2008. This statutory change provided that a student shall be determined by an institution of higher education as having the ability to benefit from the education or training offered by the institution of higher education upon satisfactory completion of six credit hours, or the equivalent coursework that are applicable toward a degree or certificate offered by the institution. Several commenters expressed appreciation for the implementation of this new option of establishing an ability to benefit. Several of the commenters supported the equivalency of the six credit hours to six semester, six trimester, six quarter hours or 225 clock hours. One commenter expressly supported the continued individual institutional determination to accept any of the ability-to-benefit (ATB) options available in current § 668.32(e). One commenter recommended that the ☐ Department monitor the application of this ATB option.

*Discussion:* We appreciate the support for these changes. With regard to the suggestion that the Department monitor the use of this eligibility option, we plan in 2011-2012 to implement a variety of changes to the data that institutions will provide to the Department that will help us determine when title IV, HEA program assistance is awarded to students who establish their title IV, HEA eligibility on the basis of either successfully completing six credit hours (or its equivalent) that are applicable toward a degree or certificate program offered at that institution, or when the student successfully passes an approved ATB test. We believe that this data will help us better understand the frequency that these options are employed and can lead to further study on the effectiveness of these alternatives to a high school diploma or its recognized equivalent.

*Changes:* None.

*Comment:* Some commenters offered conditional support for the regulatory change reflected in § 668.32(e)(5), but expressed some concerns. For example, one commenter expressed disagreement about the equivalency of six credit hours to six semester, six trimester, six quarter hours or 225 clock hours. In addition, several commenters did not agree with the application of 225 clock hours stating that this approach would not benefit students at clock hour institutions. Finally, a few commenters suggested that a conversion rate of 6 credit hours to 180 clock hours would be more reasonable.

*Discussion:* As discussed during the negotiated rulemaking sessions and in the preamble to the NPRM, the statute is silent on equivalency. The Department believes that it is a reasonable interpretation to use the successful completion of 6 semester, 6 trimester, 6 quarter or 225 clock hours for purposes of equivalency because these all would be equal to completion of one quarter of an academic year. For this reason, we are adopting as final the changes we proposed in § 668.32(e).

*Changes:* None.

*Comment:* A few commenters asked about the transferability of the successful completion of six credits (or its equivalent) among title IV, HEA eligible institutions. One commenter expressed concern that it appeared that the courses where the six credits were initially earned could not be college preparatory coursework, because they are not applicable to an eligible program. Therefore, the commenter argued, § 668.32(e)(5) would not benefit those students for whom ATB would be most helpful, students who may need preparatory coursework.

*Discussion:* Section 484(d)(4) of the HEA specifies that a student has the ability to benefit from the education or training offered by the institution of higher education if the student completes six credit hours or the equivalent coursework that are applicable toward a degree or certificate offered by the institution of higher education. When a student who earns six or more credits (or their equivalent) applicable toward a degree or certificate offered by that institution of higher education subsequently transfers to another institution, if those credits are applicable toward the degree or certificate offered by the subsequent institution, the previously-earned credits meet the requirements of section 484(d) of the HEA. However, we point out that the earning of credit hours based upon testing out is not comparable to taking and successfully completing six credit hours (or its equivalent) and, therefore, would not satisfy this ATB option.

If the courses that a student enrolls in are considered preparatory in nature, an institution must first determine whether these preparatory courses are a part of the student's program. To the extent that the preparatory courses are a part of the student's eligible program, the successful completion of six credits in these preparatory courses would meet this ATB standard. However, if the institution determines that these preparatory courses are not part of the eligible program, the successful completion of the six credits would not meet this ATB standard. It may be important to note that generally

institutions develop their admissions policies in accordance with State licensing and accrediting requirements and, as a result, some institutional admissions requirements may require that all students have a high school diploma. In those situations, because all of the students would be required to have a high school diploma, the recognized equivalent of a high school diploma option and the ATB options in section 484(d) of the HEA would be inapplicable. However, for institutions that admit students either with the recognized equivalent of a high school diploma or under one of the optional ATB standards for students who do not have a high school diploma, those institutions cannot fail to accept, for title IV, HEA student eligibility purposes, the following—

- A student's passing of an approved ATB test;

- A determination that a student has the ability to benefit from the education or training in accordance with an approved State process;

- A student's successful completion of a secondary school education in a home school setting that is treated as a home school or private school under State law; or

- The satisfactory completion of six credit hours (or the equivalent coursework), that are applicable toward a degree or certificate at that institution.

As such, the new ATB option added in section 484(d)(4) of the HEA, and reflected in § 668.32(e)(5), is not the only opportunity for a student to establish that he or she has the ability to benefit from the education or training offered by the institution.

*Changes:* None.

*Comment:* One commenter expressed support for the inclusion of language in the preamble to the NPRM that indicated that the six credits or its equivalent used to establish ATB eligibility should be applicable to an eligible program offered at that school and suggested it should be included in the regulatory language. Another commenter expressed concern about the inclusion of this language in the preamble, opining that it went beyond the statutory language and intent. This commenter recommended that the Department consider removing such language in the final regulations.

*Discussion:* We recognize that the statute does not require that the coursework completed for purposes of this ATB option be applicable to an eligible program, but we remind institutions that this ATB option is designed to allow an otherwise ineligible student to obtain title IV, HEA program assistance

while working to obtain a certificate or degree. Therefore, we expect that the coursework be applicable to an eligible program. We also acknowledge that students may change programs throughout their postsecondary career. For this reason, these regulations do not require that the student successfully complete six credits or their equivalent that are applicable to the specific degree or certificate program in which the student is enrolled. Instead, § 668.32(e)(5) requires only that the six credits be applicable to a degree or certificate program at the institution where the six credits are earned.

*Changes:* None.

*Comment:* Several commenters expressed opposition to the new § 668.32(e)(5). One commenter argued that the ATB options under current § 668.32(e)(2) and (e)(3) provide a better method of evaluating a student's ability to benefit and that the new option is not needed. One commenter stated that new □ § 668.32(e)(5) would cause greater financial hardship for students because it would require students to pay for these six credits without the benefit of title IV, HEA program assistance and that this, in turn, may lead to some students turning to high cost private financing. One commenter expressed disappointment that the Department did not seize the opportunity to fully re-evaluate the ATB regulations and make more broad and sweeping changes to the standards. Finally, some commenters expressed concern that § 668.32(e)(5) may penalize students who are very able to successfully perform class work and demonstrate learned skills, but who have difficulty taking tests and therefore may be unable to successfully complete the requisite six credit hours (or its equivalent), due to their inability to do well on written tests.

*Discussion:* Section 668.32(e)(5) incorporates the language from section 484(d)(4) of the HEA. The Department does not have the authority to not recognize this statutorily mandated ATB option. Moreover, we recognize that this new standard for establishing the ability to benefit for students who do not have a high school diploma or its recognized equivalent may not be appropriate for all students. However, we do not view this as a problem, because § 668.32(e)(5) supplements—rather than replaces—the current standards for establishing the ability to benefit under § 668.32(e)(2) and (e)(3).

*Changes:* None.

*Comment:* Most of the commenters who objected to § 668.32(e)(5) objected to this provision at least in part because the Department has stated that title IV, HEA funds may not be used to pay for any portion of the payment period in which

those credits or equivalent were earned.

*Discussion:* The underlying student eligibility issue here is that a student without a high school diploma or its equivalent cannot be eligible for title IV, HEA program assistance, except under the four circumstances described in section 484(d) of the HEA. The payment period during which a student successfully earns the six credits (or its equivalent) under section 484(d)(4) of the HEA and § 668.32(e)(5) is a period when the student has yet to meet this statutory requirement or standard. We recognize that this inability to "go back" and establish eligibility may be fiscally problematic for some students or institutions, but we continue to believe that until a student's eligibility is established, the student is ineligible for title IV, HEA funds. That said, in cases where a student is enrolled in a program that has several modules within a payment period that are independently completed and graded prior to the end of that payment period, there could be a situation where a student successfully completes a module and earns six or more credits (or the equivalent) prior to the end of the payment period. In this scenario, an institution could make a determination of the cost of attendance for the remaining modules in the payment period, and award and disburse title IV, HEA funds for those remaining credits, based upon the limited cost of attendance in the payment period after the student has successfully completed the initial six credits.

*Changes:* None.

*Comment:* One commenter stated that he would encourage other institutions to establish admissions policies to prohibit the use of the earned credit ATB option reflected in § 668.32(e)(5) because of the unique complications created with this provision and State licensing boards. Specifically, the commenter expressed concern that students who do not complete the six credit hours (or their equivalent) under this option may not be able to obtain title IV, HEA program assistance to pay for their coursework.

*Discussion:* As noted earlier in this preamble, we recognize that the ATB option reflected in section 484(d)(4) of the HEA and § 668.32(e)(5) may not meet the needs of all students, or all institutions, and is simply one method by which a student can show that he or she has the ability to benefit from a degree or certificate program of study and, therefore, is eligible to receive title IV, HEA program assistance.

*Changes:* None.

Subpart J—Approval
of Independently
Administered Tests;
Specification of
Passing Score;
Approval of State
Process

Back to Top

Special Definitions
(§ 668.142)

Back to Top

*Comment:* In response to the Department's request in the NPRM for feedback on the appropriateness of permitting specified test administrators in the assessment center to train other individuals at that assessment center to administer ATB tests, several commenters suggested that it would not be advisable or appropriate for senior test administrators in an assessment center to perform the required training of other individuals at the assessment center for the administration of approved ATB tests.

*Discussion:* The Department agrees that, consistent with the definition of the term *test administrator,* an individual must be certified by the test publisher or State, as applicable, to administer tests under subpart J of part 668 in accordance with the instructions provided by the test publisher or State. The only practical way for a test publisher or State to make a determination of whether an individual has the necessary training required in order to certify the individual as a test administrator is to provide the training that will insure that test administrators are cognizant of the test publisher's or State's written requirements. To emphasize and add clarity that the test administrator is required to be certified by the test publisher or State, as applicable, when a test is given at an assessment center by a test administrator who is an employee of the center, we have modified § 668.151(b)(1) by adding the word certified prior to the reference to test administrator.

*Changes:* We have amended § 668.151(b)(1) by adding the word "certified" prior to the reference to test administrator.

*Comment:* One commenter objected to the increased burden associated with the proposed requirement that test administrators at assessment centers be certified by the test publisher or State, as applicable.

*Discussion:* During the negotiations, the Department was told about the high incidence of staff turnover at assessment centers. One test publisher participating in the negotiations expressed concern that new staff have been trained to administer the approved ATB tests by other members of the

assessment center staff and, as a result, were providing ATB tests without being properly certified by the test publisher or State. We agree that in order to meet the new definition of the term *test administrator* in § 668.142 and to meet the increased standards of training, knowledge, skills and integrity, that it is vital for all test administrators to be certified in order to administer an approved ATB test consistent with the requirements of subpart J of part 668 and the written instructions of the test provider. Moreover, we believe that the increase in burden falls mainly upon the test publisher or the State, rather than the institution.

*Changes:* None.

*Comment:* One commenter suggested that we clarify the definition of the term *independent test administrator* by modifying it to clarify that an independent test administrator cannot have any current or prior financial interest in the institution, but that he or she may earn fees for properly administering an approved ATB test at that institution. Another commenter suggested that the definition of the term ☐ *test administrator* be expanded to include test proctors.

*Discussion:* Section 668.142, in pertinent part, defines an *independent test administrator* as a test administrator who administers tests at a location other than an assessment center and who has no current or prior financial or ownership interest in the institution, its affiliates, or its parent corporation, other than the fees earned for administering approved ATB tests through an agreement with the test publisher or State, and has no controlling interest in any other institution and has no controlling interest in any other institution. We agree that independent test administrators may obtain a fee for the administration of ATB tests generally through a written contract between the test publisher or State and the test administrator. In order to clarify this single type of allowable financial interest, we have made a change to the language in this definition.

On the matter of expanding the definition of the term *test administrator* to include test proctors, we disagree with this suggestion. The reason we disagree with the commenter's suggestion is that subpart J of part 668 specifically restricts the administration of ATB tests to test administrators certified by the test publisher or State to administer their tests, as defined in the agreement between the Secretary and the test publisher or State, as applicable. We believe it would be confusing to add test proctors to the definition of a test administrator because only certified test administrators can administer ATB tests for title IV, HEA program purposes. We

believe certification is an appropriate requirement because it insures that the approved tests are administered by trained, skilled, and knowledgeable professions.

*Changes:* We have amended the definition of the term *independent test administrator* by clarifying that an independent test administrator must have no current or prior financial or ownership interest in the institution, its affiliates, or its parent corporation, other than the fees earned through the agreement an independent test administrator has with the test publisher or State to administer the test.

**Application for Test Approval (§ 668.144)**

Back to Top

*Comment:* One commenter strongly supported the proposed change in the language regarding the norming group in §§ 668.144(c)(11)(iv)(B) and 668.146(c)(4)(ii) that requires the group to be a contemporary sample that is representative of the population of persons who have earned a high school diploma in the United States.

*Discussion:* The statute provides that a student who does not have a high school diploma or its equivalent can become eligible for title IV, HEA program assistance if the student takes an independently administered examination and achieves the score specified by the Secretary that demonstrates that the student has the ability to benefit from the training being offered. As an alternative to obtaining a high school diploma, it is appropriate that the normative group used to establish the relative placement of the test-taker's results should be comprised of U.S. high school graduates rather than a group of persons who are beyond the usual age of compulsory school attendance in the United States. However, we take this opportunity to remind institutions that a fundamental component of the definition of the term *institution of higher education* requires that an eligible and participating institution may admit as regular students only persons who have a high school diploma (or have the recognized equivalent) or are beyond the age of compulsory school attendance. Therefore, it is clear that for the purpose of establishing title IV, HEA program eligibility, approved ATB tests may only be provided to students who are beyond the age of compulsory school attendance.

*Changes:* None.

*Comment:* Several commenters supported the proposal to include in the test publisher's or State's screening of potential test administrators, their evaluation of a test administrator's integrity. In response to our request in the NPRM for feedback about how a test publisher or a State will determine—in

accordance with §§ 668.144(c)(16)(i) and 668.144(d)(7)(i)— that a test administrator has the integrity necessary to administer tests, we received a number of suggestions. These included the following—

- Requiring a prospective test administrator to sign, under penalty of perjury, an application indicating whether he or she had ever been convicted of fraud, breach of fiduciary responsibilities, or other illegal conduct involving title IV, HEA programs;

- Including a question on the test administrator's application asking whether the applicant has ever been convicted of a crime and, if the answer to this question is "yes", requiring the applicant to provide additional details;

- Including a question on the test administer application asking whether the applicant has ever worked at an institution of higher education, and if the answer to this question is "yes", requiring the applicant to provide additional details; and

- Requiring test publishers and States to perform fingerprinting and background checks, including a check for being included in any lawsuit, as well as, checking for arrests and convictions, for each test administer.

*Discussion:* We appreciate the commenters' suggestions regarding ways test publishers and States can evaluate whether a test administrator has the integrity necessary to administer ATB tests. While test publishers and States can adopt any of the methods proposed by the commenters, we do not believe it is appropriate to require all test publishers and States to use those methods to evaluate test administrator integrity. Rather, we believe § 668.144, as proposed, will provide test publishers and States with the flexibility they need to determine that the test administrator will have the necessary training, knowledge, skills and integrity to test students in accordance with subpart J of part 668 and the requirements of the test administration technical manual. Under § 668.144, test publishers and States are required to disclose how they will go about making these determinations. When evaluating the information provided by test publishers and States, we will be looking at their processes and to what extent information collected by the test publisher or State supports their determination of whether a prospective test administrator can demonstrate his or her training, knowledge, skills and integrity. In addition, we will compare the requirements in the test administration technical manual to the other provisions in § 668.144 that require test

administrators to have both the ability and facilities to keep the ATB tests secure against disclosure or release and how those issues are explained to prospective test administrators, how any monitoring may be achieved to insure that the tests are being protected.

*Changes:* None.

*Comment:* One commenter recommended that test publishers and States should not be required to disclose any proprietary information, such as test anomaly analysis, to the Department due to the proprietary nature of the study techniques. The commenter stated that, if the Department decides that test publishers and States must provide their test anomaly study procedures, the Department should provide assurances that the information will be kept confidential.

*Discussion:* It is important that test publishers and States provide the ☐ Department with their test anomaly analysis because the Department needs to understand the specific test anomaly analysis methodology employed by each test publisher or State, as applicable, to insure that they have established a robust process and procedures to identify potential test anomalies, methods to investigate test anomalies, due process in the investigation of these anomalies, as well as, the types of corrective action plans and the means of implementation of the corrective action plans, up to and including the decertification of test administrators. Because the Department agrees that test anomaly analyses may be proprietary, the Department will not release this information to the public and will otherwise treat the information as confidential.

*Changes:* None.

*Comment:* One commenter suggested that the Department define the term "test irregularities" and explain the distinction between test irregularities and test score irregularities.

*Discussion:* An ATB test irregularity occurs when the ATB test is administered in a manner that does not conform to the established rules for test administration. An ATB test score irregularity is one type of ATB test irregularity. For example, improper seating that would allow test-takers to be so close to one another that each test-taker could observe the test answer sheets or test answers on another test-taker's computer screen is an example of an ATB test score irregularity. We agree with the commenter that a clear understanding of proper test administration is needed to prevent test irregularities. For this reason, we have added a definition of the term *ATB test irregularity* to § 668.142. In addition, test publishers and

States include instructions to the ATB test administrator in their test administration manuals. Section § 668.144(c)(12) requires test publishers to include in their applications the manual they provide to test administrators. We believe it is appropriate to also require States to include their test manuals in their applications. Accordingly, we have added a new § 668.144(d)(11) to require States to include, as part of its submission to the Secretary, the State's manual for test administration.

Additionally, we have determined that in proposed § 668.144(c)(10), regarding test-taking time determinations, our reference to § 668.146(b)(2) was imprecise. Section 668.146(b)(2) relates only to sampling the major content domains, not to sampling the major content domains with regard to test-taking time. Therefore, we have revised this paragraph to refer to § 668.146(b)(3), which includes as a requirement for test approval, the appropriate test-taking time to permit adequate sampling of the major content domains. We have also added a provision to specify that a test publisher may include with its application a description of the manner in which test-taking time was determined in relation to the other requirements in § 668.146(b) to provide the flexibility for test publishers to include a more comprehensive description of the way in which test-taking time was determined.

*Changes:* In § 668.142, we have defined an *ATB test irregularity* as an irregularity that results from an ATB test being administered in a manner that does not conform to the established rules for test administration consistent with the provisions of subpart J and the test administrator's manual. We also have added new § 668.144(d)(12) to include a requirement that a State, in its submission of an ATB test for approval, must include a manual provided to test administrators containing the procedures and instructions for test security and administration.

In § 668.144(c)(10), we have made a technical correction to specifically reference § 668.146(b)(3) rather than § 668.146(b)(2) and added a provision to specify that a test publisher may include with its application a description of the manner in which test-taking time was determined in relation to the other requirements in § 668.146(b).

**Test Approval Procedures (§ 668.145)**

Back to Top

*Comment:* One commenter requested that the Department provide examples of a substantial change that would cause the Department to revoke its approval consistent with proposed § 668.145(d)(1).

*Discussion:* Section 668.144 lists the components of an application that test publishers and States must submit for the Secretary's approval of an ATB test as an alternative to having a high school diploma or its recognized equivalent. The list of required items for submission includes a summary of the precise editions, forms, levels, and sub-tests for which approval is being sought. In addition, we require that a minimum of two or more secure, equated, alternate forms of the test must be submitted. Moreover, the regulations require that if a test is being submitted as a revision of a previously approved test, the test publisher or State, as applicable, must also submit an analysis of the revisions, including the reasons for the revisions, the implications of the revisions for the comparability of scores on the currently approved test to scores on the revised test, and the data from validity studies of the revised test undertaken subsequent to the revisions. Taken together, the regulations require the test publisher and the State to submit their tests, including all forms or editions of those tests, for approval. If the approved tests are revised, we have addressed how revised tests along with the supportive data must be submitted for approval under §§ 668.144(c)(9) and (d)(12).

Examples of substantive changes are (1) when a previously approved ATB test in a pencil and paper format is converted to a computerized test, and (2) when a previously approved ATB test in a pencil and paper format is converted to a voice recorded format. In each of these examples, the test publisher or State is required to submit the list of required submissions above.

An example of a non-substantive change is a correction of a typographical error. We will not require analysis of and submission for approval for non-substantive changes; however, it is important to note that if these changes are documented and shared with the Secretary, we would be able to address inquiries or comments from the public regarding these changes. Recognizing that we cannot provide an exhaustive list that would cover every situation, we encourage test developers to contact us if they have questions about changes to an approved test and whether the proposed changes would be considered substantive or non-substantive.

*Changes:* None.

**Criteria for Approving Tests (§ 668.146)**

Back to Top

*Comment:* One commenter noted that the 1985 American Psychological Association (APA) edition of the *Standards for Educational and Psychological Testing* (Standards) addressed test construction in terms of meeting "primary, secondary and

conditional" standards. The commenter pointed out that the 1999 revised edition of the Standards no longer makes these distinctions and instead requires test developers and users to consider all the standards before operational use and does not continue the practice of designating levels of importance. As a result, the commenter suggested that we remove the reference to the words "meeting all primary and applicable conditional and secondary standards for test construction" in proposed in § 668.146(b)(6) because they are confusing. The commenter suggested—as an alternative—that we adopt language that the Department used in 34 CFR 462.13(c)(1) (*i.e.,*"The ☐ test must meet all applicable and feasible standards for test construction and validity provided in the 1999 edition of the Standards for Educational and Psychological Testing").

*Discussion:* As discussed in the 1999 edition of the Standards, each standard should be considered to determine its applicability to the test being constructed. There may be reasons why a particular standard cannot be adopted; for example, if the test in question is relatively new, it may not be possible to have sufficient data for a complete analysis. As a result of the information in the 1999 edition of the Standards, we have made a change to the proposed language in § 668.146(b)(6) to reflect that tests must meet all applicable standards. However, we do not believe that we should include all "feasible" standards in the regulatory language. We believe that where a standard is not feasible, it would also not be applicable, as provided in the example, thus the inclusion of the word "feasible" is duplicative.

*Changes:* We have revised § 668.146(b)(6) by eliminating outdated references to primary, secondary and conditional standards to make the provision consistent with the language used in the most recent edition of the Standards.

### Additional Criteria for the Approval of Certain Tests (§ 668.148)

Back to Top

*Comment:* One commenter indicated that their program of instruction is taught in Spanish to non-English speakers with an English as a Second Language (ESL) component. The commenter asked the Department for guidance for populations where there is no approved ATB test in the native language of the students.

*Discussion:* Under § 668.148, if a program is taught in a foreign language, a test in that foreign language would need to satisfy the conditions for approval under §§ 668.146 and 668.148. Absent an approved ATB test, students without a high school diploma or its equivalent could meet the alternative under proposed § 668.32(e)(5), whereby a student has been determined to have the ability to benefit from the

education or training offered by the institution based upon the satisfactory completion of 6 semester hours, 6 quarter hours, or 225 clock hours that are applicable toward a degree or certificate offered by that institution where the hours were earned. If no test is reasonably available for students whose native language is not English and who are not fluent in English, institutions will no longer be able to use any test that has not been previously rejected for approval by the Secretary. We proposed this regulatory change because we recognized that, in the last 15 years, no ATB test in a foreign language has been submitted for approval. Therefore, under the current ATB regulations, any test in a foreign language became an approved ATB test regardless of whether it measured basic verbal and quantitative skills and general learned abilities, whether the passing scores related to the passing scores of other recent high school graduates, or whether these tests were developed in accordance with the APA standards. We believe that the removal of this overly broad exception from the current regulations will improve compliance and works in concert with the change reflected in § 668.32(e)(5), which allows for an exception where ability to benefit can be measured against a standard (the successful earning of six credits toward a degree or certificate program at that institution).

*Changes:* None.

### Agreement Between the Secretary and a Test Publisher or a State (§ 668.150)

Back to Top

*Comment:* Under proposed § 668.150(b)(3)(ii), the agreement between the Secretary and a test publisher or a State requires that certified test administrators have the ability and facilities to keep ATB tests secure. One commenter stated that it does not favor storage of ATB tests anywhere other than at the institution. Another commenter offered to work with the Department and other test publishers to develop guidelines that will improve ATB test security.

*Discussion:* While ATB tests can be used for more than title IV, student eligibility determination purposes (such as for other assessment purposes), institutions, assessment center staff, as well as, independent test administrators will continue to have access to these tests. Given this reality, we acknowledge that securing tests and preventing test disclosure or release is difficult. We established the requirement in § 668.150(b)(3)(ii) in order to balance the need for legitimate access and security. We appreciate the commenter's offer to work with the Department and other test publishers to develop guidelines to improve test security.

*Changes:* None.

*Comment:* One commenter supported the requirement in proposed § 668.150(b)(3)(iii) that only allows test administrators to be certified when they have not been decertified within the last three years by any test publisher. This commenter inquired how, other than through self-reporting, a test publisher or State would have the information necessary to meet this requirement. The commenter also asked if we intend to develop, implement, and maintain a database of decertified test administrators.

*Discussion:* Under proposed § 668.144(c)(16) and (d)(7), a test publisher and a State, respectively, must describe its test administrator certification process. The Department plans to evaluate each of the test publisher's or State's certification plans to determine how they will obtain the information about test administrator decertifications by other test publishers or States. Under proposed § 668.150(b)(2), each test administrator will be required to provide to the publisher or State, as appropriate, a certification statement to indicate that the test administrator is not currently decertified and that the test administrator will notify the test publisher or State immediately if any other test publisher or State decertifies the test administrator. At this time, the Department does not plan to establish a list of all decertified test administrators.

*Changes:* None.

*Comment:* One commenter indicated that proposed § 668.150(b)(4), which provides that test administrators must be decertified under certain circumstances, will require States and test publishers to take great care when analyzing the facts prior to decertifying any test administrator. Section 668.150(b)(4) states that the agreement between the Secretary and a test publisher or a State must require the decertification of a test administrator who (a) Fails to administer the test in accordance with the test publisher's or State's requirements, (b) has not kept the test secure, (c) has compromised the integrity of the testing process, or (d) violated the test administration requirements in § 668.151.

One commenter also expressed concern that proposed § 668.150(b)(4) seems to remove the test publisher's or State's discretion about how to address certain violations of test administration rules. That commenter asked whether other corrective action is still a possible outcome, or whether decertification for any violation of the regulations or the test publisher's or State's test administration requirements is the only permissible outcome.

*Discussion:* We understand the comment regarding decertification of test administrators and that test publishers and States will need to take care when carrying out their obligations under these regulations. For example, we expect that a test publisher or State would provide an administrator an opportunity to respond to any finding ⬚ warranting decertification, including any finding based on inferences from the analysis required under § 668.151(b)(13). Regarding the inquiry whether § 668.151(b)(4) removes discretion and requires decertification without the possibility of other corrective action, we note that States and publishers are required to establish appropriate test instructions that ensure the integrity of the test and compliance with the requirements of the regulations. Having established the appropriate instructions, we do expect States and test publishers to decertify test administrators that fail to follow the test instructions or for any of the other reasons specified in § 668.151(b)(4). For example, we expect a test publisher or State to decertify a test administrator whenever it finds that a certified test administrator—

- Alters or falsifies answers or scores;

- Provides a test-taker with answers to the ATB test in order to improve the test-taker's score; or

- Allows a test-taker—other than a test-taker who is a person with a documented disability—extra time beyond the approved amount time as provided by the test publisher or State.

In situations where there is no evidence or basis to conclude that one or more of the four reasons specified in § 668.151(b)(4) has occurred, but there are other irregularities of another or lesser nature, we would expect test publishers and States to take the appropriate corrective action to protect the proper administration of its ATB test.

*Changes:* None.

*Comment:* Several commenters expressed concern about § 668.150(b)(5), which requires the test publisher or State to reevaluate the qualifications of a test administrator who has been decertified by another test publisher or State, even when the test publisher or State lacks any evidence of its own that the test administrator has performed in a manner inconsistent with the requirements in subpart J of part 668 or as required in the test administration manual.

*Discussion:* Under § 668.150(b)(2), a test administrator is required to certify that he or she is not currently decertified

and, in the event he or she subsequently is decertified, that he or she will immediately notify all other test publishers and States who have provided their certification. To the extent that a test administrator, who is certified by test publishers A, B, and C, as well as States 1 and 2, is decertified by State 1, the test administrator is required to immediately notify the other testing organizations and make them aware that the test administrator has been decertified by State 1. Upon receipt of such notification, under § 668.150(b)(5), each of the other test publishers and the other State will reevaluate the qualifications of that test administrator. While the other testing organizations may not know the factual basis for the decertification by State 1, § 668.150(b)(5) requires the other testing organizations to examine this test administrator's work. Based upon the testing organization's analysis, additional professional scrutiny, and the facts as a result of their reevaluation, the other testing organizations must make a determination of whether to continue the test administrator's certification or to decertify the test administrator for cause. The fact that a test administrator has been decertified by one testing entity is sufficient cause to require that all other test publishers or States be alerted both to the fact that there was a problem of sufficient magnitude to require decertification by the other test publisher or State, and that they need to make an additional review and subsequent determination of whether testing problems could be occurring with the administration of their ATB test.

*Changes:* None.

*Comment:* One commenter recommended that we modify proposed § 668.150(b)(5) to provide that test publishers and States are not liable for damages in the event a test administrator is decertified wrongly. This commenter indicated that proposed § 668.150(b)(6), which requires that the test publisher or State notify the Secretary and institutions immediately after decertifying a test administrator, is overly broad and that test publishers and States should be able to end their relationship with a test administrator for any reason.

*Discussion:* We cannot indemnify test publishers or States for actions that a former employee may take against a test publisher or State. This is one of the reasons it is so important to strengthen these regulations including by requiring that, as a part of the test developer's (a test publisher or a State) submission, it describe in detail the test administrator certification process—specifically how the test developer will determine that the test administrator will have the training, knowledge, skills and integrity to administer the test

consistent with the regulations and the requirements as established by the test publisher or the State. Because the current regulations already require the decertification of test administrators who fail to give the test in accordance with the test publisher's instructions, who fail to secure the tests, who compromise the test, or who violate the provisions of § 668.151 (Administration of tests), we do not anticipate that the changes to subpart J of part 668 reflected in these final regulations will cause an increase in legal actions brought by former test administrators. However, we do expect that these regulations will cause test publishers and States to strengthen their procedures and training to ensure that only properly trained test administrators will be certified by test publishers and States.

Notification of the Secretary and institutions when a test administrator is decertified is required for a variety of compliance and other issues. The Secretary needs to know to what extent a test publisher or State has a problem causing the decertification of test administrators. Recent GAO and OIG reports have reported a variety of compliance concerns around ATB testing. The Secretary has a responsibility to protect students, prospective students, institutions and taxpayers. Through these requirements, one new compliance metric will be the number of decertifications by test publishers or States, which the Secretary will monitor. Notification of any decertification by a test publisher or State to the institution is required due to the fact that institutions depend on the test publisher or State to provide certified test administrators and, therefore, are completely reliant upon test publishers and States to notify the institution of when a test administrator is no longer certified and must not be administering tests to students for title IV, HEA student eligibility determination purposes.

*Changes:* None.

*Comment:* One commenter suggested that when a test publisher or State suspends a test administrator while it conducts an investigation into a possible violation of its requirements or the regulations, the test publisher or State should not have to immediately report the suspension to the Secretary and the institution. The commenter also suggested that there should be a time limit after which notification by the test publisher or State to the Secretary and the institutions would not be required.

*Discussion:* Proposed § 668.150(b)(6) requires the immediate notification of the Secretary and all institutions where the test administrator administered tests upon decertification. We

assume that in cases of suspected test administrator violations, a suspension period will occur while fact-finding, analysis, and ultimately a determination will be made to either continue the test ☐ administrator's certification or to decertify the test administrator. The notification requirement reflected in § 668.150(b)(6) only applies immediately after a test administrator is decertified—not during the suspension period. Notification of the Secretary or others of a test administrator's suspended status is voluntary, but is an action that the Department supports.

The commenter suggested that this notification requirement be waived after a certain appropriate period of time. We do not agree. Consistent with the provisions of §§ 682.402(e) and 685.212(e), students may have their loan debt obligations discharged under a false certification discharge if the school certified the student's eligibility for a FFEL or a William D. Ford Federal Direct Loan on the basis of ability to benefit from its training and the student did not meet the applicable requirements of subpart J of part 668. Because these loans generally have a 10-year repayment schedule (and may have repayment plans under which repayment schedules can be extended to 25 or more years), we do not agree to limit the requirement to notify to the Secretary and institutions.

*Changes:* None.

*Comment:* One commenter strongly supported proposed § 668.150(b)(7), which requires that all test results administered by a test administrator who the test publisher or State decertifies be reviewed and that a determination be made about which tests were improperly administered. Upon a determination of which tests had been improperly administered, the test publisher or State must then immediately notify the affected institutions, affected students and affected prospective students. This commenter suggested that we revise this provision to require that the test publisher or State notify all students tested by the decertified test administrator.

Another commenter suggested that we add a time limit to § 668.150(b)(7)(i) so that test publishers and States that decertify a test administrator are only required to review tests administered by the decertified administrator during a specified period of time.

*Discussion:* Under proposed § 668.150(b)(7)(ii), when a determination of improper test administration is made, the test publisher or State must provide notification to all affected institutions and students or prospective students. Under §

668.150(b)(7)(iii), the test publisher or State must also provide a report to the Secretary on the results of the review of the decertified test administrator's previously administered tests that may have been improperly administered. When a determination is made that tests were improperly administered, the affected entities would include institutions, students, and prospective students affected by those tests that were improperly administered. Under § 668.150(b)(7), notifications to those affected entities are required. We believe that these notification and reporting requirements are adequate to inform all affected parties, including students and prospective students. We do not believe it is necessary to notify a student who took a test administered by a test administrator who was subsequently decertified when there is no evidence that the particular test the student took was improperly administered.

Under proposed § 668.150(b)(7), if a test administrator was certified over a long number of years, test publishers and States potentially would be required to review many years' worth of previously administered ATB tests because, as proposed, this regulatory requirement included no limit on how far back test publishers and States would need to go when reviewing tests previously administered by a decertified test administrator. We believe that the burden on test publishers and States associated with such an extensive review should be balanced against the significant student loan debt that students tested by the decertified test administrator may have incurred. For this reason, we are modifying the language in proposed § 668.150(b)(7)(i) to limit the period of the review to the five-year period prior the date of decertification. We believe that a five-year period is reasonable for the following reasons. First, we are decreasing the period of time for test publishers and States to conduct their test data anomaly studies from 3 years to 18 months. These studies, which are designed, in part, to analyze if there are ATB test irregularities, will be conducted more frequently and can be used to identify possible instances of improper test administration. Second, we believe that a longer review period will increase the likelihood that the student notification efforts of test publishers and States (in the event that their review reveals that previously administered tests were improperly administered) will be ineffective, in part, due to the low probability that the student address information that a test publisher or State obtains when the student takes the test will remain accurate over this period of the review. Finally, we strongly recommend that test publishers and States consider additional disclosures to students asking that they update their address information

with test publishers and States over time, in order for test publishers and States to provide students and prospective students with potential future notifications that could reduce their future title IV, student loan indebtedness.

*Changes:* We have revised § 668.150(b)(7)(i) to indicate that the period of the review of all the test results of the tests administered by a decertified test administrator is 5 years preceding the date of decertification.

*Comment:* One commenter, who expressed support for the proposed change reflected in § 668.150(b)(13) decreasing the timeframe from 3 years to 18 months for test publishers and States to analyze ATB test scores to determine whether the test scores and data produce any irregular patterns, suggested that that the Department also consider a separate metric for test administrators who administer large numbers of ATB test within an 18 month period.

*Discussion:* We appreciate the recommendation and acknowledge that test publishers and States are free to adopt such a suggestion for test administrators who are providing large numbers of ATB test administrations in a short period of time. As some test publishers have pointed out, test publishers have everything to gain from ensuring that their ATB tests are properly administered in accordance with the regulations and their test administration manual. To the extent that there are high volume test administrators, test publishers and States can best protect their tests by developing processes to help them to determine early whether these high volume test administrators are in compliance.

*Changes:* None.

*Comment:* One commenter suggested that the Department consider a modification to the language in § 668.150(b)(13) to change the emphasis from an analysis of the test scores to an analysis of the test data.

*Discussion:* The purpose of proposed § 668.150(b)(13) (in concert with proposed §§ 668.144(c)(17) and (d)(8), which require test publishers and States, as applicable, to explain their methodology for identifying test irregularities) is to require test publishers and States to collect and analyze test data, to determine whether the test scores and data produce any irregular patterns that raise an inference that the tests were not being properly administered, and to provide the Secretary with a copy of the test anomaly analysis. We acknowledge that this type of analysis is broader than just examining the test outcomes, *i.e.* the test scores. Because this type of item analysis, which can yield statistical irregularities,

goes beyond test score results, we have modified the proposed language accordingly.

*Changes:* We have modified § 668.150(b)(13) so that it refers to "test data of students who take the test" and not to "test scores of students who take the test" to determine whether the test data (rather than "the test scores and data") produce any irregular pattern that raises an inference that the tests were not being properly administered.

*Comment:* One commenter suggested that the Department modify proposed § 668.150(b)(14) to require that any request for information by the Secretary or other listed agencies and entities be in writing.

*Discussion:* Nothing in the regulations would prevent the test publisher or State from asking the entities listed in § 668.150(b)(14) to request the information in writing, and from implementing other safeguards to protect the security and confidentiality of the data.

*Changes:* None.

*Comment:* One commenter stated that § 668.150(b)(16), as proposed, is ambiguous. The commenter suggested that we delete the word "other," as it modifies "criminal misconduct," from this section.

*Discussion:* Upon further review, we have determined that alternative language that specifically provides for both civil and criminal fraud would clarify what we mean in this regulatory provision. The purpose of § 668.150(b)(16) is to require test publishers and States to immediately report any credible information indicating that a test administrator or institution may have engaged in fraud or other criminal misconduct. We intend for test publishers and States to report suspected fraud or misconduct without requiring them to ascertain whether the conduct constitutes civil fraud, criminal fraud or "other criminal misconduct."

*Changes:* We have revised § 668.150(b)(16) to require that the agreement between a test publisher or a State, as applicable, and the Secretary must provide that the test publisher or the State, as applicable, must immediately contact the Office of the Inspector General of the Department of Education if the test publisher or the State finds any credible information indicating that a test administrator or institution has engaged in civil or criminal fraud or other misconduct.

*Comment:* One commenter expressed general support for proposed § 668.150(b)(17), which requires test administrators who provide an ATB test to an individual with a disability who

requires an accommodation, to report to the test publisher or State both the disability and the accommodation. However, the commenter recommended that the Department provide clarification on how test publishers and States can exchange this information in a manner that would be compliant with the Health Insurance Portability and Accountability Act (HIPAA). Additionally, the commenter requested an explanation of the Department's position on distinguishing between an accommodation provided for an individual with a temporary impairment and an accommodation required by a person with a permanent or long-term disability.

*Discussion:* HIPAA is administered by the U.S. Department of Health and Human Services and the Department of Education does not provide guidance on how entities should comply with another agency's requirements. However, it is our expectation that test administrators, test publishers and States will implement the requirement reflected in § 668.150(b)(17) consistent with all other applicable Federal statutes and their implementing regulations.

With regard to the comment requesting an explanation of the Department's position on the differences between accommodations for test-takers with temporary impairments and accommodations for test-takers with permanent or long-term disabilities, we note that the regulations do not distinguish between types of accommodations. However, we acknowledge that test-takers may require accommodations for either temporary impairments or for individuals with disabilities. [1]

The following two examples are provided:

*Example 1 (Temporary Impairment).* If an approved ATB test is provided via paper and pencil and the test-taker, who is normally right-handed, has a broken right hand and, as a result, must write with his or her left hand, the test administrator must provide the test-taker an accommodation in accordance with the test publisher or State's technical manual for test administration. So, in this case, if the technical manual indicates that under a temporary impairment, such as, but not limited to, a broken writing hand, the test administrator should allow the test-taker an additional "X" minutes to complete the test, the test administrator must allow the test-taker with the broken writing hand an extra "X" minutes to complete the test.

*Example 2 (Disability).* If an approved ATB test is provided via paper and pencil and the test-taker is an individual with a disability, such as blindness. To the extent that the test

publisher or State has addressed in the technical manual consistent with the requirements of § 668.144(c)(11)(vii) and provided additional guidance on the interpretation of scores resulting from any modifications of the test for individuals with disabilities, for example, the use of a previously approved audio recorded version would be permissible. In this example, there may or may not be scoring implications, however, an appropriate accommodation as provided in the technical manual is allowable as approved under this subpart.

Absent any instructions in the technical manual about accommodations for individuals with disabilities or individuals with temporary impairments, the test administrator does not have the authority to create or provide an accommodation other than what is provided in § 668.149. Historically, test publishers have addressed types of accommodations available to test administrators in their test administration technical manual, which the test publisher or State provides to the Secretary as part of its test submission. Once the test is approved by the Secretary, the accommodations indicated in the test administration technical manual are the approved accommodations for the test. In addition, subsequent to the Secretary's initial approval of an ATB test, some test publishers, consistent with the provisions of § 668.144(c)(9), have developed large-print versions, braille versions, and audio-recorded versions of their previously-approved tests and submitted the alternative versions along with the requisite analysis of the revisions for their comparability of scores to the previously approved test, as well as the data on the validity studies of the revised or alternative version of the previously approved test. Once approved, and as published in the **Federal Register**, these alternative versions of the previously approved test would provide for certain accommodations that may be required by individuals with disabilities. ▢

*Changes:* None.

| Administration of Tests (§ 668.151) | *Comment:* One commenter provided a number of suggestions regarding test administration security, including requiring that (1) test publishers contact the Department when tests are being used for ATB and non-ATB purposes, (2) different versions of the test be used for different purposes so that one version is used exclusively for ATB purposes, (3) ATB tests only be shipped to test administrators and not to institutions, and (4) ATB tests be locked in an area that cannot be accessed by non-certified test administrators. |

Back to Top

*Discussion:* Many ATB tests that have been submitted to the

Secretary and subsequently approved for title IV, HEA student eligibility purposes are also used for general academic placement purposes not related to ATB. Regarding the suggestion that test administrators report to the Department when a test is used for ATB purposes, beginning with the 2011-2012 award year, we will begin collecting information on the use of an ATB test for each student who receives title IV, HEA funds; therefore test administrators will not have to provide the information to us. In terms of requiring that approved ATB tests must be used exclusively for this single purpose, that would require a statutory change. While it has been suggested that we revise the regulations to allow ATB tests only be shipped to test administrators and not to institutions, we believe that this is not feasible given that ATB tests are used both for title IV, HEA eligibility and non-title IV purposes, such as for course placement purposes. Finally, while it may be possible that at the discretion of the institution's assessment center (or as a result of an agreement between the test publisher or State and the institution) that ATB tests be locked in an area only accessible by certified test administrators, this may be impractical since these tests are used for non-title IV eligibility purposes.

*Changes:* None.

*Comment:* A commenter indicated that for computer-based tests, institutions maintain the associated system components on their computers, so test administrators (particularly independent test administrators) cannot be held responsible for maintaining the security of these types of tests, other than during the test administration.

For paper-and-pencil tests, the commenter expressed strong concerns regarding independent test administrators being held responsible for storing test materials. The commenter stated that independent test administrators often do not have access to secure storage, other than at the campuses where they administer the test. Use of their home or automobile for storage and transportation to test sites is clearly unacceptable for security. Institutions typically have a secure location (a locked facility to which only the test administrator and possibly a select few individuals have a key) where materials can be stored. In addition, many institutions use the same test forms for ATB purposes and other purposes, and thus would already have copies of the test forms in storage at the institution. The commenter argued that maintaining test forms at the institution while emphasizing the chain of custody, under written agreements, will better contribute to the goal of keeping test forms secure.

*Discussion:* We disagree. Proposed § 668.144(c)(16) and (d)(7) require test publishers and States, respectively, to ensure not only that the test administrator has the training, knowledge, skill and integrity to test students in accordance with the requirements of this subpart, and the requirements of the test administration technical manual, but also, that the test administrator has the ability and facilities to keep the ATB tests secure against disclosure or release. We believe that these requirements are reasonable, and prudent, and will help ensure the integrity of ATB tests. While at this time, we are not prescribing how test publishers or States must make these determinations about their test administrators, we expect that they will base their determinations on the measures taken by the test administrator to protect the security of the tests. For example, one could envision a test administrator satisfying this requirement by having a secure safe in the assessment center where only certified test administrators had the key or combination to obtain the tests. In the case of an independent test administrator, one could envision the test administrator satisfying the requirement by maintaining the tests in a mobile, portable safe or some other secure device. As these examples illustrate, test publishers and States will be required to distinguish between secure and non-secure methods of storing ATB tests that limit access and protect against unintended release or disclosure if these tests are going to continue to be used for ATB purposes, otherwise the Secretary will consider that the test is improperly administered.

*Changes:* None.

### Administration of Tests for Individuals Whose Native Language Is Not English or for Individuals With Disabilities (§ 668.153)

Back to Top

*Comment:* One commenter noted that if a non-English speaking student is in a program of study which is taught in the student's native language and the program also has an ESL component or that at least a portion of the program will be taught in English, there are two aspects that need to be tested, the student's reading, verbal and quantitative skills in their own native language, as well as, their knowledge of English in order to understand the portion of the program taught in English. The commenter expressed concern regarding the timing of these tests.

*Discussion:* We appreciate this comment because it highlights the need to address a situation not covered by the proposed regulations. Under proposed § 668.153(a)(1), we require institutions to use an ATB test in the student's native language when the student's native language is other than English and the student will be enrolled in a program that is taught in the student's native language. Paragraphs (a)(2) and (a)(3) of

proposed § 668.153 address situations where individuals who are not native speakers of English and who are not fluent in English are enrolled (or plan to enroll) in a program (a) that is taught in English with an ESL component and (b) that is taught in English without an ESL component, respectively. The proposed regulations do not address what happens in the case of a non-English speaker who is enrolled or plans on enrolling in a program that will be taught in his or her native language that includes an ESL component or a portion of the program will be taught in English. In situations such as these, we believe that institutions should require the student to take an English proficiency assessment approved under § 668.148(b) prior to when the English or ESL portion of the program commences.

*Changes:* We have added a new paragraph (a)(5) to § 668.153 to provide that if the individual is a non-native speaker of English who is enrolled or plans to enroll in a program that will be taught in his or her native language and the program includes an ESL component or a portion of the program will be taught in English, the individual must take a test approved under §§ 668.146 and 668.148(a)(1) in the student's native language. This new paragraph also provides that prior to the beginning of the ESL component or when the English portion of the program ▯ commences, the individual must take an English proficiency test approved under § 668.148(b).

*Comment:* One commenter suggested that most test administrators do not have the training or experience to determine appropriate accommodations for students with disabilities, and thus are not qualified to identify or provide an appropriate accommodation. This commenter argued that test publishers and States should not be held accountable for training test administrators in the intricacies of laws regarding the rights of persons with disabilities. The commenter stated that, to protect the privacy of the examinee, the test administrator should not need to know the specifics of the disability. This commenter argued that the test administrator only needs to know what the accommodation is. For this reason, the commenter recommended that the test administrator only be required to verify that the institution has provided the appropriate documentation of the student's disability, as described in § 668.153(b)(4). It was the commenter's view that the responsibility for determining the appropriate accommodation for the student's disability lies with the institution's staff.

*Discussion:* We agree that test administrators may not have extensive training or experience to determine whether or not a

requested accommodation is appropriate. However, each test must be administered in accordance with the test publisher's or State's technical manual. Consistent with proposed § 668.144(c)(11)(vii) and (d)(11)(vii), the technical manual must include additional guidance on the interpretation of scores resulting from any modifications of the test for individuals with disabilities. We expect that a test publisher or State will provide examples in the technical manual of the types of both allowable and non-allowable accommodations associated with a range of temporary impairments and for individuals with disabilities in order to insure that the test administrator has the necessary protocols to follow to ensure the validity of the test administration process, while allowing for a range of specialized needs to be met. While these examples of allowable and non-allowable accommodations cannot be exhaustive, we will expect them to be expansive so that test administrators have clear examples of how the approved tests can and cannot be used for individuals with temporary impairments and for individuals with disabilities. These protocols may include, for example, the use, when appropriate, of alternative tests (*e.g.*, approved audio-recorded ATB tests for individuals who are blind) and providing a test-taker whose vision is impaired (as documented by a physician) additional time to complete an approved large print version of an ATB test. To make this expectation clearer, we will revise § 668.144(c)(11)(vii) and (d)(11)(vii) to require a test's technical manual to include additional guidance on the types of accommodations that are allowable for individuals with temporary impairments or individuals with disabilities and the interpretation of scores resulting from any modifications of the test for individuals with temporary impairments or individuals with disabilities.

*Changes:* We have modified § 668.144(c)(11)(vii)and (d)(11)(vii) to require the test manual to include, in addition to guidance on the interpretation of scores resulting from modification of the test for individuals with temporary impairments or individuals with disabilities, guidance on the types of accommodations that are allowable.

Disbursements (§§ 668.164(i), 685.102(b), 685.301(e), 686.2(b), and 686.37(b))

Back to Top

## Provisions for Books and Supplies (§ 668.164(i))

*Comment:* Several commenters agreed with the proposal in § 668.164(i) to require an institution to provide, under certain conditions, a way for a Federal Pell Grant eligible student to obtain or purchase required books and supplies by the seventh day of a payment period.

Various commenters noted the academic importance of enabling students to have early access to their books and

supplies. However, some of these commenters argued that bookstore vouchers were not the most affordable option for students, noting that under current guidance an institution that issues vouchers in lieu of cash must demonstrate it provides students "a real and reasonable opportunity" to obtain materials from other vendors.

Two commenters requested that the regulations also apply to students who are eligible for the Iraq and Afghanistan Service Grants.

Various commenters believed the proposed regulations would be administratively difficult and burdensome to carry out. One of the commenters stated that institutions with nonterm programs would have special administrative problems meeting the proposed regulations because of different start dates and different payment period completion rates for students. Another commenter requested the Department to delay implementing the regulations so that institutions have sufficient time to make needed software and procedural changes. One commenter believed that the student should be required to initiate a request to obtain or purchase books and supplies instead of requiring an institution to perform this process for all Federal Pell Grant eligible students.

*Discussion:* Because we have identified situations where low-cost institutions delay disbursing funds for an extended time, or make partial disbursements to cover costs for only tuition and fees, the Department believes that these provisions are essential in enabling needy students to purchase books and supplies at the beginning of the term or enrollment period. Moreover, we find it troubling that disbursement delays at some institutions may force very needy students to take out private loans to pay for books and supplies that would otherwise be paid by Federal Pell Grant funds.

We believe that the regulations in § 668.164(i) provide an appropriate balance between the need for Federal Pell Grant eligible students to be able to purchase or obtain books and supplies early in the payment period and the administrative needs of institutions. For example, an institution may issue a bookstore voucher, make a cash disbursement, issue a stored-value card, or otherwise extend credit to students to make needed purchases. The institution has the flexibility to choose one or more of these methods or a similar method based on its administrative needs and constraints or an evaluation of the costs and benefits of implementing one or more of these methods.

With regard to the request to expand the scope of the

regulations to include recipients of Iraq and Afghanistan Service Grants, we believe that students who are not eligible for a Federal Pell Grant should have sufficient resources, as indicated by their higher expected family contributions, to purchase books and supplies. We note however, that nothing in these regulations prevents an institution from making credit balance funds available early in the payment period to any student.

In response to concerns about administrative issues for nonterm programs, we note that for purposes of the Federal Pell Grant Program an institution is already responsible for knowing when a student has either completed a payment period or started a payment period. These regulations fall within that framework.

Concerning the request for a delay in implementing these regulations, we believe that an institution has ample time to make any administrative and software changes required since the regulations are not effective until the 2011-2012 award year.

*Changes:* None.

*Comment:* Some commenters questioned whether the anticipated credit balance for a student under the proposed regulations is calculated based only on Federal Pell Grant funds; all title IV, HEA program funds; or all financial aid funds.

In determining whether an institution could disburse title IV, HEA program funds to an eligible student 10 days before the beginning of a payment period, several commenters requested the Department to clarify how an institution treats a student who (1) Is selected for verification, (2) is subject to the 30 day delayed disbursement provisions for first-time, first-year undergraduate borrowers, (3) is attending a term-based program with minisessions, (4) has a "C" code on the SAR or ISIR, or (5) has other unresolved eligibility issues.

Some commenters requested that the regulations provide that an institution is only required to provide a student with the funds or bookstore vouchers for books and supplies after the student has attended at least one day of class.

One commenter noted that under Federal law a bank must have a customer identification program to help the government fight the funding of terrorism. Under that program, a bank must verify the identity of any person who opens an account and have procedures in place to resolve conflicting identity data. The commenter was concerned that

for institutions using bank-issued stored-value cards or prepaid debit cards to deliver funds for books and supplies, any delays by the bank in resolving the conflicts would delay the delivery of funds to students. Consequently, the commenter requested that the regulations allow for this type of delay.

One commenter asked how the proposed regulations would apply under a consortium agreement between two eligible institutions if the student is enrolled in a course at the host institution with the class starting prior to the payment period at the home institution and the home institution is processing and paying the title IV, HEA program assistance. Another commenter asked what action would be required by an institution if it includes books and supplies in the tuition and provides all of those materials to the student when he or she starts class.

*Discussion:* With regard to which aid funds are used to determine whether a credit balance would be created 10 days before the beginning of a payment period, an institution must consider all the title IV, HEA program funds that a student is eligible to receive at that time. The institution does not have to consider aid from any other sources.

To be eligible, the student must meet all the eligibility requirements in subpart C of 34 CFR part 668 at least 10 days before the start of the student's payment period. A student who has not completed the verification process, has an unresolved "C" code on the SAR and ISIR, or has unresolved conflicting information is not covered by the regulations if those issues have not been resolved at least 10 days before the start of the student's payment period. With regard to the 30-day delayed disbursement provisions for Stafford Loans, the institution would not consider the amount of the loan disbursement in determining the credit balance because the institution may not disburse that loan 10 days before the start of that student's payment period. Also, the institution would not consider title IV, HEA program assistance that has not yet been awarded to a student at least 10 days before the start of classes because the student missed a financial aid deadline date.

The amount that the institution must provide to a qualifying student to obtain or purchase books and supplies is the lesser of the presumed credit balance or the amount needed by the student as determined by the institution. In determining the amount needed, an institution may use the actual costs of books and supplies or the allowance for those materials used in the student's cost of attendance for the payment period.

Since an institution has until the seventh day of a student's payment period to provide the way for the student to obtain or purchase the books and supplies, the institution may determine whether the student has attended classes if it has, or chooses to implement, a process for taking or monitoring attendance. However, by the seventh day of the payment period, that student must be able to obtain books and supplies unless the institution knows that the student is not attending.

When an institution uses a bank-issued stored-value or prepaid debit card that is supported by a federally insured bank account to deliver funds for books and supplies, a student must have access to the funds via the card by the seventh day of his or her payment period. If a bank delays issuing a stored-value or prepaid debit card to the student because it must resolve conflicting identity data under Federal law, the Department will not hold the institution accountable as long as the institution exercises reasonable care and diligence in providing in a timely manner any identity information about the student to the bank. Likewise, the institution is not responsible if the student provides inaccurate information or delays in responding to a request from the bank to resolve any discrepancies.

Under a consortium agreement between two eligible institutions, if a student is enrolled in a course at the host institution and classes start before the payment period begins at the home institution that is paying the title IV, HEA program assistance, the regulations require that the student obtain the books and supplies by the seventh day of the start of the payment period of the home institution. If the host institution is paying the title IV, HEA program assistance, the student must be able to obtain the books and supplies by the seventh day of the start of the payment period of the host institution.

An institution that includes the costs of books and supplies in the tuition charged and provides all of those materials to the student at the start of his or her classes meets the requirements of these regulations.

*Changes:* None.

*Comment:* Several commenters were concerned over who would be liable for advancing funds to a student for books and supplies if the student fails to start all of his or her classes. Some commenters indicated that the potential debt owed to an institution by students under the proposed regulations is not in the best interest of the student. A few commenters noted that the use of bookstore vouchers as the way for a student to

obtain books and supplies appears to increase the amount of unearned title IV funds that the institution must return when a student withdraws.

*Discussion:* These regulations do not change the provisions under 34 CFR 668.21 concerning the treatment of title IV grant and loan funds if the recipient does not begin attendance at the institution. In the case where the institution has credited the student's account at the institution or disbursed directly to the student any Federal Pell Grant, FSEOG, Federal Perkins Loan, TEACH Grant, ACG, or National SMART Grant program funds and the student fails to begin attendance in a payment period, the institution must return all of those program funds to the respective program. 

In addition, an institution must return any Direct Loan funds that were credited to the student's account at the institution for the payment period or period of enrollment. For any Direct Loan funds disbursed directly to a student, the institution must notify the Department of the loan funds that are outstanding, so that the Department can issue a 30-day demand letter to the student under 34 CFR 685.211. If the institution knew prior to disbursing any of the Direct Loan funds directly to the student that he or she would not begin attendance, the institution must also return those Direct Loan funds. This would apply when, for example, a student had previously notified the institution that he or she would not be attending or the institution had expelled the student before disbursing the Direct Loan directly to the student.

When an institution is responsible for returning title IV, HEA program funds for a student who failed to begin attendance at the institution it must return those funds as soon as possible, but no later than 30 days after the date that the institution becomes aware that the student will not or has not begun attendance. The funds that are required to be returned by the institution are not a student title IV, HEA liability and will not affect the student's title IV, HEA eligibility. However, institutional charges not paid by financial assistance are a student liability owed to the institution and subject to its own collection process.

The new requirement also does not change the regulations in 34 CFR 668.22 on handling the Return of Title IV Aid when a student began attendance but withdraws from the payment period or period of enrollment. If the institution provides a bookstore voucher for a student to obtain or purchase books and supplies, those expenses for the required course materials are considered institutional charges because the student does not have a real and reasonable opportunity to purchase the

materials from any other place except the institution. The institution must include the charges for books and supplies from a bookstore voucher as institutional charges in determining the portion of unearned title IV, HEA program assistance that the institution is responsible for returning. However, an institution does not have to select the bookstore voucher as the way to meet the new requirement, it is just one option.

*Changes:* None.

*Comment:* One commenter opined that students who are not Pell Grant eligible would be unfairly responsible for obtaining funds to purchase books while others at the same institution would be confused about who should or should not receive the means to obtain or purchase books and supplies at the beginning of the term or enrollment period. A few commenters suggested or asked whether a student could opt out of the way offered by an institution to obtain or purchase books and supplies.

Some commenters asked if the proposed regulations were in conflict with the current Cash Management regulations in §§ 668.164 and 668.165. A few commenters requested clarification on how student authorizations applied to the new requirements. Some commenters suggested that an institution should not be required to obtain a student's authorization to credit his or her account at the institution with title IV, HEA program funds for books and supplies, while other commenters recommended that an institution should be able to require the student's authorization before advancing funds for books and supplies.

*Discussion:* Under § 668.16(h), an institution is required to provide adequate financial aid counseling to eligible students who apply for title IV, HEA program assistance and under § 668.42, an institution is required to provide consumer information to enrolled and prospective students that, among other things, describe the method by which aid is determined and disbursed, delivered, or applied to a student's account and the frequency of those disbursements. Further under § 668.165(a)(1), before an institution disburses title IV, HEA funds it must notify a student how and when those funds will be disbursed. Based on these requirements, an institution must describe in its financial aid information and its notifications provided to students receiving title IV, HEA funds the way under § 668.164(i) that it provides for Federal Pell Grant eligible students to obtain or purchase required books and supplies by the seventh day of a payment period under certain conditions. The information must indicate

whether the institution would enter a charge on the student's account at the institution for books and supplies or pay funds to the student directly. Institutions also routinely counsel students about the variations in the amounts of Federal student aid or other resources that are available to them based upon their need and expected family contribution. We believe that this counseling process will mitigate any confusion by explaining to a student who qualifies for funds advanced to purchase books and supplies, how the process is handled at the institution, and how a student may opt-out of the process.

Regardless of the way an institution provides for a student to obtain books and supplies, the student may opt out. For instance, if an institution provides a bookstore voucher, the student may opt out by not using the voucher. If the institution uses another way, such as a bank-issued stored-value or prepaid debit card, it must have a policy under which the student may opt out. For example, a student might have to notify the institution by a certain date so that the institution does not unnecessarily issue a check to the student or transfer funds to the student's bank account. In any case, if the student opts out, the institution may, but is not required to, offer the student another way to purchase books and supplies so long as it does not otherwise delay providing funds to the student as a credit balance. We are amending the regulations to clarify that a student may opt out of the way that an institution provides for a student to obtain books and supplies.

In addition, to facilitate advancing funds or credit by the seventh day of classes of a payment period under this provision, the Department considers that a student authorizes the use of title IV, HEA funds at the time the student uses the method provided by the institution to purchase books and supplies. This means that an institution does not need to obtain a written authorization under §§ 668.164(d)(1)(iv) and 668.165(b) from the student to credit a student's account at the institution for the books and supplies that may be provided only under § 668.164(i). We are amending the regulations to indicate that an institution does not need to obtain a written authorization from a student to credit the student's account at the institution for books and supplies provided under § 668.164(i).

*Changes:* Section 668.164(i) has been revised to specify that an institution must have a policy under which a Federal Pell Grant eligible student may opt out of the way the institution provides for the student to purchase books and supplies by the seventh day of classes of a payment period. In addition, § 668.164(i) has been revised to specify that if the Federal Pell

Grant eligible student uses the method provided by the institution to purchase books and supplies, the student is considered to have authorized the use of title IV, HEA funds and the institution does not need to obtain a written authorization under §§ 668.164(d)(1)(iv) and 668.165(b) for this purpose only. 

## Reporting Disbursements, Adjustments, and Cancellations (§§ 685.102(b), 685.301(e), 686.2(b), and 686.37(b))

Back to Top

*Comment:* A few commenters supported the proposed regulations to adopt the Federal Pell Grant reporting requirements for the TEACH Grant and Direct Loan programs and to add the Federal Pell Grant definition of the term *Payment Data* to the two other programs.

*Discussion:* We believe that harmonizing the reporting requirements for the Federal Pell Grant, TEACH Grant, and Direct Loan programs in accordance with procedures established by the Secretary through publication in the **Federal Register** will make it easier for institutions to administer the programs. In addition, this flexibility to adjust the reporting requirements for all three programs through publication in the **Federal Register** will enable the Secretary to make changes in the future that take advantage of new technology and improved business processes.

*Changes:* None.

## Executive Order 12866

Back to Top

### Regulatory Impact Analysis

Under Executive Order 12866, the Secretary must determine whether the regulatory action is "significant" and therefore subject to the requirements of the Executive Order and subject to review by the OMB. Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action likely to result in a rule that may (1) Have an annual effect on the economy of $100 million or more, or adversely affect a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local or tribal governments or communities in a material way (also referred to as an "economically significant" rule); (2) create serious inconsistency or otherwise interfere with an action taken or planned by another agency; (3) materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive order.

Pursuant to the terms of the Executive order, we have determined this proposed regulatory action will have an

annual effect on the economy of more than $100 million. Therefore, this action is "economically significant" and subject to OMB review under section 3(f)(1) of Executive Order 12866. Notwithstanding this determination, we have assessed the potential costs and benefits—both quantitative and qualitative—of this regulatory action. The agency believes that the benefits justify the costs.

A detailed analysis, including the Department's Regulatory Flexibility Act certification, is found in Appendix A to these final regulations.

**Paperwork Reduction Act of 1995**

Back to Top

Sections 668.6, 668.8, 668.16, 668.22, 668.34, 668.43, 668.55, 668.56, 668.57, 668.59, 668.144, 668.150, 668.151, 668.152, and 668.164 contain information collection requirements. Under the Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)), the Department has submitted a copy of these sections to OMB for its review.

### Section 668.6—Gainful Employment

The final regulations will impose new requirements on certain programs that by law must, for purposes of the title IV, HEA programs, prepare students for gainful employment in a recognized occupation. For public and private nonprofit institutions, a program that does not lead to a degree will be subject to the eligibility requirement that the program lead to gainful employment in a recognized occupation, while a program leading to a degree, including a two-academic-year program fully transferrable to a baccalaureate degree, will not be subject to this eligibility requirement. For proprietary institutions, all eligible degree and non-degree programs will be required to lead to gainful employment in a recognized occupation, except for a liberal arts baccalaureate program under section 102(b)(1)(A)(ii) of the HEA.

An institution will be required under final § 668.6(a) to report for each student, who during an award year, began attending or completed a program under § 668.8(c)(3) or (d), information that includes, at a minimum, information needed to identify the student and the location of the institution the student attended, the CIP code of the program, the date the student completed the program, the amounts the student received from private educational loans and the amount from institutional financing plans that the student owes the institution after completing the program, and whether the student matriculated to a higher credentialed program at the institution or another institution. We estimate that it will take

the affected 1,950 proprietary institutions, on average, 12 hours to develop the processes necessary to implement the requirements in § 668.6(a) for students who, during the award year, began attending or completed a program under § 668.6(c)(3) or (d). These processes include ones to record student identifier information, to record the CIP codes associated with these programs, to record completion dates, to determine and record the amounts the student received from private educational loans and the amount from institutional financing plans that the student owes the institution after completing the program, and to record data on students who matriculate to higher credentialed programs at the same or at another institution. Therefore, burden will increase for these affected proprietary institutions by 23,400 hours.

We estimate that it will take the affected 1,736 private not-for-profit institutions, on average, 12 hours to develop the processes necessary to implement the requirements in § 668.6(a) for students who, during the award year, began attending or completed a program under § 668.6. These processes include ones to record student identifier information, to record the CIP codes associated with these programs, to record completion dates, to determine and record the amounts the student received from private educational loans and the amount from institutional financing plans that the student owes the institution after completing the program, and to record data on students who matriculate to higher credentialed programs at the same or at another institution. Therefore, burden will increase for these affected private not-for-profit institutions by 20,832 hours.

We estimate that it will take the affected 1,915 public institutions, on average, 12 hours to develop the processes necessary to implement the requirements in § 668.6(a) for students who, during the award year, began attending or completed a program under § 668.6. These processes include ones to record student identifier information, to record the CIP codes associated with these programs, to record completion dates, to determine and record the amounts the student received from private educational loans and the amount from institutional financing plans that the student owes the institution after completing the program, and to record data on students who matriculate to higher credentialed programs at the same or at another institution. Therefore, burden will increase for these affected public institutions by 22,980 hours. Collectively, we estimate that burden for institutions to meet these process development requirements in accordance with procedures established by the Secretary will increase burden by ⬚ 67,212 hours in OMB

Control Number 1845-NEW1.

We estimate that annually there will be 3,499,998 students who will begin attendance in occupational programs that train students for gainful employment in a recognized occupation. We estimate that 1,996,593 of the 3,499,998 students will attend a proprietary institution. Therefore, with regard to proprietary institutions, the total number of affected students is estimated to be 5,989,779 students (1,996,593 times 3) for the initial reporting period that will cover the 2006-2007 award year, the 2007-2008 award year and the 2008-2009 award year. We estimate that the reporting of student identifier information, the location of the institution the student attended, and the CIP codes for each beginning student (*i.e.,* a student who during the award year began attending a program under § 668.8(c)(3) or (d)) will average .03 hours (2 minutes) per student or 179,693 hours of increased burden.

We estimate that 161,308 of the 3,499,998 students will attend a private not-for-profit institution. Therefore, with regard to not-for-profit institutions, the total number of affected students is estimated to be 483,924 students (161,308 times 3) for the initial reporting period that will cover the 2006-2007 award year, the 2007-2008 award year and the 2008-2009 award year. We estimate that the reporting of student identifier information, the location of the institution the student attended, and the CIP codes for each beginning student will average .03 hours (2 minutes) per student or 14,518 hours of increased burden.

We estimate that 1,342,097 of the 3,499,998 students will attend a public institution. Therefore, with regard to public institutions, the total number of affected students is estimated to be 4,026,291 students (1,342,097 times 3) for the initial reporting period that will cover the 2006-2007 award year, the 2007-2008 award year and the 2008-2009 award year. We estimate that the reporting of student identifier information, the location of the institution the student attended, and the CIP codes for each beginning student will average .03 hours (2 minutes) per student or 120,789 hours of increased burden.

Collectively, we estimate that burden for institutions to meet these reporting requirements for a student who during the award year began attending a program under § 668.8(c)(3) or (d) will increase burden by 315,000 hours in OMB Control Number 1845-NEW1.

We estimate that annually there will be 567,334 students who will complete their occupational programs that train students

for gainful employment in a recognized occupation. We estimate that 325,416 of the 567,334 students will attend a proprietary institution. Therefore, with regard to proprietary institutions, the total number of affected students is estimated to be 976,248 students (325,416 times 3) for the initial reporting period that will cover the 2006-2007 award year, the 2007-2008 award year and the 2008-2009 award year. We estimate that the reporting of student identifier information, the location of the institution the student attended, the CIP codes for each graduate, the date of completion, the amounts the students received from private education loans and the amount from institutional financing plans that the student owes the institution after completing the program, and whether the student matriculated to a higher credentialed program at the same or another institution will average .08 hours (5 minutes) per student or 78,100 hours of increased burden.

We estimate that 33,627 of the 567,334 students will attend a private not-for-profit institution. Therefore, with regard to not-for-profit institutions, the total number of affected students is estimated to be 100,881 students (33,627 times 3) for the initial reporting period that will cover the 2006-2007 award year, the 2007-2008 award year and the 2008-2009 award year. We estimate that the reporting of student identifier information, the location of the institution the student attended, the CIP codes for each graduate, the date of completion, the amounts the student received from private education loans and the amount from institutional financing plans that the student owes the institution after completing the program, and whether the student matriculated to a higher credentialed program at the same or another institution will average .08 hours (5 minutes) per student or 8,070 hours of increased burden.

We estimate that 208,291 of the 567,334 students will attend a public institution. Therefore, with regard to public institutions, the total number of affected students is estimated to be 624,873 students (208,291 times 3) for the initial reporting period that will cover the 2006-2007 award year, the 2007-2008 award year and the 2008-2009 award year. We estimate that the reporting of student identifier information, the location of the institution the student attended, the CIP codes for each graduate, the date of completion, the amounts the student received from private education loans and the amount from institutional financing plans that the student owes the institution after completing the program, and whether the student matriculated to a higher credentialed program at the same or another institution will average .08

hours (5 minutes) per student or 49,990 hours of increased burden.

Additionally, later in the initial year of reporting, institutions will have to report information on students who began attendance during the 2009-2010 award year. We estimate that annually there will be 3,499,998 students who will begin attendance in occupational programs that train students for gainful employment in a recognized occupation. As established above, we estimate that 1,996,593 of the 3,499,998 students will begin occupational programs at proprietary institutions during the 2009-2010 award year. We estimate that the reporting of student identifier information, the location of the institution the student attended, and the CIP codes for each beginning student (*i.e.,* a student who during the award year began attending a program under § 668.8(c)(3) or (d)) will average .03 hours (2 minutes) per student or 59,898 hours of increased burden.

We estimate that 161,308 of the 3,499,998 students will attend a private not-for-profit institution. We estimate that the reporting of student identifier information, the location of the institution the student attended, and the CIP codes for each beginning student will average .03 hours (2 minutes) per student or 4,839 hours of increased burden.

We estimate that 1,342,097 of the 3,499,998 students will attend a public institution. We estimate that the reporting of student identifier information, the location of the institution the student attended, and the CIP codes for each beginning student will average .03 hours (2 minutes) per student or 40,263 hours of increased burden.

Similarly, we estimate that annually there will be 567,334 students who will complete their occupational programs that train students for gainful employment in a recognized occupation during the 2009-2010 award year. We estimate that 325,416 of the 567,334 students will complete their program at a proprietary institution during the 2009-2010 award year. We estimate that the reporting of student identifier information, the location of the institution the student attended, the CIP codes for each graduate, the date of completion, the amounts the students received from private education loans □ and the amount from institutional financing plans that the student owes the institution after completing the program, and whether the student matriculated to a higher credentialed program at the same or another institution will average .08 hours (5 minutes) per student or 26,033 hours of increased burden for the 2009-2010 award year.

We estimate that 33,627 of the 567,334 students will complete their program at a private not-for-profit institution. We estimate that the reporting of student identifier information, the location of the institution the student attended, the CIP codes for each graduate, the date of completion, the amounts the student received from private education loans and the amount from institutional financing plans that the student owes the institution after completing the program, and whether the student matriculated to a higher credentialed program at the same or another institution will average .08 hours (5 minutes) per student or 2,690 hours of increased burden during the 2009-2010 award year.

We estimate that 208,291 of the 567,334 students will complete their program at a public institution during the 2009-2010 award year. We estimate that the reporting of student identifier information, the location of the institution the student attended, the CIP codes for each graduate, the date of completion, the amounts the student received from private education loans and the amount from institutional financing plans that the student owes the institution after completing the program, and whether the student matriculated to a higher credentialed program at the same or another institution will average .08 hours (5 minutes) per student or 16,663 hours of increased burden for the 2009-2010 award year.

Collectively, we estimate that burden for institutions to meet these reporting requirements for students who begin attendance or complete their occupational programs that train students for gainful employment in a recognized occupation will increase burden by 658,758 hours in OMB Control Number 1845-NEW1.

Finally, under § 668.6(b) an institution will be required to disclose to each prospective student information about (1) The occupations (by names and Standard Occupational Code (SOC) codes) that its programs prepare students to enter, along with links to occupational profiles on O*NET or its successor site, or if the number of occupations related to the program on O*Net is more than ten (10), the institution may provide Web links to a representative sample of SOC codes for which its graduates typically find employment within a few years after completing their program; (2) the on-time graduation rate for students entering the program; (3) the total amount of tuition and fees it charges a student for completing the program within normal time as defined in § 668.41(a), the typical costs for books and supplies, and the cost of room and board, if applicable. The institution may include information on other costs, such as transportation and

living expenses, but it must provide a Web link, or access, to the program cost information the institution makes available under § 668.43(a); (4) beginning on July 1, 2011, the placement rate for students completing the program, as determined under the institution's accrediting agency or State requirements, until a new placement rate methodology is developed by the National Center for Education Statistics (NCES) and reported to the institution; and (5) the median loan debt incurred by students who completed the program as provided by the Secretary, as well as any other information the Secretary provided to the institution about that program. The institution must identify separately the median loan debt from title IV, HEA programs and the median loan debt from private educational loans and institutional financing plans.

We estimate that of the 5,601 institutions with these occupational programs that 1,950, or 35%, are proprietary institutions. We estimate that of the 5,601 with these occupational programs that 1,736, or 31%, are private not-for-profit institutions. We estimate that of the 5,601 with these occupational programs that 1,915, or 34%, are public institutions. Because under the revised disclosure requirements, institutions may use a representative sample of SOC codes and use placement rate data already required by their accrediting agency or State, or data that will be provided by the Department, we estimate that on average, it will take 1.5 hours for an institution to obtain the required disclosure information from O*Net and its own programmatic cost information and to provide that information on its Web site and in its promotional materials. Therefore, we estimate that burden for 1,950 proprietary institutions will increase by 2,925 hours. We estimate that burden for 1,736 private not-for-profit institutions will increase by 2,604 hours. We estimate that burden for 1,915 public institutions will increase by 2,873 hours.

Collectively, we estimate that burden for institutions to meet these disclosure requirements for prospective students will increase burden by 8,402 hours in OMB Control Number 1845-NEW1.

We estimate the total burden under this section to increase by 677,160 hours in OMB Control Number 1845-NEW1.

### Section 668.8—Eligible Program

Under S668.8(l)(1), we will revise the method of converting clock hours to credit hours to use a ratio of the minimum clock hours in an academic year to the minimum credit hours in an

academic year, *i.e.,* 900 clock hours to 24 semester or trimester hours or 36 quarter hours. Thus, a semester or trimester hour will be based on at least 37.5 clock hours, and a quarter hour will be based on at least 25 clock hours. Section 668.8(l)(2) will create an exception to the conversion ratio in § 668.8(l)(1) if neither an institution's designated accrediting agency nor the relevant State licensing authority for participation in the title IV, HEA programs determines there are any deficiencies in the institution's policies, procedures, and practices for establishing the credit hours that the institution awards for programs and courses, as defined in § 600.2. Under the exception provided by § 668.8(l)(2), an institution will be permitted to combine students' work outside of class with the clock-hours of instruction in order to meet or exceed the numeric requirements established in § 668.8(l)(1). However, under § 668.8(l)(2), the institution will need to use at least 30 clock hours for a semester or trimester hour or 20 clock hours for a quarter hour.

In determining whether there is outside work that a student must perform, the analysis will need to take into account differences in coursework and educational activities within the program. Some portions of a program may require student work outside of class that justifies the application of § 668.8(l)(2). In addition, the application of § 668.8(l)(2) could vary within a program depending on variances in required student work outside of class for different portions of the program. Other portions of the program may not have outside work, and § 668.8(l)(1) will need to be applied. Of course, an institution applying only § 668.8(l)(1) to a program eligible for conversion from clock hours to credit hours, without an analysis of the program's coursework, will be considered compliant with the requirements of § 668.8(l). 

Section 668.8(k)(1)(ii) will modify a provision in current regulations to provide that a program is not subject to the conversion formula in § 668.8(l) where each course within the program is acceptable for full credit toward a degree that is offered by the institution and that this degree requires at least two academic years of study. Additionally, under § 668.8(k)(1)(ii), the institution will be required to demonstrate that students enroll in, and graduate from, the degree program.

Section 668.8(k)(2)(i) will provide that a program is considered to be a clock-hour program if the program must be measured in clock hours to receive Federal or State approval or licensure, or if completing clock hours is a requirement for graduates to apply for licensure or the authorization to practice the occupation that the student is intending to pursue.

Under § 668.8(k)(2)(ii) and (iii), the program will also be considered to be offered in clock hours if the credit hours awarded for the program are not in compliance with the definition of a credit hour in § 600.2, or if the institution does not provide the clock hours that are the basis for the credit hours awarded for the program or each course in the program and, except as provided in current § 668.4(e), requires attendance in the clock hours that are the basis for the credit hours awarded. The final regulations on which tentative agreement was reached will not include the provision in § 668.8(k)(2)(iii) that, except as provided in current § 668.4(e), an institution must require attendance in the clock hours that are the basis for the credit hours awarded.

Section 668.8(k)(3) will provide that § 668.8(k)(2)(i) will not apply if a limited portion of the program includes a practicum, internship, or clinical experience component that must include a minimum number of clock hours due to a State or Federal approval or licensure requirement.

We estimate that on average, for each affected program it will take .5 hours (30 minutes) for an institution to make the determination of whether the program is an affected program, to evaluate the amount of outside student work that should be included as final and to perform the clock hour to credit hour conversion. We further estimate that of the 4,587 institutions of higher education with less than 2-year programs, that on average, each institution has approximately 8 non-degree programs of study for a total of 36,696 affected programs. We estimate that there are 16,513 affected programs at proprietary institutions times .5 hours (30 minutes) which will increase burden by 8,257 hours. We estimate that there are 1,835 affected programs at private non-profit institutions times .5 hours (30 minutes) which will increase burden by 918 hours. We estimate that there are 18,348 affected programs at public institutions times .5 hours (30 minutes) which will increase burden by 9,174 hours.

Collectively, the final regulatory changes reflected in § 668.8 will increase burden by 18,349 hours in OMB Control Number 1845-0022.

## Section 668.16—Standards of Administrative Capability

Under the final regulations, the elements of the institution's satisfactory academic progress plan have been moved from current § 668.16(e) to § 668.34. We also have updated these provisions. As a result, the estimated burden upon institutions associated with measuring academic progress currently in

OMB Control Number 1845-0022 of 21,000 hours will be administratively removed from this collection and transferred to OMB Control Number 1845-NEW2.

Under § 668.16(p), an institution will be required to develop and follow procedures to evaluate the validity of a student's high school completion if the institution or the Secretary has reason to believe that the high school diploma is not valid or was not obtained from an entity that provides secondary school education. The burden associated with this requirement will be mitigated by the fact that many institutions already have processes in place to collect high school diplomas and make determinations about their validity.

We estimate that burden will increase for each institution by 3.5 hours for the development of a high school diploma validity process. We estimate that 2,086 proprietary institutions will on average take 3.5 hours to develop the final procedures to evaluate the validity of high school completions, which will increase burden by 7,301 hours. We estimate that 1,731 private non-profit institutions will on average take 3.5 hours to develop the final procedures to evaluate the validity of high school completion, which will increase burden by 6,059 hours. We estimate that 1,892 public institutions will on average take 3.5 hours to develop the final procedures to evaluate the validity of high school completion, which will increase burden by 6,622 hours.

Additionally, we estimate that the validity of approximately 4,000 high school diplomas per year will be questioned and that these diplomas will require additional verification, which we estimate will take .5 hours (30 minutes) per questionable diploma. We estimate that proprietary institutions will have 2,000 questionable diplomas, which will result in an estimated 1,000 hours of increased burden (2000 diplomas multiplied by .5 hours). We estimate that private non-profit institutions will have 600 questionable diplomas, which will result in an estimated 300 hours of increased burden (600 diplomas multiplied by .5 hours). We estimate that public institutions will have 1,400 questionable, which will result in an estimated 700 hours of increased burden (1400 diplomas multiplied by .5 hours).

Collectively, the final regulatory changes reflected in § 668.16 will increase burden by 21,982 hours in OMB Control Number 1845-0022.

### Section 668.22—Treatment of Title IV, HEA Program Funds When a Student Withdraws

The changes to § 668.22(a)(2) clarify when a student is considered to have withdrawn from a payment period or period of enrollment. In the case of a program that is measured in credit hours, the student will be considered to have withdrawn if he or she does not complete all the days in the payment period or period of enrollment that the student was scheduled to complete prior to withdrawing. In the case of a program that is measured in clock hours, the student will be considered to have withdrawn if he or she does not complete all of the clock hours in the payment period or period of enrollment that the student was scheduled to complete prior to withdrawing.

Section 668.22(f)(2)(i) clarifies that, for credit hour programs, in calculating the percentage of the payment period or period of enrollment completed, it is necessary to take into account the total number of calendar days that the student was scheduled to complete prior to withdrawing without regard to any course completed by the student that is less than the length of the term.

These final regulations will affect all programs with courses that are less than the length of a term, including, for example, a semester-based program that has a summer nonstandard term with two consecutive six-week sessions within the term.

We estimate that approximately 425,075 students in term-based programs with modules or compressed courses will withdraw prior to completing more than 60 percent of their program of study. We estimate that on average, the burden per individual student who withdraws prior to the 60 percent point of their term-based program to be .75 hours (45 minutes) ☐ per affected individual which will increase burden for the estimated 425,075 students by 318,806 hours in OMB Control Number 1845-0022. Of these 425,075 withdrawals, we estimate that 50 percent of the withdrawals (212,538) will occur at proprietary institutions and will increase burden by 1 hour per withdrawal increasing burden by 212,538 hours. We estimate that 10 percent of the withdrawals (42,508) will occur at private non-profit institutions and will increase burden by 1 hour per withdrawal increasing burden by 42,508 hours. We estimate that 40 percent of the withdrawals (170,029) will occur at public institutions and will increase burden by 1 hour per withdrawal increasing burden by 170,029 hours. Collectively, we estimate that burden will increase by 743,881 hours in OMB Control Number 1845-0022, of which 318,806 hours is for individuals and 425,075 hours is for institutions.

**Section 668.34—Satisfactory Progress**

The final regulations restructure the satisfactory academic progress requirements. Section 668.16(e) (Standards of administrative capability) has been revised to include only the requirement that an institution establish, publish and apply satisfactory academic progress standards that meet the requirements of § 668.34. The remainder of current § 668.16(e) has been moved to § 668.34 such that it, alone, describes all of the required elements of a satisfactory academic progress policy, as well as how an institution will implement such a policy. The references in § 668.32(e) have been updated to conform the section with the final changes we have made to §§ 668.16(e) and 668.32.

Section 668.34(a) specifies the elements an institution's satisfactory academic policy must contain to be considered a reasonable policy. Under these regulations, institutions will continue to have flexibility in establishing their own policies; institutions that choose to measure satisfactory academic progress more frequently than at the minimum required intervals will have additional flexibility (see § 668.34(a)(3)).

All of the policy elements in the current regulations under §§ 668.16(e) and 668.34 are combined in § 668.34. In addition, § 668.34(a)(5) makes explicit the requirement that institutions specify the pace at which a student must progress through his or her educational program to ensure that the student will complete the program within the maximum timeframe, and provide for measurement of a student's pace at each evaluation. Under § 668.34(a)(6), institutional policies will need to describe how a student's GPA and pace of completion are affected by transfers of credit from other institutions. This provision will also require institutions to count credit hours from another institution that are accepted toward a student's educational program as both attempted and completed hours.

Section 668.34(a)(7) provides that, except as permitted in § 668.34(c) and (d), the policy requires that, at the time of each evaluation, if the student is not making satisfactory academic progress, the student is no longer eligible to receive the title IV, HEA assistance.

Section 668.34(a)(8) requires institutions that use "financial aid warning" and "financial aid probation" statuses (concepts that are defined in § 668.34(b)) in connection with satisfactory academic progress evaluations to describe these statuses and how they are used in their satisfactory academic progress policies. Section 668.34(a)(8)(i) specifies that a student on financial aid warning may continue to receive assistance under the title IV, HEA programs for one payment period despite a

determination that the student is not making satisfactory academic progress. Financial aid warning status may be assigned without an appeal or other action by the student. Section 668.34(a)(8)(ii) makes clear that an institution with a satisfactory academic progress policy that includes the use of the financial aid probation status could require that a student on financial aid probation fulfill specific terms and conditions, such as taking a reduced course load or enrolling in specific courses.

Section 668.34(a)(9) will require an institution that permits a student to appeal a determination that the student is not making satisfactory academic progress to describe the appeal process in its policy. The policy will need to contain specified elements. Section 668.34(a)(9)(i) will require an institution to describe how a student may re-establish his or her eligibility to receive assistance under the title IV, HEA programs.

Under § 668.34(a)(9)(ii), a student will be permitted to file an appeal based on the death of a relative, an injury or illness of the student, or other special circumstances. Under § 668.34(a)(9)(iii), a student will be required to submit, as part of the appeal, information regarding why the student failed to make satisfactory academic progress, and what has changed in the student's situation that will allow the student to demonstrate satisfactory academic progress at the next evaluation.

Section 668.34(a)(10) will require the satisfactory academic progress policy of an institution that does not permit students to appeal a determination that they are not making satisfactory academic progress, to describe how a student may regain eligibility for assistance under the title IV, HEA programs.

Section 668.34(a)(11) will require that an institution's policy provide for notification to students of the results of an evaluation that impacts the student's eligibility for title IV, HEA program funds.

We estimate that, on average, institutions will take 3 hours per institution to review the final regulations in § 668.34(a) and implement any changes to their satisfactory academic policies to insure compliance. We estimate that 2,086 proprietary institutions will take 3 hours per institution to review and implement the final regulations, which will result in an estimated increase of 6,258 hours in burden. We estimate that 1,731 private non-profit institutions will take 3 hours per institution to review and implement the final regulations, which will result in an estimated increase of 5,193 hours in burden. We estimate that 1,892 public institutions will take 3 hours per institution to review and implement the final

regulations, which will result in an estimated increase of 5,676 hours in burden.

Collectively, the final regulatory changes reflected in § 668.34(a) will increase burden by 17,127 hours.

Section 668.34(c) and (d) will specify that an institution's policy may provide for disbursement of title IV, HEA program funds to a student who has not met an institution's satisfactory academic standards in certain circumstances. Of the 17 million applicants in 2008-2009, we estimate that 90 percent (or 15,300,000 individuals) will begin attendance. We estimate that of the 15,300,000 individuals that begin attendance, that 90 percent (or 13,770,000 individuals) will persist at least through the end of the initial payment period and, therefore, will be subject to the institutions' satisfactory academic progress consistent with the provisions of § 668.34. We estimate that 38 percent of participating institutions will evaluate their students at the end of each payment period under § 668.34(c); therefore we expect 5,232,600 individuals to be evaluated more than annually (13,770,000 individuals multiplied 38 percent). We estimate that 62 percent of participating institutions will evaluate their students once per ☐ academic year under § 668.34(d); therefore, we expect 8,537,400 individuals to be evaluated annually (13,770,000 individuals multiplied by 62 percent).

Section 668.34(c) will permit an institution that measures satisfactory academic progress at the end of each payment period to have a policy that will permit a student who is not making satisfactory academic progress to be placed automatically on financial aid warning, a newly defined term. We estimate that, as a result of this requirement, the burden associated with an academic progress measurement at the end of each payment period, and when required, the development of an academic plan for the student, will increase. We estimate that 1,936,062 individuals at proprietary institutions will require an academic review more than once per academic year (proprietary institutions, which comprise 37 percent of the total number of institutions of higher education, multiplied by 5,232,600 individuals). Given this number of individuals (1,936,062) and an average of 2 reviews per academic year under this requirement, we expect these institutions to conduct 3,872,124 satisfactory academic progress reviews. Because these academic progress reviews are generally highly automated, we estimate that, on average, each review will take .02 hours (1.2 minutes) and will increase burden by 77,442 hours.

We estimate that 1,569,780 individuals at private non-profit

institutions will require an academic review (private non-profit institutions, which comprise 30 percent of the total number of institutions of higher education, multiplied by 5,232,600 individuals). Given this number of individuals (1,569,780) and an average of 2 reviews per academic year under this requirement, we expect these institutions to conduct 3,139,560 satisfactory academic progress reviews. Because these academic progress reviews are generally highly automated, we estimate that, on average, each review will take .02 hours (1.2 minutes) and will increase burden by 62,791 hours.

We estimate that 1,726,758 individuals at public institutions will require an academic review (public institutions, which comprise 33 percent of the total number of institutions of higher education, multiplied by 5,232,600 individuals). Given this number of individuals (1,726,758) and an average of 2 reviews per academic year under this requirement, we expect these institutions to conduct 3,453,516 satisfactory academic progress reviews. Because these academic progress reviews are generally highly automated, we estimate that, on average, each review will take .02 hours (1.2 minutes) and will increase burden by 69,070 hours.

Collectively, we estimate that the burden for institutions under this requirement will increase by 209,303 hours, in OMB Control Number 1845-NEW2.

As a result of the final satisfactory academic progress reviews conducted by institutions, we estimate that 7 percent of the 5,232,600 enrolled students (at institutions that review academic progress more often than annually) or 366,282 will not successfully achieve satisfactory academic progress. For these students, institutions will need to work with each student to develop an academic plan and this will increase burden for the individual and the institutions. We estimate that under § 668.34(c), that 366,282 students will, on average, take .17 hours (10 minutes) to establish an academic plan for an increase of 62,268 burden hours and re-evaluate the plan a second time within the academic year for an additional increase of 62,268 burden hours (2 times per academic year), increasing burden to individuals by a total of 124,536 hours.

We estimate that 1,936,062 individuals at proprietary institutions will require the development of an academic plan as a result of not progressing academically (proprietary institutions, which comprise 37 percent of the total number of institutions of higher education, multiplied by 5,232,600 individuals). Given this number of individuals (1,936,062) multiplied by 7 percent (which is our estimate for those who

will not academically progress), we expect that 135,524 individuals will need to work with their institutions to develop an academic plan. We estimate that each academic plan will take, on average, .25 hours (15 minutes) of staff time at two times within the academic year, increasing burden by 67,762 hours.

We estimate that 1,569,780 individuals at private non-profit institutions will require the development of an academic plan as a result of not progressing academically (private non-profit institutions, which comprise 30 percent of the total number of institutions of higher education, multiplied by 5,232,600 individuals). Given this number of individuals (1,569,780) multiplied by 7 percent (which is our estimate for those who will not academically progress), we expect that 109,885 individuals will need to work with their institutions to develop an academic plan. We estimate that each academic plan will take, on average, .25 hours (15 minutes) of staff time at two times within the academic year, increasing burden by 54,943 hours.

We estimate that 1,726,758 individuals at public institutions will require the development of an academic plan as a result of not progressing academically (public institutions, which comprise 33 percent of the total number of institutions of higher education, multiplied by 5,232,600 individuals). Given this number of individuals (1,726,758) multiplied by 7 percent (which is our estimate for those who will not academically progress), we expect that 120,873 individuals will need to work with their institutions to develop an academic plan. We estimate that each academic plan will take, on average, .25 hours (15 minutes) of staff time at two times within the academic year, increasing burden by 60,437 hours.

Collectively, therefore, we estimate that the burden for institutions will increase by 183,142 hours, in OMB Control Number 1845-NEW2.

Under § 668.34(d), at an institution that measures satisfactory academic progress annually, or less frequently than at the end of each payment period, a student who has been determined not to be making satisfactory academic progress will be able to receive title IV, HEA program funds only after filing an appeal and meeting one of two conditions: (1) The institution has determined that the student should be able to meet satisfactory progress standards after the subsequent payment period, or (2) the institution develops an academic plan with the student that, if followed, will ensure that the student is able to meet the institution's satisfactory academic progress standards by a specific point in time.

Because the final regulations will transfer the elements of an institution's satisfactory academic policy from § 668.16(e) to § 668.34, we are transferring the current burden estimate of 21,000 hours from the current OMB Control Number 1845-0022 to OMB Control Number 1845-NEW2.

We estimate that 3,158,838 individuals at proprietary institutions (proprietary institutions, which comprise 37 percent of the total number of institutions of higher education, multiplied by 8,537,400 individuals) will require an academic review. Because the academic progress reviews are generally highly automated, we estimate that, on average, each review will take .02 hours (1.2 minutes) and will increase burden by 63,177 hours. We estimate that 2,561,220 individuals ☐ at private non-profit institutions will require an academic review (private non-profit institutions, which comprise 30 percent of the total number of institutions of higher education, multiplied by 8,537,400 individuals). Because the academic progress reviews are generally highly automated, we estimate that, on average, each review will take .02 hours (1.2 minutes) and will increase burden by 51,224 hours.

We estimate that 2,817,342 individuals at public institutions will require an academic review (public institutions, which comprise 33 percent of the total number of institutions of higher education, multiplied by 8,537,400 individuals). Because the academic progress reviews are generally highly automated, we estimate that, on average, each review will take .02 hours (1.2 minutes) and will increase burden by 56,347 hours.

Collectively, we estimate that the burden for institutions will increase by 170,748 hours, in OMB Control Number 1845-NEW2.

As a result of the final satisfactory academic progress reviews conducted by the institutions, we estimate that 7 percent of the 8,537,400 enrolled students (at institutions that review academic progress annually) or 597,618 will not successfully achieve satisfactory academic progress. For these students, institutions will need to work with each student to develop an academic plan and this will increase burden for the individual and the institutions. We estimate that under § 668.34(d), 597,618 students will, on average, take .17 hours (10 minutes) to establish an academic plan, increasing burden to individuals by 101,595 hours.

We estimate that 3,158,838 individuals at proprietary institutions will require the development of an academic plan as a result of not progressing academically (proprietary

institutions, which comprise 37 percent of the total number of institutions of higher education, multiplied by 8,537,400 individuals). Given this number of individuals (3,158,838) multiplied by 7 percent (which is our estimate for those who will not academically progress), we expect 221,119 individuals will need to work with their institutions to develop an academic plan. We estimate that each academic plan will take, on average, .25 hours (15 minutes) of staff time, increasing burden by 55,280 hours.

We estimate that 2,561,220 individuals at private non-profit institutions will require the development of an academic plan as a result of not progressing academically (private non-profit institutions, which comprise 30 percent of the total number of institutions of higher education, multiplied by 8,537,400 individuals). Given this number of individuals (2,561,220) multiplied by 7 percent (which is our estimate for those who will not academically progress), we expect 179,285 individuals will need to work with their institutions to develop an academic plan. We estimate that each academic plan will take, on average, .25 hours (15 minutes) of staff time, increasing burden by 44,821 hours.

We estimate that 2,817,342 individuals at public institutions will require the development of an academic plan as a result of not progressing academically (public institutions, which comprise 33 percent of the total number of institutions of higher education, multiplied by 8,537,400 individuals). Given this number of individuals (2,817,342) multiplied by 7 percent (our estimate for those who will not academically progress), we expect 197,214 individuals will need to work with their institutions to develop an academic plan. We estimate that each academic plan will take, on average, .25 hours (15 minutes) of staff time, increasing burden by 49,304 hours.

Collectively, we estimate that the burden for institutions will increase by 149,405 hours, in OMB Control Number 1845-NEW2.

In total, the final regulatory changes reflected in § 668.34 will increase burden by a total of 955,856 hours in OMB Control Number 1845-NEW2; however, when the 21,000 hours of burden currently in OMB 1845-0022 are administratively transferred from OMB 1845-0022 to OMB 1845-NEW2, the grand total of burden hours under this section will increase to 976,856 in OMB 1845-NEW2.

### Section 668.43—Institutional Information

The Department has amended current § 668.5(a) by revising

and redesignating paragraph (a) as paragraph (a)(1) and adding a new paragraph (a)(2). Section 668.5(a)(1) is based on the language that is in current § 668.5(a), but has been modified to make it consistent with the definition of an "educational program" in 34 CFR 600.2.

Section 668.5(a)(2) specifies that if a written arrangement is between two or more eligible institutions that are owned or controlled by the same individual, partnership, or corporation, the institution that grants the degree or certificate must provide more than 50 percent of the educational program. These clarifications are also intended to ensure that the institution enrolling the student has all necessary approvals to offer an educational program in the format in which it is being provided, such as through distance education when the other institution is providing instruction under a written agreement using that method of delivery.

Section 668.5(c)(1) includes an expanded list of conditions that will preclude an arrangement between an eligible institution and an ineligible institution.

Sections 668.5(e) and 668.43 will require an institution that enters into a written arrangement to provide a description of the arrangement to enrolled and prospective students.

We estimate that 104 proprietary institutions will enter into an average of 1 written arrangement per institution and that, on average, the burden associated with the information collections about written agreements and its disclosure required under § 668.5(e) and 668.43 will take .5 hours (30 minutes) per arrangement, increasing burden by 52 hours.

We estimate that 1,731 private non-profit institutions will enter into an average of 50 written arrangements per institution and that, on average, the burden associated with the final collection of information about written agreements and its disclosure will take .5 hours (30 minutes) per arrangement, increasing burden by 43,275 hours.

We estimate that 1,892 public institutions will enter into an average of 25 written arrangements per institution and that, on average, the burden associated with the final collection of information about written agreements and its disclosure will take .5 hours (30 minutes) per arrangement, increasing burden by 23,650 hours.

Collectively, we estimate that burden will increase for institutions in their reporting of the details of written agreements by 66,977 hours in OMB Control Number 1845-0022.

Currently, the Department requires that an institution must make available for review to any enrolled or prospective student upon request, a copy of the documents describing the institution's accreditation and its State, Federal, or tribal approval or licensing. The Department requires in § 668.43(b) that the institution must also provide its students or prospective students with contact information for filing complaints with its accreditor and State approval or licensing entity.

We estimate that 1,919 (or 92 percent of all 2,086 proprietary institutions) will have to begin providing contact information for filing complaints with accreditors, approval or licensing agencies. We estimate that the other 8 percent of proprietary institutions are ☐ already providing this information. We estimate that on average, this disclosure will take .17 hours (10 minutes) per disclosure and that it will, therefore, increase burden to proprietary institutions by 326 hours.

We estimate that 1,593 (or 92 percent of all 1,731 private non-profit institutions) will have to begin providing contact information for filing complaints with accreditors, approval or licensing agencies. We estimate that the other 8 percent of private non-profit institutions are already providing this information. We estimate that on average, this disclosure will take .17 hours (10 minutes) per disclosure and that it will, therefore, increase burden to private non-profit institutions by 271 hours.

We estimate that 1,740 (or 92 percent of all 1,892 public institutions) will have to begin providing contact information for filing complaints with accreditors, approval or licensing agencies. We estimate that the other 8 percent of public institutions are already providing this information. We estimate that on average, this disclosure will take .17 hours (10 minutes) per disclosure and that it will, therefore, increase burden to proprietary institutions by 296 hours.

Collectively, we estimate that burden will increase for institutions in their reporting of the contact information for filing complaints to accreditors and approval or licensing agencies by 893 hours in OMB Control Number 1845-0022.

In total, the final regulatory changes reflected in § 668.43 will increase burden by 67,870 hours in OMB Control Number 1845-0022.

## Section 668.55—Updating Information

Section 668.55 will require an applicant to update all

applicable changes in dependency status that occur throughout the award year, including changes in the applicant's household size and the number of those household members attending postsecondary educational institutions. We estimate that 1,530,000 individuals will update their household size or the number of household members attending postsecondary educational institutions and that, on average, reporting will take .08 hours (5 minutes) per individual, increasing burden by 122,400 hours.

We estimate that proprietary institutions will receive updated household size or the updated number of household members attending postsecondary educational institutions from 566,100 applicants. We estimate that each updated record will take .17 hours (10 minutes) to review, which will increase burden by 96,237 hours.

We estimate that private non-profit institutions will receive updated household size or the updated number of household members attending postsecondary educational institutions from 459,000 applicants. We estimate that each updated record will take .17 hours (10 minutes) to review, which will increase burden by 78,030 hours.

We estimate that public institutions will receive updated household size or the updated number of household members attending postsecondary educational institutions from 504,900 applicants. We estimate that each updated record will take .17 hours (10 minutes) to review, which will increase burden by 85,833 hours.

Collectively, we estimate that burden will increase for individuals and institutions as a result of being required to report updated household size and the updated number of household members attending postsecondary educational institutions by 382,500 hours in OMB Control Number 1845-0041, of which 122,400 hours is for individuals and 260,100 hours is for institutions.

This section also requires individuals to make changes to their FAFSA information if their marital status changes, but only at the discretion of the financial aid administrator because such an update is necessary to address an inequity or to reflect more accurately the applicant's ability to pay. As a result, we estimate that of the 170,000 individuals that will have a change of marital status, we expect that this discretion will be applied in only ten percent of the cases, therefore, ten percent of the 170,000 estimated cases is 17,000 cases that on average the reporting will take .08 hours (5 minutes) per individual, increasing burden by 1,360 hours.

We estimate that proprietary institutions will receive updated marital status information from 6,290 applicants. We estimate that each updated record will take .17 hours (10 minutes) to review, which will increase burden by 1,069 hours.

We estimate that private non-profit institutions will receive updated marital status information from 5,100 applicants. We estimate that each updated record will take .17 hours (10 minutes) to review, which will increase burden by 867 hours.

We estimate that public institutions will receive updated marital status information from 5,610 applicants. We estimate that each updated record will take .17 hours (10 minutes) to review, which will increase burden by 954 hours.

Collectively, we estimate that burden will increase for individuals and institutions in their reporting updated marital status information by 4,250 hours in OMB Control Number 1845-0041.

Section 668.55 will also include a number of other changes to remove language that implements the marital status exception in the current regulations, including removing current § 668.55(a)(3) and revising § 668.55(b).

In total, the final regulatory changes reflected in § 668.55 will increase burden by 386,750 hours in OMB Control Number 1845-0041.

## Section 668.56—Information To Be Verified

The Department will eliminate from the regulations the five items that an institution currently is required to verify for all applicants selected for verification. Instead, pursuant to § 668.56(a), for each award year, the Secretary will specify in a **Federal Register** notice the FAFSA information and documentation that an institution and an applicant may be required to verify. The Department will then specify on an individual student's SAR and ISIR what information must be verified for that applicant.

Currently, under OMB Control Number 1845-0041, there are 1,022,384 hours of burden associated with the verification regulations of which 1,010,072 hours of burden are a result of the data gathering and submission by each individual applicant selected for verification. This estimate was based upon the number of applicants in the 2002-2003 award year. Since then, the number of applicants has grown significantly to 17.4 million applicants for the 2008-2009 award year, of which we project 5.1 million individual applicants to be selected for verification.

The projected number of items to be verified under the final regulations is expected to be reduced from the current five required data elements to an average of three items per individual. This projected reduction in items to be verified will result in a reduction of burden per individual applicant. Also, as a result of collecting information to verify applicant data on this smaller average number of data elements (three items instead of five items), the average amount of time for the individual applicant to review verification form instructions, gather the data, respond on a form and submit a form and the supporting data will decrease from the current average of .20 hours (12 minutes) per individual to .12 hours (7 minutes), thus further reducing burden on the individual applicant.

For example, when we consider the estimated 5.1 million 2008-2009 applicants selected for verification at an average of .20 hours (12 minutes) to collect and submit information, including supporting documentation for the five required data elements (which is the estimated amount of time that is associated with the requirements in current § 668.56(a)), the requirements in that section yields a total burden of 1,020,000 hours added to OMB Control Number 1845-0041. However, under § 668.56(b), where the number of verification data elements will be reduced to an average of three, the estimated 5.1 million individuals selected for verification multiplied by the reduced average of .12 minutes (7 minutes) yields an increase of 612,000 hours in burden. Therefore, we will expect the burden to be 408,000 hours less than under the current regulations.

As a result, for OMB reporting purposes, we estimate that the individuals, as a group, will have an increase in burden by 612,000 hours in OMB Control Number 1845-0041 (rather than 1,020,000 hours).

### Section 668.57—Acceptable Documentation

We have made a number of technical and conforming changes throughout § 668.57. We also have made the following substantive changes described in this section.

Section 668.57(a)(2) will allow an institution to accept, in lieu of an income tax return or an IRS form that lists tax account information, the electronic importation of data obtained from the IRS into an applicant's online FAFSA.

We also have amended § 668.57(a)(4)(ii)(A) to accurately reflect that, upon application, the IRS grants a six-month extension beyond the April 15 deadline rather than the four-month extension currently stated in the regulations.

Under § 668.57(a)(5), an institution may require an applicant who has been granted an extension to file his or her income tax return to provide a copy of that tax return once it has been filed. If the institution requires the applicant to submit the tax return, it will need to re-verify the AGI and taxes paid of the applicant and his or her spouse or parents when the institution receives the return.

Section 668.57(a)(7) clarifies that an applicant's income tax return that is signed by the preparer or stamped with the preparer's name and address must also include the preparer's Social Security number, Employer Identification Number or the Preparer Tax Identification Number.

Section 668.57(b) and (c) remain substantively unchanged.

We have deleted current § 668.57(d) regarding acceptable documentation for untaxed income and benefits and replaced it with a new § 668.57(d). This new section provides that, if an applicant is selected to verify other information specified in an annual **Federal Register** notice, the applicant must provide the documentation specified for that information in the **Federal Register** notice.

Currently under OMB Control Number 1845-0041, there are 1,022,384 hours of burden associated with the verification regulations, of which 12,312 hours are attributable to institutions of higher education to establish their verification policies and procedures. Under § 668.57, we estimate that, on average, institutions will take .12 hours (7 minutes) per applicant selected for verification to review and take appropriate action based upon the information provided by the applicant, which in some cases may mean correcting applicant data or having the applicant correct his or her data. Under current § 668.57, when we consider the significant increase to 17.4 million applicants in the 2008-2009 award year, of which 5.1 million will be selected for verification at an average of .20 hours (12 minutes) per verification response received from applicants by the institutions for review, the total increase in burden will be 1,020,000 additional hours. However, under § 668.57, both the average number of items to be verified will be reduced from five items to three items, as well as the average amount of time to review will decrease from .20 hours (12 minutes) to .12 hours (7 minutes). Therefore, the burden to institutions will be 612,000 burden hours (that is, 5.1 million multiplied by .12 hours (7 minutes)) —rather than 1,020,000 burden hours (*i.e.,* 5.1 million applicants multiplied by .20 hours (12 minutes)). Thus, as compared to the burden under the current regulations, using

the number of applicants from 2008-2009—17.4 million— there will be 408,000 fewer burden hours for institutions.

We estimate 226,440 hours of increased burden for proprietary institutions (2,086 proprietary institutions of the total 5,709 affected institutions or 37 percent multiplied by 5,100,000 applicants equals 1,887,000 applicants multiplied by .12 hours (7 minutes)).

We estimate 183,600 hours of increased burden for private non-profit institutions (1,731 private non-profit institutions of the total 5,709 affected institutions or 30 percent multiplied by 5,100,000 applicants equals 1,530,000 applicants multiplied by .12 hours (7 minutes)).

We estimate 201,960 hours of increased burden for public institutions (1,892 public institutions of the total 5,709 affected institution or 33 percent multiplied by 5,100,000 applicants multiplied by .12 hours (7 minutes)).

As a result, for OMB reporting purposes, collectively there will be a projected increase of 612,000 hours of burden for institutions in OMB Control Number 1845-0041.

## Section 668.59—Consequences of a Change in FAFSA Information

We have amended § 668.59 by removing all allowable tolerances and requiring instead that an institution submit to the Department all applicable changes to an applicant's FAFSA information resulting from verification for those applicants receiving assistance under any of the subsidized student financial assistance programs (*see* § 668.59(a)).

Under § 668.59(b), for the Federal Pell Grant program, once the applicant provides the institution with the corrected SAR or ISIR, the institution will be required to recalculate the applicant's Federal Pell Grant and disburse any additional funds, if additional funds are payable. If the applicant's Federal Pell Grant will be reduced as a result of verification, the institution will be required to eliminate any overpayment by adjusting subsequent disbursements or reimbursing the program account by requiring the applicant to return the overpayment or making restitution from its own funds (see § 668.59(b)(2)(ii)).

Section 668.59(c) provides that, for the subsidized student financial assistance programs, excluding the Federal Pell Grant Program, if an applicant's FAFSA information changes as a result of verification, the institution must recalculate the applicant's EFC and adjust the applicant's financial aid

package on the basis of the EFC on the corrected SAR or ISIR.

With the exception of minor technical edits, § 668.59(d), which describes the consequences of a change in an applicant's FAFSA information, remains substantively the same as current § 668.59(d).

Finally, we have removed current § 668.59(e), the provision that requires an institution to refer to the Department unresolved disputes over the accuracy ☐ of information provided by the applicant if the applicant received funds on the basis of that information.

Both individuals (students) and institutions will be making corrections to FAFSA information as a result of the verification process. We estimate that 30 percent of the 17,000,000 applicants or 5,100,000 individuals (students) will be selected for verification. Of those 5,100,000 individuals, students will submit, on average, 1.4 changes in FAFSA information as a result of verification for 7,140,000 changes, which will take an average of .12 hours (7 minutes) per change, increasing burden to individuals by 856,800 hours.

We estimate that institutions will need to submit 10,200,000 changes in FAFSA information as a result of verification (that is, 5,100,000 individuals selected for verification multiplied by 2.0 changes, which is what we estimate will be the average per individual).

Of the estimated total 10,200,000 changes, we estimate that 3,774,000 changes to FAFSA information as a result of verification will occur at proprietary institutions, which will take an average of .12 hours (7 minutes) per change, increasing burden by 452,880 hours.

Of the estimated total 10,200,000 changes, we estimate that 3,060,000 changes to FAFSA information as a result of verification will occur at private non-profit institutions, which will take an average of .12 hours (7 minutes) per change, increasing burden by 367,200 hours.

Of the estimated total 10,200,000 changes, we estimate that 3,366,000 changes to FAFSA information as a result of verification will occur at public institutions, which will take an average of .12 hours (7 minutes) per change, increasing burden by 403,920 hours.

Collectively, therefore, the final regulatory changes reflected in § 668.59 will increase for individuals and institutions by 2,080,800 hours in OMB Control Number 1845-0041.

## Section 668.144—Application for Test Approval

We have clarified and expanded the requirements in current §§ 668.143 and 668.144. In addition, we have consolidated all of the requirements for test approval in one section, § 668.144. Paragraphs (a) and (b) of § 668.144 describe the general requirement for test publishers and States to submit to the Secretary any test they wish to have approved under subpart J of part 668. Paragraph (c) of § 668.144 describes the information that a test publisher must include with its application for approval of a test. Paragraph (d) of § 668.144 describes the information a State must include with its application when it submits a test to the Secretary for approval.

Section 668.144(c)(16) will require test publishers to include in their applications a description of their test administrator certification process. Under § 668.144(c)(17), we will require test publishers to include in their applications, a description of the test anomaly analysis the test publisher will conduct and submit to the Secretary.

Finally, § 668.144(c)(18) will require test publishers to include in their applications a description of the types of accommodations available for individuals with disabilities, including a description of the process used to identify and report when accommodations for individuals with disabilities were provided.

We have added § 668.144(d) to describe what States must include in their test submissions to the Secretary. While this provision replaces the content in current § 668.143, its language has been revised to be parallel, where appropriate, to the test publisher submission requirements in current § 668.144. In addition to making these requirements parallel, § 668.144(d) also includes the new requirements to be added to the test publisher submissions.A description of those new provisions follows:

Both test publishers and States will be required to submit a description of their test administrator certification process that indicates how the test publisher or State, as applicable, will determine that a test administrator has the necessary training, knowledge, skills and integrity to test students in accordance with requirements and how the test publisher or the State will determine that the test administrator has the ability and facilities to keep its test secure against disclosure or release (see § 668.144(c)(16) (test publishers) and § 668.144(d)(7) (States)).

We estimate that a test publisher and State will, on average,

take 2.5 hours to develop its process to establish that a test administrator has the necessary training, knowledge, skills and integrity to administer ability-to-benefit (ATB) tests and then to report that process to the Secretary.

We estimate that the burden associated with the currently approved eight (8) ATB tests will increase for the test publishers and States by 20 hours.

The regulations will require both test publishers and States to submit a description of the test anomaly analysis they will conduct. This description must include a description of how they will identify potential test irregularities and make a determination that test irregularities have occurred; an explanation of corrective action to be taken in the event of test irregularities; and information on when and how the Secretary, test administrator, and institutions will be notified if a test administrator is decertified (see § 668.144(c)(17) (test publishers) and § 668.144(d)(8) (States)).

We estimate that each test publisher and State will, on average, take 75 hours to develop its test anomaly process, to establish its test anomaly analysis (where it explains its test irregularity detection process including its decertification of test administrator process) and to establish its reporting process to the Secretary. We estimate that the burden associated with the currently approved eight (8) ATB tests will increase for the test publishers and States by 600 hours.

Under § 668.144(c)(18) and (d)(9) respectively, both test publishers and States will be required to describe the types of accommodations available for individuals with disabilities, and the process for a test administrator to identify and report to the test publisher when accommodations for individuals with disabilities were provided. We estimate that test publishers and States will, on average, take 1 hour to develop and describe to the Secretary the types of accommodations available to individuals with disabilities, to describe the process the test administrator will use to support the identification of the disability and to develop the process to report when accommodations will be used.

We estimate that the burden associated with the currently approved eight (8) ATB tests will increase for the current test publishers by 8 hours.

Collectively, the final regulatory changes in § 668.144 will increase burden for test publishers and States by 628 hours in OMB 1845-0049.

**Section 668.150—Agreement Between the Secretary and**

Section 668.150 provides that States, as well as test publishers, must enter into agreements with the Secretary in order to have their tests approved.

We also have revised this section to require both test publishers and States to comply with a number of new requirements that will be added to the agreement with the Secretary.

These requirements will include:

Requiring the test administrators that they certify to provide them with certain information about whether they have been decertified (see § 668.150(b)(2)). ☐ We estimate that 3,774 individuals (test administrators) will take, on average, .17 hours (10 minutes) to access, read, complete and submit the written certification to a test publisher or State, which will increase burden by 642 hours.

We estimate that it will take each test publisher or State 1 hour per test submission to develop its process to obtain a certification statement from each prospective test administrator, which will increase burden by 8 hours.

We estimate that the review of the submitted written certifications by the test publishers or States for the 3,774 test administrators will take, on average, .08 hours (5 minutes) per certification form, which will increase burden by 302 hours.

With regard to the requirement to immediately notify the test administrator, the Secretary, and institutions when the test administrator is decertified (see § 668.150(b)(6)), we estimate that 1 percent of the 3,774 test administrators will be decertified. We estimate that it will take test publishers and States, on average, 1 hour per decertification to provide all of the final notifications, which will increase burden for test publishers and States by 38 hours.

With regard to the requirement to review test results of tests administered by a decertified test administrator and immediately to notify affected institutions and students (see § 668.150(b)(7)), we estimate that burden will increase. We estimate that 481,763 ATB tests will be taken for title IV, HEA purposes annually. Of the annual total of ATB tests provided, we estimate that 1 percent will be improperly administered and that 4,818 individuals will be contacted, which will take, on average, .25 hours (15 minutes) per individual. As a result, we estimate that burden will increase to test publishers and States by 1,205 hours.

In addition, we estimate that it will take test publishers and States, on average, 5 hours per ATB test submitted, to develop the process to determine when ATB tests have been improperly administered, which for 8 approved ATB tests will increase burden by 40 hours.

We estimate that test publishers and States will, on average, take .33 hours (20 minutes) for each of the 4,818 estimated improperly administered ATB tests to make the final notifications to institutions, students and prospective students, which will increase burden by 1,590 hours.

We estimate that 38 test administrators (1 percent of the 3,774 test administrators) will be decertified. Of the 38 decertified test administrators, we estimate that 1 previously de-certified test administrator (2 percent of 38 test administrators) will be re-certified after a three-year period and, therefore, reported to the Secretary. We estimate the burden for test publishers and States for this reporting will be 1 hour. We project that it will be very rare that a decertified test administrator will seek re-certification after the three-year decertification period.

Under § 668.150(b)(13), test publishers and States must provide copies of test anomaly analysis every 18 months instead of every 3 years. We estimate that it will take a test publisher or State, on average, 75 hours to conduct its test anomaly analysis and report the results to the Secretary every 18 months. We estimate the burden on test publishers and States for the submission of the 8 test anomaly analysis every 18 months will be 600 hours.

Under § 668.150(b)(15), test publishers and States will be required to report to the Secretary any credible information indicating that a test has been compromised (see § 668.150(b)(15)). We estimate that 481,763 ATB tests for title IV, HEA purposes will be given on an annual basis. Of that total number ATB tests given, we estimate that 482 ATB tests will be compromised. On average, we estimate that test publishers and States will take 1 hour per test to collect the credible information to make the determination that a test will be compromised and report it to the Secretary. We estimate that burden will increase by 482 hours.

Section 668.150(b)(16) will require test publishers and States to report to the Office of Inspector General of the Department of Education any credible information indicating that a test administrator or institution may have engaged in civil or criminal fraud or other misconduct. We estimate that 481,763 ATB tests for title IV, HEA purposes will be given on an annual basis. Of that total number ATB tests given, we estimate that

482 ATB tests will be compromised. On average, we estimate that test publishers or States will take 1 hour per test to collect the credible information to make the determination that a test administrator or institution may have engaged in fraud or other misconduct and report it to the U.S. Department of Education's Office of the Inspector General. We estimate that, as a result of this requirement, burden will increase by 482 hours.

Section 668.150(b)(17) requires a test administrator who provides a test to an individual with a disability who requires an accommodation in the test's administration to report to the test publisher or the State the nature of the disability and the accommodations that were provided. Census data indicate that 12 percent of the U.S. population is severely disabled. We estimate that 12 percent of the ATB test population (481,763 ATB test takers) or 57,812 of the ATB test takers will be individuals with disabilities that will need accommodations for an ATB test. We estimate that it will take .08 hours (5 minutes) to report the nature of the disability and any accommodation that the test administrator made for the test taker, increasing burden by 4,625 hours.

We estimate that, on average, test publishers and States will take 2 hours per ATB test to develop the process for having test administrators report the nature of the test taker's disability and any accommodations provided. We expect this to result in an increase burden for test publishers and States by 16 hours (2 hours multiplied by 8 ATB tests).

Collectively, the final changes reflected in § 668.150 will increase burden by 10,031 hours in OMB Control Number 1845-0049.

### Section 668.151—Administration of Tests

Section 668.151(g)(4) will require institutions to keep a record of each individual who took an ATB test and the name and address of the test administrator who administered the test and any identifier assigned to the test administrator by the test publisher or the State.

We estimate that 481,763 ATB tests for title IV, HEA purposes will be given on an annual basis. We estimate that proprietary institutions will give 173,445 tests (36 percent of those ATB tests) and that, on average, the amount of time to record the test takers' name and address as well as the test administrators' identifiers will be .08 hours (5 minutes) per test, increasing burden for proprietary institutions by 13,876 hours.

We estimate that private non-profit institutions will give 149,347 tests (31 percent of the total annual ATB tests given) and that, on average, the amount of time to record the test takers' name and address, as well as the test administrators' identifiers will be .08 hours (5 minutes) per test, increasing burden for private non-profit institutions by 11,948 hours.

We estimate that public institutions will give 158,962 tests (33 percent of the total annual ATB tests given) and that, on average, the amount of time to record the test takers' name and address as well as the test administrators' identifiers ⬜ will be .08 hours (5 minutes) per test, increasing burden for public institutions by 12,717 hours.

If the individual who took the test has a disability and is unable to be evaluated by the use of an approved ATB test, or the individual requested or required a testing accommodation, the institution will be required, under § 668.151(g)(5), to maintain documentation of the individual's disability and of the testing arrangements provided. Census data indicate that 12 percent of the U.S. population is severely disabled. We estimate that 12 percent of the ATB test population (481,763 ATB test takers) or 57,812 of the ATB test takers will be individuals with disabilities that will need accommodations for the ATB test. We estimate that it will take .08 hours (5 minutes) to collect and maintain documentation of the individual's disability and of the testing accommodations provided to the test taker.

We estimate that proprietary institutions will give 20,812 tests (36 of the total annual ATB tests given), resulting in an increase in burden for proprietary institutions by 1,665 hours (20,812 tests multiplied by .08 hours).

We estimate that private non-profit institutions will give 17,922 tests (31 percent of the total annual ATB tests given), resulting in an increase in burden for private non-profit institutions by 1,434 hours (17,922 tests multiplied by .08 hours).

We estimate that public institutions will give 19,078 tests (33 percent of the total annual ATB tests given), resulting in an increase in burden for public institutions by 1,526 hours (19,078 tests multiplied by .08 hours).

Collectively, the final regulatory changes reflected in § 668.151 will increase burden by 43,166 hours in OMB Control Number 1845-0049.

### Section 668.152—Administration of Tests by Assessment Centers

Section 668.152(a) clarifies that assessment centers are also

required to comply with the provisions of § 688.153 (Administration of tests for individuals whose native language is not English or for individuals with disabilities), if applicable.

Under § 668.152(b)(2), assessment centers that score tests will be required to provide copies of completed tests or lists of test-takers' scores to the test publisher or the State, as applicable, on a weekly basis. Under § 668.152(b)(2)(i) and (b)(2)(ii), copies of completed tests or reports listing test-takers' scores will be required to include the name and address of the test administrator who administered the test and any identifier assigned to the test administrator by the test publisher or the State.

We estimate that of the 3,774 ATB test administrators approximately one-third (.3328 times 3,774) or 1,256 of the ATB test administrators are at test assessment centers. Of the 1,256 test assessment centers, we estimate that 18 percent or 226 test assessment centers are at private non-profit institutions and 82 percent or 1,030 test assessment centers are at public institutions. We estimate that 92 percent of the ATB tests provided at test assessment centers are scored by the test administrators. Therefore, under the regulations, the institution will be required to maintain the scored ATB tests, to collect and submit copies of the completed ATB tests or a listing to the test publisher or State on a weekly basis, while the other 8 percent will not be impacted by these regulations. We estimate that, on average, it will take .08 hours (5 minutes) per week for the test assessment center (institution) to collect and submit the final information.

For the 226 test assessment centers at private non-profit institutions, we expect 940 hours of increased annual burden (226 test assessment centers multiplied by .08 hours (5 minutes) and then multiplied by 52 weeks in a year).

For the 1,030 test assessment centers at public institutions, we expect 4,285 hours of increased annual burden (1,030 test assessment centers multiplied by.08 hours (5 minutes) and then multiplied by 52 weeks in a year).

Collectively, the final regulatory changes reflected in § 668.152 will increase burden by 5,225 hours in OMB Control Number 1845-0049.

### Section 668.164—Disbursing Funds

Under § 668.164(i), an institution will provide a way for a Federal Pell Grant eligible student to obtain or purchase required books and supplies by the seventh day of a payment

period under certain conditions. An institution will have to comply with this requirement only if, 10 days before the beginning of the payment period, the institution could disburse the title IV, HEA program funds for which the student is eligible, and presuming that those funds were disbursed, the student will have a title IV, HEA credit balance under § 668.164(e). The amount the institution will provide to the student for books and supplies will be the lesser of the presumed credit balance or the amount needed by the student, as determined by the institution. In determining the amount needed by the student, the institution could use the actual costs of books and supplies or the allowance for books and supplies used in the student's cost of attendance for the payment period.

We estimate that of the 6,321,678 Federal Pell Grant recipients in the 2008-2009 award year, that approximately 30 percent or 1,896,503 will have or did have a title IV, HEA credit balance. Of that number of Federal Pell Grant recipients, we estimate that 25 percent or 474,126 Federal Pell Grant recipients will have a presumed credit balance 10 days prior to the beginning of the payment period, and as final, that the institution will have to provide a way for those recipients to either obtain or purchase their books and supplies within 7 days of the beginning of the payment period.

We estimate that the 2,063 proprietary institutions participating in the Federal Pell Grant program will take, on average 3 hours per institution to analyze and make programming change needed to identify these recipients with presumed credit balances, increasing burden by 6,189 hours. Additionally, we estimate that proprietary institutions will be required to disburse the presumed credit balance to 38 percent of the 474,126 at proprietary institutions (180,168 recipients), which on average, will take .08 hours (5 minutes) per recipient, increasing burden by 14,413 hours.

We estimate that the 1,523 private non-profit institutions participating in the Federal Pell Grant program will take, on average, 3 hours per institution to analyze and make programming change needed to identify these recipients with presumed credit balances, increasing burden by 4,569 hours. Additionally, we estimate that private non-profit institutions will be required to disburse the presumed credit balance to 28 percent of the 474,126 at proprietary institutions (132,755 recipients) which on average, will take .08 hours (5 minutes) per recipient, increasing burden by 10,620 hours.

We estimate that the 1,883 public institutions participating in the Federal Pell Grant program will take, on average 3 hours

per institution to analyze and make programming change needed to identify these recipients with presumed credit balances, increasing burden by 5,649 hours. Additionally, we estimate that proprietary institutions will be required to disburse the presumed credit balance to 34 percent of the 474,126 at proprietary institutions (161,203 recipients) which on average, will take .08 hours (5 minutes) per recipient, increasing burden by 12,896 hours. 

Collectively, the final regulatory changes reflected in § 668.164 will increase burden by 54,336 hours in OMB Control Number 1845-NEW3.

| Collection of Information **Back to Top** | | |
|---|---|---|
| **Regulatory Section** | **Information collection** | **Collection** |
| 668.6 | This regulatory section will require institutions to report for each student who during an award year began attending or completed a program that prepares a student for gainful employment information needed to identify the student and the location of the institution the student attended, the CIP code for the program, the date the student completed the program, the amounts the student received from private educational loans and the amount from institutional financing plans that the student owes the institution after completing the program, and whether the student matriculated to a higher credentialed program at the same institution or another institution. Institutions will have to disclose information to prospective students | OMB 1845-NEW1. This will be a new collection. Separate 60-day and 30-day Federal Register notices were published to solicit comment. The burden will increase by 677,160 hours. |

**Intergovernmental Review**

Back to Top

These programs are not subject to Executive Order 12372 and the regulations in **34 CFR part 79**.

**Assessment of Educational Impact**

Back to Top

In accordance with section 411 of the General Education Provisions Act, **20 U.S.C. 1221**e-4, and based on our own review, we have determined that these final regulations do not require transmission of information that any other agency or authority of the United States gathers or makes available.

**Electronic Access to This Document**

You can view this document, as well as all other documents of this Department published in the **Federal Register**, in text

Back to Top

or Adobe Portable Document Format (PDF) on the Internet at the following site: *http://www.ed.gov/news/fedregister*. To use PDF, you must ☐ have Adobe Acrobat Reader, which is available free at this site.

>  *Note:*
>
> The official version of this document is the document published in the **Federal Register.** Free Internet access to the official edition of the **Federal Register** and the Code of Federal Regulations is available on GPO Access at: *http://www.gpoaccess.gov/nara/index.html*.

(Catalog of Federal Domestic Assistance: 84.007 FSEOG; 84.032 Federal Family Education Loan Program; 84.033 Federal Work-Study Program; 84.037 Federal Perkins Loan Program; 84.063 Federal Pell Grant Program; 84.069 LEAP; 84.268 William D. Ford Federal Direct Loan Program; 84.376 ACG/SMART; 84.379 TEACH Grant Program)

## ❋ List of Subjects

Back to Top

### 34 CFR Part 600

- Colleges and universities
- Foreign relations
- Grant programs-education
- Loan programs-education
- Reporting and recordkeeping requirements
- Selective Service System
- Student aid
- Vocational education

### 34 CFR Part 602

- Colleges and universities
- Reporting and recordkeeping requirements

### 34 CFR Part 603

- Colleges and universities
- Vocational education

### 34 CFR Part 668

- Administrative practice and procedure
- Aliens
- Colleges and universities
- Consumer protection
- Grant programs-education
- Incorporation by reference
- Loan programs-education
- Reporting and recordkeeping requirements
- Selective Service System

- Student aid
- Vocational education

## 34 CFR Part 682

- Administrative practice and procedure
- Colleges and universities
- Loan programs-education
- Reporting and recordkeeping requirements
- Student aid
- Vocational education

## 34 CFR Part 685

- Administrative practice and procedure
- Colleges and universities
- Loan programs-education
- Reporting and recordkeeping requirements
- Student aid
- Vocational education

## 34 CFR Part 686

- Administrative practice and procedure
- Colleges and universities
- Education
- Elementary and secondary education
- Grant programs-education
- Reporting and recordkeeping requirements
- Student aid

## 34 CFR Part 690

- Colleges and universities
- Education of disadvantaged
- Grant programs-education
- Reporting and recordkeeping requirements
- Student aid

## 34 CFR Part 691

- Colleges and universities
- Elementary and secondary education
- Grant programs-education
- Student aid



Dated: October 18, 2010.

**Arne Duncan,**

*Secretary of Education.*

⚜ *begin regulatory text*

**For the reasons discussed in the preamble, the Secretary amends parts**

600, 602, 603, 668, 682, 685, 686, 690, and 691 of title 34 of the Code of Federal Regulations as follows:

📄 **PART 600—INSTITUTIONAL ELIGIBILITY UNDER THE HIGHER EDUCATION ACT OF 1965, AS AMENDED**

Back to Top

**1.** The authority citation for part 600 continues to read as follows:

**Authority:**

20 U.S.C. 1001, 1002, 1003, 1088, 1091, 1094, 1099b, and 1099c, unless otherwise noted.

**2.** Section 600.2 is amended by:

A. Adding, in alphabetical order, the definition of a *Credit hour.*

B. Revising the definition of *Recognized occupation.*

The addition and revision read as follows:

📖 **§ 600.2 Definitions.**

* * * * *

*Credit hour:* Except as provided in 34 CFR 668.8(k) and (l), a credit hour is an amount of work represented in intended learning outcomes and verified by evidence of student achievement that is an institutionally established equivalency that reasonably approximates not less than—

(1) One hour of classroom or direct faculty instruction and a minimum of two hours of out of class student work each week for approximately fifteen weeks for one semester or trimester hour of credit, or ten to twelve weeks for one quarter hour of credit, or the equivalent amount of work over a different amount of time; or

(2) At least an equivalent amount of work as required in paragraph (1) of this definition for other academic activities as established by the institution including laboratory work, internships, practica, studio work, and other academic work leading to the award of credit hours.

* * * * *

*Recognized occupation:* An occupation that is—

(1) Identified by a Standard Occupational Classification (SOC) code established by the Office of Management and Budget or an Occupational Information Network O*NET-SOC code established by the Department of Labor and available at *http://online.onetcenter.org* or its successor site; or

(2) Determined by the Secretary in consultation with the Secretary of Labor to be a recognized occupation.

* * * * *

**3.** Section 600.4 is amended by:

   **A. In paragraph (a)(3), adding the words, "in accordance with § 600.9"
   immediately after the word "located".**

   **B. Revising paragraph (a)(4)(i)(C).**

   The revision reads as follows:

📖 **§ 600.4 Institution of higher education.**

   (a) * * *

   (4) * * *

   (i) * * *

   (C) That is at least a one academic year training program that leads to a
   certificate, or other nondegree recognized credential, and prepares students
   for gainful employment in a recognized occupation; and

   * * * * *

📖 **§ 600.5 [Amended]**

**4.** Section 600.5(a)(4) is amended by adding the words, "in
   accordance with § 600.9" immediately after the word
   "located".

📖 **§ 600.6 [Amended]**

**5.** Section 600.6(a)(3) is amended by adding the words, "in
   accordance with § 600.9" immediately after the word
   "located".

**6.** Section 600.9 is added to subpart A to read as follows:

📖 **§ 600.9 State authorization.**

   (a)(1) An institution described under §§ 600.4, 600.5, and 600.6 is legally
   authorized by a State if the State has a process to review and appropriately act
   on complaints concerning the institution including enforcing applicable State
   laws, and the institution meets the provisions of paragraphs (a)(1)(i), (a)(1)
   (ii), or (b) of this section.

   (i)(A) The institution is established by name as an educational institution by a
   State through a charter, statute, constitutional provision, or other action
   issued by an appropriate State agency or State entity and is authorized to
   operate educational programs beyond secondary education, including
   programs leading to a degree or certificate.

   (B) The institution complies with any applicable State approval or licensure ⬜
   requirements, except that the State may exempt the institution from any State
   approval or licensure requirements based on the institution's accreditation by
   one or more accrediting agencies recognized by the Secretary or based upon

the institution being in operation for at least 20 years.

(ii) If an institution is established by a State on the basis of an authorization to conduct business in the State or to operate as a nonprofit charitable organization, but not established by name as an educational institution under paragraph (a)(1)(i) of this section, the institution—

(A) By name, must be approved or licensed by the State to offer programs beyond secondary education, including programs leading to a degree or certificate; and

(B) May not be exempt from the State's approval or licensure requirements based on accreditation, years in operation, or other comparable exemption.

(2) The Secretary considers an institution to meet the provisions of paragraph (a)(1) of this section if the institution is authorized by name to offer educational programs beyond secondary education by—

(i) The Federal Government; or

(ii) As defined in 25 U.S.C. 1802(2), an Indian tribe, provided that the institution is located on tribal lands and the tribal government has a process to review and appropriately act on complaints concerning an institution and enforces applicable tribal requirements or laws.

(b)(1) Notwithstanding paragraph (a)(1)(i) and (ii) of this section, an institution is considered to be legally authorized to operate educational programs beyond secondary education if it is exempt from State authorization as a religious institution under the State constitution or by State law.

(2) For purposes of paragraph (b)(1) of this section, a religious institution is an institution that—

(i) Is owned, controlled, operated, and maintained by a religious organization lawfully operating as a nonprofit religious corporation; and

(ii) Awards only religious degrees or certificates including, but not limited to, a certificate of Talmudic studies, an associate of Biblical studies, a bachelor of religious studies, a master of divinity, or a doctor of divinity.

(c) If an institution is offering postsecondary education through distance or correspondence education to students in a State in which it is not physically located or in which it is otherwise subject to State jurisdiction as determined by the State, the institution must meet any State requirements for it to be legally offering postsecondary distance or correspondence education in that State. An institution must be able to document to the Secretary the State's approval upon request.

(Authority: 20 U.S.C. 1001 and 1002)

## 📖 PART 602—THE SECRETARY'S RECOGNITION OF ACCREDITING AGENCIES

Back to Top

**7.** The authority citation for part 602 continues to read as follows:

**Authority:**

20 U.S.C. 1099b, unless otherwise noted.

**8.** Section 602.24 is amended by adding a new paragraph (f) to read as follows:

📖 **§ 602.24 Additional procedures certain institutional accreditors must have.**

\* \* \* \* \*

(f) *Credit-hour policies.* The accrediting agency, as part of its review of an institution for initial accreditation or preaccreditation or renewal of accreditation, must conduct an effective review and evaluation of the reliability and accuracy of the institution's assignment of credit hours.

(1) The accrediting agency meets this requirement if—

(i) It reviews the institution's—

(A) Policies and procedures for determining the credit hours, as defined in 34 CFR 600.2, that the institution awards for courses and programs; and

(B) The application of the institution's policies and procedures to its programs and coursework; and

(ii) Makes a reasonable determination of whether the institution's assignment of credit hours conforms to commonly accepted practice in higher education.

(2) In reviewing and evaluating an institution's policies and procedures for determining credit hour assignments, an accrediting agency may use sampling or other methods in the evaluation, sufficient to comply with paragraph (f)(1)(i)(B) of this section.

(3) The accrediting agency must take such actions that it deems appropriate to address any deficiencies that it identifies at an institution as part of its reviews and evaluations under paragraph (f)(1)(i) and (ii) of this section, as it does in relation to other deficiencies it may identify, subject to the requirements of this part.

(4) If, following the institutional review process under this paragraph (f), the agency finds systemic noncompliance with the agency's policies or significant noncompliance regarding one or more programs at the institution, the agency must promptly notify the Secretary.

\* \* \* \* \*

📄 **PART 603—SECRETARY'S RECOGNITION PROCEDURES FOR STATE AGENCIES**

Back to Top

**9.** The authority citation for part 603 is revised to read as follows:

**Authority:**

20 U.S.C. 1001, 1002, 1094(c)(4); 38 U.S.C. 3675, unless otherwise noted.

**10.** Section 603.24 is amended by redesignating paragraph (c) as paragraph (d), adding a new paragraph (c), and revising the authority citation after redesignated paragraph (d) to read as follows:

### § 603.24 Criteria for State agencies.

\* \* \* \* \*

(c) *Credit-hour policies.* The State agency, as part of its review of an institution for initial approval or renewal of approval, must conduct an effective review and evaluation of the reliability and accuracy of the institution's assignment of credit hours.

(1) The State agency meets this requirement if—

(i) It reviews the institution's—

(A) Policies and procedures for determining the credit hours, as defined in 34 CFR 600.2, that the institution awards for courses and programs; and

(B) The application of the institution's policies and procedures to its programs and coursework; and

(ii) Makes a reasonable determination of whether the institution's assignment of credit hours conforms to commonly accepted practice in higher education.

(2) In reviewing and evaluating an institution's policies and procedures for determining credit hour assignments, a State agency may use sampling or other methods in the evaluation, sufficient to comply with paragraph (c)(1)(i) (B) of this section.

(3) The State agency must take such actions that it deems appropriate to address any deficiencies that it identifies at an institution as part of its reviews and evaluations under paragraph (c)(1)(i) and (ii) of this section, as it does in relation to other deficiencies it may identify, subject to the requirements of this part.

(4) If, following the institutional review process under this paragraph (c), the agency finds systemic noncompliance with the agency's policies or significant noncompliance regarding one or more programs at the institution, the agency must promptly notify the Secretary.

\* \* \* \* \*

(Authority: 20 U.S.C. 1094(c)(4))

### PART 668—STUDENT ASSISTANCE GENERAL PROVISIONS

Back to Top

**11.** The authority citation for part 668 continues to read as follows:

Authority:

[20 U.S.C. 1001](#), 1002, 1003, 1070g, 1085, 1088, 1091, 1092, 1094, 1099c, and 1099c-1, unless otherwise noted.

**12.** Section 668.2 is amended by:

**A.** In paragraph (a), adding, in alphabetical order, the term "Credit hour".

**B.** In paragraph (b), in the definition of *Full-time student,* adding the words, "including for a term-based program, repeating any coursework previously taken in the program but not including either more than one repetition of a previously passed course, or any repetition of a previously passed course due to the student failing other coursework" immediately before the period in the second sentence.

**C.** In paragraph (b), adding, in alphabetical order, definitions of "Free application for Federal student aid (FAFSA)", "Institutional student information record (ISIR)", and "Student aid report (SAR)".

**D.** In paragraph (b), revising the definitions for "Valid Institutional Student Information Record (valid ISIR)" and "Valid Student Aid Report (valid SAR)".

The additions and revisions read as follows:

## 📖 § 668.2 General definitions.

\* \* \* \* \*

(b) \* \* \*

*Free application for Federal student aid (FAFSA):* The student aid application provided for under section 483 of the HEA, which is used to determine an applicant's eligibility for the title IV, HEA programs.

\* \* \* \* \*

*Institutional student information record (ISIR):* An electronic record that the Secretary transmits to an institution that includes an applicant's—

(1) FAFSA information; and

(2) EFC.

\* \* \* \* \*

*Student aid report (SAR):* A report provided to an applicant by the Secretary showing his or her FAFSA information and the amount of his or her EFC.

\* \* \* \* \*

*Valid institutional student information record (valid ISIR):* An ISIR on which all the information reported on a student's FAFSA is accurate and complete as of the date the application is signed.

*Valid student aid report (valid SAR):* A student aid report on which all of the information reported on a student's FAFSA is accurate and complete as of the date the application is signed.

* * * * *

**13.** **Section 668.5 is amended by:**

**A. Revising paragraph (a).**

**B. Revising paragraph (c)(1).**

**C. In paragraph (c)(2), adding the words "offered by the institution that grants the degree or certificate" after the word "program".**

**D. In paragraph (c)(3)(i), removing the words "not more than" and adding the words "or less" after the word "percent".**

**E. In paragraph (c)(3)(ii)(A), removing the words "not more" and adding, in their place, the word "less".**

**F. Adding new paragraph (e).**

The addition and revisions read as follows:

### § 668.5 Written arrangements to provide educational programs.

(a) *Written arrangements between eligible institutions.* (1) Except as provided in paragraph (a)(2) of this section, if an eligible institution enters into a written arrangement with another eligible institution, or with a consortium of eligible institutions, under which the other eligible institution or consortium provides part of the educational program to students enrolled in the first institution, the Secretary considers that educational program to be an eligible program if the educational program offered by the institution that grants the degree or certificate otherwise satisfies the requirements of § 668.8.

(2) If the written arrangement is between two or more eligible institutions that are owned or controlled by the same individual, partnership, or corporation, the Secretary considers the educational program to be an eligible program if—

(i) The educational program offered by the institution that grants the degree or certificate otherwise satisfies the requirements of § 668.8; and

(ii) The institution that grants the degree or certificate provides more than 50 percent of the educational program.

* * * * *

(c) * * *

(1) The ineligible institution or organization has not—

(i) Had its eligibility to participate in the title IV, HEA programs terminated by the Secretary;

(ii) Voluntarily withdrawn from participation in the title IV, HEA programs under a termination, show-cause, suspension, or similar type proceeding initiated by the institution's State licensing agency, accrediting agency, guarantor, or by the Secretary;

(iii) Had its certification to participate in the title IV, HEA programs revoked

by the Secretary;

(iv) Had its application for re-certification to participate in the title IV, HEA programs denied by the Secretary; or

(v) Had its application for certification to participate in the title IV, HEA programs denied by the Secretary;

* * * * *

(e) *Information made available to students.* If an institution enters into a written arrangement described in paragraph (a), (b), or (c) of this section, the institution must provide the information described in § 668.43(a)(12) to enrolled and prospective students.

* * * * *

## 14. Section 668.6 is added to subpart A to read as follows:

### § 668.6 Reporting and disclosure requirements for programs that prepare students for gainful employment in a recognized occupation.

(a) *Reporting requirements.* (1) In accordance with procedures established by the Secretary an institution must report information that includes—

(i) For each student who enrolled in a program under § 668.8(c)(3) or (d) during an award year—

(A) Information needed to identify the student and the institution the student attended;

(B) If the student began attending a program during the award year, the name and the Classification of Instructional Program (CIP) code of that program; and

(C) If the student completed a program during the award year—

(*1*) The name and CIP code of that program, and the date the student completed the program;

(*2*) The amounts the student received from private education loans and the amount from institutional financing plans that the student owes the institution upon completing the program; and

(*3*) Whether the student matriculated to a higher credentialed program at the institution or if available, evidence that the student transferred to a higher credentialed program at another institution; and

(ii) For each program, by name and CIP code, offered by the institution under § 668.8(c)(3) or (d), the total number of students that are enrolled in the program at the end of each award year and identifying information for those students.

(2)(i) An institution must report the information required under paragraph (a)(1) of this section—

(A) No later than October 1, 2011 for information from the 2006-07 award year to the extent that the information is available;

(B) No later than October 1, 2011 for information from the 2007-08 through 2009-10 award years; and

(C) No earlier than September 30, but no later than the date established by the Secretary through a notice published in the **Federal Register,** for information from the most recently completed award year.

(ii) For any award year, if an institution is unable to provide all or some of the information required under paragraph (a)(1) of this section, the institution must provide an explanation of why the missing information is not available.

(b) *Disclosures.* (1) For each program offered by an institution under this section, the institution must provide prospective students with—

(i) The occupations (by names and SOC codes) that the program prepares students to enter, along with links to occupational profiles on O*NET or its successor site. If the number of occupations related to the program, as identified by entering the program's full six digit CIP code on the O*NET crosswalk at *http://online.onetcenter.org/crosswalk/* is more than ten, the institution may provide Web links to a representative sample of the identified occupations (by name and SOC code) for which its graduates typically find employment within a few years after completing the program;

(ii) The on-time graduation rate for students completing the program, as provided under paragraph (c) of this section;

(iii) The tuition and fees it charges a student for completing the program within normal time as defined in § 668.41(a), the typical costs for books and supplies (unless those costs are included as part of tuition and fees), and the cost of room and board, if applicable. The institution may include information on other costs, such as transportation and living expenses, but it must provide a Web link, or access, to the program cost information the institutions makes available under § 668.43(a);

(iv) The placement rate for students completing the program, as determined under a methodology developed by the National Center for Education Statistics (NCES) when that rate is available. In the meantime, beginning on July 1, 2011, if the institution is required by its accrediting agency or State to calculate a placement rate on a program basis, it must disclose the rate under this section and identify the accrediting agency or State agency under whose requirements the rate was calculated. If the accrediting agency or State requires an institution to calculate a placement rate at the institutional level or other than a program basis, the institution must use the accrediting agency or State methodology to calculate a placement rate for the program and disclose that rate; and

(v) The median loan debt incurred by students who completed the program as provided by the Secretary, as well as any other information the Secretary provided to the institution about that program. The institution must identify

separately the median loan debt from title IV, HEA program loans, and the median loan debt from private educational loans and institutional financing plans.

(2) For each program, the institution must—

(i) Include the information required under paragraph (b)(1) of this section in promotional materials it makes available to prospective students and post this information on its Web site;

(ii) Prominently provide the information required under paragraph (b)(1) of this section in a simple and meaningful manner on the home page of its program Web site, and provide a prominent and direct link on any other Web page containing general, academic, or admissions information about the program, to the single Web page that contains all the required information;

(iii) Display the information required under paragraph (b)(1) of this section on the institution's Web site in an open format that can be retrieved, downloaded, indexed, and searched by commonly used Web search applications. An open format is one that is platform-independent, is machine-readable, and is made available to the public without restrictions that would impede the reuse of that information; and

(iv) Use the disclosure form issued by the Secretary to provide the information in paragraph (b)(1), and other information, when that form is available.

(c) *On-time completion rate.* An institution calculates an on-time completion rate for each program subject to this section by—

(1) Determining the number of students who completed the program during the most recently completed award year;

(2) Determining the number of students in paragraph (c)(1) of this section who completed the program within normal time, as defined under § 668.41(a), regardless of whether the students transferred into the program or changed programs at the institution. For example, the normal time to complete an associate degree is two years and this timeframe applies to all students in the program. If a student transfers into the program, regardless of the number of credits the institution accepts from the student's attendance at the prior institution, those transfer credits have no bearing on the two-year timeframe. The student would still have two years to complete from the date he or she began attending the two-year program. To be counted as completing on time, a student who changes programs at the institution and begins attending the two-year program must complete within the two-year timeframe beginning from the date the student began attending the prior program; and

(3) Dividing the number of students who completed the program within normal time, as determined under paragraph (c)(2) of this section, by the total number of students who completed the program, as determined under paragraph (c)(1) of this section, and multiplying the result by 100.

(Approved by the Office of Management and Budget under control number 1845-NEW1)

(Authority: 20 U.S.C 1001(b), 1002(b) and (c))

**15.** Section 668.8 is amended by:

**A.** Revising paragraph (c)(3).

**B.** In paragraph (d)(2)(iii), adding the words, "as provided under § 668.6" immediately after the word "occupation."

**C.** In paragraph (d)(3)(iii), adding the words, "as provided under § 668.6" immediately after the word "occupation."

**D.** Revising paragraphs (k) and (l).

The revisions read as follows:

## § 668.8 Eligible program.

\* \* \* \* \*

(c) \* \* \*

(3) Be at least a one-academic-year training program that leads to a certificate, or other nondegree recognized credential, and prepares students for gainful employment in a recognized occupation.

\* \* \* \* \*

(k) *Undergraduate educational program in credit hours.* (1) Except as provided in paragraph (k)(2) of this section, if an institution offers an undergraduate educational program in credit hours, the institution must use the formula contained in paragraph (l) of this section to determine whether that program satisfies the requirements contained in paragraph (c)(3) or (d) of this section, and the number of credit hours in that educational program for purposes of the title IV, HEA programs, unless—

(i) The program is at least two academic years in length and provides an associate degree, a bachelor's degree, a professional degree, or an equivalent degree as determined by the Secretary; or

(ii) Each course within the program is acceptable for full credit toward that institution's associate degree, bachelor's degree, professional degree, or equivalent degree as determined by the Secretary provided that—

(A) The institution's degree requires at least two academic years of study; and

(B) The institution demonstrates that students enroll in, and graduate from, the degree program.

(2) A program is considered to be a clock-hour program for purposes of the title IV, HEA programs if—

(i) Except as provided in paragraph (k)(3) of this section, a program is required to measure student progress in clock hours when—

(A) Receiving Federal or State approval or licensure to offer the program; or

(B) Completing clock hours is a requirement for graduates to apply for

licensure or the authorization to practice the occupation that the student is intending to pursue;

(ii) The credit hours awarded for the program are not in compliance with the definition of a credit hour in 34 CFR 600.2; or

(iii) The institution does not provide the clock hours that are the basis for the credit hours awarded for the program or each course in the program and, except as provided in § 668.4(e), requires attendance in the clock hours that are the basis for the credit hours awarded.

(3) The requirements of paragraph (k)(2)(i) of this section do not apply to a program if there is a State or Federal approval or licensure requirement that a limited component of the program must include a practicum, internship, or clinical experience component of the program that must include a minimum number of clock hours.

(l) *Formula.* (1) Except as provided in paragraph (l)(2) of this section, for purposes of determining whether a program described in paragraph (k) of this section satisfies the requirements contained in paragraph (c)(3) or (d) of this section, and of determining the number of credit hours in that educational program with regard to the title IV, HEA programs—

(i) A semester hour must include at least 37.5 clock hours of instruction;

(ii) A trimester hour must include at least 37.5 clock hours of instruction; and

(iii) A quarter hour must include at least 25 clock hours of instruction.

(2) The institution's conversions to establish a minimum number of clock hours of instruction per credit may be less than those specified in paragraph (l)(1) of this section, if the institution's designated accrediting agency, or recognized State agency for the approval of public postsecondary vocational institutions, for participation in the title IV, HEA programs has identified any deficiencies with the institution's policies and procedures, or their implementation, for determining the credit hours, as defined in 34 CFR 600.2, that the institution awards for programs and courses, in accordance with 34 CFR 602.24(f), or, if applicable, 34 CFR 603.24(c), so long as—

(i) The institution's student work outside of class combined with the clock-hours of instruction meet or exceed the numeric requirements in paragraph (l)(1) of this section; and

(ii)(A) A semester hour must include at least 30 clock hours of instruction;

(B) A trimester hour must include at least 30 clock hours of instruction; and

(C) A quarter hour must include at least 20 hours of instruction.

* * * * *

**16.** Section 668.14 is amended by revising paragraph (b)(22) to read as follows:

📖 **§ 668.14 Program participation agreement.**

\* \* \* \* \*

(b) \* \* \*

(22) (i) It will not provide any commission, bonus, or other incentive payment based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid, to any person or entity who is engaged in any student recruitment or admission activity, or in making decisions regarding the award of title IV, HEA program funds.

(A) The restrictions in paragraph (b)(22) of this section do not apply to the recruitment of foreign students residing in foreign countries who are not eligible to receive Federal student assistance.

(B) For the purpose of paragraph (b)(22) of this section, an employee who receives multiple adjustments to compensation in a calendar year and is engaged in any student enrollment or admission activity or in making decisions regarding the award of title IV, HEA program funds is considered to have received such adjustments based upon success in securing enrollments or the award of financial aid if those adjustments create compensation that is based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid.

(ii) Notwithstanding paragraph (b)(22)(i) of this section, eligible institutions, organizations that are contractors to eligible institutions, and other entities may make—

(A) Merit-based adjustments to employee compensation provided that such adjustments are not based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid; and

(B) Profit-sharing payments so long as such payments are not provided to any person who is engaged in student recruitment or admission activity or in making decisions regarding the award of title IV, HEA program funds.

(iii) As used in paragraph (b)(22) of this section,

(A) *Commission, bonus, or other incentive payment* means a sum of money or something of value, other than a fixed salary or wages, paid to or given to a person or an entity for services rendered.

(B) *Securing enrollments or the award of financial aid* means activities that a person or entity engages in at any point in time through completion of an educational program for the purpose of the admission or matriculation of students for any period of time or the award of financial aid to students.

(*1*) These activities include contact in any form with a prospective student, such as, but not limited to—contact through preadmission or advising activities, scheduling an appointment to visit the enrollment office or any other office of the institution, attendance at such an appointment, or involvement in a prospective student's signing of an enrollment agreement or financial aid application.

(*2*) These activities do not include making a payment to a third party for the provision of student contact information for prospective students provided that such payment is not based on—

(*i*) Any additional conduct or action by the third party or the prospective students, such as participation in preadmission or advising activities, scheduling an appointment to visit the enrollment office or any other office of the institution or attendance at such an appointment, or the signing, or being involved in the signing, of a prospective student's enrollment agreement or financial aid application; or

(*ii*) The number of students (calculated at any point in time of an educational program) who apply for ☐ enrollment, are awarded financial aid, or are enrolled for any period of time, including through completion of an educational program.

(C) *Entity or person engaged in any student recruitment or admission activity or in making decisions about the award of financial aid* means—

(*1*) With respect to an entity engaged in any student recruitment or admission activity or in making decisions about the award of financial aid, any institution or organization that undertakes the recruiting or the admitting of students or that makes decisions about and awards title IV, HEA program funds; and

(*2*) With respect to a person engaged in any student recruitment or admission activity or in making decisions about the award of financial aid, any employee who undertakes recruiting or admitting of students or who makes decisions about and awards title IV, HEA program funds, and any higher level employee with responsibility for recruitment or admission of students, or making decisions about awarding title IV, HEA program funds.

(D) *Enrollment* means the admission or matriculation of a student into an eligible institution.

* * * * *

**17.** **Section 668.16 is amended by:**

**A. Revising paragraph (e).**

**B. In paragraph (n) introductory text, removing the word "and" that appears after the punctuation ";".**

**C. In paragraph (o)(2), removing the punctuation "." and adding, in its place, the punctuation and word "; and".**

**D. Adding paragraph (p).**

**E. Revising the OMB control number at the end of the section.**

The revisions and addition read as follows:

📖 **§ 668.16 Standards of administrative capability.**

* * * * *

(e) For purposes of determining student eligibility for assistance under a title IV, HEA program, establishes, publishes, and applies reasonable standards for measuring whether an otherwise eligible student is maintaining satisfactory academic progress in his or her educational program. The Secretary considers an institution's standards to be reasonable if the standards are in accordance with the provisions specified in § 668.34.

* * * * *

(p) Develops and follows procedures to evaluate the validity of a student's high school completion if the institution or the Secretary has reason to believe that the high school diploma is not valid or was not obtained from an entity that provides secondary school education.

(Approved by the Office of Management and Budget under control number 1845-0022)

* * * * *

**18.** **Section 668.22 is amended by:**

A. Redesignating paragraphs (a)(2) through (a)(5) as paragraphs (a)(3) through (a)(6), respectively.

B. Adding new paragraph (a)(2).

C. In newly redesignated paragraph (a)(5), removing the citation "(a)(5)" and adding, in its place, the citation "(a)(6)".

D. In newly redesignated paragraph (a)(6)(ii)(A)($2$), removing the citation "(a)(5)(iii)" and adding, in its place, the citation "(a)(6)(iii)".

E. In newly redesignated paragraph (a)(6)(ii)(B)($2$), removing the citation "(a)(5)(iii)" and adding, in its place, the citation "(a)(6)(iii)".

F. In newly redesignated paragraph (a)(6)(ii)(B)($3$), removing the citation "(a)(5)(iii)" and adding, in its place, the citation "(a)(6)(iii)".

G. In newly redesignated paragraph (a)(6)(iii)(A)($1$), removing the citation "(a)(5)(ii)(A)($2$)" and adding, in its place, the citation "(a)(6)(ii)(A)($2$)".

H. In newly redesignated paragraph (a)(6)(iii)(A)($5$), removing the citation "(a)(5)(iii)(C)" and adding, in its place, the citation "(a)(6)(iii)(C)".

I. In newly redesignated paragraph (a)(6)(iii)(B), removing the citation "(a)(5)(iii)(A)" and adding, in its place, the citation "(a)(6)(iii)(A)".

J. In newly redesignated paragraph (a)(6)(iv), removing the citation "(a)(5)(iii)" and adding, in its place, the citation "(a)(6)(iii)".

K. Revising paragraph (b)(3).

L. Removing paragraph (c)(3)(ii) and redesignating paragraph (c)(3)(i) as paragraph (c)(3).

M. Revising paragraph (f)(2).

N. In the introductory text of paragraph (j)(2), removing the first word "An" and adding, in its place, the words "For an institution that is not required to take attendance, an".

**O. In paragraph (l)(3), adding the words "for an institution that is not required to take attendance" after the words "date of the institution's determination that the student withdrew".**

**P. Adding paragraphs (l)(6), (l)(7), and (l)(8).**

The additions and revisions read as follows:

## 📖 § 668.22 Treatment of title IV funds when a student withdraws.

* * * * *

(a) * * *

(2)(i) Except as provided in paragraphs (a)(2)(ii) and (a)(2)(iii) of this section, a student is considered to have withdrawn from a payment period or period of enrollment if—

(A) In the case of a program that is measured in credit hours, the student does not complete all the days in the payment period or period of enrollment that the student was scheduled to complete;

(B) In the case of a program that is measured in clock hours, the student does not complete all of the clock hours and weeks of instructional time in the payment period or period of enrollment that the student was scheduled to complete; or

(C) For a student in a nonterm or nonstandard-term program, the student is not scheduled to begin another course within a payment period or period of enrollment for more than 45 calendar days after the end of the module the student ceased attending, unless the student is on an approved leave of absence, as defined in paragraph (d) of this section.

(ii)(A) Notwithstanding paragraph (a)(2)(i)(A) and (a)(2)(i)(B) of this section, for a payment period or period of enrollment in which courses in the program are offered in modules—

(*1*) A student is not considered to have withdrawn if the institution obtains written confirmation from the student at the time that would have been a withdrawal of the date that he or she will attend a module that begins later in the same payment period or period of enrollment; and

(*2*) For nonterm and nonstandard-term programs, that module begins no later than 45 calendar days after the end of the module the student ceased attending.

(B) If an institution has obtained the written confirmation of future attendance in accordance with paragraph (a)(2)(ii)(A) of this section—

(*1*) A student may change the date of return to a module that begins later in the same payment period or period of enrollment, provided that the student does so in writing prior to the return date that he or she had previously confirmed; and

(*2*) For nonterm and nonstandard-term programs, the later module that he or

she will attend begins no later than 45 calendar days after the end of module the student ceased attending.

(C) If an institution obtains written confirmation of future attendance in accordance with paragraph (a)(2)(ii)(A) and, if applicable, (a)(2)(ii)(B) of this section, but the student does not return as scheduled—

(*1*) The student is considered to have withdrawn from the payment period or period of enrollment; and ☐

(*2*) The student's withdrawal date and the total number of calendar days in the payment period or period of enrollment would be the withdrawal date and total number of calendar days that would have applied if the student had not provided written confirmation of a future date of attendance in accordance with paragraph (a)(2)(ii)(A) of this section.

(iii)(A) If a student withdraws from a term-based credit-hour program offered in modules during a payment period or period of enrollment and reenters the same program prior to the end of the period, subject to conditions established by the Secretary, the student is eligible to receive any title IV, HEA program funds for which he or she was eligible prior to withdrawal, including funds that were returned by the institution or student under the provisions of this section, provided the student's enrollment status continues to support the full amount of those funds.

(B) In accordance with § 668.4(f), if a student withdraws from a clock-hour or nonterm credit hour program during a payment period or period of enrollment and then reenters the same program within 180 calendar days, the student remains in that same period when he or she returns and, subject to conditions established by the Secretary, is eligible to receive any title IV, HEA program funds for which he or she was eligible prior to withdrawal, including funds that were returned by the institution or student under the provisions of this section.

* * * * *

(b) * * *

(3)(i) An institution is required to take attendance if—

(A) An outside entity (such as the institution's accrediting agency or a State agency) has a requirement that the institution take attendance;

(B) The institution itself has a requirement that its instructors take attendance; or

(C) The institution or an outside entity has a requirement that can only be met by taking attendance or a comparable process, including, but not limited to, requiring that students in a program demonstrate attendance in the classes of that program, or a portion of that program.

(ii) If, in accordance with paragraph (b)(3)(i) of this section, an institution is required to take attendance or requires that attendance be taken for only some students, the institution must use its attendance records to determine a

withdrawal date in accordance with paragraph (b)(1) of this section for those students.

(iii)(A) If, in accordance with paragraph (b)(3)(i) of this section, an institution is required to take attendance, or requires that attendance be taken, for a limited period, the institution must use its attendance records to determine a withdrawal date in accordance with paragraph (b)(3)(i) of this section for that limited period.

(B) A student in attendance the last time attendance is required to be taken during the limited period identified in paragraph (b)(3)(iii)(A) of this section who subsequently stops attending during the payment period will be treated as a student for whom the institution was not required to take attendance.

(iv) If an institution is required to take attendance or requires that attendance be taken, on only one specified day to meet a census reporting requirement, the institution is not considered to take attendance.

* * * * *

(f) * * *

(2)(i) The total number of calendar days in a payment period or period of enrollment includes all days within the period that the student was scheduled to complete, except that scheduled breaks of at least five consecutive days are excluded from the total number of calendar days in a payment period or period of enrollment and the number of calendar days completed in that period.

(ii) The total number of calendar days in a payment period or period of enrollment does not include—

(A) Days in which the student was on an approved leave of absence; or

(B) For a payment period or period of enrollment in which any courses in the program are offered in modules, any scheduled breaks of at least five consecutive days when the student is not scheduled to attend a module or other course offered during that period of time.

* * * * *

(l) * * *

(6) A program is "offered in modules" if a course or courses in the program do not span the entire length of the payment period or period of enrollment.

(7)(i) "Academic attendance" and "attendance at an academically-related activity"—

(A) Include, but are not limited to—

(1) Physically attending a class where there is an opportunity for direct interaction between the instructor and students;

(2) Submitting an academic assignment;

(3) Taking an exam, an interactive tutorial, or computer-assisted instruction;

(*4*) Attending a study group that is assigned by the institution;

(*5*) Participating in an online discussion about academic matters; and

(*6*) Initiating contact with a faculty member to ask a question about the academic subject studied in the course; and

(B) Do not include activities where a student may be present, but not academically engaged, such as—

(*1*) Living in institutional housing;

(*2*) Participating in the institution's meal plan;

(*3*) Logging into an online class without active participation; or

(*4*) Participating in academic counseling or advisement.

(ii) A determination of "academic attendance" or "attendance at an academically-related activity" must be made by the institution; a student's certification of attendance that is not supported by institutional documentation is not acceptable.

(8) A program is a nonstandard-term program if the program is a term-based program that does not qualify under 34 CFR 690.63(a)(1) or (a)(2) to calculate Federal Pell Grant payments under 34 CFR 690.63(b) or (c).

* * * * *

## 19. Section 668.25 is amended by:

A. In paragraph (c)(2)(v), removing the word "and".

B. In paragraph (c)(2)(vi), adding the word "and" after the punctuation ";".

C. Adding paragraph (c)(2)(vii).

The addition reads as follows:

### 📖 § 668.25 Contracts between an institution and a third party servicer.

* * * * *

(c) * * *

(2) * * *

(vii) Payment of any commission, bonus, or other incentive payment based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid to any person or entity engaged in any student recruitment or admission activity or in making decisions regarding the award of title IV, HEA program funds.

* * * * *

## 20. Section 668.32 is amended by:

**A. In paragraph (e)(3), removing the word "or" that appears after the punctuation ";".**

**B. In paragraph (e)(4)(ii), removing the punctuation "." and adding, in its place, the punctuation and word "; or".**

**C. Adding new paragraph (e)(5).**

**D. Revising paragraph (f).**

The addition and revision read as follows:

### § 668.32 Student eligibility—general.

* * * * *

(e) * * *

(5) Has been determined by the institution to have the ability to benefit from the education or training offered by the institution based on the satisfactory completion of 6 semester hours, 6 trimester hours, 6 quarter hours, or 225 clock hours that are applicable toward a degree or certificate offered by the institution.

(f) Maintains satisfactory academic progress in his or her course of study according to the institution's published standards of satisfactory academic progress that meet the requirements of § 668.34.

* * * * *

## 21. Section 668.34 is revised to read as follows:

### § 668.34 Satisfactory academic progress.

(a) *Satisfactory academic progress policy.* An institution must establish a reasonable satisfactory academic progress policy for determining whether an otherwise eligible student is making satisfactory academic progress in his or her educational program and may receive assistance under the title IV, HEA programs. The Secretary considers the institution's policy to be reasonable if—

(1) The policy is at least as strict as the policy the institution applies to a student who is not receiving assistance under the title IV, HEA programs;

(2) The policy provides for consistent application of standards to all students within categories of students, *e.g.,* full-time, part-time, undergraduate, and graduate students, and educational programs established by the institution;

(3) The policy provides that a student's academic progress is evaluated—

(i) At the end of each payment period if the educational program is either one academic year in length or shorter than an academic year; or

(ii) For all other educational programs, at the end of each payment period or at least annually to correspond with the end of a payment period;

(4)(i) The policy specifies the grade point average (GPA) that a student must

achieve at each evaluation, or if a GPA is not an appropriate qualitative measure, a comparable assessment measured against a norm; and

(ii) If a student is enrolled in an educational program of more than two academic years, the policy specifies that at the end of the second academic year, the student must have a GPA of at least a "C" or its equivalent, or have academic standing consistent with the institution's requirements for graduation;

(5)(i) The policy specifies the pace at which a student must progress through his or her educational program to ensure that the student will complete the program within the maximum timeframe, as defined in paragraph (b) of this section, and provides for measurement of the student's progress at each evaluation; and

(ii) An institution calculates the pace at which the student is progressing by dividing the cumulative number of hours the student has successfully completed by the cumulative number of hours the student has attempted. In making this calculation, the institution is not required to include remedial courses;

(6) The policy describes how a student's GPA and pace of completion are affected by course incompletes, withdrawals, or repetitions, or transfers of credit from other institutions. Credit hours from another institution that are accepted toward the student's educational program must count as both attempted and completed hours;

(7) Except as provided in paragraphs (c) and (d) of this section, the policy provides that, at the time of each evaluation, a student who has not achieved the required GPA, or who is not successfully completing his or her educational program at the required pace, is no longer eligible to receive assistance under the title IV, HEA programs;

(8) If the institution places students on financial aid warning, or on financial aid probation, as defined in paragraph (b) of this section, the policy describes these statuses and that—

(i) A student on financial aid warning may continue to receive assistance under the title IV, HEA programs for one payment period despite a determination that the student is not making satisfactory academic progress. Financial aid warning status may be assigned without an appeal or other action by the student; and

(ii) A student on financial aid probation may receive title IV, HEA program funds for one payment period. While a student is on financial aid probation, the institution may require the student to fulfill specific terms and conditions such as taking a reduced course load or enrolling in specific courses. At the end of one payment period on financial aid probation, the student must meet the institution's satisfactory academic progress standards or meet the requirements of the academic plan developed by the institution and the student to qualify for further title IV, HEA program funds;

**(9)** If the institution permits a student to appeal a determination by the institution that he or she is not making satisfactory academic progress, the policy describes—

**(i)** How the student may reestablish his or her eligibility to receive assistance under the title IV, HEA programs;

**(ii)** The basis on which a student may file an appeal: The death of a relative, an injury or illness of the student, or other special circumstances; and

**(iii)** Information the student must submit regarding why the student failed to make satisfactory academic progress, and what has changed in the student's situation that will allow the student to demonstrate satisfactory academic progress at the next evaluation;

**(10)** If the institution does not permit a student to appeal a determination by the institution that he or she is not making satisfactory academic progress, the policy must describe how the student may reestablish his or her eligibility to receive assistance under the title IV, HEA programs; and

**(11)** The policy provides for notification to students of the results of an evaluation that impacts the student's eligibility for title IV, HEA program funds.

**(b)** *Definitions.* The following definitions apply to the terms used in this section:

*Appeal.* **Appeal** means a process by which a student who is not meeting the institution's satisfactory academic progress standards petitions the institution for reconsideration of the student's eligibility for title IV, HEA program assistance.

*Financial aid probation.* **Financial aid probation** means a status assigned by an institution to a student who fails to make satisfactory academic progress and who has appealed and has had eligibility for aid reinstated.

*Financial aid warning.* **Financial aid warning** means a status assigned to a student who fails to make satisfactory academic progress at an institution that evaluates academic progress at the end of each payment period.

*Maximum timeframe.* **Maximum timeframe** means—

**(1)** For an undergraduate program measured in credit hours, a period that is no longer than 150 percent of the published length of the educational program, as measured in credit hours;

**(2)** For an undergraduate program measured in clock hours, a period that is no longer than 150 percent of the published length of the educational program, as measured by the cumulative number of clock hours the student is required to complete and expressed in calendar time; and

**(3)** For a graduate program, a period defined by the institution that is based on the length of the educational program.

**(c)** *Institutions that evaluate satisfactory academic progress at the end of*

*each payment period.* (1) An institution that evaluates satisfactory academic progress at the end of each payment period and determines that a student is not making progress under its policy may nevertheless disburse title IV, HEA program funds to the student under the provisions of paragraph (c)(2), (c)(3), or (c)(4) of this section.

(2) For the payment period following the payment period in which the student did not make satisfactory academic progress, the institution may—

(i) Place the student on financial aid warning, and disburse title IV, HEA program funds to the student; or

(ii) Place a student directly on financial aid probation, following the procedures outlined in paragraph (d)(2) of this section and disburse title IV, HEA program funds to the student.

(3) For the payment period following a payment period during which a student was on financial aid warning, the institution may place the student on financial aid probation, and disburse title IV, HEA program funds to the student if—

(i) The institution evaluates the student's progress and determines that student did not make satisfactory academic progress during the payment period the student was on financial aid warning;

(ii) The student appeals the determination; and

(iii)(A) The institution determines that the student should be able to meet the institution's satisfactory academic progress standards by the end of the subsequent payment period; or

(B) The institution develops an academic plan for the student that, if followed, will ensure that the student is able to meet the institution's satisfactory academic progress standards by a specific point in time.

(4) A student on financial aid probation for a payment period may not receive title IV, HEA program funds for the subsequent payment period unless the student makes satisfactory academic progress or the institution determines that the student met the requirements specified by the institution in the academic plan for the student.

(d) *Institutions that evaluate satisfactory academic progress annually or less frequently than at the end of each payment period.* (1) An institution that evaluates satisfactory academic progress annually or less frequently than at the end of each payment period and determines that a student is not making progress under its policy may nevertheless disburse title IV, HEA program funds to the student under the provisions of paragraph (d)(2) or (d)(3) of this section.

(2) The institution may place the student on financial aid probation and may disburse title IV, HEA program funds to the student for the subsequent payment period if—

(i) The institution evaluates the student and determines that the student is not

making satisfactory academic progress;

(ii) The student appeals the determination; and

(iii)(A) The institution determines that the student should be able to be make satisfactory academic progress during the subsequent payment period and meet the institution's satisfactory academic progress standards at the end of that payment period; or

(B) The institution develops an academic plan for the student that, if followed, will ensure that the student is able to meet the institution's satisfactory academic progress standards by a specific point in time.

(3) A student on financial aid probation for a payment period may not receive title IV, HEA program funds for the subsequent payment period unless the student makes satisfactory academic progress or the institution determines that the student met the requirements specified by the institution in the academic plan for the student.

(Authority: 20 U.S.C. 1091(d))

## 22. Section 668.43 is amended by:

A. In paragraph (a)(10)(ii), removing the word "and" that appears after the punctuation ";".

B. In paragraph (a)(11)(ii), removing the punctuation "." and adding, in its place, the punctuation and word "; and".

C. Adding paragraph (a)(12).

D. Revising paragraph (b).

The addition and revision read as follows:

### 📖 § 668.43 Institutional information.

(a) * * *

(12) A description of written arrangements the institution has entered into in accordance with § 668.5, including, but not limited to, information on—

(i) The portion of the educational program that the institution that grants the degree or certificate is not providing;

(ii) The name and location of the other institutions or organizations that are providing the portion of the educational program that the institution that grants the degree or certificate is not providing;

(iii) The method of delivery of the portion of the educational program that the institution that grants the degree or certificate is not providing; and

(iv) Estimated additional costs students may incur as the result of enrolling in an educational program that is provided, in part, under the written arrangement.

(b) The institution must make available for review to any enrolled or prospective student upon request, a copy of the documents describing the

institution's accreditation and its State, Federal, or tribal approval or licensing. The institution must also provide its students or prospective students with contact information for filing complaints with its accreditor and with its State approval or licensing entity and any other relevant State official or agency that would appropriately handle a student's complaint.

\* \* \* \* \*

**23.** Subpart E of part 668 is revised to read as follows:



Sec.

668.51 General.
668.52 Definitions.
668.53 Policies and procedures.
668.54 Selection of an applicant's FAFSA information for verification.
668.55 Updating information.
668.56 Information to be verified.
668.57 Acceptable documentation.
668.58 Interim disbursements.
668.59 Consequences of a change in an applicant's FAFSA information.
668.60 Deadlines for submitting documentation and the consequences of failing to provide documentation.
668.61 Recovery of funds from interim disbursements.

## Subpart E—Verification and Updating of Student Aid Application Information

Back to Top

### § 668.51 General.

(a) *Scope and purpose.* The regulations in this subpart govern the verification by institutions of information submitted by applicants for student financial assistance under the subsidized student financial assistance programs.

(b) *Applicant responsibility.* If the Secretary or the institution requests documents or information from an applicant under this subpart, the applicant must provide the specified documents or information.

(c) *Foreign schools.* The Secretary exempts from the provisions of this subpart participating institutions that are not located in a State.

(Authority: 20 U.S.C. 1094) 

### § 668.52 Definitions.

The following definitions apply to this subpart:

*Specified year:* (1) The calendar year preceding the first calendar year of an award year, *i.e.,* the base year; or

(2) The year preceding the year described in paragraph (1) of this definition.

*Subsidized student financial assistance programs:* Title IV, HEA programs for which eligibility is determined on the basis of an applicant's EFC. These programs include the Federal Pell Grant, Federal Supplemental Educational

Opportunity Grant (FSEOG), Federal Work-Study (FWS), Federal Perkins Loan, and Direct Subsidized Loan programs.

*Unsubsidized student financial assistance programs:* Title IV, HEA programs for which eligibility is not based on an applicant's EFC. These programs include the Teacher Education Assistance for College and Higher Education (TEACH) Grant, Direct Unsubsidized Loan, and Direct PLUS Loan programs.

(Authority: 20 U.S.C. 1094)

### 📖 § 668.53 Policies and procedures.

(a) An institution must establish and use written policies and procedures for verifying an applicant's FAFSA information in accordance with the provisions of this subpart. These policies and procedures must include—

(1) The time period within which an applicant must provide any documentation requested by the institution in accordance with § 668.57;

(2) The consequences of an applicant's failure to provide the requested documentation within the specified time period;

(3) The method by which the institution notifies an applicant of the results of its verification if, as a result of verification, the applicant's EFC changes and results in a change in the amount of the applicant's assistance under the title IV, HEA programs;

(4) The procedures the institution will follow itself or the procedures the institution will require an applicant to follow to correct FAFSA information determined to be in error; and

(5) The procedures for making referrals under § 668.16(g).

(b) An institution's procedures must provide that it will furnish, in a timely manner, to each applicant whose FAFSA information is selected for verification a clear explanation of—

(1) The documentation needed to satisfy the verification requirements; and

(2) The applicant's responsibilities with respect to the verification of FAFSA information, including the deadlines for completing any actions required under this subpart and the consequences of failing to complete any required action.

(c) An institution's procedures must provide that an applicant whose FAFSA information is selected for verification is required to complete verification before the institution exercises any authority under section 479A(a) of the HEA to make changes to the applicant's cost of attendance or to the values of the data items required to calculate the EFC.

(Approved by the Office of Management and Budget under control number 1845-0041)

(Authority: 20 U.S.C. 1094)

Federal Register | Program Integrity Issues

Case 1:14-cv-00857-TSC   Document 70-71   Filed 01/22/16   Page 362 of 417

📖 § 668.54 Selection of an applicant's FAFSA information for verification.

(a) *General requirements.* (1) Except as provided in paragraph (b) of this section, an institution must require an applicant whose FAFSA information is selected for verification by the Secretary, to verify the information specified by the Secretary pursuant to § 668.56.

(2) If an institution has reason to believe that an applicant's FAFSA information is inaccurate, it must verify the accuracy of that information.

(3) An institution may require an applicant to verify any FAFSA information that it specifies.

(4) If an applicant is selected to verify FAFSA information under paragraph (a)(1) of this section, the institution must require the applicant to verify the information as specified in § 668.56 if the applicant is selected for a subsequent verification of FAFSA information, except that the applicant is not required to provide documentation for the FAFSA information previously verified for the applicable award year to the extent that the FAFSA information previously verified remains unchanged.

(b) *Exclusions from verification.* (1) An institution need not verify an applicant's FAFSA information if—

(i) The applicant dies;

(ii) The applicant does not receive assistance under the title IV, HEA programs for reasons other than failure to verify FAFSA information;

(iii) The applicant is eligible to receive only unsubsidized student financial assistance; or

(iv) The applicant who transfers to the institution, had previously completed verification at the institution from which he or she transferred, and applies for assistance based on the same FAFSA information used at the previous institution, if the current institution obtains a letter from the previous institution—

(A) Stating that it has verified the applicant's information; and

(B) Providing the transaction number of the applicable valid ISIR.

(2) Unless the institution has reason to believe that the information reported by a dependent student is incorrect, it need not verify the applicant's parents' FAFSA information if—

(i) The parents are residing in a country other than the United States and cannot be contacted by normal means of communication;

(ii) The parents cannot be located because their contact information is unknown and cannot be obtained by the applicant; or

(iii) Both of the applicant's parents are mentally incapacitated.

(3) Unless the institution has reason to believe that the information reported by an independent student is incorrect, it need not verify the applicant's

spouse's information if—

(i) The spouse is deceased;

(ii) The spouse is mentally incapacitated;

(iii) The spouse is residing in a country other than the United States and cannot be contacted by normal means of communication; or

(iv) The spouse cannot be located because his or her contact information is unknown and cannot be obtained by the applicant.

(Approved by the Office of Management and Budget under control number 1845-0041)

(Authority: 20 U.S.C. 1091, 1094)

## 📖 § 668.55 Updating information.

(a) If an applicant's dependency status changes at any time during the award year, the applicant must update FAFSA information, except when the update is due to a change in his or her marital status.

(b)(1) An applicant who is selected for verification of the number of persons in his or her household (household size) or the number of those in the household who are attending postsecondary institutions (number in college) must update those items to be correct as of the date of verification, except when the update is due to a change in his or her marital status.

(2) Notwithstanding paragraph (b)(1) of this section, an applicant is not required to provide documentation of household size or number in college during a subsequent verification of either item if the information has not changed.

(c) An institution may require an applicant to update FAFSA information under paragraph (a) or (b) of this section for a change in the applicant's marital status if the institution determines the  update is necessary to address an inequity or to reflect more accurately the applicant's ability to pay.

(Approved by the Office of Management and Budget under control number 1845-0041)

(Authority: 20 U.S.C. 1094)

## 📖 § 668.56 Information to be verified.

(a) For each award year the Secretary publishes in the **Federal Register** notice the FAFSA information that an institution and an applicant may be required to verify.

(b) For each applicant whose FAFSA information is selected for verification by the Secretary, the Secretary specifies the specific information under paragraph (a) of this section that the applicant must verify.

(Approved by the Office of Management and Budget under control number 1845-0041)

(Authority: 20 U.S.C. 1094, 1095)

## § 668.57 Acceptable documentation.

If an applicant is selected to verify any of the following information, an institution must obtain the specified documentation.

(a) *Adjusted Gross Income (AGI), income earned from work, or U.S. income tax paid.* (1) Except as provided in paragraphs (a)(2), (a)(3), and (a)(4) of this section, an institution must require an applicant selected for verification of AGI, income earned from work or U.S. income tax paid to submit to it—

(i) A copy of the income tax return or an Internal Revenue Service (IRS) form that lists tax account information of the applicant, his or her spouse, or his or her parents, as applicable for the specified year. The copy of the return must include the signature (which need not be an original) of the filer of the return or of one of the filers of a joint return;

(ii) For a dependent student, a copy of each IRS Form W-2 for the specified year received by the parent whose income is being taken into account if—

(A) The parents filed a joint return; and

(B) The parents are divorced or separated or one of the parents has died; and

(iii) For an independent student, a copy of each IRS Form W-2 for the specified year he or she received if the independent student—

(A) Filed a joint return; and

(B) Is a widow or widower, or is divorced or separated.

(2) An institution may accept, in lieu of an income tax return or an IRS form that lists tax account information, the information reported for an item on the applicant's FAFSA for the specified year if the Secretary has identified that item as having been obtained from the IRS and not having been changed.

(3) An institution must accept, in lieu of an income tax return or an IRS form that lists tax account information, the documentation set forth in paragraph (a)(4) of this section if the individual for the specified year—

(i) Has not filed and, under IRS rules, or other applicable government agency rules, is not required to file an income tax return;

(ii) Is required to file a U.S. tax return and has been granted a filing extension by the IRS; or

(iii) Has requested a copy of the tax return or an IRS form that lists tax account information, and the IRS or a government of a U.S. territory or commonwealth or a foreign central government cannot locate the return or provide an IRS form that lists tax account information.

(4) An institution must accept—

(i) For an individual described in paragraph (a)(3)(i) of this section, a

statement signed by that individual certifying that he or she has not filed and is not required to file an income tax return for the specified year and certifying for that year that individual's—

(A) Sources of income earned from work as stated on the FAFSA; and

(B) Amounts of income from each source. In lieu of a certification of these amounts of income, the applicant may provide a copy of his or her IRS Form W-2 for each source listed under paragraph (a)(4)(i)(A) of this section;

(ii) For an individual described in paragraph (a)(3)(ii) of this section—

(A) A copy of the IRS Form 4868, "Application for Automatic Extension of Time to File U.S. Individual Income Tax Return," that the individual filed with the IRS for the specified year, or a copy of the IRS's approval of an extension beyond the automatic six-month extension if the individual requested an additional extension of the filing time; and

(B) A copy of each IRS Form W-2 that the individual received for the specified year, or for a self-employed individual, a statement signed by the individual certifying the amount of the AGI for the specified year; and

(iii) For an individual described in paragraph (a)(3)(iii) of this section—

(A) A copy of each IRS Form W-2 that the individual received for the specified year; or

(B) For an individual who is self-employed or has filed an income tax return with a government of a U. S. territory or commonwealth, or a foreign central government, a statement signed by the individual certifying the amount of AGI and taxes paid for the specified year.

(5) An institution may require an individual described in paragraph (a)(3)(ii) of this section to provide to it a copy of his or her completed and signed income tax return when filed. If an institution receives the copy of the return, it must reverify the AGI and taxes paid by the applicant and his or her spouse or parents.

(6) If an individual who is required to submit an IRS Form W-2, under paragraph (a) of this section, is unable to obtain one in a timely manner, the institution may permit that individual to set forth, in a statement signed by the individual, the amount of income earned from work, the source of that income, and the reason that the IRS Form W-2 is not available in a timely manner.

(7) For the purpose of this section, an institution may accept in lieu of a copy of an income tax return signed by the filer of the return or one of the filers of a joint return, a copy of the filer's return that includes the preparer's Social Security Number, Employer Identification Number or the Preparer Tax Identification Number and has been signed, stamped, typed, or printed with the name and address of the preparer of the return.

(b) *Number of family members in household.* An institution must require an applicant selected for verification of the number of family members in the

household to submit to it a statement signed by both the applicant and one of the applicant's parents if the applicant is a dependent student, or only the applicant if the applicant is an independent student, listing the name and age of each family member in the household and the relationship of that household member to the applicant.

(c) *Number of family household members enrolled in eligible postsecondary institutions.* (1) An institution must require an applicant selected for verification of the number of household members in the applicant's family enrolled on at least a half-time basis in eligible postsecondary institutions to submit a statement signed by both the applicant and one of the applicant's parents, if the applicant is a dependent student, or by only the applicant if the applicant is an independent student, listing—

(i) The name of each family member who is or will be attending an eligible postsecondary educational institution as at least a half-time student in the award year;

(ii) The age of each student; and

(iii) The name of the institution that each student is or will be attending. ▯

(2) If the institution has reason to believe that an applicant's FAFSA information or the statement provided under paragraph (c)(1) of this section regarding the number of family household members enrolled in eligible postsecondary institutions is inaccurate, the institution must obtain a statement from each institution named by the applicant in response to the requirement of paragraph (c)(1)(iii) of this section that the household member in question is or will be attending the institution on at least a half-time basis, unless—

(i) The institution the student is attending determines that such a statement is not available because the household member in question has not yet registered at the institution he or she plans to attend; or

(ii) The institution has information indicating that the student will be attending the same institution as the applicant.

(d) *Other information.* If an applicant is selected to verify other information specified in the annual **Federal Register** notice, the applicant must provide the documentation specified for that information in the **Federal Register** notice.

(Approved by the Office of Management and Budget under control number 1845–0041)

(Authority: 20 U.S.C. 1094)

## 📖 § 668.58 Interim disbursements.

(a)(1) If an institution has reason to believe that an applicant's FAFSA information is inaccurate, until the information is verified and any corrections are made in accordance with § 668.59(a), the institution may not—

(i) Disburse any Federal Pell Grant, FSEOG, or Federal Perkins Loan Program funds to the applicant;

(ii) Employ or allow an employer to employ the applicant in its FWS Program; or

(iii) Originate a Direct Subsidized Loan, or disburse any such loan proceeds for any previously certified originated Direct Subsidized Loan to the applicant.

(2) If an institution does not have reason to believe that an applicant's FAFSA information is inaccurate prior to verification, the institution may—

(i)(A) Withhold payment of Federal Pell Grant, Federal Perkins Loan, or FSEOG Program funds for the applicant; or

(B) Make one disbursement from each of the Federal Pell Grant, Federal Perkins Loan, or FSEOG Program funds for the applicant's first payment period of the award year;

(ii) Employ or allow an employer to employ that applicant, once he or she is an eligible student, under the FWS Program for the first 60 consecutive days after the student's enrollment in that award year; or

(iii)(A) Withhold origination of the applicant's Direct Subsidized Loan; or

(B) Originate the Direct Subsidized Loan provided that the institution does not disburse Subsidized Stafford Loan or Direct Subsidized Loan proceeds.

(3) If, after verification, an institution determines that changes to an applicant's information will not change the amount the applicant would receive under a title IV, HEA program, the institution—

(i) Must ensure corrections are made in accordance with § 668.59(a); and

(ii) May prior to receiving the corrected valid SAR or valid ISIR—

(A) Make one disbursement from each of the Federal Pell Grant, Federal Perkins Loan, or FSEOG Program funds for the applicant's first payment period of the award year;

(B) Employ or allow an employer to employ the applicant, once he or she is an eligible student, under the FWS Program for the first 60 consecutive days after the student's enrollment in that award year; or

(C) Originate the Direct Subsidized Loan and disburse the Subsidized Stafford Loan or Direct Subsidized Loan proceeds for the applicant.

(b) If an institution chooses to make a disbursement under—

(1) Paragraph (a)(2)(i)(B) of this section, it—

(i) Is liable for any overpayment discovered as a result of verification to the extent that the overpayment is not recovered through reducing subsequent disbursements in the award year or from the student; and

(ii) Must recover the overpayment in accordance with § 668.61(a);

(2) Paragraph (a)(2)(ii) of this section, it—

**(i) Is liable for any overpayment discovered as a result of verification to the extent that the overpayment is not eliminated by adjusting other financial assistance; and**

**(ii) Must recover the overpayment in accordance with § 668.61(b); or**

**(3) Paragraph (a)(3) of this section, it—**

**(i) Is liable for any subsidized student financial assistance disbursed if it does not receive the valid SAR or valid ISIR reflecting corrections within the deadlines established under § 668.60; and**

**(ii) Must recover the funds in accordance with § 668.61(c).**

(Authority: 20 U.S.C. 1094)

### 📖 § 668.59 Consequences of a change in an applicant's FAFSA information.

**(a) For the subsidized student financial assistance programs, if an applicant's FAFSA information changes as a result of verification, the applicant or the institution must submit to the Secretary any changes to—**

**(1) A nondollar item; or**

**(2) A single dollar item of $25 or more.**

**(b) For the Federal Pell Grant Program, if an applicant's FAFSA information changes as a result of verification, an institution must—**

**(1) Recalculate the applicant's Federal Pell Grant on the basis of the EFC on the corrected valid SAR or valid ISIR; and**

**(2)(i) Disburse any additional funds under that award only if the institution receives a corrected valid SAR or valid ISIR for the applicant and only to the extent that additional funds are payable based on the recalculation;**

**(ii) Comply with the procedures specified in § 668.61 for an interim disbursement if, as a result of verification, the Federal Pell Grant award is reduced; or—**

**(iii) Comply with the procedures specified in 34 CFR 690.79 for an overpayment that is not an interim disbursement if, as a result of verification, the Federal Pell Grant award is reduced.**

**(c) For the subsidized student financial assistance programs, excluding the Federal Pell Grant Program, if an applicant's FAFSA information changes as a result of verification, the institution must—**

**(1) Adjust the applicant's financial aid package on the basis of the EFC on the corrected valid SAR or valid ISIR; and**

**(2)(i) Comply with the procedures specified in § 668.61 for an interim disbursement if, as a result of verification, the financial aid package must be reduced;**

**(ii) Comply with the procedures specified in 34 CFR 673.5(f) for a Federal**

Perkins loan or an FSEOG overpayment that is not the result of an interim disbursement if, as a result of verification, the financial aid package must be reduced; and

(iii) Comply with the procedures specified in 34 CFR 685.303(e) for Direct Subsidized Loan excess loan proceeds that are not the result of an interim disbursement if, as a result of verification, the financial aid package must be reduced.

(Approved by the Office of Management and Budget under control number 1845-0041)

(Authority: 20 U.S.C. 1094) 🗋

### 📖 § 668.60 Deadlines for submitting documentation and the consequences of failing to provide documentation.

(a) An institution must require an applicant selected for verification to submit to it, within the period of time it or the Secretary specifies, the documentation set forth in § 668.57 that is requested by the institution.

(b) For purposes of the subsidized student financial assistance programs, excluding the Federal Pell Grant Program—

(1) If an applicant fails to provide the requested documentation within a reasonable time period established by the institution—

(i) The institution may not—

(A) Disburse any additional Federal Perkins Loan or FSEOG Program funds to the applicant;

(B) Employ, continue to employ or allow an employer to employ the applicant under FWS; or

(C) Originate the applicant's Direct Subsidized Loan or disburse any additional Direct Subsidized Loan proceeds for the applicant; and

(ii) The applicant must repay to the institution any Federal Perkins Loan or FSEOG received for that award year;

(2) If the applicant provides the requested documentation after the time period established by the institution, the institution may, at its option, disburse aid to the applicant notwithstanding paragraph (b)(1) of this section; and

(3) If an institution has received proceeds for a Direct Subsidized Loan on behalf of an applicant, the institution must return all or a portion of those funds as provided under § 668.166(b) if the applicant does not complete verification within the time period specified.

(c) For purposes of the Federal Pell Grant Program—

(1) An applicant may submit a valid SAR to the institution or the institution may receive a valid ISIR after the applicable deadline specified in 34 CFR 690.61 but within an established additional time period set by the Secretary

through publication of a notice in the **Federal Register**; and

(2) If the applicant does not provide to the institution the requested documentation and, if necessary, a valid SAR or the institution does not receive a valid ISIR, within the additional time period referenced in paragraph (c)(1) of this section, the applicant—

(i) Forfeits the Federal Pell Grant for the award year; and

(ii) Must return any Federal Pell Grant payments previously received for that award year.

(d) The Secretary may determine not to process FAFSA information of an applicant who has been requested to provide documentation until the applicant provides the documentation or the Secretary decides that there is no longer a need for the documentation.

(e) If an applicant selected for verification for an award year dies before the deadline for completing verification without completing that process, the institution may not—

(1) Make any further disbursements on behalf of that applicant;

(2) Originate that applicant's Direct Subsidized Loan, or disburse that applicant's Direct Subsidized Loan proceeds; or

(3) Consider any funds it disbursed to that applicant under § 668.58(a)(2) as an overpayment.

(Authority: 20 U.S.C. 1094)

## 📖 § 668.61 Recovery of funds from interim disbursements.

(a) If an institution discovers, as a result of verification, that an applicant received under § 668.58(a)(2)(i)(B) more financial aid than the applicant was eligible to receive, the institution must eliminate the Federal Pell Grant, Federal Perkins Loan, or FSEOG overpayment by—

(1) Adjusting subsequent disbursements in the award year in which the overpayment occurred; or

(2) Reimbursing the appropriate program account by—

(i) Requiring the applicant to return the overpayment to the institution if the institution cannot correct the overpayment under paragraph (a)(1) of this section; or

(ii) Making restitution from its own funds, by the earlier of the following dates, if the applicant does not return the overpayment:

(A) Sixty days after the applicant's last day of attendance.

(B) The last day of the award year in which the institution disbursed Federal Pell Grant, Federal Perkins Loan, or FSEOG Program funds to the applicant.

(b) If an institution discovers, as a result of verification, that an applicant received under § 668.58(a)(2)(ii) more financial aid than the applicant was

eligible to receive, the institution must eliminate the FWS overpayment by—

(1) Adjusting the applicant's other financial aid; or

(2) Reimbursing the FWS program account by making restitution from its own funds, if the institution cannot correct the overpayment under paragraph (b) (1) of this section. The applicant must still be paid for all work performed under the institution's own payroll account.

(c) If an institution disbursed subsidized student financial assistance to an applicant under § 668.58(a)(3), and did not receive the valid SAR or valid ISIR reflecting corrections within the deadlines established under § 668.60, the institution must reimburse the appropriate program account by making restitution from its own funds. The applicant must still be paid for all work performed under the institution's own payroll account.

(Approved by the Office of Management and Budget under control number 1845-0041)

(Authority: 20 U.S.C. 1094)

**24** Subpart F of part 668 is revised to read as follows:



Sec.
668.71 Scope and special definitions.
668.72 Nature of educational program.
668.73 Nature of financial charges.
668.74 Employability of graduates.
668.75 Relationship with the Department of Education.



## Subpart F—Misrepresentation

Back to Top

## § 668.71 Scope and special definitions.

(a) If the Secretary determines that an eligible institution has engaged in substantial misrepresentation, the Secretary may—

(1) Revoke the eligible institution's program participation agreement;

(2) Impose limitations on the institution's participation in the title IV, HEA programs;

(3) Deny participation applications made on behalf of the institution; or

(4) Initiate a proceeding against the eligible institution under subpart G of this part.

(b) This subpart establishes the types of activities that constitute substantial misrepresentation by an eligible institution. An eligible institution is deemed to have engaged in substantial misrepresentation when the institution itself, one of its representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs, marketing, advertising, recruiting or admissions services, makes a substantial misrepresentation regarding the eligible institution, including

about the nature of its educational program, its financial charges, or the employability of its graduates. Substantial misrepresentations are prohibited in all forms, including those made in any advertising, promotional materials, or in the marketing or sale of courses or programs of instruction offered by the institution.

(c) The following definitions apply to this subpart: 

*Misrepresentation:* Any false, erroneous or misleading statement an eligible institution, one of its representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs, or to provide marketing, advertising, recruiting or admissions services makes directly or indirectly to a student, prospective student or any member of the public, or to an accrediting agency, to a State agency, or to the Secretary. A misleading statement includes any statement that has the likelihood or tendency to deceive or confuse. A statement is any communication made in writing, visually, orally, or through other means. Misrepresentation includes the dissemination of a student endorsement or testimonial that a student gives either under duress or because the institution required the student to make such an endorsement or testimonial to participate in a program.

*Prospective student:* Any individual who has contacted an eligible institution for the purpose of requesting information about enrolling at the institution or who has been contacted directly by the institution or indirectly through advertising about enrolling at the institution.

*Substantial misrepresentation:* Any misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment.

(Authority: 20 U.S.C. 1094)

### 📖 § 668.72 Nature of educational program.

Misrepresentation concerning the nature of an eligible institution's educational program includes, but is not limited to, false, erroneous or misleading statements concerning—

(a) The particular type(s), specific source(s), nature and extent of its institutional, programmatic, or specialized accreditation;

(b)(1) Whether a student may transfer course credits earned at the institution to any other institution;

(2) Conditions under which the institution will accept transfer credits earned at another institution;

(c) Whether successful completion of a course of instruction qualifies a student —

(1) For acceptance to a labor union or similar organization; or

(2) To receive, to apply to take or to take the examination required to receive, a

local, State, or Federal license, or a nongovernmental certification required as a precondition for employment, or to perform certain functions in the States in which the educational program is offered, or to meet additional conditions that the institution knows or reasonably should know are generally needed to secure employment in a recognized occupation for which the program is represented to prepare students;

(d) The requirements for successfully completing the course of study or program and the circumstances that would constitute grounds for terminating the student's enrollment;

(e) Whether its courses are recommended or have been the subject of unsolicited testimonials or endorsements by—

(1) Vocational counselors, high schools, colleges, educational organizations, employment agencies, members of a particular industry, students, former students, or others; or

(2) Governmental officials for governmental employment;

(f) Its size, location, facilities, or equipment;

(g) The availability, frequency, and appropriateness of its courses and programs to the employment objectives that it states its programs are designed to meet;

(h) The nature, age, and availability of its training devices or equipment and their appropriateness to the employment objectives that it states its programs and courses are designed to meet;

(i) The number, availability, and qualifications, including the training and experience, of its faculty and other personnel;

(j) The availability of part-time employment or other forms of financial assistance;

(k) The nature and availability of any tutorial or specialized instruction, guidance and counseling, or other supplementary assistance it will provide its students before, during or after the completion of a course;

(l) The nature or extent of any prerequisites established for enrollment in any course;

(m) The subject matter, content of the course of study, or any other fact related to the degree, diploma, certificate of completion, or any similar document that the student is to be, or is, awarded upon completion of the course of study;

(n) Whether the academic, professional, or occupational degree that the institution will confer upon completion of the course of study has been authorized by the appropriate State educational agency. This type of misrepresentation includes, in the case of a degree that has not been authorized by the appropriate State educational agency or that requires specialized accreditation, any failure by an eligible institution to disclose these

facts in any advertising or promotional materials that reference such degree; or

(o) Any matters required to be disclosed to prospective students under §§ 668.42 and 668.43 of this part.

(Authority: 20 U.S.C. 1094)

## 📖 § 668.73 Nature of financial charges.

Misrepresentation concerning the nature of an eligible institution's financial charges includes, but is not limited to, false, erroneous, or misleading statements concerning—

(a) Offers of scholarships to pay all or part of a course charge;

(b) Whether a particular charge is the customary charge at the institution for a course;

(c) The cost of the program and the institution's refund policy if the student does not complete the program;

(d) The availability or nature of any financial assistance offered to students, including a student's responsibility to repay any loans, regardless of whether the student is successful in completing the program and obtaining employment; or

(e) The student's right to reject any particular type of financial aid or other assistance, or whether the student must apply for a particular type of financial aid, such as financing offered by the institution.

(Authority: 20 U.S.C. 1094)

## 📖 § 668.74 Employability of graduates.

Misrepresentation regarding the employability of an eligible institution's graduates includes, but is not limited to, false, erroneous, or misleading statements concerning—

(a) The institution's relationship with any organization, employment agency, or other agency providing authorized training leading directly to employment;

(b) The institution's plans to maintain a placement service for graduates or otherwise assist its graduates to obtain employment;

(c) The institution's knowledge about the current or likely future conditions, compensation, or employment opportunities in the industry or occupation for which the students are being prepared;

(d) Whether employment is being offered by the institution or that a talent hunt or contest is being conducted, including, but not limited to, through the use of phrases such as "Men/women wanted to train for * * *," "Help Wanted," "Employment," or "Business Opportunities";

(e) Government job market statistics in relation to the potential placement of its graduates; or

(f) Other requirements that are generally needed to be employed in the fields for which the training is provided, such as requirements related to commercial driving licenses or permits to carry firearms, and failing to disclose factors that would prevent an applicant from qualifying for such requirements, such as prior criminal records or preexisting medical conditions.

(Authority: 20 U.S.C. 1094)

## § 668.75 Relationship with the Department of Education.

An eligible institution, its representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement may not describe the eligible institution's participation in the title IV, HEA programs in a manner that suggests approval or endorsement by the U.S. Department of Education of the quality of its educational programs.

(Authority: 20 U.S.C. 1094)

## 25. Subpart J of part 668 is revised to read as follows:



Sec.

668.141 Scope.
668.142 Special definitions.
668.143 [Reserved]
668.144 Application for test approval.
668.145 Test approval procedures.
668.146 Criteria for approving tests.
668.147 Passing scores.
668.148 Additional criteria for the approval of certain tests.
668.149 Special provisions for the approval of assessment procedures for individuals with disabilities.
668.150 Agreement between the Secretary and a test publisher or a State.
668.151 Administration of tests.
668.152 Administration of tests by assessment centers.
668.153 Administration of tests for individuals whose native language is not English or for individuals with disabilities.
668.154 Institutional accountability.
668.155 [Reserved]
668.156 Approved State process.

## Subpart J—Approval of Independently Administered Tests; Specification of Passing Score; Approval of State Process

Back to Top

## § 668.141 Scope.

(a) This subpart sets forth the provisions under which a student who has neither a high school diploma nor its recognized equivalent may become eligible to receive title IV, HEA program funds by—

(1) Achieving a passing score, specified by the Secretary, on an independently

administered test approved by the Secretary under this subpart; or

(2) Being enrolled in an eligible institution that participates in a State process approved by the Secretary under this subpart.

(b) Under this subpart, the Secretary sets forth—

(1) The procedures and criteria the Secretary uses to approve tests;

(2) The basis on which the Secretary specifies a passing score on each approved test;

(3) The procedures and conditions under which the Secretary determines that an approved test is independently administered;

(4) The information that a test publisher or a State must submit, as part of its test submission, to explain the methodology it will use for the test anomaly studies as described in § 668.144(c)(17) and (d)(8), as appropriate;

(5) The requirements that a test publisher or a State, as appropriate—

(i) Have a process to identify and follow up on test score irregularities;

(ii) Take corrective action—up to and including decertification of test administrators—if the test publisher or the State determines that test score irregularities have occurred; and

(iii) Report to the Secretary the names of any test administrators it decertifies and any other action taken as a result of test score analyses; and

(6) The procedures and conditions under which the Secretary determines that a State process demonstrates that students in the process have the ability to benefit from the education and training being offered to them.

(Authority: 20 U.S.C. 1091(d))

## 📖 § 668.142 Special definitions.

The following definitions apply to this subpart:

*Assessment center:* A facility that—

(1) Is located at an eligible institution that provides two-year or four-year degrees or is a postsecondary vocational institution;

(2) Is responsible for gathering and evaluating information about individual students for multiple purposes, including appropriate course placement;

(3) Is independent of the admissions and financial aid processes at the institution at which it is located;

(4) Is staffed by professionally trained personnel;

(5) Uses test administrators to administer tests approved by the Secretary under this subpart; and

(6) Does not have as its primary purpose the administration of ability to benefit tests.

*ATB test irregularity:* An irregularity that results from an ATB test being administered in a manner that does not conform to the established rules for test administration consistent with the provisions of subpart J of part 668 and the test administrator's manual.

*Computer-based test:* A test taken by a student on a computer and scored by a computer.

*General learned abilities:* Cognitive operations, such as deductive reasoning, reading comprehension, or translation from graphic to numerical representation, that may be learned in both school and non-school environments.

*Independent test administrator:* A test administrator who administers tests at a location other than an assessment center and who—

(1) Has no current or prior financial or ownership interest in the institution, its affiliates, or its parent corporation, other than the fees earned for administering approved ATB tests through an agreement with the test publisher or State and has no controlling interest in any other institution;

(2) Is not a current or former employee of or consultant to the institution, its affiliates, or its parent corporation, a person in control of another institution, or a member of the family of any of these individuals;

(3) Is not a current or former member of the board of directors, a current or former employee of or a consultant to a member of the board of directors, chief executive officer, chief financial officer of the institution, its affiliates, or its parent corporation or of any other institution, or a member of the family of any of these individuals; and

(4) Is not a current or former student of the institution.

*Individual with a disability:* A person who has a physical or mental impairment which substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment.

*Non-native speaker of English:* A person whose first language is not English and who is not fluent in English.

*Secondary school level:* As applied to "content," "curricula," or "basic verbal and quantitative skills," the basic knowledge or skills generally learned in the 9th through 12th grades in United States secondary schools.

*Test:* A standardized test, assessment or instrument that has formal protocols on how it is to be administered in order to be valid. These protocols include, for example, the use of parallel, equated forms; testing conditions; time allowed for the test; and standardized scoring. Tests are not limited to traditional paper and pencil (or computer-administered) instruments for which forms are constructed prior to administration to examinees. Tests may also include adaptive instruments that use computerized algorithms for selecting and administering items in real time; however, for such instruments, the size of the item pool and the method of item selection must ensure

negligible overlap in items across retests.

*Test administrator:* An individual who is certified by the test publisher (or the State, in the case of an approved State test or assessment) to administer tests approved under this subpart in accordance with the instructions provided by the test publisher or the State, as applicable, which includes protecting the test and the test results from improper disclosure or release, and who is not compensated on the basis of test outcomes.

*Test item:* A question on a test.

*Test publisher:* An individual, organization, or agency that owns a registered copyright of a test, or has been authorized by the copyright holder to represent the copyright holder's interests regarding the test.

(Authority: 20 U.S.C. 1091(d))

 **§ 668.143 [Reserved]**

 **§ 668.144 Application for test approval.**

(a) The Secretary only reviews tests under this subpart that are submitted by the publisher of that test or by a State.

(b) A test publisher or a State that wishes to have its test approved by the Secretary under this subpart must submit an application to the Secretary at such time and in such manner as the Secretary may prescribe. The application must contain all the information necessary for the Secretary to approve the test under this subpart, including but not limited to, the information contained in paragraph (c) or (d) of this section, as applicable.

(c) A test publisher must include with its application—

(1) A summary of the precise editions, forms, levels, and (if applicable) sub-tests for which approval is being sought;

(2) The name, address, telephone number, and e-mail address of a contact person to whom the Secretary may address inquiries;

(3) Each edition, form, level, and sub-test of the test for which the test publisher requests approval;

(4) The distribution of test scores for each edition, form, level, or sub-test for which approval is sought, that allows the Secretary to prescribe the passing score for each test in accordance with § 668.147;

(5) Documentation of test development, including a history of the test's use;

(6) Norming data and other evidence used in determining the distribution of test scores;

(7) Material that defines the content domains addressed by the test;

(8) Documentation of periodic reviews of the content and specifications of the test to ensure that the test reflects secondary school level verbal and

quantitative skills;

(9) If a test being submitted is a revision of the most recent edition approved by the Secretary, an analysis of the revisions, including the reasons for the revisions, the implications of the revisions for the comparability of scores on the current test to scores on the previous test, and data from validity studies of the test undertaken subsequent to the revisions;

(10) A description of the manner in which test-taking time was determined in relation to the content representativeness requirements in § 668.146(b)(3) and an analysis of the effects of time on performance. This description may also include the manner in which test-taking time was determined in relation to the other requirements in § 668.146(b);

(11) A technical manual that includes—

(i) An explanation of the methodology and procedures for measuring the reliability of the test;

(ii) Evidence that different forms of the test, including, if applicable, short forms, are comparable in reliability;

(iii) Other evidence demonstrating that the test permits consistent assessment of individual skill and ability;

(iv) Evidence that the test was normed using—

(A) Groups that were of sufficient size to produce defensible standard errors of the mean and were not disproportionately composed of any race or gender; and

(B) A contemporary sample that is representative of the population of persons who have earned a high school diploma in the United States;

(v) Documentation of the level of difficulty of the test;

(vi) Unambiguous scales and scale values so that standard errors of measurement can be used to determine statistically significant differences in performance; and

(vii) Additional guidance on the interpretation of scores resulting from any modifications of the test for individuals with temporary impairments, individuals with disabilities and guidance on the types of accommodations that are allowable;

(12) The manual provided to test administrators containing procedures and instructions for test security and administration, and the forwarding of tests to the test publisher;

(13) An analysis of the item-content of each edition, form, level, and (if applicable) sub-test to demonstrate compliance with the required secondary school level criterion specified in § 668.146(b);

(14) A description of retesting procedures and the analysis upon which the criteria for retesting are based;

(15) Other evidence establishing the test's compliance with the criteria for approval of tests as provided in § 668.146;

(16) A description of its test administrator certification process that provides—

(i) How the test publisher will determine that the test administrator has the necessary training, knowledge, skill, and integrity to test students in accordance with this subpart and the test publisher's requirements; and

(ii) How the test publisher will determine that the test administrator has the ability and facilities to keep its test secure against disclosure or release;

(17) A description of the test anomaly analysis the test publisher will conduct and submit to the Secretary that includes—

(i) An explanation of how the test publisher will identify potential test irregularities and make a determination that test irregularities have occurred;

(ii) An explanation of the process and procedures for corrective action (up to and including decertification of a certified test administrator) when the test publisher determines that test irregularities have occurred; and

(iii) Information on when and how the test publisher will notify a test administrator, the Secretary, and the institutions for which the test administrator had previously provided testing services for that test publisher, that the test administrator has been decertified; and

(18)(i) An explanation of any accessible technologies that are available to accommodate individuals with disabilities, and

(ii) A description of the process for a test administrator to identify and report to the test publisher when accommodations for individuals with disabilities were provided, for scoring and norming purposes.

(d) A State must include with its application—

(1) The information necessary for the Secretary to determine that the test the State uses measures a student's skills and abilities for the purpose of determining whether the student has the skills and abilities the State expects of a high school graduate in that State;

(2) The passing scores on that test;

(3) Any guidance on the interpretation of scores resulting from any modifications of the test for individuals with disabilities;

(4) A statement regarding how the test will be kept secure;

(5) A description of retesting procedures and the analysis upon which the criteria for retesting are based;

(6) Other evidence establishing the test's compliance with the criteria for approval of tests as provided in § 668.146;

(7) A description of its test administrator certification process that provides—

(i) How the State will determine that the test administrator has the necessary

training, knowledge, skill, and integrity to test students in accordance with the State's requirements; and

(ii) How the State will determine that the test administrator has the ability and facilities to keep its test secure against disclosure or release;

(8) A description of the test anomaly analysis that the State will conduct and submit to the Secretary that includes—

(i) An explanation of how the State will identify potential test irregularities and make a determination that test irregularities have occurred;

(ii) An explanation of the process and procedures for corrective action (up to and including decertification of a test administrator) when the State determines that test irregularities have occurred; and

(iii) Information on when and how the State will notify a test administrator, the Secretary, and the institutions for which the test administrator had previously provided testing services for that State, that the test administrator has been decertified;

(9)(i) An explanation of any accessible technologies that are available to accommodate individuals with disabilities; and

(ii) A description of the process for a test administrator to identify and report to the test publisher when accommodations for individuals with disabilities were provided, for scoring and norming purposes; and

(10) The name, address, telephone number, and e-mail address of a contact person to whom the Secretary may address inquiries.

(11) A technical manual that includes—

(i) An explanation of the methodology and procedures for measuring the reliability of the test;

(ii) Evidence that different forms of the test, including, if applicable, short forms, are comparable in reliability;

(iii) Other evidence demonstrating that the test permits consistent assessment of individual skill and ability;

(iv) Evidence that the test was normed using—

(A) Groups that were of sufficient size to produce defensible standard errors of the mean and were not disproportionately composed of any race or gender; and

(B) A contemporary sample that is representative of the population of persons who have earned a high school diploma in the United States;

(v) Documentation of the level of difficulty of the test;

(vi) Unambiguous scales and scale values so that standard errors of measurement can be used to determine statistically significant differences in performance; and

(vii) Additional guidance on the interpretation of scores resulting from any modifications of the test for individuals with temporary impairments, individuals with disabilities and guidance on the types of accommodations that are allowable;

(12) the manual provided to test administrators containing procedures and instructions for test security and administration, and the forwarding of tests to the State.

(Approved by the Office of Management and Budget under control number 1845-0049)

(Authority: 20 U.S.C. 1091(d))

## 📖 § 668.145 Test approval procedures.

(a)(1) When the Secretary receives a complete application from a test publisher or a State, the Secretary selects one or more experts in the field of educational testing and assessment, who possess appropriate advanced degrees and experience in test development or psychometric research, to determine whether the test meets the requirements for test approval contained in §§ 668.146, 668.147, 668.148, or 668.149, as appropriate, and to advise the Secretary of their determinations.

(2) If the test involves a language other than English, the Secretary selects at least one individual who is fluent in the language in which the test is written to collaborate with the testing expert or experts described in paragraph (a)(1) of this section and to advise the Secretary on whether the test meets the additional criteria, provisions, and conditions for test approval contained in §§ 668.148 and 668.149.

(3) For test batteries that contain multiple sub-tests measuring content domains other than verbal and quantitative domains, the Secretary reviews only those sub-tests covering the verbal and quantitative domains.

(b)(1) If the Secretary determines that a test satisfies the criteria and requirements for test approval, the Secretary notifies the test publisher or the State, as applicable, of the Secretary's decision, and publishes the name of the test and the passing scores in the **Federal Register**.

(2) If the Secretary determines that a test does not satisfy the criteria and requirements for test approval, the Secretary notifies the test publisher or the State, as applicable, of the Secretary's decision, and the reasons why the test did not meet those criteria and requirements.

(3) If the Secretary determines that a test does not satisfy the criteria and requirements for test approval, the test publisher or the State that submitted the test for approval may request that the Secretary reevaluate the Secretary's decision. Such a request must be accompanied by—

(i) Documentation and information that address the reasons for the non-approval of the test; and

(ii) An analysis of why the information and documentation submitted meet the criteria and requirements for test approval notwithstanding the Secretary's earlier decision to the contrary.

(c)(1) The Secretary approves a test for a period not to exceed five years from the date the notice of approval of the test is published in the **Federal Register**.

(2) The Secretary extends the approval period of a test to include the period of review if the test publisher or the State, as applicable, re-submits the test for review and approval under § 668.144 at least six months before the date on which the test approval is scheduled to expire.

(d)(1) The Secretary's approval of a test may be revoked if the Secretary determines that the test publisher or the State violated any terms of the agreement described in § 668.150, that the information the test publisher or the State submitted as a basis for approval of the test was inaccurate, or that the test publisher or the State substantially changed the test and did not resubmit the test, as revised, for approval.

(2) If the Secretary revokes approval of a previously approved test, the Secretary publishes a notice of that revocation in the **Federal Register**. The revocation becomes effective— 

(i) One hundred and twenty days from the date the notice of revocation is published in the **Federal Register**; or

(ii) An earlier date specified by the Secretary in a notice published in the **Federal Register**.

(Approved by the Office of Management and Budget under control number 1845-0049)

(Authority: 20 U.S.C. 1091(d))

📖 **§ 668.146 Criteria for approving tests.**

(a) Except as provided in § 668.148, the Secretary approves a test under this subpart if—

(1) The test meets the criteria set forth in paragraph (b) of this section;

(2) The test publisher or the State satisfies the requirements set forth in paragraph (c) of this section; and

(3) The Secretary makes a determination that the information the test publisher or State submitted in accordance with § 668.144(c)(17) or (d)(8), as applicable, provides adequate assurance that the test publisher or State will conduct rigorous test anomaly analyses and take appropriate action if test administrators do not comply with testing procedures.

(b) To be approved under this subpart, a test must—

(1) Assess secondary school level basic verbal and quantitative skills and general learned abilities;

(2) Sample the major content domains of secondary school level verbal and quantitative skills with sufficient numbers of questions to—

(i) Adequately represent each domain; and

(ii) Permit meaningful analyses of item-level performance by students who are representative of the contemporary population beyond the age of compulsory school attendance and have earned a high school diploma;

(3) Require appropriate test-taking time to permit adequate sampling of the major content domains described in paragraph (b)(2) of this section;

(4) Have all forms (including short forms) comparable in reliability;

(5) Have, in the case of a test that is revised, new scales, scale values, and scores that are demonstrably comparable to the old scales, scale values, and scores;

(6) Meet all standards for test construction provided in the 1999 edition of the *Standards for Educational and Psychological Testing,* prepared by a joint committee of the American Educational Research Association, the American Psychological Association, and the National Council on Measurement in Education incorporated by reference in this section. Incorporation by reference of this document has been approved by the Director of the Office of the Federal Register pursuant to the Director's authority under 5 U.S.C. 552(a) and 1 CFR part 51. The incorporated document is on file at the Department of Education, Federal Student Aid, room 113E2, 830 First Street, NE., Washington, DC 20002, phone (202) 377-4026, and at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 1-866-272-6272, or go to: *http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html*. The document also may be obtained from the American Educational Research Association at: *http://www.aera.net;* and

(7) Have the test publisher's or the State's guidelines for retesting, including time between test-taking, be based on empirical analyses that are part of the studies of test reliability.

(c) In order for a test to be approved under this subpart, a test publisher or a State must—

(1) Include in the test booklet or package—

(i) Clear, specific, and complete instructions for test administration, including information for test takers on the purpose, timing, and scoring of the test; and

(ii) Sample questions representative of the content and average difficulty of the test;

(2) Have two or more secure, equated, alternate forms of the test;

(3) Except as provided in §§ 668.148 and 668.149, provide tables of distributions of test scores which clearly indicate the mean score and standard deviation for high school graduates who have taken the test within three years

prior to the date that the test is submitted to the Secretary for approval under § 668.144;

(4) Norm the test with—

(i) Groups that are of sufficient size to produce defensible standard errors of the mean and are not disproportionately composed of any race or gender; and

(ii) A contemporary sample that is representative of the population of persons who have earned a high school diploma in the United States; and

(5) If test batteries include sub-tests assessing different verbal and/or quantitative skills, a distribution of test scores as described in paragraph (c) (3) of this section that allows the Secretary to prescribe either—

(i) A passing score for each sub-test; or

(ii) One composite passing score for verbal skills and one composite passing score for quantitative skills.

(Approved by the Office of Management and Budget under control number 1845-0049)

(Authority: 20 U.S.C. 1091(d))

### § 668.147 Passing scores.

Except as provided in §§ 668.144(d), 668.148, and 668.149, to demonstrate that a test taker has the ability to benefit from the education and training offered by the institution, the Secretary specifies that the passing score on each approved test is one standard deviation below the mean score of a sample of individuals who have taken the test within the three years before the test is submitted to the Secretary for approval. The sample must be representative of the population of high school graduates in the United States.

(Authority: 20 U.S.C. 1091(d))

### § 668.148 Additional criteria for the approval of certain tests.

(a) In addition to satisfying the criteria in § 668.146, to be approved by the Secretary, a test must meet the following criteria, if applicable:

(1) In the case of a test developed for a non-native speaker of English who is enrolled in a program that is taught in his or her native language, the test must be—

(i) Linguistically accurate and culturally sensitive to the population for which the test is designed, regardless of the language in which the test is written;

(ii) Supported by documentation detailing the development of normative data;

(iii) If translated from an English version, supported by documentation of procedures to determine its reliability and validity with reference to the population for which the translated test was designed;

(iv) Developed in accordance with guidelines provided in the 1999 edition of

the "Testing Individuals of Diverse Linguistic Backgrounds" section of the *Standards for Educational and Psychological Testing* prepared by a joint committee of the American Educational Research Association, the American Psychological Association, and the National Council on Measurement in Education incorporated by reference in this section. Incorporation by reference of this document has been approved by the Director of the Office of the Federal Register pursuant to the Director's authority under 5 U.S.C. 552(a) and 1 CFR part 51. The incorporated document is on file at the Department of Education, Federal Student Aid, room 113E2, 830 First Street, NE., Washington, DC 20002, phone (202) 377-4026, and at the National Archives □ and Records Administration (NARA). For information on the availability of this material at NARA, call 1-866-272-6272, or go to: *http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html.* The document also may be obtained from the American Educational Research Association at: *http://www.aera.net;* and

(v)(A) If the test is in Spanish, accompanied by a distribution of test scores that clearly indicates the mean score and standard deviation for Spanish-speaking students with high school diplomas who have taken the test within five years before the date on which the test is submitted to the Secretary for approval.

(B) If the test is in a language other than Spanish, accompanied by a recommendation for a provisional passing score based upon performance of a sample of test takers representative of non-English speaking individuals who speak a language other than Spanish and who have a high school diploma. The sample upon which the recommended provisional passing score is based must be large enough to produce stable norms.

(2) In the case of a test that is modified for use for individuals with disabilities, the test publisher or State must—

(i) Follow guidelines provided in the "Testing Individuals with Disabilities" section of the *Standards for Educational and Psychological Testing;* and

(ii) Provide documentation of the appropriateness and feasibility of the modifications relevant to test performance.

(3) In the case of a computer-based test, the test publisher or State, as applicable, must—

(i) Provide documentation to the Secretary that the test complies with the basic principles of test construction and standards of reliability and validity as promulgated in the *Standards for Educational and Psychological Testing;*

(ii) Provide test administrators with instructions for familiarizing test takers with computer hardware prior to test-taking; and

(iii) Provide two or more parallel, equated forms of the test, or, if parallel forms are generated from an item pool, provide documentation of the methods of item selection for alternate forms.

(b) If a test is designed solely to measure the English language competence of

non-native speakers of English—

(1) The test must meet the criteria set forth in § 668.146(b)(6), (c)(1), (c)(2), and (c)(4); and

(2) The test publisher must recommend a passing score based on the mean score of test takers beyond the age of compulsory school attendance who completed U.S. high school equivalency programs, formal training programs, or bilingual vocational programs.

(Approved by the Office of Management and Budget under control number 1845-0049)

(Authority: 20 U.S.C. 1091(d))

## 📖 § 668.149 Special provisions for the approval of assessment procedures for individuals with disabilities.

If no test is reasonably available for individuals with disabilities so that no test can be approved under §§ 668.146 or 668.148 for these individuals, the following procedures apply:

(a) The Secretary considers a modified test or testing procedure, or instrument that has been scientifically developed specifically for the purpose of evaluating the ability to benefit from postsecondary training or education of individuals with disabilities to be an approved test for purposes of this subpart provided that the testing procedure or instrument measures both basic verbal and quantitative skills at the secondary school level.

(b) The Secretary considers the passing scores for these testing procedures or instruments to be those recommended by the test publisher or State, as applicable.

(c) The test publisher or State, as applicable, must—

(1) Maintain appropriate documentation, including a description of the procedures or instruments, their content domains, technical properties, and scoring procedures; and

(2) Require the test administrator to—

(i) Use the procedures or instruments in accordance with instructions provided by the test publisher or State, as applicable; and

(ii) Use the passing scores recommended by the test publisher or State, as applicable.

(Approved by the Office of Management and Budget under control number 1845-0049)

(Authority: 20 U.S.C. 1091(d))

## 📖 § 668.150 Agreement between the Secretary and a test publisher or a State.

(a) If the Secretary approves a test under this subpart, the test publisher or the

State that submitted the test must enter into an agreement with the Secretary that contains the provisions set forth in paragraph (b) of this section before an institution may use the test to determine a student's eligibility for title IV, HEA program funds.

(b) The agreement between a test publisher or a State, as applicable, and the Secretary provides that the test publisher or the State, as applicable, must—

(1) Allow only test administrators that it certifies to give its test;

(2) Require each test administrator it certifies to—

(i) Provide the test publisher or the State, as applicable, with a certification statement that indicates he or she is not currently decertified; and

(ii) Notify the test publisher or the State, as applicable, immediately if any other test publisher or State decertifies the test administrator;

(3) Only certify test administrators who—

(i) Have the necessary training, knowledge, and skill to test students in accordance with the test publisher's or the State's testing requirements;

(ii) Have the ability and facilities to keep its test secure against disclosure or release; and

(iii) Have not been decertified within the last three years by any test publisher or State;

(4) Decertify a test administrator for a period of three years if the test publisher or the State finds that the test administrator—

(i) Has failed to give its test in accordance with the test publisher's or the State's instructions;

(ii) Has not kept the test secure;

(iii) Has compromised the integrity of the testing process; or

(iv) Has given the test in violation of the provisions contained in § 668.151;

(5) Reevaluate the qualifications of a test administrator who has been decertified by another test publisher or State and determine whether to continue the test administrator's certification or to decertify the test administrator;

(6) Immediately notify the test administrator, the Secretary, and the institutions where the test administrator previously administered approved tests when the test publisher or the State decertifies a test administrator;

(7)(i) Review the test results of the tests administered by a decertified test administrator and determine which tests may have been improperly administered during the five (5) year period preceding the date of decertification;

(ii) Immediately notify the affected institutions and students or prospective students; and

(iii) Provide a report to the Secretary on the results of the review and the notifications provided to institutions and students or prospective students;

(8) Report to the Secretary if the test publisher or the State certifies a previously decertified test administrator after the three year period specified in paragraph (b)(4) of this section;

(9) Score a test answer sheet that it receives from a test administrator;

(10) If a computer-based test is used, provide the test administrator with software that will—

(i) Immediately generate a score report for each test taker;

(ii) Allow the test administrator to send to the test publisher or the State, as applicable, a record of the test taker's performance on each test item and the test taker's test scores using a data transfer method that is encrypted and secure; and

(iii) Prohibit any changes in test taker responses or test scores;

(11) Promptly send to the student and the institution the student indicated he or she is attending or scheduled to attend a notice stating the student's score for the test and whether or not the student passed the test;

(12) Keep each test answer sheet or electronic record forwarded for scoring and all other documents forwarded by the test administrator with regard to the test for a period of three years from the date the analysis of the tests results, described in paragraph (b)(13) of this section, was sent to the Secretary;

(13) Analyze the test scores of students who take the test to determine whether the test scores and data produce any irregular pattern that raises an inference that the tests were not being properly administered, and provide the Secretary with a copy of this analysis within 18 months after the test was approved and every 18 months thereafter during the period of test approval;

(14) Upon request, give the Secretary, a State agency, an accrediting agency, and law enforcement agencies access to test records or other documents related to an audit, investigation, or program review of an institution, the test publisher, or a test administrator;

(15) Immediately report to the Secretary if the test publisher or the State finds any credible information indicating that a test has been compromised;

(16) Immediately report to the Office of Inspector General of the Department of Education for investigation if the test publisher or the State finds any credible information indicating that a test administrator or institution may have engaged in civil or criminal fraud, or other misconduct; and

(17) Require a test administrator who provides a test to an individual with a disability who requires an accommodation in the test's administration to report to the test publisher or the State within the time period specified in § 668.151(b)(2) or § 668.152(b)(2), as applicable, the nature of the disability

and the accommodations that were provided.

(c)(1) The Secretary may terminate an agreement with a test publisher or a State, as applicable, if the test publisher or the State fails to carry out the terms of the agreement described in paragraph (b) of this section.

(2) Before terminating the agreement, the Secretary gives the test publisher or the State, as applicable, the opportunity to show that it has not failed to carry out the terms of its agreement.

(3) If the Secretary terminates an agreement with a test publisher or a State under this section, the Secretary publishes a notice in the **Federal Register** specifying when institutions may no longer use the test publisher's or the State's test(s) for purposes of determining a student's eligibility for title IV, HEA program funds.

(Approved by the Office of Management and Budget under control number 1845-0049)

(Authority: 20 U.S.C. 1091(d))

## 📖 § 668.151 Administration of tests.

(a)(1) To establish a student's eligibility for title IV, HEA program funds under this subpart, an institution must select a test administrator to give an approved test.

(2) An institution may use the results of an approved test it received from an approved test publisher or assessment center to determine a student's eligibility to receive title IV, HEA program funds if the test was independently administered and properly administered in accordance with this subpart.

(b) The Secretary considers that a test is independently administered if the test is—

(1) Given at an assessment center by a certified test administrator who is an employee of the center; or

(2) Given by an independent test administrator who maintains the test at a secure location and submits the test for scoring by the test publisher or the State or, for a computer-based test, a record of the test scores, within two business days of administering the test.

(c) The Secretary considers that a test is not independently administered if an institution—

(1) Compromises test security or testing procedures;

(2) Pays a test administrator a bonus, commission, or any other incentive based upon the test scores or pass rates of its students who take the test; or

(3) Otherwise interferes with the test administrator's independence or test administration.

(d) The Secretary considers that a test is properly administered if the test administrator—

(1) Is certified by the test publisher or the State, as applicable, to give the test publisher's or the State's test;

(2) Administers the test in accordance with instructions provided by the test publisher or the State, as applicable, and in a manner that ensures the integrity and security of the test;

(3) Makes the test available only to a test-taker, and then only during a regularly scheduled test;

(4) Secures the test against disclosure or release; and

(5) Submits the completed test or, for a computer-based test, a record of test scores, to the test publisher or the State, as applicable, within the time period specified in § 668.152(b) or paragraph (b)(2) of this section, as appropriate, and in accordance with the test publisher's or the State's instructions.

(e) An independent test administrator may not score a test.

(f) An individual who fails to pass a test approved under this subpart may not retake the same form of the test for the period prescribed by the test publisher or the State responsible for the test.

(g) An institution must maintain a record for each individual who took a test under this subpart. The record must include—

(1) The test taken by the individual;

(2) The date of the test;

(3) The individual's scores as reported by the test publisher, an assessment center, or the State;

(4) The name and address of the test administrator who administered the test and any identifier assigned to the test administrator by the test publisher or the State; and

(5) If the individual who took the test is an individual with a disability and was unable to be evaluated by the use of an approved ATB test or the individual requested or required testing accommodations, documentation of the individual's disability and of the testing arrangements provided in accordance with § 668.153(b).

(Approved by the Office of Management and Budget under control number 1845-0049)

(Authority: 20 U.S.C. 1091(d))

## 📖 § 668.152 Administration of tests by assessment centers.

(a) If a test is given by an assessment center, the assessment center must properly administer the test as described in § 668.151(d), and § 668.153, if applicable.

(b)(1) Unless an agreement between a test publisher or a State, as applicable,

and an assessment center indicates otherwise, an assessment center scores the tests it gives and promptly notifies the institution and the student of the student's score on the test and whether the student passed the test.

(2) If the assessment center scores the test, it must provide weekly to the test publisher or the State, as applicable—

(i) All copies of the completed test, including the name and address of the test administrator who administered the test and any identifier assigned to the test administrator by the test publisher or the State, as applicable; or

(ii) A report listing all test-takers' scores and institutions to which the scores were sent and the name and address of the test administrator who administered the test and any identifier assigned to the test administrator by the test publisher or the State, as applicable.

(Approved by the Office of Management and Budget under control number 1845-0049)

(Authority: 20 U.S.C. 1091(d))

## § 668.153 Administration of tests for individuals whose native language is not English or for individuals with disabilities.

(a) *Individuals whose native language is not English.* For an individual whose native language is not English and who is not fluent in English, the institution must use the following tests, as applicable:

(1) If the individual is enrolled or plans to enroll in a program conducted entirely in his or her native language, the individual must take a test approved under §§ 668.146 and 668.148(a)(1).

(2) If the individual is enrolled or plans to enroll in a program that is taught in English with an ESL component, the individual must take an English language proficiency assessment approved under § 668.148(b) and, before beginning the portion of the program taught in English, a test approved under § 668.146.

(3) If the individual is enrolled or plans to enroll in a program that is taught in English without an ESL component, or the individual does not enroll in any ESL component offered, the individual must take a test in English approved under § 668.146.

(4) If the individual enrolls in an ESL program, the individual must take an ESL test approved under § 668.148(b).

(5) If the individual enrolls or plans to enroll in a program that is taught in the student's native language that either has an ESL component or a portion of the program will be taught in English, the individual must take an English proficiency test approved under § 668.148(b) prior to beginning the portion of the program taught in English.

(b) *Individuals with disabilities.* (1) For an individual with a disability who has neither a high school diploma nor its equivalent and who is applying for title

IV, HEA program funds and seeks to show his or her ability to benefit through the testing procedures in this subpart, an institution must use a test described in § 668.148(a)(2) or § 668.149(a).

(2) The test must reflect the individual's skills and general learned abilities.

(3) The test administrator must ensure that there is documentation to support the determination that the individual is an individual with a disability and requires accommodations—such as extra time or a quiet room—for taking an approved test, or is unable to be evaluated by the use of an approved ATB test.

(4) Documentation of an individual's disability may be satisfied by—

(i) A written determination, including a diagnosis and information about testing accommodations, if such accommodation information is available, by a licensed psychologist or physician; or

(ii) A record of the disability from a local or State educational agency, or other government agency, such as the Social Security Administration or a vocational rehabilitation agency, that identifies the individual's disability. This record may, but is not required to, include a diagnosis and recommended testing accommodations.

(Approved by the Office of Management and Budget under control number 1845-0049)

(Authority: 20 U.S.C. 1091(d))

## 📖 § 668.154 Institutional accountability.

An institution is liable for the title IV, HEA program funds disbursed to a student whose eligibility is determined under this subpart only if—

(a) The institution used a test that was not administered independently, in accordance with § 668.151(b);

(b) The institution or an employee of the institution compromised the testing process in any way; or

(c) The institution is unable to document that the student received a passing score on an approved test.

(Authority: 20 U.S.C. 1091(d))

## 📖 § 668.155 [Reserved]

## 📖 § 668.156 Approved State process.

(a)(1) A State that wishes the Secretary to consider its State process as an alternative to achieving a passing score on an approved, independently administered test for the purpose of determining a student's eligibility for title IV, HEA program funds must apply to the Secretary for approval of that process.

(2) To be an approved State process, the State process does not have to include

all the institutions located in that State, but must indicate which institutions are included.

(b) The Secretary approves a State's process if—

(1) The State administering the process can demonstrate that the students it admits under that process without a high school diploma or its equivalent, who enroll in participating institutions have a success rate as determined under paragraph (h) of this section that is within 95 percent of the success rate of students with high school diplomas; and

(2) The State's process satisfies the requirements contained in paragraphs (c) and (d) of this section.

(c) A State process must require institutions participating in the process to provide each student they admit without a high school diploma or its recognized equivalent with the following services:

(1) Orientation regarding the institution's academic standards and requirements, and student rights.

(2) Assessment of each student's existing capabilities through means other than a single standardized test.

(3) Tutoring in basic verbal and quantitative skills, if appropriate.

(4) Assistance in developing educational goals.

(5) Counseling, including counseling regarding the appropriate class level for that student given the student's individual's capabilities.

(6) Follow-up by teachers and counselors regarding the student's classroom performance and satisfactory progress toward program completion.

(d) A State process must—

(1) Monitor on an annual basis each participating institution's compliance with the requirements and standards contained in the State's process;

(2) Require corrective action if an institution is found to be in noncompliance with the State process requirements; and

(3) Terminate an institution from the State process if the institution refuses or fails to comply with the State process requirements.

(e)(1) The Secretary responds to a State's request for approval of its State's process within six months after the Secretary's receipt of that request. If the Secretary does not respond by the end of six months, the State's process is deemed to be approved.

(2) An approved State process becomes effective for purposes of ☐ determining student eligibility for title IV, HEA program funds under this subpart—

(i) On the date the Secretary approves the process; or

(ii) Six months after the date on which the State submits the process to the Secretary for approval, if the Secretary neither approves nor disapproves the

process during that six month period.

(f) The Secretary approves a State process for a period not to exceed five years.

(g)(1) The Secretary withdraws approval of a State process if the Secretary determines that the State process violated any terms of this section or that the information that the State submitted as a basis for approval of the State process was inaccurate.

(2) The Secretary provides a State with the opportunity to contest a finding that the State process violated any terms of this section or that the information that the State submitted as a basis for approval of the State process was inaccurate.

(h) The State must calculate the success rates as referenced in paragraph (b) of this section by—

(1) Determining the number of students with high school diplomas who, during the applicable award year described in paragraph (i) of this section, enrolled in participating institutions and—

(i) Successfully completed education or training programs;

(ii) Remained enrolled in education or training programs at the end of that award year; or

(iii) Successfully transferred to and remained enrolled in another institution at the end of that award year;

(2) Determining the number of students with high school diplomas who enrolled in education or training programs in participating institutions during that award year;

(3) Determining the number of students calculated in paragraph (h)(2) of this section who remained enrolled after subtracting the number of students who subsequently withdrew or were expelled from participating institutions and received a 100 percent refund of their tuition under the institutions' refund policies;

(4) Dividing the number of students determined in paragraph (h)(1) of this section by the number of students determined in paragraph (h)(3) of this section;

(5) Making the calculations described in paragraphs (h)(1) through (h)(4) of this section for students without a high school diploma or its recognized equivalent who enrolled in participating institutions.

(i) For purposes of paragraph (h) of this section, the applicable award year is the latest complete award year for which information is available that immediately precedes the date on which the State requests the Secretary to approve its State process, except that the award year selected must be one of the latest two completed award years preceding that application date.

(Approved by the Office of Management and Budget under control number 1845-0049)

(Authority: 20 U.S.C. 1091(d))

**26.** Section 668.164 is amended by:

    **A. In paragraph (g)(2)(i), removing the words "Except in the case of a parent PLUS loan, the", and adding, in their place, the word "The".**

    **B. In paragraph (g)(4)(iv), removing the words "a Federal Pell Grant, an ACG, or a National SMART Grant", and adding, in their place, the words "any title IV, HEA program assistance".**

    **C. Adding paragraph (i).**

The addition reads as follows:

### 📖 § 668.164 Disbursing funds.

\* \* \* \* \*

(i) *Provisions for books and supplies.* (1) An institution must provide a way for a Federal Pell Grant eligible student to obtain or purchase, by the seventh day of a payment period, the books and supplies required for the payment period if, 10 days before the beginning of the payment period—

(i) The institution could disburse the title IV, HEA program funds for which the student is eligible; and

(ii) Presuming the funds were disbursed, the student would have a credit balance under paragraph (e) of this section.

(2) The amount the institution provides to the Federal Pell Grant eligible student to obtain or purchase books and supplies is the lesser of the presumed credit balance under this paragraph or the amount needed by the student, as determined by the institution.

(3) The institution must have a policy under which a Federal Pell Grant eligible student may opt out of the way the institution provides for the student to obtain or purchase books and supplies under this paragraph.

(4) If a Federal Pell Grant eligible student uses the way provided by the institution to obtain or purchase books and supplies under this paragraph, the student is considered to have authorized the use of title IV, HEA funds and the institution does not need to obtain a written authorization under paragraph (d)(1)(iv) of this section and § 668.165(b) for this purpose.

\* \* \* \* \*

## 📘 PART 682—FEDERAL FAMILY EDUCATION LOAN (FFEL) PROGRAM

Back to Top

**27.** The authority citation for part 682 is revised to read as follows:

**Authority:**

20 U.S.C. 1071 to 1087-2, unless otherwise noted.

📖 **§ 682.200 [Amended]**

**28.** Section 682.200(a)(2) is amended by adding, in alphabetical order, the term "Credit hour".

📄 **PART 685—WILLIAM D. FORD FEDERAL DIRECT LOAN PROGRAM**

Back to Top

**29.** The authority citation for part 685 continues to read as follows:

> **Authority:**
>
> 20 U.S.C. 1070g, 1087a, *et seq.,* unless otherwise noted.

**30.** Section 685.102 is amended by:

A. In paragraph (a)(2), adding, in alphabetical order, the term "Credit hour".

B. In paragraph (b), adding, in alphabetical order, the definition of *Payment data* to read as follows:

📖 **§ 685.102 Definitions.**

> * * * * *
>
> (b) * * *
>
> *Payment data:* An electronic record that is provided to the Secretary by an institution showing student disbursement information.
>
> * * * * *

**31.** Section 685.301 is amended by revising paragraph (e)(1) to read as follows:

📖 **§ 685.301 Origination of a loan by a Direct Loan Program school.**

> * * * * *
>
> (e) * * *
>
> (1) The Secretary accepts a student's Payment Data that is submitted in accordance with procedures established through publication in the **Federal Register,** and that contains information the Secretary considers to be accurate in light of other available information including that previously provided by the student and the institution.
>
> * * * * *

📄 **PART 686—TEACHER EDUCATION ASSISTANCE FOR COLLEGE AND HIGHER EDUCATION (TEACH) GRANT PROGRAM**

Back to Top

**32.** The authority citation for part 686 continues to read as follows:

> **Authority:**
>
> 20 U.S.C. 1070g, *et seq.,* unless otherwise noted.

**33.** Section 686.2 is amended by:

A. In paragraph (a), adding, in alphabetical order, the term "Credit hour".

B. In paragraph (d), revising the definition of *Payment Data* to read as follows:

📖 **§ 686.2 Definitions.**

> * * * * *
>
> (d) * * *
>
> *Payment Data:* An electronic record that is provided to the Secretary by an institution showing student disbursement information.
>
> * * * * *

**34.** Section 686.37 is amended by revising paragraph (b) to read as follows:

📖 **§ 686.37 Institutional reporting requirements.**

> * * * * *
>
> (b) The Secretary accepts a student's Payment Data that is submitted in accordance with procedures established through publication in the **Federal Register,** and that contains information the Secretary considers to be accurate in light of other available information including that previously provided by the student and the institution.
>
> * * * * *

📘 **PART 690—FEDERAL PELL GRANT PROGRAM**

Back to Top

**35.** The authority citation for part 690 continues to read as follows:

> **Authority:**
>
> 20 U.S.C. 1070a, 1070g, unless otherwise noted.

📖 **§ 690.2 [Amended]**

**36.** Section 690.2 is amended by:

A. In paragraph (a), adding, in alphabetical order, the term "Credit hour".

**B.** In paragraph (b), adding, in alphabetical order, the terms "Institutional student information record (ISIR)", "Student aid report (SAR)", "Valid institutional student information record (valid ISIR)", and "Valid student aid report (valid SAR)".

**C.** In paragraph (c), by removing the definitions for the terms "Institutional Student Information Record (ISIR)", "Student Aid Report (SAR)", "Valid Institutional Student Information Record (valid ISIR)", and "Valid Student Aid Report".

### 📖 § 690.61 [Amended]

**37.** Section 690.61 is amended by:

**A.** In the paragraph (b) heading, adding the word "Valid" before the words "Student Aid Report" and before the words "Institutional Student Information Record".

**B.** In the paragraph (b) introductory text, adding the word "valid" before the word "SAR".

### 📘 PART 691—ACADEMIC COMPETITIVENESS GRANT (ACG) AND NATIONAL SCIENCE AND MATHEMATICS ACCESS TO RETAIN TALENT GRANT (NATIONAL SMART GRANT) PROGRAMS

Back to Top

**38.** The authority citation for part 691 continues to read as follows:

> **Authority:**
>
> 20 U.S.C. 1070a-1, unless otherwise noted.

### 📖 § 691.2 [Amended]

**39.** Section 691.2(a) is amended by adding, in alphabetical order, the term "Credit hour".

> 📝 Note:
>
> The following appendix will not appear in the Code of Federal Regulations.

> ### Appendix A—Regulatory Impact Analysis
> Back to Top
>
> #### Executive Order 12866
>
> Regulatory Impact Analysis
>
> Under Executive Order 12866, the Secretary must determine whether the regulatory action is "significant" and therefore subject to the requirements of the Executive Order and subject to review by the OMB. Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action likely to result in a rule that may (1) Have an annual effect on the economy of $100 million or more, or adversely affect a sector of the economy,

productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities in a material way (also referred to as an "economically significant" rule); (2) create serious inconsistency or otherwise interfere with an action taken or planned by another agency; (3) materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive order.

Pursuant to the terms of the Executive order, we have determined that this regulatory action will have an annual effect on the economy of more than $100 million. Therefore, this action is "economically significant" and subject to OMB review under section 3(f)(1) of Executive Order 12866. Notwithstanding this determination, we have assessed the potential costs and benefits—both quantitative and qualitative—of this regulatory action and have determined that the benefits justify the costs.

### Need for Federal Regulatory Action

Student debt is more prevalent and individual borrowers are incurring more debt than ever before. Twenty years ago, only one in six full-time freshmen at four-year public colleges and universities took out a Federal student loan; now more than half do. Today, nearly two-thirds of all graduating college seniors carry student loan debt. The availability of Federal student aid allows students to access post-secondary educational opportunities crucial for obtaining employment. It is therefore important for the Department to have a strong regulatory foundation on which to build to protect student aid funds. The fourteen provisions described in this *Regulatory Impact Analysis* represent a broad set of regulations and definitions that strengthen the Federal student aid programs by protecting students from aggressive and misleading recruiting practices, providing consumers with better information about the effectiveness of career college and training programs, and ensuring that only eligible students or programs receive title IV, HEA aid.

These regulations are needed to implement provisions of the HEA, as amended by the HEOA, particularly related to (1) Programs that prepare students for gainful employment, (2) incentive compensation, (3) satisfactory academic progress policies, and (4) verification of information on student aid applications. These regulations also would implement changes made by the HEOA to provisions related to ability to benefit options. A description of the regulations, the reasons for adopting them, and an analysis of their effects were presented in the NPRM published on June 18, 2010. The NPRM included a *Regulatory Impact Analysis* and this section updates that analysis and describes changes to the proposed regulations that we considered in response to comments received and our reasons for adopting or rejecting them.

### Regulatory Alternatives Considered

The Department considered a number of regulatory alternatives as part of the rulemaking process. These alternatives were described in detail in the

preamble to the NPRM under both the *Regulatory Impact Analysis* and the *Reasons* sections accompanying the discussion of each proposed regulatory provision. To the extent that the Department has addressed alternatives in response to comments received on the NPRM, these are discussed elsewhere in the preamble to these final regulations under the *Analysis of Comments and Changes* section.

As discussed in the *Analysis of Comments and Changes* section, these final regulations reflect decisions reached through negotiated rulemaking, statutory amendments included in the HEOA, and revisions in response to public comments. In many cases, these revisions were technical in nature and intended to address drafting issues or provide additional clarity.

While we received many comments relating to the validation of high school diplomas and written arrangements, for the reasons we describe elsewhere in this preamble, we did not make any changes to those provisions.

In response to comments related to disbursement of funds to Pell Grant recipients for books and supplies, § 668.164(i) has been revised to specify that an institution must have a policy under ☐ which a student may opt out of the way the institution provides for the student to purchase books and supplies by the seventh day of classes of a payment period. In addition, § 668.164(i) has been revised to specify that if a Federal Pell Grant eligible student uses the method provided by the institution to purchase books and supplies, the student is considered to have authorized the use of title IV, HEA funds and the institution does not need to obtain a written authorization under § 668.164(d)(1)(iv) and § 668.165(b) for this purpose only.

We also have updated the definition of *full-time student* to provide that a student's enrollment status for a term-based program may include repeating any coursework previously taken in the program but may not include more than one repetition of a previously passed course, or any repetition of a previously passed course due to the student's failing other coursework. The only change we have made to the satisfactory academic progress provisions has been to revise § 668.34(a)(3)(ii) to provide that, for programs longer than an academic year in length, satisfactory academic progress is measured at the end of each payment period or at least annually to correspond to the end of a payment period.

As discussed in the *Analysis of Comments and Changes,* the majority of the comments related to the Return of Title IV, HEA funds opposed the proposed changes or requested a delay in the effective date of this provision to allow further input from the community. Commenters were concerned with the burden on institutions, the potential harm to students who might withdraw after one module but return within the same payment period or period of enrollment, and the targeting of certain programs. In response to these comments, we revised § 668.22(a)(2) to provide that a student is not considered to have withdrawn if the student ceased attending the modules he or she was scheduled to attend, but the institution obtains a written confirmation from the student at the time of the withdrawal that he or she will

attend a module that begins later in the same payment period or period of enrollment. This will provide more flexibility for a student who provides the authorization. This confirmation must be obtained at the time of withdrawal even if the student has already registered for subsequent courses. However, these final regulations provide that, for nonterm and nonstandard-term programs, a confirmation is valid only if the module the student plans to attend begins no later than 45 calendar days after the end of the module the student ceased attending.

Some additional technical and clarifying changes were made, including revising § 668.22(f)(2)(ii) to clarify that, when determining the percentage of payment period or period of enrollment completed, the total number of calendar days in a payment period or period of enrollment does not include, for a payment period or period of enrollment in which any courses in the program are offered in modules, any scheduled breaks of at least five consecutive days when the student is not scheduled to attend a module or other course offered during that period of time. In response to commenters' requests, we have included in the *Analysis of Comments and Changes* examples of scenarios for return of title IV, HEA program funds.

We received extensive comments on the provisions related to the definition of a *credit hour*. Some of these comments supported the Department's efforts and pointed out that many institutions and others, including States, are already following the definition or a comparable standard that would require only a minimal adjustment. As described in the *Analysis of Comments and Changes* section, other commenters opposed the definition of a *credit hour* and expressed concern that it would stifle innovation, especially in delivery methods, undermine the American higher education system, emphasize "seat-time", and interfere in a core academic issue. The Department maintains that the credit-hour definition is intended to provide a minimum, consistent standard for all institutions in determining the amount of student work necessary to award credit hours equitably for Federal program purposes. In response to the discussion of the credit hour provision, we have revised the definition of *credit hour* to clarify the basic principles applied in the proposed definition of a *credit hour* and have specified further in the definition that it is the institution's responsibility to determine the appropriate credit hours or equivalencies. We also have revised the credit-hour definition to clarify that the amount of work specified is a minimum standard with no requirement for the standard to be exceeded.

With respect to the provisions relating to misrepresentation, we have revised § 668.72(c) to prohibit false, erroneous, or misleading statements concerning whether completion of an educational program qualifies a students for licensure or employment in the States in which the educational program is offered and not just the State in which the institution is located. Additionally, we have revised § 668.72(n) to specify that a failure to disclose that the degree requires specialized accreditation is a misrepresentation. To address concerns over liability for third-party statements, we agreed to limit the reach of the ban on making substantial misrepresentations to statements made by any

ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs or those that provide marketing, advertising, recruiting, or admissions services. We revised the definition of *misleading statement* in § 668.71(c) to remove the word "capacity" from the phrase "capacity, likelihood, or tendency to deceive or confuse."

We received numerous comments regarding the incentive compensation provisions in the NPRM. Some of these comments supported the proposed changes due to the conflict of interest between an enrollment professional's ethical obligations and financial interest. Other commenters opposed the changes, questioning the Department's legal authority to regulate, whether there was sufficient evidence to support the regulations, and the reasoning for the policy changes. We maintain that the elimination of the 12 "safe harbors" in § 668.14(b)(22) is needed to ensure program integrity, protect students, and align institutional practices with the goals intended by Congress. The Department did make a few clarifying changes. For example, the changes to § 668.14(b) based on comments include: (i) Adding "in any part" to § 668.14(b)(22) when referring to incentive payments to eliminate confusion that a portion of an individual's compensation may be based on enrollments or the award of financial aid; (ii) revising the regulations to provide that an employee who receives multiple compensation adjustments in a calendar year and is engaged in any student enrollment or admission activity or in making decisions regarding the award of title IV, HEA program funds is considered to have received such adjustments based on securing enrollment or the award of financial aid if those adjustments create compensation that is based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid; (iii) revising § 668.14(b)(22)(ii) to provide that eligible institutions, organizations that are contractors to eligible institutions, and other entities may make merit-based adjustments to employee compensation provided that such adjustments are not based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid; (iv) confirming that prohibited incentive compensation includes any commission, bonus, or other incentive payment; (v) providing that profit sharing and bonuses are not prohibited as long as they are based on an institutional goal and distributed to all employees who have otherwise contributed to satisfaction of a particular institutional goal; and (vi) revising the definition of *securing enrollments or the award of financial aid* to provide more detail and to clarify that it includes activities through the completion of an educational program.

The reporting and disclosure requirements related to gainful employment have also been updated in response to comments and further evaluation by the Department. We confirmed that the reporting and disclosure requirements apply only to programs subject to the gainful employment regulations and revised § 668.6(a) to require the reporting of CIP code and other information not only for program completers, but for all students who attend gainful employment programs. We also removed proposed § 600.4(a)(4)(iii) and revised § 600.4(a)(4)(i)(c) to clarify the programs subject to the

regulations. The time period for which information has to be provided has been changed so that an institution must report the required information for each student, who during the award year beginning July 1, 2006, and for any subsequent award year, began attending or completed a program under § 668.8(c)(3) or (d).

In addition to the student identifiers, CIP codes, program completion dates, and private education loan and institutional financing amounts specified in the NPRM, institutions will also have to report the name of the program and whether the student matriculated to a higher credentialed program at the institution or if available, □ evidence that the student transferred to a higher credentialed program at another institution. To ensure the information is accessible, § 668.6(b) has been revised to require an institution to provide a prominent and direct link to information about a program on the home page of its Web site and on other pages where general, academic, or admissions information is provided about the program. The information must also be provided in promotional materials conveyed to prospective students. The information must be provided in a simple and meaningful manner. The information to be disclosed includes the on-time graduation rate, the total amount of tuition and fees the institution charges a student for completing the program within normal time, the typical costs for books and supplies, unless included as part of the tuition and fees, and the amount of room and board, if applicable. The institution may include information on other costs, such as transportation and living expenses, but must provide a Web link or access to the program cost information it makes available under § 668.43(a). The Department intends to develop in the future a disclosure form and will be seeking public comment about the design of the form through the information collection process under the Paperwork Reduction Act of 1995 (PRA). Until a form is developed and approved under the PRA process, institutions must comply with the disclosure requirements independently.

Another area of disclosure is providing students information about potential occupations by linking to O*Net. Commenters expressed concern that this would require an unwieldy amount of data for some degree programs and the resulting information overload would not serve to accurately inform students. Section 668.6(b) has been revised so that if the number of occupations related to the program, as identified by entering the program's full six digit CIP code on the O*NET crosswalk at *http://online.onetcenter.org/crosswalk/* is more than ten, an institution is allowed to provide prospective students with Web links to a representative sample of the SOCs for which its graduates typically find employment within a few years after completing the program.

In response to comments that the proposed placement rate was administratively complex and overly burdensome, we decided to direct the National Center for Education Statistics (NCES) to develop a placement rate methodology and the processes necessary for determining and documenting student employment and reporting placement data to the Department using IPEDS no later than July 1, 2012. The collaborative process used by NCES and the opportunity for public comment on the proposed measure will allow for a

considered review and development of a meaningful placement rate. Section 668.6(b) has been revised to specify that an institution must disclose for each program the placement rate calculated under a methodology developed by its accrediting agency, State, or NCES. The institution would have to disclose the accrediting agency or State-required placement rate beginning on July 1, 2011 and to identify the accrediting agency or State under whose requirements the rate was calculated. The NCES-developed rate would have to be disclosed when the rates become available.

To remove uncertainty and to ensure a consistent calculation, we have revised § 668.6(b) to specify how an institution calculates an on-time completion rate for its programs. This is a measure designed to provide students meaningful information about the extent to which former students completed the program within the published length. As described elsewhere in this preamble, the on-time completion rate will be calculated by: (1) Determining the number of students who completed the program during the most recently completed calendar year; (2) determining the number of students in step (1) who completed the program within normal time, regardless of whether the students transferred into the program or changed programs at the institution; and (3) dividing the number of students who completed in normal time in step (2) by the total number of completers in step (1) and multiplying by 100.

We also received comments about the use of median loan debt, the definition of *private loans,* and the treatment of debt incurred at prior programs or institutions. The examples that we provide earlier in this preamble clarify the treatment of loan debt from prior programs and institutions. In general, median loan debt for a program at an institution does not include debt incurred by students in attending a prior institution, unless the prior and current institutions are under common ownership or control or are otherwise related entities. In cases where a student changes programs while attending an institution or matriculates to a higher credentialed program at the institutions, the Department will associate the total amount of debt incurred by the student to the program the student completed. In order to perform the calculation of the median loan debt,§ 668.6(a) has been revised to provide that an institution must provide information about whether a student matriculated to a higher credentialed program at the same institution, or, if it has evidence, that a student transferred to a higher credentialed program at another institution.

The provisions related to State authorization generated comments from those who supported the regulations as an effort to address fraud and abuse in Federal programs through State oversight and from others who believed the regulations infringed on States' authority and upset the balance of the "Triad" of oversight by States, accrediting agencies, and the Federal Government. We clarified that the final regulations do not mandate that a State create any licensing agency for purposes of Federal program eligibility as an institution may be legally authorized by the State based on methods such as State charters, State laws, State constitutional provisions, or articles of incorporation that authorize an entity to offer educational programs beyond

secondary education in the State.

We revised § 600.9 to clarify that an institution's legal authority to offer postsecondary education in a State must be by name and, thus, it must include the name of the institution being authorized. We have removed proposed § 600.9(b)(2) regarding adverse actions. In response to concerns about the effect on distance education and reciprocity arrangements, we clarified that an institution must meet any State requirements for it to be legally offering distance or correspondence education in that State and must be able to document to the Secretary the State's approval upon request. Thus, a public institution is considered to comply with § 600.9 to the extent it is operating in its home State, and, if operating in another State, it would be expected to comply with the requirements, if any, the other State considers applicable or with any reciprocal agreement that may be applicable. In making these clarifications, we are not preempting any State laws, regulations, or other requirements regarding reciprocal agreements, distance education, or correspondence study.

We also have revised the State authorization provisions in § 600.9 to distinguish between a legal entity that is established as an educational institution and one established as a business or nonprofit entity. An institution authorized as an educational institution may be exempted by name from any State approval or licensure requirements based on the institution's accreditation by an accrediting agency recognized by the Secretary or based on the institution being in operation for at least 20 years. An institution established as a business or nonprofit charitable organization and not specifically as an educational institution may not be exempted from the State's approval or licensure requirements based on accreditation, years in operation, or other comparable exemption. Chart A illustrates the basic principles of § 600.9 of these final regulations, with additional examples discussed in the preamble to these regulations. 

| Chart A—State Authorization Requirements Back to Top | | |
|---|---|---|
| **Legal entity** | **Entity description** | **Approval or licensure process** |
| Educational institution | A public, private nonprofit, or for-profit institution established by name by a State through a charter, statute, or other action issued by an appropriate State agency or State entity as an educational institution authorized to operate educational programs beyond secondary education, including programs leading to a degree or certificate | The institution must comply with any applicable State approval or licensure process and be approved or licensed by name, and may be exempted from such requirement based on its accreditation, or being in operation at least 20 years, or use both criteria. |
| Business | A for-profit entity established by the State on the basis of an authorization or license to conduct commerce or provide services | The State must have a State approval or licensure process, and the institution must comply with the State approval or licensure process and be approved or licensed |

| | | by name. |
|---|---|---|
| Charitable organization | A nonprofit entity established by the State on the basis of an authorization or license for the public interest or | An institution in this category may not be exempt from State approval or licensure |

To maintain the State's role in student consumer protection and handling student complaints related to State laws, we have revised § 668.43(b) to provide that an institution must make available to students or prospective students contact information for not only the State approval or licensing entities but also any other relevant State official or agency that would appropriately handle a student's complaint.

Finally, we have clarified the meaning of a religious institution for the applicability of the religious exemption. We also have expanded § 600.9(b) to provide that an institution is considered to be legally authorized by the State if it is exempt from State authorization as a religious institution by State law, in addition to the provision of the proposed regulations that an institution be exempt from State authorization as a religious institution under the State's constitution. We also have included a definition of a *religious institution* providing that an institution is considered a religious institution if it is owned, controlled, operated, and maintained by a religious organization lawfully operating as a nonprofit religious corporation and awards only religious degrees or religious certificates including, but not limited to, a certificate of Talmudic studies, an associate of biblical studies, a bachelor of religious studies, a master of divinity, or a doctor of divinity.

In response to comments, we confirmed that tribal institutions are not subject to State oversight or subject to the State process for handling complaints and revised § 600.9 to clarify the status of tribal institutions. As noted in the preamble discussion of State Authorization, we have removed proposed § 600.9(b)(2) regarding adverse actions. Further, we are providing that, in § 600.9(a)(2)(ii) of the final regulations, the tribal government must have a process to review and appropriately act on complaints concerning a tribal institution and enforce applicable tribal requirements or laws.

Finally, while the Secretary has designated amended § 600.9(a) and (b) as being effective July 1, 2011, we recognize that a State may be unable to provide appropriate State authorizations to its institutions by that date. We are providing that the institutions unable to obtain State authorization in that State may request a one-year extension of the effective date of these final regulations to July 1, 2012, and if necessary, an additional one-year extension of the effective date to July 1, 2013. To receive an extension of the effective date of amended § 600.9(a) and (b) for institutions in a State, an institution must obtain from the State an explanation of how a one-year extension will permit the State to modify its procedures to comply with amended § 600.9.

As discussed in the preamble to these regulations, we made a number of clarifying changes to the regulations regarding the administration of ability to benefit tests. We revised the definition of the term *independent test administrator* to clarify that an independent test administrator must have no

current or prior financial or ownership interest in the institution, its affiliates, or its parent corporation, other than the fees earned through the agreement to administer the test. In § 668.142, we have defined an ATB test irregularity as an irregularity that results from an ATB test being administered in a manner that does not conform to the established regulations for test administration consistent with the provision of subpart J and the test administrator's manual. We also added a provision to specify that a test publisher may include with its application a description of the manner in which test-taking time was determined in relation to the other requirements in § 668.146(b). We have revised § 668.150(b)(7)(i) to indicate that the period of review of all test results of the tests administered by a decertified test administrator is five years preceding the date of decertification.

In response to a comment regarding testing of non-native speakers of English, we have revised § 668.153 to provide that if a non-native speaker of English who is enrolled or plans to enroll in a program that will be taught in his or her native language with a component or portion in English, the individual must take a test approved under §§ 668.146 and 668.148(a)(1) in the student's native language. New § 668.153(a)(5) provides that prior to the beginning of the English portion of the program, the individual must take an English proficiency test approved under § 668.148(b). Finally, we have modified § 668.144(c)(11)(vii) to require that the test manual include, in addition to guidance on the interpretation of scores resulting from modification of the test for individuals with disabilities, guidance on the types of accommodations that are allowable. This responds to concerns that test administrators may not have extensive training or experience to determine if a requested accommodation is appropriate.

The effect of these changes on the cost estimates prepared for and discussed in the *Regulatory Impact Analysis* of the NPRM is discussed in the *Costs* section of this *Regulatory Impact Analysis*.

## Benefits

As discussed in the NPRM, benefits provided in these regulations include updated administrative procedures for the Federal student aid programs; a definition and process to determine the validity of a student's high school diploma; enhanced reliability and security of ATB tests; an additional option for students to prove ability to benefit by successfully completing college coursework; increased clarity about incentive compensation for employees at institutions of higher education; reporting of information on program completers for programs leading to gainful employment, including costs, debt levels, graduation rates, and placement rates; the establishment of minimum standards for credit hours; greater transparency for borrowers participating in the programs offered under written agreements between institutions; greater detail about misrepresentation in marketing and recruitment materials; a more structured and ☐ consistent approach to the development and implementation of satisfactory academic progress policies; updated and simplified procedures for verifying FAFSA applicant information; updated regulations related to the return of title IV, HEA funds when a student

withdraws; harmonization of Direct Loan and Teach Grant disbursement procedures with other title IV, HEA programs; and revised disbursement requirements to ensure Federal Pell Grant recipients can access funds in a timely manner. As noted in the *Regulatory Impact Analysis* in the NPRM, these provisions result in no net costs to the Federal Government over 2011-2015.

## Costs

As discussed in the *Regulatory Impact Analysis* in the NPRM, many of the provisions implemented through these regulations will require regulated entities to develop new disclosures and other materials, as well as accompanying dissemination processes. Other regulations generally will require discrete changes in specific parameters associated with existing guidance and regulations—such as changes to title IV, HEA disbursement procedures, updated processes for verification of FAFSA application information, clearer standards for the return of title IV, HEA program funds following a student's withdrawal, and updated definitions and processes for confirming the validity of a high school diploma—rather than wholly new requirements. Accordingly, entities wishing to continue to participate in the title IV, HEA programs have already absorbed many of the administrative costs related to implementing these regulations. Marginal costs over this baseline are primarily due to new procedures that, while possibly significant in some cases, are an unavoidable cost of continued program participation.

In assessing the potential impact of these regulations, the Department recognizes that certain provisions are likely to increase workload for some program participants. This additional workload is discussed in more detail under the *Paperwork Reduction Act of 1995* section of this preamble. Additional workload would normally be expected to result in estimated costs associated with either the hiring of additional employees or opportunity costs related to the reassignment of existing staff from other activities. In total, these changes are estimated to increase burden on entities participating in the title IV, HEA programs by 6,010,320 hours. Of this increased burden, 3,862,165 hours are associated with institutions and 9,454 hours with ATB test publishers, States, and ATB test administrators. An additional 2,138,701 hours are associated with borrowers, generally reflecting the time required to read new disclosures or submit required information.

As detailed in the *Paperwork Reduction Act of 1995* section of these final regulations, the additional paperwork burden is attributable to several provisions, with the greatest additional burden coming from the revised FAFSA verification process. Of the 3.9 million hours of additional burden associated with institutions, 1.8 million relate to FAFSA verification. While the average number of items to be verified is expected to decrease, the growth in the number of applicants and the requirement to submit all changes to the Department is estimated to increase overall burden. Other paperwork burden increases include the following:

- 750,725 hours related to academic reviews and development of academic plans under § 668.34;

- 425,075 hours related to calculation of unearned amounts when a student withdraws under § 668.22;

- 262,990 hours associated with updating marital and dependency status under § 668.55;

- 376,417 hours annually and an additional 300,773 hours in the initial reporting period related to the gainful employment reporting and disclosure provisions in § 668.6;

- 48,391 hours related to ATB test administration and reporting under §§ 668.151 and 668.152;

- 67,870 hours associated with disclosure of information about an institution's written agreements in § 668.43;

- 54,366 hours related to disbursement of funds to Pell Grant recipients for books and supplies under § 668.164;

- 21,982 hours related to the development of a high school diploma validation process and the validation of questionable diplomas under § 668.16; and

- 18,349 hours related to clock hour to credit hour conversion and the inclusion of outside work for program eligibility under § 668.8.

For ATB test publishers, States, and administrators, the increased burden of 9,454 hours comes from the reporting, record-keeping, test anomaly analysis, and other requirements in §§ 668.144, 668.150, and 668.151. The increased burden on students is concentrated in the FAFSA verification and status updating processes with 1,604,800 hours under §§ 668.55, 668.56, and 668.59, with additional burden associated with the withdrawal process under § 668.22 and satisfactory academic progress policies under § 668.34.

Thus, for the specific information collections listed in the *Paperwork Reduction Act of 1995* section of these final regulations, the total cost estimates are as follows:

- For Information Collection 1845-0041, the total cost will be $72,594,870;

- For Information Collection 1845-NEW2, the total cost attributable to these regulatory changes will be $21,834,272;

- For Information Collection 1845-0022, the total cost will be $15,533,671;

- For Information Collection 1845-NEW1, the total cost attributable to the regulatory changes will be $9,543,677 annually with an additional $7,624,784 in the initial reporting period;

- For Information Collection 1845-0049, the total cost will be $1,300,595; and

- For Information Collection 1845-NEW3, the total cost attributable to these regulatory changes will be $1,203,799.

The monetized cost of this additional burden, using wage data developed using Bureau of Labor Statistics available at *http://www.bls.gov/ncs/ect/sp/ecsup hst.pdf,* is $122,010,883, of which $86.7 million is associated with institutions, $0.21 million with ATB test publishers, States, and administrators, and $35.07 million with borrowers. For institutions, test publishers, and test administrators, an hourly rate of $22.14 was used to monetize the burden of these provisions. This was a blended rate based on wages of $16.79 for office and administrative staff and $38.20 for managers, assuming that office staff would perform 75 percent of the work affected by these regulations. For the gainful employment provision, an hourly rate of $25.35 was used to reflect increased management time to establish new data collection procedures associated with that provision. For students, the first quarter 2010 median weekly earnings for full-time wage and salary workers were used. This was weighted to reflect the age profile of the student loan portfolio, with half at the

$457 per week of the 20 to 24 age bracket and half at the $691 per week of the 25 to 34 year old bracket. This resulted in a $16.40 hourly wage rate to use in monetizing the burden on students.

Because data underlying many of these burden estimates was limited, in the NPRM, the Department requested comments and supporting information for use in developing more robust estimates. In particular, we asked institutions to provide detailed data on actual staffing and system costs associated with implementing these regulations. In response to comments that the regulations would be costly, we reviewed the wage rates for more recent information and the share of work performed by office workers and management and professional staff. This increased the general wage rate from $18.63 to $22.14 and the wage rate for gainful employment related matters from $20.71 to $25.35. The other areas that changed between the NPRM published on June 18, 2010 and these final regulations related to changes to the disclosure requirements related to gainful employment that extended the reporting to students who began or completed programs beginning July 1, 2006, required specified information for all students at a program, and established a requirement to report on student matriculations to higher credentialed programs.

### Net Budget Impacts

These regulations are estimated to have no net budget impact over FY 2011-2015. Consistent with the requirements of the Credit Reform Act of 1990, budget cost estimates for the student loan programs reflect the estimated net present value of all future non-administrative Federal costs associated with a cohort of loans. (A cohort reflects all loans originated in a given fiscal year.)

These estimates were developed using the Office of Management and Budget's Credit Subsidy Calculator. This calculator will also be used for re-estimates of prior-year costs, which will be performed each year beginning in FY 2009. The OMB calculator takes projected future cash flows from the Department's student loan cost estimation model and produces discounted subsidy ☐ rates reflecting the net present value of all future Federal costs associated with awards made in a given fiscal year. Values are calculated using a "basket of zeros" methodology under which each cash flow is discounted using the interest rate of a zero-coupon Treasury bond with the same maturity as that cash flow. To ensure comparability across programs, this methodology is incorporated into the calculator and used governmentwide to develop estimates of the Federal cost of credit programs. Accordingly, the Department believes it is the appropriate methodology to use in developing estimates for these regulations. That said, however, in developing the following Accounting Statement, the Department consulted with OMB on how to integrate our discounting methodology with the discounting methodology traditionally used in developing regulatory impact analyses.

Absent evidence of the impact these regulations would have on student behavior, budget cost estimates were based on behavior as reflected in various Department data sets and longitudinal surveys listed under *Assumptions,*

*Limitations, and Data Sources.* Program cost estimates were generated by running projected cash flows related to each provision through the Department's student loan cost estimation model. Student loan cost estimates are developed across five risk categories: Two-year proprietary institutions, two-year public and private, not-for-profit institutions; freshmen and sophomores at four-year institutions, juniors and seniors at four-year institutions, and graduate students. Risk categories have separate assumptions based on the historical pattern of behavior—for example, the likelihood of default or the likelihood to use statutory deferment or discharge benefits—of borrowers in each category.

The Department estimates no budgetary impact for most of these regulations as there is no data indicating that the provisions will have any impact on the volume or composition of the title IV, HEA programs.

### Assumptions, Limitations, and Data Sources

The impact estimates provided in the preceding section reflect a pre-statutory baseline in which the HEOA changes implemented in these regulations do not exist. Costs have been quantified for five years.

In developing these estimates, a wide range of data sources were used, including data from the National Student Loan Data System; operational and financial data from Department of Education systems, including especially the Fiscal Operations Report and Application to Participate (FISAP); and data from a range of surveys conducted by the National Center for Education Statistics such as the 2008 National Postsecondary Student Aid Survey, the 1994 National Education Longitudinal Study, and the 1996 Beginning Postsecondary Student Survey. Data from other sources, such as the U.S. Census Bureau, were also used. Data on administrative burden at participating institutions are extremely limited; accordingly, in the NPRM, the Department expressed interest in receiving comments in this area. No comments were received.

Elsewhere in this SUPPLEMENTARY INFORMATION section we identify and explain burdens specifically associated with information collection requirements. See the heading *Paperwork Reduction Act of 1995.*

### Accounting Statement

As required by OMB Circular A-4 (available at *http://www.Whitehouse.gov/omb/Circulars/a004/a-4.pdf*), in Table 2, we have prepared an accounting statement showing the classification of the expenditures associated with the provisions of these regulations. This table provides our best estimate of the changes in Federal student aid payments as a result of these regulations. Expenditures are classified as transfers from the Federal Government to student loan borrowers.

Table 2—Accounting Statement: Classification of Estimated Expenditures   Back to Top

| Category | Transfers |
| --- | --- |
| Annualized Monetized Costs | $126.1. Cost of compliance with paperwork |

| | requirements. |
| --- | --- |
| Annualized Monetized Transfers | $0. |
| From Whom To Whom? | Federal Government To Student Loan Borrowers. |

*[In millions]*



### Regulatory Flexibility Act Certification

The Secretary certifies that these regulations will not have a significant economic impact on a substantial number of small entities. These regulations will affect institutions that participate in title IV, HEA programs, ATB test publishers, and individual students and loan borrowers. The U.S. Small Business Administration Size Standards define for-profit institutions as "small businesses" if they are independently owned and operated and not dominant in their field of operation with total annual revenue below $7,000,000, and defines non-profit institutions as small organizations if they are independently owned and operated and not dominant in their field of operation, or if they are institutions controlled by governmental entities with populations below 50,000.

Data from the Integrated Postsecondary Education Data System (IPEDS) indicate that roughly 4,379 institutions participating in the Federal student assistance programs meet the definition of "small entities." The following table provides the distribution of institutions and students by revenue category and institutional control.

| Revenue category | Public | | Private NFP | | Proprietary | | Tribal |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Number of schools | Number of students | Number of schools | Number of students | Number of schools | Number of students | Number of schools |
| $0 to $500,000 | 43 | 2,124 | 103 | 13,208 | 510 | 38,774 | |
| $500,000 to $1 million | 44 | 7,182 | 81 | 9,806 | 438 | 61,906 | 1 |
| $1 million to $3 million | 98 | 29,332 | 243 | 65,614 | 745 | 217,715 | 3 |
| $3 million to $5 million | 75 | 65,442 | 138 | 60,923 | 303 | 182,362 | |
| $5 million to $7 million | 49 | 73,798 | 99 | 62,776 | 224 | 185,705 | 5 |
| $7 million to $10 | 78 | 129,079 | 110 | 84,659 | 228 | 235,888 | 9 |

Approximately two-thirds of these institutions are for-profit schools subject to the disclosure and reporting requirements related to programs leading to gainful employment. Other affected small institutions include small community colleges and tribally controlled schools. For these institutions, the new disclosure and administrative requirements imposed under the regulations could impose some new costs as described below. The impact of the regulations on individuals is not subject to the Regulatory Flexibility Act.

As discussed in the preamble to these regulations, the program integrity regulations were developed to update administrative procedures for the Federal student aid programs and to ensure that funds are provided to students at eligible programs and institutions. As detailed in the *Paperwork Reduction Act of 1995* section of these final regulations, many of these regulations modify existing regulations and requirements. For example, the regulations on FAFSA verification would change the number of items to be verified, but do not require the creation of a new process. The table below summarizes the estimated total hours, costs, and requirements applicable to small entities from these provisions on an annual basis. In the initial reporting period, there will be an additional 235,866 hours and $5,979,203 in gainful employment reporting for award years back to 2006-07.

| Provision & requirement | Reg. section | OMB control No. | Hours | Costs |
|---|---|---|---|---|
| Gainful Employment | 668.6 | 1845-NEW1 | 295,186 | 7,482,964 |
| Annual submission of private loan, CIP, program name, further matriculation, and identifying data for entrants and completers by program | 668.6(a) | | 288,597 | 7,315,937 |
| Disclose occupational information, graduation rates, on-time completion rates, program placement rates, and program costs | 668.6(b) | | 6,589 | 167,027 |
| Eligible Program | 668.8 | 1845-0022 | 8,800 | 194,836 |
| Determine if program is affected, evaluate amount of outside student work that should be included, and perform credit to clock hour conversion. | | | | |
| Standards of Administrative Capability | 668.16 | 1845-0022 | 10,543 | 233,412 |

To assess overall burden imposed on institutions meeting the definition of small entities, the Department developed a methodology using IPEDS data and the percentage of institutions with revenues below $7 million and all non-profit institutions, allocating approximately 66 percent of the paperwork

burden to small institutions. Using this methodology, the Department estimates the regulations will increase total burden hours for these schools by 2.58 million, or roughly 590 hours per institution. Monetized using salary data from the Bureau of Labor Statistics, this burden is $58.1 million and $13,270, respectively. If calculated using the distribution of students from 2007-08, the share of the burden allocated to small institutions would be much lower at approximately 21 percent, resulting in an estimated burden of 235 hours and $5,410 per institution. Even the more conservative estimate of $13,270 represents one percent or less of the midpoint revenue ☐ for all but the lowest revenue category, for which it is four percent of midpoint revenue.

For institutions, an hourly rate of $22.14 was used to monetize the burden of these provisions. This rate was a blended rate based on wages of $16.79 for office and administrative staff and $38.20 for managers, assuming that office staff would perform 75 percent of the work affected by these regulations. For the gainful employment provision, an hourly rate of $25.35 was used to reflect increased management time to establish new data collection procedures associated with that provision.

These rates are the same as those used for all institutions in the *Costs* section of this analysis, reflecting the fact that the primary cost of meeting the paperwork burden is in additional labor and that wages at small institutions should not be systematically higher than those at all institutions. In response to comments that the regulations would be costly, we reviewed the wage rates for more recent information and the share of work performed by office workers and management and professional staff. This review increased the general wage rate from $18.63 to $22.14 and the wage rate for gainful employment related matters from $20.71 to $25.35.

The costs discussed above represent the cost of the regulations in the first year of implementation, beginning on July 1, 2011, but several provisions will have a longer period to take effect. Most importantly, the regulations contained in subpart E of part 668, Verification and Updating of Student Aid Application Information, are effective July 1, 2012. These regulations account for approximately 50 percent of the estimated burden described above. We would expect 30 percent of the verification costs to be incurred in 2011 as institutions update their systems for the changes, but the main part of those costs will occur in the second year. These costs would occur after the other provisions had been implemented and, while we do not have a split between the development and ongoing costs of each provision, we would expect the costs to taper off as the institutions become familiar with the regulations and have the systems in place to comply. Seventy percent of the estimated costs for the Verification regulation would not be realized in the first year, reducing the overall projected costs for small institutions during the first year by approximately one-third to approximately $8,000. Assuming a 10 percent reduction in the costs of other provisions from reduced development costs and prior experience, full implementation in 2012 would cost approximately $11,000. The State authorization provision is also subject to a delayed implementation, but that implementation is not expected to have a significant

cost effect on small entities. Additionally, the recurring costs of many of the provisions are based on the number of students enrolled. As shown above, schools with small revenues have lower enrollments than others classified as small entities and would have to perform fewer verifications and reviews on an ongoing basis. Since they already have some systems and processes in place to comply with the existing regulations, once the development changes have been made to implement the regulatory changes, we would expect their ongoing costs to be lower than the averages estimated above.

Where possible, the Department has allowed institutions flexibility to establish processes that fit the institution's administrative capabilities. For example, the requirement to distribute funds to Pell Grant recipients for books and supplies within seven days of the start of the payment period allows institutions to use book vouchers or a credit to the student's account. The Department has also tried to allow more time for all entities affected by these regulations to establish procedures for new data collections, such as the placement rate information required in the data collection related to gainful employment. While these timing provisions are available to all institutions, they should permit small institutions sufficient time to make the necessary adjustments. Approximately 60 percent of the paperwork burden associated with these regulations is in OMB 1845-0041, which relates to the updating of FAFSA application information and reporting all changes resulting from verification. These updated requirements will help ensure eligible students receive aid. As detailed in the *Paperwork Reduction Act of 1995* section of these final regulations, the increase in burden associated with the FAFSA acceptable documentation provision is largely driven by the increase in student applicants since the burden for these requirements was last calculated. Given the increase in the number of students applying for title IV, HEA aid, the number of verifications is estimated to have increased from 3.0 million in 2002-03 to 5.1 million in 2008-09. Without the regulatory changes reflected in these regulations, which are estimated to reduce the number of items to be verified, the paperwork burden on small institutions in OMB 1845-0041 would increase by an additional 195,677 hours. Based on these estimates, the Department believes the new requirements do not impose significant new costs on these institutions.

We considered whether there would be any benefit to allowing small institutions additional time to come into compliance with the regulations and concluded that there would be no benefit to taking such action. First and foremost, we think the risk of delaying implementation of these program integrity regulations and the resulting negative impact on students and taxpayers would be far too high.

Second, we do not believe the comments or the facts would support such action. In the NPRM, the Secretary invited comments from small institutions and other affected entities as to whether they believed the proposed changes would have a significant economic impact on them and requested evidence to support that belief. Several commenters indicated that the provisions would be costly and the Department reviewed the estimates as described above.

However, commenters did not provide us with evidence to suggest that small institutions or entities would need additional time beyond July 1, 2011 to come into compliance with the regulations. Additionally, because we did not include such a proposal in the NPRM, we do not believe we could take this type of action without seeking further public comment.

Finally, we note that, where possible, we have built in additional time or flexibility for all institutions based on the nature of the provision and the data requested.

⚖ *end regulatory text*

[FR Doc. 2010-26531 Filed 10-28-10; 8:45 am]

BILLING CODE 4000-01-P

## FOOTNOTES

Back to Top

1. The use of the term "temporary impairments" for the purposes of these regulations should not be confused with the definition of disability as defined by these regulations (see § 668.142), section 504 of the Rehabilitation Act, or the Americans with Disabilities Act.

Back to Context

## HOME
- Home

## SECTIONS
- Money
- Environment
- World
- Science & Technology
- Business & Industry
- Health & Public Welfare

## BROWSE
- Agencies
- Topics
- Dates
- Public Inspection
- Executive Orders

## SEARCH
- Document Search
- Advanced Document Search
- Events Search
- Unified Agenda Search
- Public Inspection Search

## POLICY
- About Us
- Legal Status
- Contact Us
- Privacy
- Accessibility
- FOIA
- No Fear Act
- Continuity Information

## LEARN
- User Information
- About Public Inspection
- Document Drafting & Research
- Related Resources
- Tutorials, History, and Statistics
- Regulatory Journals
- Regulatory Improvement
- Developers

## BLOG
- Blog

## MY FR
- My Clipboard
- Sign In