# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN EDUCATIONAL RESEARCH
ASSOCIATION, INC., AMERICAN
PSYCHOLOGICAL ASSOCIATION, INC.,
and NATIONAL COUNCIL ON
MEASUREMENT IN EDUCATION, INC.,

        Plaintiffs,

        v.

PUBLIC.RESOURCE.ORG, INC.,

        Defendant.

Case No. 1:14-cv-00857-TSC-DAR

---

**PROPOSED BRIEF OF AMICUS CURIAE THE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS IN SUPPORT OF DEFENDANT-COUNTERCLAIMANT'S
MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT AND FOR A PERMANENT INJUNCTION**

---

Bruce D. Brown (D.C. Bar No. 457317)
*Counsel of record for Amicus Curiae*
Gregg P. Leslie (D.C. Bar No. 426092)
REPORTERS COMMITTEE FOR FREEDOM OF
   THE PRESS
1156 15th Street NW, Ste. 1250
Washington, D.C. 20005
(202) 795-9301

## **TABLE OF CONTENTS**

IDENTITY OF *AMICUS CURIAE* ................................................................................... 1

INTRODUCTION ............................................................................................................. 1

SUMMARY OF THE ARGUMENT ................................................................................ 3

ARGUMENT .................................................................................................................... 4

    I.    Journalists' efforts to inform the public of laws that affect them are hindered
        when copyright is used to restrict private third parties from posting standards that
        have been incorporated by reference. ..................................................................... 4

        A.    Incorporation by reference is a common practice under which the public may
              have to pay to read the law. ................................................................. 4

        B.    The role of the news media is frustrated when third parties are prohibited from
              posting standards that have been incorporated by reference. ........................... 7

    II.    The exclusive rights granted to copyright holders cannot be used to overcome the
        First Amendment right to disseminate the 1999 Standards. .................................. 9

        A.    The idea/expression dichotomy and fair use are "built-in First Amendment
              accommodations" that are necessary to accommodate the tension between the
              First Amendment and copyright law .................................................... 11

        B.    The 1999 Standards constitute an "idea," and using copyright law to prevent
              their communication would infringe upon the First Amendment rights of
              anyone seeking to disseminate their content.................................... 14

CONCLUSION............................................................................................................... 17

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Banks v. Manchester*, 128 U.S. 244 (1888) ........................................................................ 7

*Central States, Southeast & Southwest Areas Pension Fund v. Reimer Express World
    Corp.*, 230 F.3d 934 (7th Cir. 2000) ......................................................................... 16

*Eldred v. Ashcroft*, 537 U.S. 186 (2003).................................................................... 3, 12

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) ............................... 14, 15

*Golan v. Holder*, 132 S. Ct. 873 (2012)............................................................ 3, 11, 12

*Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539 (1985) ..................... 9, 10, 12, 15

*Lee v. Runge*, 404 U.S. 887 (1971) .......................................................................... 12

*Mazer v. Stein*, 347 U.S. 201 (1954)........................................................................... 9

*Mills v. Alabama,* 384 U.S. 214 (1966) ....................................................................... 7

*Morrissey v. Procter & Gamble Co.*, 379 F.2d 675 (1st Cir. 1967) ............................... 10

*National Insulation Transp. Comm. v. Interstate Commerce Comm'n*, 683 F.2d 533 (D.C.
    Cir. 1982) ............................................................................................................ 16

*New York Times Co. v. United States*, 403 U.S. 713 (1971).............................................. 7

*Saxbe v. Wash. Post Co.*, 417 U.S. 843 (1974)............................................................... 7

*Toro Co. v. R & R Products Co.*, 787 F.2d 1208 (8th Cir. 1986) .................................... 10

*Triangle Publ'ns, Inc. v. Knight-Ridder Newspapers, Inc.*, 445 F. Supp. 875 (S.D. Fla.
    1978), aff'd on other grounds, 626 F.2d 1171 (5th Cir. 1980) .................................... 11

*Veeck v. S. Bldg. Code Cong. Int'l*, 293 F.3d 791 (5th Cir. 2002)........................ 9, 14, 15

*Wheaton v. Peters*, 33 U.S. 591 (1834)....................................................................... 7

*Whitney v. Cal.*, 274 U.S. 357 (1927) ................................................................. 3

**Statutes**

17 U.S.C. § 102(b) ................................................................................... 9, 14

17 U.S.C. § 106 .......................................................................................... 11

17 U.S.C. § 107 .......................................................................................... 10

**Regulations**

29 C.F.R. § 1910.179(b)(1) ........................................................................ 8

34 C.F.R. § 668.141(a) ............................................................................... 6

34 C.F.R. § 668.146 ............................................................................... 6, 15

34 C.F.R. § 668.148 ................................................................................... 6

49 C.F.R. § 192.7(b) ................................................................................... 5

**Constitutional Provisions**

U.S. Const. amend. I .................................................................................. 11

**Other Authorities**

5 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (2015) ......................... 11

Bradley Scott Shannon, *Action is an Action is an Action is an Action*, 77 Wash. L. Rev.
65 (2002) ................................................................................................. 16

Doug Lederman, *Lacking the 'Ability to Benefit*,' Inside Higher Ed (Sept. 22, 2009),
https://www.insidehighered.com/news/2009/09/22/gao ................................................. 9

Emily S. Bremer, *Incorporation by Reference in an Open-Government Age*, 36 Harv. J.L.
& Pub. Pol'y 131 (2013) ........................................................................ 4, 5, 8

Emily S. Bremer, *On the Cost of Private Standards in Public Law*, 63 Kan. L. Rev. 279
(2015) ................................................................................................. 5, 8

H. Ball, *Law of Copyright and Literary Property* (1944) ................................................. 10

Joseph P. Liu, *Copyright and Breathing Space*, 30 Colum. J.L. & Arts 429 (2007) ........ 13

Lawrence A. Cunningham, *Private Standards in Public Law: Copyright, Lawmaking and the Case of Accounting*, 104 Mich. L. Rev. 291 (2005). ............................................. 16

Mark A. Lemley & Eugene Volokh, *Freedom of Speech and Injunctions in Intellectual Property Cases*, 48 Duke L.J. 147 (1998) .................................................... 11

Michael Herz et al., *Comment of the Section of Admin. Law & Regulatory Practice*, Am. Bar Ass'n, Public.Resource.Org (June 1, 2012), https://law.resource.org/pub/us/cfr/ regulations.gov.docket.01/0900006481025ea4.pdf ........................................................ 8

Neil Weinstock Netanel, *First Amendment Constraints on Copyright After Golan v. Holder*, 60 UCLA L. Rev. 1082 (2013) ...................................................................... 13

Nina A. Mendelson, *Private Control Over Access to the Law: The Perplexing Federal Regulatory Use of Private Standards*, 112 Mich. L. Rev. 737 (2014) .......................... 5

Paul Goldstein, *Copyright and the First Amendment*, 70 Colum. L. Rev. 983 (1970) ..... 11

Peter L. Strauss, *Private Standards Organizations and Public Law*, 22 Wm. & Mary Bill of Rts. J. 497 (2013) ........................................................................................... 5

*Standards Incorporated by Reference (SIBR) Database/Regulatory SIBR (P-SIBR) Statistics*, Standards.gov, https://standards.gov/sibr/query/ index.cfm?fuseaction=rsibr.total_regulatory_sibr .......................................................... 5

## IDENTITY OF *AMICUS CURIAE*

The Reporters Committee for Freedom of the Press (the "Reporters Committee")[1] is a voluntary, unincorporated association of reporters and editors that works to defend the First Amendment rights and freedom of information interests of the news media.  The Reporters Committee has provided representation, guidance, and research in First Amendment and Freedom of Information Act litigation since 1970.  Because the Reporters Committee believes that the exclusive rights granted under the Copyright Act should not be used to prevent the dissemination of the "law," its interest in the current litigation is high.  The authority to file derives from LCvR 7(o).[2]

## INTRODUCTION

In this case, the court must address the important question of whether copyright law can be used to prevent the dissemination of a category of information fundamental to the workings of government – the actual codification of the law.  The defendant, Public.Resource.Org ("Public Resource"), is a non-profit corporation that distributes public domain information on the Internet.  Its efforts include promoting "the dissemination of statutes, regulations, and other material that constitutes the law."  Def.'s Mem. of P. & A. 3, ECF No. 69-1.  In 2012, as part of its efforts to encourage access to the text of laws, Public Resource began posting copies of standards incorporated by reference into law.  *Id.* at 8.  Under the incorporation by reference process, legislatures

---

[1] *Amicus curiae* the Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

[2] Counsel for the *amicus curiae* declare that they authored this brief in total with no assistance from the parties, and that no individuals or organizations other than the *amicus* made a monetary contribution to the preparation and submission of this brief.

and administrative agencies refer, in the text of statutes and administrative regulations, to standards and specifications published elsewhere, often by private parties.  The referenced material becomes part of the resulting law, without actually appearing in the text of the statute or regulation.  In 2014, Plaintiffs brought an action for injunctive relief against Public Resource on the ground of copyright infringement after Public Resource posted on its website a copy of the 1999 Standards for Educational and Psychological Testing ("1999 Standards").  *Id.* at 9.  Plaintiffs claim they are joint owners of the copyright in the 1999 Standards.  Pls.' Mem. of P. & A. 12, ECF No. 60-1.  The 1999 Standards, which are incorporated into various parts of the Code of Federal Regulations, are "designed to apply to professional test developers, sponsors, publishers, and users by providing criteria for the evaluation of tests, testing practices, and the effects of test use." Compl. 8-9, ECF No. 1.

The importance of this case extends well beyond the facts presented.  It is vital that the news media and public be able to report on the text of the law without incurring copyright liability.  It is similarly important that third-party websites like Public.Resource.Org be uninhibited in their efforts to disseminate the law.  In order for the news media to inform the populace of matters of public importance, and for citizens to fulfill their civic duties, the law must be available to the public.  A lack of such access could negatively affect American democracy by reducing public knowledge of significant laws.  As Justice Brandeis wrote, "[Those who won our independence believed] that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government." *Whitney v. Cal.*, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring).

## <u>SUMMARY OF THE ARGUMENT</u>

From the perspective of the news media, which informs citizens on matters of public interest, it is important that copyright law not be used to limit the availability of standards that have been incorporated by reference into law.  At the federal level, hard copies of standards incorporated by reference are required to be kept in public offices in or around the Washington, D.C., area.  For a journalist who lives outside the Washington, D.C., area, the consequence of such a regime is that he or she must turn to the organization that owns the copyright in the standard to obtain access.  These organizations, as Plaintiffs do, often charge significant amounts of money for the right to read their standards.  Without free and immediate access to the standards, journalists may find their ability to report on the law frustrated, which accordingly harms the public.

The news media and public have a First Amendment right to communicate the 1999 Standards in their entirety, which is a right that copyright law cannot overcome. Copyright law contains two "built-in First Amendment accommodations" – the idea/expression dichotomy and fair use principles.  *See Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003); *Golan v. Holder*, 132 S. Ct. 873, 890 (2012).  The idea/expression dichotomy and fair use are necessary to accommodate the inherent tension between First Amendment rights and copyright law, and to ensure that copyright law does not run afoul of the First Amendment.  Using copyright law to enjoin or punish distribution of the 1999 Standards would impermissibly limit protected expression.

<u>**ARGUMENT**</u>

**I.**     **Journalists' efforts to inform the public of laws that affect them are hindered when copyright is used to restrict private third parties from posting standards that have been incorporated by reference.**

With just a few clicks of a computer mouse, journalists today have the ability to access a seemingly unlimited number of judicial decisions, statutes, and administrative regulations.  While government-operated websites often provide free access to these various pieces of law, journalists routinely visit websites operated by private third parties, such as Public.Resource.Org and Cornell University's Legal Information Institute, to view the text of laws.

However, third-party standards that have been incorporated by reference into statutes and regulations are not as readily available.  Unlike other statutes and regulations, such standards are often subject to copyright restrictions to prevent private third parties from distributing them, creating a lack of transparency in a category of law that touches nearly every facet of American life.

**A.**     **Incorporation by reference is a common practice under which the public may have to pay to read the law.**

Incorporation by reference is a process under which legislatures and administrative agencies turn materials that have been published elsewhere into legally binding standards by referring to the material in the text of a regulation or statute.  *See* Emily S. Bremer, *Incorporation by Reference in an Open-Government Age*, 36 Harv. J.L. & Pub. Pol'y 131, 133 (2013).  Although many standards incorporated by reference are derived from the rules and regulations of other federal agencies and state governments, thousands are developed by private organizations, like the Plaintiffs, that create various types of technical and professional standards.  At the federal level, standards developed

by private organizations and incorporated by reference into the Code of Federal Regulations ("C.F.R.") affect a myriad of areas, "ranging from toy safety to Medicare prescription-drug-dispensing requirements to nuclear power plant operation."  Nina A. Mendelson, *Private Control Over Access to the Law: The Perplexing Federal Regulatory Use of Private Standards*, 112 Mich. L. Rev. 737, 740 (2014).[3]

Although incorporating standards by reference has the benefit of reducing the complexity of the federal register and is more cost-effective for agencies than creating their own standards, Bremer, *Incorporation by Reference*, *supra*, at 140, the material incorporated by reference is typically copyrighted by the organization that created the standard, Emily S. Bremer, *On the Cost of Private Standards in Public Law*, 63 Kan. L. Rev. 279, 286 (2015).  At the federal level, this problem is exacerbated by the fact that hard copies of material incorporated are typically only made available for public inspection in government depositories located in or around Washington, D.C., and the government is not required to post incorporated standards on the web for all to see.  Peter L. Strauss, *Private Standards Organizations and Public Law*, 22 Wm. & Mary Bill of Rts. J. 497, 507 (2013) (citing 49 C.F.R. § 192.7(b) (1993)).  Thus, for someone who does not live in the Washington, D.C., area, the only realistic way to view a standard that has been incorporated into federal law is to purchase the information from the organization that owns its copyright at the price that organization dictates.  *Id.*

---

[3] *See also Standards Incorporated by Reference (SIBR) Database/Regulatory SIBR (P-SIBR) Statistics*, Standards.gov, https://standards.gov/sibr/query/ index.cfm?fuseaction=rsibr.total_regulatory_sibr (last visited Jan. 30, 2015) (stating that, as of late January 2016, there were 15,591 records of standards incorporated by reference in the C.F.R.).

The materials at issue in this case, the 1999 Standards, have been incorporated into federal law at 34 C.F.R. §§ 668.146 and 668.148.  As seen in the regulations, the 1999 Standards are used to ensure that various types of tests are adequately developed and constructed, and indirectly play a role in determining to whom federal student aid can be dispersed.  For instance, under 34 C.F.R. § 668.141(a), a student who has neither a high school diploma nor a GED certificate may receive federal student aid if she achieves a passing score on an "ability to benefit" ("ATB") test that has been approved by the Secretary of Education.  In turn, 34 C.F.R. § 668.146 states that the Secretary will approve an ATB test only if the test "meet[s] all standards for test construction provided in the 1999 edition of the *Standards for Educational and Psychological Testing* . . . ."

Considering the important role the 1999 Standards play in our educational and governing system, they should be easily obtainable.  However, the principle regulation at issue, 34 C.F.R. § 668.146(b)(6), states that the 1999 Standards can be viewed in one of three ways: (1) by physically visiting the Department of Education – Office of Federal Student Aid in Washington, D.C.; (2) by physically visiting the National Archives and Records Administration in Washington, D.C.; and (3) by obtaining a copy from the American Educational Research Association ("AERA").  If one chooses to obtain a copy from AERA, the non-member price for the 1999 Standards is currently set at $45.95 plus $7.00 for shipping and handling.  *See 1999 Standards*, American Educational Research Association, http://www.aera.net/Publications/Books/Standards(1999Ed)/Tabid/ 16144/Default.aspx (last visited Jan. 29, 2016).  To make matters worse, citizens lacked the ability to purchase the 1999 Standards directly from AERA for nearly a year.  Def.'s. Mem. 9.  After Plaintiffs published an updated edition of the standards in August 2014,

they stopped selling the 1999 Standards altogether – only reinitiating sales in July 2015 after Public Resource noted that the 1999 Standards, which remain incorporated into federal law, could no longer be acquired.  *Id.*  Considering this general lack of availability, it is undeniable that Public Resource's posting of the 1999 Standards vastly improved access to these important government rules.

> **B.    The role of the news media is frustrated when third parties are prohibited from posting standards that have been incorporated by reference.**

From the perspective of journalists, a lack of access to the law is deeply troubling. This type of information has always been understood to be free from copyright restrictions, *see, e.g.*, *Wheaton v. Peters*, 33 U.S. 591, 668 (1834); *Banks v. Manchester*, 128 U.S. 244, 253-254 (1888).  The citizens of our nation "depend on the press for information concerning public institutions."  *Saxbe v. Wash. Post Co.*, 417 U.S. 843, 864 (1974) (Powell, J., dissenting).  "In seeking out the news the press therefore acts as an agent of the public at large," ensuring that "the people receive that free flow of information and ideas essential to intelligent self-government."  *Id.* at 863.  In line with its role of informing the public, the news media further serves as a necessary and needed "check" on governmental power.  *See Mills v. Alabama,* 384 U.S. 214, 219 (1966) ("[T]he press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve."); *New York Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring) (stating that the press received constitutional protection "so that it could bare the secrets of government and inform the people").

Naturally, the news media's ability to inform the public and check governmental power is limited when access to information is restricted.  If journalists cannot examine standards incorporated by reference, the public may have no way of knowing whether a regulation incorporated is arbitrary, dangerously outdated, or the result of undue influence by special interest groups.[4]  In the context of outdated standards, the watchful eye of the professional news media and citizen journalists would be particularly valuable. Because agencies must identify specific versions of standards to be incorporated by reference, material incorporated can become outdated, meaning that a new version of the standard is available.  Bremer, *Incorporation by Reference*, *supra*, at 137; Bremer, *Cost of Private Standards*, *supra*, at 317.  References to outdated standards can pose a danger to the public, as newer standards are more likely to be safer.  Bremer, *Incorporation by Reference*, *supra*, at 137.  For instance, the regulations of the Occupational Safety and Health Administration still reference crane standards developed in the 1960s.  *Id.* (citing 29 C.F.R. § 1910.179(b)(1) (2012)).

Likewise, prompt access to the 1999 Standards can be crucial.  In the past, journalists have reported on government allegations that a branch of a for-profit college gave answers to, and altered answers given by, individuals taking ATB tests.  *See* Doug Lederman, *Lacking the 'Ability to Benefit*,' Inside Higher Ed (Sept. 22, 2009),

---

[4] *See* Michael Herz et al., *Comment of the Section of Admin. Law & Regulatory Practice*, Am. Bar Ass'n, Public.Resource.Org (June 1, 2012), https://law.resource.org/pub/us/cfr/ regulations.gov.docket.01/0900006481025ea4.pdf (writing that "[t]ransparency regarding the content of material incorporated by reference is particularly important when that material has been prepared, in the first instance, by private organizations rather than governmental agencies – as when, for example, natural gas pipeline safety rules and offshore oil drilling rules incorporate standards drafted by the American Petroleum Institute or when motor vehicle safety standards incorporate standards drafted by the Society of Automotive Engineers.").

https://www.insidehighered.com/news/2009/09/22/gao.  If similar allegations were made in the future (that is, allegations that an organization is not complying with proper testing procedure), a journalist's ability to obtain the 1999 Standards could be critical.  A journalist seeking to inform the public as to the circumstances surrounding the dispute would need to read the literal requirements of the 1999 Standards.  However, without prompt, free availability on a website like Public.Resource.Org, the journalist may find them difficult to access.  Thus, the journalist's reporting on a matter of public importance – whether a test that plays a role in determining who can receive student aid is compliant with federal regulations – stands to suffer.

## II.   The exclusive rights granted to copyright holders cannot be used to overcome the First Amendment right to disseminate the 1999 Standards.

One of the many arguments Public Resource puts forth for why the Court should rule in its favor is that, once a standard is adopted into law, that standard becomes a "fact" or, to use a different term, an "idea."  Def.'s Mem. 18 (citing *Veeck v. S. Bldg. Code Cong. Int'l*, 293 F.3d 791 (5th Cir. 2002)).  That something would be considered a fact or idea is significant because copyright protection does not "extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery . . . ." 17 U.S.C. § 102(b); *see also Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 547 (1985) ("[N]o author may copyright facts or ideas.").  Rather, copyright "protection is given only to the *expression* of the idea . . . ."  *Mazer v. Stein*, 347 U.S. 201, 217 (1954) (emphasis added).  This principle – that copyright law protects the expression of an idea, but never the underlying idea itself – is referred to as the idea/expression dichotomy.

Similarly, Public Resource argues that the Court should rule in its favor due to the "merger doctrine."  Def.'s Mem. 18-19.  "Under the copyright law doctrine of merger, a

close cousin to the idea/expression dichotomy, copyright protection will be denied to even some *expressions* of ideas if the idea behind the expression is such that it can be expressed only in a very limited number of ways." *Toro Co. v. R & R Products Co.*, 787 F.2d 1208, 1212 (8th Cir. 1986) (emphasis in original).  The doctrine serves a valuable purpose, as it is "designed to prevent an author from monopolizing an idea merely by copyrighting a few expressions of it." *Id.*; *see also Morrissey v. Procter & Gamble Co.*, 379 F.2d 675, 678-79 (1st Cir. 1967) (finding that, under the merger doctrine, copyright protection does not extend to the rules of a contest because those rules could only be expressed in "a mere handful of forms").[5]

If those and the other arguments it puts forth fail, Public Resource asserts that its conduct is protected by lawful fair use – "'a privilege in others than the owner of the copyright to use the copyrighted material in a reasonable manner without his consent.'" *Harper & Row*, 471 U.S. at 549 (quoting H. Ball, *Law of Copyright and Literary Property* 260 (1944)); *see also* 17 U.S.C. § 107 (stating that fair use "is not an infringement of copyright" and listing four statutory factors that courts must consider when making the determination of whether a use is fair).

As discussed below, the idea/expression dichotomy, merger doctrine, and fair use exist in part to ensure that copyright law does not run afoul of the First Amendment. Thus, in addition to constituting clear and justifiable reasons why the Court should rule in Public Resource's favor, the Court should invoke these doctrines to ensure that the First

---

[5] As a separate argument, Public Resource contends that, even before incorporation, 17 U.S.C. § 102(b) dictates that the 1999 Standards are primarily uncopyrightable because the standards are "procedures, systems and principles for production of fair and valid tests."  Def.'s Mem. 31-34.

Amendment rights of Public Resource, the news media, and the general public in communicating the 1999 Standards in their entirety remain unabridged.

> **A.   The idea/expression dichotomy and fair use are "built-in First Amendment accommodations" that are necessary to accommodate the tension between the First Amendment and copyright law.**

A tension exists between the First Amendment and copyright law.  This tension derives from the reality that the Copyright Act grants copyright owners with various exclusive rights that can be used to restrict the dissemination of information, *see* 17 U.S.C. § 106, while the First Amendment commands that "Congress shall make no law . . . abridging the freedom of speech, or of the press," *see* U.S. Const. amend. I; *see also* 5 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 19E.01 (2015).  The apparent contradiction between the First Amendment and copyright law has been recognized in case law, *see Golan v. Holder*, 132 S. Ct. 873, 889 (2012) ("[S]ome restriction on expression is the inherent and intended effect of every grant of copyright."); *Triangle Publ'ns, Inc. v. Knight-Ridder Newspapers, Inc.*, 445 F. Supp. 875, 881-882 (S.D. Fla. 1978), aff'd on other grounds, 626 F.2d 1171 (5th Cir. 1980) ("The Copyright Act, since its inception, has spawned a subtle tension within the protective environment surrounding the freedom of speech."), and in the academic literature, *see* Mark A. Lemley & Eugene Volokh, *Freedom of Speech and Injunctions in Intellectual Property Cases*, 48 Duke L.J. 147, 165-166 (1998) ("Copyright law restricts speech: it restricts you from writing, painting, publicly performing, or otherwise communicating what you please."); Paul Goldstein, *Copyright and the First Amendment*, 70 Colum. L. Rev. 983, 983 (1970) ("Copyright is the uniquely legitimate offspring of censorship.").

The United States Supreme Court has explored this tension on numerous occasions.  In these opinions, the Court has stressed the important role of the idea/expression dichotomy and fair use in maintaining First Amendment protected speech.  For instance, in *Harper & Row,* the Court noted that "copyright's idea/expression dichotomy [strikes] a definitional balance between the First Amendment and the Copyright Act by permitting free communication of facts while still protecting an author's expression."  471 U.S. at 556 (internal quotation marks omitted).  It further emphasized that a "copyright owner's monopoly" cannot be used "as an instrument to suppress facts" or ideas.  *Id.* at 559.  *See also Lee v. Runge*, 404 U.S. 887, 893 (1971) (Douglas J., dissenting from denial of certiorari) ("The arena of public debate would be quiet, indeed, if a politician could copyright his speeches or a philosopher his treatises and thus obtain a monopoly on the ideas they contained.  We should not construe the copyright laws to conflict so patently with the values that the First Amendment was designed to protect.").

More recently, the Court addressed the First Amendment and copyright law in *Eldred v. Ashcroft*, 537 U.S. 186 (2003) and *Golan v. Holder*, 132 S. Ct. 873 (2012).  In both cases, the Court considered amendments to the Copyright Act that increased the rights and terms of copyright holders.  In rejecting First Amendment challenges to the amendments, the Court stressed that copyright law contains "built-in First Amendment accommodations."  *Eldred*, 537 U.S. at 219; *Golan*, 132 S. Ct. at 890.  Those accommodations, which it referred to as the "traditional contours of copyright protection," are the idea/expression dichotomy and the "fair use" defense.  *Id.*  According to the Court, as long as copyright legislation "leaves undisturbed the 'idea/expression'

distinction and the 'fair use' defense," there is no need to evaluate whether a particular aspect of copyright law violates the First Amendment.  *Golan*, 132 S. Ct. at 890-91.

Because the idea/expression dichotomy and fair use are necessary to prevent copyright law from running afoul of the First Amendment, it follows that courts should apply these doctrines in a way that fosters First Amendment values.  In regard to the idea/expression dichotomy, this means that courts, when making the determination of what constitutes idea and what constitutes expression, should "err on the side of finding that the defendant has copied ideas, not expression."  Neil Weinstock Netanel, *First Amendment Constraints on Copyright After Golan v. Holder*, 60 UCLA L. Rev. 1082, 1107 (2013).  Likewise, when making the determination of whether a use is fair, courts should err on the side of finding fair use.  In copyright law, "[a]s in the constitutionalized laws of defamation, privacy, intentional infliction of emotional distress, trademark, and others, courts must provide breathing space for the dissemination of ideas and information . . . ."  *Id.*  Courts that do not provide this breathing space will inevitably and unacceptably end up chilling First Amendment protected expression and abridging the freedom of speech in the process.  *See also* Joseph P. Liu, *Copyright and Breathing Space*, 30 Colum. J.L. & Arts 429, 429-30 (2007) ("If we accept the Supreme Court's statement in *Eldred* that these doctrines [the idea/expression dichotomy and fair use] play a critical role as First Amendment safety valves, it follows that the chilling effect of uncertainty in these doctrines has a constitutional dimension . . . . [E]nsuring that copyright law does not infringe upon free speech rights requires careful attention, not only to the theoretical availability of free speech 'safety valves,' but to the actual effect these doctrines have on speech.").

**B.**     **The 1999 Standards constitute an "idea," and using copyright law to prevent their communication would infringe upon the First Amendment rights of anyone seeking to disseminate their content.**

It is initially important to recognize that the 1999 Standards can be deemed an "idea, procedure, process, system, method of operation, concept, principle, or discovery." 17 U.S.C. § 102(b).  As such, they are not protected under copyright law.  Even if there is some element of expression in the collection of the information, however, at least one federal circuit has held that any copyright protection should have ended once the 1999 Standards were incorporated by reference into law and transformed into an "idea."

The Fifth Circuit, sitting *en banc*, explored the interaction between the idea/expression dichotomy, merger doctrine, and third party material adopted into law in *Veeck*, 293 F.3d 791.  There, the court addressed whether the operator of a non-commercial website could be held liable for copyright infringement after he posted the building codes of two small towns that had adopted the 1994 edition of the Standard Building Code, a model code created by Southern Building Code Congress International, Inc.  *Id.* at 793.  Peter Veeck, the individual who posted the codes, asserted the idea/expression dichotomy and merger doctrine as defenses to the infringement suit.  *Id.* at 800.

The court agreed.  Treating "facts" as synonymous with "ideas,"[6] the court asserted that the codes, once adopted, were "transformed into the 'fact' and 'idea' of the towns' building codes."  *Id.* at 802.  It wrote: "the U.S. Constitution is a fact; the Federal

---

[6] The practice of associating "facts" with "ideas" is common.  *See e.g.*, *Harper & Row*, 471 U.S. at 560 (discussing the "Copyright Act's distinction between copyrightable expression and uncopyrightable facts and ideas"); *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 350 (1991) (using the terms "'idea/expression' dichotomy" and "'fact/expression' dichotomy" interchangeably).

Tax Code and its regulations are facts; the Texas Uniform Commercial Code is a fact. Surely, in principle, the building codes of rural Texas hamlets are no less 'facts' than the products of more August legislative or regulatory bodies." *Id.* at 801.  Therefore, as "ideas" and "facts," the codes could not be protected under the idea/expression dichotomy.  Addressing the merger doctrine, the court added that, upon adoption into law, whatever protectable expression remained in the codes could no longer be separated from the "idea" of the local law.  The law, which must be discussed with absolute precision, "can be expressed in only one way."  *Id.* at 801, 802.

In reaching these conclusions, the court repeatedly stressed the important role the idea/expression dichotomy, and copyright law in general, plays in promoting free speech. It noted that "'the idea/expression dichotomy strikes a definitional balance between the First Amendment and the Copyright Act,'" *id.* at 801 (quoting *Harper & Row*, 471 U.S. at 556), and emphasized that copyright law "'encourages others to build freely upon the ideas and information conveyed by a work,'" *id.* at 800 (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349 (1991)).

The case at hand presents a similar scenario.  At the time the 1999 Standards were incorporated into federal law, they became the idea of the standards for test construction and development that must be met as provided for in 34 C.F.R. §§ 668.146 and 668.148. Accordingly, copyright law cannot be used to prevent the dissemination of the 1999 Standards without running afoul of the First Amendment.

The merger doctrine further prevents copyright law from being used to punish or enjoin the dissemination of the 1999 Standards.  For an individual to communicate the idea of the 1999 Standards, she must use the Standards' exact wording.  In the law, words

have specific meanings and the use of synonymous language will not be sufficient to convey those meanings. *See, e.g.*, *Central States, Southeast & Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 941 (7th Cir. 2000) ("Different words in a statute . . . should be given different meanings unless the context indicates otherwise."); *National Insulation Transp. Comm. v. Interstate Commerce Comm'n*, 683 F.2d 533, 537 (D.C. Cir. 1982) ("[W]e presume that the use of different terminology within a statute indicates that Congress intended to establish a different meaning."); Bradley Scott Shannon, *Action is an Action is an Action is an Action*, 77 Wash. L. Rev. 65, 81 (2002) ("[T]here is something of a linguistic presumption that a change in terminology implies a change in meaning, however subtle."). Thus, even if the 1999 Standards contain some form of limited expression after the incorporation process, the distinction between idea and expression has disappeared. When this occurs, as noted, the merger doctrine mandates that copyright law "treat[] the result as an idea, not an expression." Lawrence A. Cunningham, *Private Standards in Public Law: Copyright, Lawmaking and the Case of Accounting*, 104 Mich. L. Rev. 291, 308 (2005). And, with the expression treated as an idea or a fact, the subsequent dissemination becomes protected under the First Amendment.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Public Resource's motion for

summary judgment and deny Plaintiffs' motion for an injunction.


Dated: February 11, 2016                              Respectfully Submitted,

                                                      /s/ Bruce D. Brown
                                                      Bruce D. Brown (D.C. Bar No. 57317)
                                                      THE REPORTERS COMMITTEE
                                                        FOR FREEDOM OF THE PRESS
                                                      1156 15th St. NW, Ste. 1250
                                                      Washington, D.C. 20005
                                                      Telephone: (202) 795-9303
                                                      Email: bbrown@rcfp.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 11, 2016, the foregoing document was filed electronically with the Clerk of the Court through the Court's CM/ECF system, which will automatically serve all counsel of record.


Dated: February 11, 2016

/s/ Bruce D. Brown
Bruce D. Brown (D.C. Bar No. 57317)
THE REPORTERS COMMITTEE
  FOR FREEDOM OF THE PRESS
1156 15th St. NW, Ste. 1250
Washington, D.C. 20005
Telephone: 202.795.9303
Email: bbrown@rcfp.org
*Counsel for Amicus Curiae*

18