# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN EDUCATIONAL RESEARCH
ASSOCIATION, INC.;

AMERICAN PSYCHOLOGICAL
ASSOCIATION, INC.; and

NATIONAL COUNCIL OF                          Case No. 1:14-cv-00857-TSC-DAR
MEASUREMENT IN EDUCATION, INC.,

        Plaintiffs,

        v.                                   Action Filed: May 23, 2014

PUBLIC.RESOURCE.ORG, INC.,

        Defendant

## BRIEF OF SINA BAHRAM AS AMICUS CURIAE
## IN SUPPORT OF DEFENDANT

Jeffrey T. Pearlman
  CA Bar #254759
  D.C. District Bar ID #CA00003
Phillip R. Malone (Admission Pending)
Juelsgaard IP and Innovation Clinic
Mills Legal Clinic at Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305
Telephone: (650) 497-9443
Fax: (650) 723-4426

*Attorneys for Amicus Curiae Sina Bahram*

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. ii

TABLE OF AUTHORITIES ......................................................................................... iii

IDENTITY AND INTEREST OF AMICUS CURIAE ...................................................... 1

SUMMARY OF ARGUMENT ....................................................................................... 2

ARGUMENT .................................................................................................................. 3

I.   Access by all persons to the law is a fundamental right and public policy. ................. 3

II.  When written works are formatted correctly, assistive technologies enable disabled
     persons to access the law and other important information and resources. ................. 7

III. Misapplying copyright to the law prevents vital access by persons with visual or print
     disabilities. ........................................................................................................... 12

     a.   Public Resource's process converts otherwise inaccessible standards into an
          accessible format. ......................................................................................... 12

     b.   Enjoining Public Resource from converting these standards to an accessible
          format will block access by the print-disabled. ............................................. 15

CONCLUSION ............................................................................................................. 16

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Authors Guild, Inc. v. HathiTrust*,
  755 F.3d 87 (2d. Cir. 2014)...................................................................15

*Banks v. Manchester*,
  128 U.S. 244 (1888).................................................................................4, 5

*The Use of Telecasts to Inform and Alert Viewers with Impaired Hearing*,
  26 F.C.C.2d 917 (1970) ...........................................................................7

*Veeck v. S. Bldg. Code Cong. Int'l, Inc.*,
  293 F.3d 791 (5th Cir. 2002) (en banc) ..................................................5

**Statutes**

*Americans with Disabilities Act of 1990*, 42 U.S.C. §§ 12,101–12,213 (2012) .............................7

*Rehabilitation Act Amendments of 1986*, Pub. L. No. 99-506 § 603(a), 100 Stat.
  1807 (codified as amended at Section 508 of the Rehabilitation Act of 1973,
  29 U.S.C. § 794d) ....................................................................................7

**Other Authorities**

28 C.F.R. § 36.303(b) (2015)..........................................................................7

*The ADA and Entertainment Technologies: Improving Accessibility from the
  Movie Screen to Your Mobile Device: Hearing Before the S. Comm. On
  Health, Educ., Labor & Pensions*, 113th Cong. (2013) (statement of Karen
  Peltz Strauss, Deputy Chief, Consumer & Governmental Affairs Bureau, Fed.
  Commc'ns. Comm'n) ...............................................................................16

Brian Wentz et al., *Retrofitting Accessibility: The Legal Inequality of After-the-
  Fact Online Access for Persons with Disabilities in the United States*, First
  Monday (Nov. 7, 2011).............................................................................6

Chris Woodford, *Optical Character Recognition (OCR)*, Explain That Stuff .............................14

*Comment on Safety Standard for Infant Bath Tubs* (Oct. 28, 2015)........................................13, 14

Crista Earl, *Can CAPTCHAs Be Made Accessible*, Am. Found. for the Blind
  (Aug. 21, 2014)..........................................................................................11

Ctrs. for Disease Control & Prevention, Nat'l Ctr. for Health Statistics, Pub. No. 2014-1588, *Summary Health Statistics for U.S. Adults: National Health Interview Survey* 40 (2014) .................................................................5

Daniel F. Goldstein & Matthias Niska, *Why Digital Accessibility Matters to the Legal Profession*, Law Prac. Today (June 2013) ..............................................6, 9, 10

Daniel Goldstein & Gregory Care, *Disability Rights and Access to the Digital World*, The Fed. Lawyer 54 (Dec. 2012) ..................................................8

L. Guarino Reid et al, *The Accessibility of Adobe Acrobat Software for People with Disabilities*, Am. Found. for the Blind.................................................11

Lainey Feingold, *Disability Rights Legal Advocacy Recent News*, Law Office of Lainey Feingold (Jan. 9, 2016) ...........................................................11

Lainey Feingold, *Note to Retailers: Chip and Pin Upgrades Must Include Real Keypads*, Law Office of Lainey Feingold (Dec. 16, 2014).....................................11

*Marrakesh Treaty to Facilitate Access to Published Works for Persons Who Are Blind, Visually Impaired, or Otherwise Print Disabled*, pmbl., June 27, 2013, WIPO Doc. VIP/DC/8 Rev .............................................................7

Matt Shipman, *White House Honors Sina Bahram as a "Champion of Change,"* CSC News (May 7, 2012) .............................................................1

Mayo Clinic Staff, *Multiple Sclerosis: Symptons and Causes*, Mayo Clinic (Oct. 1, 2015) .........................................................................8

Mohamed Cheriet et al., *Character Recognition Systems: A Guide for Students and Practitioners* (2007) ............................................................14

NVDA, *NVDA Features* (2016)...............................................................9, 10

*Proposed Information and Communication Technology (ICT) Standards and Guidelines*, 80 Fed. Reg. 10880, 10880 (proposed Feb. 27, 2015) (to be codified at 36 C.F.R. pts. 1193, 1194) .................................................9

Sina Bahram, *Consulting*, SinaBahram.com................................................1

Sina Bahram, *Publications*, SinaBahram.com ..............................................1

*Tips for Making Print More Readable*, Am. Found. for the Blind ..................................8

U.S. Copyright Office, *Compendium of Copyright Office Practices* § 313.6(c)(2) (3d ed. 2014) ......................................................................5

U.S. Equal Opportunity Employment Commission, *Reasonable Accommodations for Attorneys with Disabilities*, http://www.eeoc.gov/facts/accommodations-attorneys.html (last visited January 11, 2016) ........................................................................6

United States Census Bureau, Press Release, *Nearly 1 in 5 People Have a Disability in the U.S.*, Census Bureau Reports (July 25, 2012), https://www.census.gov/newsroom/releases/archives/miscellaneous/cb12-134.html ........................................................................5

Univ. of Wash., *Are There Screen Readers That Can Read Math Equations?* (Aug. 20, 2015) ........................................................................10

Univ. of Wash., *Why Is Accessible Math Important?* (Aug. 25, 2015) ........................................10

W3C, Web Accessibility Initiative, *Web Content Accessibility Guidelines (WCAG) 2.0 at a Glance* ........................................................................10

The White House, *Champions of Change: Sina Bahram* ........................................................1

World Wide Web Consortium, *Accessibility Features of SVG* (Aug. 7, 2000)............................10

## IDENTITY AND INTEREST OF AMICUS CURIAE

Amicus curiae Sina Bahram is a digital accessibility researcher and chief technology officer and co-founder of the International Association of Visually Impaired Technologists ("IAVIT").[1] In addition to researching human computer interaction, intelligent user interfaces, and artificial intelligence with the goal of helping users with disabilities, Mr. Bahram advocates on behalf of disabled individuals and organizations representing their interests. Mr. Bahram has authored numerous publications advocating for technical solutions to accessibility challenges, *see* Sina Bahram, *Publications*, SinaBahram.com, https://www.sinabahram.com/publications.php, and has been honored by the White House as a "Champion of Change" for his accessibility work. *See* Matt Shipman, *White House Honors Sina Bahram as a "Champion of Change,"* CSC News (May 7, 2012), http://www.csc.ncsu.edu/news/1322; The White House, *Champions of Change: Sina Bahram*, https://www.whitehouse.gov/champions/stem-equality-for-americans-with-disabilities/sina-bahram. Mr. Bahram serves on the boards of several accessibility-focused conferences and organizations in addition to working through his consultancy, Prime Access Consulting, to achieve his clients' digital accessibility goals. *See* Sina Bahram, *Consulting*, SinaBahram.com, https://www.sinabahram.com/consulting.php.

As a visually impaired individual himself, and in his capacity as an advocate for other disabled persons, Mr. Bahram has a substantial interest in the disposition of this case, the outcome of which is likely to have a profound effect on disabled persons' ability to access, understand, and participate in the development of the law. Disabled individuals like Mr. Bahram and those for whom he advocates are acutely affected by changes in education or accessibility

---

[1] This brief is being tendered with a motion for leave to file this brief. No party or party's counsel authored any part of this brief or contributed money that was intended to fund its preparation or submission. No one other than amicus and his counsel contributed money that was intended to fund the preparation or submission of this brief.

law—changes that may, as in this case, incorporate standards crafted by standards development organizations ("SDOs"). Defendant's Statement of Material Facts ("DSMF") ¶¶ 20, 21. The issue has become even more pressing for disability advocates as the federal government has encouraged agencies to forego crafting standards themselves and incorporate those developed by SDOs. *Id.* ¶ 24. When SDOs fail to provide accessible versions of these standards, they prevent millions of disabled individuals from reading the laws that govern them. Given his history of expertise and advocacy in this issue area, and as a disabled individual himself, Mr. Bahram is particularly well-positioned to explain the details of how assistive technologies permit the disabled to access the law, how barriers imposed by private SDOs thwart that access, and the potential impact of this case on disabled individuals.[2]

## SUMMARY OF ARGUMENT

Access to the law is a fundamental right. Such access is (i) essential to ensuring meaningful citizen participation in democratic processes and institutions and (ii) promotes comprehension of and compliance with the law. Without the ability to distribute, discuss, and meaningfully interact with the law, not only will members of society find it difficult or impossible to participate in the creation of the law, but they may unknowingly violate it, subjecting themselves to possible civil or criminal liability. This right to access is particularly important to disabled individuals, who may be especially vulnerable to disenfranchisement and exclusion from civic participation.

To exercise their fundamental right to access the law, many disabled individuals must use technologies that translate text into more accessible media. Fortunately, there is a vast array of

---

[2] Amicus wishes to thank Stanford Law School Juelsgaard Intellectual Property and Innovation certified law students Bethany Bengfort and Brian Quinn for their substantial assistance in drafting this brief.

new and innovative digital assistive technology that significantly improves disabled persons'
interaction with digital text. However, if the digital text of the law is not available, or is not
available in sufficiently accessible formats, assistive technology becomes impossible to use. In
such situations, disabled individuals who rely on that technology are denied essential access to
the law.

In this case, Plaintiffs only provide copies of the incorporated 1999 Standards for a fee
and in print, and their corporate designee asserted that they have no intention of providing an
electronic version in the future. DSMF ¶ 50. Accordingly, the 1999 Standards (and thus the law)
are not accessible to a significant portion of the public.[3] Prior to the filing of this suit, however,
Defendant Public.Resource.Org, Inc. posted an OCR-optimized, accessible version of the 1999
Standards to the Internet Archive, and thereby provided a vital service to the public. DSMF ¶ 90.
It is critical that copyright law not be misapplied to curtail these efforts to ensure open access to
the law, especially  considering the unique needs of disabled individuals. Permitting Plaintiffs to
modulate access to the law would cabin a vital public right and acutely impact millions of
visually impaired or otherwise print-disabled people.

## ARGUMENT

### I.      Access by all persons to the law is a fundamental right and public policy.

Open and unimpeded access to the law is critical to public engagement in a democracy.
The ability of the public to obtain, read, and understand the law is essential to both the effective

---

[3] It is important to note that even the print copies of the 1999 Standards are available only for a
fee, which constitutes an unjustifiable restraint on access to all individuals. The purpose of this
brief, however, is to emphasize that *no* version of the 1999 Standards incorporated into law is
available in a form accessible to visually impaired and print-disabled persons, and we do not
further address the issue of charging for access to the law.

administration of justice and to the core principles of democracy: participation, transparency and accountability.

Access to the law is critical to the effective administration of justice for many reasons. In our democratic system, many entities play a role in shaping, understanding, evaluating, and monitoring compliance with laws. At the highest level, government officials and agencies are responsible for creating, overseeing, and enforcing laws and regulations. In order to inform policy decisions, shape public opinion, and report on legislative processes and legal constrains, media institutions must be able to read and understand the law. Policy and advocacy organizations that represent persons affected by new laws must understand the scope and function of those laws before they can effectively convey information and advocate for changes. Academics and researchers need to examine laws before weighing their significance and warning against unintended consequences and interpretations.

Most importantly, individual individuals in our society must know and understand applicable laws so that they can ensure personal compliance and prevent others from violating their personal rights. This need to know and understand the law necessarily applies to standards that have been incorporated into law. Free availability and access to our laws is a vital right, and safeguarding that right is a critical public policy.

The Supreme Court recognized as much in *Banks v. Manchester*, 128 U.S. 244 (1888), when it held that a court reporter could not obtain copyright protection for its publication of the opinions of the Ohio Supreme Court. "[E]xposition and interpretation of the law," the Court held, "is free for publication to all." *Id.* at 253. Citing a decision of the Massachusetts Supreme Judicial Court, the Court explained that "justice requires that all should have free access to the [court] opinions, and that it is against sound public policy to prevent this, or to . . . keep from the

4

earliest knowledge of the public the statutes, or the decisions and opinions of the Justices." *Id.* (citing *Nash v. Lathrop,* 142 Mass. 29 (1886)).

An en banc panel of the Fifth Circuit applied this reasoning in a case analogous to the instant one, in which a citizen copied standards incorporated into law and posted them on his public website. In rejecting the SDO's argument that the citizen had infringed its copyright, the court held that "'the law is in the public domain for whatever use the citizens choose to make of it." *Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791, 799 (5th Cir. 2002) (en banc), *cert. denied*, 539 U.S. 969 (2003). The court explained that citizens are entitled to reproduce copies of the law for many legitimate purposes "or simply to amuse," and that free access to the law cannot be conditioned upon an SDO's voluntary forbearance from filing suit. *See id.*

This well-established principle of free access to the law has also been recognized by the U.S. Copyright Office:

> As a matter of longstanding public policy, the U.S. Copyright Office will not register a government edict that has been issued by any state, local, or territorial government, including legislative enactments, judicial decisions, administrative rulings, public ordinances, or similar types of official legal materials. Likewise, the Office will not register a government edict issued by any foreign government.

U.S. Copyright Office, *Compendium of Copyright Office Practices* § 313.6(c)(2) (3d ed. 2014).

Full access to the law is especially important for disabled persons. In the 2010 U.S. Census, about 56.7 million people—19 percent of the population—reported having a disability. United States Census Bureau, Press Release, *Nearly 1 in 5 People Have a Disability in the U.S.*, Census Bureau Reports (July 25, 2012), https://www.census.gov/newsroom/releases/archives/miscellaneous/cb12-134.html. In a 2012 survey conducted by the National Center for Health Statistics, approximately 20.6 million people reported having impaired vision or trouble reading print. Ctrs. for Disease Control & Prevention, Nat'l Ctr. for Health Statistics, Pub. No. 2014-1588, *Summary Health Statistics for U.S. Adults: National Health Interview Survey* 40 (2014).

Those with disabilities have unemployment levels three times higher than the rest of the population and significantly lower levels of educational attainment. Brian Wentz et al., *Retrofitting Accessibility: The Legal Inequality of After-the-Fact Online Access for Persons with Disabilities in the United States*, First Monday (Nov. 7, 2011), http://firstmonday.org/ojs/index.php/fm/article/view/3666/3077.

This gap in resources and education makes it even more difficult for people who are blind, visually impaired, or print-disabled to meaningfully participate in social and democratic dialogue. Furthermore, despite the substantial size of this population segment, disabled individuals report that they have significant difficulty accessing legal research tools. *See* Daniel F. Goldstein & Matthias Niska, *Why Digital Accessibility Matters to the Legal Profession*, Law Prac. Today (June 2013), https://www.americanbar.org/content/newsletter/publications/law_practice_today_home/lpt-archives/june13/why-digital-accessibility-matters-to-the-legal-profession.html. Access to legal tools is particularly important to disabled lawyers and legal professionals who require the use of these tools to perform their jobs. *See, e.g.*, U.S. Equal Opportunity Employment Commission, *Reasonable Accommodations for Attorneys with Disabilities*, http://www.eeoc.gov/facts/accommodations-attorneys.html (last visited January 11, 2016).

Gaps in accessibility can have powerful disenfranchising effects for already vulnerable citizens. From voting ballots to statutes to court documents, resources and institutions that are accessible only to the non-disabled exclude disabled persons from participation. The importance of full access by the disabled is emphasized in the Marrakesh Treaty, which recognizes that roadblocks to full accessibility are

> prejudicial to the complete development of persons with visual impairments or other print disabilities, [and] limit their freedom of expression, including the

6

freedom to seek, receive and impart information and ideas of all kinds on equal basis with others, including through all forms of communication of their choice, their enjoyment of the right to education, and the opportunity to conduct research.

*Marrakesh Treaty to Facilitate Access to Published Works for Persons Who Are Blind, Visually Impaired, or Otherwise Print Disabled*, pmbl., June 27, 2013, WIPO Doc. VIP/DC/8 Rev [hereinafter Marrakesh Treaty].

Congress and the federal agencies have increasingly recognized the importance of ensuring that people with disabilities are able to access knowledge and information on equal terms. The Americans with Disabilities Act (originally passed in 1990) ("ADA"), for example, is one of a series of laws enacted to protect the rights of disabled persons; it expressly prohibits discrimination against people with disabilities, and requires places of public accommodation— both governmental and private—to provide disabled individuals with access to a wide variety of materials. *See Americans with Disabilities Act of 1990*, 42 U.S.C. §§ 12,101–12,213 (2012).[4]

## II.    When written works are formatted correctly, assistive technologies enable disabled persons to access the law and other important information and resources.

Print versions of written works present particularly thorny access problems for individuals who are partially blind, have reading disabilities, or suffer from debilitating diseases like multiple sclerosis. These individuals may have difficulty reading the incorporated standards at all if they are unable to convert the text into a different font or size, or if they are unable to lift

---

[4] Among many other provisions, ADA implementing regulations require public accommodations to supply "auxiliary aids and services" such as "[q]ualified readers; taped texts, . . . [and] Brailled materials" to visually impaired individuals who want to access written materials. 28 C.F.R. § 36.303(b) (2015). *See also Rehabilitation Act Amendments of 1986*, Pub. L. No. 99-506 § 603(a), 100 Stat. 1807 (codified as amended at Section 508 of the Rehabilitation Act of 1973, 29 U.S.C. § 794d); *The Use of Telecasts to Inform and Alert Viewers with Impaired Hearing*, 26 F.C.C.2d 917 (1970).

and turn the pages of the print copy.[5] Ultimately, print versions of written works must be translated into braille, audio, or electronic formats before persons with visual or print disabilities can access them. *See* Daniel Goldstein & Gregory Care, *Disability Rights and Access to the Digital World*, The Fed. Lawyer 54 (Dec. 2012) ("Unlike print, which can only be accessed visually, or sound, which can only be accessed aurally, digital information is simply electronic code that can be rendered audibly, visually, or tactilely.").

Because most disabled individuals are unable to create braille versions of written works on their own, they must rely on employers, educational institutions, or specialized libraries to convert print materials into accessible versions. *Id*. The conversion process is slow and costly, and only a miniscule portion of publicly available works have been optimized for use by disabled individuals. *Id.* Furthermore, even if a book is converted into a format like braille, it will remain inaccessible to those individuals with different kinds of print disabilities, such as those with multiple sclerosis.

In contrast, accessibility-optimized digital works are immediately available to individuals who use screen readers or other assistive technology. Disabled individuals do not require an intermediary to access these works, and the optimization process can be completed quickly and cost effectively by the content creator. The mass digitization of information and the

---

[5] The American Foundation for the Blind recommends that print publishers use bold, non-decorative, 18-point font to make printed materials more readable for individuals will low vision or partial blindness. *Tips for Making Print More Readable*, Am. Found. for the Blind, http://www.afb.org/info/living-with-vision-loss/reading-and-writing/making-print-more-readable/235 (last visited Feb. 11, 2016). The Mayo Clinic reports that individuals with multiple sclerosis may experience tremors, prolonged double vision, or lack of coordination. Mayo Clinic Staff, *Multiple Sclerosis: Symptons and Causes*, Mayo Clinic (Oct. 1, 2015), http://www.mayoclinic.org/diseases-conditions/multiple-sclerosis/symptoms-causes/dxc-20131884.

correspondingly rapid development of compatible assistive technologies now offer disabled individuals a level of autonomy and access that was unimaginable in the print-only era.

In order to have meaningful access to the law by modern standards, persons with different disabilities typically require (i) an optimized digital copy of the written work and (ii) assistive technology programs or devices that operate in different ways. Innovative technologies have helped disabled individuals to achieve greater independence and participation in various aspects of society. The U.S. Access Board noted in its update to Section 508 of the Rehabilitation Act that, "since the guidelines and standards were issued in 2000 and 1998 respectively, there has been a technological revolution, accompanied by an ever-expanding use of technology and a proliferation of accessibility standards globally." *Proposed Information and Communication Technology (ICT) Standards and Guidelines*, 80 Fed. Reg. 10880, 10880 (proposed Feb. 27, 2015) (to be codified at 36 C.F.R. pts. 1193, 1194). Because of the ever increasing availability of accessibility technology, "one of the primary purposes of the [] rule is to . . . ensure that accessibility for people with disabilities keeps pace with advances in electronic and information technology." *Id.*

One key example of rapidly developing modern accessibility technology is screen-reading software. A screen-reading program such as Job Access with Speech (JAWS) or the free, open-source NVDA enables visually impaired and print-disabled users to access digital content. *See* Goldstein & Niska, *supra*; NVDA, *NVDA Features* (2016), http://www.nvaccess.org/about/nvda-features/. In conjunction with a web browser, screen-reading technology converts the structural language underlying web pages, including Hypertext Markup Language ("HTML"), Mathematical Markup Language ("MATHML"), and Scalable Vector Graphics ("SVGs"), into synthesized speech, which disabled individuals access via speakers, headphones, or a refreshable

braille display. *See id*; World Wide Web Consortium, *Accessibility Features of SVG* (Aug. 7, 2000), https://www.w3.org/TR/2000/NOTE-SVG-access-20000807/; Univ. of Wash., *Why Is Accessible Math Important?* (Aug. 25, 2015), http://www.washington.edu/doit/why-accessible-math-important. This screen-reading technology may be combined with a high-powered screen magnifier, helpful to users with dyslexia and other print disabilities. *See* Goldstein & Niska, *supra*. Individuals who have dexterity impairments or disabilities, however, may benefit more from voice command programs and tools that allow them to input speech without using a conventional keyboard or mouse. *See id.*

For assistive technologies to operate effectively, the hardware, operating platform, software program, and data must be compatible. *See id*. Such "digitally accessible" content is "designed to be aesthetic and usable to the greatest extent possible by everyone regardless of disability." *Id.* (internal quotation marks omitted). To ensure accessibility, online content must, among other things, provide text alternatives for non-text content, make it easier to see and hear content, help users navigate and find content, and maximize compatibility with current and future user tools. W3C, Web Accessibility Initiative, *Web Content Accessibility Guidelines (WCAG) 2.0 at a Glance*, http://www.w3.org/WAI/WCAG20/glance (last updated Dec. 6, 2011).

Accessibility technology—like screen-reading software—only functions effectively when used on websites and documents that contain manipulable characters and structural data, e.g., text that could be copied and pasted using conventional viewing software. Screen readers and other accessibility programs convert those characters and data, mathematical formulas, and vector graphics into a usable format for disabled individuals. *See* Goldstein & Niska, *supra*; Univ. of Wash., *Are There Screen Readers That Can Read Math Equations?* (Aug. 20, 2015), http://www.washington.edu/doit/are-there-screen-readers-can-read-math-equations; World Wide

Web Consortium, *supra*. As Adobe and other industry specialists have recognized, screen readers generally cannot meaningfully interact with copy-restricted image-only files, such as PDFs, unless they are optimized for accessibility and are properly coded and tagged. *See* L. Guarino Reid et al, *The Accessibility of Adobe Acrobat Software for People with Disabilities*, Am. Found. for the Blind, http://www.afb.org/info/afb-consulting/publications-and-presentations/accessibility-of-adobe-acrobat/235As (last visited Jan. 6, 2016). Even PDFs that contain character data but have not been tagged are difficult for the screen-reading program to negotiate, as words often run together and the document's text may not be read in the correct order. *See* Goldstein & Niska, *supra*.

Accessibility technology has the potential to significantly improve the lives and abilities of disabled persons everywhere. Achieving these benefits, however, requires that content be formatted or optimized for digital accessibility by content creators or others, such as Public Resource.[6] Given the prevalence, low cost, and ease of modern accessibility technologies and the profound improvements they make in the lives of the disabled, failing to provide content in accessible format, or imposing technological and/or legal barriers to digital accessibility, is increasingly difficult to justify.[7] In particular, there is no justification for barriers to full access to the law and incorporated standards.

---

[6] For example, recent successful digital accessibility initiatives have enabled visually impaired and print-disabled persons to independently view and order food, participate in mobile banking, and manage prescriptions. Lainey Feingold, *Disability Rights Legal Advocacy Recent News*, Law Office of Lainey Feingold (Jan. 9, 2016), http://lflegal.com/. Ensuring accessibility can often be as simple as opting for keyboards over touch screens. Lainey Feingold, *Note to Retailers: Chip and Pin Upgrades Must Include Real Keypads*, Law Office of Lainey Feingold (Dec. 16, 2014), http://lflegal.com/2014/12/chip-and-pin/.

[7] Innovators have even adapted CAPTCHA technology, which uses machine-indecipherable "fuzzy characters" to differentiate pesky "bot" spammers from legitimate human users, for use by disabled individuals. *See* Crista Earl, *Can CAPTCHAs Be Made Accessible*, Am. Found. for

**III.    Misapplying copyright to the law prevents vital access by persons with visual or print disabilities.**

While any restriction on public access to the law is impermissible, individuals with disabilities suffer a particularly acute harm when courts permit litigants to erroneously assert copyright to block open access to the law. Almost every use of accessible technology requires the creation of a copy or the manipulation of the text in the original document. Yet Plaintiffs in this case have only made their 1999 Standards available in print format, failing to provide *any* accessible copies and asserting copyright claims against those who seek to create accessible digital versions. The result is to effectively prevent millions of people with disabilities from accessing the incorporated standards. This is especially problematic because many of the subjects that the 1999 Standards address directly and disproportionately impact disabled persons. For example, the educational standards contain the legal requirements for tests used to determine students' eligibility for federal grants, including whether those tests are fair to students with disabilities. DSMF ¶ 89. Public Resource's process offers a solution to these problems, but misapplying copyright against Public Resource would effectively eliminate that remedy.

      a.    *Public Resource's process converts otherwise inaccessible standards into an accessible format.*

Public Resource's workflow process converts incorporated standards from inaccessible formats into open HTML documents, empowering disabled individuals who would otherwise be excluded from accessing the law. Early on, Public Resource recognized that disabled individuals would have great difficulty accessing the 1999 standards. The 1999 Standards are not available in electronic format on Plaintiffs' website; in fact, a purchaser is required to download and fill out a PDF order form to obtain a print copy in the mail. DSMF ¶ 59, 88. Nor are they available

the Blind (Aug. 21, 2014), http://www.afb.org/blog/afb-blog/can-captchas-be-made-accessible/ 12.

from any of the libraries that provide accessible copies of written works to print disabled individuals. *Id.* ¶ 92. Print copies of the Standards may be available from other sources, but such versions are of limited use to blind individuals. As Public Resource notes, "most blind people themselves do not have the ability to convert books" from physical paper copies into accessible braille or electronic versions. *Id.* ¶ 94. The Plaintiffs recognize that certain individuals may still want to read the legally binding 1999 Standards, but they removed them from sale after publishing the revised 2014 Standards. *Id.* ¶ 30, 40. Moreover, Plaintiffs do not intend to make an electronic version of the 1999 Standards available to the public. *Id.* ¶ 50.

Recognizing that disabled individuals would be functionally deprived of access to the law without a significant technical transformation, Public Resource responded by acquiring print copies of the 1999 Standards and beginning its eight-step conversion process. *See* Public.Resource.Org, *Comment on Safety Standard for Infant Bath Tubs* 16–17 (Oct. 28, 2015), http://www.regulations.gov/contentStreamer? documentId=CPSC-2015-0019-0009&attachmentNumber=1&disposition=attachment&contentType=pdf. Although Public Resource follows an eight-step workflow to convert each document into an optimized HTML version, converting the text into HTML format. *Id.* ¶ 83, 175. Although each step of that transformation process promotes accessibility, there are certain modifications that are particularly significant.

Converting paper and PDF versions of incorporated standards into HTML may be one of Public Resource's most important functions. Public Resource first scans the paper copies of incorporated standards and applies "metadata and optical character recognition (OCR)" to the resulting PDF files. Malamud Decl. ¶ 16. OCR technology analyzes scanned documents and identifies "images of characters and texts," facilitating data analysis "at high speed and at

13

reasonable costs." Mohamed Cheriet et al., *Character Recognition Systems: A Guide for Students and Practitioners* 2 (2007). OCR technology "revolutionized the data input industry" and eliminated much of the "mundane work of keying data into the computer." *Id.* Fundamentally, OCR technology "turn[s] a picture of text into text itself . . . producing something like a TXT or DOC file from a scanned JPG of a printed or handwritten page." Chris Woodford, *Optical Character Recognition (OCR)*, Explain That Stuff, http://www.explainthatstuff.com/how-ocr-works.html (last updated Jan. 21, 2016).

Once Public Resource applies OCR technology to the scanned (or existing PDF copies) of the standards, it converts the resulting file into HTML format. Malamud Decl. ¶ 17. Public Resource uses a "double-keying" technique to accomplish this conversion: two separate typists copy the text of the OCR-optimized file into HTML language, and then compare results to eliminate any errors in the conversion process. *Id.* ¶ 26. The paper copies of incorporated standards often include mathematical formulae and graphics in addition to text, and Public Resource recodes these features into accessible MATHML and SVG formats respectively. See Public.Resource.Org, *Comment on Safety Standard for Infant Bath Tubs* 16–17 (Oct. 28, 2015), http://www.regulations.gov/contentStreamer?documentId=CPSC-2015-0019-0009&attachmentNumber=1&disposition=attachment&contentType=pdf.

After applying OCR technology to paper copies of the 1999 Standards and posting a copy on the Internet Archive website, Public Resource intended to begin the HTML conversion process. Malamud Decl. ¶ 25. However, the Plaintiffs filed suit against Public Resource in May of 2014, and Public Resource agreed to take down versions of the 1999 Standards while the case was pending. *Id.*

     *b.*     *Enjoining Public Resource from converting these standards to an accessible format will block access by the print-disabled.*

 As explained earlier, screen readers and other assistive technologies can convert HTML, MATHML, and SVG code into a format that is accessible for disabled individuals, such as speech or braille. Public Resource is the only entity that is undertaking the crucial task of providing incorporated standards in these accessible formats. If Public Resource is enjoined from converting the 1999 Standards into HTML, MATHML, and SVGs, many people with disabilities will be precluded from accessing and understanding important areas of law that govern and disproportionately affect them. Copyright law should not be misread to bar that access. And content creators cannot be relied upon to provide accessibility on their own. As the Second Circuit noted in *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 102 (2d. Cir. 2014), "[i]t is undisputed that the present-day market for books accessible to the handicapped is so insignificant that 'it is common practice in the publishing industry for authors to forgo royalties that are generated through the sale of books manufactured in specialized formats for the blind.'" Indeed, even though public pressure may have mounted for access in this case, the SDO has failed to make any copy of the 1999 Standards available to individuals with disabilities.[8]

---

[8] In other contexts where, unlike here, content was copyrightable, the federal government has recognized that, because copyright holders have often chosen not to serve the market for accessible formats or accessible features, accessibility must be facilitated through legislation. A senior FCC official recently explained this pattern before the U.S. Senate:

> Although the number of people with disabilities in the United States is said to hover around 50 million, each individual disability group—i.e., individuals who are deaf, blind, mobility disabled, etc.—typically has not been large or strong enough to exert the market pressures needed to incentivize industry to include accessibility features in their products and services. . . . Often, when market forces have failed in the past, the government has stepped in with regulatory measures to ensure that people with disabilities have the access that they need.

## CONCLUSION

Access to the law by *all* persons—disabled or not—is a fundamental right. Misapplying

copyright law to permit private organizations to meter access to the law would subvert this right.

This Court should reject Plaintiffs' copyright claim, which would forestall the creation of

digitally accessible laws, render the law inaccessible to persons with visual or print disabilities,

and place copyright in the unwarranted and unfortunate position of blocking universal access to

the law.

DATED: February 11, 2016                          Respectfully Submitted,

                                                  Jeffrey T. Pearlman
                                                    CA Bar #254759
                                                    D.C. District Bar ID #CA00003
                                                  Phillip R. Malone (Admission Pending)
                                                  Juelsgaard IP and Innovation Clinic
                                                  Mills Legal Clinic at Stanford Law School
                                                  559 Nathan Abbott Way
                                                  Stanford, CA 94305
                                                  Telephone: (650) 497-9443
                                                  Fax: (650) 723-4426

---

*The ADA and Entertainment Technologies: Improving Accessibility from the Movie Screen to Your Mobile Device: Hearing Before the S. Comm. On Health, Educ., Labor & Pensions*, 113th Cong. 3–4 (2013) (statement of Karen Peltz Strauss, Deputy Chief, Consumer & Governmental Affairs Bureau, Fed. Commc'ns. Comm'n).