# EXHIBIT 1

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN EDUCATIONAL RESEARCH ASSOCIATION, INC., AMERICAN PSYCHOLOGICAL ASSOCIATION, INC., and NATIONAL COUNCIL ON MEASUREMENT IN EDUCATION, INC., ) ) ) ) ) | Civil Action No. 1:14-cv-00857-CRC |
| Plaintiffs, ) ) | **DECLARATION OF MARIANNE ERNESTO IN SUPPORT OF** |
| v. ) ) | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND ENTRY** |
| PUBLIC.RESOURCE.ORG, INC., ) ) | **OF A PERMANENT INJUNCTION** |
| Defendant. ) ) | |

I, MARIANNE ERNESTO, declare:

1.    I am the Director, Testing and Assessment, at the American Psychological Association, Inc. ("APA"). I have been employed with the APA since May 2001. I submit this Declaration in support of the motion of the American Educational Research Association, Inc. ("AERA"), the APA, and the National Council on Measurement in Education, Inc. ("NCME") (collectively, "Plaintiffs" or the "Sponsoring Organizations") for a summary judgment and the entry of a permanent injunction.

2.    In my role as Director, Testing and Assessment, I serve as APA's primary authority on all matters that relate to testing and assessment. This subject matter includes educational testing, clinical assessment, forensic testing and employment testing. I advocate on behalf of APA in matters involving federal or state legislative, regulatory or other policy issues concerning testing and assessment. I coordinate APA's involvement in testing issues in matters such as governance, executive boards, and managerial bodies. I also manage APA's responses to internal, public, member and media inquiries regarding testing issues in a manner that is consistent with the *Standards for Educational and Psychological Testing* (the "Standards"). I

- 1 -

advise, counsel and oversee the activities of the APA's Science Directorate (and in particular its Office of Testing and Assessment) on policy and governance issues related to testing and assessments. I further serve as staff liaison to the APA's Committee on Psychological Tests and Assessment ("CPTA"). Since 2001, I have served as APA's primary contact for information concerning the availability and interpretation of the Standards published in 1999, and more recently I have done so regarding the updated Standards published in 2014.

3.      APA is a District of Columbia not-for-profit corporation.

4.      APA is the largest scientific and professional organization representing psychology in the United States. APA is the world's largest association of psychologists and counts a vast number of researchers, educators, clinicians, consultants and students among its members.  APA's mission is to advance the creation, communication and application of psychological knowledge to benefit society and improve people's lives.

5.      In 1954, APA prepared and published the "Technical Recommendations for Psychological Tests and Diagnostic Techniques." It is my understanding that in 1955 AERA and NCME prepared and published a companion document entitled, "Technical Recommendations for Achievement Tests."

6.      Subsequently, a joint committee of the three organizations modified, revised and consolidated the two documents into the first Joint Standards. Beginning with the 1966 revision, the three organizations (AERA, APA and NCME) collaborated in developing the "Joint Standards" (or simply, the "Standards"). Each subsequent revision of the Standards has been careful to cite the previous Standards and note that it is a revision and update of that document.

7.      Beginning in the mid-1950s, AERA, APA, and NCME formed and periodically reconstituted a committee of experts in psychological and educational assessment, charged with

- 2 -

the initial development of the Technical Recommendations and then each subsequent revision of the (renamed) Standards. These committees were formed by the Plaintiffs' Presidents (or their designees), who would meet and jointly agree on the membership. Often a chair or co-chairs of these committees were selected by joint agreement. Beginning with the 1966 version of the Standards, this committee became referred to as the "Joint Committee."

8.      Financial and operational oversight for the Standards' revisions, promotion, distribution, and for the sale of the 1999 and 2014 Standards has been undertaken by a periodically reconstituted Management Committee, comprised of designees of the three Sponsoring Organizations.

9.      All members of the Joint Committee(s) and the Management Committee(s) are *unpaid* volunteers. The expenses associated with the ongoing development and publication of the Standards include travel and lodging expenses (for the Joint Committee and Management Committee members), support staff time, printing and shipment of bound volumes, and advertising costs.

10.     Many different fields of endeavor rely on assessments.     The Sponsoring Organizations have ensured that the range of these fields of endeavor is represented in the Joint Committee's membership – *e.g.*, admissions, achievement, clinical counseling, educational, licensing-credentialing, employment, policy, and program evaluation.     Similarly, the Joint Committee's members, who are *unpaid volunteers*, represent expertise across major functional assessment areas – *e.g.*, validity, equating, reliability, test development, scoring, reporting, interpretation, and large scale interpolation.

11.     From the time of their initial creation to the present, the preparation of and periodic revisions to the Standards entail intensive labor and considerable cross-disciplinary

- 3 -

expertise. Each time the Standards are revised, the Sponsoring Organizations select and arrange for meetings of the leading authorities in psychological and educational assessments (known as the Joint Committee). During these meetings, certain Standards are combined, pared down, and/or augmented, others are deleted altogether, and some are created as whole new individual Standards. The 1999 version of the Standards is nearly 200 pages and took more than five years to complete.

12.     The Standards, however, are not simply intended for members of the Sponsoring Organizations, AERA, APA, and NCME. The intended audience of the Standards is broad and cuts across audiences with varying backgrounds and different training. For example, the Standards also are intended to guide test developers, sponsors, publishers, and users by providing criteria for the evaluation of tests, testing practices, and the effects of test use. Test user standards refer to those standards that help test users decide how to choose certain tests, interpret scores, or make decisions based on tests results. Test users include clinical or industrial psychologists, research directors, school psychologists, counselors, employment supervisors, teachers, and various administrators who select or interpret tests for their organizations. There is no mechanism, however, to enforce compliance with the Standards on the part of the test developer or test user. The Standards, moreover, do not attempt to provide psychometric answers to policy or legal questions.

13.     The Standards apply broadly to a wide range of standardized instruments and procedures that sample an individual's behavior, including tests, assessments, inventories, scales, and other testing vehicles. The Standards apply equally to standardized multiple-choice tests, performance assessments (including tests comprised of only open-ended essays), and hands-on assessments or simulations. The main exceptions are that the Standards do not apply to

- 4 -

unstandardized questionnaires (*e.g.*, unstructured behavioral checklists or observational forms), teacher-made tests, and subjective decision processes (*e.g.*, a teacher's evaluation of students' classroom participation over the course of a semester).

14.     The Standards have been used to develop testing guidelines for such activities as college admissions, personnel selection, test translations, test user qualifications, and computer-based testing.  The Standards also have been widely cited to address technical, professional, and operational norms for all forms of assessments that are professionally developed and used in a variety of settings.  The Standards additionally provide a valuable public service to state and federal governments as they voluntarily choose to use them.  For instance, each testing company, when submitting proposals for testing administration, instead of relying on a patchwork of local, or even individual and proprietary, testing design and implementation criteria, may rely instead on the Sponsoring Organizations' Standards to afford the best guidance for testing and assessment practices.

15.     The Standards were not created or updated to serve as a legally binding document, in response to an expressed governmental or regulatory need, nor in response to any legislative action or judicial decision.  However, the Standards have been cited in judicial decisions related to the proper use and evidence for assessment, as well as by state and federal legislators.  These citations in judicial decisions and during legislative deliberations occurred without any lobbying by the Plaintiffs.

16.     During the discovery phase of this litigation, APA located in its archives correspondence relating to APA's support for proposed legislation sought to be introduced in 2001 by Senator Paul Wellstone (D-MN) on Fairness and Accuracy in High Stakes Educational Decisions for Students - a suggested amendment to the Elementary and Secondary Education Act

("No Child Left Behind Act") 147 Cong. Rec. S. 4,644 (daily ed. May 9, 2001).

17.     Accompanying this Declaration as Exhibit NN is a true copy of a signed correspondence between Ellen Garrison Ph.D. and Patricia Kobor of APA and Ms. Jill Morningstar, Legislative Assistant to U.S. Senator Paul Wellstone dated April 7, 2000, marked as Exhibit 1109 during my deposition.

18.     Accompanying this Declaration as Exhibit OO is a true copy of an unsigned correspondence between Ellen Garrison Ph.D. and Patricia Kobor of APA and Ms. Jill Morningstar, Legislative Assistant to U.S. Senator Paul Wellstone dated April 7, 2000, marked as Exhibit 1110 during my deposition.

19.     Accompanying this Declaration as Exhibit PP is a true copy of a signed correspondence between Patricia Kobor and Ellen Garrison, Ph.D. of APA and Ms. Jill Morningstar, Legislative Assistant to U.S. Senator Paul Wellstone dated April 13, 2000, marked as Exhibit 1111 during my deposition.

20.     Accompanying this Declaration as Exhibit QQ is a true copy of an unsigned correspondence between Raymond D. Fowler, Ph.D. of APA and an unnamed Senator dated May 7, 2001, marked as Exhibit 1114 during my deposition.

21.     Accompanying this Declaration as Exhibit RR is a true copy of an unsigned correspondence between L. Michael Honaker, Ph.D. of APA and an unnamed Senator dated March 6, 2001, marked as Exhibit 1115 during my deposition.

22.     Accompanying this Declaration as Exhibit SS is a true copy of a document containing "Highlights of APA's Involvement in Educational Testing Provisions of the 'No Child Left Behind Act'" that also contains an unsigned correspondence to an unnamed Senator dated May 7, 2001, marked as Exhibit 1116 during my deposition.

23.     As noted above, many of these letters are unsigned and are not printed on APA letterhead. Therefore, in accordance with APA practices and protocols, it is likely that the unsigned letters (not printed on letterhead) were internal discussion drafts that were never sent.

24.     Regarding the signed letters that were printed on APA letterhead, they relate to Senator Wellstone's proposed legislation that tests and assessments administered by the states are of high quality and used appropriately for the benefit of test administrators and test takers. These are goals that are consistent with APA policy as then reflected in the 1999 Standards. Even though Senator Wellstone's amendments sought, in part, to mandate states' compliance with the Standards, none of the Sponsoring Organizations actively advocated for this – and in any event Senator Wellstone's proposed amendment including this language was never enacted into law. Accompanying this Declaration as Exhibit TT is a true copy of 20 U.S.C. § 6301, which is the current version of the legislation Senator Wellstone sought to amend.

25.     APA's search of its records did not disclose any further communications with Congress relating to the Standards and, to the best of APA's knowledge, it has not engaged in communications with Congress regarding citation of the Standards in legislation since 2001.

26.     APA has not solicited any government agency to incorporate the Standards into the Code of Federal Regulations or other rules of Federal or State agencies.

27.     Rather, in the policymaking arena, APA believes the Standards should be treated as guidelines informing the enactment of legislation and regulations consistent with best practices in the development and use of tests – to insure that they are valid, reliable and fair.

28.     Plaintiffs promote and sell copies of the Standards via referrals to the AERA website, at annual meetings, in public offerings to students, and to educational institution faculty. Advertisements promoting the Standards have appeared in meeting brochures, in scholarly

- 7 -

journals, and in the hallways at professional meetings. Accompanying this Declaration as Exhibit UU is a true copy of an advertisement for the 1999 Standards that appeared in the December 1999 issue of APA's Journal of Educational Psychology.

29.     Distribution of the Standards is closely monitored by the Sponsoring Organizations. AERA, the designated publisher of the Standards, sometimes does provide promotional complementary print copies to students or professors. Except for these few complementary print copies, however, the Standards are not given away for free; and certainly they are not made available to the public by any of the three organizations for anyone to copy free of charge.

30.     To date, the Sponsoring Organizations have never posted, or authorized the posting of, a digitized copy of the 1999 Standards on any publicly accessible website.

31.     The Sponsoring Organizations do not keep any of the revenues generated from the sales of the Standards. Rather, the income from these sales is used by the Sponsoring Organizations to offset their development and production costs and to generate funds for subsequent revisions. This allows the Sponsoring Organizations to develop up-to-date, high quality Standards that otherwise would not be developed due to the time and effort that goes into producing them.

32.     Without receiving at least some moderate income from the sales of the Standards to offset their production costs and to allow for further revisions, it is very likely that the Sponsoring Organizations would no longer undertake to periodically update them, and it is unknown who else would.

33.     Due to the relative minor portion of the membership of APA who devote their careers to testing and assessment, it is highly unlikely that the members of APA will vote for a

dues increase to fund future Standards revision efforts if Public Resource successfully defends this case and is allowed to post the Standards online for the public to download or print for free. As a result, the Sponsoring Organizations would likely abandon their practice of periodically updating the Standards.

34.     The Joint Committee that authored the 1999 Standards comprised 16 members. Except for Manfred Meier (who could not be located, nor could his heirs), work made-for-hire letters were signed by 13 Joint Committee Members, and posthumous assignments were signed by the heirs of 2 deceased Joint Committee Members, vesting ownership of the copyright to the 1999 Standards in the Sponsoring Organizations. Accompanying this Declaration as Exhibits VV-HHH are the 13 work made-for-hire letters signed by Eva Baker, Lloyd Bond, Daniel Goh, Bert Green, Edward Haertel, Jo-Ida Hansen, Suzanne Lane, Sharon Johnson-Lewis, Joseph Matarazzo, Pamela Moss, Esteban Olmedo, Diana Pullin, and Paul Sackett, marked as Exhibits 1065, 1069, 1071, 1072, 1075, 1078, 1082, 1085, 1086, 1089, 1090, 1091, and 1094 during my deposition. Accompanying this Declaration as Exhibits III and JJJ are the posthumous assignments signed by the heirs of Leonard S. Feldt and Charlie Spielberger, marked as exhibits 1070 and 1097 during my deposition.

35.     Public Resource posted Plaintiffs' 1999 Standards to its website and the Internet Archive website without the permission or authorization of any of the Sponsoring Organizations.

36.     Past harm from Public Resource's infringing activities includes misuse of Plaintiffs' intellectual property without permission.

37.     Should Public Resource's infringement be allowed to continue, the harm to the Sponsoring Organizations, and public at large who rely on the preparation and administration of valid, fair and reliable tests, includes: (i) uncontrolled publication of the 1999 Standards without

Case 1:14-cv-00857-TSC   Document 84-1   Filed 02/12/16   Page 11 of 11

any notice that those guidelines have been replaced by the 2014 Standards; (ii) future unquantifiable loss of revenue from sales of authorized copies of the 1999 Standards (with proper notice that they are no longer the current version) and the 2014 Standards; and (iii) lack of funding for future revisions of the 2014 Standards and beyond.

Originally signed in identical form on December 8, 2015.

I declare under the penalty of perjury that the foregoing is true and correct. Executed on February 12, 2016, in WASHINGTON DISTRICT OF COLUMBIA

Marianne Ernesto

- 10 -