# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN EDUCATIONAL RESEARCH ASSOCIATION, INC., AMERICAN PSYCHOLOGICAL ASSOCIATION, INC., and NATIONAL COUNCIL ON MEASUREMENT IN EDUCATION, INC., )<br><br>Plaintiffs,<br><br>v.<br><br>PUBLIC.RESOURCE.ORG, INC.,<br><br>Defendant. | Civil Action No. 1:14-cv-00857-TSC-DAR<br><br>**DECLARATION OF FELICE J. LEVINE IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND ENTRY OF A PERMANENT INJUNCTION** |

I, FELICE J. LEVINE, declare:

1.      I am the Executive Director of the American Educational Research Association, Inc. ("AERA") I have been employed by the AERA since May 2002.  I submit this Declaration in support of the motion of the AERA, the American Psychological Association, Inc. ("APA"), and the National Council on Measurement in Education, Inc. ("NCME") (collectively, "Plaintiffs" or "Sponsoring Organizations") for summary judgment and the entry of a permanent injunction.

2.      As set forth in the AERA Bylaws, the Executive Director is the chief executive officer of the Association. In that capacity, I am responsible for all programmatic, financial, administrative, staffing, and managerial responsibilities of the AERA.  I also advise on and implement the policies that guide our organization.

3.      As publisher, the AERA has provided general oversight since November 1999 for the production, printing, sales, and marketing of the "Standards for Educational and Psychological Testing" (the "Standards"), and for the fiscal management of the revenue and expenditure of funds and resources of that publication.  AERA was selected to serve as publisher

by the Management Committee of the three Sponsoring Organizations. As the Executive Director of the AERA, I have administrative oversight over all of AERA's implementation of its responsibilities regarding the Standards.

4.      AERA is a District of Columbia not-for-profit corporation.

5.      AERA is the major national scientific society for research on education and learning.  AERA's mission is to advance knowledge about education, to encourage scholarly inquiry related to education, and to promote the use of research to improve education and serve the public good.

6.      In 1955, Plaintiffs AERA and NCME prepared and published a companion document to APA's "Technical Recommendations for Psychological Tests and Diagnostic Techniques" (published in 1954), entitled, "Technical Recommendations for Achievement Tests."  Subsequently, a joint committee of the three organizations modified, revised, and consolidated the two documents into the first Joint Standards.  Beginning with the 1966 revision, the Sponsoring Organizations collaborated in developing the "Joint Standards" (or simply, the "Standards").  Each subsequent revision of the Standards has been careful to note that it is a revision and update of the prior version.

7.      Beginning in the mid-1950s, the Sponsoring Organizations formed and periodically reconstituted a committee of highly trained and experienced experts in psychological and educational assessment, charged with the initial development of the Technical Recommendations and then each subsequent revision of the (renamed) Standards.  These committees were formed by the Sponsoring Organizations' Presidents (or their designees), who would meet and jointly agree on the membership.  Often a chair or co-chairs of these committees were selected by joint agreement.  Beginning with the 1966 version of the Standards, this

committee became referred to as the "Joint Committee."

8.     Financial and operational oversight for the Standards' revisions, promotion, distribution, and for the sale of the 1999 and 2014 Standards has been undertaken by a periodically reconstituted Management Committee, comprised of the designees of the three Sponsoring Organizations.  As Publisher of the 1999 and 2014 Standards, AERA works in consultation with the Management Committee to implement its managerial guidance.

9.     All members of the Joint Committee(s) and the Management Committee(s) are *unpaid* volunteers.  The expenses associated with the ongoing development and publication of the Standards include travel and lodging expenses (for the Joint Committee and Management Committee members), support staff time, production, printing and shipment of bound volumes, and advertising costs.  For the 2014 Standards, the production, printing and shipment of bound volumes, and advertising costs, are paid for by the publisher, AERA.

10.    Many different fields of endeavor rely on assessments.  The Sponsoring Organizations have ensured that the range of these fields of endeavor is represented in the Joint Committee's membership – *e.g.*, admissions, achievement, clinical counseling, educational, licensing-credentialing, employment, policy, and program evaluation.  Similarly, the Joint Committee's members, who are *unpaid volunteers*, represent expertise across major functional assessment areas – *e.g.*, validity, equating, reliability, test development, scoring, reporting, interpretation, and large scale interpolation.

11.    From the time of their initial creation to the present, the preparation of and periodic revisions to the Standards entail intensive labor and considerable cross-disciplinary expertise.  Each time the Standards are revised, the Sponsoring Organizations select and arrange for extensive meetings of and work by the leading authorities in psychological and educational

assessments (known as the Joint Committee).   During these meetings, certain Standards are combined, pared down, and/or augmented, others are deleted altogether, and some are created as whole new individual Standards.  The 1999 version of the Standards is nearly 200 pages, took more than five years to complete.

12.      The Standards were not created or updated to serve as a legally binding document, in response to an expressed governmental or regulatory need, nor in response to any legislative action or judicial decision.  However, the Standards have been cited in judicial decisions related to the proper use and evidence for assessment, as well as by state and federal legislators.  These citations in judicial decisions and during legislative deliberations occurred without any lobbying by the Plaintiffs.

13.      AERA has not solicited any government agency to incorporate the Standards into the Code of Federal Regulations or other rules of Federal or State agencies.

14.      Plaintiffs promote and sell copies of the Standards via referrals to the AERA website, at annual meetings, in public offerings to students, and to educational institution faculty. Advertisements promoting the Standards have appeared in meeting brochures, in scholarly journals, and in the hallways at professional meetings.   Accompanying this Declaration as Exhibit NNN is a true copy of advertisements promoting the 1999 Standards, marked as Exhibit 1218 during my deposition.

15.      All copies of the Standards bear a copyright notice.

16.      Distribution  of  the  Standards  is  closely  monitored  by  the  Sponsoring Organizations.    AERA,  the  designated  publisher  of  the  Standards,  sometimes  provides promotional complementary print copies to students or professors.   Except for these few complementary print copies, however, the Standards are not given away for free; and certainly

they are not made available to the public by any of the three organizations for anyone to copy free of charge. To date, AERA has never posted, or authorized the posting of, a digitized copy of the 1999 Standards on any publicly accessible website.

17.    The 1999 Standards have been sold at retail prices ranging from $25.95 to $49.95 per copy. From 2000 to 2014, except for the near two-year period during which Public Resource posted unauthorized copies online and sales diminished significantly, income generated from sales of the 1999 Standards, on average, had been approximately in excess of $127,000 per year.

18.    Accompanying this Declaration as Exhibit OOO is a true copy of AERA's Statement of Revenue and Expenses for the Standards from FY2000 to December 31, 2013, marked as Exhibit 1211 during my deposition.

19.    After the 2014 Standards were published in the late summer of 2014, AERA for a time discontinued sales of the 1999 Standards. This was to encourage sales of the newly-revised edition – the 2014 Standards. Accompanying this Declaration as Exhibit PPP is a true copy of the publication page for the 1999 Standards on the AERA website as of May 4, 2015 showing that the 1999 Standards were not available for sale at that time, marked as Exhibit 1196 during my deposition.

20.    However, so long as purchasers are made aware that it is no longer the current edition, the 1999 Standards do have an enduring value for those in the testing and assessment profession who (i) need to know the state of best testing practices as they existed between 1999 and 2014, (ii) believe they still may be held accountable to the guidance of the 1999 Standards even now, and/or (iii) study the changes in best testing and assessment practices over time. For this reason, in the summer of 2015 AERA resumed sales of the 1999 Standards. Accompanying this Declaration as Exhibit QQQ is a true copy of the publication page for the 1999 Standards on

the AERA website as updated during the summer of 2015, showing that the 1999 Standards are available for sale.

21.    All revenue from the sale of the 1999 Standards above expenses is used to cover the publishing costs of the Standards and for the preparation of subsequent editions of the Standards.  The Sponsoring Organizations do not distribute any proceeds from the sales of the Standards to the Sponsoring Organizations.  Rather, the income from these sales is used by the Sponsoring Organizations to offset their development and production costs and to generate funds for subsequent revisions.  This allows the Sponsoring Organizations to develop up-to-date, high quality Standards that otherwise would not be developed due to the time and effort that goes into producing them.

22.    Without receiving revenue from the sales of the Standards to offset their preparation costs and to allow for further revisions, it is very likely that the Sponsoring Organizations would no longer undertake to periodically update them, and it is unknown who else would.

23.    The Sponsoring Organizations decided on a model of self-funding of revisions of the Standards; that is, from the sale of prior editions of the Standards.  Funding for the Standards revision process from third party sources (*e.g.*, governmental agencies, foundations, other associations interested in testing and assessment issues, etc.) was rejected because of the appearance or potential of conflicts of interest and the importance of users of the Standards being able to trust in their scientific integrity.

24.    Due to the relative minor portion of the membership of AERA who devote their careers to testing and assessment, it is highly unlikely that the members of AERA will vote for a dues increase to fund future Standards revision efforts if Public Resource successfully defends

this case and is allowed to post the Standards online for the public to download or print for free. As a result, the Sponsoring Organizations would likely abandon their practice of periodically updating the Standards.

25.      The Standards were registered with the U.S. Register of Copyrights under Registration Number TX 5-100-196, having an effective date of December 8, 1999. Accompanying this Declaration as Exhibit RRR is a true copy of the December 8, 1999 Copyright Certificate of Registration for the 1999 Standards.

26.      A supplementary copyright registration for the Standards was issued by the U.S. Register of Copyrights under Supplementary Registration Number TX 6-434-609, having an effective date of February 25, 2014.  This Supplementary Registration was obtained to correct an error in the listing of copyright ownership in Registration Number TX 5-100-196. Accompanying this Declaration as Exhibit SSS is a true copy of the February 25, 2014 Supplementary Copyright Certificate of Registration for the 1999 Standards.

27.      The Joint Committee that authored the 1999 Standards comprised 16 members.

28.      Accompanying this Declaration as Exhibit TTT is a true copy of the 1999 Standards.

29.      Public Resource posted Plaintiffs' 1999 Standards to its website and the Internet Archive website without the permission or authorization of any of the Sponsoring Organizations.

30.      The Sponsoring Organizations can only speculate on the number of electronic copies of the 1999 Standards that were made and distributed to others by the original Internet users who accessed the unauthorized copies that Public Resource posted to its site and the Internet Archive site.  There simply is no way for the Sponsoring Organizations to calculate with any degree of certainty the number of university/college professors, students, testing companies

and others who would have purchased Plaintiffs' Standards but for their wholesale posting on Defendant's https://law.resource.org website and the Internet Archive http://archive.org website.

31.    In December 2013, Plaintiff AERA requested in writing that Public Resource remove the 1999 Standards from its online postings. Accompanying this Declaration as Exhibit UUU is a true copy of a letter sent from John S. Neikirk, Director of Publications at AERA, to Carl Malamud of Public Resource regarding the posting of the 1999 Standards at https://law.resource.org/pub/us/cfr/ibr/001/aera.standards.1999.pdf, marked as Exhibit 1228 during my deposition.

32.    Had Public Resource not promised to remove the 1999 Standards from its law.resource.org website and the Internet Archive website while this lawsuit is pending, and followed through with, these promises, the Sponsoring Organizations seriously contemplated moving forward with a motion to preliminary enjoin Public Resource from maintaining the unauthorized postings of electronic copies of the 1999 Standards on the Internet, and delaying publication of the 2014 Standards.

33.    By June 2014, when Public Resource finally removed its online postings of the 1999 Standards, the damage already had been done. In Fiscal Year ("FY") 2011 to FY 2012, as compared to FY 2011, the Sponsoring Organizations experienced a 34% drop in sales of the 1999 Standards. In FY 2013, sales of the 1999 Standards remained at their low level from the prior fiscal year.

34.    This is notable, given that Public Resource posted the Standards to the Internet in 2012-2013, and that the Sponsoring Organizations' updated Standards were not published until the summer of 2014.

35.    Past harm from Public Resource's infringing activities includes lost sales that

- 8 -

cannot be totally accounted for – due to potentially infinite Internet distribution; for example, by psychometrics students – and a lack of funding that otherwise would have been available for the update of the Sponsoring Organizations' Standards from the 1999 to the 2014 versions.

36.     Should Public Resource's infringement be allowed to continue, the harm to the Sponsoring Organizations, and public at large who rely on the preparation and administration of valid, fair and reliable tests, includes: (i) uncontrolled publication of the 1999 Standards without any notice that those guidelines have been replaced by the 2014 Standards; (ii) future unquantifiable loss of revenue from sales of authorized copies of the 1999 Standards (with proper notice that they are no longer the current version) and the 2014 Standards; and (iii) lack of funding for future revisions of the 2014 Standards and beyond.

Originally signed in identical form on December 15, 2015.

I declare under the penalty of perjury that the foregoing is true and correct.  Executed on February 10, 2016, in _Washington_, _DC_.

_____
Felice J. Levine

- 9 -