# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN EDUCATIONAL RESEARCH
ASSOCIATION, INC., AMERICAN
PSYCHOLOGICAL ASSOCIATION, INC., and
NATIONAL COUNCIL ON MEASUREMENT
IN EDUCATION, INC.,

        Plaintiffs/Counterclaim-Defendants,

        v.

PUBLIC.RESOURCE.ORG,

        Defendant/Counterclaim Plaintiff.

Case No. 1:14-CV-00857-TSC-DAR

**DEFENDANT PUBLIC RESOURCE'S
REPLY MEMORANDUM IN SUPPORT
OF ITS MOTION FOR SUMMARY
JUDGMENT**

Action Filed:   May 23, 2014

## [REDACTED VERSION]

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...........................................................................................................1

ARGUMENT ...............................................................................................................1

I.  CONGRESS HAS NOT CREATED, AND CANNOT CREATE, A
    STATUTORY MONOPOLY IN LAW................................................................1

    A.  The 1999 Standards Became Law in Their Entirety................................2

    B.  Congress Never Intended to Create a System of Privately Owned Law. ...............3

    C.  A System of Privately Owned Law Would Thwart the Purposes of
        Copyright and Pit Copyright Against the First and Fifth Amendments. .................6

    D.  This Is Not the Proper Forum to Evaluate Any Purported Takings
        Claim.........................................................................................11

II. OWNERSHIP OF A VALID COPYRIGHT AND ITS ENFORCEABILITY
    DEPEND UPON COPYRIGHTABILITY OF THE CLAIMED MATERIAL. ...............12

    A.  Plaintiffs Deliberately Misconstrue Public Resource's Asserted
        Defenses......................................................................................12

    B.  Any Purported Liability and Relief Must Be Limited to Original
        Expression...................................................................................13

III. AS A MATTER OF LAW, PUBLIC RESOURCE'S POSTING OF THE
     LEGALLY INCORPORATED 1999 STANDARDS TO IMPROVE PUBLIC
     ACCESS IS A NON-INFRINGING FAIR USE. ..............................................15

    A.  Reproducing Factual Material of Great Public Concern in Order to
        Inform Public Discussion Is a Transformative Purpose. .......................16

        1.  Providing Electronic Access to the 1999 Standards as Part of
            The Law Is a Transformative Purpose. .......................................16

        2.  Enhancing Access to the Law for People With Print
            Disabilities Is Also a Favored Fair Use Purpose. ........................18

    B.  The 1999 Standards Are Highly Factual; As Incorporated Standards,
        They Are Not the Type of Work Copyright Was Intended to Protect. .................22

    C.  The Entirety of the 1999 Standards Is Incorporated into Law;
        Reproducing and Disseminating the Entire Document Is Necessary to
        Inform the Public. .........................................................................22

## TABLE OF CONTENTS
### (Continued)

**Page**

D.    Evidence Shows No Present or Future Market Harm to Either the 1999
Standards or the 2014 Edition. ...............................................................................22

IV.    PLAINTIFFS HAVE NOT MET THEIR BURDEN OF ESTABLISHING
CONTRIBUTORY INFRINGEMENT. .............................................................................25

V.    CONCLUSION.................................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Inst. of Physics v. Winstead PC*,
  No. 3:12-CV-1230-M, 2013 WL 6242843 (N.D. Tex. Dec. 3, 2013) ....................................18

*\*American Institute of Physics v. Schwegman*,
  2013 WL 4666330 .................................................................................................................18

*Application of Nat'l Broad. Co., Inc.*,
  635 F.2d 945 (2d Cir. 1980)...................................................................................................10

*Authors Guild, Inc. v. HathiTrust*,
  755 F.3d 87 (2d Cir. 2014)...............................................................................................18, 20

*Authors Guild, Inc. v. HathiTrust*,
  902 F. Supp. 2d 445 (S.D.N.Y. 2012).....................................................................................20

*Authors Guild v. Google, Inc.*,
  804 F.3d 202 (2d Cir. 2015)...................................................................................................17

*\*Banks v. Manchester*,
  128 U.S. 244 (1888).................................................................................................................8

*\*Bldg. Officials & Code Adm. v. Code Tech., Inc.*,
  628 F.2d 730 (1st Cir. 1980)....................................................................................................8

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994)...............................................................................................................22

*CCC Information Services Inc. v. McLean Hunter Market Reports, Inc.*,
  536 F.3d 121 (2d Cir. 2008)......................................................................................................4

*Clark v. Martinez*,
  543 U.S. 371 (2005).................................................................................................................6

*Computer Assocs. Int'l, Inc. v. Altai, Inc.*,
  982 F.2d 693 (2d Cir. 1992)...................................................................................................14

*Consumers Union of U.S., Inc. v. Gen. Signal Corp.*,
  724 F.2d 1044 (2d Cir. 1983).................................................................................................22

*CoStar Realty Info., Inc. v. Field*,
  737 F. Supp. 2d 496 (D. Md. 2010) .......................................................................................26

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*,
    122 F.3d 1211 (9th Cir. 1997) ...................................................................14

*\*Golan v. Holder*,
    132 S. Ct. 873 (2012) ................................................................................15

*Hassett v. Welch*,
    303 U.S. 303 (1938) ....................................................................................4

*\*Kern River Gas v. Coastal Corp.*,
    899 F.2d 1458 (5th Cir. 1990) .....................................................................4

*\*Lambert v. California*,
    355 U.S. 225 (1957) ...............................................................................7, 10

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005) ..................................................................................28

*Mid Am. Title Co. v. Kirk*,
    59 F.3d 719 (7th Cir. 1995) ......................................................................14

*Nixon v. United States*,
    978 F.2d 1269 (D.C. Cir. 1992) ................................................................12

*North Jersey Media Group v. Pirro*,
    74 F. Supp. 3d 605 (S.D.N.Y. 2015)..........................................................17

*Online Policy Group v. Diebold, Inc.*,
    337 F. Supp. 2d 1195 (N.D. Cal. 2004) .....................................................17

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) .............................................................26, 27

*Practice Management Information Corp. v. American Medical Ass'n*,
    121 F.3d 516 (9th Cir. 1997) .......................................................................4

*R.W. Beck, Inc. v. E3 Consulting*,
    577 F.3d 1133 (10th Cir. 2009) ...................................................................3

*Righthaven v. Jama*,
    No. 2:10-CV-1322, 2011 WL 1541613 (D. Nev. April 22, 2011) .............16

*Sega Enters., Ltd. v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir. 1992) ...................................................................21

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
 464 U.S. 417 (1984)...................................................................................6, 20, 26, 27

*Stewart v. Abend*,
 495 U.S. 207 (1990).................................................................................................19

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
 756 F.3d 73 (2d Cir. 2014).................................................................................16, 17

*Ticketmaster v. RMG Techs., Inc.*,
 507 F. Supp. 2d 1096 (C.D. Cal. 2007) ...................................................................26

*United States v. Myers*,
 553 F.3d 328 (4th Cir. 2009) .....................................................................................4

*United States v. Quinn*,
 403 F. Supp. 2d 57 (D.D.C. 2005)............................................................................27

*Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*,
 618 F.3d 417 (4th Cir. 2010), as amended Aug. 24, 2010.......................................14

*Veeck v. S. Bldg. Code Cong. Int'l, Inc.*,
 293 F.3d 791(5th Cir. 2002) ............................................................................ *passim*

*Veeck v. S. Bldg. Code Cong. Int'l, Inc.*,
 49 F. Supp. 2d 885 (E.D. Tex. 1999)..........................................................................4

*Wheaton v. Peters*,
 33 U.S. 591 (1834)..................................................................................................8, 9

STATUTES

1 C.F.R. part 51 ...........................................................................................................2

34 C.F.R. § 668.146(b)(6)...........................................................................................2

5 U.S.C. § 552(a) ........................................................................................................2

17 U.S.C. § 102 ("Copyright Act")..................................................................... *passim*

17 U.S.C. § 102(b) ..................................................................................3, 11, 12, 13

17 U.S.C. § 105...........................................................................................................5

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

17 U.S.C. § 106(1) ...........................................................................................26

17 U.S.C. § 107 ...............................................................................................19

17 U.S.C. §§ 108–122 ....................................................................................19

17 U.S.C. § 121 ...............................................................................................19

H.R. Rep. No. 90–83 (1967) .........................................................................20

H.R. Rep. No. 94–1476, 94th Cong., 2d Sess. (1976) ..................................5

H.R. Rep. No. 104–3802, 104th Cong., 2d Sess. (1996) .......................10, 11

N.Y. Comp. Codes, R. & Regs. tit. 11, § 216.7(c)(1)(i) (West 1999) ...........4

Pub. L. No. 74-220, ch. 417, 49 Stat. 500-503 (July 26, 1935)
    ("Federal Register Act") ...........................................................................7

Pub. L. No. 104–231 § 4(7), 110 Stat. 3048 ................................................10

### OTHER AUTHORITIES

1 Goldstein, Paul, Goldstein on Copyright § 2.5.2 (3d Ed. 2014) ................11

4 Nimmer on Copyright § 13.03[F][3] ..........................................................14

*Browse Publications*, The U.S. Government Publishing Office  (last accessed
    Feb. 2, 2016), https://www.gpo.gov/fdsys/browse/collectiontab.action ..................................10

Compendium of U.S. Copyright Office Practices § 309.2 (3d ed. 2014) ......14

 "Law," Oxford English Dictionary, *available at*
    https://www.oxforddictionaries.com ..........................................................3

*Oil Suit Dismissed in Supreme Court*, N.Y. Times, Oct. 2, 1934 .................7

Peterson, L. Ray & Joyce, Craig, Monopolizing the law: the scope of
    Copyright Protection for Law Reports and Statutory Compilations,
    36 UCLA L. Rev 719 (1999) .....................................................................3

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

Report of the Advisory Commission on Accessible Instructional Materials in
    Postsecondary Education for Students with Disabilities, December 6, 2011,
    p. 21, *available at* http://www2.ed.gov/about/bdscomm/list/aim/meeting/aim-
    report.pdf ................................................................................................................... 21

Scalia, Antonin, *The Rule of Law as a Law of Rules*,
    56 U. Chi. L. Rev. 1175 (1989) ................................................................................ 7

Seidenfeld, Mark, *A Big Picture Approach to Presidential Influence on
    Agency Policy-Making*, 80 Iowa L. Rev. 1, 9–10 (1994) ......................................... 8

Short, Jodi L., *The Political Turn in American Administrative Law:
    Power, Rationality, and Reasons*, 61 Duke L.J. 1811, 1821 (2012) ......................... 8

U.S. Constitution, First Amendment ............................................................................ 15

U.S. Copyright Office, Report on Copyright and Digital Distance Education 162
    (1999) ...................................................................................................................... 20

U.S. Department of Justice, Civil Rights Division, "Accessibility of State and
    Local Government Websites to People with Disabilities,"
    http://www.ada.gov/websites2.htm .......................................................................... 16

Update of Revised and Reaffirmed Documents Incorporated by Reference, 75
    Fed. Reg. 22219 (April 28, 2010); *available at*
    https://www.federalregister.gov/articles/2010/04/28/2010-9612/update-of-
    revised-and-reaffirmed-documents-incorporated-by-reference ................................. 2

**INTRODUCTION**

The Constitution, numerous courts, the Copyright Office, and the Copyright Act all support the vital proposition that the law belongs to the public. The public has core due process and First Amendment rights to know and to share the law, without financial or practical barriers. A copyright in the law runs afoul of those rights, because it gives the rights claimant the ability to charge for, impede, ration, and even cut off access to the law—in Plaintiffs' words, to "prevent . . . unwanted use." ECF No. 89, Plaintiffs' Opposition Memorandum ("Pls. Opp.") at 44. The only way to reconcile that contradiction is to find that the law is outside of copyright.

Plaintiffs seek to avoid this principle by suggesting that, if a private person is the initial drafter of rules that become legal mandates, such as the 1999 Standards, that person retains the right to control the distribution of those rules (with a narrow public availability provision). That suggestion is false. Once incorporated by reference into the code of federal regulations, the 1999 edition of the Standards for Educational and Psychological Testing ("1999 Standards") took on the force and effect of law. It *is* law. Neither the Constitution nor the Copyright Act tolerates private control over access to it, no matter how or by whom it was developed. Moreover, that principle is neither novel nor surprising. Private entities have contributed to the creation of the law since the founding of this nation, but our courts have never held that those contributions could be subject to copyright protection.

The Court should grant summary judgment to Public Resource.

**ARGUMENT**

**I.    CONGRESS HAS NOT CREATED, AND CANNOT CREATE, A STATUTORY MONOPOLY IN LAW.**

Plaintiffs' principal argument is that the copyright status of standards that have become law through incorporation by reference is a decision for Congress. Congress has already made

that decision: the Copyright Act does not allow a monopoly in legally incorporated standards. Indeed, the Constitution would forbid any other outcome.

**A.      The 1999 Standards Became Law in Their Entirety.**

As an initial matter, Plaintiffs' repeated insistence that the entire set of 1999 Standards has not been incorporated into law is simply incorrect. Pls. Opp. 1, 2, 11, 12, 15, 18, 20. As Public Resource explained in its Motion for Summary Judgment (ECF No. 68/69 ("P.R.O. Mem."), the laws incorporating the 1999 Standards do not single out particular portions or language; they refer to the entire document. For example, Plaintiffs misleadingly quote from 34 C.F.R. § 668.146(b)(6), but the full reference states that the entire 1999 Standards document is incorporated by reference into law:

> To be approved under this subpart, a test must . . . meet all standards for test construction provided in the 1999 edition of the *Standards for Educational and Psychological Testing*, prepared by a joint committee of the American Educational Research Association, the American Psychological Association, and the National Council on Measurement in Education incorporated by reference in this section. Incorporation by reference *of this document* has been approved by the Director of the Office of the Federal Register pursuant to the Director's authority under 5 U.S.C. 552(a) and 1 CFR part 51.

(emphasis added). Further, federal policy is clear: "The legal effect of incorporation by reference is that the material is treated as if the *entire document* was published in the Federal Register." Update of Revised and Reaffirmed Documents Incorporated by Reference, 75 Fed. Reg. 22219 (April 28, 2010)[1] (emphasis added). Indeed, the 1999 Standards *document* had to be incorporated in its entirety, because the actual standards are not complete without the authoritative and official text that accompanies them, which explains and amplifies the basic statements.

---

[1] *Available at* https://www.federalregister.gov/articles/2010/04/28/2010-9612/update-of-revised-and-reaffirmed-documents-incorporated-by-reference.

**B.      Congress Never Intended to Create a System of Privately Owned Law.**

Congress has codified the principle that law is not subject to copyright in several ways. Section 102(b) of the Copyright Act, 17 U.S.C. § 102(b), precludes copyright for "any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." Law is a "system of rules that a particular country or community recognizes as regulating the actions of its members and may enforce by the imposition of penalties."[2] As such, the law is outside the scope of copyright pursuant to the Copyright Act itself.

Put another way, there was no need for Congress to make an explicit reference to *law* in Section 102(b); law already falls squarely within the existing categories of things that Section 102(b) declares outside the scope of copyright. Section 102(b) helps ensure that "courts do not unwittingly grant protection to an idea by granting exclusive rights in the only, or one of only a few, means of expressing that idea." *R.W. Beck, Inc. v. E3 Consulting*, 577 F.3d 1133, 1145 (10th Cir. 2009) (citation omitted). The only way to express codified laws, or law that is incorporated by reference from other sources, is to use the language of the law itself.

The *Veeck* decision represents a sensible and natural recognition that the same principle holds true for laws incorporated by reference. Once incorporated into law, the court held, standards become "the unique, unalterable expression of the 'idea' that constitutes local law." *Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791, 801 (5th Cir. 2002). Under section 102(b), they cannot be subject to copyright restrictions. *See generally* L. Ray Peterson & Craig Joyce, Monopolizing the law: the scope of Copyright Protection for Law Reports and Statutory Compilations, 36 UCLA L. Rev 719, 777 (1999) ("[C]opyright protection is driven by a

---

[2] "Law," Oxford English Dictionary, *available at* https://www.oxforddictionaries.com/.

3

fundamental policy of ensuring maximum access to the law . . . [T]he need of the public, the bench and the bar for maximum access to the law requires that the courts weigh that consideration carefully in construing provisions of [the Copyright Act], such as sections 102 . . . .").

Plaintiffs' attempt to distinguish *Veeck* on its facts is vain. The building codes at issue in that case became laws in the same manner as the standards at issue here: "by reference." *Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 49 F. Supp. 2d 885, 887 (E.D. Tex. 1999). When the Fifth Circuit distinguished the building codes at issue in *Veeck* from "references to extrinsic standards," the court was distinguishing between the "wholesale adoption" of formerly private standards into law and mere reference to external documents in regulations, as in *CCC Information Services Inc. v. McLean Hunter Market Reports, Inc.*, 536 F.3d 121 (2d Cir. 2008), and *Practice Management Information Corp. v. American Medical Ass'n*, 121 F.3d 516 (9th Cir. 1997). *Veeck*, 293 F.3d at 804. "The general rule is that when one statute adopts a provision of another statute by specific reference, *it is as if the adopting statute had itself spelled out the terms of the adopted provision*." *United States v. Myers*, 553 F.3d 328, 331 (4th Cir. 2009) (emphasis added) (citing *Hassett v. Welch*, 303 U.S. 303, 314 (1938)). The references at issue in *CCC,* for example, merely stated "[m]anuals approved for use are . . . The Redbook . . . .," without any mention of incorporation. N.Y. Comp. Codes, R. & Regs. tit. 11, § 216.7(c)(1)(i) (West 1999). Here, as in *Veeck*, we have a record of a government agency's explicit intent to transform a specific document into a law.

Plaintiffs also misrepresent *Kern River Gas v. Coastal Corp.,* 899 F.2d 1458 (5th Cir. 1990), by suggesting that a regulatory commission's approval of the pipeline route that was reproduced in a later competing proposal had nothing to do with the merger analysis. Pls. Opp.

25. In fact, as the court found, "[s]taff approval was significant because any proposed pipeline constructed within the mile-wide corridor would require no further environmental study, whereas any route falling outside the corridor would be subject to further inquiry . . . . *To extend copyright protection to the quad maps would grant Kern River a monopoly over the only approved pipeline route*." *Id.* at 1460, 1464–65 (emphasis added).

Moreover, as Public Resource explained in its earlier briefing, section 105 of the Copyright Act denies copyright for any work of the U.S. Government. A law drafted by a private lobbyist, passed by Congress, and signed by the President becomes a U.S. Government work, as does a regulation that an agency enacts by incorporating by reference a pre-existing standard. Although Plaintiffs quote a statement from legislative history of the 1976 Act, that statement concerned "Government research contracts and the like." H.R. Rep. No. 94–1476, 94th Cong., 2d Sess., at 59 (1976). It makes perfect sense that Congress would hesitate to exclude all such research from copyright protection. But that does not suggest that members of Congress who wrote that analysis meant to exclude *laws and regulations* from section 105 regarding U.S. Government works.

Further, Plaintiffs are wrong when they claim that "no legislation directly addresses the incorporation by reference of a private work"; the Code of Federal Regulations, in conjunction with the Freedom of Information Act, do precisely that. They create a procedure that is legally equivalent to copying the text of a private work into the Code itself. As with any legislative or regulatory enactment, the incorporation by reference procedure creates a government work.

As U.S. Solicitor General has noted, any other rule could lead to absurd results. As he noted in an amicus brief opposing certiorari in the *Veeck* case:

If copyright protection [for technical codes adopted as law] were nonetheless recognized, there would be "no outer limit on claims of copyright prerogatives by

> nongovernmental persons who contribute to writing 'the law'" such as lobbyists or law professors. An individual who drafted a statute or amendment later adopted by Congress could claim copyright in the text.

Brief for the United States as Amicus Curiae at 15, quoting *Veeck*, 293 F.3d at 799, available at https://www.justice.gov/osg/brief/southern-building-code-v-veeck-amicus-petition. Amici Law Scholars in this case also offer a detailed discussion of the consequence of treating standards incorporated by reference as copyrighted works, given the long tradition of private contributions to statute, regulations and the like. Brief of Amici Law Scholars, ECF No. 86, at 15–17. Public Resource urges the court to review it carefully.

There is no need to wait for Congress to contemplate whether standards that have been incorporated into law should be copyrightable and therefore subject to private restriction. Congress and the courts have already spoken.

### C.     A System of Privately Owned Law Would Thwart the Purposes of Copyright and Pit Copyright Against the First and Fifth Amendments.

The Copyright Act is clear in excluding law from its scope. To the extent there is any ambiguity in the Act, however, constitutional avoidance favors an interpretation that best reconciles the statute with the Constitution. *See Clark v. Martinez*, 543 U.S. 371, 380–81 (2005). Public Resource's interpretation does so; Plaintiffs' interpretation does not.

Allowing a copyright monopoly over laws, with all of the exclusive private power to suppress and control dissemination that copyright entails, would run contrary to the very purposes of copyright, which is intended to create a public benefit, not private gain. "The monopoly privileges that Congress may authorize are neither unlimited nor primarily designed to provide a special private benefit. Rather, the limited grant is a means by which an important public purpose may be achieved." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984). Recognizing that texts of the law embody ideas, expressible in only one

6

accurate and authoritative way (just as a statute is expressible only in one way), respects both the Copyright Act and the Constitution.

"Rudimentary justice requires that those subject to the law must have the means of knowing what it prescribes." Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1179 (1989). There are at least two reasons for this. The first and most familiar one is simple notice: anyone subject to a law, including administrative rules, must be able to know her obligations. As the Supreme Court held in a case involving a registration requirement, "Where a person did not know of the duty to register and where there was no proof of the probability of such knowledge, he may not be convicted consistently with due process. Were it otherwise, the evil would be as great as it is when the law is written in print too fine to read or in a language foreign to the community." *Lambert v. California*, 355 U.S. 225, 229–30 (1957). Indeed, one of the principal historical events leading to the Federal Register Act (Pub. L. No. 74-220, ch. 417, 49 Stat. 500-503 (July 26, 1935)) was a government action to enforce an administrative oil quota rule that, it turned out, did not exist. *See Oil Suit Dismissed in Supreme Court*, N.Y. Times, Oct. 2, 1934, at 6. Further, anyone affected by a law, such as a person who lives near a pipeline, or a parent choosing a car seat, must have free access to the standards for evaluating their safety, if they wish, so they can make informed decisions and understand the regulatory framework that lawmakers have constructed.

The other reason for the public to know the law is accountability. For citizens to participate in a democracy, from the electoral process to discussions of public affairs, they must be able to learn what the government is up to. Indeed, that right is especially important when it comes to standards. The public cannot blindly rely on the federal or state agencies that adopt private standards into law to ensure that those standards serve the public interest. Therefore, as in

every other area of law, the public must have the ability to do that work itself and register concerns with the legislatures that can provide a check on those agencies' actions. *See* Jodi L. Short, *The Political Turn in American Administrative Law: Power, Rationality, and Reasons*, 61 Duke L.J. 1811, 1821 (2012); Mark Seidenfeld, *A Big Picture Approach to Presidential Influence on Agency Policy-Making*, 80 Iowa L. Rev. 1, 9–10 (1994).

Thus, as the First Circuit observed, the public has an "essential due process right of free access to the law." *Bldg. Officials & Code Adm. v. Code Tech., Inc.*, 628 F.2d 730, 736 (1st Cir. 1980). Copyright restrictions on the law necessarily condition and even impede that access. That fundamental contradiction animated the Supreme Court's ruling, in *Banks v. Manchester*, 128 U.S. 244 (1888), that a judicial opinion is not under copyright because it is "the authentic exposition and interpretation of the law which, *binding on every citizen*, is free for publication to all, whether it is a declaration of unwritten law, or an interpretation of a statute." *Id.* at 253 (emphasis added). The same holds true for any form of law.

That principle is also integral to the Fifth Circuit's opinion in *Veeck*. The court quoted at length the briefing in *Wheaton v. Peters*, in which counsel for both sides offered some of the earliest thinking in the nation on this very issue. 33 U.S. 591 (1834). Wheaton's counsel conceded that "statutes [could] never [be] copyrighted" because they were enacted by legislatures. *Veeck*, 293 F.3d at 795 n.3. Peters' counsel, for his part, observed that "[i]t is . . . the true policy, influenced by the essential spirit of the government, that laws of every description should be universally diffused. To fetter or restrain their dissemination must be to counteract this policy; to limit, or even to regulate it, would, in fact, produce the same effect. If either statutes or decisions could be made private property, it would be in the power of an individual to shut out

the light by which we guide our actions." *Id.* (quoting *Precis of Argument by Counsel for Wheaton* [petitioner], 33 U.S. (8 Pet.) at 615–20).

Allowing organizations to own exclusive rights to control the law, through the guise of copyright, would necessarily mean that those copyright claimants could dictate the terms of public access to the law, without care for those due process rights. As the State of Ohio and ten other states and territories noted in an amicus brief filed in support of Peter Veeck, one of the cornerstones of copyright is the ability to refuse to publish the document at all – a right Plaintiffs explicitly claim here. Brief of Amicus Curiae States of Ohio and Ten Other States and Territories 14–16, *Veeck*, 293 F.3d 791 (Index of Consolidated Exhibits ("ICE") Ex. 74, ECF No. 70-73); Pls. Opp. at pp. 28, 44. Plaintiffs assert that citizens are free to access and share the law – as long as they "lawfully purchase" it. Pls. Opp. 29. Imposing a purchase price on access to the law systematically excludes those with budgetary constraints from holding both agencies and the entities they regulate accountable for the rules the agencies adopt and from studying those rules closely in order to comply with them. Those fees amount to a charge to participate in civic affairs – analogous to, and no more acceptable than, a poll tax.

By the same token, Plaintiffs' suggestion that due process is effectively met through sales, the availability of a few library copies, and (presumably) the deposit requirement offers a poor view of our constitutional rights.[3] Just as Emperor Caligula's decision to impede Romans'

---

[3] Indeed, as explained in Public Resource's evidentiary objections, Plaintiffs far overstate even the availability of library copies. Plaintiffs' evidence on this point is a WorldCat search showing 1035 results for "all 69 editions." While some of these 69 editions are the 1999 Standards (WorldCat treats the 2002 reprint as a different edition), it also includes German versions, the 1985 Standards, the 2014 Standards, and all their respective different translations and reprintings going back to 1966. These 1035 results also include libraries throughout the world, in places like Hong Kong and Switzerland, further limiting the copies readily available to U.S. citizens.

access to the law offends our sense of justice,[4] so too should the idea that the public can access

the law only through gatekeepers, whether benevolent or not – and that those who wish to

communicate that law can be prevented from doing so. It is equivalent to, as the Supreme Court

put it in *Lambert*, writing the law in "print that is too fine to read." And it is particularly

offensive in the digital age, when it is possible to make the law available widely, at relatively

little expense. As many courts have recognized, our right to access public documents

traditionally has evolved as technology has evolved. For example, as the Second Circuit has

noted "[t]he common law right to inspect and copy public records originally permitted copying

*the content* of written documents. With the advent of modern means of document

reproduction, . . . the right was applied to copying the physical embodiment of the document."

*Application of Nat'l Broad. Co., Inc.,* 635 F.2d 945, 950 (2d Cir. 1980).

Moreover, Congress, and the executive branch have consistently taken steps to use new

technologies to improve access to all kinds of government information and documents because,

in part, it is understood that they are *facts* that the public must be able to easily access and

communicate in order to fully participate in our democracy. Court documents – including briefs

by private parties– are available on PACER, and there is no charge to access judicial opinions.

The U.S. Code and the CFR are freely available online.[5] In 1996, Congress passed the Electronic

Freedom of Information Act Amendments in order to "foster democracy by ensuring public

access to agency records and information." Pub. L. No. 104–231 § 4(7), 110 Stat. 3048. Six

years later, it passed the e-Government Act, requiring agencies to create electronic rulemaking

---

[4] See P.R.O. Mem. 26.

[5] *See Browse Publications*, The U.S. Government Publishing Office (last accessed Feb. 2, 2016),
https://www.gpo.gov/fdsys/browse/collectiontab.action.

dockets, in order to increase "access, accountability and transparency" and "enhance public participation in Government." H.R. Rep. No. 104–3802, 104th Cong., 2d Sess., at 1 (1996).

"Copyright, while authorized by the Constitution, is essentially a statutory right. On the other hand, due process is a constitutional right of the first order." States' Amicus at 4 (ICE Ex. 74, ECF No. 70-73). If Congress had intended to create a system of privately owned public law, which it did not, such a system could not pass constitutional muster. Indeed, Plaintiffs' own actions in seeking to constrain access to the 1999 Standards confirm that it would place an impermissible burden on a fundamental constitutional right. Properly interpreting section 102(b), and the related merger doctrine, as applying to laws, including standards that have become law through incorporation by reference, avoids that constitutional tension altogether.

**D.      This Is Not the Proper Forum to Evaluate Any Purported Takings Claim**

Plaintiffs contend that denying them the power to control the distribution of the 1999 Standards amounts to a regulatory taking that would cause them "severe economic harm." They offer no evidence of such harm; indeed, as explained in Public Resource's opening brief, the facts suggest otherwise. P.R.O. Mem. 55–57. Moreover, Plaintiffs have also failed to rebut evidence showing that they lobbied members of Congress and other policy makers to enact the 1999 Standards into law, and therefore they cannot now claim that the fruit of their endeavor is a "taking." P.R.O. Mem. 22–24.

In any event, this litigation is not the place to determine whether a taking has occurred, or whether (or how much) Plaintiffs should be compensated. This is particularly true given that, as Professor Paul Goldstein has noted, "trade organizations have powerful reasons stemming from industry standardization, quality and self-regulation" to produce model codes and therefore do not need copyright incentives. 1 Paul Goldstein, Goldstein on Copyright § 2.5.2 (3d Ed. 2014). There is an established procedure for answering those questions: through a separate

compensation action brought against the government. *See, e.g., Nixon v. United States*, 978 F.2d 1269, 1298 (D.C. Cir. 1992) (Henderson, J., concurring). Given the benefits they receive from incorporation, Public Resource doubts that most SDOs would challenge the government. But a threat to do so, even if unlikely, should not excuse the Plaintiffs' effort to interfere with the public's constitutional right to access and share the laws to which all are subject.

## II.  OWNERSHIP OF A VALID COPYRIGHT AND ITS ENFORCEABILITY DEPEND UPON COPYRIGHTABILITY OF THE CLAIMED MATERIAL.

### A.  Plaintiffs Deliberately Misconstrue Public Resource's Asserted Defenses

Plaintiffs' argument that Public Resource did not plead merger, the *scenes a faire* doctrine, or the systems, processes, and procedures bar of section 102(b) in Public Resource's Answer and Counterclaim is incorrect. Among Public Resource's nine affirmative and other defenses, Public Resource included:

2.   Plaintiffs have no copyrights in works that government entities have incorporated by reference into law.
3.   Lack of ownership of the alleged copyrights bars Plaintiffs' claims.

(ECF No. 12, Public Resource's Answer and Counterclaim, p. 25). Merger, the *scenes a faire* doctrine, and the systems, processes, and procedures bar are subsets of the broader argument that Plaintiffs do not own the copyright that they assert, both because of incorporation into law, and to the extent that the 1999 Standards contain vast amounts of material that are not copyrightable subject matter. There is no requirement for details of arguments to appear as "affirmative defenses" when the general topic that embraces them has been pleaded.[6] Indeed, every copyright case must turn, in part, on the metes and bounds of the copyright, because that always shapes, in turn, the infringement analysis.

---

[6] Notably, Plaintiffs cite no case law for their argument that merger, *scenes a faire*, and the systems, processes, and procedures bar of 17 U.S.C. § 102(b) are affirmative defenses.

Moreover, Public Resource explained those defenses in detail in response to Plaintiffs'

Interrogatory 8, which asked: "State the factual and legal basis of each Affirmative and Other

Defense to Plaintiffs' Complaint . . . ." Public Resource responded in detail over fourteen pages,

specifically citing 17 U.S.C. § 102 for the systems, processes, and procedures bar, and stating

that "[b]ecause the 1999 Standards are technical documents with a functional purpose, there is

only one correct way to present the functional information contained in the 1999 Standards, and

that is verbatim. Therefore Plaintiffs do not own a valid copyright for the 1999 Standards

because they are uncopyrightable." Reply Declaration of Matthew Becker in Further Support of

Public Resource's Motion for Summary Judgment ("Becker Reply Decl.") ¶ 8, Ex. 81, p. 7. The

parties focused on these issues throughout discovery; Plaintiffs never before this motion

indicated that they failed to understand the nature of Public Resource's defenses; and Plaintiffs

never before now contended that Public Resource's response to Interrogatory no. 8 did not

pertain to the defenses that Public Resource pleaded.

Plaintiffs have had fair notice no matter how they interpret Public Resource's Answer.

**B.      Any Purported Liability and Relief Must Be Limited to Original Expression**

Plaintiffs fundamentally misunderstand Public Resource's more general section 102(b)

challenge to their copyright claim. Public Resource is not claiming that no part of the 1999

standards, *as standards*, is sufficiently creative to merit copyright protection prior to

incorporation; indeed PRO conceded that there may be some minimally creative materials, such

as the prefatory materials and commentary. P.R.O. Mem. 32. But Plaintiffs cannot hold Public

Resource liable for, or enjoin it from, replicating expression that is *not* original and, therefore,

not copyrightable.

Plaintiffs' reliance on its registration does not suffice to avoid this issue. A copyright registration certificate merely creates a rebuttable presumption of validity. *See, e.g., Mid Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995). The effect of this presumption is limited, because the Copyright Office "will not conduct its own factual investigation to confirm the truth of the statements made in the application." *See* Compendium of U.S. Copyright Office Practices § 309.2 (3d ed. 2014). Accordingly, "the Copyright Office's practice of summarily issuing registrations . . . counsels against placing too much weight on registrations as proof of a valid copyright." *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc*., 618 F.3d 417, 428 (4th Cir. 2010), as amended Aug. 24, 2010. To shift the burden of proof back to the copyright claimants, Public Resource must simply offer some evidence rebutting ownership of a valid copyright. *See, e.g., Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc*., 122 F.3d 1211, 1217–18 (9th Cir. 1997).

Plaintiffs' own exhibit offers evidence sufficient to raise doubt as to the copyrightability of the *entire* work. For example, the *scenes a faire* doctrine excludes from copyrightability Standard 1.1, which states a generic conclusion dictated by the current state of technical information on test development and use, as articulated by participants in the standards development process: "A rationale should be presented for each recommended interpretation and use of test scores, together with a comprehensive summary of the evidence and theory bearing on the intended use or interpretation." Pls. Mot. Ex. TTT (ECF No. 60-85, p. 17). That conclusion, as a summary of the joint opinions of experts in the field, must be the result of factors external to the developers' creativity and, as such, the developers cannot claim a monopoly in it. *See* 4 Nimmer on Copyright § 13.03[F][3]; *see also Computer Assocs. Int'l, Inc. v. Altai, Inc*., 982 F.2d 693, 709–10 (2d Cir. 1992). Prior to legal incorporation, however, Public Resource was

prepared to concede that the commentary that follows, and that is necessary to explain the Standard, may have been subject to copyright protection–though a thin protection at best.

Importantly, however, *Plaintiffs themselves* refuse to distinguish the factual and expressive aspects of the document. ████████████████████████████████ ████████████████████████████████ P.R.O. SMF ¶ 95; ICE Ex. 43 (Levine Ex. 1214); ICE Ex. 5 (Levine Dep. 164:6–169:4). In other words, Plaintiffs refuse to distinguish between text that is obviously factual (like a recipe) and text that is expressive (like a photo or an account of the recipe as a part of family history). On Plaintiffs' own account, then, the facts and expression of the 1999 standard are inseparably merged. Given their own course of conduct, they cannot meet their burden of showing otherwise.

## III.    AS A MATTER OF LAW, PUBLIC RESOURCE'S POSTING OF THE LEGALLY INCORPORATED 1999 STANDARDS TO IMPROVE PUBLIC ACCESS IS A NON-INFRINGING FAIR USE.

In addition to the due process concerns outlined above, Plaintiffs' claim to own exclusive rights in the law creates an unnecessary tension between the Copyright Act and the First Amendment. The right to share the law is fundamental to free speech on matters of public import. Plaintiffs claim a right to restrain that speech, and they strive to limit public access to the contents of important federal and state regulations.

Should the Court conclude that the Plaintiffs continue to hold a limited monopoly in the 1999 Standards, it can at least partially resolve that tension by applying the fair use doctrine. *See Golan v. Holder*, 132 S. Ct. 873, 890 (2012). As the Supreme Court stated in *Golan*, "First Amendment protections are 'embodied in the Copyright Act's distinction between copyrightable expression and uncopyrightable facts and ideas,' and in the 'latitude for scholarship and comment' safeguarded by the fair use defense." *Id.* (internal citation omitted).

That is precisely the case here. Public Resource enhances public access to governmental

facts and the documents that embody them, factual materials of the utmost public concern. This case arises in a context where the need for copyright-based incentives for authors and publishers is at its weakest. Even if the Court were to find that Plaintiffs could hold a copyright statutory monopoly in a segment of enforceable state and federal law, the firmly established precedent and policy considerations Public Resource discussed above, all four of the statutory factors, and the constitutional purpose of copyright all support a determination that Public Resource's use is a fair use as a matter of law.

**A.    Reproducing Factual Material of Great Public Concern in Order to Inform Public Discussion Is a Transformative Purpose.**

**1.    Providing Electronic Access to the 1999 Standards as Part of The Law Is a Transformative Purpose.**

Public Resource's purposes, activities, and communications to the public are not in dispute: its posting of the 1999 Standards was part of a project to make the complete contents of federal regulations available to all citizens through the Internet, the medium through which most citizens receive and access information about the workings of government. P.R.O. SMF ¶¶ 2–4; *see* U.S. Department of Justice, Civil Rights Division, "Accessibility of State and Local Government Websites to People with Disabilities," http://www.ada.gov/websites2.htm (Becker Reply Decl. ¶ 9, Ex. 82). This is a transformative purpose, especially because Plaintiffs actively restrict and discourage access to the legally incorporated 1999 Standards both in print and online. P.R.O. Mem. 57–58; P.R.O. SMF ¶ 58; *See* Pls. Answer ¶¶ 14, 19 (ECF No. 14).

Numerous cases have held that posting material of great public importance online to enable commentary and criticism by others is a purpose that supports fair use. *See, e.g., Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 84 (2d Cir. 2014) (posting recording and transcript of corporate financial presentation online was fair use); *Righthaven v. Jama*, No. 2:10-CV-1322, 2011 WL 1541613, at *3 (D. Nev. April 22, 2011) (posting entire newspaper article

concerning accusations of police misconduct on website of nonprofit group was fair use); *Online Policy Group v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1203 (N.D. Cal. 2004) (posting archive of company's emails online was fair use).

*Swatch Group*, in particular, held that "the need to convey information to the public accurately may in some instances make it desirable and consonant with copyright law for a defendant to faithfully reproduce an original work without alteration." 756 F.3d at 84. Public Resource's consistent, undisputed purpose for posting legally incorporated standards is analogous to the defendant's news reporting purpose in *Swatch Group*. And as in *Swatch Group*, it is immaterial to the transformative purpose that the copyright claimant itself made the material available to the public in limited fashion (in that case, to financial analysts). *Expanding* access is a transformative purpose in both contexts. Contrary to Plaintiffs' argument, for which they cite no authority, enabling non-parties to access and engage with material of public importance and thereby "augment[] public knowledge" is very relevant to the transformativeness inquiry. *Authors Guild v. Google, Inc.*, 804 F.3d 202, 207 (2d Cir. 2015).

Plaintiffs look to *North Jersey Media Group v. Pirro*, which they claim shows a lack of transformative purpose by Public Resource. 74 F. Supp. 3d 605 (S.D.N.Y. 2015); Pls. Opp. 31–32. But that case is easily distinguishable. The defendant in that case did not "use existing content for a materially different purpose, or disseminate existing content to a new audience that might not have seen it otherwise." *Id.* at 615. Public Resource does both of these things. P.R.O. SMF ¶¶ 1–5. The *North Jersey* court also found issues of material fact as to whether Fox News used the photo at issue for a commercial purpose. 74. F. Supp. 3d at 617–19. Public Resource's purpose is non-commercial. P.R.O. SMF ¶¶ 5–7. *Swatch Group* and *Diebold*, rather than *North Jersey*, are factual analogues to this case.

17

Plaintiffs misconstrue the phrase "indifferent to the copyrightable means of expression," as used in *American Institute of Physics v. Schwegman*, 2013 WL 4666330, at *12, to refer to a defendant's state of mind. Pls. Opp. 33. This is incorrect. It refers to a well-established variety of transformative use: a use for which the alleged creativity, utility, or labor embodied in a work is "merely incidental." *Am. Inst. of Physics v. Winstead PC*, No. 3:12-CV-1230-M, 2013 WL 6242843, at *5 (N.D. Tex. Dec. 3, 2013); *see also Schwegman*, 2013 WL 4666330, at *12; P.R.O. Mem. 32. As in those cases, Public Resource's use of the 1999 Standards has an "evidentiary character," as its purpose is to provide the public with evidence of what the law is. *Schwegman*, 2013 WL 4666330, at *12. Like evidence submitted in a court proceeding, the law is the law whether it is useful or not, creative or not. This makes the use of the 1999 Standards *as regulations* transformative. *See id.*

Providing *electronic* access is also particularly transformative because, even before Plaintiffs stopped marketing the 1999 Standards, they suppressed electronic access. P.R.O. SMF ¶ 50. Finally, contrary to Plaintiffs' assertion, Pls. Opp. 32–33, the emphasis of the court in *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014), on limiting readership in that case does not apply here because that case concerned thousands of books of all sorts – from novels to scientific works – while this case concerns only a legally incorporated standard that must, by law, be *reasonably* available to the public.

### 2. Enhancing Access to the Law for People With Print Disabilities Is Also a Favored Fair Use Purpose.

Courts and Congress recognized reproductions "for the convenience of a blind person" as a favored purpose under the first fair use factor as early as 1976, when the fair use doctrine was codified, and as recently as 2014. *See* P.R.O. Mem. 35–37. It is undisputed that only through Public Resource's efforts have people with print disabilities been able to access the 1999

Standards through the same means that are available for nearly all federal regulations: on the Web in a format compatible with screen-reader software. *Id.*

In response, Plaintiffs argue that reproductions to aid accessibility are necessarily infringing unless they comply with the Chafee Amendment, 17 U.S.C. § 121. Plaintiffs do not cite a single authority that has adopted this novel interpretation of the Copyright Act, and it is plainly incorrect.[7]

*First*, there is nothing in the Copyright Act to suggest that the specific limitations in sections 108–122 of the Act narrow the scope of fair use protection for conduct that does not fall within those limits, any more than the fact that a compulsory licensing scheme exists means that a use of a song without such a license in appropriate circumstances could no longer be a noninfringing fair use. The rights described in sections 108–122 are specific and relatively narrow; section 107 serves the equally essential purpose of providing a broader and more flexible limit, that "permits courts to avoid rigid application of the copyright statute" where such application would not serve the purposes of copyright. *Stewart v. Abend*, 495 U.S. 207, 236 (1990) (internal citations omitted).

*Second*, Congress and the Register of Copyrights have both expressly rejected Plaintiffs' interpretation. One congressional report noted that "[a] question that came up several times during the hearings was whether the specific exemptions for certain uses . . . should be in addition to or instead of fair use . . . [W]hile some of the exemptions in sections 108 through 116

_____

[7] Plaintiffs' attempt to support their argument through the opinion of their purported expert S. E. Phillips is improper, as the interpretation of the Copyright Act is a legal question and not a proper subject of expert testimony. Moreover, Dr. Phillips admitted that she is not an expert in copyright law. Becker Reply Decl. ¶ 7, Ex. 80 (Phillips Dep. 43:04–44:25). While Dr. Phillips's testimony on this subject is not material on summary judgment given Plaintiffs' misinterpretation of copyright law, Public Resource reserves the right to object to the use of Dr. Phillips' testimony for other purposes at trial. See Public Resource's Objections to Plaintiffs' Supplemental Evidence, Section III.a.

may overlap the fair use doctrine, they are not intended to supersede it." H.R. Rep. No. 90–83, at

36–37 (1967). The Register of Copyrights, in comments that led to the enactment of another

specific exemption, stated that "[f]air use could apply as well to instructional transmissions not

covered by the changes to section 110(2) recommended above. Thus, for example, the

performance of more than a limited portion of a dramatic work in a distance education program

might qualify as fair use in appropriate circumstances." U.S. Copyright Office, Report on

Copyright and Digital Distance Education 162 (1999).

*Third*, the Second Circuit's 2014 decision in *HathiTrust* affirms the legislative intent with

respect to the Chafee Amendment and flatly contradicts Plaintiffs' position here. In that case, the

district court held that *some* of the challenged copying "fit[] squarely within the Chafee

Amendment," but that *all* of the defendants "may certainly rely on fair use . . . to justify copies

made outside of these categories or in the event that they are not authorized entities" under the

Chafee Amendment. 755 F.3d at 93 (quoting *Authors Guild, Inc. v. HathiTrust*, 902 F. Supp. 2d

445, 465 (S.D.N.Y. 2012)) (ellipses in original). The Second Circuit affirmed, reasoning that the

Chafee Amendment and the Americans with Disabilities Act were evidence of Congressional

intent that "ameliorating the hardships faced by the blind and the print disabled" supports a

finding of fair use. *Id.* at 102.

The Second Circuit also reaffirmed both the Supreme Court's 1985 statement in *Sony*

*Corporation of America v. Universal City Studios*, 464 U.S. 417, 455 n.40, that a reproduction to

aid accessibility is a fair use, and the 1976 Congressional committee report stating the same

thing. *HathiTrust*, 902 F. Supp. 2d at 102. These are the very authorities that Plaintiffs assert the

Chafee Amendment had silently overruled. Pls. Opp. 35. The Ninth Circuit has also held that

specific statutory exemptions to copyright do not narrow the scope of fair use, and that argument

20

to the contrary (like that of Plaintiffs here) "verges on the frivolous." *Sega Enters., Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1520–21 (9th Cir. 1992).

Moreover, educational institutions and government agencies have never relied on the Chafee Amendment exclusively to serve the needs of students with disabilities. An advisory commission of the Department of Education, which included Public Resource's expert James Fruchterman and future Register of Copyrights Maria Pallante, reported in 2011 "that the beneficiary population of the Chafee Amendment is narrower than the population of students who may be determined to require alternative formats to print under civil rights statutes," and that fair use was "relevant to the [accessibility] discussion." Report of the Advisory Commission on Accessible Instructional Materials in Postsecondary Education for Students with Disabilities, December 6, 2011, p. 21, *available at* http://www2.ed.gov/about/bdscomm/list/aim/meeting/aim-report.pdf (Becker Reply Decl. ¶ 10, Ex. 83). The rule Plaintiffs urge would imperil widespread efforts to provide instructional materials for people with disabilities.

The Court need not find that "any digitization of a tangible book would qualify as fair use on the premise that all such conversions theoretically provide better access for the print disabled." Pls. Opp. 35. The specific importance of digital access to the 1999 Standards is clear. The design of tests that control access to student financial aid and professional certification is particularly important to people with disabilities, especially where the 1999 Standards themselves specifically reference accommodations that must be made to people with disabilities. Moreover, locating and requesting special accommodations and providing proof of one's disability are not reasonable prerequisites for the simple act of looking up the law, something that can ordinarily be done using only a Web browser and screen reading software.

**B.      The 1999 Standards Are Highly Factual; As Incorporated Standards, They Are Not the Type of Work Copyright Was Intended to Protect.**

The second fair use factor is whether the work is of a type for which "the risk of restraining the free flow of information is more significant." *Consumers Union of U.S., Inc. v. Gen. Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir. 1983). Even if the Court concludes that the 1999 Standards is not excluded altogether from copyright, it is undisputed that it is an integral part of federal and state regulations. Thus, the risk of restraining information about them is great. Indeed, laws are as far from the "core of intended copyright protection" that the Supreme Court identified in *Campbell* as any written work can be. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994).

Moreover, the 1999 Standards are highly factual works, the distillation of industry experience into optimal rules. *See* pp. 13–15, above. This favors a finding of fair use under the second factor. *Consumers Union*, 724 F.2d at 1049.

**C.      The Entirety of the 1999 Standards Is Incorporated into Law; Reproducing and Disseminating the Entire Document Is Necessary to Inform the Public.**

As noted above, page 2, the entirety of the 1999 Standards has been incorporated by reference into law. Accordingly, providing access to the entire document is integral to Public Resource's purpose of informing the public about the law and the public's rights and responsibilities. Therefore, the third factor favors a finding of fair use.

**D.      Evidence Shows No Present or Future Market Harm to Either the 1999 Standards or the 2014 Edition.**

Plaintiffs' own undisputed sales records, conduct, and testimony show conclusively that Public Resource's posting of the 1999 Standards has not caused, and will not cause, harm to any actual market for either that document or the 2014 edition. The 2014 edition is also not at issue in this case. *See* P.R.O. Mem. 1, 9, 28–30, 44–47, 55–57.

With respect to the 1999 Standards, the undisputed facts contradict Plaintiffs' claims of harm. Plaintiffs withdrew the 1999 Standards from sale in 2014. While Plaintiffs claim to have resumed offering the document for sale in late 2015, it is undisputed that Plaintiffs do not promote or market the 1999 edition; the 1999 edition does not appear in AERA's online catalog or on APA or NCME's websites; the 1999 edition is available only by submitting a paper form by mail or fax. P.R.O. Mem. at 25–26. Plaintiffs recall and destroy unsold copies of prior editions (P.R.O. Mem. at 56), and Plaintiffs believe "the sale of outdated standards," meaning the 1999 edition, would cause "harm to the public." Pls. Opp. 44. ███████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████ P.R.O. SMF ¶ 96; ICE Ex. 8 (Geisinger Dep. 114:17–21).

These facts demonstrate that Plaintiffs do not expect to receive any meaningful future revenues from sale of the 1999 edition and that Plaintiffs' pretense of continuing to sell the 1999 edition – which began shortly after one of Plaintiffs' witnesses faced probing questions at deposition about the withdrawal of that edition – is a sham intended only to manufacture an issue of fact for this lawsuit. Because of Plaintiffs' own actions, there is no genuine market for the 1999 edition. And nothing in the record suggests that, after spending years developing the 2014 Standards and decisively ceasing to market or promote the 1999 edition, Plaintiffs will "change [their] mind[s]" and begin encouraging use of an edition they believe is obsolete. Pls. Opp. 41.

Plaintiffs' argument that the availability of the 1999 Standards through Public Resource is harmful because people might unintentionally use the 1999 edition in place of the 2014 edition has two flaws. First, Plaintiffs have presented no evidence of this phenomenon, either with copies obtained through Public Resource or with print copies in circulation. Second, the 1999

23

edition is current law, while the 2014 edition is not law. Those seeking current U.S. Department of Education or state licensing agency regulations must refer to the 1999 edition, not the 2014 edition. Plaintiffs admit that some people "believe they still may be held accountable to the guidance of the 1999 Standards" Pls. Mem. 1. That belief is correct. Thus, even if there were any evidence demonstrating that access to the 1999 edition causes harm to the public, or displaces Plaintiffs' sales of the 2014 edition, the target of complaints about those theoretical harms should be the agencies.

The 2014 edition is the only edition Plaintiffs market and exploit for revenue. As long as that edition is not law, Public Resource has no intention of posting it, regardless of the outcome of this lawsuit. The 2014 edition will continue to earn revenue for Plaintiffs for the indefinite future and to fund the creation of future editions if that is how Plaintiffs want to use the proceeds. Undisputed facts show that, even if the *next* edition of the Standards were to cost three times as much to create as the 2014 edition, that development *already has sufficient funds* from sales of the 1999 and 2014 editions. *See* P.R.O. Mem. 56.

Moreover, Plaintiffs have not shown that Public Resource's activities had any effect on sales of the 1999 Standards before Plaintiffs voluntarily shut down the market for sales of new copies. The volume of sales began to decline in 2011 in anticipation of a new edition, and that decline continued at a consistent rate until 2012 when a draft of the new edition was completed but not released. Public Resource's posting of the 1999 Standards in 2012 did not change the rate of the decline that began in 2011. And sales *increased* slightly in 2013 as the release of the new edition was delayed, despite the availability of the 1999 Standards from Public Resource. P.R.O. SMF ¶¶ 44–47. █████████████████████████████████████

████████████████████████████ P.R.O. SMF ¶ 45. They are not consistent with Plaintiffs' argument that Public Resource's activities explain the decline.

Plaintiffs present a new explanation for this data in their Opposition that differs from that in their opening memorandum, but their new theory, like their original, has no foundation in the evidence. Dr. Geisinger, Plaintiffs' purported expert, testified that ████████████ ████████████████████████ Decl. of Jonathan Hudis in Support of Plaintiffs' Opposition to Defendant's Motion to Strike the Declaration of Kurt F. Geisinger ¶ 3, Ex. 1 (Geisinger Dep. 238:6-16). But Plaintiffs cite no evidence, nor even conjecture by Dr. Geisinger, as to how many students attended such classes in each relevant year, how many purchased new copies of the 1999 Standards instead of used copies in each year, or whether the 1999 Standards continued to be required reading. Plaintiffs' new theory that "[s]ales to these students should have remained constant year-after-year until at least the release of the 2014 Standards" has no basis whatsoever.

Nor do Plaintiffs' sales data show a "second drop" that "cannot be explained merely by professionals waiting for the next release." Pls. Opp. 40. The data show no "second drop," but only a single, continuous decline in sales beginning with anticipation of the next release in 2011 and unaffected by Public Resource's subsequent posting of the 1999 Standards in 2012. P.R.O. SMF ¶¶ 44–47.

In summary, undisputed evidence shows no likelihood of harm to any actual market for either the 1999 Standards or the 2014 edition. Public Resource's use of the 1999 Standards is a fair use as a matter of law.

## IV.   PLAINTIFFS HAVE NOT MET THEIR BURDEN OF ESTABLISHING CONTRIBUTORY INFRINGEMENT.

Plaintiffs' claim of contributory infringement fails as a matter of law. Plaintiffs cannot show direct infringement on the part of visitors to the Public Resource or Internet Archive

websites, because the only evidence of any visitors shows them to be engaged in the non-infringing act of simply *reading* the 1999 Standards. Plaintiffs have presented no evidence that any visitor to the websites made a reproduction in copies of the 1999 Standards, much less that any such reproduction would be infringing. *See* P.R.O. Mem. 51-52; *cf.* 17 U.S.C. § 106(1).

Instead, Plaintiffs argue that those who accessed the 1999 Standards through Public Resource necessarily made a temporary copy of the document in the random access memory of their own computers, and it is this copy on which Plaintiffs base their assertion of direct infringement by others. Pls. Mem. 6. Plaintiffs' argument fails because this act is a non-infringing fair use:

> [L]ocal caching by the browsers of individual users is noncommercial, transformative, and no more than necessary to achieve the objectives of decreasing network latency and minimizing unnecessary bandwidth usage (essential to the [I]nternet). It has a minimal impact on the potential market for the original work.

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007) (internal citation omitted). The two cases Plaintiffs cited each concerned an allegation of direct infringement by a commercial competitor of the plaintiff, not mere browsing by individual website visitors. *See CoStar Realty Info., Inc. v. Field*, 737 F. Supp. 2d 496, 507 (D. Md. 2010); *Ticketmaster v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1110 (C.D. Cal. 2007). Both cases explicitly distinguished the facts of *Perfect 10*, which involved only cache copies incidental to browsing, without evidence of further reproductions by third parties.

Because Plaintiffs' evidence shows only one form of reproduction by third parties—reproductions in temporary RAM copies incidental to the viewing of the document—and that reproduction is non-infringing, Plaintiffs cannot establish infringement by third parties.

In the context of a contributory infringement claim, Plaintiffs have the additional burden of proving that alleged third-party conduct is *not* a fair use. *Sony*, 464 U.S. at 450–51 (ruling that

26

plaintiffs "failed to carry their burden" on fair use); *see* P.R.O. Mem. 45. They cannot do so here. Even if the court were to presume, without evidence, that third parties made permanent copies of the 1999 Standards, many if not all of those reproductions are themselves fair uses, for all of the reasons Public Resource laid out in its own fair use defense. Reproducing and disseminating the law is a fair use.

Regarding Public Resource's alleged knowledge of infringement by third parties, the evidence to which Plaintiffs cite shows, at most, a general awareness that third parties may download, print, or reproduce documents from the Public Resource website. Such general knowledge is not sufficient to establish contributory liability. *Sony*, 464 U.S. at 439. Plaintiffs' contention that they "informed [Public Resource] of specific infringing uses by third parties," Pls. Opp. 7, misstates their own evidence. The documents Plaintiffs cite state only that Plaintiffs believed the posting of the 1999 standards to be infringing. *Id.* (citing Public Resource's Statement of Disputed Facts ¶¶ 92–93). They made no reference to any third parties.

Finally, Plaintiffs continue to misconstrue the doctrine of "willful blindness," in which a court presumes knowledge of infringement from a defendant's "conscious avoidance" of such knowledge. *United States v. Quinn*, 403 F. Supp. 2d 57, 68 n.11 (D.D.C. 2005). The Supreme Court has held that contributory infringement requires a finding of *actual* knowledge, and that "there is no precedent in the law of copyright" for imposing secondary liability on a theory of "constructive knowledge." *Sony*, 464 U.S. at 439; *see also Perfect 10, Inc.*, 508 F.3d at 1172 ("actual knowledge" is required for contributory infringement).

Even if the Court were to apply a theory of "willful blindness," Plaintiffs have not shown or suggested that Public Resource made any attempt to avoid knowledge of copyright infringement. Plaintiffs refer only to "restrictions to prevent downloading or printing of the 1999

standards" which they claim Public Resource should have applied. Pls. Mem. 7. But Plaintiffs do not explain how *preventing* downloading or printing would have given Public Resource knowledge of third-party reproductions, or how the absence of such prevention constitutes active avoidance of knowledge.

Finally, contributory infringement requires not mere knowledge but rather intent to promote infringement. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005). It is undisputed that Public Resource's only intent is to foster public access to and discussion of the law, and Plaintiffs argue no other purpose or intent on the part of Public Resource. *See* Plaintiffs' Statement of Disputed Facts ¶¶ 2–4. Thus, Plaintiffs cannot establish that Public Resource could be liable for contributory infringement.

## V.    CONCLUSION

For all of these reasons, the Court should grant summary judgment in favor of Public Resource on all of the claims in this case.

Dated: March 3, 2016                              Respectfully submitted,


                                                  */s/  Andrew P. Bridges*
                                                  Andrew P. Bridges (admitted)
                                                  abridges@fenwick.com
                                                  Sebastian E. Kaplan (admitted *pro hac vice*)
                                                  skaplan@fenwick.com
                                                  Matthew Becker (admitted *pro hac vice*)
                                                  mbecker@fenwick.com
                                                  FENWICK & WEST LLP
                                                  555 California Street, 12th Floor
                                                  San Francisco, CA 94104
                                                  Telephone:   (415) 875-2300
                                                  Facsimile:    (415) 281-1350


                                                  Corynne McSherry (admitted *pro hac vice*)
                                                  corynne@eff.org
                                                  Mitchell L. Stoltz (D.C. Bar No. 978149)
                                                  mitch@eff.org
                                                  ELECTRONIC FRONTIER FOUNDATION
                                                  815 Eddy Street
                                                  San Francisco, CA 94109
                                                  Telephone:   (415) 436-9333
                                                  Facsimile:    (415) 436-9993

                                                  David Halperin (D.C. Bar No. 426078)
                                                  davidhalperindc@gmail.com
                                                  1530 P Street NW
                                                  Washington, DC 20005
                                                  Telephone: (202) 905-3434

                                                  *Attorneys for Defendant-Counterclaimant*
                                                  Public.Resource.Org, Inc.