# EXHIBIT 3

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN EDUCATIONAL RESEARCH ASSOCIATION, INC., AMERICAN PSYCHOLOGICAL ASSOCIATION, INC., and NATIONAL COUNCIL ON MEASUREMENT IN EDUCATION, INC., <br><br> Plaintiffs, <br><br> v. <br><br> PUBLIC.RESOURCE.ORG, <br><br> Defendant. | Case No. 1:14-CV-00857-TSC-DAR <br><br> **DEFENDANT-COUNTERCLAIMANT PUBLIC.RESOURCE.ORG, INC.'S STATEMENT OF DISPUTED FACTS IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION** <br><br> Action Filed: May 23, 2014 |

### [REDACTED VERSION]

Pursuant to the Local Civil Rule 7(h), Defendant-Counterclaimant Public.Resource.Org ("Public Resource") submits in support of its Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment and Permanent Injunction, a Statement of Disputed Facts to be tried, as follows:

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 1. Plaintiffs, AERA, APA, and NCME, are District of Columbia not-for-profit corporations (Levine Decl., ¶ 4; Ernesto Decl., ¶ 3; Wise Decl., ¶ 3). | Undisputed. |
| 2. AERA is the major national scientific society for research on education and learning. AERA's mission is to advance knowledge about education, to encourage scholarly inquiry related to education, and to promote the use of research to improve education and serve the public good (Levine Decl., ¶ 5). | Undisputed. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 3. APA is the largest scientific and professional organization representing psychology in the United States. APA is the world's largest association of psychologists and counts a vast number of researchers, educators, clinicians, consultants and students among its members. APA's mission is to advance the creation, communication, and application of psychological knowledge to benefit society and improve people's lives (Ernesto Decl., ¶ 4). | Undisputed. |
| 4. NCME is a professional organization for individuals involved in assessment, evaluation, testing, and other aspects of educational measurement. NCME's members are involved in the construction and use of standardized tests; new forms of assessment, including performance-based assessment; program design; and program evaluation (Wise Decl., ¶ 4). | Undisputed. |
| 5. Plaintiffs have been preparing and publishing versions of the Standards for Educational and Psychological Testing for over fifty years. In 1954, Plaintiff APA prepared and published the "Technical Recommendations for Psychological Tests and Diagnostic Techniques" (Camara Decl., ¶ 7; Ernesto Decl., ¶ 5). | Plaintiffs have failed to adduce admissible evidence in support of this fact. Disputed to the extent that Plaintiffs imply that they developed any portion of the 1999 Standards. The evidence shows that volunteers and members of the public developed the 1999 Standards, not the Plaintiffs. (SMF ¶ 8-9, 17-18.) Plaintiffs refused to provide evidence or testimony concerning any edition of the Standards other than the 1999 Edition, and they redacted documents that included information concerning other editions of the Standards.  Plaintiffs should be precluded from using claimed evidence that they refused to provide during discovery. *See* ICE Ex. 62 (Plaintiffs/counterclaim-defendants' Objections and Answers to Defendant/counterclaim-plaintiff's First Set of Interrogatories (Nos. 1–10) (objecting to production of documents concerning any publications other than the 1999 Standards and |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| | stating that such documents are irrelevant)); ICE Ex. Ex. 63 (correspondence PRO counsel identifying earlier versions and redactions as issues in discovery). |
| 6. In 1955, Plaintiffs AERA and NCME prepared and published a companion document entitled, "Technical Recommendations for Achievement Tests" (Levine Decl., ¶ 6; Camara Decl., ¶ 7; Wise Decl., ¶ 5). | Plaintiffs have failed to adduce admissible evidence in support of this fact.<br><br>Disputed to the extent that Plaintiffs imply that they developed any portion of the 1999 Standards. Volunteers and members of the public developed the 1999 Standards, not the Plaintiffs. (SMF ¶ 8-9, 17-18.)<br><br>Disputed to the extent that Plaintiffs refused to provide evidence or testimony concerning any edition of the Standards other than the 1999 Edition, and redacted documents that included information concerning other editions of the Standards.  Plaintiffs should not be allowed to now testify on matters they refused to allow discovery into.  *See* ICE Ex. 62 (Plaintiffs/counterclaim-defendants' Objections and Answers to Defendant/counterclaim-plaintiff's First Set of Interrogatories (Nos. 1–10) (objecting to production of documents concerning any publications other than the 1999 Standards and stating that such documents are irrelevant)); ICE Ex. Ex. 63 (correspondence PRO counsel identifying earlier versions and redactions as issues in discovery). |
| 7. Subsequently, a joint committee of the three organizations modified, revised, and consolidated the two documents into the first Joint Standards. Beginning with the 1966 revision, the three organizations (AERA, APA and NCME – collectively, the "Sponsoring Organizations") collaborated in developing the "Joint Standards" (or simply, the "Standards"). Each subsequent revision of the Standards has been careful to note that it is a revision and update of the prior version (Levine Decl., ¶ 6; Camara Decl., ¶ 7; Ernesto Decl., ¶ 6; Wise | Plaintiffs have failed to adduce admissible evidence in support of these facts.<br><br>Disputed to the extent that Plaintiffs imply that they developed any portion of the 1999 Standards. Volunteers and members of the public developed the 1999 Standards, not the Plaintiffs. (SMF ¶ 8-9, 17-18.)<br><br>Disputed to the extent that Plaintiffs refused to provide evidence or testimony concerning any edition of the Standards other than the 1999 Edition, and redacted documents that included |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| Decl., ¶ 6). | information concerning other editions of the Standards.  Plaintiffs should not be allowed to now testify on matters they refused to allow discovery into.  *See* ICE Ex. 62 (Plaintiffs/counterclaim-defendants' Objections and Answers to Defendant/counterclaim-plaintiff's First Set of Interrogatories (Nos. 1–10) (objecting to production of documents concerning any publications other than the 1999 Standards and stating that such documents are irrelevant)); ICE Ex. 63 (correspondence PRO counsel identifying earlier versions and redactions as issues in discovery). |
| 8. Beginning in the mid-1950s, the Sponsoring Organizations formed and periodically reconstituted a committee of highly trained and experienced experts in psychological and educational assessment, charged with the initial development of the Technical Recommendations and then each subsequent revision of the (renamed) Standards. These committees were formed by the Sponsoring Organizations' Presidents (or their designees), who would meet and jointly agree on the membership. Often a chair or co-chairs of these committees were selected by joint agreement. Beginning with the 1966 version of the Standards, this committee became referred to as the "Joint Committee" (Levine Decl., ¶ 7; Camara Decl., ¶ 8; Ernesto Decl., ¶ 7; Wise Decl., ¶ 7). | Plaintiffs have failed to adduce admissible evidence in support of these facts.<br><br>Disputed to the extent that Plaintiffs imply that they developed any portion of the 1999 Standards. Volunteers and members of the public developed the 1999 Standards, not the Plaintiffs. (SMF ¶ 8-9, 17-18.)<br><br>Disputed to the extent that Plaintiffs refused to provide evidence or testimony concerning any edition of the Standards other than the 1999 Edition, and redacted documents that included information concerning other editions of the Standards.  Plaintiffs should not be allowed to now testify on matters they refused to allow discovery into.  *See* ICE Ex. 62 (Plaintiffs/counterclaim-defendants' Objections and Answers to Defendant/counterclaim-plaintiff's First Set of Interrogatories (Nos. 1–10) (objecting to production of documents concerning any publications other than the 1999 Standards and stating that such documents are irrelevant)); ICE Ex. 63 (correspondence PRO counsel identifying earlier versions and redactions as issues in discovery). |
| 9. Financial and operational oversight for the Standards' revisions, promotion, distribution, | Undisputed but immaterial. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| and for the sale of the 1999 and 2014 Standards has been undertaken by a periodically reconstituted Management Committee, comprised of the designees of the three Sponsoring Organizations (Levine Decl., ¶ 8; Camara Decl., ¶ 9; Schneider Decl., ¶ 4; Ernesto Decl., ¶ 8; Wise Decl., ¶ 8). | |
| 10. All members of the Joint Committee(s) and the Management Committee(s) are *unpaid* volunteers. The expenses associated with the ongoing development and publication of the Standards include travel and lodging expenses (for the Joint Committee and Management Committee members), support staff time, printing and shipment of bound volumes, and advertising costs (Levine Decl., ¶ 9; Camara Decl., ¶ 10; Schneider Decl., ¶ 5; Ernesto Decl., ¶ 9; Wise Decl., ¶ 9). | Undisputed.  Second sentence immaterial. |
| 11. Many different fields of endeavor rely on assessments. The Sponsoring Organizations have ensured that the range of these fields of endeavor is represented in the Joint Committees' membership – *e.g.*, admissions, achievement, clinical counseling, educational, licensing-credentialing, employment, policy, and program evaluation. Similarly, the Joint Committee's members, who are *unpaid volunteers*, represent expertise across major functional assessment areas – *e.g.*, validity, equating, reliability, test development, scoring, reporting, interpretation, and large scale interpolation (Levine Decl., ¶ 10; Ernesto Decl., ¶ 10; Wise Decl., ¶ 10). | Undisputed. |
| 12. From the time of their initial creation to the present, the preparation of and periodic revisions of the Standards entail intensive labor and considerable cross-disciplinary expertise. Each time the Standards are revised, the Sponsoring Organizations select and arrange for meetings of the leading authorities in psychological and educational assessments | Undisputed but immaterial. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| (known as the Joint Committee). During these meetings, certain Standards are combined, pared down, and/or augmented, others are deleted altogether, and some are created as whole new individual Standards. The 1999 version of the Standards is nearly 200 pages, took more than five years to complete (Levine Decl., ¶ 11; Ernesto Decl., ¶ 11; Camara Decl., ¶ 11). | |
| 13. The 1999 Standards is the result of work put in by the Joint Committee to generate a set of best practices on educational and psychological testing that are respected and relied upon by leaders in their fields (Camara Decl., ¶ 11; Wise Decl., ¶ 11). | Undisputed. |
| 14. Draft revisions of the 1985 Standards, for what became the 1999 Standards, were widely distributed for public review and comment three times during this revision effort to gauge whether the testing community believed the revised drafts to be current and inclusive of the topics at issue (Schneider Decl., ¶ 6). | Undisputed. |
| 15. The Joint Committee received thousands of pages of comments and proposed text revisions from: the membership of the Sponsoring Organizations, scientific, professional, trade and advocacy groups, credentialing boards, state and federal government agencies, test publishers and developers, and academic institutions. While the Joint Committee reviewed and took under advisement these helpful comments, the final language of the 1999 Standards was a product of the Joint Committee members (Camara Decl., ¶ 12; Schneider Decl., ¶ 7). | Disputed.  Many of the thousands of pages of comments and proposed text revisions from members of the public and government were in fact incorporated into the 1999 Standards.  *See* SMF ¶ 9; ███████████████████████████████████████ |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 16. When the 1985 Standards were revised, more than half the content of the 1999 Standards resulted from newly written prose of the Joint Committee (Camara Decl., ¶ 12). | Disputed to the extent that Plaintiffs imply that all of this text was original to the Joint Committee, when much of it was in fact taken from proposed text submitted by members of the public and government.  *See* SMF ¶ 9; ███████████████████████████████ |
| 17. The Standards originally were created as principles and guidelines – a set of best practices to improve professional practice in testing and assessment across multiple settings, including education and various areas of psychology. The Standards can and should be used as a recommended course of action in the sound and ethical development and use of tests, and also to evaluate the quality of tests and testing practices. Additionally, an essential component of responsible professional practice is maintaining technical competence. Many professional associations also have developed standards and principles of technical practice in assessment. The Sponsoring Organizations' Standards have been and still are used for this purpose (Geisinger Decl., ¶ 18; Camara Decl., ¶ 13; Wise Decl., ¶ 12). | Undisputed. |
| 18. The Standards, however, are not simply intended for members of the Sponsoring Organizations, AERA, APA, and NCME. The intended audience of the Standards is broad and cuts across audiences with varying backgrounds and different training. For example, the Standards also are intended to guide test developers, sponsors, publishers, and users by providing criteria for the evaluation of tests, testing practices, and the effects of test use. Test user standards refer to those standards that help test users decide how to choose certain tests, interpret scores, or make decisions based on | Disputed to the extent that Plaintiffs imply that the 1999 Standards are not enforceable as law. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| tests results. Test users include clinical or industrial psychologists, research directors, school psychologists, counselors, employment supervisors, teachers, and various administrators who select or interpret tests for their organizations. There is no mechanism, however, to enforce compliance with the Standards on the part of the test developer or test user. The Standards, moreover, do not attempt to provide psychometric answers to policy or legal questions (Camara Decl., ¶ 14; Wise Decl., ¶ 13; Geisinger Decl., ¶ 19; Ernesto Decl., ¶ 12). | |
| 19. The Standards promote the development of high quality tests and the sound use of results from such tests. Without such high quality standards, tests might produce scores that are not defensible or accurate, not an adequate reflection of the characteristic they were intended to measure, and not fair to the person tested. Consequently, decisions about individuals made with such test scores would be no better, or even worse, than those made with no test score information at all. Thus, the Standards help to ensure that measures of student achievement are relevant, that admissions decisions are fair, that employment hiring and professional credentialing result in qualified individuals being selected, and patients with psychological needs are diagnosed properly and treated accordingly. Quality tests protect the public from harmful decision making and provide opportunities for education and employment that are fair to all who seek them (Camara Decl., ¶ 15; Wise Decl., ¶ 14). | Disputed to the extent Plaintiffs seek to establish copyrightability of the Standards. Plaintiffs have failed to adduce admissible evidence in support of these facts.  These are not facts but opinions.  Plaintiffs provide no source other than Mr. Camara and Mr. Wise's conjectures to support these statements. Neither of them are qualified as experts. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 20. The Standards apply broadly to a wide range of standardized instruments and procedures that sample an individual's behavior, including tests, assessments, inventories, scales, and other testing vehicles. The Standards apply equally to standardized multiple-choice tests, performance assessments (including tests comprised of only open-ended essays), and hands-on assessments or simulations. The main exceptions are that the Standards do not apply to unstandardized questionnaires (*e.g.*, unstructured behavioral checklists or observational forms), teacher-made tests, and subjective decision processes (*e.g.*, a teacher's evaluation of students' classroom participation over the course of a semester) (Camara Decl., ¶ 16; Wise Decl., ¶ 15; Geisinger Decl., ¶ 20; Ernesto Decl., ¶ 13). | Undisputed. |
| 21. The Standards have been used to develop testing guidelines for such activities as college admissions, personnel selection, test translations, test user qualifications, and computer-based testing. The Standards also have been widely cited to address technical, professional, and operational norms for all forms of assessments that are professionally developed and used in a variety of settings. The Standards additionally provide a valuable public service to state and federal governments as they voluntarily choose to use them. For instance, each testing company, when submitting proposals for testing administration, instead of relying on a patchwork of local, or even individual and proprietary, testing design and implementation criteria, may rely instead on the Sponsoring Organizations' Standards to afford the best guidance for testing and assessment practices (Camara Decl., ¶ 17; Wise Decl., ¶ 16; Geisinger Decl., ¶ 21; Ernesto Decl., ¶ 14). | Undisputed. |

9

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 22. The Standards were not created or updated to serve as a legally binding document, in response to an expressed governmental or regulatory need, nor in response to any legislative action or judicial decision. However, the Standards have been cited in judicial decisions related to the proper use and evidence for assessment, as well as by state and federal legislators. These citations in judicial decisions and during legislative deliberations occurred without any lobbying by the Plaintiffs (Levine Decl., ¶ 12; Camara Decl., ¶ 18; Ernesto Decl., ¶ 15; Wise Decl., ¶ 17). | Disputed.  Plaintiffs have failed to adduce admissible evidence in support of these facts. Plaintiffs cite no evidence concerning the purposes for the creation or revision of the 1999 Standards, and they could not establish the purposes behind every contribution from the thousands of people and entities who contributed to the development and revision of the Standards. This is particularly the case for contributions by governmental entities. The APA lobbied for the 1999 Standards to be mandated in legislation that was deliberated by Congress. (SMF ¶ 52-56; ICE Exs. 31, ██████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████) |
| 23. During the discovery phase of this litigation, however, Plaintiff APA located in its archives correspondence relating to APA's support for proposed legislation sought to be introduced in 2001 by Senator Paul Wellstone (D-MN) on Fairness and Accuracy in High Stakes Educational Decisions for Students – a suggested amendment to the Elementary and Secondary Education Act ("No Child Left Behind Act") 147 Cong. Rec. S. 4,644 (daily ed. May 9, 2001) (Ernesto Decl., ¶¶ 16-22, Exhs. NN-SS). | Undisputed. |
| 24. Some of APA's letters are unsigned and are not printed on APA letterhead. Therefore, in accordance with APA practices and protocols, it is likely that the unsigned letters (not printed on letterhead) were internal discussion drafts that were never sent (Ernesto Decl., ¶ 23). | Disputed.  Plaintiffs have failed to adduce admissible evidence in support of these alleged "facts," which are actually opinions.  Plaintiffs provide no source other than Ms. Ernesto's conjectures to support these statements, have not provided any proof of "APA practices and protocols" as they concern letters sent by APA's lobbyists, and Ms. Ernesto's statements in her declaration are contradicted by her |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| | statements at deposition. At deposition, ███████████████████████████ However, a document produced by APA proves that at least one such lobbying letter was sent: Exhibit SS to Ms. Ernesto's declaration is a 2002 memorandum APA produced titled "Highlights of APA's Involvement in Educational Testing Provisions of the 'No Child Left Behind Act,'" that describes APA's lobbying work at the time. This memorandum includes the full text of a letter that APA sent on May 7, 2001 to U.S. Senators lobbying for the mandating of the 1999 Standards through an amendment by Senator Wellstone. At deposition, ████████████████████████ |
| 25. Regarding the signed letters that were printed on APA letterhead, they relate to Senator Wellstone's proposed legislation that tests and assessments administered by the states are of high quality and used appropriately for the benefit of test administrators and test takers. These are goals that are consistent with APA policy as then reflected in the 1999 Standards. Even though Senator Wellstone's amendments sought, in part, to mandate states' compliance with the Standards, none of the Sponsoring Organizations actively advocated for this – and in any event Senator Wellstone's proposed amendment including this language was never enacted into law (Ernesto Decl., ¶ 24, Exh. TT). | Disputed.  Plaintiffs have failed to adduce admissible evidence in support of these facts. Plaintiffs have no evidence to support their statement that "none of the Sponsoring Organizations actively advocated for [legislation mandating the 1999 Standards]," other than Ms. Ernesto's conjecture in her declaration ¶ 24, which is contradicted by her deposition testimony and by the documents she attaches as Exhibits QQ and SS to her declaration.  At deposition, ██████████████████████████████ |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| | ████████████████████████ ████████████████████████ ████████████ owever, a document produced by APA proves that at least one such lobbying letter was sent: Exhibit SS to Ms. Ernesto's declaration is a 2002 memorandum APA produced titled "Highlights of APA's Involvement in Educational Testing Provisions of the 'No Child Left Behind Act,'" that describes APA's lobbying work at the time. This memorandum includes the full text of a letter that APA sent on May 7, 2001 to U.S. Senators lobbying for the mandating of the 1999 Standards through an amendment by Senator Wellstone. At deposition, ████████ ████████████████████████ ████████████████ |
| 26. APA's search of its records did not disclose any further communications with Congress relating to the Standards and, to the best of APA's knowledge, it has not engaged in communications with Congress regarding citation of the Standards in legislation since 2001 (Ernesto Decl., ¶ 25). | Disputed.  The documents produced by Plaintiffs ████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████. More recently, all three plaintiff organizations put on an event at the Russell Senate Office Building on Capitol Hill about the 2014 Standards.  ICE Exs. 47-49, and █ ████████████████ |
| 27. Moreover, neither AERA nor NCME has ever communicated with Congress for the purpose of encouraging the enactment of the Standards into law (Levine Decl., ¶¶ 12-13; Wise Decl., ¶ 18). | Disputed.  Plaintiffs have no evidence to support this statement other than the conjecture of Dr. Levine and Dr. Wise. Moreover, all three plaintiff organizations organized and participated in an event at the Russell Senate Office Building on Capitol Hill about the 2014 Standards.  ICE Exs. 47-49, and ████████ ████████████████ |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 28. None of the Sponsoring Organizations has solicited any government agency to incorporate the Standards into the Code of Federal Regulations or other rules of Federal or State agencies (Levine Decl., ¶ 13; Ernesto Decl., ¶ 26; Wise Decl., ¶ 19). | Disputed.  Plaintiffs have failed to adduce admissible evidence in support of these facts. Plaintiffs have no evidence to support this statement other than the conjecture of Dr. Levine, Ms. Ernesto, and Dr. Wise.  At deposition, ███████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ |
| 29. Rather, in the policymaking arena, the Sponsoring Organizations believe the Standards should be treated as guidelines informing the enactment of legislation and regulations consistent with best practices in the development and use of tests – to insure that they are valid, reliable and fair (Wise Decl., ¶ 20; Ernesto Decl., ¶ 27). | Plaintiffs' self-serving profession of "belief" is not a material fact.  Moreover, disputed to the extent that Plaintiffs do not specify a time frame for this belief.  They may believe this now, but in the past ████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ██████████ Plaintiffs also organized an event on Capitol Hill about the 2014 Standards as recently as September 2014.  ICE Exs. 47-49, ███████████████████████ ██████████ |
| 30. Plaintiffs promote and sell copies of the Standards via referrals to the AERA website, at annual meetings, in public offerings to students, and to educational institution faculty. Advertisements promoting the Standards have appeared in meeting brochures, in scholarly journals, and in the hallways at professional meetings (Levine Decl., ¶ 14, Exh. NNN; Ernesto Decl., ¶ 28, Exh. UU; Wise Decl., ¶ 21, Exh. KKK). | Disputed to the extent that Plaintiffs did not sell copies of the 1999 Standards for approximately one year during this litigation, they do not promote the 1999 Standards or earlier editions, and they do not sell earlier editions of the Standards. Plfs Mem. at 11; ███ ███████████████████████████████ ████████████ SMF ¶¶ 40, 43. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 31. All copies of the Standards bear a copyright notice (Levine Decl., ¶ 15, 28, Exh. TTT). | Disputed to the extent that Plaintiffs refer to any edition of the Standards other than the 1999 edition, which is the only edition that Plaintiffs have provided evidence as to the placement of a copyright notice.  Moreover, the 1999 edition is the only edition at issue in this litigation, and Plaintiffs have refused to allow discovery into other editions of the Standards. *See* ICE Ex. 62 (Plaintiffs/counterclaim-defendants' Objections and Answers to Defendant/counterclaim-plaintiff's First Set of Interrogatories (Nos. 1–10) (objecting to production of documents concerning any publications other than the 1999 Standards and stating that such documents are irrelevant)); ICE Ex. 63 (correspondence PRO counsel identifying earlier versions and redactions as issues in discovery). |
| 32. Distribution of the Standards is closely monitored by the Sponsoring Organizations. AERA, the designated publisher of the Standards, sometimes does provide promotional complementary print copies to students or professors. Except for these few complementary print copies, however, the Standards are not given away for free; and certainly they are not made available to the public by any of the three organizations for anyone to copy free of charge (Levine Decl., ¶ 16; Ernesto Decl., ¶ 29; Wise Decl., ¶ 22). | Disputed.  Distribution of the Standards is not closely monitored by the Sponsoring Organizations.  At deposition, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████ |
| 33. To date, Plaintiffs have never posted, or authorized the posting of, a digitized copy of the 1999 Standards on any publicly accessible website (Levine Decl., ¶ 16; Ernesto Decl., ¶ 30; Wise Decl., ¶ 23). | Undisputed. |
| 34. The 1999 Standards have been sold at modest retail prices ranging from $25.95 to $49.95 per copy. From 2000 to 2014, except for the near two-year period during which Public Resource posted unauthorized copies online and | Disputed to the extent that sales of the 1999 Standards peaked in 2002 and have been declining since then, and declined more rapidly in the year prior to when Public Resource posted the 1999 Standards than they did |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| sales diminished significantly, income generated from sales of the 1999 Standards, on average, had been approximately in excess of $127,000 per year (Levine Decl., ¶¶ 17-18 Exh. OOO). | subsequent to Public Resource's actions. Additionally, sales of the 1999 Standards increased in the year after Public Resource posted the 1999 Standards.  (SMF ¶ 44, 47.) The characterization of the retail prices of the 1999 Standards as "modest" is an opinion, not a fact, and Dr. Levine is not qualified as an expert on the subject of the reasonableness of pricing for access to the law. |
| 35. After the 2014 Standards were published in the late summer of 2014, AERA for a time discontinued sales of the 1999 Standards. This was to encourage sales of the newly-revised edition – the 2014 Standards (Levine Decl., ¶ 19, Exh. PPP). However, so long as purchasers are made aware that it is no longer the current edition, the 1999 Standards do have an enduring value for those in the testing and assessment profession who (i) need to know the state of best testing practices as they existed between 1999 and 2014, (ii) believe they still may be held accountable to the guidance of the 1999 Standards even now, and/or (iii) study the changes in best testing and assessment practices over time. For these reasons, in the summer of 2015 AERA resumed sales of the 1999 Standards (Levine Decl., ¶ 20, Exh. QQQ). | Disputed that Plaintiffs resumed sale of the 1999 Standards in 2015 because of the reasons asserted.  Plaintiffs appear to have resumed selling the 1999 Standards to support their position in this litigation.  This is evident first because Plaintiffs have not resumed the sale of any other edition of the Standards, even though every edition would qualify under the factors that Plaintiffs cite for their decision to resume selling the 1999 edition.  Note also that the 1985 Standards were incorporated by reference into 34 CFR § 668.148 from 1995 until 2010, ███████████████████████████ ███████████████████████ ████████  Moreover, although AERA states that it has made the 1999 Standards available for purchase once more, unlike the 2014 Standards and AERA's other publications, the 1999 Standards are not available for purchase through AERA's online store; instead, prospective purchasers are required to fill out a special book order form and deliver the form to AERA for processing. (SMF ¶ 59.) |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 36. The Sponsoring Organizations do not keep any of the proceeds generated from the sales of the Standards. Rather, the income from these sales is used by the Sponsoring Organizations to offset their development and production costs and to generate funds for subsequent revisions. This allows the Sponsoring Organizations to develop up-to-date, high quality Standards that otherwise would not be developed due to the time and effort that goes into producing them (Levine Decl., ¶ 21; Geisinger Decl., ¶ 22; Camara Decl., ¶ 19; Ernesto Decl., ¶ 31). | Disputed to the extent that Plaintiffs assert that the development of the Standards would not have occurred but for the particular revenue model that Plaintiffs employ. This is an opinion, not a fact. Plaintiffs have no evidence to support this assertion other than the conjecture of their witnesses. Dr. Levine, Mr. Camara, and Ms. Ernesto are not qualified as experts to opine on this subject. Dr. Geisinger is not an expert on revenue models or standards development, and is not qualified to opine on this subject. *See* Public Resource's Motion to Strike the Declaration of Dr. Geisinger, Dkt 67. |
| 37. Without receiving at least some moderate income from the sales of the Standards to offset their production costs and to allow for further revisions, it is very likely that the Sponsoring Organizations would no longer undertake to periodically update them, and it is unknown who else would (Levine Decl., ¶ 22; Ernesto Decl., ¶ 32; Wise Decl., ¶ 24; Geisinger Decl., ¶ 22). | Disputed. Plaintiffs have failed to adduce admissible evidence in support of these alleged "facts." These are opinions, not facts. Dr. Levine, Mr. Camara, and Ms. Ernesto are not qualified as experts to opine on this subject. Dr. Geisinger is not an expert on revenue models or standards development, and is not qualified to opine on this subject. *See* Public Resource's Motion to Strike the Declaration of Dr. Geisinger, Dkt. 67. Moreover, the 2014 Standards are not implicated by this litigation, and Plaintiffs voluntarily stopped selling the 1999 Standards, the only edition at issue. Plaintiffs have provided no evidence as to how Public Resource's posting of the 1999 Standards could harm Plaintiffs' income from the 2014 Standards, far from reducing revenue from the 2014 Standards to less that "some moderate income." |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 38. At one time, funding for the Standards revision process from third party sources (*e.g.*, governmental agencies, foundations, other associations interested in testing and assessment issues, etc.) was considered. However, this option was not seriously considered as the difficulty and/or potential conflicts of interest in doing so left the Sponsoring Organizations to conclude that financial support for the Standards revisions should be self-funding – that is, from the sale of prior editions of the Standards (Levine Decl., ¶ 23; Camara Decl., ¶ 20). | Undisputed but immaterial. |
| 39. Due to the small membership size of Plaintiff NCME, and the relative minor portion of the membership of Plaintiffs AERA and APA who devote their careers to testing and assessment, it is highly unlikely that the members of the Sponsoring Organizations will vote for a dues increase to fund future Standards revision efforts if Public Resource successfully defends this case and is allowed to post the Standards online for the public to download or print for free. As a result, the Sponsoring Organizations would likely abandon their practice of periodically updating the Standards (Levine Decl., ¶ 24; Camara Decl., ¶ 24; Geisinger Decl., ¶ 23; Ernesto Decl., ¶ 33). | Disputed but immaterial.  Plaintiffs have failed to adduce admissible evidence in support of these alleged "facts." These are opinions, not facts.  Dr. Levine, Mr. Camara, and Ms. Ernesto are not qualified as experts to opine on this subject.  Dr. Geisinger is not an expert on revenue models or standards development, and is not qualified to opine on this subject.  *See* Public Resource's Motion to Strike the Declaration of Dr. Geisinger, Dkt. 67. Moreover, the 2014 Standards are not implicated by this litigation, and Plaintiffs voluntarily stopped selling the 1999 Standards, the only edition at issue. (SMF ¶ 40; Plfs Mem. at 11.)  Plaintiffs have provided no evidence as to how Public Resource's posting of the 1999 Standards could harm Plaintiffs' income from the 2014 Standards. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| | ████████████████████████<br>████████████████ |
| 40. The Plaintiffs are joint owners of the copyright in and to the Standards. The Standards were registered with the U.S. Register of Copyrights under Registration Number TX 5-100-196, having an effective date of December 8, 1999 (Levine Decl., ¶ 25, Exh. RRR). | Disputed to the extent that Plaintiffs claim to be joint owners of the copyright to the 1999 Standards.   The copyright registration is false, as Plaintiffs have admitted, because it does not list the names of the claimed other joint authors of the 1999 Standards: both the first registration, obtained in December 1999, and the supplementary registration, obtained in February 2014, list either AERA or all three Plaintiffs as the sole authors and owners of the 1999 Standards, but only months later did Plaintiffs obtain their first alleged copyright assignment (in April 2014). ICE Ex. 3 (Ernesto Dep. 122:23–127:12).  Plaintiffs have additional faults in their ownership claims. The Joint Committee for the 1999 Standards comprised 17 members, not 16 as Plaintiffs suggest below, and Plaintiffs only allege to have assignments from 15 of those individuals. *Compare* Plfs SMF ¶ 42 *with* ICE Exs. 12 and 3 (Ernesto Dep. 103:22–105:07). Additionally, Plaintiffs do not have assignments from any of the hundreds of other individuals, organizations, and other entities that participated in the development of the 1999 Standards in collaboration with the Joint Committee members. ICE Ex. 2 (Schneider Dep. 177:18–178:02). Moreover, the effect of the alleged assignments and "posthumous assignments" (for which there was no consideration) is a legal issue in dispute. ██████████████████████████<br>██████████████████████████<br>██████████████████████████<br>██████████████████████ ven if the assignments were in proper form, Plaintiffs have not established that the individuals who signed them had ownership of, and the right to transfer, the copyrights that they purport to |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| | transfer; many of the members of the Joint Committee were employed by entities that have not executed assignments. ████████ ████████████████████ ████████████████████████ |
| 41. A supplementary copyright registration for the Standards was issued by the U.S. Register of Copyrights under Supplementary Registration Number TX 6-434-609, having an effective date of February 25, 2014 (Levine Decl., ¶ 26, Exh. SSS). | Undisputed. |
| 42. The Joint Committee that authored the 1999 Standards comprised 16 members (Levine Decl., ¶¶ 27-28, Exh. TTT). Except for Manfred Meier (who could not be located, nor could his heirs), work made-for-hire letters were signed by 13 Joint Committee Members, and posthumous assignments were signed by the heirs of 2 deceased Joint Committee Members, vesting ownership of the copyright to the 1999 Standards in the Sponsoring Organizations (Ernesto Decl., ¶ 34, Exhs. VV-HHH). | Disputed.  The Joint Committee for the 1999 Standards comprised 17 members, not 16. ICE Exs. 12 and 3 (Ernesto Dep. 103:22–105:07) Additionally, Plaintiffs fail to mention that hundreds of individuals, organizations, and other entities participated in the authorship of the 1999 Standards along with the Joint Committee members. ICE Ex. 2 (Schneider Dep. 177:18–178:02); *see* SMF ¶ 9. Moreover, the effect of the alleged "work made-for-hire letters" and "posthumous assignments" is a legal issue in dispute, on which Ms. Ernesto's opinion is not determinative, and it is inconsistent with Plaintiffs' claimed "joint authorship." ████████████████ ████████████████████ ████████████████ |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 43. Government agencies also use standards, including by incorporating them by reference in statutes and regulations. The National Technology Transfer and Advancement Act of 1995 ("NTTAA"), for example, requires federal agencies to use privately developed standards whenever possible. Pub. L. No. 104-113 § 12, 110 Stat. 775, 782-83 (1996), codified at 15 U.S.C. § 272. | Undisputed. |
| 44. In alignment with the NTTAA, the Department of Education used privately developed standards in Section 668.146 of Title 34 of the Code of Federal Regulations, Subtitle B: Regulations of the Offices of the Department of Education, Chapter VI: Office of Postsecondary Education, Department of Education Part 668: Student Assistance General Provisions, Subpart J: Approval of Independently Administered Tests; Specification of Passing Score; Approval of State Process (the "Department of Education Regulations"), in relevant part, provides: <br><br> (a) Except as provided in § 668.148, the Secretary approves a test under this subpart if – <br><br> (1) The test meets the criteria set forth in paragraph (b) of this section ... <br><br> (b) To be approved under this subpart, a test must – <br><br> ... <br><br> (6) Meet all standards for test construction provided in the 1999 edition of the *Standards for Educational and Psychological Testing*, prepared by a joint committee of the American Educational Research Association, the American Psychological Association, and the National Council on Measurement in Education incorporated by reference in this section. Incorporation by reference of this document has been approved by the Director of the | Undisputed. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| Office of the Federal Register pursuant to the Director's authority under *5 U.S.C. 552*(a) and 1 CFR part 51. The incorporated document is on file at the Department of Education, Federal Student Aid, room 113E2, 830 First Street, NE., Washington, DC 20002, phone (202) 377-4026, and at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 1-866-272-6272, or go to: http://www.archives.gov/federal-register/code-of-federal-regulations/ibr-locations.html. The document also may be obtained from the American Educational Research Association at: http://www.aera.net .... | |
| 45. It is notable that Plaintiff's' 1999 Standards are referred to by way of *citation* in the U.S. Department of Education Regulations. However, the *text* of Plaintiffs' Standards is not integrated word-for-word, in whole or in part, into those regulations. Therefore, no one could, or should, interpret the Standards as "the law." | Disputed to the extent it states facts; legal argument is not factual.  The 1999 Standards are formally incorporated by reference into the U.S Department of Education Regulations in full, and compliance with *all* of the 1999 Standards is thereby mandated by law – it is not simply "referred to by way of citation," as Plaintiffs claim.  The Office of the Federal Register states: "The legal effect of incorporation by reference is that the material is treated as if it were published in the Federal Register and CFR. This material, like any other properly issued rule, has the force and effect of law. Congress authorized incorporation by reference in the Freedom of Information Act to reduce the volume of material published in the Federal Register and CFR." (SMF ¶ 31.) Plaintiffs' statement that "no one could, or should, interpret the Standards as 'the law'" is not a fact, it is an opinion (and in part a legal conclusion), and Plaintiffs do not cite any evidence to support this claim. |
| 46. On the other hand, the Department of Education Regulations are in compliance with Federal law – which requires that materials | Nonfactual legal argument; disputed.  The 1999 Standards are not reasonably available to the class of persons affected.  The regulations |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| incorporated by reference in the Federal Register must be "reasonably available to the class of persons affected." 5 U.S.C. § 552(a)(1); 1 C.F.R. § 51.7(a)(3). | specify that the 1999 Standards are available to read by written appointment at the National Archives in Washington D.C., or alternatively can be purchased from the Plaintiffs.  (SMF ¶ 27.)  But after Plaintiffs succeeded in convincing Public Resource to take down the version of the 1999 Standards it had posted on the Internet (pending the outcome of this litigation), Plaintiffs proceeded to take the 1999 Standards off sale – leaving citizens who needed access to the law to either track down a second-hand copy, or make a written appointment with the National Archives and travel to Washington D.C.  (*See* SMF ¶ 27, 39-43.)  Although Plaintiffs put the 1999 Standards on sale once more after the issue was raised at deposition, Plaintiffs assert that they expect to eventually take the 1999 Standards off sale at some undefined point in the future. ICE Ex. 5 (Levine Dep. 55:09–56:10). Moreover, the 1999 Standards are not reasonably available to individuals who are blind or visually disabled, and who cannot perceive paper copies of this document.  ICE Ex. 51 (Fruchterman Report) pp.5-6. Because sections of the 1999 Standards apply particularly to fair testing of individuals with disabilities, it is especially important that these citizens have access to the 1999 Standards to ensure that the testing they encounter is in compliance with the law.  ICE Ex. 51 (Fruchterman Report) p. 6. |
| 47. Thus, it is required that (i) a copy of the incorporated material must be on file with the Office of the Federal Register and (ii) the regulations incorporating such material must state the ways those incorporated materials are reasonably available to interested parties. 1 C.F.R. §§ 51.3, 51.5. There is no requirement that such materials be available to the public at no cost. | Nonfactual legal argument; disputed.  The contours of the requirement that materials incorporated by reference be "reasonably available to the class of persons affected" is a legal question in dispute and has not been defined by any court.  Plaintiffs' assertion that "[t]here is no requirement that [materials incorporated by reference into the law] be available to the public at no cost" is an erroneous legal conclusion – United States law must be free and available to citizens to read |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| | and speak. See Public Resource's Memorandum of Points and Authorities. |
| 48. Defendant Public Resource is a California non-profit corporation founded in 2007 by Mr. Carl Malamud ("Malamud"), with the aim of making government information more accessible with particular emphasis on the law (Hudis Decl., ¶ 2, Exh. A, pp. 77, 93-94, 163-164). | Undisputed. |
| 49. The identified purpose and objective of Public Resource is to create and maintain so-called informational "public works projects for the Internet" (Hudis Decl., ¶ 2, Exh. A, pp. 94-95, 105-109, ¶ 3, Exh. B, Section II.B., ¶ 4, Exh. C. Section 2.1). | Undisputed. |
| 50. In actuality, Public Resource maintains an assortment of seemingly random websites, which contain materials ranging from technical projects in which Malamud has been involved, to his commentary on government databases and entities (*e.g.*, PACER, EDGAR, the Government Printing Office and the Smithsonian), to myriad collections of legislative, regulatory, and case law materials (Hudis Decl., ¶ 2, Exh. A, pp. 78-84, 96-102, 111-113, ¶ 5, Exh. D). | Disputed.  Plaintiffs' derogatory characterization of Public Resource is a non-factual opinion, and Plaintiffs' counsel Mr. Hudis is not qualified as an expert to opine on this matter.  Public Resource's website is structured for navigation by search engines and for bulk access.  Data are organized by country (e.g., /pub/us/) then by type of data, such as standards incorporated by reference (/pub/us/cfr/ibr/). Malamud Decl. ¶ 29. The Court is invited to view Public Resource's website at https://law.resource.org. |
| 51. Of particular interest for this litigation is Public Resource's website titled https://law.resource.org, on which Public Resource posted the infringing digital copy of the Sponsoring Organizations' 1999 Standards (Hudis Decl., ¶¶ 2, Exh. A, pp. 83-88, 234). | Nonfactual legal argument and opinion; disputed to the extent that Plaintiffs assert Public Resource posted an "infringing digital copy of the Sponsoring Organizations' 1999 Standards."  Public Resource posted a version of the 1999 Standards on its website, but there is a legal dispute as to whether the version the Public Resource posted was infringing, as well as whether Plaintiffs own rights to the 1999 Standards.  Moreover, what Public Resource posted was not a "copy" in the legal sense.  As defined by the 1976 Copyright Act, "'copies' are material objects, other than phonorecords, |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| | in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101.  The Copyright Act provides for exclusive rights that apply to "copies" (17 U.S.C. § 106 (1) and (3)), as well as exclusive rights that do not implicate "copies" (17 U.S.C. § 106 (2) and (4)–(6)).  The electronic version of the 1999 Standards that Public Resource posted was not a material object, and therefore not a "copy" under the Copyright Act. |
| 52. Public Resource does not provide any other services, and does not sell any products (Hudis Decl., ¶ 2, Exh. A, pp. 102-103, 127). | Undisputed. |
| 53. Malamud has worked in the computer science, computer networks, and information technology fields since 1980. Although he has no formal education on these subjects, Malamud has written many books and articles on, and taught classes in, these areas (Hudis Decl., ¶ 2, Exh. A, pp. 22-77, ¶ 6, Exh. E). | Undisputed. |
| 54. On behalf of Public Resource, Malamud spends his time operating its varied websites, giving speeches, sending letters and FOIA requests to government officials, and attending to the company's finances (Hudis Decl., ¶ 2, Exh. A, pp. 78-79, 88-90). | Undisputed. |
| 55. While Public Resource does have a Board of Directors to whom Malamud reports, the company has no other officers, employees or members (Hudis Decl., ¶ 2, Exh. A, pp. 90, 120-123, Exh. E). | Undisputed. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 56. In short, except for the retention of independent contractors here and there (Hudis Decl., ¶ 2, Exh. A, pp. 135-136), Malamud *is* Public Resource. | Denied. Public Resource is a not-for-profit organization founded by Mr. Malamud, and operated under the direction of a board of trustees that includes Tim Stanley, CEO of Justia and affiliate with the Stanford University Copyright and Fair Use Center, as well as Ed Walters, CEO of Fastcase and Adjunct Professor at the Georgetown University Law Center. *See* https://public.resource.org/about/index.html |
| 57. Public Resource obtains its funding and/or outside legal assistance from a cadre of law firms, foundations and Internet companies (*e.g.*, Google and Creative Commons) (Hudis Decl., ¶ 2, Exh. A, pp. 135-136, ¶ 5, Exh. D). | Disputed to the extent that Plaintiffs characterize Public Resource's funding and legal assistance as coming from a "cadre" of law firms, foundations and Internet companies. A listing of donors who permit their names to be publicly listed appears on Public Resource's "About" page. https://public.resource.org/about/index.html |
| 58. In 2013, Malamud used a Kickstarter crowd-funding campaign to raise between $100,000 and $1.2 million in order to finance Public Resource's infringing operation of re-typing (or "double-keying") third-party standards, and publishing them to the https://law.resource.org website. However, this Kickstarter effort was unsuccessful (Hudis Decl., ¶ 2, Exh. A, pp. 82-83, 206-212, ¶ 7, Exh. F). | Immaterial. Disputed to the extent that Plaintiffs assert that Public Resource's activities are infringing, which is the subject of this litigation. Disputed also to the extent that Plaintiffs characterize Public Resource's activities as "publishing," as the term is not used according to the meaning in the 1976 Copyright Act, which defines "publication" as "the distribution of *copies* or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. . . A public performance or display of a work does not itself constitute publication." 17 U.S.C. § 101 (emphasis added). As defined by the 1976 Copyright Act, "'copies' are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101. The Copyright Act provides for exclusive rights that apply to "copies (17 U.S.C. § 106 (1) and |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| | (3)), as well as exclusive rights that do not implicate "copies" (17 U.S.C. § 106 (2) and (4)–(6)).  The electronic version of the 1999 Standards that Public Resource posted was not a material object, and therefore not a "copy" under the Copyright Act. |
| 59. In Malamud's view, "standards" are a set of best practices that the organization publishing them believes should be widely adopted. An example given by Malamud are the best practice standards for computer networking promulgated by the Internet Engineering Task Force (Hudis Decl., ¶ 2, Exh. A, pp. 59-60).<br><br>Public.Resource.Org spent [funds] ... buying privately-produced ... standards .... These ... standards govern and protect a wide range of activity .... We have started copying those ... standards despite the fact they are festooned with copyright warnings, shrinkwrap agreements and other dire warnings. (Deleted material referring to "technical public safety standards").<br><br>***<br><br>We know from all the copyright warnings, terms of use, scary shrink wrap agreements, and other red-hot rhetoric that accompanies these documents that the producers continue to believe that copies may not be made under any circumstances.<br><br>(Hudis Decl., ¶ 2, Exh. A, pp. 181-184, ¶ 9, Exh. H (Malamud, C., *Liberating America's Secret, For-Pay Laws*, boingboing, March 19, 2012), production pp. AERA_APA_NCME_31764-31765). | Disputed. Plaintiffs provide no evidence for their claim as to what Mr. Malamud considers a "standard" to be and it is not clear how they arrive at such a characterization.  The cited deposition testimony simply describes Mr. Malamud's participation in the development of Internet Engineering Task Force standards, and does not describe how Mr. Malamud defines a "standard" generally.<br><br>Disputed.  Plaintiffs lack evidence for their assertions and mischaracterize Mr. Malamud's statements in his 1993 book "Exploring the Internet: a Technical Travelogue."  This chapter, which is taken out of context, describes Mr. Malamud's work with the International Telecommunication Union ("ITU") to convert ITU specifications to a digital format and post them online, with the support of the ITU (including the blessing of the secretary general of the ITU, as described in the book).  This project was called "Bruno," and in the chapter "Geneva" Mr. Malamud uses the phrase "baby killer" as a joking way to refer to the organization's decisions as to how it should prioritize resources (not a "code-name" for the project, as Plaintiffs assert). This chapter does not support Plaintiffs' accusation that Mr. Malamud "knew that copying and widely disseminating standards, for free and without permission . . . would adversely impact the revenues of the organizations that published authorized copies of those standards," not least of which because Mr. Malamud had the permission of ITU for its activities, and also because the chapter describes how Mr. Malamud endeavored to |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| | convey to officials within the ITU that the digitization project would result in a net revenue benefit to the ITU. ICE Ex. 7 (Malamud Dep. 159:14–21); Hudis Decl. Exh. G. The project was very successful and today the ITU makes all of its standards freely available on the Internet.  Malamud Decl. ¶ 5. Although Plaintiffs appear to have mistakenly cited paragraph nine of Mr. Hudis's declaration, rather than paragraph eight, Plaintiffs lack evidentiary support for their erroneous claims regardless of which paragraph is cited. |
| | Disputed.  Plaintiffs lack evidence for their claims, as the cited text does not support the statement that Mr. Malamud "clearly knew that the copying of others' copyrighted standards to its website constituted copyright infringement."  In fact, the cited article says just the opposite, and Plaintiffs have quoted selectively. In the second sentence after the quoted passage, Mr. Malamud states ". . . we strongly believe that the documents are not entitled to copyright protection . . . ." Indeed, in the portion that Plaintiffs quote, Mr. Malamud simply states that some standards include copyright notices; Mr. Malamud does not state that these copyright claims are valid. Dkt. 60-11, Hudis Decl. Exh. H. Moreover, Plaintiffs' statement includes a legal conclusion regarding a matter that is in dispute in this litigation: whether the posting of standards incorporated by reference into the law constitutes copyright infringement. |
| 62. It is nonetheless Malamud's unwavering belief that, once a governmental entity incorporates a standard by reference into a statute or a regulation, the standard becomes "the law" and as such loses its copyright protection (Hudis Decl., ¶ 2, Exh. A, pp. 172-73, 218-219, 257, 358-61). | Undisputed. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 63. According to Malamud's line of thinking, once standards lose their copyright protection in this manner, anyone can copy them, convert them to digital form, post them on the Internet and allow others to download or print them at will and for free (Hudis Decl., ¶ 2, Exh. A, pp. 187-88). | Undisputed. |
| 64. Malamud further believes that it is perfectly acceptable for standards development organizations, such as Plaintiffs, to lose their copyright in standards incorporated by reference – and with it the economic value that copyright brings. According to Malamud, though knowing very little about the Sponsoring Organizations' operations, finances, policies or practices for updating their Standards (Hudis Dec., ¶ 2, Exh. A, pp. 192-93, 199-201, 223-232), in such circumstances Plaintiffs (and similarly situated standards development organizations) should simply change their business model(s) by finding other ways to finance updates to their Standards, or making the government pay for the updates:<br><br>**BOB GARFIELD (Interviewer):** There is an expense attached to developing and codifying these standards. If we take the revenue away from those who do this work, then what happens?<br><br>**CARL MALAMUD:** Well, there's two answers to that. One is that the non-profits that develop these standards have a lot of different revenue streams. They do conferences, they do certification. They develop standards that aren't law. ... And so, *maybe they need to adjust their business model*, particularly given the fact they are a non-profit public charity. Answer number two is that *government has shirked its responsibilities*. It said, gee, we can just incorporate these privately developed standards in the law, and we won't have to pay anything. And the only people that get | Disputed.  Plaintiffs' characterization is not supported by the quoted text, and is controverted by Mr. Malamud's deposition testimony that Plaintiffs cite, in which Mr. Malamud states that he disagrees with Plaintiffs' counsel's characterization and points out that even if the law is made freely available to the public, it does not preclude standards organizations from selling copies of those standards (particularly authenticated copies, redlines, or versions with commentary or annotations). ICE Ex. 7 (Malamud Dep. 177:20–178:14). Plaintiff's selective quotation of the On the Media transcript omits a sentence (where Plaintiffs have inserted an ellipses) in which Mr. Malamud explains that the vast majority of standards that standard organizations publish are not law (meaning that the vast majority of revenues would be unaffected for these organizations).  Plaintiffs also omit further explanation by Mr. Malamud that there are many ancillary benefits to standards organizations and their members that come from having standards incorporated by reference into the law, which offset any hypothetical loss to income.  Dkt 60-12, Hudis Decl. Exh. I. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| screwed up by this are the citizens that need to read the law.<br><br>(Hudis Decl., ¶ 2, Exh. A, pp. 173-180, ¶ 10, Exh. I (Garfield, B., *Making Laws More Public Transcript - On The Media*, interview of Carl Malamud, <u>The Media</u>, April 13, 2012), production p. AERA_APA_NCME_32076) (emphasis added). | |
| 65. In March 2012, Public Resource began copying standards incorporated by reference into the Code of Federal Regulations, and providing the copies of these standards to others. In May 2012, Public Resource began the process of posting copies [*sic*] these standards to its website. By May 2015, Public Resource had posted PDF copies of over 1,000 standards to its website (Hudis Decl., ¶ 2, Exh. A, pp. 216-218). | Disputed to the extent that Plaintiffs mischaracterize Public Resource's activities. In March 2012, Public Resource made 25 photocopies of 73 public safety standards that had been incorporated by reference into U.S. federal law and were sent to seven U.S. government offices (including the White House, Senate, House of Representatives, National Archives, Administrative Conference of the United States, Federal Trade Commission, and the Copyright Office), ten standards organizations, and to attorneys, journalists, and Harvard Law School. The 1999 Standards were not among this group of standards, nor were Plaintiffs recipients of these photocopies.  *See* Plaintiffs' Exh. H.  In May 2012 Public Resource began the process of posting electronic versions of standards incorporated by reference on the Public Resource website – not "copies," which are defined as material objects under the 1976 Copyright Act. *See* SMF ¶ 38, 17 U.S.C. § 101. |
| 66. To demonstrate the depth and breadth of Public Resource's activities, Defendant has published to its website https://law.resource.org, *inter alia*, numerous state and municipal codes, public safety codes, and technical standards – *see, e.g.*, https://law.resource.org/pub/us/code/safety.html and https://law.resource.org/pub/us/cfr/manifest.us.html (Hudis Decl., ¶¶ 11-12, Exhs. J-K). | Disputed to the extent that Plaintiffs assert Public Resource has "published" documents to its website, as the term is not used according to the meaning in the 1976 Copyright Act, which defines "publication" as "the distribution of *copies* or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. . . A public performance or display of a work does not itself constitute publication." 17 U.S.C. § 101 |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| | (emphasis added).  As defined by the 1976 Copyright Act, "'copies' are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101.  The Copyright Act provides for exclusive rights that apply to "copies" (17 U.S.C. § 106 (1) and (3)), as well as exclusive rights that do not implicate "copies" (17 U.S.C. § 106 (2) and (4)–(6)).  The electronic version of the 1999 Standards that Public Resource posted was not a material object, and therefore not a "copy" under the Copyright Act.  Undisputed to the extent that Public Resource has posted identified materials to its website. |
| 67. Several of the codes and standards that Public Resource publishes on the https://law.resource.org website are subject to U.S. copyright protection (Hudis Decl., ¶¶ 13-20, Exhs. L-S), and it is believed that Public Resource publishes these codes and standards to the https://law.resource.org website without obtaining the permission of the copyright owners of these works – for example: the Safety Standard for Belt Manlifts: ASME A90.1-2003; the Guidelines for the definition of onshore gas gathering lines, the Classification in Mental Retardation (1983 revision), the Official methods of analysis of the Association of Official Analytical Chemists, the Glazing Manual (1990 edition), Mobile and Locomotive Cranes: ASME B30.5-2004, Drinking water system components: health effects: American national standard/NSF international standard for drinking water additives : ANSI/INSF 61-2001, and the Minimum design loads for buildings and other structures (Special ed. 2003). | Nonfactual legal argument; disputed.  The question of whether standards incorporated by reference into law are "subject to U.S. copyright protection" is a legal issue in dispute in this litigation.  Additionally, Plaintiffs have not provided admissible evidence to support their assertion that copyrights for these standards are owned by the third party organizations as Plaintiffs claim, as online abstracts of copyright registrations are not official registrations, nor are they proof of copyright ownership, and Plaintiffs have not obtained any statements from these third party organizations to that effect. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 68. In early 2012, Malamud was perusing through the Code of Federal Regulations, looking for various standards purportedly incorporated by reference therein, when he came upon a reference to the Sponsoring Organizations' 1999 Standards (Hudis Decl., ¶ 2, Exh. A, pp. 232- 233). | Immaterial; disputed.  In the cited deposition testimony, Mr. Malamud states that the 1999 Standards came to his attention because they were specified as having been incorporated by reference under the Code of Federal Regulations.  Mr. Malamud does not say that he was "perusing through the Code of Federal Regulations, looking for various standards purportedly incorporated by reference therein, when he came upon a reference to the . . . 1999 Standards." ICE Ex. 7 (Malamud Dep. 232:09–25). |
| 69. On May 17, 2012, Public Resource purchased a used copy of the 1999 Standards from an Amazon re-seller, "The Book Grove" (Hudis Decl., ¶ 2, Exh. A, pp. 232-240, ¶ 21, Exh. T, Int. Ans. 1, ¶¶ 22-23, Exhs. U and V). | Undisputed. |
| 70. Public Resource only paid for the 1999 Standards, however, after a failed attempt in 2009 of procuring them for free (or at least at a reduced cost) from the National Archives pursuant to a Freedom of Information Act request and accompanying "fee waiver" (Hudis Decl., ¶ 2, Exh. A, pp. 240-51, ¶ 24, Exh. W (production pp. AERA_APA_NCME_10153-57 and 10167) and ¶ 25, Exh. X). | Immaterial; disputed to the extent that Plaintiffs characterize Public Resource's 2009 Freedom of Information Act ("FOIA") request as an attempt to procure the 1999 Standards for free.  Mr. Malamud stated at deposition that he was not certain if there would have been a charge to Public Resource by the National Archives and Records Administration for making the information it requested available. This FOIA request was for approximately 2,000 standards that have been incorporated by reference into law, of which the 1999 Standards were one of the listed standards. Public Resource requested a fee waiver, and in the alternative, requested that if no fees were waived, the National Archives should provide a partial response up to $5,000 of charges (which may or may not have included the 1999 Standards).  Dkt. 60-27, Hudis Decl. Exh. W. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 71. Upon receipt of the purchased paper copy of the 1999 Standards, Malamud disassembled the book, removed the spine, trimmed the pages to give them an even border, scanned the pages to create a PDF (Acrobat Reader) file using a Xerox scanner, and named the PDF file "aera.standards.1999.pdf." Malamud then appended a cover sheet, or self-made "Certificate," to the front of the PDF file giving a false semblance of governmental approval or permission to the unauthorized copying and online posting of the 1999 Standards (Hudis Decl., ¶ 2, Exh. A, pp. 257-259, 261-264, ¶ 21, Exh. T, Int. Anss. 3-4, ¶ 26, Exh. Y):  | Disputed to the extent that Plaintiffs assert that Public Resource's cover sheets "giv[e] a false semblance of governmental approval or permission to the unauthorized copying and online posting of the 1999 Standards." Plaintiffs have failed to adduce admissible evidence in support of this alleged "fact," and this is opinion, not fact. Plaintiffs' counsel Mr. Hudis is not qualified as an expert to opine on this matter. |
| 72. Next, Malamud *claims* he post-processed Public Resource's PDF file of the scanned 1999 Standards to generate Optical Character Recognition ("OCR") on the text (Hudis Decl., ¶ 2, Exh. A, p. 260, ¶ 21, Exh. T, Int. Anss. 3-4). | Undisputed. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 73. However, according to Public Resource's expert, James Fruchterman, Malamud never OCR-processed the PDF file, so all Malamud and Public Resource posted to the Internet was an *image-only* document (Hudis Decl., ¶ 27, Exh. Z, pp. 309-310, ¶ 28, Exh. AA, p. 9 (and sub-Exh. B thereto)). | Disputed. Public Resource posted two versions of the 1999 Standards online: one version on the Public Resource website, and the other on the Internet Archive website.  The version posted on the Internet Archive website did undergo OCR and was available in various text formats that were immediately accessible to people who are blind or visually impaired through use of screen reading programs. ICE Ex. 51 (Fruchterman Report) p. 11–12. |
| 74. OCR is the process of having a machine recognize letters and words, generally from documents, and translate those into letter or word equivalents (Hudis Decl., ¶ 27, Exh. Z, pp. 29-30). | Undisputed. |
| 75. Without OCR-processing, Public Resource's unauthorized copying and posting of the 1999 Standards provided no additional technical value, such as for word-searching, online identification, or text-to-speech utilization for the blind and visually impaired (Hudis Decl., ¶ 27, Exh. Z, pp. 30, 122, 200-01, 206, 271-72, 315-16). | Disputed.  Plaintiffs have failed to adduce admissible evidence in support of this alleged "fact," and this is opinion, not fact.  Plaintiffs' counsel Mr. Hudis is not qualified as an expert to opine on this matter. <br><br> Public Resource posted two versions of the 1999 Standards online: one version on the Public Resource website, and the other on the Internet Archive website.  The version posted on the Internet Archive website did undergo OCR and was available in various text formats that were immediately accessible to people who are blind or visually impaired through use of screen reading programs. ICE Ex. 51 (Fruchterman Report) p. 11–12. The electronic version of the 1999 Standards that Public Resource posted on the Public Resource website that did not undergo OCR is still valuable to people who are blind or visually disabled because it is relatively trivial for such a person to perform OCR on the document. What is not trivial for a person who is blind or visually disabled is to obtain a paper copy of the 1999 Standards, scan each page, and produce an electronic version that can then have OCR performed on it, as this requires |

33

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| | equipment that most people who are blind do not own, and takes hours of work.  The non-OCR version that Public Resource posted on the Public Resource website is therefore a valuable contribution to making the 1999 Standards available to people who are blind or visually disabled. ICE Ex. 51 (Fruchterman Report) p. 8–9. |
| 76. In the final step of the process, Malamud claims he stamped metadata into the headers of the PDF file, posted the file (the entirety of Plaintiffs' 1999 Standards) to Public Resource's https://law.resource.org website as well as the website of the Internet Archive (https://archive.org) (Answer & Counterclaim, Court Dkt. 12, ¶¶ 7, 55; Hudis Decl., ¶ 2, Exh. A, pp. 233-34, 271-72; ¶ 2 1, Exh. T, Int. Ans. No. 2). | Undisputed. |
| 77. In Defendant's interrogatory answers (verified by Malamud), Public Resource describes a detailed quality control process attendant to the unlawful digital copying of the Sponsoring Organizations' 1999 Standards. During deposition questioning, however, Malamud was unsure whether he followed those quality control procedures at all (Hudis Decl., ¶ 2, Exh. A, pp. 260-61, 267-68, 274-275, ¶ 21, Exh. T, Int. Anss. 3-4, ¶ 35, Exh. HH, Admission No. 2). | Disputed.  Plaintiffs have not provided evidence to support this assertion.  At deposition, Plaintiffs' counsel asked if Mr. Malamud had checked the quality of the OCR process for accuracy for the 1999 Standards, and Mr. Malamud responded that he did not, because that was not a part of Public Resource's normal workflow. ICE Ex. 7 (Malamud Dep. 267:06–268:02). |
| 78. The Internet Archive is a nonprofit organization whose mission is to build and maintain a digital library of the Internet. The Internet Archive builds this Internet library – which it makes available for public use – by scanning, digitally capturing, and saving the electronically scanned and captured third-party websites, and by receiving content submissions from third parties who have access to do so by the establishment of user accounts (Hudis Decl., ¶ 29, Exh. BB, pp. 31-41). | Undisputed. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 79. Malamud has such user account access (Hudis Decl., ¶ 29, Exh. BB, pp. 51-56), through which he uploaded the entirety of the 1999 Standards to the Internet Archive's website on May 26-27, 2012 (Hudis Decl., ¶ 29, Exh. BB, pp. 59-112, ¶ 30, Exh. CC (¶¶ 3-18 therein), ¶ 32, Exh. EE, ¶ 33, Exh. FF). | Undisputed. |
| 80. Public Resource posted Plaintiffs' 1999 Standards to its website and the Internet Archive website without the permission or authorization of any of the Sponsoring Organizations (Hudis Decl., ¶ 35, Exh. HH, Admission Nos. 4-5; Levine Decl., ¶ 29; Ernesto Decl., ¶ 35; Wise Decl., ¶ 26). | Undisputed. |
| 81. By uploading the 1999 Standards to the Internet Archive, Public Resource violated the Internet Archive's Terms of Use in effect at the time of Public Resource's infringement, which in relevant part states:<br><br>This terms of use agreement (the "Agreement") governs your use of the collection of Web pages and other digital content (the "Collections") available through the Internet Archive (the "Archive"). When accessing an archived page, you will be presented with the terms of use agreement. If you do not agree to these terms, please do not use the Archive's Collections or its Web site (the "Site").<br><br>* * *<br><br>Some of the content available through the Archive may be governed by local, national, and/or international laws and regulations ... You agree to abide by all applicable laws and regulations, including intellectual property laws, in connection with your use of the Archive. In particular, *you certify that your use of any part of the Archive's Collections will be ... limited to noninfringing or fair use under copyright law*. In using the Archive's site, Collections, | Denied.  This is a legal opinion, not a fact. The legal question of whether posting standards that have been incorporated by reference into the law is noninfringing or fair use is at issue in this litigation. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| and/or services, you further agree ... (b) *not to act in any way that might give rise to civil or criminal liability*, [and] ... (e) *not to infringe any copyright, trademark, patent, or other proprietary rights of any person*, ...<br><br>(Hudis Decl., ¶ 29, Exh. BB, pp. 41-45, ¶ 31, Exh. DD) (emphasis added). | |
| 82. The unauthorized copy of the Sponsoring Organizations' 1999 Standards that Malamud published to the Internet Archive at https://archive.org/details/gov.law.aera.standards.1999 was in the exact same format, using the same cover sheet or "Certificate" employed by Public Resource in the posting of the Sponsoring Organizations' 1999 Standards to Defendant's own website. All of the surrounding text associated with the posting to the Internet Archive website was inserted by Malamud – including the insertion of "Creative Commons License: CC0 1.0 Universal," indicating that *no rights are being asserted* over the item (Hudis Decl., ¶ 2, Exh. A, pp. 275-284, ¶ 29, Exh. BB, pp. 57-63, ¶ 30, Exh. CC (¶ 2 therein), ¶ 34, Exh. GG):<br><br> | Nonfactual legal argument in part.  Disputed to the extent that the version of the 1999 Standards that Public Resource posted to the Internet Archive underwent additional processing by the Internet Archive systems, performing OCR and creating a variety of different electronic formats that are thereby more accessible to people who are blind or visually disabled, and therefore not "the exact same format" as the version on the Public Resource website, as Plaintiffs suggest.  ICE Ex. 51 (Fruchterman Report) p. 11–12.  Disputed also to the extent that Plaintiffs assert that Public Resource has "published" the 1999 Standards to the Internet Archive website, as the term is not used according to the meaning in the 1976 Copyright Act, which defines "publication" as "the distribution of *copies* or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. . . A public performance or display of a work does not itself constitute publication." 17 U.S.C. § 101 (emphasis added).  As defined by the 1976 Copyright Act, "'copies' are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101.  The Copyright Act provides for exclusive rights that apply to "copies" (17 U.S.C. § 106 (1) and (3)), as well as exclusive rights that do not implicate "copies" (17 U.S.C. § 106 (2) and (4)–(6)). |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| | The electronic version of the 1999 Standards that Public Resource posted was not a material object, and therefore not a "copy" under the Copyright Act. |
| 83. Public Resource claims the Sponsoring Organizations' 1999 Standards were posted to Public Resource's https://law.resource.org website and to the Internet Archive https://archive.org website from July 11, 2012 to June 10, 2014 (Hudis Decl., ¶ 21, Ex. T, Int. Ans. 2). | Undisputed. |
| 84. As previously noted, Public Resource actually uploaded the 1999 Standards to Internet Archive's website on May 26-27, 2012. The Sponsoring Organizations have no ability to verify when Public Resource uploaded the 1999 Standards to its own website, because neither the "file creation date" nor user access logs were produced during discovery, notwithstanding production requests for this documentation and an accompanying discovery motion demanding production that in relevant part was denied (Hudis Decl., ¶ 36). | Disputed.  Plaintiffs have not adduced admissible evidence to support this fact. Public Resource produced the version of the 1999 Standards that it had posted on the Public Resource website, complete with the file creation date in its metadata.  As Mr. Malamud stated at deposition, Public Resource does not have logs documenting the date on which the 1999 Standards were posted to the Public Resource website. ICE Ex. 7 (Malamud Dep. 273:20–274:03). |
| 85. Although based on incomplete reporting because Public Resource destroyed some of its records (Hudis Decl., ¶ 2, Exh. A, pp. 272-74, 328-336), during the near two year period that the Sponsoring Organizations' 1999 Standards were posted on Public Resource's https://law.resource.org website, they were accessed *at least* 4,164 times (Hudis Decl., ¶ 21, Exh. T, Int. Ans. 2 and Amended Ans. 5 (labeled 6)). | Disputed.  Plaintiffs' accusation that Public Resource destroyed some of its records is unfounded, and Plaintiffs fail to adduce evidence to support their claim.  In the cited deposition testimony, Mr. Malamud stated that when Public Resource agreed to take the 1999 Standards offline pending the outcome of this litigation, the act of taking the standards offline changed metadata on one of the files that might otherwise have been used to determine the original posting date.  Plaintiffs also cite Public Resource's statement at deposition that Public Resource previously had a 2-week retention policy for server logs until litigation commenced in the ASTM v. Public.Resource.Org case in August 2013, at which time the server logs have been retained permanently (nine months prior to when the |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| | AERA Plaintiffs filed suit).  Plaintiffs' claims as to the number of accesses of the 1999 Standards on the Public Resource website is also incorrect, as their calculation appears to include access figures for a stub page that replaced the 1999 Standards on the Public Resource website in June 2014, when Public Resource had taken down the 1999 Standards pending the resolution of this litigation.  *See* Dkt. 60-23, Hudis Decl. Exh. T.  Plaintiffs also fail to explain that the number of "accesses" means the number of access requests from a computer to the Public Resource server, and does not necessarily mean accesses by human beings, but could instead be accesses by webcrawlers, bots, or other automated programs.  Dkt. 60-23, Hudis Decl. Exh. T, at 7–8. |
| 86. During that same period, the Sponsoring Organizations' 1999 Standards were accessed on the Internet Archive https://archive.org website 1,290 times (Hudis Decl., ¶ 29, Exh. BB, pp. 124-132, ¶ 37, Exh. II). | Disputed to the extent that the time period pertinent to the access figures that Plaintiffs cite as Exh. II is not established in the documents Plaintiffs cite.  Plaintiffs also fail to explain that the number of "accesses" means the number of access requests from a computer to the Public Resource server, and does not necessarily mean accesses by human beings, but could instead be accesses by webcrawlers, bots, or other automated programs.  Dkt. 60-23, Hudis Decl. Exh. T, at 7–8. |
| 87. The Internet Archive's website is open to the public and does not restrict an Internet user's ability to download or print the Sponsoring Organizations' 1999 Standards. Public Resource also placed no such restrictions on its website (Hudis Decl., ¶ 2, Exh. A, pp. 347-48), as Defendant's expert, Mr. Fruchterman, confirmed (Hudis Decl., ¶ 27, Exh. Z, pp. 327-28). | Undisputed. |
| 88. Mr. Fruchterman also confirmed that there were no sign-up procedures to enter Public Resource's https://law.resource.org website, nor | Disputed to the extent that Plaintiffs imply that DRM technology should be used to restrict access to the law. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| was there any Digital Rights Management (or "DRM") plan to protect against wide-spread copying of the files accessed from Public Resource's site (Hudis Decl., ¶ 27, Exh. Z, pp. 324-27, 167-173). | |
| 89. The parties and the Court can only speculate on the number of further electronic copies of the 1999 Standards that were made and distributed to others by the original Internet users who accessed the unauthorized copies that Public Resource posted to its site and the Internet Archive site. | Undisputed that the Plaintiffs' statement indicates a lack of any evidence about the making or distribution of copies by any persons. Nonfactual statement. Otherwise disputed. Plaintiffs have not adduced admissible evidence to support this contention. This is opinion, not a fact, and Plaintiffs do not cite any evidence or individual who holds this opinion. Plaintiffs have the burden of proof for establishing harm, and should not invite the Court to "speculate" as to downstream copying or distribution of which Plaintiffs have failed to find any evidence. Notably, after Public Resource took down the 1999 Standards pending the outcome of this litigation, Mr. Fruchterman looked for an electronic version of the 1999 Standards online and could not find one. ICE Ex. 51 (Fruchterman Expert Report), p. 5–6. |
| 90. There simply is no way for Plaintiffs to calculate with any degree of certainty the number of university/college professors, students, testing companies and others who would have purchased Plaintiffs' Standards but for their wholesale posting on Defendant's https://law.resource.org website and the Internet Archive http://archive.org website. (Levine Decl., ¶ 30; Geisinger Decl., ¶ 24). | Undisputed that there is no evidence of any lost sales of the 1999 Standards as a consequence of Defendant's postings of the 1999 Standards. Otherwise disputed. Plaintiffs have not adduced admissible evidence to support this contention. This is opinion, not a fact. Dr. Levine is not qualified as an expert, and Dr. Geisinger is not qualified as an expert on the subject of economic substitution. *See* Public Resource's Motion to Strike the Declaration of Dr. Geisinger, Dkt. 67. Plaintiffs have the burden of proof for establishing harm, cannot shrug off this burden after failing to find evidence of any individual who would have purchased the 1999 Standards but for Public Resource's posting, and similarly failing to retain an expert witness with expertise in economic substitution. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 91. In late 2013 and early 2014, the Sponsoring Organizations became aware that the 1999 Standards had been posted on the Internet without their authorization, and that students were obtaining free copies from the posting source. Upon further investigation, the Sponsoring Organizations discovered that Public Resource was the source of the online posting (Camara Decl., ¶ 21, Exh. MMM; Wise Decl., ¶¶ 27-28, Exh. LLL). | Disputed. Plaintiffs have not adduced admissible evidence to support their contention that students obtained free copies of the 1999 Standards from Public Resource. |
| 92. In December 2013, Plaintiff AERA requested in writing that Public Resource remove the 1999 Standards from its online postings (Levine Decl., ¶ 31, Exh. UUU). Defendant flatly refused (Hudis Decl., ¶ 2, Exh. A, pp. 310-19, ¶ 38, Exh. JJ, ¶ 39, Exh. KK). Once this lawsuit was filed and the Sponsoring Organizations threatened to file a motion for a preliminary injunction, Public Resource agreed in June 2014 to remove its postings of the 1999 Standards from its https://law.resource.org website and from Internet Archive's https://archive.org website – pending a resolution of this litigation on the merits. Public Resource's undertaking included the promise not to post any revision of the 1999 Standards (i.e., the 2014 Standards) pending the outcome of this litigation (Hudis Decl., ¶ 2, Exh. A, pp. 322-28, ¶ 40, Exh. LL, ¶ 41, Exh. MM). | Undisputed. |
| 93. Had Public Resource not made, and followed through with, these promises, the Sponsoring Organizations would have filed a preliminary injunction motion and were seriously contemplating delaying publication of the 2014 Standards (Levine Decl., ¶ 32). | Undisputed. |
| 94. By June 2014, when Public Resource finally removed its online postings of the 1999 Standards, the damage already had been done. In Fiscal Year ("FY") 2011 to FY 2012, as compared to FY 2011, the Sponsoring | Disputed.  There was not a 34% drop in sales in in FY 2012 compared to the prior year. What Plaintiffs present as "sales" data is actually gross revenue data, not the number of copies sold. ████████████ |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| Organizations experienced a 34% drop in sales of the 1999 Standards. In FY 2013, sales of the 1999 Standards remained at their low level from the prior fiscal year (Levine Decl., ¶¶ 18, 33, Exh. OOO). | ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Disputed also regarding Plaintiffs' characterization that "when Public Resource finally removed its online postings of the 1999 Standards, the damage already had been done." Plaintiffs fail to explain ████████████████████████████████████████████████████████████████████████████████ Plaintiffs have not demonstrated any relationship between Public Resource's posting and the sale of the 1999 Standards. ICE Exs. 39, 41. Moreover, ████████████████████████ is consistent with Plaintiffs' expert Dr. Geisinger's prediction that if sales of the 1999 Standards were affected by widespread knowledge that the new edition of the Standards were forthcoming, he expected that the decline would start in 2010 or 2011. Dkt. 60-88 (Geisinger Decl.) ¶ 25; ICE Ex. 8 (Geisinger Dep. 93:20-97:04). |
| 95. The timing of the drop in sales is notable, given that Public Resource posted the Standards to the Internet in 2012-2013, and that the | Disputed.  Dr. Levine stated ████████████████████████████████████████████████ |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| Sponsoring Organizations' updated Standards were not published until the summer of 2014 (Levine Decl., ¶ 34). | ████████████████████████ is consistent with Plaintiffs' expert Dr. Geisinger's prediction that if sales of the 1999 Standards were affected by widespread knowledge that the new edition of the Standards were forthcoming, he expected that the decline would start in 2010 or 2011.  Dkt. 60-88 (Geisinger Decl.) ¶ 25; ICE Ex. 8 (Geisinger Dep. 93:20-97:04). |
| 96. For a publication with the longevity of the 1999 Standards, one otherwise would expect to see a gradual decline in sales year-over-year; not the precipitous drop in sales experienced by the 1999 Standards in 2012 and 2013 (Geisinger Decl., ¶ 25). | Disputed.  This is not a fact, it is an opinion, and Dr. Geisinger is not qualified as an expert in the subject of economic substitution. *See* Public Resource's Motion to Strike the Declaration of Dr. Geisinger, Dkt. 67. There was not a "precipitous drop in sales experienced by the 1999 Standards in 2012 and ████████████████████████ |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| | consistent with Plaintiffs' expert Dr. Geisinger's prediction that if sales of the 1999 Standards were affected by widespread knowledge that the new edition of the Standards were forthcoming, he expected that the decline would start in 2010 or 2011. Dkt. 60-88 (Geisinger Decl.) ¶ 25; ICE Ex. 8 (Geisinger Dep. 93:20-97:04). |
| 97. Past harm from Public Resource's infringing activities includes misuse of Plaintiffs' intellectual property without permission (Ernesto Decl., ¶ 36; Geisinger Decl., ¶ 26), lost sales that cannot be totally accounted for – due to potentially infinite Internet distribution, for example by psychometrics students (Wise Decl., ¶¶ 27-28, Exh. LLL; Levine Decl., ¶ 35; Geisinger Decl., ¶ 26). | Disputed. Plaintiffs have failed to adduce admissible evidence in support of these alleged "facts."  Plaintiffs have not articulated how the use of standards incorporated into the law that Plaintiffs voluntarily took off sale could constitute "harm" to Plaintiffs, short of conclusory statements by Ms. Ernesto and Dr. Geisinger, neither of which are qualified as experts on the subject of harm. *See* Public Resource's Motion to Strike the Declaration of Dr. Geisinger, Dkt. 67. The question of whether such use is "misuse" is legal issue in dispute in this litigation.  Plaintiffs have failed to adduce admissible evidence to support their |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| | claim that there are any lost sales attributable to Public Resource's posting, nor that any such lost sales cannot be totally accounted for, nor their speculation on "potentially infinite Internet distribution." Neither Dr. Wise nor Dr. Geisinger are qualified as experts on the subject of economic substitution or Internet distribution. *See* Public Resource's Motion to Strike the Declaration of Dr. Geisinger, Dkt. 67. |
| 98. The harm also includes lack of funding that otherwise would have been available for the update of the Sponsoring Organizations' Standards from the 1999 to the 2014 versions (Levine Decl., ¶ 35; Camara Decl., ¶ 22; Geisinger Decl., ¶ 26). | Disputed. Plaintiffs have failed to adduce admissible evidence in support of this alleged "fact." ████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ Therefore, Plaintiffs had many times the amount of funding necessary for the development of the 2014 Standards, and the Test Standards Development Fund is over twelve times as large as it was shortly after the publishing of the 1999 Standards. |
| 99. Should Public Resource's infringement be allowed to continue, the harm to the Sponsoring Organizations, and public at large who rely on | Disputed. Plaintiffs have failed to adduce admissible evidence in support of these alleged "facts." These are opinions, not facts, and |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| the preparation and administration of valid, fair and reliable tests, includes: (i) uncontrolled publication of the 1999 Standards without any notice that those guidelines have been replaced by the 2014 Standards; (ii) future unquantifiable loss of revenue from sales of authorized copies of the 1999 Standards (with proper notice that they are no longer the current version) and the 2014 Standards; and (iii) lack of funding for future revisions of the 2014 Standards and beyond (Levine Decl., ¶ 36; Camara Decl., ¶ 23; Ernesto Decl., ¶ 37; Geisinger Decl., ¶ 27). | Dr. Levine, Mr. Camara, Ms. Ernesto, and Dr. Geisinger are not qualified as experts on the subjects of economic substitution or harm. *See* Public Resource's Motion to Strike the Declaration of Dr. Geisinger, Dkt. 67. |
| 100. Without the sales revenue from prior Standards versions (because – if Public Resource succeeds in this litigation – this publication will be made freely available online), it is very unlikely that future updates to the Standards will be undertaken. This is because NCME is too small an organization to financially support periodic updates of the Standards, AERA does not have the budget for it, and an insufficient number of psychometricians are members of APA for it to justify the ongoing expenditures. Charging extra membership fees to fund ongoing updates to the Standards would never happen, because the governing bodies of AERA, APA and NCME would not vote for it. If these Sponsoring Organizations ceased updating the Standards, it is unlikely that other organizations would step in and continue the effort (Geisinger Decl., ¶ 23). | Disputed. Plaintiffs have failed to adduce admissible evidence in support of this alleged "fact." These are opinions, not facts, and Dr. Geisinger is not qualified as experts on the subjects of economic substitution or harm. *See* Public Resource's Motion to Strike the Declaration of Dr. Geisinger, Dkt. 67. Plaintiffs assume, contrary to evidence, that availability of the 1999 Standards on the Internet will mean that no copies of the 1999 Standards will be sold, when sales continued even when Public Resource had posted the 1999 Standards online. *See, e.g.*, ICE Ex. 41. Moreover, Plaintiffs have no basis for claiming that the organizations cannot fund the ██ per-member annual cost of financing the development of the Standards, as described in ¶ 39, above. |
| 101. The harm caused to the public by out-of-date Standards will be significant, because the testing and assessment fields are constantly changing, given updates in testing technology and ever-evolving collective thought on the validity, reliability and fairness of tests. Members of the public who would be harmed by discontinued update of the Standards include psychometrics professors, students and | Disputed. Plaintiffs have failed to adduce admissible evidence in support of this alleged "fact." This statement is conclusory as to harm, which has not been proven, and Plaintiffs have no evidence that people will be confused in relying on outdated standard as if it were the most recent edition. Moreover, Plaintiffs' expert Dr. Geisinger stated at deposition ██ |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| professionals, as well as test developers, administrators and test takers (Geisinger Decl., ¶ 28). | ███████████████████████████████ |
| 102. Notwithstanding the harm it has caused, and could potentially continue to cause, Public Resource's intentions are crystal clear. Although not now publicly available pending the outcome of this litigation, Public Resource still has an unauthorized copy of the Sponsoring Organizations' 1999 Standards on its server (Hudis Decl., ¶ 2, Exh. A, pp. 273, 309); as does the Internet Archive (Hudis Decl., ¶ 29, Exh. BB, pp. 116-17). | Disputed that Public Resource has caused any harm.  Public Resource does not dispute that it has a version of the 1999 Standards on its server. Disputed as to whether Public Resource's copy is "unauthorized" because that is a legal conclusion and Public Resource does not accept that Plaintiffs have any right to authorize or deauthorize copies of the law. Undisputed that Public Resource's intentions of making the law available to and accessible by the public is crystal clear. |
| 103. It would be very simple for Public Resource to re-post the 1999 Standards to Public Resource's website with little effort (Hudis Decl., ¶ 2, Exh. A, pp. 306-07). | Undisputed. |
| 104. Moreover, should Public Resource successfully defend this lawsuit, it has every intention of similarly posting the Sponsoring Organizations' 2014 Standards to the Internet in the same manner it posted Plaintiffs' 1999 Standards (Hudis Decl., ¶ 2, Exh. A, pp. 308-09). | Disputed.  Public Resource has never posted the 2014 edition of the Standards anywhere, and Public Resource has never stated an intention to post the 2014 Standards. To Public Resource's knowledge, the 2014 Standards have not been incorporated by reference into law. Malamud Decl. ¶ 33. It is undisputed that Public Resource posts *only* those standards that have become law. *See* SMF ¶ 40; Malamud Decl. ¶ 33. Consistent with this policy, Mr. Malamud testified that he would consider posting the 2014 edition only "[i]f the federal government did a deliberate and explicit incorporation by reference," and only after determining "if that was an area that I wanted to continue to invest resources in." ICE Ex. 7 (Malamud Dep. 307:17–309:03). |

Dated: January 21, 2016

Respectfully submitted,

/s/   Andrew P. Bridges

Andrew P. Bridges (admitted)
abridges@fenwick.com
Sebastian E. Kaplan (*pro hac vice* pending)
skaplan@fenwick.com
Matthew Becker (admitted)
mbecker@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone:   (415) 875-2300
Facsimile:    (415) 281-1350

Corynne McSherry (admitted *pro hac vice*)
corynne@eff.org
Mitchell L. Stoltz (D.C. Bar No. 978149)
mitch@eff.org
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone:   (415) 436-9333
Facsimile:    (415) 436-9993

David Halperin (D.C. Bar No. 426078)
davidhalperindc@gmail.com
1530 P Street NW
Washington, DC 20005
Telephone: (202) 905-3434

*Attorneys for Defendant-Counterclaimant*
Public.Resource.Org, Inc.

SF/5546470.7