# EXHIBIT 1

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN EDUCATIONAL RESEARCH ASSOCIATION, INC., AMERICAN PSYCHOLOGICAL ASSOCIATION, INC., and NATIONAL COUNCIL ON MEASUREMENT IN EDUCATION, INC., <br><br>                     Plaintiffs, <br><br>        v. <br><br>PUBLIC.RESOURCE.ORG, <br><br>                   Defendant. | Case No. 1:14-CV-00857-TSC-DAR <br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT-COUNTERCLAIMANT PUBLIC.RESOURCE.ORG'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION** <br><br>Action Filed:   May 23, 2014 |

**[REDACTED VERSION]**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...............................................................................................................1

FACTUAL BACKGROUND ..............................................................................................3

    A.    Public Resource Is A Non-Profit Committed to Educating the Public About the Law...............................................................................................3

    B.    Volunteers from Many Sectors Authored the Plaintiffs' 1999 Standards, But Plaintiffs Claim Copyright Ownership Because of Their Facilitating Role. .............................................................................3

    C.    The Federal Government Has Incorporated by Reference the 1999 Standards Into Law. .......................................................................................5

    D.    Public Resource Began Making Standards Incorporated by Reference Freely Available Online In Accessible Formats. .......................................8

    E.    Plaintiffs Removed the 1999 Standards From Sale and Are Unaffected By the Availability of the Incorporated Standards Appearing Freely On Public Resource's Website................................................................9

ARGUMENT .....................................................................................................................10

I.    SUMMARY JUDGMENT STANDARD.........................................................10

II.    PLAINTIFFS CANNOT HOLD A STATUTORY MONOPOLY OVER THE LAW. ...............................................................................................................11

    A.    The Law Is Not Subject to Copyright.................................................11

        1.    An unbroken line of case law holds that the law is excluded from copyright, and the Copyright Office recognizes that exclusion. ................................................................................11

        2.    The Plain Text of the Copyright Act Reinforces this Understanding............................................................................12

        3.    A Statutory Monopoly In the Law Would Conflict with Fundamental Constitutional Protections...................................13

    B.    Incorporated Standards Are Laws and Cannot be Subject to a Statutory Monopoly.....................................................................................15

        1.    The leading cases recognize that standards development organizations cannot restrict access to the law. .........................15

i

**TABLE OF CONTENTS**
**(Continued)**

Page

2.    Incorporated Standards, As Law, Are Also Uncopyrightable Facts, Ideas, Principles, Systems, Processes, and Procedures. .................18

3.    No court has ever found that government edicts are copyrightable.............................................................................19

C.    Plaintiffs Have Actively Encouraged Transformation of Their Standards Into Law and Cannot Now Complain of a "Taking." ..........................22

D.    Public Policy Favors Promoting Public Access to the Law..................................24

1.    Plaintiffs do not make the law reasonably accessible...............................24

2.    The Plaintiffs do not need a copyright statutory monopoly and copyright incentives in order to develop standards...................................26

E.    Plaintiffs Misinterpret the Copyright Act. ............................................................30

III.    EVEN BEFORE INCORPORATION, THE STANDARDS ARE PRIMARILY UNCOPYRIGHTABLE SYSTEMS, DISCOVERIES, PROCESSES, PROCEDURES, AND *SCÈNES À FAIRE*. ..........................................................................31

A.    The 1999 Standards Are Procedures, Systems, and Principles.............................32

B.    The Incorporated Standards Are *Scènes à Faire*. .................................................34

IV.    PUBLIC RESOURCE'S POSTING IS A LAWFUL FAIR USE. ....................................35

A.    Public Resource's Posting of the Legally Binding 1999 Standards Is Transformative, Is Noncommercial, and Is for Beneficial Public Purposes. ........................................................................................................35

1.    Expanding access to the law is a transformative purpose.........................36

2.    Providing new information about the law by enabling software-based analysis is a transformative and publicly beneficial purpose. .................................................................................................38

3.    Providing access for people with print disabilities is a legally favored fair use purpose.........................................................................40

4.    Public Resource's use of the 1999 Standards is non-commercial................................................................................................42

**TABLE OF CONTENTS**
**(Continued)**

Page

B.     The 1999 Standards Are a Factual Document. ......................................42

C.     Public Resource Uses No More of the Standards than Necessary........................43

D.     Public Resource's Use of the 1999 Standards Has Not Caused, and
       Will Not Cause, Harm in Any Relevant Market.....................................44

       1.     Plaintiffs themselves have shut down the market for the
              1999 Standards...........................................................45

       2.     Only the 1999 Standards are relevant to the fair use inquiry;
              Public Resource has not posted the 2014 edition and will not
              do so unless it becomes law...............................................46

       3.     There is no proper market for the exclusive right to control
              access to, and dissemination of, the law. ................................47

V.     PUBLIC RESOURCE IS NOT SECONDARILY LIABLE FOR COPYRIGHT
       INFRINGEMENT.....................................................................49

A.     Plaintiffs Cannot Prove Direct Infringement by Third Parties. ...........................50

B.     Plaintiffs Cannot Establish Intent to Infringe or Even Knowledge of
       Any Infringement..................................................................52

VI.    DEFENDANTS HAVE NOT JUSTIFIED, AND CANNOT JUSTIFY, A
       PERMANENT INJUNCTION. ........................................................55

A.     Plaintiffs Have Experienced No Irreparable Injury to Any Valid Legal
       Interest...........................................................................55

       1.     Plaintiffs have no competent evidence of future harm. ...........................56

       2.     "Loss of control" without actual business injury does not
              authorize an injunction...................................................57

A.     An Injunction Would Harm Public Resource's Ability to Serve the
       Public Interest. ...................................................................57

C.     The Public Interest Favors Access to Laws, Edicts, and Records of
       Government........................................................................57

CONCLUSION.....................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
  562 F.3d 630 (4th Cir. 2009) .....................................................................36, 38, 40

*Am. Inst. of Physics v. Schwegman, Lundberg & Woessner, P.A.*,
  No. 12-528, 2013 WL 4666330 (D. Minn. Aug. 30, 2013)....................................37

*Am. Inst. of Physics v. Winstead PC*,
  No. 3:12-CV-1230-M, 2013 WL 6242843 (N.D. Tex. Dec. 3, 2013) ....................37

*Amoco Prod. Co. v. Vill. of Gambell, AK*,
  480 U.S. 531 (1987)..............................................................................................55

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..............................................................................................10

*Apple, Inc. v. Samsung Electronics Co.*,
  678 F.3d 1314 (Fed. Cir. 2012).............................................................................55

*ATC Distrib. Grp., Inc. v. Whatever It Takes Transmission & Parts, Inc.*,
  402 F.3d 700 (6th Cir. 2005) ................................................................................34

*Authors Guild, Inc. v. HathiTrust*,
  755 F.3d 87 (2d Cir. 2014)........................................................................38, 40, 41

*Authors Guild v. Google, Inc.*,
  804 F.3d 202 (2d Cir. 2015)...........................................................36, 38, 43, 44

*Banks v. Manchester*,
  128 U.S. 244 (1888)........................................................................................11, 12

*Bateman v. Mnemonics, Inc.*,
  79 F.3d 1532 (11th Cir. 1996) ..............................................................................35

*BellSouth Advert. & Publ'g Corp. v. Donnelley Info. Publ'g, Inc*,
  999 F.2d 1436 (11th Cir. 1993) .............................................................................34

*Bikram's Yoga College of India, L.P. v. Evolation Yoga, LLC*,
  803 F.3d 1032 (9th Cir. 2015) ..............................................................................33

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006)..................................................................................38

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Blanch v. Koons*,
    467 F.3d 244 (2d Cir. 2006)........................................................................................45, 46

*Bond v. Blum*,
    317 F.3d 385 (4th Cir. 2003) ...............................................................................................37

*Building Officials & Code Administrators v. Code Technology, Inc.*,
    628 F.2d 730 (1st Cir. 1980)................................................................................................16

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994)..................................................................................................... *passim*

*Cartoon Network LP v. CSC Holdings, Inc.*,
    536 F.3d 121 (2d Cir. 2008)...........................................................................................51, 52

*CCC Information Services Inc. v. McLean Hunter Market Reports, Inc.*,
    44 F.3d 61 (2d Cir. 1994) ..............................................................................................19, 20

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..............................................................................................................10

*Computer Assocs. Int'l, Inc. v. Altai, Inc.*,
    982 F.2d 693 (2d Cir. 1992)................................................................................................34

*Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*,
    843 F.2d 600 (1st Cir. 1988)...............................................................................................18

*Connecticut v. Massachusetts*,
    282 U.S. 660 (1931)..............................................................................................................57

*Consumers Union of U.S., Inc. v. Gen. Signal Corp.*,
    724 F.2d 1044 (2d Cir. 1983)....................................................................................42, 43, 46

*Costar Grp. Inc. v. Loopnet, Inc.*,
    164 F. Supp. 2d 688 (D. Md. 2001) *aff'd*, 373 F.3d 544 (4th Cir. 2004) ..............................53

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006)...................................................................................................55, 57, 58

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991)..............................................................................................................32

*Field v. Google Inc.*,
    412 F. Supp. 2d 1106 (D. Nev. 2006)..................................................................................46

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*Fox News Network, LLC v. TVEyes, Inc.*,
43 F. Supp. 3d 379, 395 (S.D.N.Y. 2014)...............................................................................44

*Fox v. Washington*,
236 U.S. 273 (1915)...............................................................................................................15

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) (en banc) ................................................................................49

*Globe Newspaper Co. v. Superior Court for Norfolk Cty.*,
457 U.S. 596 (1982)...............................................................................................................14

*Golan v. Holder*,
132 S. Ct. 873 (2012).............................................................................................................13

*Grayned v. City of Rockford*,
408 U.S. 104 (1972)...............................................................................................................15

*Greene v. Dalton*,
164 F.3d 671 (D.C. Cir. 1999)...............................................................................10, 26, 28

*Harding v. Gray*,
9 F.3d 150 (D.C. Cir. 1993)...................................................................................................10

*Harper & Row Publ'rs., Inc. v. Nation Enters.*,
471 U.S. 539 (1985)...............................................................................................................42

*Healthcare Advocates Inc. v. Harding, Earley, Follmer & Frailey*,
497 F. Supp. 2d 627 (E.D. Pa. 2007) ....................................................................................37

*Howell v. Miller*,
91 F. 129 (6th Cir. 1898) (Harlan, J.) ...................................................................................12

*Katz v. Google Inc.*,
802 F.3d 1178 (11th Cir. 2015) ......................................................................................45, 49

*Kern River Gas Transmission Co. v. Coastal Corp.*,
899 F.2d 1458 (5th Cir. 1990), *cert. denied*, 498 U.S. 952 (1990)..................................18, 19

*Lenz v. Universal Music Corp*,
801 F.3d 1126 (9th Cir. 2015) ..............................................................................................35

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
387 F.3d 522 (6th Cir. 2004) ...............................................................................34, 37, 38, 43

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Mattel, Inc. v. Walking Mountain Prods.*,
   353 F.3d 792 (9th Cir. 2003) ................................................................................46

*\*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
   545 U.S. 913 (2005)...........................................................................49, 50, 52, 53

*Mills v. Alabama*,
   384 U.S. 214 (1966)..............................................................................................14

*Musser v. Utah*,
   333 U.S. 95 (1948)................................................................................................14

*Newborn v. Yahoo!, Inc.*,
   391 F. Supp. 2d 181 (D.D.C. 2005) ...............................................................49, 54

*Newport-Mesa Unified Sch. Dist. v. California Dep't of Educ.*,
   371 F. Supp. 2d 1170 (C.D. Cal. 2005) ...............................................................41

*Nieman v. VersusLaw, Inc.*,
   512 Fed. App'x. 635, 2013 WL 1150277 (7th Cir. Mar. 19, 2013).......................14

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*,
   166 F.3d 65 (2d Cir. 1999)...................................................................................32

*Nuñez v. Caribbean Int'l News Corp.*,
   235 F.3d 18 (1st Cir. 2000).............................................................................44, 47

*Nuzzo v. FBI*,
   No. 95–cv–1708, 1996 WL 741587 (D.D.C. Oct. 8, 1996)...................................11

*O'Shea v. Littleton*,
   414 U.S. 488 (1974)..............................................................................................55

*\*Online Policy Grp. v. Diebold, Inc.*,
   337 F. Supp. 2d 1195 (N.D. Cal. 2004) ........................................38, 45, 47, 48

*\*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ..................................................................... *passim*

*Practice Management Information Corp. v. American Medical Ass'n*,
   121 F.3d 516 (9th Cir. 1997) ...............................................................19, 20, 21

*Pub. Warehousing Co. K.S.C. v. Def. Supply Ctr. Phila.*,
   489 F. Supp. 2d 30 (D.D.C. 2007) ........................................................................55

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*R.W. Beck v. E3 Consulting*,
  577 F.3d 1133 (10th Cir. 2009) ..........................................................................13

*Rains v. Cascade Indus., Inc.*,
  402 F.2d 241 (3d Cir. 1968)................................................................................11

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*,
  907 F. Supp. 1361 (N.D. Cal. 1995) ...................................................................53

*Righthaven, LCC v. Jama*,
  No. 2:10-CV-1322, 2011 WL 1541613 (D. Nev. Apr. 22, 2011)...............46, 48, 49

*Silvers v. Sony Pictures Entm't, Inc.*,
  402 F.3d 881 (9th Cir. 2005) ........................................................................13, 43

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984)................................................................................... *passim*

*Sturdza v. United Arab Emirates*,
  281 F.3d 1287 (D.C. Cir. 2002) ..........................................................................32

*Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*,
  24 F.3d 1088 (9th Cir. 1994) ..............................................................................50

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
  756 F.3d 73 (2d Cir. 2014).............................................................................41, 43

*U.S. v Jefferson County*,
  380 F. 2d 385 (5th Cir. 1967) .............................................................................26

*United States v. Aina–Marshall*,
  336 F.3d 167 (2d Cir. 2003)................................................................................54

*United States v. Myers*,
  553 F.3d 328 (4th Cir. 2009) ..............................................................................17

*Veeck v. S. Bldg. Code Cong. Int'l, Inc.*,
  293 F.3d 791 (5th Cir. 2002) (*en banc*) ................................................. *passim*

*Viacom Int'l Inc. v. YouTube, Inc.*,
  940 F. Supp. 2d 110 (S.D.N.Y. 2013)..................................................................54

*Wheaton v. Peters*,
  33 U.S. (8 Pet.) 591 (1834) .................................................................................11

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008).................................................................................................58

## REGULATIONS

1 C.F.R. part 51 ....................................................................................................17

*1 C.F.R. § 51.1, *et seq.*.................................................................................17, 48

34 C.F.R. Part 668, Subpart F..............................................................................8

34 C.F.R. § 668.141 .............................................................................................58

*34 C.F.R. § 668.146 .........................................................................5, 6, 7, 11, 16, 58

34 C.F.R. § 668.148 ..............................................................................................7

50 Fed. Reg. 40895 .............................................................................................20

50 Fed. Reg. 40897 .............................................................................................20

75 Fed. Reg. 66923 ...............................................................................................7

78 Fed. Reg. 17598 .............................................................................................16

## FEDERAL STATUTES AND MATERIALS

*5 U.S.C. § 552...........................................................................................5, 17, 19

*17 U.S.C. § 101 (Copyright Act of 1976)................................................... *passim*

*17 U.S.C. § 102(b) (Copyright Act, Section 102(b)).................................. *passim*

17 U.S.C. § 105 (Copyright Act, Section 105) ....................................................13

*17 U.S.C. § 106 (Copyright Act, Section 106) ......................................35, 51, 52

*17 U.S.C. § 107...........................................................................35, 38, 39, 46

17 U.S.C. § 201(a) ...............................................................................................31

H.R. Rep. No. 94–1476 (1976), 1976 U.S.C.C.A.N. 5659....................................40

*U.S. Const. art. I § 8, cl. 8...........................................................................2, 18, 49

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

RULES

Fed. R. Civ. P. 30(b)(6)..................................................................................4, 29, 30

Fed. R. Civ. P. 56(c) ...........................................................................................10

STATE LAW

Md. Admin. Rule 09.12.26.04 .............................................................................17

Md. Admin. Rule 09.12.26.06 ........................................................................11, 17

Minn. Admin. Rule 4761.2460, Subp. 2(C)....................................................11, 17

N.Y. Comp. Codes R. & Regs. tit. 11, § 216.7.................................................20

OTHER AUTHORITIES

1 Goldstein on Copyright § 2.49 n.45.2.........................................................16, 19

1 Goldstein on Copyright § 2.5.2, at 2:51............................................................27

4 Nimmer on Copyright § 13.03[B][3] ...........................................................19, 34

4 Nimmer on Copyright § 14.06[C][1][a].............................................................32

Ashley, Kevin D. & Stefanie Brüninghaus, *Computer Models for
    Legal Prediction*.............................................................................................39

Code of the District of Columbia, http://dccode.org/simple/...............................39

D.C. Municipal Regulations and D.C. Register, http://www.dcregs.dc.gov/ ..............39

Kasunic, Robert, *Is that All There Is? Reflections on the Nature of the
    Second Fair Use Factor*, 31 Colum. J.L. & Arts 529 (2008) ..................................43

Lastres, Steven A., *Rebooting Legal Research in a Digital Age*, LLRX
    (Aug. 10, 2013), https://www.llrx.com/files/rebootinglegalresearch.pdf ..............40

*Leval, Pierre N., *Toward A Fair Use Standard*,
    103 Harv. L. Rev. 1105 (1990).....................................................................38, 39

Li, William, et al., *Law Is Code: A Software Engineering Approach to Analyzing
    the United States Code*, 10 J. Bus. & Tech. L. 297 (2015)....................................39

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Samuelson, Pamela, *Questioning Copyrights in Standards*,
   48 B.C. L. Rev 193 (2007)..........................................................................................27

Smith, Thomas A., *The Web of Law*, 44 San Diego L. Rev. 309 (2007)......................................39

*Strauss, Peter L., *Private Standards Organizations and Public Law 16*
   (Columbia Pub. Law Research, Paper No. 13-334, 2013),
   http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2194210 ...............................................22

U.S. Copyright Office, Compendium of Copyright Office Practices
   § 313.6(c)(2) (3d ed. 2014)........................................................................................12

## INTRODUCTION

Public Resource deserves summary judgment in its favor on multiple independent but related grounds. The core issue here is simple: the 1999 Standards for Educational and Psychological Testing have been incorporated into law. They have become enforceable as law, and the public has a fundamental due process right to access, disseminate, and comment on them (including by annotations) at will. For more than 200 years, our courts and legislatures have recognized that it would be profoundly unjust to allow any person to claim a monopoly property right in the law, whether that law takes the form of legal opinions, statutes, or regulations. No matter who holds the pen, as a matter of law and policy in our democratic system, the citizens are the true authors and owners of the law.

In the closely analogous case of *Veeck v. Southern Building Code Congress International*, the Fifth Circuit Court of Appeals confirmed that this fundamental principle does not change just because our government has chosen to outsource the crafting of some regulations to private organizations and then incorporate those regulations by reference into law. Once incorporated, those rules are binding law. For example, under the Higher Education Act, states must comply with Department of Education rules that include the 1999 Standards or risk losing federal funds for education. As a result, millions of parents and students are affected by the legally binding standards, and they may wish to review, share, and comment on them. Journalists and education advocates share the same interest.

To be clear, this case does not concern Public Resource's right to speak or share standards as *private standards*. It concerns the public's right to speak, share, and comment upon *the law*. Public Resource does not post standards that have not been incorporated into law, such as the 2014 edition of the Standards for Educational and Psychological Testing. The sole document at issue in this case, the 1999 Standards, is current law but obsolete as a standard.

1

Indeed, Plaintiffs stopped distributing the 1999 Standards altogether for almost a year, resuming sales only for purposes of this case, and subject to a variety of practical barriers.

Plaintiffs' copyright claim—which they claim includes the right to shut down most public access altogether—is fundamentally incompatible with the purposes of copyright and with the public's practical and constitutional interest in knowing the law that governs important aspects of their daily lives. Moreover, *the law*, as a public fact, system, process, and procedure, is excluded from the statutory monopoly under traditional copyright law doctrines.  No one may claim a "right to exclude" others from using the law, and the Court should grant summary judgment to Public Resource on this ground alone.

But that issue is only the first flaw in Plaintiffs' case. The Plaintiffs' claims also fail, in whole or in part, for several other reasons: (1) *even apart from their status as law*, the 1999 Standards are largely systems, processes, and procedures, which the Copyright Act specifically excludes from copyright protection; (2) Public Resource's posting of the 1999 Standards is a lawful fair use; and (3) Plaintiffs have not established, and cannot establish conclusively, direct infringement by any third parties, which is a precondition for summary judgment on their contributory infringement claim.[1]

As the Court may surmise, the flaws in Plaintiffs' case share a common theme. Plaintiffs wish to stretch copyright law beyond its statutory borders and distort the very purposes of copyright law. Copyright is intended "to promote the Progress of Science and useful Arts," by encouraging creative expression, to the benefit of the public. *See* U.S. Const. art. I § 8, cl. 8. Copyright incentives are neither needed nor appropriate to encourage lawmaking or standardization of industry practices. Those who write the laws—whether elected or unelected

---

[1] Public Resource also disputes Plaintiffs' claim of ownership of the 1999 Standards but does not seek summary judgment on that issue at this time.

2

(like lobbyists)—do not need and should not have control over others' access to the law, whether to exercise raw political power or extract lucre.

Public Resource respectfully urges the Court to recognize the limits of copyright, and to protect due process, by granting summary judgment to Public Resource.

## FACTUAL BACKGROUND

Public Resource posts many forms of law on its website. This includes statutes, regulations, and standards that have been incorporated by reference into law.

### A.    Public Resource Is A Non-Profit Committed to Educating the Public About the Law.

Public.Resource.org is a non-profit corporation whose mission is to maintain public works projects on the Internet, including the dissemination of statutes, regulations, and other material that constitutes the law. (Public Resource's Statement of Material Facts ("SMF") ¶¶ 1-2.) Public Resource maintains an archive of laws and other government authored materials on several domains under the public.resource.org website. (*Id.* ¶ 3.) Public Resource has made judicial opinions, Internal Revenue Service records, patent filings, and safety regulations accessible on the Internet. (*Id.* ¶ 4). It does not charge for access to this archive or accept donations or gifts that are tied to the posting of specific standards or groups of standards. (*Id.* ¶ 5–6.) Its operating income is not based on the amount of traffic its websites receive. (*Id.* ¶ 7.)

### B.    Volunteers from Many Sectors Authored the Plaintiffs' 1999 Standards, But Plaintiffs Claim Copyright Ownership Because of Their Facilitating Role.

The 1999 Standards that Plaintiffs published were developed by unpaid volunteers. (SMF ¶ 8.) Plaintiffs highlight the work of the 17 volunteer Joint Committee members who helped develop the 1999 Standards, but these are just a subset of all contributors to the 1999 Standards. Hundreds of individuals, organizations, and government entities provided proposed

text and comments for 1999 Standards. (*Id.* ¶ 9.) The volunteers draft the standards to achieve a consensus of best practices in the areas covered by the 1999 Standards. (*Id.* ¶ 10.)

In December 1999, one of the Plaintiffs, AERA, sought and obtained a copyright registration claiming to be the sole author of the 1999 Standards. (*Id.* ¶ 11.) Fourteen years later, in February 2014, Plaintiffs obtained a supplemental copyright registration that listed all the Plaintiff organizations as authors and copyright owners of the 1999 Standards, ostensibly "to correct an error in the listing of copyright ownership in the prior registration." (*Id.* ¶ 12.) Yet in February 2014, at the time of that corrective filing, Plaintiffs did not have any copyright assignments from the persons who actually authored the 1999 Standards. (*Id.* ¶ 13.) It was not until April 2014 and throughout the rest of that year that Plaintiffs began to obtain certain forms[2] from some of these individuals. (*Id.*) Plaintiffs now claim to be "joint owners" of the standards. (Plaintiffs' Memorandum of Points and Authorities, ECF 60-1 ("Pls. Mem.") at 12.) Plaintiffs' staffs provide facilitative and administrative functions, but they do not author the standards or control the final content. (SMF ¶ 17.) Plaintiffs have not sought or obtained assignments from the many hundreds of individuals and organizations that participated in the development of the 1999 Standards. (*Id.* ¶ 18.). Nor have Plaintiffs done anything to ensure that the alleged assignors had authority to assign copyrights to the Plaintiffs. (*Id.* ¶ 19.)

---

[2] In their motion, Plaintiffs refer to these as "work made-for-hire letters," as well as "posthumous assignments" from alleged heirs. The description of them "work made-for-hire letters" is inconsistent with AERA's Rule 30(b)(6) representative's characterization of them as "assignments" at deposition. The documents were signed a decade and a half after the fact, and Plaintiffs did not compensate the people who developed the 1999 Standards for their work. (SMF ¶ 14.) The "posthumous assignments" were also made without any consideration having been delivered to the alleged heirs who signed them. (*Id.* ¶ 15.) There is a genuine dispute regarding whether these are valid copyright assignments.

### C.   The Federal Government Has Incorporated by Reference the 1999 Standards Into Law.

The federal government has incorporated by reference the 1999 Standards into law at 34 C.F.R. § 668.146. (*Id.* ¶ 20; Pls. Mem. 13.) Plaintiffs have actively encouraged—and indeed lobbied—the government to adopt the 1999 Standards as law. (SMF ¶ 52–56.)

The federal government incorporates standards into law following a rigorous notice and comment period. Generally, an agency responsible for regulating an industry will publish a notice in the Federal Register concerning the agency's intent to incorporate a standard into law and will ask the public to submit comments. (*Id.* ¶ 22–24.)

At the end of the notice and comment process, the agency will determine whether to incorporate the standard by reference. (*Id.* ¶ 24.) If the agency incorporates the standard by reference, the Director of the Federal Register then approves the incorporation by reference. 5 U.S.C. § 552(a). The federal government expressly encourages agencies to incorporate standards by reference, as opposed to reprinting the entire text of the standards, to limit the length of the Code of Federal Regulations. (*Id.* ¶ 26.) The standard then becomes the law of the United States. Standards are also incorporated by reference into state and local laws (*Id.* ¶ 21.)

Plaintiffs benefit from the incorporation of their standards into law. (*Id.* ¶ 30.) When a standard is incorporated by reference into the Code of Federal Regulations, the code itself informs readers that they may obtain a copy of the standards from the Office of the Federal Register ("OFR") or from the SDO that published the standard. *E.g.*, 34 C.F.R. § 668.146. The OFR directs people who want to read incorporated standards to "contact the standards organization that developed the material." (*Id.* ¶ 27.) Alternatively, one may submit a written request to the OFR to inspect (and make limited photocopies of) an incorporated standard at an office in Washington, D.C. (*Id.*)

The Higher Education Act requires states to comply with the 1999 Standards in developing and administering a variety of tests in order to receive federal aid. (*Id.* ¶ 33.) Federal aid to students under the Department of Education's Title IV program totals some $150 billion annually[3], and for-profit colleges in 2009 were taking in as much as $32 billion of that amount.[4] (*Id.*)

One specific example of the effect of the 1999 Standards' incorporation into law is their role in the so-called "ability to benefit" (ATB) program. This program allows access to federal aid for students who lack a high school diploma or a GED certificate if they either (1) complete at least 6 credit hours in a post-secondary school; or (2) pass an independently administered Department of Education approved ability to benefit test.[5] (*Id.* ¶ 34.) In a 2009 report, the U.S. Government Accountability Office raised concerns that some for-profit colleges were helping students cheat on the ability to benefit test or falsifying test results.[6] (*Id.*)

The Department of Educations responded by issuing new regulations for ATB tests, codified at 34 C.F.R. 668.146, with specific requirements to enhance the quality and integrity of the tests. (*Id.* ¶ 35.) To be approved by the Secretary of Education, an ATB test must "Meet all standards for test construction provided in the 1999 edition of the *Standards for Educational and*

---

[3] Title IV programs include Federal Perkins Loans, Direct Loans (including Stafford and PLUS loans), Pell Grants, and Federal Work Study, representing the majority of federal student aid. http://federalstudentaid.ed.gov/site/front2back/programs/programs/fb_03_01_0030.htm.

[4] *See* Senate Health Education Labor & Pensions Committee report, For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success http://www.help.senate.gov/imo/media/for_profit_report/Contents.pdf.

[5] Congress abolished the ability to benefit program in 2012 but restored it in 2014. *See* Department of Education letter, DCL ID: GEN-15-09, "Title IV Eligibility for Students Without a Valid High School Diploma Who Are Enrolled in Eligible Career Pathway Programs," https://ifap.ed.gov/dpcletters/GEN1509.html.

[6] GAO, PROPRIETARY SCHOOLS: Stronger Department of Education Oversight Needed to Help Ensure Only Eligible Students Receive Federal Student Aid, August 2009. http://www.gao.gov/new.items/d09600.pdf.

*Psychological Testing*," i.e. the 1999 Standards.[7] (*Id.*) The Department made one specific change to its final version of the 2010 Rule, codified at § 668.146(b)(6), in response to a comment pointing out that the Department's proposed rule used outdated language present in the 1985 AERA Standards, but revised in the 1999 Standards.[8] (*Id.* ¶ 36.) Thus, Department officials deliberately shaped the regulation to harmonize its printed provisions with those provisions that were incorporated by reference, i.e. the 1999 Standards. (*Id.*)

A wide range of parties might want access to the 1999 Standards in order to determine whether a given ATB test was in compliance with those regulation. These parties include:

- Test publishers in the business of devising ATB tests, and states devising ATB tests for students in their state—both wanting to ensure their products are compliant with the law;

- Federal and state law enforcement and education oversight agencies, seeking to ensure the integrity of higher education programs;

- Students, and potentially lawyers for students, assessing whether a test was compliant in order to contest denial of ATB benefits or, alternatively, to seek loan forgiveness on the grounds that the school acted improperly;

- Journalists and advocacy organizations evaluating the quality and integrity of higher education programs in which federal money—and student futures—are invested; and

- Schools, whether large and small; for-profit, non-profit, or state; seeking to ensure that the tests they use comply with federal ATB rules in order to receive aid and to

---

[7] 34 C.F.R. § 668.146(b)(6). The 1999 Standards are referenced again with respect to tests conducted in foreign languages for non-native speakers of English, 34 C.F.R. § 668.148(a)(1)(iv), for test modifications to accommodate students with disabilities, 34 C.F.R. § 668.148(a)(2)(i), and for specific requirements for computer-based tests. 34 C.F.R. § 668.148(a)(3)(i)

[8] 75 F.R. 66923

avoid potential liability. The Department of Education also can cut off Title IV

money and impose civil fines if it concludes that a college has made "a substantial

misrepresentation about the nature of its educational program, its financial charges, or

the employability of its graduates." 34 C.F.R. Part 668, Subpart F. Thus, if a school

represented the test it used as compliant with the 1999 Standards, but in fact it was

not, it could face serious penalties.

Public Resource's work makes this incorporated law accessible to all of these affected citizens.

### D. Public Resource Began Making Standards Incorporated by Reference Freely Available Online In Accessible Formats.

Beginning in 2008, Public Resource began posting state safety regulations and statutes

online, including portions of the incorporated standards in this case. (*Id.* ¶ 37.) Public Resource

purchased paper copies of the codes and scanned them into PDF files. (*Id.*) Public Resource then

applied metadata and optical character recognition ("OCR") to the PDF files. (*Id.*) Public

Resource also placed a cover sheet on each document to make it clear that Public Resource was

posting the document because it had been incorporated by reference into law. (*Id.*) Public

Resource improved this process over time and began posting some of the standards in HTML

format, which included converting formulas and graphics into appropriate formats. (*Id.*)

In 2012, Public Resource began to post on its website copies of standards incorporated by

reference into law. Public Resource began by purchasing paper copies of 73 standards, copying

them and placing a cover sheet and notice of incorporation on each one, and sending the copies

and additional material to government officials and ten standards organizations. (*Id.* ¶ 38.) Then

Public Resource president Carl Malamud began searching for copies of additional incorporated

standards, many of which were not available from the standards organizations, often because the

version incorporated into law had been superseded by a later version of the standard. (*Id.* ¶ 38.)

Public Resource makes the standards it posts freely available on its website. (*Id.* ¶ 5.)

E.     **Plaintiffs Removed the 1999 Standards From Sale and Are Unaffected By the Availability of the Incorporated Standards Appearing Freely On Public Resource's Website.**

In May 2014, Plaintiffs sued Public Resource for posting on its website and the Internet

Archive website the 1999 Standards. (Compl. ECF No. 1.) Subsequently, so as to ensure a full

record, in June 2014 Public Resource agreed to take down the versions of the 1999 Standards

that it had posted on its website and on the Internet Archive website, pending the resolution of

this case. (SMF ¶ 39.) Shortly thereafter, in August 2014, Plaintiffs published the new 2014

edition of the *Standards for Educational and Psychological Testing* ("the 2014 Standards"), and

then subsequently removed the 1999 Standards from sale. (SMF ¶ 40.) This is in keeping with

Plaintiffs' past practice of taking prior editions of the Standards off sale once the new edition is

published. (SMF ¶ 41–42.) Plaintiffs only put the 1999 Standards on sale once more in July 2015

after the issue was brought to their attention at deposition in April and May of that year. (SMF

¶ 43.)

9

Plaintiffs included an unsealed complete version of the 1999 Standards in their Motion for Summary Judgment filing (ECF No. 60-25–26; SMF ¶ 48), which is now available for download to the public for a $6 fee, and may also be available on RECAP (a service that provides PACER documents for free) now or in the future. (SMF ¶ 49.) Other than this, Plaintiffs have never made an electronic version of the 1999 Standards available to the public, nor do they plan to, and they have not published any other versions of the 1999 Standards that would be accessible to people who are blind or visually disabled. (SMF ¶ 50.)

## ARGUMENT

## I.   SUMMARY JUDGMENT STANDARD

A court must grant summary judgment if it determines that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment on the undisputed facts as a matter of law." Fed. R. Civ. P. 56(c). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A movant has the burden to make an initial showing of the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden is met, the movant is entitled to a judgment as a matter of law if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. That showing may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993). Instead, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Greene*, 164 F.3d at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

Where, as here, parties file cross-motions for summary judgment, each must carry its own burden under the applicable legal standard. *See Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968); *Nuzzo v. FBI*, No. 95–cv–1708, 1996 WL 741587, at *1 (D.D.C. Oct. 8, 1996).

## II.  PLAINTIFFS CANNOT HOLD A STATUTORY MONOPOLY OVER THE LAW.

No copyright exists in the law itself. This is true for the United States Code and the Code of Federal Regulations. It is true for every state's codes and for local ordinances. It is equally true where the law was drafted by volunteers and then made into law by a legislature or agency. In this case, the 1999 Standards have become law through incorporation by reference into various federal and state regulations. *See, e.g.*, 34 C.F.R. § 668.146(b)(6); Md. Admin. Rule 09.12.26.06(E)(1)(c)(i); Minn. Admin. Rule 4761.2460, Subp. 2(C).  As a result, they are outside the copyright statutory monopoly.

### A.  The Law Is Not Subject to Copyright.

#### 1.  An unbroken line of case law holds that the law is excluded from copyright, and the Copyright Office recognizes that exclusion.

For nearly two centuries it has been a fundamental principle of American jurisprudence that the texts that make up the law are in the public domain and cannot be under private control. Indeed, the Supreme Court's first copyright decision, *Wheaton v. Peters*, 33 U.S. (8 Pet.) 591 (1834) established this principle. In that case, one of the Court's own official reporters claimed copyright in his annotated collections of the Court's opinions. The Court declared that it was "unanimously of opinion that no reporter has or can have any copyright in the written opinions delivered by this Court." *Id.* at 668. Similarly, in *Banks v. Manchester*, 128 U.S. 244 (1888), the Court rejected a copyright claim by a court reporter for a collection of the opinions of the Ohio Supreme Court. "The whole work done by the judges constitutes the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all, whether it is

11

a declaration of unwritten law, or an interpretation of a constitution or a statute." *Id.* at 253. In

1898, the Sixth Circuit observed that "any person desiring to publish the statutes of a state may

use any copy of such statutes to be found in any printed book, whether such book be the property

of the state or the property of an individual." *Howell v. Miller*, 91 F. 129, 137 (6th Cir. 1898)

(Harlan, J.).

Decisions such as *Banks* "represent[] a continuous understanding that 'the law,' whether

articulated in judicial opinions or legislative acts or ordinances, is in the public domain and thus

not amenable to copyright." *Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791, 796 (5th Cir.

2002) (*en banc*). The U.S. Copyright Office has expanded on this fundamental principle with

respect to all forms of law from all sources, not merely U.S. Government works:

> As a matter of longstanding public policy, the U.S. Copyright Office will not
> register a government edict that has been issued by any state, local, or territorial
> government, including *legislative enactments, judicial decisions, administrative
> rulings, public ordinances, or similar types of official legal materials*. Likewise,
> the Office will not register a government edict issued by any foreign government.

U.S. Copyright Office, Compendium of Copyright Office Practices § 313.6(c)(2) (3d ed. 2014)

(emphasis added).

### 2. The Plain Text of the Copyright Act Reinforces this Understanding.

The exclusion of the law from the copyright statutory monopoly long predates the 1976

Copyright Act, but the Act reinforces the principle in two ways. Section 102(b) of the Copyright

Act, 17 U.S.C. § 102(b), precludes copyright for "any idea, procedure, process, system, method

of operation, concept, principle, or discovery, regardless of the form in which it is described,

explained, illustrated, or embodied in such work." Law is a "system of rules that a particular

country or community recognizes as regulating the actions of its members and may enforce by

the imposition of penalties."[9] As a system, the law itself and particular laws are excluded from copyright pursuant to the terms of the Copyright Act itself.

Section 102(b) helps ensure that "courts do not unwittingly grant protection to an idea by granting exclusive rights in the only, or one of only a few, means of expressing that idea." *R.W. Beck v. E3 Consulting*, 577 F.3d 1133, 1145 (10th Cir. 2009) (citation omitted). The only way to express codified laws, or law that is incorporated by reference from other sources, is to use the language of the law itself. Once incorporated in to law, standards become "the unique, unalterable expression of the 'idea' that constitutes local law." *Veeck*, 293 F.3d at 801. Under Section 102(b), they cannot be subject to copyright restrictions.

Moreover, section 105 of the Copyright Act, 17 U.S.C. § 105, denies copyright for any work of the U.S. Government. When Congress enacts a bill that was drafted by a private lobbyist, the resulting law is still a U.S. government work. So too for a regulation enacted by an agency by incorporating by reference a pre-existing standard.

### 3.    A Statutory Monopoly In the Law Would Conflict with Fundamental Constitutional Protections.

In *Golan v. Holder*, 132 S. Ct. 873, 890 (2012), the Supreme Court recognized the potential tension between the First Amendment and copyright, and it identified the exclusion of ideas, which Section 102(b) codifies, as essential to balancing copyright and free speech protections. *Id.* at 889–91. Copyright, while authorized by the Constitution, is a statutory right. *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 883–84 (9th Cir. 2005). It cannot trump fundamental constitutional rights.

---

[9] *See* "Law," Oxford English Dictionary, https://www.oxforddictionaries.com/us/definition/american_english/law.

Section 102(b) plays that vital balancing role with respect to the law. Communication about the law is a core speech interest. *See, e.g.*, *Nieman v. VersusLaw, Inc.*, 512 Fed. App'x. 635, 2013 WL 1150277, at *2 (7th Cir. Mar. 19, 2013). As the Supreme Court noted in striking down a statute that would close criminal trials, "'a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs.' [This] serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government." *Globe Newspaper Co. v. Superior Court for Norfolk Cty.*, 457 U.S. 596, 604 (1982) (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)).

Accordingly, copyright restrictions on communicating the law could put the Copyright Act in conflict with the First Amendment. Section 102(b)'s exclusion of laws from copyrightability helps resolve that conflict, ensuring that copyright does not interfere with the public's ability to access, share, and discuss the law.

Equal protection of the laws and due process are also jeopardized if some citizens can afford convenient access to the laws that all are bound to obey (with potential penalties for non-compliance), but others cannot. As Thomas Paine observed, "Every man is a proprietor in government, and considers it a necessary part of his business to understand . . . . The government of a free country, properly speaking, is not in the persons, but in the laws." Thomas Paine, Rights of Man 39 (1791). A law that is vague "may run afoul of the Due Process Clause because it fails to give adequate guidance to those who would be law-abiding, to advise defendants of the nature of the offense with which they are charged, or to guide courts in trying those who are accused." *Musser v. Utah*, 333 U.S. 95, 97 (1948). Similarly, the Supreme Court has stated:

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning.

*Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

A law that a citizen cannot access is the vaguest of vague laws. Allowing any entity to restrict access to the law would thwart the essential democratic requirement of notice. *See Fox v. Washington*, 236 U.S. 273, 277 (1915) (courts should avoid construing statutes in ways that raise constitutional concerns). The public must be able to review and understand the rules we live by, so that they do not become traps for the unwary.

**B.      Incorporated Standards Are Laws and Cannot be Subject to a Statutory Monopoly.**

The fundamental right to access and share the law does not disappear when the law in question is a technical standard that has become law through incorporation by reference.

**1.      The leading cases recognize that standards development organizations cannot restrict access to the law.**

As the Fifth Circuit concluded in *Veeck*, once a standard is incorporated into the law, the people become the owner of that law. In that case, Peter Veeck, a Texas resident who hosted a noncommercial website collecting information about north Texas, purchased and then posted online model building codes that had been incorporated into the law of two Texas towns. 293 F.3d at 793. The private organization that initially developed the codes accused Veeck of copyright infringement. Sitting *en banc*, the Fifth Circuit rejected the claim:

> Lawmaking bodies in this country enact rules and regulations only with the consent of the governed. The very process of lawmaking demands and incorporates contributions by "the people," in an infinite variety of individual and organizational capacities. Even when a governmental body consciously decides to enact proposed model building codes, it does so based on various legislative considerations, the sum of which produce its version of "the law." In performing

15

their function, the lawmakers represent the public will, and the public are the final "authors" of the law.

. . .

. . . [P]ublic ownership of the law means precisely that "the law" is in the "public domain" for whatever use the citizens choose to make of it. Citizens may reproduce copies of the law for many purposes, not only to guide their actions but to influence future legislation, educate their neighborhood association, or simply to amuse.

293 F.3d at 799.

The Fifth Circuit's reasoning in *Veeck* echoes that of the First Circuit in *Building Officials & Code Administrators v. Code Technology, Inc.*, 628 F.2d 730 (1st Cir. 1980). In that case, the First Circuit vacated a preliminary injunction obtained by the creator and copyright holder of a model building code that Massachusetts had adopted into law. *Id.* at 731. The Court remanded for further proceedings, observing:

The citizens are the authors of the law, and therefore its owners, regardless of who actually drafts the provisions, because the law derives its authority from the consent of the public, expressed through the democratic process.

. . . [C]itizens must have free access to the laws which govern them.

. . . .

[I]t is hard to see how the public's essential due process right of free access to the law (including a necessary right freely to copy and circulate all or part of a given law for various purposes), can be reconciled with the exclusivity afforded a private copyright holder . . . .

*Id.* at 734, 736.

To be clear, "copyrighted works do not 'become law' merely because a statute refers to them." *See Veeck*, 293 F.3d at 805 (citing 1 Goldstein on Copyright **§** 2.49 n.45.2). In this case, however, the material in question has not merely been cited by a government agency. Instead, it has been expressly adopted as the law of the land through the incorporation by reference process, as part of a set of regulations "for improving integrity" in education. 78 Fed. Reg. 17598; 34 C.F.R. § 668.146. The regulations state that "[i]ncorporation by reference of this document [the 1999 Standards] has been approved by the Director of the Office of the Federal Register pursuant

16

to the Director's authority under 5 U.S.C. 552(a) and 1 C.F.R. part 51." *Id.* Because they are

incorporated by reference, the 1999 Standards are "deemed published in the Federal Register"

and have the same legal import as if they had been reproduced word for word there. 5 U.S.C.

§ 552(a).[10]

     As the Office of the Federal Register has explained, material incorporated by reference,

"like any other properly issued rule, has the force and effect of law." (SMF ¶ 31.); *see also*

*United States v. Myers*, 553 F.3d 328, 331 (4th Cir. 2009) (material incorporated by reference

has the same force of law as the incorporating regulation itself). The only reason the federal

government instead incorporates some regulations by reference instead of reproducing them

word for word is to limit the (already considerable) length of the Code of Federal Regulations.

(*Id.*) That goal, however laudable, cannot be read as a reason to grant a private entity ownership

and control over regulations that bind the public. As much as landmark health care acts or

Supreme Court civil rights decisions, the 1999 Standards are a legal mandate. ██████████

████████████████████████████████████████████████████

     Like the plaintiffs in the *ASTM v. Public.Resource.Org* case, Plaintiffs here try to

distinguish *Veeck* by characterizing the incorporated standards at issue here as "extrinsic

standards," rather than texts that have been adopted into law. (Pls. Mem. 38.) That distinction

does not hold because the standard at issue here *has* been adopted into law through the

incorporation process of 5 U.S.C. § 552 and 1 C.F.R. § 51.1 *et seq.* As with the building codes at

---

[10] Likewise, several states have explicitly incorporated the 1999 Standards by reference into their laws. In Maryland, the 1999 Standards are part of the state regulations that govern tests to license crane operators. Md. Admin. Rule 09.12.26.04(A)–(B), 09.12.26.06(E)(1)(c)(i). In Minnesota, they are part of the regulations for Health Department licensing of lead supervisors, lead inspectors, and lead risk assessors. Minn. Admin. Rule 4761.2460.

issue in *Veeck*, the 1999 Standards were subject to "wholesale adoption," not mere "reference[s]"
*Veeck*, 293 F.3d at 804.

        2.        **Incorporated Standards, As Law, Are Also Uncopyrightable Facts, Ideas, Principles, Systems, Processes, and Procedures.**

As the Fifth Circuit noted in *Veeck*, once adopted into law, "codes are 'facts' under copyright law. They are the unique, unalterable expression of the 'idea' that constitutes local law." 293 F.3d at 801. In other words, by virtue of government action the idea and the expression have merged. And "[w]hen there is essentially only one way to express an idea, the idea and expression are inseparable, and copyright is no bar to copying that expression." *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 606 (1st Cir. 1988). The Fifth Circuit also expressly rejected the notion that some laws might be "less factual" than others: "It should be obvious that for copyright purposes, laws are 'facts': the U.S. Constitution is a fact; the Federal Tax Code and its regulations are facts; the Texas Uniform Commercial Code is a fact. Surely, in principle, the building codes of rural Texas hamlets are no less 'facts' than the products of more august legislative or regulatory bodies." *Id.*

The process of incorporation by reference is analogous to the process discussed in *Kern River Gas Transmission Co. v. Coastal Corp.,* 899 F.2d 1458 (5th Cir. 1990), *cert. denied*, 498 U.S. 952 (1990). There the plaintiff took a United States Geographical Survey topographical map and added lines and mile markings where it proposed to locate a natural gas pipeline. The Federal Energy Regulatory Commission expressly approved that route. The defendant then copied that map to prepare a competing bid. The court concluded that "the idea of the location of the pipeline and its expression embodied in [the map] are inseparable and not subject to protection." *Id.* at 1463–64. "To extend protection to the lines would be to grant Kern River a

monopoly of the idea for locating a proposed pipeline in the chosen corridor, a foreclosure of competition that Congress could not have intended to sanction through copyright law." *Id.*

The merger doctrine exists "precisely to avoid such absurd results as conferring on the first planner of a pipeline a 'copyright' over its proposed location in a given corridor . . . ." 4 Nimmer on Copyright § 13.03[B][3]. Merger helped avoid similarly absurd results in *Veeck* (conferring the drafters of a code copyright over that law), and it does the same work here. As in *Kern*, in this case, after the initial creation, government officials gave legal effect to the Plaintiffs' document. At the point of incorporation into law, the idea (the law) and the expression (the 1999 Standards) became inseparable and therefore not subject to copyright.

### 3.     No court has ever found that government edicts are copyrightable.

Attempting to avoid the plain meaning of the Copyright Act, settled law, and the Constitution, Plaintiffs invoke *CCC Information Services Inc. v. McLean Hunter Market Reports, Inc.*, 44 F.3d 61, 74 (2d Cir. 1994), and *Practice Management Information Corp. v. American Medical Ass'n*, 121 F.3d 516 (9th Cir. 1997). (Pls. Mem. 39–40.) But those cases, unlike *Veeck,* did not address whether government edicts could be copyrighted. Instead, as the *Veeck* court and a leading treatise note, they 'involved compilations of data that had received governmental approval, not content that had been enacted into positive law'." *Veeck*, 293 F.3d at 805, *citing* 1 Goldstein on Copyright § 2.49 n.45.2.

In *CCC*, for example, the defendant argued that the Red Book, a compilation of automobile valuations, was not copyrightable because state regulations included it as one possible metric for valuing cars. 44 F.3d at 73. The Red Book was neither a government edict nor a set of rules; it was simply an approved reference. As noted, while mere reference to a document in a regulation might not transform the document into a law, applying the procedure of 5 U.S.C. § 552 and its implementing regulations explicitly does. For example, while the

19

Minnesota Health Department regulations state that "The [1999] APA standards are incorporated by reference," one of the regulations at issue in *CCC* merely said "[m]anuals approved for use are . . . The Redbook. . . .," without any mention of incorporation. N.Y. Comp. Codes R. & Regs. tit. 11, § 216.7.

*Practice Management* also presented different circumstances. *See Veeck*, 293 F.3d at 804. In that case, the American Medical Association ("AMA") had created and copyrighted a list of code numbers, the Physician's Current Procedural Terminology ("CPT"), for physicians to report their services. *Practice Mgmt.*, 121 F.3d at 517. The AMA granted the federal Health Care Financing Administration ("HCFA") a non-exclusive, royalty-free license to use the CPT in exchange for HFCA's promise that it would not use any other set of code numbers. *Id.* at 517–18. HCFA later created its own coding system for Medicare and Medicaid claims, the HCFA common procedure coding system ("HCPCS"), that included the AMA code numbers but added new information that HFCA developed. *See Veeck*, 293 F.3d at 805 (citing 50 Fed. Reg. 40895, 40897). Practice Management ("PMI"), a publisher of medical books, sought from the AMA a discount to use the AMA's code numbers (not the government's HCPCS system). When the AMA refused to provide the discount, PMI sought a declaratory judgment that the AMA's copyright was unenforceable. *Practice Mgmt.*, 121 F.3d at 518. Under those facts, the Ninth Circuit concluded that the AMA's copyright in the CPT coding lists was, in theory, enforceable against PMI. *Id.* at 520–21. (Nevertheless, the court ultimately refused to enforce the AMA's copyright, concluding that the AMA had abused its copyright by extracting HCFA's agreement not to adopt any coding system besides the CPT. *Id.* at 521.)

The factual, legal and policy issues here are distinct First, the plaintiff in *Practice Management* was seeking to invalidate the copyright on the AMA coding lists only (the CPT),

not the government's own document (the HCPCS) and the two documents were not identical. As

the Fifth Circuit noted in *Veeck*:

> [U]nlike Veeck, Practice Management Information Corporation, a commercial
> publisher of medical textbooks, was not trying to publish its own version of the
> HCPCS. Practice Management desired to sell a cheaper edition of the AMA's
> code, which was also used by insurance companies and had other non-
> governmental uses. *It is not clear how the Ninth Circuit would have decided the
> case if Practice Management had published a copy of the HCPCS.*

293 F.3d at 805 (emphasis added). In other words, what had become the law was quite different

from the original coding lists, and it appeared that the plaintiff was not interested in publishing

the law. In this case, by contrast, as in *Veeck*, Public Resource wishes to post online only what

has been expressly adopted as law.

Second, in contrast to the coding lists (tables with descriptions of medical procedures

matched to numbers) at issue in *Practice Management*, the 1999 Standards read and function as

rules. In *Practice Management* the medical codes were never themselves law, even if regulations

required persons to refer to the codes. Here, as with the text of the model building code in *Veeck*,

the incorporated standards are part of the law itself, imposing numerous specific requirements

and technical specifications.

Third, the concern expressed by the court in *Practice Management,* that depriving

privately created materials of copyright might undermine the economic incentive to create them,

121 F.3d at 518–19, cannot apply to the incorporated standards in this case. The 1999 Standards

have been superseded by the 2014 Standards and are therefore obsolete as an industry standard.

(SMF ¶ 40, 51.) Thus, its continuing value now is *as law*. Any economic incentive for creating

them has run its course.[11] As for future standards, as discussed below at pages 45–46, Plaintiffs have ample incentives to continue their work.

### C. Plaintiffs Have Actively Encouraged Transformation of Their Standards Into Law and Cannot Now Complain of a "Taking."

Plaintiffs suggest that depriving them of a statutory monopoly in the law might qualify as a taking and that the doctrine of constitutional avoidance counsels against it. (Pls. Mem. 28). That argument fundamentally misconstrues that doctrine, which simply means that a statute should be interpreted so as to avoid placing its constitutionality in doubt. Plaintiffs' farfetched public policy argument that they could be entitled to file "takings" claims against governments that incorporated their standards into law, even if true, does not create a constitutional conflict. If a taking occurred, Plaintiffs might be entitled to compensation from the government, but that would not make the Copyright Act unconstitutional.

Even on its own terms, Plaintiffs' takings argument fails. Plaintiffs admit that they have never asked any government official to refrain from incorporating the 1999 Standard into regulations and never protested after the fact—even after the *Veeck* decision put them on notice that their copyrights were invalid as to standards incorporated into law. (Pls. Answer ¶¶ 72–74, 78–80 (ECF No. 14)). And they actively sought to have the 1999 Standards incorporated into law. For example, Plaintiff AERA specifically urged federal regulators to hold off on a new set of regulations until the 1999 Standards were completed. (SMF ¶ 52.). ████████

████████████████████████████████

████████████████████████████████

---

[11] Even if the documents were available for purchase, to charge for access to them would be inappropriate "monopoly pricing of law, not copyright pricing to the market for voluntary consensus standards." Peter L. Strauss, *Private Standards Organizations and Public Law 16* (Columbia Pub. Law Research, Paper No. 13-334, 2013), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2194210.

[REDACTED]

There is a good reason the Plaintiffs strive to have the standards they help develop become law. Adoption gives the 1999 Standards "authoritative value." (SMF ¶ 54.) Moreover if, as Plaintiffs claim, their standards ensure the most "defensible" and "accurate" testing results, regulations requiring compliance with a common standard support Plaintiffs' respective missions of advancing research, knowledge and effective "high-stakes" testing. (Pls. Mem. 3, 7.)

---

[12] Plaintiffs now try to claim this letter was never sent—but their internal memo says otherwise. (SMF ¶ 56.) Indeed, Ms. Ernesto's statement in her declaration suggesting that it is "likely" the letter was never sent is contradicted by this memo, written in 2002 and reflecting on activity by APA's lobbyists in 2001, as well as by her own statements. [REDACTED]

(*Id.*)

23

The government did not "take" the 1999 Standards. Plaintiffs gave them to the public freely and deliberately, and with an eye to their own advantage.

**D.    Public Policy Favors Promoting Public Access to the Law.**

The principle that the law must be public and available to citizens to read and speak has its roots in the concept of the rule of law itself. "The law must be accessible . . . the successful conduct of trade, investment and business generally is promoted by a body of accessible legal rules governing commercial rights and obligations." *See* Thomas Henry Bingham, The Rule of Law 37–38 (Penguin Press 2011). Citizens are expected to obey the law, but they cannot do so effectively if they do not know it. "Citizens are subject only to the law, not to the arbitrary will or judgment of another who wields coercive government power. This entails that the laws be declared publicly in clear terms in advance." Brian Z. Tamanaha, On the Rule of Law: History, Politics, Theory 34 (Cambridge Univ. Press 2004).

**1.    Plaintiffs do not make the law reasonably accessible.**

Today, one can access and share judicial opinions, statutes, and most codified regulations online, almost instantly, for free, through a variety of databases. Absent Public Resource's efforts, however, the situation is strikingly different for just one important category of law: incorporated standards. For example, the law permits parents to review testing protocols. In order to exercise that right, however, they must make their way to the Washington, D.C. reading room of the Department of Education, or the National Archives (https://www.law.cornell.edu/cfr/text/34/668.146) (SMF ¶ 27.) If they cannot afford travel to D.C., the alternative is to go to Plaintiff AERA directly and pay a fee for access. As Plaintiffs admit, that fee can run as high as $50. (Pls. Mem. 10).

But even that that assumes that Plaintiffs are willing to sell access of a copy of the Standards. Plaintiffs have repeatedly emphasized their firm belief that they should be able to

control access to the 1999 Standards—including the right not to make the 1999 Standards available *at all*. (SMF ¶ 58.) Indeed, Plaintiffs discontinued sales of the 1999 Standards in order to stimulate sales of the 2014 edition. (Pls. Mem. 11.) But the 2014 edition is not the edition *incorporated into law*. As an apparent strategic move in light of this litigation, Plaintiffs resumed sales of the 1999 edition in July 2015. (SMF ¶ 59–60.) But Plaintiffs claim the power to suppress access to the standards at their whim. Indeed, they are likely to do so as soon as this litigation ends, given that Plaintiffs believe the availability of a superseded standard to be harmful. (SMF ¶ 97.) Indeed, AERA's representative explicitly stated that they would one day discontinue sales of the 1999 Standards again. (SMF ¶ 58.) Access to the law should never be subject to the marketing whims of a publisher or the political whims of a lobbying group.

Even after they made the 1999 Standards available for purchase again, Plaintiffs imposed significant barriers to access. In July 2015, shortly after Public Resource raised the issue of future sales of the 1999 Standards in depositions, AERA placed a single link to the 1999 Standards from the page from which it sells the 2014 edition of the Standards.[13] The linked page advises users that Plaintiffs "recommend use of the 2014 Standard*s* as the authoritative source of testing standards."[14] The 1999 edition does *not* appear in the "Complete List of AERA Books" on AERA's website.[15] And the 1999 Edition is not available for purchase through AERA's online bookstore. (SMF ¶ 59.) Instead, a purchaser must fill out a separate "Mail or Fax Order Form" for the 1999 edition. (SMF ¶ 59.)

_____

[13] *See* http://www.aera.net/Publications/Books/StandardsforEducationalPsychological Testing%28NewEdition%29/tabid/15578/Default.aspx.

[14] *See* http://www.aera.net/Publications/Books/Standards%281999Ed%29/tabid/16144/ Default.aspx.

[15] *See* http://www.aera.net/Publications/tabid/10067/Default.aspx; http://www.aera.net /Publications/Books/AERABooksList/tabid/13233/Default.aspx.

As for Plaintiffs APA and NCME, they maintain pages on their websites to advertise the Testing Standards and direct visitors to the AERA store to purchase the 2014 edition.[16] Neither of these pages links to the 1999 edition. (SMF ¶ 60.)

Finally, like the Plaintiffs in *ASTM*, the Plaintiffs here make no effort to provide access for print-disabled people. Plaintiffs admit that neither the 1999 nor the 2014 Standards have ever been available in a format that is accessible to individuals who are blind. (SMF ¶ 50.)

All evidence suggests that, other than as a strategic ploy in this litigation, Plaintiffs actively oppose public access to the 1999 Standards, which they consider not "authoritative" despite their authoritative status as law. As ten states noted in an amicus brief filed in support of Peter Veeck, the Roman emperor Caligula famously published his tax laws only in narrow places, in excessively small letters, to prevent practical access to them. Declaration of Matthew Becker, Ex. 74 (Amici Brief filed in *Veeck* litigation) (citing *U.S. v Jefferson County*, 380 F. 2d 385, 410–11 (5th Cir. 1967). A statutory monopoly in the law confers similar power on a standards organization. That burden on the people's ability to access and know the law is no more tolerable as a revenue strategy of standards development organizations than as the whim of a cruel and dissolute Roman emperor.

**2.      The Plaintiffs do not need a copyright statutory monopoly and copyright incentives in order to develop standards.**

Plaintiffs' self-serving threat to stop developing testing standards if they cannot retain their statutory monopoly when their standards are incorporated into law is not plausible. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (allegations or conclusory statements insufficient to raise fact issue on summary judgment). Standards development organizations, and

---

[16] *See* http://www.apa.org/science/programs/testing/standards.aspx; http://www.ncme.org/ncme/NCME/Publication/NCME/Publication/Testing_Standards.aspx.

the thousands of volunteers upon whom they rely, have ample non-copyright rewards and incentives to continue that work.

As the court in *Veeck* observed: "[I]t is difficult to imagine an area of creative endeavor in which the copyright incentive is needed less. Trade organizations have powerful reasons stemming from industry standardization, quality control, and self-regulation to produce these model codes; it is unlikely that, without copyright, they will cease producing them." 293 F.3d at 806 (quoting 1 Goldstein on Copyright § 2.5.2, at 2:51).

The same is true here. The 1999 Standards reflected the contributions of "scientific, professional, trade and advocacy groups, credentialing boards, state and federal government agencies, test publishers and developers, and academic institutions." (Pls. Mem. 6.) All of these volunteers rely on the standards (or realize they will be required to comply with them) and, therefore, have every incentive to help shape them, as do the committee members who controlled the final production. Indeed, Plaintiffs' own expert testified that participants contribute to the standard for three reasons: to "[c]ontribute back to the field, to contribute to the standards, and to serve the associations." (SMF ¶ 61.) None of those reasons would change if the Plaintiffs lost a statutory monopoly on those contributions when they become law.

For these reasons the argument that these Plaintiffs require copyright incentives in order to carry out their mission strains credulity. As one prominent scholar has observed, copyrighting standards actually creates perverse incentives that conflict with those overarching goals:

> The long-term credibility of [standards development organizations] depends on their ability not only to produce sound standards but also to produce standards in which the [standards development organizations] do not have such a strong financial interest that they succumb to the temptation to abuse the standards process by making their standards into a cash cow that must be purchased by anyone affected by the standard.

Pamela Samuelson, *Questioning Copyrights in Standards*, 48 B.C. L. Rev 193, 223–24 (2007).

The only basis for the Plaintiffs' claim that they would cease developing standards absent the promise of copyright royalties is a set of self-serving assertions. (Pls. Mem. 12.) Those assertions fail the sniff test. According to the Plaintiffs themselves, their own members benefit from the testing standards they develop, because they create a common set of rules for the development, use and evaluation of tests. (Pl. Mem. 6.) Plaintiffs, for example, admit that they benefits from the standards. (SMF ¶ 62.) Indeed, Plaintiffs' own expert stated that NCME naturally "cares a lot" about the standards. (SMF ¶ 63.) AERA's representative admitted that the 1999 Standards are "integral" to AERA's mission of "serving the public good through sound research, which includes sound methods and practices." (SMF ¶ 64.)

Further, while Plaintiffs may shoulder some expenses associated with producing the standards (though volunteers and their employers likely bear the majority of them (SMF ¶ 65.)), Plaintiffs have many other means of earning revenue, including selling other standards that are not incorporated into law, charging membership dues and conference fees, and obtaining government research grants, all of which are current sources of income for Plaintiffs. (SMF ¶ 66.) Indeed, Plaintiff APA's annual revenues in 2012 alone were approximately $119 million. (SMF ¶ 67.) Given that the standards development process depends on the effort of countless unpaid volunteers (who (or whose employers) require no copyright rewards for their volunteer work), Plaintiffs' statement that they will no longer manage standards development if they cannot count on a statutory monopoly if the output becomes law is simply an unsupported self-serving threat. *See Greene*, 164 F.3d at 675.

Finally, the Plaintiffs have no evidence that lack of a statutory monopoly would affect sales of the 1999 Standards. The best evidence they can muster is a misleading reference to a drop in sales within the 2-year period that Public Resource posted the 1999 Standards. But

Plaintiffs' annual revenue charts for the 1999 Standards show that sales were declining faster in the year before Public Resource posted the 1999 Standards than in the year after the Standards were posted. (SMF ¶ 44.)

| Year | Revenue | % Change | Units Sold | % Change |
|------|---------|----------|------------|----------|
| FY 2000 | | | 3,797 | |
| FY 2001 | | | 3,755 | -1.11% |
| FY 2002 | | | 5,592 | 48.92% |
| FY 2003 | | | 3,310 | -40.81% |
| FY 2004 | | | 3,218 | -2.78% |
| FY 2005 | | | 3,803 | 18.18% |
| FY 2006 | | | 3,888 | 2.24% |
| FY 2007[1] | | | 3,077 | -20.86% |
| FY 2008 | | | 3,358 | 9.13% |
| FY 2009 | | | 2,590 | -22.87% |
| FY 2010 | | | 3,043 | 17.49% |
| FY 2011 | | | 2,132 | -29.94% |
| FY 2012 | | | 1,649 | -22.65% |
| FY 2013 | | | 1,732 | 5.03% |
| FY 2014 | | | 855 | -50.64% |

(SMF ¶ 44.) Indeed, sales actually *increased* in 2013 over 2012. (SMF ¶ 44, 47.) According to



(SMF ¶ 45).

(SMF ¶ 45).

---

[1] 

Public Resource was unable to determine a continuous annual sales trend because Plaintiff did not produce monthly sales information. (SMF ¶ 44.) The data, however, does not suggest                    would affect the analysis.



(SMF ¶ 46).

(*Id.*) In fact, *they did*. (SMF ¶ 47.)

(SMF ¶ 47.)[17]

Moreover, even if it were relevant, Plaintiffs have not shown that copyright is necessary to their revenue stream. Many publishers sell compilations of statutes and codes without the benefit of copyright; people will still pay for the convenience of having a physical book of codes on their shelf. (SMF ¶ 68–72.) And numerous other standards development organizations function effectively without claiming copyright in standards incorporated into law.

    **E.**    **Plaintiffs Misinterpret the Copyright Act.**

Plaintiffs' remaining arguments against the public's right to access and share the law deserve swift rejection.

---

[17] Plaintiffs also imply that only Public Resource's posting of the standard could have caused a "precipitous drop" instead of a "gradual decline in sales year-over-year." (Pls. Mem. 25.) However, their only source for this speculation was Dr. Geisinger, who invoked his experience publishing several books, none of which was a standard or had later versions that could affect demand, as with the 1999 Standards. (Defendant's Mot. to Strike Geisinger at 4–5). Dr. Geisinger is not competent to opine as to the causation of any change in Plaintiffs' sales. In contrast, AERA's Dr. Levine testified that "there would be demand for a new version of the standards because of the large number of persons knowing that the new standards are under revision and *waiting to buy the new standard*." (SMF ¶ 45) (emphasis added).

First, Plaintiffs wrongly claim that 17 U.S.C. § 201(a) and the absence of a specific statutory provision addressing incorporation by reference support their view of the law. (Pls. Mem. 20.) The principle that the law cannot be copyrighted long predates the 1976 Copyright Act, and nothing in the Act suggests any intent to contravene it. Section 201(a) merely vests copyright initially in the author; that section is consistent with Public Resource's interpretation. (There is a substantial question whether Plaintiffs—as opposed to the countless volunteers who actually drafted the 1999 Standards—were the authors, but Public Resource does not press that issue here.) How a copyright vests does not affect its scope or whether Plaintiffs may enforce a statutory monopoly to control access to the law.

Second, Plaintiffs argue that Public Resource's interpretation would permit involuntary transfers of their alleged copyrights (Pls. Mem. 40), but there is no question of a transfer of copyright here. Whatever copyright the 1999 Standards may enjoy as private standards, *as law* they are not under copyright, and therefore there is nothing to transfer.

Third, the various studies and statutes Plaintiffs cite, recommending that federal agencies take advantage of voluntary consensus standards, say nothing about what happens when such standards became laws. The opinions of various executive branch agencies, including the Office of Management and Budget, are not the conclusions of copyright or constitutional experts, much less legal precedents.

## III.   EVEN BEFORE INCORPORATION, THE STANDARDS ARE PRIMARILY UNCOPYRIGHTABLE SYSTEMS, DISCOVERIES, PROCESSES, PROCEDURES, AND *SCÈNES À FAIRE*.

Plaintiffs have challenged, and seek an injunction against, Public Resource's posting of the 1999 Standards. But a claim of infringement, and any relief, must be confined to the use of copyrightable expression. "To prevail on a copyright claim, a plaintiff must prove both ownership of a valid copyright and that the defendant copied original or 'protectible' aspects of

the copyrighted work." *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1295 (D.C. Cir. 2002)

(citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 348, 361 (1991)). "The scope of

[an] injunction . . . should generally be no broader than the infringement; courts should modify

injunctions that impinge on non-copyrightable expression." 4 Nimmer on Copyright

§ 14.06[C][1][a] ( (citations omitted). *See also Nihon Keizai Shimbun, Inc. v. Comline Bus. Data,*

*Inc.*, 166 F.3d 65, 75 (2d Cir. 1999).

Much of the 1999 Standards are non-copyrightable. Plaintiffs repeatedly stress, and

Public Resource does not dispute, that the 1999 Standards were the product of substantial time

and effort by the volunteers who developed them. (Pls. Mem. 5.) But investment and effort are

not a basis for copyright. Original creative expression is necessary. *Feist,* 499 U.S. at 346, 353

(rejecting the argument that "sweat of the brow" is sufficient to confer benefits of copyright).

As the Supreme Court explained: "the first person to find and report a particular fact has

not created the fact; he or she has merely discovered its existence." *Id.* at 347. The standards at

issue here summarize of the "discoveries" of thousands of volunteers and government employees

who, through experience and research, have determined the optimal principles, practices, and

procedures for testing. Those discoveries are no doubt valuable. But they are not copyrightable.

A.      **The 1999 Standards Are Procedures, Systems, and Principles.**

As noted, Section 102(b) excludes ideas, procedures, systems, and principles (among

other things) from copyright. The 1999 Standards are procedures, systems and principles for

production of fair and valid tests.

As Plaintiffs' own representative stated, the standards ██████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████ (SMF ¶ 77.) Plaintiffs define the 1999 Standards as

"Technical Recommendations" or "principles and guidelines to improve professional practice."

32

(Pls. Mem. 4, 6.) They are the product of "intensive labor" and "expertise," (Pls. Mem. 5), that

summarize and reinforce "technical, professional and operational norms." (Pls. Mem. 8.)

The design of the 1999 Standards resulted from a technical committee's review of the

relevant research, public input, and committee expertise, all of which aimed to create the best

rule based on available evidence. The developers' ██████████████████████████████████

(SMF ¶ 78.) The goal is to ███████████████████████████████████████████████████

███████████ (SMF ¶ 79.), in order to ensure accurate and defensible testing protocols. Indeed,

Plaintiffs do not believe that the standards can be expressed another way. For example,

Plaintiffs' own witness stated ███████████████████████████████████████████████████

███████████████████████████████████████ (SMF ¶ 81.) ██████████████████████████████

███████████████████████ *Id.* ¶ 82.)

Nor do the incorporated standards qualify as creative compilations, because their utility

dictates their organization. Guidance on this point is in the recent Ninth Circuit decision in

*Bikram's Yoga College of India, L.P. v. Evolation Yoga, LLC*, 803 F.3d 1032 (9th Cir. 2015). In

that case, the plaintiff claimed that the order and sequence of certain yoga poses (the

"Sequence") was copyrightable. The court rejected that argument because "the medical and

functional considerations at the heart of the Sequence compel the very selection and arrangement

of poses and breathing exercises for which [plaintiff] claims copyright protection." *Id.* at 1042.

The court concluded: "The Sequence's composition renders it more effective as a process or

system, but not any more suitable for copyright protection as an original work of authorship." *Id.*

The same is true here. Plaintiffs optimize for enforceable clarity, not creativity. While

they may have made choices about how to organize the 1999 Standards, the relevant inquiry is

not whether one could imagine some other, less useful, method of arrangement. *See Bikram's*

*Yoga*, 803 F.3d at 1042; *BellSouth Advert. & Publ'g Corp. v. Donnelley Info. Publ'g, Inc.*, 999

F.2d 1436, 1443 (11th Cir. 1993); *see also ATC Distrib. Grp., Inc. v. Whatever It Takes

Transmission & Parts, Inc.*, 402 F.3d 700, 712 (6th Cir. 2005) (fact that publisher "could have

arranged the parts information in other ways that were potentially less clear or useful . . . is

insufficient to demonstrate the creativity necessary for copyright protection"). Instead, it is

whether, as here, the Plaintiffs made the optimal choice to render their *system* more *effective* as

such. *See also* 4 Nimmer on Copyright § 13.03[B][3].

> **B.** **The Incorporated Standards Are *Scènes à Faire*.**

The compilations are also uncopyrightable *scènes à faire*. The *scènes à faire* doctrine

excludes from protection those elements of a work that necessarily result from factors "external

to the author's creativity." 4 Nimmer on Copyright § 13.03[F][3]; *see also Computer Assocs.

Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 709–10 (2d Cir. 1992).

Here, Plaintiffs admit that their standards are dictated by external factors: specifically, the

current state of technical information on test development and use. (SMF ¶ 83.) For example, the

1999 Standards were intended to remedy technical deficiencies in the prior 1985 standards, as

there were definitions and statements that "more recent research had suggested were incorrect or

outdated." (SMF ¶ 84.) The choices in development of the Standards were also dictated by

practical requirements and industry demands, as the industry participants voiced them in the

development process. (Pl. Memo. at 6; SMF ¶ 85.) Thus, they are like the elements of a software

program that are dictated by practical realities rather than creative design and therefore excluded

from copyright. *See, e.g., Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522,

535 (6th Cir. 2004) (content primarily shaped by extrinsic factors such as hardware standards

and mechanical specifications may not obtain copyright).

IV.     **PUBLIC RESOURCE'S POSTING IS A LAWFUL FAIR USE.**

Even if the Court were to find that Plaintiffs can exercise a statutory monopoly over a portion of the law, the statutory monopoly does not prohibit fair uses. The rights of a copyright owner, in section 106 of the Copyright Act, are expressly "[s]ubject to . . . section[] 107." *See* 17 U.S.C. § 106 (initial wording). The fair use of a work is not, as Plaintiffs contend, an "infringement [that] can be excused." (Pls. Mem. 28.) The statute is clearly to the contrary: "Notwithstanding the provisions of section[] 106 . . . , the fair use of a copyrighted work . . . is not an infringement of copyright." Fair use is "a right granted by the Copyright Act of 1976 . . . [and] not an infringement." *Lenz v. Universal Music Corp*, 801 F.3d 1126, 1133 (9th Cir. 2015) (quoting *Bateman v. Mnemonics, Inc.,* 79 F.3d 1532, 1542 n.22 (11th Cir. 1996)).

The fair use doctrine has four non-exclusive statutory factors: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for non-profit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. The Court must evaluate these factors "in light of the purposes of copyright," which are "[t]o promote the Progress of Science and useful Arts, and to serve the welfare of the public." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1163 (9th Cir. 2007) (citations and internal quotations omitted). All four statutory factors support fair use here, as does the Constitutional purpose of copyright.

A.     **Public Resource's Posting of the Legally Binding 1999 Standards Is Transformative, Is Noncommercial, and Is for Beneficial Public Purposes.**

Public Resource posted the 1999 Standards for several purposes, all of which support a finding of fair use. Public Resource's interest in the 1999 Standards is solely in publicizing the

law and making it available to all. Public Resource has enabled access to the law for all those affected by it, and in particular for those who are blind or have other disabilities with respect to printed books. And by posting the 1999 Standards in a form that can be read by computer software, Public Resource has enabled new ways of learning about and interacting with the law. Moreover, Public Resource's purpose is noncommercial, a fact that Plaintiffs do not dispute. (*See* Plaintiffs' Statement of Undisputed Material Facts ¶¶ 48, 52.)

### 1.   Expanding access to the law is a transformative purpose.

The first fair use factor favors transformative purposes and uses. *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 578–79 (1994). A transformative use is one "that communicates something new and different from the original or expands its utility, thus serving copyright's overall objective of contributing to public knowledge." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015) (citing *Campbell,* 510 U.S. at 579); *see also A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009) (a fair use "can be transformative in function or purpose").

Incorporation by reference into law transformed the 1999 Standards even before Public Resource obtained it, by turning it from a statement of best practices into the law of the land. Incorporation into law gave the 1999 Standards "a further purpose or different character." *Campbell*, 510 U.S. at 579. Public Resource's posting of the 1999 Standards built on that initial transformation and is itself transformative.

Plaintiffs sold print copies of the 1999 Standards as a guide to test designers and administrators, and a statement of best practices for assessment professionals. (SMF ¶ 86.) The Plaintiffs seek to provide answers to questions like "*How do I design a test that can accurately diagnose psychological dysfunctions,*" or "*How do I administer a test fairly to non-native English speakers?*"

Public Resource has had a very different purpose for posting the 1999 Standards. Public Resource provides access to standards incorporated into law as part of an online archive of laws and other government documents, so that citizens are able to read, speak, and engage critically with the laws that govern them. (SMF ¶ 2.) Posting the 1999 Standards was part of that mission. The Public Resource websites answer different questions, such as "*What is the law governing tests that determine eligibility for government benefits,*" and "*Does the test my child took comply with the law?*"

Public Resource's use of the 1999 Standards is "indifferent" to any copyrightable expression it allegedly contains. *See Am. Inst. of Physics v. Schwegman, Lundberg & Woessner, P.A.*, No. 12-528, 2013 WL 4666330, at *12 (D. Minn. Aug. 30, 2013). For Public Resource's purpose, it matters only that the standards it posts are legal requirements that the public must obey. Thus, Public Resource transformed the 1999 Standards "from an item of expressive content to evidence of the facts within it." *Am. Inst. of Physics v. Winstead PC*, No. 3:12-CV-1230-M, 2013 WL 6242843, at *5 (N.D. Tex. Dec. 3, 2013). Public Resource's use of standards incorporated by reference into law is akin to copying and displaying documents in the process of fulfilling a legal requirement, or in the course of judicial and administrative proceedings. *Bond v. Blum*, 317 F.3d 385, 394–97 (4th Cir. 2003) (copying and submission of copyrighted manuscript in child custody proceeding as evidence of the admissions it contained was fair use); *Healthcare Advocates Inc. v. Harding, Earley, Follmer & Frailey*, 497 F. Supp. 2d 627, 639 (E.D. Pa. 2007) (copying images from website to gather facts for the defense of an earlier copyright infringement suit was fair use). Like such uses, posting an incorporated standard to communicate the legal facts it embodies does not "seek[] to exploit or unjustly benefit from any creative energy that [Plaintiffs] devoted to writing" the Standards. *See Lexmark*, 387 F.3d at 544.

37

Even for source material other than legal texts, copying for a new and different purpose indifferent to any creative expression is transformative. *See Bill Graham Archives v. Dorling Kindersley Ltd.,* 448 F.3d 605, 608–09 (2d Cir. 2006) (use of concert poster images as "historical artifacts" on a timeline in a book rather than for "artistic expression and promotion" was transformative); *Online Policy Grp. v. Diebold, Inc*., 337 F. Supp. 2d 1195, 1203 (N.D. Cal. 2004) (posting corporation's emails on the Internet to inform the public of defects in electronic voting machines was transformative); *see also Lexmark,* 387 F.3d at 544 (using a copyrighted computer program in a competing product as a password that unlocked the functionality of a printer rather than for the program's intrinsic use was transformative). Public Resource's purpose of informing the public about the rules it must follow falls into that rubric. The purpose is a form of news reporting, a paradigmatic example of fair use in 17 U.S.C. § 107.

> **2.    Providing new information about the law by enabling software-based analysis is a transformative and publicly beneficial purpose.**

Public Resource's use is also transformative because it enables citizens to engage with this portion of the law in new ways that "provide otherwise unavailable information." *Authors Guild*, 804 F.3d at 215; *see also Authors Guild, Inc. v. HathiTrust,* 755 F.3d 87, 97–98 (2d Cir. 2014); *Vanderhye,* 562 F.3d at 638–640 (digital reproduction of student manuscripts in their entirety to detect plagiarism is transformative); *Perfect 10,* 508 F.3d at 1165 (search engine reproducing small images of copyrighted photos to aid in finding them is transformative); *see also* Pierre N. Leval, *Toward A Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990) (fair use protects a use that creates "new information . . . new insights and understandings.").

Public Resource posted the 1999 Standards to its website in Portable Document Format (PDF), which is readable by numerous devices and software programs. Widely available optical character recognition (OCR) software can transform PDF files into text that can be read by an

even greater variety of software. The version that Public Resource posted to the Internet Archive

underwent OCR and was converted into a variety of file formats. (SMF ¶ 37). Public Resource's

regular practice is to further convert the standards it posts into standard Hypertext Markup

Language (HTML) to make them still more accessible. It intended to do so for the 1999

Standards but the filing of this lawsuit interrupted that work. (SMF ¶ 38.) Public Resource also

works to ensure that standards incorporated by reference into law, along with the other legal

materials it posts, are indexed and represented accurately by search engines. (*Id.*)

Plaintiffs try to dismiss Public Resource's work as "merely converting printed text to

digital format." (Pls. Mem. 45.) Plaintiffs miss the point. Once a legal text like the 1999

Standards is available in new formats, software-based searching and analysis can reveal new

information about the source material. *See* Thomas A. Smith, *The Web of Law*, 44 San Diego L.

Rev. 309, 312–14 (2007) (describing computer analysis of citations in judicial opinions); Kevin

D. Ashley & Stefanie Brüninghaus, *Computer Models for Legal Prediction*, 46 Jurimetrics 309,

312 (2006) ("To apply such prediction tools, the case data must be amenable to computer

processing."); William Li et al., *Law Is Code: A Software Engineering Approach to Analyzing

the United States Code,* 10 J. Bus. & Tech. L. 297, 309 (2015) (describing how comprehensive

software analysis of the U.S. Code is made possible by the Code's availability in Extensible

Markup Language format). This enabling of criticism, comment, scholarship, and research are

additional paradigmatic examples of fair use in 17 U.S.C. § 107.

In the United States, nearly all statutes, regulations, and reported judicial opinions are

available on the Internet, in standard formats readable by software, for free. *See, e.g.*, Legal

Information Institute, https://www.law.cornell.edu/; Google Scholar, https://scholar.google.com/;

Code of the District of Columbia, http://dccode.org/simple/; D.C. Municipal Regulations and

D.C. Register, http://www.dcregs.dc.gov/. This new availability has transformed legal practice and scholarship and vastly increased public access. *See* Steven A. Lastres, *Rebooting Legal Research in a Digital Age,* LLRX (Aug. 10, 2013), https://www.llrx.com/files/rebootinglegal research.pdf.

      In contrast, although Plaintiff AERA conceded that ███████████████████ ████████████████████████████████████████████████████████████████ ████████████████████ the Plaintiffs in this case provide the legally binding 1999 Standards only in print while suppressing attempts to access and use the Standards in electronic formats. (SMF¶ 87–88.) Public Resource's posting of the 1999 Standards enabled the same powerful search and analysis tools that can be used for most other state and federal laws. As several courts have found, enabling search and analysis is highly transformative and favors a finding of fair use. *See HathiTrust*, 755 F.3d at 97; *Vanderhye*, 562 F.3d at 638–40; *Perfect 10*, 508 F.3d at 1165.

      **3.    Providing access for people with print disabilities is a legally favored fair use purpose.**

      Additionally, Public Resource enables blind and other print-disabled individuals to access the law. Accessibility for the disabled is a well-established fair use purpose. "Making a copy of a copyrighted work for the convenience of a blind person is expressly identified by the House Committee Report as an example of fair use, with no suggestion that anything more than a purpose to entertain or to inform need motivate the copying." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 455 n.40 (1984); *see also HathiTrust,* 755 F.3d at 103 (purpose of promoting accessibility by the disabled favored finding of fair use). The drafters of the Copyright Act of 1976 identified accessibility as a "special instance illustrating the application of the fair use doctrine." H.R. Rep. No. 94–1476, at 73 (1976), 1976 U.S.C.C.A.N. 5659, 5686.

Access to the 1999 Standards is particularly important for people with print disabilities because the Standards contain the legal requirements for tests used to determine students' eligibility for federal grants, including whether those tests are fair to students with disabilities. (SMF ¶ 89.)[18] Federal and state statutes concerning access to testing protocols have been held to support a finding of fair use. "[A] school giving parents of special education students copies of their children's test protocols when requested under [state law] is a fair use." *Newport-Mesa Unified Sch. Dist. v. California Dep't of Educ.*, 371 F. Supp. 2d 1170, 1179 (C.D. Cal. 2005).

Public Resource made the 1999 Standards accessible to print-disabled readers by scanning a print copy to create a digital version and making that version available online in a standard format. (SMF ¶ 37–38). James Fruchterman, Public Resource's expert on accessibility, concluded that "a person who is blind or print disabled would have been able to locate a version of the 1999 Standards on the Public.Resource.Org website when it was still hosted there" and would be able to "perform[] optical character recognition on the Public.Resource.Org image file" containing the 1999 Standards. (SMF ¶ 90.) The reader would then "be able to perform all of the functional tasks: reading the entire standard, navigating to a specific place in the standard, or searching on key terms." (SMF ¶ 90.) The version that Public Resource posted to the Internet Archive website had optical character recognition performed on it, so it was immediately readable by people who are blind or have visual disabilities. (SMF ¶ 90.)

Plaintiffs, in contrast, provide the 1999 Standards only in print. (SMF ¶ 88.) Mr. Fruchterman could not locate the 1999 Standards on the Internet from any source, Public

---

[18] Plaintiffs make much of the Second Circuit's statement in *HathiTrust* that "providing expanded access to the print disabled is not 'transformative.'" 755 F.3d at 101. (*See also* Pls. Mem. 45.) They neglect to mention that the Second Circuit nonetheless found that providing such access supported a finding of fair use under Supreme Court precedent. *Id.* at 102. The "transformative use" designation does not end the first factor inquiry. *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.,* 756 F.3d 73, 84 (2d Cir. 2014) (quoting *Campbell,* 510 U.S. at 579)).

Resource having disabled access to the Standards through its website and the Internet Archive during this litigation. (SMF ¶ 91.) Nor is the document available through any of the main libraries that serve people with print disabilities, and Plaintiffs state that they have not given permission for any braille versions to be created. (SMF ¶¶ 92–93.) Mr. Fruchterman noted that, while print copies of the 1999 Standards may be available, "most blind people themselves do not have the ability to convert books" and would require that "their employer, educational institution, or a specialized library for the blind create [an accessible copy]." (SMF ¶ 94.) Thus, only Public Resource has enabled print-disabled citizens to access this portion of the law independently.

### 4.    Public Resource's use of the 1999 Standards is non-commercial.

Public Resource's use of the 1999 standards is non-commercial, which supports fair use. *See Campbell,* 510 U.S. at 584. Public Resource is a non-profit organization funded entirely by donations, contributions and grants. (SMF ¶ 1.) It does not charge for access to the 1999 Standards or any other information on its website. (SMF ¶ 5.) The Plaintiffs have not asserted that Public Resource's use of the 1999 Standards is commercial.

### B.    The 1999 Standards Are a Factual Document.

"The law [of fair use] recognizes a greater need to disseminate factual works than works of fiction or fantasy." *Harper & Row Publ'rs., Inc. v. Nation Enters.*, 471 U.S. 539, 563 (1985). "Since the risk of restraining the free flow of information is more significant with informational work, the scope of permissible fair use is greater." *Consumers Union of U.S., Inc. v. Gen. Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir. 1983).

The 1999 Standards fall squarely on the factual end of the spectrum. As a part of the law, the text of the Standards is a legal fact. In addition, Plaintiffs concede that the 1999 Standards are procedures. As such, if they are not entirely excluded from copyright by 17 U.S.C. § 102(b),

their nature supports a determination of fair use.[19] *Consumers Union*, 724 F.2d at 1049; *see* pages 32–34, above.

Plaintiffs dismiss this factor as unimportant. (Pls. Mem. 46.) Copyright experts would beg to differ. *See* Robert Kasunic, *Is that All There Is? Reflections on the Nature of the Second Fair Use Factor*, 31 Colum. J.L. & Arts 529, 554–55 (2008). Important or not, the factor favors a conclusion of fair use.

### C.     Public Resource Uses No More of the Standards than Necessary.

The third statutory factor favors fair use where the amount of the original work used is "reasonable in relation to the purpose of the copying." *Authors Guild*, 804 F.3d at 221; *see also Campbell*, 510 U.S. at 586–87. The copying of entire works is fair use when it reasonably fulfills the user's purpose. *See, e.g.*, *Sony*, 464 U.S. at 449–50 (copying of entire television programs for time-shifting is fair use); *Lexmark*, 387 F.3d at 544 (copying of entire computer program as required for compatibility with printer is fair use); *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 90 (2d Cir. 2014) (copying and dissemination of entire recordings of press conferences was "reasonable in light of its purpose of disseminating important financial information to investors and analysts.").

There can be no serious dispute that the purpose for which Public Resource posted the 1999 Standards requires posting the complete document that the law has incorporated. There is no portion or excerpt short of the entirety that would fully inform the public of its rights and obligations under the law. Partial access could even create the false impression that a test that complied with only part of the Standards would fulfill Department of Education or state law

---

[19] The Second Circuit's recent *Authors Guild* decision does not alter this conclusion. That court did not impose a different meaning on the second statutory factor but simply downplayed its importance. 804 F.3d at 220.

requirements. Plaintiffs themselves forbid reprinting of individual sections of the Standards because "the standards are regarded as a unitary document." (SMF ¶ 95.)

Because Public Resource's use of the 1999 Standards is transformative, copying that is "literally necessary" or "reasonably appropriate" to that use tilts the third factor in favor of fair use. *Authors Guild*, 804 F.3d at 221. Plaintiffs' recitation of cases in which the party accused of infringement used technological measures to limit copying of the work at issue is not relevant here, where "to copy any less than" the entire work "would have made the [work] useless" for the fair use purpose. *Nuñez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 24 (1st Cir. 2000); (*see* Pls. Mem. 49–51.)

### D. Public Resource's Use of the 1999 Standards Has Not Caused, and Will Not Cause, Harm in Any Relevant Market.

The fourth fair use factor concerns "meaningful or significant effect 'upon the potential market for or value of the copyrighted work.'" *Authors Guild*, 804 F.3d at 224 (citation omitted). Where a use is highly transformative, only a strong showing of harm will weigh against fair use. "Market harm is a matter of degree, and the importance of this factor will vary, not only with the amount of harm, but also with the relative strength of the showing on other factors." *Fox News Network, LLC v. TVEyes, Inc.*, 43 F. Supp. 3d 379, 395 (S.D.N.Y. 2014) (quoting *Campbell*, 510 U.S. at 590 n. 21). And market effects that "occur in relation to interests that are not protected by the copyright" are not relevant to the fourth factor inquiry. *Authors Guild*, 804 F.3d at 224.

As discussed above, at pages 28–30, Plaintiffs provided no competent evidence that Public Resource's activities harmed sales of the 1999 Standards.

Looking ahead, the undisputed facts show that Plaintiffs themselves shut down the market for the 1999 edition of the standards, the only work at issue in this case. And copyright

law does not protect a market for the right to control "the conditions under which the public may use" public law. (Pls. Answer ¶14 (ECF No. 14)). The fourth factor favors fair use.

### 1.   Plaintiffs themselves have shut down the market for the 1999 Standards.

Where there is no actual or potential market for the work at issue, the fourth factor inclines towards fair use. *Katz v. Google Inc.*, 802 F.3d 1178, 1184 (11th Cir. 2015); *see also Blanch v. Koons*, 467 F.3d 244, 258 (2d Cir. 2006); *Online Policy Grp. v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1203 (N.D. Cal. 2004). The only document at issue in this lawsuit is the legally binding 1999 edition of the Standards. Plaintiffs, by their own admissions and actions, have little interest in revenue from sales of the 1999 edition. On the contrary, they seek to restrict access to it and deter sales. Thus, there is no actual or potential market for copies of the 1999 Standards that Public Resource could affect.

Plaintiffs halted all sales of the 1999 edition after publishing the 2014 Standards in August 2014, mere months after filing this lawsuit. (SMF ¶ 40). ███████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ (SMF ¶ 96.)

██████████████████████████████████████████████████████████████████████,

(SMF ¶ 97.), even though the 1999 edition remains the law of the land. Plaintiffs resumed sales in 2015 but, as noted in above, they have made it difficult to find, much less purchase, the 1999 Standards through Plaintiffs' normal channels.

Plaintiffs now sell the 2014 edition of the Standards, and they promote and market only the 2014 edition. ████████████████████████████████████████████████████

████████████████████████████████ (SMF ¶ 41–42.) ████████████████████

████████████████████████████████████████████████

██████████████ as only Plaintiff AERA published and sold new copies of the 1999

Standards. (SMF ¶ 42.) Nor are Plaintiffs seeking any royalty or other revenue from Public

Resource for its use of the 1999 Standards. (Complaint 13–14 (ECF No. 1)).

The inescapable conclusion from these facts is that Plaintiffs have no interest in any

market for the legally binding 1999 edition. The single link to a mail order form on a single page

buried within AERA's website cannot overcome that conclusion. Plaintiffs have "failed to allege

that a 'market' exists for [their] copyright at all," and the Court should "decline[] to simply

presume the existence of a market." *Righthaven, LCC v. Jama*, No. 2:10-CV-1322, 2011 WL

1541613, at *5 (D. Nev. Apr. 22, 2011).

Because "there is no likely market for the challenged use of the plaintiff's work[], the

fourth fair use factor favors the defendant." *Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1121 n.9

(D. Nev. 2006) (citing *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 805–06 (9th Cir.

2003)); *see also Blanch v. Koons*, 467 F.3d 244, 258 (2d Cir. 2006) (fourth factor favored fair

use where plaintiff had ceased to publish or license her photograph).

> **2.** **Only the 1999 Standards are relevant to the fair use inquiry; Public Resource has not posted the 2014 edition and will not do so unless it becomes law.**

Plaintiffs' argument that Public Resource will harm the market for the *2014 edition* of the

Standards and "future Standards" if it succeeds in this litigation is both legally and factually

incorrect. As a matter of law, only harms to the potential market for "*the* copyrighted work" at

issue are relevant to the fair use inquiry. 17 U.S.C. § 107 (emphasis added); *see Consumers*

*Union of United States, Inc. v. Gen. Signal Corp.,* 724 F.2d 1044, 1051 (2d Cir. 1983) (refusing

to consider impact of actual copying on plaintiff's future works); *Campbell*, 510 U.S. at 574

(fourth factor is concerned with the "potential market for *the* original.") (emphasis added).

Plaintiffs have not claimed infringement of the 2014 edition, let alone "future Standards" they have not yet written. Allegations concerning the "overall impact to [Plaintiffs'] business"— apart from "the market for the reproduced [work]"—are "irrelevant to a finding of fair use." *Nuñez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 24 (1st Cir. 2000).

Public Resource has not posted the 2014 edition of the Standards anywhere. (SMF ¶ 40.) It is undisputed that Public Resource posts *only* those standards that have become law. Consistent with this policy, Mr. Malamud testified that he would consider posting the 2014 edition only "[i]f the federal government did a deliberate and explicit incorporation by reference," and only after determining "if that was an area that I wanted to continue to invest resources in." (*Id.*)[20] Public Resource does not (and need not) contest Plaintiffs' claim of copyright in the 2014 edition or their ability to control its distribution. Thus, even if the market for the 2014 edition were legally relevant to the fair use analysis, Plaintiffs cannot show any imminent effect on that market.

### 3.    There is no proper market for the exclusive right to control access to, and dissemination of, the law.

Plaintiffs claim "the power to determine the conditions under which Public Resource and others may access, reproduce, publish, translate, reformat or annotate the [1999] Standards," despite the Standards' status as binding law. (Pls. Answer to Counterclaims ¶ 14, ECF No. 14.) But when a work is informational and public access to the information is vital, facilitating access to the work does not, as a matter of law, harm its "market" or "value." *See Diebold*, 337 F. Supp.

---

[20] Plaintiffs mischaracterize this testimony as stating that Mr. Malamud "intends" to post the 2014 edition "if successful in this litigation." (Pls. Mem. 48.) In fact, the very testimony they cite makes clear that Mr. Malamud would consider doing so only if the 2014 edition is deliberately incorporated by reference. (SMF ¶ 40.)

2d at 1203; *Righthaven*, 2011 WL 1541613, at *4–*5 ("using the work for informational

purposes" does not create market harm).

Although Plaintiffs assert that no one apart from historians should use the 1999

Standards, they acknowledge that many people "believe they still may be held accountable to the

guidance of the 1999 Standards." (Pls. Mem. 11.) That belief is accurate. The 1999 Standards,

not the 2014 Standards, form part of the Department of Education's regulations for the design of

tests. "Incorporation by reference of a publication is limited to the edition of the publication that

is approved." 1 C.F.R. § 51.1(f). The public has a compelling need to access, discuss, and

communicate the 1999 Standards *as law*. Plaintiffs have never had a legitimate right to prevent

people from using and distributing the 1999 Standards *as law*, and therefore cannot claim they

will suffer harm from losing that purported right.

Given that copyright does not protect the ability to suppress distribution of information of

public importance, especially where the claimant seeks no financial benefit from its distribution,

the opinion in *Worldwide Church of God v. Philadelphia Church of God, Inc.* does not apply

here. 227 F.3d 1110 (9th Cir. 2001). In that case, one church copied and used another church's

"core" liturgy for "the very purposes for which [plaintiff] created [it]" and as a "marketing

device." *Id.* at 1118–20. The court held marketing value to be a form of "compensation" that the

defendant acquired from its copying of the document. *Id.* at 1119. There was no indication that

the broader public had any interest in the document, and the court emphasized that "[t]his is not a

case of abuse of the copyright owner's monopoly as an instrument to suppress facts." *Id.* at 1116

(citation omitted).

Here, in contrast, the public importance of the 1999 Standards *as law* is undisputed, and it

overcomes Plaintiffs' desire to suppress access to them. *See Diebold*, 337 F. Supp. 2d at 1203;

*Righthaven*, 2011 WL 1541613, at *4 (distinguishing *Worldwide Church of God*). Public

Resource has never sought benefit or compensation from its posting of the 1999 Standards and

has never used it as a marketing device. (SMF ¶ 5.) In addition, Public Resource's use is highly

transformative. The Ninth Circuit has distinguished *Worldwide Church of God* from instances

where the challenged use was highly transformative and market harm "may not be so readily

inferred." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165, 1168 (9th Cir. 2007).

Finally, the Ninth Circuit and other courts have since rejected the rationale in *Worldwide Church

of God* that copyright protects against harms to "reputation." *Garcia v. Google, Inc*., 786 F.3d

733, 745 (9th Cir. 2015) (en banc); *see also Katz v. Google Inc.*, 802 F.3d 1178, 1184 (11th Cir.

2015) (per curiam).

Public Resource's use of the 1999 Standards furthers the purpose of copyright law by

improving access to vital knowledge, promoting the "Progress of Science." U.S. Const. art. I § 8

cl. 8. All four factors of the fair use analysis favor Public Resource, and the Court should grant

summary judgment to Public Resource on this additional ground.

## V.  PUBLIC RESOURCE IS NOT SECONDARILY LIABLE FOR COPYRIGHT INFRINGEMENT.

Contributory liability requires introducing facts proving that a party "intentionally

induc[ed] or encourage[ed] direct infringement." *Metro-Goldwyn-Mayer Studios Inc. v.

Grokster, Ltd.*, 545 U.S. 913, 930 (2005)*.* This Court has identified three elements: "(1) direct

infringement by a third party, (2) knowledge by the defendant that the third parties were directly

infringing, and (3) substantial participation by the defendant in the infringing activities."

*Newborn v. Yahoo!, Inc.*, 391 F. Supp. 2d 181, 186 (D.D.C. 2005) (citation omitted). The first

element demands that plaintiff show "what materials are being infringed and that the plaintiff

owns the copyright for those materials." *Newborn v. Yahoo!, Inc.*, 391 F. Supp. 2d 181, 187

(D.D.C. 2005). If plaintiff sufficiently supports these allegations, a defendant may defeat

summary judgment by introducing evidence raising a genuine issue of fact as to whether the

alleged infringement was actually fair use. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146,

1158 (9th Cir. 2007) (citing *Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 590 (1994)).

Plaintiffs' claim fails as a matter of law at the first and second elements.

### A.      Plaintiffs Cannot Prove Direct Infringement by Third Parties.

In order to show that Public Resource is liable for contributing to infringement by third

parties, Plaintiffs must first prove that third parties actually infringed. There can be no liability

for contributory infringement "unless the authorized or otherwise encouraged activity itself could

amount to infringement." *Subafilms, Ltd. v. MGM-Pathe Commc'ns Co*., 24 F.3d 1088, 1092

(9th Cir. 1994); *see also Grokster*, 545 U.S. at 940 ("[T]he inducement theory of course requires

evidence of actual infringement . . . .").

Moreover, where a colorable claim of fair use exists, the plaintiff must prove that the

third parties' use was not fair. In *Sony Corp. of Am. v. Universal City Studios, Inc.*, for example,

rightsholders sought to hold a manufacturer of videocassette recorders liable for alleged

infringements by its customers. 464 U.S. 417 (1984). After the manufacturer asserted that

customers' use of the recorders for "time-shifting" was fair use, the Supreme Court adopted "an

interpretation of the concept of 'fair use' that requires the copyright holder to demonstrate some

likelihood of harm." *Id.* at 454. "What is necessary," the Court wrote, "is a showing by a

preponderance of the evidence that *some* meaningful likelihood of future harm exists." *Id.* at 451.

Here, even if the 1999 Standards could be subject to copyright, using them *as law* is a fair

use, as described above. The purpose of Public Resource's websites is to enable access to legally

incorporated standards as laws so that the public can know and share the law. Because sharing

the law is a "substantial noninfringing use" of the material posted on the websites, it defeats a claim of contributory infringement. *Sony*, 464 U.S. at 442.

Plaintiffs' contributory infringement claim has a second fatal flaw: Plaintiffs have not produced evidence that anyone other than Public Resource and Mr. Malamud has reproduced the 1999 Standards. Plaintiffs merely state that the 1999 Standards "were accessed" from Public Resource's website and the Internet Archive. (Pls. Mem. 23, 34.)

"Access" to a document does not imply a reproduction, or any other potentially infringing act under 17 U.S.C. § 106. The evidence Plaintiffs proffered with respect to third party conduct is Public Resource's Amended Interrogatory Responses and Mr. Malamud's deposition testimony. (Pls. Mem. 34.) Plaintiffs' Interrogatory No. 5 requested "the number of visitors who viewed and/or accessed the 1999 Standards" on the Public Resource website. (ECF No. 60-23 [Hudis Decl. Exh. T, at 7].) After conferring on the issue, the parties agreed that "accessed" means "to digitally retrieve or open an electronic file or data," and "viewed" means "the act of seeing or examining." (*Id*. at 8.) Mr. Malamud gave a similar definition at deposition. "[A]ccess," he testified, "implies that a computer, not necessarily a human being, but a computer has requested some data from another computer, and that request was successful and the data was transferred." (SMF ¶ 98.) Plaintiffs have proposed no other meaning for the words "accessed" and "viewed."

By any definition, "accessing" a document from a website does not imply that a reproduction was made for purposes of copyright law. Reproduction requires the making of a copy "for a period of more than transitory duration." *Cartoon Network LP v. CSC Holdings, Inc.,* 536 F.3d 121, 127 (2d Cir. 2008). A copy is a "material object," such as a computer hard drive containing a digital file. 17 U.S.C. § 101. "Accessing" or "viewing" alone does not result in a

reproduction, even if data passes through a buffer during its journey across the Internet. *Cartoon Network*, 536 F.3d at 129–30. The Copyright Act does not grant a right to control "access" or "viewing." *See* 17 U.S.C. § 106. And Plaintiffs have made no attempt to show that any access to the Standards on Public Resource's website or the Internet Archive actually resulted in a reproduction or any distribution by any person.

Access does not even imply an act of human volition, as required for a claim of direct copyright infringement. The "accesses" Plaintiffs' rely on were simply transmissions of data from one computer to another, which can be initiated by software acting autonomously. Plaintiffs made no effort to show (through expert testimony or otherwise) that any accesses to the 1999 Standards were a result of human volition rather than a mere byproduct of the activities of automated systems. *See Cartoon Network*, 536 F.3d at 131–32 (technology that "automatically obeys commands" does not give rise to direct copyright infringement).

In short, Plaintiffs have shown only that some number of human beings or automated systems arrived at the 1999 Standards on Public Resource's website and the Internet Archive, not that any reproductions were made or copies were distributed. Because Plaintiffs have proved no act of infringement by others, they cannot show contributory infringement by Public Resource.

**B.   Plaintiffs Cannot Establish Intent to Infringe or Even Knowledge of Any Infringement.**

Just as Plaintiffs have not shown that any third party infringed upon the 1999 Standards after accessing it from Public Resource's website, they have not shown that Public Resource intended or even knew of any such infringement. Contributory liability requires "an affirmative intent that the product be used to infringe." *Grokster*, 545 U.S. at 936.  "*Grokster* tells us that "contribution to infringement must be intentional for liability to arise." *Amazon*, 508 F.3d at

1170, citing *Grokster*, 545 U.S. at 930.  "'[M]ere knowledge of infringing potential or of actual

infringing uses would not be enough[.]'"  *Grokster*, 545 U.S. at 937, citing *Sony*, 464 U.S. at 439.

As to specific instances of alleged infringement, which Plaintiffs have presented no

evidence of, when a website operator "cannot reasonably verify a claim of infringement . . .

because of a possible fair use defense," the operator's "lack of knowledge will be found

reasonable," defeating any claim that the operator intended to induce infringement.  *Religious*

*Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1374 (N.D. Cal. 1995);

*see also Costar Grp. Inc. v. Loopnet, Inc.*, 164 F. Supp. 2d 688, 698 (D. Md. 2001) *aff'd*, 373

F.3d 544 (4th Cir. 2004) (the theory of "knowledge giving rise to liability only exists when there

is no colorable claim of users' noninfringment.").

Here, there is clearly at least a colorable claim that users who share the 1999 standards, if

such user existed, were not infringing copyright, for the same reasons that Public Resource's

own use of the Standards was noninfringing. This reasonable belief means that Public Resource

did not intend for website visitors to infringe copyright in the Standards.

In addition, Plaintiffs have not even established that Public Resource knew or could know

of any infringing reproductions, as opposed to mere viewing of the 1999 Standards. The operator

of a website can observe and log instances where a device on the Internet accesses data on the

website. (SMF ¶ 99.) Public Resource kept such logs during this litigation with respect to the

1999 Standards. (ECF No. 60-23 [Hudis Decl. Exh. T, at 7].) However, a website operator has no

way of knowing whether any access to data resulted in a reproduction being made (or why), just

as a library has no way of knowing whether a patron made photocopies of a book while

borrowing it (and if they did, whether it was a fair or otherwise permitted use). (SMF ¶ 100.)

Plaintiffs cite no evidence to the contrary. Instead, they apparently assume that knowledge about third-party access to the 1999 Standards implies knowledge that reproductions occurred. (*See* Pls. Mem. 35.) It does not. Nor did AERA Vice President John Nelkirk's email to Mr. Malamud put Public Resource on notice of any third-party reproductions, as Plaintiffs represent. The email said only that the 1999 Standards were posted to the Public Resource website and that AERA believed that posting to be "unlawful." (ECF No. 60-45 [Hudis Decl. Ex. JJ].) It did not mention any reproduction or other infringement by third parties. *See Newborn v. Yahoo!, Inc.*, 391 F. Supp. 2d 181, 189 (D.D.C. 2005) (dismissing claim of contributory infringement where plaintiff "provided the defendants with only scant information to which they can evaluate the claims against them").

Finally, Plaintiffs have not shown that Public Resource engaged in "willful blindness" as to any third-party reproduction of the 1999 Standards. Willful blindness applies only when a person "was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." *Viacom Int'l Inc. v. YouTube, Inc.*, 940 F. Supp. 2d 110, 115 (S.D.N.Y. 2013) (quoting *United States v. Aina–Marshall,* 336 F.3d 167, 170 (2d Cir. 2003)). As it is simply not possible for Public Resource, as a website operator, to know whether any visitor to the website made a copy of the 1999 Standards as opposed to simply viewing them online, Public Resource could not have "consciously avoided" that knowledge. And none of the measures Plaintiffs suggest Public Resource could have taken, such as placing "restrictions on an Internet user's ability to download" the 1999 Standards, or applying "Digital Rights Management," could have given Public Resource any knowledge of infringement by third parties. (Pls. Mem. 35.) Even if such measures were effective at *preventing* copying—and

Plaintiffs have not shown this—the measures could not have informed Public Resource that copies were made.

In summary, Plaintiffs have not shown either direct infringement by others or Public Resource's knowledge of any direct infringement. The claim of contributory infringement fails.

## VI.   DEFENDANTS HAVE NOT JUSTIFIED, AND CANNOT JUSTIFY, A PERMANENT INJUNCTION.

Plaintiffs cannot satisfy the first requirement for a permanent injunction: actual success on the merits of their infringement claims. *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 546 n.12 (1987); *see also Pub. Warehousing Co. K.S.C. v. Def. Supply Ctr. Phila.*, 489 F. Supp. 2d 30, 35 (D.D.C. 2007) ("If a plaintiff has no likelihood of success on the merits, inquiry into the remaining factors is unnecessary.").

Moreover, as an equitable remedy, an injunction does not follow automatically from success on the merits. Plaintiffs must prove all four elements: "(1) that [they have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff[s] and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). These factors provide separate and independent grounds for denying an injunction.

### A.   Plaintiffs Have Experienced No Irreparable Injury to Any Valid Legal Interest.

Irreparable injury cannot be presumed. Plaintiffs must prove a "likelihood of substantial and immediate irreparable injury." *Apple, Inc. v. Samsung Electronics Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)). They cannot prove irreparable injury here.

Case 1:14-cv-00857-TSC   Document 103-2   Filed 03/15/16   Page 69 of 73

### 1.    Plaintiffs have no competent evidence of future harm.

As described above with respect to fair use, Plaintiffs have not shown that Public

Resource's posting of the 1999 Standards caused them financial harm. Plaintiffs use revenues

from sales of the current edition of the Testing Standards to fund development of the next

edition. (SMF ¶ 101.) Once they publish a new edition, Plaintiffs do not market old, superseded

editions. (SMF ¶ 102.) They recall unfilled orders for old editions, destroy unsold copies, and

post warnings that prior editions should not be used. (SMF ¶ 103.) Thus, Plaintiffs are not

seeking any "business opportunities" with respect to the 1999 Standards.

Moreover, the development of the 2014 edition was fully funded more than three times

over at the time of its publication. Plaintiffs spent approximately $400,000 to develop the 2014

Standards (SMF ¶ 104.) ███████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████ SMF ¶ 105.) ███████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████ (*Id.*)

The 2014 edition has not become law to Public Resource's knowledge. Unless that event

occurs, Public Resource will not consider posting the 2014 edition online. (SMF ¶ 40.) Plaintiffs'

claim of copyright in the 2014 edition remains unchallenged for the indefinite future.

In light of these facts, Plaintiffs' claim that Public Resource's posting "jeopardizes"

continued development of the Standards, (Pls. Mem. 56), depends on a chain of false or

unsupported suppositions: that Plaintiffs are depending on future revenues from the sale of the

1999 Standards to fund future development (which they are not); that the 2014 edition will soon

be incorporated into law (which is speculative and could be discouraged by Plaintiffs); that

Public Resource will post it soon after that (which depends on its future priorities, *see* SMF ¶

40); that the posting will have a significant effect on sales (which is contradicted by Plaintiffs'

sales data to date); and that all of this will happen before Plaintiffs have funded the development

of the next edition (which has likely occurred *already*). Alleged harm that is "merely feared as

liable to occur at some indefinite time in the future" does not justify an injunction. *Connecticut v.

Massachusetts*, 282 U.S. 660, 674 (1931).

> **2.**    **"Loss of control" without actual business injury does not authorize an injunction.**

Plaintiffs claim a "right to determine how [the 1999 Standard] is distributed to the

public." (SMF¶ 58, 96.) As a matter of law, claiming a "statutory right to exclude" alone does

not entitle a party to permanent injunctive relief, because "the creation of a right is distinct from

the provision of remedies for violations of that right," and the equitable remedy of injunction

requires a full equitable analysis rather than "broad classifications." *eBay Inc. v. MercExchange,

L.L.C.*, 547 U.S. 388, 392–93 (2006). Having shown no real and non-speculative prospect of

future business harm, Plaintiffs cannot rest their claim for an injunction on an alleged "loss of

control," as this would amount to a forbidden presumption in favor of an injunction. *See id.*

> **A.**    **An Injunction Would Harm Public Resource's Ability to Serve the Public Interest.**

While Plaintiffs have shown no likelihood of experiencing irreparable harm, by contrast a

permanent injunction will harm Public Resource's mission of providing the public with access to

the full universe of government edicts.

> **C.**    **The Public Interest Favors Access to Laws, Edicts, and Records of Government.**

Plaintiffs have expressed an intention to restrict access to and distribution of the 1999

Standards despite their status as binding law, and they claim a right to do so. (SMF ¶ 58.) Given

Case 1:14-cv-00857-TSC   Document 105-2   Filed 03/17/16   Page 71 of 151

that intention, enjoining Public Resource from facilitating access to the 1999 Standards would be particularly detrimental to the public interest. For example, by law, the 1999 Standards (not the 2014 edition) govern the design of widely used tests that determine eligibility for most federal student financial aid for those without high school diplomas. 34 C.F.R. §§ 668.141(a)(1), 668.146(b)(6). Students, parents, teachers, researchers, and new entrants in the market for government-approved tests all have an interest in knowing the full scope of the government's requirements for such tests and in communicating those requirements to others. If Plaintiffs are able to enjoin Public Resource and others from reproducing and communicating the 1999 Standards, those with an interest in the law of testing will need to search for the few remaining publicly available paper copies or to ferret out the obscure single link on AERA's website (assuming that AERA maintains it) that leads to an order form, pay $45.95, and wait for a physical delivery. (SMF ¶ 59.)

In contrast to the gauntlet that Plaintiffs impose on those who need or want access to the law of testing, nearly all other binding laws and regulations in the nation are no farther away than a smartphone, tablet, or the Internet terminal in a public library, and they can be accessed, printed, transmitted, excerpted, and annotated for free. Giving Plaintiffs the ability to limit or withhold access to an important piece of state and federal law does not serve the public interest.

Plaintiffs ignore the importance of public access to the law, arguing that only "upholding copyright protection" can satisfy the public interest test for an injunction. (Pls. Mem. 58.) The Supreme Court has long since rejected any approach that would collapse the public interest inquiry into the merits. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 26–27, 32 (2008) ("[t]he balance of equities and consideration of the public interest . . . are pertinent in assessing the propriety of any injunctive relief."); *eBay*, 547 U.S. at 393 (forbidding "broad classifications"

in place of equitable analysis). And, as described above, Plaintiffs' self-serving threat that they will "cease" to develop testing standards without the power to withhold access to older versions is contradicted by their own sales data.

> Copyright exists primarily to advance the public good, not private financial reward:
>
> > The monopoly privileges that Congress may authorize are neither unlimited nor primarily designed to provide a special private benefit. Rather, the limited grant is a means by which an important public purpose may be achieved. It is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired.

*Sony*, 464 U.S. at 429. The development of "recommended best practices for testing design and administration," (Pls. Mem. 57), is not at stake here. Public access is at stake. The public interest strongly favors denying an injunction.

## CONCLUSION

The various legal authorities and arguments of Public Resource above provide independent pathways to the same inescapable result: the 1999 Standards are law, and the AERA Plaintiffs cannot stop Public Resource from sharing the law. On each of these bases, the Court should grant summary judgment to Public Resource and deny Plaintiffs' motion for injunction.

Dated:    January 21, 2016                    Respectfully submitted,


                                              /s/   Andrew P. Bridges
                                              Andrew P. Bridges (admitted)
                                              abridges@fenwick.com
                                              Sebastian E. Kaplan (*pro hac vice* pending)
                                              skaplan@fenwick.com
                                              Matthew Becker (admitted)
                                              mbecker@fenwick.com
                                              FENWICK & WEST LLP
                                              555 California Street, 12th Floor
                                              San Francisco, CA 94104
                                              Telephone:    (415) 875-2300
                                              Facsimile:     (415) 281-1350


                                              Corynne McSherry (admitted *pro hac vice*)
                                              corynne@eff.org
                                              Mitchell L. Stoltz (D.C. Bar No. 978149)
                                              mitch@eff.org
                                              ELECTRONIC FRONTIER FOUNDATION
                                              815 Eddy Street
                                              San Francisco, CA 94109
                                              Telephone:    (415) 436-9333
                                              Facsimile:     (415) 436-9993


                                              David Halperin (D.C. Bar No. 426078)
                                              davidhalperindc@gmail.com
                                              1530 P Street NW
                                              Washington, DC 20005
                                              Telephone: (202) 905-3434


                                              *Attorneys for Defendant-Counterclaimant*
                                              Public.Resource.Org, Inc.

SF/5546626.14

60

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN EDUCATIONAL RESEARCH ASSOCIATION, INC., AMERICAN PSYCHOLOGICAL ASSOCIATION, INC., and NATIONAL COUNCIL ON MEASUREMENT IN EDUCATION, INC.,<br><br>               Plaintiffs,<br><br>      v.<br><br>PUBLIC.RESOURCE.ORG,<br><br>               Defendant. | Case No. 1:14-CV-00857-TSC-DAR<br><br>**STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT-COUNTERCLAIMANT PUBLIC.RESOURCE.ORG, INC.'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION**<br><br>Action Filed:   May 23, 2014 |

## [REDACTED VERSION]

Pursuant to the Local Civil Rule 7(h), Defendant-Counterclaimant Public.Resource.Org, Inc. ("Public Resource") contends that there are no genuine disputes as to the following facts.

Each of the following facts supports Public Resource's Motion for Summary Judgment:

| Short Form Citation | Document Title |
|---|---|
| C. Malamud Decl. | Declaration of Carl Malamud, dated January 21, 2016 |
| M. Becker Decl. | Declaration of Matthew Becker, dated January 21, 2016 |
| Request for Judicial Notice | Public Resource's Request for Judicial Notice, dated January 21, 2016 |
| Butler Dep. | Deposition of Christopher Butler, Internet Archive, dated December 2, 2014 |
| Butler Ex. | Exhibit marked in the deposition of Christopher Butler, Internet Archive, dated December 2, 2014 |

| Short Form Citation | Document Title |
| --- | --- |
| Camara Dep. | Deposition of Wayne Camara, dated May 1, 2015. |
| Camara Ex. | Exhibit marked in the deposition of Wayne Camara, dated May 1, 2015. |
| Ernesto Dep. | deposition of Marianne Ernesto, dated April 29, 2015 |
| Ernesto Ex. | Exhibit marked in the deposition of Marianne Ernesto, dated April 29, 2015 |
| Fruchterman Rep. | Expert Report of James Fruchterman, dated June 13, 2015 |
| Geisinger Dep. | Deposition of Kurt F. Geisinger, dated September 10, 2015 |
| Geisinger Ex. | Exhibit marked in the deposition of Kurt F. Geisinger, dated September 10, 2015 |
| Levine Dep. | Deposition of Felice Levine, dated May 4, 2015 |
| Levine Ex. | Exhibit marked in the deposition of Felice Levine, dated May 4, 2015 |
| Malamud Dep. | Deposition of Carl Malamud, dated May 12, 2015 |
| Malamud Ex. | Exhibit marked in the deposition of Carl Malamud, dated May 12, 2015 |
| Schneider Dep. | Deposition of Diane L. Schneider, dated April 23, 2015 |
| Schneider Ex. | Exhibit marked in the deposition of Diane L. Schneider, dated April 23, 2015 |
| Wise Dep. | Deposition of Lauress Wise, dated May 11, 2015 |
| Wise Ex. | Exhibit marked in the deposition of Lauress Wise, dated May 11, 2015 |

## STATEMENT OF MATERIAL FACTS

### I.     FACTUAL BACKGROUND

1.     Public.Resource.org is a nonprofit corporation, funded entirely by donations, contributions, and grants. January 21, 2015 Declaration of Carl Malamud in support of Public Resource's Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment ("C. Malamud Decl.") ¶ 3, 30.

2.     Public Resource's core mission is to make the law and other government materials more widely available so that people, businesses, and organizations can easily read and discuss our laws and the operations of government.  This involves maintaining public works projects on the Internet, including the publication of statutes, regulations, and other material that constitutes the law.  C. Malamud Decl. ¶ 4, Ex. 1.

3.     Public Resource maintains an archive of laws and other government authored materials on several domains under the public.resource.org website. C. Malamud Decl. ¶ 9–14.

4.     Public Resource has made judicial opinions, Internal Revenue Service records, patent filings, and safety regulations accessible on the Internet. C. Malamud Decl. ¶ 10.

5.     Public Resource does not charge for access to the archive of laws and other government authored materials on several domains under the public.resource.org website. C. Malamud Decl. ¶ 24. Public Resource has never sought benefit or compensation from its posting of the 1999 Standards and has never used it as a marketing device. *Id.* ¶ 31.

6.     Public Resource does not accept donations or gifts that are tied to the posting of specific standards or groups of standards. C. Malamud Decl. ¶ 30.

7.      Public Resource's operating income is not based on the amount of traffic its websites receive, and Public Resource does not advertise on its websites.  C. Malamud Decl. ¶ 30.

8.      The 1999 Standards that Plaintiffs published were developed by unpaid volunteers. Plaintiffs' Statement of Material Facts ("Pls. SMF") ¶ 10; Index of Consolidated Exhibits ("ICE") Ex. 2 (Schneider Dep. 90:5–10).

9.      Plaintiffs highlight the work of the 17 volunteer Joint Committee members who helped develop the 1999 Standards, but these are just a subset of all contributors to the 1999 Standards. Hundreds of individuals, organizations, and government entities provided proposed text and comments for 1999 Standards. Listed in the preface to the 1999 Standards alongside the Joint Committee members are sponsoring associations, scientific and professional membership organizations, credentialing boards, government and federal agencies, test publishers, and academic institutions. The preface states: "Draft versions of the *Standards* were widely distributed for public review and comment three times during this revision effort, providing the Committee with a total of nearly 8,000 pages of comments.  Organizations who submitted comments on drafts are listed below.  Many individuals contributed to the input from each organization . . . ." ICE Ex. 3 (Ernesto Dep. 147:25–148:08; 149:12–150:24); ICE Ex. 29 (Ernesto Ex. 1105, Preface to 1999 Standards listing contributors).

10.     The volunteers draft the standards to achieve a consensus of best practices in the areas covered by the 1999 Standard.  ICE Ex. 2 (Schneider Dep. 176:23–177:06.)

11.     In December 1999, one of the plaintiffs, AERA, sought and obtained a copyright registration claiming to be the sole author of the 1999 Standards. Ex. 3 (Ernesto Dep. 32:07–25); ICE Ex. 10 (Ernesto Ex. 1064, Copyright Right Office TX Form).

12.     In February 2014, Plaintiffs obtained a supplemental copyright registration that listed each plaintiff organization as an author and owner of the 1999 Standards.  ICE Ex. 3 (Ernesto Dep. 32:07–34:01; 122:23–124:08); ICE Ex. 28 (Ernesto Ex. 1104, Copyright Registration).

13.     In February 2014, Plaintiffs did not yet have any alleged copyright assignments from the people who authored the 1999 Standards.  It was not until two months later, in April of 2014 and throughout the rest of that year, that Plaintiffs began to obtain alleged copyright assignments from some of these individuals. ICE Ex. 3 (Ernesto Dep. 42:11–22; 124:12–127:12; 141:25–13); ICE Exs. 11 (Ernesto Ex. 1065), 13 (Ernesto Ex. 1069), 14 (Ernesto Ex. 1070), 15 (Ernesto Ex. 1071), 16 (Ernesto Ex. 1072), 17 (Ernesto Ex. 1075), 18 (Ernesto Ex. 1078), 19 (Ernesto Ex. 1082), 20 (Ernesto Ex. 1085), 21 (Ernesto Ex. 1086), 22 (Ernesto Ex. 1089), 23 (Ernesto Ex. 1090), 24 (Ernesto Ex. 1091), 25 (Ernesto Ex. 1094), 26 (Ernesto Ex. 1097).

14.     In their motion, Plaintiffs refer to 13 of these alleged assignments as "work made-for-hire letters."  These documents were signed a decade-and-a-half after completion of the 1999 Standards, and no work for hire agreements existed prior to 2014. ICE Ex. 3 (Ernesto Dep. 141:25–142:13). At deposition, Plaintiffs' Rule 30(b)(6) designee on the subject of copyright ownership identified these documents as "assignments," rather than work made-for-hire letters. ICE Ex. 3 (Ernesto Dep. 44:22–09).

15.     In their motion, Plaintiffs refer to two of these alleged assignments as "posthumous assignments."  These alleged posthumous assignments were made without Plaintiffs providing any consideration to the assignees, despite the assignment claiming that "good and valuable consideration" had been delivered to the alleged heirs who signed them. ICE Ex. 3 (Ernesto Dep. 81:03–82:14; 85:19–87:03).

16.     Plaintiffs now claim to be "joint owners" of the standards. (Plaintiffs' Memorandum of Points and Authorities, ECF 60-1 ("Pls. Mem.") at 12.)

17.     Plaintiffs' staffs provide facilitative and administrative functions towards the development of the 1999 Standards, but they do not author the standards or control the final content. ICE Ex. 3 (Ernesto Dep. 34:02–40:07).

18.     Plaintiffs have not sought or obtained assignments from the many hundreds of individuals and organizations that participated in the development of the 1999 Standards. ICE Ex. 3 (Ernesto Dep. 147:25–151:25).

19.     Plaintiffs have not taken any steps to ensure that the alleged assignors had authority to assign copyrights to the Plaintiffs.  Plaintiffs simply assumed that the assignors had ownership of the copyrights at issue and were able to grant them to Plaintiffs through the alleged assignments. ICE Ex. 3 (Ernesto Dep. 152:02–154:20).

20.     The 1999 Standards are incorporated by reference into federal law at 34 C.F.R. § 668.146.  Plaintiffs acknowledge that the 1999 Standards have been incorporated by reference into the law.  Pls. Mem. at 13–14.

21.     The 1999 Standards are also incorporated into state law.  *See, e.g.*, Md. Admin. Rule 09.12.26.06(E)(1)(c)(i); Minn. Admin. Rule 4761.2460, Subp. 2(C).

22.     In order to enact rules, a federal agency must follow minimum procedures to guarantee adequate public notice and opportunity to comment. 5 U.S.C. §553.

23.     A federal agency must publish proposed rule changes in the Federal Register, including changes to a standard incorporated by reference into the Code of Federal Regulations. 5 U.S.C. §553(b); 1 C.F.R. § 51.11(a) (2015).

24.     A standard incorporated by reference into the Code of Federal Regulations must be a "proposed rule" or "final rule" of a federal agency. 1 C.F.R. §51.5(a)-(b) (2015).

25.     Before the federal government incorporates a standard by reference into law as a final rule, it must be approved by the Director of the Federal Register. 1 C.F.R. § 51.3 (2015).

26.     Standards are incorporated by reference—as opposed to reprinting the entire text of the standards—to limit the length of the Code of Federal Regulations. Request for Judicial Notice ("RJN") ¶ 1, ICE Ex. 65 ("Incorporation by Reference" webpage of the Office of the Federal Register, http://www.archives.gov/federal-register/cfr/ibr-locations.html).

27.     Standards incorporated by reference into the Code of Federal Regulations are made available in the Washington D.C. reading room of the Office of the Federal Register, or for purchase from the Plaintiffs. The Office of the Federal Register directs people who want to read incorporated standards to "contact the standards organization that developed the material." Alternatively, one may submit a written request to the Office of the Federal Register to inspect (and make limited photocopies of) an incorporated standard in Washington, D.C. RJN ¶ 1, ICE Ex. 65.

28.     Public Resource posted versions of the 1999 Standards on its website and on the Internet Archive website. C. Malamud Decl. ¶ 25.

29.     The 1999 Standards were promulgated as private industry standards for over 11 years before being incorporated into law by the Department of Education on July 1, 2011. RJN ¶ 8, ICE Ex. 72 ("Program Integrity Issues," Federal Register, available at: https://www.federal register.gov/articles/2010/10/29/2010-26531/program-integrity-issues#h-4).

30.     The Plaintiffs have acknowledged that individuals would want to read the 1999 Standards because people "believe they still may be held accountable" to them.  Pls. Mem. 1, 11.

31.     The Office of the Federal Register states: "The legal effect of incorporation by reference is that the material is treated as if it were published in the Federal Register and CFR. This material, like any other properly issued rule, has the force and effect of law. Congress authorized incorporation by reference in the Freedom of Information Act to reduce the volume of material published in the Federal Register and CFR." RJN ¶ 1, ICE Ex. 65.

32.     The Office of the Federal Register is required to maintain a copy of each incorporated standard. It makes a copy of each standard available for public viewing, upon written request for an appointment, at its Washington, D.C. reading room. RJN ¶ 1, ICE Ex. 65.

33.     Failure to comply with the standards incorporated by law may result in penalties. Under 34 C.F.R. § 668.146, the Higher Education Act requires states to comply with the 1999 Standards in developing and administering a variety of tests in order to receive federal aid. Federal aid to students under the Department of Education's Title IV program totals approximately $150 billion annually. RJN ¶ 2, ICE Ex. 66 (New York Times, "Putting a Number on Federal Education Spending"); RJN ¶ 3, ICE Ex. 67 ("Federal Pell Grant Program—Funding Status"). Title IV programs include Federal Perkins Loans, Direct Loans (including Stafford and PLUS loans), Pell Grants, and Federal Work Study, representing the majority of federal student aid. RJN ¶ 4, ICE Ex. 68 ("What are Title IV Programs?"). For-profit colleges in 2009 were taking in as much as $32 billion of that amount. RJN ¶ 5, ICE Ex. 69 (Senate Health Education Labor & Pensions Committee report, For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success").

34.     One specific example of the effect of the 1999 Standards' incorporation into law is their role in the so-called "ability to benefit" (ATB) program. This program allows access to federal aid for students who lack a high school diploma or a GED certificate if they either (1)

complete at least 6 credit hours in a post-secondary school; or (2) pass an independently administered Department of Education approved ability to benefit test. Congress abolished the ability to benefit program in 2012 but restored it in 2014. RJN ¶ 6, ICE Ex. 70 (Department of Education letter, DCL ID: GEN-15-09, "Title IV Eligibility for Students Without a Valid High School Diploma Who Are Enrolled in Eligible Career Pathway Programs"). In a 2009 report, the U.S. Government Accountability Office raised concerns that some for-profit colleges were helping students cheat on the ability to benefit test or falsifying test results. RJN ¶ 7, ICE Ex. 71 (GAO, PROPRIETARY SCHOOLS: Stronger Department of Education Oversight Needed to Help Ensure Only Eligible Students Receive Federal Student Aid, August 2009).

35.     The Department of Educations responded by issuing new regulations for ATB tests, codified at 34 CFR 668.146, with specific requirements to enhance the quality and integrity of the tests. To be approved by the Secretary of Education, an ATB test must "Meet all standards for test construction provided in the 1999 edition of the *Standards for Educational and Psychological Testing*," i.e. the 1999 Standards. 34 C.F.R. § 668.146(b)(6).  The 1999 Standards are referenced again with respect to tests conducted in foreign languages for non-native speakers of English, 34 C.F.R. § 668.148(a)(1)(iv), for test modifications to accommodate students with disabilities,  34 C.F.R. § 668.148(a)(2)(i), and for specific requirements for computer-based tests. 34 C.F.R. § 668.148(a)(3)(i)

36.     The Department made one specific change to its final version of the 2010 Rule, codified at § 668.146(b)(6), in response to a comment pointing out that the Department's proposed rule used outdated language present in the 1985 AERA Standards, but revised in the 1999 Standards. 75 F.R. 66923. Department officials deliberately shaped the regulation to harmonize its printed provisions with those provisions that were incorporated by reference, i.e.

Case 1:14-cv-00857-TSC   Document 105-3   Filed 03/15/16   Page 11 of 26

the 1999 Standards.

37.     Beginning in 2008, Public Resource began posting state safety regulations and statutes online, including portions of the incorporated standards in this case. Public Resource purchased paper copies of the codes and scanned them into PDF files. Public Resource then applied metadata and optical character recognition ("OCR") to the PDF files. Public Resource also placed a cover sheet on each document to make it clear that Public Resource was posting the document because it had been incorporated by reference into law. Public Resource improved this process over time and began posting some of the standards in HTML format, which included converting formulas and graphics into appropriate formats. C. Malamud Decl. ¶¶ 16–17. The version of the 1999 Standards that Public Resource posted to the Internet Archive underwent OCR and was converted into a variety of file formats. Becker Decl. ¶ 51, Ex. 51 (Fruchterman Rep. 11–12).

38.     In 2012, Public Resource began to post copies of standards incorporated by reference into law on its website. Public Resource began by purchasing paper copies of 73 standards, copying them and placing a cover sheet and notice of incorporation on each one, and sending the copies and additional material to government officials and ten SDOs. Then, Public Resource began searching for copies of additional incorporated standards, many of which were not available from the SDOs, likely because the version incorporated into law had been superseded by a later version of the standard. C. Malamud Decl. ¶¶ 20–23. Public Resource's regular practice is to further convert the standards it posts into standard Hypertext Markup Language (HTML) to make them still more accessible. It intended to do so for the 1999 Standards but the filing of this lawsuit interrupted that work. *Id.* ¶ 25. Public Resource also

works to ensure that standards incorporated by reference into law, along with the other legal

materials it posts, are indexed and represented accurately by search engines. *Id.* ¶ 29.

39.    In May 2014, Plaintiffs sued Public Resource for posting on its website and the

Internet Archive website the 1999 Standards. Compl. ECF No. 1.  Subsequently, so as to ensure

a full record, in June 2014 Public Resource agreed to take down the versions of the 1999

Standards that it had posted on its website and on the Internet Archive website, pending the

resolution of this case. C. Malamud Decl. ¶ 25; ICE Ex. 9 (Malamud Ex. 43).

40.    Shortly thereafter, in August 2014, Plaintiffs published the new 2014 edition of

the *Standards for Educational and Psychological Testing* ("the 2014 Standards"), and then

subsequently removed the 1999 Standards from sale.  Plfs. SMF ¶ 35; ICE Ex. 5 (Levine Dep.

42:12–23; 43:09–24).  Public Resource has not posted the 2014 edition of the Standards

anywhere. C. Malamud Decl. ¶ 33. Public Resource would only consider posting an electronic

copy of the 2014 edition of the Standards if it were incorporated into law. *Id.*; ICE Ex. 7

(Malamud Depo 308:7–9, 308:23–309:2).

41.    In the past, Plaintiffs have ceased selling the prior edition of the Standards for

Educational and Psychological Testing when a new edition is published.  ICE Ex. 8 (Geisinger

Dep. 101:15–19).

42.    After the 1999 Standards were published, Plaintiffs ceased selling the prior 1985

edition of the Standards. ICE Ex. 3 (Ernesto Dep. 212:16–21). In year 2000, Plaintiffs recalled

copies of the 1985 Standards, and stated that the old stock of Standards was supposed to be

destroyed. This is Plaintiffs' practice following the publication of a new edition of the Standards.

ICE Ex. 5 (Levine Dep. 79:23–84:11; 84:15–88:22; 90:21–92:07; 97:17–99:24); ICE Ex. 35

(1197); ICE Ex. 36 (Levine Ex. 1198); ICE Ex.37 (Levine Ex. 1200). This is despite the fact that

the1985 Standards were incorporated by reference into law under 34 C.F.R. 668.146 from July 1,

1996 until they were replaced by the 1999 Standards in 2011. *See* 60 Federal Register 61830–

61844, Vol. 60, No. 231, Dec. 1, 1995, available at https://www.gpo.gov/fdsys/pkg/FR-1995-12-

01/pdf/95-29125.pdf. ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ ICE Ex. 3 (Ernesto Dep. 206:14–208:4).

43.     Plaintiffs only put the 1999 Standards on sale once more in July 2015 after the

issue was brought to their attention at deposition in April and May of that year.  Plfs. Mem. at

11; ICE Ex. 3 (Ernesto Dep. 1, 203:15–207:10, 208:20–209:11); ICE Ex. 5 (Levine Dep. 1,

42:12–23).

44.    ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ ICE Ex. 38 (Levine Ex. 1205); ICE Ex. 39 (Levine Ex. 1207); ICE Ex. 40 (Levine

Ex. 1208); ICE Ex. 41 (Levine Ex. 1211); ICE Ex. 5 (Levine Dep. 120:06–121:18; 148:02–

149:05). Plaintiffs' financial data provides the following image of sales oscillation for the 1999

Standards:

| Year | Revenue | % Change | Units Sold | % Change |
|------|---------|----------|-----------|----------|
| FY 2000 | ██████ | | 3,797 | |
| FY 2001 | ██████ | ██████ | 3,755 | -1.11% |
| FY 2002 | ██████ | | 5,592 | 48.92% |
| FY 2003 | ██████ | | 3,310 | -40.81% |
| FY 2004 | ██████ | | 3,218 | -2.78% |
| FY 2005 | ██████ | | 3,803 | 18.18% |
| FY 2006 | ██████ | | 3,888 | 2.24% |



| Year | Revenue | % Change | Units Sold | % Change |
|---|---|---|---|---|
| FY 2007[1] | | | 3,077 | -20.86% |
| FY 2008 | | | 3,358 | 9.13% |
| FY 2009 | | | 2,590 | -22.87% |
| FY 2010 | | | 3,043 | 17.49% |
| FY 2011 | | | 2,132 | -29.94% |
| FY 2012 | | | 1,649 | -22.65% |
| FY 2013 | | | 1,732 | 5.03% |
| FY 2014 | | | 855 | -50.64% |

45.     Dr. Levine attributed the

ICE Ex. 5 (Levine Dep. 141:19–142:08).

ICE Ex. 5 (Levine Dep. 114:9–17).

46.     Plaintiffs' expert,

ECF No. 60-88 (Geisinger Decl. ¶ 25); ICE Ex. 8 (Geisinger Dep. 93:20–97:04).

ICE Ex. 8 (Geisinger Dep. 93:20–94:7; 95:6–21).

[1] Public Resource was unable to determine a continuous annual sales trend because Plaintiff did not produce monthly sales information.

Case 1:14-cv-00857-TSC   Document 105-3   Filed 03/13/16   Page 15 of 26

████████████████████████████████████████████████

████   ICE Ex. 8 (Geisinger Dep. 94:2–7).

47.   ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████   ICE Ex. 38 (Levine Ex. 1205); ICE Ex. 39 (Levine Ex.

1207); ICE Ex. 40 (Levine Ex. 1208); ICE Ex. 41 (Levine Ex. 1211); ICE Ex. 5 (Levine Dep.

120:06–121:18; 135:11–137:03; 138:08–140:18; 148:02–149:05).

48.     In their Motion for Summary Judgment filing, Plaintiffs included an unsealed,

complete version of the 1999 Standards, split into two documents and totaling 100 pages or more

in each document. (ECF No. 60-25–60-26.) Because the document was not sealed or otherwise

designated as confidential, it is now available to the public to download.  PACER charges $0.10

per page, but caps charges at $3.00 per document, so it would cost $6.00 to download a complete

version of the 1999 Standards from PACER. *See* "Electronic Public Access Fee Schedule,"

Pacer.gov, Dec. 1, 2013, at https://www.pacer.gov/documents/epa_feesched.pdf.

49.     RECAP is a service created by the Center for Information Technology Policy at

Princeton University and Free Law Project, through which member of the public can access

PACER documents for free. Once an individual who has RECAP installed on her computer

accesses a document on PACER, RECAP uploads the document to its system and makes it

available to the public for free, through the RECAP website or browser plugin. *See* "About,"

RECAP the Law, at https://www.recapthelaw.org/about/. If someone who has the RECAP

browser plugin installed accesses Plaintiffs' summary judgment filing on PACER, RECAP will

upload it and the public will be able to access the 1999 Standards for free.

50.     At deposition this past spring, Plaintiffs' corporate designee asserted that they

have never made an electronic version of the 1999 Standards available to the public, nor do they

plan to. ICE Ex. 3 (Ernesto Dep. 207:11–208:04); ICE Ex. 5 (Levine Dep. 59:22–60:14).

Plaintiffs also asserted that they have not published any other versions of the 1999 Standards or

2014 Standards that would be accessible to people who are blind or visually disabled, including

braille formats. ICE Ex. 3 (Ernesto Dep. 208:05–19); ICE Ex. 5 (Levine Dep. 65:13–20, 79:09–

19).

## II.     PLAINTIFFS CANNOT HOLD A STATUTORY MONOPOLY OVER THE LAW

51.     The 1999 Standards have been superseded by the 2014 Standards and are

therefore obsolete as an industry standard. Plaintiffs themselves express concern about the

continued use of the 1999 Standards, claiming that it would harm the public, and state that the

2014 Standards should be used instead. ECF No. 60-88 (Geisinger Decl. ¶ 28); ICE Ex. 8

(Geisinger Dep. 105:25–109:13, 245:22–249:14); ICE Ex. 4 (Camara Dep. 295:14–296:13); ICE

Ex. 6 (Wise Dep. 332:11–333:8).

52.     According to Wayne Camara, Plaintiffs' Rule 30(b)(6) witness on the subject of

Plaintiffs' efforts to influence the requirements imposed by federal and state governments

regarding incorporation by reference, ████████████████████████████████████

████████████████████████████████████ *See* ICE Ex. 52 (Wayne

Camara, "OCR Issues Draft Guide on Disparate Impact in Educational Testing," Society for

Industrial and Organizational Psychology, October 1999); ICE Ex. 4 (Camara Dep. 43:16–18).

53.     Plaintiff APA spends millions on lobbying every year, and that work has included

calling attention to the 1999 Standards in order "to inform particular individuals about best

practices as it relates to testing and assessment, as they might have been formulating legislation."

ICE Ex. 3 (Ernesto Dep. 174:11–175:14); ICE Ex. 30 (Ernesto Ex. 1112).

54.     ████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████████████████████████ ICE Ex. 33 (Ernesto Ex. 1121); ICE

Ex. 3 (Ernesto Dep. 209:15–22). Adoption into law gives the Standards "authoritative value."

ICE Ex. 3 (Ernesto Dep. 176:14–23).

55.     ████████████████████████████████████

██████ ICE Ex. 44 (Levine Ex. 1217); ICE Ex. 45 (Levine Ex. 1218); ICE Ex. 46 (Levine Ex.

1219); ICE Ex. 5 (Levine Dep. 176:22–177:01; 178:14–179:15; 179:19–180:04).

56.     ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

57.     The law permits parents to review testing protocols, but in order to exercise that

right, they must make their way to the Washington, D.C. reading room of the Department of

Education, or the National Archives. *See* 34 C.F.R. § 668.146.

58.     Plaintiffs have repeatedly emphasized their firm belief that they should be able to

control access to the 1999 Standards—including the right not to make the 1999 Standards

available *at all.* ICE Ex. 3 (Ernesto Dep. 222:2–223:5); ECF No. 14 (Pls. Answer ¶¶14, 19).

AERA's representative stated that they could one day discontinue sales of the 1999 Standards

again. ICE Ex. 5 (Levine Dep. 55:09–56:10)..

59.     In July 2015, shortly after Public Resource raised the issue of future sales of the

1999 Standards in depositions, AERA placed a single link to the 1999 Standards from the page at

which it sells the 2014 edition of the Standards. "Standards for Educational & Psychological

Testing (2014 Edition)," AERA, at http://www.aera.net/Publications/Books/Standardsfor

EducationalPsychologicalTesting%28NewEdition%29/tabid/15578/Default.aspx. The linked

page advises users that Plaintiffs "recommend use of the 2014 Standard*s* as the authoritative

source of testing standards." "1999 Standards," AERA, at http://www.aera.net/Publications/

Books/Standards%281999Ed%29/tabid/16144/Default.aspx.  The 1999 edition does *not* appear

in the "Complete List of AERA Books" on AERA's website. "Publications," AERA, at

http://www.aera.net/Publications/tabid/10067/Default.aspx; "AERA Books List," AERA,

http://www.aera.net/Publications/Books/AERABooksList/tabid/13233/Default.aspx. And the

1999 Edition is not available for purchase through AERA's online bookstore. *Id.* Instead, a

purchaser must print and fill out a "Mail or Fax Order Form" for the 1999 edition. "AERA Book

Order Form," AERA, at http://www.aera.net/Portals/38/docs/Publications/Official%20AERA

%20Book%20Order%20Form.pdf.

60.     Plaintiffs APA and NCME maintain pages on their websites to advertise the

Testing Standards and direct visitors to the AERA store to purchase the 2014 edition but neither

of these pages links to the 1999 edition. "The Standards for Educational and Psychological

Testing," APA, at http://www.apa.org/science/programs/testing/standards.aspx; "Testing

Standards," NCME, at http://www.ncme.org/ncme/NCME/Publication/NCME/Publication

/Testing_Standards.aspx.

61.     Participants contribute to the Standards for three principal reasons: to

███████████████████████████████████████████████████████████████████████████ " ICE

Ex. 8 (Geisinger Dep. 219:1–5).

62.     APA benefits from the Standards.  ICE Ex. 6 (Wise Dep. 89:15–17).

63.     As an organization dedicated to measurement in testing, the NCME's mission is

closely tied to the 1999 Standards. ████████████████████████████ ICE Ex. 8

(Geisinger Dep. 191:2).

64.     ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████   ICE Ex. 5 (Levine Dep. 36:19–37:18; 39:11–18).

65.     ████████████████████████████████████████████████

████████   ICE Ex. 8 (Geisinger Dep. 159:1–161:17).

66. Plaintiffs have many other means of earning revenue, including selling other standards that are not incorporated into law, charging membership dues and conference fees, and obtaining government research grants, all of which are current sources of income for Plaintiffs. *See, e.g.*, ICE Ex. 53 (AERA "Membership Benefits"); ICE Ex. 54 (APA "Member" Webpage).

67. Plaintiff APA's annual revenues in 2012 alone were approximately $119 million. ICE Ex. 8 (Geisinger Dep. 176:2–12).

68. Matthew Bender/LexisNexis sells the District of Columbia Official Code for $849.00. ICE Ex. 55 (LexisNexis Store webpage).

69. Matthew Bender/LexisNexis sells the "Criminal Jury Instructions for the District of Columbia, Fifth Edition" for $186.00. ICE Ex. 56 (LexisNexis Store webpage).

70. Thomson Reuters/WestLaw sells "District of Columbia Rules of Court – District, 2015 ed. (Vol. 1, District of Columbia Court Rules)" for $167. ICE Ex. 57 (WestLaw Store Webpage).

71. Barnes & Noble sells "Moby Dick" for $8.99 in paperback as part of its Barnes & Noble Classics Series. Barnes & Noble includes additional interpretive material such as "new introductions," "chronologies of contemporary historical, biographical, and cultural events," "study questions," etc." Barnes & Noble further states that the book is "beautifully designed and []printed to superior specifications." ICE Ex. 58 (Barnes & Noble Store Webpage).

72. Barnes & Noble sells "The Adventures of Tom Sawyer" for $6.25 in paperback as part of its Barnes & Noble Classics Series. Barnes & Noble includes additional interpretive material such as "new introductions," "chronologies of contemporary historical, biographical, and cultural events," "study questions," etc." Barnes & Noble further states that the book is "beautifully designed and []printed to superior specifications." ICE Ex. 59 (Barnes & Noble

Store Webpage). Barnes & Noble promotes its Barnes & Noble Classics by calling attention to the "original ancillary materials included in each edition." ICE Ex. 60 ("About Barnes & Noble Classics" Webpage).

73.     [INTENTIONALLY BLANK]

74.     [INTENTIONALLY BLANK]

75.     [INTENTIONALLY BLANK]

76.     [INTENTIONALLY BLANK]

## III.   EVEN BEFORE INCORPORATION, THE STANDARDS ARE PRIMARILY UNCOPYRIGHTABLE SYSTEMS, DISCOVERIES, PROCESSES, PROCEDURES, AND *SCENES A FAIRE*.

77.     The standards "describe procedures, statistical procedures, research procedures . . . how to design a test, how to collect evidence of its validity, how to calculate the reliability of the tests." ICE Ex. 4 (Camara Dep. 166:8–22).

78.     Plaintiffs desired the Joint Committee developing the standards to ICE Ex. 4 (Camara Dep. 98:6–16).

79.     Plaintiffs goal in developing the Standards is to in order to ensure accurate and defensible testing protocols. ICE Ex. 4 (Camara Dep. 62:4–18).

80.     The Standards cannot be expressed in a different way. *See* Paragraphs 81 and 82 below.

81.     Rephrasing the Standards would risk making the Standards unclear. ICE Ex. 2 (Schneider Dep. 136:18–21).

82.     

ICE Ex. 2 (Schneider Dep. 136:11–137:15).

83.     The expression of the Standards are dicated by the current state of technical

information on test development and use. ICE Ex. 4 (Camara Dep. 23:4–14, 62:2–18); ICE Ex.

34 (Camara Dep. Ex. 1157).

84.     Plaintiffs intended the 1999 Standards to remedy technical deficiencies in the

prior 1985 standards, as there were definitions and statements that ████████████████████

████████████████████████████" ICE Ex. 4 (Camara Dep. 131:25–132:11).

85.     The choices in development of the Standards were also dictated by practical

requirements and industry demands, as the industry participants voiced them in the development

process. *E.g.*, ICE Ex. 6 (Wise Dep. 82:13–20).

## IV.     PUBLIC RESOURCE'S POSTING IS A LAWFUL FAIR USE.

86.     Plaintiffs sold print copies of the 1999 Standards as a guide to test designers and

administrators, and a statement of best practices for assessment professionals. ECF No. 60-25

(Hudis Decl. Ex. V at 86 ("the *Standards* are directed to test providers, and not to test takers.")).

87.     ████████████████████████████████████████████████████████████

████████████████████████████████████. ICE Ex. 5 (Levine Dep.

50:20–23).

88.     Plaintiffs do not make the 1999 Standards available for sale in electronic formats,

only in print. Pls. Mem. 10.

89.     The Standards contain the legal requirements for tests used to determine students'

eligibility for federal grants, including whether those tests are fair to students with disabilities.

ICE Ex. 51 (Fruchterman Rep. 6); ECF No. 60-25 (Hudis Decl. Ex. V at 101–106).

90.     James Fruchterman, Public Resource's expert on accessibility, concluded that "a

person who is blind or print disabled would have been able to locate a version of the 1999

Standards on the Public.Resource.Org website when it was still hosted there" and would be able

to "perform[] optical character recognition on the Public.Resource.Org image file" containing

the 1999 Standards. ICE Ex. 51 (Fruchterman Rep. 11–12.). The reader would then "be able to

perform all of the functional tasks: reading the entire standard, navigating to a specific place in

the standard, or searching on key terms." *Id.* The version that Public Resource posted to the

Internet Archive website had optical character recognition performed on it, so it was immediately

readable by people who are blind or have visual disabilities. *Id.*

91.     Mr. Fruchterman could not locate the 1999 Standards on the Internet from any

source, Public Resource having disabled access to the Standards through its website and the

Internet Archive during this litigation. ICE Ex. 51 (Fruchterman Rep. 5).

92.     The 1999 Standards are not available through any of the main libraries that serve

people with print disabilities. ICE Ex. 51 (Fruchterman Rep. 5.).

93.     ███████████████████████████████████████████

████. ICE Ex. 5 (Levine Dep. 79:9–19).

94.     While print copies of the 1999 Standards may be available, most blind people

themselves do not have the ability to convert books and would require that their employer,

educational institution, or a specialized library for the blind create an accessible copy. ICE Ex.

51 (Fruchterman Rep. 8).



95.     ██████████████████████████████████████

████████████████████████ ICE Ex. 43 (Levine Ex. 1214); ICE Ex. 5 (Levine

Dep. 164:6–169:4).

96.     ██████████████████████████████████████

████████████████████████████████. ICE Ex. 5 (Levine Dep.

49:17–50:8); ICE Ex. 8 (Geisinger Dep. 110:5–110:21).

97. ███████████████████████████████████████████████████

████████████████ Ex. 4 (Camara Dep. 295:9–296:7); ICE Ex. 8 (Geisinger Dep. 110:5–

110:21); ICE Ex. 6 (Wise 332:16–333:8).

## V.     PUBLIC RESOURCE IS NOT SECONDARILY LIABLE.

98.     Mr. Malamud defined access to imply that a computer, not necessarily a human

being, but a computer has requested some data from another computer, and that request was

successful and the data was transferred. ICE Ex. 7 (Malamud Dep. 146:19–147:4).

99.     The operator of a website can observe and log instances where a device on the

Internet accesses data on the website. ICE Ex. 7 (Malamud Dep. 328:17–329:16).

100.     A website operator has no way of knowing whether any access to data resulted in

a reproduction being made, just as a library has no way of knowing whether a patron made

photocopies of a book while borrowing it. ICE Ex. 73 at § 4.3 ("Internet Engineering Task Force

Request for Comments 7231, "Hypertext Transfer Protocol (HTTP/1.1): Semantics and Content"

(June 2014)."). Therefore, Public Resource did not have any way of knowing whether visitors to

its sites were making copies.

## VI.    DEFENDANTS HAVE NOT JUSTIFIED, AND CANNOT JUSTIFY, A
##        PERMANENT INJUNCTION.

101.     Plaintiffs use revenues from sales of the current edition of the Testing Standards

to fund development of the next edition. ICE Ex. 5 (Levine Dep. 82:05–14).

102.     Once Plaintiffs publish a new edition of the standards, they cease marketing the

old, superseded editions. *See* Paragraphs 41–42, *supra*.

103.     Once Plaintiffs publish a new edition of the standards, they recall unfilled orders

for old editions, destroy unsold copies, and post warnings that prior editions should not be used.

*See* Paragraphs 41–42, *supra*.

104.    Plaintiffs spent approximately $400,000 to develop the 2014 Standards. ICE Ex. 8
(Geisinger Dep. 200:05–201:22.).

105.    As of December 31, 2014, just after the 2014 Standards were published,

███████████████████████████████████████████████████████████████

ICE Ex. 38 (Levine Ex. 1205); ICE Ex. 42 (Levine Ex. 1212); ICE Ex. 5 (Levine Dep. 134:05–
135:07; 160:04–22); ICE Ex. 8 (Geisinger Dep. 310:20–311:03); ICE Ex. 50 (Geisinger Ex.
1263).

Dated:   January 21, 2016

Respectfully submitted,

*/s/  Andrew P. Bridges*

Andrew P. Bridges (admitted)
abridges@fenwick.com
Sebastian E. Kaplan (*pro hac vice* pending)
skaplan@fenwick.com
Matthew Becker (admitted)
mbecker@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone:   (415) 875-2300
Facsimile:   (415) 281-1350

Corynne McSherry (admitted *pro hac vice*)
corynne@eff.org
Mitchell L. Stoltz (D.C. Bar No. 978149)
mitch@eff.org
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone:   (415) 436-9333
Facsimile:   (415) 436-9993

David Halperin (D.C. Bar No. 426078)
davidhalperindc@gmail.com
1530 P Street NW
Washington, DC 20005
Telephone: (202) 905-3434

*Attorneys for Defendant-Counterclaimant*
Public.Resource.Org, Inc.

SF/5546532.5

25

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN EDUCATIONAL RESEARCH ASSOCIATION, INC., AMERICAN PSYCHOLOGICAL ASSOCIATION, INC., and NATIONAL COUNCIL ON MEASUREMENT IN EDUCATION, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>PUBLIC.RESOURCE.ORG,<br><br>Defendant. | Case No. 1:14-CV-00857-TSC-DAR<br><br>**DEFENDANT-COUNTERCLAIMANT PUBLIC.RESOURCE.ORG, INC.'S STATEMENT OF DISPUTED FACTS IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION**<br><br>Action Filed: May 23, 2014 |

## [REDACTED VERSION]

Pursuant to the Local Civil Rule 7(h), Defendant-Counterclaimant Public.Resource.Org

("Public Resource") submits in support of its Motion for Summary Judgment and in Opposition

to Plaintiffs' Motion for Summary Judgment and Permanent Injunction, a Statement of Disputed

Facts to be tried, as follows:

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 1. Plaintiffs, AERA, APA, and NCME, are District of Columbia not-for-profit corporations (Levine Decl., ¶ 4; Ernesto Decl., ¶ 3; Wise Decl., ¶ 3). | Undisputed. |
| 2. AERA is the major national scientific society for research on education and learning. AERA's mission is to advance knowledge about education, to encourage scholarly inquiry related to education, and to promote the use of research to improve education and serve the public good (Levine Decl., ¶ 5). | Undisputed. |

1

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 3. APA is the largest scientific and professional organization representing psychology in the United States. APA is the world's largest association of psychologists and counts a vast number of researchers, educators, clinicians, consultants and students among its members. APA's mission is to advance the creation, communication, and application of psychological knowledge to benefit society and improve people's lives (Ernesto Decl., ¶ 4). | Undisputed. |
| 4. NCME is a professional organization for individuals involved in assessment, evaluation, testing, and other aspects of educational measurement. NCME's members are involved in the construction and use of standardized tests; new forms of assessment, including performance-based assessment; program design; and program evaluation (Wise Decl., ¶ 4). | Undisputed. |
| 5. Plaintiffs have been preparing and publishing versions of the Standards for Educational and Psychological Testing for over fifty years. In 1954, Plaintiff APA prepared and published the "Technical Recommendations for Psychological Tests and Diagnostic Techniques" (Camara Decl., ¶ 7; Ernesto Decl., ¶ 5). | Plaintiffs have failed to adduce admissible evidence in support of this fact. Disputed to the extent that Plaintiffs imply that they developed any portion of the 1999 Standards. The evidence shows that volunteers and members of the public developed the 1999 Standards, not the Plaintiffs. (SMF ¶ 8-9, 17-18.) Plaintiffs refused to provide evidence or testimony concerning any edition of the Standards other than the 1999 Edition, and they redacted documents that included information concerning other editions of the Standards. Plaintiffs should be precluded from using claimed evidence that they refused to provide during discovery. *See* ICE Ex. 62 (Plaintiffs/counterclaim-defendants' Objections and Answers to Defendant/counterclaim-plaintiff's First Set of Interrogatories (Nos. 1–10) (objecting to production of documents concerning any publications other than the 1999 Standards and |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
|  | stating that such documents are irrelevant)); ICE Ex. Ex. 63 (correspondence PRO counsel identifying earlier versions and redactions as issues in discovery). |
| 6. In 1955, Plaintiffs AERA and NCME prepared and published a companion document entitled, "Technical Recommendations for Achievement Tests" (Levine Decl., ¶ 6; Camara Decl., ¶ 7; Wise Decl., ¶ 5). | Plaintiffs have failed to adduce admissible evidence in support of this fact. |
|  | Disputed to the extent that Plaintiffs imply that they developed any portion of the 1999 Standards. Volunteers and members of the public developed the 1999 Standards, not the Plaintiffs. (SMF ¶ 8-9, 17-18.) |
|  | Disputed to the extent that Plaintiffs refused to provide evidence or testimony concerning any edition of the Standards other than the 1999 Edition, and redacted documents that included information concerning other editions of the Standards.  Plaintiffs should not be allowed to now testify on matters they refused to allow discovery into.  *See* ICE Ex. 62 (Plaintiffs/counterclaim-defendants' Objections and Answers to Defendant/counterclaim-plaintiff's First Set of Interrogatories (Nos. 1–10) (objecting to production of documents concerning any publications other than the 1999 Standards and stating that such documents are irrelevant)); ICE Ex. Ex. 63 (correspondence PRO counsel identifying earlier versions and redactions as issues in discovery). |
| 7. Subsequently, a joint committee of the three organizations modified, revised, and consolidated the two documents into the first Joint Standards. Beginning with the 1966 revision, the three organizations (AERA, APA and NCME – collectively, the "Sponsoring Organizations") collaborated in developing the "Joint Standards" (or simply, the "Standards"). Each subsequent revision of the Standards has been careful to note that it is a revision and update of the prior version (Levine Decl., ¶ 6; Camara Decl., ¶ 7; Ernesto Decl., ¶ 6; Wise | Plaintiffs have failed to adduce admissible evidence in support of these facts. |
|  | Disputed to the extent that Plaintiffs imply that they developed any portion of the 1999 Standards. Volunteers and members of the public developed the 1999 Standards, not the Plaintiffs. (SMF ¶ 8-9, 17-18.) |
|  | Disputed to the extent that Plaintiffs refused to provide evidence or testimony concerning any edition of the Standards other than the 1999 Edition, and redacted documents that included |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| Decl., ¶ 6). | information concerning other editions of the Standards. Plaintiffs should not be allowed to now testify on matters they refused to allow discovery into. *See* ICE Ex. 62 (Plaintiffs/counterclaim-defendants' Objections and Answers to Defendant/counterclaim-plaintiff's First Set of Interrogatories (Nos. 1–10) (objecting to production of documents concerning any publications other than the 1999 Standards and stating that such documents are irrelevant)); ICE Ex. 63 (correspondence PRO counsel identifying earlier versions and redactions as issues in discovery). |
| 8. Beginning in the mid-1950s, the Sponsoring Organizations formed and periodically reconstituted a committee of highly trained and experienced experts in psychological and educational assessment, charged with the initial development of the Technical Recommendations and then each subsequent revision of the (renamed) Standards. These committees were formed by the Sponsoring Organizations' Presidents (or their designees), who would meet and jointly agree on the membership. Often a chair or co-chairs of these committees were selected by joint agreement. Beginning with the 1966 version of the Standards, this committee became referred to as the "Joint Committee" (Levine Decl., ¶ 7; Camara Decl., ¶ 8; Ernesto Decl., ¶ 7; Wise Decl., ¶ 7). | Plaintiffs have failed to adduce admissible evidence in support of these facts. Disputed to the extent that Plaintiffs imply that they developed any portion of the 1999 Standards. Volunteers and members of the public developed the 1999 Standards, not the Plaintiffs. (SMF ¶ 8-9, 17-18.) Disputed to the extent that Plaintiffs refused to provide evidence or testimony concerning any edition of the Standards other than the 1999 Edition, and redacted documents that included information concerning other editions of the Standards. Plaintiffs should not be allowed to now testify on matters they refused to allow discovery into. *See* ICE Ex. 62 (Plaintiffs/counterclaim-defendants' Objections and Answers to Defendant/counterclaim-plaintiff's First Set of Interrogatories (Nos. 1–10) (objecting to production of documents concerning any publications other than the 1999 Standards and stating that such documents are irrelevant)); ICE Ex. 63 (correspondence PRO counsel identifying earlier versions and redactions as issues in discovery). |
| 9. Financial and operational oversight for the Standards' revisions, promotion, distribution, | Undisputed but immaterial. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| and for the sale of the 1999 and 2014 Standards has been undertaken by a periodically reconstituted Management Committee, comprised of the designees of the three Sponsoring Organizations (Levine Decl., ¶ 8; Camara Decl., ¶ 9; Schneider Decl., ¶ 4; Ernesto Decl., ¶ 8; Wise Decl., ¶ 8). | |
| 10. All members of the Joint Committee(s) and the Management Committee(s) are *unpaid* volunteers. The expenses associated with the ongoing development and publication of the Standards include travel and lodging expenses (for the Joint Committee and Management Committee members), support staff time, printing and shipment of bound volumes, and advertising costs (Levine Decl., ¶ 9; Camara Decl., ¶ 10; Schneider Decl., ¶ 5; Ernesto Decl., ¶ 9; Wise Decl., ¶ 9). | Undisputed. Second sentence immaterial. |
| 11. Many different fields of endeavor rely on assessments. The Sponsoring Organizations have ensured that the range of these fields of endeavor is represented in the Joint Committees' membership – *e.g.*, admissions, achievement, clinical counseling, educational, licensing-credentialing, employment, policy, and program evaluation. Similarly, the Joint Committee's members, who are *unpaid volunteers*, represent expertise across major functional assessment areas – *e.g.*, validity, equating, reliability, test development, scoring, reporting, interpretation, and large scale interpolation (Levine Decl., ¶ 10; Ernesto Decl., ¶ 10; Wise Decl., ¶ 10). | Undisputed. |
| 12. From the time of their initial creation to the present, the preparation of and periodic revisions to the Standards entail intensive labor and considerable cross-disciplinary expertise. Each time the Standards are revised, the Sponsoring Organizations select and arrange for meetings of the leading authorities in psychological and educational assessments | Undisputed but immaterial. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| (known as the Joint Committee). During these meetings, certain Standards are combined, pared down, and/or augmented, others are deleted altogether, and some are created as whole new individual Standards. The 1999 version of the Standards is nearly 200 pages, took more than five years to complete (Levine Decl., ¶ 11; Ernesto Decl., ¶ 11; Camara Decl., ¶ 11). | |
| 13. The 1999 Standards is the result of work put in by the Joint Committee to generate a set of best practices on educational and psychological testing that are respected and relied upon by leaders in their fields (Camara Decl., ¶ 11; Wise Decl., ¶ 11). | Undisputed. |
| 14. Draft revisions of the 1985 Standards, for what became the 1999 Standards, were widely distributed for public review and comment three times during this revision effort to gauge whether the testing community believed the revised drafts to be current and inclusive of the topics at issue (Schneider Decl., ¶ 6). | Undisputed. |
| 15. The Joint Committee received thousands of pages of comments and proposed text revisions from: the membership of the Sponsoring Organizations, scientific, professional, trade and advocacy groups, credentialing boards, state and federal government agencies, test publishers and developers, and academic institutions. While the Joint Committee reviewed and took under advisement these helpful comments, the final language of the 1999 Standards was a product of the Joint Committee members (Camara Decl., ¶ 12; Schneider Decl., ¶ 7). | Disputed. Many of the thousands of pages of comments and proposed text revisions from members of the public and government were in fact incorporated into the 1999 Standards. *See* SMF ¶ 9; ███████████████████████ ███████████████████████ ███████████████████████ ███████████████████████ |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 16. When the 1985 Standards were revised, more than half the content of the 1999 Standards resulted from newly written prose of the Joint Committee (Camara Decl., ¶ 12). | Disputed to the extent that Plaintiffs imply that all of this text was original to the Joint Committee, when much of it was in fact taken from proposed text submitted by members of the public and government. *See* SMF ¶ 9; ██████████████████████████████ ██████████████████████████████ ██████████████████████████████ |
| 17. The Standards originally were created as principles and guidelines – a set of best practices to improve professional practice in testing and assessment across multiple settings, including education and various areas of psychology. The Standards can and should be used as a recommended course of action in the sound and ethical development and use of tests, and also to evaluate the quality of tests and testing practices. Additionally, an essential component of responsible professional practice is maintaining technical competence. Many professional associations also have developed standards and principles of technical practice in assessment. The Sponsoring Organizations' Standards have been and still are used for this purpose (Geisinger Decl., ¶ 18; Camara Decl., ¶ 13; Wise Decl., ¶ 12). | Undisputed. |
| 18. The Standards, however, are not simply intended for members of the Sponsoring Organizations, AERA, APA, and NCME. The intended audience of the Standards is broad and cuts across audiences with varying backgrounds and different training. For example, the Standards also are intended to guide test developers, sponsors, publishers, and users by providing criteria for the evaluation of tests, testing practices, and the effects of test use. Test user standards refer to those standards that help test users decide how to choose certain tests, interpret scores, or make decisions based on | Disputed to the extent that Plaintiffs imply that the 1999 Standards are not enforceable as law. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| tests results. Test users include clinical or industrial psychologists, research directors, school psychologists, counselors, employment supervisors, teachers, and various administrators who select or interpret tests for their organizations. There is no mechanism, however, to enforce compliance with the Standards on the part of the test developer or test user. The Standards, moreover, do not attempt to provide psychometric answers to policy or legal questions (Camara Decl., ¶ 14; Wise Decl., ¶ 13; Geisinger Decl., ¶ 19; Ernesto Decl., ¶ 12). | |
| 19. The Standards promote the development of high quality tests and the sound use of results from such tests. Without such high quality standards, tests might produce scores that are not defensible or accurate, not an adequate reflection of the characteristic they were intended to measure, and not fair to the person tested. Consequently, decisions about individuals made with such test scores would be no better, or even worse, than those made with no test score information at all. Thus, the Standards help to ensure that measures of student achievement are relevant, that admissions decisions are fair, that employment hiring and professional credentialing result in qualified individuals being selected, and patients with psychological needs are diagnosed properly and treated accordingly. Quality tests protect the public from harmful decision making and provide opportunities for education and employment that are fair to all who seek them (Camara Decl., ¶ 15; Wise Decl., ¶ 14). | Disputed to the extent Plaintiffs seek to establish copyrightability of the Standards. Plaintiffs have failed to adduce admissible evidence in support of these facts. These are not facts but opinions. Plaintiffs provide no source other than Mr. Camara and Mr. Wise's conjectures to support these statements. Neither of them are qualified as experts. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 20. The Standards apply broadly to a wide range of standardized instruments and procedures that sample an individual's behavior, including tests, assessments, inventories, scales, and other testing vehicles. The Standards apply equally to standardized multiple-choice tests, performance assessments (including tests comprised of only open-ended essays), and hands-on assessments or simulations. The main exceptions are that the Standards do not apply to unstandardized questionnaires (*e.g.*, unstructured behavioral checklists or observational forms), teacher-made tests, and subjective decision processes (*e.g.*, a teacher's evaluation of students' classroom participation over the course of a semester) (Camara Decl., ¶ 16; Wise Decl., ¶ 15; Geisinger Decl., ¶ 20; Ernesto Decl., ¶ 13). | Undisputed. |
| 21. The Standards have been used to develop testing guidelines for such activities as college admissions, personnel selection, test translations, test user qualifications, and computer-based testing. The Standards also have been widely cited to address technical, professional, and operational norms for all forms of assessments that are professionally developed and used in a variety of settings. The Standards additionally provide a valuable public service to state and federal governments as they voluntarily choose to use them. For instance, each testing company, when submitting proposals for testing administration, instead of relying on a patchwork of local, or even individual and proprietary, testing design and implementation criteria, may rely instead on the Sponsoring Organizations' Standards to afford the best guidance for testing and assessment practices (Camara Decl., ¶ 17; Wise Decl., ¶ 16; Geisinger Decl., ¶ 21; Ernesto Decl., ¶ 14). | Undisputed. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 22. The Standards were not created or updated to serve as a legally binding document, in response to an expressed governmental or regulatory need, nor in response to any legislative action or judicial decision. However, the Standards have been cited in judicial decisions related to the proper use and evidence for assessment, as well as by state and federal legislators. These citations in judicial decisions and during legislative deliberations occurred without any lobbying by the Plaintiffs (Levine Decl., ¶ 12; Camara Decl., ¶ 18; Ernesto Decl., ¶ 15; Wise Decl., ¶ 17). | Disputed. Plaintiffs have failed to adduce admissible evidence in support of these facts. Plaintiffs cite no evidence concerning the purposes for the creation or revision of the 1999 Standards, and they could not establish the purposes behind every contribution from the thousands of people and entities who contributed to the development and revision of the Standards. This is particularly the case for contributions by governmental entities. The APA lobbied for the 1999 Standards to be mandated in legislation that was deliberated by Congress. (SMF ¶ 52-56; ICE Exs. 31, ███████████████) |
| 23. During the discovery phase of this litigation, however, Plaintiff APA located in its archives correspondence relating to APA's support for proposed legislation sought to be introduced in 2001 by Senator Paul Wellstone (D-MN) on Fairness and Accuracy in High Stakes Educational Decisions for Students – a suggested amendment to the Elementary and Secondary Education Act ("No Child Left Behind Act") 147 Cong. Rec. S. 4,644 (daily ed. May 9, 2001) (Ernesto Decl., ¶¶ 16-22, Exhs. NN-SS). | Undisputed. |
| 24. Some of APA's letters are unsigned and are not printed on APA letterhead. Therefore, in accordance with APA practices and protocols, it is likely that the unsigned letters (not printed on letterhead) were internal discussion drafts that were never sent (Ernesto Decl., ¶ 23). | Disputed. Plaintiffs have failed to adduce admissible evidence in support of these alleged "facts," which are actually opinions. Plaintiffs provide no source other than Ms. Ernesto's conjectures to support these statements, have not provided any proof of "APA practices and protocols" as they concern letters sent by APA's lobbyists, and Ms. Ernesto's statements in her declaration are contradicted by her |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| | statements at deposition. At deposition, [redacted] However, a document produced by APA proves that at least one such lobbying letter was sent: Exhibit SS to Ms. Ernesto's declaration is a 2002 memorandum APA produced titled "Highlights of APA's Involvement in Educational Testing Provisions of the 'No Child Left Behind Act,'" that describes APA's lobbying work at the time. This memorandum includes the full text of a letter that APA sent on May 7, 2001 to U.S. Senators lobbying for the mandating of the 1999 Standards through an amendment by Senator Wellstone. At deposition, [redacted] |
| 25. Regarding the signed letters that were printed on APA letterhead, they relate to Senator Wellstone's proposed legislation that tests and assessments administered by the states are of high quality and used appropriately for the benefit of test administrators and test takers. These are goals that are consistent with APA policy as then reflected in the 1999 Standards. Even though Senator Wellstone's amendments sought, in part, to mandate states' compliance with the Standards, none of the Sponsoring Organizations actively advocated for this – and in any event Senator Wellstone's proposed amendment including this language was never enacted into law (Ernesto Decl., ¶ 24, Exh. TT). | Disputed. Plaintiffs have failed to adduce admissible evidence in support of these facts. Plaintiffs have no evidence to support their statement that "none of the Sponsoring Organizations actively advocated for [legislation mandating the 1999 Standards]," other than Ms. Ernesto's conjecture in her declaration ¶ 24, which is contradicted by her deposition testimony and by the documents she attaches as Exhibits QQ and SS to her declaration. At deposition, [redacted] |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| | ▮▮▮▮▮▮▮▮▮▮▮▮ owever, a document produced by APA proves that at least one such lobbying letter was sent: Exhibit SS to Ms. Ernesto's declaration is a 2002 memorandum APA produced titled "Highlights of APA's Involvement in Educational Testing Provisions of the 'No Child Left Behind Act,'" that describes APA's lobbying work at the time. This memorandum includes the full text of a letter that APA sent on May 7, 2001 to U.S. Senators lobbying for the mandating of the 1999 Standards through an amendment by Senator Wellstone. At deposition, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| 26. APA's search of its records did not disclose any further communications with Congress relating to the Standards and, to the best of APA's knowledge, it has not engaged in communications with Congress regarding citation of the Standards in legislation since 2001 (Ernesto Decl., ¶ 25). | Disputed.  The documents produced by Plaintiffs ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  More recently, all three plaintiff organizations put on an event at the Russell Senate Office Building on Capitol Hill about the 2014 Standards.  ICE Exs. 47-49, and ▮▮▮▮▮▮▮▮▮ |
| 27. Moreover, neither AERA nor NCME has ever communicated with Congress for the purpose of encouraging the enactment of the Standards into law (Levine Decl., ¶¶ 12-13; Wise Decl., ¶ 18). | Disputed.  Plaintiffs have no evidence to support this statement other than the conjecture of Dr. Levine and Dr. Wise. Moreover, all three plaintiff organizations organized and participated in an event at the Russell Senate Office Building on Capitol Hill about the 2014 Standards.  ICE Exs. 47-49, and ▮▮▮▮▮ |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 28. None of the Sponsoring Organizations has solicited any government agency to incorporate the Standards into the Code of Federal Regulations or other rules of Federal or State agencies (Levine Decl., ¶ 13; Ernesto Decl., ¶ 26; Wise Decl., ¶ 19). | Disputed.  Plaintiffs have failed to adduce admissible evidence in support of these facts.  Plaintiffs have no evidence to support this statement other than the conjecture of Dr. Levine, Ms. Ernesto, and Dr. Wise.  At deposition, █████████████████████████ |
| 29. Rather, in the policymaking arena, the Sponsoring Organizations believe the Standards should be treated as guidelines informing the enactment of legislation and regulations consistent with best practices in the development and use of tests – to insure that they are valid, reliable and fair (Wise Decl., ¶ 20; Ernesto Decl., ¶ 27). | Plaintiffs' self-serving profession of "belief" is not a material fact.  Moreover, disputed to the extent that Plaintiffs do not specify a time frame for this belief.  They may believe this now, but in the past ███████████████ ██████████████████████████  Plaintiffs also organized an event on Capitol Hill about the 2014 Standards as recently as September 2014.  ICE Exs. 47-49, ████████████████████████ █████ |
| 30. Plaintiffs promote and sell copies of the Standards via referrals to the AERA website, at annual meetings, in public offerings to students, and to educational institution faculty.  Advertisements promoting the Standards have appeared in meeting brochures, in scholarly journals, and in the hallways at professional meetings (Levine Decl., ¶ 14, Exh. NNN; Ernesto Decl., ¶ 28, Exh. UU; Wise Decl., ¶ 21, Exh. KKK). | Disputed to the extent that Plaintiffs did not sell copies of the 1999 Standards for approximately one year during this litigation, they do not promote the 1999 Standards or earlier editions, and they do not sell earlier editions of the Standards. Plfs Mem. at 11; ████████████████████████████ ████████████████  SMF ¶¶ 40, 43. |

13

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 31. All copies of the Standards bear a copyright notice (Levine Decl., ¶ 15, 28, Exh. TTT). | Disputed to the extent that Plaintiffs refer to any edition of the Standards other than the 1999 edition, which is the only edition that Plaintiffs have provided evidence as to the placement of a copyright notice. Moreover, the 1999 edition is the only edition at issue in this litigation, and Plaintiffs have refused to allow discovery into other editions of the Standards. *See* ICE Ex. 62 (Plaintiffs/counterclaim-defendants' Objections and Answers to Defendant/counterclaim-plaintiff's First Set of Interrogatories (Nos. 1–10) (objecting to production of documents concerning any publications other than the 1999 Standards and stating that such documents are irrelevant)); ICE Ex. 63 (correspondence PRO counsel identifying earlier versions and redactions as issues in discovery). |
| 32. Distribution of the Standards is closely monitored by the Sponsoring Organizations. AERA, the designated publisher of the Standards, sometimes does provide promotional complementary print copies to students or professors. Except for these few complementary print copies, however, the Standards are not given away for free; and certainly they are not made available to the public by any of the three organizations for anyone to copy free of charge (Levine Decl., ¶ 16; Ernesto Decl., ¶ 29; Wise Decl., ¶ 22). | Disputed. Distribution of the Standards is not closely monitored by the Sponsoring Organizations. At deposition, ███████████████████████ |
| 33. To date, Plaintiffs have never posted, or authorized the posting of, a digitized copy of the 1999 Standards on any publicly accessible website (Levine Decl., ¶ 16; Ernesto Decl., ¶ 30; Wise Decl., ¶ 23). | Undisputed. |
| 34. The 1999 Standards have been sold at modest retail prices ranging from $25.95 to $49.95 per copy. From 2000 to 2014, except for the near two-year period during which Public Resource posted unauthorized copies online and | Disputed to the extent that sales of the 1999 Standards peaked in 2002 and have been declining since then, and declined more rapidly in the year prior to when Public Resource posted the 1999 Standards than they did |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| sales diminished significantly, income generated from sales of the 1999 Standards, on average, had been approximately in excess of $127,000 per year (Levine Decl., ¶¶ 17-18 Exh. OOO). | subsequent to Public Resource's actions. Additionally, sales of the 1999 Standards increased in the year after Public Resource posted the 1999 Standards.  (SMF ¶ 44, 47.) The characterization of the retail prices of the 1999 Standards as "modest" is an opinion, not a fact, and Dr. Levine is not qualified as an expert on the subject of the reasonableness of pricing for access to the law. |
| 35. After the 2014 Standards were published in the late summer of 2014, AERA for a time discontinued sales of the 1999 Standards. This was to encourage sales of the newly-revised edition – the 2014 Standards (Levine Decl., ¶ 19, Exh. PPP). However, so long as purchasers are made aware that it is no longer the current edition, the 1999 Standards do have an enduring value for those in the testing and assessment profession who (i) need to know the state of best testing practices as they existed between 1999 and 2014, (ii) believe they still may be held accountable to the guidance of the 1999 Standards even now, and/or (iii) study the changes in best testing and assessment practices over time. For these reasons, in the summer of 2015 AERA resumed sales of the 1999 Standards (Levine Decl., ¶ 20, Exh. QQQ). | Disputed that Plaintiffs resumed sale of the 1999 Standards in 2015 because of the reasons asserted.  Plaintiffs appear to have resumed selling the 1999 Standards to support their position in this litigation.  This is evident first because Plaintiffs have not resumed the sale of any other edition of the Standards, even though every edition would qualify under the factors that Plaintiffs cite for their decision to resume selling the 1999 edition.  Note also that the 1985 Standards were incorporated by reference into 34 CFR § 668.148 from 1995 until 2010, ██████████████████████████████ ██████████████████████████████ ██████████████  Moreover, although AERA states that it has made the 1999 Standards available for purchase once more, unlike the 2014 Standards and AERA's other publications, the 1999 Standards are not available for purchase through AERA's online store; instead, prospective purchasers are required to fill out a special book order form and deliver the form to AERA for processing. (SMF ¶ 59.) |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 36. The Sponsoring Organizations do not keep any of the proceeds generated from the sales of the Standards. Rather, the income from these sales is used by the Sponsoring Organizations to offset their development and production costs and to generate funds for subsequent revisions. This allows the Sponsoring Organizations to develop up-to-date, high quality Standards that otherwise would not be developed due to the time and effort that goes into producing them (Levine Decl., ¶ 21; Geisinger Decl., ¶ 22; Camara Decl., ¶ 19; Ernesto Decl., ¶ 31). | Disputed to the extent that Plaintiffs assert that the development of the Standards would not have occurred but for the particular revenue model that Plaintiffs employ.  This is an opinion, not a fact.  Plaintiffs have no evidence to support this assertion other than the conjecture of their witnesses. Dr. Levine, Mr. Camara, and Ms. Ernesto are not qualified as experts to opine on this subject. Dr. Geisinger is not an expert on revenue models or standards development, and is not qualified to opine on this subject. *See* Public Resource's Motion to Strike the Declaration of Dr. Geisinger, Dkt 67. |
| 37. Without receiving at least some moderate income from the sales of the Standards to offset their production costs and to allow for further revisions, it is very likely that the Sponsoring Organizations would no longer undertake to periodically update them, and it is unknown who else would (Levine Decl., ¶ 22; Ernesto Decl., ¶ 32; Wise Decl., ¶ 24; Geisinger Decl., ¶ 22). | Disputed.  Plaintiffs have failed to adduce admissible evidence in support of these alleged "facts." These are opinions, not facts. Dr. Levine, Mr. Camara, and Ms. Ernesto are not qualified as experts to opine on this subject.  Dr. Geisinger is not an expert on revenue models or standards development, and is not qualified to opine on this subject. *See* Public Resource's Motion to Strike the Declaration of Dr. Geisinger, Dkt. 67. Moreover, the 2014 Standards are not implicated by this litigation, and Plaintiffs voluntarily stopped selling the 1999 Standards, the only edition at issue.  Plaintiffs have provided no evidence as to how Public Resource's posting of the 1999 Standards could harm Plaintiffs' income from the 2014 Standards, far from reducing revenue from the 2014 Standards to less that "some moderate income." |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 38. At one time, funding for the Standards revision process from third party sources (*e.g.*, governmental agencies, foundations, other associations interested in testing and assessment issues, etc.) was considered. However, this option was not seriously considered as the difficulty and/or potential conflicts of interest in doing so left the Sponsoring Organizations to conclude that financial support for the Standards revisions should be self-funding – that is, from the sale of prior editions of the Standards (Levine Decl., ¶ 23; Camara Decl., ¶ 20). | Undisputed but immaterial. |
| 39. Due to the small membership size of Plaintiff NCME, and the relative minor portion of the membership of Plaintiffs AERA and APA who devote their careers to testing and assessment, it is highly unlikely that the members of the Sponsoring Organizations will vote for a dues increase to fund future Standards revision efforts if Public Resource successfully defends this case and is allowed to post the Standards online for the public to download or print for free. As a result, the Sponsoring Organizations would likely abandon their practice of periodically updating the Standards (Levine Decl., ¶ 24; Camara Decl., ¶ 24; Geisinger Decl., ¶ 23; Ernesto Decl., ¶ 33). | Disputed but immaterial.  Plaintiffs have failed to adduce admissible evidence in support of these alleged "facts." These are opinions, not facts.  Dr. Levine, Mr. Camara, and Ms. Ernesto are not qualified as experts to opine on this subject.  Dr. Geisinger is not an expert on revenue models or standards development, and is not qualified to opine on this subject.  *See* Public Resource's Motion to Strike the Declaration of Dr. Geisinger, Dkt. 67. Moreover, the 2014 Standards are not implicated by this litigation, and Plaintiffs voluntarily stopped selling the 1999 Standards, the only edition at issue. (SMF ¶ 40; Plfs Mem. at 11.)  Plaintiffs have provided no evidence as to how Public Resource's posting of the 1999 Standards could harm Plaintiffs' income from the 2014 Standards. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
|  | ███████████████████████████████████████ ███████████████████████████ |
| 40. The Plaintiffs are joint owners of the copyright in and to the Standards. The Standards were registered with the U.S. Register of Copyrights under Registration Number TX 5-100-196, having an effective date of December 8, 1999 (Levine Decl., ¶ 25, Exh. RRR). | Disputed to the extent that Plaintiffs claim to be joint owners of the copyright to the 1999 Standards.   The copyright registration is false, as Plaintiffs have admitted, because it does not list the names of the claimed other joint authors of the 1999 Standards: both the first registration, obtained in December 1999, and the supplementary registration, obtained in February 2014, list either AERA or all three Plaintiffs as the sole authors and owners of the 1999 Standards, but only months later did Plaintiffs obtain their first alleged copyright assignment (in April 2014). ICE Ex. 3 (Ernesto Dep. 122:23–127:12).  Plaintiffs have additional faults in their ownership claims. The Joint Committee for the 1999 Standards comprised 17 members, not 16 as Plaintiffs suggest below, and Plaintiffs only allege to have assignments from 15 of those individuals. *Compare* Plfs SMF ¶ 42 *with* ICE Exs. 12 and 3 (Ernesto Dep. 103:22–105:07). Additionally, Plaintiffs do not have assignments from any of the hundreds of other individuals, organizations, and other entities that participated in the development of the 1999 Standards in collaboration with the Joint Committee members. ICE Ex. 2 (Schneider Dep. 177:18–178:02). Moreover, the effect of the alleged assignments and "posthumous assignments" (for which there was no consideration) is a legal issue in dispute. ██████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ██████████████████████████████ ven if the assignments were in proper form, Plaintiffs have not established that the individuals who signed them had ownership of, and the right to transfer, the copyrights that they purport to |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| | transfer; many of the members of the Joint Committee were employed by entities that have not executed assignments. ████████ ████████████████████ |
| 41. A supplementary copyright registration for the Standards was issued by the U.S. Register of Copyrights under Supplementary Registration Number TX 6-434-609, having an effective date of February 25, 2014 (Levine Decl., ¶ 26, Exh. SSS). | Undisputed. |
| 42. The Joint Committee that authored the 1999 Standards comprised 16 members (Levine Decl., ¶¶ 27-28, Exh. TTT). Except for Manfred Meier (who could not be located, nor could his heirs), work made-for-hire letters were signed by 13 Joint Committee Members, and posthumous assignments were signed by the heirs of 2 deceased Joint Committee Members, vesting ownership of the copyright to the 1999 Standards in the Sponsoring Organizations (Ernesto Decl., ¶ 34, Exhs. VV-HHH). | Disputed. The Joint Committee for the 1999 Standards comprised 17 members, not 16. ICE Exs. 12 and 3 (Ernesto Dep. 103:22–105:07) Additionally, Plaintiffs fail to mention that hundreds of individuals, organizations, and other entities participated in the authorship of the 1999 Standards along with the Joint Committee members. ICE Ex. 2 (Schneider Dep. 177:18–178:02); *see* SMF ¶ 9. Moreover, the effect of the alleged "work made-for-hire letters" and "posthumous assignments" is a legal issue in dispute, on which Ms. Ernesto's opinion is not determinative, and it is inconsistent with Plaintiffs' claimed "joint authorship." ████████████ ████████████████ |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 43. Government agencies also use standards, including by incorporating them by reference in statutes and regulations. The National Technology Transfer and Advancement Act of 1995 ("NTTAA"), for example, requires federal agencies to use privately developed standards whenever possible. Pub. L. No. 104-113 § 12, 110 Stat. 775, 782-83 (1996), codified at 15 U.S.C. § 272. | Undisputed. |
| 44. In alignment with the NTTAA, the Department of Education used privately developed standards in Section 668.146 of Title 34 of the Code of Federal Regulations, Subtitle B: Regulations of the Offices of the Department of Education, Chapter VI: Office of Postsecondary Education, Department of Education Part 668: Student Assistance General Provisions, Subpart J: Approval of Independently Administered Tests; Specification of Passing Score; Approval of State Process (the "Department of Education Regulations"), in relevant part, provides:<br><br>(a) Except as provided in § 668.148, the Secretary approves a test under this subpart if –<br><br>(1) The test meets the criteria set forth in paragraph (b) of this section ...<br><br>(b) To be approved under this subpart, a test must –<br><br>...<br><br>(6) Meet all standards for test construction provided in the 1999 edition of the *Standards for Educational and Psychological Testing*, prepared by a joint committee of the American Educational Research Association, the American Psychological Association, and the National Council on Measurement in Education incorporated by reference in this section. Incorporation by reference of this document has been approved by the Director of the | Undisputed. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| Office of the Federal Register pursuant to the Director's authority under _5 U.S.C. 552_(a) and 1 CFR part 51. The incorporated document is on file at the Department of Education, Federal Student Aid, room 113E2, 830 First Street, NE., Washington, DC 20002, phone (202) 377-4026, and at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 1-866-272-6272, or go to: http://www.archives.gov/federal-register/code-of-federal-regulations/ibr-locations.html The document may be obtained from the American Educational Research Association at: http://www.aera.net .... | |
| 45. It is notable that Plaintiff's' 1999 Standards are referred to by way of _citation_ in the U.S. Department of Education Regulations. However, the _text_ of Plaintiffs' Standards is not integrated word-for-word, in whole or in part, into those regulations. Therefore, no one could, or should, interpret the Standards as "the law." | Disputed to the extent it states facts; legal argument is not factual.  The 1999 Standards are formally incorporated by reference into the U.S Department of Education Regulations in full, and compliance with _all_ of the 1999 Standards is thereby mandated by law – it is not simply "referred to by way of citation," as Plaintiffs claim.  The Office of the Federal Register states: "The legal effect of incorporation by reference is that the material is treated as if it were published in the Federal Register and CFR. This material, like any other properly issued rule, has the force and effect of law. Congress authorized incorporation by reference in the Freedom of Information Act to reduce the volume of material published in the Federal Register and CFR." (SMF ¶ 31.) Plaintiffs' statement that "no one could, or should, interpret the Standards as 'the law'" is not a fact, it is an opinion (and in part a legal conclusion), and Plaintiffs do not cite any evidence to support this claim. |
| 46. On the other hand, the Department of Education Regulations are in compliance with Federal law – which requires that materials | Nonfactual legal argument; disputed.  The 1999 Standards are not reasonably available to the class of persons affected.  The regulations |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| incorporated by reference in the Federal Register must be "reasonably available to the class of persons affected." 5 U.S.C. § 552(a)(1); 1 C.F.R. § 51.7(a)(3). | specify that the 1999 Standards are available to read by written appointment at the National Archives in Washington D.C., or alternatively can be purchased from the Plaintiffs.  (SMF ¶ 27.)   But after Plaintiffs succeeded in convincing Public Resource to take down the version of the 1999 Standards it had posted on the Internet (pending the outcome of this litigation), Plaintiffs proceeded to take the 1999 Standards off sale – leaving citizens who needed access to the law to either track down a second-hand copy, or make a written appointment with the National Archives and travel to Washington D.C.  (*See* SMF ¶ 27, 39-43.)  Although Plaintiffs put the 1999 Standards on sale once more after the issue was raised at deposition, Plaintiffs assert that they expect to eventually take the 1999 Standards off sale at some undefined point in the future. ICE Ex. 5 (Levine Dep. 55:09–56:10). Moreover, the 1999 Standards are not reasonably available to individuals who are blind or visually disabled, and who cannot perceive paper copies of this document.  ICE Ex. 51 (Fruchterman Report) pp.5-6. Because sections of the 1999 Standards apply particularly to fair testing of individuals with disabilities, it is especially important that these citizens have access to the 1999 Standards to ensure that the testing they encounter is in compliance with the law.  ICE Ex. 51 (Fruchterman Report) p. 6. |
| 47. Thus, it is required that (i) a copy of the incorporated material must be on file with the Office of the Federal Register and (ii) the regulations incorporating such material must state the ways those incorporated materials are reasonably available to interested parties. 1 C.F.R. §§ 51.3, 51.5. There is no requirement that such materials be available to the public at no cost. | Nonfactual legal argument; disputed.  The contours of the requirement that materials incorporated by reference be "reasonably available to the class of persons affected" is a legal question in dispute and has not been defined by any court.  Plaintiffs' assertion that "[t]here is no requirement that [materials incorporated by reference into the law] be available to the public at no cost" is an erroneous legal conclusion – United States law must be free and available to citizens to read |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| | and speak. See Public Resource's Memorandum of Points and Authorities. |
| 48. Defendant Public Resource is a California non-profit corporation founded in 2007 by Mr. Carl Malamud ("Malamud"), with the aim of making government information more accessible with particular emphasis on the law (Hudis Decl., ¶ 2, Exh. A, pp. 77, 93-94, 163-164). | Undisputed. |
| 49. The identified purpose and objective of Public Resource is to create and maintain so-called informational "public works projects for the Internet" (Hudis Decl., ¶ 2, Exh. A, pp. 94-95, 105-109, ¶ 3, Exh. B, Section II.B., ¶ 4, Exh. C. Section 2.1). | Undisputed. |
| 50. In actuality, Public Resource maintains an assortment of seemingly random websites, which contain materials ranging from technical projects in which Malamud has been involved, to his commentary on government databases and entities (*e.g.*, PACER, EDGAR, the Government Printing Office and the Smithsonian), to myriad collections of legislative, regulatory, and case law materials (Hudis Decl., ¶ 2, Exh. A, pp. 78-84, 96-102, 111-113, ¶ 5, Exh. D). | Disputed.  Plaintiffs' derogatory characterization of Public Resource is a non-factual opinion, and Plaintiffs' counsel Mr. Hudis is not qualified as an expert to opine on this matter.  Public Resource's website is structured for navigation by search engines and for bulk access.  Data are organized by country (e.g., /pub/us/) then by type of data, such as standards incorporated by reference (/pub/us/cfr/ibr/). Malamud Decl. ¶ 29. The Court is invited to view Public Resource's website at https://law.resource.org. |
| 51. Of particular interest for this litigation is Public Resource's website titled https://law.resource.org, on which Public Resource posted the infringing digital copy of the Sponsoring Organizations' 1999 Standards (Hudis Decl., ¶¶ 2, Exh. A, pp. 83-88, 234). | Nonfactual legal argument and opinion; disputed to the extent that Plaintiffs assert Public Resource posted an "infringing digital copy of the Sponsoring Organizations' 1999 Standards."  Public Resource posted a version of the 1999 Standards on its website, but there is a legal dispute as to whether the version the Public Resource posted was infringing, as well as whether Plaintiffs own rights to the 1999 Standards.  Moreover, what Public Resource posted was not a "copy" in the legal sense.  As defined by the 1976 Copyright Act, "'copies' are material objects, other than phonorecords, |

23

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
|  | in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101.  The Copyright Act provides for exclusive rights that apply to "copies" (17 U.S.C. § 106 (1) and (3)), as well as exclusive rights that do not implicate "copies" (17 U.S.C. § 106 (2) and (4)–(6)).  The electronic version of the 1999 Standards that Public Resource posted was not a material object, and therefore not a "copy" under the Copyright Act. |
| 52. Public Resource does not provide any other services, and does not sell any products (Hudis Decl., ¶ 2, Exh. A, pp. 102-103, 127). | Undisputed. |
| 53. Malamud has worked in the computer science, computer networks, and information technology fields since 1980. Although he has no formal education on these subjects, Malamud has written many books and articles on, and taught classes in, these areas (Hudis Decl., ¶ 2, Exh. A, pp. 22-77, ¶ 6, Exh. E). | Undisputed. |
| 54. On behalf of Public Resource, Malamud spends his time operating its varied websites, giving speeches, sending letters and FOIA requests to government officials, and attending to the company's finances (Hudis Decl., ¶ 2, Exh. A, pp. 78-79, 88-90). | Undisputed. |
| 55. While Public Resource does have a Board of Directors to whom Malamud reports, the company has no other officers, employees or members (Hudis Decl., ¶ 2, Exh. A, pp. 90, 120-123, Exh. E). | Undisputed. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 56. In short, except for the retention of independent contractors here and there (Hudis Decl., ¶ 2, Exh. A, pp. 135-136), Malamud *is* Public Resource. | Denied. Public Resource is a not-for-profit organization founded by Mr. Malamud, and operated under the direction of a board of trustees that includes Tim Stanley, CEO of Justia and affiliate with the Stanford University Copyright and Fair Use Center, as well as Ed Walters, CEO of Fastcase and Adjunct Professor at the Georgetown University Law Center. *See* https://public.resource.org/about/index.html |
| 57. Public Resource obtains its funding and/or outside legal assistance from a cadre of law firms, foundations and Internet companies (*e.g.*, Google and Creative Commons) (Hudis Decl., ¶ 2, Exh. A, pp. 135-136, ¶ 5, Exh. D). | Disputed to the extent that Plaintiffs characterize Public Resource's funding and legal assistance as coming from a "cadre" of law firms, foundations and Internet companies. A listing of donors who permit their names to be publicly listed appears on Public Resource's "About" page. https://public.resource.org/about/index.html |
| 58. In 2013, Malamud used a Kickstarter crowd-funding campaign to raise between $100,000 and $1.2 million in order to finance Public Resource's infringing operation of re-typing (or "double-keying") third-party standards, and publishing them to the https://law.resource.org website. However, this Kickstarter effort was unsuccessful (Hudis Decl., ¶ 2, Exh. A, pp. 82-83, 206-212, ¶ 7, Exh. F). | Immaterial. Disputed to the extent that Plaintiffs assert that Public Resource's activities are infringing, which is the subject of this litigation. Disputed also to the extent that Plaintiffs characterize Public Resource's activities as "publishing," as the term is not used according to the meaning in the 1976 Copyright Act, which defines "publication" as "the distribution of *copies* or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. . . A public performance or display of a work does not itself constitute publication." 17 U.S.C. § 101 (emphasis added). As defined by the 1976 Copyright Act, "'copies' are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101. The Copyright Act provides for exclusive rights that apply to "copies" (17 U.S.C. § 106 (1) and |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| | (3)), as well as exclusive rights that do not implicate "copies" (17 U.S.C. § 106 (2) and (4)–(6)).  The electronic version of the 1999 Standards that Public Resource posted was not a material object, and therefore not a "copy" under the Copyright Act. |
| 59. In Malamud's view, "standards" are a set of best practices that the organization publishing them believes should be widely adopted. An example given by Malamud are the best practice standards for computer networking promulgated by the Internet Engineering Task Force (Hudis Decl., ¶ 2, Exh. A, pp. 59-60).<br><br>Public.Resource.Org spent [funds] ... buying privately-produced ... standards .... These ... standards govern and protect a wide range of activity .... We have started copying those ... standards despite the fact they are festooned with copyright warnings, shrinkwrap agreements and other dire warnings. (Deleted material referring to "technical public safety standards").<br><br>***<br><br>We know from all the copyright warnings, terms of use, scary shrink wrap agreements, and other red-hot rhetoric that accompanies these documents that the producers continue to believe that copies may not be made under any circumstances.<br><br>(Hudis Decl., ¶ 2, Exh. A, pp. 181-184, ¶ 9, Exh. H (Malamud, C., *Liberating America's Secret, For-Pay Laws*, boingboing, March 19, 2012), production pp. AERA_APA_NCME_31764-31765). | Disputed. Plaintiffs provide no evidence for their claim as to what Mr. Malamud considers a "standard" to be and it is not clear how they arrive at such a characterization.  The cited deposition testimony simply describes Mr. Malamud's participation in the development of Internet Engineering Task Force standards, and does not describe how Mr. Malamud defines a "standard" generally.<br><br>Disputed.  Plaintiffs lack evidence for their assertions and mischaracterize Mr. Malamud's statements in his 1993 book "Exploring the Internet: a Technical Travelogue."  This chapter, which is taken out of context, describes Mr. Malamud's work with the International Telecommunication Union ("ITU") to convert ITU specifications to a digital format and post them online, with the support of the ITU (including the blessing of the secretary general of the ITU, as described in the book).  This project was called "Bruno," and in the chapter "Geneva" Mr. Malamud uses the phrase "baby killer" as a joking way to refer to the organization's decisions as to how it should prioritize resources (not a "code-name" for the project, as Plaintiffs assert).  This chapter does not support Plaintiffs' accusation that Mr. Malamud "knew that copying and widely disseminating standards, for free and without permission . . . would adversely impact the revenues of the organizations that published authorized copies of those standards," not least of which because Mr. Malamud had the permission of ITU for its activities, and also because the chapter describes how Mr. Malamud endeavored to |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| | convey to officials within the ITU that the digitization project would result in a net revenue benefit to the ITU. ICE Ex. 7 (Malamud Dep. 159:14–21); Hudis Decl. Exh. G. The project was very successful and today the ITU makes all of its standards freely available on the Internet.  Malamud Decl. ¶ 5. Although Plaintiffs appear to have mistakenly cited paragraph nine of Mr. Hudis's declaration, rather than paragraph eight, Plaintiffs lack evidentiary support for their erroneous claims regardless of which paragraph is cited. |
| | Disputed.  Plaintiffs lack evidence for their claims, as the cited text does not support the statement that Mr. Malamud "clearly knew that the copying of others' copyrighted standards to its website constituted copyright infringement."  In fact, the cited article says just the opposite, and Plaintiffs have quoted selectively. In the second sentence after the quoted passage, Mr. Malamud states ". . . we strongly believe that the documents are not entitled to copyright protection . . . ." Indeed, in the portion that Plaintiffs quote, Mr. Malamud simply states that some standards include copyright notices; Mr. Malamud does not state that these copyright claims are valid. Dkt. 60-11, Hudis Decl. Exh. H. Moreover, Plaintiffs' statement includes a legal conclusion regarding a matter that is in dispute in this litigation: whether the posting of standards incorporated by reference into the law constitutes copyright infringement. |
| 62. It is nonetheless Malamud's unwavering belief that, once a governmental entity incorporates a standard by reference into a statute or a regulation, the standard becomes "the law" and as such loses its copyright protection (Hudis Decl., ¶ 2, Exh. A, pp. 172-73, 218-219, 257, 358-61). | Undisputed. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 63. According to Malamud's line of thinking, once standards lose their copyright protection in this manner, anyone can copy them, convert them to digital form, post them on the Internet and allow others to download or print them at will and for free (Hudis Decl., ¶ 2, Exh. A, pp. 187-88). | Undisputed. |
| 64. Malamud further believes that it is perfectly acceptable for standards development organizations, such as Plaintiffs, to lose their copyright in standards incorporated by reference – and with it the economic value that copyright brings. According to Malamud, though knowing very little about the Sponsoring Organizations' operations, finances, policies or practices for updating their Standards (Hudis Dec., ¶ 2, Exh. A, pp. 192-93, 199-201, 223-232), in such circumstances Plaintiffs (and similarly situated standards development organizations) should simply change their business model(s) by finding other ways to finance updates to their Standards, or making the government pay for the updates:<br><br>**BOB GARFIELD (Interviewer):** There is an expense attached to developing and codifying these standards. If we take the revenue away from those who do this work, then what happens?<br><br>**CARL MALAMUD:** Well, there's two answers to that. One is that the non-profits that develop these standards have a lot of different revenue streams. They do conferences, they do certification. They develop standards that aren't law. ... And so, *maybe they need to adjust their business model*, particularly given the fact they are a non-profit public charity. Answer number two is that *government has shirked its responsibilities*. It said, gee, we can just incorporate these privately developed standards in the law, and we won't have to pay anything. And the only people that get | Disputed. Plaintiffs' characterization is not supported by the quoted text, and is controverted by Mr. Malamud's deposition testimony that Plaintiffs cite, in which Mr. Malamud states that he disagrees with Plaintiffs' counsel's characterization and points out that even if the law is made freely available to the public, it does not preclude standards organizations from selling copies of those standards (particularly authenticated copies, redlines, or versions with commentary or annotations). ICE Ex. 7 (Malamud Dep. 177:20–178:14). Plaintiff's selective quotation of the On the Media transcript omits a sentence (where Plaintiffs have inserted an ellipses) in which Mr. Malamud explains that the vast majority of standards that standard organizations publish are not law (meaning that the vast majority of revenues would be unaffected for these organizations). Plaintiffs also omit further explanation by Mr. Malamud that there are many ancillary benefits to standards organizations and their members that come from having standards incorporated by reference into the law, which offset any hypothetical loss to income.  Dkt 60-12, Hudis Decl. Exh. I. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| screwed up by this are the citizens that need to read the law.<br><br>(Hudis Decl., ¶ 2, Exh. A, pp. 173-180, ¶ 10, Exh. I (Garfield, B., *Making Laws More Public Transcript - On The Media*, interview of Carl Malamud, The Media, April 13, 2012), production p. AERA_APA_NCME_32076) (emphasis added). | |
| 65. In March 2012, Public Resource began copying standards incorporated by reference into the Code of Federal Regulations, and providing the copies of these standards to others. In May 2012, Public Resource began the process of posting copies [*sic*] these standards to its website. By May 2015, Public Resource had posted PDF copies of over 1,000 standards to its website (Hudis Decl., ¶ 2, Exh. A, pp. 216-218). | Disputed to the extent that Plaintiffs mischaracterize Public Resource's activities. In March 2012, Public Resource made 25 photocopies of 73 public safety standards that had been incorporated by reference into U.S. federal law and were sent to seven U.S. government offices (including the White House, Senate, House of Representatives, National Archives, Administrative Conference of the United States, Federal Trade Commission, and the Copyright Office), ten standards organizations, and to attorneys, journalists, and Harvard Law School. The 1999 Standards were not among this group of standards, nor were Plaintiffs recipients of these photocopies. *See* Plaintiffs' Exh. H. In May 2012 Public Resource began the process of posting electronic versions of standards incorporated by reference on the Public Resource website – not "copies," which are defined as material objects under the 1976 Copyright Act. *See* SMF ¶ 38, 17 U.S.C. § 101. |
| 66. To demonstrate the depth and breadth of Public Resource's activities, Defendant has published to its website https://law.resource.org, *inter alia*, numerous state and municipal codes, public safety codes, and technical standards – *see, e.g.*, https://law.resource.org/pub/us/code/safety.html and https://law.resource.org/pub/us/cfr/manifest.us.html (Hudis Decl., ¶¶ 11-12, Exhs. J-K). | Disputed to the extent that Plaintiffs assert Public Resource has "published" documents to its website, as the term is not used according to the meaning in the 1976 Copyright Act, which defines "publication" as "the distribution of *copies* or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. . . A public performance or display of a work does not itself constitute publication." 17 U.S.C. § 101 |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| | (emphasis added).  As defined by the 1976 Copyright Act, "'copies' are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101.  The Copyright Act provides for exclusive rights that apply to "copies" (17 U.S.C. § 106 (1) and (3)), as well as exclusive rights that do not implicate "copies" (17 U.S.C. § 106 (2) and (4)–(6)).  The electronic version of the 1999 Standards that Public Resource posted was not a material object, and therefore not a "copy" under the Copyright Act.  Undisputed to the extent that Public Resource has posted identified materials to its website. |
| 67. Several of the codes and standards that Public Resource publishes on the https://law.resource.org website are subject to U.S. copyright protection (Hudis Decl., ¶¶ 13-20, Exhs. L-S), and it is believed that Public Resource publishes these codes and standards to the https://law.resource.org website without obtaining the permission of the copyright owners of these works – for example: the Safety Standard for Belt Manlifts: ASME A90.1-2003; the Guidelines for the definition of onshore gas gathering lines, the Classification in Mental Retardation (1983 revision), the Official methods of analysis of the Association of Official Analytical Chemists, the Glazing Manual (1990 edition), Mobile and Locomotive Cranes: ASME B30.5-2004, Drinking water system components: health effects: American national standard/NSF international standard for drinking water additives : ANSI/INSF 61-2001, and the Minimum design loads for buildings and other structures (Special ed. 2003). | Nonfactual legal argument; disputed.  The question of whether standards incorporated by reference into law are "subject to U.S. copyright protection" is a legal issue in dispute in this litigation.  Additionally, Plaintiffs have not provided admissible evidence to support their assertion that copyrights for these standards are owned by the third party organizations as Plaintiffs claim, as online abstracts of copyright registrations are not official registrations, nor are they proof of copyright ownership, and Plaintiffs have not obtained any statements from these third party organizations to that effect. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 68. In early 2012, Malamud was perusing through the Code of Federal Regulations, looking for various standards purportedly incorporated by reference therein, when he came upon a reference to the Sponsoring Organizations' 1999 Standards (Hudis Decl., ¶ 2, Exh. A, pp. 232- 233). | Immaterial; disputed.  In the cited deposition testimony, Mr. Malamud states that the 1999 Standards came to his attention because they were specified as having been incorporated by reference under the Code of Federal Regulations.  Mr. Malamud does not say that he was "perusing through the Code of Federal Regulations, looking for various standards purportedly incorporated by reference therein, when he came upon a reference to the . . . 1999 Standards." ICE Ex. 7 (Malamud Dep. 232:09–25). |
| 69. On May 17, 2012, Public Resource purchased a used copy of the 1999 Standards from an Amazon re-seller, "The Book Grove" (Hudis Decl., ¶ 2, Exh. A, pp. 232-240, ¶ 21, Exh. T, Int. Ans. 1, ¶¶ 22-23, Exhs. U and V). | Undisputed. |
| 70. Public Resource only paid for the 1999 Standards, however, after a failed attempt in 2009 of procuring them for free (or at least at a reduced cost) from the National Archives pursuant to a Freedom of Information Act request and accompanying "fee waiver" (Hudis Decl., ¶ 2, Exh. A, pp. 240-51, ¶ 24, Exh. W (production pp. AERA_APA_NCME_10153-57 and 10167) and ¶ 25, Exh. X). | Immaterial; disputed to the extent that Plaintiffs characterize Public Resource's 2009 Freedom of Information Act ("FOIA") request as an attempt to procure the 1999 Standards for free.  Mr. Malamud stated at deposition that he was not certain if there would have been a charge to Public Resource by the National Archives and Records Administration for making the information it requested available.  This FOIA request was for approximately 2,000 standards that have been incorporated by reference into law, of which the 1999 Standards were one of the listed standards.  Public Resource requested a fee waiver, and in the alternative, requested that if no fees were waived, the National Archives should provide a partial response up to $5,000 of charges (which may or may not have included the 1999 Standards).  Dkt. 60-27, Hudis Decl. Exh. W. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 71. Upon receipt of the purchased paper copy of the 1999 Standards, Malamud disassembled the book, removed the spine, trimmed the pages to give them an even border, scanned the pages to create a PDF (Acrobat Reader) file using a Xerox scanner, and named the PDF file "aera.standards.1999.pdf." Malamud then appended a cover sheet, or self-made "Certificate," to the front of the PDF file giving a false semblance of governmental approval or permission to the unauthorized copying and online posting of the 1999 Standards (Hudis Decl., ¶ 2, Exh. A, pp. 257-259, 261-264, ¶ 21, Exh. T, Int. Anss. 3-4, ¶ 26, Exh. Y):<br><br>    | Disputed to the extent that Plaintiffs assert that Public Resource's cover sheets "giv[e] a false semblance of governmental approval or permission to the unauthorized copying and online posting of the 1999 Standards." Plaintiffs have failed to adduce admissible evidence in support of this alleged "fact," and this is opinion, not fact.  Plaintiffs' counsel Mr. Hudis is not qualified as an expert to opine on this matter. |
| 72. Next, Malamud *claims* he post-processed Public Resource's PDF file of the scanned 1999 Standards to generate Optical Character Recognition ("OCR") on the text (Hudis Decl., ¶ 2, Exh. A, p. 260, ¶ 21, Exh. T, Int. Anss. 3-4). | Undisputed. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 73. However, according to Public Resource's expert, James Fruchterman, Malamud never OCR-processed the PDF file, so all Malamud and Public Resource posted to the Internet was an *image-only* document (Hudis Decl., ¶ 27, Exh. Z, pp. 309-310, ¶ 28, Exh. AA, p. 9 (and sub-Exh. B thereto)). | Disputed. Public Resource posted two versions of the 1999 Standards online: one version on the Public Resource website, and the other on the Internet Archive website.  The version posted on the Internet Archive website did undergo OCR and was available in various text formats that were immediately accessible to people who are blind or visually impaired through use of screen reading programs. ICE Ex. 51 (Fruchterman Report) p. 11–12. |
| 74. OCR is the process of having a machine recognize letters and words, generally from documents, and translate those into letter or word equivalents (Hudis Decl., ¶ 27, Exh. Z, pp. 29-30). | Undisputed. |
| 75. Without OCR-processing, Public Resource's unauthorized copying and posting of the 1999 Standards provided no additional technical value, such as for word-searching, online identification, or text-to-speech utilization for the blind and visually impaired (Hudis Decl., ¶ 27, Exh. Z, pp. 30, 122, 200-01, 206, 271-72, 315-16). | Disputed.  Plaintiffs have failed to adduce admissible evidence in support of this alleged "fact," and this is opinion, not fact.  Plaintiffs' counsel Mr. Hudis is not qualified as an expert to opine on this matter.<br><br>Public Resource posted two versions of the 1999 Standards online: one version on the Public Resource website, and the other on the Internet Archive website.  The version posted on the Internet Archive website did undergo OCR and was available in various text formats that were immediately accessible to people who are blind or visually impaired through use of screen reading programs. ICE Ex. 51 (Fruchterman Report) p. 11–12. The electronic version of the 1999 Standards that Public Resource posted on the Public Resource website that did not undergo OCR is still valuable to people who are blind or visually disabled because it is relatively trivial for such a person to perform OCR on the document. What is not trivial for a person who is blind or visually disabled is to obtain a paper copy of the 1999 Standards, scan each page, and produce an electronic version that can then have OCR performed on it, as this requires |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
|  | equipment that most people who are blind do not own, and takes hours of work. The non-OCR version that Public Resource posted on the Public Resource website is therefore a valuable contribution to making the 1999 Standards available to people who are blind or visually disabled. ICE Ex. 51 (Fruchterman Report) p. 8–9. |
| 76. In the final step of the process, Malamud claims he stamped metadata into the headers of the PDF file, posted the file (the entirety of Plaintiffs' 1999 Standards) to Public Resource's https://law.resource.org website as well as the website of the Internet Archive (https://archive.org) (Answer & Counterclaim, Court Dkt. 12, ¶¶ 7, 55; Hudis Decl., ¶ 2, Exh. A, pp. 233-34, 271-72; ¶ 2 1, Exh. T, Int. Ans. No. 2). | Undisputed. |
| 77. In Defendant's interrogatory answers (verified by Malamud), Public Resource describes a detailed quality control process attendant to the unlawful digital copying of the Sponsoring Organizations' 1999 Standards. During deposition questioning, however, Malamud was unsure whether he followed those quality control procedures at all (Hudis Decl., ¶ 2, Exh. A, pp. 260-61, 267-68, 274-275, ¶ 21, Exh. T, Int. Anss. 3-4, ¶ 35, Exh. HH, Admission No. 2). | Disputed. Plaintiffs have not provided evidence to support this assertion. At deposition, Plaintiffs' counsel asked if Mr. Malamud had checked the quality of the OCR process for accuracy for the 1999 Standards, and Mr. Malamud responded that he did not, because that was not a part of Public Resource's normal workflow. ICE Ex. 7 (Malamud Dep. 267:06–268:02). |
| 78. The Internet Archive is a nonprofit organization whose mission is to build and maintain a digital library of the Internet. The Internet Archive builds this Internet library – which it makes available for public use – by scanning, digitally capturing, and saving the electronically scanned and captured third-party websites, and by receiving content submissions from third parties who have access to do so by the establishment of user accounts (Hudis Decl., ¶ 29, Exh. BB, pp. 31-41). | Undisputed. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 79. Malamud has such user account access (Hudis Decl., ¶ 29, Exh. BB, pp. 51-56), through which he uploaded the entirety of the 1999 Standards to the Internet Archive's website on May 26-27, 2012 (Hudis Decl., ¶ 29, Exh. BB, pp. 59-112, ¶ 30, Exh. CC (¶¶ 3-18 therein), ¶ 32, Exh. EE, ¶ 33, Exh. FF). | Undisputed. |
| 80. Public Resource posted Plaintiffs' 1999 Standards to its website and the Internet Archive website without the permission or authorization of any of the Sponsoring Organizations (Hudis Decl., ¶ 35, Exh. HH, Admission Nos. 4-5; Levine Decl., ¶ 29; Ernesto Decl., ¶ 35; Wise Decl., ¶ 26). | Undisputed. |
| 81. By uploading the 1999 Standards to the Internet Archive, Public Resource violated the Internet Archive's Terms of Use in effect at the time of Public Resource's infringement, which in relevant part states:<br><br>This terms of use agreement (the "Agreement") governs your use of the collection of Web pages and other digital content (the "Collections") available through the Internet Archive (the "Archive"). When accessing an archived page, you will be presented with the terms of use agreement. If you do not agree to these terms, please do not use the Archive's Collections or its Web site (the "Site").<br><br>* * *<br><br>Some of the content available through the Archive may be governed by local, national, and/or international laws and regulations ... You agree to abide by all applicable laws and regulations, including intellectual property laws, in connection with your use of the Archive. In particular, *you certify that your use of any part of the Archive's Collections will be ... limited to noninfringing or fair use under copyright law*. In using the Archive's site, Collections, | Denied. This is a legal opinion, not a fact. The legal question of whether posting standards that have been incorporated by reference into the law is noninfringing or fair use is at issue in this litigation. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| and/or services, you further agree ... (b) *not to act in any way that might give rise to civil or criminal liability*, [and] ... (e) *not to infringe any copyright, trademark, patent, or other proprietary rights of any person*, ...<br><br>(Hudis Decl., ¶ 29, Exh. BB, pp. 41-45, ¶ 31, Exh. DD) (emphasis added). | |
| 82. The unauthorized copy of the Sponsoring Organizations' 1999 Standards that Malamud published to the Internet Archive at https://archive.org/details/gov.law.aera.standards.1999 was in the exact same format, using the same cover sheet or "Certificate" employed by Public Resource in the posting of the Sponsoring Organizations' 1999 Standards to Defendant's own website. All of the surrounding text associated with the posting to the Internet Archive website was inserted by Malamud – including the insertion of "Creative Commons License: <u>CC0 1.0 Universal</u>," indicating that *no rights are being asserted* over the item (Hudis Decl., ¶ 2, Exh. A, pp. 275-284, ¶ 29, Exh. BB, pp. 57-63, ¶ 30, Exh. CC (¶ 2 therein), ¶ 34, Exh. GG):<br><br> | Nonfactual legal argument in part. Disputed to the extent that the version of the 1999 Standards that Public Resource posted to the Internet Archive underwent additional processing by the Internet Archive systems, performing OCR and creating a variety of different electronic formats that are thereby more accessible to people who are blind or visually disabled, and therefore not "the exact same format" as the version on the Public Resource website, as Plaintiffs suggest. ICE Ex. 51 (Fruchterman Report) p. 11–12. Disputed also to the extent that Plaintiffs assert that Public Resource has "published" the 1999 Standards to the Internet Archive website, as the term is not used according to the meaning in the 1976 Copyright Act, which defines "publication" as "the distribution of *copies* or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. . . A public performance or display of a work does not itself constitute publication." 17 U.S.C. § 101 (emphasis added). As defined by the 1976 Copyright Act, "'copies' are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101. The Copyright Act provides for exclusive rights that apply to "copies" (17 U.S.C. § 106 (1) and (3)), as well as exclusive rights that do not implicate "copies" (17 U.S.C. § 106 (2) and (4)–(6)). |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
|  | The electronic version of the 1999 Standards that Public Resource posted was not a material object, and therefore not a "copy" under the Copyright Act. |
| 83. Public Resource claims the Sponsoring Organizations' 1999 Standards were posted to Public Resource's https://law.resource.org website and to the Internet Archive https://archive.org website from July 11, 2012 to June 10, 2014 (Hudis Decl., ¶ 21, Ex. T, Int. Ans. 2). | Undisputed. |
| 84. As previously noted, Public Resource actually uploaded the 1999 Standards to Internet Archive's website on May 26-27, 2012. The Sponsoring Organizations have no ability to verify when Public Resource uploaded the 1999 Standards to its own website, because neither the "file creation date" nor user access logs were produced during discovery, notwithstanding production requests for this documentation and an accompanying discovery motion demanding production that in relevant part was denied (Hudis Decl., ¶ 36). | Disputed. Plaintiffs have not adduced admissible evidence to support this fact. Public Resource produced the version of the 1999 Standards that it had posted on the Public Resource website, complete with the file creation date in its metadata. As Mr. Malamud stated at deposition, Public Resource does not have logs documenting the date on which the 1999 Standards were posted to the Public Resource website. ICE Ex. 7 (Malamud Dep. 273:20–274:03). |
| 85. Although based on incomplete reporting because Public Resource destroyed some of its records (Hudis Decl., ¶ 2, Exh. A, pp. 272-74, 328-336), during the near two year period that the Sponsoring Organizations' 1999 Standards were posted on Public Resource's https://law.resource.org website, they were accessed *at least* 4,164 times (Hudis Decl., ¶ 21, Exh. T, Int. Ans. 2 and Amended Ans. 5 (labeled 6)). | Disputed. Plaintiffs' accusation that Public Resource destroyed some of its records is unfounded, and Plaintiffs fail to adduce evidence to support their claim. In the cited deposition testimony, Mr. Malamud stated that when Public Resource agreed to take the 1999 Standards offline pending the outcome of this litigation, the act of taking the standards offline changed metadata on one of the files that might otherwise have been used to determine the original posting date. Plaintiffs also cite Public Resource's statement at deposition that Public Resource previously had a 2-week retention policy for server logs until litigation commenced in the ASTM v. Public.Resource.Org case in August 2013, at which time the server logs have been retained permanently (nine months prior to when the |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
|  | AERA Plaintiffs filed suit). Plaintiffs' claims as to the number of accesses of the 1999 Standards on the Public Resource website is also incorrect, as their calculation appears to include access figures for a stub page that replaced the 1999 Standards on the Public Resource website in June 2014, when Public Resource had taken down the 1999 Standards pending the resolution of this litigation. *See* Dkt. 60-23, Hudis Decl. Exh. T. Plaintiffs also fail to explain that the number of "accesses" means the number of access requests from a computer to the Public Resource server, and does not necessarily mean accesses by human beings, but could instead be accesses by webcrawlers, bots, or other automated programs. Dkt. 60-23, Hudis Decl. Exh. T, at 7–8. |
| 86. During that same period, the Sponsoring Organizations' 1999 Standards were accessed on the Internet Archive https://archive.org website 1,290 times (Hudis Decl., ¶ 29, Exh. BB, pp. 124-132, ¶ 37, Exh. II). | Disputed to the extent that the time period pertinent to the access figures that Plaintiffs cite as Exh. II is not established in the documents Plaintiffs cite. Plaintiffs also fail to explain that the number of "accesses" means the number of access requests from a computer to the Public Resource server, and does not necessarily mean accesses by human beings, but could instead be accesses by webcrawlers, bots, or other automated programs. Dkt. 60-23, Hudis Decl. Exh. T, at 7–8. |
| 87. The Internet Archive's website is open to the public and does not restrict an Internet user's ability to download or print the Sponsoring Organizations' 1999 Standards. Public Resource also placed no such restrictions on its website (Hudis Decl., ¶ 2, Exh. A, pp. 347-48), as Defendant's expert, Mr. Fruchterman, confirmed (Hudis Decl., ¶ 27, Exh. Z, pp. 327-28). | Undisputed. |
| 88. Mr. Fruchterman also confirmed that there were no sign-up procedures to enter Public Resource's https://law.resource.org website, nor | Disputed to the extent that Plaintiffs imply that DRM technology should be used to restrict access to the law. |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| was there any Digital Rights Management (or "DRM") plan to protect against wide-spread copying of the files accessed from Public Resource's site (Hudis Decl., ¶ 27, Exh. Z, pp. 324-27, 167-173). | |
| 89. The parties and the Court can only speculate on the number of further electronic copies of the 1999 Standards that were made and distributed to others by the original Internet users who accessed the unauthorized copies that Public Resource posted to its site and the Internet Archive site. | Undisputed that the Plaintiffs' statement indicates a lack of any evidence about the making or distribution of copies by any persons. Nonfactual statement. Otherwise disputed. Plaintiffs have not adduced admissible evidence to support this contention. This is opinion, not a fact, and Plaintiffs do not cite any evidence or individual who holds this opinion. Plaintiffs have the burden of proof for establishing harm, and should not invite the Court to "speculate" as to downstream copying or distribution of which Plaintiffs have failed to find any evidence. Notably, after Public Resource took down the 1999 Standards pending the outcome of this litigation, Mr. Fruchterman looked for an electronic version of the 1999 Standards online and could not find one. ICE Ex. 51 (Fruchterman Expert Report), p. 5–6. |
| 90. There simply is no way for Plaintiffs to calculate with any degree of certainty the number of university/college professors, students, testing companies and others who would have purchased Plaintiffs' Standards but for their wholesale posting on Defendant's https://law.resource.org website and the Internet Archive http://archive.org website. (Levine Decl., ¶ 30; Geisinger Decl., ¶ 24). | Undisputed that there is no evidence of any lost sales of the 1999 Standards as a consequence of Defendant's postings of the 1999 Standards. Otherwise disputed. Plaintiffs have not adduced admissible evidence to support this contention. This is opinion, not a fact. Dr. Levine is not qualified as an expert, and Dr. Geisinger is not qualified as an expert on the subject of economic substitution. *See* Public Resource's Motion to Strike the Declaration of Dr. Geisinger, Dkt. 67. Plaintiffs have the burden of proof for establishing harm, cannot shrug off this burden after failing to find evidence of any individual who would have purchased the 1999 Standards but for Public Resource's posting, and similarly failing to retain an expert witness with expertise in economic substitution. |

39

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| 91. In late 2013 and early 2014, the Sponsoring Organizations became aware that the 1999 Standards had been posted on the Internet without their authorization, and that students were obtaining free copies from the posting source. Upon further investigation, the Sponsoring Organizations discovered that Public Resource was the source of the online posting (Camara Decl., ¶ 21, Exh. MMM; Wise Decl., ¶¶ 27-28, Exh. LLL). | Disputed. Plaintiffs have not adduced admissible evidence to support their contention that students obtained free copies of the 1999 Standards from Public Resource. |
| 92. In December 2013, Plaintiff AERA requested in writing that Public Resource remove the 1999 Standards from its online postings (Levine Decl., ¶ 31, Exh. UUU). Defendant flatly refused (Hudis Decl., ¶ 2, Exh. A, pp. 310-19, ¶ 38, Exh. JJ, ¶ 39, Exh. KK). Once this lawsuit was filed and the Sponsoring Organizations threatened to file a motion for a preliminary injunction, Public Resource agreed in June 2014 to remove its postings of the 1999 Standards from its https://law.resource.org website and from Internet Archive's https://archive.org website – pending a resolution of this litigation on the merits. Public Resource's undertaking included the promise not to post any revision of the 1999 Standards (i.e., the 2014 Standards) pending the outcome of this litigation (Hudis Decl., ¶ 2, Exh. A, pp. 322-28, ¶ 40, Exh. LL, ¶ 41, Exh. MM). | Undisputed. |
| 93. Had Public Resource not made, and followed through with, these promises, the Sponsoring Organizations would have filed a preliminary injunction motion and were seriously contemplating delaying publication of the 2014 Standards (Levine Decl., ¶ 32). | Undisputed. |
| 94. By June 2014, when Public Resource finally removed its online postings of the 1999 Standards, the damage already had been done. In Fiscal Year ("FY") 2011 to FY 2012, as compared to FY 2011, the Sponsoring | Disputed.  There was not a 34% drop in sales in in FY 2012 compared to the prior year. What Plaintiffs present as "sales" data is actually gross revenue data, not the number of copies sold. ███████████ |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| Organizations experienced a 34% drop in sales of the 1999 Standards. In FY 2013, sales of the 1999 Standards remained at their low level from the prior fiscal year (Levine Decl., ¶¶ 18, 33, Exh. OOO). | ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████ Disputed also regarding Plaintiffs' characterization that "when Public Resource finally removed its online postings of the 1999 Standards, the damage already had been done." Plaintiffs fail to explain ████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████ Plaintiffs have not demonstrated any relationship between Public Resource's posting and the sale of the 1999 Standards. ICE Exs. 39, 41. Moreover, ██████████ ████████████████████████████████ is consistent with Plaintiffs' expert Dr. Geisinger's prediction that if sales of the 1999 Standards were affected by widespread knowledge that the new edition of the Standards were forthcoming, he expected that the decline would start in 2010 or 2011. Dkt. 60-88 (Geisinger Decl.) ¶ 25; ICE Ex. 8 (Geisinger Dep. 93:20-97:04). |
| 95. The timing of the drop in sales is notable, given that Public Resource posted the Standards to the Internet in 2012-2013, and that the | Disputed.  Dr. Levine stated ████████ ████████████████████████████████ |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| Sponsoring Organizations' updated Standards were not published until the summer of 2014 (Levine Decl., ¶ 34). | [redacted] is consistent with Plaintiffs' expert Dr. Geisinger's prediction that if sales of the 1999 Standards were affected by widespread knowledge that the new edition of the Standards were forthcoming, he expected that the decline would start in 2010 or 2011.  Dkt. 60-88 (Geisinger Decl.) ¶ 25; ICE Ex. 8 (Geisinger Dep. 93:20-97:04). |
| 96. For a publication with the longevity of the 1999 Standards, one otherwise would expect to see a gradual decline in sales year-over-year; not the precipitous drop in sales experienced by the 1999 Standards in 2012 and 2013 (Geisinger Decl., ¶ 25). | Disputed.  This is not a fact, it is an opinion, and Dr. Geisinger is not qualified as an expert in the subject of economic substitution. *See* Public Resource's Motion to Strike the Declaration of Dr. Geisinger, Dkt. 67. There was not a "precipitous drop in sales experienced by the 1999 Standards in 2012 and [redacted] |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| | <br><br><br><br><br><br><br><br>consistent with Plaintiffs' expert Dr. Geisinger's prediction that if sales of the 1999 Standards were affected by widespread knowledge that the new edition of the Standards were forthcoming, he expected that the decline would start in 2010 or 2011. Dkt. 60-88 (Geisinger Decl.) ¶ 25; ICE Ex. 8 (Geisinger Dep. 93:20-97:04). |
| 97. Past harm from Public Resource's infringing activities includes misuse of Plaintiffs' intellectual property without permission (Ernesto Decl., ¶ 36; Geisinger Decl., ¶ 26), lost sales that cannot be totally accounted for – due to potentially infinite Internet distribution, for example by psychometrics students (Wise Decl., ¶¶ 27-28, Exh. LLL; Levine Decl., ¶ 35; Geisinger Decl., ¶ 26). | Disputed. Plaintiffs have failed to adduce admissible evidence in support of these alleged "facts." Plaintiffs have not articulated how the use of standards incorporated into the law that Plaintiffs voluntarily took off sale could constitute "harm" to Plaintiffs, short of conclusory statements by Ms. Ernesto and Dr. Geisinger, neither of which are qualified as experts on the subject of harm. *See* Public Resource's Motion to Strike the Declaration of Dr. Geisinger, Dkt. 67. The question of whether such use is "misuse" is legal issue in dispute in this litigation. Plaintiffs have failed to adduce admissible evidence to support their |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| | claim that there are any lost sales attributable to Public Resource's posting, nor that any such lost sales cannot be totally accounted for, nor their speculation on "potentially infinite Internet distribution." Neither Dr. Wise nor Dr. Geisinger are qualified as experts on the subject of economic substitution or Internet distribution. *See* Public Resource's Motion to Strike the Declaration of Dr. Geisinger, Dkt. 67. |
| 98. The harm also includes lack of funding that otherwise would have been available for the update of the Sponsoring Organizations' Standards from the 1999 to the 2014 versions (Levine Decl., ¶ 35; Camara Decl., ¶ 22; Geisinger Decl., ¶ 26). | Disputed. Plaintiffs have failed to adduce admissible evidence in support of this alleged "fact."  <br><br> Therefore, Plaintiffs had many times the amount of funding necessary for the development of the 2014 Standards, and the Test Standards Development Fund is over twelve times as large as it was shortly after the publishing of the 1999 Standards. |
| 99. Should Public Resource's infringement be allowed to continue, the harm to the Sponsoring Organizations, and public at large who rely on | Disputed. Plaintiffs have failed to adduce admissible evidence in support of these alleged "facts." These are opinions, not facts, and |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| the preparation and administration of valid, fair and reliable tests, includes: (i) uncontrolled publication of the 1999 Standards without any notice that those guidelines have been replaced by the 2014 Standards; (ii) future unquantifiable loss of revenue from sales of authorized copies of the 1999 Standards (with proper notice that they are no longer the current version) and the 2014 Standards; and (iii) lack of funding for future revisions of the 2014 Standards and beyond (Levine Decl., ¶ 36; Camara Decl., ¶ 23; Ernesto Decl., ¶ 37; Geisinger Decl., ¶ 27). | Dr. Levine, Mr. Camara, Ms. Ernesto, and Dr. Geisinger are not qualified as experts on the subjects of economic substitution or harm. *See* Public Resource's Motion to Strike the Declaration of Dr. Geisinger, Dkt. 67. |
| 100. Without the sales revenue from prior Standards versions (because – if Public Resource succeeds in this litigation – this publication will be made freely available online), it is very unlikely that future updates to the Standards will be undertaken. This is because NCME is too small an organization to financially support periodic updates of the Standards, AERA does not have the budget for it, and an insufficient number of psychometricians are members of APA for it to justify the ongoing expenditures. Charging extra membership fees to fund ongoing updates to the Standards would never happen, because the governing bodies of AERA, APA and NCME would not vote for it. If these Sponsoring Organizations ceased updating the Standards, it is unlikely that other organizations would step in and continue the effort (Geisinger Decl., ¶ 23). | Disputed. Plaintiffs have failed to adduce admissible evidence in support of this alleged "fact." These are opinions, not facts, and Dr. Geisinger is not qualified as experts on the subjects of economic substitution or harm. *See* Public Resource's Motion to Strike the Declaration of Dr. Geisinger, Dkt. 67. Plaintiffs assume, contrary to evidence, that availability of the 1999 Standards on the Internet will mean that no copies of the 1999 Standards will be sold, when sales continued even when Public Resource had posted the 1999 Standards online. *See, e.g.*, ICE Ex. 41. Moreover, Plaintiffs have no basis for claiming that the organizations cannot fund the ███ per-member annual cost of financing the development of the Standards, as described in ¶ 39, above. |
| 101. The harm caused to the public by out-of-date Standards will be significant, because the testing and assessment fields are constantly changing, given updates in testing technology and ever-evolving collective thought on the validity, reliability and fairness of tests. Members of the public who would be harmed by discontinued update of the Standards include psychometrics professors, students and | Disputed. Plaintiffs have failed to adduce admissible evidence in support of this alleged "fact." This statement is conclusory as to harm, which has not been proven, and Plaintiffs have no evidence that people will be confused in relying on outdated standard as if it were the most recent edition. Moreover, Plaintiffs' expert Dr. Geisinger stated at deposition ███ |

| Plaintiffs' Statement of Material Facts | Defendant Public Resource's Response |
|---|---|
| professionals, as well as test developers, administrators and test takers (Geisinger Decl., ¶ 28). | ████████████████████████████████████████ |
| 102. Notwithstanding the harm it has caused, and could potentially continue to cause, Public Resource's intentions are crystal clear. Although not now publicly available pending the outcome of this litigation, Public Resource still has an unauthorized copy of the Sponsoring Organizations' 1999 Standards on its server (Hudis Decl., ¶ 2, Exh. A, pp. 273, 309); as does the Internet Archive (Hudis Decl., ¶ 29, Exh. BB, pp. 116-17). | Disputed that Public Resource has caused any harm. Public Resource does not dispute that it has a version of the 1999 Standards on its server. Disputed as to whether Public Resource's copy is "unauthorized" because that is a legal conclusion and Public Resource does not accept that Plaintiffs have any right to authorize or deauthorize copies of the law. Undisputed that Public Resource's intentions of making the law available to and accessible by the public is crystal clear. |
| 103. It would be very simple for Public Resource to re-post the 1999 Standards to Public Resource's website with little effort (Hudis Decl., ¶ 2, Exh. A, pp. 306-07). | Undisputed. |
| 104. Moreover, should Public Resource successfully defend this lawsuit, it has every intention of similarly posting the Sponsoring Organizations' 2014 Standards to the Internet in the same manner it posted Plaintiffs' 1999 Standards (Hudis Decl., ¶ 2, Exh. A, pp. 308-09). | Disputed. Public Resource has never posted the 2014 edition of the Standards anywhere, and Public Resource has never stated an intention to post the 2014 Standards. To Public Resource's knowledge, the 2014 Standards have not been incorporated by reference into law. Malamud Decl. ¶ 33. It is undisputed that Public Resource posts *only* those standards that have become law. *See* SMF ¶ 40; Malamud Decl. ¶ 33. Consistent with this policy, Mr. Malamud testified that he would consider posting the 2014 edition only "[i]f the federal government did a deliberate and explicit incorporation by reference," and only after determining "if that was an area that I wanted to continue to invest resources in." ICE Ex. 7 (Malamud Dep. 307:17–309:03). |

Dated: January 21, 2016

Respectfully submitted,

/s/    Andrew P. Bridges
Andrew P. Bridges (admitted)
abridges@fenwick.com
Sebastian E. Kaplan (*pro hac vice* pending)
skaplan@fenwick.com
Matthew Becker (admitted)
mbecker@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone:    (415) 875-2300
Facsimile:     (415) 281-1350

Corynne McSherry (admitted *pro hac vice*)
corynne@eff.org
Mitchell L. Stoltz (D.C. Bar No. 978149)
mitch@eff.org
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone:    (415) 436-9333
Facsimile:     (415) 436-9993

David Halperin (D.C. Bar No. 426078)
davidhalperindc@gmail.com
1530 P Street NW
Washington, DC 20005
Telephone: (202) 905-3434

*Attorneys for Defendant-Counterclaimant*
Public.Resource.Org, Inc.

SF/5546470.7

# EXHIBIT 4

**CORRECTIONS TO MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT-COUNTERCLAIMANT PUBLIC.RESOURCES.ORG'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION (ECF NOS. 68-2 (UNDER SEAL) AND 69-1 (REDACTED))**

FILED: **January 21, 2016**
COURT: **USDC**                                    Case No. 1:14-cv-00857-TSC-DAR

| Page No. | Line No. | Original Incorrect Citation | Corrected Citation |
|---|---|---|---|
| 3 | 14 | *Id.* ¶ 2 | *Id.* ¶ 3 |
| 25 | 7-8 | SMF ¶ 59 | SMF ¶ 97 |
| 25 | 9 | SMF ¶ 59 (*Id.*) | SMF ¶ 58 |
| 25 | 18 | SMF ¶ 59 (*Id.*) | SMF ¶ 59 |
| 25 | 19 | SMF ¶ 60 | SMF ¶ 59 |
| 26 | 3 | SMF ¶ 61 | SMF ¶ 60 |
| 27 | 15 | SMF ¶ 62 | SMF ¶ 61 |
| 28 | 6 | SMF ¶ 63 | SMF ¶ 62 |
| 28 | 7 | SMF ¶ 64 | SMF ¶ 63 |
| 28 | 9 | SMF ¶ 65 | SMF ¶ 64 |
| 28 | 11 | SMF ¶ 66 | SMF ¶ 65 |
| 28 | 14-15 | SMF ¶ 67 | SMF ¶ 66 |
| 28 | 16 | SMF ¶ 68 | SMF ¶ 67 |
| 30 | 3 | SMF ¶ 46 (*Id.*) | SMF ¶ 47 |
| 30 | 6 | SMF ¶ 46 (*Id.*) | SMF ¶ 47 |
| 33 | 6 | SMF ¶ 76 | SMF ¶ 78 |
| 33 | 7 | SMF ¶ 78 | SMF ¶ 79 |
| 33 | 10 | SMF ¶ 79 | SMF ¶ 81 |
| 33 | 11 | *Id.* ¶ 80 | *Id.* ¶ 82 |
| 34 | 14 | SMF ¶ 81 | SMF ¶ 83 |
| 34 | 17 | SMF ¶ 82 | SMF ¶ 84 |
| 34 | 19 | SMF ¶ 83 | SMF ¶ 85 |
| 36 | 21 | SMF ¶ 84 | SMF ¶ 86 |
| 40 | 9 | SMF ¶ 85–86 | SMF ¶ 87–88 |
| 41 | 4 | SMF ¶ 87 | SMF ¶ 89 |
| 41 | 14 | SMF ¶ 88 | SMF ¶ 90 |
| 41 | 16 | SMF ¶ 90 (*Id.*) | SMF ¶ 90 |
| 41 | 18 | SMF ¶ 90 (*Id.*) | SMF ¶ 90 |
| 41 | 19 | SMF ¶ 86 | SMF ¶ 88 |
| 42 | 2 | SMF ¶ 89 | SMF ¶ 91 |
| 42 | 4 | SMF ¶¶ 90–91 | SMF ¶¶ 92–93 |
| 42 | 7 | SMF ¶ 92 | SMF ¶ 94 |
| 44 | 2 | SMF ¶ 93 | SMF ¶ 95 |
| 45 | 16 | SMF ¶ 94 | SMF ¶ 96 |

1

| Page No. | Line No. | Original Incorrect Citation | Corrected Citation |
|---|---|---|---|
| 45 | 18 | SMF ¶ 95 | SMF ¶ 97 |
| 53 | 22 | SMF ¶ 98 | SMF ¶ 100 |
| 57 | 1-2 | SMF ¶ 38 | SMF ¶ 40 |

**CORRECTIONS TO STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT-COUNTERCLAIMANT PUBLIC.RESOURCE.ORG, INC.'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION (ECF NOS. 68-3 (UNDER SEAL) AND 69-2 (REDACTED))**

| Paragraph Number | Original Incorrect Citation | Corrected Citation |
|---|---|---|
| PARAGRAPH 26 | ICE Ex. 64 | ICE Ex. 65 |
| PARAGRAPH 27 | ICE Ex. 64 | ICE Ex. 65 |
| PARAGRAPH 29 | ICE Ex. 71 | ICE Ex. 72 |
| PARAGRAPH 31 | ICE Ex. 64 | ICE Ex. 65 |
| PARAGRAPH 32 | ICE Ex. 64 | ICE Ex. 65 |
| PARAGRAPH 33 | ICE Ex. 65 | ICE Ex. 66 |
| PARAGRAPH 33 | ICE Ex. 66 | ICE Ex. 67 |
| PARAGRAPH 33 | ICE Ex. 67 | ICE Ex. 68 |
| PARAGRAPH 33 | ICE Ex. 68 | ICE Ex. 69 |
| PARAGRAPH 34 | ICE Ex. 69 | ICE Ex. 70 |
| PARAGRAPH 34 | ICE Ex. 70 | ICE Ex. 71 |
| PARAGRAPH 52 | ICE Ex. 53 | ICE Ex. 52 |
| PARAGRAPH 66 | ICE Ex. 54 | ICE Ex. 53 |
| PARAGRAPH 66 | ICE Ex. 55 | ICE Ex. 54 |
| PARAGRAPH 68 | ICE Ex. 56 | ICE Ex. 55 |
| PARAGRAPH 69 | ICE Ex. 57 | ICE Ex. 56 |
| PARAGRAPH 70 | ICE Ex. 58 | ICE Ex. 57 |
| PARAGRAPH 71 | ICE Ex. 59 | ICE Ex. 58 |
| PARAGRAPH 72 | ICE Ex. 60 | ICE Ex. 59 |
| PARAGRAPH 72 | ICE Ex. 61 | ICE Ex. 60 |

**CORRECTIONS TO DEFENDANT-COUNTERCLAIMANT
PUBLIC.RESOURCE.ORG, INC.'S STATEMENT OF DISPUTED FACTS IN
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
PERMANENT INJUNCTION (ECF NOS. 68-4 (UNDER SEAL) AND 69-3 (REDACTED))**

| Paragraph Number | Original Incorrect Citation | Corrected Citation |
|---|---|---|
| PARAGRAPH 5 | ICE Ex. 63 | ICE Ex. 62 |
| PARAGRAPH 5 | ICE Ex. 62 | ICE Ex. 63 |
| PARAGRAPH 6 | ICE Ex. 63 | ICE Ex. 62 |
| PARAGRAPH 6 | ICE Ex. 62 | ICE Ex. 63 |
| PARAGRAPH 7 | ICE Ex. 63 | ICE Ex. 62 |
| PARAGRAPH 7 | ICE Ex. 62 | ICE Ex. 63 |
| PARAGRAPH 8 | ICE Ex. 63 | ICE Ex. 62 |
| PARAGRAPH 8 | ICE Ex. 62 | ICE Ex. 63 |
| PARAGRAPH 22 | ICE Ex. 52-55 | ICE Ex. 52-56 |
| PARAGRAPH 31 | ICE Ex. 63 | ICE Ex. 62 |
| PARAGRAPH 31 | ICE Ex. 62 | ICE Ex. 63 |
| PARAGRAPH 35 | ICE Ex. 60 | ICE Ex. 59 |