UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


AMERICAN SOCIETY FOR          .
TESTING AND MATERIALS,        .
et al.,                       .  CA No. 13-1215 (TSC)
                              .
        Plaintiffs,           .
                              .
    v.                        .
                              .
PUBLIC.RESOURCE.ORG, INC.,    .
                              .
        Defendant.            .
. . . . . . . . . . . . . . . .
                              .
AMERICAN EDUCATIONAL          .  CA No. 14-0857 (TSC)
RESEARCH ASSOCIATION, INC.,   .
et al.,                       .
                              .
        Plaintiffs,           .
                              .
    v.                        .
                              .
PUBLIC.RESOURCE.ORG, INC.,    .  Washington, D.C.
                              .  Monday, September 12, 2016
        Defendant.            .  9:12 a.m.
. . . . . . . . . . . . . . . .


TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For Plaintiff ASTM:          J. KEVIN FEE, ESQ.
                             JORDANA S. RUBEL, ESQ.
                             Morgan, Lewis & Bockius, LLP
                             1111 Pennsylvania Avenue, NW
                             Washington, D.C. 20004
                             (202) 739-3000

For Plaintiff NFPA:          KELLY KLAUS, ESQ.
                             ROSE L. EHLER, ESQ.
                             Munger, Tolles & Olson, LLP
                             560 Mission Street, 27th Floor
                             San Francisco, California 94105
                             (415) 512-4000

```
For Plaintiff ASHRAE:          JOSEPH R. WETZEL, ESQ.
                               J. BLAKE CUNNINGHAM, ESQ.
                               King & Spalding, LLP
                               101 2nd Street, Suite 2300
                               San Francisco, California 94105
                               (415) 318-1200

For Plaintiffs AERA,           JONATHAN HUDIS, ESQ.
APA, NCME:                     NIKIA L. GRAY, ESQ.
                               Quarles & Brady, LLP
                               1701 Pennsylvania Avenue, NW
                               Suite 700
                               Washington,  D.C. 20006
                               (202) 372-9600

For Defendant                  CORYNNE MCSHERRY, ESQ.
Public.Resourse.org:           MITCHELL L. STOLTZ, ESQ.
                               Electronic Frontier Foundation
                               815 Eddy Street
                               San Francisco, California 94109
                               (415) 436-9333

                               ANDREW P. BRIDGES, ESQ.
                               MATTHEW B. BECKER, ESQ.
                               Fenwick & West, LLP
                               555 California Street
                               San Francisco, California 94104
                               (415) 875-2300

                               DAVID E. HALPERIN, ESQ.
                               1530 P Street, NW
                               1st Floor
                               Washington, D.C. 20005
                               (202) 905-3434

Court Reporter:                BRYAN A. WAYNE, RPR, CRR
                               U.S. Courthouse, Room 4704-A
                               333 Constitution Avenue, NW
                               Washington, DC 20001
                               (202) 354-3186
```

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

THE DEPUTY CLERK:  Your Honor, this is civil case 13-1215, American Society for Testing and Materials, et al., versus Public.Resource.org, Incorporated; and civil case 14-857, American Educational Research Association, Inc., et al., versus Public.Resource.org, Incorporated.

Counsel, please come forward and state your appearance for the record.

MR. FEE:  Good morning, Your Honor.  Kevin Fee on behalf of ASTM International.  I'm joined at counsel table by Jordana Rubel, and we also have general counsel of ASTM in the back, Mr. Tom O'Brien.

THE COURT:  Good morning.

MR. KLAUS:  Good morning, Your Honor.  I'm Kelly Klaus from Munger, Tolles & Olson representing the National Fire Protection Association.  I'm joined at counsel table by my colleague, Rose Ehler.  Our general counsel, Sally Everett, is also in the audience this morning.

THE COURT:  Good morning.

MR. WETZEL:  Good morning, Your Honor.  Joe Wetzel from King & Spalding on behalf of ASHRAE, and I'm joined by Blake Cunningham from my firm at counsel table.

THE COURT:  Good morning.  And, counsel, I'm going to ask you, when you come up to argue, for you to restate your name, just because there's so many of you, for my court

1    reporter.

2         MR. HUDIS:  Good morning, Your Honor.  Jonathan Hudis

3    for the plaintiffs in the 14-857 case.  With me is Nikia Gray,

4    and sitting in the audience is immediate past general counsel,

5    Nathalie Gilfoyle, and current general counsel, Deanna Ottaviano.

6         THE COURT:  Good morning.

7         MS. MCSHERRY:  Good morning, Your Honor.

8    Corynne McSherry for Public.Resource.org, and with me at the

9    counsel table is Andrew Bridges, my co-counsel who will also be

10   arguing part of the case, the bulk of the issues, to be honest.

11   He took that all on.  Also with me at counsel table is Matt

12   Becker of Fenwick & West; Mitch Stoltz, with me from the

13   Electronic Frontier Foundation; and David Halperin.

14        THE COURT:  Good morning, everyone.  I know that the

15   parties had wanted more time; and I've given them less time than

16   they wanted, but I'm confident, having been through the

17   materials, that we can accomplish everything we need to

18   accomplish today.

19        I'm just going to ask that you be mindful of probably one

20   of the more important people in this room, which is my court

21   reporter, Mr. Wayne, who has to get all this down.  So I'm going

22   to ask you, again, announce yourselves when you come up to the

23   podium and to speak clearly and not too quickly, something I

24   have to remind myself of as well.

25        MR. HUDIS:  Your Honor, in light of the reduced time,

1    we gave your clerk our proposal for scheduled arguments.

2           THE COURT:  I saw that.  That's fine.

3       All right.  So let's get right on it.  I have some

4    questions, obviously, but I will raise them when it seems

5    appropriate as you're in your argument.  So it looks like we're

6    going to deal with copyright issues.  ASTM is going first.

7       Is that you, Mr. Klaus.

8           MR. KLAUS:  Yes.  Kelly Klaus representing NFPA

9    and speaking on behalf of all the plaintiffs in the ASTM case

10   on the copyright issues other than ownership, Your Honor, and

11   being mindful of time, I'll keep my own clock out and try to

12   watch.

13          THE COURT:  All right.

14          MR. KLAUS:  I told Mr. Hudis that I would try to

15   roughly hew to his schedule.  I also told him that if I happen

16   to go over by a few minutes, we're happy to take time off of

17   other things on the back end.

18          THE COURT:  All right.

19          MR. KLAUS:  But we'll try to keep it there.

20      Your Honor, as you noted, you have a mountain of paper

21   that's been presented to you, and we appreciate the Court's

22   patience in reviewing all of it notwithstanding the numerous

23   materials that are here.

24      This is, we think, a very straightforward case of copyright

25   infringement.  There are numerous works that have certificates

of registration that come with the presumption of ownership and validity, and we have a defendant who is engaged in wholesale, 100 percent, verbatim exercise of multiple of the exclusive rights of copyright.  It has engaged in unrestricted, and until he voluntarily stopped, pending resolution of these issues before Your Honor, unrestricted distribution of these works.

I'd like to cover -- there are numerous copyright issues other than ownership in the case, and numerous cases.  I'd like to cover three broad areas, and I'm happy, Your Honor, to address, of course, all the questions that you have on these.

But the three areas, first, are that we think this is a clear case where Congress -- this is a case of congressional intent, ultimately, and this is a case where we think Congress has spoken and that the Copyright Act makes clear that the works in question are copyrighted and do not lose their copyright protection simply because they are incorporated by reference.

The second is, I'd like to address the split in the case law which is at the center of the dispute, really, between the Veeck case from the Fifth Circuit --

THE COURT:  And I'm sorry.  Just for Mr. Wayne's purposes, Veeck is spelled V-e-e-c-k, and there's one other phrase that's going to probably come up that I had to consult my French-speaking husband for, which is *scènes à faire,* which is s-c-e-n-e-s a f-a-i-r-e.  So those are just for the transcript. Okay.

1        MR. KLAUS:   Thank you, Your Honor.   And the split

2   between the Veeck case on the one hand and the Ninth and Second

3   Circuit cases, that subsumes within it a number of issues

4   including merger and the idea-expression dichotomy.

5        The third issue that I'd like to cover briefly is the fair-

6   use defense that's been raised and why we think that that can be

7   resolved as a matter of law now.

8        Your Honor, we think that ultimately, turning to the first

9   point, this is really a question of what did Congress intend in

10   the Copyright Act.   There are numerous arguments that we have on

11   the other side that have a lot of rhetoric behind them in terms

12   of there being an impingement of due process rights, an

13   impingement of the right of people to speak or to think about

14   the law.

15        I would note a point that I will come back to several

16   times.   There is -- notwithstanding multiple years of litigation

17   with discovery into numerous issues, there is absolutely no

18   evidence to back up any of the claims that anyone has ever been

19   deprived access to the standards in issue.

20        There's no evidence that anyone has been deprived of

21   their First Amendment right to speak, much less that those

22   constitutional claims could be asserted against the property

23   rights of the plaintiffs in this case who have their own

24   constitutional issues lurking in the background in the form of a

25   potential taking by state action that would appropriate their

property and their copyright.

So you have constitutional avoidance questions that, at best for the other side, cut in both directions, and really I think ultimately counsel the Court back to the plain words and the plain intent of the copyright statute.

Now, under § 102(a), it's plain that when the underlying works are created, they meet all the standards for copyrightability.  They are original.  They meet the original requirements that were laid out by the Supreme Court in the _Feist_ case.  They certainly have much more than a minimal degree of creativity to them.

THE COURT:  Mr. Klaus, does it matter if the standards were created with anticipation or with the expectation that they would be incorporated into law?

MR. KLAUS:  No.

THE COURT:  And why not?

MR. KLAUS:  Because, first of all, what the evidence actually shows is that that is -- and it's undisputed on behalf of all the plaintiffs that the standards are used for multiple purposes other than simply being created -- simply being enacted into law.  And they in fact have numerous uses that they are used by people outside of simply a matter of legal compliance, and those points are set forth in Mr. Thomas's declaration, Mr. Pauley's declaration, and Mr. O'Brien's declaration.

So these are not standards that are solely, or as in the

1    hypothetical case that the defendant has raised, for example, a

2    K Street lobbyist who takes something to his or her favorite

3    legislator for no purpose other than to have that item enacted

4    into law.  There's not a tradition of copyright protection for

5    such materials as there is copyright protection for these

6    materials.  And the policy considerations, we'd say, are

7    completely different.

8         So we think the standards here were original in that they

9    have the minimum amount of creativity, they were not copied from

10   anywhere else, and there's nothing in the statute that says they

11   are not copyrightable when they are created.

12        To the extent that the statute speaks at all about

13   copyright protection for works that overlap with law, it's in

14   § 105 which says that works of the United States government,

15   meaning a work that's created or prepared by an officer or

16   employee of the United States in the course or scope of that

17   person's duties, are not subject to copyright protection.

18   Otherwise, nothing in the statute says that incorporation by

19   reference divests the standards of protection.

20        And we know from other legislation, Your Honor, specifically

21   the National Technology Transfer Advancement Act, NTTAA for short,

22   of 1995, specifically in 15 U.S.C. § 272(b)(3), specifically

23   expresses a preference for standards for federal agencies to

24   incorporate by reference.

25        There are a variety of policy reasons that underlie that,

but there is a recognition in that statute and in the continued

decisions of federal agencies, including the Office of the

Federal Register, including the Office of Management and Budget,

in our request for Judicial Notice No. 1, which is the Circular

A-119, that express a clear preference for federal agencies to

rely on voluntary consensus standards, numerous policy reasons

underlying that, numerous policy reasons that we think frankly

undercut a number of the parade of horribles of the lack of

transparency or accountability in government decision-making.

For example, the fact that voluntary consensus standards are

open to the public.  There's not a danger of industry capture of

voluntary consensus standards.

And repeatedly, Public.Resource has made the same arguments

that it's making to this Court about the fact that incorporation

by reference necessarily divests the copyright to OMB, to the

Office of the Federal Register, and those arguments have been

repeatedly rejected.

Now, I'd like to turn, if I could, to the heart of the case

law dispute.

THE COURT:  Mr. Klaus, let me ask you or your clients,

are they currently for sale, the standards at issue in this

case?  You currently sell the standards?

MR. KLAUS.  The standards as we publish them?

Correct.  We do.

THE COURT:  Is there any objection to sell the

1    standards since they're incorporated by reference?  In other

2    words, do you have to sell them?

3            MR. KLAUS:  That's an interesting question as to

4    whether they would have to be sold.  If this were a case where

5    some governmental body incorporated the standard by reference,

6    and if the standard-setting organization said we're not going to

7    sell them, that would be a -- not only would it be a very

8    different case; you would probably come closer, at least at a

9    minimum, on the fair-use case to something like, for example,

10   the Swatch case that the defendants cite, and that's the case

11   where the company didn't want -- they claimed copyright

12   protection over the transcript of its earnings recording.  But

13   it did that for the purpose of --

14           THE COURT:  It's a close call.

15           MR. KLAUS:  -- keeping it out of the public record.

16   And so what the interest of the copyright owner in that case was

17   trying to preserve had nothing to do with what the purposes of

18   copyright are.

19           THE COURT:  But if you stopped selling the standards,

20   is it still reasonably available under the OFR's regulation,

21   especially if the regulation incorporating the standard by

22   reference says that it's available from the authorizing

23   organization?

24           MR. KLAUS:  I think it would be a very hard case for

25   me or for anyone else to make if the standards weren't

1    available.

2         THE COURT:  Okay.  I have another question, but I'm

3    going to wait till you get to that.

4         MR. KLAUS:  Sure.  Let's talk briefly about the

5    distinction between the <u>Veeck</u> case and <u>Practice Management</u> and

6    the <u>CCC</u> case from the Second Circuit.  Ultimately, that is the

7    main argument that Public.Resource advances here, which is that

8    this Court should follow the majority opinion of the *en banc*

9    Fifth Circuit in the <u>Veeck</u> case.

10        And I think it's important to emphasize at the outset of

11   this, Your Honor, there really are two lines of cases here.

12   There are two lines of cases that deal with the same issue.

13   There is a split of authority, and ultimately the Court has

14   to decide which one is the more persuasive of the two.

15        It's our position that the better reasoned cases, the cases

16   that are more sensitive to the precedent and to the policy

17   considerations here are <u>Practice Management</u> and <u>CCC</u>.  With

18   respect to <u>Practice Management</u>, that's the Ninth Circuit case

19   that involved the HCFA regulations that incorporated by

20   reference the AMA's CPT.  My apologies for all the acronyms

21   here.

22        In the <u>Practice Management</u> case, Your Honor -- first of

23   all, let's be very clear.  <u>Practice Management</u> is not, as we

24   see some reference to it in the defendant's briefing and as

25   there were some references to it in the <u>Veeck</u> case trying to

```
 1    distinguish it, a case about simply referring to some numbers

 2    that the ABA published.   There was a system that -- an entire

 3    coding system that the AMA had, and the coding system --

 4              THE COURT:  The AMA.

 5              MR. KLAUS:  AMA.

 6              THE COURT:  Okay.  I thought you said ABA.

 7              MR. KLAUS:  My apologies if I did.  There are a lot of

 8    letters to keep up with.

 9              THE COURT:  The ABA is not organized.

10         (Laughter)

11              MR. KLAUS:  We may get a lot of stipulation for that,

12    Your Honor.

13              THE COURT:  All right.

14              MR. KLAUS:  The AMA's standards were incorporated.

15    The Ninth Circuit said so explicitly in the opinion.  There were

16    federal regulations that incorporated those by reference.

17    Someone who wanted to be reimbursed for expenditures that were

18    reimbursable under Medicare, Medicaid, had to use that system.

19    There is no difference between that and the types of standards

20    that are at issue here.

21         And as the Ninth Circuit said in that case, ultimately the

22    question, they said, boiled down to whether or not the Banks

23    case from the 1800s established some divestiture of copyright.

24    This is a major point of difference between the Ninth Circuit

25    and the Fifth Circuit.  What the Ninth Circuit recognized about
```

1    <u>Banks</u>, we think correctly, is that <u>Banks</u> is a case that says,

2    for purposes of the copyright statute, judges aren't authors.

3    Judges, in the course and scope of the opinions that they

4    write -- we certainly know judges can and do create things

5    outside of what they do and get copyright, but in the course and

6    scope of writing opinions, it's not subject to copyright

7    protection.

8            THE COURT:  No matter how celestial the prose.

9       But let me ask you, didn't the Ninth Circuit, when they

10   looked at <u>Banks</u>, it focused on <u>Banks</u>' premise that there's a due

11   process premise in fair access to law.  It seemed that the Court

12   in the Ninth Circuit considered the due process interest and

13   rejected it because of the fact that there was no evidence that

14   anyone wishing to use the copyrighted codes had any difficulty

15   obtaining access to it.

16          MR. KLAUS:  Correct.

17          THE COURT:  Is that what you're arguing here?

18          MR. KLAUS:  That's the second ground that they

19   discussed, and that's also -- that's a point of departure with

20   the <u>Veeck</u> case.  The <u>Veeck</u> majority said, we don't want to look

21   at evidence of availability or accessibility.  Don't put that in

22   front of us; we don't care.  We read <u>Banks</u> as establishing a

23   continuous tradition which we would submit, respectfully, there

24   is no continuous tradition of standards incorporated by

25   reference not being protectable.

1          But Practice Management does indeed say that accessibility,

2     that there is a due process consideration, and there's a

3     question that if somebody has to comply with a legal requirement,

4     can they have access to it.  And this is very critical here,

5     Your Honor.  There is no evidence -- again, after years of

6     discovery and litigation, there is no evidence that anyone

7     who has needed to comply with any of the standards that the

8     plaintiffs in this case publish or that are at issue here,

9     there's no evidence here that anyone has ever had any problem

10    gaining accessibility to any one of those standards.

11         In fact, the standards are all made freely available online

12    in online reading rooms.  So, if anyone wanted to know what is

13    the particular requirement, they can go to the Internet and all

14    the standards are completely available.  Again, not a shred of

15    evidence on the other side that there has been any problem of

16    accessibility.

17            THE COURT:  How do the standards here differ from the

18    model codes that were at issue in Veeck?

19            MR. KLAUS:  Well, the standards that are at issue

20    here were not -- and this goes to a question.  So, first of all,

21    with respect to Veeck, the language that's in the majority

22    opinion -- and it's important to focus this.  This is on page

23    293 F.3d at page 805.  What the majority said here is that the

24    standards -- in the case of a model code, reading in the first

25    column, model code which the majority says is not protected by

copyright, loses its copyright protection when it's incorporated. The text of the model serves no other purpose than to become law.  The characterization that the Court put on in the way it decided the case was to say that SBCCI, the acronym for the plaintiff there, operates with the sole motive and purpose of creating codes that will become obligatory law.

      And in fact, at the end, what the Court says -- and the Court says the result in this case would be different but recognizes we're potentially creating a circuit split and this is the way out, is to say that we will characterize these codes as having no purpose other than having been enacted to become positive law.

      And here, Your Honor, the undisputed evidence is that that's not the sole purpose that the plaintiffs enact the codes for.  The evidence is that they are in fact used by business and industry for purposes other than simply law, and there's not the sole expectation that they will simply become law and simply be incorporated and wholesale adopted.

      In fact, what the evidence actually shows -- and this is discussed at length in the ICC, International Code Council amicus brief, is that actually numerous of the standards, including the standards at issue here, when they are incorporated by reference, federal agencies, state agencies may adopt a portion of them.

      For example, in the Practice Management case itself, you'll

1     see there's a reference to my client's standard, the National

2     Electrical Code, and there's a citation to a particular federal

3     regulation that doesn't incorporate the entire thing by reference

4     but incorporates particular portions of it.

5         There are other jurisdictions that may incorporate and make

6     various changes and amendments to them, but it's not the

7     paradigm that you have referenced in the Veeck case, which is

8     something that is simply put forward solely for no other purpose

9     than to become law.

10        The other point of distinction between Practice Management

11    and CCC and the Veeck case that we think is important is Veeck

12    starts out by saying, here's a Supreme Court opinion in Banks.

13    We're not going to look at it just as a matter of statutory

14    construction.  We're going to say this settled the matter once

15    and for all in the 1800s, that anything that's incorporated by

16    reference automatically becomes the uncopyrightable law, free to

17    all to use.

18        But there was a backup argument that the majority put in

19    which was, even if it doesn't, there's a merger.  At the moment

20    that a standard is incorporated by reference, the fact merges

21    with whatever is capable of being the copyrightable expression.

22    And we see the merger argument raised by the defendant in this

23    case, and the merger argument, we think, was quite properly

24    rejected in Practice Management.  As the court said, the point

25    of merger is that, at the moment of creation, what was the

constraint on the author?

THE COURT:  Your argument is that the merger -- for the merger doctrine to apply, the merger doctrine analysis takes place at the instant of the work's creation.

MR. KLAUS:  That's correct.  And that's -- the most recent exposition of this was in the federal circuit's decision in the Oracle v. Google case which deals with computer software which has its own, in some ways, sui generis copyright analysis. But the important point there is the merger discussion isn't limited there, and it's also -- you see it in the Practice Management case.

The question of merger is, we don't want the very first person who writes "roses are red, violets are blue" to have a copyright on the saying that roses are red.  That is simply taking that idea out there and removing it from circulation because there are a minimal number of ways that any author could have expressed that expression.

THE COURT:  So there has to be no other ways of articulating a particular idea when the work is first published.

MR. KLAUS:  That's correct.  And we know in this case -- the record is clear in our case that, in fact, there are other organizations who create standards on the same topics here.  I'd refer Your Honor to our statement of undisputed facts 38 and 133 by way of example on that.  There's no dispute that there is no constraint on any of the organizations here in terms

1    of their authorship, in terms of the types of creative,

2    expressive choices that they would have to make at the moment

3    of creation.

4        Practice Management, at 121 F.3d at page 520 in footnote 8,

5    specifically says this is the reason why we are not going to

6    apply the merger doctrine here.  Judge Leval's opinion for the

7    Second Circuit in the CCC case is to the same effect, 44 F.3d at

8    72.  What he says is merger is a judicially created doctrine,

9    and we will decide how and when to apply it depending on what

10   are the needs to leave the breathing room for creativity and

11   expression.

12       Just in the last few minutes that I'm going to try to take

13   for my time, Your Honor, let me talk about fair use, and the

14   main points I'd like to make on fair use are that the use here,

15   however it's described, is -- and whatever the purposes that are

16   claimed, is plainly substitutional.  This is a defendant who is

17   engaged in the business of making wholesale copies, distributing

18   those --

19       THE COURT:  What aspects of the defendant's actions

20   are commercial as opposed to political?

21       MR. KLAUS:  Well, the question that the Supreme Court

22   tells us in Harper & Row is that the distinction between

23   commercial/noncommercial is not whether somebody says I'm out

24   to make a huge profit.  It's not whether I'm General Motors or

25   whether I'm the NRDC.  The distinction is whether you are

exercising a right that customarily one would have to pay for in
that context.  But regardless of whether he's commercial or
noncommercial, the question really on the first fair-use factor,
Your Honor, on the transformativeness test --

THE COURT:  I have a question.  What would be a
transformative use of your standards?

MR. KLAUS:  Well, I could -- I could certainly imagine
somebody writing, for example, an article about critiquing the
standards.  I could certainly imagine somebody writing an
academic piece that would say I've got a -- I've got a problem
with this or here's how the standards have developed in this
area.  I could certainly imagine numerous fair uses.

And that's one of the important points, Your Honor, is on
fair use, the answer to the parade of horribles that we have
from the other side about people being thrown in jail for
speaking the law, about people being subject to massive statutory
damages awards for daring to write.

The idea that copyright is somehow this omnipresent force,
that once it's conferred there exists this pressure that will
inevitably lead to people stopping talking about whatever the
standards are that have been adopted by jurisdictions, that's
just not true, and there would be plenty of cases of fair use
that would be perfectly fine.

There are plenty of uses that people can make of the works
in question.  The issue is that the defendant's work here, what

the defendant is doing is entirely substitutional.  They have

made the entire works available for copying for distribution

without limitation.

     With all due respect to my friends on the other side, there

is no case in the history of fair use that has come close to

saying that a defendant who creates -- who engages in that sort

of verbatim copying and makes the entire work available in a

manner for copying for downloading, for distribution, that that

is in any sense for fair use.

     And the two cases I would direct you to, Your Honor, the

most recent cases on this are -- calling them the Authors Guild

case does not help, because they're both Authors Guild cases

from the Third Circuit.  But one is the HathiTrust, and one is

the Google Books case.

     In the HathiTrust case, one of the claims of transformation

was that the HathiTrust had made searching easier for works.

It had a transformative purpose or function because the copying

made the works more easily searchable.  That's one of the

arguments, by the way, that the defendant has raised.  He said,

well, I, by converting these to HTML --

          THE COURT:  They're visually more searchable.

          MR. KLAUS:  Right, which I should also add

parenthetically, the evidence in the record is that a number

of the standards here are also made available in HTML and XML.

That is part of a license that one has to look to.  I would

refer Your Honor to Mr. Thomas's declaration at paragraph 44 in
that regard.

The important point in the HathiTrust case, though, is the
court went out of its way to say no copy of the work is made
available as a result of the searching.  So the transformation
that was done to enable searching allowed the computer, behind
the scenes, to find something and to refer the user to the
particular work, but it didn't make an exact copy available.

The Google Books case, also an Authors Guild case, also
from the Second Circuit, there's a wrinkle in the Google Books
case, which is that Google not only made searching easier by its
copying, but it also provided snippet view, which is --

THE COURT:  And that was what was found to have
transformative -- was found to add value to the transformative
search function.

MR. KLAUS:  It was found to add value to the
transformative search function, but Judge Leval went out of his
way to say that the snippet view did not operate as a substitute
for the work.  There were a number of precautions that Google
had put in place that it would -- for example, when a word
search was done, it would return only the same portion of the
work.  One couldn't game the system by putting together multiple
snippets and get the work.  Works that were very short were
excluded from the snippet view so that somebody couldn't game
the system that way.  Authors who wanted their works out could

1    opt out of the system.

2         And Judge Leval's quite clear that it was putting this

3    mechanism in that made the difference, and he in fact

4    specifically said that at 804 F.3d 217, that if the function --

5    not the purpose.  Because the purpose, Public.Resource says,

6    well, we're making all of your works available, but we're doing

7    it for a different purpose because we just want the law out

8    there, and therefore we win on the first factor.

9         And what the Second Circuit said is, no, when you're

10   engaged in verbatim copying, the question as to whether or not

11   you win on that first factor is not what your purpose is, not

12   what your intent is; it's whether the function of what you're

13   doing is exactly the same as what the copyright owner does.

14   We'd say you have exactly the same thing here.

15        That conclusion, we think, drives the third factor, 100

16   percent copying, 100 percent of the work made available; and

17   also the fourth factor on market substitution, on the fact that

18   if this is fair use, if what the defendant here is doing is fair

19   use, there is no limitation to anyone doing the same thing.

20        One brief other point on fair use, Your Honor.  There was a

21   claim that was made post hoc that this system was set up to make

22   these works available for the visually impaired.  Like most post

23   hoc justifications, when you actually look at the facts and the

24   reality, that wasn't the purpose.  What the HathiTrust case

25   again points the way here on, there's no question that making

works available to the print disabled is an important function.

The defendant's work doesn't just make the works available to the print disabled; it makes it available to the entire world.  And, again, what the undisputed evidence shows is that the one print-disabled person who told one of the plaintiffs -- my client, in fact -- that they had difficulty reading online, they were given an entire copy.

The other plaintiffs have said, if somebody said that they had a problem, we would give them a copy, or they could even go to what claims to be the Chafee Amendment compliant site that's operated by Mr. Fruchterman, who was the defendants' expert, and obtain a copy.  So we think, for that reason, the fair-use defense is completely without merit.

I believe I've gone over. I'm happy to answer any questions.

THE COURT:  No.  I've been peppering you with them as we go along.  Thank you.

MR. KLAUS:  Thank you very much.

THE COURT:  Mr. Hudis.

MR. HUDIS:  Good morning, Your Honor.  Jonathan Hudis for plaintiffs in the 14-857 case, American Educational Research Association, AERA; American Psychological Association, APA; and National Council on Measurement in Education, NCME.

Your Honor, in our briefs we refer to AREA, APA, and NCME as the sponsoring organizations of the 1999 *Standards for Educational and Psychological Testing*, the work that was

1    infringed in this case.

2        This is an even simpler case than the ASTM case, Your Honor.

3    Public.Resource, operated essentially by one person, Carl

4    Malamud, admits he digitally copied plaintiffs' standards and

5    published to the Internet for others to download, print, and

6    copy for free.

7        Public.Resource asks this Court to excuse its acts of

8    copyright infringement and contributory infringement as fair

9    use, stretching the limits of this defense well beyond its

10   breaking point, all while trampling on the copyrights of three

11   nonprofit organizations guaranteed to them by the Constitution

12   and the Copyright Act, and those are the rights to reproduce the

13   work, to prepare derivative works from it, to distribute copies,

14   and to display the work publicly.

15       It should be noted that, in addition to the copies of the

16   standards which can be purchased from the plaintiffs, their

17   standards are available at the U.S. Department of Education, the

18   Office of the Federal Register, and thousands of libraries

19   throughout the country.

20       THE COURT:  Mr. Hudis, how much does it matter if you

21   can get the standards for free already, either through the OFR

22   or through libraries or read-only rooms, as you all have?

23       MR. HUDIS:  Well, Your Honor, I was anticipating your

24   accessibility questions as to the ATSM plaintiffs, so we just

25   want to put that to rest.

THE COURT:  Okay.

MR. HUDIS:  So, as a legal matter, the answer is nothing if defendant's theory of the case is correct, Your Honor, that privately created standards lose their copyright upon being incorporated by reference into the regulations of an agency.

As plaintiffs' counsel said in the ASTM case, this Court would be sanctioning a widespread taking of copyrighted property without just compensation, in violation of the Fifth Amendment. The standards development organizations do not have continuing financial incentives to promulgate and update their valuable works.  Important stores of knowledge will no longer be available to the public.

How to resolve the competing interest raised in this litigation should be a decision for Congress to make, not the court legislating from the bench.  In the meantime, this Court should uphold the sponsoring organization's copyright and enjoin Public.Resource from further acts of infringement.

THE COURT:  Mr. Hudis, I see that the 1999 standards weren't sold for a period of time.

MR. HUDIS:  Yes, Your Honor.

THE COURT:  Is there any obligation to sell them since they're incorporate by reference into law?

MR. HUDIS:  Your Honor, that does not have a bearing on the case, to answer your question.  The fact is they are on

1    sale for a period of time so that the 2014 standards could get

2    into circulation.  The 1999 standards were taken off sale.  They

3    are now sold again on AERA's website.

4             THE COURT:  Even during the period in which they were

5    not for sale, were they available through OFR or through some

6    other means?

7             MR. HUDIS:  They were available in three places: the

8    U.S. Department of Education, through the Office of Federal

9    Register, and thousands of libraries throughout the country.

10            THE COURT:  Okay.

11            MR. HUDIS:  So the answer's yes.

12        Now, Your Honor, plaintiff's work, the '99 standards

13   infringed in this case, were a set of best practices of

14   guidelines in the creation, administration, scoring and use of

15   standardized tests, covering issues such as test validity,

16   reliability, comparability, fairness, and other items.  The

17   sponsoring organizations don't keep the profits from these

18   sales, and they use the profits to fund further --

19            THE COURT:  Does that matter?

20            MR. HUDIS:  No, it does not, Your Honor.  But we

21   are entitled to the fruits of our copyrighted work.

22            THE COURT:  Right.

23            MR. HUDIS:  Now as to authorship.  The '99 standards

24   were born from an extensive revision of the 1985 standards by a

25   sixteen-member expert volunteer committee.  Their work resulted

1   in over 50 percent of new content in the '99 version.

2        Although -- now, and this is important because it was

3   raised in Public.Resource's briefing.  Although the drafts of

4   the '99 standards were published for comment, and many comments

5   to these drafts were received by joint committee, the ultimate

6   content of the 1999 standards came from the authorship of the

7   joint committee members.

8        Public.Resource has not submitted any admissible evidence

9   to the contrary, and in fact concedes in its summary judgment

10  brief at page 27 that the joint committee controls the final

11  product through the text.

12            THE COURT:  So it's not creation by crowd sourcing or

13  anything like that.

14            MR. HUDIS:  No, it is not.  We have unrebutted

15  evidence in our record that says that the joint committee was

16  the ones who promulgated the final text.  They did receive many

17  comments, but there is no evidence in the record that those

18  comments were incorporated word for word into our standards.

19  The final selection of that language was chosen by the joint

20  committee members.

21       Now, Your Honor, I'll skip over ownership because we

22  have that in another segment.  Public.Resource confirmed its

23  infringing activities in its interrogatories and Mr. Malamud's

24  deposition testimony without permission.  He bought a used copy

25  of the 1999 standards, which I have here.

1        He cut apart its bindings, scanned the entire book to an

2   Acrobat Reader PDF file with a self-made certificate, which we

3   handed up to Your Honor, and appended the certificate to the

4   front, published the PDF file to its own website, and also

5   published that file to the Internet Archive site.  Importantly,

6   Your Honor, and which came up in the other argument, neither

7   side precluded users from freely downloading or printing the PDF

8   file.  These facts are uncontested.

9        As to contributory copyright infringement, the self-made

10  certificates that you have before Your Honor are appended to

11  the front of the unauthorized PDF copy of the standards,

12  unmistakably states that the work was incorporated by reference

13  into regulations.  In Public.Resource and Mr. Malamud's view --

14           THE COURT:  You said this is a self-created

15  certificate?

16           MR. HUDIS:  Yes.  Mr. Malamud created it.

17           THE COURT:  So this approved seal --

18           MR. HUDIS:  That's all Mr. Malamud's creation.

19           THE COURT:  Okay.

20           MR. HUDIS:  In Mr. Malamud's and Public.Resource's

21  view, once incorporated by reference, the standards lose their

22  copyrighted protection and thereafter can be freely copied by

23  anybody.  Therefore, the purpose of the certificate was to give

24  the public a false sense of approval or permission to download,

25  print, or copy the standards without authorization.

 1          Additionally, and if you would look --

 2          THE COURT:  Well, isn't that one reading of it?  One

 3     interpretation of the self-created certificate is to create an

 4     imprimtur of officialdom.  I mean, it has a seal.  It has an

 5     official incorporator.  It has a lot of citations to the Federal

 6     Register.  Isn't one interpretation of a certificate is just to

 7     confer an imprimtur that it's an approved, official document?

 8          MR. HUDIS:  Until we took the deposition of

 9     Mr. Malamud, one would agree with you, Your Honor.  But the

10     purpose of putting up that up certificate was, in his view,

11     to tell the public that, upon incorporation by reference, the

12     standards were now losing their copyright and freely available

13     for everybody.

14          And he went even further, Your Honor.  When he published

15     the standards to the Internet Archive site -- I've put several

16     of these in front of you, Your Honor.  You can see at the very

17     bottom right, before the red at the very bottom, it says

18     "Creative Commons License."  So we asked him about that at his

19     deposition, and he said, "This language included the creative

20     commons license, indicating that no rights were being asserted

21     over the item."

22          So, according to Public.Resource's interrogatory answers

23     and discovery taken of the Internet Archive, during the nearly

24     two-year period that the PDF file was published to the two

25     websites, the standards were accessed several thousand times.

We do not know who accessed the unauthorized, online copies because Public.Resource refused to provide its web server logs, and our discovery motion seeking their production was denied.

During the same two-year period that the unauthorized PDF file was published online, the sponsoring organizations experienced a precipitous drop in the sales of their standards, which is inconsistent with a work of this longevity where we typically would have seen a gradual year-over-year sales decline, according to our expert, Dr. Geisinger.  While ongoing work on a new edition of the standards, ultimately published in 2014, was announced during this period, this does not explain away the considerable sales drop.

While members of the sponsoring organizations might have wanted to wait for new editions of the standards, psychometrics and educational testing students could not wait because the 1999 standards were still being assigned as cross-reading material. We had become aware that students were obtaining free copies online with Public.Resource as their source.

Now as to harm.  Public.Resource still has the unauthorized PDF file of the '99 standards in its possession. If Public.Resource is successful in this suit, defendant can easily republish the file to the Internet.

Further, Public.Resource's every intention, if allowed by this Court to do so, is publishing the sponsoring organizations' 2014 standards to the Internet once incorporated by reference

1    into government regulations.

2            THE COURT:  That's where your irreparable injury and

3    continuing harm argument comes in.

4            MR. HUDIS:  Yes, Your Honor.  And future harm to the

5    sponsoring organizations includes loss of future income to fund

6    further revised editions of the standards and public confusion

7    that the '99 standards are the current version of the standards

8    published by the sponsoring organizations, when they're not.

9        High-stakes tests, Your Honor, the gateways to educational

10   matriculation and attaining employment, must be properly

11   designed, administered, scored, and relied upon.  There is thus

12   a high-societal value for the continuing update of the standards,

13   an important body work, produced for the general public.

14       Now, what could have Public.Resource done differently?

15   Public.Resource makes a red herring argument, as it did in the

16   ASTM case, that the purpose of its infringing activity was to

17   make the sponsoring organization's standards available to the

18   blind or people with less severe print disabilities.

19       If that was truly the case, Your Honor, Public.Resource

20   could have narrowly tailored access to plaintiffs' standards

21   to individuals with certified blindness or print disabilities

22   as provided under the Chafee Amendment such as Braille,

23   audiotape/CD availability, large font, video, screen, or closed-

24   circuit TV magnification, color contrast choices, human readers,

25   or limited search term availability as we discussed in the

1    <u>HathiTrust</u> and the <u>Google</u> cases.

2         Public.Resource could have imposed limitations on

3    the availability by methods as access -- methods of access by

4    credentials such as a user name, password, digital rights

5    management, fingerprint tracing of unauthorized downloads, and

6    access terms and conditions, all which was testified to by

7    defendant's expert, Mr. Fruchterman, that he and his company

8    practice on the Bookshare-Benetech website.

9         Your Honor, so we have met our elements of the cause of

10   action.  We have a valid copyright, which is conceded,

11   copyrights of the entire work.  We complied with the statutory

12   formalities of registration.  We also here have copying as a

13   factual matter, and copying of the copyrighted material was so

14   expensive that it rendered the offending and copyrighted works

15   identical.

16        THE COURT:  Mr. Hudis, what evidence do you have of

17   direct third-party copyright infringement?

18        MR. HUDIS:  Your Honor, a good question.

19   Now direct copyright by third parties.  Thousands of

20   Internet users access the standards on Public.Resource's

21   Internet Archive's website.  We have that from the deposition

22   testimony and the interrogatory answers of Public.Resource, and

23   we have the deposition testimony of Internet Archive.

24        THE COURT:  But that's based on like hits to the

25   website; right?  What's your direct evidence that people

1    actually downloaded this material?

2            MR. HUDIS:  Okay.  So, Your Honor, the one piece of

3    evidence that we were looking for for that were the web server

4    logs.  We never got them.

5            THE COURT:  Right.  You submitted, I think, an

6    affidavit -- or not an affidavit but an e-mail.

7            MR. HUDIS:  Yes.  Two sets of e-mails.

8            THE COURT:  From, I think, a professor saying that the

9    students got it off the --

10           MR. HUDIS:  Yes.

11           THE COURT:  But notwithstanding admissibility

12   questions, because --

13           MR. HUDIS:  That's hearsay, Your Honor.

14           THE COURT:  Well, you're right.  Is that it?

15           MR. HUDIS:  No.  No.  So the users who pulled up

16   the standards on their web browsers displayed the copyrighted

17   material, at which time the copies were made in the random

18   access memory of their computers to permit viewing of the

19   materials.  By displaying the work and making those copies,

20   even temporary ones, those users directly infringed the

21   copyright.  Your Honor, during that same period of time is when

22   we experienced the precipitous drop in our sales.

23       So, Your Honor, we took as much circumstantial evidence

24   as we could give to you to muster.  We have the period of time

25   from mid-2012 to mid-2014 when the standards were up on the two

1    websites.  We have the proof of access, and we have the proof

2    that the sales went down.  That's our circumstantial case

3    because we never got the web server logs.  And I am sure learned

4    counsel for the defendant will tell us that we're all wet on

5    that, but that is our circumstantial evidence.

6        Your Honor, Public.Resource contends that a copy for

7    purposes of copyright is limited to physical objects and thus

8    did not make a copy of the standards in the legal sense.  That

9    is absolutely false.  The infringing version stored on

10   Public.Resource and Internet Archive's web servers are copies

11   for the purposes of the Copyright Act.  Electronic copies of the

12   work stays on computer.  Computers, with their RAM memories, are

13   copies under § 101 of the Copyright Act.

14       I've gone through the evidence of reproducing, of creating

15   derivative works, of distribution.  Your Honor, I would like to

16   now turn to Public.Resource's defenses, unless you have any

17   questions.

18              THE COURT:  That's fine.

19              MR. HUDIS:  All right.  Your Honor, Public.Resource

20   does not need to access the standards, free or paid for, in

21   order to comply with any of the government regulations or laws.

22   Public.Resource claims it has the right to post copies --

23              THE COURT:  You have to slow down again, Mr. Hudis.

24              MR. HUDIS:  Slow down?

25              THE COURT:  A little bit.

1           MR. HUDIS:  All right -- of our standards online so

2    that others can copy, print, distribute, or otherwise use them

3    for free.  All of the cases relied upon by Public.Resource are

4    distinguishable.  Wheaton v. Peters, Supreme Court decisions.

5    Banks v. Manchester, Ohio Supreme Court decision; Howell v.

6    Miller, Michigan state statutes; and let's talk about the Veeck

7    case which you brought up with my learned co-counsel.

8           Veeck involved a word-for-word reproduction of model

9    building code into legislation which does not apply to the

10   incorporation by reference of extrinsic standards, making Veeck

11   inapplicable in reasoning and result.  The holding of Veeck is

12   that the law, whether articulated in judicial opinions or

13   legislative acts or ordinances, is in the public domain.

14          Importantly, Your Honor, at pages 803 and 804, Veeck says

15   clearly, "The limits of this holding must be explained.  Several

16   national standards-writing organizations fear that copyrights

17   may be vitiated simply by the common practice of governmental

18   entities' incorporating their standards in laws and regulations.

19   This case does not involve references to extrinsic standards.

20   Instead, it concerns the wholesale adoption of a model code

21   promulgated by its author precisely for use as legislation.

22   Case law that derives from official incorporation of extrinsic

23   standards is distinguishable in reasoning and result."

24          A statute that refers to the law requires citizens to

25   consult or use a copyrighted work in the process of fulfilling

1    their obligations.  Your Honor, importantly, copyrighted works

2    do not become law merely because the statute refers to them.

3    Discussing referenced works or standards created by private

4    groups other than incorporation by laws we have here, the Veeck

5    court explains that to the extent incentives are relevant to

6    existence of copyright protection, the authors in these cases

7    deserve incentives.

8        Now, my learned colleague brought up § 105 of the Copyright

9    Act.  I'd like to give you the reverse or other side of the coin

10   to that, which is Copyright Act § 201(e): "No action by any

11   governmental body purporting to seize, expropriate, transfer, or

12   exercise rights of ownership with respect to the copyright, or

13   any of the exclusive rights under a copyright, shall be given

14   effect."

15       So the mere incorporation by reference, as learned counsel

16   said in Circular A-119, you have to be careful of the copyright.

17   Also, we've already discussed the CCC and Practice Management

18   cases, much closer on the facts to this case.  I will not go

19   over them again.  Your Honor, fair use.

20       THE COURT:  Again, I'm going to ask you the same

21   question I asked Mr. Klaus, which would be, what would be a

22   transformative use of your standards?

23       MR. HUDIS:  Mr. Klaus gave very good examples, and

24   I will use them here; that is discussing, commenting on,

25   critiquing our standards for one reason or another, and as a

matter of fact, that is done with our standards all the time.
But it is not the wholesale copying, and it is not the wholesale
copying and making available to the public for free of our
standards which Public.Resource did here.

THE COURT:  And again, the same question.  If you
stopped selling the standards, are they still reasonably
available under the OFR's regulation?

MR. HUDIS:  Three places, Your Honor.

THE COURT:  Libraries.

MR. HUDIS:  Thousands of libraries, the Department of
Education, and the Federal Register office.  So, yes, throughout
the country.  So all of the amici -- you say, we need copies, we
need copies?  They've got them.  So the nature of our standards,
whether they are characterized as being core-expressive content,
which they are, or assemblage of facts, which they're not, is
usually not an important factor.

The third factor, Public.Resource misappropriated our
entire work, and Public.Resource's actions, as I've already
explained to the Court, will drastically affect the market and
value for plaintiffs' standards.  It's just like in the ASTM
case.  This is a wholesale substitution for the purpose for
which our clients promulgated these standards, making them
valueless, at least in a copyright sense.

Your Honor, some defenses also, in addition to fair use
that Public.Resource raised for the first time, at least in our

1    case, in their briefs should not be countenanced by the Court,

2    and that is the Copyright Act 102(b) systems process and

3    procedure bar, the idea-expression merger doctrine, and the

4    sense of fair doctrine, all of which, in any case, are

5    inapplicable, as we briefed.

6        Your Honor, there are two types of incorporation by

7    reference defenses that we have here, one which was in their

8    answer, the other one which was not, one which says, immediately

9    upon being incorporation by reference, it becomes a fact.  That

10   was raised in their answer.  We don't agree with that, and

11   that's what the Court's going to decide.

12       They're also saying that, by its very nature, these are all

13   saying the same thing, these three defenses raised for the first

14   time in their briefing, that it either is a system or process or

15   procedure, it's an idea or expression, or it is *scènes à faire*.

16       Your Honor, in each defense, there is no proof by expert

17   testimony what is the idea, what is the expression, what is the

18   system, and as a matter of fact, Your Honor, in our very

19   standards, it says at the beginning, "evaluating the

20   acceptability of a test or test application does not rest on the

21   literal satisfaction of every standard in this document."

22       THE COURT:  You have to slow down again.  We all speed

23   up when we read.

24       MR. HUDIS:  You're right.  Okay.

25       "The acceptability cannot be determined by using a

1    checklist."  This is at page 4 of our introduction of the

2    standards, which is in evidence.

3        "When testing an issue in legal proceedings and other

4    venues, witness testimony, it is essential that professional

5    judgment be based on the accepted corpus of knowledge in

6    determining the relevance of particular standards in a given

7    situation.  The intent of the standards is to offer guidance for

8    such judgments."

9        THE COURT:  But even without that preamble, Congress

10   was aware of the potential issue that materials incorporated by

11   reference posed when it crafted § 105.  Ten years before then,

12   it had given federal agencies the authority to incorporate

13   private works, and it expressly stated that they would not lose

14   copyright protection.  So I'm not even sure that we need to go

15   any further than that.

16       MR. HUDIS:  We would agree with you, Your Honor.

17       THE COURT:  I guess that question is more appropriately

18   posed to defendants.

19       MR. HUDIS:  Yes.  So, Your Honor, there's also other

20   defenses that were raised.  And by the way, none of these were

21   briefed whatsoever.  They should just be dismissed out of hand

22   -- just looking for it.  Unclean hands, copyright misuse, and

23   waiver and estoppel.  We all -- the plaintiffs move for summary

24   judgment on that.  Nothing was briefed by Public.Resource.

25       All right.  So, Your Honor, I think I am just about out of

1    time.  Unless Your Honor has any further questions, I will save

2    my remarks for the rest of the segments.

3              THE COURT:  Thank you, Mr. Hudis.

4              MR. HUDIS:  Thank you, Your Honor.

5              THE COURT:  All right.  Whose going to -- defendants,

6    you have 45 minutes, obviously.  Are you going to break it up or

7    one person is going to do the duration?

8              MS. MCSHERRY:  We're going to break it up, Your Honor.

9              THE COURT:  All right.

10             MS. MCSHERRY:  I think we have 50 minutes, I hope.

11   Perhaps we won't need it.

12             THE COURT:  If says 45, but if you need to go to 50,

13   I think we're okay.

14             MS. MCSHERRY:  Okay.

15             THE COURT:  Yes.

16             MS. MCSHERRY:  I'll try to keep my remarks as brief as

17   possible.  I, like everyone else, is very conscious of how much

18   paper you've had to read.  So I'm going to start with something

19   surprising, which is that, for once, I agree with my colleague,

20   opposing counsel, Kelly Klaus.  This is a straightforward case.

21       We think it's straightforward in a slightly different way,

22   however.  There are a lot of claims and defenses in this case,

23   but I think it does boil down to one core issue, which is that

24   the documents at issue here have been incorporated into law.

25   That's why we're here, in essence.

1          THE COURT:  Well, let's start with the last question

2     I asked Mr. Hudis about.  Hasn't Congress already ruled on this

3     issue?  And if copyright protection is going to be stripped from

4     standards such as the one at issue here, isn't that something

5     for Congress to decide to do and not this court?  It does seem

6     to be a matter of what the legislature wants.  Copyright is not

7     for me to -- you know, I can't legislate copyright.

8          MS. MCSHERRY:  Sure.  And I wouldn't ask you to.

9     Let me take you back, if you would indulge me.  I think we need

10    to take this back to first principles a little bit before we

11    decide what Congress is even allowed to do.  We know what

12    Congress legislated against was a background of 200 years of

13    unbroken law that says that the law is not copyrighted.  That

14    much I think is not controversial.

15         We have cases talking about opinions, cases talking about

16    statutes, cases talking about regulations.  In case after case,

17    every court that's looked at his has said that the law is

18    outside of copyright, and there's a reason for that: because the

19    public has a fundamental due process and First Amendment right

20    to access the law and to talk about the law, and those rights

21    are sort of fundamental to self-government.

22         THE COURT:  But by what standard are you asking that

23    I judge that the standards have enough creative expression to

24    warrant copyright protection?  What standard should I apply if

25    deciding that?

1        MS. MCSHERRY:  Well, I would suggest that you look to

2   the BOCA case and you look to the Veeck case and look to the

3   reasoning in both of those cases, and they looked at this issue

4   in two different ways.

5        First they looked at the tradition of case law that they

6   had before them and came to the conclusion that, due to due

7   process considerations in particular, the law was in the public

8   domain.  So that was the first part of the decisions in those

9   cases.

10       And to be clear, the BOCA case, what the BOCA case was

11  doing was rejecting a preliminary injunction.  But in the course

12  of that -- and then it remanded.  But in the course of its

13  rejection, it explained its reasons why it thought that the

14  district court had got it wrong in holding that there was a

15  possibility of success on the merits with respect to the

16  copyrightability of codes.

17       So it's a really -- and I urge you to look to that case,

18  because it's a very detailed explication of the tradition of

19  case law that you also get in the Veeck case.  But BOCA is

20  earlier, and it's really one of the first cases to look at the

21  problem of building codes and how we're going to look at them.

22       I think it's also important to understand that all of the

23  cases that have looked at this have looked at this one core

24  problem, which is that we have a conflict between the exclusive

25  rights that are granted to a copyright holder and our

constitutional rights to share the law and access the law.

So the only place it got strange is, you know, we have this particular conundrum where we have this one area of law that operates a little bit differently because -- and it's really an artifact of history.  The Code of Federal Regulations was getting cumbersome.  Yes.

THE COURT:  I just want to clarify something on the BOCA case that your mentioned, because you said that the district court granted the request for preliminary injunction.  But when the First Circuit reversed that decision, it didn't do so based on the merits.

MS. MCSHERRY:  What it did is it remanded for further discussion.

THE COURT:  Right.

MS. MCSHERRY:  But it also spent quite a bit of time explaining why it thought the district court had got it wrong.

So it seems to me that when we talk about a circuit split, we actually have a more substantial circuit split.  It's not just Veeck versus Practice Management.

We have Veeck and BOCA, and then, of course, we have the long tradition of cases that precede that.  But these are the cases that most directly address our issue here, which is what happens when you've got standards that are incorporated into binding regulations and whether they're an exception to what is otherwise very clearly the rule.

1        THE COURT:  But isn't your case made more difficult

2   by the fact that you're not really asking -- this is more of a

3   case of a matter of ease of access.  The codes and the standards

4   at issue here are accessible without -- you can look at them.

5   You can read them.  You can go make a copy of them at your

6   public library if you need to if you don't have $22 to buy them.

7        What you're asking for is to make them simply more easily

8   accessible; right?  It's not that they're not available; it's

9   that they're not available as easily as you'd like them to be

10  available; right?

11       MS. MCSHERRY:  Well, my client would certainly like to

12  make them more accessible, but that's actually sort of a second

13  point.  The prior point is that if they are law, then of course

14  we should make them more accessible as technology makes that

15  possible.  That's a wonderful thing.  But either way, they're in

16  the public domain.

17       THE COURT:  Well, Congress considered this when it

18  declared that simply by being incorporated, works didn't lose

19  copyright protection, and one of the reasons is because of the

20  public policy behind the creation of such standards, which is

21  they want organizations to continue to promulgate such standards

22  because they're for the public good.

23       If they rob them of copyright protection, then there is no

24  incentive to continue to promulgate these standards, and that

25  was a factor that Congress took into consideration when it

declared that simply being incorporated by a reference didn't

strip a work of its copyright protection.  So I don't think the

jump is as easy as you make it.

You know, simply because it's been incorporated by a

reference doesn't make it the law.  It's been incorporated into

certain laws, maybe, but the leap isn't quite that easy.  And I

guess that's where my concern is.  What is it about these

standards that you think make them the law?

MS. MCSHERRY:  Well, there's a couple things that I

think make them the law.  If you look at the IBR Handbook, for

example, and you look to the National Archives website, which

we've submitted to you, and in many, many other places there's

an agreement that these standards, once incorporated by

reference, have the force and effect of law.

THE COURT:  And?  In other words, one key focus of the

Ninth Circuit was whether there was evidence that individuals

had been denied accesses to incorporated works.  Have you put

forth any evidence that anybody has been denied access, or are

you saying that's irrelevant?

MS. MCSHERRY:  I actually don't think it's

irrelevant.  I think it's an important thing that distinguishes

this case from Practice Management, because you're quite right.

Practice Management says there's no realistic threat here of

access to law, and if there were, that would raise due process

and fair use issues.

1          THE COURT:  And in BOCA, similarly, the government,

2     the local government, anybody who wanted to see the building

3     codes had to go buy a $22, or whatever it was, copy of the

4     codes.  That's not the case here.  There is not just one place

5     -- you don't just have to have money to get access to these

6     standards, and that's another key distinction between this case

7     and BOCA.

8          MS. MCSHERRY:  So I think that the core question is

9     what does copyright grant in terms of how you can condition

10    access.  So what we know is that, for example, one of the

11    plaintiffs, the AERA plaintiffs, took the 1999 standards off the

12    market altogether, until it came up in a deposition and they

13    made them available again.

14         The reading rooms that exist, you can only access them

15    subject to after you sign a contract and give over your

16    information, so it's subject to a lot of restrictions.  And

17    that's what happens when you allow folks to have a copyright

18    in the law.  What a copyright gives you, in any document, is a

19    right to control and limit and restrict access, and that's the

20    fundamental contradiction that --

21         THE COURT:  But in the case of these standards, it's

22    not just that -- there's only a certain amount of control that

23    plaintiffs have.  Once they're in the Office of Federal -- the

24    standards have to be available for viewing through the Office of

25    the Federal Register; right?  Plaintiffs can't just say, you

1   have to give us money to see these or you don't get them.  There

2   are other ways to get them.

3        MS. MCSHERRY:  So what the plaintiffs -- what they're

4   obligated to do currently is to simply deposit a couple of

5   copies.  So if you don't have the means to travel to Washington,

6   D.C., and make a copy of the standards --

7        THE COURT:  Or go to a library?

8        MS. MCSHERRY:  Or if it happens to be in your local

9   library, maybe it doesn't.  And also, if you are print disabled,

10  you're going to have a harder time getting access to these

11  standards.  And again, that's exactly what copyright confers.

12  It's that statutory monopoly that lets you do that, and all of

13  those restrictions are improper because they conflict with our

14  constitutional due process and First Amendment rights.

15       THE COURT:  When Congress passed a National Technology

16  Transfer and Advancement Act, it surely knew that the standards

17  directed agencies to incorporate reference were copyrighted.

18  Since the copyright protections are also statutory, wouldn't

19  Congress have explicitly indicated that it was expanding the

20  type of government works that cannot be copyrighted if it wanted

21  to do that?

22       MS. MCSHERRY:  Well, I think that Congress didn't

23  need to do that, for two different reasons.  One is because we

24  already had -- well, two things.  One is statutory right can

25  never trump a constitutional right.  So we'll take that as a

1    given.  But secondly, the Copyright Act actually contains

2    carve-outs --

3              THE COURT:  Right.

4              MS. MCSHERRY:  -- for the law, the merger doctrine

5    and 102(b), which both reflect this idea of the idea-expression

6    dichotomy.  And I would point you to a case that came later,

7    but if you look to the case of Golan v. Holder, that's a Supreme

8    Court case, and one of the things that that case says is when

9    you have a tension between copyright and the First Amendment,

10   we have certain doctrines that help resolve that tension.  One

11   of those is the idea-expression dichotomy.  The other is fair

12   use.  And I would suggest to you that that's exactly what the

13   Veeck court was up to.

14       It recognized it had a constitutional tension, and it

15   looked to merger, it looked to 102(b), to resolve that tension.

16   The plaintiffs in this case talk a lot about constitutional

17   avoidance, but I would submit to you that the Veeck approach

18   and the BOCA approach are actually what gets you out of the

19   Constitutional conundrum that you might otherwise have.

20             THE COURT:  You're asking this Court to balance the

21   policy goal of unrestricted access to privately authored

22   materials with a policy goal of providing continued incentives

23   to private organizations to continue developing standards.

24       Isn't that kind of balancing -- didn't Congress already do

25   that when it passed the Copyright Act and didn't list

1    incorporated by reference works among those that cannot have

2    copyright protection under § 105?

3         MS. MCSHERRY:  Well, again, I would suggest to Your

4    Honor that Congress didn't think it had to because it already

5    had these carve-outs for the law, and it was legislating against

6    200 years of case law, saying that the law was out of copyright.

7    So they didn't need to reach this.

8         The other thing that I would suggest is I do think this

9    issue of incentives is quite important, and the plaintiffs talk

10    a lot about this wonderful public-private partnership.  And I

11    don't disagree that there is a powerful partnership that happens

12    here, but I think that it's false to suggest that no incentives

13    will exist if the plaintiffs can't claim a copyright in works

14    that have been incorporated into law.  I think, to the contrary,

15    they have tremendous incentives already.

16         The fact that their documents are incorporated into law is

17    very beneficial to them.  They use it as a marketing tool

18    because there's a -- do I have... excuse me just a moment.

19         I'll share with you just one example, if I may.  This is

20    an e-mail that NFPA sent out.  It's an exhibit to our motion to

21    strike, and it says, "Be confident that your electrical work

22    complies with California law."  So they know that the NEC, the

23    National Electrical Code, has been incorporated into law, and

24    they use this as a marketing tool.

25         This is reflected also in the fact that when they write,

 1    the NEC Style Manual specifically advises the folks who are

 2    working with it on how to write code-compliant regulations.

 3    They know their works are going to be incorporated into law.

 4    They benefit from their works being incorporated into law

 5    because it's a basis of other marketing.

 6         They also benefit because, as they said, and there's a lot

 7    of testimony about this, they want their works incorporated into

 8    law because that makes them mandatory, and they think that makes

 9    the world more safe.  They may very well be right.

10              THE COURT:  The Fifth Circuit in Veeck said that,

11    unlike model codes that are wholly adopted into law and impose

12    legal obligations, these incorporated standards -- and I guess

13    that's where the plaintiffs assert that they differ from Veeck

14    -- these incorporated standards are only required to be

15    consulted or used in the course of fulfilling existing legal

16    obligations.  They're not binding law.

17         So isn't that what the cases here -- I mean, Veeck drew

18    that distinction, and don't plaintiffs fall on the other side of

19    that distinction?  In other words, the standards at issue here

20    have been incorporated, but they themselves don't -- in other

21    words, plaintiffs can't send out e-mails saying if you don't

22    follow our codes or our standards, you're falling afoul of the

23    law.  They can only say to the extent they're being -- they're

24    not like building codes or model penal codes or commercial

25    codes; right?

1          MS. MCSHERRY:  I would disagree with you, Your Honor.

2     If I build a building and it doesn't comply with the National

3     Electrical Code, I'm going to face penalties.  If I don't comply

4     with a national fire safety code -- the various ones, there are

5     many -- I'm going to face penalties.  But also, if I'm a parent

6     and I want to know if the school that my child goes to is

7     complying with fire safety regulations, I want to know what

8     those fire safety regulations are because it's supposed to be

9     built to that code.  That's what incorporation by reference

10    means.  It means it has the force and effect of the law.

11          THE COURT:  Once it's incorporated.

12          MS. MCSHERRY:  Once it's incorporated.  That's

13    correct.  One other thing I'd like to speak to is this issue of

14    Veeck and intent.  So, first of all, I'd like to just clarify

15    that the Veeck holding was based on two separate grounds.

16       The first part of the Veeck holding, the Veeck court looks

17    at the Banks cases and concludes that the due process

18    considerations there apply with respect to model codes as well.

19       But the issue of intent.  So the Veeck court's merger

20    analysis does not depend on intent.  The Veeck court's merger

21    analysis depends on its conclusion that, once incorporated by

22    reference into law, the expression and the idea merge.  There

23    is no other way to describe what you have to comply with.  Just

24    like the Constitution, just like the tax code, the Code of

25    Federal Regulations works the same way.

1          THE COURT:  The standards here that are incorporated

2     by reference provide guidelines and procedures in some of them

3     that individuals or entities have to use or reference in

4     fulfillment of their legal obligations under federal

5     regulations.  But again, and I think this is a significant

6     difference, there's no evidence that anyone here has been denied

7     access to the standards.  What you're arguing is that people

8     should have better access to the standards.  That wasn't the

9     case in Veeck, was it?

10         MS. MCSHERRY:  So what I'm arguing is that the law is

11    not copyrightable, and, therefore, as technology develops, we

12    can make access better and better and better.  Access comes

13    second.  Access is important, but it is not the only thing.

14         THE COURT:  Some of the standards that have been

15    presented to me, for example, ASTM, the 86-07, which is at page

16    107 and 6, include what a law review article refers to as

17    secondary references where to fully comply with the standard you

18    also have to comply with a list of other standards.  So what's

19    your position on whether these secondarily referenced

20    standards -- have those also lost copyright protection?

21         MS. MCSHERRY:  So I think what --

22         THE COURT:  Even if they're incorporated into the

23    incorporated standard or they're included in the incorporated

24    standard?

25         MS. MCSHERRY:  Where does it end?

1          THE COURT:  Yeah.

2          MS. MCSHERRY:  So I think where it ends is I would go

3     back to the CFR, to the Code of Federal Regulations, and ask

4     what has explicitly incorporated there, which is what we're

5     presented with here.

6          Now, if there's further references on top of that that

7     aren't explicitly incorporated, I think we might understand that

8     differently, and in any event, my client doesn't publish those.

9     He's trying to publish and create a sort of grand, unified CFR,

10    because what we have right now is a very disjointed Code of

11    Federal Regulations where we have sort of one code of

12    regulations that's online that you can see.  But then it refers

13    out to hundreds of other standards that you then have to

14    separately consult if you want to understand what the law is.

15    That's the core of our problem.

16         I'd like to talk a few minutes about -- well, I think I

17    want to answer a question that I think you were asking earlier

18    about Veeck's focus, also on intent, and that building codes,

19    the model codes in that case, were intended to be created into

20    law.  I think I've already referred to this, but I would say

21    this again.  There's ample evidence in the record that the

22    standards organizations know very well and very much want their

23    standards to be incorporated into law.

24         THE COURT:  And?  I mean, of course.  If you

25    promulgate standards and you sell them, isn't it better for you

1    if your standards are promulgated into law because more people

2    will want to buy them?  Does that rob them of copyright

3    protection, the fact that they hope that some governing bodies

4    or some local governments or federal governments will incorporate

5    their standards?  Doesn't that mean they've been successful?

6        MS. MCSHERRY:  Well, I think what it just speaks to is

7    this question that I think the plaintiffs have tried to suggest,

8    that Veeck turns on the intent of the creator, and I'm just

9    simply trying to answer that question --

10       THE COURT:  And their intent is?

11       MS. MCSHERRY:  Their intent is to have them made into

12   law, and that's fine.  Again, I have no quarrel with that, and I

13   think having stuff being incorporated into law is a tremendous

14   marketing tool.  But it also helps make us all safer.  We don't

15   quarrel with that either.

16   What we quarrel with is the proposition that once one has

17   accomplished that goal of incorporation into the law, somehow

18   you still get to control and restrict access forever.  We have a

19   plaintiff, again, who took one of the standards off the market

20   altogether.  And the reading rooms that exist, they exist now.

21   They may or may not exist tomorrow.

22       THE COURT:  But isn't the solution to that issue the

23   responsibility of Congress?  I mean, if Congress wanted to strip

24   materials incorporated by reference of all copyright protection,

25   they could do so very easily and very clearly.  And your argument,

1    well, they didn't need to do that in this case is -- you know,

2    nobody wants to try to figure out what's in the mind of Congress

3    when they do something, but when they have the power to enact or

4    to declare what's covered by a copyright or not, they do so.

5        The fact that they explicitly left works incorporated by

6    reference with copyright protection means that you want me to

7    now say, well, Congress, I know you said that they have

8    copyright protection, but, actually, under these circumstances,

9    they don't.  And isn't that action one that's really meant for

10   the legislature?

11        MS. MCSHERRY:  I don't think so, Your Honor.  For one

12   thing, I don't think that Congress can make an unconstitutional

13   bargain, and so if there are, as we believe, the fundamental due

14   process and free speech considerations in play here, Congress

15   can't write a statute --

16        THE COURT:  Copyright protection comes from the

17   Constitution as well.  I mean --

18        MS. MCSHERRY:  Copyright protection is -- sorry.

19        THE COURT:  It is of constitutional dimension, and

20   therefore -- if we're talking about what the framers wanted

21   in district court, we're in trouble.  One could argue that

22   copyright, having derived from the Constitution, that Congress

23   is well aware of what it can do and not within the Constitution

24   even in the face of the Due Process Clause.

25        MS. MCSHERRY:  I completely agree with you.

1      THE COURT:  Is there a case you can cite to me where

2  a court has done what you're asking me to do where the standards

3  were available?  Not where the standards had to be purchased,

4  but where someone without funds could access the standards.

5      MS. MCSHERRY:  So, actually, I think in the Veeck

6  case, if you wanted to go get hold of them and you wanted to go

7  to this little town, the person who posted the standards online

8  was able to acquire them.  So you can get hold of the standards.

9  But again, I want to reemphasize that this case does not turn

10  simply on accessibility.  That's just a benefit of it.

11      THE COURT:  Right.  Because you're saying that the

12  standards were already basically not capable of being copyrighted

13  once they were incorporated by reference.

14      MS. MCSHERRY:  That's correct.  And, Your Honor, I

15  would say to your earlier question, of course copyright derives

16  from the Constitution as well.  But nonetheless, it's very clear

17  that copyright is a statutory right, and statutory rights don't

18  trump constitutional rights.

19      THE COURT:  Can you cite me a case where a court has

20  said that regardless of their accessibility, once a standard has

21  been incorporated by reference into a law, it loses copyright

22  protection?

23      MS. MCSHERRY:  I think that's exactly what the Veeck

24  case is saying.  I think that's what that case is saying, and I

25  think it's what the BOCA case is saying.  And they're saying it

1    against a background of hundreds of years of case law.

2        I'm mindful of my time, and I want to make sure I leave

3    time for the remaining issues, so I just want to touch on a

4    couple of other issues.

5        One is with Practice Management.  Again, Practice Management

6    said there was no realistic threat of access.  I think we do

7    have that here.  I don't think the case turns on that, but it

8    does acknowledge that if there were such a threat, they would be

9    more concerned about due process.  But that evidence is simply

10   not before the Court.

11       The other thing that Practice Management was worried about

12   and CCC was worried about is depriving the SDOs of incentives,

13   and as I think we've discussed, there are plenty of incentives

14   that would still exist.

15       The final thing I want to speak to is the issue of takings,

16   because there's been sort of a lot of hand-waving around about

17   maybe creating a takings problem.

18           THE COURT:  Well, I want to ask you, what about -- in

19   its Notice of Proposed Rulemaking, OFR relied on your argument

20   -- well, it addressed your argument, and it ultimately rejected

21   a proposal to require free online access to standards in its

22   "reasonably available" determination.

23       It said, "If we required that all materials IBR'd into CFR

24   be available for free, that requirement would compromise the

25   ability of regulators to rely on voluntary consensus standards,

1    possibly requiring them to create their own standards which is

2    contrary to the NTTAA and the OMB Circular A-119."

3         Doesn't that indicate a congressional intent to continue

4    to give copyright protection for standards incorporated by

5    reference?

6         MS. MCSHERRY:  I think the OFR came to that conclusion

7    because the SDOs came and said the exact same thing they're

8    saying here, which is we'll take our toys and go home if we're

9    not allowed to have copyright protection.

10        THE COURT:  But isn't that factor perfectly reasonable

11   for Congress to consider?  In other words, the Congress can say,

12   look, if we strip these standards of copyright protection,

13   there's not going to be any more of this voluntary consensus

14   standard development, and we're going to have to -- it's going

15   to be a problem for the government.  So, in return for that,

16   we're going to allow them to continue to keep their copyright

17   protection.  Isn't that something that Congress is allowed to

18   do?

19        MS. MCSHERRY:  Congress could do that, but I don't

20   think that's actually what Congress did.

21        Now, what the CFR said, it went through a lot of the

22   arguments, and it said we think it's beyond our authority to

23   do what the petitioners, including my client but not just my

24   client, want us to do.  We think it's beyond our authority to

25   interpret reasonable availability in the way you want to.

 1      We think that it will cause problems for the agencies in

 2   terms of monitoring compliance.  So they had various concerns,

 3   but those concerns don't apply here, because what we have here

 4   is my client who's willing to make these standards available

 5   right now, very easily, and it doesn't depend on any agency

 6   action whatsoever.

 7      Just two final points.  Again, with respect to the takings

 8   question, what I would like to say about that is, in addition to

 9   the fact that I don't think it's a credible concern given the

10   tremendous benefits of incorporation by reference, aside from

11   the ability to sell the standards -- which, by the way, most of

12   the standards aren't much used anymore anyway except for as law.

13      But the other thing that I think we can say with respect to

14   takings is that essentially that's a different process.  In the

15   Veeck case, in the wake of the Veeck case, we didn't see a

16   takings claim, and if the standards development organizations

17   want to try to bring a takings claim, which I think, again, is

18   unlikely, if they were to bring it, that's a whole separate set

19   of facts to present to the court.

20           THE COURT:  Let me ask you a question regarding the

21   merger analysis.

22           MS. MCSHERRY:  Sure.

23           THE COURT:  Could I find that the standards lost

24   copyright protection under the merger doctrine but not find that

25   they've lost protection by becoming law?  Could I do both those

1    things?

2            MS. MCSHERRY:  I think that -- so the -- you mean once

3    they've been incorporated by reference?

4            THE COURT:  Right.  In other words, could I find that

5    they retain their protection by becoming the law, but they lose

6    protection under the merger doctrine?

7            MS. MCSHERRY:  I think that you have to say that they

8    lose protection under the merger doctrine because they become

9    ideas, and the idea and the expression merge.  Essentially, they

10   become facts.

11           THE COURT:  Okay.  Is your merger approach a separate

12   theory or just a subpart of your public domain theory?  Because

13   it wasn't clear to me.

14           MS. MCSHERRY:  Okay.  I tend to think they go

15   together.  The way that I conceive of them is that the first is

16   really I think the way the Veeck court tried to conceive of it,

17   which is first we have our due process concerns.  And following

18   that case law, we have to say that anything that's been

19   incorporated into law, made regulation, is out of copyright; and

20   so Veeck could make a copy of the law -- and the court stresses

21   that at 800 -- could make a copy of the law under Banks and

22   related cases.

23       But then the second portion of the analysis is to then look

24   to the Copyright Act and see if there's a way to reconcile that

25   fact with what already exists in the Copyright Act.  So the

1   _Veeck_ court turns to the merger doctrine and says, in addition,

2   even if -- the quote is, even if _Banks_ fails, I can still look

3   to merger to find that these model codes have been incorporated

4   by reference into law, and therefore the idea and expression

5   have merged.  They're facts like the tax code, like the

6   Constitution.

7        If you don't have further questions -- sorry.  You do.

8        THE COURT:  Well, the _scènes à faire_ doctrine, I have

9   to confess I'm not quite sure how it's applicable here.  Are you

10  arguing that if somebody tried to write their own standards on

11  the exact topic as one of the standards here, they would still

12  have to be identical down to the word choice and the punctuation?

13  Is that my understanding?  I was a little confused by your

14  argument on this.

15       MS. MCSHERRY:  So that argument in particular goes to

16  the copyrightability of the standards as such, and our argument

17  is that if you look at how they're created, they're very much

18  shaped by external factors that are external to the sort of

19  creativity of anyone involved in drafting them.

20       THE COURT:  Okay.  All right.

21       MS. MCSHERRY:  Okay.  Thank you, Your Honor.

22       THE COURT:  Thank you.

23  Oh, I'm sorry.  My court reporter needs a break.  He's been

24  going for -- and we're running behind.  We just keep plowing

25  along.

1    (Recess from 10:44 a.m. to 10:54 a.m.)

2         MR. BRIDGES:  Good morning, Your Honor.

3         THE COURT:  Good morning.

4         MR. BRIDGES:  I'm Andrew Bridges, also representing

5    Public.Resource.

6         THE COURT:  Good morning.

7         MR. BRIDGES:  And I will address fair-use issues,

8    which are vitally important to the case.  Before I get to my

9    statements that I'd like to make --

10        THE COURT:  Oh, and I have pushed my meeting to 1:00,

11   which means we're only five minutes behind instead of half an

12   hour or something.

13        MR. BRIDGES:  Thank you, Your Honor.

14     Before I get to my own point, I wanted to address something

15   that Mr. Klaus said on the other side:  No case in the history

16   of fair use has endorsed an entire work being made available

17   widely for download or distribution.

18     Well, I'd like to call the Court's attention to a number

19   of cases that did exactly that.  Important cases.  Cases from

20   various United States Courts of Appeal.

21     I refer to the Court to Nuñez v. Caribbean International,

22   First Circuit.  Full copies of original pictures of a model

23   were widely disseminated by a newspaper when it became

24   newsworthy that this model, who had some racy photos, had become

25   Miss Universe Puerto Rico.  The First Circuit found fair use

1    from that widespread publication of the full photos.

2        The Second Circuit, in Swatch Group v. Bloomberg, found

3    fair use the widespread online dissemination of materials from

4    investor conferences that Swatch Group claimed a copyright in.

5        THE COURT:  But the Swatch case in particular, that

6    was the case where the conference call was closed, and without

7    the dissemination of the materials, the materials would not have

8    otherwise have been accessible, the information.

9        MR. BRIDGES:  That's a different point, Your Honor.

10   What Mr. Klaus said is there is no point in the history of fair

11   use where an entire work was disseminated broadly to the public.

12   His point was an entire work plus public dissemination.  It

13   wasn't about the nature of the original work or the circumstances

14   of the original work.

15       But to address your issue, the Ninth Circuit in

16   Hustler v. Moral Majority, where Larry Flint had basically sent

17   up Jerry Falwell in Hustler magazine, and Moral Majority, only

18   bleeping out some obscene or offensive words, disseminated

19   widely for fundraising purposes the entire item featuring

20   Mr. Falwell.

21       Righthaven v. Jama.  Now, I've given you appellate cases,

22   but there's also an important case out of the District of

23   Nevada, 2011.  Righthaven v. Jama found fair use in the

24   widespread public dissemination of an entire article from the

25   Las Vegas newspaper.

1    So the notion that fair use doesn't allow widespread

2    dissemination of an entire work is simply wrong, and Mr. Klaus

3    referred to the <u>HathiTrust</u> decision in the Second Circuit

4    because that case does talk about certain security features that

5    <u>HathiTrust</u> imposed.  But that's not necessary.  That was

6    incidental to that one decision, and it's wrong to ignore all of

7    these decisions that do allow entire works broadly disseminated.

8         THE COURT:  And that may be, but how is that germane

9    to this discussion here?  In this case, there's no evidence that

10   has been proffered that the standards at issue weren't otherwise

11   available.  I can definitely see a fair-use argument being made

12   for a situation in which, absent the fair use of the material,

13   the information would not otherwise be accessible.

14        MR. BRIDGES:  Your Honor, whether they are otherwise

15   available actually doesn't make a defense to fair use at all.

16   It really doesn't.  And I'll go through the standards.  I just

17   wanted to address the cases --

18        THE COURT:  So is it your position that -- where's the

19   line drawn?  I can -- you know, if there's a book coming out,

20   the latest *Harry Potter* book is coming out and it's copyrighted,

21   can you download the entire book and make it available to the

22   public?  No.

23        MR. BRIDGES:  Likely, no.  And that's nothing close to

24   our argument.  I think it might be helpful if I go through the

25   factors.  I just wanted to rebut the point that Mr. Klaus had

made that there had been no case in the history of fair use about entire works being disseminated.

THE COURT:  That's less important to me.  All right.

MR. BRIDGES:  So let me just explain.  First of all, I think the parties agree that fair use is amenable to summary judgment, and we have summary judgment in Nuñez and Authors Guild v. Google.  It's important to understand that fair use is outside the statutory monopoly of copyright.

Section 106 gives the rights of the copyright author, and the section starts with the wording, "Subject to § 107."  That's fair use.  Section 107 states fair use.

It says, "Notwithstanding the provisions of § 106, fair use is not an infringement of copyright."  There's a boundary zone between the rights of the author and fair use.  Fair use, therefore, takes nothing away from a copyright holder because the rights of a copyright holder don't extend into fair use anyway.

THE COURT:  How is downloading a set of copyrighted standards in their entirety and placing them on the Internet for free fair use under the definition of fair use as I have it?

MR. BRIDGES:  Well, Your Honor, to begin with, let's talk about the structure of fair use in the statute.  The statute says there are four factors to be taken into account; and it specifies the factors, and I will go through them.  Campbell v. Acuff-Rose also explains that the task of a

court is to analyze all four of those factors in light of the constitutional purpose of copyright, which is to promote the progress of science in the useful arts.

So let's go through those factors, and I will say this. You've heard about some constitutional issues.  As the Supreme Court has said, fair use as a doctrine brings First Amendment considerations into the Copyright Act.  It has built-in First Amendment accommodations.

So the first nonexclusive statutory factor -- let me back up.  Section 107 gives the four factors.  It also gives several examples of paradigmatic fair use in the introduction to the section.  It says, "Fair use, including" and it has several examples, "is not an infringement."  And then it gives the factors.

The first factor is the purpose and character of the use. This is the defendant's purpose and character of the use, and the purpose and character of Public.Resource's use is for a very, very important public benefit.  It is to report the law. It says what the law is.  When you saw that certificate that Public.Resource distributes, that is underscoring -- it's making a political point.  It says, This is law.

THE COURT:  But the point of the matter is, this law as you call it, these standards, are available in libraries. They're available in the Office of the Federal Register. They're available in reading-room online sites.  What you're

doing is making the standards available for downloading by
someone who, for example, could download the standards and sell
them; right?

MR. BRIDGES:  That is not the purpose.

THE COURT:  Right.  You have purpose, and then you
have reality.  And Congress decided that, and the framers -- and
we're back to the framers -- decided that copyright existed to
give the benefits of ownership to people who created material so
that people would continue to create material.

Congress decided not to strip copyright protection for all
material that was referenced by law, for that same reason,
because, otherwise, people would stop promulgating these
standards or people would stop promulgating whatever it was that
was being incorporated by reference.

But what you're saying is, because our purpose is noble and
good, then it's fair use.  The problem is, your purpose may be
noble and good, but despite that, you are stripping the
creators, the owners of the copyrighted material, of commercial
use of their product.

MR. BRIDGES:  Your Honor, the Supreme Court did
exactly that.  It incorporated the full lyrics of "Pretty Woman"
in the opinion of Campbell v. Acuff-Rose, and if my purpose is
to distribute copies of that opinion and some people use it to
get access to the lyrics of that song, well, that wasn't my
purpose.  It's not chargeable to me.  But the Supreme Court put

the full lyrics in its opinion, and I'm allowed to have my purpose.

THE COURT:  But the Supreme Court, somewhere in there there was an opinion.  The lyrics of the song were part of the opinion, but the purpose of that publication of the lyrics was because they were involved in a Supreme Court opinion.  You're not doing anything but lifting these standards wholesale and putting them on a website.

MR. BRIDGES:  Your Honor, that comes to the third factor of fair use, and I will go there.  Well, actually, the third factor, as I think Campbell says and as HathiTrust says, the third factor on amount and substantiality of use depends on the first factor, what the purpose is.

The third factor, the amount, depends on the purpose.  And what's the purpose here?  It's to report the law.  That's where all the focus has been.  The purpose of the defendant is also to make the law amenable to research and scholarship.

One can do textual analysis, data analysis on these that is not available in any other way.  That's why these were reformatted into HTML.  They are word searchable by the public in a way that the reading rooms can't be done.  The reading rooms, Your Honor, they've got a document that basically talks about how they're making the reading rooms inconvenient.  That's their purpose, is to make it inconvenient so that they can sell it.

Public.Resource's purpose is to make the law available to

the public, and there is no other way to make the law available
to the public than by presenting the law itself.  It is a
factor.  It goes to the merger point Your Honor made earlier.

When something becomes the law, that text is now a fact.
It is the law.  So Public.Resource is getting these re-keyed so
that they are text searchable and so that they are accessible to
the blind.  It wasn't the sole purpose by any means, but it's
something that the plaintiffs haven't done because of what the
defendant has done.

THE COURT:  Public.Resource started doing that after
this lawsuit was filed, didn't it?

MR. BRIDGES:  No.  I believe it was done beforehand,
Your Honor, and it's been part of the process.  So the purpose
is to facilitate research and scholarship.  The purpose is to
foster inclusive access for persons to this.

Now, the purpose is also noncommercial.  Public.Resource
is not trying to go into competition with the plaintiffs.
Remember that the only standards that Public.Resource has acted
on are standards that have become law.  This is not about
competing with the thousands of standards that they do.  This is
about 250 standards, roughly.

Commerciality does enter into the first factor of purpose
and character here, and Campbell v. Acuff-Rose, that was
commercial.  The Supreme Court endorsed it.  Swatch Group v.
Bloomberg was highly commercial.  The Second Circuit endorsed

it.  Nuñez v. Caribbean International, highly commercial.
The First Circuit endorsed it.

I'd like to go to another important aspect of the purpose
and character of the use, and that's the transformative use.
What's important here is that transformative use means a new and
different use or purpose.  It does not mean that the work has to
be different.  In all the cases I've been discussing up to now,
there was no change in the work itself, but the original work
was used for a new and different purpose.

For example, there's a Fourth Circuit case, Bond v. Blum,
where one party in a child custody case took an entire
autobiographical manuscript of one of the parties and put it
before the Court.  It was a different purpose because that was a
fact.

Now, here's an interesting question, Your Honor.
I think the other side has skirted the issue.  Let's match our
purpose, Public.Resource's purpose, to the plaintiffs' purpose
in creating their standards.  Was the plaintiffs' purpose to
write law?  If their purpose was to write law, then we have a
similarity of purpose, and if their purpose was to write law,
then they're falling into deeper and deeper Veeck and BOCA
problems.

But if, as they say, oh, but we had all these purposes
that had nothing to do with the law, we had best-practices
purposes, we had contractor purposes, then the law purposes of

1    Public.Resource are very different, and that's an important

2    point here.  They are not competing.  These purposes are very,

3    very different.

4         THE COURT:  What's the line between transformative and

5    not transformative here?  I mean, if you had converted the hard-

6    copy standards to a searchable PDF but had only posted on your

7    website that it was available for free upon request, would that

8    have been transformative?

9         MR. BRIDGES:  Your Honor, it's transformative

10   because it is for a different purpose and a different use.

11   The conditions of that use don't affect the issue.  It was a

12   different purpose, a different use.

13        THE COURT:  If the PDF versions that plaintiffs sold

14   were also searchable -- in other words, if plaintiffs sold a

15   searchable PDF version, is the only transformative aspect of

16   your posted PDF standards the cost, that it's free?

17        MR. BRIDGES:  No, Your Honor.  I have to say very

18   clearly: different use, different purpose to make the law

19   available.

20        THE COURT:  I understand that.  I understand that.

21   I'm asking with regard to the transformative-use issue.  Putting

22   aside the purpose, if you said you can get this if you ask for

23   it, or if plaintiff also offered what you're offering but it

24   cost money, isn't the law being reported?  It's not just

25   reporting the law that you want to do.  You want to do reporting

1   the law for free; right?  Because the law is free.

2            MR. BRIDGES:  Yes.  Absolutely.

3            THE COURT:  Right.

4            MR. BRIDGES:  Because we believe that no private

5   party should be exercising a private monopoly over the law, and

6   it is not just about seeing the law; it is about speaking the

7   law.  It is about analyzing the law.  It is about critiquing.

8       They said critiques can be transformative.  Great.

9   Critiques can be transformative only if you have access to be

10  able to critique them.  They're saying you have to pay them to

11  critique them, or you have to maybe go to one or two places in

12  the United States.  And by the way, the statistics that AERA

13  gave you about library access --

14           THE COURT:  Right.  We're running behind.

15           MR. BRIDGES:  All right, if I can get back.  The point

16  is, part of the purpose here is to facilitate public discourse

17  about the law without people having to pay a toll in order to

18  know what the law is or without having to go to Washington,

19  D.C., to get access or to have to pay them $49 to know what the

20  law is in order to critique it.

21      There's a very, very important political point here, that

22  there should not be -- in this public-private partnership that

23  they have discussed, there should not be private dominion over

24  public law.

25           THE COURT:  And there's a very big, white marble

 1    building about two blocks away where you make those political

 2    points, not in the district courts.

 3              MR. BRIDGES:  I know, Your Honor.

 4              THE COURT:  Aren't you just in the wrong forum for

 5    that point?

 6              MR. BRIDGES:  Absolutely not.  This is exactly the

 7    right point.  This is the right place for the fair-use argument,

 8    because Congress set factors precisely for courts to use.  It's

 9    a flexible doctrine for courts to analyze on a case-by-case

10    basis.  That is what § 107 is.

11        It says, "Here you go, courts.  Here's the standard.  Have

12    at it."  And there is a rich, rich jurisprudence of judge-made,

13    fair-use law that is understood to be the proper dominion of the

14    courts.  That's why we're talking about fair use. Your point is

15    a different point about the determination of copyrightability.

16    But when it comes to fair use, courts are the very, very center

17    of that focus.

18        I need to talk, though, because you are concerned about

19    some of the substitution effect.  Actually, before I get there,

20    I want to get to the second factor, and that is the nature of

21    the copyrighted work.

22        Now, the nature of the copyrighted work, when it is adopted

23    for dissemination by Public.Resource, at this point it is the

24    law.  This is not merely -- this is not merely some building

25    best practice.  The nature of the work, when it enters into

1    Public.Resource's world, it is the law.  It is the fact of law.

2    So Public.Resource is reporting facts, and these are things that

3    had been publicly disseminated to the public.  Okay?  That

4    actually weighs in favor of fair use, not against fair use.

5        Harper & Row, there was no fair use because a private,

6    nonpublic manuscript was purloined.  The Mange case was private

7    wedding pictures that were purloined.  The fact that they were

8    publicly available weighs in favor of fair use because there's

9    no preemption of the first publication availability.  That

10   weighed on the court in Harper & Row.

11       I must say this, Your Honor:  The works that are on PRO's

12   website, Public.Resource's website, almost all of them -- it may

13   be one or three or four out of maybe 250 -- have been superseded

14   for their purposes.  They are not the current standards.  They

15   are still the law.  That's why it matters to Public.Resource.

16   They are still the law, but they are not their current standards.

17       So Public.Resource isn't interested in their standards as

18   standards.  Public.Resource is interested in the law.  So this

19   is a huge point that the second factor, the nature of the

20   copyrighted work, is in this case -- they are obsolete or

21   obsolescent standards, by their standards, but the nature of the

22   copyrighted work insofar as Public.Resource is interested in it

23   is because it's still the law.

24       THE COURT:  But once the 2014 standards become

25   incorporated by reference, you're going to want to put those up

1    as well; right?

2           MR. BRIDGES:  Yes.  All the same reasons, and for

3    salutary reasons.  It's entirely appropriate.  I would also like

4    to discuss -- the third factor is the amount and substantiality

5    of the work compared to the original, yet it does turn on what

6    the purpose is.

7           Again, at the beginning of my time I gave the Court five or

8    six cases, most of them from circuit courts, where the entire

9    work was used.  That doesn't weigh against fair use when the

10   purpose is to present the law as law.

11          There is no way of saying, well, we'll give you a summary

12   of the law.  People don't have to obey a summary.  There was one

13   executive -- I've forgotten the company.  One prominent executive

14   went to prison for violating a standard that was incorporated by

15   reference.  Went to prison.  If you're trying to make public

16   what the law is, you have to give the whole thing.

17          Finally, I do want to talk about the fourth factor, which

18   is the effect of the use on the potential market for or value of

19   the copyrighted work, and this is where I think they are saying,

20   oh, look, we're going to lose business.  You're concerned that

21   they're going to lose business.

22          First of all, this factor focuses on loss to the copyright

23   value, not losses to other values.  The factor must focus on the

24   standards at issue in this case.  What's interesting is when

25   they use some experts to try to talk about substitutive effect,

for reasons we can just talk about in motions to strike, the experts shot air balls with extraordinary mistakes.

For example, Mr. Geisinger for AERA attributes the decline of sale of standards to Public.Resource, missing the fact that the catastrophic decline that he's looking at began a year, year and a half before Public.Resource ever posted anything.

As a matter of fact, the sale of the standards appeared to go back up towards the end of the time that Public.Resource had it up there.  There is no real evidence of the loss.  And when they talk about the harm, they talk about loss of control. They don't have real numbers about any substitution effect. They don't.

THE COURT:  Well, are you really arguing that it's not rational to conclude that if their standards are available for free for anyone to download off the Internet that people aren't going to buy them?  That's a logical conclusion, isn't it?

MR. BRIDGES:  No, Your Honor.  It's a speculative conclusion, exactly the sort of speculative conclusion that the Supreme Court rejected in the Sony Betamax case.  The argument that, oh, people are going to stop watching live TV and they're going to stop watching movies because of the Betamax, and the Supreme Court expressly rejected that as speculative.

And we have ASTM's president, Mr. Thomas, stating that we have seen no measurable effect from Public.Resource's actions. We have seen no measurable effect, and they have substituted

1    hypothesis, conjecture.

2         The point is, what is expanding is access.  Yes, there are

3    accesses to these.  That's very good, because that means that

4    more people are seeing, reading, speaking, analyzing the law.

5    More access is a good thing.  They have not shown any competent

6    evidence of actual losses, and we have ASTM's president

7    admitting no measurable effect.

8         Your Honor, I think I'd like to say one --

9              THE COURT:  You need to make it brief.

10             MR. BRIDGES:  -- more thing.  That's right.

11        I would like to come back, however -- we've got the four

12   factors in fair use, and it is the Court's province, emphatically

13   the Court's province on fair use.  That's why we have all these

14   fair-use cases.  People could have argued in all of those cases

15   that Congress could have adjusted copyright law, but Congress

16   has expressly given the courts authority over fair use because

17   it's an equitable case-by-case doctrine.

18        But as Campbell v. Acuff-Rose made clear in the Supreme

19   Court, it's the job of the courts to analyze the four factors in

20   light of the constitutional purpose of copyright, which is to

21   promote the progress of science in the useful arts.

22        To promote the progress of science in the useful arts means,

23   in the case of law, the study of law, the critique of law, and

24   the education about the law, giving full public access to the

25   law and ruling that whatever statutory monopoly they have over

1    their building standards, they do not have a private monopoly

2    over the law.  We have this important carve-out.  It's a

3    statutory boundary between the rights of the copyright holder

4    and fair use.

5         So we ask Your Honor to look at these factors and to

6    understand that this purpose is a laudable and appropriate

7    purpose.  The nature of the work is as factual as it could be.

8    It is the law.  Your Honor could rule that it is merged; it is

9    fact.  You could rule that there's no copyright at all.  But

10   fair use allows a pressure valve here.  If the Court is

11   uncomfortable ruling that it's not copyrighted, fair use is

12   exactly how to accommodate the concerns on both sides.

13        Thank you, Your Honor.

14            MR. HUDIS:  Your Honor, we did reserve some time for

15   rebuttal.  I will take less than five minutes.

16            THE COURT:  All right.

17            MR. HUDIS:  Your Honor, I'll just take the issues that

18   are of most concern from the presentations from Public.Resource.

19   First, with reference to the BOCA case at page 736, in remanding

20   the case for further argument after reversing the preliminary

21   injunction, the case says, "The rule denying copyright

22   protection to judicial opinions and statutes grew out of a much

23   different set of circumstances than to these technical

24   regulatory codes."

25        All right.  As to our standards being off sale for a time,

as we discussed, Your Honor, they were still available in
thousands of libraries, and if one could not get it from one
library, there's an inter-lending program between libraries.

Your Honor, Public.Resource is asking this Court to
substitute its judgment for the will of Congress.  Mr. Bridges
spoke about one of the exceptions to copyright.  There are a
number of exceptions to copyrighting, sections 107 through 121
of the Act, and Congress, through all of this, has not seen fit
for a special exception to copyright that Public.Resource now
would like to introduce.

As to the external factors in creativity, in their
briefs and in responses to our statement of material facts,
Public.Resource has already conceded that we have copyrightable
content in our book.  The HathiTrust case, the central holding
of that case was to guard against entire dissemination essential
to the court's decision.

Mr. Bridges brings up the fact that HTML and OCR coding
were done of the standards.  Not in our case.  It just went up
as a standard graphic PDF.

Now, you asked about the dividing line between what is and
what is not transformative.  Your Honor, if you could look to
the Leval article where all of this transformative language
originated, cited by the court in Campbell v. Acuff-Rose, it
says the mere repackaging and republishing of the original does
not pass that test.

1      And finally, as to the alleged obsolescence of our

2 standards, Your Honor, those standards are still valuable today

3 for any test that was promulgated between 1999 and 2014, and

4 those standards are still applicable today.  They are still on

5 sale today, and what Public.Resource is doing would endanger our

6 income to further promulgate standards in the future.

7      Thank you, Your Honor.

8           THE COURT:  Thank you, Mr. Hudis.  All right.

9           MR. KLAUS:  Thank you, Your Honor.

10      Mr. Bridges misheard me on fair use, because I did not say

11 there's never been a case in the history of fair use that has

12 not said that the copying of a work -- a work -- would not be

13 fair use.

14      What I did say was that there's never been a case in the

15 history of fair use that has said setting up an entire business

16 of the repeated copying and distribution of entire works would

17 be fair use.  And, in fact, the Authors Guild v. Google and

18 Authors Guild v. HathiTrust case made it clear that would not be

19 acceptable.

20      Mr. Bridges also said there's no evidence of actual

21 substitution, actual market harm.  I would simply give cites

22 to Your Honor to places in the record.  Mr. Berry's declaration,

23 paragraphs 11 through 12, which talk about people disseminating

24 entire PDF copies of the works.  Mr. Bridges also said that

25 Public.Resource alone makes the works available in HTML or text-

1    searchable format.

2         In fact, if you look at Mr. Thomas's declaration at

3    paragraph 44, what he says is that they actually make their

4    standards available in text-searchable format.  The difference

5    is -- as does my client, NFPA.  The difference is that if

6    somebody wants that, that's a different format that they pay the

7    right for.

8         Finally, I'd like to go back to Ms. McSherry's point on the

9    Veeck case.  Two things to note about it.  One is an entire

10   section of that that talks about the difference between model

11   codes and extrinsic standards.  I've discussed why I think the

12   "sole purpose" language, which is the qualifier which the Veeck

13   court, which the defendant is relying on, put on to that

14   distinction.

15        I would also point out that that was in response -- that

16   entire discussion in Veeck was in response to amici filings,

17   not just by anyone, but by my client, by ASHRAE.  That was the

18   qualification that the Court put on.

19        Happy to answer any other questions.

20             THE COURT:  Thank you.

21             MR. KLAUS:  Otherwise, I'll just move on, Your Honor.

22             THE COURT:  Thank you, Mr. Klaus.

23        All right.  And, again, we are still very much behind, so

24   I'm going to ask, let's be as concise as we can.  Who's going to

25   argue on behalf of ASTM on ownership?

1          MR. FEE:  Your Honor, I'm Kevin Fee from Morgan Lewis

2     on behalf of ASTM and on behalf of all of the plaintiffs in the

3     ASTM case.

4          THE COURT:  All right.  Good morning.

5          MR. FEE:  Your Honor, Ms. McSherry started off the

6     defendant's presentation by saying the core of this case has

7     always been about whether or not incorporation by reference

8     destroys the copyrights on standards written by private

9     organizations, and we agree.

10         Having said that, plaintiffs understand they have the

11    burden of proving that they own the copyrights in this case, but

12    the defendants have spent over three years trying to concoct

13    arguments about why there are some holes in the ownership here.

14         THE COURT:  Well, let me ask you.  Does the

15    registration certificate for the *1999 Annual Book of Standards*

16    create the same rebuttable presumption of ownership for D39698

17    and D1217-93(98) as the registration certificates for those

18    specific standards?  And I single those two out because they're

19    different from the others.  Are those copyrighted individually?

20    Is that in the record somewhere?

21         MR. FEE:  No, Your Honor.  They're part of a

22    compilation registration for the Book of Standards.

23         THE COURT:  Okay.

24         MR. FEE:  And, first of all, I want to note that the

25    reason you're probably asking this question is we didn't have an

1    opportunity to address this in our briefing.  It was raised in

2    the final brief by Public.Resource.  But anticipating that you

3    might have that question, I have the answer here for you.

4         The Book of Standards' collective registration covers all

5    the individual works contained in that collection under a series

6    of cases that have found that where an owner of a collective

7    work also owns the copyright and the constituent parts of that

8    collective work, that the registration for that collective work

9    covers both the collective work and the constituent parts.

10   Just a couple of citations for that.

11        There's the Xoom v. Imageline case.  That's 323 F.3d 279

12   from the Fourth Circuit.  There's also the Morris v. Business

13   Concepts case, 259 F.3d 65.  That's at page 68 for a pinpoint

14   site, Second Circuit, 2001.

15             THE COURT:  All right.

16             MR. FEE:  So, because the Book of Standards were

17   timely registered within five years of the first publication,

18   then we are entitled to a presumption of ownership and validity

19   with respect to those works as a result of that collective

20   registration.

21             THE COURT:  All right.

22             MR. FEE:  So getting back to where I was a moment ago,

23   we've gone through three years of litigation in this case now,

24   and Public.Resource still has not been able to come forward with

25   any evidence to rebut the presumption of ownership that we're

entitled to from those registrations.

The simple fact is they have no evidence that anybody other than the plaintiffs in this case owns these works, and that's particularly important, I think, Your Honor, because there have been literally thousands of participants who have been involved in the creation of these works. And this litigation has been the subject of a lot of publicity in the standards-development community.

And despite, I'm sure, the efforts by the defendants, everybody's awareness of these issues, not a single person in the thousands and thousands of participants who have ever been involved in the development of standards for these plaintiffs has been identified by the defendant as saying, you know what, I am the owner and exclusive owner of the copyrights of any of those works.

And I think it's also important to note that it isn't good enough for them to poke a hole and then say, oh, you didn't get a perfect assignment from this one person out of the 10 people on this committee.

They can't defend their infringement by saying the plaintiffs in this case only owned 80 percent of the copyright interest of the works in issue. They have to prove that plaintiffs owned literally no copyright interest in the standards at issue in order for them to have a defense based on ownership.

1          THE COURT:  If I didn't find that you were entitled

2     to the presumption on all the standards, have you sufficiently

3     demonstrated a specific author of each of the six standards has

4     assigned their ownership stake to you?

5          MR. FEE:  Well, Your Honor, there's a couple ways we

6     have ownership other than the presumption that arises from this

7     registration.  First of all, we submitted evidence from all the

8     plaintiffs in this case that their employees made contributions

9     to these works.

10         There's no dispute that if they made contributions in the

11    course of their employment, then the plaintiffs in this case

12    would own at least that copyright interest as a result of the

13    work for hire doctrine, and as I pointed out before, as long

14    as we own some ownership interest in the copyrights, that's

15    sufficient for us to prevail in this claim.

16         In addition, we have also provided evidence related to

17    assignments as well.  Maybe the most clear instance of that is

18    the 2014 National Electrical Code.  I believe even the

19    defendants don't contest the validity of the ownership of the

20    NFPA with respect to that code, because there's clear

21    documentation that they agreed to be works for hire and that

22    anything that wasn't a works for hire was assigned.

23         But even with respect to the other works, I know, for

24    example, with respect to ASTM, we identified specific language

25    that were authored by employees of ASHRAE works for hire.  And,

in addition, we do have assignments from some of the persons who were involved in the development of those works.

In particular, I have the declarations of a couple of individuals, Mr. Jennings and Mr. Cummings, I believe his name is, who have identified their role in developing certain of these standards.

They've clarified that they understood from the start that those standards were going to be owned exclusively by ASTM, and to the extent there was any complaint about documentation with respect to the assignments, we've confirmed and provided evidence that they did do the click-through assignments that are part of the ASTM renewal of memberships every year which provides that everybody understands that they have assigned all of their copyright interest in any of the works that they were involved in to ASTM.

So, because Public.Resource cannot meet its burden of overcoming the presumption of ownership arising from the registrations, they do spend a fair amount of time trying to argue that they're not entitled to a presumption in the first place.  They argue that because there was a mistake, supposedly, in the completion of the copyright registration forms that somehow the presumption goes away.

But as we pointed out in our briefs, the overwhelming amount of case law stands for a proposition that even if there are mistakes in a registration, that does not affect the

plaintiffs' ability to bring the lawsuit or the presumption of
validity and ownership that accompany that registration unless
two factors are met.

First, the mistake has to be material, and secondly, the
mistake has to be made with the intent to defraud the copyright
office.  The defendants in this case cannot be either of those
requirements.

First of all, identifying the works as works made for hire
was not a material mistake because it's undeniable that even if
we had identified those works as joint works with us being one
of the authors, that the copyright registration would have
issued.  So we cited a brief in our case on that point exactly
where a court found that a work made for hire form from the
registration was not materially impacted by the fact that it was
really not a work made for hire, but the plaintiff still had an
ownership interest in that work.

And certainly there's no proof of an intent to defraud the
copyright office.  In fact, the only evidence with respect to
intent on how these forms were filled out was the evidence that
ASTM had contacted the copyright office to describe the
circumstance and ask the copyright office for guidance as to how
to complete these forms.  And the copyright office told ASTM
that the proper mechanism under these circumstances was to claim
a work for hire, so there's neither a material mistake nor an
intent to defraud the copyright office.

1    There is one case, I believe from the Third Circuit, that

2    Public.Resource cites for a proposition that fraudulent intent

3    is not required, but even that case does not stand for that

4    proposition.

5    The court sort of left open the question of whether intent

6    in the Third Circuit alone is required to eliminate the

7    presumption of validity and ownership, but it did not decide the

8    issue, because it doesn't have to.  All the other cases that

9    have been cited, Your Honor, stand for the proposition that they

10   both have to be material mistakes and made with the intent to

11   defraud.

12   So I think the easiest way to sort of support a factual

13   finding of ownership here, as I mentioned, in addition to the

14   presumption that arises from the registration, is the joint

15   authorship point.  A joint work is described or defined in the

16   copyright statute as a work that is prepared by two or more

17   authors with an intention that their contributions be merged

18   into inseparable or interdependent parts of a unitary whole.

19   In this case, there can be no dispute that all the

20   participants in the standards development organizations

21   understood that these works would be combined into a single

22   standard at the end of the day, and Public.Resource does not

23   argue otherwise.  So, under the plain meaning of the language

24   under § 101 of the Copyright Act, that's all that's required for

25   a joint work.

1    Public.Resource does try to argue that any copyright or
2    any contributions by the plaintiffs' employees in connection
3    with this matter were not copyrightable, but they provide no
4    evidence for that assertion.

5    There's no description in their brief, for example, as to
6    why the contributions that we've identified that were made by
7    employees with respect to D975 are not protectable or
8    copyrightable.  They don't mention any of these standards at all
9    in their briefs, and they have an obligation to overcome the
10   presumption that those are not copyrightable.  They just haven't
11   even tried to do so.

12   Now, Public.Resource also tries to get around the joint
13   authorship issue by relying on Aalmuhammed, a Ninth Circuit
14   case, for the proposition that joint authorship requires more
15   than just an intent of all the authors to combine their
16   contributions into a single unitary work, but it also requires
17   an intention at the time of the creation that the parties
18   understand that they will both jointly own the work.  But that
19   is certainly not the law in this circuit, and it is not the law
20   according to the United States Supreme Court.

21   In the CCNV case, the D.C. Circuit addressed a very similar
22   issue where there is a dispute between two parties who were
23   involved in the creation of a sculpture.  Both parties, at some
24   point in time, filed applications to register, so they certainly
25   didn't have a joint understanding that this work was going to be

1    jointly owned at the time.

2         The D.C. Circuit described those facts, if they remained to

3    be the same after a remand, to be a textbook example of jointly

4    authored works in which the joint authors co-owned the copyright,

5    because one party basically did the sculpture of the person; the

6    other party did the sculpture of a grate.  Everybody knew they

7    were going to be put together in a single unitary work, and that

8    was all that was required for there to be joint authorship.

9         Now, that case, of course, did go up to the United States

10   Supreme Court as well, and the Supreme Court agreed with the

11   D.C. Circuit's assessment of the parties' rights under those

12   circumstances.  It said that the parties would be joint owners

13   if they prepared the work, intending that their contributions

14   be merged into a separate or interdependent whole, and nothing

15   else.  There was no discussion about an intent requirement.

16        Now, I know we're running very short on time, so I'm just

17   going to deal very briefly with assignments.  I'm sure when they

18   get up, they're going to tell you somebody didn't sign a form or

19   this language isn't appropriate for this particular form that

20   they're going to show you.

21        The problem that they have, among many, with respect to

22   those arguments is they have the obligation, in light of their

23   presumption of ownership, to show that every single participant

24   who was involved in creating that work did not sign a form that

25   assigned those works to the plaintiffs in this case.  I don't

know what forms they're going to show you, but in their briefing they certainly have not linked any of the forms that they complained about to any particular works at issue in this case.

For example, they haven't come forward and said, here are the authors of D975; let me show you the assignment forms for all those.  None of those people signed the forms that were required to be signed in order to assign ownership.

The bottom line is, with respect to the ownership, there are no magic words with respect to assignment.  The intention of all the parties is clear.  These plaintiffs have been publishing these works for over a century in some circumstances, always claiming to be the owner of the copyrights.  Nobody has ever come forward and said otherwise.  Public.Resource has no evidence of anybody ever claiming ownership, and as a result, they just can't meet their burden with respect to any complaints about assignment.

But maybe even more importantly, they don't have the right to raise this argument.  The courts have made it clear that you cannot defend your copyright infringement by saying, oh, I infringed a copyright, sure, but it's not the plaintiff's copyright; there's some defect in the assignment that entitles me to copy their works without any consequences.

The courts have said that the point of the statute of frauds, a provision essentially of the Copyright Act that requires assigned writing, is to prevent disputes between

1    authors or claimed authors about who owns the rights in the

2    works.  That is not what we have here.  Public.Resource does not

3    claim to be an author in this case, and as a result doesn't have

4    standing to raise this issue.

5         Courts have -- we've submitted a bunch of cases to

6    Your Honor about this issue that have concluded as I've

7    suggested here, but I think it also makes sense just to think

8    for a second about what this would entail if we're going to do

9    this and allow them to challenge assignments with respect to

10   each of these works.

11        Bear in mind, we have over 200 works in this case.

12   Almost all, if not all, these works involve many, many authors.

13   They would have, I suppose, us have a trial where for each work

14   we say, okay, identify every one of the authors.  There may be

15   dozens.  For each of those authors, what documents did they

16   sign?  For each of those documents that they signed, were they

17   authorized by their employer to sign it?  We will be here for

18   years doing trials, and --

19             THE COURT:  No, we won't.

20        (Laughter)

21             MR. FEE:  I think you got my point.

22             THE COURT:  I got your point.

23             MR. FEE:  So, unless you have any other questions,

24   Your Honor, that's all I have.

25             THE COURT:  Thank you.

1     MR. HUDIS:  Your Honor, Jonathan Hudis for the AERA

2 plaintiffs.  Hopefully, we'll make up some time here, because on

3 ownership we have a very, very simple case.  We have one work.

4 Of the 16 joint committee members of the 1999 standards, 13 of

5 them signed nunc pro tunc work made for hire agreements with the

6 sponsoring organizations.

7     The heirs of two deceased committee members signed

8 posthumous copyright assignments.  Those are all attached to

9 Ms. Ernesto's declaration.  To Register of Copyrights issued a

10 copyright registration to these standards to AERA in 1999.  An

11 ownership of record was corrected by a supplementary copyright

12 registration in the standards to all of the three sponsoring

13 organizations in 2014.

14     Public.Resource has not submitted any evidence to contest

15 these facts of ownership, and in defendant's summary judgment

16 brief, Public.Resource specifically elected not to move for

17 summary judgment on this issue.

18     So we have the registration certificates as prima facie

19 evidence of validity and ownership, we have the work made for

20 hire letters, the two assignments, all of which are of record;

21 and as my colleagues from the ASTM case said, the assignee is

22 not required to have been assigned a copyright by all of the

23 co-owners to have standing to sue.  We couldn't find one of the

24 15.  Just *poof*.  He just could not be found.

25     THE COURT:  Mr. Hudis, I think that -- I have zero

1    minutes under the approximate schedule for arguments on

2    Plaintiffs AERA, but if they're not contesting your ownership --

3            MR. HUDIS:  Well, let's hear from them.

4            THE COURT:  Right.  What I want to do is I'll let you

5    get back up if hear that they are contesting your ownership.

6            MR. HUDIS:  But like the ASTM plaintiffs said, they

7    don't have standing to assert any problems with our copyright,

8    even if they wanted to.  Thank you, Your Honor.

9            THE COURT:  All right.  Why don't we start with the

10   standing issue.

11           MR. BRIDGES:  Thank you, Your Honor.  The Supreme

12   Court in _Feist_ said the burden is on the plaintiff to prove

13   ownership of a valid copyright and infringement of the

14   constituent parts of a valid copyright.

15           THE COURT:  But isn't that in a case where there are

16   disputed copyright holders?  And what of plaintiffs' argument

17   that you don't have standing to challenge their ownership of the

18   copyrights in this case because you're not alleging that you own

19   a competing copyright?

20           MR. BRIDGES:  Your Honor, the point is, _Feist_ says

21   the plaintiff has the burden of showing ownership in an

22   infringement case.  That was an infringement case.  The Supreme

23   Court said the plaintiff has the burden of proof of ownership.

24       Now, they are relying upon a statement in the Copyright Act

25   that says a registration within five years of first publication

is prima facie evidence.  Doesn't say that a defendant doesn't have standing.  It says it's simply prima facie evidence.

And by the way, speaking about AERA, AERA is now relying on a 2014 registration, because it acknowledges that the 2009 registration was wrong.  So the 1999 registration was wrong.  So it's not relying on the 1999 registration; it's relying on a 2014 registration.  It's not within the five years.  No presumption on error.

But coming back to your point, the argument that they're basically making is that there's no standing to challenge standing.  Standing is an Article III plaintiff burden.  It has to show that it owns something.  And, yes, it can have a prima facie case from the statute, but the statute doesn't say somebody accused of infringement can't challenge the first Feist factor.  That's a red herring.

There have been some cases that have said that, where I think they are cases where they're saying somebody's a dirty infringer; I'm going to throw the book at them.  That seems to be the approach.  It's almost like the fugitive disqualification doctrine or something like that.  It doesn't play here.  Feist made it clear that plaintiff has the burden.

And in every copyright case brought by a U.S. author, there must be a registration.  There must be a registration.  Otherwise, you don't get into court.  So the argument that a registration denies a defendant the ability to defend against

1   the first element of Feist makes no sense, Your Honor.

2        Now I would like to go to the substance here because,

3   frankly, yes, the ownership issues here are a dog's breakfast,

4   Your Honor.  They are a complete chaos, and I think it's --

5            THE COURT:  Why isn't it enough for the plaintiffs to

6   demonstrate that they have at least one individual who will sign

7   their authorship rights to the plaintiffs in each of the works

8   at issue?

9            MR. BRIDGES:  That would be enough to give them

10  standing, and we're not saying they don't have standing.  But I

11  would like to direct the Court's attention to a case involving

12  one of the plaintiffs here, National Fire Protection Association.

13       It had standing in its case when it was sued for copyright

14  infringement by another code company.  It had standing, it

15  challenged ownership, and the district court, Northern District

16  of Illinois in 2006, when the shoe was on the other foot,

17  acknowledged that when NFPA was the defendant, it made some

18  valid points about problems with the ownership.

19       It said summary judgment would be inappropriate on

20  ownership.  It's clear that they don't own everything.  There

21  needs to be a trial to sort out what they do and don't own,

22  because what they do and don't own makes a difference to what

23  the alleged infringement is.  So I absolutely ask the Court to

24  read International Code Council v. National Fire Protection

25  Association, 2006 Westlaw 850879, Northern District of Illinois,

1   2006.

2       And what's interesting is that Public.Resource is just

3   making the arguments here that National Fire Protection

4   Association made there.  Now it's changed its tune.  But what's

5   interesting is how many different ways the plaintiffs have

6   changed their tune.  If you read their briefs, they are all in

7   on these being joint works.  They're joint works.  That's where

8   they put all their force.

9       Except that none of their registrations call them joint

10  works.  They didn't.  And it's a material omission.  Why?

11  Because if a work is a joint work, all authors are to be named

12  in the registration.  All authors.  And they didn't do that.

13  And so the whole joint-works argument that you see now is just

14  thrown up here.  It wasn't in the registrations.  It's thrown up

15  here because they know they've got severe problems with the

16  assignments.

17      And I've given a copy of this to opposing counsel.  I would

18  like to hand this up.  This, Your Honor, is a compilation of

19  documents regarding ownership, and we have put a summary -- I'm

20  not asking the first one to be into evidence, but there's a

21  summary on page 1 that you should consider part of our argument

22  that explains the various, different types of documents.

23          THE COURT:  Is this in the record?

24          MR. BRIDGES:  Tabs 2 through the end are in the

25  record, Your Honor, and they all have the filing stripes.

 1              THE COURT:  Tab 1 is the summary for --

 2              MR. BRIDGES:  Tabs 2 through 27.

 3              THE COURT:  All right.

 4              MR. BRIDGES:  And, Your Honor, if you look at the

 5    summary in tab 1, every one of ASHRAE's supposed assignments are

 6    not assignments.  They just aren't assignments.  If you look at

 7    what is in tab 2, that's the document.

 8         It says, "I hereby grant ASHRAE the nonexclusive royalty

 9    rights, including nonexclusive rights in copyright."  And down

10    below, it says "nonexclusive royalty rights."

11         A grant of nonexclusive rights does not convey an

12    assignment.  An assignment must convey exclusive rights of the

13    copyright holder.  There are no assignment documents from ASHRAE

14    with any assignment language.  It's all nonexclusive.  So that's

15    the first problem.

16         The second problem is with ASTM.  Bear in mind that the

17    latest ASTM standard at issue is 2007, and it admits that it

18    didn't ask for assignments until 2005.  And then it later said,

19    well, we sort of got assignments in our membership applications.

20    But before 2008, they have no completed membership forms and

21    therefore no assignments with the exception of one that really

22    doesn't matter.

23         It claims, well, we had an IP policy, but an IP policy is

24    not an assignment.  I mean, the copyright law is quite clear in

25    § 204.  It says, a transfer of ownership is not valid unless --

I mean, it is not valid unless an instrument of conveyance or a note or memorandum of the transfer is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.  And the cases are clear that when you say on these membership forms, oh, I agree that anything I do will belong to you, that's not an assignment.  So that's the ASTM problem. It's a severe problem.

Then we get to NFPA, and I will admit that the most recent NFPA standard is better.  Okay?  It is absolutely better. That's why they amended the complaint to add it to the lawsuit, because it may be the only document at issue in this case where there looks like pretty good ownership.  But even there, there's a problem, Your Honor, and this gets a little technical.

Now that they claim that everything is joint works from joint owners, what about the fact that some of these joint owners are the U.S. government?  That U.S. government employees participate as joint authors?

No case has ever dealt with this, Your Honor, and I don't know how to deal with it.  But § 105 of the Copyright Act says that U.S. government works are not subject to copyright, and Mr. Klaus explained that those are, where they're prepared by an employee acting in the scope of employment.  Now they're saying they've got joint works with a whole bunch of federal employees as joint authors.

So this is just a mess.  Your Honor, yes.  It is a dog's

breakfast.  It's a mess.  Mr. Fee said that.  They chose what case to bring.  They chose how complicated to make it.  They chose how vulnerable a set of standards they would choose. That's their problem.  I think, Your Honor, there's no way they get summary judgment on ownership.

I'm not necessarily saying that we deserve summary judgment on ownership, but the problem is this is a complete mess.  It's a mess of their own creation, and it's a mess caused in part because they've changed their story as to what it is.  Some of these things are nonexclusive licenses.  Some they claim -- they say in the registration, works made for hire.

Well, there's a reason for that, Your Honor, because if it's a works made for hire, then people can't terminate assignments after 35 years the way they can if they're not works made for hire.  There's a reason for that strategic point in copyright registrations.

They claim, oh, we didn't mean anything wrong, because we were told by the copyright office.  Your Honor, somebody reported what somebody said, something that happened years ago with no discussion about, well, what facts did they give the copyright office that caused the copyright office to say to do this?

The problem is the whole thing is a mess.  What we do know is that NFPA has been entirely hypocritical.  We know that everybody has abandoned the very basis of ownership they claimed in their registrations that they don't want us to challenge.

1    It's just -- it's got to be done thoroughly.

2         Unfortunately, ownership is on a work-by-work basis, and I

3    notice that they brought this motion on only -- I think it's

4    nine out of over 250 standards at issue.  There's a reason for

5    that.  They've cherry-picked their best cases, and even then

6    they've got a problem.

7         And then one thing about joint authorship, they say, well,

8    our staff were joint authors because we sort of helped add a

9    footnote or we helped perfect some language or whatever.  It's

10   clear that in a law review -- I don't want to say law review,

11   because it's got its own structure, but if I submit an article

12   to a law review and I own the copyright and the article, the

13   editor at the law review who edits my law review article doesn't

14   become my joint author.

15        Having some editing function isn't an authorial function.

16   And in many of these, the staff were forbidden from being

17   members of the technical committees that actually did the

18   writing, technical committees that had academics, government

19   officials and the like.  And Childress v. Taylor out of the

20   Second Circuit makes it clear that an editor is not an author.

21        I know we're running long, so I won't go any further.

22   I would just say, Your Honor, there is no way that they've

23   established ownership to the level that is necessary to get

24   summary judgment for them on this.

25        And I will say this.  Now that they claim that it's joint

works, the Copyright Act -- and remember, they claim they've got

joint works, but they have not identified in any registration

all the authors.  It is important and it is material, because in

the Copyright Act, it provides for the Court to consider

bringing in the other owners.  I'm not sure the other joint

owners here know about this case, and if any one joint owner

decides they like Public.Resource, that joint owner has full

authority to grant Public.Resource a complete license.

So they're saying, oh, we're joint owners with thousands

of people.  I think ASTM, across all its standards, says it has

24,000 people.  That's for thousands of standards, not just the

standards here.  But the point is, the Court has a responsibility

to look to make sure the joint owners are protected, because if

they are joint owners, they have a fiduciary duty to account

their profits to the other joint owners, which is just another

reason why it's such a specious argument.

And why are they making a specious argument?  Because what

they said in the registration isn't right, and what they tried

to do with the assignments couldn't turn the corner.  So that

was their third fallback, and it's intellectually dishonest,

Your Honor, and should not be countenanced.  Thank you.

THE COURT:  Thank you.

MR. FEE:  May I have one or two minutes, Your Honor?

There was a lot in there.

THE COURT:  I'd prefer one, but I'll give you two.

1          MR. FEE:  First of all, let's just cut to the chase

2     with respect to the notion that it was somehow a material

3     mistake not to list all the individual and joint authors.

4     We cited a case, the Original Appalachian Artworks case, for the

5     proposition that that's not a material mistake.  The other side

6     said nothing in their briefs.  We've heard nothing about it

7     today.

8          The other notion that I want to correct for Your Honor

9     is this notion that we are only claiming joint authorship.

10    As we point out in the briefs, and as even the court in Veeck

11    identified, organizations like this who are creating standards

12    are the organizational authors of these works, but because they

13    have literally no evidence to rebut the evidence we put in about

14    what particular authors wrote while they were in our employment,

15    that's the simplest way for you to dispel of this non-ownership

16    issue.  But we believe that we were the organizational authors,

17    we have joint ownership at a minimum, and we also have

18    assignments from the relevant persons.

19         Again, we didn't see any evidence about assignments that

20    were tied to any of the works in these issues.  I don't think

21    this book -- you know, I looked at whatever he pointed you to.

22    You couldn't tell if that person ever made any contribution.

23         That's also, I think, important with respect to the

24    government point he's trying to inject here at the last minute.

25    He's sort of hypothesizing about what contributions, if ever,

1    were made by federal government employees in the course of their

2    employment.  Then he's hypothesizing about a potential argument

3    that that somehow affects the copyright interest here.  There's

4    no support for any of that in either the case law or in the

5    record.

6        I do want to turn just for one second to this ICC case, as

7    well, that he likes to make a big deal about.  The ICC case,

8    first of all, there's two points that I think are important.

9    One is the assignment issues in the ICC case were a little

10   different than the ones that we have here in that there is also

11   a provision that was not raised in the ICC case that is raised

12   in this case as a basis for assignment.

13       And similar language is also available to ASHRAE.  If you

14   look at the ASHRAE assignment that Mr. Bridges read to you --

15   I think it was Exhibit 2.  So he read one portion of that

16   document to you.  But in the section that has the No. 2 next to

17   it, at sort of the end of that, it says, "I understand that I

18   acquire no rights in publication of this standard in which my

19   proposal in this or other similar analogous form is used."

20       So there's a clear disavowal of any ownership right in

21   these forms that was also present in the NFPA forms as well.

22   That, combined with the fact that the NFPA has been claiming

23   ownership for these works for over a century without any

24   objection I think is more than adequate to show that there's an

25   intent to assign, and this document suffices to meet the statute

of frauds requirement for the Copyright Act, assuming you even

believe that they could raise that issue.

Did Your Honor have anything else?

THE COURT:  No.  Thank you.

And I'll just say now that, given where we are with time,

I'm not going to hear argument on the motion to strike the

experts.  I can rule on the papers on those unless you think

there's something absolutely -- and I apologize if somebody

spent a lot of time preparing to argue that; but given where we

are, I feel like the briefs have covered that, and I can rule on

the papers on that one.

Mr. Hudis, did you have something that your learned

co-counsel didn't cover?

MR. HUDIS:  Only what Mr. Bridges just brought up.

I'll take a minute.  The '99 registration, yes.  We are

absolutely relying on that.  The only thing that was changed

from '99 to 2014 was to add the two other co-owners.  A mere

correction of ownership.  We have cited the Billy-Bob v. Novelty

case out of the Seventh Circuit, and it says they have no

standing to challenge any of this.  This was a mere correction

of a mistake.  It is not a material mistake, and anything that

Mr. Bridges says otherwise is just not true.

Merely providing comments, by the way, this is something

that Mr. Bridges just said that was very surprising to me.

Merely providing comments is not authorship.  Well, then, we

1    have ownership and validity and authorship all wrapped up in a

2    very nice, neat bow.  There's no challenge on anything I heard

3    from Mr. Bridges just now about the ownership of our copyright.

4    Thank you, Your Honor.

5              THE COURT:  Thank you, Mr. Hudis.

6         So on the trademark issue from ASTM?

7              MR. FEE:  Kevin Fee again, Your Honor.  Just one more

8    point, if you don't mind, on the copyright that Mr. Hudis just

9    reminded me of.  The evidence with respect to copyright

10   ownership is not that there were just editorial changes made by

11   the parties.  We have declarations with respect to ASTM where

12   we've identified entire paragraphs that were written by ASTM

13   employees in the course of their employment.  So the notion that

14   we were adding a footnote or changing a comma here and there is

15   just not consistent with the evidence.

16        Now moving on to the trademark issues.  Public.Resource,

17   like its ownership story, has done its best to try to complicate

18   this trademark case, which I think is really actually a

19   relatively straightforward trademark case.

20        Public.Resource has used exact copies of plaintiffs' marks

21   on what it claims to be exact replicas of plaintiffs' standards,

22   and it intends the public to believe that the materials that it

23   posted on its website are authentic versions of the standards

24   offered by the plaintiffs, when they simply are not.

25        The fact of the matter is that the plaintiffs in this case

1  have absolutely nothing to do with the electronic files that

2  Public.Resource posted on their website.  Plaintiffs had never

3  seen those files before they were posted on the Internet, and

4  plaintiffs exercised no quality control over the files that the

5  defendant posted on the Internet.  And it certainly did not

6  authorize Public.Resource to put those files -- sure.

7  The bottom line is, Public.Resource placed plaintiffs'

8  trademarks and logos on knockoff publications that are of an

9  inferior quality to the publications of the plaintiffs, and

10  that is a clear-cut trademark infringement case for which

11  summary judgment is warranted.

12  Now, there is no argument here about whether or not

13  plaintiffs own protectable trademarks.  And when an identical

14  trademark is used in connection with identical or very similar

15  products, it is not necessary for Your Honor to even walk

16  through all the likelihood of confusion factors, and we cited

17  numerous cases for that proposition in our briefs.

18  And not surprisingly, Public.Resource doesn't cite a single

19  case where a plaintiff failed to meet its burden with respect to

20  trademark infringement when there is evidence of the exact same

21  mark being used in connection with very similar services when

22  there is an intent to have consumers believe that the source or

23  origin of the defendant's product was the plaintiff.

24  THE COURT:  Let me ask you.  You argue that the

25  defendant's double-keying method is not as effective as the

1    triple-keying method for guarding against inaccuracies, but as

2    I understand the doctrine, I should be able to look at evidence

3    of your quality control standards to determine that defendant

4    hasn't met them.

5         Did you put in any evidence of your own quality control

6    standards, and if so, where is it in the record?

7              MR. FEE:  I believe that if you look in the ASTM one

8    I'm most familiar with, Mr. Tom O'Brien's declaration, there is

9    a description of those quality control methods.

10             THE COURT:  All right.

11             MR. FEE:  But I would point out that I think

12   the bottom line is that that doesn't really matter in this

13   circumstance except with respect to harm, which you may hear

14   about later.

15             THE COURT:  Right.

16             MR. FEE:  But whether or not -- you know, they could

17   have done a perfect job complying with our quality control

18   standards.  They still don't have the right to steal our

19   trademarks and put it on something we have nothing to do with.

20        Because there's no real good argument for the assertion

21   that you could use the exact same mark on virtually identical

22   products without avoiding infringement, the primary argument

23   that we hear from Public.Resource is that you can't bring a

24   trademark case in this circumstance, and that argument is based

25   entirely on the Supreme Court's decision in Dastar.

1      But the very first sentence of the <u>Dastar</u> opinion starts

2  with Justice Scalia saying that the issue before it was "whether

3  § 43(a) of the Lanham Act prevents the unaccredited copying of a

4  work."

5      That is not the issue in this case.  In fact, it's the

6  exact opposite.  This is not an unaccredited copying of a work.

7  It is placing a party's trademark on a work that the plaintiff

8  had no involvement in the product that bears its trademark.

9  But the Supreme Court in that case decided that it must assess

10  whether or not § 43(a)(1)(A) of the Lanham Act's use of the term

11  "origin of goods" covered just the person who made the physical

12  good or whether it was the person who created the expression.

13      The Court in that case held that "origin of goods," as that

14  term is used in § 43(a), covers just the physical good at issue

15  and not the person who created the expression that might be

16  embodied in that good, and it reached that conclusion because

17  it wanted to avoid the possibility of there being a perpetual

18  copyright for the expression after the copyright had expired or

19  otherwise gone away.

20      So the Court noted that "The rights of a patentee or a

21  copyright holder are part of a carefully crafted bargain under

22  which, once the copyright monopoly has expired, the public may

23  use the invention or work at will but" -- and this is

24  important -- "without attribution."  That is not what happened

25  here.

1        On the other hand, the Supreme Court noted, "A party could

2   face Lanham Act liability for crediting the creator if that

3   should be regarded as implying the creator's sponsorship or

4   approval of the copy."  And that's exactly what's happened here.

5        So Dastar actually confirms that a trademark infringement

6   case is possible in this circumstance, not the opposite.

7        But you don't have to take my interpretation of Dastar.

8   We've cited many cases that confirm this is how Dastar's

9   properly interpreted.  In the Bock case, the Court held that

10  Dastar stood for the proposition "that the origin of goods

11  provision in 43(a) of the Lanham Act does not contain a cause of

12  action for plagiarism."  That's true.  If we were complaining

13  about the unattributed copying of our text, then Dastar would

14  bar that claim, assuming we didn't have a copyright infringement

15  claim.

16       On the other hand, the Slep-Tone case that we cited

17  indicated that Dastar suggested that "there would have been a

18  Lanham Act violation where, for example, Dastar had simply

19  copied the television series and sold it as *Crusade* in Europe

20  without changing the title or packaging, including the original

21  credits to Fox.

22       So just like in our case where they don't change the

23  original crediting to the plaintiffs, the Slep-Tone case

24  concluded that a trademark case could be brought in conjunction

25  with a copyright infringement case in that circumstance.

1    Public.Resource really only cites one other case in support

2    of its argument; but that case also involved an attempt to

3    convert a plagiarism case into a trademark infringement claim,

4    and that was the Prunte v. Universal Music Group case.

5    Public.Resource also has tried to defend its conduct under

6    the first sale doctrine, but the first sale doctrine applies

7    only to goods that are being sold when those goods are the

8    genuine product of the plaintiff that are being resold to

9    consumers.  The electronic files that are being sold by the

10   defendant in this case were posted, are not the authorized

11   documents that were created by the plaintiffs, and therefore

12   are not subject to the first sale doctrine.

13   Public.Resource had purchased hard-copy materials from

14   the plaintiffs, and if they had wanted to repackage those or

15   do something with the hard copy that they had, that would be

16   covered by the first sale doctrine.  But that's not what they've

17   done here.

18   Instead, they've created new documents or electronic files

19   of what they purchased from the plaintiffs and tried to defend

20   that under the first sale doctrine, but the bottom line is that

21   those electronic files were never purchased from the plaintiffs

22   in this case.  Making things worse, of course, they're of a

23   lesser quality than the plaintiffs' works.

24   Defendants also try to defend their use of the plaintiffs'

25   trademarks by claiming nominative fair use, but there's three

1    requirements that prove nominative fair use.  One is that the

2    use of the plaintiffs' mark is necessary to describe the

3    plaintiff's product.  But there's no reason that the plaintiffs

4    need to refer to ASTM if what they're really trying to publish

5    is the law.  They could just publish what they call "the law"

6    without reference to ASTM or the other plaintiffs, and that's

7    exactly what happened in the Veeck case.  In Veeck, the Fifth

8    Circuit noted that Veeck had just identified the building codes

9    as the law as to relevant towns and not as the model codes

10   themselves, which is what is being done here.

11       The second requirement for non-fair use is that the

12   defendant only use as much of the plaintiffs' trademark as is

13   necessary.  It's not necessary, as I just explained, for them to

14   use any of our marks, but it certainly is not necessary for them

15   to use the logos of our clients.

16       There's a long line of cases that we've identified in our

17   brief that stand for the proposition that it's very unusual, if

18   not almost never the case, that you have to actually use a logo

19   as part of a nominative fair use.  If they had to use our name

20   at all, they could just call it ASTM Standard D975.  They don't

21   need our circle and our symbol there.  There's no way to argue

22   otherwise.

23       It's even pointed out and made more clear by the fact that

24   Public.Resource, after the fact now, has started to post some

25   standards not at issue in this case, but other standards of

1    plaintiffs where they don't put the logo on there.  So they

2    obviously don't need to have the logo there.

3         The third requirement for nominative fair use is that the

4    defendant not do anything that suggests sponsorship or

5    endorsement by the plaintiffs of the works that are being

6    provided by the defendant.  But Public.Resource, the testimony

7    is clear, did everything in its power to try to make the

8    standards that he was posting or that Public.Resource was posting

9    on the website to look exactly like our standards.  So there's

10   no basis for the notion that they did anything to avoid a

11   likelihood of confusion in their supposed nominative fair use.

12        The last point I want to touch on real quickly is the

13   notion that some disclaimer is present and that somehow that

14   will eliminate the likelihood of confusion.

15        First of all, it bears noting that the defendant has the

16   burden of proof with respect to showing that a disclaimer will

17   eliminate the likelihood of confusion.  The CFE Racing case,

18   793 F.3d 571, from the Sixth Circuit so holds, as does Weight

19   Watchers v. Luigino's, 423 F.3d 137.

20        Public.Resource presented literally no evidence that any

21   disclaimer would be effective in this case.  In fact, the truth

22   of the matter is, with respect to the standards at issue in this

23   case, there are no disclaimers at all.

24        You saw the sort of cover sheet you were referring to

25   earlier with the red, white, and blue stripes on there which I

1    think Public.Resource likes to suggest is a disclaimer of some

2    sort, but that disclaimer says nothing about not being affiliated

3    with the plaintiffs in this case or that Public.Resource has

4    authored these materials in any way.  After the fact,

5    Public.Resource submitted some evidence of a disclaimer, but it

6    has nothing to do with any of the works in connection with this

7    matter.  In any event, a proper disclaimer is not sufficient in

8    this case.

9        As the court in the International Kennel Club case in

10   the Seventh Circuit recognized, quote, "especially where

11   infringement in the case is verbatim copying of plaintiff's

12   name, we are convinced that plaintiff's representation and

13   goodwill should not be rendered forever dependent on the

14   effectiveness of fine-print disclaimers often ignored by

15   consumers."

16       The thing that's most prominent and that tells the

17   consumers in the first instance who is the source of these

18   materials are the logos of the plaintiffs in this case.

19   That's what parties are going to look at when they're trying to

20   figure out who was responsible for these files. If you have some

21   sort of disclaimer on it, it's going to be ignored.  That's why

22   courts frequently don't find disclaimers to be sufficient to

23   avoid confusion.

24       Unless Your Honor has any other questions, that's all I

25   have.

```
 1              THE COURT:  Thank you.

 2              MR. BRIDGES:  Thank you, Your Honor.  This is

 3    Andrew Bridges again for Public.Resource.

 4              THE COURT:  Mr. Bridges, if the defendant's sole

 5    purpose is to disseminate the law, as you say, why do you need

 6    to disseminate the plaintiffs' logos?

 7              MR. BRIDGES:  We don't have to, Your Honor, except

 8    that what we've done is, in the spirit of what we understand the

 9    incorporation is to be, which is incorporation of particular

10    documents, Public.Resource has replicated the entire document.

11    As is.  Now, we need --

12              THE COURT:  Well, then you add this certificate; right?

13              MR. BRIDGES:  That's right, which emphatically

14    makes the point that it is the law.  It doesn't say this is

15    Public.Resource's.  We need to be clear.  The allegations that

16    Public.Resource is trying to confuse the public about source

17    sponsorship or affiliation of these standards is pretextual and

18    ironic.  The fact is, they would sue Public.Resource no matter

19    what.  If Public.Resource dropped the logos, they would sue for

20    reverse passing-off, but because it maintained the logos,

21    they're suing for trademark infringement.

22         Let me be clear.  Public.Resource would take direction from

23    this Court.  Logos: yes or no?  It doesn't care.  It simply

24    tried to replicate the law which consists of these documents

25    incorporated by reference.
```

1        Disclaimer.  First of all, the Supreme Court in two cases

2   has approved disclaimers.  If Public.Resource needs to say --

3   first of all, I'm not sure that the plaintiffs would want their

4   logos taken off because they use their monopoly position to try

5   to make money by associating these standards that have become

6   law with themselves.  But if they want the logos off, we will

7   get the logos off, Your Honor.  That's not a sticking point.

8   We're just trying to make clear that these are the laws that are

9   in the CFR or state law or whatever.  If the Court wants a

10  disclaimer --

11        THE COURT:  Well, with regard to disclaimer, if you

12  point to your disclaimers as sufficient to notify consumers that

13  the standards aren't originals, that they're reproductions, I

14  look at the language on the cover page, and it's hard to

15  understand how this -- is this Exhibit 16? -- how this resolves

16  any confusion.

17        MR. BRIDGES:  Your Honor, it's not just about this.

18  It's about the entire experience that somebody has going to

19  Public.Resource's website.  When I go to the Cornell website, I

20  don't think I'm going to the Library of Congress to get a law.

21  I know I'm going someplace where I can get the law.  I've got no

22  confusion between the National Archives and Cornell, but I know

23  that I can go to Cornell to get the law.  There is no likelihood

24  of confusion that somebody thinks Public.Resource wrote these.

25        THE COURT:  Then why do you have a disclaimer?

1        MR. BRIDGES:  We have this document that says this is

2    the law.  We have -- and I'm not -- there are different

3    disclaimers at different times, so I'm not clear on exactly what

4    they've all been.

5        THE COURT:  Why do you even need this?

6        MR. BRIDGES:  We need this to make a political point

7    that this is the law, and we want people to understand that this

8    is no longer just somebody's private standard.  This is the law,

9    and that's exactly what it says here.  It's giving the citation

10   to the U.S. Code that makes it the law.

11       THE COURT:  If all you want to do is to make sure that

12   consumers realize that it is the law, why do you need their logo?

13       MR. BRIDGES:  I'm saying, Your Honor, we would drop

14   the logo in a second if that's the Court's direction.  The

15   reason we included the logo -- we don't have to have a fight

16   over them with this.

17       THE COURT:  Well, they brought a claim.

18       MR. BRIDGES:  That's right.  They brought a claim, and

19   they would have brought a claim no matter what we did, because

20   it's really a copyright issue.

21       THE COURT:  The Court is unconcerned with their

22   motivations for bringing a claim.  My only concern is whether

23   they have a valid claim.

24       MR. BRIDGES:  Your Honor, if the motivation is to

25   enforce a copyright right, then it's squarely in the middle of

 1    <u>Dastar</u>, and that's a problem.  That's why the motivation is

 2    relevant.  If it is to get around a limitation imposed by the

 3    Copyright Act, then it's a <u>Dastar</u> problem.

 4        But let me make it clear.  We're trying -- we don't -- what

 5    we want is to continue to make the law available.  It doesn't

 6    matter if it is with a logo or without a logo.  We just want to

 7    make the law available.  But they would have sued us for

 8    dropping the logo as well as for including the logo because they

 9    don't want the standards out there.  And that's the copyright

10    issue.  This is really a copyright case.

11        So if the Court says drop the logos, they would be dropped.

12    If the Court says add a disclaimer that says you have scanned

13    and reformatted these, we would add that disclaimer.  If you

14    want to say Public.Resource had no involvement in the creation

15    of these standards, that's fine.  Public.Resource has no desire

16    to create any confusion.

17        As a matter of fact, Public.Resource tries to be very clear

18    about what these are.  If anything, the plaintiffs want everybody

19    to think you have to buy the law from them, and that's the

20    problem in this case because they're saying they've got an

21    exclusive right to the law and they have the right to control

22    who accesses the law, who makes a derivative work of the law and

23    so forth.

24        So this trademark issue need not be an issue, because

25    Public.Resource isn't trying to make a point about itself other

than to be clear about what it's doing.  So there is -- we can
fight the trademark fight, but we don't need to fight a
trademark fight, Your Honor.

THE COURT:  All right.  Thank you, Mr. Bridges.

MR. BRIDGES:  Thank you.

THE COURT:  Any discussion of remedies?

Good afternoon now.

MR. CUNNINGHAM:  Good afternoon, Your Honor.
Blake Cunningham of King & Spalding.  I represent Plaintiff
ASHRAE.  I'll be speaking on behalf of the ASTM plaintiffs on
this topic.  I'm mindful of the time, so I'll try to keep this
very brief.

Now, Your Honor, the Supreme Court counseled, in the
eBay v. MercExchange case, that there are four essential factors
that should be considered when a court is deciding whether to
exercise its discretion to issue a permanent injunction.

The first of these factors is whether or not irreparable
injury will occur in the absence of an injunction.  Now, here
it's not disputed that plaintiffs' standards have been accessed
thousands of times on defendant's website.  It's also not
disputed that defendant placed plaintiffs' standards on the
Internet Archive website and that they were downloaded thousands
of times from that site.

That these downloads and accesses would represent some
impact on the legitimate market for these works is, as Your

Honor noted earlier today, somewhat a matter of common sense.
But in this case, we've also backed it up with the expert
opinion of Mr. Jarosz, which of course went unrebutted.

THE COURT:  Let me ask you -- and I don't mean to jump
around, but while I have you up here.  You've moved to summary
judgment as to six standards.  At this time, are you still
seeking a permanent injunction just as to those six?

MR. CUNNINGHAM:  So we are seeking a permanent
injunction -- I think it was nine standards, Your Honor, that we
moved on.  So we're seeking a permanent injunction for those
nine standards.  We're also asking that the Court enjoin future
infringement.  We've cited a number of cases in our briefs where
courts have enjoined future infringement of separate works, and
here we think that's especially on topic because Public.Resource
-- I think even earlier today Mr. Bridges stated that they plan
to keep posting more and more works, and it would not be
efficient for any of us if we have to keep coming back and
reliving this same case.

THE COURT:  You seek to cure the copyright
infringement broad enough to cure any trademark infringement,
as well as -- from what I hear, everybody's willing to be
reasonable on this, but --

MR. CUNNINGHAM:  Yeah.  I think an injunction on the
copyright infringement would tend to also encompass the
trademark issues.

1      THE COURT:  And what's your intention regarding your

2 remaining contributory copyright infringement claim?

3      MR. CUNNINGHAM:  If we got an injunctive relief that

4 involves taking the standards off the website, I don't think we

5 would intend to keep pressing for any sort of damages or

6 anything on a contributory theory.

7      THE COURT:  All right.

8      MR. CUNNINGHAM:  So, Your Honor, the kind of question

9 becomes, when looking at the harm here, whether the harm is

10 itself irreparable.  Now, courts have looked at this question of

11 what makes harm reparable or irreparable, and the Second Circuit

12 in the Salinger v. Colting case took up this question and said

13 the following:

14 "Harm might be irremediable or irreparable, for many

15 reasons, including that a loss is difficult to replace or

16 difficult to measure, or that it is a loss that one should not

17 be expected to suffer."

18 Now, in this case, I feel like there are at least three

19 reasons why the harm that's suffered would be very difficult to

20 measure and difficult to compensate with monetary damages.

21 The first is, as our expert Mr. Jarosz went into detail on,

22 one of the likely outcomes of this case is that plaintiffs would

23 have to change their business models.  If we lose the revenue

24 from selling standards, we may have to switch, for instance, to

25 a business model where we charge people to participate in the

1    standards creation process.

2        Now, our clients feel like that would result in less

3    preferable standards that don't reflect the broad interest that

4    we currently try to reflect in our standards creation.  They may

5    also be the result that we would produce less standards, fewer

6    standards.  Again, that's a negative outcome for us, but it's

7    one that's particularly hard to quantify.

8        A second reason why damages might be hard to quantify here

9    is that the works are shared without restriction online by the

10   defendant.  This leads to an outright loss of control by

11   plaintiffs of their copyrights.  The works can be downloaded,

12   printed, and even redistributed by anyone.  And Public.Resource

13   notably does not have information on how the works are used

14   after they're downloaded, which means that we can't even know

15   the full extent of the infringement here.

16       Now, this is very much analogous to the 2007 Grokster

17   case which we discuss in the briefing.  In that case, the

18   defendant was being sued for marketing a peer-to-peer

19   file-sharing network that facilitated widespread sharing of

20   files, and the Court found irreparable harm because the nature

21   of the defendant's conduct and the redistributable nature of the

22   works rendered the works "particularly vulnerable to continuing

23   infringement on an enormous scale."

24       The Court went on there to say, "When digital works

25   are distributed via the Internet, every downloader who receives

1    one of the copyrighted works is, in turn, capable of also

2    transmitting perfect copies of the works.  Accordingly, the

3    process is potentially exponential rather than linear,

4    threatening virtually unstoppable infringement of the copyright."

5        And we feel like we're in the same situation here.

6    Defendant has shared our works without restriction, we have no

7    view into how they're being used down the line, and there's

8    virtually unlimited infringement happening.  So it represents an

9    outright loss of control of our copyrighted works.

10       The third thing I wanted to get into in terms of why harm

11   would be incredibly difficult to quantify here is that there's

12   reputational harm.  It's not disputed, I think, that our

13   clients, the plaintiffs, have spent decades, if not over a

14   century, building their reputations by producing quality

15   standards.  And if these are recreated in ways that include

16   errors, include substantive errors, then that could be

17   potentially damaging to the reputation of our clients.

18       And as Mr. Fee explained in his argument, this is not

19   necessarily a purely theoretical argument.  We do believe that

20   Public.Resource's quality control mechanisms have been quite lax

21   and have resulted in some substantive errors.  One that I'll

22   provide as an example, in Mr. Pauley's declaration, Mr. Pauley

23   from NFPA described how Public.Resource's OCR process had changed

24   the letter M, which stands for meters, into two letters, I and

25   N, which of course could be an abbreviation for inches.

1    So it's not hard to see that these errors could lead to

2    real substantive changes in the works, and we feel like our

3    clients should not be forced to suffer the kind of reputational

4    damages that come along with these type of errors.  And in fact,

5    the law is pretty clear on this.  We cited two recent cases from

6    this circuit, the Breaking the Chain case and the Hanley-Wood

7    case that said that where there's a continued threat of

8    infringement that could harm the reputational interest, that

9    that in fact does justify an injunction.

10   Now, defendant, for its part, they can't come up here and

11   tell you that absolutely there is no harm that exists.  Instead,

12   they're going to try to shift the dialogue here to say that

13   there's not very much harm or enough harm.  They're essentially

14   trying to import a fifth factor into the eBay test and say that

15   there must be a severe harm.  But that's not really the standard

16   here, Your Honor.  The standard is whether the harm at issue is

17   irreparable, and the bar is much lower than defendants would

18   suggest.  I'll refer again to the Grokster case.

19   In that case, the court stated, "Irreparable harm may not

20   be presumed, but in run-of-the-mill copyright litigation, such

21   proof should not be difficult to establish."  And then the court

22   went on to explain that loss of market share and reputational

23   harm were prime examples of how that could be established.

24   Similarly, the Second Circuit in Salinger v. Colting

25   speculated that, even after eBay, as an empirical matter, most

copyright cases would likely involve some form of irreparable
harm.  And then the court went on to say, "The historical
tendency to issue preliminary injunctions readily in copyright
cases may reflect just that."  Put simply, the burden is not so
high as the defendant suggests when it comes to irreparable
harm.

The second one of the factors which I'd like to discuss
quickly is whether or not there are other remedies available
that would be sufficient here.  As I've already explained, it
would be very hard to quantify what damages would be in this
situation, but even if you could do so, I think it's not
necessarily contested that defendant has no willingness or
ability to pay damages here.

In fact, if you look at the briefing, the defendants were
silent on this one of the four _eBay_ factors.  They essentially
conceded it, and there's a reason for that.  We've got 257 works
at issue in just the ASTM case.  Statutory damages in the
copyright scenario can be up to $150,000 per work for the kind
of willful infringement that we've got here.  So you're looking
at tens of millions of dollars in potential damages and a
defendant who has very, very limited resources and no ability to
pay that.  So there are no monetary damages really available
here, and that's why we've chosen to bring this case and ask for
an injunction.

Now, one other thing I'd like to say on that is, because

the monetary relief here is really inadequate, if the Court finds for us on the merits, the only prudent thing to do would be to issue an injunction.  We can't be in a situation where it's kind of winner takes nothing, where we don't get an injunction or damages, and the damages here aren't available.

So if Your Honor did find for us on the merits but didn't find that injunction was warranted, I guess our only option would be to, next time Mr. Malamud posts a standard, actually to sue him again and this time to ask for damages.  I don't think that that would be an efficient outcome for the defendants or the plaintiffs or the court.

The third factor, Your Honor, to consider under eBay is a balance of the hardships.  This is a particularly easy factor here because we have deposition testimony from Mr. Malamud where he essentially admits that there would be no harm to Public.Resource.  Mr. Malamud was asked at his deposition:

"If Public.Resource was unable to continue to post the standards incorporated by reference on its website, what impact, if any, would that have on Public.Resource's financial ability to survive long-term?"

He stated, "Probably none."

Mr. Malamud was also asked if he could identify any way in which Public.Resource would be harmed.  The only thing he could think of was that there might be potential wasted effort in posting these standards online.  But, of course, this wasted

1    effort is legally irrelevant since an infringer cannot claim an

2    equitable interest in its infringing conduct.  I would direct

3    the Court to the Fox television case for that proposition.

4        Now, the final of the four factors that I'd like to talk

5    about is the public interest.  This has already been covered to

6    some degree in the earlier arguments today, so I won't go into

7    the details other than to say that there is a public interest in

8    promoting the creation of creative works.

9        In this instance, we feel that's especially important since

10   the works here serve the public good.  Even Mr. Malamud has

11   admitted that these are important works.  He's stated that

12   NFPA's works, quote, "save lives."  And we've got the opinions

13   of Mr. Jarosz and in amicus briefs where we've seen that if an

14   injunction doesn't issue here, there's a real fear that the

15   quantity and quality of these works will be diminished.

16       Now, we have to balance that against the public interest

17   that Public.Resource claims that it serves, which is increased

18   access.  But I think as we've heard a lot about earlier today,

19   there is really no access issue here.  Mr. Malamud is kind of

20   the lone complaining voice when it comes to access to these

21   standards.  There's no evidence that anyone who really needed to

22   use these standards has not been afforded access, and we already

23   provide access in our reading rooms.

24       So when you balance these two things, I think it's pretty

25   clear that this factor, as well as the other three factors that

we've discussed, weighs in favor of granting an injunction. Thank you, Your Honor.

THE COURT:  Thank you.

MR. HUDIS:  Good afternoon, Your Honor.  Jonathan Hudis for the AERA plaintiffs.  This is on the right to relief.

As Mr. Cunningham cited the eBay four factors for entitlement to a permanent injunction, I won't reiterate them for the Court now but just to go through the factors as unique to our plaintiffs in the 14-857 case.

As the sponsoring organizations have established the threat of Public.Recource's continuing infringement, they're entitled to an injunction.  That's the Green v. Brown case in this Court, DDC 2015.  Public.Resource's stated goal and mission is to publicly post standards incorporated by reference into federal and state law.  Public.Resource still has an unauthorized copy of the sponsoring organization's standards on its server, as does the Internet Archive.

It would be very simple for Public.Resource to repost the 1999 standards to Public.Resource's website and to the Internet Archive with little effort.  Mr. Malamud further admits that he will strongly consider posting the 2014 standards to the Internet if they are incorporated by reference to law, and that was repeated by Mr. Bridges here today.

Thus, absent the issuance of a permanent injunction, Public.Resource will continue to disseminate plaintiffs'

standards without authorization.

To the factor of irreparable harm, the Court should properly look to the future threat of injury to the sponsoring organizations.  Number one is plaintiff's inability to prevent further viral infringement, and we cited, among many cases in our briefing, the Walt Disney and Hanley-Wood cases in this circuit.

The damage has already been done with respect to the '99 standards that were published for the two years online.  The 2014 standards were announced in 2011, at which point there was a 27 percent drop in the sales of the 1999 standards.  Then in 2012, the year that Public.Resources posted the infringing copies of the 1999 standards to the Internet, there was a further 34 percent drop in sales, and then the sales stayed suppressed in 2013.

The 1999 standards are used in many graduate courses. The sales to students should have remained constant year after year until the release of the 2014 standards in August of 2014, and that was testified to by Professor Geisinger, both in his declaration and in his deposition.

So again, same with the ASTM plaintiffs.  The sponsoring organization's inability to measure sales losses due to Public.Resource's acts of infringement and contributory infringement, the funds which otherwise would be used for saving up to underwrite the cost of developing future updated standards

1    would be in jeopardy.

2         There would also be two -- excuse me -- three adverse

3    effects on the quantity and quality of the effort the joint

4    committee selected by the sponsoring organizations put in to

5    creating and updating the standards.  If their work can be

6    freely distributed on the Internet immediately upon publication

7    and incorporation by reference --

8              THE COURT:  Slow down a little bit, Mr. Hudis.

9              MR. HUDIS:  Slowing down -- potential future joint

10   committee members and the sponsoring organizations themselves

11   will lose incentives to update this work.

12        Finally, as to irreparable harm, would be the inability to

13   inform the public that the 1999 standards are no longer the

14   latest version, and the public should purchase the 2014 version

15   instead.  This harm to the public would be highly damaging to

16   the sponsoring organizations' collective reputations.

17        The balance of hardships.  In contrast to the significant

18   harms to the sponsoring organizations if a permanent injunction

19   is not granted, Public.Resource has no cognizable interest in

20   continuing to infringe our standards and our copyright.

21        As an infringer, Public.Resource cannot complain about its

22   loss of copyright to offering an infringing substitute online,

23   and that's the WPIX case we cite in our briefs.  It therefore

24   will suffer no recognizable harm if a permanent injunction is

25   entered.

1    Finally, the public interest, Your Honor.  Here the public

2  interest favors entry of an injunction to stop further copyright

3  infringement.  The object of copyright law is to promote the

4  store of knowledge available to the public.  The Copyright Act

5  accomplishes this by providing a financial incentive to

6  contribute to the store of knowledge.

7    Allowing Public.Resource and others to freely copy the

8  sponsoring organization's standards will detract from the

9  important store of knowledge, recommended best practices for

10 testing, design, and administration available to the public.

11 If plaintiffs do not have continuing incentives to secure

12 copyright protection, those incentives to have updated standards

13 in the future will be lost.

14    Unless Your Honor has any questions, those are my remarks.

15         THE COURT:  Thank you.

16         MR. HUDIS:  Thank you, Your Honor.

17         MR. BRIDGES:  Your Honor, while I think we agree that

18 eBay has stated the facts, one thing eBay also said was success

19 on the merits alone does not justify an injunction.  So I think

20 that much is clear.  I want to move quickly through the first

21 three factors and focus a bit on the fourth factor.

22    The question as to whether plaintiff has suffered

23 irreparable injury.  So ASTM's president conceded, in an

24 internal document, "To date, all of Public.Resource's postings

25 have not had a measurable effect on our finances."

1      So they have relied upon two experts.  I'll let the motions

2  to strike speak for themselves, but they are extremely weak, and

3  that's trying to be very charitable.  They are not competent

4  evidence.  There are no qualifications that are appropriate for

5  them.  It's just serving as mouthpieces for things that

6  witnesses should have been saying on their own and

7  cross-examined on, and their methodologies were appalling.  And

8  that's what they needed to show actual harm.

9      I want to go back to this point in Mr. Geisinger's report.

10  He completely whiffed on the --

11      THE COURT:  What would be an appropriate remedy?  If I

12  found for the plaintiffs, what would be an appropriate remedy in

13  your case if there is no irreparable injury for an injunction?

14  I assume you're not going to say, oh, we are able to pay money

15  damages.  What would be the appropriate remedy?

16      MR. BRIDGES:  I am not able to say, Your Honor,

17  because we feel that the public interest here is huge, and I'll

18  have to address that.  If the Court decides the Court is

19  inclined to grant an injunction, then I would suggest that we

20  have a separate round to address details.  But it's just not

21  appropriate here, for a variety of reasons.

22      In HathiTrust, the court -- well, that's in hardships.

23  I'll get to that later.  But the experts here were their

24  substitute for facts, and their experts did not provide valid

25  bases for claiming irreparable harm.

1    What's interesting is, they sort of concede that, because

2    they move their focus to, well, we've lost control.  We've lost

3    control.  Well, that's like saying our copyright's been infringed

4    because that's what it means to have a copyright infringed.

5    So they're sort of falling back on what eBay says is not

6    important, not relevant, which is mere success.

7    Then they said, oh, but we would suffer reputational harm

8    because people will mistake our product.  Well, that is very

9    fixable, and that's not irreparable at all.  I guess it could be

10   repaired with a very, very modest injunction which says, put in

11   a disclaimer and say the standards organizations are not

12   responsible for this transcription.  But they worry about that.

13   And it's very curious that they mentioned, oh, the problem

14   of quality standards.  There's a reference to Mr. Pauley's

15   declaration, and it's really instructive, Your Honor, because

16   Mr. Pauley highlighted a dangerous error.  He said in paragraph

17   54, one passage left out the phrase "cables rated above 2,000

18   volts shall be shielded."  That was a major mistake, he said.

19   It was NFPA's mistake.  It was an error that NFPA corrected

20   with an erratum.  Why did Public.Resource omit it?  Because the

21   law of incorporation by reference is very clear.  Incorporation

22   by reference applies only to the specific document, and it does

23   not extend to any corrections or revisions.

24   So, in fact, this was not an error on Public.Resource's

25   part; it was an error on ASTM's part.  But because

1    Public.Resource is putting out there the very document that is

2    incorporated by reference, it was accurate.  NFPA's inaccuracy

3    became the law.  And maybe that's important for people to know

4    about, and if so, that's something that Public.Resource shows

5    people: This is what got incorporated, and if it's a mistake

6    that NFPA had to correct, well, then as an incorporated law,

7    it's missing something important.  So this is very, very key,

8    and this is actually a reason why Public.Resource's work is good

9    and important, because it's telling people what the law is even

10   when NFPA wants to recast what the law really is.

11          The question of remedies at law are inadequate to

12   compensate for the injury?  Well, the presumption is first there

13   has to be a showing of actual injury, and there just hasn't been.

14   There's a nullity to consider whether remedies are inadequate to

15   compensate for the injury when they haven't shown injury, and

16   they like to retreat behind the thing, oh, the damages are

17   unquantifiable.

18          Well, that's what expert -- competent experts would usually

19   do, and they didn't have competent experts here.  And we have

20   again the admission from ASTM's president, no measurable effect.

21   The plaintiffs' experts didn't analyze what happened in Veeck.

22          They're saying here that there would be terrible harm if

23   they suffer what actually happened in Veeck, and nobody showed

24   that the standards development organizations had to go out of

25   business or couldn't afford to do standards anymore because

1    <u>Veeck</u> said they had no right to monopolize them.  There was

2    a case study that their experts chose not to consider.  The

3    methodology just makes my mind explode.  So they just don't have

4    evidence on this.

5        Let's go to the balance of hardships, because this is

6    important.  Again, it assumes actual injury.  The Second Circuit

7    said, when it was discussing hardship for a different purpose --

8    it was a standing question.  But the Second Circuit said,

9    "The mere possibility of a future injury, unless it is the cause

10   of some present detriment, does not constitute hardship."

11       So what is the hardship, they say?  Well, the hardship is,

12   Your Honor, we've had a business model for a hundred years, and

13   it would be hard for us to change it.  Well, antiquity is not a

14   virtue, and antiquity doesn't deserve for its own sake -- the

15   fact that this business model has been here a hundred years

16   doesn't mean that that's what the business model should always

17   be.

18       And their documents -- and this is Exhibit 53 where they

19   talk about the next year at NFPA.  This was NFPA's previous

20   president, was talking about the need to change the business

21   model anyway because of technological advances.  So asking the

22   Court to defend this business model is not an appropriate factor

23   to take into consideration when their business model has to

24   change anyway, and evolution of business models is natural.

25       You know, there had to be an evolution of business models

for the Southern Building Codes Conference after <u>Veeck</u>.  Lexis
changed West's business model.  Google Scholar is changing
Lexis's business model.  Everybody adapts.  PACER has threatened
the business model of the courthouse filing and retrieval
systems.

Business models evolve, and there's no hardship to say, oh,
well, our business model may have to evolve.  The failure of
plaintiffs to exert a monopoly power over the law is not itself
a hardship that the Court should take into account.

I want to go back again to one of the experts for AERA,
Mr. Geisinger.  Complete whiff on the ascription of losses
because he got the years wrong.  He got the years wrong.
Public.Resource didn't start posting standards till two years
into the catastrophic decline.  When an expert has such a bad
mistake on the key fact for which he keeps getting cited, it is
just not evidence.  So the hardship is not there.

Let's talk about the hardship to Public.Resource.
No, there would be no financial effect on Public.Resource, but
Public.Resource has a mission, and that mission is to make the
law accessible to every American: poor Americans as well as rich
Americans, disabled Americans as well as abled Americans.  And
one of the things it does is make it possible for all sorts of
Americans to do things with the law that bring power to persons
to analyze the law, to critique it, to run their data analysis
tools on it because of the way they are implemented.

1    There is no other way for Public.Resource to make these
2  public tools available other than by doing what it's doing.
3  So there would be a hardship.  Not a financial hardship, but it
4  would be a hardship to the very beneficial mission of
5  Public.Resource.
6    So that takes us to the public interest, and there is a
7  very broad public interest here.  Now, I think that the
8  plaintiffs tend to think of their communities as people engaged
9  in building or designing or law enforcement or law making.  If
10  you look at all the stakeholders who come together, these are
11  people who are sort of their community.  They're not so focused
12  on all the public.
13    I mean, certainly they care about public safety; we grant
14  that.  But they're not sort of -- they're not available to
15  people to try to sort of stick their nose in and find out, well,
16  what's going on with the law making here?  What's going on with
17  the regulations that apply to my child's school or to my child's
18  safety seat?
19    They require -- for access, by the way, they require -- and
20  I went to the NFPA site.  I wanted to see -- I couldn't do it.
21  Because for me to go get that public access, I had to agree to
22  consent to jurisdiction of the states where they're located.
23  I had to enter into a contract, and I had to acknowledge their
24  copyright as a matter of contract in order to have access to
25  their public reading rooms.

1    So the fact that I have to enter into a contract, I have to

2    submit to jurisdiction of a distant court?  That's not real

3    public access.  That's exactly what they want.  It's our

4    control, our control over the law itself, and that is a problem.

5    We have a problem, Your Honor.  I'm not sure I want to say

6    it's a problem.  It's a controversy right now over the

7    privatization of public functions.  We've got private operators

8    of federal prisons and immigration facilities --

9    THE COURT:  Keep your argument, though, to the issue

10   of remedies, because we are really running out of time.

11   MR. BRIDGES:  But I think the question is, is a remedy

12   at all important?  And my point is the public interest would be

13   disserved by an injunction that more allocates to the plaintiffs

14   a private right over controlling access to the law.  They have

15   said it's loss of control.

16   They have said they have a power to exclude.  That's fine

17   when it's just an ordinary copyrighted work.  It's not fine when

18   they are claiming -- and the phrase is in their briefs: loss of

19   control, power to exclude.  When they are claiming a power to

20   exclude anybody from the law, for any reason, that is not in the

21   public interest.

22   The public interest is in having no private gatekeepers to

23   the law, because what everyone thinks about emergency managers

24   in Michigan or privatization of parking meters in Chicago,

25   privatizing the law and giving any private party exclusive

1    control and the power to exclude what anybody chooses to do with

2    the law and, oh, maybe it's only $49.  That's still saying, your

3    right to do what you want to do with the law?  Pay us $49, and

4    it's all yours.  This is unconscionable, Your Honor.

5              THE COURT:  Or go to the library and make a photocopy.

6              MR. BRIDGES:  Your honor, I'm not sure that works for

7    someone in Helena, Montana, or Anaconda, Montana.  His statement

8    about accessibility in libraries, it doesn't pan out.  There is

9    one specific version that is incorporated into law, and that's

10   not -- his statistics were not right about the specific version.

11   And these are not available widely in public libraries.  They

12   aren't.

13        One of the interesting things, a Polish graduate student

14   about Polish law asked them and said, I want to quote this

15   standard in my thesis.  I want to quote this standard in my

16   thesis, and my thesis will only go to the three people on my

17   thesis committee.  And they said, Sorry.  You can't.  You'll

18   just have to cite to it.

19        This is control.  And when it becomes the law, ordinary

20   control of a copyright holder over a copyrighted work, I get

21   that, but not when it becomes the law, Your Honor.

22             THE COURT:  Thank you, Mr. Bridges.

23             MR. BRIDGES:  Thank you.

24             THE COURT:  I have to walk out of this courtroom in

25   three minutes.  All right?

1          MR. HUDIS:  Real fast.

2          THE COURT:  The chief judge is waiting for me, and

3     that's somebody I'm not going to keep waiting.

4          MR. HUDIS:  I want to make sure we get this in the

5     record, Your Honor.  Dr. Geisinger did not whiff.  He got it

6     right on our present harm.  It's submitted into the record,

7     paragraphs 24 through 27 of his declaration.  He got it right.

8     And Mr. Bridges can pontificate all he wants.  We have shown

9     harm.  We've shown not only past harm but also likelihood of

10    irreparable future harm.  Thank you, Your Honor.

11         THE COURT:  All right.  Thank you very much.

12    Thank you all for your very hard work and your real effort in

13    presentation and your arguments, which were very well prepared.

14    Thank you.

15         (Proceedings adjourned at 12:57 p.m.)

* * * * * *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


*Bryan A. Wayne*
BRYAN A. WAYNE