**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN EDUCATION RESEARCH ASSOCIATION, INC., | ) ) ) |
| AMERICAN PSYCHOLOGICAL ASSOCIATION, INC., | ) ) |
| and | ) ) |
| NATIONAL COUNCIL ON MEASUREMENT IN EDUCATION, INC. | ) ) ) |
| Plaintiff-Counterdefendants, | ) |
| v. | ) ) |
| PUBLIC RESOURCE ORG., INC., | ) ) |
| Defendant-Counterclaimant. | ) ) ) |

Case No. 1:14-cv-00857 (TSC)

**MEMORANDUM OF POINTS AND AUTHORITIES
ADDRESSING THE FAIR USE ISSUE REMANDED BY THE
COURT OF APPEALS AND IN SUPPORT OF RE-ENTRY OF
SUMMARY JUDGMENT AND A PERMANENT INJUNCTION**

John I. Stewart, Jr. (D.C. Bar No. 913905)
Clifton S. Elgarten (D.C. Bar No. 366898)
Amanda Shafer Berman (D.C. Bar No. 497860)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004-2595
(202) 624-2500
celgarten@crowell.com

*Attorneys for Plaintiff-Counterdefendants*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION ............................................................................ 1

STATEMENT OF FACTS ..................................................................... 5

STANDARD OF REVIEW ..................................................................... 6

ARGUMENT ................................................................................ 7

I.     THE ISSUE REMANDED BY THE COURT OF APPEALS......................................... 7

II.    PLAINTIFFS' CONDUCT WAS NOT FAIR USE.............................................. 8

       A.    The Purpose and Character of Public Resource's Conduct in Copying
             the 1999 Standards Weigh Heavily Against a Finding of Fair Use. ............... 8

       B.    The Expressive Character of the 1999 Standards Weighs Heavily
             Against a Finding of Fair Use. .............................................. 17

       C.    The Amount and Substantiality of Public Resource's Copying of the
             1999 Standards Weighs Heavily Against a Finding of "Fair Use." ............... 20

       D.    The Likely Effect on the Market for Standards Weighs Heavily Against
             a Finding of "Fair Use." .................................................... 23

CONCLUSION .............................................................................. 30

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Am. Geophysical Union v. Texaco Inc.*,
  60 F.3d 913 (2d Cir. 1994)....................................................................................7, 10

*Am. Society for Testing & Materials v. Public.Resource.Org, Inc.*,
  No. 1:13-cv-1215, 2017 WL 473822 (D.D.C. Feb. 2, 2017)................................1, 17

*American Society for Testing and Materials, et al. v. Public.Resource.Org, Inc.*,
  896 F.3d 437 (2018)............................................................................................ *passim*

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..................................................................................................6

*\*Authors Guild, Inc. v. HathiTrust*,
  755 F.3d 87 (2d Cir. 2014).......................................................................................10

*Banks v. Manchester*,
  128 U.S. 244 (1888)............................................................................................19, 20

*\*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994)............................................................................................ *passim*

*\*Castle Rock Entertainment, Inc. v. Carol Publ. Group, Inc.*,
  150 F.3d 132 (2d Cir. 1998)......................................................................................27

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)....................................................................................................6

*\*Harper & Row, Publishers, Inc. v. Nation Enterprises*,
  471 U.S. 539 (1985)......................................................................................7, 9, 23, 24

*Holcomb v. Powell*,
  433 F.3d 889 (D.C. Cir. 2006) ...................................................................................6

*\*Howell v. Miller*,
  91 F. 129 (6th Cir. 1898) ..............................................................................19, 20, 22

*Monge v. Maya Magazines, Inc.*,
  688 F.3d 1164 (9th Cir. 2012) ..................................................................................11

*Nat'l Cable Television Ass'n v. Copyright Royalty Tribunal*,
  689 F.2d 1077 (D.C. Cir. 1982)................................................................................29

*Penguin Random House LLC v. Colting*,
  270 F. Supp. 3d 736 (S.D.N.Y. 2017)...................................................................27

*\*Peter Letterese And Associates, Inc. v. World Inst. of Scientology Enterprises*,
  533 F.3d 1287 (11th Cir. 2008) ..............................................................21, 23

*Radji v. Kkakbaz*,
  607 F. Supp. 1296 (D.D.C. 1985) .............................................................24

*Salinger v. Random House, Inc*.
  811 F.2d 90 (2d Cir. 1987)..........................................................................29

*Seltzer v. Green Day, Inc.*,
  725 F.3d 1170 (9th Cir. 2013) ...................................................................10

*Sony Corp. of American v. Universal Studios Inc.*,
  464 U.S. 417 (1984)......................................................................................11

*Swatch Group Management Services Ltd. v. Bloomberg L.P.*,
  756 F.3d 73 (2d Cir. 2014).............................................................11, 12, 13, 14

*Television Digest, Inc. v. U.S. Telephone Ass'n*,
  841 F.Supp. 5 (D.D.C. 1993) ....................................................................24

*Ty, Inc. v. Publ'ns Int'l Ltd.*,
  292 F.3d 512 (7th Cir. 2002) ......................................................................23

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
  562 F.3d 630 (4th Cir. 2009) .........................................................11, 12, 13, 14

*WorldWide Church of God v. Philadelphia Church of God, Inc.*,
  227 F.3d 1110 (9th Cir. 2000) ................................................................23, 29

## STATUTES

5 U.S.C. §552(a)(1).................................................................................................16

17 U.S.C. §107...........................................................................................................7

17 U.S.C. §107(1)........................................................................................................8

17 U.S.C. §107(2).......................................................................................................17

17 U.S.C. §107(3).......................................................................................................20

17 U.S.C. §107(4).......................................................................................................23

28 U.S.C. §1292(a)(1).................................................................................................30

## REGULATIONS

34 C.F.R. §462.13(c)(1) ................................................................................................16

34 C.F.R. §462.13(f)(1) .................................................................................................16

34 C.F.R. §668.146(b)(6) ..............................................................................................16

## OTHER AUTHORITIES

Fed. R. Civ. P. 56(a) .......................................................................................................6

Fed. R. Civ. P. 56(c) .......................................................................................................6

Pierre N. Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. 1105, 1111
    (1990) .......................................................................................................................11

**INTRODUCTION**

Plaintiffs American Educational Research Association, Inc. (AERA), American Psychological Association, Inc. (APA) and National Council on Measurement in Education, Inc. (NCME), the "Sponsoring Organizations," file this memorandum in support of summary judgment on the issue that the Court of Appeals remanded back to this Court for further consideration. *See American Society for Testing and Materials, et al. v. Public.Resource.Org, Inc.*, 896 F.3d 437 (2018). That issue is whether Defendant Public.Resource.Org., Inc. (PRO) has sustained its burden of demonstrating that its wholesale, verbatim copying of the entire 200-page copyrighted volume entitled Standards for Educational and Psychological Testing (1999) – the "1999 Standards" – onto PRO's own website and that of the Internet Archive, where it can be freely read and further copied, is a "fair use" that negates any claim of copyright infringement.

In its February 2, 2017 Memorandum Opinion (Op.) filed both in this case and the ASTM case (No. 13-cv-1215), this Court determined (a) that Plaintiffs' 1999 Standards were properly copyrighted; (b) that the 1999 Standards retained copyright protection notwithstanding that various standards from that volume are incorporated by reference in certain Department of Education regulations: (c) that PRO infringed Plaintiffs' copyright, and (d) that PRO failed to demonstrate fair use. *See Am. Society for Testing & Materials v. Public.Resource.Org, Inc.*, No. 1:13-cv-1215, 2017 WL 473822 (D.D.C. Feb. 2, 2017).

On appeal, the panel held that the Court had not engaged in a sufficiently detailed and particularized analysis of the fair use question and remanded for further factual development

and consideration.[1]  *See* 896 F.3d at 448-54.  Specifically, PRO had presented this Court with

an "undifferentiated view" (896 F.3d at 447) of why publication of *any* standards incorporated

by reference in federal regulations – including those contained in the 1999 Standards, or any

of the many standards at issue in the ASTM case – qualified as fair use (or were not entitled to

copyright protection at all).   This Court (and Plaintiffs) addressed and rejected PRO's

arguments mostly in the broad brush, undifferentiated terms that PRO presented them.

The Court of Appeals faulted that approach because it "failed to account for the

variation among the standards at issue and … failed to consider each fair use claim 'on its own

facts.'"  The Court of Appeals directed that

> On remand, the district court will need to develop a fuller record
> regarding the nature of each of the standards at issue, the way in
> which they are incorporated, and the manner and extent to which
> they were copied by PRO in order to resolve this "mixed question
> of law and fact."

*Id.* at 449.  Referring primarily to the numerous standards and incorporations at issue in the

ASTM case, the Court of Appeals said that "the parties" had "poorly served the court by treating

the standards interchangeably," and should consider ways to group standards to aid analysis.  *Id.*

---

[1]   The Court of Appeals affirmed this Court's rulings and reasoning, and rejected PRO's arguments, on a variety of issues, including PRO's claim that the materials at issue were authored by the government and therefore not entitled to copyright protection.  *See* 896 F.3d at 446 (finding the argument both "forfeited" and "meritless").   The Court of Appeals declined to decide the central question that PRO attempted to pose, namely, whether incorporation by reference somehow results in loss of copyright.

While remanding for further consideration of fair use, the Court of Appeals affirmed the Court's rejection of PRO's arguments that the format in which PRO presented the 1999 Standards was transformative.   896 F.3d at 450 ("On this point, the district court properly rejected some of PRO's arguments as to its transformative use—for instance, that PRO was converting the works into a format more accessible for the visually impaired or that it was producing a centralized database of all incorporated standards.")

Plaintiffs in this case – the Sponsoring Organizations – obviously cannot speak to the many standards and incorporations by reference at issue in the ASTM case. They are not parties to that case and their circumstances contrast with those addressed in that case.[2] However, Plaintiffs can and will, with particularity, address the fair use issues related to the Department of Education's incorporation by reference of certain parts of the 1999 Standards, and PRO's wholesale verbatim copying, and posting to facilitate further copying, of the 1999 Standards.

In so doing, Plaintiffs are mindful of the central focus of any fair use analysis: the defendant must demonstrate that the precise conduct at issue was, in fact, a fair use, given the nature, manner, and extent of its copying. This Court is not presented with hypothetical and abstract questions about whether some more limited form of copying – limited, perhaps, to extracting and copying only the actual standards incorporated by reference – would be permissible fair use. Neither is the Court asked to hypothesize about how much verbatim quotation from the 1999 Standards might be allowed as fair use if PRO were critiquing the 1999 Standards, or summarizing some aspect of the 1999 Standards to achieve some legitimate aim. Rather, the Court is asked to decide whether what PRO did *in this case* – copying the 1999 Standards verbatim, in their entirety (including standards, commentary and background), without addition, onto its own website and the Internet Archive, in order to disseminate them for use and copying by others – was a fair use. See Facts §§59-65, 69 (describing PRO's copying). To be sure, for the sake of perspective, it may be appropriate to compare and contrast what PRO did

---

[2]    As the Court of Appeals summarized, the Sponsoring Organizations "have collaborated to jointly produce a single volume… collection of standards that aims 'to promote the sound and ethical use of tests and to provide a basis for evaluating the quality of testing practices.'" 896 F.3d at 441. In contrast, as the Court of Appeals pointed out, ASTM has issued more than 12,000 standards, and more than 1200 have been incorporated by reference. *Id.* at 441-42. The nature of the standards, and "incorporations" and perhaps the extent of copying in the two cases may also be different.

here with conduct that might be closer to fair use.  But the issue here is not what PRO *might do* that might be a fair use, but rather whether what PRO *did* was fair use.

Indeed, the Sponsoring Organizations would readily concede that there may be occasions and situations when it would seem perfectly reasonable to quote extracts from the 1999 Standards verbatim for teaching, critique or related purposes.  For example, in the course of these proceedings, counsel learned of the attached document.  See Hutter Decl. Exh. 4 (California State Personnel Board Merit Selection Manual: Policy and Practices, Summary of the Standards for Educational and Psychological Testing).  The attachment summarizes, restates, explains, and comments on certain aspects of the 1999 Standards in order to encourage use of the Standards. In so doing, it also includes several verbatim quotations.  The attachment thus reflects far more closely the kind of uses that might be regarded as "fair uses" of portions of the Standards.  And again, that usage contrasts sharply with what PRO did here.  PRO copied the entire volume of 1999 Standards – the standards themselves, the background and explanatory sections, and the commentary – and did so in a way that would make the 1999 Standards easily copied and downloaded by others.

For the reasons explained below, the Court should find that PRO has not come close to demonstrating fair use for any number of reasons, including that:

(1) the copied work, including the background instructional material and comments, is highly creative and at the core of copyright protection;

(2) there is no teaching, commentary, or critique – or any other transformative element – associated with PRO's verbatim copying of the 1999 Standards, which has no purpose other than to broadly disseminate the 1999 Standards (which is Plaintiffs' purpose) and allow them to be

further copied for free, which PRO believes it should be able to do solely as a matter of principle; and

(3) PRO's verbatim copying of the entire volume is not limited to those discrete portions of the 1999 Standards that have been incorporated by reference into federal regulations (and upon which PRO bases its claim of an entitlement to copy), but is predominantly comprised of material *not* incorporated by reference.

Even if one were to posit some sort of *sui generis* entitlement to copy standards actually incorporated by reference in Code of Federal Regulations, it would not justify the wholesale copying of the 1999 Standards that Defendant engaged in here.

## STATEMENT OF FACTS

This Court's earlier Memorandum Decision set forth much of the basic background relevant on the remanded issue. Nonetheless, for the sake of completeness and compliance with LCvR 7(h)(1) – and also because the Court of Appeals asked for additional factual development – Plaintiffs repeat much of that basic background in the accompanying Statement of Material Facts for the Court's ready reference.[3]

In addition, the Statement of Material Facts (Facts) addresses specific points that the Court of Appeals suggested required further development. This includes a description of the statutes and regulations under which federal agencies are authorized and encouraged to incorporate by reference. See Facts ¶¶ 36-41. It includes a detailed description of the specific Department of Education regulations that incorporate by reference certain standards from the

---

[3]    For the sake of brevity, the attachments include only excerpts from certain deposition transcripts previously provided in full in connection with the prior summary judgment motions, and thus already of record in this case. In addition, rather than append multiple copies of the 1999 Standards – and because PRO copied the 1999 Standards in their entirety – the attachments and citations are only to a single copy of the 1999 Standards recently posted by PRO and downloaded from the Internet Archive.

1999 Standards.  See Facts ¶¶ 42-57.  It also includes a detailed description of the nature of the 1999 Standards, highlighting what PRO copied in relation to what was actually incorporated by reference in the DOE regulations.  See Facts ¶¶ 31-35, 44-54.  This Court may, of course, refer directly to the 1999 Standards, and the relevant regulations, rather than rely on the parties' descriptions.

## STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The existence of some alleged factual dispute between the parties on an immaterial or non-determinative point "will not defeat an otherwise properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *see also Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  And while "[j]ustifiable inferences are to be drawn in [the non-movant's] favor," *Liberty Lobby*, 477 U.S.at 255, those inferences must be reasonable and supported by the record.  As this Court correctly noted in its prior decision in this case, the non-movant must offer "more than mere unsupported allegations or denials"; it must show there is "a genuine issue for trial" through "affidavits, declarations, or other competent evidence setting forth specific facts."  Op. at 10 (citing Fed. R. Civ. P. 56(c) & *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

That a party bears the burden of proof on the matter at issue affects the summary judgment analysis.  *Celotex,* 477 U.S. at 322 ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.")  In a copyright case in which defendant asserts that its conduct is fair use, the burden is on the defendant to so demonstrate.  *See*

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994); *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 561 (1985).

## ARGUMENT

## I.     THE ISSUE REMANDED BY THE COURT OF APPEALS.

The Court of Appeals remanded this case for further consideration of one issue: whether PRO's wholesale verbatim copying of the entire volume of the 1999 Standards qualifies as "fair use" under the Copyright Act in view of PRO's argument that "incorporation by reference" provides a proper predicate for what it did.

The Copyright Act gives examples of fair use, which include copying "for purposes such as criticism, comment, new reporting, teaching (including multiple copies for classroom use), scholarship, or research."   17 U.S.C. §107.   And the Act directs the consideration of four identified fair use factors, though it doesn't preclude consideration of other factors. Those factors are:

(1)     the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2)     the nature of the copyrighted work;

(3)     the amount and substantiality of the portion used in relation to the copyrighted book as a whole; and

(4)     the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. §107.  Because fair use is an affirmative defense, PRO, as "the party claiming that its secondary use of the original copyrighted work constitutes a fair use … carries the burden of proof as to all issues in the dispute."  *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 918 (2d Cir. 1994).  Given the nature of PRO's conduct, no reasonable finder of fact could conclude

that the four fair use factors favor PRO here.   Because PRO cannot meet its burden of demonstrating that publication of the 1999 Standards, in full, on its website and on the Internet Archive was a "fair use," summary judgment should again be granted in favor of the Sponsoring Organizations and the injunction restored.

## II.     PLAINTIFFS' CONDUCT WAS NOT FAIR USE.

### A.     The Purpose and Character of Public Resource's Conduct in Copying the 1999 Standards Weigh Heavily Against a Finding of Fair Use.

The first factor asks courts to consider "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes."  17 U.S.C. §107(1).

To be sure, PRO offers an altruistic, non-commercial purpose for its copying here.  As the Court of Appeals summarized it, PRO asserts that its purpose in copying the 1999 Standards (or any other standards) to its website – and doing so in a way that would allow it to be readily copied for free by anyone accessing the website – is "to *facilitate* public debate."  896 F.3d at 449 (emphasis added).  We can accept that this is not a commercial purpose in the sense that PRO does not seek to sell the copyrighted work or profit directly from the posting.  But it is also not the type of purpose that the case law has ever recognized as qualifying as a basis for a fair use defense because it does not involve the kind of conduct or purpose on the part of PRO – commentary, teaching, scholarship or criticism – that the Copyright Act seeks to accommodate with the fair use defense.  To be clear:  PRO does <u>not</u> claim that *it* is in engaging in criticism or scholarship or debate.  PRO itself is not "using" the 1999 Standards at all for such purposes, let alone fairly.  Rather, its argument is that it is potentially enabling unknown unidentified others to possibly engage in what might be fair uses for them – teaching, scholarship and criticism.  With such a breathtakingly, all-encompassing assertion of purpose, PRO might just as readily justify

uploading, disseminating, and facilitating the free copying of every book, every movie, every newspaper, every journal, every photograph, every piece of music, and every piece of software now or ever created.  That argument would countenance unlimited infringement of copyrighted works, virtually extinguishing copyright owners' exclusive rights.

This Court addressed a related point in its earlier opinion.  PRO claimed that its conduct was somehow "analogous to those who make copies of copyrighted works in order to comply with legal requirements."  See Op. at 34.  But as this Court pointed out earlier: "Defendant was not actually acting to comply with a particular law—unlike, for example, an individual who makes a photocopy of the standards located at OFR [Office of the Federal Register] for use on her building project.  Instead, Defendant has placed identical copies of Plaintiffs' standards into the online marketplace with no intention to use them itself, but instead to simply offer them for free in competition with Plaintiffs' standards."  *Id.*

Indeed, on its face, PRO's ostensible purpose – to disseminate, facilitate access and copying by unknown and unspecified others, for the sake of doing so – does not distinguish PRO's "use" from that of the copyright holder.  The Sponsoring Organizations created the 1999 Standards so that it can be read, taught, critiqued, debated and used for guidance.  PRO's dissemination seeks simply to substitute its method of dissemination – for free, and on-line – for that of the copyright holders, who seek to exercise their lawful control over the work as copyright owners, and to charge a price and sell the work in hard copy.

Providing substitute access to a copyrighted work has never been regarded as fair use.  To the contrary, the "fair use doctrine has always precluded a use that 'supersede[s] the use of the original."  *Harper & Row v. Nation Enterprises*, 471 U.S. at 550, quoting *Folsom v. Marsh*, 9 F.Cas. 342, 345 (No. 4,901(CC Mass.) (Story, J.).  And, as this Court previously held in this case

– and as the Court of Appeals directly affirmed – digitizing the copies and putting them in a centralized database of incorporated standards simply cannot be deemed a transformative use giving rise to a fair use defense.  *See* 896 F.3d at 450 ("On this point, the district court properly rejected some of PRO's arguments as to its transformative use—for instance, that PRO was converting the works into a format more accessible for the visually impaired or that it was producing a centralized database of all incorporated standards."[4]).

In any event, as the Court of Appeals pointed out, "the mere fact that a use is educational and not for profit does not insulate it from a finding of infringement, any more than the commercial character of a use bars a finding of fairness."  *Id.* at 449 (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. at 584).  Rather, the key issue for this first factor is whether the "use" is transformative.  A use qualifies as transformative when it "adds something new, with a further purpose or different character, altering the first [use] with new expression, meaning, or message."  *Id.*; *see also Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014) (A "transformative work is one that serves a new and different function from the original work and is not a substitute for it.")  Moreover, this Court has observed that "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use."  Op. at 33 (quoting *Campbell*, 510 U.S. at 579).  The converse is logically also true.

There is, quite simply, nothing transformative about ordinary, unelaborated, verbatim copying, as numerous courts have held.  Indeed, that is the easy case.  *See Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1177 (9th Cir. 2013) ("In the typical 'non-transformative' case, the use is

---

[4]    Citing this Court's opinion and *American Geophysical Union v. Texaco Inc*., 60 F.3d 913, 923–24 (2d Cir. 1994) (photocopying articles "into a form more easily used in a laboratory" does not constitute transformative use but acknowledging "the benefit of a more usable format").

one which makes no alteration to the *expressive content or message* of the original work."); *see also Sony Corp. of American v. Universal Studios Inc.,* 464 U.S. 417, 449–450 (1984) (reproduction of entire work has the "ordinary effect of militating against a finding of fair use"); Pierre N. Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. 1105, 1111 (1990) (use of copyrighted material that "merely repackages or republishes the original" is unlikely to be fair use). Even when "wholesale copying [is] sprinkled with written commentary," it is considered "at best minimally transformative." *Monge v. Maya Magazines, Inc*., 688 F.3d 1164 (9th Cir. 2012). Here, PRO did not elaborate or comment on the 1999 Standards at all; it simply reproduced them in full, without adding any new expression, meaning or message. As explained above, PRO's ostensible purpose of making the 1999 Standards available for use is no different from the copyright holders' purpose. In short, PRO's copying and dissemination of the 1999 Standards plainly was not "transformative."

In its decision remanding this case, the D.C. Circuit noted that, sometimes, "a secondary work can be transformative in function or purpose without altering or actually adding to the original work," citing *A.V. ex rel. Vanderhye v. iParadigms, LLC,* 562 F.3d 630 (4th Cir. 2009), and *Swatch Group Management Services Ltd. v. Bloomberg L.P.*, 756 F.3d 73 (2d Cir. 2014). 896 F.3d at 450. Of course that is true in certain very limited circumstances.[5] But Public Resource's copying of Plaintiffs' Standards is unlike the copying at issue in the *iParadigms* and *Swatch* cases. In fact, the differences between those cases and this one readily illustrate why this is not one of those instances in which wholesale copying could be regarded as transformative.

---

[5]   There is simply no precedent, however, for the notion that any such argument might somehow extend to the copying of an entire 200-page book.

In *iParadigms*, a software company converted students' school papers into digital code, archived them, and then used the archived papers to evaluate the originality of other students' works in the future.  Even though the substance of the papers remained unchanged, the Fourth Circuit readily deemed the company's use transformative, because the company's use of the papers "was completely unrelated to expressive content and was instead aimed at detecting or discouraging plagiarism." 562 F.3d at 640.  In other words, the copying was directed to a wholly different use than the authors of the papers intended.

By contrast, the sole purpose of PRO's use of the 1999 Standards is to convey the Standards' existing substantive, expressive content to an audience—albeit free of charge.  The use of the essays in *iParadigms* did not involve conveying the copied works' original message to anyone, whereas that is the entire point of PRO's copying of Plaintiffs' 1999 Standards.

In *Swatch Group Management Services Ltd. v. Bloomberg L.P.*, a news service made an unauthorized audio recording of a company's confidential earnings call, and then made the recording and a transcript of the call available to its own paid subscribers.  756 F.3d 73 (2d Cir. 2014).  The Second Circuit characterized the use as transformative in large part because call participants had been instructed not to record or broadcast the call.  Therefore – as this Court has already pointed out, Op. at 16 – absent the news service's reproduction of the call, "any direct knowledge of what the executives said would have been limited to those analysts who participated."  The use intended by the "authors" was secret; its publication and dissemination, particularly to that news service's readership, was transformative.  Indeed, the court in *Swatch* could not have failed to recognize that a contrary ruling could well have allowed the Copyright Act to become the go-to vehicle for maintaining corporate secrets.

Unlike the news service in *Swatch*, Public Resource has not transformed secret information into publicly available information.  Plaintiffs' Standards are available to anyone who wants them.  The 1999 Standards may be purchased from AERA, reviewed at or checked out from libraries across the country, or viewed for free at the location designated in the Federal Register as required by federal law.  As with *iParadigms*, therefore, the decision in *Swatch* simply underscores the difference between legitimate transformational uses, on the one hand, and Public Resource's non-transformational use, on the other.

Indeed, the other fair use factors at issue in *Swatch and IParadigms* further highlight the basic differences between the copying there and here.  For example, with respect to the second factor, the copyrighted material at issue in *Swatch* (recorded spontaneous oral conversations involving corporate financial matters) bears no resemblance to the 1999 Standards, which are the product of a lengthy, painstaking process of thoughtful creation and expression in writing.  And on the fourth factor, the recording had no commercial value that could be undermined by copying and making that copy freely available for further copying.  *See Swatch*, at 91-92.  When assessing the second factor in *iParadigms*, the court relied on the fact that there was no secondary dissemination of the material at all; the alleged copyright infringer uploaded it to a private database that did not allow users to engage in substantive review, but only to digitally compare the material to other documents.  *See iParadigms*, 562 F.3d at 641-42.  Here, PRO has not only posted the 1999 Standards on its public website for all to read, but in a manner so as to allow viewers to again copy, and further disseminate, that text.  In short, this case could not be more different from *Swatch* and *iParadigms*.

The Court of Appeals stated that there could be some merit in PRO's argument that verbatim copying may sometimes be necessary to "capture the precision that is necessary to

understand the legal obligations that governments impose and enforce."   896 F.3d at 450 (quoting PRO's brief).   Indeed, there are certainly circumstances where verbatim copying of a law might be necessary – in a legal brief or text, for example – and thus it may be appropriate "to reproduce in full the relevant portions of that particular standard."   *Id.*   But any need to quote verbatim pre-supposes a bona fide, transformative fair use purpose in the first place, which is absent here.   In sharp contrast to *Swatch* and *IParadigms,* there is no such "transformative" purpose behind PRO's reproduction of the 1999 standards in full on its website.

Moreover, while it might be true that sometimes it is necessary to read a statute verbatim – if one is an attorney, for example, arguing over some fine point of law before a court[6] – we all understand that legal rules can often be described sufficiently to allow comprehension and compliance through summaries, paraphrases and descriptions.   Indeed, summaries and paraphrases typically suffice to communicate one's legal responsibilities.   It simply defies the vast capacity of the English language for PRO to suggest that the essential ideas from all of the standards incorporated by reference from the 1999 Standards could not have been effectively communicated using different words.

The Court of Appeals also suggested that it may be important for this Court to examine whether and how particular regulations incorporate standards by reference, albeit without detailed guidance on how that becomes relevant to this inquiry.   The Court of Appeals noted at the outset that one "way in which the incorporated standards vary is how readily they resemble ordinary, binding law."   896 F.3d at 442-43 (noting that some standards, like a local building

---

[6]   And even in the courthouse, the consideration of the statute is often better captured or explained in a paraphrase of the statutory words that renders it more user-friendly, even for legal practitioners.

code, define legal obligations).  It also asked whether knowledge of the standard was "essential to complying with any legal duty."  *Id.*  at 450.

On one end of the spectrum of this inquiry, there are mandatory rules addressing primary conduct:  rules that directly govern the conduct of certain businesses or individuals engaged in private enterprises in the ordinary course, and subject persons or businesses to punishment or penalty for failing to comply.[7]  As examples of such rules, the Court of Appeals cited a building code adopted as law, as well as one of the ASTM standards that would require a company to meet certain labeling requirements.  *Id.* at 443.

The Department of Education's incorporations by reference of certain of the standards set forth in the 1999 Standards are quite different, and fall on the other end of the spectrum.  They are generally related to qualification for government benefits or grants.  The Government enjoys wide discretion in determining whether to provide those grants, and would presumably be free to apply professional standards, such as those set forth in the 1999 Standards, in determining how to dispense funds, whether or not it alerted the grant applicant (or test publisher) to a specific set of standards.  Moreover, participation in such programs is elective.  Thus, a student seeking to qualify for the benefits under one type of program, rather than obtain a diploma or equivalent,

---

[7]     In a brief to the United States Supreme Court in connection with the petition for certiorari in the *Veeck* case (No. 02-355), the Solicitor General distinguished between incorporations by reference to govern "primary conduct" and those addressed to other matters.  See https://www.justice.gov/osg/brief/southern-building-code-v-veeck-amicus-petition.  The Solicitor General emphasized that the building codes incorporated by reference in that case:

> were created for the sole purpose of enactment into law, they comprehensively regulate a very broad area of primary conduct, they do not involve exceptional and unusually pervasive government regulation of a highly specialized industry, they are backed by criminal sanctions, and the party seeking to make copies seeks only to copy the portions of the codes actually enacted into law.

None of these characterizations fit the 1999 Standards.

can choose to take a test that meets certain of the standards set forth in the 1999 Standards.  34
C.F.R. §668.146(b)(6); see Facts §§43-48.  The regulation informs the applicant of which tests
he or she may take to qualify for the benefit.  It imposes no direct obligation on the applicant.
And, of course, the decision whether to seek the government grant is the applicant's.

The specification of the quality of tests for use in the National Reporting System for
Adult Education, in order to measure the efficacy of adult education programs, 34 C.F.R.
§462.13(c)(1) and (f)(1), is also part of a government benefits program.  See Facts §§51-53.
States may seek funding to support adult education programs.  If they do, they must provide
reports on the efficacy of their programs, including by testing persons who participate.  The
Department of Education directs that the tests used by the States to demonstrate such facts meet
certain of the standards set forth in the 1999 Standards.  Therefore, test publishers may want to
qualify their tests so that States will use their products.  Again, the regulations do *not* purport to
govern any form of primary conduct.  Test publishers – a specialized group presumably well-
versed and trained in testing standards – are directed to the 1999 Standards to qualify their tests
so that States can use those tests to be eligible for federal funds.  It is the publishers' choice
whether to seek such qualification, and there is no suggestion that any test publisher did not have
the 1999 Standards, or could not obtain one from AERA if that were necessary.[8]

But even if there were some special entitlement to copy verbatim certain standards
incorporated by reference, it would not help PRO's fair use case here.  That is because PRO
copied, verbatim, *the entire volume* of the 200 page 1999 Standards, of which the three DOE
regulations discussed above incorporated by reference only a small part.  See Facts ¶¶ 43-54.

---

[8]    By law, no person may be required to resort to, or can be adversely affected by, material
incorporated by reference in the Federal Register unless the material is "reasonably available to
the class of persons affected thereby."  5 U.S.C. §552(a)(1).

The 1999 Standards are primarily composed of background, comments and other material.  That material may certainly be instructive, useful and insightful in working with any of the black-letter standards incorporated by reference, but it assuredly does not fall within PRO's claimed need for verbatim quotation of standards "incorporated by reference" into regulations.

The first fair use factor, based on the purpose and character of the copying, and which is utterly non-transformative, weighs squarely against Public Resource.

**B.**     **The Expressive Character of the 1999 Standards Weighs Heavily Against a Finding of Fair Use.**

The second fair use factor asks about "the nature of the copyrighted work." 17 U.S.C. §107(2). "This factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586.

In its earlier summary judgment opinion, this Court correctly observed that standards are "exactly the type of expressive work that warrants full protection under … the Copyright Act." 2017 WL 473822, at *17.  As the Court pointed out, the Constitution explicitly states that copyright exists to "advance the progress of science and the useful arts."  Op. at 38.  Indeed, what is true of most standards' development is especially true of the Sponsoring Organization's 1999 Standards, which reflect important judgmental elements of ethics, professionalism and fairness, and attempt to embody them in best practices.  The record reflects that the 1999 Standards were the product of intense creative attention in their manner of construction, in the formulation of principles, in the seeking and development of consensus, and in the expression of ideas.  See Facts ¶¶ 5-8; 29-34.

The Court of Appeals, however, posited that however expressive and creative standards might be at their inception and creation, once incorporated by reference in federal regulations,

they somehow acquire another nature, as legal requirements.  But it denies reality to suggest that individual standards incorporated by regulation are transformed into nothing but "the law," regardless of whether they are identified in that regulation as compulsory, optional (as here, as discussed above), or merely informative.  Later incorporation by reference does not change the fact that the 1999 Standards' primary purpose, both before and after incorporation by reference, remains nongovernmental, and that the Standards retain vitality for that intended purpose. And it does not change the fact that the Standards are not the product of any public enterprise using government funds, but are rather the product of the creative efforts of private citizens devoting their independent intelligence to create a work that has far wider and greater utility than any use to which any government may put the work—or rather, parts of that work.  And, of course, the introductory, background material, and commentary that predominates in the 1999 Standards look nothing like "law."

To illustrate the point, imagine that a local school board explicitly conditions receipt of a high school diploma on memorizing and reciting by rote a famous copyrighted poem.  It cannot be that the school board's requirement takes the poem entirely out of the realm of art and transforms it into something else, "the law."  The school board's action might allow for certain fair uses—such as limited copying for the classroom to help a student memorize the text.  But the board's action does not result in the poem shedding its artistic nature, which remains at the core of copyright protection, and thus entitled to great weight in connection with the fair use analysis. The consequences of the alternative view – that the creative nature of any privately-created work somehow evaporates in toto when incorporated by reference, and is thereby transformed into non-creative "law" – are profound.

18

The Court of Appeals cited *Banks v. Manchester*, 128 U.S. 244 (1888), and *Howell v. Miller*, 91 F. 129, 137 (6th Cir. 1898), as supportive of the proposition that "the express text of the law falls plainly outside of the realm of copyright protection."  But the rationale of those decisions also demonstrates their limits.[9]  Those decisions do not deal with fair use, but rather eliminate copyright protection for government edicts because the renderings of courts and legislatures, financed by the public fisc, belong in the public domain as of their creation:  From their inception, they cannot be copyrighted.  But the 1999 Standards were created and intended for use as private guidelines and best practices, and Plaintiffs never so much as asked that they be incorporated into law.  Whatever level of protection might be afforded statutes and regulations that are, from their inception, created to be law, the 1999 Standards are quite different.  At their creation they were the product of precisely the kind of creative and expressive process that the copyright laws protect.

Citing the notion that the "express text of the law" cannot be copyrighted, the Court of Appeals posited that, "where the consequence of the incorporation by reference is virtually indistinguishable from a situation in which the standard had been expressly copied into law, this factor weighs heavily in favor of fair use" because it places those standards at the "outer edge" of copyright protection.  *Id.* at 451.  The Sponsoring Organizations profoundly disagree with that *ipse dixit* conclusion because it obscures the private creativity underlying the work.  The creativity that pre-dates the incorporation by reference is the form of creativity that copyright is intended to promote.[10]  To suggest that the creative nature of the work is somehow stripped away

---

[9]     The Court of Appeals said that PRO cited those cases for its "constitutional argument."  But those are not constitutional cases.  They addressed a copyright question in copyright terms.

[10]    The provenance of the rule that the "express text of the law" cannot be copyrighted is not based on any inherent notion that law lacks creativity.  Rather, it is based on the principle that the
(continued)

by a government's subsequent decision to avail itself of that creativity by using that work would be to destroy the fundamental incentive toward creativity and expression that copyright is supposed to promote.

But these issues concerning how close to the core of copyright highly original and creative standards should be regarded once they have been incorporated by reference in a federal regulation need not be resolved here.  As long as the 1999 Standards retains copyright protection – even if certain standards were relegated to the "outer edge" by virtue of being incorporated by reference – PRO's conduct here cannot be regarded as fair use.  As shown above, DOE's incorporations by reference of various standards in connection with federal grant programs are starkly different from mandatory rules of general application designed to govern and mete out punishment with respect to primary conduct, the kind of "law" at issue in *Banks* and *Howell*. And even more to the point, the *remainder* of the 1999 Standards – including the commentary and background material, as well as the standards not referenced in DOE's regulations – is in no way the law.  The vast majority of that does not even look like "law."  And it embodies precisely the type of creative, thoughtful, expressive content that is entitled to the highest level of copyright protection in a fair use analysis.

C.     **The Amount and Substantiality of Public Resource's Copying of the 1999 Standards Weighs Heavily Against a Finding of "Fair Use."**

The third fair use factor asks about "the amount and substantiality of the portion used in relation to the copyrighted work as a whole."  17 U.S.C. §107(3).  This factor "examines whether defendants have 'helped themselves overmuch' to the copyrighted work in light of the purpose

---

(continued)

express text of statutes or judicial opinions was created for and by, and belongs to, the government, which in turn means it is owned by the people, not any one person.

and character of the use." *Peter Letterese And Associates, Inc. v. World Inst. of Scientology Enterprises*, 533 F.3d 1287, 1314 (11th Cir. 2008) (quoting *Campbell*, 510 U.S. at 587).  As the Court of Appeals pointed out, the "Supreme Court has explained that 'the extent of permissible copying varies with the purpose and character of the use and characterized the relevant inquiry as whether ''the amount and substantiality of the portion used['] ... are reasonable in relation to the purpose of the copying."  896 F.3d at 452, *Campbell*, 510 U.S. at 586–87 (quoting 17 U.S.C. §107(3)).

This Court has already recognized that this factor "weighs overwhelmingly in Plaintiffs' favor and against a finding of fair use" because Public Resource "copied and distributed identical versions of the Plaintiffs' standards in their entirety."  Op. at 38.  Public Resource did so even though the cited federal regulations incorporate only limited portions of Plaintiffs' 1999 Standards.  The actual referenced standards occupy only around 6% of the 200-page 1999 Standards.[11]  In such circumstances, Public Resource's stated purpose and rationale might justify posting only the standards incorporated by reference, certainly no more.  896 F.3d at 452.  Yet PRO copied, verbatim, *the entire volume* of the 200 page 1999 Standards.  The highly creative and expressive material set forth as introduction, background and commentary does not fall within the terms of PRO's asserted "incorporation by reference" rationale.  Thus, even if there were some fair use rationale that could justify copying the particular standards incorporated by reference in the DOE regulations, it would not justify what PRO did here.  PRO's copying far exceeded its ostensible purpose.

---

[11]    Facts ¶ 54 (as computed by comparing the lines of text in the referenced standards with the total lines of text in the volume).  The standards in total occupy less than 15% of the 1999 edition.  See Facts ¶ 35 (using the same method based on lines of text).

Indeed, the argument that PRO should be allowed to copy, and facilitate copying of, the entire 1999 Standards because a subset of standards are incorporated by reference in federal regulations leads to absurd results.  Even if one were not talking about the "incorporation by reference" of privately-created copyrighted material, but rather were talking about law generated by government officials at government expense – statutes, regulations, and judicial opinions – and thus deemed to be in the public domain, the mere fact that statutes, regulations and judicial opinions are *included* in a volume or article or treatise does not eliminate the copyright in the volume, article, or treatise.  Think of any legal text or law review article that quotes statutes or regulations, and then comments on those statutes and regulations.  One may be able to fairly copy the quoted regulatory or statutory excerpt from the article or text, but it is impossible to cogently argue that the fact that the article or text contains non-copyrightable "law" makes *the entire article* fair game for verbatim copying.[12]

---

[12]   The Court of Appeals (at 451) quoted *Howell v. Miller*, 91 F. 129, 137 (6th Cir. 1898) (Harlan, J.) ("[A]ny person desiring to publish the statutes of a state may use any copy *of such statutes* to be found in any printed book, whether such book be the property of the state or the property of an individual.") (emphasis added).

As Justice Harlan, sitting as Circuit Justice, went on to explain, however, even if a book contains or compiles statutes or other legal materials created by government employees and deemed public property, a person could nonetheless enforce copyright with respect to those other parts of the book that are the product of his or her individual labors.  Thus even for a compilation of statutes, the author can enforce the copyright with respect to:

> all in his books that may fairly be deemed the result of his labors. Speaking generally, this would include marginal references, notes, memoranda, table of contents, indexes, and digests of judicial decisions prepared by him from original sources of information; also such headnotes as are clearly the result of his labors. We do not perceive any difficulty in holding that his copyright would embrace all such matters, for they constitute no part of that which is public property, and are plainly produced by the compiler.

*Howell v. Miller*, 91 F. at 137.

PRO's reproduction of the entirety of the 1999 Standards belies any notion that it limited its copying to what was necessary to fulfill a legitimate purpose.  And it maximizes the negative effect of the copying on the market for sales of the work by the copyright owner.  See *Peter Letterese And Associates*, 533 F.3d at 1314 (third fair use factor "partly functions as a heuristic to determine the impact on the market for the original"; "'were a book reviewer to quote the entire book . . . he would be cutting into the publisher's market, and the defense of fair use would fail'") (quoting *Ty, Inc. v. Publ'ns Int'l Ltd.*, 292 F.3d 512, 517 (7th Cir. 2002)).  The "amount and substantiality" of PRO's copying therefore weighs heavily against any finding of fair use. *See WorldWide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1120 (9th Cir. 2000) ("We have found no published case holding that fair use protected the verbatim copying, without criticism, of a written work in its entirety.").

### D.   The Likely Effect on the Market for Standards Weighs Heavily Against a Finding of "Fair Use."

The final fair use factor concerns "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. §107(4).  This factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant … would result in a substantially adverse impact on the potential market for the original."  *Campbell*, 510 U.S. at 590 (internal quotation marks omitted).  In evaluating this factor, the Court "must take account not only of harm to the original but also of harm to the market for derivative works." *Harper & Row*, 471 U.S. at 568.  The case law addressing this factor often concerns instances of partial copying, or the creation of some kind of partial substitute, and its effect on the market for

the original.[13]   In contrast, this is one of the easy cases, addressing complete verbatim copying

and republication of an entire work by PRO and making it available for further copying for free.

*See*, *e.g.*, *Television Digest, Inc. v. U.S. Telephone Ass'n*, 841 F. Supp. 5, 10-11 (D.D.C. 1993)

(finding obvious impact on potential market and no fair use where defendant copied entire trade

newsletter published by plaintiff and distributed it to its employees).

The Court of Appeals nonetheless suggested three questions for this Court to consider:

First, the Court of Appeals asked "how much additional harm does PRO's reproduction cause to

the market for these standards" in view of the fact that "SDO's, by their own admission[,] make

copies of their standards freely available online in controlled reading rooms"?   Second, noting

that "wholesale copying may be unjustified if a law incorporates by reference only a few select

provisions of a much longer standard," the Court of Appeals asked: "[I]f PRO were to reproduce

only the incorporated provisions, would there still be a vibrant market for the standards in their

entirety?" And third, the Court of Appeals inquired regarding the effect of "PRO's reproduction

on the market for derivative works."   *See* 896 F.3d at 453.   Those questions were primarily

derived from facts before the court the ASTM case and do not fit the facts here.   But attempting

to apply them nonetheless makes it clear that the market effect of PRO's wholesale copying of

the 1999 Standards cannot support a finding of fair use.

---

[13]    For example, in *Harper & Row*, the Supreme Court concluded that publication of *excerpts* from President Ford's unpublished memoirs had both an actual effect on the market for the memoir (causing Time Magazine to cancel a planned serial publication) and, if that conduct were permitted more broadly, would substantially impact the market for rights to such material. 471 U.S. at 568-69; *see also Radji v. Kkakbaz*, 607 F. Supp. 1296, 1302-03 (D.D.C. 1985) (applying fourth "fair use" factor and finding negative impact on potential market for book where defendants had copied, translated into Farsi, and republished excerpts in the *Iran Times*).

As to the first question, it is difficult to measure the actual loss of sales from the copying at issue here.[14]  More important, no one doubts that if a product is available, via the internet, at a price, and the same product is just as easily available via the internet for free, the ability to sell the product at a price is diminished, as would-be users will elect to download the free version.  In a case, like this, involving verbatim and complete copying by PRO, and making it available for free download from the internet, the marketplace effect "of widespread conduct of the sort engaged in by the defendant" (*Campbell*, 510 U.S. at 590) is self-evident.[15]  See Op. at 39. Indeed, the Court of Appeals ultimately did not doubt the existence of adverse market impact resulting from PRO's conduct, and certainly not from the type of conduct that PRO engaged in here should it become "widespread." 896 F.3d at 453 ("[T]he SDOs are right to suggest that there may be some adverse impact on the market for the copyrighted works PRO reproduced on its website.").

The Court of Appeals was, however, particularly curious about the extent of "additional harm" caused by PRO when (the Court of Appeals said) the "SDOs, by their own admission,

---

[14]   While the precise economic harm here is difficult to measure, as it requires speculation as to the level of sales that may have occurred but for PRO's unlawful publication of the 1999 Standards, sales records show a drop in sales of the 1999 Standards after Public Resource posted them online – lasting the entire 2 year period during which they were initially posted.  See Levine Tr. Exh. 1207. To be fair, that period was also coincident with the market arguably becoming saturated, and publication of the revised and updated version of the Standards, the 2014 Standards, becoming imminent.  But the fact that Public Resource's postings were viewed thousands of times is evidence of harm to the Sponsoring Organizations' sales of the 1999 Standards; each viewer was, potentially, someone who would otherwise have had cause to purchase the Standards.

[15] As the Court correctly explained, the inference of harm from the availability of free verbatim copies for download "is intuitive."  Op. at 39.  The "logical presumption" is "that such activity, particularly if it became more widespread by others in the marketplace, would impact Plaintiffs' revenues.  It is not Plaintiffs' burden to establish that they *have* been harmed in the market, but Defendant's burden to affirmatively establish that such conduct could not even 'potentially' harm the Plaintiffs' market."  *Id.*

make copies of their standards freely available on line in controlled reading rooms," and presumably do so "without entirely cannibalizing sales of their standards."  896 F.3d at 453.  Of course, even for entities that do post standards in on-line reading rooms, there is presumably a difference between carefully allowing read-only access on their own website (with associated messages), and posting to a website that allows unlimited copying.  But more importantly, this question involving measurement of "additional harm" beyond the "harm" caused by the voluntary self-posting in reading rooms is not relevant here.  The Sponsoring Organizations for the 1999 Standards – apparently unlike some or all of the ASTM plaintiffs – have no free on-line reading room for the Standards.[16]

To the contrary, the Sponsoring Organization's basic business model for the 1999 Standards reflects that persons seeking the 1999 Standards would have to purchase a hard copy – either from AERA, or through a resale.[17]  The Sponsoring Organizations rely on the income from sales to finance further revisions and development of the Standards.  Revenue earned from sales is what supported the process of updating and revising the 1999 Standards, and will support the future revision of the 2014 Standards when that becomes necessary.  Facts ¶¶ 15-18.  As the Court of Appeals implied, free on-line access would presumably reduce such sales.  Thus, as respects the 1999 Standards, the controlling principle remains that a ruling authorizing widespread copying and posting of the Standards would destroy the commercial market for the Standards.  *See Campbell*, 510 U.S. at 590.  And the almost inevitable result of such a ruling is

---

[16]    The Sponsoring Organizations also sell a single user e-book version of the 2014 Standards. Facts §§11-12.  Offering free on-line access to the 2014 Standards would directly undermine such e-book sales and the effort to obtain revenue from such sales.

[17]    Or if they simply wished to review or read the 1999 Standards, they could either go to a library, or avail themselves of one of the many hard copies in circulation in the possession of professionals, academics and testing organizations who previously purchased a hard copy.

that Plaintiffs would be unable to fund future editions of the Standards, an outcome that would harm testing bodies across the country.

As to the Court of Appeals' second question — about the likely consequences of reproducing only those individual standards that are incorporated by reference — it is impossible to say for certain because Public Resource has only ever copied and published Plaintiffs' 1999 Standards in their entirety. We are, of course, willing to assume that the publication of the extracted incorporated standards alone would be *less* harmful in the marketplace. That is because the 1999 Standards, with its background and commentary, is chock full of additional insights, instruction, advice and helpful information, providing a great deal of instruction, whether in or outside an academic setting, beyond the specific standards that happen to have been incorporated by reference. But all that goes to emphasize that PRO's verbatim copying of the full volume of the 1999 Standards, with all that additional guidance and creative material, is uniquely harmful, and cannot plausibly be allowed as fair use.

On the Court of Appeals' third question — about how copying the 1999 Standards might affect the market for derivative works — the case law treats harm to derivative works as an *additional* form of harm to the copyright owner. *See, e.g., Castle Rock Entertainment, Inc. v. Carol Publ. Group, Inc.*, 150 F.3d 132 (2d Cir. 1998) (Seinfeld trivia game harmed market for derivatives because it substituted for products that the copyright holder might have developed); *Penguin Random House LLC v. Colting*, 270 F. Supp. 3d 736, (S.D.N.Y. 2017) (finding no fair use where defendant's "guides" to famous novels for children harmed publisher's ability to market its own such derivatives). The Court of Appeals appears to have inverted this inquiry, asking instead whether SDOs could somehow support their work of revising and updating standards, even in the face of PRO making standards available for free, by "continuing to make

money on derivative goods" such as "program services, including consulting, certification and training." 896 F.3d at 453. But even assuming that might be a relevant consideration in the abstract, it is not a relevant consideration here because there is no evidence that the Sponsoring Organizations engage in such derivative revenue-generating activities. The business model of the Sponsoring Organizations instead rests on using revenues from sales (including sales to academia, to use the Standards in connection with teaching) to support the vitally important work of creating derivative works by updating and revising the Standards as necessary. Maximizing that revenue facilitates that work; loss of that revenue would severely impair – or eliminate – the Sponsoring Organizations' ability to continue that work.

The Court of Appeals noted that standards setting organizations may update their standards and specifically queried whether PRO's posting of outdated standards affects the sales of updated standards. Of course, at the time this lawsuit was brought, there were no updated Standards. The 1999 Standards were the only version in circulation, and PRO's unlawful postings on the internet made them freely available at the expense of authorized sales of 1999 Standards. Beginning in mid-2014, AERA began offering the 2014 editions for sale. As to whether PRO's posting of the 1999 Standards affects sales of the 2014 Standards, the logical inference is clear: The fact that the 1999 Standards are freely available online is more likely to hurt, rather than help, sales of the 2014 edition. With the 1999 Standards available for viewing or downloading for free, at least some people will settle for that, rather than seek out and buy a later edition. This "market substitution" of a defendant's copy of the original for an updated version by the creators is exactly the type of core "harm to derivatives that need concern [the court]." *Campbell*, 510 U.S. at 593.

Moreover, while AERA still offers the 1999 Standards for sale, it does so *only with the Sponsoring Organization's explicit admonition that the 1999 edition has been superseded* and should not be purchased except for scholarly study.[18]   Facts §12.   Given their mission, the Sponsoring Organizations would not want the 1999 Standards to be used when the superseding 2014 Standards better represents the views of the Sponsoring Organizations on best practices for testing.   It is only reasonable to believe that at least some people, seeking information on best practices in testing, have found the PRO's reposting of the 1999 Standards on the Internet Archive, and at least some people have taken that posting as indicating that the 1999 Standards continue to represent best practices in testing.   As the copyright holders, the Sponsoring Organizations should have control of the sales of their copyrighted work, not only to profit from any revenue resulting from those sales and sales of derivative works, but also so that they can convey important information as they deem appropriate in connection with the sales of their copyrighted work – such as to expressly discourage the use of the 1999 Standards in favor of the 2014 Standards.[19]   PRO's infringement usurps that basic right as well.

---

[18]   Since introduction of the 2014 Standards, sales of 1999 Standards have been near nil.

[19]   The copyright-holder's right to attempt to direct sales away from an original work and to a derivative work follows from the fact that its rights include not only the right to sell the copyrighted work, but to *not* sell, or to limit access to the work.   See *Worldwide Church of God*, 227 F.3d at 1119 (rejecting argument that there was no market harm where holder of copyright had no plan to publish a new version of an outdated work because "[e]ven an author who has disavowed any intention to publish his work . . . was entitled to the protection of his copyright" and "the relevant consideration was the 'potential market'"); *Salinger v. Random House, Inc.* 811 F.2d  90, 97, 99  (2d Cir. 1987) (respecting the decision not to publish as part of the fair use analysis, notwithstanding that the works were available in libraries and would not be published during the author's lifetime); *see also Nat'l Cable Television Ass'n v. Copyright Royalty Tribunal*, 689 F.2d 1077, 1079 n.6 (D.C. Cir. 1982) ("the right to control information [under copyright law] may include the right to suppress it").

**CONCLUSION**

For the foregoing reasons, all four statutory factors weigh heavily against a finding of fair use.  Public Resource's wholesale copying of Plaintiffs' 1999 Standards cannot qualify as fair use.  Accordingly, this Court should reaffirm its earlier grant of summary judgment, and reinstate its injunction prohibiting PRO from posting the 1999 Standards on its website and that of the Internet Archive.  Reinstating the injunction will again allow for the immediate appeal of the Court's order, *see* 28 U.S.C. §1292(a)(1) and 896 F.3d at 445 (resting appellate jurisdiction on the injunction).

Respectfully submitted,

<u>s/Clifton S. Elgarten</u>
John I. Stewart, Jr. (D.C. Bar No. 913905)
Clifton S. Elgarten (D.C. Bar No. 366898)
Amanda Berman (D.C. Bar No. 497860)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004-2595
(202) 624-2500
celgarten@crowell.com

*Attorneys for Plaintiff-Counterdefendants*

October 4, 2019