# EXHIBIT A

Case No. 1:14-cv-00857-TSC-DAR

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLUMBIA

 3    _____

 4    AMERICAN EDUCATIONAL RESEARCH      )

 5    ASSOCIATION, INC., AMERICAN        )

 6    PSYCHOLOGICAL ASSOCIATION, INC., )

 7    and NATIONAL COUNCIL ON            )

 8    MEASUREMENT IN EDUCATION, INC., ) Civil Action No.

 9                   Plaintiffs,      ) 1:14-cv-00857-TSC-DAR

10          v.                         )

11    PUBLIC.RESOURCE.ORG,             )

12                   Defendant.        )

13    _____)

14

15

16         VIDEOTAPED DEPOSITION OF CARL MALAMUD

17

18

19    DATE:             May 12, 2015

20    TIME:             9:33 a.m.

21    LOCATION:         Fenwick & West

22                      555 California Street

23                      12th Floor

24                      San Francisco, California  94104

25    REPORTED BY:      Diane S. Martin, CSR 6464, CCRR
```

Carl Malamud                                                    May 12, 2015
San Francisco, CA

```
 1                    P R O C E E D I N G S

 2                         --oOo--

 3         THE VIDEOGRAPHER:  Good morning.  We're on

 4    the video record, ladies and gentlemen, at

 5    9:33 a.m.  I am Anthony Hensley from Alderson Court

 6    Reporting in Washington D.C.  The phone number is

 7    202-289-2260.

 8         This is matter pending before the court of

 9    the United States District Court for the District

10    of Columbia in the case captioned American

11    Educational Research Association et al., versus

12    Public.Resource.Org, Incorporated, case number

13    1-14-cv-00857-TSC-DAR.

14         This is the beginning of Disc 1, Volume 1

15    of the deposition of Carl Malamud on 5/11/2015.

16         We're located at address 555 California

17    Street, San Francisco, California.  This is taken

18    on behalf of the plaintiffs.

19         Counsel, would you please identify

20    yourselves starting with the questioning attorney.

21         MR. HUDIS:  Jonathan Hudis, and Katherine

22    Cappaert for the plaintiffs.

23         MR. BRIDGES:  Andrew Bridges and Matt

24    Becker of Fenwick & West for the defendant.

25         MR. SMITH:  Corynne McSherry from the
```

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1    Electronic Frontier Foundation for the defendant.

2            THE VIDEOGRAPHER:  You may proceed.

3            MR. HUDIS:  Just a correction for the

4    record.  Today is May 12th, 2015.

5    BY MR. HUDIS:

6        Q.  Sir, could I have your full name and

7    address for the record?

8            Oh, go ahead.

9            THe REPORTER:  Thank you.

10           Sir, could I have you raise your right

11   hand, please.

12                   CARL MALAMUD,

13   called as a witness, after having been duly sworn

14   by the Certified Shorthand Reporter to tell the

15   truth, the whole truth, and nothing but the truth,

16   testified as follows:

17                   EXAMINATION

18   BY MR. HUDIS:

19       Q.  Sir, if I could have your full name and

20   address for the record.

21       A.  Carl Andrew Malamud, and my address is

22   1005, Gravenstein Highway North in Sebastapol,

23   California.  Zip code is 95472.

24       Q.  And is that your home address?

25       A.  No, that's my work address.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1      Q.   All right.  And your home address, sir?

2      A.   It's P.O. Box 361 in Bodega, California,

3   94992.

4      Q.   Mr. Malamud, we're here to take your

5   deposition in the matter of American Educational

6   Research Association and its co-plaintiffs versus

7   Public.Resource.Org.

8           The parties all have long names.  So I want

9   to establish some working acronyms between the two

10  of us.

11          So if I say AERA, do you understand that to

12  mean the American Educational Research Association,

13  Inc.?

14     A.   Yes, I do.

15     Q.   And if I use the acronym APA, that will

16  refer to the American Psychological Association,

17  Inc.

18     A.   Yes.

19     Q.   And if I use the acronym NCME, that will

20  refer to National Council on Measurement and

21  Education, Inc.

22     A.   Yes.

23     Q.   And if I refer to Public.Resource, that

24  will be a shorthand version of Public.Resource.Org,

25  Inc.?

Carl Malamud                                              May 12, 2015
San Francisco, CA

Page 76

 1   with these organizations?

 2       A.  I was charged with investigating and

 3   proposing mechanisms for the governance of the

 4   Internet standards-making process.

 5       Q.  And if you could briefly describe what that

 6   means, "mechanisms for the governance of the

 7   Internet standards-making process"?

 8       A.  The core issue I investigated was the

 9   proper institutional home for the Internet

10   Engineering Task Force, which at the time was an

11   unincorporated association.

12       Q.  What did you mean by "proper institutional

13   home"?

14       A.  That was actually the question I was

15   investigating, what should that institutional home

16   be.

17       Q.  Well, what did you mean by "institutional

18   home"?

19           MR. BRIDGES:  Objection.  Lacks foundation.

20           THE WITNESS:  I can tell you what the

21   conclusion was of that process.

22   BY MR. HUDIS:

23       Q.  What was the conclusion of that process?

24       A.  That the Internet society would provide

25   the -- the corporate framework that would then run

Carl Malamud                                                          May 12, 2015
San Francisco, CA

1    the Internet Engineering Task Force and the

2    associated standards-making process.

3       Q.  Back to your consultancy with the

4    Architectural Board and the Internet Engineering

5    Task Force.  What did you do for gainful

6    employment?

7       A.  I worked at the Center for American

8    Progress.

9       Q.  What's the nature of that business?

10          MR. BRIDGES:  Objection.  Lacks foundation;

11   vague and ambiguous.

12          THE WITNESS:  It is a 501(c)(3) think tank.

13   BY MR. HUDIS:

14      Q.  And what did you do there?

15      A.  I was a senior fellow and the chief

16   technology officer.

17      Q.  And what years was that?

18      A.  2005 to 2006.

19      Q.  What did you do next for gainful

20   employment?

21      A.  I founded Public.Resource.Org.

22      Q.  And that was in 2007?

23      A.  That's correct.

24      Q.  Are you presently employed by

25   Public.Resource?

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 78

 1      A.  I am.

 2      Q.  And you are the founder of Public.Resource?

 3      A.  I am.

 4      Q.  What is your current title with

 5  Public.Resource?

 6      A.  Founder and president.

 7      Q.  Is that the position you have held from

 8  2007 until today?

 9      A.  It is.

10      Q.  What is your -- what are your duties and

11  responsibilities as founder and president of

12  Public.Resource?

13          MR. BRIDGES:  Objection.  Vague and

14  ambiguous; compound.

15          THE WITNESS:  I'm responsible for the

16  activities of Public.Resource.Org.

17  BY MR. HUDIS:

18      Q.  What are those activities?

19      A.  Well, there's the governance of the

20  corporation.

21      Q.  What else?

22      A.  There is the operation of websites and

23  Internet services.

24      Q.  What types of websites and services does

25  Public.Resource provide?

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1        A.   That is a crawl of the Internet that's

2   available to others to openly use.

3        Q.   Without restriction?

4             MR. BRIDGES:   Objection.   Vague and

5   ambiguous.

6   BY MR. HUDIS:

7        Q.   When you say it is a crawl of the Internet

8   that's available to others to openly use, what did

9   you mean by for "others to openly use"?

10       A.   The data is available on the Amazon hosting

11  service for any organization to use for analysis.

12       Q.   Are you an employee of any other companies

13  today?

14       A.   I am not.

15       Q.   Besides Common Crawl and Public.Resource,

16  do you have any roles in any other nonprofit

17  organizations today?

18            MR. BRIDGES:   Objection.   Vague and

19  ambiguous.

20            THE WITNESS:   No, I do not.

21  BY MR. HUDIS:

22       Q.   And Public.Resource is an IRS 501(c)(3)

23  nonprofit corporation?

24       A.   It is.

25       Q.   And it was incorporated in California in

1    2007?

2        A.   That's correct.

3             (PLAINTIFFS' EXHIBITS 16-18 WERE MARKED.)

4             MR. HUDIS:  All right.  Let's go off the

5    record.  There's ten minutes left.  So let's go off

6    the record.

7             MR. BRIDGES:  Okay.

8             MR. HUDIS:  And I'll do the marking with

9    you, Andrew.

10            THE VIDEOGRAPHER:  This marks the end of

11   Disc 1, Volume 1 in the deposition of Carl Malamud.

12            The time is 11:34 and we are off the

13   record.

14            (Discussion off the record.)

15            THE VIDEOGRAPHER:  This marks the beginning

16   of Disc 2, Volume 1 in the deposition of Carl

17   Malamud.

18            The time is 11:40, and we are on the

19   record.

20   BY MR. HUDIS:

21       Q.  Mr. Malamud, what is the purpose of

22   Public.Resource?

23            MR. BRIDGES:  Objection.  Vague and

24   ambiguous and may lack foundation.

25            THE WITNESS:  It's the creation and

Case 1:14-cv-00857-TSC   Document 60-4   Filed 12/22/15   Page 96 of 370

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 95

1    maintenance of public works projects for the

2    Internet.

3    BY MR. HUDIS:

4        Q.  What do you mean by "public works

5    projects"?

6        A.  Operational services that have real

7    information that people can access.

8        Q.  What do you mean by "operational services"?

9        A.  Public works is a term that refers to a

10   creation of infrastructure that's used by the

11   public.  And that is what we attempt to do for the

12   Internet.

13       Q.  And in that regard what are the objectives

14   of Public.Resource?

15           MR. BRIDGES:  Objection.  Vague; asked and

16   answered; vague and ambiguous; lacks foundation.

17           THE WITNESS:  I guess I don't understand

18   the difference between purpose and objective.

19   BY MR. HUDIS:

20       Q.  Do you make no distinction between the two

21   terms, purpose and objectives?

22           MR. BRIDGES:  Object -- objection.

23   Counsel, he needs to understand your question.

24           MR. HUDIS:  Okay.

25           MR. BRIDGES:  You need to explain what you

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 96

1    mean.

2         MR. HUDIS:  Fair enough, Counsel.

3         MR. BRIDGES:  You can ask him -- he can

4    answer the question.

5         MR. HUDIS:  Fair enough.

6    BY MR. HUDIS:

7    Q.  In creating an infrastructure for the

8    Internet, what objectives does Public.Resource have

9    towards that goal?

10        MR. BRIDGES:  Objection.  Vague and

11   ambiguous; confusing.

12        THE WITNESS:  To create something that is

13   useful to the public.

14   BY MR. HUDIS:

15   Q.  Could you give me an example?

16   A.  Yes.  The IRS database we created.

17   Q.  Before the break you listed a number of

18   websites that are operated by Public.Resource.  I

19   want to make sure that I have them all.

20   Public.Resource.Org, USCourts.gov,

21   House.Resource.org, WWLBD.org, YesWeScan.Org,

22   Law.Resource.Org.

23        Have I named them all?

24        MR. BRIDGES:  Objection.  Lacks foundation;

25   vague and ambiguous.

Carl Malamud                                          May 12, 2015
                   San Francisco, CA

                                                    Page 104

 1   business record of Public.Resource?

 2          MR. BRIDGES:  I'll object to the extent it

 3   calls for any kind of legal conclusion.

 4          You can testify as to whether you think

 5   it's an accurate reproduction of it.

 6          THE WITNESS:  This appears at first glance.

 7   Obviously, I would want to go check my originals.

 8   This appears at first glance to be a copy of our

 9   articles of incorporation, yes.

10   BY MR. HUDIS:

11      Q.  And these articles of incorporation were

12   prepared about the time of the founding of

13   Public.Resource.Org, Inc.?

14      A.  Well, yes.

15      Q.  And is Exhibit 16, the articles of

16   incorporation, kept on your company's website?

17      A.  Yes.

18      Q.  And is that website operated in the regular

19   course of Public.Resource's business?

20          MR. BRIDGES:  Objection.  Lacks foundation;

21   may call for a legal conclusion; argumentative.

22   BY MR. HUDIS:

23      Q.  You may answer.

24          MR. BRIDGES:  Vague and ambiguous.

25   BY MR. HUDIS:

Carl Malamud                                                    May 12, 2015
                              San Francisco, CA

Page 105

1       Q.  You may answer.

2       A.  Yes.

3       Q.  And the articles of incorporation were made

4   at the time that you founded Public.Resource?

5       A.  The articles of incorporation are what

6   created the corporation.

7       Q.  Let's look at Exhibit 17.  What is this

8   document?

9           MR. BRIDGES:  Check it out.

10          THE WITNESS:  This appears to be a copy of

11   our bylaws.

12   BY MR. HUDIS:

13      Q.  Do you have any reason to doubt that

14   Exhibit 17 is an authentic document?

15          MR. BRIDGES:  Objection.  Lacks foundation;

16   vague and ambiguous.

17          THE WITNESS:  I do not.

18          MR. BRIDGES:  Assumes facts not in

19   evidence.

20          I will note that this document has lines

21   without signatures on the final page.

22          THE WITNESS:  The version of our bylaws

23   posted on our website has no signatures on it.

24          I have no reason to doubt.  I would

25   obviously want to double-check this with the copy

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 106

 1    that I have.

 2    BY MR. HUDIS:

 3        Q.  I'll represent to you, Mr. Malamud, that I

 4    obtained Exhibits 16 and 17 from your website.

 5        A.  Mm-hm.

 6            MR. HUDIS:  Counsel, can you stipulate that

 7    Exhibit 17 is an authentic business record of

 8    Public.Resource?

 9            MR. BRIDGES:  Let me get back to you after

10    a break when I'll have to confer with my client.  I

11    anticipate that will not be a problem.

12            MR. HUDIS:  Because I'd rather not have to

13    go through the foundation if I don't have to.

14            MR. BRIDGES:  I understand.  I just want to

15    confirm with him during a break.

16            MR. HUDIS:  Do you want to -- I'll allow

17    you to do that right now if you'd like.  We can go

18    off the record.

19            MR. BRIDGES:  Sure.

20            MR. HUDIS:  Andrew, do you want us to step

21    out of the room?

22            MR. BRIDGES:  No.  No.  We need to go off

23    the record though.

24            THE VIDEOGRAPHER:  The time is 11:58, and

25    we are off the record.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1          (Discussion off the record.)

2          THE VIDEOGRAPHER:  The time is 12:02, and

3   we are back on the record.

4          MR. BRIDGES:  So, Mr. Hudis, 18 we can

5   stipulate to the authenticity.

6          17 we can stipulate this does appear to be

7   a copy of what is posted on the website, and we

8   believe this is a genuine copy of the article of

9   incorporation -- of the form of the articles of

10  incorporation without the signatures.

11         So I think -- you know, if -- the problem

12  is --

13         THE WITNESS:  Bylaws.

14         MR. BRIDGES:  The bylaws, thank you.

15         The concern is if -- it's a long document

16  and needs to be compared.  If there is an issue

17  with that, we can get back and let you know that.

18         So the stipulation is sort of a conditional

19  stipulation, subject to a correction at the time of

20  the transcript if we find after comparing it, there

21  is a material variance.

22         MR. HUDIS:  Okay.  So, Counsel, unless

23  there is a material variance, we can stipulate that

24  Exhibits 16 and 17 are authentic business records

25  of Public.Resource?

Carl Malamud                                                      May 12, 2015
San Francisco, CA

Page 108

1          MR. BRIDGES:  Yes, subject to our right to

2    correct the deposition to the extent we may need to

3    correct that stipulation if there is a material

4    variance on 17.

5          MR. HUDIS:  Understood and agreed.

6          And Exhibit 18, you are stipulating that

7    that's an authentic document.

8          MR. BRIDGES:  Yes.

9          MR. HUDIS:  Can we stipulate that it's a

10   business record of Public.Resource?

11         MR. BRIDGES:  We'll stipulate that it is a

12   document in the possession of Public.Resource.  I

13   would consider it to be a business record, I would

14   think, of the Internal Revenue service.

15         MR. HUDIS:  Satisfied.

16   BY MR. HUDIS:

17     Q.  Turning, Mr. Malamud, to Exhibit 16.

18         Does paragraph II B of the articles of

19   incorporation accurately describe the purpose of

20   Public.Resource?

21         MR. BRIDGES:  Objection.  Lacks foundation;

22   vague and ambiguous and may call for legal

23   expertise and legal conclusion.

24         THE WITNESS:  Yes.

25   BY MR. HUDIS:

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1       Q.  Turning to Exhibit 17.  Does section 2.1 of

2   the bylaws of Public.Resource accurately describe

3   the objectives and purposes of Public.Resource?

4           MR. BRIDGES:  Same objections.

5           THE WITNESS:  Yes.

6   BY MR. HUDIS:

7       Q.  Mr. Malamud, I show you what's been marked

8   as Exhibit 18.  Could you please tell me what that

9   document is?

10          MR. BRIDGES:  I'll object to the extent it

11  requires him to -- object to the extent it requires

12  legal expertise to characterize it or seeks a legal

13  conclusion.

14          The witness may testify as to what he

15  knows.

16          THE WITNESS:  I don't know the official

17  title of this.  It's a -- I believe it's called a

18  Form 1045.  It's a notification of nonprofit

19  status.

20  BY MR. HUDIS:

21      Q.  And does it indicate to you that

22  Public.Resource attained its nonprofit status in

23  September of 2007?

24          MR. BRIDGES:  Objection.  Vague and

25  ambiguous; may call for a -- may call for legal

Page 110

1    expertise or conclusion.

2    BY MR. HUDIS:

3        Q.  Should I repeat the question, Mr. Malamud?

4        A.  Yeah.

5        Q.  Does Exhibit 18 indicate to you that

6    Public.Resource attained its nonprofit status in

7    September of 2007?

8            MR. BRIDGES:  Same objections.

9            THE WITNESS:  The date of the letter is

10   September 25th.  That's not the date of the

11   nonprofit status.

12   BY MR. HUDIS:

13       Q.  What is the date of the nonprofit status?

14       A.  April 13th, 2007.

15       Q.  Fair enough.  And I see that date.

16       A.  Yeah.

17       Q.  Thank you very much.

18           (PLAINTIFFS' EXHIBITS 19-20 WERE MARKED.)

19   BY MR. HUDIS:

20       Q.  Mr. Malamud, please take a moment to look

21   at Exhibits 19 and 20.

22       A.  Okay.

23       Q.  Have you looked at the exhibits?

24       A.  Yes, I have.

25       Q.  Could you tell me what Exhibit 19 is?

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 231

 1         I believe there are a number of other

 2    agencies, I believe Office of Personnel Management,

 3    I believe Department of Defense, a number of state

 4    organizations, are all users of the standard

 5    because they specify that it shall be used.

 6    BY MR. HUDIS:

 7        Q.  Do you know of any non-governmental users

 8    of the standards?

 9         MR. BECKER:  All the same objections.

10    Vague.

11         To the extent that there is any information

12    that the witness has learned from his attorneys, I

13    will instruct him not to divulge this privileged

14    information.

15         THE WITNESS:  I know that the Educational

16    Testing Service, ETS and a number of organizations

17    that create tests, are users of the standard, and

18    the reason I know that is there's been a series of

19    procurements by government organizations that

20    require the use of the standard.

21    BY MR. HUDIS:

22        Q.  Do you know of any other non-governmental

23    users of the standards?

24         MR. BECKER:  All the same objections.  Also

25    object for competence.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 232

1           THE WITNESS:  My sister read it in the

2    course of her doctoral course work.

3    BY MR. HUDIS:

4        Q.  And what was your sister's doctoral course

5    work?

6        A.  On, I want to state this properly.  I

7    believe physical and rehabilitative therapy.  A

8    subset of psychology.

9        Q.  How did the standards first come to your

10   attention?

11          MR. BECKER:  Objection.  Vague.  Objection.

12   Ambiguous.

13          THE WITNESS:  I was looking at the

14   standards incorporated by reference under the Code

15   of Federal Regulations, and the standards at issue

16   were one of the ones that were specified.

17   BY MR. HUDIS:

18       Q.  And what year was that?

19       A.  Probably 2012.  Early 2012.

20       Q.  When did Public.Resource --

21       A.  Might have been earlier.  Might have been

22   earlier.  I'm not sure.

23       Q.  Sometime in 20 -- in 2012?

24       A.  Coming to my attention in the sense of

25   remembering it now, yes.

Page 233

1      Q.   What, if anything, made you interested in

2   acquiring the standards?

3      A.   It was --

4          MR. BECKER:  Objection.  Vague.

5          THE WITNESS:  -- incorporated by reference

6   into the Code of Federal Regulations.

7   BY MR. HUDIS:

8      Q.   When did Public.Resource first make the

9   decision to post the standards to one of its

10  websites?

11         MR. BECKER:  Objection.  Vague.  Objection.

12  Lacks foundation.  Objection.  May call for a legal

13  conclusion.

14         THE WITNESS:  So it would have been

15  sometime after obtaining a copy of the standard and

16  examining it and satisfying myself that, in fact,

17  it was the document that was incorporated by

18  reference, and sometime between the procurement,

19  which I believe was in May 2012, and the actual

20  posting, which I believe was in July 2012.

21  BY MR. HUDIS:

22     Q.   So how did Public.Resource come to the

23  decision to post the standards on one of its

24  websites?

25         MR. BECKER:  Objection.  Vague and

Page 234

1    ambiguous.

2           THE WITNESS:  By determining that it was

3    incorporated by reference and that this particular

4    document that I held in my hand was the specific

5    document that had been incorporated by reference.

6    BY MR. HUDIS:

7       Q.  On which of its websites did

8    Public.Resource post the standards?

9       A.  Law.Resource.Org.

10      Q.  Mr. Malamud, this question is directed to

11   you personally.

12          Do you claim any copyright ownership

13   interest in the Standards for Educational and

14   Psychological Testing?

15          MR. BECKER:  Objection.  Calls for a legal

16   conclusion.  Objection.  Argumentative; lacks

17   foundation; competence.

18          THE WITNESS:  I do not.

19   BY MR. HUDIS:

20      Q.  Does Public.Resource claim any copyright

21   ownership interest in the Standards for Educational

22   and Psychological Testing?

23          MR. BECKER:  All the same objections.

24          THE WITNESS:  We do not.  We do not.

25   BY MR. HUDIS:

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 235

1      Q.   When did you first procure the standards?

2      A.   May 2012.

3      Q.   What was the year of the publication of the

4   particular standards that you procured?

5           MR. BECKER:  Objection.  Vague; assumes

6   facts not in evidence.

7           THE WITNESS:  I don't know the year of the

8   publication.  I know it's a 1999 edition.

9   BY MR. HUDIS:

10     Q.   That's what I wanted to know.  Thank you.

11          Have you procured any earlier or subsequent

12   versions of the standards?

13     A.   Subsequent to the commencement of

14   litigation, I purchased a copy of the 2014 and 1985

15   standards because I wanted to see what was in them.

16   I have not posted those documents.

17     Q.   Mr. Malamud, did you personally procure the

18   1999 standards?

19     A.   I did.

20     Q.   From -- from what source did you procure

21   the 1999 standards?

22     A.   It's --

23          MR. BECKER:  Objection.  Vague.

24          THE WITNESS:  It's called the Amazon

25   Marketplace.  So I paid my money to Amazon, and

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1    that was through a used book seller that actually

2    had the document and sent it to me.

3           (PLAINTIFFS' EXHIBIT 29 WAS MARKED.)

4    BY MR. HUDIS:

5       Q.  I marked the next document as Exhibit 29,

6    and it is Defendant's Amended Responses to

7    Plaintiff's Interrogatories.

8           Mr. Malamud, do you recognize this

9    document?

10      A.  I do.

11      Q.  Mr. Malamud, if you could turn to the last

12   page.  On page 15, is that your signature?

13      A.  Yes, it is.

14      Q.  Mr. Malamud, could you please turn to the

15   question and answer to interrogatory number 1 on

16   page 4 of Exhibit 29.

17      A.  I'm there.

18      Q.  And it says in the third paragraph of that

19   interrogatory answer, "Public.Resource purchased a

20   printed copy from," quote, "The Book Grove,"

21   unquote, "a used book seller on May 17, 2012."

22          And does this interrogatory answer verify

23   the source from which you procured the 1999

24   standards?

25      A.  Yes.  The Book Grove was the used book

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 237

1   seller on the Amazon marketplace.

2       Q.  And does interrogatory answer number 1 also

3   state the date of purchase?

4       A.  It does.

5       Q.  And that date is May 17th, 2012?

6       A.  That is correct.

7           MR. BECKER:  Objection.  The interrogatory

8   speaks for itself.

9           (PLAINTIFFS' EXHIBIT 30 WAS MARKED.)

10  BY MR. HUDIS:

11      Q.  Mr. Malamud, have you taken the time to

12  read what has now been marked as Exhibit 30?

13      A.  I have.

14      Q.  And the document Exhibit 30 bears

15  production pages PROAERA 446 through 5 --

16  through -- well --

17      A.  446.

18          MR. HUDIS:  PROAERA 446, PROAERA 447 and

19  PROAERA 544.

20          Counsel, just so we have an understanding,

21  this is a part of a much larger document of many

22  other purchases that Carl Malamud made.  We are

23  only concentrating on a specific purchase.

24          THE WITNESS:  I don't have 544 here.  I

25  have two pages.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 238

```
 1    BY MR. HUDIS:

 2        Q.  Okay.  So my colleague, Ms. Cappaert, has

 3    told me that I've misspoken.  So I'm going to

 4    re-identify the document.

 5            Exhibit number 30 should contain production

 6    pages PROAERA 446 and 447.

 7        A.  That's correct.

 8        Q.  I apologize, Mr. Malamud.  That was my

 9    error.

10        A.  Oh, that's okay.

11        Q.  Okay.  So, Mr. Malamud, if you could take a

12    look at the document.  Do you have any doubt that

13    this document is authentic?

14        A.  No, I do not.

15            MR. HUDIS:  Counsel, can you stipulate that

16    Exhibit 30 is a business record of

17    Public.Resource?

18            MR. BECKER:  It appears to be a document

19    produced by Public.Resource that is a receipt.

20            MR. HUDIS:  I'll take that representation.

21    Thank you.

22    BY MR. HUDIS:

23        Q.  Mr. Malamud, Exhibit 30, is this the

24    receipt for the 1999 standards book that you

25    purchased?
```

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 239

1        A.  Yes, it is.

2        Q.  And for what purpose did you procure the

3   1999 standards?

4        A.  To look at the document and ascertain that

5   it was, in fact, the document incorporated by

6   reference into the Code of Federal Regulations.

7             (PLAINTIFFS' EXHIBIT 31 WAS MARKED.)

8   BY MR. HUDIS:

9        Q.  Mr. Malamud, I show you what's been marked

10  as Exhibit 31.  It bears production numbers

11  AERA_APA_NCME 1 through 201.

12       A.  Do you want me to read the document?

13       Q.  No, I do not.

14       A.  Okay.

15       Q.  Mr. Malamud, is this the book that you

16  purchased from The Book Grove on May 17, 2012?

17            MR. BECKER:  Objection.  Vague.  Objection.

18  The witness has been instructed not to read the

19  document.  Objection.  Misleading.

20  BY MR. HUDIS:

21       Q.  Mr. --

22       A.  I don't know if this is the one that I

23  bought, but this appears to be a copy of the

24  standards at issue.

25       Q.  Did you buy the standards at issue from the

Carl Malamud                                          May 12, 2015
San Francisco, CA

Page 240

1    Book Grove?

2        A.  Yes.

3        Q.  Mr. Malamud, according to Exhibit 30, you

4    paid $64.48 for the book plus shipping and

5    handling.

6        A.  68.47, including shipping and handling,

7    yes.

8        Q.  Mr. Malamud, did you ever attempt to

9    acquire a copy of the 1999 standards for free?

10       A.  I think the answer to that is yes.

11       Q.  From where?

12       A.  See, I'm not sure "free" is the right term.

13   I submitted a Freedom of Information Act request

14   that included the standards at issue.  That request

15   was denied.  So I have no idea if there would have

16   been a charge or not in making that data available.

17   So that's a qualified yes.

18            (PLAINTIFFS' EXHIBIT 32 WAS MARKED.)

19   BY MR. HUDIS:

20       Q.  Mr. Malamud, I show you what's been marked

21   as Exhibit 32 bearing pro -- pages PROAERA 10153

22   through 10195.

23            Do you recognize the document?

24       A.  It appears to be a Freedom of Information

25   Act request I submitted to Mr. Stern, who is the

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 241

1    general counsel of the National Archives.

2        Q.  Is the National Archives and Records

3    Administration also known as NARA, N-A-R-A?

4        A.  Yes, it is.

5        Q.  And this letter of July 14th, 2009, Exhibit

6    32, this was a freedom of information request by

7    Public.Resource?

8        A.  Yes, it was.

9            MR. HUDIS:  Counsel, can you stipulate that

10   Exhibit 32 is a business record of Public.Resource?

11           MR. BECKER:  I'm not certain if it

12   constitutes a business record by Public.Resource,

13   but it is a document produced by Public.Resource.

14   BY MR. HUDIS:

15       Q.  Mr. Malamud, so was this document, Exhibit

16   32, created on or about July 14th, 2009?

17       A.  It's when I sent it, it is.

18       Q.  Have you kept a copy of Exhibit 32 in

19   Public.Resource's records?

20       A.  Yes, we disclosed it to you.

21       Q.  And writing such letters such as Exhibit 32

22   is the regular practice of Public.Resource?

23           MR. BECKER:  Objection.  Vague.

24           THE WITNESS:  I don't know about regular

25   practice, but it was certainly not unusual for me

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 256

1    wait for a question to be asked by counsel.

2          THE WITNESS:  Yes.

3    BY MR. HUDIS:

4      Q.  Mr. Malamud, at the end -- well, it's not

5    the end.  On page 10248 of Exhibit 33 at the

6    bottom, Mr. Mosley says in his letter to you,

7    "Although many of our library holdings are in the

8    public domain as products of employees or agents of

9    the federal government, some documents incorporated

10   by reference do or may have copyright protection.

11   You are responsible for obtaining any necessary

12   permission for use, copying and publication from

13   copyright holders and for -- and for any other

14   applicable provisions of the Copyright Act."  And

15   he cites Title 17 of the United States code.

16         Do you agree or disagree with that

17   statement?

18         MR. BECKER:  Objection.  Calls for a legal

19   conclusion.  Objection.  Form.

20         THE WITNESS:  It says, "some documents

21   incorporated by reference do or may have copyright

22   protection."  It is my understanding that the law

23   in the United States has no copyright.  It is owned

24   by the people.  Not by the government agencies.

25   BY MR. HUDIS:

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 257

1      Q.  So the moment any standard is incorporated

2   by reference into a federal regulation, it loses

3   its copyright protection; is that correct,

4   according to your view?

5           MR. BECKER:  Objection.  Calls for a legal

6   conclusion.  Objection.  Argumentative.  Objection.

7   May misstate prior testimony.

8           THE WITNESS:  I think words like "loses its

9   copyright" are loaded.  I do believe that the Code

10  of Federal Regulations has no copyright.  It's a

11  law.  And that standards incorporated by reference

12  into the Code of Federal Regulations are an

13  integral part of the code and therefore have no

14  copyright.

15  BY MR. HUDIS:

16     Q.  Mr. Malamud, once you procured the 1999

17  standards in May of 2012, what, if anything, did

18  you do with them?

19          MR. BECKER:  Objection.  Form.

20          THE WITNESS:  I examined the standard to

21  determine that it was, in fact, the document that

22  was specified and incorporated by reference.

23  BY MR. HUDIS:

24     Q.  What else did you do with the standards

25  once you had them?

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1      A.  I scanned the standard and turned it into a

2   PDF file.

3      Q.  So I would like to draw your attention back

4   to Exhibit 29, which is the interrogatory answers.

5   And I draw your attention to interrogatory answer

6   number 3 at the bottom of page 5 in Exhibit 29.  Do

7   you see that?

8      A.  Yes, I see that.

9      Q.  All right.  Now, do you see

10  Public.Resource's answer that starts at the bottom

11  of page 5 and continues on page 6?

12     A.  I do.

13     Q.  Does this interrogatory answer accurately

14  state what you did with the 1999 standards once you

15  procured them?

16         MR. BECKER:  Objection.  Form.

17         THE WITNESS:  It does.

18  BY MR. HUDIS:

19     Q.  All right.  So as I understand, you

20  disassembled the book; correct?

21     A.  Mm-hm.

22         MR. BECKER:  Objection.  Form.

23  BY MR. HUDIS:

24     Q.  You removed the spine and any other

25  extraneous materials.  You trimmed the document.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 259

1   Do you see that?

2       A.  I do.

3       Q.  All right.  And then you scanned it on a

4   Xerox 4250 scanner at 30 or 40 dots per inch.  Do

5   you see that?

6       A.  At 300 or 400 dots per inch.  Yes, I do.

7       Q.  And then you named the file

8   AERA.standards.1999.PDF?

9       A.  That's correct.

10      Q.  Now, the book that you got from the

11  reseller on Amazon, you said it was a used book?

12      A.  I really don't recall if it was used or

13  new.

14      Q.  Did you check the quality of the pages of

15  the book before you scanned them?

16      A.  Yes, I did.

17      Q.  Did you notice -- did you compare your

18  copy -- your procured copy of the 1999 standards to

19  a new version of the standards?

20          MR. BECKER:  Objection.  Vague and

21  ambiguous; possibly misleading and misstates the

22  testimony.

23          THE WITNESS:  So again, I'm not sure

24  whether it was new or used.  I simply have no

25  recollection.  I know I was able to obtain it on

Carl Malamud                                                        May 12, 2015

San Francisco, CA

Page 260

1    the Amazon Marketplace.

2           What was the rest of your question?

3    BY MR. HUDIS:

4       Q.  Did you compare the used version that you

5    procured with a new version of the standards?

6           MR. BECKER:  Same objections.

7           THE WITNESS:  So again, I'm not sure if it

8    was a used or a new.  Did I compare it to another

9    copy of the standards?

10   BY MR. HUDIS:

11      Q.  Correct.

12      A.  No, I did not.

13      Q.  And in interrogatory answer number 3 you

14   talk about a quality check process.  Could you tell

15   me what that quality check process was?

16      A.  In the case of a scan, making sure all the

17   pages are there and that the scan was successful.

18      Q.  Did you check to make sure all the pages

19   were there?

20      A.  I believe I did, yes.

21      Q.  And then you say, "The files are post

22   process to optimize the scan and to generate

23   optical character recognition on the text."

24          Did you do that?

25      A.  Yes, I believe I did.

Carl Malamud                                          May 12, 2015
San Francisco, CA

Page 261

1      Q.  And then it says, "Public.Resource then

2   double checks the IBR."  That's incorporation by

3   reference?

4      A.  That's correct.

5      Q.  "The incorporation by references, puts a

6   cover sheet on the files and stamps metadata into

7   the headers."

8          What kind of metadata did you stamp into

9   the headers?

10     A.  I have not examined the AERA standard

11  recently, but the normal practice is to stamp in

12  the name of the standard and possibly the CFR site

13  that we have there.  And the name of the original

14  publisher, I believe, was also in the metadata.

15     Q.  Did you or anyone on Public.Resource's

16  behalf use graphic design web tools to post the

17  1999 standards to the Internet?

18          MR. BECKER:  Objection.  Compound.

19  Objection.  Vague.

20          THE WITNESS:  I created the cover sheet,

21  the certificate of incorporation using graphic

22  design tools.  I did not apply any graphic design

23  tools to the core document, because it was simply a

24  scan.

25          (PLAINTIFFS' EXHIBIT 34 WAS MARKED.)

Carl Malamud                                                    May 12, 2015
San Francisco, CA

1   BY MR. HUDIS:

2       Q.  Mr. Malamud, I show you a document that has

3   been marked as Exhibit 34, bearing production

4   numbers AERA_APA_NCME 31528 through 31738.

5           Do you recognize this document?

6       A.  It appears to be a copy of the standards at

7   issue with the certificate of incorporation on the

8   top.

9       Q.  All right.  And is this the cover sheet

10  that you appended on top of the 1999 standards

11  posted on Public.Resource's website?

12      A.  Yes, it appears to be.

13      Q.  Who prepared this cover sheet?

14      A.  I did.

15      Q.  And who chose the language for the cover

16  sheet?

17      A.  I did.

18      Q.  What was your intention, Mr. Malamud, for

19  appending this cover sheet of Exhibit 34 on top of

20  the 1999 standards posted on Public.Resource's

21  website?

22      A.  I wanted to be very clear that this was a

23  posting of a standard incorporated by reference

24  into the Code of Federal Regulations.  I wanted to

25  place this document in context.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 263

1      Q.  And what was your purpose on the cover

2   sheet of using the medallion that had the word

3   "Repeatedly Approved."

4      A.  To signify that the executive director of

5   the Office of the Federal Register had explicitly

6   and deliberately approved this incorporation by

7   reference.

8      Q.  We just went through the process that you

9   used.  We asked you the question, did you digitize

10  or convert to a digital format the 1999 standards,

11  and we went through that process.

12        My question is, who participated in the

13  process of disassembling the paper version of the

14  1999 standards, scanning them and processing them,

15  as you described here in interrogatory answer

16  number 3 and posting them to the Internet?

17        MR. BECKER:  Objection.  Compound.

18        THE WITNESS:  That was me.

19  BY MR. HUDIS:

20     Q.  Did Point.B Studio participate in this

21  process?

22     A.  No.

23     Q.  Did Rebecca Malamud participate in this

24  process?

25     A.  She did not.

Page 264

```
 1      Q.  Did HTC Global participate in this process?

 2      A.  They did not.

 3      Q.  Did anyone else besides yourself

 4  participate in this process?

 5      A.  It's just me.

 6      Q.  I'd like you to look in Exhibit 29,

 7  interrogatory answer number 4 on page 6.

 8          So consistent with your -- your prior

 9  testimony, does this interrogatory answer number 4

10  in Exhibit 29 accurately identify all the persons

11  and entities who were involved in disassembling the

12  paper version of the 1999 standards, scanning them,

13  processing them and posting them to the Internet?

14          MR. BECKER:  Objection to form.

15          THE WITNESS:  Yes, it was me.

16  BY MR. HUDIS:

17      Q.  I just want to go a little bit into depth

18  about quality control.

19          So what quality control procedures did you

20  use to ensure the quality of the textual comment --

21  content of the 1999 standards that you posted to

22  the Internet?

23          MR. BECKER:  Objection.  Vague.

24          THE WITNESS:  This is a scan of a document.

25  BY MR. HUDIS:
```

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 265

1      Q.   Mm-hm.

2      A.   It's a pixel-by-pixel replication of what

3    was on the printed page.

4      Q.   I'll be more specific.

5           Did you check for missing or incorrectly

6    scanned pages?

7      A.   I believe I did.

8      Q.   Did you check for pages that may have had

9    blurred text?

10     A.   I believe I did.

11     Q.   Now, you say, "I believe I did."  Do you

12   know for sure that you did?

13     A.   My standard procedure is to do those

14   things.  I don't know this specific document simply

15   because I don't recollect back to that period in

16   May 2012.  So I can't testify under oath that I

17   did, in fact, do that.  But that certainly is my

18   standard procedure.

19     Q.   Mr. Malamud, what is search engine

20   optimization?

21     A.   Search engine optimization is a technical

22   term of art that has to do with how documents that

23   are on a web server show up in search engine

24   results.

25     Q.   Please continue.

Case 1:14-cv-00857-TSC Document 134-9 Filed 10/04/19 Page 41 of 80
Case 1:14-cv-00857-TSC Document 60-4 Filed 12/21/15 Page 271 of 376

1          So in that sense, large print, we did not

2     retype the documents into a large print edition.

3     BY MR. HUDIS:

4       Q.  Mr. Malamud, do you have any materials in

5     your -- in Public.Resource's possession documenting

6     the process you went through of disassembling the

7     paper version of the 1999 standards, scanning them,

8     processing them and posting them to the Internet?

9          MR. BECKER:  Objection.  Compound.

10          THE WITNESS:  No, there's no intermediate

11     process.  That's a book and then it gets scanned.

12          THE REPORTER:  Did you say "there's no

13     intermediate product"?

14          THE WITNESS:  Intermediate process.

15     BY MR. HUDIS:

16       Q.  Mr. Malamud, once you converted the 1999

17     standards from paper to the PDF format, what did

18     you do with the contents of the file?

19       A.  I posted the file to Law.Resource.Org and

20     to the Internet Archive.

21       Q.  Mr. Malamud, could you please return your

22     attention to Exhibit 29, interrogatory answer

23     number 2.

24       A.  Okay.

25       Q.  Does interrogatory answer number 2

Case 1:14-cv-00857-TSC  Document 134-9  Filed 10/04/19  Page 42 of 80
Case 1:14-cv-00857-TSC  Document 60-4  Filed 12/21/15  Page 273 of 376

Page 272

1   accurately state when and where you posted the 1999

2   standards to the Internet?

3       A.  It does.

4       Q.  And what was the date that you posted the

5   standards to the Internet?

6           MR. BECKER:  Objection.  Form.

7           THE WITNESS:  As our interrogatory says,

8   July 11, 2012 on Law.Resource.Org and ...

9   BY MR. HUDIS:

10      Q.  All right.  And --

11      A.  Yeah.

12      Q.  And as you said, you posted the standards

13  to Law.Resource.Org, and you also posted the

14  standards to the Internet Archive; correct?

15      A.  That is correct.

16      Q.  Mr. Malamud, what is the name of the

17  Public.Resource web server to which you saved the

18  file containing the contents of the 1999 standards?

19      A.  Law.Resource.Org.

20      Q.  That's the name of the server?

21      A.  Yes.

22          MR. BECKER:  Please give me time to object.

23          MR. HUDIS:  I'm sorry.

24          THE WITNESS:  That was my fault.

25          MR. HUDIS:  I don't want to be rude,

Carl Malamud                                          May 12, 2015
San Francisco, CA

Page 273

1    Counsel, seriously.  Okay.

2    BY MR. HUDIS:

3        Q.  Is the file containing the 1999 standards

4    still saved on that web server?

5            MR. BECKER:  Objection.  Vague and

6    ambiguous; assumes facts not in evidence.

7            THE WITNESS:  It is not in the document

8    tree of the web server, no.

9    BY MR. HUDIS:

10       Q.  Do you still have that file still saved

11   somewhere within Public.Resource's computer

12   systems?

13       A.  Yes, I do.

14       Q.  Where?

15       A.  One copy on my desktop.  One copy in the

16   not published directory.  I don't know what the

17   exact name of it is.  Someplace on our server, but

18   it's a private area that's not accessible to -- to

19   anybody but myself and our systems administrator.

20       Q.  Mr. Malamud, does Public.Resource have any

21   logs from its web servers documenting the date on

22   which the 1999 standards were posted to

23   Public.Resource's website?

24           MR. BECKER:  Objection.  Vague and

25   ambiguous.  Objection.  Lacks foundation.  And

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 274

1    assumes facts not in evidence.

2              THE WITNESS:  There's no logs, but there

3    was a file creation date on the file.

4    BY MR. HUDIS:

5         Q.  Has any documentation noting the file

6    creation date ever been produced to us?

7         A.  I don't know.

8              MR. HUDIS:  Counsel, if that document has

9    not been provided to us, it should be provided to

10   us now.

11             THE WITNESS:  So the file creation date was

12   the date that the standard was posted.  And when at

13   your request we removed that standard and replaced

14   it with a stub, that's going to be the new creation

15   date.  So I don't believe there's going to be a

16   record.

17   BY MR. HUDIS:

18        Q.  What about the old creation date when the

19   original standards file was -- was posted to your

20   web server?

21        A.  I moved it to a different area.  I mean,

22   you can make the request and we'll go look and see

23   if that's there, but it's --

24        Q.  Thank you, Mr. Malamud, I appreciate that.

25             Did you post the entirety of the 1999

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 275

1    standards to Public.Resource's website?

2        A.  Yes.

3        Q.  Mr. Malamud, as it pertains to the Internet

4    Archive, what is a collection?

5            MR. BECKER:  Objection.  Asked and

6    answered.

7            THE WITNESS:  A collection is a set of

8    items that often have a common theme.

9    BY MR. HUDIS:

10       Q.  And you said you posted the 1999 standards

11   to Internet Archive's website; correct?

12       A.  That is correct.

13       Q.  And did you post the entirety of the 1999

14   standards to Internet Archive's website?

15       A.  I did.

16       Q.  Under which collection at the Internet

17   Archive did you post the 1999 standards?

18           MR. BECKER:  Objection.  Form.

19           THE WITNESS:  The current name of that

20   collection is Codes of the World.

21   BY MR. HUDIS:

22       Q.  How did you choose this particular

23   collection to which to post the 1999 standards?

24       A.  It's the --

25           MR. BECKER:  Objection.  Assumes facts not

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 276

1    in evidence.

2            THE WITNESS:  It's the collection I created

3    to hold the standards incorporated by reference.

4    BY MR. HUDIS:

5        Q.  All right.  So you created the Codes of the

6    World collection on Internet Archive's website?

7        A.  I did.

8        Q.  Mr. Malamud, I show you what was previously

9    marked at Internet Archive's deposition in this

10   case as Butler Exhibit 6.

11           Do you see that?

12       A.  I do.  Let me correct a misstatement.  It

13   wasn't called Codes of the World.  It was called

14   Global Public Safety Codes is the name of the

15   collection.

16       Q.  And what types of materials did you post to

17   the Global Public Safety Codes collection on

18   Internet Archive?

19       A.  Standards incorporated by reference in the

20   law.

21       Q.  Do you recognize Butler Exhibit 6?

22       A.  This is a document you created?

23       Q.  It's a document we printed from the

24   Internet Archive.

25       A.  This appears to be a series of screen dumps

Carl Malamud                                                      May 12, 2015
San Francisco, CA

Page 277

1    from that item in which you are paging through the

2    standards at issue, is what this appears to be.

3        Q.  That's exactly correct.  And you just saved

4    me about five minutes of explanation.

5        A.  Oh, sorry about that.

6        Q.  That's fine.  Thank you very much,

7    Mr. Malamud.

8            What is the web tool, if you know, that

9    creates the ability for a user to turn the pages of

10   the 1999 standards like a book?

11           MR. BECKER:  Objection.  Vague and

12   ambiguous; confusing.

13           THE WITNESS:  I have heard it called book

14   reader, but I don't know the details of what the

15   code is or how it's embedded or anything of that

16   sort.

17   BY MR. HUDIS:

18       Q.  So you've heard it referred to as a book

19   reader application?

20       A.  Yes.

21       Q.  All right.  Have you ever heard of a DjVu

22   Reader?

23       A.  Yes, I have.

24       Q.  And what -- what is its function, to the

25   best of your knowledge?

Carl Malamud                                              May 12, 2015
San Francisco, CA

Page 278

1      A.  DjVu is another format for creating

2  documents, and a DjVu Reader is one that enables

3  one to page through a document in a DjVu format.

4      Q.  When you posted the 1999 standards --

5  skip -- strike that.

6          Looking at Exhibit Butler 6, does this look

7  like the '99 -- 1999 standards --

8          MR. BECKER:  Objection.  Form.

9          MR. HUDIS:  I didn't finish.

10 BY MR. HUDIS:

11     Q.  -- were presented in page-turning format

12 using either book reader or DjVu Reader?

13         MR. BECKER:  Same -- same objection.

14         THE WITNESS:  Yeah, if this is the standard

15 Internet Archive screen, this is a PDF file that is

16 being used for the -- the page turning capability.

17 BY MR. HUDIS:

18     Q.  Now I'll continue with my next question.

19         When you posted the 1999 standards to the

20 Internet Archive website, did you input the

21 following information to go with the file?  And

22 I'll take them one at a time.  Author?

23     A.  I did.  That's actually a standard Internet

24 Archive field that I believe is required.

25     Q.  And did you input that information?

Carl Malamud                                                    May 12, 2015
                            San Francisco, CA

                                                              Page 279

     1        A.  I did in the sense of the API call that

     2   created this -- this item.

     3        Q.  The API call is?

     4        A.  API is application programming interface,

     5   and it is a mechanism to write a command script

     6   that talks to a remote system and creates an item,

     7   in this case at the Internet Archive.

     8        Q.  So when you use the API call to post the

     9   1999 standards to the Internet Archive website, did

    10   you input the information under author?

    11        MR. BECKER:  Objection.  Form.

    12        THE WITNESS:  Yes, although I believe in

    13   the API call, it's called creator.  And the

    14   Internet Archive images it as author.

    15   BY MR. HUDIS:

    16        Q.  And did you input the language for subject?

    17        A.  I did.

    18        Q.  Did you input the language for language?

    19        A.  Yes.

    20        Q.  Did you input the language for collection?

    21        A.  I specified which collection this item

    22   would be, and this field here is automatically

    23   generated, I believe, by the Internet Archive.

    24        Q.  Now, if you would please turn to the next

    25   page of Exhibit Butler 6.

Carl Malamud                                           May 12, 2015
San Francisco, CA

Page 280

1        Did you input the information for

2   identifier?

3       A.  Yes, I specified the identifier.

4       Q.  Did you input the information for the

5   credits?

6       A.  The phrase uploaded by Public.Resource.Org,

7   yes, I did.

8       Q.  Did you input the information for license

9   URL?

10       A.  Yes, I did.

11       Q.  And what was the purpose of you inputting

12   the URL for CreativeCommons.org?

13          MR. BECKER:  Objection.  Form.

14          THE WITNESS:  Any specification of

15   providence on the Internet Archive uses the

16   Creative Commons mechanism.

17   BY MR. HUDIS:

18       Q.  And what is the significance of using the

19   Creative Commons mechanism?

20          MR. BECKER:  Objection.  Vague and

21   ambiguous.

22          THE WITNESS:  In this case it's a Creative

23   Commons CC0 license.

24   BY MR. HUDIS:

25       Q.  What is a Creative Commons 0 license?

Carl Malamud                                                      May 12, 2015
San Francisco, CA

Page 281

 1      A.  CC.

 2          MR. BECKER:  Objection.  Vague and

 3  ambiguous; may call for a legal conclusion.

 4          THE WITNESS:  CC0, again, I'm not a lawyer,

 5  is no rights asserted.  The creator of this

 6  identifier is not asserting any rights over this

 7  item.

 8  BY MR. HUDIS:

 9      Q.  And that would have been you?

10      A.  That's correct.

11      Q.  And did you insert the language for media

12  type?

13      A.  Yes, I specified in the API call that this

14  was a object of type text.

15      Q.  And did you insert the information for

16  identifier access?

17      A.  That's automatically generated based on the

18  name of the identifier.

19      Q.  And what is identifier ark?

20      A.  I have no idea.

21      Q.  Did you insert that information for

22  identifier ark?

23      A.  No, I don't know what that is.

24      Q.  In what format did you post the 1999

25  standards to the Internet Archive website?

Page 282

```
 1          MR. BECKER:  Objection.  Form.

 2          THE WITNESS:  A PDF document.

 3   BY MR. HUDIS:

 4      Q.  Did you post the 1999 standards to the

 5   Internet Archive website in any other format?

 6      A.  The API call that created that item ID

 7   uploaded a PDF file.

 8      Q.  When Public.Resource posts standards

 9   incorporated by reference by a governmental agency

10   to one of its websites, is it Public.Resource's

11   policy to always post the same standard to a

12   collection on the Internet Archive website?

13          MR. BECKER:  Objection.  Vague and

14   ambiguous; may assume facts not in evidence.

15          THE WITNESS:  Not always, but it's a

16   general practice.

17   BY MR. HUDIS:

18      Q.  Turning back to Exhibit Butler 6.  Please

19   turn to the first page, Mr. Malamud.

20      A.  Okay.

21      Q.  And I'd like you to look on the left-hand

22   side of the page.  I'd like to know what the

23   following entries mean, if you know.

24          PDF 4.2 M?

25      A.  Where does it say that?
```

Carl Malamud                                               May 12, 2015
San Francisco, CA

1      Q.  To the very --

2      A.  Oh, I see.  I see what you're talking

3   about.

4      Q.  All right.  What does the entry PDF 14.2 M

5   mean?

6      A.  14.2 M is 14.2 megabytes.

7          And PDF is the item in PDF format.  In this

8   case it's the one that I uploaded.

9      Q.  And then the next entry is EPUB 335.4 K.

10  What does that entry mean?

11     A.  It is the same item in EPUB format, which

12  is an e-book format.

13     Q.  And what does the next entry mean here,

14  full text 6.86. -- I'll start again.  68 -- full

15  text 686.0 K.  What does that mean?

16         MR. BECKER:  Objection for

17  mischaracterizing the document.

18         THE WITNESS:  That file is 686 kilobytes in

19  size.  And the full text is derived from an OCR

20  process that the Internet Archive conducts on all

21  text items.

22  BY MR. HUDIS:

23     Q.  And the next entry I believe is a shorthand

24  for DjVu.  Do you understand that?

25     A.  I do.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 284

1          MR. BECKER:  Objection.  Form.

2     BY MR. HUDIS:

3          Q.  And so the next entry DjVu 8.2 M, what does

4     that mean?

5          A.  It's the item in DjVu format 8.2 megabytes.

6          Q.  And then what does -- what does it mean

7     when it says, "All files HTTPS"?

8          A.  By clicking on that link, you can see all

9     the files in that item, such as the PDF file, the

10    EPUB file, but also a metadata file, for example.

11         Q.  Besides Law.Resource.Org and Internet

12    Archive, did you post the 1999 standards to any

13    other website?

14         A.  I did not.

15         Q.  Mr. Malamud, in your opinion what value did

16    Public.Resource add to the 1999 standards by

17    disassembling the paper version, scanning it,

18    processing it, as you described in interrogatory

19    answer number 3, and posting the file to the

20    Internet?

21         MR. BECKER:  Objection as compound -- the

22    question is compound; may misstate prior testimony;

23    vague and ambiguous.

24         THE WITNESS:  The value we provided is to

25    make a document that was incorporated by reference

Carl Malamud                                                     May 12, 2015
San Francisco, CA

Page 285

1   under the Code of Federal Regulations available on

2   the Internet for people to read.

3   BY MR. HUDIS:

4       Q.  For free?

5           MR. BECKER:  Also object as argumentative

6   to that last question.

7   BY MR. HUDIS:

8       Q.  For free?

9       A.  We never charge for content.

10      Q.  Mr. Malamud, did Public.Resource anticipate

11  incurring legal liability for posting the 1999

12  standards on the Internet?

13          MR. BECKER:  Objection.  I will instruct

14  the witness not to answer as to any attorney-client

15  privileged communications.  And moreover, object to

16  any legal conclusions.

17          THE WITNESS:  We did not.

18  BY MR. HUDIS:

19      Q.  Mr. Malamud, you scanned and posted the

20  1999 standards to the -- to the Internet, did you

21  consult with educational or psychological

22  professionals?

23          MR. BECKER:  Objection as vague and

24  ambiguous; argumentative; potentially objection

25  towards competence.

Page 309

1    thing, then I would certainly consider strongly

2    posting that document.

3    BY MR. HUDIS:

4        Q.  What is -- what distinction do you make

5    between substantive and offhand?

6        A.  I look for an explicit and deliberate

7    incorporation by reference.

8        Q.  If I asked you this before, Mr. Malamud,

9    and certainly your counsel will tell me, I

10   apologize.

11          Even though the 1999 standards have been

12   removed from public view on Public.Resource's

13   website, is the digital file containing the text of

14   the 1999 standards still stored somewhere on

15   Public.Resource's computer systems?

16          MR. BRIDGES:  Objection.  Vague and

17   ambiguous.

18          THE WITNESS:  Yes.

19   BY MR. HUDIS:

20       Q.  Even though the 1999 standards were removed

21   from public view on Internet Archive's website, to

22   the best of your knowledge is the digital file

23   containing the text of the 1999 standards still

24   stored somewhere on Internet Archive's computer

25   systems?

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 310

```
 1        A.  I do not --

 2             MR. BRIDGES:  Same objection.  Vague and

 3   ambiguous.

 4             THE WITNESS:  I don't --

 5             MR. BRIDGES:  And lacks foun -- I'm sorry.

 6             THE WITNESS:  I'm sorry.

 7             MR. BRIDGES:  And maybe competence and may

 8   call for speculation.

 9             THE WITNESS:  I do not have access to that

10   document.  And so I do not know.

11             (PLAINTIFFS' EXHIBIT 39 WAS MARKED.)

12   BY MR. HUDIS:

13        Q.  Mr. Malamud, I show you what's been marked

14   as Exhibit 39 bearing production number

15   AERA_APA_NCME 5129.

16             Do you recognize this document?

17        A.  I do.

18        Q.  What is this document of Exhibit 39?

19        A.  It is a take-down notice from John S.

20   Neikirk.

21        Q.  I believe he pronounces it Neikirk.

22        A.  I've never met the gentleman.

23        Q.  Do you have any reason to doubt the

24   authenticity of Exhibit 39?

25             MR. BRIDGES:  Objection.  Lacks foundation.
```

Carl Malamud                                              May 12, 2015
San Francisco, CA

 1         THE WITNESS:  I do not.

 2    BY MR. HUDIS:

 3         Q.  Do you recall receiving this e-mail from

 4    Mr. Neikirk?

 5         A.  I do.

 6         Q.  When you received this e-mail from

 7    Mr. Neikirk, do you know with which organization he

 8    was affiliated?

 9         MR. BRIDGES:  Objection.  You're asking

10    him -- sorry.  Objection.  Competence; may call for

11    speculation; lacks personal knowledge.

12         THE WITNESS:  His signature line said

13    American Educational Research Association.

14    BY MR. HUDIS:

15         Q.  And do you remember receiving this e-mail

16    of Exhibit 39 --

17         A.  I do.

18         Q.  -- from Mr. Neikirk?

19         A.  I received this e-mail, yes.

20         Q.  What did you do in response to

21    Mr. Neikirk's e-mail?

22         MR. BRIDGES:  Objection.  Argumentative;

23    lacks foundation.

24         THE WITNESS:  I sent him a letter a couple

25    days later.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

 1   BY MR. HUDIS:

 2       Q.  In either December 2013 or January 2014 did

 3   you consult with counsel after receiving

 4   Mr. Neikirk's e-mail?

 5           MR. BRIDGES:  Objection.  That's --

 6   contains the -- an implication that the

 7   consultation would be regarding the e-mail.

 8           Further, the question calls for

 9   attorney-client privileged information.  Objection.

10   I instruct the witness not to answer.

11   BY MR. HUDIS:

12       Q.  In either December 2013 or January 2014 did

13   you remove the 1999 standards from public view

14   where you had posted them on the Internet?

15           MR. BRIDGES:  Objection.  Vague and

16   ambiguous; lacks foundation.

17           THE WITNESS:  I did not.

18   BY MR. HUDIS:

19       Q.  Did you reply to Mr. Neikirk's e-mail?

20           MR. BRIDGES:  Objection.  I think that's

21   asked and answered.

22           THE WITNESS:  Yes, I did.

23           MR. BRIDGES:  Vague and ambiguous and

24   argumentative.

25   BY MR. HUDIS:

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 313

 1      Q.  Do you remember -- do you remember when you

 2  responded to Mr. Neikirk's e-mail of Exhibit 39?

 3      A.  I believe it was on December 19th.

 4          (PLAINTIFFS' EXHIBIT 40 WAS MARKED.)

 5  BY MR. HUDIS:

 6      Q.  Mr. Malamud, I show you what has been

 7  marked as Exhibit 40 bearing production numbers

 8  AERA_APA_NCME 5127 through 5128.

 9          Do you recognize Exhibit 40?

10      A.  I do.

11      Q.  Is Exhibit 40 your response to

12  Mr. Neikirk's e-mail of Exhibit 39?

13      A.  It is.

14      Q.  Is this your digital signature at the

15  bottom of the second page of the letter of Exhibit

16  39 on page 5128?

17          MR. BRIDGES:  Objection.  Misformed

18  question; lacks foundation.

19          THE WITNESS:  It is.

20  BY MR. HUDIS:

21      Q.  Did anyone --

22          MR. BRIDGES:  Sorry, I'll ask the witness

23  to listen carefully to the question.  That was a

24  question about Exhibit 39.

25          MR. HUDIS:  Thank you, Counsel.  I

Carl Malamud                                      May 12, 2015
San Francisco, CA

Page 314

1   appreciate it.

2   BY MR. HUDIS:

3       Q.  Is this your digital signature at the

4   bottom of the second page of the letter of Exhibit

5   40, page 5128?

6       A.  Yes, it is.

7       Q.  Did anyone help you write this letter of

8   Exhibit 40?

9           MR. BRIDGES:  Objection.  To the extent

10  this calls for an implicit revelation of

11  attorney-client communications, I would object on

12  the grounds that it's privileged, and I would

13  instruct the witness not to answer.  But only to

14  that extent.

15          THE WITNESS:  I'm not going to be able to

16  answer that question.

17  BY MR. HUDIS:

18      Q.  In the first paragraph of Exhibit 40 on the

19  first page, there is a word missing.  I believe it

20  should say, "I am in."  Do you see that?

21      A.  I do.

22      Q.  All right.  So I'm going to read the

23  sentence with the word "in" in it.

24          "Dear Mr. Neikirk, I am in receipt of your

25  communication of December 16 regarding the

Page 315

1    publication of the AERA publication standard for

2    Educational and Psychological Testing," in parens

3    1999, at

4    HTTPS//Law.Resource.Org/pub/US/US/IBR/001/AERA.

5    standards.1999.PDF."

6            "We are responsible for uploading this

7    document.  In addition, you will find this document

8    at HTTPS://archive.org/details/thegov.law.AERA.

9    standards.1999."

10           Do you see that?

11           MR. BRIDGES:  Objection.  Misquotes the

12   letter.

13           THE WITNESS:  I do.

14   BY MR. HUDIS:

15     Q.  Specifically in this first paragraph what

16   did you mean when you used the term "publication"

17   the first time it appears in the sentence?

18           MR. BRIDGES:  Objection to the extent it

19   may imply a legal conclusion or legal expertise or

20   opinion; vague and ambiguous.

21           THE WITNESS:  There's a couple typos in

22   this sentence.  I meant posting.

23   BY MR. HUDIS:

24     Q.  All right.  So when you used the term

25   publication, you meant posting?

Carl Malamud                                                    May 12, 2015

San Francisco, CA

                                                              Page 316

 1      A.  In this sentence, yes.

 2      Q.  What did you mean by "We are responsible

 3  for uploading this document"?

 4      A.  It meant that I was the person that

 5  uploaded that document.

 6      Q.  To where?  The two URLs in that paragraph?

 7      A.  Yes, that's what the --

 8          MR. BRIDGES:  Object.

 9          THE WITNESS:  Sorry.

10          MR. BRIDGES:  Objection.  Lacks foundation;

11  vague and ambiguous.

12          THE WITNESS:  Yes.

13  BY MR. HUDIS:

14      Q.  If you could on Exhibit 40 please go on

15  page 5127 to the third paragraph.

16      A.  Okay.

17      Q.  And I will read the first sentence.  "While

18  the standards drafted by the American Educational

19  Research Association were entitled to copyright

20  protection when issued, once they were incorporated

21  into regulations, these standards became the law,

22  and thus, have entered the public domain."

23          Do you see that?

24      A.  I do.

25      Q.  What did you mean when you said, "the

Carl Malamud                                                      May 12, 2015
San Francisco, CA

Page 317

1    standards drafted by the American Educational

2    Research Association were entitled to copyright

3    protection when issued"?

4          MR. BRIDGES:  Objection to the extent it

5    calls for a legal opinion; legal expertise; legal

6    conclusion; vague and ambiguous; lacks foundation.

7          THE WITNESS:  So I'm not a lawyer.  I know

8    one thing.  That the law in the United States has

9    no copyright.  And thus a standard incorporated by

10   reference into the Code of Federal Regulations has

11   no copyright.

12   BY MR. HUDIS:

13     Q.  Mr. Malamud, could you turn to the next

14   page of Exhibit 40.  Page 5128.  And I am directing

15   your attention to the last paragraph of the letter.

16          As you can see by looking at the document

17   in question, a cover sheet has been prepended

18   clearly spelling out the section of the Code of

19   Federal Regulations that has incorporated by

20   reference this document into law.

21          Do you see that?

22     A.  I do.

23     Q.  And referring you back to Exhibit 34, is

24   this the cover sheet to which you were referring in

25   your letter of Exhibit 40?

Page 318

1     A.   34?

2     Q.   Yes.

3     A.   Yes, it is.

4     Q.   Mr. Malamud, at the end of your letter of

5  Exhibit 40, did you decline to remove the 1999

6  standards from the websites where you posted the

7  document on the Internet?

8         MR. BRIDGES:  Objection.  Are you asking

9  him if that's what the letter says?

10        MR. HUDIS:  Yes.

11        MR. BRIDGES:  Or are you asking him

12  something -- okay.

13        MR. HUDIS:  No.  Yes.  Yes, I am asking him

14  if that's what the letter says.

15        MR. BRIDGES:  The letter -- objection.  The

16  letter speaks for itself.  The document speaks for

17  itself.

18        THE WITNESS:  The letter says, "We

19  respectfully decline to remove this document."

20  BY MR. HUDIS:

21     Q.   At the end of your letter of Exhibit 40,

22  did you also decline to seek permission from anyone

23  to post the 1999 standards on the Internet?

24        MR. BRIDGES:  Objection.  Argumentative;

25  lacks foundation; vague and ambiguous.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 319

1          THE WITNESS:  The letter states, "We

2     respectfully decline to request permission."

3     BY MR. HUDIS:

4        Q.  Mr. Malamud, had Mr. Neikirk sent you his

5     e-mail of Exhibit 39 a year earlier in 2012, would

6     Public.Resource have removed the 1999 standards

7     from where you posted the document on the Internet?

8          MR. BRIDGES:  Objection.  A hypothetical;

9     calls for speculation; vague and ambiguous.

10         THE WITNESS:  So you're asking if the date

11    of his letter was December 19th, 2012, we would

12    have changed our answer?

13    BY MR. HUDIS:

14       Q.  Correct.

15         MR. BRIDGES:  Same objections.

16         THE WITNESS:  No.

17         (PLAINTIFFS' EXHIBIT 41 WAS MARKED.)

18    BY MR. HUDIS:

19       Q.  Mr. Malamud, I show you a document marked

20    Exhibit 41 bearing production number PROAERA 810.

21         Do you recognize the document?

22       A.  I do.

23       Q.  What is this document?

24       A.  It is -- it's an incomplete electronic

25    mail.  So it is a electronic mail from me to

Page 320

1    Mr. Butler at the Internet Archive.

2        Q.  All right.  So Mr. -- to the best of your

3    knowledge Mr. Butler, Christopher Butler, is an

4    employee of Internet Archive?

5        A.  I believe --

6            MR. BRIDGES:  Objection.  Calls for --

7    sorry.  Objection.  Lacks competence.

8            THE WITNESS:  Yes.

9    BY MR. HUDIS:

10       Q.  And you cc'd Brewster -- how do you

11   pronounce that?

12       A.  Kahle.

13       Q.  Kahle.  And you cc'd Brewster Kahle in your

14   e-mail to Mr. Butler of Exhibit 41?

15       A.  I did.

16       Q.  And who is Brewster Kahle?

17       A.  He is the founder and librarian of the

18   Internet Archive.

19       Q.  What, if anything, was attached to this

20   e-mail of Exhibit 41?

21           MR. BRIDGES:  I instruct the witness not to

22   speculate.  I object to the extent it calls for

23   speculation.

24           THE WITNESS:  The attachments line in the

25   header says AERA.org, and a date.  So this appears

Carl Malamud                                                        May 12, 2015
San Francisco, CA

                                                                    Page 321

1     to be the correspondence with Mr. Neikirk.

2     BY MR. HUDIS:

3         Q.  And is that the correspondence of exhibits

4     39 and 40?

5         A.  Based on the file names, I would say yes.

6         Q.  Why did you send this e-mail of Exhibit 41

7     to Mr. Butler at the Internet Archive?

8         A.  Because I keep Mr. Butler informed on any

9     take-down activity, and he keeps me informed on any

10    take-down activity.

11        Q.  What do you mean by take-down activity?

12        A.  A letter invoking the DMCA or otherwise

13    complaining about copyright violations.

14        Q.  At this time in December 2013 did you make

15    the 1999 standards go dark on Internet Archive's

16    website?

17            MR. BRIDGES:  Objection.  Lacks foundation;

18    vague and ambiguous.

19            THE WITNESS:  No, I did not.

20    BY MR. HUDIS:

21        Q.  Why not?

22            MR. BRIDGES:  Objection.  Argumentative;

23    lacks foundation; vague and ambiguous.

24            THE WITNESS:  Because I did not believe

25    there was any copyright violation involved.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 322

1    BY MR. HUDIS:

2        Q.  So after you refused to remove the 1999

3    standards from public view on the Internet in

4    December 2013, why did you then remove the 1999

5    standards from public view on Public.Resource's

6    website and the Internet Archive's website in June

7    2014?

8            MR. BRIDGES:  Objection.  To the extent the

9    question might call for disclosure of

10   attorney-client privileged communications, I would

11   object on the grounds of privilege and instruct the

12   witness not to answer.

13           If he can answer beyond that objection and

14   instruction, he may.

15           THE WITNESS:  That would involve

16   discussions with counsel.  I'm not going to answer

17   that question.

18           (PLAINTIFFS' EXHIBIT 42 WAS MARKED.)

19   BY MR. HUDIS:

20       Q.  Mr. Malamud, I show you what's been marked

21   as Exhibit 42 bearing production numbers PROAERA

22   820 and PROAERA 821.

23           Do you recognize the document?

24       A.  I do.

25       Q.  Do you have any reason to doubt the

Page 323

1   authenticity of Exhibit 42?

2          MR. BRIDGES:  Objection.  Vague and

3   ambiguous; lacks foundation.

4          THE WITNESS:  I do not.

5   BY MR. HUDIS:

6      Q.  Do you remember receiving this e-mail of

7   Exhibit 42 from me on June 10th, 2014?

8      A.  I do.

9      Q.  What did you do after receiving this e-mail

10  of Exhibit 42?

11         MR. BRIDGES:  Objection.  To the extent

12  this question calls for an answer that would

13  disclose attorney-client communications, I would

14  object on the grounds of privilege and instruct the

15  witness not to answer.

16         In addition, it's vague and ambiguous and

17  lacks foundation.

18  BY MR. HUDIS:

19     Q.  Can you answer my question, Mr. Malamud,

20  without revealing the substance of attorney-client

21  communications?

22     A.  No.

23     Q.  Mr. Malamud, could you return to Exhibit

24  38.  Why did you send the e-mail of Exhibit 38 to

25  Alexis Rossi the day after receiving my e-mail of

Page 324

```
 1    Exhibit 42?

 2            MR. BRIDGES:  Object.  Asked and answered,

 3    and argumentative and lacks foundation.

 4            THE WITNESS:  Because that was the day that

 5    I made that item go dark.

 6            (PLAINTIFFS' EXHIBIT 43 WAS MARKED.)

 7    BY MR. HUDIS:

 8       Q.  Mr. Malamud, I show you what's been marked

 9    as Exhibit 43.

10            Do you recognize this document?

11       A.  I do.

12       Q.  What is this document of Exhibit 43?

13       A.  This is a memorandum concerning the posting

14    of the standards at issue.

15       Q.  Is that your signature at the bottom left

16    of Exhibit 43?

17       A.  It is.

18       Q.  Did anyone help you write this memo Exhibit

19    43?

20            MR. BRIDGES:  Objection.  To the extent the

21    question calls for disclosure of attorney-client

22    communications, I would object on the grounds of

23    privilege and would instruct the witness not to

24    answer.

25            THE WITNESS:  I'll be unable to answer that
```

Carl Malamud                                              May 12, 2015
San Francisco, CA

Page 325

1    question.

2    BY MR. HUDIS:

3        Q.  Who was this memo of Exhibit 43 intended

4    for?

5            MR. BRIDGES:  Objection.  Lacks foundation.

6            THE WITNESS:  I believe it was for you.

7    BY MR. HUDIS:

8        Q.  "You," meaning me, plaintiff's counsel?

9        A.  Plaintiffs.

10       Q.  Thank you.

11           Mr. Malamud, could you read the first

12   paragraph of the memo to yourself.  Tell me when

13   you're done.

14       A.  Okay.

15       Q.  I am not going to read the whole paragraph.

16   "This memorandum is in reference to the lawsuit

17   named above," and I'm skipping, "and specifically

18   in response to the stated intention to file a

19   preliminary injunction motion."

20           What did you mean?

21       A.  Well, I believe you had said you were going

22   to file a preliminary injunction motion.

23       Q.  And I will read in full the second sentence

24   of the second paragraph of Exhibit 43.

25           "Public.Resource also believes that this

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 326

1    case deserves the Court's fullest attention without

2    a rush to reach an interim ruling in the absence of

3    a full record."

4           What did you mean by that?

5           MR. BRIDGES:  Objection.  Lacks foundation;

6    vague and ambiguous.

7           THE WITNESS:  As I state in the next

8    paragraph, "In order to focus this case on

9    developing an appropriate record for a decision on

10   the merits, Public.Resource.Org has voluntarily

11   removed the document in question from the websites

12   under its control."

13          And as you had stated in a previous

14   sentence, this was so it was done without a rush to

15   reach an interim ruling in the absence of a full

16   record.

17   BY MR. HUDIS:

18      Q.  I'd like to now direct your attention,

19   Mr. Malamud, to the fourth paragraph of Exhibit 43.

20   And it says, "Until the conclusion at trial on the

21   merits in this case, Public.Resource.Org will keep

22   the document in question off of the websites under

23   its control and will not disseminate the document

24   in whole or in part, including any revisions, and

25   will maintain the status on the Internet Archive to

Carl Malamud                                         May 12, 2015
San Francisco, CA

                                                    Page 327

1    prevent any public access to the document from the

2    archive's websites."  Do you see that?

3           MR. BRIDGES:  Objection.  The document

4    speaks for itself.

5           THE WITNESS:  I do.

6    BY MR. HUDIS:

7       Q.  What did you mean by that sentence?

8           MR. BRIDGES:  Objection.  The document

9    speaks for itself; lacks foundation; vague and

10   ambiguous; argumentative.

11          THE WITNESS:  I think the sentence is very

12   clear; right?

13   BY MR. HUDIS:

14      Q.  What did you mean?

15      A.  I meant "Until the conclusion of trial on

16   the merits of this case, Public.Resource.Org will

17   keep the document in question off of the websites

18   under its control and will not disseminate the

19   document in whole or in part, including any

20   revisions, and will maintain the status on the

21   Internet Archive to prevent any public access to

22   the document from the archive's websites."

23      Q.  And this memo was written by you on June

24   12th, 2014?

25          MR. BRIDGES:  Objection.  Lacks foundation;

Page 328

1    vague and ambiguous.

2           THE WITNESS:  Yes.

3    BY MR. HUDIS:

4        Q.  Since the time of this memo of Exhibit 43,

5    have the 1999 standards been reposted to a website

6    under Public.Resource's control?

7           MR. BRIDGES:  Objection.  Vague and

8    ambiguous; argumentative.

9           THE WITNESS:  Yes.

10   BY MR. HUDIS:

11       Q.  Why?

12       A.  There was a technical malfunction in one of

13   our servers and by mistake a copy of the full

14   standard was posted in place of the stub.

15       Q.  And when was that?

16       A.  That was in January 2015.

17       Q.  Mr. Malamud, during the two-year period

18   that the 1999 standards were posted to

19   Public.Resource's website, was a record kept of how

20   many Internet users viewed or accessed the

21   standards from that website location?

22          MR. BRIDGES:  Objection.  Utterly lacks

23   foundation; argumentative; vague and ambiguous,

24   and -- yeah.  And competence.

25          THE WITNESS:  Our server log's document

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 329

1   retention policy was a two-week window until

2   litigation commenced in the ASTM case when we began

3   keeping the logs permanently.  And so we -- we did

4   not keep a record prior to that.

5   BY MR. HUDIS:

6       Q.  Do you know the earliest date on which you

7   kept such logs?

8           MR. BRIDGES:  Objection.  Again, lacks

9   foundation; argumentative; vague and ambiguous and

10  competence.

11          THE WITNESS:  So again, the document

12  retention policy was a two-week window on the logs,

13  and in September -- August or September of 2013 we

14  changed that policy because litigation had

15  commenced.  And so at that point we began keeping

16  the logs permanently.

17  BY MR. HUDIS:

18      Q.  And do you still have those logs today?

19          MR. BRIDGES:  Same objections.  I think I

20  missed a compound objection to the underlying

21  question.

22          THE WITNESS:  Yes.

23  BY MR. HUDIS:

24      Q.  In what form are the logs kept?

25          MR. BRIDGES:  Same objections.

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 346

1   1999 standards to the Internet, did you ever

2   receive written correspondence complaining that

3   someone could not obtain a copy of the 1999

4   standards on his or her own?

5          MR. BRIDGES:  Same objections;

6   argumentative.

7          THE WITNESS:  I did not.

8   BY MR. HUDIS:

9      Q.  During the two-year period that the 1999

10  standards were posted to Public.Resource's website,

11  was a record kept of how many Internet users

12  downloaded the standards from that website location

13  to their computer hard drives?

14         MR. BRIDGES:  Objection.  Lacks foundation;

15  argumentative; assumes facts not in evidence; vague

16  and ambiguous.

17         THE WITNESS:  We would have no way of

18  determining that.

19  BY MR. HUDIS:

20     Q.  During the two-year period that the 1999

21  standards were posted to Public.Resource's website,

22  did Public.Resource deploy any protocols or use any

23  settings on its web server to prevent Internet

24  users from downloading the 1999 standards to their

25  computer hard drives?

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 347

1          MR. BRIDGES:  Objection.  Argumentative;

2     lacks foundation; possibly competence; vague and

3     ambiguous.

4          THE WITNESS:  The only thing we know about

5     is access to the data and the fact that the data

6     left our computer in response to a request.  So I

7     don't know about downloads.  It's technically

8     impossible to determine that.

9     BY MR. HUDIS:

10         Q.  I didn't want to -- my last question was

11    not about logging downloads.  What I wanted to know

12    is once an HTTP request or an FTP request or an

13    rsync request was made of Public.Resource's server

14    where the 1999 standards were, did Public.Resource

15    deploy any protocols or use any settings on its web

16    server to prevent Internet users from downloading

17    the 1999 standards to their computer hard drives?

18         MR. BRIDGES:  Objection.  Argumentative;

19    lacks foundation; assumes facts not in evidence.

20         THE WITNESS:  I have no idea how one would

21    do that.

22    BY MR. HUDIS:

23         Q.  During the two-year period that the 1999

24    standards were posted to Public.Resource's website,

25    did Public.Resource deploy any protocols or use any

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 348

1    settings on its web server to prevent Internet

2    users from printing to paper the 1999 standards

3    accessed from that website?

4         MR. BRIDGES:  All the same objections,

5    plus, Mr. Hudis, I've been -- you've been prefacing

6    many of your questions with the phrase, "During the

7    two-year period that the 1999 standards were posted

8    to Public.Resource's website."  It's not clear to

9    me that they were posted to the website for two

10   years.

11        So every time you ask that question, I'm

12   going to object on the grounds that it lacks

13   foundation; argumentative and misstates -- it

14   misstates evidence.

15        So in addition to that, the other

16   objections apply to this question.  Mainly lacks

17   foundation; argumentative; vague and ambiguous;

18   possibly competence.

19        THE WITNESS:  No, we did not.

20        MR. HUDIS:  Counsel, just for the record,

21   so we can avoid some disagreements, if possible,

22   interrogatory answer number 2 says the 1999

23   standard was first posted to the Law.Resource.Org

24   website on July 11, 2012.  And then it says the

25   1999 standard was last posted to a Public.Resource

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 349

1   website on June 10, 2014.

2   BY MR. HUDIS:

3       Q.  Mr. Malamud, during the two-year period

4   that the 1999 standards were posted to

5   Public.Resource's website, or any time after that

6   until today, did Public.Resource receive any

7   communications from people who claimed to have

8   accessed a copy of the 1999 standards from

9   Public.Resource's website?

10          MR. BRIDGES:  Mr. Hudis, you've just given

11  me dates that are not two years.  And then you

12  immediately ask a question that says, "during the

13  two-year period."

14          I'm not sure why you insist on using

15  two-year period, but every time you ask a question

16  that says "during the two-year period," I'm going

17  to object as misleading, misstating the facts, and

18  deceptive.

19          MR. HUDIS:  Counsel.

20          MR. BRIDGES:  Yes.

21          MR. HUDIS:  Would you accept an

22  introductory phrase "approximate two-year period"?

23          MR. BRIDGES:  I will not.  If you want to

24  say, "during the period," fine.

25          MR. HUDIS:  I'll accept that.