**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN EDUCATIONAL RESEARCH ASSOCIATION, INC., AMERICAN PSYCHOLOGICAL ASSOCIATION, INC., and NATIONAL COUNCIL ON MEASUREMENT IN EDUCATION, INC., <br><br> Plaintiffs-Counterdefendants, <br><br> v. <br><br> PUBLIC.RESOURCE.ORG., INC., <br><br> Defendant-Counterclaimant. | Case No. 1:14-cv-00857-TSC |

**PUBLIC RESOURCE'S
MEMORANDUM OF LAW IN OPPOSITION TO [134] PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND PERMANENT INJUNCTION, AND IN SUPPORT OF
PUBLIC RESOURCE'S SECOND MOTION FOR SUMMARY JUDGMENT**


**[PUBLIC REDACTED VERSION]**

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................1

STATEMENT OF FACTS ........................................................................4

I.      INCORPORATION BY REFERENCE ................................................4

        A.      The Nature of Incorporation by Reference ...............................4

        B.      The Process of Incorporation by Reference................................5

        C.      Objects of Incorporation ..................................................6

        D.      Incorporation by Reference Versus Extrinsic Unincorporated
                Standards................................................................8

II.     THE 1999 STANDARDS...........................................................9

        A.      The 1999 Standards as Laws by Incorporation...........................9

                1.      The 1999 Standards were enacted into law to regulate
                        distribution of federal student aid money. .......................9

                2.      Two sections of the Code of Federal Regulations
                        incorporate the complete 1999 Standards into law.....................11

                3.      New York incorporated the complete 1999 Standards
                        into state law, with Plaintiffs' permission......................13

        B.      Drafting and Publication .................................................14

                1.      The drafters were volunteers without a copyright
                        incentive..........................................................14

                2.      Plaintiffs claim a professional purpose for publishing the
                        1999 Standards.....................................................15

        C.      The 1999 Standards Are Obsolete as Standards but Still Current
                and Relevant as Binding Law. ...............................................15

III.    STANDARDS THAT HAVE BECOME LAW ARE NOT
        GENERALLY AND FREELY ACCESSIBLE.....................................16

IV.     FURTHER DISCOVERY SHOWed THAT PUBLIC RESOURCE
        HAS HAD NO EFFECT ON SALES OF THE 1999 STANDARDS,
        AND PLAINTIFFS HAVE NO INTEREST IN MARKETING THEM .............17

**TABLE OF CONTENTS**
**(Continued)**

Page(s)

V.    PUBLIC RESOURCE AND CARL MALAMUD ...............................................18

    A.    Carl Malamud's Record of Public Service ...............................18

    B.    Public Resource's Mission.........................................................21

    C.    Public Resource's Litigation and Other Disputes......................22

        1.    SMACNA standards incorporated into law ...................22

        2.    Oregon Revised Statutes .................................................22

        3.    District of Columbia Code ..............................................23

        4.    Official Code of Georgia Annotated ...............................23

PROCEDURAL BACKGROUND.......................................................................23

I.    THE COORDINATED CASES AND THE EARLIER ORDER.........................23

II.    THE COURT OF APPEALS VACATED THE INJUNCTION, RESERVED THE QUESTION OF ENFORCEABILITY OF COPYRIGHT IN THE LAW, AND REMANDED FOR A FULLER FAIR USE ANALYSIS. .................................................................................24

III.    INTERACTIONS BETWEEN THE PARTIES AFTER THE APPEAL..............25

STANDARD FOR SUMMARY JUDGMENT...................................................26

SUMMARY OF ARGUMENT .........................................................................26

ARGUMENT ....................................................................................................26

I.    PUBLIC RESOURCE IS ENTITLED TO SUMMARY JUDGMENT OF NO PERMANENT INJUNCTION. .................................................26

    A.    The Standard for a Permanent Injunction After eBay v. MercExchange .............................................................................26

    B.    Plaintiffs Did Not Argue for a Permanent Injunction, Ignored the Supreme Court's Decision in eBay, and Have Waived a Permanent Injunction. ................................................................27

**TABLE OF CONTENTS**
**(Continued)**

Page(s)

C.   The Evidence Conclusively Shows Plaintiffs Have Not Suffered
Irreparable Harm. .................................................................................27

1.   Plaintiffs show no lost sales and no genuine interest in
revenue from the 1999 Standards. ...............................................28

2.   Plaintiffs' effort to suppress the 1999 Standards serves
no valid copyright interest, and public access causes no
harm to the copyright. ..................................................................30

D.   The Balance of Hardships Weighs Strongly Against an
Injunction. ..............................................................................................30

E.   The Public Interest Demands Unfettered Access to the Law, No
Matter How the Law Came to Be. ...........................................................31

II.   PUBLIC RESOURCE IS ENTITLED TO SUMMARY JUDGMENT
BECAUSE ITS POSTING OF LAWS BY INCORPORATION IS
FAIR USE. .........................................................................................................33

A.   That the Works in Question Are Edicts of Government Must Be
the Touchstone of the Fair Use Analysis. ...............................................33

B.   The Section 107 Preamble .......................................................................34

C.   First Factor: The Purpose of Public Resource's Use ...............................35

D.   Second Factor: The Nature of the Work as Multiple Government
Edicts........................................................................................................38

E.   Third Factor:  Amount and Substantiality of the Portion Used ...............39

F.   Fourth Factor: The Effect on the Market Value of the 1999
Standards..................................................................................................41

CONCLUSION....................................................................................................................43

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
    486 U.S. 492 (1988).................................................................................................32

*Am. Inst. of Physics v. Winstead PC*,
    No. 3:12–CV–1230–M, 2013 WL 6242843 (N.D. Tex. Dec. 3, 2013) ..................................37

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*,
    896 F.3d 437 (D.C. Cir. 2018) ............................................................... *passim*

*American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*,
    456 U.S. 556 (1982).................................................................................................32

*Authors Guild v. Google, Inc.*,
    804 F.3d 202, 21 (2d Cir. 2015)...........................................................................39

*Banks v. Manchester*,
    128 U.S. 244 (1888).................................................................................................38

*Bellwether Props., LLC, v. Duke Energy Indiana, Inc.*,
    87 N.E.3d 462 (Ind. 2017) ................................................................................1, 2

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
    448 F.3d 605 (2d Cir. 2006)......................................................................35, 37, 42

*Bond v. Blum*,
    317 F.3d 385 (4th Cir. 2003) ...............................................................................37

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994)....................................................................................... *passim*

*CCC Information Services, Inc. v. Maclean Hunter Market Reports, Inc.*,
    44 F.3d 61 (2d Cir. 1994) ..................................................................................8, 43

*Code Revision Commission v. Public.Resource.Org, Inc.*,
    906 F.3d 1229 (11th Cir. 2018) ............................................................................23

*eBay Inc. v. MercExchange, L.L.C.*
    547 U.S. 388 (2006)..........................................................................................3, 26, 27

*Eldred v. Ashcroft*,
    537 U.S. 186, 219-20 ........................................................................................4, 34

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) (*en banc*) .................................................................27

*Georgia et al. v. Public.Resource.Org., Inc.*,
    U.S. Supreme Court Docket No. 18-1150, filed Oct. 16, 2019, at 3 ......................34

*Getty Petroleum Mktg., Inc. v. Capital Terminal Co.*,
    391 F.3d 312 (1st Cir. 2004) (per curiam) ..................................................3, 17, 30

*Golan v. Holder*,
    1565 U.S. 302 (2012)...............................................................................................34

*Harper & Row v. Nation Enterprises*,
    471 U.S. 539 (1985).................................................................................................41

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*,
    736 F.3d 1239 (9th Cir. 2013) .................................................................................27

*Hustler Magazine, Inc.*, 606 F. Supp. at 1535 .............................................................35

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    387 F.3d 522 (6th Cir. 2004) ..............................................................................37, 40

*Mathews Conveyer Co v. Palmer-Bee Co.*,
    135 F.2d 73 (6th Cir. 1943) .....................................................................................34

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) .................................................................................35

*Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*,
    121 F.3d 516 (9th Cir. 1997) .....................................................................................8

*Righthaven, LLC v. Jama*,
    No. 2:10–CV–1322 JCM (LRL), 2011 WL 1541613 (D. Nev. April 22, 2011) ....40

*Salinger v. Random House, Inc.*,
    811 F.2d 90 (2d Cir. 1987)........................................................................................43

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984).................................................................................................39

*Warren Publ'g Co. v. Spurlock*,
    645 F. Supp. 2d 402, 418 (ED Pa. 2009) ............................................................36, 40

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*State of Georgia et. al. v. Public.Resource.Org, Inc.,*
  U.S. Supreme Court Docket 18-1150 ................................................................23, 24, 34

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.,*
  756 F.3d 73 (2d Cir. 2014).........................................................................36, 37, 38, 40

*TD Bank N.A. v. Hill,*
  928 F.3d 259 (3d Cir 2019)...........................................................................................27

*United States v. Myers,*
  553 F.3d 328 (4th Cir. 2009) .....................................................................................5, 39

*Wheaton v. Peters,*
  33 U.S. 591 (1834)........................................................................................................38

**U.S. CONSTITUTION**

U.S. Const. art. I § 8, cl. 8............................................................................................27, 33

First Amendment ..................................................................................................4, 21, 31, 33

**STATUTES**

5 U.S.C. § 552(a) ...........................................................................................................6, 7, 8

5 U.S.C. § 552(a)(1)................................................................................................................4

17 U.S.C. § 102(b) ............................................................................................................4, 25

17 U.S.C. § 107.............................................................................................................34, 35

17 U.S.C. § 121...................................................................................................................38

8 CRR-NY 30-2.2 ...............................................................................................................13

8 CRR-NY 30-2.2 ...............................................................................................................40

8 CRR-NY 30-2.4 ...............................................................................................................13

8 CRR-NY 30-2.5 ...............................................................................................................13

8 CRR-NY 30-2.8 ...............................................................................................................13

Cal. Code of Regs., Title 24, Part 3 .....................................................................................5

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

N.Y. Comp. Codes, R. & Regs. tit. 11, § 216.7(c)(1)(i) (West 1999) ............................................8

Title 24 of the California Code of Regulations...............................................................................6

**REGULATIONS**

1 CFR part 51 ...........................................................................................................................7, 8

1 C.F.R. §§ 51.1–51.11 .................................................................................................................4

10 C.F.R. § 434.403 .....................................................................................................................22

24 C.F.R. § 3280.4(aa)(4) (2019) ..................................................................................................7

34 C.F.R. 668.146 ..........................................................................................................................9

34 C.F.R 668.146 (b) ....................................................................................................................10

34 C.F.R. § 462.13(c)(1)–(2) ..................................................................................................13, 40

34 C.F.R. § 462.13(f)–(f)(1) .........................................................................................................13

34 C.F.R. § 600 *et seq.* .................................................................................................................9

34 C.F.R. § 668, Subpart F ...........................................................................................................11

34 C.F.R. § 668.146 ............................................................................................................5, 6, 16

34 C.F.R. § 668.146(b)(6)..................................................................................................10, 12, 40

34 C.F.R. § 668.148(a)(1)(iv) ...........................................................................................10, 12, 40

34 C.F.R. § 668.148(a)(2)(i .........................................................................................................10

34 C.F.R. § 668.148(a)(3)(i) .........................................................................................................10

49 C.F.R. § 192.7 (2009) ...............................................................................................................8

24 CFR part 3280 ..........................................................................................................................7

24 CFR § 3280.4(aa)(4)(i)–(iv).....................................................................................................8

75 FR 209 (Oct. 29, 2010) at 66831–66975 .................................................................................9

75 FR 66923..................................................................................................................................11

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

**RULES**

Minn. Admin. Rule 4761.2460, Subp. 2(C)......................................................................5

**OTHER AUTHORITIES**

2002 National Electrical Safety Code ("NESC") ................................................1, 2, 3

Mendelson, Nina A., *Private Control Over Access to Public Law: The Perplexing Federal Regulatory Use of Private Standards*, 112 Mich. L. Rev. 737, 771 (2014)...............................................................................................................................32

National Archives, *Code of Federal Regulations Incorporation by Reference*, https://www.archives.gov/federal-register/cfr/ibr-locations.html...........................39

## INTRODUCTION

Defendant Public Resource aims to do one simple and important thing: provide a complete database of laws and regulations so that people can know, understand, and debate the rules that govern them. Public Resource does so by presenting to the public, without fee or restriction, complete laws and regulations, including documents that federal and state governments have enacted into law through incorporation by reference. It makes these laws and regulations available online to all persons, including those who are visually impaired and those who cannot travel to the repositories where governments store them.

That is a crucial public service. Indeed, while this lawsuit has been pending, the Indiana Supreme Court experienced the benefits of Public Resource's work firsthand. *See Bellwether Props., LLC, v. Duke Energy Indiana, Inc.*, 87 N.E.3d 462, 468–69 (Ind. 2017). The court faced a statute-of-limitations question that turned upon Indiana's adoption and incorporation by reference of the 2002 version of the National Electrical Safety Code (NESC), which the Institute of Electrical and Electronic Engineers (IEEE) had promulgated. *Id.* at 465. Neither of the parties had submitted the incorporated NESC for the record, and the Indiana Supreme Court needed to know what the law said. So a court employee asked the relevant government agency to furnish a copy of NESC for the Supreme Court's study. The agency refused, saying the court employee could make an appointment to inspect the NESC, but she could neither get a copy nor check it out for the court because of restrictions imposed by the publisher. *Id*. at 468.

How did the Indiana Supreme Court eventually find the 2002 version of NESC, which was its own state's relevant law? By visiting the website of the Internet Archive.[1] *Id*. at 469. How did

---

[1] The court, 87 N.E.3d at 469, cited to
https://ia600704.us.archive.org/16/items/gov.law.ieee.c2.2002/ieee.c2.2002.pdf.

that document get onto the Internet Archive website? Public Resource had placed it there.[2] Public Resource's Supplemental Statement of Material Facts (SSMF) ¶ 81.

The Indiana Supreme Court described the crux of the problem: "If the rule of law means anything, it is that persons have meaningful access to the laws they are obliged to follow, so they can conform their conduct accordingly." *Id*. at 467. The court noted that, if *it* had difficulty accessing the NESC to learn its own Indiana law, perhaps the plaintiff had a similar difficulty, which would bear on application of the discovery rule and the limitations issue in that case. The court remanded the case for a determination of whether, and when, the substance of the Indiana law had become "sufficiently in the public domain." *Id*. at 470.

The Indiana court was hardly the first to face this issue. In a published First Circuit decision, for example, the appellate court stated that neither counsel nor the court itself could find and access the 1987 version of Plaintiff NFPA's standard NFPA 30, which Rhode Island law had

---

[2] Public Resource requests that the Court take judicial notice that the 2002 edition of the NESC that the Indiana Supreme Court cited is a resource on the Internet Archive website by examining the online location cited; that the metadata page for this document indicates that it was "Uploaded by Public.Resource.Org," *see* https://archive.org/details/gov.law.ieee.c2.2002 and https://ia600704.us.archive.org/16/items/gov.law.ieee.c2.2002/ieee.c2.2002.pdf_meta.txt; that Internet Archive hosts Public Resource's materials; and that the "cover sheet" of the document on the Internet Archive website is characteristic of other Public Resource postings of incorporated laws. *See, e.g.,* JA806(ASTM-Dkt-118-12). Public Resource also requests that the Court take judicial notice that IEEE describes the 2002 version of the NESC as "inactive–superseded," even though it is still Indiana law. *See* http://ieeexplore.ieee.org/document/6516109/.

incorporated by reference and on which a counterclaim depended. *See Getty Petroleum Mktg., Inc. v. Capital Terminal Co.*, 391 F.3d 312, 320–21, 330 (1st Cir. 2004) (per curiam).[3]

These events illustrate two propositions, either of which effectively resolves this case. First, in the unique circumstances of this case, a permanent injunction—the sole relief Plaintiffs seek—cannot be proper. The Supreme Court under *eBay Inc. v. MercExchange, L.L.C.* made it *Plaintiffs'* burden to establish *all four* prerequisites for a permanent injunction in copyright cases, including that the injunction would not disserve the public interest. 547 U.S. 388, 391 (2006). Indeed, had the earlier injunction in this case extended to the 2002 version of the NESC (whose publisher, IEEE, has supported Plaintiffs as amicus), Indiana's highest court might never have found it. That would have harmed the public interest. So would an injunction here. Any injunction here would impose an intolerable burden upon fundamental rights under the First, Fifth, and Fourteenth Amendments.

Moreover, Plaintiffs here concede *all* the *eBay* factors by failing to address or argue any of them. On the record now before the Court, the Court should deny Plaintiffs' injunction motion.

Second, these events show why the public interest must be the touchstone of the fair use analysis where the works in question are the law. Recognizing the serious constitutional issue presented by the imposition of copyright restrictions on access to the law, the D.C. Circuit remanded this case for further consideration of whether the fair use doctrine might provide a path

---

[3] That dispute turned upon compliance with a Rhode Island law that incorporated the 1987 version of one of the standards at issue in the sister case: Plaintiff NFPA's standard NFPA 30. Like the standards document at issue here, that version of the document was obsolete as a standard but still relevant as law. The trial judge asked for a copy. Counsel could find the 2000 version but not the 1987 version. The court then looked for a copy but could not locate it. *Id.* at 320. The court ruled against the party that relied on the law because neither that party nor the court could find the document. *Id.* at 321. A concurring opinion specifically noted that the 1987 edition of NFPA 30 was "not so readily available" and that "it is neither reproduced in the Rhode Island statute books nor retrievable via commonly used legal research methods." *Id.* at 330 (Lipez, J., concurring).

out of the constitutional thicket. As one of copyright's "built-in First Amendment accommodations," *Eldred v. Ashcroft*, 537 U.S. 186, 219-20 (2003), it does just that.[4] Public Resource posts the law to serve a public purpose—access to the law—that is entirely distinct from Plaintiffs' purpose. The works in question are legal facts: as the D.C. Circuit recognized, where the consequence of incorporation by reference is the same as if the document had been copied into legislation, the second factor favors fair use. This is precisely the case here. By the same token, Public Resource has posted only what governments have expressly incorporated into law and, therefore, is necessary to understand the standards' "legal import." Finally, in six years of litigation Plaintiffs have never produced a shred of evidence of market harm attributable to Public Resource.

All the guideposts of the Constitution and the Copyright Act, along with decisions from numerous courts, call for summary judgment in favor of Public Resource.

## STATEMENT OF FACTS

### I.  INCORPORATION BY REFERENCE

#### A.    The Nature of Incorporation by Reference

Incorporation by reference is an alternative to direct inclusion of language into a government's published laws or regulations. *See* 5 U.S.C. § 552(a)(1); 1 C.F.R. §§ 51.1–51.11. As the Office of the Federal Register has explained, material incorporated by reference, "like any

---

[4] The other built-in First Amendment accommodation to which the Court referred is the distinction between ideas and expression, with a corresponding exclusion from copyright of "any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b); *Eldred*, 537 U.S. at 219. The Court stated that the doctrine permits "free communication of facts." *Id.* Public Resource previously argued that, upon incorporation of a standard into law, the entire standard becomes a fact—a government edict notwithstanding its private origin—and that the law-as-standard becomes available for all to use freely. It understands that the Court of Appeals reserved a decision on that point, if it remains necessary, until after this Court addresses the fair use issue again. For that reason, Public Resource incorporates by reference in this motion and this memorandum all its arguments and evidence on those points, and all the supporting filings, of its earlier motion, including Dkt. Nos. 66–71, 76–88, 96–99, 102, 103, 105, 112, and 113.

other properly issued rule, has the force and effect of law." SSMF ¶ 2; *see also United States v. Myers*, 553 F.3d 328, 331 (4th Cir. 2009) (material incorporated by reference has the same force of law as the incorporating regulation itself). The federal government began incorporating some materials by reference, instead of reproducing them, to limit the bulk of the Code of Federal Regulations (CFR). SSMF ¶ 3. The federal government expressly encourages agencies to follow this practice. *Id*.

States and municipalities also turn standards into law through incorporation by reference and in other instances by reproducing an entire standard verbatim in the text of the law. *See, e.g.*, Minn. Admin. Rule 4761.2460, Subp. 2(C); Cal. Code of Regs., Title 24, Part 3.

Public Resource endeavors to post on its website only standards that have become a federal or state law through incorporation by reference. SSMF ¶¶ 71-2. For example, the National Electrical Code has been incorporated by reference into federal law as well as published verbatim in the California Electrical Code. *See* Cal. Code of Regs., Title 24, Part 3.

Standards development organizations (SDOs) often lobby governments to incorporate their standards by reference or otherwise make their standards law. In this instance, Plaintiff APA lobbied members of Congress to support an amendment to mandate the use of the 1999 Standards. SSMF ¶ 16.

### B.     The Process of Incorporation by Reference

The process of incorporation by reference is careful and deliberate. At the federal level, it starts when an agency responsible for regulating an industry publishes a notice in the Federal Register concerning the agency's intent to incorporate a standard into law and asks the public to submit comments. SSMF ¶ 7. After the notice and comment process, the agency will determine whether to incorporate the standard by reference. SSMF ¶ 9. If the agency incorporates the

standard by reference, the Director of the Federal Register then approves it. 5 U.S.C. § 552(a). The standard then becomes the law of the United States.

State adoptions are equally rigorous. For example, the State of California incorporates model codes into Title 24 of the California Code of Regulations on a triennial cycle, with a 45-day public-comment period, a six-month publication requirement, and a three-month delay to allow local governments to implement them. The California Building Standards Law precisely defines this process. SSMF ¶ 12.

SDOs, including Plaintiffs, benefit from the incorporation of their standards into law. SSMF ¶¶ 13, 17. Adoption of a standard into law promotes the efforts of the sponsoring SDOs to make the standard influential in relevant industries. In addition, when the Code of Federal Regulations incorporates a standard, the code itself informs readers that they may obtain a copy of the standard from the Office of the Federal Register (OFR) or from the SDO that published the standard, effectively promoting sales of the standard. *E.g.*, 34 C.F.R. § 668.146. The OFR directs people who want to read incorporated standards to "contact the standards organization that developed the material." SSMF ¶ 14.

### C.    Objects of Incorporation

According to the Office of the Federal Register's Incorporation by Reference (IBR) Handbook, any time a federal agency refers to material when it is developing regulations, it must consider two questions: First, "does it have a legal citation?" SSMF ¶ 20; Becker Decl. ¶ 11, Ex. 45. If yes, the agency must use the legal citation. If not, the agency then must consider the second question: "Is it required to understand or comply with the regulations? Do your regulations require that a party 'resort to' material that is not published in the *Federal Register*?" If the material is necessary to understand or comply with the regulation, then the agency must seek IBR approval from the Director of the Federal Register. *Id*. at p. 2 (citing 5 U.S.C. § 552(a)).

Only the Director of the Federal Register can approve IBR requests, and "[p]ublication in the *Federal Register* of a document containing reference(s) to incorporated material does not in itself constitute an approval of the IBR by the Director." *Id*. at 6. Similarly, the Federal Register may contain references to incorporated material, but the referenced material is not actually incorporated by reference when it has not received the Director's formal approval. *Id*. at 11.

To be eligible for incorporation by reference, the material must be *published* and "impossible or impractical" to print in the C.F.R. *Id*. at 6. This means it is typically documents, or portions of documents, that are incorporated by reference—not mere words, which could otherwise be printed in the C.F.R.

According to the Director of Legal Affairs and Policy at the Office of the Federal Register, if an agency identifies a *document* in its IBR language and does not specify a specific section of that document, then the *entire document* is incorporated by reference. Malamud Decl. ¶ 40, Ex. 34. Where a federal agency seeks to incorporate only specific provisions of a standards document, it is explicit. For example, 24 C.F.R. § 3280.4(aa)(4) (2019) states that only specific portions of the 2005 edition of the National Electrical Code, NFPA 70, should be incorporated into law: "(a) The specifications, standards, and codes of the following organizations are incorporated by reference in 24 CFR part 3280 (this Standard) pursuant to 5 U.S.C. 552(a) and 1 CFR part 51 as though set forth in full. . . . (aa) National Fire Protection Association (NFPA) . . . (4) NFPA No. 70-2005, National Electrical Code, IBR approved as follows:

> (i) Article 110.22, IBR approved for §§ 3280.803(k) and 3280.804(k).
>
> (ii) Article 210.12(A) and (B), IBR approved for § 3280.801(b).
>
> (iii) Article 220.61, IBR approved for § 3280.811(b).
>
> (iv) Article 230, IBR approved for §§ 3280.803(k) and 3280.804(k). . . ."

24 CFR § 3280.4(aa)(4)(i)–(iv). Therefore, where only a portion of a document is incorporated by reference, the text of the C.F.R. will say so explicitly within the formal incorporation itself.

In contrast, the full 2005 edition of the National Electrical Code, NFPA 70, is incorporated by reference at 49 C.F.R. § 192.7 (2009): "What documents are incorporated by reference partly or wholly in this part? (a) Any documents or portions thereof incorporated by reference in this part are included in this part as though set out in full. When only a portion of a document is referenced, the remainder is not incorporated in this part. (b) . . . These materials have been approved for incorporation by reference by the Director of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. . . . F. National Fire Protection Association (NFPA): . . . (4) NFPA 70 (2005) 'National Electrical Code.'" As Public Resource shows below, the complete 1999 Standards document has been incorporated at least three times.

## D.      Incorporation by Reference Versus Extrinsic Unincorporated Standards

As explained above, incorporation by reference into the C.F.R. is a rigorous and formal process. Government edicts, including the C.F.R., nevertheless sometimes refer to external documents but do not formally incorporate them into law. When a document is referenced but not formally incorporated, it serves as only an "extrinsic standard." *See, e.g.*, *Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516 (9th Cir. 1997) (regulations required Medicare and Medicaid claimants to use a private medical coding system, but did not incorporate the medical coding system into law). Likewise, *CCC Information Services, Inc. v. Maclean Hunter Market Reports, Inc.* concerned a document that was one of several automobile valuation references that regulations approved for use in insurance adjusting. 44 F.3d 61 (2d Cir. 1994). The regulation at issue stated, "[m]anuals approved for use are…The Redbook," without any mention of incorporating those manuals into enforceable laws. *See* N.Y. Comp. Codes, R. & Regs. tit. 11, § 216.7(c)(1)(i) (West 1999), *cited in CCC*, 44 F.3d at 73 n.29.

## II.   THE 1999 STANDARDS

### A.   The 1999 Standards as Laws by Incorporation

#### 1.   The 1999 Standards were enacted into law to regulate distribution of federal student aid money.

The 1999 Standards are law that regulates certain federal aid programs. Federal officials who oversee the programs must apply the 1999 Standards in evaluating schools that receive tuition through the aid money, as well as states and businesses that create tests to qualify students for federal aid.

The U.S. Department of Education incorporated the complete 1999 Standards in its 2010 "Program Integrity" regulations ("the 2010 Regulations"). 34 C.F.R. § 600 *et seq*.; 75 FR 209 (Oct. 29, 2010) at 66831–66975. The 2010 Regulations govern the use of federal aid money under the "ability to benefit" (ATB) program, which allows students without a high school diploma to enroll in post-secondary education programs under certain circumstances, including if they pass a standardized test that meets government specifications.[5]

The Secretary of Education must apply the requirements of 34 C.F.R. 668.146 to approve an ATB test from either a state or a private test publisher. That regulation incorporates by reference the entire 1999 Standards document, and it also includes a legal requirement that an ATB test must

---

[5] Most students in the ATB population rely on federal aid to afford higher education. The ATB program allows access to federal aid for students in career training programs who lack a high school diploma or a GED certificate, but only if they either (1) complete at least 6 credit hours in a post-secondary school; or (2) pass an independently administered Department of Education approved ATB test. Access to federal aid through the ATB program is also critical to states that want to provide educational opportunities for their residents, and to the career education schools that depend on tuition paid through federal aid. But unscrupulous schools seeking federal money threaten the integrity of the ATB program and the welfare of students. For example, in a 2009 report, the U.S. Government Accountability Office raised concerns that some for-profit colleges were helping students cheat on ATB tests or falsifying test results. GAO, PROPRIETARY SCHOOLS: Stronger Department of Education Oversight Needed to Help Ensure Only Eligible Students Receive Federal Student Aid, August 2009, http://www.gao.gov/new.items/d09600.pdf.

"[m]eet all standards for test construction provided in the 1999 edition of the *Standards for Educational and Psychological Testing*," i.e., the 1999 Standards. *Id.* § 668.146(b)(6). Federal regulations also identify the 1999 Standards as containing the legal requirements for tests conducted in foreign languages for non-native speakers of English, *id.* § 668.148(a)(1)(iv), for test modifications to accommodate students with disabilities, *id.* § 668.148(a)(2)(i), and for specific requirements for computer-based tests, *id.* § 668.148(a)(3)(i).

The provisions of the 2010 Regulations addressing ATB tests specify requirements for the tests.[6] In turn, the provisions of the 1999 Standards include requirements for tests that are comparable to the requirements in the 2010 Regulations.[7]

Department of Education officials deliberately adapted the regulations to the 1999 Standards. For example, the Department made one specific change to its final version of the 2010 Regulations, codified at § 668.146(b)(6), in response to a comment pointing out that the

---

[6] The test must, among other requirements:

**(1)** Assess secondary school level basic verbal and quantitative skills and general learned abilities;

**(2)** Sample the major content domains of secondary school level verbal and quantitative skills with sufficient numbers of questions to—

    **(i)** Adequately represent each domain; and

    **(ii)** Permit meaningful analyses of item-level performance by students who are representative of the contemporary population beyond the age of compulsory school attendance and have earned a high school diploma;

34 C.F.R § 668.146 (b).

[7] For example:

Standard 1.9

If a test is claimed to be essentially unaffected by practice and coaching, then the sensitivity of test performance to change with these forms of instruction should be documented. . . .

Standard 1.12

When interpretation of subscores, score differences, or profiles is suggested, the rationale and relevant evidence in support of such interpretation should be provided. Where composite scores are developed, the basis and rationale for arriving at the composites should be given.

Department's proposed rule used language inconsistent with the 1999 Standards (but consistent with the previous 1985 Standards) while incorporating the 1999 Standards by reference. *See* 75 FR 66923.

Because the 1999 Standards are a substantive and integral part of the 2010 Regulations, a wide range of parties needs access to them. These parties include students (and their lawyers) wanting to contest a denial of ATB benefits, students seeking loan forgiveness on the grounds that the school acted improperly under the regulation, ATB test publishers, and state governments designing ATB tests for students in their state. Federal and state law enforcement and education oversight agencies apply the law by incorporation in their oversight and enforcement activities to ensure the integrity of higher education aid programs. Journalists and advocacy organizations need to study the law to evaluate the compliance of higher education programs that federal money supports and in which students invest their hopes for their futures. Schools—large and small, and for-profit, non-profit, or state-run—need to know the law by incorporation to ensure their tests comply with the 2010 Regulations to avoid potential liability and the loss of funding. A school and its administrators could face serious penalties if it misrepresents that the test it uses is compliant with the 1999 Standards. The Department of Education also can cut off Title IV money and impose civil fines if it concludes that a college has made "a substantial misrepresentation about the nature of its educational program, its financial charges, or the employability of its graduates." 34 C.F.R. § 668, Subpart F.

> ## 2. Two sections of the Code of Federal Regulations incorporate the *complete* 1999 Standards into law.

Contrary to Plaintiffs' assertions, the Department of Education incorporated by reference the entire 1999 Standards document, referring to complete document in its incorporating text. That incorporation states, in full:

> (6) Meet all standards for test construction provided in the 1999 edition of the *Standards for Educational and Psychological Testing,* prepared by a joint committee of the American Educational Research Association, the American Psychological Association, and the National Council on Measurement in Education incorporated by reference in this section. Incorporation by reference of *this document* has been approved by the Director of the Office of the Federal Register pursuant to the Director's authority under 5 U.S.C. 552(a) and 1 CFR part 51. The *incorporated document* is on file at the Department of Education, Federal Student Aid, room 113E2, 830 First Street, NE., Washington, DC 20002, phone (202) 377–4026, and at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA,        call        1–866–272–6272,        or        go        to: *http://www.archives.gov/federal_register/code_of_federal_regulati ons/ibr_locations.html.* The *document* also may be obtained from the        American        Educational        Research        Association        at: *http://www.aera.net* . . . .

34 C.F.R. § 668.146(b)(6) (emphasis added); *see also id.* § 668.148(a)(1)(iv) (incorporating entire document with identical incorporation language). Thus there are two instances of the Department of Education's incorporation of the *entire* 1999 Standards into title 34 of the C.F.R.

Plaintiffs engage in misdirection regarding the extent of incorporation of the 1999 Standards in two different ways. First, they dwell upon one instance of a vague incorporation of

unspecified parts of the 1999 Standards (Mot. at 16),[8] ignoring other instances of incorporation of the complete document. Second, they refer to a requirement of compliance with standards as though the standards are a subset of the 1999 Standards document, while ignoring that the regulation expressly incorporates the *document* and not just parts of the document by reference. "The incorporated document" that is now law by incorporation is the 1999 Standards, not some excerpt of the 1999 Standards.

### 3. New York incorporated the complete 1999 Standards into state law, with Plaintiffs' permission.

State and local law may also incorporate standards. For example, New York state law incorporates the 1999 Standards at 8 CRR-NY 30-2.2 (defining "Testing Standards" as the 1999 Standards), 8 CRR-NY 30-2.4 (requiring evaluations of teachers and principals to comply with the 1999 Standards), 8 CRR-NY 30-2.5 (requiring evaluations of teachers and principals to comply with the 1999 Standards), and 8 CRR-NY 30-2.8 (same).

---

[8] 34 C.F.R. § 462.13(c)(1)–(2) broadly refers to "all applicable and feasible standards for test construction and validity provided in the 1999 edition of the *Standards for Educational and Psychological Testing*," and then states that "[t]he Director of the Federal Register approves this incorporation by reference." It does not refer to the whole document, as in the examples above, nor does it specify which portions of the 1999 Standards constitute "all applicable and feasible standards for test construction and validity." Yet the following subsection, (c)(2), implies that it is incumbent on the test publisher to be familiar with the 1999 Standards as a whole and be prepared to justify why it has not followed a particular standard. That section states: "If requested by the Secretary, a test publisher must explain why it believes that certain standards in the 1999 edition of the *Standards for Educational and Psychological Testing* were not applicable or were not feasible to meet." To the extent that this incorporation might be construed as referring only to Part I of the 1999 Standards (titled "Test Construction, Evaluation, and Documentation"), the ambiguity is further complicated by the following subsection, which specifically references a chapter from Part II of the 1999 Standards, stating: "(f) For a test that has been modified for individuals with disabilities, the test publisher must—(1) Provide documentation that it followed the guidelines provided in the Testing Individuals With Disabilities section of the 1999 edition of the *Standards for Educational and Psychological Testing* . . . ." 34 C.F.R. § 462.13(f)–(f)(1).

On May 11, 2011, Gerald Sroufe, AERA's Director of Government Relations for Plaintiff AERA, gave Plaintiffs' consent to New York's incorporation by reference of the *complete* 1999 Standards, further agreeing that when New York provides "a photocopy of *all or any part* of the Standards upon request of any person," that such copying is "*a fair use* of the Standards and that such use will not violate the copyright interest [that Plaintiffs claim to hold in the 1999 Standards]." SSMF ¶ 44; Becker Decl. Ex. 43 (emphasis added).

B.      **Drafting and Publication**

1.      **The drafters were volunteers without a copyright incentive.**

The Plaintiffs provide a framework by which a committee of volunteers—industry representatives, academics, and other technical experts—weigh proposals for appropriate methods, processes, procedures, specifications, and other standards on the subject of testing. SSMF ¶ 46. Volunteer committee members suggest and evaluate both new language and revised language, weighing and implementing language proposals from federal, state, and local government employees; academics; and others. *Id*. They debate the scope, structure, and wording of standards, working to a consensus on the final form to reflect either minimally acceptable or best industry practices using the most precise, scientific terms possible. *Id*. Plaintiffs' employees facilitate that process, but they do not author the standards or control the final content. *Id*.

The drafters of the 1999 Standards received no pay for their work. SSMF ¶ 46-8. Instead, their motivation rested upon professional and public interests, including advancing the field of testing and education and obtaining professional recognition. SSMF ¶ 8. Despite jointly authoring the 1999 Standards, they have never received any proceeds from the sale of that document. And when Plaintiffs began preparing this lawsuit and realized that they did not own the copyright they asserted, they belatedly sought assignments from the living drafters and heirs of deceased drafters, but they provided no compensation for the assignments. *Id*.

### 2. Plaintiffs claim a professional purpose for publishing the 1999 Standards.

Plaintiffs' missions are to advance the fields of education, psychology, and test assessment. Plfs. SMF ¶¶ 2–4. Plaintiffs state that they publish the various editions of the Standards "to promote the sound and ethical use of tests and to provide a basis for evaluating the quality of testing practices." Plfs. SMF ¶ 20. Plaintiffs also allege that their purpose in publishing the Standards is not to make law or meet regulatory or governmental needs, but instead only for "professional use." Plfs. SMF ¶ 25. This is unlike Public Resource, which posts the standards solely for their value as law. SSMF ¶ 75; Declaration of Carl Malamud ("Malamud Decl.") ¶ 38.

### C. The 1999 Standards Are Obsolete as Standards but Still Current and Relevant as Binding Law.

In 2014, Plaintiffs adopted a new set of Standards as state of the art for the industry. Since then, Plaintiffs "expressly discourage the use of the 1999 Standards," stating they "would not want the 1999 Standards to be used" now that the 2014 Standards are available. Mot. at 29. They further state that the 1999 Standards "should not be purchased except for scholarly study." *Id.* Indeed, they ceased selling the 1999 Standards completely.

But the 1999 Standards—not the 2014 Standards—are current and binding law. And Plaintiffs admit that "the 1999 Standards continue to have value for those [who] . . . believe they still may be held accountable to the guidance of the 1999 Standards." Plfs. SMF ¶ 14. After counsel for Public Resource asked Plaintiffs why the 1999 Standards were no longer available for sale, Plaintiffs resumed sale—but only in a more cumbersome, mail-order channel. SSMF ¶ 50. Plaintiffs report that, after restoring the 1999 Standards to the marketplace, "sales of the 1999 Standards have been near nil." Mot. at 29, n.18.

Except for their ECF filings in this lawsuit, Plaintiffs have never made an electronic version of the 1999 Standards available to the public. Nor do they plan to. They have not published any version of the 1999 Standards accessible to people who are visually disabled. Plf. SMF ¶ 11.[9]

## III.   STANDARDS THAT HAVE BECOME LAW ARE NOT GENERALLY AND FREELY ACCESSIBLE.

Without the database that Public Resource provides, citizens have few options for accessing laws and regulations by incorporation.

First, one may make an appointment to visit the National Archives in Washington, D.C., to read a paper version of a federally incorporated standard. *See, e.g.*, 34 C.F.R. § 668.146. This option does not provide meaningful access for persons without the means to travel to Washington, or persons with visual disabilities, and it does not allow computer-aided analysis.

Second, one can sometimes purchase copies. This can be not only expensive but also sometimes difficult, because where, as here, the standards are currently effective *as law* but obsolete *as standards,* at least some publishers apparently see little reason to make them widely available. Some standards, including the 1999 Standards, are available only on paper because the sponsoring SDO has not authorized electronic versions, and thus they are unavailable to persons with visual disabilities or for computer-aided analysis. SSMF ¶ 29. Even when available, the 1999 Standards can cost $49.95, plus shipping and handling. *Id*. And many older standards are not available for purchase. Indeed, Plaintiffs took the 1999 Standards off the market for a year and a half during this litigation. *Id.*

---

[9] Plaintiffs included an unsealed complete version of the 1999 Standards in their Motion for Summary Judgment filing (ECF No. 134-4) and in their previous Motion for Summary Judgment filing (ECF No. 60-25–26), which are now available for download to the public for a $3 or $6 fee to PACER, respectively. The earlier public filing of the 1999 Standards is available on RECAP (a service that provides PACER documents for free), and the more recent filing may similarly become available for free in the future. SSMF ¶ 52-3.

Third, one can search libraries for standards. Contrary to the SDOs' suggestion, library availability is poor; libraries typically carry current standards but not earlier standards that still function as law, and library copies are typically only on paper. *See, e.g.*, *Getty Petroleum Mktg., Inc.*, 391 F.3d at 320–21, 330.

Finally, one can access some standards through online "reading rooms"—all but one of which were established by standards publishers only after Public Resource embarrassed them by highlighting the lack of public access. Here, the 1999 Standards are among the many standards that are part of the law but are not available in any online reading room. Plf. SMF ¶ 11 ("To date, Plaintiffs have never posted, or authorized the posting of, a digitized copy of the 1999 Standards on any publicly accessible website.").

## IV.   FURTHER DISCOVERY SHOWED THAT PUBLIC RESOURCE HAS HAD NO EFFECT ON SALES OF THE 1999 STANDARDS, AND PLAINTIFFS HAVE NO INTEREST IN MARKETING THEM.

Updated data and testimony from Plaintiffs show they have suffered no loss from Public Resource's activities. Sales of the 1999 Standards declined after peaking in 2002, and they started to plummet in 2011, a year before Public Resource posted the 1999 Standards. SSMF ¶ 56. Plaintiffs attributed the decline to the widespread knowledge that a new edition of the Standards was imminent, and they admit that they cannot clearly attribute the decline to Public Resource's activities. SSMF ¶¶ 57-59. In 2013, the only full year in which Public Resource's versions of the 1999 Standards were online, sales of the 1999 Standards *increased* over the previous year. SSMF ¶ 59.

In June 2014, Public Resource agreed to take the 1999 Standards down pending guidance from the Court, to allow the parties time to develop a fuller record. Two months later, Plaintiffs published their 2014 Standards and removed the 1999 Standards from the market, despite Plaintiffs' knowledge that the 1999 Standards were binding law. SSMF ¶¶ 29, 49-50. This is

consistent with Plaintiffs' past practice of taking older editions of the Standards off the market upon publishing new editions and consistent with a lack of interest in revenue from earlier editions. SSMF ¶ 54. Plaintiffs put the 1999 Standards on sale again a year and a half later, in July 2015, only after Public Resource called out their withdrawal in April and May of that year. SSMF ¶ 55. But unlike the 2014 Standards, the 1999 Standards are available only through a cumbersome purchase channel, requiring a mail-order form instead of allowing a direct purchase through the AERA online store, and they are more difficult to find on the AERA website.

Plaintiffs report that after they restored the 1999 Standards to the marketplace, "sales of the 1999 Standards have been near nil." Mot. at 29, n.18. In fact, Plaintiffs sold only ███ copies in 2015, and they █████████████ in 2016 or 2017, even though Public Resource was under an injunction and did not have the 1999 Standards online at that time. SSMF ¶ 51. But in 2018, once Public Resource restored the 1999 Standards to the Internet Archive website after the D.C. Circuit vacated the injunction, sales of the 1999 Standards showed a modest uptick and were the highest they had been since Plaintiffs first removed the 1999 Standards from sale. SSMF ¶ 60.

Sales of the 2014 Standards have been as robust as sales of the 1999 Standards were upon launch, years before Public Resource's activities. The first five years of sales of the 2014 Standards are almost identical to the first five years' sales of the 1999 Standards. SSMF ¶ 60 ██████ ████████████████████████.

## V.    PUBLIC RESOURCE AND CARL MALAMUD

### A.    Carl Malamud's Record of Public Service

Carl Malamud is the president and founder of Public Resource. Since the 1980s, Mr. Malamud has dedicated his career to the public interest, with a focus on Internet connectivity and public access. Mr. Malamud's career began as a Senior Systems Analyst at Indiana University.

After completing his doctoral coursework with a focus on antitrust and regulation at the Indiana University School of Business, Mr. Malamud left the program to work on early relational database programs and computer networking. Malamud Decl. ¶ 3. In 1984, Mr. Malamud assisted the Board of Governors of the Federal Reserve System in using computer and network technology to improve key indicators such as forecasts of the money supply. Malamud Decl. ¶ 4. Throughout the rest of the 1980s, Mr. Malamud continued his public service as a computer consultant to the Argonne and Lawrence Livermore National Laboratories and the Department of Defense, as well as teaching advanced seminars in relational databases and computer networks. Malamud Decl. ¶ 5. In 1993, Mr. Malamud founded the first radio station on the Internet, which he ran as a 501(c)(3) nonprofit public station. Malamud Decl. ¶ 6.

In January 1994, Mr. Malamud began to make government and legal materials more widely available to the public. Using a National Science Foundation grant, he purchased all electronic filings that corporations submitted to the Securities and Exchange Commission (SEC) and created the Electronic Data Gathering and Retrieval (EDGAR) service, which he made available for free on the Internet. Malamud Decl. ¶ 7. In August 1995, he donated computers and software to the SEC so the Commission could take over the service. *Id*. The SEC continues to operate this popular service. It reports that the system processes about 3,000 filings per day and 3,000 terabytes of data annually. *See* "About EDGAR," https://www.sec.gov/edgar/aboutedgar.htm.

Also in 1994, Mr. Malamud obtained the first "new media" credentials from the Radio-TV Gallery of the U.S. House of Representatives and started live-streaming all proceedings from the floors of the House and Senate. Malamud Decl. ¶ 9. He assisted the Joint Economic Committee in hosting the first congressional hearing on the Internet. Malamud Decl. ¶ 10. That year, Mr. Malamud also purchased feeds of all U.S. patents and made them available for free on the Internet.

He later convinced the U.S. Patent and Trademark Office to take over providing that service to the public. Malamud Decl. ¶ 12.

Throughout the 2000s, Mr. Malamud continued his mission of making government information more accessible to the public. In 2005 and 2006, Mr. Malamud was the Chief Technology Officer for the non-profit education organization Center for American Progress. While there, he developed a plan to make all congressional hearings available to the public in high-resolution video. Malamud Decl. ¶ 13. In 2007, Mr. Malamud founded Public Resource. Through Public Resource, Mr. Malamud has spearheaded successful efforts to make government records and information publicly accessible. Malamud Decl. ¶ 14.

In January 2009, President Barack Obama's transition effort recruited Mr. Malamud to develop plans and assist with transforming the Federal Register. The resulting program won the first-ever Walter Gellhorn Award for innovation in government services by the Administrative Conference of the United States. The Archivist of the United States, Hon. David Ferriero, recognized Mr. Malamud's efforts in a letter dated April 2, 2019, stating: "Our Founding Fathers believed that an informed and involved citizenry was key to our democracy and Public Resource helps us make[] this true." Malamud Decl. ¶ 22.

Mr. Malamud has been recognized by numerous government officials for his efforts to make government information freely accessible on the Internet. For example, Hon. Nancy Pelosi, Speaker of the House of Representatives, thanked him for his work "to increase public discourse on technology, public domain, and transparency issues and look[ed] forward to continuing to work with" him. Malamud Decl. ¶ 13. On January 5, 2011, Hon. John Boehner, then Speaker of the House of Representatives, together with Representative Darrell Issa, Chair of the House Committee on Oversight and Government Reform, wrote to Mr. Malamud to thank him for his

"nearly two decades of work to increase the availability of public data" and his "efforts to publish proceedings of the House Oversight and Government Reform Committee in their entirety." Malamud Decl. ¶ 15. They later recognized Public Resource on the floor of the House. *Id*. Mr. Malamud has also received commendations from Hon. Lee H. Rosenthal, Chair of the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States, and many others. Malamud Decl. ¶ 18.

In addition to recognition from government officials, organizations have routinely applauded Mr. Malamud's efforts to make government information more accessible, including awards from Harvard University, the Society of Professional Journalists, the First Amendment Coalition, and the American Association of Law Libraries. Malamud Decl. ¶ 23.

### B.    Public Resource's Mission

Public Resource is a non-profit charitable organization that provides online access to many kinds of government materials, from judicial opinions to video recordings of congressional hearings. SSMF ¶ 71. As part of its mission, Public Resource operates a website providing public access to the law, including statutes, judicial opinions, and public safety and other standards that federal and state governments have incorporated into law by reference. *Id*. Public Resource also contributes its materials to the Internet Archive database. *Id.*

Public Resource does not limit, or charge for, access to its platform. SSMF ¶ 73. It does not display, or derive any revenue, from advertising. It relies entirely on contributions and grants. *Id*.

Public Resource promotes public discourse by making laws and regulations, including laws by incorporation, more accessible. For example, by reformatting documents, Public Resource allows persons with visual disabilities to enlarge the text or use electronic text-to-speech readers to hear the text of a document. SSMF ¶ 74. Similarly, Public Resource often translates images into

scalable vector graphics for better enlargement. *Id.* It uses optical character recognition, and it often painstakingly retypes documents into Hypertext Markup Language (HTML) and converts formulas to Mathematics Markup Language (MML). *Id.* This makes documents newly word-searchable and allows researchers to analyze them at a large scale with techniques such as machine learning. *Id.*

### C.    Public Resource's Litigation and Other Disputes

#### 1.    SMACNA standards incorporated into law

In January 2013, the Sheet Metal and Air Conditioning Contractors National Association (SMACNA) threatened Public Resource with litigation for posting the "HVAC Air Duct Leakage Test Manual," which was incorporated by reference into 10 C.F.R. § 434.403 and state regulations. Malamud Decl. ¶ 33. Public Resource sued for declaratory relief in the U.S. District Court for the Northern District of California, Case No. 3:13-cv-00815. On July 9, 2013 SMACNA agreed to a stipulated judgment in which it agreed no longer to threaten Public Resource or other parties for the posting of the four standards explicitly incorporated into the C.F.R., not to assert copyright in those documents, and to pay Public Resource a token one dollar. Malamud Decl. ¶ 34; Ex. 27 (Stipulation and Judgment).

#### 2.    Oregon Revised Statutes

When the State of Oregon objected to Public Resource's posting of the Oregon Revised Statutes, Mr. Malamud spoke to the Legislative Counsel Committee, a joint committee of the Oregon Legislature chaired by the Speaker of the House and the Senate President. After hearing from him and other witnesses, including the Legislative Counsel, the committee voted to abandon assertions of copyright over the Oregon Revised Statutes. *See* Malamud Decl. ¶ 24 and Ex. 23 (Prepared Stmt. of C. Malamud before the Legislative Counsel Committee, June 19, 2008).

### 3. District of Columbia Code

Similarly, in 2012, after Public Resource posted the official Code of the District of Columbia, the General Counsel of the District of Columbia studied the situation and decided to produce a better website for public access to the laws of the District of Columbia. The software is maintained by the non-profit Open Law Library and available at https://code.dccouncil.us/. Malamud Decl. ¶ 25.

### 4. Official Code of Georgia Annotated

The State of Georgia sued Public Resource for posting online the "Official Code of Georgia Annotated." Malamud Decl. ¶ 26. That is Georgia's only official law, with annotations that the state has designated as "official." The Eleventh Circuit held that Public Resource's actions were lawful: it ruled the entire Code, with annotations, is a government edict not subject to copyright. *See Code Revision Commission v. Public.Resource.Org, Inc.*, 906 F.3d 1229, 1233, 1244 (11th Cir. 2018). Georgia petitioned the U.S. Supreme Court for review, and Public Resource responded by asking the Court to grant certiorari. The case is set for argument December 2, 2019. *See State of Georgia et. al. v. Public.Resource.Org, Inc.*, U.S. Supreme Court Docket 18-1150.

## PROCEDURAL BACKGROUND

### I. THE COORDINATED CASES AND THE EARLIER ORDER

The AERA Plaintiffs sue only for copyright infringement of one document, the 1999 Standards, and they seek only an injunction. The ASTM Plaintiffs sue Public Resource for direct and contributory copyright infringement and for trademark infringement involving hundreds of standards. After discovery, the parties filed cross-motions for summary judgment: the ASTM Plaintiffs sought summary judgment on nine standards, and the AERA Plaintiffs sought judgment on their sole standard. This Court heard the motions together and issued one consolidated memorandum opinion. Dkt. 117. This Court granted summary judgment to both sets of plaintiffs

(with the exception of AERA Plaintiffs' contributory infringement claim) and permanently enjoined Public Resource from use of the standards that were the subject of the motions and use of the ASTM Plaintiffs' trademarks. *Id.*; Dkt. 118. Public Resource appealed.

## II.    THE COURT OF APPEALS VACATED THE INJUNCTION, RESERVED THE QUESTION OF ENFORCEABILITY OF COPYRIGHT IN THE LAW, AND REMANDED FOR A FULLER FAIR USE ANALYSIS.

The Court of Appeals for the District of Columbia Circuit vacated the injunction and reversed the summary judgment order. *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437 (D.C. Cir. 2018). No part of this Court's earlier order remains in effect. Although the Court of Appeals stated that Public Resource presented "a serious constitutional concern with permitting private ownership of standards essential to understanding legal obligations," it ultimately focused solely on the question of fair use so as "to avoid 'pass[ing] on questions of constitutionality . . . unless such adjudication is unavoidable.'" *Id.* at 447 (quoting *Spector Motor Serv. v. McLaughlin*, 323 U.S. 101, 105 (1944)).

The Court of Appeals ruled that this Court misapplied the fair use standard, and it remanded the case for further proceedings on whether Public Resource's posting of standards was a non-infringing fair use and for further development of the factual record. The Court of Appeals deferred the "far thornier question" of whether standards that have been incorporated by reference necessarily enter the public domain, leaving that issue for consideration on a later appeal if necessary. *Id.* at 441, 447, 459. The Court of Appeals also declined to address the question of ownership generally, ruling only that Public Resource had not sufficiently argued below that the standards were works of the United States Government due to the participation of government employees in developing the standards. *Id.* at 446.

The Court of Appeals' opinion stressed the importance of a more detailed fair use analysis and called for further development of the factual record. The Court of Appeals stated:

> though there is reason to believe "as a matter of law" that PRO's
> reproduction of certain standards "qualif[ies] as a fair use of the
> copyrighted work," *id.* (internal quotations and citations omitted),
> we ultimately think the better course is to remand the case for the
> district court to further develop the factual record and weigh the
> factors as applied to PRO's use of each standard in the first instance.

896 F.3d at 448–49. The Court of Appeals offered additional legal guidance regarding the specific

fair use factors, which Public Resource discusses below at Section II. In a concurring opinion,

Judge Katsas was more explicit: "The Court's fair-use analysis faithfully recites the governing

four-factor balancing test, yet, in conducting the balancing, it puts a heavy thumb on the scale in

favor of an unrestrained ability to say what the law is." He continued:

> Thus, when an incorporated standard sets forth binding legal
> obligations, and when the defendant does no more and no less than
> disseminate an exact copy of it, three of the four relevant factors—
> purpose and character of the use, nature of the copyrighted work,
> and amount and substantiality of the copying—are said to weigh
> "heavily" or "strongly" in favor of fair use. . . . [W]here a particular
> standard *is* incorporated as a binding legal obligation, and where the
> defendant has done nothing more than disseminate it, the Court leaves
> little doubt that the dissemination amounts to fair use.

896 F.3d at 459. Judge Katsas remarked that he joined the Court's opinion with the understanding

that, "in the *unlikely* event that disseminating 'the law' might be held not to be fair use," the Court

would revisit the constitutional issues Public Resource had raised, as well as its section 102(b)

argument that the incorporated standards are uncopyrightable. *Id*. (emphasis added).

## III.   INTERACTIONS BETWEEN THE PARTIES AFTER THE APPEAL

After the remand on July 17, 2018, Plaintiffs delayed bringing this matter back for further

proceedings. After not hearing from Plaintiffs, Public Resource requested a discussion in

September, which took place in October. Plaintiffs did not move the Court to reopen the case until

February 2019, nearly seven months after the injunction was vacated.

## STANDARD FOR SUMMARY JUDGMENT

Plaintiffs correctly articulated the standard for summary judgment. Mot. at 6.

## SUMMARY OF ARGUMENT

Public Resource posts law by incorporation in an easily readable and searchable form to educate the public and enable research, criticism, and commentary. It has no commercial purpose. Its actions fall easily within the ambit of fair use.

As Public Resource explains below, it is entitled to summary judgment because it engages in fair use. Even if the fair use doctrine did not apply, however, Plaintiffs cannot obtain the only relief they've requested—a permanent injunction—for two reasons: (1) they have made no effort to meet their burden of establishing all the requirements for a permanent injunction under *eBay v. MercExchange*; and (2) they could not meet their burden if they tried. Because Plaintiffs' omission has put the Court in the unusual situation of being able to decide this case fully on the permanent injunction standard alone, this brief first addresses the issue of a permanent injunction and then turns to the merits of Public Resource's fair use.

## ARGUMENT

## I.    PUBLIC RESOURCE IS ENTITLED TO SUMMARY JUDGMENT OF NO PERMANENT INJUNCTION.

### A.    The Standard for a Permanent Injunction After *eBay v. MercExchange*

As the Supreme Court has ruled, injunctions are not mandatory in copyright cases, regardless of the success of a plaintiff's case. It is plaintiff's burden to show (1) that it has suffered an irreparable injury; (2) that other remedies are inadequate to compensate for that injury; (3) that the balance of hardships favors an injunction; and (4) that the public interest would not be disserved." *eBay,* 547 U.S. at 391.

**B.    Plaintiffs Did Not Argue for a Permanent Injunction, Ignored the Supreme Court's Decision in *eBay,* and Have Waived a Permanent Injunction.**

In a stunning omission, Plaintiffs' brief supporting their motion for a permanent injunction makes no attempt to meet the *eBay* standard. The Court of Appeals noted that Public Resource had appealed this Court's injunctions, and it *vacated* this Court's injunctions. There is no basis for any "reinstatement" of an injunction without argument to support it—which is doubtless why the ASTM Plaintiffs devoted eight pages to the issue. ASTM Dkt. 200 at 38–45. In this context, Plaintiffs have waived any claim to a permanent injunction.

But that is just one reason an injunction is improper. The other is that Plaintiffs could not have justified an injunction even if they had tried.

**C.    The Evidence Conclusively Shows Plaintiffs Have Not Suffered Irreparable Harm.**

On the first injunction factor, particularly on a motion for *permanent injunction*, a plaintiff must demonstrate that it has suffered an irreparable injury. That requires proof, not conjecture.

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249–51 (9th Cir. 2013) (holding that after *eBay*, actual evidence of irreparable harm must be proven to obtain a permanent injunction, and vacating injunction where the district court relied on conclusory statements and conjecture). Moreover, the harm must be the type of harm that the relevant law *tries to* prevent— in other words, here, a *copyright* harm. *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (*en banc*); *TD Bank N.A. v. Hill*, 928 F.3d 259, 281 (3d Cir 2019) (agreeing with *Garcia v. Google*). A copyright injunction must serve the purposes of copyright law, namely "to promote the Progress of Science and useful Arts." U.S. Const. art. I § 8, cl. 8.

Plaintiffs simply complain that the obsolete standards are no longer best practices for educational testing; they want to suppress access to encourage adoption of new ones. That is not a copyright interest. *See, e.g., TD Bank N.A. v. Hill*, 928 F.3d at 281 (stating that an interest in

suppressing or removing a work from circulation "bore little relation to any interest protected by copyright law" and could not support a finding of irreparable injury). Moreover, there is no indication that the *creators* of the 1999 Standards received any monetary incentive: the actual *creators* were the *volunteers* who wrote the standards and then assigned their copyrights to the plaintiffs without receiving payment for their contribution.

Plaintiffs' purported evidence of harm is limited to (1) speculation that the people who viewed the 1999 Standards on the Public Resource or Internet Archive websites would otherwise have either filled out a mail-order form to obtain them or purchased the 2014 Standards; (2) speculation that people will be confused by the mere availability of the 1999 Standards and therefore never consider that there might be more recent educational and testing standards; (3) a single hearsay-within-hearsay account of a teacher who said a student had found a version of the 1999 Standards online; and (4) decreasing sales figures that Plaintiffs concede coincided with their announcement of the 2014 Standards' release, and could also be attributable to market saturation. None of this is concrete evidence of *irreparable* harm during the two and a half years that Public Resource has made the 1999 Standards available online before and after the injunction.

### 1. Plaintiffs show no lost sales and no genuine interest in revenue from the 1999 Standards.

Plaintiffs have been unable to provide any substantial evidence of lost sales. SSMF ¶¶ 56-61. Plaintiffs argue that the version of the 1999 Standards on Public Resource's website was "accessed" 4,164 times, while the version on the Internet Archive website was "accessed" 1,290 times before 2016, and as of September 11, 2019 was "viewed" 1,445 times. Plf. SMF ¶¶ 64, 69. As an initial matter, an "access" or a "view" of a document on a website does not mean that a person sitting at a computer visited that webpage and read the contents. Any number of those "accesses" or "views" may be automated web crawling programs, such as what Google and other

companies use to ensure accurate and immediate web searches based on key words, or to cache web pages, or to perform other technical functions. SSMF ¶ 63. Likewise, these are not "unique" page views; each time a person refreshed or reloaded the page, it would increase the view count, further complicating any ability to equate page views with lost sales. *Id*. But more importantly, Plaintiffs have no evidence that a single one of these views replaced or prevented a sale of the paper version of the 1999 Standards.

Plaintiffs must prove that anyone who visits the Internet Archive website *today* to view the version of the 1999 Standards that Public Resource posted would otherwise have gone to the AERA website, clicked through the multiple levels necessary to find the mail-order form, and printed and sent in that mail-order form. To the extent Plaintiffs argue that the 1999 Standards are available in libraries or available for borrowing from academics and professionals (Mot. at 26, n.17), this further undercuts the likelihood that someone would go through the cumbersome mail-order process Plaintiffs have created. Moreover, Plaintiffs concede that, even while the injunction was in effect and Public Resource did not make the 1999 Standards available, sales were still "near nil." Mot. at 29, n. 18. ████████████████████████████████████████ at which time Public Resource's version was down. SSMF ¶ 51. Plaintiffs cannot credibly argue that Public Resource's posting will cut into their "near nil" sales.

To be clear, Plaintiffs' decision to waive copyright damages by seeking only an injunction does not weaken the evidentiary standard. When a plaintiff waives damages, it cannot turn around and claim that harm is irreparable because of the waiver.

Despite the Court's earlier observation that "there is no basis for the court to determine that accessing a website is equivalent to copying or violating any of the exclusive rights under § 106,"

Dkt. 117 at 41, and despite additional discovery, Plaintiffs have not adduced any new evidence other than what the Court already considered to be insufficient.

Moreover, the fact that Plaintiffs took the 1999 Standards off the market suggests they had no expectation of revenues from them. SSMF ¶ 29. They put the 1999 Standards back on sale only because Public Resource confronted Plaintiffs about the matter in this litigation. SSMF ¶ 50. Even then, they took months to do so, and they still refuse to offer them conveniently. *Id*. What is worse, Plaintiffs claim the right to take the 1999 Standards *back off sale* at will. SSMF ¶ 62.

> **2.** **Plaintiffs' effort to suppress the 1999 Standards serves no valid copyright interest, and public access causes no harm to the copyright.**

Undisputed evidence shows that Plaintiffs discourage reference to the 1999 Standards because they consider them obsolete. Mot. at 29 ("[T]he 1999 edition has been superseded and should not be purchased except for scholarly study."). That is why Plaintiffs have no interest in financially exploiting the 1999 Standards. An injunction would do nothing to strengthen the copyright incentives for authorship, publication, or distribution of the 1999 Standards.

Of course, while the 1999 Standards may be obsolete as best practices, they are not obsolete as the law, and even when the law changes, they will never be obsolete as a historical record of what the law was during the time that the 1999 Standards were incorporated into law by reference. *See, e.g.*, *Getty Petroleum Mktg., Inc.*, 391 F.3d at 320–21, 330 (1st Cir. 2004) (applying 1987 edition of NFPA 30, which had been incorporated into law many years earlier). The public *and courts* have a vital interest in knowing, and communicating, what the law was at earlier times. Encouraging that communication serves the purposes of copyright far better than restricting it.

> **D.** **The Balance of Hardships Weighs Strongly Against an Injunction.**

Public Resource has no way of fulfilling its mission to the public and to governments other than by engaging in the activities that the Plaintiffs challenge here.

By contrast, allowing Public Resource to post the 1999 Standards won't cause any meaningful hardship to Plaintiffs. Their sales have been near zero, the evidence strongly suggests they are making the 1999 Standards available for sale only for purposes of this litigation, they have threatened to take the 1999 Standards back off sale once the lawsuit is over, and they discourage the public from using or accessing the 1999 Standards. Plaintiffs claim to be concerned that the public would think that the 1999 Standards were the most up-to-date guidance on educational and testing practices. Mot. at 29. But if the 1999 Standards were used only by educational and testing professionals, as Plaintiffs claim (*see* Mot. at 29), one would expect those professionals to be aware of the well-publicized 2014 Standards. And Plaintiffs' determination to suppress a document that is still the law and thus legally binding on the public seems remarkably uncivic.

If Plaintiffs wish to minimize the effect of incorporation on the sales of their standards, they should work with regulators and legislators either to *avoid* incorporation or to *limit* it with clear and precise incorporations of only sections of the document, leaving no room for doubt and avoiding legal jeopardy to those, like Public Resource, who make the law available to the public.

### E.    The Public Interest Demands Unfettered Access to the Law, No Matter How the Law Came to Be.

Plaintiffs cannot show any evidence that the public interest justifies a permanent injunction. To the contrary, putting the law into the hands of the public—whether to learn the law, to analyze the law using digital technologies and formats for modern linguistic and data analysis, to criticize the law by digital annotations, or to teach the law by sharing it with others—manifestly *serves* the public interest. That interest includes strong First Amendment rights to speech and access to information, and Fifth and Fourteenth Amendment rights of due process and access to the law.

Oversight agencies, students, test publishers, school officials, and journalists must apply the 1999 Standards as federal law. They have compelling reasons to access that law to discern their

rights, obligations, and benefits. Under New York law, evaluation of teachers and principals must comply with the 1999 Standards, and school superintendents, district superintendents, and chancellors must apply the law to assess that compliance. The law has adopted these standards as enforceable, and the public interest (not to mention due process) requires access to them.

As Professor Mendelson noted,

> regulatory beneficiaries of all sorts, as well as regulated entities, have a strong and direct interest in access to the content of regulatory standards…because it directly affects their interests and can potentially affect their conduct. Accordingly, if notice is to be effective, ready public access must be provided to anyone potentially affected by the law.

Nina A. Mendelson, *Private Control Over Access to Public Law: The Perplexing Federal Regulatory Use of Private Standards*, 112 Mich. L. Rev. 737, 771 (2014).

Public access is especially important where laws may emerge from private processes. In *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 559–62 (1982), the Supreme Court upheld a civil claim against ASME, an amicus supporting Plaintiffs, for abusing the standards process to favor one member. The Court noted that "ASME can be said to be 'in reality an extra-governmental agency, which prescribes rules for the regulation and restraint of interstate commerce.'" *Id.* at 570 (quoting *Fashion Originators Guild v. FTC*, 312 U.S. 457, 465 (1941)).

Six years later, in *Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 500 (1988), the Supreme Court observed that, while one may presume that a government acts in the public interest, one may also presume that a private party is acting primarily on its own behalf. Addressing the National Electrical Code (NEC), at issue in the companion case, the Supreme Court observed that "the dividing line between restraints resulting from government action and those resulting from private action may not always be obvious." *Allied Tube,* 486 U.S. at 501–02. It

described the restraint of trade that the NEC embodied as "imposed by persons unaccountable to the public and without official authority, many of whom have financial interests in restraining competition." *Id.* To guard against such abuses, citizens must readily be able to access, analyze, and criticize the laws that emerge from these private processes.

Finally, Plaintiffs' argument that public access to the incorporated standards is adequate for due process is inconsistent with their assertion of an absolute right to withdraw the 1999 Standards from circulation entirely. SSMF ¶ 62.

## II.   PUBLIC RESOURCE IS ENTITLED TO SUMMARY JUDGMENT BECAUSE ITS POSTING OF LAWS BY INCORPORATION IS FAIR USE.

This is not a traditional copyright dispute, but an important and traditional copyright doctrine can resolve it. Public Resource's posting of documents that have become *laws by incorporation*, as part of a free, non-profit archive of federal and state laws, is a non-infringing fair use as a matter of law. The fair use doctrine does not undermine copyright but serves its ultimate purpose. As the Supreme Court has stated, "[f]rom the infancy of copyright protection, some opportunity for fair use of copyrighted materials has been thought necessary to fulfill copyright's very purpose, '[t]o promote the Progress of Science and useful Arts.…' U.S. Const., Art. I, § 8, cl. 8." *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 575 (1994).

### A.   That the Works in Question Are Edicts of Government Must Be the Touchstone of the Fair Use Analysis.

While the D.C. Circuit declined to reach the question of copyrightability, it recognized that the fair use analysis must focus on the nature of the works in question: laws by incorporation. The court recognized that private control of the work here raises a serious constitutional concern and looked to fair use to provide a path, within the confines of the Copyright Act, to resolve it. This path is logical because fair use has always played a role on resolving tensions between Article 1, section 8, and the First Amendment. The fair use doctrine is one of copyright law's "built-in First

Amendment accommodations." *Eldred*, 537 U.S. at 219; *see also Golan v. Holder* 1565 U.S. 302, 328-29 (2012).

Where the works are laws by incorporation, those accommodations are particularly important. As law professors noted in *State of Georgia*, copyright barriers "substantially impede regulated entities and the public at large from knowing the law, with destructive consequences for fair notice and the public's ability to participate in core government processes." Brief of Amici Curiae Law Professors Mendelson et al., *Georgia et al. v. Public.Resource.Org., Inc.*, U.S. Supreme Court Docket No. 18-1150, filed Oct. 16, 2019, at 3. For example, "[a] neighbor or nearby local government emergency response authority might well wish to know the pipeline operator's legal obligations. [The relevant] standard (now superseded by a second edition) presently costs $133. At times, API's list price for the incorporated-by-reference version of RP 1162 *has exceeded $1,000*." *Id.* at 10-11 (citation omitted).

Courts apply the fair use doctrine by considering four nonexclusive statutory factors. 17 U.S.C. § 107. Determinations require "a consideration of all the evidence in the case," *Mathews Conveyer Co v. Palmer-Bee Co.*, 135 F.2d 73, 85 (6th Cir. 1943), and are "not to be simplified with bright-line rules," *Campbell*, 510 U.S. at 577. "All [factors] are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell,* 510 U.S. at 578. All four factors, the preamble to Section 107, and the constitutional purpose of copyright conclusively require a determination of fair use here.

**B.      The Section 107 Preamble**

While the preamble of Section 107 contains illustrative and non-exhaustive examples of fair use and is not itself a factor, Public Resource's use fits *all* the preamble's characteristic purposes. Public Resource presents complete laws and regulations as a public archive for "criticism, comment, news reporting, teaching, . . . scholarship, and research." 17 U.S.C. § 107.

Public Resource engages in teaching and news reporting by making the full text of laws by incorporation available to the public. Public Resource also has a purpose of fostering research, criticism, comment, and scholarship. There is no better way to teach the law to the public than to *provide the public with the law*. Paraphrases, summaries, and descriptions do not capture the precision necessary to know the specifics of the law.

### C.      First Factor: The Purpose of Public Resource's Use

The first statutory factor considers "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes," and the preamble to section 107 identifies purposes that are characteristic of fair use. Plaintiffs' stated purpose is to advance the fields of education, psychology, and evaluation, not to inform citizens about the law. Plf. SMF ¶¶ 2–4. Public Resource aims to create a public collection of *government edicts*. SSMF ¶ 72; *see generally* http://www.public.resource.org/. Lesser transformations have been fair uses. *See, e.g.*, *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608–10 (2d Cir. 2006) (posters in a book). A shift in purpose, whether from "artistic expression" to "biographical" expression, as in *Bill Graham*, or from an industry-consensus standard to part of a legal archive, as here, is the essence of transformative use.

As the Court of Appeals held, Public Resource's purpose is noncommercial. 896 F.3d at 449. It is non-profit, depends on donations and grants, and does not charge users any fees. *Id.*

Public Resource's actions are also transformative. A "transformative" use "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 578. A use with a new "intrinsic purpose," serving an "entirely different function," is transformative. *Hustler Magazine, Inc.*, 606 F. Supp. at 1535; *see also Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) (transformative use of Web images in Google Image Search); *Bill Graham*, 448 F.3d at 609–11.

The Court of Appeals held that Public Resource's use was transformative if it posted what was necessary to comprehend a legal duty. 896 F.3d at 450. Public Resource does precisely that: it posts legally incorporated standards as part of an effort to make all current and historical U.S. law accessible on the Internet, not merely to read but also to analyze, excerpt, and share. No other broadly accessible archive of all standards incorporated by reference into federal law exists. Just as including full-size color reproductions of magazine cover art in a book achieves a transformative purpose when combined with "a history of the artist and plac[ing] his work into some context," Public Resource's re-purposing of the standards into a legal archive with context is a transformative use. *See Warren Publ'g Co. v. Spurlock*, 645 F. Supp. 2d at 421.

Public Resource also transformed the standards by adding HTML code, MML descriptions of formulas, and vector graphic representations of diagrams. SSMF ¶ 74. These enable the public to interact with the laws by incorporation through word searches, annotations, copy/paste functions, computer-aided analysis, and text-to-speech technologies. They also enable screen-reading software and other assistive technologies for people who are visually disabled. *Id.*

The Court of Appeals did *not* hold that posting "nonessential" text would render Public Resource's use nontransformative or tilt the first factor against fair use. Like the Second Circuit in *Swatch,* the court recognized that sharing "information of critical importance" that serves a public purpose, particularly one the Section 107 preamble specified, favors fair use. In *Swatch*, Bloomberg faced a copyright lawsuit after making a recording of a company's invitation-only earnings call available to Bloomberg subscribers. *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 78–79 (2d Cir. 2014). The Second Circuit held that Bloomberg's dissemination of the full recording was fair use. *Id.* at 77. In analyzing the first factor, the court concluded that Bloomberg's purpose of publicly disseminating information "of critical importance to securities

markets" in the form of "news reporting"—one of the activities in the preamble—favored fair use.

*Id.* at 82. The Second Circuit observed that

> the need to convey information to the public accurately may in some
> instances make it desirable and consonant with copyright law for a
> defendant to faithfully reproduce an original work without alteration. …
> [B]y disseminating not just a written transcript or article but an actual
> sound recording, Bloomberg was able to convey with precision not only
> the raw data of the Swatch Group executives' words, but also more subtle
> indications of meaning inferable from their hesitation, emphasis, tone of
> voice, and other such aspects of their delivery. This latter type of
> information may be just as valuable to investors and analysts as the former
> . . . .

*Id.* at 84. Here, Public Resource seeks to convey the law accurately and precisely so that the public

can fully comprehend it. As part of Public Resource's legal archive, the standards at issue were

transformed "from [items] of expressive content to evidence of the facts within [them]," rendering

the expressive content "merely incidental." *Am. Inst. of Physics v. Winstead PC*, No. 3:12–CV–

1230–M, 2013 WL 6242843, at *5 (N.D. Tex. Dec. 3, 2013) (use of technical articles in patent

proceeding was fair use); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 387 F.3d

522, 544 (6th Cir. 2004) (no use "for its commercial value *as a copyrighted work*"); *Bill Graham

Archives*, 448 F.3d at 608–09 (use of poster images as "historical artifacts" was transformative);

*Bond v. Blum*, 317 F.3d 385, 394–98 (4th Cir. 2003) (use of manuscript in child-custody

proceeding as evidence of admissions was transformative).

Put another way, Public Resource did not post the laws by incorporation for their technical

utility, creativity, or effectiveness at promoting safety. Public Resource selected them because

governments had adopted them as edicts and made them into law. Someone researching current

best-practice standards in designing buildings, consumer products, or standardized tests will not

seek Public Resource's website, because most laws by incorporation have been superseded *as

private standards* by later editions of the standards, while older versions remain *binding law*. But

someone wanting to know the *law* (current or historical) can rely on Public Resource's database for an answer. If Plaintiffs succeed here, that person will be hard-pressed to find it.

The record also shows that Plaintiffs have no interest in enabling access to the law for people with print disabilities, a key part of Public Resource's overall purpose. Plaintiffs do not make any electronic version of the 1999 Standards available, and they do not want one to be available. Plf. SMF ¶ 11. Public Resource's website allows universal access through many different kinds of software and devices. Persons who are print-disabled cannot depend solely on the Chafee Amendment, 17 U.S.C. § 121; educational institutions have always relied in part on fair use to serve persons with disabilities. SSMF ¶ 32. Moreover, universal access to regulations on safety, and on fairness of educational and vocational testing, furthers federal policy. *Id.*; *see Swatch Grp.*, 756 F.3d at 83 (use that advances a federal policy favors fair use).

Finally, Plaintiffs have conceded uses like Public Resource's are fair. On May 11, 2011, Plaintiffs signed an agreement with the New York State Education Department consenting to the incorporation by reference of the 1999 Standards and agreeing that New York could provide citizens with photocopies of "*all or any part* of the [1999] Standards upon request of any person" and that Plaintiffs agree that this copying and distribution "is a fair use of the Standards and that such use will not violate the copyright interest." SSMF ¶ 44; Ex. 43 (emphasis added). They were correct then. Their contrary litigation posture is wrong now.

### D.    Second Factor: The Nature of the Work as Multiple Government Edicts

The second fair use factor, the nature of the copyrighted work, recognizes that "some works are closer to the core of intended copyright protection than others." *Campbell*, 510 U.S. at 586. The holdings of *Wheaton v. Peters,* 33 U.S. 591 (1834), and *Banks v. Manchester,* 128 U.S. 244 (1888), suggest that few things are further from the core of copyright than laws and other government edicts. In addition to due process problems in allowing anyone to own the law, the

precise wording of each law by incorporation is itself a legal fact. The D.C. Circuit pulled these strands together, recognizing that "where the consequence of the incorporation by reference is virtually indistinguishable from a situation in which the standards has been expressly copied into law, this favor weighs heavily in favor of fair use." *ASTM*, 896 F.3d at 452.

That is precisely the situation here. "The general rule is that when one statute adopts a provision of another statute by specific reference, it is as if the adopting statute had itself spelled out the terms of the adopted provision." *United States v. Myers*, 553 F.3d 328, 331 (4th Cir. 2009) (citing *Hassett v. Welch*, 303 U.S. 303, 314 (1938)). Indeed, that is the goal of the incorporation process. "[I]ncorporation by reference is used primarily to make privately developed technical standards Federally enforceable." National Archives, *Code of Federal Regulations Incorporation by Reference*, https://www.archives.gov/federal-register/cfr/ibr-locations.html. Moreover, the incorporation process is rigorous at both the federal and the state level.

As standards, Plaintiffs' document was already at the factual end of the spectrum from "factual" to "creative." As *laws several times over* (owing to multiple incorporations by federal and state governments), however, the document has become *authoritatively factual* in stating the substance of the laws. Each word in each document, in each incorporation, has become a relevant legal fact to citizens, groups, and agencies, including courts, researching the law, complying with it, enforcing it, and interpreting it.

### E.     Third Factor:  Amount and Substantiality of the Portion Used

The third factor, the amount and substantiality of the portion used, favors fair use where the amount of the original work used is "reasonable in relation to the purpose of the copying." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 21 (2d Cir. 2015). Reproduction of entire works is fair use when it reasonably fulfills the user's purpose. *See, e.g.*, *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 449–50 (1984) (recording of entire television programs for time-

shifting); *Lexmark*, 387 F.3d at 544 (reproduction of entire computer program for printer compatibility); *Swatch Grp. Mgmt. Servs. Ltd.*, 756 F.3d at 90 (reproduction and dissemination of entire press-conference recordings).

As Public Resource's purpose is to create a thorough and accurate archive of federal law, it was both reasonable and necessary to post the entire incorporated document. Posting less would thwart Public Resource's goal and could mislead users who seek complete regulations. *See Righthaven, LLC v. Jama*, No. 2:10–CV–1322 JCM (LRL), 2011 WL 1541613, at *3 (D. Nev. April 22, 2011) (fair use where impracticable to use less of original); *see also Spurlock*, 645 F. Supp. 2d 402, 418 (ED Pa. 2009) (reproduction "virtually the same size as the original" was fair use).

The Court of Appeals held that, "[i]f PRO limits its copying to only what is required to fairly describe the standard's legal import, this factor would weigh strongly in favor of finding fair use." That is precisely what Public Resource has done with the 1999 Standards.

Federal law incorporated the *complete* 1999 Standards *document* in two separate provisions: 34 C.F.R. § 668.146(b)(6) and 34 C.F.R. § 668.148(a)(1)(iv). New York law also incorporated it completely, at 8 CRR-NY 30-2.2 *et seq*. Plaintiffs' signed agreement with the New York State Education Department acknowledged the incorporation of the entire document and agreed that New York could provide citizens with photocopies of "*all or any part* of the [1999] Standards upon request of any person." SSMF ¶ 44; Ex. 43.

Plaintiffs focus on a third incorporation at 34 C.F.R. § 462.13(c)(1)–(2), saying it was of only a "small part." Mot. at 16. But they cannot identify specifically that small part. The incorporation broadly refers to "all applicable and feasible standards for test construction and validity provided in the 1999 [Standards]" but does not specify whether that means the complete

1999 Standards or certain discrete portions. And it puts the burden on regulated citizens to identify parts that are *not* applicable: "If requested by the Secretary, a test publisher must explain why it believes that certain standards in the 1999 [Standards] were not applicable or were not feasible to meet." One could fairly read this to require either compliance with the complete 1999 Standards or sufficient familiarity with the entire document to guess what the regulation meant and argue why specific parts of the 1999 Standards are not applicable.

Thus, Plaintiffs seek to put Public Resource and its audience in an impossible position, forced to decide what the incorporating entity meant when it chose to incorporate a standard, and what is and is not necessary to comprehend a legal duty. The better course, consistent with Public Resource's purpose, is to take regulators at their word and post the entire incorporated text.

Again, the incorporation process gives regulators, the public, and the SDOs an opportunity to narrow the scope of incorporation. Once incorporation occurs, the document becomes a government edict, and Public Resource or some other member of the public should not have to second-guess its scope—and risk lawsuits and possible damages if it guesses wrong.

### F.       Fourth Factor: The Effect on the Market Value of the 1999 Standards

The fourth factor, the effect of the use on the potential market for or value of the copyrighted work, concerns only "harm cognizable under the Copyright Act." *Campbell*, 510 U.S. at 592. Courts look to whether a person seeks to "profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row v. Nation Enterprises*, 471 U.S. 539, 562 (1985).

As the Court of Appeals held, Public Resource does not seek profit from this use. 896 F.3d at 449. Moreover, the "customary price" for the right to reproduce, disseminate, and provide access to the law is zero. And because the 1999 Standards are out of date *as industry standards* (even though they are current *laws*), their traditional market value as anything but law is essentially zero.

41

For example, sales of the 1999 Standards plummeted when Plaintiffs announced the 2014 edition and removed the 1999 Standards from the market. SSMF ¶ 56-9. Plaintiffs acknowledged that their recent sales of the 1999 Standards have been "near nil," even while Public Resource had taken the standards down. Mot. at 29, n.18. This helps explain why, despite Public Resource's use of the 1999 Standards, the record in this case reveals *no* harm to Plaintiffs' revenues.

Plaintiffs wrongly portray Public Resource's public posting of the standards as the sole determinative fact under the fourth factor. "[The fourth] factor, no less than the other three, may be addressed only through a 'sensitive balancing of interests.'" *Campbell*, 510 U.S. 569 at n.21 (quoting *Sony*, 464 U.S. at 455 n.40). It "requires a balancing of 'the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied.'" *Bill Graham Archives*, 448 F.3d at 613 (citation omitted).

The balance here tilts in favor of the public benefit and fair use. Plaintiffs' revenue does not depend on denying Public Resource the ability to post the law. The record, including Plaintiffs' own sales figures, shows no lost sales attributable to Public Resource. SSMF ¶¶ 56-61.

And Plaintiffs' claims that sales of their 2014 Standards could be harmed is irrelevant. Public Resource has not posted it or yet argued that it has any reason to do so. Moreover, Plaintiffs' self-serving assertion that harm has occurred, without credible evidence, cannot outweigh the actual evidence to the contrary. Mot. at 28 (drawing an "inference" but failing to provide actual evidence). Plaintiffs' argument that people who encounter the 20-year-old 1999 Standards online will assume they "continue to represent the best practices in testing" lacks both credibility and evidentiary support. Mot. at 29.

Evidence of Plaintiffs' sales shows the opposite: Plaintiffs' first five years of sales of the 2014 Standards are *almost identical* to the first five years sale of the 1999 Standards. SSMF ¶ 60

████ copies of 2014 Standards sold from 2014 through 2018, compared to ████ copies of 1999 Standards sold from 1999 through 2003). In case there is any doubt, sales of the 2014 Standards have increased since Public Resource put the 1999 Standards back online. *Id.*

Finally, Plaintiffs' argument that they have a right "to *not* sell, or to limit access to the work" (Mot. at 29, n. 19) is not a traditional or reasonable *market* interest under the fourth factor.[10] This is particularly the case where, as here, Plaintiffs argue that they have a right to restrict access to the law. This also shows that Plaintiffs have no concern with the market value for the 1999 Standards. They simply want to veto access to the 1999 Standards.[11]

## CONCLUSION

For all these reasons, the Court should deny Plaintiffs' motion for summary judgment and for a permanent injunction and grant Defendant's second motion for summary judgment.

---

[10] When a work is unpublished, there may be a "first publication" potential market value of a work that a defendant's use may impair. *See Salinger v. Random House, Inc.*, 811 F.2d 90, 99 (2d Cir. 1987). There might even be market value in withdrawing works from the market to "reintroduce" them later, as occurs with some Disney motion pictures. But the facts here are the opposite: Plaintiffs have shown no interest in manipulating the disappearance of the 1999 Standards for market-value maximizing purposes; they want the 1999 Standards off the market (except for pretextual availability for this lawsuit). They emphasize their right to suppress the standards and not just to time their intermittent availability. In these circumstances, the evidence points conclusively to no effect on the actual *or* potential market value of the 1999 Standards.

[11] While courts have often treated fair use as a defense on which a defendant bears the burden on the fourth factor, a plaintiff would typically be in the best position to access evidence of harm to market value, and a plaintiff should bear that burden. In any event, in this case and in this motion, Public Resource has conclusively established that the Plaintiffs have suffered no market harm.

Dated: November 8, 2019                    Respectfully submitted,

                                           /s/   Andrew P. Bridges
                                           Andrew P. Bridges (USDC-DC AR0002)
                                           abridges@fenwick.com
                                           Matthew B. Becker (admitted *pro hac vice*)
                                           mbecker@fenwick.com
                                           Armen N. Nercessian (pending *pro hac vice*)
                                           anercessian@fenwick.com
                                           Shannon E. Turner (pending *pro hac vice*)
                                           sturner@fenwick.com
                                           FENWICK & WEST LLP
                                           801 California Street
                                           Mountain View, CA 94041
                                           Telephone:   (650) 988-8500
                                           Facsimile:    (650) 938-5200

                                           Corynne McSherry (admitted *pro hac vice*)
                                           corynne@eff.org
                                           Mitchell L. Stoltz (D.C. Bar No. 978149)
                                           mitch@eff.org
                                           ELECTRONIC FRONTIER FOUNDATION
                                           815 Eddy Street
                                           San Francisco, CA 94109
                                           Telephone:   (415) 436-9333
                                           Facsimile:    (415) 436-9993

                                           David Halperin (D.C. Bar No. 426078)
                                           davidhalperindc@gmail.com
                                           1530 P Street NW 2nd Floor
                                           Washington, DC 20005
                                           Telephone: (202) 905-3434

                                           Attorneys for Defendant-Counterclaimant
                                           Public Resource, Inc.

B9620/00404/FW/11104988