# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN EDUCATIONAL RESEARCH ASSOCIATION, INC., AMERICAN PSYCHOLOGICAL ASSOCIATION, INC., and NATIONAL COUNCIL ON MEASUREMENT IN EDUCATION, INC., | Case No. 1:14-cv-00857 (TSC) |
| Plaintiffs-Counterdefendants, | |
| v. | |
| PUBLIC.RESOURCE.ORG., INC., | |
| Defendant-Counterclaimant. | |

## PUBLIC RESOURCE'S SUPPLEMENTAL STATEMENT OF MATERIAL FACTS IN OPPOSITION TO [134] PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION, AND IN SUPPORT OF PUBLIC RESOURCE'S SECOND MOTION FOR SUMMARY JUDGMENT

### [PUBLIC REDACTED VERSION]

# TABLE OF CONTENTS

**Page**

SUPPLEMENTAL STATEMENT OF MATERIAL FACTS ........................................1

I.     Incorporation by reference ...........................................................................1

A.    The Nature of Incorporation by Reference ..............................................1

B.    The Process of Incorporation by Reference..............................................2

C.    Objects of Incorporation ..........................................................................6

D.    Incorporation by Reference Versus Extrinsic Unincorporated Standards ..............8

II.    Standards That Have Become Law Are Not Generally and Freely Accessible ..............8

III.   The 1999 Standards...................................................................................10

A.    The 1999 Standards as Laws by Incorporation.......................................10

        1.    Two Sections of the Code of Federal Regulations Incorporate the Complete 1999 Standards into Law.....................13

        2.    New York Incorporated the Complete 1999 Standards into State Law, with Plaintiffs' Permission ...................................15

B.    Drafting and Publication ........................................................................16

        1.    The Drafters were Volunteers Without a Copyright Incentive......................................................................................16

            a.    No Copyright Revenue to Volunteers who Wrote the Standards............................................16

C.    The 1999 Standards Are Obsolete as Standards but Still Current as Binding Law ..............17

IV.   Public Resource and Carl Malamud .........................................................24

A.    Carl Malamud's Record of Public Service ............................................24

B.    Public Resource's Mission......................................................................26

C.    Public Resource's Litigation and Other Disputes ..................................28

## SUPPLEMENTAL STATEMENT OF MATERIAL FACTS[1]

**I.     INCORPORATATION BY REFERENCE**

**A.     The Nature of Incorporation by Reference**

1.      Incorporation by reference is an alternative to direct inclusion of language into a government's published laws or regulations.  *See* 5 U.S.C. §552(a)(1); 1 C.F.R. §§ 51.1-51.11.

2.      The Office of the Federal Register has explained that material incorporated by reference is "like any other properly issued rule, has the force and effect of law."  Dkt. 70-64 at 3.

3.      The federal government initiated the practice of incorporating some materials by reference instead of reproducing them to limit the bulk of the Code of Federal Regulations ("CFR").  Dkt. 70-64 at 3.

4.      States and municipalities also turn standards into law, through incorporation by reference and in other instances by reproducing an entire standard verbatim in the text of the law. *See, e.g.*, Minn. Admin.  Rule 4761.2460, Subp. 2(C); California Code of Regulations, Title 24, Part 3.

5.      Governments may prosecute and punish persons for failing to obey standards that have become law.  To take just two examples: The Supreme Court of Virginia treated violation of the National Electrical Code as equivalent to a violation of the Virginia Building Code, which incorporated the NEC by reference, and subject to criminal sanctions.  *Virginia Elec. & Power Co. v. Savoy Const. Co.*, 294 S.E.2d 811, 816-17 (Va. 1982).

---

[1] Public Resource filed an earlier Statement of Material Facts (original Dkt. 68-3 and corrected at Dkt. 102-3) ("SMF").  Public Resource hereby incorporates by reference those two documents and the evidence of record that they cited. This Supplemental Statement of Material Facts ("SSMF") complements those two earlier filings and their associated exhibits and supplements the earlier record.  Public Resource files with this document only the most frequently-cited and informational exhibits from its earlier summary judgment motion for the Court's handy reference without unduly burdening the case file with duplicate filings. At the Court's request, Public Resource will refile any document it previously filed but has not included in the new filing.

6.     After the deadly "Ghost Ship" fire in Oakland, California, prosecutors charged principal tenant and alleged manager of the building with manslaughter for violation of fire safety codes that are incorporated by reference.  Declaration of Matthew Becker in support of Public Resource's Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment ("Becker Decl.") ¶ 33, Ex. 65 (Declaration in Support of Probable Cause, *California v. Harris*, No. 17-CR-017349A (Cal. Super. Ct. June 5, 2017), *available at* https://www.scribd.com/document/350446988/Ghost-Ship-fire-criminal-charges; Becker Decl. ¶ 34, Ex. 66 (Criminal Complaint, *California v. Harris*, No. 17-CR-017349A (Cal. Super. Ct. June 5, 2017)), *available at* https://web.archive.org/web/20170729051241/https://cbssanfran.files.wordpress.com/2017/06/almena-and-harris-complaint.pdf.).

**B.     The Process of Incorporation by Reference**

7.     The process of incorporation by reference is careful and deliberate. At the federal level, it starts when an agency responsible for regulating an industry publishes a notice in the Federal Register concerning the agency's intent to incorporate a standard into law and asks the public to submit comments.  5 U.S.C. §553.

8.     A federal agency must publish proposed rule changes in the Federal Register, including changes to a standard incorporated by reference into the Code of Federal Regulations. 5 U.S.C. §553(b); 1 C.F.R. § 51.11(a) (2015).

9.     A standard incorporated by reference into the Code of Federal Regulations must be a "proposed rule" or "final rule" of a federal agency.  1 C.F.R. §51.5(a)-(b) (2019). Before the federal government incorporates a standard by reference into law as a final rule, the Director of the Federal Register must approve the incorporation.  1 C.F.R. § 51.3 (2019).

10.     Standards are incorporated by reference—as opposed to reprinting the entire text of the standards—to limit the length of the Code of Federal Regulations. Dkt. 70-63 ("Incorporation by Reference" webpage of the Office of the Federal Register, http://www.archives.gov/federal-register/cfr/ibr-locations.html).

11.     Standards are also incorporated by reference into state and local laws. *See, e.g.*, Md. Admin. Rule 09.12.26.06(E)(1)(c)(i); Minn. Admin. Rule 4761.2460, Subp. 2(C).

12.     State adoptions are equally rigorous. For example, the State of California incorporates model codes into Title 24 of the California Code of Regulations on a triennial cycle, with a 45-day public-comment period, a six-month publication requirement, and a three-month delay to allow local governments to implement them.  The California Building Standards Law precisely defines this process. *See* Cal. Dep't of Gen. Servs., *2015 Triennial Code Adoption Cycle* (Dec.                                                                2014), https://web.archive.org/web/20170207201000/https://www.documents.dgs.ca.gov/BSC/2015Tri Cycle/2015TricycleTimeline.pdf; *18-Month Code Adoption Cycle*, Cal. Bldg. Standards Comm'n, https://www.dgs.ca.gov/BSC/Rulemaking (last visited Nov. 8, 2019).

13.     SDOs, including Plaintiffs, benefit from the incorporation of their standards into law. For example, Plaintiffs acknowledge that people will want to read the 1999 Standards because they "believe they still may be held accountable" to comply with them.  Dkt. 60-1 at 1, 11. Adoption of a standard into law promotes the efforts of SDOs to make the standard influential in relevant industries.  The Office of the Federal Register (OFR) states: "The legal effect of incorporation by reference is that the material is treated as if it were published in the Federal Register and CFR. This material, like any other properly issued rule, has the force and effect of

law. Congress authorized incorporation by reference in the Freedom of Information Act to reduce the volume of material published in the Federal Register and CFR." Dkt. 70-64.

14.     The OFR directs people who want to read incorporated standards to "contact the standards organization that developed the material."   Becker Decl. ¶ 31, Ex. 63 (printout of National Archives website on incorporation by reference).

15.     In addition, when the Code of Federal Regulations incorporates a standard, the code itself informs readers that they may obtain a copy of the standards from the Office of the Federal Register ("OFR") or from the SDO that published the standard, effectively promoting sales of the standard. *E.g.*, 34 C.F.R. § 668.146.

16.     Standards development organization (SDOs) often lobby governments to incorporate their standards by reference or otherwise make their standards law. ██████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████ Dkt. 70-31 (Ernesto Ex.

1116). █████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

Becker Decl., ¶ 17, Ex. 50 (Ernesto Depo.) at 189:06–190:11.████████████████

███████████████████████████████████████████████████

████ Becker Decl., ¶ 17, Ex. 50 (Ernesto Depo.) at 174:11-175:14, 179:24–194:24); Dkt. 70-51;

Dkt. 68-30; Dkt. 68-31; Dkt. 68-32; Becker Decl. ¶ 19, Ex. 52 (Levine Depo. I) at 176:22-181:13;

Dkt. 70-43; Dkt. 70-44; Dkt. 70-45.

17.     Adoption into law gives the Standards "authoritative value." Becker Decl., ¶ 17,

Ex. 50 (Ernesto Depo.) at 176:14–23.  Dkt. 70-32 (Ernesto Ex.

1121); Becker Decl., ¶ 17, Ex. 50 (Ernesto Depo.) at 209:15–22.

18.     According to Wayne Camara, Plaintiffs' Rule 30(b)(6) witness on the subject of

Plaintiffs' efforts to influence the requirements imposed by federal and state governments

regarding incorporation by reference,                                                                     . Becker Decl. ¶ 18, Ex 51 (Camara

Depo.) 43:16–18; Becker Decl. ¶ 36, Ex. 68 (Wayne Camara, "OCR Issues Draft Guide on

Disparate Impact in Educational Testing," Society for Industrial and Organizational Psychology,

October 1999).

19.     

Dkt. 70-43 (Levine Ex. 1217); Dkt. 70-44 (Levine Ex. 1218); Dkt. 70-45 (Levine Ex.

1219); Becker Decl. ¶ 19, Ex. 52 (Levine Depo. I) at 176:22–177:01; 178:14–179:15; 179:19–

180:04.

### C.      Objects of Incorporation

20.      According to the Office of the Federal Register's Incorporation by Reference ("IBR") Handbook, any time a federal agency refers to material when it is developing regulations, it must consider two questions:  First, "does it have a legal citation?"  If yes, the agency must use the legal citation.  If not, the agency then must consider the second question: "Is it required to understand or comply with the regulations? Do your regulations require that a party "resort to" material that is not published in the *Federal Register*?"  If the material is necessary to understand or comply with the regulation, the agency must seek IBR approval from the Director of the Federal Register. Becker Decl., ¶ 11, Ex. 45 (IBR Handbook) at p. 2 (citing 5 U.S.C. § 552(a)).

21.      Only the Director of the Federal Register can approve IBR requests, and "[p]ublication in the *Federal Register* of a document containing reference(s) to incorporated material does not in itself constitute an approval of the IBR by the Director."  Becker Decl., ¶ 11, Ex. 45 (IBR Handbook) at 6.

22.      Similarly, the Federal Register may contain references to incorporated material, but the referenced material is not actually incorporated by reference when it has not received the Director's formal approval.  Becker Decl., ¶ 11, Ex. 45 (IBR Handbook) at 11.

23.      To be eligible for incorporation by reference, the material must be *published* and "impossible or impractical" to print in the C.F.R.  Becker Decl., ¶ 11, Ex. 45 (IBR Handbook) at 6.  This means it is typically documents, or portions of documents, that are incorporated by reference—not mere text, which could otherwise be printed in the C.F.R.  *See* Becker Decl., ¶ 11, Ex. 45 (IBR Handbook) at 11-12.

24.      According to the Director of Legal Affairs and Policy at the Office of the Federal Register, if an agency identifies a document in its IBR language and does not specify a specific

section of that document, the entire document is incorporated by reference.  Malamud Decl. ¶ 40,

Ex. 34.

25.     Where a federal agency seeks to incorporate only parts of a standards document, it

is explicit.  For example, 24 CFR § 3280.4(aa)(4) (2019) states that only specific parts of the 2005

edition of the National Electrical Code, NFPA 70, are incorporated into law:

> (a) The specifications, standards, and codes of the following
> organizations are incorporated by reference in 24 CFR part 3280
> (this Standard) pursuant to 5 U.S.C. 552(a) and 1 CFR part 51 as
> though set forth in full.
>
> …
>
> (aa) National Fire Protection Association (NFPA), 1 Batterymarch
> Park, Quincy, MA 02269, phone number 617-770-3000, fax number
> 617-770-0700, Web site: http://www.nfpa.org.
>
> …
>
> (4) NFPA No. 70-2005, National Electrical Code, IBR approved as
> follows:
>
> (i) Article 110.22, IBR approved for §§ 3280.803(k) and
> 3280.804(k).
>
> (ii) Article 210.12(A) and (B), IBR approved for § 3280.801(b).
>
> (iii) Article 220.61, IBR approved for § 3280.811(b).
>
> (iv) Article 230, IBR approved for §§ 3280.803(k) and 3280.804(k).
>
> …

24 CFR § 3280.4(aa)(4)(i)-(iv).

26.     In contrast, the full 2005 edition of the National Electrical Code, NFPA 70, is

incorporated by reference at 49 C.F.R. § 192.7 (2009):

> § 192.7 What documents are incorporated by reference partly or
> wholly in this part?
>
> (a) Any documents or portions thereof incorporated by reference in
> this part are included in this part as though set out in full. When only

a portion of a document is referenced, the remainder is not incorporated in this part.

(b) . . . These materials have been approved for incorporation by reference by the Director of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. . . .

F. National Fire Protection Association (NFPA): . . .

(4) NFPA 70 (2005) ''National Electrical Code.''

### D.    Incorporation by Reference Versus Extrinsic Unincorporated Standards

27.    Sometimes external documents are referred to in the C.F.R. or in other government edicts but not formally incorporated into law.  When a document is referenced but not formally incorporated, it serves as only an "extrinsic standard".  *See, e.g.*, *Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516 (9th Cir. 1997) (regulations required Medicare and Medicaid claimants to use a private medical coding system but did not incorporate the medical coding system into law).  Likewise, *CCC Information Services, Inc. v. Maclean Hunter Market Reports, Inc.*, concerned a document that was one of several automobile valuation references that regulations approved for use in insurance adjusting.  44 F.3d 61 (2d Cir. 1994).  The regulation stated "[m]anuals approved for use are…The Redbook….," without any mention of incorporating those manuals into enforceable laws. *See* N.Y. Comp. Codes, R. & Regs. tit. 11, § 216.7(c)(1)(i) (West 1999), *cited in CCC*, 44 F.3d at 73 n.29.

## II.    STANDARDS THAT HAVE BECOME LAW ARE NOT GENERALLY AND FREELY ACCESSIBLE

28.    Without the database that Public Resource provides, citizens have few options for accessing laws and regulations by incorporation.  First, one may make an appointment to visit the National Archives in Washington, D.C., to read a paper version of a federally incorporated standard.  *See, e.g.*, 34 C.F.R. § 668.146.  This option does not provide meaningful access for

persons without the means to travel to Washington, or persons with visual disabilities, and it does not allow computer-aided analysis.

29.     Second, one can sometimes purchase copies.  This can be not only expensive but also difficult, because where, as here, the standards are currently effective as law, but are obsolete as standards, at least some publishers apparently see little reason to make them widely available. Some standards, including the 1999 Standards, are available only on paper because the sponsoring standards development organization (SDO) has not authorized electronic versions, and thus they are unavailable to persons with visual disabilities or for computer-aided analysis. Becker Decl. ¶ 30, Ex. 60 (Fruchterman expert report) at 8-16; Becker Decl. ¶ 2, Ex. 36 (Levine Depo. II) at 61:10-17 and 63:15-64:21. Even when available, the 1999 Standards can cost $49.95, plus shipping and handling.  Becker Decl. ¶ 7, Ex. 41 (AERA website printout).  And many older standards are not available for purchase.  Plaintiffs took the 1999 Standards off the market for a year and a half during this litigation. Dkt. 60-1 at 18 (Plaintiffs assert they took the 1999 Standards off sale "to encourage sales of the newly-revised edition—the 2014 Standards")

30.     Third, one can search libraries for standards.  Contrary to the SDOs' suggestion, library availability is poor; libraries typically carry current standards but not earlier standards that still function as law, and library copies are typically only on paper.  *See, e.g.*, *Getty Petroleum Mktg., Inc.*, 391 F.3d at 320-21, 330 (1st Cir. 2004).

31.     Finally, one can access some standards through online "reading rooms"—all but one of which standards publishers established only after Public Resource embarrassed them by highlighting the lack of public access.  Here, the 1999 Standards are among the many standards that are part of the law but not available in any online reading room. Plf. SMF ¶ 11 ("To date,

Plaintiffs have never posted, or authorized the posting of, a digitized copy of the 1999 Standards on any publicly accessible website.").

32.     Persons who are print-disabled cannot depend solely on the Chafee Amendment, 17 U.S.C. § 121.  Educational institutions have always relied in part on fair use to serve persons with disabilities. Dkt. 99-13 at 22; Becker Decl. ¶ 30, Ex. 60 (Fruchterman expert report) at 8-16.

## III.    THE 1999 STANDARDS

### A.     The 1999 Standards as Laws by Incorporation

33.     The 1999 Standards are law that regulates certain federal aid programs.  The U.S. Department of Education incorporated the complete 1999 Standards in its 2010 "Program Integrity" regulations ("the 2010 Regulations"). 34 C.F.R. § 600 *et seq*.; 75 FR 209 (Oct. 29, 2010) at 66831-66975.  The 2010 Regulations govern the use of federal aid money under the "ability to benefit" ("ATB") program, which allows students without a high school diploma to enroll in post-secondary education programs under certain circumstances, including if they pass a standardized test that meets government requirements.

34.     Most students in the ATB population rely on federal aid to afford higher education. The ATB program allows access to federal aid for students in career training programs who lack a high school diploma or a GED certificate, but only if they either (1) complete at least 6 credit hours in a post-secondary school; or (2) pass an independently administered Department of Education approved ATB test.  Access to federal aid through the ATB program is also critical to states that want to provide educational opportunities for their residents, and to the career education schools that depend on tuition paid through federal aid. But unscrupulous schools seeking federal money threaten the integrity of the ATB program and the welfare of students.  For example, in a 2009 report, the U.S. Government Accountability Office raised concerns that some for-profit colleges were helping students cheat on ATB tests or falsifying test results. Becker Decl. ¶ 13, Ex.

47, "GAO, PROPRIETARY SCHOOLS: Stronger Department of Education Oversight Needed to Help Ensure Only Eligible Students Receive Federal Student Aid," August 2009, available at http://www.gao.gov/new.items/d09600.pdf.

35.    The Secretary of Education must apply 34 C.F.R. 668.146 to approve an ATB test from either a state or a private test publisher.  That regulation incorporates by reference the entire 1999 Standards document, and it further requires that an ATB test "[m]eet all standards for test construction provided in the 1999 edition of the *Standards for Educational and Psychological Testing*," i.e. the 1999 Standards.  34 C.F.R. § 668.146(b)(6).  Federal regulations also identify the 1999 Standards as containing the legal requirements for tests conducted in foreign languages for non-native speakers of English, 34 C.F.R. § 668.148(a)(1)(iv), for test modifications to accommodate students with disabilities, 34 C.F.R. § 668.148(a)(2)(i), and for specific requirements for computer-based tests.  34 C.F.R. § 668.148(a)(3)(i).

36.    Department officials deliberately adapted the regulation to the 1999 Standards.  For example, the Department made one specific change to its final version of the 2010 Rule, codified at § 668.146(b)(6), in response to a comment pointing out that the Department's proposed rule used language inconsistent with the 1999 Standards (but consistent with the previous 1985 Standards) while incorporating the 1999 Standards by reference.  *See* 75 FR 209 (Oct. 29, 2010) at 66923.

37.    Because the 1999 Standards are a substantive and integral component of the 2010 Regulation, a wide range of parties needs access to them. These parties include students (and their lawyers) wanting to contest a denial of ATB benefits, students seeking loan forgiveness on the grounds that the school acted improperly under the regulation, ATB test publishers, and state governments designing ATB tests for students in their state.  Federal and state law enforcement

and education oversight agencies apply the law by incorporation in their oversight and enforcement activities to ensure the integrity of higher education aid programs. Journalists and advocacy organizations need to study the law to evaluate the compliance of higher education programs that federal money supports and in which students invest their hopes for their futures. Schools—large and small, and for-profit, non-profit, or state-run—need to know the law by incorporation to ensure their tests comply with the 2010 Regulation to avoid potential liability and the loss of funding.

38.     A school and its administrators could face serious penalties if it misrepresents that the test it used complies with the 1999 Standards. *See* 34 C.F.R. § 668.146. The colleges and trade schools that want to enroll students financed by ATB/Title IV money get some immunity from responsibility for a non-compliant test by the terms of 34 CFR 668.154, but could violate other applicable Department regulations if they certified compliance with ATB requirements based on a test that was not compliant with the 1999 Standards. In a comparable matter, the CEO of for-profit Fast Train College in Florida was convicted in late 2015 of conspiracy to steal government money because he falsely certified that many of his students were high school graduates. Becker Decl., ¶ 13, Ex. 47 (Press release, FastTrain Owner and Admissions Representative Convicted of Federal Student Aid Scheme, https://www.fbi.gov/miami/press-releases/2015/fasttrain-owner-and-admissions-representative-convicted-of-federal-student-aid-scheme). The Justice Department has also sued FastTrain under the False Claims Act for this conduct. Becker Decl., ¶ 14, Ex. 48 (*U.S. vs. FastTrain II Corp.*, complaint, http://www.justice.gov/sites/default/files/usao-sdfl/legacy/2014/12/03/141203-01.FasttrainIICorpCaseComplaint.pdf). The Department of Education also can cut off Title IV money and impose civil fines if it concludes that a college has made "a substantial misrepresentation about the nature of its educational program, its financial charges, or the employability of its graduates." 34 CFR Part 668, Subpart F.

1.    **Two Sections of the Code of Federal Regulations Incorporate the Complete 1999 Standards into Law.**

39.    The Department of Education incorporated by reference the entire 1999 Standards document, referring to complete document in its incorporating text.  That incorporation states, in full:

> (6) Meet all standards for test construction provided in the 1999 edition of the *Standards for Educational and Psychological Testing,* prepared by a joint committee of the American Educational Research Association, the American Psychological Association, and the National Council on Measurement in Education incorporated by reference in this section. Incorporation by reference of *this document* has been approved by the Director of the Office of the Federal Register pursuant to the Director's authority under 5 U.S.C. 552(a) and 1 CFR part 51. The *incorporated document* is on file at the Department of Education, Federal Student Aid, room 113E2, 830 First Street, NE., Washington, DC 20002, phone (202) 377–4026, and at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 1–866–272–6272, or go to: *http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html.* The *document* also may be obtained from the American Educational Research Association at: *http://www.aera.net;*

34 C.F.R. § 668.146(b)(6) (emphasis added); *see also* 34 C.F.R. § 668.148(a)(1)(iv) (incorporating entire document with identical incorporation language).

40.    Additionally, a third portion of the C.F.R. incorporates the 1999 Standards in a manner that does not explicitly refer to the document as a whole, and is instead ambiguous in scope.

> (c)(1) The test must meet *all applicable and feasible standards for test construction and validity* provided in the 1999 edition of the *Standards for Educational and Psychological Testing,* prepared by the Joint Committee on Standards for Educational and Psychological Testing of the American Educational Research Association, the American Psychological Association, and the National Council on Measurement in Education incorporated by reference in this section. *The Director of the Federal Register approves this incorporation by reference* in accordance with 5

13

U.S.C. 552(a) and 1 CFR part 51. You may obtain a copy from the American Psychological Association, Inc., 750 First Street, NE., Washington, DC 20002. You may inspect a copy at the Department of Education, room 11159, 550 12th Street, SW., Washington, DC 20202 or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call (202) 741–6030, or go to: *http://www.archives.gov/federal_register/code_of_federal_regulati ons/ibr_locations.html.*

(2) If requested by the Secretary, a test publisher must explain why it believes that certain standards in the 1999 edition of the *Standards for Educational and Psychological Testing* were not applicable or were not feasible to meet.

…

(f) For a test that has been modified for individuals with disabilities, the test publisher must—

(1) Provide documentation that it followed the guidelines provided in the Testing Individuals With Disabilities section of the 1999 edition of the *Standards for Educational and Psychological Testing;…*

34 C.F.R. § 462.13(c)(1)-(2) and (f)(1).

41.     34 C.F.R. § 462.13(c)(1)-(2) broadly refers to "all applicable and feasible standards for test construction and validity provided in the 1999 edition of the *Standards for Educational and Psychological Testing,*" and then states that "[t]he Director of the Federal Register approves this incorporation by reference."  It does not refer to the whole document, as in the examples above, nor does it specify which portions of the 1999 Standards constitute "all applicable and feasible standards for test construction and validity."  Yet the following subsection, (c)(2), implies that it is incumbent on the test publisher to be familiar with the 1999 Standards as a whole and be prepared to justify why it has not followed a particular standard: "If requested by the Secretary, a test publisher must explain why it believes that certain standards in the 1999 edition of the

*Standards for Educational and Psychological Testing* were not applicable or were not feasible to meet."

42.     To the extent that this incorporation might be construed as referring only to Part I of the 1999 Standards (titled "Test Construction, Evaluation, and Documentation"), the ambiguity is further complicated by the following subsection, which specifically references a chapter from Part II of the 1999 Standards, stating: "(f) For a test that has been modified for individuals with disabilities, the test publisher must—(1) Provide documentation that it followed the guidelines provided in the Testing Individuals With Disabilities section of the 1999 edition of the *Standards for Educational and Psychological Testing;…*"  34 C.F.R. § 462.13(f)-(f)(1).

### 2.     New York Incorporated the Complete 1999 Standards into State Law, with Plaintiffs' Permission

43.     State and local law may also incorporate standards.  For example, New York state law incorporates the 1999 Standards at 8 CRR-NY 30-2.2 (defining "Testing Standards" as the 1999 Standards), 8 CRR-NY 30-2.4 (requiring evaluations of teachers and principals to comply with the 1999 Standards), 8 CRR-NY 30-2.5 (requiring evaluations of teachers and principals to comply with the 1999 Standards), and 8 CRR-NY 30-2.8 (same).

44.     On May 11, 2011, Gerald Sroufe, AERA's Director of Government Relations for Plaintiff AERA, gave Plaintiffs' consent to New York's incorporation by reference of the *complete* 1999 Standards, further agreeing that when New York provides "a photocopy of *all or any part* of the Standards upon request of any person," that such copying is "*a fair use* of the Standards and that such use will not violate the copyright interest [that Plaintiffs claim to hold in the 1999 Standards]."  Becker Decl., ¶ 9, Ex. 43 (AERA_APA_NCME_0032528) (emphases added).

45.     In an internal memorandum, Plaintiff APA has also acknowledged that the complete 1999 Standards document was incorporated by reference into law.  Becker Decl. ¶ 10, Ex. 44 (Plaintiff APA's memorandum titled "Litigation Report," dated August 8, 2014).

**B.     Drafting and Publication**

**1.     The Drafters were Volunteers Without a Copyright Incentive**

46.     The Plaintiffs provide a framework by which a committee of volunteers—industry representatives, academics, and other technical experts—weigh proposals for appropriate methods, processes, procedures, specifications, and other standards on the subject of testing.  Becker Decl. ¶ 16, Ex. 49 (Schneider Depo.) 90:5–10; Dkt. 68-29 at 5-8; Dkt. 60-2 ¶ 10, Plfs. original Stmt. of Facts ("All members of the Joint Committee(s) and the Management Committee(s) are *unpaid* volunteers") (emphasis in original).  Volunteer committee members suggest and evaluate both new language and revise language, weighing and implementing language proposals from federal, state, and local government employees, academics, and others.  Becker Decl. ¶ 16, Ex. 49 (Schneider Depo.) at 34:2-22, 35:18-36:2; Dkt. 68-29 at 5-8.  They debate the scope, structure, and wording of standards, working to consensus on the final form to reflect either minimally acceptable or best industry practices using the most precise, scientific terms possible.  Becker Decl. ¶ 16, Ex. 49 (Schneider Depo.) at 176:23-177:6.  Plaintiffs' employees facilitate that process, but they do not author the standards or control the final content.  Becker Decl. ¶ 17, Ex. 50 (Ernesto Depo.) at 34:2-22.

47.     ██████████████████████████████████████████████████████ ███████  Becker Decl., ¶ 21, Ex. 54 (Geisinger Depo.) 159:1–161:17.

**a.     No Copyright Revenue to Volunteers who Wrote the Standards**

48.     The drafters of the 1999 Standards received no pay for their work.  Becker Decl., ¶ 17, Ex. 50 (Ernesto Depo.) at 234:2-235:21.  Instead, their motivation rested upon professional

and public interests, including advancing the field of testing and education, and obtaining professional recognition. Becker Decl. ¶ 16, Ex. 49 (Schneider Depo.) at 176:23-177:6; Becker Decl., ¶ 21, Ex. 54 (Geisinger Depo.) 219:1–5.  Despite jointly drafting the 1999 Standards, they have never received any proceeds from the sale of that document.  Becker Decl. ¶ 17, Ex. 50 (Ernesto Depo.) at 234:24-235:11.  When Plaintiffs began preparing this lawsuit and realized that they had not obtained copyright assignments, and they belatedly sought assignments from the remaining living drafters and their heirs, they provided no compensation for the assignments. Becker Decl. ¶ 17, Ex. 50 (Ernesto Depo.) 42:11–22; 81:03–82:14; 85:19–87:03; 124:12–127:12; 141:25–13.

      **C.**    **The 1999 Standards Are Obsolete as Standards but Still Current as Binding Law**

     49.     In 2014, Plaintiffs adopted a new set of Standards as state of the art for the industry. Since then, Plaintiffs "expressly discourage the use of the 1999 Standards," state that they "would not want the 1999 Standards to be used" now that the 2014 Standards are available, and further state that the 1999 Standards "should not be purchased except for scholarly study."  Mot. at 29.

     50.     But the 1999 Standards—not the 2014 Standards—are current and binding law. And Plaintiffs admit that "the 1999 Standards continue to have value for those [who] . . . believe they still may be held accountable to the guidance of the 1999 Standards.  Plf. SMF ¶ 14.  After counsel for Public Resource asked Plaintiffs why the 1999 Standards were no longer available for sale, Plaintiffs resumed sale of the 1999 Standards—but only in a more cumbersome, mail-order channel.  Becker Decl. ¶ 17, Ex. 50 (Ernesto Depo.) at 203:15–207:10, 208:20–209:11; Becker Decl. ¶ 19, Ex. 52 (Levine Depo. I) at 42:12–23; *compare* "Standards for Educational & Psychological Testing (2014 Edition)," AERA, at http://www.aera.net/Publications/Books/StandardsforEducationalPsychologicalTesting%28New

Edition%29/tabid/15578/Default.aspx      *with*      "1999      Standards,"      AERA,      at

http://www.aera.net/Publications/Books/Standards%281999Ed%29/tabid/16144/Default.aspx.

51.     Plaintiffs report that, after restoring the 1999 Standards to the marketplace, "sales

of the 1999 Standards have been near nil."  Plfs. Mot. at 29, n.8.  In fact, Plaintiffs sold only ▮

▮ copies in 2015, and they ▮▮▮▮▮ in 2016 or 2017, even though Public

Resource was subject to an injunction and did not have the 1999 Standards online at that time.

Becker Decl., ¶ 2, Ex. 36 (Levine Depo. II) at 43:21-44:6; Becker Decl. ¶ 5, Ex. 39 (1999 and 2014

Standard sales figures) at 0000007 (listing 1999 Standards revenues are under "Publication

Income," while listing 2014 Standards revenues are under "Book Royalty Revenues"). But in 2018

once Public Resource restored the 1999 Standards to the Internet Archive website after the D.C.

Circuit vacated the injunction, sales of the 1999 Standards showed a modest uptick and were the

highest they had been since Plaintiffs first removed the 1999 Standards from sale. *Id.*

52.     Apart from filings in this lawsuit, Plaintiffs have never made an electronic version

of the 1999 Standards available to the public, nor do they plan to, and they have not published any

other versions of the 1999 Standards that would be accessible to people who are blind or visually

disabled. Plfs SMF ¶ 11.  But, Plaintiffs included an unsealed complete version of the 1999

Standards in their summary judgment filing (ECF No. 134-4) and in their previous summary

judgment filing (ECF No. 60-25–26), which are now available for download to the public for a $3

or $6 fee to PACER, respectively.  (PACER charges $0.10 per page, but caps charges at $3.00 per

document, so it would cost $6.00 to download a complete version of the 1999 Standards from

PACER. *See* "Electronic Public Access Fee Schedule," Pacer.gov, Dec. 1, 2013, at

https://www.pacer.gov/documents/epa_feesched.pdf.)

53.     The earlier public filing of the 1999 Standards is also available for free on RECAP and can be downloaded here:   https://www.courtlistener.com/docket/4212743/60/25/american-educational-research-association-inc-v-publicresourceorg/;

https://www.courtlistener.com/docket/4212743/60/26/american-educational-research-association-inc-v-publicresourceorg/.  The more recent filing may similarly become available for free in the future.   RECAP is a service by the Center for Information Technology Policy at Princeton University and the Free Law Project, through which member of the public can access PACER documents for free. Once an individual who has RECAP on her computer accesses a document on PACER, RECAP uploads the document to its system and makes it available to the public for free, through the RECAP website or browser plugin. *See* "About," RECAP the Law, at https://www.recapthelaw.org/about/.

54.     In the past, Plaintiffs stopped selling the earlier edition of the Standards for Educational and Psychological Testing when they published a new edition.  Becker Decl., ¶ 21, Ex. 54 (Geisinger Depo.) at 101:15–19.  After publishing the 1999 Standards, Plaintiffs stopped selling the 1985 edition. Becker Decl., ¶ 17, Ex. 50 (Ernesto Depo.) at 212:16–21. In 2000, Plaintiffs recalled copies of the 1985 Standards, and stated that the old stock of Standards was supposed to be destroyed. This is Plaintiffs' practice after publishing a new edition of the Standards. Becker Decl., ¶ 19, Ex. 52-5 (Levine Depo. I) at 79:23–84:11; 84:15–88:22; 90:21–92:07; 97:17–99:24; Dkt. 70-34 (Levine Ex. 1197); Dkt. 70-35 (Levine Ex. 1198); Dkt. 70-36 (Levine Ex. 1200). This is even though the 1985 Standards were incorporated by reference into law under 34 C.F.R. 668.146 from July 1, 1996 until they were replaced by the 1999 Standards that were incorporated into law in 2011. *See* 60 Federal Register 61830–61844, Vol. 60, No. 231, Dec. 1, 1995, available at https://www.gpo.gov/fdsys/pkg/FR-1995-12-01/pdf/95-29125.pdf.

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████  Becker Decl., ¶ 17, Ex. 50 (Ernesto Depo.) at 206:14–208:4.

55.     Plaintiffs put the 1999 Standards on sale once more in July 2015 only after Public Resource's counsel raised the issue at deposition in April and May of that year.  Plfs. Mem. at 11; Becker Decl., ¶ 17, Ex. 50 (Ernesto Depo.) at 203:15–207:10, 208:20–209:11; Becker Decl., ¶ 19, Ex. 52 (Levine Depo. I) at 42:12–23.

56.     ██████████████████████████████████████

██████████████████████████████████████████  Dkt. 70-37 (Levine Ex. 1205); Dkt. 70-38 (Levine Ex. 1207); Dkt. 70-39 (Levine Ex. 1208); Dkt. 70-40 (Levine Ex. 1211); Dkt. 70-5 (Levine Depo.) at 120:06–121:18; 148:02–149:05. Plaintiffs' financial data provides the following image of sales oscillation for the 1999 Standards:

| Year | Revenue | % Change | Units Sold | % Change |
|---|---|---|---|---|
| FY 2000 | ██ | | 3,797 | |
| FY 2001 | ██ | | 3,755 | -1.11% |
| FY 2002 | ██ | | 5,592 | 48.92% |
| FY 2003 | ██ | | 3,310 | -40.81% |
| FY 2004 | ██ | | 3,218 | -2.78% |
| FY 2005 | ██ | | 3,803 | 18.18% |
| FY 2006 | ██ | | 3,888 | 2.24% |
| FY 2007[1] | ██ | | 3,077 | -20.86% |
| FY 2008 | ██ | | 3,358 | 9.13% |
| FY 2009 | ██ | | 2,590 | -22.87% |
| FY 2010 | ██ | | 3,043 | 17.49% |
| FY 2011 | ██ | | 2,132 | -29.94% |
| FY 2012 | ██ | | 1,649 | -22.65% |
| FY 2013 | ██ | | 1,732 | 5.03% |

[1] ████████████████████████████████████████
█████████████████  Public Resource was unable to determine a continuous annual sales trend because Plaintiff did not produce monthly sales information.

| Year | Revenue | % Change | Units Sold | % Change |
|------|---------|----------|------------|----------|
| FY 2014 | ████████████████ | | 855 | -50.64% |

57.     Dr. Felice J. Levine, AERA's executive director and a deposition witness

representing all Plaintiffs, attributed the ███████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████    Becker Decl., ¶ 19, Ex. 52 (Levine Depo. I) at

141:19–142:08. ████████████████████████

████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████    Becker Decl., ¶ 19, Ex. 52 (Levine Depo. I) at

114:9–17.  See also Mot. at 25, n. 14 (conceding that the decline of Plaintiffs' sales of the 1999

Standards was "coincident with the market arguably becoming saturated, and publication of the

revised and updated version of the Standards, the 2014 Standards, becoming imminent").

58.     Plaintiffs' expert, ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████. Dkt. 60-88

(Geisinger Decl.) at ¶ 25; Becker Decl., ¶ 21, Ex. 54 (Geisinger Depo.) at 93:20–97:04. ████████

████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████. Becker Decl., ¶ 21, Ex. 54 (Geisinger Depo.) at 93:20–

94:7; 95:6–21. ████████████████████████████████████████████████████████████████████

██████████████████████████████████" Becker Decl., ¶ 21, Ex. 54 (Geisinger Depo.) at 94:2–7.

59.     ████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██ ar. Dkt. 70-37 (Levine Ex. 1205); Dkt. 70-38 (Levine Ex. 1207); Dkt. 70-39 (Levine Ex. 1208);

Dkt. 70-40 (Levine Ex. 1211); Becker Decl., ¶ 19, Ex. 52 (Levine Depo. I) at 120:06–121:18;

135:11–137:03; 138:08–140:18; 148:02–149:05.

60.     Sales of the 2014 Standards have been as robust as sales of the 1999 Standards were

upon launch, years before Public Resource's activities.  The first five years of sales of the 2014

Standards are almost identical to the first five years sale of the 1999 Standards. *Compare* Becker

Decl., ¶ 5, Ex. 39 (AERA_APA_NCME_RFP2_0000025 ████████████████████████

████████████████ ) *with* Becker Decl., ¶ 4, Ex. 38 (AERA_APA_NCME_RFP2_0000027

███████████████████████████████████████ )).  That amounts to ████████

██████████████████████ And sales of the 2014 Standards have increased since

Public Resource put the 1999 Standards back online in mid-2018.  Becker Decl., ¶ 5, Ex. 39

(AERA_APA_NCME_RFP2_0000025) (sales in 2018 and first four months of 2019 higher than

prior comparable periods).

61.     The record, including Plaintiffs' own sales figures, shows no lost sales attributable

to Public Resource.  Becker Decl. ¶ 26, Ex. 58 (sales figures); Becker Decl. ¶ 28, Ex. 60 (sales

figures); Becker Decl. ¶ 29, Ex. 61 (sales figures); Becker Decl. ¶ 27, Ex. 59 (sales figures); Becker

Decl. ¶ 19, Ex. 52 (Levine Depo. I) at 14-15, 17-20; Becker Decl. ¶ 21, Ex. 54 (Geisinger Depo.)

at 4-5.

62.     Plaintiffs claim the right to take the 1999 Standards *back off sale* at will. Dkt. 60-1 at 18 (AERA asserting it took the 1999 Standards off sale "to encourage sales of the newly-revised edition—the 2014 Standards"); Dkt. 14 ¶¶ 14, 19; Becker Decl. ¶ 17, Ex. 50 (Ernesto Depo.) at 222:02-223:05.

63.     Plaintiffs argue that the version of the 1999 Standards posted to Public Resource's website was "accessed" 4,164 times, while the version posted to the Internet Archive was "accessed" 1,290 times before 2016, and as of September 11, 2019 was "viewed" 1,445 times. Plf. SMF ¶¶ 64, 69. As an initial matter, an "access" or a "view" of a document on a website does not mean that a person sitting at a computer visited that webpage and read the contents. Any number of those "accesses" or "views" may be automated web crawling programs, such as what Google and other companies use to ensure accurate and immediate web searches based on key words, or cache web pages, or perform other technical functions. Likewise, these are not "unique" page views; each time a person refreshed or reloaded the page, it would increment the view count, further complicating any ability to equate page views with lost sales. Mr. Malamud defined "access" to imply that a computer, not necessarily a human being, but a computer has requested some data from another computer, and that request was successful and the data was transferred. Becker Decl. ¶ 23, Ex. 56 (Malamud Depo.) 146:19–147:4. The operator of a website can observe and log instances where a device on the Internet accesses data on the website. Id at 328:17–329:16. A website operator has no way of knowing whether any access to data resulted in a reproduction being made, just as a library has no way of knowing whether a patron made photocopies of a book while borrowing it. Dkt. 70-72 at § 4.3 ("Internet Engineering Task Force Request for Comments 7231, "Hypertext Transfer Protocol (HTTP/1.1): Semantics and Content" (June 2014).").

23

Therefore, Public Resource did not have any way of knowing whether visitors to its sites were making copies.

## IV.     PUBLIC RESOURCE AND CARL MALAMUD

### A.     Carl Malamud's Record of Public Service

64.     Carl Malamud is the President and Founder of Public Resource.  Since the 1980's, Mr. Malamud has dedicated his career to matters of public interest with a focus on Internet connectivity and public access.  Mr. Malamud's career began as a Senior Systems Analyst at Indiana University.  After completing his doctoral coursework with a focus on antitrust and regulation at the Indiana University School of Business, Mr. Malamud left the program to work on early relational database programs and computer networking. Declaration of Carl Malamud in Support of Public Resource's Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment ("Malamud Decl") ¶ 3.  In 1984, Mr. Malamud assisted the Board of Governors of the Federal Reserve System in using computer and network technology to improve key indicators such as forecasts of the money supply.  Malamud Decl. ¶ 4.  Throughout the rest of the 1980's Mr. Malamud continued his public service as a computer consultant to the Argonne and Lawrence Livermore National Laboratories and the Department of Defense as well as teaching advanced seminars in relational databases and computer networks. Malamud Decl. ¶ 5. In 1993, Mr. Malamud founded the first radio station on the Internet, which he ran as a 501(c)(3) nonprofit public station. Malamud Decl. ¶ 6.

65.     In January 1994, Mr. Malamud began to make government and legal materials more widely available to the public.  Using a National Science Foundation grant, he purchased all electronic filings corporations submitted to the Securities and Exchange Commission (SEC) and created the Electronic Data Gathering and Retrieval (EDGAR) service, which he made available for free on the Internet. Malamud Decl. ¶ 7. In August 1995, he donated computers and software

24

to the SEC so the Commission could take over this service. *Id*. The SEC continues to operate this popular service, and reports that the system processes about 3,000 filings per day and 3,000 terabytes of data annually. *See* "About EDGAR," https://www.sec.gov/edgar/aboutedgar.htm.

66.     Also in 1994, Mr. Malamud obtained the first "new media" credentials from the Radio-TV Gallery of the U.S. House of Representatives and started live-streaming all proceedings from the floors of the House and Senate. Malamud Decl. ¶ 9. He later assisted the Joint Economic Committee in hosting the first congressional hearing on the Internet. Malamud Decl. ¶ 10. That year, Mr. Malamud also purchased feeds of all U.S. patents and made them available for free on the Internet, and later convinced the U.S. Patent and Trademark Office to provide this service to the public itself. Malamud Decl. ¶ 12.

67.     Throughout the 2000s, Mr. Malamud continued his mission of making government information more accessible to the public.  In 2005 and 2006, Mr. Malamud was the Chief Technology Officer for the non-profit education organization Center for American Progress. While there, he focused on developing a plan to make all congressional hearing available to the public as high-resolution video. Malamud Decl. ¶ 13. And, in 2007, Mr. Malamud founded Public Resource.  Through Public Resource, Mr. Malamud has spearheaded successful efforts to make government records and information publicly accessible. Malamud Decl. ¶ 14.

68.     In January 2009, President Barack Obama's transition effort recruited Mr. Malamud to develop plans and assist with transforming the Federal Register.  The resulting program won the first-ever Walter Gellhorn Award for innovation in government services by the Administrative Conference of the United States. The Archivist of the United States, Hon. David Ferriero, recognized Mr. Malamud's efforts in a letter dated April 2, 2019, stating: "Our Founding

Fathers believed that an informed and involved citizenry was key to our democracy and Public Resource helps us make[] this true." Malamud Decl. ¶ 22.

69.     Mr. Malamud has been recognized by numerous government officials for his efforts to make government information freely accessible on the Internet.  For example, Hon. Nancy Pelosi, Speaker of the House of Representatives, wrote to Mr. Malamud on April 17, 2008, stating: "I thank you for your work to increase public discourse on technology, public domain, and transparency issues and look forward to continuing to work with you." Malamud Decl. ¶ 13. Hon. John Boehner, then Speaker of the House of Representatives, together with Representative Darrell Issa, Chair of the House Committee on Oversight and Government Reform, wrote to Mr. Malamud on January 5, 2011, stating: "We're writing today to thank you for your nearly two decades of work to increase the availability of public data, and more recently your efforts to publish proceedings of the House Oversight and Government Reform Committee in their entirety," and later recognized Public Resource from the floor of the House. Malamud Decl. ¶ 15. Mr. Malamud has also received commendations from Hon. Lee H. Rosenthal, Chair of the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States, and many others. Malamud Decl. ¶ 18.

70.     In addition to recognition from government officials, organizations have routinely recognized Mr. Malamud's efforts to make government information more accessible, including awards from Harvard University, the Society of Professional Journalists, the First Amendment Coalition, and the American Association of Law Libraries. Malamud Decl. ¶ 23.

**B.     Public Resource's Mission**

71.     Public Resource is a non-profit charitable organization that provides online access to many kinds of government materials, from judicial opinions to video recordings of congressional hearings.  Becker Decl. ¶ 32, Ex. 64 (2016 Malamud Decl.) ¶¶ 8-14; Malamud Decl.,

¶ 1.  As part of this mission, Public Resource operates a website providing public access to the law, including statutes, judicial opinions, and public safety and other standards that federal and state governments have incorporated into law by reference.  Becker Decl. ¶ 32, Ex. 64 (2016 Malamud Decl.) ¶¶ 8-25.  Public Resource also contributes its materials to the Internet Archive. *Id.*

72.     Public Resource aims to create a public collection of *government edicts*. Malamud Decl. ¶ 38; *see generally* http://www.public.resource.org/.

73.     Public Resource does not limit, or charge for, access to its platform.  Becker Decl. ¶ 32, Ex. 64 (2016 Malamud Decl.) ¶ 24.  It does not display, or derive any revenue from, advertising.  It relies entirely on contributions and grants.  Becker Decl. ¶ 32, Ex. 64 (2016 Malamud Decl.) ¶ 30.

74.     Public Resource promotes public discourse by making laws and regulations, including those incorporated by reference, more accessible.  For example, by reformatting documents, Public Resource allows persons with visual disabilities to enlarge the text or use electronic text-to-speech readers to hear the text.  Becker Decl. ¶ 30, Ex. 60 (Fruchterman expert report) at 8-16.  Similarly, Public Resource often translates images into scalable vector graphics for better enlargement.  *Id.*  It uses optical character recognition and often painstakingly retypes documents into Hypertext Markup Language ("HTML") and converts formulas to Mathematics Markup Language ("MML").  *Id.*  This makes documents newly word-searchable and allows researchers to analyze them at large scale with techniques such as machine learning.  Becker Decl. ¶ 32, Ex. 64 (2016 Malamud Decl.) ¶¶ 16-17, 25-28.

75.     Public Resource endeavors to post on its website only standards that have become a federal or state law or regulation through incorporation by reference. Becker Decl. ¶ 36, Ex. 64 (2016 Malamud Decl.) ¶¶ 4, 20, 24.

**C.      Public Resource's Litigation and Other Disputes**

76.     In January 2013, the Sheet Metal and Air Conditioning Contractors National Association (SMACNA) threatened Public Resource with litigation for posting the "HVAC Air Duct Leakage Test Manual," which was incorporated by reference into 10 CFR § 434.403 as well as incorporated into state regulations.  Malamud Decl., ¶ 33.

77.     Public Resource sued for declaratory relief in the U.S. District Court for the Northern District of California, Case 3:13-cv-00815. Malamud Decl., ¶ 34.  On July 9, 2013 SMACNA agreed to a stipulated judgment in which it agreed no longer to threaten Public Resource or other parties for the posting of the four standards explicitly incorporated into the CFR, not to assert copyright in those documents, and to pay Public Resource a token one dollar. *See* Malamud Decl., ¶ 34, Ex. 27.

78.     When the State of Oregon objected to Public Resource's posting of the Oregon Revised Statutes, Carl Malamud spoke to the Legislative Counsel Committee, a joint committee of the Oregon Legislature chaired by the Speaker of the House and the Senate President. After hearing him and other witnesses, including the Legislative Counsel, the committee voted to abandon assertions of copyright over the Oregon Revised Statutes.  *See* Malamud Decl., ¶ 24, Ex. 23.

79.     Similarly, in 2012, after Public Resource posted the official Code of the District of Columbia, the General Counsel of the District of Columbia studied the situation and decided to produce a better web site for public access to the laws of the District of Columbia. The software is

maintained by the non-profit Open Law Library and available at https://code.dccouncil.us/.  *See* Malamud Decl., ¶ 25.

80.     The State of Georgia sued Public Resource for posting online the Official Code of Georgia Annotated.  Malamud Decl., ¶ 26.  That case concerns Georgia's only official law, which the state publishes as the "Official Code of Georgia Annotated" with annotations that the state has designated as "official."  The Eleventh Circuit held that Public Resource's actions were lawful: it ruled the entire Code, with annotations, is a government edict not subject to copyright. *See Code Revision Commission v. Public.Resource.Org*, 906 F.3d 1229, 1233, 1244 (11th Cir. 2018).  That case is now before the U.S. Supreme Court. *See State of Georgia v. Public.Resource.Org, Inc.*, U.S. Supreme Court Docket 18-1150. *Id.*, ¶ 26.

81.     Mr. Malamud and Public Resource posted to the Internet Archive the version of the 2002 version of the National Electrical Safety Code (NESC) that the Indiana Supreme Court reviewed in *Bellwether Properties, LLC, v. Duke Energy Indiana, Inc.*, 87 N.E.3d 462, 468–69 (Ind.        2017),        which        is        located        at https://ia600704.us.archive.org/16/items/gov.law.ieee.c2.2002/ieee.c2.2002.pdf.    Malamud Decl. ¶ 42. The metadata page for the 2002 version of the NESC indicates that it was "Uploaded by Public.Resource.Org,"       *see*       https://archive.org/details/gov.law.ieee.c2.2002       and https://ia600704.us.archive.org/16/items/gov.law.ieee.c2.2002/ieee.c2.2002.pdf_meta.txt. *Id*.

Dated: November 8, 2019    Respectfully submitted,

       */s/   Andrew P. Bridges*
       Andrew P. Bridges (admitted)
       abridges@fenwick.com
       Matthew B. Becker (admitted *pro hac vice*)
       mbecker@fenwick.com
       Armen N. Nercessian (pending *pro hac vice*)
       anercessian@fenwick.com
       Shannon E. Turner (pending *pro hac vice*)
       sturner@fenwick.com
       FENWICK & WEST LLP
       801 California Street
       Mountain View, CA 94041
       Telephone:   (650) 988-8500
       Facsimile:   (650) 938-5200

       Corynne McSherry (admitted *pro hac vice*)
       corynne@eff.org
       Mitchell L. Stoltz (D.C. Bar No. 978149)
       mitch@eff.org
       ELECTRONIC FRONTIER FOUNDATION
       815 Eddy Street
       San Francisco, CA 94109
       Telephone:   (415) 436-9333
       Facsimile:   (415) 436-9993

       David Halperin (D.C. Bar No. 426078)
       davidhalperindc@gmail.com
       1530 P Street NW
       CSRL 2nd Floor
       Washington, DC 20005
       Telephone: (202) 905-3434

       *Attorneys for Defendant-Counterclaimant*
       Public Resource, Inc.