# EXHIBIT 44

**MEMORANDUM**

TO:          American Psychological Association Council of Representatives

FROM:        Nathalie F.P. Gilfoyle, General Counsel

DATE:        August 8, 2014

SUBJECT:     Litigation Report

The following describes the nature and status of current litigation in which APA has been engaged, either as a party or as *amicus curiae*, since the February 2014 meeting of Council.  This is not a privileged communication.

I.  APA AS A PARTY
NEW DEVELOPMENTS SINCE FEBRUARY 2014

A.     AERA/APA/NCME v. Public.Resource.Org, Inc. – (U.S. District Court for the District of Columbia) - AERA, APA and NCME jointly publish and own the copyright on the *Standards for Educational and Psychological Testing* under a Management Agreement and have done so since 1985.

In December 2013, a full scanned version of the Standards was discovered on the website of Public.Resource.Org, Inc.  (https://law.resource.org/pub/us/cfr/ibr/001/aera.standards.1999.pdf) a website that seeks to provide all government publications and citations from government documents to the public.  It is owned and operated by Carl Malamud.  AERA sent Mr. Malamud a letter asking him to take down the Standards from the PublicResource.org website, which he refused to do.  Mr. Malamud's position is that because the Standards are incorporated by reference in government regulations, anyone has the right to publish the full text version of the Standards without permission of the copyright holders.

The Standards were incorporated by reference by the Department of Education into regulations under *Title 34: Education, Part 668-Student Assistance General Provisions, Subpart J-Approval of Independently Administered Tests: Specification of Passing Score; Approval of State Process* as follows:

**§668.148  Additional criteria for the approval of certain tests.**
    (a) In addition to satisfying the criteria in §668.146, to be approved by the Secretary, a test must meet the following criteria, if applicable:
    (1) In the case of a test developed for a non-native speaker of English who is enrolled in a program that is taught in his or her native language, the test must be—
    (iv) Developed in accordance with guidelines provided in the 1999 edition of the "Testing Individuals of Diverse Linguistic Backgrounds" section of the *Standards for Educational and Psychological Testing* prepared by a joint committee of the American Educational Research Association, the American Psychological Association, and the National Council on Measurement in Education incorporated by reference in this section. Incorporation by reference of this document has been approved by the Director of the Office of the Federal Register pursuant to the Director's authority under 5 U.S.C. 552(a) and 1 CFR part 51. The incorporated document is on file at the Department of Education, Federal Student Aid, room 113E2, 830 First Street, NE., Washington, DC 20002, phone (202) 377-4026, and at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 1-866-272-6272, or go to:

http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html. The
document also may be obtained from the American Educational Research Association at:
http://www.aera.net;

The AERA, APA and NCME assert that Public.Resource.Org, Inc. has no right to post their
copyrighted work without permission.

AERA, APA and NCME concluded that it was essential to protect their copyright in the Joint
Standards and on May 23, 2014 filed a complaint in federal district court in D. C. seeking both a
declaratory judgment and injunctive relief requiring the removal of the book from the website.  In
response to the lawsuit, Public.Resource.Org, Inc. voluntarily removed the standards from its website,
pending the court's disposition of the law suit.  They maintain their position that the DOE reference to the
Test Standards effectively voids the copyright and allows publication of the Test Standards by anyone.

Legal fees for this infringement action will be paid from the Standards Fund, which is comprised
of revenue from the sales of the Test Standards and is administered by AERA, which serves as
Publisher of the Test Standards.

Because this case is in active litigation, any further discussion of the case would need to occur in
an executive session. The court order that is under appeal is posted on the COR teamsite. Public
communications about the lawsuit are handled by Rhea Farberman (rfarberman@apa.org).

B.    In re APA Assessment Fee Litigation – (U.S. District Court for the District of Columbia)
Beginning in late 2010 several class action lawsuits were filed in federal court in Washington,
D.C. alleging that the manner in which the practice assessment had been billed was actionable under a
variety of legal theories. These actions were consolidated in February, 2011 and a single putative class
action complaint against APA and APAPO was then filed.   As a general matter, the consolidated
complaint alleged that APA and APAPO deceptively stated that the practice assessment was a
"mandatory" payment.  The complaint asserted that APA and APAPO were unjustly enriched and
violated California's consumer protection statute.  Among other things, the complaint sought
disgorgement of all practice assessment monies paid since 2001.

APA and APAPO filed a motion to dismiss the lawsuit on March 2, 2011 asserting that  the
complaint failed to set forth facts to support its conclusory assertions that the statements in the APA dues
forms were false or misleading; that dismissal of the unjust enrichment count was appropriate because it
is an established legal doctrine that disputes with members are governed by contract principles and
equitable claims such as unjust enrichment are therefore not available; and that the California statutory
claims were improper under established "choice of law" principles, which require application of District
of Columbia law, which expressly exempts from consumer protection claims any action against a
membership organization arising out of "membership services," which includes disputes about dues
statements.

On May 30, 2012, the court issued an order granting APA and APAPO's motion to dismiss the
complaint. Because leave to amend complaints is liberally given, the court allowed plaintiffs to file a
motion for leave to amend the complaint but required the plaintiffs to demonstrate that any alternative
claims would not be "futile."  On July 2, 2012, plaintiffs filed a motion seeking leave to amend their
complaint to add claims of 1) fraudulent misrepresentation; 2) rescission; and 3) negligent
misrepresentation.  On August 2, 2012, APA and APAPO filed an opposition asserting that 1) the dues
statements did not misrepresent the effect on APA membership of non-payment of the practice
assessment and that, as a legal matter, the plaintiffs failed to  meet the legal standard for fraudulent
misrepresentation; 2) the contract relationship between APA and its members precludes these claims; and

3) rescission and negligent misrepresentation claims fail because the plaintiffs received services from APAPO in exchange for their assessment payments and there was no economic loss.

On February 4, 2013, the court issued an order granting APA and APAPO's opposition to the motion to amend and dismissing the complaint with prejudice. The court found that given the totality of information that was available to members on the dues form and in the bylaws, as a matter of law the plaintiffs could not show reasonable reliance on one sentence in the dues statement. Absent a showing of reasonable reliance the misrepresentation claims fail. The court also found that rescission of the member contracts and repayment of the practice assessment, which plaintiffs sought, was legally barred because the contracts with APAPO had been fully performed, making it legally impossible to equitably return the parties to the pre-contract status quo.

The plaintiffs have appealed the trial court rulings. On March 27, 2013, another plaintiff, Ira Grossman, filed a separate putative class action complaint in the U.S. District Court for the Southern District of California. Mr. Grossman is represented by the same counsel representing the plaintiffs in the consolidated D.C. action. Mr. Grossman purports to represent a putative class comprised of all individuals in California who paid the Practice Assessment in connection with their APA dues after 2000. The substantive allegations in the Grossman complaint are substantially similar to those contained in the consolidated D.C. action. The Grossman complaint seeks to asserts claims for (1) unjust enrichment and constructive trust; (2) violation of California's Unfair Competition Law ("UCL") § 17200 (Unfair Business Act); (3) violation of California's UCL § 17200 (Unlawful Business Act); (4) violation of California's UCL § 17200 (Fraudulent Business Act); (5) violation of California's False Advertising Law § 17500; (6) fraud and deceit; and (7) negligent misrepresentation.

In September 2013, APA and APAPO moved to transfer the case to the U.S. District Court for the District of Columbia. This motion was granted on December 15, 2013 and the case has now been transferred and assigned to the judge who dismissed the national class action. The Plaintiffs did not appeal that decision

The plaintiffs' appeal of the order dismissing the national class action was heard on April 7, 2014 and a decision is pending. Because this case is in active litigation, any further discussion of the case would need to occur in an executive session. The court order that is under appeal is posted on the COR teamsite.

Public communications about the lawsuit are handled by Rhea Farberman (rfarberman@apa.org).


II.  APA AS AMICUS CURIAE
NEW DEVELOPMENTS SINCE FEBRUARY 2014


A.     Hall v. Florida – (U.S. Supreme Court) – The central issue in this case was whether a statutory definition of mental retardation that has a bright-line cutoff requiring an IQ score of 70 or below adequately captures the constitutional imperative that the mentally retarded not be executed.

The defendant in this case, Freddie Lee Hall, was convicted of a capital murder that occurred in 1978 and sentenced to death. After his original sentence was vacated, Hall was resentenced to death in 1991. At the time, the judge who sentenced Hall noted that he was "mentally retarded" but found that fact to have "unquantifiable" mitigating weight. Following Atkins, Hall filed a habeas petition and an evidentiary hearing was held. Although there was ample evidence supporting Hall's claim – he had been repeatedly diagnosed with mental retardation in the past - because Hall had scored 73 and 80 on the WAIS-R and 71 on the WAIS-III, the trial court held he could not establish the threshold of a mental

retardation claim.  The Florida Supreme Court had interpreted the Florida statute to mean that a score above 70 on the WAIS-III absolutely precludes a showing of mental retardation, and rejected Hall's argument that the standard error of measurement should be taken into account:  "The statute does not use the word approximate, nor does it reference the SEM.  Thus, the language of the statute [is] clear."  The Florida court also rejected the argument that a bright-line cutoff score of 70 was contrary to Atkins, reasoning that the Supreme Court had left the determination of who should be classified as mentally retarded "to the individual states."  The court claimed that the Florida statute is consistent with DSM criteria for mental retardation.

APA's brief to the Supreme Court advised that:  1) there is unanimous professional consensus that the diagnosis of intellectual disability requires comprehensive assessment and the application of clinical judgment; 2) the existence of concurrent deficits in intellectual adaptive functioning is central to the rationale of the *Atkins* decision and a system for identifying intellectual disability that does not include analysis of adaptive functioning is based on a fundamental misunderstanding of the diagnostic criteria; and 3) the use of a fixed IQ score as a cutoff to assess intellectual functioning ignores the fact that IQ test scores are subject to a standard error of measurement and the interpretation of IQ test scores must take the test's reliability into account.

On May 27, 2014, the U.S. Supreme Court issued a 5-4 majority ruling against the Florida statute setting an IQ score requirement for defendants arguing their intellectual disability should protect them from the death penalty. Twelve years after leaving it to the states to determine when individuals were too intellectually incapacitated to be executed, the Court withdrew some of that discretion.

Justice Kennedy's majority opinion noted that the Court was not moving the rule of law on executing those who claim intellectual disability very far from where it had left that question twelve years ago in Atkins. However, the majority opinion and concluded that it was rare to make anyone eligible for the death penalty based simply on an IQ score above 70. The ruling did not rule out states' use of IQ test scores as part of the analysis of whether an individual had sufficient intellectual functioning to qualify for the death sentence. However, it stressed that use of such scores must take into account the "inherent" imprecision of such scores.

APA's amicus brief was cited multiple times by Justice Kennedy in the decision. APA was joined on its brief by the American Psychiatric Association, American Academy of Psychiatry and the Law, Florida Psychological Association, National Association of Social Workers, and National Association of Social Workers Florida Chapter.

B.       Commonwealth v. Walker – (Pennsylvania Supreme Court, Eastern Division) – The *Walker* case involved a gunpoint robbery of two students in the early morning hours. One of the victims was hit with the gun and injured; the other was able to get away quickly. The victim who had been struck identified the Petitioner as the perpetrator from a photo array, and the other was not able to make certain identification. At trial, only one victim was able to positively identify the Petitioner as the one who had committed the robbery. The crime occurred in poor lighting, was brief, involved a gun, and was committed by an individual of a different race than the victims. Motions raised pre-trial asked the court to allow for an expert to testify to those issues, for appropriate jury instructions, and for limiting instructions on argument. All motions were denied, and the Superior Court affirmed the decisions on appeal.

The Pennsylvania Supreme Court had long held that expert testimony from social scientists in the fields related to eyewitness identification – human memory, perception, and recall – is improper as it intruded on the jury's duty to judge the credibility of each witness. While the overwhelming majority of jurisdictions allow for the admission of such testimony at trial, Pennsylvania did not.

The Pennsylvania Supreme Court accepted the case for review on two grounds: "1) whether the trial court should have had the discretion to allow the Petitioner to present expert testimony regarding human memory, perception, and recall, and 2) whether the Court should permit expert scientific testimony, whether it be for the defense or prosecution, on how the mind works as long as the testimony has general acceptance."  In a nutshell, at the heart of the case was the issue of admissibility in Pennsylvania courts of expert testimony on research regarding the reliability of eyewitness identification.

There is a large and growing body of scientific research directed specifically at eyewitness reliability.  There are a number of scholarly books by psychologists summarizing the research and related issues. Gary Wells and others authored the first APA Division 41 White Paper on Eyewitness Identification Procedures (published in *Law and Human Behavior* in 1998).

Research regarding eyewitness memory is extensive (e.g., reliability of eyewitness identification, factors affecting the reliability of eyewitness identification, etc.).  Given that the well-established expert testimony regarding human perception, memory, and recall in cases involving eyewitness identification is generally accepted in the field and that the overwhelming response of courts nationally is to allow such testimony, COLI recommended and the Board of Directors agreed that it was important to file a brief to educate the Pennsylvania courts on this matter. Specifically, because many of the variables affecting eyewitness identification are counter-intuitive and simply unknown to the layperson, not admitting expert testimony in this regard could result in mistaken convictions  (In many cases in which DNA evidence has revealed a wrongful conviction, the conviction was based primarily or exclusively on eyewitness identification.)

On August 1, 2011, APA filed an amicus brief urging the court to follow the majority of other states and allow expert testimony on the strong body of psychological research regarding eyewitness testimony, including research regarding juror misunderstanding of the accuracy of eyewitness identification and the factors that can affect the accuracy of eyewitness identifications. The brief also explains that the means by which this research has been undertaken and the results have been widely accepted in the scientific community.

On May 28, 2014, Pennsylvania Supreme Court reversed prior precedent that barred expert testimony on the social science research regarding factors that affect the reliability of eyewitness testimony.  In reaching its decision, the court cited APA's brief on each of the following points: 1) most jurors do not understand the factors that affect reliability of eyewitness testimony, making expert testimony important; 2) experts would speak to objective scientific research regarding eyewitness identification, not factual issues within the jury's purview; 3) research shows that juries do not abdicate their fact finding responsibility when presented with expert testimony; 4) this area of research has general acceptance in the scientific community — specifically that extensive research has been conducted on human memory and its limits, as well as inaccurate eyewitness identification; and 5) published research has identified numerous factors that impact the reliability of eyewitness identification.

C.    Cases Involving The Right of Same Sex Couples to Marry  - Golinski v. Office of Personnel Management  (U.S. Court of Appeals for the 9th Circuit); Kitchen v. Herbert and Bishop v. Smith – (10th Circuit Court of Appeals); Bostic v. Schaefer (4th Circuit Court of Appeals); Latta, et al., v. Otter (U.S. Court of Appeals for the 9th Circuit); Baskin, et al. v. Zoeller, et al.- (U.S. Court of Appeals for the 7th Circuit) and Deleon v. Perry  – (U.S. Court of Appeals for the 5th Circuit) (legal fees for these subject matter briefs are capped at $10,000)

1)    Golinski v. Office of Personnel Management (U.S. Court of Appeals for the 9th Circuit) - This lawsuit was a challenge to the constitutionality of section 3 of the Defense of Marriage Act (DOMA), the section that defines the terms "marriage" as "a legal union between one man and one

woman as husband and wife" and "spouse" as "a person of the opposite sex who is a husband or a wife." Section 3 prevents the federal government from recognizing the marriages of same-sex couples who are legally married in their own states and restricts the federal government from granting such couples any federal benefits it provides to opposite-sex married couples.

In this case, Karen Golinski was denied spousal health benefits by her employer, the U.S. Court of Appeals, Ninth Circuit in San Francisco. She married her partner of 20 years in 2008 when such marriages were legal in California and attempted to obtain health insurance for her partner under the federal government's health benefit plans. She was refused with DOMA being cited as the basis. In January 2009, Chief Judge Alex Kozinski ruled in an administrative action that it violates the Ninth Circuit's employment policies prohibiting discrimination based on sexual orientation to deny the legally married Golinski the same benefits for her wife as heterosexual court employees receive for their lawful spouses. The federal Office of Personal Management (OPM)—an agency of the executive branch—responded that the law governing federal employees' health insurance and the so-called Defense of Marriage Act (DOMA) prevent coverage for the spouses of lesbian and gay federal employees, and instructed Golinski's insurer not to enroll her wife. Lambda Legal sued the federal government to compel it to stop interfering with the orders of the court's chief judge so that Golinski can be provided equal benefits for her wife, and subsequently raised a direct challenge to DOMA in federal court.

In February 2011, President Obama and Attorney General Eric Holder concluded that Section 3 of DOMA is unconstitutional and inappropriate to defend. Thereafter, the Bipartisan Legal Advisory Group (BLAG) intervened on behalf of the leadership in the U.S. House of Representatives to defend DOMA. Plaintiff moved for summary judgment in July of 2011, and on February 22, 2012, U.S. District Court Judge Jeffrey White issued a ruling declaring DOMA unconstitutional. BLAG appealed the district court decision to the U.S. Court of Appeals for the Ninth Circuit.

On July 10, 2012, APA filed a brief in support of Golinski, joined by the California Psychological Association, the American Psychiatric Association, the National Association of Social Workers, the American Medical Association, the American Academy of Pediatrics and the American Psychoanalytic Association. The brief is similar to the brief APA previously filed in the U.S. Court of Appeals in the First Circuit (*Gill v. Office of Personnel Management*). The brief applies social science research to rebut some of the justifications offered for the prohibition in Section 3 of DOMA of any federal recognition of the marriages of same-sex couples. Those justifications, involving procreation, the welfare of children and the like, are closely similar to those offered in cases defending states' refusal to allow same-sex couples to marry. The amicus brief provided extensive psychological research on key points, including how homosexuality is a normal expression of human sexuality, is generally not chosen, and is highly resistant to change. Also provided was current scientific research on the nature of same-sex relationships, the role of child-rearing, and the stigma resulting from denying the label "marriage" to same-sex unions. For example, the brief cited psychological research showing that gay and lesbian parents are not any less fit or capable than heterosexual parents, and that their children are not less adjusted. The brief also addressed how denying federal recognition to legally married same-sex couples stigmatizes them.

The government filed a preemptive petition for certiorari to the U.S. Supreme Court and the 9th Circuit stayed oral argument in the case pending the Court's action on the petition for Certiorari. Following the Supreme Court's decision in *U.S. v. Windsor* that found Section 3 of DOMA unconstitutional, with the consent of all parties, the Ninth Circuit dismissed the appeals.

2)      Kitchen v. Herbert and Bishop v. Smith – (U.S. Court of Appeals for the 10th Circuit) – This case involved a federal challenge to Utah and Oklahoma's laws prohibiting same-sex couples from marrying and recognition of the legal marriage of same-sex couples who married in other states.

Utah Constitutional Amendment 3, passed by referendum in 2004, states that no union other than one between a man and a woman may be recognized as a marriage. Derek Kitchen and five co-plaintiffs took issue with this definition and filed a lawsuit in federal district court to challenge the gay marriage ban. In a December 2013 ruling, the court invalidated the amendment, finding that such a restriction was an affront to equal protection and the fundamental right to marry. Meanwhile, Mary Bishop and Sharon Baldwin also filed a federal suit to challenge a similar provision that was added to Oklahoma's constitution by referendum in 2004. Like Utah's district court, the Oklahoma district court found the amendment unconstitutional. Following the Supreme Court ruling in *United States v. Windsor* — which struck down part of the Defense of Marriage Act — these state cases were brought before the U.S. Court of Appeals for the Tenth Circuit, to consider the constitutionality of a state's decision to exclude same-sex unions from the definition of marriage.

APA filed a brief supporting the Utah and Oklahoma plaintiffs' fight for equality under the law in their respective challenges. As in prior APA briefs, scientific evidence was presented concerning sexual orientation and families relevant these combined cases. APA argued that: 1) homosexuality is a normal expression of human sexuality, is generally not chosen, and is highly resistant to change; 2) that gay men and lesbians form stable, committed relationships that are equivalent to heterosexual relationships; 3) that the institution of marriage offers social, psychological and health benefits that are denied to same-sex couples who cannot legally marry; and, 4) there is no scientific basis for concluding that same-sex couples are any less fit or capable parents than heterosexual couples or that their children are any less psychologically healthy. The brief further states that by devaluing and delegitimizing same-sex relationships, the Oklahoma and Utah laws compound and perpetuate the stigma historically attached to homosexuality.

Oral argument was held on April 10, 2014 and on June 24, a three-judge panel of the Tenth Circuit issued a ruling that Utah's constitutional amendment barring marriage for same-sex couples violates the U.S. Constitution.

3)      Bostic v. Schaefer – (U.S. Court of Appeals for the 4th Circuit) – At issue is the constitutional challenge to Virginia's refusal to issue marriage licenses to same-sex couples.

In July 2013, Bostic and his partner, London, sought to obtain a marriage license at the Norfolk Circuit Court but were turned down because of the state's ban on marriage equality. The couple then filed a lawsuit in the U.S. District Court. In February 2014, the U.S. District Court ruled in favor of the plaintiffs declaring that laws prohibiting gay and lesbian couples from marrying are unconstitutional. The ruling was appealed to the U.S. Court of Appeals for the Fourth Circuit. State Registrar of Vital Records Janet Rainey and Clerk of the Circuit Court for the City of Norfolk George Schaefer served as defendants-appellants in their official capacities. Prince William County Circuit Court Clerk Michele McQuigg was an intervenor defendant-appellant.

APA's brief argued that Virginia's laws banning recognition of same-sex marriage are instances of institutional stigma and further argues that the laws are unconstitutional in that it denies them the equal protection rights guaranteed by the Fourteenth Amendment.

The 4th Circuit Court of Appeals heard oral arguments in this case on May 13, 2014. On July 28, 2014, the United States Court of Appeals for the Fourth Circuit upheld a lower court's decision in *Bostic v. Rainey*, No. 14-1167 (4th Cir. July 28, 2014), striking down Virginia state laws that prohibit same-sex marriage or the recognition of such marriages lawfully entered in other states. In a 2-1 decision, the Court found that the United States Constitution provides individuals with a fundamental right to marry another individual, no matter the gender. This continues the trend of recent decisions throughout the country

finding bans on same-sex marriage unconstitutional, including the Tenth Circuit's recent decisions in *Kitchen v. Herbert* and *Bishop v. Smith*.

After finding that the opponents of Virginia's same-sex marriage ban had legal standing to challenge the ban, the Court rejected the ban-proponents' argument that existing Supreme Court precedent, *Baker v. Nelson*, barred the challenge. Because Supreme Court jurisprudence has changed substantially since *Baker*, the Fourth Circuit, echoing other courts that have ruled on this issue, held that *Baker* is no longer controlling.

The Fourth Circuit held that "the fundamental right to marry encompasses the right to same-sex marriage," and therefore, that Virginia's same-sex marriage ban must pass strict scrutiny review, the highest level of scrutiny applied to governmental restrictions on constitutional rights. The Court held that the right to same-sex marriage was no different from the right to interracial marriage recognized in 1967 by the Supreme Court in *Loving v. Virginia*, both subsets "of a broad right to marry that is not circumscribed based on the characteristics of the individuals seeking to exercise that right."

Under strict scrutiny, the law infringing a fundamental right "may be justified only by compelling state interests, and must be narrowly drawn to express only those interests." The Court addressed and rejected five asserted "compelling" interests offered by the proponents. The Court rejected the proponents' argument that principles of federalism and states' rights provided a compelling interest supporting the ban, because, although states traditionally have the authority to define marriage, a state cannot place restrictions on marriage that violate the constitutional rights of individuals. Similarly, the Court found the proponents' appeal to "history and tradition" lacking, because tradition provides an insufficient basis to infringe a fundamental individual liberty, such as the right to marry.

Further, the Court dismissed the argument regarding the parental effectiveness of same-sex couples. Quoting extensively from APA's amicus brief (joined by American Academy of Pediatrics, American Psychiatric Association, National Association of Social Workers, and Virginia Psychological Association), the Court noted that "'there is no scientific evidence that parenting effectiveness is related to parental sexual orientation,' and 'the same factors' – including family stability, economic resources, and the quality of parent-child relationships – 'are linked to children's positive development, whether they are raised by heterosexual, lesbian, or gay parents.'" The court also noted that "[a]ccording to the APA, 'the parenting abilities of gay men and lesbians—and the positive outcomes for their children—are not areas where most credible scientific researchers disagree.'" While the Court found the arguments "extremely persuasive," it held that it did not need to resolve that dispute, because the proponents' optimal childrearing argument faltered under strict scrutiny.

In this regard, the Court affirmed the district court's decision to enjoin enforcement of the Virginia Marriage Laws. It is not yet clear whether the Court will stay its decision pending further appeals by the proponents.

4)      <u>Latta v. Otter</u> – (U.S. Court of Appeals for the 9th Circuit) – This law suit is a challenge to Idaho's laws prohibiting same-sex couples from marrying and refusing to respect the legal marriages of same-sex couples who married in other states. This case is on appeal from the U.S. District Court for the District of Idaho. APA filed an amicus brief on July 25, 2014 in support of Plaintiffs-Appellees (*Latta et al.*) and was joined by American Psychiatric Association and the National Association of Social Workers.

Consistent with prior APA briefs, the brief presents an accurate summary of the current state of scientific and professional knowledge concerning sexual orientation and families relevant to this case – including that homosexuality is a normal expression of human sexuality, resistant to change, factors that affect adjustment of children are not dependent on parental gender or sexual orientation, etc.

APA's brief further states that there is no scientific basis for concluding that same-sex couples are any less fit than heterosexual couples who are parents and are no less psychologically healthy and denying the status of marriage to same-sex couples stigmatizes them.

The case will be heard late August or September.

5)      Baskin, et al. v. Zoeller, et al.- (U.S. Court of Appeals for the 7th Circuit) – This law suit is a challenge to the constitutionality of the Indiana and Wisconsin laws prohibiting same-sex couples from marrying.

APA filed an amicus curiae brief in support of Plaintiff-Appellees on August 5, 2014. APA was joined by the Wisconsin Psychological Association, the American Psychiatric Association; American Academy of Pediatrics and their state chapter; American Association for Marriage & Family Therapy; NASW and their state chapters.

Consistent with prior APA briefs, the brief presents an accurate summary of the current state of scientific and professional knowledge concerning sexual orientation and families relevant to this case – including that homosexuality is a normal expression of human sexuality, resistant to change, factors that affect adjustment of children are not dependent on parental gender or sexual orientation, etc.

APA's brief further states that there is no scientific basis for concluding that same-sex couples are any less fit than heterosexual couples who are parents and are no less psychologically healthy and denying the status of marriage to same-sex couples stigmatizes them.

This case will be heard by the 7th Circuit this fall.

6)      Deleon v. Perry  – (**Corrected 8/12/2014**) (U.S. Court of Appeals for the 5th Circuit) – This case challenges Texas law prohibiting same-sex couples from marrying and refusing to respect the legal marriages of same-sex couples who married in other states.

On October 28, 2013, lawyers filed a federal lawsuit on behalf of two same-sex couples seeking the freedom to marry or respect for their legal marriage in Texas. In Texas, same-sex couples are prohibited from joining together in marriage because of a 2005 constitutional amendment.  The two couples are Mark Phariss & Vic Holmes and Cleopatra De Leon & Nicole Dimetman. Pharriss and Holmes are unmarried, while De Leon and Dimetman married in Massachusetts in 2009 and are seeking respect for their marriage in Texas.

On February 26, 2014, U.S. District Court Judge Orlando Garcia ruled that laws in Texas prohibiting same-sex couples from marrying are unconstitutional. The federal judge also issued a stay on the ruling pending appeal, so same-sex couples were not immediately allowed to receive marriage licenses. The ruling was quickly appealed to the United States Court of Appeals for the 5th Circuit.

Consistent with prior APA briefs, the brief presents an accurate summary of the current state of scientific and professional knowledge concerning sexual orientation and families relevant to this case – including that homosexuality is a normal expression of human sexuality, resistant to change, factors that affect adjustment of children are not dependent on parental gender or sexual orientation, etc.

APA's brief further states that there is no scientific basis for concluding that same-sex couples are any less fit than heterosexual couples who are parents and are no less psychologically healthy and denying the status of marriage to same-sex couples stigmatizes them.

The 5th Circuit Court of Appeals has yet to schedule oral arguments in the appeal.

D.     MKB Management, Inc. v. Burdick – (U.S. Court of Appeals for the 8th Circuit) – This case challenges North Dakota's law that would prohibit abortion as early as six weeks into a pregnancy.

After being struck down in the trial court as unconstitutional, the case goes to the U.S. Court of Appeals for the Eighth Circuit. APA's 2008 Task Force on Mental Health and Abortion Report has been cited by both those opposing the restrictions and criticized by those supporting the restrictions. The Report reviews and evaluates empirical studies relating to the mental health of women who have abortions in the United States and finds that, based on the best research, among women who have a single, legal, first-trimester abortion of an unplanned pregnancy there is no greater risk of mental health repercussions than among women who deliver an unplanned pregnancy.

EMG and COLI approved a straightforward defense of our Report and an explanation of some of the challenges of social science research in this area. APA, in 2010, sought leave to file a brief in another case in the Eighth Circuit (*Planned Parenthood et al. v. Mike Rounds et al.*)  *Rounds* was an appeal by the state of South Dakota of a trial court ruling striking down as unconstitutional a South Dakota statute that required physicians to warn women considering an abortion that suicide or suicidal ideation are known medical risks of abortion. In reaching that decision the trial court relied in part on the Report of the APA Task Force on Mental Health and Abortion, which found after a comprehensive literature review that the research does not support a finding that an abortion in the first trimester causes mental health problems. The appellant state of South Dakota opposed APA's request for leave to file an amicus brief on several grounds, including that the copy of the APA Task Force report that APA had attached to the amicus brief for the court's convenience contained several tables in the appendix that had not appeared in the original report filed with the trial court. APA replied to these arguments but the 8th Circuit did not allow APA's brief to be filed. Thereafter APA sought leave to file a revised shortened brief that among other things deleted the tables to the report. The state also opposed this request, accusing APA of trying to supplement the record with expert testimony. The 8th Circuit again denied APA's request and thus the brief was not included in the material that the merits panel will consider when it decides the appeal. Thus, the brief was submitted to the 8th Circuit Court of Appeals but not accepted.

The OGC is working with the APA Public Interest Directorate and outside counsel to review, and update as needed, any new research that may appear to in any way undermine the APA Task Force Report that presents a valid summary of the social science.  For example, OGC has identified recent studies that appear to improperly infer causation from correlation.  Although correlation is a necessary prerequisite for causation, the simple existence of a correlation, by itself, does not provide a sufficient scientific basis for making causal inferences about abortion history and mental health variables.

The *Rounds* brief provides a strong template for filing a brief in *Burdick* or any case where the APA Task Force Report's findings come into issue.  Legal fees are capped at $10,000.  An APA amicus brief will be filed in late August.

E.     Cases Involving Eyewitness Testimony – (Massachusetts Supreme Judicial Court) - The Massachusetts Supreme Judicial Court sponsored an expert report on eyewitness testimony and has now

issued a call for amicus briefs in three separate eyewitness identification cases, which will be heard in September.  We expect that there will be one consolidated brief. The cases and certified questions are:

1) Commonwealth v. Jeremy Gomes (SJC-11537) - Whether the judge erred in refusing to instruct the jury, as requested by the defendant, in essence that (a) a witness's prior viewing of a suspect in an identification procedure, without making a positive identification, reduces the reliability of the witness's later identification of the same suspect; (b) human memory is not like a video recording; and (c) witnesses who are highly confident of their identifications are not therefore necessarily reliable.

2) Commonwealth v. Kenneth Johnson (SJC-11567) - Where a victim of a crime has failed to identify the defendant in an identification procedure such as a police line-up, whether the defendant is entitled to a modified identification instruction that informs the jury that they may consider the fact that the victim failed to identify the defendant as the perpetrator.

3) Commonwealth v. Walter Crayton (SJC-11639) - Whether the court should adopt the recommendation of the S.J.C. Study Group on Eyewitness Evidence, that "in-court identification not be permitted except, in the judge's discretion, on redirect examination, in rebuttal, or in other circumstances where the defendant challenges the witness's ability to make such identification."  [We will evaluate whether there is strong research to present in this case with our experts and COLI reviewers. As noted above it is likely that there will be one consolidated brief. ]

APA has filed three briefs in the eyewitness testimony area (*Commonwealth v. Walker; Perry v. New Hampshire; and State of Connecticut v. Troy Artis*) and we will build on those briefs in filing these cases.

 Gary Wells, Steve Penrod, and Brian Cutler have agreed to be reviewers on this brief.

Legal fees are capped at $10,000.

NO NEW DEVELOPMENTS SINCE FEBRUARY 2014

A.      Sevcik v. Sandoval and Jackson v. Abercrombie (U.S. Court of Appeals for the 9th Circuit) - This case challenges whether the Equal Protection Clause, part of the 14th Amendment to the U.S. Constitution, does not prohibit the state from limiting marriage to people of the opposite sex.

These two cases, arising in Hawaii and Nevada, respectively, had similar outcomes in that the District Courts each found there was no constitutional right to marriage for couples of the same sex. In both cases, the courts applying rational basis review, ruled that the Equal Protection Clause of the 14th Amendment does not prohibit the state from limiting marriage to people of the opposite sex. The Hawaii case, based on Hawaii's marriage statute, also upheld the legitimacy of state policy refusing to recognize same sex marriages performed in other states. The Nevada case involves the validity of an amendment to the state's constitution banning same sex marriage.

APA's brief relied on much of the scientific and professional literature sited in previous marriage briefs — that most gay men and lesbians do not experience their sexual orientation as resulting from a voluntary choice; that the consensus of mental health professionals and researchers has been that homosexuality and bisexuality are normal expressions of human sexuality; that they pose no inherent obstacle to leading a happy, healthy and productive life; and that there is no scientific basis for concluding that same-sex couples are any less fit or capable parents than heterosexual couples. APA's position, based

on that science, is that the states' judgment that, in the realm of intimate relationships, legally united same-sex couples are inherently less deserving of society's full recognition than heterosexual couples is unconstitutional. APA's position is that by devaluing and delegitimizing the relationships that constitute the very core of homosexual orientation, the Nevada and Hawaii laws challenged by this brief compound and perpetuate the stigma historically attached to homosexuality, and that the states' judgments should be reversed.

     B.    <u>State of Connecticut v. Troy Artis</u> – (Supreme Court of Connecticut) – At issue is whether the appellate court majority properly determined that admission of the victim's in-court and out-of-court identifications following a suggestive police display of defendant's photograph was a reversible due process violation.

     The case before the Connecticut Supreme Court involves research as presented in *Perry v. New Hampshire* but involves a different legal issue.  In this case, Mr. Artis was convicted as an accessory to the first-degree assault in connection with a club fight.  The central issue is whether the trial court's admission into evidence of the victim's out-of-court identification of the defendant violated the defendant's due process rights under *Manson v. Brathwait,* 432 U.S. 98 (1977), and *Neil v. Biggers*, 409 U.S. 188 (1972).  Here, all parties and the courts agree that the identification procedure was unnecessarily suggestive.   The trial and appellate courts disagreed, however, in the application of the reliability factors.  The State appealed the reversal of Artis's conviction to the Connecticut Supreme Court, which agreed to hear the case.

     APA filed an amicus brief providing the Court with an overview of the strong body of research showing the variables that affect accuracy of eyewitness identification, specifically addressing the point that suggestive circumstances that will affect eyewitness identification can occur without police action and that limiting due process protections to only those faulty eyewitness identification procedures that are caused by state actors is too narrow a band of protection.  In this case, the state's sweeping attacks on the appellate court's ruling (and on psychological research and researchers) are addressed in detail in the APA brief as lacking merit.  APA's brief also notes that courts throughout the country have acknowledged that the relevant research is reliable and properly considered by the courts.

     Legal fees were capped at $10,000.