# EXHIBIT 46

**United States Government Accountability Office**

# GAO

Report to the Chairman, Subcommittee on Higher Education, Lifelong Learning and Competitiveness, Committee on Education and Labor, House of Representatives

August 2009

# PROPRIETARY SCHOOLS

# Stronger Department of Education Oversight Needed to Help Ensure Only Eligible Students Receive Federal Student Aid



GAO
Accountability ★ Integrity ★ Reliability



**GAO**
Accountability · Integrity · Reliability

# Highlights

Highlights of GAO-09-600, a report to the Chairman, Subcommittee on Higher Education, Lifelong Learning, and Competitiveness, Committee on Education and Labor, House of Representatives

August 2009

# PROPRIETARY SCHOOLS

## Stronger Department of Education Oversight Needed to Help Ensure Only Eligible Students Receive Federal Student Aid

## Why GAO Did This Study

For-profit schools–also known as proprietary schools–received over $16 billion in federal loans, grants, and campus-based aid under Title IV of the Higher Education Act in 2007/08. GAO was asked to determine (1) how the student loan default profile of proprietary schools compares with that of other types of schools and (2) the extent to which Education's policies and procedures for monitoring student eligibility requirements for federal aid at proprietary schools protect students and the investment of Title IV funds. To address these objectives, GAO analyzed data and records from Education, examined Education's policies and procedures, reviewed relevant research studies, conducted site visits and undercover investigations at proprietary schools, and interviewed officials from Education, higher education associations, and state oversight agencies.

## What GAO Recommends

GAO is making three recommendations for Education to strengthen its monitoring and oversight of federal aid eligibility requirements. Specifically, GAO recommends Education (1) improve its monitoring of basic skills tests and target schools for further review; (2) revise regulations to strengthen controls over basic skills tests; and (3) provide information and guidance on valid high school diplomas for use in gaining access to federal student aid. The Department of Education noted the steps it would take to address GAO's recommendations.

View GAO-09-600 or key components. For more information, contact George A. Scott at (202) 512-7215 or scottg@gao.gov.

## What GAO Found

The Department of Education makes loans available to students to help them pay for higher education at public, private non-profit, and proprietary schools, and the students who attend proprietary schools are most likely to default on these loans, according to analysis of recent student loan data. As shown in the graph below, students from proprietary schools have higher default rates than students from other schools at 2, 3, and 4 years into repayment. Academic researchers have found that higher default rates at proprietary schools are linked to the characteristics of the students who attend these schools. Specifically, students who come from low income backgrounds and from families who lack higher education are more likely to default on their loans, and data show that students from proprietary schools are more likely to come from low income families and have parents who do not hold a college degree. Borrowers who are not successful in school and drop out also have high default rates. Ultimately, when student loan defaults occur, both taxpayers and the government, which guarantees the loans, are left with the costs.

**Proprietary Schools Have Higher Default Rates than Public and Private Non-Profit Schools**
Percentage of defaults



Source: GAO analysis of Education's 2004 cohort data from the National Student Loan Data System.

Note: Education provided official 2-year default rates and modeled 3- and 4-year default rates, by sector, using December 2007 student loan data.

Although students must meet certain eligibility requirements to demonstrate that they have the ability to succeed in school before they receive federal loans, weaknesses in Education's oversight of these requirements place students and federal funds at risk of potential fraud and abuse at proprietary schools. Students are required to pass a test of basic math and English skills or have a high school diploma or GED to qualify for federal student aid. Yet, GAO and others have found violations of these requirements. For example, when GAO analysts posing as prospective students took the basic skills test at a local proprietary school, the independent test administrator gave out answers to some of the test questions. In addition, the analysts' test forms were tampered with–their actual answers were crossed out and changed–to ensure the individuals passed the test. GAO also identified cases in which officials at two proprietary schools helped prospective students obtain invalid high school diplomas from diploma mills in order to gain access to federal loans. GAO's findings do not represent nor imply widespread problems at all proprietary schools. However, GAO's work has identified significant vulnerabilities in Education's oversight. Education's inadequate monitoring of basic skills tests and lack of guidance on valid high school diplomas enables unqualified students to gain access to federal student aid. Unqualified students are at greater risk of dropping out of school, incurring substantial debt, and defaulting on federal loans.

**United States Government Accountability Office**

# Contents

| | | |
|---|---|---|
| **Letter** | | 1 |
| | Background | 3 |
| | Education's Analysis Shows That Default Rates Are Higher at Proprietary Schools than at Public and Private Non-Profit Schools and Studies Link High Default Rates to Borrowers' Characteristics | 13 |
| | Weaknesses in Education's Oversight of Federal Aid Eligibility Requirements Place Students and Title IV Funds at Risk of Potential Fraud and Abuse at Proprietary Schools | 22 |
| | Conclusions | 28 |
| | Recommendations for Executive Action | 29 |
| | Agency Comments and Our Evaluation | 30 |
| **Appendix I** | **Objectives, Scope, and Methodology** | 33 |
| **Appendix II** | **Comments from the Department of Education** | 37 |
| **Appendix III** | **GAO Contact and Staff Acknowledgments** | 39 |
| **Related GAO Products** | | 40 |
| **Tables** | | |
| | Table 1: Age, Dependency Status, and Gender of Students at Proprietary, Public, and Private Non-Profit Schools | 7 |
| | Table 2: Family Income and Parental Education of Students at Proprietary, Public, and Private Non-Profit Schools | 20 |
| **Figures** | | |
| | Figure 1: School Sectors by Percentage of Enrollments in Different Program Lengths for the 2007-2008 Academic Year | 6 |
| | Figure 2: Race of Students by School Sector | 8 |
| | Figure 3: ATB Test Process | 10 |
| | Figure 4: Defaults Captured by the 2-year Cohort Default Rate | 14 |

Figure 5: Proprietary Schools Have Higher Default Rates Than
            Public and Private Non-Profit Schools                    15
Figure 6: Among 4-year Schools, Proprietary Schools Have
            Consistently Higher Default Rates Than Other Schools     16
Figure 7: Among 2-year Schools, Proprietary Schools Have Higher
            Default Rates Than Other Schools                         17
Figure 8: Among Less Than 2-year Schools, Private Non-profit and
            Proprietary Schools Have Nearly Identical Default Rates  18

**Abbreviations**

| | |
|---|---|
| ATB | ability-to-benefit |
| CDR | cohort default rate |
| FSA | Office of Federal Student Aid |
| GED | general equivalency diploma |
| IPEDS | Integrated Postsecondary Education Data System |
| NCES | National Center for Education Statistics |
| NPSAS | National Postsecondary Student Aid Study |
| NSLDS | National Student Loan Data System |
| OIG | Office of the Inspector General |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**United States Government Accountability Office**
**Washington, DC 20548**

August 17, 2009

The Honorable Rubén Hinojosa
Chairman
Subcommittee on Higher Education, Lifelong Learning
    and Competitiveness
Committee on Education and Labor
House of Representatives

Dear Mr. Chairman:

Institutions of higher education, including public colleges, private non-profit, and private for-profit schools, receive billions of dollars each year from the Department of Education (Education) to help students pay for school. In the 2007-2008 school year, private for-profit schools–also known as proprietary schools–received over $16 billion in loans, grants, and campus-based aid for disbursement to students under Title IV of the Higher Education Act. Currently, there are over 2,000 proprietary schools of higher education that participate in Title IV programs. Title IV funds for the proprietary sector have increased 164 percent since the 2001-2002 school year, and grown at a substantially faster rate than Title IV funds for the public and private non-profit sectors.[1] Moreover, institutions of higher education, including proprietary schools, are poised to receive additional Title IV funds under the American Recovery and Reinvestment Act of 2009.

In recent years, the scale and scope of proprietary schools have changed considerably. Once comprised of local, sole proprietor ownership, the nation's proprietary institutions now range from small, privately-owned schools to profitable publicly traded corporations such as the Apollo Group, Corinthian Colleges, and Career Education Corporation. Traditionally focused on certificate and associate programs ranging from cosmetology to medical assistance and business administration, proprietary institutions have expanded their offerings to include bachelors, masters, and doctoral level programs. Both the certificate and degree programs provide students with training for careers in a variety of fields. Under current economic conditions, more students may attend proprietary schools to acquire additional work skills and training to help

---

[1] Title IV funding data beginning in the 2001-2002 school year are more accurate than data from prior years.

them obtain jobs. Proprietary schools also provide course offerings through online education, and many proprietary schools have open admissions policies to accept any student who applies.

Students can only receive Title IV funds, provided in the form of grants, loans, and campus-based aid, when they attend schools approved to participate in the Title IV program. The schools must ensure that the students receiving the funds meet certain eligibility requirements: generally, students must have a high school diploma, or a general equivalency diploma (GED), or demonstrate that they are ready for higher education by passing an independently administered "ability to benefit" (ATB) test of basic math and English skills or completing 6 credit hours applicable toward a degree or certificate offered at an institution of higher education. Students who receive loans under the Title IV program are responsible for repaying the loans, and those who default increase the cost of the Title IV program to the federal government and taxpayers.

Given your interest in learning more about proprietary schools, we examined: (1) how the student loan default profile of proprietary schools compares with that of other types of schools and (2) the extent to which Education's policies and procedures for monitoring eligibility requirements for federal aid at proprietary schools protect students and the investment of Title IV funds.

To determine how the student loan default profile of proprietary schools compares with that of other types of schools, we analyzed Education data on school default rates from the National Student Loan Data System (NSLDS), reviewed studies on factors that contribute to student defaults, and conducted interviews with officials from Education and higher education associations. As part of our analysis of default rates at proprietary schools, we also looked at information on student characteristics and outcomes. We analyzed the most recent student survey data available from the 2004 National Postsecondary Student Aid Study (NPSAS), data on students during the 2007-2008 school year from the Integrated Postsecondary Education Data System (IPEDS), and data on student outcomes from a 6-year study following students beginning in the 1995-1996 school year conducted by the National Center for Education Statistics (NCES). To assess the reliability of those data elements needed for our study, we (1) performed electronic testing of required data elements, (2) reviewed existing information about the data and the systems that produced them and (3) interviewed agency officials knowledgeable about the data. We determined that the data are sufficiently reliable for the purposes of this report. To determine the

extent to which Education's policies and procedures for monitoring student eligibility requirements for federal aid at proprietary schools protect students and the investment of Title IV funds, we reviewed Education's policies and procedures for monitoring the administration of ability-to-benefit tests and for enforcing high school diploma requirements; reviewed relevant program reviews, independent audits, relevant laws and regulations, and enforcement actions taken against schools; and interviewed officials from Education, state education licensing agencies, and higher education associations. We also gathered information during school site visits conducted in California, Illinois, New York, and Virginia. We selected these sites for geographic diversity and a mixture of ownership types (independently-owned and publicly-traded schools) and degree and certificate programs. In addition, GAO anonymously tested institution compliance with Title IV eligibility requirements and sent, on two separate occasions, analysts posing as prospective students to take and purposely fail ATB tests at a local proprietary institution. We supplemented this work with a review of investigations conducted by Education's Office of Inspector General and the New York Department of Education.

We conducted this performance audit from October 2007 to August 2009, in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives. For additional information on the methodology used for this review, see appendix I.

# Background

## Title IV Programs

The Department of Education's Office of Federal Student Aid (FSA) manages and administers student financial assistance programs authorized under Title IV of the Higher Education Act of 1965, as amended.[2]  These programs include, among others, the William D. Ford Federal Direct Loan Program (Direct Loan program), the Federal Family Education Loan Program (FFEL program), the Federal Pell Grant Program (Pell Grant

---

[2]20 U.S.C. 1001 et seq.

program), and campus-based aid programs.[3]  In the 2007-2008 school year, Title IV programs provided more than $85 billion in student aid.

In 1990, we placed Education's student financial aid programs on our high risk list of programs at risk of fraud, waste, abuse, and mismanagement. At the time, Education had various problems, including poor financial management and fragmented and inefficient information systems. In 2005, we removed these programs from the list due to improvements made to Education's financial management of federal student aid programs and better integration of its information systems. However, we continue to monitor Education's administration and oversight of federal student aid programs.

## Types of Title IV Eligible Institutions

The Higher Education Act provides that a variety of institutions of higher education are eligible to participate in Title IV programs, including:

- Public institutions–Institutions operated and funded by state or local governments, which include state universities and community colleges.

- Private non-profit institutions–Institutions owned and operated by non-profit organizations whose net earnings do not benefit any shareholder or individual. These institutions are eligible for tax deductible contributions in accordance with the Internal Revenue code (26 U.S.C. § 501(c)(3)).

- Proprietary institutions–Institutions that are privately-owned whose net earnings can benefit a shareholder or individual; that is, for-profit institutions.

These institutions can be further classified by their program lengths:

- 4-year and above–The program length for colleges and universities. Such schools typically offer bachelor's degrees and higher-level degrees. Some 4-year and above schools also offer associate's degrees, which generally take 2 years to complete.

---

[3]The Federal Supplemental Educational Opportunity Grant (FSEOG), Federal Work-Study (FWS), and Federal Perkins Loan programs are called campus-based programs and are administered directly by the financial aid office at each participating school.

- 2-year–The program length for many community colleges and other institutions offering associate's degrees. These schools often also offer certificate programs.[4]

- Less than 2-year–Includes schools, often referred to as "vocational and technical schools," that offer certificate programs, but typically do not offer degrees.

  Overall, the proprietary sector receives the smallest percentage of Title IV funds–about 19 percent–compared with the public and private non-profit sectors, which receive about 48 and 33 percent, respectively.[5] However, the amount of Title IV funding going to the proprietary sector has risen significantly in recent years and some of the schools receiving the most Title IV funds are proprietary schools.

  Four-year and above schools account for the majority of enrollments in the public, private non-profit, and proprietary sectors. Two-year schools account for a significant percentage of the enrollments in the public and proprietary sectors, but only about 2 percent of enrollments in the private non-profit sector. Less than 2-year schools account for 19 percent of the enrollment in the proprietary sector, but are less than half of 1 percent of the enrollments at both public and private non-profit sectors. Figure 1 shows school sectors by the percentage of enrollments in different program length categories.

---

[4]Education refers to these schools as "2-3 year schools." Based on our analysis of the schools included in the 2-3 year category, we refer to this school group as "2-year schools" as most of them are schools with programs that are 2 years in length.

[5]For the purposes of this report, we refer to public, private non-profit and proprietary schools as separate sectors. The NCES uses the term "sector" differently and defines school sector as a combination of school control, such as public, private non-profit, and proprietary, and program length, such as 4-year and above, 2-year and less than 2-years.

**Figure 1: School Sectors by Percentage of Enrollments in Different Program Lengths for the 2007-2008 Academic Year**



Source: GAO analysis of IPEDS data.

Under Title IV of the Higher Education Act, a school can receive student aid if it offers courses of study such as certificate, associates, bachelor's, graduate, or professional degree programs. Vocational and technical training, in which skills related to a specific trade, vocation or occupation are taught, are generally offered at community colleges as well as proprietary schools. Relative to the total number of schools in the Title IV program that award degrees and certificates, the proprietary sector awards a small percentage of bachelor's degrees and above, but a substantial percentage of certificates.

## Characteristics of Students Attending Proprietary Schools

Students who attend proprietary schools generally have characteristics that differ from students at public and private non-profit schools. First, over half of the student population at proprietary schools is comprised of "non-traditional" students, such as students who are 25 years old and older. Second, more students at proprietary schools are financially independent compared to students at public and private non-profit schools.[6] Third, proprietary schools serve a higher percentage of women than schools in other sectors. See table 1 for analysis of Education's data on age, dependency status, and gender of students in the three school sectors.

**Table 1: Age, Dependency Status, and Gender of Students at Proprietary, Public, and Private Non-Profit Schools**

| School sector | Students age 25 and older (percentage) | Financially independent students (percentage) | Female students (percentage) |
|---|---|---|---|
| Proprietary | 56 | 76 | 63 |
| Public | 35 | 50 | 54 |
| Private non-profit | 38 | 39 | 56 |

Source: GAO analyses of 2007/2008 IPEDS and 2004 NPSAS datasets.

Lastly, proprietary schools have a higher percentage of minority students, specifically African-American and Hispanic students, than public and private non-profit schools. However, a higher percentage of Asian-American students attend both public and private non-profit schools than proprietary schools. See figure 2 for analysis of Education's data on student race in the three school sectors.

---

[6]The NCES at the Department of Education classifies all graduate students and undergraduate students age 24 or older as independent. Students under the age of 24 can also be classified as independent if they are married or have dependents, are veterans or active military, or have been wards of the court.

**Figure 2: Race of Students by School Sector**

Percentage of students by race



Source: GAO analysis of 2007/2008 IPEDS dataset.

## Eligibility Criteria for School Participation in the Title IV Program

In order for students attending a school to receive Title IV funds, a school must be:

(1) licensed or otherwise legally authorized to provide higher education in the state in which it is located,

(2) accredited by an agency recognized for that purpose by the Secretary of the U.S. Department of Education, and

(3) deemed eligible and certified to participate in federal student aid programs by Education.

This is commonly referred to as the triad. Under the Higher Education Act, Education does not determine the quality of higher education institutions or their programs; rather, it relies on recognized accrediting agencies to do so. As part of its role in the administration of federal student aid programs, Education determines which institutions of higher education are eligible to participate in Title IV programs. Education is responsible for overseeing school compliance with Title IV laws and regulations and ensuring that only eligible students receive federal student aid. As part of its compliance

monitoring, Education relies on department employees and independent auditors of schools to conduct program reviews and audits of schools.

## ATB Test

Generally, students without a high school diploma or GED can qualify for Title IV loans, grants, and campus-based aid if they pass an independently administered test of basic math and English skills, called an "ability-to-benefit" or ATB test.[7] The intent of the test is to measure whether students have the basic skills needed to benefit from higher education and succeed in school. The test must be approved by the Secretary of Education and administered by an independent party. Students must pass the test prior to enrolling in classes and receiving Title IV funds. Since the inception of ATB test requirements, hundreds of thousands of non-high school graduates have qualified for Title IV aid by taking these tests.

Under the ATB test program, Education is responsible for overseeing test publishers, who, in turn, are responsible for certifying and monitoring test administrators to ensure the independent and proper administration of ATB tests. Test publishers are required to conduct and submit to Education an analysis of test scores every 3 years to identify any test irregularities that would suggest ATB tests are not administered in accordance with test rules. Certified test administrators administer ATB tests to prospective students at schools. Figure 3 describes the ATB test process and how it is carried out.

[7]While eligibility for federal student aid is based on a number of factors, such as financial need and U.S. citizenship, for the purposes of our report we focus on whether a student has a high school diploma, GED or recognized equivalent, or has passed an independently administered ATB test.

**Figure 3: ATB Test Process**



Sources: GAO analysis; images, Art Explosion.

## Default Rates Calculated for Schools Participating in Title IV Loan Programs

Education computes default rates for all schools with students who receive Title IV loans through the FFEL Program or the Direct Loan Program. Education calculates default rates each year by tracking whether borrowers in a cohort–a group of students who begin repaying their loans in a given fiscal year–at each school default on their federal student loans over a 2-year period. The resulting calculation is called the cohort default rate. For example, to calculate the 2-year default rate for the 2006 cohort, Education divided (1) the number of borrowers who began their repayment period in fiscal year 2006 and defaulted before the end of fiscal year 2007 (the numerator) by (2) the number of borrowers who began their repayment period in fiscal year 2006 (the denominator). The resulting default rate is expressed as a percentage with a higher percentage indicating more defaults. The majority of schools now have default rates under 10 percent, which is a qualifying rate for favorable loan

disbursement and delivery terms.[8] These terms allow schools to disburse loans in a single installment rather than in two or more installments.

Borrowers begin repayment after dropping below half-time enrollment, graduating, or leaving their program.[9] Borrowers generally default when they do not make any payments on their loan for 270 days (about 9 months) or more and they have not obtained a temporary cessation or reduction of payments—referred to as a deferment or forbearance—for reasons such as economic hardship, disability, or enrollment in another school that is eligible to participate in the Title IV program.[10]

Starting in January 1991, the Secretary of Education initiated proceedings for immediate loss, suspension, or termination of schools' eligibility to participate in Title IV loan programs if their default rates were above specified thresholds. From 1992, the first year from which Education data were available on numbers of schools by sector subject to immediate loss, suspension, or termination from the Title IV program due to high default rates, until 1999, 1,846 schools, including 1,580 from the proprietary sector, were subject to sanctions. More recently, from 2000 until 2008, four schools were subject to immediate loss, suspension, or termination from the Title IV program due to high default rates, including three from the proprietary sector. According to an Education official, there are several possible explanations for the drop in defaults and, subsequently, for the drop in the number of schools subject to sanctions. For example, the Education official noted that the Department's efforts to provide schools with default prevention training may have reduced default rates. In addition, he pointed out that many proprietary schools with chronically high default rates lost Title IV eligibility and subsequently went out of business in the early 1990s.

---

[8]As of fiscal year 2011, the qualifying rate for favorable loan disbursement and delivery terms will change to 15 percent. Higher Education Opportunity Act, Pub. L. No. 110-315, § 427(a).

[9]Prior to entering repayment, borrowers who drop below half-time enrollment, graduate, or leave their program generally have a 6- to 12-month grace period.

[10]This default definition applies to loans that require repayment on a monthly basis. Loans that require repayment on a less frequent basis default when payments are not made for 330 days (about 11 months).

| | |
|---|---|
| Consequences of Student Loan Defaults | When students do not make payments on their federal loans and the loans are in default, the federal government and taxpayers assume nearly all the risk and are left with the costs. For example, in the FFEL program, the federal government and taxpayers pick up 97 percent of the cost on defaulted loans. In the Direct Loan program, the federal government and taxpayers pick up 100 percent of the unpaid principle and accrued interest on defaulted loans. |

Though the federal government and taxpayers pick up the majority of the costs on defaulted loans, students who default are also at risk of facing a number of personal and financial burdens. For example, defaulted loans will appear on the student's credit record, which may make it more difficult for them to obtain an auto loan, mortgage, or credit card. A negative credit record could also harm the student's ability to obtain a job or rent an apartment. Students will also be ineligible for assistance under most federal loan programs and may not receive any additional Title IV federal student aid until the loan is repaid in full. Furthermore, the Department of Education can refer defaulted student loan debts to the Department of the Treasury to offset any federal and/or state income tax refunds due to the borrower to repay the defaulted loan. In addition, Education may require employers who employ individuals who have defaulted on a student loan to deduct 15 percent of the borrower's disposable pay toward repayment of the debt. Garnishment may continue until the entire balance of the outstanding loan is paid.

# Education's Analysis Shows That Default Rates Are Higher at Proprietary Schools than at Public and Private Non-Profit Schools and Studies Link High Default Rates to Borrowers' Characteristics

## Default Rates of Borrowers from Proprietary Schools Are Higher than Those of Borrowers from Other Schools and Increase over Time

Default rates measured 2 years after students begin repaying their loans show that students from proprietary schools have higher default rates than students from public and private non-profit schools. According to Education's calculations from the group, or cohort, of students who entered repayment in fiscal year 2004, the proprietary sector's 2-year cohort default rate is 8.6 percent.[11] This rate is higher than the public and private non-profit sectors, which have rates of 4.7 percent and 3 percent, respectively. Although the proprietary sector's rate is higher than other sectors, it is still below the threshold cut-off rates—25 percent for 3 years or 40 percent for 1 year—used by Education to disqualify schools from Title IV eligibility.[12]

While the cohort default rate is one of the means by which Education monitors schools' eligibility to participate in Title IV programs, the rate captures only a small portion of all student loan defaults at schools. First, any defaults that occur over the life of the loan after the 2-year period are

---

[11]Fiscal year 2004 cohort data were the most recent data available that allowed us to make comparisons of default rates at 2 years in 2006, 3 years in 2007, and 4 years in 2008. The 2-year default rate was the official measurement used to track defaults until fiscal year 2009, when the 3-year default rate became the official default measurement.  Higher Education Opportunity Act, Pub. L. No. 110-315, § 436(e).

[12]In 2008, Congress increased the 3-year maximum default rate threshold from 25 percent to 30 percent, which will take effect in 2011. Higher Education Opportunity Act, Pub. L. No. 110-315, § 436(a)(1).

excluded from schools' cohort rate calculations.[13]  Second, during the 2-year period, borrowers are generally considered in repayment as long as they have made a payment in the last 270 days, or about 9 months. Third, borrowers who seek forbearances or deferments on their loans during that 2-year cohort period are also considered to be in repayment.[14]  Figure 4 illustrates the 2-year cohort default rate.

**Figure 4: Defaults Captured by the 2-year Cohort Default Rate**



Sources: GAO analysis; images, Art Explosion.

While borrowers from all sectors are defaulting at higher rates after the 2-year period, Education's default rate calculations of borrower's repayments in the third and fourth years show that proprietary schools'

---

[13]Based on recent changes made to the default measurement, any defaults that occur after a 3-year period will be excluded from a school's cohort default rate calculation.

[14]A previous GAO report about default rates (GAO/HEHS-99-135) noted these limitations in its finding that Education's cohort default rate calculations are understated because borrowers who are in forbearance or deferment are considered to be in repayment even though they are not making any loan payments. Furthermore, these borrowers are not included in any subsequent cohorts after their period of forbearance or deferment is over. GAO recommended that Congress consider amending the Higher Education Act to exclude borrowers from schools' cohort default rate calculations if the borrowers are in deferment or forbearance. To date, Congress has not made this change.

default rates increase more than those of public and private non-profit schools. For example, 4 years after borrowers entered repayment, 23.3 percent of proprietary school borrowers have defaulted, compared to 9.5 percent of borrowers from public schools and 6.5 percent of borrowers from private non-profit schools, as shown in figure 5.

**Figure 5: Proprietary Schools Have Higher Default Rates Than Public and Private Non-Profit Schools**



Source: GAO analysis of 2004 cohort data from NSLDS, provided by the Department of Education of 2-year, 3-year, and 4-year default rates by sector.

Note: Education provided official 2-year default rates and modeled 3- and 4-year default rates, by sector, using December 2007 student loan data.

Generally, higher default rates in the proprietary sector persist for programs of different lengths. Among 4-year schools, the default rates at 2, 3, and 4 years into repayment are higher among proprietary schools than other schools. Further, at 4-year schools, the default rate 4 years into repayment for proprietary schools is more than twice the rate of public and private non-profit schools. See figure 6.

**Figure 6: Among 4-year Schools, Proprietary Schools Have Consistently Higher Default Rates Than Other Schools**

Percentage of defaults



4-year schools

- Public
- Non-profit
- Proprietary

Source: GAO analysis of 2004 cohort data from NSLDS, provided by the Department of Education of 2-year, 3-year, and 4-year default rates by sector.

Note: Education provided official 2-year default rates and modeled 3- and 4-year default rates, by sector, using December 2007 student loan data.

Similarly, among 2-year schools, proprietary schools have higher default rates than other schools. For example, the default rate 4 years into repayment for proprietary schools is the highest–27.2 percent–of the three school sectors. See figure 7.

**Figure 7: Among 2-year Schools, Proprietary Schools Have Higher Default Rates Than Other Schools**



Percentage of defaults

Source: GAO analysis of 2004 cohort data from NSLDS, provided by the Department of Education of 2-year, 3-year, and 4-year default rates by sector.

Note: Education provided official 2-year default rates and modeled 3- and 4-year default rates, by sector, using December 2007 student loan data.

Among less than 2-year schools, proprietary schools have higher default rates than public schools, but nearly identical rates to those of private non-profit schools.[15]  See figure 8.

---

[15]According to 2004 cohort data of individual schools for which Education calculated a 3-year cohort default rate, among programs less than 2 years in length, there were 556 proprietary schools, but only 86 public schools and 19 non-profit schools.

**Figure 8: Among Less Than 2-year Schools, Private Non-profit and Proprietary Schools Have Nearly Identical Default Rates**



Percentage of defaults

Source: GAO analysis of 2004 cohort data from NSLDS, provided by the Department of Education of 2-year, 3-year, and 4-year default rates by sector.

Note: Education provided official 2-year default rates and modeled 3- and 4-year default rates, by sector, using December 2007 student loan data.

Even though the proprietary sector generally has higher cohort default rates than the public and private non-profit sectors, many individual proprietary schools have lower rates than the sector as a whole. Using a fiscal year 2004 dataset of 3-year cohort default rates for individual schools, we found that some proprietary schools had among the lowest default rates of all schools in the country.[16] Our results indicated that 121 proprietary schools, or about 9.3 percent of all proprietary schools for which Education calculated cohort default rates, had rates under 5

---

[16]Education's fiscal year 2004 dataset was the only one available for individual schools that measured default rates for longer than 2 years.

percent.[17] Furthermore, 18 of those schools had no students who defaulted on their loans over the 3-year period. These proprietary schools with relatively low default rates represent a variety of ownership types and program offerings.

## Various Student Characteristics Contribute to Higher Default Rates, according to Research

Variations in default rates across school sectors may reflect the characteristics of the students who attend the schools, according to academic research studies. Although the research linking explanatory factors to federal student loan defaults is limited, especially in recent years, we found in 8 of the 11 studies that we reviewed that there are multiple demographic characteristics of borrowers that correlate with higher default rates.[18]

In several of the studies, two borrower characteristics closely linked to higher default rates are low family income and parents who lack a higher education degree. Analysis of Education's data shows that the annual median family income of students at proprietary schools is significantly lower than that of students at public and private non-profit schools. Data analysis also show that a significantly lower percent of parents of proprietary school students have an associate's degree or higher, compared to parents of public and private non-profit school students. See table 2 for data on family income and parental education of students at proprietary, public, and private non-profit schools.

---

[17]Across all sectors, schools with cohort default rates of less than 5 percent qualify for the most favorable loan disbursement and delivery terms. Such schools can disburse student loans in a single payment at the start of the year for study-abroad students. Further, schools that have a cohort most recent rate under 10 percent for the 3 most recent fiscal years can disburse federal student loans at the start of the semester and in a single installment if the period of enrollment does not exceed 1 term or 4 months. 20 U.S.C. §§ 1078-7(a)(3) and (e).

[18]The remaining three studies examined factors other than demographic characteristics that may correlate with high default rates.

**Table 2: Family Income and Parental Education of Students at Proprietary, Public, and Private Non-Profit Schools**

| School sector | Annual median family income | Parents with associate's degree or higher (percentage) |
|---|---|---|
| Proprietary | $24,300 | 37 |
| Public | 40,400 | 52 |
| Private non-profit | 49,200 | 61 |

Source: GAO analysis of 2004 NPSAS dataset.

Note: These numbers are estimates and include both dependent and independent students.

Student age was also linked to default rates in some of the research studies, with borrowers who take out student loans at an older age being more likely to default on their loans. One of the studies that linked age to default rates suggested that older students may default at higher rates because they tend to have other obligations besides paying for college. These obligations may include paying a mortgage or paying for child care. Our analysis of Education's data shows that proprietary schools serve a higher percentage of older students than public and private non-profit schools and the majority of students at proprietary schools are 25 years old and older.

Research also shows that borrowers' success in school may help predict whether they will default. We found studies published in national journals that showed that borrowers who have a low grade point average and who are not continuously enrolled in school before they leave their programs are more likely to default. Across the three school sectors and program lengths, a factor closely associated with increased default rates was drop-out rates. In six different research studies—three that examined default rates from national datasets and three that examined default rates from state-specific datasets—default rates were positively correlated with drop outs, or students who failed to complete their programs. A 6-year study by Education's NCES, which followed students who began higher education in the 1995-1996 school year, found that a larger estimated percentage of students at 4-year proprietary schools dropped out than students at private non-profit schools.[19] The same study estimated no statistically significant difference in drop-out rates between students at 4-year proprietary and

---

[19]The study presented results for whether students attained a degree from or were still enrolled at the first institution they attended. For the purposes of our study, we considered those who had neither a degree nor where still enrolled as drop-outs.

public schools. In addition, the study estimated that 6 years after beginning a 4-year school, a significantly smaller percentage of proprietary students attained their bachelor's degree compared to those at public and private non-profit schools. In contrast, data show that for students who first started at 2-year proprietary schools, there is a significantly higher percentage who attained their associate's degrees compared to students at public schools.[20] While program completion was an important factor in predicting default rates, we reviewed one study that found that completing associate's and bachelor's degrees were significantly correlated with lower default rates, but completing a certificate or license was not.

Characteristics of borrowers' loans and their repayment options may help predict default rates as well. For example, a factor in predicting defaults can be the amount that borrowers take out in loans; those who borrow smaller amounts, according to one study, may have a higher likelihood of defaulting than those who borrow larger amounts. Researchers estimated that borrowing larger amounts is correlated with higher levels of education—such as graduate or professional programs—which give borrowers an increased earning potential so that they are better able to repay their loans. In another study that examined characteristics of borrowers' loans and repayment options, researchers estimated that those who graduated with a bachelor's degree and used the forbearance or deferment options after entering repayment were more than twice as likely to default. Finally, borrowers who had consolidated loans and income-contingent repayment plans were also more likely to default than those who had not used those options.[21]

---

[20]There is no significant difference in associate's degree attainment between students at proprietary schools and students at private non-profit schools.

[21]Income-contingent repayment plans are based on a borrower's income, family size, and loan amount. Consolidated loans are those that are generally based on the weighted average of the interest rates on the loans being consolidated.

# Weaknesses in Education's Oversight of Federal Aid Eligibility Requirements Place Students and Title IV Funds at Risk of Potential Fraud and Abuse at Proprietary Schools

## Education's Weak Oversight of ATB Test Requirements Allows Ineligible Students to Receive Federal Aid

Through separate investigations at proprietary schools, we, along with other federal and state investigative agencies, found test administrators or school officials violating rules to ensure prospective students without high school diplomas passed required tests and obtained access to Title IV aid. Generally, prospective students without high school diplomas or GEDs must pass ATB tests to become eligible to receive federal financial aid, and test administrators are responsible for administering ATB tests at schools in accordance with test publisher rules. When we conducted our own investigation of compliance with ATB requirements, we found improper activities that compromised the integrity of the test process. For example, in 2008 we sent two GAO analysts who posed as prospective students to a local branch of a publicly traded proprietary school to deliberately flunk an ATB test. Each analyst was sent separately to the school and on both occasions, the independent test administrator gave them and all the test takers in the room–about 20 in total–answers to some of the test questions. We later obtained copies of the analysts' test forms and found that they had been tampered with–their actual answers had been crossed out and changed–to ensure the analysts passed and would become eligible to receive Title IV funds. We turned over the information on testing violations to Education's Office of Inspector General (OIG), which then used the information to further investigate the ATB tests at this school.

Investigators at the OIG and the New York Department of Education have previously reported finding similar problems. For example, in one case the

OIG found personnel at a proprietary school in Louisiana had changed the failing test scores of prospective students to allow 80 individuals to pass and inappropriately qualify for federal funding.[22] Likewise, in two separate New York investigations in which multiple undercover operatives were sent to flunk ATB tests at local proprietary schools, test answers were changed by either the test administrator or school officials to ensure all people posing as students passed and gained access to federal aid.[23] In addition to giving out test answers and falsifying test results, test administrators and officials at proprietary schools have violated other ATB test rules, impairing the independence of the testing process and allowing ineligible students to access federal financial aid. Regulations governing the test process require test administrators, who are certified by test publishers to administer ATB tests, to be independent of the school at which tests are taken and to submit test answer sheets directly to the test publisher for scoring. However, Education's Office of Inspector General previously found violations of the requirement for independent test administration, in which proprietary school officials inappropriately administered tests. In another case involving improper testing at a proprietary school, the Education OIG found that test administrators failed to follow test rules that govern when students can retake the test on the same form. As a result, 724 students who passed improper retests received over $3 million in federal financial aid.[24] While OIG officials told us that some of their cases have involved public schools, they reported that most of their findings regarding abuse of ATB tests have involved proprietary schools. When ATB tests are not properly administered, a prospective student's ability to benefit from higher education may not be accurately assessed. As a result, prospective students who are academically unqualified are more likely to be admitted to a school and receive federal student aid. Such students are at greater risk of dropping out of school, incurring substantial debt, and defaulting on their federal student loans.

These problems result, in part, from key weaknesses in Education's oversight of ATB testing, which were previously identified in a 2002

---

[22]*Investigation of Moler Beauty College* (Department of Education OIG Investigative Reports: Apr. 12, 2006).

[23]*Interboro Institute, Admission Requirements Review* (New York State Education Department: Oct. 5, 2005); *Investigative Report: CaliberTraining Institute* (New York State Education Department: Apr. 10, 2007).

[24]*Audit of Wonderlic's Ability to Benefit (ATB) Program* (Department of Education OIG Audit Control Number ED-OIG/03-B0022: February 2002).

Education Office of Inspector General report.[25] As part of its report, the OIG recommended changes to strengthen Education's monitoring of test publishers. Education approves the tests for ATB use and test publishers monitor how tests are administered. However, Education has done little since then to strengthen its oversight of test publishers. Although test publishers are required to conduct and submit to Education test score analyses every 3 years to help identify test score irregularities, Education has not followed up with test publishers to ensure that all comply with these requirements. For example, as of early 2009, one of the four approved test publishers had yet to submit test score analyses due in April 2005 and in April 2008 for two of its approved tests. Further, the same test publisher had failed to submit test score analysis also due in April 2008 for another of its approved tests. Similarly, two of the four test publishers failed to submit test score analyses due to Education in January 2008. Education officials told us the employee responsible for test publisher oversight and review of test submissions retired in 2008. Since that time and until March 2009, no one at Education had followed up to obtain unsubmitted test score analyses, increasing the risk of unidentified test violations and fraudulent access to federal student aid. In response to our review, Education followed up with test publishers in the spring of 2009 to obtain missing test score submissions. In addition to ensuring the timeliness of submissions, Education should also ensure that the analyses conducted by test publishers are sufficient to identify improper testing. When we spoke with OIG and Education officials, they told us that one test publisher provides thorough analyses that have led to the identification of possible violations; however, other test publishers provide only cursory analyses of test scores. According to the *Standards for Internal Controls in the Federal Government*, federal agencies need to have systems in place that ensure timely, effective, and efficient oversight of government programs and continually monitor programs to address potential risks.[26] Weaknesses in Education's systems of controls for monitoring test publishers may not adequately guard against fraud and abuse in the ATB test program.

---

[25]*Audit of FSA's Controls Over ED-Approved ATB Programs* (Department of Education OIG Audit Report ED-OIG/A03-B0001: Aug. 22, 2002).

[26]GAO, *Standards for Internal Control in the Federal Government*, GAO/AIMD-00-21.3.1 (Washington, D.C.: November 1999). Internal control standards and the definition of internal control in Circular No. A-123 are based on the aforementioned GAO standards.

In addition to problems with Education's monitoring of test publishers, Education regulations do not allow for timely identification of improper test administration. Education's regulations only require test publishers to conduct test score analyses every 3 years. Consequently, test administrators who improperly administer tests can go undetected for 3 years before violations are discovered, resulting in an increased risk of fraud and abuse. As part of the internal control standards for federal agencies, the evaluation of a program should depend on the risks associated with the program and should ensure that timely information is available to allow for effective monitoring.[27] Given the risks of potential fraud and abuse associated with the ATB test program, the analysis of test scores every 3 years may leave the program vulnerable to violations. Education and test publisher officials we spoke with suggested that more frequent analyses of test scores by test publishers could improve the integrity of the testing process.

Education's regulations also do not specifically require test publishers to follow up on test score irregularities or report any corrective actions to Education. While test publishers are required to identify test score irregularities that raise suggestions that tests are not being properly administered, there is no requirement that test publishers further investigate irregularities to determine if actual violations occurred. In addition, regulations require that test publishers decertify test administrators who fail to properly administer tests; however, Education regulations do not require test publishers to report to Education on the implementation of their decertification process. Because test publishers are not required to provide Education with the results of their decertification activities, Education cannot be assured that test administrators found in violation of test rules are decertified. Likewise, without further requirements in regulation for test publishers to provide information on test administrators, Education has no way to determine whether test administrators decertified by one publisher are instead administering tests for other publishers, and therefore cannot protect against the risk of future violations.

---

[27]GAO, *Internal Control Management and Evaluation Tool,* GAO-01-1008G (Washington, D.C.: August 2001).

## Education's Weak Oversight of High School Diploma Requirements Does Not Adequately Protect against the Use of Diploma Mills to Obtain Federal Aid

During our review, we identified cases in which proprietary schools helped students obtain high school diplomas from diploma mills–entities that provide invalid diplomas, usually for a fee and little academic work–in order to obtain access to federal student loans. Through one of our site visits and interviews with students and student interest groups, we learned of cases where recruiters at two separate publicly traded proprietary schools referred students to diploma mills for invalid high school diplomas in order to gain access to federal loans without having to take an ATB test. In one case, a student interest group told us a student who dropped out of high school in the 9th grade was guided by the proprietary school to take an online test to receive a high school diploma. Based on our discussion with a state education agency, we confirmed that the entity that provided the diploma was a diploma mill. In another case, a student told us he was flunking out of high school when a recruiter at the proprietary school directed him to a place where he could pay a fee to take a test and obtain a high school diploma. Based on our review of that county's listing of high schools considered diploma mills, we later determined that the entity offering the high school diploma was a diploma mill. Although Education has also identified some cases of high school diploma mills–including one in which a proprietary school had arrangements with a diploma mill to secure high school diplomas for 30 students who obtained $76,000 in federal financial aid–Education regional officials told us that the problem may be more widespread than is known.

Despite evidence of invalid high school diplomas being used to gain access to federal student loans, Education has not established clearly written policies to help ensure high school diploma requirements are met for Title IV funding. Although senior Education officials told us that the department's official policy is that high school diplomas from diploma mills are not acceptable for Title IV eligibility and the department prosecutes diploma mill cases, Education officials told us they do not explicitly assert this policy in any written form. Rather, Education notes in its Federal Student Aid Handbook that a high school diploma is one that comes from a school recognized by the state in which the school is located. Internal control standards provide that federal agencies should employ effective ways to record and communicate important information to employees and others, such as in policy manuals, to enable them to carry out their duties and responsibilities.[28] Without a written policy that

---

[28]GAO, *Internal Control Management and Evaluation Tool*, GAO-01-1008G (Washington, D.C.: August 2001).

clearly communicates Education's position against the use of diploma mills to obtain access to federal student aid, Education staff and external parties such as schools and independent auditors–who must comply or monitor compliance with Title IV rules–lack important information regarding eligibility requirements. Education officials have acknowledged that the use of high school diplomas from diploma mills to obtain access to federal student aid is a problem and that more guidance would be helpful. In May 2009, Education announced plans to convene public forums to help inform the development of proposed regulations that would address matters related to Title IV program integrity, including the definition of a high school diploma as a condition of receiving federal student aid.

In addition to weaknesses in its policies governing high school diploma requirements, Education provides limited guidance and tools that Education program review staff, schools, and independent auditors can use to help identify high school diploma mills. Though Education, in its Federal Student Aid Handbook, advises officials to contact state education agencies if they question the validity of a high school diploma, Education officials told us that program review staff have no other guidance to help them judge whether there is a potential problem. Further, they acknowledged that in many cases, the identification of an invalid high school diploma is based on the experience of the program review staff and whether something appears to be wrong. For example, when a reviewer finds an unusually large number of students with high school diplomas coming from the same school located outside the state, this may prompt the reviewer to look into the origin of the diplomas further. As we noted earlier, standards for internal controls in the federal government require federal agencies to communicate relevant and reliable information to help agency staff and external stakeholders carry out their responsibilities. Education provides limited information and resources that would help internal and external reviewers and schools better monitor compliance with high school diploma requirements. Education officials told us that a comprehensive list of recognized high schools could help Education staff and schools better identify diplomas from diploma mills. Several states already provide lists of the high schools they recognize and make them available to the public on their Web sites. However, Education provides little information on these already available resources that could help officials identify invalid high school diplomas. In contrast, Education already maintains information and resources on its Web site to help

individuals identify and avoid higher education diploma mills by listing colleges and universities that are eligible to participate in federal student aid programs.[29] Education's limited guidance to help both internal and external parties detect the use of high school diploma mills for Title IV eligibility may hinder its efforts to ensure that students receiving federal financial aid have the ability to succeed in higher education.

# Conclusions

Proprietary schools have become a rapidly growing sector of higher education in this country and will likely continue to grow with the availability of additional federal funding and an increased demand for education and job training. Many of these schools play an important role in providing a range of students, including non-traditional and disadvantaged students, with an opportunity to obtain the education they need to increase their work skills and find jobs. However, students who attend proprietary schools are more likely to default on their federal student loans, which can tarnish their credit records, make it difficult for them to obtain employment, and jeopardize their long-term financial well-being. Students from lower-income backgrounds can be particularly hurt when they default on their loans. In addition, taxpayers and the government, which guarantees the loans, are left with the cost when students default on their school loans.

To decrease the likelihood that students will default on their loans, it is critical that Education increase its oversight of federal student aid eligibility requirements to make sure that only students who have the ability to benefit receive federal funds to attend college. While our findings do not represent nor should they be interpreted as implying widespread problems at all proprietary schools, our work has identified significant vulnerabilities in Education's oversight that should be addressed. Without better oversight of the ATB testing process to ensure more frequent identification of improper testing, and stronger processes for handling and reporting improper testing, both the integrity of the testing process and the qualifications of students who receive federal funding cannot be assured. In addition, without stronger controls, such as clear guidance from Education banning the use of high school diploma mills to obtain federal

---

[29]The Higher Education Opportunity Act, which reauthorized and amended the Higher Education Act, provides that the Secretary shall maintain information and resources on the department's Web site to assist students, families, and employers in understanding what a college diploma mill is and how to identify and avoid such diploma mills Pub. L. No. 110-315, § 109.

aid and information on how to identify diploma mills, the government cannot be assured that its student aid funds are only provided to students who have an ability to benefit from higher education. Unqualified students who receive federal financial aid for higher education programs are at greater risk of dropping out of school, incurring substantial debt, and defaulting on federal loans. Targeted improvements in these areas would help provide greater assurance that the federal investment in higher education and students are adequately protected.

## Recommendations for Executive Action

In order to help ensure the eligibility of Title IV recipients, the Secretary of Education should strengthen the department's process for monitoring the ATB program. Education should:

- Conduct regular follow-up of ATB test analyses submissions to ensure federally approved test publishers provide complete submissions as required; and

- Use data provided by test publishers on schools where test administrators improperly administered tests and were later decertified to target schools for further review.

In order to help ensure that only eligible students receive Title IV funds, the Secretary of Education should revise regulations to strengthen controls over the ATB testing process. For example, under its authority to regulate the administration of tests, Education could consider:

- Requiring test publishers to conduct an interim or mid-point analysis–a supplement to the 3-year test score analysis and submission requirement–to provide a preliminary review of potential testing problems, and submit a copy of their results to the Secretary; or

- Requiring test publishers to have a process to follow-up on identified test score irregularities, take action to decertify test administrators if test irregularities suggest improper test administration, report actions taken as a result of test score analyses to the Secretary and prohibit test publishers from using ATB test administrators who have been decertified by any test publisher.

In order to protect against the use of high school diplomas from diploma mills to obtain Title IV eligibility and help ensure that only students with

the ability to benefit from higher education receive federal aid, the Secretary of Education should:

- Create guidance, using information gathered from public hearings or other forums regarding the definition of a high school diploma, to clearly communicate to Education staff, schools, and independent auditors the department's position that diplomas from high school diploma mills cannot be used for Title IV eligibility purposes. For example, Education could provide this guidance through regulation or the Federal Student Aid Handbook; and

- Establish a cost-effective and readily available source of information that the department's program review staff, schools, and independent auditors can use to help them determine whether a high school diploma is from a diploma mill. For example, Education could obtain existing lists of state-approved high schools and make them available on the department's student financial aid Web site.

## Agency Comments and Our Evaluation

We provided a draft of this report to the Department of Education for review and comment. The agency provided written comments, which are reproduced in appendix II. In its comments, Education noted the steps it will take to address our recommendations:

In response to our recommendation that Education strengthen its oversight process for monitoring the ATB program, Education commented that it is changing its procedures for monitoring ATB test publishers to ensure that required reports and analyses are submitted in a timely manner, and program compliance staff are provided the information.

In response to our recommendation that Education strengthen regulations that govern the ATB test process, Education commented that it is considering the management of the ATB testing process as a topic to include in the new round of upcoming negotiated rulemaking sessions.

In response to our recommendation that Education provide guidance and establish a cost-effective and readily available source of information to protect against the use of diplomas from high school diploma mills, Education provided the following comments. With regard to providing guidance, Education noted that it is considering revising the regulations regarding high school diplomas through the upcoming negotiated rulemaking process. Education noted that final regulations would become effective no sooner than July 1, 2011, as provided under the Higher Education Act of 1965, as amended.  In the interim, Education will provide

additional guidance in the next revision of the Federal Student Aid Handbook. However, in regards to providing a source of information to help protect against the use of diplomas from high school diploma mills, Education commented that there is no centralized source for information about all high schools and no specific statutory authority for Education to create and maintain one, making it unlikely that it will be able to establish a readily available source of such information.  Further, Education stated that it can only expend appropriated funds for authorized purposes, and this use is not authorized under the Department of Education Organization Act or other federal education laws. We acknowledge that there is no centralized source for information about all high schools and we do not recommend that Education investigate the status of all high schools. Rather, we recommend that Education collect readily available information, such as already existing lists of state-approved high schools, and make them available on its student financial aid website.  Under the Higher Education Act, as amended, Education is responsible for administering and overseeing the Title IV student aid programs, including the eligibility requirements for obtaining Title IV funds.  Education's oversight includes the responsibility to protect against the improper use of Title IV funds. Given that publishing information on state-recognized high school diplomas on its Web site will assist Education in carrying out its oversight responsibilities, in our view, Education's appropriations are available to fund this effort.

As agreed with your office, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from the report date.  At that time, we will send copies to the Secretary of Education and interested congressional committees. The report will also be available at no charge on the GAO Web site at www.gao.gov.

If you or your staff have any questions about this report, please contact me at (202) 512-7215 or scottg@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made major contributions to this report are listed in appendix III.

Sincerely yours,

George A. Scott, Director
Education, Workforce, and Income Security Issues

# Appendix I: Objectives, Scope, and Methodology

This appendix discusses in detail our methodology for addressing two research questions: (1) How does the student loan default profile of proprietary schools compare with that of other types of schools? and (2) To what extent do Education's policies and procedures for monitoring student eligibility requirements for federal aid at proprietary schools protect students and the investment of Title IV funds? To address these questions, we analyzed data and records obtained from Education; reviewed federal laws, regulations, agency policies, and relevant research studies and investigations; conducted interviews with Education officials and with other representatives of the higher education community; and conducted site visits and undercover visits to schools. We conducted our work from October 2007 through August 2009 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and recommendations based on our audit objectives.

## Analysis of Education Data

To determine how proprietary schools compare to public and private non-profit schools in regard to federal student loan default profiles, we analyzed fiscal year 2004 cohort default rate data that Education calculated from the National Student Loan Data System (NSLDS). NSLDS includes data from schools, agencies that guaranty loans, the Direct Loan program, and other Education programs. We used fiscal year 2004 cohort default rate data to analyze default rates 2, 3, and 4 years after students entered repayment. These data were drawn from NSLDS in December 2007. From the dataset of 3-year cohort default rates for individual schools, we conducted our own analysis to calculate the numbers of proprietary schools that had default rates of 0 and under 5 percent. We chose 5 percent because it is a qualifying rate for the most favorable loan disbursement and delivery terms in all school sectors. In addition, we used Education calculations of Title IV funding for the various sectors over time from NSLDS for background information. We began our data analysis of Title IV funding in the 2001/02 award year after learning from a data specialist at Education that data prior to 2001/02 are considered less accurate because the Department used different methodologies to identify and calculate Title IV funding data. To ensure that the Title IV funding and cohort default rates from NSLDS were accurate for us to report Education's data and for us to conduct our own analysis, we reviewed information about the data itself and the NSLDS system and interviewed an Education official knowledgeable about the data and the system.

Appendix I: Objectives, Scope, and
Methodology

Additionally, we reviewed the analyses that Education performed and determined that the data were accurate and reliable for our purposes.

As part of our analysis of student default rates, we examined data on student demographics and outcomes. To identify information on borrowers' dependency status and their parents' education and income levels, we analyzed the most recent student survey data available from the 2004 National Postsecondary Student Aid Study (NPSAS). NPSAS is a nationally representative sample of students in postsecondary education institutions, including undergraduate and graduate students from all types of institutions. To provide information on borrowers' age, gender, enrollment, and racial status, we analyzed the most recent data available on schools during the 2007/08 school year from the Integrated Postsecondary Education Database System (IPEDS). IPEDS contains data on postsecondary institutions such as student demographics, enrollments, and finances. Finally, to provide information on student outcomes, specifically degree attainment and drop-out rates, we used data from the *Descriptive Summary of 1995-96 Beginning Postsecondary Students: Six Years Later* study, conducted by the National Center for Education Statistics (NCES). The NCES study provides information on enrollment, persistence, and attainment of students from the time they began higher education for the first time in academic year 1995-1996 until the 2000-2001 academic year. We tested results from this study for statistical significance and reported on our findings. The 1995/96 study was the most recent that included data on bachelor's degree attainment 6 years from the time that students started school. NCES's study of its most recent cohort—those who began their postsecondary education in 2003/04—is now in progress; therefore, 6-year results are not yet available.

We assessed the reliability of the datasets we used from NPSAS, IPEDS, and NCES for our study by: (1) performing electronic testing of required data elements, (2) reviewing existing information about the data and the system that produced them, and (3) conducting interviews with a data specialist from Education. Based on these assessments, we determined that data were sufficiently reliable for the purposes of reporting.

## Analysis of Education Policies and Records

To determine the extent to which Education's policies and procedures for monitoring student eligibility requirements for federal aid at proprietary schools protect students and the investment of Title IV funds, we reviewed Education's policies and procedures for monitoring the administration of ability-to-benefit (ATB) tests and high school diploma requirements. We also reviewed relevant program reviews and independent audits of schools

**Appendix I: Objectives, Scope, and
Methodology**

found to be in violation of ATB test administration procedures, relevant laws and regulations, and enforcement actions taken against schools. To assess the number of schools subjected to sanctions due to their high cohort default rates, we also examined Education's records from 1992 through the present. We selected 1992 as it was the first year from which Education data were available on numbers of schools by sector that were subject to immediate loss, suspension, or termination from the Title IV program.

## Research Studies

To understand the different factors that are linked to high default rates, we reviewed 11 academic studies about student defaults. Our criteria for selecting studies were those that were original research, peer-reviewed, or performed with a strong methodology and focused on explanatory factors for default rates. The studies we used were published from 1994 through 2008. For each of the selected studies that are used in this report, we determined whether the studies' findings were generally reliable. We evaluated the methodological soundness of each study and only reported on those results deemed statistically significant.

## Department of Education and Expert Interviews

To examine Education's oversight of proprietary schools, we interviewed officials from Education, 10 state education licensing agencies, ATB test publishers, and education associations. At Education, we spoke with officials in Federal Student Aid, field offices, the General Counsel's office, the Office of Inspector General, and the Office of Postsecondary Education. The ATB publishers we spoke with were Wonderlic Inc., ACT, and College Board. We interviewed experts from a broad range of higher education associations and interest groups including the American Association of Community Colleges, the Career College Association, the American Association of Collegiate Registrars and Admissions Officers, the "I Have a Dream" Foundation, the National Association for Collegiate Admission Counseling, the National Association of Student Financial Aid Administrators, and the National Consumer Law Center.

## Site Visits

To understand schools' administrative, admissions, and financial aid practices as they relate to Education's policies and procedures for monitoring Title IV funds, we conducted site visits at proprietary schools in California, Illinois, New York, and Virginia. We selected these sites for geographic diversity and chose schools that represented a mixture of ownership types (independently-owned and publicly-traded schools), and degree and certificate programs. We also conducted site visits at

**Appendix I: Objectives, Scope, and Methodology**

community colleges in Maryland and Illinois to provide us with a perspective of comparable programs in the public sector. We selected these schools based on geographic diversity and their breadth of both certificate and degree programs. During all site visits, we interviewed administrators, faculty, staff, and students to learn about topics including admissions practices, financial aid disbursement, and program offerings.

## Undercover Visits

To examine the extent to which Education's policies and procedures for monitoring student eligibility requirements for federal aid at proprietary schools protect students and the investment of Title IV funds, we tested compliance with ATB tests. To do so, GAO analysts, acting in an undercover capacity, posed as prospective students on two separate occasions to take and purposely fail ATB tests at a local proprietary school. We chose this proprietary school chain based on geographic proximity. We supplemented this work with a review of investigations conducted by Education's Office of Inspector General and the New York Department of Education.

# Appendix II: Comments from the Department of Education



CHIEF OPERATING OFFICER

JUL 27 2009

Mr. George A. Scott
Director, Education, Workforce, and Income Security Issues
Government Accountability Office
441 G Street, NW
Washington, DC  20548

Dear Mr. Scott:

In accordance with 31 U.S.C. 720, I am writing to respond to recommendations made in the Government Accountability Office (GAO) report, "Proprietary Schools:  Stronger Department of Education Oversight Needed to Help Ensure Only Eligible Students Receive Federal Student Aid" (GAO-09-600).  The report recommendations focused on monitoring basic skills tests, or Ability-to-Benefit (ATB) tests, revising regulations relating to those tests, and providing information and guidance on valid high school diplomas for use in gaining access to federal student aid.  Below is the Department of Education's (Department's) response to each recommendation.

**Recommendation 1:**  *The Secretary of Education should strengthen the department's process for monitoring the ATB program, conducting regular follow up of ATB test analyses submissions to ensure federally approved test publishers provide complete submissions as required; and using data provided by test publishers on schools where test administrators improperly administered tests and were later decertified to target schools for further review.*

**Response:**  Federal Student Aid is changing its procedures to ensure that ATB test publishers are submitting required reports and analyses in timeframes consistent with the regulatory requirements, and will provide that information to Program Compliance staff.

**Recommendation 2:**  *The Secretary of Education should revise regulations to strengthen controls over the ATB testing process, requiring test publishers to conduct an interim or mid-point analysis – a supplement to the 3-year test score analysis and submission requirement – to provide a preliminary review of potential testing problems, and submit a copy of their results to the Secretary; or requiring test publishers to have a process to follow up on identified test score irregularities, take action to decertify test administrators if test irregularities suggest improper test administration, report actions taken as a result of test score analyses to the Secretary and prohibit test publishers from using ATB test administrators who have been decertified by any test publisher.*

830 First St. N.E., Washington, DC 20202
www.FederalStudentAid.ed.gov
1-800-4-FED-AID

FEDERAL STUDENT AID ▓▓ START HERE. GO FURTHER.

**Response:**  The Office of Postsecondary Education (OPE) has begun a new round of negotiated rulemaking, having conducted public hearings in Denver, Little Rock, and Philadelphia and received additional public comments by e-mail.  The Department is considering including management of the ATB testing process as a topic within the upcoming negotiated rulemaking sessions.

**Recommendation 3:**  *The Secretary of Education should create guidance, using information gathered from public hearings or other forums regarding the definition of a high school diploma, to clearly communicate to Education staff, schools and independent auditors the department's position that diplomas from high school diploma mills cannot be used for Title IV eligibility purposes; and establish a cost effective and readily available source of information that the department's program review staff, schools, and independent auditors can use to help them determine whether a high school diploma is from a diploma mill.*

**Response:**  As indicated previously in meetings with GAO staff, the Department is considering using the negotiated rulemaking process to make changes to the existing regulatory requirements related to high school diplomas as a component of eligibility for federal student aid.  Because of the statutory requirements related to negotiated rulemaking, including the delayed effective date requirements contained in the master calendar provisions of the Higher Education Act of 1965, as amended, this process would result in final regulations becoming effective no sooner than July 1, 2011.  In the interim, the Department will provide additional guidance, based on the current regulatory requirements, in the next revision to the Federal Student Aid Handbook.  As there is no centralized source for information about all high schools and no specific statutory authority for the Department to create and maintain one, it is unlikely that the Department will be able to establish a readily available source of such information.  The Department can only expend appropriated funds for authorized purposes, and this use is not authorized under the Department of Education Organization Act or other federal education laws.

If you or your staff has any questions regarding these responses, please contact Jeff Baker at 202-377-4009.

Sincerely,

William J. Taggart

2

# Appendix III: GAO Contact and Staff Acknowledgments

## GAO Contact

George A. Scott (202) 512-7215 or scottg@gao.gov

## Staff Acknowledgments

In addition to the contact name above, the following staff members made important contributions to this report: Melissa Emrey-Arras, Assistant Director; Kathy Peyman and Claudine Pauselli, Co-Analysts-in-Charge; Karen Febey; Jessica Mace; and Lauren Mohlie. Also, Jean McSween, John Mingus, and George Quinn provided guidance on the study's design and data analysis; Jessica Botsford provided legal advice; Mimi Nguyen and Cheron Brooks assisted with report graphics; and Ashley McCall provided library services. In addition, Paul Desaulniers, Kim Perteet, and Ashanta Williams made contributions to the report. Susan Aschoff and Charlie Willson advised the team on writing the report and Nagla El-Hodiri, Carla Craddock and Michelle St. Pierre verified our findings.

# Related GAO Products

*Student Loans: Default Rates Need to Be Computed More Appropriately.* HEHS-99-135. Washington, D.C.: July 28, 1999.

*Proprietary Schools: Analysis of Comments Received from an Association of Schools.* HEHS-98-12R. Washington, D.C.: October 1997.

*Proprietary Schools: Poorer Student Outcomes at Schools That Rely More on Federal Student Aid.* HEHS-97-103. Washington, D.C.: June 1997.

*Proprietary Schools: Millions Spent to Train Students for Oversupplied Occupations.* HEHS-97-104. Washington, D.C.: June 1997.

*School Accreditation: Activities of Seven Agencies That Accredit Proprietary Schools.* HRD-90-179BR. Washington, D.C.: September 1990.

*Many Proprietary Schools Do Not Comply With Department of Education's Pell Grant.* HRD-84-17. Washington, D.C.: August 1984.

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday afternoon, GAO posts on its Web site newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to www.gao.gov and select "E-mail Updates." |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's Web site, http://www.gao.gov/ordering.htm.<br><br>Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537.<br><br>Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Ralph Dawn, Managing Director, dawnr@gao.gov, (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, DC 20548 |

Please Print on Recycled Paper