# EXHIBIT 56

Carl Malamud                                                    May 12, 2015
                          San Francisco, CA

```
 1            IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3    _____

 4    AMERICAN EDUCATIONAL RESEARCH       )

 5    ASSOCIATION, INC., AMERICAN         )

 6    PSYCHOLOGICAL ASSOCIATION, INC.,    )

 7    and NATIONAL COUNCIL ON             )

 8    MEASUREMENT IN EDUCATION, INC.,     ) Civil Action No.

 9                  Plaintiffs,           ) 1:14-cv-00857-TSC-DAR

10          v.                            )

11    PUBLIC.RESOURCE.ORG,                )

12                  Defendant.            )

13    _____)

14

15

16         VIDEOTAPED DEPOSITION OF CARL MALAMUD

17

18

19    DATE:            May 12, 2015

20    TIME:            9:33 a.m.

21    LOCATION:        Fenwick & West

22                     555 California Street

23                     12th Floor

24                     San Francisco, California  94104

25    REPORTED BY:     Diane S. Martin, CSR 6464, CCRR
```

Carl Malamud                                                                May 12, 2015

San Francisco, CA

Page 2

```
 1          A P P E A R A N C E S :
 2
 3     For the Plaintiffs:
 4        OBLON, McCLELLAND, MAIER & NEUSTADT, LLP
 5        BY:  JONATHAN HUDIS, ESQ.
 6            KATHERINE D. CAPPAERT, ESQ.
 7        1940 Duke Street
 8        Alexandria, Virginia  22314
 9        703-413-3000
10        jhudis@oblon.com
11        kcappaert@oblon.com
12
13     For the Defendant Public.Resource.Org:
14        FENWICK & WEST
15        BY:  ANDREW P. BRIDGES, ESQ.
16        555 California Street
17        112th Floor
18        San Francisco, California  94104
19        415-875-2300
20        abridges@fenwick com
21        BY:  MATTHEW BECKER, ESQ.
22        801 California Street
23        Mountain View, California  94041
24        650-988-8500
25        mbecker@fenwick.com
```

Page 3

```
 1          A P P E A R A N C E S : (Continued)
 2
 3     For the Defendant Electronic Frontier Foundation:
 4        ELECTRONIC FRONTIER FOUNDATION
 5        BY:  CORYNNE McSHERRY, ESQ.
 6            MITCHELL L. STOLTZ, ESQ.
 7        815 Eddy Street
 8        San Francisco, California  94109
 9        415-436-9333
10        corynne@eff.org
11        mitch@eff.org
12
13
14     The Videographer:        Anthony Hensley
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1          EXAMINATION INDEX
 2     EXAMINATION BY:                    PAGE
 3     MR. HUDIS                        10
 4
 5
 6
 7          EXHIBIT INDEX
 8     PLAINTIFFS'                      PAGE
 9     13 - Notice of Deposition of Carl Malamud   14
10     14 - Notice of Deposition of Defendant      14
11        Public.Resource.Org, Inc.
12     15 - Reference Citations             28
13     16 - Articles of Incorporation of         94
14        Public.Resource.Org
15     17 - Bylaws of Public.Resource.Org, Inc.    94
16     18 - Letter to Public.Resource.Org, Inc. from  94
17        IRS dated September 25, 2007
18     19 - Public.Resource.Org home page, Bates    110
19        AERA_APA_NCME_0031411
20     20 - Public.Resource.Org Agency Directory,  110
21        Bates AERA_APA_NCME_0031412 to 31413
22     21 - Defendant-Counterclaimant          125
23        Public.Resource.Org, Inc.'s Initial
24        Disclosures Pursuant to
25        Fed.R.Civ.P.26(a)(1)
```

Page 5

```
 1          EXHIBIT INDEX (Continued)
 2     PLAINTIFFS'                      PAGE
 3     22 - Exploring the Internet, a Technical    155
 4        Travelogue, Bates AERA_APA_NCME_0032079
 5        to 32228
 6     23 - E-mail from Carl Malamud to Jonathan   166
 7        Siegel dated October 1, 2011, Bates
 8        AERA_APA_NCME_0031488 to 31489
 9     24 - On The Media transcript, Bates        173
10        AERA_APA_NCME_0032075 to 0032078
11     25 - Boing Boing Official Guest Memorandum of 181
12        Law, Bates AERA_APA_NCME_0031764 to 31769
13     26 - Kickstarter Campaign, Bates         185
14        AERA_APA_NCME_0031480 to 31485
15     27 - Kickstarter Campaign, Bates         207
16        AERA_APA_NCME_0031480 to 31485
17     28 - An Edicts of Government Amendment, Bates 213
18        AERA_APA_NCME_0031208 to 0031250
19     29 - Defendant-Counterclaimant          236
20        Public.Resource.Org, Inc.'s Amended
21        Responses to
22        Plaintiffs-Counterdefendants' First Set
23        of Interrogatores Nos. 1-8
24     30 - Receipt from Amazon.com, Bates        237
25        PROAERA_00000446 to 447
```

2  (Pages 2 to 5)

Carl Malamud                                                          May 12, 2015

San Francisco, CA

---

Page 6

1            EXHIBIT INDEX (Continued)
2       PLAINTIFFS'                    PAGE
3       31 - Standards for Educational and       239
4            Psychological Testing, Bates
5            AERA_APA_NCME_0000001 to 201
6       32 - Letter to Gary M. Stern from Carl   240
7            Malamud dated July 14, 2009, Bates
8            PROAERA_00010153 to 10195
9       33 - Letter to Carl Malamud from National  251
10           Archives and Records Administration
11           dated August 3, 2009, Bates
12           PROAERA_00010247 to 249
13       34 - AERA: Standard for Educational and   261
14           Psychological Testing, Bates
15           AERA_APA_NCME_0031528 to 31738
16       35A - Yo! Your Honor transcription dated April  287
17           7, 2015, Bates AERA_APA_NCME_0032046 to
18           32074
19       35B - Yo! Your Honor transcription dated April  287
20           7, 2015, Bates AERA_APA_NCME_0032046 to
21           32074 CD
22       36 - Directory of Tables and ReadMe File,   293
23           Bates PROAERA_00000830 to 837
24
25

---

Page 8

1            EXHIBIT INDEX (Continued)
2       PLAINTIFFS'                    PAGE
3       46 - Public.Resource.Org, Inc.'s Counterclaim  358
4            for Declaratory Relief; Answer to
5            Complaint
6       47 - E-mail from Carl Malamud to All Members  366
7            of the Public.Resource Legal Staff dated
8            December 28, 2012, Bates
9            AERA_APA_NCME_0031807 to 809
10
11
12           INDEX OF MARKED QUESTIONS
13       PAGE                    LINE
14       18                      5
15           Q. Without revealing the substance of
16       attorney-client communications, who did you speak
17       with to prepare to testify today?
18
19
20
21
22
23
24
25

---

Page 7

1            EXHIBIT INDEX (Continued)
2       PLAINTIFFS'                    PAGE
3       37 - AERA: Standard for Educational and   301
4            Psychological Testing, Bates
5            PROAERA_00000822 to 823
6       38 - E-mail from Carl Malamud to Alexis Rossi  304
7            dated 6/11/2014, Bates PROAERA_00000824
8       39 - E-mail from John Neikirk to Carl Malamud  310
9            dated 12/16/2013, Bates
10           AERA_APA_NCME_0005129
11       40 - Letter to John Neikirk from Carl Malamud  313
12           dated December 19, 2013, Bates
13           AERA_APA_NCME_0005127 to 5128
14       41 - E-mail from Carl Malamud to Christopher  319
15           Butler dated 12/19/2013, Bates
16           PROAERA_00000810
17       42 - E-mail from Jonathan Hudis to Carl   322
18           Malamud dated 6/10/2014, Bates
19           PROAERA_00000820 to 821
20       43 - Memorandum dated 6/12/2014        324
21       44 - Spreadsheet, Bates PROAERA_00000827   336
22       45 - Defendant-Counterclaimant        351
23           Public.Resource.Org, Inc.'s Responses to
24           Plaintiffs' Second Set of
25           Interrogatories

---

Page 9

1            P R O C E E D I N G S
2                --oOo--
3            THE VIDEOGRAPHER:  Good morning.  We're on
4       the video record, ladies and gentlemen, at
5       9:33 a.m.  I am Anthony Hensley from Alderson Court
6       Reporting in Washington D.C.  The phone number is
7       202-289-2260.
8            This is matter pending before the court of
9       the United States District Court for the District
10      of Columbia in the case captioned American
11      Educational Research Association et al., versus
12      Public.Resource.Org, Incorporated, case number
13      1-14-cv-00857-TSC-DAR.
14           This is the beginning of Disc 1, Volume 1
15      of the deposition of Carl Malamud on 5/11/2015.
16           We're located at address 555 California
17      Street, San Francisco, California.  This is taken
18      on behalf of the plaintiffs.
19           Counsel, would you please identify
20      yourselves starting with the questioning attorney.
21           MR. HUDIS:  Jonathan Hudis, and Katherine
22      Cappaert for the plaintiffs.
23           MR. BRIDGES:  Andrew Bridges and Matt
24      Becker of Fenwick & West for the defendant.
25           MR. SMITH:  Corynne McSherry from the

---

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                          May 12, 2015
San Francisco, CA

Page 10

1    Electronic Frontier Foundation for the defendant.
2        THE VIDEOGRAPHER:  You may proceed.
3        MR. HUDIS:  Just a correction for the
4    record.  Today is May 12th, 2015.
5    BY MR. HUDIS:
6        Q.  Sir, could I have your full name and
7    address for the record?
8        Oh, go ahead.
9        THe REPORTER:  Thank you.
10       Sir, could I have you raise your right
11   hand, please.
12           CARL MALAMUD,
13   called as a witness, after having been duly sworn
14   by the Certified Shorthand Reporter to tell the
15   truth, the whole truth, and nothing but the truth,
16   testified as follows:
17           EXAMINATION
18   BY MR. HUDIS:
19       Q.  Sir, if I could have your full name and
20   address for the record.
21       A.  Carl Andrew Malamud, and my address is
22   1005, Gravenstein Highway North in Sebastapol,
23   California.  Zip code is 95472.
24       Q.  And is that your home address?
25       A.  No, that's my work address.

Page 11

1        Q.  All right.  And your home address, sir?
2        A.  It's P.O. Box 361 in Bodega, California,
3    94992.
4        Q.  Mr. Malamud, we're here to take your
5    deposition in the matter of American Educational
6    Research Association and its co-plaintiffs versus
7    Public.Resource.Org.
8        The parties all have long names.  So I want
9    to establish some working acronyms between the two
10   of us.
11       So if I say AERA, do you understand that to
12   mean the American Educational Research Association,
13   Inc.?
14       A.  Yes, I do.
15       Q.  And if I use the acronym APA, that will
16   refer to the American Psychological Association,
17   Inc.
18       A.  Yes.
19       Q.  And if I use the acronym NCME, that will
20   refer to National Council on Measurement and
21   Education, Inc.
22       A.  Yes.
23       Q.  And if I refer to Public.Resource, that
24   will be a shorthand version of Public.Resource.Org,
25   Inc.?

Page 12

1        A.  That's correct.
2        Q.  And a couple of housekeeping matters,
3    Mr. Malamud.
4        You understand that today you're giving
5    testimony under oath?
6        A.  I do.
7        Q.  And that the court reporter is taking down
8    everything you are saying?
9        A.  I do.
10       Q.  And we will need audible responses from
11   you.  So no nods or gestures.
12       A.  Yes.
13       Q.  If at any point, Mr. Malamud, you don't
14   understand a question, please let me know and I
15   will try to clarify that question for you.
16       A.  I will.
17       Q.  If you need a break for any reason, please
18   let me know and we can provide that break for you.
19   Except if there is a question pending, you must
20   answer the question before we take the break.  Is
21   that okay?
22       A.  Yes, I understand.
23       Q.  All right.  If at any point you come to
24   realize that an answer that you've already given is
25   not completely correct, please let me know and I

Page 13

1    will give you an opportunity to correct that
2    answer.  Do you understand?
3        A.  I do.
4        Q.  All right.
5        MR. BRIDGES:  I would like to take the time
6    to say that under the rules, we do request the
7    opportunity to review and correct the deposition
8    afterwards.
9        MR. HUDIS:  Thank you, Counsel.
10   BY MR. HUDIS:
11       Q.  Is there any reason, Mr. Malamud, either by
12   your taking medication or by reason of illness,
13   that you cannot testify completely, accurately and
14   truthfully today?
15       A.  There is no reason.
16       Q.  Have you been deposed before?
17       A.  Yes, I have.
18       Q.  In what case or what cases?
19       A.  That was in the case of --
20       MR. BRIDGES:  Sorry.  I need for you to
21   give me time to --
22       THE WITNESS:  Yes, sir.
23       MR. BRIDGES:  That was not objectionable,
24   but give me time.
25       THE WITNESS:  That was the case ASTM et

4 (Pages 10 to 13)

Carl Malamud                                                      May 12, 2015
San Francisco, CA

Page 14

1    al., versus Public.Resource.Org.
2    BY MR. HUDIS:
3        Q. Have you been deposed in any other cases?
4        A. No, I have not.
5        Q. One other housekeeping matter that your
6    counsel just reminded me.
7            So for the benefit of the court reporter,
8    wait until I finish my question before you start
9    answering so that for one thing, the court reporter
10   has a clean transcript.  And the other, your
11   counsel has time to object if he wants to.
12           Do you understand that?
13       A. Yes, I understand.
14          (PLAINTIFFS' EXHIBITS 13-14 WERE MARKED.)
15   BY MR. HUDIS:
16       Q. Mr. Malamud, I put in front of you what has
17   now been marked as Plaintiff's Exhibit Malamud 13.
18           Have you seen this deposition notice
19   before, Exhibit 13 that is directed to you?
20           MR. BRIDGES:  I'm sorry, so which -- it
21   appears as though two -- I received two.  I just
22   want -- 13 is -- okay.
23           THE WITNESS:  It says 14.
24           MR. BRIDGES:  Yes.  The one he's looking at
25   is -- this is 13.  It came to me.

Page 15

1    BY MR. SPEAR:
2        Q. All right.  Are we good?
3        A. The document entitled notice of deposition
4    of Carl Malamud.
5        Q. Right.  And that's Exhibit 13?
6        A. Yes, it is.
7        Q. Have you seen this deposition notice of
8    Exhibit 13 before?
9        A. Yes, I have.
10       Q. When for the first time?
11       A. When it was served, I believe.
12       Q. So if we gave it to your counsel on April
13   9, that's the first time around which you probably
14   saw Exhibit 13?
15           MR. BRIDGES:  Objection.  Calls for
16   speculation.
17   BY MR. HUDIS:
18       Q. You may answer.
19       A. I saw it in April.
20       Q. What did you do to prepare to testify
21   regarding the deposition notice of Exhibit 13?
22           MR. BRIDGES:  Objection.  Argumentative;
23   lacks foundation; assumes facts not in evidence.
24   BY MR. HUDIS:
25       Q. You may answer.

Page 16

1        A. I reviewed the deposition notice.  I
2    reviewed the materials that were disclosed to the
3    plaintiffs during the discovery process.
4        Q. Do you remember which documents you
5    reviewed?
6        A. It was the materials that were disclosed to
7    the plaintiffs.
8        Q. Do you remember any specific documents that
9    you reviewed?
10       A. There were a large number of such
11   documents.  Would you like a couple examples?
12       Q. Yes, please.
13       A. There was a California Code of Regulations.
14   There were some -- there was a FOIA request.  There
15   was an electronic mail.  There were some letters.
16       Q. Anything else that you can remember at this
17   time?
18       A. I think that was the main material.  There
19   were some appendices to some of the -- the letters
20   and electronic mail.
21       Q. All right.  Do you remember in total how
22   many documents you might have reviewed to prepare
23   to testify?
24           MR. BRIDGES:  Objection.  Calls for
25   speculation.

Page 17

1            THE WITNESS:  I don't know how many
2    exactly, no.
3    BY MR. HUDIS:
4        Q. In preparation for testifying today,
5    pursuant to the personal deposition notice of
6    Exhibit 13, did you talk with anybody?
7            MR. BRIDGES:  Objection.  To the extent it
8    calls for the witness to reveal attorney-client
9    communications, I'll object on that basis and
10   instruct the witness not to answer.
11   BY MR. HUDIS:
12       Q. All right.  Without revealing the substance
13   of attorney-client communications, who did you
14   speak with to prepare to testify today?
15           MR. BRIDGES:  If -- if he had a
16   conversation with attorneys, that answer would call
17   for divulging of attorney-client communications
18   itself.  And I'd object and instruct the witness
19   not to answer.
20           If you want to ask him about any
21   conversations he had with persons other than
22   attorneys, please do so.
23           MR. HUDIS:  All right.  So you're
24   instructing the witness not to answer whether he
25   spoke with attorneys regarding this preparation?

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                                    May 12, 2015
San Francisco, CA

| Page 18 | Page 20 |
|---|---|

**Page 18**

1    MR. BRIDGES: If you're asking about
2  talking with attorneys regarding preparation, yes,
3  that's correct.
4    MR. HUDIS: Mark that question for ruling.
5  BY MR. HUDIS:
6    Q. Besides counsel, who, if anyone, did you
7  speak with to prepare to testify today?
8    A. I didn't speak to anybody.
9    Q. Did you speak with anyone at Internet
10  Archive to prepare to testify today?
11    A. No, I did not.
12    Q. How long did you take to prepare for your
13  deposition testimony today?
14    MR. BRIDGES: Objection. Argumentative;
15  lacks foundation.
16    THE WITNESS: I spent several hours a day,
17  all of last week. And I spent some time over the
18  weekend and on Monday preparing.
19  BY MR. HUDIS:
20    Q. And how long in total do you think you
21  spent preparing to testify?
22    MR. BRIDGES: Actually, same objections and
23  also vague and ambiguous.
24    Are you referring to his personal
25  deposition as opposed to his 30(b)(6) deposition?

**Page 20**

1    Do you see that?
2    A. I do.
3    Q. Which topics of the deposition notice in
4  Exhibit 14 are you prepared to testify to today?
5    MR. BRIDGES: I'm going to note for the
6  record that there are objections which we as
7  lawyers have interposed, and I will state for the
8  record that we are not -- the defendant is not
9  producing Mr. Malamud with respect to categories 4,
10  10, 11, 19, 23, 29 and 30. And we will object to
11  any questions on those topics.
12    Of course, questions to Mr. Malamud on
13  those topics may proceed to the extent that they
14  are otherwise unobjectionable. But they would not
15  be pursuant to Rule 30(b)(6).
16    MR. HUDIS: So, Counsel, other than the
17  ones that you specifically named, is Mr. Malamud
18  prepared to testify on all the other deposition
19  topics in the deposition notice of Exhibit 14?
20    MR. BRIDGES: Yes.
21  BY MR. HUDIS:
22    Q. Now, with respect to the deposition notice
23  of Exhibit 14, what did you do to prepare to
24  testify regarding these topics?
25    MR. BRIDGES: Objection. Vague and

| Page 19 | Page 21 |
|---|---|

**Page 19**

1    MR. HUDIS: Yes.
2    MR. BRIDGES: Then it's -- lacks
3  foundation; argumentative; vague and ambiguous.
4  BY MR. HUDIS:
5    Q. You may answer.
6    A. My preparation was for my deposition in
7  both of my capacities. So I was unable to separate
8  out which times were one or the other.
9    Q. That's fine. Then how long in total did
10  you prepare to testify in all your capacities
11  today?
12    MR. BRIDGES: Objection. Vague and
13  ambiguous.
14  BY MR. HUDIS:
15    Q. You may answer.
16    A. Well, it was a few hours a day last week.
17  It was tens of hours. I don't have an exact
18  number.
19    MR. BRIDGES: Please give me time to
20  object.
21  BY MR. HUDIS:
22    Q. Mr. Malamud, I'd like to now place in front
23  of you what has been marked as Exhibit 14. And
24  that is the deposition notice directed to
25  Public.Resource.

**Page 21**

1  ambiguous.
2  BY MR. HUDIS:
3    Q. You may answer.
4    A. The same thing that I recently described to
5  you about my personal preparation.
6    Q. And you reviewed the same documents and the
7  same number of documents?
8    MR. BRIDGES: Lacks foundation; vague and
9  ambiguous.
10  BY MR. HUDIS:
11    Q. You may answer.
12    A. Yes. My preparation was in toto. It
13  wasn't separate by the type of deposition.
14    Q. And to prepare to testify for your
15  deposition of Exhibit 14, did you speak with
16  counsel?
17    MR. BRIDGES: I will not object to that
18  question exactly as phrased.
19    THE WITNESS: I spoke with counsel.
20  BY MR. HUDIS:
21    Q. Did you speak with anyone else besides
22  counsel in order to prepare to testify on the
23  deposition topics of Exhibit 14?
24    A. No, I did not.
25    Q. Did you speak with anyone at Internet

6 (Pages 18 to 21)

Carl Malamud                                                          May 12, 2015
                          San Francisco, CA

---

Page 22

1    Archive to prepare to testify today?
2        A.  No, I did not.
3        Q.  And you spent the same number of hours in
4    total to prepare to testify regarding Exhibits 13
5    and 14, as you described before?
6            MR. BRIDGES:  Objection.  Vague and
7    ambiguous.
8    BY MR. HUDIS:
9        Q.  You may answer.
10           MR. BRIDGES:  Lacks foundation.
11           THE WITNESS:  My preparation was for the
12   deposition.  I did not separate my time out between
13   the two roles that I play.
14   BY MR. HUDIS:
15       Q.  To prepare to testify today with respect to
16   both deposition notices of Exhibit 13 and 14, did
17   you speak with Ms. Rebecca Malamud?
18       A.  No, I did not.
19       Q.  Mr. Malamud, what's the highest level of
20   your education?
21       A.  Highest degree?
22       Q.  Yes.
23       A.  I have an MBA.
24       Q.  Do you have a bachelor's degree?
25       A.  Yes, I do.

---

Page 23

1        Q.  All right.  And from where?
2        A.  Indiana University.
3        Q.  And what was the degree in?
4        A.  Business economics and public policy.
5        Q.  And when did you receive that degree?
6        A.  Which degree?
7        Q.  The B.S. in business economics and public
8    policy.
9        A.  1980.
10       Q.  Towards your bachelor's degree, did you
11   have any major concentration?
12       A.  Business economics and public policy.
13       Q.  Did you have a minor concentration?
14       A.  No, that was the program.
15       Q.  And you said you have an MBA?
16       A.  I do.
17       Q.  And from which institution did you receive
18   your MBA?
19       A.  Indiana University.
20           MR. BRIDGES:  Again, I'll ask you to give
21   me time to object.
22           THE WITNESS:  Yes.
23   BY MR. HUDIS:
24       Q.  And what type of -- what type of MBA degree
25   was that?

---

Page 24

1            MR. BRIDGES:  Objection.  Vague and
2    ambiguous.
3    BY MR. HUDIS:
4        Q.  You may answer.
5        A.  It was an MBA granted as part of the
6    doctoral program in business economics and public
7    policy.
8        Q.  And I believe you said you received your
9    MBA from Indiana University?
10       A.  That's correct.
11       Q.  And what year did you receive your MBA?
12       A.  I think it was 1982.  It might have been
13   early '83.
14       Q.  Did you have any concentration towards your
15   MBA, major concentration?
16       A.  My doctoral course work was in anti-trust
17   and regulation economics.
18       Q.  Did you have a minor concentration?
19       A.  No, I did not.
20       Q.  Mr. Malamud, do you have any formal legal
21   training?
22           MR. BRIDGES:  Objection.  Vague and
23   ambiguous.
24   BY MR. HUDIS:
25       Q.  You may answer.

---

Page 25

1        A.  I did a year at the Georgetown Law Center,
2    the first year of law school.
3        Q.  And what year was that?
4        A.  1984.
5        Q.  And I take it you didn't go on to finish
6    the degree?
7        A.  No, I did not.
8        Q.  Now, you said you did a doctorate.  Do you
9    have a Ph.D.?
10       A.  No, I do not.
11       Q.  Do you --
12           MR. BRIDGES:  Again, I need time to object.
13           THE WITNESS:  Yes, sir.
14           MR. BRIDGES:  I'll object to that as
15   misstating testimony.
16           Go ahead.
17   BY MR. HUDIS:
18       Q.  Do you have any other degrees?
19       A.  No, I do not.
20       Q.  Do you possess any certificates of any kind
21   for training?
22           MR. BRIDGES:  Objection.  Vague and
23   ambiguous.
24           THE WITNESS:  No.
25   BY MR. HUDIS:

---

7 (Pages 22 to 25)

Carl Malamud                                                    May 12, 2015

San Francisco, CA

Page 26

1    Q.  Mr. Malamud, I'd like you to define a term
2  for me, "computer science."
3        MR. BRIDGES:  Objection.  Argumentative;
4  vague and ambiguous.
5  BY MR. HUDIS:
6    Q.  You may answer.
7    A.  It's an academic discipline having to do
8  with the study of computers.
9    Q.  And how about "computer networks"?
10        MR. BRIDGES:  Objection.  Vague and
11  ambiguous; argumentative; lacks foundation; assumes
12  facts not in evidence.
13        THE WITNESS:  Computer networks are -- is
14  the discipline and study of how one computer
15  communicates with another computer.
16  BY MR. HUDIS:
17    Q.  Thank you.
18        Have you written any books on computer
19  science or computer networks?
20    A.  Yes.
21        MR. BRIDGES:  Objection.  Vague and
22  ambiguous.
23        THE WITNESS:  Yes.
24  BY MR. HUDIS:
25    Q.  As your counsel said, give him time to

Page 27

1  object.
2    A.  I will try.  Sorry.
3    Q.  Thank you.
4        So do you consider yourself to have any
5  expertise in computer science or computer networks
6  or both?
7        MR. BRIDGES:  Objection.  Vague and
8  ambiguous; compound; argumentative.
9        MR. HUDIS:  Good point, Counsel.
10        MR. BRIDGES:  Could call for a legal
11  conclusion.
12        MR. HUDIS:  Good point, Counsel.
13  BY MR. HUDIS:
14    Q.  Do you consider yourself to have expertise
15  in computer science?
16        MR. BRIDGES:  Objection.  Vague and
17  ambiguous; argumentative; may call for a legal
18  conclusion.
19        THE WITNESS:  I have worked in the
20  profession since 1980.  I think it's up to others
21  to decide whether I have expertise or not.
22  BY MR. HUDIS:
23    Q.  And if you could briefly summarize your
24  work in the profession over that 30 years.
25        MR. BRIDGES:  Objection.  Calls for a

Page 28

1  narrative; vague and ambiguous.
2  BY MR. HUDIS:
3    Q.  You may answer.
4    A.  I'm not sure what you're asking for.  Do
5  you want to know what jobs I worked or --
6    Q.  We'll take that later.
7        Do you consider yourself to have an
8  expertise in computer networks?
9        MR. BRIDGES:  Objection.  Vague and
10  ambiguous; argumentative; may call for a legal
11  conclusion.
12        THE WITNESS:  Again, I've worked in the
13  profession since 1980, and I believe it's up to
14  others to decide whether I have expertise or not.
15        (PLAINTIFFS' EXHIBIT 15 WAS MARKED.)
16  BY MR. HUDIS:
17    Q.  Mr. Malamud, I show you a document that has
18  now been marked as Exhibit 15.  And I'd like you to
19  look at the exhibit and tell me if that appears to
20  be a representative list of books you have authored
21  or co-authored?
22        MR. BRIDGES:  Objection.  Lacks foundation;
23  vague and ambiguous.
24        THE WITNESS:  It is some books by me, but
25  there's a number of other items in this list.

Page 29

1  BY MR. HUDIS:
2    Q.  And the other items in the list, are they
3  items that you co-authored with others?
4        MR. BRIDGES:  Objection.  Lacks foundation;
5  vague and ambiguous.
6        THE WITNESS:  This is a rather strange
7  list.  Item number 1, Gage, Bailey, Kahn, Malamud,
8  I have no idea what that is.  It may have been some
9  conference proceedings.
10        MR. BRIDGES:  I'll -- I'll ask the witness
11  not to speculate.
12        And I would object to the question at this
13  point on the grounds that may call for speculation
14  and lacks foundation.
15        THE WITNESS:  There are a number of items
16  in here including pamphlets, and it looks like at
17  least one video presentation.
18  BY MR. HUDIS:
19    Q.  Do you recognize the titles on Exhibit 15
20  as either authored by you or co-authored by you?
21        MR. BRIDGES:  Objection.  Lacks foundation;
22  vague and ambiguous; potentially argumentative;
23  compound.
24        Do you want him to identify particular
25  titles?

8 (Pages 26 to 29)

Carl Malamud                                                    May 12, 2015

San Francisco, CA

| Page 30 | Page 32 |
|---|---|

**Page 30**

1    MR. HUDIS:  I'll --
2  BY MR. HUDIS:
3    Q.  Well, first answer that question.
4    MR. BRIDGES:  All those same objections
5  apply.
6    THE WITNESS:  At first glance, these do
7  appear to be items that I was involved with, either
8  as an author, a co-author or a producer.
9  BY MR. HUDIS:
10    Q.  Are there any items on Exhibit 15 which you
11  do not recognize your involvement as either an
12  author, co-author or producer?
13    MR. BRIDGES:  Objection.  Lacks foundation;
14  vague and ambiguous.
15    THE WITNESS:  I'm not sure what item number
16  1 is on that list, the number one, Gage, Bailey,
17  Kahn.
18    MR. BRIDGES:  Objection.  The question
19  was -- I'm sorry.  Not objection.
20    The question is, are there any items which
21  you do not recognize?  That's the question.
22    THE WITNESS:  Yes.
23  BY MR. HUDIS:
24    Q.  Which one?
25    A.  Item number 1.

**Page 31**

1    Q.  Any others?
2    A.  No.
3    Q.  Of the ones you recognize on Exhibit 15,
4  what generally are the subject matters of these
5  writings?
6    MR. BRIDGES:  Objection.  Massively lacks
7  foundation; massively compound; vague and
8  ambiguous, and misleading and assumes facts not in
9  evidence.
10    THE WITNESS:  There's a large number of
11  topics.  I'd be happy to discuss the individual
12  items and tell you what they're about.
13  BY MR. HUDIS:
14    Q.  Sure.  Sure.
15    So the second item, "12 Tables of American
16  Law."  What -- what is that about?
17    MR. BRIDGES:  Objection.  Vague and
18  ambiguous.
19    THE WITNESS:  That is a lecture I gave at
20  the Harvard Law School to a series -- to a
21  collection of law librarians that had convened.
22  BY MR. HUDIS:
23    Q.  And what was the topic?
24    MR. BRIDGES:  Objection.  Vague and
25  ambiguous.

**Page 32**

1    THE WITNESS:  The topic was a history of
2  the 12 tables of Roman law, and the application of
3  the concept of promulgation of the law to current
4  system of American justice.
5  BY MR. HUDIS:
6    Q.  The next item, "Law.gov, a revolution in
7  legal affairs."  Could you tell me the subject
8  matter of that item?
9    MR. BRIDGES:  Objection.  Vague and
10  ambiguous.
11    THE WITNESS:  That was a kickoff panel
12  session for the Law.gov effort, which was a attempt
13  to study the question of the availability of
14  primary legal materials in the United States.
15  BY MR. HUDIS:
16    Q.  Availability where?
17    A.  Generally.
18    Q.  On the Internet?  Elsewhere?
19    MR. BRIDGES:  Objection.  Asked and
20  answered.
21    THE WITNESS:  Generally.  The availability
22  of legal materials in the United States.
23  BY MR. HUDIS:
24    Q.  And the next item, "Cyberjockeying in the
25  21st Century," what was that item about?

**Page 33**

1    MR. BRIDGES:  Objection.  Vague and
2  ambiguous.
3    THE WITNESS:  That was a satellite-based
4  video production that was produced by Mr. John Gage
5  of Sun Microsystems, and I was a guest where I
6  demonstrated the first radio station on the
7  Internet and how it worked.
8    MR. BRIDGES:  I'll just instruct the
9  witness to answer the question.
10    That question was, what was that item
11  about?
12  BY MR. HUDIS:
13    Q.  The next item, "The currents of our time."
14    What -- what was that publication about?
15    MR. BRIDGES:  Objection.  Vague and
16  ambiguous.
17  BY MR. HUDIS:
18    Q.  You may answer.
19    A.  It was about the procurement of information
20  technology by the federal government.
21    Q.  What did you -- what did you mean in your
22  last answer by "information technology"?
23    A.  Computers, computer networks and software.
24    Q.  The next item, "The future of the Internet
25  protocol."  What was that item about?

9 (Pages 30 to 33)

Carl Malamud                                                                    May 12, 2015

San Francisco, CA

Page 34

1        MR. BRIDGES:  Objection.  Vague and
2    ambiguous.
3        THE WITNESS:  That was a series of
4    interviews that I conducted with Internet engineers
5    about the future of the Internet protocol.
6    BY MR. HUDIS:
7        Q.  And what did you mean by "Internet
8    protocol"?
9        MR. BRIDGES:  Objection.  Vague and
10   ambiguous.
11       THE WITNESS:  The Internet protocol is a
12   specific networking protocol known as IP, which is
13   one of the foundations of the Internet.
14   BY MR. HUDIS:
15       Q.  The next item, "Ten rules for radicals."
16   What was that item about?
17       MR. BRIDGES:  Objection.  Vague and
18   ambiguous.
19       THE WITNESS:  That was a speech before the
20   World Wide Web conference.
21   BY MR. HUDIS:
22       Q.  And what was your speech about?
23       MR. BRIDGES:  Objection.  Asked and
24   answered; vague and ambiguous.
25       THE WITNESS:  It was a keynote speech about

Page 35

1    my experiences in the past and some lessons that I
2    had for the attendees.
3    BY MR. HUDIS:
4        Q.  Could you summarize the lessons you
5    imparted to the attendees?
6        MR. BRIDGES:  Objection.  Vague and
7    ambiguous.
8        THE WITNESS:  I can summarize one.  I
9    explained the story of how I put the Securities and
10   Exchange Commission EDGAR database online and the
11   efforts that we undertook in order to get the
12   government to -- to -- to run that service
13   themselves.
14   BY MR. HUDIS:
15       Q.  And the EDGAR database, that's the database
16   for the Securities and Exchange Commission?
17       MR. BRIDGES:  Objection.  Vague and
18   ambiguous.
19       THE WITNESS:  EDGAR is the Electronic Data
20   Gathering, and I forget what AR is, and it is, in
21   fact, the information dissemination database of the
22   Securities and Exchange Commission.
23   BY MR. HUDIS:
24       Q.  And the next item, "Concert in the park,
25   Internet 1996 World Exposition," what -- what was

Page 36

1    that item about?
2        MR. BRIDGES:  Objection.  Vague and
3    ambiguous.
4        THE WITNESS:  I was simply a producer on
5    that item.  It was a series of audio compositions
6    by Martin Lucas and Corrine Becknell, and it was
7    released as an audio CD.
8    BY MR. HUDIS:
9        Q.  The next item, "Three revolutions in
10   American law," what was that item about?
11       MR. BRIDGES:  Objection.  Vague and
12   ambiguous.
13       THE WITNESS:  It was a paper about the
14   history of promulgation of the law in the United
15   States beginning with the Wheaton v Peters
16   decision.
17   BY MR. HUDIS:
18       Q.  And what specific area of the law?
19       MR. BRIDGES:  Objection.  Lacks foundation;
20   vague and ambiguous.
21       THE WITNESS:  About promulgation of -- of
22   the law.  Of the laws.
23   BY MR. HUDIS:
24       Q.  And what did you mean by "promulgation"?
25       A.  Promulgation is the process of publication

Page 37

1    and dissemination of primary legal materials.
2        Q.  The next item, "Security and networks."
3    What was that item about?
4        MR. BRIDGES:  Objection.  Vague and
5    ambiguous.
6        THE WITNESS:  That was two different audio
7    interviews I did as part of the radio station on
8    the Internet that I ran, one with Jeffrey Schiller
9    and one with John Romkey, about security and
10   networks.
11       MR. BRIDGES:  And I'll ask the witness
12   simply to answer the question that is asked.
13   BY MR. HUDIS:
14       Q.  Mr. Malamud, the next item, "By the
15   people."  What was that item about?
16       MR. BRIDGES:  Objection.  Vague and
17   ambiguous.
18       THE WITNESS:  It was a speech that I gave
19   to the Gov 2.0 conference, I believe was the
20   official name of that.
21   BY MR. HUDIS:
22       Q.  What was the topic of that speech?
23       MR. BRIDGES:  Objection.  Vague and
24   ambiguous.
25       THE WITNESS:  It discussed the history of,

10 (Pages 34 to 37)

Carl Malamud                                                    May 12, 2015
                        San Francisco, CA

---

Page 38

1    among other things, the government printing office.
2    BY MR. HUDIS:
3        Q.  Do you remember what else that speech was
4    about besides the government printing office?
5        MR. BRIDGES:  Objection.  Vague and
6    ambiguous.
7        THE WITNESS:  It was about the creation of
8    the official journals of government.
9    BY MR. HUDIS:
10       Q.  What did you mean by "official journals"?
11       A.  The official journals of government in the
12   United States include the Congressional Record, the
13   Federal Register, the Code of Federal Regulation
14   and the papers of the president.
15       Q.  The next item, "Mobile IP networking."
16   What was that item about?
17       MR. BRIDGES:  Objection.  Vague and
18   ambiguous.
19       THE WITNESS:  As with the security networks
20   thing we discussed previously, it was an interview
21   that I conducted as part of Internet talk radio
22   with Internet engineers.
23   BY MR. HUDIS:
24       Q.  The next item, "Global network operations,"
25   what was that item about?

---

Page 39

1        MR. BRIDGES:  Objection.  Vague and
2    ambiguous.
3        THE WITNESS:  Same as the previous.  It was
4    a discussion with Internet engineers about the work
5    that they do.
6    BY MR. HUDIS:
7        Q.  The next item, "Law.gov, the raw materials
8    of our democracy, a shining city upon the hill, an
9    appeal to the court."  What was that item about?
10       MR. BRIDGES:  Objection.  Vague and
11   ambiguous.
12       THE WITNESS:  That was a pamphlet that
13   contained prepared remarks that I delivered upon
14   three occasions.
15   BY MR. HUDIS:
16       Q.  And what is the subject matter of that
17   pamphlet?
18       MR. BRIDGES:  Objection.  Vague and
19   ambiguous.
20       THE WITNESS:  There were -- the subject
21   matter was the Law.gov effort and the question of
22   promulgation of primary legal materials in the
23   United States.
24   BY MR. HUDIS:
25       Q.  As you described before?

---

Page 40

1        MR. BRIDGES:  Objection.  Vague and
2    ambiguous.
3    BY MR. HUDIS:
4        Q.  What do you mean by "primary legal
5    materials"?
6        A.  Primary legal materials are edicts of
7    government.  Those are materials that have the
8    force of law that are -- are -- originated from a
9    governmental body.
10       Q.  Could you give me some examples, please?
11       A.  A supreme court opinion.
12       Q.  So legal opinions?
13       MR. BRIDGES:  Objection.  Vague and
14   ambiguous; misstates testimony.
15       THE WITNESS:  A supreme court opinion is
16   one example.  There are other court opinions that
17   also are edicts of government, yes.
18   BY MR. HUDIS:
19       Q.  Would a statute passed by a legislature be
20   another edict of government?
21       MR. BRIDGES:  Objection.  Vague and
22   ambiguous; lacks foundation.
23       THE WITNESS:  Yes, statutes are edicts of
24   government.
25   BY MR. HUDIS:

---

Page 41

1        Q.  Would an agency regulation be another edict
2    of government?
3        MR. BRIDGES:  Objection.  Vague and
4    ambiguous; lacks foundation.
5        THE WITNESS:  Any materials that have the
6    force of law, and that includes a regulation.
7    BY MR. HUDIS:
8        Q.  The next item, "DEC Networks and
9    architectures."  What was that item about?
10       A.  That was a professional reference book
11   about the computer networking protocols that were
12   adopted by the Digital Equipment Corporation.
13       Q.  What did you mean by "computer networking
14   protocols"?
15       A.  It's a suite of specifications that were
16   known as DECnets, which is how Digital Equipment
17   Corporation computers were able to communicate with
18   each other.
19       Q.  When you say the "suite of specifications,"
20   do you mean software?
21       A.  No, I mean protocol specifications.
22       Q.  What do you mean by "protocol
23   specifications"?
24       A.  A detailed and formal description of the
25   way that one computer communicates with another

---

11 (Pages 38 to 41)

Carl Malamud                                                          May 12, 2015

San Francisco, CA

Page 42

1    computer.
2         Q.  The next item, "The World's Fair For the
3    Global Village."  What was that item about?
4             MR. BRIDGES:  Objection.  Vague and
5    ambiguous.
6         THE WITNESS:  That was a book that I wrote
7    about the Internet 1996 World Exposition.
8         This listing is incorrect in the sense of
9    there were two additional contributors to that
10   book.
11   BY MR. HUDIS:
12        Q.  And who were the two additional
13   contributors?
14        A.  The afterword was by a musician named
15   Laurie Anderson.  The foreword was by his holiness,
16   the Dalai Lama.
17        Q.  And generally what was the book, "The
18   World's Fair For the Global Village," about?
19             MR. BRIDGES:  Objection.  Vague and
20   ambiguous.
21        THE WITNESS:  It was a description of the
22   Internet 1996 World Exposition, which I was a
23   co-founder of, and served as secretary general.
24   BY MR. HUDIS:
25        Q.  The next item, "Ingres:  Tools for building

Page 43

1    an information architecture."  What was that item
2    about?
3             MR. BRIDGES:  Objection.  Vague and
4    ambiguous.
5         THE WITNESS:  It is a professional
6    reference book about the Ingres relational database
7    management system.
8    BY MR. HUDIS:
9         Q.  Could you describe the Ingres --
10            THE REPORTER:  It is a professional book
11   about the Ingres --
12            THE WITNESS:  Professional reference book.
13   BY MR. HUDIS:
14        Q.  Could you describe for me what is the
15   Ingres information database management system?
16        A.  That's the Ingres relational database
17   management system.
18        Q.  Thank you.
19        A.  RDMS.
20        Q.  And could you describe what it is, please?
21        A.  It is one of the two early relational
22   database management systems.  Somewhat akin to a
23   system called Oracle that is very popular today.
24        Ingres and DB2 were the original two
25   relational database systems.  That's capital D,

Page 44

1    capital B letter 2.
2         Q.  Could you tell me the next item, what it is
3    about, "Analyzing DECnet/OSI phase Roman Numeral
4    V"?
5             MR. BRIDGES:  Objection.  Vague and
6    ambiguous.
7         THE WITNESS:  My first book about DEC was
8    about something known as DECnet phase IV.  This
9    book was about the successor to DECnet phase IV, a
10   system of international protocols known as open
11   systems interconnect, or OSI, and this was a
12   professional reference book that discussed in
13   detail the protocols inherent in that protocol
14   suite.
15   BY MR. HUDIS:
16        Q.  In simple terms, what -- what are -- what
17   is the purpose of those protocols?
18             MR. BRIDGES:  Objection.  Vague and
19   ambiguous.
20        THE WITNESS:  OSI was an alternative to
21   TCP/IP, which is the foundation of today's
22   Internet.  So it is a full protocol suite that
23   goes -- that describes all the different
24   capabilities that computers will have when they
25   communicate with each other.

Page 45

1    BY MR. HUDIS:
2         Q.  So it's an Internet communications
3    protocol?
4             MR. BRIDGES:  Objection.  Misstates
5    testimony; vague and ambiguous.
6         THE WITNESS:  It's a protocol suite, and
7    that is a whole set of protocols.
8    BY MR. HUDIS:
9         Q.  For Internet communications?
10            MR. BRIDGES:  Objection.  Vague and
11   ambiguous.
12        THE WITNESS:  No, because Internet
13   communications is the Internet protocol suite.
14   This was an alternative that was devised, and it
15   was, in effect, a competitor to the Internet.
16   BY MR. HUDIS:
17        Q.  All right.  So it's computer-to-computer
18   communications?
19            MR. BRIDGES:  Objection.  Vague; misstates
20   testimony; vague and ambiguous.
21        THE WITNESS:  Computer-to-computer
22   communications, routing protocols, and a whole
23   suite of other functions that make up a protocol
24   suite.  Again, equivalent to the Internet protocol
25   suite.

Carl Malamud                                                                May 12, 2015

San Francisco, CA

Page 46

1    BY MR. HUDIS:
2        Q.  So the next item, "Exploring the Internet,
3    a Technical Travelogue," t-r-a-v-e-l-o-u-g-e.
4             What was that item about?
5             MR. BRIDGES:  Objection.  Vague and
6    ambiguous.
7             THE WITNESS:  That was a book I wrote that
8    described three trips I made around the world to
9    visit people that were creating what has become our
10   modern Internet.
11   BY MR. HUDIS:
12       Q.  The next item in Exhibit 15, "Stacks:
13   Interoperability in today's computer networks."
14   What was that item about?
15            MR. BRIDGES:  Objection.  Vague and
16   ambiguous.
17            THE WITNESS:  That was a professional
18   reference book that described a series of new and
19   emerging topics in the field of computer networks
20   aimed at advanced networking engineers.  It was a
21   way of letting them know what was coming around --
22   around the corner.
23   BY MR. HUDIS:
24       Q.  The next item on which you are co-author
25   with many authors, what is the next item, "Law.gov

Page 47

1    workshops"?
2             MR. BRIDGES:  Objection.  Lacks foundation;
3    vague and ambiguous; assumption facts not in
4    evidence.
5             THE WITNESS:  Yeah, co-author is incorrect.
6    And this really is not a bibliographic item.
7    BY MR. HUDIS:
8        Q.  Then what is that item, "Law.gov
9    workshops"?
10       A.  I organized a series of 15 workshops around
11   the country focused on the issue of promulgation of
12   primary legal materials in the United States.
13       Q.  And were these individuals who were named
14   with you in this reference, lecturers with you on
15   that same series of workshops?
16            MR. BRIDGES:  Objection.  Lacks foundation;
17   assumes facts not in evidence; vague and ambiguous.
18            THE WITNESS:  Lecturers would be an
19   incorrect characterization.  These were all
20   participants in one or more of the workshops.
21   BY MR. HUDIS:
22       Q.  What do you mean by "participants"?
23       A.  In each case these people made a brief
24   presentation and then participated in discussions.
25       Q.  The next item, "Analyzing Novell networks."

Page 48

1    What was that item about?
2             MR. BRIDGES:  Objection.  Vague and
3    ambiguous.
4             THE WITNESS:  It was a professional
5    reference book about the Novell networking protocol
6    suite.  It was part of a three-volume series we had
7    previously discussed analyzing DECnet OSI phase V.
8    This was a companion volume to that.
9    BY MR. HUDIS:
10       Q.  And what was the subject matter of that
11   companion volume?
12       A.  The Novell protocol suite, which was
13   another mechanism for computers to communicate with
14   computers, like OSI, or what we know of as the
15   Internet today.
16       Q.  And the next item, what is -- what was
17   "Global network operations"?
18            MR. BRIDGES:  Objection.  Lacks foundation;
19   vague and ambiguous.
20            THE WITNESS:  That's another one of those
21   audio interviews I did with network engineers as
22   part of the program Geek of the Week.
23   BY MR. HUDIS:
24       Q.  What was the subject of that interview?
25            MR. BRIDGES:  Objection.  Vague and

Page 49

1    ambiguous.
2             THE WITNESS:  There were four different
3    interviews.  Each of these individuals was involved
4    in one aspect or another of global network
5    operations on the emerging Internet computer
6    network.
7    BY MR. HUDIS:
8        Q.  And what was your involvement in this item?
9             MR. BRIDGES:  Objection.  Vague and
10   ambiguous.
11            THE WITNESS:  I was the host and producer
12   of Geek of the Week.
13   BY MR. HUDIS:
14       Q.  And the last item on this list, what was
15   "Analyzing Sun networks"?
16            MR. BRIDGES:  Objection.  Vague and
17   ambiguous.
18            THE WITNESS:  That was a professional
19   reference book.  It was part of a three-volume
20   series that included analyzing DECnet OSI,
21   analyzing Novell networks.
22            The analyzing Sun networks volume had to do
23   with the TCP/IP protocol suite, which is known
24   today as the Internet.
25   BY MR. HUDIS:

Carl Malamud                                                    May 12, 2015

San Francisco, CA

---

Page 50

1       Q. Mr. Malamud, what experience do you have
2   working with textual databases, converting them
3   into new formats and making them available on the
4   Internet?
5       MR. BRIDGES: Objection. Massively
6   overbroad and vague; ambiguous; lacks foundation
7   and compound.
8       THE WITNESS: I have -- I'm sorry, could
9   you repeat that question?
10  BY MR. HUDIS:
11      Q. Yes.
12      A. There were a lot of parts to that.
13      Q. Yes.
14          What experience do you have working with
15  textual databases, converting them into new formats
16  and making them available on the Internet?
17      MR. BRIDGES: Same objections. And I'll
18  add another objection of argumentative.
19  BY MR. HUDIS:
20      Q. You may answer.
21      MR. BRIDGES: And to the extent there's a
22  legal conclusion implied in that, I would object on
23  that basis as well.
24      THE WITNESS: So would you like a specific
25  example? Is that what you're looking for?

---

Page 51

1   BY MR. HUDIS:
2       Q. Yes.
3       A. Okay. In 1991 and '92, I worked with my
4   colleague, Michael Swartz, a professor at the time
5   at the University of Colorado, to convert the
6   international telecommunication union protocol
7   specifications into a format that was viewable on
8   the Internet, and then I posted those standards on
9   the Internet.
10      Q. And what do you mean by "posted"?
11      A. In those days, posting meant making textual
12  files available using the FTP protocol.
13      Q. And when you say make available, do you
14  mean make available on the Internet?
15      MR. BRIDGES: Objection. Lacks foundation;
16  vague and ambiguous.
17      THE WITNESS: That database was distributed
18  using a facility known as anonymous FTP, which was
19  a mechanism that allowed anybody to access the
20  material that was connected to the Internet.
21  BY MR. HUDIS:
22      Q. Can you give me any other examples that
23  come to mind of your experience with working with
24  textual databases, converting them into new formats
25  and making them available on the Internet?

---

Page 52

1       MR. BRIDGES: All the same objections as to
2   earlier. Vague and ambiguous; lacks foundation;
3   potentially -- and argumentative; potentially
4   calling for a legal conclusion.
5       THE WITNESS: In 1993 and 1994 I headed a
6   project that took magnetic tapes that we purchased
7   from the Securities and Exchange Commission's
8   vendor, and converted those files into a database
9   accessible on the Internet using a variety of
10  access mechanisms.
11  BY MR. HUDIS:
12      Q. Can you give me any other examples of your
13  experience in working with textual databases,
14  converting them into new formats and making them
15  available on the Internet?
16      MR. BRIDGES: All the same objections.
17  Vague and ambiguous; lacks foundation;
18  argumentative; potentially calling for legal
19  conclusion; compound.
20      THE WITNESS: A third example is I
21  purchased the magnetic tapes that were produced by
22  the United States Patent and Trademark Office
23  consisting of the patent database and the trademark
24  database. I then converted that data into a format
25  that was compatible with Internet access and posted

---

Page 53

1   that information using a variety of access
2   mechanisms.
3   BY MR. HUDIS:
4       Q. Mr. Malamud, what experience, if any, do
5   you have working with printed textual materials,
6   converting them into new formats and making them
7   available on the Internet?
8       MR. BRIDGES: Same objections. Vague and
9   ambiguous; lacks foundation; argumentative;
10  possibly calling for a legal conclusion.
11      THE WITNESS: I was responsible for
12  procuring, scanning, processing and posting the
13  historical opinions of the court of appeals known
14  as the National Reporter System, as well as the
15  federal cases, which was the predecessor to the
16  National Reporter System.
17  BY MR. HUDIS:
18      Q. And what did you -- what did you do with
19  those reporter systems?
20      MR. BRIDGES: Objection. Vague and
21  ambiguous.
22  BY MR. HUDIS:
23      Q. In your last answer, you said you were
24  responsible for procuring, scanning, processing and
25  posting historical opinions. What did you mean by

---

14 (Pages 50 to 53)

Carl Malamud                                                    May 12, 2015

San Francisco, CA

---

### Page 54

1    "processing"?
2        A.  Processing involved a number of steps,
3    beginning with the scanning of the documents, and
4    proceeded to include a process known as
5    double-keying, which is a way of converting the
6    printed page into, in our case, valid HTML files
7    with proper metadata.
8        Q.  In your last answer, what did you mean by
9    double-keying?
10       A.  Double-keying is a technical term of art
11   used by legal publishers.  It is the process of
12   having the information typed independently twice,
13   and then the two copies compared to each other as a
14   way of looking for errors in the transcription.
15       Q.  Is there such a thing as triple-keying?
16          MR. BRIDGES:  Objection.  Lacks foundation;
17   vague and ambiguous.
18          THE WITNESS:  Yes.
19   BY MR. HUDIS:
20       Q.  And what is that process?
21       A.  That process is independently typing the
22   data three times and comparing the results.
23       Q.  What did you mean by "valid HTML files"?
24          MR. BRIDGES:  Objection.  Lacks foundation.
25          THE WITNESS:  A valid HTML file is one that

---

### Page 55

1    conforms to one of the HTML specifications that are
2    produced by the W3C organization, which is the
3    standards making body for HTML.
4    BY MR. HUDIS:
5        Q.  And what is a valid HTML file?
6           MR. BRIDGES:  Objection.
7    BY MR. HUDIS:
8        Q.  Under that protocol?
9           MR. BRIDGES:  Objection.  Lacks foundation;
10   vague and ambiguous.
11          THE WITNESS:  It is a file that --
12          MR. BRIDGES:  May call for -- may be a
13   hypothetical and call for speculation.
14          THE WITNESS:  It's a file that conforms to
15   the protocol specification, the contents of which
16   conform to what the protocol says it should.
17   BY MR. HUDIS:
18       Q.  And what's the significance of the HTML
19   file conforming to the specification?
20          MR. BRIDGES:  Objection.  Lacks foundation;
21   vague and ambiguous.
22          THE WITNESS:  Well, it's important that a
23   file posted on a web server conform to the HTML
24   standard because that means that a browser or other
25   client will correctly parse the data and display it

---

### Page 56

1    to the user or perform other actions on that HTML
2    file.
3    BY MR. HUDIS:
4        Q.  And what did you mean by "proper metadata"?
5           MR. BRIDGES:  Objection.  Lacks foundation.
6           THE WITNESS:  There are a number of
7    specifications that list the metadata that --
8    specifications and best current practices that list
9    the metadata that should be, in this case, in the
10   header section of an HTML file.  An example of that
11   is the title of the document.
12   BY MR. HUDIS:
13       Q.  Do you have any experience, Mr. Malamud,
14   working with graphic design web tools?
15          MR. BRIDGES:  Objection.  Vague and
16   ambiguous; lacks foundation.
17          THE WITNESS:  Yes.
18   BY MR. HUDIS:
19       Q.  Can you give me some examples of the types
20   of graphic design web tools you've worked with?
21       A.  So graphic design web tools is kind of a
22   broad example.  And I'm not a graphic designer, but
23   I certainly have used programs such as Photoshop
24   and tools for authoring, SVG graphics, for example.
25       Q.  What about MathML?

---

### Page 57

1           MR. BRIDGES:  Objection.  Vague and
2    ambiguous.
3           THE WITNESS:  Well, that's not a graphic
4    design tool.  MathML is a specification for
5    expressing mathematical formulas, and I am, in
6    fact, familiar with that specification.
7    BY MR. HUDIS:
8        Q.  And how long have you been working with
9    graphic design web tools such as SVG and Photoshop?
10          MR. BRIDGES:  Objection.  Lacks foundation;
11   vague and ambiguous; compound.
12          THE WITNESS:  I've been using graphic
13   design tools since the early '80s, but that's
14   before the web, so ...
15   BY MR. HUDIS:
16       Q.  All right.  And have you been using graphic
17   design web tools since the advent of the web, say,
18   mid 1990s?
19          MR. BRIDGES:  Objection.  Lacks foundation;
20   vague and ambiguous.
21          THE WITNESS:  I've been building websites
22   since the web began, and as part of that process
23   one uses graphic design web tools, as you call
24   them.
25   BY MR. HUDIS:

---

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                    May 12, 2015
San Francisco, CA

---

Page 58

1        Q.  Mr. Malamud, are you a member of any
2    professional associations?
3            MR. BRIDGES:  Objection.  Vague and
4    ambiguous.
5            THE WITNESS:  Professional associations?
6    BY MR. HUDIS:
7        Q.  For example, I am a member of the American
8    Intellectual Property Law Association.
9            So are you a member of any professional
10   associations?
11       A.  Well, I'm a member of EFF.  I don't know if
12   that counts.
13           MR. BRIDGES:  I'll ask the witness to
14   testify as to what he knows.  If he doesn't
15   understand the question, then he should ask for a
16   further explanation of the question.
17           THE WITNESS:  Yes, sir.
18   BY MR. HUDIS:
19       Q.  Do you understand my question?
20       A.  Vaguely.  It's a broad question.
21           "No" I think is the proper answer.
22       Q.  Are you -- are you a member of any
23   engineering societies?
24           MR. BRIDGES:  Objection.  Vague and
25   ambiguous.

---

Page 59

1            THE WITNESS:  I was a participant in the
2    Internet Engineering Task Force.
3    BY MR. HUDIS:
4        Q.  When was that?
5        A.  Late '80s to mid '90s.  Later than that,
6    actually.  I was, all the way through 2005 I was a
7    participant.
8        Q.  Is that organization still in existence?
9            MR. BRIDGES:  Objection.  Lacks foundation;
10   vague and ambiguous.
11           THE WITNESS:  Yes.
12   BY MR. HUDIS:
13       Q.  What was your affiliation with the Internet
14   Engineering Task Force?
15       A.  I played a number of roles.  I was a
16   creator of Internet drafts and requests for
17   comments, which is the proposals for standards and
18   standards that are created by the Internet
19   Engineering Task Force.
20       Q.  What's a standard?
21           MR. BRIDGES:  Objection.  Lacks foundation;
22   vague and ambiguous.
23           THE WITNESS:  A standard is a document that
24   was marked by the Internet Engineering Task Force
25   as being a standard.  It's a decision made by the

---

Page 60

1    management organization of the IETF.
2    BY MR. HUDIS:
3        Q.  I don't think that answers my question.
4            What do you understand to be a standard?
5            MR. BRIDGES:  Asked and answered.  He did
6    answer your question.
7            MR. HUDIS:  I disagree, Counsel.
8            THE WITNESS:  Well, are you --
9            MR. BRIDGES:  Vague and ambiguous; lacks
10   foundation.
11           THE WITNESS:  Do you want to know what an
12   IETF standards?
13   BY MR. HUDIS:
14       Q.  No, I want to know generally what your
15   understanding of a standard is?
16           MR. BRIDGES:  Objection.  Vague; lacks
17   foundation in context; argumentative.
18           THE WITNESS:  It is a very vague question
19   in the sense that a standard is anything that the
20   organization publishes or creates or says.  It's a
21   standard.
22   BY MR. HUDIS:
23       Q.  Is a standard a set of norms that an
24   organization would like others to follow?
25           MR. BRIDGES:  Objection.  Entirely lacks

---

Page 61

1    foundation; vague and ambiguous.
2            THE WITNESS:  It depends --
3            MR. BRIDGES:  And may call for opinion
4    testimony.  It may call for legal conclusion.  And
5    may be argumentative.
6            THE WITNESS:  Again, it depends on the
7    organization.  I can tell you what an IETF standard
8    is.
9    BY MR. HUDIS:
10       Q.  Give me an example of what an IETF
11   standards is.
12       A.  IETF standard is a document that the IETF
13   believes should be widely adopted that describes a
14   set of best practices or mechanisms involved in
15   some aspect of computer networking.
16           MR. BRIDGES:  I'll ask the witness to
17   listen to the question and answer the question.
18           The question was, give me an example of an
19   IETF standard.
20   BY MR. HUDIS:
21       Q.  You said that you are a member of EFF and
22   that in the past you were a member of the Internet
23   Engineering Task Force.
24           Have you been a member of any other
25   professional associations?

16 (Pages 58 to 61)

Carl Malamud                                                    May 12, 2015
                            San Francisco, CA

Page 62

1    MR. BRIDGES:  Objection.  Misstates
2  testimony; vague and ambiguous; lacks foundation.
3    THE WITNESS:  IETF does not have members.
4  It has participants.  That's an important
5  distinction.
6    And no, I have not.
7  BY MR. SPEAR:
8    Q.  Mr. Malamud, I would like to discuss with
9  you, your professional experience since you
10  received your MBA from Indiana University in 1983
11  or 1984.
12    After you received your MBA, what was the
13  first gainful employment that you had?
14    A.  So you just want to know about my
15  employment after my MBA?
16    Q.  Yes.
17    A.  Okay.  I -- after my MBA, my next job was
18  as the Board of Governors of the Federal Reserve
19  System.
20    Q.  What did you do there?
21    A.  I worked with a small group to create a
22  plan and implement the plan for putting computer
23  networks into the research division of the Board of
24  Governors of the Federal Reserve System.
25    Q.  Do you remember what your title was at the

Page 63

1  Board of Governors of the Federal Reserve?
2    A.  Senior systems analyst.
3    Q.  How long did you hold that position?
4    A.  One year as an employee.
5    Q.  So was that 1983 to 1984?
6    A.  It was 1984, I'm pretty sure.
7    Q.  You said one year as an employee.  At some
8  point were you a consultant for the Board of
9  Governors of the Federal Reserve?
10    A.  Subsequent to my year of employment, I
11  became a consultant to the Board of Governors of
12  the Federal Reserve System.
13    Q.  And how long were you a consultant?
14    A.  Approximately a year.
15    Q.  So that would have been 1985?
16    A.  Approximately.
17    Q.  What did you do for the Board of Governors
18  of the Federal Reserve as a consultant?
19    A.  The same thing I did as an employee.
20    Q.  What was your next position of gainful
21  employment?
22    A.  I was a consultant to a number of
23  government agencies.
24    Q.  Do you remember which ones?
25    A.  Yes, I do.

Page 64

1    Q.  Please --
2    MR. BRIDGES:  Go ahead.
3  BY MR. HUDIS:
4    Q.  Please tell me which ones they are.  Or
5  were.
6    A.  The Department of Defense, the Joint Chiefs
7  of Staff, Argon National Laboratory, Lawrence
8  Livermore National Laboratory.
9    Q.  Let's put some time frames on this.
10    When were you a consultant for the
11  Department of Defense?
12    A.  I don't remember the exact dates.  My
13  consulting business was predominantly from 1985
14  into the late 1980s.
15    Q.  Approximate -- approximately what year?
16  1989, your consulting business?
17    A.  Yes, as a -- yes.
18    Q.  So your consulting business was for all of
19  these clients, the Department of Defense, the Joint
20  Chiefs of Staff, Argon and Lawrence Livermore?
21    MR. BRIDGES:  Objection.  Vague and
22  ambiguous.
23    THE WITNESS:  My consulting business had
24  two aspects.  One was consulting with the
25  government agencies.

Page 65

1    The other was giving advanced seminars on
2  computer networks and relational databases.
3    MR. BRIDGES:  I'll ask the witness to
4  answer the question.  If he wants to invite you
5  beyond the question, he can ask about those.
6  BY MR. HUDIS:
7    Q.  And the part of your consulting business
8  working with government agencies, what did that
9  entail?
10    MR. BRIDGES:  Objection.  Vague and
11  ambiguous.
12    THE WITNESS:  I worked in the area of
13  relational databases and computer networking.
14  BY MR. HUDIS:
15    Q.  What do you mean by "relational databases"?
16    A.  The Ingres relational database management
17  system.
18    Q.  That you described before?
19    A.  Yes.
20    Q.  All right.  After your consulting business
21  ended in approximately 1989, what did you do next
22  for gainful employment?
23    A.  In the late '80s, around 1988, I began
24  writing, and by I'm pretty sure '89, I was making
25  my living as a writer.

17  (Pages 62 to 65)

Carl Malamud                                                     May 12, 2015

San Francisco, CA

## Page 66

1    Q. And what was the subject of your writings?
2       MR. BRIDGES: Objection. Vague.
3       THE WITNESS: That's the documents that we
4    went over, the professional reference books.
5    BY MR. HUDIS:
6    Q. That was the references in Exhibit 15?
7    A. That's correct.
8       MR. BRIDGES: I do want to note for the
9    record an objection generally to Exhibit 15. It
10   appears to be a printout of documents from a
11   catalog. It appears to have been an incomplete set
12   of results, pursuant to a selection that we assume
13   was made by plaintiffs' counsel, rather than a
14   straight printout of all responsive items.
15   BY MR. HUDIS:
16   Q. And how long did you make your living as a
17   writer?
18   A. Through 1992.
19   Q. And what did you do for gainful employment
20   starting in 1992?
21   A. I founded the Internet Multicasting
22   Service.
23   Q. Is that company still in existence today?
24   A. No.
25   Q. How long was the Internet Multicasting

## Page 67

1    Service in existence?
2    A. It was active through 1997.
3    Q. What was the nature of the business of the
4    Internet Multicasting Service?
5    A. The Internet Multicasting Service was a
6    501(c)(3) nonprofit that was engaged in creating
7    new services for the Internet.
8    Q. What types of new services?
9    A. One example was I created the first radio
10   station on the Internet.
11   Q. Any other examples?
12   A. A second example is we took the Securities
13   and Exchange Commission EDGAR database and made it
14   available on the Internet for the public to use.
15   Q. Any others examples?
16   A. A third example is we took the U.S. patent
17   And Trademark database and made it available on the
18   Internet for the public to use.
19   Q. Any other examples?
20   A. A fourth example is we created the Internet
21   1996 World Exposition, a World's Fair for the
22   Internet.
23   Q. And what was that?
24   A. It --
25      MR. BRIDGES: Objection. Vague and

## Page 68

1    ambiguous.
2       THE WITNESS: It was a set of activities
3    taking place in 50 countries around the world
4    modeled on the metaphor of a world's fair.
5    BY MR. HUDIS:
6    Q. And what activities were taking place in
7    the 50 countries?
8       MR. BRIDGES: Objection. Vague and
9    ambiguous.
10      THE WITNESS: A huge number of activities.
11   In Japan there were street festivals, for
12   example.
13      In Taiwan there were thousands of computers
14   throughout the country that people could go up to
15   and learn about the Internet, which was a new
16   phenomenon in those days. Those are two examples.
17   BY MR. HUDIS:
18   Q. What was the general theme of Internet 1996
19   a world's fair?
20   A. A world's fair for the information age.
21   Q. Was it a general theme of teaching people
22   about the Internet?
23      MR. BRIDGES: Objection. Misstates the
24   testimony; vague and ambiguous.
25      THE WITNESS: There were two goals. One

## Page 69

1    was teaching the world about the Internet and what
2    it could do. The second was to make a substantial
3    contribution to Internet infrastructure.
4    BY MR. HUDIS:
5    Q. What did you mean by "Internet
6    infrastructure"?
7    A. I can give you two examples. One is, with
8    a contribution of two terabytes of disc from
9    Quantum and a set of large scale computers from Sun
10   Microsystems, we were able to put large computers
11   in different locations around the world, which were
12   mirroring common Internet databases, such as the
13   world's fair website.
14   Q. Have you told me all of the services you
15   can remember that were conducted by the Internet
16   Multicasting Service?
17      MR. BRIDGES: Objection. Vague and
18   ambiguous; lack of foundation.
19      THE WITNESS: There's at least two more.
20   We ran north.pole.org, which was the first home for
21   Santa Claus on the Internet.
22      A second example is with my colleague
23   Dr. Marshall T. Rose, we created a service called
24   TPC.int, TPC standing for the phone company.
25   BY MR. HUDIS:

18 (Pages 66 to 69)

Carl Malamud                                                    May 12, 2015

San Francisco, CA

---

**Page 70**

1   Q. And what was that service?
2   A. TPC.int was a mechanism that allowed an
3   individual to send electronic mail which would then
4   go to a fax machine that was addressed by its phone
5   number.
6   Q. Have you told me all of the services you
7   can remember that were performed by the Internet
8   Multicasting Service?
9       MR. BRIDGES: Objection. Vague and
10  ambiguous.
11      THE WITNESS: I'm sure we had a number of
12  other small websites, what we would call a
13  microsite today.
14  BY MR. HUDIS:
15  Q. Anything else?
16      MR. BRIDGES: Same objection.
17      THE WITNESS: Those were our main
18  activities.
19  BY MR. HUDIS:
20  Q. And what did you do for gainful employment
21  after the Internet Multicasting Service was no
22  longer in business?
23  A. In 1996 I went to the MIT Media Lab where I
24  was a visiting professor.
25  Q. How long were you a visiting professor at

---

**Page 71**

1   the MIT Media Lab?
2   A. Maybe eight months. Eight or nine months.
3   Q. After your terms of term as visiting
4   professor at the MIT Media Lab, what did you do
5   next for gainful employment?
6   A. I was a visiting professor at Keio
7   University, K-e-i-o, in Japan.
8   Q. What kinds of courses did you teach at the
9   MIT Media Lab?
10  A. I did not. I consulted with students and I
11  wrote a book.
12  Q. What was the book?
13  A. "The Internet 1996 World Exposition."
14  Q. How long were you a visiting professor at
15  Keio University in Japan?
16  A. I'd say about six months.
17  Q. What year was that?
18  A. '97.
19  Q. What kinds of courses, if any, did you
20  teach at Keio University?
21  A. I did not. I consulted with the faculty
22  and with graduate students.
23  Q. What was the nature of the consultations?
24  A. Doctoral dissertations concerned with the
25  Internet and networking protocols.

---

**Page 72**

1   Q. Was that the same type of consultations
2   that you did at the MIT Media Lab?
3       MR. BRIDGES: Objection. Lacks foundation;
4   vague and ambiguous.
5       THE WITNESS: Yes, that's correct.
6   BY MR. HUDIS:
7   Q. After your employment with Keio University,
8   what next did you do for gainful employment?
9   A. I spent a few months in Amsterdam at RIPE,
10  which is the Internet numbering authority for the
11  European region.
12      MR. BRIDGES: Mr. Hudis, I think I'm going
13  to need a break in a minute or two. Is this a
14  convenient time?
15      MR. HUDIS: Yes, let's take a break.
16      THE VIDEOGRAPHER: The time is 10:50, and
17  we are off the record.
18      (Recess taken.)
19      THE VIDEOGRAPHER: The time is 11:01, and
20  we are back on the record.
21  BY MR. HUDIS:
22  Q. Mr. Malamud, how long were you employed at
23  RIPE?
24  A. I was not employed at RIPE. I was in
25  residence at RIPE.

---

**Page 73**

1   Q. How long were you in residence at RIPE?
2   A. Just a few months.
3   Q. So what year was that?
4   A. 1997.
5   Q. What did you do at RIPE?
6       MR. BRIDGES: Objection. Vague and
7   ambiguous.
8   BY MR. HUDIS:
9   Q. What, if anything, did you do at RIPE?
10  A. I learned about the operation of Internet
11  number registries.
12  Q. After RIPE, what was your next place of
13  gainful employment?
14  A. I was the founder and chief executive
15  officer of Invisible Worlds.
16  Q. What was the nature of that business,
17  Invisible Worlds?
18  A. It was an Internet startup.
19  Q. What do you mean by Internet startup?
20  A. It was a new company that was attempting to
21  create a new service for the Internet.
22  Q. And what service was that?
23  A. In today's parlance, it was a semantic web
24  company.
25  Q. And what does that mean?

---

19 (Pages 70 to 73)

Carl Malamud                                                                May 12, 2015

San Francisco, CA

---

Page 74

1       A.  It's a little complicated.  It was involved
2    with transferring metadata between different
3    computers on the Internet.
4       Q.  Is that company still in existence?
5       A.  No, it is not.
6       Q.  How long was that company in existence?
7       A.  It was formally dissolved, I believe, in
8    2002.
9       Q.  So it was in existence from 1997 to 2002?
10      A.  1998 through 2001 was the active period of
11   the company.
12          MR. BRIDGES:  I'll ask the witness to
13   answer the precise question asked.
14   BY MR. HUDIS:
15      Q.  And it was just an inactive period from
16   2001 to 2002?
17      A.  Yes.
18      Q.  What did you do next for gainful employment
19   after Invisible Worlds?
20      A.  I was a co-founder and CEO of a company
21   called NetTopBox, Inc., all one word, capital N,
22   capital T, capital B.
23      Q.  Is that company still in existence?
24      A.  No, it is not.
25      Q.  When was it in existence?

---

Page 75

1       A.  I'm trying to refresh my memory here.  I
2    believe 2001 through 2003.  I may be off a year on
3    those dates.
4       Q.  What was the nature of the business of
5    NetTopBox, Inc.?
6       A.  It was an attempt to create an electronic
7    programming guide for the Internet.
8       Q.  What do you mean by "electronic programming
9    guide"?
10      A.  In layman's terms, something like the T.V.
11   Guide.
12      Q.  After NetTopBox, Inc. was dissolved, what
13   did you do next for gainful employment?
14      A.  I was hired as a consultant by the Internet
15   Architecture Board and Internet Engineering Task
16   Force.
17      Q.  How long were you a consultant for the
18   Internet Architecture Board and Internet
19   Engineering Task Force?
20          MR. BRIDGES:  Objection.  Compound.
21          THE WITNESS:  A little over a year.
22   BY MR. HUDIS:
23      Q.  So that would have been 2004?
24      A.  Yeah, '04 to '05.
25      Q.  And what was the nature of your consultancy

---

Page 76

1    with these organizations?
2       A.  I was charged with investigating and
3    proposing mechanisms for the governance of the
4    Internet standards-making process.
5       Q.  And if you could briefly describe what that
6    means, "mechanisms for the governance of the
7    Internet standards-making process"?
8       A.  The core issue I investigated was the
9    proper institutional home for the Internet
10   Engineering Task Force, which at the time was an
11   unincorporated association.
12      Q.  What did you mean by "proper institutional
13   home"?
14      A.  That was actually the question I was
15   investigating, what should that institutional home
16   be.
17      Q.  Well, what did you mean by "institutional
18   home"?
19          MR. BRIDGES:  Objection.  Lacks foundation.
20          THE WITNESS:  I can tell you what the
21   conclusion was of that process.
22   BY MR. HUDIS:
23      Q.  What was the conclusion of that process?
24      A.  That the Internet society would provide
25   the -- the corporate framework that would then run

---

Page 77

1    the Internet Engineering Task Force and the
2    associated standards-making process.
3       Q.  Back to your consultancy with the
4    Architectural Board and the Internet Engineering
5    Task Force.  What did you do for gainful
6    employment?
7       A.  I worked at the Center for American
8    Progress.
9       Q.  What's the nature of that business?
10          MR. BRIDGES:  Objection.  Lacks foundation;
11   vague and ambiguous.
12          THE WITNESS:  It is a 501(c)(3) think tank.
13   BY MR. HUDIS:
14      Q.  And what did you do there?
15      A.  I was a senior fellow and the chief
16   technology officer.
17      Q.  And what years was that?
18      A.  2005 to 2006.
19      Q.  What did you do next for gainful
20   employment?
21      A.  I founded Public.Resource.Org.
22      Q.  And that was in 2007?
23      A.  That's correct.
24      Q.  Are you presently employed by
25   Public.Resource?

---

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 78

1     A. I am.
2     Q. And you are the founder of Public.Resource?
3     A. I am.
4     Q. What is your current title with
5   Public.Resource?
6     A. Founder and president.
7     Q. Is that the position you have held from
8   2007 until today?
9     A. It is.
10    Q. What is your -- what are your duties and
11  responsibilities as founder and president of
12  Public.Resource?
13        MR. BRIDGES:  Objection.  Vague and
14  ambiguous; compound.
15        THE WITNESS:  I'm responsible for the
16  activities of Public.Resource.Org.
17  BY MR. HUDIS:
18    Q. What are those activities?
19    A. Well, there's the governance of the
20  corporation.
21    Q. What else?
22    A. There is the operation of websites and
23  Internet services.
24    Q. What types of websites and services does
25  Public.Resource provide?

Page 79

1     A. There's a number of different services.
2     Q. Could you name them for me, please?
3     A. Sure.  Public.Resource.Org is our main
4   corporate website.
5     Q. And what kind of information is on the
6   Public.Resource.Org site?
7     A. It has speeches by me.  Correspondence.
8   And governance information, such as financials.
9     Q. Anything else?
10    A. A number of web pages describing our
11  interaction with a number of government agencies.
12    Q. What kinds of interactions?
13    A. Well, for example, there is a page devoted
14  to USCourts.gov, which contains a number of letters
15  back and forth with officials about the PACER
16  system and court of appeals decisions.
17    Q. Does Public.Resource operate any other
18  websites?
19    A. Yes, we do.
20    Q. Could you name another one, please?
21    A. House resource.org.
22    Q. What is provided on House.resource.org?
23    A. That is a system that I created in
24  cooperation with the United States House of
25  Representatives at the request of Speaker Boehner

Page 80

1   and Chairman Darrell Issa.  It contains video from
2   congressional hearings.
3     Q. Anything else?
4         MR. BRIDGES:  Objection.  Vague and
5   ambiguous.
6   BY MR. HUDIS:
7     Q. Does the House.resource.org website provide
8   anything else besides video from congressional
9   hearings?
10    A. There's some correspondence that was back
11  and forth between myself and Congress as part of
12  this effort.
13    Q. Does Public.Resource operate any other
14  websites?
15    A. Yes.
16    Q. Could you tell me another one?
17    A. WWLBD.org, which stands for what would
18  Luther Burbank do?
19    Q. What kind of information is provided on the
20  WWLBD.org site?
21    A. That is a site devoted to the seed catalogs
22  that the Smithsonian Institution scanned.
23    Q. Spell, in that context, seed?
24    A. S-e-e-d.
25    Q. And literally is your website providing

Page 81

1   information about seeds, plant seeds?
2     A. It is covers of seed catalogs, which the
3   Smithsonian scanned and made available on a limited
4   and restricted basis.
5     Q. Just so I understand, do you mean seed,
6   literally plant seed catalogs?
7     A. Yes, like Burpee.
8     Q. Is that all generally that the WWLBD.org
9   website provides?
10        MR. BRIDGES:  Objection.  Vague and
11  ambiguous.
12        THE WITNESS:  It is the seed catalog covers
13  and essay discussing the restrictions on use that
14  were imposed by the Smithsonian.
15  BY MR. HUDIS:
16    Q. Restrictions on use of what?
17    A. Of the seed catalog images.
18    Q. Does Public.Resource provide any other
19  websites?
20    A. Yes, we do.
21    Q. Could you name another one, please?
22    A. YesWeScan.Org.
23    Q. What type of information does YesWeScan.Org
24  provide?
25    A. It has gone through several different life

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 82

1   times, if you will.  It began with a series of
2   proposals that I authored about the operation of
3   the government printing office, and my
4   qualifications to be public printer of the United
5   States.
6        Q.  Does the YesWeScan.Org website provide any
7   other information?
8        A.  The second iteration of YesWeScan.Org was a
9   letter from myself and John D. Podesta to President
10  Obama discussing the digitization of federal
11  archives.
12       Q.  Does the YesWeScan.Org website provide any
13  other information?
14       A.  The third iteration of YesWeScan.Org was an
15  effort to get individuals to fund, adopt the
16  double-keying of volumes of the Federal Reporter.
17       Q.  That's West Federal Reporter?
18       A.  F1.  So yes, the -- yes.
19       Q.  F first?
20       A.  Yes.
21       Q.  Does the YesWeScan.Org website provide any
22  other information?
23       A.  The most recent iteration was a crowd
24  funding exercise for the scanning and posting of
25  state statutes and codes.

Page 83

1        Q.  Does the YesWeScan.Org website provide any
2   other information?
3        A.  I think that's its four life times.  I
4   think that's correct.
5        Q.  Does Public.Resource operate any other
6   websites?
7        A.  Law.Resource.Org.
8        Q.  What information is provided on the
9   Law.Resource.Org website?
10       A.  Primary legal materials.
11       Q.  Can you give me examples?
12       A.  Court of appeals decisions.
13       Q.  Anything else?
14       A.  The federal cases.
15       Q.  Anything else?
16       A.  The California cases from Judge McAllister.
17       MR. BRIDGES:  Just leave me time to object.
18       THE WITNESS:  Yes.
19  BY MR. HUDIS:
20       Q.  Anything else?
21       A.  Materials incorporated by reference into
22  state and federal law.
23       Q.  What types of materials incorporated by
24  state and federal law are provided on the
25  Law.Resource.Org website?

Page 84

1        MR. BRIDGES:  Objection.  Vague; ambiguous.
2        THE WITNESS:  An example is California's
3   Title 24.
4   BY MR. HUDIS:
5        Q.  Is Title 24 a statute or a state
6   regulation?
7        A.  It's a regulation.
8        Q.  Any other types of materials that are
9   posted on the Law.Resource.Org website?
10       MR. BRIDGES:  Objection.  Vague and
11  ambiguous.
12       THE WITNESS:  I think that's a good
13  description of what's on there, yes.
14  BY MR. HUDIS:
15       Q.  Are standards posted on the
16  Law.Resource.Org website?
17       MR. BRIDGES:  Objection.  Lacks foundation;
18  vague and ambiguous; possibly argumentative.
19       THE WITNESS:  Standards incorporated by
20  reference into federal and state regulations are on
21  the Law.Resource.Org website.
22  BY MR. HUDIS:
23       Q.  What do you mean by incorporation by
24  reference?
25       MR. BRIDGES:  Objection.  May call for a

Page 85

1   legal conclusion.
2   BY MR. HUDIS:
3        Q.  You may answer.
4        MR. BRIDGES:  Vague and ambiguous.
5   BY MR. HUDIS:
6        Q.  You may answer.
7        A.  Incorporation by reference at the federal
8   level is a formal process which is run by the
9   Office of the Federal Register, which incorporates
10  specific materials into the Code of Federal
11  Regulations.
12       Q.  And as a result of that formal process
13  engaged in by the Office of the Federal Register,
14  how are these materials incorporated by reference
15  into the Code of Federal Regulations?
16       MR. BRIDGES:  Objection.  May call for
17  legal conclusion; vague and ambiguous.
18       THE WITNESS:  I'm not sure what you mean by
19  "how are."
20  BY MR. HUDIS:
21       Q.  How would I know that materials are
22  incorporated into the Code of Federal Regulations?
23       MR. BRIDGES:  Objection.  Hypothetical;
24  calls for speculation; vague and ambiguous.
25       THE WITNESS:  The Code of Federal

22 (Pages 82 to 85)

Carl Malamud                                                    May 12, 2015
                           San Francisco, CA

---

| Page 86 |
|---|

1   Regulations itself will contain a very specific and
2   formal statement signifying that a particular
3   specific document was incorporated with the
4   approval of the director of the Office of the
5   Federal Register.
6   BY MR. HUDIS:
7       Q.  And how are materials incorporated by
8   reference at the state level?
9           MR. BRIDGES:  Objection.  Lacks foundation;
10  may call for a legal conclusion; may call for
11  opinion testimony; vague and ambiguous, and it may
12  be argumentative.
13          THE WITNESS:  That's a very broad question.
14  I think it varies by state.
15  BY MR. HUDIS:
16      Q.  Could you give me an example of how
17  material has been incorporated by reference at the
18  state level?
19          MR. BRIDGES:  Same objections.
20          THE WITNESS:  The State of California again
21  has very specific language that will be shown in
22  the California Code of Regulations, and it
23  specifically is the phrase "incorporated by
24  reference," and then a specific indicator to a very
25  specific standard and edition of that standard or

---

| Page 87 |
|---|

1   other document.
2   BY MR. HUDIS:
3       Q.  Is material incorporated by reference into
4   state reg -- into federal regulations by the same
5   methods that you just described for the California
6   Code of Regulations?
7           MR. BRIDGES:  Objection.  Utterly lacks
8   foundation; vague and ambiguous; competence; may
9   call for speculation; may call for legal
10  conclusion; argumentative.
11          THE WITNESS:  They are two very separate
12  processes.
13  BY MR. HUDIS:
14      Q.  When material is incorporated by reference
15  at the federal level, does it contain specific
16  language that the material is incorporated by
17  reference?
18          MR. BRIDGES:  Objection.  Lacks foundation;
19  hypothetical; vague and ambiguous; competence; may
20  call for speculation; may call for opinion and
21  legal conclusion.
22          THE WITNESS:  In order for the material to
23  be incorporated by reference in the Code of Federal
24  Regulations, it does require very specific
25  language, including the phrase "incorporated by

---

| Page 88 |
|---|

1   reference."
2   BY MR. HUDIS:
3       Q.  Now, you said part of your duties and
4   responsibilities as founder and president of
5   Public.Resource was its governance and the websites
6   and services that it provides.
7           What are your other duties and
8   responsibilities for Public.Resource, if any?
9           MR. BRIDGES:  Objection.  Vague and
10  ambiguous.
11          THE WITNESS:  I give a number of speeches.
12  BY MR. HUDIS:
13      Q.  And you give these speeches on behalf of
14  Public.Resource?
15      A.  Yes, that's my only professional activity.
16      Q.  Is there anything else that you do on
17  behalf of Public.Resource?
18      A.  I send letters.
19      Q.  To whom?
20      A.  To government officials, for example.
21      Q.  For what purpose?
22      A.  An example would be a FOIA request.
23      Q.  Freedom of Information Act request?
24      A.  That's correct.
25      Q.  And what types of materials were you

---

| Page 89 |
|---|

1   looking for with these FOIA requests?
2           MR. BRIDGES:  Objection.  Vague and
3   ambiguous.
4           THE WITNESS:  An example was a FOIA request
5   to the Internal Revenue Service for the particular
6   format of the form 990, which is the filings of
7   exempt organizations.
8   BY MR. HUDIS:
9       Q.  Can you give me another example of a FOIA
10  request that you made to a government agency?
11      A.  I sent a large number of FOIA requests out
12  asking how much agencies spent on PACER and retail
13  legal information services.
14      Q.  Have you told me all your duties and
15  responsibilities that you're aware of on behalf of
16  Public.Resource?
17          MR. BRIDGES:  Objection.  Argumentative;
18  lacks foundation; vague and ambiguous.
19          THE WITNESS:  No, I have other
20  responsibilities.
21  BY MR. HUDIS:
22      Q.  Could you name them for me, please?
23      A.  I handle our finances.  So bookkeeping and
24  auditing and the -- the taxes.  And I am engaged in
25  supervising the litigation effort in which

---

23 (Pages 86 to 89)

Carl Malamud                                                          May 12, 2015
San Francisco, CA

## Page 90

1    Public.Resource is currently engaged in.
2        Q.  Anything else?
3        A.  That's a good overview.  Yeah, no, I think
4    that's a good overview of what I do.
5        Q.  Do you report to anybody at
6    Public.Resource?
7            MR. BRIDGES:  Objection.  Vague and
8    ambiguous.
9            THE WITNESS:  I report to our board of
10   directors.
11   BY MR. HUDIS:
12       Q.  Does anybody report to you at
13   Public.Resource?
14           MR. BRIDGES:  Objection.  Vague and
15   ambiguous.
16           THE WITNESS:  What do you mean "report" to
17   me?
18   BY MR. HUDIS:
19       Q.  Somebody that you supervise as another
20   officer of the corporation or employees.
21       A.  No.
22       Q.  Are there any other employees of
23   Public.Resource, besides yourself?
24       A.  No.
25       Q.  Mr. Malamud, since you have been president

## Page 91

1    and CEO of Public.Resource, do you get a salary?
2        A.  Yes, I do.
3        Q.  And how much is that salary?
4            MR. BRIDGES:  We'll presumptively mark the
5    deposition confidential subject to --
6            THE WITNESS:  We're 501(c)(3).  My salary
7    is published.
8            MR. BRIDGES:  Okay, I withdraw that.
9    Go ahead.
10           THE WITNESS:  $180,000 a year.
11   BY MR. HUDIS:
12       Q.  And how long have you taken that as an
13   annual salary from Public.Resource?  For how many
14   years?
15       A.  I think I've been at 180 for three years.
16       Q.  And before that what was your annual
17   salary?
18       A.  I began at 144 and then -- yeah.
19       Q.  And you've had increases since then in your
20   annual salary up to 180,000 a year?
21           MR. BRIDGES:  Objection.  Misstates
22   testimony; lacks foundation.
23           THE WITNESS:  I had one increase, if I
24   recollect.
25   BY MR. HUDIS:

## Page 92

1        Q.  So in 2007 until 2011 your salary was
2    approximately $144,000, and then from 2011 until
3    now your salary has been at approximately $180,000?
4        A.  That's not correct.  My salary began at
5    144.  There was a step to 160 at some point.  And
6    then up to 180.  And I don't recall the exact dates
7    when those steps were.
8        Q.  Presently, Mr. Malamud, do you have any
9    other gainful employment besides your roles at
10   public -- at Public.Resource?
11       A.  I do not.
12       Q.  Presently are you an officer of any other
13   companies?
14       A.  No.
15       Q.  Presently are you a director of any other
16   companies?
17       A.  I am on the board of directors of Common
18   Crawl.
19       Q.  What is Common Crawl?
20       A.  It is a 501(c)(3) nonprofit devoted to an
21   open crawl of the Internet.
22       Q.  What is an "open crawl of the Internet"?
23       A.  A crawl is what a search engine such as
24   Google does.
25       Q.  And what is an open crawl?

## Page 93

1        A.  That is a crawl of the Internet that's
2    available to others to openly use.
3        Q.  Without restriction?
4            MR. BRIDGES:  Objection.  Vague and
5    ambiguous.
6    BY MR. HUDIS:
7        Q.  When you say it is a crawl of the Internet
8    that's available to others to openly use, what did
9    you mean by for "others to openly use"?
10       A.  The data is available on the Amazon hosting
11   service for any organization to use for analysis.
12       Q.  Are you an employee of any other companies
13   today?
14       A.  I am not.
15       Q.  Besides Common Crawl and Public.Resource,
16   do you have any roles in any other nonprofit
17   organizations today?
18           MR. BRIDGES:  Objection.  Vague and
19   ambiguous.
20           THE WITNESS:  No, I do not.
21   BY MR. HUDIS:
22       Q.  And Public.Resource is an IRS 501(c)(3)
23   nonprofit corporation?
24       A.  It is.
25       Q.  And it was incorporated in California in

24  (Pages 90 to 93)

Carl Malamud                                                                        May 12, 2015

San Francisco, CA

---

Page 94

1    2007?
2        A.  That's correct.
3        (PLAINTIFFS' EXHIBITS 16-18 WERE MARKED.)
4        MR. HUDIS:  All right.  Let's go off the
5    record.  There's ten minutes left.  So let's go off
6    the record.
7        MR. BRIDGES:  Okay.
8        MR. HUDIS:  And I'll do the marking with
9    you, Andrew.
10       THE VIDEOGRAPHER:  This marks the end of
11   Disc 1, Volume 1 in the deposition of Carl Malamud.
12       The time is 11:34 and we are off the
13   record.
14       (Discussion off the record.)
15       THE VIDEOGRAPHER:  This marks the beginning
16   of Disc 2, Volume 1 in the deposition of Carl
17   Malamud.
18       The time is 11:40, and we are on the
19   record.
20   BY MR. HUDIS:
21       Q.  Mr. Malamud, what is the purpose of
22   Public.Resource?
23       MR. BRIDGES:  Objection.  Vague and
24   ambiguous and may lack foundation.
25       THE WITNESS:  It's the creation and

---

Page 95

1    maintenance of public works projects for the
2    Internet.
3    BY MR. HUDIS:
4        Q.  What do you mean by "public works
5    projects"?
6        A.  Operational services that have real
7    information that people can access.
8        Q.  What do you mean by "operational services"?
9        A.  Public works is a term that refers to a
10   creation of infrastructure that's used by the
11   public.  And that is what we attempt to do for the
12   Internet.
13       Q.  And in that regard what are the objectives
14   of Public.Resource?
15       MR. BRIDGES:  Objection.  Vague; asked and
16   answered; vague and ambiguous; lacks foundation.
17       THE WITNESS:  I guess I don't understand
18   the difference between purpose and objective.
19   BY MR. HUDIS:
20       Q.  Do you make no distinction between the two
21   terms, purpose and objectives?
22       MR. BRIDGES:  Object -- objection.
23   Counsel, he needs to understand your question.
24       MR. HUDIS:  Okay.
25       MR. BRIDGES:  You need to explain what you

---

Page 96

1    mean.
2        MR. HUDIS:  Fair enough, Counsel.
3        MR. BRIDGES:  You can ask him -- he can
4    answer the question.
5        MR. HUDIS:  Fair enough.
6    BY MR. HUDIS:
7        Q.  In creating an infrastructure for the
8    Internet, what objectives does Public.Resource have
9    towards that goal?
10       MR. BRIDGES:  Objection.  Vague and
11   ambiguous; confusing.
12       THE WITNESS:  To create something that is
13   useful to the public.
14   BY MR. HUDIS:
15       Q.  Could you give me an example?
16       A.  Yes.  The IRS database we created.
17       Q.  Before the break you listed a number of
18   websites that are operated by Public.Resource.  I
19   want to make sure that I have them all.
20   Public.Resource.Org, USCourts.gov,
21   House.Resource.org, WWLBD.org, YesWeScan.Org,
22   Law.Resource.Org.
23       Have I named them all?
24       MR. BRIDGES:  Objection.  Lacks foundation;
25   vague and ambiguous.

---

Page 97

1        THE WITNESS:  USCourts.gov is not a
2    website.  It is a web page on Public.Resource.Org,
3    and the answer to your question is no.
4    BY MR. HUDIS:
5        Q.  What other websites does Public.Resource
6    operate?
7        A.  There is Yo.YourHonor.org.
8        Q.  What kind of information is provided on
9    Yo.YourHonor.org?
10       A.  It is a discussion of the PACER system,
11   P-A-C-E-R, which is the public access to court
12   electronic records.
13       Q.  You're not a fan of the PACER system; are
14   you?
15       MR. BRIDGES:  Objection.  Argumentative;
16   vague and ambiguous; lacks foundation.
17       THE WITNESS:  I'm a big fan of the PACER
18   system.  I think it's an essential piece of
19   information technology infrastructure.
20   BY MR. HUDIS:
21       Q.  Do you have criticisms of how the PACER
22   system is operated?
23       A.  I do.
24       Q.  And what are those criticisms?
25       MR. BRIDGES:  Objection.  Relevance.

---

25 (Pages 94 to 97)

Carl Malamud                                                    May 12, 2015

San Francisco, CA

---

Page 98

1      THE WITNESS:  There's a number of issues
2  with the PACER system.  We uncovered a systematic
3  and pervasive set of violations of judicial
4  conference privacy rules, and we furnished that
5  information to the judicial conference in the form
6  of an audit, is one example.
7  BY MR. HUDIS:
8      Q.  Are your criticisms of the PACER system
9  posted as information to the Yo.YourHonor.org
10  website?
11      MR. BRIDGES:  Objection.  Vague and
12  ambiguous.
13      THE WITNESS:  There is a substantial essay
14  on the website that discusses a number of issues
15  having to do with the PACER system.
16  BY MR. HUDIS:
17      Q.  Now, are these issues criticisms,
18  commentary, extolling the virtues of PACER?  What
19  type of information concerning PACER is posted on
20  Yo.YourHonor.org?
21      MR. BRIDGES:  Objection.  Extraordinarily
22  compound; vague and ambiguous.
23      THE WITNESS:  I would say all of the above.
24  It's a discussion of the PACER system.
25  BY MR. HUDIS:

---

Page 99

1      Q.  Have we discussed today all of the web
2  pages or websites operated today by
3  Public.Resource?
4      MR. BRIDGES:  Objection.  Compound; vague
5  and ambiguous.
6      THE WITNESS:  Also continue to operate a
7  number of the websites that originated with the
8  Internet Multicasting Service.
9  BY MR. HUDIS:
10      Q.  Could you name those websites for me,
11  please?
12      A.  North.pole.org.  Park.org.  Town hall.org.
13  My.phone.org.  Museum.media.org.
14      I think that's all of them, but there could
15  be a few that I'm missing.
16      Q.  Is that all you remember today?
17      A.  That's all I remember today.
18      Q.  What kind of information is posted on the
19  park.org website?
20      A.  That was the website created for the
21  Internet in the 1996 World Exposition.
22      Q.  What kind of information is posted on the
23  town hall.org website?
24      A.  That is the archives of Internet talk
25  radio.

---

Page 100

1      Q.  What kind of information is posted at the
2  my.phone.org website?
3      A.  It's a single web page with the line, this
4  is the web page for my phone.  It's inactive right
5  now.
6      Q.  What kind of information is posted at the
7  museum media.org website?
8      A.  That is the archives of the Internet
9  Multicasting Service.
10      Q.  And what kinds of archives are posted
11  there?
12      A.  It's things like historical essays about
13  the EDGAR database.
14      There's one more website I just remembered.
15  Mappa mundi.net, M-a-p-p-a, dot m-u-n-d-i, dot net.
16      Q.  What kind of information is posted at the
17  mappa mundi.net website?
18      A.  Mappa, m-a-p-p-a.  Mappa mundi.net was an
19  early EZ, an electronic magazine on the Internet.
20      Q.  What kind of information is posted there?
21      MR. BRIDGES:  Objection.  Lacks foundation.
22      THE WITNESS:  A series of columns I wrote
23  for the EZ, for example.
24  BY MR. HUDIS:
25      Q.  On what topics?

---

Page 101

1      A.  Mapping the Internet was one topic.
2      Q.  Any others you can remember?
3      A.  There is a tribute to my friend Jon Postel
4  when he passed away called the Internet prayer
5  wheel.
6      Q.  For the record, who was Jon Postel?
7      A.  Jon Postel was one of the early and
8  instrumental creators of the Internet.
9      Q.  Have you told me all of the websites that
10  you can recall today operated by Public.Resource?
11      A.  I think we still have undesign.net is still
12  active.
13      Q.  What -- what kind of information is posted
14  at undesign.net?
15      A.  It was a tribute to Tibor Kalman and a
16  discussion of --
17      Q.  Could you spell his name, please?
18      A.  T-i-b-o-r, K-a-l-m-a-n.  A tribute to Tibor
19  Kalman, and a discussion of the role of
20  advertising.
21      Q.  Who is or was Tibor Kalman?
22      A.  A famous designer.
23      Q.  Of what?
24      A.  You know, I don't know.  That was done in
25  conjunction with Rebecca Malamud.

---

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                                    May 12, 2015

San Francisco, CA

Page 102

1      Q.  Earlier, Mr. Malamud, you said that
2   Internet ar -- excuse me, that Public.Resource
3   operates websites and provides services.  What
4   kinds of services does Internet -- excuse me, does
5   Public.Resource provide?  Or are the websites the
6   provision of the services?
7      A.  "Service" is a technical term of art, and
8   it is the protocols that are used to access
9   information.  So a website is an example of a
10  service.
11     Q.  What other services does Public.Resource
12  provide, other than the provision of these
13  websites?
14     A.  The websites are accessible using the HTTP
15  service, and are also accessible using the FTP
16  service.  FTP stands for file transfer protocol.
17     Q.  Other than providing the websites, the HTTP
18  service and the FTP service, are there any other
19  services that Public.Resource provides?
20     A.  We did provide information access using the
21  rsync protocol, r-s-y-n-c, and we terminated that
22  in January.
23     Q.  Have you told me all of the services that
24  Public.Resource provides?
25     A.  The only service we provide is access via

Page 103

1   the Internet.  And again, the word "service" is a
2   technical term of art denoting the protocols.
3      Q.  Does Public.Resource sell any products?
4      A.  No, we do not.
5      Q.  Mr. Malamud, before the break we marked a
6   few exhibits.  I'd like you to look at them,
7   please.
8          Exhibits 16, 17 and 18.  Let's take them
9   one at a time.
10         What is Exhibit 16?
11     A.  It appears to be a copy of our articles of
12  incorporation.
13     MR. HUDIS:  Counsel, would you stipulate
14  that Exhibit 16 is an authentic business record of
15  Public.Resource?
16     MR. BRIDGES:  I don't know.  I think the
17  witness should -- I'm nervous about stipulating
18  when I don't have personal knowledge.
19     MR. HUDIS:  Okay.
20     MR. BRIDGES:  It looks to be a record of
21  the Secretary of State of the State of California,
22  given the file stamp.
23     MR. HUDIS:  I'll ask the witness.
24  BY MR. HUDIS:
25     Q.  Mr. Malamud, is Exhibit 16 an authentic

Page 104

1   business record of Public.Resource?
2      MR. BRIDGES:  I'll object to the extent it
3   calls for any kind of legal conclusion.
4          You can testify as to whether you think
5   it's an accurate reproduction of it.
6      THE WITNESS:  This appears at first glance.
7   Obviously, I would want to go check my originals.
8   This appears at first glance to be a copy of our
9   articles of incorporation, yes.
10  BY MR. HUDIS:
11     Q.  And these articles of incorporation were
12  prepared about the time of the founding of
13  Public.Resource.Org, Inc.?
14     A.  Well, yes.
15     Q.  And is Exhibit 16, the articles of
16  incorporation, kept on your company's website?
17     A.  Yes.
18     Q.  And is that website operated in the regular
19  course of Public.Resource's business?
20     MR. BRIDGES:  Objection.  Lacks foundation;
21  may call for a legal conclusion; argumentative.
22  BY MR. HUDIS:
23     Q.  You may answer.
24     MR. BRIDGES:  Vague and ambiguous.
25  BY MR. HUDIS:

Page 105

1      Q.  You may answer.
2      A.  Yes.
3      Q.  And the articles of incorporation were made
4   at the time that you founded Public.Resource?
5      A.  The articles of incorporation are what
6   created the corporation.
7      Q.  Let's look at Exhibit 17.  What is this
8   document?
9      MR. BRIDGES:  Check it out.
10     THE WITNESS:  This appears to be a copy of
11  our bylaws.
12  BY MR. HUDIS:
13     Q.  Do you have any reason to doubt that
14  Exhibit 17 is an authentic document?
15     MR. BRIDGES:  Objection.  Lacks foundation;
16  vague and ambiguous.
17     THE WITNESS:  I do not.
18     MR. BRIDGES:  Assumes facts not in
19  evidence.
20         I will note that this document has lines
21  without signatures on the final page.
22     THE WITNESS:  The version of our bylaws
23  posted on our website has no signatures on it.
24         I have no reason to doubt.  I would
25  obviously want to double-check this with the copy

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                          May 12, 2015
San Francisco, CA

Page 106

1   that I have.
2   BY MR. HUDIS:
3       Q.  I'll represent to you, Mr. Malamud, that I
4   obtained Exhibits 16 and 17 from your website.
5       A.  Mm-hm.
6       MR. HUDIS:  Counsel, can you stipulate that
7   Exhibit 17 is an authentic business record of
8   Public.Resource?
9       MR. BRIDGES:  Let me get back to you after
10  a break when I'll have to confer with my client.  I
11  anticipate that will not be a problem.
12      MR. HUDIS:  Because I'd rather not have to
13  go through the foundation if I don't have to.
14      MR. BRIDGES:  I understand.  I just want to
15  confirm with him during a break.
16      MR. HUDIS:  Do you want to -- I'll allow
17  you to do that right now if you'd like.  We can go
18  off the record.
19      MR. BRIDGES:  Sure.
20      MR. HUDIS:  Andrew, do you want us to step
21  out of the room?
22      MR. BRIDGES:  No.  No.  We need to go off
23  the record though.
24      THE VIDEOGRAPHER:  The time is 11:58, and
25  we are off the record.

Page 107

1       (Discussion off the record.)
2       THE VIDEOGRAPHER:  The time is 12:02, and
3   we are back on the record.
4       MR. BRIDGES:  So, Mr. Hudis, 18 we can
5   stipulate to the authenticity.
6       17 we can stipulate this does appear to be
7   a copy of what is posted on the website, and we
8   believe this is a genuine copy of the article of
9   incorporation -- of the form of the articles of
10  incorporation without the signatures.
11      So I think -- you know, if -- the problem
12  is --
13      THE WITNESS:  Bylaws.
14      MR. BRIDGES:  The bylaws, thank you.
15      The concern is if -- it's a long document
16  and needs to be compared.  If there is an issue
17  with that, we can get back and let you know that.
18      So the stipulation is sort of a conditional
19  stipulation, subject to a correction at the time of
20  the transcript if we find after comparing it, there
21  is a material variance.
22      MR. HUDIS:  Okay.  So, Counsel, unless
23  there is a material variance, we can stipulate that
24  Exhibits 16 and 17 are authentic business records
25  of Public.Resource?

Page 108

1       MR. BRIDGES:  Yes, subject to our right to
2   correct the deposition to the extent we may need to
3   correct that stipulation if there is a material
4   variance on 17.
5       MR. HUDIS:  Understood and agreed.
6       And Exhibit 18, you are stipulating that
7   that's an authentic document.
8       MR. BRIDGES:  Yes.
9       MR. HUDIS:  Can we stipulate that it's a
10  business record of Public.Resource?
11      MR. BRIDGES:  We'll stipulate that it is a
12  document in the possession of Public.Resource.  I
13  would consider it to be a business record, I would
14  think, of the Internal Revenue service.
15      MR. HUDIS:  Satisfied.
16  BY MR. HUDIS:
17      Q.  Turning, Mr. Malamud, to Exhibit 16.
18      Does paragraph II B of the articles of
19  incorporation accurately describe the purpose of
20  Public.Resource?
21      MR. BRIDGES:  Objection.  Lacks foundation;
22  vague and ambiguous and may call for legal
23  expertise and legal conclusion.
24      THE WITNESS:  Yes.
25  BY MR. HUDIS:

Page 109

1       Q.  Turning to Exhibit 17.  Does section 2.1 of
2   the bylaws of Public.Resource accurately describe
3   the objectives and purposes of Public.Resource?
4       MR. BRIDGES:  Same objections.
5       THE WITNESS:  Yes.
6   BY MR. HUDIS:
7       Q.  Mr. Malamud, I show you what's been marked
8   as Exhibit 18.  Could you please tell me what that
9   document is?
10      MR. BRIDGES:  I'll object to the extent it
11  requires him to -- object to the extent it requires
12  legal expertise to characterize it or seeks a legal
13  conclusion.
14      The witness may testify as to what he
15  knows.
16      THE WITNESS:  I don't know the official
17  title of this.  It's a -- I believe it's called a
18  Form 1045.  It's a notification of nonprofit
19  status.
20  BY MR. HUDIS:
21      Q.  And does it indicate to you that
22  Public.Resource attained its nonprofit status in
23  September of 2007?
24      MR. BRIDGES:  Objection.  Vague and
25  ambiguous; may call for a -- may call for legal

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                          May 12, 2015
                            San Francisco, CA

| Page 110 | Page 112 |
|---|---|

### Page 110

1   expertise or conclusion.
2   BY MR. HUDIS:
3       Q.  Should I repeat the question, Mr. Malamud?
4       A.  Yeah.
5       Q.  Does Exhibit 18 indicate to you that
6   Public.Resource attained its nonprofit status in
7   September of 2007?
8           MR. BRIDGES:  Same objections.
9           THE WITNESS:  The date of the letter is
10  September 25th.  That's not the date of the
11  nonprofit status.
12  BY MR. HUDIS:
13      Q.  What is the date of the nonprofit status?
14      A.  April 13th, 2007.
15      Q.  Fair enough.  And I see that date.
16      A.  Yeah.
17      Q.  Thank you very much.
18          (PLAINTIFFS' EXHIBITS 19-20 WERE MARKED.)
19  BY MR. HUDIS:
20      Q.  Mr. Malamud, please take a moment to look
21  at Exhibits 19 and 20.
22      A.  Okay.
23      Q.  Have you looked at the exhibits?
24      A.  Yes, I have.
25      Q.  Could you tell me what Exhibit 19 is?

### Page 112

1   look like, but I don't know at specific points in
2   time.
3   BY MR. HUDIS:
4       Q.  Now, Exhibit 19, in the center are these
5   some of the websites that Public.Resource provides
6   to the public?
7       A.  Yes.  And there's one more website that I
8   forgot to tell you about on there.
9       Q.  Which one?
10      A.  Bulk --
11          MR. BRIDGES:  I'm sorry.
12          THE WITNESS:  Pardon me.
13          MR. BRIDGES:  I object on the grounds it
14  lacks foundation; very confusing to me.
15          What are you directing his attention to in
16  this exhibit?
17          MR. HUDIS:  Sure.  Counsel, do you see
18  where it says "Watch FedFlix" in the center of the
19  page on Exhibit 19?
20          MR. BRIDGES:  Right.
21          MR. HUDIS:  And there are a number of
22  websites listed below that?
23          MR. BRIDGES:  Okay.  I just wanted to be
24  clear.
25          MR. HUDIS:  Yes.

### Page 111

1       A.  It looks like an out of date copy of the
2   Public.Resource.Org home page.
3       Q.  So since the time that my office printed
4   this web page of Exhibit 19, you have updated the
5   content since then?
6           MR. BRIDGES:  Objection.  Misstates
7   testimony; vague and ambiguous.
8           THE WITNESS:  When did you print this?
9   BY MR. HUDIS:
10      Q.  Our best recollection is January of 2015.
11      A.  I don't know.  I would have to
12  double-check.
13      Q.  I amend that because Exhibit 20 was also
14  printed on the same date.  So we probably printed
15  it in March of 2014.
16      A.  Yeah.  That makes sense.
17      Q.  So this -- so Exhibit 19 and 20 appears to
18  you to be the content of the home page and the
19  about page of the Public.Resource.Org website in or
20  about March of 2014?
21          MR. BRIDGES:  Objection.  May call for
22  speculation if he doesn't have definite memory;
23  vague and ambiguous; compound; lacks foundation.
24          THE WITNESS:  I'd have to speculate.  It
25  has the look and feel of what those pages typically

### Page 113

1           MR. BRIDGES:  If that's what you're
2   referring to, fine.
3           MR. HUDIS:  Yes.
4   BY MR. HUDIS:
5       Q.  So continue, Mr. Malamud.
6       A.  Bulk resource.org is the website that I
7   forgot to tell you about.
8       Q.  So what kind of information is provided on
9   the Bulk resource.org website?
10      A.  Its primary function is the home for
11  approximately 8 million IRS-exempt organization
12  filings.
13      Q.  And when you say "exempt," do you mean tax
14  exempt?
15      A.  Exempt organizations is a category that the
16  IRS has assigned.  Many of them are tax exempt, but
17  it also includes political organizations.
18      Q.  So if I remember my Internal Revenue Code,
19  those are 501(c)(3) and 501(c)(4) organizations?
20          MR. BRIDGES:  Objection.  May call for
21  legal expertise or conclusion.
22          THE WITNESS:  Also section 527
23  organizations.
24  BY MR. HUDIS:
25      Q.  So all three?

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                    May 12, 2015

San Francisco, CA

## Page 114

1      A.  Yes.
2      Q.  Do you have -- if you could please look at
3  Exhibit 20.  Do you see that?
4      A.  Yes.
5      Q.  Are the current trustees of Public.Resource
6  Tim Stanley, Ed Walters and yourself?
7      A.  Yes.
8      Q.  Who is Tim Stanley?
9      A.  Tim Stanley is the CEO of Justia.
10     Q.  And what is Justia?
11     A.  It is a company in the legal information
12  services industry.
13     Q.  What kind of service do they provide?
14         MR. BRIDGES:  Objection.  Vague and
15  ambiguous.
16         THE WITNESS:  One example is a directory
17  for lawyers.
18  BY MR. HUDIS:
19     Q.  Any other services that Justia provides
20  that you're aware of?
21         MR. BRIDGES:  Objection.  Vague and
22  ambiguous.
23         THE WITNESS:  They provide a large number
24  of files such as court opinions for public access.
25  BY MR. HUDIS:

## Page 115

1      Q.  And who is Ed Walters?
2      A.  Mr. Walters is the CEO of FastCase, all one
3  word.
4      Q.  And what is the business of FastCase?
5      A.  FastCase is a company in the legal
6  information services industry.
7      Q.  What kind of information do they provide?
8      A.  They provide access to court opinions,
9  statutes, and other information.
10     Q.  What kinds of other information?
11     A.  You know, I don't know.  Court opinions and
12  statutes.
13     Q.  Do the former trustees of Public.Resource
14  also include Dale Dougherty, Marshall Rose and Hal
15  Varian?
16     A.  Yes.
17     Q.  Who is Dale Dougherty?
18     A.  Dale Dougherty is the founder of Maker
19  Media.
20     Q.  What is Maker Media?
21     A.  It's a company that, among other things,
22  operates the Maker Faire.  That's all one word,
23  dash F-a-i-r-e.
24     Q.  What is Maker Faire?
25     A.  It is a set of events around the world

## Page 116

1  devoted to the maker movement.
2      Q.  What is the maker movement?
3      A.  People that like to make things.
4      Q.  Inventors?
5      A.  For example, inventors.
6      Q.  Who is Marshall Rose?
7      A.  Dr. Rose is an Internet engineer.
8      Q.  Who is Hal Varian?
9      A.  Dr. Varian is the chief economist of
10  Google.
11     Q.  How long did Mr. Dougherty serve on
12  Public.Resource's board?
13     A.  Six years.
14     Q.  What years?
15     A.  2007 to 2013.
16     Q.  Why did he leave Public.Resource's board?
17         MR. BRIDGES:  Objection.  May call for
18  speculation; vague and ambiguous.
19         THE WITNESS:  He put in his time, and I
20  thanked him very much.
21  BY MR. HUDIS:
22     Q.  So he voluntarily left?
23     A.  Absolutely.
24     Q.  And Dr. Rose, how long was he on
25  Public.Resource's board?

## Page 117

1      A.  The same period of time, 2007 to 2013,
2  June.
3      Q.  Why did he leave Public.Resource's board?
4         MR. BRIDGES:  Objection.  May call for
5  speculation; vague and ambiguous.
6         THE WITNESS:  Dr. Rose created a new
7  Internet startup, and I was assisting him in that,
8  and we decided at the time that that would not have
9  him be an outside director.  And so again, I
10  thanked him for his valuable service.
11  BY MR. HUDIS:
12     Q.  And Hal Varian, when did he -- how long did
13  he serve on Public.Resource's board?
14     A.  The same period of time.
15     Q.  Why did he leave the board?
16         MR. BRIDGES:  Object.
17         THE WITNESS:  He was an investor -- I'm
18  sorry.
19         MR. BRIDGES:  The same objections.
20         THE WITNESS:  Okay.
21         MR. BRIDGES:  May call for speculation and
22  vague and ambiguous.
23  BY MR. HUDIS:
24     Q.  Mr. Malamud, between you and myself, we're
25  having a nice conversation.  You have to give

30 (Pages 114 to 117)

Carl Malamud                                                    May 12, 2015
                            San Francisco, CA

Page 118

1    Mr. Bridges time to object.
2       A.  Thank you.
3       Q.  All right.  So I'm sorry.  We were in the
4    middle of your answer.
5       Why did Mr. Varian leave Public.Resource's
6    board?
7          MR. BRIDGES:  Same objection.
8          THE WITNESS:  Dr. Varian was an investor in
9    Dr. Rose's company.
10   BY MR. HUDIS:
11      Q.  So that, is it true to say that they --
12   Dr. Varian and Dr. Rose needed time to operate
13   their startup company?
14         MR. BRIDGES:  No.  Objection.  Misstates
15   testimony.
16         THE WITNESS:  Public.Resource.Org requires
17   that the majority of the board of directors are not
18   interested parties, and because I had a business
19   relationship with Dr. Rose, that would have made
20   him an interested party.
21   BY MR. HUDIS:
22      Q.  And Dr. Varian as well?
23      A.  Because he was an investor in Dr. Rose's
24   company, yes.
25      Q.  If we could turn back -- Mr. Malamud, if we

Page 119

1    could turn back to the bylaws, Exhibit 17.  Does
2    section 3.3 accurately describe the functions of
3    the Public.Resource trustees?
4          MR. BRIDGES:  Objection.  May call for a
5    legal conclusion and lacks foundation and vague and
6    ambiguous.
7          THE WITNESS:  Yes.  It's the specification
8    of the duties of the trustees.
9    BY MR. HUDIS:
10      Q.  What other duties, if any, besides those
11   listed in section 3.3 of Exhibit 17, do the
12   trustees perform for Public.Resource?
13         MR. BRIDGES:  Objection.  Lacks foundation;
14   vague and ambiguous; confusing; argumentative.
15         THE WITNESS:  These are the duties.  It
16   says, "Supervise all officers, agents and employees
17   of the corporation."
18   BY MR. HUDIS:
19      Q.  So besides what are listed here in section
20   3.3, do the trustees of Public.Resource perform any
21   other duties for the company?
22         MR. BRIDGES:  Same objection.  Lack of
23   foundation; vague and ambiguous; confusing;
24   argumentative.
25         THE WITNESS:  I believe clause C,

Page 120

1    "supervise all officers," is pretty inclusive, and
2    I think that covers their duties.
3    BY MR. HUDIS:
4       Q.  Does section 4.4 of the bylaws, Exhibit 17,
5    accurately describe the president's duties?
6          MR. BRIDGES:  Objection.  May call for a
7    legal conclusion; vague and ambiguous;
8    argumentative; lacks foundation.
9          THE WITNESS:  Yes.
10   BY MR. HUDIS:
11      Q.  Mr. Malamud, do you perform any other
12   duties on behalf of Public.Resource as its
13   president, other than those that are stated in
14   section 4.6 of Exhibit 17?
15         MR. BRIDGES:  Objection.  Argumentative;
16   lacks foundation; vague and ambiguous; may call for
17   a legal conclusion and construction of the
18   document.
19         THE WITNESS:  Section 4.6 says, "He or she
20   shall perform all duties incident to his or her
21   office."  I think that's pretty inclusive.
22   BY MR. HUDIS:
23      Q.  Mr. Malamud, section 4.1 of Exhibit 17, the
24   bylaws, provides for the following officers.  "A
25   president, a secretary and a chief financial

Page 121

1    officer who shall be designated the treasurer."
2       Today who is the secretary of
3    Public.Resource?
4       A.  That would be me.
5       Q.  Today who is the chief financial
6    officer/treasurer of Public.Resource?
7       A.  That is me.
8       Q.  Mr. Malamud, if you could turn to section
9    5.1 of the bylaws, Exhibit 17.  And 5.2.
10      Are there today operating committees of
11   Public.Resource?
12         MR. BRIDGES:  Objection.  Vague and
13   ambiguous; lacks foundation.
14         THE WITNESS:  We have a small board.  We
15   operate as a committee of the whole.  So yes, we
16   do.
17   BY MR. HUDIS:
18      Q.  Other than the board, does Public.Resource
19   have any other committees?
20         MR. BRIDGES:  Objection.  Argumentative;
21   lacks foundation; vague and ambiguous; asked and
22   answered.
23         THE WITNESS:  Yes.  Again, the audit
24   committee, for example, is a committee of the whole
25   board.

31  (Pages 118 to 121)

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 122

1   BY MR. HUDIS:
2       Q. Okay.  Other than the committee of the
3   whole, which is the board and the audit committee,
4   does Public.Resource -- Public.Resource have any
5   other operating committees?
6           MR. BRIDGES:  Objection.  Asked and
7   answered; lacks foundation; vague and ambiguous.
8           THE WITNESS:  No.
9   BY MR. HUDIS:
10      Q. Mr. Malamud, could you turn to article 13
11  of the bylaws, Exhibit 17?  Are you there?
12      A. Yes.
13      Q. How many members does Public.Resource have
14  in the Council of Public Engineers?
15      A. None.
16      Q. What is the Council of Public Engineers?
17      A. The bylaws were created in a fashion that
18  allowed us to become a membership organization in
19  the future.  We have not activated that.
20      Q. Besides yourself, does Public.Resource have
21  any employees?
22      A. No.
23      Q. Who is or was Joel Hardi, H-a-r-d-i?
24      A. He was an employee.
25      Q. What did he do?

Page 123

1       A. He was a systems engineer.
2       Q. For how long was he a systems engineer at
3   Public.Resource?
4       A. It was less than a year.
5       Q. Do you remember what year?
6       A. 2008.
7           MR. HUDIS:  Let's go off the record.
8           MR. BRIDGES:  Shall we break for lunch?
9           MR. HUDIS:  Yeah.  That's why I want to --
10  we're at a good breaking point.
11          THE VIDEOGRAPHER:  The time is 12:26.  We
12  are off the record.
13          (Lunch recess taken.)
14          THE VIDEOGRAPHER:  The time is 1:11, and we
15  are back on the record.
16  BY MR. HUDIS:
17      Q. Mr. Malamud, before we had the break you
18  were telling me about Joel Hardi, and he was a
19  systems engineer for Public.Resource in 2008?
20      A. That's correct.
21      Q. What did he do as systems engineer for the
22  year he was with you?
23      A. He did systems administration and
24  programming.
25      Q. Mr. Malamud, how does Public.Resource

Page 124

1   obtain funding for its operations?
2           MR. BECKER:  Objection.  Relevance.
3   Objection.  This is beyond the scope of the
4   30(b)(6) designation.
5           THE WITNESS:  We receive contributions and
6   grants.
7           And I wanted to add there was one more
8   website that I remembered.  When an appropriate
9   time, I'd be happy to tell you what it is.
10  BY MR. HUDIS:
11      Q. You know what, Mr. Malamud?  Why don't we
12  do that right now?
13      A. All right.
14      Q. So there is another website that is
15  provided by Public.Resource?
16      A. Yes.
17      Q. And what is the name of that website?
18      A. Betterdogfood.org.
19      Q. And what information is provided on the
20  Betterdogfood.org website?
21      A. It's a spoof of Silicon Valley.  It's a
22  fake dot com.  We give you the dog and sell you the
23  dog food.
24      Q. So Public.Resource obtains funding for its
25  operations by contributions and grants?

Page 125

1           MR. BECKER:  Objection.  Again, beyond the
2   scope of Mr. Malamud's 30(b)(6) designation.  May
3   misstate prior testimony.
4           THE WITNESS:  We receive contributions and
5   grants.
6           MR. HUDIS:  It's deposition topic 4, and if
7   I could put something into the record.
8           (PLAINTIFFS' EXHIBIT 21 WAS MARKED.)
9   BY MR. HUDIS:
10      Q. If we notice on item 2 on --
11          MR. BECKER:  Counsel, what exhibit number
12  is this?
13          MR. HUDIS:  Yeah, 21.  So I've marked as
14  Exhibit 21 -- thank you, Counsel.
15          We have marked as Exhibit 21
16  Public.Resource's initial disclosures pursuant to
17  FRCP 26(a)(1), and under the items relating to the
18  documents that Public.Resource may use to support
19  its claims of defense, among them it says documents
20  relating to Public.Resource's income and finances.
21          So we believe that Public.Resource has put
22  its income and finances into -- into relevant play
23  in the litigation, and we did notice it as a topic.
24          MR. BECKER:  And we have had a discussion
25  about this, and of course, Public.Resource

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                      May 12, 2015

San Francisco, CA

## Page 126

1  disagrees with your characterization.
2      This says documents that Public.Resource
3  may use to support its claims for defenses.  Any
4  such documents that Public.Resource plans to use to
5  support its claims for defenses have been produced
6  to plaintiffs, and the -- I should also note that
7  category 4 is far broader than simply documents
8  relating to Public.Resource's income and finances.
9  Its records and communications and information
10  relating to Public.Resource's income and finances.
11      MR. HUDIS:  So I'll ask the questions,
12  Counsel.  If you have objections, we can either
13  take Mr. Malamud's testimony subject to your
14  objections, or you're within your rights to tell
15  him not to answer.  I just want to make my record.
16      MR. BECKER:  Mm-hm.
17  BY MR. HUDIS:
18      Q.  Does Public.Resource sell any products?
19      MR. BECKER:  I'm just going to take a
20  moment to say that we have a standing objection to
21  all questions that are related to the records,
22  communications and information relating to
23  Public.Resource's income and finances as being
24  beyond the scope of the 30(b)(6) designation.
25      MR. HUDIS:  Okay.  So, Counsel --

## Page 127

1      MR. BECKER:  And also being irrelevant.
2      MR. HUDIS:  So, Counsel, we do disagree.
3  So I'll just make the record and ask my questions
4  and we can proceed from there.
5  BY MR. HUDIS:
6      Q.  So, Mr. Malamud, does product -- does
7  Public.Resource sell any products?
8      MR. BECKER:  Objection.  Vague and
9  ambiguous and all prior objections.
10      THE WITNESS:  Some of our pamphlets are
11  available for purchase on Lulu, but nobody's ever
12  bought them.
13  BY MR. HUDIS:
14      Q.  Does Public.Resource sell any services?
15      MR. BECKER:  Same objections.  Vague and
16  ambiguous.
17      THE WITNESS:  No.
18  BY MR. HUDIS:
19      Q.  Now, you mentioned before that
20  Public.Resource obtains grants.  Do you recall
21  that?
22      A.  Yes.
23      Q.  From let's say the five largest.  From whom
24  does Public.Resource obtain grants from the five
25  largest that you can remember?

## Page 128

1      MR. BECKER:  Objection.  For the same
2  objections prior.  Vague and ambiguous, and also an
3  objection on privacy grounds for any individuals or
4  entities that are not publicly listed among their
5  list of provided grants to Public.Resource.Org.
6      THE WITNESS:  Our list of contributors is
7  confidential.  As part of the schedule B of our
8  Form 990 we have listed some of our contributors on
9  our "About" page.
10  BY MR. HUDIS:
11      Q.  So if we could look at Exhibit 20,
12  Mr. Malamud.
13      A.  Okay.
14      Q.  And you see under "Our Contributors"?
15      A.  Yes.
16      Q.  So are -- strike that.
17      Under the first bullet point where it says,
18  "Pro bono legal support for our 2013 activities."
19  Do you see that?
20      A.  I do.
21      Q.  And the pro bono legal support provided,
22  these are all law firms?
23      A.  No.
24      Q.  Which one -- which one of these entities is
25  not a law firm?

## Page 129

1      A.  Christopher Sprigman is a professor of law.
2      Q.  Except for Christopher Sprigman, all the
3  rest of the pro bono legal supporters in 2013 are
4  these law firms listed in here?
5      MR. BECKER:  Objection.  Vague.
6  What do you mean by law firm?
7      MR. HUDIS:  It says, "the following law
8  firms."
9  BY MR. HUDIS:
10      Q.  You may answer.
11      A.  Yes.
12      Q.  Are there any other law firms that have
13  provided pro bono legal support to Public.Resource
14  that are not listed here on Exhibit 20?
15      MR. BECKER:  Objection to the extent that
16  this calls for anything that is attorney-client
17  privilege, including the -- the type of legal
18  support that any entity may or may not have
19  provided to Public.Resource.Org.
20  BY MR. HUDIS:
21      Q.  You may answer.
22      A.  We have disclosed it.  Morrison & Foerster
23  represents us on a pro bono basis.
24      Q.  Any other law firms?
25      A.  Not that we have disclosed.

33  (Pages 126 to 129)

Carl Malamud                                            May 12, 2015
San Francisco, CA

---

Page 130

1       Q.  And then on the next bullet it says, "Major
2   support for our 2012 activities is provided by a
3   grant from Google.Org with additional support from
4   the Elbaz Family Foundation and the Cutts
5   Foundation.
6           Do you see that?
7           MR. BECKER:  Objection.  The document
8   speaks for itself.
9           THE WITNESS:  I do.
10  BY MR. HUDIS:
11      Q.  All right.  And could you tell me the
12  amounts of the grants of these three entities in
13  2012?
14          MR. BECKER:  Objection.  Once again,
15  renewing the objection that this is beyond the
16  scope of the 30(b)(6) designation.  Objection.
17  Competence to the extent that the witness is in a
18  position to state specific figures.  Objection for
19  relevance.
20  BY MR. HUDIS:
21      Q.  You may answer.
22      A.  Google.Org was a million dollar grant in
23  2012.
24          The Cutts Foundation was $10,000.
25          And I forget how much the Elbaz Family

---

Page 131

1   Foundation was.
2       Q.  Has Public.Resource obtained grants from
3   any other entities larger than a hundred thousand
4   dollars?
5           MR. BECKER:  Objection.  Vague and
6   ambiguous.  Objection.  The -- may call for
7   privileged information concerning the identities of
8   donors, and their first amended rights in
9   association and rights of free speech.
10          Objection.  Relevance.
11          THE WITNESS:  I'm willing to answer that
12  question with respect to the publicly disclosed
13  donors.  As I explained before some of our donors
14  have not been publicly disclosed.
15          And would you repeat the question?  Make
16  sure I get it right.
17  BY MR. HUDIS:
18      Q.  Sure.  Has Public.Resource obtained grants
19  from any other entity at this time larger than a
20  hundred thousand dollars?
21          MR. BECKER:  All the same objections,
22  including vague and ambiguous.
23          THE WITNESS:  There are two individual
24  grants that are greater than that sum.  The Arcadia
25  Foundation provided a grant of $200,000.

---

Page 132

1           The Omidyar Network provided a grant of
2   $500,000 plus $750,000 in a matching funds
3   challenge.
4           Let me add -- greater than a hundred
5   thousand dollars.  I believe that's the list.
6   BY MR. HUDIS:
7       Q.  Could you spell Arcadia for me?
8       A.  A-r-c-a-d-i-a.
9       Q.  And could you spell Omidyar?
10      A.  O-m-i-d-y-a-r.
11      Q.  And is Arcadia a foundation?
12      A.  I believe that's their formal name.
13      Q.  And is Omidyar Network a foundation?
14      A.  Yes, it is.
15      Q.  Have you provided to us all of the publicly
16  disclosed entities who have donated to
17  Public.Resource in amounts greater than a hundred
18  thousand dollars?
19          MR. BECKER:  Objection.  Vague and
20  ambiguous.  Objection.  Relevance.  Objection.
21  Beyond the scope of the 30(b)(6) designation.
22  Objection.  Competence.
23          THE WITNESS:  It's -- we've disclosed all
24  of those on our about page, and you can simply
25  refresh this document and you'll have the list.

---

Page 133

1   BY MR. HUDIS:
2       Q.  What is the Project 10 award?
3           MR. BECKER:  Objection.  Vague and
4   ambiguous.
5           THE WITNESS:  The project 10 to 100.
6   BY MR. HUDIS:
7       Q.  Oh, Project 10 to 100 award?
8       A.  Is a set of grants that Google gave out in
9   celebration of their tenth anniversary.
10      Q.  And what is the Mitchell Kapor Foundation?
11      A.  It is a private foundation run by Mitchell
12  Kapor.
13      Q.  What is the Sunlight Foundation?
14      A.  The Sunlight Foundation is a nonprofit
15  organization based in Washington D.C.
16      Q.  What is Creative Commons?
17      A.  Creative Commons is a nonprofit
18  organization based in San Francisco, which is the
19  creator of the Creative Commons licenses.
20      Q.  What are the creative commons licenses?
21          MR. BECKER:  Objection.  Vague and
22  ambiguous; relevance.
23          THE WITNESS:  I'm not a lawyer so I'm not
24  sure the proper characterization, but it is a set
25  of licenses that people can apply to content that

---

Carl Malamud                                                    May 12, 2015

San Francisco, CA

Page 134

1   permit other people to use that content under
2   certain conditions.
3   BY MR. HUDIS:
4       Q.  Understanding you're not a lawyer, what are
5   those conditions?
6       MR. BECKER:  Objection.  May call for a
7   legal conclusion; vague and ambiguous.  Objection
8   for relevance.  Objection for beyond the scope of
9   the 30(b)(6) designation.  Objection for
10  competence.
11      THE WITNESS:  One example of the creative
12  commons license is attribution non-commercial use.
13  And what that says is you may use this content as
14  long as you provide attribution and only use it for
15  non-commercial purposes.
16  BY MR. HUDIS:
17      Q.  Does Public.Resource obtain funding for its
18  operations from sources other than contributions or
19  grants?
20      MR. BECKER:  Objection for being beyond the
21  scope of the 30(b)(6,) and objection for relevance.
22  Objection to the extent that it calls for
23  information concerning the identities of any
24  private donors that have not been publicly
25  disclosed and therefore would impact their privacy

Page 135

1   rights.
2       THE WITNESS:  We had a small in-kind
3   contribution of a computer.  And that would be it.
4   BY MR. HUDIS:
5       Q.  So other than the donation of the in-kind
6   computer and contributions and grants, does
7   Public.Resource have any other sources of funding
8   for its operations?
9       MR. BECKER:  All the same objections.
10      THE WITNESS:  No.
11      MR. BECKER:  Vague and ambiguous.
12      THE WITNESS:  Contributions and grants.
13  BY MR. HUDIS:
14      Q.  Does Public.Resource retain any independent
15  contractors?
16      MR. BECKER:  Objection.  Vague and
17  ambiguous.
18      THE WITNESS:  Yes.
19  BY MR. HUDIS:
20      Q.  For what purpose?
21      MR. BECKER:  Objection.  Vague and
22  ambiguous.
23      THE WITNESS:  We -- one independent
24  contractor is Point.B Studio, which does graphic
25  design support.

Page 136

1   BY MR. HUDIS:
2       Q.  And that's -- that business Point.B Studio
3   is operated by Rebecca Malamud?
4       MR. BECKER:  Objection.  Assumes facts not
5   in evidence; vague and ambiguous.
6       THE WITNESS:  She's the principal of
7   Point.B Studio, yes.
8   BY MR. HUDIS:
9       Q.  Who is or was Mike Kail, K-a-i-l?
10      MR. BECKER:  Objection.  Vague; compound.
11      THE WITNESS:  Mike D. Kail provides system
12  administration support to Public.Resource on a
13  part-time basis.
14  BY MR. HUDIS:
15      Q.  What is systems administration support?
16      A.  That is the maintenance and operation of
17  UNIX-based computers that we use as servers.  UNIX
18  is all capital letters.
19      Q.  Who -- who or what is HTC Global?
20      A.  A former contractor.
21      Q.  What services did they provide to
22  Public.Resource?
23      MR. BECKER:  Objection.  Vague.
24      THE WITNESS:  Double-key services.
25  BY MR. HUDIS:

Page 137

1       Q.  Does Public.Resource retain any independent
2   contractors today who provide double-key services
3   to your company?
4       MR. BECKER:  Objection.  Irrelevance.
5   Objection.  Vague.
6       THE WITNESS:  No.
7   BY MR. HUDIS:
8       Q.  Mr. Malamud, could we turn back to the
9   bylaws of Public.Resource, Exhibit 17?
10      A.  Okay.
11      Q.  Could we turn to section 7.6?
12      Since 2007 has Public.Resource issued any
13  annual reports?
14      A.  Yes.
15      Q.  Are these reports published on
16  Public.Resource's website?
17      A.  I don't know.
18      Q.  Since 2007 -- now I'm -- strike that.
19      So now we're on -- I'm looking at section
20  7.7 of Exhibit 17, the bylaws of Public.Resource.
21      Since 2007 has Public.Resource issued any
22  annual statements of specific transactions?
23      A.  I think you left out a part of section 7.7.
24  It's annual statement of specific transactions to
25  members.  We have no members.  We have not issued

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                                May 12, 2015

San Francisco, CA

Page 138

1   any statements.
2       Q.  Thank you for the correction, Mr. Malamud.
3   I appreciate it.
4       Turning to section 9.4 of Exhibit 17, the
5   bylaws.
6       Since 2007 has Public.Resource kept board
7   meetings -- kept board meeting minutes?
8       A.  We conduct all of our board business by
9   electronic mail.  And yes, in fact, that's part of
10  our document retention.
11      Q.  Are those meeting minutes published on
12  Public.Resource's website?
13      A.  No.
14      Q.  Since 2007 has Public.Resource kept board
15  committee meeting minutes?
16      A.  As I said earlier, we function as a
17  committee of the whole, and yes, we did.
18      Q.  Where are these reports and minutes kept?
19      A.  They're --
20      MR. BECKER:  Objection.  Relevance.
21      THE WITNESS:  They're in electronic mail,
22  and they were also furnished to our auditors and
23  our accountant.
24      MR. HUDIS:  Counsel, we would like
25  production of Public.Resource's annual reports and

Page 139

1   board minutes from 2007 until now.
2       MR. BECKER:  Counsel, what is the basis for
3   that request?  Do you believe that any of your
4   written document requests would include those
5   documents?
6       MR. HUDIS:  I'd have to look, and if they
7   don't, we'll certainly propound more.
8       MR. BECKER:  And, Counsel, what is the
9   relevance of those documents that you're requesting
10  to --
11      MR. HUDIS:  Oh, any of the reports or
12  meeting minutes that would discuss either the
13  posting of the 1999 standards or this litigation.
14      MR. BECKER:  Counsel, what is the basis for
15  requesting them back to 2007?
16      MR. HUDIS:  Good point.  We'll amend our
17  request back to 2012.
18      MR. BECKER:  Counsel, what is the basis for
19  requesting all -- all minutes as opposed to simply
20  any that would mention the 1999 standards and this
21  litigation?
22      MR. HUDIS:  I agree.  I agree.  We'll limit
23  our request to any board minutes and any annual
24  reports of Public.Resource that mention either the
25  1999 standards or this litigation from 2012 to the

Page 140

1   present.
2       MR. BECKER:  We will take this under
3   advisement and reserve objections.
4   BY MR. HUDIS:
5       Q.  Mr. Malamud, what is the Internet Archive?
6       MR. BECKER:  Objection.  Vague.
7       THE WITNESS:  It's a nonprofit corporation
8   based in San Francisco.
9   BY MR. HUDIS:
10      Q.  What is the business of Internet Archive?
11      MR. BECKER:  Objection.  Vague and
12  competence.
13      THE WITNESS:  And I'm sorry, your question
14  was, what --
15  BY MR. HUDIS:
16      Q.  What is the business of Internet Archive?
17      A.  So that is probably a question best asked
18  of them.  If I were to characterize it, I would say
19  it is a public library on the Internet.
20      Q.  And are you familiar with the URL of
21  Public.Resource's website?
22      MR. BECKER:  Objection.  Vague.
23      THE WITNESS:  I'm not sure what you're
24  asking there.
25  BY MR. HUDIS:

Page 141

1       Q.  Is www.archive.org the URL of
2   Public.Resource's website?
3       MR. BECKER:  Objection.  Confusing.
4       THE WITNESS:  No, it is not.
5   BY MR. HUDIS:
6       Q.  Oh, thank you.  I misspoke.
7       What is the URL of Internet Archive's
8   website?
9       A.  Archive.org.
10      Q.  What relationship, if any, do you have with
11  the Internet Archive?
12      MR. BECKER:  I'd just like to note my --
13  our objection that Mr. Malamud is not designated to
14  discuss generally any interaction between the
15  Internet Archive and Public.Resource.Org.
16  Mr. Malamud is only designated to discuss those
17  interactions that may relate to the 1999 standards.
18      MR. HUDIS:  Well, we -- he -- Mr. Malamud
19  is appearing here not only in his Rule 30(b)(6)
20  capacity, but he is also appearing here in his
21  personal capacity.
22      So I will ask again.
23  BY MR. HUDIS:
24      Q.  Mr. Malamud, what relationship, if any, do
25  you have with Internet Archive?

36 (Pages 138 to 141)

Carl Malamud                                                    May 12, 2015
                         San Francisco, CA

---

Page 142

1      MR. BECKER:  And same objection, as well as
2  vague.
3  BY MR. HUDIS:
4      Q.  You may answer.
5      A.  I'm a user.
6      Q.  Mr. Malamud, are you a registered user with
7  Internet Archive?
8      MR. BECKER:  Objection.  Vague.
9      THE WITNESS:  Yes, I am.
10  BY MR. HUDIS:
11      Q.  What rights does an Internet Archive
12  registered user have?
13      MR. BECKER:  Objection.  Assumes facts not
14  in evidence.
15      THE WITNESS:  So again, the specific nature
16  of the rights is something you would have to ask
17  the Internet Archive, but a user can read content
18  and can create what is known as an item.
19  BY MR. HUDIS:
20      Q.  What -- in relation to the Internet
21  Archive, what is an item?
22      A.  An example of an item is a piece of video.
23      Q.  Could the creation of an item be also
24  written content?
25      MR. BECKER:  Objection.  Competence.

---

Page 143

1  Objection.  Vague.
2      THE WITNESS:  Items have types, and one
3  type of an item is a text item.
4  BY MR. HUDIS:
5      Q.  Are there other types of items that one can
6  create on Internet Archive?
7      A.  Yes.
8      Q.  And what are they?
9      A.  Audio.  What I would call an opaque item,
10  just an arbitrary file, such as a zip file.  Data
11  is actually the formal type name for that.
12      Q.  So generally these items could include
13  video, text, audio and opaque data, such as a zip
14  file?
15      MR. BECKER:  Objection.  Compound.
16  Objection.  Vague.
17      THE WITNESS:  I'm not sure that's the
18  complete list, but that is certainly a subset of
19  the items one can create.
20  BY MR. HUDIS:
21      Q.  Do you have administrator privileges with
22  Internet Archive?
23      MR. BECKER:  Objection.  Vague.  Objection.
24  Competence.
25      THE WITNESS:  Yes, although that's a

---

Page 144

1  carefully defined term.
2  BY MR. HUDIS:
3      Q.  And how would you define "administrator
4  privileges"?
5      A.  It allows me to create and edit items
6  within the collections that I have created or have
7  access to.
8      Q.  You anticipated one of my later questions.
9      A.  Sorry about that.
10      Q.  No, that's -- that's actually very good.
11      With respect to the Internet Archive, what
12  is a collection?
13      A.  A collection is a set of items that are
14  grouped together.
15      Q.  Are these sets of items grouped together in
16  a collection under a theme?
17      MR. BECKER:  Objection.  Vague.
18      THE WITNESS:  Typically.
19  BY MR. HUDIS:
20      Q.  Mr. Malamud, do you have an e-mail address?
21      A.  Yes, I do.
22      Q.  And is that e-mail address Carl@media.org?
23      A.  Yes.
24      Q.  Is your e-mail address also the user name
25  that you use to log on to Internet Archive's

---

Page 145

1  servers so that you can post content to their
2  website?
3      A.  Yes.
4      Q.  For questions that are going to follow
5  later, Mr. Malamud, I'd like to know your
6  understanding of certain terms related to the
7  Internet.
8      First, content.  What is content in
9  relation to the Internet?
10      MR. BECKER:  Objection.  Vague and
11  ambiguous.  Objection.  Relevance.  May be
12  argumentative.
13      THE WITNESS:  That's a broad philosophical
14  question, sir.  I mean, that sounds like the --
15  something one would write an essay about.
16  BY MR. HUDIS:
17      Q.  All right.  So we'll -- we'll take the
18  definition by way of example.
19      Can content include textual data?
20      A.  Sure, yes.
21      Q.  Can content include graphical data such as
22  image -- images?
23      A.  Images would be content, yes.
24      Q.  Yes.  And would data files be content?
25      A.  Maybe or maybe not.

---

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                          May 12, 2015

San Francisco, CA

| Page 146 | Page 148 |

**Page 146**

1    Q. In what way would data files be considered
2  content for the Internet?
3    A. So content in my mind, and again, this is a
4  broad, philosophical topic, implies something that
5  a human being can look at and take some meaning
6  from.
7      So a data file might include a binary
8  image. Is that content or not? Again, that's --
9  it would be a fascinating essay.
10   Q. Which brings me to my next question.
11     What does it mean to view content on an
12  Internet website?
13     MR. BECKER: Objection. Vague.
14     THE WITNESS: So view to me sounds to me
15  like a human being at a computer using the
16  Internet. So I think that is an end user looking
17  at an item that is available from another computer.
18  BY MR. HUDIS:
19   Q. What does it mean to access content on an
20  Internet website?
21     MR. BECKER: Objection. Vague. Objection.
22  May also be argumentative. Objection. May call
23  for a legal conclusion.
24     THE WITNESS: So access is a more precise
25  technical term, and that to me implies that a

**Page 147**

1  computer, not necessarily a human being, but a
2  computer has requested some data from another
3  computer, and that request was successful and the
4  data was transferred.
5  BY MR. HUDIS:
6   Q. What does it mean to download content from
7  an Internet website?
8     MR. BECKER: Objection. Vague. Objection.
9  May call for a legal conclusion. Objection. May
10  be argumentative.
11     THE WITNESS: Again, that's a vague term,
12  like view. But from the standpoint of an
13  individual human being at a computer, download
14  implies taking some content from another location
15  and having it copied on your personal computer, for
16  example.
17  BY MR. HUDIS:
18   Q. Could you tell us what an HTTP question is,
19  otherwise known as a hypertext transfer protocol
20  request?
21   A. It is one of a series of operations --
22  protocol operations defined in the HTTP protocol
23  specification.
24   Q. And what does it do?
25     MR. BECKER: Objection. Vague.

**Page 148**

1     THE WITNESS: Well, there's different kinds
2  of requests.
3  BY MR. HUDIS:
4   Q. There are different kinds of HTTP requests?
5   A. Yes.
6   Q. All right. Could you tell me what they
7  are? Are there many?
8     MR. BECKER: Objection. Compound.
9  BY MR. HUDIS:
10   Q. Are there many types of HTTP requests?
11   A. Okay. Let me preface this by saying I
12  would want to review the HTTP protocol
13  specification, but there are several, I can say
14  that for a fact.
15   Q. All right. So if you could name me a few
16  of the ones that you recall at this time.
17   A. One of the more common requests is the get
18  request, g-e-t. And that request is how a client
19  asks for a particular URL from a server.
20   Q. All right. What's another type of HTTP
21  request?
22   A. The post request is used to add data to,
23  for example, a web form on the server.
24   Q. Can you tell us another type of HTTP
25  request?

**Page 149**

1   A. The head request asks for the metadata
2  associated with the document, such as the last
3  modified time or the number of bytes.
4   Q. Can you name another type of HTTP request?
5   A. There is a put request, and I would have to
6  consult for the precise definition of that one.
7   Q. What generally does a put request do?
8     MR. BECKER: Objection. Vague.
9     THE WITNESS: I'd want to --
10     MR. BECKER: Objection. Competence.
11     THE WITNESS: I'd want to look at the HTTP
12  protocol specification. It's not something I'm
13  familiar with.
14  BY MR. HUDIS:
15   Q. Is there any other type of HTTP request
16  that you can think of as we sit here now?
17   A. There are others, and I do not know what
18  they are right now.
19   Q. If an Internet user wants to obtain data
20  from a website, would that be a get request?
21     MR. BECKER: Objection. Hypothetical.
22  Objection. Vague.
23     THE WITNESS: A get request is one of the
24  more common mechanisms for accessing data from an
25  HTTP server.

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                    May 12, 2015

San Francisco, CA

---

Page 150

BY MR. HUDIS:

1  BY MR. HUDIS:
2      Q. What is a file transfer protocol or an FTP
3  transfer?
4      MR. BECKER: Objection. Vague. Objection.
5  May be compound.
6      THE WITNESS: So the file transfer protocol
7  is a protocol specification written by Jon Postel,
8  which specifies a series of operations in which a
9  client may get listings of files and transfer
10  files.
11      Jon is J-o-n, by the way.
12      MR. HUDIS: Postel is P-o-s-t-e-l.
13  BY MR. HUDIS:
14      Q. What is an rsync data transfer?
15      A. Rsync is another mechanism for the transfer
16  of files with a particular focus on replication of
17  one archive on a system to an identical archive on
18  another system.
19      Q. Does an archive -- does an F -- strike
20  that.
21      Does an rsync data transfer ensure that the
22  data on the source server and the destination
23  server are the same?
24      MR. BECKER: Objection. Vague and
25  ambiguous.

---

Page 151

1      Objection. Assumes facts not in evidence.
2  Objection. Lacks foundation.
3      THE WITNESS: The intent of rsync is
4  replication. However, the word assurance, I do not
5  know what specific steps the rsync software takes
6  to verify the identity. So it could be that the
7  files are different, but again, I just don't know
8  what those mechanisms are.
9  BY MR. HUDIS:
10      Q. Does an rsync transfer typically -- is an
11  rsync transfer typically used to synchronize files
12  and directories between two systems?
13      MR. BECKER: Objection. Vague and
14  ambiguous. May assume facts not in evidence.
15      THE WITNESS: Rsync is typically used -- we
16  use it internally to make a replica of one of our
17  servers on another one as a backup.
18  BY MR. HUDIS:
19      Q. What does it mean to post content to an
20  Internet website?
21      MR. BECKER: Objection. Vague and
22  ambiguous.
23      THE WITNESS: I can think of two meanings
24  of that term. So the first meaning is a user fills
25  out a form such as a comment. And that data then

---

Page 152

1  appears on that website, for example, at the end of
2  a blog post. So that's example 1.
3      Example 2 would be taking a file and
4  transferring it on to another system, which then
5  becomes publicly visible, much as one would do if
6  we were updating our blog and it is hosted on some
7  other site.
8  BY MR. HUDIS:
9      Q. And what does it mean to publish content to
10  an Internet website?
11      MR. BECKER: Objection. May call for --
12  actually, objection. Does call for a legal
13  conclusion; vague. Objection. Ambiguous;
14  argumentative.
15      THE WITNESS: Publish is a vague term.
16  Post is more precise, and it's a term that I prefer
17  to use.
18  BY MR. HUDIS:
19      Q. You've never used the term publish with
20  respect to transferring data to another website?
21      MR. BECKER: Objection. Argumentative.
22  Objection. Vague as to time period.
23      THE WITNESS: I have used the word publish.
24  Just like many laymen, I've used the term
25  imprecisely at times.

---

Page 153

1  BY MR. HUDIS:
2      Q. Okay. To you does post and publish mean
3  the same thing, only post is a more precise term?
4      MR. BECKER: Objection. Argumentative.
5  Objection. May call for a legal conclusion.
6  Objection. Assumes facts not in evidence.
7      THE WITNESS: No.
8  BY MR. HUDIS:
9      Q. Have you ever posted content to Internet
10  Archive's website?
11      A. Yes.
12      Q. Do you remember when for the first time?
13  Just a year would be fine.
14      MR. BECKER: Objection. Relevance.
15      THE WITNESS: I don't remember the year. I
16  think it probably had the numbers 19 at the
17  beginning.
18  BY MR. HUDIS:
19      Q. So sometime in the 1990s, maybe?
20      A. I would be speculating, but that would be
21  my guess.
22      Q. We discussed earlier the concept of
23  incorporation by reference.
24      Is the mere listing of a standard in the
25  government regulation incorporation by reference?

---

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                May 12, 2015

San Francisco, CA

Page 154

1    MR. BECKER: Objection. Calls for a legal
2  conclusion. Objection. Vague. Objection.
3  Argumentative. Objection. It assumes facts not in
4  evidence. Objection. May be a hypothetical.
5    THE WITNESS: No, it is not.
6  BY MR. HUDIS:
7    Q. In your experience what types of documents
8  have been incorporated by reference by a
9  governmental agency?
10    MR. BECKER: Objection. Calls for a legal
11  conclusion. Objection. Competence. Objection.
12  Vague. Objection. Argumentative.
13    THE WITNESS: Are you talking about the
14  Code of Federal Regulations, or is this kind of a
15  general-purpose question?
16  BY MR. HUDIS:
17    Q. A general-purpose question.
18    A. I can give you specific examples.
19    Q. Please.
20    A. Well, in the Code of Federal Regulations, a
21  number of agencies have incorporated documents.
22  The Department of Education, for example, has
23  incorporated by reference the standards at issue in
24  this litigation.
25    Q. Other than standards, what other documents

Page 155

1  have you observed incorporation by reference into
2  governmental regulations?
3    MR. BECKER: Objection. Calls for a legal
4  conclusion. Objection. Competence.
5    THE WITNESS: My focus has been on
6  standards incorporated by reference into the Code
7  of Federal Regulations. So that's what I'd look
8  for.
9  BY MR. HUDIS:
10    Q. Which brings me to my next question. When
11  did you first become interested in making available
12  to the Internet public documents that have been
13  incorporated by reference by some governmental
14  agency?
15    MR. BECKER: Objection. Assumes facts not
16  in evidence. Objection. Lacks foundation.
17  Objection. Vague as to time period.
18    THE WITNESS: In 2008 I posted California's
19  Title 24 to our website.
20  BY MR. HUDIS:
21    Q. And that is when you first became
22  interested in this area?
23    A. It's when I became interested in technical
24  standards that have the force of law.
25    (PLAINTIFFS' EXHIBIT 22 WAS MARKED.)

Page 156

1  BY MR. HUDIS:
2    Q. Mr. Malamud, I've placed in front of you a
3  document that we have marked as Exhibit 22 bearing
4  production numbers AERA_APA_NCME 32079 through
5  32228.
6    I'd like to know if you recognize the
7  document.
8    A. Well, it appears to be an incomplete set of
9  excerpts from a book I wrote. It appears to be.
10    MR. BECKER: I'd like to just object to the
11  extent that this document may be incomplete, and to
12  the extent that this document appears to have
13  handwriting on page 32082, and may have other
14  notations throughout it.
15    MR. HUDIS: Counsel, could I see your copy?
16  It should not have -- okay. If you see any other
17  handwritten notations, they shouldn't be there on
18  your copy, and I don't think they are on
19  Mr. Malamud's copy as the original exhibit.
20    So if it does contain handwritten notes, we
21  can --
22    THE WITNESS: There are several handwritten
23  notes on Bates number 32087, for example, has a
24  series of handwritten notes. There is a mark under
25  my name on 32086. There is writing on 32088.

Page 157

1    MR. HUDIS: Oh, those are not our
2  handwriting. It was on the document as we obtained
3  it from the Internet.
4    So, Counsel, just to address your
5  objections, this is only one chapter from the whole
6  book.
7  BY MR. HUDIS:
8    Q. So, Mr. Malamud, could you please turn to
9  production page 32224 of Exhibit 22.
10    A. Okay.
11    Q. And if you see the penultimate paragraph at
12  the bottom where it starts with "Many
13  jurisdictions"?
14    A. Yes.
15    Q. All right. The second sentence and the
16  third sentence say, "Even a private standards body
17  might be considered by the courts to be
18  quasi-governmental. Many places such as the U.S.
19  make standards a procurement requirement making
20  copyright enforcement questionable at best."
21    Was this one of your early thoughts on
22  incorporation by reference?
23    MR. BECKER: Objection. Vague.
24    THE WITNESS: I'm not a lawyer, and this is
25  not about incorporation by reference. This is

40 (Pages 154 to 157)

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                    May 12, 2015
San Francisco, CA

| Page 158 | Page 160 |
|---|---|

**Page 158**

1   about standards made by quasi-governmental
2   organizations.  A totally different topic.
3   BY MR. HUDIS:
4        Q.  Could we turn to the next page.  Page 3225
5   of Exhibit 22.  It says two-thirds of the way down
6   the page, "I gave a little speech about the morals
7   necessity of disseminating standards."
8        What did you mean by that?
9        A.  This was a --
10       MR. BECKER:  Objection.  Vague.
11       THE WITNESS:  This was in the context of a
12   visit to the International Organization For
13   Standards or organization, known as --
14   International Organization For Standardization,
15   known as ISO.  The acronym is different than the
16   name, which says something about them.
17       And this was the organization that was
18   attempting to have the whole Internet run on the
19   open systems interconnection protocol suite, and my
20   little speech to the gentlemen that I visited was
21   that if they wanted their protocol suite to be
22   ubiquitous, to be globally adopted, that would only
23   work if those standards were readily available for
24   people to read.
25   BY MR. HUDIS:

**Page 159**

1        Q.  When you say "readily available," do you
2   mean -- did you mean readily available for free?
3        MR. BECKER:  Objection.  Vague.  Objection.
4   Relevance.
5        THE WITNESS:  The IETF made its protocol
6   specifications available for me.  And my little
7   moral lecture to the International Organization For
8   Standardization was that if they wished to win this
9   race to become the basis for the modern Internet,
10   that would only happen if their standards were, in
11   fact, available for free, so anybody could read
12   them.
13   BY MR. HUDIS:
14       Q.  The next paragraph says, "We then started
15   talking about applying Bruno to the ISO world."
16       First of all, what is Bruno?
17       A.  Bruno was a project that I undertook with
18   the blessings of the secretary general of the
19   International Telecommunication Union to convert
20   and post the ITU specifications to the Internet so
21   anybody could read them for free.
22       Q.  So it was basically wide dissemination of
23   documents on the Internet?
24       A.  Of ITU specifications.  And the ITU is
25   specifications for the telephone network.

**Page 160**

1        Q.  What is an ITU specification?
2        A.  How a modem works, for example.
3        Q.  And please define ISO.
4        A.  ISO is the International Organization for
5   Standardization.
6        Q.  And the next sentence begins with Eicher.
7   Who is Eicher?
8        A.  Eicher was the secretary general of the
9   International Organization for Standardization.
10       Q.  Now, the rest of this paragraph reads,
11   "Eicher was quite frank.  25 percent of ISO
12   revenues came from the sale of standards documents.
13   How did I propose to replace that revenue?  Even
14   more importantly, ISO was controlled by its member
15   organizations, which also made much money from
16   standards sales.  How did I propose to convince
17   groups like ANSI that posting standards for free
18   would help them?"
19       Do you see that?
20       A.  Yes, I do.
21       MR. BECKER:  Objection.  The document
22   speaks for itself.  Objection.  Relevance.
23   BY MR. HUDIS:
24       Q.  In this context -- sorry.  I'm sorry if I
25   spoke over you.

**Page 161**

1        In this context, what is ANSI?
2        A.  ANSI is the American National Standards
3   Institute.
4        Q.  So you pose a series of questions here on
5   page 32225, and then on the next page you say, and
6   this is on page 32226 of Exhibit 22, "I proposed my
7   high resolution/low resolution compromise.  The
8   plan would post low resolution versions of
9   documents for free on the network and allow ISO and
10   ANSI to continue to sell high resolution versions
11   either on paper or electronically."
12       So was that your answer to the question
13   that you posed on the prior page, 32225?
14       MR. BECKER:  Objection.  The document
15   speaks for itself.
16       THE WITNESS:  It was one of my thoughts in
17   1991 as to a way that ISO could function in a
18   modern world.
19   BY MR. HUDIS:
20       Q.  Then in two paragraphs later, you say, "The
21   crucial assumption was that people with the free
22   version would then pay for documents."  And at the
23   end of that paragraph it says, "Giving away
24   standards would lead to increased revenues."
25       So here is my question about that crucial

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 162

1  assumption.
2         What if people who had copies of lower
3  resolution versions of these documents were just
4  fine with this quality?  What if -- if I may
5  finish.  What if they did not want to pay for the
6  high resolution copies?
7         MR. BECKER:  Objection.  Compound.
8  Objection.  Relevance.  Objection.  The document
9  speaks for itself.  Objection.  Argumentative.
10 Objection.  Assumes facts not in evidence.  And
11 also hypothetical.  Calls for speculation.  And
12 competence.
13        THE WITNESS:  So this was a informal
14 discussion in 1991.  I have since gathered more
15 experience on that particular topic, and I actually
16 believe that that statement is true.
17 BY MR. HUDIS:
18    Q.  On what basis?
19    A.  When I put the SEC EDGAR database online
20 for free, there was great speculation that that
21 would destroy the revenues of those vendors that
22 were selling the reports of public corporations.
23        And after I turned that service back over
24 to the Securities and Exchange Commission, I
25 donated my software and hardware and they begin --

Page 163

1  began ranning it -- running it, I had the president
2  of one of those vendors that was in the industry
3  come up to me and say, "You know?  Our business
4  went way up because a lot more people were reading
5  those EDGAR documents, and those that were serious
6  about the financial industry began subscribing to
7  all our commercial services, to have all the back
8  copies, to have red lines, to have all the
9  value-added things that the industrial folks can
10 do."  So that's my personal experience with that
11 topic.
12        I'm glad people are still reading this
13 book.
14 BY MR. HUDIS:
15    Q.  Mr. Malamud, why did you become interested
16 in making available to the public, documents that
17 were incorporated by reference by a governmental
18 agency?
19        MR. BECKER:  Objection.  Calls for a legal
20 conclusion.  Objection.  Vague and ambiguous.
21 Objection.  Argumentative.  Objection.  Lacks
22 foundation.
23        THE WITNESS:  Public.Resource.Org was
24 founded with the aim of making government
25 information more accessible with the particular

Page 164

1  focus on the law.
2         Information such as building codes and fire
3  codes are, in fact, the law.  And they are
4  critically important legal documents.  And that's
5  why I became interested in them.
6  BY MR. HUDIS:
7     Q.  What did you do -- strike that.
8         What did you decide to do about making
9  available to the public, documents that were
10 incorporated by reference by a governmental agency?
11        MR. BECKER:  Objection.  Calls for a legal
12 conclusion.  Objection.  Vague and ambiguous.
13 Objection.  Vague as to time period.
14        THE WITNESS:  Could you repeat that
15 question?
16 BY MR. HUDIS:
17    Q.  Yes.  What did you do -- decide to do about
18 making available to the public that were
19 incorporated by reference by a governmental agency?
20        MR. BECKER:  Same objections.
21        THE WITNESS:  So making available, I don't
22 know what that term means, but what I did is I
23 posted California's Title 24 on our website at the
24 time, Bulk.Resource.Org.
25 BY MR. HUDIS:

Page 165

1     Q.  That's exactly what I meant.
2         So after you posted Title 24, what other
3  types of materials did you start posting after that
4  of like kind?
5         MR. BECKER:  Objection.  Vague and
6  ambiguous.  What -- as to "like kind."  Objection.
7  Vague as to time period.
8         THE WITNESS:  If by "like kind" you mean
9  building codes and similar documents --
10 BY MR. HUDIS:
11    Q.  I do.
12    A.  I did a careful survey of state regulations
13 and statutes looking for explicit and deliberate
14 incorporation by reference, and posted a series of
15 building electrical, fire, plumbing codes.
16    Q.  What did you mean by "explicit and
17 deliberate incorporation by reference"?
18        MR. BECKER:  Objection.  Calls for legal --
19 may call for a legal conclusion.  Additionally, a
20 standing objection to this line of questioning to
21 the extent that it is not asking about the 1999
22 standards.  It is beyond the 30(b)(6) designation.
23        THE WITNESS:  I looked for a explicit
24 mention of a specific standard for a particular
25 year and the words "incorporated by reference," as

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                    May 12, 2015
                          San Francisco, CA

| Page 166 | Page 168 |
|---|---|

**Page 166**

1    opposed to a passing mention of a document or a
2    mention of the adoption of a document but not
3    specifying which specific edition of that document
4    they were talking about.
5       (PLAINTIFFS' EXHIBIT 23 WAS MARKED.)
6    BY MR. HUDIS:
7       Q.  Mr. Malamud, do you recognize this
8    document?
9       A.  Yes, I do.
10      Q.  This is Exhibit 23.  What is this document?
11      A.  This appears to be e-mail from me to
12   Jonathan Siegel of the Administrative Conference of
13   the United States.
14      Q.  And who is Jonathan Siegel?
15      A.  I don't remember his exact title.  He was
16   in a capacity as a research director or a program
17   director for the activities of ACUS, the
18   Administrative Conference of the United States.
19      Q.  That brings me to my next question.  Who or
20   what is ACUS?
21      A.  ACUS is a governmental body which is
22   partially appointed by the president and partially
23   appointed by the chairman, who is appointed by the
24   president, and it is the -- a body that formulates
25   recommendations on administrative law.

**Page 167**

1       MR. HUDIS:  We're going to go off the
2    record.
3       THE WITNESS:  Okay.
4       MR. HUDIS:  He wants to switch media.
5       THE WITNESS:  Yeah.
6       THE VIDEOGRAPHER:  This marks the end of
7    Disc 2, Volume 1 in the deposition of Carl Malamud.
8       The time is 2:18, and we are off the
9    record.
10      (Recess taken.)
11      THE VIDEOGRAPHER:  This marks the beginning
12   of Disc 3, Volume 1 in the deposition of Carl
13   Malamud.
14      The time is 2:26, and we are on the record.
15   BY MR. HUDIS:
16      Q.  Mr. Malamud, Exhibit 23, do you have any
17   reason to doubt that this document is authentic?
18      THE VIDEOGRAPHER:  Shoot, sorry, guys.
19   I've got to stop.  Can I stop?  I'm so sorry.  I
20   had an accident here.
21      THE WITNESS:  That's okay.
22      MR. HUDIS:  Yep.
23      (Discussion off the record.)
24      THE VIDEOGRAPHER:  This marks the beginning
25   of Disc 3, Volume 1 in the deposition of Carl

**Page 168**

1    Malamud.
2       The time is 2:28, and we are on the record.
3    BY MR. HUDIS:
4       Q.  Mr. Malamud, do you have any reason to
5    doubt the authenticity of Exhibit 23?
6       MR. BECKER:  Objection to the extent that
7    it is not clear where this document has come from.
8       THE WITNESS:  It appears to be e-mail from
9    me to Mr. Siegel, but I would want to check it.  Is
10   this something we disclosed to you or --
11   BY MR. HUDIS:
12      Q.  It's something we found on the Internet.
13      A.  Oh, okay.  It appears to be the e-mail that
14   I sent, yes.
15      Q.  And what was the reason that you sent this
16   e-mail of October 1, 2011 to Mr. Siegel?
17      A.  I was a member of the committee that was
18   looking at the issue of incorporation by reference
19   for the Administrative Conference for the United
20   States.
21      Q.  And why did you write this particular
22   e-mail to Mr. Siegel?
23      MR. BECKER:  Objection to relevance as to
24   ACUS and this line of questioning.
25      I'll note that for category 21,

**Page 169**

1    Public.Resource has designated Carl Malamud only as
2    to the -- its participation, if any, in Federal
3    Government committees on the subject of
4    incorporation by reference of the 1999 standards
5    into any government laws, statutes, regulations or
6    ordinances.
7    BY MR. HUDIS:
8       Q.  You may answer.
9       A.  I had some concerns about the -- the
10   procedures and the way that the committee was going
11   about doing its deliberations on incorporation by
12   reference.  So I wrote this e-mail to Mr. Siegel,
13   who had overall direction over the committee
14   process.
15      Q.  And which committee was that?
16      A.  The committee -- I don't know what the
17   formal name was.  It was the committee that was
18   dealing with the issue of incorporation by
19   reference.
20      Q.  And in paragraph 1, what did you mean by
21   the preamble?
22      A.  The preamble to the proposed recommendation
23   that the Administrative Conference was considering.
24      Q.  And you say here in paragraph numbered 1
25   for the preamble, "Would it make sense to

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                                    May 12, 2015
San Francisco, CA

Page 170

1   acknowledge that the issue of copyright and
2   standards, after they've been incorporated into
3   law, is unsettled and that ACUS is not taking a
4   position on this subject?"  What did you mean?
5          MR. BECKER:  Objection.  The document
6   speaks for itself.  Objection.  Vague.
7          THE WITNESS:  I felt it inappropriate for
8   ACUS to be taking a strong position on what the
9   copyright status was of documents incorporated into
10  law.
11  BY MR. HUDIS:
12     Q.  Why?
13     A.  Frankly, there was a young staff member who
14  was doing the research for this recommendation who
15  felt very strongly that standards incorporated by
16  reference into law maintained their copyright, even
17  as a part of the Code of Federal Regulations.  And
18  as I said in this paragraph here, I think it would
19  be fair to say this is above our pay grade.  I felt
20  that the young staffer was -- was stretching.
21     Q.  So that brings me to my next question.
22         The next sentence says, "There is obviously
23  a strong bias towards protecting and honoring
24  copyright on the one hand, but we also have the
25  Veeck," V-e-e-c-k, "decision and some ambiguity in

Page 171

1   the law.  I think it would be fair to say this is,"
2   quote, "above our pay grade," period, unquote.
3          A couple of questions on that passage.
4          What did you mean in the third sentence by
5   "some ambiguity in the law"?
6          MR. BECKER:  Again, same objections.  The
7   document speaks for itself.  It's beyond the scope
8   of the 30(b)(6) designation.  And the objection on
9   relevance grounds.  Again, objection that this may
10  call for a legal conclusion.
11         THE WITNESS:  So I'm not a lawyer, but I
12  read the Veeck decision, and it seemed to me that
13  the researcher at ACUS was drawing conclusions from
14  the Veeck decision that while perhaps appropriate
15  for a federal judge to be making, were
16  inappropriate to be laying them down as categorical
17  statements.  I felt she was reading into the Veeck
18  decision in ways that were perhaps not supported by
19  the language.  And again, I'm not a lawyer.
20  BY MR. HUDIS:
21     Q.  I understand.
22         What conclusions was the researcher drawing
23  from Veeck that concerned you?
24         MR. BECKER:  Objection.  Relevance.
25  Objection.  Vague.  Objection.  Lacks foundation.

Page 172

1          THE WITNESS:  So it's pronounced Veeck, by
2   the way.  It's a Dutch name.  P. Veeck.  It -- the
3   preamble was taking at the time a strong position
4   that standards incorporated into reference by law
5   had copyright and that the law could have
6   copyright.
7          And again, I felt that this young staffer
8   was simply moving beyond what a body such as the
9   Administrative Conference of the United States
10  could say is the established truth.  I felt she was
11  speculating, to use the language we use in
12  depositions.
13  BY MR. HUDIS:
14     Q.  And what did you mean by "I think it would
15  be fair to say this is above our pay grade"?
16         MR. BECKER:  Objection again.  The document
17  speaks for itself.  Objection.  Asked and answered.
18         THE WITNESS:  So I'm not a lawyer, but I
19  have looked at a number of documents that indicate
20  that in the United States the law has no copyright.
21  And that includes, in many formulations, materials
22  incorporated by reference into the law.  Mr. Bhatia
23  from ANSI, for example, B-h-a-t-i-a, has stated
24  many times that standards incorporated by reference
25  are the law, and it seemed to me that that was a

Page 173

1   long-standing policy of the United States.
2          And again, this was something that if one
3   were to draw a different conclusion that a portion
4   of the law in fact, did maintain copyright and one
5   needed a license to access and use that material,
6   that was certainly not a statement that the
7   organization such as the Administrative Conference
8   of the United States should be making.
9          (PLAINTIFFS' EXHIBIT 24 WAS MARKED.)
10  BY MR. HUDIS:
11     Q.  Mr. Malamud, I'll now show you what's been
12  marked as Exhibit 24.  Before I ask you questions
13  about the document, what is On The Media?
14     A.  Oh, that's a National Public Radio program.
15     Q.  Who is Bob Garfield?
16     A.  I assume he's a host or reporter.
17     Q.  Do you recognize Exhibit 24?
18     A.  No, I do not.  I remember doing an
19  interview with On The Media, however.
20     Q.  Did you do this interview with On The Media
21  on or about April 13, 2012?
22     A.  That sounds about right.
23     Q.  What was the purpose of the interview?
24     A.  I think you'd have to ask On The Media.
25     Q.  What was your purpose for giving the

                                          44  (Pages 170 to 173)

Carl Malamud                                                    May 12, 2015

San Francisco, CA

Page 174

1  interview?
2         MR. BECKER:  Objection for relevance.
3         THE WITNESS:  If a well-respected program
4  such as On The Media by National Public Radio wants
5  me to talk to them, I will generally make myself
6  available.
7  BY MR. HUDIS:
8      Q.  Exhibit 24 appears to be an interview that
9  you gave in April of 2012 to Mr. Garfield.  I'd
10 like to ask you a couple of questions.
11         If you would turn in Exhibit 24 to
12 production page AERA_APA_NCME 32076.
13     A.  Okay.  Yes.
14     Q.  Mr. Garfield in the middle of the page
15 asks, "There is an expense attached to developing
16 and codifying these standards.  If we take the
17 revenue away from those who do this work, then what
18 happens?"  And you provide two answers.  I'll read
19 them.
20         "Well, there's two answers to that.  One is
21 that the nonprofits that develop these standards
22 have a lot of different revenue streams.  They do
23 conferences.  They do certification.  They develop
24 standards that aren't law.  In fact, the vast
25 majority of their standards are not.  And so maybe

Page 175

1  they need to adjust their business model,
2  particularly given the fact that they are a
3  nonprofit public charity."
4         You continue.  "Answer number two is that
5  government has shirked its responsibilities.  It
6  said 'Gee, we can just incorporate these privately
7  developed standards in the law and we won't have to
8  pay anything.'  And the only people that get
9  screwed up by this are the citizens that need to
10 read the law."
11         Do you recall giving those answers to
12 Mr. Garfield at the interview of April 2012?
13         MR. BECKER:  Objection.  Mr. Malamud has
14 said that he does not recognize this document.
15 Objection to the extent that it's not clear how
16 this document was transcribed or its authenticity.
17 Objection with regards to relevance, particularly
18 on the grounds that the plaintiffs have said that
19 the finances and revenue of the plaintiffs, other
20 than directly related to the sale of the 1999
21 standards, is not at issue in this case as they so
22 claim.
23         Objection on the grounds that the question
24 assumes facts not in evidence.
25         MR. HUDIS:  I don't mind the objections,

Page 176

1  Counsel.  I just mind the ones that would try to
2  indicate the -- to the witness how he should answer
3  his questions.
4  BY MR. HUDIS:
5      Q.  So my question about this document, do you
6  recall this interview?
7      A.  Yes, I do.
8      Q.  All right.  Do you recall giving this
9  answer that I just read into the record?
10     A.  No, I don't, but I'd be happy to discuss
11 the general topics that are addressed there.
12     Q.  Sure.
13         So if standards development organizations
14 lose their copyright by incorporation by reference,
15 is it your theory that the standards
16 organization -- development organization should
17 make their money some other way?
18         MR. BECKER:  Objection.  Vague.  Objection.
19 May call for a legal conclusion.  Objection.
20 Hypothetical.  Objection.  May mischaracterize the
21 witness.
22 BY MR. HUDIS:
23     Q.  You may answer.
24     A.  I have testified on this subject before
25 Congress saying that I believe that when a standard

Page 177

1  is incorporated by reference, usually with the
2  active ascents of -- of the SDO, that organization
3  is given a gold seal of approval, right.  They are
4  the original creator of what has become a portion
5  of American law, and that that is a unique
6  marketing opportunity.
7         That opportunity can be used to -- to sell
8  authenticated versions of the standard.  To sell
9  auxiliary products.  That there are a number, in
10 general, of business models that can emerge out of
11 this favored position.
12         As to how that specifically applies to a
13 specific SDO, again, we would want to look at -- I
14 would want to look at the very specific nature of
15 that organization.  But I still talk in general
16 about the unique position of having a standard
17 incorporated by reference into federal law and how
18 favorable that is.
19 BY MR. HUDIS:
20     Q.  And is it your view that once incorporated
21 by reference, the standard loses its copyright
22 enforcement ability and the standards development
23 organization that wrote that standard,
24 "incorporated by reference," would have to obtain
25 its income some other way than selling the

45  (Pages 174 to 177)

Carl Malamud                                                    May 12, 2015
San Francisco, CA

---

Page 178

1  standard?
2          MR. BECKER: Objection. Calls for a legal
3  conclusion. Objection. Argumentative. Objection.
4  Lacks foundation and assumes facts not in evidence.
5  Objection. Vague.
6          THE WITNESS: So I disagree with that
7  characterization. I -- I believe that even if the
8  law is available to citizens, that does not
9  preclude a standards development organization
10 continuing to sell that document. Particularly
11 selling an authenticated version, a redlined
12 version, a version with commentary. I believe
13 there are a number of ways one can continue to make
14 that -- that document available for sale.
15 BY MR. HUDIS:
16     Q. Is one of your alternative theories that
17 once a standard is incorporated by reference, that
18 the government should pay for it?
19         MR. BECKER: Objection. May call for a
20 legal conclusion. Objection. Lacks foundation.
21 Assumes facts not in evidence. Objection.
22 Argumentative.
23         THE WITNESS: So there are some things I
24 know and some things I can speculate on.
25         The thing that I know is that the law in

---

Page 179

1  the United States has no copyright, and one is free
2  to read and speak the law. Without needing a
3  license, without needing permission.
4          What I can speculate on is different ways
5  that one might go about handling issues such as
6  revenue and whether the government should be paying
7  or not, and I frankly don't have strong views as to
8  whether or not the -- this scenario that I posited
9  here is the right solution.
10         MR. BECKER: I would advise the witness not
11 to speculate and only to give those answers that
12 the witness knows.
13         THE WITNESS: Okay.
14 BY MR. HUDIS:
15     Q. Do you have any views, whether they're
16 strong or not, whether once a standard is
17 incorporated by reference into a government
18 regulation, the government should pay for that?
19         MR. BECKER: Objection. May call for a
20 legal conclusion. Objection. Vague. Objection.
21 Lacks foundation and assumes facts not in evidence.
22 And argumentative.
23         THE WITNESS: So the government is already
24 paying in many different revenue streams for
25 standards. They pay for access. They help fund

---

Page 180

1  development. And in many cases standards are
2  created, and there are other revenue streams that
3  go to the organization, such as the funding of
4  basic research.
5          So I don't think it's an either/or
6  proposition. I think there's already a lot of
7  money flowing.
8  BY MR. HUDIS:
9      Q. I don't believe your last answer,
10 Mr. Malamud, answered my question.
11     A. Okay. Could you restate the question?
12     Q. Sure. Do you have any views, whether they
13 are strong or not, whether once a standard is
14 incorporated by reference into a government
15 regulation, the government should pay for that?
16         MR. BECKER: All the same objections and
17 also asked and answered.
18         THE WITNESS: I believe I did answer your
19 question in the sense of the government is already
20 paying.
21         Now, my view is it proper for government
22 money to go to an SDO? In theory, yes.
23         MR. HUDIS: Just for the record Exhibit 24
24 bears production numbers AERA_APA_NCME 32075
25 through 32078.

---

Page 181

1          (PLAINTIFFS' EXHIBIT 25 WAS MARKED.)
2  BY MR. HUDIS:
3      Q. Mr. Malamud, I've placed in front of you a
4  document that's been marked as Exhibit 25, bearing
5  production numbers AERA_APA_NCME 31764 through
6  31768.
7          Do you recognize this document?
8      A. It appears to be an essay that I wrote for
9  boingboing. This appears to be a printout of that.
10     Q. Do you have any reason to doubt the
11 authenticity of this document, Exhibit 25?
12     A. No, but I'd want to double check. It
13 appears to be the essay that I wrote.
14     Q. And what is boingboing?
15     A. Boingboing is a blog.
16     Q. And do you recall posting this blog on
17 March 19th, 2012, to boingboing?
18     A. I'm not sure of the exact date, but I did,
19 in fact, author a boingboing official guest
20 memorandum of law.
21     Q. Why did you call it a memorandum of law?
22     A. Because it was talking about an obscure
23 topic in a publication that reaches a very general
24 audience.
25     Q. Under the first heading Roman numeral I,

---

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                                May 12, 2015

San Francisco, CA

Page 182

1   code is law, Lessig, L-e-s-s-i-g.  In the second
2   paragraph it says, "Public.Resource.Org spent
3   $7,414.26 buying privately produced, technical
4   public safety standards that have been incorporated
5   into U.S. Federal law."
6        And then I'm skipping a sentence.  It then
7   says, "We have started copying those 73 standards
8   despite the fact that -- "despite the fact they
9   are festooned with copyright warnings, shrink wrap
10  agreements and other dire warnings."
11       When did Public.Resource start copying
12  these 73 standards?
13       MR. BECKER:  Objection.  Assumes facts not
14  in evidence; lacks foundation; vague; argumentative
15  as to "copying."
16       THE WITNESS:  So these were printed
17  documents, and it was a period of January through
18  approximately March 19th.  Actually, March 15th was
19  the period.
20  BY MR. HUDIS:
21       Q.  Of what year?
22       A.  Of 2012.
23       Q.  And could you turn to the next page, page
24  31765 of Exhibit 25.  Under Roman numeral II, "If a
25  law isn't public, it isn't law."  The middle

Page 183

1   paragraph just before the picture that says,
2   "Notice," you see where it says the paragraph
3   starts "Public.Resource.Org has a mission"?
4        A.  Yes, I do.
5        Q.  The next sentence says, "We've taken a
6   gamble and spent $7,414.26 to buy 73 of these
7   technical public safety standards that are
8   incorporated into the U.S. Code of Federal
9   Regulations.  We made 25 print copies of each of
10  these standards and bound each document in a red,
11  white, blue patriotic certificate of incorporation
12  stating that the documents are legally binding on
13  citizens and residents in the United States, and
14  that criminal penalties may apply for
15  noncompliance."
16       In this paragraph why did you state "we've
17  taken a gamble"?
18       MR. BECKER:  Objection.  The document
19  speaks for itself.
20       THE WITNESS:  $7,414.26 is a lot of money
21  to be spending on a program that I simply decided
22  was important to do.
23  BY MR. HUDIS:
24       Q.  And why was it important?
25       A.  Because the law needs to be available in

Page 184

1   the United States.
2        Q.  At the bottom of this page, 31765, it says,
3   "We know from all the copyright warnings, terms of
4   use, scary shrink wrap agreements and other red hot
5   rhetoric that accompanies these documents, that the
6   producers continue to believe that copies may not
7   be made under any circumstances."
8        Is this why you were taking a gamble on
9   making the copies of the technical standards?
10       MR. BECKER:  Objection.  The document
11  speaks for itself.  Objection.  I'll also note that
12  it's not clear whether the highlighting that's on
13  this page is on the authentic document or whether
14  it's been added to the documents.
15       THE WITNESS:  Yeah, I agree.  There was no
16  highlighting in the original.  I'm not sure where
17  that came from.
18  BY MR. HUDIS:
19       Q.  Must have been from us.
20       A.  Okay.  So your question again?
21       Q.  The question is, the passage that I just
22  read, does this explain why you were taking a
23  gamble by making the copies of the 73 standards?
24       MR. BECKER:  All the same objections.  Also
25  objection for misstates prior testimony and asked

Page 185

1   and answered.
2        THE WITNESS:  The gamble was the financial
3   risk.  I mean, spending close to $10,000 on
4   something is a lot of money for a small nonprofit
5   like mine.
6        (PLAINTIFFS' EXHIBIT 26 WAS MARKED.)
7   BY MR. HUDIS:
8        Q.  I now mark as Exhibit 26 a document bearing
9   production numbers AERA_APA_NCME pages 31832
10  through 31847.
11       Mr. Malamud, do you recognize this
12  document?
13       A.  Yes, I do.
14       Q.  What is this document?
15       A.  It is a response to the Office of
16  Management and Budget Requests for information on
17  the -- as they put it, the development and use of
18  voluntary consensus standards and in conformity
19  assessment activities.
20       Q.  Do you have any reason to doubt this letter
21  is authentic?
22       A.  No, I do not.
23       Q.  And the date of the letter is April 11,
24  2012?
25       A.  That sounds about right, yes.

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                    May 12, 2015

San Francisco, CA

Page 186

1      Q.  What was your purpose of writing this
2  letter to Cass Sunstein at the Office of
3  Information of Regulatory Affairs?
4          MR. BECKER:  Objection.  Vague.
5          THE WITNESS:  Ask for information.  It was
6  a request for information.
7  BY MR. HUDIS:
8      Q.  And what type of information?
9      A.  I believe I answered it.  It was a request
10  for information about federal participation in the
11  development and use of voluntary consensus
12  standards.
13      Q.  And you co-wrote this letter with David
14  Halperin?
15      A.  Yes, I did.
16      Q.  In the second paragraph on page 31832 of
17  Exhibit 26, it says, "We believe that the
18  fundamental law of the United States requires that
19  the government make standards that are incorporated
20  by reference into federal regulations widely
21  available to the public without charge, and that
22  such standards be deemed in the public domain,
23  rather than subject to copyright restrictions."
24          In that sentence, what does "fundamental
25  law" mean?

Page 187

1          MR. BECKER:  Objection.  The document
2  speaks for itself.  Objection.  May call for a
3  legal conclusion.
4          THE WITNESS:  That would be primary legal
5  materials.  That's materials that are emanating
6  from a law-making entity, such as in the Code of
7  Federal Regulations.
8  BY MR. HUDIS:
9      Q.  So what is the fundamental law of the
10  United States that requires standards incorporated
11  by reference into federal law be made public
12  without charge?
13          MR. BECKER:  Objection.  Misstates the
14  document.  Objection.  May call for a legal
15  conclusion.  Objection.  The document speaks for
16  itself.
17          THE WITNESS:  It is clearly established
18  that the Code of Federal Regulations and
19  Congressional statutes and supreme court opinions
20  must be made available to the public without
21  restrictions on use, and standards that are
22  explicitly incorporated by reference into the Code
23  of Federal Regulations are part and parcel of the
24  Code of Federal Regulations, and that is a
25  fundamental principle of American law, that this

Page 188

1  material must be made available to the public.
2  BY MR. HUDIS:
3      Q.  In the final paragraph of page 31832 of
4  Exhibit 26, it says, Public.Resource --
5  "Public.Resource.Org, whose mission is to make law
6  available to all citizens."  Do you see that?
7      A.  I'm sorry, what page are we on?
8      Q.  The page -- the very first page of the
9  document.
10      A.  Yes, I see that.
11      Q.  All right.  And that mission is done by
12  making the law available on the websites that you
13  mentioned earlier?
14          MR. BECKER:  Objection.  The document
15  speaks for itself.  Objection.  May mischaracterize
16  previous testimony.  Objection.  May call for a
17  legal conclusion.
18          THE WITNESS:  Making the law available to
19  all citizens, one mechanism is to post that on our
20  website.
21  BY MR. HUDIS:
22      Q.  Could you please turn to page 31836 of
23  Exhibit 26.
24      A.  Okay.
25      Q.  In the middle of the page it says, "A

Page 189

1  copyrighted work does not become law simply because
2  the statute refers to it."
3          What did you mean by that?
4          MR. BECKER:  Objection.  The document
5  speaks for itself.  Objection.  May call for a
6  legal conclusion.
7          THE WITNESS:  This, again, is a subject
8  that we discussed previously when we were
9  discussing incorporation by reference at the state
10  level.  It needs to be an explicit and deliberate
11  incorporation into the law.  Not simply a passing
12  mention of some external document.
13  BY MR. HUDIS:
14      Q.  Mr. Malamud, could you please turn to page
15  31838 of Exhibit 26.
16      A.  Okay.
17      Q.  At the bottom of the page it says, "In
18  order to be eligible for incorporation for a
19  reference, a publication must meet standards
20  including that the publication
21  reduces the volume of material published in the
22  Federal Register and is reasonably available to and
23  usable by the class of persons affected by the
24  publication."
25          My question is --

48  (Pages 186 to 189)

Carl Malamud                                                          May 12, 2015
San Francisco, CA

Page 190

1      MR. BECKER: I'm sorry, where are we,
2  Counsel?
3      MR. HUDIS: Bottom of 31838.
4  BY MR. HUDIS:
5      Q. My question, Mr. Malamud, is this passage
6  your understanding of a publication that is
7  eligible for incorporation by reference?
8      MR. BECKER: Objection. This document
9  speaks for itself, and unintelligible,
10  incomprehensible question.
11  BY MR. HUDIS:
12      Q. You may answer.
13      A. We are quoting one CFR 51.7(a)(3) and
14  (a)(4). That's what that sentence is doing, is
15  it's simply restating what the CFR states.
16      Q. But is this your understanding of a
17  document that would qualify for incorporation by
18  reference?
19      MR. BECKER: Objection. Calls for a legal
20  conclusion. Objection. Vague as to "this."
21      THE WITNESS: That section of the CFR
22  states two conditions that must be met before a
23  standard or other document can be incorporated by
24  reference in the CFR.
25  BY MR. HUDIS:

Page 191

1      Q. Could you turn to page 31839 of Exhibit 26.
2      A. I'm there.
3      Q. And do you see it refers to OMB Circular
4  A-119 at the bottom of the page?
5      A. Yes, I see that.
6      Q. To the best of your knowledge has this
7  circular changed in language since 1980 -- 1998, so
8  far as you're aware?
9      MR. BECKER: Objection. Competence.
10  Objection. Calls -- may call for a legal
11  conclusion. Objection. Assumes facts not in
12  evidence; lacks foundation.
13      THE WITNESS: The document is currently
14  being revised by the Office of Management and
15  Budget, and I believe they published a notice of
16  proposed ruling.
17  BY MR. HUDIS:
18      Q. Today has OMB Circular-A119 changed since
19  19 -- 1998?
20      MR. BECKER: All the same objections and
21  asked and answered.
22      THE WITNESS: Yeah, I don't know. I would
23  have to look at their website.
24  BY MR. HUDIS:
25      Q. On the next page, page 31840 of Exhibit 26,

Page 192

1  in the second paragraph at the end of the paragraph
2  it says, "Today the only thing impeding the broader
3  availability to the public of standards
4  incorporation by reference into the law is the
5  interest of standards development organizations in
6  making money by charging for the standards."
7      Do you see that?
8      A. I do.
9      Q. All right. Do you know how much the
10  plaintiffs in this action charge for the 1999
11  Standards of Educational and Psychological Testing?
12      MR. BECKER: Objection. Competence.
13  Objection. Misleading.
14  BY MR. HUDIS:
15      Q. Go ahead, Mr. Malamud.
16      MR. BECKER: Excuse me. Argumentative and
17  assumes facts not in evidence.
18      THE WITNESS: I don't believe they charge
19  anything. I don't think it's available for sale;
20  is it?
21  BY MR. HUDIS:
22      Q. At the time you purchased the standards, do
23  you know how much you paid for them?
24      MR. BECKER: Objection. Assumes facts not
25  in evidence.

Page 193

1      THE WITNESS: In the $60 range, I believe.
2  BY MR. HUDIS:
3      Q. Could you turn to page 31840. At the
4  bottom on -- in Exhibit 26, it says, "Greater
5  public access to standards" incorporation by
6  reference -- "incorporated by reference into
7  federal regulations might alert policy and industry
8  communities to the fact that federal rules are too
9  often connected to outdated private standards and
10  are in need of updating to improve public safety."
11      What is your support for this statement?
12      MR. BECKER: Objection. The document
13  speaks for itself. Objection. May call for a
14  legal conclusion.
15      THE WITNESS: In surveying the Code of
16  Federal Regulations, I was shocked by how old some
17  of the standards that are still on the books.
18  There are standards from the '40s and '50s and
19  '60s. There is a crane safety standard from the
20  1960s, which is still required.
21      And one has to believe that the state of
22  the art in safety for cranes has probably advanced
23  since that point in time.
24  BY MR. HUDIS:
25      Q. Do you know the plaintiffs' policies or

49 (Pages 190 to 193)

Carl Malamud                                                    May 12, 2015
                        San Francisco, CA

Page 194

1    practices for updating the standards on the
2    educational and psychological testing?
3           MR. BECKER:  Objection.  Competence.
4           THE WITNESS:  I don't know what you mean by
5    "practices."
6    BY MR. HUDIS:
7        Q.  How often they do so; when they do so; the
8    circumstances under which they do so?
9        A.  Well, I can answer one part of that
10   question.  I believe there was an '85 standard, a
11   '99 standard, and a 2014 standard has recently been
12   issued.
13       Q.  Right.  Do you know the circumstances under
14   which the standards for educational and
15   psychological testing have been updated?
16          MR. BECKER:  Objection.  I'll simply note
17   that the witness should not divulge any information
18   that has resulted from attorney-client
19   communications.
20          THE WITNESS:  I read on a website that the
21   plaintiffs put together having to do with the
22   revision of the standards and was able to read a
23   little bit about what they were doing and why they
24   were doing it for the 2014 standard.
25   BY MR. HUDIS:

Page 195

1        Q.  And what is your understanding as a result
2    of that reading?
3           MR. BECKER:  Objection.  Vague.
4           THE WITNESS:  Oh, now, I'm not an expert in
5    this area.  My take-away was that the standard was
6    old and they wanted to revise it.
7    BY MR. HUDIS:
8        Q.  If you could turn to page 31845 in Exhibit
9    26.  In the middle of the page it says, "Defenders
10   of upholding copyright protection" and charge --
11   "protections and charging fees in this context
12   claim that granting citizens more reasonable access
13   to the law will destroy the economic incentives
14   that today motivate private organizations to craft
15   important standards."
16          Who have you heard say this?
17          MR. BECKER:  Objection.  The document
18   speaks for itself.  Objection.  Relevance;
19   argumentative.
20          THE WITNESS:  I --
21          MR. BECKER:  Assumes facts not in evidence.
22          THE WITNESS:  I've heard that statement or
23   a variant of that statement several times.  For
24   example, there was a hearing before the Pipeline
25   Hazardous Materials Safety Administration known as

Page 196

1    PHMSA, P-H-M-S-A, and I heard representatives from
2    the National Fire Protection Association, ASTM and
3    asked me all explain that this basic theory would
4    hold in their view.  It's a theory I disagree with,
5    but it's what I've heard many times.
6    BY MR. HUDIS:
7        Q.  Have you read this theory anywhere?
8           MR. BECKER:  Objection.  Vague.
9           THE WITNESS:  Well, yes, we made a
10   transcript of the PHMSA hearing, so I read it
11   there.
12   BY MR. HUDIS:
13       Q.  Any other writings on this theory besides
14   the PHMSA hearing?
15       A.  There's been a couple of speeches by the
16   president of ANSI and by both the current and past
17   president of the National Fire Protection
18   Association of -- on this general line of thought.
19       Q.  In that same paragraph the second to last
20   sentence, it says, "We do recognize the importance
21   of giving private SDO," that's standards
22   development organizations?
23       A.  That's correct.
24       Q.  All right, "private SDOs adequate
25   incentives to create standards."

Page 197

1           What incentives did you mean?
2           MR. BECKER:  Objection.  The document
3    speaks for itself.  This is a partial quoting out
4    of context.  Objection.  Vague and ambiguous.
5    Lacks foundation.
6           THE WITNESS:  As my lawyer said, that was
7    taken out of context of a broader discussion of the
8    importance of this area of activity, this society.
9           I do think it is important that SDOs
10   continue to operate.  I believe they do valuable
11   work.
12          One of the incentives is what I previously
13   discussed with you, the gold seal of approval of
14   the American government by deeming that a
15   particular standard is, in fact, incorporated by
16   reference in the law.  I believe that's a huge
17   marketing advantage for an organization.
18   BY MR. HUDIS:
19       Q.  So how are the rights to these incentives
20   to create standards to be protected?
21          MR. BECKER:  Objection.  Vague and
22   ambiguous; confusing; hypothetical; calls for
23   speculation.
24          THE WITNESS:  Yeah, you used the words
25   rights.  Is that right really what you meant?

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                        May 12, 2015
San Francisco, CA

Page 198

1  Could you repeat the question?
2  BY MR. HUDIS:
3      Q.  How were the rights to these incentives to
4  create standards to be protected?
5      MR. BECKER:  All the same objections, and
6  also objection that this calls for a legal
7  conclusion.
8      THE WITNESS:  It sounds to me like you're
9  asking about a legal thing, and what I'm talking
10 about here is the fact that our government has a
11 number of relationships with the SDOs ranging from
12 funding research directly relevant to a standard,
13 to funding research in general for their members.
14 Purchasing documents.  Helping create a platform
15 where different players can get together.
16     And so I think there are a number of
17 different mechanisms that can lead the government
18 and our SDOs to work together happily to continue
19 to create these important standards, and yet still
20 satisfy that fundamental requirement that the law
21 must be available to those that must obey it.
22     MR. BECKER:  I'd just like to renew my
23 objections, my standing objection concerning the
24 fact that this line of discussion is regarding
25 standards other than the 1999 standards, and is

Page 199

1  therefore outside of the scope of the 30(b)(6)
2  designation.
3  BY MR. HUDIS:
4      Q.  Mr. Malamud, could you please turn to page
5  31846 in Exhibit 26.  At the top it says, "We
6  understand that SDOs need money to fund their
7  standards development efforts."
8      Where is that money supposed to come from?
9      MR. BECKER:  Objection.  The document
10 speaks for itself.  Objection again that this is a
11 selected and partial quoting of a much longer
12 sentence.  Objection.  Hypothetical.  Objection.
13 Calls for speculation; argumentative.
14     THE WITNESS:  So the sentence, you read the
15 first half.  "We understand that SDOs need money to
16 fund their standards developing efforts.  But
17 perhaps these organizations have begun treating
18 this revenue stream as an opportunity for a
19 financial windfall at the expense of U.S.
20 citizens."
21 BY MR. HUDIS:
22     Q.  Do you have any basis to say that for the
23 plaintiffs as to the Standards for Educational and
24 Psychological Testing?
25     A.  No.  That was not an example I had in mind

Page 200

1  when I wrote that sentence.
2      Q.  All right.  And so that's -- so we
3  discussed the second half.  And I'm still
4  concentrating on the first half of that sentence.
5  "We understand the SDOs need to fund their
6  standards development efforts."
7      Where is this revenue supposed to come
8  from?
9      MR. BECKER:  Objection.  Once again this
10 calls for speculation.  It's a hypothetical.  It --
11 the document speaks for itself.
12     THE WITNESS:  So I do not have to do sharer
13 responsibility for any of the three plaintiffs.  So
14 I am merely speculating when I say how they should
15 run their businesses.  It is not my area of
16 expertise.
17     But it seems to me that these three
18 organizations have a number of revenue streams,
19 some of them quite substantial.  Some of them
20 related to the standards.  Some of them not related
21 to the standards.  And I believe that it's
22 important that as the Internet changes things, as
23 we become able to make the law available to all
24 people, that perhaps that might lead to some
25 adjustments in the business models.  But I believe

Page 201

1  there's a lot of money, particularly at the APA,
2  for example, is a very large organization.  I just
3  don't believe that these organizations would stop
4  developing these standards, because I believe that
5  it's an important and crucial part of their --
6  their mission.
7      And this is my personal speculation about
8  their models.  Again, I don't run the APA.  I'm not
9  their CFO, and so it's not necessarily an area that
10 I know a lot about.
11 BY MR. HUDIS:
12     Q.  This next question basically goes to the
13 rest of the theories posited on page 31846 and
14 31847 of Exhibit 26.  So I'll just ask it straight
15 out.
16     Is it your view, Mr. Malamud, that once the
17 standard is incorporated by reference, the SDO who
18 created that standard should look to other sources
19 for revenue than the sale of that standard?
20     MR. BECKER:  Objection.  Calls for a legal
21 conclusion.  Objection.  Argumentative; assumes
22 facts not in evidence; hypothetical; calls for
23 speculation.  Objection to the extent that there is
24 a characterization of two entire pages of this
25 document that have not been discussed, and assumes

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                    May 12, 2015
San Francisco, CA

---

**Page 202**

1    facts not in evidence.
2        THE WITNESS:  We previously discussed this
3    topic, and I believe that when a standard has been
4    incorporated by reference into law, the original
5    creator of that standard, the SDO, as we say here,
6    has a number of revenue opportunities, including
7    continued sale of the standard, and particularly an
8    authenticated version, a redlined version, a
9    commentary, a manual.  There's all sorts of things
10   one can do.
11       And the fact that this organization was the
12   original creator of that document gives a
13   tremendous credibility.
14       And so I just don't believe that the
15   revenue stream will go away.  I do believe that
16   there is a potential, at least, for an adjustment
17   of business models as time progresses, but that's
18   the case for any organization.
19   BY MR. HUDIS:
20       Q.  And what did you mean by "adjustment of
21   business models"?
22       A.  I think the Internet has forced government,
23   industry, to adjust the way they do business.  And
24   I believe that that is equally true for private
25   nonprofit organizations engaged in public missions,

---

**Page 203**

1    such as the APA or such as Public.Resource.Org.
2        Q.  And what do you mean by "adjustment" by the
3    way one does business in this context?
4        A.  I believe a continual assertion that a
5    document that is the law cannot be copied without a
6    license and special permission is an unfounded
7    assertion.  And in this letter we are discussing
8    here in Exhibit 26, I gave a series of examples of
9    revenue streams that were possible or already exist
10   in many of these nonprofit organizations.  And
11   again, this is something that I believe any
12   organization continually faces as technology
13   progresses.
14       The printing press forced an adjustment in
15   the business models of legal publishers.  The
16   Internet has forced a dramatic change in the
17   business models of a large number of organizations.
18   And I just think that that -- that SDOs should not
19   be surprised that they may need to adjust their
20   business models over time.
21       Q.  And that adjustment of a business model
22   will include foregoing a revenue stream from a
23   straight sale of the standards as incorporated by
24   reference?
25       MR. BECKER:  Objection.  Misstates prior

---

**Page 204**

1    testimony; argumentative; asked and answered.
2        THE WITNESS:  I am not convinced that the
3    revenue stream would go away.  And that is based on
4    my actual experience putting information online
5    that at one time was charged for, and then became
6    available at no cost to citizens.
7        And as we discussed earlier in the case of
8    the Securities and Exchange Commission, making the
9    documents more broadly available, vastly increased
10   the number of readers, lead to increased revenue
11   streams for those documents.
12       The Bible is sold, despite the fact that
13   it's available.  You can take the Bible.  You can
14   copy it.  You can print your own edition, but a lot
15   of people buy the Bible from publishers because
16   they want the particular edition or version or --
17   or form factor that that Bible has.
18   BY MR. HUDIS:
19       Q.  Mr. Malamud, what is your understanding of
20   what a code or a statute is?
21       MR. BECKER:  Objection.  Calls for a legal
22   conclusion; vague and ambiguous; assumes facts not
23   in evidence; lacks foundation.
24       THE WITNESS:  Did you mean code or statute?
25   BY MR. HUDIS:

---

**Page 205**

1        Q.  Yes.
2        A.  Okay.  So a statute is a law passed by a --
3    typically a legislature is one how would normally
4    use the word statute as opposed to ordinance, for
5    example.
6        A code is a much broader term.  It's short
7    for codification.
8        Q.  And how is a code to be distinguished from
9    a standard?
10       MR. BECKER:  Objection.  Calls for a legal
11   conclusion; lacks foundation; assumes facts not in
12   evidence; competence.
13       THE WITNESS:  The two terms are often used
14   interchangeably, and in fact, when laymen are
15   talking about standards and codes, they are
16   definitely used interchangeably, and in this case
17   by "laymen," I include lawyers and SDO executives.
18   So the terms really are -- are basically conflated.
19   BY MR. HUDIS:
20       Q.  Synonymous, in your view?
21       A.  Oh --
22       MR. BECKER:  Objection.  Misstates prior
23   testimony.
24       THE WITNESS:  So I believe codes equals
25   standards in common usage.

---

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                        May 12, 2015
San Francisco, CA

Page 206

1        Statutes are different than codes in the
2   sense that a code is a codification of the statute.
3   Each statute is put into a different portion of the
4   code, and therefore functions as a stand-alone
5   document to a particular area of the law, as do
6   many standards.
7   BY MR. HUDIS:
8        Q.  And what is your understanding of what a
9   regulation is?
10       MR. BECKER:  Objection.  Vague; calls for a
11  legal conclusion; lacks foundation.
12       THE WITNESS:  So I'm not a lawyer and I
13  don't know the technical term, but a regulation is
14  what the executive branch does.  A statute is what
15  the legislative branch does.  Both have the force
16  of law.
17  BY MR. HUDIS:
18       Q.  Mr. Malamud, what is Kickstarter?
19       MR. BECKER:  Objection.  Relevance.
20  Objection.  Objection to the extent that this line
21  of questioning is going to be -- asked for the
22  identities of any donors or potential private --
23  private donors to Public.Resource.Org that have
24  sought to keep their identities anonymous, and
25  therefore have a privacy interest.

Page 207

1        THE WITNESS:  It's a crowd-funding
2   platform.
3   BY MR. HUDIS:
4        Q.  What is a crowd-funding platform?
5        A.  It is a place where people can create a
6   thing or an idea or a mission and get other people
7   to give them money to carry out that objective.
8        Q.  Does Public.Resource use Kickstarter to
9   raise operating funds?
10       MR. BECKER:  Objection.  Irrelevant.
11  Objection.  Beyond the scope of the 30(b)(6)
12  designation.  Objection to the extent that this
13  answer implicates the identities of any private
14  donors who have a privacy right.
15       THE WITNESS:  We did not use it to raise
16  operating funds.  We did use it.
17  BY MR. HUDIS:
18       Q.  For what purpose?
19       A.  For raising money for a specific task,
20  which was the double-keying of standards.
21  Double-keying of standards incorporated by
22  reference into law.
23       (PLAINTIFFS' EXHIBIT 27 WAS MARKED.)
24  BY MR. HUDIS:
25       Q.  Mr. Malamud, I show you what has been

Page 208

1   marked as Exhibit 27 bearing production pages
2   AERA_APA_NCME 31480 through 31485.
3        Have you seen this document before?
4        A.  It appears to be the posting I made on
5   Kickstarter for the double-key campaign I just
6   described to you.
7        Q.  Do you have any reason to doubt its
8   authenticity, Exhibit 27?
9        A.  No.
10       Q.  Now, it says at the top, Mr. Malamud,
11  "Funding unsuccessful.  This project's funding goal
12  was not reached on October 28th."
13       Do you see that?
14       A.  Yes, I do.
15       Q.  October 28th of what year?
16       A.  2013.
17       Q.  And it says below the picture, "We are
18  converting 28,040 public safety standards into
19  valid HTML files to make them freely accessible and
20  more usable."
21       Was that the reason you were seeking to
22  raise funds through Kickstarter?
23       MR. BECKER:  Objection.  The document
24  speaks for itself.
25       THE WITNESS:  We were raising funds

Page 209

1   specifically for the double-key operation of
2   documents.
3   BY MR. HUDIS:
4        Q.  And further down on page 31480, it says,
5   "In the last two years we've posted 28,040 public
6   safety codes from around the world."
7        Did you mean codes, or did you mean
8   standards?
9        MR. BECKER:  Objection.  The document
10  speaks for itself.
11       THE WITNESS:  The terms are interchangeable
12  in this context.
13  BY MR. HUDIS:
14       Q.  And then it says, "We post all these
15  documents on Law.Resource.Org and make them
16  available on the Internet Archive."
17       Did you do that project in 2013?
18       MR. BECKER:  Objection.  The document
19  speaks for itself.  Objection.  Vague.  Objection.
20  Lacks foundation.
21       THE WITNESS:  And the answer is no, we
22  didn't do it in 2013.  The paragraph says, "In the
23  last two years we've posted these standards."
24  So ...
25  BY MR. HUDIS:

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 210

1      Q.  So you -- so you conducted that activity in
2  2011 -- in 2011 and 2012, you said the last two
3  years?
4          MR. BECKER:  Objection.  The document
5  speaks for itself.  Objection.  Misstates
6  testimony.
7          THE WITNESS:  What I was saying there is
8  from the two-year period ending September 28th,
9  2013, which is the date that I published this blog
10  post, we had posted those documents.
11  BY MR. HUDIS:
12      Q.  And then if you would please turn to the
13  text that spans from production pages 31482 to
14  31483.
15          At the bottom of 31482 it says, "Your help
16  matters.  Your support is what makes our work
17  possible."
18          Do you see that?
19      A.  Yes, I do.
20      Q.  All right.  And then on the next page, you
21  set to raise at least a hundred thousand dollars
22  for this Kickstarter campaign?
23      A.  Kickstarter requires that you set a minimum
24  amount, and the minimum amount we set was a hundred
25  thousand dollars.

Page 211

1      Q.  And you were looking to raise up to 1.2
2  million dollars for this campaign?
3          MR. BECKER:  Objection.  The document
4  speaks for itself.
5          THE WITNESS:  The way Kickstarter works is
6  you may get a lot more than the minimum, and it's
7  considered good form to say what you would do if
8  you happened to be wildly successful, which, of
9  course, we were not.
10  BY MR. HUDIS:
11      Q.  And what did the contributors get for their
12  contribution to this campaign?
13      A.  So contributors to Kickstarter can, of
14  course, say they don't want anything, but at
15  different levels there are a different set of
16  prizes, I guess is the right word, equivalent to a
17  gift that NPR might give you in a pledging
18  campaign.  And those are listed on the page Bates
19  numbered 31481.
20          MR. BECKER:  I'd just like to state an
21  objection to the question for vague and misleading
22  to the extent it asks what did people get for this
23  campaign, their contributions to this campaign.
24  BY MR. HUDIS:
25      Q.  Mr. Malamud, so the goal of this

Page 212

1  Kickstarter campaign by Public.Resource was to
2  raise money so that Public.Resource could post
3  standards on the Internet and make them available
4  to Internet users for free?
5          MR. BECKER:  Objection.  May -- misstates
6  prior testimony.  The document speaks for itself.
7  BY MR. HUDIS:
8      Q.  You may answer.
9          MR. BECKER:  Objection.  Compound.
10  Objection.  Argumentative.  Objection.  Assumes
11  facts not in evidence.
12  BY MR. HUDIS:
13      Q.  Go ahead, Mr. Malamud.
14      A.  The purpose of the campaign was to fund the
15  double-keying of the standards.
16      Q.  And what happened with those standards that
17  were double-keyed?
18          MR. BECKER:  Objection.  Misleading.
19  Objection.  Vague and ambiguous.
20          THE WITNESS:  None of those standards were
21  double-keyed as a result of this effort.  Right?
22  This was an unsuccessful effort.  This led to
23  nothing.  Except a tremendous amount of my time
24  maintaining the Kickstarter campaign, but it was
25  unsuccessful.

Page 213

1  BY MR. HUDIS:
2      Q.  Mr. Malamud, have you testified before
3  Congress regarding incorporation by reference
4  issues?
5      A.  Yes, I --
6          MR. BECKER:  Objection.  Vague.
7          THE WITNESS:  Yes, I have.
8  BY MR. HUDIS:
9      Q.  When was that?
10          MR. BECKER:  Objection.  Vague and
11  ambiguous.
12          THE WITNESS:  Was it January 2014?  I'm
13  assuming you have a set of my -- my testimony.  You
14  can probably tell me.  I know it was January.
15  BY MR. HUDIS:
16      Q.  Of 2014?
17      A.  I think it was '14, but I'm not certain
18  about that.
19          (PLAINTIFFS' EXHIBIT 28 WAS MARKED.)
20  BY MR. HUDIS:
21      Q.  Mr. Malamud, I show you a document that's
22  been marked as Exhibit 28 bearing production
23  numbers AERA_APA_NCME 31208 through 31250.
24          Do you recognize the document?
25      A.  It's a badly mangled version of my

54 (Pages 210 to 213)

Carl Malamud                                                    May 12, 2015

San Francisco, CA

Page 214

1   testimony, which was posted on our website.
2        MR. BECKER:  Objection to the extent that
3   this document may have errors or other content in
4   it or may have -- otherwise be incorrectly
5   formatted.
6   BY MR. HUDIS:
7        Q.  Do you have any reason to doubt that this
8   document is authentic?
9        A.  Yeah, it appears to be my testimony.
10       Q.  Mr. Malamud, could you please turn to page
11  31215 of Exhibit 28.
12       A.  Okay.
13       Q.  And at the bottom it says, "In 2008
14  Public.Resource.Org began posting state-mandated
15  public safety codes.  Although the model codes as
16  developed by the SDOs had copyright restrictions,
17  we based our actions on the ruling of the Veeck
18  case," and then you quote from it.
19       My question is, here in 2008 were the text
20  of these model codes written into state laws or
21  were they incorporated by reference?
22       MR. BECKER:  Objection.  Relevance.
23  Objection.  Compound.  Objection.  Vague and
24  ambiguous; may call for a legal conclusion; assumes
25  facts not in evidence; lacks foundation.

Page 215

1        THE WITNESS:  California Title 24 is a
2   publication of the State of California that
3   actually has the codes as part of the state
4   regulations.  So it is not incorporated by
5   reference into the CCR.
6        Most states use the incorporation by
7   reference mechanisms.  So the answer to your
8   question is both.
9   BY MR. HUDIS:
10       Q.  Mr. Malamud, could you turn to page 31217
11  in Exhibit 28.
12       A.  Okay.
13       Q.  And in the second paragraph, second
14  sentence it says, "When SDOs have offered copies of
15  standards to read with or without a fee, that
16  access has come with significant limitations on
17  use, and SDOs have jealously guarded against the
18  right of anyone but themselves to communicate these
19  provisions to others."
20       Do you see that?
21       A.  I do.
22       Q.  When was the first time that you were aware
23  that an SDO had such a policy?
24       MR. BECKER:  Objection.  Vague.  Objection.
25  Lacks foundation and assumes facts not in evidence.

Page 216

1        THE WITNESS:  When I bought California
2   Title 24 and at the beginning there was a big
3   notice saying that I couldn't repeat this part of
4   the law because of what appeared to be copyright
5   assertions by the State of California.
6   BY MR. HUDIS:
7        Q.  That was 2008?
8        A.  I don't know when I bought Title 24, but I
9   posted it in 2008.  But shortly before that.
10       Q.  If you could turn to page 31218 in Exhibit
11  28.
12       A.  Okay.
13       Q.  It says at the top, "In March 2012
14  Public.Resource.Org began the process of making
15  available technical standards incorporated by
16  reference into the CFR."  That's the Code of
17  Federal Regulations?
18       A.  That's correct.
19       Q.  At this time in March 2012, was
20  Public.Resource only providing these documents in
21  print?
22       MR. BECKER:  Objection.  Vague and
23  ambiguous; lacks foundation and assumes facts not
24  in evidence.
25       THE WITNESS:  In March 2012 we made 25

Page 217

1   copies of 73 carefully selected standards and
2   mailed them, FedEx, actually, to ten standards
3   organizations, seven government officials and asked
4   for their comment on a whole series of issues that
5   were raised by the lack of availability of the law.
6   BY MR. HUDIS:
7        Q.  And continuing in that same paragraph,
8   towards the end it says, and I realize I'm starting
9   mid sentence, "In May 2012 we began the process of
10  posting these standards on our website.  We have
11  posted a total of 969 standards that are required
12  by federal law."
13       My question is, as of today, May 2015, how
14  many standards incorporated into law have you
15  posted on Public.Resource's website?
16       MR. BECKER:  I'll restate the objection
17  that this is beyond the 30(b)(6) designation.  And
18  I will object to the extent that it calls for a
19  legal conclusion.  And that it assumes facts not in
20  evidence.  And lacks foundation.
21       THE WITNESS:  Is your question federal law?
22  Because that's what this statement was in the
23  testimony.
24  BY MR. HUDIS:
25       Q.  Yes.

55 (Pages 214 to 217)

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 218

1        A.  I believe there's approximately 1,020
2   standards incorporated by reference into the CFR on
3   the Law.Resource.Org website.  And that number is a
4   guess based on the number of PDF files in that
5   particular directory.  So it may be a different
6   number.
7        Q.  Mr. Malamud, could you turn to page 31222
8   of Exhibit 28.
9        A.  Okay.
10       Q.  In the first paragraph on that page the
11  last sentence it says, "Standards incorporated by
12  reference have the force of law and are no
13  different than text authored" -- or -- "authored
14  directly by the government."
15       Do you see that?
16       A.  I do.
17       Q.  What is the basis for that statement?
18       MR. BECKER:  Objection.  Calls for a legal
19  conclusion.
20       THE WITNESS:  One basis for that statement
21  is a speech Mr. Bhatia made, which was quoted on
22  the ANSI website that said standards incorporated
23  by reference into law are the law.  Very clear.
24  BY MR. HUDIS:
25       Q.  What other basis do you have for making

Page 219

1   that statement?
2        A.  There are several bases.  One is the
3   compendium of copyright office procedures, both the
4   second and the third edition published by the U.S.
5   copyright Office, which has a strong statement
6   about edicts of government, that the law must be
7   available and has no copyright.
8        The creation of the Federal Register and
9   the Code of Federal Regulations contains a great
10  deal of legislative history and language about how
11  the purpose of the official journals of government
12  is to make the law available to people, and how
13  standards incorporated by reference into the code
14  are part and parcel of the Code of Federal
15  Regulations.  They are as if they are contained in
16  the actual document.
17       MR. BECKER:  I'd like to state a further
18  objection to this line of testimony in that
19  Mr. Malamud has been designated as a 30(b)(6)
20  representative for factual bases for issues such as
21  these, but not for any legal bases.
22       THE WITNESS:  Yes.  And I want to be very
23  clear.  I am not a lawyer.  This is based on my
24  reading of -- I've read quite a bit about this
25  subject, but I'm not a professional in this field.

Page 220

1   But I have read court opinions and other documents
2   and this is my -- my assessment as a layman of
3   these materials.
4   BY MR. HUDIS:
5        Q.  Could you turn to page 31223 of Exhibit 28.
6        A.  Yes.
7        Q.  And I am directing you to the second full
8   paragraph where it starts, "Reading the law."
9        Do you see that?
10       A.  I do.
11       Q.  And it says in the second sentence,
12  "Activities that our organization undertakes, such
13  as putting all the standards required by law in one
14  location with common access methods or rekeying the
15  texts in order to make them searchable and
16  available on new platforms, are purportedly
17  prohibited under this scheme."
18       Do you see that?
19       A.  I do.
20       Q.  To what scheme were you referring?
21       MR. BECKER:  Objection.  The document
22  speaks to itself -- excuse me.  Objection.  The
23  document speaks for itself.  Objection.  Lacks
24  foundation and assumes facts not in evidence.
25       THE WITNESS:  If you go two paragraphs

Page 221

1   back, the paragraph beginning on Bates number 31222
2   and ending at the top of 31223, you'll see that my
3   testimony describes the concept of the legal
4   reading room in which standards development
5   organizations have recently begun posting read-only
6   copies of standards with restricted functionality
7   such as no printing, terms of use, license
8   agreements and a variety of other restrictions
9   that.
10  BY MR. HUDIS:
11       Q.  And that was the scheme to which you were
12  referring?
13       A.  The legal reading room scheme, yes.
14       Q.  Mr. Malamud, on page 31227 of Exhibit 28,
15  it says at the bottom, "As this committee considers
16  revisions to the Copyright Act, there is one simple
17  change that would make a world of difference to the
18  functioning of our system of government, which is
19  to specify, as the Copyright Office stated, that
20  edicts of government are not copyrightable for
21  reasons of public policy."
22       Do you see that?
23       A.  I do.
24       Q.  Has this suggested text ever been enacted
25  as part of the U.S. Copyright Act, to the best of

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                        May 12, 2015
                              San Francisco, CA

Page 222

1    your knowledge?
2          MR. BECKER: Objection. Calls for a legal
3    conclusion.
4          THE WITNESS: This was January 2014
5    testimony. Chairman Goodlatte has been undergoing
6    a two-year process of revision of the Copyright
7    Act, and that -- that process is currently
8    underway. This testimony was invited as -- as part
9    of that examination by the chairman.
10   BY MR. HUDIS:
11         Q. As you and I sit here today in May of 2015,
12   has the language, "edicts of government are not
13   copyrightable for reasons of public policy," been
14   enacted into the U.S. Copyright Act?
15         MR. BECKER: Objection. Calls for a legal
16   conclusion. Objection. Argumentative; lacks
17   foundation; assumes facts not in evidence.
18   Objection. Competence.
19         THE WITNESS: There was a long-standing
20   public policy, and that's what the Copyright Office
21   was talking about. There has not been a U.S.
22   statute passed in the last couple years that deals
23   specifically with this topic.
24         I believe, however, that if one looks
25   carefully at the mechanisms of incorporation by

Page 223

1    reference that are specified in statutes such as
2    the APA, at least it's my reading, again, as an
3    amateur, that the policy is that the law must be
4    available and that that would include standards
5    that are incorporated by reference.
6    BY MR. HUDIS:
7          Q. Thank you, Doc -- thank you, Mr. Malamud,
8    but that does not answer my question.
9          My question is, yes or no, has the
10   language, "as of today edicts of government are not
11   copyrightable for reasons of public policy," been
12   enacted into the U.S. Copyright Act?
13         MR. BECKER: All the same objections and
14   asked and answered.
15         THE WITNESS: I did answer your question.
16   I said that there had not been a statute in the
17   last two years that -- that included -- in the
18   Copyright Act that included this phrase.
19   BY MR. HUDIS:
20         Q. Mr. Malamud, generally what do you know
21   about the American Educational Research
22   Association?
23         MR. BECKER: Objection. Vague.
24         THE WITNESS: Oh, I don't know a huge
25   amount. I know they're suing me.

Page 224

1    BY MR. HUDIS:
2          Q. Besides that.
3          A. I've looked at their website briefly,
4    particularly after the litigation commenced, to
5    learn a little bit more about their activities.
6          Q. Do you know what they do?
7          MR. BECKER: Objection. Vague.
8          THE WITNESS: They hold meetings. They
9    just had their annual meetings. They had all sorts
10   of what appeared to be very interesting talks about
11   education. They lobby for education funding to
12   their membership is my impression, but again, I
13   don't know the organization very well. But they
14   advocate for more money flowing to research and
15   education, a noble cause.
16   BY MR. HUDIS:
17         Q. What do you know about the American
18   Psychological Association?
19         MR. BECKER: Objection. Vague; calls for a
20   narrative.
21         THE WITNESS: Oh, I know a little bit about
22   the APA. When I was in -- sophomore in college I
23   did an internship with the National Association of
24   Private Psychiatric Hospitals, and as part of that
25   I spent a few months in Washington and attended

Page 225

1    some APA functions. So I -- I got to see a little
2    bit about what -- what they did and how they did
3    it.
4    BY MR. HUDIS:
5          Q. What do you know about the National Council
6    on Measurement and Education?
7          MR. BECKER: Objection. Vague; calls for a
8    narrative.
9          THE WITNESS: Almost nothing.
10   BY MR. HUDIS:
11         Q. Do you know what kind of work the AERA
12   does?
13         MR. BECKER: Objection. Vague.
14         THE WITNESS: Well, I know one piece of
15   work they do, which is they coordinate and publish
16   the Standards for Educational and Psychological
17   Testing.
18   BY MR. HUDIS:
19         Q. Do you know what kind of work the APA does?
20         MR. BECKER: Objection. Vague.
21         THE WITNESS: I know they're a very large
22   organization that is involved in a number of
23   things. I recently read about their involvement in
24   the torture program, for example. So I know about
25   that from news reports.

57 (Pages 222 to 225)

Carl Malamud                                                                    May 12, 2015

San Francisco, CA

| Page 226 |
|---|

BY MR. HUDIS:
1
2       Q.  What do you know about the work that the
3   NCME does?
4           MR. BECKER:  Objection.  Vague.
5           THE WITNESS:  Nothing beyond the name of
6   the organization.  Measurement education.
7   BY MR. HUDIS:
8       Q.  Besides the standards that we are
9   discussing today, do you know anything about the
10  publications of either the AERA, the APA or the
11  NCME?
12          MR. BECKER:  Objection.  Vague; calls for a
13  narrative.
14          THE WITNESS:  I briefly looked at the AERA
15  bookstore and saw a listing of the various
16  publications that they did, but they don't mean
17  much to me.
18  BY MR. HUDIS:
19      Q.  Did you look at the APA bookstore?
20          MR. BECKER:  Same objections.
21          THE WITNESS:  I did, looking for the
22  standards at issue, and found that they were not
23  available on the APA bookstore, and that brought me
24  over to the AERA bookstore.  So that was the extent
25  of that examination.

| Page 227 |
|---|

1           MR. HUDIS:  Just for the benefit of the
2   court reporter, AERA is A-E-R-A.  Good.
3   BY MR. HUDIS:
4       Q.  What do you know about the Standards for
5   Educational and Psychological Testing?
6           MR. BECKER:  Objection.  Vague; calls for a
7   narrative.
8           To the extent that any of the witness's
9   knowledge comes from attorney-client
10  communications, I'll instruct him not to answer,
11  with that particular knowledge.
12          Lacks foundation.
13          THE WITNESS:  So I'm not an expert in this
14  area, but the standards at issue are standards that
15  specify how to create tests that are valid and
16  fair.  So it is a standard for the creation of
17  tests that are used in a variety of applications.
18  BY MR. HUDIS:
19      Q.  What is your understanding of who prepared
20  the standards?  All right.  So withdraw the
21  question.
22          When I refer from now on to "the
23  standards," I am referring to the Standards for
24  Educational and Psychological Testing.  Is that
25  okay?

| Page 228 |
|---|

1       A.  The 1999 version, or just in general?
2       Q.  I will specify.
3       A.  Okay.
4       Q.  But so we have an understanding between the
5   two of us, if I refer to "the standards," it's the
6   Standards for Educational and Psychological
7   Testing.
8       A.  I'm fine with that.
9       Q.  Do you know who prepared the standards?
10          MR. BECKER:  Objection.  Vague.  Objection.
11  May call for a legal conclusion.
12          To the extent that the answer to this
13  question requires the witness to divulge any
14  attorney-client confidential information, I will --
15  I will instruct the witness not to divulge that
16  privileged information.
17          Assumes facts not in evidence and lacks
18  foundation.
19          THE WITNESS:  So I know there was a
20  committee involved in the preparation of the
21  standards.  It appears all three of the editions,
22  '85, '99 and 2014.
23          My impression is that there were a large
24  number of other individuals in the three
25  organizations and others involved as well in this

| Page 229 |
|---|

1   process.
2   BY MR. HUDIS:
3       Q.  Do you know who publishes the standards?
4           MR. BECKER:  Objection.  Calls for a legal
5   conclusion.
6           Objection to the extent that the witness
7   has learned this information from -- through
8   attorney-client privileged communications, I'll
9   instruct the witness not to divulge that
10  information.
11          THE WITNESS:  I believe it's AERA and the
12  other two organizations are the ones certainly that
13  are claiming to be the publisher and owner of the
14  copyright, hence the litigation that we're
15  currently engaged in.
16  BY MR. HUDIS:
17      Q.  Do you know the purpose of the standards?
18          MR. BECKER:  Objection.  Vague.
19          THE WITNESS:  Yeah.  It's what we recently
20  discussed, the creation of fair and accurate and
21  valid tests that are used in a variety of
22  applications.
23  BY MR. HUDIS:
24      Q.  And are you familiar with how the standards
25  are updated over time?

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                              May 12, 2015

San Francisco, CA

---

Page 230

1       MR. BECKER: Objection. Vague.
2       Objection. To the extent that any of this
3   information has come from attorney-client
4   communications, I will instruct the witness not to
5   divulge any privileged information.
6       THE WITNESS: I'm aware that they are
7   updated. I'm not terribly clear on the exact
8   process that the organizations went through to do
9   that.
10  BY MR. HUDIS:
11      Q. Do you know who uses the standards?
12      MR. BECKER: Objection. Vague.
13      Again, to the extent that this answer
14  requires the divulging of any attorney-client
15  privileged communications, I'll instruct the
16  witness not to divulge that information.
17      Competence. Lacks foundation.
18      THE WITNESS: So I know some of the people
19  that use the standard. I know that the Department
20  of Education has incorporated by reference into its
21  regulations. So I am -- I know that the Department
22  of Education has people that use it.
23      I know a lot of state governments are
24  putting together tests that conform to the
25  standards.

---

Page 231

1       I believe there are a number of other
2   agencies, I believe Office of Personnel Management,
3   I believe Department of Defense, a number of state
4   organizations, are all users of the standard
5   because they specify that it shall be used.
6   BY MR. HUDIS:
7       Q. Do you know of any non-governmental users
8   of the standards?
9       MR. BECKER: All the same objections.
10  Vague.
11      To the extent that there is any information
12  that the witness has learned from his attorneys, I
13  will instruct him not to divulge this privileged
14  information.
15      THE WITNESS: I know that the Educational
16  Testing Service, ETS and a number of organizations
17  that create tests, are users of the standard, and
18  the reason I know that is there's been a series of
19  procurements by government organizations that
20  require the use of the standard.
21  BY MR. HUDIS:
22      Q. Do you know of any other non-governmental
23  users of the standards?
24      MR. BECKER: All the same objections. Also
25  object for competence.

---

Page 232

1       THE WITNESS: My sister read it in the
2   course of her doctoral course work.
3   BY MR. HUDIS:
4       Q. And what was your sister's doctoral course
5   work?
6       A. On, I want to state this properly. I
7   believe physical and rehabilitative therapy. A
8   subset of psychology.
9       Q. How did the standards first come to your
10  attention?
11      MR. BECKER: Objection. Vague. Objection.
12  Ambiguous.
13      THE WITNESS: I was looking at the
14  standards incorporated by reference under the Code
15  of Federal Regulations, and the standards at issue
16  were one of the ones that were specified.
17  BY MR. HUDIS:
18      Q. And what year was that?
19      A. Probably 2012. Early 2012.
20      Q. When did Public.Resource --
21      A. Might have been earlier. Might have been
22  earlier. I'm not sure.
23      Q. Sometime in 20 -- in 2012?
24      A. Coming to my attention in the sense of
25  remembering it now, yes.

---

Page 233

1       Q. What, if anything, made you interested in
2   acquiring the standards?
3       A. It was --
4       MR. BECKER: Objection. Vague.
5       THE WITNESS: -- incorporated by reference
6   into the Code of Federal Regulations.
7   BY MR. HUDIS:
8       Q. When did Public.Resource first make the
9   decision to post the standards to one of its
10  websites?
11      MR. BECKER: Objection. Vague. Objection.
12  Lacks foundation. Objection. May call for a legal
13  conclusion.
14      THE WITNESS: So it would have been
15  sometime after obtaining a copy of the standard and
16  examining it and satisfying myself that, in fact,
17  it was the document that was incorporated by
18  reference, and sometime between the procurement,
19  which I believe was in May 2012, and the actual
20  posting, which I believe was in July 2012.
21  BY MR. HUDIS:
22      Q. So how did Public.Resource come to the
23  decision to post the standards on one of its
24  websites?
25      MR. BECKER: Objection. Vague and

---

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                          May 12, 2015
                              San Francisco, CA

Page 234

1    ambiguous.
2        THE WITNESS: By determining that it was
3    incorporated by reference and that this particular
4    document that I held in my hand was the specific
5    document that had been incorporated by reference.
6    BY MR. HUDIS:
7        Q. On which of its websites did
8    Public.Resource post the standards?
9        A. Law.Resource.Org.
10       Q. Mr. Malamud, this question is directed to
11   you personally.
12       Do you claim any copyright ownership
13   interest in the Standards for Educational and
14   Psychological Testing?
15       MR. BECKER: Objection. Calls for a legal
16   conclusion. Objection. Argumentative; lacks
17   foundation; competence.
18       THE WITNESS: I do not.
19   BY MR. HUDIS:
20       Q. Does Public.Resource claim any copyright
21   ownership interest in the Standards for Educational
22   and Psychological Testing?
23       MR. BECKER: All the same objections.
24       THE WITNESS: We do not. We do not.
25   BY MR. HUDIS:

Page 235

1        Q. When did you first procure the standards?
2        A. May 2012.
3        Q. What was the year of the publication of the
4    particular standards that you procured?
5        MR. BECKER: Objection. Vague; assumes
6    facts not in evidence.
7        THE WITNESS: I don't know the year of the
8    publication. I know it's a 1999 edition.
9    BY MR. HUDIS:
10       Q. That's what I wanted to know. Thank you.
11       Have you procured any earlier or subsequent
12   versions of the standards?
13       A. Subsequent to the commencement of
14   litigation, I purchased a copy of the 2014 and 1985
15   standards because I wanted to see what was in them.
16   I have not posted those documents.
17       Q. Mr. Malamud, did you personally procure the
18   1999 standards?
19       A. I did.
20       Q. From -- from what source did you procure
21   the 1999 standards?
22       A. It's --
23       MR. BECKER: Objection. Vague.
24       THE WITNESS: It's called the Amazon
25   Marketplace. So I paid my money to Amazon, and

Page 236

1    that was through a used book seller that actually
2    had the document and sent it to me.
3        (PLAINTIFFS' EXHIBIT 29 WAS MARKED.)
4    BY MR. HUDIS:
5        Q. I marked the next document as Exhibit 29,
6    and it is Defendant's Amended Responses to
7    Plaintiff's Interrogatories.
8        Mr. Malamud, do you recognize this
9    document?
10       A. I do.
11       Q. Mr. Malamud, if you could turn to the last
12   page. On page 15, is that your signature?
13       A. Yes, it is.
14       Q. Mr. Malamud, could you please turn to the
15   question and answer to interrogatory number 1 on
16   page 4 of Exhibit 29.
17       A. I'm there.
18       Q. And it says in the third paragraph of that
19   interrogatory answer, "Public.Resource purchased a
20   printed copy from," quote, "The Book Grove,"
21   unquote, "a used book seller on May 17, 2012."
22       And does this interrogatory answer verify
23   the source from which you procured the 1999
24   standards?
25       A. Yes. The Book Grove was the used book

Page 237

1    seller on the Amazon marketplace.
2        Q. And does interrogatory answer number 1 also
3    state the date of purchase?
4        A. It does.
5        Q. And that date is May 17th, 2012?
6        A. That is correct.
7        MR. BECKER: Objection. The interrogatory
8    speaks for itself.
9        (PLAINTIFFS' EXHIBIT 30 WAS MARKED.)
10   BY MR. HUDIS:
11       Q. Mr. Malamud, have you taken the time to
12   read what has now been marked as Exhibit 30?
13       A. I have.
14       Q. And the document Exhibit 30 bears
15   production pages PROAERA 446 through 5 --
16   through -- well --
17       A. 446.
18       MR. HUDIS: PROAERA 446, PROAERA 447 and
19   PROAERA 544.
20       Counsel, just so we have an understanding,
21   this is a part of a much larger document of many
22   other purchases that Carl Malamud made. We are
23   only concentrating on a specific purchase.
24       THE WITNESS: I don't have 544 here. I
25   have two pages.

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                    May 12, 2015

San Francisco, CA

Page 238

1    BY MR. HUDIS:
2        Q. Okay. So my colleague, Ms. Cappaert, has
3    told me that I've misspoken. So I'm going to
4    re-identify the document.
5        Exhibit number 30 should contain production
6    pages PROAERA 446 and 447.
7        A. That's correct.
8        Q. I apologize, Mr. Malamud. That was my
9    error.
10       A. Oh, that's okay.
11       Q. Okay. So, Mr. Malamud, if you could take a
12   look at the document. Do you have any doubt that
13   this document is authentic?
14       A. No, I do not.
15       MR. HUDIS: Counsel, can you stipulate that
16   Exhibit 30 is a business record of
17   Public.Resource?
18       MR. BECKER: It appears to be a document
19   produced by Public.Resource that is a receipt.
20       MR. HUDIS: I'll take that representation.
21   Thank you.
22   BY MR. HUDIS:
23       Q. Mr. Malamud, Exhibit 30, is this the
24   receipt for the 1999 standards book that you
25   purchased?

Page 239

1        A. Yes, it is.
2        Q. And for what purpose did you procure the
3    1999 standards?
4        A. To look at the document and ascertain that
5    it was, in fact, the document incorporated by
6    reference into the Code of Federal Regulations.
7        (PLAINTIFFS' EXHIBIT 31 WAS MARKED.)
8    BY MR. HUDIS:
9        Q. Mr. Malamud, I show you what's been marked
10   as Exhibit 31. It bears production numbers
11   AERA_APA_NCME 1 through 201.
12       A. Do you want me to read the document?
13       Q. No, I do not.
14       A. Okay.
15       Q. Mr. Malamud, is this the book that you
16   purchased from The Book Grove on May 17, 2012?
17       MR. BECKER: Objection. Vague. Objection.
18   The witness has been instructed not to read the
19   document. Objection. Misleading.
20   BY MR. HUDIS:
21       Q. Mr. --
22       A. I don't know if this is the one that I
23   bought, but this appears to be a copy of the
24   standards at issue.
25       Q. Did you buy the standards at issue from the

Page 240

1    Book Grove?
2        A. Yes.
3        Q. Mr. Malamud, according to Exhibit 30, you
4    paid $64.48 for the book plus shipping and
5    handling.
6        A. 68.47, including shipping and handling,
7    yes.
8        Q. Mr. Malamud, did you ever attempt to
9    acquire a copy of the 1999 standards for free?
10       A. I think the answer to that is yes.
11       Q. From where?
12       A. See, I'm not sure "free" is the right term.
13   I submitted a Freedom of Information Act request
14   that included the standards at issue. That request
15   was denied. So I have no idea if there would have
16   been a charge or not in making that data available.
17   So that's a qualified yes.
18       (PLAINTIFFS' EXHIBIT 32 WAS MARKED.)
19   BY MR. HUDIS:
20       Q. Mr. Malamud, I show you what's been marked
21   as Exhibit 32 bearing pro -- pages PROAERA 10153
22   through 10195.
23       Do you recognize the document?
24       A. It appears to be a Freedom of Information
25   Act request I submitted to Mr. Stern, who is the

Page 241

1    general counsel of the National Archives.
2        Q. Is the National Archives and Records
3    Administration also known as NARA, N-A-R-A?
4        A. Yes, it is.
5        Q. And this letter of July 14th, 2009, Exhibit
6    32, this was a freedom of information request by
7    Public.Resource?
8        A. Yes, it was.
9        MR. HUDIS: Counsel, can you stipulate that
10   Exhibit 32 is a business record of Public.Resource?
11       MR. BECKER: I'm not certain if it
12   constitutes a business record by Public.Resource,
13   but it is a document produced by Public.Resource.
14   BY MR. HUDIS:
15       Q. Mr. Malamud, so was this document, Exhibit
16   32, created on or about July 14th, 2009?
17       A. It's when I sent it, it is.
18       Q. Have you kept a copy of Exhibit 32 in
19   Public.Resource's records?
20       A. Yes, we disclosed it to you.
21       Q. And writing such letters such as Exhibit 32
22   is the regular practice of Public.Resource?
23       MR. BECKER: Objection. Vague.
24       THE WITNESS: I don't know about regular
25   practice, but it was certainly not unusual for me

Alderson Reporting Company
1-800-FOR-DEPO

Page 242

1   to write a letter.
2   BY MR. HUDIS:
3       Q.  A letter like this, Exhibit 32?
4       A.  Well, that particular FOIA request was
5   fairly unique at the time, and I don't believe we
6   did that again for quite a while.  So ...
7       Q.  You've done it on more than one occasion?
8       A.  FOIA requests?
9       Q.  Yes.
10      A.  Oh, yeah, I've submitted a lot of FOIA
11  requests over time.
12      Q.  And that's part of what you do during your
13  business at Public.Resource?
14      A.  If -- if there is a reason to request
15  government information that is not otherwise
16  available, yes.
17      Q.  What types of materials were you attempting
18  to obtain by this FOIA request of Exhibit 32?
19      A.  Standards incorporated by reference into
20  the Code of Federal Regulations.
21      Q.  Mr. Malamud, could you turn to production
22  page 10154 of Exhibit 32.
23      A.  Okay.
24      Q.  Do you see the text under "What I am
25  specifically asking for"?

Page 243

1       A.  I do.
2       Q.  So reading this first paragraph and its
3   bullet points that follow, were you asking
4   Mr. Stern that either the government post these
5   items to the Internet or allow Public.Resource to
6   do it?
7           MR. BECKER:  Objection.  Vague and
8   ambiguous.  The document speaks for itself.
9   Possibly compound.
10          THE WITNESS:  I outlined three different
11  ways that the FOIA request could be satisfied.
12  BY MR. HUDIS:
13      Q.  And in the next paragraph you say, "I am
14  particularly interested in technical standards for
15  Underwriters Laboratories, the American National
16  Standards Institute and other standards that are
17  expensive and unavailable on the Internet and in
18  public libraries."
19          Do you see that?
20      A.  I do.
21      Q.  Would you consider the 1999 standards to be
22  expensive?
23          MR. BECKER:  Objection.  Vague.  Objection.
24  Lacks foundation; assumes facts not in evidence.
25          THE WITNESS:  I think a $50 document is

Page 244

1   expensive.  Whether it's unduly expensive is
2   another question.  But I think $50 is a lot of
3   money.
4   BY MR. HUDIS:
5       Q.  Do you think the price for which you paid
6   for the standards, to be unduly expensive?
7       A.  Of this particular standard?
8       Q.  Yes.
9       A.  Well, I guess it's by comparison to what?
10  And who was doing the purchasing; right?  So --
11      Q.  While you were doing the purchasing?
12      A.  I was doing the purchasing, and I have
13  spent considerable funds purchasing standards that
14  are much more expensive, and so by comparison to
15  the Underwriters Laboratory $800 price, 50 is
16  certainly less.
17          I do think that's a lot of money though.
18      Q.  And on page 10155 of Exhibit 32, you were
19  requesting a public-interest fee waiver.  Do you
20  see that?
21      A.  I do.
22      Q.  All right.  So by this public-interest fee
23  waiver, were you asking NARA to provide the
24  standards, whose list is attached at the back of
25  Exhibit 32, to Public.Resource for free?

Page 245

1           MR. BECKER:  Objection.  The document
2   speaks for itself; assumes facts not in evidence
3   and lacks foundation.
4           THE WITNESS:  That's a standard mechanism
5   in a FOIA request is if the request is in the
6   public interest, to request a fee waiver and yes,
7   we did, in fact, request one.
8   BY MR. HUDIS:
9       Q.  So you were asking for NARA to provide
10  copies of these standards for free?
11      A.  Well, no.  We were asking for a
12  public-interest fee waiver, and it's up to the
13  government to decide if they're going to waive all
14  or some of the fees.
15          MR. BECKER:  Let me just say, give me a
16  moment to object.
17          THE WITNESS:  Sorry about that.
18          MR. BECKER:  All the same objections and
19  also asked and answered and mischaracterizes
20  testimony.
21  BY MR. HUDIS:
22      Q.  Mr. Malamud, could you look at production
23  page 10156 of Exhibit 32.
24      A.  Okay.
25      Q.  Up at the top of the page it says in the

Carl Malamud                                                    May 12, 2015

San Francisco, CA

---

Page 246

1   first bullet point, "Public.Resource.Org maintains
2   one of the most popular and visible document
3   servers on the Internet for legal information and
4   have demonstrated public expertise to disseminate
5   this information to a broad spectrum of the
6   public."
7        What was the basis for you making that
8   statement?
9        MR. BECKER: Objection. Misquotes the
10  document. The document speaks for itself. Vague.
11       THE WITNESS: It's based on the fact that
12  we were at the time serving the opinions of the
13  court of appeals of the United States, which were
14  unavailable in any other location on the Internet,
15  and the service was very popular.
16  BY MR. HUDIS:
17       Q. And what did you mean by "very popular"?
18       A. When I would go to a conference, a lot of
19  people would come up to me and say, "This is really
20  great that the court of appeal opinions are
21  available on the Internet."
22       Q. Mr. Malamud, could you look at page 10157
23  of Exhibit 32. At the top of that page it says,
24  "Given the lack of any specific regulations
25  governing disclosure of materials incorporated by

---

Page 247

1   reference, given the importance of these core
2   materials, and given the clear unqualified language
3   of the president, NARA should disclose this
4   material."
5        Do you see that?
6        A. I do.
7        Q. All right. I'm concentrating on just the
8   first part of that sentence.
9        What is the basis for saying "there is a
10  lack of any specific regulations concerning
11  disclosure of materials incorporated by reference"?
12       MR. BECKER: Objection. The document
13  speaks for itself; calls for speculation;
14  competence; assumes facts not in evidence.
15       THE WITNESS: I meant that the Office of
16  the Federal Register on their website had taken --
17  not addressed the issue of public availability of
18  these -- these documents.
19  BY MR. HUDIS:
20       Q. "These documents," meaning what, standards?
21       A. The standards incorporated by reference
22  under the Code of Federal Regulations.
23       Q. Mr. Malamud, attached to the letter of
24  Exhibit 32 is an appendix. What is this an
25  appendix of?

---

Page 248

1        MR. BECKER: Objection. The document
2   speaks for itself.
3        THE WITNESS: It is a listing of standards
4   incorporated by reference, which I obtained by
5   looking at the National Institute of Standards and
6   Technology database of standards incorporated by
7   reference.
8   BY MR. HUDIS:
9        Q. And was this a list of standards that
10  Public.Resource was asking NARA to provide?
11       MR. BECKER: Objection. The document
12  speaks for itself.
13       THE WITNESS: Yes. This is standards
14  incorporated by reference, and this was a FOIA
15  request for all standards incorporated by
16  reference.
17  BY MR. HUDIS:
18       Q. And you were asking that NARA provide these
19  standards incorporation by reference pursuant to a
20  fee waiver?
21       MR. BECKER: Objection. The document
22  speaks for itself; mischaracterizes -- potentially
23  mischaracterizes prior testimony.
24       THE WITNESS: There was a fee waiver, but
25  there was also an offer to pay funds as well. So

---

Page 249

1   there was -- this is a standard FOIA request in
2   which you say, "I'm willing to pay a certain amount
3   of money. If it costs more than that amount of
4   money, please contact me." And by the way, this is
5   also in the public interest.
6   BY MR. HUDIS:
7        Q. Where in --
8        A. On Bates number 10156, the section
9   limitation of fees. "If you decide that we qualify
10  neither as news media or for a public interest fee
11  waiver, we agree to pay fees up to a maximum of
12  $5,000. If $5,000 is not sufficient," and it goes
13  on to say, "please provide a partial response with
14  $5,000 worth of documents."
15       Q. So you were willing to pay up to $5,000 to
16  procure the standards listed on appendix A?
17       MR. BECKER: Objection. Mischaracterizes
18  prior testimony; vague and ambiguous; misleading.
19       THE WITNESS: It says "$5,000 worth of
20  documents." So as to how many documents that would
21  end up being, we don't know. And since FOIA didn't
22  grant the FOIA request -- NARA didn't grant the
23  FOIA request, it's really moot.
24  BY MR. HUDIS:
25       Q. And on page 10167 of Exhibit 32, is the

---

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                        May 12, 2015
San Francisco, CA

Page 250

1   1999 edition of the standards one of the documents
2   you were asking NARA for?
3          MR. BECKER:  Objection.  The document
4   speaks for itself.
5          THE WITNESS:  10167?  Is that the right
6   number?
7   BY MR. HUDIS:
8      Q.  Yes, sir.
9      A.  Because I'm not seeing a 10167.  I'm
10  looking here to see if it's someplace else.  Can
11  you direct me to where on that page?
12     Q.  It's the equivalent of appendix A, page 10.
13     A.  I'm on that page.  I'm just not seeing it.
14  I'm sorry.  I may be missing it.
15     Q.  Do you see --
16     A.  I see a bunch of ANSI.
17     Q.  Keep going.
18     A.  AOAC, the officials methods.  APA.  Oh, I
19  see.  It's listed under APA.  That's because the
20  NIST database listed it under the American
21  Psychological Association.  Yes, I do see -- in
22  fact, see the standards at issue here.
23     Q.  All right.  So just so we have a clean
24  record, and on page 10167 of Exhibit 32, is the
25  1999 edition of the standards one of the documents

Page 251

1   you were asking NARA for?
2          MR. BECKER:  Objection.  Misstates prior
3   testimony; the document speaks for itself; asked
4   and answered; vague.
5          THE WITNESS:  The standards at issue are,
6   in fact, listed on page 10 of appendix A of my FOIA
7   request.
8   BY MR. HUDIS:
9      Q.  Which is the equivalent of production
10  page --
11     A.  10167.
12     Q.  Thank you, sir.
13        (PLAINTIFFS' EXHIBIT 33 WAS MARKED.)
14  BY MR. HUDIS:
15     Q.  So, Mr. Malamud, I show you Exhibit 33,
16  which has been -- Exhibit 33, which bears
17  production numbers PROAERA 10247 through 10249.
18        Do you recognize the document?
19     A.  It appears to be the response from the
20  Office of the Federal Register to my FOIA request.
21     Q.  So Exhibit 33 is the response to your
22  letter of Exhibit 32?
23     A.  Yes.
24     Q.  Do you have any reason to doubt the
25  authenticity of Exhibit 33?

Page 252

1      A.  I do not.
2      Q.  Mr. Malamud, I'm looking now at
3   Mr. Mosley's letter of Exhibit 33.  And I draw your
4   attention to the third paragraph, the last sentence
5   in that paragraph.
6          "While the standards themselves are not set
7   out in their entirety in the CFR text, there was
8   enough information set out in the regulation text
9   that affected parties can obtain or inspect these
10  standards in order to comply with the regulation."
11        Do you agree with that statement, with
12  respect to the 1999 standards?
13        MR. BECKER:  Objection.  Potentially seeks
14  legal conclusion; argumentative; lacks foundation.
15        THE WITNESS:  No, I do not believe that
16  there is enough information set out in the CFR
17  text.  I believe one would need to consult the
18  standards at issue in order to understand what they
19  specify.
20        MR. BECKER:  I'm sorry, are we going off
21  the record?
22        MR. HUDIS:  He has to.  We've got five
23  minutes left.
24        THE VIDEOGRAPHER:  This marks the end of
25  Disc 3, Volume 1 in the deposition of Carl Malamud.

Page 253

1          The time is 4:23 and we are off the record.
2          (Recess taken.)
3          THE VIDEOGRAPHER:  This marks the beginning
4   of Disc 4, Volume 1 in the deposition of Carl
5   Malamud.
6          The time is 4:33, and we are on the record.
7   BY MR. HUDIS:
8      Q.  Mr. Malamud, I'm referring you to Exhibit
9   33, page 10247 at the bottom.  And in his letter to
10  you, Mr. Mosley says, "Contrary to your
11  suggestions, there is no federal law, regulation or
12  presidential memorandum that requires the standards
13  incorporated by reference to be set out in full
14  text in the CFR or posted verbatim on the National
15  Archives and Records Administration, NARA,
16  website."
17        Mr. Malamud, do you agree or disagree with
18  that statement?
19     A.  I disagree with that statement.
20     Q.  Why?
21     A.  There are certainly a series of
22  presidential memoranda having to do with the
23  availability of government information.  President
24  Obama has been extremely aggressive in his
25  open-government platform in a series of memoranda

64  (Pages 250 to 253)

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 254

1    on availability of documents.
2         In terms of federal law, I believe very
3    strongly that it is a long-standing public policy
4    in the United States that the law has no copyright.
5    That goes back to the decision of Wheaton v.
6    Peters.
7         Again, I'm not a lawyer, but I have read
8    fairly extensively on this very specific topic, and
9    I believe if you look at everything from
10   supreme court decisions to U.S. Copyright Office
11   policy, it's very clear that the law has no
12   copyright and must be available to citizens to
13   inform themselves as to their rights and their
14   obligations.
15        Q. Another comment that -- or another
16   statement that Mr. Mosley made in his letter of
17   Exhibit 33, you already said you disagreed with.
18   "There is enough information set out in the
19   regulation text that affected -- that affected
20   parties can obtain or inspect these standards in
21   order to comply with the regulation."
22        And you said you disagreed with that;
23   correct?
24        A. That is correct.
25        Q. Why do you disagree with that statement?

Page 255

1         MR. BECKER: Objection to the extent that
2    calls for a legal conclusion.
3         THE WITNESS: Because I believe the
4    standards incorporated by reference are integral
5    parts of the documents, of the Code of Federal
6    Regulations. And one cannot understand the Code of
7    Federal Regulations based on a very brief summary.
8    One needs to actually read the text.
9    BY MR. HUDIS:
10        Q. That's not what Mr. Mosley is saying here.
11   He says that "There is enough information set out
12   in the regulation text that affected parties can
13   obtain or inspect these standards in order to
14   comply with the regulation."
15        A. I believe the provisions to obtain them are
16   difficult. They involve high costs and
17   restrictions on use. I believe the inspection
18   facility provided by the National Archives and
19   the -- the regulatory agencies doing the
20   incorporation, are not nearly adequate.
21        One has to travel to Washington D.C. with a
22   roll of quarters in your pocket to -- to inspect
23   the documents. That's just not the way one needs
24   to make the law available in this day and age.
25        MR. BECKER: I'll instruct the witness to

Page 256

1    wait for a question to be asked by counsel.
2         THE WITNESS: Yes.
3    BY MR. HUDIS:
4         Q. Mr. Malamud, at the end -- well, it's not
5    the end. On page 10248 of Exhibit 33 at the
6    bottom, Mr. Mosley says in his letter to you,
7    "Although many of our library holdings are in the
8    public domain as products of employees or agents of
9    the federal government, some documents incorporated
10   by reference do or may have copyright protection.
11   You are responsible for obtaining any necessary
12   permission for use, copying and publication from
13   copyright holders and for -- and for any other
14   applicable provisions of the Copyright Act." And
15   he cites Title 17 of the United States code.
16        Do you agree or disagree with that
17   statement?
18        MR. BECKER: Objection. Calls for a legal
19   conclusion. Objection. Form.
20        THE WITNESS: It says, "some documents
21   incorporated by reference do or may have copyright
22   protection." It is my understanding that the law
23   in the United States has no copyright. It is owned
24   by the people. Not by the government agencies.
25   BY MR. HUDIS:

Page 257

1         Q. So the moment any standard is incorporated
2    by reference into a federal regulation, it loses
3    its copyright protection; is that correct,
4    according to your view?
5         MR. BECKER: Objection. Calls for a legal
6    conclusion. Objection. Argumentative. Objection.
7    May misstate prior testimony.
8         THE WITNESS: I think words like "loses its
9    copyright" are loaded. I do believe that the Code
10   of Federal Regulations has no copyright. It's a
11   law. And that standards incorporated by reference
12   into the Code of Federal Regulations are an
13   integral part of the code and therefore have no
14   copyright.
15   BY MR. HUDIS:
16        Q. Mr. Malamud, once you procured the 1999
17   standards in May of 2012, what, if anything, did
18   you do with them?
19        MR. BECKER: Objection. Form.
20        THE WITNESS: I examined the standard to
21   determine that it was, in fact, the document that
22   was specified and incorporated by reference.
23   BY MR. HUDIS:
24        Q. What else did you do with the standards
25   once you had them?

65 (Pages 254 to 257)

Carl Malamud                                                    May 12, 2015
                        San Francisco, CA

Page 258

1      A. I scanned the standard and turned it into a
2  PDF file.
3      Q. So I would like to draw your attention back
4  to Exhibit 29, which is the interrogatory answers.
5  And I draw your attention to interrogatory answer
6  number 3 at the bottom of page 5 in Exhibit 29. Do
7  you see that?
8      A. Yes, I see that.
9      Q. All right. Now, do you see
10 Public.Resource's answer that starts at the bottom
11 of page 5 and continues on page 6?
12     A. I do.
13     Q. Does this interrogatory answer accurately
14 state what you did with the 1999 standards once you
15 procured them?
16     MR. BECKER: Objection. Form.
17     THE WITNESS: It does.
18 BY MR. HUDIS:
19     Q. All right. So as I understand, you
20 disassembled the book; correct?
21     A. Mm-hm.
22     MR. BECKER: Objection. Form.
23 BY MR. HUDIS:
24     Q. You removed the spine and any other
25 extraneous materials. You trimmed the document.

Page 259

1  Do you see that?
2      A. I do.
3      Q. All right. And then you scanned it on a
4  Xerox 4250 scanner at 30 or 40 dots per inch. Do
5  you see that?
6      A. At 300 or 400 dots per inch. Yes, I do.
7      Q. And then you named the file
8  AERA.standards.1999.PDF?
9      A. That's correct.
10     Q. Now, the book that you got from the
11 reseller on Amazon, you said it was a used book?
12     A. I really don't recall if it was used or
13 new.
14     Q. Did you check the quality of the pages of
15 the book before you scanned them?
16     A. Yes, I did.
17     Q. Did you notice -- did you compare your
18 copy -- your procured copy of the 1999 standards to
19 a new version of the standards?
20     MR. BECKER: Objection. Vague and
21 ambiguous; possibly misleading and misstates the
22 testimony.
23     THE WITNESS: So again, I'm not sure
24 whether it was new or used. I simply have no
25 recollection. I know I was able to obtain it on

Page 260

1  the Amazon Marketplace.
2      What was the rest of your question?
3  BY MR. HUDIS:
4      Q. Did you compare the used version that you
5  procured with a new version of the standards?
6      MR. BECKER: Same objections.
7      THE WITNESS: So again, I'm not sure if it
8  was a used or a new. Did I compare it to another
9  copy of the standards?
10 BY MR. HUDIS:
11     Q. Correct.
12     A. No, I did not.
13     Q. And in interrogatory answer number 3 you
14 talk about a quality check process. Could you tell
15 me what that quality check process was?
16     A. In the case of a scan, making sure all the
17 pages are there and that the scan was successful.
18     Q. Did you check to make sure all the pages
19 were there?
20     A. I believe I did, yes.
21     Q. And then you say, "The files are post
22 process to optimize the scan and to generate
23 optical character recognition on the text."
24     Did you do that?
25     A. Yes, I believe I did.

Page 261

1      Q. And then it says, "Public.Resource then
2  double checks the IBR." That's incorporation by
3  reference?
4      A. That's correct.
5      Q. "The incorporation by references, puts a
6  cover sheet on the files and stamps metadata into
7  the headers."
8      What kind of metadata did you stamp into
9  the headers?
10     A. I have not examined the AERA standard
11 recently, but the normal practice is to stamp in
12 the name of the standard and possibly the CFR site
13 that we have there. And the name of the original
14 publisher, I believe, was also in the metadata.
15     Q. Did you or anyone on Public.Resource's
16 behalf use graphic design web tools to post the
17 1999 standards to the Internet?
18     MR. BECKER: Objection. Compound.
19 Objection. Vague.
20     THE WITNESS: I created the cover sheet,
21 the certificate of incorporation using graphic
22 design tools. I did not apply any graphic design
23 tools to the core document, because it was simply a
24 scan.
25     (PLAINTIFFS' EXHIBIT 34 WAS MARKED.)

66 (Pages 258 to 261)

Carl Malamud                                                    May 12, 2015
                         San Francisco, CA

Page 262

1    BY MR. HUDIS:
2        Q.  Mr. Malamud, I show you a document that has
3    been marked as Exhibit 34, bearing production
4    numbers AERA_APA_NCME 31528 through 31738.
5            Do you recognize this document?
6        A.  It appears to be a copy of the standards at
7    issue with the certificate of incorporation on the
8    top.
9        Q.  All right.  And is this the cover sheet
10   that you appended on top of the 1999 standards
11   posted on Public.Resource's website?
12       A.  Yes, it appears to be.
13       Q.  Who prepared this cover sheet?
14       A.  I did.
15       Q.  And who chose the language for the cover
16   sheet?
17       A.  I did.
18       Q.  What was your intention, Mr. Malamud, for
19   appending this cover sheet of Exhibit 34 on top of
20   the 1999 standards posted on Public.Resource's
21   website?
22       A.  I wanted to be very clear that this was a
23   posting of a standard incorporated by reference
24   into the Code of Federal Regulations.  I wanted to
25   place this document in context.

Page 263

1        Q.  And what was your purpose on the cover
2    sheet of using the medallion that had the word
3    "Repeatedly Approved."
4        A.  To signify that the executive director of
5    the Office of the Federal Register had explicitly
6    and deliberately approved this incorporation by
7    reference.
8        Q.  We just went through the process that you
9    used.  We asked you the question, did you digitize
10   or convert to a digital format the 1999 standards,
11   and we went through that process.
12           My question is, who participated in the
13   process of disassembling the paper version of the
14   1999 standards, scanning them and processing them,
15   as you described here in interrogatory answer
16   number 3 and posting them to the Internet?
17       MR. BECKER:  Objection.  Compound.
18       THE WITNESS:  That was me.
19   BY MR. HUDIS:
20       Q.  Did Point.B Studio participate in this
21   process?
22       A.  No.
23       Q.  Did Rebecca Malamud participate in this
24   process?
25       A.  She did not.

Page 264

1        Q.  Did HTC Global participate in this process?
2        A.  They did not.
3        Q.  Did anyone else besides yourself
4    participate in this process?
5        A.  It's just me.
6        Q.  I'd like you to look in Exhibit 29,
7    interrogatory answer number 4 on page 6.
8            So consistent with your -- your prior
9    testimony, does this interrogatory answer number 4
10   in Exhibit 29 accurately identify all the persons
11   and entities who were involved in disassembling the
12   paper version of the 1999 standards, scanning them,
13   processing them and posting them to the Internet?
14       MR. BECKER:  Objection to form.
15       THE WITNESS:  Yes, it was me.
16   BY MR. HUDIS:
17       Q.  I just want to go a little bit into depth
18   about quality control.
19           So what quality control procedures did you
20   use to ensure the quality of the textual comment --
21   content of the 1999 standards that you posted to
22   the Internet?
23       MR. BECKER:  Objection.  Vague.
24       THE WITNESS:  This is a scan of a document.
25   BY MR. HUDIS:

Page 265

1        Q.  Mm-hm.
2        A.  It's a pixel-by-pixel replication of what
3    was on the printed page.
4        Q.  I'll be more specific.
5            Did you check for missing or incorrectly
6    scanned pages?
7        A.  I believe I did.
8        Q.  Did you check for pages that may have had
9    blurred text?
10       A.  I believe I did.
11       Q.  Now, you say, "I believe I did."  Do you
12   know for sure that you did?
13       A.  My standard procedure is to do those
14   things.  I don't know this specific document simply
15   because I don't recollect back to that period in
16   May 2012.  So I can't testify under oath that I
17   did, in fact, do that.  But that certainly is my
18   standard procedure.
19       Q.  Mr. Malamud, what is search engine
20   optimization?
21       A.  Search engine optimization is a technical
22   term of art that has to do with how documents that
23   are on a web server show up in search engine
24   results.
25       Q.  Please continue.

67 (Pages 262 to 265)

Carl Malamud                                                      May 12, 2015
San Francisco, CA

Page 266

1      A.  In particular with the PDF document, what
2  you want in a search engine result is rather than,
3  for example, a snippet of OCR, you want the actual
4  title of the document to show up in a description.
5  It's what Google would cause a snippet.
6      So by embedding metadata in the header of
7  the PDF file, the attempt is to make sure that that
8  document title shows up in the search engine
9  results so people know what that document is.
10     Q.  So, Mr. Malamud, did you check the metadata
11 you added to the PDF file comprising the 1999
12 standards for search engine optimization?
13     A.  Well, when I created the script that embeds
14 the metadata in the header, I had in mind search
15 engine optimization.
16     So assuming I did my job right, and
17 remember search engines change over time.  So if
18 you did something in one period of time, that
19 doesn't necessarily mean that a search engine will
20 react the same way later on.
21     But assuming that I wrote that initial
22 script properly, then this document would have
23 shown up in a meaningful fashion in search engine
24 results.
25     Q.  And your answer just now said, "assuming."

Page 267

1  You don't know for sure with respect to this
2  particular document?
3      A.  I don't recollect looking at this document
4  in Google or Bing or other search engine results to
5  determine that fact.
6      Q.  Did you check the quality of the optical
7  character recognition process for accuracy for the
8  1999 standards?
9      MR. BECKER:  Objection.  Form.
10     THE WITNESS:  Hold on a second.  I'd like
11 to double-check something.
12     OCR is inherently prone to certain errors.
13 And what I used was the best available OCR that I
14 had, which was in Adobe Acrobat Pro.  But I did not
15 pull up the underlying text.  The underlying OCR
16 text is used to search a file; not to read a file.
17     Does that answer your question?
18 BY MR. HUDIS:
19     Q.  So in doing a quality check of the optical
20 character recognition process for accuracy, did you
21 attempt to pull up the underlying text after the
22 scan was completed?
23     A.  No.
24     MR. BECKER:  Objection.  Form.
25     THE WITNESS:  No.  And I never said that I

Page 268

1  did do that on a consistent basis.  It's not part
2  of our normal workflow, no.
3  BY MR. HUDIS:
4      Q.  Was the PDF file of the 1999 standards that
5  you created ever converted from PDF to any other
6  format before posting to the Internet?
7      MR. BECKER:  Objection.  Form.
8      THE WITNESS:  I don't think so.
9  BY MR. HUDIS:
10     Q.  So the 1999 standards that you scanned and
11 creed a PDF file, was it ever converted to JPEG?
12     MR. BECKER:  Objection.  Form.
13     THE WITNESS:  I'm not sure what that means.
14 BY MR. HUDIS:
15     Q.  Was it converted from PDF format to a JPEG
16 format?
17     MR. BECKER:  Same objection.
18     THE WITNESS:  I don't think that would make
19 any sense on a document like that.  You'd end up
20 with, you know, a couple hundred JPEG files.
21     No.  I certainly wouldn't have done that.
22 BY MR. HUDIS:
23     Q.  Okay.  Did you convert it to SBG format?
24     A.  No.  That wouldn't make any sense at all.
25     Q.  And would you have any -- would you have

Page 269

1  had any reason to convert the PDF file of the 1999
2  standards to a MathML format?
3      MR. BECKER:  Objection.  Form.
4      THE WITNESS:  I don't -- well, first of
5  all, MathML is embedded in an HTML file.
6      And second of all, at least to the best of
7  my recollection, I don't think there's any
8  mathematical formulas in the standards at issue.
9  BY MR. HUDIS:
10     Q.  So that brings me to my next question.
11     Was the PDF file that you created from the
12 1999 standards ever converted to HTML format?
13     MR. BECKER:  Objection.  Form.
14     THE WITNESS:  No, we didn't do that.
15 BY MR. HUDIS:
16     Q.  Was the PDF file of the 1999 standards that
17 you created ever converted from PDF to a format
18 making the standards accessible to the visually
19 impaired?
20     MR. BECKER:  Objection.  Form.  Objection.
21 Competence; lacks foundation and assumes facts not
22 in evidence.
23     THE WITNESS:  The OCR procedure does, in
24 fact, make the document accessible to the visually
25 impaired.

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                           May 12, 2015

San Francisco, CA

Page 270

BY MR. HUDIS:
    Q.  In what way?
    A.  A screen reader is able to read the
underlying text, granted with potential OCR errors,
but the vast majority of the text is accessible to
those that are visually impaired.
    Q.  Are you familiar with the format,
refreshable Braille?
    A.  No, I'm not.
    Q.  Did you convert the PDF file of the 1999
standards that you made to refreshable Braille
format?
    A.  We don't do that.  We convert to HTML.
    Q.  Did -- and you didn't convert --
    A.  So no.  No is the answer.
    Q.  All right.  And you didn't convert the PDF
file to HTML either?
    A.  This particular standard, no, we did not.
    Q.  Okay.  And did you convert the PDF file
that you created from the 1999 standards to large
print?
        MR. BECKER:  Objection.  Form.
        THE WITNESS:  It is an unencumbered PDF,
and so a viewer can, in fact, magnify the text that
is there.

Page 271

So in that sense, large print, we did not
retype the documents into a large print edition.
BY MR. HUDIS:
    Q.  Mr. Malamud, do you have any materials in
your -- in Public.Resource's possession documenting
the process you went through of disassembling the
paper version of the 1999 standards, scanning them,
processing them and posting them to the Internet?
        MR. BECKER:  Objection.  Compound.
        THE WITNESS:  No, there's no intermediate
process.  That's a book and then it gets scanned.
        THE REPORTER:  Did you say "there's no
intermediate product"?
        THE WITNESS:  Intermediate process.
BY MR. HUDIS:
    Q.  Mr. Malamud, once you converted the 1999
standards from paper to the PDF format, what did
you do with the contents of the file?
    A.  I posted the file to Law.Resource.Org and
to the Internet Archive.
    Q.  Mr. Malamud, could you please return your
attention to Exhibit 29, interrogatory answer
number 2.
    A.  Okay.
    Q.  Does interrogatory answer number 2

Page 272

accurately state when and where you posted the 1999
standards to the Internet?
    A.  It does.
    Q.  And what was the date that you posted the
standards to the Internet?
        MR. BECKER:  Objection.  Form.
        THE WITNESS:  As our interrogatory says,
July 11, 2012 on Law.Resource.Org and ...
BY MR. HUDIS:
    Q.  All right.  And --
    A.  Yeah.
    Q.  And as you said, you posted the standards
to Law.Resource.Org, and you also posted the
standards to the Internet Archive; correct?
    A.  That is correct.
    Q.  Mr. Malamud, what is the name of the
Public.Resource web server to which you saved the
file containing the contents of the 1999 standards?
    A.  Law.Resource.Org.
    Q.  That's the name of the server?
    A.  Yes.
        MR. BECKER:  Please give me time to object.
        MR. HUDIS:  I'm sorry.
        THE WITNESS:  That was my fault.
        MR. HUDIS:  I don't want to be rude,

Page 273

Counsel, seriously.  Okay.
BY MR. HUDIS:
    Q.  Is the file containing the 1999 standards
still saved on that web server?
        MR. BECKER:  Objection.  Vague and
ambiguous; assumes facts not in evidence.
        THE WITNESS:  It is not in the document
tree of the web server, no.
BY MR. HUDIS:
    Q.  Do you still have that file still saved
somewhere within Public.Resource's computer
systems?
    A.  Yes, I do.
    Q.  Where?
    A.  One copy on my desktop.  One copy in the
not published directory.  I don't know what the
exact name of it is.  Someplace on our server, but
it's a private area that's not accessible to -- to
anybody but myself and our systems administrator.
    Q.  Mr. Malamud, does Public.Resource have any
logs from its web servers documenting the date on
which the 1999 standards were posted to
Public.Resource's website?
        MR. BECKER:  Objection.  Vague and
ambiguous.  Objection.  Lacks foundation.  And

Carl Malamud                                                    May 12, 2015

San Francisco, CA

---

Page 274

1   assumes facts not in evidence.
2       THE WITNESS: There's no logs, but there
3   was a file creation date on the file.
4   BY MR. HUDIS:
5       Q. Has any documentation noting the file
6   creation date ever been produced to us?
7       A. I don't know.
8       MR. HUDIS: Counsel, if that document has
9   not been provided to us, it should be provided to
10  us now.
11      THE WITNESS: So the file creation date was
12  the date that the standard was posted. And when at
13  your request we removed that standard and replaced
14  it with a stub, that's going to be the new creation
15  date. So I don't believe there's going to be a
16  record.
17  BY MR. HUDIS:
18      Q. What about the old creation date when the
19  original standards file was -- was posted to your
20  web server?
21      A. I moved it to a different area. I mean,
22  you can make the request and we'll go look and see
23  if that's there, but it's --
24      Q. Thank you, Mr. Malamud, I appreciate that.
25      Did you post the entirety of the 1999

---

Page 275

1   standards to Public.Resource's website?
2       A. Yes.
3       Q. Mr. Malamud, as it pertains to the Internet
4   Archive, what is a collection?
5       MR. BECKER: Objection. Asked and
6   answered.
7       THE WITNESS: A collection is a set of
8   items that often have a common theme.
9   BY MR. HUDIS:
10      Q. And you said you posted the 1999 standards
11  to Internet Archive's website; correct?
12      A. That is correct.
13      Q. And did you post the entirety of the 1999
14  standards to Internet Archive's website?
15      A. I did.
16      Q. Under which collection at the Internet
17  Archive did you post the 1999 standards?
18      MR. BECKER: Objection. Form.
19      THE WITNESS: The current name of that
20  collection is Codes of the World.
21  BY MR. HUDIS:
22      Q. How did you choose this particular
23  collection to which to post the 1999 standards?
24      A. It's the --
25      MR. BECKER: Objection. Assumes facts not

---

Page 276

1   in evidence.
2       THE WITNESS: It's the collection I created
3   to hold the standards incorporated by reference.
4   BY MR. HUDIS:
5       Q. All right. So you created the Codes of the
6   World collection on Internet Archive's website?
7       A. I did.
8       Q. Mr. Malamud, I show you what was previously
9   marked at Internet Archive's deposition in this
10  case as Butler Exhibit 6.
11      Do you see that?
12      A. I do. Let me correct a misstatement. It
13  wasn't called Codes of the World. It was called
14  Global Public Safety Codes is the name of the
15  collection.
16      Q. And what types of materials did you post to
17  the Global Public Safety Codes collection on
18  Internet Archive?
19      A. Standards incorporated by reference in the
20  law.
21      Q. Do you recognize Butler Exhibit 6?
22      A. This is a document you created?
23      Q. It's a document we printed from the
24  Internet Archive.
25      A. This appears to be a series of screen dumps

---

Page 277

1   from that item in which you are paging through the
2   standards at issue, is what this appears to be.
3       Q. That's exactly correct. And you just saved
4   me about five minutes of explanation.
5       A. Oh, sorry about that.
6       Q. That's fine. Thank you very much,
7   Mr. Malamud.
8       What is the web tool, if you know, that
9   creates the ability for a user to turn the pages of
10  the 1999 standards like a book?
11      MR. BECKER: Objection. Vague and
12  ambiguous; confusing.
13      THE WITNESS: I have heard it called book
14  reader, but I don't know the details of what the
15  code is or how it's embedded or anything of that
16  sort.
17  BY MR. HUDIS:
18      Q. So you've heard it referred to as a book
19  reader application?
20      A. Yes.
21      Q. All right. Have you ever heard of a DjVu
22  Reader?
23      A. Yes, I have.
24      Q. And what -- what is its function, to the
25  best of your knowledge?

---

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                          May 12, 2015
San Francisco, CA

| Page 278 | Page 280 |
|---|---|

**Page 278**

1      A.  DjVu is another format for creating
2  documents, and a DjVu Reader is one that enables
3  one to page through a document in a DjVu format.
4      Q.  When you posted the 1999 standards --
5  skip -- strike that.
6          Looking at Exhibit Butler 6, does this look
7  like the '99 -- 1999 standards --
8          MR. BECKER:  Objection.  Form.
9          MR. HUDIS:  I didn't finish.
10  BY MR. HUDIS:
11      Q.  -- were presented in page-turning format
12  using either book reader or DjVu Reader?
13          MR. BECKER:  Same -- same objection.
14          THE WITNESS:  Yeah, if this is the standard
15  Internet Archive screen, this is a PDF file that is
16  being used for the -- the page turning capability.
17  BY MR. HUDIS:
18      Q.  Now I'll continue with my next question.
19          When you posted the 1999 standards to the
20  Internet Archive website, did you input the
21  following information to go with the file?  And
22  I'll take them one at a time.  Author?
23      A.  I did.  That's actually a standard Internet
24  Archive field that I believe is required.
25      Q.  And did you input that information?

**Page 279**

1      A.  I did in the sense of the API call that
2  created this -- this item.
3      Q.  The API call is?
4      A.  API is application programming interface,
5  and it is a mechanism to write a command script
6  that talks to a remote system and creates an item,
7  in this case at the Internet Archive.
8      Q.  So when you use the API call to post the
9  1999 standards to the Internet Archive website, did
10  you input the information under author?
11          MR. BECKER:  Objection.  Form.
12          THE WITNESS:  Yes, although I believe in
13  the API call, it's called creator.  And the
14  Internet Archive images it as author.
15  BY MR. HUDIS:
16      Q.  And did you input the language for subject?
17      A.  I did.
18      Q.  Did you input the language for language?
19      A.  Yes.
20      Q.  Did you input the language for collection?
21      A.  I specified which collection this item
22  would be, and this field here is automatically
23  generated, I believe, by the Internet Archive.
24      Q.  Now, if you would please turn to the next
25  page of Exhibit Butler 6.

**Page 280**

1      Did you input the information for
2  identifier?
3      A.  Yes, I specified the identifier.
4      Q.  Did you input the information for the
5  credits?
6      A.  The phrase uploaded by Public.Resource.Org,
7  yes, I did.
8      Q.  Did you input the information for license
9  URL?
10      A.  Yes, I did.
11      Q.  And what was the purpose of you inputting
12  the URL for CreativeCommons.org?
13          MR. BECKER:  Objection.  Form.
14          THE WITNESS:  Any specification of
15  providence on the Internet Archive uses the
16  Creative Commons mechanism.
17  BY MR. HUDIS:
18      Q.  And what is the significance of using the
19  Creative Commons mechanism?
20          MR. BECKER:  Objection.  Vague and
21  ambiguous.
22          THE WITNESS:  In this case it's a Creative
23  Commons CC0 license.
24  BY MR. HUDIS:
25      Q.  What is a Creative Commons 0 license?

**Page 281**

1      A.  CC.
2          MR. BECKER:  Objection.  Vague and
3  ambiguous; may call for a legal conclusion.
4          THE WITNESS:  CC0, again, I'm not a lawyer,
5  is no rights asserted.  The creator of this
6  identifier is not asserting any rights over this
7  item.
8  BY MR. HUDIS:
9      Q.  And that would have been you?
10      A.  That's correct.
11      Q.  And did you insert the language for media
12  type?
13      A.  Yes, I specified in the API call that this
14  was a object of type text.
15      Q.  And did you insert the information for
16  identifier access?
17      A.  That's automatically generated based on the
18  name of the identifier.
19      Q.  And what is identifier ark?
20      A.  I have no idea.
21      Q.  Did you insert that information for
22  identifier ark?
23      A.  No, I don't know what that is.
24      Q.  In what format did you post the 1999
25  standards to the Internet Archive website?

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                      May 12, 2015

San Francisco, CA

---

Page 282

1      MR. BECKER: Objection. Form.
2      THE WITNESS: A PDF document.
3  BY MR. HUDIS:
4      Q. Did you post the 1999 standards to the
5  Internet Archive website in any other format?
6      A. The API call that created that item ID
7  uploaded a PDF file.
8      Q. When Public.Resource posts standards
9  incorporated by reference by a governmental agency
10  to one of its websites, is it Public.Resource's
11  policy to always post the same standard to a
12  collection on the Internet Archive website?
13      MR. BECKER: Objection. Vague and
14  ambiguous; may assume facts not in evidence.
15      THE WITNESS: Not always, but it's a
16  general practice.
17  BY MR. HUDIS:
18      Q. Turning back to Exhibit Butler 6. Please
19  turn to the first page, Mr. Malamud.
20      A. Okay.
21      Q. And I'd like you to look on the left-hand
22  side of the page. I'd like to know what the
23  following entries mean, if you know.
24      PDF 4.2 M?
25      A. Where does it say that?

---

Page 283

1      Q. To the very --
2      A. Oh, I see. I see what you're talking
3  about.
4      Q. All right. What does the entry PDF 14.2 M
5  mean?
6      A. 14.2 M is 14.2 megabytes.
7      And PDF is the item in PDF format. In this
8  case it's the one that I uploaded.
9      Q. And then the next entry is EPUB 335.4 K.
10  What does that entry mean?
11      A. It is the same item in EPUB format, which
12  is an e-book format.
13      Q. And what does the next entry mean here,
14  full text 6.86. -- I'll start again. 68 -- full
15  text 686.0 K. What does that mean?
16      MR. BECKER: Objection for
17  mischaracterizing the document.
18      THE WITNESS: That file is 686 kilobytes in
19  size. And the full text is derived from an OCR
20  process that the Internet Archive conducts on all
21  text items.
22  BY MR. HUDIS:
23      Q. And the next entry I believe is a shorthand
24  for DjVu. Do you understand that?
25      A. I do.

---

Page 284

1      MR. BECKER: Objection. Form.
2  BY MR. HUDIS:
3      Q. And so the next entry DjVu 8.2 M, what does
4  that mean?
5      A. It's the item in DjVu format 8.2 megabytes.
6      Q. And then what does -- what does it mean
7  when it says, "All files HTTPS"?
8      A. By clicking on that link, you can see all
9  the files in that item, such as the PDF file, the
10  EPUB file, but also a metadata file, for example.
11      Q. Besides Law.Resource.Org and Internet
12  Archive, did you post the 1999 standards to any
13  other website?
14      A. I did not.
15      Q. Mr. Malamud, in your opinion what value did
16  Public.Resource add to the 1999 standards by
17  disassembling the paper version, scanning it,
18  processing it, as you described in interrogatory
19  answer number 3, and posting the file to the
20  Internet?
21      MR. BECKER: Objection as compound -- the
22  question is compound; may misstate prior testimony;
23  vague and ambiguous.
24      THE WITNESS: The value we provided is to
25  make a document that was incorporated by reference

---

Page 285

1  under the Code of Federal Regulations available on
2  the Internet for people to read.
3  BY MR. HUDIS:
4      Q. For free?
5      MR. BECKER: Also object as argumentative
6  to that last question.
7  BY MR. HUDIS:
8      Q. For free?
9      A. We never charge for content.
10      Q. Mr. Malamud, did Public.Resource anticipate
11  incurring legal liability for posting the 1999
12  standards on the Internet?
13      MR. BECKER: Objection. I will instruct
14  the witness not to answer as to attorney-client
15  privileged communications. And moreover, object to
16  any legal conclusions.
17      THE WITNESS: We did not.
18  BY MR. HUDIS:
19      Q. Mr. Malamud, you scanned and posted the
20  1999 standards to the -- to the Internet, did you
21  consult with educational or psychological
22  professionals?
23      MR. BECKER: Objection as vague and
24  ambiguous; argumentative; potentially objection
25  towards competence.

---

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                    May 12, 2015
                              San Francisco, CA

Page 286

1        THE WITNESS:  No.
2   BY MR. HUDIS:
3        Q.  Before you scanned and posted the 1999
4   standards to the Internet, did you check the
5   records of the U.S. copyright Office to determine
6   whether the 1999 standards were registered?
7        MR. BECKER:  Objection.  Calls for -- it
8   may call for a legal conclusion.  Objection as to
9   being potentially misleading.  And objection as to
10  competence, and argumentative and lacks foundation.
11       THE WITNESS:  I did not.
12  BY MR. HUDIS:
13       Q.  Before you scanned and posted the 1999
14  standards to the Internet, did you consult with
15  counsel to determine whether the scanning and
16  posting of this work to the Internet would not be a
17  violation of U.S. copyright law?
18       MR. BECKER:  Objection.  I will instruct
19  the witness not to provide any information about
20  privileged communications between the witness and
21  counsel.
22       THE WITNESS:  I'm not going to discuss my
23  discussions with counsel.
24  BY MR. HUDIS:
25       Q.  Before you scanned and posted the 1999

Page 287

1   standards on the Internet, did you obtain
2   permission from either AERA, APA or NCME to do so?
3        MR. BECKER:  Objection.  Argumentative;
4   assumes facts not in evidence; may call for a legal
5   conclusion.
6        THE WITNESS:  I did not.
7        (PLAINTIFFS' EXHIBITS 35A-35B WERE MARKED.)
8   BY MR. HUDIS:
9        Q.  Mr. Malamud, do you recall giving a speech
10  at MIT entitled Yo! Your Honor in April of this
11  year?
12       A.  I do.
13       Q.  And who co-hosted your speech?
14       MR. BECKER:  Objection.  Assumes facts not
15  in evidence.
16       THE WITNESS:  It was the MIT Center for
17  Civic Media and the Laboratory for Social Machines.
18  BY MR. HUDIS:
19       Q.  Mr. Malamud, that speech was -- was made
20  available on the Internet.  We had it transcribed.
21  What I gave you was the text of the speech, and the
22  CD is the download of the audio and video, just so
23  you can -- you and your counsel can assure yourself
24  that the transcription was accurate.  I only have a
25  few questions for it.

Page 288

1        MR. BECKER:  And I'll just state an
2   objection that we are unable at this moment to view
3   the contents of this CD.  So we have no knowledge
4   as to what is actually on that CD, nor does the
5   deponent.
6        And also state an objection to the -- to
7   the extent that this document 35-A has been
8   transcribed by counsel for plaintiffs, and at
9   present we do not know whether it is accurate or
10  not.
11  BY MR. HUDIS:
12       Q.  Mr. Malamud, on Exhibit 35-A if you could
13  turn to page AERA -- well, let me just identify the
14  document.
15       Exhibit 35-A bears production numbers
16  AERA_APA_NCME 32036 through 32074.
17       Mr. Malamud, could you please turn to
18  production page 32039.
19       A.  Okay.  I want to note, however, that there
20  appears to be a large number of transcription
21  errors, but I'm on page 32039.
22       Q.  Thank you, Mr. Malamud.
23       In the middle of that page it says, "So we
24  did two things that were fairly significant in 2007
25  and 2008.  I began posting all the building codes

Page 289

1   for the country because these are the law.  These
2   are not advisory codes.  These are incorporated in
3   the law in all our states.  Things like the
4   national electric code, and I began posting those
5   and nothing happened."
6        What did you expect to happen?
7        MR. BECKER:  Objection again to the fact
8   that the witness has noted that there are
9   transcription errors in this document.  The
10  document may not accurately reflect what is
11  purported to be Mr. Malamud's April 7th speech.
12  And objection to the extent that this document
13  otherwise speaks for itself, and vague and
14  ambiguous; argumentative.
15       THE WITNESS:  If you look at the statement
16  that you read it says, "I began posting these and
17  nothing happened."  Nobody sent me take-down
18  notices, and there are copyright assertions on
19  these documents.  I dealt with that a little later
20  in the speech, if I remember right.
21       So nothing happened.  Nobody sent me
22  take-down notices.  And just as importantly, nobody
23  picked up the phone and called me up and said,
24  "Let's talk about these building codes."
25  BY MR. HUDIS:

                                          73  (Pages 286 to 289)

Carl Malamud                                                                    May 12, 2015
                                San Francisco, CA

| Page 290 |
| --- |

1         Q.  So continuing that same answer here as you
2    were talking with a moderator, going down lower on
3    the page it says, "And so I did that for a few
4    years and nothing much happened.  I began posting
5    all the safety standards that are required by law
6    at the federal level and the Code of Federal
7    Regulations.  And then the shit kind of hit the fan
8    on that one.  We got sued in two district court
9    cases by six plaintiffs, and we're currently in
10   court.  It's an intense legal battle."
11        Were you speaking of the AERA lawsuit and
12   the ASTM lawsuit?
13        A.  I was.
14        Q.  If you could turn to page -- production
15   page 32066 in Exhibit 35-A.
16        A.  Okay.
17        Q.  At the top of the -- at the top of the page
18   it says, "So to me it's about education.  But also
19   about justice and democracy and, you know, those
20   kinds of little things, because I think that's an
21   important thing in the United States.  We are
22   overly lawyered, and one of the reasons is you have
23   to be part of the guild in order to access the
24   material, and I've been doing this issue for a
25   while.  There are so many people that are

| Page 291 |
| --- |

1    non-lawyers that are intensely interested in the
2    operation of our system of justice, and I think
3    those people should have the same access as those
4    that are actually practicing inside."
5         Do you see that?
6         A.  I do.
7         Q.  What did you mean by "part of the guild"?
8         MR. BECKER:  Objection.  Same objections
9    concerning the authenticity of this document, as
10   well as the document speaking for itself; vague.
11        THE WITNESS:  I was discussing the PACER
12   system, first of all.  Not the standards at issue
13   or incorporation by reference.
14        I meant that there is a feeling within the
15   legal profession that the only people that need to
16   access the PACER system are those in the legal
17   profession, and I believe that feeling is misguided
18   and wrong.
19   BY MR. HUDIS:
20        Q.  Let's then return to the 1999 standards.
21        Do you know whether AERA, APA or NCME
22   restrict access to the 1999 standards?
23        MR. BECKER:  Objection.  To the extent that
24   any of Mr. Malamud's knowledge comes from
25   discussion with counsel, I will instruct him not to

| Page 292 |
| --- |

1    answer, as to any knowledge that he has that has
2    come from counsel.
3         Objection to the extent that this may call
4    for a legal conclusion.  Objection to the extent
5    that it's argumentative and vague and ambiguous.
6         THE WITNESS:  If by "restrict" you mean
7    impose conditions on people attempting to make
8    documents incorporated by reference in the law,
9    yes, I believe they do restrict.
10   BY MR. HUDIS:
11        Q.  In what way?
12        A.  You're suing me for having posted this
13   document that was incorporated by reference in the
14   law.  I think that's evidence of an attempt to
15   restrict that process.
16        Q.  Mr. Malamud, if the three plaintiffs that
17   have brought this lawsuit charged 50 or $60 for a
18   printed copy of the 1999 standards, do you believe
19   that is a restriction to the access of the 1999
20   standards by the public?
21        MR. BECKER:  Objection.  Misleading.
22   Objection.  Hypothetical; calls for speculation;
23   lacks foundation and assumes facts not in evidence
24   and argumentative.
25        THE WITNESS:  The issue is not whether the

| Page 293 |
| --- |

1    plaintiffs are charging $60 for purchasing a
2    printed copy.  The issue is whether the plaintiffs
3    are restricting the ability of Public.Resource to
4    make documents incorporated by reference into the
5    Code of Federal Regulations available to citizens
6    on the Internet.
7    BY MR. HUDIS:
8         Q.  Do you believe that charging $60 a copy for
9    the 1999 standards is a restriction on the public's
10   access to the 1999 standards?
11        MR. BECKER:  Objection.  Asked and
12   answered.  Objection.  Argumentative; calls for
13   speculation; assumes facts not in evidence.
14        THE WITNESS:  Charging $60 for a document
15   and only making it available on that basis,
16   certainly restricts the ability of citizens to
17   easily find and read that particular portion of the
18   Code of Federal Regulations.
19        (PLAINTIFFS' EXHIBIT 36 WAS MARKED.)
20   BY MR. HUDIS:
21        Q.  Mr. Malamud, I show you what's been marked
22   as Exhibit 36, bearing production numbers PROAERA
23   830 through PROAERA 837.
24        Do you recognize the document?
25        A.  I do.  It appears to be a copy of table 12

                                        74  (Pages 290 to 293)

Carl Malamud                                                           May 12, 2015
San Francisco, CA

---

Page 294

1    of the 12 tables.
2        Q. What are the 12 tables?
3        A. It is the directory, if you will, on
4    Law.Resource.Org to standards incorporated by
5    reference.
6        Q. Do you have any reason to doubt the
7    authenticity of Exhibit 36?
8        A. I do not.
9        MR. HUDIS: Counsel, can you stipulate that
10   Exhibit 36 is a business record of Public.Resource?
11       MR. BRIDGES: Well, I will respond to this.
12   You're saying Exhibit 36 as an -- as a directory is
13   a business record? I'm not -- I'm not clear what
14   the stipulation is that you're asking for.
15       MR. HUDIS: Yeah, so I just want to know,
16   this is a document that Mr. Malamud said he's
17   created during his work at Public.Resource. He's
18   identified the document as authentic. And I would
19   like to know if you can stipulate that Exhibit 36
20   is a business record of Public.Resource.
21       MR. BRIDGES: What -- what do you mean by
22   "business record" in this context?
23       MR. HUDIS: A business record under Federal
24   Rules of Evidence 8036.
25       MR. BRIDGES: Let me look at that rule.

---

Page 295

1        I don't think we're going to stipulate to
2    that. I don't think this is a record of a
3    regularly conducted activity.
4        MR. HUDIS: All right. Let me just ask
5    Mr. Malamud the questions.
6    BY MR. HUDIS:
7        Q. Mr. Malamud, did you create Exhibit 36?
8        A. I did.
9        Q. Okay. And did -- from what information did
10   you create Exhibit 36?
11       A. It is a record of correspondence with --
12   related to the Law.Resource.Org documents.
13       Q. And has this document been kept in the
14   regularly -- in the regular course of
15   Public.Resource's business?
16       MR. BECKER: Objection. Ambiguous;
17   possibly argumentative.
18       THE WITNESS: Yeah, I don't know regularly
19   kept. It was created at the end of December 2012,
20   and I have updated it on occasion.
21   BY MR. HUDIS:
22       Q. And making records of the type shown in
23   Exhibit 36 is a regular practice of
24   Public.Resource's business?
25       MR. BECKER: Objection. Vague and

---

Page 296

1    ambiguous; argumentative; lacks foundation.
2        THE WITNESS: Yeah, I don't know about a
3    regular practice, but in the case of letters
4    received and sent relating to Law.Resource.Org,
5    this is a place where I've posted some of that
6    correspondence.
7    BY MR. HUDIS:
8        Q. As Exhibit 36 was produced to us by your
9    counsel, we could not tell whether these columns
10   had any particular headings because it's all black.
11       Mr. Malamud, are there column heading
12   designations to this table of Exhibit 36?
13       A. I don't know. I would have to check. It
14   certainly doesn't appear to be so, however, from
15   the formatting. You'll notice that the text in the
16   column above that is in white, right. When there's
17   a dark header. So I don't know. I mean we can go
18   check. It's online.
19       Q. Let's take a break. Can you check that
20   online?
21       A. Well, I can't. I don't have a computer.
22   But you can if you'd like. Do you want me to give
23   you the URL?
24       Q. We'll check.
25       A. Okay.

---

Page 297

1        THE VIDEOGRAPHER: Take a break?
2        MR. HUDIS: Yes. Just so she can get
3    there.
4        THE WITNESS: Sure.
5        MR. BECKER: Off the record.
6        THE VIDEOGRAPHER: The time is 5:36 and we
7    are off the record.
8        (Recess taken.)
9        THE VIDEOGRAPHER: The time is 5:45, and we
10   are back on the record.
11   BY MR. HUDIS:
12       Q. Mr. Malamud, while we were on a break, we
13   checked the color version of Exhibit 36 on
14   Public.Resource's website, and could you please
15   tell us for the record what the column headings are
16   for the four columns of Exhibit 36?
17       A. The four columns are "Date," "RFC,"
18   "Initiator" and "Description."
19       Q. What does RFC refer to?
20       A. Request for comment.
21       Q. And that was -- and so the second column
22   labeled RFC, that is a request for comment from
23   whom to whom?
24       A. RFC is a term used in the Internet
25   Engineering Task Force for numbering documents.

---

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                                    May 12, 2015

San Francisco, CA

Page 298

1    And so it's simply a sequential numbering
2    mechanism.
3        Q. So other than the sequential numbering, RFC
4    has no other significance?
5        A. (Witness shaking head from side to side.)
6        MR. BRIDGES: Objection. Lacks foundation;
7    vague and ambiguous.
8        THE WITNESS: No, it's just a term I used.
9    BY MR. HUDIS:
10       Q. Okay. And the column labeled initiator,
11   what did you mean by initiator?
12       A. The organization that authored the
13   correspondence or other information that is listed
14   in the next column.
15       Q. And what information did you put in the
16   description column?
17       A. Well, it depends. If it was a -- a grayed
18   out section, it's a section divider. And then the
19   other components are individual documents.
20       Q. Overall, what did you collect in Exhibit
21   36?
22       MR. BRIDGES: Objection. Lacks foundation;
23   vague and ambiguous; argumentative.
24       THE WITNESS: Two things. One are blog
25   posts that are relevant to the Law.Resource.Org

Page 299

1    activities.
2    BY MR. HUDIS:
3        Q. And you say there was a second item?
4        A. Letters received from institutions having
5    to do with the Law.Resource.Org activities.
6        Q. Were some of these letters that were
7    received from institutions complaining about
8    Public.Resource posting standards incorporated by
9    reference on to its website?
10       MR. BRIDGES: Objection. Compound;
11   argumentative; vague and ambiguous.
12       THE WITNESS: Yes.
13   BY MR. HUDIS:
14       Q. And could you tell me what information is
15   provided in the row on page PROAERA 832 at the
16   bottom bearing the date 12/16/2013?
17       A. That was the take-down notice from AERA
18   regarding the standards at issue.
19       Q. The 1999 standards?
20       A. That's correct.
21       Q. Mr. Malamud, at some time after you posted
22   the 1999 standards to the Internet, did you remove
23   them from public view?
24       MR. BRIDGES: Objection. Lacks foundation;
25   vague and ambiguous.

Page 300

1        THE WITNESS: Yes.
2    BY MR. HUDIS:
3        Q. When did you do this?
4        MR. BRIDGES: Same objection.
5        THE WITNESS: I believe that would be June
6    2014. That date is specified in the interrogatory
7    answers.
8    BY MR. HUDIS:
9        Q. I was just going to direct you there.
10       So if you could go back to Exhibit 29.
11   Interrogatory answer number 2, page 5.
12       A. I'm here.
13       Q. All right. And so June 10, 2014 is when
14   you removed the 1999 standards from public view
15   from Law.Resource.Org and from the Internet
16   Archive?
17       MR. BRIDGES: Objection. Compound; lacks
18   foundation and all the other objections I gave to
19   the earlier question along this line.
20       THE WITNESS: That's correct.
21   BY MR. HUDIS:
22       Q. What, if anything, did you put in place of
23   the content of the 1999 standards on
24   Public.Resource's website once the standards were
25   removed?

Page 301

1        MR. BRIDGES: Objection. Vague and
2    ambiguous; lacks foundation.
3        THE WITNESS: I put what I call a stub
4    document, with the cover sheet and a single page
5    explaining the document had been removed from view.
6        (PLAINTIFFS' EXHIBIT 37 WAS MARKED.)
7    BY MR. HUDIS:
8        Q. Mr. Malamud, I show you what's been marked
9    as Exhibit 37 bearing production numbers PROAERA
10   822 through PROAERA 823.
11       Is this the stub document that you were
12   referring to?
13       A. It is.
14       Q. Do you have any reason to doubt the
15   authenticity of this document?
16       A. I do not.
17       MR. BRIDGES: Objection. Vague and
18   ambiguous; lacks foundation.
19       THE WITNESS: I do not.
20   BY MR. HUDIS:
21       Q. What was the purpose of posting this single
22   page where the content of the 1999 standards
23   previously was on Public.Resource's website?
24       MR. BRIDGES: I'm sorry. I -- it's
25   misleading; confusing question. I'll ask the court

76 (Pages 298 to 301)

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 302

1    reporter to reread it.  You may have misspoken.
2          MR. HUDIS:  No, it's mistranscribed.  I'm
3    going to ask it again, Counsel.  Thank you.
4          MR. BRIDGES:  I heard it the same way the
5    transcription.
6          MR. HUDIS:  Okay.
7    BY MR. HUDIS:
8          Q.  What was the purpose of posting this single
9    page where the content of the 1999 standards
10   previously was on the Public.Resource's website?
11         MR. BRIDGES:  Objection.  Vague and
12   ambiguous; lacks foundation.
13         THE WITNESS:  So anybody accessing that URL
14   knew that the document had been removed and it was
15   not a technical error.
16   BY MR. HUDIS:
17         Q.  When did you post this stub page to
18   Public.Resource's website?
19         A.  June 10th, 2014.
20         Q.  And on page 823 why did you use the word
21   "temporarily"?
22         MR. BRIDGES:  Objection.  Argumentative.
23         THE WITNESS:  Because it's pending the
24   resolution of this litigation.
25         MR. HUDIS:  Turning back to Exhibit 29,

Page 303

1    interrogatory number 2, the answer on page 5 of
2    Exhibit 29.
3          So June 10th, 2014 was the date that you
4    removed the 1999 standards from public view on
5    Public.Resource.Org's website and on Internet
6    Archive's website?
7          MR. BRIDGES:  I'm sorry, are you --
8    objection.  Are you asking him if that's what the
9    interrogatory says?
10         MR. HUDIS:  No, I'm asking him the date of
11   removal.
12         MR. BRIDGES:  I think it's asked and
13   answered.
14         THE WITNESS:  June 10th, 2014.  It's in the
15   interrogatory.
16   BY MR. HUDIS:
17         Q.  Mr. Malamud, do you know what a make-dark
18   command is?
19         MR. BRIDGES:  Objection.  Lacks foundation;
20   vague and ambiguous.
21         THE WITNESS:  Yes, although you need to
22   place that in context.  I mean, I have a general
23   impression of what you mean.
24   BY MR. HUDIS:
25         Q.  All right.  What is a make -- what is your

Page 304

1    understanding of a make-dark command?
2          MR. BRIDGES:  Objection.  Lacks foundation.
3          THE WITNESS:  Yeah, do you have a specific
4    instance of -- of that and I'd be happy to --
5    BY MR. HUDIS:
6          Q.  Sure.
7          A.  -- to talk about it.
8          Q.  Did you remove the 1999 standards from
9    public view on Internet Archive's website by
10   issuing a make-dark command to their server as a
11   registered user having administrative privileges to
12   do so?
13         MR. BRIDGES:  Objection.  Lacks foundation;
14   vague and ambiguous.
15         THE WITNESS:  I used the item manager, and
16   I pressed the make-dark button on that form.
17   BY MR. HUDIS:
18         Q.  All right.  All right.  And what is the
19   purpose of the make-dark button?
20         MR. BRIDGES:  Objection.  May lack
21   competence.
22         THE WITNESS:  It makes the document
23   inaccessible for public view.
24         (PLAINTIFFS' EXHIBIT 38 WAS MARKED.)
25   BY MR. HUDIS:

Page 305

1          Q.  Mr. Malamud, I show you a document that's
2    been marked Exhibit 38 bearing production number
3    PROAERA 824.
4          Do you recognize the document?
5          A.  I do.
6          Q.  What is this document of Exhibit 38?
7          A.  It is e-mail to the Internet Archive
8    informing them that I have made an item go dark.
9          Q.  Do you remember sending this e-mail of
10   Exhibit 38?
11         A.  I do.
12         Q.  And why did you send this e-mail to Alexis
13   Rossi at -- why did you send this e-mail to Alexis
14   Rossi on June 11, 2014?
15         A.  Alexis is responsible for the collections
16   on the Internet Archive.
17         Q.  And Alexis Rossi is an employee of Internet
18   Archive?
19         MR. BRIDGES:  Objection.  May lack
20   competence.
21         THE WITNESS:  She is.
22   BY MR. HUDIS:
23         Q.  And in your e-mail you carbon copy to
24   collections-service@Archive.org.
25         Why did you add this e-mail address as a cc

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                    May 12, 2015

San Francisco, CA

Page 306

1  in your e-mail to Alexis Rossi?
2      A. Because that's the proper address to inform
3  the Internet Archive about matters pertaining to a
4  collection.
5      Q. And what do you mean by matters relating to
6  a collection?
7      A. If you have technical problems with your
8  collection or other issues or problems, that would
9  be the address that you would write to.
10     Q. And at the end of this e-mail there's a
11 URL. Do you see that?
12     A. I do.
13     Q. And it ends with AERA.standards.1999?
14     A. I see that.
15     Q. All right. Is this the URL where you
16 posted the 1999 standards on Internet Archive's
17 website?
18     A. It is.
19     Q. Mr. Malamud, if Public.Resource succeeds in
20 this lawsuit brought by AERA and its co-plaintiffs,
21 will Public.Resource repost the 1999 standards on
22 its website?
23         MR. BRIDGES: Objection. Hypothetical.
24         THE WITNESS: I guess I'd have to read the
25 decision and make my determination based on that.

Page 307

1  BY MR. HUDIS:
2      Q. Well, if you're totally successful?
3          MR. BRIDGES: Again, hypothetical.
4          THE WITNESS: Our goal is to post all
5  standards incorporated by reference into the Code
6  of Federal Regulations. So yes.
7  BY MR. HUDIS:
8      Q. If Public.Resource is successful in this
9  litigation, how easy or difficult would it be for
10 you to repost the 1999 standards on
11 Public.Resource's website?
12         MR. BRIDGES: Hypothetical; lacks
13 foundation; assumes facts not in evidence; vague
14 and ambiguous; compound.
15         THE WITNESS: It wouldn't be difficult.
16 BY MR. HUDIS:
17     Q. If the next version of the Standards on
18 Educational and Psychological Testing, the 2014
19 version, is ever incorporated by reference by a
20 state or federal agency, will you post that version
21 of the standards to the Internet as well?
22         MR. BRIDGES: Objection. Hypothetical;
23 compound; vague and ambiguous.
24         THE WITNESS: I don't know.
25 BY MR. HUDIS:

Page 308

1      Q. How would you make that determination?
2          MR. BRIDGES: Objection. May call for
3  speculation; vague and ambiguous; argumentative.
4          THE WITNESS: I would want to look at the
5  specific nature of the incorporation by reference.
6  I would want to look at that specific standard, and
7  I'd want to make a determination if that was an
8  area that I wanted to continue to invest resources
9  in. So I don't know. It would depend on the
10 specifics.
11 BY MR. HUDIS:
12     Q. If you looked at the 2014 standards and
13 made a determination that it was an area in which
14 you wanted to continue to invest resources, if
15 Public.Resource is successful in this litigation
16 and the 2014 standards are incorporated by
17 reference by a state or federal agency, would you
18 post the 2014 standards to the Internet?
19         MR. BRIDGES: Entirely hypothetical; lacks
20 foundation; argumentative; vague and ambiguous.
21         THE WITNESS: So I really don't know about
22 the states.
23         If the federal government did a deliberate
24 and explicit incorporation by reference in what I
25 felt was a substantive rule, right, not an offhand

Page 309

1  thing, then I would certainly consider strongly
2  posting that document.
3  BY MR. HUDIS:
4      Q. What is -- what distinction do you make
5  between substantive and offhand?
6      A. I look for an explicit and deliberate
7  incorporation by reference.
8      Q. If I asked you this before, Mr. Malamud,
9  and certainly your counsel will tell me, I
10 apologize.
11         Even though the 1999 standards have been
12 removed from public view on Public.Resource's
13 website, is the digital file containing the text of
14 the 1999 standards still stored somewhere on
15 Public.Resource's computer systems?
16         MR. BRIDGES: Objection. Vague and
17 ambiguous.
18         THE WITNESS: Yes.
19 BY MR. HUDIS:
20     Q. Even though the 1999 standards were removed
21 from public view on Internet Archive's website, to
22 the best of your knowledge is the digital file
23 containing the text of the 1999 standards still
24 stored somewhere on Internet Archive's computer
25 systems?

78  (Pages 306 to 309)

Carl Malamud                                                    May 12, 2015
                            San Francisco, CA

---

Page 310

1       A. I do not --
2            MR. BRIDGES: Same objection. Vague and
3    ambiguous.
4            THE WITNESS: I don't --
5            MR. BRIDGES: And lacks foun -- I'm sorry.
6            THE WITNESS: I'm sorry.
7            MR. BRIDGES: And maybe competence and may
8    call for speculation.
9            THE WITNESS: I do not have access to that
10   document. And so I do not know.
11           (PLAINTIFFS' EXHIBIT 39 WAS MARKED.)
12   BY MR. HUDIS:
13       Q. Mr. Malamud, I show you what's been marked
14   as Exhibit 39 bearing production number
15   AERA_APA_NCME 5129.
16           Do you recognize this document?
17       A. I do.
18       Q. What is this document of Exhibit 39?
19       A. It is a take-down notice from John S.
20   Neikirk.
21       Q. I believe he pronounces it Neikirk.
22       A. I've never met the gentleman.
23       Q. Do you have any reason to doubt the
24   authenticity of Exhibit 39?
25           MR. BRIDGES: Objection. Lacks foundation.

---

Page 311

1            THE WITNESS: I do not.
2    BY MR. HUDIS:
3        Q. Do you recall receiving this e-mail from
4    Mr. Neikirk?
5        A. I do.
6        Q. When you received this e-mail from
7    Mr. Neikirk, do you know with which organization he
8    was affiliated?
9            MR. BRIDGES: Objection. You're asking
10   him -- sorry. Objection. Competence; may call for
11   speculation; lacks personal knowledge.
12           THE WITNESS: His signature line said
13   American Educational Research Association.
14   BY MR. HUDIS:
15       Q. And do you remember receiving this e-mail
16   of Exhibit 39 --
17       A. I do.
18       Q. -- from Mr. Neikirk?
19       A. I received this e-mail, yes.
20       Q. What did you do in response to
21   Mr. Neikirk's e-mail?
22           MR. BRIDGES: Objection. Argumentative;
23   lacks foundation.
24           THE WITNESS: I sent him a letter a couple
25   days later.

---

Page 312

1    BY MR. HUDIS:
2        Q. In either December 2013 or January 2014 did
3    you consult with counsel after receiving
4    Mr. Neikirk's e-mail?
5            MR. BRIDGES: Objection. That's --
6    contains the -- an implication that the
7    consultation would be regarding the e-mail.
8            Further, the question calls for
9    attorney-client privileged information. Objection.
10   I instruct the witness not to answer.
11   BY MR. HUDIS:
12       Q. In either December 2013 or January 2014 did
13   you remove the 1999 standards from public view
14   where you had posted them on the Internet?
15           MR. BRIDGES: Objection. Vague and
16   ambiguous; lacks foundation.
17           THE WITNESS: I did not.
18   BY MR. HUDIS:
19       Q. Did you reply to Mr. Neikirk's e-mail?
20           MR. BRIDGES: Objection. I think that's
21   asked and answered.
22           THE WITNESS: Yes, I did.
23           MR. BRIDGES: Vague and ambiguous and
24   argumentative.
25   BY MR. HUDIS:

---

Page 313

1        Q. Do you remember -- do you remember when you
2    responded to Mr. Neikirk's e-mail of Exhibit 39?
3        A. I believe it was on December 19th.
4            (PLAINTIFFS' EXHIBIT 40 WAS MARKED.)
5    BY MR. HUDIS:
6        Q. Mr. Malamud, I show you what has been
7    marked as Exhibit 40 bearing production numbers
8    AERA_APA_NCME 5127 through 5128.
9            Do you recognize Exhibit 40?
10       A. I do.
11       Q. Is Exhibit 40 your response to
12   Mr. Neikirk's e-mail of Exhibit 39?
13       A. It is.
14       Q. Is this your digital signature at the
15   bottom of the second page of the letter of Exhibit
16   39 on page 5128?
17           MR. BRIDGES: Objection. Misformed
18   question; lacks foundation.
19           THE WITNESS: It is.
20   BY MR. HUDIS:
21       Q. Did anyone --
22           MR. BRIDGES: Sorry, I'll ask the witness
23   to listen carefully to the question. That was a
24   question about Exhibit 39.
25           MR. HUDIS: Thank you, Counsel. I

---

                                    79 (Pages 310 to 313)

Carl Malamud                                                          May 12, 2015
                              San Francisco, CA

Page 314

1   appreciate it.
2   BY MR. HUDIS:
3       Q.  Is this your digital signature at the
4   bottom of the second page of the letter of Exhibit
5   40, page 5128?
6       A.  Yes, it is.
7       Q.  Did anyone help you write this letter of
8   Exhibit 40?
9           MR. BRIDGES:  Objection.  To the extent
10  this calls for an implicit revelation of
11  attorney-client communications, I would object on
12  the grounds that it's privileged, and I would
13  instruct the witness not to answer.  But only to
14  that extent.
15          THE WITNESS:  I'm not going to be able to
16  answer that question.
17  BY MR. HUDIS:
18      Q.  In the first paragraph of Exhibit 40 on the
19  first page, there is a word missing.  I believe it
20  should say, "I am in."  Do you see that?
21      A.  I do.
22      Q.  All right.  So I'm going to read the
23  sentence with the word "in" in it.
24          "Dear Mr. Neikirk, I am in receipt of your
25  communication of December 16 regarding the

Page 315

1   publication of the AERA publication standard for
2   Educational and Psychological Testing," in parens
3   1999, at
4   HTTPS//Law.Resource.Org/pub/US/US/IBR/001/AERA.
5   standards.1999.PDF."
6           "We are responsible for uploading this
7   document.  In addition, you will find this document
8   at HTTPS://archive.org/details/thegov.law.AERA.
9   standards.1999."
10          Do you see that?
11          MR. BRIDGES:  Objection.  Misquotes the
12  letter.
13          THE WITNESS:  I do.
14  BY MR. HUDIS:
15      Q.  Specifically in this first paragraph what
16  did you mean when you used the term "publication"
17  the first time it appears in the sentence?
18          MR. BRIDGES:  Objection to the extent it
19  may imply a legal conclusion or legal expertise or
20  opinion; vague and ambiguous.
21          THE WITNESS:  There's a couple typos in
22  this sentence.  I meant posting.
23  BY MR. HUDIS:
24      Q.  All right.  So when you used the term
25  publication, you meant posting?

Page 316

1       A.  In this sentence, yes.
2       Q.  What did you mean by "We are responsible
3   for uploading this document"?
4       A.  It meant that I was the person that
5   uploaded that document.
6       Q.  To where?  The two URLs in that paragraph?
7       A.  Yes, that's what the --
8           MR. BRIDGES:  Object.
9           THE WITNESS:  Sorry.
10          MR. BRIDGES:  Objection.  Lacks foundation;
11  vague and ambiguous.
12          THE WITNESS:  Yes.
13  BY MR. HUDIS:
14      Q.  If you could on Exhibit 40 please go on
15  page 5127 to the third paragraph.
16      A.  Okay.
17      Q.  And I will read the first sentence.  "While
18  the standards drafted by the American Educational
19  Research Association were entitled to copyright
20  protection when issued, once they were incorporated
21  into regulations, these standards became the law,
22  and thus, have entered the public domain."
23          Do you see that?
24      A.  I do.
25      Q.  What did you mean when you said, "the

Page 317

1   standards drafted by the American Educational
2   Research Association were entitled to copyright
3   protection when issued"?
4           MR. BRIDGES:  Objection to the extent it
5   calls for a legal opinion; legal expertise; legal
6   conclusion; vague and ambiguous; lacks foundation.
7           THE WITNESS:  So I'm not a lawyer.  I know
8   one thing.  That the law in the United States has
9   no copyright.  And thus a standard incorporated by
10  reference into the Code of Federal Regulations has
11  no copyright.
12  BY MR. HUDIS:
13      Q.  Mr. Malamud, could you turn to the next
14  page of Exhibit 40.  Page 5128.  And I am directing
15  your attention to the last paragraph of the letter.
16          As you can see by looking at the document
17  in question, a cover sheet has been prepended
18  clearly spelling out the section of the Code of
19  Federal Regulations that has incorporated by
20  reference this document into law.
21          Do you see that?
22      A.  I do.
23      Q.  And referring you back to Exhibit 34, is
24  this the cover sheet to which you were referring in
25  your letter of Exhibit 40?

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                        May 12, 2015

San Francisco, CA

---

Page 318

1      A. 34?
2      Q. Yes.
3      A. Yes, it is.
4      Q. Mr. Malamud, at the end of your letter of
5    Exhibit 40, did you decline to remove the 1999
6    standards from the websites where you posted the
7    document on the Internet?
8          MR. BRIDGES: Objection. Are you asking
9    him if that's what the letter says?
10         MR. HUDIS: Yes.
11         MR. BRIDGES: Or are you asking him
12   something -- okay.
13         MR. HUDIS: No. Yes. Yes, I am asking him
14   if that's what the letter says.
15         MR. BRIDGES: The letter -- objection. The
16   letter speaks for itself. The document speaks for
17   itself.
18         THE WITNESS: The letter says, "We
19   respectfully decline to remove this document."
20   BY MR. HUDIS:
21     Q. At the end of your letter of Exhibit 40,
22   did you also decline to seek permission from anyone
23   to post the 1999 standards on the Internet?
24         MR. BRIDGES: Objection. Argumentative;
25   lacks foundation; vague and ambiguous.

---

Page 319

1          THE WITNESS: The letter states, "We
2    respectfully decline to request permission."
3    BY MR. HUDIS:
4      Q. Mr. Malamud, had Mr. Neikirk sent you his
5    e-mail of Exhibit 39 a year earlier in 2012, would
6    Public.Resource have removed the 1999 standards
7    from where you posted the document on the Internet?
8          MR. BRIDGES: Objection. A hypothetical;
9    calls for speculation; vague and ambiguous.
10         THE WITNESS: So you're asking if the date
11   of his letter was December 19th, 2012, we would
12   have changed our answer?
13   BY MR. HUDIS:
14     Q. Correct.
15         MR. BRIDGES: Same objections.
16         THE WITNESS: No.
17         (PLAINTIFFS' EXHIBIT 41 WAS MARKED.)
18   BY MR. HUDIS:
19     Q. Mr. Malamud, I show you a document marked
20   Exhibit 41 bearing production number PROAERA 810.
21         Do you recognize the document?
22     A. I do.
23     Q. What is this document?
24     A. It is -- it's an incomplete electronic
25   mail. So it is a electronic mail from me to

---

Page 320

1    Mr. Butler at the Internet Archive.
2      Q. All right. So Mr. -- to the best of your
3    knowledge Mr. Butler, Christopher Butler, is an
4    employee of Internet Archive?
5      A. I believe --
6          MR. BRIDGES: Objection. Calls for --
7    sorry. Objection. Lacks competence.
8          THE WITNESS: Yes.
9    BY MR. HUDIS:
10     Q. And you cc'd Brewster -- how do you
11   pronounce that?
12     A. Kahle.
13     Q. Kahle. And you cc'd Brewster Kahle in your
14   e-mail to Mr. Butler of Exhibit 41?
15     A. I did.
16     Q. And who is Brewster Kahle?
17     A. He is the founder and librarian of the
18   Internet Archive.
19     Q. What, if anything, was attached to this
20   e-mail of Exhibit 41?
21         MR. BRIDGES: I instruct the witness not to
22   speculate. I object to the extent it calls for
23   speculation.
24         THE WITNESS: The attachments line in the
25   header says AERA.org, and a date. So this appears

---

Page 321

1    to be the correspondence with Mr. Neikirk.
2    BY MR. HUDIS:
3      Q. And is that the correspondence of exhibits
4    39 and 40?
5      A. Based on the file names, I would say yes.
6      Q. Why did you send this e-mail of Exhibit 41
7    to Mr. Butler at the Internet Archive?
8      A. Because I keep Mr. Butler informed on any
9    take-down activity, and he keeps me informed on any
10   take-down activity.
11     Q. What do you mean by take-down activity?
12     A. A letter invoking the DMCA or otherwise
13   complaining about copyright violations.
14     Q. At this time in December 2013 did you make
15   the 1999 standards go dark on Internet Archive's
16   website?
17         MR. BRIDGES: Objection. Lacks foundation;
18   vague and ambiguous.
19         THE WITNESS: No, I did not.
20   BY MR. HUDIS:
21     Q. Why not?
22         MR. BRIDGES: Objection. Argumentative;
23   lacks foundation; vague and ambiguous.
24         THE WITNESS: Because I did not believe
25   there was any copyright violation involved.

---

81 (Pages 318 to 321)

Carl Malamud                                                        May 12, 2015
San Francisco, CA

Page 322

BY MR. HUDIS:
   Q. So after you refused to remove the 1999
standards from public view on the Internet in
December 2013, why did you then remove the 1999
standards from public view on Public.Resource's
website and the Internet Archive's website in June
2014?
      MR. BRIDGES: Objection. To the extent the
question might call for disclosure of
attorney-client privileged communications, I would
object on the grounds of privilege and instruct the
witness not to answer.
      If he can answer beyond that objection and
instruction, he may.
      THE WITNESS: That would involve
discussions with counsel. I'm not going to answer
that question.
      (PLAINTIFFS' EXHIBIT 42 WAS MARKED.)
BY MR. HUDIS:
   Q. Mr. Malamud, I show you what's been marked
as Exhibit 42 bearing production numbers PROAERA
820 and PROAERA 821.
      Do you recognize the document?
   A. I do.
   Q. Do you have any reason to doubt the

Page 323

authenticity of Exhibit 42?
      MR. BRIDGES: Objection. Vague and
ambiguous; lacks foundation.
      THE WITNESS: I do not.
BY MR. HUDIS:
   Q. Do you remember receiving this e-mail of
Exhibit 42 from me on June 10th, 2014?
   A. I do.
   Q. What did you do after receiving this e-mail
of Exhibit 42?
      MR. BRIDGES: Objection. To the extent
this question calls for an answer that would
disclose attorney-client communications, I would
object on the grounds of privilege and instruct the
witness not to answer.
      In addition, it's vague and ambiguous and
lacks foundation.
BY MR. HUDIS:
   Q. Can you answer my question, Mr. Malamud,
without revealing the substance of attorney-client
communications?
   A. No.
   Q. Mr. Malamud, could you return to Exhibit
38. Why did you send the e-mail of Exhibit 38 to
Alexis Rossi the day after receiving my e-mail of

Page 324

Exhibit 42?
      MR. BRIDGES: Object. Asked and answered,
and argumentative and lacks foundation.
      THE WITNESS: Because that was the day that
I made that item go dark.
      (PLAINTIFFS' EXHIBIT 43 WAS MARKED.)
BY MR. HUDIS:
   Q. Mr. Malamud, I show you what's been marked
as Exhibit 43.
      Do you recognize this document?
   A. I do.
   Q. What is this document of Exhibit 43?
   A. This is a memorandum concerning the posting
of the standards at issue.
   Q. Is that your signature at the bottom left
of Exhibit 43?
   A. It is.
   Q. Did anyone help you write this memo Exhibit
43?
      MR. BRIDGES: Objection. To the extent the
question calls for disclosure of attorney-client
communications, I would object on the grounds of
privilege and would instruct the witness not to
answer.
      THE WITNESS: I'll be unable to answer that

Page 325

question.
BY MR. HUDIS:
   Q. Who was this memo of Exhibit 43 intended
for?
      MR. BRIDGES: Objection. Lacks foundation.
      THE WITNESS: I believe it was for you.
BY MR. HUDIS:
   Q. "You," meaning me, plaintiff's counsel?
   A. Plaintiffs.
   Q. Thank you.
      Mr. Malamud, could you read the first
paragraph of the memo to yourself. Tell me when
you're done.
   A. Okay.
   Q. I am not going to read the whole paragraph.
"This memorandum is in reference to the lawsuit
named above," and I'm skipping, "and specifically
in response to the stated intention to file a
preliminary injunction motion."
      What did you mean?
   A. Well, I believe you had said you were going
to file a preliminary injunction motion.
   Q. And I will read in full the second sentence
of the second paragraph of Exhibit 43.
      "Public.Resource also believes that this

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                              May 12, 2015

San Francisco, CA

Page 326

1  case deserves the Court's fullest attention without
2  a rush to reach an interim ruling in the absence of
3  a full record."
4        What did you mean by that?
5        MR. BRIDGES:  Objection.  Lacks foundation;
6  vague and ambiguous.
7        THE WITNESS:  As I state in the next
8  paragraph, "In order to focus this case on
9  developing an appropriate record for a decision on
10  the merits, Public.Resource.Org has voluntarily
11  removed the document in question from the websites
12  under its control."
13        And as you had stated in a previous
14  sentence, this was so it was done without a rush to
15  reach an interim ruling in the absence of a full
16  record.
17  BY MR. HUDIS:
18        Q.  I'd like to now direct your attention,
19  Mr. Malamud, to the fourth paragraph of Exhibit 43.
20  And it says, "Until the conclusion at trial on the
21  merits in this case, Public.Resource.Org will keep
22  the document in question off of the websites under
23  its control and will not disseminate the document
24  in whole or in part, including any revisions, and
25  will maintain the status on the Internet Archive to

Page 327

1  prevent any public access to the document from the
2  archive's websites."  Do you see that?
3        MR. BRIDGES:  Objection.  The document
4  speaks for itself.
5        THE WITNESS:  I do.
6  BY MR. HUDIS:
7        Q.  What did you mean by that sentence?
8        MR. BRIDGES:  Objection.  The document
9  speaks for itself; lacks foundation; vague and
10  ambiguous; argumentative.
11        THE WITNESS:  I think the sentence is very
12  clear; right?
13  BY MR. HUDIS:
14        Q.  What did you mean?
15        A.  I meant "Until the conclusion of trial on
16  the merits of this case, Public.Resource.Org will
17  keep the document in question off of the websites
18  under its control and will not disseminate the
19  document in whole or in part, including any
20  revisions, and will maintain the status on the
21  Internet Archive to prevent any public access to
22  the document from the archive's websites."
23        Q.  And this memo was written by you on June
24  12th, 2014?
25        MR. BRIDGES:  Objection.  Lacks foundation;

Page 328

1  vague and ambiguous.
2        THE WITNESS:  Yes.
3  BY MR. HUDIS:
4        Q.  Since the time of this memo of Exhibit 43,
5  have the 1999 standards been reposted to a website
6  under Public.Resource's control?
7        MR. BRIDGES:  Objection.  Vague and
8  ambiguous; argumentative.
9        THE WITNESS:  Yes.
10  BY MR. HUDIS:
11        Q.  Why?
12        A.  There was a technical malfunction in one of
13  our servers and by mistake a copy of the full
14  standard was posted in place of the stub.
15        Q.  And when was that?
16        A.  That was in January 2015.
17        Q.  Mr. Malamud, during the two-year period
18  that the 1999 standards were posted to
19  Public.Resource's website, was a record kept of how
20  many Internet users viewed or accessed the
21  standards from that website location?
22        MR. BRIDGES:  Objection.  Utterly lacks
23  foundation; argumentative; vague and ambiguous,
24  and -- yeah.  And competence.
25        THE WITNESS:  Our server log's document

Page 329

1  retention policy was a two-week window until
2  litigation commenced in the ASTM case when we began
3  keeping the logs permanently.  And so we -- we did
4  not keep a record prior to that.
5  BY MR. HUDIS:
6        Q.  Do you know the earliest date on which you
7  kept such logs?
8        MR. BRIDGES:  Objection.  Again, lacks
9  foundation; argumentative; vague and ambiguous and
10  competence.
11        THE WITNESS:  So again, the document
12  retention policy was a two-week window on the logs,
13  and in September -- August or September of 2013 we
14  changed that policy because litigation had
15  commenced.  And so at that point we began keeping
16  the logs permanently.
17  BY MR. HUDIS:
18        Q.  And do you still have those logs today?
19        MR. BRIDGES:  Same objections.  I think I
20  missed a compound objection to the underlying
21  question.
22        THE WITNESS:  Yes.
23  BY MR. HUDIS:
24        Q.  In what form are the logs kept?
25        MR. BRIDGES:  Same objections.

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                           May 12, 2015
                              San Francisco, CA

---

Page 330

1    THE WITNESS:  In log format.  Standard.
2    Apache web server log format.
3    BY MR. HUDIS:
4        Q.  Are they kept in print format or electronic
5    format?
6        MR. BRIDGES:  Same objections.
7        THE WITNESS:  Electronic.
8    BY MR. HUDIS:
9        Q.  Has Public.Resource produced these logs to
10   us?
11       MR. BRIDGES:  Objection.  Competence; may
12   call for speculation; may call for some form of
13   legal conclusion; vague and ambiguous.
14       THE WITNESS:  No, we did not.
15       MR. HUDIS:  Counsel, we've had discussions
16   about this.  We're again demanding the logs that
17   provide documentation of the information
18   Public.Resource gave us in its amended response to
19   interrogatory number 6.
20       MR. BRIDGES:  I believe that there's a
21   motion to compel pending.  Am I correct on that
22   issue, Mr. Hudis?
23       MR. HUDIS:  You are correct.
24       MR. BRIDGES:  And I believe we gave you an
25   opportunity to -- first of all, I believe that this

---

Page 331

1    was mentioned for the first time in your reply
2    brief; is that correct?
3        MR. HUDIS:  That's not correct.
4        MR. BRIDGES:  That's my understanding.
5    That motion has been pending, and you elected to
6    proceed with this deposition in the absence of a
7    ruling on that motion to compel.
8        I'm not sure what you mean by the fact that
9    you are demanding the logs.  You have chosen to
10   proceed with this deposition in the absence of a
11   ruling on that motion.  And so the demand -- your
12   demand appears to be moot.  It is a question that
13   is before the court.
14   BY MR. HUDIS:
15       Q.  Mr. Malamud, I'd like you to turn your
16   attention back to Exhibit Number 29.
17       A.  Okay.
18       Q.  Does Public.Resource's answer to exhibit --
19   to interrogatory number 6, accurately state the
20   number of Internet users who viewed or accessed the
21   1999 standards posted to Public.Resource's website
22   from June 2013 to October 2014?
23       MR. BRIDGES:  Objection.  That objection --
24   that interrogatory is itself subject to a number of
25   objections, and is a competence issue, and it's

---

Page 332

1    vague and ambiguous; may lack foundation.
2        Are you asking him if that's what the
3    interrogatory says?  Or are you asking him whether
4    that is his memory sitting here today?  I'd like to
5    know where you're going, what you're looking for.
6        MR. HUDIS:  Sure.  I want to know whether
7    Mr. Malamud, in looking at the answer to
8    interrogatory number 6, can verify the accuracy of
9    the information provided.
10       MR. BRIDGES:  The verification was
11   furnished on page 16 of Exhibit 29 at the time of
12   the response.  Are you asking him if this is his
13   independent memory today?
14       MR. HUDIS:  Yes.
15       MR. BRIDGES:  Objection.  Objection.  You
16   can ask him the questions of what -- what numbers
17   he believes there are independently.
18       If you're -- if you're asking him to look
19   at the document, then you need to find out if it
20   refreshes an independent recollection.
21   BY MR. HUDIS:
22       Q.  Mr. Malamud, does the answer in
23   interrogatory number 6 refresh your independent
24   recollection of the number of Internet users who
25   viewed or accessed the 1999 standards posted to

---

Page 333

1    Public.Resource's website from June 2013 to October
2    2014?
3        MR. BRIDGES:  Objection.  The same
4    objections on vagueness, and lacks foundation and
5    argumentativeness.
6        THE WITNESS:  And so again, the document
7    retention policy was a two-week policy until that
8    period in August when litigation commenced.
9        The standard at issue was removed in June
10   of 2014.  And so this interrogatory, as it says in
11   the answer, is, in fact, a complete record from
12   September of 2013 to June of 2014.
13   BY MR. HUDIS:
14       Q.  So then with respect to the number of FTP
15   requests for the file name AERA.standards.1999.PDF,
16   why does the information go back to June of 2013?
17       A.  Because we had an FTP log hanging around
18   that was not conforming with our document retention
19   policy, and since that data was there, we furnished
20   it to you.
21       Q.  So now I'd like to take you one at a time
22   as to the information provided in interrogatory --
23   answer -- amended interrogatory answer number 6.
24       Mr. Malamud, on page 9, the information is
25   stated as the number of HTTP requests.  Do you see

---

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                          May 12, 2015

San Francisco, CA

Page 334

1    that?
2        A.  Yes.
3        Q.  All right.  What do these numbers
4    represent?
5        MR. BRIDGES:  Objection.  The document
6    speaks for itself.  It's been verified.
7        THE WITNESS:  It's the number --
8        MR. BRIDGES:  If he's testifying -- it's
9    not clear whether you're asking him to explain this
10   document or to give percipient testimony.
11       MR. HUDIS:  To explain the document.
12       MR. BRIDGES:  Objection.
13   BY MR. HUDIS:
14       Q.  So what --
15       MR. BRIDGES:  Objection on the grounds that
16   it lacks foundation; vague and ambiguous;
17   misleading and fails to account for objections, and
18   the document speaks for itself.
19   BY MR. HUDIS:
20       Q.  So what do these numbers represent in HTTP
21   requests?
22       MR. BRIDGES:  Same objections.
23       THE WITNESS:  The number of accesses to the
24   standards at issue using the HTTP protocol.
25   BY MR. HUDIS:

Page 335

1        Q.  By month and year?
2        MR. BRIDGES:  Same objections.
3        THE WITNESS:  Yes.
4    BY MR. HUDIS:
5        Q.  Okay.  And what do the numbers of H -- of
6    FTP requests represent?
7        MR. BRIDGES:  Same objections.
8        THE WITNESS:  Number of file transfers by
9    month and year.
10   BY MR. HUDIS:
11       Q.  And what do the number of rsync requests
12   represent?
13       MR. BRIDGES:  Objection.  The document --
14   same objections and the document speaks for itself.
15       THE WITNESS:  Number of rsync accesses by
16   month and year.
17   BY MR. HUDIS:
18       Q.  So if there are accountings of HTTP
19   requests or FTP requests in interrogatory answer
20   number -- amended interrogatory answer number 6
21   after June of 2014, were those requests for the
22   stub document?
23       A.  That's correct.
24       MR. HUDIS:  Andrew, he's got to change the
25   video, so we're off.

Page 336

1        THE VIDEOGRAPHER:  This marks the end of
2    Disc 4, Volume 1 in the deposition of Carl Malamud.
3        The time is 6:38 and we are off the record.
4        (Recess taken.)
5        THE VIDEOGRAPHER:  This marks the beginning
6    of Disc 5, Volume 1 in the deposition of Carl
7    Malamud.
8        The time is 6:46, and we are on the record.
9    BY MR. HUDIS:
10       Q.  Mr. Malamud, in your last answer we
11   discussed referrals to the stub document.
12       Is that the document of Exhibit 37?
13       A.  It is.
14       Q.  Mr. Malamud, during the two-year period
15   that the 1999 standards were posted by you to
16   Internet Archive's website, do you know whether a
17   record was kept of how many Internet users viewed
18   or accessed the standards from that website?
19       MR. BRIDGES:  Objection.  Vague and
20   ambiguous.
21       THE WITNESS:  I don't know if they kept a
22   record.  There is a view count number that I
23   believe was there.
24       (PLAINTIFFS' EXHIBIT 44 WAS MARKED.)
25   BY MR. HUDIS:

Page 337

1        Q.  Mr. Malamud, I show you a document that has
2    been marked as Exhibit 44 bearing a single
3    production number PROAERA 827, and it says, "This
4    document has been produced in native format."  So
5    what follows it looks like an Excel spreadsheet.
6        Do you see that?
7        A.  I do.
8        Q.  Do you know what this document is, Exhibit
9    44?
10       A.  I'm not totally sure.
11       MR. BRIDGES:  Object on the grounds of
12   competence and may call for speculation.
13       THE WITNESS:  Was this a document produced
14   by us or the Internet Archive?
15   BY MR. HUDIS:
16       Q.  It was produced by your counsel.
17       A.  It appears --
18       MR. BRIDGES:  I'll direct the witness to
19   testify as to what he knows.
20       MR. HUDIS:  Fair enough, Counsel.
21       THE WITNESS:  Well, this is a spreadsheet.
22   I can tell you what -- what I see here on this
23   document, if that's useful to you.
24   BY MR. HUDIS:
25       Q.  Please.

85  (Pages 334 to 337)

Carl Malamud                                                          May 12, 2015

San Francisco, CA

---

Page 338

1     A.  It's a spreadsheet that's got a series of
2   identifiers and downloads as well as the title
3   creator of documents.  Clearly documents
4   incorporated by reference.  And there is a date
5   field.
6     Q.  Mr. Malamud, to the best of your knowledge
7   what does the creator column represent?
8        MR. BRIDGES:  Objection.  Competence; may
9   call for speculation.
10       THE WITNESS:  This is clearly a set of
11  technical standards incorporated by reference, and
12  so the creator is the original creator of the
13  standard.  And then there is a title.
14  BY MR. HUDIS:
15    Q.  Do you know -- do you know what the date
16  column represents?
17       MR. BRIDGES:  I'd ask the witness -- object
18  to the extent I think the witness may not be
19  competent and this may call for speculation.
20       THE WITNESS:  I don't know what the date
21  field says.
22  BY MR. HUDIS:
23    Q.  Do you know what the downloads column
24  represents?
25       MR. BRIDGES:  Objection.  Competence; vague

---

Page 339

1   and ambiguous; may call for speculation -- or calls
2   for speculation.
3        THE WITNESS:  Yeah, I'd have to speculate,
4   sir.  I'm sorry.  This is just not a document that
5   I -- I remember.  So no.
6   BY MR. HUDIS:
7     Q.  Do you know what the identifier column
8   represents?
9        MR. BRIDGES:  Objection.  Competence; calls
10  for speculation.
11       THE WITNESS:  That is the naming scheme
12  that I used for Internet Archive identifiers.
13  BY MR. HUDIS:
14    Q.  Do you know what the title column
15  represents?
16       MR. BRIDGES:  Objection.  Competence; may
17  call for speculation; vague and ambiguous.
18       THE WITNESS:  Yeah, that's what I had
19  explained previously, that this appears to be a
20  listing of standards incorporated by reference, and
21  so there's the creator and the name -- the title of
22  the document.
23  BY MR. HUDIS:
24    Q.  Do you know the source of this document of
25  Exhibit 44?

---

Page 340

1        MR. BRIDGES:  Objection.  I think that may
2   be asked and answered.
3        THE WITNESS:  No, I do not.  I -- like I
4   said, I do not recall this.  That --
5   BY MR. HUDIS:
6     Q.  Do you know who created this document?
7        MR. BRIDGES:  Objection.  Competence; calls
8   for speculation.
9        THE WITNESS:  I simply don't recall this
10  document.
11  BY MR. HUDIS:
12    Q.  Mr. Malamud, if you would turn to the
13  bottom of the first spreadsheet page of Exhibit 44.
14    A.  Reads American Architectural Manufacturers
15  Association?
16    Q.  No.  It -- so for the -- for the page I'm
17  looking at of Exhibit 44, it says American
18  Educational Research Association.
19       MR. BRIDGES:  That's not -- that's not the
20  case on our -- on our exhibits.
21  BY MR. HUDIS:
22    Q.  Could you find on the document American
23  Educational Research Association?
24    A.  Yes.  It's on page 2 in the middle of the
25  page.

---

Page 341

1     Q.  Thank you.  If you go to -- on that row, if
2   you go to the identifier.  Is that -- is
3   gov.log.AERA.standards. 99 -- dot 1999, is that the
4   identifier that you used for the 1999 standards
5   that you posted to the Internet Archive?
6        MR. BRIDGES:  Objection.  Vague and
7   ambiguous; may call for speculation.
8        THE WITNESS:  It is.
9   BY MR. HUDIS:
10    Q.  Do you believe that Exhibit 44 came from
11  the Internet Archive?
12       MR. BRIDGES:  Objection.  Calls for
13  speculation; competence.  He's testified he doesn't
14  know where this came from.  He hasn't seen it
15  before.
16       THE WITNESS:  I really don't recollect this
17  spreadsheet.
18  BY MR. HUDIS:
19    Q.  Mr. Malamud, we had asked Public
20  research -- Resource to search for and produce
21  materials relating to its posting or publication of
22  the 1999 standards on one of its websites.  What
23  materials did you search for?
24       MR. BRIDGES:  Objection.  May call for
25  attorney-client communications, in which case it

---

86 (Pages 338 to 341)

Carl Malamud                                                                          May 12, 2015

San Francisco, CA

Page 342

1    would be privileged, and I would object on the
2    grounds of privilege, and I would instruct the
3    witness not to answer.
4         If you're asking what Mr. Malamud -- it's
5    also vague and ambiguous; lacks foundation.
6    BY MR. HUDIS:
7         Q.  I'd like to know, Mr. Malamud, what records
8    you searched for, independent of your discussions
9    with counsel?
10        MR. BRIDGES:  All the other objections
11   still apply.
12        THE WITNESS:  Having to do with the posting
13   of the standards on Public.Resource.Org websites?
14   BY MR. HUDIS:
15        Q.  Yes.
16        MR. BRIDGES:  Same objections.
17        THE WITNESS:  Well, we've gone over that
18   process of the posting of the standards at issue on
19   the Law.Resource.org website.
20   BY MR. HUDIS:
21        Q.  What I want to know is what documents did
22   you search for?
23        MR. BRIDGES:  Objection.  Argumentative;
24   lacks foundation; vague and ambiguous.
25        THE WITNESS:  Well, the number of accesses

Page 343

1    information I searched are logs, and computed the
2    number of accesses per month based on the criteria
3    that I indicated in the interrogatory answers.
4    BY MR. HUDIS:
5         Q.  Interrogatory -- amended interrogatory
6    answer number 6?
7         A.  That's correct.
8         Q.  And what else did you search for?
9         MR. BRIDGES:  Objection.  Vague and
10   ambiguous.
11        I think there's some confusion going on
12   here.  You were talking about in response to a
13   document request?
14        MR. HUDIS:  Yes.
15        MR. BRIDGES:  Can you show him the document
16   requests?
17        MR. HUDIS:  I can read it to him, sure.
18        MR. BRIDGES:  You're asking what he
19   searched for in response to a document request?
20        MR. HUDIS:  Mm-hm.
21        MR. BRIDGES:  These are interrogatories.
22   He was asking about document requests.
23        THE WITNESS:  The discovery process.
24   BY MR. HUDIS:
25        Q.  Yes, sir.

Page 344

1         MR. BRIDGES:  Searching for documents.
2         THE WITNESS:  I did not conduct those
3    searches.  I gave materials to our legal team and
4    their discovery engine and they did the searches.
5    So I didn't search for anything.
6    BY MR. HUDIS:
7         Q.  So you said you gave the materials to your
8    legal team.  What I want to know is from
9    Public.Resource's records, what materials did you
10   search for to give to your counsel?
11        I do not want to know your communications
12   with counsel.  I want to know the materials you
13   searched for.
14        MR. BRIDGES:  Here's the difficulty.
15        MR. HUDIS:  Sure.
16        MR. BRIDGES:  I think the legal team did
17   the searching.  He turned -- he gave access to the
18   legal team.  The legal team did the searching.
19   So ...
20        MR. HUDIS:  Thank you for the
21   clarification.
22        MR. BRIDGES:  Yeah.
23   BY MR. HUDIS:
24        Q.  Did -- Mr. Malamud, did you do any
25   independent searches for discovery records,

Page 345

1    independently yourself?
2         A.  No, I didn't.
3         MR. BRIDGES:  Objection.  Lacks foundation;
4    vague and ambiguous.
5         THE WITNESS:  No, I did not.
6    BY MR. HUDIS:
7         Q.  So the document request, Mr. Malamud, was
8    "Produce those documents, things and/or items,
9    electronically stored information regarding
10   Public.Resource posting or publishing the 1999
11   standards to a Public.Resource website."
12        And just to clarify, you're saying that
13   your counsel did the search of Public.Resource's
14   records.  You did not do that search yourself?
15        A.  That's correct.
16        Q.  Mr. Malamud, before or after
17   Public.Resource posted the 1999 standards to the
18   Internet, did you ever hear someone complain that
19   he or she could not obtain a copy of the 1999
20   standards on his or her own?
21        MR. BRIDGES:  Objection.  Vague and
22   ambiguous; lacks foundation; compound.
23        THE WITNESS:  I did not.
24   BY MR. HUDIS:
25        Q.  Before or after Public.Resource posted the

87 (Pages 342 to 345)

Carl Malamud                                                        May 12, 2015

San Francisco, CA

---

Page 346

1    1999 standards to the Internet, did you ever
2    receive written correspondence complaining that
3    someone could not obtain a copy of the 1999
4    standards on his or her own?
5         MR. BRIDGES:  Same objections;
6    argumentative.
7         THE WITNESS:  I did not.
8    BY MR. HUDIS:
9         Q.  During the two-year period that the 1999
10   standards were posted to Public.Resource's website,
11   was a record kept of how many Internet users
12   downloaded the standards from that website location
13   to their computer hard drives?
14        MR. BRIDGES:  Objection.  Lacks foundation;
15   argumentative; assumes facts not in evidence; vague
16   and ambiguous.
17        THE WITNESS:  We would have no way of
18   determining that.
19   BY MR. HUDIS:
20        Q.  During the two-year period that the 1999
21   standards were posted to Public.Resource's website,
22   did Public.Resource deploy any protocols or use any
23   settings on its web server to prevent Internet
24   users from downloading the 1999 standards to their
25   computer hard drives?

---

Page 347

1         MR. BRIDGES:  Objection.  Argumentative;
2    lacks foundation; possibly competence; vague and
3    ambiguous.
4         THE WITNESS:  The only thing we know about
5    is access to the data and the fact that the data
6    left our computer in response to a request.  So I
7    don't know about downloads.  It's technically
8    impossible to determine that.
9    BY MR. HUDIS:
10        Q.  I didn't want to -- my last question was
11   not about logging downloads.  What I wanted to know
12   is once an HTTP request or an FTP request or an
13   rsync request was made of Public.Resource's server
14   where the 1999 standards were, did Public.Resource
15   deploy any protocols or use any settings on its web
16   server to prevent Internet users from downloading
17   the 1999 standards to their computer hard drives?
18        MR. BRIDGES:  Objection.  Argumentative;
19   lacks foundation; assumes facts not in evidence.
20        THE WITNESS:  I have no idea how one would
21   do that.
22   BY MR. HUDIS:
23        Q.  During the two-year period that the 1999
24   standards were posted to Public.Resource's website,
25   did Public.Resource deploy any protocols or use any

---

Page 348

1    settings on its web server to prevent Internet
2    users from printing to paper the 1999 standards
3    accessed from that website?
4         MR. BRIDGES:  All the same objections,
5    plus, Mr. Hudis, I've been -- you've been prefacing
6    many of your questions with the phrase, "During the
7    two-year period that the 1999 standards were posted
8    to Public.Resource's website."  It's not clear to
9    me that they were posted to the website for two
10   years.
11        So every time you ask that question, I'm
12   going to object on the grounds that it lacks
13   foundation; argumentative and misstates -- it
14   misstates evidence.
15        So in addition to that, the other
16   objections apply to this question.  Mainly lacks
17   foundation; argumentative; vague and ambiguous;
18   possibly competence.
19        THE WITNESS:  No, we did not.
20        MR. BRIDGES:  Counsel, just for the record,
21   so we can avoid some disagreements, if possible,
22   interrogatory answer number 2 says the 1999
23   standard was first posted to the Law.Resource.Org
24   website on July 11, 2012.  And then it says the
25   1999 standard was last posted to a Public.Resource

---

Page 349

1    website on June 10, 2014.
2    BY MR. HUDIS:
3         Q.  Mr. Malamud, during the two-year period
4    that the 1999 standards were posted to
5    Public.Resource's website, or any time after that
6    until today, did Public.Resource receive any
7    communications from people who claimed to have
8    accessed a copy of the 1999 standards from
9    Public.Resource's website?
10        MR. BRIDGES:  Mr. Hudis, you've just given
11   me dates that are not two years.  And then you
12   immediately ask a question that says, "during the
13   two-year period."
14        I'm not sure why you insist on using
15   two-year period, but every time you ask a question
16   that says "during the two-year period," I'm going
17   to object as misleading, misstating the facts, and
18   deceptive.
19        MR. HUDIS:  Counsel.
20        MR. BRIDGES:  Yes.
21        MR. HUDIS:  Would you accept an
22   introductory phrase "approximate two-year period"?
23        MR. BRIDGES:  I will not.  If you want to
24   say, "during the period," fine.
25        MR. HUDIS:  I'll accept that.

---

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                    May 12, 2015

San Francisco, CA

---

Page 350

1      MR. BRIDGES:  But if you want to start
2   making a characterization, I'm going to object,
3   unless it's accurate.
4      MR. HUDIS:  Counsel, I'll accept that.
5   Thank you very much.
6      MR. BRIDGES:  The -- there are other -- you
7   might want to restate your question because I had
8   other objections that I didn't get around to on
9   that.
10  BY MR. HUDIS:
11     Q.  During the period that the 1999 standards
12  were posted to Public.Resource's website, or at any
13  other time after that until today, did
14  Public.Resource receive any communications from
15  people who claimed to have accessed a copy of the
16  1999 standards from Public.Resource's website?
17     MR. BRIDGES:  Objection.  Lacks foundation;
18  competence; vague and ambiguous.  Also
19  argumentative and may call for a legal conclusion
20  to the extent you were trying to give "copy" a
21  copyright term.  And argumentative.  I said that.
22     THE WITNESS:  No.
23     MR. HUDIS:  Counsel, instead of the word
24  "copy," would you prefer I use the term
25  reproduction?  I don't want to use a charged word

---

Page 351

1   here.  I just want to get some information.
2      MR. BRIDGES:  You could use a -- accessed a
3   file containing.  I would accept that.
4      MR. HUDIS:  Thank you, Counsel.
5   BY MR. HUDIS:
6      Q.  Does Public.Resource know what people do
7   with their files containing the 1999 standards that
8   they obtained from Public.Resource's website?
9      MR. BRIDGES:  Objection.  Utterly lacks
10  foundation; assumes facts not in evidence;
11  argumentative; vague and ambiguous and competence.
12     THE WITNESS:  No.
13  BY MR. HUDIS:
14     Q.  Does Public.Resource know what people do,
15  if anything, with their file containing the 1999
16  standards that they obtained from Internet
17  Archive's website after you posted the standards
18  there?
19     MR. BRIDGES:  Same objections.  Lacks
20  foundation; assumes facts not in evidence;
21  argumentative; vague and ambiguous; competence;
22  calls for ...
23     THE WITNESS:  No.
24     (PLAINTIFFS' EXHIBIT 45 WAS MARKED.)
25  BY MR. HUDIS:

---

Page 352

1      Q.  Mr. Malamud, I show you what has been
2   marked as Exhibit 45.  It is Public.Resource's
3   responses to plaintiff's second set of
4   interrogatories.
5      A.  Okay.
6      Q.  Is that your signature at the bottom of
7   page 10?
8      A.  It is.
9      MR. BRIDGES:  I'm sorry.  Whoa.
10     MR. HUDIS:  Everything okay, Counsel?
11     MR. BRIDGES:  No, it's not okay.
12     THE WITNESS:  There's two page 10s.  The
13  document goes up to 12 and then there is a 10 at
14  the end.  Is it the same on your copy?
15     MR. HUDIS:  Mm-hm.  That's how it was given
16  to us.
17     Counsel, should we stay on the record or go
18  off the record?
19     MR. BRIDGES:  We'll stay on the record.
20  I think you can get his testimony that's
21  his signature on the final page of Exhibit 45.
22  BY MR. HUDIS:
23     Q.  Sure.  Mr. Malamud, is that your signature
24  on the final page of Exhibit 45?
25     A.  It is.

---

Page 353

1      Q.  Now, Mr. Malamud, I'd like you to read
2   Public.Resource's answers to interrogatory numbers
3   9 and 11.  You don't have to read them into the
4   record.  I just want you to familiarize yourself
5   with the information contained in those
6   interrogatory answers.  Tell me when you're done.
7      A.  9 and 11 or 9 and 10?
8      Q.  9 and 11.
9      A.  Okay.
10     Okay.
11     Q.  Do interrogatory answers numbers 9 and 11
12  identify all of the state and federal regulations
13  of which Public.Resource is currently aware in
14  which the 1999 standards have been incorporated by
15  reference?
16     MR. BRIDGES:  Objection.  Competence, in
17  terms of recalling all of the instances that may
18  exist; vague and ambiguous; may call for a legal
19  conclusion.
20     THE WITNESS:  I would have to disclose
21  communications with counsel to answer that
22  question.
23  BY MR. HUDIS:
24     Q.  I want your -- your independent knowledge;
25  not substance of attorney-client communications.

---

89 (Pages 350 to 353)

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                      May 12, 2015
San Francisco, CA

Page 354

1      A.  Well, my knowledge is based on my
2  attorney-client communications.  So I can't really
3  answer that.
4      Q.  All right.  So you cannot answer my
5  question without revealing substance of
6  attorney-client communications?
7      A.  Yeah.
8      Q.  Mr. Malamud, could you read in Exhibit 45
9  interrogatory answer number 10?
10      A.  Okay.
11      Q.  Does interrogatory answer number 10
12  identify all the instances of which a state or
13  federal agency cited the 1999 standards of which
14  Public.Resource is aware?
15      MR. BRIDGES:  Objection.  May -- may lack
16  competence; lacks foundation; vague and ambiguous.
17      And to the extent that the answer would
18  depend upon attorney-client communications, I would
19  object on the grounds of privilege and instruct him
20  not to answer to that extent.
21      THE WITNESS:  I would have to divulge my
22  communications with counsel to answer that
23  question.
24  BY MR. HUDIS:
25      Q.  So you can't answer my question without

Page 355

1  revealing the substance of attorney-client
2  communications?
3      A.  That's correct.
4      Q.  The citations in interrogatory number 10,
5  are these examples of incorporation by reference of
6  the 1999 standards?
7      MR. BRIDGES:  I'm sorry?  I think
8  interrogatory number -- interrogatory -- the answer
9  to interrogatory number 10 speaks for itself.
10      THE WITNESS:  The interrogatory asks for
11  times it has been cited by a government agency; not
12  times that it was incorporated by reference.
13  BY MR. HUDIS:
14      Q.  So what I want to know is, in the answer
15  are these examples or are they not examples of the
16  1999 standards incor -- being incorporated by
17  reference into law --
18      MR. BRIDGES:  Objection.
19      MR. HUDIS:  Let me finish.
20  BY MR. HUDIS:
21      Q.  -- in interrogatory answer number 10?
22      MR. BRIDGES:  Objection.  Competence; may
23  call for speculation; lacks foundation; may require
24  legal conclusion or legal expertise; legal opinion.
25      THE WITNESS:  So incorporation by reference

Page 356

1  is a technical process that would involve the
2  Federal Register and the Code of Federal
3  Regulations at the federal level.
4      Would involve potentially a statute or a
5  regulation at the state level.
6      So a number of these documents cited here
7  are papers, right.  So that wouldn't be an
8  incorporation by reference issue.
9      There are a series of Federal Register
10  publications that are listed in the interrogatory.
11  I would have to pull up those individual documents
12  and look at them to see whether or not that was, in
13  fact, an incorporation by reference, in addition to
14  the citation, which is what you asked for.
15  BY MR. HUDIS:
16      Q.  Mr. Malamud, does Public.Resource claim
17  that any of the plaintiffs have promoted the 1999
18  standards as being incorporated by reference into
19  law?
20      MR. BRIDGES:  Objection to the extent it
21  calls for a legal conclusion or -- or attorney work
22  product or for attorney-client privilege, and also
23  vague and ambiguous.
24      THE WITNESS:  So can you repeat that
25  question?

Page 357

1  BY MR. HUDIS:
2      Q.  Yes.  Does -- does Public.Resource claim
3  that any of the plaintiffs have promoted the 1999
4  standards as being incorporated by reference into
5  law?
6      MR. BRIDGES:  Same objections to the extent
7  it calls for a legal conclusion or attorney work
8  product or attorney-client privilege.  Also vague
9  and ambiguous.
10      THE WITNESS:  Yeah, I don't know the
11  official positions of the plaintiffs for promoting
12  things.  I just don't know what that means.
13      I know individuals associated with the
14  standards at issue have discussed the fact that the
15  standards have been incorporated by reference.
16  Promoted seems like a loaded term.
17  BY MR. HUDIS:
18      Q.  Does Public.Resource claim that any of the
19  plaintiffs have encouraged the 1999 standards as
20  being incorporated by reference into law?
21      MR. BRIDGES:  All the same objections.
22      THE WITNESS:  I don't know the answer to
23  that.  I believe that's something that -- that
24  would require an examination of the discovery
25  materials and depositions and that.  That's exactly

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 358

1  the kind of issue that I believe is going to be
2  discussed and brought out as we continue this
3  litigation. I don't know the answer to that.
4  BY MR. HUDIS:
5      Q. Does Public.Resource claim that any of the
6  plaintiffs have consented to, accepted or
7  acquiesced in the 1999 standards as being
8  incorporated by reference into law?
9      MR. BRIDGES: Objection. Calls for legal
10  conclusions; calls for attorney work product; lacks
11  foundation; competence; vague and ambiguous.
12     THE WITNESS: I don't know the answer
13  either way to that.
14     (PLAINTIFFS' EXHIBIT 46 WAS MARKED.)
15  BY MR. HUDIS:
16     Q. Mr. Malamud, I have marked as Exhibit 46
17  Public.Resource's answer and counterclaim to the
18  plaintiffs' complaint in this action. I'd like you
19  to turn to page 25.
20     A. Okay.
21     Q. And I would like you to look at the top of
22  page 25, and numbered paragraph 2. Do you see
23  that?
24     A. The one that reads "Plaintiffs have no
25  copyrights in works that government entities have

Page 359

1  incorporated by reference into law"?
2      Q. Yes.
3          And what is the factual basis for that
4  statement?
5      MR. BRIDGES: Objection. Calls for a legal
6  conclusion; calls for attorney work product;
7  competence and may call for attorney-client
8  communications.
9          To that extent I would object on the
10  grounds of privilege and instruct the witness not
11  to answer. If he feels that he can answer
12  otherwise for that instruction, then he may
13  proceed.
14     THE WITNESS: So you would like my personal
15  opinion as a layman as to why standards
16  incorporated by reference in the law have no
17  copyright; is that correct?
18  BY MR. HUDIS:
19     Q. Well, specifically directed to plaintiffs'
20  work here, the 1999 standards.
21     MR. BRIDGES: All the same objections and
22  partial instruction.
23     THE WITNESS: I can't speak to the specific
24  standard at issue. I can tell you why I believe
25  that standards incorporated by reference under the

Page 360

1  Code of Federal Regulations have no copyright.
2  BY MR. HUDIS:
3      Q. What -- what is Public.Resource's basis for
4  making that statement?
5      MR. BRIDGES: I'm sorry?
6  BY MR. HUDIS:
7      Q. Public.Resource's basis for making that
8  statement?
9      MR. BRIDGES: What statement? The basis
10  for making the -- for asserting the second
11  affirmative defense?
12     MR. HUDIS: Yes, sir.
13     MR. BRIDGES: Okay. I think that's asked
14  and answered, and all the same objections and
15  partial instruction from earlier.
16     THE WITNESS: So I can't speak to the
17  specific standards at issue. I can speak in
18  general terms as to why I believe the standards
19  incorporated by reference under the CFR have no
20  copyright.
21  BY MR. HUDIS:
22     Q. And why is that?
23     MR. BRIDGES: Same objections and partial
24  instruction. The instruction he may answer to the
25  extent it doesn't depend upon any attorney-client

Page 361

1  privileged communication.
2      THE WITNESS: So as a layman; not a lawyer,
3  I have read widely on this subject, and looked at a
4  number of supreme court decisions on the question
5  of copyright into the law.
6          I have examined the compendium of Copyright
7  Office practices issued by the U.S. copyright
8  Office.
9          I participated in the Administrative
10  Conference of the U.S. deliberations on this issue.
11         I have read fairly widely in the history of
12  promulgation of the law, both in the United States
13  and in the common-law system more generally, and I
14  have read the legislative history, and
15  congressional hearings that led to the creation of
16  the Federal Register and the official journals, as
17  well as the incorporation-by-reference mechanism,
18  which was in the 1960s, and based on this reading,
19  it is my feeling that the law has no copyright in
20  the United States. A standard deliberately and
21  explicitly incorporated by reference into law is
22  the law. And therefore the standards have no
23  copyright.
24  BY MR. HUDIS:
25     Q. If you could turn back to Exhibit 46, page

91 (Pages 358 to 361)

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                           May 12, 2015
San Francisco, CA

---

Page 362

1   25, numbered paragraph 3.  It says, "Lack of
2   ownership of the alleged copyrights bars
3   plaintiffs' claim."
4        What is Public.Resource's factual basis for
5   that statement?
6        MR. BRIDGES:  Objection.  Attorney work
7   product; attorney-client privilege and instruct --
8   instruct the witness not to answer.
9        THE WITNESS:  I won't be able to answer
10  that question.
11  BY MR. HUDIS:
12       Q.  Mr. Malamud, on page 25 of Exhibit 46, the
13  fourth paragraph says, "The doctrine of copyright
14  fair use bars plaintiffs' claim."  What is the
15  factual basis for this statement?
16       MR. BRIDGES:  I'll object on the grounds of
17  attorney work product and attorney-client
18  privilege.
19       And to the extent this would depend upon
20  attorney-client communications, I would object on
21  the grounds of privilege and would instruct the
22  witness not to answer.
23       Also calls for a legal conclusion and
24  object on the grounds of competence.
25       If the witness can answer beyond the

---

Page 363

1   instruction I've given, he is free to.
2        THE WITNESS:  I'm not a lawyer.  This is
3   beyond my competence.
4   BY MR. HUDIS:
5        Q.  Mr. Malamud, on page 25 of Exhibit 46, the
6   paragraph says, "The doctrine of unclean hands bars
7   plaintiffs' claim -- claims."
8        What is the factual basis for that
9   statement?
10       MR. BRIDGES:  All the same objections as to
11  the previous line of questions.
12       THE WITNESS:  I don't even know what the
13  doctrine of unclean hands is.  I'm not qualified to
14  answer that question.
15  BY MR. HUDIS:
16       Q.  On page 25 of Exhibit 46, the sixth
17  paragraph says, "The doctrine of copyright misuse
18  bars plaintiffs' claims."
19       What is the factual basis for that
20  statement?
21       MR. BRIDGES:  All the same objections and
22  partial instruction as to the previous questions.
23       THE WITNESS:  I'm not familiar with the
24  doctrine of copyright misuse.  I'm not qualified to
25  answer that question.

---

Page 364

1   BY MR. HUDIS:
2        Q.  Mr. Malamud, on page 25 of Exhibit 46, the
3   seventh paragraph says, "Waiver and estoppel bars
4   plaintiffs' claims."  What is the factual basis
5   for that statement?
6        MR. BRIDGES:  All the same objections and
7   partial instruction apply here as to the previous
8   questions.
9        THE WITNESS:  I'm not familiar with how
10  waiver and estoppel work.  I'm not qualified to
11  answer that question.
12  BY MR. HUDIS:
13       Q.  Mr. Malamud, on page 25 of Exhibit 46 the
14  eighth paragraph reads, "Lack of irreparable injury
15  bars plaintiffs' demand for injunction."  What is
16  the factual basis for that statement?
17       MR. BRIDGES:  All the same objections and
18  partial instruction apply here as to the previous
19  questions.
20       THE WITNESS:  I don't know what lack of
21  irreparable injury bars means in a legal context.
22  I'm not qualified to answer that.
23  BY MR. HUDIS:
24       Q.  On page 25 of Exhibit 46, the ninth
25  paragraph reads, "Injunction would greatly harm the

---

Page 365

1   public interest, and thus, the public interest bars
2   plaintiffs' demand for an injunction."
3        What's the factual basis for that
4   statement?
5        MR. BRIDGES:  All the same objections and
6   partial instruction apply here as to the previous
7   questions.
8        If he -- if he can answer beyond that
9   partial instruction, he may.
10       THE WITNESS:  I'm not sure I understand the
11  implications of an injunction and what specifically
12  that would mean in this context.  Again, that's a
13  legal question.  I would need to know what that
14  means before I could answer that.
15  BY MR. HUDIS:
16       Q.  Mr. Malamud, who is Dr. David Michaels?
17       A.  Dr. David Michaels is the assistant
18  Secretary of Labor and the administrator of the
19  Occupational Health and Safety Administration.
20       Q.  Who is Mr. Shems, S-h-e-m-s, Peterson?
21       A.  Mr. Peterson is the retired chief building
22  inspector for Sonoma County, California.
23       Q.  Who is Mr. Raymond Mosley?
24       A.  Mr. Mosley is the former executive director
25  of the Office of the Federal Register at the

---

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                                May 12, 2015

San Francisco, CA

Page 366

1    National Archives and Records Administration.
2        Q.  Who is Benjamin Goldstein?
3        A.  Mr. Goldstein is a former official at the
4    Department Of Energy.
5        Q.  Have any of these gentlemen, Dr. Michaels,
6    Mr. Peterson, Mr. Mosley or Mr. Goldstein, provided
7    any statements to Public.Resource discussing
8    incorporation by reference in this case?
9            MR. BRIDGES:  Objection.  Vague and
10   ambiguous; lacks foundation.
11           THE WITNESS:  I don't know.  I'm letting
12   our legal team handle that issue.  I really don't
13   know.
14           (PLAINTIFFS' EXHIBIT 47 WAS MARKED.)
15   BY MR. HUDIS:
16       Q.  Mr. Malamud, I show you what's been marked
17   as Exhibit 47, bearing a document production
18   numbers AERA_APA_NCME 31807 through 31809.
19           Please take a moment to review the
20   document.
21       A.  Okay.
22           MR. BRIDGES:  I need to hold on for a
23   second.
24           MR. HUDIS:  Sure.
25           MR. BRIDGES:  I need to go off the record

Page 367

1    briefly to consult with my client about this
2    document.
3            THE VIDEOGRAPHER:  The time is 7:32, and we
4    are off the record.
5            (Discussion off the record.)
6            THE VIDEOGRAPHER:  The time is 7:37, and we
7    are back on the record.
8    BY MR. HUDIS:
9        Q.  Mr. Malamud, I'll show you what's been
10   marked as Exhibit 47.  Do you recognize this
11   document?
12       A.  Yes, I do.
13       Q.  What is it?
14       A.  It is a notice from the American Petroleum
15   Institute that was sent from the Internet Archive
16   and forwarded along to me.
17       Q.  So do you recall receiving API's e-mail
18   correspondence to Internet Archive being forwarded
19   to you at the end of 2012?
20           MR. BRIDGES:  Objection.  You're referring
21   to this document?
22           MR. HUDIS:  Yes.
23           THE WITNESS:  Are you objecting or --
24           MR. BRIDGES:  No.
25           THE WITNESS:  Oh, yes.  I do remember.

Page 368

1    BY MR. HUDIS:
2        Q.  Okay.  And Mr. Butler, Chris Butler, is an
3    employee of Internet Archive?
4            MR. BRIDGES:  Objection.  Competence.
5            THE WITNESS:  Yes.
6    BY MR. HUDIS:
7        Q.  Do you know why Mr. Butler forwarded API's
8    cease-and-desist copyright notice to you?
9            MR. BRIDGES:  Objection.  Competence; calls
10   for speculation.
11           THE WITNESS:  I am the creator of that
12   particular collection, and any take-down notices go
13   to my attention.
14   BY MR. HUDIS:
15       Q.  All right.  That was my next question.  Did
16   you post API's technical standards to a collection
17   on the Internet Archive?
18           MR. BRIDGES:  Objection.  Lacks foundation;
19   vague and ambiguous.
20           THE WITNESS:  I did.
21   BY MR. HUDIS:
22       Q.  When did you post API's technical standards
23   to a collection on Internet Archive?
24           MR. BRIDGES:  Objection.  Lacks foundation;
25   vague and ambiguous.

Page 369

1            THE WITNESS:  Before November 2nd, 2012.
2    BY MR. HUDIS:
3        Q.  So around that time?
4            MR. BRIDGES:  Objection.  Misstates
5    testimony.
6            THE WITNESS:  I don't know.
7            MR. BRIDGES:  Vague and ambiguous; lacks
8    foundation.
9            THE WITNESS:  I don't know when I posted
10   them.
11   BY MR. HUDIS:
12       Q.  At the time that you posted API's technical
13   standards to a collection on the Internet Archive,
14   did you also post API's technical standards to a
15   Public.Resource website?
16           MR. BRIDGES:  Objection.  Lacks foundation;
17   vague and ambiguous.
18           THE WITNESS:  I did.
19   BY MR. HUDIS:
20       Q.  What did you do, if anything, in response
21   to receiving API's e-mail correspondence to
22   Internet Archive after it was forwarded to you by
23   Mr. Butler?
24           MR. BRIDGES:  Objection.  Vague and
25   ambiguous; argumentative; lacks foundation.

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                              May 12, 2015
                              San Francisco, CA

---

Page 370

1          THE WITNESS:  I sent a response to the
2    author of that letter, Mr. Brett Heavner.
3          BY MR. HUDIS:
4          Q.  Did you forward Mr. Butler's e-mail and the
5    API e-mail to anyone affiliated with
6    Public.Resource?
7          MR. BRIDGES:  Objection.  Vague and
8    ambiguous; may call for speculation.
9          THE WITNESS:  I would have to speculate.  I
10   don't remember.
11         BY MR. HUDIS:
12         Q.  Well, who are all members of the
13   Public.Resource legal staff?
14         MR. BRIDGES:  Objection.  Lacks foundation.
15         THE WITNESS:  Well, that's an interesting
16   question because we don't really have a legal
17   staff.  I have one part-time of counsel.  So this
18   was clearly my attempt at some form of humor.
19         MR. BRIDGES:  Jonathan, they were an Army
20   you never want to see.
21         MR. HUDIS:  Or never could.
22         BY MR. HUDIS:
23         Q.  After receiving Mr. Heavner's e-mail, did
24   you remove API's technical standards from public
25   view, either from Public.Resource's website or

---

Page 371

1    Internet Archive's website?
2          MR. BRIDGES:  Objection.  Lacks foundation;
3    vague and ambiguous; argumentative.
4          THE WITNESS:  We did not.
5          BY MR. HUDIS:
6          Q.  Did you respond to Mr. Heavner -- strike
7    that.
8          Did you respond to Mr. Heavner's e-mail of
9    November 2nd, 2012?
10         MR. BRIDGES:  Objection.  Vague and
11   ambiguous; also asked and answered.
12         THE WITNESS:  I did.
13         BY MR. HUDIS:
14         Q.  Mr. Malamud, in response to Mr. Heavner's
15   e-mail of November 2, 2012 as shown in Exhibit 47,
16   did you send him a letter similar to the one you
17   sent to John Neikirk reflected in Exhibit 40?
18         MR. BRIDGES:  Objection.  Totally
19   argumentative; lacks foundation; vague and
20   ambiguous.
21         THE WITNESS:  I sent him a letter
22   explaining that the standards were incorporated by
23   reference into federal law, and respectfully
24   declined to remove the standards.
25         BY MR. HUDIS:

---

Page 372

1          Q.  Did anyone from API follow up with you
2    after receiving that letter?
3          MR. BRIDGES:  Objection.  Lacks foundation;
4    vague and ambiguous.
5          THE WITNESS:  No, they dropped the matter.
6    We didn't hear from them again.
7          MR. HUDIS:  Mr. Malamud, that's all the
8    questions I have for you at this point, subject to
9    our outstanding discovery motion pending with the
10   court.  Thank you for your time.
11         THE WITNESS:  Great.  Thank you, sir.
12         MR. BRIDGES:  I'll just say that you had an
13   opportunity to postpone this deposition until after
14   the motion to compel.  The choice to proceed with
15   the motion to compel pending, and to take I think
16   over eight-and-a-half hours of deposition was --
17   was a choice that was the plaintiffs' own decision.
18   And so if there are no more questions, the
19   depositions of Public.Resource.Org and Mr. Malamud
20   have, in fact, concluded.
21         MR. HUDIS:  We would disagree, Counsel.
22         MR. BRIDGES:  Well, then ask whatever
23   questions you want for the next 25 minutes and then
24   it's over.
25         MR. HUDIS:  Counsel, we don't have to

---

Page 373

1    argue.  There are questions that we would like to
2    ask Mr. Malamud, but we cannot until the court
3    rules on our pending motion to compel.  We don't --
4          MR. BRIDGES:  You have chosen to proceed
5    now without waiving a -- a ruling by the court.
6          If at some time you wish to seek what I
7    suppose would be something like 20 more minutes of
8    Mr. Malamud's deposition, the costs attendant to
9    that for the defendant -- well, we would oppose.
10   And in any event if -- if you are unwilling to
11   proceed, we would insist on being paid the
12   extraordinary costs of the second session.
13         MR. HUDIS:  We would respectfully disagree
14   with that position.
15         THE VIDEOGRAPHER:  This marks the end of
16   Disc 5, Volume 1 and ends today's deposition of
17   Carl Malamud.
18         The time is 7:47, and we are off the
19   record.
20         (The deposition of CARL MALAMUD
21          was adjourned at 7:47 p.m. this date.)
22                  --oOo--
23
24
25

---

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                                    May 12, 2015
San Francisco, CA

```
                          Page 374
 1            CERTIFICATE OF DEPONENT
 2
 3    I hereby certify that I have read and examined the
 4    foregoing transcript, and the same is a true and
 5    accurate record of the testimony given by me.
 6    Any additions or corrections that I feel are
 7    necessary, I will attach on a separate sheet of
 8    paper to the original transcript.
 9
10          _____
11              Signature of Deponent
12
13    I hereby certify that the individual representing
14    himself/herself to be the above-named individual,
15    appeared before me this _____ day of _____,
16    2015, and executed the above certificate in my
17    presence.
18
19          _____
20             NOTARY PUBLIC IN AND FOR
21
22          _____
23                 County Name
24
25    MY COMMISSION EXPIRES:
```

```
                          Page 375
 1            REPORTER'S CERTIFICATE
 2         The undersigned Certified Shorthand Reporter
 3    licensed in the State of California does hereby
 4    certify:
 5         I am authorized to administer oaths or
 6    affirmations pursuant to Code of Civil Procedure,
 7    Section 2093(b), and prior to being examined, the
 8    witness was duly administered an oath by me.
 9         I am not a relative or employee or attorney or
10    counsel of any of the parties, nor am I a relative or
11    employee of such attorney or counsel, nor am I
12    financially interested in the outcome of this action.
13         I am the deposition officer who
14    stenographically recorded the testimony in the
15    foregoing deposition, and the foregoing transcript is a
16    true record of the testimony given by the witness.
17         Before completion of the deposition, review of
18    the transcript [X] was [ ] was not requested.  If
19    requested, any changes made by the deponent (and
20    provided to the reporter) during the period allowed are
21    appended hereto.
22         In witness whereof, I have subscribed my name
23    this _____ day of _____, 2015.
24          _____
25             DIANE S. MARTIN, CSR No. 6464
```

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                    May 12, 2015
San Francisco, CA

**A**

**a119** 191:4
**ability** 177:22
  277:9 293:3,16
**able** 41:17 69:10
  194:22 200:23
  259:25 270:3
  314:15 362:9
**abovenamed**
  374:14
**abridges** 2:20
**absence** 326:2
  326:15 331:6
  331:10
**absolutely**
  116:23
**academic** 26:7
**accept** 349:21
  349:25 350:4
  351:3
**accepted** 358:6
**access** 51:19
  52:10,25 53:1
  95:7 97:11
  102:8,20,25
  114:24 115:8
  144:7 146:19
  146:24 173:5
  179:25 193:5
  195:12 215:16
  220:14 281:16
  290:23 291:3
  291:16,22
  292:19 293:10
  310:9 327:1,21
  344:17 347:5
**accessed** 328:20
  331:20 332:25
  336:18 348:3
  349:8 350:15
  351:2
**accesses** 334:23
  335:15 342:25
  343:2

**accessible** 52:9
  102:14,15
  163:25 208:19
  269:18,24
  270:5 273:18
**accessing** 149:24
  302:13
**accident** 167:20
**accompanies**
  184:5
**account** 334:17
**accountant**
  138:23
**accountings**
  335:18
**accuracy** 267:7
  267:20 332:8
**accurate** 104:5
  229:20 287:24
  288:9 350:3
  374:5
**accurately** 13:13
  108:19 109:2
  119:2 120:5
  258:13 264:10
  272:1 289:10
  331:19
**acknowledge**
  170:1
**acquiesced**
  358:7
**acquire** 240:9
**acquiring** 233:2
**acrobat** 267:14
**acronym** 11:15
  11:19 158:15
**acronyms** 11:9
**act** 88:23 221:16
  221:25 222:7
  222:14 223:12
  223:18 240:13
  240:25 256:14
**action** 1:8
  192:10 358:18
  375:12

**actions** 56:1
  214:17
**activated** 122:19
**active** 67:2
  74:10 101:12
  177:2
**activities** 68:2,6
  68:10 70:18
  78:16,18
  128:18 130:2
  166:17 185:19
  220:12 224:5
  299:1,5
**activity** 88:15
  197:8 210:1
  295:3 321:9,10
  321:11
**actual** 204:4
  219:16 233:19
  266:3
**acus** 166:17,20
  166:21 168:24
  170:3,8 171:13
**add** 50:18 124:7
  132:4 148:22
  284:16 305:25
**added** 184:14
  266:11
**addition** 315:7
  323:16 348:15
  356:13
**additional** 42:9
  42:12 130:3
**additionally**
  165:19
**additions** 374:6
**address** 9:16
  10:7,20,21,24
  10:25 11:1
  144:20,22,24
  157:4 305:25
  306:2,9
**addressed** 70:4
  176:11 247:17
**adequate** 196:24

  255:20
**adjourned**
  373:21
**adjust** 175:1
  202:23 203:19
**adjustment**
  202:16,20
  203:2,14,21
**adjustments**
  200:25
**administer**
  375:5
**administered**
  375:8
**administration**
  6:10 123:23
  136:12,15
  195:25 241:3
  253:15 365:19
  366:1
**administrative**
  166:12,18,25
  168:19 169:23
  172:9 173:7
  304:11 361:9
**administrator**
  143:21 144:3
  273:19 365:18
**adobe** 267:14
**adopt** 82:15
**adopted** 41:12
  61:13 158:22
**adoption** 166:2
**advanced** 46:20
  65:1 193:22
**advantage**
  197:17
**advent** 57:17
**advertising**
  101:20
**advise** 179:10
**advisement**
  140:3
**advisory** 289:2
**advocate** 224:14

**aera** 4:19,21 5:4
  5:8,10,12,14
  5:16,18 6:5,13
  6:15,17,20 7:3
  7:10,13 8:9
  11:11 156:4
  174:12 180:24
  181:5 185:9
  208:2 213:23
  225:11 226:10
  226:14,24
  227:2,2 229:11
  239:11 259:8
  261:10 262:4
  287:2 288:13
  288:16 290:11
  291:21 299:17
  306:13,20
  310:15 313:8
  315:1,4,8
  320:25 333:15
  341:3 366:18
**affairs** 32:7
  186:3
**affiliated** 311:8
  370:5
**affiliation** 59:13
**affirmations**
  375:6
**affirmative**
  360:11
**afterword** 42:14
**age** 68:20
  255:24
**agencies** 63:23
  64:25 65:8
  79:11 89:12
  154:21 231:2
  255:19 256:24
**agency** 4:20
  41:1 89:10
  154:9 155:14
  163:18 164:10
  164:19 282:9
  307:20 308:17

Carl Malamud											May 12, 2015

San Francisco, CA

354:13 355:11
**agents** 119:16
　256:8
**aggressive**
　253:24
**agree** 139:22,22
　184:15 249:11
　252:11 253:17
　256:16
**agreed** 108:5
**agreements**
　182:10 184:4
　221:8
**ahead** 10:8
　25:16 64:2
　91:9 192:15
　212:13
**aim** 163:24
**aimed** 46:20
**akin** 43:22
**al** 9:11 14:1
**alderson** 9:5
**alert** 193:7
**alexandria** 2:8
**alexis** 7:6 305:12
　305:13,15,17
　306:1 323:25
**alleged** 362:2
**allow** 106:16
　161:9 243:5
**allowed** 51:19
　70:2 122:18
　375:20
**allows** 144:5
**alternative**
　44:20 45:14
　178:16
**amateur** 223:3
**amazon** 5:24
　93:10 235:24
　235:25 237:1
　259:11 260:1
**ambiguity**
　170:25 171:5
**ambiguous**

18:23 19:3,13
21:1,9 22:7
24:2,23 25:23
26:4,11,22
27:8,17 28:1
28:10,23 29:5
29:22 30:14
31:8,18,25
32:10 33:2,16
34:2,10,18,24
35:7,18 36:3
36:12,20 37:5
37:17,24 38:6
38:18 39:2,11
39:19 40:2,14
40:22 41:4
42:5,20 43:4
44:6,19 45:5
45:11,20 46:6
46:16 47:3,17
48:3,19 49:1
49:10,17 50:6
51:16 52:2,17
53:9,21 54:17
55:10,21 56:16
57:2,11,20
58:4,25 59:10
59:22 60:9
61:1 62:2
64:22 65:11
68:1,9,24
69:18 70:10
72:4 73:7
77:11 78:14
80:5 81:11
84:1,11,18
85:4,17,24
86:11 87:8,19
88:10 89:3,18
90:8,15 93:5
93:19 94:24
95:16 96:11,25
97:16 98:12,22
99:5 104:24
105:16 108:22

109:25 111:7
111:23 114:15
114:22 116:18
117:5,22 119:6
119:14,23
120:7,16
121:13,21
122:7 127:9,16
128:2 131:6,22
132:20 133:4
133:22 134:7
135:11,17,22
136:5 145:11
150:25 151:14
151:22 152:13
163:20 164:12
165:6 197:4,22
204:22 212:19
213:11 214:24
216:23 232:12
234:1 243:8
249:18 259:21
273:6,25
277:12 280:21
281:3 282:14
284:23 285:24
289:14 292:5
295:16 296:1
298:7,23
299:11,25
301:2,18
302:12 303:20
304:14 307:14
307:23 308:3
308:20 309:17
310:3 312:16
312:23 315:20
316:11 317:6
318:25 319:9
321:18,23
323:3,16 326:6
327:10 328:1,8
328:23 329:9
330:13 332:1
334:16 336:20

339:1,17 341:7
342:5,24
343:10 345:4
345:22 346:16
347:3 348:17
350:18 351:11
351:21 353:18
354:16 356:23
357:9 358:11
366:10 368:19
368:25 369:7
369:17,25
370:8 371:3,11
371:20 372:4
**amend** 111:13
　139:16
**amended** 5:20
　131:8 236:6
　330:18 333:23
　335:20 343:5
**amendment**
　5:17
**american** 1:4,5
　9:10 11:5,12
　11:16 31:15
　32:4 36:10
　58:7 77:7
　161:2 177:5
　187:25 197:14
　223:21 224:17
　243:15 250:20
　311:13 316:18
　317:1 340:14
　340:17,22
　367:14
**amount** 210:24
　210:24 212:23
　223:25 249:2,3
**amounts** 130:12
　132:17
**amsterdam** 72:9
**analysis** 93:11
**analyst** 63:2
**analyzing** 44:3
　47:25 48:7

49:15,20,21,22
**anderson** 42:15
**andrew** 2:15
　9:23 10:21
　94:9 106:20
　335:24
**anniversary**
　133:9
**annual** 91:13,16
　91:20 137:13
　137:22,24
　138:25 139:23
　224:9
**anonymous**
　51:18 206:24
**ansi** 160:17
　161:1,2,10
　172:23 196:16
　218:22 250:16
**answer** 8:4
　12:20,24 13:2
　15:18,25 17:10
　17:16,19,24
　19:5,15 21:3
　21:11 22:9
　24:4,25 26:6
　28:3 30:3 33:9
　33:18,22 37:12
　50:20 53:23
　54:8 58:21
　60:6 61:17
　65:4 74:13
　85:3,6 96:4
　97:3 104:23
　105:1 118:4
　126:15 129:10
　129:21 130:21
　131:11 142:4
　161:12 169:8
　175:4 176:2,9
　176:23 180:9
　180:18 190:12
　194:9 207:13
　209:21 212:8
　215:7 223:8,15

Carl Malamud                                                          May 12, 2015
San Francisco, CA

227:10 228:12
230:13 236:15
236:19,22
237:2 240:10
258:5,10,13
260:13 263:15
264:7,9 266:25
267:17 270:15
271:22,25
284:19 285:14
290:1 292:1
300:11 303:1
312:10 314:13
314:16 319:12
322:12,13,16
323:12,15,19
324:24,25
331:18 332:7
332:22 333:11
333:23,23
335:19,20
336:10 342:3
343:6 348:22
353:21 354:3,4
354:9,11,17,20
354:22,25
355:8,14,21
357:22 358:3
358:12,17
359:11,11
360:24 362:8,9
362:22,25
363:14,25
364:11,22
365:8,14
**answered** 32:20
34:24 60:5
95:16 121:22
122:7 172:17
180:10,17
185:1 186:9
191:21 204:1
223:14 245:19
251:4 275:6
293:12 303:13

312:21 324:2
340:2 360:14
371:11
**answering** 14:9
**answers** 60:3
174:18,20
175:11 179:11
258:4 300:7
343:3 353:2,6
353:11
**anthony** 3:14
9:5
**anticipate**
106:11 285:10
**anticipated**
144:8
**antitrust** 24:16
**anybody** 17:6
18:8 51:19
90:5,12 159:11
159:21 273:19
302:13
**aoac** 250:18
**apa** 4:19,21 5:4
5:8,10,12,14
5:16,18 6:5,15
6:17,20 7:10
7:13 8:9 11:15
156:4 174:12
180:24 181:5
185:9 201:1,8
203:1 208:2
213:23 223:2
224:22 225:1
225:19 226:10
226:19,23
239:11 250:18
250:19 262:4
287:2 288:16
291:21 310:15
313:8 366:18
**apache** 330:2
**api** 279:1,3,4,8
279:13 281:13
282:6 370:5

372:1
**apis** 367:17
368:7,16,22
369:12,14,21
370:24
**apologize** 238:8
309:10
**appeal** 39:9
246:20
**appeals** 53:13
79:16 83:12
246:13
**appear** 30:7
107:6 296:14
**appeared** 216:4
224:10 374:15
**appearing**
141:19,20
**appears** 14:21
28:19 66:10,11
103:11 104:6,8
105:10 111:17
152:1 156:8,9
156:12 166:11
168:8,13 174:8
181:8,9,13
208:4 214:9
228:21 238:18
239:23 240:24
251:19 262:6
262:12 276:25
277:2 288:20
293:25 315:17
320:25 331:12
337:17 339:19
**appended**
262:10 375:21
**appendices**
16:19
**appending**
262:19
**appendix**
247:24,25
249:16 250:12
251:6

**applicable**
256:14
**application** 32:2
277:19 279:4
**applications**
227:17 229:22
**applies** 177:12
**apply** 30:5
133:25 183:14
261:22 342:11
348:16 364:7
364:18 365:6
**applying** 159:15
**appointed**
166:22,23,23
**appreciate**
138:3 274:24
314:1
**appropriate**
124:8 171:14
326:9
**approval** 86:4
177:3 197:13
**approved** 263:3
263:6
**approximate**
64:15 349:22
**approximately**
63:14,16 64:15
65:21 92:2,3
113:11 182:18
218:1
**april** 6:16,19
15:12,19
110:14 173:21
174:9 175:12
185:23 287:10
289:11
**ar** 35:20 102:2
**arbitrary**
143:10
**arcadia** 131:24
132:7,8,11
**architectural**
77:4 340:14

**architecture**
43:1 75:15,18
**architectures**
41:9
**archive** 18:10
22:1 140:5,10
140:16 141:1,9
141:11,15,25
142:7,11,17,21
143:6,22
144:11 150:17
150:17,19
209:16 271:20
272:14 275:4
275:17 276:18
276:24 278:15
278:20,24
279:7,9,14,23
280:15 281:25
282:5,12
283:20 284:12
300:16 305:7
305:16,18,24
306:3 315:8
320:1,4,18
321:7 326:25
327:21 337:14
339:12 341:5
341:11 367:15
367:18 368:3
368:17,23
369:13,22
**archives** 6:10
82:11 99:24
100:8,10 141:7
144:25 153:10
241:1,2 253:15
255:18 275:11
275:14 276:6,9
303:6 304:9
306:16 309:21
309:24 321:15
322:6 327:2,22
336:16 351:17
366:1 371:1

Carl Malamud                                                      May 12, 2015
San Francisco, CA

**area** 36:18 65:12
  155:22 195:5
  197:8 200:15
  201:9 206:5
  227:14 273:18
  274:21 308:8
  308:13
**arent** 174:24
**argon** 64:7,20
**argue** 373:1
**argumentative**
  15:22 18:14
  19:3 26:3,11
  27:8,17 28:10
  29:22 50:18
  52:3,18 53:9
  60:17 61:5
  84:18 86:12
  87:10 89:17
  97:15 104:21
  119:14,24
  120:8,15
  121:20 145:12
  146:22 147:10
  152:14,21
  153:4 154:3,12
  162:9 163:21
  178:3,22
  179:22 182:14
  192:16 195:19
  199:13 201:21
  204:1 212:10
  222:16 234:16
  252:14 257:6
  285:5,24
  286:10 287:3
  289:14 292:5
  292:24 293:12
  295:17 296:1
  298:23 299:11
  302:22 308:3
  308:20 311:22
  312:24 318:24
  321:22 324:3
  327:10 328:8

  328:23 329:9
  342:23 346:6
  346:15 347:1
  347:18 348:13
  348:17 350:19
  350:21 351:11
  351:21 369:25
  371:3,19
**argumentativ...**
  333:5
**ark** 281:19,22
**army** 370:19
**art** 54:10 102:7
  103:2 193:22
  265:22
**article** 107:8
  122:10
**articles** 4:13
  103:11 104:9
  104:11,15
  105:3,5 107:9
  108:18
**ascents** 177:2
**ascertain** 239:4
**asked** 32:19
  34:23 37:12
  60:5 74:13
  95:15 121:21
  122:6 140:17
  172:17 180:17
  184:25 191:21
  196:3 204:1
  206:21 217:3
  223:14 245:19
  251:3 256:1
  263:9 275:5
  293:11 303:12
  309:8 312:21
  324:2 340:2
  341:19 356:14
  360:13 371:11
**asking** 18:1 28:4
  89:12 140:24
  165:21 198:9
  242:25 243:3

  244:23 245:9
  245:11 248:10
  248:18 250:2
  251:1 294:14
  303:8,10 311:9
  318:8,11,13
  319:10 332:2,3
  332:12,18
  334:9 342:4
  343:18,22
**asks** 148:19
  149:1 174:15
  211:22 355:10
**aspect** 49:4
  61:15
**aspects** 64:24
**asserted** 281:5
**asserting** 281:6
  360:10
**assertion** 203:4
  203:7
**assertions** 216:5
  289:18
**assessment**
  185:19 220:2
**assigned** 113:16
**assistant** 365:17
**assisting** 117:7
**associated** 77:2
  149:2 357:13
**association** 1:5,6
  9:11 11:6,12
  11:16 58:8
  76:11 131:9
  196:2,18
  223:22 224:18
  224:23 250:21
  311:13 316:19
  317:2 340:15
  340:18,23
**associations**
  58:2,5,10
  61:25
**assume** 66:12
  151:14 173:16

  282:14
**assumes** 15:23
  26:11 31:8
  47:17 105:18
  136:4 142:13
  151:1 153:6
  154:3 155:15
  162:10 175:24
  178:4,21
  179:21 182:13
  191:11 192:17
  192:24 195:21
  201:21,25
  204:22 205:11
  212:10 214:24
  215:25 216:23
  217:19 220:24
  222:17 228:17
  235:5 243:24
  245:2 247:14
  269:21 273:6
  274:1 275:25
  287:4,14
  292:23 293:13
  307:13 346:15
  347:19 351:10
  351:20
**assuming**
  213:13 266:16
  266:21,25
**assumption** 47:3
  161:21 162:1
**assurance** 151:4
**assure** 287:23
**astm** 13:25
  196:2 290:12
  329:2
**attach** 374:7
**attached** 174:15
  244:24 247:23
  320:19
**attachments**
  320:24
**attained** 109:22
  110:6

  **attempt** 32:12
  75:6 95:11
  240:8 266:7
  267:21 292:14
  370:18
**attempting**
  73:20 158:18
  242:17 292:7
**attendant** 373:8
**attended** 224:25
**attendees** 35:2,5
**attention** 112:15
  232:10,24
  252:4 258:3,5
  271:22 317:15
  326:1,18
  331:16 368:13
**attorney** 9:20
  356:21 357:7
  358:10 359:6
  362:6,17 375:9
  375:11
**attorneyclient**
  8:16 17:8,13
  17:17 129:16
  194:18 227:9
  228:14 229:8
  230:3,14
  285:14 312:9
  314:11 322:10
  323:13,20
  324:21 341:25
  353:25 354:2,6
  354:18 355:1
  356:22 357:8
  359:7 360:25
  362:7,17,20
**attorneys** 17:16
  17:22,25 18:2
  231:12
**attribution**
  134:12,14
**audible** 12:10
**audience** 181:24
**audio** 36:5,7

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                               May 12, 2015
San Francisco, CA

37:6 48:21
143:9,13
287:22
**audit** 98:6
121:23 122:3
**auditing** 89:24
**auditors** 138:22
**august** 6:11
329:13 333:8
**authentic**
103:14,25
105:14 106:7
107:24 108:7
167:17 184:13
185:21 214:8
238:13 294:18
**authenticated**
177:8 178:11
202:8
**authenticity**
107:5 168:5
175:16 181:11
208:8 251:25
291:9 294:7
301:15 310:24
323:1
**author** 30:8,12
181:19 278:22
279:10,14
370:2
**authored** 28:20
29:20 82:2
218:13,13
298:12
**authoring** 56:24
**authority** 72:10
**authorized**
375:5
**authors** 46:25
**automatically**
279:22 281:17
**auxiliary** 177:9
**availability**
32:13,16,21
192:3 217:5

247:17 253:23
254:1
**available** 50:3
50:16 51:12,13
51:14,25 52:15
53:7 67:14,17
81:3 93:2,8,10
127:11 146:17
155:11 158:23
159:1,2,6,11
163:16 164:9
164:18,21
174:6 178:8,14
183:25 186:21
187:20 188:1,6
188:12,18
189:22 192:19
198:21 200:23
204:6,9,13
209:16 212:3
216:15 219:7
219:12 220:16
223:4 226:23
240:16 242:16
246:21 254:12
255:24 267:13
285:1 287:20
293:5,15
**avoid** 348:21
**award** 133:2,7
**aware** 89:15
114:20 191:8
215:22 230:6
353:13 354:14

———— **B** ————
**b** 18:25 20:15
23:7 44:1
74:22 108:18
124:4 125:2
126:24 128:7
130:16 132:21
134:9,21
135:24 136:2,7
141:19 165:22

171:8 199:1
207:11 217:17
219:19 263:20
375:7
**bachelors** 22:24
23:10
**back** 72:20 77:3
79:15 80:10
106:9 107:3,17
118:25 119:1
123:15 137:8
139:15,17
162:23 163:7
221:1 244:24
254:5 258:3
265:15 282:18
297:10 300:10
302:25 317:23
331:16 333:16
361:25 367:7
**backup** 151:17
**badly** 213:25
**bailey** 29:7
30:16
**bars** 362:2,14
363:6,18 364:3
364:15,21
365:1
**based** 133:15,18
140:8 204:3
214:17 218:4
219:23 246:11
255:7 281:17
306:25 321:5
343:2 354:1
361:18
**bases** 219:2,20
219:21
**basic** 180:4
196:3
**basically** 159:22
201:12 205:18
**basis** 17:9 50:23
81:4 129:23
136:13 139:2

139:14,18
159:9 162:18
199:22 218:17
218:20,25
246:7 247:9
268:1 293:15
359:3 360:3,7
360:9 362:4,15
363:8,19 364:4
364:16 365:3
**bates** 4:18,21
5:4,7,9,12,13
5:15,17,24 6:4
6:7,11,14,17
6:20,23 7:4,7,9
7:12,15,18,21
8:8 156:23
211:18 221:1
249:8
**battle** 290:10
**bearing** 156:3
181:4 185:8
208:1 213:22
240:21 262:3
293:22 299:16
301:9 305:2
310:14 313:7
319:20 322:21
337:2 366:17
**bears** 180:24
237:14 239:10
251:16 288:15
**becker** 2:21 9:24
124:2 125:1,11
125:24 126:16
126:19 127:1,8
127:15 128:1
129:5,15 130:7
130:14 131:5
131:21 132:19
133:3,21 134:6
134:20 135:9
135:11,16,21
136:4,10,23
137:4 138:20

139:2,8,14,18
140:2,6,11,22
141:3,12 142:1
142:8,13,25
143:15,23
144:17 145:10
146:13,21
147:8,25 148:8
149:8,10,21
150:4,24
151:13,21
152:11,21
153:4,14 154:1
154:10 155:3
155:15 156:10
157:23 158:10
159:3 160:21
161:14 162:7
163:19 164:11
164:20 165:5
165:18 168:6
168:23 170:5
171:6,24
172:16 174:2
175:13 176:18
178:2,19
179:10,19
180:16 182:13
183:18 184:10
184:24 186:4
187:1,13
188:14 189:4
190:1,8,19
191:9,20
192:12,16,24
193:12 194:3
194:16 195:3
195:17,21
196:8 197:2,21
198:5,22 199:9
200:9 201:20
203:25 204:21
205:10,22
206:10,19
207:10 208:23

Carl Malamud

May 12, 2015

San Francisco, CA

209:9,18 210:4
211:3,20 212:5
212:9,18 213:6
213:10 214:2
214:22 215:24
216:22 217:16
218:18 219:17
220:21 222:2
222:15 223:13
223:23 224:7
224:19 225:7
225:13,20
226:4,12,20
227:6 228:10
229:4,18 230:1
230:12 231:9
231:24 232:11
233:4,11,25
234:15,23
235:5,23 237:7
238:18 239:17
241:11,23
243:7,23 245:1
245:15,18
246:9 247:12
248:1,11,21
249:17 250:3
251:2 252:13
252:20 255:1
255:25 256:18
257:5,19
258:16,22
259:20 260:6
261:18 263:17
264:14,23
267:9,24 268:7
268:12,17
269:3,13,20
270:22 271:9
272:6,22 273:5
273:24 275:5
275:18,25
277:11 278:8
278:13 279:11
280:13,20

281:2 282:1,13
283:16 284:1
284:21 285:5
285:13,23
286:7,18 287:3
287:14 288:1
289:7 291:8,23
292:21 293:11
295:16,25
297:5
**becknell** 36:6
**began** 57:22
65:23 82:1
91:18 92:4
163:1,6 214:14
216:14 217:9
288:25 289:4
289:16 290:4
329:2,15
**beginning** 9:14
36:15 54:3
94:15 153:17
167:11,24
216:2 221:1
253:3 336:5
**begins** 160:6
**begun** 199:17
221:5
**behalf** 9:18
88:13,17 89:15
120:12 261:16
**believe** 15:11
24:8 28:13
37:19 74:7
75:2 107:8
109:17 119:25
125:21 132:5
132:12 139:3
162:16 176:25
178:7,12 180:9
180:18 184:6
186:9,17
191:15 192:18
193:1,21
194:10 197:10

197:16 200:21
200:25 201:3,4
202:3,14,15,24
203:4,11
205:24 218:1
222:24 229:11
231:1,2,3
232:7 233:19
233:20 242:5
252:15,17
254:2,9 255:3
255:15,17
257:9 260:20
260:25 261:14
265:7,10,11
274:15 278:24
279:12,23
283:23 291:17
292:9,18 293:8
300:5 310:21
313:3 314:19
320:5 321:24
325:6,21
330:20,24,25
336:23 341:10
357:23 358:1
359:24 360:18
**believes** 61:13
325:25 332:17
**benefit** 14:7
227:1
**benjamin** 366:2
**best** 56:8 61:14
111:10 140:17
157:20 191:6
221:25 267:13
269:6 277:25
309:22 320:2
338:6
**betterdogfood**
124:18,20
**beyond** 65:5
124:3 125:1
126:24 130:15
132:21 134:8

134:20 165:22
171:7 172:8
207:11 217:17
226:5 322:13
362:25 363:3
365:8
**bhatia** 172:22
172:23 218:21
**bias** 170:23
**bible** 204:12,13
204:15,17
**bibliographic**
47:6
**big** 97:17 216:2
**binary** 146:7
**binding** 183:12
**bing** 267:4
**bit** 194:23
219:24 224:5
224:21 225:2
264:17
**black** 296:10
**blessings** 159:18
**blog** 152:2,6
181:15,16
210:9 298:24
**blue** 183:11
**blurred** 265:9
**board** 62:18,23
63:1,8,11,17
75:15,18 77:4
90:9 92:17
116:12,16,25
117:3,13,15
118:6,17
121:14,18,25
122:3 138:6,7
138:8,14 139:1
139:23
**bob** 173:15
**bodega** 11:2
**body** 40:9 55:3
157:16 166:21
166:24 172:8
**boehner** 79:25

**boing** 5:11,11
**boingboing**
181:9,14,15,17
181:19
**bono** 128:18,21
129:3,13,23
**book** 41:10 42:6
42:10,17 43:6
43:10,12 44:7
44:9,12 46:7
46:18 48:5
49:19 71:11,12
156:9 157:6
163:13 236:1
236:20,21,25
236:25 238:24
239:15,16
240:1,4 258:20
259:10,11,15
271:11 277:10
277:13,18
278:12
**bookkeeping**
89:23
**books** 26:18
28:20,24 66:4
193:17
**bookstore**
226:15,19,23
226:24
**bottom** 157:12
184:2 189:17
190:3 191:4
193:4 210:15
214:13 221:15
253:9 256:6
258:6,10
299:16 313:15
314:4 324:15
340:13 352:6
**bought** 127:12
216:1,8 239:23
**bound** 183:10
**box** 11:2
**braille** 270:8,11

Carl Malamud

San Francisco, CA

May 12, 2015

Page 382

**branch** 206:14
206:15
**break** 12:17,18
12:20 72:13,15
96:17 103:5
106:10,15
123:8,17
296:19 297:1
297:12
**breaking** 123:10
**brett** 370:2
**brewster** 320:10
320:13,16
**bridges** 2:15
9:23,23 13:5
13:20,23 14:20
14:24 15:15,22
16:24 17:7,15
18:1,14,22
19:2,12,19
20:5,20,25
21:8,17 22:6
22:10 23:20
24:1,22 25:12
25:14,22 26:3
26:10,21 27:7
27:10,16,25
28:9,22 29:4
29:10,21 30:4
30:13,18 31:6
31:17,24 32:9
32:19 33:1,8
33:15 34:1,9
34:17,23 35:6
35:17 36:2,11
36:19 37:4,11
37:16,23 38:5
38:17 39:1,10
39:18 40:1,13
40:21 41:3
42:4,19 43:3
44:5,18 45:4
45:10,19 46:5
46:15 47:2,16
48:2,18,25

49:9,16 50:5
50:17,21 51:15
52:1,16 53:8
53:20 54:16,24
55:6,9,12,20
56:5,15 57:1
57:10,19 58:3
58:13,24 59:9
59:21 60:5,9
60:16,25 61:3
61:16 62:1
64:2,21 65:3
65:10 66:2,8
67:25 68:8,23
69:17 70:9,16
72:3,12 73:6
74:12 75:20
76:19 77:10
78:13 80:4
81:10 83:17
84:1,10,17,25
85:4,16,23
86:9,19 87:7
87:18 88:9
89:2,17 90:7
90:14 91:4,8
91:21 93:4,18
94:7,23 95:15
95:22,25 96:3
96:10,24 97:15
97:25 98:11,21
99:4 100:21
103:16,20
104:2,20,24
105:9,15,18
106:9,14,19,22
107:4,14 108:1
108:8,11,21
109:4,10,24
110:8 111:6,21
112:11,13,20
112:23 113:1
113:20 114:14
114:21 116:17
117:4,16,19,21

118:1,7,14
119:4,13,22
120:6,15
121:12,20
122:6 123:8
294:11,21,25
298:6,22
299:10,24
300:4,17 301:1
301:17,24
302:4,11,22
303:7,12,19
304:2,13,20
305:19 306:23
307:3,12,22
308:2,19
309:16 310:2,5
310:7,25 311:9
311:22 312:5
312:15,20,23
313:17,22
314:9 315:11
315:18 316:8
316:10 317:4
318:8,11,15,24
319:8,15 320:6
320:21 321:17
321:22 322:8
323:2,11 324:2
324:20 325:5
326:5 327:3,8
327:25 328:7
328:22 329:8
329:19,25
330:6,11,20,24
331:4,23
332:10,15
333:3 334:5,8
334:12,15,22
335:2,7,13
336:19 337:11
337:18 338:8
338:17,25
339:9,16 340:1
340:7,19 341:6

341:12,24
342:10,16,23
343:9,15,18,21
344:1,14,16,22
345:3,21 346:5
346:14 347:1
347:18 348:4
349:10,20,23
350:1,6,17
351:2,9,19
352:9,11,19
353:16 354:15
355:7,18,22
356:20 357:6
357:21 358:9
359:5,21 360:5
360:9,13,23
362:6,16
363:10,21
364:6,17 365:5
366:9,22,25
367:20,24
368:4,9,18,24
369:4,7,16,24
370:7,14,19
371:2,10,18
372:3,12,22
373:4
**brief** 47:23
255:7 331:2
**briefly** 27:23
76:5 224:3
226:14 367:1
**brings** 146:10
155:10 166:19
170:21 269:10
**broad** 56:22
58:20 86:13
145:13 146:4
246:5
**broader** 126:7
192:2 197:7
205:6
**broadly** 204:9
**brought** 226:23

292:17 306:20
358:2
**browser** 55:24
**bruno** 159:15,16
159:17
**budget** 185:16
191:15
**building** 42:25
57:21 164:2
165:9,15
288:25 289:24
365:21
**bulk** 112:10
113:6,9 164:24
**bullet** 128:17
130:1 243:3
246:1
**bunch** 250:16
**burbank** 80:18
**burpee** 81:7
**business** 23:4,7
23:12 24:6
64:13,16,18,23
65:7,20 67:3
70:22 73:16
75:4 77:9
103:14 104:1
104:19 106:7
107:24 108:10
108:13 115:4
118:18 136:2
138:8 140:10
140:16 163:3
175:1 177:10
200:25 202:17
202:21,23
203:3,15,17,20
203:21 238:16
241:10,12
242:13 294:10
294:13,20,22
294:23 295:15
295:24
**businesses**
200:15

Carl Malamud                                    May 12, 2015
San Francisco, CA

**butler** 7:15
  276:10,21
  278:6 279:25
  282:18 320:1,3
  320:3,14 321:7
  321:8 368:2,2
  368:7 369:23
**butlers** 370:4
**button** 304:16
  304:19
**buy** 183:6
  204:15 239:25
**buying** 182:3
**bylaws** 4:15
  105:11,22
  107:13,14
  109:2 119:1
  120:4,24 121:9
  122:11,17
  137:9,20 138:5
**bytes** 149:3

**C**
**c** 2:1 3:1 9:1,6
  67:6 77:12
  91:6 92:20
  93:22 113:19
  113:19 119:25
  133:15 255:21
**california** 1:22
  1:24 2:16,18
  2:22,23 3:8
  9:16,17 10:23
  11:2 16:13
  83:16 86:20,22
  87:5 93:25
  103:21 215:1,2
  216:1,5 365:22
  375:3
**californias** 84:2
  155:18 164:23
**call** 17:16 27:10
  27:17 28:10
  29:13 55:12,13
  57:23 61:3,4

70:12 84:25
  85:16 86:10,10
  87:9,9,20,20
  104:21 108:22
  109:25,25
  111:21 113:20
  116:17 117:4
  117:21 119:4
  120:6,16 131:6
  134:6 143:9
  146:22 147:9
  152:11,12
  153:5 165:19
  171:10 176:19
  178:19 179:19
  181:21 187:2
  187:14 188:16
  189:5 191:10
  193:13 214:24
  228:11 233:12
  279:1,3,8,13
  281:3,13 282:6
  286:8 287:4
  292:3 301:3
  308:2 310:8
  311:10 322:9
  330:12,12
  337:12 338:9
  338:19 339:1
  339:17 341:7
  341:24 350:19
  353:18 355:23
  359:7 370:8
**called** 10:13
  43:23 69:23
  74:21 101:4
  109:17 235:24
  276:13,13
  277:13 279:13
  289:23
**calling** 52:4,18
  53:10
**calls** 15:15 16:24
  17:8 27:25
  85:24 104:3

129:16 134:22
  154:1,10 155:3
  162:11 163:19
  164:11 165:18
  178:2 190:19
  191:10 197:22
  198:6 199:13
  200:10 201:20
  201:22 204:21
  205:10 206:10
  217:18 218:18
  222:2,15
  224:19 225:7
  226:12 227:6
  229:4 234:15
  247:13 255:2
  256:18 257:5
  286:7 292:22
  293:12 312:8
  314:10 317:5
  319:9 320:6,22
  323:12 324:21
  339:1,9 340:7
  341:12 351:22
  356:21 357:7
  358:9,10 359:5
  359:6 362:23
  368:9
**campaign** 5:13
  5:15 208:5
  210:22 211:2
  211:12,18,23
  211:23 212:1
  212:14,24
**cant** 265:16
  296:21 354:2
  354:25 359:23
  360:16
**capabilities**
  44:24
**capability**
  278:16
**capacities** 19:7
  19:10
**capacity** 141:20

141:21 166:16
**capital** 43:25
  44:1 74:21,22
  74:22 136:18
**cappaert** 2:6
  9:22 238:2
**captioned** 9:10
**carbon** 305:23
**careful** 165:12
**carefully** 144:1
  217:1 222:25
  313:23
**carl** 1:16 4:9 5:6
  6:6,9 7:6,8,11
  7:14,17 8:6
  9:15 10:12,21
  15:4 94:11,16
  144:22 167:7
  167:12,25
  169:1 237:22
  252:25 253:4
  336:2,6 373:17
  373:20
**carry** 207:7
**case** 9:10,12
  13:18,19,25
  47:23 54:6
  56:9 175:21
  202:18 204:7
  205:16 214:18
  260:16 276:10
  279:7 280:22
  283:8 296:3
  326:1,8,21
  327:16 329:2
  340:20 341:25
  366:8
**cases** 13:18 14:3
  53:15 83:14,16
  180:1 290:9
**cass** 186:2
**catalog** 66:11
  81:12,17
**catalogs** 80:21
  81:2,6

**categorical**
  171:16
**categories** 20:9
**category** 113:15
  126:7 168:25
**cause** 224:15
  266:5
**cc** 281:1 305:25
**cc0** 280:23 281:4
**ccd** 320:10,13
**ccr** 215:5
**ccrr** 1:25
**cd** 6:21 36:7
  287:22 288:3,4
**ceaseanddesist**
  368:8
**celebration**
  133:9
**center** 25:1 77:7
  112:4,18
  287:16
**century** 32:25
**ceo** 74:20 91:1
  114:9 115:2
**certain** 134:2
  145:6 213:17
  241:11 249:2
  267:12
**certainly** 56:23
  139:7 143:18
  173:6 229:12
  241:25 244:16
  253:21 265:17
  268:21 293:16
  296:14 309:1,9
**certificate**
  183:11 261:21
  262:7 374:1,16
  375:1
**certificates**
  25:20
**certification**
  174:23
**certified** 10:14
  375:2

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                                    May 12, 2015
San Francisco, CA

certify 374:3,13
375:4
cfo 201:9
cfr 190:13,15,21
190:24 216:16
218:2 252:7,16
253:14 261:12
360:19
chairman 80:1
166:23 222:5,9
challenge 132:3
change 203:16
221:17 266:17
335:24
changed 191:7
191:18 319:12
329:14
changes 200:22
375:19
chapter 157:5
character
260:23 267:7
267:20
characterizati...
47:19 126:1
133:24 178:7
201:24 350:2
characterize
109:12 140:18
charge 186:21
187:12 192:10
192:18 195:10
240:16 285:9
charged 76:2
204:5 292:17
350:25
charging 192:6
195:11 293:1,8
293:14
charity 175:3
check 104:7
105:9 168:9
181:12 259:14
260:14,15,18
265:5,8 266:10

267:6,19 286:4
296:13,18,19
296:24
checked 297:13
checks 261:2
chief 73:14
77:15 116:9
120:25 121:5
365:21
chiefs 64:6,20
choice 372:14,17
choose 275:22
chose 262:15
chosen 331:9
373:4
chris 368:2
christopher 7:14
129:1,2 320:3
circular 191:3,7
circulara119
191:18
circumstances
184:7 194:8,13
citation 356:14
citations 4:12
355:4
cited 354:13
355:11 356:6
cites 256:15
citizens 175:9
178:8 183:13
188:6,19
195:12 199:20
204:6 254:12
293:5,16
city 39:8
civ 4:25
civic 287:17
civil 1:8 375:6
claim 175:22
195:12 234:12
234:20 356:16
357:2,18 358:5
362:3,14 363:7
claimed 349:7

350:15
claiming 229:13
claims 125:19
126:3,5 363:7
363:18 364:4
clarification
344:21
clarify 12:15
345:12
class 189:23
claus 69:21
clause 119:25
clean 14:10
250:23
clear 112:24
168:7 175:15
184:12 218:23
219:23 230:7
247:2 254:11
262:22 294:13
327:12 334:9
348:8
clearly 187:17
317:18 338:3
338:10 370:18
clicking 284:8
client 55:25
106:10 148:18
150:9 367:1
clients 64:19
close 185:3
coauthor 30:8
30:12 46:24
47:5
coauthored
28:21 29:3,20
code 10:23
16:13 38:13
85:10,15,22,25
86:22 87:6,23
113:18 154:14
154:20 155:6
170:17 182:1
183:8 187:6,18
187:22,24

193:15 204:20
204:24 205:6,8
206:2,4 216:16
219:9,13,14
232:14 233:6
239:6 242:20
247:22 255:5,6
256:15 257:9
257:12,13
262:24 277:15
285:1 289:4
290:6 293:5,18
307:5 317:10
317:18 356:2
360:1 375:6
codes 82:25
164:2,3 165:9
165:15 205:15
205:24 206:1
209:6,7 214:15
214:15,20
215:3 275:20
276:5,13,14,17
288:25 289:2
289:24
codification
205:7 206:2
codifying
174:16
cofounder 42:23
74:20
cohosted 287:13
colleague 51:4
69:22 238:2
collect 298:20
collection 31:21
144:12,13,16
275:4,7,16,20
275:23 276:2,6
276:15,17
279:20,21
282:12 306:4,6
306:8 368:12
368:16,23
369:13

collections 144:6
305:15
collectionsser...
305:24
college 224:22
color 297:13
colorado 51:5
columbia 1:2
9:10
column 296:11
296:16 297:15
297:21 298:10
298:14,16
338:7,16,23
339:7,14
columns 100:22
296:9 297:16
297:17
com 2:10,11,20
2:25 5:24
124:22
come 12:23
51:23 163:3
168:7 199:8
200:7 215:16
230:3 232:9
233:22 246:19
292:2
comes 227:9
291:24
coming 46:21
232:24
command 279:5
303:18 304:1
304:10
commenced
224:4 329:2,15
333:8
commencement
235:13
comment 151:25
217:4 254:15
264:20 297:20
297:22
commentary

Carl Malamud                                        May 12, 2015

San Francisco, CA

98:18 178:12
202:9
**comments** 59:17
**commercial**
163:7
**commission**
35:10,16,22
67:13 162:24
204:8 374:25
**commissions**
52:7
**committee**
121:15,24,24
122:2,3 138:15
138:17 168:17
169:10,13,15
169:16,17
221:15 228:20
**committees**
121:10,19
122:5 169:3
**common** 69:12
92:17,19 93:15
148:17 149:24
205:25 220:14
275:8
**commonlaw**
361:13
**commons**
133:16,17,19
133:20 134:12
280:16,19,23
280:25
**communicate**
41:17 44:25
48:13 215:18
**communicates**
26:15 41:25
**communication**
314:25 361:1
**communicatio...**
8:16 17:9,13
17:17 45:2,9
45:13,18,22
126:9,22

194:19 227:10
229:8 230:4,15
285:15 286:20
314:11 322:10
323:13,21
324:22 341:25
344:11 349:7
350:14 353:21
353:25 354:2,6
354:18,22
355:2 359:8
362:20
**communities**
193:8
**companies**
92:13,16 93:12
**companion** 48:8
48:11
**company** 66:23
69:24 73:20,24
74:4,6,11,20
74:23 114:11
115:5,21 118:9
118:13,24
119:21 137:3
**companys**
104:16
**compare** 259:17
260:4,8
**compared** 54:13
107:16
**comparing**
54:22 107:20
**comparison**
244:9,14
**compatible**
52:25
**compel** 330:21
331:7 372:14
372:15 373:3
**compendium**
219:3 361:6
**competence**
87:8,19 130:17
132:22 134:10

140:12 142:25
143:24 149:10
154:11 155:4
162:12 191:9
192:12 194:3
205:12 222:18
230:17 231:25
234:17 247:14
269:21 285:25
286:10 304:21
305:20 310:7
311:10 320:7
328:24 329:10
330:11 331:25
337:12 338:8
338:25 339:9
339:16 340:7
341:13 347:2
348:18 350:18
351:11,21
353:16 354:16
355:22 358:11
359:7 362:24
363:3 368:4,9
**competent**
338:19
**competitor**
45:15
**complain** 345:18
**complaining**
299:7 321:13
346:2
**complaint** 8:5
358:18
**complete** 143:18
333:11
**completed**
267:22
**completely**
12:25 13:13
**completion**
375:17
**complicated**
74:1
**comply** 252:10

254:21 255:14
**components**
298:19
**compositions**
36:5
**compound** 27:8
29:23 31:7
50:7 52:19
57:11 75:20
78:14 98:22
99:4 111:23
136:10 143:15
148:8 150:5
162:7 212:9
214:23 243:9
261:18 263:17
271:9 284:21
284:22 299:10
300:17 307:14
307:23 329:20
345:22
**comprising**
266:11
**compromise**
161:7
**computed** 343:1
**computer** 26:2,9
26:13,14,15,18
26:19 27:5,5
27:15 28:8
33:23 41:11,13
41:25 42:1
46:13,19 49:5
61:15 62:22
65:2,13 135:3
135:6 146:15
146:17 147:1,2
147:3,13,15
273:11 296:21
309:15,24
346:13,25
347:6,17
**computers** 26:8
33:23 41:17
44:24 48:13,14

68:13 69:9,10
74:3 136:17
**computertoco...**
45:17,21
**concentrating**
200:4 237:23
247:7
**concentration**
23:11,13 24:14
24:15,18
**concept** 32:3
153:22 221:3
**concern** 107:15
**concerned** 71:24
171:23
**concerning**
98:19 131:7
134:23 198:23
247:10 291:9
324:13
**concerns** 169:9
**concert** 35:24
**concluded**
372:20
**conclusion**
27:11,18 28:11
50:22 52:4,19
53:10 61:4
76:21,23 85:1
85:17 86:10
87:10,21 104:3
104:21 108:23
109:13 110:1
113:21 119:5
120:7,17 134:7
146:23 147:9
152:13 153:5
154:2,11 155:4
163:20 164:12
165:19 171:10
173:3 176:19
178:3,20
179:20 187:3
187:15 188:17
189:6 190:20

Carl Malamud

May 12, 2015

San Francisco, CA

Page 386

191:11 193:14
198:7 201:21
204:22 205:11
206:11 214:24
217:19 218:19
222:3,16
228:11 229:5
233:13 234:16
252:14 255:2
256:19 257:6
281:3 286:8
287:5 292:4
315:19 317:6
326:20 327:15
330:13 350:19
353:19 355:24
356:21 357:7
359:6 362:23
**conclusions**
171:13,22
285:16 358:10
**conditional**
107:18
**conditions** 134:2
134:5 190:22
292:7
**conduct** 138:8
344:2
**conducted** 34:4
38:21 69:15
210:1 295:3
**conducts** 283:20
**confer** 106:10
**conference** 29:9
34:20 37:19
98:4,5 166:12
166:18 168:19
169:23 172:9
173:7 246:18
361:10
**conferences**
174:23
**confidential**
91:5 128:7
228:14

**confirm** 106:15
**conflated** 205:18
**conform** 55:16
55:23 230:24
**conforming**
55:19 333:18
**conformity**
185:18
**conforms** 55:1
55:14
**confusing** 96:11
112:14 119:14
119:23 141:3
197:22 277:12
301:25
**confusion**
343:11
**congress** 80:11
176:25 213:3
**congressional**
38:12 80:2,8
187:19 361:15
**conjunction**
101:25
**connected** 51:20
193:9
**consensus**
185:18 186:11
**consented** 358:6
**consider** 27:4,14
28:7 108:13
243:21 309:1
**considerable**
244:13
**considered**
146:1 157:17
211:7
**considering**
169:23
**considers**
221:15
**consistent** 264:8
268:1
**consisting** 52:23
**constitutes**

241:12
**construction**
120:17
**consult** 149:6
252:17 285:21
286:14 312:3
367:1
**consultancy**
75:25 77:3
**consultant** 63:8
63:11,13,18,22
64:10 75:14,17
**consultation**
312:7
**consultations**
71:23 72:1
**consulted** 71:10
71:21
**consulting** 64:13
64:16,18,23,24
65:7,20
**contact** 249:4
**contain** 86:1
87:15 156:20
238:5
**contained** 39:13
219:15 353:5
**containing**
272:18 273:3
309:13,23
351:3,7,15
**contains** 79:14
80:1 219:9
312:6
**content** 111:5,18
133:25 134:1
134:13 142:17
142:24 145:1,8
145:8,19,21,23
145:24 146:2,3
146:8,11,19
147:6,14
151:19 152:9
153:9 214:3
264:21 285:9

300:23 301:22
302:9
**contents** 55:15
271:18 272:18
288:3
**context** 60:17
80:23 158:11
160:24 161:1
195:11 197:4,7
203:3 209:12
262:25 294:22
303:22 364:21
365:12
**continual** 203:4
**continually**
203:12
**continue** 99:6
113:5 161:10
175:4 178:13
184:6 197:10
198:18 265:25
278:18 308:8
308:14 358:2
**continued** 3:1
5:1 6:1 7:1 8:1
202:7
**continues**
258:11
**continuing**
178:10 217:7
290:1
**contractor**
135:24 136:20
**contractors**
135:15 137:2
**contrary** 253:10
**contribution**
69:3,8 135:3
211:12
**contributions**
124:5,25 125:4
134:18 135:6
135:12 211:23
**contributors**
42:9,13 128:6

128:8,14
211:11,13
**control** 264:18
264:19 326:12
326:23 327:18
328:6
**controlled**
160:14
**convened** 31:21
**convenient**
72:14
**conversation**
17:16 117:25
**conversations**
17:21
**convert** 51:5
159:19 263:10
268:23 269:1
270:10,13,14
270:16,19
**converted** 52:8
52:24 268:5,11
268:15 269:12
269:17 271:16
**converting** 50:2
50:15 51:24
52:14 53:6
54:5 208:18
**convince** 160:16
**convinced** 204:2
**cooperation**
79:24
**coordinate**
225:15
**copied** 147:15
203:5
**copies** 54:13
162:2,6 163:8
183:9 184:6,9
184:23 215:14
217:1 221:6
245:10
**coplaintiffs** 11:6
306:20
**copy** 103:11

Carl Malamud                                                    May 12, 2015

San Francisco, CA

104:8 105:10
105:25 107:7,8
111:1 156:15
156:18,19
204:14 233:15
235:14 236:20
239:23 240:9
241:18 259:18
259:18 260:9
262:6 273:15
273:15 292:18
293:2,8,25
305:23 328:13
345:19 346:3
349:8 350:15
350:20,24
352:14
**copying** 182:7
182:11,15
256:12
**copyright**
157:20 170:1,9
170:16,24
172:5,6,20
173:4 176:14
177:21 179:1
182:9 184:3
186:23 195:10
214:16 216:4
219:3,5,7
221:16,19,25
222:6,14,20
223:12,18
229:14 234:12
234:20 254:4
254:10,12
256:10,13,14
256:21,23
257:3,9,10,14
286:5,17
289:18 316:19
317:2,9,11
321:13,25
350:21 359:17
360:1,20 361:5

361:6,7,19,23
362:13 363:17
363:24 368:8
**copyrightable**
221:20 222:13
223:11
**copyrighted**
189:1
**copyrights**
358:25 362:2
**core** 76:8 247:1
261:23
**corner** 46:22
**corporate** 76:25
79:4
**corporation**
41:12,17 78:20
90:20 93:23
105:6 119:17
140:7
**corporations**
162:22
**correct** 12:1,25
13:1,7 18:3
24:10 66:7
72:5 77:23
83:4 88:24
92:4 94:2
108:2,3 123:20
196:23 216:18
237:6 238:7
254:23,24
257:3 258:20
259:9 260:11
261:4 272:14
272:15 275:11
275:12 276:12
277:3 281:10
299:20 300:20
319:14 330:21
330:23 331:2,3
335:23 343:7
345:15 355:3
359:17
**correction** 10:3

107:19 138:2
**corrections**
374:6
**correctly** 55:25
**correspondence**
79:7 80:10
295:11 296:6
298:13 321:1,3
346:2 367:18
369:21
**corrine** 36:6
**corynne** 3:5,10
9:25
**cost** 204:6
**costs** 249:3
255:16 373:8
373:12
**couldnt** 216:3
**council** 1:7
11:20 122:14
122:16 225:5
**counsel** 9:19
13:9 14:6,11
15:12 18:6
20:16 21:16,19
21:22 26:25
27:9,12 60:7
66:13 95:23
96:2 103:13
106:6 107:22
112:17 125:11
125:14 126:12
126:25 127:2
138:24 139:2,8
139:14,18
156:15 157:4
176:1 190:2
237:20 238:15
241:1,9 256:1
273:1 274:8
286:15,21,23
287:23 288:8
291:25 292:2
294:9 296:9
302:3 309:9

312:3 313:25
322:16 325:8
330:15 337:16
337:20 342:9
344:10,12
345:13 348:20
349:19 350:4
350:23 351:4
352:10,17
353:21 354:22
370:17 372:21
372:25 375:10
375:11
**count** 336:22
**counterclaim**
8:3 358:17
**countries** 68:3,7
**country** 47:11
68:14 289:1
**counts** 58:12
**county** 365:22
374:23
**couple** 12:2
16:11 171:3
174:10 196:15
222:22 268:20
311:24 315:21
**course** 20:12
24:16 104:19
125:25 211:9
211:14 232:2,2
232:4 295:14
**courses** 71:8,19
**court** 1:1 9:5,8,9
12:7 14:7,9
39:9 40:11,15
40:16 53:13
79:16 83:12
97:11 114:24
115:8,11
187:19 220:1
227:2 246:13
246:20 254:10
290:8,10
301:25 331:13

361:4 372:10
373:2,5
**courts** 157:17
326:1
**cover** 261:6,20
262:9,13,15,19
263:1 301:4
317:17,24
**covers** 81:2,12
120:2
**cowrote** 186:13
**craft** 195:14
**crane** 193:19
**cranes** 193:22
**crawl** 92:18,19
92:21,22,23,25
93:1,7,15
**create** 62:21
73:21 75:6
96:12 142:18
143:6,19 144:5
196:25 197:20
198:4,14,19
207:5 227:15
231:17 295:7
295:10
**created** 59:18
67:9,20 69:23
79:23 96:16
99:20 105:6
117:6 122:17
144:6 180:2
201:18 241:16
261:20 266:13
268:5 269:11
269:17 270:20
276:2,5,22
279:2 282:6
294:17 295:19
340:6
**creates** 60:20
277:9 279:6
**creating** 46:9
67:6 96:7
278:1

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                                          May 12, 2015
San Francisco, CA

Page 388

| | | | | |
|---|---|---|---|---|
| creation 38:7 94:25 95:10 142:23 219:8 227:16 229:20 274:3,6,11,14 274:18 361:15 | 32:24 **D** **d** 2:6 9:1,6 25:9 43:25 82:9 133:15 136:11 255:21 | 272:4 273:21 274:3,6,11,12 274:15,18 297:17 299:16 300:6 303:3,10 319:10 320:25 | 306:25 326:9 372:17 **decisions** 79:16 83:12 254:10 361:4 **declaratory** 8:4 | 263:6 361:20 **deliberations** 169:11 361:10 **delivered** 39:13 **demand** 331:11 331:12 364:15 365:2 |
| **creative** 133:16 133:17,19,20 134:11 280:16 280:19,22,25 | **dalai** 42:16 **dale** 115:14,17 115:18 **dark** 296:17 | 329:6 338:4,15 338:20 373:21 **dated** 4:17 5:7 6:7,11,16,19 | **decline** 318:5,19 318:22 319:2 **declined** 371:24 **decnet** 44:3,8,9 | **demanding** 330:16 331:9 **democracy** 39:8 290:19 |
| **creativecomm...** 280:12 **creator** 59:16 133:19 177:4 | 305:8 321:15 324:5 **darrell** 80:1 **dash** 115:23 | 7:7,9,12,15,18 7:20 8:7 **dates** 64:12 75:3 92:6 349:11 | 48:7 49:20 **decnets** 41:16 **deemed** 186:22 **deeming** 197:14 | **demonstrated** 33:6 246:4 **denied** 240:15 **denoting** 103:2 |
| 202:5,12 279:13 281:5 338:3,7,12,12 339:21 368:11 | **data** 35:19 52:24 54:22 55:25 93:10 143:10 143:13 145:19 | **david** 186:13 365:16,17 **day** 18:16 19:16 255:24 323:25 | **defendant** 1:12 2:13 3:3 4:10 9:24 10:1 20:8 373:9 | **department** 64:6,11,19 154:22 230:19 230:21 231:3 |
| **creators** 101:8 **credibility** 202:13 **credits** 280:5 | 145:21,24 146:1,7 147:2 147:4 148:22 149:19,24 | 324:4 374:15 375:23 **days** 51:11 68:16 311:25 | **defendantcou...** 4:22 5:19 7:22 **defendants** 236:6 | 366:4 **depend** 308:9 354:18 360:25 362:19 |
| **creed** 268:11 **criminal** 183:14 **criteria** 343:2 | 150:14,21,22 151:25 152:20 240:16 333:19 | **db2** 43:24 **deal** 219:10 **dealing** 169:18 | **defenders** 195:9 **defense** 64:6,11 64:19 125:19 | **depends** 61:2,6 298:17 **deploy** 346:22 347:15,25 |
| **critically** 164:4 **criticisms** 97:21 97:24 98:8,17 | 347:5,5 **database** 35:10 35:15,15,21 | **deals** 222:22 **dealt** 289:19 **dear** 314:24 | 231:3 360:11 **defenses** 126:3,5 **define** 26:1 | **deponent** 288:5 374:1,11 375:19 |
| **crowd** 82:23 **crowdfunding** 207:1,4 | 43:6,15,16,22 43:25 51:17 52:8,23,24 | **dec** 41:8 44:7 **december** 7:12 8:8 295:19 | 144:3 160:3 **defined** 144:1 147:22 | **deposed** 13:16 14:3 **deposition** 1:16 |
| **crucial** 161:21 161:25 201:5 **csr** 1:25 375:25 | 65:16 67:13,17 96:16 100:13 162:19 248:6 | 312:2,12 313:3 314:25 319:11 321:14 322:4 | **definite** 111:22 **definitely** 205:16 | 4:9,10 9:15 11:5 13:7 14:18 15:3,7 |
| **current** 32:3 56:8 78:4 114:5 196:16 | 250:20 **databases** 50:2 50:15 51:24 | **deceptive** 349:18 **decide** 27:21 | **definition** 145:18 149:6 **degree** 22:21,24 | 15:21 16:1 17:5 18:13,25 18:25 19:6,24 |
| 275:19 **currently** 90:1 191:13 222:7 | 52:13 65:2,13 65:15 69:12 **date** 1:19 110:9 | 28:14 164:8,17 245:13 249:9 **decided** 117:8 | 23:3,5,6,10,24 25:6 **degrees** 25:18 | 20:3,18,19,22 21:13,15,23 22:12,16 91:5 |
| 229:15 290:9 353:13 **currents** 33:13 | 110:10,13,15 111:1,14 181:18 185:23 | 183:21 **decision** 36:16 59:25 170:25 | 165:13,17 189:10 308:23 | 94:11,16 108:2 125:6 167:7,12 167:25 252:25 |
| **cutts** 130:4,24 **cyberjockeying** | 210:9 237:3,5 | 171:12,14,18 233:9,23 254:5 | 309:6 **deliberately** | |

Carl Malamud                                                    May 12, 2015
                         San Francisco, CA

253:4 276:9
331:6,10 336:2
336:6 372:13
372:16 373:8
373:16,20
375:13,15,17
**depositions**
172:12 357:25
372:19
**depth** 264:17
**derived** 283:19
**describe** 43:9,14
43:20 76:5
108:19 109:2
119:2 120:5
**described** 21:4
22:5 39:25
46:8,18 65:18
87:5 208:6
263:15 284:18
**describes** 44:23
61:13 221:3
**describing** 79:10
**description**
41:24 42:21
84:13 266:4
297:18 298:16
**deserves** 326:1
**design** 56:14,20
56:21 57:4,9
57:13,17,23
135:25 261:16
261:22,22
**designated**
121:1 141:13
141:16 169:1
219:19
**designation**
124:4 125:2
126:24 130:16
132:21 134:9
165:22 171:8
199:2 207:12
217:17
**designations**

296:12
**designer** 56:22
101:22
**desktop** 273:15
**despite** 182:8,8
204:12
**destination**
150:22
**destroy** 162:21
195:13
**detail** 44:13
**detailed** 41:24
**details** 277:14
315:8
**determination**
306:25 308:1,7
308:13
**determine**
257:21 267:5
286:5,15 347:8
**determining**
234:2 346:18
**develop** 174:21
174:23
**developed** 175:7
214:16
**developing**
174:15 199:16
201:4 326:9
**development**
176:13,16
177:22 178:9
180:1 185:17
186:11 192:5
196:22 199:7
200:6 221:4
**devised** 45:14
**devoted** 79:13
80:21 92:20
116:1
**diane** 1:25
375:25
**didnt** 18:8 25:5
209:22 249:21
249:22 269:14

270:14,16
278:9 344:5
345:2 347:10
350:8 372:6
**difference** 95:18
221:17
**different** 37:6
44:23 49:2
69:11 74:2
79:1 81:25
148:1,4 151:7
158:2,15 173:3
174:22 179:4
179:24 198:15
198:17 206:1,3
211:15,15
218:5,13
243:10 274:21
**difficult** 255:16
307:9,15
**difficulty** 344:14
**digital** 41:12,16
263:10 309:13
309:22 313:14
314:3
**digitization**
82:10
**digitize** 263:9
**dire** 182:10
**direct** 250:11
300:9 326:18
337:18
**directed** 14:19
19:24 234:10
359:19
**directing** 112:15
220:7 317:14
**direction** 169:13
**directly** 175:20
198:12 218:14
**director** 86:4
92:15 117:9
166:16,17
263:4 365:24
**directories**

151:12
**directors** 90:10
92:17 118:17
**directory** 4:20
6:22 114:16
218:5 273:16
294:3,12
**disagree** 60:7
127:2 178:6
196:4 253:17
253:19 254:25
256:16 372:21
373:13
**disagreed**
254:17,22
**disagreements**
348:21
**disagrees** 126:1
**disassembled**
258:20
**disassembling**
263:13 264:11
271:6 284:17
**disc** 9:14 69:8
94:11,16 167:7
167:12,25
252:25 253:4
336:2,6 373:16
**discipline** 26:7
26:14
**disclose** 247:3
323:13 353:20
**disclosed** 16:2,6
129:22,25
131:12,14
132:16,23
134:25 168:10
241:20
**disclosure**
246:25 247:11
322:9 324:21
**disclosures** 4:24
125:16
**discovery** 16:3
343:23 344:4

344:25 357:24
372:9
**discuss** 31:11
62:8 139:12
141:14,16
176:10 286:22
**discussed** 37:25
38:20 44:12
48:7 99:1
153:22 189:8
197:13 200:3
201:25 202:2
204:7 229:20
336:11 357:14
358:2
**discusses** 98:14
**discussing** 81:13
82:10 189:9
203:7 226:9
291:11 366:7
**discussion** 39:4
94:14 97:10
98:24 101:16
101:19 107:1
125:24 162:14
167:23 197:7
198:24 291:25
367:5
**discussions**
47:24 286:23
322:16 330:15
342:8
**display** 55:25
**disseminate**
246:4 326:23
327:18
**disseminating**
158:7
**dissemination**
35:21 37:1
159:22
**dissertations**
71:24
**dissolved** 74:7
75:12

Carl Malamud                                                    May 12, 2015

San Francisco, CA

**distinction** 62:5
95:20 309:4
**distinguished**
205:8
**distributed**
51:17
**district** 1:1,2 9:9
9:9 290:8
**divider** 298:18
**division** 62:23
**divulge** 194:17
228:13,15
229:9 230:5,16
231:13 354:21
**divulging** 17:17
230:14
**djvu** 277:21
278:1,2,3,12
283:24 284:3,5
**dmca** 321:12
**doc** 223:7
**doctoral** 24:6,16
71:24 232:2,4
**doctorate** 25:8
**doctrine** 362:13
363:6,13,17,24
**document** 15:3
28:17 56:11
59:23 61:12
86:3 87:1
105:8,14,20
107:15 108:7
108:12 109:9
120:18 130:7
132:25 138:10
139:4 149:2
156:3,7,11,12
157:2 160:21
161:14 162:8
166:1,2,3,8,10
167:17 168:7
170:5 171:7
172:16 173:13
175:14,16
176:5 178:10

178:14 181:4,7
181:11 183:10
183:18 184:10
184:13 185:8
185:12,14
187:1,14,15
188:9,14 189:4
189:12 190:8
190:17,23
191:13 193:12
195:17 197:2
199:9 200:11
201:25 202:12
203:5 206:5
208:3,23 209:9
209:18 210:4
211:3 212:6
213:21,24
214:3,8 219:16
220:21,23
233:17 234:4,5
236:2,5,9
237:14,21
238:4,12,13,18
239:4,5,12,19
240:23 241:13
241:15 243:8
243:25 245:1
246:2,10,10
247:12 248:1
248:11,21
250:3 251:3,18
257:21 258:25
261:23 262:2,5
262:25 264:24
265:14 266:1,4
266:8,9,22
267:2,3 268:19
269:24 273:7
274:8 276:22
276:23 278:3
282:2 283:17
284:25 288:7
288:14 289:9
289:10,12

291:9,10
292:13 293:14
293:24 294:16
294:18 295:13
301:4,5,11,15
302:14 304:22
305:1,4,6
309:2 310:10
310:16,18
315:7,7 316:3
316:5 317:16
317:20 318:7
318:16,19
319:7,19,21,23
322:23 324:10
324:12 326:11
326:22,23
327:1,3,8,17
327:19,22
328:25 329:11
332:19 333:6
333:18 334:5
334:10,11,18
335:13,14,22
336:11,12
337:1,4,8,13
337:23 339:4
339:22,24
340:6,10,22
343:13,15,19
343:22 345:7
352:13 366:17
366:20 367:2
367:11,21
**documentation**
274:5 330:17
**documenting**
271:5 273:21
**documents** 16:4
16:8,11,22
21:6,7 54:3
66:3,10 125:18
125:19 126:2,4
126:7 139:5,9
154:7,21,25

155:12 159:23
160:12 161:9
161:22 162:3
163:5,16 164:4
164:9,18 165:9
170:9 172:19
182:17 183:12
184:5,14
198:14 204:9
204:11 209:2
209:15 210:10
216:20 220:1
235:16 247:18
247:20 249:14
249:20,20
250:1,25 254:1
255:5,23 256:9
256:20 265:22
271:2 278:2
289:19 292:8
293:4 295:12
297:25 298:19
338:3,3 342:21
344:1 345:8
356:6,11
**doesnt** 58:14
111:22 266:19
296:14 341:13
360:25
**dog** 124:22,23
**doing** 169:11
170:14 173:18
190:14 194:23
194:24 244:10
244:11,12
255:19 267:19
290:24
**dollar** 130:22
**dollars** 131:4,20
132:5,18
210:21,25
211:2
**domain** 186:22
256:8 316:22
**donated** 132:16

162:25
**donation** 135:5
**donors** 131:8,13
131:13 134:24
206:22,23
207:14
**dont** 12:13 17:1
19:17 58:11
60:3 64:12
92:6 95:17
101:24 103:16
103:18 106:13
109:16 111:11
112:1 115:11
124:11 137:17
139:7 151:7
153:15 156:18
164:21 166:15
169:16 175:25
176:10 179:7
180:5,9 191:22
192:18,19
194:4 201:3,8
202:14 206:13
211:14 216:8
223:24 224:13
226:16 235:7
237:24 239:22
241:24 242:5
249:21 259:12
265:14,15
267:1,3 268:8
268:18 269:4,7
270:13 272:25
273:16 274:7
274:15 277:14
281:23 295:1,2
295:18 296:2
296:13,17,21
307:24 308:9
308:21 310:4
336:21 338:20
340:9 341:16
347:7 350:25
353:3 357:10

Carl Malamud

May 12, 2015

San Francisco, CA

357:12,22
358:3,12
363:12 364:20
366:11,12
369:6,9 370:10
370:16 372:25
373:3
**dot** 100:15,15
124:22 341:3
**dots** 259:4,6
**double** 181:12
261:2
**doublecheck**
105:25 111:12
267:11
**doublekey**
136:24 137:2
208:5 209:1
**doublekeyed**
212:17,21
**doublekeying**
54:5,9,10
82:16 207:20
207:21 212:15
**doubt** 105:13,24
167:17 168:5
181:10 185:20
208:7 214:7
238:12 251:24
294:6 301:14
310:23 322:25
**dougherty**
115:14,17,18
116:11
**download** 147:6
147:13 287:22
**downloaded**
346:12
**downloading**
346:24 347:16
**downloads**
338:2,23 347:7
347:11
**dr** 69:23 116:7,9
116:24 117:6

118:8,9,12,12
118:19,22,23
365:16,17
366:5
**drafted** 316:18
317:1
**drafts** 59:16
**dramatic** 203:16
**draw** 173:3
252:3 258:3,5
**drawing** 171:13
171:22
**drives** 346:13,25
347:17
**dropped** 372:5
**duke** 2:7
**duly** 10:13 375:8
**dumps** 276:25
**dutch** 172:2
**duties** 78:10
88:3,7 89:14
119:8,10,15,21
120:2,5,12,20

———————
**E**
**e** 2:1,1 3:1,1 9:1
9:1
**earlier** 52:2
102:1 138:16
153:22 188:13
204:7 232:21
232:22 235:11
300:19 319:5
360:15
**earliest** 329:6
**early** 24:13
43:21 57:13
100:19 101:7
157:21 232:19
**easily** 293:17
**easy** 307:9
**ebook** 283:12
**economic**
195:13
**economics** 23:4

23:7,12 24:6
24:17
**economist** 116:9
**ed** 114:6 115:1
**eddy** 3:7
**edgar** 35:10,15
35:19 67:13
100:13 162:19
163:5
**edict** 40:20 41:1
**edicts** 5:17 40:6
40:17,23 219:6
221:20 222:12
223:10
**edit** 144:5
**edition** 86:25
166:3 204:14
204:16 219:4
235:8 250:1,25
271:2
**editions** 228:21
**education** 1:8
11:21 22:20
154:22 224:11
224:11,15
225:6 226:6
230:20,22
290:18
**educational** 1:4
6:3,13 7:3 9:11
11:5,12 192:11
194:2,14
199:23 223:21
225:16 227:5
227:24 228:6
231:15 234:13
234:21 285:21
307:18 311:13
315:2 316:18
317:1 340:18
340:23
**eff** 3:10,11 58:11
61:21
**effect** 45:15
**effort** 32:12

39:21 80:12
82:15 89:25
212:21,22
**efforts** 35:11
199:7,16 200:6
**eicher** 160:6,7,8
160:11
**eight** 71:2,2
**eightandahalf**
372:16
**eighth** 364:14
**either** 13:11
29:20 30:7,11
126:12 139:12
139:24 161:11
180:5 226:10
243:4 270:17
278:12 287:2
312:2,12
358:13 370:25
**elbaz** 130:4,25
**elected** 331:5
**electric** 289:4
**electrical** 165:15
**electronic** 3:3,4
10:1 16:15,20
35:19 70:3
75:6,8 97:12
100:19 138:9
138:21 319:24
319:25 330:4,7
**electronically**
161:11 345:9
**eligible** 189:18
190:7
**email** 5:6 7:6,8
7:14,17 8:6
144:20,22,24
166:11 168:8
168:13,16,22
169:12 305:7,9
305:12,13,23
305:25 306:1
306:10 311:3,6
311:15,19,21

312:4,7,19
313:2,12 319:5
320:14,20
321:6 323:6,9
323:24,25
367:17 369:21
370:4,5,23
371:8,15
**emanating**
187:5
**embedded** 269:5
277:15
**embedding**
266:6
**embeds** 266:13
**emerge** 177:10
**emerging** 46:19
49:5
**employed** 72:22
72:24 77:24
**employee** 63:4,7
63:19 93:12
122:24 305:17
320:4 368:3
375:9,11
**employees** 90:20
90:22 119:16
122:21 256:8
**employment**
62:13,15 63:10
63:21 65:22
66:19 70:20
71:5 72:7,8
73:13 74:18
75:13 77:6,20
92:9
**enables** 278:2
**enacted** 221:24
222:14 223:12
**encouraged**
357:19
**ended** 65:21
**ends** 306:13
373:16
**energy** 366:4

Carl Malamud

May 12, 2015

San Francisco, CA

Page 392

enforcement
157:20 177:22
engaged 67:6
85:13 89:24
90:1 202:25
229:15
engine 92:23
265:19,21,23
266:2,8,12,15
266:19,23
267:4 344:4
engineer 116:7
123:1,2,19,21
engineering
58:23 59:2,14
59:19,24 61:23
75:15,19 76:10
77:1,4 297:25
engineers 34:4
38:22 39:4
46:20 48:21
122:14,16
engines 266:17
ensure 150:21
264:20
entail 65:9
entered 316:22
entire 201:24
entirely 60:25
308:19
entirety 252:7
274:25 275:13
entities 128:4,24
130:12 131:3
132:16 264:11
358:25
entitled 15:3
287:10 316:19
317:2
entity 129:18
131:19 187:6
entries 282:23
entry 283:4,9,10
283:13,23
284:3

epub 283:9,11
284:10
equally 202:24
equals 205:24
equipment
41:12,16
equivalent 45:24
211:16 250:12
251:9
error 238:9
302:15
errors 54:14
214:3 267:12
270:4 288:21
289:9
esq 2:5,6,15,21
3:5,6
essay 81:13
98:13 145:15
146:9 181:8,13
essays 100:12
essential 97:18
establish 11:9
established
172:10 187:17
estoppel 364:3
364:10
et 9:11 13:25
ets 231:16
european 72:11
event 373:10
events 115:25
evidence 15:23
26:12 31:9
47:4,17 105:19
136:5 142:14
151:1,14 153:6
154:4 155:16
162:10 175:24
178:4,21
179:21 182:14
191:12 192:17
192:25 195:21
201:22 202:1
204:23 205:12

212:11 214:25
215:25 216:24
217:20 220:24
222:17 228:17
235:6 243:24
245:2 247:14
269:22 273:6
274:1 276:1
282:14 287:4
287:15 292:14
292:23 293:13
294:24 307:13
346:15 347:19
348:14 351:10
351:20
exact 19:17
64:12 92:6
166:15 181:18
230:7 273:17
exactly 17:2
21:18 165:1
277:3 357:25
examination 4:1
4:2 10:17
222:9 226:25
357:24
examined
257:20 261:10
361:6 374:3
375:7
examining
233:16
example 40:16
50:25 52:20
56:10,22,24
58:7 61:10,18
67:9,12,16,20
68:12 69:22
79:13 84:2
86:16 88:20,22
89:4,9 96:15
98:6 100:23
102:9 114:16
116:5 121:24
134:11 142:22

145:18 147:16
148:23 152:1,2
152:3 154:22
156:23 160:2
172:23 195:24
199:25 201:2
205:5 225:24
266:3 284:10
examples 16:11
40:10 51:22
52:12 56:19
67:11,15,19
68:16 69:7
83:11 154:18
203:8 355:5,15
355:15
excel 337:5
excerpts 156:9
exchange 35:10
35:16,22 52:7
67:13 162:24
204:8
excuse 102:2,4
192:16 220:22
executed 374:16
executive 73:14
206:14 263:4
365:24
executives
205:17
exempt 89:7
113:13,14,15
113:16
exercise 82:24
exhibit 4:7 5:1
6:1 7:1 8:1
14:17,19 15:5
15:8,14,21
17:6 19:23
20:4,19,23
21:15,23 22:16
28:15,18,19
29:19 30:10
31:3 46:12
66:6,9 103:10

103:14,25
104:15 105:7
105:14 106:7
108:6,17 109:1
109:8 110:5,25
111:4,13,17
112:4,16,19
114:3 119:1,11
120:4,14,23
121:9 122:11
125:8,11,14,15
128:11 129:14
137:9,20 138:4
155:25 156:3
156:19 157:9
158:5 161:6
166:5,10
167:16 168:5
173:9,12,17
174:8,11
180:23 181:1,4
181:11 182:24
185:6,8 186:17
188:4,23
189:15 191:1
191:25 193:4
195:8 199:5
201:14 203:8
207:23 208:1,8
213:19,22
214:11 215:11
216:10 218:8
220:5 221:14
236:3,5,16
237:9,12,14
238:5,16,23
239:7,10 240:3
240:18,21
241:5,10,15,18
241:21 242:3
242:18,22
244:18,25
245:23 246:23
247:24 249:25
250:24 251:13

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 393

251:15,16,21
251:22,25
252:3 253:8
254:17 256:5
258:4,6 261:25
262:3,19 264:6
264:10 271:22
276:10,21
278:6 279:25
282:18 288:12
288:15 290:15
293:19,22
294:7,10,12,19
295:7,10,23
296:8,12
297:13,16
298:20 300:10
301:6,9 302:25
303:2 304:24
305:2,6,10
310:11,14,18
310:24 311:16
313:2,4,7,9,11
313:12,15,24
314:4,8,18
316:14 317:14
317:23,25
318:5,21 319:5
319:17,20
320:14,20
321:6 322:18
322:21 323:1,7
323:10,23,24
324:1,6,9,12
324:16,18
325:3,24
326:19 328:4
331:16,18
332:11 336:12
336:24 337:2,8
339:25 340:13
340:17 341:10
351:24 352:2
352:21,24
354:8 358:14

358:16 361:25
362:12 363:5
363:16 364:2
364:13,24
366:14,17
367:10 371:15
371:17
**exhibits** 14:14
22:4 94:3
103:6,8 106:4
107:24 110:18
110:21,23
287:7 321:3
340:20
**exist** 203:9
353:18
**existence** 59:8
66:23 67:1
74:4,6,9,23,25
**expect** 289:6
**expense** 174:15
199:19
**expensive**
243:17,22
244:1,1,6,14
**experience** 50:1
50:14 51:23
52:13 53:4
56:13 62:9
154:7 162:15
163:10 204:4
**experiences** 35:1
**expert** 195:4
227:13
**expertise** 27:5
27:14,21 28:8
28:14 108:23
109:12 110:1
113:21 200:16
246:4 315:19
317:5 355:24
**expires** 374:25
**explain** 95:25
184:22 196:3
334:9,11

**explained** 35:9
131:13 339:19
**explaining**
301:5 371:22
**explanation**
58:16 277:4
**explicit** 165:13
165:16,23
189:10 308:24
309:6
**explicitly** 187:22
263:5 361:21
**exploring** 5:3
46:2
**exposition** 35:25
42:7,22 67:21
71:13 99:21
**expressing** 57:5
**extensively**
254:8
**extent** 17:7
20:13 50:21
104:2 108:2
109:10,11
129:15 130:17
134:22 156:11
156:12 165:21
168:6 175:15
201:23 206:20
207:12 211:22
214:2 217:18
226:24 227:8
228:12 229:6
230:2,13
231:11 255:1
288:7 289:12
291:23 292:3,4
314:9,14
315:18 317:4
320:22 322:8
323:11 324:20
338:18 350:20
354:17,20
356:20 357:6
359:9 360:25

362:19
**external** 189:12
**extolling** 98:18
**extraneous**
258:25
**extraordinarily**
98:21
**extraordinary**
373:12
**extremely**
253:24
**ez** 100:19,23

---
**F**
**f** 82:19 150:19
**f1** 82:18
**faces** 203:12
**facility** 51:18
255:18
**fact** 35:21 57:6
138:9 148:14
159:11 164:3
173:4 174:24
175:2 181:19
182:8,8 193:8
197:15 198:10
198:24 202:11
204:12 205:14
233:16 239:5
245:7 246:11
250:22 251:6
257:21 265:17
267:5 269:24
270:24 289:7
331:8 333:11
347:5 356:13
357:14 372:20
**factor** 204:17
**facts** 15:23
26:12 31:8
47:3,17 105:18
136:4 142:13
151:1,14 153:6
154:3 155:15
162:10 175:24

178:4,21
179:21 182:13
191:11 192:17
192:24 195:21
201:22 202:1
204:22 205:11
212:11 214:25
215:25 216:23
217:19 220:24
222:17 228:17
235:6 243:24
245:2 247:14
269:21 273:6
274:1 275:25
282:14 287:4
287:14 292:23
293:13 307:13
346:15 347:19
349:17 351:10
351:20
**factual** 219:20
359:3 362:4,15
363:8,19 364:4
364:16 365:3
**faculty** 71:21
**fails** 334:17
**fair** 42:2,18
67:21 68:4,19
68:20 69:13
96:2,5 110:15
170:19 171:1
172:15 227:16
229:20 337:20
362:14
**faire** 115:22,23
115:24
**fairly** 242:5
254:8 288:24
361:11
**fake** 124:22
**familiar** 57:6
140:20 149:13
229:24 270:7
363:23 364:9
**familiarize**

Carl Malamud                                                    May 12, 2015

San Francisco, CA

353:4
**family** 130:4,25
**famous** 101:22
**fan** 97:13,17
  290:7
**far** 126:7 191:8
**fascinating**
  146:9
**fashion** 122:17
  266:23
**fastcase** 115:2,4
  115:5
**fault** 272:24
**favorable**
  177:18
**favored** 177:11
**fax** 70:4
**fed** 4:25
**federal** 33:20
  38:13,13 53:15
  62:18,24 63:1
  63:9,12,18
  82:10,16,17
  83:14,22,24
  84:20 85:7,9
  85:10,13,15,22
  85:25 86:5
  87:4,15,23
  154:14,20
  155:7 169:2
  170:17 171:15
  177:17 182:5
  183:8 186:10
  186:20 187:7
  187:11,18,23
  187:24 189:22
  193:7,8,16
  216:17 217:12
  217:21 219:8,9
  219:14 232:15
  233:6 239:6
  242:20 247:16
  247:22 251:20
  253:11 254:2
  255:5,7 256:9

257:2,10,12
  262:24 263:5
  285:1 290:6,6
  293:5,18
  294:23 307:6
  307:20 308:17
  308:23 317:10
  317:19 353:12
  354:13 356:2,2
  356:3,9 360:1
  361:16 365:25
  371:23
**fedex** 217:2
**fedflix** 112:18
**fee** 215:15
  244:19,22
  245:6,12
  248:20,24
  249:10
**feel** 111:25
  374:6
**feeling** 291:14
  291:17 361:19
**feels** 359:11
**fees** 195:11
  245:14 249:9
  249:11
**fellow** 77:15
**felt** 170:7,15,19
  171:17 172:7
  172:10 308:25
**fenwick** 1:21
  2:14,20,25
  9:24
**festivals** 68:11
**festooned** 182:9
**field** 46:19
  219:25 278:24
  279:22 338:5
  338:21
**figures** 130:18
**file** 6:22 54:25
  55:5,11,14,19
  55:23 56:2,10
  102:16 103:22

143:10,10,14
  146:7 150:2,6
  152:3 258:2
  259:7 266:7,11
  267:16,16
  268:4,11 269:1
  269:5,11,16
  270:10,17,19
  271:18,19
  272:18 273:3
  273:10 274:3,3
  274:5,11,19
  278:15,21
  282:7 283:18
  284:9,10,10,19
  309:13,22
  321:5 325:18
  325:22 333:15
  335:8 351:3,15
**files** 51:12 52:8
  54:6,23 114:24
  145:24 146:1
  150:9,10,16
  151:7,11
  208:19 218:4
  260:21 261:6
  268:20 284:7,9
  351:7
**filings** 89:6
  113:12
**fills** 151:24
**final** 105:21
  188:3 352:21
  352:24
**finances** 89:23
  125:20,22
  126:8,10,23
  175:19
**financial** 120:25
  121:5 163:6
  185:2 199:19
**financially**
  375:12
**financials** 79:8
**find** 107:20

293:17 315:7
  332:19 340:22
**fine** 19:9 113:2
  153:13 162:4
  228:8 277:6
  349:24
**finish** 14:8 25:5
  162:5 278:9
  355:19
**fire** 164:2
  165:15 196:2
  196:17
**firm** 128:25
  129:6
**firms** 128:22
  129:4,8,12,24
**first** 5:22 15:10
  15:13 25:2
  30:3,6 33:6
  44:7 62:13
  67:9 69:20
  82:19 104:6,8
  128:17 131:8
  145:8 151:24
  153:12 155:11
  155:21 159:16
  181:25 188:8
  199:15 200:4
  215:22 218:10
  232:9 233:8
  235:1 243:2
  246:1 247:8
  269:4 282:19
  291:12 314:18
  314:19 315:15
  315:17 316:17
  325:11 330:25
  331:1 340:13
  348:23
**five** 127:23,24
  252:22 277:4
**floor** 1:23 2:17
**flowing** 180:7
  224:14
**focus** 150:16

155:5 164:1
  326:8
**focused** 47:11
**foerster** 129:22
**foia** 16:14 88:22
  89:1,4,9,11
  242:4,8,10,18
  243:11 245:5
  248:14 249:1
  249:21,22,23
  251:6,20
**folks** 163:9
**follow** 60:24
  145:4 243:3
  372:1
**following**
  120:24 129:7
  278:21 282:23
**follows** 10:16
  337:5
**food** 124:23
**force** 40:8 41:6
  59:2,14,19,24
  61:23 75:16,19
  76:10 77:1,5
  155:24 206:15
  218:12 297:25
**forced** 202:22
  203:14,16
**foregoing**
  203:22 374:4
  375:15,15
**foreword** 42:15
**forget** 35:20
  130:25
**forgot** 112:8
  113:7
**form** 89:6 98:5
  107:9 109:18
  128:8 148:23
  151:25 204:17
  211:7 256:19
  257:19 258:16
  258:22 264:14
  267:9,24 268:7

Carl Malamud

May 12, 2015

San Francisco, CA

268:12 269:3
269:13,20
270:22 272:6
275:18 278:8
279:11 280:13
282:1 284:1
304:16 329:24
330:12 370:18
**formal** 24:20
41:24 85:8,12
86:2 132:12
143:11 169:17
**formally** 74:7
**format** 51:7
52:24 89:6
263:10 268:6
268:15,16,23
269:2,12,17
270:7,12
271:17 278:1,3
278:11 281:24
282:5 283:7,11
283:12 284:5
330:1,2,4,5
337:4
**formats** 50:3,15
51:24 52:14
53:6
**formatted** 214:5
**formatting**
296:15
**former** 115:13
136:20 365:24
366:3
**formulas** 57:5
269:8
**formulates**
166:24
**formulations**
172:21
**forth** 79:15
80:11
**forward** 370:4
**forwarded**
367:16,18

368:7 369:22
**foun** 310:5
**found** 168:12
226:22
**foundation** 3:3,4
10:1 15:23
18:15 19:3
21:8 22:10
26:11 28:22
29:4,14,21
30:13 31:7
36:19 40:22
41:4 44:21
47:2,16 48:18
50:6 51:15
52:2,17 53:9
54:16,24 55:9
55:20 56:5,16
57:10,19 59:9
59:21 60:10,17
61:1 62:2
69:18 72:3
76:19 77:10
84:17 86:9
87:8,18 89:18
91:22 94:24
95:16 96:24
97:16 100:21
104:20 105:15
106:13 108:21
111:23 112:14
119:5,13,23
120:8,16
121:13,21
122:7 130:4,5
130:24 131:1
131:25 132:11
132:13 133:10
133:11,13,14
151:2 155:16
163:22 171:25
178:4,20
179:21 182:14
191:12 197:5
204:23 205:11

206:11 209:20
214:25 215:25
216:23 217:20
220:24 222:17
227:12 228:18
230:17 233:12
234:17 243:24
245:3 252:14
269:21 273:25
286:10 292:23
296:1 298:6,22
299:24 300:18
301:2,18
302:12 303:19
304:2,13
307:13 308:20
310:25 311:23
312:16 313:18
316:10 317:6
318:25 321:17
321:23 323:3
323:17 324:3
325:5 326:5
327:9,25
328:23 329:9
332:1 333:4
334:16 342:5
342:24 345:3
345:22 346:14
347:2,19
348:13,17
350:17 351:10
351:20 354:16
355:23 358:11
366:10 368:18
368:24 369:8
369:16,25
370:14 371:2
371:19 372:3
**foundations**
34:13
**founded** 66:21
77:21 105:4
163:24
**founder** 73:14

78:2,6,11 88:4
115:18 320:17
**founding** 104:12
**four** 49:2 83:3
297:16,17
**fourth** 67:20
326:19 362:13
**frames** 64:9
**framework**
76:25
**francisco** 1:24
2:18 3:8 9:17
133:18 140:8
**frank** 160:11
**frankly** 170:13
179:7
**frcp** 125:17
**free** 131:9 159:2
159:11,21
160:17 161:9
161:21 162:20
179:1 212:4
240:9,12
244:25 245:10
285:4,8 363:1
**freedom** 88:23
240:13,24
241:6
**freely** 208:19
**friend** 101:3
**front** 14:16
19:22 156:2
181:3
**frontier** 3:3,4
10:1
**ftp** 51:12,18
102:15,16,18
150:2 333:14
333:17 335:6
335:19 347:12
**full** 10:6,19
44:22 220:7
253:13 283:14
283:14,19
325:23 326:3

326:15 328:13
**fullest** 326:1
**function** 113:10
138:16 161:17
277:24
**functionality**
221:6
**functioning**
221:18
**functions** 45:23
119:2 206:4
225:1
**fund** 82:15
179:25 199:6
199:16 200:5
212:14
**fundamental**
186:18,24
187:9,25
198:20
**funding** 82:24
124:1,24
134:17 135:7
180:3 198:12
198:13 208:11
208:11 224:11
**funds** 132:2
207:9,16
208:22,25
244:13 248:25
**furnished** 98:4
138:22 332:11
333:19
**further** 58:16
209:4 219:17
312:8
**future** 33:24
34:5 122:19

---
**G**
---

**g** 9:1
**gage** 29:7 30:16
33:4
**gainful** 62:13
63:20 65:22

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                    May 12, 2015
San Francisco, CA

66:19 70:20
71:5 72:8
73:13 74:18
75:13 77:5,19
92:9
**gamble** 183:6,17
184:8,23 185:2
**garfield** 173:15
174:9,14
175:12
**gary** 6:6
**gathered** 162:14
**gathering** 35:20
**gee** 175:6
**geek** 48:22
49:12
**general** 42:23
68:18,21
159:18 160:8
176:11 177:10
177:15 181:23
196:18 198:13
228:1 241:1
282:16 303:22
360:18
**generally** 31:4
32:17,21 42:17
60:14 66:9
81:8 141:14
143:12 149:7
174:5 223:20
361:13
**generalpurpose**
154:15,17
**generate** 260:22
**generated**
279:23 281:17
**gentleman**
310:22
**gentlemen** 9:4
158:20 366:5
**genuine** 107:8
**georgetown** 25:1
**gestures** 12:11
**gift** 211:17

**give** 13:1,21,24
19:19 23:20
26:25 40:10
51:22 52:12
56:19 61:10,18
69:7 83:11
86:16 88:11,13
89:9 96:15
117:25 124:22
154:18 179:11
207:7 211:17
245:15 272:22
296:22 334:10
344:10 350:20
**given** 12:24
103:22 175:2
177:3 246:24
247:1,2 349:10
352:15 363:1
374:5 375:16
**gives** 202:12
**giving** 12:4 65:1
161:23 173:25
175:11 176:8
196:21 287:9
**glad** 163:12
**glance** 30:6
104:6,8
**global** 38:24
42:3,18 48:17
49:4 136:19
264:1 276:14
276:17
**globally** 158:22
**go** 10:8 25:5,16
64:2 68:14
70:4 91:9 94:4
94:5 104:7
106:13,17,22
123:7 167:1
179:5 180:3,22
192:15 202:15
204:3 212:13
220:25 246:18
264:17 274:22

278:21 296:17
300:10 305:8
316:14 321:15
324:5 333:16
341:1,2 352:17
366:25 368:12
**goal** 96:9 208:11
211:25 307:4
**goals** 68:25
**goes** 44:23
201:12 249:12
254:5 352:13
**going** 20:5 72:12
126:19 145:4
167:1 169:10
206:21 238:3
245:13 250:17
252:20 274:14
274:15 286:22
290:2 295:1
300:9 302:3
314:15,22
322:16 325:15
325:21 332:5
343:11 348:12
349:16 350:2
358:1
**gold** 177:3
197:13
**goldstein** 366:2
366:3,6
**good** 9:3 15:2
27:9,12 84:12
90:3,4 123:10
139:16 144:10
211:7 227:2
**goodlatte** 222:5
**google** 92:24
116:10 130:3
130:22 133:8
266:5 267:4
**gov** 32:6,12
37:19 39:7,21
46:25 47:8
79:14 96:20

97:1 341:3
**governance** 76:3
76:6 78:19
79:8 88:5
**governing**
246:25
**government**
5:17 33:20
35:12 38:1,4,8
38:11 40:7,17
40:20,24 41:2
63:23 64:25
65:8 79:11
82:3 88:20
89:10 153:25
163:24 169:3,5
175:5 178:18
179:6,17,18,23
180:14,15,19
180:21 186:19
197:14 198:10
198:17 202:22
217:3 218:14
219:6,11
221:18,20
222:12 223:10
231:19 242:15
243:4 245:13
253:23 256:9
256:24 308:23
355:11 358:25
**governmental**
40:9 154:9
155:2,13
163:17 164:10
164:19 166:21
282:9
**governments**
230:23
**governors** 62:18
62:24 63:1,9
63:11,17
**grade** 170:19
171:2 172:15
**graduate** 71:22

**grant** 130:3,22
131:25 132:1
249:22,22
**granted** 24:5
270:4
**granting** 195:12
**grants** 124:6,25
125:5 127:20
127:24 128:5
130:12 131:2
131:18,24
133:8 134:19
135:6,12
**graphic** 56:14
56:20,21,22
57:3,9,12,16
57:23 135:24
261:16,21,22
**graphical**
145:21
**graphics** 56:24
**gravenstein**
10:22
**grayed** 298:17
**great** 162:20
219:9 246:20
372:11
**greater** 131:24
132:4,17 193:4
**greatly** 364:25
**grounds** 29:13
112:13 128:3
171:9 175:18
175:23 314:12
322:11 323:14
324:22 334:15
337:11 342:2
348:12 354:19
359:10 362:16
362:21,24
**group** 62:21
**grouped** 144:14
144:15
**groups** 160:17
**grove** 236:20,25

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 397

| | | | | |
|---|---|---|---|---|
| 239:16 240:1 | **hard** 346:13,25 | **hes** 14:24 173:16 | **housekeeping** | 43:13 44:15 |
| **guarded** 215:17 | 347:17 | 294:16,17 | 12:2 14:5 | 45:1,8,16 46:1 |
| **guess** 95:17 | **hardi** 122:23,23 | 334:8 335:24 | **htc** 136:19 264:1 | 46:11,23 47:7 |
| 153:21 211:16 | 123:18 | 341:13 | **html** 54:6,23,25 | 47:21 48:9,23 |
| 218:4 244:9 | **hardware** | **high** 161:7,10 | 55:1,3,5,18,23 | 49:7,13,25 |
| 306:24 | 162:25 | 162:6 255:16 | 56:1,10 208:19 | 50:10,19 51:1 |
| **guest** 5:11 33:5 | **harm** 364:25 | **highest** 22:19,21 | 269:5,12 | 51:21 52:11 |
| 181:19 | **harvard** 31:20 | **highlighting** | 270:13,17 | 53:3,17,22 |
| **guide** 75:7,9,11 | **hasnt** 341:14 | 184:12,16 | **http** 102:14,17 | 54:19 55:4,7 |
| **guild** 290:23 | **hazardous** | **highway** 10:22 | 147:18,22 | 55:17 56:3,12 |
| 291:7 | 195:25 | **hill** 39:8 | 148:4,10,12,20 | 56:18 57:7,15 |
| **guys** 167:18 | **head** 149:1 | **hired** 75:14 | 148:24 149:4 | 57:25 58:6,18 |
| | 298:5 | **historical** 53:13 | 149:11,15,25 | 59:3,12 60:2,7 |
| **H** | **headed** 52:5 | 53:25 100:12 | 333:25 334:20 | 60:13,22 61:9 |
| **h** 335:5 | **header** 56:10 | **history** 32:1 | 334:24 335:18 | 61:20 64:3 |
| **hal** 115:14 116:8 | 266:6,14 | 36:14 37:25 | 347:12 | 65:6,14 66:5 |
| 117:12 | 296:17 320:25 | 219:10 361:11 | **https** 284:7 | 66:15 68:5,17 |
| **half** 199:15 | **headers** 261:7,9 | 361:14 | 315:4,8 | 69:4,25 70:14 |
| 200:3,4 | **heading** 181:25 | **hit** 290:7 | **hudis** 2:5 4:3 | 70:19 72:6,12 |
| **hall** 99:12,23 | 296:11 | **hold** 63:3 196:4 | 7:17 9:21,21 | 72:15,21 73:8 |
| **halperin** 186:14 | **headings** 296:10 | 224:8 267:10 | 10:3,5,18 13:9 | 74:14 75:22 |
| **hand** 10:11 | 297:15 | 276:3 366:22 | 13:10 14:2,15 | 76:22 77:13 |
| 170:24 234:4 | **health** 365:19 | **holders** 256:13 | 15:17,24 17:3 | 78:17 80:6 |
| **handle** 89:23 | **hear** 345:18 | **holdings** 256:7 | 17:11,23 18:4 | 81:15 83:19 |
| 366:12 | 372:6 | **holiness** 42:15 | 18:5,19 19:1,4 | 84:4,14,22 |
| **handling** 179:5 | **heard** 195:16,22 | **home** 4:18 10:24 | 19:14,21 20:16 | 85:2,5,20 86:6 |
| 240:5,6 | 196:1,5 277:13 | 11:1 69:20 | 20:21 21:12,20 | 86:15 87:2,13 |
| **hands** 363:6,13 | 277:18,21 | 76:9,13,15,18 | 21:20 22:8,14 | 88:2,12 89:8 |
| **handwriting** | 302:4 | 111:2,18 | 23:23 24:3,24 | 89:21 90:11,18 |
| 156:13 157:2 | **hearing** 195:24 | 113:10 | 25:17,25 26:5 | 91:11,25 93:6 |
| **handwritten** | 196:10,14 | **honor** 6:16,19 | 26:16,24 27:9 | 93:21 94:4,8 |
| 156:17,20,22 | **hearings** 80:2,9 | 287:10 | 27:12,13,22 | 94:20 95:3,19 |
| 156:24 | 361:15 | **honoring** 170:23 | 28:2,16 29:1 | 95:24 96:2,5,6 |
| **hanging** 333:17 | **heavner** 370:2 | **hospitals** 224:24 | 29:18 30:1,2,9 | 96:14 97:4,20 |
| **happen** 159:10 | 371:6 | **host** 49:11 | 30:23 31:13,22 | 98:7,16,25 |
| 289:6 | **heavners** 370:23 | 173:16 | 32:5,15,23 | 99:9 100:24 |
| **happened** 211:8 | 371:8,14 | **hosted** 152:6 | 33:12,17 34:6 | 103:13,19,23 |
| 212:16 289:5 | **held** 78:7 234:4 | **hosting** 93:10 | 34:14,21 35:3 | 103:24 104:10 |
| 289:17,21 | **help** 160:18 | **hot** 184:4 | 35:14,23 36:8 | 104:22,25 |
| 290:4 | 179:25 210:15 | **hours** 18:16 | 36:17,23 37:13 | 105:12 106:2,6 |
| **happens** 174:18 | 314:7 324:18 | 19:16,17 22:3 | 37:21 38:2,9 | 106:12,16,20 |
| **happily** 198:18 | **helping** 198:14 | 372:16 | 38:23 39:6,15 | 107:4,22 108:5 |
| **happy** 31:11 | **hensley** 3:14 9:5 | **house** 79:21,22 | 39:24 40:3,18 | 108:9,15,16,25 |
| 124:9 176:10 | **heres** 344:14 | 79:24 80:7 | 40:25 41:7 | 109:6,20 110:2 |
| 304:4 | **hereto** 375:21 | 96:21 | 42:11,24 43:8 | 110:12,19 |

Carl Malamud                                                      May 12, 2015
                           San Francisco, CA

111:9 112:3,17
112:21,25
113:3,4,24
114:18,25
116:21 117:11
117:23 118:10
118:21 119:9
119:18 120:3
120:10,22
121:17 122:1,9
123:7,9,16
124:10 125:6,9
125:13 126:11
126:17,25
127:2,5,13,18
128:10 129:7,9
129:20 130:10
130:20 131:17
132:6 133:1,6
134:3,16 135:4
135:13,19
136:1,8,14,25
137:7 138:24
139:6,11,16,22
140:4,9,15,25
141:5,18,23
142:3,10,19
143:4,20 144:2
144:19 145:16
146:18 147:5
147:17 148:3,9
149:14 150:1
150:12,13
151:9,18 152:8
152:18 153:1,8
153:18 154:6
154:16 155:9
155:20 156:1
156:15 157:1,7
158:3,25
159:13 160:23
161:19 162:17
163:14 164:6
164:16,25
165:10 166:6

167:1,4,15,22
168:3,11 169:7
170:11 171:20
172:13 173:10
174:7 175:25
176:4,22
177:19 178:15
179:14 180:8
180:23 181:2
182:20 183:23
184:18 185:7
186:7 187:8
188:2,21
189:13 190:3,4
190:11,25
191:17,24
192:14,21
193:2,24 194:6
194:25 195:7
196:6,12
197:18 198:2
199:3,21
201:11 202:19
204:18,25
205:19 206:7
206:17 207:3
207:17,24
209:3,13,25
210:11 211:10
211:24 212:7
212:12 213:1,8
213:15,20
214:6 215:9
216:6 217:6,24
218:24 220:4
221:10 222:10
223:6,19 224:1
224:16 225:4
225:10,18
226:1,7,18
227:1,3,18
229:2,16,23
230:10 231:6
231:21 232:3
232:17 233:7

233:21 234:6
234:19,25
235:9 236:4
237:10,18
238:1,15,20,22
239:8,20
240:19 241:9
241:14 242:2
243:12 244:4
245:8,21
246:16 247:19
248:8,17 249:6
249:24 250:7
251:8,14
252:22 253:7
255:9 256:3,25
257:15,23
258:18,23
260:3,10 262:1
263:19 264:16
264:25 267:18
268:3,9,14,22
269:9,15 270:1
271:3,15 272:9
272:23,25
273:2,9 274:4
274:8,17 275:9
275:21 276:4
277:17 278:9
278:10,17
279:15 280:17
280:24 281:8
282:3,17
283:22 284:2
285:3,7,18
286:2,12,24
287:8,18
288:11 289:25
291:19 292:10
293:7,20 294:9
294:15,23
295:4,6,21
296:7 297:2,11
298:9 299:2,13
300:2,8,21

301:7,20 302:2
302:6,7,16,25
303:10,16,24
304:5,17,25
305:22 307:1,7
307:16,25
308:11 309:3
309:19 310:12
311:2,14 312:1
312:11,18,25
313:5,20,25
314:2,17
315:14,23
316:13 317:12
318:10,13,20
319:3,13,18
320:9 321:2,20
322:1,19 323:5
323:18 324:7
325:2,7 326:17
327:6,13 328:3
328:10 329:5
329:17,23
330:3,8,15,22
330:23 331:3
331:14 332:6
332:14,21
333:13 334:11
334:13,19,25
335:4,10,17,24
336:9,25
337:15,20,24
338:14,22
339:6,13,23
340:5,11,21
341:9,18 342:6
342:14,20
343:4,14,17,20
343:24 344:6
344:15,20,23
345:6,24 346:8
346:19 347:9
347:22 348:5
348:20 349:2
349:10,19,21

349:25 350:4
350:10,23
351:4,5,13,25
352:10,15,22
353:23 354:24
355:13,19,20
356:15 357:1
357:17 358:4
358:15 359:18
360:2,6,12,21
361:24 362:11
363:4,15 364:1
364:12,23
365:15 366:15
366:24 367:8
367:22 368:1,6
368:14,21
369:2,11,19
370:3,11,21,22
371:5,13,25
372:7,21,25
373:13
**huge** 68:10
   197:16 223:24
**human** 146:5,15
   147:1,13
**humor** 370:18
**hundred** 131:3
   131:20 132:4
   132:17 210:21
   210:24 268:20
**hypertext**
   147:19
**hypothetical**
   55:13 85:23
   87:19 149:21
   154:4 162:11
   176:20 197:22
   199:12 200:10
   201:22 292:22
   306:23 307:3
   307:12,22
   308:19 319:8

───────────
            **I**
───────────

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 399

| | | | | |
|---|---|---|---|---|
| **ibr** 261:2 315:4 | 25:14 29:10,10 | 195:4 198:9 | 62:22 | **include** 38:12 |
| **id** 17:18 19:22 | 30:1 33:8 | 200:3 201:8 | **implicates** | 54:4 115:14 |
| 26:1 28:18 | 37:11 50:17 | 206:12 213:12 | 207:13 | 139:4 143:12 |
| 31:11 71:16 | 58:13 61:16 | 213:17 217:8 | **implication** | 145:19,21 |
| 103:6 106:12 | 65:3 74:12 | 219:25 227:13 | 312:6 | 146:7 203:22 |
| 111:24 124:9 | 94:8 103:23 | 228:8 230:6,7 | **implications** | 205:17 223:4 |
| 139:6 141:12 | 104:2 106:3,10 | 232:22 236:17 | 365:11 | **included** 49:20 |
| 145:5 149:9,11 | 106:16 109:10 | 238:3 240:12 | **implicit** 314:10 | 223:17,18 |
| 155:7 156:6,10 | 126:11 127:3 | 241:11 247:7 | **implied** 50:22 | 240:14 |
| 174:9 176:10 | 168:25 173:11 | 249:2 250:9,9 | **implies** 146:4,25 | **includes** 41:6 |
| 181:12 198:22 | 174:18 184:11 | 250:13,13,14 | 147:14 | 113:17 172:21 |
| 211:20 219:17 | 194:16 201:14 | 252:2,20 253:8 | **imply** 315:19 | **including** 29:16 |
| 264:6 267:10 | 217:16 227:10 | 254:7 259:23 | **importance** | 87:25 129:17 |
| 282:6,21,22 | 229:8 230:15 | 260:7 268:13 | 196:20 197:8 | 131:22 189:20 |
| 304:4 306:24 | 238:20 255:25 | 270:9 272:23 | 247:1 | 202:6 240:6 |
| 308:7 326:18 | 265:4 278:18 | 281:4 286:22 | **important** 55:22 | 326:24 327:19 |
| 331:15 332:4 | 278:22 283:14 | 288:21 294:13 | 62:4 164:4 | **inclusive** 120:1 |
| 333:21 338:17 | 288:1 301:25 | 294:13 300:12 | 183:22,24 | 120:21 |
| 339:3 342:7 | 313:22 324:25 | 301:24 302:2 | 195:15 197:9 | **income** 125:20 |
| 353:1 358:18 | 337:18 349:25 | 303:7,10 310:5 | 198:19 200:22 | 125:22 126:8 |
| **idea** 29:8 207:6 | 350:4 362:16 | 310:6 314:15 | 201:5 290:21 | 126:10,23 |
| 240:15 281:20 | 367:9 372:12 | 314:22 317:7 | **importantly** | 177:25 |
| 347:20 | **illness** 13:12 | 322:16 325:17 | 160:14 289:22 | **incomplete** |
| **identical** 150:17 | **im** 14:20 20:5 | 331:8 337:10 | **impose** 292:7 | 66:11 156:8,11 |
| **identified** | 28:4 30:15,19 | 339:4 340:16 | **imposed** 81:14 | 319:24 |
| 294:18 | 50:8 56:22 | 348:11 349:14 | **impossible** | **incomprehens...** |
| **identifier** 280:2 | 58:11 63:6 | 349:16 350:2 | 347:8 | 190:10 |
| 280:3 281:6,16 | 65:24 70:11 | 352:9 355:7 | **imprecisely** | **incor** 355:16 |
| 281:18,19,22 | 72:12 75:1 | 360:5 363:2,13 | 152:25 | **incorporate** |
| 339:7 341:2,4 | 78:15 85:18 | 363:23,24 | **impression** | 175:6 |
| **identifiers** 338:2 | 97:17 99:15 | 364:9,10,22 | 224:12 228:23 | **incorporated** |
| 339:12 | 103:17 112:11 | 365:10 366:11 | 303:23 | 9:12 83:21,23 |
| **identify** 9:19 | 117:17 118:3 | **image** 145:22 | **improve** 193:10 | 84:19 85:14,22 |
| 29:24 264:10 | 126:19 131:11 | 146:8 | **inaccessible** | 86:3,7,17,23 |
| 288:13 353:12 | 133:23,23 | **images** 81:17 | 304:23 | 87:3,14,16,23 |
| 354:12 | 137:25 18,19 | 145:22,23 | **inactive** 74:15 | 87:25 93:25 |
| **identities** 131:7 | 140:13,23 | 279:14 | 100:4 | 154:8,21,23 |
| 134:23 206:22 | 142:5 143:17 | **immediately** | **inappropriate** | 155:6,13 |
| 206:24 207:13 | 149:12 157:24 | 349:12 | 170:7 171:16 | 163:17 164:10 |
| **identity** 151:6 | 160:24 163:12 | **impact** 134:25 | **incentives** | 164:19 165:25 |
| **ietf** 60:1,12 61:7 | 167:19 171:11 | **impaired** 269:19 | 195:13 196:25 | 170:2,9,15 |
| 61:10,12,12,19 | 171:19 172:18 | 269:25 270:6 | 197:1,12,19 | 172:4,22,24 |
| 62:3 159:5 | 181:18 182:6 | **imparted** 35:5 | 198:3 | 177:1,17,20,24 |
| **ii** 108:18 182:24 | 184:16 188:7 | **impeding** 192:2 | **inch** 259:4,6 | 178:17 179:17 |
| **ill** 17:9 23:20 | 190:1 191:2 | **implement** | **incident** 120:20 | 180:14 182:4 |

Carl Malamud                                                    May 12, 2015
San Francisco, CA

183:8 186:19
187:10,22
190:23 193:6
197:15 201:17
202:4 203:23
207:21 214:21
215:4 216:15
217:14 218:2
218:11,22
219:13 223:5
230:20 232:14
233:5,17 234:3
234:5 239:5
242:19 246:25
247:11,21
248:4,6,14,15
253:13 255:4
256:9,21 257:1
257:11,22
262:23 276:3
276:19 282:9
284:25 289:2
292:8,13 293:4
294:4 299:8
307:5,19
308:16 316:20
317:9,19 338:4
338:11 339:20
353:14 355:12
355:16 356:18
357:4,15,20
358:8 359:1,16
359:25 360:19
361:21 371:22
**incorporates**
85:9
**incorporation**
4:13 84:23
85:7 103:12
104:9,11,16
105:3,5 107:9
107:10 108:19
153:23,25
155:1 157:22
157:25 165:14

165:17 168:18
169:4,11,18
176:14 183:11
189:9,11,18
190:7,17 192:4
193:5 213:3
215:6 222:25
248:19 255:20
261:2,5,21
262:7 263:6
291:13 308:5
308:24 309:7
355:5,25 356:8
356:13 366:8
**incorporation...**
361:17
**incorrect** 42:8
47:5,19
**incorrectly**
214:4 265:5
**increase** 91:23
**increased**
161:24 204:9
204:10
**increases** 91:19
**incurring**
285:11
**independent**
135:14,23
137:1 332:13
332:20,23
342:8 344:25
353:24
**independently**
54:12,21
332:17 345:1
**index** 4:1,7 5:1
6:1 7:1 8:1,12
**indiana** 23:2,19
24:9 62:10
**indicate** 109:21
110:5 172:19
176:2
**indicated** 343:3
**indicator** 86:24

**individual** 31:11
70:3 131:23
147:13 298:19
356:11 374:13
374:14
**individuals**
47:13 49:3
82:15 128:3
228:24 357:13
**industrial** 163:9
**industry** 114:12
115:6 163:2,6
193:7 202:23
**inform** 254:13
306:2
**informal** 162:13
**information**
33:19,22 35:21
43:1,15 53:1
54:12 68:20
79:5,8 80:19
81:1,23 82:7
82:13,22 83:2
83:8 88:23
89:13 95:7
97:8,19 98:5,9
98:19 99:18,22
100:1,6,16,20
101:13 102:9
102:20 113:8
114:11 115:6,7
115:9,10
124:19 126:9
126:22 131:7
134:23 163:25
164:2 185:16
186:3,5,6,8,10
194:17 204:4
228:14,16
229:7,10 230:3
230:5,16
231:11,14
240:13,24
241:6 242:15
246:3,5 252:8

252:16 253:23
254:18 255:11
278:21,25
279:10 280:1,4
280:8 281:15
281:21 286:19
295:9 298:13
298:15 299:14
312:9 330:17
332:9 333:16
333:22,24
343:1 345:9
351:1 353:5
**informed** 321:8
321:9
**informing** 305:8
**infrastructure**
69:3,6 95:10
96:7 97:19
**ingres** 42:25
43:6,9,11,15
43:16,24 65:16
**inherent** 44:13
**inherently**
267:12
**initial** 4:23
125:16 266:21
**initiator** 297:18
298:10,11
**injunction**
325:19,22
364:15,25
365:2,11
**injury** 364:14,21
**inkind** 135:2,5
**input** 278:20,25
279:10,16,18
279:20 280:1,4
280:8
**inputting**
280:11
**insert** 281:11,15
281:21
**inside** 291:4
**insist** 349:14

373:11
**inspect** 252:9
254:20 255:13
255:22
**inspection**
255:17
**inspector** 365:22
**instance** 304:4
**instances** 353:17
354:12
**institute** 161:3
243:16 248:5
367:15
**institution** 23:17
80:22
**institutional**
76:9,12,15,17
**institutions**
299:4,7
**instruct** 17:10
17:18 33:8
227:10 228:15
229:9 230:4,15
231:13 255:25
285:13 286:18
291:25 312:10
314:13 320:21
322:11 323:14
324:23 342:2
354:19 359:10
362:7,8,21
**instructed**
239:18
**instructing**
17:24
**instruction**
322:14 359:12
359:22 360:15
360:24,24
363:1,22 364:7
364:18 365:6,9
**instrumental**
101:8
**int** 69:24 70:2
**integral** 255:4

Carl Malamud                                                    May 12, 2015
                            San Francisco, CA

                                                                  Page 401

257:13
**intellectual** 58:8
**intended** 325:3
**intense** 290:10
**intensely** 291:1
**intent** 151:3
**intention** 262:18
  325:18
**interaction**
  79:11 141:14
**interactions**
  79:12 141:17
**interchangeable**
  209:11
**interchangeably**
  205:14,16
**interconnect**
  44:11
**interconnection**
  158:19
**interest** 192:5
  206:25 234:13
  234:21 245:6
  249:5,10 365:1
  365:1
**interested**
  118:18,20
  155:11,22,23
  163:15 164:5
  233:1 243:14
  291:1 375:12
**interesting**
  224:10 370:15
**interface** 279:4
**interim** 326:2,15
**intermediate**
  271:10,13,14
**internal** 89:5
  108:14 113:18
**internally**
  151:16
**international**
  44:10 51:6
  158:12,14
  159:7,19 160:4

160:9
**internet** 5:3 18:9
  21:25 32:18
  33:7,24 34:4,5
  34:7,11,13
  35:25 37:8
  38:21,22 39:4
  42:7,22 44:22
  45:2,9,12,13
  45:15,24 46:2
  46:10 48:15
  49:5,24 50:4
  50:16 51:8,9
  51:14,20,25
  52:9,15,25
  53:7 59:2,13
  59:16,18,24
  61:22 66:21,25
  67:4,5,7,10,14
  67:18,20,22
  68:15,18,22
  69:1,3,5,12,15
  69:21 70:7,21
  71:13,25 72:10
  73:10,18,19,21
  74:3 75:7,14
  75:15,18,18
  76:4,7,9,24
  77:1,4 78:23
  92:21,22 93:1
  93:7 95:2,12
  96:8 99:8,21
  99:24 100:8,19
  101:1,4,8
  102:2,4 103:1
  116:7 117:7
  140:5,10,16,19
  141:7,11,15,25
  142:7,11,17,20
  143:6,22
  144:11,25
  145:7,9 146:2
  146:12,16,20
  147:7 149:19
  151:20 152:10

153:9 155:12
  157:3 158:18
  159:9,20,23
  168:12 200:22
  202:22 203:16
  209:16 212:3,4
  243:5,17 246:3
  246:14,21
  261:17 263:16
  264:13,22
  268:6 271:8,20
  272:2,5,14
  275:3,11,14,16
  276:6,9,18,24
  278:15,20,23
  279:7,9,14,23
  280:15 281:25
  282:5,12
  283:20 284:11
  284:20 285:2
  285:12,20
  286:4,14,16
  287:1,20 293:6
  297:24 299:22
  300:15 303:5
  304:9 305:7,16
  305:17 306:3
  306:16 307:21
  308:18 309:21
  309:24 312:14
  318:7,23 319:7
  320:1,4,18
  321:7,15 322:3
  322:6 326:25
  327:21 328:20
  331:20 332:24
  336:16,17
  337:14 339:12
  341:5,11
  345:18 346:1
  346:11,23
  347:16 348:1
  351:16 367:15
  367:18 368:3
  368:17,23

369:13,22
  371:1
**internship**
  224:23
**interoperability**
  46:13
**interposed** 20:7
**interrogatores**
  5:23
**interrogatories**
  7:25 236:7
  343:21 352:4
**interrogatory**
  236:15,19,22
  237:2,7 258:4
  258:5,13
  260:13 263:15
  264:7,9 271:22
  271:25 272:7
  284:18 300:6
  300:11 303:1,9
  303:15 330:19
  331:19,24
  332:3,8,23
  333:10,22,23
  335:19,20
  343:3,5,5
  348:22 353:2,6
  353:11 354:9
  354:11 355:4,8
  355:8,9,10,21
  356:10
**interview** 38:20
  48:24 173:19
  173:20,23
  174:1,8 175:12
  176:6
**interviews** 34:4
  37:7 48:21
  49:3
**introductory**
  349:22
**inventors** 116:4
  116:5
**invest** 308:8,14

**investigated**
  76:8
**investigating**
  76:2,15
**investor** 117:17
  118:8,23
**invisible** 73:15
  73:17 74:19
**invite** 65:4
**invited** 222:8
**invoking** 321:12
**involve** 255:16
  322:15 356:1,4
**involved** 30:7
  49:3 54:2
  61:14 74:1
  225:22 228:20
  228:25 264:11
  321:25
**involvement**
  30:11 49:8
  225:23
**ip** 34:12 38:15
  44:21 49:23
**irrelevance**
  137:4
**irrelevant** 127:1
  207:10
**irreparable**
  364:14,21
**irs** 4:17 93:22
  96:16 113:16
**irsexempt**
  113:11
**isnt** 182:25,25
**iso** 158:15
  159:15 160:3,4
  160:11,14
  161:9,17
**issa** 80:1
**issue** 47:11 76:8
  107:16 154:23
  168:18 169:18
  170:1 175:21
  226:22 227:14

Carl Malamud                                                    May 12, 2015
San Francisco, CA

232:15 239:24
239:25 240:14
247:17 250:22
251:5 252:18
262:7 269:8
277:2 290:24
291:12 292:25
293:2 299:18
324:14 330:22
331:25 333:9
334:24 342:18
356:8 357:14
358:1 359:24
360:17 361:10
366:12
**issued** 137:12,21
137:25 194:12
316:20 317:3
361:7
**issues** 98:1,14,17
179:5 213:4
217:4 219:20
306:8
**issuing** 304:10
**item** 29:7 30:15
30:25 31:15
32:6,8,24,25
33:10,13,24,25
34:15,16 35:24
36:1,5,9,10
37:2,3,14,15
38:15,16,24,25
39:7,9 41:8,9
42:2,3,25 43:1
44:2 46:2,4,12
46:14,24,25
47:6,8,25 48:1
48:16 49:8,14
125:10 142:18
142:21,22,23
143:3,3,9
146:17 277:1
279:2,6,21
281:7 282:6
283:7,11 284:5

284:9 299:3
304:15 305:8
324:5
**items** 28:25 29:2
29:3,15 30:7
30:10,20 31:12
66:14 125:17
143:2,5,12,19
144:5,13,15
243:5 275:8
283:21 345:8
**iteration** 82:8,14
82:23
**itu** 159:20,24,24
160:1
**iv** 44:8,9
**ive** 28:12 57:12
57:21 91:15
125:13 152:24
156:2 167:19
181:3 195:22
196:5 219:24
224:3 238:3
242:10 290:24
296:5 310:22
348:5 363:1

— J —

**january** 102:22
111:10 182:17
213:12,14
222:4 312:2,12
328:16
**japan** 68:11
71:7,15
**jealously** 215:17
**jeffrey** 37:8
**jhudis** 2:10
**job** 62:17 266:16
**jobs** 28:5
**joel** 122:23
123:18
**john** 7:8,11 33:4
37:9 82:9
310:19 371:17

**joint** 64:6,19
**jon** 101:3,6,7
150:7,11,11
**jonathan** 2:5 5:6
7:17 9:21
166:12,14
370:19
**journals** 38:8,10
38:11 219:11
361:16
**jpeg** 268:11,15
268:20
**judge** 83:16
171:15
**judicial** 98:3,5
**july** 6:7 233:20
241:5,16 272:8
348:24
**june** 117:2 300:5
300:13 302:19
303:3,14
305:14 322:6
323:7 327:23
331:22 333:1,9
333:12,16
335:21 349:1
**jurisdictions**
157:13
**justia** 114:9,10
114:19
**justice** 32:4
290:19 291:2

— K —

**k** 283:9,15
**kahle** 320:12,13
320:13,16
**kahn** 29:7 30:17
**kail** 136:9,9,11
**kalman** 101:15
101:18,19,21
**kapor** 133:10,12
**katherine** 2:6
9:21
**kcappaert** 2:11

**keep** 206:24
250:17 321:8
326:21 327:17
329:4
**keeping** 329:3
329:15
**keeps** 321:9
**keio** 71:6,7,15
71:20 72:7
**kept** 104:16
138:6,7,14,18
241:18 295:13
295:19 328:19
329:7,24 330:4
336:17,21
346:11
**keynote** 34:25
**kickoff** 32:11
**kickstarter** 5:13
5:15 206:18
207:8 208:5,22
210:22,23
211:5,13 212:1
212:24
**kilobytes** 283:18
**kind** 25:20
56:21 79:5
80:19 97:8
99:18,22 100:1
100:6,16,20
101:13 104:3
113:8 114:13
115:7 154:14
165:4,6,8
225:11,19
261:8 290:7
358:1
**kinds** 71:8,19
79:12 100:10
102:4 115:10
148:1,4 290:20
**knew** 302:14
**know** 12:14,18
12:25 17:1
28:5 46:21

48:14 58:11
60:11,14 62:14
85:21 101:24
101:24 103:16
107:11,17
109:16 111:11
112:1 115:11
115:11 124:11
137:17 145:5
149:17 151:5,7
156:6 163:3
164:22 169:16
178:24,25
184:3 191:22
192:9,23
193:25 194:4
194:13 201:10
206:13 213:14
216:8 223:20
223:24,25
224:6,13,17,21
225:5,11,14,19
225:21,24
226:2,9 227:4
228:9,19 229:3
229:17 230:11
230:18,19,21
230:23 231:7
231:15,18,22
235:7,8,10
239:22 241:24
249:21 259:25
265:12,14
266:9 267:1
268:20 273:16
274:7 277:8,14
281:23 282:22
282:23 288:9
290:19 291:21
294:15,19
295:18 296:2
296:13,17
303:17 307:24
308:9,21
310:10 311:7

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                    May 12, 2015
San Francisco, CA

317:7 329:6
332:5,6 336:16
336:21 337:8
338:15,15,20
338:23 339:7
339:14,24
340:6 341:14
342:7,21 344:8
344:11,12
347:4,7,11
351:6,14
355:14 357:10
357:12,13,22
358:3,12
363:12 364:20
365:13 366:11
366:13 368:7
369:6,9
**knowledge**
103:18 191:6
222:1 227:9,11
277:25 288:3
291:24 292:1
309:22 311:11
320:3 338:6
353:24 354:1
**known** 34:12
41:16 44:8,10
49:23 51:18
53:13 54:4
142:18 147:19
158:13,15
195:25 241:3
**knows** 58:14
109:15 179:12
337:19

**L**
**l** 3:6
**lab** 70:23 71:1,4
71:9 72:2
**labeled** 297:22
298:10
**labor** 365:18
**laboratories**

243:15
**laboratory** 64:7
64:8 244:15
287:17
**lack** 69:18 94:24
119:22 217:5
246:24 247:10
304:20 305:19
332:1 354:15
362:1 364:14
364:20
**lacks** 15:23
18:15 19:2
21:8 22:10
26:11 28:22
29:4,14,21
30:13 31:6
36:19 40:22
41:4 47:2,16
48:18 50:6
51:15 52:2,17
53:9 54:16,24
55:9,20 56:5
56:16 57:10,19
59:9,21 60:9
60:16,25 62:2
72:3 76:19
77:10 84:17
86:9 87:7,18
89:18 91:22
95:16 96:24
97:16 100:21
104:20 105:15
108:21 111:23
112:14 119:5
119:13 120:8
120:16 121:13
121:21 122:7
151:2 155:16
163:21 171:25
178:4,20
179:21 182:14
191:12 197:5
204:23 205:11
206:11 209:20

214:25 215:25
216:23 217:20
220:23 222:16
227:12 228:17
230:17 233:12
234:16 243:24
245:3 252:14
269:21 273:25
286:10 292:23
296:1 298:6,22
299:24 300:17
301:2,18
302:12 303:19
304:2,13
307:12 308:19
310:5,25
311:11,23
312:16 313:18
316:10 317:6
318:25 320:7
321:17,23
323:3,17 324:3
325:5 326:5
327:9,25
328:22 329:8
333:4 334:16
342:5,24 345:3
345:22 346:14
347:2,19
348:12,16
350:17 351:9
351:19 354:16
355:23 358:10
366:10 368:18
368:24 369:7
369:16,25
370:14 371:2
371:19 372:3
**ladies** 9:4
**lama** 42:16
**language** 86:21
87:16,25
171:19 172:11
191:7 219:10
222:12 223:10

247:2 262:15
279:16,18,18
279:20 281:11
**large** 16:10
31:10 69:9,10
89:11 114:23
201:2 203:17
225:21 228:23
270:20 271:1,2
288:20
**larger** 131:3,19
237:21
**largest** 127:23
127:25
**late** 59:5 64:14
65:23
**laurie** 42:15
**law** 5:12 25:1,2
31:16,20,21
32:2,3,6,12
36:10,14,18,22
39:7,21 40:8
41:6 46:25
47:8 58:8 83:7
83:9,22,24,25
84:9,16,21
96:22 128:22
128:25 129:1,4
129:6,7,12,24
155:24 164:1,3
166:25 170:3
170:10,16
171:1,5 172:4
172:5,20,22,25
173:4 174:24
175:7,10 177:5
177:17 178:8
178:25 179:2
181:20,21
182:1,5,25,25
183:25 186:18
186:25 187:9
187:11,25
188:5,12,18
189:1,11 192:4

195:13 197:16
198:20 200:23
202:4 203:5
205:2 206:5,16
207:22 209:15
216:4 217:5,12
217:14,21
218:3,12,23,23
219:6,12 220:8
220:13 223:3
234:9 253:11
254:2,4,11
255:24 256:22
257:11 271:19
272:8,13,19
276:20 284:11
286:17 289:1,3
290:5 292:8,14
294:4 295:12
296:4 298:25
299:5 300:15
315:4,8 316:21
317:8,20
342:19 348:23
355:17 356:19
357:5,20 358:8
359:1,16 361:5
361:12,19,21
361:22 371:23
**lawmaking**
187:6
**lawrence** 64:7
64:20
**laws** 36:22 169:5
214:20
**lawsuit** 290:11
290:12 292:17
306:20 325:16
**lawyer** 133:23
134:4 157:24
171:11,19
172:18 197:6
206:12 219:23
254:7 281:4
317:7 361:2

Carl Malamud                                                      May 12, 2015
                        San Francisco, CA

363:2
lawyered 290:22
lawyers 20:7
  114:17 205:17
laying 171:16
layman 220:2
  359:15 361:2
laymans 75:10
laymen 152:24
  205:14,17
lead 161:24
  198:17 200:24
  204:10
learn 68:15
  224:5
learned 73:10
  229:7 231:12
leave 83:17
  116:16 117:3
  117:15 118:5
lecture 31:19
  159:7
lecturers 47:14
  47:18
led 212:22
  361:15
left 94:5 116:22
  137:23 252:23
  324:15 347:6
lefthand 282:21
legal 8:7 24:20
  27:10,17 28:10
  32:7,14,22
  37:1 39:22
  40:4,6,12
  47:12 50:22
  52:4,18 53:10
  54:11 61:4
  83:10 85:1,17
  86:10 87:9,21
  89:13 104:3,21
  108:22,23
  109:12,12,25
  113:21 114:11
  115:5 119:5

120:7,17
128:18,21
129:3,13,17
134:7 146:23
147:9 152:12
153:5 154:1,10
155:3 163:19
164:4,11
165:18,19
171:10 176:19
178:2,20
179:20 187:3,4
187:14 188:17
189:6 190:19
191:10 193:14
198:6,9 201:20
203:15 204:21
205:10 206:11
214:24 217:19
218:18 219:21
221:3,13 222:2
222:15 228:11
229:4 233:12
234:15 246:3
252:14 255:2
256:18 257:5
281:3 285:11
285:16 286:8
287:4 290:10
291:15,16
292:4 315:19
315:19 317:5,5
317:5 330:13
344:3,8,16,18
344:18 350:19
353:18 355:24
355:24,24
356:21 357:7
358:9 359:5
362:23 364:21
365:13 366:12
370:13,16
legally 183:12
legislative
  206:15 219:10

361:14
legislature 40:19
  205:3
lessig 182:1,1
lessons 35:1,4
letter 4:16 6:6,9
  7:11 44:1 82:9
  110:9 185:20
  185:23 186:2
  186:13 203:7
  241:5 242:1,3
  247:23 251:22
  252:3 253:9
  254:16 256:6
  311:24 313:15
  314:4,7 315:12
  317:15,25
  318:4,9,14,15
  318:16,18,21
  319:1,11
  321:12 370:2
  371:16,21
  372:2
letters 16:15,19
  79:14 88:18
  136:18 241:21
  296:3 299:4,6
letting 46:21
  366:11
level 22:19 85:8
  86:8,18 87:15
  189:10 290:6
  356:3,5
levels 211:15
liability 285:11
librarian 320:17
librarians 31:21
libraries 243:18
library 140:19
  256:7
license 134:12
  173:5 179:3
  203:6 221:7
  280:8,23,25
licensed 375:3

licenses 133:19
  133:20,25
life 81:25 83:3
limit 139:22
limitation 249:9
limitations
  215:16
limited 81:3
line 8:13 100:3
  165:20 168:24
  196:18 198:24
  206:20 219:18
  300:19 311:12
  320:24 363:11
lines 105:20
  163:8
link 284:8
list 28:20,25
  29:2,7 30:16
  49:14 56:7,8
  128:5,6 132:5
  132:25 143:18
  244:24 248:9
listed 96:17
  112:22 119:11
  119:19 128:4,8
  129:4,14
  211:18 249:16
  250:19,20
  251:6 298:13
  356:10
listen 61:17
  313:23
listing 42:8
  153:24 226:15
  248:3 339:20
listings 150:9
literally 80:25
  81:6
litigation 89:25
  125:23 139:13
  139:21,25
  154:24 224:4
  229:14 235:14
  302:24 307:9

308:15 329:2
329:14 333:8
358:3
little 74:1 75:21
  158:6,20 159:6
  194:23 224:5
  224:21 225:1
  264:17 289:19
  290:20
livermore 64:8
  64:20
living 65:25
  66:16
llp 2:4
loaded 257:9
  357:16
lobby 224:11
located 9:16
location 1:21
  147:14 220:14
  246:14 328:21
  346:12
locations 69:11
log 144:25 330:1
  330:2 333:17
  341:3
logging 347:11
logs 273:21
  274:2 328:25
  329:3,7,12,16
  329:18,24
  330:9,16 331:9
  343:1
long 11:8 18:12
  18:20 19:9
  57:8 63:3,13
  66:16,25 70:25
  71:14 72:22
  73:1 74:6
  75:17 91:12
  107:15 116:11
  116:24 117:12
  123:2 134:14
longer 70:22
  199:11

Carl Malamud

May 12, 2015

San Francisco, CA

longstanding
173:1 222:19
254:3
look 28:19 103:6
105:7 110:20
111:25 112:1
114:2 128:11
139:6 146:5
149:11 155:7
177:13,14
191:23 201:18
226:19 238:12
239:4 245:22
246:22 254:9
264:6 274:22
278:6 282:21
289:15 294:25
308:4,6 309:6
332:18 356:12
358:21
looked 110:23
165:23 172:19
224:3 226:14
308:12 361:3
looking 14:24
50:25 54:14
89:1 137:19
146:16 165:13
168:18 211:1
226:21 232:13
248:5 250:10
252:2 267:3
278:6 317:16
332:5,7 340:17
looks 29:16
103:20 111:1
222:24 337:5
lose 176:14
loses 177:21
257:2,8
lot 50:12 163:4
174:22 180:6
183:20 185:4
201:1,10
204:14 211:6

230:23 242:10
244:2,17
246:18
low 161:7,8
lower 162:2
290:2
lucas 36:6
lulu 127:11
lunch 123:8,13
luther 80:18

_____

M

m 1:20 6:6 9:5
282:24 283:4,6
284:3 373:21
machine 70:4
machines
287:17
magazine
100:19
magnetic 52:6
52:21
magnify 270:24
maier 2:4
mail 16:15,20
70:3 138:9,21
319:25,25
mailed 217:2
main 16:18
70:17 79:3
maintain 173:4
326:25 327:20
maintained
170:16
maintaining
212:24
maintains 246:1
maintenance
95:1 136:16
major 23:11
24:15 130:1
majority 118:17
174:25 270:5
makedark
303:17 304:1

304:10,16,19
maker 115:18
115:20,22,24
116:1,2
making 50:3,16
51:11,25 52:14
53:6 55:3
65:24 155:11
157:19 163:16
163:24 164:8
164:18,21
171:15 173:8
184:9,23
188:12,18
192:6 204:8
216:14 218:25
240:16 246:7
260:16 269:18
293:15 295:22
350:2 360:4,7
360:10
malamud 1:16
4:9 5:6 6:7,9
7:6,8,11,14,18
8:6 9:15 10:12
10:21 11:4
12:3,13 13:11
14:16,17 15:4
19:22 20:9,12
20:17 22:17,19
24:20 26:1
28:17 29:7
37:14 50:1
53:4 56:13
58:1 62:8
72:22 90:25
92:8 94:11,17
94:21 101:25
102:1 103:5,25
106:3 108:17
109:7 110:3,20
113:5 117:24
118:25 120:11
120:23 121:8
122:10 123:17

123:25 124:11
127:6 128:12
136:3 137:8
138:2 140:5
141:13,16,18
141:24 142:6
144:20 145:5
156:2 157:8
163:15 166:7
167:7,13,16
168:1,4 169:1
173:11 175:13
180:10 181:3
185:11 189:14
190:5 192:15
199:4 201:16
204:19 206:18
207:25 208:10
211:25 212:13
213:2,21
214:10 215:10
218:7 219:19
221:14 223:7
223:20 234:10
235:17 236:8
236:11,14
237:11,22
238:8,11,23
239:9,15 240:3
240:8,20
241:15 242:21
245:22 246:22
247:23 251:15
252:2,25 253:5
253:8,17 256:4
257:16 262:2
262:18 263:23
265:19 266:10
271:4,16,21
272:16 273:20
274:24 275:3
276:8 277:7
282:19 284:15
285:10,19
287:9,19

288:12,17,22
292:16 293:21
294:16 295:5,7
296:11 297:12
299:21 301:8
303:17 305:1
306:19 309:8
310:13 313:6
317:13 318:4
319:4,19
322:20 323:19
323:23 324:8
325:11 326:19
328:17 331:15
332:7,22
333:24 336:2,7
336:10,14
337:1 338:6
340:12 341:19
342:4,7 344:24
345:7,16 349:3
352:1,23 353:1
354:8 356:16
358:16 362:12
363:5 364:2,13
365:16 366:16
367:9 371:14
372:7,19 373:2
373:17,20
malamuds 125:2
126:13 156:19
289:11 291:24
373:8
malfunction
328:12
management
43:7,15,17,22
60:1 65:16
185:16 191:14
231:2
manager 304:15
mangled 213:25
manual 202:9
manufacturers
340:14

Carl Malamud                                                                    May 12, 2015

San Francisco, CA

**mappa** 100:15
100:15,17,18
100:18,18
**mapping** 101:1
**march** 111:15
111:20 181:17
182:18,18
216:13,19,25
**mark** 18:4 91:4
156:24 185:8
**marked** 8:12
14:14,17 19:23
28:15,18 59:24
94:3 103:5
109:7 110:18
125:8,13,15
155:25 156:3
166:5 173:9,12
181:1,4 185:6
207:23 208:1
213:19,22
236:3,5 237:9
237:12 239:7,9
240:18,20
251:13 261:25
262:3 276:9
287:7 293:19
293:21 301:6,8
304:24 305:2
310:11,13
313:4,7 319:17
319:19 322:18
322:20 324:6,8
336:24 337:2
351:24 352:2
358:14,16
366:14,16
367:10
**marketing** 177:6
197:17
**marketplace**
235:25 237:1
260:1
**marking** 94:8
**marks** 94:10,15

167:6,11,24
252:24 253:3
336:1,5 373:15
**marshall** 69:23
115:14 116:6
**martin** 1:25
36:6 375:25
**massively** 31:6,7
50:5
**matching** 132:2
**material** 16:18
51:20 86:17
87:3,14,16,22
107:21,23
108:3 173:5
188:1 189:21
247:4 290:24
**materials** 16:2,6
32:14,22 37:1
39:7,22 40:5,6
40:7 41:5
47:12 53:5
83:10,21,23
84:8 85:10,14
85:21 86:7
88:25 165:3
172:21 187:5,5
195:25 220:3
242:17 246:25
247:2,11
258:25 271:4
276:16 341:21
341:23 344:3,7
344:9,12
357:25
**mathematical**
57:5 269:8
**mathml** 56:25
57:4 269:2,5
**matt** 9:23
**matter** 9:8 11:5
14:5 32:8
39:16,21 48:10
372:5
**matters** 12:2

31:4 210:16
306:3,5
**matthew** 2:21
**maximum**
249:11
**mba** 22:23 23:15
23:18,24 24:5
24:9,11,15
62:10,12,15,17
**mbecker** 2:25
**mcallister** 83:16
**mcclelland** 2:4
**mcsherry** 3:5
9:25
**mean** 11:12
33:21 34:7
36:24 38:10
40:4 41:13,20
41:21,22 47:22
51:10,14 53:25
54:8,23 56:4
65:15 69:5
73:19,25 75:8
76:12,17 81:5
84:23 85:18
90:16 93:9
95:4,8 96:1
113:13 129:6
145:14 146:11
146:19 147:6
151:19 152:9
153:2 158:8
159:2,2 165:8
165:16 169:20
170:4 171:4
172:14 185:3
186:25 189:3
194:4 197:1
202:20 203:2
204:24 209:7,7
226:16 246:17
266:19 274:21
282:23 283:5
283:10,13,15
284:4,6 291:7

292:6 294:21
296:17 298:11
303:22,23
306:5 315:16
316:2,25
321:11 325:20
326:4 327:7,14
331:8 365:12
**meaning** 146:5
151:24 247:20
325:8
**meaningful**
266:23
**meanings**
151:23
**means** 55:24
76:6 164:22
268:13 357:12
364:21 365:14
**meant** 51:11
165:1 197:25
247:15 291:14
315:22,25
316:4 327:15
**measurement**
1:8 11:20
225:6 226:6
**mechanism**
48:13 51:19
70:2 150:15
188:19 245:4
279:5 280:16
280:19 298:2
361:17
**mechanisms**
52:10 53:2
61:14 76:3,6
149:24 151:8
198:17 215:7
222:25
**medallion** 263:2
**media** 5:9 70:23
71:1,4,9 72:2
99:13 100:7
115:19,20

144:22 167:4
173:13,19,20
173:24 174:4
249:10 281:11
287:17
**medication**
13:12
**meet** 189:19
**meeting** 138:7
138:11,15
139:12
**meetings** 138:7
224:8,9
**megabytes**
283:6 284:5
**member** 58:1,7
58:9,11,22
61:21,22,24
160:14 168:17
170:13
**members** 8:6
62:3 122:13
137:25,25
198:13 370:12
**membership**
122:18 224:12
**memo** 324:18
325:3,12
327:23 328:4
**memoranda**
253:22,25
**memorandum**
5:11 7:20
181:20,21
253:12 324:13
325:16
**memory** 75:1
111:22 332:4
332:13
**mention** 139:20
139:24 165:24
166:1,2 189:12
**mentioned**
127:19 188:13
331:1

Carl Malamud                                                            May 12, 2015
                              San Francisco, CA

**mere** 153:24
**merely** 200:14
**merits** 326:10,21
    327:16
**met** 190:22
    310:22
**metadata** 54:7
    56:4,7,9 74:2
    149:1 261:6,8
    261:14 266:6
    266:10,14
    284:10
**metaphor** 68:4
**methods** 87:5
    220:14 250:18
**michael** 51:4
**michaels** 365:16
    365:17 366:5
**microsite** 70:13
**microsystems**
    33:5 69:10
**mid** 57:18 59:5
    217:9
**middle** 118:4
    174:14 182:25
    188:25 195:9
    288:23 340:24
**mike** 136:9,11
**million** 113:11
    130:22 211:2
**mind** 51:23
    146:3 175:25
    176:1 199:25
    266:14
**mine** 185:5
**minimum**
    210:23,24
    211:6
**minor** 23:13
    24:18
**minute** 72:13
**minutes** 94:5
    138:7,11,15,18
    139:1,12,19,23
    252:23 277:4

**mirroring** 69:12
**mischaracterize**
    176:20 188:15
**mischaracteri...**
    245:19 248:22
    248:23 249:17
**mischaracteri...**
    283:17
**misformed**
    313:17
**misguided**
    291:17
**misleading** 31:8
    192:13 211:21
    212:18 239:19
    249:18 259:21
    286:9 292:21
    301:25 334:17
    349:17
**misquotes** 246:9
    315:11
**missed** 329:20
**missing** 99:15
    250:14 265:5
    314:19
**mission** 183:3
    188:5,11 201:6
    207:6
**missions** 202:25
**misspoke** 141:6
**misspoken**
    238:3 302:1
**misstate** 125:3
    257:7 284:22
**misstatement**
    276:12
**misstates** 40:14
    45:4,19 62:1
    68:23 91:21
    111:6 118:14
    184:25 187:13
    203:25 205:22
    210:5 212:5
    251:2 259:21

**mirroring** 348:13,14
    369:4
**misstating** 25:15
    349:17
**mistake** 328:13
**mistranscribed**
    302:2
**misuse** 363:17
    363:24
**mit** 70:23 71:1,4
    71:9 72:2
    287:10,16
**mitch** 3:11
**mitchell** 3:6
    133:10,11
**mmhm** 106:5
    126:16 258:21
    265:1 343:20
    352:15
**mobile** 38:15
**model** 175:1
    203:21 214:15
    214:20
**modeled** 68:4
**models** 177:10
    200:25 201:8
    202:17,21
    203:15,17,20
**modem** 160:2
**moderator**
    290:2
**modern** 46:10
    159:9 161:18
**modified** 149:3
**moment** 110:20
    126:20 245:16
    257:1 288:2
    366:19
**monday** 18:18
**money** 160:15
    176:17 180:7
    180:22 183:20
    185:4 192:6
    199:6,8,15
    201:1 207:7,19

**mmhm** 212:2 224:14
    235:25 244:3
    244:17 249:3,4
**month** 335:1,9
    335:16 343:2
**months** 71:2,2
    71:16 72:9
    73:2 224:25
**moot** 249:23
    331:12
**moral** 159:7
**morals** 158:6
**morning** 9:3
**morrison** 129:22
**mosley** 253:10
    254:16 255:1
    256:6 365:23
    365:24 366:6
**mosleys** 252:3
**motion** 325:19
    325:22 330:21
    331:5,7,11
    372:9,14,15
    373:3
**motivate** 195:14
**mountain** 2:23
**moved** 274:21
**movement** 116:1
    116:2
**moving** 172:8
**multicasting**
    66:21,25 67:4
    67:5 69:16
    70:8,21 99:8
    100:9
**mundi** 100:15
    100:15,17,18
**museum** 99:13
    100:7
**musician** 42:14

**N**

**n** 2:1 3:1 9:1
    74:21
**name** 10:6,19

**mere** 37:20 79:2,20
    81:21 89:22
    99:10 101:17
    124:17 132:12
    143:11 144:24
    148:15 149:4
    156:25 158:16
    169:17 172:2
    226:5 261:12
    261:13 272:16
    272:20 273:17
    275:19 276:14
    281:18 333:15
    339:21 374:23
    375:22
**named** 20:17
    42:14 47:13
    96:23 259:7
    325:17
**names** 11:8
    321:5
**naming** 339:11
**nara** 241:3,3
    244:23 245:9
    247:3 248:10
    248:18 249:22
    250:2 251:1
    253:15
**narrative** 28:1
    224:20 225:8
    226:13 227:7
**national** 1:7 6:9
    11:20 53:14,16
    64:7,8 161:2
    173:14 174:4
    196:2,17
    224:23 225:5
    241:1,2 243:15
    248:5 253:14
    255:18 289:4
    366:1
**native** 337:4
**nature** 67:3
    71:23 73:16
    75:4,25 77:9

Carl Malamud

May 12, 2015

San Francisco, CA

Page 408

142:15 177:14
308:5
**ncme** 4:19,21
5:4,8,10,12,14
5:16,18 6:5,15
6:17,20 7:10
7:13 8:9 11:19
156:4 174:12
180:24 181:5
185:9 208:2
213:23 226:3
226:11 239:11
262:4 287:2
288:16 291:21
310:15 313:8
366:18
**nearly** 255:20
**necessarily**
147:1 201:9
266:19
**necessary**
256:11 374:7
**necessity** 158:7
**need** 12:10,17
13:20 25:12
72:13 95:25
106:22 108:2
175:1,9 193:10
199:6,15 200:5
203:19 252:17
291:15 303:21
332:19 365:13
366:22,25
**needed** 118:12
173:5
**needing** 179:2,3
**needs** 95:23
107:16 183:25
189:10 255:8
255:23
**neikirk** 7:8,11
310:20,21
311:4,7,18
314:24 319:4
321:1 371:17

**neikirks** 311:21
312:4,19 313:2
313:12
**neither** 249:10
**nervous** 103:17
**net** 100:15,15,17
100:18 101:11
101:14
**nettopbox** 74:21
75:5,12
**network** 38:24
48:17,21 49:4
49:6 132:1,13
159:25 161:9
**networking**
34:12 38:15
41:11,13 46:20
48:5 61:15
65:13 71:25
**networks** 26:9
26:13,19 27:5
28:8 33:23
37:2,10 38:19
41:8 46:13,19
47:25 49:15,21
49:22 62:23
65:2
**neustadt** 2:4
**never** 152:19
267:25 285:9
310:22 370:20
370:21
**new** 46:18 50:3
50:15 51:24
52:14 53:6
67:7,8 68:15
73:20,21 117:6
220:16 259:13
259:19,24
260:5,8 274:14
**news** 225:25
249:10
**nice** 117:25
**nine** 71:2
**ninth** 364:24

**nist** 250:20
**noble** 224:15
**nobodys** 127:11
**nods** 12:11
**noncommercial**
134:12,15
**noncompliance**
183:15
**nongovernme...**
231:7,22
**nonlawyers**
291:1
**nonprofit** 67:6
92:20 93:16,23
109:18,22
110:6,11,13
133:14,17
140:7 175:3
185:4 202:25
203:10
**nonprofits**
174:21
**normal** 261:11
268:2
**normally** 205:3
**norms** 60:23
**north** 10:22
69:20 99:12
**nos** 5:23
**notary** 374:20
**notations** 156:14
156:17
**note** 20:5 66:8
105:20 126:6
141:12 168:25
184:11 194:16
288:19
**noted** 289:8
**notes** 156:20,23
156:24
**notice** 4:9,10
14:18 15:3,7
15:21 16:1
17:5 19:24
20:3,19,22

125:10,23
183:2 191:15
216:3 259:17
296:15 299:17
310:19 367:14
368:8
**notices** 22:16
289:18,22
368:12
**notification**
109:18
**noting** 274:5
**novell** 47:25
48:5,12 49:21
**november** 369:1
371:9,15
**npr** 211:17
**number** 9:6,12
16:10 19:18
21:7 22:3
28:25 29:7,15
30:15,16,25
31:10 54:2
56:6 59:15
63:22 68:10
70:5,11 73:11
79:1,10,11,14
88:11 89:11
96:17 98:1,14
99:7 112:21
114:23 125:11
149:3 154:21
156:23 172:19
175:4 177:9
178:13 198:11
198:16 200:18
202:6 203:17
204:10 218:3,4
218:6 221:1
225:22 228:24
231:1,3,16
236:15 237:2
238:5 249:8
250:6 258:6
260:13 263:16

264:7,9 271:23
271:25 284:19
288:20 300:11
303:1 305:2
310:14 319:20
330:19 331:16
331:19,20,24
332:8,23,24
333:14,23,25
334:7,23 335:8
335:11,15,20
335:20 336:22
337:3 342:25
343:2,6 348:22
354:9,11 355:4
355:8,9,21
356:6 361:4
**numbered**
169:24 211:19
358:22 362:1
**numbering**
72:10 297:25
298:1,3
**numbers** 153:16
156:4 180:24
181:5 185:9
213:23 239:10
251:17 262:4
288:15 293:22
301:9 313:7
322:21 332:16
334:3,20 335:5
353:2,11
366:18
**numeral** 44:3
181:25 182:24

---

**O**

**o** 9:1 11:2
**oath** 12:5 265:16
375:8
**oaths** 375:5
**obama** 82:10
253:24
**obey** 198:21

Carl Malamud                                                    May 12, 2015
San Francisco, CA

| | | | | |
|---|---|---|---|---|
| **object** 14:11 | 46:15 47:2,16 | 133:3,21 134:6 | 184:10,11,25 | 234:16 235:5 |
| 17:9,18 19:20 | 48:2,18,25 | 134:7,8,9,20 | 186:4 187:1,2 | 235:23 237:7 |
| 20:10 21:17 | 49:9,16 50:5 | 134:21,22 | 187:13,14,15 | 239:17,17,19 |
| 23:21 25:12,14 | 50:18 51:15 | 135:16,21 | 188:14,15,16 | 241:23 243:7 |
| 27:1 29:12 | 53:20 54:16,24 | 136:4,10,23 | 189:4,5 190:8 | 243:23,23 |
| 50:22 83:17 | 55:6,9,20 56:5 | 137:4,5 138:20 | 190:19,20 | 245:1 246:9 |
| 95:22 104:2 | 56:15 57:1,10 | 140:6,11,22 | 191:9,10,11 | 247:12 248:1 |
| 109:10,11 | 57:19 58:3,24 | 141:3,13 142:1 | 192:12,13,24 | 248:11,21 |
| 112:13 117:16 | 59:9,21 60:16 | 142:8,13,25 | 193:12,13 | 249:17 250:3 |
| 118:1 156:10 | 60:25 62:1 | 143:1,15,16,23 | 194:3,16 195:3 | 251:2 252:13 |
| 217:18 231:25 | 64:21 65:10 | 143:23 144:17 | 195:17,18 | 255:1 256:18 |
| 245:16 272:22 | 66:2,9 67:25 | 145:10,11 | 196:8 197:2,4 | 256:19 257:5,6 |
| 281:14 285:5 | 68:8,23 69:17 | 146:13,21,21 | 197:21 198:6 | 257:6,19 |
| 285:15 314:11 | 70:9,16 72:3 | 146:22 147:8,8 | 198:23 199:9 | 258:16,22 |
| 316:8 320:22 | 73:6 75:20 | 147:9,25 148:8 | 199:10,12,12 | 259:20 261:18 |
| 322:11 323:14 | 76:19 77:10 | 149:8,10,21,22 | 200:9 201:20 | 261:19 263:17 |
| 324:2,22 | 78:13 80:4 | 150:4,4,24 | 201:21,23 | 264:14,23 |
| 337:11 338:17 | 81:10 84:1,10 | 151:1,2,13,21 | 203:25 204:21 | 267:9,24 268:7 |
| 342:1 348:12 | 84:17,25 85:16 | 152:11,12,13 | 205:10,22 | 268:12,17 |
| 349:17 350:2 | 85:23 86:9 | 152:21,22 | 206:10,19,20 | 269:3,13,20,20 |
| 354:19 359:9 | 87:7,18 88:9 | 153:4,5,6,14 | 206:20 207:10 | 270:22 271:9 |
| 362:16,20,24 | 89:2,17 90:7 | 154:1,2,2,3,4 | 207:11,12 | 272:6 273:5,24 |
| **objecting** 367:23 | 90:14 91:21 | 154:10,11,11 | 208:23 209:9 | 273:25 275:5 |
| **objection** 15:15 | 93:4,18 94:23 | 154:12 155:3,4 | 209:18,19,19 | 275:18,25 |
| 15:22 16:24 | 95:15,22 96:10 | 155:15,16,17 | 210:4,5 211:3 | 277:11 278:8 |
| 17:7 18:14 | 96:24 97:15,25 | 157:23 158:10 | 211:21 212:5,9 | 278:13 279:11 |
| 19:12 20:25 | 98:11,21 99:4 | 159:3,3 160:21 | 212:10,10,18 | 280:13,20 |
| 22:6 24:1,22 | 100:21 104:20 | 160:22 161:14 | 212:19 213:6 | 281:2 282:1,13 |
| 25:22 26:3,10 | 105:15 108:21 | 162:7,8,8,9,10 | 213:10 214:2 | 283:16 284:1 |
| 26:21 27:7,16 | 109:24 111:6 | 163:19,20,21 | 214:22,23,23 | 284:21 285:13 |
| 27:25 28:9,22 | 111:21 113:20 | 163:21 164:11 | 215:24,24 | 285:23,24 |
| 29:4,21 30:13 | 114:14,21 | 164:12,13 | 216:22 217:16 | 286:7,8,9,18 |
| 30:18,19 31:6 | 116:17 117:4 | 165:5,6,18,20 | 218:18 219:18 | 287:3,14 288:2 |
| 31:17,24 32:9 | 118:7,14 119:4 | 168:6,23 170:5 | 220:21,22,23 | 288:6 289:7,12 |
| 32:19 33:1,15 | 119:13 120:6 | 170:6 171:8,9 | 222:2,15,16,18 | 291:8,23 292:3 |
| 34:1,9,17,23 | 120:15 121:12 | 171:24,25,25 | 223:23 224:7 | 292:4,21,22 |
| 35:6,17 36:2 | 121:20 122:6 | 172:16,17 | 224:19 225:7 | 293:11,12 |
| 36:11,19 37:4 | 124:2,3 125:1 | 174:2 175:13 | 225:13,20 | 295:16,25 |
| 37:16,23 38:5 | 126:20 127:8 | 175:15,17,23 | 226:4,12 227:6 | 298:6,22 |
| 38:17 39:1,10 | 128:1,3 129:5 | 176:18,18,19 | 228:10,10 | 299:10,24 |
| 39:18 40:1,13 | 129:15 130:7 | 176:20 178:2,3 | 229:4,6,18 | 300:4,17 301:1 |
| 40:21 41:3 | 130:14,15,16 | 178:3,5,19,20 | 230:1,2,12 | 301:17 302:11 |
| 42:4,19 43:3 | 130:18 131:5,6 | 178:21 179:19 | 232:11,11 | 302:22 303:8 |
| 44:5,18 45:4 | 131:10 132:19 | 179:20,20 | 233:4,11,11,12 | 303:19 304:2 |
| 45:10,19 46:5 | 132:20,20,22 | 182:13 183:18 | 233:25 234:15 | 304:13,20 |

Carl Malamud                                                    May 12, 2015
San Francisco, CA

305:19 306:23
307:22 308:2
309:16 310:2
310:25 311:9
311:10,22
312:5,9,15,20
313:17 314:9
315:11,18
316:10 317:4
318:8,15,24
319:8 320:6,7
321:17,22
322:8,13 323:2
323:11 324:20
325:5 326:5
327:3,8,25
328:7,22 329:8
329:20 330:11
331:23,23
332:15,15
333:3 334:5,12
334:15 335:13
336:19 338:8
338:25 339:9
339:16 340:1,7
341:6,12,24
342:23 343:9
345:3,21
346:14 347:1
347:18 350:17
351:9 353:16
354:15 355:18
355:22 356:20
358:9 359:5
362:6 366:9
367:20 368:4,9
368:18,24
369:4,16,24
370:7,14 371:2
371:10,18
372:3
**objectionable**
13:23
**objections** 18:22
20:6 30:4

50:17 52:1,16
53:8 86:19
109:4 110:8
117:19 119:22
126:12,14
127:9,15 128:2
131:21 135:9
140:3 157:5
164:20 171:6
175:25 180:16
184:24 191:20
198:5,23
223:13 226:20
231:9,24
234:23 245:18
260:6 291:8
300:18 319:15
329:19,25
330:6 331:25
333:4 334:17
334:22 335:2,7
335:14 342:10
342:16 346:5
348:4,16 350:8
351:19 357:6
357:21 359:21
360:14,23
363:10,21
364:6,17 365:5
**objective** 95:18
207:7
**objectives** 95:13
95:21 96:8
109:3
**obligations**
254:14
**oblon** 2:4,10,11
**obscure** 181:22
**observed** 155:1
**obtain** 124:1
127:24 134:17
149:19 177:24
242:18 252:9
254:20 255:13
255:15 259:25

287:1 345:19
346:3
**obtained** 106:4
131:2,18 157:2
248:4 351:8,16
**obtaining**
233:15 256:11
**obtains** 124:24
127:20
**obviously** 104:7
105:25 170:22
**occasion** 242:7
295:20
**occasions** 39:14
**occupational**
365:19
**ocr** 266:3 267:12
267:13,15
269:23 270:4
283:19
**october** 5:7
168:16 208:12
208:15 331:22
333:1
**offer** 248:25
**offered** 215:14
**offhand** 308:25
309:5
**office** 38:1,4
52:22 82:3
85:9,13 86:4
111:3 120:21
185:15 186:2
191:14 219:3,5
221:19 222:20
231:2 247:15
251:20 254:10
263:5 286:5
361:7,8 365:25
**officer** 73:15
77:16 90:20
92:12 121:1,6
375:13
**officers** 119:16
120:1,24

**official** 5:11
37:20 38:8,10
38:11 109:16
181:19 219:11
357:11 361:16
366:3
**officials** 79:15
88:20 217:3
250:18
**oh** 10:8 133:7
139:11 141:6
157:1 168:13
173:14 195:4
205:21 223:24
224:21 238:10
242:10 250:18
277:5 283:2
367:25
**okay** 12:21
14:22 51:3
62:17 91:8
94:7 95:24
103:19 107:22
110:22 112:23
117:20 122:2
126:25 128:13
137:10 148:11
153:2 156:16
157:10 167:3
167:21 168:13
174:13 179:13
180:11 184:20
188:24 189:16
205:2 214:12
215:12 216:12
218:9 227:25
228:3 238:2,10
238:11 239:14
242:23 245:24
268:23 270:19
271:24 273:1
282:20 288:19
290:16 295:9
296:25 298:10
302:6 316:16

318:12 325:14
331:17 335:5
352:5,10,11
353:9,10
354:10 358:20
360:13 366:21
368:2
**old** 193:16 195:6
274:18
**omb** 191:3,18
**omidyar** 132:1,9
132:10,13
**once** 130:14
177:20 178:17
179:16 180:13
200:9 201:16
257:16,25
258:14 271:16
300:24 316:20
347:12
**ones** 20:17 31:3
63:24 64:4
148:16 176:1
229:12 232:16
**online** 35:10
162:19 204:4
296:18,20
**ooo** 9:2 373:22
**opaque** 143:9,13
**open** 44:10
92:21,22,25
158:19
**opengovernm...**
253:25
**openly** 93:2,8,9
**operate** 79:17
80:13 83:5
97:6 99:6
118:12 121:15
197:10
**operated** 96:18
97:22 99:2
101:10 104:18
136:3
**operates** 102:3

Carl Malamud                                                    May 12, 2015
San Francisco, CA

115:22
**operating**
121:10 122:5
207:9,16
**operation** 73:10
78:22 82:2
136:16 209:1
291:2
**operational** 95:6
95:8
**operations**
38:24 48:17
49:5 124:1,25
134:18 135:8
147:21,22
150:8
**opinion** 40:11
40:15 61:3
86:11 87:20
284:15 315:20
317:5 355:24
359:15
**opinions** 40:12
40:16 53:13,25
114:24 115:8
115:11 187:19
220:1 246:12
246:20
**opportunities**
202:6
**opportunity**
13:1,7 177:6,7
199:18 330:25
372:13
**oppose** 373:9
**opposed** 18:25
139:19 166:1
205:4
**optical** 260:23
267:6,19
**optimization**
265:20,21
266:12,15
**optimize** 260:22
**oracle** 43:23

**order** 21:22
35:11 87:22
189:18 220:15
252:10,18
254:21 255:13
290:23 326:8
**ordinance** 205:4
**ordinances**
169:6
**org** 1:11 2:13
3:10,11 4:11
4:14,15,16,18
4:20,23 5:20
7:23 8:3 9:12
11:7,24 14:1
69:20 77:21
78:16 79:3,6
79:21,22 80:7
80:17,20 81:8
81:22,23 82:6
82:8,12,14,21
83:1,7,9,25
84:9,16,21
96:20,21,21,21
96:22 97:2,7,9
98:9,20 99:12
99:12,12,13,13
99:19,23 100:2
100:7 104:13
111:2,19 113:6
113:9 118:16
124:18,20
128:5 129:19
130:3,22 141:1
141:9,15
144:22 163:23
164:24 182:2
183:3 188:5
203:1 206:23
209:15 214:14
216:14 218:3
234:9 246:1
271:19 272:8
272:13,19
280:6,12

284:11 294:4
295:12 296:4
298:25 299:5
300:15 305:24
315:4,8 320:25
326:10,21
327:16 342:13
342:19 348:23
372:19
**organization**
55:2 59:8 60:1
60:20,24 61:7
93:11 113:11
122:18 133:15
133:18 158:12
158:13,14,17
159:7 160:4,9
173:7 176:16
176:16 177:2
177:15,23
178:9 180:3
197:17 201:2
202:11,18
203:12 220:12
224:13 225:22
226:6 298:12
311:7
**organizations**
76:1 89:7
93:17 113:15
113:17,19,23
158:2 160:15
176:13 192:5
195:14 196:22
199:17 200:18
201:3 202:25
203:10,17
217:3 221:5
228:25 229:12
230:8 231:4,16
231:19
**organized** 47:10
**orgs** 303:5
**original** 43:24
156:19 177:4

184:16 202:4
202:12 261:13
274:19 338:12
374:8
**originals** 104:7
**originated** 40:8
99:7
**osi** 44:3,11,20
48:7,14 49:20
**outcome** 375:12
**outdated** 193:9
**outlined** 243:10
**outside** 117:9
199:1
**outstanding**
372:9
**overall** 169:13
298:20
**overbroad** 50:6
**overly** 290:22
**overview** 90:3,4
**owned** 256:23
**owner** 229:13
**ownership**
234:12,21
362:2

**P**

**p** 2:1,1,15 3:1,1
4:25 9:1 11:2
172:2 373:21
**pacer** 79:15
89:12 97:10,11
97:13,17,21
98:2,8,15,18
98:19,24
291:11,16
**page** 4:2,8,18
5:2 6:2 7:2 8:2
8:13 54:6
79:13 97:2
100:3,4 105:21
111:2,4,18,19
112:19 128:9
132:24 156:13

157:9 158:4,4
158:6 161:5,5
161:6,13
174:12,14
182:23,23
184:2,13
186:16 188:3,7
188:8,8,22,25
189:14,17
191:1,4,25,25
193:3 195:8,9
199:4 201:13
209:4 210:20
211:18 214:10
215:10 216:10
218:7,10 220:5
221:14 236:12
236:12,16
242:22 244:18
245:23,25
246:22,23
249:25 250:11
250:12,13,24
251:6,10 253:9
256:5 258:6,11
258:11 264:7
265:3 278:3,16
279:25 282:19
282:22 288:13
288:18,21,23
290:3,14,15,17
299:15 300:11
301:4,22 302:9
302:17,20
303:1 313:15
313:16 314:4,5
314:19 316:15
317:14,14
332:11 333:24
340:13,16,24
340:25 352:7
352:12,21,24
358:19,22
361:25 362:12
363:5,16 364:2

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                                          May 12, 2015
San Francisco, CA

364:13,24
pages 79:10 99:2
   111:25 185:9
   201:24 208:1
   210:13 237:15
   237:25 238:6
   240:21 259:14
   260:17,18
   265:6,8 277:9
pageturning
   278:11
paging 277:1
paid 192:23
   235:25 240:4
   244:5 373:11
pamphlet 39:12
   39:17
pamphlets 29:16
   127:10
panel 32:11
paper 36:13
   161:11 263:13
   264:12 271:7
   271:17 284:17
   348:2 374:8
papers 38:14
   356:7
paragraph
   108:18 157:11
   159:14 160:10
   161:23 169:20
   169:24 170:18
   182:2 183:1,2
   183:16 186:16
   188:3 192:1,1
   196:19 209:22
   215:13 217:7
   218:10 220:8
   221:1 236:18
   243:2,13 252:4
   252:5 314:18
   315:15 316:6
   316:15 317:15
   325:12,15,24
   326:8,19

358:22 362:1
362:13 363:6
363:17 364:3
364:14,25
paragraphs
   161:20 220:25
parcel 187:23
   219:14
pardon 112:12
parens 315:2
park 35:24
   99:12,19
parlance 73:23
parse 55:25
part 24:5 37:7
   38:21 48:6,22
   49:19 57:22
   65:7 80:11
   88:3 128:7
   137:23 138:9
   170:17 187:23
   194:9 201:5
   215:3 216:3
   219:14 221:25
   222:8 224:24
   237:21 242:12
   247:8 257:13
   268:1 290:23
   291:7 326:24
   327:19
partial 197:3
   199:11 249:13
   359:22 360:15
   360:23 363:22
   364:7,18 365:6
   365:9
partially 166:22
   166:22
participant 59:1
   59:7
participants
   47:20,22 62:4
participate
   263:20,23
   264:1,4

participated
   47:24 263:12
   361:9
participation
   169:2 186:10
particular 29:24
   86:2 89:5
   148:19 150:16
   162:15 163:25
   165:24 168:21
   197:15 204:16
   206:5 218:5
   227:11 234:3
   235:4 242:4
   244:7 266:1
   267:2 270:18
   275:22 293:17
   296:10 368:12
particularly
   175:2,17
   178:10 201:1
   202:7 224:4
   243:14
parties 11:8
   118:18 252:9
   254:20 255:12
   375:10
parts 50:12
   255:5
parttime 136:13
   370:17
party 118:20
passage 171:3
   184:21 190:5
passed 40:19
   101:4 205:2
   222:22
passing 166:1
   189:11
patent 52:22,23
   67:16
patriotic 183:11
pay 161:22
   162:5 170:19
   171:2 172:15

175:8 178:18
179:18,25
180:15 248:25
249:2,11,15
paying 179:6,24
   180:20
pdf 218:4 258:2
   259:8 266:1,7
   266:11 268:4,5
   268:11,15
   269:1,11,16,17
   270:10,16,19
   270:23 271:17
   278:15 282:2,7
   282:24 283:4,7
   283:7 284:9
   315:5 333:15
penalties 183:14
pending 9:8
   12:19 302:23
   330:21 331:5
   372:9,15 373:3
penultimate
   157:11
people 37:15
   46:9 47:23
   68:14,21 95:7
   116:3 133:25
   134:1 158:24
   161:21 162:2
   163:4,12 175:8
   200:24 204:15
   207:5,6 211:22
   219:12 230:18
   230:22 246:19
   256:24 266:9
   285:2 290:25
   291:3,15 292:7
   349:7 350:15
   351:6,14
percent 160:11
percipient
   334:10
perform 56:1
   119:12,20

120:11,20
performed 70:7
period 74:10,15
   117:1,14
   152:22 155:17
   164:13 165:7
   171:2 182:17
   182:19 210:8
   265:15 266:18
   328:17 333:8
   336:14 346:9
   346:20 347:23
   348:7 349:3,13
   349:15,16,22
   349:24 350:11
   375:20
permanently
   329:3,16
permission
   179:3 203:6
   256:12 287:2
   318:22 319:2
permit 134:1
person 316:4
personal 17:5
   18:24 21:5
   103:18 141:21
   147:15 163:10
   201:7 311:11
   359:14
personally
   234:11 235:17
personnel 231:2
persons 17:21
   189:23 264:10
pertaining 306:3
pertains 275:3
pervasive 98:3
peters 36:15
   254:6
peterson 365:20
   365:21 366:6
petroleum
   367:14
ph 25:9

Carl Malamud                                                      May 12, 2015
San Francisco, CA

**phase** 44:3,8,9
48:7
**phenomenon**
68:16
**philosophical**
145:13 146:4
**phmsa** 196:1,1
196:10,14
**phone** 9:6 69:24
70:4 99:13
100:2,4 289:23
**photoshop**
56:23 57:9
**phrase** 86:23
87:25 223:18
280:6 348:6
349:22
**phrased** 21:18
**physical** 232:7
**picked** 289:23
**picture** 183:1
208:17
**piece** 97:18
142:22 225:14
**pipeline** 195:24
**pixelbypixel**
265:2
**place** 19:22 68:3
68:6 73:12
207:5 262:25
296:5 300:22
303:22 328:14
**placed** 156:2
181:3
**places** 157:18
**plaintiffs** 1:9 2:3
4:8 5:2 6:2 7:2
7:24 8:2 9:18
9:22 14:14,17
16:3,7 28:15
66:13 94:3
110:18 125:8
126:6 155:25
166:5 173:9
175:18,19

181:1 185:6
192:10 193:25
194:21 199:23
200:13 207:23
213:19 236:3,7
237:9 239:7
240:18 251:13
261:25 287:7
288:8 290:9
292:16 293:1,2
293:19 301:6
304:24 310:11
313:4 319:17
322:18 324:6
325:8,9 336:24
351:24 352:3
356:17 357:3
357:11,19
358:6,14,18,24
359:19 362:3
362:14 363:7
363:18 364:15
365:2 366:14
372:17
**plaintiffscoun...**
5:22
**plaintiffss** 364:4
**plan** 62:22,22
161:8
**plans** 126:4
**plant** 81:1,6
**platform** 198:14
207:2,4 253:25
**platforms**
220:16
**play** 22:13
125:22
**played** 59:15
**players** 198:15
**please** 9:19
10:11 12:14,17
12:25 16:12
17:22 19:19
40:10 43:20
64:1,4 79:2,20

81:21 89:22
99:11 101:17
103:7 109:8
110:20 114:2
154:19 157:8
160:3 188:22
189:14 199:4
210:12 214:10
236:14 249:4
249:13 265:25
271:21 272:22
279:24 282:18
288:17 297:14
316:14 337:25
366:19
**pledging** 211:17
**plumbing**
165:15
**plus** 132:2 240:4
348:5
**pocket** 255:22
**podesta** 82:9
**point** 12:13,23
27:9,12 29:13
63:8 92:5
123:10 128:17
135:24 136:2,7
139:16 193:23
246:1 263:20
329:15 372:8
**points** 112:1
243:3
**pole** 69:20 99:12
**policies** 193:25
**policy** 23:4,8,12
24:7 173:1
193:7 215:23
221:21 222:13
222:20 223:3
223:11 254:3
254:11 282:11
329:1,12,14
333:7,7,19
**political** 113:17
**popular** 43:23

246:2,15,17
**portion** 173:3
177:4 206:3
293:17
**pose** 161:4
**posed** 161:13
**posited** 179:8
201:13
**position** 63:3,20
78:7 130:18
170:4,8 172:3
177:11,16
373:14
**positions** 357:11
**possess** 25:20
**possession**
108:12 271:5
**possible** 203:9
210:17 348:21
**possibly** 53:10
84:18 243:9
259:21 261:12
295:17 347:2
348:18
**post** 145:1
148:22 151:19
152:2,16 153:2
153:3 159:20
161:8 188:19
209:14 210:10
212:2 233:9,23
234:8 243:4
260:21 261:16
274:25 275:13
275:17,23
276:16 279:8
281:24 282:4
282:11 284:12
302:17 307:4
307:20 308:18
318:23 368:16
368:22 369:14
**posted** 51:8,10
52:25 55:23
84:9,15 98:9

98:19 99:18,22
100:1,6,10,16
100:20 101:13
105:23 107:7
153:9 155:18
164:23 165:2
165:14 209:5
209:23 210:10
214:1 216:9
217:11,15
235:16 253:14
262:11,20
264:21 271:19
272:1,4,12,13
273:22 274:12
274:19 275:10
278:4,19
285:19 286:3
286:13,25
292:12 296:5
299:21 306:16
312:14 318:6
319:7 328:14
328:18 331:21
332:25 336:15
341:5 345:17
345:25 346:10
346:21 347:24
348:7,9,23,25
349:4 350:12
351:17 369:9
369:12
**postel** 101:3,6,7
150:7,12,12
**posting** 51:11
53:12,25 82:24
139:13 160:17
165:3 181:16
208:4 214:14
217:10 221:5
233:20 262:23
263:16 264:13
268:6 271:8
284:19 285:11
286:16 288:25

Carl Malamud                                                      May 12, 2015
                          San Francisco, CA

289:4,16 290:4
299:8 301:21
302:8 309:2
315:22,25
324:13 341:21
342:12,18
345:10
**postpone** 372:13
**posts** 282:8
298:25
**potential** 202:16
206:22 270:4
**potentially**
29:22 52:3,3
52:18 248:22
252:13 285:24
286:9 356:4
**practice** 241:22
241:25 261:11
282:16 295:23
296:3
**practices** 56:8
61:14 194:1,5
361:7
**practicing** 291:4
**prayer** 101:4
**preamble**
169:21,22,25
172:3
**precise** 74:13
146:24 149:6
152:16 153:3
**preclude** 178:9
**predecessor**
53:15
**predominantly**
64:13
**preface** 148:11
**prefacing** 348:5
**prefer** 152:16
350:24
**preliminary**
325:19,22
**preparation**
17:4,25 18:2

19:6 21:5,12
22:11 228:20
**prepare** 8:17
15:20 16:22
17:14 18:7,10
18:12 19:10
20:23 21:14,22
22:1,4,15
**prepared** 20:4
20:18 39:13
104:12 227:19
228:9 262:13
**preparing** 18:18
18:21
**prepended**
317:17
**presence** 374:17
**present** 140:1
288:9
**presentation**
29:17 47:24
**presented**
278:11
**presently** 77:24
92:8,12,15
**president** 38:14
78:6,11 82:9
88:4 90:25
120:13,25
163:1 166:22
166:24 196:16
196:17 247:3
253:23
**presidential**
253:12,22
**presidents** 120:5
**press** 203:14
**pressed** 304:16
**presumptively**
91:4
**pretty** 63:6
65:24 120:1,21
**prevent** 327:1
327:21 346:23
347:16 348:1

**previous** 39:3
188:16 326:13
363:11,22
364:7,18 365:6
**previously** 38:20
48:7 189:8
197:12 202:2
276:8 301:23
302:10 339:19
**price** 244:5,15
**primary** 32:14
37:1 39:22
40:4,6 47:12
83:10 113:10
187:4
**principal** 136:6
**principle** 187:25
**print** 111:8
183:9 204:14
216:21 270:21
271:1,2 330:4
**printed** 53:5
54:6 111:3,14
111:14 182:16
236:20 265:3
276:23 292:18
293:2
**printer** 82:4
**printing** 38:1,4
82:3 203:14
221:7 348:2
**printout** 66:10
66:14 181:9
**prior** 125:3
127:9 128:2
161:13 184:25
203:25 205:22
212:6 248:23
249:18 251:2
257:7 264:8
284:22 329:4
375:7
**privacy** 98:4
128:3 134:25
206:25 207:14

**private** 133:11
134:24 157:16
193:9 195:14
196:21,24
202:24 206:22
206:23 207:13
224:24 273:18
**privately** 175:6
182:3
**privilege** 129:17
322:11 323:14
324:23 342:2
354:19 356:22
357:8 359:10
362:7,18,21
**privileged** 131:7
228:16 229:8
230:5,15
231:13 285:15
286:20 312:9
314:12 322:10
342:1 361:1
**privileges**
143:21 144:4
304:11
**prizes** 211:16
**pro** 128:18,21
129:3,13,23
240:21 267:14
**proaera** 5:25 6:8
6:12,23 7:5,7
7:16,19,21
237:15,18,18
237:19 238:6
240:21 251:17
293:22,23
299:15 301:9
301:10 305:3
319:20 322:21
322:22 337:3
**probably** 15:13
111:14 140:17
153:16 193:22
213:14 232:19
**problem** 106:11

107:11
**problems** 306:7
306:8
**procedure**
265:13,18
269:23 375:6
**procedures**
169:10 219:3
264:19
**proceed** 10:2
20:13 127:4
331:6,10
359:13 372:14
373:4,11
**proceeded** 54:4
**proceedings**
29:9
**process** 16:3
36:25 54:4,11
54:20,21 57:22
76:4,7,21,23
77:2 85:8,12
169:14 216:14
217:9 222:6,7
229:1 230:8
260:14,15,22
263:8,11,13,21
263:24 264:1,4
267:7,20 271:6
271:11,14
283:20 292:15
342:18 343:23
356:1
**processes** 87:12
**processing**
53:12,24 54:1
54:2 263:14
264:13 271:8
284:18
**procure** 235:1
235:17,20
239:2 249:16
**procured** 235:4
235:11 236:23
257:16 258:15

Carl Malamud                                                                    May 12, 2015
San Francisco, CA

Page 415

**procurement**
259:18 260:5
33:19 157:19
233:18
**procurements**
231:19
**procuring** 53:12
53:24
**produce** 341:20
345:8
**produced** 33:4
52:21 55:2
126:5 182:3
238:19 241:13
274:6 296:8
330:9 337:4,13
337:16
**producer** 30:8
30:12 36:4
49:11
**producers** 184:6
**producing** 20:9
**product** 127:6
271:13 356:22
357:8 358:10
359:6 362:7,17
**production** 33:4
138:25 156:4
157:9 174:12
180:24 181:5
185:9 208:1
210:13 213:22
237:15 238:5
239:10 242:21
245:22 251:9
251:17 262:3
288:15,18
290:14 293:22
301:9 305:2
310:14 313:7
319:20 322:21
337:3 366:17
**products** 103:3
126:18 127:7
177:9 256:8

**profession** 27:20
27:24 28:13
291:15,17
**professional**
41:10 43:5,10
43:12 44:12
46:17 48:4
49:18 58:2,5,9
61:25 62:9
66:4 88:15
219:25
**professionals**
285:22
**professor** 51:4
70:24,25 71:4
71:6,14 129:1
**program** 23:14
24:6 48:22
166:16 173:14
174:3 183:21
225:24
**programming**
75:7,8 123:24
279:4
**programs** 56:23
**progress** 77:8
**progresses**
202:17 203:13
**prohibited**
220:17
**project** 52:6
133:2,5,7
159:17 209:17
**projects** 95:1,5
208:11
**promoted**
356:17 357:3
357:16
**promoting**
357:11
**promulgation**
32:3 36:14,21
36:24,25 39:22
47:11 361:12
**prone** 267:12

**pronounce**
320:11
**pronounced**
172:1
**pronounces**
310:21
**proper** 54:7
56:4 58:21
76:9,12 133:24
180:21 306:2
**properly** 232:6
266:22
**property** 58:8
**proposals** 59:17
82:2
**propose** 160:13
160:16
**proposed** 161:6
169:22 191:16
**proposing** 76:3
**proposition**
180:6
**propound** 139:7
**protected**
197:20 198:4
**protecting**
170:23
**protection**
195:10 196:2
196:17 256:10
256:22 257:3
316:20 317:3
**protections**
195:11
**protocol** 33:25
34:5,8,11,12
41:21,22 44:13
44:22 45:3,6
45:13,23,24
48:5,12 49:23
51:6,12 55:8
55:15,16
102:16,21
147:19,22,22
148:12 149:12

150:2,6,7
158:19,21
159:5 334:24
**protocols** 41:11
41:14 44:10,13
44:17 45:7,22
71:25 102:8
103:2 346:22
347:15,25
**provide** 12:18
76:24 78:25
80:7 81:18,24
82:6,12,21
83:1 102:5,12
102:20,25
114:13,23
115:7,8 134:14
136:21 137:2
174:18 244:23
245:9 248:10
248:18 249:13
286:19 330:17
**provided** 79:22
80:19 83:8,24
97:8 113:8
124:15,19
128:5,21
129:13,19
130:2 131:25
132:1,15
255:18 274:9,9
284:24 299:15
332:9 333:22
366:6 375:20
**providence**
280:15
**provides** 81:9
88:6 102:3,19
102:24 112:5
114:19 120:24
136:11
**providing** 80:25
102:17 216:20
**provision** 102:6
102:12

**provisions**
215:19 255:15
256:14
**psychiatric**
224:24
**psychological**
1:6 6:4,14 7:4
11:16 192:11
194:2,15
199:24 224:18
225:16 227:5
227:24 228:6
234:14,22
250:21 285:21
307:18 315:2
**psychology**
232:8
**pub** 315:4
**public** 1:11 2:13
4:11,14,15,16
4:18,20,23
5:20 7:23 8:3,7
9:12 11:7,23
11:24 14:1
19:25 23:4,7
23:12 24:6
67:14,18 77:21
77:25 78:2,5
78:12,16,25
79:3,6,17
80:13 81:18
82:4 83:5 88:5
88:8,14,17
89:16 90:1,6
90:13,23 91:1
91:13 92:10,10
93:15,22 94:22
95:1,4,9,11,14
96:8,13,18,20
97:2,5,11 99:3
101:10 102:2,5
102:11,19,24
103:3,15 104:1
104:13,19
105:4 106:8

Carl Malamud                                                    May 12, 2015
San Francisco, CA

107:25 108:10
108:12,20
109:2,3,22
110:6 111:2,19
112:5,6 114:5
114:24 115:13
116:12,16,25
117:3,13 118:5
118:16 119:3
119:12,20
120:12 121:3,6
121:11,18
122:4,4,13,14
122:16,20
123:3,19,25
124:15,24
125:16,18,20
125:21,25
126:2,4,8,10
126:18,23
127:7,14,20,24
128:5 129:13
129:19 131:2
131:18 132:17
134:17 135:7
135:14 136:12
136:22 137:1,9
137:12,16,20
137:21 138:6
138:12,14,25
139:24 140:19
140:21 141:2
141:15 155:12
162:22 163:16
163:23 164:9
164:18 169:1
173:14 174:4
175:3 182:2,4
182:11,25
183:3,7 186:21
186:22 187:11
187:20 188:1,4
188:5 192:3
193:5,10
202:25 203:1

206:23 207:8
208:18 209:5
212:1,2 214:14
214:15 216:14
216:20 217:15
221:21 222:13
222:20 223:11
232:20 233:8
233:22 234:8
234:20 236:19
238:17,19
241:7,10,12,13
241:19,22
242:13 243:5
243:18 244:25
245:6 246:1,4
246:6 247:17
248:10 249:5
249:10 254:3
256:8 258:10
261:1,15
262:11,20
271:5 272:17
273:11,20,23
275:1 276:14
276:17 280:6
282:8,10
284:16 285:10
292:20 293:3
294:10,17,20
295:15,24
297:14 299:8
299:23 300:14
300:24 301:23
302:10,18
303:4,5 304:9
304:23 306:19
306:21 307:8
307:11 308:15
309:12,12,15
309:21 312:13
316:22 319:6
322:3,5,5
325:25 326:10
326:21 327:1

327:16,21
328:6,19 330:9
330:18 331:18
331:21 333:1
341:19 342:13
344:9 345:10
345:11,13,17
345:25 346:10
346:21,22
347:13,14,24
347:25 348:8
348:25 349:5,6
349:9 350:12
350:14,16
351:6,8,14
352:2 353:2,13
354:14 356:16
357:2,18 358:5
358:17 360:3,7
362:4 365:1,1
366:7 369:15
370:6,13,24,25
372:19 374:20
**publication**
33:14 36:25
181:23 189:19
189:20,24
190:6 215:2
235:3,8 256:12
315:1,1,16,25
341:21
**publications**
226:10,16
356:10
**publicinterest**
244:19,22
245:12
**publicly** 128:4
131:12,14
132:15 134:24
152:5
**publics** 293:9
**publish** 152:9,15
152:19,23
153:2 225:15

**published** 91:7
137:15 138:11
189:21 191:15
210:9 219:4
273:16
**publisher**
229:13 261:14
**publishers**
54:11 203:15
204:15
**publishes** 60:20
229:3
**publishing**
345:10
**pull** 267:15,21
356:11
**purchase** 127:11
237:3,23
**purchased** 52:6
52:21 192:22
235:14 236:19
238:25 239:16
**purchases**
237:22
**purchasing**
198:14 244:10
244:11,12,13
293:1
**purported**
289:11
**purportedly**
220:16
**purpose** 44:17
88:21 94:21
95:18,21
108:19 135:20
173:23,25
186:1 207:18
212:14 219:11
229:17 239:2
263:1 280:11
301:21 302:8
304:19
**purposes** 109:3
134:15

**pursuant** 4:24
17:5 20:15
66:12 125:16
248:19 375:6
**put** 14:16 35:9
64:9 69:10
116:19 125:7
125:21 149:5,7
162:19 185:17
194:21 206:3
298:15 300:22
301:3
**puts** 261:5
**putting** 62:22
204:4 220:13
230:24

———————
**Q**
**qualifications**
82:4
**qualified** 240:17
363:13,24
364:10,22
**qualify** 190:17
249:9
**quality** 162:4
259:14 260:14
260:15 264:18
264:19,20
267:6,19
**quantum** 69:9
**quarters** 255:22
**quasigovernm...**
157:18 158:1
**question** 12:14
12:15,19,20
14:8 18:4
21:18 29:12
30:3,18,20,21
32:13 33:9,10
37:12 39:21
50:9 58:15,16
58:19,20 60:3
60:6,18 61:17
61:17,18 65:4

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 417

| | | | | |
|---|---|---|---|---|
| 65:5 74:13 | 365:13 368:15 | **ran** 37:8 69:20 | **readonly** 221:5 | **receive** 23:5,17 |
| 76:14 86:13 | 370:16 | **range** 193:1 | **reads** 160:10 | 24:11 124:5 |
| 95:23 96:4 | **questionable** | **ranging** 198:11 | 340:14 358:24 | 125:4 346:2 |
| 97:3 110:3 | 157:20 | **ranning** 163:1 | 364:14,25 | 349:6 350:14 |
| 131:12,15 | **questioning** | **raw** 39:7 | **real** 95:6 | **received** 14:21 |
| 140:13,17 | 9:20 165:20 | **raymond** 365:23 | **realize** 12:24 | 24:8 62:10,12 |
| 145:14 146:10 | 168:24 206:21 | **rdms** 43:19 | 217:8 | 296:4 299:4,7 |
| 147:18 154:15 | **questions** 8:12 | **reach** 326:2,15 | **really** 47:6 | 311:6,19 |
| 154:17 155:10 | 20:11,12 | **reached** 208:12 | 197:25 205:18 | **receiving** 311:3 |
| 161:12,25 | 126:11,21 | **reaches** 181:23 | 246:19 249:23 | 311:15 312:3 |
| 164:15 166:19 | 127:3 144:8 | **react** 266:20 | 259:12 308:21 | 323:6,9,25 |
| 170:21 175:23 | 145:4 161:4 | **read** 142:17 | 341:16 354:2 | 367:17 369:21 |
| 176:5 180:10 | 171:3 173:12 | 158:24 159:11 | 366:12 370:16 | 370:23 372:2 |
| 180:11,19 | 174:10 176:3 | 159:21 171:12 | **reason** 12:17 | **recess** 72:18 |
| 184:20,21 | 287:25 295:5 | 174:18 175:10 | 13:11,12,15 | 123:13 167:10 |
| 189:25 190:5 | 332:16 348:6 | 176:9 179:2 | 105:13,24 | 253:2 297:8 |
| 190:10 194:10 | 363:11,22 | 184:22 194:20 | 167:17 168:4 | 336:4 |
| 198:1 201:12 | 364:8,19 365:7 | 194:22 196:7 | 168:15 181:10 | **recognition** |
| 211:21 214:19 | 372:8,18,23 | 196:10 199:14 | 185:20 208:7 | 260:23 267:7 |
| 215:8 217:13 | 373:1 | 215:15 219:24 | 208:21 214:7 | 267:20 |
| 217:21 223:8,9 | **quite** 160:11 | 220:1 225:23 | 231:18 242:14 | **recognize** 29:19 |
| 223:15 227:21 | 200:19 219:24 | 232:1 237:12 | 251:24 269:1 | 30:11,21 31:3 |
| 228:13 234:10 | 242:6 | 239:12,18 | 294:6 301:14 | 156:6 166:7 |
| 236:15 244:2 | **quote** 171:2 | 254:7 255:8 | 310:23 322:25 | 173:17 175:14 |
| 256:1 260:2 | 214:18 236:20 | 267:16 270:3 | **reasonable** | 181:7 185:11 |
| 263:9,12 | **quoted** 218:21 | 285:2 289:16 | 195:12 | 196:20 213:24 |
| 267:17 269:10 | **quoting** 190:13 | 293:17 306:24 | **reasonably** | 236:8 240:23 |
| 278:18 284:22 | 197:3 199:11 | 314:22 316:17 | 189:22 | 251:18 262:5 |
| 285:6 300:19 | | 325:11,15,23 | **reasons** 221:21 | 276:21 293:24 |
| 301:25 312:8 | ———— | 343:17 353:1,3 | 222:13 223:11 | 305:4 310:16 |
| 313:18,23,24 | **R** | 354:8 361:3,11 | 290:22 | 313:9 319:21 |
| 314:16 317:17 | **r** 2:1 3:1 4:25 | 361:14 374:3 | **rebecca** 22:17 | 322:23 324:10 |
| 322:9,17 | 9:1 | **reader** 270:3 | 101:25 136:3 | 367:10 |
| 323:12,19 | **race** 159:9 | 277:14,19,22 | 263:23 | **recollect** 91:24 |
| 324:21 325:1 | **radicals** 34:15 | 278:2,12,12 | **recall** 92:6 | 265:15 267:3 |
| 326:11,22 | **radio** 33:6 37:7 | **readers** 204:10 | 101:10 127:20 | 341:16 |
| 327:17 329:21 | 38:21 67:9 | **readily** 158:23 | 148:16 175:11 | **recollection** |
| 331:12 347:10 | 99:25 173:14 | 159:1,2 | 176:6,8 181:16 | 111:10 259:25 |
| 348:11,16 | 174:4 | **reading** 163:4 | 259:12 287:9 | 269:7 332:20 |
| 349:12,15 | **raise** 10:10 | 163:12 171:17 | 311:3 340:4,9 | 332:24 |
| 350:7 353:22 | 207:9,15 | 195:2 219:24 | 367:17 | **recommendati...** |
| 354:5,23,25 | 208:22 210:21 | 220:8 221:4,13 | **recalling** 353:17 | 169:22 170:14 |
| 356:25 361:4 | 211:1 212:2 | 223:2 243:2 | **receipt** 5:24 | **recommendati...** |
| 362:10 363:14 | **raised** 217:5 | 361:18 | 238:19,24 | 166:25 |
| 363:25 364:11 | **raising** 207:19 | **readme** 6:22 | 314:24 | **record** 9:4 10:4 |
| | 208:25 | | | |

Carl Malamud                                                      May 12, 2015

San Francisco, CA

10:7,20 20:6,8
38:12 66:9
72:17,20 94:5
94:6,13,14,19
101:6 103:14
103:20 104:1
106:7,18,23,25
107:1,3 108:10
108:13 123:7
123:12,15
125:7 126:15
127:3 167:2,9
167:14,23
168:2 176:9
180:23 238:16
241:10,12
250:24 252:21
253:1,6 274:16
294:10,13,20
294:22,23
295:2,11 297:5
297:7,10,15
326:3,9,16
328:19 329:4
333:11 336:3,8
336:17,22
346:11 348:20
352:17,18,19
353:4 366:25
367:4,5,7
373:19 374:5
375:16
**recorded** 375:14
**records** 6:10
97:12 107:24
126:9,21 241:2
241:19 253:15
286:5 295:22
342:7 344:9,25
345:14 366:1
**red** 163:8
183:10 184:4
**redlined** 178:11
202:8
**reduces** 189:21

**refer** 11:16,20
11:23 227:19
228:5 297:19
**reference** 4:12
41:10 43:6,12
44:12 46:18
47:14 48:5
49:19 66:4
83:21 84:20,24
85:7,14 86:8
86:17,24 87:3
87:14,17,23
88:1 153:23,25
154:8,23 155:1
155:6,13
157:22,25
163:17 164:10
164:19 165:14
165:17,25
168:18 169:4
169:12,19
170:16 172:4
172:22,24
176:14 177:1
177:17,21,24
178:17 179:17
180:14 186:20
187:11,22
189:9,19 190:7
190:18,24
192:4 193:6,6
197:16 201:17
202:4 203:24
207:22 213:3
214:21 215:5,7
216:16 218:2
218:12,23
219:13 223:1,5
230:20 232:14
233:5,18 234:3
234:5 239:6
242:19 247:1
247:11,21
248:4,7,14,16
248:19 253:13

255:4 256:10
256:21 257:2
257:11,22
261:3 262:23
263:7 276:3,19
282:9 284:25
291:13 292:8
292:13 293:4
294:5 299:9
307:5,19 308:5
308:17,24
309:7 317:10
317:20 325:16
338:4,11
339:20 353:15
355:5,12,17,25
356:8,13,18
357:4,15,20
358:8 359:1,16
359:25 360:19
361:21 366:8
371:23
**references** 66:6
261:5
**referrals** 336:11
**referred** 277:18
**referring** 18:24
113:2 220:20
221:12 227:23
253:8 301:12
317:23,24
367:20
**refers** 95:9
189:2 191:3
**reflect** 289:10
**reflected** 371:17
**refresh** 75:1
132:25 332:23
**refreshable**
270:8,11
**refreshes** 332:20
**refused** 322:2
**reg** 87:4
**regard** 95:13
**regarding** 15:21

17:25 18:2
20:24 22:4
198:24 213:3
299:18 312:7
314:25 345:9
**regards** 175:17
**region** 72:11
**register** 38:13
85:9,13 86:5
189:22 219:8
247:16 251:20
263:5 356:2,9
361:16 365:25
**registered** 142:6
142:12 286:6
304:11
**registries** 73:11
**regular** 104:18
241:22,24
295:14,23
296:3
**regularly** 295:3
295:14,18
**regulation** 24:17
38:13 41:1,6
84:6,7 153:25
179:18 180:15
206:9,13 252:8
252:10 253:11
254:19,21
255:12,14
257:2 356:5
**regulations**
16:13 84:20
85:11,15,22
86:1,22 87:4,6
87:24 154:14
154:20 155:2,7
165:12 169:5
170:17 183:9
186:20 187:7
187:18,23,24
193:7,16 215:4
216:17 219:9
219:15 230:21

232:15 233:6
239:6 242:20
246:24 247:10
247:22 255:6,7
257:10,12
262:24 285:1
290:7 293:5,18
307:6 316:21
317:10,19
353:12 356:3
360:1
**regulatory**
186:3 255:19
**rehabilitative**
232:7
**reidentify** 238:4
**rekeying** 220:14
**relate** 141:17
**related** 126:21
145:6 175:20
200:20,20
295:12
**relating** 125:17
125:20 126:8
126:10,22
296:4 306:5
341:21
**relation** 142:20
145:9
**relational** 43:6
43:16,21,25
65:2,13,15,16
**relationship**
118:19 141:10
141:24
**relationships**
198:11
**relative** 375:9
375:10
**released** 36:7
**relevance** 97:25
124:2 130:19
131:10 132:20
133:22 134:8
134:21 138:20

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud
San Francisco, CA
May 12, 2015

139:9 145:11
153:14 159:4
160:22 162:8
168:23 171:9
171:24 174:2
175:17 195:18
206:19 214:22
**relevant** 125:22
198:12 298:25
**relief** 8:4
**remarks** 39:13
**remember** 16:4
16:8,16,21
38:3 62:25
63:24 64:12
69:15 70:7
99:16,17 101:2
113:18 123:5
127:25 153:12
153:15 166:15
173:18 266:17
289:20 305:9
311:15 313:1,1
323:6 339:5
367:25 370:10
**remembered**
100:14 124:8
**remembering**
232:25
**reminded** 14:6
**remote** 279:6
**removal** 303:11
**remove** 299:22
304:8 312:13
318:5,19 322:2
322:4 370:24
371:24
**removed** 258:24
274:13 300:14
300:25 301:5
302:14 303:4
309:12,20
319:6 326:11
333:9
**renew** 198:22

**renewing** 130:15
**repeat** 50:9
110:3 131:15
164:14 198:1
216:3 356:24
**repeatedly**
263:3
**replace** 160:13
**replaced** 274:13
**replica** 151:16
**replication**
150:16 151:4
265:2
**reply** 312:19
331:1
**report** 90:5,9,12
90:16
**reported** 1:25
**reporter** 10:9,14
12:7 14:7,9
43:10 53:14,16
53:19 82:16,17
173:16 227:1
271:12 302:1
375:2,20
**reporters** 375:1
**reporting** 9:6
**reports** 137:13
137:15 138:18
138:25 139:11
139:24 162:22
225:25
**repost** 306:21
307:10
**reposted** 328:5
**represent** 106:3
334:4,20 335:6
335:12 338:7
**representation**
238:20
**representative**
28:20 219:20
**representatives**
79:25 196:1
**representing**

374:13
**represents**
129:23 338:16
338:24 339:8
339:15
**reproduction**
104:5 350:25
**request** 13:6
16:14 79:25
88:22,23 89:4
89:10 139:3,17
139:23 147:3
147:20 148:18
148:18,21,22
148:25 149:1,4
149:5,7,15,20
149:23 186:6,9
240:13,14,25
241:6 242:4,14
242:18 243:11
245:5,5,6,7
248:15 249:1
249:22,23
251:7,20
274:13,22
297:20,22
319:2 343:13
343:19 345:7
347:6,12,12,13
**requested** 147:2
375:18,19
**requesting**
139:9,15,19
244:19
**requests** 59:16
89:1,11 139:4
148:2,4,10,17
185:16 242:8
242:11 333:15
333:25 334:21
335:6,11,19,19
335:21 343:16
343:22
**require** 87:24
231:20 355:23

357:24
**required** 193:20
217:11 220:13
278:24 290:5
**requirement**
157:19 198:20
**requires** 109:11
109:11 118:16
186:18 187:10
210:23 228:13
230:14 253:12
**reread** 302:1
**research** 1:4
9:11 11:6,12
62:23 166:16
170:14 180:4
198:12,13
223:21 224:14
311:13 316:19
317:2 340:18
340:23 341:20
**researcher**
171:13,22
**reseller** 259:11
**reserve** 62:18,24
63:1,9,12,18
140:3
**residence** 72:25
73:1
**residents** 183:13
**resolution** 161:7
161:7,8,10
162:3,6 302:24
**resource** 1:11
2:13 4:11,14
4:15,16,18,20
4:23 5:20 7:23
8:3,7 9:12 11:7
11:23,24 14:1
19:25 77:21,25
78:2,5,12,16
78:25 79:3,6
79:17,21,22
80:7,13 81:18
83:5,7,9,25

84:9,16,21
88:5,8,14,17
89:16 90:1,6
90:13,23 91:1
91:13 92:10
93:15,22 94:22
95:14 96:8,18
96:20,21,22
97:2,5 99:3
101:10 102:2,5
102:11,19,24
103:3,15 104:1
104:13 105:4
106:8 107:25
108:10,12,20
109:2,3,22
110:6 111:2,19
112:5 113:6,9
114:5 115:13
118:16 119:3
119:12,20
120:12 121:3,6
121:11,18
122:4,4,13,20
123:3,19,25
124:15,24
125:18,21,25
126:2,4,18
127:7,14,20,24
128:5 129:13
129:19 131:2
131:18 132:17
134:17 135:7
135:14 136:12
136:22 137:1,9
137:12,20,21
138:6,14
139:24 141:15
163:23 164:24
169:1 182:2,11
183:3 188:4,5
203:1 206:23
207:8 209:15
212:1,2 214:14
216:14,20

Carl Malamud                                                    May 12, 2015
San Francisco, CA

218:3 232:20
233:8,22 234:8
234:9,20
236:19 238:17
238:19 241:7
241:10,12,13
241:22 242:13
243:5 244:25
246:1 248:10
261:1 271:19
272:8,13,17,19
273:20 280:6
282:8 284:11
284:16 285:10
293:3 294:4,10
294:17,20
295:12 296:4
298:25 299:5,8
300:15 303:5
306:19,21
307:8 308:15
315:4 319:6
325:25 326:10
326:21 327:16
330:9,18
341:20 342:13
342:19 345:10
345:11,17,25
346:22 347:14
347:25 348:23
348:25 349:6
350:14 351:6
351:14 353:13
354:14 356:16
357:2,18 358:5
366:7 369:15
370:6,13
372:19
**resources**
104:19 116:12
116:16,25
117:3,13 118:5
125:16,20
126:8,10,23
137:16 138:12

138:25 140:21
141:2 217:15
241:19 258:10
261:15 262:11
262:20 271:5
273:11,23
275:1 282:10
295:15,24
297:14 300:24
301:23 302:10
302:18 307:11
308:8,14
309:12,15
322:5 328:6,19
331:18,21
333:1 344:9
345:13 346:10
346:21 347:13
347:24 348:8
349:5,9 350:12
350:16 351:8
352:2 353:2
358:17 360:3,7
362:4 370:25
**respect** 20:9,22
22:15 131:12
144:11 152:20
252:12 267:1
333:14
**respectfully**
318:19 319:2
371:23 373:13
**respond** 294:11
371:6,8
**responded** 313:2
**response** 185:15
249:13 251:19
251:21 311:20
313:11 325:18
330:18 332:12
343:12,19
347:6 369:20
370:1 371:14
**responses** 5:21
7:23 12:10

236:6 352:3
**responsibilities**
78:11 88:4,8
89:15,20 175:5
**responsibility**
200:13
**responsible**
53:11,24 78:15
256:11 305:15
315:6 316:2
**responsive**
66:14
**rest** 129:3
160:10 201:13
260:2
**restate** 180:11
217:16 350:7
**restating** 190:15
**restrict** 291:22
292:6,9,15
**restricted** 81:4
221:6
**restricting** 293:3
**restriction** 93:3
292:19 293:9
**restrictions**
81:13,16
186:23 187:21
214:16 221:8
255:17
**restricts** 293:16
**result** 85:12
195:1 212:21
266:2
**resulted** 194:18
**results** 54:22
66:12 265:24
266:9,24 267:4
**retail** 89:12
**retain** 135:14
137:1
**retention** 138:10
329:1,12 333:7
333:18
**retired** 365:21

**return** 271:21
291:20 323:23
**retype** 271:2
**reveal** 17:8
**revealing** 8:15
17:12 323:20
354:5 355:1
**revelation**
314:10
**revenue** 89:5
108:14 113:18
160:13 174:17
174:22 175:19
179:6,24 180:2
199:18 200:7
200:18 201:19
202:6,15 203:9
203:22 204:3
204:10
**revenues** 160:12
161:24 162:21
**review** 13:7
148:12 366:19
375:17
**reviewed** 16:1,2
16:5,9,22 21:6
**revise** 195:6
**revised** 191:14
**revision** 194:22
222:6
**revisions** 221:16
326:24 327:20
**revolution** 32:6
**revolutions** 36:9
**rfc** 297:17,19,22
297:24 298:3
**rhetoric** 184:5
**right** 10:10 11:1
12:23 13:4
15:2,5 16:21
17:12,23 23:1
45:17 57:16
65:20 94:4
100:4 106:17
108:1 112:20

118:3 124:12
124:13 130:11
131:16 145:17
148:6,15,20
149:18 157:15
173:22 176:8
177:3 179:9
185:25 188:11
192:9 194:13
196:24 197:25
200:2 207:14
210:20 211:16
212:21 215:18
227:20 240:12
244:10,22
247:7 250:5,23
258:9,19 259:3
262:9 266:16
270:16 272:10
276:5 277:21
283:4 289:20
295:4 296:16
300:13 303:25
304:18,18
306:15 308:25
314:22 315:24
320:2 327:12
334:3 354:4
356:7 368:15
**rights** 126:14
131:8,9 135:1
142:11,16
197:19,25
198:3 254:13
281:5,6
**ripe** 72:9,23,24
72:25 73:1,5,9
73:12
**risk** 185:3
**role** 101:19
**roles** 22:13
59:15 92:9
93:16
**roll** 255:22
**roman** 32:2 44:3

Carl Malamud

May 12, 2015

San Francisco, CA

181:25 182:24
**romkey** 37:9
**room** 106:21
  221:4,13
**rose** 69:23
  115:14 116:6,7
  116:24 117:6
  118:12,19
**roses** 118:9,23
**rossi** 7:6 305:13
  305:14,17
  306:1 323:25
**routing** 45:22
**row** 299:15
  341:1
**rsync** 102:21,21
  150:14,15,21
  151:3,5,10,11
  151:15 335:11
  335:15 347:13
**rude** 272:25
**rule** 20:15
  141:19 294:25
  308:25
**rules** 13:6 34:15
  98:4 193:8
  294:24 373:3
**ruling** 18:4
  191:16 214:17
  326:2,15 331:7
  331:11 373:5
**run** 35:12 76:25
  85:8 133:11
  158:18 200:15
  201:8
**running** 163:1
**rush** 326:2,14

**S**

**s** 1:25 2:1 3:1
  4:23 5:20 7:23
  8:3 9:1 23:7
  67:19 157:18
  182:5 183:8
  199:19 219:4

221:25 222:14
222:21 223:12
254:10 286:5
286:17 310:19
361:7,10
375:25
**safety** 182:4
  183:7 193:10
  193:19,22
  195:25 208:18
  209:6 214:15
  276:14,17
  290:5 365:19
**salary** 91:1,3,6
  91:13,17,20
  92:1,3,4
**sale** 160:12
  175:20 178:14
  192:19 201:19
  202:7 203:23
**sales** 160:16
**san** 1:24 2:18
  3:8 9:17
  133:18 140:8
**santa** 69:21
**satellitebased** 33:3
**satisfied** 108:15
  243:11
**satisfy** 198:20
**satisfying** 233:16
**saved** 272:17
  273:4,10 277:3
**saw** 15:14,19
  226:15
**saying** 12:8
  148:11 176:25
  210:7 216:3
  247:9 255:10
  294:12 345:12
**says** 14:23 55:16
  60:20 112:18
  119:16 120:19
  125:19 126:2

128:17 129:7
130:1 134:13
158:5,16
159:14 161:23
170:22 182:2,7
183:1,2,5
184:2 186:17
188:4,25
189:17 192:2
193:4 195:9
196:20 199:5
208:10,17
209:4,14,22
210:15 214:13
215:14 216:13
217:8 218:11
220:11 221:15
236:18 245:25
246:23 249:19
253:10 255:11
256:6,20 261:1
272:7 284:7
288:23 289:16
290:3,18 303:9
318:9,14,18
320:25 326:20
332:3 333:10
337:3 338:21
340:17 348:22
348:24 349:12
349:16 362:1
362:13 363:6
363:17 364:3
**sbg** 268:23
**scale** 69:9
**scan** 260:16,17
  260:22 261:24
  264:24 267:22
**scanned** 80:22
  81:3 258:1
  259:3,15 265:6
  268:10 271:11
  285:19 286:3
  286:13,25
**scanner** 259:4

**scanning** 53:12
  53:24 54:3
  82:24 263:14
  264:12 271:7
  284:17 286:15
**scary** 184:4
**scenario** 179:8
**schedule** 128:7
**scheme** 220:17
  220:20 221:11
  221:13 339:11
**schiller** 37:8
**school** 25:2
  31:20
**science** 26:2,19
  27:5,15
**scope** 124:3
  125:2 126:24
  130:16 132:21
  134:8,21 171:7
  199:1 207:11
**screen** 270:3
  276:25 278:15
**screwed** 175:9
**script** 266:13,22
  279:5
**sdo** 177:2,13
  180:22 196:21
  201:17 202:5
  205:17 215:23
**sdos** 196:24
  197:9 198:11
  198:18 199:6
  199:15 200:5
  203:18 214:16
  215:14,17
**seal** 177:3
  197:13
**search** 92:23
  265:19,21,23
  266:2,8,12,14
  266:17,19,23
  267:4,16
  341:20,23
  342:22 343:8

344:5,10
345:13,14
**searchable**
  220:15
**searched** 342:8
  343:1,19
  344:13
**searches** 344:3,4
  344:25
**searching** 344:1
  344:17,18
**sebastapol** 10:22
**sec** 162:19
**second** 7:24
  31:15 67:12
  69:2,22 82:8
  157:15 182:1
  186:16 192:1
  196:19 200:3
  215:13,13
  219:4 220:7,11
  267:10 269:6
  297:21 299:3
  313:15 314:4
  325:23,24
  352:3 360:10
  366:23 373:12
**secretary** 42:23
  103:21 120:25
  121:2 159:18
  160:8 365:18
**section** 56:10
  109:1 113:22
  119:2,11,19
  120:4,14,19,23
  121:8 137:11
  137:19,23
  138:4 190:21
  249:8 298:18
  298:18 317:18
  375:7
**securities** 35:9
  35:16,22 52:7
  67:12 162:24
  204:8

Carl Malamud                                              May 12, 2015

San Francisco, CA

Page 422

**security** 37:2,9
   38:19
**see** 20:1 110:15
   112:17 114:3
   128:14,19
   130:6 156:15
   156:16 157:11
   160:19 183:2
   188:6,10 191:3
   191:5 192:7
   208:13 210:18
   215:20 218:15
   220:9,18 221:2
   221:22 225:1
   235:15 240:12
   242:24 243:19
   244:20 247:5
   250:10,15,16
   250:19,21,22
   258:7,8,9
   259:1,5 274:22
   276:11 283:2,2
   284:8 291:5
   306:11,14
   314:20 315:10
   316:23 317:16
   317:21 327:2
   333:25 337:6
   337:22 356:12
   358:22 370:20
**seed** 80:21,23,24
   81:2,5,6,12,17
**seeds** 81:1,1
**seeing** 250:9,13
**seek** 318:22
   373:6
**seeking** 208:21
**seeks** 109:12
   252:13
**seen** 14:18 15:7
   208:3 341:14
**selected** 199:11
   217:1
**selection** 66:12
**sell** 103:3 124:22

126:18 127:7
127:14 161:10
177:7,8 178:10
**seller** 236:1,21
   237:1
**selling** 162:22
   177:25 178:11
**semantic** 73:23
**seminars** 65:1
**send** 70:3 88:18
   305:12,13
   321:6 323:24
   371:16
**sending** 305:9
**senior** 63:2
   77:15
**sense** 42:8 60:19
   111:16 169:25
   180:19 206:2
   232:24 268:19
   268:24 271:1
   279:1
**sent** 89:11
   168:14,15
   236:2 241:17
   289:17,21
   296:4 311:24
   319:4 367:15
   370:1 371:17
   371:21
**sentence** 157:15
   157:16 160:6
   170:22 171:4
   182:6 183:5
   186:24 190:14
   196:20 199:12
   199:14 200:1,4
   215:14 217:9
   218:11 220:11
   247:8 252:4
   314:23 315:17
   315:22 316:1
   316:17 325:23
   326:14 327:7
   327:11

**separate** 19:7
   21:13 22:12
   87:11 374:7
**september** 4:17
   109:23 110:7
   110:10 210:8
   329:13,13
   333:12
**sequential** 298:1
   298:3
**series** 31:20 34:3
   36:5 46:18
   47:10,15 48:6
   49:20 82:1
   100:22 147:21
   150:8 156:24
   161:4 165:14
   203:8 217:4
   231:18 253:21
   253:25 276:25
   338:1 356:9
**serious** 163:5
**seriously** 273:1
**serve** 116:11
   117:13
**served** 15:11
   42:23
**server** 55:23
   148:19,23
   149:25 150:22
   150:23 265:23
   272:17,20
   273:4,8,17
   274:20 304:10
   328:25 330:2
   346:23 347:13
   347:16 348:1
**servers** 136:17
   145:1 151:17
   246:3 273:21
   328:13
**service** 35:12
   66:22 67:1,4,5
   69:16,23 70:1
   70:8,21 73:21

73:22 89:5
93:11 99:8
100:9 102:7,10
102:15,16,18
102:18,25
103:1 108:14
114:13 117:10
162:23 231:16
246:15
**services** 67:7,8
   69:14 70:6
   78:23,24 79:1
   88:6 89:13
   95:6,8 102:3,4
   102:6,11,19,23
   114:12,19
   115:6 127:14
   136:21,24
   137:2 163:7
**serving** 246:12
**session** 32:12
   373:12
**set** 5:22 7:24
   45:7 60:23
   61:14 66:11
   68:2 69:9 98:3
   115:25 133:8
   133:24 144:13
   156:8 210:21
   210:23,24
   211:15 213:13
   252:6,8,16
   253:13 254:18
   255:11 275:7
   338:10 352:3
**sets** 144:15
**settings** 346:23
   347:15 348:1
**seven** 217:3
**seventh** 364:3
**shaking** 298:5
**sharer** 200:12
**sheet** 261:6,20
   262:9,13,16,19
   263:2 301:4

317:17,24
374:7
**shems** 365:20,20
**shes** 136:6
**shining** 39:8
**shipping** 240:4,6
**shirked** 175:5
**shit** 290:7
**shocked** 193:16
**shoot** 167:18
**short** 205:6
**shorthand** 10:14
   11:24 283:23
   375:2
**shortly** 216:9
**shouldnt** 156:17
**show** 28:17
   109:7 173:11
   207:25 213:21
   239:9 240:20
   251:15 262:2
   265:23 266:4
   276:8 293:21
   301:8 305:1
   310:13 313:6
   319:19 322:20
   324:8 337:1
   343:15 352:1
   366:16 367:9
**shown** 86:21
   266:23 295:22
   371:15
**shows** 266:8
**shrink** 182:9
   184:4
**side** 282:22
   298:5,5
**siegel** 5:7 166:12
   166:14 168:9
   168:16,22
   169:12
**signature**
   236:12 311:12
   313:14 314:3
   324:15 352:6

Carl Malamud                                                    May 12, 2015
San Francisco, CA

Page 423

352:21,23
374:11
**signatures**
105:21,23
107:10
**significance**
55:18 280:18
298:4
**significant**
215:16 288:24
**signify** 263:4
**signifying** 86:2
**silicon** 124:21
**similar** 165:9
371:16
**simple** 44:16
221:16
**simply** 36:4
37:12 126:7
132:24 139:19
172:8 183:21
189:1,11
190:15 194:16
259:24 261:23
265:14 298:1
340:9
**single** 100:3
301:4,21 302:8
337:2
**sir** 10:6,10,19
11:1 13:22
25:13 58:17
145:14 250:8
251:12 339:4
343:25 360:12
372:11
**sister** 232:1
**sisters** 232:4
**sit** 149:16
222:11
**site** 79:6 80:20
80:21 152:7
261:12
**sitting** 332:4
**six** 71:16 116:13

290:9
**sixth** 363:16
**size** 283:19
**skip** 278:5
**skipping** 182:6
325:17
**small** 62:21
70:12 121:14
135:2 185:4
**smith** 9:25
**smithsonian**
80:22 81:3,14
**snippet** 266:3,5
**social** 287:17
**societies** 58:23
**society** 76:24
197:8
**software** 33:23
41:20 151:5
162:25
**sold** 204:12
**solution** 179:9
**somebody** 90:19
**someplace**
250:10 273:17
**somewhat** 43:22
**sonoma** 365:22
**sophomore**
224:22
**sorry** 13:20
14:20 27:2
30:19 50:8
112:11 117:18
118:3 140:13
144:9 160:24
160:24 167:18
167:19 188:7
190:1 245:17
250:14 252:20
272:23 277:5
301:24 303:7
310:5,6 311:10
313:22 316:9
320:7 339:4
352:9 355:7

360:5
**sort** 107:18
277:16
**sorts** 202:9
224:9
**sought** 206:24
**sounds** 145:14
146:14 173:22
185:25 198:8
**source** 150:22
235:20 236:23
339:24
**sources** 134:18
135:7 201:18
**spans** 210:13
**speak** 8:16
17:14 18:7,8,9
21:15,21,25
22:17 179:2
359:23 360:16
360:17
**speaker** 79:25
**speaking** 290:11
291:10
**speaks** 130:8
160:22 161:15
162:9 170:6
171:7 172:17
183:19 184:11
187:2,15
188:15 189:5
190:9 193:13
195:18 197:3
199:10 200:11
208:24 209:10
209:19 210:5
211:4 212:6
220:22,23
237:8 243:8
245:2 246:10
247:13 248:2
248:12,22
250:4 251:3
289:13 318:16
318:16 327:4,9

334:6,18
335:14 355:9
**spear** 15:1 62:7
**special** 203:6
**specific** 16:8
34:12 36:18
50:24 85:10
86:1,3,21,24
86:25 87:15,24
112:1 130:18
137:22,24
142:15 151:5
154:18 165:24
166:3 177:13
177:14 207:19
234:4 237:23
246:24 247:10
254:8 265:4,14
359:23 360:17
**specifically**
20:17 86:23
177:12 209:1
222:23 242:25
315:15 325:17
359:19 365:11
**specification**
55:15,19 57:4
57:6 119:7
147:23 148:13
149:12 150:7
160:1 280:14
**specifications**
41:15,19,21,23
51:7 55:1 56:7
56:8 159:6,20
159:24,25
**specifics** 308:10
**specified** 223:1
232:16 257:22
279:21 280:3
281:13 300:6
**specifies** 150:8
**specify** 221:19
227:15 228:2

231:5 252:19
**specifying** 166:3
**spectrum** 246:5
**speculate** 29:11
111:24 178:24
179:4,11
320:22 339:3
370:9
**speculating**
153:20 172:11
200:14
**speculation**
15:16 16:25
29:13 55:13
85:24 87:9,20
111:22 116:18
117:5,21
162:11,20
197:23 199:13
200:10 201:7
201:23 247:13
292:22 293:13
308:3 310:8
311:11 319:9
320:23 330:12
337:12 338:9
338:19 339:1,2
339:10,17
340:8 341:7,13
355:23 368:10
370:8
**speech** 34:19,22
34:25 37:18,22
38:3 131:9
158:6,20
218:21 287:9
287:13,19,21
289:11,20
**speeches** 79:7
88:11,13
196:15
**spell** 80:23
101:17 132:7,9
**spelling** 317:18
**spending** 183:21

Carl Malamud                                                          May 12, 2015
San Francisco, CA

| | | | | |
|---|---|---|---|---|
| 185:3 | 230:19 231:4 | 189:19 192:3,5 | 251:5 252:6,10 | 324:14 328:5 |
| **spent** 18:16,17 | 231:17,20 | 192:6,11,22 | 252:12,18 | 328:18,21 |
| 18:21 22:3 | 233:15 244:7 | 193:5,9,17,18 | 253:12 254:20 | 331:21 332:25 |
| 72:9 89:12 | 245:4 249:1 | 194:1,14,22 | 255:4,13 | 333:15 334:24 |
| 182:2 183:6 | 257:1,20 258:1 | 195:15 196:21 | 257:11,17,24 | 336:15,18 |
| 224:25 244:13 | 261:10,12 | 196:25 197:20 | 258:14 259:8 | 338:11 339:20 |
| **spine** 258:24 | 262:23 265:13 | 198:4,19,25,25 | 259:18,19 | 341:3,4,22 |
| **spoke** 17:25 | 265:18 270:18 | 199:7,16,23 | 260:5,9 261:17 | 342:13,18 |
| 21:19 160:25 | 274:12,13 | 200:6,20,21 | 262:6,10,20 | 345:11,17,20 |
| **spoof** 124:21 | 278:14,23 | 201:4 203:23 | 263:10,14 | 346:1,4,10,12 |
| **spreadsheet** | 282:11 308:6 | 205:15,25 | 264:12,21 | 346:21,24 |
| 7:21 337:5,21 | 315:1 317:9 | 206:6 207:20 | 266:12 267:8 | 347:14,17,24 |
| 338:1 340:13 | 328:14 330:1 | 207:21 208:18 | 268:4,10 269:2 | 348:2,7 349:4 |
| 341:17 | 333:9 338:13 | 209:8,23 212:3 | 269:8,12,16,18 | 349:8 350:11 |
| **sprigman** 129:1 | 348:23,25 | 212:15,16,20 | 270:11,20 | 350:16 351:7 |
| 129:2 | 359:24 361:20 | 215:15 216:15 | 271:7,17 272:2 | 351:16,17 |
| **stacks** 46:12 | **standardization** | 217:1,2,10,11 | 272:5,12,14,18 | 353:14 354:13 |
| **staff** 8:7 64:7,20 | 158:14 159:8 | 217:14 218:2 | 273:3,22 | 355:6,16 |
| 170:13 370:13 | 160:5,9 | 218:11,22 | 274:19 275:1 | 356:18 357:4 |
| 370:17 | **standards** 6:3 | 219:13 220:13 | 275:10,14,17 | 357:14,15,19 |
| **staffer** 170:20 | 51:8 55:3 | 221:4,6 223:4 | 275:23 276:3 | 358:7 359:15 |
| 172:7 | 59:17,18 60:12 | 225:16 226:8 | 276:19 277:2 | 359:20,25 |
| **stamp** 103:22 | 61:11 84:15,19 | 226:22 227:4 | 277:10 278:4,7 | 360:17,18 |
| 261:8,11 | 139:13,20,25 | 227:14,14,20 | 278:19 279:9 | 361:22 368:16 |
| **stamps** 261:6 | 141:17 154:23 | 227:23,23 | 281:25 282:4,8 | 368:22 369:13 |
| **standalone** | 154:25 155:6 | 228:5,6,9,21 | 284:12,16 | 369:14 370:24 |
| 206:4 | 155:24 157:16 | 229:3,17,24 | 285:12,20 | 371:22,24 |
| **standard** 6:13 | 157:19 158:1,7 | 230:11,25 | 286:4,6,14 | **standardsmak...** |
| 7:3 55:24 | 158:13,23 | 231:8,23 232:9 | 287:1 290:5 | 76:4,7 77:2 |
| 59:20,23,25 | 159:10 160:12 | 232:14,15 | 291:12,20,22 | **standing** 69:24 |
| 60:4,15,19,21 | 160:16,17 | 233:2,9,23 | 292:18,20 | 126:20 165:20 |
| 60:23 61:7,12 | 161:2,24 | 234:8,13,21 | 293:9,10 294:4 | 198:23 |
| 61:19 86:25,25 | 165:22 169:4 | 235:1,4,12,15 | 299:8,18,19,22 | **standpoint** |
| 153:24 165:24 | 170:2,15 172:4 | 235:18,21 | 300:14,23,24 | 147:12 |
| 176:25 177:8 | 172:24 174:16 | 236:24 238:24 | 301:22 302:9 | **stands** 80:17 |
| 177:16,21,23 | 174:21,24,25 | 239:3,24,25 | 303:4 304:8 | 102:16 |
| 178:1,17 | 175:7,21 | 240:9,14 | 306:13,16,21 | **stanley** 114:6,8 |
| 179:16 180:13 | 176:13,15 | 242:19 243:14 | 307:5,10,17,21 | 114:9 |
| 190:23 193:19 | 177:22 178:9 | 243:16,16,21 | 308:12,16,18 | **start** 14:8 165:3 |
| 194:10,11,11 | 179:25 180:1 | 244:6,13,24 | 309:11,14,20 | 182:11 283:14 |
| 194:24 195:5 | 182:4,7,12 | 245:10 247:20 | 309:23 312:13 | 350:1 |
| 197:15 198:12 | 183:7,10 184:9 | 247:21 248:3,5 | 315:5,9 316:18 | **started** 159:14 |
| 201:17,18,19 | 184:23 185:18 | 248:6,9,13,15 | 316:21 317:1 | 182:7 |
| 202:3,5,7 | 186:12,19,22 | 248:19 249:16 | 318:6,23 319:6 | **starting** 9:20 |
| 205:9 227:16 | 187:10,21 | 250:1,22,25 | 321:15 322:3,5 | 66:20 217:8 |

Carl Malamud                                                        May 12, 2015
San Francisco, CA

Page 425

starts 157:12
  183:3 220:8
  258:10
startup 73:18,19
  117:7 118:13
state 20:7 82:25
  83:22,24 84:5
  84:20 86:8,14
  86:18,20 87:4
  103:21,21
  130:18 165:12
  183:16 189:9
  193:21 211:20
  214:20 215:2,3
  216:5 219:17
  230:23 231:3
  232:6 237:3
  258:14 272:1
  288:1,6 307:20
  308:17 326:7
  331:19 353:12
  354:12 356:5
  375:3
stated 120:13
  172:23 221:19
  325:18 326:13
  333:25
statemandated
  214:14
statement 86:2
  137:24 162:16
  173:6 193:11
  195:22,23
  217:22 218:17
  218:20 219:1,5
  246:8 252:11
  253:18,19
  254:16,25
  256:17 289:15
  359:4 360:4,8
  360:9 362:5,15
  363:9,20 364:5
  364:16 365:4
statements
  137:22 138:1

171:17 366:7
states 1:1 9:9
  32:14,22 36:15
  38:12 39:23
  47:12 52:22
  79:24 82:5
  166:13,18
  168:20 172:9
  172:20 173:1,8
  179:1 183:13
  184:1 186:18
  187:10 190:15
  190:22 215:6
  246:13 254:4
  256:15,23
  289:3 290:21
  308:22 317:8
  319:1 361:12
  361:20
stating 183:12
station 33:6 37:7
  67:10
status 109:19,22
  110:6,11,13
  170:9 326:25
  327:20
statute 40:19
  84:5 189:2
  204:20,24
  205:2,4 206:2
  206:3,14
  222:22 223:16
  356:4
statutes 40:23
  82:25 115:9,12
  165:13 169:5
  187:19 206:1
  223:1
stay 352:17,19
stenographica...
  375:14
step 92:5 106:20
steps 54:2 92:7
  151:5
stern 6:6 240:25

243:4
stipulate 103:13
  106:6 107:5,6
  107:23 108:9
  108:11 238:15
  241:9 294:9,19
  295:1
stipulating
  103:17 108:6
stipulation
  107:18,19
  108:3 294:14
stoltz 3:6
stop 167:19,19
  201:3
stored 309:14,24
  345:9
story 35:9
straight 66:14
  201:14 203:23
strange 29:6
stream 199:18
  203:22 204:3
streams 174:22
  179:24 180:2
  200:18 202:15
  203:9 204:11
street 1:22 2:7
  2:16,22 3:7
  9:17 68:11
stretching
  170:20
strike 128:16
  137:18 150:19
  164:7 278:5
  371:6
strong 170:8,23
  172:3 179:7,16
  180:13 219:5
strongly 170:15
  254:3 309:1
stub 274:14
  301:3,11
  302:17 328:14
  335:22 336:11

students 71:10
  71:22
studio 135:24
  136:2,7 263:20
study 26:8,14
  32:13
subject 31:4
  32:7 39:16,20
  48:10,24 66:1
  91:5 107:19
  108:1 126:13
  169:3 170:4
  176:24 186:23
  189:7 219:25
  279:16 331:8
  361:3 372:8
submitted
  240:13,25
  242:10
subscribed
  375:22
subscribing
  163:6
subsequent
  63:10 235:11
  235:13
subset 143:18
  232:8
substance 8:15
  17:12 323:20
  353:25 354:5
  355:1
substantial 69:2
  98:13 200:19
substantially
  189:20
substantive
  308:25 309:5
succeeds 306:19
successful 147:3
  211:8 260:17
  307:2,8 308:15
successor 44:9
sued 290:8
sufficient

249:12
suggested
  221:24
suggestions
  253:11
suing 223:25
  292:12
suite 41:15,19
  44:14,22 45:6
  45:13,23,24,25
  48:6,12 49:23
  158:19,21
sum 131:24
summarize
  27:23 35:4,8
summary 255:7
sun 33:5 49:15
  49:22 69:9
sunlight 133:13
  133:14
sunstein 186:2
supervise 90:19
  119:16 120:1
supervising
  89:25
support 125:18
  126:3,5 128:18
  128:21 129:13
  129:18 130:2,3
  135:25 136:12
  136:15 193:11
  210:16
supported
  171:18
supporters
  129:3
suppose 373:7
supposed 199:8
  200:7
supreme 40:11
  40:15 187:19
  254:10 361:4
sure 28:4 30:15
  31:14,14 63:6
  65:24 70:11

Carl Malamud                                                                    May 12, 2015
San Francisco, CA

| | | | | |
|---|---|---|---|---|
| 79:3 85:18 | 43:25 44:11 | 177:15 260:14 | telecommunic... | 209:11 221:7 |
| 96:19 106:19 | 53:19 63:2 | 289:24 304:7 | 51:6 159:19 | 254:2 353:17 |
| 112:17 131:16 | 123:1,2,19,21 | talking 18:2 | telephone | 360:18 |
| 131:18 133:24 | 123:23 136:15 | 154:13 159:15 | 159:25 | terribly 230:7 |
| 140:23 143:17 | 151:12 158:19 | 166:4 181:22 | tell 10:14 28:19 | testified 10:16 |
| 145:20 176:12 | 273:12,19 | 198:9 205:15 | 31:12 32:7 | 176:24 213:2 |
| 180:12 181:18 | 309:15,25 | 222:21 283:2 | 44:2 61:7 64:4 | 341:13 |
| 184:16 232:22 | | 290:2 343:12 | 76:20 80:16 | testify 8:17 |
| 240:12 259:23 | **T** | talks 224:10 | 109:8 110:25 | 13:13 15:20 |
| 260:7,16,18 | t 69:23 74:22 | 279:6 | 112:8 113:7 | 16:23 17:14 |
| 265:12 266:7 | 75:10 | tank 77:12 | 124:9 126:14 | 18:7,10,21 |
| 267:1 268:13 | table 293:25 | tapes 52:6,21 | 130:11 147:18 | 19:10 20:4,18 |
| 297:4 304:6 | 296:12 | task 59:2,14,19 | 148:6,24 | 20:24 21:14,22 |
| 331:8 332:6 | tables 6:22 | 59:24 61:23 | 213:14 260:14 | 22:1,4,15 |
| 337:10 343:17 | 31:15 32:2 | 75:15,19 76:10 | 296:9 297:15 | 58:14 104:4 |
| 344:15 349:14 | 294:1,2 | 77:1,5 207:19 | 299:14 309:9 | 109:14 265:16 |
| 352:23 365:10 | taiwan 68:13 | 297:25 | 325:12 337:22 | 337:19 |
| 366:24 | take 11:4 12:20 | tax 113:13,16 | 353:6 359:24 | testifying 17:4 |
| surprised | 13:5 18:12 | taxes 89:24 | telling 123:18 | 334:8 |
| 203:19 | 25:5 28:6 | tcp 44:21 49:23 | temporarily | testimony 12:5 |
| survey 165:12 | 72:15 103:8 | teach 71:8,20 | 302:21 | 18:13 25:15 |
| surveying | 110:20 126:13 | teaching 68:21 | ten 34:15 94:5 | 40:14 45:5,20 |
| 193:15 | 126:19 140:2 | 69:1 | 217:2 | 61:4 62:2 |
| svg 56:24 57:9 | 145:17 146:5 | team 344:3,8,16 | tens 19:17 | 68:24 86:11 |
| swartz 51:4 | 174:16 204:13 | 344:18,18 | tenth 133:9 | 91:22 111:7 |
| switch 167:4 | 238:11,20 | 366:12 | terabytes 69:8 | 118:15 125:3 |
| sworn 10:13 | 278:22 296:19 | technical 5:3 | term 26:1 54:10 | 126:13 184:25 |
| synchronize | 297:1 333:21 | 46:3 54:10 | 71:3 95:9 | 188:16 204:1 |
| 151:11 | 366:19 372:15 | 102:7 103:2 | 102:7 103:2 | 205:23 210:6 |
| synonymous | takeaway 195:5 | 146:25 155:23 | 144:1 146:25 | 212:6 213:13 |
| 205:20 | takedown | 182:3 183:7 | 147:11 151:24 | 214:1,9 217:23 |
| system 32:4 43:7 | 289:17,22 | 184:9 206:13 | 152:15,16,19 | 219:18 221:3 |
| 43:15,17,23 | 299:17 310:19 | 216:15 243:14 | 152:24 153:3 | 222:5,8 245:20 |
| 44:10 53:14,16 | 321:9,10,11 | 265:21 302:15 | 164:22 205:6 | 248:23 249:18 |
| 62:19,24 63:12 | 368:12 | 306:7 328:12 | 206:13 240:12 | 251:3 257:7 |
| 65:17 79:16,23 | taken 9:17 72:18 | 338:11 356:1 | 265:22 297:24 | 259:22 264:9 |
| 97:10,13,18,22 | 91:12 123:13 | 368:16,22 | 298:8 315:16 | 284:22 334:10 |
| 98:2,8,15,24 | 167:10 183:5 | 369:12,14 | 315:24 350:21 | 352:20 369:5 |
| 136:11 150:17 | 183:17 197:7 | 370:24 | 350:24 357:16 | 374:5 375:14 |
| 150:18 152:4 | 237:11 247:16 | technically | terminated | 375:16 |
| 221:18 279:6 | 253:2 297:8 | 347:7 | 102:21 | testing 6:4,14 |
| 291:2,12,16 | 336:4 | technology | terms 44:16 71:3 | 7:4 192:11 |
| 361:13 | takes 151:5 | 33:20,22 77:16 | 75:10 95:21 | 194:2,15 |
| systematic 98:2 | talk 17:6 38:21 | 97:19 203:12 | 145:6 184:3 | 199:24 225:17 |
| systems 43:22 | 99:24 174:5 | 248:6 | 205:13,18 | 227:5,24 228:7 |

Carl Malamud                                           May 12, 2015

San Francisco, CA

231:16 234:14
234:22 307:18
315:2
**tests** 227:15,17
229:21 230:24
231:17
**text** 143:3,13
210:13 214:19
218:13 221:24
242:24 252:7,8
252:17 253:14
254:19 255:8
255:12 260:23
265:9 267:15
267:16,21
270:4,5,24
281:14 283:14
283:15,19,21
287:21 296:15
309:13,23
**texts** 220:15
**textual** 50:2,15
51:11,24 52:13
53:5 145:19
264:20
**thank** 10:9 13:9
26:17 27:3
43:18 107:14
110:17 118:2
125:14 138:2
141:6 223:7,7
235:10 238:21
251:12 274:24
277:6 288:22
302:3 313:25
325:10 341:1
344:20 350:5
351:4 372:10
372:11
**thanked** 116:20
117:10
**thats** 10:25 12:1
15:5,13 18:3
19:9 24:10
30:21 35:15

43:16,25 48:20
57:3,13 62:4
66:3,7 72:5
77:23 82:17
83:3,4 84:12
86:13 88:15,24
90:3,4 92:4
93:1,8 94:2
95:10 99:14,17
108:7 110:10
113:1 115:22
120:21 123:9
123:20 132:5
132:12 136:2
138:9 143:17
143:25 144:10
144:10 145:13
146:8 147:11
152:2 155:7
163:10 164:4
165:1 167:21
173:14 181:4
184:12 187:5
190:14 196:21
196:23 197:16
200:2 202:17
213:21 216:16
216:18 217:22
222:20 235:10
238:7,10
240:17 242:12
244:17 245:4
250:19 255:10
255:23 259:9
261:2,4 271:11
272:20 273:18
274:14,23
277:3,6 278:23
281:10,17
290:20 292:14
299:20 300:20
303:8 305:1
306:2 312:5,20
316:7 318:9,14
331:3,4 332:2

335:23 337:23
338:1 339:18
340:19,19
343:7 345:15
352:15,20
355:3 357:23
357:25 360:13
365:12 370:15
372:7
**thegov** 315:8
**theme** 68:18,21
144:16 275:8
**theories** 178:16
201:13
**theory** 176:15
180:22 196:3,4
196:7,13
**therapy** 232:7
**theres** 28:25
31:10 50:21
69:19 78:19
79:1 80:10
94:5 98:1
100:14 112:7
148:1 174:20
180:6 196:15
201:1 202:9
218:1 231:18
269:7 271:10
271:12 274:2
274:15 296:16
306:10 315:21
330:20 339:21
343:11 352:12
**theyre** 31:12
138:19,21
179:15 223:25
225:21 245:13
**theyve** 170:2
**thing** 14:9 21:4
38:20 54:15
63:19 153:3
178:25 192:2
198:9 207:6
290:21 309:1

317:8 347:4
**things** 38:1
100:12 115:21
116:3 163:9
178:23,24
200:22 202:9
225:23 265:14
288:24 289:3
290:20 298:24
345:8 357:12
**think** 16:18
18:20 24:12
27:20 58:21
60:3 72:12
77:12 83:3,4
84:12 86:14
90:3 91:15
97:18 99:14
101:11 103:16
104:4 107:11
108:14 120:2
120:21 137:23
146:16 149:16
151:23 153:16
156:18 170:18
171:1 172:14
173:24 180:5,6
192:19 197:9
198:16 202:22
203:18 213:17
240:10 243:25
244:2,5,17
257:8 268:8,18
269:7 290:20
291:2 292:14
295:1,2 303:12
312:20 327:11
329:19 338:18
340:1 343:11
344:16 352:20
355:7 360:13
372:15
**third** 52:20
67:16 82:14
157:16 171:4

219:4 236:18
252:4 316:15
**thought** 196:18
**thoughts** 157:21
161:16
**thousand** 131:3
131:20 132:5
132:18 210:21
210:25
**thousands** 68:13
**three** 36:9 39:14
46:8 54:22
91:15 113:25
130:12 200:13
200:17 228:21
228:24 243:10
292:16
**threevolume**
48:6 49:19
**tibor** 101:15,18
101:18,21
**tim** 114:6,8,9
**time** 1:20 13:5
13:21,24 14:11
15:10,13 16:17
18:17 19:19
22:12 23:21
25:12 26:25
33:13 51:4
64:9 72:14,16
72:19 76:10
83:17 94:12,18
103:9 104:12
105:4 106:24
107:2,19 111:3
112:2 116:19
117:1,8,14
118:1,12
123:11,14
124:9 131:19
148:16 149:3
152:22 153:12
155:17 164:13
164:24 165:7
167:8,14 168:2

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud

May 12, 2015

San Francisco, CA

Page 428

172:3 192:22
193:23 202:17
203:20 204:5
212:23 215:22
216:19 229:25
237:11 242:5
242:11 246:12
253:1,6 266:17
266:18 272:22
278:22 297:6,9
299:21 315:17
321:14 328:4
331:1 332:11
333:21 336:3,8
348:11 349:5
349:15 350:13
367:3,6 369:3
369:12 372:10
373:6,18
**times** 19:8 54:22
82:1 83:3
152:25 172:24
195:23 196:5
355:11,12
**title** 56:11 62:25
78:4 84:3,5
109:17 155:19
164:23 165:2
166:15 215:1
216:2,8 256:15
266:4,8 338:2
338:13 339:14
339:21
**titles** 29:19,25
**today** 8:17 10:4
12:4 13:14
17:4,14 18:7
18:10,13 19:11
20:4 22:1,15
43:23 48:15
49:24 66:23
70:13 78:8
93:13,17 99:1
99:2,16,17
101:10 121:2,5

121:10 137:2
191:18 192:2
195:14 217:13
222:11 223:10
226:9 329:18
332:4,13 349:6
350:13
**todays** 44:21
46:13 73:23
373:16
**told** 69:14 70:6
89:14 101:9
102:23 238:3
**tool** 57:4 277:8
**tools** 42:25
56:14,20,21,24
57:9,13,17,23
261:16,22,23
**top** 199:5 208:10
216:13 221:2
245:25 246:23
262:8,10,19
290:17,17
358:21
**topic** 31:23 32:1
37:22 101:1
125:6,23 146:4
158:2 162:15
163:11 181:23
202:3 222:23
254:8
**topics** 20:3,11
20:13,19,24
21:23 31:11
46:19 100:25
176:11
**torture** 225:24
**total** 16:21
18:20 19:9
22:4 217:11
**totally** 158:2
307:2 337:10
371:18
**toto** 21:12
**town** 99:12,23

**tpc** 69:24,24
70:2
**trademark**
52:22,23 67:17
**training** 24:21
25:21
**transactions**
137:22,24
**transcribed**
175:16 287:20
288:8
**transcript** 5:9
14:10 107:20
196:10 374:4,8
375:15,18
**transcription**
6:16,19 54:14
287:24 288:20
289:9 302:5
**transfer** 102:16
147:19 150:2,3
150:6,9,14,15
150:21 151:10
151:11
**transferred**
147:4
**transferring**
74:2 152:4,20
**transfers** 335:8
**travel** 255:21
**travelogue** 5:4
46:3
**traveloque** 46:3
**treasurer** 121:1
121:6
**treating** 199:17
**tree** 273:8
**tremendous**
202:13 212:23
**trial** 326:20
327:15
**tribute** 101:3,15
101:18
**trimmed** 258:25
**triplekeying**

54:15
**trips** 46:8
**true** 118:11
162:16 202:24
374:4 375:16
**trustees** 114:5
115:13 119:3,8
119:12,20
**truth** 10:15,15
10:15 172:10
**truthfully** 13:14
**try** 12:15 27:2
176:1
**trying** 75:1
350:20
**turn** 118:25
119:1 121:8
122:10 137:8
137:11 157:8
158:4 174:11
182:23 188:22
189:14 191:1
193:3 195:8
199:4 210:12
214:10 215:10
216:10 218:7
220:5 236:11
236:14 242:21
277:9 279:24
282:19 288:13
288:17 290:14
317:13 331:15
340:12 358:19
361:25
**turned** 162:23
258:1 344:17
**turning** 108:17
109:1 138:4
278:16 282:18
302:25
**twice** 54:12
**two** 11:9 14:21
14:21 22:13
37:6 42:9,12
43:21,24 54:13

64:24 68:16,25
69:7,8,19
72:13 87:11
95:20 131:23
151:12,23
161:20 174:18
174:20 175:4
190:22 201:24
205:13 209:5
209:23 210:2
220:25 223:17
228:5 229:12
237:25 288:24
290:8 298:24
316:6 348:9
349:11 352:12
**twothirds** 158:5
**twoweek** 329:1
329:12 333:7
**twoyear** 210:8
222:6 328:17
336:14 346:9
346:20 347:23
348:7 349:3,13
349:15,16,22
**type** 21:13 23:24
23:24 72:1
81:23 98:19
129:17 143:3
143:11 148:20
148:24 149:4
149:15 186:8
281:12,14
295:22
**typed** 54:12
**types** 56:19 67:8
78:24 83:23
84:8 88:25
143:2,5 148:10
154:7 165:3
242:17 276:16
**typically** 111:25
144:18 151:10
151:11,15
205:3

Carl Malamud                                                    May 12, 2015
San Francisco, CA

**typing** 54:21
**typos** 315:21

---

**U**

**u** 67:16 157:18
   182:5 183:8
   199:19 219:4
   221:25 222:14
   222:21 223:12
   254:10 286:5
   286:17 361:7
   361:10
**ubiquitous**
   158:22
**unable** 19:7
   288:2 324:25
**unavailable**
   243:17 246:14
**unclean** 363:6
   363:13
**uncovered** 98:2
**undergoing**
   222:5
**underlying**
   267:15,15,21
   270:4 329:20
**undersigned**
   375:2
**understand**
   11:11 12:4,14
   12:22 13:2
   14:12,13 58:15
   58:19 60:4
   81:5 95:17,23
   106:14 171:21
   199:6,15 200:5
   252:18 255:6
   258:19 283:24
   365:10
**understanding**
   60:15 134:4
   145:6 190:6,16
   195:1 204:19
   206:8 227:19
   228:4 237:20

256:22 304:1
   331:4
**understood**
   108:5
**undertakes**
   220:12
**undertook** 35:11
   159:17
**underway** 222:8
**underwriters**
   243:15 244:15
**undesign** 101:11
   101:14
**unduly** 244:1,6
**unencumbered**
   270:23
**unfounded**
   203:6
**unincorporated**
   76:11
**unintelligible**
   190:9
**union** 51:6
   159:19
**unique** 177:5,16
   242:5
**united** 1:1 9:9
   32:14,22 36:14
   38:12 39:23
   47:12 52:22
   79:24 82:4
   166:13,18
   168:19 172:9
   172:20 173:1,8
   179:1 183:13
   184:1 186:18
   187:10 246:13
   254:4 256:15
   256:23 290:21
   317:8 361:12
   361:20
**university** 23:2
   23:19 24:9
   51:5 62:10
   71:7,15,20

72:7
**unix** 136:17
**unixbased**
   136:17
**unobjectionable**
   20:14
**unqualified**
   247:2
**unquote** 171:2
   236:21
**unsettled** 170:3
**unsuccessful**
   208:11 212:22
   212:25
**updated** 111:4
   194:15 229:25
   230:7 295:20
**updating** 152:6
   193:10 194:1
**upholding**
   195:10
**uploaded** 280:6
   282:7 283:8
   316:5
**uploading** 315:6
   316:3
**url** 140:20 141:1
   141:7 148:19
   280:9,12
   296:23 302:13
   306:11,15
**urls** 316:6
**usable** 189:23
   208:20
**usage** 205:25
**uscourts** 79:14
   96:20 97:1
**use** 11:15,19
   67:14,18 81:13
   81:16 93:2,8,9
   93:11 125:18
   126:3,4 134:1

134:12,13,14
   136:17 144:25
   151:16 152:17
   172:11,11
   173:5 184:4
   185:17 186:11
   187:21 205:4
   207:8,15,16
   215:6,17 221:7
   230:19,22
   231:20 255:17
   256:12 261:16
   264:20 279:8
   302:20 346:22
   347:15,25
   350:24,25
   351:2 362:14
**useful** 96:13
   337:23
**user** 56:1 142:5
   142:6,12,17
   144:24 146:16
   149:19 151:24
   277:9 304:11
**users** 212:4
   231:4,7,17,23
   328:20 331:20
   332:24 336:17
   346:11,24
   347:16 348:2
**uses** 57:23
   230:11 280:15
**usually** 177:1
**utterly** 87:7
   328:22 351:9

---

**V**

**v** 1:10 36:15
   44:4 48:7
   75:10 254:5
**vague** 18:23
   19:3,12 20:25
   21:8 22:6 24:1
   24:22 25:22
   26:4,10,21

27:7,16 28:1,9
   28:23 29:5,22
   30:14 31:7,17
   31:24 32:9
   33:1,15 34:1,9
   34:17,24 35:6
   35:17 36:2,11
   36:20 37:4,16
   37:23 38:5,17
   39:1,10,18
   40:1,13,21
   41:3 42:4,19
   43:3 44:5,18
   45:5,10,19,20
   46:5,15 47:3
   47:17 48:2,19
   48:25 49:9,16
   50:6 51:16
   52:2,17 53:8
   53:20 54:17
   55:10,21 56:15
   57:1,11,20
   58:3,24 59:10
   59:22 60:9,16
   60:18 61:1
   62:2 64:21
   65:10 66:2
   67:25 68:8,24
   69:17 70:9
   72:4 73:6
   77:11 78:13
   80:4 81:10
   84:1,10,18
   85:4,17,24
   86:11 87:8,19
   88:9 89:2,18
   90:7,14 93:4
   93:18 94:23
   95:15,16 96:10
   96:25 97:16
   98:11,22 99:4
   104:24 105:16
   108:22 109:24
   111:7,23
   114:14,21

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud                                                    May 12, 2015

San Francisco, CA

116:18 117:5
117:22 119:5
119:14,23
120:7,16
121:12,21
122:7 127:8,15
128:2 129:5
131:5,22
132:19 133:3
133:21 134:7
135:11,16,21
136:5,10,23
137:5 140:6,11
140:22 142:2,8
143:1,16,23
144:17 145:10
146:13,21
147:8,11,25
149:8,22 150:4
150:24 151:13
151:21 152:13
152:15,22
154:2,12
155:17 157:23
158:10 159:3
163:20 164:12
164:13 165:5,7
170:6 171:25
176:18 178:5
179:20 182:14
186:4 190:20
195:3 196:8
197:4,21
204:22 206:10
209:19 211:21
212:19 213:6
213:10 214:23
215:24 216:22
223:23 224:7
224:19 225:7
225:13,20
226:4,12 227:6
228:10 229:18
230:1,12
231:10 232:11

233:4,11,25
235:5,23
239:17 241:23
243:7,23
246:10 249:18
251:4 259:20
261:19 264:23
273:5,24
277:11 280:20
281:2 282:13
284:23 285:23
289:13 291:10
292:5 295:25
298:7,23
299:11,25
301:1,17
302:11 303:20
304:14 307:13
307:23 308:3
308:20 309:16
310:2 312:15
312:23 315:20
316:11 317:6
318:25 319:9
321:18,23
323:2,16 326:6
327:9 328:1,7
328:23 329:9
330:13 332:1
334:16 336:19
338:25 339:17
341:6 342:5,24
343:9 345:4,21
346:15 347:2
348:17 350:18
351:11,21
353:18 354:16
356:23 357:8
358:11 366:9
368:19,25
369:7,17,24
370:7 371:3,10
371:19 372:4
**vaguely** 58:20
**vagueness** 333:4

**valid** 54:6,23,25
55:5 208:19
227:15 229:21
**valley** 124:21
**valuable** 117:10
197:10
**value** 284:15,24
**valueadded**
163:9
**varian** 115:15
116:8,9 117:12
118:5,8,12,22
**variance** 107:21
107:23 108:4
**variant** 195:23
**varies** 86:14
**variety** 52:9
53:1 221:8
227:17 229:21
**various** 226:15
**vast** 174:24
270:5
**vastly** 204:9
**veeck** 170:25,25
171:12,14,17
171:23 172:1,2
214:17
**vendor** 52:8
**vendors** 162:21
163:2
**verbatim** 253:14
**verification**
332:10
**verified** 334:6
**verify** 151:6
236:22 332:8
**version** 11:24
105:22 161:22
178:11,12,12
202:8,8 204:16
213:25 228:1
259:19 260:4,5
263:13 264:12
271:7 284:17
297:13 307:17

307:19,20
**versions** 161:8
161:10 162:3
177:8 235:12
**versus** 9:11 11:6
14:1
**video** 9:4 29:17
33:4 80:1,8
142:22 143:13
287:22 335:25
**videographer**
3:14 9:3 10:2
72:16,19 94:10
94:15 106:24
107:2 123:11
123:14 167:6
167:11,18,24
252:24 253:3
297:1,6,9
336:1,5 367:3
367:6 373:15
**videotaped** 1:16
**view** 2:3
146:11,14
147:12 177:20
180:21 196:4
201:16 205:20
257:4 288:2
299:23 300:14
301:5 303:4
304:9,23
309:12,21
312:13 322:3,5
336:22 370:25
**viewable** 51:7
**viewed** 328:20
331:20 332:25
336:17
**viewer** 270:24
**views** 179:7,15
180:12
**village** 42:3,18
**violation** 286:17
321:25
**violations** 98:3

321:13
**virginia** 2:8
**virtues** 98:18
**visible** 152:5
246:2
**visit** 46:9 158:12
**visited** 158:20
**visiting** 70:24,25
71:3,6,14
**visually** 269:18
269:24 270:6
**volume** 9:14
48:8,11 49:22
94:11,16 167:7
167:12,25
189:21 252:25
253:4 336:2,6
373:16
**volumes** 82:16
**voluntarily**
116:22 326:10
**voluntary**
185:18 186:11

**W**

**w3c** 55:2
**wait** 14:8 256:1
**waive** 245:13
**waiver** 244:19
244:23 245:6
245:12 248:20
248:24 249:11
364:3,10
**waiving** 373:5
**walters** 114:6
115:1,2
**want** 11:8 14:22
17:20 28:5
29:24 60:11,14
62:14 66:8
96:19 104:7
105:25 106:14
106:16,20
123:9 126:15
148:12 149:9

Carl Malamud

May 12, 2015

San Francisco, CA

149:11 162:5
168:9 177:13
177:14 181:12
204:16 211:14
219:22 232:6
239:12 264:17
266:2,3 272:25
288:19 294:15
296:22 308:4,6
308:7 332:6
342:21 344:8
344:11,12
347:10 349:23
350:1,7,25
351:1 353:4,24
355:14 370:20
372:23
**wanted** 112:23
124:7 158:21
195:6 235:10
235:15 262:22
262:24 308:8
308:14 347:11
**wants** 14:11
65:4 149:19
167:4 174:4
**warnings** 182:9
182:10 184:3
**washington** 9:6
133:15 224:25
255:21
**wasnt** 21:13
276:13
**watch** 112:18
**way** 41:25 46:21
54:5,14 59:6
145:18 146:1
150:11 158:5
161:17 163:4
169:10 172:2
176:17 177:25
202:23 203:3
211:5 249:4
255:23 266:20
270:2 292:11

302:4 346:17
358:13
**ways** 171:18
178:13 179:4
243:11
**web** 34:20 55:23
56:14,20,21
57:9,14,17,17
57:22,23 73:23
79:10 97:2
99:1 100:3,4
111:4 148:23
261:16 265:23
272:17 273:4,8
273:21 274:20
277:8 330:2
346:23 347:15
348:1
**website** 69:13
79:4 80:7,25
81:9 82:6,12
82:21 83:1,9
83:25 84:9,16
84:21 97:2
98:10,14 99:19
99:20,23 100:2
100:7,14,17
102:9 104:16
104:18 105:23
106:4 107:7
111:19 112:7
113:6,9 124:8
124:14,17,20
137:16 138:12
140:21 141:2,8
145:2 146:12
146:20 147:7
149:20 151:20
152:1,10,20
153:10 155:19
164:23 188:20
191:23 194:20
214:1 217:10
217:15 218:3
218:22 224:3

247:16 253:16
262:11,21
273:23 275:1
275:11,14
276:6 278:20
279:9 281:25
282:5,12
284:13 297:14
299:9 300:24
301:23 302:10
302:18 303:5,6
304:9 306:17
306:22 307:11
309:13,21
321:16 322:6,6
328:5,19,21
331:21 333:1
336:16,18
342:19 345:11
346:10,12,21
347:24 348:3,8
348:9,24 349:1
349:5,9 350:12
350:16 351:8
351:17 369:15
370:25 371:1
**websites** 57:21
70:12 78:22,24
79:18 80:14
81:19 83:6
88:5 96:18
97:5 99:2,7,10
101:9 102:3,5
102:13,14,17
112:5,22
188:12 233:10
233:24 234:7
282:10 318:6
326:11,22
327:2,17,22
341:22 342:13
**week** 18:17
19:16 48:22
49:12
**weekend** 18:18

**wellrespected**
174:3
**went** 66:4 70:23
163:4 230:8
263:8,11 271:6
**west** 1:21 2:14
9:24 82:17
**weve** 132:23
183:5,16 209:5
209:23 252:22
330:15 342:17
**whats** 22:19
55:18 59:20
77:9 84:13
109:7 148:20
173:11 239:9
240:20 293:21
301:8 310:13
322:20 324:8
365:3 366:16
367:9
**wheaton** 36:15
254:5
**wheel** 101:5
**whereof** 375:22
**white** 183:11
296:16
**whoa** 352:9
**wide** 34:20
159:22
**widely** 61:13
186:20 361:3
361:11
**wildly** 211:8
**willing** 131:11
249:2,15
**win** 159:8
**windfall** 199:19
**window** 329:1
329:12
**wish** 373:6
**wished** 159:8
**withdraw** 91:8
227:20
**witness** 10:13

13:22,25 14:23
17:1,8,10,18
17:24 18:16
21:19 22:11
23:22 25:13,24
26:13,23 27:19
28:12,24 29:6
29:10,15 30:6
30:15,22 31:10
31:19 32:1,11
32:21 33:3,9
34:3,11,19,25
35:8,19 36:4
36:13,21 37:6
37:11,18,25
38:7,19 39:3
39:12,20 40:15
40:23 41:5
42:6,21 43:5
43:12 44:7,20
45:6,12,21
46:7,17 47:5
47:18 48:4,20
49:2,11,18
50:8,24 51:17
52:5,20 53:11
54:18,25 55:11
55:14,22 56:6
56:17 57:3,12
57:21 58:5,13
58:17 59:1,11
59:23 60:8,11
60:18 61:2,6
61:16 62:3
64:23 65:3,12
66:3 68:2,10
68:25 69:19
70:11,17 72:5
74:12 75:21
76:20 77:12
78:15 81:12
83:18 84:2,12
84:19 85:18,25
86:13,20 87:11
87:22 88:11

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud May 12, 2015

San Francisco, CA

| | | | | |
|---|---|---|---|---|
| 89:4,19 90:9 | 157:24 158:11 | 232:1,13 233:5 | 304:15,22 | 360:16 361:2 |
| 90:16 91:6,10 | 159:5 161:16 | 233:14 234:2 | 305:21 306:24 | 362:8,9,22,25 |
| 91:23 93:20 | 162:13 163:23 | 234:18,24 | 307:4,15,24 | 363:2,12,23 |
| 94:25 95:17 | 164:14,21 | 235:7,24 | 308:4,21 | 364:9,20 |
| 96:12 97:1,17 | 165:8,23 167:3 | 237:24 239:18 | 309:18 310:4,6 | 365:10 366:11 |
| 98:1,13,23 | 167:5,21 168:8 | 241:24 243:10 | 310:9 311:1,12 | 367:23,25 |
| 99:6 100:22 | 170:7 171:11 | 243:25 245:4 | 311:24 312:10 | 368:5,11,20 |
| 103:17,23 | 172:1,18 174:3 | 245:17 246:11 | 312:17,22 | 369:1,6,9,18 |
| 104:6 105:10 | 176:2,21 178:6 | 247:15 248:3 | 313:19,22 | 370:1,9,15 |
| 105:17,22 | 178:23 179:10 | 248:13,24 | 314:13,15 | 371:4,12,21 |
| 107:13 108:24 | 179:12,13,23 | 249:19 250:5 | 315:13,21 | 372:5,11 375:8 |
| 109:5,14,16 | 180:18 182:16 | 251:5 252:15 | 316:9,12 317:7 | 375:16,22 |
| 110:9 111:8,24 | 183:20 184:15 | 255:3,25 256:2 | 318:18 319:1 | **witnesss** 227:8 |
| 112:12 113:22 | 185:2 186:5 | 256:20 257:8 | 319:10,16 | **wont** 175:7 |
| 114:16,23 | 187:4,17 | 257:20 258:17 | 320:8,21,24 | 362:9 |
| 116:19 117:6 | 188:18 189:7 | 259:23 260:7 | 321:19,24 | **word** 74:21 |
| 117:17,20 | 190:21 191:13 | 261:20 263:18 | 322:12,15 | 103:1 115:3,22 |
| 118:8,16 119:7 | 191:22 192:18 | 264:15,24 | 323:4,15 324:4 | 151:4 152:23 |
| 119:15,25 | 193:1,15 194:4 | 267:10,25 | 324:23,25 | 205:4 211:16 |
| 120:9,19 | 194:17,20 | 268:8,13,18 | 325:6 326:7 | 263:2 302:20 |
| 121:14,23 | 195:4,20,22 | 269:4,14,23 | 327:5,11 328:2 | 314:19,23 |
| 122:8 124:5 | 196:9 197:6,24 | 270:23 271:10 | 328:9,25 | 350:23,25 |
| 125:4 127:10 | 198:8 199:14 | 271:14 272:7 | 329:11,22 | **words** 165:25 |
| 127:17 128:6 | 200:12 202:2 | 272:24 273:7 | 330:1,7,14 | 197:24 257:8 |
| 130:9,17 | 204:2,24 | 274:2,11 275:7 | 333:6 334:7,23 | **work** 10:25 |
| 131:11,23 | 205:13,24 | 275:19 276:2 | 335:3,8,15 | 24:16 27:24 |
| 132:23 133:5 | 206:12 207:1 | 277:13 278:14 | 336:21 337:13 | 39:4 158:23 |
| 133:23 134:11 | 207:15 208:25 | 279:12 280:14 | 337:18,21 | 174:17 189:1 |
| 135:2,10,12,18 | 209:11,21 | 280:22 281:4 | 338:10,17,18 | 197:11 198:18 |
| 135:23 136:6 | 210:7 211:5 | 282:2,15 | 338:20 339:3 | 210:16 225:11 |
| 136:11,24 | 212:20 213:7 | 283:18 284:24 | 339:11,18 | 225:15,19 |
| 137:6 138:21 | 213:12 215:1 | 285:14,17 | 340:3,9 341:8 | 226:2 232:2,5 |
| 140:7,13,23 | 216:1,25 | 286:1,11,19,20 | 341:16 342:3 | 286:16 294:17 |
| 141:4 142:9,15 | 217:21 218:20 | 286:22 287:6 | 342:12,17,25 | 356:21 357:7 |
| 143:2,17,25 | 219:22 220:25 | 287:16 289:8 | 343:23 344:2 | 358:10 359:6 |
| 144:18 145:13 | 222:4,19 | 289:15 291:11 | 345:5,23 346:7 | 359:20 362:6 |
| 146:14,24 | 223:15,24 | 292:6,25 | 346:17 347:4 | 362:17 364:10 |
| 147:11 148:1 | 224:8,21 225:9 | 293:14 295:18 | 347:20 348:19 | **worked** 27:19 |
| 149:9,11,23 | 225:14,21 | 296:2 297:4 | 350:22 351:12 | 28:5,12 33:7 |
| 150:6 151:3,15 | 226:5,14,21 | 298:5,8,24 | 351:23 352:12 | 51:3 56:20 |
| 151:23 152:15 | 227:13 228:13 | 299:12 300:1,5 | 353:20 354:21 | 62:21 65:12 |
| 152:23 153:7 | 228:15,19 | 300:20 301:3 | 355:10,25 | 77:7 |
| 153:15 154:5 | 229:6,9,11,19 | 301:19 302:13 | 356:24 357:10 | **workflow** 268:2 |
| 154:13 155:5 | 230:4,6,16,18 | 302:23 303:14 | 357:22 358:12 | **working** 11:9 |
| 155:18 156:22 | 231:12,15 | 303:21 304:3 | 359:10,14,23 | 50:2,14 51:23 |

Carl Malamud

May 12, 2015

San Francisco, CA

52:13 53:5
56:14 57:8
65:8
**works** 95:1,4,9
160:2 211:5
358:25
**workshops** 47:1
47:9,10,15,20
**world** 34:20
35:25 42:7,22
46:8 67:21
68:3 69:1,11
71:13 99:21
115:25 159:15
161:18 209:6
221:17 275:20
276:6,13
**worlds** 42:2,18
67:21 68:4,19
68:20 69:13
73:15,17 74:19
**worth** 249:14,19
**wouldnt** 268:21
268:24 307:15
356:7
**wrap** 182:9
184:4
**write** 145:15
168:21 242:1
279:5 306:9
314:7 324:18
**writer** 65:25
66:17
**writing** 65:24
156:25 186:1
241:21
**writings** 31:5
66:1 196:13
**written** 26:18
139:4 142:24
150:7 214:20
327:23 346:2
**wrong** 291:18
**wrote** 42:6 46:7
71:11 100:22

156:9 169:12
177:23 181:8
181:13 200:1
266:21
**wwlbd** 80:17,20
81:8 96:21
**www** 141:1

—————————
**X**
—————————
**x** 375:18
**xerox** 259:4

—————————
**Y**
—————————
**yeah** 47:5 75:24
90:3 91:18
110:4,16
111:16 123:9
125:13 167:5
184:15 191:22
197:24 214:9
229:19 242:10
272:11 278:14
294:15 295:18
296:2 304:3
328:24 339:3
339:18 344:22
354:7 357:10
**year** 24:11 25:1
25:2,3 63:4,7
63:10,14 64:15
71:17 73:3
75:2,21 91:10
91:20 123:4,5
123:22 153:13
153:15 165:25
182:21 208:15
232:18 235:3,7
287:11 319:5
335:1,9,16
**years** 27:24
77:17 91:14,15
116:13,14
209:5,23 210:3
222:22 223:17
290:4 348:10

349:11
**yep** 167:22
**yeswescan** 81:22
81:23 82:6,8
82:12,14,21
83:1 96:21
**yo** 6:16,19 97:7
97:9 98:9,20
287:10
**youd** 106:17
173:24 268:19
296:22
**youll** 132:25
221:2 296:15
**young** 170:13,20
172:7
**youre** 12:4
17:23 18:1
28:4 50:25
89:15 97:13
113:1 114:20
126:14 134:4
139:9 140:23
191:8 198:8
283:2 292:12
294:12,14
307:2 311:9
319:10 325:13
332:5,5,18,18
334:9 342:4
343:18 345:12
353:6 367:20
**yourhonor** 97:7
97:9 98:9,20
**youve** 12:24
56:20 91:19
152:19 242:7
277:18 348:5
349:10

—————————
**Z**
—————————
**zip** 10:23 143:10
143:13

—————————
**0**
—————————

**0** 37:19 280:25
283:15
**000** 91:10,20
92:2,3 130:24
131:25 132:2,2
185:3 249:12
249:12,14,15
249:19
**0000001** 6:5
**00000446** 5:25
**00000810** 7:16
**00000820** 7:19
**00000822** 7:5
**00000824** 7:7
**00000827** 7:21
**00000830** 6:23
**00010153** 6:8
**00010247** 6:12
**0005127** 7:13
**0005129** 7:10
**001** 315:4
**0031208** 5:18
**0031250** 5:18
**0031411** 4:19
**0031412** 4:21
**0031480** 5:14,16
**0031488** 5:8
**0031528** 6:15
**0031764** 5:12
**0031807** 8:9
**0032046** 6:17,20
**0032075** 5:10
**0032078** 5:10
**0032079** 5:4
**01** 72:19
**02** 107:2
**020** 218:1
**04** 75:24
**040** 208:18
209:5
**05** 75:24

—————————
**1**
—————————
**1** 1:9 4:25 5:7
9:14,14 29:7

30:16,25 94:11
94:11,16 109:11
120:23 121:9
123:14 125:17
152:2 167:7,12
167:25 168:16
169:20,24
211:1 218:1
236:15 237:2
239:11 252:25
253:4 336:2,6
373:16
**10** 4:3 7:18
20:10 72:16
130:24 133:2,5
133:7 185:3
250:12 251:6
300:13 349:1
352:7,13 353:7
354:9,11 355:4
355:9,21
**100** 133:5,7
**1005** 10:22
**10153** 240:21
**10154** 242:22
**10155** 244:18
**10156** 245:23
249:8
**10157** 246:22
**10167** 249:25
250:5,9,24
251:11
**10195** 6:8
240:22
**10247** 251:17
253:9
**10248** 256:5
**10249** 251:17
**1045** 109:18
**10s** 352:12
**10th** 302:19
303:3,14 323:7
**11** 7:7 9:15
20:10 72:19
94:12,18

Carl Malamud                                                    May 12, 2015
                          San Francisco, CA

| | | | | |
|---|---|---|---|---|
| 106:24 123:14 | 299:16 314:25 | **1988** 65:23 | 284:16 285:11 | 283:4,6,6 |
| 185:23 272:8 | 332:11 | **1989** 64:16 | 285:20 286:3,6 | 284:3,5 300:11 |
| 305:14 348:24 | **160** 92:5 | 65:21 | 286:13,25 | 303:1 340:24 |
| 353:3,7,8,11 | **1618** 94:3 | **1990s** 57:18 | 291:20,22 | 348:22 358:22 |
| **110** 4:18,20 | **166** 5:6 | 153:19 | 292:18,19 | 371:15 |
| **112th** 2:17 | **17** 4:15 103:8 | **1991** 51:3 | 293:9,10 | **20** 4:20 110:21 |
| **114cv00857tsc...** | 105:7,14 106:4 | 161:17 162:14 | 299:19,22 | 111:13,17 |
| 9:13 | 106:7 107:6,24 | **1992** 66:18,20 | 300:14,23 | 114:3 128:11 |
| **12** 1:19 7:9,15 | 108:4 109:1 | **1993** 52:5 | 301:22 302:9 | 129:14 232:23 |
| 7:20 31:15 | 119:1,11 120:4 | **1994** 52:5 | 303:4 304:8 | 373:7 |
| 32:2 107:2 | 120:14,23 | **1996** 35:25 42:7 | 306:13,16,21 | **200** 131:25 |
| 123:11 293:25 | 121:9 122:11 | 42:22 67:21 | 307:10 309:11 | **2001** 74:10,16 |
| 294:1,2 299:16 | 137:9,20 138:4 | 68:18 70:23 | 309:14,20,23 | 75:2 |
| 352:13 | 236:21 239:16 | 71:13 99:21 | 312:13 315:3,5 | **2002** 74:8,9,16 |
| **125** 4:22 | 256:15 | **1997** 67:2 73:4 | 315:9 318:5,23 | **2003** 75:2 |
| **12th** 1:23 10:4 | **173** 5:9 | 74:9 | 319:6 321:15 | **2004** 75:23 |
| 327:24 | **17th** 237:5 | **1998** 74:10 | 322:2,4 328:5 | **2005** 59:6 77:18 |
| **13** 4:9 14:17,19 | **18** 4:16 5:23 | 191:7,19 | 328:18 331:21 | **2006** 77:18 |
| 14:22,25 15:5 | 8:14 103:8 | **1999** 139:13,20 | 332:25 333:15 | **2007** 4:17 77:22 |
| 15:8,14,21 | 107:4 108:6 | 139:25 141:17 | 336:15 341:3,4 | 78:8 92:1 94:1 |
| 17:6 22:4,16 | 109:8 110:5 | 165:21 169:4 | 341:22 345:10 | 109:23 110:7 |
| 122:10 173:21 | 167:8 | 175:20 192:10 | 345:17,19 | 110:14 116:15 |
| **1314** 14:14 | **180** 91:10,15,20 | 198:25 228:1 | 346:1,3,9,20 | 117:1 137:12 |
| **13th** 110:14 | 92:3,6 | 235:8,18,21 | 346:24 347:14 | 137:18,21 |
| **14** 4:9,10,10 6:7 | **181** 5:11 | 236:23 238:24 | 347:17,23 | 138:6,14 139:1 |
| 14:23 19:23 | **185** 5:13 | 239:3 240:9 | 348:2,7,22,25 | 139:15 288:24 |
| 20:4,19,23 | **19** 4:18 7:12,15 | 243:21 250:1 | 349:4,8 350:11 | **2008** 123:6,19 |
| 21:15,23 22:5 | 20:10 110:21 | 250:25 252:12 | 350:16 351:7 | 155:18 214:13 |
| 22:16 213:17 | 110:25 111:4 | 257:16 258:14 | 351:15 353:14 | 214:19 216:7,9 |
| 283:4,6,6 | 111:17 112:4 | 259:8,18 | 354:13 355:6 | 288:25 |
| **144** 91:18 92:2,5 | 112:19 153:16 | 261:17 262:10 | 355:16 356:17 | **2009** 6:7,11 |
| **14cv00857tscd...** | 191:19 | 262:20 263:10 | 357:3,19 358:7 | 241:5,16 |
| 1:9 | **1920** 110:18 | 263:14 264:12 | 359:20 | **201** 6:5 239:11 |
| **14th** 241:5,16 | **1940** 2:7 | 264:21 266:11 | **19th** 181:17 | **2011** 5:7 92:1,2 |
| **15** 4:12 28:15,18 | **1960s** 193:20 | 267:8 268:4,10 | 182:18 313:3 | 168:16 210:2,2 |
| 29:19 30:10 | 361:18 | 269:1,12,16 | 319:11 | **2012** 8:8 130:2 |
| 31:3 46:12 | **1980** 23:9 27:20 | 270:10,20 | ――――――― | 130:13,23 |
| 47:10 66:6,9 | 28:13 191:7 | 271:7,16 272:1 | **2** | 139:17,25 |
| 236:12 | **1980s** 64:14 | 272:18 273:3 | **2** 37:19 44:1 | 173:21 174:9 |
| **155** 5:3 | **1982** 24:12 | 273:22 274:25 | 94:16 109:1 | 175:12 181:17 |
| **15th** 182:18 | **1983** 62:10 63:5 | 275:10,13,17 | 121:9 125:10 | 182:22 185:24 |
| **16** 4:13 7:9 | **1984** 25:4 62:11 | 275:23 277:10 | 152:3 167:7,8 | 210:2 216:13 |
| 103:8,10,14,25 | 63:5,6 | 278:4,7,19 | 167:14 168:2 | 216:19,25 |
| 104:15 106:4 | **1985** 63:15 | 279:9 281:24 | 211:1 271:23 | 217:9 232:19 |
| 107:24 108:17 | 64:13 235:14 | 282:4 284:12 | 271:25 282:24 | 232:19,23 |

Alderson Reporting Company
1-800-FOR-DEPO

Carl Malamud

San Francisco, CA

May 12, 2015

Page 435

| | | | | |
|---|---|---|---|---|
| 233:19,20 | **21st** 32:25 | 168:2 208:18 | **31** 6:3 239:7,10 | **319** 7:14 |
| 235:2 236:21 | **22** 5:3 155:25 | 209:5 213:19 | **310** 7:8 | **32** 6:6 240:18,21 |
| 237:5 239:16 | 156:3 157:9 | 213:22 214:11 | **31208** 213:23 | 241:6,10,16,18 |
| 257:17 265:16 | 158:5 161:6 | 215:11 216:11 | **31215** 214:11 | 241:21 242:3 |
| 272:8 295:19 | **22314** 2:8 | 218:8 220:5 | **31217** 215:10 | 242:18,22 |
| 319:5,11 | **23** 5:6 20:10 | 221:14 | **31218** 216:10 | 244:18,25 |
| 348:24 367:19 | 166:5,10 | **287** 6:16,19 | **31222** 218:7 | 245:23 246:23 |
| 369:1 371:9,15 | 167:16 168:5 | **28th** 208:12,15 | 221:1 | 247:24 249:25 |
| **2013** 7:9,12,15 | 253:1 | 210:8 | **31223** 220:5 | 250:24 251:22 |
| 116:15 117:1 | **236** 5:19 | **29** 5:19 20:10 | 221:2 | 367:3 |
| 128:18 129:3 | **237** 5:24 | 236:3,5,16 | **31227** 221:14 | **32036** 288:16 |
| 208:16 209:17 | **239** 6:3 | 258:4,6 264:6 | **31250** 213:23 | **32039** 288:18,21 |
| 209:22 210:9 | **24** 5:9 84:3,5 | 264:10 271:22 | **313** 7:11 | **32066** 290:15 |
| 299:16 312:2 | 155:19 164:23 | 300:10 302:25 | **31413** 4:21 | **32074** 6:18,21 |
| 312:12 321:14 | 165:2 173:9,12 | 303:2 331:16 | **31480** 208:2 | 288:16 |
| 322:4 329:13 | 173:17 174:8 | 332:11 | 209:4 | **32075** 180:24 |
| 331:22 333:1 | 174:11 180:23 | **293** 6:22 | **31481** 211:19 | **32076** 174:12 |
| 333:12,16 | 215:1 216:2,8 | **2nd** 369:1 371:9 | **31482** 210:13,15 | **32078** 180:25 |
| **2014** 7:7,18,20 | **240** 6:6 | | **31483** 210:14 | **32079** 156:4 |
| 111:15,20 | **249** 6:12 | ——————— | **31485** 5:14,16 | **32082** 156:13 |
| 194:11,24 | **25** 4:17 5:11 | **3** | 208:2 | **32086** 156:25 |
| 213:12,16 | 160:11 181:1,4 | **3** 6:11 67:6 | **31489** 5:8 | **32087** 156:23 |
| 222:4 228:22 | 181:11 182:24 | 77:12 91:6 | **31528** 262:4 | **32088** 156:25 |
| 235:14 300:6 | 183:9 216:25 | 92:20 93:22 | **31738** 6:15 | **322** 7:17 |
| 300:13 302:19 | 358:19,22 | 113:19 119:2,2 | 262:4 | **32224** 157:9 |
| 303:3,14 | 362:1,12 363:5 | 119:11,11,20 | **31764** 181:5 | **32225** 161:5,13 |
| 305:14 307:18 | 363:16 364:2 | 119:20 167:12 | **31765** 182:24 | **32226** 161:6 |
| 308:12,16,18 | 364:13,24 | 167:25 190:13 | 184:2 | **32228** 5:5 156:5 |
| 312:2,12 322:7 | 372:23 | 252:25 258:6 | **31768** 181:6 | **3225** 158:4 |
| 323:7 327:24 | **251** 6:9 | 260:13 263:16 | **31769** 5:12 | **324** 7:20 |
| 331:22 333:2 | **25th** 110:10 | 284:19 362:1 | **31807** 366:18 | **33** 1:20 6:9 9:5 |
| 333:10,12 | **26** 4:25 5:13 | **30** 5:24 18:25 | **31809** 366:18 | 251:13,15,16 |
| 335:21 349:1 | 123:11 125:17 | 20:10,15 27:24 | **31832** 185:9 | 251:21,25 |
| **2015** 1:19 6:17 | 167:14 182:3 | 124:4 125:2 | 186:16 188:3 | 252:3 253:6,9 |
| 6:20 9:15 10:4 | 183:6,20 185:6 | 126:24 130:16 | **31836** 188:22 | 254:17 256:5 |
| 111:10 217:13 | 185:8 186:17 | 132:21 134:9 | **31838** 189:15 | **335** 283:9 |
| 222:11 328:16 | 188:4,23 | 134:21 141:19 | 190:3 | **336** 7:21 |
| 374:16 375:23 | 189:15 191:1 | 165:22 171:8 | **31839** 191:1 | **34** 6:13 94:12 |
| **2022892260** 9:7 | 191:25 193:4 | 199:1 207:11 | **31840** 191:25 | 261:25 262:3 |
| **207** 5:15 | 195:9 199:5 | 217:17 219:19 | 193:3 | 262:19 317:23 |
| **2093** 375:7 | 201:14 203:8 | 237:9,12,14 | **31845** 195:8 | 318:1 |
| **21** 4:22 125:8,13 | **261** 6:13 | 238:5,16,23 | **31846** 199:5 | **351** 7:22 |
| 125:14,15 | **27** 5:15 207:23 | 240:3 259:4 | 201:13 | **358** 8:3 |
| 168:25 | 208:1,8 | **300** 259:6 | **31847** 185:10 | **35a** 6:16 288:7 |
| **213** 5:17 | **28** 4:12 5:17 8:8 | **301** 7:3 | 201:14 | 288:12,15 |
| | | **304** 7:6 | | |

Carl Malamud

May 12, 2015

San Francisco, CA

Page 436

290:15
**35a35b** 287:7
**35b** 6:19
**36** 6:22 293:19
293:22 294:7
294:10,12,19
295:7,10,23
296:8,12 297:6
297:13,16
298:21
**361** 11:2
**366** 8:6
**37** 7:3 301:6,9
336:12 367:6
**38** 7:6 304:24
305:2,6,10
323:24,24
336:3
**39** 7:8 310:11,14
310:18,24
311:16 313:2
313:12,16,24
319:5 321:4

**4**

**4** 20:9 113:19
120:4,14,19
120:23 125:6
126:7 138:4
190:14 236:16
253:1,4,6
264:7,9 282:24
283:9 336:2
**40** 7:11 94:18
259:4 313:4,7
313:9,11 314:5
314:8,18
316:14 317:14
317:25 318:5
318:21 321:4
371:17
**400** 259:6
**40s** 193:18
**41** 7:14 319:17
319:20 320:14

320:20 321:6
**414** 182:3 183:6
183:20
**4154369333** 3:9
**4158752300**
2:19
**42** 7:17 322:18
322:21 323:1,7
323:10 324:1
**4250** 259:4
**43** 7:20 324:6,9
324:12,16,19
325:3,24
326:19 328:4
**44** 7:21 336:24
337:2,9 339:25
340:13,17
341:10
**446** 237:15,17
237:18 238:6
**447** 5:25 237:18
238:6
**45** 7:22 297:9
351:24 352:2
352:21,24
354:8
**46** 8:3 336:8
358:14,16
361:25 362:12
363:5,16 364:2
364:13,24
**47** 8:6 240:6
366:14,17
367:10 371:15
373:18,21
**48** 240:4

**5**

**5** 8:14 9:15
121:9,9 237:15
249:12,12,14
249:15,19
258:6,11 297:6
297:9 300:11
303:1 336:6

373:16
**50** 68:3,7 72:16
243:25 244:2
244:15 292:17
**500** 132:2
**501** 67:6 77:12
91:6 92:20
93:22 113:19
113:19
**50s** 193:18
**51** 190:13
**5127** 313:8
316:15
**5128** 7:13 313:8
313:16 314:5
317:14
**5129** 310:15
**527** 113:22
**544** 237:19,24
**555** 1:22 2:16
9:16
**58** 106:24

**6**

**6** 7:7,18,20
18:25 20:15
120:14,19
124:4 125:2
126:24 130:16
132:21 134:9
134:21 137:11
141:19 165:22
171:8 199:1
207:11 217:17
219:19 258:11
264:7 276:10
276:21 278:6
279:25 282:18
283:14 330:19
331:19 332:8
332:23 333:23
335:20 336:3,8
343:6
**60** 193:1 292:17
293:1,8,14

**60s** 193:19
**64** 240:4
**6464** 1:25
375:25
**6509888500**
2:24
**68** 240:6 283:14
**686** 283:15,18

**7**

**7** 6:17,20 137:11
137:20,20,23
137:23 182:3
183:6,20
190:13 367:3,6
373:18,21
**7034133000** 2:9
**73** 182:7,12
183:6 184:23
217:1
**750** 132:2
**7th** 289:11

**8**

**8** 113:11 284:3,5
**800** 244:15
**801** 2:22
**8036** 294:24
**809** 8:9
**80s** 57:13 59:5
65:23
**810** 319:20
**815** 3:7
**820** 322:22
**821** 7:19 322:22
**822** 301:10
**823** 7:5 301:10
302:20
**824** 305:3
**827** 337:3
**83** 24:13
**830** 293:23
**832** 299:15
**837** 6:23 293:23
**85** 194:10

228:22
**86** 283:14
**89** 65:24

**9**

**9** 1:20 9:5 15:13
138:4 333:24
353:3,7,7,8,11
**90s** 59:5
**92** 51:3
**94** 4:13,15,16
**94041** 2:23
**94104** 1:24 2:18
**94109** 3:8
**94992** 11:3
**95472** 10:23
**969** 217:11
**97** 71:18
**99** 194:11
228:22 278:7
341:3
**990** 89:6 128:8