# EXHIBIT 67

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

1 (Pages 1 to 4)

**1**

1    UNITED STATES DISTRICT COURT
2    FOR THE DISTRICT OF COLUMBIA
3
4    AMERICAN EDUCATIONAL RESEARCH
5    ASSOCIATION, INC., ET AL.,
6         PLAINTIFF,
7         vs.        No. 1:14-CV-00857-TSC-DAR
8    PUBLIC.RESOURCE.ORG, INC.,
9         DEFENDANT.
10   _____
11
12
13        VIDEOTAPED DEPOSITION OF
14        JAMES R. FRUCHTERMAN
15        CONFIDENTIAL
16        Tuesday, September 8, 2015
17
18
19
20
21
22
23
24   Reported By:
25   KATHLEEN WILKINS, CSR #10068, RPR-RMR-CRR-CCRR-CLR

**2**

1    VIDEOTAPED DEPOSITION OF JAMES R. FRUCHTERMAN
2         BE IT REMEMBERED that on Tuesday,
3    September 8, 2015, commencing at the hour of
4    9:21 a.m. thereof, at FENWICK & WEST, LLP, 801
5    California Street, Mountain View, California,
6    before me, Kathleen A. Wilkins,
7    RPR-RMR-CRR-CCRR-CLR, a Certified Shorthand
8    Reporter, in and for the State of California,
9    personally appeared JAMES R. FRUCHTERMAN, a
10   witness in the above-entitled court and cause,
11   who, being me first duly sworn, was thereupon
12   examined as a witness in said action.

**3**

1         APPEARANCES OF COUNSEL
2    FOR THE PLAINTIFFS:
3         QUARLES & BRADY LLP
4         BY: JONATHAN HUDIS, ESQ.
5         1700 K Street, NW, Suite 825
6         Washington, D.C.  20006
7         Telephone: (202) 372-9599
8         E-mail: jon.hudis@quarles.com
9         and
10        OBLON, MCCLELLAND, MAIER & NEUSTADT,
11        L.L.P.
12        BY: KATHERINE D. CAPPAERT, ESQ.
13        1940 Duke Street
14        Alexandria, Virginia  22314
15        Telephone: (703) 413-3000
16        E-mail: Kcappaert@oblon.com
17   FOR THE DEFENDANT:
18        FENWICK & WEST, LLP
19        BY: SEBASTIAN KAPLAN, ESQ.
20        555 California Street, 12th Floor
21        San Francisco, California  94104
22        Telephone: (415) 875-2477
23        E-mail: skaplan@fenwick.com
24   ALSO PRESENT:
25        STEVE PATAPOFF, VIDEOGRAPHER

**4**

1              INDEX
2         INDEX OF EXAMINATIONS
3                              PAGE
4    EXAMINATION BY MR. HUDIS ....................9
5    AFTERNOON SESSION ..........................143
6
7         INDEX OF EXHIBITS
8    EXHIBIT        DESCRIPTION        PAGE
9    Exhibit 48   Document entitled, ............12
10               "Subpoena to Testify in a
11               Civil Action"
12   Exhibit 49   Curriculum Vitae, James .......21
13               R. Fruchterman
14   Exhibit 50   Spreadsheet entitled, .........41
15               "Patents, Trademarks and
16               Copyrights of Calera
17               Recognition Systems,
18               Inc."
19   Exhibit 51   Spreadsheet entitled, .........50
20               "Patents and Trademarks
21               of RAF Technology, Inc."
22   Exhibit 52   Document entitled, ............68
23               "Patents and Trademarks
24               of Arkenstone, Inc."
25   //

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

2 (Pages 5 to 8)

5

1          INDEX OF EXHIBITS (Continued)
2     EXHIBIT        DESCRIPTION        PAGE
3     Exhibit 53A   United States Patent No. ......69
4          5,470,233
5     Exhibit 53B   Document entitled, ............69
6          "Abstract of Title for
7          Application 08210239"
8     Exhibit 54   Spreadsheet entitled, .........98
9          "Trademarks and
10         Copyrights of Beneficent,
11         Inc."
12    Exhibit 55   Screenshots from ............143
13         Bookshare website
14    Exhibit 56   Document entitled, "The ......179
15         Chafee Amendment:
16         Improving Access to
17         Information"
18    Exhibit 57   Article entitled, ............185
19         "Developing Information
20         Technology to Meet Social
21         Needs"
22    Exhibit 58   Document entitled, ...........190
23         "Assistive Technology for
24         Visually Impaired and
25         Blind People"

7

1          INDEX OF EXHIBITS (Continued)
2     EXHIBIT        DESCRIPTION        PAGE
3     Exhibit 62   Lexis reported version of ....237
4          the Second Circuit Court
5          of Appeals decision in
6          Authors Guild versus
7          HathiTrust reported at
8          755 F.3d 87
9     Exhibit 63   Document entitled, "The ......241
10         Internet Archive's Open
11         Library is violating
12         authors' copyrights"
13    Exhibit 64   Document entitled, ...........249
14         "Expert Report of James
15         R. Fruchterman"
16
17         EXHIBITS PREVIOUSLY MARKED
18         AND REFERRED TO IN THIS DEPOSITION
19    EXHIBIT                 PAGE
20    Exhibit 34              304
21
22    QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
23         PAGE  LINE
24         221   8
25         227   4

6

1          INDEX OF EXHIBITS (Continued)
2     EXHIBIT        DESCRIPTION        PAGE
3     Exhibit 59   Document entitled, ...........208
4          "Declaration of James
5          Fruchterman in Support of
6          Motion For Summary
7          Judgment"
8     Exhibit 60   Document entitled, ...........208
9          "Supplemental Declaration
10         of James Fruchterman In
11         Support of Defendant
12         Intervenors' Opposition
13         to Plaintiffs' Motion For
14         Summary Judgment"
15    Exhibit 61   Westlaw reported version .....229
16         of district court opinion
17         in the Authors Guild,
18         Inc. versus HathiTrust,
19         et al., reported at 902
20         F.Supp.2d 445
21
22
23
24
25    //

8

1     September 8, 2015              9:21 A.M.
2          P R O C E E D I N G S
3          THE VIDEOGRAPHER:  Good morning.  Here
4     begins Tape No. 1 in the video deposition of
5     James Fruchterman in the matter of American
6     Educational Research Association, Incorporated, et
7     al., versus Public.Resource.Org, Incorporated, in
8     the U.S. District Court of the District of
9     Columbia, Case Number 1:14-CV-00857-TSC-DAR.
10         Today's date is September 8th, 2015.
11    Time on the video monitor is 9:21 a.m.  The
12    videographer today is Steve Patapoff representing
13    Planet Depos.  The video deposition is taking
14    place at Fenwick & West, 801 California Street,
15    Mountain View, California.
16         Would counsel please voice-identify
17    themselves and state whom they represent.
18         MR. HUDIS:  Jonathan Hudis,
19    Quarles & Brady, LLP, for plaintiffs.
20         MS. CAPPAERT:  Katherine Cappaert from
21    Oblon, LLP, for plaintiffs.
22         MR. KAPLAN:  Sebastian Kaplan,
23    Fenwick & West, LLP, for defendant
24    Public.Resource.Org, Incorporated.
25         THE VIDEOGRAPHER:  Court reporter today

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

9

1  is Kathleen Wilkins representing Planet Depos.
2          Would the reporter please swear in the
3  witness.
4          JAMES R. FRUCHTERMAN,
5          having been duly sworn,
6      was examined and testified as follows:
7          EXAMINATION BY MR. HUDIS
8  BY MR. HUDIS:
9      Q.   Good morning, sir.  Would you state your
10  full name and address for the record.
11      **A.   James Robert Fruchterman, Jr.**
12  **1850 Middlefield Road, Palo Alto, California.**
13      Q.   And is that your business address or
14  your home address?
15      **A.   My home address.**
16      Q.   Could I have your business address,
17  please.
18      **A.   My business address is 4780 California**
19  **Avenue, Palo Alto, California.**
20      Q.   Mr. Fruchterman, I am here -- my name is
21  Jonathan Hudis, representing the plaintiffs in an
22  action in which you've been designated as an
23  expert witness.
24          My colleague, Katherine Cappaert, is
25  here with me and will be working with me during

10

1  the deposition.
2          Before we get started, a couple of
3  deposition rules which I'd like you to
4  acknowledge.
5          You understand you're giving testimony
6  under oath?
7      **A.   Yes.**
8      Q.   The court reporter, you understand, is
9  taking down everything that you're saying?
10      **A.   Yes.**
11      Q.   We'll need audible responses from you,
12  so no nods or gestures.
13      **A.   Yes.**
14      Q.   If at any point you do not understand a
15  question, please let me know, and I will try to
16  clarify the question for you.
17      **A.   Okay.**
18      Q.   All right.  If you need a break for any
19  reason, please let me know, and we can provide you
20  that break.  Except if there is a question
21  pending, you must answer the question before we
22  take the break.
23      **A.   Yes.**
24          MR. KAPLAN:  Unless it's about
25  privilege.

11

1  BY MR. HUDIS:
2      Q.   Correct.  And your counsel is right,
3  unless it's about privilege.
4          If at any point you come to realize that
5  an answer that you've already given during the
6  day, Mr. Fruchterman, is not completely correct,
7  will you please let me know, and I will give you
8  an opportunity to correct that answer.
9      **A.   Yes.**
10      Q.   Is there any reason, whether by taking
11  medication or illness, that you cannot testify
12  completely, accurately and truthfully today?
13      **A.   No.**
14      Q.   Mr. Fruchterman, have you been deposed
15  before?
16      **A.   Yes.**
17      Q.   When?
18      **A.   In the last month or two, once.**
19      Q.   Was that in the ASTM case?
20      **A.   Yes.**
21      Q.   And that case is also pending in DC,
22  federal court?
23      **A.   I'm not familiar with what court it's**
24  **in.**
25      Q.   And that case is also pending against

12

1  Public.Resource.Org, Inc.?
2      **A.   Yes, that's my understanding.**
3      Q.   Is that the only time you've been
4  deposed?
5      **A.   Yes.**
6      Q.   Have you ever testified at a trial
7  before?
8      **A.   No.**
9          MR. HUDIS:  I'd like the court reporter
10  to now mark as Plaintiff's Exhibit Fruchterman 48.
11          Counsel.
12          (Whereupon, Deposition Exhibit 48 was
13          marked for identification.)
14  BY MR. HUDIS:
15      Q.   Mr. Fruchterman, I now place in front of
16  you what's been marked as Deposition Exhibit 48.
17          Have you seen this deposition subpoena
18  of Exhibit 48 that is directed to you before
19  today?
20      **A.   No, I don't believe so.**
21      Q.   How is it you were made aware that you
22  were testifying today?
23      **A.   Through counsel.**
24      Q.   All right.  What did you do to prepare
25  for testifying today?

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

13

1      MR. KAPLAN:  And I'll object to the
2  extent that the question calls for privileged
3  communications or other information protected by
4  Federal Rule of Civil Procedure 26 and instruct
5  the witness to answer only to the extent that it
6  does not involve communications with counsel.
7      THE WITNESS:  I reread my expert report.
8  I read the rebuttal report from plaintiff's
9  expert.
10  BY MR. HUDIS:
11     Q.   Anything else?
12     **A.   Nothing beyond the things I can**
13  **disclose.**
14     Q.   Okay.
15     MR. KAPLAN:  Jonathan, if you don't
16  mind.
17     To clarify my instruction, you can
18  mention the existence of conversations that we
19  had, just not their content.
20     THE WITNESS:  So I have also spoken with
21  counsel.
22  BY MR. HUDIS:
23     Q.   All right.  And that was the
24  Fenwick & West counsel?
25     **A.   Correct.**

14

1      Q.   All right.  Did you speak with any of
2  the counsel from EFF, Electronic Frontier
3  Foundation, to prepare to testify?
4      **A.   No.  Well, just to be accurate, not in**
5  **months.  So ...**
6      Q.   All right.  So just to clarify, you were
7  told by counsel you were going to be testifying
8  today, but you haven't seen the deposition
9  subpoena of Exhibit 48 before?
10     **A.   Correct.**
11     Q.   Besides reviewing your expert report and
12  the rebuttal expert report, did you review any
13  other documents to prepare to testify today?
14     **A.   Only those attached to those reports.**
15     Q.   Okay.  So let me ask it as a fuller
16  question.
17     **A.   Mh-hmm.**
18     Q.   Other than reviewing your expert report
19  and its attachments and the rebuttal report and
20  its attachments, did you read anything else in
21  order to prepare to testify today?
22     **A.   No.**
23     Q.   To prepare to testify today, did you
24  speak with anyone else except the lawyers at
25  Fenwick & West?

15

1      A.   No.
2      Q.   Did you speak with Mr. Malamud to
3  prepare to testify today?
4      **A.   No.**
5      MR. KAPLAN:  Objection.  Asked and
6  answered.
7      THE WITNESS:  I will try to pause.
8  Sorry.
9      MR. KAPLAN:  Got to give me --
10     THE WITNESS:  Yeah, you're not in that
11  rhythm yet.
12     MR. HUDIS:  Come on.  Got to catch up.
13     Q.   How long do you think you took to
14  prepare by reading the two reports and their
15  attachments?
16     **A.   Less than two hours total for the**
17  **reading.**
18     Q.   And that is the sum total of the
19  documents you reviewed to prepare to testify?
20     **A.   Yes.**
21     **And I believe in this entire line of**
22  **questioning, we're talking about in preparation**
23  **for this deposition, since the creation of my**
24  **expert report.**
25     Q.   That is correct, sir.

16

1      **A.   Okay.  Then my -- my testimony has been**
2  **accurate so far.**
3      Q.   All right.  Since you were retained to
4  be an expert witness in this case, have you read
5  the pleadings, meaning the complaint, the answer
6  and the reply?
7      **A.   No.**
8      Q.   Mr. Fruchterman, what is the highest
9  level of your education?
10     **A.   A master's degree.**
11     Q.   Okay.  And based upon reviewing some of
12  your papers and your expert witness report, you
13  received a bachelor's degree from the California
14  Institute of Technology?
15     **A.   Correct.**
16     Q.   And that was a bachelor's of science in
17  engineering in 1980?
18     **A.   Correct.**
19     Q.   What was your major?
20     **A.   I would say electrical engineering.**
21     Q.   Did you have a minor during your
22  undergraduate studies?
23     **A.   No.**
24     Q.   Did you have what's called a
25  concentration during your undergraduate studies?

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

---

17

1    A.   I simultaneously got a master's in
2  applied physics while completing my bachelor's, so
3  I would say applied physics might fall in that
4  category.
5    Q.   So you also received a master's degree
6  from California Institute of Technology?
7    A.   Correct.
8    Q.   And that was in 1980?
9    A.   Correct.
10   Q.   And that was a master of science in
11 applied physics?
12   A.   Correct.
13   Q.   Now, for your master's, did you have a
14 major?
15   A.   Caltech didn't have a major under the
16 applied physics degree.
17   Q.   Do you have a minor for your master's?
18   A.   They didn't have minors.
19   Q.   And did you have a concentration for
20 your master's?
21   A.   Informally, I focused on optics and
22 lasers over other areas of applied physics.
23   Q.   Now, you did start studies towards a
24 Ph.D.?
25   A.   Correct.

---

18

1    Q.   And that was at Stanford?
2    A.   Yes.
3    Q.   And that was from 1980 to 1981?
4    A.   Correct.
5    Q.   That was in electrical engineering?
6    A.   Yes.
7    Q.   Do you recall what courses you took
8  towards your Ph.D.?
9    A.   No.  It would have been in the applied
10 physics and electrical engineering directions, for
11 the most part.
12   Q.   And you did not obtain your Ph.D.?
13   A.   Correct.
14   Q.   Why not?
15   A.   I took a leave of absence to join a
16 private rocket company.
17   Q.   And that was G.H.C., Inc.?
18   A.   G.C.H., Inc.
19   Q.   G.C.H., Inc.  Sorry for my dyslexia.
20       And that was the -- I don't know if I'm
21 spelling -- pronouncing this right -- Percheron?
22   A.   Correct pronunciation, yes.
23   Q.   Thank you.
24       All right.  And that was the Percheron
25 private enterprise rocket project, as an

---

19

1  electrical engineer?
2    A.   Yes.
3    Q.   And that was the project where the
4  rocket blew up?
5    A.   Correct.
6    Q.   Mr. Fruchterman, just to outline the
7  extent of your formal school training, you do not
8  have any formal school training in psychology?
9    A.   Correct.
10   Q.   And you do not have any formal school
11 training in psychometrics?
12   A.   Correct.
13   Q.   You don't have any formal school
14 training in educational or achievement tests or
15 measures?
16   A.   Correct.
17   Q.   And you do not have any formal education
18 in psychological tests or measures?
19   A.   Correct.
20   Q.   Now, your resume notes that you have
21 several -- you had several engineering positions
22 with the following companies:  Phoenix
23 Engineering, Inc.?
24   A.   Yes.
25   Q.   What years was that?

---

20

1    A.   '81-'83.
2    Q.   1981 to 1983?
3    A.   Correct.
4    Q.   What type of company was it?
5    A.   It was a private enterprise rocket
6  company.
7    Q.   Where was it located?
8    A.   Santa Clara -- certainly -- Santa Clara
9  County.  Certainly this area.
10   Q.   What was your job title at Phoenix?
11   A.   I had a -- I was vice president.
12   Q.   What were your job responsibilities?
13   A.   I don't recall.
14   Q.   What did you do there?
15   A.   Tried to raise money to start a rocket
16 company.
17   Q.   Do you remember anything else you did?
18   A.   I probably was involved with the
19 finances.  We tested some prototype rocket
20 engines.  And I spent most of my time trying to
21 raise money, which we were unsuccessful in doing.
22       MR. HUDIS:  Off the record.
23       THE VIDEOGRAPHER:  Going off the record
24 at 9:34.
25       (Whereupon, a recess was taken.)

---

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

6 (Pages 21 to 24)

21

1     THE VIDEOGRAPHER:  Back on the record at
2  9:37.
3  BY MR. HUDIS:
4     Q.   So while we were off the record,
5  Mr. Fruchterman, my colleague noted that I was a
6  little dilatory in marking your resume.  So we're
7  discussing your background.  You might as well
8  have your resume in front of you.
9     A.   Okay.  Thank you.
10     MR. HUDIS:  I'd like the court reporter
11  to mark as Deposition Exhibit Fruchterman 49.
12     (Whereupon, Deposition Exhibit 49 was
13     marked for identification.)
14     THE WITNESS:  Okay.  Thank you.
15  BY MR. HUDIS:
16     Q.   Mr. Fruchterman, do you recognize this
17  document?
18     A.   I do.
19     Q.   What is it?
20     A.   My resume.
21     Q.   All right.  So we were discussing your
22  background, and we finished discussing your
23  engineering position with Phoenix Engineering.
24     Let's go on to G.C.H., Inc.
25     A.   All right.

22

1     Q.   All right.  And what type of company was
2  that?
3     A.   It was a private company, probably a C
4  corp, I'm guessing.
5     Q.   What business was it in?
6     A.   In the business of building a private
7  enterprise rocket.
8     Q.   How long were you with the company?
9     A.   Under one year.
10     Q.   What year -- what year was that?
11     A.   1981 -- probably -- I was probably only
12  employed during 1981.
13     Q.   What was your job title?
14     A.   Electrical engineer.
15     Q.   And what were your responsibilities at
16  G.H.C.?
17     A.   At G.C.H., my responsibilities --
18     Q.   G.C.H.
19     A.   No problem.
20     -- were to design remote fuel loading
21  systems to fuel up the rocket, telemetry systems
22  to collect data about the rocket's performance, a
23  remote igniting system and a command destruct
24  system to blow up the rocket if it went off
25  course.  Yeah.  That was my main -- top

23

1  responsibilities.
2     Q.   And you were employed at the IBM T.J.
3  Watson Research Center?
4     A.   Correct.
5     Q.   What type of company was that?
6     A.   IBM is a large computer company.
7     Q.   All right.  What did -- was that a
8  division, the Watson Research Company?
9     A.   The Watson Research Center --
10     Q.   Center.
11     A.   -- is -- was one of IBM's major research
12  centers.
13     Q.   And at that research center, what did
14  they do at the time you were employed there?
15     A.   Well, this is a large research center
16  with a couple thousand of employees, so they did a
17  whole bunch of different things.
18     Q.   What did you do?
19     A.   I worked on photoacoustic microscopy.
20     Q.   And if you could define what that is,
21  please.
22     A.   Making dust scream.  So our task was to
23  detect dust on top of silicon wafers that would be
24  hard to see, sort of visual inspection, by hitting
25  them with a pulsed laser that would cause the dust

24

1  to heat up and emit sound, which we could then
2  detect.  So it was an inspection technique to
3  improve silicon wafer -- reduce defects,
4  basically.
5     MR. KAPLAN:  Kathleen, I was wrong.  We
6  are going to talk about semiconductors.
7  BY MR. HUDIS:
8     Q.   What year was this?  Or years.
9     A.   This would have been '80, '81.  This was
10  the summer -- it was a summer internship between
11  my master's and my -- starting up my Ph.D. program
12  at Stanford.
13     Q.   So that was the summer of '80 or summer
14  or '81?
15     A.   The summer of '80.
16     Q.   Did you have a job title there?
17     A.   Some variation on summer intern.  I
18  don't recall the exact title.
19     Q.   Have you told me all about your job
20  responsibilities at the Watson Research Center at
21  the time you were employed there?
22     MR. KAPLAN:  Objection.  Vague.
23     THE WITNESS:  Certainly that was the
24  main project I worked on, and I wasn't engaged to
25  work on any other major projects.

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

25

1    BY MR. HUDIS:
2        Q.   And you were employed at the General
3    Motors Company?
4        A.   **Two summers, while -- while doing my**
5    **engineering degree.**
6        Q.   Which summers?
7        A.   **That would have been the summers of '78**
8    **and '79.**
9        Q.   You were an intern?
10       A.   **Yes.**
11       Q.   What projects did you work on?
12       A.   **I only remember one project, which was**
13   **to build a fast start system for a diesel engine,**
14   **so that the engine would start faster when you**
15   **turn on the ignition.  Often called a glow plug.**
16       Q.   Do you remember any other projects you
17   worked on?
18       A.   **No.**
19       Q.   And you worked at the NASA Jet
20   Propulsion Laboratory?
21       A.   **Correct.**
22       Q.   When was that?
23       A.   **I'm going to say '77 through '79, but I**
24   **am not exactly sure.  It was also during my**
25   **undergraduate work at -- at Caltech.  I was a**

26

1    **student research associate for Dr. Bruce Murphy --**
2    **Murray, who was then the director of JPL.**
3        Q.   Do you remember what you did for
4    Dr. Murray?
5        A.   **I worked on the Spacel photographic data**
6    **retrieval system which held imagery from the**
7    **Viking missions, primarily.**
8        Q.   I think for the court reporter, you're
9    going to have to spell out the name of that
10   device.
11       A.   **Spacel, like the word "space" plus an L**
12   **at the end.  Are we otherwise good, or do you need**
13   **more?**
14            THE REPORTER:  I'm sorry?
15            THE WITNESS:  Do you need any more or is
16   that enough?
17            (Discussion held off record.)
18   BY MR. HUDIS:
19       Q.   Do you remember any other
20   responsibilities you had working for Dr. Murray at
21   the NASA Jet Propulsion Laboratory?
22       A.   **That was my primary project there, and I**
23   **don't recall any others.**
24       Q.   And you worked at the Fermi National
25   Accelerator Laboratory?

27

1        A.   **Correct.**
2        Q.   When was that?
3        A.   **The summer of 1977.**
4        Q.   What did they do there at the Fermi
5    National Accelerator Laboratory while you were
6    there?
7        A.   **They -- they ran a large accelerator,**
8    **and they designed physics experiments to detect**
9    **elementary particles.**
10       Q.   What was your job title there?
11       A.   **Something like student intern or summer**
12   **intern.**
13       Q.   What did you do there?
14       A.   **Primarily worked on instruments,**
15   **maintenance of instruments, upgrading of**
16   **instruments.**
17       Q.   What kind of instruments?
18       A.   **Well, the largest and longest-term**
19   **project was on a multiwire proportional chamber.**
20       Q.   What did it do?
21       A.   **Detected signals from elementary**
22   **particles.**
23       Q.   Sounds?
24       A.   **More electrical signals.  The -- it was**
25   **a large frame, maybe four by six, that had many**

28

1    different wires.  You put it in, I believe, a
2    noble gas environment with a bunch of other
3    things, and you detected the path of the particle
4    by hitting some of these gas atoms, and then that
5    would create a ionization that would create a
6    signal on the wires, so you would actually be able
7    to measure the track through the -- through the
8    space.
9        Q.   So other than what is on your resume on
10   the first page, are there any other companies you
11   worked for that are -- that are not listed here
12   since graduating from Caltech?
13       A.   **Yes.  There were additional positions,**
14   **all -- all either ones that I did while trying to**
15   **start companies or companies that didn't get**
16   **started.**
17       Q.   What field of endeavor were these
18   companies that you tried to get started?
19       A.   **Technology.**
20       Q.   Any particular technology?
21       A.   **Well, they would have related to either**
22   **electrical engineering or to computer science and**
23   **at least one semiconductor company.**
24       Q.   Any particular projects that you
25   remember working on in starting up these companies

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

8 (Pages 29 to 32)

---

**29**

1    as you sit here today?
2       A.   Oh, many ideas.  Microfluidics, math and
3    science simulation software, more pattern
4    recognition companies, but none of these reached
5    the point of where I was actually employed,
6    because they never got started.
7       Q.   Could you define for us microfluidics?
8       A.   It's a semiconductor-based technology
9    for moving gases or fluids rather than electrical
10   current, but under the control of electrical
11   signals.
12      Q.   Any other notable projects in your
13   working background that you haven't told us about?
14         MR. KAPLAN:  Objection.  Vague.
15         THE WITNESS:  I taught night school, in
16   computer programming.  I crawled under houses as
17   part of helping homeowners understand more of
18   their earthquake risks.  But those were back in
19   the early '80s, when I was trying to get my first
20   company really going.
21   BY MR. HUDIS:
22      Q.   Since it's a fair part of your expert's
23   report, Mr. Fruchterman, in simple terms could you
24   please define what is "optical character
25   recognition" and what does it do?

---

**30**

1       A.   So optical character recognition is the
2    process of having a machine recognizing letters
3    and words, generally from documents, though it can
4    be from other objects, and translating those into
5    the letter or word equivalent so that those things
6    can be processed.
7          So the most common application of
8    optical character recognition is scanning, let's
9    say, a page of a document and turning it into a
10   word processor file that is the equivalent of what
11   you would have done if you had typed it in, but
12   the machine, instead, had it scanned and then took
13   the picture of the page and turned it into the
14   text of the page.
15      Q.   So for the remainder of this deposition,
16   if I use the initials "OCR," we'll understand that
17   to mean "optical character recognition"?
18      A.   Yes.
19      Q.   Is OCR a common method of creating
20   searchable digital copies of texts?
21         MR. KAPLAN:  Objection.  Competence.
22   Vague.
23         THE WITNESS:  It is the most common form
24   when the source document is in physical or solely
25   image-based form, but it's probably not the most

---

**31**

1    common.
2    BY MR. HUDIS:
3       Q.   What is the most common?
4       A.   Having digitally created content that
5    stays digital and then is searched.
6       Q.   So, for example --
7          MR. KAPLAN:  Can I just interject.  For
8    the court reporter, you had my objection as
9    "compound."  It was "competence."  I just wanted
10   to make sure we had that on the record.
11   BY MR. HUDIS:
12      Q.   So, for example, Mr. Fruchterman, a
13   document created in Microsoft Word would be a
14   method of creating searchable digital text?
15         MR. KAPLAN:  Objection.  Incomplete
16   hypothetical.  Vague.
17         THE WITNESS:  It would be a great source
18   document to put into a system that analyzed
19   documents for full text.  I'm not sure -- could
20   you repeat the question.
21   BY MR. HUDIS:
22      Q.   Yes.
23          So, for example, a document created in
24   Microsoft Word would be a method of creating
25   searchable digital text?

---

**32**

1          MR. KAPLAN:  Objection.  Incomplete
2    hypothetical.  Vague.
3          THE WITNESS:  Yes.  I would say that's
4    pretty true.
5    BY MR. HUDIS:
6       Q.   Thank you for your candor.
7          Mr. Fruchterman, was the OCR process
8    first developed by Ray Kurzweil?
9          MR. KAPLAN:  Objection.  Vague.
10   Competence.
11         THE WITNESS:  No, that's not my
12   understanding.  But he was a noteworthy inventor
13   along a spectrum of inventors that progressively
14   improved the practice of optical character
15   recognition.
16   BY MR. HUDIS:
17      Q.   Was the OCR process that was developed
18   by Ray Kurzweil used to create a reading machine
19   for the blind?
20         MR. KAPLAN:  Objection.  Vague.
21   Competence.
22         THE WITNESS:  Yes.
23   BY MR. HUDIS:
24      Q.   I'd like to turn back, Mr. Fruchterman,
25   to your resume and talk about the noted companies

---

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

33

1   with which you have been associated, starting with
2   Calera Recognition Systems and working up towards
3   Benetech.
4        So is Benetech -- excuse me, is Calera
5   Recognition Systems, Inc., still in business
6   today?
7        **A.   It merged into a company that is still**
8   **extant today.**
9        Q.   All right.  Is the company, Calera
10   Recognition Systems, Inc., as that company was
11   known between 1982 and 1989, still in existence
12   today?
13        MR. KAPLAN:  Objection.  Calls for a
14   legal conclusion.  Competence.
15        THE WITNESS:  Not by that name.
16   BY MR. HUDIS:
17        Q.   All right.  What type of company was
18   Calera Recognition Systems when it was in business
19   under that name?
20        **A.   It was a optical character recognition**
21   **company.**
22        Q.   What products did it make at the time
23   you were affiliated with Calera?
24        MR. KAPLAN:  Objection.  Argumentative.
25   Vague.

34

1        THE WITNESS:  A series of OCR products.
2   BY MR. HUDIS:
3        Q.   What services, if any, did Calera
4   recognition systems render to customers?
5        **A.   Calera was primarily a product sales**
6   **company, but it did provide maintenance services**
7   **and product customization services to its**
8   **customers.**
9        Q.   And according to your resume, which
10   we've marked as Exhibit 49, you were the founder,
11   vice -- vice president of finance from 1982 to
12   1988?
13        **A.   Correct.**
14        Q.   What were your responsibilities as vice
15   president, finance?
16        **A.   I had, I'd say, the typical**
17   **responsibilities of a chief financial officer,**
18   **which was to participate in the raising of**
19   **capital, the accounting systems, financial**
20   **controls, reporting.  So those were my primary**
21   **financial responsibilities while I was in that**
22   **role.**
23        Q.   Have you told me all the
24   responsibilities you can recall when you were in
25   that role?

35

1        **A.   No.**
2        Q.   Are there other responsibilities you had
3   in that role as vice president of finance?
4        **A.   Yes.  I was also a technical founder.**
5   **So during that time period, I wrote software code.**
6   **I worked a great deal with customers.**
7        Q.   In what capacity?
8        **A.   In technology companies, there's usually**
9   **a salesperson and a tech person when you're doing**
10   **a major sale to a company like Hewlett-Packard.  I**
11   **would have been that tech person.  So an executive**
12   **with a technology background combined with a sales**
13   **executive, and together we would work on the care**
14   **and feeding of that account and hopefully getting**
15   **their business.**
16        Q.   Have you told me all of your duties and
17   responsibilities as founder and vice president of
18   finance --
19        MR. KAPLAN:  Objection.  Vague.
20   BY MR. HUDIS:
21        Q.   -- at Calera at the time you were
22   employed there?
23        **A.   That was a great majority of my**
24   **responsibilities.  Nothing else occurs to me.**
25        Q.   And you were the vice president of

36

1   marketing for Calera from 1987 through 1989?
2        **A.   Correct.**
3        Q.   What were your responsibilities in that
4   role at that time?
5        **A.   Primarily product marketing.  So what**
6   **features the product should have, how it should be**
7   **communicated to the customers, relationships with**
8   **the press.  Those would be the primary**
9   **responsibilities.**
10        Q.   Are there any other responsibilities
11   that you had as vice president of marketing that
12   you haven't told me that you can recall now?
13        **A.   No.**
14        Q.   Mr. Fruchterman, what is or was
15   Omnifront Character Recognition Technology?
16        MR. KAPLAN:  Objection.  Compound.
17        THE WITNESS:  Different vendors use that
18   term different ways.  It was Calera's primary
19   initial claim to primacy in the OCR market, which
20   was that our character recognition recognized all
21   fonts without needing to be trained on those fonts
22   or having those fonts be in some way memorized in
23   memory.  And so that was our primary edge, which
24   made a pretty powerful product.
25

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

37

BY MR. HUDIS:
Q.   Just so we have a working definition,
please define, as you understand it, what a "font"
is.
A.   So in the field of typography, when you
were preparing a printed document, you have font.
Designers design different looks for fonts, and
fonts have many different properties.
And so a font is a group of a complete
character set that might be all the different
letters or symbols that you might want to have be
represented in that font, and then a font is
essentially a -- has a similar design feeling
across all of those characters.  For example, is
it tall and narrow or squat and wide or have
serifs, attached letters or not.
Q.   By way of example, Times Roman is a type
of font?
A.   Correct.
Q.   And Courier New is a type of font?
A.   Yes.
Q.   And Helvetica is a type of font?
A.   Yes.
Q.   As a product of Calera Recognition
Systems, what is or was WordScan?

38

MR. KAPLAN:  Objection.  Compound.
MR. HUDIS:  Well, I don't know if it's
still in existence, Counsel.
THE WITNESS:  So WordScan was -- was
Calera's software OCR product as opposed to one
that had hardware attached to it.
BY MR. HUDIS:
Q.   As a product of Calera Recognition
Systems, what is or was TrueScan?
MR. KAPLAN:  Objection.  Compound.
THE WITNESS:  TrueScan --
MR. KAPLAN:  Just preserving.
MR. HUDIS:  Go on, Counsel.
THE WITNESS:  Whatever you guys are
doing.
TrueScan was the hardware version of OCR
that preceded WordScan in the product line
evolution of Calera.
BY MR. HUDIS:
Q.   And was it the intent of Calera at that
time that TrueScan and WordScan would work
together as a software-hardware package?
A.   No.
MR. KAPLAN:  Objection.  Vague.
Go ahead.

39

THE WITNESS:  Sorry.
BY MR. HUDIS:
Q.   What was Calera's purpose of selling
WordScan and TrueScan to customers?
MR. KAPLAN:  Objection.  Vague.
Competence.
THE WITNESS:  So this is -- Calera,
during this time period, released a series of
products, and the general characteristic of that
progression was that they got better and cheaper
and required less resources.
So the original product was 40- or
$50,000 and was the size of three or four
breadboxes.  TrueScan was a coprocessor card that
cost maybe $5,000, and WordScan was an OCR
software product that required no hardware, that
was perhaps $1,000 when it was launched.
So there was just the same capabilities
getting better in a different format for
delivering OCR to a customer.
BY MR. HUDIS:
Q.   Okay.  Now, you left Calera in 1989?
A.   Correct.
Q.   Okay.  Why?
A.   I was unhappy and wanted to do something

40

new.
Q.   Now, Calera Recognition Systems was
acquired by Caere, C-A-E-R-E, Recognition Systems
in 1994?
A.   That's my rough understanding.  And it's
pronounced "Caere."
Q.   Caere?
A.   As if it didn't have the extra "E," yes.
But, yes, I remember that they were
acquired in the early '90s.
Q.   And that was for a sale price of
$35 million?
MR. KAPLAN:  Objection.  Lack of
foundation.  Competence.
THE WITNESS:  That order of magnitude.
It varied on when you priced the deal, 'cause
Caere's stock as a public company varied from the
time the deal was announced to when it was
consummated.
BY MR. HUDIS:
Q.   Is 35 million approximately the sale
price of the company?
MR. KAPLAN:  Objection.  Vague.
THE WITNESS:  Yes.  But I also heard
50 million when the stock price was higher.

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

41

BY MR. HUDIS:
 1   Q.   So it could have been anywhere from 35
 2   to $50 million?
 3   A.   In that range, yeah.
 4   Q.   Were -- to the best of your knowledge,
 5   were Calera's patents and trademarks part of the
 6   assets that were sold to Caere?
 7   A.   I -- I'm assuming so.  I don't have
 8   knowledge to the contrary.
 9   Q.   Do you know whether Caere itself was
10   later acquired by a speech recognition company
11   called Nuance Communications?
12   A.   Yes.  It's my understanding that Nuance
13   is the surviving company of that merger.
14       (Whereupon, Deposition Exhibit 50 was
15       marked for identification.)
16   BY MR. HUDIS:
17   Q.   Mr. Fruchterman, I've now put in front
18   of you what has been marked as Exhibit 50.  And
19   we're going to go off the record for a few seconds
20   so that you can at least familiarize yourself with
21   the document.
22       MR. KAPLAN:  No, we're not.
23       MR. HUDIS:  We're not?
24       MR. KAPLAN:  No.

42

 1       MR. HUDIS:  I don't want to burn up time
 2   for him just reading a document.
 3       MR. KAPLAN:  Well, if there's parts that
 4   you want him to review --
 5       MR. HUDIS:  Yes, I do.
 6       MR. KAPLAN:  -- I mean, you can point
 7   him to those parts if you want him to have a
 8   general understanding of the document.
 9       THE WITNESS:  I'm ready to go if there's
10   questions.
11   BY MR. HUDIS:
12   Q.   Okay.  Sure.  Okay.  All right.
13   So, Mr. Fruchterman, do you -- let's
14   take the trademarks first.
15       Do you recognize the trademarks listed
16   on Exhibit 50 as trademarks of Calera Recognition
17   Systems?
18   A.   Yes, I -- I recall those trademarks,
19   yes.
20   Q.   And on pages 4 and 5, do you recognize
21   those as copyrights of Calera?  This is in
22   Exhibit 50.
23   A.   Yes.  They are consistent with my
24   recollection of copyrightable material that Calera
25   would have produced.

43

 1   Q.   And if we can turn to the first page of
 2   Exhibit 50, do you recognize the title of that
 3   patent as being owned by Calera Recognition
 4   Systems at one time?
 5   A.   It's consistent with technology that was
 6   in use at Calera while I was there, and
 7   Mindy Bokser was an engineer who was there while I
 8   was there.  I don't know this precise content of
 9   this particular patent.
10       MR. HUDIS:  Let's go off the record.
11       THE VIDEOGRAPHER:  Going off the record
12   at 10:06.
13       (Whereupon, a recess was taken.)
14       THE VIDEOGRAPHER:  Back on the record at
15   12:10 -- I'm sorry, 10:12.
16       THE WITNESS:  Time flies when you're
17   having fun.
18       THE VIDEOGRAPHER:  Another dyslexic.
19       MR. KAPLAN:  We'll take it.
20       MR. HUDIS:  Two for two.
21       THE WITNESS:  Okay.
22       THE VIDEOGRAPHER:  10:12.
23   BY MR. HUDIS:
24   Q.   Okay.  So, Mr. Fruchterman, after you
25   left Calera Recognition Systems, you went to work

44

 1   for RAF Technology, Inc.?
 2   A.   Yes.
 3   Q.   What type of company was RAF?
 4   A.   An optical character recognition company
 5   and pattern recognition company.
 6   Q.   Patent recognition?
 7   A.   Pattern.  Pattern recognition.
 8   Q.   In this context, Mr. Fruchterman, what
 9   is pattern recognition?
10   A.   It's a more general form than optical
11   character recognition, where you're looking for
12   patterns rather than -- rather than just letters.
13   So, for example, RAF worked on recognizing rare
14   coins and whale tails.
15   Q.   All right.  And a whale tail is a?
16       MR. KAPLAN:  Whale tail.
17       THE WITNESS:  A tail of a whale.  To
18   identify --
19   BY MR. HUDIS:
20   Q.   Oh, a whale tail.
21   A.   Yes.
22   Q.   As in the big large mammal that swims in
23   the ocean?
24   A.   That's right.  To recognize individuals
25   by the scars on their tails as being able to

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

12 (Pages 45 to 48)

45

1    identify them.  So many different things that
2    pattern recognition can be used to do.
3         Q.   What kinds of products, if any, did RAF
4    make?
5         A.   So RAF did a lot of custom products,
6    which I've already described.  The primary
7    products would be in the area of recognizing
8    letters and forms for large-scale document
9    processing, such as routing the mail or scanning
10   forms that might be used in business or
11   government.
12        Q.   And in your last answer, when you said
13   "recognizing letters," do you mean letters of the
14   alphabet or as in I wrote a letter to so-and-so?
15        A.   Well, both.  We recognize letters as in
16   doing optical character recognition, and we
17   recognize addresses on letters that people want
18   routed to a certain destination by doing optical
19   character recognition plus doing a bunch of
20   processing related to knowing that it's an
21   address.
22        Q.   And who were the major customers of
23   RAF's products at the time you were there?
24        A.   Postal services and service bureaus that
25   process a lot of documents.

46

1         Q.   When you say process documents, for what
2    purpose?
3         A.   Diverse purposes.  But probably the most
4    common one was doing presorting of mass mailings
5    to get a postal discount.
6         Q.   What services, if any, do you recall RAF
7    rendering to its customers at the time you were
8    there?
9         A.   RAF is primarily a product company, and
10   so they would sell products.  And then they would
11   sell associated services, such as maintenance,
12   database maintenance.  If you were going to route
13   the mail, you have to repeatedly meet certain
14   postal standards about accuracy of routing the
15   mail, and so you would get a database update that
16   had passed the latest test.
17            Custom character sets.  And I don't
18   remember if we did Icelandic, but if we did
19   Icelandic, you'd have to add a few characters that
20   the Icelanders use.  Some custom products.
21            Handwriting recognition was a feature
22   that we developed for certain customers and
23   productized.  And there were non-OCR or pattern
24   recognition -- well, there were non -- there were
25   also products and services around, I don't know,

47

1    recognizing things as counterfeit, helping the
2    U.S. Treasury track fraud.  And that's -- I've
3    described the majority of the customers and kinds
4    of services, but if someone came to RAF with
5    something that needed pattern recognition help,
6    they would probably have a great conversation and
7    take their money, so ...
8         Q.   So you were the president, CEO and
9    founder from 1989 through 1995 at RAF?
10        A.   Correct.
11        Q.   And you were the vice president,
12   finance, and CFO from 1989 to 2004?
13        A.   Yes.
14        Q.   All right.  Let's divide out your
15   responsibilities in the two roles.
16            What were your responsibilities at RAF
17   as president, CEO and founder?
18        A.   Business strategy.  Customer relations.
19   Some technology, but I was primarily more of a
20   relationship person than a developer at that
21   stage.  So I made deals with customers, business
22   development.
23        Q.   And what were your duties and
24   responsibilities as vice president of finance and
25   CFO at RAF?

48

1         A.   Similar to the standard ones of a chief
2    financial officer.  So overseeing legal and
3    administrative and financial responsibilities for
4    the company.  Maintaining the books.  Preparing
5    reports.  Negotiating contracts.
6             Retaining counsel -- which I left out of
7    my Calera list of things I was responsible for.  I
8    was also overseeing all the legal affairs for
9    Calera as well as for RAF.
10        Q.   To the best of your recollection, have
11   you told me all of the main duties and
12   responsibilities as your -- in your position as
13   vice president of finance and CFO of RAF?
14        A.   Yes.
15            MR. KAPLAN:  Objection.  Vague.
16            THE WITNESS:  Sorry.
17   BY MR. HUDIS:
18        Q.   And have you told me, to the best of
19   your recollection, the main duties and
20   responsibilities you had at RAF as president, CEO
21   and founder?
22            MR. KAPLAN:  Objection.  Vague.
23            THE WITNESS:  Yes.
24   BY MR. HUDIS:
25        Q.   And you are currently a director of RAF

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

49

1  Technology?
2     **A.  Correct.**
3     Q.   And you've been so since 1989?
4     **A.  Correct.**
5     Q.   As a product of RAF Technology, what is
6  or was Argosy Post?
7        MR. KAPLAN:  Objection.  Compound.
8        THE WITNESS:  Argosy Post was the
9  address recognition product targeted at companies
10 that processed or were in the postal business.  So
11 that included organizations called service bureaus
12 that do this presorting for postal, OEM customers,
13 like Pitney Bowes, that produce postal equipment,
14 that would want it.
15 BY MR. HUDIS:
16    Q.   And "OEM" is original equipment
17 manufacturer?
18    **A.  Correct.  So our technology would go**
19 **into their postal solution that they would sell to**
20 **postal services or to service bureaus as well.**
21    Q.   And in context of your last answer, a
22 "solution" is a product?
23    **A.  Yes.**
24    Q.   As a product of RAF Technology, what is
25 or was its complementary processing technology?

50

1        MR. KAPLAN:  Objection.  Compound.
2        THE WITNESS:  I actually don't recall
3  that particular term at RAF.
4  BY MR. HUDIS:
5     Q.   Would it refresh your recollection if I
6  told you that complementary processing technology
7  was used by RAF Technology in mail recognition and
8  sorting operations?
9     **A.  I don't know the marketing terms they**
10 **use.  We talk more about the customers and the**
11 **technical problems that we solve rather than sort**
12 **of the marketing content.  But it would seem**
13 **consistent with what RAF does.**
14       **(Whereupon, Deposition Exhibit 51 was**
15       **marked for identification.)**
16 BY MR. HUDIS:
17    Q.   Mr. Fruchterman, I now place in front of
18 you what's been marked as Exhibit 51.  And I'd
19 like you to just familiarize yourself with the
20 document.
21       MR. KAPLAN:  Mr. Hudis, am I correct to
22 understand that this is something your office
23 created again?
24       MR. HUDIS:  Yes.  From publicly
25 available information.

51

1        MR. KAPLAN:  And that would be the same
2  as Exhibit 50?
3        MR. HUDIS:  That is true.
4        THE WITNESS:  I'm ready to answer
5  questions about the document.
6  BY MR. HUDIS:
7     Q.   Mr. Fruchterman, on pages 1 through 4,
8  do you recognize these as patents that were issued
9  to RAF Technology?
10       MR. KAPLAN:  Objection.  Vague.
11 Compound.
12       THE WITNESS:  Without reading each one
13 line by line, they all seem -- the ones that I'm
14 spot-checking all seem consistent with the areas
15 that RAF works in and the names of engineers and
16 inventors at RAF that I am familiar with.
17 BY MR. HUDIS:
18    Q.   And from pages 4 through 8 of
19 Exhibit 51, do you recognize these as pending
20 patent applications of RAF Technology?
21       MR. KAPLAN:  Objection.  Vague.
22 Compound.
23       THE WITNESS:  Similar to my prior
24 answer, the topics and the inventors are all
25 familiar based on spot-checking these, without

52

1  reading them comprehensively.
2  BY MR. HUDIS:
3     Q.   On pages 8 and 9 of Exhibit 51, do you
4  recognize these as trademarks registered to RAF
5  Technology?
6     **A.  Yeah.**
7        MR. KAPLAN:  Objection.  Vague.
8  Compound.
9        THE WITNESS:  Yes.  All of these
10 trademarks are familiar to me.
11 BY MR. HUDIS:
12    Q.   And pages 9 through 10, do you recognize
13 that list as pending trademark applications of RAF
14 Technology?
15       MR. KAPLAN:  Objection.  Vague.
16 Compound.
17       THE WITNESS:  Yes.  They all look
18 familiar to me from my service on the board at
19 RAF.
20 BY MR. HUDIS:
21    Q.   Okay.  Done with that one.
22       Mr. Fruchterman, if you could pull out
23 your resume again.  That was Exhibit 49.
24    **A.  Okay.**
25    Q.   Thank you.

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

53

1      A.   All right.
2      Q.   According to your resume, Exhibit 49,
3  Mr. Fruchterman, you worked at a company called
4  Arkenstone, Inc., from 1989 through 2000?
5      A.   Yes.
6      Q.   What type of company was Arkenstone?
7      A.   It was a California public benefit
8  corporation that had 501(c)(3) charity status.
9      Q.   What types of products did it make?
10     A.   Primarily reading machines or systems
11  for people with disabilities.
12     Q.   What types of disabilities?
13     A.   Vision impairments, learning
14  disabilities, such as dyslexia, and physical
15  disabilities that might interfere with reading,
16  such as quadriplegia, fine motor control issues,
17  cerebral palsy, traumatic brain injury and others.
18     Q.   And these products that you just
19  described, they were sold to customers?
20     A.   Yes.
21     Q.   What services, if any, did Arkenstone
22  render to customers at the time you were there?
23     A.   It was primarily a product sales
24  company, and it rendered services associated with
25  the sale of the products, which included

54

1  maintenance at one point in time, and customer
2  service and support.
3      Q.   What was the range of the sale price of
4  these reading machines at Arkenstone?
5          MR. KAPLAN:  Objection.  Foundation.
6          THE WITNESS:  The first price point was
7  under $5,000 to turn a talking PC into a reading
8  machine.  And prices fell over the time period.
9  BY MR. HUDIS:
10     Q.   So it started around under 5,000.  As
11  Arkenstone continued and the technology got
12  better, faster, cheaper, the products got less
13  expensive?
14     A.   5,000, 4,000, 3,000, 2500, 1800, 1500.
15     Q.   And were the reading machines at
16  Arkenstone produced based upon Calera's OCR
17  technology?
18         MR. KAPLAN:  Objection.  Foundation.
19         THE WITNESS:  Yes.
20  BY MR. HUDIS:
21     Q.   And you were the president, CEO,
22  chairman and founder from Arkenstone from 1989
23  through 2000?
24     A.   Correct.
25     Q.   Is this company still in business today?

55

1  Arkenstone.
2      A.   Not under that name.
3      Q.   What happened to the company?
4      A.   It has been merged into the charity that
5  is now known commonly as Benetech.
6      Q.   In 2000, did Arkenstone sell its --
7  repeat -- I'm going to rephrase the question.
8          In 2000, did Arkenstone sell some -- at
9  least some of its assets to Freedom Scientific?
10         MR. KAPLAN:  Objection.  Vague.
11         THE WITNESS:  Yes.
12  BY MR. HUDIS:
13     Q.   Do you remember the sale price?
14     A.   Approximately $5 million.
15     Q.   And was the money from that sale of the
16  Arkenstone assets to Freedom Scientific used to
17  found Benetech?
18         MR. KAPLAN:  Objection.  Vague.
19         THE WITNESS:  It was commonly described
20  as such.
21  BY MR. HUDIS:
22     Q.   Do you agree with that assessment?
23     A.   Yes.  But technically you might parse it
24  more finely.
25     Q.   As a product of Arkenstone, what is or

56

1  was the Arkenstone Reader?
2      A.   The Arkenstone Reader was a device
3  designed to turn a standard personal computer into
4  a reading machine by adding a Calera TrueScan
5  card, a Hewlett-Packard Scanjet scanner and some
6  specialized software to an existing PC that
7  already had a voice synthesizer and a screen
8  reader, so that the ensemble would be able to scan
9  a document and read it aloud.
10     Q.   As a product of Arkenstone,
11  Mr. Fruchterman, what is or was the Arkenstone
12  portable hand scanner?
13     A.   I barely recall this product, but I
14  assume it was substituting the Hewlett-Packard
15  desktop Scanjet scanner with a bar scanner that
16  could feed a sheet of paper through a scanner.
17     Q.   Do you recall whether the Arkenstone
18  mark was registered with the U.S. Patent and
19  Trademark Office?
20     A.   I believe it was.
21     Q.   Were any parts of the Arkenstone Reader
22  sought for patent protection?
23     A.   Yes.
24     Q.   Which part?
25     A.   Actually, no.  Not that particular

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

57

1    **product.  Not the Arkenstone Reader product.**
2    Q.   Were any parts of the Arkenstone
3    portable hand scanner sought for patent
4    protection?
5    **A.   No.**
6    Q.   Was the software code for the Arkenstone
7    Reader registered with the U.S. Copyright Office?
8    **A.   I don't recall.**
9    Q.   Is there anything that would refresh
10   your recollection?
11   **A.   Beyond a formal record, no.**
12   Q.   Was the software code for the Arkenstone
13   portable hand scanner registered with the U.S.
14   Copyright Office?
15   **A.   No.**
16   Q.   As a product of Arkenstone, what is or
17   was VERA, V-E-R-A?
18       MR. KAPLAN:  Objection.  Compound.
19       THE WITNESS:  The Very Easy Reading
20   Appliance was designed for senior citizens who
21   were uncomfortable using a computer.  So we
22   wrapped the computer in a fake wooden case and
23   said, "This isn't a computer.  It's a reading
24   appliance, like a piece of hi-fi equipment."
25

58

1    BY MR. HUDIS:
2    Q.   Was the VERA mark, to the best of your
3    recollection, registered with the U.S. Patent and
4    Trademark Office?
5        MR. KAPLAN:  Objection.  Vague.
6        THE WITNESS:  No.
7    BY MR. HUDIS:
8    Q.   Was the software code for the VERA
9    product registered with the U.S. Copyright Office?
10   **A.   No.**
11   Q.   As a product of Arkenstone, what is or
12   was Open Book?
13       MR. KAPLAN:  Objection.  Compound.
14       THE WITNESS:  Similar to the transition
15   from the Calera TrueScan hardware card to the
16   WordScan software product, Open Book was a product
17   based on the WordScan technology to replace the
18   hardware coprocessor card with software running on
19   the computer's main CPU.
20   BY MR. HUDIS:
21   Q.   And Open Book ran over Windows software?
22   **A.   Open Book was two different products**
23   **with a common name.  Open Book itself was a**
24   **reading machine sold as a hardware unit plus**
25   **scanner plus keypad.  And Open Book Unbound was**

59

1    **the software-only version that was designed to**
2    **turn a PC into a reading system.  And all of these**
3    **were based on Microsoft Windows technology.**
4    Q.   So if I understand your testimony, the
5    Open -- Open Book was marketed as two different
6    products, at least at one time, one as an
7    appliance and the other one called Open Book
8    Unbound, as software?
9    **A.   Correct.**
10       MR. KAPLAN:  Objection.  Misstates
11   testimony.
12       THE WITNESS:  Sorry.
13   BY MR. HUDIS:
14   Q.   Was the Open Book mark registered with
15   the U.S. Patent and Trademark Office?
16       MR. KAPLAN:  Objection.  Foundation.
17   Vague.
18       THE WITNESS:  I don't remember.
19   BY MR. HUDIS:
20   Q.   Is there anything that would refresh
21   your recollection?
22   **A.   A formal registration indication.**
23   Q.   Was the software code for Open Book
24   registered with the U.S. Copyright Office?
25       MR. KAPLAN:  Objection.  Foundation.

60

1        THE WITNESS:  I don't recall.
2    BY MR. HUDIS:
3    Q.   Is there anything that would refresh
4    your recollection?
5    **A.   Not beyond a registration statement.**
6    Q.   As a product of Arkenstone, what is or
7    was WYNN, What You Need Now?
8        MR. KAPLAN:  Objection.  Compound.
9        MR. HUDIS:  That's all one product.
10       MR. KAPLAN:  Yeah.  But you're asking
11   him what it was.
12       MR. HUDIS:  Or is.
13       MR. KAPLAN:  What it is.
14       MR. HUDIS:  All right.
15       THE WITNESS:  WYNN was similar to Open
16   Book Unbound as -- in that it was a OCR-based
17   software product.  It was specifically designed
18   for the needs of people with learning disabilities
19   rather than blind people.
20   BY MR. HUDIS:
21   Q.   Would it be correct to characterize
22   WYNN, What You Need Now, as a customizable user
23   interface for the Open Book software?
24       MR. KAPLAN:  Objection.  Vague.
25       THE WITNESS:  No.

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

61

1    BY MR. HUDIS:
2        Q.   How would you describe it?
3            MR. KAPLAN:  Objection.  Asked and
4    answered.
5            THE WITNESS:  I thought of it as a
6    completely different user interface designed for
7    the needs of people with learning disabilities
8    and, to some extent, people with low vision, that
9    was built on top of the same OCR technology as the
10   Open Book product but was not simply grafted onto
11   the Open Book product.
12   BY MR. HUDIS:
13       Q.   Did the Open Book -- did either of the
14   two Open Book products, whether it was the
15   appliance or the software, come with OCR
16   technology?
17       A.   Yeah --
18           MR. KAPLAN:  Objection.  Foundation,
19   vague.
20           THE WITNESS:  Yes.  It was built in.
21   BY MR. HUDIS:
22       Q.   Did the WYNN product come with OCR
23   technology?
24           MR. KAPLAN:  Objection.  Vague.
25   Foundation.

62

1            THE WITNESS:  The primary WYNN product
2    did come with OCR technology.
3    BY MR. HUDIS:
4        Q.   Was the software code for the OCR
5    technology that was built into Open Book
6    registered with the U.S. Copyright Office?
7            MR. KAPLAN:  Objection.  Foundation.
8    Vague.
9            THE WITNESS:  I believe that in the
10   documents that you've showed me, the companies
11   that make those OCR technologies did have
12   registrations and trademarks and patents.
13   Certainly my nonprofit didn't do anything separate
14   for the OCR technology.
15   BY MR. HUDIS:
16       Q.   And that would be true of WYNN as well?
17           MR. KAPLAN:  Objection.  Vague.
18   Foundation.
19           THE WITNESS:  Yes.
20   BY MR. HUDIS:
21       Q.   As a product of Arkenstone, what is or
22   was Strider, S-T-R-I-D-E-R?
23           MR. KAPLAN:  Objection.  Compound.
24           THE WITNESS:  It was a talking GPS
25   product designed to guide blind users to their

63

1    destination.
2    BY MR. HUDIS:
3        Q.   Was the Strider mark registered with the
4    U.S. Patent and Trademark Office?
5            MR. KAPLAN:  Objection.  Lacks
6    foundation.  Vague.
7            THE WITNESS:  I do not believe so.
8    BY MR. HUDIS:
9        Q.   Was the software code for the Strider
10   product registered with the U.S. Copyright Office?
11           MR. KAPLAN:  Objection.  Lacks
12   foundation.  Vague.
13           THE WITNESS:  Not that I recall.
14   BY MR. HUDIS:
15       Q.   Was any part of the Strider product
16   subject to U.S. patent protection?
17           MR. KAPLAN:  Objection.  Calls for a
18   legal conclusion.  Lacks foundation.  Vague.
19           THE WITNESS:  Yes.
20   BY MR. HUDIS:
21       Q.   As a product of Arkenstone, what is or
22   was Atlas Speaks?
23           MR. KAPLAN:  Objection.  Compound.
24           THE WITNESS:  It was an accessible map
25   product for the blind, to look at maps and plot

64

1    routes.  It would be easy to characterize it as
2    Strider without the GPS.
3            MR. HUDIS:  Off the record.
4            THE VIDEOGRAPHER:  Coming off the record
5    at 10:40.
6            MR. KAPLAN:  You need my consent to go
7    off the record.
8            Can you let me know why?
9            MR. HUDIS:  I just want to take this
10   call.
11           MR. KAPLAN:  Okay.  Off the record is
12   fine.
13           (Discussion held off record.)
14           THE VIDEOGRAPHER:  Back on the record at
15   10:43.
16   BY MR. HUDIS:
17       Q.   Mr. Fruchterman, was the Atlas Speaks
18   mark registered with the U.S. Patent and Trademark
19   Office?
20           MR. KAPLAN:  Objection.  Lacks
21   foundation.  Vague.
22           THE WITNESS:  I don't believe so.
23   BY MR. HUDIS:
24       Q.   Do you know if the software code for the
25   Atlas Speaks product was registered with the U.S.

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

---

65

1    Copyright Office?
2         MR. KAPLAN: Objection. Lacks
3    foundation. Vague.
4         THE WITNESS: I don't know.
5    BY MR. HUDIS:
6     Q.  And we discussed that Arkenstone had an
7    asset sale to Freedom Scientific in 2000.
8         Do you remember that?
9     A.  Correct.
10    Q.  All right. I'd like to know whether
11   each one of the following products was part of
12   that asset sale. And you can just say "yes" or
13   "no."
14        Open Book?
15        MR. KAPLAN: Objection. Lacks
16   foundation. Vague.
17        THE WITNESS: Yes.
18   BY MR. HUDIS:
19    Q.  WYNN?
20        MR. KAPLAN: Objection. Lacks
21   foundation. Vague.
22        THE WITNESS: Yes.
23   BY MR. HUDIS:
24    Q.  Strider?
25        MR. KAPLAN: Objection. Lacks

---

66

1    foundation. Vague.
2         THE WITNESS: I don't believe so.
3    BY MR. HUDIS:
4     Q.  Atlas Speaks?
5         MR. KAPLAN: Objection. Lacks
6    foundation. Vague.
7         THE WITNESS: I don't believe so.
8    BY MR. HUDIS:
9     Q.  VERA?
10        MR. KAPLAN: Objection. Lacks
11   foundation. Vague.
12        THE WITNESS: Yes.
13   BY MR. HUDIS:
14    Q.  The Arkenstone mark?
15        MR. KAPLAN: Objection. Lacks
16   foundation. Vague.
17        THE WITNESS: Yes.
18   BY MR. HUDIS:
19    Q.  Okay. Now, of the products that you
20   listed, that was part of the asset sale, was the
21   code for those products part of the asset sale?
22        MR. KAPLAN: Objection. Lacks
23   foundation. Vague.
24        THE WITNESS: Yes.
25

---

67

1    BY MR. HUDIS:
2     Q.  Were the copyright rights for those
3    products transferred as parts of the asset sale?
4         MR. KAPLAN: Objection. Calls for a
5    legal conclusion. Lacks foundation. Vague.
6         THE WITNESS: As a layman, I believe so.
7    BY MR. HUDIS:
8     Q.  By yes or no, I'd like to know whether
9    the following technologies were sold to Freedom
10   Scientific by Arkenstone as part of the asset
11   sale.
12        Arkenstone Reader?
13        MR. KAPLAN: Objection. Vague. Lacks
14   foundation.
15        THE WITNESS: I'm not sure because I
16   don't think it was an active product. So they
17   probably could claim it, but I'm not sure we
18   actually did it because I don't think it was alive
19   at that time.
20   BY MR. HUDIS:
21    Q.  Would your answer be the same for
22   Arkenstone portable scanner?
23        MR. KAPLAN: Objection. Vague. Lacks
24   foundation.
25        THE WITNESS: Yes.

---

68

1    BY MR. HUDIS:
2     Q.  Would your answer be the same for the
3    VERA product?
4         MR. KAPLAN: Objection. Vague. Lacks
5    foundation.
6         THE WITNESS: No. The VERA product was
7    active and sold as part of the asset sale.
8         (Whereupon, Deposition Exhibit 52 was
9    marked for identification.)
10   BY MR. HUDIS:
11    Q.  Mr. Fruchterman, I show you now what has
12   been marked as Exhibit 52.
13        MR. KAPLAN: Counsel, you'll represent
14   that this is another document created by your
15   office?
16        MR. HUDIS: Yes. From publicly
17   available records.
18   BY MR. HUDIS:
19    Q.  Mr. Fruchterman, do you recognize in the
20   top chart on the single page of Exhibit 52 the
21   titles of patents that were owned by Arkenstone,
22   Inc., at one time?
23    A.  Yes.
24    Q.  And in the bottom chart, a copyright
25   registration that was owned by Arkenstone at one

---

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

69

1    time?
2        A.   I don't recognize that work.  And I'm
3    just -- the date predates the existence of
4    Arkenstone by seven years, so something's wrong
5    about this document.
6        Q.   Okay.
7        MR. KAPLAN:  Is that true for the second
8    patent as well?
9        THE WITNESS:  I recognize the second
10   patent, but I think the date is wrong as well.
11   Whereas, the date on the first patent looks
12   vaguely right.
13       (Whereupon, Deposition Exhibit 53A and
14       53B were marked for identification.)
15       THE WITNESS:  Thank you.
16   BY MR. HUDIS:
17       Q.   Mr. Fruchterman, I show you what has
18   been marked as Exhibits 53A and 53B.  Let's take a
19   look at Exhibit 53A.
20       Do you recognize this document?
21       A.   Yes.  It's a patent where I am listed as
22   an inventor.
23       Q.   And was issued on November 28, 1995?
24       A.   November 28th, 1995, yes.
25       Q.   And the patent number is listed as

70

1    5,470,233.  I will refer to this as "the
2    '233 patent."
3        Do you understand that?
4        A.   Yes.
5        Q.   All right.  What was the nature of the
6    invention claimed in the '233 patent of
7    Exhibit 53A?
8        MR. KAPLAN:  Objection.  Calls for a
9    legal conclusion.  Lacks foundation.
10       THE WITNESS:  In layman's term, it's a
11   patent on technology to help a blind person use
12   GPS to move around.
13   BY MR. HUDIS:
14       Q.   Was that the product that was sold by
15   Arkenstone under the Strider mark?
16       MR. KAPLAN:  Objection.  Vague.
17       THE WITNESS:  Yes.  We -- the Strider
18   product incorporated the patented technology
19   subject to this patent.
20   BY MR. HUDIS:
21       Q.   Who was the assigning owner of the
22   '233 patent when it issued in 1995?
23       MR. KAPLAN:  Objection.  Vague.  Calls for
24   a legal conclusion.  Lacks foundation.
25       THE WITNESS:  Arkenstone.

71

1    BY MR. HUDIS:
2        Q.   Mr. Fruchterman, if we could turn for a
3    moment to Exhibit 53B.
4        And if you could turn to the last page.
5    Actually, it's bordering on the fifth and sixth
6    pages.
7        You notice that there was an assignment
8    of the inventor's interest to Arkenstone, Inc.?
9        A.   Yes.
10       Q.   And ultimately, the patent was assigned
11   from Arkenstone to Freedom Scientific?
12       MR. KAPLAN:  Objection.  Lacks
13   foundation.  Calls for a legal conclusion.  Vague.
14       THE WITNESS:  No.
15   BY MR. HUDIS:
16       Q.   It was not?
17       A.   It was not.
18       Q.   What happened -- today, as you sit here,
19   who is the current owner of the '233 patent of
20   Exhibit 53A?
21       MR. KAPLAN:  Objection.  Calls for a
22   legal conclusion.  Lacks foundation.
23       THE WITNESS:  The world.  It's expired.
24   BY MR. HUDIS:
25       Q.   Before its expiration, who was the owner

72

1    of the '233 patent of Exhibit 53A?
2        MR. KAPLAN:  Objection.  Lacks
3    foundation.  Calls for a legal conclusion.
4        THE WITNESS:  Beneficent Technology,
5    Inc. which is the legal corporate name of
6    Benetech.
7    BY MR. HUDIS:
8        Q.   So to the best of your recollection, the
9    '233 patent was not a part of the asset sale from
10   Arkenstone to Freedom Scientific?
11       A.   That was --
12       MR. KAPLAN:  Objection.  Vague.  Lacks
13   foundation.
14       THE WITNESS:  That was my understanding,
15   yes.
16   BY MR. HUDIS:
17       Q.   While it was still active, was the
18   '233 patent ever licensed to third parties?
19       MR. KAPLAN:  Objection.  Lacks
20   foundation.  Vague.  Calls for a legal conclusion.
21       THE WITNESS:  Yes.
22   BY MR. HUDIS:
23       Q.   Was it licensed for royalties?
24       MR. KAPLAN:  Objection.  Vague.  Lacks
25   foundation.

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

73

1          THE WITNESS:  Yes.
2    BY MR. HUDIS:
3        Q.    To whom was the '233 patent of
4    Exhibit 53A licensed at the time it was active?
5          MR. KAPLAN:  Objection.  Vague.  Lacks
6    foundation.
7          THE WITNESS:  I don't know their full
8    legal name, but it's like the Sendero Group.
9    BY MR. HUDIS:
10       Q.    Spell Sendero.
11       A.    **S-E-N-D-E-R-O.**
12       Q.    Do you remember the financial terms of
13   the license?
14       A.    **It was a minimum -- a minimal royalty,**
15   **and the payments were not large.**
16       Q.    Define "not large."
17       A.    **I'd be stunned if we collected $10,000**
18   **over the entire life of the patent in royalties.**
19       Q.    Was Sendero the only company to whom the
20   '233 patent of Exhibit 53A was licensed?
21         MR. KAPLAN:  Objection.  Calls for a
22   legal conclusion.  Vague.  Lacks foundation.
23         THE WITNESS:  There was another company
24   that was -- and I do not know the legal term, but
25   sort of a co-owner, and they had rights to

74

1    practice the patent without paying us a royalty.
2    BY MR. HUDIS:
3        Q.    And who was that?
4        A.    **They've gone by different names.  Their**
5    **current name is HumanWare.**
6        Q.    Do you know what the name of the company
7    was at the time they were co-owner of the
8    '233 patent while it was active?
9          MR. KAPLAN:  Objection.  Misstates
10   testimony.  Argumentative.
11         THE WITNESS:  VisuAide, V-I-S-U-A-I-D-E.
12   BY MR. HUDIS:
13       Q.    Turning back to your resume of
14   Exhibit 49, Mr. Fruchterman, according to your
15   resume, Benetech was founded in 2000?
16         MR. KAPLAN:  Objection.  Misstates the
17   document.
18         THE WITNESS:  My nonprofit activities
19   started operating under the Benetech name in 2000.
20   BY MR. HUDIS:
21       Q.    Now, the official name of the company is
22   Beneficent Technology, Inc., correct?
23       A.    **Correct.**
24       Q.    And it's located in Palo Alto,
25   California?

75

1        A.    **Correct.**
2        Q.    All right.  And it's a nonprofit
3    California company?
4        A.    **I believe it's structured as a**
5    **California public benefit corporation.**
6        Q.    And tell me the nature of -- withdraw
7    the question.
8          When I refer to "Benetech," we will
9    understand that that is the trade name for
10   Beneficent Technology?
11       A.    **Okay.**
12       Q.    Would you understand it that way?
13       A.    **During the current time period, yes.**
14   **We've had more complicated legal structures in the**
15   **past, where "Benetech" might refer to any one of**
16   **three different corporate entities.  But I'm happy**
17   **just to call them all Benetech for the purposes of**
18   **this conversation.**
19       Q.    Thank you.
20         What type of company is Benetech?
21         MR. KAPLAN:  Objection.  Vague.
22         THE WITNESS:  It's a charity.  And it
23   does technology for social good.
24   BY MR. HUDIS:
25       Q.    I've read, Mr. Fruchterman, that

76

1    Benetech was started up from the result of the
2    asset sale from Arkenstone to Freedom Scientific.
3          Is that your understanding?
4          MR. KAPLAN:  Objection.  Asked and
5    answered.  Vague.
6          THE WITNESS:  There were a series of
7    legal transactions that, over time, have created
8    the Benetech we know today.
9    BY MR. HUDIS:
10       Q.    What were those to the best of your
11   recollection?
12       A.    **The nonprofit that was formerly known as**
13   **Arkenstone changed its name, because the**
14   **Arkenstone name was sold to Freedom Scientific.**
15   **It had a charter limited to helping the disabled.**
16   **Beneficent Technology, Inc., was created**
17   **with as -- sorry, can't disclose -- let's just say**
18   **a vanilla charitable charter, so that it could do**
19   **a wider range of charitable activities.**
20   **A wholly owned for profit subsidiary**
21   **named Bengineering, Inc., was also created to**
22   **conduct services connected with the asset sale.**
23       Q.    And what were those services?
24       A.    **Primarily engineering services, to**
25   **continue the product development of the products**

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

77

1    **that were sold for a period following the asset**
2    **sale.**
3        MR. KAPLAN:  Let me just interrupt here
4    for a second.  I'm not sure exactly where you're
5    going with this, but if we get into areas that are
6    potentially confidential information of Benetech
7    or other entities, my understanding of the
8    protective order is that neither party will
9    disclose the deposition transcript until 30 days
10   have elapsed, giving the -- giving us the
11   opportunity to designate portions or the entire
12   transcript as confidential.  Is that correct?
13       MR. HUDIS:  Counsel, that's correct.
14       MR. KAPLAN:  Okay.  Good.  Just glad we
15   had that on the record.
16       THE WITNESS:  And nothing I've talked
17   about so far is, I believe, confidential.
18   BY MR. HUDIS:
19   Q.   Mr. Fruchterman, your counsel raises a
20   good point.  If anything I ask you in your mind
21   requires you to disclose confidential information,
22   would you let us all know, please?
23   **A.   Yes.**
24       MR. KAPLAN:  Thank you.
25       THE WITNESS:  I'll let you decide if

78

1    there's a follow-up question.
2    BY MR. HUDIS:
3    Q.   So one of the products that has been
4    made by Benetech is a series of software tools for
5    people who are blind or have visual disabilities
6    to access printed information?
7    **A.   That is some of what we do.  Sorry.  I**
8    **thought you had -- I thought I had given the**
9    **pause.**
10       MR. KAPLAN:  I was wondering what the
11   question was going to be.
12       THE WITNESS:  Okay.  Okay.
13   BY MR. HUDIS:
14   Q.   And you have been the president, CEO,
15   chairman and founder since 2000?
16   **A.   No.**
17   Q.   What part of my last question was
18   incorrect?
19   **A.   In 2000, I had all of those titles.  At**
20   **present, I am the founder and CEO.**
21   Q.   I see.  So from 2000 to 2014, you were
22   the president, CEO, chairman and founder, at least
23   according to your resume, Exhibit 49.
24   **A.   I believe so.  Yes.**
25   Q.   And from 2015 -- well, to the present --

79

1    we're still in 2015 -- you were the CEO and
2    founder?
3    **A.   Correct.**
4    Q.   Thank you.
5        What has been --
6        MR. KAPLAN:  Let me make sure the
7    witness's answer is finished.
8        THE WITNESS:  Would you like me to
9    explain in more detail how finely graded that
10   answer is, or are we good?
11   BY MR. HUDIS:
12   Q.   Well, my next question was going to be
13   the nature of your duties and responsibilities.
14   So if that would help you, please.
15   **A.   Okay.  So I transferred the chairman's**
16   **responsibilities first in early 2014, and I ceased**
17   **being the president in the idea that we had a new**
18   **president in January of this year, though I**
19   **believe I stopped using the term "president"**
20   **somewhere during the last year at the suggestion**
21   **of one of my board members.**
22   Q.   So from 2000 to 2014, what were your
23   general duties and responsibilities at Benetech?
24       MR. KAPLAN:  Objection.  Vague.
25       THE WITNESS:  I was the main guy.  So in

80

1    my role as chairman, I was responsible for the
2    standard duties of a chairman of a board of
3    directors, which I can elaborate if needed.
4    BY MR. HUDIS:
5    Q.   You ran board meetings?
6    **A.   I did.**
7    Q.   You set the agenda?
8    **A.   I did.**
9    Q.   You set policy for the company?
10   **A.   In --**
11       MR. KAPLAN:  Objection.  Vague.
12       THE WITNESS:  I set policy for the
13   company in conjunction with either the board for
14   board-level issues or my management team for
15   issues that were the scope of the management
16   team's.
17   BY MR. HUDIS:
18   Q.   Does that generally describe your duties
19   and responsibilities as chairman?
20   **A.   Yes.**
21   Q.   Okay.  And up until 2015, starting in
22   2000, you were the president?
23   **A.   Correct.**
24   Q.   What were your duties and
25   responsibilities as president of --

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

21 (Pages 81 to 84)

81

1    MR. KAPLAN:  Objection.
2  BY MR. HUDIS:
3     Q.   -- Benetech?
4     MR. KAPLAN:  Objection.  Vague.
5     THE WITNESS:  During that time period,
6  the title "president" and "chief executive
7  officer" were essentially interchangeable, and our
8  bylaws specified that the president was the
9  executive chief officer.
10     So my responsibilities with those dual
11  titles was to be the chief executive officer of a
12  nonprofit corporation, a public benefit
13  corporation, and so I oversaw everything.
14  BY MR. HUDIS:
15     Q.   Product development?
16     **A.   I was responsible for all aspects of the**
17  **operations of the organization, from legal and**
18  **administrative, to technical and product, to**
19  **fundraising, to public relations, to advocacy.  I**
20  **was responsible for everything we did, ultimately,**
21  **in the role of chief executive officer.**
22     **Our chief financial officer had certain**
23  **statutory responsibilities and had a dotted line**
24  **to our board of directors, but I was her**
25  **supervisor.**

82

1     Q.   Mr. Fruchterman, what is Bookshare?
2     MR. KAPLAN:  Objection.  Vague.
3     THE WITNESS:  It's a digital library for
4  people with print disabilities.
5  BY MR. HUDIS:
6     Q.   Is Bookshare part of Benetech?
7     MR. KAPLAN:  Objection.  Vague.
8     THE WITNESS:  It's a project of
9  Benetech.
10  BY MR. HUDIS:
11     Q.   What do you mean by "project"?
12     **A.   Benetech runs multiple projects that**
13  **target different social needs, and we have**
14  **programs that are a level-above project that**
15  **target an area of social need.  So it's a project.**
16     Q.   Is Bookshare a stand-alone corporation?
17     **A.   No.**
18     Q.   Is Bookshare an unincorporated division
19  of Benetech?
20     MR. KAPLAN:  Objection.  Vague.  Calls
21  for a legal conclusion.
22     THE WITNESS:  We wouldn't call it a
23  division, and the only active corporate entity at
24  Benetech today is Beneficent Technology, Inc., and
25  all the things I'm describing operate under that

83

1  corporate entity.
2  BY MR. HUDIS:
3     Q.   You would describe Bookshare as a
4  project of Benetech?
5     **A.   Yes.**
6     Q.   All right.  And that Bookshare project
7  is still ongoing today?
8     **A.   Yes.**
9     Q.   And it has been operating as a project
10  of Benetech since 2002?
11     **A.   Publicly, yes.**
12     Q.   Why did you, in your last answer,
13  qualify it with "publicly"?
14     **A.   When a technology product is created,**
15  **it's often operating -- being tested before its**
16  **actual public release date.  So its public release**
17  **date was, I believe, in 2002, but we were working**
18  **on Bookshare or doing initial testing or beta**
19  **testing probably in 2001.**
20     Q.   Now, you described the Bookshare project
21  as a technology product.  Why?
22     **A.   If you look at what Bookshare is, you**
23  **can think of it as a web platform that operates a**
24  **large body of software that delivers an online**
25  **library.  So I think of Amazon.com as a technology**

84

1  **product as well, even though it's a whole bunch of**
2  **technology that looks like a web site.**
3     Q.   As a product of Benetech, what is or was
4  Read2Go?
5     MR. KAPLAN:  Objection.  Compound.
6     THE WITNESS:  Read2Go is what people
7  would commonly call an iPad or iPhone app that
8  is designed primarily as an eBook reading
9  product for people with disabilities.
10  BY MR. HUDIS:
11     Q.   Was the Read2Go mark registered with the
12  U.S. Patent and Trademark Office?
13     MR. KAPLAN:  Objection.  Lacks
14  foundation.  Calls for a legal conclusion.  Vague.
15     THE WITNESS:  It may have been.
16  BY MR. HUDIS:
17     Q.   What would refresh your recollection, if
18  anything?
19     **A.   A public record of the registration.**
20     Q.   Was the software code for Read2Go
21  registered with the U.S. Copyright Office?
22     MR. KAPLAN:  Objection.  Vague.  Lacks
23  foundation.  Calls for a legal conclusion.
24     THE WITNESS:  I don't know.
25

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

85

1  BY MR. HUDIS:
2      Q.   What would refresh your recollection?
3      A.   A public registration statement.
4      Q.   As a product of Benetech, what is or was
5  Go Read?
6          MR. KAPLAN: Objection. Compound.
7  Lacks foundation.
8          THE WITNESS: It's an Android app that
9  is designed as an eBook reader for people with
10 disabilities.
11 BY MR. HUDIS:
12     Q.   When you say "people with disabilities,"
13 do you mean people with reading disabilities?
14     A.   I -- it's designed primarily for people
15 with print disabilities.
16     Q.   Could you define in this context people
17 with print disabilities?
18     A.   People who have a disability that
19 functionally interferes with their ability to read
20 standard print.
21     Q.   In this context, what do you mean by
22 "standard print"?
23     A.   For example, one of the printed
24 documents that we are looking at here, if a person
25 with a disability can't pick that page up, can't

86

1  look at it, can't read it, can't track along the
2  lines, can't recall what they've read when they've
3  completed reading -- so basically as a normal
4  person without a disability, I can pick up a print
5  document and acquire the knowledge that's there.
6          And a person with a print disability has
7  some limitation that interferes with that process.
8  Typically blindness or severe dyslexia or cerebral
9  palsy that keeps them from being able to hold the
10 page still or -- and I can could go on with a wide
11 range of disabilities that get in the way.
12     Q.   So we would -- so people who have print
13 disabilities either have a finer gross motor
14 disability that keeps the person from picking up
15 the printed page and turning the pages; is that
16 one type of print disability?
17         MR. KAPLAN: Objection. Misstates
18 testimony. Vague.
19         THE WITNESS: That would be one type of
20 print disability.
21 BY MR. HUDIS:
22     Q.   And another type of disability could be
23 total blindness?
24     A.   Yes.
25     Q.   Low vision?

87

1          MR. KAPLAN: Objection. Vague.
2          THE WITNESS: Yes.
3  BY MR. HUDIS:
4      Q.   Dyslexia?
5          MR. KAPLAN: Objection. Vague.
6          THE WITNESS: Yes.
7  BY MR. HUDIS:
8      Q.   Was the Go Read mark registered with the
9  U.S. Patent and Trademark Office?
10         MR. KAPLAN: Objection. Lacks
11 foundation. Vague. Calls for a legal conclusion.
12         THE WITNESS: I don't believe so.
13 BY MR. HUDIS:
14     Q.   Was the software code for the Go Read
15 product registered with the U.S. Copyright Office?
16         MR. KAPLAN: Objection. Lacks
17 foundation. Vague. Calls for a legal conclusion.
18         THE WITNESS: No.
19 BY MR. HUDIS:
20     Q.   As a product of Benetech, what is or was
21 the Bookshare Web Reader?
22         MR. KAPLAN: Objection. Compound.
23 Argumentative. Lacks foundation.
24         THE WITNESS: It's a set of technology
25 that is added into the Bookshare web site that

88

1  allows for an eBook to be read while in a web
2  browser, either with associated assistive
3  technology or by itself.
4  BY MR. HUDIS:
5      Q.   In this context, what did you mean by
6  "associated assistive technology"?
7      A.   Some users of the web reader would be
8  using a screen reader to make what's on the screen
9  of their personal computer or device accessible.
10     Q.   An example of a screen reader would be,
11 for example, JAWS?
12         MR. KAPLAN: Objection. Vague.
13         THE WITNESS: Yes.
14 BY MR. HUDIS:
15     Q.   Was the Bookshare Web Reader mark
16 registered with the U.S. Patent and Trademark
17 Office?
18         MR. KAPLAN: Objection. Vague. Lacks
19 foundation. Calls for a legal conclusion.
20         THE WITNESS: I don't believe so.
21 BY MR. HUDIS:
22     Q.   Was the software code for the Bookshare
23 Web Reader registered with the U.S. Copyright
24 Office?
25         MR. KAPLAN: Objection. Vague. Calls

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

89

1  for a legal conclusion.  And lacks foundation.
2       THE WITNESS:  No.
3  BY MR. HUDIS:
4       Q.   As a product of Benetech, what is or was
5  Bookshelf?
6       MR. KAPLAN:  Objection.  Compound.
7  Argumentative.  Lacks foundation.
8       THE WITNESS:  It was a feature of
9  individual accounts for a period of time on the
10  Bookshare web site.
11  BY MR. HUDIS:
12       Q.   The product's no longer in use?
13       MR. KAPLAN:  Objection.  Vague.
14       THE WITNESS:  Not by that name.
15  BY MR. HUDIS:
16       Q.   What is it -- what does the product go
17  under today?
18       MR. KAPLAN:  Objection.  Lacks
19  foundation.  Vague.  Argumentative.
20       THE WITNESS:  I believe Reading Lists.
21  BY MR. HUDIS:
22       Q.   Was the Bookshelf mark registered with
23  the U.S. Patent and Trademark Office?
24       MR. KAPLAN:  Objection.  Vague.  Lacks
25  foundation.  Calls for a legal conclusion.

90

1       THE WITNESS:  Not by Benetech.
2  BY MR. HUDIS:
3       Q.   Was the Bookshare -- excuse me.
4       Was the Bookshelf mark registered by
5  somebody else with the U.S. Patent and Trademark
6  Office?
7       MR. KAPLAN:  Objection.  Vague.  Lacks
8  foundation.  Calls for a legal conclusion.
9       THE WITNESS:  That is my understanding.
10  BY MR. HUDIS:
11       Q.   And who registered Bookshelf with the
12  U.S. Patent and Trademark Office, to the best of
13  your knowledge?
14       MR. KAPLAN:  Objection.  Vague and calls
15  for a legal conclusion.
16       THE WITNESS:  This may be a place where
17  we're getting into confidential material.  I'm
18  just going to put that on the record.
19       MR. HUDIS:  We're almost out of tape,
20  but let's put the next question and answer on the
21  confidential portion of the record.
22       Let's go off the record so we can change
23  the tape.
24       MR. KAPLAN:  Okay.  Counsel, would this
25  be a good time to take a break --

91

1       MR. HUDIS:  Yes.
2       MR. KAPLAN:  -- to stretch our legs?
3       MR. HUDIS:  Yes.
4       THE VIDEOGRAPHER:  Going off the record
5  at 11:17.  This is the end of Tape No. 1.
6       (Whereupon, a recess was taken.)
7       THE VIDEOGRAPHER:  Here begins Tape
8  No. 2 in the deposition of James Fruchterman.  We
9  are back on the record at 11:31.
10       MR. KAPLAN:  So, Counsel, pursuant to
11  paragraph 1E of the protective order in this
12  action, we agree to provisionally designate the
13  transcript as confidential for 30 days and shall
14  make such specific designations of the transcript
15  before the end of that time.  I may have gotten
16  that paragraph number wrong, but under the
17  protective order.
18       MR. HUDIS:  Agreed.
19       MR. KAPLAN:  Thank you.
20  BY MR. HUDIS:
21       Q.   So, Mr. Fruchterman, my last question to
22  you was whether the Bookshelf mark had been
23  registered with the U.S. Patent and Trademark
24  Office by someone else.
25       **A.   Yes.**

92

1       Q.   All right.  And to the best of your
2  knowledge, who registered the mark with the
3  trademark office?
4       **A.   I don't remember which company.  It was**
5  **a big company.**
6       Q.   But you don't remember whom?
7       **A.   No.  I -- I wouldn't care to guess.**
8       Q.   Anything that would refresh your
9  recollection?
10       **A.   A public registration of the term**
11  **"Bookshelf" as it applies in the digital world, or**
12  **something along those lines.**
13       Q.   Was the software code for the Bookshelf
14  product registered with the U.S. Copyright Office?
15       MR. KAPLAN:  Objection.  Vague.  Lacks
16  foundation.  Calls for a legal conclusion.
17       THE WITNESS:  No.  And Bookshelf was a
18  feature, not really a product.
19  BY MR. HUDIS:
20       Q.   And why do you describe it as a feature?
21       **A.   Well, it's part of the Bookshare site**
22  **code, and there are many, many things that the**
23  **Bookshare site code does, and this was just one**
24  **thing.  It -- it -- it makes no sense apart from**
25  **Bookshare.**

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

93

1    Q.   And it's purpose is to organize
2  selections by the reader?
3         MR. KAPLAN: Objection. Vague.
4         THE WITNESS: I believe the primary
5  purpose of this feature was to make it easier for
6  teachers to assign a list of materials for a
7  student to read.
8  BY MR. HUDIS:
9    Q.   And Bookshelf, to the best of your
10 recollection, is now offered as a feature under
11 the name Reading Lists?
12   **A.   Correct.**
13   Q.   Are any of -- is the Read2Go product
14 offered for a fee?
15        MR. KAPLAN: Objection. Vague.
16        THE WITNESS: No.
17 BY MR. HUDIS:
18   Q.   Is the Go Read product offered for a
19 fee?
20   **A.   Okay. I want --**
21        MR. KAPLAN: Objection. Vague.
22        THE WITNESS: I want to correct my
23 testimony.
24 BY MR. KAPLAN:
25   Q.   Please.

94

1    **A.   Okay. We're talking about two different**
2  **eBook readers.**
3    Q.   Right.
4    **A.   And the first question you asked was is**
5  **the Read2Go product offered for a fee.**
6    Q.   For a fee?
7    **A.   And the correct answer is, yes. It's**
8  **listed in the Apple App Store for a fee.**
9         **And your -- the question that was**
10 **pending was whether Go Read was offered for a fee.**
11 **And the answer is, no, it is not offered for a**
12 **fee. It's available for free.**
13   Q.   Is the Bookshare Web Reader offered for
14 a fee?
15        MR. KAPLAN: Objection. Vague.
16        THE WITNESS: Not for a separate fee.
17 BY MR. KAPLAN:
18   Q.   Is it part of the fee that one would pay
19 to become a member of Bookshare?
20        MR. KAPLAN: Objection. Vague.
21        THE WITNESS: The web reader is part of
22 the Bookshare web site. Whether or not you need
23 to pay a fee depends on the material you read and
24 whether or not a third party is effectively paying
25 for your fee, your subscription fee.

95

1  BY MR. KAPLAN:
2    Q.   So if a third party does not pay the
3  user subscription fee, would a Bookshare member
4  have to pay for the Bookshare Web Reader?
5         MR. KAPLAN: Objection. Incomplete
6  hypothetical. Vague. Lacks foundation.
7  Argumentative.
8         THE WITNESS: If they wish to read
9  copyrighted material.
10 BY MR. KAPLAN:
11   Q.   If the user wishes to read copyrighted
12 material, then there would be a fee associated
13 with the user using the Bookshare Web Reader?
14        MR. KAPLAN: Objection. Incomplete
15 hypothetical. Misstates the testimony. Vague.
16 Lacks foundation.
17        THE WITNESS: Bookshare is a
18 subscription web site. If you are a subscriber,
19 the Bookshare Web Reader is a feature of that web
20 site that is included in your subscription, much
21 as your Reading Lists are included as a feature of
22 the web site's operation.
23 BY MR. KAPLAN:
24   Q.   Separate and apart from the subscription
25 fee for Bookshare, does, in any circumstance, the

96

1  user pay a separate fee for the Bookshare web
2  reader?
3         MR. KAPLAN: Objection. Vague.
4  Argumentative. Lacks foundation.
5         THE WITNESS: Not by Benetech.
6  BY MR. HUDIS:
7    Q.   Would somebody else charge that fee?
8         MR. KAPLAN: Objection. Vague.
9         THE WITNESS: It's an open source
10 product, to my knowledge, and under open source
11 licensing, it is possible for someone to grab a
12 piece of open source code and, within the
13 constraints of that license, charge some fees.
14 I'm not aware of anyone doing that at this moment.
15 BY MR. HUDIS:
16   Q.   And what used to be Bookshelf, now
17 Reading Lists, is a feature of the Bookshare
18 service?
19        MR. KAPLAN: Objection. Argumentative.
20 Vague.
21        THE WITNESS: Yes.
22 BY MR. HUDIS:
23   Q.   Is a separate fee charged for Reading
24 Lists?
25        MR. KAPLAN: Objection. Vague. Lacks

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

---

97

1    foundation. Argumentative.
2         THE WITNESS: No.
3    BY MR. HUDIS:
4         Q.   Was a separate fee charged for
5    Bookshelf?
6         MR. KAPLAN: Objection. Vague. Lacks
7    foundation. Argumentative.
8         THE WITNESS: No.
9    BY MR. HUDIS:
10        Q.   Do I understand correctly that Read2Go
11   is an eReader for an Apple product?
12        MR. KAPLAN: Objection. Vague.
13        THE WITNESS: Yes.
14   BY MR. HUDIS:
15        Q.   All right. Can anyone acquire Read2Go
16   for use with an Apple product or must the person
17   show proof of a print disability?
18        MR. KAPLAN: Objection. Compound.
19   Lacks foundation. Vague.
20        THE WITNESS: Anyone can purchase the
21   product online without showing proof of
22   disability.
23   BY MR. HUDIS:
24        Q.   Is that also true for Go Read?
25        MR. KAPLAN: Objection. Lacks

---

98

1    foundation. Vague.
2         THE WITNESS: Anyone is able to download
3    Go Read and use it to read any material.
4    BY MR. HUDIS:
5         Q.   Without -- without showing proof of
6    print disability?
7         A.   That is correct.
8         (Whereupon, Deposition Exhibit 54 was
9         marked for identification.)
10        MR. HUDIS: Mr. Fruchterman, I now show
11   you what's been marked as Exhibit Fruchterman 54.
12        Counsel, just to speed up, I will
13   represent this was prepared by my office from
14   publicly available information.
15        MR. KAPLAN: Thank you.
16   BY MR. HUDIS:
17        Q.   Mr. Fruchterman, could you please look
18   at pages 1 through 3 of Exhibit 54. And I ask
19   you, do you recognize these as registered
20   trademarks of Beneficent Technology, Inc.?
21        A.   Yes.
22        Q.   And on page 4 of Exhibit 54, do you
23   recognize Martus client software as a registered
24   copyright owned by Beneficent Technology, Inc.?
25        A.   Yes.

---

99

1         Q.   Mr. Fruchterman, what is Bookshare's
2    University Partnership Program?
3         MR. KAPLAN: Objection. Argumentative.
4    Lacks foundation. Vague.
5         THE WITNESS: It's a program where
6    universities that have scanned books for students
7    can add them to the Bookshare collection so that
8    other people don't have to scan the same work, to
9    make it accessible to people with disabilities.
10   BY MR. HUDIS:
11        Q.   Print disabilities?
12        A.   Correct.
13        Q.   When was the Bookshare University
14   Partnership Program started?
15        MR. KAPLAN: Objection. Lacks
16   foundation.
17        THE WITNESS: I don't know a precise
18   date. In the last six years.
19   BY MR. HUDIS:
20        Q.   Around 2009 maybe?
21        MR. KAPLAN: Objection. Asked and
22   answered. Lacks foundation.
23        THE WITNESS: I don't have an exact date
24   for you.
25

---

100

1    BY MR. HUDIS:
2         Q.   To the best of your knowledge, which
3    major publishers have agreed to donate digital
4    files of their books to Bookshare?
5         MR. KAPLAN: Objection. Argumentative.
6    Lacks foundation. Vague.
7         THE WITNESS: More than 500 publishers
8    have done so. HarperCollins, Simon & Schuster,
9    Random House, Penguin. But I don't want to
10   characterize a publisher as not major by omission
11   from my list.
12   BY MR. HUDIS:
13        Q.   Before becoming part of Bookshare's
14   University Partnership Program, did any of the
15   publishers express to you concern about the
16   sighted community taking unfair advantage by
17   downloading from Bookshare's -- from Bookshare the
18   digital files of their books without permission or
19   payment?
20        MR. KAPLAN: Objection. Vague.
21        THE WITNESS: Yes.
22   BY MR. HUDIS:
23        Q.   Which of the publishers -- which of the
24   publishers expressed such a concern?
25        MR. KAPLAN: Objection. Lacks

---

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

101

1  foundation.
2       THE WITNESS:  To the best of my
3  recollection, it would have been a higher ed
4  publisher.
5  BY MR. HUDIS:
6    Q.   Do you remember the name of the higher
7  ed publisher?
8    **A.   I do not.**
9    Q.   What, if anything, did they say to you?
10       MR. KAPLAN:  Objection.  Lacks
11  foundation.
12       THE WITNESS:  We've had many
13  conversations with publishers.  And your question
14  touches effectively on whether someone without a
15  qualifying disability can sign up for Bookshare.
16       And so publishers would ask us questions
17  about our sign-up process and about our mechanisms
18  to prevent nondisabled people from signing up for
19  Bookshare.  So I'd say we certainly have had
20  conversations about those processes.
21  BY MR. HUDIS:
22    Q.   And when such concerns were expressed to
23  you, what did you tell those publishers about
24  Bookshare's sign-up process?
25       MR. KAPLAN:  Objection.  Vague.

102

1       THE WITNESS:  We discussed at length the
2  mechanisms by which people provide proof of
3  disability.
4  BY MR. HUDIS:
5    Q.   And after providing that explanation to
6  the publishers, were they satisfied with the
7  explanations and, as a result, went forward by
8  joining Bookshare's University Partnership
9  Program?
10       MR. KAPLAN:  Objection.  Vague.  Calls
11  for speculation.  Lacks foundation.  Compound.
12       THE WITNESS:  That question actually
13  doesn't make sense as structured.
14  BY MR. HUDIS:
15    Q.   Okay.
16    **A.   Because the University Partners Program**
17  **is not a publisher program.  It's a university**
18  **program separate from publishers and separate from**
19  **university presses.  So the question doesn't hold**
20  **together.**
21    Q.   So -- so the entities that expressed
22  concerns with -- if any, with Bookshare's
23  University Partnership Program were not the
24  universities, but it was the publishers?
25    **A.   Correct.**

103

1    Q.   All right.  And after you gave them an
2  explanation about the sign-up process for
3  Bookshare, did the publishers allow their
4  publications to be offered as part of the
5  University Partnership Program?
6       MR. KAPLAN:  Objection.  Argumentative.
7  Vague.  Lacks foundation.
8       THE WITNESS:  Still, that question
9  doesn't make sense.
10  BY MR. HUDIS:
11    Q.   Okay.  What doesn't make -- what would
12  make your understanding of my question clearer?
13       MR. KAPLAN:  Objection.  Calls for
14  speculation.  Vague.
15       THE WITNESS:  Okay.  You keep linking
16  the University Partners Program to publishers.
17  BY MR. HUDIS:
18    Q.   Right.
19    **A.   They're not linked.  So any time you ask**
20  **me a question about publishers and then the**
21  **University Partners Program, I just have to say,**
22  **sorry, that -- those don't go together.  Those are**
23  **apples and oranges.**
24       **Do you want to just talk about**
25  **publishers?**

104

1    Q.   Sure.
2    **A.   Let's talk about that.**
3    Q.   Well -- fine.
4       So you had whole libraries as part of
5  the University Partnership Program who digitized
6  the works in their collections and made them
7  available as part of Bookshare, correct?
8       MR. KAPLAN:  Objection.  Misstates
9  testimony.  Vague.
10       THE WITNESS:  No, that's not what I've
11  said.
12  BY MR. HUDIS:
13    Q.   All right.  How does the University
14  Partnership Program work?
15    **A.   So let's break this into two halves.**
16    Q.   Sure.
17    **A.   The interaction with the disabled**
18  **student and the interaction with Bookshare.**
19       **So universities -- many universities**
20  **have a disabled student services center that is**
21  **responsible for responding to accommodation**
22  **requests from students with disabilities.**
23       **A common request is that a**
24  **print-disabled student will come to the disabled**
25  **student services office and say, "I need this book**

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

105

1    for my class."
2          There are many different ways that a
3    disabled student services office can fulfill that
4    request.  One of the possible ways, and generally
5    one that they don't prefer to go for if they can
6    avoid it, is to scan the entire book.  They scan
7    that entire book and provide it to the student,
8    satisfying their obligation to the student.
9          Now, a university disabled student
10   services office can voluntarily sign up for the
11   University Partners Program on behalf of their
12   university, going through whatever process, and
13   send Bookshare copies of accessible versions of
14   textbooks or books needed for education and add
15   them to the -- and we will add them to the
16   Bookshare collection as a way to save potentially
17   other universities from having to scan the same
18   book at expense and delay.  So that's how that
19   program works.
20   Q.    Thank you for that explanation.
21   A.    Mh-hmm.
22   Q.    Now, if I am a publisher of one of those
23   books --
24   A.    Yes.
25   Q.    -- I might have a problem with -- if

106

1    there weren't proper safeguards in place -- having
2    my text made part of Bookshare so that the sighted
3    community takes unfair advantage.
4          Now, my question goes back to --
5    A.    Mh-hmm.
6    Q.    -- did any of the publishers express a
7    concern with the University Partnership Program by
8    having their books made available on Bookshare?
9          MR. KAPLAN: Objection.  Vague.
10   Argumentative.  Lacks foundation.
11         THE WITNESS:  No.
12   BY MR. HUDIS:
13   Q.    Why not?
14         MR. KAPLAN: Objection.  Calls for
15   speculation.  Lacks foundation.  Vague.
16         THE WITNESS:  In my earlier testimony
17   where we had conversations with publishers about
18   our qualification processes, the University
19   Partnership Program never came up.
20   BY MR. HUDIS:
21   Q.    Okay.  What is Benetech's Route 66
22   Literacy Project?
23         MR. KAPLAN: Objection.  Argumentative.
24   Lacks foundation.
25         THE WITNESS:  It's a project to help

107

1    people with developmental disabilities learn how
2    to read.
3    BY MR. HUDIS:
4    Q.    And is the program web-based?
5          MR. KAPLAN: Objection.  Vague.
6          THE WITNESS:  Yes.
7    BY MR. HUDIS:
8    Q.    Is the uploading of copyrighted text
9    part of the Route 66 Literacy Project?
10         MR. KAPLAN: Objection.  Vague.  Calls
11   for a legal conclusion.  Lacks foundation.
12         THE WITNESS:  Route 66 focuses on openly
13   licensed content, both pictures and text.  We --
14   sorry.  I'll wait for your next question.
15   BY MR. HUDIS:
16   Q.    Oh, I was going to let you finish your
17   answer.  I'm sorry.
18   A.    Maybe you should restate the question to
19   make sure I've answered it completely.
20   Q.    Well, you said that Route 66 -- that the
21   Route 66 Literacy Project is deployed using openly
22   licensed content, pictures and text.
23   A.    Correct.
24   Q.    In what way?
25         MR. KAPLAN: Objection.  Misstates

108

1    testimony.  Vague.
2          THE WITNESS:  It's a community of people
3    that want to help people with developmental
4    disabilities learn to read.
5    BY MR. HUDIS:
6    Q.    Using openly licensed content?
7    A.    And if they provide the content to Route
8    66, it's on the understanding that it be openly
9    licensed.
10   Q.    What is Martus?
11         MR. KAPLAN: Objection.  Lacks
12   foundation.
13         THE WITNESS:  Martus is our software for
14   human rights activists.
15   BY MR. HUDIS:
16   Q.    And it's used to capture and effectively
17   use human rights violations data?
18   A.    Primarily, yes.
19   Q.    Now, let's turn to the specifics of
20   Bookshare.
21   A.    Mh-hmm.
22   Q.    Since its founding in 2002, who has been
23   eligible to join Bookshare?
24         MR. KAPLAN: Objection.  Lacks
25   foundation.  Vague.

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

109

1    THE WITNESS:  The primary beneficiary of
2  Bookshare is a person with a qualifying print
3  disability.
4  BY MR. HUDIS:
5    Q.   And how is one who has a qualifying
6  print disability determined?
7    **A.   By a professional who meets the**
8  **competent authority requirements under U.S. law**
9  **and regulation as having the professional**
10  **credentials to make that assessment.**
11    Q.   So it's a medical professional?
12    **A.   No.**
13    Q.   Please, in this context, define
14  "competent authority."
15    **A.   I can't quote the precise language, but**
16  **it includes doctors, optometrists.  Let's see.**
17  **People with specialized expertise in disabilities.**
18  **Educational psychologists.**
19    **But I'm not giving you the complete list**
20  **that comes from the statutory regulations.  This**
21  **is publicly available regulatory information.  And**
22  **the term of art is "competent authority."**
23    Q.   And that's defined by statute?
24    **A.   That's my understanding.  Or the**
25  **supporting regulations.**

110

1    Q.   Is there an initial setup fee charged to
2  members when they join Bookshare?
3    MR. KAPLAN:  Objection.  Vague.  Lacks
4  foundation.
5    THE WITNESS:  A small proportion of our
6  users do pay an initial setup fee.
7  BY MR. HUDIS:
8    Q.   And that's $25?
9    **A.   In the United States and other wealthy**
10  **countries, yes.**
11    Q.   Is there an ongoing membership fee
12  charged to Bookshare members?
13    MR. KAPLAN:  Objection.  Vague.  Lacks
14  foundation.
15    THE WITNESS:  For those that are paying
16  for their own membership, yes.
17  BY MR. HUDIS:
18    Q.   And that's $50 a year?
19    MR. KAPLAN:  Objection.  Vague.
20    THE WITNESS:  In the United States and
21  other wealthy countries.
22  BY MR. HUDIS:
23    Q.   Are some members eligible to receive
24  Bookshare services for free?
25    **A.   Yes.**

111

1    Q.   Who?
2    **A.   Those that have their membership paid**
3  **for by a third party.**
4    Q.   If they're not paying on their own and
5  their fees are not paid by a third party, are
6  there members of Bookshare who can receive
7  Bookshare services for free?
8    MR. KAPLAN:  Objection.  Vague.
9    THE WITNESS:  Yes.  We occasionally give
10  someone who would otherwise have to pay a
11  complimentary membership.
12  BY MR. HUDIS:
13    Q.   Is that the exception or the rule?
14    MR. KAPLAN:  Objection.  Vague.
15    THE WITNESS:  We sometimes run programs
16  where we say for the next 90 days, you can get a
17  free membership to Bookshare if you qualify.  And
18  then we hope that you continue to subscribe,
19  so ...
20  BY MR. HUDIS:
21    Q.   Besides fees, from where else does
22  Bookshare get its funding, if anyplace?
23    MR. KAPLAN:  Objection.  Vague.
24    THE WITNESS:  Government contracts.
25  Foundation grants.  Individual donations.  Similar

112

1  philanthropy.
2  BY MR. HUDIS:
3    Q.   And part of the Bookshare's funding has
4  come from the Department of Education special
5  education programs?
6    MR. KAPLAN:  Objection.  Vague.  Lacks
7  foundation.
8    THE WITNESS:  Correct.  A major funder
9  is the Office of Special Education Programs at the
10  U.S. Department of Education.
11  BY MR. HUDIS:
12    Q.   From where does Bookshare obtain the
13  textual reading content to provide to its members?
14    MR. KAPLAN:  Objection.  Vague.
15  Argumentative.
16    THE WITNESS:  At this time, the majority
17  of the Bookshare collection has been supplied by
18  publishers under voluntary agreements.
19  BY MR. HUDIS:
20    Q.   Was that always the case?
21    **A.   No.**
22    Q.   Prior to the publisher supplying their
23  content under voluntary agreements, how did
24  Bookshare obtain textual reading material to
25  provide to its members?

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

113

1      MR. KAPLAN: Objection. Misstates
2  testimony. Argumentative. Vague. Lacks
3  foundation.
4      THE WITNESS: Volunteer scanning.
5  BY MR. HUDIS:
6    Q.  If you know, how -- what portion of the
7  content available on Bookshare today is
8  copyrighted content?
9      MR. KAPLAN: Objection. Calls for a
10  legal conclusion. Lacks foundation. Vague.
11     THE WITNESS: I would estimate over
12  95 percent is copyrighted content.
13  BY MR. HUDIS:
14    Q.  Once Bookshare obtains the textual
15  reading content, if it's in printed form, what
16  does Bookshare or its volunteers do with it?
17     MR. KAPLAN: Objection. Vague. Lacks
18  foundation.
19     THE WITNESS: If we receive a book in
20  printed form, we take off its binding, chop the
21  binding off, put it through a high-speed scanner,
22  perform optical character recognition on it, and
23  then someone proofreads it.
24     It goes through generally an automated
25  quality control assessment and then gets added to

114

1  our collection of books available to our users.
2  BY MR. HUDIS:
3    Q.  What's part of that quality control
4  assessment?
5      MR. KAPLAN: Objection. Argumentative.
6  Vague. Lacks foundation.
7      THE WITNESS: I'm not familiar with all
8  the tests, but if the book is supposed to have 600
9  pages and it has one page, or 10,000, someone's
10  going to look at it.
11     If it's a religious title, and it is
12  full of swear words, it's likely to get additional
13  quality control. So we're looking for is this
14  book as represented. And, you know, that tends to
15  be greater on completely voluntary copies as
16  opposed to one where we were actually operating
17  the process.
18  BY MR. HUDIS:
19    Q.  Would that quality control include a
20  check to make sure none of the pages were scanned
21  upside down?
22     MR. KAPLAN: Objection. Incomplete
23  hypothetical. Lacks foundation. Vague.
24     THE WITNESS: I would say that part of
25  our quality control processes are designed to

115

1  detect missing pages, low-quality character
2  recognition. So, yes, we're trying to spot common
3  errors.
4  BY MR. HUDIS:
5    Q.  Would upside-down pages be one of those
6  common errors?
7    **A.  No.**
8      MR. KAPLAN: Objection. Incomplete
9  hypothetical.
10     THE WITNESS: Sorry.
11     MR. KAPLAN: It's okay.
12  BY MR. HUDIS:
13    Q.  How about off-centered scanned pages,
14  where they're not properly centered?
15     MR. KAPLAN: Objection. Incomplete
16  hypothetical. Vague.
17     THE WITNESS: No. The most common error
18  is a double feed, where two pages fed at once.
19  BY MR. HUDIS:
20    Q.  What type of file does the Bookshare
21  scanning process produce?
22     MR. KAPLAN: Objection. Argumentative.
23  Lacks foundation. Vague.
24     THE WITNESS: Generally --
25

116

1  BY MR. HUDIS:
2    Q.  Go ahead.
3    **A.  Generally, a Microsoft Word or RTF**
4  **format file.**
5    Q.  Not Adobe PDF?
6    **A.  No.**
7    Q.  And "RTF" stands for rich text format?
8    **A.  Correct.**
9    Q.  As part of the process you just
10  described, the digital scan from paper to
11  electronic, what is the initial file -- what type
12  of initial file is created?
13     MR. KAPLAN: Objection. Vague. Lacks
14  foundation.
15     THE WITNESS: I believe we acquire image
16  scans as TIFF images.
17  BY MR. HUDIS:
18    Q.  Again, not PDF?
19    **A.  No.**
20    Q.  I should know this.
21     And "TIFF" stands for?
22    **A.  I believe it's tagged image file format.**
23    Q.  Once the TIFF process is created, apart
24  from the quality control that you just described,
25  what other processes, if any, does the file

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

117

1  undergo?
2        MR. KAPLAN: Objection. Vague.
3  Unintelligible. Argumentative. Lacks foundation.
4  BY MR. HUDIS:
5        Q.   I can ask the question another way if
6  you'd like, Mr. Fruchterman.
7        **A.   I don't think I have anything to add to**
8  **the description I gave earlier.**
9        Q.   All right. Which was you take the
10  printed material, chop it off from its bindings,
11  digitally scan it, employ the OCR process, have it
12  proofread and a quality control?
13        MR. KAPLAN: Objection. Misstates
14  testimony.
15        THE WITNESS: Yes. And, of course,
16  proofreading is a quality control step that has a
17  lot of elements to it as well as the final quality
18  control step I described.
19  BY MR. HUDIS:
20        Q.   For the next series of questions,
21  Mr. Fruchterman, I need your definition of
22  "access." And that has been a term that we have
23  litigated over the course of this legal
24  proceeding.
25        So I am talking now about a print --

118

1  print-disabled person having the ability to access
2  content. In that respect, how would you define
3  "access"?
4        MR. KAPLAN: Objection. Vague.
5        THE WITNESS: So accessibility -- which
6  is how I think of this term, as opposed to access,
7  per se -- I usually focus on functional tasks that
8  a person would use on a given piece of information
9  or material.
10  BY MR. HUDIS:
11        Q.   And those functional tasks are?
12        **A.   Can they get the material? Can they**
13  **actually have some form of access to it without**
14  **regard to is it accessible or not? Can they find**
15  **it? Can they access it? So that might be can**
16  **they download it?**
17        Q.   So --
18        **A.   Can they --**
19        Q.   -- that part of it would you define as
20  acquisition, to obtain the content? I want -- I
21  want your definition without using the term
22  "access."
23        MR. KAPLAN: Objection. Vague.
24  Argumentative.
25        THE WITNESS: "Acquisition" does not

119

1  seem like the right term. There's -- there's a
2  series of processes around obtaining an
3  information object. Depending on -- it could be
4  handed to you physically. It could be assigned to
5  you by your teacher with a link. It could be that
6  you have to search a web search engine to find it.
7  You might go to Amazon and try to buy it.
8        So -- so let's say --
9  BY MR. HUDIS:
10        Q.   That's all obtaining the content?
11        **A.   Yes. Let's say obtaining. Okay.**
12        Q.   So that's the first functional task.
13        After you obtain the content, what's
14  next?
15        **A.   Can I read the content. If it's textual**
16  **material, especially. In other words, can I**
17  **actually acquire words in that content. For**
18  **example, if it's a novel, can I read it all the**
19  **way from the beginning to the end.**
20        Q.   Are those all the functional tasks? Are
21  there more?
22        **A.   There are more.**
23        Q.   Which -- what are they?
24        **A.   Accessing -- sorry. Using the structure**
25  **of the document to do tasks that other people**

120

1  **might do on that document. For example, you said**
2  **look at page 5 of a given document. Can the**
3  **person go to page 5. Is page 5 actually in their**
4  **copy.**
5        Q.   That would be a search function?
6        **A.   It can be done either through structured**
7  **markup or it can be done by search. So, for**
8  **example, a table of contents, an index. It's not**
9  **a search function --**
10        Q.   That's a structured markup?
11        **A.   That's a structure markup.**
12        And so if someone says, Go to
13  **Section 7.1, you know, you can flip through and**
14  **get to Section 7.1, or you can search for 7.1, and**
15  **perhaps the first mention of 7.1 is maybe table of**
16  **contents. Maybe the second one is Section 7.1, if**
17  **the phrase "7.1" doesn't appear frequently in the**
18  **document otherwise.**
19        Q.   What is the next functional task?
20        MR. KAPLAN: Objection. Argumentative.
21  Vague.
22  BY MR. HUDIS:
23        Q.   If any.
24        **A.   I -- in modern use, you might be looking**
25  **for certain phrases or content. So, for example,**

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

121

1    **I might want to know pages that mention**
2    **Constitution and bananas on the same page.**
3        Q.   All right.  So that would be a Boolean
4    search?
5        **A.   Yes.  So there are searches you could**
6    **do.  Those are easier to do on digital content,**
7    **obviously.  But, you know, human beings often do**
8    **word spotting as well.  Skimming.  There's**
9    **skimming that people do.**
10       **And -- I mean, there are other tasks**
11   **that people do.  I choose to focus on those as the**
12   **primary ones that encompass what 95 percent or**
13   **more people would want to do with a given**
14   **document.**
15       Q.   And those functional tasks, just to
16   summarize -- I've been listening very carefully --
17   to obtain the content, to read the content, to use
18   the structure of the document such as by markup or
19   by search, to skim the document and more
20   complicated phrase searches?
21       A.   Yeah.
22       MR. KAPLAN:  Objection.  Misstates
23   testimony.
24       Go ahead.
25       THE WITNESS:  More or less, yeah.

122

1    BY MR. HUDIS:
2        Q.   Okay.  All right.  Could Bookshare's
3    members with print disabilities access the content
4    in the TIFF file created by the process you
5    described earlier without having the file undergo
6    an OCR process?
7        MR. KAPLAN:  Objection.  Incomplete
8    hypothetical.  Vague.  Lacks foundation.
9        THE WITNESS:  They could have a human
10   being read it to them.
11   BY MR. HUDIS:
12       Q.   Without intervention by another human
13   being, could Bookshare's members with print
14   disabilities access the TIFF file created as we
15   discussed -- I'm going to rephrase the question.
16       Without human intervention, could
17   Bookshare's members with print disabilities access
18   the content in the TIFF file without having
19   undergone the OCR process?
20       MR. KAPLAN:  Objection.  Incomplete
21   hypothetical.  Vague.  Lacks foundation.
22       THE WITNESS:  I think the answer is no.
23   They need either OCR or a human to access TIFF
24   images if they're completely blind.
25

123

1    BY MR. HUDIS:
2        Q.   Now, what if they are a low-vision
3    reader?
4        MR. KAPLAN:  Objection.  Incomplete
5    hypothetical.  Vague.  Lacks foundation.
6        THE WITNESS:  Then they could view the
7    TIFF image magnified or otherwise visually
8    processed and read the document.
9    BY MR. HUDIS:
10       Q.   What do you mean by "visually
11   processed"?
12       **A.   An example -- one obvious example is**
13   **making it bigger.  Another one is reversing the**
14   **contrast so that instead of being black text on a**
15   **white background, being white text on black**
16   **background.  There are many other visual things**
17   **that people with low vision benefit from other**
18   **than those two.  Those are the two most common.**
19       Q.   With the current state of technology as
20   you know it, how accurate is the OCR process in
21   recognizing words on a printed page?
22       MR. KAPLAN:  Objection.  Vague.
23       THE WITNESS:  It's quite good.
24   BY MR. HUDIS:
25       Q.   Is there a known error recognition rate?

124

1        MR. KAPLAN:  Objection.  Vague.
2        THE WITNESS:  It varies by content type.
3    So a text document, like my resume --
4    BY MR. HUDIS:
5        Q.   Sure.  Let's look at Exhibit 49.
6        **A.   -- I would -- yeah, I would expect**
7    **modern OCR to do that perfectly.**
8        Q.   With no error recognition --
9        **A.   With no errors.  Or maybe one or two**
10   **just -- I should double-check, but I don't see**
11   **any.  That's -- that's a very -- of course, I'm**
12   **not going to find it.  There we go.  Yeah.  I**
13   **mean, this is a--**
14       Q.   That's straight text?
15       **A.   Yeah.  Well, the first page I would say**
16   **it would recognize perfectly.  The second page, it**
17   **might have problems with some of the underlines.**
18       Q.   Right.
19       **A.   And --**
20       Q.   What about if it's in italics?
21       **A.   I think it's the combination of italics**
22   **and underlines that might give it the problem.  I**
23   **think it should still do quite well, but I would**
24   **expect there's a possibility of an error -- of**
25   **error showing up with italics.**

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

125

1    So a novel, very few errors.  A -- well,
2    a child's picture book that had no words in it
3    would be hard for a blind person to use, as
4    another example.  So it just -- it varies by the
5    content.  But modern OCR on straight text should
6    do quite well.
7       Q.   And the events in question in this
8    litigation occurred between 2012 and 2014.
9           Would your answer still be the same
10   about the error recognition rate of OCR in that
11   time period?
12          MR. KAPLAN:  Objection.  Incomplete
13   hypothetical.  Vague.  Lacks foundation.
14          THE WITNESS:  Yes.
15   BY MR. HUDIS:
16      Q.   After the scanning and OCR processes and
17   the quality control, how does Bookshare decide
18   whether a book should be made available on its web
19   site?
20          MR. KAPLAN:  Objection.  Vague.
21   Unintelligible.  Lacks foundation.  Incomplete
22   hypothetical.
23          THE WITNESS:  We wouldn't engage in that
24   process if we weren't planning on making it
25   available.  It would be a waste of resources.

126

1    BY MR. HUDIS:
2       Q.   Is there a validation process that the
3    scanned book goes through before --
4           MR. KAPLAN:  Object.
5    BY MR. HUDIS:
6       Q.   -- before it is uploaded to Bookshare's
7    web site?
8           MR. KAPLAN:  Objection.  Vague.  Lacks
9    foundation.  Incomplete hypothetical.
10          THE WITNESS:  I don't know what you mean
11   by "validation" beyond the quality control stuff
12   that we've already discussed.
13          Is there some other thing that --
14   BY MR. HUDIS:
15      Q.   I saw that in some of the materials
16   discussing Bookshare, that there was a validation
17   process.
18      A.   If a work is a play, we won't scan it.
19      Q.   Why?
20      A.   Because the copyright exception says it
21   only applies to nondramatic literary works.  So
22   there is a process to not scan books that aren't
23   covered by the copyright exception.
24      Q.   So, for example, if a student with print
25   disabilities needs to access a modern play that's

127

1    still within copyright, Bookshare couldn't help
2    them?
3           MR. KAPLAN:  Objection.  Incomplete
4    hypothetical.  Calls for a legal conclusion.
5    Vague.
6           THE WITNESS:  Bookshare couldn't help
7    them by scanning a printed version of that play,
8    no.
9    BY MR. HUDIS:
10      Q.   Why is Bookshare permitted to digitally
11   copy and distribute copyrighted materials to the
12   print-disabled?
13          MR. KAPLAN:  Objection.  Calls for a
14   legal conclusion.  Incomplete hypothetical.
15   Argumentative.  Vague.
16          THE WITNESS:  Because we avail ourselves
17   of copyright exceptions and license agreements and
18   the public domain.  And I think that's it.  Those
19   are the three ways that we are permitted.
20   BY MR. HUDIS:
21      Q.   And when you say "copyright exceptions,"
22   are you familiar with the 1996 Chafee Amendment to
23   the U.S. Copyright Act?
24          MR. KAPLAN:  Objection.  Vague.
25          THE WITNESS:  Yes.

128

1    BY MR. HUDIS:
2       Q.   What's your understanding of the Chafee
3    Amendment?
4           MR. KAPLAN:  Objection.  Vague.
5           THE WITNESS:  Chafee is C-H-A-F-E-E.  I
6    don't have all of the provisions of Chafee
7    memorized, but it allows an authorized entity,
8    defined in the statute, to make copies of
9    copyrighted works available to people with
10   qualifying disabilities, print disabilities.
11   There's more details, but those are, I'd say, the
12   primary points.
13   BY MR. HUDIS:
14      Q.   And --
15          MR. KAPLAN:  Just to be clear, you're
16   not seeking his legal opinion on this or legal
17   advice regarding this, correct?
18          MR. HUDIS:  I am not.  I am seeking the
19   witness's understanding vis-a-vis his operation of
20   Bookshare.
21      Q.   So the three methods you just described
22   permitting Bookshare to digitally copy and
23   distribute materials on its web site is either,
24   one, a copyright exception; two, a license
25   agreement; and, three, a public domain; is that

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

129

1  correct?
2      A.   Yes, that's my understanding as someone
3  who operates Bookshare.
4      Q.   And the copyright exception, we are now
5  talking about the Chafee Amendment?
6          MR. KAPLAN:  Objection.  Argumentative.
7  BY MR. HUDIS:
8      Q.   What did you mean by "copyright
9  exception"?
10     A.   I'm not a lawyer, but it's my
11 understanding that there are multiple copyright
12 exceptions that our work may be covered by.
13     Q.   Well, let's concentrate on the Chafee
14 Amendment.  All right.
15     A.   Okay.
16     Q.   So -- and that's what -- that's one of
17 the three rubrics under which Bookshare operates?
18         MR. KAPLAN:  Objection.  Vague.
19 Misstates testimony.  Argumentative.
20         THE WITNESS:  I agree that we actively
21 try to utilize the Chafee Amendment in our
22 operations.
23 BY MR. HUDIS:
24     Q.   All right.  And Bookshare, under the
25 Chafee Amendment, is an authorized entity?

130

1          MR. KAPLAN:  Objection.  Calls for a
2  legal conclusion.  Vague.
3          THE WITNESS:  We believe that we qualify
4  as an authorized entity.
5  BY MR. HUDIS:
6      Q.   And that you provide the content on
7  Bookshare's web site to people with qualifying
8  disabilities?
9          MR. KAPLAN:  Objection.  Calls for a
10 legal conclusion.  Vague.
11         THE WITNESS:  Yes.
12 BY MR. HUDIS:
13     Q.   When you founded Bookshare, did you
14 inform the book publishers of your organization's
15 intentions?
16         MR. KAPLAN:  Objection.  Really vague.
17         THE WITNESS:  Yes.
18 BY MR. HUDIS:
19     Q.   Okay.  All right.  At that time, how did
20 the publishers react?
21         MR. KAPLAN:  Objection.  Really vague.
22         THE WITNESS:  This is another
23 confidential segment.
24 BY MR. HUDIS:
25     Q.   Well, the whole thing is confidential.

131

1      A.   Okay.  But -- I know.  But I know that
2  we then go back and re-mark it as confidential.
3  So I figured I'd just get it right out there right
4  now.
5          MR. KAPLAN:  That's helpful for me.  I
6  appreciate that, Jim.
7          THE WITNESS:  So I would say that
8  different segments of the publishing industry
9  reacted differently.  The trade publishers were
10 pretty open to it.  They had a tradition of
11 helping people with disabilities.  The educational
12 publishers, especially those in higher ed, were
13 much more concerned about Bookshare.
14 BY MR. HUDIS:
15     Q.   Any other groups that reacted to your
16 initial concept of Bookshare?
17         MR. KAPLAN:  Objection.  Still really
18 vague.  Lack of foundation.  Calls for
19 speculation.
20         THE WITNESS:  I'm -- I'm describing my
21 interaction with the main publishing industry --
22 publisher association which, in my mind,
23 represents the interests of those stakeholders.
24 BY MR. HUDIS:
25     Q.   All right.  So you have --

132

1      A.   So that was -- my interaction before the
2  launch of Bookshare with the publishing industry
3  was primarily through that group.
4  BY MR. HUDIS:
5      Q.   And it was the trade and higher
6  educational publishers?
7      A.   It was the Association of American
8  Publishers, which has divisions of different
9  segments of the publishing industry of which
10 trade, higher education, K-12, scientific, I
11 think -- there's a lot of different segments, but
12 the ones that were most noteworthy in their
13 reaction were the postsecondary publishers as
14 being less excited and the trade publishers being
15 more "eh" -- sorry, I guess that's not a technical
16 term -- more "sounds reasonable."
17     Q.   What concerns did the secondary
18 educational publishers relay to you?
19         MR. KAPLAN:  Objection.  Vague.
20         THE WITNESS:  The primary concern
21 expressed by the postsecondary publishers were
22 that disabled students who obtained a copy of a
23 textbook from Bookshare might share that copy with
24 other nonqualifying students in an unauthorized
25 manner.

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

133

1    BY MR. HUDIS:
2       Q.   What did you do to allay their concerns?
3            MR. KAPLAN:  Objection.
4    BY MR. HUDIS:
5       Q.   If anything.
6            MR. KAPLAN:  Vague.
7            THE WITNESS:  We presented our
8    seven-point digital rights management plan to them
9    as the overarching structure of our plans to meet
10   our obligations under the Chafee Amendment.
11   BY MR. HUDIS:
12      Q.   Where are the digital files of the books
13   scanned for Bookshare stored?
14           MR. KAPLAN:  Objection.  Vague.  Lacks
15   foundation.
16           THE WITNESS:  At present, in Amazon
17   cloud services.
18   BY MR. HUDIS:
19      Q.   How about back then, at the founding?
20           MR. KAPLAN:  Objection.  Vague.  Lacks
21   foundation.
22           THE WITNESS:  We operated our own
23   servers.
24   BY MR. HUDIS:
25      Q.   And were they secure?

134

1       A.   Yes.
2       Q.   So they needed user name and password
3    protection?
4            MR. KAPLAN:  Objection.  Argumentative.
5    Vague.
6            THE WITNESS:  In addition to other.  So,
7    yes, user name and password, yes.
8    BY MR. HUDIS:
9       Q.   All right.  And the content now that is
10   available on Amazon cloud, that is also secured
11   with user name and password protection?
12           MR. KAPLAN:  Objection.  Argumentative.
13   Vague.
14           THE WITNESS:  At least that.
15   BY MR. HUDIS:
16      Q.   And more?
17      A.   And more.
18      Q.   All right.  Do the digital files of the
19   books made available on the Bookshare site have
20   copyright and limited access notices on them?
21           MR. KAPLAN:  Objection.  Vague.  Lacks
22   foundation.  Calls for a legal conclusion.  And
23   compound.
24           THE WITNESS:  Yeah.
25

135

1    BY MR. HUDIS:
2       Q.   All right.  We'll do it one at a time.
3       A.   Okay.  When users get a copyrighted work
4    from Bookshare, it includes copyright and limited
5    access notices, yes.
6       Q.   Are members of Bookshare obligated to
7    sign an agreement to abide by copy -- copyright
8    laws when accessing materials made available on
9    Bookshare's web site?
10           MR. KAPLAN:  Objection.  Vague.  Lacks
11   foundation.  Calls for a legal conclusion.
12   Incomplete hypothetical.
13           THE WITNESS:  If a copyrighted work is
14   downloaded from Bookshare, there needs to have
15   been a responsible party signing an agreement with
16   respect to that work.  For example, a parent or
17   guardian has to sign an agreement on behalf of a
18   minor.  A teacher or educator or school district
19   can sign on behalf of the students that they serve
20   books to.  But there always needs to be someone
21   who has -- with the ability to make an agreement
22   who has taken on that obligation.
23   BY MR. HUDIS:
24      Q.   Whether it is the person who is
25   print-disabled him or herself or the responsible

136

1    party on their behalf?
2            MR. KAPLAN:  Objection.  Vague.
3    Incomplete hypothetical.
4            THE WITNESS:  Yes.
5    BY MR. HUDIS:
6       Q.   What is Bookshare's fingerprint system?
7            MR. KAPLAN:  Objection.  Argumentative.
8    Lacks foundation.  Vague.
9            THE WITNESS:  We incorporate
10   fingerprints into copyrighted works, including the
11   name of the user or could be the name of the
12   school district or teacher that downloads the
13   work, and we also hide that identity in the work
14   itself in a way that's not easily seen by
15   inspection.
16   BY MR. HUDIS:
17      Q.   What is the purpose for the fingerprint
18   system?
19           MR. KAPLAN:  Objection.  Vague.
20           THE WITNESS:  If unauthorized copies
21   appear, say, online, that we can trace back the
22   source user that downloaded that work originally
23   from Bookshare.
24   BY MR. HUDIS:
25      Q.   And if you can trace them, you tell

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

137

1   them, You can't do that again or you're no longer
2   going to be a member of Bookshare; is that
3   correct?
4           MR. KAPLAN: Objection. Incomplete
5   hypothetical. Vague. Lacks foundation.
6           THE WITNESS: We have a disciplinary
7   process associated with that discovery, yes.
8   BY MR. HUDIS:
9       Q.   And what is that disciplinary process?
10      A.   Typically, we reach out and say, We
11  found a copyrighted work online that came from
12  you, and do you know how it happened to get out
13  there? And most frequently, it's inadvertent.
14          The majority of the works have the plain
15  text name of the person who downloaded the book in
16  the file still when we find it. So that tends to
17  be someone who doesn't understand how the Internet
18  works and uploaded a textbook to the school web
19  site so that their kid could get it easily, their
20  student, but didn't realize that Google could also
21  index that site.
22          If a person seems to have tried to cover
23  their tracks or delete the fingerprint or delete
24  things or doesn't have a very good answer on how
25  the work appeared, we discontinue services to that

138

1   individual. And we check in with the industry
2   association occasionally about that. And some
3   large scale -- I think one large scale thing,
4   where we had 50 works by a single publisher, we
5   contacted the publisher.
6       Q.   When you say "we," you're talking about
7   Bookshare?
8       A.   Bookshare, yes.
9       Q.   Once Bookshare makes --
10          MR. KAPLAN: So are you saying that
11  interchangeably with "Benetech"?
12          MR. HUDIS: It's the Bookshare project
13  of Benetech as the witness testified.
14          THE WITNESS: Okay. So you want me to
15  be clear between Benetech, the organization, and
16  Bookshare the project?
17          MR. KAPLAN: Yeah. The actor is --
18  BY MR. HUDIS:
19      Q.   Who is the actor in this context when
20  you say "we"?
21      A.   Well, Benetech employees. Benetech
22  operates the project. I've not -- I've not --
23  I've not been distinguishing between Bookshare and
24  Benetech. I've just been treating them sort of
25  the same, even though --

139

1       Q.   So the actors in this context, to make
2   Counsel's question very clear, these are Benetech
3   employees acting under the auspices of the
4   Bookshare project?
5       A.   Correct.
6       Q.   All right. Once Bookshare makes textual
7   reading material available to its members in
8   digital format, how do its members access the
9   material?
10          MR. KAPLAN: Objection. Calls for
11  speculation. Lacks foundation. Vague.
12  Incomplete hypothetical.
13          THE WITNESS: Generally, they would use
14  some form of assistive technology to access that
15  material.
16  BY MR. HUDIS:
17      Q.   So let's take that assistive technology
18  one at a time.
19          Could the person access the material
20  directly on Bookshare's web site?
21          MR. KAPLAN: Objection. Incomplete
22  hypothetical. Lacks foundation. Vague.
23          THE WITNESS: Yes. Using the web
24  reader, a person could access the content either
25  using separate assistive technology running on top

140

1   of their web browser or intrinsic technology built
2   into the combination of our web site and the web
3   browser.
4   BY MR. HUDIS:
5       Q.   Could the user download the file?
6           MR. KAPLAN: Objection. Vague.
7   Incomplete hypothetical. Lacks foundation.
8           THE WITNESS: Yes, the user can download
9   the file.
10  BY MR. HUDIS:
11      Q.   Could the user access the content using
12  a Braille reader?
13          MR. KAPLAN: Objection. Incomplete
14  hypothetical. Vague. Lacks foundation.
15          THE WITNESS: A blind person could
16  transfer the file into a Braille note taker or, in
17  some cases, download the file directly from their
18  Braille note taker into its memory and read it in
19  Braille.
20  BY MR. HUDIS:
21      Q.   Could the user access the content
22  through an MP3 player?
23          MR. KAPLAN: Objection. Incomplete
24  hypothetical. Vague. Lacks foundation.
25          THE WITNESS: Yes. If they downloaded

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

141

1    the work in an MP3 format from the Bookshare web
2    site, they could then transfer that into an MP3
3    player and listen to it.
4    BY MR. HUDIS:
5        Q.   Could the user access the content
6    through a smartphone?
7            MR. KAPLAN: Objection.  Incomplete
8    hypothetical.  Vague.  Lacks foundation.
9            THE WITNESS: Yes.  There's quite a
10   number of ways that a user can use a smartphone to
11   access the content.
12   BY MR. HUDIS:
13       Q.   Using assisted -- assistive technology?
14       A.   Yes.
15           MR. KAPLAN: Objection.  Vague.
16   BY MR. HUDIS:
17       Q.   All right.  Could -- could the user
18   access the content through a digital tablet?
19           MR. KAPLAN: Objection.  Incomplete
20   hypothetical.  Vague.  Lacks foundation.
21           THE WITNESS: In similar ways to
22   smartphone, yes.
23   BY MR. HUDIS:
24       Q.   And could the user access that content
25   through a talking book?

142

1            MR. KAPLAN: Objection.  Incomplete
2    hypothetical.  Vague.  Lacks foundation.
3            THE WITNESS: Much of what we've been
4    described would be commonly described as a talking
5    book, so I'm not sure what a separate talking book
6    might be.
7    BY MR. HUDIS:
8        Q.   It's usually a combination of hardware
9    and software that is not a digital tablet, not a
10   smartphone, not an MP3 player.
11           You used -- one example was a Braille
12   reader or a Braille note taker.  So I'm talking
13   about a talking book being a technology other than
14   the other -- others that I've listed in this
15   series of questions.
16       A.   Okay.
17           MR. KAPLAN: Objection.  Vague.
18   Incomplete hypothetical.  Lacks foundation.
19           THE WITNESS: There are dedicated
20   eBook readers that have their own text-to-speech
21   that would be able to make a -- one of our works
22   talk, in addition to the other ways we've
23   discussed.
24           MR. HUDIS: Counsel, I think we should
25   take a break here.

143

1            MR. KAPLAN: I -- I consent.
2            THE WITNESS: All right.
3            THE VIDEOGRAPHER: Going off the record
4    at 12:34.
5            (Whereupon, a lunch recess was taken.)
6            (Whereupon, Deposition Exhibit 55 was
7    marked for identification.)
8                AFTERNOON SESSION
9            THE VIDEOGRAPHER: Back on the record at
10   1:08.
11   BY MR. HUDIS:
12       Q.   Mr. Fruchterman, I have marked a
13   document as Exhibit 55.  Please take a moment to
14   just review the pages.
15       A.   Looks like a lot of screen shots from
16   our web site.
17       Q.   Okay.  And when you say "our web site,"
18   that's Bookshare's web site?
19       A.   The Bookshare project web site.
20       Q.   And do you have any reason to doubt the
21   authenticity of those pages on Exhibit 55?
22           MR. KAPLAN: Objection.  Calls for a
23   legal conclusion.
24           THE WITNESS: Not on a quick inspection.
25           MR. HUDIS: Okay.  Counsel can we

144

1    stipulate that Exhibit 55 comprises a business
2    record of Beneficent Technology, Inc.?
3            MR. KAPLAN: Let me get back to you on
4    that.
5            MR. HUDIS: Okay.
6            THE VIDEOGRAPHER: Mr. Kaplan, your mike
7    is not --
8            MR. KAPLAN: Oh, apologies.
9            Let me get back to you about that.
10           MR. HUDIS: Okay.  I'll tell you what,
11   I'll ask Mr. Fruchterman questions about the
12   exhibit, and then when I'm done with the exhibit,
13   then I can address it then.  If you can't, I'll
14   ask him the foundation questions.
15       Q.   Okay.  So, Mr. Fruchterman --
16       A.   Yes.
17       Q.   -- so I've numbered the pages so that we
18   can get a clear transcript.  You'll see them in
19   the lower right-hand corner.
20       A.   Okay.
21       Q.   All right.  So the page 1 of Exhibit 55,
22   that's the help page of the Bookshare web site?
23       A.   Looks like it.
24       Q.   Okay.  Let's turn to page 2 of
25   Exhibit 55.  I want to read for you -- read to you

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

145

1     a few passages.
2               "Bookshare is the world's
3          largest accessible online library
4          for people with print
5          disabilities."
6          You would agree with that?
7     A.   Yes.
8     Q.   And then in the next paragraph it says:
9               "Bookshare is a global
10         literacy initiative of Benetech, a
11         leading Silicon Valley based
12         nonprofit technology company
13         founded by Jim Fruchterman."
14         You would agree with that?
15    A.   Yes.
16    Q.   And then dropping down two paragraphs,
17    it says:
18              "Bookshare operates in the
19         U.S. under a copyright exemption,
20         the Chafee Amendment, which grants
21         nonprofit organizations the
22         ability to make books available to
23         people with print disabilities
24         without publisher permission."
25         You'd agree with that?

146

1     A.   I agree that that's a layman's
2     description of what we do, yes.
3     Q.   Let's turn to page 3 of Exhibit 55.
4          In the third paragraph it says:
5               "Our books are accessible" --
6          There's that word "accessible" again.
7     A.   Mh-hmm.
8     Q.    -- "which means you can read
9          our books many different ways."
10         Now, next to the picture of the children
11    in the classroom, it says:
12              "How can you read Bookshare
13         books?"
14         Do you see that?
15    A.   Mh-hmm.
16    Q.   Is that the ways that the books on
17    Bookshare's web site are accessible?
18         MR. KAPLAN:  Objection.  Vague.
19         THE WITNESS:  That are -- that are some
20    of the ways, yes.
21    BY MR. HUDIS:
22    Q.   Now, at the bottom of that list it says,
23    "And more."
24         What does "and more" mean in this
25    context?

147

1          MR. KAPLAN:  Objection.  Lacks
2     foundation.
3          THE WITNESS:  Okay.  I will pause and
4     try to divine what that might be, so ...
5          There are at least 40 assistive
6     technology products that support access to
7     Bookshare as well as other production means that
8     you could imagine.  So I'm sure that there are
9     other accessible media that are created that don't
10    precisely align with the list here.  For example,
11    tactile graphics is not mentioned here, and yet we
12    work on tactile graphics.
13    BY MR. HUDIS:
14    Q.   Like Braille?
15    A.   Tactile graphics are not Braille.  But
16    let's say the Pythagorean theorem, you would be
17    able to feel a triangle.  It wouldn't be Braille,
18    but would be tactile.
19         You might produce a book that has print
20    and Braille on it.  But I would say that, you
21    know, these descriptions describe the majority of
22    ways that people interact with Bookshare books.
23    Q.   Who are print-disabled?
24    A.   Correct.
25    Q.   Let's turn to page 4 of Exhibit 55.

148

1          Under the title "Sign-up and Read," it
2     says:
3               "Get started with Bookshare.
4          In this section you will sign up
5          and learn how to read your first
6          book."
7     A.   Mh-hmm.
8     Q.   So my question is from this passage,
9     does a Bookshare user have to sign up as a member
10    before accessing the materials made available on
11    the Bookshare site?
12    A.   No.
13    Q.   In what instance would a user not sign
14    up as a member before accessing the materials on
15    Bookshare's site?
16    A.   If they wanted to access public domain
17    or creative commons licensed works, there is no
18    requirement that they sign up.
19    Q.   So the only sign-up is if it's
20    copyrighted material?
21    A.   That would be the primary reason you
22    would sign up, would be to access copyrighted
23    material.
24    Q.   Let's turn to page 5 of Exhibit 55.  It
25    says:

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

38 (Pages 149 to 152)

149

1       "Learn who can join.  In
2   order for you to become a
3   Bookshare member, an expert must
4   confirm that you have a print
5   disability that prevents you from
6   reading traditional print
7   materials."
8       I'm skipping the rest of that paragraph
9   and going to the second paragraph.
10      "People with hearing loss,
11  autism, attention deficit
12  hyperactivity disorder (ADHD) or
13  emotion or intellectual
14  disabilities or whose first
15  language is not English generally
16  do not qualify based upon those
17  criteria unless they have a
18  qualifying vision, physical or
19  learning disability."
20      MR. KAPLAN:  You missed an "also."
21      MR. HUDIS:  Thank you.
22      "Unless they also have a
23  qualifying, vision or learning
24  disability."
25      Q.   Are these qualifications for one to

150

1   become a Bookshare member?
2       MR. KAPLAN:  Objection.  Vague.
3   BY MR. HUDIS:
4       Q.   All right.  I'll ask it a different way.
5       To be a Bookshare member, do you have to
6   have a qualifying vision, physical or learning
7   disability?
8       A.   Yes.
9       Q.   Let's turn to page 6 of Exhibit 55.  And
10  there are some definitions and examples of people
11  who are low-vision blindness, physical
12  disabilities and learning disabilities.  So it
13  says here at the top:
14      "A person who is blind or who
15      has low vision and who is unable
16      to read standard print qualifies
17      for Bookshare."
18      You agree with that?
19      A.   Yes.
20      Q.   Next:
21      "A person with a physical
22      disability who is unable to read
23      standard print qualifies for
24      Bookshare."
25      Do you agree with that?

151

1       MR. KAPLAN:  Counsel, is there a reason
2   you're omitting the full text of that sentence?
3       MR. HUDIS:  Yeah.  Because I don't want
4   to clutter -- I can read the whole text.
5       THE WITNESS:  Yeah.  Subject to the
6   qualification in that sentence, yes.
7   BY MR. HUDIS:
8       Q.   Okay.  All right.  So I'll read the
9   whole thing.
10      "A person with a physical
11      disability who is unable to read
12      standard print qualifies for
13      Bookshare as long as a competent
14      authority confirms that the
15      physical disability significantly
16      interferes with reading."
17      Do you agree with that?
18      A.   Yes.
19      Q.   All right.  Next on that page:
20      "A person with a learning
21      disability qualifies for Bookshare
22      as long as a competent authority
23      confirms that the learning
24      disability significantly
25      interferes with reading."

152

1       Do you agree with that?
2       A.   Yes.
3       Q.   All right.  Does each one of these print
4   disabilities have to be confirmed by a competent
5   authority?
6       MR. KAPLAN:  Objection.  Vague.
7   Incomplete hypothetical.
8       THE WITNESS:  Not in general.  But for
9   Bookshare membership, yes.
10  BY MR. HUDIS:
11      Q.   Does this page, page 6 of Exhibit 55,
12  identify the types of competent authorities who
13  may confirm the vision and disabilities of
14  potential Bookshare members?
15      MR. KAPLAN:  Objection.  Vague.
16  Misstates the document.
17      THE WITNESS:  This is not a
18  comprehensive list.  It's a representative list of
19  examples of people who are competent authorities.
20  I can imagine that there are other professional
21  credentials that would also be recognized by us as
22  a competent authority.
23  BY MR. HUDIS:
24      Q.   So this is a representative list of
25  competent authorities?

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

153

1    **A.   Yeah.  That's why it says "examples of."**
2    Q.   Let's turn to page 7 of Exhibit 55.
3         "If you are legally blind,
4    you qualify.  In addition, if you
5    don't meet the legal blindness
6    standard, a functional vision
7    assessment that indicates a
8    significant problem accessing text
9    is also acceptable."
10        Does this statement accurately summarize
11   who may become a Bookshare member?
12   **A.   Not --**
13        MR. KAPLAN:  Objection.  Vague.
14        THE WITNESS:  Not generally.  But in the
15   area of a person who has a vision impairment who
16   wants to become a Bookshare member, they would
17   either have to be completely blind, legally blind
18   or have a functional vision problem.  But other
19   people could qualify that don't have any of those
20   issues.
21   BY MR. HUDIS:
22   Q.   And let's explore who those people are.
23        Turn to page 8 of Exhibit 55.
24        "If you cannot pick up a
25   book, turn pages, maintain visual

154

1    focus on a book or do not have the
2    physical stamina to work with
3    printed material, you most likely
4    qualify for Bookshare membership."
5         Does this statement also accurately
6    summarize who may become a Bookshare member?
7         MR. KAPLAN:  Objection.  Vague.
8         THE WITNESS:  Yes, as phrased here.
9    BY MR. HUDIS:
10   Q.   Let's turn to page 9 of Exhibit 55.
11   **A.   Mh-hmm.  Under "So who doesn't qualify,"**
12   **it says:**
13        **"The 98 percent of the**
14   **population who can pick up a book**
15   **and read it or could if they**
16   **learned to read."**
17   Q.   I'm focusing on just this statement.
18   Does this page accurately summarize who can be --
19   who cannot become a Bookshare member?
20        MR. KAPLAN:  Objection.  Vague.
21        You're asking about the entire page?
22        THE WITNESS:  Or just that one sentence?
23   BY MR. HUDIS:
24   Q.   Just that one sentence.
25   **A.   That one sentence is an informal way of**

155

1    **stating this.  The number could be 97 percent.**
2    **And -- but, yeah, it's designed to get -- to have**
3    **most people realize that you actually have to have**
4    **a real disability that affects reading before you**
5    **can qualify for Bookshare to access copyrighted**
6    **material.**
7    Q.   Let's turn to page 10 of Exhibit 55.
8    I'm focusing on the second sentence of that
9    paragraph.
10        "If you are certifying
11   someone who has a physically based
12   disability (including dyslexia)
13   that makes it difficult to read
14   standard print effectively, he or
15   she should meet the technical
16   requirements and you should be
17   able to confirm this in writing if
18   your professional expertise is
19   applicable to such a
20   determination."
21        What's the intent of that sentence,
22   Mr. Fruchterman?
23        MR. KAPLAN:  Objection.  Lacks
24   foundation.  Vague.
25        THE WITNESS:  So we're in a section

156

1    that's essentially frequently asked questions, and
2    we're trying to provide answers.  And we're trying
3    to describe that if you're a professional with
4    some professional competence that allows you to
5    make this assessment, if someone has a disability
6    that gets in the way of them reading, you should
7    be able to sign the form saying that they have a
8    qualifying disability.
9    BY MR. HUDIS:
10   Q.   Let's turn to page 11 of Exhibit 55.  At
11   the top of the page, it says:
12        "Bookshare is a nonprofit
13   entity established with a
14   principal purpose of helping
15   people with disabilities.  It
16   would very much like to see more
17   people with disabilities,
18   including more students, benefit
19   from our services.  However, we
20   are bound first by copyright law
21   and, when it comes to serving
22   students, special education law."
23        What does this mean?
24        MR. KAPLAN:  Objection.  Vague.  Lacks
25   foundation.

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

157

1    BY MR. HUDIS:
2        Q.   I'll ask it a different way.
3            What was the intent of this text that I
4    just read?
5            MR. KAPLAN:  Objection.  Vague.  Lacks
6    foundation.
7            THE WITNESS:  This is in a frequently
8    asked questions area, and the question being asked
9    is:
10            "Why doesn't Bookshare follow
11        special education law in
12        determining eligibility for
13        services?"
14            The reason we get that question is some
15    people say, My student's in special ed.  Why don't
16    they get Bookshare?
17            And the answer is some students who are
18    in special ed don't meet the requirement of the
19    copyright exception.
20    BY MR. HUDIS:
21        Q.   That's the Chafee Amendment.
22        A.   That's the Chafee Amendment.
23            And some of those students might
24    actually benefit from our services, but we -- when
25    we're dealing with special ed students, we're --

158

1    we're bound by actually multiple legal regimes,
2    and we have to operate at the intersection of
3    those.
4        Q.   Which brings me to the next passage on
5    this page that I'd like to read to you, in the
6    second paragraph.
7            "The standards set in the
8        U.S. copyright laws which permit
9        copying and distribution of these
10        copyrighted materials apply only
11        to certain specified groups of
12        people.  Bookshare qualifies under
13        the Chafee Amendment, 17 United
14        States Code Section 121, to
15        provide such services which
16        would" -- "which would otherwise
17        be copyright infringement.  Thus,
18        Bookshare does not set the rules
19        for qualification.  It is very
20        important that Bookshare respect
21        these rules to ensure we can
22        continue to serve people with the
23        most significant disabilities when
24        it comes to reading print.  The
25        copyright law exemption."

159

1            Do you agree with this?
2        A.   Well, it looks like that extra clause,
3    "the copyright law exemption," is a typo that
4    needs to be deleted since it doesn't seem to be
5    part of the sentence.
6            But excluding that clause --
7        Q.   Right.
8        A.   -- I would say that I agree with this.
9        Q.   So I'd like to skip down two paragraphs,
10    to the next passage I'd like to read to you.
11            "This copyright law exemption
12        is a social bargain which tries to
13        balance the needs of people who
14        are unable to read normal print
15        with the economic rights of
16        publishers and authors.  It is not
17        simply based on who might benefit
18        from access to accessible
19        materials.  It restricts the
20        exemption to a group of people who
21        are assumed to not be able to
22        access regular print materials
23        because of a severe disability.
24        Publishers and authors do not
25        receive a royalty under this

160

1        copyright exemption, so they have
2        an economic interest in ensuring
3        it stays narrowly focused on the
4        2 percent of the population who
5        cannot read standard print."
6            Do you agree with this passage?
7            MR. KAPLAN:  Objection.  Vague.
8            THE WITNESS:  As an informal expression
9    of how we operate, yes.
10            MR. KAPLAN:  They didn't make this
11    exhibit very print accessible.
12            THE WITNESS:  I'm -- I'm trying to
13    magnify it now.
14    BY MR. HUDIS:
15        Q.   Let's turn to page 12 of Exhibit 55.
16        A.   Okay.
17        Q.   Before, Mr. Fruchterman, we were talking
18    about membership costs -- do you remember that? --
19        A.   Yes.
20        Q.   -- to join Bookshare.
21            So it says here:
22            "U.S. students free and other
23        individuals $50 annual and a $25
24        setup."
25            Is that still the normal individual cost

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

161

1    to become a member of Bookshare?
2        **A.    If you're in wealthy countries and don't**
3    **have a third party paying for your service, or**
4    **we've comp'ed you for some reason on a very**
5    **limited basis, I think that's accurate.**
6        Q.   Okay.
7        MR. KAPLAN:  Counsel, actually, I have a
8    question that goes to the stipulation.
9        When was this document created?  When
10   did your office create this based on -- when did
11   you visit the Benetech web site to create this
12   document?
13       MR. HUDIS:  We're in August?  September?
14       MR. KAPLAN:  September.
15       MR. HUDIS:  August.
16       MR. KAPLAN:  Okay.  And is this a screen
17   shot or a PDF?  How was it created?
18       MR. HUDIS:  What's the program we use?
19       MS. CAPPAERT:  We use?
20       MR. HUDIS:  Yeah.
21       MS. CAPPAERT:  Snagit.
22       MR. HUDIS:  Snagit.  These are Snagit
23   shots.  Thank you.
24       MR. KAPLAN:  Okay.
25       MR. HUDIS:  So that was the software we

162

1    used to do these captures.
2        Q.    Now, if an organization were to join
3    Bookshare, your schools could be joining for free,
4    and then other organizations -- how is this charge
5    rendered on 6 to $10 per book?
6        MR. KAPLAN:  Objection.  Vague.
7        THE WITNESS:  So organizations can buy,
8    essentially, a package of downloads.  And I think
9    that if you pay $300, you can download 30 titles,
10   30 books.  So that would be a fee associated with
11   getting a group of books.  So instead of buying a
12   subscription for each student, you can just get a
13   package of books.
14   BY MR. HUDIS:
15       Q.    And this -- and on page 12, it's
16   describing that package.
17       **A.   It has a link --**
18       MR. KAPLAN:  Objection.  Vague.
19       THE WITNESS:  Yeah.  It has a link to
20   where those things are described, but it doesn't
21   actually describe those packages on this page.
22   BY MR. HUDIS:
23       Q.    Let's turn to page 13 of Exhibit 55.  It
24   says:
25           "Welcome to Bookshare.  You

163

1        must log in to use this page or
2        sign up for a Bookshare account."
3        My question, Mr. Fruchterman, is there a
4    log-in requirement to access Bookshare as a
5    member?
6        MR. KAPLAN:  Objection.  Vague.
7        THE WITNESS:  If a person wishes to
8    download copyrighted materials, they need to have
9    a Bookshare account and have supplied proof of
10   disability and have paid the fee if applicable.
11   BY MR. HUDIS:
12       Q.    And once you've done all of that, do you
13   get a user name and password?
14       **A.   Yes.  You tend to use your e-mail plus a**
15   **password, yes.**
16       Q.    Could we turn to page 15, of Exhibit 55.
17       **A.   Okay.**
18       Q.    So the first paragraph:
19           "Bookshare is a Benetech
20       initiative.  Benetech operates
21       Bookshare under an exception to
22       copyright law called the Chafee
23       Amendment, 17 United States Code
24       Section 121, which makes Bookshare
25       legally possible in the U.S.  The

164

1        Chafee Amendment allows us to
2        provide copyrighted digital books
3        as long as they are available only
4        to people with bona fide print
5        disabilities.  The Bookshare site
6        does not provide access to
7        copyrighted works for the general
8        public."
9        Do you agree with this statement?
10       MR. KAPLAN:  Objection.  Vague.
11       THE WITNESS:  Yes.
12   BY MR. HUDIS:
13       Q.    All right.  The next paragraph says --
14   and I'm not reading the whole thing.
15           "Although the requirements of
16       the copyright law exception are
17       clear, Benetech has gone beyond
18       these requirements to ensure broad
19       support for the project.  We have
20       been working for more than a
21       decade with the Association of
22       American Publishers, the main
23       American industry group, to
24       address publishers' concerns about
25       the design of the service."

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

165

1      In what ways, Mr. Fruchterman, did you
2  work with the Association of American Publishers
3  to address their concerns about the design of
4  Bookshare?
5      MR. KAPLAN:  Objection.  Vague.
6  Argumentative.  Lacks foundation.
7      THE WITNESS:  This is another
8  confidential segment.
9      We had the meeting that we discussed in
10  prior testimony with the AAP roughly a year before
11  the launch of Bookshare.  As part of that meeting,
12  we made various agreements around engaging the
13  publishing industry.  Agreements that still hold
14  today include not surprising their general
15  counsel.
16      So any significant policy changes or
17  changes to our legal agreements, we give the
18  counsel for the association an early copy of those
19  and allow them to comment.
20      I think -- I think, in general, checking
21  in with them before we make major changes to the
22  service is the number one way.  But over the
23  years, we've made quite a number of changes or
24  accommodations based on those conversations.
25

166

1  BY MR. HUDIS:
2      Q.    And that would include what we talked
3  about earlier; that's the storage of the content
4  on your service -- on your servers or, more
5  recently, the Amazon cloud --
6      MR. KAPLAN:  Objection.
7  BY MR. HUDIS:
8      Q.   -- in a secure manner?
9      MR. KAPLAN:  Objection.  Misstates
10  testimony.  Vague.
11      THE WITNESS:  I would differentiate
12  between things that are just the way we operate
13  the service and representations or changes we've
14  made in conversations with the publishers.
15      There are many, many things where we
16  simply say, We're doing it this way, and -- they
17  don't -- the association doesn't have any ability
18  to approve of our activities.  It's not their
19  place, as it were.
20  BY MR. HUDIS:
21      Q.   Right.
22      A.   They're simply a way to effectively
23  converse with the industry association and with
24  the industry.  And if they see an issue that they
25  think their members want to hear about, they'll go

167

1  back to their members and talk to them.  So it's
2  an efficiency mechanism.
3      But there is a difference between things
4  we just do and things we've explicitly conversed
5  with them and maybe made changes as a result of
6  that conversation.
7      Q.   So what I'm concerned about is how you
8  worked with the American -- with the Association
9  of American Publishers to make them comfortable
10  that the Bookshare site would not be subject to
11  abuse.
12      MR. KAPLAN:  Objection.  Was there a
13  question?
14      MR. HUDIS:  Yes.  I'll phrase it a
15  different way.
16      Q.   In what ways did you work with the
17  Association of American Publishers to ensure
18  that -- to make them comfortable that the
19  Bookshare site would not be the subject of abuse?
20  That people in the sighted community would not be
21  able to download their content without permission,
22  without compensation?
23      MR. KAPLAN:  Objection.  Argumentative.
24  Vague.
25      THE WITNESS:  Okay.  So we're now in a

168

1  much narrower area, and I'd say the
2  representations in our seven-point digital rights
3  management plan were the primary mechanism that we
4  dealt with that particular concern of the
5  publishing industry.
6  BY MR. HUDIS:
7      Q.   Okay.  The last sentence on that page,
8  page 15 of Exhibit 55, it says:
9          "With the extensive input
10      from consumers, authors,
11      publishers and leading
12      organizations, we have created a
13      model for Bookshare that can be
14      supported by a broad array of
15      interests."
16      What model is this passage talking
17  about?
18      MR. KAPLAN:  Objection.  Lacks
19  foundation.
20      THE WITNESS:  The Bookshare operational
21  model.
22  BY MR. HUDIS:
23      Q.   How would you describe the Bookshare
24  operational model?
25      A.   A package of technologies and policies

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

169

1    and legal agreements and product features and -- I
2    mean, you know, it's a -- these things combined
3    create a service that delivers a value to people
4    with disabilities in a way that gets support from
5    these different stakeholders.
6        Q.   Including the publishing industry?
7        A.   Yes.
8        Q.   Could we turn to page 16 of Exhibit 55.
9            Under copyright information, it says:
10            "Bookshare is an online
11       library that provides accessible
12       eBooks to people with print
13       disabilities.  Bookshare meets the
14       requirements of the Chafee
15       Amendment which permits an
16       authorized entity like Benetech to
17       make books available to people
18       with print disabilities provided
19       that copies may not be reproduced
20       or distributed in a format other
21       than a specialized format
22       exclusively for use by blind or
23       other persons with disabilities.
24       Must bear a notice that any
25       further reproduction or

170

1        distribution in a format other
2        than a specialized format is an
3        infringement.  Must include a
4        copyright notice identifying the
5        copyright owner and the date of
6        the original publication.
7        'Specialized formats' means
8        Braille, audio or digital text
9        which is exclusively intended for
10       use by blind or other persons with
11       disabilities."
12           All right.  So I've read this passage,
13   Mr. Fruchterman.
14       A.   Right.
15       Q.   Does this accurately describe the
16   overall way that Benetech makes reading materials
17   available to its members?
18           MR. KAPLAN:  Objection.  Vague.
19   Misleading.
20           THE WITNESS:  I think that these bullet
21   points that you just read recapitulate the
22   provisions of the Chafee Amendment, which is the
23   primary copyright exception that we use for making
24   copyright material to people with qualifying
25   disabilities inside the United States.

171

1    BY MR. HUDIS:
2        Q.   If we could go to page 17 of Exhibit 55.
3            What is the purpose of this page on
4    Bookshare's web site?
5            MR. KAPLAN:  Objection.  Vague.  Lacks
6    foundation.
7            THE WITNESS:  This is part of our,
8    essentially, frequently asked questions, and it's
9    entitled "Digital Millennium Copyright Act."
10           And so as a -- and I'm not a lawyer, but
11   my understanding is someone who provides access
12   to copyrighted material online, we are required to
13   have a DMCA agent to accept notices that there is
14   content on our web site that infringes the
15   copyright of others.
16           We frequently get DMCA notices from
17   authors or their agents or publishers saying, We
18   searched the web.  This copyright work is on your
19   web site.  Take it down.
20           And this is both explaining the DMCA
21   notice process at some level, as well as the, more
22   or less, if you don't know what the Chafee
23   Amendment is, you should look it up because we're
24   allowed to have it.
25           But I'm summarizing this in very direct

172

1    terms, because it's very rare for someone to issue
2    us a DMCA notice that results in us actually
3    taking down the work because it's usually legally
4    permitted under the copyright amendment.
5    BY MR. HUDIS:
6        Q.   The Chafee Amendment to the copyright?
7        A.   The Chafee Amendment.  Or often a
8    license from the author's publisher who gave us
9    the content, but the author and their agent
10   weren't aware this was one of the nice things that
11   their publisher did for their entire catalog of
12   books, not just that author.
13       Q.   Mr. Fruchterman, could we turn to page
14   18 of Exhibit 55.
15           Is this text on page 18 Bookshare's
16   digital rights plan -- digital rights management
17   plan?
18       A.   This is the current or, let's just say,
19   last month's current -- but I don't believe it's
20   changed since last month -- version of our
21   seven-point digital rights management plan that we
22   have discussed earlier.
23       Q.   And what was the purpose of Bookshare
24   implementing this DRM plan?
25           MR. KAPLAN:  Objection.  Vague.  Lacks

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

173

1    foundation.
2         THE WITNESS:  I would say that the
3    purpose of this was to represent to the
4    intellectual property industry, especially
5    publishers, that we were intending to follow the
6    law when it came to use of these materials.  So it
7    was created for that original conversation we had
8    with the publishing industry quite a number of
9    years ago.
10   BY MR. HUDIS:
11       Q.   And when you say "these materials,"
12   that's the copyrighted materials on the Bookshare
13   web site?
14        MR. KAPLAN:  Objection.  Misstates
15   testimony.
16        THE WITNESS:  Yes.
17   BY MR. HUDIS:
18       Q.   Could we turn to page 19.
19       A.   Mh-hmm.
20       Q.   What's the purpose of this sign-up page?
21   That's page 19 of Exhibit 55.
22        MR. KAPLAN:  Objection.  Vague.  Lacks
23   foundation.
24        THE WITNESS:  This is a screen shot that
25   appears to be of the individual sign-up for

174

1    Bookshare that is collecting data about a
2    potential user in order to start the process of
3    becoming a Bookshare member.
4    BY MR. HUDIS:
5        Q.   And at the bottom it says -- it has a
6    check box, and then you would sign your name or
7    its equivalent.
8         Do you see at the bottom?
9        A.   Yes.
10       Q.   And by doing so you're agreeing to the
11   terms and conditions of the Bookshare web site.
12        Do you see that?
13        MR. KAPLAN:  Objection.  Is the -- the
14   question is whether or not he sees that check box?
15        MR. HUDIS:  Counsel, good.
16       Q.   Is the purpose of this check box to have
17   the user acknowledge that he or she is agreeing to
18   the terms and conditions of the Bookshare web
19   site?
20        MR. KAPLAN:  Objection.  Vague.  Lacks
21   foundation.
22        MR. HUDIS:  Thank you, Counsel.
23        THE WITNESS:  Yes.  I believe that that
24   check box and the filling in of your name
25   indicates that you're agreeing to the terms and

175

1    conditions of our -- of our -- of our agreement,
2    of our Bookshare individual membership agreement.
3    BY MR. HUDIS:
4        Q.   And if you could turn to page 20 of
5    Exhibit 55.  Are those the terms and conditions of
6    the -- of the Bookshare web site?
7        A.   It appears to be our standard Bookshare
8    membership agreement of a recent date.
9         MR. HUDIS:  Counsel, same request.  Can
10   we stipulate this is a business record of
11   Benetech?
12        MR. KAPLAN:  Subject to your
13   representation that this is -- each page
14   represents a complete Snagit screen shot of a
15   particular web site or web page of the Benetech
16   web site, I believe so.
17        But can we go off the record for just a
18   second?
19        MR. HUDIS:  Yes.  I consent.  We can go
20   off the record.
21        THE VIDEOGRAPHER:  Okay.  Going off the
22   record at 1:43.
23        (Discussion held off record.)
24        THE VIDEOGRAPHER:  Back on the record at
25   1:43.

176

1         MR. KAPLAN:  So subject to Counsel's
2    representation regarding the contents of this
3    exhibit, we stipulate to its authenticity as
4    select web pages from the Benetech web site.
5         MR. HUDIS:  All right.  Now, that's the
6    authenticity.  What about business record?  That
7    was what I was concerned about.  You stipulated to
8    the authenticity.  We do have -- I do --
9         MR. KAPLAN:  You want a stipulation that
10   the statements in here are not hearsay for the
11   purpose of --
12        MR. HUDIS:  For what they contain.
13        MR. KAPLAN:  I don't believe we can
14   stipulate that -- to that because, as far as I
15   know, we don't represent Benetech.
16   BY MR. HUDIS:
17       Q.   All right.  So if you could -- if,
18   Mr. Fruchterman, you could put Exhibit 55 back in
19   front of you.
20        A.   Yes.
21       Q.   All right.  So the pages on Exhibit 55,
22   I'm going to represent to you that they are Snagit
23   screen shots of the Bookshare web site.
24        So my question is are these pages items
25   of data compilations made by Benetech?

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

177

1      **A.   You used a term of --**
2      Q.   Term of art.
3      **A.   -- that I don't know.**
4      Q.   Okay.  This is -- all right.
5          Is this content on Exhibit 55 content
6   that was created by Benetech and its employees?
7          MR. KAPLAN:  Objection.  Vague.
8          THE WITNESS:  We also had the assistance
9   of counsel in creating some of this material,
10  and --
11  BY MR. HUDIS:
12     Q.   That person would count as an employee
13  of Benetech.
14        (Reporter interruption.)
15        THE WITNESS:  No.
16  BY MR. HUDIS:
17     Q.   No?  All right.
18     **A.   I mean, we use --**
19        MR. KAPLAN:  Maybe.
20        THE WITNESS:  -- pro bono counsel --
21        (Reporter interruption.)
22  BY MR. HUDIS:
23     Q.   One person.  Okay.
24     **A.   Please frame a --**
25     Q.   Better question?

178

1      **A.   Yes, please.**
2      Q.   Okay.  So with the assistance of
3   counsel, was the content of Exhibit 55 created by
4   employees of Benetech?
5          MR. KAPLAN:  Objection.  Lacks
6   foundation.  Vague.
7          THE WITNESS:  The content that we
8   reviewed in Exhibit 55 was created by employees,
9   contractors, pro bono counsel, paid counsel, of
10  Benetech.  I believe that's a comprehensive list
11  of the people who helped created this content.
12  BY MR. HUDIS:
13     Q.   Was the content created for the web
14  pages of Exhibit 55 made in the regular course of
15  Benetech's business?
16        MR. KAPLAN:  Objection.  Vague.  Calls
17  for a legal conclusion.  Lacks foundation.
18        THE WITNESS:  In the common
19  understanding of what that would mean, yes.
20  BY MR. HUDIS:
21     Q.   All right.  Was the content on
22  Exhibit 55 kept by Benetech in the regular course
23  of its business?
24        MR. KAPLAN:  Objection.  Vague.  Calls
25  for a legal conclusion.  Lacks foundation.

179

1          THE WITNESS:  We maintain the web site
2   that serves these pages up, yes.
3   BY MR. HUDIS:
4      Q.   And is it a regular practice of Benetech
5   to create web pages of the type shown in
6   Exhibit 55?
7          MR. KAPLAN:  Objection.  Vague.  Lacks
8   foundation.  Calls for a legal conclusion.
9          THE WITNESS:  As far as I know, yes.
10        Should I have my general counsel here
11  for this part?  Okay.  All right.
12        MR. HUDIS:  In my opinion, no.  How's
13  that?
14        MR. KAPLAN:  If you want to discuss it,
15  we should discuss it.
16        THE WITNESS:  Let's see where else we go
17  with this.
18        MR. HUDIS:  We're done with this
19  exhibit, so ...
20        THE WITNESS:  Great.
21        MR. HUDIS:  All right.
22        (Whereupon, Deposition Exhibit 56 was
23  marked for identification.)
24        THE WITNESS:  Okay.
25

180

1   BY MR. HUDIS:
2      Q.   Mr. Fruchterman, I show you what's been
3   marked as Exhibit 56.
4          Do you recognize the document?
5      **A.   Yes.  It's an article I coauthored a
6   dozen years ago.**
7      Q.   You coauthored that with Alison Lingane?
8      **A.   Correct.**
9      Q.   At the bottom of the first page of
10  Exhibit 56, it says:
11        "The essence of the social
12        bargain between publishers and the
13        disability community was to
14        provide easier access to people
15        with disabilities while protecting
16        the economic interests of
17        publishers.  Chafee" --
18        I gather that means Chafee Amendment?
19     **A.   Correct.**
20     Q.     "Chafee was drawn narrowly to
21        seal this bargain."
22        Do you still agree with this passage?
23     **A.   I do, though I was not present when the
24  Chafee Amendment was passed.**
25     Q.   If we could turn to page 2 of

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

181

1    Exhibit 56.  At the top it says:
2         "It is of course extremely
3         important that organizations
4         operating under Chafee do so with
5         the utmost integrity and with" --
6    "and within the strict letter of
7         the law to protect this important
8         amendment that has provided such a
9         big leap forward for access."
10        Do you still agree with this passage?
11        MR. KAPLAN:  Objection.  Vague.
12        THE WITNESS:  Yes.
13   BY MR. HUDIS:
14        Q.   I'd like you to drop down under the
15   title "How Has Chafee Affected Education," to the
16   second paragraph.  And then it -- and in the
17   second sentence of that paragraph it says:
18        "The Chafee definition of
19        entities authorized to make
20        accessible books is a nonprofit
21        organization or a governmental
22        agency that has a primary mission
23        to provide specialized services
24        relating to training, education or
25        adaptive reading or information,

182

1         access needs of blind or other
2         persons with disabilities."
3         Do you still agree with that?
4         MR. KAPLAN:  Objection.  Vague.
5         THE WITNESS:  Yes.  That's an informal
6    summary of the requirements of the Chafee
7    Amendment.
8    BY MR. HUDIS:
9         Q.   And Bookshare complies with this
10   definition of "authorized entity"?
11        MR. KAPLAN:  Objection.  Calls for a
12   legal conclusion.  Lacks foundation.  Vague.
13        THE WITNESS:  Yes.
14   BY MR. HUDIS:
15        Q.   Do you know whether the defendant in
16   this case, Public.Resource, qualifies under this
17   definition?
18        A.   I am --
19        MR. KAPLAN:  Objection.  Calls for a
20   legal conclusion.  Vague.
21        THE WITNESS:  I am not an attorney, and
22   I have not investigated that either.
23   BY MR. HUDIS:
24        Q.   Mr. Fruchterman, could we turn to page 3
25   of Exhibit 56.

183

1         A.   Yes.
2         Q.   I draw your attention to the second full
3    paragraph.  It says, "Even with Chafee."
4         Are you following me?
5         A.   No.
6         Q.   Okay.
7         A.   So what page are we on again?
8         Q.   Three.
9         A.   Okay.  All right.  All right.
10        MR. HUDIS:  Thank you.  Thank you,
11   Counsel.  Appreciate it.
12        Q.   It says, in the second sentence of that
13   paragraph:
14        "Working with publishers
15        directly (individually or legally
16        mandated as with the IMAA) to
17        create a secure distribution
18        system to qualifying individuals
19        from original digital files would
20        save work for everybody, while at
21        the same time make access by
22        people with disabilities faster,
23        higher quality, and more
24        comprehensive."
25        First of all, do you still agree with

184

1    this?
2         MR. KAPLAN:  Objection.  Vague.
3         THE WITNESS:  This is a very dated
4    document.
5    BY MR. HUDIS:
6         Q.   Okay.
7         A.   And I would say that this was making the
8    case for Bookshare roughly in its first year of
9    existence, and I would say that we have
10   accomplished many of the things we set out to
11   accomplish as expressed in this paragraph with the
12   Bookshare solution that exists today.
13        Q.   Did you investigate whether
14   Public.Resource has done this?
15        MR. KAPLAN:  Objection.  Vague.
16        THE WITNESS:  My scope of my expert
17   engagement was to evaluate the accessibility of
18   several documents.  I didn't do any legal research
19   on Public.Resource.Org and whether or not it
20   qualified.
21        MR. KAPLAN:  I think you can say that
22   out loud.
23        MR. HUDIS:  Okay.  Counsel, I'd like to
24   go off the record.
25        MR. KAPLAN:  No problem.

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

185

1     THE VIDEOGRAPHER:  This is the end of
2  Tape Number 2 in the deposition of
3  James Fruchterman.  The time is 1:53.  Going off
4  the record.
5     (Whereupon, a recess was taken.)
6     (Whereupon, Deposition Exhibit 57 was
7  marked for identification.)
8     THE VIDEOGRAPHER:  Here begins Tape
9  No. 3 in the deposition of James Fruchterman.
10 Back on the record at 2:01.
11 BY MR. HUDIS:
12    Q.   Mr. Fruchterman, I've marked as
13 Exhibit 57 and ask if you recognize the document.
14    A.   Yes.  It's an article I wrote seven or
15 eight years ago.
16    Q.   What is the article of Exhibit 57 about?
17    MR. KAPLAN:  Objection.  Vague.
18    THE WITNESS:  It's a case study on the
19 creation of my nonprofit organization, Benetech.
20 BY MR. HUDIS:
21    Q.   So you describe in the first paragraph
22 your organization Benetech.  And, again, it's
23 dated 2007, 2008.
24    "We build innovation
25       technology solutions and widely

186

1       promote entrepreneurial models for
2       developing projects in the
3       nonprofit community.  Benetech was
4       founded as a nonprofit social
5       enterprise in 1989 to pursue the
6       making of affordable reading
7       machines for the blind."
8    And it continues.  It says:
9       "Because the market wasn't"
10      -- "wasn't interesting to my
11      original venture capital-backed
12      company."
13   Now, you were referring to Arkenstone?
14    A.   No.  Calera.
15    Q.   Calera.  All right.
16      And is that an accurate description of
17 why you founded Benetech?
18    A.   Yes.
19    Q.   And then it says:
20      "We've since branched out
21      into three major fields in the
22      social sector:  Helping provide
23      technology solutions to people
24      with disabilities, human rights
25      groups and environmental groups."

187

1      So providing technology solutions to
2  people with disabilities, that's Bookshare?
3    A.   That's one of our projects in the area
4  of helping people with disabilities, yes.
5    Q.   And then the other one was Route 66?
6    A.   That's another one.
7    Q.   All right.
8    A.   There are more.
9    Q.   And then in the human rights arena, that
10 would be Martus?
11    A.   That is our primary product in that
12 field.
13    MR. KAPLAN:  Objection.
14    THE WITNESS:  Sorry.
15 BY MR. HUDIS:
16    Q.   And what is your project in the
17 environmental area?
18    MR. KAPLAN:  Objection.  Argumentative.
19 Vague.
20    THE WITNESS:  At the time, it was the
21 Miradi software project.  M-I-R-A-D-I.
22 BY MR. HUDIS:
23    Q.   And what did Miradi do?
24    A.   Essentially project management software
25 for environmental project managers.

188

1    Q.   If you could turn to page 86 of
2  Exhibit 57.  In the middle of the page it says,
3  "Our initial reading machine."
4      Do you see that?
5    A.   Yes.
6    Q.   All right.
7      "Our initial reading machine
8      had four major components:  The
9      PC, the Calera OCR board, a
10     DECtalk voice synthesizer board
11     and a Hewlett-Packard scanner.
12     Together, these three additional
13     pieces turned the standard PC into
14     a reading machine."
15      My question is, Mr. Fruchterman, are
16 these the hardware elements of an OCR reading
17 machine?
18    MR. KAPLAN:  Objection.  Vague.  Calls
19 for speculation.  Lacks foundation.
20    THE WITNESS:  This is a description of
21 our earliest reading system based on the Calera
22 TrueScan board.
23 BY MR. HUDIS:
24    Q.   Mr. Fruchterman, could you please turn
25 to page 95 of Exhibit 57.

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

48 (Pages 189 to 192)

189

1    A.   Yes.
2    Q.   Now, we talked about this outside a very
3  narrow description, so I'd like to ask you here.
4  I am under Bookshare.org, the third full paragraph
5  which starts with "Jerry also came up with."
6    A.   Yes.
7    Q.   Okay.  So I'm concentrating on the
8  second sentence of that paragraph.
9         "So a year before Bookshare
10         was ready" --
11         Who is Jerry?
12   A.   My counsel.
13   Q.   Okay.
14        -- "Jerry got us a meeting with the
15        copyright committee of the
16        Association of American Publishers.
17        This committee is made up of the top
18        lawyers from the major publishers.
19        We explained how we would honor the
20        social bargain in the legal
21        exception:  Help people with
22        disabilities while not hurting the
23        business interests of publishers and
24        authors.  Giving them a year to work
25        with us to keep this social bargain

190

1        gained us tremendous credibility
2        with the publishers and convinced
3        them not to sue us."
4        So we talked about before,
5  Mr. Fruchterman, about why, when you were founding
6  Bookshare, you were talking with the publishers.
7        Does this passage that I just read
8  accurately state why you met with the publishers
9  before Bookshare was founded?
10        MR. KAPLAN:  Objection.  Vague.  Lacks
11  foundation.
12        THE WITNESS:  Yes.  This is a public
13  description of the strategy that our counsel came
14  up with for us.
15        (Whereupon, Deposition Exhibit 58 was
16        marked for identification.)
17  BY MR. HUDIS:
18    Q.   Mr. Fruchterman, I show you what's been
19  marked as Exhibit 58.
20        Are you familiar with the book
21  "Assistive" -- "Assistive Technology for Visually
22  Impaired and Blind People"?
23    A.   Yes.
24    Q.   Were you a contributing author to this
25  book of Exhibit 58?

191

1    A.   I wrote a chapter for the book.
2    Q.   Was the title of that book "Accessing
3  Books and Documents"?
4        MR. KAPLAN:  Objection.  Form.
5        THE WITNESS:  That was the title of the
6  chapter.
7  BY MR. HUDIS:
8    Q.   Thank you.  I will reask the question
9  because it was very poorly asked.
10        Was your chapter of the book "Assistive
11  Technology for Visually Impaired and Blind People"
12  titled "Accessing Books and Documents"?
13    A.   Yes.
14    Q.   So, Mr. Fruchterman, I'm going to
15  represent to you that this Exhibit 58 is not the
16  entire book.  The entire book --
17    A.   Great.
18    Q.   -- spans over 700 pages.  So I have only
19  provided a copy to you of your chapter.
20    A.   Okay.
21        MR. KAPLAN:  Is it Counsel's position
22  that this is fair use?
23        MR. HUDIS:  It is Counsel's position
24  that it is fair use in the context of litigation
25  with this witness.

192

1    Q.   Now, if you recall earlier today,
2  Mr. Fruchterman, we had discussed functional tasks
3  associated with a person with print disabilities
4  accessing content.
5        Do you remember that?
6    A.   Yes.
7    Q.   Okay.  And you said that one of the
8  first functional tasks is to obtain the content?
9    A.   Yes.
10    Q.   All right.  I'd like to read you here
11  from the -- from a portion of the first paragraph
12  of your Chapter 15 from Exhibit 58.
13        You see where it says, "Text
14  acquisition"?
15    A.   Okay.  What page are we on?
16    Q.   Yes.  It is the first page of your
17  chapter.  So it's not numbered itself, but it is
18  page 555.
19    A.   Okay.  So we're on the first page, which
20  is the titled "Chapter 15.  Accessing"-- "Learning
21  Objectives."
22    Q.   Right.
23    A.   Where am I looking right now?
24    Q.   Okay.  In the middle of that first
25  paragraph it says, "Text acquisition."

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

193

1      **A.   Yes.**
2          **"Text acquisition can be"** --
3      **(Reporter interruption.)**
4   BY MR. HUDIS:
5      Q.   I'll read it.  It says:
6          "Text acquisition can be as
7      varied as scanning the printed
8      page and doing the optical
9      character recognition to directly
10     downloading the text from the
11     Internet."
12         What were you describing here?
13     **A.   Acquiring the text.**
14     Q.   That's why I was -- I was curious as to
15  our conversation earlier today, where you said
16  text acquisition was not something you would use.
17         MR. KAPLAN:  Objection.  Confusing.
18  BY MR. HUDIS:
19     Q.   All right.  So we had discussed the
20  functional tasks associated with accessing content
21  of a person with print disabilities.  So I had
22  used "text acquisition."  You said that was a
23  wrong phrase, so I'm -- I'm confused as to the
24  nature of text acquisition used here in
25  Exhibit 58.

194

1      **A.   The tasks described --**
2          MR. KAPLAN:  Wait.
3          THE WITNESS:  Sorry.  Please.
4          MR. KAPLAN:  Counsel, there needs to be
5   a question.
6          MR. HUDIS:  Okay.
7      Q.   What did you mean by "text acquisition"
8   in the context of the passage that I just read
9   from page 55 of Exhibit 58?
10     **A.   Our earlier conversation encompassed**
11  **other tasks beyond the two listed here.**
12     Q.   Okay.  So the two listed here are text
13  acquisition and accessible presentations.  And
14  that says:
15         "Accessible presentations
16     range from having a human reader
17     narrate the text to enlarged
18     print, to Braille, to synthetic
19     speech."
20         So what I'd like to know is what did you
21  mean by these two activities as described here on
22  page 55 of Exhibit -- 555 of Exhibit 58, "text
23  acquisition" and "accessible presentations"?
24         MR. KAPLAN:  Objection.  Confusing.
25  Vague.  Misstates the document.

195

1          THE WITNESS:  The question appears to be
2   what did you mean by these two activities?
3   BY MR. HUDIS:
4      Q.   (Nods head.)
5      **A.   Text acquisition and accessible**
6   **presentation is kind of what they mean.  I'm a**
7   **little lost on --**
8      Q.   As used in this paragraph in page -- in
9   Exhibit 58, what did you mean by "text
10  acquisition"?
11         MR. KAPLAN:  Objection.  Vague and
12  confusing.
13         THE WITNESS:  I'm rereading the
14  paragraph.
15  BY MR. HUDIS:
16     Q.   Mh-hmm.
17     **A.   I'm still trying to figure out the**
18  **context here of all of this.**
19         **I think I was talking primarily about**
20  **scanning the page in order to potentially getting**
21  **the content directly from the Internet, which in**
22  **this case I'd be probably thinking about**
23  **Bookshare.**
24     Q.   And what did you mean in this context as
25  used on page 555 of Exhibit 58 of "accessible

196

1   presentations"?
2          MR. KAPLAN:  Objection.  Confusing and
3   vague.
4          THE WITNESS:  Well, I think this covers
5   territory that we've discussed before of how does
6   a person with a disability access an inaccessible
7   print document.  One way is that a human being
8   reads it aloud, or it can be made larger, or it
9   can be made Braille, or it can be made synthetic
10  speech.  And there are obviously other ones beyond
11  those as well as the four examples given here.
12  BY MR. HUDIS:
13     Q.   Could we turn to page 556 of Exhibit 58.
14         Mr. Fruchterman, this book, "Assistive
15  Technology for Visually Impaired and Blind
16  People," was published in 2008.
17         So do you recall approximately what year
18  you wrote Chapter 15?
19         MR. KAPLAN:  Objection.  Confusing.
20  Argumentative.
21         THE WITNESS:  I would assume either in
22  2008 or in 2007.
23  BY MR. HUDIS:
24     Q.   Okay.  So turning to page 556, it says:
25         "Magnification is the

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

50 (Pages 197 to 200)

197

1    traditional method for addressing
2    vision loss and access to text."
3        Is this still true today?
4        MR. KAPLAN:  Objection.  Vague.
5    Confusing.
6        THE WITNESS:  Yes, 'cause it's described
7    as a traditional method.  So the fact that another
8    few years have gone by, it's still a traditional.
9    BY MR. HUDIS:
10    Q.   The next paragraph describes Braille as
11   a -- one of -- was probably the most significant
12   adaptive technology advance for the blind of the
13   1800s.
14       Is Braille still used by blind people
15   today?
16       MR. KAPLAN:  Objection.
17   Mischaracterizes the document.  Vague.
18       But go ahead.
19       THE WITNESS:  Yes.
20   BY MR. HUDIS:
21    Q.   Skipping down another two paragraphs, it
22   says:
23       "These three alternative
24   techniques for accessing print,
25   magnification, tactile Braille and

199

1    technique still in wide use today.
2    The Perkins Brailler and Braille
3    printing presses are important
4    tools for professionals to use to
5    create Braille books.  And
6    human-narrated books are widely
7    available on audio cassettes."
8        We've replaced audio cassettes at this
9    point with technology, but the rest of it, are
10   these still document transformation methods in use
11   today?
12       MR. KAPLAN:  Objection.
13   BY MR. HUDIS:
14    Q.   All right.  And that -- and the ones
15   that I'm pointing to are having the sighted person
16   read aloud, the Perkins Brailler and a Braille
17   printing press.
18       MR. KAPLAN:  Objection.  Vague.
19       THE WITNESS:  All of these are still in
20   use today.
21   BY MR. HUDIS:
22    Q.   Now, the next paragraph, it says:
23       "Technology in use today has
24   greatly expanded the options
25   available for accessible reading

198

1    audible speech, are at the core of
2    almost all book and document
3    access technology for the visually
4    impaired."
5        So my question is are these still three
6    alternative techniques for accessing print by the
7    print-disabled?
8        MR. KAPLAN:  Objection.  Vague.
9        THE WITNESS:  These are three -- these
10   are still three alternate techniques used for
11   accessing print by the print-disabled, yes.
12   BY MR. HUDIS:
13    Q.   Okay.  If we could now skip down two
14   paragraphs.  It describes these transformations in
15   the past -- and the transformations, I gather, is
16   talking about what precedes this paragraph.
17       "These transformations in the
18   past have required human
19   intervention.  Generally a sighted
20   person reworks the document into
21   accessible form."
22       And it says here:
23       "The original approach was to
24   have the sighted person read aloud
25   to the visually impaired person, a

200

1    and lessoned the need to have a
2    sighted person intervene in the
3    process.  We now have Braille
4    transcription software, personal
5    Braille embossers, refreshable
6    electronic Braille displays for
7    audio.  We have computer
8    synthesized voices to speak aloud
9    digital text, also known as text
10   to speech or TTS."
11       My question is, are these technologies
12   still in use today as nonhuman intervention
13   methods for the print-disabled to access printed
14   material?
15       MR. KAPLAN:  Objection.  Vague and
16   confusing.
17       THE WITNESS:  Yes.
18   BY MR. HUDIS:
19    Q.   The next sentence says:
20       "With reading systems that
21   use optical character recognition,
22   or OCR, we can provide access to
23   Braille, audio and customized
24   visual displays directly from the
25   printed page."

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

201

1      Why is this important?
2      MR. KAPLAN: Objection. Vague.
3      THE WITNESS: Because we want to turn
4  inaccessible print books into forms where disabled
5  people can access them using OCR.
6  BY MR. HUDIS:
7      Q.  Could we turn to page 557 of Exhibit 58.
8      At the bottom of page 50 -- 557 to the
9  top of 558 it says:
10         "Authors and publishers of
11         books are concerned about piracy
12         and worry about making books
13         easily available in electronic
14         form, although they rarely object
15         to access for people with
16         disabilities."
17     Do you believe this is still true?
18     MR. KAPLAN: Objection. Vague.
19     THE WITNESS: Yes.
20  BY MR. HUDIS:
21     Q.  Mr. Fruchterman, could we turn to page
22  558.
23     A.  Yes.
24     MR. KAPLAN: We were there.
25     MR. HUDIS: We were there. Okay. Thank

202

1  you.
2      Q.  I would like to direct your attention to
3  the middle of the page, where it starts "however."
4      A.  Yes.
5      Q.  All right. It says:
6         "However, the image cannot be
7         directly used to generate Braille
8         or synthetic voice output."
9      Why is that?
10     MR. KAPLAN: Objection. Vague. Lacks
11  foundation. Incomplete hypothetical.
12     THE WITNESS: You need to convert the
13  inaccessible image into a text file in OCR.
14  BY MR. HUDIS:
15     Q.  Mr. Fruchterman, could you turn to page
16  560 of Exhibit 58.
17     This paragraph at the bottom of page 560
18  talks about the image processing steps of -- in
19  OCR. And it talks about despeckling, orienting
20  and straightening the page, recognition of
21  specialty fine characteristics and recognition of
22  a character or glyph.
23     Are those the --
24     MR. KAPLAN: You're talking about the
25  last full paragraph, not the last paragraph?

203

1      MR. HUDIS: Yeah. Correct. Excuse me.
2  You're right, Counsel, it's the last two
3  paragraphs.
4      THE WITNESS: Two paragraphs.
5      MR. KAPLAN: Both paragraphs.
6      MR. HUDIS: Yeah.
7      Q.  Are these the steps in OCR technology?
8      MR. KAPLAN: Objection. Vague.
9      THE WITNESS: Those are some steps in
10  OCR technology, yes.
11  BY MR. HUDIS:
12     Q.  Mr. Fruchterman, could you turn to page
13  562 at the top. And I'd like to know, are these
14  typical types of OCR errors? And what's described
15  here are misrecs, nonrecs, drops and adds.
16     A.  I --
17     MR. KAPLAN: Objection. Vague.
18     THE WITNESS: I would say those are
19  common OCR errors.
20  BY MR. HUDIS:
21     Q.  What happens with these common OCR
22  errors are encountered?
23     MR. KAPLAN: Objection.
24     MR. HUDIS: I'll reask the question.
25     Q.  If any of these OCR errors are

204

1  encountered, what happens when the printed text is
2  converted to speech?
3      MR. KAPLAN: Objection. Vague.
4  Incomplete hypothetical.
5      THE WITNESS: Depending on what the
6  error is, a person listening to the text might
7  hear something different in the word.
8  BY MR. HUDIS:
9      Q.  Could it be garbled text?
10     MR. KAPLAN: Objection. Vague.
11     THE WITNESS: Yeah, it really depends on
12  the error. I mean, humans listening to text, you
13  know, will they notice an error? It depends on
14  how extreme it is. For example, if R and N get
15  turned into M, you know, you might hear it was a
16  case of modem times. Person is going to say, Oh,
17  it's probably modern. But 'cause that's -- that
18  was a common error.
19     It gets -- it's been less common in
20  recent years because "modem" isn't as common a
21  word now as it was once. And the OCR engines do
22  tune themselves for statistics in language.
23  BY MR. HUDIS:
24     Q.  Mr. Fruchterman, could you please turn
25  to page 565 of Exhibit 58.

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

52 (Pages 205 to 208)

205

1          What is the DAISY standard?
2     A.   The DAISY standard is a standard for
3  delivering accessible books to people with
4  disabilities.
5     Q.   Is that standard still in use today?
6     A.   It is.
7     Q.   By whom?
8          MR. KAPLAN:  Objection.  Lacks
9  foundation.  Vague.
10         THE WITNESS:  The DAISY consortium is
11  essentially the leading libraries for people with
12  print-disabilities, and I believe almost all of
13  the DAISY members' libraries use the DAISY format
14  as part of their system of delivering accessible
15  books to their disabled patrons.
16  BY MR. HUDIS:
17     Q.   Is this a proprietary format?
18         MR. KAPLAN:  Objection.  Vague.
19  Confusing.
20         MR. HUDIS:  I'll ask -- I'll reask the
21  question.
22     Q.   Is DAISY a proprietary format by the
23  participating libraries in the consortium?
24         MR. KAPLAN:  Objection.  Vague.
25  Confusing.

206

1          THE WITNESS:  My understanding is the
2  DAISY format is shared widely so that anyone can
3  use the standard and it is not proprietary to the
4  members.
5  BY MR. HUDIS:
6     Q.   Does this technology require use of a
7  PDF file?
8         MR. KAPLAN:  Objection.  Vague and
9  confusing.
10         THE WITNESS:  It's the antithesis of a
11  PDF file.
12  BY MR. HUDIS:
13     Q.   Okay.  And why do you say that?
14     A.   Because PDFs are frequently not
15  accessible in the form that they present
16  themselves.
17     Q.   Without OCR technology?
18     A.   That's --
19         MR. KAPLAN:  Objection.  Vague.
20         THE WITNESS:  That's one of the problems
21  with PDFs.  Yes.
22  BY MR. HUDIS:
23     Q.   All right.  So does -- does the DAISY
24  technology require use of an OCR-processed PDF
25  file?

207

1          MR. KAPLAN:  Objection.  Vague and
2  confusing.
3          THE WITNESS:  No.
4  BY MR. HUDIS:
5     Q.   What is required for use of DAISY
6  technology?
7          MR. KAPLAN:  Objection.  Vague.
8          THE WITNESS:  Well, the DAISY standard
9  is a format for digitally delivering typically
10  books, but could be other kinds of documents.  It
11  encompasses digital text, structure, audio, video,
12  pictures, tactile graphics.
13         And so a DAISY book might contain one or
14  all of those different elements without respect to
15  how it was created or how it will get used.  It's
16  just a file format.
17  BY MR. HUDIS:
18     Q.   And --
19         MR. KAPLAN:  Can we, when you're done
20  with this line of questioning, take a very short
21  break?
22         MR. HUDIS:  Yes.
23         MR. KAPLAN:  Thank you.
24  BY MR. HUDIS:
25     Q.   And DAISY -- DAISY-processed texts can

208

1  be delivered either by an audio DAISY book or a
2  full-text DAISY book, correct?
3          MR. KAPLAN:  Objection.  Vague and
4  incomplete hypothetical.
5          THE WITNESS:  Those are two ways a DAISY
6  book can be delivered.
7          MR. HUDIS:  That's it for this, so let's
8  take a break.
9          THE VIDEOGRAPHER:  Going off the record
10  at 2:30.
11         (Whereupon, a recess was taken.)
12         (Whereupon, Deposition Exhibit 59 and
13  60 were marked for identification.)
14         THE VIDEOGRAPHER:  Going back on the
15  record at 2:38.
16  BY MR. HUDIS:
17     Q.   Mr. Fruchterman, are you familiar with
18  the litigation titled "Authors Guild Versus
19  HathiTrust" which was litigated at the trial level
20  in New York Federal Court in Manhattan in 2011 and
21  2012?
22         MR. KAPLAN:  Objection.  Vague and
23  argumentative.
24         THE WITNESS:  Yes.
25

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

209

BY MR. HUDIS:
Q.   Okay.  What do you recall about who the
plaintiffs were in the HathiTrust litigation?
        MR. KAPLAN:  Objection.  Argumentative.
        THE WITNESS:  I remember it was
primarily the Authors Guild.  That was certainly
the public face.  I believe there were some
foreign authors associations or publishing
associations.  I'm a little confused, but I know
they were foreign entities.  Probably a couple
specific authors.  That's my recollection
primarily from reading the press coverage of the
case.
BY MR. HUDIS:
Q.   Do you remember what the plaintiffs'
legal claims were in the HathiTrust case?
        MR. KAPLAN:  Objection.  Vague.
        THE WITNESS:  The case was always
described as one over allegations of copyright
infringement.
BY MR. HUDIS:
Q.   Do you remember who the defendants were
in the HathiTrust case?
A.   The HathiTrust is an assemblage of
research libraries that basically had a large book

210

scanning repository that they were using.
Q.   Do you remember what legal defenses
those defendants asserted in the HathiTrust
litigation?
        MR. KAPLAN:  Objection.  Vague.  Calls
for a legal conclusion.
        THE WITNESS:  As publicly reported, it
was primarily defenses of fair use and
Section 121.
BY MR. HUDIS:
Q.   And that's the Chafee Amendment?
A.   Yes.
Q.   What role, if any, did you play in the
HathiTrust litigation?
        MR. KAPLAN:  Objection.  Vague.
        THE WITNESS:  I provided declarations in
the case and an amicus brief.
BY MR. HUDIS:
Q.   Were you an expert witness for the
intervener, the National Federation for the Blind?
A.   I don't believe I met the definition of
"expert witness."
Q.   Why do you say that?
A.   Because I prepared a declaration, which
I've been told is different than being an expert

211

witness.  But I'm not a lawyer, so -- but I
understand that that's not the same thing.
        MR. KAPLAN:  I think the issue is you
did not submit an expert report in that case.
        THE WITNESS:  Thank you, Counsel, for
the legal advice.
        MR. KAPLAN:  Yes.
BY MR. HUDIS:
Q.   So, Mr. Fruchterman, is that true, what
Public.Resource's counsel said, that you did not
provide an expert's report in the HathiTrust case?
A.   That is my understanding, yes.
Q.   Okay.  Now, these questions all have to
do with the HathiTrust case.
        Did you testify at any deposition?
A.   No.
Q.   Did you testify at any trial?
A.   No.
Q.   Did you submit any expert's reports?
A.   No.
Q.   Okay.  Did you submit any declarations?
A.   Yes.
Q.   Okay.  Do you know what a summary
judgment motion is?
        MR. KAPLAN:  Objection.  Vague.

212

        THE WITNESS:  I have a decent idea as
someone who has been familiar with legal affairs
as a business and nonprofit executive.
BY MR. HUDIS:
Q.   Okay.  In that context, what's your
understanding of what a summary judgment motion
is?
A.   That rather than going to trial, the
plaintiffs or defendants create a motion to the
judge saying, Based on what you've seen, are we
done?
Q.   Did you submit any declarations in
support of a summary judgment motion in the
HathiTrust case?
A.   Yes.
Q.   Do you remember how the HathiTrust
Digital Library operated?
        MR. KAPLAN:  Objection.  Vague.
        THE WITNESS:  I have a general
familiarity with how it operates, but I have not
studied its operation in detail.
BY MR. HUDIS:
Q.   What's the nature of your general
familiarity?
        MR. KAPLAN:  Objection.  Vague.

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

54 (Pages 213 to 216)

213

1      THE WITNESS:  That the HathiTrust
2  collection is made available to faculty, students
3  and staff of the member libraries.
4  BY MR. HUDIS:
5      Q.   And what was the source of the materials
6  for the HathiTrust Digital Library?
7      MR. KAPLAN:  Objection.  Lacks
8  foundation.  Vague.  Calls for speculation.
9      THE WITNESS:  I believe, based on press
10  reports, that the primary source is the Google
11  book scanning project.
12  BY MR. HUDIS:
13      Q.   And what -- what were the sources of
14  material that were scanned as part of the Google
15  scanning project for the HathiTrust library?
16      MR. KAPLAN:  Objection.  Lacks
17  foundation.  Vague.  Calls for speculation.
18      THE WITNESS:  My general understanding,
19  it was the collection of the libraries of these
20  research universities.
21  BY MR. HUDIS:
22      Q.   Mr. Fruchterman, I placed in front of
23  you what's been marked Exhibits 59 and 60.
24      Do you recognize the documents?
25      A.   Yes.  I believe these -- first is my

214

1  **declaration, and then a supplemental**
2  **declaration -- declaration.**
3      Q.   So on Exhibit 59, is that your signature
4  on page 7?
5      A.   Yes.
6      Q.   And the date of the signature is
7  June 28th, 2012?
8      A.   Yes.
9      Q.   And Exhibit 60 on page 4, is that your
10  signature?
11      A.   Yes.
12      Q.   And is your signature in Exhibit 60
13  dated July 17, 2012?
14      A.   Yes, it appears to be.
15      Q.   Mr. Fruchterman --
16      MR. KAPLAN:  Counsel, the docket number
17  is garbled in Exhibit 59.
18      MR. HUDIS:  It is.
19      MR. KAPLAN:  Do you happen to know what
20  that is?
21      MR. HUDIS:  The problem is, the document
22  was submitted twice.  I believe the documents in
23  the HathiTrust litigation are Document Numbers 80
24  and 118.
25      THE WITNESS:  Looks like the exhibits

215

1  aren't quite as garbled.  If you go to --
2      MR. KAPLAN:  118.
3      MR. HUDIS:  I believe, but cannot
4  confirm, that Mr. Fruchterman's declaration was
5  submitted once without the attachments as Document
6  Number 80 and then again with the attachments as
7  Document Number 118.
8      Q.   Mr. Fruchterman, if you could tell me,
9  is there anything on pages 1 through 7 of
10  Exhibit 59 that you would change at this time.
11  Something that you believe is incorrect?
12  Something that you believe, upon further inquiry,
13  you would supplement?  Is there anything you would
14  change in this declaration?
15      MR. KAPLAN:  Objection.  Vague.
16      THE WITNESS:  I will read it.  So ...
17      MR. KAPLAN:  That's why I wanted to do it
18  off the record.
19      Can we go off the record?
20      MR. KAPLAN:  No.  No.
21      MR. HUDIS:  You want to burn the time
22  up?
23      MR. KAPLAN:  It's your question.
24      MR. HUDIS:  That is my question.
25      THE WITNESS:  My first reaction -- and I

216

1  will continue as I read the document, though -- is
2  that in the facts relied upon, these are dated
3  figures.  And so if I was saying how many books we
4  had or how many members we had, I would update it
5  to a current number because this is a few years
6  old.  So that's my first change of things that I
7  would -- I would change.
8      At Number 16, I guess -- what would you
9  call these numbers to the left here in the
10  declaration?
11      MR. HUDIS:  Mh-hmm.
12      THE WITNESS:  Item 16?
13  BY MR. HUDIS:
14      Q.   Paragraph.
15      A.   **Paragraph 16.**
16      **In paragraph 16, at that time, it was**
17  **close to 200 publishers.  Now it's over 500**
18  **publishers, so I would update the number.**
19      **In paragraph 23, we cite average numbers**
20  **of cost per book.  I think these numbers are**
21  **dated.  They're going to be higher now.**
22      **In paragraph 28, I talk about image**
23  **descriptions, K-12 textbooks in highest demand.**
24  **We actually -- I think that at this point in time,**
25  **we probably devote less towards image descriptions**

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

217

1  than we did at the time of this declaration three
2  years ago. That was in paragraph 28.
3          Okay. That's the end of that
4  declaration. So those are the items I would
5  update or change.
6   Q.   Okay. So of the items that you mention
7  that you want to update, I'd like to talk about
8  paragraph 23 on page 5 of Exhibit 59.
9          You said that today, in contrast to when
10  you created this declaration in 2002 -- 2012, it
11  would cost more per book to make it accessible to
12  the print-disabled. My question is why?
13   A.   So this paragraph cites two different
14  figures. One is an average cost across the books
15  that we're scanning. I believe that it's going to
16  cost more both because costs have gone up per unit
17  of effort and because the books that we're
18  converting on average are more complex than they
19  were three years ago. And so because the greater
20  complexity of book, the greater the cost.
21          So I wouldn't stand behind this current
22  number of $40 a book because I'm quite certain
23  it's higher. I don't know exactly how much higher
24  unless I inquire of my team, but that's the
25  impression I've gotten from that.

218

1   Q.   Well, so you cited two possible
2  increases in cost. One was more complex books.
3          Is the first one labor costs?
4   A.   The cost of our contractor to do a given
5  amount of work costs more today than it did three
6  years ago.
7   Q.   So it's outside contractor work?
8   A.   Yeah. Most of our paid costs are from
9  outside contractors.
10   Q.   I thought it was members who scan books
11  for Bookshare.
12   A.   At the origin of Bookshare, it was
13  mainly members scanning for each other. With our
14  Department of Education funding, we're required to
15  deliver high-quality books to students. We
16  actually pay outsourcers to proofread the books.
17  And that's a significant expense.
18   Q.   So excuse my rudeness, Mr. Fruchterman.
19  I cut off your answer on why it would cost more
20  than $40 per book. I did not let you talk about
21  the $400 per book on the next page.
22          Is there anything you would change about
23  that cost?
24          MR. KAPLAN: Objection. Vague.
25          THE WITNESS: Other than our costs per

219

1  unit of work have gone up from our outsourcers and
2  it may be that our textbooks are getting more
3  complicated. So I'm not certain. That number
4  probably has changed. It's probably not less than
5  $400 a book, but I would have to inquire since
6  this is a dated declaration.
7  BY MR. HUDIS:
8   Q.   Mr. Fruchterman, if you could turn to
9  page 6, paragraph 25, of your declaration of
10  Exhibit 59. It says:
11          "Bookshare divides books into
12      six levels based upon their
13      complexity."
14          Is this -- does Bookshare use these
15  levels of complexity today?
16          MR. KAPLAN: Objection. Vague.
17          THE WITNESS: Yes.
18  BY MR. HUDIS:
19   Q.   In what way?
20   A.   Primarily as a --
21          MR. KAPLAN: Objection. Vague.
22          THE WITNESS: Primarily as a cost and
23  management tool for our outsourcers.
24  BY MR. HUDIS:
25   Q.   So as I read paragraphs 25 and 26, I

220

1  would like to know if this statement is true: As
2  the complexity of the books you are scanning
3  increases, it costs more to scan the book and make
4  it accessible to those with print disabilities.
5          MR. KAPLAN: Counsel, is this a
6  statement in paragraph 25 --
7          MR. HUDIS: No.
8          MR. KAPLAN: -- or 26?
9          MR. HUDIS: No. It's a summary, and I
10  want to know if he agrees with it.
11          MR. KAPLAN: Okay. I'm sorry. That was
12  my confusion. Do you want to try that again
13  and --
14          MR. HUDIS: I do.
15          MR. KAPLAN: -- I can state my
16  objections?
17          MR. HUDIS: Sure.
18   Q.   Based upon what you've written here in
19  paragraphs 25 and 26, is it true that as the
20  complexity of the scanned material increases, it
21  costs more to scan the book and make it accessible
22  to those with print disabilities?
23          MR. KAPLAN: Objection. Vague.
24  Incomplete hypothetical.
25          Go ahead.

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

221

1    THE WITNESS:  It costs more to proofread
2  the book.  And so if by "scan" you mean scan and
3  proofread, yes.  But scanning, the complexity of
4  the page doesn't change the cost to scan a page.
5  BY MR. HUDIS:
6    Q.   Mr. Fruchterman, you go into great
7  detail about how Bookshare operated, at least in
8  2012, in paragraphs 12 through the 29.
9    My question, why was there no discussion
10  in this declaration of Exhibit 59 of all the
11  security protocols Bookshare uses to prevent
12  unauthorized access by the sighted community to
13  Bookshare?
14    MR. KAPLAN:  Objection.  Privileged.
15  Calls for information protected by Rule 26 of the
16  Federal Rules of Civil Procedure.  And I don't
17  think -- I think that I'm instructing the witness
18  not to answer.  I instruct the witness not to
19  answer.
20    THE WITNESS:  I agree.
21  BY MR. HUDIS:
22    Q.   All right.  And you're going to adhere
23  to Counsel's instruction?
24    A.   I am.
25    Q.   Okay.  Mr. Fruchterman, could you turn

222

1  to page 2 of Exhibit 59.  It says, on paragraph
2  9 -- are you there?
3    MR. KAPLAN:  Almost.
4    THE WITNESS:  Page 2.  Just the second
5  page.
6    MR. HUDIS:  You've got it rolled over.
7  That's why.
8    THE WITNESS:  You're at the back.
9    MR. HUDIS:  You're at the back.
10    MR. KAPLAN:  Which exhibit?  Oh, I'm
11  sorry.  I thought you meant the declaration.  I'm
12  sorry.  There's only one exhibit.  Exhibit 59,
13  page 2.
14    MR. HUDIS:  Right.  Paragraph 9.
15    Q.   You say:
16    "Having reviewed
17    Daniel Clancy's description of
18    Google's Book" -- "of the Google
19    Books project and the HathiTrust
20    web site, it is my opinion that
21    the HathiTrust provides the best
22    opportunity for [sic] blind
23    students will ever have to access
24    a comprehensive digital library of
25    university collections."

223

1    What's your recollection of Mr. Clancy's
2  description of the HathiTrust web site?
3    MR. KAPLAN:  Objection.  Vague.
4    THE WITNESS:  I don't think that's what
5  I said in this sentence.
6  BY MR. HUDIS:
7    Q.   Okay.  What did you say and what did you
8  mean in this sentence?
9    A.   I reviewed Dan Clancy's description of
10  Google Books project.  Stop.  And I also reviewed
11  the HathiTrust web site.  And based on those two
12  things, I concluded this opinion.
13    Q.   Okay.  So my question is, what do you
14  recall of -- I see what you're saying.  Okay.
15    So what do you recall of your review of
16  the HathiTrust web site?
17    MR. KAPLAN:  Objection.  Vague.
18    THE WITNESS:  I've looked at the
19  HathiTrust web site since this time, and so I'm
20  not sure I can distinguish between those.
21    But it discussed how they were going to
22  make available the full text of all of these works
23  to students who they provided access to.
24  BY MR. HUDIS:
25    Q.   Okay.  Do you recall what security

224

1  measures the HathiTrust web site used to prevent
2  unauthorized access?
3    MR. KAPLAN:  Objection.  Argumentative.
4  Calls for a legal conclusion.  Vague.  Lacks
5  foundation.
6    THE WITNESS:  I believe that they used
7  authentication protocols common in the university
8  systems for authenticating faculty, staff and
9  students.
10  BY MR. HUDIS:
11    Q.   Was that a user name and password?
12    MR. KAPLAN:  Objection.  Vague.  Lacks
13  foundation.
14    THE WITNESS:  Yes.  Primarily.
15  BY MR. HUDIS:
16    Q.   Mr. Fruchterman, let's now turn to
17  Exhibit 60, your supplemental declaration in the
18  HathiTrust litigation.  Please read through the
19  document and tell me if there's anything today you
20  would change about the document and what you wrote
21  here.
22    A.   As before, I would change numbers that
23  are based on the date of this declaration.
24    Oh, you're having problems with the
25  captioning again.

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

225

1     MR. HUDIS:  No.  I'm having problems
2  with --
3     MR. KAPLAN:  Scrolling.
4     MR. HUDIS:  -- what was put down as your
5  answer.
6     (Record read by the reporter
7     as follows:
8     ANSWER:  As before, I would
9     change numbers that are based on
10    the date of this declaration.)
11  BY MR. HUDIS:
12   Q.   So which numbers would you change?
13     MR. KAPLAN:  Objection.  Vague.
14     THE WITNESS:  Yeah.  Paragraph 1 -- 2 --
15  sorry, paragraph 2, I cite how many users, how
16  many books, what our monthly capacity is.  I would
17  update those to current figures.
18  BY MR. HUDIS:
19   Q.   So it would be more?
20   A.   Yes.
21     MR. KAPLAN:  Description.
22     THE WITNESS:  Sorry.
23     That's it.
24  BY MR. HUDIS:
25   Q.   Are paragraphs 4 through 12 of

226

1  Exhibit 60 still today an accurate description of
2  Bookshare's seven-point digital rights management
3  plan?
4     MR. KAPLAN:  Objection.  Vague.
5     THE WITNESS:  Yes.
6  BY MR. HUDIS:
7   Q.   If we could turn to paragraph 1, page 1,
8  of Exhibit 60.  You say:
9     "Based upon my experience
10    with the Bookshare online library
11    for people with print
12    disabilities, I believe that the
13    risk of online piracy or
14    unauthorized copying and
15    distribution of works made fully
16    available to individuals" --
17    "individuals with print
18    disabilities through the
19    HathiTrust is minimal."
20     What was the basis for this statement
21  that you made in paragraph 1?
22     MR. KAPLAN:  Objection.  Confusing.  The
23  document speaks for itself.  Vague.
24     THE WITNESS:  My declaration explains
25  why, at length.

227

1  BY MR. HUDIS:
2   Q.   Why is there no discussion of the
3  HathiTrust security measures in this declaration
4  of Exhibit 60?
5     MR. KAPLAN:  Objection.  Argumentative.
6  Vague.
7     And I will instruct the witness not to
8  answer to the extent that it calls for privileged
9  communications or information protected by Rule 26
10  of the Federal Rules of Civil Procedure.
11  BY MR. HUDIS:
12   Q.   Mr. Fruchterman, first of all, will you
13  adhere to counsel's instructions?
14   A.   Yes.
15     MR. KAPLAN:  First --
16  BY MR. HUDIS:
17   Q.   And can you --
18     MR. KAPLAN:  Yeah.  Okay.
19  BY MR. HUDIS:
20   Q.   And can you answer my question without
21  revealing the substance of attorney-client
22  communications?
23   A.   No.
24   Q.   In making the statement "I believe that
25  the risk of online piracy or unauthorized copying

228

1  and distribution of works made fully available to
2  individuals with print disabilities through the
3  HathiTrust is minimal," did you review the
4  security measures on the HathiTrust web site?
5     MR. KAPLAN:  Objection.  Vague.
6     THE WITNESS:  Not beyond previously
7  discussed.
8  BY MR. HUDIS:
9   Q.   Mr. Fruchterman, do you recall what the
10  outcome was in the HathiTrust litigation?
11     MR. KAPLAN:  Objection.  Vague.  Calls
12  for a legal conclusion.  Lacks foundation.
13     THE WITNESS:  I do.
14     MR. KAPLAN:  I'm sorry.  Scratch the
15  last objection.
16     THE WITNESS:  I do.
17  BY MR. HUDIS:
18   Q.   All right.  What -- and what was -- what
19  is your understanding of the outcome of the
20  HathiTrust litigation?
21   A.   That the motion for summary judgment by
22  the defendants was granted by the district court
23  judgment and upheld in an appellate court
24  decision.
25   Q.   And did you -- did you review the

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

229

1    district court's opinion after it was issued?
2       **A.  I did.**
3          **(Whereupon, Deposition Exhibit 61 was**
4    **marked for identification.)**
5    BY MR. HUDIS:
6       Q.   Mr. Fruchterman, I'd like you to turn to
7    page 4 of what's now been marked as Exhibit 61.
8    It is the district court's opinion in the Authors
9    Guild, Inc. versus HathiTrust, et al., reported at
10   902 F.Supp.2d 445 and the date of the decision is
11   October 10, 2012.
12          MR. KAPLAN:  Counsel, it's a Westlaw
13   printout.
14          MR. HUDIS:  Yes.
15          MR. KAPLAN:  Including Westlaw's
16   commentary and descriptions and additional
17   material that was not contained in the original
18   decision.
19          MR. HUDIS:  Noted.
20      Q.   Mr. Fruchterman, could you please turn
21   to page 4 of the document.
22      **A.   Yes.**
23      Q.   And it says, under "Background,"
24   "Defendants"-- are you with me?
25      **A.   Yes.**

230

1       Q.   All right.
2          "Defendants have entered into
3          agreements with Google Inc. that
4          allow Google to create digital
5          copies of works in the
6          universities' libraries in
7          exchange for which Google provides
8          digital copies to defendants, the
9          mass digitization product or MDP."
10         Was that your understanding of how the
11   HathiTrust library worked?
12          MR. KAPLAN:  Objection.  Vague.
13   Confusing.
14          THE WITNESS:  Yes.  Generally.
15   BY MR. HUDIS:
16      Q.   All right.  If we could turn to page 5
17   of Exhibit 61.  At the top left-hand corner, it
18   says:
19          "After digitization, Google
20          retains a copy of the digital book
21          that is available through Google
22          Books, an online system through
23          which Google users can search the
24          content and view snippets of the
25          books.  Google also provides a

231

1          digital copy of each scanned work
2          to the universities which includes
3          scanned image files of the pages
4          and a text file from the printed
5          work."
6          Was that also your understanding of how
7    the HathiTrust Library worked?
8          MR. KAPLAN:  Objection.  Vague.
9          THE WITNESS:  This describes much more
10   of what Google does than what the HathiTrust does.
11   It simply says that it gave them a copy.  It
12   doesn't actually describe what the HathiTrust does
13   with the copy.
14   BY MR. HUDIS:
15      Q.   So -- and then it says:
16          "After Google provides the
17          universities with digital copies
18          of their works, the universities
19          then contribute these digital
20          copies to the HathiTrust Digital
21          Library."
22          Is that your understanding --
23          MR. KAPLAN:  Objection.  Vague.
24   BY MR. HUDIS:
25      Q.   -- of how the HathiTrust Digital Library

232

1    worked?
2          MR. KAPLAN:  Still vague.
3          THE WITNESS:  To the extent it's stated
4    here, yes.
5    BY MR. HUDIS:
6       Q.   And then skipping below Footnote 4, it
7    says:
8          "For works with known
9          authors, defendants use the works
10         within the HDL or HathiTrust
11         Digital Library in three ways:
12         Full-text searches, preservation
13         and access for people with
14         certified print disabilities.  The
15         full-text search capabilities
16         allow users to search for
17         particular terms" -- "a particular
18         term across all the works within
19         the HathiTrust Digital Library.
20         For works that are not in the
21         public domain or for which the
22         copyright owner has not authorized
23         use, the full-text search
24         indicates only page numbers on
25         which a particular term is found

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

59 (Pages 233 to 236)

233

1    and the number of times the term
2    appears on each page."
3        Was that your understanding of how the
4    HathiTrust Digital Library worked?
5        MR. KAPLAN: Objection. Vague and
6    confusing.
7        THE WITNESS: This states my
8    understanding about how some of the Hathi digital
9    trust works.
10   BY MR. HUDIS:
11   Q.    All right. At the bottom of page 5,
12   starting at the bottom of the left-hand column and
13   going to the top of the right-hand column, it
14   says:
15        ""Since the digital text in
16    the HDL or" --
17        MR. KAPLAN: Wait. Wait. Okay. I
18   found it.
19        THE WITNESS: Okay.
20        (Reporter interruption.)
21   BY MR. HUDIS:
22   Q.     "Since the digital texts in
23    the HathiTrust Digital Library
24    became available, print-disabled
25    students have had full access to the

234

1    materials through a secure system
2    intended solely for students with
3    certified disabilities."
4        Was this also your understanding of how
5    the HathiTrust Digital Library worked?
6        MR. KAPLAN: Objection. Vague.
7        THE WITNESS: I didn't think they
8    excluded disabled faculty and staff from their
9    system. I thought it was not just students, but
10   also faculty and staff.
11   BY MR. HUDIS:
12   Q.    But, otherwise, you would agree with
13   this statement?
14   **A.   I think I'm less familiar with what the**
15   **secure system actually was. I -- but that they**
16   **had access, I did understand.**
17   Q.    Which brings me to my next question.
18       Could you turn to page 15 of Exhibit 61.
19   **A.   Okay. I'm on page 15.**
20   Q.    I'm reading from the bottom of the
21   right-hand column.
22       It says:
23        "Defendants respond with a
24    declaration from the individual in
25    charge" --

235

1    **A.   Stop. Stop.**
2        MR. HUDIS: Yep.
3        THE WITNESS: Okay. So it's the last
4    partial sentence there. All right.
5    BY MR. HUDIS:
6    Q.    Yes. So it says:
7        "Defendants respond with a
8    declaration from the individual in
9    charge of security for the works
10    in the HathiTrust Digital Library
11    who describes the security
12    measures in place" -- citing to
13    the Snavely declaration -- "and
14    notes that the libraries have been
15    certified as a trustworthy
16    depository by the Center for
17    Research Libraries."
18       Do you see that?
19   **A.   Yes.**
20   Q.    All right. Is that your understanding
21   of how the security measures of the HathiTrust
22   Digital Library worked?
23       MR. KAPLAN: Objection. Vague and
24   confusing.
25       THE WITNESS: It's consistent with my

236

1    understanding of the access control portion of the
2    system, yes.
3    BY MR. HUDIS:
4    Q.    And that was -- the access control
5    portion of the system was a user name and password
6    access?
7    **A.   Yes.**
8        MR. KAPLAN: Objection. Vague.
9    Misstates testimony. Lacks foundation.
10       THE WITNESS: Yes.
11   BY MR. HUDIS:
12   Q.    Mr. Fruchterman, I'm done with
13   Exhibit 61.
14   **A.   Okay.**
15   Q.    Do you know, Mr. Fruchterman, if the
16   plaintiffs appealed the trial court's decision in
17   the HathiTrust litigation?
18   **A.   I do.**
19   Q.    And what's your understanding? Did
20   they -- did the plaintiffs appeal?
21   **A.   They did.**
22   Q.    Okay. What role, if any, did you play
23   in the HathiTrust appeal?
24   **A.   I filed an amicus brief with our chief**
25   **competitor/collaborator in the field.**

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

237

1    Q.   And who was that?
2    A.   Learning Ally.
3    Q.   Do you recall what the outcome was in
4  the HathiTrust appeal?
5    A.   That the appellate court sustained, for
6  the most part, the district court's decision to
7  grant a summary judgment.
8    Q.   Did you review the appeals court opinion
9  in the HathiTrust litigation after it was issued?
10   A.   Yes.
11      (Whereupon, Deposition Exhibit 62 was
12   marked for identification.)
13 BY MR. HUDIS:
14   Q.   Mr. Fruchterman --
15      MR. KAPLAN:  It's getting confusing.
16 We're switching from Westlaw to Lexis?
17      MR. HUDIS:  What can I tell you.
18      THE WITNESS:  Okay.
19 BY MR. HUDIS:
20   Q.   So, Mr. Fruchterman, I now place in
21 front of you what's been marked as Exhibit 62.  It
22 is, as Counsel noted, the Lexis reported version
23 of the Second Circuit Court of Appeals decision in
24 Authors Guild versus HathiTrust reported at 755
25 F.3d 87.  The decision was issued on October 30,

238

1  2013.
2      MR. KAPLAN:  Is that --
3  BY MR. HUDIS:
4    Q.   Mr. Fruchterman -- did I get something
5  wrong, Counsel?
6      MR. KAPLAN:  I think it was decided on
7  June 10th, 2014.
8      MR. HUDIS:  Oh, it says --
9      MR. KAPLAN:  Argued October 30th, 2013.
10      MR. HUDIS:  Counsel, thank you.  All
11 right.  So it was argued in October 2013.  And the
12 decision was issued on June 10, 2014.  Thank you.
13 Appreciate it.
14   Q.   If you could turn to page 7 of
15 Exhibit 62.  Mr. Fruchterman, I'm reading now from
16 the top of the right-hand column of page 7.
17      Are you with me?  It says "second."
18   A.   Yes.
19   Q.   Okay.  It says:
20      "Second, the HathiTrust
21   Digital Library allows member
22   libraries to provide patrons with
23   certified print disabilities
24   access to the full text of
25   copyrighted works.  A 'print

239

1  disability' is any disability that
2  prevents a person from effectively
3  reading printed material.
4  Blindness is one example, but
5  print disabilities also include
6  those that prevent a person from
7  physically holding a book or
8  turning pages."
9      First, Mr. Fruchterman, do you agree
10 with the court's description of what a print
11 disability is?
12      MR. KAPLAN:  Objection.  Vague.
13      THE WITNESS:  Yes, in general.
14 BY MR. HUDIS:
15   Q.   Continuing, the court says:
16      "To use this service, a
17   patron must obtain certification
18   of his disability from a qualified
19   expert.  Through the HathiTrust
20   Digital Library, a print-disabled
21   user can obtain access to the
22   contents of works in the digital
23   library using adaptive
24   technologies such as software that
25   converts the text into spoken

240

1  words or that magnifies the text.
2  Currently" -- I guess it means at
3  the time of this decision -- "the
4  University of Michigan's library
5  is the only HDL member that
6  permits such access, although
7  other member libraries intend to
8  provide it in the future."
9      With respect to individuals with print
10 disabilities, Mr. Fruchterman, do you agree with
11 the Court's description of how the HathiTrust
12 Digital Library worked?
13      MR. KAPLAN:  Objection.  Vague.
14 Compound.  Confusing.
15      THE WITNESS:  Yes.  I think it's a
16 decent summary of my understanding of the state at
17 the time of the decision.
18 BY MR. HUDIS:
19   Q.   Mr. Fruchterman, if you could now turn
20 to page 13 of Exhibit 62.
21      Now, starting towards the bottom of the
22 left-hand column and continuing to most of the
23 right-hand column of Exhibit 62, page 13, it
24 describes -- and the Court says:
25      "The record before us

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

241

1      documents the extensive security
2      measures the libraries have
3      undertaken to safeguard against
4      the risk of a data breach."
5          And citing to the Wilkins' declaration.
6          As part of your work in the HathiTrust
7   litigation, did you ever review the Wilkins'
8   declaration?
9          MR. KAPLAN:  Objection.  Vague and
10  confusing.
11         THE WITNESS:  No.
12  BY MR. HUDIS:
13      Q.   As part of your work in the HathiTrust
14  litigation, did you review the security controls
15  that the HathiTrust Digital Library employed?
16         MR. KAPLAN:  Objection.  Vague.
17         THE WITNESS:  No.
18  BY MR. HUDIS:
19         (Whereupon, Deposition Exhibit 63 was
20  marked for identification.)
21  BY MR. HUDIS:
22      Q.   Mr. Fruchterman, I have now marked a
23  document as Fruchterman Exhibit 63.  It's ten
24  pages.  I'd like to know if you recognize the
25  document.

242

1      A.   I recognize it as an article that I
2   believe I've read at least a portion of.
3      Q.   Now, it is entitled "The Internet
4   Archive's Open Library is violating authors'
5   copyrights," and it bears a date of July 10, 2013.
6          Mr. Fruchterman, did you provide any
7   comments to this article?
8          MR. KAPLAN:  Objection.  Vague.
9          THE WITNESS:  I will take a moment to
10  examine the comments.
11         I think it's a possibility that I
12  submitted a comment on this, but I didn't find it
13  on the initial inspection.  Maybe I need to reread
14  more carefully.
15  BY MR. HUDIS:
16      Q.   We're going to go over that.
17      A.   There we go.  I just found my comment.
18      Q.   Okay.
19      A.   So, yes.
20      Q.   All right.  So you recall Exhibit 63 as
21  being a blog post by Chris --
22         MR. KAPLAN:  I'm going to ask the
23  witness to review the entire document.
24         MR. HUDIS:  Sure.
25         THE WITNESS:  Okay.

243

1          MR. HUDIS:  Thank you, Counsel.
2          MR. KAPLAN:  For the sake of brevity and
3   to be clear, I just wanted to point out that
4   there's multiple comments.
5          MR. HUDIS:  Right.
6          THE WITNESS:  That I've written multiple
7   comments?
8          MR. HUDIS:  Yes.
9          THE WITNESS:  Okay.  Sorry.  Thank you.
10         MR. KAPLAN:  I don't want you to be
11  misled.
12         MR. HUDIS:  That wasn't my intention.
13         MR. KAPLAN:  I know it wasn't.
14  BY MR. HUDIS:
15      Q.   Mr. Fruchterman, just let me know when
16  you're ready.
17      A.   All right.  Read the rest of the
18  comments after my --
19         MR. KAPLAN:  No.
20         MR. HUDIS:  I'm not going to ask --
21         MR. KAPLAN:  Advertisements after that.
22         THE WITNESS:  All right.  Cool.  So the
23  question?
24  BY MR. HUDIS:
25      Q.   Yes.  Mr. Fruchterman, first of all, the

244

1   author, Mr. Meadows, on page 2 refers to top of
2   the page -- third paragraph that starts with "and
3   some of those modern eBooks."
4      A.   Okay.  I'm -- on which page?
5      Q.   Page 2.
6      A.   Page 2.
7      Q.   Okay.  And the paragraph starting "and
8   some of those modern eBooks."
9      A.   Yeah.
10     Q.   All right.  He says:
11         "And some of those modern
12      eBooks for the print-disabled are
13      only available in protected DAISY
14      format."
15         Do you see that?
16     A.   Yes.
17     Q.   Would you describe the DAISY format as a
18  protected format?
19         MR. KAPLAN:  Objection.  Vague.
20         THE WITNESS:  There are DAISY format
21  books that have protections on them and those that
22  do not.  DAISY by itself does not require
23  protection.
24  BY MR. HUDIS:
25     Q.   Does the -- does the DAISY format come

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

62 (Pages 245 to 248)

245

1   with protections, some of them?
2       A.   Some --
3       Q.   I'll reask the question.
4       Do some textual material available in
5   DAISY format come with access protections?
6           MR. KAPLAN:  Calls for speculation.
7   Lacks foundation.  Vague.
8           THE WITNESS:  Some DAISY libraries use
9   digital rights management technical protection
10  mechanisms and some -- well, some -- we do, but I
11  would characterize our books as unprotected rather
12  than protected in the common understanding of what
13  "protected" means.
14  BY MR. HUDIS:
15      Q.   In the context of the question I'm going
16  to ask you next, I'd like you to refer to, on
17  page 2, the text that Mr. Meadows has called out
18  in tan -- in a tan background.
19          Do you see that?
20      A.   Yes.
21      Q.   All right.  And it says -- it's the
22  copyright page of X-COM PDF.
23          "No part of this book may be
24      reproduced or transmitted in any
25      form or by any means, electronic

246

1       or mechanical, including
2       photocopying, recording or by any
3       information storage or retrieval
4       system without written permission
5       from Prima Publishing, except for
6       the inclusion of quotations in a
7       review.  All products and
8       characters mentioned in this book
9       are trademarks of their respective
10      companies."
11          Do you see that?
12      A.   Yes.
13      Q.   In your comment of July 12, 2013, at
14  8:06 p.m. on page 4 --
15      A.   Yes.
16      Q.   -- of Exhibit 63, you say:
17          "Restricted language in a
18      printed book like that quoted from
19      the copyright page of the X-COM is
20      a useless gesture."
21          What did you mean by that, that it was a
22  useless gesture?
23      A.   As a nonlawyer, I read it as asserting
24  powers that they don't have.
25      Q.   Why?

247

1       A.   Because, for example, if I believed
2   them, I could not operate the Bookshare library on
3   that title.  And I think that's incorrect.
4       Q.   Mr. Fruchterman, I want to verify.  Did
5   you write this post of July 13, 2013, at 8:06 p.m.
6   on page 4 of Exhibit 63?
7       A.   I would agree that I wrote these posts.
8       Q.   And did you also write the post on
9   July 12, 2013, at 10:45 p.m., which spans pages 4
10  and 5 of Exhibit 63?
11      A.   Yes.
12      Q.   I just want to get some context here
13  just to make sure.
14          "SFWA" stands for the Science and
15  Fantasy Writers of America?
16      A.   I believe it's Science Fiction and
17  Fantasy Writers of America.
18      Q.   Okay.  And you say here at the bottom of
19  page 4 to the top of page 5:
20          "In the case of SFWA, we
21      committed ourselves to be against
22      digital piracy (already our
23      approach since we're an example of
24      legal copying without permission,
25      didn't want to support illegal

248

1       copying without permission) and
2       increased respect for authors'
3       rights in the quality of their
4       accessible version of their work."
5           Mr. Fruchterman, what did you mean by
6   this sentence?
7           MR. KAPLAN:  Objection.  Vague.
8   Compound.
9           THE WITNESS:  Benetech signed an
10  agreement with SFWA that contained many of the
11  things I'm summarizing here.  So, yes, we had an
12  agreement with the Science Fiction and Fantasy
13  Writers of America that could be summarized with
14  this sentence.
15          MR. HUDIS:  So, Sebastian, we're going
16  to go into Mr. Fruchterman's expert's report.  I
17  think now would be a good time to take a break
18  before we dive into that.
19          MR. KAPLAN:  Okay.  I was wondering if
20  we were going to get there.
21          MR. HUDIS:  Now --
22          THE VIDEOGRAPHER:  Going off the record
23  at 3:34 p.m.
24          (Whereupon, a recess was taken.)
25          (Whereupon, Deposition Exhibit 64 was

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

63 (Pages 249 to 252)

249

1    marked for identification.)
2         THE VIDEOGRAPHER:  Here begins -- here
3    begins Tape No. 4 in the deposition of
4    James Fruchterman.  We're back on the record at
5    3:48.
6    BY MR. HUDIS:
7         Q.   Mr. Fruchterman, I place in front of you
8    what's been marked as Exhibit Fruchterman 64.
9         This is your expert's report?
10        A.   Yes.
11        Q.   And you've reviewed it before testifying
12   today?
13        A.   Correct.
14        Q.   Mr. Fruchterman, I'd like you to turn to
15   page 1.
16        A.   Yes.
17        Q.   In the first paragraph at the top, it
18   says:
19             "As an expert in
20        accessibility of written materials
21        for people who have disabilities
22        that affect using standard print,
23        people who are print-disabled, I
24        have been retained by
25        Public.Resource.Org to evaluate

250

1        the accessibility of certain
2        content that had been available on
3        the web site of the defendant in
4        this case."
5         Do you see that?
6         A.   Yes.
7         Q.   All right.  And as you use
8    "accessibility" in this report at the top of
9    page 1, that's consistent with the definition of
10   "accessible" or "access" that we discussed this
11   morning?
12            MR. KAPLAN:  Objection.  Vague.
13            THE WITNESS:  Yes.
14   BY MR. HUDIS:
15        Q.   And when you discuss people who are
16   print-disabled, that's consistent with the
17   definition of "print-disabled" that you testified
18   to this morning?
19            MR. KAPLAN:  Objection.  Vague.
20            THE WITNESS:  Yes.
21   BY MR. HUDIS:
22        Q.   All right.  You are not offering your
23   expertise on any other topic related to this
24   litigation?
25            MR. KAPLAN:  Objection.  Vague.

251

1             THE WITNESS:  Not in this report.
2    BY MR. HUDIS:
3         Q.   Do you intend to offer any expert
4    opinions in this litigation other than that's
5    contained in your expert's report of Exhibit 64?
6         A.   Am I?
7             MR. HUDIS:  Note, Counsel has pointed to
8    the --
9             THE WITNESS:  To my expert report.
10            MR. HUDIS:  To his expert's report.
11            THE WITNESS:  I don't -- I believe that
12   I'm here to talk about the matter of accessibility
13   of this document, but --
14            MR. KAPLAN:  Sorry.
15            THE WITNESS:  -- if I'm asked some other
16   question and it's okay with the Court, I will
17   answer any other question.
18            MR. KAPLAN:  I'm just pointing you to
19   the last sentence of the second full paragraph of
20   your expert report.
21            THE WITNESS:  "I reserve the right
22        to change or supplement this
23        report if additional evidence comes
24        to my attention and to prepare
25        demonstrative and/or exhibits to

252

1        explain my opinions as appropriate."
2    BY MR. HUDIS:
3         Q.   Other than the reservation in your
4    expert's report that you just read into the
5    record, do you intend to provide any other expert
6    opinions in this case other than what's in your
7    expert's report of Exhibit 64?
8         A.   I do not intend to.
9         Q.   So you're offering your opinion or
10   evaluation on the accessibility of certain content
11   that had been posted at one time on
12   Public.Resource's web site?
13            MR. KAPLAN:  Objection.  Vague and
14   compound.
15            THE WITNESS:  Yes.
16   BY MR. HUDIS:
17        Q.   Your evaluation on the accessibility of
18   content that had been posted on the
19   Public.Resource's web site concerns the 1999
20   edition of the Standards for Educational and
21   Psychological Testing.
22        A.   Yes.
23        Q.   And if we refer to that document as "the
24   1999 standards," you'll understand what I mean?
25        A.   Yes.

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

253

1      Q.   You are not offering your evaluations on
2   the Internet posting of any other content related
3   to this litigation, other than the 1999 standards?
4      **A.   On two different web sites, yes.**
5   **Although, I will note that I searched for them on**
6   **other web sites.**
7      Q.   So apart from the Public.Resource web
8   site and the Internet archive web site, you were
9   not offering your evaluations on the Internet
10  posting of the 1999 standards to any other web
11  site?
12         MR. KAPLAN:  Objection.  Vague.
13         THE WITNESS:  I didn't find them on any
14  other web site.
15  BY MR. HUDIS:
16     Q.   That's not what I asked, though.
17         So what I asked was you are not offering
18  your evaluations on the Internet posting of the
19  1999 standards to any other web site besides
20  Public.Resource's web site and the Internet
21  Archive web site?
22         MR. KAPLAN:  Objection.  Vague.
23         THE WITNESS:  Yes, I am offering my
24  evaluation on the availability of the 1999
25  standards on other web sites where I did not find

254

1   them.
2         (Reporter clarification.)
3         THE WITNESS:  1999.
4         MR. HUDIS:  1999.
5      Q.   Mr. Fruchterman, your entire
6   participation in this litigation is pro bono?
7         MR. KAPLAN:  Objection.  Calls for a
8   legal conclusion.  Vague.
9         THE WITNESS:  I am offering my time pro
10  bono, yes.
11  BY MR. HUDIS:
12     Q.   You are not receiving any compensation
13  for your participation in this litigation?
14         MR. KAPLAN:  Objection.  Vague.
15         THE WITNESS:  Not for my time, no.
16  BY MR. HUDIS:
17     Q.   Are you receiving compensation for any
18  other purpose for your participation in this
19  litigation?
20         MR. KAPLAN:  Objection.  Vague.
21         THE WITNESS:  I have not been offered
22  any compensation up till this point for any
23  expenses I have incurred with respect to this,
24  though, in theory, you sent me a check for $40,
25  but I didn't get it.

255

1         MR. KAPLAN:  Because you sent it to us.
2         MR. HUDIS:  We actually --
3         MR. KAPLAN:  I think.
4         MR. HUDIS:  Well, no.
5         MR. KAPLAN:  Actually, I don't know.
6   Matt handled that part of it.
7         MR. HUDIS:  Yeah.  We actually -- all
8   the counsel waived the expert fee for all experts.
9         MR. KAPLAN:  Yeah, that may have been
10  the other case.
11         THE WITNESS:  I don't know.  It said $40
12  on the thing that I was shown this morning.  And
13  so -- which I didn't remember seeing.
14         MR. KAPLAN:  Okay.
15  BY MR. HUDIS:
16     Q.   Whether for compensation or not,
17  Mr. Fruchterman, did you enter into any agreement
18  with Public.Resource in connection with your
19  participation in this litigation?
20         MR. KAPLAN:  Objection.  Vague.
21         THE WITNESS:  Yes.
22  BY MR. HUDIS:
23     Q.   Was it a written agreement?
24         MR. KAPLAN:  Objection.  Argumentative
25  and vague.

256

1         THE WITNESS:  Yes.
2         MR. HUDIS:  Counsel, just noted, we have
3   never been provided with that agreement.  We
4   didn't think that it was necessary to ask for it
5   by way of subpoena since that's part of what's
6   required under Federal Rules 26.
7   BY MR. HUDIS:
8      Q.   Mr. Fruchterman --
9         MR. KAPLAN:  Where is that required
10  by --
11         MR. HUDIS:  Well, it's part -- that's
12  what's part of the expert's report.
13         MR. KAPLAN:  I'm sorry.  I don't know
14  what you mean by that.
15         MR. HUDIS:  Part of the --
16         MR. KAPLAN:  Looking at
17  Rule 26(a)(2)(B)?
18         MR. HUDIS:  (a)(2)(B).
19         MR. KAPLAN:  I don't see it.
20         MR. HUDIS:  It's -- I believe it's the
21  last item.
22         MR. KAPLAN:  The statement of the
23  compensation to be paid for the study and
24  testimony in the case is what the rule says.
25         MR. HUDIS:  So anyway, Counsel, I just

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

257

1    note that the agreement that Mr. Fruchterman has
2    just testified to was not produced.  We think it
3    should be.
4        Q.   Mr. Fruchterman, if you could turn to
5    page 3 of your expert's report.  And when I say
6    "expert's report," just note for the record that I
7    am constantly referring to Exhibit 64 so I don't
8    have to constantly say it over and over again.
9        A.   Yes.
10       Q.   Are you there?  All right.
11           So, Mr. Fruchterman, you limited the
12   focus of your report to accessibility challenges
13   faced by totally blind people.
14       MR. KAPLAN:  Is there a question?
15       MR. HUDIS:  Yes.
16       MR. KAPLAN:  What is the question?
17   BY MR. HUDIS:
18       Q.   You limited the focus of your report to
19   accessibility challenges faced by totally blind
20   people.
21       A.   That sounds like a statement.
22       Q.   All right.  Do you --
23       A.   Do you want to reframe it as a question?
24       Q.   Sure.  Mr. Fruchterman --
25       A.   Thank you.

258

1        Q.   -- did you limit the focus of your
2    report to accessibility challenges based -- faced
3    by totally blind people?
4        MR. KAPLAN:  Objection.  Vague.
5        THE WITNESS:  I believe that I talked
6    about a variety of people with different
7    disabilities and that I focused my report on the
8    needs of people with -- who are blind, because
9    they generally have the most severe needs.  But I
10   did discuss the needs of other people with print
11   disabilities.
12   BY MR. HUDIS:
13       Q.   Well, Mr. Fruchterman, you did not
14   consider print accessibilities -- accessibility
15   problems faced by the visually impaired.
16       A.   That sounds like a statement again.
17           Do you want to reframe it as a question.
18       Q.   All right.  Well, that's either a yes or
19   no.
20           Isn't it true, you did not consider
21   print accessibility problems faced by the visually
22   impaired?
23       A.   I believe I did consider the
24   accessibility problems of people who are visually
25   impaired.

259

1        Q.   Can you find that in your expert's
2    report?
3        A.   Reading from the page that we're
4    referring to:
5            "The other groups of people
6        with print disabilities use
7        similar techniques to access
8        print, such as having it read
9        aloud, and experience similar
10       challenges as blind people.  In
11       the accessibility field, it is
12       generally understood that if you
13       make information accessible to a
14       blind person, it will probably
15       also meet the accessibility needs
16       of the great majority of people
17       with other print disabilities."
18       I can continue to search my report for
19   other references that I feel address that need.
20   Would you like me to do that?
21       Q.   Go ahead.  I don't think you'll find
22   them, but please go ahead.
23       A.   Okay.  On page 6:
24           "The unavailability of a
25       version of the 1999 standards that

260

1        is accessible to people who are
2        blind or print-disabled is
3        problematic because the 1999
4        standards are important references
5        for those making tests that are
6        accessible to students who are
7        print-disabled as well as those
8        impacted by these tests."
9        Q.   And that's your -- that, in your view,
10   is a discussion of making print content available
11   to people with -- who are visually impaired?
12       MR. KAPLAN:  Objection.  Argumentative.
13   Vague.
14       THE WITNESS:  I include them in the
15   definition of people with print disabilities.  I
16   have an additional line I can read from this page.
17   BY MR. HUDIS:
18       Q.   Please.
19       A.   I will look for more references to print
20   disabilities, but as a starting point,
21           "This also means that it is
22       an important resource to any
23       students or other individuals with
24       print disabilities who want to
25       assess compliance with the 1999

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

261

1       **standards.  The unavailability of**
2       **the 1999 standards means that some**
3       **of those who are most impacted,**
4       **people who are blind or**
5       **print-disabled, are unable to**
6       **independently access the 1999**
7       **standard."**
8       Q.   So in that -- in that passage that you
9    just read, you are equating people who are totally
10   blind with people who have print disabilities?
11          MR. KAPLAN: Objection. Vague.
12   Misstates the document and the testimony.
13   Confusing.
14          THE WITNESS: My phrase is "people who
15   are blind or print-disabled." That way I was
16   including people who are print-disabled who aren't
17   blind, but I wasn't meaning to say that blind
18   people are not print-disabled.
19   BY MR. HUDIS:
20      Q.   Just so we have a working context here,
21   so "print-disabled" can mean the following:
22   Totally blind?
23      **A.   Correct.**
24      Q.   Somebody who has low vision?
25      **A.   Right.**

262

1       Q.   Somebody who is learning-disabled?
2       **A.   Okay.**
3       Q.   Someone who is brain-injured?
4       **A.   Mh-hmm.**
5       Q.   And someone who is physically disabled
6    so that the person cannot pick up text?
7          MR. KAPLAN: Objection. Vague and
8    misleading.
9          THE WITNESS: That describes, I'd say,
10   over 95 percent of people with print disabilities,
11   but there are quite another -- other diagnoses
12   that would qualify as print disabilities beyond
13   those.
14   BY MR. HUDIS:
15      Q.   All right.
16      **A.   For example, cortical blindness would be**
17   **an example of something where the eyes work fine,**
18   **but they still can't perceive.**
19      Q.   All right. So, Mr. Fruchterman, I turn
20   now back to page 3, the second paragraph. What I
21   want to know is why did you say:
22          "I focused on the
23          accessibility challenges that
24          would be experienced by blind
25          people"?

263

1          MR. KAPLAN:  Objection.  Asked and
2    answered.  Vague, confusing.
3          MR. HUDIS:  I don't believe he's
4    answered the question.
5          MR. KAPLAN:  That's your opinion,
6    Counsel.
7          THE WITNESS:  So the question, why did I
8    focus on that?
9    BY MR. HUDIS:
10      Q.   Yes.
11      **A.   I think from our extensive discussion**
12   **today, that taking an inaccessible print document**
13   **and turning it into text is a fundamental element**
14   **of accessibility.**
15          **A person with a physical disability who**
16   **cannot turn a page can greatly benefit from having**
17   **a digital copy of that book so that they can, for**
18   **example, use electronic controls to turn the page.**
19          **So when I say that I focused on the**
20   **needs of blind people, is if you solve the needs**
21   **of blind people, you solve the needs of every**
22   **other one of the categories of print-disabled**
23   **persons that are in that definition.**
24          **Please.  And I note that I haven't**
25   **actually gone through the rest of the report to**

264

1    look for more examples of this.  There may be
2    more.  But I'll let you manage the time of how I
3    spend that time.
4       Q.   Thank you, Mr. Fruchterman.
5       **A.   Certainly.**
6       Q.   All right.  Now, looking at page 3, at
7    the bottom, it's the third full paragraph, which
8    also spans to page 4, you say:
9          "The most common technology
10          used by a blind person for
11          accessibility is called a screen
12          reader."
13          First of all, what is a screen reader?
14      **A.   Quoting from the report, a screen reader**
15   **is a program that runs on a personal computer or a**
16   **smartphone that reads the information on the**
17   **screen aloud using a computer-synthesized voice.**
18      Q.   Is that also known as text to speech or
19   TTS?
20      **A.   It utilizes text to speech as the most**
21   **common way of outputting information from a screen**
22   **reader.**
23      Q.   In your report, did you consider the
24   accessibility of the 1999 standards through screen
25   magnification systems?

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

265

1        MR. KAPLAN: Objection. Vague.
2        THE WITNESS: I don't believe that I
3    discussed screen magnification in this report.
4    BY MR. HUDIS:
5        Q.   In your report, Mr. Fruchterman, did you
6    consider the accessibility of the 1999 standards
7    through a portable magnifier?
8        MR. KAPLAN: Objection. Vague.
9        THE WITNESS: No, I did not.
10   BY MR. HUDIS:
11       Q.   In your report, did you consider the
12   accessibility of the 1999 standards through a
13   video magnifier?
14       MR. KAPLAN: Objection. Vague.
15       THE WITNESS: No, I did not.
16   BY MR. HUDIS:
17       Q.   In your report, did you consider the
18   accessibility of the 1999 standards through
19   closed-circuit television technology?
20       MR. KAPLAN: Objection. Vague.
21       THE WITNESS: No, I did not.
22   BY MR. HUDIS:
23       Q.   Okay. In your report, did you consider
24   the accessibility of the 1999 standards through
25   Braille display technology?

266

1        MR. KAPLAN: Objection. Vague.
2        THE WITNESS: I might have. Yes, I did.
3    BY MR. HUDIS:
4        Q.   Where?
5        A.   On page 11, second sentence.
6            "Because the text is provided
7        in the standard format, such as
8        Microsoft Word, a blind person is
9        able to listen to the text or
10       access it using a digital Braille
11       device. This kind of text content
12       is also highly accessible to
13       people with other print
14       disabilities and the assistive
15       telling technology they use to
16       access print. For example, people
17       with low vision or dyslexia often
18       use a screen reader to read text
19       aloud."
20       Q.   Mr. Fruchterman, in your report, did you
21   consider the accessibility of the 1999 standards
22   through writing Braille?
23       MR. KAPLAN: Objection. Vague.
24       THE WITNESS: As phrased, that question
25   doesn't make sense to me.

267

1    BY MR. HUDIS:
2        Q.   It's Braille technology using a slate
3    and stylus.
4        MR. KAPLAN: Objection. Vague.
5        THE WITNESS: The question still doesn't
6    make any sense to me.
7    BY MR. HUDIS:
8        Q.   In your report, did you consider the
9    accessibility of the 1999 standards through a
10   Braille embosser?
11       MR. KAPLAN: Objection. Vague.
12       THE WITNESS: Yes, because you emboss
13   text by sending it -- basically, you create a
14   Braille document by sending text to the Braille
15   embosser, like a printer.
16   BY MR. HUDIS:
17       Q.   Text in what form? Digital text?
18       A.   Yes.
19       Q.   And that would have to be OCR scanned
20   digital text or text recognized?
21       MR. KAPLAN: Objection. Compound.
22   Vague.
23       THE WITNESS: Any text can be sent to a
24   Braille printer, much as any text can be sent to a
25   print printer.

268

1    BY MR. HUDIS:
2        Q.   Did you consider the accessibility of
3    the 1999 standards through refreshable Braille?
4        MR. KAPLAN: Objection. Vague.
5        THE WITNESS: Yes, when I use the phrase
6    "a digital Braille device," I was referring it --
7    basically to all types of digital Braille devices,
8    which would include an embosser, a note taker, a
9    Braille display. It would not include slate and
10   stylus.
11   BY MR. HUDIS:
12       Q.   Mr. Fruchterman, now I'd like to know
13   your understanding of the following terms we've
14   used.
15       What is a screen magnification system?
16       A.   It is software that operates on top of a
17   PC or device to magnify what's on the screen.
18       Q.   And what is your understanding of a
19   portable magnifier?
20       A.   Most commonly, a magnifying glass. But
21   there are other variations on the theme.
22       Q.   Can it include a video magnifier with a
23   handheld camera?
24       A.   It can.
25       Q.   And what's your understanding of what a

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

269

1  video magnifier is?
2      A.  It would be a -- most commonly a device
3  with a camera and a monitor attached to it that
4  would magnify what's in the field of view of the
5  camera.
6      Q.   Is that also known as closed-circuit
7  television technology?
8      A.   That's another term for the same.
9      Q.   And you said that you considered the use
10 of Braille display technology.
11         What is your understanding of Braille
12 display technology?
13     A.   Do you want to know how it works?
14     Q.   No.  Just your understanding.
15     A.   It takes text and displays Braille to
16 the reader in a tactile form.
17     Q.   Mr. Fruchterman, I'm turning again now
18 to page 3 of your expert's report at the bottom.
19         Please describe generally how screen
20 reader technology works.
21     A.   Screen reader is a separate software
22 program that operates on top of the program that
23 the person is using at that moment and changes
24 generally the visual and auditory presentation of
25 that material, most commonly by reading what's on

270

1  the screen aloud.
2      Q.   All right.  And is that example of text
3  to speech?
4          MR. KAPLAN:  Objection.  Vague.
5          THE WITNESS:  Different users use their
6  screen reader with different forms of information.
7  The most common is text to speech.  But, for
8  example, a deaf/blind person uses a screen reader
9  with a Braille display, and the text is -- that's
10 on the screen is presented on the Braille display.
11 BY MR. HUDIS:
12     Q.   And, again, so that -- if it's a blind
13 and deaf person, it would be a tactile Braille?
14     A.   All Braille is tactile.  Or at least all
15 sensible uses of Braille are tactile, though there
16 are sighted people who can read Braille visually,
17 so ...
18     Q.   I'd like to know if you recognize these
19 as brand names of screen reader technology.
20         JAWS from Freedom Scientific?
21     A.   Yes.
22     Q.   Window-Eyes from GW Micro?
23     A.   Yes.
24     Q.   Okay.  Dolphin SuperNova from Dolphin
25 Computer Access?

271

1      A.   Yes.
2      Q.   System Access from Serotek?
3      A.   Yes.
4      Q.   ZoomText from Ai Squared?
5      A.   ZoomText is a combination screen reader,
6  but most people think of it as a screen
7  magnification product.
8      Q.   And NVDA open source screen reader.
9      A.   Yes.
10     Q.   Would screen reader technology work with
11 an image-only PDF document?
12         MR. KAPLAN:  Objection.  Incomplete
13 hypothetical.  Vague.
14         THE WITNESS:  Some do.  Some screeners
15 also have image magnification as well as screen
16 reading.  So you can make it big or change the
17 contrast by reversing the contrast or changing the
18 colors, so -- but that would be not the typical
19 use.
20 BY MR. HUDIS:
21     Q.   What is the typical use of screen reader
22 technology?
23         MR. KAPLAN:  Objection.  Vague.
24 Confusing.
25         THE WITNESS:  Generally, to read what's

272

1  on the screen aloud in words.
2  BY MR. HUDIS:
3      Q.   So text to speech?
4      A.   Yes.
5      Q.   So would screen reader technology for
6  text to speak -- text to speech work with an
7  image-only PDF document?
8          MR. KAPLAN:  Objection.  Incomplete
9  hypothetical.  Vague.
10         THE WITNESS:  No.
11 BY MR. HUDIS:
12     Q.   Mr. Fruchterman, please turn to page 4
13 of your report.  And I'm focusing in on the first
14 full paragraph of that page.  The paragraph starts
15 "For the purpose of this report."
16         Do you see that?
17     A.   Mh-hmm.
18     Q.   And the second sentence says:
19         "Based on the information the
20         screen reader can glean from the
21         pages displayed on the screen, can
22         a blind person locate the standard
23         and read it."
24         In this context, what did you mean by
25 "locate the standard"?

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

273

1    A.   In this context, I was focusing on web
2  searches.
3    Q.   And in this context, what did you mean
4  by "read the standard"?
5    A.   Basically, read it aloud, generally,
6  would be the most common use.
7    Q.   Which, if the person was blind, could
8  not do?
9         MR. KAPLAN:  Objection.  Vague and
10  confusing.
11         THE WITNESS:  Well, if they located a
12  text version of the standard, they certainly could
13  read it aloud.
14  BY MR. HUDIS:
15    Q.   They'd need assistive technology to do
16  so?
17    A.   Yes.  But when -- when I use the term
18  "can a blind person read it," I'm presuming that
19  they're using technology to read it as opposed to
20  something else.
21    Q.   And when you say "use technology," what
22  did you mean?
23         MR. KAPLAN:  Objection.  Vague.
24         THE WITNESS:  Okay.  Taking a step back.
25

274

1  BY MR. HUDIS:
2    Q.   Sure.
3    A.   When a blind person says "I've read a
4  book," they mean that they have ingested the
5  content of that book in a way that would be
6  similar to what a sighted person would do.  And
7  whether they did that in Braille or by listening
8  to it, or if they're low vision, seeing it
9  enlarged, they, in the common use of "I read that
10  book," a blind or vision-impaired person would
11  mean those things without describing the
12  technology that they happen to use to read that
13  book.
14    Q.   Mr. Fruchterman, I'm looking now at the
15  second full paragraph on page 4.
16         "The accessibility tasks I
17         tested were designed to assess
18         whether a blind user with basic
19         assistive technology skills could
20         perform the same kind of tasks one
21         might expect a user without a
22         disability to perform in accessing
23         a given standard without requiring
24         the intervention of a third
25         party."

275

1         In the context of that sentence, what
2  did you mean by "assistive technology"?
3    A.   I would include all the different
4  technology that people, in this case blind users,
5  would use to -- to access information.
6    Q.   And that would include the technologies
7  we discussed previously?
8         MR. KAPLAN:  Objection.  Vague.
9         THE WITNESS:  Yes.
10  BY MR. HUDIS:
11    Q.   All right.  All right.  So in the
12  context of a totally blind person, that would
13  include screen reader technology?
14    A.   Most commonly, yes.
15    Q.   But it would not include screen
16  magnification systems because that would be of no
17  use to a blind person?
18    A.   Many of the tasks that I examined, I was
19  also considering whether other people with print
20  disabilities could use that same content because,
21  as I've noted, people with low vision and dyslexia
22  often use screen readers as well.
23    Q.   My question was screen magnification
24  systems would not be of use to a blind person;
25  isn't that correct?

276

1         MR. KAPLAN:  Objection.  Incomplete
2  hypothetical.  Vague.
3         THE WITNESS:  A screen magnification
4  system would not be useful to a completely blind
5  person, that is correct.
6  BY MR. HUDIS:
7    Q.   All right.  And closed-circuit
8  television technology would not be of any use to a
9  completely blind person --
10         MR. KAPLAN:  Objection.
11  BY MR. HUDIS:
12    Q.   -- that is also correct?
13         MR. KAPLAN:  Objection.  Vague.
14         THE WITNESS:  Yes.
15  BY MR. HUDIS:
16    Q.   Mr. Fruchterman, at the bottom of page 4
17  of your report, what did you mean by "the
18  functional approach as a method of assessing
19  accessibility"?
20         MR. KAPLAN:  Objection.  Vague.
21         THE WITNESS:  Can a person with a
22  disability functionally do tasks similar to those
23  of people who do not have a disability?
24  BY MR. HUDIS:
25    Q.   So that's to obtain the content, to read

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

277

1    the content, and make structural use of the
2    document?
3         MR. KAPLAN: Objection. Confusing.
4    Misstates testimony. Vague.
5         THE WITNESS: I included do a full-text
6    search and find specific mentions of terms of
7    interest.
8    BY MR. HUDIS:
9       Q.   Now, you call the functional approach
10   "the most common method of assessing
11   accessibility."
12         Do you see that?
13      A.  Yes.
14      Q.   Are there any other methods of assessing
15   print accessibility?
16         MR. KAPLAN: Objection. Vague.
17         THE WITNESS: There are, let's say,
18   attempts to say do these ten things, and your
19   document will be accessible. And those approaches
20   have often fallen short of actually being usable
21   by disabled people.
22         So when implementing accessibility,
23   people usually focus on functional elements, like
24   can a person with a disability actually do this
25   task, as opposed to did you follow a checklist,

278

1    which might end up in resulting in them not being
2    able to do that task.
3    BY MR. HUDIS:
4       Q.   Are there any other usable methods of
5    assessing print accessibility besides the
6    functional method?
7         MR. KAPLAN: Objection. Vague.
8         THE WITNESS: Yes. You could design a
9    completely automated tool that purported to
10   access -- to assess accessibility.
11   BY MR. HUDIS:
12      Q.   And what would such an automated tool
13   do?
14         MR. KAPLAN: Objection. Incomplete
15   hypothetical. Vague.
16         THE WITNESS: It might show -- okay.
17   These tools do exist. And like any pattern
18   recognition system, they have errors. They pick
19   up problems that aren't problems. They miss
20   problems that are problems. And they don't see
21   things that they weren't designed to see.
22   BY MR. HUDIS:
23      Q.   Could you give me an example of such an
24   automated tool?
25         MR. KAPLAN: Objection. Argumentative.

279

1    Vague.
2         THE WITNESS: I would do a Google search
3    on "automated accessibility tools" and I would
4    find a bunch of them.
5    BY MR. HUDIS:
6       Q.   Are there any ones that you know of as
7    we sit here today?
8         MR. KAPLAN: Objection. Vague.
9         THE WITNESS: I have certainly used them
10   in the past, and I find them through Google
11   searches. And I've certainly -- I've used one in
12   the last year. I just don't memorize their brand
13   names because they're generally free on the
14   Internet.
15   BY MR. HUDIS:
16      Q.   Can you recall any such automated tools
17   by their -- by its brand name?
18         MR. KAPLAN: Objection. Vague.
19         THE WITNESS: I know early on, the
20   Center on Applied Special Technology, CAST, had an
21   elevated tool for assessing this, and it had a
22   name like Willie (phonetic) or Sammy (phonetic) or
23   something. But, no, I don't. I know -- I can
24   remember a brand name, CAST, who was the original
25   publisher of this accessibility tool.

280

1    BY MR. HUDIS:
2       Q.   So other than automated tools and the
3    functional approach for assessing print
4    accessibility, can you name any other method as
5    you sit here now for assessing print
6    accessibility?
7         MR. KAPLAN: Objection. Vague.
8         THE WITNESS: Well, I would certainly
9    refer you to the W3C web content accessibility
10   guidelines that specify a standard for
11   assessing -- I would say that they primarily
12   follow a functional approach, but they also have a
13   proscriptive approach.
14   BY MR. HUDIS:
15      Q.   What is the proscriptive approach?
16      A.  I think I've kind of alluded to it
17   earlier. It's to follow a set of specifications
18   without actually testing them.
19         An example of a proscriptive approach is
20   don't have flashing lights that go at a certain
21   number of hertz because it might trigger an
22   epileptic seizure. So that's something, for
23   example, that -- don't do this. And there's no
24   need to test this on an epileptic person to see if
25   it generates a seizure. Just don't do this.

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

281

1      Q.   So as I understand your definition of "a
2   proscription approach to assessing print
3   accessibility," it is a checklist of items without
4   testing them in context?
5          MR. KAPLAN: Objection. Misstates
6   testimony. Vague.
7          THE WITNESS: Correct.
8   BY MR. HUDIS:
9      Q.   In your report, what distinction do you
10  make, Mr. Fruchterman, between one who is blind
11  and one who is otherwise print-disabled?
12         MR. KAPLAN: Objection. Argumentative.
13  Vague.
14         THE WITNESS: I consider blind people to
15  be a subset of those people with print
16  disabilities.
17  BY MR. HUDIS:
18     Q.   In what way is a blind person a subset
19  of people with print disabilities?
20     A.   **Let me rephrase that more carefully.**
21         **There are, let's say, a population of**
22  **people who have print disabilities, which I would**
23  **generally define functionally as having a**
24  **limitation when it comes to accessing print.**
25  **People who have a visual impairment that is**

282

1   **commonly described as blindness are one of those**
2   **people.**
3          **But there are many people with other**
4   **print disabilities that do not meet the definition**
5   **of blindness as its commonly understood.**
6      Q.   Mr. Fruchterman --
7          MR. KAPLAN: Jonathan, we've been going
8   almost an hour. Do you want to take a break when
9   you've reached the end of a line of questions?
10         MR. HUDIS: Actually, now is a good
11  time.
12         MR. KAPLAN: Okay.
13         THE WITNESS: Okay.
14         MR. KAPLAN: Go off the record at
15  4:28 --
16         THE WITNESS: I guess I moved, huh?
17         THE VIDEOGRAPHER: You did, but people
18  do.
19         THE WITNESS: Right after saying that I
20  didn't move, I, of course --
21         THE VIDEOGRAPHER: Going off the record
22  at 4:29.
23         (Whereupon, a recess was taken.)
24         THE VIDEOGRAPHER: We are back on record
25  at 4:37.

283

1   BY MR. HUDIS:
2      Q.   Mr. Fruchterman, I'd like to create a
3   shorthand so that we can be efficient in the rest
4   of your testimony.
5          So referring back to your expert's
6   report at page 5, the first paragraph:
7          "I was asked to review the
8          accessibility of the 1999 edition of the
9          standards for people who are blind or
10         otherwise print-disabled."
11         I'm going to use the term "accessibility
12  review."
13         Can you -- can we use that as a
14  shorthand for the work you did in the report you
15  have given us?
16         MR. KAPLAN: Objection. Calls for
17  speculation.
18         THE WITNESS: Fine.
19  BY MR. HUDIS:
20     Q.   Okay. What tools did you use for your
21  accessibility review of the 1999 standards?
22         MR. KAPLAN: Objection. Vague.
23         THE WITNESS: A variety of technological
24  tools, usually using a computer, assistive
25  technology, web browsers, commonly available

284

1   software.
2   BY MR. HUDIS:
3      Q.   Was the ABBYY FineReader one of those
4   tools?
5      A.   **Yes.**
6      Q.   And was Window-Eyes one of those tools?
7      A.   **Yes.**
8      Q.   And you used those pieces of software on
9   a Windows-based PC?
10     A.   **Yes.**
11     Q.   As part of your accessibility review,
12  what did you use the ABBYY FineReader software
13  for?
14         MR. KAPLAN: Objection. Vague.
15         THE WITNESS: One of the two standards I
16  was examining was an image-based PDF, and I used
17  the ABBYY FineReader software to do optical
18  character recognition on the image-based PDF to
19  create a text version of the standard.
20  BY MR. HUDIS:
21     Q.   And when you use the term "the
22  standard," you're talking about the 1999
23  standards?
24     A.   **Correct.**
25     Q.   Do you remember what version of the

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

285

1    ABBYY FineReader software you used?
2        A.   No.  But a recent one from this year.
3        Q.   Do you know how the price of the ABBYY
4    FineReader program that you use compares with
5    competitor OCR software programs on the market?
6           MR. KAPLAN: Objection.  Vague.
7           THE WITNESS: I'm familiar that they
8    range from free or nearly free to many thousands
9    of dollars.
10   BY MR. HUDIS:
11       Q.   And where would the ABBYY FineReader
12   program fall in that spectrum?
13       A.   I don't know.  I didn't buy it.
14       Q.   Mr. Fruchterman, in your report, you use
15   two different terms, and I'd like to know if there
16   is a distinction with a difference or a
17   distinction without a difference.
18          On page 8, the first full paragraph at
19   the bottom, you use the term "recognized text."
20          Do you see that?
21       A.   As in the resulting word processor file,
22   a recognized text --
23       Q.   Yes.
24       A.   -- could then be read using a screen
25   reader?

286

1        Q.   Yes.
2        A.   Okay.
3        Q.   And then on page 10 at the top, you use
4    the term "accessible text."  It's the sentence
5    just before the picture.
6        A.   Accessible --
7           MR. KAPLAN: That's the end of the
8    question.
9           MR. HUDIS: I wanted him to look at the
10   two different terms for reference.
11          THE WITNESS: I've looked at the two
12   terms.
13   BY MR. HUDIS:
14       Q.   All right.  Now, here's the question:
15   Do you make any distinction between "recognized
16   text" and "accessible text"?
17          MR. KAPLAN: Objection.  Vague.
18          THE WITNESS: Yes.
19   BY MR. HUDIS:
20       Q.   What is the distinction?
21       A.   Recognized text is a subset of
22   accessible text.
23       Q.   So let's have these definitions one at a
24   time.
25          What is recognized text and what is

287

1    accessible text?
2        A.   Recognized text is text that has been
3    created through a process using recognition.
4    Accessible text is digital text without regard to
5    its source production mechanism.  For example, it
6    could be created digitally by typing it into a
7    word processor, and it would be accessible text
8    without it ever having been recognized.
9        Q.   So recognized text, for example, would
10   be to use OCR technology on a PDF image-only
11   document?
12          MR. KAPLAN: Objection.  Incomplete
13   hypothetical.  Vague.
14          THE WITNESS: That would be one way to
15   produce recognized text.
16   BY MR. HUDIS:
17       Q.   All right.  Now, accessible text, an
18   example would be creating a Word document, but
19   that's not necessarily using recognition
20   technology?
21          MR. KAPLAN: Objection.  Vague.
22   Incomplete hypothetical.
23          THE WITNESS: There are many ways you
24   can create a Word document.
25

288

1    BY MR. HUDIS:
2        Q.   And using --
3        A.   And they would generally be accessible.
4        Q.   All right.  So one way to create
5    accessible text would be to use Microsoft Word?
6           MR. KAPLAN: Objection.  Incomplete
7    hypothetical.  Vague.
8           THE WITNESS: There are many ways to use
9    Microsoft Word, but typing into Microsoft Word
10   would be an example of a way to create accessible
11   text.
12          Copying, pasting from an Internet
13   document web page into a Word document would be
14   taking accessible text in one program, a web
15   browser, and putting it into a different program,
16   a web or processor.
17   BY MR. HUDIS:
18       Q.   And the distinction with -- you're
19   making with recognized text is you are taking text
20   that's in an image document, using technology to
21   recognize it and make it accessible?
22          MR. KAPLAN: Objection.  Vague and
23   confusing.
24          THE WITNESS: Yes.  That's one way to
25   create recognized text.

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

289

1    BY MR. HUDIS:
2        Q.   If you know, how commonly is the ABBYY
3    FineReader software used by the blind or visually
4    impaired to convert textual material to recognized
5    text?
6            MR. KAPLAN: Objection. Vague.
7    Compound.
8            THE WITNESS: I think of it as one of
9    the top two commercial OCR products that are
10   frequently used in the production of recognized
11   text.
12           Many blind consumers have OCR products
13   that are built into assistive technology products.
14   Many of those license the ABBYY FineReader or
15   other leading commercial products. So the
16   technology is the same, but the product
17   presentation would be different.
18   BY MR. HUDIS:
19       Q.   Referring to the top of page 5, why did
20   you also use the free online OCR service as part
21   of your accessibility review?
22           MR. KAPLAN: Objection. Vague.
23           THE WITNESS: I just chose to use
24   another OCR engine. And by doing a Google search
25   on OCR, I found a free online OCR, and I thought,

290

1    Wow, let's see, let's see if it works as well on
2    that one. Yeah, it does.
3    BY MR. HUDIS:
4        Q.   In the context of your accessibility
5    review, how did the OCR conversion process using
6    the free online OCR service compare with the
7    conversion process you used using the ABBYY
8    FineReader software?
9            MR. KAPLAN: Objection. Vague.
10   Confusing.
11           THE WITNESS: I visually inspected the
12   pages and didn't see a noticeable difference in
13   OCR accuracy.
14   BY MR. HUDIS:
15       Q.   And what is your definition of "OCR
16   accuracy"?
17       A.   Well, in this context, do I spot a bunch
18   of errors or not. And I didn't spot very many
19   errors at all, actually.
20       Q.   You did spot a few?
21           MR. KAPLAN: Objection. Vague.
22   Confusing.
23   BY MR. HUDIS:
24       Q.   Did you spot any errors?
25       A.   I am sure I spotted at least one error

291

1    in the ABBYY FineReader, one which I looked at
2    more pages on. But it didn't seem like a
3    significant number.
4        Q.   As part of your accessibility review,
5    what did you use the Window-Eyes software for?
6            MR. KAPLAN: Objection. Vague.
7            THE WITNESS: Window-Eyes is one of the
8    leading screen readers, and so I was confirming
9    that functional element of being able to do the
10   process and read the recognized text aloud.
11   BY MR. HUDIS:
12       Q.   Do you recall what version of
13   Window-Eyes software you used?
14       A.   No. But it would have been a current
15   one from this year.
16       Q.   Do you know how the price of the
17   Window-Eyes program that you use compares with
18   competitor screen reader software programs on the
19   market?
20           MR. KAPLAN: Objection. Vague.
21           THE WITNESS: I'm aware that it's free
22   to people who have Microsoft Office. That's
23   probably why I chose it.
24   BY MR. HUDIS:
25       Q.   Is Window-Eyes sold as a stand-alone

292

1    program?
2            MR. KAPLAN: Objection. Lacks
3    foundation.
4            THE WITNESS: It historically has been.
5    But I had read of this offer through Microsoft,
6    buying it for all Microsoft Office users, and saw
7    that, well, I'll use the free one.
8    BY MR. HUDIS:
9        Q.   Do you know what the price of the
10   stand-alone product is for Window-Eyes?
11           MR. KAPLAN: Objection. Vague.
12   Argumentative.
13           THE WITNESS: I don't recall a current
14   price. In the past, it was generally cheaper than
15   JAWS. Hundreds of dollars as opposed to a
16   thousand dollars or more than a thousand dollars.
17   BY MR. HUDIS:
18       Q.   Generally, without going into minute
19   detail, what steps does the Window-Eyes program go
20   through to convert textual material into
21   synthesized speech?
22           MR. KAPLAN: Objection. Vague.
23           THE WITNESS: So think of the
24   synthesized speech as a printer for words. You
25   send a stream of words to it, and it says them

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

74 (Pages 293 to 296)

293

1 aloud, much like a printer puts them on a page.
2        So a screen reader has a bunch of
3 controls so the user can kind of say what they
4 want spoken, the stop speech, that's the most
5 important control. It also analyzes the structure
6 of a document if that structure is available to
7 it. Analyzes what's on the screen.
8        And so, you know, a screen reader will
9 tell you different things depending on whether
10 you're examining a Word document, a web page, an
11 Excel spreadsheet. But the goal is through the
12 use of your -- generally, your keyboard as your
13 input mechanism to control things and listening,
14 you glean the information from the program and the
15 content in the program that you need to access the
16 information.
17 BY MR. HUDIS:
18   Q.   How commonly is Window-Eyes software
19 used by the blind or visually impaired to convert
20 textual material into synthesized speech?
21   A.   I think of it as the number two screen
22 reader.
23   Q.   Which is the number one?
24   A.   JAWS.
25   Q.   What other tools, if any, besides the

294

1 ABBYY FineReader program, the free OCR service,
2 Window-Eyes and a Windows-based computer did you
3 use as part of your accessibility review?
4        MR. KAPLAN: Objection. Vague.
5        THE WITNESS: Web browser. Web search
6 engines. The web sites of different
7 organizations.
8 BY MR. HUDIS:
9   Q.   And you listed them in your report?
10   A.   Yes. I think that covers -- did I say
11 Microsoft Word?
12   Q.   You have now.
13   A.   Yeah. Certainly those seem to be all
14 the significant ones that come to mind.
15   Q.   I just want to make sure that I have a
16 list of all the tools that you've used as part of
17 your accessibility review for this report. So I'm
18 going to list them --
19   A.   Add one more?
20   Q.   Yes.
21   A.   Adobe Acrobat Reader.
22        Let me pause for a second.
23        Okay. Continue.
24   Q.   So I'm going to list them, and I want to
25 make sure I have a complete list.

295

1        MR. KAPLAN: Objection. Vague.
2        MR. HUDIS: I haven't asked a question
3 yet. You like that.
4   Q.   So the tools that you used as part of
5 your accessibility review included the ABBYY
6 FineReader software?
7   A.   Mh-hmm.
8   Q.   The free OCR service?
9        MR. KAPLAN: Are we doing it this way?
10 Okay. Objection. Vague.
11 BY MR. HUDIS:
12   Q.   Do you want to do it one at a time and
13 say yes or no or --
14        MR. KAPLAN: That's how you started
15 doing it, but you're the questioner.
16        MR. HUDIS: Okay. Right.
17   Q.   I'm going to list the tools I believe
18 that you have used as part of your accessibility
19 review, Mr. Fruchterman, and I'd like to know at
20 the end of my list if I have mentioned them all.
21        The ABBYY FineReader software; the free
22 OCR service; the Window-Eyes screen reader
23 program; the third-party web sites mentioned in
24 your report, which is on page 5; a web browser;
25 web search engines; Microsoft Word; and Adobe

296

1 Acrobat Reader.
2        MR. KAPLAN: Objection. Vague.
3        THE WITNESS: I think my report also
4 mentions going to Amazon.com.
5 BY MR. HUDIS:
6   Q.   Anything else?
7        MR. KAPLAN: Objection. Vague.
8        THE WITNESS: Public -- sorry. Internet
9 Archive.
10 BY MR. HUDIS:
11   Q.   Any other tools?
12        MR. KAPLAN: Objection. Vague.
13        THE WITNESS: Not that I recollect.
14 BY MR. HUDIS:
15   Q.   Mr. Fruchterman, on pages 5 through 6 of
16 your report, it says you searched library catalogs
17 that serve the print-disabled and conducted an
18 online Google search to find electronic versions
19 of the 1999 standards; is that true?
20        MR. KAPLAN: Are you summarizing or are
21 you quoting?
22        MR. HUDIS: Summarizing.
23        MR. KAPLAN: Objection. Vague.
24 Misstates the document. Confusing.
25        THE WITNESS: Yes.

Case 1:14-cv-00857-TSC   Document 138-67   Filed 11/09/19   Page 76 of 139
Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

75 (Pages 297 to 300)

297

BY MR. HUDIS:
   Q.   What -- in this context, what did you
mean by an "electronic version"?
      MR. KAPLAN: Objection. Vague.
      THE WITNESS: A version that a person
could find and download, ideally, in a text
format. But an image-only format would have been
the next best thing.
      And then, I guess, the print version
would have been the third best thing. And then I
did find a used version of the book available for
sale on Amazon.
BY MR. HUDIS:
   Q.   All right. So you did not find an
electronic version for download either in text
format or image format?
      MR. KAPLAN: Objection. Vague.
      THE WITNESS: Correct.
BY MR. HUDIS:
   Q.   You did find a print version of the 1999
standards for sale on Amazon.com?
   A.   Correct.
   Q.   Did you capture the Amazon.com web pages
showing the 1999 standards for sale on that site?
      MR. KAPLAN: Objection. Vague.

298

      THE WITNESS: No.
BY MR. HUDIS:
   Q.   All right. Did you document the
availability of the 1999 standards for sale on
Amazon.com in some other way?
      MR. KAPLAN: Objection. Vague and
confusing.
      THE WITNESS: Not beyond noting it in my
report.
BY MR. HUDIS:
   Q.   Did you document your searches for the
1999 standards online?
      MR. KAPLAN: Objection. Vague and
confusing.
      THE WITNESS: No, I did not document
them beyond stating in my expert report that I
performed them.
BY MR. HUDIS:
   Q.   Do you know the demand for the 1999
standards by persons who are blind or visually
impaired?
      MR. KAPLAN: Objection. Vague.
      THE WITNESS: Not beyond the mentions by
a couple of the leading organizations in the field
that this is a relevant document in test

299

preparation for people with disabilities.
BY MR. HUDIS:
   Q.   Did you determine -- did you attempt to
determine the level of the demand for the 1999
standards by the -- by persons who are blind or
visually impaired?
      MR. KAPLAN: Objection. Vague.
      THE WITNESS: Not beyond the sites at
the web sites that I mentioned and plus the fact
that it wasn't on any of the web sites was at
least some indication that -- I guess what would
you say -- there are many, many books that people
with disabilities desire that are not available in
accessible formats. So -- but if it was already
available in accessible format, that would have
been an indicator that someone had requested it or
that someone had thought it was worth doing
proactively.
BY MR. HUDIS:
   Q.   So is the converse true, the fact that
it was not available in electronic format on the
Internet, as you searched for it, means there was
not a high demand for it in digital form?
      MR. KAPLAN: Objection. Vague.
Confusing.

300

      THE WITNESS: I don't think you can
reach that conclusion by its lack of availability
alone.
BY MR. HUDIS:
   Q.   What other facts would you need?
      MR. KAPLAN: Objection. Incomplete
hypothetical. Vague.
      THE WITNESS: I might measure if
Google -- like, for example, how many times it was
searched for on Google. That would be some
indication of -- of demand for this particular
document.
      The fact that I was able to find the
document cited at blindness organizations made me
think that it was, relatively speaking to other
books and education, more important than many
other books. So let's just say middling
importance.
BY MR. HUDIS:
   Q.   I'm sorry, Mr. Fruchterman, I've never
heard the word before.
      What is your definition of "middling"?
   A.   This book --
   Q.   The 1999 standards?
   A.   -- was referred to in documents on both

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

301

1  the American Printing House for the Blind and the
2  American Foundation for the Blind's web sites.
3       MR. KAPLAN:  You just want to answer his
4  question, which is define "middling."
5       THE WITNESS:  Definition of "middling."
6  Above zero.  Below infinity.
7       MR. KAPLAN:  That defines it as moderate
8  or average in size of note to rank.
9       THE WITNESS:  It's not a "Harry Potter"
10  book.  It's not the political history of Albania
11  from 1960 to 1980.
12  BY MR. HUDIS:
13     Q.   So the fact that the 1999 standards are
14  mentioned in publications for the blind does not
15  tell you the level of demand for the 1999
16  standards by people who are blind or otherwise
17  print-disabled?
18       MR. KAPLAN:  Objection.  Vague.
19  Argumentative.
20       THE WITNESS:  I disagree.
21  BY MR. HUDIS:
22     Q.   Why?
23     A.   Because there are many blind educators
24  and many blind students.  And testing of blind
25  people is a very big issue in the blindness field.

302

1  The number of books specifically mentioned as
2  relevant to the blindness field is very small
3  because the publishing of the American Printing
4  House on topics concerning blind people or the
5  American Foundation for the Blind is very small.
6       The fact that it's mentioned at two
7  different web sites as an important reference work
8  to me is a statement that it is far more likely to
9  be interesting to a blind person, knowing what I
10  know about the blindness field, than some random
11  other title.  It's an indication that this is a
12  relevant book.
13       I am certain that some blind person has
14  said, I wish I had a copy of this book in an
15  accessible format, though no one has actually said
16  that to me.  I'm quite certain that that has
17  occurred to a blind person in the United States.
18     Q.   So the fact that the 1999 standards are
19  relevant to some blind people does not tell you
20  whether the demand for the 1999 standards are
21  something that blind people would want to acquire
22  in the tens, the hundreds, the thousands, the
23  hundred thousand, is it?
24       MR. KAPLAN:  Vague.  Argumentative.
25       THE WITNESS:  I could tell you with

303

1  certainty that it's not in the hundred thousands.
2  BY MR. HUDIS:
3     Q.   And you could probably say with
4  certainty that it's not in the hundred thousands.
5       MR. KAPLAN:  Objection.
6       THE WITNESS:  I'm not --
7       MR. KAPLAN:  Misleading.
8       THE WITNESS:  -- really certain of that.
9  BY MR. HUDIS:
10     Q.   You have no knowledge as you sit here
11  about the level of demand for the 1999 standards
12  by the blind or the visually impaired?
13       MR. KAPLAN:  Objection.  Asked and
14  answered.  Vague.
15       THE WITNESS:  Not beyond the
16  considerations I've already expressed.
17       MR. HUDIS:  Counsel, what I'm about to
18  put in front of the witness was already marked
19  during Mr. Malamud's deposition.  Do you want us
20  to re-mark it as a separate exhibit for this
21  deposition?
22       MR. KAPLAN:  I think we can use the same
23  exhibit number.  In this case, not in that case?
24       MR. HUDIS:  Yes.
25       I'm going to give a copy to the court

304

1  reporter.  Just note for the record that the
2  document I'm now putting in front of the witness
3  was marked as Exhibit 34 during Mr. Malamud's
4  deposition on May 12, 2015.
5       THE WITNESS:  Do you need to do anything
6  with it?  Okay.  And the mike got kind of knocked.
7  I don't know if that matters.  Okay.  All right.
8  BY MR. HUDIS:
9     Q.   Mr. Fruchterman, could you please pull
10  out Exhibit 59 that was previously marked at your
11  deposition today.  It's in the pile of documents
12  in front of you.
13       That's your declaration from the
14  HathiTrust litigation?
15     A.   Okay.  Was it a truck or an earthquake?
16       MR. KAPLAN:  I don't think that was an
17  earthquake.
18       MR. HUDIS:  I think that was a truck.
19  Bite your tongue.
20     Q.   Mr. Fruchterman, let's turn back to your
21  declaration from the HathiTrust litigation that's
22  Exhibit 59.
23     A.   Yes.
24     Q.   At pages 6 through 7, paragraphs 25 and
25  26.

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

305

1    **A.   Yes.**
2    Q.   All right.  And that's where you
3    discover the levels of complexity of documents?
4    **A.   Yes.**
5         MR. KAPLAN:  It's paragraph 25.
6    BY MR. HUDIS:
7    Q.   And then it goes to 26.
8    **A.   Talks about costs.**
9    Q.   Costs.
10   **A.   Yeah.  Yes.  Okay.**
11   Q.   Now, Mr. Fruchterman, I've put in front
12   of you what was previously marked during
13   Mr. Malamud's deposition as Exhibit 34.  And I'm
14   really focusing you on the textual material after
15   the certificate on the front and after the cover.
16   So I want you to concentrate on the textual
17   material.
18        MR. HUDIS:  All right.  And just note
19   for the record, the witness is thumbing through
20   Malamud Exhibit 34 to review the textual material.
21        Let me know when you're ready.
22        While the witness is reading through the
23   document, Exhibit 34 is the 1999 Standards for
24   Educational and Psychological Testing.
25        THE WITNESS:  Okay.  I'm ready for a

306

1    question.
2    BY MR. HUDIS:
3    Q.   Using the complexity levels discussed in
4    your HathiTrust declaration, Exhibit 59, what
5    level of complexity would you assign to the 1999
6    standards?
7    **A.   Probably a Level 2.  It could be a Level**
8    **3.  It would be in that range.**
9    Q.   With that complexity level, how much
10   would it cost to make the 1999 standards
11   accessible to persons who are blind or visually
12   impaired?
13   **A.   Low hundreds of dollars.**
14   Q.   To put a finer point on that, when you
15   say "low hundreds," do you mean 100 to $200?
16   **A.   I'd say 100 to $400.**
17   Q.   Turning back to your expert's report, on
18   pages 5 through 6 --
19   **A.   Yes.**
20   Q.   -- that's Exhibit 64 --
21        MR. KAPLAN:  Objection.
22   Mischaracterizes the document.
23        MR. HUDIS:  Okay.
24        MR. KAPLAN:  Oh, are we talking about --
25        THE WITNESS:  Pages 5 and 6?

307

1         MR. KAPLAN:  I'm sorry.  I'm getting
2    confused about numbers.
3         THE WITNESS:  Oh, are we on my expert
4    report now?
5         MR. HUDIS:  Yes.
6         THE WITNESS:  Oh, okay.
7    BY MR. HUDIS:
8    Q.   Yes.
9    **A.   All right.  All right.  So a third**
10   **document.  Okay.  Great.  5 and 6.**
11   Q.   And I'm pointing you now to the sentence
12   that spans from the bottom of page 5 to the top of
13   page 6.
14   **A.   Yes.**
15   Q.   So, Mr. Fruchterman, you were told by
16   defense counsel that an electronic version of the
17   1999 standards was hosted on the
18   Public.Resource.Org web site but has since been
19   removed during the course of this litigation.
20   **A.   Yes, that is a fact that I was informed**
21   **of by counsel.**
22   Q.   All right.  You did not obtain this
23   information from Carl Malamud?
24   **A.   No, I did not.**
25   Q.   Did you attempt to locate a historical

308

1    version of the Public.Resource.Org web site to
2    determine whether an electronic version of the
3    1999 standards was previously hosted there?
4         MR. KAPLAN:  Objection.  Vague.
5         THE WITNESS:  I did discover in
6    Google-searching a placeholder noting the
7    voluntary takedown of the file.
8    BY MR. HUDIS:
9    Q.   So other than the placeholder that you
10   just described, did you conduct, say, using the
11   Wayback Machine historical search of the
12   Public.Resource.Org web site to determine whether
13   an electronic version of the 1999 standards, in
14   its full form, was previously hosted there?
15        MR. KAPLAN:  Objection.  Vague and
16   confusing.
17        THE WITNESS:  I did not examine the
18   Wayback Machine as you've described.
19   BY MR. HUDIS:
20   Q.   Did you use any other method to
21   determine whether an historical version of the
22   1999 standards was at any time hosted on the
23   Public.Resource.Org web site?
24        MR. KAPLAN:  Objection.  Vague and
25   confusing.

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

309

1      THE WITNESS: Not beyond the two points
2   already mentioned.
3   BY MR. HUDIS:
4      Q.   Turning to page 9 now at the top of your
5   report, Exhibit 64, and I am focused on the first
6   full paragraph under the title "The
7   Public.Resource.Org Version of the 1999
8   Standards."
9      **A.   Yes.**
10     Q.   Mr. Fruchterman, you were provided by
11  defense counsel with a PDF file containing the
12  content of the 1999 standards.
13     **A.   That's my recollection.**
14     Q.   And it was represented to you by defense
15  counsel that this PDF file containing the 1999
16  standards was the version that had been made
17  available on the Public.Resource.Org web site at
18  one time?
19     **A.   That was my understanding, yes.**
20     Q.   You were informed Public.Resource
21  created this PDF file by purchasing a printed copy
22  of the 1999 standards, chopping off the binding
23  and scanning the pages?
24     **A.   I am not sure I was informed of that**
25  **fact by anyone in particular.  I might have read**

310

1   **it in a deposition 'cause I read the deposition**
2   **reports.  So I don't recall exactly, but that**
3   **makes a lot of sense to me, that that would be**
4   **what they would do.**
5      Q.   So you were either informed of that fact
6   either by defense counsel or by reading a
7   deposition transcript in this case?
8      **A.   Yes.**
9      Q.   The OCR process had not been performed
10  on the electronic PDF file of the 1999 standards
11  that defense counsel gave to you?
12        MR. KAPLAN: Objection.  Vague.
13        THE WITNESS: Correct.  The
14  Public.Resource.Org version of the 1999 standards
15  was an image-only PDF format.
16  BY MR. HUDIS:
17     Q.   Okay.  In your report, Mr. Fruchterman,
18  on page 9, in that same full paragraph, you
19  describe the content of the 1999 standards within
20  the PDF file given to you by defense counsel to be
21  the result of a high-quality image scan.
22     **A.   Mh-hmm.  Yes.**
23     Q.   What did you mean by "high-quality image
24  scan"?
25        MR. KAPLAN: Objection.  Vague and

311

1   confusing.
2         THE WITNESS: I was able to easily read
3   the content, and it looked like an OCR device
4   would be able to recognize the characters.
5   BY MR. HUDIS:
6      Q.   As part of your work for the report of
7   Exhibit 64, did you compare the text of the PDF
8   file given to you of 1999 standards with the
9   printed version?
10        MR. KAPLAN: Objection.  Vague.
11        THE WITNESS: Not side-by-side.
12  BY MR. HUDIS:
13     Q.   Did you check for any missing pages in
14  the PDF file?
15        MR. KAPLAN: Objection.  Vague.
16        THE WITNESS: No.
17  BY MR. HUDIS:
18     Q.   Did you check for any misaligned pages
19  in the PDF file?
20        MR. KAPLAN: Objection.  Vague.
21        THE WITNESS: I scanned quite a number
22  of pages looking for misalignments and didn't see
23  any.
24  BY MR. HUDIS:
25     Q.   Did you review the entire document to

312

1   look for PDF misaligned pages?
2         MR. KAPLAN: Objection.  Vague.
3         THE WITNESS: I did not review every
4   page.
5   BY MR. HUDIS:
6      Q.   After you were provided with the
7   image-only PDF file of the 1999 standards by
8   defense counsel, you used the ABBYY FineReader
9   software and free online OCR service to OCR
10  process selected pages of the document; isn't that
11  right?
12     **A.   Correct.**
13     Q.   All right.  You did not OCR process the
14  entire 212 pages of the PDF-scanned 1999
15  standards?
16     **A.   Correct.**
17     Q.   And it is common that OCR processing of
18  scanned text results in text recognition errors?
19        MR. KAPLAN: Objection.  Argumentative.
20  And vague.
21        THE WITNESS: Depending on the quality
22  of the scan and the complexity of the material,
23  you would see a variety of OCR error levels, yes.
24  BY MR. HUDIS:
25     Q.   After you subjected the selected pages

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

313

1  of the 1999 standards from the PDF document you
2  were given, did you check for the following
3  errors, yes or no.
4       Misrec errors?
5       MR. KAPLAN: Objection. Vague.
6       THE WITNESS: Yes.
7  BY MR. HUDIS:
8       Q.  Did you find any?
9       A.  Yes.
10      Q.  Did you check for nonrec errors?
11      MR. KAPLAN: Objection. Vague.
12      THE WITNESS: Yes.
13  BY MR. HUDIS:
14      Q.  Did you find any?
15      A.  Yes.
16      Q.  Did you check for drops?
17      MR. KAPLAN: Objection. Vague.
18      THE WITNESS: Yes.
19  BY MR. HUDIS:
20      Q.  Did you find any?
21      A.  Yes.
22      Q.  Did you check for adds?
23      MR. KAPLAN: Objection, vague.
24      THE WITNESS: I didn't see any adds.
25

314

1  BY MR. KAPLAN:
2       Q.  So let's take that one at a time.
3       So you checked for adds?
4       A.  Well, I examined the document, and I'm
5  talking about errors I observed as opposed to
6  errors I didn't observe.  So if I had seen an add,
7  I would have been seeing it.  I don't know.
8       Q.  So --
9       A.  I was looking for errors.
10      Q.  Right.  So my first question is, did you
11  check for adds errors?
12      MR. KAPLAN: Objection. Vague.
13      THE WITNESS: If I -- if an add had been
14  there and I had been looking at it, I would have
15  been checking for them, yes.  But --
16  BY MR. HUDIS:
17      Q.  And you didn't find any?
18      A.  I didn't see any adds.
19      Q.  And did you check the entire 212 pages
20  of the document for adds errors?
21      A.  No.
22      Q.  So now we're at page 10, at the bottom
23  of page -- of Exhibit 64, your expert's report.
24      A.  Yes.
25      Q.  After you OCR-processed select pages

315

1  from the image-only PDF file of the 1999 standards
2  given to you by defense counsel, you used the
3  Window-Eyes software tool to read text aloud and
4  to conduct full-text searches by keyword?
5       A.  Right.
6       Q.  All right.  Now, Mr. Fruchterman, you
7  could not use the Window-Eyes software tool to
8  read text of the 1999 standards aloud or to
9  conduct full-text searches by keyword before the
10  PDF pages were OCR processed.
11      MR. KAPLAN: Objection. Vague.
12  Compound.
13      THE WITNESS: You're making a statement.
14  What's the question?
15  BY MR. KAPLAN:
16      Q.  All right.  I will ask the question a
17  different way.
18      Could you use the Window-Eyes software
19  tool to read the text of the 1999 standards aloud
20  before the PDF pages were OCR processed?
21      MR. KAPLAN: Objection. Vague.
22  Confusing.
23      THE WITNESS: No.
24  BY MR. KAPLAN:
25      Q.  Could you use the Window-Eyes software

316

1  to conduct full-text searches by keyword before
2  the PDF pages were OCR processed?
3       MR. KAPLAN: Objection. Vague and
4  confusing.
5       THE WITNESS: No.
6  BY MR. KAPLAN:
7       Q.  And, in fact, Mr. Fruchterman, you could
8  not use any screen reader software tool to read
9  the text of the 1999 standards aloud before the
10  PDF pages were OCR processed?
11      MR. KAPLAN: Objection. Vague and
12  confusing.
13      THE WITNESS: That's correct.  But some
14  screen readers have OCR software built in and
15  would be able to do that process inside the screen
16  reader.  But I did not do that process inside the
17  screen reader.  I did it in a separate product.
18  BY MR. KAPLAN:
19      Q.  And you could not use a screen reader
20  software tool to conduct full-text searches by
21  keyword before the PDF pages were OCR processed?
22      MR. KAPLAN: Objection. Vague and
23  confusing.
24      THE WITNESS: Correct.
25

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

317

1    BY MR. KAPLAN:
2      Q.   Let's turn to pages 11 and 12 of your
3    report.  And I'm focusing on the textual material
4    in your report, Mr. Fruchterman, under the title
5    "The Archive.Org Version of the 1999 Standards."
6      **A.   Yes.**
7      Q.   Now, it's true you were -- it's true you
8    were told by a representative of the Internet
9    Archive that an electronic text or txt version of
10   the '99 standards was hosted on the Internet
11   Archive web site at one time?
12     **A.   Yes.**
13     Q.   You did not attempt to locate a
14   historical version of the Internet Archive web
15   site to determine whether an electronic text
16   version of the 1999 standards was previously
17   hosted on Internet Archive?
18         MR. KAPLAN:  Objection.  Vague and
19   confusing.
20         THE WITNESS:  Not beyond doing a Google
21   search, which I don't believe turned it up for me.
22   But it might have if I kept going in the results.
23   BY MR. HUDIS:
24     Q.   But if you did, you didn't document it
25   in your report.

318

1          MR. KAPLAN:  Objection.  Vague.
2          THE WITNESS:  What's your question?
3    BY MR. KAPLAN:
4      Q.   Well, you said if you had a Google
5    search, you would have kept going.  You would have
6    found an historical version of the 1999 standards
7    on the Internet Archive web site.  You didn't
8    document that in your report, did you?
9      **A.   I didn't say that.**
10         MR. KAPLAN:  Objection.  Vague.
11   BY MR. HUDIS:
12     Q.   What did you say?
13     **A.   I said I did conduct a Google search for**
14   **the report.  I found it on the Internet Archive**
15   **site.  I did not see a link -- I'm sorry.**
16   **I found it on the Public.Resource.Org**
17   **site with a takedown notice that it was gone.  I**
18   **did not see a link to the Internet Archive.  All I**
19   **said is it might have been in the Google results**
20   **beyond the place where I stopped looking.**
21     Q.   So my question, then, is did you use any
22   method to determine whether an historical version
23   of the '99 standards was hosted on the Internet
24   Archive web site at one time in the past?
25         MR. KAPLAN:  Objection.  Vague.

319

1          THE WITNESS:  No.
2    BY MR. HUDIS:
3      Q.   And you didn't use the Wayback Machine
4    for that purpose either?
5          MR. KAPLAN:  Objection.  Vague.
6          THE WITNESS:  No.
7    BY MR. HUDIS:
8      Q.   And on that same page, page 11, at the
9    bottom paragraph, you were provided by an Internet
10   Archive representative with a text or txt file
11   containing the content of the 1999 standards?
12     **A.   Correct.**
13     Q.   All right.  And it was represented to
14   you by the Internet Archive representative that
15   this txt file containing the 1999 standards was
16   the version that had been made available on the
17   Internet Archive web site at one time?
18     **A.   Yes.**
19     Q.   All right.  And now continuing on that
20   same explanation on pages 11 and 12 of Exhibit 64,
21   your report, by reviewing the Archive.Org
22   derivatives page, you were able to determine that
23   when a PDF file is uploaded to the Internet
24   Archive web site, that web site automatically
25   creates derivative file types that are also

320

1    accessible on that web site, including in the txt
2    format?
3          MR. KAPLAN:  Objection.  Vague and
4    confusing.
5          THE WITNESS:  Yes.  I read that at that
6    link.  And I believe I also saw mention of that in
7    some of the depositions that I reviewed.
8    BY MR. HUDIS:
9      Q.   You just anticipated my next question.
10   Thank you, Mr. Fruchterman.
11         So from reading -- from your reading of
12   the transcripts from the depositions of
13   Carl Malamud of Public.Resource and
14   Christopher Butler of Internet Archive, when
15   Public.Resource uploaded the PDF file of the 1999
16   standards to the Internet Archive web site, that
17   web site automatically created a txt file of the
18   1999 standards?
19         MR. KAPLAN:  Objection.  Vague.
20         THE WITNESS:  That's my understanding.
21   BY MR. HUDIS:
22     Q.   Okay.  And this txt file of the 1999
23   standards, in your view, had been created by
24   optical character recognition because the txt file
25   contained uncorrected errors typical of the OCR

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

321

1  process?
2         MR. KAPLAN: Objection. Vague.
3         THE WITNESS: Correct.
4  BY MR. HUDIS:
5     Q.   What were those errors?
6     A.   Well, looking at Malamud 34, the first
7  page is a very stylized cover sheet. And the
8  second page has the word "standards" bridging the
9  entire page. Those didn't recognize well. It's
10 quite typical of OCR that it doesn't do well --
11 so, for example, I remember specifically the word
12 "standards," I think, had errors in it as it
13 appeared on the top of this.
14    Q.   Continuing through the rest of
15 Malamud 34, did you notice any other errors
16 typical of the OCR process?
17    A.   Those were the -- certainly that cover
18 page kind of material was the thing that stuck in
19 my mind as having obvious OCR errors. Once I got
20 down to, say, the copyright section, you know, I
21 zeroed to that, and I saw very few errors.
22    Q.   But you did see errors?
23         MR. KAPLAN: Objection. Vague and
24 confusing.
25         THE WITNESS: I don't remember any

322

1  particular errors. I could conceive of that there
2  might be one or two in that amount of text, but
3  perhaps zero.
4  BY MR. HUDIS:
5     Q.   When you engaged in your accessibility
6  to review, in particular, the txt file, access --
7  accessible at one time from the Internet Archive
8  web site, did you go through the rest of the 1999
9  standards to look for OCR errors?
10        MR. KAPLAN: Objection. Vague and
11 confusing.
12        THE WITNESS: I did go through more
13 pages and performed the same tests that -- that I
14 had performed on the earlier one, but I had the
15 benefit of the entire text file instead of just
16 the handful of pages I'd recognized.
17 BY MR. HUDIS:
18    Q.   And I did notice OCR errors throughout
19 the document?
20        MR. KAPLAN: Objection. Vague.
21        THE WITNESS: A few. But I felt like
22 the OCR was working quite well on this document.
23 BY MR. HUDIS:
24    Q.   Mr. Malamud, let's --
25    A.   I'm not --

323

1     Q.   I'm sorry. It's late.
2         Mr. Fruchterman --
3     A.   Yes.
4     Q.   -- if you could turn to page 7 of your
5  expert's report, Exhibit 64.
6         MR. KAPLAN: That one almost slipped
7  past me.
8         (Reporter interruption.)
9         MR. HUDIS: Sure. What he said was I
10 blew past him.
11        MR. KAPLAN: Yes.
12 BY MR. HUDIS:
13    Q.   Are you there, Mr. Fruchterman?
14    A.   I am.
15    Q.   Thank you.
16        As part -- now, looking at page 7, the
17 top paragraph of your expert's report, as part of
18 your accessibility review for the purposes of your
19 expert's report, you reviewed the
20 Public.Resource.Org web site?
21        MR. KAPLAN: Objection. Vague.
22        THE WITNESS: Yes.
23 BY MR. HUDIS:
24    Q.   Did you observe on Public.Resource's web
25 site any place where Public.Resource held itself

324

1  out as making the materials posted on its site
2  accessible to the blind or print-disabled?
3         MR. KAPLAN: Objection. Vague.
4         THE WITNESS: I did not.
5  BY MR. HUDIS:
6     Q.   Except for a placeholder noting the
7  voluntary takedown of the 1999 standards, you
8  could not locate this document on the
9  Public.Resource web site, correct?
10        MR. KAPLAN: Objection. Vague.
11        THE WITNESS: Correct.
12 BY MR. HUDIS:
13    Q.   However, you did search for and access
14 other standards posted on the Public.Resource web
15 site?
16        MR. KAPLAN: Objection. Vague.
17        THE WITNESS: Correct.
18 BY MR. HUDIS:
19    Q.   Mr. Malamud -- I did it again. My
20 apologies.
21        Mr. Fruchterman, there were no sign-up
22 procedures in order for an Internet user to access
23 the content on the Public.Resource web site,
24 correct?
25        MR. KAPLAN: Objection. Vague. Calls

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

82  (Pages 325 to 328)

325

1    for speculation.  Lacks foundation.
2          THE WITNESS:  Correct.
3    BY MR. HUDIS:
4      Q.   During your review of Public.Resource's
5    web site, you were able to access standards
6    produced by other companies, such as the NFPA,
7    without restriction?
8          MR. KAPLAN:  Objection.  Vague.
9          THE WITNESS:  Yes.
10   BY MR. HUDIS:
11     Q.   There were no requirements that a user
12   be visually impaired to access these other
13   standards documents on Public.Resource's web site?
14         MR. KAPLAN:  Objection.  Vague.
15         THE WITNESS:  Correct.
16   BY MR. HUDIS:
17     Q.   Mr. Fruchterman, for the next series of
18   questions, I would like you to pull out
19   Exhibit 60, which was your supplemental
20   declaration from the HathiTrust litigation.
21     A.   Okay.
22     Q.   And I'd also like you to pull out
23   Exhibit 55, which is the materials we reviewed
24   from the Bookshare web site.
25     A.   Good.  Do I get to put the rest of them

326

1    away?
2      Q.   Soon.
3      A.   Or are these the only two I need to have
4    out now?
5      Q.   Those are the only two you have to have
6    out now.
7      A.   Okay.  I have those two documents in
8    front of me, Exhibit 55 and 60.
9      Q.   Okay.  So I would like to focus your
10   attention on -- in the supplemental declaration,
11   Exhibit 60, to pages 2 and 3, where you talk about
12   the digital rights management plan.
13     A.   Yes.
14     Q.   Okay.  And similarly, an explanation of
15   the DRM plan on page 18 of Exhibit 55.  And that's
16   the Bookshare web site.
17     A.   Okay.
18     Q.   During your review of Public.Resource's
19   web site, how did their web site compare with the
20   Bookshare web site in terms of employing a digital
21   rights management or DRM plan to protect the
22   digital copies of standards posted on
23   Public.Resource's web site from unauthorized
24   copying?
25         MR. KAPLAN:  Objection.  Vague.  Calls

327

1    for a legal conclusion.  Confusing.
2          THE WITNESS:  I didn't find a DRM plan
3    in evidence on the Public.Resource.Org site.
4          MR. HUDIS:  I'd like to take a break for
5    five minutes.
6          THE VIDEOGRAPHER:  Going off the record
7    at 5:33.
8          (Whereupon, a recess was taken.)
9          THE VIDEOGRAPHER:  Back on the record at
10   5:39.
11   BY MR. HUDIS:
12     Q.   Mr. Fruchterman, when you examined
13   Public.Resource's web site, you noticed a number
14   of standards that were hosted on that web site?
15     A.   Correct.
16         MR. KAPLAN:  Objection.  Vague.  Asked
17   and answered.
18   BY MR. HUDIS:
19     Q.   Did you notice any restrictions on the
20   ability of an Internet user to copy any of the
21   standards that you saw on Public.Resource's web
22   site?
23         MR. KAPLAN:  Objection.  Vague.
24         THE WITNESS:  No.
25

328

1    BY MR. HUDIS:
2      Q.   Did you notice any restrictions on the
3    ability of an Internet user to download any of the
4    standards hosted on the Public.Resource's web
5    site?
6          MR. KAPLAN:  Objection.  Vague.
7          THE WITNESS:  No.
8    BY MR. HUDIS:
9      Q.   Did you notice any restrictions on the
10   ability of an Internet user to print any of the
11   standards hosted on the Public.Resource web site?
12         MR. KAPLAN:  Objection.  Vague.
13         THE WITNESS:  No.
14         MR. HUDIS:  Thank you, Mr. Fruchterman.
15   That's all I have.
16         THE WITNESS:  Okay.  Thank you.
17         MR. KAPLAN:  I have no questions at this
18   time.
19         THE WITNESS:  Okay.  Oh, that's right.
20   You get a chance, huh.
21         THE VIDEOGRAPHER:  This marks the end of
22   the deposition of James Fruchterman.  Going off
23   the record at 5:41.
24         (Whereupon, the deposition concluded
25   at 5:41 p.m.)

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

329

```
1              CERTIFICATE OF REPORTER
2         I, Kathleen A. Wilkins, Certified
3    Shorthand Reporter licensed in the State of
4    California, License No. 10068, hereby certify that
5    the deponent was by me first duly sworn, and the
6    foregoing testimony was reported by me and was
7    thereafter transcribed with computer-aided
8    transcription; that the foregoing is a full,
9    complete, and true record of proceedings.
10        I further certify that I am not of
11   counsel or attorney for either or any of the
12   parties in the foregoing proceeding and caption
13   named or in any way interested in the outcome of
14   the cause in said caption.
15        The dismantling, unsealing, or unbinding
16   of the original transcript will render the
17   reporter's certificates null and void.
18        In witness whereof, I have hereunto set
19   my hand this day:
20   _____ Reading and Signing was requested.
21   _____ Reading and Signing was waived.
22   ___X___ Reading and Signing was not requested.
23   _____
24        KATHLEEN A. WILKINS
25        CSR 10068, RPR-RMR-CRR-CCRR-CLR
```

**A**

**AAP**
165:10
**ABBYY**
284:3,12,17 285:1,3,11
289:2,14 290:7 291:1
294:1 295:5,21 312:8
**abide**
135:7
**ability**
85:19 118:1 135:21
145:22 166:17 327:20
328:3,10
**able**
28:6 44:25 56:8 86:9
98:2 142:21 147:17
155:17 156:7 159:21
167:21 266:9 278:2
291:9 300:13 311:2,4
316:15 319:22 325:5
**above-entitled**
2:10
**absence**
18:15
**Abstract**
5:6
**abuse**
167:11,19
**accelerator**
26:25 27:5,7
**accept**
171:13
**acceptable**
153:9
**access**
5:16 78:6 117:22 118:1
118:3,6,13,15,22
122:3,14,17,23
126:25 134:20 135:5
139:8,14,19,24
140:11,21 141:5,11
141:18,24 147:6
148:16,22 155:5
159:18,22 163:4
164:6 171:11 180:14
181:9 182:1 183:21
196:6 197:2 198:3

200:13,22 201:5,15
221:12 222:23 223:23
224:2 232:13 233:25
234:16 236:1,4,6
238:24 239:21 240:6
245:5 250:10 259:7
261:6 266:10,16
270:25 271:2 275:5
278:10 293:15 322:6
324:13,22 325:5,12
**accessibilities**
258:14
**accessibility**
118:5 184:17 249:20
250:1,8 251:12
252:10,17 257:12,19
258:2,14,21,24
259:11,15 262:23
263:14 264:11,24
265:6,12,18,24
266:21 267:9 268:2
274:16 276:19 277:11
277:15,22 278:5,10
279:3,25 280:4,6,9
281:3 283:8,11,21
284:11 289:21 290:4
291:4 294:3,17 295:5
295:18 322:5 323:18
**accessible**
63:24 88:9 99:9 105:13
118:14 145:3 146:5,6
146:17 147:9 159:18
160:11 169:11 181:20
194:13,15,23 195:5
195:25 198:21 199:25
205:3,14 206:15
217:11 220:4,21
248:4 250:10 259:13
260:1,6 266:12
277:19 286:4,6,16,22
287:1,4,7,17 288:3,5
288:10,14,21 299:14
299:15 302:15 306:11
320:1 322:7 324:2
**accessing**
119:24 135:8 148:10
148:14 153:8 191:2

191:12 192:4,20
193:20 197:24 198:6
198:11 274:22 281:24
**accommodation**
104:21
**accommodations**
165:24
**accomplish**
184:11
**accomplished**
184:10
**account**
35:14 163:2,9
**accounting**
34:19
**accounts**
89:9
**accuracy**
46:14 290:13,16
**accurate**
14:4 16:2 123:20 161:5
186:16 226:1
**accurately**
11:12 153:10 154:5,18
170:15 190:8
**achievement**
19:14
**acknowledge**
10:4 174:17
**acquire**
86:5 97:15 116:15
119:17 302:21
**acquired**
40:3,10 41:11
**Acquiring**
193:13
**acquisition**
118:20,25 192:14,25
193:2,6,16,22,24
194:7,13,23 195:5,10
**Acrobat**
294:21 296:1
**Act**
127:23 171:9
**acting**
139:3
**action**

2:12 4:11 9:22 91:12
**active**
67:16 68:7 72:17 73:4
74:8 82:23
**actively**
129:20
**activists**
108:14
**activities**
74:18 76:19 166:18
194:21 195:2
**actor**
138:17,19
**actors**
139:1
**actual**
83:16
**adaptive**
181:25 197:12 239:23
**add**
46:19 99:7 105:14,15
117:7 294:19 314:6
314:13
**added**
87:25 113:25
**adding**
56:4
**addition**
134:6 142:22 153:4
**additional**
28:13 114:12 188:12
229:16 251:23 260:16
**address**
9:10,13,14,15,16,18
45:21 49:9 144:13
164:24 165:3 259:19
**addresses**
45:17
**addressing**
197:1
**adds**
203:15 313:22,24
314:3,11,18,20
**ADHD**
149:12
**adhere**
221:22 227:13

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

331

**administrative**
48:3 81:18
**Adobe**
116:5 294:21 295:25
**advance**
197:12
**advantage**
100:16 106:3
**Advertisements**
243:21
**advice**
128:17 211:6
**advocacy**
81:19
**affairs**
48:8 212:2
**affect**
249:22
**affiliated**
33:23
**affordable**
186:6
**AFTERNOON**
4:5 143:8
**agency**
181:22
**agenda**
80:7
**agent**
171:13 172:9
**agents**
171:17
**ago**
173:9 180:6 185:15
217:2,19 218:6
**agree**
55:22 91:12 129:20
145:6,14,25 146:1
150:18,25 151:17
152:1 159:1,8 160:6
164:9 180:22 181:10
182:3 183:25 221:20
234:12 239:9 240:10
247:7
**agreed**
91:18 100:3
**agreeing**

174:10,17,25
**agreement**
128:25 135:7,15,17,21
175:1,2,8 248:10,12
255:17,23 256:3
257:1
**agreements**
112:18,23 127:17
165:12,13,17 169:1
230:3
**agrees**
220:10
**ahead**
38:25 116:2 121:24
197:18 220:25 259:21
259:22
**Ai**
271:4
**al**
1:5 6:19 8:7 229:9
**Albania**
301:10
**Alexandria**
3:14
**align**
147:10
**Alison**
180:7
**alive**
67:18
**allay**
133:2
**allegations**
209:19
**allow**
103:3 165:19 230:4
232:16
**allowed**
171:24
**allows**
88:1 128:7 156:4 164:1
238:21
**alluded**
280:16
**Ally**
237:2
**aloud**

56:9 196:8 198:24
199:16 200:8 259:9
264:17 266:19 270:1
272:1 273:5,13
291:10 293:1 315:3,8
315:19 316:9
**alphabet**
45:14
**alternate**
198:10
**alternative**
197:23 198:6
**Alto**
9:12,19 74:24
**Amazon**
119:7 133:16 134:10
166:5 297:12
**Amazon.com**
83:25 296:4 297:21,23
298:5
**amendment**
5:15 127:22 128:3
129:5,14,21,25
133:10 145:20 157:21
157:22 158:13 163:23
164:1 169:15 170:22
171:23 172:4,6,7
180:18,24 181:8
182:7 210:11
**America**
247:15,17 248:13
**American**
1:4 8:5 132:7 164:22
164:23 165:2 167:8,9
167:17 189:16 301:1
301:2 302:3,5
**amicus**
210:17 236:24
**amount**
218:5 322:2
**analyzed**
31:18
**analyzes**
293:5,7
**Android**
85:8
**and/or**

251:25
**announced**
40:18
**annual**
160:23
**answer**
7:22 10:21 11:5,8 13:5
16:5 45:12 49:21
51:4,24 67:21 68:2
79:7,10 83:12 90:20
94:7,11 107:17
122:22 125:9 137:24
157:17 218:19 221:18
221:19 225:5,8 227:8
227:20 251:17 301:3
**answered**
15:6 61:4 76:5 99:22
107:19 263:2,4
303:14 327:17
**answers**
156:2
**anticipated**
320:9
**antithesis**
206:10
**anyplace**
111:22
**anyway**
256:25
**apart**
92:24 95:24 116:23
253:7
**apologies**
144:8 324:20
**app**
84:7 85:8 94:8
**appeal**
236:20,23 237:4
**appealed**
236:16
**appeals**
7:5 237:8,23
**appear**
120:17 136:21
**APPEARANCES**
3:1
**appeared**

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

332

2:9 137:25 321:13
**appears**
173:25 175:7 195:1
214:14 233:2
**appellate**
228:23 237:5
**Apple**
94:8 97:11,16
**apples**
103:23
**appliance**
57:20,24 59:7 61:15
**applicable**
155:19 163:10
**application**
5:7 30:7
**applications**
51:20 52:13
**applied**
17:2,3,11,16,22 18:9
279:20
**applies**
92:11 126:21
**apply**
158:10
**appreciate**
131:6 183:11 238:13
**approach**
198:23 247:23 276:18
277:9 280:3,12,13,15
280:19 281:2
**approaches**
277:19
**appropriate**
252:1
**approve**
166:18
**approximately**
40:21 55:14 196:17
**archive**
253:8,21 296:9 317:9
317:11,14,17 318:7
318:14,18,24 319:10
319:14,17,24 320:14
320:16 322:7
**Archive's**
7:10 242:4

**Archive.Org**
317:5 319:21
**area**
20:9 45:7 82:15 153:15
157:8 168:1 187:3,17
**areas**
17:22 51:14 77:5
**arena**
187:9
**Argosy**
49:6,8
**argued**
238:9,11
**argumentative**
33:24 74:10 87:23 89:7
89:19 95:7 96:4,19
97:1,7 99:3 100:5
103:6 106:10,23
112:15 113:2 114:5
115:22 117:3 118:24
120:20 127:15 129:6
129:19 134:4,12
136:7 165:6 167:23
187:18 196:20 208:23
209:4 224:3 227:5
255:24 260:12 278:25
281:12 292:12 301:19
302:24 312:19
**Arkenstone**
4:24 53:4,6,21 54:4,11
54:16,22 55:1,6,8,16
55:25 56:1,2,10,11,17
56:21 57:1,2,6,12,16
58:11 60:6 62:21
63:21 65:6 66:14
67:10,12,22 68:21,25
69:4 70:15,25 71:8,11
72:10 76:2,13,14
186:13
**array**
168:14
**art**
109:22 177:2
**article**
5:18 180:5 185:14,16
242:1,7
**asked**

15:5 61:3 76:4 94:4
99:21 156:1 157:8,8
171:8 191:9 251:15
253:16,17 263:1
283:7 295:2 303:13
327:16
**asking**
60:10 154:21
**aspects**
81:16
**assemblage**
209:24
**asserted**
210:3
**asserting**
246:23
**assess**
260:25 274:17 278:10
**assessing**
276:18 277:10,14
278:5 279:21 280:3,5
280:11 281:2
**assessment**
55:22 109:10 113:25
114:4 153:7 156:5
**asset**
65:7,12 66:20,21 67:3
67:10 68:7 72:9 76:2
76:22 77:1
**assets**
41:7 55:9,16
**assign**
93:6 306:5
**assigned**
71:10 119:4
**assigning**
70:21
**assignment**
71:7
**assistance**
177:8 178:2
**assisted**
141:13
**assistive**
5:23 88:2,6 139:14,17
139:25 141:13 147:5
190:21,21 191:10

196:14 266:14 273:15
274:19 275:2 283:24
289:13
**associate**
26:1
**associated**
33:1 46:11 53:24 88:2
88:6 95:12 137:7
162:10 192:3 193:20
**association**
1:5 8:6 131:22 132:7
138:2 164:21 165:2
165:18 166:17,23
167:8,17 189:16
**associations**
209:8,9
**assume**
56:14 196:21
**assumed**
159:21
**assuming**
41:8
**ASTM**
11:19
**Atlas**
63:22 64:17,25 66:4
**atoms**
28:4
**attached**
14:14 37:16 38:6 269:3
**attachments**
14:19,20 15:15 215:5,6
**attempt**
299:3 307:25 317:13
**attempts**
277:18
**attention**
149:11 183:2 202:2
251:24 326:10
**attorney**
182:21 329:11
**attorney-client**
227:21
**audible**
10:11 198:1
**audio**
170:8 199:7,8 200:7,23

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

333

**auditory**
269:24
**August**
161:13,15
**auspices**
139:3
**authenticating**
224:8
**authentication**
224:7
**authenticity**
143:21 176:3,6,8
**author**
172:9,12 190:24 244:1
**authorities**
152:12,19,25
**authority**
109:8,14,22 151:14,22
152:5,22
**authorized**
128:7 129:25 130:4
169:16 181:19 182:10
232:22
**authors**
6:17 7:6,12 159:16,24
168:10 171:17 189:24
201:10 208:18 209:6
209:8,11 229:8 232:9
237:24 242:4 248:2
**author's**
172:8
**autism**
149:11
**automated**
113:24 278:9,12,24
279:3,16 280:2
**automatically**
319:24 320:17
**avail**
127:16
**availability**
253:24 298:4 300:2
**available**
50:25 68:17 94:12
98:14 104:7 106:8
109:21 113:7 114:1

125:18,25 128:9
134:10,19 135:8
139:7 145:22 148:10
164:3 169:17 170:17
199:7,25 201:13
213:2 223:22 226:16
228:1 230:21 233:24
244:13 245:4 250:2
260:10 283:25 293:6
297:11 299:13,15,21
309:17 319:16
**Avenue**
9:19
**average**
216:19 217:14,18
301:8
**avoid**
105:6
**aware**
12:21 96:14 172:10
291:21
**a.m**
2:4 8:1,11

## B

**B**
256:18
**bachelor's**
16:13,16 17:2
**back**
21:1 29:18 32:24 43:14
64:14 74:13 91:9
106:4 131:2 133:19
136:21 143:9 144:3,9
167:1 175:24 176:18
185:10 208:14 222:8
222:9 249:4 262:20
273:24 282:24 283:5
304:20 306:17 327:9
**background**
21:7,22 29:13 35:12
123:15,16 229:23
245:18
**balance**
159:13
**bananas**
121:2
**bar**

56:15
**barely**
56:13
**bargain**
159:12 180:12,21
189:20,25
**based**
16:11 51:25 54:16
58:17 59:3 145:11
149:16 155:11 159:17
161:10 165:24 188:21
212:10 213:9 219:12
220:18 223:11 224:23
225:9 226:9 258:2
272:19
**basic**
274:18
**basically**
24:4 86:3 209:25
267:13 268:7 273:5
**basis**
161:5 226:20
**bear**
169:24
**bears**
242:5
**becoming**
100:13 174:3
**beginning**
119:19
**begins**
8:4 91:7 185:8 249:2,3
**behalf**
105:11 135:17,19
136:1
**beings**
121:7
**believe**
12:20 15:21 28:1 56:20
62:9 63:7 64:22 66:2
66:7 67:6 75:4 77:17
78:24 79:19 83:17
87:12 88:20 89:20
93:4 116:15,22 130:3
172:19 174:23 175:16
176:13 178:10 201:17
205:12 209:7 210:21

213:9,25 214:22
215:3,11,12 217:15
224:6 226:12 227:24
242:2 247:16 251:11
256:20 258:5,23
263:3 265:2 295:17
317:21 320:6
**believed**
247:1
**Beneficent**
5:10 72:4 74:22 75:10
76:16 82:24 98:20,24
144:2
**beneficiary**
109:1
**benefit**
53:7 75:5 81:12 123:17
156:18 157:24 159:17
263:16 322:15
**Benetech**
33:3,4 55:5,17 72:6
74:15,19 75:8,15,17
75:20 76:1,8 77:6
78:4 79:23 81:3 82:6
82:9,12,19,24 83:4,10
84:3 85:4 87:20 89:4
90:1 96:5 138:11,13
138:15,21,21,24
139:2 145:10 161:11
163:19,20 164:17
169:16 170:16 175:11
175:15 176:4,15,25
177:6,13 178:4,10,22
179:4 185:19,22
186:3,17 248:9
**Benetech's**
106:21 178:15
**Bengineering**
76:21
**best**
41:5 48:10,18 58:2
72:8 76:10 90:12
92:1 93:9 100:2
101:2 222:21 297:8
297:10
**beta**
83:18

Case 1:14-cv-00857-TSC   Document 138-67   Filed 11/09/19   Page 89 of 139
Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

334

**better**
39:10,19 54:12 177:25
**beyond**
13:12 57:11 60:5
126:11 164:17 194:11
196:10 228:6 262:12
298:8,16,23 299:8
303:15 309:1 317:20
318:20
**big**
44:22 92:5 181:9
271:16 301:25
**bigger**
123:13
**binding**
113:20,21 309:22
**bindings**
117:10
**Bite**
304:19
**black**
123:14,15
**blew**
19:4 323:10
**blind**
5:25 32:19 60:19 62:25
63:25 70:11 78:5
122:24 125:3 140:15
150:14 153:3,17,17
169:22 170:10 182:1
186:7 190:22 191:11
196:15 197:12,14
210:20 222:22 257:13
257:19 258:3,8
259:10,14 260:2
261:4,10,15,17,17,22
262:24 263:20,21
264:10 266:8 270:12
272:22 273:7,18
274:3,10,18 275:4,12
275:17,24 276:4,9
281:10,14,18 283:9
289:3,12 293:19
298:20 299:5 301:1
301:14,16,23,24,24
302:4,5,9,13,17,19,21
303:12 306:11 324:2

**blindness**
86:8,23 150:11 153:5
239:4 262:16 282:1,5
300:14 301:25 302:2
302:10
**Blind's**
301:2
**blog**
242:21
**blow**
22:24
**board**
52:18 79:21 80:2,5,13
81:24 188:9,10,22
**board-level**
80:14
**body**
83:24
**Bokser**
43:7
**bona**
164:4
**bono**
177:20 178:9 254:6,10
**book**
58:12,16,21,22,23,25
59:5,7,14,23 60:16,23
61:10,11,13,14 62:5
65:14 104:25 105:6,7
105:18 113:19 114:8
114:14 125:2,18
126:3 130:14 137:15
141:25 142:5,5,13
147:19 148:6 153:25
154:1,14 162:5
190:20,25 191:1,2,10
191:16,16 196:14
198:2 207:13 208:1,2
208:6 209:25 213:11
216:20 217:11,20,22
218:20,21 219:5
220:3,21 221:2
222:18 230:20 239:7
245:23 246:8,18
263:17 274:4,5,10,13
297:11 300:23 301:10
302:12,14

**books**
48:4 99:6 100:4,18
105:14,23 106:8
114:1 126:22 133:12
134:19 135:20 145:22
146:5,9,13,16 147:22
162:10,11,13 164:2
169:17 172:12 181:20
191:3,12 199:5,6
201:4,11,12 205:3,15
207:10 216:3 217:14
217:17 218:2,10,15
218:16 219:11 220:2
222:19 223:10 225:16
230:22,25 244:21
245:11 299:12 300:16
300:17 302:1
**Bookshare**
5:13 82:1,6,16,18 83:3
83:6,18,20,22 87:21
87:25 88:15,22 89:10
90:3 92:21,23,25
94:13,19,22 95:3,4,13
95:17,19,25 96:1,17
99:7,13 100:4,17
101:15,19 103:3
104:7,18 105:13,16
106:2,8 108:20,23
109:2 110:2,12,24
111:6,7,17,22 112:12
112:17,24 113:7,14
113:16 115:20 125:17
126:16 127:1,6,10
128:20,22 129:3,17
129:24 130:13 131:13
131:16 132:2,23
133:13 134:19 135:4
135:6,14 136:23
137:2 138:7,8,9,12,16
138:23 139:4,6 141:1
143:19 144:22 145:2
145:9,18 146:12
147:7,22 148:3,9,11
149:3 150:1,5,17,24
151:13,21 152:9,14
153:11,16 154:4,6,19
155:5 156:12 157:10

157:16 158:12,18,20
160:20 161:1 162:3
162:25 163:2,4,9,19
163:21,24 164:5
165:4,11 167:10,19
168:13,20,23 169:10
169:13 172:23 173:12
174:1,3,11,18 175:2,6
175:7 176:23 182:9
184:8,12 187:2 189:9
190:6,9 195:23
218:11,12 219:11,14
221:7,11,13 226:10
247:2 325:24 326:16
326:20
**Bookshare's**
99:1 100:13,17 101:24
102:8,22 112:3 122:2
122:13,17 126:6
130:7 135:9 136:6
139:20 143:18 146:17
148:15 171:4 172:15
226:2
**Bookshare.org**
189:4
**Bookshelf**
89:5,22 90:4,11 91:22
92:11,13,17 93:9
96:16 97:5
**Boolean**
121:3
**bordering**
71:5
**bottom**
68:24 146:22 174:5,8
180:9 201:8 202:17
233:11,12 234:20
240:21 247:18 264:7
269:18 276:16 285:19
307:12 314:22 319:9
**bound**
156:20 158:1
**Bowes**
49:13
**box**
174:6,14,16,24
**Brady**

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

335

3:3 8:19
**Braille**
140:12,16,18,19
142:11,12 147:14,15
147:17,20 170:8
194:18 196:9 197:10
197:14,25 199:2,5,16
200:3,5,6,23 202:7
265:25 266:10,22
267:2,10,14,14,24
268:3,6,7,9 269:10,11
269:15 270:9,10,13
270:14,15,16 274:7
**Brailler**
199:2,16
**brain**
53:17
**brain-injured**
262:3
**branched**
186:20
**brand**
270:19 279:12,17,24
**breach**
241:4
**breadboxes**
39:14
**break**
10:18,20,22 90:25
104:15 142:25 207:21
208:8 248:17 282:8
327:4
**brevity**
243:2
**bridging**
321:8
**brief**
210:17 236:24
**brings**
158:4 234:17
**broad**
164:18 168:14
**browser**
88:2 140:1,3 288:15
294:5 295:24
**browsers**
283:25

**Bruce**
26:1
**build**
25:13 185:24
**building**
22:6
**built**
61:9,20 62:5 140:1
289:13 316:14
**bullet**
170:20
**bunch**
23:17 28:2 45:19 84:1
279:4 290:17 293:2
**bureaus**
45:24 49:11,20
**burn**
42:1 215:21
**business**
9:13,16,18 22:5,6 33:5
33:18 35:15 45:10
47:18,21 49:10 54:25
144:1 175:10 176:6
178:15,23 189:23
212:3
**Butler**
320:14
**buy**
119:7 162:7 285:13
**buying**
162:11 292:6
**bylaws**
81:8

————————
**C**
————————
**C**
8:2 22:3
**Caere**
40:3,6,7 41:7,10
**Caere's**
40:17
**Calera**
4:16 33:2,4,9,18,23
34:3,5 35:21 36:1
37:24 38:8,18,20 39:7
39:22 40:2 42:16,21
42:24 43:3,6,25 48:7
48:9 56:4 58:15

186:14,15 188:9,21
**Calera's**
36:18 38:5 39:3 41:6
54:16
**California**
2:5,5,8 3:20,21 8:14,15
9:12,18,19 16:13 17:6
53:7 74:25 75:3,5
329:4
**call**
64:10 75:17 82:22 84:7
216:9 277:9
**called**
16:24 25:15 41:12
49:11 53:3 59:7
163:22 245:17 264:11
**calls**
13:2 33:13 63:17 67:4
70:8,24 71:13,21 72:3
72:20 73:21 82:20
84:14,23 87:11,17
88:19,25 89:25 90:8
90:14 92:16 102:10
103:13 106:14 107:10
113:9 127:4,13 130:1
130:9 131:18 134:22
135:11 139:10 143:22
178:16,24 179:8
182:11,19 188:18
210:5 213:8,17
221:15 224:4 227:8
228:11 245:6 254:7
283:16 324:25 326:25
**Caltech**
17:15 25:25 28:12
**camera**
268:23 269:3,5
**candor**
32:6
**capabilities**
39:18 232:15
**capacity**
35:7 225:16
**capital**
34:19
**capital-backed**
186:11

**Cappaert**
3:12 8:20,20 9:24
161:19,21
**caption**
329:12,14
**captioning**
224:25
**capture**
108:16 297:23
**captures**
162:1
**card**
39:14 56:5 58:15,18
**care**
35:13 92:7
**carefully**
121:16 242:14 281:20
**Carl**
307:23 320:13
**case**
8:9 11:19,21,25 16:4
57:22 112:20 182:16
184:8 185:18 195:22
204:16 209:13,16,18
209:23 210:17 211:4
211:11,14 212:14
247:20 250:4 252:6
255:10 256:24 275:4
303:23,23 310:7
**cases**
140:17
**cassettes**
199:7,8
**CAST**
279:20,24
**catalog**
172:11
**catalogs**
296:16
**catch**
15:12
**categories**
263:22
**category**
17:4
**cause**
2:10 23:25 40:16 197:6

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

336

204:17 310:1 329:14
**ceased**
79:16
**center**
23:3,9,10,13,15 24:20
104:20 235:16 279:20
**centered**
115:14
**centers**
23:12
**CEO**
47:8,17 48:20 54:21
78:14,20,22 79:1
**cerebral**
53:17 86:8
**certain**
45:18 46:13,22 81:22
120:25 158:11 217:22
219:3 250:1 252:10
280:20 302:13,16
303:8
**certainly**
20:8,9 24:23 62:13
101:19 209:6 264:5
273:12 279:9,11
280:8 294:13 321:17
**certainty**
303:1,4
**certificate**
305:15 329:1
**certificates**
329:17
**certification**
239:17
**certified**
2:7 232:14 234:3
235:15 238:23 329:2
**certify**
329:4,10
**certifying**
155:10
**CFO**
47:12,25 48:13
**Chafee**
5:15 127:22 128:2,5,6
129:5,13,21,25
133:10 145:20 157:21

157:22 158:13 163:22
164:1 169:14 170:22
171:22 172:6,7
180:17,18,20,24
181:4,15,18 182:6
183:3 210:11
**chairman**
54:22 78:15,22 80:1,2
80:19
**chairman's**
79:15
**challenges**
257:12,19 258:2
259:10 262:23
**chamber**
27:19
**chance**
328:20
**change**
90:22 215:10,14 216:6
216:7 217:5 218:22
221:4 224:20,22
225:9,12 251:22
271:16
**changed**
76:13 172:20 219:4
**changes**
165:16,17,21,23
166:13 167:5 269:23
**changing**
271:17
**chapter**
191:1,6,10,19 192:12
192:17,20 196:18
**character**
29:24 30:1,8,17 32:14
33:20 36:15,20 37:10
44:4,11 45:16,19
46:17 113:22 115:1
193:9 200:21 202:22
284:18 320:24
**characteristic**
39:9
**characteristics**
202:21
**characterize**
60:21 64:1 100:10

245:11
**characters**
37:14 46:19 246:8
311:4
**charge**
96:7,13 162:4 234:25
235:9
**charged**
96:23 97:4 110:1,12
**charitable**
76:18,19
**charity**
53:8 55:4 75:22
**chart**
68:20,24
**charter**
76:15,18
**cheaper**
39:10 54:12 292:14
**check**
114:20 138:1 174:6,14
174:16,24 254:24
311:13,18 313:2,10
313:16,22 314:11,19
**checked**
314:3
**checking**
165:20 314:15
**checklist**
277:25 281:3
**chief**
34:17 48:1 81:6,9,11
81:21,22 236:24
**children**
146:10
**child's**
125:2
**choose**
121:11
**chop**
113:20 117:10
**chopping**
309:22
**chose**
289:23 291:23
**Chris**
242:21

**Christopher**
320:14
**Circuit**
7:4 237:23
**circumstance**
95:25
**cite**
216:19 225:15
**cited**
218:1 300:14
**cites**
217:13
**citing**
235:12 241:5
**citizens**
57:20
**Civil**
4:11 13:4 221:16
227:10
**claim**
36:19 67:17
**claimed**
70:6
**claims**
209:16
**Clancy's**
222:17 223:1,9
**Clara**
20:8,8
**clarification**
254:2
**clarify**
10:16 13:17 14:6
**class**
105:1
**classroom**
146:11
**clause**
159:2,6
**clear**
128:15 138:15 139:2
144:18 164:17 243:3
**clearer**
103:12
**client**
98:23
**close**

Case 1:14-cv-00857-TSC Document 138-67 Filed 11/09/19 Page 92 of 139
Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

337

216:17
**closed-circuit**
265:19 269:6 276:7
**cloud**
133:17 134:10 166:5
**clutter**
151:4
**coauthored**
180:5,7
**code**
35:5 57:6,12 58:8
59:23 62:4 63:9
64:24 66:21 84:20
87:14 88:22 92:13,22
92:23 96:12 158:14
163:23
**coins**
44:14
**colleague**
9:24 21:5
**collect**
22:22
**collected**
73:17
**collecting**
174:1
**collection**
99:7 105:16 112:17
114:1 213:2,19
**collections**
104:6 222:25
**colors**
271:18
**Columbia**
1:2 8:9
**column**
233:12,13 234:21
238:16 240:22,23
**combination**
124:21 140:2 142:8
271:5
**combined**
35:12 169:2
**come**
11:4 15:12 61:15,22
62:2 104:24 112:4
244:25 245:5 294:14

**comes**
109:20 156:21 158:24
251:23 281:24
**comfortable**
167:9,18
**Coming**
64:4
**command**
22:23
**commencing**
2:3
**comment**
165:19 242:12,17
246:13
**commentary**
229:16
**comments**
242:7,10 243:4,7,18
**commercial**
289:9,15
**committed**
247:21
**committee**
189:15,17
**common**
30:7,19,23 31:1,3 46:4
58:23 104:23 115:2,6
115:17 123:18 178:18
203:19,21 204:18,19
204:20 224:7 245:12
264:9,21 270:7 273:6
274:9 277:10 312:17
**commonly**
55:5,19 84:7 142:4
268:20 269:2,25
275:14 282:1,5
283:25 289:2 293:18
**commons**
148:17
**communicated**
36:7
**communications**
13:3,6 41:12 227:9,22
**community**
100:16 106:3 108:2
167:20 180:13 186:3
221:12

**companies**
19:22 28:10,15,15,18
28:25 29:4 32:25
35:8 49:9 62:10
246:10 325:6
**company**
18:16 20:4,6,16 22:1,3
22:8 23:5,6,8 25:3
28:23 29:20 33:7,9,10
33:17,21 34:6 35:10
40:17,22 41:11,14
44:3,4,5 46:9 48:4
53:3,6,24 54:25 55:3
73:19,23 74:6,21 75:3
75:20 80:9,13 92:4,5
145:12 186:12
**compare**
290:6 311:7 326:19
**compares**
285:4 291:17
**compensation**
167:22 254:12,17,22
255:16 256:23
**competence**
30:21 31:9 32:10,21
33:14 39:6 40:14
156:4
**competent**
109:8,14,22 151:13,22
152:4,12,19,22,25
**competitor**
285:5 291:18
**competitor/collabor...**
236:25
**compilations**
176:25
**complaint**
16:5
**complementary**
49:25 50:6
**complete**
37:9 109:19 175:14
294:25 329:9
**completed**
86:3
**completely**
11:6,12 61:6 107:19

114:15 122:24 153:17
276:4,9 278:9
**completing**
17:2
**complex**
217:18 218:2
**complexity**
217:20 219:13,15
220:2,20 221:3 305:3
306:3,5,9 312:22
**compliance**
260:25
**complicated**
75:14 121:20 219:3
**complies**
182:9
**complimentary**
111:11
**components**
188:8
**compound**
31:9 36:16 38:1,10
49:7 50:1 51:11,22
52:8,16 57:18 58:13
60:8 62:23 63:23
84:5 85:6 87:22 89:6
97:18 102:11 134:23
240:14 248:8 252:14
267:21 289:7 315:12
**comprehensive**
152:18 178:10 183:24
222:24
**comprehensively**
52:1
**comprises**
144:1
**computer**
23:6 28:22 29:16 56:3
57:21,22,23 88:9
200:7 264:15 270:25
283:24 294:2
**computer's**
58:19
**computer-aided**
329:7
**computer-synthesized**
264:17

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

338

comp'ed
161:4
conceive
322:1
concentrate
129:13 305:16
concentrating
189:7
concentration
16:25 17:19
concept
131:16
concern
100:15,24 106:7
132:20 168:4
concerned
131:13 167:7 176:7
201:11
concerning
302:4
concerns
101:22 102:22 132:17
133:2 164:24 165:3
252:19
concluded
223:12 328:24
conclusion
33:14 63:18 67:5 70:9
70:24 71:13,22 72:3
72:20 73:22 82:21
84:14,23 87:11,17
88:19 89:1,25 90:8,15
92:16 107:11 113:10
127:4,14 130:2,10
134:22 135:11 143:23
178:17,25 179:8
182:12,20 210:6
224:4 228:12 254:8
300:2 327:1
conditions
174:11,18 175:1,5
conduct
76:22 308:10 315:4,9
316:1,20 318:13
conducted
296:17
confidential

1:15 77:6,12,17,21
90:17,21 91:13
130:23,25 131:2
165:8
confirm
149:4 152:13 155:17
215:4
confirmed
152:4
confirming
291:8
confirms
151:14,23
confused
193:23 209:9 307:2
confusing
193:17 194:24 195:12
196:2,19 197:5
200:16 205:19,25
206:9 207:2 226:22
230:13 233:6 235:24
237:15 240:14 241:10
261:13 263:2 271:24
273:10 277:3 288:23
290:10,22 296:24
298:7,14 299:25
308:16,25 311:1
315:22 316:4,12,23
317:19 320:4 321:24
322:11 327:1
confusion
220:12
conjunction
80:13
connected
76:22
connection
255:18
consent
64:6 143:1 175:19
consider
258:14,20,23 264:23
265:6,11,17,23
266:21 267:8 268:2
281:14
considerations
303:16

considered
269:9
considering
275:19
consistent
42:23 43:5 50:13 51:14
235:25 250:9,16
consortium
205:10,23
constantly
257:7,8
Constitution
121:2
constraints
96:13
consumers
168:10 289:12
consummated
40:19
contacted
138:5
contain
176:12 207:13
contained
229:17 248:10 251:5
320:25
containing
309:11,15 319:11,15
content
13:19 31:4 43:8 50:12
107:13,22 108:6,7
112:13,23 113:7,8,12
113:15 118:2,20
119:10,13,15,17
120:25 121:6,17,17
122:3,18 124:2 125:5
130:6 134:9 139:24
140:11,21 141:5,11
141:18,24 166:3
167:21 171:14 172:9
177:5,5 178:3,7,11,13
178:21 192:4,8
193:20 195:21 230:24
250:2 252:10,18
253:2 260:10 266:11
274:5 275:20 276:25
277:1 280:9 293:15

309:12 310:19 311:3
319:11 324:23
contents
120:8,16 176:2 239:22
context
44:8 49:21 85:16,21
88:5 109:13 138:19
139:1 146:25 191:24
194:8 195:18,24
212:5 245:15 247:12
261:20 272:24 273:1
273:3 275:1,12 281:4
290:4,17 297:2
continue
76:25 111:18 158:22
216:1 259:18 294:23
continued
5:1 6:1 7:1 54:11
continues
186:8
continuing
239:15 240:22 319:19
321:14
contractor
218:4,7
contractors
178:9 218:9
contracts
48:5 111:24
contrary
41:9
contrast
123:14 217:9 271:17
271:17
contribute
231:19
contributing
190:24
control
29:10 53:16 113:25
114:3,13,19,25
116:24 117:12,16,18
125:17 126:11 236:1
236:4 293:5,13
controls
34:20 241:14 263:18
293:3

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

conversation
47:6 75:18 167:6 173:7
  193:15 194:10
conversations
13:18 101:13,20
  106:17 165:24 166:14
converse
166:23 299:20
conversed
167:4
conversion
290:5,7
convert
202:12 289:4 292:20
  293:19
converted
204:2
converting
217:18
converts
239:25
convinced
190:2
Cool
243:22
copies
30:20 105:13 114:15
  128:8 136:20 169:19
  230:5,8 231:17,20
  326:22
coprocessor
39:14 58:18
copy
120:4 127:11 128:22
  132:22,23 135:7
  165:18 191:19 230:20
  231:1,11,13 263:17
  302:14 303:25 309:21
  327:20
copying
158:9 226:14 227:25
  247:24 248:1 288:12
  326:24
copyright
57:7,14 58:9 59:24
  62:6 63:10 65:1 67:2
  68:24 84:21 87:15

88:23 92:14 98:24
126:20,23 127:1,17
127:21,23 128:24
129:4,8,11 134:20
135:4,7 145:19
156:20 157:19 158:8
158:17,25 159:3,11
160:1 163:22 164:16
169:9 170:4,5,23,24
171:9,15,18 172:4,6
189:15 209:19 232:22
245:22 246:19 321:20
copyrightable
42:24
copyrighted
95:9,11 107:8 113:8,12
  127:11 128:9 135:3
  135:13 136:10 137:11
  148:20,22 155:5
  158:10 163:8 164:2,7
  171:12 173:12 238:25
copyrights
4:16 5:10 7:12 42:21
  242:5
core
198:1
corner
144:19 230:17
corp
22:4
corporate
72:5 75:16 82:23 83:1
corporation
53:8 75:5 81:12,13
  82:16
correct
11:2,6,8 13:25 14:10
  15:25 16:15,18 17:7,9
  17:12,25 18:4,13,22
  19:5,9,12,16,19 20:3
  23:4 25:21 27:1
  34:13 36:2 37:19
  39:23 47:10 49:2,4,18
  50:21 54:24 59:9
  60:21 65:9 74:22,23
  75:1 77:12,13 79:3
  80:23 93:12,22 94:7

98:7 99:12 102:25
104:7 107:23 112:8
116:8 128:17 129:1
137:3 139:5 147:24
180:8,19 203:1 208:2
249:13 261:23 275:25
276:5,12 281:7
284:24 297:18,22
310:13 312:12,16
316:13,24 319:12
321:3 324:9,11,17,24
325:2,15 327:15
correctly
97:10
cortical
262:16
cost
39:15 160:25 216:20
  217:11,14,16,20
  218:2,4,19,23 219:22
  221:4 306:10
costs
160:18 217:16 218:3,5
  218:8,25 220:3,21
  221:1 305:8,9
counsel
3:1 8:16 11:2 12:11,23
  13:6,21,24 14:2,7
  38:3,13 48:6 68:13
  77:13,19 90:24 91:10
  98:12 142:24 143:25
  151:1 161:7 165:15
  165:18 174:15,22
  175:9 177:9,20 178:3
  178:9,9 179:10
  183:11 184:23 189:12
  190:13 194:4 203:2
  211:5,10 214:16
  220:5 229:12 237:22
  238:5,10 243:1 251:7
  255:8 256:2,25 263:6
  303:17 307:16,21
  309:11,15 310:6,11
  310:20 312:8 315:2
  329:11
counsel's
139:2 176:1 191:21,23

221:23 227:13
count
177:12
counterfeit
47:1
countries
110:10,21 161:2
County
20:9
couple
10:2 23:16 209:10
  298:24
Courier
37:20
course
22:25 117:15,23
  124:11 178:14,22
  181:2 282:20 307:19
courses
18:7
court
1:1 2:10 6:16 7:4 8:8
  8:25 10:8 11:22,23
  12:9 21:10 26:8 31:8
  208:20 228:22,23
  237:5,8,23 239:15
  240:24 251:16 303:25
court's
229:1,8 236:16 237:6
  239:10 240:11
cover
137:22 305:15 321:7
  321:17
coverage
209:12
covered
126:23 129:12
covers
196:4 294:10
co-owner
73:25 74:7
CPU
58:19
crawled
29:16
create
28:5,5 32:18 161:10,11

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

340

169:3 179:5 183:17
199:5 212:9 230:4
267:13 283:2 284:19
287:24 288:4,10,25
**created**
31:4,13,23 50:23 68:14
76:7,16,21 83:14
116:12,23 122:4,14
147:9 161:9,17
168:12 173:7 177:6
178:3,8,11,13 207:15
217:10 287:3,6
309:21 320:17,23
**creates**
319:25
**creating**
30:19 31:14,24 177:9
287:18
**creation**
15:23 185:19
**creative**
148:17
**credentials**
109:10 152:21
**credibility**
190:1
**criteria**
149:17
**CSR**
1:25 329:25
**curious**
193:14
**current**
29:10 71:19 74:5 75:13
123:19 172:18,19
216:5 217:21 225:17
291:14 292:13
**currently**
48:25 240:2
**Curriculum**
4:12
**custom**
45:5 46:17,20
**customer**
39:20 47:18 54:1
**customers**
34:4,8 35:6 36:7 39:4

45:22 46:7,22 47:3,21
49:12 50:10 53:19,22
**customizable**
60:22
**customization**
34:7
**customized**
200:23
**cut**
218:19
**C-A-E-R-E**
40:3
**C-H-A-F-E-E**
128:5

---

## D

**D**
3:12 8:2
**DAISY**
205:1,2,10,13,13,22
206:2,23 207:5,8,13
207:25 208:1,2,5
244:13,17,20,22,25
245:5,8
**DAISY-processed**
207:25
**Dan**
223:9
**Daniel**
222:17
**data**
22:22 26:5 108:17
174:1 176:25 241:4
**database**
46:12,15
**date**
8:10 69:3,10,11 83:16
83:17 99:18,23 170:5
175:8 214:6 224:23
225:10 229:10 242:5
**dated**
184:3 185:23 214:13
216:2,21 219:6
**day**
11:6 329:19
**days**
77:9 91:13 111:16
**DC**

11:21
**deaf**
270:13
**deaf/blind**
270:8
**deal**
35:6 40:16,18
**dealing**
157:25
**deals**
47:21
**dealt**
168:4
**decade**
164:21
**decent**
212:1 240:16
**decide**
77:25 125:17
**decided**
238:6
**decision**
7:5 228:24 229:10,18
236:16 237:6,23,25
238:12 240:3,17
**declaration**
6:4,9 210:24 214:1,2,2
215:4,14 216:10
217:1,4,10 219:6,9
221:10 222:11 224:17
224:23 225:10 226:24
227:3 234:24 235:8
235:13 241:5,8
304:13,21 306:4
325:20 326:10
**declarations**
210:16 211:21 212:12
**DECtalk**
188:10
**dedicated**
142:19
**defects**
24:3
**defendant**
1:9 3:17 6:11 8:23
182:15 250:3
**defendants**

209:22 210:3 212:9
228:22 229:24 230:2
230:8 232:9 234:23
235:7
**defense**
307:16 309:11,14
310:6,11,20 312:8
315:2
**defenses**
210:2,8
**deficit**
149:11
**define**
23:20 29:7,24 37:3
73:16 85:16 109:13
118:2,19 281:23
301:4
**defined**
109:23 128:8
**defines**
301:7
**definition**
37:2 117:21 118:21
181:18 182:10,17
210:21 250:9,17
260:15 263:23 281:1
282:4 290:15 300:22
301:5
**definitions**
150:10 286:23
**degree**
16:10,13 17:5,16 25:5
**delay**
105:18
**delete**
137:23,23
**deleted**
159:4
**deliver**
218:15
**delivered**
208:1,6
**delivering**
39:20 205:3,14 207:9
**delivers**
83:24 169:3
**demand**

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

341

**216:23 298:19 299:4**
**299:23 300:11 301:15**
**302:20 303:11**
**demonstrative**
251:25
**Department**
112:4,10 218:14
**depending**
119:3 204:5 293:9
312:21
**depends**
94:23 204:11,13
**deployed**
107:21
**deponent**
329:5
**Depos**
8:13 9:1
**deposed**
11:14 12:4
**deposition**
1:13 2:1 7:18 8:4,13
10:1,3 12:12,16,17
14:8 15:23 21:11,12
30:15 41:15 50:14
68:8 69:13 77:9 91:8
98:8 143:6 179:22
185:2,6,9 190:15
208:12 211:15 229:3
237:11 241:19 248:25
249:3 303:19,21
304:4,11 305:13
310:1,1,7 328:22,24
**depositions**
320:7,12
**depository**
235:16
**derivative**
319:25
**derivatives**
319:22
**describe**
61:2 80:18 83:3 92:20
147:21 156:3 162:21
168:23 170:15 185:21
231:12 244:17 269:19
310:19

**described**
45:6 47:3 53:19 55:19
83:20 116:10,24
117:18 122:5 128:21
142:4,4 162:20 194:1
194:21 197:6 203:14
209:19 282:1 308:10
308:18
**describes**
197:10 198:14 231:9
235:11 240:24 262:9
**describing**
82:25 131:20 162:16
193:12 274:11
**description**
4:8 5:2 6:2 7:2 117:8
146:2 186:16 188:20
189:3 190:13 222:17
223:2,9 225:21 226:1
239:10 240:11
**descriptions**
147:21 216:23,25
229:16
**design**
22:20 37:7,13 164:25
165:3 278:8
**designate**
77:11 91:12
**designated**
9:22
**designations**
91:14
**designed**
27:8 56:3 57:20 59:1
60:17 61:6 62:25
84:8 85:9,14 114:25
155:2 274:17 278:21
**Designers**
37:7
**desire**
299:13
**desktop**
56:15
**despeckling**
202:19
**destination**
45:18 63:1

**destruct**
22:23
**detail**
79:9 212:21 221:7
292:19
**details**
128:11
**detect**
23:23 24:2 27:8 115:1
**detected**
27:21 28:3
**determination**
155:20
**determine**
299:3,4 308:2,12,21
317:15 318:22 319:22
**determined**
109:6
**determining**
157:12
**developed**
32:8,17 46:22
**developer**
47:20
**developing**
5:19 186:2
**development**
47:22 76:25 81:15
**developmental**
107:1 108:3
**device**
26:10 56:2 88:9 266:11
268:6,17 269:2 311:3
**devices**
268:7
**devote**
216:25
**diagnoses**
262:11
**diesel**
25:13
**difference**
167:3 285:16,17
290:12
**different**
23:17 28:1 36:17,18
37:7,8,10 39:19 45:1

**58:22 59:5 61:6 74:4**
**75:16 82:13 94:1**
**105:2 131:8 132:8,11**
**146:9 150:4 157:2**
**167:15 169:5 204:7**
**207:14 210:25 217:13**
**253:4 258:6 270:5,6**
**275:3 285:15 286:10**
**288:15 289:17 293:9**
**294:6 302:7 315:17**
**differentiate**
166:11
**differently**
131:9
**difficult**
155:13
**digital**
30:20 31:5,14,25 82:3
92:11 100:3,18
116:10 121:6 133:8
133:12 134:18 139:8
141:18 142:9 164:2
168:2 170:8 171:9
172:16,16,21 183:19
200:9 207:11 212:17
213:6 222:24 226:2
230:4,8,20 231:1,7,17
231:19,20,25 232:11
232:19 233:4,8,15,22
233:23 234:5 235:10
235:22 238:21 239:20
239:22 240:12 241:15
245:9 247:22 263:17
266:10 267:17,20
268:6,7 287:4 299:23
326:12,20,22
**digitally**
31:4 117:11 127:10
128:22 207:9 287:6
**digitization**
230:9,19
**digitized**
104:5
**dilatory**
21:6
**direct**
171:25 202:2

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

**directed**
12:18
**directions**
18:10
**directly**
139:20 140:17 183:15
193:9 195:21 200:24
202:7
**director**
26:2 48:25
**directors**
80:3 81:24
**disabilities**
53:11,12,14,15 60:18
61:7 78:5 82:4 84:9
85:10,12,13,15,17
86:11,13 99:9,11
104:22 107:1 108:4
109:17 122:3,14,17
126:25 128:10,10
130:8 131:11 145:5
145:23 149:14 150:12
150:12 152:4,13
156:15,17 158:23
164:5 169:4,13,18,23
170:11,25 180:15
182:2 183:22 186:24
187:2,4 189:22 192:3
193:21 201:16 205:4
220:4,22 226:12,18
228:2 232:14 234:3
238:23 239:5 240:10
249:21 258:7,11
259:6,17 260:15,20
260:24 261:10 262:10
262:12 266:14 275:20
281:16,19,22 282:4
299:1,13
**disability**
85:18,25 86:4,6,14,16
86:20,22 97:17,22
98:6 101:15 102:3
109:3,6 149:5,19,24
150:7,22 151:11,15
151:21,24 155:4,12
156:5,8 159:23
163:10 180:13 196:6

239:1,1,11,18 263:15
274:22 276:22,23
277:24
**disabled**
76:15 104:17,20,24
105:3,9 132:22 201:4
205:15 234:8 262:5
277:21
**disagree**
301:20
**disciplinary**
137:6,9
**disclose**
13:13 76:17 77:9,21
**discontinue**
137:25
**discount**
46:5
**discover**
305:3 308:5
**discovery**
137:7
**discuss**
179:14,15 250:15
258:10
**discussed**
65:6 102:1 122:15
126:12 142:23 165:9
172:22 192:2 193:19
196:5 223:21 228:7
250:10 265:3 275:7
306:3
**discussing**
21:7,21,22 126:16
**discussion**
26:17 64:13 175:23
221:9 227:2 260:10
263:11
**dismantling**
329:15
**disorder**
149:12
**display**
265:25 268:9 269:10
269:12 270:9,10
**displayed**
272:21

**displays**
200:6,24 269:15
**distinction**
281:9 285:16,17
286:15,20 288:18
**distinguish**
223:20
**distinguishing**
138:23
**distribute**
127:11 128:23
**distributed**
169:20
**distribution**
158:9 170:1 183:17
226:15 228:1
**district**
1:1,2 6:16 8:8,8 135:18
136:12 228:22 229:1
229:8 237:6
**dive**
248:18
**Diverse**
46:3
**divide**
47:14
**divides**
219:11
**divine**
147:4
**division**
23:8 82:18,23
**divisions**
132:8
**DMCA**
171:13,16,20 172:2
**docket**
214:16
**doctors**
109:16
**document**
4:9,22 5:5,14,22 6:3,8
7:9,13 21:17 30:9,24
31:13,18,23 37:6
41:22 42:2,8 45:8
50:20 51:5 56:9
68:14 69:5,20 74:17

86:5 119:25 120:1,2
120:18 121:14,18,19
123:8 124:3 143:13
152:16 161:9,12
180:4 184:4 185:13
194:25 196:7 197:17
198:2,20 199:10
214:21,23 215:5,7
216:1 224:19,20
226:23 229:21 241:23
241:25 242:23 251:13
252:23 261:12 263:12
267:14 271:11 272:7
277:2,19 287:11,18
287:24 288:13,13,20
293:6,10 296:24
298:3,11,15,25
300:12,14 304:2
305:23 306:22 307:10
311:25 312:10 313:1
314:4,20 317:24
318:8 322:19,22
324:8
**documents**
14:13 15:19 30:3 31:19
45:25 46:1 62:10
85:24 184:18 191:3
191:12 207:10 213:24
214:22 241:1 300:25
304:11 305:3 325:13
326:7
**doing**
20:21 25:4 35:9 38:15
45:16,18,19 46:4
83:18 96:14 166:16
174:10 193:8 289:24
295:9,15 299:17
317:20
**dollars**
285:9 292:15,16,16
306:13
**Dolphin**
270:24,24
**domain**
127:18 128:25 148:16
232:21
**donate**

Case 1:14-cv-00857-TSC   Document 138-67   Filed 11/09/19   Page 98 of 139
Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

343

**100:3**

**donations**
111:25

**dotted**
81:23

**double**
115:18

**double-check**
124:10

**doubt**
143:20

**download**
98:2 118:16 140:5,8,17
162:9 163:8 167:21
297:6,15 328:3

**downloaded**
135:14 136:22 137:15
140:25

**downloading**
100:17 193:10

**downloads**
136:12 162:8

**dozen**
180:6

**Dr**
26:1,4,20

**draw**
183:2

**drawn**
180:20

**DRM**
172:24 326:15,21
327:2

**drop**
181:14

**dropping**
145:16

**drops**
203:15 313:16

**dual**
81:10

**Duke**
3:13

**duly**
2:11 9:5 329:5

**dust**
23:22,23,25

**duties**
35:16 47:23 48:11,19
79:13,23 80:2,18,24

**dyslexia**
18:19 53:14 86:8 87:4
155:12 266:17 275:21

**dyslexic**
43:18

**D.C**
3:6

---

**E**

**E**
8:2,2 40:8

**earlier**
106:16 117:8 122:5
166:3 172:22 192:1
193:15 194:10 280:17
322:14

**earliest**
188:21

**early**
29:19 40:10 79:16
165:18 279:19

**earthquake**
29:18 304:15,17

**easier**
93:5 121:6 180:14

**easily**
136:14 137:19 201:13
311:2

**easy**
57:19 64:1

**eBook**
84:8 85:9 88:1 94:2
142:20

**eBooks**
169:12 244:3,8,12

**economic**
159:15 160:2 180:16

**ed**
101:3,7 131:12 157:15
157:18,25

**edge**
36:23

**edition**
252:20 283:8

**education**

16:9 19:17 105:14
112:4,5,9,10 132:10
156:22 157:11 181:15
181:24 218:14 300:16

**educational**
1:4 8:6 19:14 109:18
131:11 132:6,18
252:20 305:24

**educator**
135:18

**educators**
301:23

**EFF**
14:2

**effectively**
94:24 101:14 108:16
155:14 166:22 239:2

**efficiency**
167:2

**efficient**
283:3

**effort**
217:17

**eh**
132:15

**eight**
185:15

**either**
28:14,21 61:13 80:13
86:13 88:2 120:6
122:23 128:23 139:24
153:17 182:22 196:21
208:1 258:18 297:15
310:5,6 319:4 329:11

**elaborate**
80:3

**elapsed**
77:10

**electrical**
16:20 18:5,10 19:1
22:14 27:24 28:22
29:9,10

**electronic**
14:2 116:11 200:6
201:13 245:25 263:18
296:18 297:3,15
299:21 307:16 308:2

308:13 310:10 317:9
317:15

**element**
263:13 291:9

**elementary**
27:9,21

**elements**
117:17 188:16 207:14
277:23

**elevated**
279:21

**eligibility**
157:12

**eligible**
108:23 110:23

**emboss**
267:12

**embosser**
267:10,15 268:8

**embossers**
200:5

**emit**
24:1

**emotion**
149:13

**employ**
117:11

**employed**
22:12 23:2,14 24:21
25:2 29:5 35:22
241:15

**employee**
177:12

**employees**
23:16 138:21 139:3
177:6 178:4,8

**employing**
326:20

**encompass**
121:12

**encompassed**
194:10

**encompasses**
207:11

**encountered**
203:22 204:1

**endeavor**

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

344

28:17
engage
125:23
engaged
24:24 322:5
engagement
184:17
engaging
165:12
engine
25:13,14 119:6 289:24
engineer
19:1 22:14 43:7
engineering
16:17,20 18:5,10 19:21
19:23 21:23,23 25:5
28:22 76:24
engineers
51:15
engines
20:20 204:21 294:6
295:25
English
149:15
enlarged
194:17 274:9
ensemble
56:8
ensure
158:21 164:18 167:17
ensuring
160:2
enter
255:17
entered
230:2
enterprise
18:25 20:5 22:7 186:5
entire
15:21 73:18 77:11
105:6,7 154:21
172:11 191:16,16
242:23 254:5 311:25
312:14 314:19 321:9
322:15
entities
75:16 77:7 102:21

entitled
4:9,14,19,22 5:5,8,14
5:18,22 6:3,8 7:9,13
171:9 242:3
entity
82:23 83:1 128:7
129:25 130:4 156:13
169:16 182:10
entrepreneurial
186:1
environment
28:2
environmental
186:25 187:17,25
epileptic
280:22,24
equating
261:9
equipment
49:13,16 57:24
equivalent
30:5,10 174:7
eReader
97:11
error
115:17 123:25 124:8
124:24,25 125:10
204:6,12,13,18
290:25 312:23
errors
115:3,6 124:9 125:1
203:14,19,22,25
278:18 290:18,19,24
312:18 313:3,4,10
314:5,6,9,11,20
320:25 321:5,12,15
321:19,21,22 322:1,9
322:18
especially
119:16 131:12 173:4
ESQ
3:4,12,19
essence
180:11
essentially
37:13 81:7 156:1 162:8

171:8 187:24 205:11
established
156:13
estimate
113:11
et
1:5 6:19 8:6 229:9
evaluate
184:17 249:25
evaluation
252:10,17 253:24
evaluations
253:1,9,18
events
125:7
everybody
183:20
evidence
251:23 327:3
evolution
38:18
exact
24:18 99:23
exactly
25:24 77:4 217:23
310:2
EXAMINATION
4:4 9:7
EXAMINATIONS
4:2
examine
242:10 308:17
examined
2:12 9:6 275:18 314:4
327:12
examining
284:16 293:10
example
31:6,12,23 37:14,17
44:13 85:23 88:10,11
119:18 120:1,8,25
123:12,12 125:4
126:24 135:16 142:11
147:10 204:14 239:4
247:1,23 262:16,17
263:18 266:16 270:2
270:8 278:23 280:19

280:23 287:5,9,18
288:10 300:9 321:11
examples
150:10 152:19 153:1
196:11 264:1
Excel
293:11
exception
111:13 126:20,23
128:24 129:4,9
157:19 163:21 164:16
170:23 189:21
exceptions
127:17,21 129:12
exchange
230:7
excited
132:14
excluded
234:8
excluding
159:6
exclusively
169:22 170:9
excuse
33:4 90:3 203:1 218:18
executive
35:11,13 81:6,9,11,21
212:3
exemption
145:19 158:25 159:3
159:11,20 160:1
exhibit
4:8,9,12,14,19,22 5:2,3
5:5,8,12,14,18,22 6:2
6:3,8,15 7:2,3,9,13,19
7:20 12:10,12,16,18
14:9 21:11,12 34:10
41:15,19 42:16,22
43:2 50:14,18 51:2,19
52:3,23 53:2 68:8,12
68:20 69:13,19 70:7
71:3,20 72:1 73:4,20
74:14 78:23 98:8,11
98:18,22 124:5 143:6
143:13,21 144:1,12
144:12,21,25 146:3

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

345

147:25 148:24 150:9
152:11 153:2,23
154:10 155:7 156:10
160:11,15 162:23
163:16 168:8 169:8
171:2 172:14 173:21
175:5 176:3,18,21
177:5 178:3,8,14,22
179:6,19,22 180:3,10
181:1 182:25 185:6
185:13,16 188:2,25
190:15,19,25 191:15
192:12 193:25 194:9
194:22,22 195:9,25
196:13 201:7 202:16
204:25 208:12 214:3
214:9,12,17 215:10
217:8 219:10 221:10
222:1,10,12,12
224:17 226:1,8 227:4
229:3,7 230:17
234:18 236:13 237:11
237:21 238:15 240:20
240:23 241:19,23
242:20 246:16 247:6
247:10 248:25 249:8
251:5 252:7 257:7
303:20,23 304:3,10
304:22 305:13,20,23
306:4,20 309:5 311:7
314:23 319:20 323:5
325:19,23 326:8,11
326:15
**exhibits**
4:7 5:1 6:1 7:1,17
69:18 213:23 214:25
251:25
**exist**
278:17
**existence**
13:18 33:11 38:3 69:3
184:9
**existing**
56:6
**exists**
184:12
**expanded**

199:24
**expect**
124:6,24 274:21
**expense**
105:18 218:17
**expenses**
254:23
**expensive**
54:13
**experience**
226:9 259:9
**experienced**
262:24
**experiments**
27:8
**expert**
7:14 9:23 13:7,9 14:11
14:12,18 15:24 16:4
16:12 149:3 184:16
210:19,22,25 211:4
239:19 249:19 251:3
251:9,20 252:5 255:8
298:16 307:3
**expertise**
109:17 155:18 250:23
**experts**
255:8
**expert's**
29:22 211:11,19
248:16 249:9 251:5
251:10 252:4,7
256:12 257:5,6 259:1
269:18 283:5 306:17
314:23 323:5,17,19
**expiration**
71:25
**expired**
71:23
**explain**
79:9 252:1
**explained**
189:19
**explaining**
171:20
**explains**
226:24
**explanation**

102:5 103:2 105:20
319:20 326:14
**explanations**
102:7
**explicitly**
167:4
**explore**
153:22
**express**
100:15 106:6
**expressed**
100:24 101:22 102:21
132:21 184:11 303:16
**expression**
160:8
**extant**
33:8
**extensive**
168:9 241:1 263:11
**extent**
13:2,5 19:7 61:8 227:8
232:3
**extra**
40:8 159:2
**extreme**
204:14
**extremely**
181:2
**eyes**
262:17
**e-mail**
3:8,16,23 163:14

**F**

**face**
209:7
**faced**
257:13,19 258:2,15,21
**fact**
197:7 299:9,20 300:13
301:13 302:6,18
307:20 309:25 310:5
316:7
**facts**
216:2 300:5
**faculty**
213:2 224:8 234:8,10
**fair**

29:22 191:22,24 210:8
**fake**
57:22
**fall**
17:3 285:12
**fallen**
277:20
**familiar**
11:23 51:16,25 52:10
52:18 114:7 127:22
190:20 208:17 212:2
234:14 285:7
**familiarity**
212:20,24
**familiarize**
41:21 50:19
**Fantasy**
247:15,17 248:12
**far**
16:2 77:17 176:14
179:9 302:8
**fast**
25:13
**faster**
25:14 54:12 183:22
**feature**
46:21 89:8 92:18,20
93:5,10 95:19,21
96:17
**features**
36:6 169:1
**fed**
115:18
**federal**
11:22 13:4 208:20
221:16 227:10 256:6
**Federation**
210:20
**fee**
93:14,19 94:5,6,8,10
94:12,14,16,18,23,25
94:25 95:3,12,25 96:1
96:7,23 97:4 110:1,6
110:11 162:10 163:10
255:8
**feed**
56:16 115:18

**feeding**
35:14
**feel**
147:17 259:19
**feeling**
37:13
**fees**
96:13 111:5,21
**fell**
54:8
**felt**
322:21
**Fenwick**
2:4 3:18 8:14,23 13:24
14:25
**Fermi**
26:24 27:4
**Fiction**
247:16 248:12
**fide**
164:4
**field**
28:17 37:5 187:12
236:25 259:11 269:4
298:24 301:25 302:2
302:10
**fields**
186:21
**fifth**
71:5
**figure**
195:17
**figured**
131:3
**figures**
216:3 217:14 225:17
**file**
30:10 115:20 116:4,11
116:12,22,25 122:4,5
122:14,18 137:16
140:5,9,16,17 202:13
206:7,11,25 207:16
231:4 285:21 308:7
309:11,15,21 310:10
310:20 311:8,14,19
312:7 315:1 319:10
319:15,23,25 320:15

**feeding**
320:17,22,24 322:6
322:15
**filed**
236:24
**files**
100:4,18 133:12
134:18 183:19 231:3
**filling**
174:24
**final**
117:17
**finance**
34:11,15 35:3,18 47:12
47:24 48:13
**finances**
20:19
**financial**
34:17,19,21 48:2,3
73:12 81:22
**find**
118:14 119:6 124:12
137:16 242:12 253:13
253:25 259:1,21
277:6 279:4,10
296:18 297:6,11,14
297:20 300:13 313:8
313:14,20 314:17
327:2
**fine**
53:16 64:12 104:3
202:21 262:17 283:18
**finely**
55:24 79:9
**finer**
86:13 306:14
**FineReader**
284:3,12,17 285:1,4,11
289:3,14 290:8 291:1
294:1 295:6,21 312:8
**fingerprint**
136:6,17 137:23
**fingerprints**
136:10
**finish**
107:16
**finished**
21:22 79:7

**first**
2:11 28:10 29:19 32:8
42:14 43:1 54:6
69:11 79:16 94:4
119:12 120:15 124:15
148:5 149:14 156:20
163:18 180:9 183:25
184:8 185:21 192:8
192:11,16,19,24
213:25 215:25 216:6
218:3 227:12,15
239:9 243:25 249:17
264:13 272:13 283:6
285:18 309:5 314:10
321:6 329:5
**five**
327:5
**flashing**
280:20
**flies**
43:16
**flip**
120:13
**Floor**
3:20
**fluids**
29:9
**focus**
118:7 121:11 154:1
257:12,18 258:1
263:8 277:23 326:9
**focused**
17:21 160:3 258:7
262:22 263:19 309:5
**focuses**
107:12
**focusing**
154:17 155:8 272:13
273:1 305:14 317:3
**follow**
157:10 173:5 277:25
280:12,17
**following**
19:22 65:11 67:9 77:1
183:4 261:21 268:13
313:2
**follows**

9:6 225:7
**follow-up**
78:1
**font**
37:3,6,9,12,12,18,20
37:22
**fonts**
36:21,21,22 37:7,8
**Footnote**
232:6
**foregoing**
329:6,8,12
**foreign**
209:8,10
**form**
30:23,25 44:10 113:15
113:20 118:13 139:14
156:7 191:4 198:21
201:14 206:15 245:25
267:17 269:16 299:23
308:14
**formal**
19:7,8,10,13,17 57:11
59:22
**format**
39:19 116:4,7,22 139:8
141:1 169:20,21
170:1,2 205:13,17,22
206:2 207:9,16
244:14,17,18,20,25
245:5 266:7 297:7,7
297:16,16 299:15,21
302:15 310:15 320:2
**formats**
170:7 299:14
**formerly**
76:12
**forms**
45:8,10 201:4 270:6
**forward**
102:7 181:9
**found**
55:17 137:11 232:25
233:18 242:17 289:25
318:6,14,16
**foundation**
14:3 40:14 54:5,18

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

347

59:16,25 61:18,25
62:7,18 63:6,12,18
64:21 65:3,16,21 66:1
66:6,11,16,23 67:5,14
67:24 68:5 70:9,24
71:13,22 72:3,13,20
72:25 73:6,22 84:14
84:23 85:7 87:11,17
87:23 88:19 89:1,7,19
89:25 90:8 92:16
95:6,16 96:4 97:1,7
97:19 98:1 99:4,16,22
100:6 101:1,11
102:11 103:7 106:10
106:15,24 107:11
108:12,25 110:4,14
111:25 112:7 113:3
113:10,18 114:6,23
115:23 116:14 117:3
122:8,21 123:5
125:13,21 126:9
131:18 133:15,21
134:22 135:11 136:8
137:5 139:11,22
140:7,14,24 141:8,20
142:2,18 144:14
147:2 155:24 156:25
157:6 165:6 168:19
171:6 173:1,23
174:21 178:6,17,25
179:8 182:12 188:19
190:11 202:11 205:9
213:8,17 224:5,13
228:12 236:9 245:7
292:3 301:2 302:5
325:1
**founded**
74:15 130:13 145:13
186:4,17 190:9
**founder**
34:10 35:4,17 47:9,17
48:21 54:22 78:15,20
78:22 79:2
**founding**
108:22 133:19 190:5
**four**
27:25 39:13 188:8

196:11
**frame**
27:25 177:24
**Francisco**
3:21
**fraud**
47:2
**free**
94:12 110:24 111:7,17
160:22 162:3 279:13
285:8,8 289:20,25
290:6 291:21 292:7
294:1 295:8,21 312:9
**Freedom**
55:9,16 65:7 67:9
71:11 72:10 76:2,14
270:20
**frequently**
120:17 137:13 156:1
157:7 171:8,16
206:14 289:10
**front**
12:15 21:8 41:18 50:17
176:19 213:22 237:21
249:7 303:18 304:2
304:12 305:11,15
326:8
**Frontier**
14:2
**Fruchterman**
1:14 2:1,9 4:13 6:5,10
7:15 8:5 9:4,11,20
11:6,14 12:10,15 16:8
19:6 21:5,11,16 29:23
31:12 32:7,24 36:14
41:18 42:13 43:24
44:8 50:17 51:7
52:22 53:3 56:11
64:17 68:11,19 69:17
71:2 74:14 75:25
77:19 82:1 91:8,21
98:10,11,17 99:1
117:6,21 143:12
144:11,15 145:13
155:22 160:17 163:3
165:1 170:13 172:13
176:18 180:2 182:24

185:3,9,12 188:15,24
190:5,18 191:14
192:2 196:14 201:21
202:15 203:12 204:24
208:17 211:9 213:22
214:15 215:8 218:18
219:8 221:6,25
224:16 227:12 228:9
229:6,20 236:12,15
237:14,20 238:4,15
239:9 240:10,19
241:22,23 242:6
243:15,25 247:4
248:5 249:4,7,8,14
254:5 255:17 256:8
257:1,4,11,24 258:13
262:19 264:4 265:5
266:20 268:12 269:17
272:12 274:14 276:16
281:10 282:6 283:2
285:14 295:19 296:15
300:20 304:9,20
305:11 307:15 309:10
310:17 315:6 316:7
317:4 320:10 323:2
323:13 324:21 325:17
327:12 328:14,22
**Fruchterman's**
215:4 248:16
**fuel**
22:20,21
**fulfill**
105:3
**full**
9:10 31:19 73:7 114:12
151:2 183:2 189:4
202:25 223:22 233:25
238:24 251:19 264:7
272:14 274:15 285:18
308:14 309:6 310:18
329:8
**fuller**
14:15
**fully**
226:15 228:1
**full-text**
208:2 232:12,15,23

277:5 315:4,9 316:1
316:20
**fun**
43:17
**function**
120:5,9
**functional**
118:7,11 119:12,20
120:19 121:15 153:6
153:18 192:2,8
193:20 276:18 277:9
277:23 278:6 280:3
280:12 291:9
**functionally**
85:19 276:22 281:23
**fundamental**
263:13
**funder**
112:8
**funding**
111:22 112:3 218:14
**fundraising**
81:19
**further**
169:25 215:12 329:10
**future**
240:8
**F.Supp.2d**
6:20 229:10
**F.3d**
7:8 237:25

--------

**G**

**G**
8:2
**gained**
190:1
**garbled**
204:9 214:17 215:1
**gas**
28:2,4
**gases**
29:9
**gather**
180:18 198:15
**general**
25:2 39:9 42:8 44:10
79:23 152:8 164:7

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

**165:**14,20 **179:**10 **212:**19,23 **213:**18 **239:**13
**generally**
30:3 80:18 105:4 113:24 115:24 116:3 139:13 149:15 153:14 198:19 230:14 258:9 259:12 269:19,24 271:25 273:5 279:13 281:23 288:3 292:14 292:18 293:12
**generate**
202:7
**generates**
280:25
**gesture**
246:20,22
**gestures**
10:12
**getting**
35:14 39:19 90:17 162:11 195:20 219:2 237:15 307:1
**give**
11:7 15:9 111:9 124:22 165:17 278:23 303:25
**given**
11:5 78:8 118:8 120:2 121:13 196:11 218:4 274:23 283:15 310:20 311:8 313:2 315:2
**giving**
10:5 77:10,10 109:19 189:24
**glad**
77:14
**glass**
268:20
**glean**
272:20 293:14
**global**
145:9
**glow**
25:15
**glyph**
202:22

**go**
21:24 38:13,25 41:20 42:9 43:10 49:18 64:6 85:5 86:10 87:8 87:14 89:16 90:22 93:18 94:10 97:24 98:3 103:22 105:5 116:2 119:7 120:3,12 121:24 124:12 131:2 166:25 171:2 175:17 175:19 179:16 184:24 197:18 215:1,19 220:25 221:6 242:16 242:17 248:16 259:21 259:22 280:20 282:14 292:19 322:8,12
**goal**
293:11
**goes**
106:4 113:24 126:3 161:8 305:7
**going**
14:7 20:23 24:6 25:23 26:9 29:20 41:20 43:11 46:12 55:7 77:5 78:11 79:12 90:18 91:4 105:12 107:16 114:10 122:15 124:12 137:2 143:3 149:9 175:21 176:22 185:3 191:14 204:16 208:9,14 212:8 216:21 217:15 221:22 223:21 233:13 242:16 242:22 243:20 245:15 248:15,20,22 282:7 282:21 283:11 292:18 294:18,24 295:17 296:4 303:25 317:22 318:5 327:6 328:22
**good**
8:3 9:9 26:12 75:23 77:14,20 79:10 90:25 123:23 137:24 174:15 248:17 282:10 325:25
**Google**
137:20 213:10,14

**222:**18 **223:**10 **230:**3 **230:**4,7,19,21,23,25 **231:**10,16 **279:**2,10 **289:**24 **296:**18 **300:**9 **300:**10 **317:**20 **318:**4 **318:**13,19
**Google's**
222:18
**Google-searching**
308:6
**gotten**
91:15 217:25
**government**
45:11 111:24
**governmental**
181:21
**GPS**
62:24 64:2 70:12
**grab**
96:11
**graded**
79:9
**graduating**
28:12
**grafted**
61:10
**grant**
237:7
**granted**
228:22
**grants**
111:25 145:20
**graphics**
147:11,12,15 207:12
**great**
31:17 35:6,23 47:6 179:20 191:17 221:6 259:16 307:10
**greater**
114:15 217:19,20
**greatly**
199:24 263:16
**gross**
86:13
**group**
37:9 73:8 132:3 159:20 162:11 164:23

**groups**
131:15 158:11 186:25 186:25 259:5
**guardian**
135:17
**guess**
92:7 132:15 216:8 240:2 282:16 297:9 299:11
**guessing**
22:4
**guide**
62:25
**guidelines**
280:10
**Guild**
6:17 7:6 208:18 209:6 229:9 237:24
**guy**
79:25
**guys**
38:14
**GW**
270:22
**G.C.H**
18:18,19 21:24 22:17 22:18
**G.H.C**
18:17 22:16

**H**
**halves**
104:15
**hand**
56:12 57:3,13 329:19
**handed**
119:4
**handful**
322:16
**handheld**
268:23
**handled**
255:6
**Handwriting**
46:21
**happen**
214:19 274:12
**happened**

55:3 71:18 137:12
**happens**
203:21 204:1
**happy**
75:16
**hard**
23:24 125:3
**hardware**
38:6,16 39:16 58:15,18
58:24 142:8 188:16
**HarperCollins**
100:8
**Harry**
301:9
**Hathi**
233:8
**HathiTrust**
6:18 7:7 208:19 209:3
209:16,23,24 210:3
210:14 211:11,14
212:14,16 213:1,6,15
214:23 222:19,21
223:2,11,16,19 224:1
224:18 226:19 227:3
228:3,4,10,20 229:9
230:11 231:7,10,12
231:20,25 232:10,19
233:4,23 234:5
235:10,21 236:17,23
237:4,9,24 238:20
239:19 240:11 241:6
241:13,15 304:14,21
306:4 325:20
**HDL**
232:10 233:16 240:5
**head**
195:4
**hear**
166:25 204:7,15
**heard**
40:24 300:21
**hearing**
149:10
**hearsay**
176:10
**heat**
24:1

**held**
26:6,17 64:13 175:23
323:25
**help**
47:5 70:11 79:14
106:25 108:3 127:1,6
144:22 189:21
**helped**
178:11
**helpful**
131:5
**helping**
29:17 47:1 76:15
131:11 156:14 186:22
187:4
**Helvetica**
37:22
**hereunto**
329:18
**hertz**
280:21
**Hewlett-Packard**
35:10 56:5,14 188:11
**hide**
136:13
**high**
299:23
**higher**
40:25 101:3,6 131:12
132:5,10 183:23
216:21 217:23,23
**highest**
16:8 216:23
**highly**
266:12
**high-quality**
218:15 310:21,23
**high-speed**
113:21
**historical**
307:25 308:11,21
317:14 318:6,22
**historically**
292:4
**history**
301:10
**hitting**

23:24 28:4
**hi-fi**
57:24
**hold**
86:9 102:19 165:13
**holding**
239:7
**home**
9:14,15
**homeowners**
29:17
**honor**
189:19
**hope**
111:18
**hopefully**
35:14
**hosted**
307:17 308:3,14,22
317:10,17 318:23
327:14 328:4,11
**hour**
2:3 282:8
**hours**
15:16
**House**
100:9 301:1 302:4
**houses**
29:16
**How's**
179:12
**Hudis**
3:4 4:4 8:18,18 9:7,8
9:21 11:1 12:9,14
13:10,22 15:12 20:22
21:3,10,15 24:7 25:1
26:18 29:21 31:2,11
31:21 32:5,16,23
33:16 34:2 35:20
37:1 38:2,7,13,19
39:2,21 40:20 41:1,17
41:24 42:1,5,11 43:10
43:20,23 44:19 48:17
48:24 49:15 50:4,16
50:21,24 51:3,6,17
52:2,11,20 54:9,20
55:12,21 58:1,7,20

59:13,19 60:2,9,12,14
60:20 61:1,12,21 62:3
62:15,20 63:2,8,14,20
64:3,9,16,23 65:5,18
65:23 66:3,8,13,18
67:1,7,20 68:1,10,16
68:18 69:16 70:13,20
71:1,15,24 72:7,16,22
73:2,9 74:2,12,20
75:24 76:9 77:13,18
78:2,13 79:11 80:4,17
81:2,14 82:5,10 83:2
84:10,16 85:1,11
86:21 87:3,7,13,19
88:4,14,21 89:3,11,15
89:21 90:2,10,19 91:1
91:3,18,20 92:19 93:8
93:17 96:6,15,22 97:3
97:9,14,23 98:4,10,16
99:10,19 100:1,12,22
101:5,21 102:4,14
103:10,17 104:12
106:12,20 107:3,7,15
108:5,15 109:4 110:7
110:17,22 111:12,20
112:2,11,19 113:5,13
114:2,18 115:4,12,19
116:1,17 117:4,19
118:10 119:9 120:22
122:1,11 123:1,9,24
124:4 125:15 126:1,5
126:14 127:9,20
128:1,13,18 129:7,23
130:5,12,18,24
131:14,24 132:4
133:1,4,11,18,24
134:8,15 135:1,23
136:5,16,24 137:8
138:12,18 139:16
140:4,10,20 141:4,12
141:16,23 142:7,24
143:11,25 144:5,10
146:21 147:13 149:21
150:3 151:3,7 152:10
152:23 153:21 154:9
154:23 156:9 157:1
157:20 160:14 161:13

161:15,18,20,22,25
162:14,22 163:11
164:12 166:1,7,20
167:14 168:6,22
171:1 172:5 173:10
173:17 174:4,15,22
175:3,9,19 176:5,12
176:16 177:11,16,22
178:12,20 179:3,12
179:18,21 180:1
181:13 182:8,14,23
183:10 184:5,23
185:11,20 187:15,22
188:23 190:17 191:7
191:23 193:4,18
194:6 195:3,15
196:12,23 197:9,20
198:12 199:13,21
200:18 201:6,20,25
202:14 203:1,6,11,20
203:24 204:8,23
205:16,20 206:5,12
206:22 207:4,17,22
207:24 208:7,16
209:1,14,21 210:10
210:18 211:8 212:4
212:22 213:4,12,21
214:18,21 215:3,17
215:21,24 216:11,13
219:7,18,24 220:7,9
220:14,17 221:5,21
222:6,9,14 223:6,24
224:10,15 225:1,4,11
225:18,24 226:6
227:1,11,16,19 228:8
228:17 229:5,14,19
230:15 231:14,24
232:5 233:10,21
234:11 235:2,5 236:3
236:11 237:13,17,19
238:3,8,10 239:14
240:18 241:12,18,21
242:15,24 243:1,5,8
243:12,14,20,24
244:24 245:14 248:15
248:21 249:6 250:14
250:21 251:2,7,10

252:2,16 253:15
254:4,11,16 255:2,4,7
255:15,22 256:2,7,11
256:15,18,20,25
257:15,17 258:12
260:17 261:19 262:14
263:3,9 265:4,10,16
265:22 266:3 267:1,7
267:16 268:1,11
270:11 271:20 272:2
272:11 273:14 274:1
275:10 276:6,11,15
276:24 277:8 278:3
278:11,22 279:5,15
280:1,14 281:8,17
282:10 283:1,19
284:2,20 285:10
286:9,13,19 287:16
288:1,17 289:1,18
290:3,14,23 291:11
291:24 292:8,17
293:17 294:8 295:2
295:11,16 296:5,10
296:14,22 297:1,13
297:19 298:2,10,18
299:2,19 300:4,19
301:12,21 303:2,9,17
303:24 304:8,18
305:6,18 306:2,23
307:5,7 308:8,19
309:3 310:16 311:5
311:12,17,24 312:5
312:24 313:7,13,19
317:23 318:11 319:2
319:7 320:8,21 321:4
322:4,17,23 323:9,12
323:23 324:5,12,18
325:3,10,16 327:4,11
327:18 328:1,8,14
**huh**
282:16 328:20
**human**
108:14,17 121:7 122:9
122:12,16,23 186:24
187:9 194:16 196:7
198:18
**humans**

204:12
**HumanWare**
74:5
**human-narrated**
199:6
**hundred**
302:23 303:1
**hundreds**
292:15 302:22 303:4
306:13,15
**hurting**
189:22
**hyperactivity**
149:12
**hypothetical**
31:16 32:2 95:6,15
114:23 115:9,16
122:8,21 123:5
125:13,22 126:9
127:4,14 135:12
136:3 137:5 139:12
139:22 140:7,14,24
141:8,20 142:2,18
152:7 202:11 204:4
208:4 220:24 271:13
272:9 276:2 278:15
287:13,22 288:7
300:7

_____
**I**
_____
**IBM**
23:2,6
**IBM's**
23:11
**Icelanders**
46:20
**Icelandic**
46:18,19
**idea**
79:17 212:1
**ideally**
297:6
**ideas**
29:2
**identification**
12:13 21:13 41:16
50:15 68:9 69:14
98:9 143:7 179:23

185:7 190:16 208:13
229:4 237:12 241:20
249:1
**identify**
44:18 45:1 152:12
**identifying**
170:4
**identity**
136:13
**igniting**
22:23
**ignition**
25:15
**illegal**
247:25
**illness**
11:11
**IMAA**
183:16
**image**
116:15,22 123:7 202:6
202:13,18 216:22,25
231:3 271:15 288:20
297:16 310:21,23
**imagery**
26:6
**images**
116:16 122:24
**image-based**
30:25 284:16,18
**image-only**
271:11 272:7 287:10
297:7 310:15 312:7
315:1
**imagine**
147:8 152:20
**impacted**
260:8 261:3
**impaired**
5:24 190:22 191:11
196:15 198:4,25
258:15,22,25 260:11
289:4 293:19 298:21
299:6 303:12 306:12
325:12
**impairment**
153:15 281:25

Case 1:14-cv-00857-TSC   Document 138-67   Filed 11/09/19   Page 106 of 139
Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

351

**impairments**
53:13
**implementing**
172:24 277:22
**importance**
300:18
**important**
158:20 181:3,7 199:3
201:1 260:4,22 293:5
300:16 302:7
**impression**
217:25
**improve**
24:3
**improved**
32:14
**Improving**
5:16
**inaccessible**
196:6 201:4 202:13
263:12
**inadvertent**
137:13
**include**
114:19 165:14 166:2
170:3 239:5 260:14
268:8,9,22 275:3,6,13
275:15
**included**
49:11 53:25 95:20,21
277:5 295:5
**includes**
109:16 135:4 231:2
**including**
136:10 155:12 156:18
169:6 229:15 246:1
261:16 320:1
**inclusion**
246:6
**incomplete**
31:15 32:1 95:5,14
114:22 115:8,15
122:7,20 123:4
125:12,21 126:9
127:3,14 135:12
136:3 137:4 139:12
139:21 140:7,13,23

141:7,19 142:1,18
152:7 202:11 204:4
208:4 220:24 271:12
272:8 276:1 278:14
287:12,22 288:6
300:6
**incorporate**
136:9
**incorporated**
8:6,7,24 70:18
**incorrect**
78:18 215:11 247:3
**increased**
248:2
**increases**
218:2 220:3,20
**incurred**
254:23
**independently**
261:6
**index**
4:1,2,7 5:1 6:1 7:1
120:8 137:21
**indicates**
153:7 174:25 232:24
**indication**
59:22 299:11 300:11
302:11
**indicator**
299:16
**individual**
89:9 111:25 138:1
160:25 173:25 175:2
234:24 235:8
**individually**
183:15
**individuals**
44:24 160:23 183:18
226:16,17 228:2
240:9 260:23
**industry**
131:8,21 132:2,9 138:1
164:23 165:13 166:23
166:24 168:5 169:6
173:4,8
**infinity**
301:6

**inform**
130:14
**informal**
154:25 160:8 182:5
**Informally**
17:21
**information**
5:17,19 13:3 50:25
77:6,21 78:6 98:14
109:21 118:8 119:3
169:9 181:25 221:15
227:9 246:3 259:13
264:16,21 270:6
272:19 275:5 293:14
293:16 307:23
**informed**
307:20 309:20,24
310:5
**infringement**
158:17 170:3 209:20
**infringes**
171:14
**ingested**
274:4
**initial**
36:19 83:18 110:1,6
116:11,12 131:16
188:3,7 242:13
**initials**
30:16
**initiative**
145:10 163:20
**injury**
53:17
**innovation**
185:24
**input**
168:9 293:13
**inquire**
217:24 219:5
**inquiry**
215:12
**inside**
170:25 316:15,16
**inspected**
290:11
**inspection**

23:24 24:2 136:15
143:24 242:13
**instance**
148:13
**Institute**
16:14 17:6
**instruct**
13:4 221:18 227:7
**INSTRUCTED**
7:22
**instructing**
221:17
**instruction**
13:17 221:23
**instructions**
227:13
**instruments**
27:14,15,16,17
**integrity**
181:5
**intellectual**
149:13 173:4
**intend**
240:7 251:3 252:5,8
**intended**
170:9 234:2
**intending**
173:5
**intent**
38:20 155:21 157:3
**intention**
243:12
**intentions**
130:15
**interact**
147:22
**interaction**
104:17,18 131:21
132:1
**interchangeable**
81:7
**interchangeably**
138:11
**interest**
71:8 160:2 277:7
**interested**
329:13

**interesting**
186:10 302:9
**interests**
131:23 168:15 180:16
189:23
**interface**
60:23 61:6
**interfere**
53:15
**interferes**
85:19 86:7 151:16,25
**interject**
31:7
**intern**
24:17 25:9 27:11,12
**Internet**
7:10 137:17 193:11
195:21 242:3 253:2,8
253:9,18,20 279:14
288:12 296:8 299:22
317:8,10,14,17 318:7
318:14,18,23 319:9
319:14,17,23 320:14
320:16 322:7 324:22
327:20 328:3,10
**internship**
24:10
**interrupt**
77:3
**interruption**
177:14,21 193:3
233:20 323:8
**intersection**
158:2
**intervene**
200:2
**intervener**
210:20
**Intervenors**
6:12
**intervention**
122:12,16 198:19
200:12 274:24
**intrinsic**
140:1
**invention**
70:6

**inventor**
32:12 69:22
**inventors**
32:13 51:16,24
**inventor's**
71:8
**investigate**
184:13
**investigated**
182:22
**involve**
13:6
**involved**
20:18
**ionization**
28:5
**iPad**
84:7
**iPhone**
84:7
**issue**
166:24 172:1 211:3
301:25
**issued**
51:8 69:23 70:22 229:1
237:9,25 238:12
**issues**
53:16 80:14,15 153:20
**italics**
124:20,21,25
**item**
216:12 256:21
**items**
176:24 217:4,6 281:3

**J**

**James**
1:14 2:1,9 4:12 6:4,10
7:14 8:5 9:4,11 91:8
185:3,9 249:4 328:22
**January**
79:18
**JAWS**
88:11 270:20 292:15
293:24
**Jerry**
189:5,11,14
**Jet**

25:19 26:21
**Jim**
131:6 145:13
**job**
20:10,12 22:13 24:16
24:19 27:10
**join**
18:15 108:23 110:2
149:1 160:20 162:2
**joining**
102:8 162:3
**Jonathan**
3:4 8:18 9:21 13:15
282:7
**jon.hudis@quarles.c...**
3:8
**JPL**
26:2
**Jr**
9:11
**judge**
212:10
**judgment**
6:7,14 211:24 212:6,13
228:21,23 237:7
**July**
214:13 242:5 246:13
247:5,9
**June**
214:7 238:7,12

**K**

**K**
3:5
**Kaplan**
3:19 8:22,22 10:24
13:1,15 15:5,9 24:5
24:22 29:14 30:21
31:7,15 32:1,9,20
33:13,24 35:19 36:16
38:1,10,12,24 39:5
40:13,23 41:23,25
42:3,6 43:19 44:16
48:15,22 49:7 50:1,21
51:1,10,21 52:7,15
54:5,18 55:10,18
57:18 58:5,13 59:10
59:16,25 60:8,10,13

60:24 61:3,18,24 62:7
62:17,23 63:5,11,17
63:23 64:6,11,20 65:2
65:15,20,25 66:5,10
66:15,22 67:4,13,23
68:4,13 69:7 70:8,16
70:23 71:12,21 72:2
72:12,19,24 73:5,21
74:9,16 75:21 76:4
77:3,14,24 78:10 79:6
79:24 80:11 81:1,4
82:2,7,20 84:5,13,22
85:6 86:17 87:1,5,10
87:16,22 88:12,18,25
89:6,13,18,24 90:7,14
90:24 91:2,10,19
92:15 93:3,15,21,24
94:15,17,20 95:1,5,10
95:14,23 96:3,8,19,25
97:6,12,18,25 98:15
99:3,15,21 100:5,20
100:25 101:10,25
102:10 103:6,13
104:8 106:9,14,23
107:5,10,25 108:11
108:24 110:3,13,19
111:8,14,23 112:6,14
113:1,9,17 114:5,22
115:8,11,15,22
116:13 117:2,13
118:4,23 120:20
121:22 122:7,20
123:4,22 124:1
125:12,20 126:4,8
127:3,13,24 128:4,15
129:6,18 130:1,9,16
130:21 131:5,17
132:19 133:3,6,14,20
134:4,12,21 135:10
136:2,7,19 137:4
138:10,17 139:10,21
140:6,13,23 141:7,15
141:19 142:1,17
143:1,22 144:3,6,8
146:18 147:1 149:20
150:2 151:1 152:6,15
153:13 154:7,20

155:23 156:24 157:5
160:7,10 161:7,14,16
161:24 162:6,18
163:6 164:10 165:5
166:6,9 167:12,23
168:18 170:18 171:5
172:25 173:14,22
174:13,20 175:12
176:1,9,13 177:7,19
178:5,16,24 179:7,14
181:11 182:4,11,19
184:2,15,21,25
185:17 187:13,18
188:18 190:10 191:4
191:21 193:17 194:2
194:4,24 195:11
196:2,19 197:4,16
198:8 199:12,18
200:15 201:2,18,24
202:10,24 203:5,8,17
203:23 204:3,10
205:8,18,24 206:8,19
207:1,7,19,23 208:3
208:22 209:4,17
210:5,15 211:3,7,25
212:18,25 213:7,16
214:16,19 215:2,15
215:20,23 218:24
219:16,21 220:5,8,11
220:15,23 221:14
222:3,10 223:3,17
224:3,12 225:3,13,21
226:4,22 227:5,15,18
228:5,11,14 229:12
229:15 230:12 231:8
231:23 232:2 233:5
233:17 234:6 235:23
236:8 237:15 238:2,6
238:9 239:12 240:13
241:9,16 242:8,22
243:2,10,13,19,21
244:19 245:6 248:7
248:19 250:12,19,25
251:14,18 252:13
253:12,22 254:7,14
254:20 255:1,3,5,9,14
255:20,24 256:9,13

256:16,19,22 257:14
257:16 258:4 260:12
261:11 262:7 263:1,5
265:1,8,14,20 266:1
266:23 267:4,11,21
268:4 270:4 271:12
271:23 272:8 273:9
273:23 275:8 276:1
276:10,13,20 277:3
277:16 278:7,14,25
279:8,18 280:7 281:5
281:12 282:7,12,14
283:16,22 284:14
285:6 286:7,17
287:12,21 288:6,22
289:6,22 290:9,21
291:6,20 292:2,11,22
294:4 295:1,9,14
296:2,7,12,20,23
297:4,17,25 298:6,13
298:22 299:7,24
300:6 301:3,7,18
302:24 303:5,7,13,22
304:16 305:5 306:21
306:24 307:1 308:4
308:15,24 310:12,25
311:10,15,20 312:2
312:19 313:5,11,17
313:23 314:1,12,16
315:11,15,21,24
316:3,6,11,18,22
317:1,18 318:1,3,10
318:25 319:5 320:3
320:19 321:2,23
322:10,20 323:6,11
323:21 324:3,10,16
324:25 325:8,14
326:25 327:16,23
328:6,12,17
**Katherine**
3:12 8:20 9:24
**Kathleen**
1:25 2:6 9:1 24:5 329:2
329:24
**Kcappaert@oblon.c...**
3:16
**keep**

103:15 189:25
**keeps**
86:9,14
**kept**
178:22 317:22 318:5
**keyboard**
293:12
**keypad**
58:25
**keyword**
315:4,9 316:1,21
**kid**
137:19
**kind**
27:17 195:6 266:11
274:20 280:16 293:3
304:6 321:18
**kinds**
45:3 47:3 207:10
**knocked**
304:6
**know**
10:15,19 11:7 18:20
38:2 41:10 43:8
46:25 50:9 64:8,24
65:4,10 67:8 73:7,24
74:6 76:8 77:22
84:24 99:17 113:6
114:14 116:20 120:13
121:1,7 123:20
126:10 131:1,1
137:12 147:21 169:2
171:22 176:15 177:3
179:9 182:15 194:20
203:13 204:13,15
209:9 211:23 214:19
217:23 220:1,10
236:15 241:24 243:13
243:15 255:5,11
256:13 262:21 268:12
269:13 270:18 279:6
279:19,23 285:3,13
285:15 289:2 291:16
292:9 293:8 295:19
298:19 302:10 304:7
305:21 314:7 321:20
**knowing**

45:20 302:9
**knowledge**
41:5,9 86:5 90:13 92:2
96:10 100:2 303:10
**known**
33:11 55:5 76:12
123:25 200:9 232:8
264:18 269:6
**Kurzweil**
32:8,18
**K-12**
132:10 216:23

---

**L**

**L**
26:11
**labor**
218:3
**Laboratory**
25:20 26:21,25 27:5
**lack**
40:13 131:18 300:2
**lacks**
63:5,11,18 64:20 65:2
65:15,20,25 66:5,10
66:15,22 67:5,13,23
68:4 70:9,23 71:12,22
72:2,12,19,24 73:5,22
84:13,22 85:7 87:10
87:16,23 88:18 89:1,7
89:18,24 90:7 92:15
95:6,16 96:4,25 97:6
97:19,25 99:4,15,22
100:6,25 101:10
102:11 103:7 106:10
106:15,24 107:11
108:11,24 110:3,13
112:6 113:2,10,17
114:6,23 115:23
116:13 117:3 122:8
122:21 123:5 125:13
125:21 126:8 133:14
133:20 134:21 135:10
136:8 137:5 139:11
139:22 140:7,14,24
141:8,20 142:2,18
147:1 155:23 156:24
157:5 165:6 168:18

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

354

171:5 172:25 173:22
174:20 178:5,17,25
179:7 182:12 188:19
190:10 202:10 205:8
213:7,16 224:4,12
228:12 236:9 245:7
292:2 325:1
**language**
109:15 149:15 204:22
246:17
**large**
23:6,15 27:7,25 44:22
73:15,16 83:24 138:3
138:3 209:25
**larger**
196:8
**largest**
27:18 145:3
**large-scale**
45:8
**laser**
23:25
**lasers**
17:22
**late**
323:1
**latest**
46:16
**launch**
132:2 165:11
**launched**
39:17
**law**
109:8 156:20,22
157:11 158:25 159:3
159:11 163:22 164:16
173:6 181:7
**laws**
135:8 158:8
**lawyer**
129:10 171:10 211:1
**lawyers**
14:24 189:18
**layman**
67:6
**layman's**
70:10 146:1

**leading**
145:11 168:11 205:11
289:15 291:8 298:24
**leap**
181:9
**learn**
107:1 108:4 148:5
149:1
**learned**
154:16
**learning**
53:13 60:18 61:7
149:19,23 150:6,12
151:20,23 192:20
237:2
**learning-disabled**
262:1
**leave**
18:15
**left**
39:22 43:25 48:6 216:9
**left-hand**
230:17 233:12 240:22
**legal**
33:14 48:2,8 63:18
67:5 70:9,24 71:13,22
72:3,5,20 73:8,22,24
75:14 76:7 81:17
82:21 84:14,23 87:11
87:17 88:19 89:1,25
90:8,15 92:16 107:11
113:10 117:23 127:4
127:14 128:16,16
130:2,10 134:22
135:11 143:23 153:5
158:1 165:17 169:1
178:17,25 179:8
182:12,20 184:18
189:20 209:16 210:2
210:6 211:6 212:2
224:4 228:12 247:24
254:8 327:1
**legally**
153:3,17 163:25 172:3
183:15
**legs**
91:2

**length**
102:1 226:25
**lessoned**
200:1
**letter**
30:5 45:14 181:6
**letters**
30:2 37:11,16 44:12
45:8,13,13,15,17
**let's**
21:24 30:8 42:13 43:10
47:14 69:18 76:17
90:20,22 104:2,15
108:19 109:16 119:8
119:11 124:5 129:13
139:17 144:24 146:3
147:16,25 148:24
150:9 153:2,22
154:10 155:7 156:10
160:15 162:23 172:18
179:16 208:7 224:16
277:17 281:21 286:23
290:1,1 300:17
304:20 314:2 317:2
322:24
**level**
16:9 171:21 208:19
299:4 301:15 303:11
306:5,7,7,9
**levels**
219:12,15 305:3 306:3
312:23
**level-above**
82:14
**Lexis**
7:3 237:16,22
**libraries**
104:4 205:11,13,23
209:25 213:3,19
230:6 235:14,17
238:22 240:7 241:2
245:8
**library**
7:11 82:3 83:25 145:3
169:11 212:17 213:6
213:15 222:24 226:10
230:11 231:7,21,25

**length**
232:11,19 233:4,23
234:5 235:10,22
238:21 239:20,23
240:4,12 241:15
242:4 247:2 296:16
**license**
73:13 96:13 127:17
128:24 172:8 289:14
329:4
**licensed**
72:18,23 73:4,20
107:13,22 108:6,9
148:17 329:3
**licensing**
96:11
**life**
73:18
**lights**
280:20
**limit**
258:1
**limitation**
86:7 281:24
**limited**
76:15 134:20 135:4
161:5 257:11,18
**line**
7:23 15:21 38:17 51:13
51:13 81:23 207:20
260:16 282:9
**lines**
86:2 92:12
**Lingane**
180:7
**link**
119:5 162:17,19
318:15,18 320:6
**linked**
103:19
**linking**
103:15
**list**
48:7 52:13 93:6 100:11
109:19 146:22 147:10
152:18,18,24 178:10
294:16,18,24,25
295:17,20

listed
28:11 42:15 66:20
69:21,25 94:8 142:14
194:11,12 294:9
listen
141:3 266:9
listening
121:16 204:6,12 274:7
293:13
Lists
89:20 93:11 95:21
96:17,24
literacy
106:22 107:9,21
145:10
literary
126:21
litigated
117:23 208:19
litigation
125:8 191:24 208:18
209:3 210:4,14
214:23 224:18 228:10
228:20 236:17 237:9
241:7,14 250:24
251:4 253:3 254:6,13
254:19 255:19 304:14
304:21 307:19 325:20
little
21:6 195:7 209:9
LLP
2:4 3:3,18 8:19,21,23
loading
22:20
locate
272:22,25 307:25
317:13 324:8
located
20:7 74:24 273:11
log
163:1
log-in
163:4
long
15:13 22:8 151:13,22
164:3
longer

89:12 137:1
longest-term
27:18
look
52:17 63:25 69:19
83:22 86:1 98:17
114:10 120:2 124:5
171:23 260:19 264:1
286:9 312:1 322:9
looked
223:18 286:11 291:1
311:3
looking
44:11 85:24 114:13
120:24 192:23 256:16
264:6 274:14 311:22
314:9,14 318:20
321:6 323:16
looks
37:7 69:11 84:2 143:15
144:23 159:2 214:25
loss
149:10 197:2
lost
195:7
lot
45:5,25 117:17 132:11
143:15 310:3
loud
184:22
low
61:8 86:25 123:17
150:15 261:24 266:17
274:8 275:21 306:13
306:15
lower
144:19
low-quality
115:1
low-vision
123:2 150:11
lunch
143:5
L.L.P
3:11

_____
M
M

204:15
machine
30:2,12 32:18 54:8
56:4 58:24 188:3,7,14
188:17 308:11,18
319:3
machines
53:10 54:4,15 186:7
magnification
196:25 197:25 264:25
265:3 268:15 271:7
271:15 275:16,23
276:3
magnified
123:7
magnifier
265:7,13 268:19,22
269:1
magnifies
240:1
magnify
160:13 268:17 269:4
magnifying
268:20
magnitude
40:15
MAIER
3:10
mail
45:9 46:13,15 50:7
mailings
46:4
main
22:25 24:24 48:11,19
58:19 79:25 131:21
164:22
maintain
153:25 179:1
Maintaining
48:4
maintenance
27:15 34:6 46:11,12
54:1
major
16:19 17:14,15 23:11
24:25 35:10 45:22
100:3,10 112:8

165:21 186:21 188:8
189:18
majority
35:23 47:3 112:16
137:14 147:21 259:16
making
23:22 123:13 125:24
170:23 184:7 186:6
201:12 227:24 260:5
260:10 288:19 315:13
324:1
Malamud
15:2 305:20 307:23
320:13 321:6,15
322:24 324:19
Malamud's
303:19 304:3 305:13
mammal
44:22
manage
264:2
management
80:14,15 133:8 168:3
172:16,21 187:24
219:23 226:2 245:9
326:12,21
managers
187:25
mandated
183:16
Manhattan
208:20
manner
132:25 166:8
manufacturer
49:17
map
63:24
maps
63:25
mark
12:10 21:11 56:18 58:2
59:14 63:3 64:18
66:14 70:15 84:11
87:8 88:15 89:22
90:4 91:22 92:2
marked

7:17 12:13,16 21:13
34:10 41:16,19 50:15
50:18 68:9,12 69:14
69:18 98:9,11 143:7
143:12 179:23 180:3
185:7,12 190:16,19
208:13 213:23 229:4
229:7 237:12,21
241:20,22 249:1,8
303:18 304:3,10
305:12
**market**
36:19 186:9 285:5
291:19
**marketed**
59:5
**marketing**
36:1,5,11 50:9,12
**marking**
21:6
**marks**
328:21
**markup**
120:7,10,11 121:18
**Martus**
98:23 108:10,13
187:10
**mass**
46:4 230:9
**master**
17:10
**master's**
16:10 17:1,5,13,17,20
24:11
**material**
42:24 90:17 94:23 95:9
95:12 98:3 112:24
117:10 118:9,12
119:16 139:7,9,15,19
148:20,23 154:3
155:6 170:24 171:12
177:9 200:14 213:14
220:20 229:17 239:3
245:4 269:25 289:4
292:20 293:20 305:14
305:17,20 312:22
317:3 321:18

**materials**
93:6 126:15 127:11
128:23 135:8 148:10
148:14 149:7 158:10
159:19,22 163:8
170:16 173:6,11,12
213:5 234:1 249:20
324:1 325:23
**math**
29:2
**Matt**
255:6
**matter**
8:5 251:12
**matters**
304:7
**MCCLELLAND**
3:10
**MDP**
230:9
**Meadows**
244:1 245:17
**mean**
30:17 42:6 45:13 82:11
85:13,21 88:5 121:10
123:10 124:13 126:10
129:8 146:24 156:23
169:2 177:18 178:19
194:7,21 195:2,6,9,24
204:12 221:2 223:8
246:21 248:5 252:24
256:14 261:21 272:24
273:3,22 274:4,11
275:2 276:17 297:3
306:15 310:23
**meaning**
16:5 261:17
**means**
146:8 147:7 170:7
180:18 240:2 245:13
245:25 260:21 261:2
299:22
**meant**
222:11
**measure**
28:7 300:8
**measures**

19:15,18 224:1 227:3
228:4 235:12,21
241:2
**mechanical**
246:1
**mechanism**
167:2 168:3 287:5
293:13
**mechanisms**
101:17 102:2 245:10
**media**
147:9
**medical**
109:11
**medication**
11:11
**meet**
5:20 46:13 133:9 153:5
155:15 157:18 259:15
282:4
**meeting**
165:9,11 189:14
**meetings**
80:5
**meets**
109:7 169:13
**member**
94:19 95:3 137:2 148:9
148:14 149:3 150:1,5
153:11,16 154:6,19
161:1 163:5 174:3
213:3 238:21 240:5,7
**members**
79:21 110:2,12,23
111:6 112:13,25
122:3,13,17 135:6
139:7,8 152:14
166:25 167:1 170:17
205:13 206:4 216:4
218:10,13
**membership**
110:11,16 111:2,11,17
152:9 154:4 160:18
175:2,8
**memorize**
279:12
**memorized**

36:22 128:7
**memory**
36:23 140:18
**mention**
13:18 120:15 121:1
217:6 320:6
**mentioned**
147:11 246:8 295:20
295:23 299:9 301:14
302:1,6 309:2
**mentions**
277:6 296:4 298:23
**merged**
33:7 55:4
**merger**
41:14
**met**
190:8 210:21
**method**
30:19 31:14,24 197:1,7
276:18 277:10 278:6
280:4 308:20 318:22
**methods**
128:21 199:10 200:13
277:14 278:4
**Mh-hmm**
14:17 105:21 106:5
108:21 146:7,15
148:7 154:11 173:19
195:16 216:11 262:4
272:17 295:7 310:22
**Michigan's**
240:4
**Micro**
270:22
**microfluidics**
29:2,7
**microscopy**
23:19
**Microsoft**
31:13,24 59:3 116:3
266:8 288:5,9,9
291:22 292:5,6
294:11 295:25
**middle**
188:2 192:24 202:3
**Middlefield**

9:12
middling
300:17,22 301:4,5
mike
144:6 304:6
Millennium
171:9
million
40:12,21,25 41:3 55:14
mind
13:16 77:20 131:22
294:14 321:19
Mindy
43:7
minimal
73:14 226:19 228:3
minimum
73:14
minor
16:21 17:17 135:18
minors
17:18
minute
292:18
minutes
327:5
Miradi
187:21,23
misaligned
311:18 312:1
misalignments
311:22
Mischaracterizes
197:17 306:22
misleading
170:19 262:8 303:7
misled
243:11
Misrec
313:4
misrecs
203:15
missed
149:20
missing
115:1 311:13
mission

181:22
missions
26:7
Misstates
59:10 74:9,16 86:17
95:15 104:8 107:25
113:1 117:13 121:22
129:19 152:16 166:9
173:14 194:25 236:9
261:12 277:4 281:5
296:24
model
168:13,16,21,24
models
186:1
modem
204:16,20
moderate
301:7
modern
120:24 124:7 125:5
126:25 204:17 244:3
244:8,11
moment
71:3 96:14 143:13
242:9 269:23
money
20:15,21 47:7 55:15
monitor
8:11 269:3
month
11:18 172:20
monthly
225:16
months
14:5
month's
172:19
morning
8:3 9:9 250:11,18
255:12
motion
6:6,13 211:24 212:6,9
212:13 228:21
motor
53:16 86:13
Motors

25:3
Mountain
2:5 8:15
move
70:12 282:20
moved
282:16
moving
29:9
MP3
140:22 141:1,2 142:10
multiple
82:12 129:11 158:1
243:4,6
multiwire
27:19
Murphy
26:1
Murray
26:2,4,20
M-I-R-A-D-I
187:21

_____

N
N
8:2 204:14
name
9:10,20 26:9 33:15,19
55:2 58:23 72:5 73:8
74:5,6,19,21 75:9
76:13,14 89:14 93:11
101:6 134:2,7,11
136:11,11 137:15
163:13 174:6,24
224:1 236:5 279:17
279:22,24 280:4
named
76:21 329:13
names
51:15 74:4 270:19
279:13
narrate
194:17
narrow
37:15 189:3
narrower
168:1
narrowly

160:3 180:20
NASA
25:19 26:21
National
26:24 27:5 210:20
nature
70:5 75:6 79:13 193:24
212:23
nearly
285:8
necessarily
287:19
necessary
256:4
need
10:11,18 26:12,15 60:7
60:22 64:6 82:15
94:22 104:25 117:21
122:23 163:8 200:1
202:12 242:13 259:19
273:15 280:24 293:15
300:5 304:5 326:3
needed
47:5 80:3 105:14 134:2
needing
36:21
needs
5:21 60:18 61:7 82:13
126:25 135:14,20
159:4,13 182:1 194:4
258:8,9,10 259:15
263:20,20,21
Negotiating
48:5
neither
77:8
NEUSTADT
3:10
never
29:6 106:19 256:3
300:20
new
37:20 40:1 79:17
208:20
NFPA
325:6
nice

172:10
**night**
29:15
**noble**
28:2
**nods**
10:12 195:4
**non**
46:24
**nondisabled**
101:18
**nondramatic**
126:21
**nonhuman**
200:12
**nonlawyer**
246:23
**nonprofit**
62:13 74:18 75:2 76:12
  81:12 145:12,21
  156:12 181:20 185:19
  186:3,4 212:3
**nonqualifying**
132:24
**nonrec**
313:10
**nonrecs**
203:15
**non-OCR**
46:23
**normal**
86:3 159:14 160:25
**notable**
29:12
**note**
140:16,18 142:12
  251:7 253:5 257:1,6
  263:24 268:8 301:8
  304:1 305:18
**noted**
21:5 32:25 229:19
  237:22 256:2 275:21
**notes**
19:20 235:14
**noteworthy**
32:12 132:12
**notice**

71:7 169:24 170:4
  171:21 172:2 204:13
  318:17 321:15 322:18
  327:19 328:2,9
**noticeable**
290:12
**noticed**
327:13
**notices**
134:20 135:5 171:13
  171:16
**noting**
298:8 308:6 324:6
**novel**
119:18 125:1
**November**
69:23,24
**Nuance**
41:12,13
**null**
329:17
**number**
8:9 69:25 91:16 141:10
  155:1 165:22,23
  173:8 185:2 214:16
  215:6,7 216:5,8,18
  217:22 219:3 233:1
  280:21 291:3 293:21
  293:23 302:1 303:23
  311:21 327:13
**numbered**
144:17 192:17
**numbers**
214:23 216:9,19,20
  224:22 225:9,12
  232:24 307:2
**NVDA**
271:8
**NW**
3:5

---
**O**
---

**O**
8:2
**oath**
10:6
**object**
13:1 119:3 126:4

201:14
**objection**
15:5 24:22 29:14 30:21
  31:8,15 32:1,9,20
  33:13,24 35:19 36:16
  38:1,10,24 39:5 40:13
  40:23 48:15,22 49:7
  50:1 51:10,21 52:7,15
  54:5,18 55:10,18
  57:18 58:5,13 59:10
  59:16,25 60:8,24 61:3
  61:18,24 62:7,17,23
  63:5,11,17,23 64:20
  65:2,15,20,25 66:5,10
  66:15,22 67:4,13,23
  68:4 70:8,16,23 71:12
  71:21 72:2,12,19,24
  73:5,21 74:9,16 75:21
  76:4 79:24 80:11
  81:1,4 82:2,7,20 84:5
  84:13,22 85:6 86:17
  87:1,5,10,16,22 88:12
  88:18,25 89:6,13,18
  89:24 90:7,14 92:15
  93:3,15,21 94:15,20
  95:5,14 96:3,8,19,25
  97:6,12,18,25 99:3,15
  99:21 100:5,20,25
  101:10,25 102:10
  103:6,13 104:8 106:9
  106:14,23 107:5,10
  107:25 108:11,24
  110:3,13,19 111:8,14
  111:23 112:6,14
  113:1,9,17 114:5,22
  115:8,15,22 116:13
  117:2,13 118:4,23
  120:20 121:22 122:7
  122:20 123:4,22
  124:1 125:12,20
  126:8 127:3,13,24
  128:4 129:6,18 130:1
  130:9,16,21 131:17
  132:19 133:3,14,20
  134:4,12,21 135:10
  136:2,7,19 137:4
  139:10,21 140:6,13

140:23 141:7,15,19
  142:1,17 143:22
  146:18 147:1 150:2
  152:6,15 153:13
  154:7,20 155:23
  156:24 157:5 160:7
  162:6,18 163:6
  164:10 165:5 166:6,9
  167:12,23 168:18
  170:18 171:5 172:25
  173:14,22 174:13,20
  177:7 178:5,16,24
  179:7 181:11 182:4
  182:11,19 184:2,15
  185:17 187:13,18
  188:18 190:10 191:4
  193:17 194:24 195:11
  196:2,19 197:4,16
  198:8 199:12,18
  200:15 201:2,18
  202:10 203:8,17,23
  204:3,10 205:8,18,24
  206:8,19 207:1,7
  208:3,22 209:4,17
  210:5,15 211:25
  212:18,25 213:7,16
  215:15 218:24 219:16
  219:21 220:23 221:14
  223:3,17 224:3,12
  225:13 226:4,22
  227:5 228:5,11,15
  230:12 231:8,23
  233:5 234:6 235:23
  236:8 239:12 240:13
  241:9,16 242:8
  244:19 248:7 250:12
  250:19,25 252:13
  253:12,22 254:7,14
  254:20 255:20,24
  258:4 260:12 261:11
  262:7 263:1 265:1,8
  265:14,20 266:1,23
  267:4,11,21 268:4
  270:4 271:12,23
  272:8 273:9,23 275:8
  276:1,10,13,20 277:3
  277:16 278:7,14,25

Case 1:14-cv-00857-TSC   Document 138-67   Filed 11/09/19   Page 114 of 139
Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

359

| | | | |
|---|---|---|---|
| 279:8,18 280:7 281:5 | 132:22 | **offer** | 167:25 168:7 175:21 |
| 281:12 283:16,22 | **obtaining** | 251:3 292:5 | 177:4,23 178:2 |
| 284:14 285:6 286:17 | 119:2,10,11 | **offered** | 179:11,24 183:6,9 |
| 287:12,21 288:6,22 | **obtains** | 93:10,14,18 94:5,10,11 | 184:6,23 189:7,13 |
| 289:6,22 290:9,21 | 113:14 | 94:13 103:4 254:21 | 191:20 192:7,15,19 |
| 291:6,20 292:2,11,22 | **obvious** | **offering** | 192:24 194:6,12 |
| 294:4 295:1,10 296:2 | 123:12 321:19 | 250:22 252:9 253:1,9 | 196:24 198:13 201:25 |
| 296:7,12,23 297:4,17 | **obviously** | 253:17,23 254:9 | 206:13 209:2 211:13 |
| 297:25 298:6,13,22 | 121:7 196:10 | **office** | 211:21,23 212:5 |
| 299:7,24 300:6 | **occasionally** | 50:22 56:19 57:7,14 | 217:3,6 220:11 |
| 301:18 303:5,13 | 111:9 138:2 | 58:4,9 59:15,24 62:6 | 221:25 223:7,13,14 |
| 306:21 308:4,15,24 | **occurred** | 63:4,10 64:19 65:1 | 223:25 227:18 233:17 |
| 310:12,25 311:10,15 | 125:8 302:17 | 68:15 84:12,21 87:9 | 233:19 234:19 235:3 |
| 311:20 312:2,19 | **occurs** | 87:15 88:17,24 89:23 | 236:14,22 237:18 |
| 313:5,11,17,23 | 35:24 | 90:6,12 91:24 92:3,14 | 238:19 242:18,25 |
| 314:12 315:11,21 | **ocean** | 98:13 104:25 105:3 | 243:9 244:4,7 247:18 |
| 316:3,11,22 317:18 | 44:23 | 105:10 112:9 161:10 | 248:19 251:16 255:14 |
| 318:1,10,25 319:5 | **OCR** | 291:22 292:6 | 259:23 262:2 265:23 |
| 320:3,19 321:2,23 | 30:16,19 32:7,17 34:1 | **officer** | 270:24 273:24 278:16 |
| 322:10,20 323:21 | 36:19 38:5,16 39:15 | 34:17 48:2 81:7,9,11 | 282:12,13 283:20 |
| 324:3,10,16,25 325:8 | 39:20 54:16 61:9,15 | 81:21,22 | 286:2 294:23 295:10 |
| 325:14 326:25 327:16 | 61:22 62:2,4,11,14 | **official** | 295:16 304:6,7,15 |
| 327:23 328:6,12 | 117:11 122:6,19,23 | 74:21 | 305:10,25 306:23 |
| **objections** | 123:20 124:7 125:5 | **off-centered** | 307:6,10 310:17 |
| 220:16 | 125:10,16 188:9,16 | 115:13 | 320:22 325:21 326:7 |
| **Objectives** | 200:22 201:5 202:13 | **Oh** | 326:9,14,17 328:16 |
| 192:21 | 202:19 203:7,10,14 | 29:2 44:20 107:16 | 328:19 |
| **objects** | 203:19,21,25 204:21 | 144:8 204:16 222:10 | **old** |
| 30:4 | 206:17 267:19 285:5 | 224:24 238:8 306:24 | 216:6 |
| **obligated** | 287:10 289:9,12,20 | 307:3,6 328:19 | **omission** |
| 135:6 | 289:24,25,25 290:5,6 | **okay** | 100:10 |
| **obligation** | 290:13,15 294:1 | 10:17 13:14 14:15 16:1 | **omitting** |
| 105:8 135:22 | 295:8,22 310:9 311:3 | 16:11 21:9,14 39:22 | 151:2 |
| **obligations** | 312:9,9,13,17,23 | 39:24 42:12,12 43:21 | **Omnifront** |
| 133:10 | 315:10,20 316:2,10 | 43:24 52:21,24 64:11 | 36:15 |
| **Oblon** | 316:14,21 320:25 | 66:19 69:6 75:11 | **once** |
| 3:10 8:21 | 321:10,16,19 322:9 | 77:14 78:12,12 79:15 | 11:18 113:14 115:18 |
| **observe** | 322:18,22 | 80:21 90:24 93:20 | 116:23 138:9 139:6 |
| 314:6 323:24 | **OCR-based** | 94:1 102:15 103:11 | 163:12 204:21 215:5 |
| **observed** | 60:16 | 103:15 106:21 115:11 | 321:19 |
| 314:5 | **OCR-processed** | 119:11 122:2 129:15 | **ones** |
| **obtain** | 206:24 314:25 | 130:19 131:1 135:3 | 28:14 48:1 51:13 |
| 18:12 112:12,24 | **October** | 138:14 142:16 143:17 | 121:12 132:12 196:10 |
| 118:20 119:13 121:17 | 229:11 237:25 238:9 | 143:25 144:5,10,15 | 199:14 279:6 294:14 |
| 192:8 239:17,21 | 238:11 | 144:20,24 147:3 | **ongoing** |
| 276:25 307:22 | **OEM** | 151:8 160:16 161:6 | 83:7 110:11 |
| **obtained** | 49:12,16 | 161:16,24 163:17 | **online** |

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

360

83:24 97:21 136:21
137:11 145:3 169:10
171:12 226:10,13
227:25 230:22 289:20
289:25 290:6 296:18
298:12 312:9
**open**
7:10 58:12,16,21,22,23
58:25 59:5,5,7,14,23
60:15,23 61:10,11,13
61:14 62:5 65:14
96:9,10,12 131:10
242:4 271:8
**openly**
107:12,21 108:6,8
**operate**
82:25 158:2 160:9
166:12 247:2
**operated**
133:22 212:17 221:7
**operates**
83:23 129:3,17 138:22
145:18 163:20 212:20
268:16 269:22
**operating**
74:19 83:9,15 114:16
181:4
**operation**
95:22 128:19 212:21
**operational**
168:20,24
**operations**
50:8 81:17 129:22
**opinion**
6:16 128:16 179:12
222:20 223:12 229:1
229:8 237:8 252:9
263:5
**opinions**
251:4 252:1,6
**opportunity**
11:8 77:11 222:22
**opposed**
38:5 114:16 118:6
273:19 277:25 292:15
314:5
**Opposition**

6:12
**optical**
29:24 30:1,8,17 32:14
33:20 44:4,10 45:16
45:18 113:22 193:8
200:21 284:17 320:24
**optics**
17:21
**options**
199:24
**optometrists**
109:16
**oranges**
103:23
**order**
14:21 40:15 77:8 91:11
91:17 149:2 174:2
195:20 324:22
**organization**
81:17 138:15 162:2
181:21 185:19,22
**organizations**
49:11 145:21 162:4,7
168:12 181:3 294:7
298:24 300:14
**organization's**
130:14
**organize**
93:1
**orienting**
202:19
**origin**
218:12
**original**
39:12 49:16 170:6
173:7 183:19 186:11
198:23 229:17 279:24
329:16
**originally**
136:22
**outcome**
228:10,19 237:3
329:13
**outline**
19:6
**output**
202:8

**outputting**
264:21
**outside**
189:2 218:7,9
**outsourcers**
218:16 219:1,23
**overall**
170:16
**overarching**
133:9
**oversaw**
81:13
**overseeing**
48:2,8
**owned**
43:3 68:21,25 76:20
98:24
**owner**
70:21 71:19,25 170:5
232:22

**P**

**P**
8:2
**package**
38:22 162:8,13,16
168:25
**packages**
162:21
**page**
4:3,8 5:2 6:2 7:2,19,23
28:10 30:9,13,14 43:1
68:20 71:4 85:25
86:10,15 98:22 114:9
120:2,3,3 121:2
123:21 124:15,16
144:21,22,24 146:3
147:25 148:24 150:9
151:19 152:11,11
153:2,23 154:10,18
154:21 155:7 156:10
156:11 158:5 160:15
162:15,21,23 163:1
163:16 168:7,8 169:8
171:2,3 172:13,15
173:18,20,21 175:4
175:13,15 180:9,25
182:24 183:7 188:1,2

188:25 192:15,16,18
192:19 193:8 194:9
194:22 195:8,20,25
196:13,24 200:25
201:7,8,21 202:3,15
202:17,20 203:12
204:25 214:4,9 217:8
218:21 219:9 221:4,4
222:1,4,5,13 226:7
229:7,21 230:16
232:24 233:2,11
234:18,19 238:14,16
240:20,23 244:1,2,4,5
244:6 245:17,22
246:14,19 247:6,19
247:19 249:15 250:9
257:5 259:3,23
260:16 262:20 263:16
263:18 264:6,8 266:5
269:18 272:12,14
274:15 276:16 283:6
285:18 286:3 288:13
289:19 293:1,10
295:24 307:12,13
309:4 310:18 312:4
314:22,23 319:8,8,22
321:7,8,9,18 323:4,16
326:15
**pages**
42:20 51:7,18 52:3,12
71:6 86:15 98:18
114:9,20 115:1,5,13
115:18 121:1 143:14
143:21 144:17 153:25
176:4,21,24 178:14
179:2,5 191:18 215:9
231:3 239:8 241:24
247:9 272:21 290:12
291:2 296:15 297:23
304:24 306:18,25
309:23 311:13,18,22
312:1,10,14,25
314:19,25 315:10,20
316:2,10,21 317:2
319:20 322:13,16
326:11
**paid**

Case 1:14-cv-00857-TSC   Document 138-67   Filed 11/09/19   Page 116 of 139
Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

361

111:2,5 163:10 178:9
218:8 256:23
**Palo**
9:12,19 74:24
**palsy**
53:17 86:9
**paper**
56:16 116:10
**papers**
16:12
**paragraph**
91:11,16 145:8 146:4
149:8,9 155:9 158:6
163:18 164:13 181:16
181:17 183:3,13
184:11 185:21 189:4
189:8 192:11,25
195:8,14 197:10
198:16 199:22 202:17
202:25,25 216:14,15
216:16,19,22 217:2,8
217:13 219:9 220:6
222:1,14 225:14,15
226:7,21 244:2,7
249:17 251:19 262:20
264:7 272:14,14
274:15 283:6 285:18
305:5 309:6 310:18
319:9 323:17
**paragraphs**
145:16 159:9 197:21
198:14 203:3,4,5
219:25 220:19 221:8
225:25 304:24
**parent**
135:16
**parse**
55:23
**part**
18:11 29:17,22 41:6
56:24 63:15 65:11
66:20,21 67:10 68:7
72:9 78:17 82:6
92:21 94:18,21
100:13 103:4 104:4,7
106:2 107:9 112:3
114:3,24 116:9

118:19 159:5 165:11
171:7 179:11 205:14
213:14 237:6 241:6
241:13 245:23 255:6
256:5,11,12,15
284:11 289:20 291:4
294:3,16 295:4,18
311:6 323:16,17
**partial**
235:4
**participate**
34:18
**participating**
205:23
**participation**
254:6,13,18 255:19
**particle**
28:3
**particles**
27:9,22
**particular**
28:20,24 43:9 50:3
56:25 168:4 175:15
232:17,17,25 300:11
309:25 322:1,6
**parties**
72:18 329:12
**Partners**
102:16 103:16,21
105:11
**Partnership**
99:2,14 100:14 102:8
102:23 103:5 104:5
104:14 106:7,19
**parts**
42:3,7 56:21 57:2 67:3
**party**
77:8 94:24 95:2 111:3
111:5 135:15 136:1
161:3 274:25
**passage**
148:8 158:4 159:10
160:6 168:16 170:12
180:22 181:10 190:7
194:8 261:8
**passages**
145:1

**passed**
46:16 180:24
**password**
134:2,7,11 163:13,15
224:11 236:5
**pasting**
288:12
**Patapoff**
3:25 8:12
**patent**
5:3 43:3,9 44:6 51:20
56:18,22 57:3 58:3
59:15 63:4,16 64:18
69:8,10,11,21,25 70:2
70:6,11,19,22 71:10
71:19 72:1,9,18 73:3
73:18,20 74:1,8 84:12
87:9 88:16 89:23
90:5,12 91:23
**patented**
70:18
**patents**
4:15,20,23 41:6 51:8
62:12 68:21
**path**
28:3
**patron**
239:17
**patrons**
205:15 238:22
**pattern**
29:3 44:5,7,7,9 45:2
46:23 47:5 278:17
**patterns**
44:12
**pause**
15:7 78:9 147:3 294:22
**pay**
94:18,23 95:2,4 96:1
110:6 111:10 162:9
218:16
**paying**
74:1 94:24 110:15
111:4 161:3
**payment**
100:19
**payments**

73:15
**PC**
54:7 56:6 59:2 188:9
188:13 268:17 284:9
**PDF**
116:5,18 161:17 206:7
206:11,24 245:22
271:11 272:7 284:16
284:18 287:10 309:11
309:15,21 310:10,15
310:20 311:7,14,19
312:1,7 313:1 315:1
315:10,20 316:2,10
316:21 319:23 320:15
**PDFs**
206:14,21
**PDF-scanned**
312:14
**pending**
10:21 11:21,25 51:19
52:13 94:10
**Penguin**
100:9
**people**
5:25 45:17 53:11 60:18
60:19 61:7,8 78:5
82:4 84:6,9 85:9,12
85:13,14,16,18 86:12
99:8,9 101:18 102:2
107:1 108:2,3 109:17
119:25 121:9,11,13
123:17 128:9 130:7
131:11 145:4,23
147:22 149:10 150:10
152:19 153:19,22
155:3 156:15,17
157:15 158:12,22
159:13,20 164:4
167:20 169:3,12,17
170:24 178:11 180:14
183:22 186:23 187:2
187:4 189:21 190:22
191:11 196:16 197:14
201:5,15 205:3,11
226:11 232:13 249:21
249:23 250:15 257:13
257:20 258:3,6,8,10

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

362

258:24 259:5,10,16
260:1,11,15 261:4,9
261:10,14,16,18
262:10,25 263:20,21
266:13,16 270:16
271:6 275:4,19,21
276:23 277:21,23
281:14,15,19,22,25
282:2,3,17 283:9
291:22 299:1,12
301:16,25 302:4,19
302:21
**perceive**
262:18
**percent**
113:12 121:12 154:13
155:1 160:4 262:10
**Percheron**
18:21,24
**perfectly**
124:7,16
**perform**
113:22 274:20,22
**performance**
22:22
**performed**
298:17 310:9 322:13
322:14
**period**
35:5 39:8 54:8 75:13
77:1 81:5 89:9
125:11
**Perkins**
199:2,16
**permission**
100:18 145:24 167:21
246:4 247:24 248:1
**permit**
158:8
**permits**
169:15 240:6
**permitted**
127:10,19 172:4
**permitting**
128:22
**person**
35:9,11 47:20 70:11

85:24 86:4,6,14 97:16
109:2 118:1,8 120:3
125:3 135:24 137:15
137:22 139:19,24
140:15 150:14,21
151:10,20 153:15
163:7 177:12,23
192:3 193:21 196:6
198:20,24,25 199:15
200:2 204:6,16 239:2
239:6 259:14 262:6
263:15 264:10 266:8
269:23 270:8,13
272:22 273:7,18
274:3,6,10 275:12,17
275:24 276:5,9,21
277:24 280:24 281:18
297:5 302:9,13,17
**personal**
56:3 88:9 200:4 264:15
**personally**
2:9
**persons**
169:23 170:10 182:2
263:23 298:20 299:5
306:11
**philanthropy**
112:1
**Phoenix**
19:22 20:10 21:23
**phonetic**
279:22,22
**photoacoustic**
23:19
**photocopying**
246:2
**photographic**
26:5
**phrase**
120:17 121:20 167:14
193:23 261:14 268:5
**phrased**
154:8 266:24
**phrases**
120:25
**physical**
30:24 53:14 149:18

150:6,11,21 151:10
151:15 154:2 263:15
**physically**
119:4 155:11 239:7
262:5
**physics**
17:2,3,11,16,22 18:10
27:8
**Ph.D**
17:24 18:8,12 24:11
**pick**
85:25 86:4 153:24
154:14 262:6 278:18
**picking**
86:14
**picture**
30:13 125:2 146:10
286:5
**pictures**
107:13,22 207:12
**piece**
57:24 96:12 118:8
**pieces**
188:13 284:8
**pile**
304:11
**piracy**
201:11 226:13 227:25
247:22
**Pitney**
49:13
**place**
8:14 12:15 50:17 90:16
106:1 166:19 235:12
237:20 249:7 318:20
323:25
**placed**
213:22
**placeholder**
308:6,9 324:6
**plain**
137:14
**PLAINTIFF**
1:6
**plaintiffs**
3:2 6:13 8:19,21 9:21
209:3,15 212:9

236:16,20
**plaintiff's**
12:10 13:8
**plan**
133:8 168:3 172:16,17
172:21,24 226:3
326:12,15,21 327:2
**Planet**
8:13 9:1
**planning**
125:24
**plans**
133:9
**platform**
83:23
**play**
126:18,25 127:7
210:13 236:22
**player**
140:22 141:3 142:10
**pleadings**
16:5
**please**
8:16 9:2,17 10:15,19
11:7 23:21 29:24
37:3 77:22 79:14
93:25 98:17 109:13
143:13 177:24 178:1
188:24 194:3 204:24
224:18 229:20 259:22
260:18 263:24 269:19
272:12 304:9
**plot**
63:25
**plug**
25:15
**plus**
26:11 45:19 58:24,25
163:14 299:9
**point**
10:14 11:4 29:5 42:6
54:1,6 77:20 199:9
216:24 243:3 254:22
260:20 306:14
**pointed**
251:7
**pointing**

Case 1:14-cv-00857-TSC   Document 138-67   Filed 11/09/19   Page 118 of 139
Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

363

199:15 251:18 307:11
**points**
128:12 170:21 309:1
**policies**
168:25
**policy**
80:9,12 165:16
**political**
301:10
**poorly**
191:9
**population**
154:14 160:4 281:21
**portable**
56:12 57:3,13 67:22
265:7 268:19
**portion**
90:21 113:6 192:11
236:1,5 242:2
**portions**
77:11
**position**
21:23 48:12 191:21,23
**positions**
19:21 28:13
**possibility**
124:24 242:11
**possible**
96:11 105:4 163:25
218:1
**post**
49:6,8 242:21 247:5,8
**postal**
45:24 46:5,14 49:10,12
49:13,19,20
**posted**
252:11,18 324:1,14
326:22
**posting**
253:2,10,18
**posts**
247:7
**postsecondary**
132:13,21
**potential**
152:14 174:2
**potentially**

77:6 105:16 195:20
**Potter**
301:9
**powerful**
36:24
**powers**
246:24
**practice**
32:14 74:1 179:4
**preceded**
38:17
**precedes**
198:16
**precise**
43:8 99:17 109:15
**precisely**
147:10
**predates**
69:3
**prefer**
105:5
**preparation**
15:22 299:1
**prepare**
12:24 14:3,13,21,23
15:3,14,19 251:24
**prepared**
98:13 210:24
**preparing**
37:6 48:4
**present**
3:24 78:20,25 133:16
180:23 206:15
**presentation**
195:6 269:24 289:17
**presentations**
194:13,15,23 196:1
**presented**
133:7 270:10
**preservation**
232:12
**preserving**
38:12
**president**
20:11 34:11,15 35:3,17
35:25 36:11 47:8,11
47:17,24 48:13,20

54:21 78:14,22 79:17
79:18,19 80:22,25
81:6,8
**presorting**
46:4 49:12
**press**
36:8 199:17 209:12
213:9
**presses**
102:19 199:3
**presuming**
273:18
**pretty**
32:4 36:24 131:10
**prevent**
101:18 221:11 224:1
239:6
**prevents**
149:5 239:2
**previously**
7:17 228:6 275:7
304:10 305:12 308:3
308:14 317:16
**price**
40:11,22,25 54:3,6
55:13 285:3 291:16
292:9,14
**priced**
40:16
**prices**
54:8
**Prima**
246:5
**primacy**
36:19
**primarily**
26:7 27:14 34:5 36:5
46:9 47:19 53:10,23
76:24 84:8 85:14
108:18 132:3 195:19
209:6,12 210:8
219:20,22 224:14
280:11
**primary**
26:22 34:20 36:8,18,23
45:6 62:1 93:4 109:1
121:12 128:12 132:20

148:21 168:3 170:23
181:22 187:11 213:10
**principal**
156:14
**print**
82:4 85:15,17,20,22
86:4,6,12,16,20 97:17
98:6 99:11 109:2,6
117:25 122:3,13,17
126:24 128:10 145:4
145:23 147:19 149:4
149:6 150:16,23
151:12 152:3 155:14
158:24 159:14,22
160:5,11 164:4
169:12,18 192:3
193:21 194:18 196:7
197:24 198:6,11
201:4 220:4,22
226:11,17 228:2
232:14 238:23,25
239:5,10 240:9
249:22 258:10,14,21
259:6,8,17 260:10,15
260:19,24 261:10
262:10,12 263:12
266:13,16 267:25
275:19 277:15 278:5
280:3,5 281:2,15,19
281:22,24 282:4
297:9,20 328:10
**printed**
37:6 78:6 85:23 86:15
113:15,20 117:10
123:21 127:7 154:3
193:7 200:13,25
204:1 231:4 239:3
246:18 309:21 311:9
**printer**
267:15,24,25 292:24
293:1
**printing**
199:3,17 301:1 302:3
**printout**
229:13
**print-disabilities**
205:12

**print-disabled**
104:24 118:1 127:12
135:25 147:23 198:7
198:11 200:13 217:12
233:24 239:20 244:12
249:23 250:16,17
260:2,7 261:5,15,16
261:18,21 263:22
281:11 283:10 296:17
301:17 324:2
**prior**
51:23 112:22 165:10
**private**
18:16,25 20:5 22:3,6
**privilege**
10:25 11:3
**privileged**
13:2 221:14 227:8
**pro**
177:20 178:9 254:6,9
**proactively**
299:18
**probably**
20:18 22:3,11,11 30:25
46:3 47:6 67:17
83:19 195:22 197:11
204:17 209:10 216:25
219:4,4 259:14
291:23 303:3 306:7
**problem**
22:19 105:25 124:22
153:8,18 184:25
214:21
**problematic**
260:3
**problems**
50:11 124:17 206:20
224:24 225:1 258:15
258:21,24 278:19,19
278:20,20
**Procedure**
13:4 221:16 227:10
**procedures**
324:22
**proceeding**
117:24 329:12
**proceedings**

329:9
**process**
30:2 32:7,17 45:25
46:1 86:7 101:17,24
103:2 105:12 114:17
115:21 116:9,23
117:11 122:4,6,19
123:20 125:24 126:2
126:17,22 137:7,9
171:21 174:2 200:3
287:3 290:5,7 291:10
310:9 312:10,13
316:15,16 321:1,16
**processed**
30:6 49:10 123:8,11
315:10,20 316:2,10
316:21
**processes**
101:10 106:18 114:25
116:25 119:2 125:16
**processing**
45:9,20 49:25 50:6
202:18 312:17
**processor**
30:10 285:21 287:7
288:16
**produce**
49:13 115:21 147:19
287:15
**produced**
42:25 54:16 257:2
325:6
**product**
34:5,7 36:5,6,24 37:24
38:5,8,17 39:12,16
46:9 49:5,9,22,24
53:23 55:25 56:10,13
57:1,1,16 58:9,11,16
58:16 60:6,9,17 61:10
61:11,22 62:1,21,25
63:10,15,21,25 64:25
67:16 68:3,6 70:14,18
76:25 81:15,18 83:14
83:21 84:1,3,9 85:4
87:15,20 89:4,16
92:14,18 93:13,18
94:5 96:10 97:11,16

97:21 169:1 187:11
230:9 271:7 289:16
292:10 316:17
**production**
147:7 287:5 289:10
**productized**
46:23
**products**
33:22 34:1 39:9 45:3,5
45:7,23 46:10,20,25
53:9,18,25 54:12
58:22 59:6 61:14
65:11 66:19,21 67:3
76:25 78:3 147:6
246:7 289:9,12,13,15
**product's**
89:12
**professional**
109:7,9,11 152:20
155:18 156:3,4
**professionals**
199:4
**profit**
76:20
**program**
24:11 99:2,5,14 100:14
102:9,16,17,18,23
103:5,16,21 104:5,14
105:11,19 106:7,19
107:4 161:18 264:15
269:22,22 285:4,12
288:14,15 291:17
292:1,19 293:14,15
294:1 295:23
**programming**
29:16
**programs**
82:14 111:15 112:5,9
285:5 291:18
**progression**
39:10
**progressively**
32:13
**project**
18:25 19:3 24:24 25:12
26:22 27:19 82:8,11
82:14,15 83:4,6,9,20

106:22,25 107:9,21
138:12,16,22 139:4
143:19 164:19 187:16
187:21,24,25 213:11
213:15 222:19 223:10
**projects**
24:25 25:11,16 28:24
29:12 82:12 186:2
187:3
**promote**
186:1
**pronounced**
40:6
**pronouncing**
18:21
**pronunciation**
18:22
**proof**
97:17,21 98:5 102:2
163:9
**proofread**
117:12 218:16 221:1,3
**proofreading**
117:16
**proofreads**
113:23
**proper**
106:1
**properly**
115:14
**properties**
37:8
**property**
173:4
**proportion**
110:5
**proportional**
27:19
**proprietary**
205:17,22 206:3
**Propulsion**
25:20 26:21
**proscription**
281:2
**proscriptive**
280:13,15,19
**protect**

Case 1:14-cv-00857-TSC   Document 138-67   Filed 11/09/19   Page 120 of 139
Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

365

**protected**
181:7 326:21
**protected**
13:3 221:15 227:9
244:13,18 245:12,13
**protecting**
180:15
**protection**
56:22 57:4 63:16 134:3
134:11 244:23 245:9
**protections**
244:21 245:1,5
**protective**
77:8 91:11,17
**protocols**
221:11 224:7
**prototype**
20:19
**provide**
10:19 34:6 102:2 105:7
108:7 112:13,25
130:6 156:2 158:15
164:2,6 180:14
181:23 186:22 200:22
211:11 238:22 240:8
242:6 252:5
**provided**
169:18 181:8 191:19
210:16 223:23 256:3
266:6 309:10 312:6
319:9
**provides**
169:11 171:11 222:21
230:7,25 231:16
**providing**
102:5 187:1
**provisionally**
91:12
**provisions**
128:6 170:22
**psychological**
19:18 252:21 305:24
**psychologists**
109:18
**psychology**
19:8
**psychometrics**
19:11

**public**
40:17 53:7 75:5 81:12
81:19 83:16,16 84:19
85:3 92:10 127:18
128:25 148:16 164:8
190:12 209:7 232:21
296:8
**publication**
170:6
**publications**
103:4 301:14
**publicly**
50:24 68:16 83:11,13
98:14 109:21 210:7
**Public.Resource**
182:16 184:14 253:7
255:18 309:20 320:13
320:15 323:25 324:9
324:14,23 328:11
**Public.Resource's**
211:10 252:12,19
253:20 323:24 325:4
325:13 326:18,23
327:13,21 328:4
**Public.Resource.Org**
1:8 8:7,24 12:1 184:19
249:25 307:18 308:1
308:12,23 309:7,17
310:14 318:16 323:20
327:3
**published**
196:16
**publisher**
100:10 101:4,7 102:17
105:22 112:22 131:22
138:4,5 145:24 172:8
172:11 279:25
**publishers**
100:3,7,15,23,24
101:13,16,23 102:6
102:18,24 103:3,16
103:20,25 106:6,17
112:18 130:14,20
131:9,12 132:6,8,13
132:14,18,21 159:16
159:24 164:22,24
165:2 166:14 167:9

167:17 168:11 171:17
173:5 180:12,17
183:14 189:16,18,23
190:2,6,8 201:10
216:17,18
**publishing**
131:8,21 132:2,9
165:13 168:5 169:6
173:8 209:8 246:5
302:3
**pull**
52:22 304:9 325:18,22
**pulsed**
23:25
**purchase**
97:20
**purchasing**
309:21
**purported**
278:9
**purpose**
39:3 46:2 93:1,5
136:17 156:14 171:3
172:23 173:3,20
174:16 176:11 254:18
272:15 319:4
**purposes**
46:3 75:17 323:18
**pursuant**
91:10
**pursue**
186:5
**put**
28:1 31:18 41:18 90:18
90:20 113:21 176:18
225:4 303:18 305:11
306:14 325:25
**puts**
293:1
**putting**
288:15 304:2
**Pythagorean**
147:16
**p.m**
246:14 247:5,9 248:23
328:25
_____
**Q**

**quadriplegia**
53:16
**qualification**
106:18 151:6 158:19
**qualifications**
149:25
**qualified**
184:20 239:18
**qualifies**
150:16,23 151:12,21
158:12 182:16
**qualify**
83:13 111:17 130:3
149:16 153:4,19
154:4,11 155:5
262:12
**qualifying**
101:15 109:2,5 128:10
130:7 149:18,23
150:6 156:8 170:24
183:18
**quality**
113:25 114:3,13,19,25
116:24 117:12,16,17
125:17 126:11 183:23
248:3 312:21
**Quarles**
3:3 8:19
**question**
10:15,16,20,21 13:2
14:16 31:20 55:7
75:7 78:1,11,17 79:12
90:20 91:21 94:4,9
101:13 102:12,19
103:8,12,20 106:4
107:14,18 117:5
122:15 125:7 139:2
148:8 157:8,14 161:8
163:3 167:13 174:14
176:24 177:25 188:15
191:8 194:5 195:1
198:5 200:11 203:24
205:21 215:23,24
217:12 221:9 223:13
227:20 234:17 243:23
245:3,15 251:16,17
257:14,16,23 258:17

263:4,7 266:24 267:5
275:23 286:8,14
295:2 301:4 306:1
314:10 315:14,16
318:2,21 320:9
**questioner**
295:15
**questioning**
15:22 207:20
**questions**
7:22 42:10 51:5 101:16
117:20 142:15 144:11
144:14 156:1 157:8
171:8 211:13 282:9
325:18 328:17
**quick**
143:24
**quite**
123:23 124:23 125:6
141:9 165:23 173:8
215:1 217:22 262:11
302:16 311:21 321:10
322:22
**quotations**
246:6
**quote**
109:15
**quoted**
246:18
**quoting**
264:14 296:21

**R**

**R**
1:14 2:1,9 4:13 7:15
8:2 9:4 204:14
**RAF**
4:21 44:1,3,13 45:3,5
46:6,9 47:4,9,16,25
48:9,13,20,25 49:5,24
50:3,7,13 51:9,15,16
51:20 52:4,13,19
**RAF's**
45:23
**raise**
20:15,21
**raises**
77:19

**raising**
34:18
**ran**
27:7 58:21 80:5
**random**
100:9 302:10
**range**
41:4 54:3 76:19 86:11
194:16 285:8 306:8
**rank**
301:8
**rare**
44:13 172:1
**rarely**
201:14
**rate**
123:25 125:10
**Ray**
32:8,18
**reach**
137:10 300:2
**reached**
29:4 282:9
**react**
130:20
**reacted**
131:9,15
**reaction**
132:13 215:25
**read**
13:8 14:20 16:4 56:9
75:25 85:5,19 86:1,2
87:8,14 88:1 93:7,18
94:10,23 95:8,11
97:24 98:3,3 107:2
108:4 119:15,18
121:17 122:10 123:8
140:18 144:25,25
146:8,12 148:1,5
150:16,22 151:4,8,11
154:15,16 155:13
157:4 158:5 159:10
159:14 160:5 170:12
170:21 190:7 192:10
193:5 194:8 198:24
199:16 215:16 216:1
219:25 224:18 225:6

242:2 243:17 246:23
252:4 259:8 260:16
261:9 266:18 270:16
271:25 272:23 273:4
273:5,13,18,19 274:3
274:9,12 276:25
285:24 291:10 292:5
309:25 310:1 311:2
315:3,8,19 316:8
320:5
**reader**
56:1,2,8,21 57:1,7
67:12 85:9 87:21
88:7,8,10,15,23 93:2
94:13,21 95:4,13,19
96:2 123:3 139:24
140:12 142:12 194:16
264:12,13,14,22
266:18 269:16,20,21
270:6,8,19 271:5,8,10
271:21 272:5,20
275:13 285:25 291:18
293:2,8,22 294:21
295:22 296:1 316:8
316:16,17,19
**readers**
94:2 142:20 275:22
291:8 316:14
**reading**
15:14,17 32:18 42:2
51:12 52:1 53:10,15
54:4,7,15 56:4 57:19
57:23 58:24 59:2
84:8 85:13 86:3
89:20 93:11 95:21
96:17,23 112:13,24
113:15 139:7 149:6
151:16,25 155:4
156:6 158:24 164:14
170:16 181:25 186:6
188:3,7,14,16,21
199:25 200:20 209:12
234:20 238:15 239:3
259:3 269:25 271:16
305:22 310:6 320:11
320:11 329:20,21,22
**reads**

196:8 264:16
**ready**
42:9 51:4 189:10
243:16 305:21,25
**Read2Go**
84:4,6,11,20 93:13
94:5 97:10,15
**real**
155:4
**realize**
11:4 137:20 155:3
**really**
29:20 92:18 130:16,21
131:17 204:11 303:8
305:14
**reask**
191:8 203:24 205:20
245:3
**reason**
10:19 11:10 143:20
148:21 151:1 157:14
161:4
**reasonable**
132:16
**rebuttal**
13:8 14:12,19
**recall**
18:7 20:13 24:18 26:23
34:24 36:12 42:18
46:6 50:2 56:13,17
57:8 60:1 63:13 86:2
192:1 196:17 209:2
223:14,15,25 228:9
237:3 242:20 279:16
291:12 292:13 310:2
**recapitulate**
170:21
**receive**
110:23 111:6 113:19
159:25
**received**
16:13 17:5
**receiving**
254:12,17
**recess**
20:25 43:13 91:6 143:5
185:5 208:11 248:24

282:23 327:8
**recognition**
4:17 29:4,25 30:1,8,17
32:15 33:2,5,10,18,20
34:4 36:15,20 37:24
38:8 40:2,3 41:11
42:16 43:3,25 44:4,5
44:6,7,9,11 45:2,16
45:19 46:21,24 47:5
49:9 50:7 113:22
115:2 123:25 124:8
125:10 193:9 200:21
202:20,21 278:18
284:18 287:3,19
312:18 320:24
**recognize**
21:16 42:15,20 43:2
44:24 45:15,17 51:8
51:19 52:4,12 68:19
69:2,9,20 98:19,23
124:16 180:4 185:13
213:24 241:24 242:1
270:18 288:21 311:4
321:9
**recognized**
36:20 152:21 267:20
285:19,22 286:15,21
286:25 287:2,8,9,15
288:19,25 289:4,10
291:10 322:16
**recognizing**
30:2 44:13 45:7,13
47:1 123:21
**recollect**
296:13
**recollection**
42:24 48:10,19 50:5
57:10 58:3 59:21
60:4 72:8 76:11
84:17 85:2 92:9
93:10 101:3 209:11
223:1 309:13
**record**
9:10 20:22,23 21:1,4
26:17 31:10 41:20
43:10,11,14 57:11
64:3,4,7,11,13,14

77:15 84:19 90:18,21
90:22 91:4,9 143:3,9
144:2 175:10,17,20
175:22,23,24 176:6
184:24 185:4,10
208:9,15 215:18,19
225:6 240:25 248:22
249:4 252:5 257:6
282:14,21,24 304:1
305:19 327:6,9
328:23 329:9
**recording**
246:2
**records**
68:17
**reduce**
24:3
**refer**
70:1 75:8,15 245:16
252:23 280:9
**reference**
286:10 302:7
**references**
259:19 260:4,19
**referred**
7:18 300:25
**referring**
186:13 257:7 259:4
268:6 283:5 289:19
**refers**
244:1
**reframe**
257:23 258:17
**refresh**
50:5 57:9 59:20 60:3
84:17 85:2 92:8
**refreshable**
200:5 268:3
**regard**
118:14 287:4
**regarding**
128:17 176:2
**regimes**
158:1
**registered**
52:4 56:18 57:7,13
58:3,9 59:14,24 62:6

63:3,10 64:18,25
84:11,21 87:8,15
88:16,23 89:22 90:4
90:11 91:23 92:2,14
98:19,23
**registration**
59:22 60:5 68:25 84:19
85:3 92:10
**registrations**
62:12
**regular**
159:22 178:14,22
179:4
**regulation**
109:9
**regulations**
109:20,25
**regulatory**
109:21
**related**
28:21 45:20 250:23
253:2
**relating**
181:24
**relations**
47:18 81:19
**relationship**
47:20
**relationships**
36:7
**relatively**
300:15
**relay**
132:18
**release**
83:16,16
**released**
39:8
**relevant**
298:25 302:2,12,19
**relied**
216:2
**religious**
114:11
**remainder**
30:15
**remember**

20:17 25:12,16 26:3,19
28:25 40:9 46:18
55:13 59:18 65:8
73:12 92:4,6 101:6
160:18 192:5 209:5
209:15,22 210:2
212:16 255:13 279:24
284:25 321:11,25
**REMEMBERED**
2:2
**remote**
22:20,23
**removed**
307:19
**render**
34:4 53:22 329:16
**rendered**
53:24 162:5
**rendering**
46:7
**repeat**
31:20 55:7
**repeatedly**
46:13
**rephrase**
55:7 122:15 281:20
**replace**
58:17
**replaced**
199:8
**reply**
16:6
**report**
7:14 13:7,8 14:11,12
14:18,19 15:24 16:12
29:23 211:4,11
248:16 249:9 250:8
251:1,5,9,10,20,23
252:4,7 256:12 257:5
257:6,12,18 258:2,7
259:2,18 263:25
264:14,23 265:3,5,11
265:17,23 266:20
267:8 269:18 272:13
272:15 276:17 281:9
283:6,14 285:14
294:9,17 295:24

296:3,16 298:9,16
306:17 307:4 309:5
310:17 311:6 314:23
317:3,4,25 318:8,14
319:21 323:5,17,19
**reported**
1:24 6:15,19 7:3,7
210:7 229:9 237:22
237:24 329:6
**reporter**
2:8 8:25 9:2 10:8 12:9
21:10 26:8,14 31:8
177:14,21 193:3
225:6 233:20 254:2
304:1 323:8 329:1,3
**reporter's**
329:17
**reporting**
34:20
**reports**
14:14 15:14 48:5
211:19 213:10 310:2
**repository**
210:1
**represent**
8:17 68:13 98:13 173:3
176:15,22 191:15
**representation**
175:13 176:2
**representations**
166:13 168:2
**representative**
152:18,24 317:8
319:10,14
**represented**
37:12 114:14 309:14
319:13
**representing**
8:12 9:1,21
**represents**
131:23 175:14
**reproduced**
169:19 245:24
**reproduction**
169:25
**request**
104:23 105:4 175:9

**requested**
299:16 329:20,22
**requests**
104:22
**require**
206:6,24 244:22
**required**
39:11,16 171:12
198:18 207:5 218:14
256:6,9
**requirement**
148:18 157:18 163:4
**requirements**
109:8 155:16 164:15
164:18 169:14 182:6
325:11
**requires**
77:21
**requiring**
274:23
**reread**
13:7 242:13
**rereading**
195:13
**research**
1:4 8:6 23:3,8,9,11,13
23:15 24:20 26:1
184:18 209:25 213:20
235:17
**reservation**
252:3
**reserve**
251:21
**resource**
260:22
**resources**
39:11 125:25
**respect**
118:2 135:16 158:20
207:14 240:9 248:2
254:23
**respective**
246:9
**respond**
234:23 235:7
**responding**
104:21

**responses**
10:11
**responsibilities**
20:12 22:15,17 23:1
24:20 26:20 34:14,17
34:21,24 35:2,17,24
36:3,9,10 47:15,16,24
48:3,12,20 79:13,16
79:23 80:19,25 81:10
81:23
**responsible**
48:7 80:1 81:16,20
104:21 135:15,25
**rest**
149:8 199:9 243:17
263:25 283:3 321:14
322:8 325:25
**restate**
107:18
**Restricted**
246:17
**restriction**
325:7
**restrictions**
327:19 328:2,9
**restricts**
159:19
**result**
76:1 102:7 167:5
310:21
**resulting**
278:1 285:21
**results**
172:2 312:18 317:22
318:19
**resume**
19:20 21:6,8,20 28:9
32:25 34:9 52:23
53:2 74:13,15 78:23
124:3
**retained**
16:3 249:24
**Retaining**
48:6
**retains**
230:20
**retrieval**

26:6 246:3
**revealing**
227:21
**reversing**
123:13 271:17
**review**
14:12 42:4 143:14
223:15 228:3,25
237:8 241:7,14
242:23 246:7 283:7
283:12,21 284:11
289:21 290:5 291:4
294:3,17 295:5,19
305:20 311:25 312:3
322:6 323:18 325:4
326:18
**reviewed**
15:19 178:8 222:16
223:9,10 249:11
320:7 323:19 325:23
**reviewing**
14:11,18 16:11 319:21
**reworks**
198:20
**re-mark**
131:2 303:20
**rhythm**
15:11
**rich**
116:7
**right**
10:18 11:2 12:24 13:23
14:1,6 16:3 18:21,24
21:21,25 22:1 23:7
33:9,17 42:12 44:15
44:24 47:14 53:1
60:14 65:10 69:12
70:5 75:2 83:6 92:1
94:3 97:15 103:1,18
104:13 117:9 119:1
121:3 122:2 124:18
129:14,24 130:19
131:3,3,25 134:9,18
135:2 139:6 141:17
143:2 144:21 150:4
151:8,19 152:3 159:7
164:13 166:21 170:12

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

369

170:14 176:5,17,21
177:4,17 178:21
179:11,21 183:9,9
186:15 187:7 188:6
192:10,22,23 193:19
199:14 202:5 203:2
206:23 221:22 222:14
228:18 230:1,16
233:11 235:4,20
238:11 242:20 243:5
243:17,22 244:10
245:21 250:7,22
251:21 257:10,22
258:18 261:25 262:15
262:19 264:6 270:2
275:11,11 276:7
282:19 286:14 287:17
288:4 295:16 297:14
298:3 304:7 305:2,18
307:9,9,22 312:11,13
314:10 315:5,6,16
319:13,19 328:19
**rights**
67:2 73:25 108:14,17
133:8 159:15 168:2
172:16,16,21 186:24
187:9 226:2 245:9
248:3 326:12,21
**right-hand**
144:19 233:13 234:21
238:16 240:23
**risk**
226:13 227:25 241:4
**risks**
29:18
**Road**
9:12
**Robert**
9:11
**rocket**
18:16,25 19:4 20:5,15
20:19 22:7,21,24
**rocket's**
22:22
**role**
34:22,25 35:3 36:4
80:1 81:21 210:13

236:22
**roles**
47:15
**rolled**
222:6
**Roman**
37:17
**rough**
40:5
**roughly**
165:10 184:8
**route**
46:12 106:21 107:9,12
107:20,21 108:7
187:5
**routed**
45:18
**routes**
64:1
**routing**
45:9 46:14
**royalties**
72:23 73:18
**royalty**
73:14 74:1 159:25
**RPR-RMR-CRR-C...**
1:25 2:7 329:25
**RTF**
116:3,7
**rubrics**
129:17
**rudeness**
218:18
**rule**
13:4 111:13 221:15
227:9 256:17,24
**rules**
10:3 158:18,21 221:16
227:10 256:6
**run**
111:15
**running**
58:18 139:25
**runs**
82:12 264:15

———————
**S**
———————
**S**

8:2
**safeguard**
241:3
**safeguards**
106:1
**sake**
243:2
**sale**
35:10 40:11,21 53:25
54:3 55:13,15 65:7,12
66:20,21 67:3,11 68:7
72:9 76:2,22 77:2
297:12,21,24 298:4
**sales**
34:5 35:12 53:23
**salesperson**
35:9
**Sammy**
279:22
**San**
3:21
**Santa**
20:8,8
**satisfied**
102:6
**satisfying**
105:8
**save**
105:16 183:20
**saw**
126:15 292:6 320:6
321:21 327:21
**saying**
10:9 138:10 156:7
171:17 212:10 216:3
223:14 282:19
**says**
120:12 126:20 145:8
145:17 146:4,11,22
148:2,25 150:13
153:1 154:12 156:11
160:21 162:24 164:13
168:8 169:9 174:5
180:10 181:1,17
183:3,12 186:8,19
188:2 192:13,25
193:5 194:14 196:24

197:22 198:22 199:22
200:19 201:9 202:5
219:10 222:1 229:23
230:18 231:11,15
232:7 233:14 234:22
235:6 238:8,17,19
239:15 240:24 244:10
245:21 249:18 256:24
272:18 274:3 292:25
296:16
**scale**
138:3,3
**scan**
56:8 99:8 105:6,6,17
116:10 117:11 126:18
126:22 218:10 220:3
220:21 221:2,2,4
310:21,24 312:22
**Scanjet**
56:5,15
**scanned**
30:12 99:6 114:20
115:13 126:3 133:13
213:14 220:20 231:1
231:3 267:19 311:21
312:18
**scanner**
56:5,12,15,15,16 57:3
57:13 58:25 67:22
113:21 188:11
**scanning**
30:8 45:9 113:4 115:21
125:16 127:7 193:7
195:20 210:1 213:11
213:15 217:15 218:13
220:2 221:3 309:23
**scans**
116:16
**scars**
44:25
**school**
19:7,8,10,13 29:15
135:18 136:12 137:18
**schools**
162:3
**Schuster**
100:8

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

370

**science**
16:16 17:10 28:22 29:3
247:14,16 248:12
**scientific**
55:9,16 65:7 67:10
71:11 72:10 76:2,14
132:10 270:20
**scope**
80:15 184:16
**Scratch**
228:14
**scream**
23:22
**screen**
56:7 88:8,8,10 143:15
161:16 173:24 175:14
176:23 264:11,13,14
264:17,21,24 265:3
266:18 268:15,17
269:19,21 270:1,6,8
270:10,19 271:5,6,8
271:10,15,21 272:1,5
272:20,21 275:13,15
275:22,23 276:3
285:24 291:8,18
293:2,7,8,21 295:22
316:8,14,15,17,19
**screeners**
271:14
**Screenshots**
5:12
**Scrolling**
225:3
**se**
118:7
**seal**
180:21
**search**
119:6,6 120:5,7,9,14
121:4,19 230:23
232:15,16,23 259:18
277:6 279:2 289:24
294:5 295:25 296:18
308:11 317:21 318:5
318:13 324:13
**searchable**
30:20 31:14,25

**searched**
31:5 171:18 253:5
296:16 299:22 300:10
**searches**
121:5,20 232:12 273:2
279:11 298:11 315:4
315:9 316:1,20
**Sebastian**
3:19 8:22 248:15
**second**
7:4 69:7,9 77:4 120:16
124:16 149:9 155:8
158:6 175:18 181:16
181:17 183:2,12
189:8 222:4 237:23
238:17,20 251:19
262:20 266:5 272:18
274:15 294:22 321:8
**secondary**
132:17
**seconds**
41:20
**section**
120:13,14,16 148:4
155:25 158:14 163:24
210:9 321:20
**sector**
186:22
**secure**
133:25 166:8 183:17
234:1,15
**secured**
134:10
**security**
221:11 223:25 227:3
228:4 235:9,11,21
241:1,14
**see**
23:24 78:21 109:16
124:10 144:18 146:14
156:16 166:24 174:8
174:12 179:16 188:4
192:13 223:14 235:18
244:15 245:19 246:11
250:5 256:19 272:16
277:12 278:20,21
280:24 285:20 290:1

290:1,12 311:22
312:23 313:24 314:18
318:15,18 321:22
**seeing**
255:13 274:8 314:7
**seeking**
128:16,18
**seen**
12:17 14:8 136:14
212:10 314:6
**sees**
174:14
**segment**
130:23 165:8
**segments**
131:8 132:9,11
**seizure**
280:22,25
**select**
176:4 314:25
**selected**
312:10,25
**selections**
93:2
**sell**
46:10,11 49:19 55:6,8
**selling**
39:3
**semiconductor**
28:23
**semiconductors**
24:6
**semiconductor-based**
29:8
**send**
105:13 292:25
**Sendero**
73:8,10,19
**sending**
267:13,14
**senior**
57:20
**sense**
92:24 102:13 103:9
266:25 267:6 310:3
**sensible**
270:15

**sent**
254:24 255:1 267:23
267:24
**sentence**
151:2,6 154:22,24,25
155:8,21 159:5 168:7
181:17 183:12 189:8
200:19 223:5,8 235:4
248:6,14 251:19
266:5 272:18 275:1
286:4 307:11
**separate**
62:13 94:16 95:24 96:1
96:23 97:4 102:18,18
139:25 142:5 269:21
303:20 316:17
**September**
1:16 2:3 8:1,10 161:13
161:14
**series**
34:1 39:8 76:6 78:4
117:20 119:2 142:15
325:17
**serifs**
37:16
**Serotek**
271:2
**serve**
135:19 158:22 296:17
**servers**
133:23 166:4
**serves**
179:2
**service**
45:24 49:11,20 52:18
54:2 96:18 161:3
164:25 165:22 166:4
166:13 169:3 239:16
289:20 290:6 294:1
295:8,22 312:9
**services**
34:3,6,7 45:24 46:6,11
46:25 47:4 49:20
53:21,24 76:22,23,24
104:20,25 105:3,10
110:24 111:7 133:17
137:25 156:19 157:13

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

371

157:24 158:15 181:23
**serving**
156:21
**SESSION**
4:5 143:8
**set**
37:10 80:7,9,12 87:24
  158:7,18 184:10
  280:17 329:18
**sets**
46:17
**setup**
110:1,6 160:24
**seven**
69:4 185:14
**seven-point**
133:8 168:2 172:21
  226:2
**severe**
86:8 159:23 258:9
**SFWA**
247:14,20 248:10
**share**
132:23
**shared**
206:2
**sheet**
56:16 321:7
**short**
207:20 277:20
**shorthand**
2:7 283:3,14 329:3
**shot**
161:17 173:24 175:14
**shots**
143:15 161:23 176:23
**show**
68:11 69:17 97:17
  98:10 180:2 190:18
  278:16
**showed**
62:10
**showing**
97:21 98:5 124:25
  297:24
**shown**
179:5 255:12

**sic**
222:22
**side-by-side**
311:11
**sighted**
100:16 106:2 167:20
  198:19,24 199:15
  200:2 221:12 270:16
  274:6
**sign**
101:15 105:10 135:7
  135:17,19 148:4,9,13
  148:18,22 156:7
  163:2 174:6
**signal**
28:6
**signals**
27:21,24 29:11
**signature**
214:3,6,10,12
**signed**
248:9
**significant**
153:8 158:23 165:16
  197:11 218:17 291:3
  294:14
**significantly**
151:15,24
**signing**
101:18 135:15 329:20
  329:21,22
**sign-up**
101:17,24 103:2 148:1
  148:19 173:20,25
  324:21
**silicon**
23:23 24:3 145:11
**similar**
37:13 48:1 51:23 58:14
  60:15 111:25 141:21
  259:7,9 274:6 276:22
**similarly**
326:14
**Simon**
100:8
**simple**
29:23

**simply**
61:10 159:17 166:16
  166:22 231:11
**simulation**
29:3
**simultaneously**
17:1
**single**
68:20 138:4
**sir**
9:9 15:25
**sit**
29:1 71:18 279:7 280:5
  303:10
**site**
84:2 87:25 89:10 92:21
  92:23 94:22 95:18,20
  125:19 126:7 128:23
  130:7 134:19 135:9
  137:19,21 139:20
  140:2 141:2 143:16
  143:17,18,19 144:22
  146:17 148:11,15
  161:11 164:5 167:10
  167:19 171:4,14,19
  173:13 174:11,19
  175:6,15,16 176:4,23
  179:1 222:20 223:2
  223:11,16,19 224:1
  228:4 250:3 252:12
  252:19 253:8,8,11,14
  253:19,20,21 297:24
  307:18 308:1,12,23
  309:17 317:11,15
  318:7,15,17,24
  319:17,24,24 320:1
  320:16,17 322:8
  323:20,25 324:1,9,15
  324:23 325:5,13,24
  326:16,19,19,20,23
  327:3,13,14,22 328:5
  328:11
**sites**
253:4,6,25 294:6
  295:23 299:8,9,10
  301:2 302:7
**site's**

95:22
**six**
27:25 99:18 219:12
**sixth**
71:5
**size**
39:13 301:8
**skaplan@fenwick.co...**
3:23
**skills**
274:19
**skim**
121:19
**skimming**
121:8,9
**skip**
159:9 198:13
**skipping**
149:8 197:21 232:6
**slate**
267:2 268:9
**slipped**
323:6
**small**
110:5 302:2,5
**smartphone**
141:6,10,22 142:10
  264:16
**Snagit**
161:21,22,22 175:14
  176:22
**Snavely**
235:13
**snippets**
230:24
**social**
5:20 75:23 82:13,15
  159:12 180:11 186:4
  186:22 189:20,25
**software**
29:3 35:5 38:5 39:16
  56:6 57:6,12 58:8,16
  58:18,21 59:8,23
  60:17,23 61:15 62:4
  63:9 64:24 78:4
  83:24 84:20 87:14
  88:22 92:13 98:23

Case 1:14-cv-00857-TSC   Document 138-67   Filed 11/09/19   Page 127 of 139
Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

372

108:13 142:9 161:25
187:21,24 200:4
239:24 268:16 269:21
284:1,8,12,17 285:1,5
289:3 290:8 291:5,13
291:18 293:18 295:6
295:21 312:9 315:3,7
315:18,25 316:8,14
316:20
**software-hardware**
38:22
**software-only**
59:1
**sold**
41:7 53:19 58:24 67:9
68:7 70:14 76:14
77:1 291:25
**solely**
30:24 234:2
**solution**
49:19,22 184:12
**solutions**
185:25 186:23 187:1
**solve**
50:11 263:20,21
**somebody**
90:5 96:7 261:24 262:1
**someone's**
114:9
**something's**
69:4
**Soon**
326:2
**sorry**
15:8 18:19 26:14 39:1
43:15 48:16 59:12
76:17 78:7 103:22
107:14,17 115:10
119:24 132:15 187:14
194:3 220:11 222:11
222:12 225:15,22
228:14 243:9 251:14
256:13 296:8 300:20
307:1 318:15 323:1
**sort**
23:24 50:11 73:25
138:24

**sorting**
50:8
**sought**
56:22 57:3
**sound**
24:1
**sounds**
27:23 132:16 257:21
258:16
**source**
30:24 31:17 96:9,10,12
136:22 213:5,10
271:8 287:5
**sources**
213:13
**so-and-so**
45:14
**space**
26:11 28:8
**Spacel**
26:5,11
**spans**
191:18 247:9 264:8
307:12
**speak**
14:1,24 15:2 200:8
272:6
**speaking**
300:15
**speaks**
63:22 64:17,25 66:4
226:23
**special**
112:4,9 156:22 157:11
157:15,18,25 279:20
**specialized**
56:6 109:17 169:21
170:2,7 181:23
**specialty**
202:21
**specific**
91:14 209:11 277:6
**specifically**
60:17 302:1 321:11
**specifications**
280:17
**specifics**

108:19
**specified**
81:8 158:11
**specify**
280:10
**spectrum**
32:13 285:12
**speculation**
102:11 103:14 106:15
131:19 139:11 188:19
213:8,17 245:6
283:17 325:1
**speech**
41:11 194:19 196:10
198:1 200:10 204:2
264:18,20 270:3,7
272:3,6 292:21,24
293:4,20
**speed**
98:12
**spell**
26:9 73:10
**spelling**
18:21
**spend**
264:3
**spent**
20:20
**spoken**
13:20 239:25 293:4
**spot**
115:2 290:17,18,20,24
**spotted**
290:25
**spotting**
121:8
**spot-checking**
51:14,25
**spreadsheet**
4:14,19 5:8 293:11
**Squared**
271:4
**squat**
37:15
**staff**
213:3 224:8 234:8,10
**stage**

47:21
**stakeholders**
131:23 169:5
**stamina**
154:2
**stand**
217:21
**standard**
48:1 56:3 80:2 85:20
85:22 150:16,23
151:12 153:6 155:14
160:5 175:7 188:13
205:1,2,2,5 206:3
207:8 249:22 261:7
266:7 272:22,25
273:4,12 274:23
280:10 284:19,22
**standards**
46:14 158:7 252:20,24
253:3,10,19,25
259:25 260:4 261:1,2
264:24 265:6,12,18
265:24 266:21 267:9
268:3 283:9,21
284:15,23 296:19
297:21,24 298:4,12
298:20 299:5 300:24
301:13,16 302:18,20
303:11 305:23 306:6
306:10 307:17 308:3
308:13,22 309:8,12
309:16,22 310:10,14
310:19 311:8 312:7
312:15 313:1 315:1,8
315:19 316:9 317:5
317:10,16 318:6,23
319:11,15 320:16,18
320:23 321:8,12
322:9 324:7,14 325:5
325:13 326:22 327:14
327:21 328:4,11
**stands**
116:7,21 247:14
**stand-alone**
82:16 291:25 292:10
**Stanford**
18:1 24:12

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

373

| | | | |
|---|---|---|---|
| **start** 17:23 20:15 25:13,14 28:15 174:2 | 202:18 203:7,9 292:19 **Steve** 3:25 8:12 | **stuck** 321:18 **student** 26:1 27:11 93:7 104:18 | **subscription** 94:25 95:3,18,20,24 162:12 |
| **started** 10:2 28:16,18 29:6 54:10 74:19 76:1 99:14 148:3 295:14 | **stipulate** 144:1 175:10 176:3,14 **stipulated** 176:7 | 104:20,24,25 105:3,7 105:8,9 126:24 137:20 162:12 | **subset** 281:15,18 286:21 **subsidiary** 76:20 |
| **starting** 24:11 28:25 33:1 80:21 233:12 240:21 244:7 260:20 | **stipulation** 161:8 176:9 **stock** 40:17,25 | **students** 99:6 104:22 132:22,24 135:19 156:18,22 157:17,23,25 160:22 213:2 218:15 222:23 | **substance** 227:21 **substituting** 56:14 |
| **starts** 189:5 202:3 244:2 272:14 | **stop** 223:10 235:1,1 293:4 **stopped** 79:19 318:20 | 223:23 224:9 233:25 234:2,9 260:6,23 301:24 | **sue** 190:3 **suggestion** 79:20 |
| **state** 2:8 8:17 9:9 123:19 190:8 220:15 240:16 329:3 | **storage** 166:3 246:3 **Store** 94:8 | **student's** 157:15 **studied** 212:21 | **Suite** 3:5 **sum** 15:18 |
| **stated** 232:3 | **stored** 133:13 | **studies** 16:22,25 17:23 | **summarize** 121:16 153:10 154:6 154:18 |
| **statement** 60:5 85:3 153:10 154:5 154:17 164:9 220:1,6 226:20 227:24 234:13 256:22 257:21 258:16 302:8 315:13 | **straight** 124:14 125:5 **straightening** 202:20 **strategy** 47:18 190:13 | **study** 185:18 256:23 **stuff** 126:11 **stunned** 73:17 **stylized** 321:7 | **summarized** 248:13 **summarizing** 171:25 248:11 296:20 296:22 **summary** 6:6,14 182:6 211:23 212:6,13 220:9 |
| **statements** 176:10 | **stream** 292:25 | **stylus** 267:3 268:10 | 228:21 237:7 240:16 |
| **states** 1:1 5:3 110:9,20 158:14 163:23 170:25 233:7 302:17 | **Street** 2:5 3:5,13,20 8:14 **stretch** 91:2 | **subject** 63:16 70:19 151:5 167:10,19 175:12 176:1 | **summer** 24:10,10,13,13,15,17 27:3,11 **summers** 25:4,6,7 |
| **stating** 155:1 298:16 | **strict** 181:6 | **subjected** 312:25 | **SuperNova** 270:24 |
| **statistics** 204:22 | **Strider** 62:22 63:3,9,15 64:2 65:24 70:15,17 | **submit** 211:4,19,21 212:12 | **supervisor** 81:25 |
| **status** 53:8 | **structural** 277:1 | **submitted** 214:22 215:5 242:12 | **supplement** 215:13 251:22 |
| **statute** 109:23 128:8 | **structure** 119:24 120:11 121:18 133:9 207:11 293:5,6 | **subpoena** 4:10 12:17 14:9 256:5 | **supplemental** 6:9 214:1 224:17 325:19 326:10 |
| **statutory** 81:23 109:20 | **structured** 75:4 102:13 120:6,10 | **subscribe** 111:18 | **supplied** 112:17 163:9 |
| **stays** 31:5 160:3 | **structures** 75:14 | **subscriber** 95:18 | |
| **step** 117:16,18 273:24 | | | |
| **steps** | | | |

supplying
112:22
support
6:5,11 54:2 147:6
   164:19 169:4 212:13
   247:25
supported
168:14
supporting
109:25
supposed
114:8
sure
25:24 31:10,19 42:12
   67:15,17 77:4 79:6
   104:1,16 107:19
   114:20 124:5 142:5
   147:8 220:17 223:20
   242:24 247:13 257:24
   274:2 290:25 294:15
   294:25 309:24 323:9
surprising
165:14
surviving
41:14
sustained
237:5
swear
9:2 114:12
swims
44:22
switching
237:16
sworn
2:11 9:5 329:5
symbols
37:11
synthesized
200:8 292:21,24
   293:20
synthesizer
56:7 188:10
synthetic
194:18 196:9 202:8
system
22:23,24 25:13 26:6
   31:18 59:2 136:6,18

183:18 188:21 205:14
230:22 234:1,9,15
236:2,5 246:4 268:15
271:2 276:4 278:18
systems
4:17 22:21,21 33:2,5
   33:10,18 34:4,19
   37:25 38:9 40:2,3
   42:17 43:4,25 53:10
   200:20 224:8 264:25
   275:16,24
S-E-N-D-E-R-O
73:11
S-T-R-I-D-E-R
62:22

**T**
table
120:8,15
tablet
141:18 142:9
tactile
147:11,12,15,18
   197:25 207:12 269:16
   270:13,14,15
tagged
116:22
tail
44:15,16,17,20
tails
44:14,25
take
10:22 42:14 43:19 47:7
   64:9 69:18 90:25
   113:20 117:9 139:17
   142:25 143:13 171:19
   207:20 208:8 242:9
   248:17 282:8 314:2
   327:4
takedown
308:7 318:17 324:7
taken
20:25 43:13 91:6
   135:22 143:5 185:5
   208:11 248:24 282:23
   327:8
taker
140:16,18 142:12

268:8
takes
106:3 269:15
talk
24:6 32:25 50:10
   103:24 104:2 142:22
   167:1 216:22 217:7
   218:20 251:12 326:11
talked
77:16 166:2 189:2
   190:4 258:5
talking
15:22 54:7 62:24 94:1
   117:25 129:5 138:6
   141:25 142:4,5,12,13
   160:17 168:16 190:6
   195:19 198:16 202:24
   284:22 306:24 314:5
talks
202:18,19 305:8
tall
37:15
tan
245:18,18
tape
8:4 90:19,23 91:5,7
   185:2,8 249:3
target
82:13,15
targeted
49:9
task
23:22 119:12 120:19
   277:25 278:2
tasks
118:7,11 119:20,25
   121:10,15 192:2,8
   193:20 194:1,11
   274:16,20 275:18
   276:22
taught
29:15
teacher
119:5 135:18 136:12
teachers
93:6
team

80:14 217:24
team's
80:16
tech
35:9,11
technical
35:4 50:11 81:18
   132:15 155:15 245:9
technically
55:23
technique
24:2 199:1
techniques
197:24 198:6,10
technological
283:23
technologies
62:11 67:9 168:25
   200:11 239:24 259:7
   275:6
technology
4:21 5:20,23 16:14
   17:6 28:19,20 29:8
   35:8,12 36:15 43:5
   44:1 47:19 49:1,5,18
   49:24,25 50:6,7 51:9
   51:20 52:5,14 54:11
   54:17 58:17 59:3
   61:9,16,23 62:2,5,14
   70:11,18 72:4 74:22
   75:10,23 76:16 82:24
   83:14,21,25 84:2
   87:24 88:3,6 98:20,24
   123:19 139:14,17,25
   140:1 141:13 142:13
   144:2 145:12 147:6
   185:25 186:23 187:1
   190:21 191:11 196:15
   197:12 198:3 199:9
   199:23 203:7,10
   206:6,17,24 207:6
   264:9 265:19,25
   266:15 267:2 269:7
   269:10,12,20 270:19
   271:10,22 272:5
   273:15,19,21 274:12
   274:19 275:2,4,13

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

375

276:8 279:20 283:25
287:10,20 288:20
289:13,16
**telemetry**
22:21
**Telephone**
3:7,15,22
**television**
265:19 269:7 276:8
**tell**
75:6 101:23 136:25
144:10 215:8 224:19
237:17 293:9 301:15
302:19,25
**telling**
266:15
**ten**
241:23 277:18
**tend**
163:14
**tends**
114:14 137:16
**tens**
302:22
**term**
36:18 50:3 70:10 73:24
79:19 92:10 109:22
117:22 118:6,21
119:1 132:16 177:1,2
232:18,25 233:1
269:8 273:17 283:11
284:21 285:19 286:4
**terms**
29:23 50:9 73:12 172:1
174:11,18,25 175:5
232:17 268:13 277:6
285:15 286:10,12
326:20
**territory**
196:5
**test**
46:16 280:24 298:25
**tested**
20:19 83:15 274:17
**testified**
9:6 12:6 138:13 250:17
257:2

**testify**
4:10 11:11 14:3,13,21
14:23 15:3,19 211:15
211:17
**testifying**
12:22,25 14:7 249:11
**testimony**
10:5 16:1 59:4,11
74:10 86:18 93:23
95:15 104:9 106:16
108:1 113:2 117:14
121:23 129:19 165:10
166:10 173:15 236:9
256:24 261:12 277:4
281:6 283:4 329:6
**testing**
83:18,19 252:21
280:18 281:4 301:24
305:24
**tests**
19:14,18 114:8 260:5,8
322:13
**text**
30:14 31:14,19,25
106:2 107:8,13,22
116:7 123:14,15
124:3,14 125:5
137:15 151:2,4 153:8
157:3 170:8 172:15
192:13,25 193:2,6,10
193:13,16,22,24
194:7,12,17,22 195:5
195:9 197:2 200:9,9
202:13 204:1,6,9,12
207:11 223:22 231:4
233:15 238:24 239:25
240:1 245:17 262:6
263:13 264:18,20
266:6,9,11,18 267:13
267:14,17,17,20,20
267:23,24 269:15
270:2,7,9 272:3,6,6
273:12 284:19 285:19
285:22 286:4,16,16
286:21,22,25 287:1,2
287:2,4,4,7,9,15,17
288:5,11,14,19,19,25

289:5,11 291:10
297:6,15 311:7
312:18,18 315:3,8,19
316:9 317:9,15
319:10 322:2,15
**textbook**
132:23 137:18
**textbooks**
105:14 216:23 219:2
**texts**
30:20 207:25 233:22
**textual**
112:13,24 113:14
119:15 139:6 245:4
289:4 292:20 293:20
305:14,16,20 317:3
**text-to-speech**
142:20
**thank**
18:23 21:9,14 32:6
52:25 69:15 75:19
77:24 79:4 91:19
98:15 105:20 149:21
161:23 174:22 183:10
183:10 191:8 201:25
207:23 211:5 238:10
238:12 243:1,9
257:25 264:4 320:10
323:15 328:14,16
**theme**
268:21
**theorem**
147:16
**theory**
254:24
**thereof**
2:4
**They'd**
273:15
**thing**
92:24 126:13 130:25
138:3 151:9 164:14
211:2 255:12 297:8
297:10 321:18
**things**
13:12 23:17 28:3 30:5
45:1 47:1 48:7 82:25

92:22 123:16 137:24
162:20 166:12,15
167:3,4 169:2 172:10
184:10 216:6 223:12
248:11 274:11 277:18
278:21 293:9,13
**think**
15:13 26:8 67:16,18
69:10 83:23,25 117:7
118:6 122:22 124:21
124:23 127:18 132:11
138:3 142:24 161:5
162:8 165:20,20
166:25 170:20 184:21
195:19 196:4 211:3
216:20,24 221:17,17
223:4 234:7,14 238:6
240:15 242:11 247:3
248:17 255:3 256:4
257:2 259:21 263:11
271:6 280:16 289:8
292:23 293:21 294:10
296:3 300:1,15
303:22 304:16,18
321:12
**thinking**
195:22
**third**
72:18 94:24 95:2 111:3
111:5 146:4 161:3
189:4 244:2 264:7
274:24 297:10 307:9
**third-party**
295:23
**thought**
61:5 78:8,8 218:10
222:11 234:9 289:25
299:17
**thousand**
23:16 292:16,16
302:23
**thousands**
285:8 302:22 303:1
**three**
39:13 75:16 127:19
128:21,25 129:17
183:8 186:21 188:12

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

197:23 198:5,9,10
217:1,19 218:5
232:11
**thumbing**
305:19
**TIFF**
116:16,21,23 122:4,14
122:18,23 123:7
**till**
254:22
**time**
8:11 12:3 20:20 23:14
24:21 33:22 35:5,21
36:4 38:21 39:8
40:18 42:1 43:4,16
45:23 46:7 53:22
54:1,8 59:6 67:19
68:22 69:1 73:4 74:7
75:13 76:7 81:5 89:9
90:25 91:15 103:19
112:16 125:11 130:19
135:2 139:18 183:21
185:3 187:20 215:10
215:21 216:16,24
217:1 223:19 240:3
240:17 248:17 252:11
254:9,15 264:2,3
282:11 286:24 295:12
308:22 309:18 314:2
317:11 318:24 319:17
322:7 328:18
**times**
37:17 204:16 233:1
300:9
**title**
5:6 20:10 22:13 24:16
24:18 27:10 43:2
81:6 114:11 148:1
181:15 191:2,5 247:3
302:11 309:6 317:4
**titled**
191:12 192:20 208:18
**titles**
68:21 78:19 81:11
162:9
**today**
8:12,25 11:12 12:19,22

12:25 14:8,13,21,23
15:3 29:1 33:6,8,12
54:25 71:18 76:8
82:24 83:7 89:17
113:7 165:14 184:12
192:1 193:15 197:3
197:15 199:1,11,20
199:23 200:12 205:5
217:9 218:5 219:15
224:19 226:1 249:12
263:12 279:7 304:11
**Today's**
8:10
**told**
14:7 24:19 29:13 34:23
35:16 36:12 48:11,18
50:6 210:25 307:15
317:8
**tongue**
304:19
**tool**
219:23 278:9,12,24
279:21,25 315:3,7,19
316:8,20
**tools**
78:4 199:4 278:17
279:3,16 280:2
283:20,24 284:4,6
293:25 294:16 295:4
295:17 296:11
**top**
22:25 23:23 61:9 68:20
139:25 150:13 156:11
181:1 189:17 201:9
203:13 230:17 233:13
238:16 244:1 247:19
249:17 250:8 268:16
269:22 286:3 289:9
289:19 307:12 309:4
321:13 323:17
**topic**
250:23
**topics**
51:24 302:4
**total**
15:16,18 86:23
**totally**

257:13,19 258:3 261:9
261:22 275:12
**touches**
101:14
**trace**
136:21,25
**track**
28:7 47:2 86:1
**tracks**
137:23
**trade**
75:9 131:9 132:5,10,14
**trademark**
52:13 56:19 58:4 59:15
63:4 64:18 84:12
87:9 88:16 89:23
90:5,12 91:23 92:3
**trademarks**
4:15,20,23 5:9 41:6
42:14,15,16,18 52:4
52:10 62:12 98:20
246:9
**tradition**
131:10
**traditional**
149:6 197:1,7,8
**trained**
36:21
**training**
19:7,8,11,14 181:24
**transactions**
76:7
**transcribed**
329:7
**transcript**
77:9,12 91:13,14
144:18 310:7 329:16
**transcription**
200:4 329:8
**transcripts**
320:12
**transfer**
140:16 141:2
**transferred**
67:3 79:15
**transformation**
199:10

**transformations**
198:14,15,17
**transition**
58:14
**translating**
30:4
**transmitted**
245:24
**traumatic**
53:17
**Treasury**
47:2
**treating**
138:24
**tremendous**
190:1
**trial**
12:6 208:19 211:17
212:8 236:16
**triangle**
147:17
**tried**
20:15 28:18 137:22
**tries**
159:12
**trigger**
280:21
**truck**
304:15,18
**true**
32:4 51:3 62:16 69:7
97:24 197:3 201:17
211:9 220:1,19
258:20 296:19 299:20
317:7,7 329:9
**TrueScan**
38:9,11,16,21 39:4,14
56:4 58:15 188:22
**trust**
233:9
**trustworthy**
235:15
**truthfully**
11:12
**try**
10:15 15:7 119:7
129:21 147:4 220:12

**trying**
20:20 28:14 29:19
  115:2 156:2,2 160:12
  195:17
**TTS**
200:10 264:19
**Tuesday**
1:16 2:2
**tune**
204:22
**turn**
25:15 32:24 43:1 54:7
  56:3 59:2 71:2,4
  108:19 144:24 146:3
  147:25 148:24 150:9
  153:2,23,25 154:10
  155:7 156:10 160:15
  162:23 163:16 169:8
  172:13 173:18 175:4
  180:25 182:24 188:1
  188:24 196:13 201:3
  201:7,21 202:15
  203:12 204:24 219:8
  221:25 224:16 226:7
  229:6,20 230:16
  234:18 238:14 240:19
  249:14 257:4 262:19
  263:16,18 272:12
  304:20 317:2 323:4
**turned**
30:13 188:13 204:15
  317:21
**turning**
30:9 74:13 86:15
  196:24 239:8 263:13
  269:17 306:17 309:4
**twice**
214:22
**two**
11:18 15:14,16 25:4
  43:20,20 47:15 58:22
  59:5 61:14 94:1
  104:15 115:18 123:18
  123:18 124:9 128:24
  145:16 159:9 194:11
  194:12,21 195:2
  197:21 198:13 203:2

203:4 208:5 217:13
218:1 223:11 253:4
284:15 285:15 286:10
286:11 289:9 293:21
302:6 309:1 322:2
326:3,5,7
**txt**
317:9 319:10,15 320:1
  320:17,22,24 322:6
**type**
20:4 22:1 23:5 33:17
  37:17,20,22 44:3 53:6
  75:20 86:16,19,22
  115:20 116:11 124:2
  179:5
**typed**
30:11
**types**
53:9,12 152:12 203:14
  268:7 319:25
**typical**
34:16 203:14 271:18
  271:21 320:25 321:10
  321:16
**typically**
86:8 137:10 207:9
**typing**
287:6 288:9
**typo**
159:3
**typography**
37:5
**T.J**
23:2

_____
          **U**
**ultimately**
71:10 81:20
**unable**
150:15,22 151:11
  159:14 261:5
**unauthorized**
132:24 136:20 221:12
  224:2 226:14 227:25
  326:23
**unavailability**
259:24 261:1
**unbinding**

329:15
**Unbound**
58:25 59:8 60:16
**uncomfortable**
57:21
**uncorrected**
320:25
**undergo**
117:1 122:5
**undergone**
122:19
**undergraduate**
16:22,25 25:25
**underlines**
124:17,22
**understand**
10:5,8,14 29:17 30:16
  37:3 50:22 59:4 70:3
  75:9,12 97:10 137:17
  211:2 234:16 252:24
  281:1
**understanding**
12:2 32:12 40:5 41:13
  42:8 72:14 76:3 77:7
  90:9 103:12 108:8
  109:24 128:2,19
  129:2,11 171:11
  178:19 206:1 211:12
  212:6 213:18 228:19
  230:10 231:6,22
  233:3,8 234:4 235:20
  236:1,19 240:16
  245:12 268:13,18,25
  269:11,14 309:19
  320:20
**understood**
259:12 282:5
**undertaken**
241:3
**unfair**
100:16 106:3
**unhappy**
39:25
**unincorporated**
82:18
**Unintelligible**
117:3 125:21

**unit**
58:24 217:16 219:1
**United**
1:1 5:3 110:9,20
  158:13 163:23 170:25
  302:17
**universities**
99:6 102:24 104:19,19
  105:17 213:20 230:6
  231:2,17,18
**university**
99:2,13 100:14 102:8
  102:16,17,19,23
  103:5,16,21 104:5,13
  105:9,11,12 106:7,18
  222:25 224:7 240:4
**unprotected**
245:11
**unsealing**
329:15
**unsuccessful**
20:21
**update**
46:15 216:4,18 217:5,7
  225:17
**upgrading**
27:15
**upheld**
228:23
**uploaded**
126:6 137:18 319:23
  320:15
**uploading**
107:8
**upside**
114:21
**upside-down**
115:5
**usable**
277:20 278:4
**use**
30:16 36:17 43:6 46:20
  50:10 70:11 89:12
  97:16 98:3 108:17
  118:8 120:24 121:17
  125:3 139:13 141:10
  161:18,19 163:1,14

Case 1:14-cv-00857-TSC   Document 138-67   Filed 11/09/19   Page 133 of 139
Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

378

169:22 170:10,23
173:6 177:18 191:22
191:24 193:16 199:1
199:4,10,20,23
200:12,21 205:5,13
206:3,6,24 207:5
210:8 219:14 232:9
232:23 239:16 245:8
250:7 259:6 263:18
266:15,18 268:5
269:9 270:5 271:19
271:21 273:6,17,21
274:9,12 275:5,17,20
275:22,24 276:8
277:1 283:11,13,20
284:12,21 285:4,14
285:19 286:3 287:10
288:5,8 289:20,23
291:5,17 292:7
293:12 294:3 303:22
308:20 315:7,18,25
316:8,19 318:21
319:3

**useful**
276:4

**useless**
246:20,22

**user**
60:22 61:6 95:3,11,13
96:1 134:2,7,11
136:11,22 140:5,8,11
140:21 141:5,10,17
141:24 148:9,13
163:13 174:2,17
224:11 236:5 239:21
274:18,21 293:3
324:22 325:11 327:20
328:3,10

**users**
62:25 88:7 110:6 114:1
135:3 225:15 230:23
232:16 270:5 275:4
292:6

**uses**
221:11 270:8,15

**usually**
35:8 118:7 142:8 172:3

277:23 283:24

**utilize**
129:21

**utilizes**
264:20

**utmost**
181:5

**U.S**
8:8 47:2 56:18 57:7,13
58:3,9 59:15,24 62:6
63:4,10,16 64:18,25
84:12,21 87:9,15
88:16,23 89:23 90:5
90:12 91:23 92:14
109:8 112:10 127:23
145:19 158:8 160:22
163:25

---

**V**

**vague**
24:22 29:14 30:22
31:16 32:2,9,20 33:25
35:19 38:24 39:5
40:23 48:15,22 51:10
51:21 52:7,15 55:10
55:18 58:5 59:17
60:24 61:19,24 62:8
62:17 63:6,12,18
64:21 65:3,16,21 66:1
66:6,11,16,23 67:5,13
67:23 68:4 70:16,24
71:13 72:12,20,24
73:5,22 75:21 76:5
79:24 80:11 81:4
82:2,7,20 84:14,22
86:18 87:1,5,11,17
88:12,18,25 89:13,19
89:24 90:7,14 92:15
93:3,15,21 94:15,20
95:6,15 96:3,8,20,25
97:6,12,19 98:1 99:4
100:6,20 101:25
102:10 103:7,14
104:9 106:9,15 107:5
107:10 108:1,25
110:3,13,19 111:8,14
111:23 112:6,14
113:2,10,17 114:6,23

115:16,23 116:13
117:2 118:4,23
120:21 122:8,21
123:5,22 124:1
125:13,20 126:8
127:5,15,24 128:4
129:18 130:2,10,16
130:21 131:18 132:19
133:6,14,20 134:5,13
134:21 135:10 136:2
136:8,19 137:5
139:11,22 140:6,14
140:24 141:8,15,20
142:2,17 146:18
150:2 152:6,15
153:13 154:7,20
155:24 156:24 157:5
160:7 162:6,18 163:6
164:10 165:5 166:10
167:24 170:18 171:5
172:25 173:22 174:20
177:7 178:6,16,24
179:7 181:11 182:4
182:12,20 184:2,15
185:17 187:19 188:18
190:10 194:25 195:11
196:3 197:4,17 198:8
199:18 200:15 201:2
201:18 202:10 203:8
203:17 204:3,10
205:9,18,24 206:8,19
207:1,7 208:3,22
209:17 210:5,15
211:25 212:18,25
213:8,17 215:15
218:24 219:16,21
220:23 223:3,17
224:4,12 225:13
226:4,23 227:6 228:5
228:11 230:12 231:8
231:23 232:2 233:5
234:6 235:23 236:8
239:12 240:13 241:9
241:16 242:8 244:19
245:7 248:7 250:12
250:19,25 252:13
253:12,22 254:8,14

254:20 255:20,25
258:4 260:13 261:11
262:7 263:2 265:1,8
265:14,20 266:1,23
267:4,11,22 268:4
270:4 271:13,23
272:9 273:9,23 275:8
276:2,13,20 277:4,16
278:7,15 279:1,8,18
280:7 281:6,13
283:22 284:14 285:6
286:17 287:13,21
288:7,22 289:6,22
290:9,21 291:6,20
292:11,22 294:4
295:1,10 296:2,7,12
296:23 297:4,17,25
298:6,13,22 299:7,24
300:7 301:18 302:24
303:14 308:4,15,24
310:12,25 311:10,15
311:20 312:2,20
313:5,11,17,23
314:12 315:11,21
316:3,11,22 317:18
318:1,10,25 319:5
320:3,19 321:2,23
322:10,20 323:21
324:3,10,16,25 325:8
325:14 326:25 327:16
327:23 328:6,12

**vaguely**
69:12

**validation**
126:2,11,16

**Valley**
145:11

**value**
169:3

**vanilla**
76:18

**variation**
24:17

**variations**
268:21

**varied**
40:16,17 193:7

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

379

**varies**
124:2 125:4
**variety**
258:6 283:23 312:23
**various**
165:12
**vendors**
36:17
**venture**
186:11
**VERA**
57:17 58:2,8 66:9 68:3
68:6
**verify**
247:4
**version**
6:15 7:3 38:16 59:1
127:7 172:20 237:22
248:4 259:25 273:12
284:19,25 291:12
297:3,5,9,11,15,20
307:16 308:1,2,13,21
309:7,16 310:14
311:9 317:5,9,14,16
318:6,22 319:16
**versions**
105:13 296:18
**versus**
6:18 7:6 8:7 208:18
229:9 237:24
**vice**
20:11 34:11,11,14 35:3
35:17,25 36:11 47:11
47:24 48:13
**video**
8:4,11,13 207:11
265:13 268:22 269:1
**videographer**
3:25 8:3,12,25 20:23
21:1 43:11,14,18,22
64:4,14 91:4,7 143:3
143:9 144:6 175:21
175:24 185:1,8 208:9
208:14 248:22 249:2
282:17,21,24 327:6,9
328:21
**VIDEOTAPED**

**1:13 2:1**
**view**
2:5 8:15 123:6 230:24
260:9 269:4 320:23
**Viking**
26:7
**violating**
7:11 242:4
**violations**
108:17
**Virginia**
3:14
**vision**
53:13 61:8 86:25
123:17 149:18,23
150:6,15 152:13
153:6,15,18 197:2
261:24 266:17 274:8
275:21
**vision-impaired**
274:10
**visit**
161:11
**VisuAide**
74:11
**visual**
23:24 78:5 123:16
153:25 200:24 269:24
281:25
**visually**
5:24 123:7,10 190:21
191:10 196:15 198:3
198:25 258:15,21,24
260:11 270:16 289:3
290:11 293:19 298:20
299:6 303:12 306:11
325:12
**vis-a-vis**
128:19
**Vitae**
4:12
**voice**
56:7 188:10 202:8
264:17
**voices**
200:8
**voice-identify**

**8:16**
**void**
329:17
**voluntarily**
105:10
**voluntary**
112:18,23 114:15
308:7 324:7
**Volunteer**
113:4
**volunteers**
113:16
**vs**
1:7
**V-E-R-A**
57:17
**V-I-S-U-A-I-D-E**
74:11

─────────────────
**W**
**wafer**
24:3
**wafers**
23:23
**wait**
107:14 194:2 233:17
233:17
**waived**
255:8 329:21
**want**
37:11 42:1,4,7 45:17
49:14 64:9 93:20,22
100:9 103:24 108:3
118:20,21 121:1,13
138:14 144:25 151:3
166:25 176:9 179:14
201:3 215:21 217:7
220:10,12 243:10
247:4,12,25 257:23
258:17 260:24 262:21
269:13 282:8 293:4
294:15,24 295:12
301:3 302:21 303:19
305:16
**wanted**
31:9 39:25 148:16
215:17 243:3 286:9
**wants**

**153:16**
**Washington**
3:6
**wasn't**
24:24 186:9,10 243:12
243:13 261:17 299:10
**waste**
125:25
**Watson**
23:3,8,9 24:20
**way**
36:22 37:17 75:12
86:11 105:16 107:24
117:5 119:19 136:14
150:4 154:25 156:6
157:2 165:22 166:12
166:16,22 167:15
169:4 170:16 196:7
219:19 256:5 261:15
264:21 274:5 281:18
287:14 288:4,10,24
295:9 298:5 315:17
329:13
**Wayback**
308:11,18 319:3
**ways**
36:18 105:2,4 127:19
141:10,21 142:22
146:9,16,20 147:22
165:1 167:16 208:5
232:11 287:23 288:8
**wealthy**
110:9,21 161:2
**web**
83:23 84:2 87:21,25
88:1,7,15,23 89:10
94:13,21,22 95:4,13
95:18,19,19,22 96:1
119:6 125:18 126:7
128:23 130:7 135:9
137:18 139:20,23
140:1,2,2 141:1
143:16,17,18,19
144:22 146:17 161:11
171:4,14,18,19
173:13 174:11,18
175:6,15,15,16 176:4

Case 1:14-cv-00857-TSC   Document 138-67   Filed 11/09/19   Page 135 of 139
Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

380

176:4,23 178:13
179:1,5 222:20 223:2
223:11,16,19 224:1
228:4 250:3 252:12
252:19 253:4,6,7,8,10
253:14,19,20,21,25
273:1 280:9 283:25
288:13,14,16 293:10
294:5,5,6 295:23,24
295:25 297:23 299:9
299:10 301:2 302:7
307:18 308:1,12,23
309:17 317:11,14
318:7,24 319:17,24
319:24 320:1,16,17
322:8 323:20,24
324:9,14,23 325:5,13
325:24 326:16,19,19
326:20,23 327:13,14
327:21 328:4,11
**website**
5:13
**web-based**
107:4
**Welcome**
162:25
**went**
22:24 43:25 102:7
**weren't**
106:1 125:24 172:10
278:21
**West**
2:4 3:18 8:14,23 13:24
14:25
**Westlaw**
6:15 229:12 237:16
**Westlaw's**
229:15
**we'll**
10:11 30:16 43:19
135:2
**we're**
15:22 21:6 41:20,23,24
79:1 90:17,19 94:1
114:13 115:2 155:25
156:2,2 157:25,25
158:1 161:13 166:16

167:25 171:23 179:18
192:19 217:15,17
218:14 237:16 242:16
247:23 248:15 249:4
259:3 314:22
**we've**
34:10 75:14 101:12
126:12 142:3,22
161:4 165:23 166:13
167:4 186:20 196:5
199:8 268:13 282:7
**whale**
44:14,15,16,17,20
**whereof**
329:18
**white**
123:15,15
**wholly**
76:20
**wide**
37:15 86:10 199:1
**widely**
185:25 199:6 206:2
**wider**
76:19
**Wilkins**
1:25 2:6 9:1 241:5,7
329:2,24
**Willie**
279:22
**Windows**
58:21 59:3
**Windows-based**
284:9 294:2
**Window-Eyes**
270:22 284:6 291:5,7
291:13,17,25 292:10
292:19 293:18 294:2
295:22 315:3,7,18,25
**wires**
28:1,6
**wish**
95:8 302:14
**wishes**
95:11 163:7
**withdraw**
75:6

**witness**
2:10,12 7:22 9:3,23
13:5,7,20 15:7,10
16:4,12 21:14 24:23
26:15 29:15 30:23
31:17 32:3,11,22
33:15 34:1 36:17
38:4,11,14 39:1,7
40:15,24 42:9 43:16
43:21 44:17 48:16,23
49:8 50:2 51:4,12,23
52:9,17 54:6,19 55:11
55:19 57:19 58:6,14
59:12,18 60:1,15,25
61:5,20 62:1,9,19,24
63:7,13,19,24 64:22
65:4,17,22 66:2,7,12
66:17,24 67:6,15,25
68:6 69:9,15 70:10,17
70:25 71:14,23 72:4
72:14,21 73:1,7,23
74:11,18 75:22 76:6
77:16,25 78:12 79:8
79:25 80:12 81:5
82:3,8,22 84:6,15,24
85:8 86:19 87:2,6,12
87:18,24 88:13,20
89:2,8,14,20 90:1,9
90:16 92:17 93:4,16
93:22 94:16,21 95:8
95:17 96:5,9,21 97:2
97:8,13,20 98:2 99:5
99:17,23 100:7,21
101:2,12 102:1,12
103:8,15 104:10
106:11,16,25 107:6
107:12 108:2,13
109:1 110:5,15,20
111:9,15,24 112:8,16
113:4,11,19 114:7,24
115:10,17,24 116:15
117:15 118:5,25
121:25 122:9,22
123:6,23 124:2
125:14,23 126:10
127:6,16,25 128:5
129:20 130:3,11,17

130:22 131:7,20
132:20 133:7,16,22
134:6,14,24 135:13
136:4,9,20 137:6
138:13,14 139:13,23
140:8,15,25 141:9,21
142:3,19 143:2,24
146:19 147:3 151:5
152:8,17 153:14
154:8,22 155:25
157:7 160:8,12 162:7
162:19 163:7 164:11
165:7 166:11 167:25
168:20 170:20 171:7
173:2,16,24 174:23
177:8,15,20 178:7,18
179:1,9,16,20,24
181:12 182:5,13,21
184:3,16 185:18
187:14,20 188:20
190:12 191:5,25
194:3 195:1,13 196:4
196:21 197:6,19
198:9 199:19 200:17
201:3,19 202:12
203:4,9,18 204:5,11
205:10 206:1,10,20
207:3,8 208:5,24
209:5,18 210:7,16,19
210:22 211:1,5 212:1
212:19 213:1,9,18
214:25 215:16,25
216:12 218:25 219:17
219:22 221:1,17,18
221:20 222:4,8 223:4
223:18 224:6,14
225:14,22 226:5,24
227:7 228:6,13,16
230:14 231:9 232:3
233:7,19 234:7 235:3
235:25 236:10 237:18
239:13 240:15 241:11
241:17 242:9,23,25
243:6,9,22 244:20
245:8 248:9 250:13
250:20 251:1,9,11,15
251:21 252:15 253:13

253:23 254:3,9,15,21
255:11,21 256:1
258:5 260:14 261:14
262:9 263:7 265:2,9
265:15,21 266:2,24
267:5,12,23 268:5
270:5 271:14,25
272:10 273:11,24
275:9 276:3,14,21
277:5,17 278:8,16
279:2,9,19 280:8
281:7,14 282:13,16
282:19 283:18,23
284:15 285:7 286:11
286:18 287:14,23
288:8,24 289:8,23
290:11 291:7,21
292:4,13,23 294:5
296:3,8,13,25 297:5
297:18 298:1,8,15,23
299:8 300:1,8 301:5,9
301:20 302:25 303:6
303:8,15,18 304:2,5
305:19,22,25 306:25
307:3,6 308:5,17
309:1 310:13 311:2
311:11,16,21 312:3
312:21 313:6,12,18
313:24 314:13 315:13
315:23 316:5,13,24
317:20 318:2 319:1,6
320:5,20 321:3,25
322:12,21 323:22
324:4,11,17 325:2,9
325:15 327:2,24
328:7,13,16,19
329:18
**witness's**
79:7 128:19
**wondering**
78:10 248:19
**wooden**
57:22
**word**
26:11 30:5,10 31:13,24
116:3 121:8 146:6
204:7,21 266:8

285:21 287:7,18,24
288:5,9,9,13 293:10
294:11 295:25 300:21
321:8,11
**words**
30:3 114:12 119:16,17
123:21 125:2 240:1
272:1 292:24,25
**WordScan**
37:25 38:4,17,21 39:4
39:15 58:16,17
**work**
24:25 25:11,25 35:13
38:21 43:25 69:2
99:8 104:14 126:18
129:12 135:3,13,16
136:13,13,22 137:11
137:25 141:1 147:12
154:2 165:2 167:16
171:18 172:3 183:20
189:24 218:5,7 219:1
231:1,5 241:6,13
248:4 262:17 271:10
272:6 283:14 302:7
311:6
**worked**
23:19 24:24 25:17,19
26:5,24 27:14 28:11
35:6 44:13 53:3
167:8 230:11 231:7
232:1 233:4 234:5
235:22 240:12
**working**
9:25 26:20 28:25 29:13
33:2 37:2 83:17
164:20 183:14 261:20
322:22
**works**
51:15 104:6 105:19
126:21 128:9 136:10
137:14,18 138:4
142:21 148:17 164:7
223:22 226:15 228:1
230:5 231:18 232:8,9
232:18,20 233:9
235:9 238:25 239:22
269:13,20 290:1

**world**
71:23 92:11
**world's**
145:2
**worry**
201:12
**worth**
299:17
**wouldn't**
82:22 92:7 125:23
147:17 217:21
**Wow**
290:1
**wrapped**
57:22
**write**
247:5,8
**Writers**
247:15,17 248:13
**writing**
155:17 266:22
**written**
220:18 243:6 246:4
249:20 255:23
**wrong**
24:5 69:4,10 91:16
193:23 238:5
**wrote**
35:5 45:14 185:14
191:1 196:18 224:20
247:7
**WYNN**
60:7,15,22 61:22 62:1
62:16 65:19
**W3C**
280:9

_____
| X |
_____
**X**
329:22
**X-COM**
245:22 246:19

_____
| Y |
_____
**yeah**
15:10 22:25 41:4 52:6
60:10 61:17 121:21
121:25 124:6,12,15

134:24 138:17 151:3
151:5 153:1 155:2
161:20 162:19 203:1
203:6 204:11 218:8
225:14 227:18 244:9
255:7,9 290:2 294:13
305:10
**year**
22:9,10,10 24:8 79:18
79:20 110:18 165:10
184:8 189:9,24
196:17 279:12 285:2
291:15
**years**
19:25 24:8 69:4 99:18
165:23 173:9 180:6
185:15 197:8 204:20
216:5 217:2,19 218:6
**Yep**
235:2
**York**
208:20

_____
| Z |
_____
**zero**
301:6 322:3
**zeroed**
321:21
**ZoomText**
271:4,5

_____
| $ |
_____
**$1,000**
39:17
**$10**
162:5
**$10,000**
73:17
**$200**
306:15
**$25**
110:8 160:23
**$300**
162:9
**$35**
40:12
**$40**
217:22 218:20 254:24

Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

382

255:11
**$400**
218:21 219:5 306:16
**$5**
55:14
**$5,000**
39:15 54:7
**$50**
41:3 110:18 160:23
**$50,000**
39:13

**#**

**#10068**
1:25

**0**

**08210239**
5:7

**1**

**1**
8:4 51:7 91:5 98:18
144:21 215:9 225:14
226:7,7,21 249:15
250:9
**1E**
91:11
**1:08**
143:10
**1:14-CV-00857-TSC...**
1:7 8:9
**1:43**
175:22,25
**1:53**
185:3
**10**
52:12 155:7 229:11
238:12 242:5 286:3
314:22
**10th**
238:7
**10,000**
114:9
**10:06**
43:12
**10:12**
43:15,22

**10:40**
64:5
**10:43**
64:15
**10:45**
247:9
**100**
306:15,16
**10068**
329:4,25
**11**
156:10 266:5 317:2
319:8,20
**11:17**
91:5
**11:31**
91:9
**118**
214:24 215:2,7
**12**
4:9 160:15 162:15
221:8 225:25 246:13
247:5,9 304:4 317:2
319:20
**12th**
3:20
**12:10**
43:15
**12:34**
143:4
**121**
158:14 163:24 210:9
**13**
162:23 240:20,23
**143**
4:5 5:12
**15**
163:16 168:8 192:12
192:20 196:18 234:18
234:19
**1500**
54:14
**16**
169:8 216:8,12,15,16
**17**
158:13 163:23 171:2
214:13

**1700**
3:5
**179**
5:14
**18**
172:14,15 326:15
**1800**
54:14
**1800s**
197:13
**185**
5:18
**1850**
9:12
**19**
173:18,21
**190**
5:22
**1940**
3:13
**1960**
301:11
**1977**
27:3
**1980**
16:17 17:8 18:3 301:11
**1981**
18:3 20:2 22:11,12
**1982**
33:11 34:11
**1983**
20:2
**1987**
36:1
**1988**
34:12
**1989**
33:11 36:1 39:22 47:9
47:12 49:3 53:4
54:22 186:5
**1994**
40:4
**1995**
47:9 69:23,24 70:22
**1996**
127:22
**1999**

252:19,24 253:3,10,19
253:24 254:3,4
259:25 260:3,25
261:2,6 264:24 265:6
265:12,18,24 266:21
267:9 268:3 283:8,21
284:22 296:19 297:20
297:24 298:4,12,19
299:4 300:24 301:13
301:15 302:18,20
303:11 305:23 306:5
306:10 307:17 308:3
308:13,22 309:7,12
309:15,22 310:10,14
310:19 311:8 312:7
312:14 313:1 315:1,8
315:19 316:9 317:5
317:16 318:6 319:11
319:15 320:15,18,22
322:8 324:7

**2**

**2**
91:8 144:24 160:4
180:25 185:2 222:1,4
222:13 225:14,15
244:1,5,6 245:17
256:18 306:7 326:11
**2:01**
185:10
**2:30**
208:10
**2:38**
208:15
**20**
175:4
**200**
216:17
**2000**
53:4 54:23 55:6,8 65:7
74:15,19 78:15,19,21
79:22 80:22
**20006**
3:6
**2001**
83:19
**2002**
83:10,17 108:22

Case 1:14-cv-00857-TSC   Document 138-67   Filed 11/09/19   Page 138 of 139
Confidential Videotaped Deposition of James R. Fruchterman
Conducted on September 8, 2015

383

217:10
**2004**
47:12
**2007**
185:23 196:22
**2008**
185:23 196:16,22
**2009**
99:20
**2011**
208:20
**2012**
125:8 208:21 214:7,13
217:10 221:8 229:11
**2013**
238:1,9,11 242:5
246:13 247:5,9
**2014**
78:21 79:16,22 125:8
238:7,12
**2015**
1:16 2:3 8:1,10 78:25
79:1 80:21 304:4
**202**
3:7
**208**
6:3,8
**21**
4:12
**212**
312:14 314:19
**221**
7:24
**22314**
3:14
**227**
7:25
**229**
6:15
**23**
216:19 217:8
**233**
70:2,6,22 71:19 72:1,9
72:18 73:3,20 74:8
**237**
7:3
**241**

7:9
**249**
7:13
**25**
219:9,25 220:6,19
304:24 305:5
**2500**
54:14
**26**
13:4 219:25 220:8,19
221:15 227:9 256:6
304:25 305:7
**26(a)(2)(B)**
256:17
**28**
69:23 216:22 217:2
**28th**
69:24 214:7
**29**
221:8

---
**3**
---
**3**
98:18 146:3 182:24
185:9 257:5 262:20
264:6 269:18 306:8
326:11
**3,000**
54:14
**3:34**
248:23
**3:48**
249:5
**30**
77:9 91:13 162:9,10
237:25
**30th**
238:9
**304**
7:20
**34**
7:20 304:3 305:13,20
305:23 321:6,15
**35**
40:21 41:2
**372-9599**
3:7

---
**4**
---
**4**
7:25 42:20 51:7,18
98:22 147:25 214:9
225:25 229:7,21
232:6 246:14 247:6,9
247:19 249:3 264:8
272:12 274:15 276:16
**4,000**
54:14
**4:28**
282:15
**4:29**
282:22
**4:37**
282:25
**40**
39:12 147:5
**41**
4:14
**413-3000**
3:15
**415**
3:22
**445**
6:20 229:10
**4780**
9:18
**48**
4:9 12:10,12,16,18
14:9
**49**
4:12 21:11,12 34:10
52:23 53:2 74:14
78:23 124:5

---
**5**
---
**5**
42:20 120:2,3,3 148:24
217:8 230:16 233:11
247:10,19 283:6
289:19 295:24 296:15
306:18,25 307:10,12
**5,000**
54:10,14
**5,470,233**
5:4 70:1

**5:33**
327:7
**5:39**
327:10
**5:41**
328:23,25
**50**
4:14,19 40:25 41:15,19
42:16,22 43:2 51:2
138:4 201:8
**500**
100:7 216:17
**501(c)(3)**
53:8
**51**
4:19 50:14,18 51:19
52:3
**52**
4:22 68:8,12,20
**53A**
5:3 69:13,18,19 70:7
71:20 72:1 73:4,20
**53B**
5:5 69:14,18 71:3
**54**
5:8 98:8,11,18,22
**55**
5:12 143:6,13,21 144:1
144:21,25 146:3
147:25 148:24 150:9
152:11 153:2,23
154:10 155:7 156:10
160:15 162:23 163:16
168:8 169:8 171:2
172:14 173:21 175:5
176:18,21 177:5
178:3,8,14,22 179:6
194:9,22 325:23
326:8,15
**555**
3:20 192:18 194:22
195:25
**556**
196:13,24
**557**
201:7,8
**558**

```
    201:9,22           64                 81
56                     7:13 248:25 249:8    20:1 24:9,14
 5:14 179:22 180:3,10   251:5 252:7 257:7  825
  181:1 182:25          306:20 309:5 311:7   3:5
560                     314:23 319:20 323:5 83
 202:16,17             66                    20:1
562                     106:21 107:9,12,20,21 86
 203:13                 108:8 187:5          188:1
565                    68                   87
 204:25                 4:22                 7:8 237:25
57                     69                   875-2477
 5:18 185:6,13,16 188:2 5:3,5                3:22
  188:25
58                     ─────── 7 ───────   ─────── 9 ───────
 5:22 190:15,19,25     7                    9
  191:15 192:12 193:25  153:2 214:4 215:9    4:4 52:3,12 154:10
  194:9,22 195:9,25      238:14,16 304:24     222:2,14 309:4
  196:13 201:7 202:16    323:4,16             310:18
  204:25               7.1                  9:21
59                      120:13,14,14,15,16,17 2:4 8:1,11
 6:3 208:12 213:23     700                  9:34
  214:3,17 215:10       191:18               20:24
  217:8 219:10 221:10  703                  9:37
  222:1,12 304:10,22    3:15                 21:2
  306:4                755                  90
                        7:8 237:24           111:16
─────── 6 ───────     77                   90s
6                       25:23                40:10
 150:9 152:11 162:5    78                   902
  219:9 259:23 296:15   25:7                 6:19 229:10
  304:24 306:18,25     79                   94104
  307:10,13             25:8,23              3:21
60                                          95
 6:8 208:13 213:23     ─────── 8 ───────    113:12 121:12 188:25
  214:9,12 224:17      8                      262:10
  226:1,8 227:4 325:19  1:16 2:3 7:24 8:1 51:18 97
  326:8,11              52:3 153:23 285:18    155:1
600                    8th                  98
 114:8                  8:10                 5:8 154:13
61                     8:06                 99
 6:15 229:3,7 230:17    246:14 247:5         317:10 318:23
  234:18 236:13        80
62                      24:9,13,15 214:23
 7:3 237:11,21 238:15   215:6
  240:20,23            80s
63                      29:19
 7:9 241:19,23 242:20  801
  246:16 247:6,10       2:4 8:14
```