## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN EDUCATIONAL RESEARCH
ASSOCIATION, INC., AMERICAN
PSYCHOLOGICAL ASSOCIATION, INC., and
NATIONAL COUNCIL ON MEASUREMENT
IN EDUCATION, INC.,

*Plaintiff-Counterdefendants*,

v.

PUBLIC.RESOURCE.ORG, INC.

*Defendant-Counterclaimant*.

Case No: 1:14-cv-00857-TSC

**BRIEF OF LAW SCHOLARS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT-
COUNTERCLAIMANT PUBLIC.RESOURCE.ORG'S SECOND MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF-
COUNTERDEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT AND
PERMANENT INJUNCTION**

Marcia Hofmann
DC Bar ID # 484136
Zeitgeist Law PC
25 Taylor Street
San Francisco, CA 94102
(415) 830-6664
Marcia@zeitgeist.law

Christopher Bavitz
Mason Kortz
Cyberlaw Clinic, Harvard Law School
Wasserstein Hall, Suit WCC 5018
1585 Massachusetts Avenue
Cambridge, MA 02138
(617) 394-9125
cbavitz@law.harvard.edu
mkortz@law.harvard.edu

## **TABLE OF CONTENTS**

Page

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

INTERESTS OF *AMICI* ...............................................................................................1

SUMMARY OF ARGUMENT ......................................................................................1

ARGUMENT ..................................................................................................................2

    I.   Fair Use Must Be Analyzed in Light of Copyright's Ultimate Goal of Expanding and Spreading Public Knowledge and Ideas. ............................................................... 2

    II.  Providing the Public Access to the Laws Which Govern Them Is at the Heart of Fair Use. ........................................................................................................................ 5

        A.   Public Access to the Content of the Law is a Public Good. ................................... 5

        B.   PRO's Purpose and Effect is to Promote Public Access to the Content of the Law. 5

        C.   Promoting Access to the Law Is Consistent with the Purposes of Copyright in General and Fair Use in Particular. ................................................................. 7

    III.  The Four Fair Use Factors Should Be Interpreted in the Context of Promoting Public Knowledge. ....................................................................................................... 8

        A.   Factor One: Purpose and Character of Use. ......................................................... 9

        B.   Factor Two: Nature of the Copyrighted Work. .................................................... 12

        C.   Factor Three: Amount and Substantiality Used. .................................................. 13

        D.   Factor Four: Effect of Use Upon Market for or Value of Copyrighted Work. ...... 14

            1.   Factor Four Is Concerned with Protecting Incentives to Create Expressive Content, Not Factual Content. ............................................................... 15

            2.   Providing Public Access to the Law Does Not Affect a Properly Cognizable Market. ....................................................................................... 15

CONCLUSION ..............................................................................................................20

APPENDIX ................................................................................................................ A-1

i

# <u>TABLE OF AUTHORITIES</u>

## CASES

*Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994)............................................ 15

*Am. Inst. of Physics v. Schwegman, Lundberg & Woessner, P.A.*, No. CIV. 12-528 RHK/JJK, 2013 WL 4666330 (D. Minn. Aug. 30, 2013) .......................................................................... 11

*Am. Soc'y for Testing & Materials v. Public.Resource.org, Inc.*, No. 13-CV-1215 (TSC), 2017 WL 473822 (D.D.C. Feb. 2, 2017) ............................................................................ 7, 8, 9, 10

*Arica Inst., Inc. v. Palmer*, 970 F.2d 1067 (2d Cir. 1992) ........................................................... 13

*Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) ........................................................ 3

*Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014) ................................ 10, 12, 13, 16

*Baker v. Selden*, 101 U.S. 99 (1879).......................................................................................... 14

*Banks v. Manchester*, 128 U.S. 244 (1888) ..................................................................... 7, 12, 18

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006) ........................ 16

*Boddie v. Connecticut*, 401 U.S. 371 (1971) .............................................................................. 8

*Cambridge Univ. Press v. Patton*, 769 F.3d 1232 (11th Cir. 2014) ............................................. 2

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ................................................... passim

*Cary v. Kearsley*, 170 Eng. Rep. 679, 4 Esp. 68 (1803) ................................................................ 3

*Castle Rock Entm't, Inc. v. Carol Publ'g. Grp., Inc.*, 150 F.3d 132 (2d Cir. 1998) ................. 5, 16

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) .................................................. 14

*Folsom v. Marsh*, 9 F. Cas. 342 (C.C.D. Mass. 1841)................................................................... 3

*Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985) .................... 2, 11, 12

*Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey*, 497 F. Supp. 2d 627 (E.D. Pa. 2007) ...................................................................................................................... 11

*Howell v. Miller*, 91 F. 129 (6th Cir. 1898) ................................................................................. 18

*Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) ............................................................ 12

*Long v. Jordan*, 29 F. Supp. 287 (N.D. Cal. 1939)....................................................................... 17

*Marinello v. United States*, 138 S. Ct. 1101 (2018)........................................................ 5

*McBoyle v. United States*, 283 U.S. 25 (1931) ............................................................. 5

*Murphy v. Millennium Radio Grp. LLC,* 650 F.3d 295 (3d Cir. 2011)........................................ 15

*Nunez v. Caribbean Int'l News Corp.,* 235 F.3d 18 (1st Cir. 2000)........................................... 15

*Oracle Am., Inc. v. Google LLC*, 886 F.3d 1179 (Fed. Cir. 2018) ............................................. 15

*Princeton Univ. Press v. Mich. Document Servs.*, 99 F.3d 1381 (6th Cir. 1996)........................ 15

*Seltzer v. Green Day, Inc.*, 725 F.3d 1170 (9th Cir. 2013) .......................................... 15

*Smith v. United States*, 508 U.S. 223 (1993) ............................................................. 13

*Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417 (1984) ............................ passim

*Stewart v. Abend*, 495 U.S. 207 (1990)....................................................................... 12

*Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257 (11th Cir. 2001).................................... 11

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73 (2d Cir. 2014)........................ 13

*United States v. Burgess*, No. 133066, 1987 WL 39092 (N.D. Ill. Dec. 1, 1987)........................ 5

*Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791 (5th Cir. 2002)........................................ 5

*Yates v. United States*, 135 S. Ct. 1074 (2015) .......................................................... 13

## STATUTES

17 U.S.C. § 106(2) ................................................................................................ 17

17 U.S.C. § 107................................................................................................... 4, 9

5 U.S.C. § 552(a)(4)(A)(iii) .................................................................................... 8

## OTHER AUTHORITIES

*Articles of Incorporation*, Public.Resource.Org (Apr. 13, 2007)
https://public.resource.org/public.resource.articles.html ........................................ 6

*Contact the Office of the Federal Registrar*, National Archives,
https://www.archives.gov/federal-register/contact.html (last visited Nov. 8, 2019). ................. 7

Frederick Seaton Siebert, *Freedom of the Press in England 1476–1776* (2d ed. 1965).............. 18

H.R. Rep. No. 94–1476 (1976) ................................................................................. 9

Henry Farrell, *Conservatives Remade American State Politics. Here's How They Did It.*
Washington Post (Aug. 29, 2019),
https://www.washingtonpost.com/politics/2019/08/29/conservatives-remade-american-state-politics-heres-how-they-did-it/ .................................................................................................. 18

*Intellectual Property Policy of ASTM International*, https://www.astm.org/Itpolicy.pdf ............ 17

J.L. Austin, How to Do Things with Words (1975).................................................................... 10

Mike McIntyre*, Conservative Nonprofit Acts as a Stealth Business Lobbyist*, N.Y. Times, Apr.
22, 2012............................................................................................................................. 18

P.R. Coleman-Norton, *Cicero's Contribution to the Text of the Twelve Tables*, 46 Classical J. 51
(1950).................................................................................................................................. 18

Pierre N. Leval, *Toward A Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990)................. 2, 4, 16

*Public Safety Standards*, Public.Resource.Org,
https://law.resource.org/pub/us/cfr/manifest.us.html (last updated Dec. 31, 2012) .................. 6

*Reading Room*, ASTM International, https://www.astm.org/READINGLIBRARY/ (last visited
Nov. 11, 2019) ...................................................................................................................... 7

Yon Malley, *The Language of Legislation*, 16 Language in Soc'y 25 (2010) ............................ 10

## CONSTITUTIONAL PROVISIONS

U.S. Const., Art. I, § 8, cl. 8.................................................................................................... 2, 6

## INTERESTS OF *AMICI*[1]

*Amici* identified in the accompanying Appendix are scholars experienced in the study and development of copyright law.[2] Each has an interest in the proper functioning of the copyright system and in the public's access to laws with which they are required to comply. As set forth in their motion for leave to file this brief, *Amici* write to articulate the serious damage to access to law, copyright doctrine, and the democratic process that would arise should plaintiffs' theory of fair use prevail in this case.

## SUMMARY OF ARGUMENT

This case touches on one of the core principles of fair use: permitting uses that further copyright's ultimate purpose of enhancing the public welfare by providing the public with access to knowledge. Public.Resource.Org ("PRO") has long been committed to enhancing public discourse and facilitating the spread of knowledge to the public. Here, consistent with its mission, PRO has provided the public with access to standards written by standards development organizations ("SDOs"), which have become incorporated by reference into binding law.

Providing knowledge of the governing laws to the public is consistent with the broader interest that copyright seeks to promote. Public knowledge of the laws is fundamental to a just, democratic society and an informed citizenry, and recognizing that a private entity can exclude access to the content of the laws is antithetical to the public welfare.

---

[1]  Pursuant to LCvR 7(o)(5) and Fed. R. App. P. 29(a)(4)(E), *Amici* hereby certify that no party or party's counsel authored the brief in whole or part, that no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and that no person other than *Amici* or their counsel contributed money that was intended to fund preparing or submitting the brief.

[2] *Amici Curiae* Law Scholars joined this brief in their individual capacity. Titles and affiliations are for identification purposes only.

In undertaking a fair use analysis, this Court should weigh all four factors in light of PRO's publicly beneficial purpose. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994). In this case, read in light of PRO's strong public purpose, the four factors weigh in favor of fair use.

## ARGUMENT

**I.     Fair Use Must Be Analyzed in Light of Copyright's Ultimate Goal of Expanding and Spreading Public Knowledge and Ideas.**

The ultimate purpose of copyright is to benefit the public welfare by disseminating knowledge and ideas to the public. *See Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 432 (1984); *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 545 (1985) ("[c]opyright is intended to increase and not to impede the harvest of knowledge"); *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1282 (11th Cir. 2014) (promoting "the dissemination of knowledge is consistent with the goals of copyright"). This goal is reflected in the constitutional provision that grants Congress the authority to establish copyright law: "Congress shall have the power . . . [t]o promote the Progress of Science and useful arts . . . by securing for limited Times to Authors . . . the exclusive Right to their respective Writings." U.S. Const., Art. I, § 8, cl. 8. Copyright law is premised on the recognition that intellectual and creative ideas are vital to a flourishing society, and it is designed to maximize the spread of those ideas to the public. *See* Pierre N. Leval, *Toward A Fair Use Standard*, 103 Harv. L. Rev. 1105, 1109 (1990).

To fulfill its purpose, copyright law must strike a balance between incentivizing the creation of new works and enabling the public to reap the benefits of those that already exist. *Id.* at 1107-08. Typically, copyright encourages the creation of new knowledge and ideas by providing authors an incentive in the form of a limited monopoly. *See Sony*, 464 U.S. at 429.

This monopoly is not a natural right inherent in the creation of a written work; rather, it is an economic right bestowed "upon the ground that the welfare of the public will be served and progress of science and useful arts will be promoted." *Id.* at 429 n.10 (quoting H.R. Rep. No. 60-2222 (1909)).

That said, copyright law has always recognized that access to some knowledge is so fundamental to the public benefit that it cannot be left in the control of one author. This is seen in the rules that dictate which works can be copyrighted, such as copyright's distinction between ideas and expression, where the latter can be copyrighted and the former cannot. But, courts have also recognized that blanket rules are insufficient to address all of these circumstances. Thus, copyright law also carves out a case-by-case exception to copyright's monopoly in the doctrine of fair use. *See Campbell*, 510 U.S. at 575 ("From the infancy of copyright protection, some opportunity for fair use of copyright materials has been thought necessary to fulfill copyright's very purpose.").

For nearly three hundred years, fair use has been recognized as an essential safe harbor to preserve the public's ability to use and access copyrighted works in publicly beneficial ways. *See Authors Guild v. Google, Inc.*, 804 F.3d 202, 212 (2d Cir. 2015). *See also Folsom v. Marsh*, 9 F. Cas. 342, 348-49 (C.C.D. Mass. 1841) (the first American court to explicitly recognize fair use). As British jurist Lord Ellenborough put it, "While I think myself bound to secure every man the enjoyment of his copyright, one must not put manacles upon science." *Cary v. Kearsley*, 170 Eng. Rep. 679, 681, 4 Esp. 68, 170 (1803). Fair use ultimately serves "the cause of promoting the broad public availability," *Sony,* 464 U.S. at 432 (citation omitted) (internal quotation marks omitted), of copyrightable material by protecting those who seek to use or spread it in the public interest. Though the owner of a copyrighted work retains a broad interest in the reproductions of

3

that work, "some [uses] are in the public domain. Any individual may reproduce a copyrighted work for a 'fair use;' the copyright owner does not possess the exclusive right to such a use." *Id.* at 433. Fair use is an integral part of the design of copyright and a necessary mechanism to ensure that copyright's ultimate objectives are achieved. Leval, *supra* at 1110.

Because the purpose of fair use is to enable uses of copyrighted works that are consistent with the aim of disseminating knowledge, there are no "bright-line rules" for conducting a fair use analysis. *Campbell*, 510 U.S. at 577. Rather, § 107[3] outlines four factors to evaluate:

1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

2) the nature of the copyrighted work;

3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. The factors must be "weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 578. *See also id.* (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990) ("the fair use doctrine thus 'permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.'")). Put differently, "[t]he ultimate test of fair use . . . is whether the copyright law's goal of promot[ing] the Progress of Science and useful Arts would be better served by allowing the use than by preventing it." *Castle Rock Entm't, Inc. v. Carol Publ'g. Grp., Inc*., 150 F.3d 132,

---

[3] Fair use was not officially codified into law until 1976. The codification of fair use was merely meant to "restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way." *Campbell*, 510 U.S. at 577, (quoting H.R. Rep. No. 94–1476, at 66 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5679).

141 (2d Cir. 1998) (quoting *Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1077 (2d Cir. 1992) (internal quotation marks omitted).

## II.     Providing the Public Access to the Laws Which Govern Them Is at the Heart of Fair Use.

This case goes to the very heart of the public interest that copyright law in general, and fair use in particular, seeks to promote. Copyright exists to encourage the spread of knowledge for the public benefit, *see, e.g.*, *Sony*, 464 U.S. at 432, and few works are more central to the public interest than the laws that govern us.

### A.   Public Access to the Content of the Law is a Public Good.

Public access to the laws is fundamental to the functioning of a democratic society. *See Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791, 799 (5th Cir. 2002) ("Citizens may reproduce copies of the law for many purposes, not only to guide their actions but to influence future legislation, educate their neighborhood association, or simply to amuse."); *United States v. Burgess*, No. 133066, 1987 WL 39092, at *7 (N.D. Ill. Dec. 1, 1987) ("The very nature of republican government requires that the most important actions of Congress, the laws it enacts, be made known to the citizenry."). Indeed, absent fair warning, a party should not be subject to punishment under the law. *See McBoyle v. United States*, 283 U.S. 25, 27 (1931) ("[I]t is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed."); *see also Marinello v. United States*, 138 S. Ct. 1101, 1106 (2018). This is not a matter of a copyright claimant's interests but of citizens' rights.

### B.   PRO's Purpose and Effect is to Promote Public Access to the Content of the Law.

PRO has publicly noted that it provides access to SDO standards that have been incorporated into law to "promote public education and public safety, equal justice for all, a

better-informed citizenry, the rule of law, world trade and world peace . . . as it is the right of all

humans to know and speak the laws that govern them." *Public Safety Standards*,

Public.Resource.Org,  https://law.resource.org/pub/us/cfr/manifest.us.html (last updated Dec. 31,

2012). Such notions have guided PRO since its founding. In its articles of incorporation, for

example, PRO noted that "[t]he specific purpose of this corporation is to create, architect, design,

implement, operate and maintain public works projects on the Internet for Educational,

Charitable, and Scientific Purposes to the benefit of the general public and the public interest; to

increase and diffuse knowledge about the Internet in its broadest sense." *Articles of*

*Incorporation*, Public.Resource.Org (Apr. 13, 2007)

https://public.resource.org/public.resource.articles.html.

   Indeed, plaintiffs do not suggest that PRO has any motive beyond the advancement of

public knowledge. In their brief to the D.C. Circuit Court of Appeals, for example, American

Society for Testing and Materials ("ASTM") noted that "PRO's purpose is to enable members of

the public to obtain copies of Plaintiffs' Works." Appellee Br. 34, *Am. Soc'y for Testing &*

*Materials, et al. v. Public.Resource.Org, Inc.*, 896 F.3d 437 (D.C. Cir. 2018); *see also* ASTM's

Mem. Supp. Summ. J. 4 (discussing PRO's "ideological" commitment to public access to the

law). American Education Research Association ("AERA") similarly does not suggest that PRO

has any ulterior purpose. *See* AERA's Mem. Supp. Summ. J. 9. The D.C. Circuit Court of

Appeals also mentioned that "by all accounts, PRO distributed these standards for the purpose of

educating the public about the specifics of governing law." *Am. Soc'y for Testing & Materials*,

896 F.3d at 448. These statements by PRO and plaintiffs in this case reinforce the notion that

PRO's actions align with copyright's general purpose to "promote the Progress of Science." U.S.

Const. art. I, § 8, cl. 8. They also reaffirm the broader notion that "the law, which, binding every

citizen . . . [should be] free for publication to all, whether it is a declaration of unwritten law, or an interpretation of a constitution or a statute." *Banks v. Manchester*, 128 U.S. 244, 253 (1888).

### C. Promoting Access to the Law Is Consistent with the Purposes of Copyright in General and Fair Use in Particular.

PRO's dissemination of the SDO standards weighs in favor of fair use, as it is critical for the public to comply with laws that incorporate, but do not otherwise publish, these standards. At present, the SDOs present several obstacles to access the standards. ASTM, for example, sells copies of its standards for as much as $200. *See Am. Soc'y for Testing & Materials v. Public.Resource.org, Inc.*, No. 13-CV-1215 (TSC), 2017 WL 473822, at *4 (D.D.C. Feb. 2, 2017). ASTM offers an online reading room but restricts access to its standards by converting them in to "read only" files. *Id.* This means that while individuals may "view and read ASTM safety standards incorporated in United States regulations," a user may not print or download them. *See Reading Room*, ASTM International, https://www.astm.org/READINGLIBRARY/ (last visited Nov. 11, 2019). As many of the ASTM standards involve safety specifications for procedures, equipment, and other materials, *id.*, their limited availability means that users may not be able to access them where they need them most – in the field or laboratories. Other SDOs, such as AERA, do not offer even this modicum of access to their standards. *See Am. Soc'y for Testing & Materials*, 2017 WL 473822, at *4. Moreover, some standards that have been incorporated into law are not available online. *See* Def.'s Mem. Opp. Summ. J. 17. Physical copies of the standards are on file with the Office of the Federal Register or appropriate agency, *see Am. Soc'y for Testing & Materials*, 2017 WL 473822, at *3-4. However, this requires individuals to travel to these offices during standard business hours. *See Contact the Office of the Federal Registrar*, National Archives, https://www.archives.gov/federal-register/contact.html (last visited Nov. 8, 2019). Requiring citizens to pay for copies of the standards or to take time

off work to travel to an agency office runs counter to notions that the law should not distinguish between citizens based on their wealth. Indeed, in the Freedom of Information Act context, Congress expressed a congressional policy favoring free access to information possessed by the government that benefits the general public. *See* 5 U.S.C. § 552(a)(4)(A)(iii) ("Documents shall be furnished without any charge if disclosure of the information is in the public interest . . . and is not primarily in the commercial interest of the requester."); *cf. Boddie v. Connecticut*, 401 U.S. 371 (1971) (where fundamental rights are at stake, access to courts cannot be made dependent on ability to pay).

Limitations on access to information as vital as the content of the law are not consistent with copyright's purpose. Plaintiffs and other standards organizations offer insufficient access to technical standards despite benefiting from these standards' incorporation into law. PRO, by contrast, seeks to expand public access to these standards by creating digital versions of hard copy documents and making some files more accessible by transforming them in to formats more conducive to search and "text-to speech" software. *Am. Soc'y for Testing & Materials*, 896 F.3d at 444. By making the standards at issue available to the public in an accessible format, PRO has taken a necessary step to realize the ultimate purpose of copyright: to support the advancement of public knowledge.

## III.    The Four Fair Use Factors Should Be Interpreted in the Context of Promoting Public Knowledge.

The law classifies some uses of copyrighted material as fair use to "fulfill copyright's very purpose, to promote the Progress of Science and useful Arts." *Campbell*, 510 U.S. at 575 (citation omitted) (internal quotation marks omitted). Expanding access to the law may not be a typical fair use case, in part because of the background expectation that the law is not subject to private ownership at all, but the authors of § 107 anticipated that unexpected cases would arise

and drafted the law accordingly. *See* H.R. Rep. No. 94–1476, at 66 (1976) ("[T]he endless

variety of situations and combinations of circumstances that can rise in particular cases precludes

the formulation of exact rules in the statute."). PRO seeks to strengthen public discourse and

debate by expanding access to the laws and, as the D.C. Circuit noted, "there is reason to believe

as a matter of law that PRO's reproduction of certain standards" is fair use. *Am. Soc'y for Testing*

*& Materials*, 896 F.3d at 448 (internal quotation marks omitted).

    As described above, the purpose of copyright law is to promote the creation *and*

*dissemination* of creative and scientific works. Although that purpose requires a degree of

exclusive control by the copyright owner, it also requires that specific publicly beneficial uses be

permitted as "fair." Section 107's preamble lists specific uses, including "criticism, comment,

news reporting, teaching (including multiple copies for classroom use), scholarship, or research,"

17 U.S.C. § 107, but fair use extends well beyond these examples, and thus courts must weigh

four factors in determining whether a given use of a copyrighted work is fair. The Supreme

Court has made clear that the four statutory factors should not be treated in "isolation" from one

another, but rather "weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S.

at 578.  In other words, each of the four fair use factors can and should be interpreted in a way

that supports the purpose of copyright law. In this case, a purpose-driven analysis of each factor

weighs in favor of PRO.

    **A.  Factor One: Purpose and Character of Use.**

    The first factor of fair use analysis considers "the purpose and character of the use,

including whether such use is of a commercial nature or is for nonprofit educational purposes."

17 U.S.C. § 107(1). This factor advances copyright law's objective of disseminating public

information because it counsels in favor of fair use in nonprofit and educational circumstances. It

also advances copyright law's objective of promoting the development of new works by

examining the extent to which the contested work adds something new to the copyrighted one. *See Campbell*, 510 U.S. at 579. "[T]he goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works." *Id*. As the statutory text indicates, courts examining this factor look to the transformative nature of the contested use, which includes analysis of its overall purpose.

"[A] transformative work is one that serves a new and different function from the original work and is not a substitute for it." *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014). Moreover, as the D.C. Circuit notes, being "transformative in function or purpose" is sufficient to meet this criterion; secondary users do not need to edit or augment the original work. *Am. Soc'y for Testing & Materials*, 896 F.3d at 450 (quoting *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009)). In this case, the standards were transformed from merely being the work of private drafters when they were incorporated by reference into law. PRO's use was a furtherance of that transformation.

When a copyrighted work is incorporated by reference into law, that new law represents a fundamental transformation from the original work. Outside language that has been incorporated by reference into a law becomes legally binding. *See What is Incorporation by Reference?*, Office of the Federal Register Blog, https://www.federalregister.gov/reader-aids/office-of-the-federal-register-blog/2011/02/what-is-incorporation-by-reference (last visited Nov. 21, 2019). This distinction between speech that has no legal effect and speech that does has been recognized as one of the most profound differences in language and law. *See generally* J.L. Austin, How to Do Things with Words (1975); Yon Malley, *The Language of Legislation*, 16 Language in Soc'y 25, 27-28 (2010) (explaining that enactment into law, uniquely, gives statutory language its performative and coercive force).  It is the force of law that makes ignoring a publicly posted "no

parking" sign on a public street into a traffic offense, while ignoring a physically identical privately posted sign on the same street is not. In fair use terms, adding the force of law by adopting standards into law works a fundamental transformation in purpose—to mandate rather than to recommend behavior—which is evidenced by the fundamental transformation in effect.[4] As originally written, the standards represented industry leaders' recommendations for best practices. Those standards were transformed into law when they were made legally binding. The objective of the original standards was to communicate recommended best practices. The objective of the legislature was to govern behavior. The objective of the standards as used by PRO was, in accordance with that transformation, to communicate with American citizens about specific laws that govern them.[5]

Moreover, PRO's purpose in publishing the standards was both noncommercial and educational in nature. Noncommercial, nonprofit uses are presumably fair. *Sony*, 464 U.S. at 449. The key inquiry in such cases is "whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562.

---

[4] Similarly, courts have found that reproduction of copyrighted works can constitute a transformative use of a work when used in evidentiary or judicial proceedings. *See, e.g.*, *Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey*, 497 F. Supp. 2d 627, 637 (E.D. Pa. 2007); *Am. Inst. of Physics v. Schwegman, Lundberg & Woessner, P.A.*, No. CIV. 12-528 RHK/JJK, 2013 WL 4666330, at *12 (D. Minn. Aug. 30, 2013). Such use is considered transformative because the works are used in a "narrower" context than their original "manner of expression." *Am. Inst. of Physics*, 2013 WL 4666330, at *12.

[5] Courts routinely analyze the creation and distribution of a transformative work together, not distinguishing between creation and dissemination. For the song in *Campbell*, for example, the fair use analysis for radio stations that had played the parodic song would necessarily look at the extent to which the source material song had been transformed *prior* to radio play, not by the act of being played on the radio itself; otherwise, the stations would be infringing because they wouldn't be further transforming an already transformed work. *Campbell*, 510 U.S. at 578-86. *See also Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1269-71 (11th Cir. 2001) (without separate discussion of distributor liability, finding fair use by publisher/distributor of transformative work).

Here, it is conceded that PRO, which is not profit-motivated, intended to use the standards for nonprofit and educational purposes. *See supra* Section II.B. PRO operates as a 501(c)(3) nonprofit organization that exists to inform the public about the law in a cost-free way. Its objectives are to increase the accessibility of the law and to promote democracy by ensuring that access to the letter of the law is not limited by one's ability to afford that access. *See supra* Section II.B. This falls squarely within the dissemination purpose of copyright law.

### B.  Factor Two: Nature of the Copyrighted Work.

Some types of work are "closer to the core of intended copyright protection than others." *Campbell*, 510 U.S. at 586. The second factor urges courts to consider the extent to which the works at issue "are of the type that the copyright laws value and seek to protect." *HathiTrust*, 755 F.3d at 98. For example, the use of fictional works may cut against the incentives copyright law provides to produce creative expression and is therefore less likely to be fair use. *See, e.g., Campbell*, 510 U.S. at 586; *Stewart*, 495 U.S. at 237-38; *Harper & Row*, 471 U.S. at 563. Conversely, when it comes to works of a highly factual natural, the dissemination aspects of copyright law are more important, given the public's interest in access to knowledge, research, and development. *See Harper & Row*, 471 U.S. at 563.

In the case at hand, the public-interest purpose of copyright law counsels in favor of holding that PRO's use of the standards is fair. Indeed, there is "a greater need to disseminate factual works than works of fiction or fantasy,"  *Harper & Row*, 471 U.S. at 563, as such material conveys information that can be critical to the advancement of science and can increase civic involvement. Similarly, the Supreme Court has previously held that the text of a law is so unrelated to the purpose of copyright as to not be protected thereby. *See, e.g., Banks*, 128 U.S. at 253. Codes enacted into law are highly factual because they describe what actions and behaviors

are necessary for conformity with the law. Relatedly, the more law-like a code is, the more likely the public interest in disseminating those standards weighs in favor of finding fair use.

In addition, the fact that the works were previously published weighs in favor of a finding of fair use, because the works have already been voluntarily disclosed to the public. *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820 (9th Cir. 2003) ("Published works are more likely to qualify as fair use because the first appearance of the artist's expression has already occurred."); *Arica*, 970 F.2d at 1078 (plaintiff's work was "a published work available to the general public," and the second factor thus favored the defendant).

### C.  Factor Three: Amount and Substantiality Used.

The third factor, which examines the amount and substantiality of the work used, is intertwined with the other three factors: "the extent of permissible copying varies with the purpose and the character of the use." *Campbell*, 510 U.S. at 586-87; *see also Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 89 (2d Cir. 2014) ("It is well established that 'the scope of fair use is greater with respect to factual than non-factual works.'" (quoting *New Era Publ'ns Int'l, ApS v. Carol Publ'g Grp.*, 904 F.2d 152, 157 (2d Cir. 1990)). The test is whether the amount copied is "reasonable in relation to the purpose of copying." *Campbell,* 510 U.S. at 587.

In some cases, the use of an entire copyrighted work is acceptable. *HathiTrust*, 755 F.3d at 98. In this case, copying an entire standard comports with PRO's purpose of conveying the content of the laws to the public. *See Swatch*, 756 F.3d at 84 ("[T]he need to convey information to the public accurately may in some instances make it desirable and consonant with copyright law for a defendant to faithfully reproduce an original work without alteration."). Because the standards became binding law once incorporated by reference, PRO must reproduce their language exactly in order to accurately communicate the law. The only way to express the law is

by using the entire law. Each word is critical to the interpretation of a law and a simple rephrasing can completely alter the law's meaning. *See, e.g.*, *Yates v. United States*, 135 S. Ct. 1074, 1081-83 (2015) (in which liability depended on the meaning of "tangible object" in the Sarbanes-Oxley Act); *Smith v. United States*, 508 U.S. 223, 228-37 (1993) (in which liability depended on the meaning of "use" in 18 U.S.C. §924(c)(1)).

In addition, when the standards were made freely available to the public (even in limited ways), the relevance of this factor is diminished. *Sony*, 464 U.S. at 449-50 ("[W]hen one considers … that timeshifting merely enables a viewer to see such a work which he had been invited to witness in its entirety free of charge, the fact that the entire work is reproduced does not have its ordinary effect of militating against a finding of fair use."). Consistent with PRO's publicly beneficial purpose, factor three weighs in favor of PRO.

### D.  Factor Four: Effect of Use Upon Market for or Value of Copyrighted Work.

As the Supreme Court explained in *Sony*, a presumption of fairness is appropriate for noncommercial, nonprofit uses. *Sony*, 464 U.S. at 451. The burden falls on the copyright holder to prove that "the particular use is harmful, or that if it should become widespread, it would adversely affect the potential market for the copyrighted work." *Id.* Here, there is no cognizable harm to the plaintiff.

SDO incentives to produce new standards fall largely outside a factor four analysis because copyright is only concerned with incentivizing expressive content, not non-expressive content. Because the relevant market here is the market for standards incorporated into law, which is not a market that falls within the scope of protection of copyright, factor four favors fair use.

1.   **Factor Four Is Concerned with Protecting Incentives to Create Expressive Content, Not Factual Content.**

Copyright law distinguishes between expressive content and non-expressive content, incentivizing the creation of only the former. Facts and ideas cannot be copyrighted, nor does the work required to compile this content justify copyrightability. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349-50 (1991); *see also Baker v. Selden*, 101 U.S. 99, 103 (1879) (distinguishing between descriptions of a method of operation, which can be copyrighted, and the method of operation itself, which cannot be copyrighted). While "it may seem unfair" to the creators of factual or informational works that much of the content may be used by others without compensation, this was an intentional part of copyright's architecture. *Feist*, 499 U.S. at 349. Copyright's primary objective is to promote the dissemination of knowledge and ideas, not to reward the labor of authors. *Id.*

To the extent that PRO's use of SDO standards incorporated into law implicates SDO's incentives to create new standards for further incorporation into law, it should bear little or no weight in the factor four analysis. Incentives to produce unprotectable content are irrelevant to a factor four analysis, as copyright does not even encourage the creation of this content in the first instance by providing it monopoly protection.

2.   **Providing Public Access to the Law Does Not Affect a Properly Cognizable Market.**

In conducting a market harm analysis, courts limit their inquiry to harm to "protectable markets." *See Campbell*, 510 U.S. at 592. *Campbell* explicitly recognized that the market for parodies and critical derivative works is outside the scope of the fourth factor because creators were unlikely to license their works for those purposes. *Id.* More generally, *Campbell* has been interpreted to confine the fourth factor's analysis to markets that are "traditional, reasonable, or likely to be developed." *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir.

1994);[6] *see also Princeton Univ. Press*, 99 F.3d at 1387 (stating that a copyright holder must have a right to copyright revenues before finding that a failure to pay a license fee equals market harm); Leval, *supra*, at 1124 (stating that "[b]y definition every fair use involves some loss of royalty revenue because the secondary user has not paid royalties"). This limitation helps further the ultimate purpose of copyright, the development and spread of knowledge, by preventing speculative copyright behavior that might stymie intellectual pursuits.

Where a market is not within the scope of the copyright owner's rights, the fact that the copyright owner has attempted to create a market for a fair use—and even secured some licensing fees—does not count as a cognizable market effect. *See Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614–15 (2d Cir. 2006) ("[A] copyright holder cannot prevent others from entering fair use markets merely by developing or licensing a market for . . . transformative uses of its own creative work."); *Castle Rock*, 150 F.3d at 146 n. 11 ("[C]opyright owners may not preempt exploitation of transformative markets . . . by actually developing or licensing others to develop those markets."); Relatedly, the harm, to be cognizable, must be related to nontransformative uses. *See HathiTrust*, 755 F.3d at 99 ("any economic 'harm' caused by transformative uses does not count because such uses, by definition, do not serve as substitutes for the original work").

Here, it would be inconsistent with copyright's ultimate purpose of promoting public knowledge to hold that the market for standards incorporated by reference into public laws is cognizable. The putative "market" consists of the people and institutions that are governed by

---

[6] This definition has been adopted in numerous circuits. *See, e.g.*, *Nunez v. Caribbean Int'l News Corp.,* 235 F.3d 18, 25 (1st Cir. 2000); *Murphy v. Millennium Radio Grp. LLC,* 650 F.3d 295, 308 (3d Cir. 2011); *Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381, 1387 (6th Cir. 1996); *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1179 (9th Cir. 2013); *Oracle Am., Inc. v. Google LLC*, 886 F.3d 1179, 1208 (Fed. Cir. 2018).

that law, and the members of that group require copies of the law in order to understand the rules that are being applied. In a democratic society, public knowledge of the law is so fundamental to public interest that it would not be reasonable for a private entity to develop the "market" in a manner consistent with the exclusive rights of a copyright holder. *Cf. Campbell*, 510 U.S. at 592 (explaining that copyright owners' rights do not extend to transformative uses because of the likelihood that they would suppress such uses if given the power to do so).

SDOs could not exercise their exclusive rights without creating absurd consequences that undermine fundamental democratic principles. Under plaintiffs' theory, if a legislature wanted to amend a code, they would risk needing the SDO's permission, because the modification might be significant enough to constitute a derivative work, and giving the legislature the right to reproduce the standard is not the same thing as giving it the right to create derivative works. 17 U.S.C. § 106(2); *see, e.g.*, *Intellectual Property Policy of ASTM International*, https://www.astm.org/Itpolicy.pdf (asserting the right to prohibit derivative works). Even if the SDO conceded that legislative modifications themselves constituted fair use, it would still be able to suppress *dissemination* of the modified work on the same theory offered here, and its own published code would not reflect the law as enacted. The result would be that no one could have meaningful access to the law governing their conduct. Enabling SDOs to maintain a private monopoly over what should be public information is incompatible with a democratic system of government. *See Long v. Jordan*, 29 F. Supp. 287, 289 (N.D. Cal. 1939) ("[P]laintiff advances a system requiring legislation . . . and now, under his copyright, seeks to prevent the submission to the voting power of the very legislation . . . . But a plan or system advanced for government adoption cannot be copyrighted so as to prevent the publication of that plan or system . . . .")

Such control stifles political debate and shifts power from publicly elected officials to private hands.

Furthermore, holding that the market for public law is cognizable in copyright would open the door for other individuals and organizations, from NGOs to lobbyists, to do the same. The scope of legislation drafted by third parties is vast, although difficult to quantify. For instance, the American Legislative Exchange Council ("ALEC")—a coalition that at its peak included hundreds of Fortune 500 companies and major advocacy groups—drafts "model bills" that state legislators can literally copy and paste into law. Henry Farrell, *Conservatives Remade American State Politics. Here's How They Did It.* Washington Post (Aug. 29, 2019), https://www.washingtonpost.com/politics/2019/08/29/conservatives-remade-american-state-politics-heres-how-they-did-it/. In 2011, ALEC boasted to its members that more than one thousand of its model bills were introduced in state legislatures, about seventeen percent of which became binding law. Mike McIntyre*, Conservative Nonprofit Acts as a Stealth Business Lobbyist*, N.Y. Times, Apr. 22, 2012, at A1. Recognizing that the market for private text incorporated into public law is not "protectable" would address not just SDOs but the much larger and broader category of private actors that contribute to the legislative process.

The principle of public access to the law has been a cornerstone of democracy since the Ancient Roman era, when the laws were inscribed on bronze tablets in simple Latin and erected in the Roman Forum for all to see. P.R. Coleman-Norton, *Cicero's Contribution to the Text of the Twelve Tables*, 46 Classical J. 51, 51 (1950). The tradition of open access to the laws was also part of 18th century British common law tradition, where the writings and speeches of legislatures were made publicly available as a bulwark against governmental tyranny. Frederick Seaton Siebert, *Freedom of the Press in England 1476–1776*, at 356–63 (2d ed. 1965). Finally, in

our own nation, the courts have repeatedly reaffirmed that the public should have free access to the law. *See Banks*, 128 U.S. at 253 ("The whole work done by the judges constitutes the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all . . . ."); *Howell v. Miller*, 91 F. 129, 137 (6th Cir. 1898) (holding that "any person desiring to publish the statutes of a state may use any copy of such statutes to be found in any printed book").

The properly cognizable market for codes developed by private organizations, therefore, is limited to markets that have not been fundamentally altered by adoption of a code into law. Where codes suggest best practices, they will be copyrightable. Where SDOs write annotations or other explanatory material or useful guides to standards, they will be copyrightable. But where standards become mandated by the government, and backed up by the government's monopoly on force, there is no "market" for copyright purposes any more than there is a "market" for a citizen of a jurisdiction who wishes to purchase a different governing law.[7]

In summary, limiting the market analysis to uses that do not involve public law is consistent with both prior case precedent and copyright's ultimate purpose of promoting the public welfare. Where public law is concerned, the interest in disseminating such fundamental knowledge must outweigh any harm to an unreasonable and non-traditional market that is unprotected as a matter of law.

---

[7] Citizens can leave or advocate for legislative change. But these are fundamentally different choices than those made in copyright's market for expressive works.

## <u>CONCLUSION</u>

For the foregoing reasons, *Amici* respectfully request that this Court grant

Public.Resource.Org's second motion for summary judgment and deny plaintiffs' second motion

for summary judgment.

Respectfully submitted,

/s/ Marcia Hofmann
Marcia Hofmann
DC Bar ID # 484136
Zeitgeist Law PC
25 Taylor Street
San Francisco, CA 94102
(415) 830-6664
Marcia@zeitgeist.law

Christopher Bavitz
Mason Kortz
Cyberlaw Clinic, Harvard Law School[8]
1585 Massachusetts Avenue
Cambridge, MA 02138
(617) 394-9125
cbavitz@law.harvard.edu
mkortz@law.harvard.edu

---

[8] *Amici* thank fall 2019 Harvard Law School Cyberlaw Clinic students Katie Lin, Ari Sillman, and Elizabeth Strassner for their valuable contributions to this brief.

## **CERTIFICATE OF COMPLIANCE**

Pursuant to LCvR 7(o)(5) and Fed. R. App. P. 29(a)(4)(G), I hereby certify that:

This brief complies with the requirements of LCvR 7(o)(4) because it does not exceed 25 pages

in length.


Dated: November 22, 2019

/s/ Marcia Hofmann

Marcia Hofmann
DC Bar ID # 484136
Zeitgeist Law PC
25 Taylor Street
San Francisco, CA 94102
(415) 830-6664
Marcia@zeitgeist.law

## APPENDIX

Ann Bartow
Professor of Law, University of New Hampshire Franklin Pierce School of Law
Director, Franklin Pierce Center for Intellectual Property

      Ann Bartow is the Director of the Franklin Pierce Center for Intellectual Property and a Professor of Law at the University of New Hampshire Franklin Pierce School of Law. Prior to joining the University of New Hampshire in 2015, Professor Bartow was taught at the Pace Law School and the University of South Carolina School of Law. Professor Bartow was a Fulbright Scholar at Tongji University in Shanghai, China during the 2011-2012 academic year. Bartow is the current chair of the American Association of Law Schools Intellectual Property Section and and a current member of the Advisory Board of the Electronic Privacy Information Center (EPIC). Bartow is also a member of the American Law Institute.

      Her scholarship focuses on the intersection between intellectual property laws and public policy concerns, privacy and technology law, and feminist legal theory. At the University of New Hampshire, Professor Bartow teaches courses about copyright law and intellectual property.

Elizabeth Townsend Gard
Professor of Law, Tulane University Law School
Director, Tulane Center for IP Law and Culture

      Elizabeth Townsend Gard is a professor of law at Tulane University Law School and is the founder and co-director of the Tulane Center for IP Law and Culture. She also founded and co-directs the Law/Culture/Innovation Initiative in the Social Innovation Social Entrepreneurship Program at Tulane. Professor Townsend Gard has served as a non-resident fellow at the Center for Internet and Society at Stanford Law School since 2004. She previously taught at Seattle

University School of Law. She is also a co-inventor of the Durationer® Copyright Experiment, a software system that collects information about the copyright status of a work around the globe.

Professor Townsend Gard's research focuses on copyright law, international copyright issues, and copyright duration, among other subjects. Her writings have appeared in *Vanderbilt Law Review*, *DePaul Law Review*, *Cardozo Arts & Entertainment Law Journal*, the *Journal of the Copyright Society of the U.S.A.*, *Journal of Internet Law*, *Columbia Journal of Law & the Arts* and *Santa Clara Computer & High Technology Law Journal*.

James Gibson
Sesquicentennial Professor of Law, University of Richmond School of Law

James Gibson is the Sesquicentennial Professor of Law at Richmond School of Law. Professor Gibson teaches and writes on copyright law, the fair use doctrine, law and technology, and other subjects. He has published scholarship in the *Yale Law Journal*, *Virginia Law Review*, *Georgetown Law Journal*, *Texas Law Review*, and *UCLA Law Review*.

Brian L. Frye
Spears-Gilbert Associate Professor of Law, University of Kentucky College of Law

Brian L. Frye is the Spears-Gilbert Associate Professor of Law at the University of Kentucky College of Law. Prior to joining the University of Kentucky faculty in 2012, he was a Visiting Assistant Professor of Law at Hofstra University School of Law and a litigation associate at Sullivan & Cromwell LLP. He also clerked for Judge Andrew J. Kleinfeld of the United States Court of Appeals for the Ninth Circuit and Justice Richard B. Sanders of the Washington Supreme Court.

Professor Frye's research focuses on intellectual property and charity law, especially in relation to artists and art organizations. At the University of Kentucky, he teaches courses in intellectual property, copyright law, and trademark law, among others.

Stacey M. Lantagne
Associate Professor of Law, The University of Mississippi School of Law

Stacey M. Lantagne is the Associate Dean for Faculty Development and an Associate Professor of Law at the University of Mississippi School of Law. Professor Lantagne graduated from Boston College *summa cum laude* with a B.A. in English and a computer science minor and received her J.D. *cum laude* from Harvard Law School, where she was the co-executive editor of the Harvard *Journal of Law & Technology*. After law school, she clerked for a year for Judge Martin L.C. Feldman in the Eastern District of Louisiana. Upon completion of her clerkship, Professor Lantange practiced law first at Drinker Biddle & Reath in Washington, D.C., and then at Goodwin Procter in Boston, where she practiced intellectual property litigation with a focus on copyright and trademark matters, including a number of trade secret and deceptive advertising cases. Prior to joining the University of Mississippi School of Law faculty, Professor Lantagne was a Westerfield Fellow at Loyola New Orleans College of Law. Professor Lantagne is admitted to practice in Massachusetts and the District of Columbia.

Jessica Silbey
Professor of Law and Director of Center for Law, Innovation, and Creativity, Northeastern University School of Law

Jessica Silbey is a Professor of Law and the Faculty Director for the Center for Law, Innovation, and Creativity at the Northeastern University School of Law. She was a 2018 Guggenheim Fellow in Law. Professor Silbey clerked for Judge Robert E. Keeton of the U.S.

District Court for the District of Massachusetts and Judge Levin H. Campbell of the U.S. Court of Appeals for the First Circuit.

Professor Silbey's work focuses on intellectual property, copyright law, trademark law, constitutional law, and cultural analysis of law. She is the author of *The Eureka Myth: Creators, Innovators and Everyday Intellectual Property* (Stanford University Press, 2015), and the co-editor of two books about depictions of law in media and popular culture. She has been published in the *Boston University Law Review*, the *Notre Dame Law Review*, the *Maryland Law Review*, and the *Columbia Journal of Law & the Arts*, among others.

Rebecca Tushnet
Frank Stanton Professor of the First Amendment, Harvard Law School

Rebecca Tushnet is the Frank Stanton Professor of the First Amendment at Harvard Law School. Professor Tushnet specializes in copyright, trademark, and false advertising law. Her publications include a casebook, *The Law of Advertising and Marketing* (2d ed., 2014), and a chapter on transformative purpose in *The Routledge Companion to Media Education, Copyright, and Fair Use* (Renee Hobbs ed., 2018). Her research has been published in the *Harvard Law Review*, the *Yale Law Journal*, and the *Texas Law Review*, among other publications.