**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| AMERICAN EDUCATION RESEARCH ASSOCIATION, INC., | ) ) ) | |
| AMERICAN PSYCHOLOGICAL ASSOCIATION, INC., | ) ) | |
| and | ) ) | |
| NATIONAL COUNCIL ON MEASUREMENT IN EDUCATION, INC. | ) ) ) | Case No. 1:14-cv-00857 (TSC) |
| Plaintiffs-Counterdefendants, | ) ) | |
| v. | ) ) | |
| PUBLIC RESOURCE ORG., INC., | ) ) | |
| Defendant-Counterclaimant. | ) ) ) | |

**ON REMAND BY THE COURT OF APPEALS,
PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR RE-ENTRY OF
SUMMARY JUDGMENT AND A PERMANENT INJUNCTION AND RESPONSE
TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

John I. Stewart, Jr. (D.C. Bar No. 913905)
Clifton S. Elgarten (D.C. Bar No. 366898)
Amanda Shafer Berman (D.C. Bar No. 497860)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004-2595
(202) 624-2500
celgarten@crowell.com

*Attorneys for Plaintiff-Counterdefendants*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

I.  PRO'S WHOLESALE COPYING AND POSTING OF THE 1999
    STANDARDS FOR FREE DOWNLOAD IS NOT FAIR USE. ...................................... 2

    A.  The Purpose and Character of Public Resource's Conduct in Copying
        and Posting the 1999 Standards Weigh Heavily Against a Finding of
        Fair Use. ............................................................................................................ 2

        1.  PRO's "Use"  Is Not Transformative. ....................................................... 2

        2.  PRO Cannot Rely on Digital Formatting and Archiving. ........................... 6

        3.  PRO Cannot Justify Verbatim Copying of the 1999 Standards. ................. 7

        4.  PRO Did Not Limit Its Copying to that Which Is Essential to
            Comply with a Legal Duty. ..................................................................... 8

        5.  PRO's Remaining Arguments Are Unavailing. ........................................ 13

    B.  The Expressive Character of the 1999 Standards Weighs Heavily
        Against a Finding of Fair Use. ........................................................................... 14

    C.  The Amount and Substantiality of Public Resource's Copying of the
        1999 Standards Weighs Heavily Against a Finding of "Fair Use." ...................... 18

    D.  The Likely Effect on the Market for Standards Weighs Heavily Against
        a Finding of "Fair Use." .................................................................................... 19

II. THE COURT SHOULD REINSTATE THE PERMANENT INJUNCTION. ................. 22

    A.  Likelihood of Success on the Merits. ................................................................. 22

    B.  Irreparable Harm. ............................................................................................. 23

    C.  Balance of Hardships & Public Interest. ............................................................ 24

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Am. Soc'y for Testing and Materials v. Public.Resource.Org, Inc.*,
896 F.3d 437 (2018)................................................................................................. *passim*

*Banks v. Manchester*,
128 U.S. 244 (1888)....................................................................................................15, 16

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
448 F.3d 605 (2d Cir. 2006)................................................................................................5

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994)................................................................................................ *passim*

*Canadian Lumber Trade All. v. United States*,
517 F.3d 1319 (Fed. Cir. 2008)............................................................................................20

*eBay Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006)............................................................................................................22

*Elektra Enter. Group, Inc. v. Bryant*,
No. CV 03-6381GAF(JTLX), 2004 WL 783123 (C.D. Cal. Feb. 13, 2004)..........................24

*Folsom v. Marsh*,
9 F.Cas. 342 (C.C.D. Mass 1841) (No. 4901) ....................................................................4

*Hanley-Wood LLC v. Hanley Wood LLC*,
783 F. Supp. 2d 147 (D.D.C. 2011) .................................................................................23

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985)........................................................................................2, 4, 19

*Howell v. Miller*,
91 F. 129 (6th Cir. 1898) ................................................................................................16

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*,
518 F. Supp. 2d 1197 (C.D. Cal. 2007) ......................................................................3, 23

*Peter Letterese and Associates, Inc. v. World Inst. of Scientology Enter.*,
533 F.3d 1287 (11th Cir. 2008) .......................................................................................18

*Salinger v. Random House, Inc.*
811 F.2d 90 (2d Cir. 1987)................................................................................................22

*Seltzer v. Green Day, Inc.*,
725 F.3d 1170 (9th Cir. 2013) ...................................................................5

*Sony Corp. of America v. Universal Studios Inc.*,
464 U.S. 417 (1984).....................................................................................5

*Swatch Group Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
756 F.3d 73 (2d Cir. 2014)..........................................................................7

*Television Digest, Inc. v. U.S. Telephone Ass'n*,
841 F. Supp. 5 (D.D.C. 1993) ....................................................................20

*Ty, Inc. v. Publ'ns Int'l Ltd.*,
292 F.3d 512 (7th Cir. 2002) .....................................................................19

*Walt Disney Co. v. Powell*,
897 F.2d 565 (D.C. Cir. 1990) ...................................................................23

*Wheaton v. Peters*,
33 U.S. 591 (1834)......................................................................................15

*WorldWide Church of God v. Philadelphia Church of God, Inc.*,
227 F.3d 1110 (9th Cir. 2000) .............................................................19, 20

**STATUTES**

17 U.S.C. §107..............................................................................................2, 4

17 U.S.C. §107(2) ............................................................................................14

17 U.S.C. §107(3) ............................................................................................18

17 U.S.C. §107(4) ............................................................................................19

17 U.S.C. §121.................................................................................................6

17 U.S.C. §504(c)(1)–(2).................................................................................24

**REGULATIONS**

34 C.F.R. §462.12(c) .......................................................................................13

34 C.F.R. §462.13(c)(1)...............................................................................9, 13

34 C.F.R. §668.141(a)......................................................................................12

34 C.F.R. §668.141(a)(1).................................................................................12

34 C.F.R. §668.144..........................................................................................12

34 C.F.R. §668.145 .................................................................................................13

34 C.F.R. §668.146 .............................................................................................12, 13

34 C.F.R. §668.146(b) ...........................................................................................13

34 C.F.R. §668.146(b)(6) .................................................................................8, 9, 12

34 C.F.R. §668.148 .................................................................................................13

34 C.F.R. §668.148(a)(1)(iv) ...............................................................................8, 9

## INTRODUCTION

Without authorization, Public Resource Org., Inc. ("PRO") has copied and uploaded to its website the entirety of the copyrighted 200-page volume known as the 1999 Standards in order to allow anyone to access and download it for free.  PRO's copying and posting cannot qualify as fair use, particularly given that PRO is not itself using the Standards for *any* purpose, but rather enabling the public to copy and disseminate the 1999 Standards for any use desired—fair or not.

PRO tries to justify its wholesale copying and posting of the 1999 Standards by arguing that the entire volume was incorporated *in full* by certain federal and state regulations.  But those regulations only require that potential grantees use tests determined by the Department of Education to have met certain standards (not all) in order to qualify for certain optional government programs, and they do not refer at all to the hundreds of pages of accompanying commentary, history and annotations.  PRO has not limited its copying to the specific standards referenced by regulations, let alone those "essential to complying with [one's] legal duties," to which the Court of Appeals suggested that fair use law might show special solicitude.

If PRO had put the necessary effort, intelligence and creativity into extracting and copying only the specific standards referenced in and necessary to comply with federal or state regulations—a small subset of the 1999 Standards document—we *might* have a different kind of case.  But it did not, and the unelaborated copying and posting of the entire 1999 Standards (including all of the standards, the history, commentary, glossary, index and other material) *without* engaging in any commentary, criticism, teaching, or other creative work itself cannot plausibly be deemed fair use.[1]

---

[1]  With its opposition and summary judgment cross-motion, PRO refiled its prior objections to declarations submitted by the Sponsoring Organizations in support of summary judgment.  *See*
(continued)

**ARGUMENT**

I.  **PRO'S WHOLESALE COPYING AND POSTING OF THE 1999 STANDARDS FOR FREE DOWNLOAD IS NOT FAIR USE.**

The principles for conducting a fair use analysis are set forth at 17 U.S.C. §107.  The four listed factors are not exclusive, but have long been applied to determine fair use.  The burden is squarely on PRO to show that its use is fair. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994); *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 561 (1985) (fair use is "an affirmative defense").  PRO mostly ignores its burden,[2] and its analysis largely ignores the D.C. Circuit's remand directions and most of the relevant case law.

A.  **The Purpose and Character of Public Resource's Conduct in Copying and Posting the 1999 Standards Weigh Heavily Against a Finding of Fair Use.**

The purpose and character of PRO's copying weigh heavily against fair use.

1.  **PRO's "Use" Is Not Transformative.**

The key consideration for the first §107 factor is whether the "use" is transformative.  A use is transformative when it "adds something new, with a further purpose or different character, altering the first [use] with new expression, meaning, or message." *Am. Soc'y for Testing and Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437, 449 (2018) (quoting *Campbell*, 510 U.S. at 584*).*  As demonstrated in Plaintiffs' Opening Brief, there is nothing remotely transformative in PRO's "use" of the 1999 Standards.

---

(continued)
Dkt. 136-6.  The Sponsoring Organizations refer the Court to, and stand by, their prior responses, Dkt. 90-4, and this Court's prior dispositions.

[2] PRO suggests that plaintiffs should bear the burden for one factor, market impact.  Public Resource's Mem. of Law in Opp. to Pl. Mot. for Summary Judgment (Doc. 136-1) ("PRO Br.") at 43, n.11.  But in *Campbell*, the Supreme Court explained that the burden of showing fair use is on the defendant, specifically when discussing market impact. 510 U.S. at 590 ("Since fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets.").

Plaintiffs, the Sponsoring Organizations, created, copyrighted and offer the 1999 Standards to the world for any purpose to which a potential purchaser wishes to put them – to be commented on and critiqued, to be taught, for research, and to provide guidance to test developers and takers.  PRO offers the same 1999 Standards to the world, verbatim, for any purpose to which anyone wants to put them.  The difference is that Plaintiffs offer the 1999 Standards at a price – $49.95 in hard copy – on a website that also directs the user to their derivative work, their 2014 Standards.  PRO disseminates the 1999 Standards online, in a format that allows the 1999 Standards to be easily copied by others for free, and then for those copies to be transmitted even more widely.  *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*, 518 F. Supp. 2d 1197, 1218 (C.D. Cal. 2007) (discussing the special threat to copyright posed by online posting given the ease of downloading and, with it, potential "exponential" redistribution).

PRO's ostensible "use" is not distinguishable from that of the copyright holder.  PRO says that it is interested in disseminating the 1999 Standards because that document has been incorporated by reference into law, but nothing limits PRO's copying (or that of persons who download the 1999 Standards from PRO's site) to that purpose.  Of course, the Sponsoring Organizations already disseminate the Standards for that or any other purpose.  Indeed, the regulations that incorporate certain portions of the Standards by reference direct the interested party to the AERA website.  At bottom, PRO seeks simply to substitute its method of dissemination – for free and online – for that of the copyright holders, who seek to exercise their lawful control over the work, and to charge a price and sell the work in hard copy.  But simply providing substitute access to a copyrighted work for free *cannot* be fair use.  It is black letter law that the "fair use doctrine has always precluded a use that 'supersede[s] the use of the

3

original." *Harper & Row*, 471 U.S. at 550, quoting *Folsom v. Marsh*, 9 F.Cas. 342, 345 (C.C.D. Mass 1841) (No. 4901) (Story, J.).

PRO ignores this principle.  It invokes *all* of the potential fair use purposes identified in the preamble to §107 – criticism, comment, news reporting, teaching, scholarship and research – and claims that its own "use" fits "*all*" those purposes.[3]  PRO Br. at 34.   But PRO's "use" fits none of them.  PRO does not claim that *it* is engaging in criticism or scholarship or debate or teaching or reporting or commentary.  PRO itself is not "using" the 1999 Standards at all.

Rather, PRO's argument is that, by making it easier and less expensive to access the 1999 Standards, it is *potentially* facilitating fair use by unknown, unidentified others.  As Plaintiffs pointed out in their opening brief, if that were a legitimate purpose, PRO or anyone else might readily justify uploading, disseminating, and facilitating the free copying of every book, movie, newspaper, photograph, piece of music, and piece of software now or ever created, on the rationale that someone *else* might later make fair use of them.   That argument would countenance unlimited infringement, virtually extinguishing copyright owners' exclusive rights.[4]

The fair use inquiry is conducted on a case-by-case basis.  If someone actually copied the 1999 Standards for any of the cited fair use purposes, one could examine that person's use under

---

[3]  Similarly, PRO's *amici*, "Law Scholars," ignore the case-by-case focus on defendant's manner of use that the statute demands.  *See* 17 U.S.C. §107 ("whether the use made of a work *in any particular case* is a fair use") (emphasis added).  Their argument is that law is special.  But even if one were to accept their assertion that law is special in a way that would distinguish it from all other special and important printed materials, it would not justify what PRO did here – including copying all of the 1999 Standards book, most of which is not referenced in regulations.

[4]  *Amici* Law Scholars do not directly argue that PRO engaged in a transformative use, but rather that incorporation by reference "represents a fundamental transformation from the original work."  Doc. 140-1 at 10.  But the issue is not whether that governmental act was transformative, but whether *defendant's use* was transformative in the particular case.  Here, the government itself was careful not to copy any part of the 1999 Standards, in order not to interfere with the copyrighted work.   Therefore, the Court need not consider whether it might have been transformative fair use for the *government* to copy from the 1999 Standards.

the statutory factors and determine whether it was actually fair use.  But PRO cannot invoke the

theoretical existence of some unknown person's unknown purpose in some unknown setting as

its own – let alone justify the widespread dissemination that its online posting permits.  This

Court went to the heart of that issue in its prior decision, rejecting PRO's claim that its actions

were like those of someone who engaged in fair use in connection with complying with the law.

As this Court explained, PRO:

> was not actually acting to comply with a particular law—unlike,
> for example, an individual who makes a photocopy of the
> standards located at OFR [Office of the Federal Register] for use
> on her building project.  Instead, Defendant has placed identical
> copies of Plaintiffs' standards into the online marketplace with no
> intention to use them itself, but instead to simply offer them for
> free in competition with Plaintiffs' standards.

*Am. Soc'y for Testing and Materials ("*Op.*")*, 2017 WL 473822, at *16.  PRO has no response to

this fundamental problem with its assertion of fair use.  Yet as this and other courts have held,

there is nothing transformative about ordinary, unelaborated, verbatim copying.  *See Seltzer v.*

*Green Day, Inc.*, 725 F.3d 1170, 1177 (9th Cir. 2013) ("In the typical 'non-transformative' case,

the use is one which makes no alteration to the *expressive content or message* of the original

work."); *Sony Corp. of America v. Universal Studios Inc.,* 464 U.S. 417, 449–450 (1984)

(reproduction of entire work has the "ordinary effect of militating against a finding of fair use").

PRO cites *Bill Graham Archives v. Dorling Kindersley Ltd*., 448 F.3d 605 (2d Cir. 2006),

but what PRO has done lacks the transformative aspects of that artistic endeavor.  At issue there

was a coffee-table book that included miniatures of seven Grateful Dead concert posters, placed

alongside thousands of other images and text to create a visual timeline of the band to "capture

the eye and inform the reader."  *Id*. at 607.  The court agreed that such a use was

"transformatively different than the original expressive purpose" of the posters.  *Id*. at 609.

PRO, in contrast, did not juxtapose, elaborate or even comment on the 1999 Standards; it simply reproduced them in full, without adding anything.  There is nothing transformative about that.

### 2. PRO Cannot Rely on Digital Formatting and Archiving.

PRO argues that converting text into digital form "transforms" the text, making it more accessible to the visually disabled, as well as other users who will now be able to search and manipulate the text.  PRO Br. at 36.  PRO also says that its effort is transformative because it "aims to create a public collection of all government edicts."  *Id*. at 35.

Suffice it to say that this Court previously rejected each of those theories, *see* Op. at *16, **and the Court of Appeals affirmed precisely those  parts of the district court's decision**.  It held:  "[T]he district court properly rejected some of PRO's arguments as to its transformative use—for instance, that PRO was converting the works into a format more accessible for the visually impaired or that it was producing a centralized database of all incorporated standards." 896 F.3d at 450.  That is the law of the case, and PRO cannot now resurrect those rejected arguments on remand.

PRO also argues that the Chaffee Amendment, 17 U.S.C. §121, which creates a well-defined statutory copyright exemption to address the needs of the blind, does not go far enough. PRO Br. at 38.  But Congress plainly and properly intended to confer copyright protection on creative works like the 1999 Standards.  It has not provided any mechanism by which that copyright protection is surrendered.  It has not authorized federal agencies to themselves publish and disseminate such standards online—precisely because it understands the importance of protecting the copyright of standards-setting organizations, so that they will continue to do the hard and important work of devising such standards.

### 3.   PRO Cannot Justify Verbatim Copying of the 1999 Standards.

PRO points out that, under a fair use analysis, it is sometimes excusable to copy some part, or occasionally all, of a work verbatim.  But the debates about whether one has engaged in too much copying are all predicated on first finding a legitimate transformative use associated with the copying.  After that, one determines whether there was more verbatim copying than necessary to serve the permissible purpose.  Here, PRO's argument fails at the first juncture; its use was not transformative.  And even if that were not the case, there is simply no precedent for the notion that fair use verbatim copying might somehow extend to an entire 200-page book.

PRO cites *Swatch Group Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73 (2d Cir. 2014).  But nothing about PRO's copying of the 1999 Standards is like what transpired in *Swatch*.  In *Swatch*, a news service made an unauthorized audio recording of a company's confidential earnings call, and then made the recording and a transcript available to its own paid subscribers.  The use was transformative because, as this Court pointed out (Op. at *16), absent the news service's reproduction of the call, "any direct knowledge of what the executives said would have been limited to those analysts who participated."  The use intended by the "authors" was secret; its publication, particularly to that news service's readership, was transformative.  But unlike the news service in *Swatch*, PRO has not transformed secret information into publicly available information.  Plaintiffs' Standards are already available to anyone who wants them.  They may be purchased from AERA, reviewed or checked out from libraries across the country, or viewed for free at the location designated in the Federal Register as required by federal law.[5]

---

[5]  As pointed out before, the fair use analysis in *Swatch* highlights the basic differences between the copying there and here.  For example, the recorded spontaneous oral conversations at issue there, involving corporate financial matters, bear no resemblance to the 1999 Standards, which are the product of a painstaking process of thoughtful creation and written expression.  And unlike here, the recording at issue in Swatch had no commercial value.  *See* 756 F.3d at 91-92.

The Court of Appeals noted that verbatim copying may sometimes be necessary to "capture the precision that is necessary to understand the legal obligations that governments impose and enforce." *Am. Society,* 896 F.3d at 450 (quoting PRO's brief).  But any need to quote verbatim pre-supposes a bona fide, transformative use in the first place, which is absent here.  Further, if this case involved someone actually trying to conform their conduct to a legal requirement, the circumstances could be reviewed to determine whether there was a fair use need "to reproduce in full the relevant portions of that particular standard." *Id*.  But as noted in Plaintiffs' opening brief, it has been sufficient in many instances instead to paraphrase the Standards, with occasional quotation, to communicate their basic ideas.  And one could assuredly comply with the 1999 Standards by complying with the 2014 Standards.  PRO has not identified any situation in which *anyone* has needed to resort to PRO's website or any other form of unauthorized copying in order to comply with any legal duty.

### 4.    PRO Did Not Limit Its Copying to that Which Is Essential to Comply with a Legal Duty.

In their Opening Brief and Statement of Facts, the Sponsoring Organizations referred to the four places in the federal regulations where the 1999 Standards are incorporated.  Each regulation was quoted.  Each begins with the specific identification of the *standards* "provided in" the 1999 Standards to which tests must comply in order for potential grantees to qualify for certain programs.  Plaintiffs explained, with respect to each, that the reference in each regulation is only to certain chapters of the 1999 Standards, readily recognized by title.  For example, 34 C.F.R. §668.146(b)(6) refers to "all standards for test construction."  The standards for test construction are Part I of the three-part 1999 Standards.  A related requirement under the same program is set forth at 34 C.F.R. §668.148(a)(1)(iv), which refers to tests developed for non-native speakers of English, and requires that they be developed "in accordance with guidelines

8

provided in the "Testing Individuals of Diverse Linguistic Backgrounds' section" of the 1999 Standards, which is chapter 9.

Similarly, 34 C.F.R. §462.13(c)(1) requires that, to qualify a test as suitable for use in the reporting system for adult education, the test must "meet all applicable and feasible standards for test construction and validity provided in the 1999 edition of the Standards." As noted above, the portion of the 1999 Standards addressing Test Construction is Part I, and it includes chapter 1, entitled "validity." The regulations for that program also specifically reference the possibility of modifying the test for persons with disabilities, in which case the test publisher must provide documentation that it followed the "Individuals with Disabilities" section, which is chapter 10. *See* Plaintiffs' Statement of Facts (Doc. 134-2) ("Facts") ¶¶ 42-56. Thus, the federal regulations reference only a few chapters, and those chapters are only a part of the 200-page volume.

The actual standards that some tests must "meet" occupy, in turn, only a small part of the chapters in which they are contained, the rest consisting of commentary and other explicatory materials. Even if one were to total up all of the standards being referenced, it would amount to only 6% of the total volume of the 1999 Standards. *See* Hutter Decl. (Doc. 134-3) ¶ 6. And even if *all* of the actual "standards" in the entire 200-page volume were incorporated – and they were not – that would amount to less than 15% of the document. Commentary, history, background, glossary, index, and other material take up the bulk of the 1999 Standards.[6] *See* Facts ¶¶ 31-35.

PRO argues that two regulations, 34 C.F.R. §668.146(b)(6) and 34 C.F.R. §668.148(a)(1)(iv)), refer to the incorporation by reference of "this document," and argues that

---

[6] Even *Amici Curiae* Law Scholars concede that "[w]here SDOs write annotations or other explanatory material … they will be copyrightable." Doc. 140-1 at 19.

this means that all 200 pages of the 1999 Standards are incorporated by reference into law, and this renders it fair use for PRO to publish the entirety of the work online. *See id*. at 40-41.

That is not a reasonable reading of the regulations.  Referring to the location of the specifically named standards by referring to the incorporated "document" that contains them is simply an English language convention.  And consistent with federal policy and practice, the Department of Education could rest assured that by incorporating by reference to certain portions of the 1999 Standards document, rather than quoting those standards in the regulatory text, it was fully protecting the Sponsoring Organizations' copyright and thereby maintaining their economic incentive and ability to continue their important work and make it accessible to the government.

PRO does not explain how a regulation that requires reference only to the portion of the Standards addressing how an *educational* test is to be *constructed* – Part I – can be said to incorporate the remaining two-thirds of the 1999 Standards, which in Parts II and III address things like "The Rights and Responsibilities of Test Takers" (Chapter 8); "Psychological Testing and Assessment" (Chapter 12); "Testing in Employment and Credentialing" (Chapter 14); and "Testing in Program Evaluation and Public Policy" (Chapter 15).  And, of course, PRO offers nothing to explain or suggest how or why the bulk of the volume, which are not standards at all, but consist of background or guidance, would be incorporated by reference.  PRO thus has not met its burden of showing that the whole 200-page volume was incorporated as "law."

But even if the entire 1999 Standards book were, in some casual sense, incorporated by reference into federal regulations, it would not aid PRO's arguments here.  The Court of Appeals' suggestion that standards incorporated by reference might be entitled to special dispensation in a fair use analysis focused on whether the incorporated standards were "essential to complying with any legal duty."  *Am. Society*, 896 F.3d at 450; *see also* 896 F.3d at 442-43

(asking whether incorporated standards "resemble ordinary, binding law").  Examination of the regulations at issue demonstrates that PRO cannot be said to have limited its copying to standards essential to meet a legal duty.  Even beyond the fact that only certain standards are referenced, there are at least three reasons why that is true.

1.      The only plausible claim of legal duty can be with respect to the actual standards being referenced.  The remainder – unreferenced standards, background, comments, history, glossary, index, and other material – does not "resemble ordinary, binding law," and does not directly relate to any legal duty imposed on anyone.  That material may "help inform one's understanding of the law," *id*. at 450, but is not essential to meeting a legal duty.  Thus, under the Court of Appeals' remand instruction, this additional material – all of which is highly creative and none of which looks like "the law" – would not qualify for special treatment.

If PRO had put the requisite effort into extracting the standards referenced in the regulations from the 1999 Standards, then it might have been appropriate (and possible) to seek to evaluate whether free online access to them was essential to comply with a legal duty.  But PRO did not trouble itself with that effort.  It has simply copied the whole volume verbatim, history, background, comments, and unreferenced standards and all.

2.      Even if PRO's copying were limited to the actual standards that tests used by program applicants were supposed to meet, the way in which the regulations refer to the referenced standards would still not warrant a conclusion that they are "essential to complying with some legal duty."  The Court of Appeals drew this contrast itself, noting that the references to the 1999 Standards are <u>not</u> like those incorporations by reference that impose "legally binding requirements indistinguishable from, for example, a cigarette-labeling" requirement."  *Am. Society*, 896 F.3d at 443.  Rather, "the 'Standards for Educational and Psychological Testing' …

11

establish criteria that determine one's eligibility to apply for federal educational grants." *Id*. (citing 34 C.F.R. §§ 668.141(a), 668.146(b)(6)).

The Department of Education's references to the 1999 Standards also do not directly impose restrictions on "primary conduct," as does a local building code, *see* PRO Br. at 15 n.7, or even the cigarette labeling requirement referenced by the Court of Appeals.   The 1999 Standards, in contrast, are referenced in connection with grant programs, participation in which is voluntary.  Moreover, the government enjoys a special relationship with the grantee, akin to a contract.  The government would, for example, be free to specify in a particular contract that a product must meet certain industry standards.   And while a contract does impose legal obligations, the reference to a standard in a contract would not be the kind of generally applicable law, essential to complying with a legal duty, that the Court of Appeals suggested might give rise to special fair use treatment.

3.     Equally important in judging whether even the specifically referenced standards were "essential to complying with any legal duty" is the nature of the regulations.  The entities and persons who may be directly affected by the regulations are grant applicants.   But the grantees are not told that they must conform their *own* conduct to any part of the 1999 Standards, even for their government grant.  They are simply directed – if they want to qualify for the grant – to select a test that has been approved by the Secretary of Education based on compliance with, among a long list of other things, the cited standard.  As a general matter, they do not need to read or review the 1999 Standards to comply with anything.  Under 34 C.F.R. §668.146, States or test publishers may obtain approval of the tests used.[7]  Thus, test publishers and designers are

---

[7]  Under 34 C.F.R. §668.141(a)(1), certain students may become eligible for funds if they pass a test "approved by the Secretary under this subpart."  34 C.F.R. §668.144 permits a test publisher
(continued)

affected by these federal regulations – specifically under §668.146(b) – because they may seek to qualify their tests so that they can be utilized by the potential grantees to qualify for the federal grants.  But the fact remains that publishers can create tests that meet the referenced standards or not; they are under no obligation to do so.

In sum, PRO cannot show that its conduct meets the first fair use criterion under the guise of an assertion that it was publishing only what was essential to complying with a legal duty.

### 5.   PRO's Remaining Arguments Are Unavailing.

PRO argues that the government grant programs that reference the 1999 Standards are important, and hypothesizes about how the 1999 Standards might become relevant in some hypothetical context involving a student contending that a school acted improperly, or where federal regulators or oversight entities seek to "ensure the integrity of higher education aid programs."   PRO Br. at 9-11.  While the hypotheticals are imaginative, they are flatly irrelevant in light of the actual structure of the regulations, under which grantees simply have to take a test that has already been approved under the relevant criteria.[8]   PRO has not offered a single example of the Standards being injected into any real life dispute or controversy.   And, more

---

(continued)

to submit an application for such approval.  34 C.F.R. §668.145 provides that the Secretary either approves or disapproves the submitted test based on criteria set forth in 34 C.F.R. §§668.146 and 668.148, which include the references to specific standards found in the 1999 Standards. *See also* 34 C.F.R. §§462.12(c), 462.13(c)(1) (tests approved as "suitable" for use in NRS reporting).

[8]  Most of PRO's parade of horribles, such as student lawsuits, funding cutoffs, and civil fines for misrepresentations by colleges, PRO Br. at 11, involve unrelated parts of the regulations.  The Department of Education publishes lists of the ATB tests and tests "suitable" for use in NRS reporting that it has already approved as complying with the Standards and other requirements. *See* https://ifap.ed.gov/eannouncements/062415ATBTests.html; https://www.federalregister.gov/documents/2018/09/21/2018-20590/tests-determined-to-be-suitable-for-use-in-the-national-reporting-system-for-adult-education (last visited 12/3/2019).

important, PRO cannot contrive a situation where the involved parties would not have reasonable access to any standards in question.

PRO also raises due process concerns, arguing that it can be a violation of due process to subject someone to a legal requirement to which that person has had no reasonable access. Perhaps so, but the due process clause bars *the government* from depriving persons of life, liberty or property, absent certain basic protections.  The duty is placed on the government, not private citizens.  And the government understands as much:  The regulations allowing the government to incorporate by reference state that the government may not enforce any regulations based on incorporated standards not reasonably available to the affected party.  Facts ¶¶ 40-41.  If the government seeks to enforce the standards, the government must ensure reasonable availability. In any event, there is no evidence that anyone has ever lacked reasonable access to the 1999 Standards or any part of them.

### B.     The Expressive Character of the 1999 Standards Weighs Heavily Against a Finding of Fair Use.

The second fair use factor asks about "the nature of the copyrighted work." 17 U.S.C. §107(2).  In its earlier opinion, this Court correctly observed that 1999 Standards are "exactly the type of expressive work that warrants full protection under … the Copyright Act." Op. at *17. They were the product of intense creative attention in their construction, in the formulation of principles, in the seeking and development of consensus, and in the expression of ideas.  *See* Facts ¶¶ 5-8; 29-34.  PRO's assertion that the 1999 Standards are "already at the factual end of the spectrum" (PRO Br. at 39) is inconsistent with the nature of the works and their creation. While they are certainly non-fiction, the very nature of the process of preparation and a review of the material demonstrates that the 1999 Standards are not like a recitation of known facts, and more in the nature of developed principles and practices.

14

The Court of Appeals posited that, however expressive and creative particular standards might be at their creation, once incorporated by reference in federal regulations, they acquire an additional nature, as legal requirements.  But it denies reality to suggest that they are transformed into nothing but "law," regardless whether they are identified in that regulation as compulsory, optional, or merely informative.  Later incorporation by reference does not change the fact that the 1999 Standards' primary character, before and after incorporation by reference, remains non-governmental; that the 1999 Standards retain vitality for that intended purpose; and that they reflect exactly the kind of creative effort the copyright laws promote.

Citing *Wheaton v. Peters*, 33 U.S. 591 (1834) and *Banks v. Manchester*, 128 U.S. 244 (1888), PRO argues that "government edicts" are far from the core of copyright law.  That is of course true, but only because the government edicts discussed in *Wheaton* and *Banks* are, by definition, far from the "core" of copyright protection, and indeed cannot be copyrighted at all.  Works *created as law by or for the Government* are owned by the public at large and therefore beyond copyright protection.  But the government edict doctrine has never been held to apply to materials that were not expressly created by government officials to be the law.

To be sure, the Court of Appeals ruled that, where "incorporation by reference is virtually indistinguishable from a situation in which the standard had been expressly copied into law, this factor weighs heavily in favor of fair use" because it places those standards at the "outer edge" of copyright protection.  *Id.* at 451.  The Sponsoring Organizations maintain their disagreement with that *ipse dixit* assertion because it obscures the private creativity underlying the work, which pre-dates incorporation, and is the form of creativity that copyright is intended to promote.  The Court of Appeals was, of course, correct that incorporation of a standard into law affects fair use analysis.  Thus, if someone really were involved in trying to prepare a test, and needed to

direct a subordinate to undertake some task, it might be fair to copy an applicable standard to instruct on compliance.  But like all fair use analyses, that is a case-by-case determination related to the circumstance in which the use is made.

But even if certain standards were somehow relegated to the "outer edge" of copyright protection, that would not help PRO here.  As shown above, the Department of Education's cross-references to particular standards do not resemble the kind of "law" at issue in *Banks* and *Howell v. Miller,* 91 F. 129 (6th Cir. 1898).  And even more to the point, the *remainder* of the 1999 Standards – including the commentary and background material, as well as the standards not referenced in DOE's regulations – is in no way "the law."  That material embodies the type of creative, expressive content that is entitled to the highest level of copyright protection in a fair use analysis.

PRO also calls attention to the fact that AERA granted permission to the New York Department of Education to reference the 1999 Standards in certain regulations addressing what tests may be used by local authorities to judge teacher and principal performance. PRO Br. at 13. But PRO is (yet again) incorrect in asserting that the entire 1999 Standards are part of New York law.  *See* PRO Br. at 40.  As with the federal regulations, the state regulations direct only that, if local entities wish to use certain tests, those tests must be "valid and reliable" as defined in the 1999 Standards.[9]  "Reliability" and "validity" standards are contained in the first two chapters of the 1999 Standards, and so titled.  They represent a very small number of the standards, and the

---

[9]  8 CRR-NY 30-2.4 ("the provider must demonstrate that there is strong evidence that the assessment is aligned with industry standards of reliability and validity as defined in the testing standards");  8 CRR-NY 30-2.5 ("rigorous shall mean that the locally selected measure is aligned to the New York State learning standards … and, to the extent practicable, the locally selected measure must be valid and reliable as defined by the testing standards"); 8 CRR-NY 30-2.8 ("the locally selected measure must be valid and reliable as defined by the testing standards").

reference is to the definition of those terms – not the associated commentaries, histories, background information, glossary or index that PRO also reproduced in full on its website.

Second, the arrangement that AERA reached with the New York Department of Education stands in sharp contrast to what PRO is doing here.  The careful terms under which AERA agreed that "limited reproduction and distribution *under New York State Law*" is a fair use of the 1999 Standards (PRO Exhibit 43) bear repeating here:

> Upon adoption of the proposed amendment incorporating the Standards, New York Executive Law §102 requires NYSED to file two copies of the Standards with the New York State Department of State (NYSDOS), and those copies will be available for public use at NYSDOS's offices at One Commerce Plaza, Albany New York.  A copy of the Standards will also be kept and made available for public use at NYSED's offices at the State Education Building ….  In addition, NYSDOS and NYSED will, as required by State law, make a photocopy of all or any part of the Standards upon request of any person.  The statutory fee for any such photocopy is $.25 per page.  New York Executive Law §102 requires NYSED to submit a copy of the Standards to the New York State Legislative Library and to each of the thirteen State Supreme Court Libraries, and that such copies be made available for public use, and for photocopy at $.25 per page.
>
> It is our understanding the [Sponsoring Organizations] hold the copyright to the Standards.  In signing this letter, you agree that such limited reproduction and distribution under New York State Law, is a fair use of the Standards and that such use will not violate the copyright interest.

This limited agreement to make the 1999 Standards available for photocopying at certain locations in New York does not justify PRO's wholesale online posting of that document.  First, it is an agreement with the copyright owner, not the kind of unauthorized usurpation of copyright that PRO takes upon itself.  Second, the copies of the 1999 Standards provided to state libraries and offices are printed volumes purchased from the Sponsoring Organizations, not unauthorized online copies.  Third, the further photocopying of those printed volumes is only as required by state law.  Fourth, that copying is manual, direct from the hard copy (which tends to be limited given the physical burden) and, because of the price of 25 cents per page, poses little threat to the

sales of 1999 Standards or derivative works.  This is all quite different from the free internet access and copying from its website that PRO undertook on its own initiative here.

### C.    The Amount and Substantiality of Public Resource's Copying of the 1999 Standards Weighs Heavily Against a Finding of "Fair Use."

The third fair use factor asks about "the amount and substantiality of the portion used in relation to the copyrighted work as a whole."  17 U.S.C. §107(3).  This factor "examines whether defendants have 'helped themselves overmuch' to the copyrighted work in light of the purpose and character of the use."  *Peter Letterese and Associates, Inc. v. World Inst. of Scientology Enter.*, 533 F.3d 1287, 1314 (11th Cir. 2008) (quoting *Campbell*, 510 U.S. at 587).

This Court has already recognized that this factor "weighs overwhelmingly in Plaintiffs' favor and against a finding of fair use" because Public Resource "copied and distributed identical versions of the Plaintiffs' standards in their entirety."  Op. at 38.  Yet the actual referenced standards occupy only around 6% of the 200-page 1999 Standards.[10]  In such circumstances, even PRO's stated purpose and rationale – if it were to be credited – might justify posting the particular standards incorporated by reference, but certainly no more.  *Am. Society*, 896 F.3d at 452.  Yet PRO copied, verbatim, *the entire volume* of the 200-page 1999 Standards.  The highly creative and expressive material set forth as introduction, background, and commentary, as well as the glossary and the index, does not fall within the terms of PRO's asserted "incorporation by reference" rationale.  PRO's copying far exceeded even its own ostensible purpose.

Conversely, as the *Letterese* court observed, the third fair use factor "partly functions as a heuristic to determine the impact on the market for the original."  *Peter Letterese and Associates*,

---

[10]  Facts ¶ 54 (as computed by comparing the lines of text in the referenced standards with the total lines of text in the volume).  The standards in total occupy less than 15% of the 1999 edition.  See Facts ¶ 35 (using the same method based on lines of text).

533 F.3d at 1314 ("were a book reviewer to quote the entire book … he would be cutting into the publisher's market, and the defense of fair use would fail") (quoting *Ty, Inc. v. Publ'ns Int'l Ltd.*, 292 F.3d 512, 517 (7th Cir. 2002)).   Similarly here, PRO's wholesale reproduction of the 1999 Standards maximizes the potential effect on the market for sales of that work.   The "amount and substantiality" of PRO's copying therefore weighs heavily against any finding of fair use.   *See WorldWide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1120 (9th Cir. 2000) ("We have found no published case holding that fair use protected the verbatim copying, without criticism, of a written work in its entirety.").

PRO's response again rests on its assertion that the entire 200-page volume – not just the referenced standards, or even all the standards, but every additional comment, annotation, elaboration, and glossary definition – has become the law, and is essential toward fulfilling someone's legal duties.   PRO ignores that the comments and background material are more likely, if anything, to "inform" *about* the law, rather than *be* the law.   Copying the entirety of this 200-page work cannot plausibly weigh in favor of fair use, but must weigh against it.

**D.    The Likely Effect on the Market for Standards Weighs Heavily Against a Finding of "Fair Use."**

The final fair use factor concerns "the effect of the use upon the potential market for or value of the copyrighted work."   17 U.S.C. §107(4).   This factor requires courts to consider both the harm caused by the particular actions of the alleged infringer, "but also *whether unrestricted and widespread conduct of the sort engaged in by the defendant … would result in a substantially adverse impact on the potential market for the original*."   *Campbell*, 510 U.S. at 590 (internal quotation marks omitted; emphasis added).   In evaluating this factor, the Court "must take account not only of harm to the original but also of harm to the market for derivative works."   *Harper & Row*, 471 U.S. at 568.

19

The case law addressing this factor often concerns instances of partial copying, and its effect on the market for the original.  In contrast, this is an easy case, addressing complete verbatim copying and republication of an entire work by PRO and making it available for further copying for free.  *See*, *e.g.*, *Television Digest, Inc. v. U.S. Telephone Ass'n*, 841 F. Supp. 5, 10-11 (D.D.C. 1993) (finding obvious impact on potential market and no fair use where defendant copied entire trade newsletter published by plaintiff and distributed it to its employees).  Where the infringer is providing a complete substitute copy, the effect on the "potential market" is obvious; the Sponsoring Organizations do not need to submit more detailed information about the extent of that harm.  *Cf. Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1333-34 (Fed. Cir. 2008) (affirming injunction based on "economic logic" that distribution of duties to American wheat promotor would harm Canadian seller, rejecting assertion that further "empirical analysis" was needed).  That is particularly true given that the burden is on PRO to show that the market impact of its actions favors a finding of fair use. *Supra* p. 2.

PRO suggests that there is no market effect because actual sales of the 1999 Standards have been "near nil" since the Sponsoring Organizations introduced the 2014 Standards, regardless of whether the 1999 Standards were available online.  PRO Br. at 42.  PRO's argument misses the point.  The fair use inquiry turns how PRO's conduct would affect the "potential market" if the conduct were "unrestricted and widespread."  *Campbell*, 510 U.S. at 590.  Substitute dissemination of an entire work has an obvious impact on the *potential* market for that work, even if the work is not currently being marketed.  Otherwise, an infringer would be free to copy and distribute any out-of-print book, or art that was never intended to be marketed.[11]

---

[11]  See *Worldwide Church of God*, 227 F.3d at 1119 (rejecting argument that there was no market harm where holder of copyright had no plan to publish a new version of an outdated work
(continued)

Here, of course, there are likely additional market impacts.   AERA's website, while continuously offering the 1999 Standards for sale (except for a brief period when the 2014 Standards were first being offered), clearly indicates that the derivate work, the 2014 Standards, is to be preferred as a more up-to-date statement of best practices.   *See* Opening Br. 29.   The availability of a substitute, outdated work is bound to have some impact on the Sponsoring Organizations' sales of derivative works.   Again, this is simply economic logic.   This "market substitution" of the original for an updated version by the creators is exactly the type of core "harm to derivatives that need concern [the Court]."   *Campbell*, 510 U.S. at 593.

PRO looks at the sales figures for the 2014 Standards and observes that they are "almost identical" to the first five years of sales of the 1999 Standards, from which it would conclude that there was no negative impact from PRO's posting on the sales of the derivative work, the 2014 Standards.   But it is reasonable to assume instead that the potential market for the 2014 Standards would be larger absent the free online availability of the 1999 Standards.   It is difficult to draw any conclusion either way from the actual sales figures—and again, the burden is on PRO to show that the market impact of its actions favors a finding of fair use.[12]

Finally, PRO says that the Sponsoring Organizations' right "not to sell" the 1999 Standards is not a valid "market" interest.   But a copyright owner has a right not to sell that must

---

(continued)

because "[e]ven an author who has disavowed any intention to publish his work … was entitled to the protection of his copyright" and "the relevant consideration was the 'potential market'").

[12] *Amici* Law Scholars argue that the market for standards is not "cognizable" because it "consists of" persons who would reference the standards because it is law.   Doc. 140-1 at 17. That is, of course, factually false.   The Standards are for students and professionals.   Indeed, it is only because they are accepted by professionals that they are eligible for incorporation.   Sales of the 1999 Standards were highest in the years following publication (before being referenced in regulations), and were similar to sales of the 2014 Standards, which have not yet been referenced in any regulations.   *See* Facts ¶¶ 13, 60.   In fact, PRO has not shown that *anyone* has specifically sought access to the 1999 Standards in order to comply with federal or state regulations.

be factored into the fair use analysis, whether as a "market interest" or otherwise.[13]   In any event, there is assuredly a market interest in play here:   Plaintiffs seek to encourage the purchase of their derivative work, the 2014 Standards, which they can do more effectively if their copyrighted 1999 Standards are not being infringed by PRO's online posting.

## II.    THE COURT SHOULD REINSTATE THE PERMANENT INJUNCTION.

PRO says that Plaintiffs should have re-briefed the injunction issues, applying *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).   PRO is incorrect.   This Court issued its injunction after applying those standards, and considering the same arguments that PRO is again presenting.   The Court of Appeals did not suggest that this Court applied those standards incorrectly, and did not direct any rethinking of the Court's conclusions on that front.

Moreover, PRO's argument suggests that, under its interpretation of *eBay*, there should be no remedy at all:   It can go on infringing at will, and enabling others to infringe by posting the 1999 Standards online for easy download and dissemination.   That is not what *eBay* says or suggests.   While *eBay* provides that a grant of an injunction is not automatic, it only requires the Court to apply the standard factors applicable to an injunction analysis.   547 U.S. at 391.   The Court's prior analysis of those factors remains correct, for the same reasons as before.   Briefly:

### A.    Likelihood of Success on the Merits.

The first and most important factor – plaintiff's chance of success on the merits – obviously weighs heavily in favor of a permanent injunction once the merits have been decided.

---

[13]   *See Salinger v. Random House, Inc.* 811 F.2d  90, 99 (2d Cir. 1987) (an author is entitled "to protect his *opportunity* to sell" his work, and the value of that opportunity is relevant to "the 'potential market' for the copyrighted work"). The Sponsoring Organizations' decision not to sell the 1999 Standards to preserve the market for their 2014 Standards is similarly relevant to the market impact inquiry, and the fair use analysis more broadly.

If this Court agrees that PRO's wholesale publication of the 1999 Standards on its website was not fair use, then this factor of the injunction analysis favors the Sponsoring Organizations.

### B.      Irreparable Harm.

The second factor in the injunction analysis, irreparable harm, also favors Plaintiffs. PRO argues that the Sponsoring Organizations do not actively seek to sell the 1999 Standards any longer, preferring to sell the derivative work, the 2014 Standards. Therefore, PRO asks, where is the harm? But PRO fails to understand the inquiry.

First, the copyright interest includes the right to *exclude* – to prevent others from distributing, reproducing or displaying their protected works – and PRO's continuing infringement violates that right to exclude. That is harm, and PRO suggests no way to remedy that harm. That is why, as the Court pointed out, it remains well established that the threat of *continuing* copyright infringement justifies a permanent injunction. *See Walt Disney Co. v. Powell*, 897 F.2d 565, 567 (D.C. Cir. 1990) ("When a [ ] plaintiff has established a threat of continuing infringement, he is entitled to an injunction."); *accord Hanley-Wood LLC v. Hanley Wood LLC*, 783 F. Supp. 2d 147, 151 (D.D.C. 2011).

Second, PRO's *internet* posting presents a grave threat – the likelihood of rampant infringement by additional persons and entities – that can only be remedied by an injunction. A copy posted on the Internet for no-cost downloading can be quickly shared. The physical and temporal burdens of manual photocopying, which curtailed widespread distribution, have disappeared. *See Grokster*, 518 F. Supp. 2d at 1218 ("When digital works are distributed via the internet, every downloader … is in turn capable of also transmitting perfect copies of the works. Accordingly, the process is potentially exponential rather than linear, threatening virtually unstoppable infringement of the copyright.") (internal quotation omitted). Indeed, the copy PRO

posted has been reposted on "Scribd," https://www.scribd.com/document/224788800/Standards-for-Educational-and-Psychological-Testing, where it is accessible for a fee.

Third, as this Court described – and as remains true – the primary threat here is of *future* harm if PRO's practices are authorized.  As this Court noted: "Defendant's counsel at oral argument admitted that Defendant would post the AERA Plaintiffs' 2014 Standards if they were incorporated by reference into federal regulations in the future."  Op. at *24.  That is a real threat to the Sponsoring Organizations' business model and ability to continue to improve the Standards.  The Sponsoring Organizations must be assured that if they invest time in the project of updating and revising the Standards, it will be protected by copyright, even if some government agency were to find it useful to reference it.

Finally, what makes this ongoing and threatened future harm indisputably irreparable is that PRO will not be able to pay damages, even statutory damages.  *Id.* at *25.  PRO's inability to pay weighs decisively towards equitable relief.  *See* 17 U.S.C. §504(c)(1)–(2).

**C.     Balance of Hardships & Public Interest.**

As the Court pointed out when concluding that an injunction was the appropriate remedy previously, PRO cannot show that it would be harmed by an injunction.  This "factor weighs strongly in favor of an injunction."  Op. at *25.

This Court also rightly explained that "the public interest is served by the policy interests that underlie the Copyright Act itself, namely the protection of financial incentives for the continued creation of valuable works, and the continued value in maintaining the public-private system in place in the U.S. to ensure continued development of technical standards."  *Id*.  This Court also observed, at length, that the regulations and statutes providing for incorporation by reference reflect the policy of the United States.  Specifically, the approach of incorporating by

reference (rather than directly copying standards into law), was designed to *protect* the interests of copyright holders generating standards – so they can continue their important work.

PRO touts the public interest it claims to serve by making the Standards freely accessible and easily copied.  But there is, of course, an arguable public interest in making *any* important written work freely available.  The Copyright Act draws a different balance.  It reflects Congress's considered judgment that creative works must be protected to encourage further creativity.  Again, the Court must consider how likely it is that the Sponsoring Organizations, or others who undertake laborious efforts to research and define professional standards, will continue to do that good work if the fruit of their labors can be published online, in full, by others once some small part of it has been referenced in a statute or regulation.  PRO, in contrast, has not shown that *anyone* would be denied reasonable access to the 1999 Standards without its unauthorized posting.  And PRO's actions go far beyond what could possibly be needed in order to give persons with a legal duty to comply with one or more standards access to them, given that PRO makes it possible for persons not only to view the Standards, but to download them.

In short, the balance of harm falls heavily on Plaintiffs' side.  On one hand, PRO has identified no harm it or the public will suffer if enjoined from making the 1999 Standards available online, while on the other, if PRO were permitted to continue its online publication of the Standards, the Sponsoring Organizations' important work in updating and revising that document would be threatened.  The injunction therefore should be reinstated.

## CONCLUSION

Public Resource's wholesale copying of Plaintiffs' 1999 Standards is not a fair use.  This Court should reaffirm its earlier grant of summary judgment, and reinstate its injunction prohibiting PRO from posting the 1999 Standards on its website and that of the Internet Archive.

Respectfully submitted,


s/Clifton S. Elgarten
John I. Stewart, Jr. (D.C. Bar No. 913905)
Clifton S. Elgarten (D.C. Bar No. 366898)
Amanda S. Berman (D.C. Bar No. 497860)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004-2595
(202) 624-2500
celgarten@crowell.com

*Attorneys for Plaintiffs-Counterdefendants*

December 6, 2019