# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN EDUCATIONAL RESEARCH ASSOCIATION, INC., AMERICAN PSYCHOLOGICAL ASSOCIATION, INC. and NATIONAL COUNCIL ON MEASUREMENT IN EDUCATION, INC., <br><br>                         Plaintiffs-Counterdefendants, <br><br>     v. <br><br> PUBLIC.RESOURCE.ORG, INC., <br><br>                     Defendant-Counterclaimant. | Civil Action No.: 1:14-cv-00857-TSC |

**DEFENDANT-COUNTERCLAIMANT PUBLIC.RESOURCE.ORG'S**
**REPLY IN SUPPORT OF ITS SECOND MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

I.   THE AERA PLAINTIFFS HAVE NOT MET THEIR BURDEN OF JUSTIFYING A PERMANENT INJUNCTION. ..................................................................2

    A.   With the Passage of Time, An Injunction Has Only Become Less Appropriate. ....................................................................................2

    B.   The AERA Plaintiffs have not satisfied any of the four factors for a permanent injunction. ..............................................................4

        1.   The AERA Plaintiffs have not demonstrated that they have suffered irreparable injury.................................................5

        2.   The AERA Plaintiffs' own argument shows the balance of hardships weighs against an injunction.......................................7

        3.   The AERA Plaintiffs failed to show that a permanent injunction would serve the public interest. ..................................7

II.  PUBLIC RESOURCE IS ENTITLED TO SUMMARY JUDGMENT BECAUSE ITS POSTING OF LAWS BY INCORPORATION IS FAIR USE...........................................8

    A.   First Factor: The Purpose and Character of Public Resource's Use Favors Non-Infringement..................................................8

        1.   The Court of Appeals suggested a spectrum, not a binary, to guide the court in assessing the first factor..............................8

        2.   Courts and citizens need a practical test for fair use of standards incorporated into law. ..........................................10

    B.   Second Factor:  The Nature of the Work as Government Edict ............................13

    C.   Third Factor: Using The 1999 Standards Document as a Whole is Reasonable and Necessary to Fulfill Public Resource's Public Interest Purpose....................................................................17

    D.   Fourth Factor: The Record Shows No Current or Likely Future Effect on the Market for the "Standards for Educational and Psychological Testing."..................................................................19

CONCLUSION....................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.V. ex rel. Vanderhyge v. iParadigms, LLC*,
562 F.3d 630 (4th Cir. 2009) ...................................................18

*Am. Soc'y for Testing & Mat'ls v. Public.Resource.Org, Inc.*,
896 F.3d 437 (D.C. Cir. 2018) ..................................................... *passim*

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015)......................................................18

*Bellwether Props., LLC, v. Duke Energy Indiana, Inc.*,
87 N.E.3d 462 (Ind. 2017) ....................................................3, 4

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
448 F. 3d 605 (2d Cir. 2006).....................................................18

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994).................................................................17

*CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reports, Inc.*,
44 F.3d 61 (2d Cir. 1994) .........................................................19

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006).........................................................4, 5, 6, 7

*Lexmark v. Static Control Components, Inc.*,
387 F.3d at 544 ........................................................................18

*Papachristou v. Jacksonville*,
405 U.S. 156 (1972)....................................................................3

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984)..................................................................18

*SunTrust Bank v. Houghton Mifflin Co.*,
268 F.3d 1257 (11th Cir. 2001) .................................................4

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg LP*,
756 F.3d 73 (2d Cir. 2014)...................................................18, 20

*Thornhill v. Alabama*,
310 U.S. 101-02 (1940) ..............................................................3

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*United States v. Mead Corp.*,
    533 U.S. 218 (2001) ..........................................................................................................11

*Veeck v. Southern Building Code Congress Int'l, Inc,*
    293 F.3d 791 (5th Cir. 2002) .........................................................................................7, 8

**STATUTES AND REGULATIONS**

1 C.F.R. §§ 51.1-51.11 ...........................................................................................................12

24 C.F.R. § 3280.4(aa)(4) (2019) .........................................................................................12

34 C.F.R. § 668.148(a)(1)(iv) ...............................................................................................15

17 U.S.C. § 101 ("Copyright Act") .......................................................................................14

17 U.S.C. § 102(b) ...................................................................................................................3

17 U.S.C. § 107(4) .................................................................................................................19

8 CRR-NY § 30-2.2 ...............................................................................................................16

8 CRR-NY § 30-2.4 ..........................................................................................................15, 16

8 CRR-NY § 30-2.5 ...............................................................................................................16

8 CRR-NY § 30-2.8 ...............................................................................................................16

**U.S. CONSTITUTION**

U.S. Const., amend. I ...........................................................................................................3, 4

U.S. Const., amend II ............................................................................................................11

**OTHER AUTHORITIES**

John R. Searle, *A Taxonomy of Illocutionary Acts*, 7 Minn. Studies in the
    Philosophy of Science, 358–59, 368 (1975) ..................................................................17

## INTRODUCTION

Public Resource seeks to do something simple but profoundly important: to make every form of law available to the public, for free, so we can know, share, and fully comment on the rules that govern our conduct. These laws include the otherwise obscure regulations that govern the conduct of the many entities that educate our youth; build our houses, workplaces, and pipelines; sell us the toys we give to our children, and so on.

The AERA Plaintiffs' response offers no serious obstacle to summary judgment allowing Public Resource to continue this crucial work. In fact, the AERA Plaintiffs' arguments and positions actually help tilt the analysis even further in Public Resource's favor. On fair use, the AERA Plaintiffs' case depends on a misreading the Court of Appeals' clear guidance. With respect to the first factor, Public Resource's use fits comfortably within the spectrum of transformative and public interest purposes that the Court of Appeals recognized in its opinion. *See Am. Soc'y for Testing & Mat'ls v. Public.Resource.Org, Inc.*, 896 F.3d 437, 450-51 (D.C. Cir. 2018). Public Resource also offers a practical rubric for classifying the 1999 Standards document that avoids a legal morass of regulatory interpretation. As for the second factor, it heavily favors fair use where, as here, "the consequence of incorporation by reference is virtually indistinguishable from a situation in which the standard had been expressly copied into law . . . ." *Id.* at 452. On the third factor, Public Resource's posting of the entire document was necessary to present the full law that the federal government had *twice* adopted as its own speech by reference. Finally, the significant passage of time since Public Resource has posted the 1999 Standards, as well as the AERA Plaintiffs' own conduct, has provided ample opportunity to collect evidence of any possible market effects. The updated record shows an *absence* of any adverse effect on the market for the 1999 Standards (or for the 2014 Standards).

1

On the motion for a permanent injunction, the AERA Plaintiffs' position has only worsened: it is now abundantly clear that they cannot show any harm from Public Resource's conduct or that an injunction would serve the public interest. Indeed, the Plaintiffs have barely attempted to satisfy the four factors that are necessary to obtain a permanent injunction, much less succeeded. And because that is the only relief the Plaintiffs seek, the Court may actually render this case moot by denying the permanent injunction. Therefore, Public Resource again takes the admittedly unusual step of turning first to the issue of relief in the argument below.

On every issue, the record is now clear: Public Resource deserves summary judgment because its use is fair and the Plaintiffs cannot meet any element of the standard for a permanent injunction.

## I.   THE AERA PLAINTIFFS HAVE NOT MET THEIR BURDEN OF JUSTIFYING A PERMANENT INJUNCTION.

The AERA Plaintiffs present their first and only argument for a permanent injunction in their reply brief. They provide too little too late.

### A.   With the Passage of Time, An Injunction Has Only Become Less Appropriate.

The AERA Plaintiffs pretend that nothing has changed since the first motion for permanent injunction, presuming that the Court will automatically order a new injunction without argument, based solely on papers from three and a half years ago. That is not how injunctions work; now, as before, a party seeking injunctive relief must justify it.

The AERA Plaintiffs cannot do so. In particular, and despite the passage of additional time, the AERA Plaintiffs have not been able to point to any harms that they have suffered from Public Resource's posting of the standards. To the contrary, it is clearer than ever that Public Resource's activities have not harmed and will not harm the AERA Plaintiffs. *See* Public Resource's Supplemental Statement of Material Facts ("SSMF") ¶¶ 51-63.

Moreover, the decision of the Court of Appeals recognized the "serious constitutional concern with permitting private ownership of standards essential to understanding legal obligations." *Am. Soc. For Testing and Materials, et al. v. Public.Resource.Org*, 896 F.3d 437, 447 (D.C. Cir. 2018). Even apart from the merits, this constitutional concern must influence the Court's evaluation of injunctive relief. Due process requires that persons be able to know and understand the law. "Living under a rule of law entails various suppositions, one of which is that '[all persons] are entitled to be informed as to what the State commands or forbids.'" *Papachristou v. Jacksonville,* 405 U.S. 156, 162 (1972) (quoting *Lanzetta* v. *New Jersey,* 306 U. S. 451, 453 (1939)).  Moreover, under the First Amendment, "[t]he freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment."  *Thornhill v. Alabama*, 310 U.S. 101-02 (1940).  As the Indiana Supreme Court observed in *Bellwether Props., LLC, v. Duke Energy Indiana, Inc.*, addressing precisely the constitutional problem of restricted access to standards incorporated by reference into law:

> It is a maxim of universal application that every man is presumed to know the law, and it would seem inherent that freedom of access to the laws, or the official interpretations of those laws, should be coextensive with the sweep of the maxim. Knowledge is the only just condition of obedience. The laws of Rome were written on tablets and posted, that all might read, and all were bound to obedience.  *Ex parte Brown*, 166 Ind. 593, 611, 78 N.E. 553, 559 (1906) (citation omitted). If the rule of law means anything, it is that persons have meaningful access to the laws they are obliged to follow, so they can conform their conduct accordingly.

87 N.E.3d 462, 467 (Ind. 2017).

The Court of Appeals also held in abeyance, and explicitly reserved, the other defenses that Public Resource had raised, such as whether the Standards are copyrightable as law or whether the merger doctrine and 17 U.S.C. § 102(b) preclude enforcement. Those First

3

Amendment-infused copyright issues remain serious issues in the case, even if a fair use ruling for Public Resource would make them moot, and should color the overall context in which the court evaluates an injunction. As the Eleventh Circuit has noted in the context of injunctive relief, "the public interest is always served in promoting First Amendment values . . . ." *SunTrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1276 (11th Cir. 2001).

Finally, a recent decision of the Indiana Supreme Court has helped illuminate one consequence of impeding access to obsolete standards that remain laws: even courts may not be able to find them. *See Bellwether,* 87 N.E.3d at 468-69. The importance of *unfettered* access to the law for all, including citizens and government officials, is particularly important here, where the AERA Plaintiffs claim that the copyright statutory monopoly gives them the right to keep the 1999 Standards off the market. Overcoming that strong public interest is a heavy burden; the AERA Plaintiffs do not meet it.

**B.      The AERA Plaintiffs have not satisfied any of the four factors for a permanent injunction.**

The AERA Plaintiffs presume that they are entitled to a permanent injunction if they prevail on the question of fair use now before the Court. The Supreme Court says otherwise; indeed, it "has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed." *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006) at 392-93. That refusal is especially appropriate here, where even a ruling for the AERA Plaintiffs on fair use does not resolve the merits but rather signals a need to address other doctrines, which the Court of Appeals held in abeyance, that may independently preclude a finding of infringement.

Under *eBay*, the AERA Plaintiffs have the burden of demonstrating

(1) that [they have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering

4

the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Id.* They cannot meet *any* of these requirements.[1]

### 1.    The AERA Plaintiffs have not demonstrated that they have suffered irreparable injury.

After years of litigation, the AERA Plaintiffs still cannot point to any economic harm from Public Resource's posting of the standards. Indeed, as Public Resource explained in its opening brief, whenever Public Resource's posting of the standards was available to the public, sales of the standards *increased*. Public Resource's Mem. of Law in Opp. to Pltfs. Mot. For Summary Judgment and In Support of Public Resource's Mot. for Summary Judgment [Dkt. 137] ("PRO Opening Br.") at 17-18. Any effect on those sales came from the AERA Plaintiffs themselves, first by taking the standards off the market and then again when, hoping to shore up the claim that they had a market that might be injured, they resumed selling the standards only through a cumbersome purchase channel. While Public Resource had withdrawn its posting of the standards, the AERA Plaintiffs' sales were "near nil" in the three years 2015, 2016, and 2017. PRO Opening Br. at 17-18.

Unable to combat the strong evidence showing no actual harm, the AERA Plaintiffs resort to speculation and hyperbole, insisting there is "a grave threat—the likelihood of rampant infringement by additional persons and entities—that can only be remedied by an injunction." AERA Reply [Dkt 143] at 23. If there is such a threat, it would have become manifest by now. As the Supreme Court stated in *eBay*, "[a] plaintiff must demonstrate . . . that it *has suffered* an

---

[1] The Plaintiffs failed to respond to Public Resource's point, PRO Opening Br. at 29, that their waiver of a damages claim does not allow them to claim that their harm is irreparable. That point applies to both the first and second elements of the Plaintiffs' burden under *eBay*. Plaintiffs have not argued the second factor and have therefore conceded it.

irreparable injury . . . ." 547 U.S. at 391 (emphasis added). If the AERA Plaintiffs could make such a demonstration, they would have done so.

The AERA Plaintiffs also accuse Public Resource's posting of spawning infringements on the user upload platform Scribd, but they offer no evidence of how the material actually made it to that platform. Plaintiffs conducted no discovery on this question. And if the AERA Plaintiffs felt harm from any Scribd postings, they would presumably have taken steps to alleviate that harm by using Scribd's readily available copyright infringement reporting facility.[2] There is no evidence that they have done so or that any alleged "rampant infringements" have had a measurable effect on any market.

Lacking any evidence of economic impact, the AERA Plaintiffs stress their impaired ability to prevent public access to or communication of the law that their Standards have become. *See* AERA Reply at 23. That theory plainly violates the Supreme Court's instruction in *eBay* by collapsing the merits and injunction analyses: the professed injury is the alleged violation itself.

The AERA Plaintiffs make the same error when they complain that "the primary threat here is of future harm if PRO's practices are authorized." AERA Reply at 24. In other words, the harm the AERA Plaintiffs see as "primary" is the harm that will ensue if Public Resource wins, i.e. that Public Resource will rely on the precedent in this case to guide its future conduct. That anxiety is not evidence favoring a permanent injunction against posting the document at issue; it is an attempted (and insufficient) argument for why they should not lose the case on the merits. Public Resource, and any other person, should be able to look to the outcome of this litigation for guidance—that is one of the basic functions of judicial decisions—but that reliance does not

---

[2] "Report copyright infringement," Scribd (last visited Dec. 20, 2019), https://www.scribd.com/copyright/report-infringement.

equal an independent harm. And the fact that the AERA Plaintiffs see such a loss as their primary potential damage simply reinforces their lack of evidence that they have suffered, or will suffer, any actual injury that *eBay* would credit.

2.     **The AERA Plaintiffs' own argument shows the balance of hardships weighs against an injunction.**

The AERA Plaintiffs stress that their most critical consideration is their right to *exclude* others from having access to, or communicating, the 1999 Standards. They did in fact take the 1999 Standards off the market and then restored them for sale only through a cumbersome process. SSMF ¶ 50. Given these facts, the Court should expect that the AERA Plaintiffs will take the Standards off the market again once this litigation is complete. An injunction that would empower the AERA Plaintiffs to control access to the law at their whim would cause real hardship to the public, to educators, to institutions, and even to governments that rely on the 1999 Standards.

3.     **The AERA Plaintiffs failed to show that a permanent injunction would serve the public interest.**

The AERA Plaintiffs' "public interest" argument favors Public Resource. They concede that the public has an interest in the free availability of written works, but they deny any public interest in access to their 1999 Standards document. AERA Reply at 25. The vindication of copyright holders' interests cannot be the sole public interest at stake, because that would again make injunctions presumptively available for any alleged infringement. Once again, this violates the teaching of *eBay*. The countervailing public interest in unfettered access to the law must be part of the analysis.

The AERA Plaintiffs also claim that failure to enjoin Public Resource will jeopardize future standards development activities. History suggests otherwise. Standards development organizations similarly predicted the demise of their industry after an adverse decision in *Veeck*

*v. Southern Building Code Congress Int'l, Inc,* 293 F.3d 791 (5th Cir. 2002). As the court in

*Veeck* itself anticipated, 293 F.3d at 806, that did not happen, likely because the persons who do

the drafting and revising of standards—the actual volunteers—do not need or demand any

copyright incentive to do the work.

By contrast, Public Resource's opening brief offers ample evidence that a permanent

injunction in this context and on this record would manifestly *disserve* the public interest in

accessing the law. PRO Opening Br. at 31.

The AERA Plaintiffs have barely attempted, much less managed, to meet their burden to

justify a permanent injunction. Whichever way the Court rules on the fair use question, it should

deny the remedy of a permanent injunction.

## II.   PUBLIC RESOURCE IS ENTITLED TO SUMMARY JUDGMENT BECAUSE ITS POSTING OF LAWS BY INCORPORATION IS FAIR USE.

The AERA Plaintiffs make more of an effort on the merits than on the relief they seek,

but their case fares no better. The record supports summary judgment for Public Resource on the

issue of fair use.

### A.   First Factor: The Purpose and Character of Public Resource's Use Favors Non-Infringement.

#### 1.   The Court of Appeals suggested a spectrum, not a binary, to guide the court in assessing the first factor.

Contrary to Plaintiffs' interpretation, the Court of Appeals did not suggest that this Court

should organize its analysis based on a false binary division between documents that are essential

to comply with a legal duty and those that are informational. *Cf.* AERA Reply at 10-11. Rather,

the Court of Appeals suggested a "spectrum" that this Court could consider in determining

whether factor one—the purpose and character of the use—favors Public Resource. 896 F.3d at

442-43 ("At one end of this spectrum lie incorporated standards that define one's legal

obligations just as much as, say, a local building code . . . . At the other end of the spectrum lie standards that serve as mere references but have no direct legal effect on any private party's conduct."). Notably, while the Court of Appeals suggested that posting incorporated standards at the "reference" end of the spectrum may be *less* transformative, it did not find that such a use was not transformative at all, much less disfavored. *Id*. at 450.

Accordingly, the decision suggests that each of Public Resource's uses are at least somewhat transformative, and the task at hand is determining how transformative that use is for each incorporated standard. As to the 1999 Standards document, the Court of Appeals stated that it lay between the "two poles" of the spectrum, suggesting that its use reflects a degree of transformativeness. *Id*. at 443. While the AERA Plaintiffs argue that certain portions of the 1999 Standards like "comments and background material are more likely, if anything, to 'inform' about the law, rather than be the law," taken in the context of the Court of Appeals' instructions, those portions would still fall within the spectrum for transformative use when posted to educate fellow citizens. AERA Reply at 19. And the AERA Plaintiffs effectively concede that other portions of the document, such as the bolded standards at the end of each chapter, are akin to text that dictates a legal duty and therefore falls towards the even more transformative end of the spectrum.[3]

Indeed, it is undisputed that private individuals, including test publishers and administrators, *must* comply with the 1999 Standards in certain situations. The AERA Plaintiffs' assertion that test publishers are not "obligated" to create tests that meet these requirements is

---

[3] Plaintiffs' reference to the phrase "primary conduct" (AERA Reply at 12), purportedly quoted from Public Resource's brief, is unclear. That phrase does not appear anywhere in Public Resource's brief or in the Court of Appeals' opinion, and there is no "footnote 7" on page 15 of Public Resource's brief, as cited by Plaintiffs.

disingenuous at best. AERA Reply at 13. Publishers can either comply with the regulation or lose customers who can only use compliant tests. And the AERA Plaintiffs' claim that federal grant recipients do not need to conform their own conduct under the 1999 Standards, but simply take the test that is administered to them, improperly discounts the interest that potential grant recipients and the public have in confirming the terms on which federal student aid is administered. AERA Reply at 12.

Beyond that point, it is undisputed that the government's incorporation of the Standards is a *fact*: by that incorporation, the Standards have become the government's speech and a government edict. It is no different from the passage of a lobbyist's draft of a bill into law: the government has adopted that language as its own, and anyone must be free to report what the government has said. While the "government edicts" doctrine affecting copyrightability, currently before the United States Supreme Court in *Georgia v. Public.Resource.Org., Inc.*, no. 18-1150 (argued Dec. 2, 2019), is not directly before this Court now, the status of the 1999 Standards—the entire document—as a government edict establishes the substance of the government's speech as a fact, and shows that propagation of that fact qualifies as a form of news reporting to the same degree that conveying the entire text of a government debate or proclamation does.

### 2. Courts and citizens need a practical test for fair use of standards incorporated into law.

Public Resource, the Court, and other adjudicating bodies need a workable method to determine what documents should be freely accessible. The AERA Plaintiffs' approach—requiring the Court to determine, for each law and regulation incorporating a standard, precisely what portions of the incorporated document are "essential" to comply with the law—does not offer such a method. AERA Reply at 10-13. To begin with, citizens require access to laws and

government edicts far beyond that with which *they themselves* must comply. Is the preamble to the Second Amendment "essential"? Does public access to the text of an oath of office of a state official depend on whether the public must comply with the oath? Trying to parse these questions does not yield a workable legal test.

Moreover, Plaintiffs' approach means disregarding federal agencies' own statements about incorporation by reference and their formal expressions of incorporation which, when part of notice-and-comment rulemaking, normally deserves judicial deference. *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). It also means a tedious and intensive process requiring the Court to review every standard (each of which, like the 1999 Standards, may be hundreds of pages long); each incorporating regulation and all related provisions that speak to the purpose and scope of the regulation; the rulemaking history and comments; all relevant enforcement actions by the agencies; and any other cases where a court may have addressed or interpreted the scope of the incorporation. Each instance is likely to be an issue of first impression, and when a regulation is updated several years later, the analysis would need to be performed anew.

Critically, the consequences of this cumbersome task would not be limited to this case. The Court would necessarily have to determine the scope of the regulation; whom it governs; how it governs them; and what portions of the incorporated documents are relevant to understanding, interpreting, and complying with the regulation. These determinations would inevitably affect the interpretation of these regulations in later disputes concerning anyone bound by them, despite the fact that this Court does not have the benefit of a controversy involving an enforcement or violation of the regulations before it, meaning that the Court does not have all of the factual nuances that might emerge in other litigation.

Public Resource's approach avoids this morass. The Court can instead focus on whether what has been posted has been made law through incorporation by reference. If so, that fact favors fair use. The Court need not make a detailed holding analyzing the scope of each regulation, make law that will affect the rights and obligations of unknown parties in future cases under these regulations, or second-guess the incorporating agencies. If an agency follows all necessary procedures and incorporates *an entire document* into the law, using the process in 1 C.F.R. §§ 51.1-51.11 or other comparable processes, then Public Resource's posting of the entire document to educate the public has a favored purpose under the first factor. Where federal regulations incorporate only certain specific (and readily identifiable) sections of a document,[4] then posting only those sections has such a favored purpose. But in this case, the federal government has twice incorporated the entire 1999 Standards into law.

Indeed, the AERA Plaintiffs prove just how difficult it is, under their proposal, to determine how to comply with the regulations incorporating the 1999 Standards when they claim, for the first time in over five years of litigation, that "one could assuredly comply with the 1999 Standards by complying with the 2014 Standards." AERA Reply at 8. The AERA Plaintiffs do not offer any evidence for this proposition, nor is it credible given the significant disparities between the two editions. For example, the chapter on "Fairness in Testing" has 12 standards in the 1999 edition (Dkt. 134-4 at 80-84), but 20 standards in the 2014 edition. *See* Declaration of Matthew Becker on Reply in Support of Public Resource's Second Motion for Summary Judgment ("Becker Reply Decl.") ¶ 2, Ex. 70 (2014 Standards excerpts) pp. 63-72. And many chapters were significantly revised, including "[t]he chapters 'Educational Testing and

---

[4] *See, e.g.*, SSMF ¶ 25 (showing how 24 C.F.R. § 3280.4(aa)(4) (2019) incorporates by reference into law only specific portions of the National Electrical Code, such as "Article 110.22" and "Article 210.12(A)" of that document.

Assessment' and 'Testing in Program Evaluation and Public Policy,' in the 1999 version, [which] were rewritten to attend to the issues associated with the uses of tests for educational and accountability purposes," and completely rewriting and combining the chapters on "Testing Individuals of Diverse Linguistic Backgrounds," "Testing Individuals with Disabilities," and "Fairness in Testing and Test Use." *See* Becker Reply Decl. ¶ 2, Ex. 70 (2014 Standards excerpts) pp. 4-5.

**B.      Second Factor:  The Nature of the Work as Government Edict**

The second factor carries great weight where, as here, the nature of the work is not just factual, but binding law. 896 F.3d at 451 ("[S]tandards incorporated by reference into law are, at best, at the outer edge of 'copyright's protective purposes.'"). Public Resource does not argue, as the AERA Plaintiffs would have the Court believe, that a document should be free to post online in full "once some small part of it has been referenced in a statute or regulation." AERA Reply at 25. First, a mere reference or citation does not carry the weight of a formal incorporation by reference into law—cited text is not itself law. Second, and more fundamentally, Public Resource agrees with Plaintiffs that if only a "small part" of a document has been made law, then only that portion of the document should be freely posted for citizens to read and speak.

That is not what happened in this case. Numerous regulations refer to incorporation by reference of the entire document. Plaintiffs' claim that the incorporation of the "document" is "simply an English language convention," AERA Reply at 10, runs contrary to clear rules of statutory interpretation, particularly where agencies are instructed to only incorporate precisely what they intend to make law, and where the Code of Federal Regulations is replete with examples where only discrete chapters, sections, or provisions of a standard or other document are incorporated by reference.

In most instances, the incorporating regulations do not specify discrete sections of the 1999 Standards that a regulated individual or entity should consult, but instead refer to certain general subject areas. The AERA Plaintiffs argue that *they* know what particular chapters and standards the agency meant, but offer no confirmation from the Department of Education that they are correct. Various standards in other sections of the document could plausibly apply.[5] Indeed, given their new and incorrect claim that compliance with the 2014 Standards would satisfy requirements for the 1999 Standards (see pp. 12-3, *supra*), it is hard to believe that the AERA Plaintiffs offer anything other than their own subjective interpretation of the Department of Education's regulations. Moreover, the Department of Education may have had reasons for requiring regulated individuals to be bound by (and therefore read) the entire 1999 Standards document. For instance, there may be portions in the latter sections of the document that inform the reasons for certain test construction or validation principles, and the agency may not have wanted to leave out any valuable guidance.

The AERA Plaintiffs argue that only 6% of the 1999 Standards document is necessary to comply with the regulations that incorporate it. AERA Reply at 18. This is wrong, and a review of those sections shows why: The bold-faced "standards" in the document are curt, vague, and full of terms of art that have specific definitions and explanations in the remaining text of the document. Just like a citizen would need to look to 17 U.S.C. § 101 for the definitions of terms used throughout the remainder of the Copyright Act, a citizen likewise needs to look to the

---

[5] *See, e.g.*, p. 16 *infra* discussing how Standard 5.12 from Chapter 5 addresses both verifiability and reliability, contrary to Plaintiffs' assertion that one need only look to the first two chapters to exhaust any standards applicable to verifiability and reliability.

supposedly "explanatory" portion of the 1999 Standards in order to understand what each bold-faced standard requires.[6]

The AERA Plaintiffs' discussion of the New York regulations is equally specious.[7] They claim that New York law only incorporates the first two chapters of the 1999 Standards, addressing validity and reliability (AERA Reply at 16-17), even though the language of the regulation refers to the entire document,[8] and validity and reliability are addressed throughout the

---

[6] *See*, for example, Standard 9.2, which Plaintiffs admit is required under 34 C.F.R. § 668.148(a)(1)(iv). Dkt. 134-2 (Pltfs' SMF) ¶ 49. Standard 9.2 reads:

> When credible research evidence reports that test scores differ in meaning across subgroups of linguistically diverse test takers, then to the extent feasible, test developers should collect for each linguistic subgroup studied the same form of validity evidence collected for the examinee population as a whole.

Dkt. 134-4 at 97. The commentary accompanying Standard 9.2 includes important qualifications that a reader otherwise would not be aware of from the simple language of the standard itself, such as that "It is important to note that this standard calls for more than representativeness in the selection of samples used for validation or norming studies. Rather, it calls for separate, parallel analyses of data for members of different linguistic groups, sample sizes permitting." *Id*. at 98. But what is "validity evidence," as used in this standard? To understand that term, the reader must turn back eight chapters, returning to Chapter 1, "Validity", in particular the text under the subheading "Sources of Validity Evidence." *Id*. at 11. Notably, this text is not the bolded standards, nor even the commentary for the bolded standards. It is in the "background and explanatory material" that Plaintiffs claim citizens do not need to consult. *See* Pltfs.' SMF ¶ 45.

[7] On October 8, 2019 the State of New York issued emergency rulemaking action amending the regulations that had previously incorporated the 1999 Standards. From 2011 until October 8, 2019, the 1999 Standards were mandated under New York law at 8 CRR-NY 30-2.2, 30-2.4, 30-2.5, and 30-2.8. Becker Reply Decl. ¶¶ 3-4 and Exs. 71-74. After the October 8, 2019 emergency rulemaking, the 1999 Standards are no longer mandated or referenced in the current regulations. Although the 2014 Standards are now referenced in the current regulations (8 CRR-NY 30-2.2), Public Resource is not aware of any provision that actually mandates use of or compliance with the terms of the 2014 Standards under those regulations. Becker Reply Decl. ¶ 3.

[8] For example, 8 CRR-NY § 30-2.4(c)(3)(iii) (2018) states:

> For school districts or BOCES that use more than one of the local measures described in subparagraph (i) of this paragraph for a grade/subject (e.g. one measure is utilized for some of the district's fifth grade math classes and another measure is utilized for the other fifth grade math classes in the district), the superintendent, district superintendent or Chancellor shall certify in the annual

1999 Standards (not simply the first two chapters). For example, in Chapter 5, Standard 5.12 states:

> When group-level information is obtained by aggregating the results of partial tests taken by individuals, validity and reliability should be reported for the level of aggregation at which results are reported. Scores should not be reported for individuals unless the validity, comparability, and reliability of such scores have been established.

Dkt. 134-4 at 65. Moreover, the AERA Plaintiffs' *own signed agreement* with the State of New York recognizes that the entire document is incorporated by reference, and provides permission to New York to reproduce the entire document.

When New York asked for permission to incorporate "the Standards" and copy "all or any part" of the 1999 Standards, the AERA Plaintiffs could have asked for the incorporation to be limited to certain pages or chapters. Similarly, the AERA Plaintiffs could have asked the Department of Education to incorporate only discrete portions of the 1999 Standards – or simply paste those portions into the text of the regulation. Even today, the AERA Plaintiffs could ask to revise the incorporation to include only the 6% of the 1999 Standards that they assert is truly necessary to comply with the regulations; Public Resource would thus be motivated to post only what is incorporated, and there would be unique content for the AERA Plaintiffs to sell. What the AERA Plaintiffs cannot do is require the rest of society to ignore the actual incorporating language, figure out the likely scope of the incorporation based on conjecture, and regulate itself accordingly.

---

professional performance review plan that the measures are comparable, *in accordance with the Testing Standards*.

Becker Reply Decl. ¶ 4, Ex. 72 (emphasis added). The "Testing Standards" are defined in 8 CRR-NY § 30-2.2(t) (2018) as the 1999 Standards. *Id*. Ex. 71. Similar language appears at 8 CRR-NY 30-2.4(c)(2)(i) and (c)(4)(ii); 30-2.5(c)(2)(i), (c)(3)(iii), and (c)(4)(iii); and 30-2.8(b)(2) and (c)(2).  Becker Reply Decl. ¶ 4, Ex. 72-74.

Finally, standards incorporated by reference are not just government *speech* but also government *action*. Speech act theory, which concerns the ways actions are performed through language, helps explain how language adopted by a law-making body in a legislative capacity is fundamentally different in nature from that same language when uttered by someone without law-making authority. When a government body incorporates the 1999 Standards by reference, they become part of what philosopher John Searle termed a "declaration"—a special type of speech act that brings about some change in its subject purely by virtue of having been performed. *See* John R. Searle, *A Taxonomy of Illocutionary Acts*, 7 Minn. Studies in the Philosophy of Science, 358–59, 368 (1975).[9] Whether a legal enactment creates an obligation on anyone's part is irrelevant to this analysis; the key is that the language of the incorporation itself brings about a change in the legal status of the incorporated material. In other words, government bodies not only *say* something when they incorporate a text by reference, they also *do* something: transform that text into law. Copyright law cannot prohibit Public Resource from reporting the facts of that government action—facts which include the content of the incorporated text. Because that is what Public Resource does, this factor weighs heavily in its favor.

C.     **Third Factor: Using The 1999 Standards Document as a Whole is Reasonable and Necessary to Fulfill Public Resource's Public Interest Purpose.**

The third fair use factor looks at whether "the amount and substantiality of the portion used . . . are reasonable in relation to the purpose of the copying." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, at 586-87 (1994); *Am. Soc. For Testing and Materials*, 896 F.3d at 452. As discussed above, the federal government has twice incorporated the 1999 Standards document

---

[9] Available at http://hdl.handle.net/11299/185220.

into law. The federal and state regulations that incorporate the 1999 Standards refer to the entire

document, and people who seek to understand what those regulations require must do the same.

In those circumstances, "given that precision is ten-tenths of the law," neither a partial quotation

nor a paraphrase of the 1999 Standards would fulfill Public Resource's goal of creating a

complete archive of federal regulations incorporated by reference. *Id.*

Contrary to the AERA Plaintiffs' assertion, courts have found the use of an entire work,

without modification, to be a fair use, when such use is reasonable to the user's purpose. Such

works have included complete television programs, movies, books, computer programs, posters,

and transcripts of live events. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S.

417, 449-50 (1984); *Authors Guild v. Google, Inc.*, 804 F.3d 202, 210 (2d Cir. 2015); *Lexmark v.*

*Static Control Components, Inc.*, 387 F.3d at 544; *A.V. ex rel. Vanderhyge v. iParadigms, LLC,*

562 F.3d 630, 642 (4th Cir. 2009)*; Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F. 3d

605, 613 (2d Cir. 2006)*; Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg LP*, 756 F.3d 73, 90 (2d

Cir. 2014). There is no authority or sound basis for excluding a "200-page volume," or indeed

any other type of work, from this principle. AERA Reply at 19.[10]

This is not a case where "the incorporation merely makes reference to an external

standard," such that "a paraphrase or a summary" would be sufficient under the Court of

Appeals' framework. 896 F.3d at 452. *Incorporation* is different from *mere reference*:

incorporation makes the expression in the document *the government's own* speech. The

Department of Education regulations incorporate the entirety of the 1999 Standards using a

deliberate rulemaking process, resulting in text that, "like any other properly issued rule, has the

---

[10] The third factor is not relevant to the market harm analysis where, as here, the record shows
that no such impact has occurred, or is likely to occur. AERA Reply at 18-19.

force and effect of law." SSMF ¶ 2 (Dkt. 70-64 at 3). This makes the 1999 Standards wholly

unlike, for example, the list of used car valuations at issue in *CCC Info. Servs., Inc. v. Maclean*

*Hunter Mkt. Reports, Inc.*, 44 F.3d 61, 74 (2d Cir. 1994), which the relevant regulations referred

to only as an "approved reference[]," without adopting the used car valuations as the

government's own speech.

> **D.     Fourth Factor: The Record Shows No Current or Likely Future Effect on the Market for the "Standards for Educational and Psychological Testing."**

The fourth fair use factor looks at "the effect of the use upon the potential market for or

value of the copyrighted work." 17 U.S.C. § 107(4). The record after remand shows no lost sales

attributable to Public Resource, for either the 1999 Standards document at issue in this case or its

2014 replacement. SSMF ¶¶ 56-61. In fact, sales figures for both the 1999 and 2014 editions did

not respond in any meaningful way to Public Resource's posting, unposting, and reposting of the

1999 Standards over the course of this lawsuit. *Id.* Instead, the record shows that sales trends for

the 1999 Standards are consistent with, in the AERA Plaintiffs' words, "the market arguably

becoming saturated, and publication of . . . the 2014 Standards, becoming imminent." AERA

Plaintiffs' Mem. of Points and Authorities ("AERA Opening Br.") [Dkt 134] at 25 n.14; SSMF ¶

57. And sales of the 2014 Standards at its introduction proceeded on the same trajectory as the

1999 Standards in its early years, long before Public Resource began its work. These facts show

affirmatively that Public Resource has not affected the market for the Standards, and is unlikely

to do so in the future.

As a matter of "economic logic," AERA Reply at 20, this evidence makes sense.

According to the AERA Plaintiffs, the 1999 Standards are obsolete as a statement of best

practices, and the AERA Plaintiffs discourage their use. SSMF ¶¶ 29 and 49. The AERA

Plaintiffs make the 1999 standards available only by mail-order form from a single location on

their website, and they do not include the 1999 Standards in their online catalog. SSMF ¶ 50. These facts—not Public Resource's posting—best explain "near nil" sales of the 1999 Standards since the introduction of the 2014 Standards. AERA Opening Br. at 29, n.18.

Likewise, as sales figures of the 2014 Standards are nearly identical to early sales figures for the 1999 Standards, the only reasonable conclusion is that Public Resource's posting of the 1999 Standards did *not* meaningfully affect sales of the 2014 Standards. Plaintiffs' alternative explanation assumes two things: that demand for the 2014 Standards at its inception was greater than demand for the 1999 Standards in a comparable timeframe, and that the marginal increase in availability of the now-obsolete 1999 Standards caused by Public Resource's posting led a meaningful number of people to forgo purchasing the current standards. Neither assumption finds any support in the record.

Faced with this significant hole in the analysis, the AERA Plaintiffs can only insist that an adverse effect on the market for their standards "is obvious." AERA Reply at 20. In effect, they argue for an irrebuttable presumption of market harm resulting from verbatim copying. But the Court of Appeals foreclosed any such presumption when it held that market effect cannot be inferred from the mere fact of posting complete works on a public website (which this Court had previously labelled "mere copying for commercial purposes") 896 F.3d at 452-53, and "cannot be sustained on the basis of undisputed evidence" in the first summary judgment record. *Id.* The updated record offers nothing new to support the AERA Plaintiffs' claim. The record now evidences the *absence* of harm.

Public Resource need not prove that adverse market effects are impossible under every hypothetical scenario Plaintiffs can propose. The fourth factor looks only at "traditional, reasonable, or likely to be developed markets." *Swatch Grp*, 756 F.3d 73, 91 (2d Cir. 2014)

(citing *Am. Geophysical Union v. Texaco Inc.,* 60 F.3d 913, 922, 930-31 (2d Cir.1994)). Thus, the Court need not credit the mere possibility that a would-be purchaser of the 2014 Standards would be confused by the availability of the 1999 Standards, or that the AERA Plaintiffs will someday choose to seek meaningful revenues from sales of the 1999 Standards that grow more outdated with each passing year. Public Resource has met its burden of showing an absence of current or probable future adverse effect on the market for the 1999 Standards, or the 2014 Standards, based on undisputed facts in the record. The fourth factor favors fair use.

## CONCLUSION

The complete record after remand to this Court shows conclusively that the AERA Plaintiffs are not entitled to a permanent injunction. And in light of the Court of Appeals' opinion, the record shows that Public Resource's use of the 1999 Standards is fair. For these reasons, Public Resource asks the Court to grant its motion for summary judgment and deny the Plaintiffs' motion for a permanent injunction.

Dated: December 20, 2019     Respectfully submitted,

/s/ *Andrew P. Bridges*
Andrew P. Bridges (AR0002)
abridges@fenwick.com
Matthew Becker (admitted *pro hac vice*)
mbecker@fenwick.com
Armen N. Nercessian (pending *pro hac vice*)
anercessian@fenwick.com
Shannon E. Turner (pending *pro hac vice*)
sturner@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: (415) 875-2300
Facsimile: (415) 281-1350

Corynne McSherry (admitted *pro hac vice*)
corynne@eff.org
Mitchell L. Stoltz (D.C. Bar No. 978149)
mitch@eff.org
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
Facsimile: (415) 436-9993

David Halperin (D.C. Bar No. 426078)
davidhalperindc@gmail.com
1530 P Street NW
Washington, DC 20005
Telephone: (202) 905-3434

*Attorneys for Defendant-Counterclaimant*
Public.Resource.Org, Inc.